## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., <u>et al.</u>,[1] | ) Case No. 15-01145 (ABG) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

### MEMORANDUM IN SUPPORT OF CHAPTER 11 PETITIONS

The Debtors in these chapter 11 cases are the primary operating units of the Caesars gaming enterprise, which was taken private in a leveraged buyout just as the 2008 recession was overtaking the world economy.  In the past several years, as economic conditions squeezed the gaming industry, the Debtors have attempted to extend their debt maturities and deleverage their balance sheets through various asset sales and capital markets transactions.  By mid-2014, however, it became clear that a wholesale restructuring was required.  Now, after more than six months of intense, arm's-length negotiations among the Debtors, their Caesars affiliates, and certain of their creditors, the parties have agreed on a comprehensive restructuring that substantially reduces the Debtors' debt, reorganizes their business into a REIT structure to maximize value and creditor recoveries, and secures significant financial and other support from the Debtors' non-Debtor affiliates that is critical to a successful restructuring.  This compromise, which is set forth in a Restructuring Support Agreement (the "<u>RSA</u>"), enhances recoveries for all stakeholders, and positions the Debtors to exit these chapter 11 proceedings as viable going

---

[1]   The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/CEOC.

concerns that can successfully compete in the gaming industry with appropriately-sized balance sheets.

In connection with these chapter 11 cases, the debtors are seeking important "first-day" relief to achieve uninterrupted operations across the company's network of properties and to ensure the Debtors' valued employees, guests, and stakeholders that all Caesars properties are open for business and will continue to provide guests with the amenities and experiences they expect from Caesars properties.[2]

As discussed further in Section VII.A, below, this Court has jurisdiction over these chapter 11 cases, and the Northern District of Illinois is a proper venue.  The Debtors submit this memorandum to provide the Court with an overview of the Debtors, the events leading to their chapter 11 petitions, and the complex negotiations that led to the RSA.

## Background

CEOC is the largest majority-owned operating subsidiary of Caesars Entertainment Corporation ("CEC").  The remaining Debtors are direct and indirect subsidiaries of CEOC. CEC, together with its affiliates (collectively, "Caesars"), is the world's most geographically diversified casino-entertainment company.  Since its founding in Reno, Nevada more than 75 years ago, Caesars has grown through new development, expansions, and acquisitions. Caesars now owns, operates or manages 50 casinos in five countries on three continents, with properties in the United States, Canada, the United Kingdom, South Africa, and Egypt.  Within the United States, Caesars owns, operates, or manages casinos in 14 states, primarily under the Caesars®, Harrahs® and Horseshoe® brand names.  In total, Caesars oversees approximately

---

[2]   Further support for the relief requested in the first day motions is set forth in the *Declaration of Randall S. Eisenberg, Chief Restructuring Officer of Caesars Entertainment Operating Company, Inc., in Support of First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.

3 million square feet of gaming space, 39,000 hotel rooms, 45 million customer loyalty program participants, and 68,000 employees.

In addition to the Debtors, the Caesars enterprise includes non-Debtor affiliates Caesars Entertainment Resort Properties, LLC ("CERP"); Caesars Growth Partners, LLC ("CGP"), a joint venture of CEC and independent public company Caesars Acquisition Company ("CACQ"); and a shared services venture, Caesars Enterprise Services, LLC ("CES"), as depicted in the following organization chart:



As Caesars' largest operating subsidiaries, the Debtors are an integral part of the Caesars enterprise owning, operating, or managing 38 casinos in 14 states and 5 countries. For the twelve months ending September 30, 2014, the Debtors contributed approximately $5.4 billion—

or 64 percent—of Caesars' $8.4 billion in total net revenues.  Today, the Debtors' core casino offerings are spread across the United States—including strong concentrations in Chicagoland, Nevada, and Atlantic City—as well as throughout the world.   The Debtors employ approximately 32,000 people, including approximately 3,000 in the Chicagoland area and approximately 6,500 in Las Vegas.

The Debtors' capital structure is a legacy of one of the largest leveraged buyouts in history.  On January 28, 2008, affiliates of Apollo and TPG, along with certain co-investors (together with Apollo and TPG, the "Sponsors"), acquired Caesars (then known as Harrah's Entertainment, Inc.) for approximately $30.7 billion (the "2008 LBO").  The Sponsors and other investors contributed approximately $6.1 billion in cash to fund the 2008 LBO.  The remainder was funded through the issuance of approximately $24 billion in debt, approximately $19.7 billion of which was secured by liens on substantially all of the Debtors' assets and, in most cases, subject to intercreditor agreements.

As of the date hereof (the "Petition Date"), the Debtors have outstanding funded debt obligations of approximately $18.4 billion, comprising:

- four tranches of first lien bank debt totaling approximately $5.35 billion;

- three series of outstanding first lien notes totaling approximately $6.35 billion;

- three series of outstanding second lien notes totaling approximately $5.24 billion;

- one series of subsidiary-guaranteed unsecured debt of approximately $479 million; and

- two series of senior unsecured notes totaling approximately $530 million.

The Debtors have positive cash flow before debt service, but a number of economic factors and industry trends unforeseen at the time of the 2008 LBO have left the Debtors unable to support their overleveraged capital structure and extraordinary interest expense.  The 2008

LBO was agreed to in December 2006, when both the economy and the casino industry were robust, and was consummated at the very beginning of the 2008 recession.  In the ensuing months and years, casinos worldwide struggled as consumer and business spending on travel and entertainment sharply declined.  As the economy rebounded, the Debtors faced new challenges. While consumers have increased discretionary spending on travel and entertainment, the gaming industry is capturing a smaller share of that spending.  Meanwhile, gaming has become increasingly competitive as new casinos have entered the market.  As a result, CEOC's total same store revenues[3] have steadily declined since the 2008 LBO:



The Debtors' substantial debt load has effectively prevented them from confronting these operational challenges.  Although the Debtors have invested in priority projects, they have been forced to raise and direct significant cash to debt service, money that could otherwise have been used for certain capital improvement projects such as hotel room remodeling, infrastructure renovations, and expansion of convention and amenities space.

---

[3]    Net Revenue includes property-level revenues only and does not include former CEOC properties.  Net Revenue (i) is presented net of promotional allowances, (ii) includes only property-level revenues (iii) excludes amounts attributable to properties not currently part of the CEOC portfolio and (iv) does not include reimbursed management costs and other corporate revenue items.

Over the past several years, Caesars has undertaken numerous initiatives to restructure the Debtors' operations and manage their debt maturities and interest expense without subjecting CEOC to a formal bankruptcy proceeding.  In addition to certain operational initiatives and property closures, Caesars has engaged in over 45 capital market transactions, including a number of asset sales, exchange and tender offers, debt repurchases and re-financings, in an effort to extend debt maturities, meet interest obligations, monetize assets and transfer debt and capital expenditure obligations at properties CEOC could not afford to invest in.  Certain of these transactions have been hotly contested by some of the Debtors' creditors and are the subject of pending litigation in, among other venues, the New York Supreme and Delaware Chancery Courts.[4]  The primary subject transactions include the following:

- The "CIE Transactions":  In May 2009, the Debtors transferred their interest in the World Series of Poker ("WSOP") intellectual property to non-Debtor affiliate Caesars Interactive Entertainment ("CIE") in exchange for an economic interest in CIE valued at $15.0 million.  CEOC retained the right to use the WSOP trademark and intellectual property in certain contexts pursuant to a perpetual, royalty-free license (the "2009 Trademark License Agreement").  In September 2011, the Debtors transferred their rights to host WSOP tournaments to CIE for $20.5 million in cash. In 2013, CEC contributed its interests in CIE to CGP as part of the Growth Transaction (defined below).

- The "CERP Transaction":  In fall 2013, the Debtors sold their interests in the Octavius Tower and Project Linq, a retail, dining, and entertainment development, to CERP for $80.7 million in cash, the retirement of $52.9 million of CEOC notes and avoided corporate overhead.

- The "Growth Transaction":  In fall 2013, as part of a larger public capital raise transaction and the formation of a new-publicly traded company, CACQ, that would co-own CGP, the Debtors sold their interests in (i) the Planet Hollywood Resort & Casino in Las Vegas, (ii) the Horseshoe Baltimore and (iii) 50% of the management fees for those properties to CGP for $360 million in cash.

- The "Four Properties Transaction":  In spring 2014, the Debtors sold their interests in (i) The Cromwell in Las Vegas, (ii) The Quad in Las Vegas, (iii) Bally's Las Vegas,

---

[4]    Copies of each of the complaints and answers will be provided to the Court.

(iv) Harrah's New Orleans, and (v) 50% of the management fees for those properties, to CGP for approximately $1.8 billion in cash.

- The "Shared Services Joint Venture":  In spring 2014, as part of the Four Properties Transaction, CEOC entered into a shared services joint venture, CES, with the companies that own and/or operate Caesars' branded properties:  CEC, CEOC, and Caesars Growth Properties Holdings, LLC ("CGPH"), an affiliate of CGP.  The joint venture partners executed an enterprise services and license agreement under which CEOC contributed to CES a worldwide license to certain intellectual property, including Total Rewards®, and received a 69% ownership stake plus 33% voting rights in CES.  CES also employs personnel who provide services to Caesars' branded properties and functions as a shared services center for the Caesars enterprise, providing most of the back office, procurement, payroll and similar services across the enterprise, with costs allocated back to each entity based on certain formulas.

- The "B-7 Refinancing":  In May and June 2014, CEOC refinanced short-term maturities with $1.75 billion of new term loans (the "B-7 Term Loan"), and amended its First Lien Credit Agreement (defined below) to extend maturities and provide covenant relief.  As part of the B-7 Refinancing, CEC sold five percent of its stock in CEOC to unaffiliated investors, which triggered a release of CEC's guarantee of certain first lien, second lien, and unsecured debt.

