## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

## DECLARATION OF RANDALL S. EISENBERG, CHIEF RESTRUCTURING OFFICER OF CAESARS ENTERTAINMENT OPERATING COMPANY, INC., IN SUPPORT OF FIRST DAY PLEADINGS

I, Randall S. Eisenberg, hereby declare under penalty of perjury:

1.       I am the Chief Restructuring Officer ("CRO") of Caesars Entertainment Operating Company, Inc. ("CEOC"), a corporation organized under the laws of the State of Delaware and one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I became CEOC's CRO contemporaneously with this chapter 11 filing on January 15, 2015. I have been overseeing the Debtors' preparations for chapter 11 since October 23, 2014, through my role as Managing Director at AlixPartners, LLP, which served as restructuring advisor and consultant to the Debtors since that time. Contemporaneously with this chapter 11 filing on January 15, 2015, AP Services, LLC, an affiliate of AlixPartners, began providing temporary employees to the Company to assist it in its restructuring. As CRO, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and

---

[1]     The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/CEOC.

records, as well as the Debtors' restructuring efforts.  I am above 18 years of age, and I am competent to testify.

2.      On the date hereof (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>").  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  With this declaration (the "<u>Declaration</u>"), the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

3.      I submit this Declaration to support the Debtors' "first day" pleadings (each, a "<u>First Day Pleading</u>," and, collectively, the "<u>First Day Pleadings</u>").  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of documents, or information I have received from other members of the Debtors' management, the Debtors' advisors, or temporary employees of the Debtors working under my direction.  If called upon to testify, I would testify to the facts set forth herein on that basis.

<u>Background and Qualifications</u>

4.      I have held the position of Managing Director at AlixPartners since January 2013, where I co-lead its transformation and Restructuring Advisory Practice.  Prior to that time, I was a Senior Managing Director in FTI's Corporate Finance Practice.  I was a member of FTI's corporate Finance Practice leadership team during most of the approximately 10 year period following FTI's acquisition of PricewaterhouseCoopers, LLP's Business Recovery Services U.S. Practice, which was acquired by FTI in September 2002.  Prior to this acquisition, I was a Partner at PricewaterhouseCoopers, LLP.

2

KE 34489932

5.     Over the past 23 years, I have advised senior management and boards of directors of companies in numerous industries to devise and implement sound turnaround and restructuring strategies in out-of-court turnarounds, chapter 11 restructurings, and foreign insolvency proceedings.  In addition, I have advised creditor constituencies who often become the new owners of a business upon consummation of a restructuring.  During the course of my career, I have been involved in numerous large and complex restructurings, including, but not limited to, Momentive Performance Materials, Inc., Delphi Corporation, US Airways Group, Inc., Visteon Corporation, Jackson Hewitt, Vertis, Inc., Anthracite Capital, Inc., Kmart Corporation, Planet Hollywood International, Inc., RSL Communications, Ltd., Rotech Healthcare, Inc., and Select Staffing.  I am a Certified Turnaround Professional and a Certified Public Accountant.  In addition, I am a Fellow in both the American College of Bankruptcy and the International Insolvency Institute.  During the course of my career, I have served as the President and Chairman of the Turnaround Management Association and the Association of Certified Turnaround Professionals, the latter of which was merged into the Turnaround Management Association.

## The Debtors

6.     CEOC, together with its Debtor and non-Debtor subsidiaries, provides casino entertainment services and owns, operates, or manages 38 gaming and resort properties in 14 states and five countries, operating primarily under the Caesars®, Harrahs®, and Horseshoe® brand names.  The Debtors represent the largest, majority-owned operating subsidiary of Caesars Entertainment Corporation ("CEC"), a publicly traded company that is the world's most diversified casino-entertainment provider.  CEC, through its ownership and economic interests in CEOC, Caesars Entertainment Resort Properties ("CERP"), and Caesars Growth Partners ("CGP"), owns, operates, or manages 50 casinos in 14 U.S. states and 5 countries, covering

3

3 million square feet of gaming space, 42,000 hotel rooms, 45 million customer loyalty program participants, and 68,000 employees.

7.       The Debtors employ approximately 32,000 people through geographically diverse operations throughout the United States, including seven regional casino properties located in the Midwest (across Illinois, Indiana, Iowa, and Missouri); six regional casino properties located in the Southeast (throughout Louisiana, Mississippi, and North Carolina); four casinos located in Arizona, California, Maryland, and Pennsylvania; four casinos located in Nevada, including the world famous Caesars Palace at the heart of the Las Vegas Strip; and two casinos located in Atlantic City, New Jersey.  On a consolidated basis, CEOC and its subsidiaries reported approximately $993 million of Adjusted EBITDA on net revenues of approximately $5.4 billion for the twelve months ending September 30, 2014.

### First Day Pleadings[2]

8.       The Debtors have filed a number of First Day Pleadings seeking targeted relief intended to allow the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases on their ongoing business operations.  The First Day Pleadings seek authority to, among other things, continue to pay employee compensation and benefits to maintain morale and retention during this critical juncture, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption.  I believe that Court approval of the relief requested in the First Day Pleadings is essential to stabilizing these estates to provide the Debtors with an opportunity to maximize enterprise value, which inures to the benefit of all creditors and stakeholders.  Moreover, I believe that failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely

---

[2]     Capitalized terms used but not otherwise defined hrein shall have the meanings ascribed to such terms in the respective First Day Pleading.

disrupt the Debtors' operations at this critical juncture. Simply put, I believe that the relief requested in the First Day Pleadings is necessary to prevent immediate and irreparable harm to the Debtors.

9.     I have reviewed each of the First Day Pleadings. For the reasons set forth herein, I believe that the relief sought in each of the First Day Pleadings is necessary because: (a) it will allow the Debtors to maintain baseline operations following the commencement of the chapter 11 cases; (b) it will enable the Debtors to operate in chapter 11 with minimal disruption to their business operations; and (c) it will maximize the enterprise value of the Debtors' business. I believe that if the Court grants the relief requested in the First Day Pleadings, the prospect of achieving these objectives—to the maximum benefit of the Debtors' estates, creditors, and other parties in interest—will be substantially enhanced. Accordingly, I believe that the Court should grant each of the First Day Pleadings.

I.     **Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases, and (II) Granting Related Relief (the "Joint Administration Motion").**

10.     The Debtors operate an integrated business, including the payment of employee wages, the operation of the cash management system, customer programs such as the Total Rewards® program, and the fact that the vast majority of the Debtors are obligors or guarantors of the Debtors' funded debt obligations. Given the integrated nature of the Debtors' operations, I believe that the joint administration of these chapter 11 cases will provide significant administrative convenience. Many of the motions, hearings, and orders that will arise in these chapter 11 cases will affect each and every Debtor entity. I believe that the entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. I also believe that joint administration will allow the Office of

KE 34489932

the United States Trustee for the Northern District of Illinois, the Court, and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency.

**II.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition (A) Wages, Salaries, and Other Compensation, (B) Reimbursable Employee Expenses, and (C) Obligations Relating to Medical and Other Benefits Programs, and (II) Granting Related Relief (the "Wages Motion").**

**A.** **The Debtors' Workforce.**

11. As of the Petition Date, the Debtors employ approximately 32,000 employees (each an "Employee" and collectively, the "Employees"). Approximately 24,000 of the Debtors' Employees are full-time employees and 8,000 are part-time employees. Approximately 4,000 Employees are paid a salary; approximately 28,000 Employees are paid on an hourly basis.

12. Approximately 35 percent of the Debtors' Employees are members of various unions (the "Unions") and are employed pursuant to certain collective bargaining agreements (the "CBAs"). The CBAs generally provide compensation and benefit standards the Debtors must meet for the union Employees.

13. The Debtors also supplement their workforce by employing approximately 1,700 temporary workers and independent contractors (the "Supplemental Workers"). The Debtors procure the services of the Supplemental Workers either directly or, in the case of temporary workers, through approximately 45 separate third-party staffing agencies (collectively, the "Staffing Agencies"). The Supplemental Workers generally provide on-site accounting, finance, information technology, security, and other services on both a full-time and seasonal basis.

14. The Employees (together with the Supplemental Workers) perform a variety of critical functions, including management and operation of the Debtors' casino, resorts, restaurants, and entertainment facilities, accounting, administration, finance, human resources,

6

marketing, facilities maintenance, information technology, security, and other tasks.   The

Employees' skills, training, and knowledge and understanding of the Debtors' operations are

essential to continuing operations and, ultimately, the effective reorganization of the Debtors'

businesses.

15.     I believe that the vast majority of the Debtors' Employees rely exclusively on

their compensation and benefits to pay their daily living expenses and provide for their

households.   These Employees (and their families) would be exposed to significant financial

harm if the Debtors were not permitted to ensure uninterrupted payment of compensation

(including obligations related to benefits) and maintain other programs benefiting their

Employees.

16.     To minimize the personal hardship that the Employees (and the Supplemental

Workers) would suffer if prepetition Employee-related obligations were not paid when due or as

expected and to maintain morale and stability in the Debtors' workforce during this critical time,

the Debtors are seeking authority to pay and honor certain prepetition claims relating to, among

other things, wages, salaries, ordinary-course raises and other pay increases, bonuses and other

compensation, payroll services, federal and state withholding taxes and other amounts withheld

(including garnishments, Employees' share of insurance premiums, taxes, and 401(k)

contributions), health insurance, retirement health and related benefits, workers' compensation

benefits, vacation time, leaves of absence, life insurance, short- and long-term disability

coverage and all other benefits that the Debtors have historically provided in the ordinary course

of business (collectively, the "Employee Compensation and Benefits") and to pay all costs

incident to the foregoing.

KE 34489932

17.    Certain of the Employee Compensation and Benefits are administered by the Debtors' ultimate non-Debtor parent, CEC, or non-Debtor affiliate CES.  The administration by CES and CEC of Employee Compensation and Benefits is conducted on a profit-neutral basis, and all amounts owed between CES, CEC, and the Debtors are reconciled on a daily, weekly, or monthly basis, as applicable, in the ordinary course of intercompany claims reconciliation. Though CES and CEC are not Debtors and do not require this Court's approval to maintain certain of the Debtors' Employee Compensation and Benefits programs, the Debtors nevertheless and out of an abundance of caution seek authority to continue remitting any and all of their obligations, including for any prepetition amounts outstanding, to their affiliates in the ordinary course, to ensure the continued and uninterrupted provision of Employee Compensation and Benefits.

**B.     Employee Compensation and Obligations.**

**1.     Unpaid Compensation.**

18.    In the ordinary course of business, the Debtors incur payroll obligations for their Employees.  Such obligations generally consist of wages and salaries.  In some cases, the Debtors also collect tips on behalf of their Employees and distribute those amounts through the payroll process.  This practice is mainly used for casino-floor table dealers and attendants, such as Blackjack dealers and Craps attendants, who receive tips in the form of casino chips and deposit those chips into buckets near their tables.  At the end of each shift, these tips, which are often called "tokes" in the industry, are counted and the chips re-enter circulation. The total toke amount for each shift is then divided amongst the Employees who worked that shift and is paid out through in the next applicable payroll cycle (described in more detail below).

19.    The Debtors' Employees are paid salaries, wages, and any applicable tips or tokes on either a weekly or bi-weekly basis, with bi-weekly employees split between two alternating

8

cycles. Thursday is the payday for both bi-weekly cycles and the weekly cycle, with all payments made one week in arrears. Approximately 85 percent of the Employees receive their wages and salaries by direct deposit through electronic transfer of funds directly to these Employees' accounts ("Direct Deposit"), with the remainder of Employees receiving checks. Because all of the Employees are paid in arrears, the Employees have not been paid all of their prepetition wages and compensation and are still owed certain tips and tokes as of the Petition Date.

20.    On average, the Debtors have weekly gross payroll expenses of approximately $19 million, encompassing the weekly payroll cycle and one of the two bi-weekly payroll cycles. The Debtors fund their payroll obligations in advance of each pay day. In the ordinary course of business, every Tuesday, the Debtors pre-fund that week's payroll cycles (the weekly cycle and one of the two bi-weekly cycles) and other Employee Compensation and Benefits into CES's cash concentration account and provide CES with applicable schedules and payment data for processing. CES then issues payroll checks and Direct Deposit payments and remits deductions, payroll taxes, and withholdings to applicable taxing authorities and other third-party benefit providers. CES makes payroll payments from its disbursement account after drawing funds from CES's cash concentration account.[3]

21.    The Debtors, CERP, and CGP each fund their respective payroll payment amounts into the CES cash concentration account before funds are transferred to the CES disbursement account for payment. Costs that CES incurs while providing payroll processing

---

[3]    Employees of two of the Debtors' managed tribal properties (Harrah's Resort Southern California and Harrah's Ak-Chin) are paid through cash accounts held at the property level (the "Tribal Accounts"). These separate payroll systems do not otherwise differ materially from the CES payroll system with respect to timing and mechanics. Approximately 2,500 Employees are paid through the Tribal Accounts, with average weekly distributions amounting to approximately $1.6 million.

KE 34489932

and remittance services to the Debtors and their affiliates are ultimately shared costs subject to a daily, weekly, or monthly allocation process that factors the size, geography, and recent operating performance of each of the Debtors (the "CES Allocation").

22.     In addition, the Debtors incur compensation obligations for their Supplemental Workers in the ordinary course of business.  The Debtors pay approximately $2.1 million per week on account of the work performed by the Supplemental Workers (the "Supplemental Worker Fees").  Supplemental Worker Fees are processed through the Debtors' accounts payable system, which is centrally managed by CES.  As with payroll, funds are drawn from the applicable Debtors' property-level concentration accounts into the CES main concentration account before payment is made by CES.  Costs that CES incurs while providing accounts payable processing and remittance services to the Debtors are ultimately passed on to the Debtors through the CES Allocation.

23.     As of the Petition Date, the Debtors estimate that approximately $29 million in prepetition accrued wages, salaries, tips, tokes, Supplemental Worker Fees, and other ordinary cash compensation (excluding earned but unused PTO or Vacation time) earned before the Petition Date remains unpaid (the "Unpaid Compensation"), substantially all of which the Debtors believe will become due and owing during the first 21 days of these chapter 11 cases.

24.     Importantly, the Debtors do not owe any Employee Unpaid Compensation in excess of the $12,475 cap imposed by section 507(a)(4) of the Bankruptcy Code.  Accordingly, the Debtors are not seeking authority on an interim basis to pay Unpaid Compensation that exceeds $12,475 to any single Employee.

### 2.     Deductions and Payroll Taxes.

25.     During each applicable pay-period, the Debtors routinely deduct certain amounts (collectively, the "Deductions") from Employees' paychecks, including, among other items,

(a) union dues and union fund contributions, (b) garnishments, child support, and similar deductions, and (c) other pre-tax and after-tax deductions payable pursuant to certain of the Employee Benefit Programs discussed herein (such as an Employee's share of health care benefits and insurance premiums, contributions under flexible spending plans, 401(k) contributions and deferred compensation contributions, legally ordered deductions, fees, and assessments, and miscellaneous deductions).

26.      The Debtors (through CES in accordance with the payroll processing arrangement described above) forward the Deductions to the appropriate recipients.  On average, the Debtors deduct and forward approximately $2.1 million in the aggregate from the Employees' paychecks per week.  Although the Debtors believe all Deductions have been forwarded to CES (and then to the appropriate recipients as of the Petition Date), due to the commencement of these chapter 11 cases, it is possible that certain funds deducted from Employees' paychecks may not have been forwarded to CES and then to the appropriate recipients before the Petition Date.  Out of an abundance of caution, the Debtors request authority to process any unpaid Deductions that they may discover.  In addition, the Debtors request authority to continue to honor and process Deductions on a postpetition basis, in the ordinary course of business, as routinely done before the Petition Date.

27.      Further, the Debtors are required by law to withhold from Employees' wages and salaries amounts related to federal, state, and local income taxes, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "Withholdings").  The Withholdings total approximately $4 million per week.  The Debtors must match from their own funds Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance

11

(collectively, the "Employer Payroll Taxes" and, together with the Withholdings, the "Payroll Taxes"). The Payroll Taxes, including portions paid by the Debtors and portions paid by the Employees, total approximately $5.7 million per week.

28.    The Debtors believe that, as of the Petition Date, all Payroll Taxes have been forwarded to the appropriate taxing authorities. Out of an abundance of caution, however, the Debtors request authority to forward any outstanding Payroll Taxes to CES so that such amounts may be forwarded to the appropriate taxing authorities. In addition, the Debtors seek authority to continue to honor and process the Payroll Taxes on a postpetition basis, in the ordinary course of business, as routinely done before the Petition Date.

### 3.    Reimbursable Expenses.

29.    In the ordinary course of their businesses, the Debtors reimburse Employees for certain reasonable and customary expenses (the "Reimbursable Expenses") incurred on behalf of the Debtors in the scope of their employment.[4] The Reimbursable Expenses include expenses for travel, meals, parking, automobile mileage, and other business-related expenses paid directly by Employees. Employees submit their expense reports and accompanying receipts through an online portal managed by an affiliate of Wells Fargo Bank, N.A. ("Wells Fargo"). While Employees typically submit expense reports for Reimbursable Expenses on a rolling basis, all expense reports for each monthly billing period (which usually runs through the 20th day of each month) are due by the end of each month. The Reimbursable Expenses typically are processed within seven to ten business days of receipt of the expense reports and are then paid out in the next payroll cycle for such Employees.

---

[4]    In addition, certain reasonable and customary expenses are paid to the Staffing Agencies and independent contractors as a component of the Supplemental Worker Fees.

KE 34489932

30.     As of the Petition Date, the Debtors have approximately $50,000 in pending requests for reimbursement of Reimbursable Expenses.  In addition, it is possible that certain Employees may have incurred prepetition expenses for which they have not yet submitted requests for reimbursement and will submit such requests to the Debtors after the Petition Date. The Debtors estimate that based on the $50,000 in pending requests for Reimbursable Expenses as well as other prepetition expenses incurred but not yet submitted, as of the Petition Date they will have no more than $100,000 in prepetition requests for Reimbursable Expenses outstanding.

31.     I believe that the failure to reimburse the Reimbursable Expenses will disrupt the Debtors' business operations and cause Employees to be concerned about personal liability for business-related charges, thereby distracting the Employees from devoting full attention to their day-to-day responsibilities and likely increase turnover.  Accordingly, the Debtors seek authority to  (a) continue  paying  Reimbursable  Expenses  in  accordance  with  prepetition  practices, (b) modify prepetition policies relating to the Reimbursable Expenses program as the Debtors deem  appropriate,  and  (c) pay  all  Reimbursable  Expenses  obligations  that  relate  to  the prepetition period.

### C.     Employee Benefit Programs.

32.     The Debtors offer Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical, prescription drug, dental, and vision plans, vacation time, sick leave, and other paid leaves of absence, retirement savings plans, pension plans, flexible spending accounts, life insurance, comprehensive disability insurance, long term disability insurance, workers' compensation insurance, business travel accident insurance, and other employee benefit plans as described below (collectively, the "Employee Benefit Programs").  The Debtors request authority to continue the Employee Benefit

13

Programs on a postpetition basis, in the ordinary course of business, as routinely done before the

Petition Date and to pay any prepetition amounts related thereto.

### 1.  Health Plans.

33.     The Debtors offer all full-time Employees who work a minimum of 30 hours a

week the opportunity to participate in a number of health benefit plans, including medical,

prescription, dental, and vision plans (collectively, the "Health Plans").  As part of the Health

Plans, the Debtors also subsidize or continue to provide certain benefits to certain former

Employees (or their survivors) after their termination, retirement, or disability leave, including

benefits provided under the Consolidated Omnibus Budget Reconciliation Act of 1985

("COBRA"). The Health Plans include the following:[5]

### a.  Medical Plans.

34.     The Debtors participate in two medical and prescription drug benefit programs

sponsored by CEC, in which approximately 17,500 Employees participate, with a total cost to

the Debtors of approximately $14.3 million each month, $11.5 million of which is paid for by the

Debtors and $2 million of which is paid for by Employees through premium deductions taken

from paychecks.  The two plans are the Health Savings Account Plan (the "HSA Plan") and the

health reimbursement account plan (the "HRA Plan").  The HSA Plan and the HRA Plan are

administered by Cigna Health and Life Insurance Company ("Cigna"), Humana Inc.

("Humana"), and Horizon Health Corp. ("Horizon," and collectively with Cigna and Humana,

the "Medical Plan Providers").  For both the HSA Plan and the HRA Plan, monthly health care

premiums differ depending on the plan in which the Employee is enrolled and whether the

---

[5]     Approximately 2,200 of the Debtors' Employees do not participate in the Debtors' Medical Plans.  For an Employee not to participate in the Medical Plans, the Employee must provide the Debtors with proof of medical insurance.  Union Employees who do not use the Debtors' Health Plans are generally covered by health benefit plans sponsored by their applicable union.  The Debtors contribute a pre-tax credit towards those plans on account of such Employees, with the credit ranging from $2 to $6 per hour.

