## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
|  | ) |
| Debtors. | ) (Joint Administration Requested) |
|  | ) |

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND
## FINAL ORDERS (I) AUTHORIZING USE OF CASH COLLATERAL,
## (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE
## AUTOMATIC STAY TO PERMIT IMPLEMENTATION, (IV) SCHEDULING
## A FINAL HEARING, AND (V) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (collectively, the "Debtors") file this motion (this "Motion") for entry of an interim order (the "Interim Order"),[2] substantially in the form attached hereto as **Exhibit A**, and a final order (the "Final Order," and, together with the Interim Order, collectively, the "Orders"), (I) authorizing the Debtors to use Cash Collateral; (II) granting adequate protection to the Prepetition Secured Creditors solely to the extent of any diminution in the value of their respective interests in the Prepetition First Lien Collateral and Prepetition Second Lien Collateral, as applicable; (III) modifying the automatic stay as necessary to effectuate all of the terms and provisions provided herein; (IV) prescribing the form and

---

[1]   The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/CEOC.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Interim Order.

KE 34464885

manner of notice and setting the time for the final hearing (the "<u>Final Hearing</u>"); and (V) granting related relief.  In support of this motion, the Debtors respectively submit the *Declaration of Randall S. Eisenberg in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay to Permit Implementation, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, which has been filed contemporaneously herewith.

<u>**Preliminary Statement**</u>

1.      The Debtors have significant cash on hand to fund their operations throughout these chapter 11 cases.  As of the Petition Date, the Debtors have approximately $864 million of cash.  Much of that cash constitutes the Prepetition Secured Creditors' Cash Collateral.  The Debtors' ability to access Cash Collateral is critical to maintaining ongoing operations and to ensuring the success of this restructuring.  Absent the use of Cash Collateral, the Debtors will be unable to pay their thousands of employees that report to work every day, fund working capital, pay their taxes, maintain their insurance policies, continue their cash management system, make capital expenditures, or pay the administrative costs throughout these chapter 11 cases.

2.      To that end, in advance of these chapter 11 filings, the Debtors engaged in good faith negotiations regarding the terms of the restructuring and the consensual use of Cash Collateral with both an *ad hoc* group of certain of the First Lien Lenders (the "<u>First Lien Credit Agreement Group</u>") and an *ad hoc* group of certain of the First Lien Noteholders (the "<u>First Lien Note Group</u>," and together with the First Lien Credit Agreement Group, the "<u>First Lien Group</u>").

3.      To the extent that any objections to the Debtors' use of Cash Collateral remain, the Debtors believe that all relevant stakeholders' interests are adequately protected for the following reasons:

- *First*, the Debtors will provide the Prepetition Secured Creditors with replacement liens on substantially all of the Debtors' assets to the extent of any diminution in value of the Prepetition Secured Creditors' respective interests in the prepetition collateral.

- *Second*, the Debtors will provide the Prepetition First Lien Creditors with superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code.

- *Third*, the Debtors will provide the Prepetition First Lien Creditors with monthly adequate protection payments at a rate of 1.5% per year of the aggregate amount of all Prepetition First Lien Obligations as of the Petition Date, and payment on a pro rata basis to the Prepetition First Lien Creditors of all remaining Available Cash, as that term is defined in the previously filed Restructuring Support Agreement, upon the effective date of a plan of reorganization.

- *Fourth*, the Debtors will continue to operate in the ordinary course of business consistent with the terms of an agreed-to cash flow forecast used to establish the Budget.

- *Fifth*, the Debtors have entered into a Restructuring Support Agreement with the holders of approximately 80% of the principal amount outstanding under the First Lien Notes, which sets forth the treatment of claims pursuant to a plan of reorganization and requires compliance with various plan-related milestones. This defined path to emergence further preserves the value of the Debtors' business and maximizes the Prepetition Secured Creditors' collateral, including the Cash Collateral.

- *Lastly*, the Debtors will (a) stipulate as to the amount of the Prepetition Secured Creditors' obligations, and the validity and perfection of the Prepetition First Lien Creditors' prepetition liens, (b) pay each of the Prepetition First Lien Agent's and the First Lien Group's reasonable professional fees and expenses, and (c) provide the professional advisors of the Prepetition First Lien Agents and the First Lien Group with access to the Debtors' books and records and other reporting functions.

Thus, the Debtors believe that this robust adequate protection package is more than sufficient to adequately protect the interests of the Prepetition Secured Creditors against any diminution of value of their Cash Collateral.

4.      Finally, the First Lien Noteholders and the Second Lien Noteholders cannot object to the Debtors' use of Cash Collateral under various intercreditor agreements under

certain circumstances, provided that they receive certain minimal levels of adequate protection, which is in fact the case here.

5.      Based on the foregoing, and as discussed in more detail herein, the Debtors respectfully request that the Court approve the use of Cash Collateral as the Prepetition Secured Creditors have either consented to such use or are otherwise adequately protected as required by the Bankruptcy Code.

## **Background**[3]

6.      Caesars Entertainment Operating Company, Inc. ("CEOC"), together with its Debtor and non-Debtor subsidiaries, provides casino entertainment services and owns, operates, or manages 38 gaming and resort properties in 14 states and five countries, operating primarily under the Caesars®, Harrahs®, and Horseshoe® brand names.  The Debtors represent the largest, majority-owned operating subsidiary of Caesars Entertainment Corporation ("CEC"), a publicly traded company that is the world's most diversified casino-entertainment provider.  CEC, through its ownership and economic interests in CEOC, Caesars Entertainment Resort Properties ("CERP"), and Caesars Growth Partners ("CGP"), owns, operates, or manages 50 casinos in 14 U.S. states and 5 countries, covering 3 million square feet of gaming space, 42,000 hotel rooms, 45 million customer loyalty program participants, and 68,000 employees.

7.      The Debtors employ approximately 32,000 people through geographically diverse operations throughout the United States, including seven regional casino properties located in the Midwest (across Illinois, Indiana, Iowa, and Missouri); six regional casino properties located in the Southeast (throughout Louisiana, Mississippi, and North Carolina); four casinos located in

---

3   The facts and circumstances supporting this Motion are set forth in the *Declaration of Randall S. Eisenberg, Chief Restructuring Officer of Caesars Entertainment Operating Company, Inc., in Support of First Day Pleadings* (the "First Day Declaration"), filed contemporaneously herewith.

KE 34464885

Arizona, California, Maryland, and Pennsylvania; four casinos located in Nevada, including the world famous Caesars Palace at the heart of the Las Vegas Strip; and two casinos located in Atlantic City, New Jersey.  On a consolidated basis, CEOC and its subsidiaries reported approximately $993 million of Adjusted EBITDA on net revenues of approximately $5.4 billion for the twelve months ending September 30, 2014.

8.      On the date hereof (the "Petition Date"), each of the Debtors filed a petition with this Court under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Motion, the Debtors requested procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b).  No party has requested the appointment of a trustee or examiner in these chapter 11 cases, and no committees have been appointed or designated.

## Jurisdiction

9.      The United States Bankruptcy Court for the Northern District of Illinois (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

10.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

11.     The statutory bases for the relief requested in this Motion are sections 105, 361, 362, 363, 503, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4001-1, 4001-2, and 5005-3(D) of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules").

5

## Relief Requested

12.    The Debtors seek entry of the Orders granting the following relief: (a) authorizing the Debtors to use "cash collateral" (as defined in section 363(a) of the Bankruptcy Code, "Cash Collateral") pursuant to sections 361 and 363 of the Bankruptcy Code; (b) granting adequate protection to the Prepetition Secured Creditors pursuant to sections 361, 362, and 363 of the Bankruptcy Code, solely to the extent of diminution in value of their respective interests in the Prepetition First Lien Collateral or Prepetition Second Lien Collateral; (c) vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms provided herein; and (d) granting related relief.   In addition, the Debtors request that the Court schedule the Final Hearing to consider approval of this Motion on a final basis.

## I.    Concise Statement of the Material Terms of the Interim Order.

13.    Pursuant to and in accordance with Bankruptcy Rule 4001(b)(1)(B) and Local Rule 4001-2(A)(3), the material provisions of the relief requested in the Interim Order, and the location of such provisions in the Interim Order, are as follows:[4]

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **Parties with Interest in Cash Collateral:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(i)] | The Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Creditors, and to the Second Lien Agent, for the benefit of itself and the Second Lien Noteholders. | ¶E (i)-(iii) |

---

[4]    This summary is qualified in its entirety by the provisions of the Interim Order.  To the extent there are any conflicts between this summary and the Interim Order, the terms of the Interim Order shall govern.

KE 34464885

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **Use of Cash Collateral:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(ii)] | Upon entry of the Interim Order, the Debtors are authorized to use Cash Collateral subject to and solely in accordance with the terms and conditions of the Interim Order.  Cash Collateral may only be used during the Specified Period for working capital and general corporate purposes, including the renewal and extension of existing letters of credit in the ordinary course of business, to pay costs associated with the Debtors' restructuring, and otherwise in accordance with this Interim Order.  The Debtors will continue to operate in the ordinary course of business consistent with the cash flow forecast used to establish the Budget. | ¶¶ 3(b); 4(g) |
| **Duration of Use:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] | The Debtors' right to use Cash Collateral under the Interim Order will terminate immediately upon the earlier of (i) March 3, 2015, if the Final Order, in form and substance acceptable to the Required Lenders, has not been entered by this Court prior to such date, (ii) the First Lien Credit Parties' Outside Date, (iii) immediately upon expiration of the First Lien Credit Parties' Remedies Notice Period, and (iv) the date the Interim Order ceases to be in full force and effect.  The Debtors may continue using the Cash Collateral during any First Lien Credit Parties' or First Lien Noteholder Parties' Remedies Notice Period. | ¶ 3(a) |

**Events of Default:**

[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]

[Local Bankr. R. 4001-2(A)(3)]

<u>Events of Default.</u>  The Interim Order contains two sets of Events of Default — one applicable to the First Lien Credit Parties, who are entitled to exercise remedies under the First Lien Documents, and one applicable to the First Lien Noteholder Parties, with whom the Debtors have entered into a Restructuring Support Agreement.  The following is a summary of the applicable events of default.

