## Exhibit A

**Proposed Interim Order**

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,[1] | ) | Case No. 15-01145 (ABG) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## INTERIM ORDER (I) AUTHORIZING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION, (III) MODIFYING THE AUTOMATIC STAY TO PERMIT IMPLEMENTATION; (IV) SCHEDULING A FINAL HEARING AND (V) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of this interim order (including each of the Budgets (as defined herein), (this "Interim Order") and a final order (a "Final Order") pursuant to sections 105, 361, 362, 363, 503, 506, 507, and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, 7052, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001-1 and 4001-2 of the Local Rules of the United States Bankruptcy Court for the Northern District of Illinois (the "Local Rules"), *inter alia*:

(i)      authorizing the Debtors' use of the Prepetition First Lien Collateral and Prepetition Second Lien Collateral (each as defined below), including the "cash collateral" (as

---

[1]    The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these chapter 11 cases, for which the Debtors have requested joint administration, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' proposed claims and noticing agent at https://cases.primeclerk.com/CEOC.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

defined in section 363(a) of the Bankruptcy Code, "Cash Collateral") of the Prepetition Secured Agents and Prepetition Secured Creditors (each as defined below), on the terms and conditions set forth in this Interim Order;

(ii)    providing adequate protection to the Prepetition Secured Agents and Prepetition Secured Creditors (each as defined below) for diminution in value of their respective interests in the Prepetition First Lien Collateral or Prepetition Second Lien Collateral, as relevant, including the Cash Collateral;

(iii)    approving certain stipulations by the Debtors as set forth in this Interim Order with respect to the Prepetition Secured Obligations (as defined herein), and the liens and security interests relating thereto, subject to paragraph 12 herein;

(iv)    subject to entry of the Final Order, waiving (x) any "equities of the case" claims under section 552(b) of the Bankruptcy Code and (y) any right to surcharge the Collateral (as defined herein) pursuant to section 506(c) of the Bankruptcy Code or other applicable law;

(v)    vacating or modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim Order;

(vi)    waiving any applicable stay (including under Bankruptcy Rule 6004) and provision for immediate effectiveness of this Interim Order; and

(vii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and the entry of a Final Order, and approving the form of notice with respect to the Final Hearing;

in each case, in accordance with and subject to the express terms and conditions of this Interim Order.

Upon due and sufficient notice of the Motion and the interim hearing on the Motion (the "<u>Interim Hearing</u>") having been provided by the Debtors; and the Interim Hearing having been held on _____; and after considering all the pleadings filed with this Court, the *Declaration of Randall S. Eisenberg, Chief Restructuring Officer of Caesars Entertainment Company, Inc. in Support of First Day Pleadings* and the *Declaration of Randall S. Eisenberg in Support of the Debtors' Motion for Interim and Final Orders (I) Authorizing Use Of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying The Automatic Stay, (IV) Scheduling A Final Hearing And (V) Granting Related Relief* ; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper in this District pursuant to 28 U.S.C. § 1408; and upon the record made by the Debtors at the Interim Hearing; and the Court having found and determined that the relief sought in the Motion is fair and reasonable and in the best interests of the Debtors, their estates, creditors, and all parties in interest; and after due deliberation and consideration and good and sufficient cause appearing therefor, **THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW**:[3]

A.    *Petition Date*:  On January 15, 2015, (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (this "<u>Court</u>") commencing these chapter

---

[3]    Findings of fact shall be construed as conclusion of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

11 cases (the "Chapter 11 Cases").  On _____, this Court entered an order approving the joint administration of the Chapter 11 Cases.

B.    *Debtors in Possession*.  The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Cases.

C.    *Jurisdiction and Venue*.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Committee*.  As of the date hereof, the United States Trustee (the "U.S. Trustee") has not yet appointed an official committee of unsecured creditors in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

E.    *Debtors' Stipulations*.  Subject to paragraph 12 herein, the Debtors stipulate and agree that (collectively, paragraphs E(i) through (v) below are referred to herein as the "Debtors' Stipulations"):

(i)    *First Lien Credit Agreement Obligations*.

(a)    First Lien Credit Agreement.  Pursuant to that certain Third Amended and Restated Credit Agreement, dated as of July 25, 2014 (as amended, modified, and/or supplemented from time to time, the "First Lien Credit Agreement"), among Caesars Entertainment Operating Company, Inc., a Delaware corporation ("CEOC"), as borrower, Caesars Entertainment Corporation, a Delaware corporation ("CEC"), as parent guarantor and pledgor, Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent (the "First Lien Credit Agent"), and the lenders thereunder from time to time (the "First Lien

4

Lenders" and together with the First Lien Credit Agent, the "First Lien Credit Parties"), CEOC

incurred certain term loans and entered into certain revolving credit facilities, as well as other

financial accommodations, with the First Lien Credit Parties.

(b)    First Lien Security Agreement.  In connection with the First Lien Credit

Agreement, CEOC and certain of its subsidiaries (the "Subsidiary Pledgors") entered into that

certain Amended and Restated Collateral Agreement (as amended, modified and/or

supplemented from time to time, the "First Lien Security Agreement"), dated as of June 10,

2009, with the First Lien Credit Agent, as collateral agent for the First Lien Lenders, pursuant

to which CEOC and the Subsidiary Pledgors granted first priority liens (subject to Permitted

Liens (as defined below)), or mortgages on, security interests in, and collateral assignments,

charges or pledges of (the "Prepetition First Lien Credit Agreement Liens") the "Collateral"

(as defined in the First Lien Security Agreement), including the Cash Collateral (the

"Prepetition First Lien Credit Agreement Collateral") to the First Lien Credit Agent, for the

benefit of the First Lien Credit Parties, as security for all "Obligations" as defined in the First

Lien Security Agreement.

(c)    Guaranty and Pledge Agreement.  In connection with the First Lien

Credit Agreement, CEC entered into that certain Guaranty and Pledge Agreement, dated as of

July 25, 2014, with the First Lien Credit Agent (as amended, modified and/or supplemented

from time to time, the "First Lien Guaranty and Pledge Agreement"), pursuant to which CEC,

subject to the terms and conditions of such agreement (x) guaranteed to the First Lien Credit

Agent, for the benefit of the First Lien Credit Parties, collection of the Required Amount of

the HoldCo Guaranteed Obligations (each, as defined in the First Lien Guaranty and Pledge

Agreement), and (y) pledged to the First Lien Credit Agent, for the benefit of the First Lien

Credit Parties, a security interest (the "Prepetition First Lien Guaranty Liens") in all of CEC's right, title, and interest in the "Collateral," as defined in the First Lien Guaranty and Pledge Agreement (the "Prepetition First Lien Guaranty Collateral"), as security for the HoldCo Guaranteed Obligations.  For purposes hereof, the First Lien Credit Agreement, the First Lien Security Agreement, the Loan Documents (as defined in the First Lien Credit Agreement), the First Lien Intercreditor Agreement (defined below), the Second Lien Intercreditor Agreement (defined below), the First Lien Guaranty and Pledge Agreement and all other documents and agreements executed and/or delivered in connection with the First Lien Credit Agreement and the "Loans" or "Letters of Credit" (each, as defined in the First Lien Credit Agreement) shall hereinafter be referred to collectively as the "First Lien Credit Documents".

(d)     First Lien Credit Agreement Obligations as of the Petition Date.  As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind, were indebted and liable to the First Lien Credit Parties under the First Lien Credit Documents in the aggregate principal amount of not less than $5,354,400,000, plus any amounts incurred, or accrued prior to the Petition Date in accordance with the First Lien Credit Documents, accrued and unpaid interest, premiums, interest-on-interest and default interest, any fees, costs, expenses, and disbursements (including, without limitation, attorneys' fees, related expenses, and disbursements reimbursable thereunder), any other amounts, indemnities, contingent obligations, reimbursement obligations, obligations with respect to any "Loans" or "Letter of Credit" (each as defined in the First Lien Credit Agreement), indemnification obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing in respect thereof to the extent and as provided for in the First Lien Credit Documents, including, without limitation, all "Obligations" as defined in the First Lien

Credit Agreement, in each case to the extent and as provided for in the First Lien Credit
Documents (collectively, the "Prepetition First Lien Credit Agreement Obligations").  As of
the Petition Date, CEC remains liable to the First Lien Credit Parties under the First Lien
Credit Guaranty and Pledge Agreement for collection of the Required Amount (as defined in
the First Lien Credit Guaranty and Pledge Agreement), subject to the terms and conditions
thereof, and the First Lien Credit Guaranty and Pledge Agreement remains in full force and
effect and enforceable against CEC, subject to its terms (the "CEC Guaranty Obligations").

      (ii)    *First Lien Note Obligations.*

      (a)    First Lien Notes.  Pursuant to that certain (i) Indenture, dated as of
June 10, 2009 (as amended, modified, waived, and/or supplemented from time to time, the
"11.25% First Lien Notes Indenture"), between Caesars Operating Escrow LLC, a Delaware
limited liability company formerly known as Harrah's Operating Escrow LLC ("Escrow LLC"),
Caesars Escrow Corporation, a Delaware corporation formerly known as Harrah's Escrow
Corporation ("Escrow Corporation", and together with Escrow LLC, the "Escrow Issuers"),
CEC, and U.S. Bank, National Association, in its capacity as indenture trustee under the First
Lien Notes Indentures (as defined below), and any successors in such capacity, including UMB
Bank National Association (the "First Lien Notes Indenture Trustee," together with the First Lien
Credit Agent, collectively, the "Prepetition First Lien Agents"), notes (the "11.25% Senior
Secured Notes due 2017") were issued in an original principal amount of $1,375,000,000,
(ii) Second Supplemental Indenture, dated as of September 11, 2009 (as amended, modified,
waived, and/or supplemented from time to time, the "11.25% First Lien Notes Second
Supplemental Indenture"), between CEOC, CEC and the First Lien Notes Indenture Trustee,
additional 11.25% Senior Secured Notes due 2017 were issued in an original principal amount of

$720,000,000, (iii) Indenture, dated as of February 14, 2012 (as amended, modified, waived, and/or supplemented from time to time, the "8.50% First Lien Notes Indenture"), between the Escrow Issuers, CEC and the First Lien Notes Indenture Trustee, notes (the "8.50% Senior Secured Notes due 2020") were issued in an original principal amount of $1,250,000,000, (iv) Indenture, dated as of August 22, 2012 (as amended, modified, waived, and/or supplemented from time to time, the "9.00% First Lien Notes Indenture"), between the Escrow Issuers, CEC and the First Lien Notes Indenture Trustee, notes (the "9.00% Senior Secured Notes due 2020") were issued in the original principal amount of $750,000,000, (v) Additional Notes Supplemental Indenture, dated as of December 13, 2012 (as amended, modified, waived, and/or supplemented from time to time, the "9.00% CEOC First Lien Notes Additional Notes Supplemental Indenture"), between the Escrow Issuers, CEC and the First Lien Notes Indenture Trustee, additional 9.00% Senior Secured Notes due 2020 were issued in an original principal amount of $750,000,000 and (vi) Indenture, dated as of February 15, 2013 (as amended, modified, waived, and/or supplemented from time to time, the "9.00% CEOC First Lien Notes February 2013 Indenture"), between the Escrow Issuers, CEC and the First Lien Notes Indenture Trustee, notes (the "9.00% Senior Secured Notes due 2020 (2013)," together with the 11.25% Senior Secured Notes due 2017, the 8.50% Senior Secured Notes due 2020 and the 9.00% Senior Secured Notes due 2020, the "First Lien Notes") were issued in the original principal amount of $1,500,000,000.  As used herein, (w) "First Lien Notes Indentures" means the 11.25% CEOC First Lien Notes Indenture, the 11.25% CEOC First Lien Notes Second Supplemental Indenture, the 8.50% CEOC First Lien Notes Indenture, the 9.00% CEOC First Lien Notes Indenture, the 9.00% CEOC First Lien Notes Additional Notes Supplemental Indenture and the 9.00% CEOC First Lien Notes February 2013 Indenture; (x) "First Lien Noteholders" means the holders of the

First Lien Notes (together with the First Lien Notes Indenture Trustee, the "First Lien Noteholder Parties"); (y) "Prepetition First Lien Creditors" means the First Lien Credit Parties and the First Lien Noteholder Parties; and (z) the "First Lien Notes Documents" means the First Lien Notes, the First Lien Notes Indentures, the First Lien Security Agreement, and all agreements, documents, notes, security agreements, pledges, guarantees, subordination agreements, mortgages, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreement related to, referenced in, delivered pursuant to, or entered into in connection with any of the foregoing, including, without limitation, the "Security Documents" as defined in the First Lien Credit Agreement and the First Lien Notes Indentures (the "First Lien Note Documents," and together with the First Lien Credit Documents, the "First Lien Documents").

