**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*, | ) ) | Case No. 15-01145 (ABG) |
| | ) | (Jointly Administered) |
| Debtors. | ) ) | |

**OMNIBUS REPLY OF THE AD HOC COMMITTEE OF FIRST LIEN BANK LENDERS TO OBJECTIONS TO DEBTORS' CASH COLLATERAL MOTION**

The ad hoc committee (the "Ad Hoc Committee") of beneficial holders, or the investment advisors or managers for certain beneficial holders, of first lien bank debt issued by the Debtors (the "First Lien Bank Lenders"), by and through its undersigned counsel, hereby replies (this "Reply") to the objections of the Statutory Unsecured Claimholders' Committee (the "UCC") and the indenture trustee for the 10.75% Senior Unsecured Notes (the "Subordinated Notes Trustee", and together with the UCC, the "Objectors") to the Debtors' motion (the "Motion")[1] seeking entry of a Proposed Order (the "Proposed Order")[2] authorizing the use of Cash Collateral, granting adequate protection and granting related relief, and in support hereof, respectfully states as follows:[3]

---

[1] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the Motion.

[2] The Ad Hoc Committee filed this Reply in order to comply with the Court's scheduling order with respect to the Motion, and reserves the right to supplement this Reply and participate in any proceedings related to the Motion. The Debtors and the Ad Hoc Committee are still in the process of finalizing the form of Proposed Order, and the Ad Hoc Committee is informed that the Debtors intend to file the form of Proposed Order with the Court as soon as possible once finalized.

[3] Konami Gaming, Inc. also filed a limited objection to the Motion, but revised language is expected to be inserted in the Proposed Order that should resolve such objection. The Ad Hoc Committee has also engaged counsel to the UCC and the Subordinated Notes Trustee in an effort to resolve their concerns and believes that certain language incorporated in the Proposed Order will resolve some, but not all, of their objections.

{11157-001 REP A0399324.DOCX}

**PRELIMINARY STATEMENT**

1. The Ad Hoc Committee is owed more than $2.8 billion in first lien bank debt, and represents one of the single largest non-RSA non-litigating creditor constituencies in these chapter 11 cases. As a class, the First Lien Bank Lenders are owed at least approximately $5.4 billion. When taken together with the First Lien Notes, the Debtors owe a staggering $11.7 billion in first lien debt, easily eclipsing the creditor constituencies represented by the Objectors by billions of dollars.

2. In addition, the Prepetition First Lien Creditors hold valid and perfected first priority liens on substantially all of the Debtors' assets—not just cash but also non-cash assets (such as casinos, hotels, gaming equipment, fixtures, rents, etc.)—that have been in decline and now suffer significant risk of diminution in value. Indeed, the Debtors are more than 22x levered (based on estimated 2014 EBITDA of $832 million), have experienced a historical decline in revenue (a trend that is expected to continue in 2015) and are operating within a highly competitive and saturated industry that is similarly facing decline. The secured lenders' collateral faces further risk of diminution in value given that the Debtors' chapter 11 cases have devolved into a virtual free-fall, with an involuntary petition pending, two official creditors' committees appointed, requests for the appointment of an examiner filed and the prospect of multi-billion dollar litigation related to pre-petition transactions that have siphoned assets away from CEOC looming, all of which could spell a protracted bankruptcy proceeding that would negatively affect the Debtors' businesses. Further, professional fees are forecasted by the Debtors to run into the hundreds of millions of dollars within the next 12 months.

3. Accordingly, to protect against the obvious risk of diminution in the value of the lenders' collateral, and in exchange for the Ad Hoc Committee's consent to the Debtors' use of their cash and non-cash collateral, the First Lien Bank Lenders and the Debtors negotiated an

adequate protection package consisting of (a) post-petition liens and super-priority claims limited to the extent of any diminution in collateral value, (b) monthly adequate protection payments that are far below the secured lenders' (non-default) contract rate of interest due under their loan documents and which are nonetheless subject to recharacterization, (c) the reimbursement of professional fees, as is standard in any chapter 11 case, (d) milestones, financial reporting and covenant testing designed to facilitate the efficient administration of these cases and provide transparency into the Debtors' operations and (e) certain waivers and protections reasonably designed as a *quid pro quo* for the secured lenders' agreement to (among other things) subordinate their liens and claims to a massive Carve-Out of $50 million in post-default fees and all unpaid pre-default fees. This type of adequate protection package is common practice within this District and elsewhere, and is appropriately tailored to provide the Prepetition First Lien Creditors with adequate protection against the very real risk of the diminution in value of their collateral and to provide the Debtors' estates with the use of cash and other concessions.