- The "Senior Unsecured Notes Transaction":  In August 2014, CEOC and CEC purchased approximately $155 million in CEOC Senior Unsecured Notes (defined below), CEC contributed $426.6 million of Senior Unsecured Notes to CEOC for cancellation, and CEOC amended its Senior Unsecured Notes Indentures (defined below).

Although controversial, these transactions sought to extend runway.  In addition, CEC shareholders invested more than $1.2 billion in additional capital as part of the transactions.

Since the CERP transaction the Debtors have:

- Raised more than $2 billion in liquidity;

- Paid approximately $2.2 billion of interest and $2.6 billion of principal on their debt, including approximately $1 billion of interest and $1.5 billion of principal to second lien and unsecured noteholders; and

- Extended over $10 billion of debt with pre-2016 maturity.

Notwithstanding these efforts, the Debtors remain overleveraged, with 2014 EBITDA estimated to be less than $1 billion compared with more than $18 billion in debt (including over

$12 billion of first lien senior secured debt having liens on nearly all of Debtors' assets).  It became clear that a more comprehensive restructuring was necessary.  Accordingly, the Debtors and CEC began negotiations with organized groups of CEOC's senior secured creditors—namely certain First Lien Lenders (as defined below), and certain First Lien Noteholders (as defined below)—regarding a comprehensive restructuring of the Debtors' balance sheet.  Early in the negotiations, the first lien creditors made clear that CEC would need to provide substantial financial and continuing operational support for any proposed restructuring to, among other things, avoid the regulatory, tax, and practical complexities associated with any separation of CEOC from the Caesars enterprise.  CEC was equally clear that, as a condition to providing continued support to CEOC, CEC would require releases.

Anticipating these issues, and to establish an independent decision-making process at CEOC,  two independent directors were appointed to the CEOC Board of Directors in June 2014 and CEOC retained independent counsel and financial advisors.  The two independent directors then formed a Special Governance Committee of the CEOC Board of Directors (the "Special Governance Committee") and were charged with, among other things, conducting an independent investigation into potential claims that the Debtors and/or their creditors may have against CEC or its affiliates, including claims that would eventually form the basis of filed creditor complaints.

The Special Governance Committee's investigation has been ongoing for approximately six months, in parallel with restructuring negotiations among CEC, CEOC and the first lien creditors.  To date, advisors assisting the Special Governance Committee have reviewed approximately 35,000 documents produced by CEC, its affiliates, and the Sponsors; interviewed various Caesars officers, employees, and advisors; and worked thousands of hours on the

investigation.  Based on the investigation to date, the Special Governance Committee determined that it would require a significant contribution from CEC and its affiliates to settle and release claims.[5]

Over the same period, the Special Governance Committee has been actively monitoring the restructuring negotiations with first lien creditors and has engaged in its own negotiations with CEC to secure substantial contributions by CEC to the restructuring, and improved recoveries for all stakeholders.  These extensive, hard-fought, parallel negotiations ultimately led to the development of a restructuring framework for a chapter 11 plan with the following key features:

- Reducing the Debtors' total debt obligations by approximately $10 billion and their annual interest expense from approximately $1.7 billion to approximately $450 million;

- Reorganizing the Debtors' business as a tax-efficient real estate investment trust ("REIT") by, among other things, transferring substantially all of the Debtors' real properties to a property company ("PropCo") which would in turn lease those properties to an operating company ("OpCo") to maximize recoveries to creditors;[6]

- Securing significant, near term contributions from CEC , including:

  - cash contributions of up to $406 million plus an additional $75 million in cash if required to exit;

  - backstopping, with no associated fees, up to $969 million of equity put options to support the REIT structure and provide cash out opportunities to CEOC's creditors receiving equity in PropCo and OpCo under the proposed chapter 11 plan;

  - offering the Debtors certain rights of first refusal for owning and managing all future non-Las Vegas domestic acquisitions; and

---

[5]   The investigation remains ongoing and the releases included in the RSA, discussed below, are expressly subject to its completion.

[6]   REITs are publicly-traded tax-advantaged vehicles for holding real estate.  A REIT pays no entity-level tax to the extent earnings are distributed, and REITs trade at higher values compared to other public companies.

- importantly, providing a guarantee of OpCo's operating lease obligations, which underpins the value of PropCo and its ability to service the debt it will carry;

- Providing significant creditor recoveries of:

  - 100% to the First Lien Lenders (as defined below);

  - 92% to the First Lien Noteholders (as defined below); and

  - A baseline recovery to non-First Lien Creditors of 17.5% of PropCo equity, valued at approximately $319 million, with the opportunity, if the class votes in favor of the Plan, to receive 30.1% of PropCo equity, valued at approximately $549 million plus equity buy in rights for up to an additional 65% of PropCo equity at plan value; and

- Settles complicated litigation claims related to historical transactions that could mire the estate in protracted and costly proceedings for years, delaying creditor recoveries.[7]

The parties documented their agreement to this framework in the *Restructuring Support and Forbearance Agreement*, originally dated as of December 19, 2014, and related Plan Term Sheet the current versions of which is attached hereto as collective **Exhibit A** (the "RSA").  The RSA was initially supported by approximately 38 percent of the First Lien Noteholders (as defined below).  Since its execution, the RSA has obtained additional support, and the RSA is now endorsed by holders of over 80 percent in aggregate principal amount of the Debtors' first lien bonds and approximately 15 percent of first lien bank debt.

The Debtors believe that the restructuring contemplated by the RSA is in the best interests of their estates and the most advantageous solution for the Debtors' 32,000 employees, millions of customers, and all stakeholders.  Importantly, the RSA contains an express and unlimited "fiduciary out" permitting the Debtors to pursue a better alternative transaction if one arises.  Any such alternative framework would need to address the many complexities of these

---

[7]   The RSA expressly provides that the Debtors' release of claims against CEC and its affiliates is subject to completion of the Special Governance Committee's investigation.

cases, including:  the need to preserve stable operations in all geographic locations of the Debtors' heavily regulated industry, the significant tax and business implications associated with any attempt to separate the Debtors from the broader Caesars enterprise; certain creditors' demands for substantial continuing financial and operational investment by CEC to support the reorganized companies; and the complicated pending and potential litigation claims related to historical transactions.

Indeed, one of the key benefits of the RSA is that it secures substantial contributions to settle uncertain litigation claims.  To ensure adequate funding will be available for its contributions under the Plan and to enhance the value of CEC's guarantee, CEC announced on December 22, 2014, that it had entered into an agreement with CACQ to merge the two publicly traded companies, conditioned on, among other things, confirmation of a plan of reorganization in these chapter 11 cases on terms materially consistent with those in the RSA and on the timeline contemplated by the RSA.  The combined enterprise would provide additional credit support for the lease guarantee under the proposed REIT structure and otherwise secure the cash contributions supporting near-term creditor recoveries.

The Debtors, therefore, intend to promptly seek approval of the RSA and to prosecute these chapter 11 cases pursuant to the milestones contained therein.  Among other things, the milestones require the Debtors to:

- file a motion seeking to assume the RSA within 20 days of the Petition Date and obtain an order approving the Debtors' assumption of the RSA within 90 days of the filing of that motion;

- file their proposed chapter 11 plan and related disclosure statement within 45 days of the Petition Date;

- obtain entry of an interim cash collateral order within 5 days of the Petition Date and a final cash collateral order within 75 days of the Petition Date;

- obtain entry of an order approving the Debtors' disclosure statement and approving solicitation of the chapter 11 plan within 150 days of the Petition Date;

- obtain entry of an order confirming the chapter 11 plan within 120 days of the entry of the order approving the Disclosure Statement; and

- emerge from chapter 11 within 120 days of the date that the order confirming the chapter 11 plan becomes a final order.

These milestones were heavily negotiated with the Debtors' First Lien Noteholders (as defined below), whose cash collateral is being used to finance the administration of these cases, and achieve an appropriate balance between the desire for the Debtors to quickly emerge from chapter 11 and the recognition that creditors and other stakeholders need sufficient time to pressure test the compromises set forth in the RSA.

### The Debtors' Businesses, Affiliates, and Capital Structure

**I.      The Debtors' Businesses.**

    **A.      Casino operations.**

The Debtors were founded in 1937 when William F. Harrah opened a small bingo hall in Reno, Nevada.  That casino, now called Harrah's Reno, is still owned and operated by the Debtors.  Since then, the Debtors have grown their businesses across the country and around the globe.  Today, the Debtors' core casino offerings are spread across the United States—including strong concentrations in Chicagoland, Nevada, and Atlantic City—as well as throughout the world.

12

**CEOC's Casinos**



The Debtors' Chicagoland locations are a significant cash flow driver for their businesses.  The Debtors own and operate two casinos in the Chicagoland market:  Horseshoe Casino Hammond in Hammond, Indiana—their second most profitable casino behind Caesars Palace—and Harrah's Joliet in Joliet, Illinois.  Together, these locations include almost 400,000 square feet of gaming space, more than 200 hotel rooms, more than 4,100 slot machines and more than 130 table games.

In Nevada, the Debtors own and operate four properties, including their flagship property Caesars Palace that is located in the heart of the Las Vegas "Strip."  The Debtors' other Nevada gaming properties are Harrah's Reno, Harrah's Lake Tahoe, and Harvey's Lake Tahoe.  In total, the Debtors operate approximately 270,000 square feet of gaming space and 6,400 hotel rooms in Nevada, including over 3,600 slot machines and 370 table games.

The Debtors also have significant operations in Atlantic City.  The Debtors' presence in Atlantic City dates back to 1979—three years after New Jersey authorized legal gambling—

when they opened Caesars Atlantic City and Bally's Atlantic City.  The Debtors also owned and operated a third casino in Atlantic City (the Showboat Atlantic City) until August 2014, when that property was closed and then later sold to a New Jersey university.  The Debtors currently have more than 240,000 square feet of gaming space and approximately 2,400 hotel rooms in Atlantic City, including approximately 3,700 slot machines and 320 table games.