Employee has dependents covered by the applicable plan.  Both plans offer (a) comprehensive medical and prescription drug coverage, preventive care—such as annual physicals and immunizations—paid 100 percent by the plan when the Employee uses in-network providers, (b) tools and resources to help Employees understand and control their health spending decisions, and (c) direct access to medical specialists without the need to get a primary care physician's approval.

35.     The Debtors contribute money to both types of plans on the first day of each calendar year in the following amounts:  $250 if the Employee is enrolled in an Employee-only plan; $375 if the Employee also has a child or spouse/same-sex partner in the plan; and $500 if the Employee has several children or a family covered by the plan.  If an Employee's spouse or same-sex partner is eligible for medical coverage under their own employer's benefits and they are enrolled in the Debtors' plan, a $1,300 annual surcharge is imposed upon that Employee, payable each paycheck ($25 for each weekly paycheck or $50 for each bi-weekly paycheck).

36.     The HSA Plan is a high deductible plan with a built-in health savings account ("HSA") managed by Bank of America, N.A. ("Bank of America").  It differs from the HRA Plan by having a lower monthly premium but a higher deductible and out-of-pocket maximum. The HSA is the property of the Employee for life; any dollars deposited into the HSA carry over year-after-year and can be used as a tool to prepare for health care spending in retirement.  On top of money contributed by the Debtors, Employees can contribute their own money using pre-tax payroll deductions so long as such amounts (including the Debtors' contributions) do not exceed the annual limits set by the IRS.  For 2015, those limits are: $3,350 for individual-only plans and $6,650 for all other plans.  If the Employee is 55 or older they can contribute an extra $1,000.  The Debtors deduct approximately $2.6 million per year from Employees' paychecks on

account of the HSA Plan.  As of the Petition Date, the Debtors do not owe Employees any amount for deductions taken from payroll for the HSA Plan which have not yet been transferred to Bank of America.

37.     The HRA Plan uses a health reimbursement account ("HRA") that is managed by each Employee's Medical Plan Provider.  Unlike the HSA Plan, the HRA Plan carries a higher premium but has lower deductibles and out-of-pocket maximums.  Also, unlike an HSA, the HRA belongs to the Debtors; the HRA is funded solely by the Debtors, Employees cannot make contributions to the HRA through payroll deductions or otherwise, unspent funds cannot be carried over year-after-year, and if the Employee is terminated, retires, or stops working for the Debtors, the unspent funds in that Employee's HRA will revert to the Debtors.

38.     To supplement the HSA Plan and HRA Plan and incentivize healthy Employee behavior, the Debtors run a program ("Wellness Rewards") that offers Employees multiple opportunities to save money on their annual health expenditures.  The Wellness Rewards program is carried out in two steps.  In the first step, Employees undergo a biometric screening that sets certain baseline metrics related to Employee health and indicates any potentially serious health conditions.  If an Employee's biometric screening indicates a negative health condition, such as high cholesterol, blood pressure, or obesity, that Employee is directed towards certain condition management goals.   Once an Employee completes this first step, she can save $50 per paycheck on her health care costs, with an additional $50 in savings if the Employee's spouse or domestic partner also participates.  In the second step, Employees who were given a clean bill of health after the biometric screen must only complete a full annual physical exam to qualify for an additional $50 in savings per paycheck (or $100 in savings if the spouse or domestic partner of the Employee completes the physical exam as well).  Employees who received a negative health

16

indication in the biometric screen must demonstrate satisfactory completion of their applicable condition management goals in order to receive the same rewards. In addition, special bonuses are available to Employees whose biometric screening results indicate excellent health. In total, the Debtors estimate their annual costs for the Wellness Rewards program are approximately $7 million.

### b.   Dental Plan.

39.     The Debtors provide dental benefits to approximately 18.000 Employees with a total cost of approximately $850,000 each month, approximately $450,000 of which is paid for by the Debtors and approximately $400,000 of which is paid for by Employees through premium deductions taken from paychecks. Generally, the dental plans provide benefits for preventive services, basic care, and restorative services. There are two coverage options: Dental and Dental Plus Orthodontia, with the latter option covering half the cost (after deductible) of orthodontic services for Employees and their families, subject to a $2,000 per person lifetime cap. Dental plan benefits and participant costs differ depending on the level of coverage an Employee elects and the number of Dependents covered. The dental plans are sponsored by CEC and are administered by MetLife, Inc. ("MetLife").

### c.   Vision Plan.

40.     The Debtors provide vision benefits to approximately 17,000 Employees with a total cost of approximately $140,000 each month, approximately $10,000 of which is paid for by the Debtors and approximately $130,000 of which is paid for by Employees through premium deductions taken from paychecks. Generally, the vision plan provides benefits for annual eye exams and prescription lenses for covered Employees and their respective dependents. Participating Employees may select from one of three plan choices, which are designed to address Employees with standard, moderate, and high use of vision services and provide varying

levels of coverage at graduated price points. The standard use plan, which most Employees use, does not require any payroll deductions while the moderate and high use plans do. The vision plan is sponsored by CEC and administered by EyeMed Vision Care.

41. For 2014, the Debtors estimate total expenditures for the Health Plans, net of Employee contributions, to be approximately $143.5 million on an annualized basis. Because the Health Plans are ultimately sponsored by CEC, the Debtors do not accrue obligations under the Health Plans other than premiums as they become due. As of the Petition Date, the Debtors do not believe they owe any amounts on account of accrued but unpaid premiums.

### 2. Flexible Spending Accounts.

42. The Debtors offer their Employees additional options for saving pre-tax dollars to help pay for health care and dependent care expenses.

### a. Limited Purpose Flexible Spending Account.

43. Employees who enroll in the HSA Plan are eligible for a limited purpose flexible spending account (the "Limited Purpose FSAs"). The Limited Purpose FSA provides Employees with a tax-free savings account to help pay for certain dental and vision expenses if such Employees do not have enough money in their HSAs. The annual limit for contributions to the Limited Purpose FSAs is $2,500 and all unspent funds will be lost at the end of the year. Approximately 350 Employees use the Limited Purpose FSA. The Debtors do not pay any administration costs on account of the Limited Purpose FSAs. Accordingly, as of the Petition Date, the Debtors do not owe any amounts on account of the Limited Purpose FSAs.

### b. Health Care Flexible Spending Account.

44. The Debtors offer Employees who have the HRA Plan the ability to contribute a portion of their pre-tax compensation into health care flexible spending accounts for themselves and their respective dependents (the "Health Care FSAs"). The Health Care FSAs cover a wider

variety of expenses than the Limited Purpose FSAs, including medical, prescription drug, dental, and vision expenses. Approximately 1,600 Employees participate in the Health Care FSAs. The Health Care FSAs allow each Employee to contribute up to $2,500 per year to pay for unreimbursed tax-deductible medical expenses for themselves and his or her respective dependents. Employees cannot roll-over their Health Care FSA balances and must spend funds in such accounts or lose them at the end of the year. The Debtors deduct approximately $1.7 million per year from Employees paychecks on account of the Health Care FSAs. The Debtors do not pay any administration costs on account of the Health Care FSAs. Accordingly, as of the Petition Date, the Debtors do not owe any amounts on account of the Health Care FSAs.

### c.     Dependent Care Flexible Spending Account.

45.     The Debtors offer Employees who participate in either the HRA Plan or the HSA Plan the ability to contribute a portion of their pre-tax compensation into a savings account to help pay for eligible day care, after-school care, disabled-dependent care, and elder care expenses (the "Dependent Care FSAs"). Only Employees can make contributions to the Dependent Care FSAs, subject to an annual limit of $5,000 per household. Approximately 60 Employees use Dependent Care FSAs. The Debtors deduct approximately $100,000 per year from Employees' paychecks on account of the Dependent Care FSAs. The Debtors do not pay any administration costs on account of the Dependent Care FSAs. Accordingly, as of the Petition Date, the Debtors do not owe any amounts on account of the Dependent Care FSAs.

### 3.     Employee Assistance Program.

46.     The Debtors' Employees are able to participate in an employee assistance program (the "Employee Assistance Program") provided by Cigna's Behavioral Health division, a provider of health and wellness services. The Employee Assistance Program is designed to help Employees maximize their health and effectiveness both at work and at home. Through the

KE 34489932

Employee Assistance Program, Employees can obtain confidential support for a wide range of issues, including child care and parenting, elder care, marital or relationship issues, stress or depression, alcohol or substance abuse, work-life balance issues, legal resources, financial resources, and gambling problems.  The Debtors provide their Employees with unlimited phone consultations and five face-to-face counseling sessions each for Employees and their family members per situation.  The cost of the Employee Assistance Program is included in the annual amounts the Debtors pay on behalf of the Health Plans.

    **4.**       **Disability Programs, Workers' Compensation, and Other Insurance Programs.**

    **a.**       **Short-Term Disability Plan.**

47.    The Debtors provide all full-time Employees with a short-term disability plan (the "Comprehensive Disability Plan") administered by Cigna.  The Comprehensive Disability Plan protects against loss of income from short-term disabilities.  Once an absence from work due to a qualifying illness or injury exceeds 14 days, a participating Employee becomes eligible for the Comprehensive Disability Plan and is able to receive between 50 and 70 percent of pay, depending on level of employment, until 24 weeks have elapsed or when the Employee recovers, whichever occurs first.  Approximately 250 of the Debtors' Employees currently are receiving payments under the Comprehensive Disability Plan.  The Debtors provide this benefit to their Employees at no cost but hourly and non-management employees are able to "buy-up" their coverage amounts so that they will receive a higher percentage of pay in the event of a short term disability.  The Debtors' total monthly cost to provide the Comprehensive Disability Plan is approximately $375,000.  As of the Petition Date, the Debtors believe they owe approximately $100,000 on account of the Comprehensive Disability Plan, all of which will become due and owing within the first 21 days of these chapter 11 cases.

KE 34489932

### b.    Long-Term Disability Plan.

48.    The Debtors provide Employees with a long-term disability plan (the "Long-Term Disability Plan") administered by Cigna.  The benefits under the Long-Term Disability Plan kick in when the Short-Term Disability benefits wear off:  after 26 weeks of continuous qualifying injury or illness.  The Long-Term Disability Plan provides employees with 50 to 60 percent of their pay at no cost with up to an additional 10 percent of coverage available at cost depending on the employment level.  As a fully-insured plan, the Long-Term Disability Plan does not require the Debtors to make payments on account of claims, so the Debtors do not have any current or contingent liabilities on account of the Long-Term Disability Plan as of the Petition Date.

### c.    Workers' Compensation.

49.    The Debtors maintain workers' compensation insurance for Employees at the statutorily required level in each state in which the Debtors conduct business (the "Workers' Compensation").    The Debtors' Workers' Compensation insurance is currently provided by a captive insurance provider wholly owned by CEC (the "Captive").    Safety National is used by the Captive for claims that exceed the captive amount.  Costs associated with the Workers' Compensation program are borne by the Captive on a profit-neutral basis and are paid by the Captive on an annual basis.  Costs are then allocated among the Debtors and their non-Debtor affiliates by CES.  The Debtors pay their share of the Workers' Compensation premiums, and any claims related thereto, on a monthly basis according to a performance-based allocation method that is calculated annually (the "Insurance Allocation").  For 2014, the Debtors' total allocation for costs associated with Workers' Compensation was approximately $20.2 million.

21

50.     To ensure that the Debtors comply with applicable workers' compensation laws and requirements, the Debtors request authority, but not direction, to continue making their share of payments through the Insurance Allocation so that claim assessment, determination, adjudication, and claim payment can continue without regard to whether such liabilities are outstanding before the Petition Date.[6]

### d.     Business Travel Accident Insurance.

51.     The Debtors provide all Employees who travel more than 50 miles for work-related purposes business travel accident insurance (the "BTA Insurance") through AIG at no cost to eligible Employees.  The BTA Insurance program is run through the Captive and the premium is $30,000 per year, a portion of which is borne by the Debtors and spread among the Debtors' properties using the Insurance Allocation.  The BTA Insurance provides varying amounts of coverage for different Employees based on each Employee's position with the company, subject to a $2 million maximum payment, for any deaths or injuries suffered by Employees due to an accident while traveling on business for the Debtors.  The BTA Insurance is paid one year in advance and as a result the Debtors do not currently owe any amounts on account of the BTA Insurance.

### e.     Basic Life and Accidental Death and Dismemberment Insurance.

52.     The Debtors provide basic life and accidental death and dismemberment insurance (the "Basic Life and AD&D Insurance") along with the option to purchase additional levels of coverage.  Aetna, Inc. ("Aetna") is the plan administrator for all hourly, salaried, and most management Employees while Minnesota Life and Health Insurance Guaranty Association

---

[6]     Certain of the Debtors' Workers' Compensation may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder.  By the Wages Motion, the Debtors request authority to continue the Workers' Compensation postpetition, including making any changes to current policies and practices that become necessary.

KE 34489932

("Minnesota Life") is the plan administrator for senior management Employees.  The base level

of insurance provided by the Debtors is one year's base pay (subject to a $50,000 cap for

employees covered under the Aetna plan and $500,000 for employees covered under the

Minnesota Life plan) with options to increase coverage in $50,000 increments up to $500,000

and then $100,000 increments up to $2 million.  As of the Petition Date, the Debtors do not

believe they owe any amounts on account of Basic Life and AD&D Insurance.

### 5.    Paid Time Off and Other Leaves of Absence.

### a.    Paid Time Off.

53.    To ensure ample time to their Employees to rest and rejuvenate, the Debtors

provide Employees the ability to work with their supervisor to schedule paid time off for

vacations, special days off, illness/wellness, or alternative dates for celebrating holidays (the

"PTO").[7]  PTO is available to all part-time and full-time hourly and salaried non-Union

Employees and is awarded to each Employee on his or her employment anniversary date.  The

amount of PTO days awarded is based on the number of regular hours worked since the previous

award date, with overtime hours and PTO days taken into account.  Experienced hires are

generally given an amount of PTO at the start of their employment that is commensurate with

their level of experience in the industry.  Employees who average less than 40 hours per week

will receive a pro-rated amount of PTO based on tenure and the hours worked since their last

award date.  The following table lists the PTO awarded to Employees who have worked an

average of 40 hours a week since their last award date:

| Length of Service | Time Off Awarded |
| --- | --- |
| < 6 months | Paid for Holidays |
| 6 months | 10 days  (80 hours) |
| 1 - 4 years | 19 days  (152 hours) |

---

[7]    Employees given Vacation Time (as defined herein) also receive three (3) paid sick days per year.

| Length of Service | Time Off Awarded |
|---|---|
| 5 -11 years | 24 days  (192 hours) |
| 12+ years | 29 days  (232 hours) |

54.     The Debtors provide vacation time to certain management level Employees in lieu of PTO (the "Vacation Time").  Vacation Time for these Employees is awarded on January 1 of each year and is pro-rated for new hires.  The Vacation Time is awarded based upon tenure as detailed below:[8]

| Length of Service | Time Off Awarded |
|---|---|
| < 1 year | 2 weeks |
| 1 - 3 years | 3 weeks |
| 4 - 13 years | 4 weeks |
| 14+ years | 5 weeks |

55.     The majority of the Debtors' Union Employees are subject to the Debtors' PTO policy.  Certain of the Debtors' Union Employees, however, participate in vacation or paid time off plans that are detailed in their applicable CBAs (the "Union Vacation Plans").  The Union Vacation Plans do not materially differ from the PTO or Vacation Time programs: Employees in the Union Vacation Plans are provided a certain number of days off each year with that number increasing as the applicable Employee increases his or her tenure with the Debtors (the "Union Vacation Time").

56.     When PTO or Vacation Time (including Union Vacation Time) is used, Employees are paid at their regular salaried or hourly rates.  PTO and Vacation Time obligations of the Debtors generally are satisfied by Employees' using such time during the course of their employment.  In general, unused PTO and Vacation Time does not carry over past Employees' anniversary dates.

---

[8]     Experienced hires are generally given an amount of Vacation Time at the start of their employment that is commensurate with their level of experience in the industry.

KE 34489932

57.     In some states, however, including California, Illinois, and Louisiana, state law requires that Employees must be able to cash out their unused PTO and/or Vacation Time upon the termination of their employment with the Debtors.  In addition, some of the Union Vacation Plans provide Employees covered under such plans with the ability to cash out their unused but accrued Union Vacation Time.  As of the Petition Date, the Debtors' estimate that they owe approximately $16 million in unused but accrued PTO and Vacation Time (including Union Vacation Time) for those Employees who are able to cash out such time upon termination or retirement.

### b.      Bereavement.

58.     Full-time Employees may receive up to three consecutive paid days to attend funerals and attend to personal matters following the death of family members ("Bereavement Time").  Employees who have not yet been with the Debtors for 90 days may be granted unpaid time off at the discretion of their manager.

### c.      Jury Duty.

59.     In order to allow Employees to meet their civic responsibility, the Debtors allow any full-time Employee who is called to serve on a jury to receive jury duty pay, which is the difference between regular pay and the pay offered by the court (the "Jury Duty Program").  This special payment is made for any days the employee would have normally been scheduled to work.  The Debtors will pay jury duty pay for the duration the Employee is serving as a juror. Employees are eligible for jury duty pay their first day of employment.  Payments made to Employees on account of jury duty pay are processed through the regular payroll system and are included in the total amount of Unpaid Compensation discussed above.

KE 34489932

### d.    Leaves of Absence.

60.    The Debtors provide eligible Employees who need extended time to attend to certain family, medical, military, or personal needs with unpaid leave (the "Leaves of Absences").    Personal leaves of absence are granted depending on business needs and management approval, while military leaves of absence are granted based on military orders. The following is a summary of the various types of leave offered to eligible Employees:

| Type of Leave | Eligibility | 90 Days to 1 Year of Employment | 1 - 5 Years of Employment | 5+ Years of Employment |
|---|---|---|---|---|
| **Family/ Medical Leave of Absence (FMLA)** | 1 year of service in the past 7 years and 1,250 hours of work in prior calendar 12-month period | N/A | Up to **12 weeks** *(in a rolling 12-month period)* | Up to **12 weeks** *(in a rolling 12-month period)* |
| **Family/Medical Military Caregiver Leave (FMMCL)** | 1 year of service in past 7 years and 1,250 hours of work in prior calendar 12-month period | N/A | Up to **26 weeks** *(in a rolling 12-month period)* | Up to **26 weeks** *(in a rolling 12-month period)* |
| **Same Sex Domestic Partner Leave (SSDPL)** | 1 year of service in past 7 years and 1,250 hours of work in prior calendar 12-month period | N/A | Up to **12 weeks** *(in a rolling 12-month period)* or up to **26 weeks** as military caregiver | Up to **12 weeks** *(in a rolling 12-month period)* or up to **26 weeks** as military caregiver |
| **Caesars Medical Leave (HML)** | Full-time employees with at least 90 days of service | Up to **6 weeks** | N/A *(see FMLA above)* | Up to **14 weeks** |
| **Personal Leave of Absence (PLOA)** | Full or part-time employees with 90 days of service and satisfactory work performance | Up to **6 weeks** | Up to **6 weeks** | Up to **6 weeks** |
| **Military Leave of Absence (MiLOA)** | Immediately | Full- and part-time employees may be granted Leave with the proper documentation for up to five (5) years. | | |

### 6.    Employee Savings and Retirement Plans.

### a.    Qualified Defined Contribution 401(k) Plan.

61.    All Employees who have been with the Debtors for at least 90 days are eligible to participate in a 401(k) savings plan (the "401(k) Plan") sponsored by CES and administered by

an affiliate of Aon plc ("Aon"), through which Employees may contribute up to half of their annual pay to the 401(k) Plan subject to the annual Internal Revenue Service ("IRS") limits for contributions and eligible compensation (the "Employee 401(k) Contributions").  Each week the Debtors withhold approximately $1.1 million in Employee 401(k) Contributions and forward this amount to CES, which sends the 401(k) Contributions to Aon, the trustee of the 401(k) Plan.

62.     The Debtors match 50 percent of the Employees' 401(k) Contributions up to 6 percent of each Employee's base pay (the "401(k) Matching"), subject to a $600 annual cap. Matched funds are deposited directly in Employees' 401(k) accounts in March following the year such contributions were made.  The Debtors estimate that they (or CES on behalf of the Debtors using Debtor funds) will deposit approximately $7.5 million on account of Employee matches in April 2015 for contributions made throughout 2014.  Employees vest into their matched amounts at a rate of 20 percent per year and are fully vested after 5 years of service with the Debtors.

### b.     Defined Benefit Pension Plans.

63.     The Debtors contribute to a number of multi-employer defined benefit pension plans (the "Pension Plans") under the terms of the CBAs that cover the Union Employees. While the Debtors are required to make contributions to the Pension Plans in amounts established under the CBAs, the Pension Plans are not administered by the Debtors.  The Debtors' contributions to the Pension Plans totaled approximately $22.5 million in 2014.  Upon the termination of a Pension Plan, or in the event of a withdrawal from the Pension Plan by the Debtors, the Debtors would be required to make payments to the Pension Plan for the Debtors' proportionate share of the Pension Plan's unfunded vested liabilities (if any). This could require the Debtors to contribute an amount under a plan of rehabilitation or surcharge assessment that would have a material adverse impact on the Debtors' financial condition and cash flow.