¶¶ 7;8

| First Lien Credit<br>Parties' Events of Default | First Lien Noteholder<br>Parties' Events of Default | |
|---|---|---|
| • failure to file a plan and disclosure statement within 90 days of the Petition Date, in form, scope, and substance reasonably satisfactory to the Required Lenders and the Debtors; | • failure to file a motion seeking to assume the Restructuring Support Agreement within 20 days; | ¶¶ 7(a);8(a) |
| • failure to have obtained entry of (i) an order approving the disclosure statement and (ii) an order approving solicitation procedures within 123 days of the Petition Date, in each case in form, scope, and substance reasonably satisfactory to the Required Lenders and the Debtors; | • failure to file a plan and disclosure statement within 45 days of the Petition Date, in each case, in form, scope, and substance reasonably satisfactory to the Requisite Consenting Creditors and the Debtors; | ¶¶ 7(b); 8(b) |
| • failure to have obtained entry of a confirmation order that is reasonably satisfactory to the Required Lenders and the Debtors within 240 days of the Bankruptcy Court's approval of the Disclosure Statement; | • failure to have an order approving the Restructuring Support Agreement within 90 days of the Petition Date ; | ¶¶ 7(c); 8(c) |

7

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | • failure to effectuate the Plan within 365 days of the Petition Date; | • failure to have obtained entry of (i) an order approving the disclosure statement and (ii) an order approving solicitation procedures within 150 days of the Petition Date, in each case in form, scope, and substance reasonably satisfactory to the Requisite Consenting Creditors and the Debtors; | ¶¶ 7(d); 8(d) |
| | • obtaining indebtedness for borrowed money secured by a security interest, mortgage, or other lien on all or any portion of the Collateral equal or senior to any security interest, mortgage, or other lien of the Prepetition Secured Agents or the Prepetition Secured Creditors; | • failure to have obtained entry of a confirmation order that is reasonably satisfactory to the Requisite Consenting Creditors and the Debtors within 120 days of the Bankruptcy Court's approval of the Disclosure Statement; | ¶¶ 7(e); 8(e) |
| | • obtaining indebtedness for borrowed money, or guaranties in respect thereof, in excess of $35 million outside of the ordinary course of business without the prior written consent of the Required Lenders, in their reasonable discretion; | • failure to effectuate the Plan within 120 days of entry of the confirmation order, subject to certain regulatory extensions; | ¶¶ 7(f); 8(f) |
| | • any Debtor allows, incurs, or creates certain postpetition liens or security interests, subject to certain exceptions; | • failure to have obtained entry of a Final Order within 75 days; | ¶¶ 7(g); 8(g) |
| | • any Debtor allows, incurs, or creates any claim entitled to administrative status which is equal or senior to the Superpriority Claim granted to any of the Prepetition First Lien Creditors; | • obtaining indebtedness for borrowed money secured by a security interest, mortgage, or other lien on all or any portion of the Collateral equal or senior to any security interest, mortgage, or other lien of the Prepetition Secured Agents or the Prepetition Secured Creditors; | ¶¶ 7(h); 8(h) |

8

| Material Terms | Summary of Material Terms | | Provision |
|---|---|---|---|
| | • entry of an order under certain circumstances granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code to (i) allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien on or the granting of any lien on any Collateral to any federal, state, or local environmental or regulatory agency or authority, which in either case could reasonably be expected to have a material adverse effect on the business, operations, property, assets, or financial condition of the Debtors within a particular region (taken as a whole); | • obtaining indebtedness for borrowed money, or guaranties in respect thereof, in excess of $35 million outside of the ordinary course of business without the prior written consent of the Required Lenders, in their reasonable discretion; | ¶¶ 7(i); 8(i) |
| | • entry of an order modifying or granting relief from the automatic stay with respect to any Collateral or assets exceeding $35 million; | • any Debtor allows, incurs, or creates certain postpetition liens or security interests, subject to certain exceptions; | ¶¶7(j); 8(j) |
| | • the Interim Order ceases to be in full force and effect, including without limitation, without the Required Lenders' consent of the Interim Order; | • any Debtor allows, incurs, or creates any claim entitled to administrative status which is equal or senior to the Superpriority Claim granted to any of the Prepetition First Lien Creditors; | ¶¶ 7(k); 8(k) |
| | • dismissal or conversion of any of the Chapter 11 Cases, or appointment of a trustee or examiner with enlarged powers; | • entry of an order under certain circumstances granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code to (i) allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien on or the granting of any lien on any Collateral to any federal, state, or local environmental or regulatory agency or authority, which in either case could reasonably be expected to have a material adverse effect on the business, operations, property, assets, or financial condition of the Debtors within a particular region (taken as a whole); | ¶¶ 7(l); 8(l) |

9

| Material Terms | Summary of Material Terms | | Provision |
|---|---|---|---|
| | • entry of an order impairing the Prepetition First Lien Creditors' rights or claims under numerous circumstances; | • entry of an order modifying or granting relief from the automatic stay with respect to any Collateral or assets exceeding $35 million; | ¶¶ 7(m); 8(m) |
| | • failure to make adequate protection payments and such failure shall (other than in respect of the Monthly Adequate Protection Payment) remain unremedied for five (5) business days; | • the Interim Order ceases to be in full force and effect, including without limitation, without the Required Lenders' consent of the Interim Order; | ¶¶ 7(n); 8(n) |
| | • entry of an order among other things, avoiding, terminating, or invalidating the Adequate Protection Payments; | • dismissal or conversion of any of the Chapter 11 Cases, or appointment of a trustee or examiner with enlarged powers; | ¶¶ 7(o); 8(o) |
| | • entry of any (i) "first day orders" that are not in form and substance reasonably satisfactory to the Required Lenders, or (ii) other order that seeks payment in respect of a prepetition claim in excess of $5 million individually or $20 million in the aggregate, without the consent of the Required Lenders; | • entry of an order impairing the Prepetition First Lien Creditors' rights or claims under numerous circumstances; | ¶¶ 7(p);8(p) |
| | • termination of the Debtors' exclusivity to file a plan; | • failure to make adequate protection payments and such failure shall (other than in respect of the Monthly Adequate Protection Payment) remain unremedied for five (5) business days; | ¶¶ 7(q); 8(q) |
| | • failure to comply with various gaming or regulatory requirements which results in a material adverse effect to the Debtors' financial condition; | • entry of an order among other things, avoiding, terminating, or invalidating the Adequate Protection Payments; | ¶¶ 7(r);8(r) |
| | • failure to comply with the Budget reporting and delivery requirements set forth in paragraph 4(g) of the Interim Order; | • entry of any (i) "first day orders" that are not in form and substance reasonably satisfactory to the Required Lenders, or (ii) other order that seeks payment in respect of a prepetition claim in excess of $5 million individually or $20 million in the aggregate, without the consent of the Required Lenders; | ¶¶ 7(s); 8(s) |

KE 34464885

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | • filing any motion to modify the Interim Order without the consent of the Required Lenders; or | • termination of the Debtors' exclusivity to file a plan; | ¶ 7(t);8(t) |
| | • failure to comply with any other provision of the Interim Order and such failure remains unremedied for five business days. | • failure to comply with various gaming or regulatory requirements which results in a material adverse effect to the Debtors' financial condition; | ¶¶ 7(u);8(u) |
| | | • failure to comply with the Budget reporting and delivery requirements set forth in paragraph 4(g) of the Interim Order; | ¶ 8(v) |
| | | • filing any motion to modify the Interim Order without the consent of the Required Lenders; or | ¶ 8(x) |
| | | • failure to comply with any other provision of the Interim Order and such failure remains unremedied for five business days. | ¶ 8(y) |
| **Adequate Protection:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | The Debtors are providing adequate protection for the interests of the Prepetition Secured Creditors in Prepetition Collateral (including Cash Collateral), solely to the extent of any diminution in the value of the Prepetition Secured Creditors' respective interest in the Prepetition Collateral from and after the Petition Date.<br><br>Specifically, the Debtors propose to provide the Prepetition Secured Creditors with the following adequate protection package  *First*, the Debtors will provide the Prepetition Secured Creditors with replacement liens on substantially all of the Debtors' assets to the extent of any diminution in value of the Prepetition Secured Creditors' respective interests in the prepetition collateral.  *Second*, the Debtors will grant the Prepetition First Lien Creditors with superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code.  *Third*, the Debtors will provide the Prepetition First Lien Creditors with monthly adequate protection payments at a rate of 1.5% per year of the aggregate amount of all Prepetition First Lien Obligations as of the Petition Date, and payment on a pro rata basis to the Prepetition First Lien Creditors of all remaining Available Cash, as that term is defined in the previously filed Restructuring Support Agreement, upon the effective date of a plan of reorganization.  *Fourth*, the Debtors will operate in the ordinary course of business pursuant to an agreed-upon cash flow forecast used to establish the budget.  *Fifth*, the Debtors will abide by certain milestones pursuant to a Restructuring Support Agreement with the holders of approximately 80% of the principal amount outstanding under the First Lien Notes, which sets forth the treatment of claims pursuant to a plan of reorganization and requires compliance with various plan-related milestones.  This defined path to emergence preserves the value of the Debtors' business and maximizes the Prepetition Secured Creditors' collateral, including the Cash Collateral.  *Lastly*, the Debtors will (a) stipulate as to the amount of the Prepetition Secured Creditors' obligations, and the validity and perfection of the Prepetition First Lien Creditors' prepetition liens, (b) pay each of the Prepetition First Lien Agents' and the First Lien Group's reasonable professional fees and expenses, and (c) provide the professional advisors of the Prepetition First Lien Agents and the First Lien Group with access | ¶ 4 |