(b)    First Lien Security Agreement.  In connection with the First Lien Notes, CEOC and the Subsidiary Pledgors entered into the First Lien Security Agreement, pursuant to which CEOC and the Subsidiary Pledgors granted first priority liens (subject to Permitted Liens (as defined below)), or mortgages on, security interests in, and collateral assignments, charges or pledges of (the "Prepetition First Lien Notes Liens," and together with the Prepetition First Lien Credit Agreement Liens, the "Prepetition First Priority Liens") the "Collateral" (as defined in the First Lien Security Agreement), including the Cash Collateral (the "Prepetition First Lien Notes Collateral," and together with the Prepetition First Lien Credit Agreement Collateral, the "Prepetition First Lien Collateral")[4] to the First Lien Notes Indenture

---

[4]    For the avoidance of doubt, the term "Prepetition First Lien Collateral" shall include, solely with respect to the First Lien Credit Parties, the Prepetition First Lien Guaranty Collateral.

Trustee, for the benefit of the First Lien Noteholders, as security for all "Notes Obligations" as defined in the First Lien Notes Indentures.

(c)      First Lien Notes Obligations as of the Petition Date.  As of the Petition Date, the Debtors, without defense, counterclaim, or offset of any kind, were indebted and liable to the First Lien Noteholders Parties, pursuant to the First Lien Notes, the First Lien Notes Indentures and the other First Lien Notes Documents in the aggregate principal amount of not less than $6,345,000,000 plus accrued and unpaid interest thereon and all other "Notes Obligations" (including fees, costs, expenses reimbursable thereunder) as defined in each of the First Lien Notes Indentures, including, solely as applicable, interest-on-interest and default interest, in each case to the extent and as provided for in the First Lien Note Documents (collectively, the "Prepetition First Lien Note Obligations," and together with the Prepetition First Lien Credit Agreement Obligations, the "Prepetition First Lien Obligations").

(d)      First Lien Intercreditor Agreement.  The First Lien Intercreditor Agreement, dated as of June 10, 2009 (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement"), entered into by and among the Prepetition First Lien Agents, other parties thereto from time to time and consented to by CEOC and CEC, governs, among other things: (a) payment and priority with respect to holders of claims related to the Prepetition First Lien Obligations; (b) rights and remedies of the holders of Prepetition First Lien Obligations with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (c) the relative priority of liens granted to holders of "First Lien Obligations" (as defined in the First Lien Intercreditor Agreement).

(iii)   *Second Lien Notes Obligations*.

(a)   <u>Second Lien Notes</u>.  Pursuant to that certain (i) Indenture, dated as of April 16, 2010 (as amended, modified, waived, and/or supplemented from time to time, the "<u>12.75% CEOC Second Lien Notes Indenture</u>"), between the Escrow Issuers, CEC and U.S. Bank, National Association, in its capacity as indenture trustee under the Second Lien Notes Indentures (as defined below) and collateral agent, and any successors in such capacities (the "<u>Second Lien Agent</u>," and together with the Prepetition First Lien Agents, the "<u>Prepetition Secured Agents</u>"), notes (the "<u>12.75% Second-Priority Senior Secured Notes due 2018</u>") were issued in an original principal amount of $750,000,000, (ii) Indenture, dated as of December 24, 2008 (as amended, modified, waived, and/or supplemented from time to time, the "<u>10.00% CEOC Second Lien Notes December 2008 Indenture</u>"), between CEOC, CEC and the Second Lien Agent, certain notes (the "<u>10.00% Second-Priority Senior Secured Notes due 2015</u>") were issued in the original principal amount of $214,800,000 and additional notes (the "<u>10.00% Second-Priority Senior Secured Notes due 2018 (2008)</u>") were issued in the original principal amount of $847,621,000, and (iii) Indenture, dated as of April 15, 2009 (as amended, modified, waived, and/or supplemented from time to time, the "<u>10.00% CEOC Second Lien Notes April 2009 Indenture</u>", together with the 12.75% CEOC Second Lien Notes Indenture and the 10.00% CEOC Second Lien Notes December 2008 Indenture, the "<u>Second Lien Notes Indentures</u>"), between CEOC, CEC and the Second Lien Agent, notes (the "<u>10.00% Second-Priority Senior Secured Notes due 2018 (2009)</u>", together with the 12.75% Second-Priority Senior Secured Notes due 2018, the 10.00% Second-Priority Senior Secured Notes due 2015 and the 10.00% Second-Priority Senior Secured Notes due 2018 (2008), the "<u>Second Lien Notes</u>").  As used herein, (x) the "<u>Second Lien Noteholders</u>" means the holders under the Second Lien Notes

11

Indentures (together with the Second Lien Agent, the "Second Lien Noteholder Parties"); (y) the "Prepetition Secured Creditors" means the Second Lien Noteholder Parties together with the Prepetition First Lien Creditors; and (z) the "Second Lien Documents" means the Second Lien Notes Indentures and all agreements, documents, notes, security agreements, pledges, guarantees, subordination agreements, mortgages, deeds, instruments, indemnities, indemnity letters, fee letters, assignments, charges, amendments, and any other agreement related to, referenced in, delivered pursuant to, or entered into in connection with any of the foregoing, including, without limitation, the "Security Documents" as defined in the Second Lien Notes Indentures (and together with the First Lien Documents, the "Prepetition Secured Documents").

(b)     Second Lien Notes Security Agreement.  In connection with the Second Lien Notes Indentures, CEOC and certain subsidiary pledgors entered into that certain Collateral Agreement (as amended, modified and/or supplemented from time to time, the "Second Lien Notes Security Agreement"), dated as of December 24, 2008, with the Second Lien Agent, as collateral agent for the Second Lien Noteholders, pursuant to which CEOC and the subsidiary pledgors granted second priority liens, or mortgages on, security interests in, and collateral assignments, charges or pledges of (the "Prepetition Second Priority Notes") in the "Collateral" (as defined in the Second Lien Indentures) (and otherwise subject to Permitted Liens (as defined in the Second Lien Indentures)) (the "Prepetition Second Lien Collateral").

(c)     Second Lien Notes Obligations as of the Petition Date.  The "Prepetition Second Lien Obligations" shall mean all "Obligations" under the Second Lien Notes Indentures, including any amounts paid, incurred, or accrued prior to the Petition Date in accordance with the Second Lien Notes Indentures, principal, accrued and unpaid interest, any fees, expenses, and disbursements (including, without limitation, attorneys' fees, related

expenses, and disbursements), reimbursement obligations, indemnification obligations, contingent obligations, and other charges of whatever nature, whether or not contingent, whenever arising, due, or owing in respect thereof to the extent and as provided for in the Second Lien Notes Indentures.  The "Prepetition Secured Obligations" shall mean the Prepetition First Lien Obligations together with the Prepetition Second Lien Obligations.

(d)    Second Lien Intercreditor Agreement.    The second lien Intercreditor Agreement, dated as of December 24, 2008 (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement"), entered into by and among the Prepetition First Lien Agent and the Second Lien Agent and acknowledged by CEOC, governs, among other things, the relative priority of the liens and claims held by, and the rights and remedies of the holders of Prepetition First Lien Obligations and the Prepetition Second Lien Obligations with respect to debtor-in-possession financing, use of cash collateral, and adequate protection.  Among other things, pursuant to sections 6.1 and 6.3 of the Second Lien Intercreditor Agreement, holders of Prepetition Second Lien Obligations are prohibited from contesting the Debtors' use of cash collateral with the consent of any First Lien Agent (as defined in the Second Lien Intercreditor Agreement).

(iv)    *Validity, Perfection, and Priority of Prepetition First Priority Liens and Prepetition First Lien Obligations*.  Subject to the provisions of paragraph 12 of this Interim Order, each of the Debtors (for itself and its estate), acknowledges and agrees that:  (a) as of the Petition Date, the Prepetition First Priority Liens granted to the Prepetition First Lien Creditors on the Prepetition First Lien Collateral were valid, binding, enforceable, non-avoidable, and properly perfected; (b) as of the Petition Date, the Prepetition First Priority Liens were senior in priority over any and all other liens on the Prepetition First Lien Collateral (other than valid,

binding, enforceable, and perfected liens on the Prepetition First Lien Collateral that are (x) senior to the Prepetition First Priority Liens, and (y) not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, subordination, or impairment pursuant to the Bankruptcy Code or applicable non-bankruptcy law) (the "Permitted Liens"); (c) the Prepetition First Lien Obligations constitute legal, valid, binding, enforceable, and non-avoidable obligations of the Debtors, and allowed claims against each of the Debtors in the Chapter 11 Cases; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition First Priority Liens or Prepetition First Lien Obligations exist, and no portion of the Prepetition First Priority Liens or Prepetition First Lien Obligations is subject to any challenge, defense, setoff, objection, claim, or counterclaim of any kind, including, without limitation, avoidance, disallowance, disgorgement, recharacterization, reduction, recoupment, or subordination (whether equitable or otherwise) pursuant to the Bankruptcy Code or applicable nonbankruptcy law; (e) at no time have the Prepetition First Lien Creditors engaged in any inequitable conduct in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the use of Cash Collateral; and (f) the Debtors and their estates have no setoffs, recoupments, claims, objections, challenges, causes of actions, and/or choses in action, including, without limitation, avoidance claims under chapter 5 of the Bankruptcy Code, against any of the Prepetition First Lien Creditors and each of their respective partners, shareholders, members, funds, managers, affiliates, agents, attorneys, advisors, professionals, officers, directors, or employees (collectively, the "Identified Persons"), whether arising under applicable state, federal, or foreign law or whether arising out of, or in connection with, based upon, or related to the use of Cash Collateral or the Debtors' Stipulations.

14

(v)     The Debtors' Stipulations, acknowledgements, and waivers hereunder are made by the Debtors after consultation with their attorneys and financial advisors.

F.      _Necessity of Relief Requested_.   The ability of the Debtors to finance their operations and complete a successful chapter 11 reorganization requires immediate and continued use of Cash Collateral.  In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and immediate and irreparable harm to the Debtors, their estates, and their creditors would occur.  The Debtors do not have sufficient available sources of working capital and financing to operate their businesses in the ordinary course of business or to maintain their property without the use of Cash Collateral.  The relief requested in the Motion is therefore necessary for the continued operation of the Debtors' businesses and the preservation of their property.  The Prepetition First Lien Agents, the Prepetition First Lien Creditors, and the Debtors have negotiated at arms' length and in good faith regarding the Debtors' consensual use of Cash Collateral to fund the continued operation of the Debtors' businesses during the Specified Period (as defined below) in accordance with the Budget.  Entry of this Interim Order is in the best interests of the Debtors and their respective estates and creditors.

G.      _Budget_.   The Budget is an integral part of this Interim Order, is hereby incorporated by reference as though fully restated herein, and has been relied upon by the Prepetition First Lien Creditors in consenting to this Interim Order and in permitting the use of the Cash Collateral on the terms and conditions set forth herein.  The Budget includes the Debtors' reasonable estimate as of the date of delivery of all operational receipts and all operational disbursements, fees, costs, and other expenses that will be payable, incurred and/or accrued by any of the Debtors during the period covered by the Budget.

15

H.     _Adequate Protection_.   The Prepetition Secured Agents, for the benefit of themselves and the Prepetition Secured Creditors, as applicable, are entitled to receive adequate protection to the extent of any diminution in value of their respective interests in the Prepetition First Lien Collateral (including the Cash Collateral) and, if any, in the Prepetition Second Lien Collateral, as applicable, from and after the Petition Date, resulting from the use of Cash Collateral (including the use of Cash Collateral pursuant to the Budget), the use, sale, lease, consumption, or disposition of Prepetition First Lien Collateral or Prepetition Second Lien Collateral, as applicable, the subordination of the Prepetition First Priority Liens and the Prepetition Second Priority Liens to the Carve Out (as defined herein), as applicable, or the imposition of the automatic stay (collectively, "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code, pursuant to this Interim Order.   The adequate protection provided herein and other benefits and privileges provided herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to protect the Prepetition First Lien Creditors from the diminution of their respective and relative interests in the value of their Prepetition First Lien Collateral from and after the Petition Date, and the Second Lien Noteholders from the diminution of their respective and relative interests (if any) in the value of their Prepetition Second Lien Collateral from and after the Petition Date.