4.  Despite the enormity of the secured claims at risk and the compelling need for (and statutorily mandated requirement of) adequate protection, the UCC resorts to obfuscation by falsely suggesting that the terms of the Proposed Order reflect ulterior motives designed to entrench the Debtors' RSA. However, the Ad Hoc Committee is _not_ a party to the RSA and does _not_ support the Debtors' proposed plan, which the Ad Hoc Committee views as non-confirmable. Contrary to the UCC's suggestion, the Proposed Order was a product of arm's length negotiations and properly balances the interests of the Debtors' estates and the need for adequate protection. The UCC also raises a number of other objections in an attempt to cherry-pick those provisions of the Proposed Order that it deems unfavorable and to force the First Lien Bank

Lenders to exclusively shoulder the costs of administering these chapter 11 cases. However, for the reasons set forth below, the UCC's objections should be denied.

## ARGUMENT

**I.    The First Lien Bank Lenders are Entitled to Adequate Protection Against the Risk of Diminution in Value of their Cash and Non-Cash Collateral**

5.    It is a bedrock principle of law that the First Lien Bank Lenders are entitled to adequate protection of their interests in the Debtors' property to protect them against the risk of diminution in the value of their collateral during the course of these chapter 11 cases. *See* 11 U.S.C. §§ 362(d), 363(e). Indeed, the Bankruptcy Code requires this Court to prohibit or condition the Debtors' use of the First Lien Bank Lenders' collateral (including cash collateral) as necessary to provide adequate protection to the First Lien Bank Lenders. Specifically, section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use cash collateral unless each creditor holding an interest in such cash collateral consents to, or the court authorizes, such use. 11 U.S.C. § 363(c)(2). Also, section 363(e) of the Bankruptcy Code provides that the Court "*shall* prohibit or condition [the] use, sale, or lease [of a creditor's interest in property] as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e) (emphasis added).

6.    Although the term "adequate protection" is not defined in the Bankruptcy Code, section 361 offers a non-exhaustive description of the forms of adequate protection, such as (a) requiring a debtor to make periodic cash payments, (b) providing additional or replacement liens and/or (c) granting such other relief as will result in the realization by the secured creditor of the indubitable equivalent of such creditor's interest in such property. *See* 11 U.S.C. § 361. Section 361 thus reflects the elastic nature of the concept of adequate protection, and courts generally afford debtors flexibility in fashioning an adequate protection package based on the

circumstances of each case.[4]  Accordingly, "[i]f a creditor's interest is *threatened with a decline in value*, 'the estate must take action to make up the decline.'" *In re Thompson*, No. 08 A 182, 2008 WL 2157163, at *2 (Bankr. N.D. Ill. May 23, 2008) (Goldgar, J.) (citations omitted) (emphasis added).[5]  Absent such "adequate protection," a creditor is entitled to relief from the automatic stay to pursue its remedies against such property.  11 U.S.C. § 362(d)(1).

7. Despite the statutory requirement that secured lenders be afforded adequate protection against the risk of diminution in value of their collateral, the UCC asks the Court to strip away nearly all of the protections that were heavily negotiated between the First Lien Bank Lenders and the Debtors.  For the reasons described below, the UCC's approach is deeply misguided, and, if accepted, will likely result in a motion by the secured creditors seeking additional adequate protection or, in the alternative, authority to lift the stay in order to foreclose on their collateral.

### A. The First Lien Bank Lenders Hold Validly Perfected First Priority Liens in Cash and Non-Cash Collateral, Each of Which is Entitled to Adequate Protection

8. Although the Objectors focus on cash, the First Lien Bank Lenders' security interests are far more expansive.  Specifically, pursuant to the First Lien Credit Documents, CEOC and each of the Subsidiary Pledgors (as defined therein) granted first priority liens and mortgages (and related assignments of rent) on, and security interests in, substantially all of their

---

[4] *See MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396–97 (10th Cir. 1987) (adequate protection is a concept which is "to be decided flexibly on the proverbial 'case-by-case' basis"); *Crocker Nat'l Bank v. Am. Mariner Indus., Inc. (In re Am. Mariner Indus., Inc.)*, 734 F.2d 426, 435 (9th Cir. 1984) (stating that "[c]onsistent with the policies behind sections 361 and 362, the debtor should be permitted maximum flexibility in structuring a proposal for adequate protection.").