Finally, the Debtors own and operate or manage 15 gaming properties in other U.S. locations, including managed properties on reservations and owned river-based casinos.  The majority of these properties are located throughout the Midwest and South.[8]  In total, these locations include more than 1.0 million square feet of gaming space, 5,000 hotel rooms, 23,000 slot machines, and 1,000 table games.

The Debtors employ approximately 32,000 people through their various operations, including 24,000 full-time and 8,000 part-time employees.  Approximately 35 percent of the Debtors' workforce is covered by collective bargaining agreements.

### B.    Highly Regulated Industry.

As owners and operators of casino entertainment facilities, the Debtors are subject to pervasive regulations in each of the jurisdictions in which they operate.  In the United States, the Debtors are required to comply with the laws and regulations of 21 federal and state authorities, three tribal gaming authorities, and many local authorities to obtain and maintain licenses to own and/or operate casino properties.  Certain gaming laws require Debtors engaged in gaming

---

[8]    The regional-owned locations include: Harrah's Council Bluffs, Council Bluffs, Iowa; Harrah's Gulf Coast, Biloxi, Mississippi; Harrah's Louisiana Downs, Bossier City, Louisiana; Harrah's Metropolis, Metropolis, Illinois; Harrah's North Kansas City, North Kansas City, Missouri; Horseshoe Bossier City, Bossier City, Louisiana; Horseshoe Council Bluffs, Council Bluffs, Iowa; Horseshoe Southern Indiana, Elizabeth, Indiana; Horseshoe Tunica, Tunica, Mississippi; and Tunica Roadhouse Hotel & Casino, Tunica, Mississippi.  In addition to these owned locations, the Debtors manage the following domestic properties:  Harrah's Ak-Chin, Phoenix, Arizona; Harrah's Cherokee, Cherokee, North Carolina; Harrah's Philadelphia, Chester, Pennsylvania; and Harrah's Rincon, San Diego, California; and Horseshoe Baltimore, Baltimore, Maryland.

operations and certain of their directors, officers, and employees to obtain licenses or findings of suitability from gaming authorities, unless some type of exemption applies or a waiver is obtained.  Qualification and suitability determinations require submission of detailed entity and personal and financial information followed by a thorough investigation.  In general, gaming authorities have wide discretion to deny an application for licensing.

In addition, many jurisdictions require the Debtors' stockholders or holders of debt securities to file an application, be investigated, and have their qualifications or suitability determined, unless they fall within an exception or obtain a waiver.  For example, under Nevada gaming laws, each person who acquires, directly or indirectly, beneficial ownership of any voting security, or beneficial record ownership of any non-voting security or any debt security in a public corporation which is registered with the Nevada Gaming Commission may be required to be found suitable if the Commission has reason to believe that the person's ownership would be inconsistent with the declared public policy of Nevada, in the sole discretion of the Commission.

Licensing requirements make a change of control of the Debtors more complex.  Licenses to own or operate casino properties generally are not transferable unless the transfer is approved by the requisite regulatory agency.  Regulators must consider a number of public policy concerns when investigating and approving casino operators.  As a result, the regulatory approval process may, for good reason, last several months or longer.  In Illinois, for instance, the Gaming Board requires two meetings to approve any change of control:  one to present an application and another, after an investigation by the Gaming Board, to approve the transfer.

II.    **The Debtors' Corporate Structure, Parent, Affiliates, and Joint Ventures.**

The Debtors' corporate organization is depicted on the chart attached hereto as **Exhibit B**.  As set forth on **Exhibit B**, CEC owns approximately 89 percent of the outstanding

shares of CEOC's common stock.  Certain institutional investors own approximately 5 percent of CEOC's common stock, and the remaining 6 percent is held by employees who received the stock pursuant to an employee benefit plan that was instituted in May 2014 for CEOC's directors, officers, and other management-level employees.  CEOC, in turn, directly or indirectly wholly- or majority-owns its Debtor subsidiaries.  All of CEOC's subsidiaries are Debtors in these chapter 11 cases other than those listed on **Exhibit C** attached hereto.

In addition to CEOC, CEC owns casino-entertainment properties indirectly through CERP and CGP.  CERP and CGP are licensed to use Total Rewards®, the industry-leading customer loyalty program to market promotions and generate customer play across the entire network of Caesars properties.

### A.      Caesars Entertainment Corporation.

The Sponsors acquired CEC in the 2008 LBO.  On February 8, 2012, CEC conducted an initial public offering of its common stock, which now actively trades on NASDAQ under the ticker symbol "CZR."   The Sponsors own or control approximately 60 percent of CEC's common stock, and thus have voting control of the company.  CEC's remaining common stock is held by institutional and retail investors not affiliated with the Sponsors.  As of the Petition Date, CEC has a market capitalization of $1.8 billion.

### B.      Caesars Entertainment Resort Properties, LLC.

After the 2008 LBO, CEC operated through two primary groups of wholly-owned subsidiaries:  (i) CEOC and (ii) a group of six subsidiaries financed by commercial mortgage-backed securities ("CMBS"):  Harrah's Atlantic City Holding, LLC; Harrah's Las Vegas, LLC; Harrah's Laughlin, LLC; Flamingo Las Vegas Holding, LLC; Paris Las Vegas Holding, LLC; and Rio Properties, LLC (the "CMBS Properties").

In September 2013, CEC announced that the CMBS Properties would enter into a series of transactions to refinance their outstanding CMBS debt and reposition them as subsidiaries of CERP, a newly created direct subsidiary of CEC.  As discussed more fully below, the Debtors sold certain properties to CERP to facilitate the refinancing.

### C.      Caesars Growth Partners, LLC.

CGP is a partnership that was formed by CACQ, a separate publicly traded company that was formed by the Sponsors and public investors in 2013 to raise capital for Caesars, and certain indirect subsidiaries of CEC.[9]  CACQ purchased approximately 42.4 percent of the economic interest and 100 percent of the voting rights in CGP for $457.8 million in cash.  CEC acquired the remaining approximate 57.6 percent economic interest (with no voting rights) in CGP in exchange for $1.1 billion in face value of Senior Unsecured Notes and all of CEC's equity in CIE.

CGP was designed to be a flexible organization that could raise capital necessary to fund Caesars' more capital-intensive growth projects, such as online gaming and certain properties in need of significant investment.  CIE, now a CGP subsidiary, operates an online gaming business providing games on social media and mobile applications.  CIE also provides certain real money games in Nevada and New Jersey, "play for fun" offerings in other jurisdictions, and owns the WSOP tournament and brand.

As discussed below, since its formation, CGP has purchased several properties and a portion of their associated management fees from CEOC.

---

[9]      CACQ was established on October 21, 2013 and initially funded with $457.8 million in cash from the Sponsors. On November 18, 2013, CACQ closed a public rights offering, which resulted in another $700 million in funding from both non-Sponsor and Sponsor investment.

###### D.    Caesars Enterprise Services, LLC.

CES (often referred to as "ServicesCo") is a joint venture among the three companies which own and/or operate Caesars' properties:  CEOC, CERP and CGPH.  Historically, CEOC and its employees managed and funded centralized corporate functions for shared services among all Caesars' branded properties, such as legal, accounting, payroll, information technology and other enterprise-wide services. As the Caesars' branded properties expanded since 2008, including with the formation of CACQ and CGP, which did not exist when the initial centralized service structure was put in place,  there was a need to form a centralized "Services Company" to (i) manage centralized assets, such as certain intellectual property and the Total Rewards® loyalty program, (ii) employ personnel who provide services to Caesars' branded properties, and (iii) ensure proper governance and equitable allocation of costs around centralized services, including capital expenditures for shared services and the prioritization of projects.

CERP and CGPH contributed the initial funding needs of CES with $42.5 million and $22.5 million in cash, in exchange for which they received 20.2 percent and 10.8 percent ownership of CES, respectively.  CEOC owns the remaining 69 percent of CES.  Each of CEOC, CERP and CGPH have equal 33 percent voting control over CES.  CES's management and operations are governed by a steering committee, which consists of one member from each of CEOC, CERP, and CGPH.  The steering committee can take action by a majority vote (subject to unanimity requirements for certain material actions) or written consent of the steering committee members.

CES provides the Debtors with substantially all of their corporate, regional, and shared (with CERP, CGPH/CGP, or both) employees, as well as substantially all of their casino-level employees at the director level or above.   As of the Petition Date, the majority of the

approximately 2,000 management-level personnel responsible for running the Debtors' businesses are employed by CES, and CES is responsible for all employment-related obligations associated with these employees, including employment agreements, collective bargaining agreements, and any obligation to bargain and negotiate with a union.

Pursuant to an Omnibus License and Enterprise Services Agreement (the "Omnibus Agreement"), CEOC granted to CES a non-exclusive license to use—but otherwise retained ownership of—certain intellectual property, including Total Rewards®.  In turn, CES generally grants to each entity that owns a property a license in and to the intellectual property relevant to such entity's property.

CES is a cost allocation center and not a for-profit entity; all services provided for CEOC, CERP and CGP are provided on a profit-neutral basis.  The corporate overhead expenses incurred by CES in performing centralized services, employing personnel and managing intellectual property are allocated among CEOC, CERP, and CGPH, and generally reimbursed on a weekly basis, with a monthly true-up.[10]  Allocation percentages are based on a complex allocation methodology that takes into account each entity's consumption of the specified service or cost.

Prior to the formation of CES, the Debtors also historically managed payroll and accounts payable functions for CEOC, CERP, CGP, and their predecessor entities, with periodic reimbursements from CERP and CGP.  The formation of CES has shifted these duties from the Debtors to CES as well, with CES processing all payroll data for the Debtors and their non-Debtor affiliates, and in substantially all cases acts as a third party administrator in making payments to the Debtors' employees and remitting any appropriate deductions on account of

---

[10]   From time to time, CES has and may continue to issue capital calls to CEOC, CERP, and CGPH to ensure that CES meets its working capital requirements.

payroll taxes or other withholdings to taxing authorities and other third-party benefit providers. CES provides the same services for CERP and CGP, and each entity prefunds the required amounts to CES in advance, so there are generally no intercompany payables or claims created in connection with CEOC's direct payroll expenses.