27

### c.      Deferred Compensation Plans.

64.      The Debtors utilize five deferred compensation plans (collectively, the "Deferred Compensation Plans"), none of which remain open for additional deferral investments. The Deferred Compensation Plans allowed certain key employees, including executive officers, to make deferrals of specified percentages of salary and bonus.   The Deferred Compensation Plans are intended to allow retirement benefits for participants whose participation in the 401(k) Plan is limited because of certain IRS regulations. Under the Deferred Compensation Plans, deferred compensation amounts are placed into certain Rabbi trusts for the benefit of the participants and disbursement from these trusts are made to the participants upon retirement or separation from the Debtors.   Returns are based on fixed or variable rates, depending upon the plan and certain investment decisions made by the participant.   Employed participants' distribution election(s) will be honored when their employment ends.   Those participants no longer with the Debtors that have participated in any of the Deferred Compensation Plans are paid based on their distribution election until the deferred payments have been fully distributed.

65.      The Deferred Compensation Plans have approximately 280 participants, including approximately 165 current employees, and the Rabbi trusts currently have assets of approximately $125 million and liabilities of approximately $90 million.   CEC has the reversionary beneficial interest in the Rabbi trusts.

### 7.      Employee Recognition and Reward Programs.

66.      The Debtors believe it is important to recognize and reward outstanding Employees in every part of their organization.   As part of the Debtors' "Pay for Results" recognition efforts, the Debtors have established several programs (the "Employee Recognition and Rewards Programs") designed to reward and recognize Employees at every level who demonstrate a high commitment to fulfilling the needs of customers, delivering a great user

28

experience, and attaining certain position-specific performance goals. The Debtors believe the

Employee Recognition and Rewards Programs, discussed more fully below, help their

Employees develop skills, create confidence, and boost morale. "Insiders" are not eligible to

participate in any of the Employee Recognition and Rewards Programs.

### a.    Total Return Program.

67.    The Debtors offer a quarterly performance award program to all property-level

Employees at the Debtors' casino and resort facilities (the "Total Return Program"). The Total

Return Program operates on a property-by-property basis and is based on certain customer

experience metrics. An affiliate of Maritz Holdings Inc. ("Maritz") administers the Total Return

Program. Employees receive awards through the Total Return Program in the form of virtual

currency ("Total Return Credits"), which can then be exchanged for certain items and goods on a

website portal managed by Maritz (the "Maritz Platform"). The Debtors accrue an accounting

liability when the Total Return Credits are delivered to the Employees' accounts on the Maritz

Platform, which is generally one month after the end of each calendar quarter, and record a cash

expense when the Total Return Credits are used through the Maritz Platform to make a purchase.

68.    In 2014, the Debtors paid approximately $6 million on account of the Total

Return Program. Because the Total Return Program is the main employee recognition and

reward program, its continued operation and availability is critical to supporting and enhancing

Employee morale. Accordingly, although the Debtors believe all amounts have been paid to

Maritz as of the Petition Date, the Debtors request authority, out of an abundance of caution and

on a final basis only, to process any unpaid amounts that they may discover.

### b.    Pay for Results Program.

69.    The Debtors offer annual cash bonuses for the highest-rated hourly and salaried

non-management Employees (the "Pay for Results Program"). Approximately 30 percent of the

Debtors' hourly and salaried non-management Employees are rewarded through the Pay for Results Program. For salaried Employees, the annual award is 3 percent of the eligible Employee's salary, and for hourly Employees, the annual award is $500. Payments under the Pay for Results Program are delivered on April 1 for salaried Employees and on September 30 for hourly Employees. Historically, the Debtors pay approximately $2.7 million per year on account of the Pay for Results Program. Because the review and payment process for hourly Employees has recently concluded and not yet begun for the salaried Employees, the Debtors do not currently owe any amounts to Employees under this program. The Debtors are nonetheless seeking approval, out of an abundance of caution, to continue the Pay for Results Program in the ordinary course on a final basis.

### c.   Sales Incentive Program and Miscellaneous Programs.

70.     The Debtors run a program for their sales team designed to ensure the Debtors meet or exceed certain sales-related financial goals, reward Employees who demonstrate significant levels of achievement, and attract and retain the Debtors' highest-performing Employees (the "Sales Incentive Program"). Eligible Employees earn awards under the Sales Incentive Program when they achieve certain position-specific goals that are directly tied to certain sales metrics, including monthly hotel room book rates, convention and event bookings, and group bookings. Awards under the Sales Incentive Program are calculated by the Debtors on a quarterly basis, with payments made to Employees within 60 days of the end of each quarter. Eligible Employees must be employed by the Debtors at the time awards for the Sales Incentive Program are distributed to qualify for such awards.

71.     In addition to the Sales Incentive Program, the Debtors employ various discretionary programs to reward and incentivize non-management property-level Employees (the "Miscellaneous Awards"). These Miscellaneous Awards programs include certain

"employee of the month" awards, project-based awards, and other one-time discretionary awards. The Debtors spent approximately $26.5 million on account of the Sales Incentive Program and Miscellaneous Awards in 2014. Out of an abundance of caution, the Debtors seek authority on a final basis to continue the Sales Incentive Program and Miscellaneous Awards in the ordinary course.

### 8.    Other Benefit Programs.

72.    The Debtors provide a myriad of other miscellaneous benefits to Employees, including  an educational assistance program, a relocation program, a transportation program, and certain programs for retired and former employees (collectively, the "Other Benefit Programs").

### a.    Educational Assistance Program.

73.    The Debtors offer educational assistance to all full-time Employees who have completed at least six months of employment (the "Educational Assistance Program"). Under the Educational Assistance Program, the Debtors reimburse eligible Employees for up to 90 percent of tuition costs (subject to annual caps of $3,000 for undergraduate coursework and $4,000 for graduate coursework) at an accredited college or university. In order to qualify for the Educational Assistance Program, courses taken must be related to the Debtors' business or the Employee's job or prepare the Employee for greater responsibility within the Debtors' business. In addition, Employees need to earn a "C" or better grade for undergraduate coursework or a "B" or better grade for graduate-level coursework in order to qualify for reimbursement. Employees who have successfully completed their coursework must then submit paperwork to their applicable human resources contact with evidence of their satisfactory grades. Once this paperwork is approved, the Debtors will fund the reimbursement through the next payroll cycle for that Employee. In 2014, the Debtors spent approximately $250,000 on the

KE 34489932

Educational Assistance Program.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Educational Assistance Program.

### b.    Relocation Program.

74.    The Debtors provide their Employees with various levels of relocation assistance depending on an Employee's level of compensation (the "Relocation Program").  Specifically, the Relocation Program provides eligible Employees with home sale assistance, home finding and temporary living assistance, home purchase assistance, rental assistance, moving and household transportation assistance, and employee and family transition assistance.  In 2014, the Debtors spent approximately $2 million on account of the Relocation Program.  In 2015, the Debtors estimate they will spend substantially less—approximately $1.5 million—on account of the Relocation Program because most of the Employees who typically make use of this program are now employed by non-Debtor CES.  As of the Petition Date, the Debtors do not believe they owe any amounts on account of the Relocation Program.

### c.    Transportation Program.

75.    In addition to free parking, the Debtors provide certain Employees access to transit vouchers and bus passes for use on public transportation (the "Transportation Program").  The Employees pay for the transit vouchers and bus passes directly so there is no cost to the Debtors.  Accordingly, as of the Petition Date, the Debtors do not owe any amounts on account of the Transportation Program.

**III.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Their Cash Management System, (B) Maintain Their Existing Bank Accounts and Business Forms, and (C) Continue Intercompany Transactions, and (II) Granting Related Relief (the "Cash Management Motion").**

76.    The Debtors maintain and direct an integrated Cash Management System as part of the ordinary course of their businesses that allows them to efficiently collect, transfer, and

KE 34489932

disburse funds generated by their multifaceted casino, gaming, hotel, and entertainment operations. The Cash Management System is vital to the Debtors' ability to conduct business at their owned and managed casinos or gaming operations throughout the United States and Canada. Indeed, the integrated Cash Management System helps control funds, serves as a repository for cash receipts, manages cash disbursements, ensures cash availability for each of the Debtors, and reduces overhead expenses by facilitating the movement of funds among multiple entities by generally centralizing cash operations from a central location. Further, the Debtors' heavily regulated business relies on the existing Cash Management System to comply with certain government regulations. Moreover, the Cash Management System generally is similar to those commonly employed by complex businesses comparable to that of the Debtors.

77.     Given the economic and operational scale of the Debtors' operations, I believe that any disruption to the Cash Management System would have an immediate adverse effect on the Debtors' business and operations to the detriment of their estates and numerous stakeholders. Accordingly, to minimize the disruption caused by these chapter 11 cases and to maximize the value of the Debtors' estates, the Debtors request authority to continue to utilize their existing Cash Management System during the pendency of these chapter 11 cases, subject to the terms described herein.

### A.     Description of the Cash Management System.

### 1.     The Bank Accounts.

78.     The Cash Management System consists of 167[9] active operating bank accounts (collectively, the "Bank Accounts") maintained by the Debtors at twelve U.S. banks and

---

[9]     This total number of Bank Accounts is inclusive of twenty-seven disbursements, receipts, and other Bank Accounts related to certain of the Debtors' closed or sold casino resort properties. As of the Petition Date, these Bank Accounts hold approximately $455,000. These Bank Accounts are not otherwise described herein.

KE 34489932

three foreign banks (collectively, the "Banks").   The Cash Management System includes the

following Banks and Bank Accounts:   (a) seventy-eight Bank Accounts at Wells Fargo Bank,

N.A. ("Wells Fargo"); (b) twenty-nine Bank Accounts at Bank of America, N.A. ("BofA");

(c) ten Bank Accounts at First Tennessee Bank ("First Tennessee"); (d) three Bank Accounts at

First Midwest Bank ("First Midwest"); (e) fifteen Bank Accounts at Capital One Bank (USA)

N.A. ("Capital One"); (f) one Bank Account at First Savings Bank f/k/a Farmers State Bank

("First Savings");   (g) seven Bank   Accounts   at JPMorgan   Chase   Bank, N.A.   ("JPM");

(h) eleven Bank Accounts at U.S. Bank, N.A. ("U.S. Bank"); (i) two Bank Accounts at People's

Bank; (j) three Bank Accounts at BMO Harris Bank ("BMO"); (k) one Bank Account at Pitney

Bowes Reserve Bank ("Pitney Bowes"); (l) one Bank Account at Citibank, N.A. ("Citi");

(m) two Bank Accounts at Canadian Imperial Bank of Commerce ("CIBC"); (n) two Bank

Accounts at Scotia Bank ("Scotia"), and (o) two Bank Accounts at Mizuho Bank ("Mizuho").

As discussed more fully below, 154 of the 167 Bank Accounts are maintained with Banks

designated as authorized depositories by the Office of the United States Trustee for the Northern

District of Illinois, Eastern Division (the "U.S. Trustee"), pursuant to the U.S. Trustee's

Operating Guidelines and Financial Reporting Requirements for Debtors-in-Possession and

Trustees (the "U.S. Trustee Guidelines").   A schedule of the Bank Accounts is attached as

**Exhibit 2** to the Interim Order attached to the Cash Management Motion.

79.     Generally, and as more fully described below, the Bank Accounts are organized

as follows:[10]

---

[10]   For the avoidance of doubt, certain of the following Bank Accounts are used to receive, concentrate, and
disburse funds, including certain of the Receipts Accounts and the Concentration Accounts (each as defined
herein).

KE 34489932

- "Receipts Accounts" include:

    - sixty Casino Property[11] specific Bank Accounts established to, among other things: (a) receive credit card payments, wire transfers, checks, and cash funds, which accounts then transfer amounts to the Property Concentration Account (as described herein) (collectively, the "Property Depository Accounts"), (b) pool tips at Casino Properties for the benefit of employees (the "Toke Deposit Accounts"), (c) comply with state-specific obligations required by regulatory requirements to maintain licenses (the "Gaming Taxes Accounts"), (d) hold funds related to horse- and dog-racing wagers, purses, and related activities (the "Racing Accounts"), and (e) send and receive funds for certain foreign customers in connection with gaming operations at the Casino Properties ("Foreign Transfer Accounts");

    - two operating Bank Accounts with CIBC, one depository Bank Account with Scotia Bank, and one depository Bank Account with Wells Fargo, each in the name of Debtor Caesars Entertainment Windsor Limited ("CEWL," and such Bank Accounts, the "CEWL Operating Accounts"); and

    - two operating Bank Accounts with BofA, each in the name of Debtor Hole in the Wall, LLC ("HITW," and such Bank Accounts, the "HITW Operating Accounts").

- "Concentration Accounts" include:

    - three primary operating Bank Accounts in the name of CEOC, one each with Wells Fargo, BofA, and First Tennessee (the "Main Operating Accounts"), of which the Wells Fargo Main Operating Account is subject to a control agreement with the Debtors' first lien secured creditors;

    - one operating Bank Account in the name of CEOC with U.S. Bank (the "CEOC U.S. Bank Account"), which is subject to a control agreement with the Debtors' first lien secured creditors; and

    - twenty-six Casino Property concentration Bank Accounts (collectively, the "Property Concentration Accounts"), including (i) twelve automatic transfer zero balance accounts with Wells Fargo and two automatic transfer zero balance accounts with First Tennessee (collectively, the "Automatic Concentration Accounts") and (ii) three manual transfer accounts with U.S. Bank, one manual

---

[11]   The "Casino Properties" (each, a "Casino Property") collectively are comprised of the following gaming hospitality facilities, each of which is owned by the Debtors:  (a) Bally's Atlantic City; (b) Caesars Atlantic City; (c) Caesars Palace Las Vegas; (d) Harrah's Council Bluffs; (e) Harrah's Gulf Coast; (f) Harrah's Joliet; (g) Harrah's Lake Tahoe; (h) Harrah's Louisiana Downs; (i) Harrah's Metropolis; (j) Harrah's North Kansas City; (k) Harrah's Reno; (*l*) Harvey's Lake Tahoe; (m) Horseshoe Bossier City; (n) Horseshoe Council Bluffs; (o) Horseshoe Hammond; (p) Horseshoe Southern Indiana; (q) Horseshoe Tunica; and (r) Tunica Roadhouse Hotel & Casino.

transfer zero balance accounts with BofA, two manual transfer accounts with Capital One, two manual transfer accounts with JPM, two manual transfer accounts with People's Bank, one manual transfer account with First Midwest, and one manual transfer account with BMO Harris (collectively, the "Manual Concentration Accounts").

- "Disbursement Accounts" include:

  - one master funding Bank Account in the name of CEOC with Wells Fargo (the "Master Funding Account");

  - twenty-six Casino Property disbursement Bank Accounts, twenty-four with Wells Fargo and one with Capital One (the "Casino Disbursement Accounts");

  - two dormant disbursement Bank Accounts in the name of CEOC with Wells Fargo, which are pending closure; and

  - five cash Bank Accounts in the name of CEOC, each with JPM, established to fund employee benefits for the Debtors, CERP, and CGP, and one cash Bank Account in the name of CEOC with Citi, established for purposes of the Debtors', CERP's, and CGP's disability insurance program (collectively, the "Employee Benefit Accounts").

- Miscellaneous cash collateral accounts include:

  - one cash reserve Bank Account for the Debtors' direct mail marketing expenses in the name of CEOC with Pitney Bowes (the "Postage Account");

  - one cash collateral Bank Account for the Debtors' purchasing cards ("P-Cards") in the name of CEOC with Wells Fargo (the "P-Card Account"); and

  - one escrow Bank Account (currently unfunded) in the name of Caesars Operating Escrow LLC with Wells Fargo.

- Other miscellaneous accounts include:

  - one depository Bank Account in the name of Caesars World Merchandising, Inc. with Wells Fargo (the "Online Purchases Account"); and

  - four deferred compensation Bank Accounts in the name of CEOC, each with Wells Fargo (the "Deferred Compensation Accounts").[12]

---

[12]   The Deferred Compensation Accounts were established for certain of the Debtors' current and former upper management employees, and all amounts placed in such accounts are deferrals of such employees' salary and bonuses. The Debtors do not fund the Deferred Compensation Accounts and they do not remain open for additional deferral investments.

80.     CES is a shared services joint venture among CEOC, CERP, and Caesars Growth Properties Holdings, LLC ("CGPH").  Pursuant to agreements among the parties, CES makes certain payments on behalf of the joint venture entities.  Specifically, and as further described herein, CES satisfies certain of the ordinary course obligations of the Debtors (and CGP and CERP), including employee payroll, much of the Debtors' accounts payable, and CEOC's allocable share of costs associated with enterprise-wide goods and services.  As and when needed, CEOC manually funds amounts due or owed to CES to an independent concentration account maintained by CES (the "CES Concentration Account").  The CES Concentration Account is outside the Debtors' cash management system but is nevertheless described herein given the magnitude of the Debtors' disbursements that flow through CES.

### 2.      Casino Cage.

81.     Each Casino Property maintains a physically secured area (the "Casino Cage") to support its ongoing gaming operations.  The Casino Cage is a centralized location for receipts and disbursements related to the Debtors' gaming and casino operations.  Thus, the Casino Cage performs customer transactions, including, but not limited to, chip redemptions for cash, jackpot payouts, cash advances on credit cards, and check cashing.  Each Casino Property must maintain adequate funds in the Casino Cage both for regulatory requirements and to fund expected levels of cash demand at any given time.  The amount of cash fluctuates based on the day of the week, the seasonality of each Casino Property's gaming business, and the occurrence of major attractions or events.  The cash held in the Casino Cage is not subject to any liens or encumbrances.

### 3.      Non-Debtor Subsidiary Bank Accounts.

82.     CEOC indirectly owns certain non-Debtor subsidiaries.  These non-Debtor subsidiaries own certain U.S. and foreign casino resort properties.  Specifically, (a) Debtor

Harrah's Chester Downs Investment Company, LLC owns a 99.5 percent interest in non-Debtor subsidiary, Chester Downs and Marina, LLC, which owns Harrah's Philadelphia in Chester, Pennsylvania, (b) CEOC, through an indirect non-Debtor subsidiary (Caesars Ohio Investment, LLC), is a 20 percent minority owner in a non-Debtor joint venture, Rock Ohio Caesars, LLC, which indirectly owns Horseshoe Cleveland, Horseshoe Cincinnati, ThistleDown Racino, and Turfway Park, and (c) Debtor Harrah's Bossier City Investment Company, LLC owns 49 percent of the equity interest in LAD Hotel Partners, LLC, which owns a Springhill Suites in Bossier, Louisiana.  The bank accounts for Harrah's Philadelphia, Horseshoe Cleveland, Horseshoe Cincinnati, and the Springhill Suite in Bossier are not in the Cash Management System; they are operated separately or are not under CEOC's direct or indirect control.

83.    The Debtors' foreign non-Debtor subsidiaries also have their own cash management operations and maintain bank accounts separate and apart from the U.S.-based Cash Management System.  The non-Debtor foreign subsidiaries would only contribute cash to the U.S. Cash Management System if the Debtors direct the non-Debtors to contribute cash to the U.S. Bank Accounts; the Debtors do not regularly repatriate this cash.  This foreign cash is not subject to the Debtors' secured lenders' and noteholders' liens.  In addition, and as described more fully below, (a) the Debtors send and receive funds related to their gaming operations to certain of their foreign non-Debtor subsidiary bank accounts and/or foreign customer accounts in connection with foreign customer gaming at certain Casino Properties and (b) the Debtors provide credit and working capital support for foreign non-Debtor subsidiary London Clubs International Limited ("LCI") through the LCI Revolver (as defined herein).

### 4.    The Flow of Funds within the Cash Management System.

84.    The funds flow diagram, which is attached as **Exhibit 1** to the Interim Order attached to the Cash Management Motion (the "Funds Flow Diagram"), is a detailed diagram

setting forth the flow of funds among the Bank Accounts.  As set forth in the Funds Flow Diagram, the Cash Management System has three main components: (a) receipt of funds, (b) cash concentration, and (c) cash disbursements to fund the Debtors' operations.  Each of these components will be described in turn.

### a.    Receipts/Collection.

85.    The Debtors generate revenue from a number of sources, and funds enter the Cash Management System at both the Casino Property level and directly at CEOC.  The Debtors' revenues generally flow into (a) as applicable, each Casino Property's Property Depository Accounts or Property Concentration Account, (b) one of the three Main Operating Accounts, (c) the Online Purchases Account, (d) the CEWL Operating Accounts, and (e) the HITW Operating Accounts, as follows:

- Gaming Revenue.  A significant portion of the Debtors' revenue is derived from their gambling operations at the Casino Properties.  More specifically, the Debtors earn income from their casino gaming operations.  Each Casino Property collects receipts via check, cash, wire transfer, ACH payments, or credit card charges.  Gaming revenue is generally processed as follows:

  - Certain Casino Properties receive all of these payments, including credit card payments, checks, ACH payments, and wire transfers, directly into the Property Concentration Account.

  - Certain other Casino Properties receive these payments to specific Property Depository Accounts, such as accounts that are set up exclusively for credit card deposits, and then those accounts are automatically swept to the applicable Property Concentration Account each night.