KE 34464885

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | to the Debtors' books and records and other reporting functions. | |
| **Priority of Adequate Protection Liens:** [Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | The Adequate Protection Liens granted to the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Creditors (the "First Priority Adequate Protection Liens"), shall be senior liens, shall rank in the same relative priority and right as do their respective security interests and liens under the respective First Lien Documents pursuant to the First Lien Intercreditor Agreement, and shall be subject and subordinate only to the Carve Out. The Adequate Protection Liens granted to the Second Lien Agent, for the benefit of itself and the Second Lien Noteholders (the "Second Priority Adequate Protection Liens"), shall be junior and subordinate in all respects to (i) the Carve Out, (ii) the First Priority Adequate Protection Liens, and (iii) the Prepetition First Priority Liens. | ¶ 4(b) |
| **Adequate Protection Payments:** [Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | <u>Payment of Professional Fees</u>.  The Debtors seek authority to pay all outstanding prepetition and all postpetition reasonable and documented out-of-pocket fees (including any transaction fees) and expenses of (i) Rothschild Inc. ("Rothschild"), financial advisors to certain of the First Lien Lenders (the "First Lien Credit Agreement Group"), pursuant to the engagement letter dated as of September 10, 2014, (ii) Stroock & Stroock & Lavan LLP ("Stroock"), as counsel to the First Lien Credit Agreement Group, (iii) one special REIT counsel retained by the First Lien Credit Agreement Group in the Chapter 11 Cases, (iv) Shaw Fishman Glantz & Towbin LLC, as local Illinois bankruptcy counsel to the First Lien Credit Agreement Group in the Chapter 11 Cases, (v) one local Delaware bankruptcy counsel retained by the First Lien Credit Agreement Group, (vi) one local bankruptcy counsel for each other applicable jurisdiction in which the Debtors may commence, or have commenced against them, bankruptcy proceedings (vii) one gaming counsel and one special counsel, each as retained by the First Lien Credit Agreement Group, (viii) Cahill Gordon & Reindel LLP, as counsel to the First Lien Credit Agent, (ix) the First Lien Credit Agent, (x) Miller Buckfire & Co. ("Miller Buckfire"), financial advisors to certain of the First Lien Note Group, pursuant to the engagement letter dated as of October 15, 2014, (xi) Kramer Levin Naftalis & Frankel LLP, as counsel to the First Lien Note Group ("Kramer Levin"), (xii) Breazeale, Sachse & Wilson, L.L.P., as counsel to the First Lien Note Group, (xiii) Ballard Spahr LLP, as counsel to the First Lien Note Group, (xiv) one special REIT counsel retained by the First Lien Note Group in the Chapter 11 Cases, (xv) Neal, Gerber & Eisenberg LLP, as local Illinois counsel to the First Lien Note Group in the Chapter 11 Cases, (xvi) one local Delaware bankruptcy counsel retained by the First Lien Note Group, (xvii) one local bankruptcy counsel for each other applicable jurisdiction in which the Debtors may commence, or have commenced against them, bankruptcy proceedings, as retained by the First Lien Note Group, (xviii) the First Lien Notes Indenture Trustee, (xix) Katten Muchin Rosenman LLP, as counsel to the First Lien Notes Indenture Trustee, and (xx) such other legal, financial, consulting, financial, and/or other professional advisors as may be retained or may have been retained from time to time by any of the members of the First Lien Group with the prior written consent of the Debtors, which consent shall not be unreasonably withheld. The payment of such fees and expenses will be subject to disclosure to the U.S. Trustee and the Committee, and will allow for a 10 day objection period.<br><br><u>Adequate Protection Payments</u>.  The Debtors seek authority to pay to each of the Prepetition First Lien Agents, on behalf of themselves and the Prepetition First | ¶ 4(e); (f) |

12

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Lien Creditors, (i) monthly adequate protection payments in cash at a rate equal to 1.5% per annum of the aggregate amount of all Prepetition First Lien Obligations as of the Petition Date (the "Monthly Adequate Protection Payments") and (ii) payment on a pro rata basis of all Available Cash (as defined in the Second Amended Restructuring Support and Forbearance Agreement, dated January 14, 2015) remaining upon the effective date of a plan of reorganization in these Chapter 11 Cases (together with the Monthly Adequate Protection Payments and the payments required under paragraph 4 hereunder, the "Adequate Protection Payments"). | |
| **Findings of Fact Binding on the Debtors and Parties in Interest:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br><br>[Local Bankr. R. 4001-2(A)(2)(b); 4001-2(A)(3)] | Subject in all respects to the Challenge Period (as defined in the Interim Order), the Interim Order contains certain stipulations by the Debtors binding on all parties in interest upon the Challenge Period Termination Date (as defined in the Interim Order), including:<br><br>• The Debtors' stipulation as to the amount of the claims of the Prepetition Secured Creditors as of the Petition Date; and<br><br>• The Debtors' stipulation that validity amount, and priority of the Prepetition First Lien Obligations and First Priority Liens. | ¶¶ E, 12<br><br><br><br>¶ E(i)–(v)<br><br><br>¶ E(iv) |
| **506(c) Waiver**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br><br>[Local Bankr. R. 4001-2(A)(2)(c); 4001-2(A)(3)] | Subject to entry of the Final Order, in partial consideration for, among other things, the Carve Out and the payments made under the Budget to administer the Chapter 11 Cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against any Prepetition First Lien Agent or any Prepetition First Lien Creditor or any of the Prepetition First Lien Obligations or the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Prepetition First Lien Creditors upon the Prepetition First Lien Collateral or Prepetition Second Lien Collateral, as applicable, without the prior express written consent of the affected Prepetition First Lien Agent and/or affected Prepetition First Lien Creditor, in their sole discretion, and no such consent shall be implied, directly or indirectly, from any other action, inaction, or acquiescence by any such agents or creditors. | ¶¶ I, 15 |
| **Liens on Chapter 5 Causes of Actions**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br><br>[Local Bankr. R. 4001-2(A)(2)(d); 4001-2(A)(3)] | Subject to entry of a Final Order, the Prepetition Secured Creditors will be granted Adequate Protection Liens on, among other things, the proceeds of any causes of action under sections 502(d), 544, 545, 547, 548, 550 (except as provided above), or 553 of the Bankruptcy Code (the "Avoidance Actions"). | ¶4(a) |
| **Carve Out and Committee Investigation Budget:**<br><br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iii)]<br><br>[Local Bankr. R. | Carve Out. (a)    As used in this Interim Order, "Carve Out" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "Estate Professional Fees") incurred | ¶¶ 11, 13 |

13

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| 4001-2(A)(2)(f);<br>4001-2(A)(3)] | by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "Debtor Professionals") and any Committee appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the First Lien Credit Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Estate Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first business day following delivery by the First Lien Credit Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap"). For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by the First Lien Credit Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of a First Lien Credit Parties' Event of Default stating that the Post-Carve Out Trigger Notice Cap has been invoked.<br><br>Carve Out Reserves. On the day on which a Carve Out Trigger Notice is given by the First Lien Credit Agent to the Debtors, the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Estate Professional Fees. The Debtors shall deposit and hold cash in an amount equal to the then unpaid amounts of the Estate Professional Fees in a segregated account at the First Lien Credit Agent in trust to pay any then-unpaid Estate Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims. On the day on which a Carve Out Trigger Notice is given by the First Lien Credit Agent to the Debtors, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap. The Debtors shall deposit and hold such amounts in a segregated account at the First Lien Credit Agent in trust to pay such Estate Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve," and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims. All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Creditors under the First Lien Documents in accordance with their rights and priorities as of the Petition Date. All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Creditors under the First Lien Documents in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in this Interim Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in this paragraph 11, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out |  |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 11, prior to making any payments to the Prepetition First Lien Creditors. Notwithstanding anything to the contrary in the Prepetition Secured Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Prepetition Secured Agents and the Prepetition Secured Creditors shall not, and shall not direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute CEOC Secured Debt or increase or reduce the Prepetition Secured Obligations; (ii) the failure of the Carve Out Reserves to satisfy in full the Estate Professional Fees shall not affect the priority of the Carve Out; and (iii) in no way shall the Budget, the Budget Variance Report, the Carve Out, the Post-Carve Out Trigger Notice Cap, the Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Estate Professional Fees due and payable by the Debtors. For the avoidance of doubt and notwithstanding anything to the contrary herein or in this Interim Order or in any Prepetition Secured Documents, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and the Superpriority Claim, and any and all other forms of adequate protection, liens, or claims securing the Prepetition Secured Obligations. <br><br> <u>Payment of Estate Professional Fees Prior to the Carve Out Trigger Notice</u>. Any payment or reimbursement made prior to the delivery of the Carve Out Trigger Notice in respect of any Estate Professional Fees shall not reduce the Carve Out. <br><br> <u>Payment of Carve Out On or After Carve Out Trigger Notice</u>. Any payment or reimbursement made on or after the delivery of the Carve Out Trigger Notice in respect of any Estate Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis. Any funding or payment of the Carve Out shall be added to, and made a part of, the Prepetition Secured Obligations secured by the Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the Prepetition Secured Documents, the Bankruptcy Code, and applicable law. <br><br> <u>No Lender Guaranty</u>. The Prepetition First Lien Creditors shall not be responsible for the direct payment or reimbursement of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases. Nothing contained herein shall be construed (i) to obligate the Prepetition First Lien Creditors in any way to pay compensation to or reimburse expenses of any Professional Persons or member of any Committee, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out if actual Estate Professional Fees allowed by this Court are higher in fact than the estimated fees and disbursements reflected in the Budget; or (iii) as a consent to the allowance of any professional fees or expenses of any Estate Professionals or shall affect the right of the Prepetition First Lien Creditors to object to the allowance and payment of such fees and expenses. <br><br> <u>Committee Investigation Budget</u>. The Interim Order provides that up to $75,000 may be made available to any Committee (if appointed) to investigate the Prepetition First Lien Obligations, the Prepetition First Priority Liens and/or any potential Challenge (as defined below); provided that the Prepetition First Lien Creditors shall have the right to object to, contest, or otherwise challenge any | |