I.     _Sections 506(c) and 552(b)_.   In light of the Prepetition First Lien Agents' and Prepetition First Lien Creditors' agreement to subordinate their liens and superpriority claims to the Carve Out (as defined below) to the extent provided in paragraph 11 below and to permit the use of their Cash Collateral as and to the extent set forth herein, the Prepetition First Lien Creditors shall receive (a) subject to entry of the Final Order, a waiver of any "equities of the

case" claims or exceptions under section 552(b) of the Bankruptcy Code and (b) subject to entry

of the Final Order, a waiver of the provisions of section 506(c) of the Bankruptcy Code.

J.      *Final Hearing*.  The Debtors will seek final approval of the relief requested in the

Motion pursuant to a proposed Final Order at the Final Hearing, notice of which will be provided

in accordance with paragraph 31 of this Interim Order.

K.      *Notice*.  In accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d), and

9014, and the Local Rules, notice of the Interim Hearing and the emergency relief requested in

the Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or

hand delivery, to certain parties in interest, including:  (a) the Office of the United States Trustee

for the Northern District of Illinois; (b) the entities listed on the Consolidated List of Creditors

Holding the 50 Largest Unsecured Claims; (c) the administrative agent for the Debtors' credit

facility; (d) the indenture trustees for each of the Debtors' secured and unsecured notes;

(e) counsel to certain holders of claims against the Debtors regarding each of the foregoing

referenced in clauses (c) and (d); (f) the state attorneys general for states in which the Debtors

conduct business; (g) the Office of the United States Attorney for the Northern District of

Illinois; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) the

gaming commissions for each of the states in which the Debtors operate or manage a casino;

(k) counsel to CEC; and (l) any party that has requested notice pursuant to Bankruptcy Rule

2002.  The Debtors have made reasonable efforts to afford the best notice possible under the

circumstances to permit the relief set forth in this Interim Order, and no other or further notice is

or shall be required.

Based upon the foregoing findings and conclusions, the Motion and the record before the

Court with respect to the Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.      <u>Motion Granted</u>.  The Motion is granted on an interim basis, and the use of Cash Collateral on an interim basis is authorized, subject to the express terms and conditions of this Interim Order.

2.      <u>Objections Overruled</u>.  All objections to the Motion to the extent not withdrawn or resolved are overruled.  Notwithstanding any applicability of any Bankruptcy Rules or Local Rules, this Interim Order shall be effective immediately upon its entry.

3.      <u>Authorization to Use Cash Collateral</u>.

(a)      <u>Specified Period</u>.  Subject to and solely in accordance with the express terms and conditions of this Interim Order, the Debtors are hereby authorized to use Cash Collateral on an interim basis solely for the period (the "<u>Specified Period</u>") from the Petition Date through the date (unless such date is extended by the written consent of the Required Lenders)[5] that is the earliest to occur of (i) March 3, 2015, if the Final Order, in form and substance acceptable to the Required Lenders, has not been entered by this Court prior to such date, (ii) the First Lien Credit Parties' Outside Date (as defined herein), (iii) immediately upon expiration of the First Lien Credit Parties' Remedies Notice Period (as defined herein), and (iv) the date this Interim Order ceases to be in full force and effect.  The Debtors' authority to use Cash Collateral shall automatically terminate immediately upon expiration of the Specified Period, without further notice or order of this Court (and the automatic stay shall automatically

---

[5]  For purposes hereof, all references to agreements, decisions, approvals, or consents required by the "Required Lenders" hereunder shall refer to the holders of a majority in principal amount of all Loans made under the First Lien Credit Agreement as of the applicable reference date.  Any such agreement, decision, approval or consent must be made in writing, and signed by such Required Lenders (in their sole and absolute discretion), and the Debtors shall be entitled to conclusively rely on any representations made in such signed writing regarding the beneficial ownership of such amounts, without the need for any further evidence or support thereof.

be deemed lifted to implement the forgoing), unless otherwise extended or waived by the Required Lenders.

(b)    <u>Use of Collateral</u>. Subject to and solely in accordance with the terms and conditions of this Interim Order, Cash Collateral may only be used during the Specified Period for working capital and general corporate purposes, including the renewal and extension of existing letters of credit in the ordinary course of business, to pay costs associated with the Debtors' restructuring, and otherwise in accordance with this Interim Order.   The Debtors will continue to operate in the ordinary course of business consistent with the cash flow forecast used to establish the Budget.

4.    <u>Adequate Protection</u>.

(a)    <u>Adequate Protection Liens</u>.  As adequate protection of the interests of the Prepetition First Lien Creditors in the Prepetition First Lien Collateral against any Diminution in Value of such interest from and after the Petition Date, pursuant to sections 361 and 363(e) of the Bankruptcy Code, and as adequate protection of the interests of the Second Lien Noteholders in the Prepetition Second Lien Collateral against any Diminution in Value of such interest (if any) from and after the Petition Date, pursuant to sections 361 and 363(e) of the Bankruptcy Code, the Debtors are authorized to grant, and as of entry of the Interim Order are hereby deemed to have granted, to the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Creditors, and to the Second Lien Agent, for the benefit of itself and the Second Lien Noteholders (in each case without the necessity of physical possession or the execution, recordation or filing of mortgages, security agreements, pledge agreements, financing statements, copyright mortgages, ship mortgages, aircraft filings, vehicle registrations, or other agreements), additional and replacement continuing valid, binding,

19

enforceable, non-avoidable, and automatically perfected postpetition security interests in and

liens (together, the "Adequate Protection Liens") on any and all assets and properties, whether

now owned or in existence on the Petition Date or thereafter acquired or existing and wherever

located, of each Debtor and each Debtor's "estate" (as created pursuant to section 541(a) of the

Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible,

including, without limitation, all Prepetition First Lien Collateral, Prepetition Second Lien

Collateral, all cash, cash equivalents, accounts, inventory, goods, contract rights, instruments,

documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts

receivable, receivables and receivables records, general intangibles, payment intangibles, tax or

other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property

leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments,

investment property, letter-of-credit rights, supporting obligations, machinery and equipment,

real property, leases (and proceeds from the disposition thereof), all of the issued and outstanding

capital stock of each Debtor, other equity or ownership interests, including equity interests in

subsidiaries and non-wholly-owned subsidiaries, money, investment property, and causes of

action (including causes of action arising under section 549 of the Bankruptcy Code and any

related action under section 550 of the Bankruptcy Code), the Debtors' rights under section

506(c) of the Bankruptcy Code (subject to entry of the Final Order), the proceeds of any causes

of action under sections 502(d), 544, 545, 547, 548, 550 (except as provided above), or 553 of

the Bankruptcy Code (the "Avoidance Actions") (subject to entry of the Final Order), Cash

Collateral, documents, vehicles, intellectual property, securities, partnership or membership

interests in limited liability companies, and capital stock, including, without limitation, the

products, proceeds, and supporting obligations thereof, and all cash and non-cash proceeds,

rents, products, substitutions, accessions, and profits of any of the collateral described above, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located (all such property collectively with the Prepetition First Lien Collateral, the "Collateral"); provided, however, that Collateral shall expressly exclude the following:  (i) any assets (including equity interests), to the extent that, and for so long as, the granting of Adequate Protection Liens would violate any applicable law pursuant to which any gaming board, commission, or other governmental gaming regulatory body or agency in any jurisdiction in which the Debtors or any of their subsidiaries manages or conducts any casino, gaming business or activities, which (A) has, or may at any time after the date hereof have, jurisdiction over the gaming activities at the property or any successor to such authority or (B) is, or may at any time after the date hereof be, responsible for interpreting, administering and enforcing the Gaming Laws (as herein defined) (the "Gaming Authorities") possesses regulatory, licensing, or permit authority over gaming, gambling or casino activities and all rules, rulings, orders, ordinances, regulations of any Gaming Authority applicable to the gambling, casino, or gaming business or activities of the Debtors or any of their subsidiaries in any jurisdiction, as in effect from time to time, including the policies, interpretations and administration thereof by the Gaming Authorities ("Gaming Law"), (ii) more than 65% of the issued and outstanding voting equity interests of (A) any foreign subsidiary or (B) a subsidiary that owns no material assets other than equity interests (or debt or other instruments treated as equity for U.S. federal income tax purposes) in one or more foreign subsidiaries whose ownership of such foreign subsidiaries amounts to at least 99% of the voting power and the value of the equity interests (or debt or other instruments as equity for U.S. federal income tax purposes) in such foreign subsidiaries in the case of clauses (A) and (B) solely to the extent that the grant of the Adequate Protection Liens thereon would

21

result in adverse tax consequence to the Debtors, (iii) to the extent such grant would result material incremental costs or expenses being incurred by the Debtors in excess of the value of such liens and solely in respect of the First Lien Noteholders, the equity interests of any Debtor or subsidiary in the event that Rule 3-16 of Regulation S-X under the Securities Act of 1933, as amended is amended, modified, or interpreted by the Securities Exchange Commission ("SEC") to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental authority) of separate financial statements, and (iv) any "intent-to-use" trademark applications for which a statement of use or an amendment to allege use has not been filed (it being understood that the Adequate Protection Liens shall include the proceeds or products of any such assets). Notwithstanding anything to the contrary contained herein, (i) in no event shall Caesars Entertainment Windsor Limited be subject to, otherwise provide, or deemed to provide, any adequate protection hereunder, nor shall Caesars Entertainment Windsor Limited pledge, secure, or otherwise lend any credit support to the Debtors in respect of the Prepetition Secured Obligations and (ii) any Adequate Protection Liens granted in cash and deposit accounts subject to those certain Zero/Controlled Balance Arrangements Agreements (Sweeping) dated January 8, 2015 shall be subordinate to the liens granted therein to Bank of America, N.A.

(b) The Adequate Protection Liens granted to the Prepetition First Lien Agents, for the benefit of themselves and the Prepetition First Lien Creditors (the "First Priority Adequate Protection Liens"), shall be senior liens, shall rank in the same relative priority and right as do their respective security interests and liens under the respective First Lien Documents pursuant to the First Lien Intercreditor Agreement, and shall be subject and subordinate only to the Carve Out. The Adequate Protection Liens granted to the Second Lien

Agent, for the benefit of itself and the Second Lien Noteholders (the "Second Priority Adequate Protection Liens"), shall be junior and subordinate in all respects to (i) the Carve Out, (ii) the First Priority Adequate Protection Liens, and (iii) the Prepetition First Priority Liens.  The First Priority Adequate Protection Liens shall secure the Prepetition First Lien Obligations solely to the extent of any Diminution in Value of the Prepetition First Lien Agents' interests in the Prepetition First Lien Collateral from and after the Petition Date.  The Second Priority Adequate Protection Liens shall secure the Prepetition Second Lien Obligations solely to the extent of any Diminution in Value of the Second Lien Agent's interests (if any) in the Prepetition Second Lien Collateral from and after the Petition Date.

(c)    The Adequate Protection Liens shall be enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee or other estate representative appointed in the Chapter 11 Cases, or any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings in which any of the Debtors is or has been named as a debtor or alleged debtor or superseding or related to any of the foregoing (collectively, "Successor Cases").  The Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and the Adequate Protection Liens shall be valid and enforceable against any trustee or other estate representative appointed in any of the Chapter 11 Cases or any Successor Cases, or upon the dismissal of any of the Chapter 11 Cases or Successor Cases; provided that (i) the Carve Out shall be senior to the Adequate Protection Liens as provided herein, and (ii) the First Priority Adequate Protection Liens and the Prepetition First Priority Liens shall be senior to the Second Priority Adequate Protection Liens.  The Adequate Protection Liens shall not be subject to

sections 510(b) or (c), 549, or 550 of the Bankruptcy Code and, subject to entry of the Final

Order, the Adequate Protection Liens shall not be subject to section 506(c) of the Bankruptcy

Code. The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and

automatically perfected liens, not subject to subordination, impairment, or avoidance, for all

purposes in the Chapter 11 Cases and any Successor Cases. No lien or interest avoided and

preserved for the benefit of any of the Debtors' estates pursuant to section 551 of the Bankruptcy

Code shall be made *pari passu* with or senior to the Adequate Protection Liens.