[5] The Subordinated Notes Trustee incorrectly asserts that the creditor must prove this threat of a decline in value. *See* Subordinated Notes Trustee's Objection ¶ 6, Feb. 25, 2015, ECF No. 487.  The Bankruptcy Code makes clear that the Debtors bear the burden of proof on the issue of adequate protection, and the creditor bears the burden as to the validity and extent of their interests in the Debtors' property.  *See* 11 U.S.C. § 363(p).

assets to secure the obligations owed to the Prepetition First Lien Creditors. *See* First Lien Security Agreement § 4.01; *see generally*, Mortgages (as defined in the First Lien Credit Agreement). In particular, pursuant to the First Lien Security Agreement, the Prepetition First Lien Creditors were granted security interests in, among other things, "all cash and Deposit Accounts". *Id.* § 4.01(a)(iii). Those security interests were perfected by CEOC's entry into the deposit account control agreements, dated October 15, 2014 and October 16, 2014, with respect to CEOC's deposit accounts maintained at U.S. Bank, N.A. (deposit account ending in #4436) and Wells Fargo Bank, N.A. (deposit account ending in #6448), respectively (the "Deposit Accounts").[6]

9. The Prepetition First Lien Creditors were also granted first priority liens in substantially all of the Debtors' other assets, including, among other things, the "Collateral" as well as real property and rents.[7] CEOC and the Subsidiary Pledgors also pledged their securities and investment property for the benefit of the Prepetition First Lien Creditors. *Id.* § 4.01(a)(xi). In addition, the Prepetition First Lien Creditors are secured by liens in 'all proceeds" and "and products" of the "Collateral." *Id.* § 4.01(a)(xvi).

10. The UCC appears to be singularly focused on the liens of the Prepetition First Lien Creditors in the two Deposit Accounts, which the UCC asserts may be avoidable due to the involuntary filing, and thereafter suggesting that all of the Debtors' cash should be

---

[6] Upon information and belief, the cash held in at least one of the Deposit Accounts represents traceable proceeds from the prior disposition of assets in which the First Lien Bank Lenders were perfected.

[7] "Collateral" generally includes, without limitation, all of the Debtors right, title and interest in or to any and all of the following (each, as defined in the First Lien Security Agreement): (i) all Accounts; (ii) all Chattel Paper; (iii) all cash and Deposit Accounts; (iv) all Documents; (v) all Equipment; (vi) all Fixtures; (vii) all General Intangibles; (viii) all Instruments; (ix) all Intellectual Property; (x) all Inventory; (xi) all Investment Property other than the Pledged Collateral; (xii) all Letter of Credit Rights; (xiii) all Commercial Tort Claims; (xiv) all books and records pertaining to the Article 9 Collateral; (xv) all Vessels; and (xvi) to the extent not otherwise included, all proceeds, supporting obligations (including all letter-of-credit rights or secondary obligations that supports the payment or performance of an account, chattel paper, a document, a general intangible, an instrument, or investment property) and products of any and all of the foregoing and all collateral security and guarantees given by any person with respect to any of the foregoing. First Lien Security Agreement § 4.01.

unencumbered. *See* UCC Objection ¶ 17. As a threshold matter, the involuntary filing (which the First Lien Bank Lenders believe was filed in bad faith and in violation of an intercreditor agreement) is not presently before the Court. In any event, those liens exist—valid and perfected—as of the Petition Date and are therefore entitled to adequate protection. Moreover, as demonstrated above, the First Lien Bank Lenders' sweeping security interest includes liens in cash generated from a number of sources, including (among others), receivables, rights to payment, rents, hotel revenues, management fees, cash proceeds of other collateral, and, importantly, revenues from gaming operations, each of which would be considered part of the Prepetition First Lien Creditors' collateral package for purposes of sections 552(b)(1) and (2) of the Bankruptcy Code.[8] In any event, the Objectors overlook the fact that, as demonstrated above, the First Lien Bank Lenders hold valid and perfected first priority liens in substantially all of the Debtors' assets, including not just cash, which are also entitled to adequate protection.[9]