With respect to accounts payable, CES generally manages and funds all accounts payable on behalf of the Debtors and their non-Debtor affiliates. If and when CES makes a payment for any direct expense on behalf of CEOC, CERP or CGP, CES is reimbursed on a regular basis (usually within 24-48 hours) for those payments.

Finally, CES functions as the governor on all enterprise-wide investments, including capital expenditures. The CES steering committee must approve all capital expenditures and cost allocations relating thereto.

## III.    **The Debtors' Capital Structure**.

As of the Petition Date, the Debtors have outstanding funded debt for borrowed money in the aggregate principal amount of approximately $18.4 billion. These obligations are illustrated below.

| As of December 31, 2014 | | | | |
|---|---|---|---|---|
| **CEOC Debt ($ in Millions)** | **Maturity** | **Int. Rate** | **Face Value** | |
| Term Loan B4 | 2016 | 10.50% | $ | 376.7 |
| Term Loan B5 | 2017 | 5.95% | | 937.6 |
| Term Loan B6 | 2017 | 6.95% | | 2,298.8 |
| Term Loan B7 | 2017 | 9.75% | | 1,741.3 |
| **First Lien Bank Debt** | | | | **5,354.4** |
| | | | | |
| 11.25% First Lien Notes | 2017 | 11.25% | | 2,095.0 |
| 8.50% First Lien Notes | 2020 | 8.50% | | 1,250.0 |
| 9.00 First Lien Notes | 2020 | 9.00% | | 3,000.0 |
| **First Lien Notes** | | | | **6,345.0** |
| | | | | |
| 12.75% Second Lien Notes | 2018 | 12.75% | | 750.0 |
| 10.00% Second Lien Notes due 2018 | 2018 | 10.00% | | 4,484.6 |
| 10.00% Second Lien Notes due 2015 | 2015 | 10.00% | | 3.7 |
| **Second Lien Notes** | | | | **5,238.3** |
| | | | | |
| Senior Notes (Subsidiary Guaranteed Notes) | 2016 | 10.75% | | 479.0 |
| | | | | |
| 6.50% Senior Unsecured Notes | 2016 | 6.50% | | 296.7 |
| 5.75% Senior Unsecured Notes | 2017 | 5.75% | | 233.3 |
| **Senior Unsecured Notes** | | | | **530.0** |
| | | | | |
| Other Borrowings | various | various | | 426.0 |
| | | | | |
| **Total CEOC Funded Debt** | | | $ | **18,372.7** |

A.      **First Lien Debt.**

1.      **First Lien Bank Debt.**

The Debtors owe approximately $5.35 billion under four term loans issued pursuant to that certain Third Amended and Restated Credit Agreement, dated as of July 25, 2014 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "First Lien Credit Agreement"), by and among CEOC, CEC, Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent (the "First Lien Credit Agent"), and certain lenders from time to time party thereto (the "First Lien Lenders"). Under the First Lien Credit

Agreement, the Debtors have approximately $106.1 million of capacity under a revolving  credit

facility extended pursuant to the First Lien Credit Agreement, approximately $100.3 million of

which is committed to outstanding letters of credit as  of the Petition Date.[11]

### 2.    First Lien Notes.

As of the Petition Date the Debtors owe approximately $6.35 billion in principal amount

outstanding to holders (the "First Lien Noteholders" and together with the First Lien Lenders the

"First Lien Creditors") of three series of first lien notes (the "First Lien Notes") issued pursuant

to various indentures (the "First Lien Indentures"):

- that certain Indenture, dated as of June 10, 2009 by and among CEOC, CEC, Caesars
  Operating Escrow LLC (f/k/a Harrah's Operating Escrow LLC )("Escrow LLC"),
  Caesars Escrow Corporation (f/k/a Harrah's Escrow Corporation ) ("Escrow
  Corporation," and together with Escrow LLC, the "Escrow Issuers"), and U.S. Bank,
  National Association, in its capacity as indenture trustee under the First Lien Notes
  Indentures, and any successors in such capacity (the "First Lien Notes Indenture
  Trustee," and together with the First Lien Credit Agent, the "First Lien Agents");

- that certain Second Supplemental Indenture, dated as of September 11, 2009 by and
  among CEOC, CEC, and the First Lien Notes Indenture Trustee;

- that certain Indenture, dated as of February 14, 2012 by and between CEOC, the
  Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee;

- that certain Indenture, dated as of August 22, 2012 by and among the Escrow Issuers,
  CEC, and the First Lien Notes Indenture Trustee;

- that certain Additional Notes Supplemental Indenture, dated as of December 13, 2012
  by and among the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee;
  and

- that certain Indenture, dated as of February 15, 2013 by and among the Escrow
  Issuers, CEC, and the First Lien Notes Indenture Trustee.

---

[11]   In addition, the Debtors use interest rate swap agreements to manage certain variable and fixed interest rate.  As of the
Petition Date, the Debtors had eight interest rate swap agreements outstanding (collectively, the "Swap Agreements")
with notional amounts totaling $5.75 billion. The Swap Agreements reset monthly or quarterly and expire in January
2015.

### 3.     First Lien Collateral and Intercreditor Agreements.

The obligations under the First Lien Credit Agreement and the First Lien Notes (collectively the "First Lien Debt") are secured by first priority liens in the "Collateral," as defined in that certain Amended and Restated Collateral Agreement (as amended, modified, waived, and/or supplemented from time to time, the "First Lien Collateral Agreement"), dated as of June 10, 2009, by and among CEOC, certain CEOC subsidiaries identified therein (the "First Lien Pledgors"), and Bank of America, N.A. in its capacity as collateral agent and any successors in such capacity as collateral agent (the "First Lien Collateral Agent").[12]

Pursuant to the First Lien Collateral Agreement, the First Lien Pledgors have pledged substantially all of their assets—including, among other things, commercial tort claims and cash—to secure the First Lien Debt.  Specifically, section 4.04(b) of the First Lien Collateral Agreement requires the First Lien Pledgors to (i) promptly notify the First Lien Collateral Agent if the Debtors at any time hold or acquire any commercial tort claim the First Lien Pledgors reasonably estimate to be in an amount greater than $15 million and (ii) grant to the First Lien Collateral Agent a security interest in such commercial tort claim and in the proceeds thereof.[13] On September 25, 2014, in compliance with their obligations under the First Lien Collateral Agreement, the Debtors granted to the First Lien Collateral Agent, for the benefit of the First Lien Creditors an interest in and lien on all of the First Lien Pledgors' rights, title, and interests in certain commercial tort claims (and proceeds thereof) (the "Commercial Tort Claims"), to the extent any such claims exist.

---

[12]   On July 25, 2014 Credit Suisse AG, Cayman Islands Branch replaced Bank of America, N.A. as administrative agent and collateral agent under the First Lien Credit Agreement.

[13]   Generally, a categorical description insufficient to grant a security interest in commercial tort claims.  See U.C.C. §§ 9-108(e)(1); 9-204(b)(2).

Under section 4.01(a) of the First Lien Collateral Agreement, the First Lien Pledgors have pledged to the First Lien Collateral Agent all right, title, and interest in or to substantially all of the First Lien Pledgors' assets, including cash.  Accordingly, as part of ongoing negotiations that ultimately led to the successful adoption of the RSA—which includes the First Lien Noteholders' consent to the use of their cash collateral to finance these chapter 11 cases— on October 16, 2014, the Debtors entered into certain control agreements with the First Lien Collateral Agent to perfect the First Lien Creditors' lien on substantially all of the Debtors' unrestricted cash.

The First Lien Agents, and other parties from time to time, entered into the First Lien Intercreditor Agreement, dated as of June 10, 2009 (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement"), which was consented to by CEOC and CEC and governs, among other things:  (i) payment and priority with respect to holders of claims related to the First Lien Debt; (ii) rights and remedies of the holders of First Lien Debt with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (iii) the relative priority of liens granted to holders of "First Lien Obligations" (as defined in the First Lien Intercreditor Agreement).

### B.       Second Lien Debt.

#### 1.       Second Lien Notes.

As of the Petition Date the Debtors owe approximately $5.24 billion in principal amount outstanding to holders (the "Second Lien Noteholders" and together with the First Lien Creditors, the "Secured Creditors") of three series of second lien notes (the "Second Lien Notes") issued pursuant to three indentures (the "Second Lien Notes Indentures"):

- that certain Indenture, dated as of April 16, 2010 by and among the Escrow Issuers, CEC, and U.S. Bank, National Association, in its capacity as indenture trustee under

24

the Second Lien Notes Indentures and collateral agent, and any successors in such capacity (the "Second Lien Agent");

- that certain Indenture, dated as of December 24, 2008  by and among CEOC, CEC and the Second Lien Agent; and

- that certain Indenture, dated as of April 15, 2009 by and among CEOC, CEC, and the Second Lien Agent.

### 2.      Second Lien Collateral and Intercreditor Agreements.

The Second Lien Notes are secured by second priority liens in the Collateral, as set forth in and subject to the terms of the Collateral Agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Collateral Agreement"), dated as of December 24, 2008, by and among CEOC, each subsidiary of CEOC identified therein (the "Second Lien Pledgors"), and the Second Lien Agent. [14]

Section 4.04(b) of the Second Lien Collateral Agreement requires the Second Lien Pledgors to (i) promptly notify the Second Lien Collateral Agent if the Second Lien Pledgors at any time hold or acquire any commercial tort claim they reasonably estimate to be in an amount greater than $15 million and (ii) grant to the Second Lien Collateral Agent a security interest in such commercial tort claim and in the proceeds thereof.  On November 25, 2014, in compliance with the Second Lien Collateral Agreement, the Second Lien Pledgors granted to the Second Lien Agent, in its capacity as collateral agent under the Second Lien Collateral Agreement, a security interest in and lien on all of the Second Lien Pledgors' rights, title, and interests in and to the Commercial Tort Claims (and proceeds thereof), to the extent any such claims exist.