  - After daily balancing and audit procedures are completed at each Casino Property, a daily deposit is prepared for all checks received and any excess cash not needed for daily activity in the applicable Casino Cage.  This deposit is made to either the relevant Property Depository Account (if applicable) or Property Concentration Account.  An armored car service is used to make the deposits due to the large amount of cash involved.

  - Credit card charges are batched and transmitted daily to the applicable credit card processor.  Certain Casino Properties have credit cards fees debited separately from the daily credit card settlement, while other Casino Properties will receive

their funds net of processing fees.  The time that it takes for the Casino Property to receive these funds in the applicable Property Depository Account or Property Concentration Account varies by Casino Property and credit card processor, among other things.

- Other Casino Property Revenue.  The Debtors' Casino Properties offer entertainment and hotel options other than casino gaming.  For example, Casino Properties earn revenue from restaurants, hotels, and retail located on their properties either directly, through ownership of those assets, or through rent payments.  In addition, Casino Properties host concerts and other events, in which the Casino Property derives revenue from the tickets sold and concessions.  The Casino Properties collect this revenue in much the same fashion that they collect gaming revenue, and this revenue ultimately is deposited in either the relevant Property Depository Account (if applicable) or Property Concentration Account.

- Management Fees.  CEOC is party to management services agreements with third parties (collectively, the "Third-Party Management Agreements") and with certain non-Debtor affiliates (the "Affiliate Management Agreements"), including, among others, (a) CES, (b) CEC, (c) CERP, and (d) CGP.  Pursuant to the Third-Party Management Agreements, CEOC receives wire payments from the applicable third-party property owner on a monthly basis; the wire payment is sent directly to one of the Main Operating Accounts (depending on the terms of the Third-Party Management Agreement).  Pursuant to the Affiliate Management Agreements, CEOC reconciles its books and records on a monthly basis and after netting for the amounts CEOC owes to the applicable non-Debtor related to Contract Revenue (as defined herein) and any other payables from CEOC to such property owner, the relevant management fee is processed and transferred to one of the Main Operating Accounts (depending on the terms of the Affiliate Management Agreement).

- Contract Revenue.  CEOC is party to a number of contracts with various third-party vendors, including on behalf of the Debtors and non-Debtor subsidiaries and affiliates (including CGP and CERP), that result in certain fees or other income to the Debtors and their affiliates (collectively, the "Contract Revenue").  Such contracts include, among other things, agreements with automated teller machine ("ATM") and cash access providers.  Customers are charged fees for ATM withdrawals and cash advances at casino properties throughout the Caesars enterprise and the applicable property earns income from such transactions.  The applicable third-party ATM vendor makes payment directly to CEOC by check, ACH payment, or wire transfer for fee income earned across the Caesars enterprise, which the Debtors track in their books and records and allocate to the appropriate property owner.  Contract Revenue is held by the Debtors in the Main Operating Accounts until CEOC reconciles its books and records on a monthly basis and nets such Contract Revenue against amounts owed to the Debtors pursuant to the Affiliate Management Agreements.

- Convention and Event Revenue.  The Casino Properties host conventions and other events, which require the event organizer to pay the Debtors for the use of the Debtors' convention space at the Casino Properties, including deposits related to such

40

use and, in certain circumstances, the reservation of blocks of hotel rooms. Generally, payments for these events are sent either by check or wire deposited directly to one of the Main Operating Accounts. The Debtors then credit the applicable Casino Property for such payment or deposit. In certain circumstances, a party may reserve rooms (or an event) at Caesars Palace Las Vegas and reserve space for an event (or rooms) at a property owned by CERP or CGP. In such circumstances, the Debtors track the deposit in their books and records and these amounts are settled as part of the normal month end settlement process.

- <u>CEWL Operating Agreement Fee</u>. CEWL receives a monthly operator fee from Caesars Windsor (in Canada) related to its management of that property, and these funds are placed in the CEWL Operating Accounts. Funds held in the CEWL Operating Accounts generally do not get moved to the U.S. Bank Accounts, and remain in the CEWL Operating Accounts to fund operations, such as making monthly payments to the Canada Revenue Agency and, as necessary, payments to auditors.

- <u>Batista's Restaurant Revenue</u>. HITW operates a restaurant under the name Batista's Hole in the Wall, and collects payment for its services via check, cash, or credit card charges, and these funds are placed in the HITW Operating Accounts. The Debtors may manually move funds held in the HITW Operating Accounts to the Main Operating Accounts on an as needed basis. Funds held in the HITW Operating Accounts are used to pay employees, vendors, and other expenses related to HITW's restaurant business, and funds have not historically been sent from the Main Operating Accounts to the HITW Operating Accounts.

- <u>Online Purchases Revenue</u>. Debtor Caesars World Merchandising, Inc. formerly received funds from selling Caesars-related merchandise online. These services have been transferred to CES.

86.     In addition to the Receipt Accounts described above, Casino Properties maintain other property-specific Bank Accounts as necessary for their operations, where funds are pooled or segregated for specific purposes:

- <u>Toke Deposit Accounts</u>. The Toke Deposit Accounts hold cash and credit card tips to employees, which are then pooled and paid out through payroll. Funds held in the Toke Deposit Accounts are paid to employees pursuant to Casino Property-specific policies.

- <u>Gaming Taxes Accounts</u>. Where required by state regulatory bodies, the applicable Casino Property deposits a percentage of gaming revenue into the applicable Casino Property's Gaming Taxes Account on a daily basis. The Gaming Taxes Accounts are accounts required by state regulatory bodies to hold funds to pay gaming-related taxes to the applicable state regulatory agency. Funds in the Gaming Taxes Accounts are not intermingled with the other Bank Accounts.

KE 34489932

- Racing Accounts.  The Racing Accounts hold horse and dog racing wagers, race purses, and related-cash obligations at Casino Properties that either host racing activity or permit wagering on racing that occurs at other locations.  Such accounts are subject to state regulations and Casino Property-specific requirements, and Casino Properties that host racing activity, as well as Bluegrass Downs, a Debtor-owned horse racing facility in Paducah, Kentucky, maintain numerous Racing Accounts to meet these requirements.  If a customer's wager is successful, the customer is paid back his or her wager as well as his or her winnings.  For Casino Properties in Nevada, funds related to customer wagers/wins are manually settled on a periodic basis via wire or ACH to the Las Vegas Dissemination Company, a Nevada-licensed systems operator for parimutuel wagering.  For Casino Properties that host racing activity, as well as Bluegrass Downs, customer losses are manually swept into the Property Concentration Account.  In addition, the applicable Casino Property or Bluegrass Downs will periodically sweep funds from the Casino Property's Property Depository Account or Property Concentration Account into the Racing Accounts (including such accounts related to purses) in the event that the Racing Account drops below the required level.

- Foreign Transfer Accounts.  Pursuant to one of the Debtors' customer programs, the Foreign Transfer Accounts send and receive funds to and from, as applicable, certain of the Debtors' foreign non-Debtor subsidiaries' bank accounts to facilitate foreign customer gaming at the Debtors' U.S.-based Casino Properties.  Funds in the Foreign Transfer Accounts are swept into one of the Main Operating Accounts or to the applicable Property Concentration Account.

### b. Cash Concentration.

87.    The concentration of the Debtors' receipts and collections can generally be described as follows:

- Property Concentration Accounts.  As noted above, each Casino Property has a Property Concentration Account.  Certain of the Property Concentration Accounts directly receive funds via cash, check, wire transfer, ACH, or credit card payment, directly from customers, while other Property Concentration Accounts receive funds when such funds are swept (manually or automatically) from, as applicable, the Property Depository Accounts, the Toke Deposit Accounts, the Foreign Transfer Accounts, and the Racing Accounts.  If the Property Concentration Account is an Automatic Concentration Account, the funds in such Bank Account above a "peg amount" are swept at the end of each day into the applicable Main Operating Account.  If the Property Concentration Account is a Manual Concentration Account, the Debtors' treasury department will manually sweep funds from such account into the applicable Main Operating Account multiple times per week.

- Main Operating Accounts.   The three Main Operating Accounts receive funds/revenue directly as described above and also from automatic and manual sweeps from the Property Concentration Accounts.  On an as needed basis and in the

ordinary course of business, the Debtors' treasury department manually sweeps funds between the Wells Fargo Main Operating Account, the BofA Main Operating Account, and the First Tennessee Main Operating Account.  The Debtors use of funds in the Wells Fargo Main Operating Account is subject to a control agreement with the Debtors' first-lien secured creditors.  The Main Operating Accounts are also used to make certain CEOC-level wire and check payments to third-parties and non-Debtor affiliates, including related to the P-Cards and the LCI Revolver, as more fully described below.  Additionally, on an as needed basis and in the ordinary course of business, the Debtors' treasury department manually sends funds from the Main Operating Accounts to the CES Concentration Account in connection with payment of the Debtors' payroll and accounts payable, as more fully described below.  The Debtors historically have also made debt payments from the Main Operating Accounts.

- <u>CEOC U.S. Bank Account</u>.  The CEOC U.S. Bank Account has been funded with funds that the Debtors may use at their discretion, subject to a control agreement with the Debtors' first-lien secured creditors.  Funds are not generally swept in or out of the CEOC U.S. Bank Account, but are available on an as needed basis.

### c.    **Cash Disbursements.**

88.    Other than with respect to certain disbursements by the Main Operating Accounts, the CEWL Operating Accounts, the HITW Operating Accounts, the Gaming Taxes Accounts, and the Racing Accounts described above, the Debtors' cash disbursements are generally made either (a) by CES on behalf of the Debtors out of CES's accounts or (b) directly by the Debtors from their Disbursement Accounts as follows:

- <u>Master Funding Account</u>.  The Master Funding Account is funded by the Main Operating Accounts.   The Master Funding Account then funds the Casino Disbursement Accounts at each Casino Property.

- <u>Casino Disbursement Accounts</u>.  The Casino Properties use the Casino Disbursement Accounts to pay large jackpots directly to customers.  In addition, one of the Casino Disbursement Accounts is a payroll account used to pay Casino Property employees below the level of director and nine Casino Disbursement Accounts are accounts payable accounts that the applicable Casino Properties use on a limited basis to make certain payments to vendors, such as to make payments on cash on demand (or "COD"), deliveries, and certain liquor purchases.

- <u>Employee Benefit Accounts</u>.  The Employee Benefit Accounts are funded by the Main Operating Accounts.  The Employee Benefit Accounts are administered on behalf of all CEC-majority owned U.S. entities, including non-Debtor affiliates CES, CERP, and CGP.  The Employee Benefit Accounts fund CEOC's (and the other

43

entities') health insurance, health benefits, disability, and other similar benefit programs. CEOC is reimbursed at the end of each month after funds expended on behalf of non-CEOC entities are settled.

- Postage Account. The Postage Account, which as of the Petition Date was funded with approximately $200,000, is used as a reserve for funding related to the Debtors' postage costs for various marketing activities. The Debtors prepay the Postage Account and adjust the amount as necessary to reflect increased or reduced marketing activity. Postage Account funds can be drawn by parties if the Debtors do not otherwise directly pay such vendors for the marketing postage costs.

**B.     The Cash Management System's Compliance with the U.S. Trustee Guidelines and Section 345 of the Bankruptcy Code.**

89.     As noted above, 154 of the 167 Bank Accounts are maintained with Banks designated as authorized depositories by the U.S. Trustee. The U.S. Trustee has designated the following Banks that hold Bank Accounts as authorized depositories: Wells Fargo, BofA, First Tennessee, Capital One, JPM, U.S. Bank, BMO, and Citi.

90.     Thirteen Bank Accounts are held at Banks that are not authorized depository institutions under the U.S. Trustee Guidelines. Specifically, (a) in connection with Harrah's Gulf Coast, the Debtors maintain a Property Depository Account and a Property Concentration Account with People's Bank, a local bank in the Biloxi, Mississippi region, which have an average month-end balance of approximately $800,000 during the twelve months prior to the Petition Date; (b) in connection with Harrah's Joliet, the Debtors maintain a Property Concentration Account, a Property Depository Account, and a Toke Deposit Account with First Midwest, a local bank in the Chicago, Illinois region, which have an average month-end balance of approximately $3.2 million during the twelve months prior to the Petition Date; (c) in connection with a golf course related to Horseshoe Southern Indiana, the Debtors maintain a Property Depository Account with First Savings, a local bank in southern Indiana, which has an average month-end balance of approximately $100,000 during the twelve months prior to the Petition Date; (d) in connection with prepaid postage for their marketing operations, the Debtors

44

maintain the Postage Account with Pitney Bowes to ensure their payment of their marketing postage costs; (e) in connection with their customer programs, the Debtors maintain the Foreign Transfer Accounts with, among others, Scotia Bank and Mizuho, which have an average month-end balance of approximately $4.9 million during the twelve months prior to the Petition Date, and (f) in connection with the management of Caesars Windsor, the Debtors maintain one CEWL Depository Account with Scotia Bank and the CEWL Operating Accounts with CIBC, which have an average aggregate month-end balance of approximately $135 million during the twelve months prior to the Petition Date.  The Debtors maintain that each of the Banks are well-capitalized and each of the U.S.-based Banks (and Bank Accounts) are insured by the Federal Deposit Insurance Corporation, and therefore the Debtors can maintain all of the Bank Accounts without jeopardizing any party in interest.  Moreover, each of the Banks is a necessary part of the Cash Management System, and any changes in this system could cause significant disruption to the applicable Casino Property's operations.

91.    In addition, the Debtors' cash is kept in the Bank Accounts and is not invested in any money market or other types of short-term securities.

### C.    Intercompany Transactions.

92.    The Debtors maintain business relationships with each other and with non-Debtor affiliates resulting in intercompany receivables and payables in the ordinary course of business (collectively,  the "Intercompany Claims").    Indeed, such Intercompany Transactions are frequently conducted among Debtors as well as between Debtors and non-Debtor affiliates, such as CES, CEC, CERP, CGP, and other domestic and foreign non-Debtors subsidiaries and affiliates.  Moreover, in connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted among Debtor entities and among the Debtors and their non-Debtor affiliates, at any given time

there may be Intercompany Claims owing by one Debtor to another Debtor or between a Debtor and a non-Debtor affiliate.  Certain Intercompany Claims are settled on a daily basis while others are reflected as receivables and payables, as applicable, in the respective Debtor's or non-Debtor affiliate's accounting systems.  Accordingly, the Debtors can ascertain, trace, and account for all Intercompany Transactions, and will also be able to do so on a postpetition basis.  The Debtors' transactions with their non-Debtor affiliates generally fall into the categories described below.

### 1.    CES Shared Services.

93.    CEOC owns 69 percent of CES, a joint venture between CEOC, CERP, and CGPH.  CES provides services to the Debtors pursuant to a shared services agreement among the parties.  CES provides these services to CEOC and the other joint venture parties on a profit-neutral basis.  Intercompany Transactions between the Debtors and CES generally fall into the following categories:

- <u>Operating Expenses/Corporate Overhead</u>:  CES allocations are based on a complex allocation methodology that primarily takes into account each entity's consumption of CES's services, which allocations are subject to adjustment each year.  The Debtors make these payments to the CES Concentration Account weekly in arrears, with a monthly true up.

- <u>Payroll</u>:  As described more fully in the Wages Motion, CES processes the vast majority of the Debtors' employees' wages.  The Debtors prefund the CES Concentration Account prior to CES making payroll.  Generally, there are no Intercompany Claims on account of CES's payroll services to the Debtors.

- <u>Accounts Payable</u>:  CES processes most of the Debtors' accounts payable in the ordinary course of business.  The Debtors make reimbursement payments to the CES Concentration Account on a regular basis, usually within 24–48 hours of when CES makes such payments.

- <u>Capital Expenditures</u>:  CES acts as a governor on all enterprise-wide capital expenditures and approves all projects and relative allocations borne by the respective entities.  Funding for such projects will be called by CES when cash is required, and may result in intercompany payables from CEOC to CES for its share of such costs.

### 2.      Other Intercompany Transactions.

### a.      Affiliate Management Agreements.

94.      CEOC is party to the Affiliate Management Agreements with CERP, CGP, and certain non-Debtor subsidiaries pursuant to which CEOC manages certain of CERP's, CGP's, and the non-Debtor subsidiaries' properties in exchange for management fees, which are paid monthly in arrears after netting for other Intercompany Claims, including the transactions described below.

### b.      Contract Revenue and Deposits.

95.      As described above, CEOC is party to certain contracts, many of which result in payments to CEOC of Contract Revenue on account of activity at casino resorts owned by CEOC's subsidiaries (including non-Debtors), CERP, and CGP.  Similarly, and as noted above, CEOC may occasionally hold deposits related to conventions/events (or related reserved hotel rooms) at Caesars Palace Las Vegas, while the hotel rooms (or the convention/event) may be reserved for a Las Vegas property owned by CERP or CGP.  CEOC reflects both the payments made and received in its books and records, makes credits to the applicable non-Debtor affiliate as applicable, and then nets these amounts against the payments required under the Affiliate Management Agreements (which generally decreases the amount owed).

### c.      CEOC Payments to Third Party Service Providers.

96.      CEOC provides the U.S. based Caesars Enterprise, including CERP and CGP, with certain administrative services, including funding the employee benefit programs and the P-Card program (which is further described below).  In each of these instances, CEOC reflects the payments made and received for these programs in its books and records, makes credits to its non-Debtor subsidiaries and affiliates as applicable, and generally nets these amounts against or adds these to any amounts required under the Affiliate Management Agreements.

47

### 3. Joint Venture Payments.

97. As noted above, the Debtors own equity interests in certain non-wholly owned non-Debtor subsidiaries that own hotel and casino resort properties (e.g., Rock Ohio Caesars, LLC). Pursuant to the applicable governance documents, the Debtors have ongoing obligations to the underlying entities, including, without limitation, related to capital calls. The Debtors ability to continue to make these payments as necessary and required is an important part of the Debtors' ongoing business interests related to these properties.

### 4. Foreign Non-Debtor Subsidiary Transactions.

#### a. Financing Arrangements.

98. CEOC is party to that certain Credit Agreement, dated as of December 28, 2007 (as amended or modified from time to time, and including all exhibits and supplements thereto, the "LCI Credit Agreement"), by and between CEOC (as successor in interest to Harrah's Operating Company, Inc.) and non-Debtor foreign subsidiary LCI. Pursuant to the LCI Credit Agreement, CEOC provides LCI with a £150 million revolving credit facility (the "LCI Revolver") to provide LCI with necessary working capital to support its ongoing operations. The LCI Revolver matures on February 15, 2022, and £142 million is outstanding as of the Petition Date. The Debtors do not anticipate funding working capital pursuant to the LCI Revolver during these chapter 11 cases; however, the ability to continue to provide working capital under the LCI Revolver, if needed, is important to LCI and its operations.

#### b. Letters of Support.

99. The Debtors provide support to their foreign non-Debtor subsidiaries by executing letters of support for their foreign subsidiary standalone financial audit reports. These letters of support are instrumental to obtain non-qualified audit opinions for such foreign non-Debtor subsidiaries. The Debtors generally do not need to provide financial support to these foreign

non-Debtor subsidiaries even where the Debtors have executed a letter of support; however, the ability to honor these letters of support, if needed, is important to these foreign non-Debtor subsidiaries.

### c.    Foreign Customers Program.

100.    The Debtors offer their foreign customers a program by which the Foreign Transfer Accounts send to and receive funds from certain of the Debtors' foreign non-Debtor subsidiaries' bank accounts.  More specifically, these foreign customers place funds (generally by check or wire) in non-Debtor foreign bank accounts and are then provided chips at a Casino Property where that foreign customer gambles; the foreign customer may occasionally also choose to withdraw cash for other purposes.  Generally, once the foreign customer has concluded his or her gambling activities for a particular trip, funds can be either transferred to the foreign customers' bank account or a non-Debtor subsidiaries' foreign bank account to the Foreign Transfer Accounts (i.e., the Debtors' U.S. and foreign Bank Accounts linked to the non-Debtor foreign bank accounts) or vice versa, depending upon whether the customer ultimately recognized winnings or losses.[13]  In addition, the customer may choose to receive cash in the U.S. for winnings rather than only withdrawing cash on return to his or her home country.  This customer program, which is similar to programs administered by other large casino companies with important Las Vegas gaming operations, is a key driver in attracting foreign customers to the Debtors' destination casino properties.

---

[13]    For example, if the customer deposits $1 million in the foreign account and then loses $400,000 while gambling in the U.S., $400,000 will be transferred to the Foreign Transfer Accounts to cover such $400,000 loss, and then the customer may withdraw the remaining $600,000 upon return to his or her home country.  If such foreign customer wins $400,000, then the Debtors will fund $400,000 into the Foreign Transfer Accounts, which will then transfer such funds to the applicable foreign bank account or directly to the customer's account, and the customer may then withdraw his or her $1.4 million upon return to his or her country.