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| | claim for amounts incurred in connection with such activities on the grounds that such claim shall not be allowed, treated or payable as an administrative expense claim pursuant to section 1129(a)(9)(A) of the Bankruptcy Code; provided, further, that, nothing herein shall preclude the Committee from arguing that they are entitled to a larger budget. | |
| **Waiver/Modification of Automatic Stay** [Fed. R. Bankr. P. 4001(b)(1)(B)(iii)] [Local Bankr. R. 4001-2(A)(2)(i); 4001-2(A)(3)] | The Debtors seek authority to modify the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as of the date hereof as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to: (a) permit the Debtors to grant the Adequate Protection Liens and the Superpriority Claim; (b) permit the Debtors to perform such acts as the Prepetition First Lien Agents or Prepetition First Lien Creditors each may request in its reasonable discretion to assure the perfection and priority of the liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the Prepetition First Lien Creditors under this Interim Order; (d) authorize the Debtors to pay, and the Prepetition First Lien Creditors to retain and apply, payments made in accordance with the terms of this Interim Order; and (e) exercise of remedies in accordance with paragraph 9 of the Interim Order or as otherwise ordered by this Court. | ¶¶ 5, 9 |
| **Adequacy of Budget:** [Local Bankr. R. 4001-2(A)(4)] | The Debtors have reason to believe that the Budget will be adequate (inclusive of professional fees and disbursements) considering all available assets, to pay all administrative expenses due or accruing during the period covered by the Budget. | ¶ 4(g) |

## II.   Provisions to be Highlighted Under Local Rule 4001-2(A)(2).

14.     Local Rule 4001-2(A)(2) requires a debtor to:  (a) recite whether the proposed form of the cash collateral order contains certain provisions of the type enumerated therein; (b) identify the location of such provisions in the proposed cash collateral order; and (c) justify the inclusion of such provisions in the proposed cash collateral order (the "Highlighted Provisions").  The chart below summarizes the applicable terms of the Interim Order and, where required under Local Rule 4001-2(A)(2), provides a justification for the Interim Order's inclusion of certain Highlighted Provisions.

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **Cross Collateralization:** [Local Bankr. R. 4001-2(A)(2)(a)] | The Interim Order contains a grant of cross collateralization protection to the Secured Parties, *but as replacement liens or other adequate protection*. | ¶ 4 |

KE 34464885

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **Investigation Periods:**<br><br>[Local Bankr. R. 4001-2(A)(2)(b)] | The Interim Order contains a provision binding the estate and all parties in interest with respect to the validity, perfection, enforceability, and extent of certain creditors' prepetition lien and debt and the waiver of claims against such secured creditors, *but gives parties in interest at least 75 days from the entry of the order, and the Creditors' Committee, if formed, at least 60 days from the formation, to investigate such matters.* | ¶ 12 |
| **506(c) Waiver:**<br><br>[Local Bankr. R. 4001-2(A)(2)(c)] | The Interim Order contains a waiver of rights the estate may have under section 506(c) of the Bankruptcy Code, *subject to entry of a Final Order.*<br><br>The Debtors believe this provision is a justified component of the adequate protection they have proposed to provide to the Prepetition Secured Creditors, which has been narrowly tailored to fit the circumstances of these chapter 11 cases and limited to entry of a final order.  Similar waivers have been approved in cases in this jurisdiction. See, e.g., In re XMH Corp. I (f/k/a Hartmarx Corp.), No. 09-02046 (BWB) (Bankr. N.D. Ill. Jan. 26, 2009) (approving waiver of section 506(c) claims). | ¶¶ I, 15 |
| **Chapter 5 Causes of Action:**<br><br>[Local Bankr. R. 4001-2(A)(2)(d)] | The Interim Order grants to the secured creditor liens on any proceeds or property recovered in respect of the Debtors' causes of action arising under sections 544, 545, 547, 548, and 550 of the Bankruptcy Code, *upon entry of a Final Order.*<br><br>The Debtors believe this provision is a justified component of the adequate protection they have proposed to provide to the Prepetition Secured Creditors upon entry of a final order.  Similar grants have been approved in cases in this jurisdiction. See, e.g., In re Ryan Int'l Airlines, Inc., No. 12-80802 (TML) (Bankr. N.D. Ill. Mar. 7, 2012) (approving grant of adequate protection lien on chapter 5 causes of action); In re XMH Corp. I (f/k/a Hartmarx Corp.), No. 09-02046 (BWB) (Bankr. N.D. Ill. Jan. 26, 2009) (approving grant of adequate protection lien on chapter 5 causes of action subject to entry of final order). | ¶ 4(a) |
| **Prepetition Debt:**<br><br>[Local Bankr. R. 4001-2(A)(2)(e)] | The Interim Order contains no provision deeming prepetition secured debt to be postpetition debt or using postpetition loans from a prepetition secured creditor to pay that creditor's prepetition debt. | None |
| **Carve Out:**<br><br>[Local Bankr. R. 4001-2(A)(2)(f)] | The Interim Order contains a Carve Out for the benefit of professionals retained by the Debtors and any statutory committee appointed in these chapter 11 cases, *but providing no disparate treatment with respect to such committee's professionals.* | ¶ 11 |
| **Nonconsensual Priming Liens:**<br><br>[Local Bankr. R. 4001-2(A)(2)(g)] | The Interim Order contains no provisions that prime any secured lien. | None |

17

| Material Terms | Summary of Material Terms | Provision |
|---|---|---|
| **Lender Liability Declaration:**<br><br>[Local Bankr. R. 4001-2(A)(2)(h)] | The Interim Order contains a declaration that the proposed order does not impose lender liability on any secured creditor.<br><br>The Debtors believe this provision is justified in light of the consideration provided by the Prepetition Secured Creditors.  Similar provisions have been approved in cases in this jurisdiction.  See, e.g., In re Ryan Int'l Airlines, Inc., No. 12-80802 (TML) (Bankr. N.D. Ill. Mar. 7, 2012) (releasing secured lender and its affiliates from any lender liability claims); In re XMH Corp. I (f/k/a Hartmarx Corp.), No. 09-02046 (BWB) (Bankr. N.D. Ill. Jan. 26, 2009) (same). | ¶ 16 |
| **Stay Modification:**<br><br>[Local Bankr. R. 4001-2(A)(2)(i)] | The Interim Order contains a grant to the lender of relief from the automatic stay without further order of the court to allow the parties to take all actions to implement the terms of the order.<br><br>The Debtors believe this provision is a justified component of the adequate protection they have proposed to provide to the Prepetition Secured Creditors, particularly in light of the applicable First Lien Credit Parties' Remedies Notice Period, during which the Debtors may use Cash Collateral in accordance with the terms and provisions of the Interim Order.  Similar modifications have often been approved in cases in this jurisdiction.  See, e.g., In re Ryan Int'l Airlines, Inc., No. 12-80802 (TML) (Bankr. N.D. Ill. Mar. 7, 2012) (approving stay modification for purposes of implementing cash collateral order and enforcing remedies); In re XMH Corp. I (f/k/a Hartmarx Corp.), No. 09-02046 (BWB) (Bankr. N.D. Ill. Jan. 26, 2009); In re Nat'l Terrazzo, Inc., No. 06-11292 (PSH) (Bankr. N.D. Ill. Oct. 5, 2006) (same); In re Mid-City Parking, Inc., No. 04-45177 (JPC) (Bankr. N.D. Ill. Jan. 6, 2005) (same). | ¶¶ 5; 9 |
| **Joint and Several Liability:**<br><br>[Local Bankr. R. 4001-2(A)(2)(j)] | The Interim Order contains no provision for joint and several liability on loans. | None |

### Overview of the Debtors' Prepetition Indebtedness

15.     The Debtors have a large, complex capital structure with several levels of secured and unsecured obligations in numerous tranches and with varying interest rates and maturities. As of the Petition Date, the Debtors' consolidated long-term debt obligations totaled approximately $18.4 billion and consisted of, among other things, funded debt under the First Lien Credit Agreement, the First Lien Notes, the Second Lien Notes, the Senior Unsecured Notes, and the Subsidiary Guaranteed Notes (each as defined below) as well as obligations under

18

interest rate swaps, capital leases, and to unsecured creditors.  The following is a brief summary of the primary components of the Debtors' prepetition funded debt obligations.

## I.  The First Lien Credit Agreement.

16.     As of the Petition Date, the Debtors have approximately (a) $5.35 billion in principal amounts outstanding pursuant to several senior secured term loan facilities, in various tranches and with varying interest rates (the "First Lien Term Loan Facility") and (b) $100.3 million in committed outstanding letters of credit pursuant to a senior secured revolving credit facility (the "First Lien Revolving Facility," and together with the First Lien Term Loan Facility, the "First Lien Credit Facility").[5]  Additionally, the First Lien Credit Parties and CEC are party to a guaranty and pledge agreement, dated as of July 25, 2014 (as amended and restated, modified, or supplemented from time to time, the "First Lien Guaranty and Pledge Agreement") whereby CEC agreed to, among other things, guarantee certain obligations arising under the First Lien Credit Agreement pursuant to the terms and conditions thereof.  The obligations arising under the First Lien Credit Agreement are secured by first priority liens on the "Collateral" (as defined in the First Lien Credit Agreement) (the "Prepetition First Lien Collateral").  The Prepetition First Lien Collateral includes substantially all of the Debtors' assets, including for example, cash, accounts, deposit accounts, equipment, general intangibles, inventory, intellectual property, certain commercial tort claims, and all proceeds thereof.