(d)   <u>Adequate Protection Superpriority Claim</u>. As further adequate

protection against any Diminution in Value of the interests of the Prepetition First Lien Creditors

in the Prepetition First Lien Collateral from and after the Petition Date, the Prepetition First Lien

Agents, on behalf of themselves and the Prepetition First Lien Creditors, are hereby granted an

allowed superpriority administrative expense claim in the Chapter 11 Cases and any Successor

Cases against each of the Debtors and their estates, pursuant to sections 503(b) and 507(b) of the

Bankruptcy Code (the "<u>Superpriority Claim</u>"). The Superpriority Claim shall be subject to the

Carve Out, and shall be an allowed claim against the Debtors (jointly and severally) with priority

over any and all administrative expenses and all other claims against the Debtors now existing or

hereafter arising, of any kind whatsoever, including, without limitation, all other administrative

expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over

any and all other administrative expenses or other claims arising under any other provision of the

Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment

lien or other nonconsensual lien, levy or attachment. The Superpriority Claim shall be payable

from and have recourse to all assets of the Debtors' estates, including without limitation the

Avoidance Actions and all unencumbered pre- and post-petition property and assets of the

Debtors, including without limitation all excluded collateral.  Other than the Carve Out, no cost

or expense of administration under sections 105, 503 or 507 of the Bankruptcy Code or

otherwise, including any such cost or expense resulting from or arising after the conversion of

any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code, shall be senior to, or

pari passu with, the Superpriority Claim, subject to the First Lien Intercreditor Agreement, to the

extent applicable, if at all.

    (e)  <u>Fees and Expenses</u>. The Debtors are hereby authorized and

directed to pay all outstanding prepetition and all postpetition reasonable and documented out-of-

pocket fees (including any transaction fees) and expenses of (i) Rothschild Inc. ("<u>Rothschild</u>"),

financial advisors to certain of the First Lien Lenders (the "<u>First Lien Credit Agreement Group</u>"),

pursuant to the engagement letter dated as of September 10, 2014, (ii) Stroock & Stroock &

Lavan LLP ("<u>Stroock</u>"), as counsel to the First Lien Credit Agreement Group, (iii) one special

REIT counsel retained by the First Lien Credit Agreement Group in the Chapter 11 Cases,

(iv) Shaw Fishman Glantz & Towbin LLC, as local Illinois bankruptcy counsel to the First Lien

Credit Agreement Group in the Chapter 11 Cases, (v) one local Delaware bankruptcy counsel

retained by the First Lien Credit Agreement Group, (vi) one local bankruptcy counsel for each

other applicable jurisdiction in which the Debtors may commence, or have commenced against

them, bankruptcy proceedings (vii) one gaming counsel and one special counsel, each as retained

by the First Lien Credit Agreement Group, (viii) Cahill Gordon & Reindel LLP, as counsel to the

First Lien Credit Agent, (ix) the First Lien Credit Agent, (x) Miller Buckfire & Co. ("<u>Miller</u>

<u>Buckfire</u>"), financial advisors to certain of the First Lien Noteholders (the "<u>First Lien Note</u>

<u>Group</u>," together with the First Lien Credit Agreement Group, the "<u>First Lien Group</u>"), pursuant

to the engagement letter dated as of October 15, 2014, (xi) Kramer Levin Naftalis & Frankel

LLP, as counsel to the First Lien Note Group ("Kramer Levin"), (xii) Breazeale, Sachse &

Wilson, L.L.P., as counsel to the First Lien Note Group, (xiii) Ballard Spahr LLP, as counsel to

the First Lien Note Group, (xiv) one special REIT counsel retained by the First Lien Note Group

in the Chapter 11 Cases, (xv) Neal, Gerber & Eisenberg LLP, as local Illinois counsel to the First

Lien Note Group in the Chapter 11 Cases, (xvi) one local Delaware bankruptcy counsel retained

by the First Lien Note Group, (xvii) one local bankruptcy counsel for each other applicable

jurisdiction in which the Debtors may commence, or have commenced against them, bankruptcy

proceedings, as retained by the First Lien Note Group, (xviii) the First Lien Notes Indenture

Trustee, (xix) Katten Muchin Rosenman LLP, as counsel to the First Lien Notes Indenture

Trustee, and (xx) such other legal, consulting, financial, and/or other professional advisors as

may be retained or may have been retained from time to time by any of the members of the First

Lien Group with the prior written consent of the Debtors, which consent shall not be

unreasonably withheld.  The invoices for such fees and expenses will only provide summary

detail of services performed and payment of all such fees and expenses shall not be subject to

allowance by the Court; provided, however, that the Debtors shall promptly provide copies of

invoices for such fees and expenses received on account of such fees and expenses to the U.S.

Trustee and counsel to the Committee, if appointed, and the Court shall have exclusive

jurisdiction over any objections raised to the invoiced amount of the fees and expenses proposed

to be paid, which objections may only be raised within ten (10) calendar days after delivery of an

invoice(s) therefor.  In the event that within ten (10) calendar days from delivery of such invoice,

the Debtors, the U.S. Trustee, or counsel to the Committee raises an objection to a particular

invoice, and the parties are unable to resolve such objection, the Court shall hear and determine

such dispute.  For the avoidance of doubt, the Debtors shall pay all fees and expenses not subject

to a timely objection, and to the extent any timely objection is not resolved or withdrawn, the

Debtors shall pay the disputed amounts only upon entry of an order of the Court resolving such

dispute, in each case, within ten (10) business days of receipt of delivery to the Debtors of any

applicable invoice or receipt, and in each case without further order of, or application to, the

Court or notice to any other party.

    (f)  <u>Adequate Protection Payments</u>.  As further adequate protection, the

Debtors are hereby authorized and directed to pay to each of the Prepetition First Lien Agents,

on behalf of themselves and the Prepetition First Lien Creditors, (i) monthly adequate protection

payments in cash at a rate equal to 1.5% per annum of the aggregate amount of all Prepetition

First Lien Obligations as of the Petition Date (the "<u>Monthly Adequate Protection Payments</u>") and

(ii) payment on a pro rata basis of all Available Cash (as defined in the Second Amended and

Restated Restructuring Support and Forbearance Agreement, dated January 14, 2015) remaining

upon the effective date of a plan of reorganization in these Chapter 11 Cases (together with the

Monthly Adequate Protection Payments and the other payments required under paragraph 4

hereunder, the "<u>Adequate Protection Payments</u>").  The Adequate Protection Payments and the

expenses paid by the Debtors pursuant to the "Fees and Expenses" section above do not

themselves result in Diminution in Value.  The Monthly Adequate Protection Payments will be

due and payable on the first business day of each month following the Petition Date (with the

first such payment to include a pro rated amount from the Petition Date through the end of the

month in which the Chapter 11 Cases were commenced as well as the monthly payment for the

following month).

    (g)  <u>Reporting and Budget Compliance</u>.

27

(1)    <u>Budget</u>.   Prior to the Petition Date, the Debtors shall have

delivered to each lead counsel within the First Lien Group an initial six (6) week cash flow

forecast, in form and substance acceptable to, and with amounts set forth therein approved by,

(A) the Required Lenders or their professional advisors and (B) the Requisite Consenting

Creditors or their professional advisors, setting forth all projected cash receipts and cash

disbursements on a weekly basis, a copy of which is attached hereto as Exhibit A (the

"<u>Budget</u>").

(2)    <u>Budget Variance Reports (during the initial six (6) week period)</u>.

Commencing no later than February 3, 2015 (the "<u>Initial Budget Report Date</u>"), the Debtors

shall deliver to the (A) the Required Lenders or their professional advisors and (B) the First

Lien Noteholders or their professional advisors a variance report (a "<u>Budget Variance Report</u>")

comparing the actual cash receipts and disbursements of the Debtors for the period from the

Petition Date through the week-ended January 23, 2015 (the "<u>Initial Test Period</u>"), and each

week from the Initial Budget Report Date, the Debtors shall deliver to (A) the Required Lenders

or their professional advisors and (B) the First Lien Noteholders or their professional advisors, a

Budget Variance Report comparing the actual cash receipts and disbursements of the Debtors

for the each week following the Initial Test Period, in each case, on a line item basis, and each

Budget Variance Report shall include explanations for any material variances.  Beginning in the

seventh week following the Petition Date and each week thereafter, the Budget Variance Report

shall be delivered every Thursday for the preceding week.

(3)    The Debtors shall deliver to (A) the Required Lenders or their

professional advisors and (B) the First Lien Noteholders or their professional advisors: (a) no

later than the date that is two (2) weeks following the Petition Date, financial information

reasonably necessary to assess the Debtors' short and long term cash flow forecasts and projections, including, without limitation, all reasonable detail supporting each line item reflected in the Budget (and as may be reasonably anticipated to be reflected in any future updated budgets), including intercompany transfers to non-debtor entities; and (b) no later than the date that is three (3) weeks following the Petition Date, an annual operating budget for the fiscal year 2015, by month, on a consolidated basis and shall include, without limitation, an income statement, balance sheet, cash flow statement, projected capital expenditures and asset sales (with reasonable detail on a property by property basis).

(4)      No later than the date that is five (5) weeks following the Petition Date, (a) the Debtors shall deliver to (A) the Required Lenders or their professional advisors and (B) the First Lien Noteholders or their professional advisors, a thirteen (13) week cash flow forecast, in form and substance acceptable to, with amounts set forth therein and approved by, (A) the Required Lenders or their professional advisors and (B) the Requisite Consenting Creditors or their professional advisors, setting forth all projected cash receipts and cash disbursements (including a monthly professional accrual fee schedule, each as a separate sub-schedule) on a weekly basis, for period commencing on the seventh week following the Petition Date through the consecutive thirteen (13) week period thereafter (the "13 Week Cash Flow Forecast").

(5)      No later than February 28, 2015, the Debtors shall provide the (A) the Required Lenders or their professional advisors and (B) the First Lien Noteholders or their professional advisors (a) a five-year business plan, which shall be broken down by month for the first year only, by quarter for the second year, and annually thereafter and which shall include sufficient detail (as determined in the sole discretion of (A) the Required Lenders or

29

their professional advisors and (B) the Requisite Consenting Creditors or their professional advisors) to properly assess such business plan, and shall include, without limitation, an income statements, balance sheet, cash flow statement, projected capital expenditures and asset sales; and (b) comparative historical financial information on a similar basis.

(6)     Following the receipt of all information set forth in paragraphs (2) through (4) above, (A) the Required Lenders or their professional advisors and (B) the Requisite Consenting Creditors or their professional advisors (each, in their sole and absolute discretion) and the Debtors shall confer in good faith and mutually agree upon the (i) the financial reporting requirements of the Debtors with respect to the 13 Week Cash Flow Forecast (including the frequency and timing of the delivery of updated cash flow forecasts with respect thereto and future budget deliveries and variance reporting), (ii) Total Operating Receipts and Total Operating Disbursements covenant testing (including frequency, period tested and cushion levels), and (iii) the terms of covenants related to the minimum and maximum amount of capital expenditures (as shall be defined by agreement of the parties) on an accrual basis and related calculations within 45 days of the end of each fiscal quarter.

(h)     Access to Records.

(1)     In addition to, and without limiting, whatever rights to access the Prepetition First Lien Creditors have under their respective First Lien Documents, upon reasonable notice, at reasonable times during normal business hours, the Debtors shall, subject to mutually agreeable confidentiality agreements, permit the professional advisors of the First Lien Group and of the Prepetition First Lien Agents (i) to have reasonable access to the Debtors' properties and other Collateral of any Debtor for the purposes of inspection, (ii) to examine the Debtors' books and records, (iii) to conduct reasonable and customary financial

due diligence, and (iv) to have reasonable access to, and to discuss the Debtors' affairs, finances, and condition with, the Debtors' senior officers, professionals, and financial advisors, in each case excluding (a) all privileged and attorney-client work product, (b) trade secrets, and (c) information otherwise subject to a third-party confidentiality agreement.  For the avoidance of doubt, the confidentiality agreements currently entered into between the Debtors and each of Stroock, Rothschild, Kramer Levin and Miller Buckfire shall be deemed reasonably satisfactory to the Debtors in all respects, and none of Stroock, Rothschild, Miller Buckfire or Kramer Levin shall be required to enter into any additional confidentiality agreements before being permitted to conduct due diligence or have access to information and the Debtors' officers and advisors as set forth above.

(2)     The Debtors, including their senior management team, to the extent reasonably available, and financial advisors, shall conduct a telephonic conference call, at least once a week, with professionals for the First Lien Group, in order to discuss the Budget, any variance or related reports delivered in connection therewith, the financial condition and business affairs of the Debtors and the status of the Chapter 11 Cases.

(i)     Insurance.  At all times the Debtors shall maintain casualty and loss insurance coverage for the Collateral on substantially the same basis as maintained prior to the Petition Date.

(j)     Cash Management.     The Debtors shall maintain a cash management system consistent with any order of the Court approving the maintenance of the Debtors' cash management system (the "Cash Management System") and the interim and final orders approving the Cash Management System shall be reasonably satisfactory, in form and substance, to the Required Lenders.