      **B.**      **The First Lien Bank Lenders' Interest In Cash and Non-Cash Collateral Faces Risk of Diminution in Value and Is Entitled to Adequate Protection**

      11.      The UCC asserts, in conclusory fashion, that the "Debtors are building higher profits and cash" and thus the lenders should not be granted adequate protection. UCC Objection ¶ 6. As noted above, the First Lien Bank Lenders' collateral consists of cash as well as other assets, including, among other things, the casinos, hotels, real estate, fixtures, equipment, inventory, personal property and other assets used daily in the operation of the Debtors'

---

[8] The Objectors raise the novel theory that gaming revenues do not constitute "proceeds" of the First Lien Bank Lenders' collateral. *See* UCC Objection ¶ 8. However, this position is neither supported by fact or law, and in any event presents a confirmation-related issue to be decided at a later stage in these cases.

[9] The UCC brazenly asserts that the Prepetition First Lien Creditors are not entitled to adequate protection at all because they have not sought stay relief, have contracted with CEOC to procure confirmation of a plan, require the Debtors to operate and do not want a foreclosure. *See* UCC Objection ¶ 5. As noted above, the Ad Hoc Committee is not a party to the RSA. The UCC also misstates the applicable standard for adequate protection. The notion that the First Lien Bank Lenders must have first sought to seek to lift the stay and foreclose elevates form over substance and only underscores the UCC's impractical approach to the Motion. However, as noted above, without an acceptable cash collateral order, the Ad Hoc Committee will indeed seek to lift stay and foreclose.

businesses. Contrary to the UCC's suggestion, that collateral has already diminished in value and is threatened with further decline, as demonstrated below.[10]

12. The Debtors' Net Revenue and EBITDA have declined for the past several years. Net Revenue has declined from $6.6 billion in 2007 to an estimated $4.8 billion for 2014, almost a 28% decline, with estimated 2014 Net Revenue representing more than a 7% decline from 2013. Similarly, the Debtors project 2014 Adjusted EBITDA of $832 million, a substantial decline from the prior year. That decline was driven by a series of factors, including the mid-year closures of Harrah's Tunica and Showboat Atlantic City and overall gaming contraction in many of CEOC's markets attributable to, among other things, changing customer preferences, the adverse impact of on-line gaming on brick and mortar casinos, increased competition and saturation. The negative revenue trends in the Debtors' businesses are expected to continue in 2015, with improved Adjusted EBITDA performance predicated on the execution of operating initiatives that bear material execution risk.

13. The Debtors' businesses are also likely to be negatively impacted by what may turn out to be contentious chapter 11 proceedings (and which would have a negative impact upon the Debtors' projections). Such protracted and contentious chapter 11 proceedings could, for example, have a negative impact on anticipated trade terms and certain licensing arrangements[11] and management agreements, each of which could negatively impact the Debtors' operations. Further, protracted chapter 11 proceedings may engender heightened regulatory concern. Also, the Debtors have forecasted hundreds of millions of dollars in professional fees for the next 12-

---

[10] The Ad Hoc Committee reserves the right to present evidence at any hearing to consider the Motion, and to respond to the declaration filed by the UCC's financial advisor in connection with the UCC's objection.

[11] In fact, just four days ago, on February 27, 2015, it was reported that the risk of the chapter 11 cases was a "key reason" why the Debtors did not win a license to operate a casino in New York. Freeman Klopott & Christopher Palmeri, *Caesars Bankruptcy Risk Killed Its Bid for N.Y. Casino License*, Bloomberg Business (Feb. 27, 2015), http://www.bloomberg.com/news/articles/2015-02-27/caesars-bankruptcy-risk-killed-its-bid-for-n-y-casino-license.

month period. Those fees and expenses are likely to significantly increase with the appointment of two official creditors' committees, requests for the appointment of an examiner and the prospect of significant litigation across a number of fronts.

14. These and other facts readily demonstrate that the First Lien Bank Lender's Collateral is at risk of further erosion, thus entitling the First Lien Bank Lenders to adequate protection.[12]

### C. The Proposed Adequate Protection Package is Reasonably Tailored to Protect the Lenders Against the Risk of Diminution in Value

15. Next, the UCC would have this Court supplant its judgment for that of the Debtors and the First Lien Bank Lenders by challenging (without merit) each of the separate components of adequate protection. The Ad Hoc Committee respectfully submits that the Court should consider the elements of the adequate protection as inextricably linked, and decline the UCC's invitation to cherry-pick certain provisions of the Proposed Order. However, an examination of each of the elements of the adequate protection demonstrates that they are reasonable and appropriate under the circumstances.