---

[14]     Section 4.01 of the Second Lien Collateral Agreement expressly carves out cash from the Second Lien Collateral:  "Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a grant of a security interest in…cash, deposit accounts and securities accounts (to the extent that a Lien thereon must be perfected by an action other than the filing of customary financing statements)."  Because perfection of cash requires control or possession, the Second Lien Collateral Agreement cannot provide Second Lien Noteholders with a security interest in the Debtors' cash.

The First Lien Agents and the Second Lien Agent entered into the Second Lien Intercreditor Agreement, dated as of December 24, 2008 (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement"), which was acknowledged by CEOC. The Second Lien Intercreditor Agreement governs, among other things, the relative priority of the First Lien Debt and the Second Lien Notes and the rights and remedies of the holders of and Second Lien Notes with respect to debtor-in-possession financing, use of cash collateral, and adequate protection.

### C.   Subsidiary-Guaranteed Debt.

#### 1.   Subsidiary-Guaranteed Notes.

As of the Petition Date the Debtors owe approximately $479 million in principal amount outstanding to holders (the "Subsidiary-Guaranteed Noteholders") of senior unsecured subsidiary-guaranteed notes (the "Subsidiary-Guaranteed Notes") issued pursuant to that certain Indenture, dated as of February 1, 2008 (as amended, modified, waived, and/or supplemented from time to time, the "Subsidiary-Guaranteed Notes Indenture"), by and among CEOC, the Note Guarantors (as defined therein), and U.S. Bank N.A., in its capacity as indenture trustee under the Subsidiary-Guaranteed Notes Indenture.

#### 2.   Guarantor Intercreditor Agreement.

The First Lien Credit Agent, the First Lien Notes Indenture Trustee, and Citibank, N.A. (solely in its capacity as administrative agent under the Senior Unsecured Interim Loan Agreement, dated as of January 28, 2008, among CEOC, Citibank, N.A., and other parties thereto from time to time), among others, entered into the Guarantor Intercreditor Agreement, dated as of January 28, 2008 (as amended, restated, modified, and supplemented from time to time, the "Guarantor Intercreditor Agreement"). The Guarantor Intercreditor Agreement

26

governs, among other things, the relative priority of the Subsidiary-Guaranteed Notes and the First Lien Creditors.

### D.      Senior Unsecured Note Obligations.

As of the Petition Date the Debtors owe approximately $530 million in principal amount outstanding to holders of senior unsecured notes (the "Senior Unsecured Notes") issued pursuant to two indentures (the "Senior Unsecured Notes Indentures"):

- that certain Indenture, dated as of June 9, 2006 by and among CEOC, CEC, and U.S. Bank National Association, in its capacity as indenture trustee (the "Senior Unsecured Notes Trustee"); and

- that certain Indenture, dated as of September 28, 2005 by and among CEOC, CEC, and the Senior Unsecured Notes Trustee.

### Events Leading to the Chapter 11 Cases

The Debtors and their non-Debtor affiliates operate one of the largest and most comprehensive portfolio of casino properties in North America.  This unique combination of gaming products has allowed the Debtors to offer patrons both local and destination options for gaming or entertainment.  Unlike competitors that offer only regional gaming properties, the Debtors have been able to obtain higher than average spending at their regional properties because their industry-leading customer loyalty program, Total Rewards®, provides customers with entertainment and gaming rewards that can be used in Las Vegas and other destinations.  And unlike competitors that offer only destination properties, the Debtors' more frequent interactions with their customers at the local level allows them to fashion personally-tailored reward packages that enhance their customers' experiences and encourage trips to destinations such as Las Vegas.  This business model has resulted in higher customer traffic and spending at both regional and Las Vegas casinos.

Despite these operational successes, the Debtors have faced significant challenges due to a number of factors that ultimately required them to file for chapter 11. The 2008 LBO closed just as the recession was beginning. Business and consumer spending plummeted and unemployment increased to levels not seen since the Great Depression. Consumers were left with less discretionary income to spend on gambling and trips to casino-resorts. Although the economy has rebounded, the Debtors are now confronting changed consumer habits and increased competition from local and online outlets.

## IV.    Economic Challenges.

### A.    The 2008 Recession.

The 2008 recession had a significant impact on the Debtors, with enterprise-wide net revenues before promotional allowances falling from $12.7 billion in 2007 to $10.3 billion in 2009. In response to the 2008 recession, the Debtors eliminated hundreds of millions of dollars of corporate, marketing, and operational costs. Despite these efforts, CEC's adjusted EBITDA dropped from $2.1 billion in 2007 to $1.7 billion in 2009, and continued to decline thereafter.

### B.    Changing Consumer Spending Habits.

The challenges facing the Debtors were not limited to the 2008 recession. Even though the economy has improved, the Debtors are now facing changing consumer preferences. For example, the "Millennial" generation has shown less interest in gaming than previous generations. Thus, although Las Vegas's tourist numbers have largely rebounded to pre-recession rates, visitors, on average, are younger and less willing to gamble. According to the Las Vegas Convention and Visitors Bureau, 47 percent of Las Vegas visitors in 2012 indicated that their primary reason to visit was for vacation or pleasure instead of gambling, which is up

from 39 percent in 2008.[15]  To address this changing dynamic and capture this younger crowd, many of the newest gaming properties provide significant non-gaming entertainment options. The Debtors likewise are pursuing younger consumers, including by renovating Caesars Palace's nightclub to drive additional traffic to that property.  But nightlife, restaurants, and other entertainment options are not as profitable as gaming.

### C.      Increased Competition.

The Debtors also face increased competition for gaming dollars.  Since 2001, nine states have legalized gambling (bringing the total to 18), which has resulted in more local casinos.[16]  In Ohio, for example, the first casino opened in 2012; now there are eleven.  Similarly, over the past five years, Pennsylvania, which had almost no gaming at the time the 2008 LBO was signed, has become the second-largest domestic gaming market outside of Nevada.[17]  These additional gaming options have added pressure to existing casinos as the total customer population has remained relatively stable.[18]

---

[15]   Las Vegas Convention & Visitors Auth., *2012 Las Vegas Visitor Profile* [Page 17] (2012), <u>available at</u> http://www.lvcva.com/includes/content/images/MEDIA/docs/2012-Las_Vegas_Visitor_Profile1.pdf.

[16]   Ryan McCarthy, <u>The End of a Casino Monopoly, in Three Charts</u>, Washington Post (Sept. 23, 2014), http://www.washingtonpost.com/news/storyline/wp/2014/09/23/the-end-of-a-casino-monopoly-in-three-charts/; Matt Villano, <u>All In: Gambling Options Proliferate Across USA</u>, USA Today (Jan. 26, 2013), http://www.usatoday.com/story/travel/destinations/2013/01/24/gambling-options-casinos-proliferate-across-usa/1861835/.

[17]   IBISWorld: Safe Bet: A rise in tourism and personal expenditure will boost demand for casinos, IBISWorld Industry Report 71321: Non-Casino Hotels in the US, 8 (November 2014).

[18]   Josh Barro, <u>The Strange Case of States' Penchant for Casinos</u>, N.Y. Times (Nov. 5, 2014), http://www.nytimes.com/2014/11/06/upshot/the-strange-case-of-states-addiction-to-casinos.html?abt=0002&abg=1 ("States have gradually expanded legal gambling over the last four decades as a way to generate revenue without unpopular tax increases. But large parts of the American market are now saturated, with revenue in decline in most major casino markets. A majority of Americans already live relatively near casinos, so opening new ones does more to shift revenue around than to generate new business. As supply has outpaced demand, some casinos are closing, and governments have missed their projections for gambling-related revenue.").

Even in Las Vegas, new developments have increased competition for existing casinos. Since 2008, three new developments have opened on the Las Vegas Strip: (i) in December 2008, Wynn Resorts Limited opened the $2.3 billion Encore Las Vegas, which includes more than 2,000 hotel rooms, approximately 76,000 square feet of gaming space, and approximately 27,000 square feet of retail and entertainment space; (ii) in December 2009, MGM Resorts International opened CityCenter, a $9.2 billion gaming and residential resort that was partially funded by the Dubai government and includes more than 6,000 hotel rooms, approximately 150,000 square feet of gaming space, and 500,000 square feet of retail and restaurant space; and (iii) in December 2010, the Cosmopolitan of Las Vegas, a $3.9 billion gaming resort, opened, adding approximately 3,000 hotel rooms, 110,000 square feet of gaming space, and 300,000 square feet of retail and restaurant space.  These developments, as well as newly renovated properties by many of Las Vegas's traditional operators, have increased the supply of gaming, hotel, restaurant, and shopping opportunities available to Las Vegas visitors, leading to top-line revenue pressures for Caesars Palace.

### D.    Atlantic City Issues.

The Debtors also face significant challenges in the Atlantic City market, where they own Caesars Atlantic City and Bally's Atlantic City.  These challenges are the result of, among other things, the effects of Hurricanes Irene and Sandy on the local economy, an oversaturated local market, and increased competition from casinos on the East Coast.  As the chair of the New Jersey Casino Control Commission noted in the opening to that body's 2010 annual report:

> Over the years, Atlantic City's gaming industry has gone from enjoying a monopoly in the eastern half of the United States to a fiercely competitive situation today with slot machines or full blown casinos in every neighboring state. Gamblers in the New York, Philadelphia and Baltimore metropolitan areas now have places a lot closer to home than Atlantic City is. The so-called "convenience gambler" has found more convenient places to go to gamble. Similarly, development of casino hotels in Macau and Singapore, as well as the

new properties in Las Vegas, has made it harder for Atlantic City to attract the real high-end players.[19]

As a result, Atlantic City has seen several high profile casino bankruptcies in recent years.[20] Four Atlantic City casinos closed in 2014 alone,[21] including the Debtors' Showboat Atlantic City property. According to the Atlantic City Gaming Industry Report, prepared by the Office of Communications, State of New Jersey Casino Control Commission, gaming revenues for Atlantic City properties have declined more than 40 percent since the 2008 LBO was agreed to, from $5.2 billion in 2006 to $2.8 billion in 2013.