KE 34489932

### 5.      Importance of Intercompany Transactions.

101.      I believe that these and other Intercompany Transactions are essential aspects of the Debtors' complex operations.  The Intercompany Transactions are crucial for the Debtors to process payroll, pay vendors for goods and services, continue to receive significant management income, provide working capital support for their non-Debtor foreign operations, and facilitate gaming activity for foreign customers.  Moreover, I believe that the Debtors would be unduly burdened both financially and logistically if the Debtors were required to halt the Intercompany Transactions at this time and to reorganize their business operations without such transactions.  I believe that without the Intercompany Transactions, including with their non-Debtor affiliates, the Debtors' business and the Cash Management System would be disrupted unnecessarily to the detriment of the Debtors, their creditors, and other stakeholders.

### D.      Banking Transactions, Bank Fees, and Related Expenses.

102.      The Debtors conduct transactions by debit, wire, credit card, ACH payments, and other similar methods, as well as by check.  Moreover, a certain percentage of the Debtors' customer receipts are received through wire transfer, credit card payments, and ACH payments.  Thus, the Debtors' ability to conduct transactions by debit, wire, ACH payment, or other similar methods is of vital importance to their ability to manage their businesses; if the Debtors were unable to perform such transactions, they may be unable to perform under certain contracts, their business operations may be unnecessarily disrupted, their estates may incur additional costs, and stakeholder value may be needlessly destroyed.  Yet the U.S. Trustee Guidelines require chapter 11 debtors to annotate all receipts and to make all disbursements of estate funds by check annotated with the reason for the disbursement.

103.      I believe that it is therefore important that the Banks continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors, as debtors in possession, without

50

interruption and in the ordinary course of business.  In this regard, the Debtors submit that the Banks should be authorized and directed to receive, process, honor, and pay any and all checks, ACH transfers, and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto.

104.    In addition, in the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees").   Historically, the Debtors estimate that they are charged approximately $200,000 in Bank Fees each month, with fluctuations depending upon transaction volume, and the Debtors then pay a portion of such charges depending on netting of other costs.  The Debtors estimate approximately $40,000 in accrued but unpaid Bank Fees exists as of the Petition Date (collectively, the "Prepetition Bank Fees").  The Cash Management System depends on the ability of the Banks to maintain and administer the Bank Accounts and to honor and process the Debtors' banking transactions.

105.    Accordingly, to maintain the integrity of the Cash Management System, I believe it is important that the Banks are able to (a) continue to charge the Debtors the Bank Fees and (b) charge back returned items to the Bank Accounts, whether such items are dated before, on, or after the Petition Date in the ordinary course of business and consistent with prior practice.  In addition, I believe it is important that the Debtors are authorized to honor and pay any and all other Prepetition Bank Fees required by the Cash Management System in the ordinary course of business.

### E.    The Purchasing Cards.

106.    The Debtors provide P-Cards to certain corporate and Casino Property-level employees—including to CERP and CGP employees—to purchase goods and services that are

51

used to operate the Debtors' and their non-Debtor affiliates' businesses.  The P-Cards are issued

by Wells Fargo and, along with certain business-to-business payments, are supported by a

$7.5 million cash collateral deposit in the P-Card Account.   CEOC, through the Wells Fargo

Main Operating Account, reimburses Wells Fargo two times per month for amounts outstanding

under the P-Cards and the business-to-business payments.  The Debtors spend approximately

$15 million per month through the use of the P-Cards and the business-to-business payments,

and the Debtors are reimbursed on a periodic basis for amounts paid with respect to CERP and

CGP.  As of the Petition Date, the Debtors believe approximately $872,000 is outstanding and

due to Wells Fargo with respect to the P-Cards and business-to-business payments.

Significantly, if the Debtors do not continue to make these payments, it is likely that Wells Fargo

would draw on the cash collateral deposit and may also reconsider its substantial cash

management relationship with the Debtors.  It therefore is critical that the Debtors receive

authorization to continue using the P-Cards in the ordinary course of business on a postpetition

basis and to pay any amounts incurred in connection with the P-Cards and the business-to-

business payments, whether such amounts arose prepetition or postpetition.

### F.   Business Forms.

107.    As part of the Cash Management System, the Debtors utilize numerous preprinted

business forms in the ordinary course of their businesses.  The Debtors also maintain books and

records to document, among other things, their profits and expenses.  Rather than requiring the

Debtors to incur the expense and delay of ordering entirely new business forms as required under

the U.S. Trustee Guidelines, the Debtors are seeking authority to continue using all currently

existing correspondence and business forms (including letterhead, purchase orders, invoices, and

preprinted checks) as such forms were in existence immediately before the Petition Date, without

reference to the Debtors' status as debtors in possession.  This will minimize expenses to the

KE 34489932

Debtors' estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases.

**IV.** **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Prepetition Claims of Certain Lien Claimants, (B) Section 503(b)(9) Claims, and (C) Foreign Vendor Claims, (II) Approving Procedures Related Thereto, and (III) Granting Related Relief (the "Shippers, Warehousemen, Lienholders, 503(b)(9), Foreign Vendors Motion").**

**A.** **Lien Claims.**

108.   The Debtors derive their operating revenues primarily from owning and operating or managing casinos. The Debtors' ability to continue operating and managing casinos depends on their prompt receipt of and continued access to certain goods and services used in connection therewith. To that end, the Debtors heavily rely upon Shippers to ship, transport, and deliver equipment and other goods, and Warehousemen to hold temporarily such goods. Further, the Debtors depend upon Third-Party Contractors to repair, maintain, and improve their property and efficiently operate their businesses.

**1.** **Shippers and Warehousemen.**

109.   Certain of the Debtors contract with Shippers to ship, transport, and deliver equipment, parts, components, and other goods to the Debtors through established national and international distribution networks, as well as a network of third-party warehouses maintained by Warehousemen to store such goods while in transit or otherwise. The services provided by Shippers and Warehousemen are critical to the Debtors' day-to-day operations. At any given time, there are countless shipments en route to and from various locations. Certain Shippers and Warehousemen currently possess goods that are vital to the Debtors' operations. For example, the Debtors use certain Shippers and Warehousemen to deliver essential amenities like shampoo and linens, marketing and promotional goods for the benefit of customers, equipment parts and tools, and perishable food items like lobster, shrimp, and king crab. Absent access to these

essential items, the Debtors cannot operate their hotels and casinos in the ordinary course. The Debtors carefully monitor their inventory of such goods, move and repurpose supplies within the hotels and casinos where appropriate on a daily basis, and rely upon immediate and uninterrupted access to certain amenities, all of which requires replacement parts, supplies, calibration devices, and other goods critical to continue operating. Any disruption to the Debtors' acquisition of these goods from Shippers or Warehousemen could result in a slow-down or shut-down of certain operations at the Debtors' various facilities adversely impacting the customer experience to the detriment of all parties in interest.

110.    The Debtors estimate that approximately $160,000 on account of claims held by Shippers and/or Warehousemen have accrued as of the Petition Date, approximately $110,000 of which will become due and owing within the first 21 days of these chapter 11 cases.

111.    In light of these circumstances, Shippers and Warehousemen likely will argue that they have possessory liens for transportation or storage costs, and may refuse to deliver or release those goods in their possession until their invoices are paid and their liens redeemed. In addition, it is my understanding that pursuant to section 363(e) of the Bankruptcy Code, Shippers and Warehousemen, as bailees, may be entitled to adequate protection for any valid possessory lien. Shippers and Warehousemen may be unwilling to release the goods in their possession to which they may be entitled to liens, thereby releasing alleged security for prepetition claims. Moreover, a Shipper or Warehousemen simply refusing to deliver the Debtors' goods and supplies could severely disrupt the Debtors' operations and impair the customer experience potentially causing a substantial amount of lost revenue and future business. Additionally, the Debtors typically do not operate under long-term contracts with any of their Shippers or Warehousemen, and instead pay daily spot prices for their shipping needs. This practice allows

the Debtors to take advantage of the best rates available to ship and store goods; however, it also means that the Shippers and Warehousemen may not have a long-term interest in doing business with the Debtors and may therefore look to exercise their liens for short-term benefit. Accordingly, to maintain access to equipment, parts, components, and other goods that are critical to the continued viability of the Debtors' business operations, the Debtors seek authority to honor accrued and outstanding claims related to prepetition services provided by Shippers and Warehousemen.

### 2.    Third-Party Contractors.

112.    The Debtors routinely transact business with a number of Third-Party Contractors that can assert a variety of statutory, common law, or possessory liens against the Debtors and their property if the Debtors fail to pay for certain goods delivered or services rendered.  These Third-Party Contractors perform various services for the Debtors, including the installation and repair of certain equipment in the casinos and hotel buildings, maintenance and improvement of the Debtors' real property and facilities, manufacturing component parts necessary for the Debtors' operating equipment, and other repair, renovation, or construction of the facilities and property therein.

113.    The Debtors' staffing model places a great deal of importance on the services provided by third-party equipment maintenance providers.  The Debtors' hotels and casinos are operated with minimal in-house staffing capable of performing routine maintenance and are supplemented by specialized maintenance and repair services provided by third parties on a regular or ad hoc basis.  For example, in the ordinary course of business, the Debtors frequently engage a third-party servicer to perform essential maintenance and repairs to the Debtors' elevators, HVAC and fire protection systems, boilers and chillers, plumbing, and other infrastructure items, all important to the normal operations of properties.  Such specialized

maintenance and repair ensures the uninterrupted operations of the Debtors' facilities to the benefit of all parties in interest.

114.    Additionally, the Debtors regularly evaluate expansion, development, and renovation opportunities.   Such projects typically involve the use of carpenters, mechanics, electricians, and other skilled labor.   Non-payment of Third-Party Contractors hired in connection therewith could lead to shortages of skilled labor, labor disputes, work stoppages, and disputes with contractors or subcontractors.   Any of these contingencies would affect the Debtors' anticipated costs and timetables for such improvement projects.  As a result, the cost of a project may vary significantly from initial expectations and the Debtors may have a limited amount of capital resources to fund cost overruns which, in turn, will delay the completion of the project until adequate funding is available.

115.    The availability of Third-Party Contractors likewise can present challenges since certain manufacturers and jurisdictions in which the Debtors operate require the Debtors to utilize certain services from particular vendors.  If the Debtors do not have continued access to the services from these manufacturer- or government-directed vendors, the Debtors could be unable to maintain their equipment.  For example, certain manufacturers of the Debtors' fire protection systems require that the Debtors use specified specialists to maintain and repair their proprietary equipment.  Similarly, only those technicians with the necessary certifications are able to repair the Debtors' elevators in accordance with certain state and local rules and regulations.   Failure to utilize such Third-Party Contractors would result in the Debtors either risking non-compliance with local regulations, breaching their contracts, or being unable to maintain certain essential equipment and systems, without which the Debtors would simply be unable to operate their hotels and casinos in the ordinary course.  For these reasons, replacing

56

certain Third-Party Contractors would not only be especially difficult in the current market, but also could potentially disrupt or suspend operations at the Debtors' facilities.

116.    Although the Debtors generally make timely payments to their vendors, as of the Petition Date, a substantial number of vendors may not have been paid for certain prepetition goods or services. he Debtors estimate that approximately $9,840,000 on account of claims held by Third-Party Contractors have accrued as of the Petition Date, approximately $7,890,000 of which will become due and owing within the first 21 days of these chapter 11 cases.  It is my understanding that many Third-Party Contractors may have a right to assert and perfect certain liens on account of such unpaid goods or services, including mechanics' or artisans' liens, against the Debtors' relevant equipment or goods, notwithstanding the automatic stay under section 362 of the Bankruptcy Code.  These statutory liens often allow such parties to retain possession of the tools or impair title to the tools by filing a security interest until the debtor satisfies the outstanding amounts owed.  And unless they are paid for outstanding prepetition amounts, the Debtors believe that Third-Party Contractors may refuse to provide services for, and/or honor obligations under their existing agreements with, the Debtors on a going-forward basis, including essential installation, maintenance, and warranty obligations, or may refuse to release certain goods in their possession.

### 3.    Proposed Treatment of the Lien Claims.

117.    The Debtors seek authority to pay and discharge the claims of all Lien Claimants that have given or could give rise to a lien against the materials, goods, and equipment of the Debtors, regardless of whether such Lien Claimants have already perfected their interests. Operationally speaking, the relief requested will prevent the breakdown of the Debtors' supply and maintenance network that the Debtors determine are necessary and appropriate to:  (a) obtain release of critical or valuable goods, equipment, or other property that may be subject to liens;

(b) maintain a reliable, efficient, and smooth distribution system; and (c) induce critical Lien Claimants to continue to provide and service goods and equipment consistent with historical practices. Notwithstanding the authority requested, the Debtors will not pay a Lien Claim unless the Lien Claimant has perfected or, in the Debtors' judgment, is or may be capable of perfecting one or more liens in respect of such claim irrespective of the automatic stay. Nor shall payment of a Lien Claim be deemed to be a waiver of rights regarding the extent, validity, perfection, or possible avoidance of such liens. The Debtors expect that they will pay only Lien Claims when they believe, in their business judgment, that the benefits to making such payments would exceed the costs, delays, and disruption associated with bringing an action to compel the turnover of such goods. The Debtors' payments on account of the Lien Claims are not expected to exceed $10,000,000 in the aggregate.

### B.      503(b)(9) Claims.

118.      Due to the nature of their businesses, the Debtors received a significant amount of goods or other materials in the ordinary course from various vendors—namely, 503(b)(9) Claimants—within the 20 days before the Petition Date. Many of the Debtors' relationships with 503(b)(9) Claimants are not governed by long-term contracts. Rather, the Debtors often obtain essential supplies on an order-by-order basis. As a result, a 503(b)(9) Claimant may refuse to supply new orders without payment of its prepetition claims. The Debtors also believe certain 503(b)(9) Claimants could restrict the Debtors' existing trade terms—or demand payment in cash on delivery—further impairing the Debtors' operations. The Debtors estimate that approximately $30,000,000 on account of 503(b)(9) Claims have accrued as of the Petition Date, $20,700,000 of which will become due and owing within the first 21 days of these chapter 11 cases. Accordingly, the Debtors request that they be authorized to pay—in an amount not to exceed $20,700,000 on an interim basis, and $30,000,000 on a final basis—

undisputed 503(b)(9) Claims. The Debtors do not seek to accelerate or modify existing payment terms with respect to the 503(b)(9) Claims. Rather, the Debtors will pay 503(b)(9) Claims as they come due and in the ordinary course of business.

### C.   Foreign Vendor Claims.

119.   The Debtors rely upon certain Foreign Vendors to supply goods in connection with their business operations. For example, certain Chinese vendors manufacture customized cups, glassware, bags, and other retail items that are used or sold in the Debtors' domestic casinos. Most, if not all, of the Foreign Vendors have little to no connection to the United States, and the Debtors believe that such vendors may discontinue providing goods and/or services absent payment of their Foreign Vendor Claims. The Debtors estimate that, as of the Petition Date, they owe only a *de minimis* amount to Foreign Vendors on account of prepetition claims held against the Debtors' estates—i.e., approximately $110,000. Accordingly, the Debtors request that they be authorized to pay Foreign Vendor Claims as they come due and in the ordinary course of business.

### V.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Claims Arising Under the Perishable Agricultural Commodities Act, and (II) Granting Related Relief (the "PACA Motion").

120.   The Debtors own and operate or manage 44 gaming and resort properties hotels in 14 U.S. states and 5 countries. These casinos and hotels not only provide customers with high-quality casino entertainment and hospitality experiences, but also offer first-class fine and casual dining choices, which include restaurants, bars, and catering, and in-room dining services to approximately 42,000 hotel rooms. In connection therewith, the Debtors purchase a variety of consumable goods, including goods that may be deemed "perishable agricultural commodities" under under the Perishable Agricultural Commodities Act of 1930 ("PACA"). The PACA Vendors are intimately familiar with the Debtors' businesses, restaurants, and food-service

amenities, and in many cases, make deliveries to the Debtors' numerous locations on a daily basis.  To ensure the uninterrupted supply of the necessary fresh produce, the Debtors seek authority to continue to pay PACA Vendors in the ordinary course of business and consistent with historical practices.  The Debtors estimate they owe PACA Vendors approximately $400,000 in the aggregate for goods covered under PACA delivered prior to the Petition Date.

121.   It is my understanding that PACA requires sellers of perishable agricultural commodities to take certain procedural steps to preserve its rights as a trust beneficiary. Specifically, a PACA Vendor must provide written notice (a "PACA Notice") to the purchaser of such goods and its intent to preserve the benefits of the PACA Trust.  It is my understanding that written notice under PACA may be accomplished by either (a) including the statutorily-mandated language on the face of the vendor's invoices or (b) providing written notice to the purchaser of the PACA goods within 30 days after the time payment is due.  It is also my understanding that beneficiaries of a PACA Trust that adhere to the statutory notice requirements are entitled to prompt payment from the PACA Trust Assets ahead of secured and unsecured creditors of a debtor's estate.  It is also my understanding that a PACA Vendor who fails to comply with the notice requirements, however, is only entitled to a general unsecured claim in a debtor's chapter 11 case.  Further, it is my understanding that PACA provides various protections to fresh fruit and vegetable sellers, including the establishment of a statutory constructive trust ("PACA Trust") consisting of a purchaser's entire inventory of food or other derivatives of perishable agricultural commodities, the products derived therefrom, and the proceeds related to any sale of the commodities or products (collectively, the "PACA Trust Assets").

122.    It is my understanding that the Debtors are "dealers" under PACA.  As a result,

insofar as the PACA Vendors abide by the notice requirements of PACA, they can assert PACA

Claims granting them priority ahead of all other secured and unsecured creditors in the Debtors'

chapter 11 cases.  Therefore, payment of PACA Claims at this time will not prejudice or affect

the amount available for distributions to other creditors of the Debtors.

123.    I believe that it is essential to the Debtors' operations that the supply of fresh

produce continues unimpeded.  Any disruptions or delays in that regard would harm the Debtors'

operations and could jeopardize their ability to reorganize successfully.

**VI.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of Prepetition Claims of Certain Vendors, (II) Approving and Authorizing Procedures Related Thereto, and (III) Granting Related Relief (the "Critical Vendors Motion").**

**A.    Overview of Critical Vendors.**

124.    The Debtors seek authority, but not direction, to pay the prepetition claims of

certain vendors and service providers that provide essential goods and services critical to the

operation of their businesses (collectively, the "Critical Vendors") in an interim amount not to

exceed $10.7 million, and an aggregate amount not to exceed $16.3 million, on the terms

described in the Critical Vendors Motion.  The Critical Vendors are integral to the Debtors'

multi-faceted supply chain that services the Debtors' casino properties throughout the United

States and globally to ensure uninterrupted customer service.  The Debtors' businesses are

dependent on customer satisfaction.  Their ability to retain and grow that customer base depends,

in part, on leveraging key third-party suppliers, vendors, and service providers such as the

Critical Vendors.  Performance by the Debtors' supply chain directly impacts achieving the

Debtors' underlying business plan, preserving the benefits of the restructuring support agreement

for all creditors.  In addition, the Debtors' seek authority to implement procedures that will assist

61

them in securing favorable terms and to deal with any vendors that repudiate or otherwise refuse to honor contractual obligations to the Debtors.

### B.      Identification Process.

125.    The Debtors are mindful of their duties to preserve and maximize the value of their estates for the benefit of all stakeholders in these chapter 11 cases.  To that end, the Debtors have carefully estimated all vendor claims as of the Petition Date, including the Critical Vendor Claims, and have determined that the ability to use estate funds to satisfy Critical Vendor Claims is absolutely necessary to maximize enterprise value and avoid immediate and irreparable harm to the Debtors.  The Critical Vendor Claims that the Debtors seek authority to pay represent approximately 13 percent of the Debtors' accrued trade payables of approximately $125,000,000.

126.    With the assistance of their advisors, including my team at AlixPartners, the Debtors have spent significant time reviewing and analyzing their books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and historical practice to identify truly critical business relationships and/or suppliers of goods and services—the loss of which could materially harm their businesses, shrink their market share, reduce their enterprise value, implicate compliance risk, impair going-concern viability, or any combination of the foregoing.

127.    We began the process by identifying 13,000 vendors that had received a payment from the Debtors in fiscal year 2014.  Of these 13,000 vendors, we identified approximately 2,000 vendors that comprised 99 percent of the Debtors' total vendor spend for the same period. With respect to this population of approximately 2,000 vendors, the Debtors then considered a variety of factors, including:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning business to them;

- whether a vendor is subject to certification, licensing, registration, or any other regulatory requirements;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to hold goods owned by the Debtors, or refuse to ship inventory or to provide critical services on a postpetition basis;

- whether the Debtors' inability to pay all or part of the vendor's prepetition claim could trigger financial distress for the applicable vendor; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

Except with respect to a select few Casino Games Leases (as defined herein) and gaming support and other operationally indispensable vendors described below, the Debtors are not seeking to honor prepetition obligations arising under enforceable, long-term contractual relationships. This analysis and screening process, which included follow-up interviews with procurement and marketing teams responsible for and closest to the applicable vendors, ultimately resulted in the exclusion of the vast majority of the Debtors' vendors (and related vendor claims) from consideration for Critical Vendor status.