---

[5]  The terms of the First Lien Credit Facility are set forth in that certain Third Amended and Restated Credit Agreement, dated as of July 25, 2014 (as amended, modified, or supplemented and in effect immediately prior to the Petition Date, the "First Lien Credit Agreement"), by and among CEOC, as borrower, CEC, as holdings, Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent (the "First Lien Credit Agent"), and the lenders that are parties thereto from time to time (the "First Lien Lenders," and together, the "First Lien Credit Parties").

KE 34464885

However, certain collateral, such as the Debtors' cash held in casino cages, is not subject to any

lien or encumbrance in order to comply with various federal and state gaming regulations.

## II.   The First Lien Notes.

17.   As of the Petition Date, the Debtors have approximately $6.35 billion in principal

amounts outstanding under various series of first lien notes (the "First Lien Notes").[6]   The First

Lien Notes are also secured by a first priority lien on the First Lien Prepetition Collateral, subject

---

[6]   The terms of the First Lien Notes are set forth in:  (a) that certain Indenture, dated as of June
10, 2009 (as amended, modified, waived, and/or supplemented from time to time, the
"11.25% First Lien Notes Indenture"), by and among CEOC, CEC, Caesars Operating
Escrow LLC, a Delaware limited liability company formerly known as Harrah's Operating
Escrow LLC ("Escrow LLC"), Caesars Escrow Corporation, a Delaware corporation
formerly known as Harrah's Escrow Corporation ("Escrow Corporation," and together with
Escrow LLC, the "Escrow Issuers"), and U.S. Bank, National Association, in its capacity as
indenture trustee under the First Lien Notes Indentures, and any successors in such capacity
(the "First Lien Notes Indenture Trustee," and together with the First Lien Credit Agent, the
"Prepetition First Lien Agents"); (b) that certain Second Supplemental Indenture, dated as of
September 11, 2009 (as amended, modified, waived, and/or supplemented from time to time,
the "11.25% First Lien Notes Second Supplemental Indenture"), by and among CEOC, CEC
and the First Lien Notes Indenture Trustee; (c) that certain Indenture, dated as of
February 14, 2012 (as amended, modified, waived, and/or supplemented from time to time,
the "8.50% First Lien Notes Indenture"), by and between CEOC, the Escrow Issuers, CEC,
and the First Lien Notes Indenture Trustee; (d) that certain Indenture, dated as of August 22,
2012 (as amended, modified, waived, and/or supplemented from time to time, the "9.00%
First Lien Notes Indenture"), by and among the Escrow Issuers, CEC, and the First Lien
Notes Indenture Trustee; (e) that certain Additional Notes Supplemental Indenture, dated as
of December 13, 2012 (as amended, modified, waived, and/or supplemented from time to
time, the "9.00% First Lien Notes Additional Notes Supplemental Indenture"), by and among
the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee; and (f) that certain
Indenture, dated as of February 15, 2013 (as amended, modified, waived, and/or
supplemented from time to time, the "9.00% First Lien Notes February 2013 Indenture," and
together with the 11.25% CEOC First Lien Notes Indenture, the 11.25% CEOC First Lien
Notes Second Supplemental Indenture, the 8.50% CEOC First Lien Notes Indenture, the
9.00% CEOC First Lien Notes Indenture, the 9.00% CEOC First Lien Notes Additional
Notes Supplemental Indenture and the 9.00% CEOC First Lien Notes February 2013
Indenture, the "First Lien Notes Indentures"), between the Escrow Issuers, CEC and the First
Lien Notes Indenture Trustee, notes (the "9.00% Senior Secured Notes due 2020 (2013)").
The "First Lien Noteholders" means the holders of the First Lien Notes (together with the
First Lien Notes Indenture Trustee, the "First Lien Noteholder Parties," and together with the
"Prepetition First Lien Credit Parties, the "Prepetition First Lien Creditors").

to the same regulatory carve-outs as the First Lien Credit Facility. Pursuant to the First Lien

Intercreditor Agreement (discussed in detail below), the liens on the Prepetition First Lien

Collateral securing the obligations under the First Lien Credit Facility and the First Lien Notes

are of equal priority.

### III.   The Second Lien Notes.

18.     As of the Petition Date, the Debtors have approximately $5.24 billion in principal

amounts outstanding under various series of second lien notes (the "Second Lien Notes").[7] The

Second Lien Notes are secured by second priority liens in the "Collateral" (as defined in the

Second Lien Indentures), subject to the same regulatory carve-outs in the First Lien Credit

Agreement and First Lien Indentures (the "Prepetition Second Lien Collateral"). The Prepetition

Second Lien Collateral includes much of the same collateral as the Prepetition First Lien

Collateral. However, the Second Lien Collateral does not include equity pledges. Moreover, the

Second Lien Indentures did not require the Debtors to take additional steps to perfect liens on

certain collateral. For example, the pledgors under the Second Lien Notes were not required to

enter into account control agreements with the Second Lien Agent. Because section 9-312 of the

---

[7]   The terms of the Second Lien Notes are set forth in: (a) that certain Indenture, dated as of
April 16, 2010 (as amended, modified, waived, and/or supplemented from time to time, the
"12.75% CEOC Second Lien Notes Indenture"), by and among the Escrow Issuers, CEC, and
U.S. Bank, National Association, in its capacity as indenture trustee under the Second Lien
Notes Indentures and collateral agent, and any successors in such capacity (the "Second Lien
Agent," and together with the Prepetition First Lien Agents, the "Prepetition Secured
Agents"); (b) that certain Indenture, dated as of December 24, 2008 (as amended, modified,
waived, and/or supplemented from time to time, the "10.00% Second Lien Notes 2008
Indenture"), by and among CEOC, CEC and the Second Lien Agent; (c) that certain
Indenture, dated as of April 15, 2009 (as amended, modified, waived, and/or supplemented
from time to time, the "10.00% Second Lien Notes 2009 Indenture," and together with the
12.75% Second Lien Notes Indenture and the 10.00% Second Lien Notes 2008 Indenture, the
"Second Lien Notes Indentures," and the holders thereunder, the "Second Lien Noteholders"
(together with the Second Lien Agent, the "Second Lien Noteholder Parties"). The
"Prepetition Secured Creditors" means the Prepetition First Lien Creditors and the Second
Lien Noteholder Parties.

KE 34464885

Uniform Commercial Code requires "control" for a security interest in a deposit account to be

perfected, and the Second Lien Noteholder Parties did not have such control, the Debtors believe

that the Second Lien Noteholder Parties do not have a perfected security interest in the Debtors'

deposit accounts.

## IV.    The Unsecured Obligations.

19.    In addition to the above secured obligations, as of the Petition Date, the Debtors

have (a) approximately $479 million in principal amounts outstanding under various senior

unsecured subsidiary-guaranteed notes (the "Subsidiary-Guaranteed Notes"),[8] (b) approximately

$530 million in principal amount outstanding under various senior unsecured notes (the "Senior

Unsecured Notes"),[9] and (c) approximately $430 million in other obligations.

## V.    Intercreditor Agreements.

20.    Prior to the Petition Date, certain of the Prepetition Secured Creditors entered into

various intercreditor agreements, which generally provide for the rights, remedies, and priorities

among the Prepetition Secured Creditors.  The following is a summary of the relevant provisions

of those agreements as they relate to the Debtors' use of Cash Collateral and adequate protection.

---

[8]    The terms of the Subsidiary-Guaranteed Notes are set forth in that certain Indenture, dated as of February 1, 2008 (as amended, modified, waived, and/or supplemented from time to time, the "Subsidiary-Guaranteed Notes Indenture"), by and among CEOC, the Note Guarantors, and U.S. Bank National Association, in its capacity as indenture trustee under the Subsidiary-Guaranteed Notes Indenture (the "Subsidiary-Guaranteed Notes Indenture Trustee").

[9]    The terms of the Senior Unsecured Notes are set forth in: (a) that certain Indenture, dated as of June 9, 2006 (as amended, modified, waived, and/or supplemented from time to time, the "6.5% Senior Unsecured Notes Indenture"), by and among CEOC, CEC, and U.S. Bank National Association, in its capacity as indenture trustee under the 6.5% Senior Notes Indenture (the "Senior Unsecured Notes Trustee"); and (b) that certain Indenture, dated as of September 28, 2005 (as amended, modified, waived, and/or supplemented from time to time, the "5.75% Senior Unsecured Notes Indenture," and together with the 6.5% Senior Unsecured Notes Indenture, the "Senior Unsecured Notes Indentures"), by and among CEOC, CEC, and the Senior Unsecured Notes Trustee.

KE 34464885

A.    **The First Lien Intercreditor Agreement**.

21.    The Prepetition First Lien Agents, and other parties thereto from time to time,

entered into that certain First Lien Intercreditor Agreement, dated as of June 10, 2009 (as

amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor

Agreement"). CEOC and CEC consented to the First Lien Intercreditor Agreement.