(k)     Sales.  No portion of the Collateral in excess of a fair market value

of $20 million in the aggregate shall be transferred, sold, leased, or otherwise disposed of outside

of the ordinary course of business without the prior consent of the Required Lenders.

(l)     Pleadings.  To the extent reasonably practicable, the Debtors shall

provide respective counsel to the First Lien Group and to the First Lien Notes Indenture Trustee,

to the extent material to its interests, advanced notice and copies of any material motions or other

material documents to be filed in the Chapter 11 Cases.

5.     Modification of Automatic Stay.  The automatic stay imposed under section

362(a) of the Bankruptcy Code is hereby modified as of the date hereof as necessary to effectuate

all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit

the Debtors to grant the Adequate Protection Liens and the Superpriority Claim; (b) permit the

Debtors to perform such acts as the Prepetition First Lien Agents or Prepetition First Lien

Creditors each may request in its reasonable discretion to assure the perfection and priority of the

liens granted herein; (c) permit the Debtors to incur all liabilities and obligations to the

Prepetition First Lien Creditors under this Interim Order; (d) authorize the Debtors to pay, and

the Prepetition First Lien Creditors to retain and apply, payments made in accordance with the

terms of this Interim Order; and (e) exercise of remedies in accordance with paragraph 8 below.

6.     Grant and Perfection of Adequate Protection Liens.  This Interim Order shall be

sufficient and conclusive evidence of the granting, creation, attachment, validity, perfection, and

priority of the Adequate Protection Liens without the necessity of (i) obtaining, filing, recording,

delivering notice of, or entering into any financing statement, mortgage, copyright security

agreement, ship mortgage, aircraft filing, vehicle registration, control agreement, physical

possession, notice, or other instrument or document that may otherwise be required under the law

or regulation of any jurisdiction, or (ii) the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement or securities account control agreement and any other action required to obtain "control" or "possession" pursuant to sections 9-104, 9-105, 9-106, 9-107, 9-313 and/or any other provision of the Uniform Commercial Code) to grant, create, attach, validate or perfect (in accordance with applicable nonbankruptcy law) the Adequate Protection Liens, or to entitle the Prepetition Secured Agents and Prepetition Secured Creditors to the priorities granted herein.    Notwithstanding the foregoing, the Prepetition Secured Agents are authorized to file, as they deem advisable, such financing statements, mortgages, notices of liens, and other instruments or documents to perfect in accordance with applicable nonbankruptcy law or to otherwise evidence the applicable Adequate Protection Liens and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create, evidence, or perfect the Adequate Protection Liens or to entitle the Prepetition Secured Agents and Prepetition Secured Creditors to the priority granted herein.    The Debtors are authorized and directed to execute and deliver to the Prepetition Secured Agents promptly after written demand all such financing statements, mortgages, notices, instruments, and other documents as the Prepetition Secured Agents or Prepetition Secured Creditors may reasonably request.    The Prepetition Secured Agents may file a copy of this Interim Order as a financing statement or notice with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, mortgages, notices of lien, instruments, or similar documents.

7.      <u>First Lien Credit Parties' Events of Default</u>.  The occurrence and continuation of

any of the following events, unless waived by the Required Lenders in their sole discretion, shall

constitute an event of default (each, a "<u>First Lien Credit Parties' Event of Default</u>" and

collectively, the "<u>First Lien Credit Parties' Events of Default</u>"):

(a)      the Debtors' failure to, within 90 days of the Petition Date, file a plan of

reorganization in form, scope, and substance reasonably satisfactory to the Required Lenders and

the Debtors (the "<u>Plan</u>"); for the avoidance of doubt, any supplement to the Plan must be in form,

scope, and substance reasonably satisfactory to the Required Lenders and the Debtors, and a

disclosure statement related to such Plan in form, scope, and substance reasonably satisfactory to

the Required Lenders and the Debtors (the "<u>Disclosure Statement</u>");

(b)      the Debtors' failure to, within 123 days of the Petition Date, have obtained

entry by the Bankruptcy Court of (i) an order approving the Disclosure Statement and (ii) an

order approving solicitation procedures (the "<u>Solicitation Procedures</u>") in relation to the Plan and

Disclosure Statement, in each case in form, scope, and substance reasonably satisfactory to the

Required Lenders and the Debtors;

(c)      the Debtors' failure to, within 240 days of the Bankruptcy Court's

approval of the Disclosure Statement, have obtained entry by the Bankruptcy Court of an order

confirming the Plan (the "<u>Confirmation Order</u>") that is reasonably satisfactory to the Required

Lenders and the Debtors;

(d)      the Debtors' failure to effectuate the Plan within 365 days of the Petition

Date (the "<u>First Lien Credit Parties' Outside Date</u>"); <u>provided</u>, <u>further</u>, that any extensions of the

First Lien Credit Parties' Outside Date shall require the written consent of the Required Lenders;

34

(e)      the obtaining after the Petition Date of indebtedness for borrowed money that is secured by a security interest, mortgage, or other lien on all or any portion of the Collateral which is equal or senior to any security interest, mortgage, or other lien of the Prepetition Secured Agents or the Prepetition Secured Creditors;

(f)      the obtaining on or after after the Petition Date of indebtedness for borrowed money, or guaranties in respect thereof in excess of $35 million outside of the ordinary course of business without the prior written consent of the Required Lenders, in their reasonable discretion;

(g)      any Debtor allow, incurs, or creates any postpetition lien or security interest, other than those (v) granted pursuant to this Interim Order, (w) consented to by the Required Lenders, (x) junior to the First Priority Adequate Protection Liens and the Prepetition First Priority Liens, (y) securing less than an aggregate of $35 million of claims (as defined in the Bankruptcy Code) at any time outstanding, or (z) otherwise incurred in the ordinary course of business;

(h)      any Debtor allows, incurs, or creates any claim entitled to administrative status which is equal or senior to the Superpriority Claim granted to any of the Prepetition First Lien Creditors herein;

(i)      the entry of an order by the Court, other than this Interim Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien on or the granting of any lien on any Collateral to any federal, state, or local environmental or regulatory agency or authority, which in either case could reasonably be

35

expected to have a material adverse effect on the business, operations, property, assets, or financial condition of the Debtors within a particular region (taken as a whole);

(j)     the entry of an order by the Court modifying or granting relief from the automatic stay with respect to any Collateral or assets of any Debtor which has an aggregate value in excess of $35 million;

(k)     any portion of this Interim Order ceases to be in full force and effect, including without limitation, pursuant to any reversal, staying, vacatur, revocation, amendment, or modification (without the Required Lenders' consent) of this Interim Order;

(l)     dismissal of any of the Chapter 11 Cases or conversion of the Chapter 11 Cases to chapter 7 cases, or appointment of a trustee, receiver, interim receiver or receiver, and manager, or appointment of a responsible officer or examiner with enlarged powers in any of the Chapter 11 Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(m)     the entry of a judgment or order by this Court or any other court modifying, limiting, subordinating, recharacterizing, or avoiding the validity, enforceability, perfection, or priority of any of the Debtors' obligations under this Interim Order, the Prepetition First Lien Obligations, the Prepetition First Priority Liens, any obligations under the First Lien Pledge and Guaranty Agreement, the Prepetition First Lien Guaranty Liens, the Adequate Protection Liens, the Superpriority Claim, or the Adequate Protection Payments pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (ii) the entry of a judgment or order by this Court or any other court (x) imposing, surcharging or assessing against the Prepetition First Lien Creditors' claims, the Prepetition First Lien Collateral or the Collateral, any costs or expenses, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, or (y) impairing the

Prepetition First Lien Creditors' right in any respect to credit bid (subject in all respects to the terms and conditions of the First Lien Intercreditor Agreement); or (iii) the Debtors commence, join, or assist in any such proceeding, challenge, objection, defense, claim, or counterclaim of any kind or nature against the Identified Parties or that seeks relief that is inconsistent or contrary in any respect to any of the Debtors' Stipulations or any of the Debtors' other acknowledgements and stipulations contained herein;

(n)     the failure to make any Adequate Protection Payment or any other payment to any of the Prepetition First Lien Agents or Prepetition First Lien Creditors as set forth herein when due and such failure shall (other than in respect of the Monthly Adequate Protection Payment) remain unremedied for five (5) business days after receipt by the Debtors of written notice thereof from the First Lien Credit Agent or Required Lenders;

(o)     the entry of an order by this Court or any other Court avoiding, recharacterizing, subordinating, or requiring repayment of any portion of any payment made pursuant to the terms of this Interim Order, or terminating any Adequate Protection Payments;

(p)     the entry of any (i) "first day orders" that are not in form and substance reasonably satisfactory to the Required Lenders, or (ii) other order that seeks payment in respect of a prepetition claim in excess of $5 million individually or $20 million in the aggregate, without the consent of the Required Lenders, which consent shall not be unreasonably withheld;

(q)     the termination or modification of the exclusive right of the Debtors to file and/or solicit acceptances of a plan of reorganization under section 1121 of the Bankruptcy Code;

(r)     revocation, failure to renew (after all applicable grace periods have lapsed), or suspension of, or the appointment of a receiver, supervisor, conservator, or similar

37

official with respect to, any casino, gambling, or gaming license issued by any Gaming Authority

(as defined in the First Lien Credit Agreement) covering any casino or gaming facility of any of

the Debtors or any of their non-Debtor subsidiaries, which in each case would reasonably be

expected to have a material adverse effect on the business, operations, property, assets, or

financial condition of any of the Debtors within a particular region (taken as a whole);

(s)      the failure by the Debtors to comply with the paragraphs set forth in

paragraph 4(g) hereof;

(t)      the filing of a motion by any Debtor seeking any modification or extension

of this Interim Order without the consent of the Required Lenders (or otherwise subject to the

consent of the Required Lenders), or the failure by any Debtor to dismiss any such motion

promptly; and

(u)      the failure by the Debtors to comply with any other provision of this

Interim Order (other than those previously identified in this paragraph 7) and such failure shall

continue unremedied for five (5) business days after receipt by the Debtors of written notice

thereof from the First Lien Credit Agent or Required Lenders.

8.      <u>First Lien Noteholder Parties' Events of Default</u>.  The occurrence and continuance

of any of the following events, unless waived by the Requisite Consenting Creditors, shall

constitute an event of default solely with respect to the First Lien Noteholder Parties (each, a

"<u>First Lien Noteholder Parties' Event of Default</u>" and collectively, the "<u>First Lien Noteholder</u>

<u>Parties' Events of Default</u>"):

(a)      the Debtors' failure to, within 20 days of the Petition Date, file a motion

with the Bankruptcy Court seeking authorization to assume the Restructuring Support

Agreement (the "<u>RSA Assumption Motion</u>") in form, scope, and substance materially consistent

with the Restructuring Support Agreement and otherwise reasonably acceptable to the Debtors,
CEC, and the Requisite Consenting Creditors;

(b)      the Debtors' failure to, within 45 days of the Petition Date, file a plan of
reorganization (the "Plan") and disclosure statement ("Disclosure Statement"), in each case in
form, scope, and substance reasonably satisfactory to the Requisite Consenting Creditors and the
Debtors; for the avoidance of doubt, any supplement to the Plan must be in form, scope, and
substance materially consistent with the Restructuring Term Sheet and otherwise reasonably
satisfactory to the Requisite Consenting Creditors and the Debtors;

(c)      the Debtors' failure to, within 90 days of filing the RSA Assumption
Motion, have obtained entry by the Bankruptcy Court of an order approving the RSA
Assumption Motion, in form, scope, and substance (i) consistent in all material respects with the
Restructuring Support Agreement and (ii) otherwise reasonably satisfactory to the Debtors, CEC,
and the Requisite Consenting Creditors;

(d)      the Debtors' failure to, within 150 days of the Petition Date, have obtained
entry by the Bankruptcy Court of (i) an order approving the Disclosure Statement and (ii) an
order approving solicitation procedures (the "Solicitation Procedures") in relation to the Plan and
Disclosure Statement, in each case in form, scope, and substance (i) consistent in all material
respects with the Restructuring Support Agreement and (ii) reasonably satisfactory to the
Requisite Consenting Creditors and the Debtors;

(e)      the Debtors' failure to, within 120 days of the Bankruptcy Court's
approval of the Disclosure Statement, have obtained entry by the Bankruptcy Court of an order
confirming the Plan (the "Confirmation Order") that is materially consistent with the

Restructuring Term Sheet and otherwise reasonably satisfactory to the Requisite Consenting

Creditors and the Debtors;