#### 1. *The Periodic Cash Payments Are Designed for Adequate Protection (Not as Post-Petition Interest) and are Appropriate Under the Circumstances*

16. The UCC conflates permissible monthly adequate protection payments that are consistent with section 361(1) of the Bankruptcy Code, with the concept of post-petition interest,

---

[12] *See Mem. in Supp. of Chapter 11 Pets.*, Jan. 15, 2015, ECF No. 4; *see also* Gary Loveman, Chairman, President & Chief Executive Officer Caesars Entertainment Corporation, *Second Quarter 2014 Earnings Announcement* (Aug. 11, 2014), http://www.sec.gov/Archives/edgar/data/858395/000085839514000013/ex992-2014q2cecpreparedrem.htm (stating that "[a]way from Caesars Palace, Atlantic City and the regional markets that make up the rest of CEOC had a challenging second quarter. Volumes in Atlantic City and Illinois declined driven by non-VIP trip declines. While we see no indication that the difficult conditions facing the regional markets will change in the near-term, we are working to maximize EBITDA on lower revenue. In the most extreme cases, we have reduced capacity to appropriately align supply in certain markets with the levels of demand. We closed Harrah's Tunica on June 2, and, as I mentioned earlier, announced plans to close Showboat Atlantic City at the end of August. These difficult actions follow persistent declines in trips and volumes in both markets.").

and in so doing, ignores the plain language of section 363(e) of the Bankruptcy Code.[13] Here, the Ad Hoc Committee negotiated for the right to receive periodic cash payments in an amount equal to 1.5% *per annum* of the aggregate amount of all Prepetition First Lien Obligations as of the Petition Date, together with an excess cash sweep at the end of the chapter 11 cases. These payments reflect a major concession on the part of the Prepetition First Lien Creditors, whose non-default contract rates, on a blended or weighted average basis per annum, is approximately 8% for the First Lien Bank Lenders and approximately 9.6% for the first lien noteholders.

17. In any event, unsecured creditors would not be prejudiced by these payments. If the Court later determines that the First Lien Bank Lenders are not entitled to adequate protection or are otherwise undersecured, the monthly adequate protection payments and the proposed cash sweep are expressly made subject to recharacterization as principal payment reductions; those adequate protection payments in the aggregate will never approach the total face amount of the $12 billion in secured claims held by the lenders that would be offset by any such payments (to the extent applicable).

        2. ***The Debtors' Waiver of the Section 506(c) Surcharge and Section 552(b)"Equities of the Case" Exception are Proper Under These Facts***

18. The Debtors are well within their discretion to waive their right to surcharge collateral pursuant to section 506(c) of the Bankruptcy Code[14] and to waive the "equities of the

---

[13] The UCC's reliance on the U.S. Supreme Court's decision in *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.* is misguided. 484 U.S. 365, 370 (1988). In *Timbers*, the Supreme Court held that an undersecured creditor's "interest in property" for purposes of section 362(d)(1) of the Bankruptcy Code does not include the right to post-petition interest or lost opportunity costs for the delay in its recovery of its collateral prior to confirmation. *Id.* at 371. However, the Supreme Court explicitly held that a lender's "interest in property" would include the right to be compensated against any decline in the value of its collateral, even if such lender were undersecured. *Id.* at 370. The Ad Hoc Committee takes no position with respect to valuation, an issue that is not presently before the Court.

[14] *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 & n.3 (2000) (holding that only the trustee or debtor-in-possession could take advantage of section 506(c)); *In re Smart World Techs., LLC*, 423 F.3d 166, 1818–82 (2d Cir. 2005) (citing to *Hartford Underwriters Ins. Co.* and stating that only the trustee or debtor-in-possession could take advantage of section 506(c)).

case" exception in section 552(b) of the Bankruptcy Code.[15] Such waivers are permissible and, in fact, are routinely approved by bankruptcy courts in this District and elsewhere as a *quid pro quo* for the agreement of secured lenders to subordinate their liens and claims to a professional fee carve-out.[16] Here, the First Lien Bank Lenders agreed to subordinate their liens and claims in favor of (and, upon an event of default, to immediately fund a reserve for), a massive Carve Out. Indeed, the Debtors are forecasting hundreds of millions of dollars in professional fees for the next 12 month period, an amount that is expected to significantly rise due to the appointment of two official creditors' committees, the request for the appointment of an examiner and the prospect of substantial litigation expected in these cases.