## V.    Out-of-Court Transactions.

Over the past several years, Caesars has executed over 45 asset sales and capital markets transactions in an effort to restructure and manage its debt. As set forth below, the Special Governance Committee has been investigating the controversial transactions over the last six months and certain creditor groups have filed lawsuits challenging various aspects of these transactions.

### A.    The CIE Transactions.

Before 2009, CEOC indirectly owned the WSOP trademark. The trade name was used to run branded, in-person poker tournaments around the United States, with the final round held at the Rio Hotel and Casino in Las Vegas. The Rio is owned by Rio Property Holding LLC and Cinderlane Inc., non-debtor subsidiaries of CEC and CERP.

---

[19]    State of New Jersey Casino Control Comm'n, 2010 Annual Report (2010), available at http://www.state.nj.us/casinos/reports/.

[20]    See, e.g., In re Trump Entertainment Resorts, Inc., No. 14-12103 (KG) (Bankr. D. Del.); In re Revel AC, Inc., No. 14-22654 (GMB) (Bankr. D.N.J.); In re Revel AC, Inc., No. 13-16253 (JHW) (Bankr. D.N.J.).

[21]    Mark Berman, Trump Plaza Closes, Making It Official: A Third of Atlantic City's Casinos Have Closed This Year, Wash. Post (Sept. 16, 2014), http://www.washingtonpost.com/news/post-nation/wp/2014/09/16/trump-plaza-closes-making-it-official-a-third-of-atlantic-citys-casinos-have-closed-this-year/.

In 2009, CEOC sold the WSOP trademark to CIE, a new CEC subsidiary created to pursue online gaming opportunities.[22]  In exchange, CEOC received certain preferred shares that granted it an economic interest in CIE, and a perpetual, royalty-free right to use the WSOP trademark and intellectual property.  Duff & Phelps, which was hired by the CEC Board to advise on the transaction, valued the WSOP IP and License Agreement at $15 million.  It also concluded that the transaction was fair from a financial point of view to CEOC, and the terms were no less favorable to CEOC than those that would have been obtained in an arm's-length non-affiliate transaction.

In 2011, CEOC sold the right to host the WSOP-branded poker tournaments (which it owned as part of the 2009 Trademark License Agreement) to CIE for $20.5 million in cash.[23] Following this transaction, CEC (through its majority ownership of CIE) controlled all aspects of the WSOP, including the trademark, the property where the WSOP tournament finals were held, and the right to host the tournament.  The transaction was approved by CEC's Board.  The CEC Board's financial advisor, Valuation Research Corporation, provided a fairness opinion concluding, among other things, that the principal economic terms of the transaction were fair from a financial point of view to CEOC and the transaction was on terms that were no less favorable to CEOC than it could obtain in a comparable arm's-length non-affiliate transaction.

### B.     The CERP Transaction.

In fall 2013, CEC decided to refinance the debt associated with the six CMBS properties. Without a refinancing, CEC faced an eventual default on the CMBS debt, which was set to mature in early 2015.  As discussed above, in October 2013, CEC combined the six CMBS

---

[22]   CEOC's rights with respect to hosting the WSOP Tournament were *not* transferred at this time.

[23]   CEOC retained certain rights granted to it under the 2009 Trademark License Agreement: the right to maintain WSOP-branded poker rooms on its properties and to sell WSOP-branded merchandise.

properties to form CERP as part of this refinancing.  CEC also contributed $200 million in cash

to CERP.  CEOC sold to CERP the equity of Octavius Linq Intermediate Hold Co., which owned

the Octavius Tower and Project Linq.  In exchange, CEOC received approximately $80 million

in cash and $53 million in CEOC notes for retirement, and CERP assumed $450 million of debt

associated with these properties and continued to fund its then-30% share of corporate costs.

These transactions closed on October 11, 2013.

CEOC's Board retained Perella Weinberg Partners ("Perella") as an independent

financial advisor to advise it on the CERP transaction.  Following due diligence, Perella opined

that the value of the consideration CEOC received was reasonably equivalent to the value of the

assets CEOC transferred.

### C.      The Growth Transaction.

As a part of the series of transactions resulting in the formation of CGP in fall 2013, CGP

used a portion of the capital invested through CACQ (the minority owner of CGP) to purchase

from CEOC Planet Hollywood Resort & Casino in Las Vegas, CEOC's interest in the Horseshoe

Baltimore project, and 50 percent of the management fees associated with these two properties

from CEOC for $360 million in cash and CGP's assumption of $513 million in debt associated

with these properties.

The Growth Transaction was negotiated over several months between representatives of

the Sponsors and an independent Valuation Committee of CEC's Board, which was formed to

estimate the fair market value of the assets and equity exchanged in the Growth Transaction.

The CEC Valuation Committee engaged Morrison & Foerster LLP as counsel and Evercore

Partners L.L.C. as its financial advisor.   Evercore opined, among other things, that the

consideration CEOC received in exchange for these assets was not less than the fair market value

of such assets.  The CEC Valuation Committee likewise concluded that the consideration paid

for the assets represented fair market value.   The Growth Transaction closed on October 21, 2013.

### D.   The Four Properties Transaction.

In March 2014, CEOC announced that it would sell to CGP four casino properties (The Quad, Bally's Las Vegas, The Cromwell, and Harrah's New Orleans) and 50 percent of the management fees payable by each casino in exchange for approximately $2.0 billion.   The final purchase price consisted of approximately $1.8 billion of cash and CGP's assumption of a $185 million credit facility used to renovate The Cromwell.

The Four Properties Transaction was negotiated and unanimously recommended by special committees consisting of independent members of CEC and CACQ's Boards of Directors.   The CEC Special Committee engaged Centerview Partners and Duff & Phelps as financial advisors, and Reed Smith LLP as legal advisor.   Centerview Partners opined that (1) the purchase price was fair to CEOC from a financial point of view, and (2) the purchase price was reasonably equivalent to the value of the transferred casinos plus 50% of their management fee streams.   Duff & Phelps opined that the transaction was on terms that were no less favorable to CEOC than would be obtained in a comparable arm's-length transaction with a non-affiliate. The sale of the Las Vegas properties in the Four Properties Transaction closed on May 5, 2014. The sale of Harrah's New Orleans closed on May 20, 2014.

### E.   The Shared Services Joint Venture.

On May 20, 2014, CES was formed as a joint venture among CEOC, CERP and CGPH to provide centralized property management services and common management of enterprise-wide intellectual property.   CEOC has a 69% ownership stake, and 33% of the voting rights, in CES. CERP and CGPH have a 20.2 percent and 10.8 percent ownership of CES, respectively, with

each partner having a 33% vote.  CEOC's primary contribution to CES was a license to certain intellectual property, including Total Rewards®.

Pursuant to CES's limited liability company agreement, CEOC and CERP both transferred, or caused their respective subsidiaries to transfer, the employment of certain individuals to CES, and agreed to assign to CES all employment-related obligations associated with these employees.  In addition, the Omnibus Agreement assigned to CES certain duties that CEOC and its subsidiaries historically had performed, such as duties to manage, on a reimbursable basis, the payroll and accounts payable for CEOC, CERP, and CGP and their predecessor entities.  Finally, CEOC granted to CES a license to certain intellectual property, including Total Rewards®, which CES then licenses to other entities in the Caesars enterprise.

The CEC Special Committee, established for the Four Properties Transaction, approved the term sheet for the Shared Services Joint Venture.  The Duff & Phelps opinion for the Four Properties Transaction also covered the Shared Services Joint Venture term sheet.  A CEC ad hoc committee ultimately recommended that the CEC Board approve the CES Amended and Restated Limited Liability Company Agreement, as well as the Omnibus Agreement.  The CEC and CEOC Boards approved the agreements by unanimous written consents.

**F.    The B-7 Refinancing.**

On May 6, 2014, CEC and CEOC announced a financing plan designed to extend CEOC's near-term maturities and provide it with covenant relief and the stability to execute its business plan.  Among other things, the plan included the following terms:

- Certain of the First Lien Lenders provided an additional $1.75 billion to CEOC under the First Lien Credit Agreement via the B-7 Term Loan;

- CEC sold 5 percent (68.1 shares) of CEOC's outstanding common shares to institutional investors unaffiliated with CEC for $6.15 million, indicating a $123 million total equity valuation for CEOC; and

- the First Lien Credit Agreement was amended to: (i) relax certain financial covenants; (ii) make CEC's guarantee of the First Lien Credit Agreement obligations a guarantee of collection rather than of payment; and (iii) limit that guarantee to debt held by consenting First Lien Lenders and approximately $2.9 billion of additional indebtedness.

On July 25, 2014, the B-7 Term Loan was assumed by CEOC after regulatory approvals were obtained and the First Lien Credit Agreement amendments became effective. CEOC used the proceeds of the B-7 Term Loan to retire virtually all existing debt maturing before 2016. Specifically, CEOC retired (i) 98 percent of the $214.8 million in aggregate principal amount of 10.00% Second Priority Senior Secured Notes due 2015, (ii) 99.1 percent[24] of the $792 million in aggregate principal amount of 5.625% Senior Notes due 2015, and (iii) 100 percent of the $29 million aggregate principal amount in term loans due 2015.

CEC's sale of CEOC stock to unaffiliated entities resulted in the automatic release of CEC's guarantee of the Debtors' obligations under the First Lien Credit Facilities, First Lien Notes, and Second Lien Notes. As noted above, the B-7 Refinancing also modified CEC's guarantee of the obligations under the First Lien Credit Agreement from a guarantee of payment to a capped guarantee of collection.