128.    Following this analysis, the Debtors identified a select group of vendors representing approximately two percent of the Debtors' top 2,000 vendor pool as Critical Vendor candidates for purposes of the relief requested herein.  In many instances, a Critical Vendor must

satisfy rigorous registration, certification, and licensing protocols before they are even eligible to provide essential goods and services necessary to operate the Debtors' businesses, and such vendors are single- or limited-source vendors in the markets they serve for that reason, thus making timely resourcing impractical. In other instances, the failure to maintain certain services creates compliance risks that may implicate adverse regulatory consequences that could jeopardize going-forward operations. Throughout this process, we considered the risk that a vendor would not perform postpetition without payment of prepetition claims to ensure that the Critical Vendors only included those where the Debtors deemed that risk was too great. As of the Petition Date, the Debtors believe they owe Critical Vendors approximately 16,300,000.[14] The Debtors are seeking relief to pay up to $10,700,000 in Critical Vendor Claims during the first 21 days of these chapter 11 cases.

129.    I believe that the Debtors' ability to continue their operations without interruption in the aftermath of the commencement of these chapter 11 cases largely will depend upon the continued provision of goods and services by the Critical Vendors.

### C.    The Critical Vendors.

130.    The Critical Vendors are comprised of, among others, Service Vendors, Operating and Retail Providers, Marketing Support Vendors, Casino Games Vendors, Gaming Support Vendors, and Alcoholic Beverage Vendors. The Debtors seek authority to pay all or part of the Critical Vendor Claims to ensure that the Critical Vendors provide essential goods and services to the Debtors on a postpetition basis. The Critical Vendors generally fall into the categories discussed below.

---

[14]    This figure does not include claims held by Critical Vendors that may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"). The Debtors have requested separate relief to pay 503(b)(9) Claims pursuant to the Other Vendors Motion.

KE 34489932

### 1.    Service Vendors.

131.    The Debtors rely on a variety of vendors to provide necessary services that allow the Debtors to run their facilities on a day-to-day basis.   These services include lodging management software (which allows customers to check in and out of Debtors' hotels), data security (which protects Debtors' customers' data and allows them to process credit card transactions) and other information technology and compliance support.   In many instances, these vendors are either sole-source providers or the only ones able to provide the required services to meet the Debtors' operational needs.   Even where an alternative provider theoretically exists, the replacement costs—including the risk of irreparable business disruption in some cases—would substantially exceed the amount of such vendors' respective prepetition claims. For example, if certain technical service providers ceased supporting the Debtors' integrated network systems related to lodging logistics or data management, the Debtors' ability to operate their businesses, process credit card transactions, and take in revenue in the ordinary course would be substantially and irreparably impaired.   Moreover, many of these vendors provide services to the Debtors on the basis of informal arrangements, relying on past practice, course of dealing with the Debtors, and industry standards to set the trade terms of these transactions.   I believe that any loss of these vendors during the critical time following the commencement of these chapter 11 cases dramatically risks impacting the customer experience and thereby adversely impact future revenues and enterprise value.

### 2.    Operating and Retail Vendors.

132.    The Debtors do business with certain suppliers of hospitality-related goods, in-room amenities, and other retail suppliers.   Essential goods provided by such vendors include linen supply for hotel bed sheets and towels, audio visual and other materials necessary for conventions at Debtors' facilities, hotel room keys, cleaning and HVAC equipment, custom

uniforms for Debtors' personnel, and customized retail items.  In many instances, these vendors are the only vendors able to produce or deliver (from a logistics standpoint or otherwise) the volume or quality of certain materials or products sufficient to meet the Debtors' operational needs.  Without cleaning or HVAC equipment to use at Debtors' facilities or sheets and towels to provide to their guests, the Debtors cannot run the type of hotel and casino that their customers expect.

### 3.      Marketing Support Vendors.

133.    The Debtors use certain vendors that provide critical marketing  support products and services for their hotel and casino facilities.  These vendors provide essential advertising, including regulated direct mail services, that the Debtors utilize to attract customers and drive sales.  Many of these vendors provide products and services to the Debtors on the basis of informal arrangements.  Additionally, because certain jurisdictions in which the Debtors operate heavily regulate the vendors providing these goods and services, many such vendors must satisfy rigorous registration and certification protocols before they are eligible to provide such goods and services.  For example, the Debtors rely upon certain direct mail providers to distribute approximately 9 million pieces of mail each month.  Due to the magnitude of the Debtors' customer base, there are very few direct mail providers that can support the Debtors' marketing needs.  These mailings are essential to promote upcoming events and programs, build customer loyalty, and ultimately drive revenue that is necessary to achieve the financial metrics under the Debtors' restructuring support agreement.  In addition, many of the Debtors' direct mail vendors must be registered or certified to distribute such marketing materials under applicable gaming regulations.  For these reasons, many such vendors are single- or limited-source suppliers in the markets they serve.

134.    If certain marketing support vendors refuse to provide goods and services to the Debtors after the Petition Date on account of unpaid prepetition claims, the Debtors would be forced to convince third-party vendors, to the extent they even exist, to obtain the requisite licensing or certification.   This process can take as long as several months in certain jurisdictions, and there is no guarantee that any such replacement vendors would in fact become certified or otherwise be able to provide the required support in a timely and cost-efficient manner.  At this critical time following the commencement of these chapter 11 cases, I believe there is a risk that the loss of marketing support vendors would have a significant negative impact on the Debtors' operations and revenues.

### 4.    Casino Games Vendors.

135.    The Debtors' North American casinos feature more than 3,000 table games and 54,000 slot machines and similar games (collectively, the "Casino Games").   Casino Games generate approximately $3.7 billion of revenue annually and are a core segment of the Debtors' business.  Although the Debtors own some of the gaming equipment, certain Casino Games and their related gaming systems are leased on a "cost-per-day" or "percentage of handle" basis (the "Casino Games Leases") from third-party vendors.  Importantly, several Casino Games Leases and other Casino Games are predicated on revenue sharing arrangements where the Debtors receive a direct share of the revenue generated and share an allocated portion thereof with the applicable Casino Games vendor.  The Casino Games Leases govern many of the Debtors' most popular and profitable Casino Games, including Wheel of Fortune slot machines.

136.    The distribution, sales, and use of Casino Games are closely regulated.   While licensing requirements vary by locality, state gaming laws, together with substantial research and development costs, create a high barrier to entry, requiring manufacturers or distributors of Casino Games to procure and maintain a manufacturer and distributor's license (which licensing

67

process includes a detailed investigation of a licensee's business activities and financial status) to sell, use, or distribute Casino Games. Accordingly, the Casino Games industry is concentrated in the hands of a few, well-established vendors, which limits significantly the Debtors' ability to source alternate providers in a time- and cost-efficient manner. Moreover, as discussed below, maintenance services and replacement parts and supplies are also only available from specific Casino Games vendors.

137.    Customers expect and demand that the Debtors provide the most entertaining and modern Casino Games. The Casino Games industry is fluid, and manufacturers' technology is ever-changing to develop more sophisticated, innovative Casino Games while also upgrading existing games specifically to attract frequent play and increase profitability. For example, many slot machines experience significant declines in customer popularity and play after 12 months, and such Casino Games must be replaced with a new slot machine for the Debtors to remain competitive in the marketplace. As a result, casinos are forced to vie for the best Casino Games to appeal to and bring in new players in order to maintain market share. While the Debtors have positive relationships with their gaming vendors under the Casino Games Leases, certain of these vendors have no obligation to make new games or enhancements available or extend favorable trade terms to the Debtors on a going-forward basis. Any delay or missed payment to Casino Games providers, whether under the Casino Games Leases or otherwise, jeopardizes critical relationships. A damaged reputation among key Casino Games providers could increase the cost of accessing the Casino Games in the future. I believe there is a risk that losing access to the latest Casino Games would result in significant and irreparable harm to the Debtors' revenues and brand equity. Likewise, customer trust and loyalty could be compromised as players of Casino Games invariably will turn to the Debtors' competitors for the most innovative games.

The occurrence of any of the foregoing could materially and adversely affect one of the Debtors'

most valuable sources of revenue to the detriment of all parties in interest.

### 5.    Gaming Support Vendors.

138.    The Debtors rely on several vendors to supply essential goods and services that

are ancillary to the operation of the Casino Games and other wagering activity that drive

revenues.   Such vendors provide the tables, cards, dice, chips, shuffling machines, currency

counters, tiles and ticket-tape for, as well as software, data, closed-circuit, simulcast,

information, and accounting systems that support, the Casino Games and other wagering activity.

In many instances, these vendors are either sole-source providers or the only ones able to provide

the required goods and services to meet the Debtors' operational needs.   One example of a

Critical Vendor in this category is the only vendor that can provide NFL football games for

broadcast at the Debtors' sportsbooks.   I believe that the failure to broadcast NFL football games

at the Debtors' casinos will cause customers to take their business elsewhere and material

damage to the Debtors' brand equity.   Similarly, Critical Vendors also provide software that is

essential to running casino gaming equipment across the Debtors' enterprise—the "heart beat" of

the Debtors' casinos.   In certain states, a shutdown of this software requires immediate cessation

of operations at the casino.   Even where an alternative provider theoretically exists, the

replacement costs would substantially exceed the amount of such vendors' respective prepetition

claims.   Additionally, because certain jurisdictions in which the Debtors operate casinos heavily

regulate the vendors providing these goods and services in connection with gaming, many such

vendors must satisfy rigorous screening and licensing protocols before they are eligible to

provide such goods and services.   For this reason, many of the gaming support vendors are

single-source suppliers in the markets.   If certain gaming support vendors refuse to provide

goods and services to the Debtors after the Petition Date on account of unpaid prepetition claims,

the Debtors would be forced to convince third-party vendors, to the extent they even exist, to obtain the requisite licensing.  This process can take as long as 12 months in certain jurisdictions, and there is no guarantee that any such replacement vendors would in fact obtain a license or otherwise be able to provide the required support in a timely and cost-efficient manner.  In other instances, the failure to maintain, and in some cases fund, certain support services related to information security and other gaming and racing requirements represent compliance risks that may implicate adverse regulatory consequences that jeopardize going-forward operations.[15]  For example, the Debtors cannot operate dog races in the State of Iowa without certain closed-circuit, simulcast, and calibrated timing systems.  If the Critical Vendors providing such services refuse to perform, the Debtors will be forced to shut-down racing or risk regulatory enforcement actions from the state.  And given that the Debtors hold relatively low inventory levels of certain gaming support goods and services, I believe there is a risk that any delay or disruption to the provision of such goods and services would substantially harm the Debtors' casino operations and cause irreparable damage to their estates.

### 6.    Alcoholic Beverage Vendors.

139.    As noted above, the Debtors own, operate, and manage 38 major, full-service casinos in 14 U.S. states and five countries, which include numerous restaurants, bars, and catering and in-room dining services.  The Debtors purchase a variety of alcoholic beverages that are served daily and continuously at their gaming and hotel facilities.  The sale of alcoholic beverages generates more than $110 million of revenue on an annual basis.  It is also standard

---

[15]    The Debtors estimate that there are approximately 10 sole- or limited-source vendors, certain of which may be subject to long-term, enforceable contracts, holding approximately $1 million of prepetition claims, that provide such goods and services.  Should any of such vendors elect not to perform on a postpetition basis notwithstanding a potential violation of the automatic stay and/or their contractual obligations, I believe there is a material risk that the Debtors could be forced to cease operating certain business segments effective immediately.

KE 34489932

industry practice to serve alcoholic beverages, especially providing complementary drinks in the casinos.

140.    Because of the nature of the services business and the size and complexity of the Debtors' operations, there are only a limited number of suppliers that can meet the Debtors' substantial volume requirements with respect to certain specialty products and/or are the sole source provider of such beverages in the markets in which the Debtors operate.  For example, certain alcohol vendors are the exclusive suppliers of various higher-end brands of beer, wine, and spirits in the States of Illinois, Nevada, and New Jersey, among others.  The failure to pay such sole-source suppliers can literally dry-up the availability of products like Jack Daniels, Grey Goose, Bud Light or Crown Royale overnight.  Due to this controlled supply chain, delayed or missed payments to such vendors could disrupt the Debtors' operations and limit the variety of alcohol available.  And because many of the specialty beverages delivered to the Debtors are dispensed on a high-volume basis, the Debtors maintain a limited inventory of such items, placing many of their orders with vendors on a weekly (and often daily) basis.

141.    As a result, the Debtors rely significantly on certain alcoholic beverage vendors that understand, without the delivery of these items, the Debtors lack the requisite products to meet their operational needs.  The Debtors' dining establishments, bars, and in-room services offered at their gaming and hotel facilities generate substantial revenue and are an important element of the Debtors' brand as a full-service gaming and hospitality establishment.  The Debtors submit that delayed or missed payments to certain alcoholic beverage vendors may jeopardize the Debtors' access to essential beverages.  I believe there is a risk that any disruption to the Debtors' alcoholic beverage services would likely cause substantial financial and reputational harm to the Debtors' businesses.  For these reasons, I believe that payment of certain

of the Debtors' alcoholic beverage vendors to ensure that the Debtors continue to receive such beverage items of the same quality, quantity, consistency, and price as those received in the prepetition period is critical to the success of these chapter 11 cases and to the benefit of the Debtors' estates, creditors, and all parties in interest.

### D.    Narrowly Tailored Relief.

142.    The relief requested by the Critical Vendors Motion is narrowly tailored to facilitate the Debtors' restructuring efforts.  By contrast, the Debtors will suffer irreparable harm if essential goods and services are not provided by the Critical Vendors.  The Debtors cannot take the material risk that the Critical Vendors will refuse to perform postpetition if their prepetition claims are not paid.  Many of these vendors supply goods and services to the Debtors on the basis of informal arrangements, relying on past practice, course of dealing with the Debtors, and industry standards to set the trade terms of these transactions.  While the Debtors typically enjoy good working relationships with these vendors, the limited number of vendors who can supply the Debtors with a quantity and quality of goods and services that meet their operational needs provides such vendors with considerable bargaining power in the event of non-payment by the Debtors.  At this critical time following the filing of these chapter 11 cases, I believe that the loss of such vendors will impair significantly the Debtors' ability to find replacement vendors (to the extent they exist), even on new, less favorable trade terms.  And even where an alternative provider theoretically exists, I believe that the replacement costs— including business disruption, lost revenue, and reputational damage—would substantially exceed the amount of such vendors' respective prepetition claims.

143.    The Debtors intend to use the flexibility afforded by the Critical Vendors Motion to limit amounts paid on prepetition amounts while ensuring the uninterrupted supply of critical goods and services on the best available terms.  Although the Debtors recognize that they

provide significant volume of business to these vendors based on the size and scale of the Debtors' operations, the Debtors have a well-deserved reputation in the industry for effectively negotiating favorable terms with vendors. There is very real risk that certain Critical Vendors will not continue to work with the Debtors in the absence of being made whole on some or all of their outstanding prepetition balances. And importantly, the Debtors cannot afford to take that risk.

144.    Importantly, the Debtors, with the assistance of their advisors, have a protocol in place for senior members of the procurement team, with legal oversight as necessary, to make decisions about what vendors to pay, in what amounts, and on what terms. Among other things, these individuals will ensure that only those vendors that will not perform postpetition without the Debtors first satisfying all or part of their prepetition claims receive any payments. The Debtors have every intention of using the relief requested in the Critical Vendors Motion to recoup working capital, prevent disruption in the supply chain, and maximize earnings, which will benefit all creditors.

**VII.    Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (B) Granting Related Relief (the "Customer Programs Motion").**

145.    The Debtors traditionally have maintained various customer-related programs in the ordinary course of business designed to enrich their customers' loyalty and goodwill and sustain the Debtors' positive reputation in the marketplace. Among others, these programs include:    (a) Customer Reinvestment Programs; (b) Safekeeping, Front Money, and Non-U.S. Customer Bank Deposits; (c) Convention and Customer Deposits; (d) Outstanding Gaming Currency; (e) Gift Cards and Certificates; (f) Progressive Gaming Obligations and Accrued Customer Winnings; (g) Independent Sales Representatives and Third-Party Meeting

Planners; and (h) Property Damage Claims (each as defined herein, and together with all other similar customer claims, obligations, and offerings, the "Customer Programs").

146.    I believe that the importance of maintaining the Customer Programs and honoring related prepetition obligations cannot be understated.  The Debtors operate in highly competitive markets where the quality of customer experience is a defining factor in differentiating the Debtors from their competitors.  The Debtors rely heavily on the Customer Programs to ensure a customer experience that surpasses expectations.  The goal is to drive repeat business, attract new customers, and ultimately (as a result) increase revenue and earnings.

147.    I believe that if the Debtors fail to maintain and honor the Customer Programs, they will put at risk their most valuable intangible assets—customer loyalty and goodwill.  The resulting loss of customers to their competitors would not only jeopardize the Debtors' bottom line, it would threaten their ability to successfully reorganize.  Moreover, it is my understanding that the failure to honor certain of the Customer Programs would trigger violations under various state gaming and other laws and regulations.  As such, I believe that the continuation of the Customer Programs in the ordinary course (including the ability to pay related prepetition obligations) is necessary to the fair and responsible administration of these chapter 11 cases and essential to maximize the value of the Debtors' estates.

### A.    Customer Reinvestment Programs.

148.    In the ordinary course of business, the Debtors "reinvest" in their customers by engaging in numerous programs designed to enhance customer experience, reward continued patronage, and drive new and repeat business (collectively, the "Customer Reinvestment Programs").  The Debtors' Customer Reinvestment Programs generally fall into three categories: (a) Customer Loyalty Programs; (b) Customer Offers; and (c) Complimentary Goods and Services (each as defined herein).

### 1.      Customer Loyalty Programs.

149.   The Debtors offer various customer loyalty programs (the "Customer Loyalty Programs").   Pursuant to these programs, the Debtors incur obligations directly to their customers, as well as to various third parties that maintain and facilitate these programs (collectively, the "Customer Loyalty Program Obligations").   The Debtors' most prevalent Customer Loyalty Program is the enterprise-wide Total Rewards® program.   As of the Petition Date, the Total Rewards program included approximately 45 million members.[16]   Through the program, participating customers can accumulate Reward Credits® and Tier Credits® in various ways, including when they play, dine, shop, or stay at the Debtors' resorts and casinos. Customers can also earn Reward Credits through additional methods, including a Total Rewards Visa credit card and partnerships with Starwood Hotels and Resorts Worldwide, Inc. and SkyMall Ventures, LLC.

150.   The Total Rewards program places each participating customer into one of four tiers—Gold, Platinum, Diamond, and Seven Stars.   Membership in a particular tier is based upon the number of Tier Credits a customer earns during a specified period of time.   Higher tiers correspond with greater benefits and privileges (the "Tier Benefits").   For example, a customer in the Seven Stars tier is eligible to receive, among other things, guaranteed complimentary rooms at Caesars' properties, a once-a-year retreat for the member and a guest (including airfare) to a Caesars' property, a free annual gift, a $500 celebration dinner at any Caesars-owned restaurant of their choice, and a complimentary cruise.   The estimated cost of honoring a customer's Tier Benefits is initially recorded as a liability of such customer's dominant property (i.e., the property where the majority of the customer's activities take place).

---

[16]   Customers of the Debtors' non-Debtor affiliates, including CERP and CGP, also participate in the Total Rewards® program.

KE 34489932

151.     Participating customers can also redeem the Reward Credits they have earned for, among other things, free slot play, meals, hotel stays, and event tickets.  Reward Credits remain outstanding until they are redeemed, unless forfeited—which generally results when a customer fails to earn or use a Reward Credit for a six-month period.  The estimated cost of fulfilling the redemption of Reward Credits is initially recorded as a liability of the property[17] where the Reward Credit was earned.[18]

152.     Because the Total Rewards program is enterprise wide, customers can redeem their Reward Credits and use their Tier Benefits at a property other than where the liability is initially recorded, including at certain non-Debtor properties (e.g., a CERP or CGP property).  Accordingly, during a monthly reconciliation, the Reward Credits and Tier Benefits liability of each property (including the non-Debtor properties) are transferred to Debtor Caesars Entertainment Operating Company, Inc. ("CEOC").  This transfer is done so through a cash payment by each property to CEOC in the amount of such liabilities recorded since the last monthly reconciliation.  Similarly, during each monthly reconciliation, CEOC reimburses each property in cash based on the number of Reward Credits and Tier Benefits redeemed at such property.  These payments are netted against each other.

153.     As of the Petition Date, the Debtors estimate approximately $74 million in Customer Loyalty Program Obligations remains outstanding, substantially all of which relate to the Total Rewards program.

---

[17]   Reward Credits earned from the Total Rewards Visa credit card or the Debtors' partnerships—such as those with Starwood Hotels and Resorts Worldwide, Inc. and SkyMall Ventures, LLC—are initially recorded as a liability at a "virtual" property, where their treatment is substantially similar to Reward Credits earned at a physical property.

[18]   The amount of liability the Debtors book for each Reward Credit and the Tier Benefits takes into account, among other things, estimates and assumptions based upon historical data with respect to forfeiture rates and the mix of goods and services actually provided on account of the Reward Credits and Tier Benefits.