22.    Pursuant to section 2.05(b) of the First Lien Intercreditor Agreement, any First

Lien Credit Party may oppose or object to the use of cash collateral until the First Lien Credit

Facility is paid in full. The First Lien Noteholder Parties, however, have agreed that they will

not object to the use of cash collateral so long as: (a) the First Lien Credit Parties do not object to

such use; (b) all Prepetition First Lien Creditors are granted liens on any additional collateral

pledged to any Prepetition First Lien Creditor as adequate protection, with the same priority

vis-a-vis the First Lien Intercreditor Agreement; and (c) the proceeds of any adequate protection

granted, including periodic payments, are applied pursuant to the terms of the First Lien

Intercreditor Agreement.[10]  Moreover, section 2.02 of the First Lien Intercreditor Agreement

provides that only the First Lien Credit Agent, acting in its capacity as "Collateral Agent" under

---

[10]  First Lien Intercreditor Agreement as Section 2.05(b) ("If any Grantor shall become subject
to a case (a "Bankruptcy Case") under the Bankruptcy Code and shall, as debtor(s)-in-
possession, move for approval of . . . the use of cash collateral under Section 363 of the
Bankruptcy Code, each First Lien Secured Party (other than any Controlling Secured Party or
any Authorized Representative of any Controlling Secured Party) agrees that it will raise no
objection to . . . any use of cash collateral that constitutes Shared Collateral, unless any
Controlling Secured Party, or an Authorized Representative of any Controlling Secured
Party, shall then oppose or object to such . . . use of cash collateral . . . in each case so long as
. . . (B) the First Lien Secured Parties of each Series are granted Liens on any additional
collateral pledged to any First Lien Secured Parties as adequate protection or otherwise in
connection with such DIP Financing or use of cash collateral, with the same priority vis-a-vis
the First Lien Secured Parties as set forth in this Agreement, . . . and (D) if any First Lien
Secured Parties are granted adequate protection, including in the form of periodic payments,
in connection with such DIP Financing or use of cash collateral, the proceeds of such
adequate protection is applied pursuant to Section 2.01(a) of this Agreement . . . .").

the First Lien Credit Agreement and First Lien Intercreditor Agreement, may take any action with respect to the Prepetition First Lien Collateral, and is prohibited from taking any direction from the any other Prepetition First Lien Creditor.[11]

### B.    The Second Lien Intercreditor Agreement.

23.    The Prepetition First Lien Agents and the Second Lien Agent entered into that certain Second Lien Intercreditor Agreement, dated as of December 24, 2008 (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement"). CEOC acknowledged the Second Lien Intercreditor Agreement.[12]

24.    Sections 6.1 and 6.3 of the Second Lien Intercreditor Agreement expressly prohibit the Second Lien Noteholder Parties from contesting the Debtors' use of Cash Collateral

---

[11]  First Lien Intercreditor Agreement at Section 2.02: ("(a) With respect to any Shared Collateral, (i) notwithstanding Section 2.01, only the Collateral Agent shall act or refrain from acting with respect to the Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), and then only on the instructions of the Applicable Authorized Representative, (ii) the Collateral Agent shall not follow any instructions with respect to such Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral) from any Non-Controlling Authorized Representative (or any other First Lien Secured Party other than the Applicable Authorized Representative) and (iii) no Non-Controlling Authorized Representative or other First Lien Secured Party (other than the Applicable Authorized Representative) shall or shall instruct the Collateral Agent to, commence any judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its security interest in or realize upon, or take any other action available to it in respect of, any Shared Collateral (including with respect to any intercreditor agreement with respect to any Shared Collateral), whether under any First Lien Security Document, applicable law or otherwise, it being agreed that only the Collateral Agent, acting on the instructions of the Applicable Authorized Representative and in accordance with the applicable First Lien Security Documents, shall be entitled to take any such actions or exercise any such remedies with respect to Shared Collateral.

[12]  See Second Lien Intercreditor Agreement at section 8.16, which provides that CEOC is "an intended beneficiary and third party beneficiary hereof with the right and power to enforce with respect to Sections 5.1, 5.3, 5.7, 8.3, 8.16 and 8.22 and Article VI hereof and as otherwise provided herein."

KE 34464885

if the Prepetition First Lien Creditors consent to its use.[13]  Moreover, even if the Prepetition First

Lien Creditors do not consent to the use of Cash Collateral, the Second Lien Agent and Second

Lien Noteholders are still limited in the actions they may take.  In particular, section 6.3 of the

Second Lien Intercreditor Agreement provides that, to the extent that the Prepetition First Lien

Creditors (or any subset thereof) are granted adequate protection in the form of additional

collateral, the only adequate protection that the Second Lien Noteholder Parties may seek is a

replacement lien on such additional collateral, which will be subordinated to the Prepetition First

Lien Creditors' Adequate Protection Liens.[14]

---

[13]  See Second Lien Intercreditor Agreement at section 6.1 ("If the Company or any other
Grantor shall be subject to any Insolvency or Liquidation Proceeding and any First Lien
Agent shall desire to permit the use of cash collateral . . . , then each Second Priority Agent,
on behalf of itself and each applicable Second Priority Secured Party, agrees that it will raise
no objection to, and will not support any objection to, and will not otherwise contest (a) such
use of cash collateral or DIP Financing and will not request adequate protection or any other
relief in connection therewith (except to the extent permitted by Section 6.3) . . . ."); Second
Lien Intercreditor Agreement at section 6.3 ("Each Second Priority Agent, on behalf of itself
and each applicable Second Priority Secured Party, agrees that none of them shall contest (or
support any other Person contesting) (a) any request by any First Lien Agent or Senior
Lenders for adequate protection or (b) any objection by any First Lien Agent or Senior
Lenders to any motion, relief, action or proceeding based on such First Lien Agent's or the
Senior Lenders' claiming a lack of adequate protection.").

[14]  See Second Lien Intercreditor Agreement at section 6.3 (Notwithstanding the foregoing, in
any Insolvency or Liquidation Proceeding, (i) if the Senior Lenders (or any subset thereof)
are granted adequate protection in the form of additional collateral in connection with any
DIP Financing or use of cash collateral under Section 363 or Section 364 of Title 11 of the
United States Code or any similar Bankruptcy Law, then each Second Priority Agent, on
behalf of itself and any applicable Second Priority Secured Party, (A) may seek or request
adequate protection in the form of a replacement Lien on such additional collateral, which
Lien is subordinated to the Liens securing the Senior Lender Claims and such DIP Financing
(and all Obligations relating thereto) on the same basis as the other Liens securing the
Second Priority Claims are so subordinated to the Liens securing Senior Lender Claims
under this Agreement and (B) agrees that it will not seek or request, and will not accept,
adequate protection in any other form . . . .").

KE 34464885

**Basis for Relief**

I.    **The Debtors' Need for Immediate Access to Cash Collateral.**

25.    The Debtors' access to Cash Collateral is absolutely necessary to preserve and maximize value for the Debtors' stakeholders.  See Eisenberg Declaration at ¶¶ 5, 15.  The Debtors' use of Cash Collateral in the ordinary course of business is essential to ensuring smooth, continued operations, including procurement of goods and services from vendors, payment of their employees, and satisfaction of other working capital needs.  See id. at ¶ 5. Absent approval of the Interim Order, the Debtors will be unable to generate revenue, operate their businesses, or pay the thousands of individuals who report to work each day, or fund their reorganization process, resulting in immediate and irreparable harm to the Debtors' estates.  See id.  The Debtors, therefore, believe that immediate authority to use Cash Collateral as set forth in this Motion and in the Interim Order is necessary to prevent immediate and irreparable harm to the Debtors' estates.  See id. at ¶ 15.

**Supporting Authority**

I.    **The Prepetition Secured Creditors' Interests in the Prepetition Collateral are Adequately Protected**.

26.    The Debtors' use of property of their estates is governed by section 363 of the Bankruptcy Code, which provides in pertinent part that a debtor in possession "may use property of the estate in the ordinary course of business without notice or a hearing."  See 11 U.S.C. § 363(c)(1).  Section 363(c)(2)(A) of the Bankruptcy Code more specifically permits a debtor in possession to use cash collateral with the consent of the secured party or with court authorization in accordance with, among other things, section 363(e) of the Bankruptcy Code.  Section 363(e) of the Bankruptcy Code in turn requires that the debtor adequately protect the secured creditors'

26

interest in property to be used by a debtor against any diminution in value of such interest resulting from the debtor's use of the property during a chapter 11 case.

27.    Section 361 of the Bankruptcy Code provides a non-exhaustive list of examples of what may constitute adequate protection under section 363:  (1) periodic cash payments; (2) additional or replacement liens; or (3) any other relief that will result in the party's realization of the "indubitable equivalent" of its interest in the property.  See 11 U.S.C. § 361.  The determination of whether there is adequate protection requires a fact-specific inquiry and must be decided on a case-by-case basis.  See, H.R. Rep. No. 595, 95th Cong., 2d Sess. at 339 (1978) (adequate protection is to be "left to case-by-case interpretation and development."); see also, In re EES Lambert Assocs., 62 B.R. 328, 343 (Bankr. N.D. Ill. 1986) (noting the "case by case development of adequate protection").  In order to facilitate the likelihood of reorganization, courts should be flexible in the application of the adequate protection standard.  See, e.g., In re Martin, 761 F.2d 472, 476 (8th Cir. 1985) (noting that diminution in value was to be considered a flexible concept); In re George Ruggiere Chrysler-Plymouth, Inc., 727 F.2d 1017, 1019 (10th Cir. 1984) (explaining the Bankruptcy Code's attempt to balance the protection of a secured creditor's property interests against a debtor's need to use cash in order to meet daily operating expenses and promote the "congressional policy favoring rehabilitation over economic failure").

A.    **The Debtors Are Providing a Substantial Adequate Protection Package to Safeguard the Prepetition Secured Creditors' Interests**.

28.    The Debtors will provide the Prepetition Secured Creditors with a robust adequate protection package.  See id. at ¶ 8.  This adequate protection package includes:  (a) replacement liens on substantially all of the Debtors' assets to the extent there is any diminution in value in the Prepetition Secured Creditors' interests; (b) allowed super-priority administrative claims to the Prepetition First Lien Creditors; (c) monthly adequate protection payments at a rate of 1.5%

27

per year to the Prepetition First Lien Creditors and payment; (d) payment on a pro rata basis to the Prepetition First Lien Creditors of all remaining Available Cash; (e) agreement to operate in the ordinary course consistent with the terms of an agreed-upon cash flow forecast; (f) a defined path to emergence; and (g) payment of the Prepetition First Lien Agents' and the First Lien Group's reasonable and documented fees and expenses, and access to the Debtors' books and records and other financial reporting for the professional advisors of the Prepetition First Lien Agents and the First Lien Groups.  See id.; Interim Order at ¶ 4.