(f)     the Debtors' failure to effectuate the Plan within 120 days of the

Confirmation Order becoming a final order (the "First Lien Noteholder Parties Outside Date");

provided, however, that in the event the Debtors have failed to obtain required regulatory

approvals for certain of their assets as of the Outside Date, the Debtors shall close and proceed to

effectiveness with respect to those assets for which they do have regulatory approval, unless the

Debtors determine in good faith, after consultation with the Requisite Consenting Creditors, that

to do so would have a materially adverse effect on the Debtors, in which case the Debtors shall

have an additional 60 days in which to obtain the additional required regulatory approvals and

close on those assets; provided, further, that any further extensions of the First Lien Noteholder

Parties' Outside Date shall require the consent of the Requisite Consenting Creditors;

(g)     the Debtors' failure to, within 75 days of the Petition Date, have obtained

entry by the Bankruptcy Court of a Final Order that is substantially consistent with the terms of

this Interim Order and reasonably acceptable to the Requisite Consenting Creditors;

(h)     the obtaining after the Petition Date of indebtedness for borrowed money

that is secured by a security interest, mortgage, or other lien on all or any portion of the

Collateral which is equal or senior to any security interest, mortgage, or other lien of the

Prepetition Secured Agents or the Prepetition Secured Creditors;

(i)     the obtaining after the Petition Date of indebtedness for borrowed money,

or guaranties in respect thereof in excess of $35 million outside of the ordinary course of

business without the prior written consent of the Requisite Consenting Creditors, in their

reasonable discretion;

(j) any Debtor allows, incurs, or creates any postpetition lien or security interest, other than those (v) granted pursuant to this Interim Order, (w) consented to by the Requisite Consenting Creditors, (x) junior to the First Priority Adequate Protection Liens and the Prepetition First Priority Liens, (y) securing less than an aggregate of $35 million of claims (as defined in the Bankruptcy Code) at any time outstanding, or (z) otherwise incurred in the ordinary course of business;

(k) any Debtor allows, incurs, or creates any claim entitled to administrative status which is equal or senior to the Superpriority Claim granted to any of the Prepetition First Lien Creditors herein;

(l) the entry of an order by the Court, other than this Interim Order, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on or security interest in any Collateral, or (ii) with respect to any lien on or the granting of any lien on any Collateral to any federal, state, or local environmental or regulatory agency or authority, which in either case would reasonably be expected to have a material adverse effect on the business, operations, property, assets, or financial condition of any of the Debtors within a particular region (taken as a whole);

(m) the entry of an order by the Court modifying or granting relief from the automatic stay with respect to any Collateral or assets of any Debtor which has an aggregate value in excess of $35 million;

(n) any portion of this Interim Order ceases to be in full force and effect, including without limitation, pursuant to any reversal, vacatur, revocation, amendment, or modification (without the Requisite Consenting Creditors' prior consent) of this Interim Order;

(o)      dismissal of any of the Chapter 11 Cases or conversion of the Chapter 11 Cases to chapter 7 cases, or appointment of a trustee, receiver, interim receiver or receiver, and manager, or appointment of a responsible officer or examiner with enlarged powers in any of the Chapter 11 Cases (having powers beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4));

(p)      the entry of a judgment or order by this Court or any other court modifying, limiting, subordinating, recharacterizing, or avoiding the validity, enforceability, perfection, or priority of any of the Debtors' obligations under this Interim Order, the Prepetition First Lien Obligations, the Prepetition First Priority Liens, the Adequate Protection Liens, the Superpriority Claim, or the Adequate Protection Payments pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (ii) the entry of a judgment or order by this Court or any other court (x) imposing, surcharging or assessing against the Prepetition First Lien Creditors' claims, the Prepetition First Lien Collateral or the Collateral, any costs or expenses, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise, or (y) impairing the Prepetition First Lien Creditors' right in any respect to credit bid (subject in all respects to the terms and conditions of the First Lien Intercreditor Agreement); or (iii) the Debtors commence, join, or assist in any such proceeding, challenge, objection, defense, claim, or counterclaim of any kind or nature against the Identified Parties or that seeks relief that is inconsistent or contrary in any respect to any of the Debtors' Stipulations or any of the Debtors' other acknowledgements and stipulations contained herein;

(q)      the failure to make any Adequate Protection Payment or any other payment to any of the Prepetition First Lien Agents or Prepetition First Lien Creditors as set forth herein when due and such failure shall (other than in respect of the Monthly Adequate

42

Protection Payment) remain unremedied for five (5) business days after receipt by the Debtors of written notice thereof from the First Lien Notes Indenture Trustee or the Requisite Consenting Creditors;

(r)      the entry of a final order by this Court or any other Court avoiding, recharacterizing, subordinating, or requiring repayment of any portion of any payment made pursuant to the terms of this Interim Order, or terminating any Adequate Protection Payments;

(s)      the entry of any (i) "first day orders" that are not in form and substance reasonably satisfactory to the Requisite Consenting Creditors, or (ii) other order that seeks payment in respect of a prepetition claim in excess of $5 million individually or $20 million in the aggregate, without the consent of the Requisite Consenting Creditors, which consent shall not be unreasonably withheld;

(t)      the termination or modification of the exclusive right of the Debtors to file and/or solicit acceptances of a plan of reorganization under section 1121 of the Bankruptcy Code;

(u)      revocation, failure to renew (after all applicable grace periods have lapsed), or suspension of, or the appointment of a receiver, supervisor, conservator, or similar official with respect to, any casino, gambling, or gaming license issued by any Gaming Authority (as defined in the First Lien Credit Agreement) covering any casino or gaming facility of any of the Debtors or any of their non-Debtor subsidiaries, which in each case would reasonably be expected to have a material adverse effect on the business, operations, property, assets, or financial condition of any of the Debtors within a particular region (taken as a whole);

(v)      the failure by the Debtors to comply with any obligations set forth in paragraph 4(g) hereof;

43

(w)     the filing of a motion by any Debtor seeking any modification or extension of this Interim Order without the consent of the Requisite Consenting Creditors (or otherwise subject to the consent of the Requisite Consenting Creditors), or the failure by any Debtor to dismiss any such motion promptly;

(x)     the entry of an order by the Court modifying or extending this Interim Order without the consent of the Requisite Consenting Creditors; and

(y)     the failure by the Debtors to comply with any other provision of this Interim Order (other than those previously identified in this paragraph 8) and such failure shall continue unremedied for five (5) business days after receipt by the Debtors of written notice thereof from the First Lien Notes Indenture Trustee or the Requisite Consenting Creditors.

9.     <u>Rights and Remedies First Lien Credit Parties Upon Event of Default</u>.

(a)     Upon the occurrence and continuation of a First Lien Credit Parties' Event of Default, the Required Lenders may deliver a written notice of the Required Lenders' intention to declare a termination, reduction, or restriction of the Debtors' ability to use Cash Collateral (any such declaration, shall be referred to herein as a "<u>First Lien Credit Parties' Termination Declaration</u>").  The First Lien Credit Parties' Termination Declaration shall be given by facsimile (or other electronic means) to counsel to the Debtors, counsel to each of the Prepetition Secured Agents, counsel to any statutory committee, and the U.S. Trustee (the earliest date any such First Lien Credit Parties' Termination Declaration is made shall be referred to herein as the "<u>First Lien Credit Parties' Termination Declaration Date</u>"), and the automatic stay under section 362 of the Bankruptcy Code is hereby vacated to allow the delivery of the First Lien Credit Parties' Termination Declaration.  The Debtors shall have seven (7) business days from the First Lien Credit Parties' Termination Declaration Date to cure

such First Lien Credit Parties' Event of Default (the "First Lien Credit Parties' Remedies Notice Period"). During the First Lien Credit Parties' Remedies Notice Period, the Debtors may use Cash Collateral pursuant to the terms of this Interim Order.

(b)     Unless the Court determines during the First Lien Credit Parties' Remedies Notice Period that a First Lien Credit Parties' Event of Default has not occurred, the automatic stay shall automatically be terminated upon the expiration of the First Lien Credit Parties' Remedies Notice Period without further notice or order, the Debtors shall no longer have the right to use or seek to use Cash Collateral, and the Required Lenders shall be permitted to (i) terminate the Debtors' use of any Cash Collateral, (ii) declare all accrued adequate protection payment obligations to be immediately due and payable, and/or (iii) take any other actions or exercise any other remedies set forth herein or in the First Lien Documents or as otherwise available at law (subject, in each case, and in all respects, to the terms of the First Lien Intercreditor Agreement, the Second Lien Intercreditor Agreement, and this Interim Order), against the Prepetition First Lien Collateral or the Collateral, in each case, without further action, notice, or order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens on and security interest in the Collateral or any other rights and remedies granted to the Prepetition First Lien Creditors with respect thereto pursuant to the First Lien Documents, this Interim Order or applicable law, rule or regulation, as applicable. For the avoidance of doubt, nothing contained in this paragraph 9 shall reduce the Carve Out.

10.     Rights and Remedies First Lien Noteholder Parties Upon Event of Default. On or after (i) the forty-fifth (45th) day following receipt by the Debtors of written notice from the Requisite Consenting Creditors of the occurrence and continuation of a First Lien Noteholder

Parties' Event of Default under any of subparagraphs (a) through (f) of paragraph 8 of this

Interim Order; or (ii) the seventh (7th) business day following receipt by the Debtors of written

notice from the Requisite Consenting Creditors (x) of the occurrence and continuation of a First

Lien Noteholder Parties' Event of Default under any other subparagraph of paragraph 8 of this

Interim Order, or (y) that any Budget is not in form and substance acceptable to the Requisite

Consenting Creditors (or their advisors) or that the First Lien Noteholders have not received

documents, reports, or information required to be delivered to them pursuant to section 4(g); or

(iii) any day on or after this Interim Order ceases to be in full force and effect, or any

amendment, modification, waiver, supplement or extension of this Interim Order is effected

without the prior written consent of the Requisite Consenting Creditors, the Requisite

Consenting Creditors shall have the right to (A) declare a termination of their consent to the

Debtors' use of Cash Collateral with respect to the First Lien Noteholder Parties (it being

understood that the termination of such consent shall not terminate the Debtors' right to use Cash

Collateral in accordance with the terms hereof nor shall it authorize the First Lien Noteholder

Parties to exercise any rights and remedies with respect to Collateral absent further order of the

Court, upon notice and a hearing); (B) seek any other or supplemental relief or exercise any other

rights in respect of the Debtors, including without limitation seeking and receiving additional

adequate protection, subject to the terms of the First Lien Intercreditor Agreement and applicable

bankruptcy law; and/or (C) terminate the Restructuring Support Agreement. Notice of the

occurrence and continuation of any First Lien Noteholder Parties' Event of Default shall be

given by facsimile (or other electronic means) to counsel to the Debtors, counsel to each of the

Prepetition Secured Agents, counsel to any statutory committee, and the U.S. Trustee.

Notwithstanding the foregoing, the First Lien Noteholder Parties at all times shall have the right

to consent to the Debtors' use of Cash Collateral, and nothing contained herein shall be deemed a finding by the Court or an acknowledgement by the First Lien Noteholder Parties that the adequate protection granted herein does in fact adequately protect the First Lien Noteholder Parties.

11.   <u>Carve Out</u>.