19. Moreover, some courts have adopted a narrow interpretation of the "equities of the case" exception under section 552(b), precluding its application where a secured party's cash collateral is required to preserve the value of a debtor's assets.[17] Here, the Debtors require the use of cash collateral to continue their operations and maintain the value of their assets, thus this waiver is appropriate.

---

[15] *See In re Blockbuster Inc.*, No. 10-14997, 2010 WL 4873646, at *18 (Bankr. S.D.N.Y. Sept. 24, 2010) (holding that, because the debtor in possession lender and prepetition lenders had agreed that their claims were subordinate to a carve-out, they were "entitled to all benefits of section 552(b) of the Bankruptcy Code and the 'equities of the case' exception under sections 552(b)(i) and (ii) of the Bankruptcy Code [would] not apply"); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 127 (Bankr. S.D.N.Y. 2009) (holding that "[i]n light of the Lenders' agreement to subordinate their liens and superpriority claims to the Carve-Out, the Lenders are entitled to a waiver of … any 'equities of the case' claims under section 552(b) of the Bankruptcy Code . . .").

[16] *In re Enesco Grp., Inc.*, No. 07-00565 (Bankr. N.D. Ill. Jan. 22, 2007), ECF No. 73 (Goldgar, J.) (granting motion to incur post-petition debt with adequate protection for prepetition lenders containing waivers of "surcharge provisions of Code § 506(c) [and] the enhancement of collateral provisions of Code § 552" and a carve-out provision); *In re ITR Concession Co. LLC*, No. 14-34284, 2014 WL 6723784, at *4 (Bankr. N.D. Ill. Oct. 28, 2014) (same); *In re Hartmarx Corp.*, No. 09-02046 (Bankr. N.D. Ill. Feb. 19, 2009), ECF No. 149 at 24 (same); *see*; *In re Ryan Int'l Airlines, Inc.*, No. 12-80802, 2012 WL 1656025, at *3 (Bankr. N.D. Ill. Apr. 6, 2012); *In re Blockbuster Inc.*, Case No. 10-14997, 2010 WL 4873646, at *18 (Bankr. S.D.N.Y. Sept 24, 2010); *In re Gen. Growth Props., Inc.*, 412 B.R. 122, 127 (Bankr. S.D.N.Y. 2009).

[17] *See In re Muma Servs., Inc.*, 322 B.R. 541, 559 (Bankr. D. Del. 2005).

### *3.    The Debtors' Grant of Post-Petition Liens, Including Liens on Proceeds of Avoidance Actions, is Appropriate*

20. The granting of adequate protection liens on the Debtors' assets is a form of adequate protection specifically contemplated by section 361(2) of the Bankruptcy Code. Moreover, under the explicit terms of sections 541(a)(3) and (a)(4) of the Bankruptcy Code, avoidance proceeds are property of the Debtors' estate. Like all other property of the estate, they may be pledged to secure the claims of senior secured lenders as adequate protection.[18] In fact, none of the cases cited by the UCC stands for the proposition that proceeds of avoidance actions cannot serve as adequate protection for the use of collateral.[19]

21. Also, the Debtors are justified in granting adequate protection liens on avoidance action proceeds under these circumstances because the First Lien Bank Lenders' pre-petition liens on any property subsequently recovered by the Debtors' estates remain subject to such valid security interests. *See*, *e.g.*, *In re Figearo*, 79 B.R. 914 (Bankr. D. Nev. 1987) (finding that property recovered by the trustee through an avoidance action was subject to a secured creditor's pre-petition security interest).