### G.     The Senior Unsecured Notes Transaction.

On August 22, 2014, CEC and CEOC consummated the Senior Unsecured Notes Transaction with certain holders of CEOC's outstanding Senior Unsecured Notes, who represented $237.8 million in aggregate principal amount of the Senior Unsecured Notes and greater than 51 percent of each series of the Senior Unsecured Notes that were then held by non-affiliates of CEC and CEOC (the "August Noteholders"). As part of the Senior Unsecured Notes Transaction, the August Noteholders sold to CEC and CEOC an aggregate principal amount of

---

[24]    The remaining 0.9% was subsequently retired by the Debtors.

approximately $89.4 million of the 6.5% Senior Unsecured Notes due 2016 and an aggregate principal amount of approximately $66 million of the 5.75% Senior Unsecured Notes due 2017. In return, CEC and CEOC each paid the August Noteholders $77.7 million in cash, and CEOC also paid the August Noteholders accrued and unpaid interest in cash. CEC also contributed Senior Unsecured Notes in the aggregate principal amount of approximately $426.6 million to CEOC for cancellation. Through the Senior Unsecured Notes Transaction, CEOC reduced its outstanding indebtedness by approximately $582 million.

As part of the Senior Unsecured Notes Transaction, and with the consent of the August Noteholders, CEOC and the Senior Unsecured Notes Trustee entered into supplemental Senior Unsecured Notes Indentures to remove provisions relating to CEC's guarantee of the Senior Unsecured Notes and to modify the covenant restricting disposition of "substantially all" of CEOC's assets so that future asset sales would be measured against CEOC's assets as of the date of the supplemental indentures (the "August 2014 Indenture Amendments"). In addition, with the consent of the August Noteholders, CEOC and the Senior Unsecured Notes Trustee amended the Senior Unsecured Notes Indentures to modify a ratable amount of the approximately $82.4 million face amount of the 6.5% Senior Unsecured Notes and 5.75% Senior Unsecured Notes held by the August Noteholders (the "Amended Senior Unsecured Notes") to include provisions that holders of those two series of the Amended Senior Unsecured Notes will be deemed to consent to any restructuring of the Senior Unsecured Notes (including the Amended Senior Unsecured Notes) that has been consented to by holders of at least 10 percent of the outstanding 6.5% Senior Unsecured Notes and 5.75% Senior Unsecured Notes, as applicable. The August 2014 Indenture Amendments and the Amended Senior Unsecured Notes

were effective as of August 22, 2014, the closing date of the Senior Unsecured Notes Transaction.

### H.    Recent and Impending Property Closures.

The Debtors have considered other options to reduce overhead and improve cash flows. In particular, the Debtors conducted a comprehensive review of their property portfolio to identify their weakest performing casino properties, especially those in markets that are oversupplied with gaming options.  As a result of this review, the Debtors have closed two U.S. properties in 2014:  Harrah's Tunica, which was closed on June 2, 2014 and Showboat Atlantic City, which was closed on August 31, 2014.  Subsequently, the Debtors sold the Showboat Atlantic City property to a New Jersey public university in a transaction that closed on December 12, 2014.  In addition, the Debtors are ceasing their greyhound racing activities at the Horseshoe Council Bluffs casino in Council Bluffs, Iowa, effective December 31, 2015.

### VI.   **Independent Investigation, Disputes with Creditors, and Negotiation of the RSA.**

### A.    Special Governance Committee Investigation.

On June 27, 2014, the Debtors appointed Steve Winograd, Managing Director of BMO Capital Markets, and Ronen Stauber, Managing Director of Jenro Capital, LLC, as independent directors of CEOC.  Winograd and Stauber are each disinterested directors who are not beholden to CEC, its affiliates other than CEOC, or the Sponsors.  They have no current material ties to CEC, its affiliates other than CEOC, or the Sponsors that would compromise their impartiality, and their compensation as directors of CEOC is not contingent upon taking or approving any particular action.

The CEOC Board of Directors formed the Special Governance Committee, comprising Winograd and Stauber.  The Special Governance Committee was tasked with conducting an independent investigation into potential claims the Debtors and/or their creditors may have

against CEC or its affiliates, including the claims asserted in certain of the then recently filed complaints.

The Special Governance Committee asked Kirkland & Ellis LLP ("K&E") and Mesirow Financial Consulting, LLC ("Mesirow," and together with K&E, the "Advisors") to advise on legal and financial issues, respectively, in connection with its independent investigation.

Beginning in August 2014, the Special Governance Committee issued written requests for documents to CEC, its affiliates, and the Sponsors.  The Advisors have reviewed and analyzed approximately 35,000 documents in the course of the independent investigation.  In addition, the Advisors have interviewed employees and officers of CEC and its affiliates, as well as CEC's legal and financial advisors.  To date, Mesirow alone has worked **over** 7,500 hours on the investigation.

The members of the Special Governance Committee also have reviewed and considered the allegations made by certain creditors in pending litigation related to certain of these transactions (discussed below), documents relating to those transactions, and materials prepared by the Advisors.  The Special Governance Committee has consulted frequently with the Advisors concerning the independent investigation.

Based on the investigation to date, the Special Governance Committee determined that it would require a significant contribution from CEC and its affiliates to settle and release certain claims, including an avoidable insider preference, but that prosecuting and collecting on such claims would be subject to significant challenges, including disagreements over the size of the claims.  As a result, the Debtors secured significant contributions under the RSA that the Special Governance Committee believes, subject to completion of its investigation, will be sufficient to address such claims.

B.        **Litigation Regarding Transactions.**

The transactions set forth above are the subject of serious and complicated disputes between CEOC, CEC, and various noteholders.  Generally speaking, the noteholders claim that the transactions were unlawful and/or violate certain covenants under the applicable indentures.  More specifically, the noteholders allege that the transactions were done at below-market prices as part of a scheme by CEC and the Sponsors to transfer valuable assets from CEOC to CEC and its affiliates to remove them from the reach of CEOC's creditors.  The noteholders further allege that CEOC's directors and officers are unavoidably conflicted due to their extensive business and commercial ties to CEC and the Sponsors, and that they violated their fiduciary duties by approving the transactions.

On August 4, 2014, the Second Lien Notes Trustee commenced an action in the Court of Chancery of the State of Delaware against, among others, CEC, CEOC, CGP, CERP, CEC's directors, and certain of CEOC's directors in a case captioned *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corporation*, C.A. No. 10004-VCG (the "Delaware Chancery Court Action").  In the Delaware Chancery Court Action, the Second Lien Notes Trustee has alleged claims for, among other things, intentional and constructive fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, corporate waste, and breach of contract.  The claims in the Delaware Chancery Court Action are focused on the CIE, CERP, Growth, and Four Properties Transactions, as well as the Shared Services Joint Venture.

On August 5, 2014, CEC and CEOC commenced a lawsuit in the Supreme Court of New York, County of New York, against certain institutional First and Second Lien Noteholders, which is captioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et al.*, Index No. 652392/2014 (the "New York State Action").  The members of the Special Governance Committee abstained from

40

the decision to file the New York State Action.  In the New York State Action, CEC and CEOC assert that the defendants have tortiously interfered with CEC's and CEOC's businesses in an attempt to improve defendants' credit default swap and other securities positions.  CEC and CEOC also seek declarations that no defaults have occurred under CEOC's First and Second Lien Notes Indentures and that there have been no breaches of fiduciary duty or fraudulent transfers.

On November 25, 2014, the First Lien Notes Trustee commenced an action in the Court of Chancery of the State of Delaware against CEC, CEOC, CGP, CERP, CEC's directors, and all of CEOC's directors in a case captioned *UMB Bank v. Caesars Entertainment Corporation*, C.A. No. 10393-VCG (the "Receiver Action").  In the Receiver Action, the First Lien Notes Trustee alleges that Caesars has engaged in a fraudulent scheme to strip assets from CEOC, and seeks, among other things, to have the Delaware Chancery Court appoint a receiver to manage CEOC's affairs for the benefit of its noteholders.  Pursuant to the RSA, the Receiver Action will be consensually stayed as to all defendants upon the filing of these chapter 11 petitions.

Finally, certain Unsecured Noteholders have commenced two actions against CEC and CEOC in the United States District Court for the Southern District of New York, which are captioned *Meehancombs Global Credit Opportunities Master Fund, LP v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, Case No. 14-cv-07091-SAS, and *Danner v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, Case No. 14-cv-07093-SAS (the "SDNY Actions").  Through the SDNY Actions, the Unsecured Noteholders have asserted that the Unsecured Notes Transaction breached the Unsecured Notes Indentures and violated the Trust Indenture Act of 1939.

Motions to dismiss are pending in each of the Delaware Chancery Court Action, the New York State Action, and the SDNY Actions.  A motion to transfer the Receiver Action to New York is also pending.

### C.      Restructuring Negotiations and Restructuring Support Agreement.

Given their substantial debt obligations, the Debtors engaged their stakeholders, including the First Lien Lenders, the First Lien Noteholders and CEC in extensive, multilateral, arm's-length negotiations regarding the terms of a potential restructuring beginning in summer 2014.

These negotiations were complicated by a number of factors.  First, certain of the First Lien Lenders and First Lien Noteholders also held credit default swap positions, which could have significant value if the Debtors defaulted on their debts.  Second, CEC, the Debtors, and certain creditors also were engaged in ongoing, contentious litigation set forth above.  Third, it was critical that CEC support any potential restructuring given gaming regulatory requirements and the fact that the Caesars' businesses are interrelated through shared services and employees as well as the Total Rewards program.  Similarly, the Debtors could trigger significant tax obligations—including for the Debtors—by separating from CEC.