KE 34489932

### 2.      Customer Offers.

154.      In the ordinary course of business, the Debtors present certain of their customers with various offers (the "Customer Offers").   Substantially all of these Customer Offers are individually tailored to the customer and are delivered through direct marketing campaigns.   The offers include free slot play, free hotel nights, and free event tickets, among others.   Generally, the offers are property-specific and expire within one to two months from the offer date.   The Debtors estimate that they spend approximately $40 million each month on account of the Customer Offers.   The Debtors believe that generally no liability exists on account of such Customer Offers until such offers are actually accepted and redeemed—accordingly, the Debtors estimate that their outstanding obligations on the Customer Offers as of the Petition Date is de minimis.

### 3.      Complimentary Goods and Services.

155.      In the ordinary course of business, the Debtors present certain of their customers with various offers (the "Customer Offers").   Substantially all of these Customer Offers are individually tailored to the customer and are delivered through direct marketing campaigns.   The offers include free slot play, free hotel nights, and free event tickets, among others.   Generally, the offers are property-specific and expire within one to two months from the offer date.   The Debtors generally only incur an obligation with respect to the Customer Offers when such offers are accepted and redeemed, and the Debtors estimate that they spend approximately $40 million each month on account of the Customer Offers.

### B.      Safekeeping, Front Money, and Non-U.S. Customer Bank Deposits.

156.      In the ordinary course of their businesses, the Debtors hold certain customer winnings ("Safekeeping") until the customer claims those winnings.   For example, when a customer lacks proper identification, any winnings of that customer are held by the Debtors until

the customer is able to produce proper identification to claim the winnings.  Additionally, the Debtors hold funds in Safekeeping where a customer does not wish to immediately claim its winnings or where such funds have been confiscated from "prohibited patrons" (i.e., patrons who are excluded under applicable state law that governs certain of the Debtors' casinos).  Depending on the circumstances and applicable legal requirements, such funds are subsequently remitted to either the customer or the applicable state upon demand.

157.   In addition, the Debtors provide a service in the ordinary course of business whereby customers may deposit funds ("Front Money") with the Debtors' properties, including cash in the casino cage that can later be withdrawn while at a gaming table.  Similarly, certain non-U.S. customers place funds in bank accounts owned by various non-Debtor, foreign subsidiaries (the "Non-U.S. Subsidiaries") prior to traveling to the United States to visit one of the Debtors' properties (the "Non-U.S. Customer Bank Deposits").  The Debtors then either transfer funds into or receive funds from these accounts based on each non-U.S. customer's winnings or losses while visiting the Debtors' properties.  Accordingly, at any given time, the Debtors may have outstanding balances due to or due from their Non-U.S. Subsidiaries on account of such non-U.S. customer's winnings at the Debtors' properties.  The Debtors' obligations on account of Safekeeping, Front Money, and the Non-U.S. Customer Bank Deposits fluctuate at any given time; and it would be extremely costly and burdensome, if not impossible, for the Debtors to ascertain the exact amount of such obligations due and owing to customers as of the Petition Date.  The Debtors do estimate, however, that as of December 31, 2014, approximately $56 million in Safekeeping, Front Money, and Non-U.S. Customer Bank Deposits remained outstanding.

158.     The Safekeeping, Front Money, and Non-U.S. Customer Bank Deposit programs are comparable to those offered by other casino companies, particularly those with significant Las Vegas gaming operations.   The winnings held in Safekeeping and the Front Money deposited into the casino cage are not part of the Debtors' estate, and therefore the Debtors do not have a property interest in or ownership rights with respect to such funds.   Additionally, the Non-U.S. Customer Bank Deposit service is a key driver in attracting wealthy, non-U.S. customers to the Debtors' casino properties.

### C.      Convention and Customer Deposits.

159.     In the ordinary course of the Debtors' businesses, customers deposit money with the Debtors in connection with, among other things, hotel stays, events and conventions, banquet room rentals, and advance ticket sales for performances held at the Debtors' facilities (collectively, the "Customer Deposits").   Typically, Customer Deposits are utilized (as an offset) by the Debtors in connection with the anticipated future service or event.   In some cases, however, customers cancel their reservation, in which case a customer may be entitled to a full or partial refund of the Customer Deposit.   The Debtors believe that as of the Petition Date, approximately $32 million in Customer Deposits liability has accrued.

160.     I believe that the Customer Deposits are an important aspect of the Debtors' business, and the repercussions of failing to refund the Customer Deposits would likely be severe, disruptive to the Debtors' business, and damaging to the Debtors' reorganization efforts. For example, if the Debtors were to develop a reputation in the gaming industry for not honoring refund policies related to Customer Deposits, customers may book future reservations with the Debtors' competitors, which could substantially reduce revenue and dissipate customer goodwill.

KE 34489932

**D.      Outstanding Gaming Currency.**

161.    As is customary in the casino business, the Debtors routinely issue gaming chips, slot vouchers, and the like to customers for use at gaming tables and slot machines (the "Gaming Currency").  Customers possess Gaming Currency while on the Debtors' property, and some customers, whether advertently or inadvertently, retain Gaming Currency after they leave the properties ("Outstanding Gaming Currency").  The Debtors generally account monthly for the amount of Outstanding Gaming Currency on a consolidated basis across their properties, and, although exceedingly difficult to ascertain the exact amount at any given moment, the Debtors estimate that, as of the Petition Date, customers are in possession of approximately $42 million in Outstanding Gaming Currency.

**E.      Gift Cards and Certificates.**

162.    In the ordinary course of business, the Debtors provide customers with, among other things, gift certificates, gift cards, and various coupons (the "Promotional Gift Cards").  Additionally, the Debtors' customers may also purchase gift certificates, gift cards, and various coupons (the "Retail Gift Cards," and together with the Promotional Gift Certificates, the "Gift Cards").  Customers may then redeem the Gift Cards for, among other things, hotel stays, dining, entertainment, and retail merchandise at various locations throughout the Debtors' resorts and casinos, as well as at various approved third-party merchants.

163.    The Debtors rely on a third-party financial services company, TransCard, LLC ("Transcard"), to manage obligations on account of outstanding Gift Cards.  When a customer uses a Promotional Gift Card, the merchant (whether it be the Debtors, a non-Debtor affiliate, or an approved third-party merchant) seeks reimbursement from TransCard, and TransCard, in turn, seeks reimbursement from the Debtors solely for the amount of the Promotional Gift Card used by the customer (a "Promotional Gift Card Obligation").  With respect to Retail Gift Cards,

80

however, the Debtors have an obligation to turn over to TransCard the payment made to purchase the Retail Gift Card (the "Retail Gift Card Obligations").  As a result, when a customer actually uses a Retail Gift Card, the Debtors incur no further obligations.  In addition, the Debtors also have prepetition obligations associated with outstanding "brand-wide" and "property-level" gift certificates that were issued before the Debtors' recent switch to TransCard, which transition took place throughout 2014 (the "Legacy Gift Certificate Obligations," and together with the Promotional and Retail Gift Card Obligations, the "Gift Card and Certificate Obligations").

164.   The Debtors estimate that as of the Petition Date approximately $1 million in Gift Card and Certificate Obligations remain outstanding.

### F.   Progressive Gaming Obligations, Accrued Customer Winnings.

#### 1.   Progressive Gaming Obligations.

165.   The Debtors offer progressive and multi-link progressive gaming machines and table games to their customers in the ordinary course of business.   Progressive gaming machines—electronic games that progressively accumulate funds wagered until the accumulated funds are won and paid out—and table games, including games such as poker, accrue value over a period of time based on amount of customer play.   Multi-link progressive gaming machines accrue value in the same manner, but do so at a more rapid rate on account of the fact that multiple progressive machines are "linked" together across several casinos, referred to as a "pot."  When a customer wins on a progressive gaming machine, the winnings are paid either by the Debtors or by the manufacturer, depending on the Debtors' contractual arrangement with the manufacturer.   Additionally, where the winnings are paid by the manufacturer, the Debtors periodically pay the manufacturers either a flat amount or a percentage of the amount wagered

on the gaming machines (depending on the Debtors' contractual arrangement with the manufacturer).

166.   The Debtors accrue obligations related to the table games and the progressive and multi-link progressive gaming machines (collectively, the "Progressive Gaming Obligations"). The Debtors estimate that as of the Petition Date, approximately $18 million in Progressive Gaming Obligations remains outstanding.

### 2.   Accrued Customer Winnings.

167.   In the ordinary course of business, when certain of the Debtors' customers win a jackpot, they may be offered the option of either a lump-sum payment or a stream of payments over a specified period of time.  Where such customers decide to receive their jackpot over a period of time, the Debtors carry a liability to such customer (the "Accrued Customer Winnings").  Accrued Customer Winnings also include the Debtors' outstanding liabilities with respect to parimutuel betting (i.e., where multiple bets are placed together in a pool, and payoff odds are derived by sharing the pool among all winning bets).   As of the Petition Date, the Debtors estimate that approximately $18.7 million in Accrued Customer Winnings remain outstanding.  Failure to continue honoring these Accrued Customer Winnings will not only threaten the Debtor's reputation in the gaming industry, but may also be unlawful under various laws and regulations applicable to the Debtors.

### G.   Independent Sales Representatives and Third-Party Meeting Planners.

168.   In the ordinary course of business, the Debtors rely on a network of independent agents (the "Independent Sales Representatives") to encourage customers to visit the Debtors' casino properties.  The Independent Sales Representatives serve as a liaison between the Debtors and the Independent Sales Representatives' independent customer databases, organizing group and individual trips for their customers to the Debtors' properties.  Because the Independent

Sales Representatives know and understand their customers' preferences, they can plan these trips to ensure maximum customer satisfaction, taking into account each customer's preferences with respect to, for example, hotel rooms, special event tickets, and dinner reservations.  In many instances, Independent Sales Representatives have connections to some of the Debtors' most valuable customers.  In exchange, the Debtors pay the Independent Sales Representatives certain commissions based on the estimated amount of revenue that such customers would bring to the Debtors' properties, as well as reimburse certain of the Independent Sales Representatives' out-of-pocket expenses incurred at the direction of the Debtors.  As of the Petition Date, the Debtors believe that approximately $3 million in liabilities remain outstanding with respect to the Independent Sales Representatives.

169.    Additionally, the Debtors rely in the ordinary course of business on a network of independent agents (the "Third-Party Meeting Planners") to arrange for various events and conventions to be held at their casino properties.  Like Independent Sales Representatives, the Third-Party Meeting Planners have independent customer databases and serve as the Debtors' primary (if not only) connection to the entities seeking locations to hold their events and conventions.  Annually, the Third-Party Meeting Planners are responsible for bringing hundreds of events and conventions to the Debtors' properties, ultimately resulting in substantial revenue. In exchange, the Debtors pay the Third-Party Meeting Planners commissions based on a percentage of hotel room revenue created as a result of the event or convention.   As of the Petition Date, the Debtors believe that approximately $3 million in liabilities remain outstanding with respect to the Third-Party Meeting Planners.

170.    Independent Sales Representatives and Third-Party Meeting Planners are an essential element of the Debtors business, generating a substantial portion of the Debtors revenue

each year.  Additionally, they provide the Debtors with more opportunities to interact with new customers, thereby providing the Debtors with the ability to grow their customer base and cultivate repeat business.  If the Debtors fail to honor prepetition obligations of the Independent Sales Representatives and Third-Party Meeting Planners, I believe such parties likely would seek to work more frequently with the Debtors' competitors and may even end all business relationships with the Debtors.

### H.    Property Damage Claims.

171.    In the ordinary course of business, customers assert various property damage claims (the "Property Damage Claims") against the Debtors.  Property Damage Claims may consist of, for example, damage to a customer's vehicle while in the care of the Debtors' employees and property lost during a customer's stay at one of the Debtors' properties.  The Debtors estimate that they spend approximately $500,000 each year on account of Property Damage Claims.

172.    The Debtors seek authority to maintain each of the Customer Programs in the ordinary course of business and to satisfy any prepetition obligations related thereto.  I believe that continuing to honor Customer Programs during these chapter 11 cases is critical to protecting the Debtors' ordinary course operations and preserving value, ultimately to the benefit of the Debtors' stakeholders.

### I.    Importance of Customer Programs.

173.    I believe that entry of a final order approving the Cash Management Motion and the relief requested therein is vital to the Debtors' business.  The Total Rewards program is an important driver of the Debtors' gaming operations, and any questions regarding whether the Debtors will be able to honor their obligations under such program would be severely detrimental to the Total Rewards program and the Debtors' ability to retain customer loyalty.

84

Moreover, many Customer Deposits are made well in advance of conventions, weddings, or other large events, and customers may request refunds and decide to do business with the Debtors' competitors if they fear that their Customer Deposit may no longer be available to them after 21 days; VIP customers that book their trips well in advance may have similar concerns.  I believe that the potential loss of customer business that is driven by these Customer Programs would be severely detrimental to the Debtors' operations at this important time.  Accordingly, I believe that the order approving the Customer Programs Motion should be entered on a final basis.

**VIII.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief (the "Taxes Motion").**

174.    In the ordinary course of business, the Debtors:  (a) collect and incur taxes in both Canada and the United States, including Sales and Use Taxes, Franchise Taxes, Income Taxes, Real and Personal Property Taxes, Gaming Taxes and Fees, and other taxes (as each is defined herein, and, collectively, the "Taxes"); (b) incur fees, assessments, and other similar charges necessary to operate their businesses, including fees related to Business Licenses and Permits and Other Fees (as each is defined herein, and, collectively, the "Fees"); and (c) remit such Taxes and Fees to various taxing, licensing, regulatory, and other authorities (collectively, the "Authorities"), a list of which is attached to the Taxes Motion as **Exhibit C**.  The Debtors pay or remit, as applicable, Taxes and Fees daily, weekly, monthly, quarterly, semi-annually, or annually to the respective Authorities, as required by applicable laws and regulations.  The failure by the Debtors' to pay the Taxes and Fees may have an adverse impact on their ability to operate.  Non-Debtor affiliate CES administers the reporting and remittance of substantially all of the Debtors' Tax and Fee obligations.

175.   I believe that any regulatory dispute or delinquency caused by Debtors' failure to pay the Taxes and Fees that affects the Debtors' ability to conduct business in a particular jurisdiction could have wide-ranging and adverse effects on the Debtors' operations as a whole. Among other things, Authorities could attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and pursue other remedies that will harm the estates. Furthermore, it is my understanding that certain directors and officers might be subject to personal liability—even if the failure to pay such Taxes and Fees was not a result of malfeasance on their parts—which would distract those key individuals from their duties related to the Debtors' restructuring.   Finally, Authorities could audit the Debtors or prevent the Debtors from continuing their businesses, which, even if unsuccessful, I believe would unnecessarily divert the Debtors' attention away from the reorganization process and may cause disruptions to the Debtors' businesses.

### A.   Sales and Use Taxes.

176.   The Debtors incur and collect from customers various state, local, and Canadian sales taxes (the "Sales Taxes"), including hotel occupancy, food and beverage, entertainment,[19] and luxury taxes, in connection with the sale of various products and services to their customers. Sales Taxes are charged at the point of purchase for certain goods and services and set by the applicable taxing authority as a percentage of the total purchase price.  In Canada, the Debtors are required to collect and remit the "goods and services tax" or "GST," which is a tax that applies to the purchase of property, goods, and services in Canada.  The GST is calculated as a percentage of the fair market value of the property, goods, or services.  Generally, the Debtors

---

[19]   Certain state Authorities impose Sales Taxes on entertainment furnished at a casino in connection with the selling of food or refreshment and/or where admission is charged, which typically are remitted to Authorities on a monthly basis.

KE 34489932

collect and remit Sales Taxes to Authorities on a monthly or quarterly basis following their collection.

177.     The Debtors are also responsible for remitting use taxes (the "Use Taxes," and together with the Sales Taxes, the "Sales and Use Taxes") on account of the purchase of tangible personal property and certain goods and services from vendors who are not always located in the state to which the property is to be delivered.  Use Taxes typically arise if a supplier does not have business operations in the state in which it is supplying goods and does not charge state taxes.  In such instances, applicable law generally requires the Debtors to self-assess the amount of Use Taxes and, accordingly, pay Use Taxes to the applicable Authorities.  Generally, the Debtors collect and remit Use Taxes to Authorities on a monthly, quarterly, or annual basis following their collection.

178.     From time to time, the Debtors also receive certain tax credits from Authorities for overpayments or refunds of Sales and Use Taxes.  The tax credits may arise, for instance, if the amount of the Debtors' prepayment of Sales and Use Taxes exceeds the actual amount of Sales and Use Taxes owed that month.  The Debtors use these tax credits in the ordinary course of business to offset against future Sales and Use Taxes.  By the Taxes Motion, the Debtors seek authority to continue using such tax credits from time to time in the ordinary course of business.

179.     Certain of the Debtors prepay an estimated amount of the Sales and Use Taxes they owe to applicable Authorities on a monthly basis.  To the extent that the Debtors' actual tax liability exceeds the estimated prepayment, these Debtors owe monthly true-ups to the applicable Authorities.

180.     For 2014, the Debtors remitted approximately $111 million in the aggregate to various Authorities on account of Sales and Use Taxes.  As of the Petition Date, the Debtors

believe they are current with respect to their payment of Sales and Use Taxes and that no Sales and Use Taxes will come due within the first 21 days of these chapter 11 cases.  However, out of an abundance of caution, the Debtors seek authority to pay any outstanding Sales and Use Taxes due as of the Petition Date, only upon entry of the Final Order, and continue to pay Sales and Use Taxes on a postpetition basis in the ordinary course of business.

### B.    Franchise and Income Taxes.

181.    The Debtors pay certain franchise taxes (the "Franchise Taxes") to Authorities as a condition to operate their businesses in the applicable taxing jurisdictions.  Franchise Taxes may be based on net operating income, a flat fee, or the amount or value of capital used in the business.   The Debtors pay Franchise Taxes on a bi-weekly, quarterly, or annual basis, depending on the jurisdiction.

182.    For 2014, the Debtors remitted approximately $3 million in the aggregate to various Authorities on account of Franchise Taxes.  The Debtors estimate that as of the Petition Date, $700,000 in Franchise Taxes will have accrued that remain unpaid, but none will become due and owing during the first 21 days of these chapter 11 cases.

183.    Additionally, certain Authorities require that the Debtors pay income or corporate taxes (the "Income Taxes") on net income (i.e., the difference between gross receipts, expenses, and additional write-offs).  The Debtors are required to pay, when due, Income Taxes on a monthly or quarterly basis.  For 2014, the Debtors did not pay any Income Taxes to any Authority due to projected net operating losses.  As of the Petition Date, the Debtors do not owe any Authority Income Taxes and no Income Taxes will come due within the first 21 days of these chapter 11 cases.  However, out of an abundance of caution, the Debtors seek authority to pay any outstanding Income Taxes due as of the Petition Date, only upon entry of the Final

KE 34489932

Order, and continue to pay Sales and Use Taxes on a postpetition basis in the ordinary course of business.

### C.    Real and Personal Property Taxes.

184.    State and local laws in many of the jurisdictions in which the Debtors operate generally grant Authorities the power to levy property taxes against the Debtors' personal and real property (the "Real and Personal Property Taxes").  To avoid the imposition of statutory liens on their properties, the Debtors typically pay the Real and Personal Property Taxes in the ordinary course of business on a quarterly, semi-annual, or annual basis, as applicable by jurisdiction, which typically are calculated in arrears.

185.    From time to time, the Debtors also receive certain tax credits for overpayments or refunds of Real and Personal Property Taxes.  These credits may arise, for instance, if the amount of the Debtors' prepayment of Real and Personal Property Taxes exceeds the actual amount of taxes owed.  The Debtors use these credits in the ordinary course of business to offset against future Real and Personal Property Taxes.

186.    For 2014, the Debtors remitted approximately $107 million in the aggregate to various Authorities on account of Real and Personal Property Taxes.  The Debtors estimate that as of the Petition Date, approximately $28.2 million in Real and Personal Property Taxes will have accrued and remain unpaid, of which approximately $1.2 million will become due and owing within the first 21 days of these chapter 11 cases.

### D.    Gaming Taxes and Fees.

187.    In the ordinary course of business, the Debtors are required to pay certain gaming-related taxes and fees (the "Gaming Taxes and Fees") to various Authorities.[20]  These Gaming

---

[20]    In some instances, the Debtors remit Gaming Taxes and Fees directly to private organizations, including the Harrison County Foundation and the Horseshoe Foundation of Floyd County, pursuant to agreements the

Taxes and Fees are payable daily, weekly, quarterly, or annually, as applicable by jurisdiction, and the amounts are based upon a number of criteria, including (a) flat fees, (b) a percentage of gross revenues received, (c) the number of gaming devices operated during the applicable period, and (d) the need for withholding from patron winnings.

188.    The Gaming Taxes and Fees include:

- Gaming Revenue Taxes.    In addition to Income Taxes, some state and local Authorities impose flat and/or graduated taxes on gaming receipts, which are remitted to Authorities on a daily, weekly, monthly, quarterly, or annual basis, as required by applicable law and regulations.