> 1.   *The Adequate Protection Liens Provide Substantial Additional Value to the Prepetition Secured Creditors.*

29.   The Debtors will provide the Prepetition Secured Creditors — both the Prepetition First Lien Creditors and the Second Lien Noteholders — with replacement liens on substantially all of the Debtors' assets to the extent of any diminution in value of the Prepetition Secured Creditors' respective interests in their prepetition collateral.  See Interim Order at ¶ 4(a). The First Priority Adequate Protection Liens will rank in the same relative priority and right as do the respective security interests and liens of the respective first lien facilities, as provided in the First Lien Intercreditor Agreement, and will be subject and subordinate only to the Carve Out.  See id.  The Second Lien Adequate Protection Liens will be junior and subordinate in all respects to (i) the Carve Out and (ii) the First Priority Adequate Protection Liens, as provided in the Second Lien Intercreditor Agreement.[15]  See id.  Importantly, the Adequate Protection Liens provide the Prepetition Secured Creditors with significant value that they may not otherwise be entitled to under the Prepetition Secured Documents.  See Eisenberg Declaration at ¶ 9.

---

[15]  As set forth above, the Debtors do not believe that the Second Lien Noteholders have any lien in the Debtors' Cash Collateral; nevertheless, the Debtors still have provided the Second Lien Noteholders with junior adequate protection liens to the extent their interest—if any—in the Cash Collateral suffers a diminution in value.

KE 34464885

30.    The Adequate Protection Liens will provide substantial additional value to the Prepetition Secured Creditors to the extent there is any diminution in value of the Prepetition First Lien Collateral or the Prepetition Second Lien Collateral.  See id.  For example, certain Debtors are not obligors or guarantors under the Prepetition Secured Documents, but will grant Adequate Protection Liens to the Prepetition Secured Creditors.[16]  Thus, the postpetition collateral is even more expansive than the prepetition collateral as it includes liens on the assets of additional Debtor entities, and therefore additional value that the Prepetition Secured Creditors would not otherwise have been able to access.[17]  See id.

---

[16] The following Debtors are not obligors or guarantors pursuant to the Prepetition Secured Documents:  Caesars Escrow Corporation (f/k/a Harrah's Escrow Corporation); Caesars Operating Escrow LLC (f/k/a Harrah's Operating Escrow LLC); Corner Investment Company Newco, LLC; Harrah's Maryland Heights Operating Company; BPP Providence Acquisition Company, LLC; Caesars Air, LLC; Caesars Baltimore Development Company, LLC; Caesars Massachusetts Acquisition Company, LLC; Caesars Massachusetts Development Company, LLC; Caesars Massachusetts Investment Company, LLC; Caesars Massachusetts Management Company, LLC; CG Services, LLC; Christian County Land Acquisition Company, LLC; CZL Management Company, LLC; HIE Holdings Topco, Inc.; PH Employees Parent LLC; PHW Investments, LLC; Octavius Linq Holding Co., LLC; Caesars Baltimore Acquisition Company, LLC; Caesars Baltimore Management Company, LLC; PHW Las Vegas, LLC; 3535 LV Parent, LLC; Bally's Las Vegas Manager, LLC; Cromwell Manager, LLC; JCC Holding Company II Newco, LLC; Laundry Parent, LLC; LVH Parent, LLC; Parball Parent, LLC; The Quad Manager, LLC; and Des Plaines Development Limited Partnership.

[17] Additionally, the First Lien Credit Facility is backed by a secured guaranty from the non-Debtor entity, CEC.  Courts recognize that, in appropriate circumstances, a guaranty by a third party may provide sufficient adequate protection.  See, H.R. REP. 95-595, 95th Cong., 1st Sess. at at 339 (1977) ("another form of adequate protection might be the guarantee by a third party . . . ."); see also, In re Lombardo's Ravioli Kitchen, Inc., No. 08-20774 (ASD), 2009 WL 585814, at *4 (Bankr. D. Conn. Feb. 20, 2009) (holding secured creditor adequately protected because of guaranties by various government agencies and secured personal guaranties by debtor's principals); In re Diaconx Corp., 69 B.R. 333, 339 (Bankr. E.D. Pa. 1987) ("[p]articularly when a guaranty is secured, it may be a component of an adequate protection package.").  Courts are more inclined to find adequate protection where the guaranty is secured by substantial assets. See, e.g., In re T.H.B. Corp., 85 B.R. 192, 194 (Bankr. D. Mass. 1988) (holding that a non-debtor guaranty secured by property of substantial value provided adequate protection for debtor's use of secured creditor's cash

31.     Additionally, the Debtors will grant Adequate Protection Liens on assets that may otherwise be cut off pursuant to section 552(a) of the Bankruptcy Code.  Under section 552(a) of the Bankruptcy Code, "postpetition revenue is not cash collateral" unless it falls into one of the narrow exceptions set forth in section 552(b) of the Bankruptcy Code.  Section 552(b) of the Bankruptcy Code allows a perfected prepetition security interest to extend to "proceeds, products, offspring, or profits" of prepetition collateral and "amounts paid as rents" of prepetition collateral if the prepetition interest expressly included such property — otherwise, the postpetition revenue is unencumbered.  See 11 U.S.C. § 552(b).  To qualify as a "proceed," the property must "necessarily derive[] from the sale, exchange or other dispensation of other encumbered property."  See e.g., In re Bering Trader, 944 F.2d 500, 502 (9th Cir. 1991); see also, U.C.C. § 9-102(a)(64) (2001) (defining proceeds as "whatever is acquired upon the sale, lease, license, exchange, or other disposition of collateral . . . .").  Here, the Prepetition Secured Creditors may not have an interest in cash generated from the use of encumbered gaming equipment pursuant to section 552(b) of the Bankruptcy Code.  See e.g., In re Wright Group, Inc., 443 B.R. 795 (Bankr. N.D. Ind. 2011) (proceeds from postpetition admission payments to debtors' miniature golf park were unencumbered under section 552 of the Bankruptcy Code notwithstanding the fact that the lender had a perfected security interest in the tangible property used (e.g., the putters, golf balls, scorecards, and pencils, among other tangible property)), In re Premier Golf Props., LP, 477 B.R. 767, 772 (B.A.P. 9th Cir. 2012) (holding that "revenue . . . is not produced from the [real property] as much as generated by other services that are performed on the [real property], and therefore, is not rents"); see also, Dawn M. Cica and Laury Macauley,

---

collateral) (*rejected on other grounds*).  Here, CEC is an asset-rich entity that provides further adeqequate protection to the First Lien Lenders from diminution in value of their interest in the Prepetition First Lien Collateral.

30

When Gaming Goes Heads Up with the Bankruptcy Code:  Unique Restructuring Issues for Gaming Businesses in Difficult Economic Times, 3 UNLV Gaming L.J. 23 (2012) (discussing 552(b) in the context of proceeds from gaming equipment).  The Debtors, nevertheless, have provided the Prepetition Secured Creditors with an adequate protection replacement lien in such proceeds.

### 2. *The Superpriority Claims Protect Against Diminution in Value.*

32.     The Debtors will provide the Prepetition First Lien Creditors with superpriority administrative claims pursuant to section 507(b) of the Bankruptcy Code.  See Interim Order at ¶ 4(b).  These claims will have priority over all administrative expenses of any kind, subject only to the Carve Out.  The Superpriority Claims are allowed against ***all*** Debtors — thus, the Prepetition First Lien Creditors again obtain the additional value of having recourse against Debtors not originally obligated under the First Lien Documents.

### 3. *The Adequate Protection Payments Provide Significant Value to the Prepetition First Lien Creditors Throughout the Chapter 11 Cases.*

33.     The Debtors will provide the Prepetition First Lien Creditors with monthly adequate protection payments in cash at a rate equal to 1.5% per year of the aggregate amount of all Prepetition First Lien Obligations as of the Petition Date, as well as payment on a pro rata basis to the Prepetition First Lien Creditors of all remaining Available Cash upon the effective date of a plan of reorganization.  See Interim Order at ¶ 4(d).  Periodic cash payments are specifically provided in section 361 of the Bankruptcy Code as a form of adequate protection. The specific amount of adequate protection payments required under section 361(1) of the Bankruptcy Code depends on the facts of each case; however, courts are encouraged to apply the adequate protection standard flexibly.  See, e.g., In re O'Connor, 808 F.2d 1393, 1398 (10th Cir. 1987); In re Martin, 761 F.2d 472, 476 (8th Cir. 1985). Given the various other forms of

31

adequate protection provided to the Prepetition First Lien Creditors, the Debtors believe that

payments at a rate of 1.5% per annum are more than sufficient to protect against diminution in

value.

*4.    The Debtors Have Proposed to Comply with a Budget Approved by the
Prepetition First Lien Creditors.*

34.    The Debtors will continue to operate in the ordinary course of business consistent

with agreed-upon cash flow forecast.  <u>See</u> Interim Order at ¶ 4(g); Eisenberg Declaration at ¶ 8.

Additionally, the Debtors will deliver, among other things, a budget variance report, financial

information necessary to assess the Debtors' short and long term cash flow, and an annual

operating budget to the First Lien Group during the interim period.  Providing this financial

information will ensure that the First Lien Group has sufficient information regarding the

Debtors' financial performance and will provide assurance that the business remains on track.