(a)   As used in this Interim Order, "<u>Carve Out</u>" means the sum of (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses (the "<u>Estate Professional Fees</u>") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (collectively, the "<u>Debtor Professionals</u>") and any Committee appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code (the "<u>Committee Professionals</u>" and, together with the Debtor Professionals, the "<u>Professional Persons</u>") at any time before or on the first business day following delivery by the First Lien Credit Agent of a Carve Out Trigger Notice (defined below), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice; and (iv) Estate Professional Fees of Professional Persons in an aggregate amount not to exceed $50,000,000 incurred after the first business day following delivery by the First Lien Credit Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order, or otherwise (the amounts set forth in this clause (iv) being the "<u>Post-Carve Out Trigger Notice Cap</u>").  For purposes of the foregoing, "<u>Carve Out Trigger</u>

Notice" shall mean a written notice delivered by electronic mail (or other electronic means) by the First Lien Credit Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and lead counsel to the Committee, if any, which notice may be delivered following the occurrence and during the continuation of a First Lien Credit Parties' Event of Default stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)      Carve Out Reserves.   On the day on which a Carve Out Trigger Notice is given by the First Lien Credit Agent to the Debtors, the Carve Out Trigger Notice shall constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Estate Professional Fees.   The Debtors shall deposit and hold cash in an amount equal to the then unpaid amounts of the Estate Professional Fees in a segregated account at the First Lien Credit Agent in trust to pay any then-unpaid Estate Professional Fees (the "Pre-Carve Out Trigger Notice Reserve") prior to any and all other claims.   On the day on which a Carve Out Trigger Notice is given by the First Lien Credit Agent to the Debtors, the Carve Out Trigger Notice shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap.   The Debtors shall deposit and hold such amounts in a segregated account at the First Lien Credit Agent in trust to pay such Estate Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve," and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves") prior to any and all other claims.   All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clauses (i) through (iii) of the definition of Carve Out set forth above (the "Pre-Carve Out Amounts"), but not, for the

avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full, and then, to the extent the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Creditors under the First Lien Documents in accordance with their rights and priorities as of the Petition Date.  All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in clause (iv) of the definition of Carve Out set forth above (the "Post-Carve Out Amounts"), and then, to the extent the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, to pay the Prepetition First Lien Creditors under the First Lien Documents in accordance with their rights and priorities as of the Petition Date. Notwithstanding anything to the contrary in this Interim Order, if either of the Carve Out Reserves are not funded in full in the amounts set forth in this paragraph 11, then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve, up to the applicable amount set forth in this paragraph 11, prior to making any payments to the Prepetition First Lien Creditors.  Notwithstanding anything to the contrary in the Prepetition Secured Documents or this Interim Order, following delivery of a Carve Out Trigger Notice, the Prepetition Secured Agents and the Prepetition Secured Creditors shall not, and shall not direct any entity to, sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded. Further, notwithstanding anything to the contrary in this Interim Order, (i) disbursements by the Debtors from the Carve Out Reserves shall not constitute CEOC Secured Debt or increase or reduce the Prepetition Secured Obligations; (ii) the failure of the Carve Out Reserves to satisfy in full the Estate Professional Fees shall not affect the priority of the Carve Out; and (iii) in no way shall the Budget, the Budget Variance Report, the Carve Out, the Post-Carve Out Trigger Notice

Cap, the Carve Out Reserves, or any of the foregoing be construed as a cap or limitation on the amount of the Estate Professional Fees due and payable by the Debtors.  For the avoidance of doubt and notwithstanding anything to the contrary herein or in this Interim Order or in any Prepetition Secured Documents, the Carve Out shall be senior to all liens and claims securing the Adequate Protection Liens and the Superpriority Claim, and any and all other forms of adequate protection, liens, or claims securing the Prepetition Secured Obligations.

(c)    <u>Payment of Estate Professional Fees Prior to the Carve Out Trigger Notice</u>.  Any payment or reimbursement made prior to the delivery of the Carve Out Trigger Notice in respect of any Estate Professional Fees shall not reduce the Carve Out.

(d)    <u>Payment of Carve Out On or After Carve Out Trigger Notice</u>.  Any payment or reimbursement made on or after the delivery of the Carve Out Trigger Notice in respect of any Estate Professional Fees shall permanently reduce the Carve Out on a dollar-for-dollar basis.  Any funding or payment of the Carve Out shall be added to, and made a part of, the Prepetition Secured Obligations secured by the Collateral and shall be otherwise entitled to the protections granted under this Interim Order, the Prepetition Secured Documents, the Bankruptcy Code, and applicable law.

(e)    <u>No Lender Guaranty</u>.  The Prepetition First Lien Creditors shall not be responsible for the direct payment or reimbursement of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases.  Nothing contained herein shall be construed (i) to obligate the Prepetition First Lien Creditors in any way to pay compensation to or reimburse expenses of any Professional Persons or member of any Committee, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement; (ii) to increase the Carve Out if actual Estate Professional Fees allowed by this Court are higher

50

in fact than the estimated fees and disbursements reflected in the Budget; or (iii) as a consent to the allowance of any professional fees or expenses of any Estate Professionals or shall affect the right of the Prepetition First Lien Creditors to object to the allowance and payment of such fees and expenses.

      12.    <u>Reservation of Certain Committee and Third Party Rights and Bar of Challenges and Claims</u>.

      (a)    Subject to paragraph 12(b) hereof, the Debtors' acknowledgements, stipulations, and waivers contained in this Interim Order, including, without limitation, the Debtors' Stipulations, shall be binding upon the applicable Debtors and their respective estates and any representatives, successors and assigns thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors), and the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Petition Date).

      (b)    Nothing in this Interim Order prejudices the right of a Committee or other party in interest, in each case, if and to the extent granted standing by the Court, to seek to avoid, object to or otherwise challenge (each, a "<u>Challenge</u>") the findings or Debtors' Stipulations or to challenge, initiate any proceeding, or assert any claim or cause of action with respect to (i) the validity, enforceability, extent, priority, or perfection of the First Lien Documents or any of the mortgages, security interests, and liens (including the Prepetition First Priority Liens) of any Prepetition Secured Agent or Prepetition Secured Creditor; (ii) the validity, allowability, priority, secured status or amount of the Prepetition First Lien Obligations, or (iii) the Prepetition First Lien Creditors arising under or in connection with the First Lien Documents or the Prepetition First Lien Obligations, in each case, whether in the

nature of a setoff, recharacterization, counterclaim, defense of the Prepetition First Lien

Obligations or otherwise, no later than (a) with respect to any Committee (if appointed), the

date that is sixty (60) days after the Committee's formation, and (b) with respect to other parties

in interest, no later than the date that is seventy-five (75) days after the entry of the Final Order,

in each case subject to further extension by written agreement of the Required Lenders and the

Requisite Consenting Creditors (such time period shall be referred to as the "Challenge Period"

and the date of expiration of each Challenge Period being a "Challenge Period Termination

Date").   Upon the Challenge Period Termination Date without the filing of a Challenge, or

unless a Challenge is successful pursuant to a final order entered no later than ninety (90) days

from the commencement of such Challenge, then in either case:  (x) any and all such Challenges

by any party (including, without limitation, the Committee, any chapter 11 trustee, and/or any

examiner or other estate representative appointed or elected in the Chapter 11 Cases, and any

chapter 7 trustee and/or examiner or other estate representative appointed or elected in any

Successor Case) shall be deemed to be forever waived, released, and barred, and (y) all of the

Debtors' Stipulations, waivers, releases, affirmations, and other stipulations as to the grant,

creation, attachment, perfection, priority, extent, and validity as to the Prepetition First Lien

Agents' and Prepetition First Lien Creditors' claims, liens, and interests shall be of full force

and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates and all

creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any

Successor Cases.   Nothing in this Interim Order vests or confers on any person or entity,

including any Committee, standing or authority bring, to pursue or settle any claim or cause of

action belonging to the Debtors or their estates, including, without limitation, any Challenges

with respect to the First Lien Documents, the Prepetition First Lien Obligations and the

Prepetition First Priority Liens, and an order of the Court conferring such standing on a Committee or other party in interest shall be a prerequisite for the prosecution of a Challenge by the Committee or such other party in interest

13.    <u>Limitations on the Use of Cash Collateral and the Carve Out</u>.  Notwithstanding anything to the contrary herein, no proceeds of the Prepetition First Lien Collateral, including the Cash Collateral, and none of the Carve Out may be used:  (a) in connection with or to finance in any way any investigation, action, suit, arbitration, proceeding, application, motion, or other litigation of any type objecting to, challenging or contesting in any manner, invalidating, setting aside, avoiding, subordinating or raising any defenses to, in whole or in part, the amount, validity, extent, priority, enforceability or perfection of the Prepetition First Lien Obligations or the Prepetition First Priority Liens, or any other rights or interests of any of the Prepetition First Lien Agents or the Prepetition First Lien Creditors, including with respect to the Adequate Protection Liens and the Adequate Protection Payments, including any objection or challenge to the Debtors' Stipulations; or (b) for or in connection with contesting, preventing, hindering, impairing, interfering with, or otherwise delaying the exercise by any Prepetition First Lien Agent or Prepetition First Lien Creditor of any rights or remedies provided under this Interim Order in a manner inconsistent with the terms of this Interim Order (which for the avoidance of doubt, shall enable the Debtors to use Cash Collateral and the Carve Out, pursuant to the Interim Order, among other things, to dispute whether the Prepetition First Lien Creditor has the right to exercise such rights and remedies).  Notwithstanding the foregoing, up to $75,000 may be made available to any Committee (if appointed) to investigate the Prepetition First Lien Obligations, the Prepetition First Priority Liens and/or any potential Challenge (as defined below); <u>provided</u> that the Prepetition First Lien Creditors shall have the right to object to, contest, or otherwise

challenge any claim for amounts incurred in connection with such activities on the grounds that

such claim shall not be allowed, treated or payable as an administrative expense claim pursuant

to section 1129(a)(9)(A) of the Bankruptcy Code; provided, further, that, nothing herein shall

preclude the Committee from arguing that they are entitled to a larger budget.

14. <u>No Third Party Rights</u>.   Except as explicitly provided for herein, this Interim

Order does not create any rights for the benefit of any creditor, equity holder, or other person or

entity, or any direct, indirect, or incidental beneficiary, other than the Prepetition Secured Agents

and the Prepetition Secured Creditors.

15. <u>Section 506(c) Claims</u>.   Subject to entry of the Final Order, in partial

consideration for, among other things, the Carve Out and the payments made under the Budget to

administer the Chapter 11 Cases or Successor Cases with the use of Cash Collateral, no costs or

expenses of administration which have been or may be incurred in the Chapter 11 Cases at any

time shall be charged against any Prepetition First Lien Agent or any Prepetition First Lien

Creditor or any of the Prepetition First Lien Obligations or the Collateral pursuant to sections

105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in

connection with the preservation, protection, or enhancement of realization by the Prepetition

First Lien Creditors upon the Prepetition First Lien Collateral or Prepetition Second Lien

Collateral, as applicable, without the prior express written consent of the affected Prepetition

First Lien Agent and/or affected Prepetition First Lien Creditor, in their sole discretion, and no

such consent shall be implied, directly or indirectly, from any other action, inaction, or

acquiescence by any such agents or creditors.

16. <u>No Liability to Third Parties</u>.   None of the Prepetition First Lien Creditors (a)

shall have any liability to any third party and none of them shall be deemed to be in control of

the operations of any Debtors or to be acting as a "controlling person," "responsible person,"
"owner or operator," or "participant" with respect to the operation or management of any
Debtors (as such term, or any similar terms, are used in the Internal Revenue Code, the United
States Comprehensive Environmental Response, Compensation and Liability Act, as amended,
or any similar Federal or state statute or regulation), or (b) shall owe any fiduciary duty to the
Debtors, their creditors, or their estates or shall be deemed to constitute a joint venture or
partnership with any of the Debtors.

17.    No Marshaling.  Subject to entry of the Final Order, none of the Prepetition First
Lien Agents, the Prepetition First Lien Creditors, or the Prepetition First Lien Obligations shall
be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to
any of the Collateral, as the case may be, and proceeds thereof shall be received and applied in
accordance with this Interim Order notwithstanding any other agreement or provision to the
contrary (except for the First Lien Intercreditor Agreement and the Second Lien Intercreditor
Agreement).

18.    Section 552(b).  Subject to entry of the Final Order, the Prepetition First Lien
Creditors shall each be entitled to all of the rights and benefits of section 552(b) of the
Bankruptcy Code, and neither the Debtors nor any of their creditors or equity holders nor any
other person or entity shall have any right to seek to apply the "equities of the case" exception
under section 552(b) of the Bankruptcy Code to any of the Prepetition First Lien Agents, the
Prepetition First Lien Creditors, or the Prepetition First Lien Obligations.

19.    Section 507(b) Reservation.   Nothing herein shall impair or modify the
application of section 507(b) of the Bankruptcy Code in the event that the adequate protection
provided to any of the Prepetition First Lien Agents or Prepetition First Lien Creditors hereunder

is insufficient during the Chapter 11 Cases or any Successor Cases.  Nothing contained herein

shall be deemed a finding by the Court or an acknowledgement by the Prepetition First Lien

Agents or the Prepetition First Lien Creditors that the adequate protection granted herein does in

fact adequately protect the Prepetition First Lien Creditors; provided, however, except as

expressly set forth herein the Prepetition First Lien Creditors shall not seek alternative or

additional adequate protection prior to the expiration of the Specified Period.

20.     Recharacterization.  In the event that it is determined by a final order, which order

shall not be subject to any appeal, stay, reversal or vacateur (a "Final Order"),  that the

Prepetition First Lien Creditors are not entitled to Adequate Protection Payments, then, pursuant

to a further Final Order, such Adequate Protection Payments shall be applied as a payment made

to the principal balance of such Prepetition First Lien Obligations.