---

[18] *See* 11 U.S.C. § 541(a)(3)–(a)(4) (providing that any interest in property that a trustee recovers in an avoidance action under section 550 of the Bankruptcy Code is property of the estate); *see also In re EWGS Intermediary, LLC*, No. 13-12876 (Bankr. D. Del. Apr. 29, 2014), ECF No. 371 at 8; *In re Dex One Corp.*, No 13-10533 (Bankr. D. Del. Apr. 10, 2013), ECF Nos. 78 at 10, 131 at 2; *In re Conextant Sys., Inc.*, No. 13-10367 (Bankr. D. Del. Apr. 19, 2013), ECF No. 203 at 3; *In re School Specialty, Inc.*, No. 13-10125 (Bankr. D. Del. Feb. 26, 2013), ECF No. 300 at 14; *In re Educ. Holdings 1, Inc.*, No 13-10101 (Bankr. Feb. 7, 2013), ECF No. 64 at 18–19; *In re Metro Fuel Oil Corp.*, No. 12-46913 (Bankr. E.D.N.Y. Nov 20, 2012), ECF No. 187 at 20; *In re Eastman Kodak Co.*, No. 12-10202 (Bankr. S.D.N.Y. Feb. 16, 2012), ECF No. 375 at 5; *In re Tropicana Entm't, LLC*, No. 08-10856 (Bankr. D. Del. May 30, 2008), ECF No. 220 at 11–12; *Applied Theory Corp.*, No. 02-11868, 2008 WL 1869770, at *1 (Bankr. S.D.N.Y. Apr. 24, 2008); *In re Outboard Marine Corp.*, No. 00-37405, 2002 WL 571661, at *3 (Bankr. N.D. Ill. Jan. 9, 2002) aff'd, 278 B.R. 778 (N.D. Ill. 2002) aff'd sub nom. *Bank of Am., N.A. v. Moglia*, 330 F.3d 942 (7th Cir. 2003).

[19] *See, e.g.*, *Mellon Bank, N.A. v. Dick Corp.*, 351 F.3d 290, 291 (7th Cir. 2003) (granting secured creditors a lien on the first $30 million of any preference recovery); *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 253 (3d Cir. 2000) (not addressing issue of proceeds of avoidance actions on appeal because party failed to raise the issue in lower court); *Official Comm. of Unsecured Creditors v. Gould Elecs. Corp.*, 1993 WL 408366 (N.D. Ill. Sept. 22, 1993) (holding that preference actions are not subject to creditor's lien, and not determining whether the proceeds of avoidance actions were subject to the creditor's lien).

22. In addition, the proceeds of certain avoidance actions are already included within the Prepetition First Lien Creditors' collateral package as a result of the perfection of the secured lenders' pre-petition liens in certain specified Commercial Tort Claims.[20] In any event, the post-petition liens granted under the Proposed Order are limited to the extent of any actual diminution in value, and thus would not unfairly prejudice general unsecured creditors.

### 4.   *The Milestones Provided for in the Proposed Order are Appropriate*

23. Although the UCC objects to the imposition of certain milestones in the Proposed Order, those milestones were heavily negotiated and ultimately approved by, the Debtors and the Prepetition First Lien Creditors.  The Debtors affirmatively believe that the milestones are achievable.  In any event the milestones are principally designed to bring discipline to these chapter 11 cases and to provide for the efficient administration thereof, and always remain subject to further discussion as the cases unfold.

### 5.   *The UCC Investigation Period and Budget are Reasonable, and Automatic Standing Should Not be Conferred Upon the UCC*

24. The UCC's request for a 150-day investigation period (despite clearly being up to speed), a limitless budget and the granting of automatic standing to pursue challenges is without basis. The Proposed Order provides for a 60-day investigation period in compliance with this Court's Local Rules.[21]  In addition, the 60-day investigation period and proposed budget of $75,000 are reasonable, consistent with recent precedent and other gaming cases, and are in line

---

[20] On September 25, 2014, CEOC and the Subsidiary Pledgors perfected the First Lien Credit Parties' liens on certain "Commercial Tort Claims" specifically identified in an exhibit to the Amended and Restated Waiver Agreement dated as of August 12, 2014 that was filed as Exhibit 10.1 to CEOC's Form 8-K dated September 19, 2014, and which relate in large measure to the pre-petition transactions described by the Debtors in their motion seeking the appointment of an examiner.

[21] *See* Local Bankruptcy Rules, United Stated Bankruptcy Court Northern District of Illinois, 4001-2(A)(2)(b).

with investigation budgets approved generally in this and other districts.[22] Also, it would be entirely premature, if not inappropriate, to grant the UCC automatic standing at this nascent stage in the chapter 11 cases.[23]

### 6. *The Proposed Order Does Not Provide for the Automatic Lifting of the Stay Upon the Expiration of the Default Notice Period*

25. Finally, the Proposed Order does not provide for the automatic lifting of the stay upon the expiration of the default notice period, thus addressing the concerns raised by the Objectors with respect to the enforcement of remedies.