The Debtors and their stakeholders examined structures that would maximize the value of their estates and creditor recoveries.  After significant diligence and hard fought negotiations, the parties agreed to reorganize the Debtors' businesses as a REIT, which would enhance the value of the Debtors' real estate and allow the Debtors to provide their creditors with improved recoveries, including a 100 percent recovery for the First Lien Lenders.  The Debtors also focused on maximizing non-First Lien Noteholder recoveries, and successfully negotiated for improved recoveries for such classes from the initial proposals while also maintaining recoveries for the First Lien Creditors.

Despite this substantial progress, certain of the First Lien Noteholders and each of the First Lien Lenders involved in the negotiations withdrew their support on December 11, 2014. The Debtors, CEC, and certain of the First Lien Noteholders, however, continued negotiating and ultimately reached agreement on the terms of a comprehensive restructuring. This proposed restructuring is documented in the RSA and Term Sheet, which were initially executed on December 19, 2014 by the Debtors, CEC, certain Apollo-affiliated funds, and 38 percent of the First Lien Noteholders. As of the Petition Date, holders of over 80 percent in aggregate principal amount of the Debtors' first lien bonds, and approximately 15 percent of first lien bank debt, have signed the RSA.

The RSA and Term Sheet form the basis of a comprehensive chapter 11 plan that will permit the Debtors to reorganize and effectively compete in the changing casino environment without the burden of their significant debt load. Among other things, the Term Sheet provides that the Debtors will shed approximately $10 billion in debt, reducing their yearly interest payment from approximately $1.7 billion to approximately $450 million. As part of the restructuring, the Debtors will reorganize as a REIT and transfer all of the Debtors' casino properties to PropCo. CEOC will lease these properties as OpCo. Both PropCo and OpCo will issue take-back paper as part of creditor recoveries. Caesars Palace will be owned by a subsidiary of PropCo that will issue its own debt. OpCo will enter into a master lease with Caesars Palace and PropCo. The leases will include a full guarantee from CEC of all monetary obligations. This REIT structure will allow the Debtors to unlock the value of their properties for the benefit of all stakeholders.

Moreover, CEC is making significant contributions that are critical to funding anticipated payments under the Debtors' chapter 11 plan. Specifically, CEC will contribute up to

$1.45 billion in cash in support of the restructuring:  $700 million to offer to purchase up to

100 percent of the equity in OpCo from creditors; $269 million to offer to purchase up to

15 percent of the equity in PropCo; $406 million to fund liquidity, cash recoveries to creditors,

and a forbearance fee related to the RSA; and a guarantee of up to an additional $75 million of

cash, which can be drawn by CEOC under certain circumstances.  CEC also will guarantee

OpCo's monetary obligations under the master leases (up to $635 million per year), which will

help facilitate the creation of the valuable REIT structure.  Further, the releases encompassed in

the RSA—which are an important inducement for CEC's contributions—remain subject to the

Special Governance Committee's ongoing investigation.

The transactions proposed by the RSA generally provide for the following treatments to

holders of claims against and interests in the Debtors:

- First Lien Lenders will receive approximately a 100 percent recovery through a mix of cash, first and second lien OpCo debt, first lien PropCo debt, and either additional cash or mezzanine Caesars Palace Las Vegas ("CPLV") debt (depending on whether the CPLV debt is financed for cash);

- First Lien Noteholders will (i) receive approximately a 92 percent recovery through a mix of cash, first and second lien OpCo debt, first and second lien PropCo debt, either additional cash or mezzanine CPLV debt (depending on whether the CPLV debt is financed for cash), PropCo equity, and OpCo equity, (ii) have the right to "put" to CEC and First Lien Noteholders who elect to backstop (in exchange for cash at "plan" value) up to 14.8 percent of their PropCo equity and 100 percent of their OpCo equity, and (iii) have the right to purchase at least 50 percent of preferred PropCo equity;

- Non-First Lien Noteholders will receive either (i) if the class or classes of non-First Lien Noteholders votes to accept the plan, 30.1 percent of the PropCo equity, plus the right to purchase for cash at "plan" value up to an additional 65% of the PropCo equity or (ii) if the class or classes of non-First Lien Noteholders reject the plan, 17.5 percent of the PropCo equity; and

- Critical trade vendors will be paid in full, and the treatment of other general unsecured creditors will be agreed-to by the parties.

The restructuring contemplated by the RSA and Term Sheet is in the best interests of the Debtors' estates, maximizes stakeholder recoveries, secures a viable pathway to future growth, and ensures that the Debtors continue to operate on an ongoing basis for the benefit of their customers, vendors, and approximately 32,000 employees.   The Debtors are in the process of drafting and negotiating the terms of the chapter 11 plan and preparing a related disclosure statement.   They will seek to move promptly to assume the RSA and to confirm their plan in accordance with the milestones set forth in the RSA, which, as described above, provide a fair and reasonable amount of time for various stakeholders to analyze the terms of the agreements set forth therein.

**VII.   Chapter 11 Cases.**

    **A.      Jurisdiction and Venue.**

The United States Bankruptcy Court for the Northern District of Illinois has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408.

On January 12, 2015, certain holders of Second Lien Notes filed an involuntary bankruptcy petition against CEOC, but no other Debtor, in the United States Bankruptcy Court for the District of Delaware.  Pursuant to recent amendments to Bankruptcy Rule 1014(b), the pendency of that involuntary petition does not automatically stay these cases, which may appropriately proceed in this Court.[25]

The RSA is the result of over six months of negotiation among the Debtors and stakeholders, and is supported by creditors representing $6.45 billion of the Debtors' capital

---

[25]   Rule 1014(b) provides that if two or more petitions are filed regarding the same debtor, "the court in the district in which the first-filed petition is pending may determine, in the interests of justice and for the convenience of the parties, the district or districts in which any of the cases should proceed.  The court may so determine on motion and after a hearing…. The court *may* order the parties to the later-filed cases not to proceed further until it makes the determination." (emphasis added)

structure.  These chapter 11 filings involve more than 170 Debtors, and the Debtor's intent to file

bankruptcy petitions has long been a matter of public knowledge.  The involuntary bankruptcy

petition filed in Delaware against a single Debtor is a transparent tactic by three out-of-the-

money creditors holding one series of second lien notes to derail this entire process.  Now that

the Debtors have filed their voluntary petitions, the predicate for an involuntary petition—

supervision by a bankruptcy court—has been achieved.  Accordingly, CEOC will seek to dismiss

the involuntary petition within its time to answer or otherwise plead in response to that petition.

### B.     Use of Cash Collateral.

The Debtors have significant cash on hand that constitutes the Secured Creditors' cash

collateral and seek to fund their operations and the administration of these cases with such cash.

Recognizing the importance of the Debtors' access to cash collateral, the Debtors have provided

the Secured Creditors with the following adequate protection package in consideration for the

use of cash collateral:

- replacement liens for the Secured Creditors;

- superpriority administrative expense claims for the First Lien Creditors;

- payment of the First Lien Group's professional fees and expenses;

- adequate protection payments to the First Lien Creditors at an annual rate of 1.5% and payment of available cash upon the effective date of a plan of reorganization;

- agreement to operate in the ordinary course consistent with a cash forecast; and

- disclosure and access to certain financial information.

The Debtors' proposed cash collateral package also contains several customary events of

default and restructuring-related milestones.  The Debtors have also provided various stipulations

customary for adequate protection packages in large complex chapter 11 cases.  Pursuant to the

Second Lien Intercreditor Agreement, the Second Lien Noteholders are prohibited from

objecting to, or seeking additional, adequate protection, so long as they are granted similar adequate protection liens on a junior priority basis, which the Debtors have provided.

### C.     Governance Protocols.

To ensure the efficient and independent management of these cases for the benefit of CEOC's estates, the Debtors have also put in place certain governance protocols.  Specifically, the Debtors have:

- appointed Randall S. Eisenberg, a managing director at AlixPartners as Chief Restructuring Officer of CEOC (the "CRO") to oversee the chapter 11 cases and implementation of the restructuring transactions at the operational level;

- established a Special Restructuring Committee of the CEOC Board of Directors, comprising the two independent directors and one Apollo director, to oversee day-to-day decision making regarding restructuring related issues; and

- established decision making mandates that require the CRO to report to the Special Restructuring Committee with respect to all restructuring-related decisions requiring Board approval other than decisions involving related parties, which remain reserved exclusively for the Special Governance Committee.

### Conclusion

The reorganization of Debtors' businesses will require difficult compromises in a challenging environment.  The Debtors are a key part of an $8.5 billion, heavily regulated, worldwide gaming enterprise with a complex capital structure.  Shedding the Debtors' unsustainable burden of more than $18 billion in funded debt will necessitate concessions from sophisticated financial institutions with disparate motivations.  Moreover, the disputed asset sales and capital markets transactions undertaken in the past several years are complicated, and must be resolved in a manner that fairly compensates these estates.  Cognizant of their responsibility as fiduciaries, the Debtors have taken a lead role in driving solutions to these and other problems facing their businesses. The proposed RSA reflects the significant compromises the Debtors have already achieved to create the architecture for a plan of reorganization that maximizes recoveries

for all stakeholders.  The Debtors are in the best, most informed, position to garner broader consensus around the proposed RSA framework and intend to shepherd these cases to a successful conclusion.

Dated:  January 15, 2015  
Chicago, Illinois

/s/ David R. Seligman, P.C.

James H.M. Sprayregen, P.C.  
David R. Seligman, P.C.  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
300 North LaSalle  
Chicago, Illinois 60654  
Telephone:    (312) 862-2000  
Facsimile:    (312) 862-2200  

- and -

Paul M. Basta, P.C.  
Nicole L. Greenblatt  
**KIRKLAND & ELLIS LLP**  
**KIRKLAND & ELLIS INTERNATIONAL LLP**  
601 Lexington Avenue  
New York, New York 10022-4611  
Telephone:    (212) 446-4800  
Facsimile:    (212) 446-4900  

*Proposed Counsel to the Debtors*  
*and Debtors in Possession*