- Slot Machine Taxes and Fees.    Certain Authorities impose slot machine fees and taxes, calculated on a flat fee basis, according to revenue, or based on the number of games operated in a casino, and which are remitted to Authorities on a daily, weekly, monthly, quarterly, or annual basis, as required by applicable law and regulations.

- Tax Withholdings From Patron Winnings.    Certain Authorities, including the Internal Revenue Service, require the Debtors to withhold certain amounts from patron winnings in the ordinary course of business.    Such withholdings are typically remitted to Authorities on a bi-weekly basis.

- Regulatory Fees.    Certain local, state, and federal Authorities impose various fees for necessary regulatory licenses, including casino and gaming licenses.    The Debtors also pay regulatory fees to certain Authorities to cover costs for complying with state and local gaming laws and obtaining gaming licenses for employees.    Such fees are typically remitted to Authorities on a weekly, monthly, quarterly, or annual basis.

- Investment Alternative Tax.    The New Jersey Casino Control Commission allows casino licensees to either (a) pay a tax equal to 2.5% of its gaming revenue or (b) reinvest 1.25% of its gaming revenue through the Casino Reinvestment Development Authority (the "CRDA") in community and economic development projects in Atlantic City and throughout the state of New Jersey.    The Debtors have chosen option (b) and remit such amounts to the CRDA on a quarterly basis.

---

Debtors entered into with governmental Authorities in connection with state gaming license law.    In other instances, the Debtors pay certain Fees that are necessary to operate their horse racing businesses to private associations such as the Louisiana Thoroughbred Breeders Association and the Louisiana Horsemen's Benevolence Protective Association.    Such Fees include amounts for mandatory purse distributions required in connection with the Debtors' horse racing licenses.    Additionally, the Iowa West Racing Association, the non-profit sponsor for the Debtors, holds the gaming licenses for certain of the Debtors located in Iowa as required by state law and receives a percentage of gross revenue from the Debtors' operations in the state.

KE 34489932

- <u>Additional Miscellaneous Gaming Taxes and Fees</u>.   Several Authorities impose miscellaneous Gaming Taxes and Fees on the Debtors' operations including, without limitation, riverboat taxes, admission taxes and fees, federal excise taxes on wagering, and law enforcement fees.[21]   Also, the Debtors have, from time to time, incurred fines and penalties imposed by regulatory Authorities in jurisdictions in which the Debtors operate.

189.    For 2014, the Debtors remitted approximately $880 million in the aggregate to various Authorities on account of Gaming Taxes and Fees.  The Debtors estimate that, as of the Petition Date, approximately $7.1 million in Gaming Taxes and Fees will have accrued and remain unpaid, of which approximately $2.6 million will become due and owing within the first 21 days of these chapter 11 cases.

### E.    Business Licenses, Permits, and Other Fees.

190.    The Debtors must obtain various non-gaming related business licenses and permits (the "<u>Business License and Permits</u>") and pay corresponding fees (the "<u>Other Fees</u>") to operate their businesses in certain jurisdictions.  State and local laws require the Debtors to pay Other Fees for a wide-range of Business Licenses and Permits (<u>e.g.</u>, operating, mercantile, health, restaurant, telecommunications, vehicle, and liquor–from a number of local, state, and federal regulatory agencies).   Further, certain state Authorities require that the Debtors pay annual reporting fees to remain in good standing and conduct business within the state.  The method for calculating amounts due for the Business Licenses and Permits and the deadlines for paying such amounts varies by jurisdiction.  Generally, the Debtors collect and remit the Other Fees due on a weekly, bi-weekly, monthly, quarterly, annual, or semi-annual basis, depending on the jurisdiction.

---

[21]    For example, the Debtors are required to pay for the time spent by the New Jersey Division of Gaming Enforcement (the "<u>DGE</u>") personnel on matters directly related to the Debtors' casino and online gaming licenses, at the hourly rates set by the DGE.

KE 34489932

191.    For 2014, the Debtors remitted approximately $45 million in the aggregate to various Authorities on account of Other Fees for Business License and Permits.  The Debtors estimate that as of the Petition Date, approximately $4 million in Other Fees for Business License and Permits will have accrued and remain unpaid, of which approximately $3 million will become due and owing during the first 21 days of these chapter 11 cases.

**IX.    Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage, (B) Satisfy Payment of Prepetition Obligations Related to That Insurance Coverage in the Ordinary Course of Business, and (C) Renew, Supplement, or Enter into New Insurance Coverage in the Ordinary Course of Business, and (II) Granting Related Relief (the "Insurance Motion").**

192.    In the ordinary course of their business, the Debtors maintain multiple insurance policies providing coverage for, among other things, automobile liability, crime liability, employment-practice liability, general liability, marine liability, property liability, pollution liability, directors and officers liability, and workers' compensation liability (collectively, the "Policies").  The vast majority of the Policies providing coverage for the Debtors belong to a master insurance program, under which Policies are issued in the name of the Debtors' parent, CEC, and cover all CEC subsidiaries, including the Debtors and certain non-Debtor affiliates (cumulatively, and together with CEC, the "Insured Entities").   A schedule of the current Policies is attached to the Insurance Motion as **Exhibit B**.

A.    **Master Insurance Program.**

193.    CES administers certain corporate and enterprise services to the Caesars enterprise, including the master insurance program.  With regard to insurance, CES works with brokers and a third-party administrator to evaluate, procure, and administer cost-efficient Policies.  CEC also allocates the costs of the Policy premiums and related insurance obligations, including broker and third-party administrator fees, to the responsible Insured Entities in

accordance with established measures developed with the assistance of third-party brokers, administrators, and actuaries.  More specifically, CES allocates insurance costs to the Insured Entities either (a) on a fixed, per-claim basis that assesses a predetermined amount for each applicable insurance claim, or (b) on an exposure basis that allocates costs based on traditional insurance exposure factors such as revenue, employee count, and payroll.

194.    CES projects each Insured Entity's respective annual allocations for the applicable Policies based on historical trends, and the Debtors remit their proportional share of insurance costs to CES on a weekly basis.  CES then reimburses CEC, which, as the named insured party on such Policies, pays the combined insurance premiums for all Insured Entities to the Brokers (as defined below).  If, throughout the year, the actual costs of these Policies are more or less than the amounts allocated, CES reconciles the discrepancies and charges or reimburses the applicable Insured Entities.

195.    CEC obtains the Policies under the master insurance program through either (a) various third-party insurance carriers (collectively, the "Third-Party Insurance Carriers"), each of which is listed on **Exhibit B** to the Insurance Motion, or (b) one of CEC's captive insurance companies (collectively, the "Captive Insurance Companies"), which are non-Debtor direct, wholly owned subsidiaries of CEC.[22]    During the 12-month period spanning December 2013 through November 2014, the Debtors paid an aggregate amount of approximately $55.9 million on account of the Policies.  As of the Petition Date, the Debtors believe that they do not have any outstanding obligations under the Policies.

---

[22]    Because of the cost-saving function of captive insurance companies, preference is given to obtaining insurance coverage from the Captive Insurance Companies; however, when appropriate given the nature, risks, or regulations inherent to certain coverage, policies or excess coverage will be procured from the Third-Party Insurance Carriers.

1.    **Workers' Compensation Insurance.**

196.    In the ordinary course of business, CEC maintains workers' compensation insurance policies for the benefit of the employees of the Insured Entities (the "Workers' Compensation Policies").  In some states, CEC is a qualified self-insurer for workers' compensation purposes and prefunds deductible buy-down and self-insurance reimbursement obligations in one of the Captive Insurance Companies.  In other states, CEC obtains Workers' Compensation Policies from several different Third-Party Insurance Carriers. CES allocates the costs associated with the Workers' Compensation Policies on a fixed, per-claim basis because such allocation concentrates management attention on the reduction of claims during current operations rather than relying on eventual actual claims costs that can significantly lag after the time that the individual claimant makes a claim.  During the 12-month period spanning December 2013 through November 2014, the Debtors paid an aggregate amount of approximately $20.2 million on account of the Workers' Compensation Policies.  The current Workers' Compensation Policies expire on June 1, 2015.

2.    **Directors and Officers Insurance.**

197.    In the ordinary course of business, CEC maintains insurance coverage for the directors and officers of the Insured Entities that covers, among other things, defense costs, damages, settlements, and pre- and post-judgment interest arising from claims alleging an insured is liable for a breach of duty, neglect, error, misstatement, misleading statement, omission, securities-regulation violation, or any other act causing damage to the applicable Insured Entities or their shareholders (the "D&O Policies").  CEC obtains the current D&O Policies from several different Third-Party Insurance Carriers.  CES allocates the premiums under the D&O Policies among the Debtors and certain non-Debtor affiliates in accordance with CES's limited liability company agreement.  This allocation is subject to annual adjustment, with

94

the Debtors currently allocated approximately 70 percent of the premiums. The Debtors pay an aggregate annual amount of approximately $2 million on account of the current D&O Policies, which expire on February 8, 2015.

### 3.    General Liability and Excess Insurance.

198.    In the ordinary course of business, CEC maintains general-liability insurance that covers the Insured Entities against, among other things, personal injury, bodily injury, automobile liability, innkeeper's and garagekeeper's liability, and umbrella excess liability (the "General Liability Policies"). CEC obtains the current General Liability Policies from one of the Captive Insurance Companies and several different Third-Party Insurance Carriers and prefunds deductible buy-down and self-insurance reimbursement obligations in one of the Captive Insurance Companies. Generally, the costs associated with the General Liability Policies are allocated either in accordance with market practice by relying on calculations of the relative exposure of each applicable Insured Entity as compared to the aggregate exposure of all applicable Insured Entities or on a fixed, per-claim basis that assesses a predetermined amount for each applicable insurance claim, depending on the nature of the coverage. As an exception, because innkeeper's and garagekeeper's liability typically involves actual costs that can be reliably estimated and attributed wholly to a particular Insured Entity, CES will generally allocate these costs directly to that Insured Entity. During the 12-month period spanning December 2013 through November 2014, the Debtors paid an aggregate amount of approximately $10.7 million on account of the General Liability Policies. The current General Liability Policies expire on July 1, 2015.

### 4.    Property Insurance.

199.    In the ordinary course of business, CEC maintains property insurance that covers, among other things, the Insured Entities' property and fire, flood, and earthquake damage

(the "Property Policies").  CEC obtains the current Property Policies from several different Third-Party Insurance Carriers.  The costs associated with the master Property Policies are allocated in accordance with market practice by calculating the relative exposure of each applicable Insured Entity as compared to the total exposure of all applicable Insured Entities.  During the 12-month period spanning December 2013 through November 2014, the Debtors have paid an aggregate amount of approximately $21.1 million on account of the Property Policies.  The current Property Policies expire on December 1, 201.

### 5.   Debtor-Specific Insurance.

200.   Some Policies apply only to a certain Debtor entity and are maintained to cover circumstances particular to that Debtor's operations and properties.  For example, a particular Debtor's property may undergo construction and thus require a specific builder's-risk insurance policy beyond the coverage offered by the master Policies procured in CEC's name.  Because each of these Debtor-specific Policies applies only to the needs of a particular Debtor, CES does not allocate the costs of those Policies among the Insured Entities.  Rather, the individual Debtors obtain and maintain such Policies and, accordingly, pay the entire corresponding costs.  The Debtors typically pay these costs on a weekly basis to CES, which coordinates the administration of such Policies and forwards payment to the applicable parties.[23]

### 6.   Other Insurance.

201.   In addition to the Policies discussed above, CEC maintains the following categories of insurance policies that cover the Insured Entities:  (a) media and cyber risk coverage, protecting against, among other things, database breaches and unauthorized access;

---

[23]   In contrast, CEOC subsidiaries not based in the United States—including Debtor CEWL—typically maintain and administer most, if not all, of their Policies without the assistance of CES and generally are not covered by the master insurance program.  During the 12-month period spanning December 2013 to November 2014, CEWL, the only such Debtor entity, paid approximately $1.5 million on account of its various Policies.

KE 34489932

(b) coverage against crimes such as theft and wire fraud; (c) terrorism coverage; (d) automobile coverage; (e) aviation coverage; (f) marine coverage; (g) coverage against pollution-related legal liability; (h) fiduciary coverage; and (i) catering coverage.   CEC obtains these miscellaneous policies from one of the Captive Insurance Companies and several different Third-Party Insurance Carriers.   The costs associated with these Policies are allocated in accordance with market practice by calculating the relative exposure of each applicable Insured Entity as compared to the total exposure of all applicable Insured Entities.   Additionally, as discussed above, individual Debtors may maintain various Debtor-specific Policies that cover circumstances particular to that Debtor's operations and properties.   During the 12-month period spanning December 2013 through November 2014, the Debtors paid an aggregate amount of approximately $1.0 million on account of these miscellaneous Policies, which renew throughout the year.

### B.    Insurance Brokers and Third-Party Administrator.

202.    Aon Risk Solutions, Beecher Carlson Insurance Services, Conner Strong & Buckelew, and the Willis Group (together, the "Brokers") assist the Insured Entities with the procurement, evaluation, and negotiation of insurance coverage.   The Brokers' services ensure that the Debtors obtain insurance policies on the most advantageous terms available.   The Brokers receive compensation (the "Broker Fees") historically comprising approximately 2 to 3 percent of the total costs of the Policies.

203.    Additionally, Cannon Cochran Management Services, Inc. (the "Third-Party Administrator") is engaged to ease the Insured Entities' administrative burden with respect to the Workers' Compensation Policies and the General Liability Policies, ensuring that the entities maintain these Policies in the most cost-effective manner.   The Third-Party Administrator

receives compensation (the "Third-Party Administrator Fees") historically comprising approximately 4 to 5 percent of the total costs of the Policies.

204.    The Broker Fees and Third-Party Administrator Fees are allocated across the Insured Entities, which includes both the Debtors and non-Debtor affiliates.[24] As of the Petition Date, the Debtors do not believe there are any outstanding Broker Fees or Third-Party Administrator Fees for prepetition services.

**X.    Debtors' Motion for Entry of an Order (I) Approving Continuation of Surety Bond Program, and (II) Granting Related Relief (the "Surety Bond Motion").**

205.    In the ordinary course of business, certain third parties—often governmental units or other public agencies—require the Debtors to post surety bonds to secure their payment or performance of certain obligations (the "Surety Bond Program"). These obligations relate to, among other things, (a) workers' compensation obligations, (b) taxes, (c) gaming regulations and licenses, (d) litigation costs, (e) utilities, and (h) construction. A schedule of the current surety bonds maintained by the Debtors is attached to the Surety Motion as **Exhibit B**. Often, statutes or ordinances require the Debtors to post surety bonds to secure such obligations. As such, failure to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations.

206.    The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to the surety. Unlike an insurance policy, if a surety incurs a loss on a surety bond, the surety has the right to recover the full amount of that loss from the principal. The premiums for the surety bonds generally are determined on an annual basis and are paid by the Debtors when the surety issues the bond and annually upon each renewal. During

---

[24]    The Debtors request authority only to pay the Broker Fees and Third-Party Administrator Fees allocated to Debtor entities in the ordinary course of business.

KE 34489932

the 12-month period spanning December 2013 to November 2014, premiums for the Debtors' surety bonds totaled approximately $267,575.  The Debtors' outstanding surety bonds were issued by several different sureties, including:  (a) Safeco Insurance Company of America (nine surety bonds totaling approximately $1.2 million); (b) Liberty Mutual Insurance Company (one surety bond totaling approximately $160,000); (c) Romulus Risk and Insurance Inc. (seven surety bonds totaling approximately $9.7 million); (d) Safeco Insurance Company of America (nine surety bonds totaling approximately $1.2 million); (d) Western Surety Company (one surety bond totaling approximately $25,000); (f) The Ohio Casualty Insurance Company (one surety bond totaling approximately $6,000); (g) Travelers Casualty and Surety Company of America (two surety bonds totaling approximately $756,000); and (h) Lexon Insurance Company (eight surety bonds totaling approximately $846,000) (collectively, the "Sureties").

207.   As of the Petition Date, the Debtors have approximately $31.1 million in outstanding surety bonds.  The Debtors' outstanding surety bonds secure their performance and obligations in the following general categories and for the following approximate amounts:

| Number of Bonds | Nature of Bond | Approximate Aggregate Bond Amount (in thousands) |
|---|---|---|
| 8 | Workers' Compensation | $2,851 |
| 21 | Statutorily Required Tax Bonds | $3,503 |
| 12 | Statutorily Required Gaming Bonds | $15,873 |
| 16 | Contractor / Construction Performance and Payment Bonds | $1,634 |
| 3 | Utility Bonds | $3,517 |
| 2 | Litigation-Related Bonds | $198 |
| 15 | Various Operationally Required Bonds | $3,481 |
| 77 | Total | $31,056 |

208.   To continue their business operations during the reorganization process, the Debtors must retain the ability to provide financial assurances to state governments, regulatory

agencies, and other third parties.   This, in turn, requires that the Debtors maintain the existing

Surety Bond Program, including paying any and all premiums as they come due, renewing or

potentially acquiring additional bonding capacity as needed in the ordinary course of their

business, and execution of other agreements in connection with the Surety Bond Program.   As of

the Petition Date, the Debtors believe that they do not have any outstanding obligations, and that

they have the ability to fulfill continuing obligations, under the Surety Bond Program.

XI.     **Debtors' Application for Entry of an Order (A) Authorizing the Debtors to Employ and Retain Prime Clerk LLC as Notice, Claims, and Solicitation Agent, Effective Nunc Pro Tunc to the Petition Date, and (B) Granting Related Relief (the "Prime Clerk Retention Motion").**

209.     As discussed in the Prime Clerk Retention Application, the Debtors see to appoint

Prime Clerk LLC ("Prime Clerk") as notice, claims, and solicitation agent (the "Notice, Claims,

and Solicitation Agent") in the Debtors' chapter 11 cases, effective nunc pro tunc to the Petition

Date.   The Debtors will have thousands of creditors in these chapter 11 cases.   By appointing

Prime Clerk as the Notice, Claims, and Solicitation Agent in these chapter 11 cases, the

distribution of notices, the processing of claims, and the solicitation of votes will be expedited

and the Clerk of the United States Bankruptcy Court for the Northern District of Illinois (the

"Clerk") will be relieved of the administrative burden of processing what may be an

overwhelming number of claims.   It is my understanding that Prime Clerk is fully equipped to

handle the volume of mailing involved in properly sending the required notices to creditors and

other interested parties in these chapter 11 cases and processing the claims filed in the Debtors'

cases.   Moreover, on behalf of the Debtors, I submit, based on all engagement proposals obtained

and reviewed, that Prime Clerk's rates are competitive and reasonable given Prime Clerk's

quality of services and expertise.

**XII.** **Debtors' Motion for Entry of an Order Approving Case Management Procedures (the "Case Management Motion").**

210.    The Debtors believe there are thousands of parties in interest in these chapter 11

cases.  As a result, the Debtors anticipate that numerous parties may file requests for service of

filings pursuant to Bankruptcy Rule 2002, and that numerous motions, applications, and other

pleadings may be filed in these chapter 11 cases.

211.    Given the size and complexity of these chapter 11 cases, I believe that

implementation of the Case Management Procedures will facilitate the fair and efficient

administration of these cases.  More specifically, I believe that the Case Management Procedures

will benefit the Debtors' estates, the Court, and all parties in interest by, among other things:

- reducing the need for emergency hearings and requests for expedited relief;

- fostering consensual resolution of important matters;

- assuring prompt receipt of appropriate notice affecting parties' interests;

- providing ample opportunity to parties in interest to prepare for and respond to matters before the Court;

- reducing the substantial administrative and financial burden that likely would otherwise be placed on the Debtors and parties in interest who file documents in these chapter 11 cases; and

- reducing administrative burdens on the Court and the clerk's office.

**XIII.** **Debtors' Motion for Entry of an Order (I) Extending Deadline to File Schedules of Assets and Liabilities, Current Income and Expenditures, and Executory Contracts and Unexpired Leases and Statements of Financial Affairs, and (II) Granting Related Relief (the "Schedules and Statements Extension Motion").**

212.    The Debtors seek an extension of 47 days to file their schedules of assets and

liabilities, schedules of current income and expenditures, schedules of executory contracts and

unexpired leases (collectively, the "Schedules"), and statements of financial affairs (collectively,

the "Statements").  To prepare their Statements and Schedules, the Debtors will have to compile

101

a voluminous amount of information from books, records, and documents—not centrally located within the Debtors' organization—relating to a large number of claims, assets, and contracts. Collecting the necessary information will require an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors.  Because focusing the attention of key personnel on critical operational and chapter-11-compliance issues during the early days of these chapter 11 cases will facilitate the Debtors' smooth transition into chapter 11, I believe that the Debtors' request for a 47-day extension of time to file their Schedules and Statements will therefore maximize the value of their estates for the benefit of all parties in interest.  Moreover, I do not believe an extension will harm creditors or other parties in interest because, even under the extended deadline, the Debtors will file the Schedules and Statements far in advance of any deadline for filing proofs of claim in these chapter 11 cases.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 34489932

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Chicago, Illinois
Dated:  January 15, 2015

_____
Randall S. Eisenberg
Chief Restructuring Officer
Caesars Entertainment Operating Company, Inc.