*5.    The Restructuring Support Agreement Provides a Path to Emergence,
Maximizing Value for all Stakeholders.*

35.    As discussed above, the Debtors have entered into a Restructuring Support

Agreement with holders of approximately 80% of the principal amount outstanding under the

First Lien Notes, creating a platform for their entry into chapter 11 and creating the framework

for consensual resolution of these chapter 11 cases on a timely basis.  <u>See</u> Memorandum in

Support of Chapter 11 Petitions at Dkt. No. 4; Eisenberg Declaration at ¶ 13.  Among other

things, the Debtors have agreed to various milestones, incorporated into the Interim Order, for:

(a) the approval of the Final Order; (b) the filing and approval of a motion to approve their

Restructuring Support Agreement; (c) the filing of a plan and disclosure statement; (d) the

approval of the disclosure statement; (e) confirmation of the plan; and (f) the Debtors'

emergence from chapter 11, all under less than one year.  <u>See</u> Interim Order at ¶ 8.  The shorter

the time spent in chapter 11, the more value that is created and preserved for the benefit of the Prepetition Secured Creditors.  See Eisenberg Declaration at ¶ 13.

36.     Moreover, the Restructuring Support Agreement provides for substantial recoveries to the First Lien Lenders.  While all of the First Lien Lenders have not yet agreed to support the Debtors' restructuring, the fact that the Debtors already contemplate significant recoveries to such First Lien Lenders is another form of adequate protection as it will hopefully facilitate constructive and quick dialogue among the various constituents to form the basis for further consensus.  Id. at ¶ 13.

37.     Finally, the Restructuring Support Agreement contemplates significant contributions from CEC in respect of various estate and other causes of action that have been asserted against it.  See Memorandum in Support of Chapter 11 Petitions at Dkt. No. 4.  The fact that there already exists a framework for resolution of what could be costly, protracted, and uncertain litigation is itself another form of adequate protection to the Prepetition Secured Creditors.  Id.

> 6.     *The Debtors' Stipulations are an Additional Form of Adequate Protection.*

38.     Finally, the Debtors have also proposed to (a) stipulate as to the amount of the Prepetition Secured Creditors' obligations, and the validity and perfection of the Prepetition First Lien Creditors' prepetition liens, (b) pay the Prepetition First Lien Agents' and the First Lien Group's professional fees and expenses, and (c) provide the advisors to the Prepetition First Lien Agents and the First Lien Groups with access to the Debtors' books and records and provide other forms of information reporting.  See Interim Order at ¶¶ 3, 4(c), and 4(f).  This provides further comfort to the Prepetition First Lien Creditors that their interests will be protected during the pendency of these chapter 11 cases.

**B.** **The Debtors' Use of Cash Collateral will Also Increase the Value of the Prepetition Secured Creditors' Collateral, Including Cash Collateral.**

39.     In addition, the Debtors are providing additional adequate protection because they intend to use the Cash Collateral to operate the business.  Courts have held that a secured party's interest in collateral may be adequately protected when a debtor's continued use of such collateral in its operations generates a net positive return.  See, e.g., Fed. Nat'l Mortg. Ass'n v. Dacon Bolingbrook Assocs. LP, 153 B.R. 204, 214 (N.D. Ill. 1993) (holding that creditor was adequately protected so long as the use of cash collateral went into the maintenance and operation of creditor's underlying collateral); In re Las Vegas Monorail Co., 429 B.R. 317, 341 (Bankr. D. Nev. 2010) ("[A debtor's] use of the cash it generates in its operations is itself a form of adequate protection.  This is because [the debtor's] continued investment in, and operation of, the monorail will increase, or at least maintain, the collateral's value.").  Here, the Debtors' investment of cash into the business not only improves the value of the business, and therefore the prepetition collateral, but also creates additional Cash Collateral that will be subject to Adequate Protection Liens.

**II.    The Intercreditor Agreements Prohibit Various Parties from Contesting the Use of Cash Collateral.**

40.     In light of the foregoing, the Debtors believe that the Prepetition Secured Creditors are adequately protected.  Therefore, pursuant to the Intercreditor Agreements discussed above, certain of the Prepetition Secured Creditors are prohibited from objecting to the Debtors' request for use of Cash Collateral.

**A.    Second Lien Intercreditor Agreement**.

41.     Sections 6.1 and 6.3 of the Second Lien Intercreditor Agreement expressly prohibit the Second Lien Noteholder Parties from contesting the Debtors' use of Cash Collateral if the Prepetition First Lien Creditors consent to its use.

KE 34464885

42.     Moreover, pursuant to section 6.3 of the Second Lien Intercreditor Agreement, even if the Prepetition First Lien Creditors do not consent to the Debtors' use of Cash Collateral, the Second Lien Intercreditor Agreement strictly limits the actions that the Second Lien Noteholder Parties can take.   To the extent that the Court grants the Prepetition First Lien Creditors adequate protection in the form of replacement liens on additional collateral, section 6.3 of the Second Lien Intercreditor Agreement makes clear that the only adequate protection the Second Lien Noteholder Parties are entitled to is replacement liens on that additional collateral on a junior priority basis.   The Debtors have already provided such junior priority liens, <u>see</u> Interim Order at ¶ 4(a), thus the Second Lien Noteholder Parties are prohibited from seeking any additional adequate protection.[18]

### III.     <u>The Debtors' Interim Use of the Cash Collateral Should Be Approved</u>.

43.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use Cash Collateral may not be commenced earlier than 14 days after service of such motion.   The Court, however, is authorized to conduct an expedited hearing prior to the expiration of such 14-day period and to authorize the use of cash collateral where, as here, such relief is necessary to avoid immediate and irreparable harm to the debtor's estate.

44.     In addition, Local Rule 4001-2(B) provides that the court shall not approve interim financing orders that include any of the provisions specified in Local Rule 4001-2(A)(2) "in the absence of extraordinary circumstances."

---

[18]   In addition, pursuant to section 2.05(b) of the First Lien Intercreditor Agreement, nonconsenting First Lien Noteholders are prohibited from objecting to the use of Cash Collateral unless (a) the First Lien Credit Parties are objecting, and (b) the Prepetition First Lien Creditors are provided with Adequate Protection Liens and adequate protection payments that are inconsistent with the priorities of the First Lien Intercreditor Agreement. Moreover, nonconsenting First Lien Noteholders lack standing to object because they have no right to direct the Collateral Agent pursuant to the terms of the First Lien Intercreditor and First Lien Documents.

KE 34464885

45.     As set forth in detail herein and in the Eisenberg Declaration, without continued use of Cash Collateral, the Debtors will have no ability to operate their businesses.  See Eisenberg Declaration at ¶ 15.  As such, the Debtors respectfully submit that they have satisfied the requirements of Bankruptcy Rule 4001(b) and Local Rule 4001-2(B) to support entry of the Interim Order and immediate Cash Collateral availability pending the entry of the Final Order.

## IV.     The Automatic Stay Should Be Modified on a Limited Basis.

46.     The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified as necessary to effectuate the terms and provisions of the Interim Order.  The Interim Order further provides that the automatic stay is modified and vacated to the extent necessary to permit the Prepetition Secured Creditors to exercise, upon an event of default under the Interim Order, certain rights and remedies provided for in the Interim Order.

47.     Stay modifications of this kind are ordinary and standard features of adequate protection packages and, in the Debtors' business judgment, are reasonable under the circumstances of these chapter 11 cases.  Courts in this district have granted similar relief in other recent chapter 11 cases.  See, e.g., In re Ryan Int'l Airlines, Inc., No. 12-80802 (TML) (Bankr. N.D. Ill. Mar. 7, 2012) (approving stay modification for purposes of implementing cash collateral order and enforcing remedies); In re XMH Corp. I (f/k/a Hartmarx Corp.), No. 09-02046 (BWB) (Bankr. N.D. Ill. Jan. 26, 2009) (same); In re Nat'l Terrazzo, Inc., No. 06-11292 (PSH) (Bankr. N.D. Ill. Oct. 5, 2006) (same); In re Mid-City Parking, Inc., No. 04-45177 (JPC) (Bankr. N.D. Ill. Jan. 6, 2005) (same).[19]

---

[19] Contemporaneously herewith, the Debtors have submitted the "Required Statement" pursuant to Local Rule 4001-1.

KE 34464885

## Request for Final Hearing

48.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule 4001-2(C), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than 25 days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

## The Requirements of Bankruptcy Rule 6003 Are Satisfied

49.     Bankruptcy Rule 6003 empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm."  For reasons discussed above, authorizing the use of Cash Collateral and granting adequate protection to the Prepetition Secured Agents and Prepetition Secured Creditors and granting the other relief requested herein is integral to the Debtors' ability to transition their operations into these chapter 11 cases.  Failure to receive such authorization and other relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture.  For the reasons discussed herein, the relief requested is necessary in order for the Debtors to operate their business in the ordinary course and preserve the ongoing value of the Debtors' operations and maximize the value of their estates for the benefit of all stakeholders.  Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 to support granting the relief requested herein.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

50.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

**No Prior Request**

51.     No prior request for the relief sought in this Motion has been made to this or any other court.

**Reservation of Rights**

52.     Except as may otherwise be provided in the Interim Order upon entry, nothing contained herein is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein. Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

**Notice**

53.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the Northern District of Illinois; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims; (c) the administrative agent for the Debtors' credit facility; (d) the indenture trustees for each of the Debtors' secured and unsecured notes; (e) counsel to certain holders of claims against the Debtors regarding each of the foregoing referenced in clauses (c) and (d); (f) the state attorneys general for states in which the Debtors conduct business; (g) the Office of the United States Attorney for the Northern District of Illinois; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the gaming commissions for each of the states in which the Debtors operate or manage a casino; (k) counsel to CEC; and (l) any party that has requested notice pursuant to Bankruptcy Rule

2002.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

## Waiver of Page Limit Restrictions

54.    Given the complexity of issues addressed herein, the Debtors respectfully request that the fifteen page limit established by Rule 5005-3(D) of the Local Rules be waived for this Motion.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 34464885

WHEREFORE, the Debtors respectfully request entry of the Interim Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and granting such other relief as is just and proper.

Dated:  January 15, 2015
Chicago, Illinois

       /s/ David R. Seligman, P.C.

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

KE 34464885