21.     Rights Preserved.  Notwithstanding anything herein to the contrary, if at any time

the Interim Order is no longer in full force or effect (or, with respect to the Prepetition First Lien

Creditors, upon the First Lien Noteholder Parties' Termination Declaration Date), or any Debtor

has sought to amend, modify, supplement, or extend this Interim Order over the objection of the

Required Lenders, then neither the entry of this Interim Order nor anything herein shall

prejudice, or constitute a waiver of, expressly or implicitly: (a) the right of the Prepetition First

Lien Agents or the Prepetition First Lien Creditors to seek any other or supplemental relief in

respect of the Debtors, including the right to seek and receive additional adequate protection; (b)

any rights of the Prepetition First Lien Agents or any Prepetition First Lien Creditor under the

Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i)

request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request

dismissal of the Chapter 11 Cases or any Successor Cases, conversion of the Chapter 11 Cases to

a case under chapter 7, or appointment of a chapter 11 trustee or examiner with expanded powers, (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan, or (iv) submit a credit bid in respect of any sale of any Collateral pursuant to the immediately preceding paragraph; and nothing contained herein shall be deemed a finding by the Court or an acknowledgement by the Prepetition First Lien Agents or the Prepetition First Lien Creditors that the adequate protection granted herein does in fact adequately protect the Prepetition First Lien Creditors.  Notwithstanding anything in this Interim Order to the contrary, if at any time (x) this Interim Order ceases to be in full force and effect, or (y) any amendment, modification, waiver, supplement or extension of this Interim Order is effected without the prior written consent of the Requisite Consenting Creditors, then the Requisite Consenting Creditors shall have the right to terminate the Restructuring Support Agreement pursuant to section 8(e) thereof.

22.     <u>No Waiver by Failure to Seek Relief</u>.  The failure of any Prepetition First Lien Agent or Prepetition First Lien Creditor to seek relief or otherwise exercise its rights and remedies under this Interim Order, the First Lien Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the applicable Prepetition First Lien Agent or Prepetition First Lien Creditor.

23.     <u>Proofs of Claim</u>.  Notwithstanding any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or Successor Cases to the contrary, the Prepetition First Lien Creditors will not be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim described herein or otherwise arising under or in connection with the First Lien Documents or this Interim Order, and the Debtors' Stipulations in paragraph E herein shall be deemed to constitute a timely filed proof of claim for

the Prepetition First Lien Creditors.  Notwithstanding the foregoing, the Prepetition First Lien Agents for the benefit of themselves and the Prepetition First Lien Creditors are authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) a proof of claim and/or aggregate proofs of claim in each of the Chapter 11 Cases or Successor Cases for any claim described herein.

24.     <u>Good Faith</u>.     The Prepetition First Lien Creditors and their respective professionals each have acted in good faith, and without negligence or violation of public policy or law, in respect of all actions taken by any of  them in connection with or related in any way to negotiating, implementing, documenting, or obtaining requisite approvals of the use of Cash Collateral, including in respect of the granting of the Adequate Protection Liens, the making of the Adequate Protection Payments, any challenges, or objections to the use of Cash Collateral, and all documents related to and all transactions contemplated by the foregoing.

25.     <u>Binding Effect of Interim Order</u>.     Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the Prepetition First Lien Agents, the Prepetition First Lien Creditors, all other creditors of any of the Debtors, any Committee or any other Court appointed committee appointed in any Chapter 11 Cases, and all other parties in interest, and their respective successors and assigns, including any chapter 7 or chapter 11 trustee hereafter appointed or elected for the estate of any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors, in each case in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Cases or Successor Case.

26.     <u>Interim Order Governs</u>.  The terms of this Interim Order shall govern the use of Cash Collateral and nothing contained herein shall require the Debtors to comply with the Prepetition Secured Documents as a condition to the use Cash Collateral.  In the event of any inconsistency between the provisions of this Interim Order and the Prepetition Secured Documents or any other order (including any "First Day" order), the provisions of this Interim Order shall govern and control.  Any payments to be made under any order (including any "First Day" order) shall be made in accordance with this Interim Order and the Budget.

27.     <u>Effect of Dismissal of Chapter 11 Cases</u>.  If any of the Chapter 11 Cases is dismissed, converted, transferred, or substantively consolidated, such dismissal, transfer, conversion or substantive consolidation shall not affect the rights of the Prepetition First Lien Agents or the Prepetition First Lien Creditors under this Interim Order, and all of their rights and remedies thereunder shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed, converted, transferred, or substantively consolidated.  If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide or be deemed to provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that:  (i) subject to paragraph 12 of this Interim Order, the Prepetition First Priority Liens, Adequate Protection Liens and Superpriority Claims granted to and conferred upon the Prepetition First Lien Creditors shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order (and that such Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties), and (ii) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the Prepetition First Priority Liens, Adequate Protection Liens and Superpriority Claims referred to in this Interim Order.

28.     <u>No Modification of Interim Order</u>.  In the event any or all of the provisions of this Interim Order are modified, amended or vacated by a subsequent order of this Court or any other court, such modification, amendment, or vacatur shall not affect the validity, perfection, priority, allowability, enforceability, or non-avoidability of any advances previously made or made hereunder, uses of cash or Cash Collateral previously authorized or authorized hereunder, or lien, claim, or priority authorized or created hereby.  Any liens or claims granted to the Prepetition First Lien Agents or Prepetition First Lien Creditors arising prior to the effective date of any modification, amendment, or vacatur of this Interim Order that is not consented to by the Required Lenders and the Requisite Consenting Creditors shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges, and benefits granted herein.

29.     <u>Survival</u>.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; (d) discharging any Debtor; or (e) abstaining from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the Debtors' Stipulations and the claims, liens, security interests, and other protections granted to the Prepetition First Lien Creditors pursuant to this Interim Order, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal or conversion of any of the Chapter 11 Cases or Successor Cases, and shall maintain their priority as provided by this Interim Order until all Prepetition First Lien Obligations have been indefeasibly and irrevocably

paid in full, notwithstanding the expiration of the Specified Period or any earlier termination of the Debtors' authorization to use Cash Collateral.

30.     <u>Continuing and Binding Effect of Intercreditor Agreements and the First Lien Guaranty and Pledge Agreement</u>.  Notwithstanding anything contained herein to the contrary (x) the terms of the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement are incorporated by reference as though fully restated herein; (y) the First Lien Intercreditor Agreement and the Second Lien Intercreditor Agreement each remain in full force and effect and are fully enforceable in accordance with their respective terms, and (z) the First Lien Guaranty and Pledge Agreement remains in full force and effect and is enforceable in accordance with its terms, and in each case, each of the parties to the respective agreements and the beneficiaries thereof shall continue to be bound to all terms, provisions, and restrictions contained in their respective agreements and all rights of the parties thereto are fully preserved.

31.     <u>Notice of Final Hearing</u>.  The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on _____, 2015, at__:__ [a/p].m., prevailing Central Time. On or before [_____ __], 2015, the Debtors shall serve, by United States mail, first-class postage prepaid, notice of the entry of this Interim Order and of the Final Hearing (the "<u>Final Hearing Notice</u>"), together with copies of this Interim Order and the Motion, on the following parties:  (a) the Debtors, One Caesars Palace Drive, Las Vegas, Nevada 89109, Attn:  Timothy J. Lambert; (b) proposed counsel for the Debtors, Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attn:  David R. Seligman, P.C. and Jeffrey D. Pawlitz, Esq.; and Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attn:   Nicole L. Greenblatt, Esq.; (c) counsel to Caesars Entertainment Corp., Inc., Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019, Attn: Jeffrey D. Saferstein,

Esq. and Samuel E. Lovett, Esq.; (d) counsel for the First Lien Note Group, Kramer Levin

Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, New York 10036, Attn:

Kenneth H. Eckstein, Esq. and Douglas H. Mannal, Esq.; (e) counsel for the First Lien Credit

Agreement Group, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, New York

10038, Attn:  Kristopher M. Hansen, Esq., Erez E. Gilad, Esq., and Jonathan D. Canfield, Esq.

(f) counsel for the indenture trustee under the First Lien Notes Indenture, Katten Muchin

Rosenman LLP, 575 Madison Avenue, New York, New York 10022, Attn:  Craig A. Barbarosh,

Esq. and Karen B. Dine, Esq.; (g) the Office of the United States Trustee for the Northern

District of Illinois, 219 South Dearborn Street, Suite 873, Chicago, Illinois 60604; (h) counsel to

any statutory committee appointed in these chapter 11 cases; and (i) any party that has requested

notice pursuant to Bankruptcy Rule 2002.  The Final Hearing Notice shall state that any

responses or objections to the Motion shall be made in writing, conform to the applicable

Bankruptcy Rules and Local Rules, be filed with the Bankruptcy Court, set forth the name of the

objecting party, the basis for the objection, and the specific grounds therefor, and be served so as

to be actually received no later than _____, 2014, at 4:00 p.m. (prevailing Eastern time) by

the Notice Parties.  If no objections are filed to the Motion, the Court may enter the Final Order

without further notice or hearing.

32.    Effect of this Interim Order.  This Interim Order shall constitute findings of fact

and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be

enforceable immediately upon execution hereof.

33.    Retention of Jurisdiction.  The Court retains exclusive jurisdiction with respect to

all matters arising from or related to the implementation of this Interim Order.

Dated: _____


_____
UNITED STATES BANKRUPTCY JUDGE

<u>EXHIBIT A</u>

Budget

# Caesars Entertainment Operating Company[1]

**6-Week Cash Flow Model**

HIGHLY CONFIDENTIAL

SUBJECT TO MATERIAL CHANGE

*Updated as of 1/14/2015*

| *(in millions of USD)* | | | | | | | **6 Weeks From** |
|---|---|---|---|---|---|---|---|
| | | | | | | | 1/17/15 |
| *Week Ending (Friday):* | 1/23/15 | 1/30/15 | 2/6/15 | 2/13/15 | 2/20/15 | 2/27/15 | 2/27/15 |
| *Week Number* | 1 | 2 | 3 | 4 | 5 | 6 | |

## Cash Flow Summary

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | |
| Gaming Activity | $42 | $40 | $50 | $53 | $68 | $54 | $308 |
| Non-Gaming Activity | 14 | 14 | 15 | 16 | 19 | 15 | 93 |
| Casino Management Fees | -- | -- | -- | -- | 19 | -- | 19 |
| Intercompany Reimbursements | -- | -- | 14 | -- | -- | -- | 14 |
| **Total Operating Receipts** | **$56** | **$55** | **$79** | **$69** | **$106** | **$69** | **$434** |
| | | | | | | | |
| Payroll, Taxes & Benefits | ($21) | ($9) | ($23) | ($16) | ($23) | ($16) | ($109) |
| Vendor Payments (ex First Day Orders) | (15) | (9) | (10) | (10) | (11) | (12) | (67) |
| Intercompany Disbursements/Payments | (3) | (3) | (6) | (3) | (3) | (3) | (22) |
| Utilities | (3) | (3) | (3) | (3) | (3) | (3) | (17) |
| Taxes | (14) | (12) | (22) | (14) | (16) | (20) | (99) |
| **Total Operating Disbursements** | **($57)** | **($35)** | **($64)** | **($47)** | **($56)** | **($55)** | **($314)** |
| | | | | | | | |
| **Net Operating Cash Flow** | **($0)** | **$19** | **$15** | **$23** | **$49** | **$14** | **$120** |
| | | | | | | | |
| Capital Expenditures | ($6) | ($4) | ($5) | ($4) | ($6) | ($4) | ($28) |
| Adequate Protection & Cash Interest | -- | (15) | (0) | -- | (0) | -- | (15) |
| Chapter 11 Fees | -- | -- | -- | -- | (2) | -- | (2) |
| Other Restructuring Items | (5) | (7) | (14) | (19) | (14) | (14) | (72) |
| | | | | | | | |
| **Net Cash Flow** | **($11)** | **($6)** | **($4)** | **($0)** | **$27** | **($4)** | **$2** |

## Cash Balance Rollforward

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Opening Bank Cash** | **$864** | **$852** | **$847** | **$844** | **$846** | **$873** | **$864** |
| Change in Cage Cash | (1) | 1 | 1 | 2 | 0 | (1) | 3 |
| Net Cash Flow | (11) | (6) | (4) | (0) | 27 | (4) | 2 |
| **Ending Bank Cash** | **$852** | **$847** | **$844** | **$846** | **$873** | **$869** | **$869** |

Note:
1) Excludes foreign subsidiaries and joint ventures where CEOC does not control bank accounts