## II. The Subordinated Notes Trustee's Objection Should Similarly be Overruled

26. The Subordinated Notes Trustee (despite being subject to certain intercreditor restrictions and pay-over obligations) mischaracterizes the nature of the First Lien Bank Lenders' rights and claims with respect to the Subsidiary Pledgors, and assumes, without basis, that the First Lien Bank Lenders lack an interest in cash or other property held by the subsidiary-Debtors that are entitled to adequate protection. The First Lien Bank Lenders' security interests in the Subsidiary Pledgors covers substantially all of their assets. In fact, the definition of the "Collateral" granted by the Subsidiary Pledgors is identical to the scope of the "Collateral" pledged by the Debtors, including all cash and deposit accounts, real estate, furniture fixtures and

---

[22] *See In re Revel AC, Inc.*, No. 14-22654 (Bankr. D.N.J. Jan. 30, 2015), ECF No. 1236 ($50,000 budget and 45-day challenge period); *In re ITR Concession Co. LLC*, No. 14-34284 (Bankr. N.D. Ill. Oct 28, 2014), ECF No 178 ($50,000 budget and 41 days from entry of final cash collateral order challenge period); *In re Trump Entm't Resorts Inc.*, No. 14-12103 (Bankr. D. Del. Oct. 23, 2014), ECF No. 342 ($75,000 budget and 60-day challenge period for committee); *In re Journal Register*, No. 12-13774 (Bankr. S.D.N.Y. Oct 4, 2012), ECF No 113 ($50,000 budget, 75-day challenge period); *In re Blockbuster Inc.*, No. 10-14997 (Bankr. S.D.N.Y. Oct 27, 2010), ECF No. 432 ($50,000 budget, 60-day challenge period); *In re TCI 2 Holdings, LLC*, No. 09-13654 (Bankr. D.N.J. Mar. 23, 2009), ECF No. 157 ($35,000 and 60-day challenge period); *In re Citation Corp.*, No. 04-08130 (Bankr. N.D. Ala. Oct 19, 2004), ECF No. 348 ($75,000 budget and 90-day challenge period).

[23] *See Fogel v. Zell*, 221 F.3d 955, 965 (7th Cir. 2000) (stating that "[i]f a trustee unjustifiably refuses a demand to bring an action to enforce a colorable claim of a creditor, the creditor may obtain the permission of the bankruptcy court to bring the action in place of, and in the name of, the trustee") (internal citations committed); *Matter of Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990) (requiring that an individual creditor or creditors' committee (i) show that the trustee unjustifiably refused a demand to pursue the action; (ii) show that there is a colorable claim or cause of action and (iii) obtain leave from the bankruptcy court) (internal citations committed).

equipment, etc.. *See Supra* fn. 7.  Because the Subsidiary Pledgors are using the Collateral daily in their operations, the First Lien Bank Lenders are entitled to adequate protection.

## **RESERVATION OF RIGHTS**

27. The Ad Hoc Committee is still in the process of finalizing the terms of the Proposed Order, and reserves all rights in connection therewith.  Also, the Ad Hoc Committee understands that the Debtors do not intend to go forward with the hearing to consider the Proposed Order at the omnibus hearing currently scheduled to take place on March 4, 2015 before this Court, and that the Debtors intend to implement a further briefing and discovery schedule with respect to the adjourned Cash Collateral portion of the hearing.  Accordingly, the Ad Hoc Committee reserves its rights to submit further briefing, to reply to any responsive pleadings, to submit evidence and be heard at any hearing to consider the Motion and/or the Proposed Order.

Dated:  March 2, 2015
        Chicago, Illinois

Respectfully submitted,

Brian L. Shaw
Brian L. Shaw
SHAW FISHMAN GLANTZ & TOWBIN LLC
321 N. Clark Street, Suite 800
Chicago, Illinois 60654
Telephone: (312) 541-0151

-and-

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen
Frank A. Merola
Erez E. Gilad
Jonathan D. Canfield
180 Maiden Lane
New York, New York 10038
Telephone: (212) 806-5400

*Counsel to the Ad Hoc Committee of First Lien Bank Lenders*