# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

## NOTICE OF FILING OF THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on March 2, 2015, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the attached *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Plan") with the United States Bankruptcy Court for the Northern District of Illinois (the "Court").

**PLEASE TAKE FURTHER NOTICE** that the Debtors filed the Plan as required by the milestones under that certain *Third Amended and Restated Restructuring Support and Forbearance Agreement*, dated as of January 14, 2015, and the Plan remains subject to ongoing review and comment from the parties to the RSA. The Debtors have not concurrently filed a motion seeking approval of their disclosure statement related to the Plan and are not seeking to set a hearing with respect to approval of such disclosure statement at this time.

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan as well as copies of all documents filed in these chapter 11 cases are available free of charge by visiting https://cases.primeclerk.com/CEOC or by calling (855) 842-4123 within the United States or Canada or, outside of the United States or Canada, by calling +1 (646) 795-6969. You may also obtain copies of any pleadings by visiting the Court's website at www.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these jointly-administered chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC.

Dated:  March 2, 2015
Chicago, Illinois

/s/ David R. Seligman, P.C.
James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**DEBTORS' JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

**Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions.  This Plan is not an offer with respect to any securities.  YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

| | |
|---|---|
| James H.M. Sprayregen, P.C. | Paul M. Basta, P.C. |
| David R. Seligman, P.C. | Nicole L. Greenblatt |
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 300 North LaSalle | 601 Lexington Avenue |
| Chicago, Illinois 60654 | New York, New York 10022-4611 |
| Telephone: (312) 862-2000 | Telephone: (212) 446-4800 |
| Facsimile: (312) 862-2200 | Facsimile (212) 446-4900 |

Proposed Counsel to the Debtors and Debtors in Possession

Dated:  March 2, 2015

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623.  A complete list of the Debtors (as defined herein) and the last four digits of their federal tax identification numbers are identified on **Exhibit A** attached hereto.

# **TABLE OF CONTENTS**

**Page**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**..........................................................................................................1
  A.    Defined Terms ........................................................................................................1
  B.    Rules of Interpretation. ..........................................................................................23
  C.    Computation of Time. ............................................................................................24
  D.    Governing Law. .....................................................................................................24
  E.    Reference to Monetary Figures. ............................................................................24

**ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS**.................24
  A.    Administrative Claims. ..........................................................................................24
  B.    Professional Fee Claims.........................................................................................25
  C.    Priority Tax Claims.................................................................................................26

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**.............26
  A.    Summary of Classification......................................................................................26
  B.    Treatment of Claims and Interests.........................................................................27
  C.    Special Provision Governing Unimpaired Claims. ...............................................35
  D.    Elimination of Vacant Classes. .............................................................................35
  E.    Voting Classes; Presumed Acceptance by Non-Voting Classes. ..........................35
  F.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................35
  G.    Controversy Concerning Impairment.....................................................................35

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** .........................................35
  A.    Sources and Uses. ..................................................................................................35
  B.    Master Lease Agreement. ......................................................................................39
  C.    Management and Lease Support Agreement...........................................................39
  D.    Right of First Refusal Agreement. .........................................................................39
  E.    PropCo Call Right Agreement. ..............................................................................39
  F.    The Separation Structure........................................................................................39
  G.    Restructuring Transactions.....................................................................................40
  H.    New Corporate Governance Documents.................................................................40
  I.    New Boards..............................................................................................................41
  J.    Shared Services. .....................................................................................................41
  K.    Section 1145 Exemption. .......................................................................................42
  L.    New Interests. ........................................................................................................42
  M.    Cancellation of Existing Securities and Agreements. ...........................................42
  N.    Corporate Action.....................................................................................................43
  O.    Effectuating Documents; Further Transactions......................................................43
  P.    Exemption from Certain Taxes and Fees. ..............................................................43
  Q.    Corporate Existence. ..............................................................................................44
  R.    Vesting of Assets.....................................................................................................44
  S.    General Settlement of Claims. ...............................................................................44
  T.    Retention of Causes of Actions..............................................................................44

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** .....................45
  A.    Assumption of Executory Contracts and Unexpired Leases. .................................45
  B.    Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases............45
  C.    Rejection of Executory Contracts and Unexpired Leases. .....................................45
  D.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases..........46
  E.    Modifications, Amendments, Supplements, Restatements, or Other Agreements..........46
  F.    Indemnification Provisions. ...................................................................................47

KE 33843292

G.    Treatment of D&O Liability Insurance Policies. ...............................................47
H.    Insurance Policies. ...........................................................................................48
I.    Benefit Programs. .............................................................................................48
J.    Reservation of Rights. .......................................................................................48
K.    Nonoccurrence of Effective Date. .....................................................................48
L.    Contracts and Leases Entered Into After the Petition Date. ..............................48

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ........................................**49**
A.    Timing and Calculation of Amounts to Be Distributed. ...................................49
B.    Distributions on Account of Obligations of Multiple Debtors. ..........................49
C.    Distributions Generally. ....................................................................................49
D.    Rights and Powers of Disbursing Agent. ...........................................................49
E.    Distributions on Account of Claims or Interests Allowed After the Effective Date. ....................50
F.    Delivery of Distributions and Undeliverable or Unclaimed Distributions. .......50
G.    Compliance with Tax Requirements/Allocations................................................51
H.    No Postpetition Interest on Claims. ..................................................................52
I.    Setoffs and Recoupment. ..................................................................................52
J.    Allocation Between Principal and Accrued Interest. .........................................52
K.    Claims Paid or Payable by Third Parties............................................................52

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS**..........................................................................................**53**
A.    Resolution of Disputed Claims. ........................................................................53
B.    Adjustment to Claims Without Objection. ........................................................53
C.    Time to File Objections to Claims. ...................................................................53
D.    Disallowance of Claims. ...................................................................................54
E.    Amendments to Claims. ....................................................................................54
F.    No Distributions Pending Allowance.................................................................54
G.    Distributions After Allowance. .........................................................................54

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ....................**54**
A.    Discharge of Claims and Termination of Interests.............................................54
B.    **Debtor Release.**.................................................................................................55
C.    **Third-Party Release.** ........................................................................................56
D.    **Exculpation.** ....................................................................................................56
E.    **Injunction.**.......................................................................................................57
F.    **Release of Liens.** .............................................................................................57
G.    Setoffs. .............................................................................................................57
H.    Recoupment. .....................................................................................................58
I.    Subordination Rights. .......................................................................................58
J.    Document Retention. .........................................................................................58
K.    Protections Against Discriminatory Treatment...................................................58
L.    Reimbursement or Contribution. .......................................................................58
M.    Term of Injunctions or Stays.............................................................................58

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN**........................**58**
A.    Conditions Precedent to the Effective Date. ......................................................58
B.    Waiver of Conditions.........................................................................................60
C.    Substantial Consummation of the Plan. .............................................................60
D.    Effect of Nonoccurrence of Conditions to the Effective Date. ..........................60

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**......................**60**
A.    Modification and Amendments...........................................................................60
B.    Effect of Confirmation on Modifications............................................................61
C.    Revocation or Withdrawal of the Plan. ..............................................................61

KE 33843292

**ARTICLE XI. RETENTION OF JURISDICTION** ..................................................................................61

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ..............................................................................63

    A.     Immediate Binding Effect. ..........................................................................................63
    B.     Additional Documents. ...............................................................................................63
    C.     Payment of Statutory Fees. .........................................................................................63
    D.     Dissolution of the Second Lien Notes Committee and Unsecured Creditors Committee. ..............63
    E.     Reservation of Rights. .................................................................................................63
    F.     Successors and Assigns. ..............................................................................................64
    G.     Service of Documents. ................................................................................................64
    H.     Entire Agreement. .......................................................................................................65
    I.     Exhibits. ......................................................................................................................65
    J.     Votes Solicited in Good Faith. ...................................................................................65
    K.     Waiver or Estoppel. ....................................................................................................66
    L.     Nonseverability of Plan Provisions. ...........................................................................66
    M.     Conflicts. .....................................................................................................................66
    N.     Closing of Chapter 11 Cases. .....................................................................................66

KE 33843292

Caesars Entertainment Operating Company, Inc. and the other Debtors in the above-captioned Chapter 11 Cases respectfully propose the following joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.      Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.      "5.75% Senior Unsecured Notes Indenture" means that certain Indenture, dated as of September 28, 2005, by and between CEOC, CEC, and the Senior Unsecured Notes Indenture Trustee, providing for the issuance of 5.75% Senior Notes due 2017, as amended, amended and restated, supplemented, or otherwise modified from time to time.

2.      "6.50% Senior Unsecured Notes Indenture" means that certain Indenture, dated as of June 9, 2006, by and between CEOC, CEC, and the Senior Unsecured Notes Indenture Trustee, providing for the issuance of 6.50% Senior Notes due 2016, as amended, amended and restated, supplemented, or otherwise modified from time to time.

3.      "8.50% First Lien Notes Indenture" means that certain Indenture, dated as of February 14, 2012, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 8.50% Senior Secured Notes due 2020, as amended, amended and restated, supplemented, or otherwise modified from time to time.

4.      "9.00% First Lien Notes Indentures" means (a) that certain Indenture, dated as of August 22, 2012, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 9.00% Senior Secured Notes due 2020, as amended, amended and restated, or otherwise modified from time to time, including pursuant to that certain Additional Notes Supplemental Indenture, dated as of December 13, 2012, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee; and (b) that certain Indenture, dated as of February 15, 2013, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 9.00% Senior Secured Notes due 2020, as amended, amended and restated, supplemented, or otherwise modified from time to time.

5.      "10.00% Second Lien Notes Indentures" means, collectively, that (a) certain Indenture, dated as of December 24, 2008, by and between CEOC, CEC, and the applicable 10.00% Second Lien Notes Indenture Trustee, providing for the issuance of 10.00% Second-Priority Senior Secured Notes due 2015 and 10.00% Second-Priority Senior Secured Notes due 2018, as amended, amended and restated, supplemented, or otherwise modified from time to time, and (b) certain Indenture, dated as of April 15, 2009, between CEOC, CEC, and the applicable 10.00% Second Lien Notes Indenture Trustee, providing for the issuance of 10.00% Second-Priority Senior Secured Notes due 2018, as amended, amended and restated, supplemented, or otherwise modified from time to time.

6.      "10.00% Second Lien Notes Indenture Trustee" means, as applicable, (a) Delaware Trust Company, solely in its capacity as indenture trustee under the 10.00% Second Lien Notes Indentures dated as of December 24, 2008, and any successors in such capacity, or (b) Wilmington Savings Fund Society, FSB, solely in its capacity as indenture trustee under the 10.00% Second Lien Notes Indentures dated as of April 15, 2009, and any successors in such capacity.

1

7.      "<u>11.25% First Lien Notes Indenture</u>" means that certain Indenture, dated as of June 10, 2009, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 11.25% Senior Secured Notes due 2017, as amended, amended and restated, supplemented, or otherwise modified from time to time, including that certain Second Supplemental Indenture, dated as of September 11, 2009, between CEOC, CEC, and the First Lien Notes Indenture Trustee.

8.      "<u>12.75% Second Lien Notes Indenture</u>" means that certain Indenture, dated as of April 16, 2010, by and between the Escrow Issuers, CEC, and the 12.75% Second Lien Notes Indenture Trustee, providing for the issuance of 12.75% Second-Priority Senior Secured Notes due 2018, as amended, amended and restated, supplemented, or otherwise modified from time to time.

9.      "<u>12.75% Second Lien Notes Indenture Trustee</u>" means BOKF, N.A., solely in its capacity as indenture trustee under the 12.75% Second Lien Notes Indenture, and any successors in such capacity.

10.     "<u>Administrative Claim</u>" means a Claim for the costs and expenses of administration of the Estates pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees;  and (c) Professional Fee Claims.

11.     "<u>Administrative Claims Bar Date</u>" means the deadline for filing requests for payment of Administrative Claims other than (x) Professional Fee Claims and (y) Administrative Claims arising in the ordinary course of business; in each case which shall be the first Business Day that is 45 days following the Effective Date, except as specifically set forth in the Plan, a Final Order, or agreed-to by the Reorganized Debtors.

12.     "<u>Administrative Claims Objection Bar Date</u>" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the first Business Day that is 180 days following the Effective Date; <u>provided</u> that the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

13.     "<u>Affiliate</u>" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

14.     "<u>Allowed</u>" means with respect to Claims:  (a) any Claim other than an Administrative Claim that is evidenced by a Proof of Claim which is or has been timely Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; or (c) any Claim Allowed pursuant to (i) the Plan, (ii) any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or (iii) a Final Order of the Bankruptcy Court; <u>provided</u> that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed for voting purposes only by a Final Order.  Except as otherwise specified in the Plan or any Final Order, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law.  Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.  Notwithstanding anything to the contrary herein, no Claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be. "Allow" and "Allowing" shall have correlative meanings.

15.     "<u>Available Cash</u>" shall have the meaning set forth in the Restructuring Support Agreement.

KE 33843292

16.    "Avoidance Actions" means any and all avoidance, recovery, subordination, or similar remedies that may be brought by or on behalf of the Debtors or the Estates, including causes of action or defenses arising under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

17.    "Assumed Executory Contracts and Unexpired Leases Schedule" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, as applicable, by the Debtors pursuant to the Plan in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

18.    "Backstop Commitment" means the PropCo Preferred Backstop Investors' commitment to backstop the exercise of the PropCo Preferred Equity Call Right with respect to PropCo Preferred Equity with Cash in an amount equal to $250,000,000 pursuant to the Backstop Commitment Agreement.

19.    "Backstop Commitment Agreement" means that certain Backstop Commitment Agreement, dated as of [●] by and between CEOC and PropCo Preferred Backstop Investors party thereto from time to time, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms.

20.    "Ballot" means the form or forms distributed to certain Holders of Claims or Interests that are entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan.

21.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

22.    "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code, the United States District Court for the Northern District of Illinois.

23.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

24.    "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

25.    "CAC" means Caesars Acquisition Company, a Delaware corporation, a non-Debtor.

26.    "Cash" or "$" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

27.    "Caesars Cases" means, collectively, the cases captioned (a) Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second-Priority Senior Secured Notes due 2018, on behalf of itself and derivatively on behalf of Caesars Entertainment Operating Company, Inc. v. Caesars Entertainment Corporation, et. al., Case No. 10004-VCG (Del. Ch.), (b) MeehanCombs Global Credit Opportunities Master Fund, LP, et. al. v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc., No. 14-cv-7097 (S.D.N.Y.), (c) Frederick Barton Danner v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc., No. 14-cv-7973 (S.D.N.Y.), (d) UMB Bank v. Caesars Entertainment Corporation, et al., C.A. No. 10393-VCG (Del. Ch.), and (e) all claims, in causes of action relating to, claims arising out of any facts alleged in the Caesars Cases otherwise described in clauses (a)–(d) above.

28.    "Caesars Palace-Las Vegas" means the hotel, gaming, retail, and resort property located at 3500-3570 Las Vegas Boulevard South, Las Vegas, Nevada 89109, and related properties, including the portion of

such property known as The Forum Shops, but specifically excluding the portion of such property commonly known as Octavius Tower.

29.     "Cash Election Procedures" mean those certain procedures governing the exercise of the Cash Elections, which procedures shall be approved by the Disclosure Statement Order.

30.     "Cash Elections" means, collectively, the OpCo Common Stock Cash Election and the PropCo Common Equity Cash Election.

31.     "Causes of Action" means any claim, cause of action (including Avoidance Actions or rights arising under section 506(c) of the Bankruptcy Code), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.   Causes of Action also include:  (a) all rights of setoff, counterclaim, cross-claim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) all claims and defenses set forth in section 558 of the Bankruptcy Code.

32.     "CEC" means Caesars Entertainment Corporation, a Delaware corporation formerly known as Harrah's Entertainment, Inc, a non-Debtor.

33.     "CEC Cash Contribution" means the $406,000,000 in Cash CEC shall contribute to the Reorganized Debtors on the Effective Date to fund general corporate purposes, the Restructuring Transactions, and the distributions under the Plan, as such amount shall be reduced by any portion of the RSA Forbearance Fee paid by CEC.

34.     "CEC OpCo Cash Commitment" means CEC's obligation to purchase up to 100% of the OpCo Common Stock from the Debtors for Cash in an amount up to $700,000,000 in connection with the exercise by Holders of Secured First Lien Notes Claims of the OpCo Common Stock Cash Election.

35.     "CEC PropCo Common Equity Cash Commitment" means CEC's commitment to purchase 14.8% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or the CPLV Mezzanine Debt Conversion, if any) for Cash in an amount up to $269,000,000, reduced by any participation of the PropCo Common Equity Commitment Parties pursuant to the PropCo Common Equity Purchase Commitment Agreement, upon the exercise by Holders of Secured First Lien Notes Claims of the PropCo Common Equity Cash Election, as more fully set forth in the PropCo Common Equity Purchase Commitment Agreement.

36.     "CEC Released Parties" means:  (a) CEC; (b) CAC; and (c) each of CEC's and CAC's respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, agents, attorneys, professionals, advisors, and representatives, each in their capacities as such.

37.     "CEC Standby Commitment" means $75 million in Cash that CEC shall contribute to the Reorganized Debtors on the Effective Date to the extent there is insufficient Cash (after giving effect to the Debtors Available Cash and the CEC Cash Contribution) to fund the Consummation of the Plan on the Effective Date; provided that for the purpose of determining whether CEC is required to fund the CEC standby Commitment, the amount of Available Cash shall be deemed to exclude $206 million.

38.     "CEOC" means Caesars Entertainment Operating Company, Inc., a Delaware corporation, formerly known as Harrah's Operating Company, Inc, a Debtor.

39.     "CEOC Interests" means an Interest in CEOC.

40.    "CERP" means Caesars Entertainment Resort Properties, Inc., a non-Debtor.

41.    "Certificate of Designation" means that certain Certificate of Designation of Series A Convertible Preferred Units and/or Series A Convertible Preferred Stock of the REIT with respect to PropCo Preferred Equity.

42.    "CES" means Caesars Enterprise Services, LLC, a non-Debtor.

43.    "CES LLC Agreement" means that certain Amended Limited Liability Company Agreement of Caesars Enterprise Services, LLC, dated as of May 20, 2014, as amended, amended and restated, supplemented, or otherwise modified from time to time.

44.    "CES Shared Services Agreement" means certain Omnibus License and Enterprise Services Agreement, dated as of May 20, 2014, by and between CEOC CERP, Caesars Growth Properties Holdings, LLC, Caesars World, Inc., and CES, as amended, amended and restated, supplemented, or otherwise modified from time to time.

45.    "Challenged Transactions" means all of the transactions that are reviewed by any examiner appointed pursuant to section 1106 of the Bankruptcy Code in the Chapter 11 Cases.

46.    "Chapter 11 Cases" means the jointly administered chapter 11 cases commenced by the Debtors in the Bankruptcy Court and styled In re Caesars Entertainment Operating Company, Inc., et al., No. 15-01145 (ABG).

47.    "Claim" means any claim against the Debtors, as defined in section 101(5) of the Bankruptcy Code, including: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

48.    "Claims Bar Date" means the date established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims, pursuant to:  (a) the *[Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (II) Establishing the Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing of Claims, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief]* [Docket No. [__]]; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

49.    "Claims Objection Bar Date" shall mean the later of:  (a) the first Business Day following 180 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion Filed on or before the day that is 180 days before the Effective Date.

50.    "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent.

51.    "Class" means a category of Holders of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

52.    "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

53.    "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on its docket in the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

54.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

KE 33843292

55.      "Confirmation Objection Deadline" means **[TO COME]**.

56.      "Confirmation Order" means the order of the Bankruptcy Court, materially consistent with the Restructuring Support Agreement and reasonably satisfactory to the Debtors and CEC, confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

57.      "Consenting First Lien Noteholders" means Holders of First Lien Notes who are Consenting Creditors (as defined in the Restructuring Support Agreement).

58.      "Consummation" shall mean "substantial consummation" as defined in section 1101(2) of the Bankruptcy Code.

59.      "CPLV Loan Agreement" means the mortgage loan agreement by and among CPLV Sub and the CPLV Loan Lender, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

60.      "CPLV Loan Lender" means the lender or the trustee for the certificate holders for the CPLV Loan.

61.      "CPLV Loan Documents" means, collectively, the CPLV Loan Agreement and all other agreements, documents, and instruments evidencing or securing the CPLV Market Debt to be delivered or entered into in connection therewith (including any mortgage, promissory note, intercreditor agreements, and other security documents).

62.      "CPLV Market Debt" means the first lien mortgage loan to be provided on or prior to the Effective Date by the CPLV Loan Lender to CPLV Sub in an amount no less than $2,000,000,000 but no more than $2,600,000,000, at least $2,000,000,000 of which will be provided by third party lenders in Cash,  the Cash proceeds of which shall be distributed to the Holders of Prepetition Credit Agreement Claims and Secured First Lien Notes Claims as set forth in Article III.B of the Plan.

63.      "CPLV Mezz" means the one or more newly formed wholly owned unrestricted direct or indirect subsidiaries of PropCo, which on and after the Effective Date will be the sole member of CPLV Sub or, if there are multiple such subsidiaries, each tranche will be the sole member of the below subsidiary and with one such tranche being the sole member of CPLV Sub.

64.      "CPLV Mezz Organizational Documents" means the form of **[operating agreement, certificate of incorporation,]** and other similar organizational and constituent documents for CPLV Mezz, which shall be included in the Plan Supplement.

65.      "CPLV Mezzanine Debt" means the mezzanine debt under the CPLV Mezzanine Loan Agreement, which debt shall be issued only if the Debtors, after using commercially reasonable efforts, are unable to finance all of the $2,600,000,000 of the CPLV Market Debt, and which CPLV Mezzanine Debt shall be issued in an initial aggregate amount equal to the difference between $2,600,000,000 and original aggregate principal amount of the CPLV Market Debt, and which may be further reduced by the (a) Equity Rights as set forth in Article IV.A.5(b) hereof, (b) PropCo Preferred Equity Call Right as set forth in Article IV.A.6 hereof, and (c) CPLV Mezzanine Debt Conversion.

66.      "CPLV Mezzanine Debt Conversion" means the conversion of up to $100,000,000 of CPLV Mezzanine Debt into an equal amount of OpCo First Lien Term Loan, OpCo Second Lien Notes, PropCo First Lien Term Loan, PropCo Second Lien Notes, or PropCo Common Equity, which Holders of Prepetition Credit Agreement Claims may elect to effect pursuant to the Prepetition Credit Agreement CPLV Option Procedures.

67.      "CPLV Mezzanine Lenders" means the lenders under for the CPLV Mezzanine Loan Agreement.

68.    "CPLV Mezzanine Loan Agreement" means the loan agreement by and among CPLV Mezz and the CPLV Mezzanine Lender, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

69.    "CPLV Mezzanine Loan Documents" means, collectively, the CPLV Mezzanine Loan Agreement and all other agreements, documents, and instruments evidencing or securing the CPLV Mezzanine Debt to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

70.    "CPLV Sub" means the newly formed wholly owned unrestricted direct or indirect subsidiary of PropCo, which on and after the Effective Date will own Caesars Palace-Las Vegas, and which shall lease Caesars Palace-Las Vegas to OpCo.

71.    "CPLV Sub Organizational Documents" means the form of **[limited liability company agreement]** and other similar organizational and constituent documents for CPLV Sub, which shall be included in the Plan Supplement.

72.    "Debtors" means, collectively, each of the entities identified on **Exhibit A** attached hereto.

73.    "Debtor Release" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.B of the Plan.

74.    "Des Plaines Interests" means an Interest in Des Plaines Development Limited Partnership, a Debtor.

75.    "Disbursing Agent" means, on the Effective Date, the Debtors, their agent, or any Entity or Entities designated by the Debtors to make or facilitate distributions that are to be made on or after the Initial Distribution Date pursuant to the Plan, which designee may be the Reorganized Debtors.

76.    "Disclosure Statement" means the **[*Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*]**, dated **[TO COME]**, and as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

77.    "Disclosure Statement Order" means the **[*Order (A) Approving the Adequacy of the Debtors' Disclosure Statement, (B) Approving the Notice and Solicitation Procedures With Respect to Confirmation of the Debtors' Proposed Joint Plan of Reorganization, (C) Approving the Form of Various Ballots and Notices In Connection Therewith, (D) Scheduling Certain Dates With Respect Thereto, and (E) Granting Related Relief*]**, entered on **[TO COME]** [Docket No. **[__]**], which order approved the Disclosure Statement and granted related relief.

78.    "Disputed" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

79.    "Distribution Record Date" means the date for determining which Holders of Allowed Claims or Interests are eligible to receive distributions hereunder, which shall be (a) the Effective Date for all Claims other than the Prepetition Credit Agreement Claims, Secured First Lien Notes Claims, Second Lien Note Claims, Senior Unsecured Note Claims, and Subsidiary Guaranteed Note Claims, (b) the Confirmation Date for all Prepetition Credit Agreement Claims, Secured First Lien Notes Claims Second Lien Note Claims, Senior Unsecured Note Claims, and Subsidiary Guaranteed Note Claims, or (c) such other date as designated in a Bankruptcy Court order.

80.    "D&O Liability Insurance Policies" means, collectively, (a) all insurance policies for directors', members', trustees', officers', and managers' liability maintained by CEC for the benefit of the Debtors' directors,

members, trustees, officers, and managers as of the Petition Date (including any "tail policy") and (b) all insurance policies for directors', members', trustees', officers', and managers' liability maintained by the Debtors or the Estates as of the Effective Date (including any "tail policy").

81.      "<u>Effective Date</u>" means the Business Day that is at least one (1) Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, which shall be the day Consummation occurs.

82.      "<u>Entity</u>" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

83.      "<u>Equitized CPLV Mezzanine Debt</u>" means the conversion of CPLV Mezzanine Debt to PropCo Common Equity upon the purchase of such CPLV Mezzanine Debt with proceeds from the exercise of any Equity Rights, as set forth in Article IV.A.5(b) of the Plan, which purchase shall reduce the original aggregate principal amount of the CPLV Mezzanine Debt issued to the Holders of Secured First Lien Notes Claims on a dollar-for-dollar basis.

84.      "<u>Equity Rights</u>" means the right of Holders of Non-First Lien Claims that are Institutional Accredited Investors or Qualified Institutional Buyers to elect to purchase pursuant to the Equity Rights Procedures: (a) PropCo Common Equity from (i) the Holders of Secured First Lien Notes Claims pursuant to the Plan or (ii) CEC and the PropCo Common Equity Commitment Parties in the event any Holders of Secured First Lien Notes exercise the PropCo Common Equity Cash Election; and (b) CPLV Mezzanine Debt from the Holders of Secured First Lien Notes Claims pursuant to the Plan (which CPLV Mezzanine Debt shall be equitized as PropCo Common Equity as set forth in Article IV.A.5(b) hereof); <u>provided</u> that the Equity Rights are conditioned on Class F voting to accept the Plan; <u>provided</u>, <u>further</u>, that the Equity Rights may be exercised only by those Holders of Non-First Lien Claims and that, within 60 days of the Petition Date, executed the Restructuring Support Agreement and irremovably elected to exercise such Equity Rights; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, such rights shall be subject to (x) reduction on a Pro Rata basis based on the amount of Equity Rights actually exercised and (y) under the Partnership Contribution Structure, the condition that at least 5.0% of PropCo Common Equity shall be retained by OpCo in all instances.

85.      "<u>Equity Rights Procedures</u>" mean those certain procedures governing the exercise of the Equity Rights that shall be approved by the Disclosure Statement Order.

86.      "<u>Escrow Issuers</u>" means Caesars Operating Escrow LLC, a Delaware limited liability company formerly known as Harrah's Operating Escrow LLC, and Caesars Escrow Corporation, a Delaware corporation formerly known as Harrah's Escrow Corporation.

87.      "<u>Estate</u>" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to section 541 of the Bankruptcy Code.

88.      "<u>Estimated REIT E&P</u>" means the Debtors' reasonable estimate of the earnings and profits of the REIT, which will be calculated and delivered to the Consenting First Lien Noteholders in accordance with the Restructuring Support Agreement.

89.      "<u>Exculpated Party</u>" mean each of the Released Parties.

90.      "<u>Exculpation</u>" means the exculpation set forth in Article VIII.D of the Plan.

91.      "<u>Executory Contract</u>" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

92.      "<u>Federal Judgment Rate</u>" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code.

KE 33843292

93.     "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Cases or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

94.     "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has not been reversed, stayed, modified, or amended, as to which the time to appeal, petition for certiorari or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration, or rehearing has been timely filed, or as to which any appeal, petition for certiorari or motion for reargument, reconsideration, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration, or rehearing was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

95.     "First Lien Notes" means, collectively, the:  (a) 11.25% Senior Secured Notes due 2017, issued in the aggregate principal amount of $2,095,000,000 pursuant to the 11.25% First Lien Notes Indenture; (b) 8.50% Senior Secured Notes due 2020, issued in the original principal amount of $1,250,000,000 pursuant to the 8.50% First Lien Notes Indenture; and (c) 9.00% Senior Secured Notes due 2020, issued in the aggregate principal amount of $3,000,000,000 pursuant to the 9.00% First Lien Notes Indentures.

96.     "First Lien Notes Indentures" means, collectively, the:  (a) 11.25% First Lien Notes Indenture; (b) 8.50% First Lien Notes Indenture; and (c) 9.00% First Lien Notes Indentures.

97.     "First Lien Notes Indenture Trustee(s)" means UMB Bank, National Association, solely in its capacity as indenture trustee under the First Lien Notes Indentures, and any successors in such capacity.

98.     "First Lien Notes Deficiency Claims" means any unsecured Claim arising under the First Lien Notes Indentures.

99.     "Gaming Approvals" means all state and local authorizations, consents, and regulatory approvals required to consummate the transactions contemplated by the Plan and maintain the Debtors' casino gaming licenses for their casino properties in the ordinary course.

100.    "General Unsecured Claims" means any Claim that is not Secured and is not:  (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim); (b) a Non-Obligor Unsecured Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Intercompany Claim; or (f) a Section 510(b) Claim.  For the avoidance of doubt, General Unsecured Claims include all:  (x) First Lien Notes Deficiency Claims; (y) Second Lien Note Claims; and (z) Senior Unsecured Note Claims.

101.    "Goldman Sachs Swap Claim" means any Claim arising from or related to that certain interest rate swap agreement pursuant to that certain ISDA Master Agreement, dated as of January 28, 2008, by and between Goldman Sachs Capital Markets, L.P. and Harrah's Operating Company, Inc., as supplemented by that certain Confirmation, dated as of September 29, 2010, by and between Goldman Sachs Bank USA and Harrah's Operating Company, Inc., as supplemented by that certain Confirmation, dated as of October 4, 2010, by and between Goldman Sachs Bank USA and Harrah's Operating Company, Inc., as supplemented by that certain Third Revised Confirmation, dated as of January 18, 2012, by and between Goldman Sachs Bank USA and CEOC, as supplemented by that certain Fourth Revised Confirmation, dated as of January 18, 2012, by and between Goldman Sachs Bank USA and CEOC, and may be further amended, modified, revised, or supplemented from time to time.

102.    "Governmental Unit" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

103.    "Guaranty and Pledge Agreement" means that certain Guaranty and Pledge Agreement, dated as of July 25, 2014, made by CEC in favor of the Prepetition Credit Agreement Agent.

104.    "Holder" means any Entity holding a Claim or an Interest.

KE 33843292

105.    "Impaired" means, with respect to a Claim, a Class of Claims, or a Class of Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

106.    "Indemnification Provisions" means each of the Debtors' indemnification or contribution provisions in place before or as of the Effective Date whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, or employment contracts for the Debtors' current and former directors, members, trustees, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors, members, trustees, officers, and managers' respective Affiliates.

107.    "Initial Distribution Date" means the date on which the Disbursing Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

108.    "Institutional Accredited Investor" means an institution that is an "accredited investor" pursuant to Rule 501(a)(1), (2), (3) or (7) under the Securities Act that is not also a Qualified Institutional Buyer.

109.    "Intercompany Claim" means any Claim held by a Debtor against any Debtor, including, for the avoidance of doubt, all prepetition and postpetition Claims.

110.    "Intercompany Interests" means any Interest held by a Debtor in a Debtor.

111.    "Interests" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in the Debtors (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

112.    "Interim Compensation Order" means the **[Order Approving Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals]**, entered by the Bankruptcy Court on **[TO COME]** [Docket No. **[__]**], as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

113.    "Internal Revenue Code" means title 26 of the United States Code, 26 U.S.C. §§ 1–9834, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

114.    "IRS" means the Internal Revenue Service.

115.    "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

116.    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

117.    "Local Bankruptcy Rules" means the local rules for the United States Bankruptcy Court for the Northern District of Illinois, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

118.    "Management and Lease Support Agreement" means that certain Management and Lease Support Agreement, by and among CEC, OpCo, PropCo, and Manager to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth at Annex II to Exhibit B to the Restructuring Support Agreement.

119.    "Management Equity Incentive Plan" means the management equity incentive plan to be adopted by the New Board(s) on the Effective Date, the form of which shall be included in the Plan Supplement.  The

amount of New Interests to be set aside for the Management Equity Incentive Plan shall be determined by the Debtors prior to the Confirmation Hearing.

120. "Manager" means a wholly-owned subsidiary of CEC that will provide management services pursuant to the Management and Lease Support Agreement with respect to the assets subject to the Master Lease Agreement.

121. "Master Lease Agreement" means those certain **[Master]** Leases, by and among OpCo and/or its subsidiaries and PropCo and/or its subsidiaries, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

122. "New Boards" means, collectively, the boards of directors of OpCo and PropCo and any other Reorganized Debtor, if applicable, on and after the Effective Date to be appointed in accordance with the Plan, the board members of which shall be identified in the Plan Supplement.

123. "New Corporate Governance Documents" means such certificates or articles of incorporation, bylaws, or such other applicable formation documents of some or all of the Reorganized Debtors, which form shall be included in the Plan Supplement.

124. "New Debt" means, collectively, the: (a) CPLV Market Debt; (b) CPLV Mezzanine Debt, if any; (c) OpCo First Lien Market Debt, if any; (d) OpCo First Lien Term Loan, if any; (e) OpCo First Lien Notes, if any; (f) OpCo Second Lien Notes; (g) PropCo First Lien Term Loan; (h) PropCo First Lien Notes; and (i) PropCo Second Lien Notes.

125. "New Debt Documents" means, collectively, the: (a) CPLV Loan Documents; (b) CPLV Mezzanine Loan Documents, if necessary; (c) OpCo First Lien Loan Documents, if any; (d) OpCo First Lien Credit Agreement Documents, if any; (e) OpCo First Lien Notes Documents, if any; (f) OpCo Second Lien Notes Documents; (g) PropCo First Lien Credit Agreement Documents; (h) PropCo First Lien Notes Documents; and (i) PropCo Second Lien Notes Documents.

126. "New Interests" means, collectively, the: (a) OpCo Common Stock; (b) PropCo LP Interests; (c) PropCo Preferred Equity; (d) REIT Common Stock; and (e) REIT Preferred Stock.

127. "New Property Entities" mean, collectively: (a) the REIT; (b) PropCo GP; (c) PropCo; (d) CPLV Sub; (e) CPLV Mezz, if necessary; and (f) the TRS(s).

128. "New Property Entity Organizational Documents" mean, collectively, the: (a) PropCo Organizational Documents; (b) REIT Organizational Documents; (c) CPLV Sub Organizational Documents; (d) CPLV Mezz Organizational Documents, if necessary; (e) PropCo GP Organizational Documents; and (f) TRS Organizational Documents.

129. "Non-Debtor Subsidiaries" means all direct and indirect subsidiaries of any Debtor that are not Debtors in the Chapter 11 Cases.

130. "Non-First Lien Claims" means, collectively, the: (a) Second Lien Notes Claims; (b) Subsidiary Guaranteed Notes Claims; (c) Senior Unsecured Notes Claims; and (d) General Unsecured Claims.

131. "Non-Obligor Debtors" means, collectively: (a) 3535 LV Parent, LLC; (b) Bally's Las Vegas Manager, LLC; (c) BPP Providence Acquisition Company, LLC; (d) Caesars Air, LLC; (e) Caesars Baltimore Acquisition Company, LLC; (f) Caesars Baltimore Development Company, LLC; (g) Caesars Baltimore Management Company, LLC; (h) Caesars Entertainment Windsor Limited (f/k/a Caesars Entertainment Windsor Holding, Inc.); (i) Caesars Escrow Corporation (f/k/a Harrah's Escrow Corporation); (j) Caesars Massachusetts Acquisition Company, LLC; (k) Caesars Massachusetts Development Company, LLC; (l) Caesars Massachusetts Investment Company, LLC; (m) Caesars Massachusetts Management Company, LLC; (n) Caesars Operating

Escrow LLC (f/k/a Harrah's Operating Escrow LLC); (o) CG Services, LLC; (p) Christian County Land Acquisition Company, LLC; (q) Cromwell Manager, LLC; (r) Corner Investment Company Newco, LLC; (s) CZL Management Company, LLC; (t) Des Plaines Development Limited Partnership; (u) Flamingo-Laughlin Parent, LLC; (v) FHR Parent, LLC; (w) HIE Holdings Topco, Inc.; (x) JCC Holding Company II Newco, LLC; (y) Laundry Parent, LLC; (z) LVH Parent, LLC; (aa) Octavius Linq Holding Co., LLC; (bb) Parball Parent, LLC; (cc) PH Employees Parent LLC; (dd) PHW Investments, LLC; and (ee) The Quad Manager, LLC.

132.    "Non-Obligor Unsecured Claim" means any Claims against a Non-Obligor Debtor other than: (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim); (b) an Other Secured Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Intercompany Claim; or (f) a Section 510(b) Claim.

133.    "Non-Released Parties" means those parties identified on the Non-Released Parties Schedule from time to time.

134.    "Non-Released Parties Schedule" means that certain schedule of Non-Released Parties, which shall be included in the Plan Supplement.

135.    "Notice and Claims Agent" means Prime Clerk LLC, in its capacity as notice, claims, and solicitation agent for the Debtors.

136.    "OpCo" means Reorganized CEOC, a corporation organized under the laws of Delaware, which on and after the Effective Date will hold, directly or indirectly, all of the Debtors' assets other than the assets to be owned by PropCo.

137.    "OpCo Common Stock" means the common equity interests in OpCo, to be issued on the Effective Date pursuant to the terms of the Plan and the OpCo Organizational Documents.

138.    "OpCo Common Stock Cash Election" means the right but not the obligation of each Holder of Secured First Lien Notes Claims to elect to receive Cash from the Debtors or the Reorganized Debtors, as applicable, pursuant to the Cash Election Procedures, in lieu of some or all of the OpCo Common Stock it would otherwise receive pursuant to the Plan on account of such Secured First Lien Notes Claims.

139.    "OpCo First Lien Credit Agreement" means the credit agreement by and among OpCo, as borrower, certain of its subsidiaries, as guarantors, the lenders from time to time party thereto, and the OpCo Credit Agreement Agent, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

140.    "OpCo First Lien Credit Agreement Agent" means the administrative and collateral agent to be appointed for the OpCo Term Loan.

141.    "OpCo First Lien Credit Agreement Documents" means, collectively, the OpCo Credit Agreement and all other agreements, documents, and instruments evidencing or securing the OpCo First Lien Term Loan to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

142.    "OpCo First Lien Financing Option" means the successful syndication of the OpCo Market Debt to the OpCo First Lien Loan Lenders, which OpCo First Lien Market Debt would be marketed at an interest rate less than or equal to the rates applicable to the OpCo First Lien Term Loan and OpCo First Lien Notes, and which would replace the OpCo First Lien Term Loan and the OpCo First Lien Notes in their entirety, all as more fully set forth in Article IV.A.3 hereof.

143.    "OpCo First Lien Loan Agreement" means, to the extent the Debtors successfully exercise the OpCo First Lien Financing Option, the loan agreement by and among OpCo and the OpCo First Lien Loan Lenders,

to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

144. "OpCo First Lien Loan Documents" means, collectively and to the extent the Debtors successfully exercise the OpCo First Lien Financing Option, the OpCo First Lien Loan Agreement and all other agreements, documents, and instruments evidencing or securing the OpCo First Lien Market Debt to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

145. "OpCo First Lien Loan Lenders" means, to the extent the Debtors successfully exercise the OpCo First Lien Financing Option, one or more third party lenders or trustees providing for the OpCo First Lien Market Debt.

146. "OpCo First Lien Market Debt" means the $1,188,000,000 first lien loan to be made on the Effective Date by the OpCo First Lien Loan Lenders to OpCo, and which would replace the OpCo First Lien Term Loan and the OpCo First Lien Notes in their entirety.

147. "OpCo First Lien Notes" means the $306,000,000 of first lien notes to be issued under the OpCo First Lien Notes Indenture.

148. "OpCo First Lien Notes Documents" means, collectively, the OpCo First Lien Notes Indenture and all other agreements, documents, and instruments evidencing or securing the OpCo First Lien Notes to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

149. "OpCo First Lien Notes Indenture" means the indenture to be entered into by and among OpCo, as issuer, certain of its subsidiaries, as guarantors, and the OpCo First Lien Notes Indenture Trustee, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

150. "OpCo First Lien Notes Indenture Trustee" means the indenture trustee to be appointed for the OpCo First Lien Notes Indenture.

151. "OpCo First Lien Term Loan" means the $883,000,000 of first lien debt to be issued pursuant to the Plan and outstanding under the OpCo First Lien Credit Agreement, as may be increased by up to $100,000,000 pursuant to the CPLV Mezzanine Debt Conversion.

152. "OpCo Organizational Documents" means the form of amended or restated articles of incorporation, bylaws, charter, and other similar organizational and constituent documents for OpCo, which shall be included in the Plan Supplement.

153. "Other Priority Claim" means any Claim against any of the Debtors described in section 507(a) of the Bankruptcy Code to the extent such Claim has not already been paid during the Chapter 11 Cases, other than: (a) an Administrative Claim; (b) a Professional Fee Claim; or (c) a Priority Tax Claim.

154. "OpCo Second Lien Notes" means the $547,000,000 of second lien notes to be issued under the OpCo Second Lien Notes Indenture, as may be increased by up to $100,000,000 pursuant to the CPLV Mezzanine Debt Conversion.

155. "OpCo Second Lien Notes Documents" means, collectively, the OpCo Second Lien Notes Indenture and all other agreements, documents, and instruments evidencing or securing the OpCo Second Lien Notes to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

KE 33843292

156.   "OpCo Second Lien Notes Indenture" means the indenture by and among OpCo, as borrower, certain of its subsidiaries, as guarantors, and the OpCo Second Lien Notes Indenture Trustee, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

157.   "OpCo Second Lien Notes Indenture Trustee" means the indenture trustee for the OpCo Second Lien Notes Indenture.

158.   "Other Secured Claim" means a Secured Claim that is not:  (a) a Prepetition Credit Agreement Claim; (b) a Secured First Lien Notes Claim; or (c) a Secured Tax Claim.  For the avoidance of doubt, all Second Lien Notes Claims are General Unsecured Claims and are not Other Secured Claims.

159.   "Ownership Limit Waiver Agreement" means an agreement between the Board of the REIT and a holder of REIT Stock waiving certain equity ownership limits in the REIT charter.

160.   "Partnership Contribution Structure" means the contribution of real property assets to PropCo in a transaction intended to qualify under section 721 of the Internal Revenue Code.

161.   "Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

162.   "Petition Date" means January 15, 2015.

163.   "Plan" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms of Article X hereof, including all exhibits hereto and the Plan Supplement, which is incorporated herein by reference and made part of this Plan as if set forth herein.

164.   "Plan Supplement" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, which the Debtors shall use commercially reasonable efforts to cause to be Filed fourteen (14) days prior to the Confirmation Objection Deadline, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, as may be amended, supplemented, or modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, and which includes the:  (a) form of the New Corporate Governance Documents; (b) form of the OpCo Organizational Documents; (c) form of the PropCo Organizational Documents; (d) form of the REIT Organizational Documents; (e) form of PropCo GP Organizational Documents; (f) form of CPLV Sub Organizational Documents; (g) form of CPLV Mezz Organizational Documents;  (h) TRS Organizational Documents; (i) Backstop Commitment Agreement; (j) Certificate of Designation; (k) form of OpCo First Lien Loan Agreement, if any; (l) form of the OpCo First Lien Credit Agreement, if any; (m) form of the OpCo First Lien Notes Indenture, if any; (n) form of the OpCo Second Lien Notes Indenture; (o) form of the PropCo First Lien Credit Agreement; (p) form of the PropCo First Lien Notes Indenture; (q) form of the PropCo Second Lien Notes Indenture; (r) form of the CPLV Loan Agreement; (s) form of the CPLV Mezzanine Loan Agreement, if any; (t) form of the Management and Lease Support Agreement; (u) form of the Master Lease Agreement; (v) form of Right of First Refusal Agreement; (w) form of PropCo Call Right Agreement; (x) Rejected Executory Contract and Unexpired Lease Schedule; (y) Assumed Executory Contracts and Unexpired Lease Schedule; (z) schedule of retained Causes of Action; (aa) Non-Released Parties Schedule; (bb) identity of members of the OpCo New Board and the PropCo New Board; (cc) identity of observer of OpCo New Board; (dd) Restructuring Transactions Memorandum; (ee) schedule of PropCo assets; and (ff) Management Equity Incentive Plan.

165.   "Prepetition CEC Guarantees" means any guarantee, whether currently in existence or not, that CEC may have entered into in respect of any indebtedness of the Debtors, for the avoidance of doubt including any guarantees (whether in existence or not) in respect of the Prepetition Credit Agreement, the First Lien Notes, the Second Lien Notes, the Senior Unsecured Notes and the Subsidiary Guaranteed Notes.

166.   "Prepetition Credit Agreement" means that certain Third Amended and Restated Credit Agreement, dated as of July 25, 2014, by and between CEC, CEOC, the lenders party thereto, the Prepetition Credit

14

Agreement Agent, as amended, amended and restated, supplemented, or otherwise modified from time to time, and including all security, collateral, and guaranty and pledge agreements related thereto.

167.   "Prepetition Credit Agreement Agent" means Credit Suisse AG, Cayman Islands Branch, in its capacity as successor agent under the Credit Agreement.

168.   "Prepetition Credit Agreement Claim" means any Claim against CEOC arising under or related to the Credit Agreement or otherwise secured pursuant to the Prepetition Credit Agreement Documents, including Swap and Hedge Claims.

169.   "Prepetition Credit Agreement Documents" means, collectively, the Prepetition Credit Agreement and all other agreements, documents, and instruments related thereto (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

170.   "Prepetition Credit Agreement CPLV Option Procedures" means the procedures controlling the option of the Holders of Prepetition Credit Agreement Claims, voting as a Class, to cause the CPLV Mezzanine Debt Conversion, which procedures shall be approved by the Disclosure Statement Order.

171.   "Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

172.   "Pro Rata" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that Allowed Claims in a particular Class bear to the aggregate amount of Allowed Claims in such Class and other Classes (or sub-Classes, as the case may be) entitled to share in the same recovery as such Allowed Claim under the Plan.

173.   "Professional" means an Entity retained in the Chapter 11 Cases pursuant to and in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

174.   "Professional Fee Claims" means all Claims for accrued fees and expenses (including transaction or sale fees) for services rendered by a Professional through and including the Confirmation Date regardless of whether a monthly fee statement or interim fee application has been Filed for such fees and expenses.  To the extent the Bankruptcy Court or any higher court of competent jurisdiction denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

175.   "Professional Fee Escrow" means an interest bearing escrow account to be funded by the Debtors on the Effective Date with Cash from Cash on hand in an amount equal to all unpaid Professional Fee Claims; provided that the Professional Fee Escrow shall be increased from Cash on hand at OpCo to the extent fee applications are filed after the Confirmation Date in excess to the amount of Cash funded into the escrow as of the Effective Date.

176.   "Proof of Claim" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

177.   "Proof of Interest" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

178.   "PropCo" means the newly formed limited partnership organized under the laws of Delaware, which on and after the Effective Date will hold, directly or indirectly, certain assets of the Debtors, a schedule of which assets shall be included in the Plan Supplement.

179.    "<u>PropCo Call Right Agreement</u>" means that certain Call Right Agreement, by and among CEC, CERP, and PropCo to be effective on the Effective Date, the form of which shall be included in the Plan Supplement.

180.    "<u>PropCo Common Equity</u>" means PropCo LP Interests and REIT Common Stock.

181.    "<u>PropCo Common Equity Cash Election</u>" means the right but not the obligation of each Holder of a Secured First Lien Notes Claim to elect to receive Cash from the Debtors pursuant to the Cash Election Procedures, in lieu of the PropCo Common Equity it would otherwise receive pursuant to the Plan on account of such Secured First Lien Notes Claim; <u>provided</u> that if the Spin Structure is utilized, PropCo Common Equity may be issued directly to Holders of Secured First Lien Note Claims and CEC and the PropCo Common Equity Commitment Parties may purchase for Cash such PropCo Common Equity from the Holders of Secured First Lien Notes Claims; <u>provided</u>, <u>further</u>, that, for the avoidance of doubt, such Holders may elect to receive Cash in lieu of no more than 14.8% of such PropCo Common Equity in the aggregate (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or the CPLV Mezzanine Debt Conversion, if any).

182.    "<u>PropCo Common Equity Commitment Parties</u>" means those Holders of Secured First Lien Notes Claims that exercise their right to become purchase commitment parties pursuant to the PropCo Common Equity Backstop Agreement pursuant to the PropCo Purchase Commitment Election Form, which election must be made on or before the Voting Deadline.

183.    "<u>PropCo Common Equity Commitment Procedures</u>" mean those certain procedures governing the election of Holders of Secured First Lien Notes Claims to become purchase commitment parties pursuant to the PropCo Common Equity Backstop Agreement by exercising such rights through the PropCo Purchase Commitment Election Form, which procedures shall be approved by the Disclosure Statement Order.

184.    "<u>PropCo Common Equity Purchase Commitment Agreement</u>" means that certain agreement by and between CEOC, CEC, and the PropCo Common Equity Commitment Parties party thereto from time to time, governing the commitment by CEC and the PropCo Common Equity Commitment Parties to purchase the PropCo Common Equity subject to the exercise by the Holders of General Unsecured Claims of the Equity Rights, which agreement shall be approved by the Disclosure Statement Order.

185.    "<u>PropCo First Lien Credit Agreement</u>" means the credit agreement to be entered into by and among PropCo, as borrower, certain of its subsidiaries (but not, for the avoidance of doubt, CPLV Sub or CPLV Mezz), as guarantors, the lenders from time to time party thereto, and the PropCo First Lien Credit Agreement Agent, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

186.    "<u>PropCo First Lien Credit Agreement Agent</u>" means the administrative and collateral agent to be appointed for the PropCo Term Loan.

187.    "<u>PropCo First Lien Credit Agreement Documents</u>" means, collectively, the PropCo First Lien Credit Agreement and all other agreements, documents, and instruments evidencing or securing the PropCo First Lien Term Loan to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

188.    "<u>PropCo First Lien Term Loan</u>" means the $1,961,000,000 of first lien debt to be issued pursuant to the Plan and outstanding under the PropCo First Lien Credit Agreement, as may be increased by $100,000,000 pursuant to the CPLV Mezzanine Debt Conversion.

189.    "<u>PropCo First Lien Notes</u>" means the $431,000,000 of first lien notes to be issued under the PropCo First Lien Notes Indenture.

190.    "<u>PropCo First Lien Notes Documents</u>" means, collectively, the PropCo First Lien Notes Indenture and all other agreements, documents, and instruments evidencing or securing the PropCo First Lien Notes to be

KE 33843292

delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

191.   "PropCo First Lien Notes Indenture" means the indenture to be entered into by and among PropCo, as borrower, certain of its subsidiaries (but not, for the avoidance of doubt, CPLV Sub or CPLV Mezz), as guarantors, and the PropCo First Lien Notes Indenture Trustee, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

192.   "PropCo First Lien Notes Indenture Trustee" means the indenture trustee for the PropCo First Lien Notes Indenture.

193.   "PropCo GP" means the newly formed limited liability company organized under the laws of Delaware, which on and after the Effective Date will be the general partner in PropCo and whose sole shareholder on the Effective Date shall be the REIT.

194.   "PropCo GP Interests" mean the ownership interests in PropCo GP.

195.   "PropCo GP Organizational Documents" means the form of limited liability company agreement and other similar organizational and constituent documents for PropCo GP, which shall be included in the Plan Supplement.

196.   "PropCo Limited Partnership Agreement" means the limited partnership agreement for PropCo, the form of which shall be included in the Plan Supplement.

197.   "PropCo LP Interests" mean the limited partnership interests in PropCo, to be issued on the Effective Date pursuant to the terms of the Plan and the PropCo Limited Partnership Agreement to the REIT, OpCo, CEC, certain Holders of Secured First Lien Notes Claims, and/or Holders of Non-First Lien Claims that have purchased such interests pursuant to the Equity Rights.

198.   "PropCo Organizational Documents" means the PropCo Limited Partnership Agreement and other similar organizational and constituent documents for PropCo.

199.   "PropCo Preferred Backstop Investors" shall have the meaning set forth in the Backstop Commitment Agreement.

200.   "PropCo Preferred Equity" means REIT Series A Preferred Stock, REIT Series B Preferred Stock and any preferred Securities in PropCo, to be issued on the Effective Date pursuant to the terms of the Plan, the REIT Organizational Documents, and the PropCo Limited Partnership Agreement, and the material terms of which are set forth in the Restructuring Support Agreement.

201.   "PropCo Preferred Equity Call Right" means the right of the PropCo Preferred Backstop Investors to purchase up to 50% of the PropCo Preferred Equity distributed to Holders of Secured First Lien Notes Claims.

202.   "PropCo Preferred Equity Put Right"   means the non-transferrable option of the Holders of Secured First Lien Notes Claims to put such Holder's Pro Rata share of  any PropCo Preferred Equity remaining after the exercise of the  PropCo Preferred Equity Call Right to the PropCo Preferred Backstop Investors.

203.   "PropCo Purchase Commitment Election Form" means the form approved by the Disclosure Statement Order permitting Holders of Secured First Lien Notes Claims that are Institutional Accredited Investors or Qualified Institutional Buyers to elect to become backstop parties under the PropCo Common Equity Purchase Commitment Agreement as set forth in the PropCo Common Equity Purchase Commitment Procedures.

204.   "PropCo Second Lien Notes" means the $1,425,000,000 of second lien notes issued under the PropCo Second Lien Notes Indenture, as may be increased by up to $100,000,000 pursuant to the CPLV Mezzanine Debt Conversion.

205.   "PropCo Second Lien Notes Documents" means, collectively, the PropCo Second Lien Notes Indenture and all other agreements, documents, and instruments evidencing or securing the PropCo Second Lien Notes to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents).

206.   "PropCo Second Lien Notes Indenture" means the indenture by and among PropCo, as borrower, certain of its subsidiaries (but not, for the avoidance of doubt, CPLV Sub or CPLV Mezz), as guarantors, and the PropCo Second Lien Notes Indenture Trustee, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement and the material terms of which are set forth in the Restructuring Support Agreement.

207.   "PropCo Second Lien Notes Indenture Trustee" means the indenture trustee for the PropCo Second Lien Notes Indenture.

208.   "PropCo Tax Letter" means either an opinion letter from the Debtors' legal counsel to CEOC, or a private letter ruling received by CEOC from the IRS, concluding, based on facts, customary representations, and assumptions set forth or described in such opinion and/or private letter ruling, that the transfer of assets to PropCo and to the REIT, and the transfer of consideration to CEOC's creditors should not result in a material amount of U.S. federal income tax to CEOC, determined as if CEOC and its subsidiaries were a stand-alone consolidated group.

209.   "Qualified Institutional Buyer" shall have the meaning set forth in Rule 144A of the Securities Act.

210.   "Quarterly Distribution Date" means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30, and December 31 of each calendar year) occurring after the Effective Date.

211.   "Reinstated" means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim or Interest entitles the Holder of such Claim or Interest so as to leave such Claim or Interest not Impaired or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of a Claim or Interest to demand or receive accelerated payment of such Claim or Interest after the occurrence of a default:  (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (ii) reinstating the maturity (to the extent such maturity has not otherwise accrued by the passage of time) of such Claim or Interest as such maturity existed before such default; (iii) compensating the Holder of such Claim or Interest for any damages incurred as a result of any reasonable reliance by such Holder on such contractual provision or such applicable law; (iv) if such Claim or Interest arises from a failure to perform a nonmonetary obligation other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensating the Holder of such Claim or Interest (other than the Debtor or an insider) for any actual pecuniary loss incurred by such Holder as a result of such failure; and (v) not otherwise altering the legal, equitable, or contractual rights to which such Claim or Interest entitles the Holder.

212.   "REIT" means the newly formed real estate investment trust, a corporation organized under the laws of Maryland, which on and after the Effective Date will own and control PropCo GP and hold PropCo LP Interests.

213.   "REIT Common Stock" means the common equity interest in the REIT, to be issued on the Effective Date pursuant to the terms of the Plan and the REIT Organizational Documents.

214.   "REIT Opinion Letter" means an opinion letter from the Debtors' legal counsel on which the Holders of Secured First Lien Notes Claims may rely, concluding, based on facts, customary representations, and

assumptions set forth or described in such opinion, that the REIT's method of operation since its formation has enabled as of such date up to and including the end of the date of the opinion, and its proposed method of operation as of such date will enable, the REIT to meet the requirements for qualification and taxation as a real estate investment trust under the Internal Revenue Code.

215.    "REIT Organizational Documents" means the form of articles of incorporation, bylaws, charter, and other similar organizational and constituent documents for the REIT, which shall be included in the Plan Supplement.

216.    "REIT Preferred Stock" means, collectively, the REIT Series A Preferred Stock and the REIT Series B Preferred Stock.

217.    "REIT Series A Preferred Stock" means Series A Preferred Stock of the REIT, with terms set forth in the Certificate of Designation issued to either the PropCo Preferred Backstop Investors or to Holders of Secured First Lien Notes Claims that exercise their PropCo Preferred Equity Option.

218.    "REIT Series B Preferred Stock" means the 125 shares of Series B Preferred Stock of the REIT, which shall have an aggregate value of $125,000, a liquidation preference of $1,000 per share, and an annual dividend of approximately 12.0%, which may be issued by the REIT on the Effective Date pursuant to the terms of the Plan and the REIT Organizational Documents.

219.    "Rejected Executory Contracts and Unexpired Leases Schedule" means the schedule of certain Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to the Plan in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

220.    "Released Party" means, collectively, in each case solely in their capacity as such:  (a) each Debtor; (b) the Consenting First Lien Noteholders; (c) with respect to each of the foregoing identified in subsections (a) and (b) herein, each of such Entities' respective direct and indirect sponsors, shareholders, affiliates, officers, directors, employees, managers, agents, attorneys, investment bankers, professionals, advisors, and representatives, each in their capacities as such; and (d) the CEC Released Parties.

221.    "Releasing Parties" means, collectively:  (a) the Debtors; (b) the CEC Released Parties; (c) the Consenting First Lien Noteholders; and (d) all other Persons or Entities holding Claims against, or Interests in, the Debtors.

222.    "Reorganized Debtors" means each of the Debtors, as reorganized pursuant to and under the Plan or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date, including, as of and after the Effective Date, OpCo.  For the avoidance of doubt, Reorganized Debtors do not include:  (a) PropCo; (b) PropCo GP; (c) CPLV Sub; (d) CPLV Mezz; (e) the TRS(s); or (f) the REIT.

223.    "Requisite Consenting Creditors" shall have the meaning set forth in the Restructuring Support Agreement.

224.    "Restructuring Documents" means the Plan, the Plan Supplement, the Disclosure Statement, the New Corporate Governance Documents, the New Debt Documents, the Restructuring Transactions Memorandum, and any other agreements or documentation effectuating the Plan.

225.    "Restructuring Support Agreement" means that certain Third Amended and Restated Restructuring Support and Forbearance Agreement, dated as of January 14, 2015, as amended, amended and restated, supplemented, or otherwise modified from time to time, by and between, among others, CEOC on behalf of itself and each of the Subsidiary Loan Parties (as defined therein), CEC, and the Consenting Creditors (as defined therein) party thereto from time to time.

226.    "Restructuring Transactions" means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on or before the Effective Date or as soon as reasonably practicable thereafter, that

KE 33843292

may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of appropriate agreements or other documents of merger, sale, consolidation, equity issuance, certificates of incorporation, operating agreements, bylaws, or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law; (b) the execution and delivery of appropriate instruments of sale, equity issuance, transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan; (c) the execution and delivery of the New Debt Documents; and (d) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate to implement the Plan.

227.    "Restructuring Transactions Memorandum" means that certain memorandum describing the Restructuring Transactions, the form of which shall be included in the Plan Supplement.

228.    "Right of First Refusal Agreement" means that certain Right of First Refusal Agreement, by and among CEC and PropCo, to be effective on the Effective Date, the form of which shall be included in the Plan Supplement.

229.    "RSA Forbearance Fee" shall have the meaning set forth in the Restructuring Support Agreement.

230.    "Schedules" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as they may be or may have been amended, modified, or supplemented from time to time.

231.    "Second Lien Notes" means, collectively, the: (a) 12.75% Second-Priority Senior Secured Notes due 2018, issued in the original principal amount of $750,000,000 pursuant to the 12.75% Second Lien Notes Indenture; (b) 10.00% Second-Priority Senior Secured Notes due 2015, issued in the original principal amount of $214,800,000 pursuant to the 10.00% Second Lien Notes Indentures; (c) 10.00% Second-Priority Senior Secured Notes due 2018, issued in the original principal amount of $847,621,000 pursuant to the 10.00% Second Lien Notes Indentures; and (d) 10.00% Second-Priority Senior Secured Notes due 2018, issued in the original principal amount of $3,705,498,000 pursuant to the 10.00% Second Lien Notes Indentures.

232.    "Second Lien Notes Claim" means any Claim against a Debtor arising under or related to the Second Lien Notes.

233.    "Second Lien Notes Committee" means the official committee of second priority noteholders appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on February 5, 2015.

234.    "Second Lien Notes Committee Members" means each of the following, in each case solely in its capacity as a member of the Second Lien Notes Committee: (a) Wilmington Savings Fund Society, FSB, solely in its capacity as 10.00% Second Lien Notes Indenture Trustee; (b) BOKF, N.A., solely in its capacity as 12.75% Second Lien Notes Indenture Trustee; (c) Delaware Trust Company, solely in its capacity as 10.00% Second Lien Notes Indenture Trustee; (d) Tennenbaum Opportunities Partner V, LP; (e) Centerbridge Credit Partners Master LP; (f) Palomino Fund Ltd.; and (g) Oaktree FF Investment Fund LP.

235.    "Second Lien Notes Indentures" means, collectively, the: (a) 10.00% Second Lien Notes Indentures; and (b) 12.75% Second Lien Notes Indenture.

236.    "Section 510(b) Claim" means any Claim subject to subordination under section 510(b) of the Bankruptcy Code; provided that a Section 510(b) Claim shall not include any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising from or related to an Interest.

237.    "Secured" means when referring to a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to

the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan as a Secured Claim.

238.    "Secured First Lien Notes Claim" means all Claims against a Debtor arising under or related to the First Lien Notes that is a Secured Claim.

239.    "Secured First Lien Notes Claim PropCo Equity Recovery" means the Pro Rata share of REIT Common Stock to be issued to Holders of Allowed Secured First Lien Notes Claims except to the extent that any such Holder would end up with more an 9.8% of the REIT Common Stock and does not enter into an Ownership Limit Waiver Agreement, in which case they will receive any such excess amount as PropCo LP Interests.

240.    "Secured Tax Claim" means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

241.    "Securities Act" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

242.    "Security" means a security as defined in section 2(a)(1) of the Securities Act.

243.    "Senior Unsecured Notes" means, collectively, the:  (a) 6.50% Senior Notes due 2016, issued in the original principal amount of $214,800,000 pursuant to the 6.50% Senior Unsecured Notes Indenture; and (b) 5.75% Senior Notes due 2017, issued in the original principal amount of $750,000,000 pursuant to the 5.75% Senior Unsecured Notes Indenture.

244.    "Senior Unsecured Notes Claim" means any Claim against a Debtor arising under or related to the Senior Unsecured Notes.

245.    "Senior Unsecured Notes Indentures" means collectively, the:  (a) 5.75% Senior Unsecured Notes Indenture; and (c) 6.50% Senior Unsecured Notes Indenture.

246.    "Senior Unsecured Notes Indenture Trustee" means Law Debenture Trust Company of New York, solely in its capacity as indenture trustee under the CEOC Senior Unsecured Notes Indentures, and any successors in such capacity.

247.    "Separation Structure" means the separation of the Debtors into OpCo, PropCo, and the REIT in accordance with the Plan.

248.    "Spin Structure" means the contribution of assets to the REIT in a reorganization intended to qualify under section 368(a)(1)(G) of the Internal Revenue Code.

249.    "Spin Opinion" shall have the meaning set forth in Article IV.F hereof.

250.    "Spin Ruling" shall have the meaning set forth in Article IV.F hereof.

251.    "Subsidiary-Guaranteed Notes" means the 10.75% Senior Notes due 2016, issued in the original principal amount of $4,932,417,000 pursuant to the Subsidiary-Guaranteed Notes Indenture.

252.    "Subsidiary-Guaranteed Notes Claim" means any Claim against a Debtor arising under or related to the Subsidiary-Guaranteed Notes.

253.    "Subsidiary-Guaranteed Notes Indenture" means that certain Indenture, dated as of February 1, 2008, by and between CEOC, the Subsidiary Guarantors, and the Subsidiary-Guaranteed Notes

Indenture Trustee, providing for the issuance of 10.75% Senior Notes due 2016 and 10.75%/11.50% Senior Toggle Notes due 2018, as amended, supplemented, or otherwise modified from time to time as amended, amended and restated, supplemented, or otherwise modified from time to time.

254.    "Subsidiary-Guaranteed Notes Indenture Trustee" means Wilmington Trust, NA, solely in its capacity as indenture trustee under the Subsidiary-Guaranteed Notes Indenture, and any successors in such capacity.

255.    "Subsidiary Guarantors" means, collectively: (a) 190 Flamingo, LLC; (b) 3535 LV Corp. (f/k/a Harrah's Imperial Palace); (c) AJP Holdings, LLC; (d) AJP Parent, LLC; (e) B I Gaming Corporation; (f) Bally's Midwest Casino, Inc.; (g) Bally's Park Place, Inc.; (h) Benco, Inc.; (i) Biloxi Hammond, LLC; (j) Biloxi Village Walk Development, LLC; (k) BL Development Corp.; (l) Boardwalk Regency Corporation; (m) Caesars Entertainment Canada Holding, Inc.; (n) Caesars Entertainment Finance Corp.; (o) Caesars Entertainment Golf, Inc.; (p) Caesars Entertainment Retail, Inc.; (q) Caesars India Sponsor Company, LLC; (r) Caesars License Company, LLC (f/k/a Harrah's License Company, LLC); (s) Caesars Marketing Services Corporation (f/k/a Harrah's Marketing Services Corporation); (t) Caesars New Jersey, Inc.; (u) Caesars Palace Corporation; (v) Caesars Palace Realty Corporation; (w) Caesars Palace Sports Promotions, Inc.; (x) Caesars Riverboat Casino, LLC; (y) Caesars Trex, Inc.; (z) Caesars United Kingdom, Inc.; (aa) Caesars World Marketing Corporation; (bb) Caesars World Merchandising, Inc. (cc) Caesars World, Inc.; (dd) California Clearing Corporation; (ee) Casino Computer Programming, Inc.; (ff) Chester Facility Holding Company, LLC; (gg) Consolidated Supplies, Services and Systems; (hh) DCH Exchange, LLC; (ii) DCH Lender, LLC; (jj) Desert Palace, Inc.; (kk) Durante Holdings, LLC; (ll) East Beach Development Corporation; (mm) FHR Corporation; (nn) Flamingo-Laughlin, Inc. (f/k/a Flamingo Hilton-Laughlin, Inc.); (oo) GCA Acquisition Subsidiary, Inc.; (pp) GNOC, Corp.; (qq) Grand Casinos of Biloxi, LLC; (rr) Grand Casinos of Mississippi, LLC—Gulfport; (ss) Grand Casinos, Inc.; (tt) Grand Media Buying, Inc.; (uu) Harrah South Shore Corporation; (vv) Harrah's Arizona Corporation; (ww) Harrah's Bossier City Investment Company, L.L.C.; (xx) Harrah's Bossier City Management Company, LLC; (yy) Harrah's Chester Downs Investment Company, LLC; (zz) Harrah's Chester Downs Management Company, LLC; (aaa) Harrah's Illinois Corporation; (bbb) Harrah's Interactive Investment Company; (ccc) Harrah's International Holding Company, Inc.; (ddd) Harrah's Investments, Inc. (f/k/a Harrah's Wheeling Corporation); (eee) Harrah's Management Company; (fff) Harrah's Maryland Heights Operating Company; (hhh) Harrah's MH Project, LLC; (iii) Harrah's NC Casino Company, LLC; (jjj) Harrah's New Orleans Management Company; (kkk) Harrah's North Kansas City LLC (f/k/a Harrah's North Kansas City Corporation); (lll) Harrah's Operating Company Memphis, LLC; (mmm) Harrah's Pittsburgh Management Company; (nnn) Harrah's Reno Holding Company, Inc.; (ooo) Harrah's Shreveport Investment Company, LLC; (ppp) Harrah's Shreveport Management Company, LLC; (qqq) Harrah's Shreveport/Bossier City Holding Company, LLC; (rrr) Harrah's Shreveport/Bossier City Investment Company, LLC; (sss) Harrah's Southwest Michigan Casino Corporation; (ttt) Harrah's Travel, Inc.; (uuu) Harrah's West Warwick Gaming Company, LLC; (vvv) Harveys BR Management Company, Inc.; (www) Harveys C.C. Management Company, Inc.; (xxx) Harveys Iowa Management Company, Inc.; (yyy) Harveys Tahoe Management Company, Inc.; (zzz) H-BAY, LLC; (aaaa) HBR Realty Company, Inc.; (bbbb) HCAL, LLC; (cccc) HCR Services Company, Inc.; (dddd) HEI Holding Company One, Inc.; (eeee) HEI Holding Company Two, Inc.; (ffff) HHLV Management Company, LLC; (gggg) Hole in the Wall, LLC; (hhhh) Horseshoe Entertainment; (iiii) Horseshoe Gaming Holding, LLC; (jjjj) Horseshoe GP, LLC; (kkkk) Horseshoe Hammond, LLC; (llll) Horseshoe Shreveport, L.L.C.; (mmmm) HTM Holding, Inc.; (nnnn) Koval Holdings Company, LLC; (oooo) Koval Investment Company, LLC; (pppp) Las Vegas Golf Management, LLC; (qqqq) Las Vegas Resort Development, Inc.; (rrrr) LVH Corporation; (ssss) Martial Development Corp.; (tttt) Nevada Marketing, LLC; (uuuu) New Gaming Capital Partnership; (vvvv) Ocean Showboat, Inc.; (wwww) Parball Corporation; (xxxx) Players Bluegrass Downs, Inc.; (yyyy) Players Development, Inc.; (zzzz) Players Holding, LLC; (aaaaa) Players International, LLC; (bbbbb) Players LC, LLC; (ccccc) Players Maryland Heights Nevada, LLC; (ddddd) Players Resources, Inc.; (eeeee) Players Riverboat II, LLC; (fffff) Players Riverboat Management, LLC; (ggggg) Players Riverboat, LLC; (hhhhh) Players Services, Inc.; (iiiii) Reno Crossroads LLC; (jjjjj) Reno Projects, Inc.; (kkkkk) Rio Development Company, Inc.; (lllll) Robinson Property Group Corp.; (mmmmm) Roman Empire Development, LLC; (nnnnn) Roman Entertainment Corporation of Indiana; (ooooo) Roman Holding Corporation of Indiana; (ppppp) Showboat Atlantic City Mezz 1, LLC; (qqqqq) Showboat Atlantic City Mezz 2, LLC; (rrrrr) Showboat Atlantic City Mezz 3, LLC; (sssss) Showboat Atlantic City Mezz 4, LLC; (ttttt) Showboat Atlantic City Mezz 5, LLC; (uuuuu) Showboat Atlantic City Mezz 6, LLC; (vvvvv) Showboat Atlantic City Mezz 7, LLC; (wwwww) Showboat Atlantic City Mezz 8, LLC; (xxxxx) Showboat Atlantic City Mezz 9, LLC; (yyyyy) Showboat Atlantic City Operating Company, LLC; (zzzzz) Showboat Atlantic City Propco, LLC; (aaaaaa) Showboat Holding,

KE 33843292

Inc.; (bbbbbb) Southern Illinois Riverboat/Casino Cruises, Inc.; (cccccc) Tahoe Garage Propco, LLC; (dddddd) TRB Flamingo, LLC; (eeeeee) Trigger Real Estate Corporation; (ffffff) Tunica Roadhouse Corporation (f/k/a Sheraton Tunica Corporation); (gggggg) Village Walk Construction, LLC; (hhhhhh) Winnick Holdings, LLC; and (iiiiii) Winnick Parent, LLC.

256. "Swap and Hedge Claims" mean, collectively, the Goldman Sachs Swap Claim and any other Claim arising under any swap or hedge agreements that arise under the Prepetition Credit Agreement.

257. "TRS" means one or more entities to be owned by PropCo or the REIT intended to qualify as taxable REIT subsidiaries as defined under the Internal Revenue Code.

258. "TRS Organizational Documents" means the form of articles of incorporation, bylaws, charter, and other similar organizational and constituent documents for the TRS(s), which shall be included in the Plan Supplement.

259. "Unexpired Lease" means an unexpired lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

260. "Unimpaired" means, with respect to a Claim or Interest, or a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

261. "Unsecured Creditors Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code on February 5, 2015, as modified on February 6, 2015.

262. "Unsecured Creditors Committee Members" means each of the following, in each case solely in its capacity as a member of the Unsecured Creditors Committee:  (a) National Retirement Fund; (b) International Game Technology; (c) US Foods, Inc.; (d) Law Debenture Trust Company of New York, solely in its capacity as Senior Unsecured Notes Indenture Trustee; (e) MeehanCombs Global Credit Opportunities Master Fund, LP; (f) Wilmington Trust, N.A., solely in its capacity as Subsidiary-Guaranteed Notes Indenture Trustee; (g) Hilton Worldwide, Inc.; (h) Earl of Sandwich (Atlantic City) LLC; and (i) PepsiCo, Inc.

263. "U.S. Trustee" means the United States Trustee for the Northern District of Illinois.

264. "U.S. Trustee Fees" means fees arising under section 1930(a)(6) of the Judicial Code and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

265. "Voting Deadline" means **[TO COME]**.

266. "Voting Record Date" means the Business Day on which the Bankruptcy Court enters the Disclosure Statement Order.

B.      *Rules of Interpretation.*

For purposes herein:  (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (d) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (e) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only

KE 33843292

and are not intended to be a part of or to affect the interpretation hereof; (g) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (h) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (i) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (j) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (k) any effectuating provisions may be interpreted by the Reorganized Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, and such interpretation shall control; and (l) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.

C.      *Computation of Time.*

        The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.      *Governing Law.*

        Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of Illinois, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided that corporate or limited liability company governance matters shall be governed by the laws of the state of incorporation or formation, of the applicable Entity.  To the extent a rule of law or procedure is supplied by the Bankruptcy Code, the Bankruptcy Rules, and the decisions and standards of the United States Supreme Court, the United States Court of Appeals for the Seventh Circuit, the United States District Court for the Northern District of Illinois, and the Bankruptcy Court, as applicable, shall govern and control.

E.      *Reference to Monetary Figures.*

        All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

## ARTICLE II.
## ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS

        In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Fee Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.      *Administrative Claims.*

        Unless otherwise agreed to by the Holder of an Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as applicable, to the extent an Allowed Administrative Claim has not already been paid in full or otherwise satisfied during the Chapter 11 Cases, each Holder of an Allowed Administrative Claim will receive, in full and final satisfaction of its Allowed Administrative Claim, Cash equal to the amount of the unpaid portion of such Allowed Administrative Claim either:  (1) if such Administrative Claim is Allowed as of the Effective Date, no later than 30 days after the Effective Date or as soon as reasonably practicable thereafter; (2) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order of the Bankruptcy Court Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (3) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors' Estates in the ordinary course of their business after the Petition Date, pursuant to the terms and conditions of the particular

transaction or course of business giving rise to such Allowed Administrative Claim, without any further action by the Holder of such Allowed Administrative Claim.

B.    *Professional Fee Claims.*

    1.    <u>Professional Fee Escrow</u>.

    As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow.  Funds held in the Professional Fee Escrow shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but the Reorganized Debtors shall hold a reversionary interest in funds held in the Professional Fee Escrow after all Professional Fee Claims Allowed by the Bankruptcy Court have been irrevocably paid in full pursuant to one or more Final Orders of the Bankruptcy Court.  The Professional Fee Escrow shall be held in trust for the Professionals and for no other parties until all Professional Fee Claims Allowed by the Bankruptcy Court have been paid in full pursuant to one or more Final Orders of the Bankruptcy Court.  No Liens, claims, or interests shall encumber the Professional Fee Escrow or Cash held in the Professional Fee Escrow in any way.  Professional Fees owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; <u>provided</u> that the Debtors obligations to pay Professional Fee Claims shall not be limited nor be deemed limited to funds held in the Professional Fee Escrow.

    2.    <u>Estimation of Fees and Expenses</u>.

    The applicable Professionals shall provide a good faith estimate of their Professional Fee Claims projected to be outstanding as of the Effective Date and shall deliver such estimate to the Debtors no later than five (5) calendar days before the anticipated Effective Date; <u>provided</u>, <u>however</u>, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow, <u>provided</u> that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow to the extent fee applications are Filed after the Effective Date in excess to the amount held in the Professional Fee Escrow based on such estimates.

    3.    <u>Final Fee Applications and Payment of Allowed Professional Fee Claims</u>.

    All final requests for payment of Professional Fee Claims must be Filed with the Bankruptcy Court and served on the Debtors or the Reorganized Debtors, as applicable, no later than the first Business Day that is sixty (60) days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, and prior Bankruptcy Court orders, the Allowed amounts of such Professional Fee Claims shall be determined by the Bankruptcy Court.  The amount of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by order of the Bankruptcy Court.

    4.    <u>Post-Confirmation Fees and Expenses</u>.

    Except as otherwise specifically provided in the Plan, on and after the Confirmation Date, the Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Debtors.  Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention for services rendered after such date shall terminate, and the Debtors may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

KE 33843292

C.      *Priority Tax Claims.*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Summary of Classification.*

All Claims and Interests, other than Administrative Claims, Professional Fee Claims, and Priority Tax Claims are classified in the Classes set forth in this Article III for all purposes, including voting, Confirmation, and distributions pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of such Claim or Interest qualifies within the description of such other Classes.  A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as set forth below.  The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims shall be treated as set forth in Article III.D hereof.  For all purposes under the Plan, each Class will contain sub-Classes for each of the Debtors, except that:  (1) Class D, Class E, Class F, Class G, Class H, and Class J shall be vacant for each Non-Obligor Debtor; (2) Class I shall be vacant for each Debtor other than CEOC and the Subsidiary Guarantors; (3) Class K shall be vacant for each Debtor other than the Non-Obligor Debtors, (4) Class O shall be vacant for each Debtor other than CEOC; and (5) Class P shall be vacant for each Debtor other than Des Plaines Development Limited Partnership.

| Class | Applicable Entities | Claims and Interests | Status | Voting Rights |
|-------|--------------------|--------------------|--------|--------------|
| Class A | Each Debtor | Secured Tax Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class B | Each Debtor | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class C | Each Debtor | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class D | Each Debtor other than Non-Obligor Debtors | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| Class E | Each Debtor other than Non-Obligor Debtors | Secured First Lien Notes Claims | Impaired | Entitled to Vote |
| Class F | Each Debtor other than Non-Obligor Debtors | First Lien Notes Deficiency Claims | Impaired | Entitled to Vote |

26

| Class | Applicable Entities | Claims and Interests | Status | Voting Rights |
|---|---|---|---|---|
| Class G | Each Debtor other than Non-Obligor Debtors | Second Lien Notes Claims | Impaired | Entitled to Vote |
| Class H | Each Debtor other than Non-Obligor Debtors | Senior Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class I | CEOC and Each Subsidiary Guarantor | Subsidiary Guaranteed Notes Claims | Impaired | Entitled to Vote |
| Class J | Each Debtor other than Non-Obligor Debtors | General Unsecured Claims | Impaired | Entitled to Vote |
| Class K | Each Non-Obligor Debtor | Non-Obligor Unsecured Claims | Impaired | Entitled to Vote |
| Class L | Each Debtor | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class M | Each Debtor | Intercompany Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class N | Each Debtor | Intercompany Interests | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class O | CEOC | CEOC Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class P | Des Plaines Development Limited Partnership | Des Plaines Interests | **[TO COME]** | **[TO COME]** |

B.      *Treatment of Claims and Interests.*

1.      <u>Class A—Secured Tax Claims</u>.

(a)      *Classification*:  Class A consists of all Secured Tax Claims.

(b)      *Treatment*:  Except to the extent that a Holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Secured Tax Claim, each such Holder shall receive, at the option of the Reorganized Debtors:

(i)      payment in full in Cash of such Holder's Allowed Secured Tax Claim as of the Effective Date or as soon as reasonably practicable thereafter; or

(ii)      equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five (5) years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the option of the Reorganized Debtors to prepay the entire amount of such Allowed Secured Tax Claim during such time period.

KE 33843292

(c)      *Voting*: Class A is Unimpaired. Holders of Secured Tax Claims in Class A are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2.      <u>Class B—Other Secured Claims</u>.

(a)      *Classification*: Class B consists of all Other Secured Claims.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such Holder shall receive, at the option of the Reorganized Debtors:

         (i)      payment in full in Cash of such Holder's Allowed Other Secured Claim;

         (ii)      Reinstatement of such Holder's Allowed Other Secured Claim;

         (iii)      the collateral securing such Holder's Allowed Other Secured Claim; or

         (iv)      such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired.

(c)      *Voting*: Class B is Unimpaired. Holders of Other Secured Claims in Class B are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3.      <u>Class C—Other Priority Claims</u>.

(a)      *Classification*: Class C consists of all Other Priority Claims.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Other Priority Claim, each such Holder shall receive, at the option of the Reorganized Debtors:

         (i)      payment in full in Cash on the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; or

         (ii)      such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired.

(c)      *Voting*: Class C is Unimpaired. Holders of Other Priority Claims in Class C are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

4.      <u>Class D—Prepetition Credit Agreement Claims</u>.

(a)      *Classification*: Class D consists of all Prepetition Credit Agreement Claims.

(b)      *Treatment*: Except to the extent that a Holder of an Allowed Prepetition Credit Agreement Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Prepetition Credit Agreement Claim, each such Holder shall receive its Pro Rata share of:

28

(i)  $705,000,000 in Cash;

(ii)  $883,000,000 of (A) additional Cash out of the proceeds, if any, of the OpCo First Lien Financing Option or (B) if the Debtors are not able to exercise the OpCo First Lien Financing Option, the OpCo First Lien Term Loan;

(iii)  $406,000,000 of the OpCo Second Lien Notes;

(iv)  $1,961,000,000 of the PropCo First Lien Term Loan; and

(v)  $1,450,000,000 of (A) the CPLV Mezzanine Loan and (B) additional Cash in the amount of the difference between (I) $1,450,000,000 minus (II) the amount of the CPLV Mezzanine Loan; provided that $100,000,000 of the CPLV Mezzanine Loan, if any, may be converted to $100,000,000 of OpCo First Lien Term Loan, OpCo Second Lien Notes, PropCo First Lien Term Loan, PropCo Second Lien Notes, or PropCo Common Equity if Class D elects (on the Class D Ballot) as a Class to cause the CPLV Mezzanine Loan Conversion to occur pursuant to the Prepetition Credit Agreement CPLV Option Procedures.

(c)  *Allowance*:  **[TO COME]**.

(d)  *Voting*:  Class D is Impaired.  Holders of Prepetition Credit Agreement Claims in Class D are entitled to vote to accept or reject the Plan.

5.  Class E—Secured First Lien Notes Claims.

(a)  *Classification*:  Class E consists of all Secured First Lien Notes Claims.

(b)  *Treatment*:  Except to the extent that a Holder of an Allowed Secured First Lien Notes Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Secured First Lien Notes Claim, each such Holder shall receive their Pro Rata share of:

(i)  $306,000,000 of (A) Cash out of the proceeds, if any, of the OpCo First Lien Financing Option or (B) if the Debtors are not able to exercise the OpCo First Lien Financing Option, the OpCo First Lien Notes;

(ii)  $141,000,000 of the OpCo Second Lien Notes;

(iii)  $431,000,000 of the PropCo First Lien Notes;

(iv)  $1,425,000,000 of the PropCo Second Lien Notes;

(v)  the PropCo Preferred Equity, subject to the PropCo Preferred Put Right and the PropCo Preferred Call Right.;

(vi)  $1,107,000,000 of (A) the CPLV Mezzanine Debt and/or (B) additional Cash in the amount of the difference between (I) $1,150,000,000 minus (II) the amount of the CPLV Mezzanine Debt;

(vii)  69.9% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any), subject to the exercise of any Equity Rights, or Cash in lieu thereof to the extent such Holder elects pursuant to the

29

PropCo Common Equity Cash Election (subject to the limitations set forth in the definition thereof); and

(viii)   100% of OpCo Common Stock or Cash in lieu thereof to the extent such Holder elects pursuant to the OpCo Common Stock Cash Election.

(c)   *Allowance*:  **[TO COME]**.

(d)   *Voting*:  Class E is Impaired.  Holders of Secured First Lien Notes Claims in Class E are entitled to vote to accept or reject the Plan.

6.   Class F—First Lien Notes Deficiency Claims.

(a)   *Classification*:  Class F consists of all First Lien Notes Deficiency Claims.

(b)   *Treatment*:  Except to the extent that a Holder of an Allowed First Lien Notes Deficiency Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Deficiency Claim:

(i)   **if each of Class F, Class G, Class H, Class I, and Class J vote to accept the Plan**, Holders of First Lien Notes Deficiency Claims shall be deemed to waive all distributions in respect of such Claims (whether pursuant to the applicable turnover provisions of intercreditor agreements or otherwise).

(ii)   **if any of Class F, Class G, Class H, Class I, or Class J vote to reject the Plan**, their Pro Rata share (shared ratably with CEC and the PropCo Common Equity Commitment Parties) of 12.6% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any).

(c)   *Allowance*:  **[TO COME]**.

(d)   *Voting*:  Class F is Impaired.  Holders of First Lien Notes Deficiency Claims in Class F are entitled to vote to accept or reject the Plan.

7.   Class G—Second Lien Notes Claims.

(a)   *Classification*:  Class G consists of all Second Lien Notes Claims.

(b)   *Treatment*:  Except to the extent that a Holder of an Allowed Second Lien Notes Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Notes Claim:

(i)   **if each of Class F, Class G, Class H, and Class I, and Class J vote to accept the Plan**,

(a)   their Pro Rata share (shared ratably with Class H, Class I, and Class J) of 30.1% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any); provided that, for the avoidance of doubt, Holders of First Lien Note Deficiency Claims shall be deemed to waive all distributions in respect of such Claims (whether pursuant to the applicable turnover provisions of intercreditor agreements or otherwise); and

30

(b)    their Pro Rata share (shared ratably with Class H, Class I, and Class J) to exercise the Equity Rights, which shall be elected pursuant to the Equity Rights Procedures; <u>provided</u> that Holders of Allowed Second Lien Notes Claims that are not an Institutional Accredited Investor or a Qualified Institutional Buyer as of the Voting Record Date shall receive **[TO COME]**, which shall have the value equal to the value of the Equity Rights such Holder would have been eligible to exercise if such Holder were an Institutional Accredited Investor or a Qualified Institutional Buyer.

(ii)    **if any of Class F, Class G, Class H, Class I, or Class J vote to reject the Plan**, their Pro Rata share (shared ratably with Class H, Class I, and Class J) of 17.5% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any).

(c)    *Allowance*:  **[TO COME]**.

(d)    *Voting*:  Class G is Impaired.  Holders of Second Lien Notes Claims in Class G are entitled to vote to accept or reject the Plan.

8.    <u>Class H—Senior Unsecured Notes Claims</u>.

(a)    *Classification*:  Class H consists of all Senior Unsecured Notes Claims.

(b)    *Treatment*:  Except to the extent that a Holder of an Allowed Senior Unsecured Notes Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Senior Unsecured Notes Claim:

(i)    **if each of Class F, Class G, Class H, Class I, and Class J vote to accept the Plan**,

(a)    their Pro Rata share (shared ratably with Class G, Class I, and Class J) of 30.1% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any); <u>provided</u> that, for the avoidance of doubt, Holders of First Lien Note Deficiency Claims shall be deemed to waive all distributions in respect of such Claims (whether pursuant to the applicable turnover provisions of intercreditor agreements or otherwise);and

(b)    their Pro Rata share (shared ratably with Class G, Class I, and Class J) to exercise the Equity Rights, which shall be elected pursuant to the Equity Rights Procedures; <u>provided</u> that Holders of Allowed Senior Unsecured Notes Claims that are not an Institutional Accredited Investor or a Qualified Institutional Buyer as of the Voting Record Date shall receive **[TO COME]**, which shall have the value equal to the value of the Equity Rights such Holder would have been eligible to exercise if such Holder were an Institutional Accredited Investor or a Qualified Institutional Buyer.

(ii)    **if any of Class F, Class G, Class H, Class I, or Class J vote to reject the Plan**, their Pro Rata share (shared ratably with Class G, Class I, and Class J) of

31

17.5% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any).

(c)     *Allowance*:  **[TO COME]**.

(d)     *Voting*:  Class H is Impaired.  Holders of Senior Unsecured Notes Claims in Class H are entitled to vote to accept or reject the Plan.

9.     <u>Class I—Subsidiary Guaranteed Notes Claims</u>.

(a)     *Classification*:  Class I consists of all Subsidiary Guaranteed Notes Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Allowed Subsidiary Guaranteed Notes Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Subsidiary Guaranteed Notes Claim:

(i)     **if each of Class F, Class G, Class H, Class I, and Class J vote to accept the Plan**,

(a)     their Pro Rata share (shared ratably with Class G, Class H, and Class J) of 30.1% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any); <u>provided</u> that, for the avoidance of doubt, Holders of First Lien Note Deficiency Claims shall be deemed to waive all distributions in respect of such Claims (whether pursuant to the applicable turnover provisions of intercreditor agreements or otherwise); and

(b)     their Pro Rata share (shared ratably with Class G, Class H, and Class J) to exercise the Equity Rights, which shall be elected pursuant to the Equity Rights Procedures; <u>provided</u> that Holders of Allowed Subsidiary Guaranteed Notes Claims that are not an Institutional Accredited Investor or a Qualified Institutional Buyer as of the Voting Record Date shall receive **[TO COME]**, which shall have the value equal to the value of the Equity Rights such Holder would have been eligible to exercise if such Holder were an Institutional Accredited Investor or a Qualified Institutional Buyer.

(ii)     **if any of Class F, Class G, Class H, Class I, or Class J vote to reject the Plan**, their Pro Rata share (shared ratably with Class G, Class H, and Class J) of 17.5% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any).

(c)     *Allowance*:  **[TO COME]**.

(d)     *Voting*:  Class I is Impaired.  Holders of Subsidiary Guaranteed Notes Claims in Class I are entitled to vote to accept or reject the Plan.

KE 33843292

10. <u>Class J—General Unsecured Claims</u>.

(a) *Classification*:  Class J consists of all General Unsecured Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed General Unsecured Claim, each such Holder shall receive their Pro Rata share of:

(i) **if each of Class F, Class G, Class H, Class I, and Class J vote to accept the Plan**,

(a) their Pro Rata share (shared ratably with Class G, Class H, and Class I) of 30.1% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any); <u>provided</u> that, for the avoidance of doubt, Holders of First Lien Note Deficiency Claims shall be deemed to waive all distributions in respect of such Claims (whether pursuant to the applicable turnover provisions of intercreditor agreements or otherwise); and

(b) their Pro Rata share (shared ratably with Class G, Class H, and Class I) to exercise the Equity Rights, which shall be elected pursuant to the Equity Rights Procedures; <u>provided</u> that Holders of Allowed General Unsecured Claims that are not an Institutional Accredited Investor or a Qualified Institutional Buyer as of the Voting Record Date shall received **[TO COME]**, which shall have the value equal to the value of the Equity Rights such Holder would have been eligible to exercise if such Holder were an Institutional Accredited Investor or a Qualified Institutional Buyer.

(ii) **if any of Class F, Class G, Class H, Class I, or Class J vote to reject the Plan**, their Pro Rata share (shared ratably with Class G, Class H, and Class I) of 17.5% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any).

(c) *Voting*:  Class J is Impaired.  Holders of General Unsecured Claims in Class J are entitled to vote to accept or reject the Plan.

11. <u>Class K—Non-Obligor Unsecured Claims</u>.

(a) *Classification*:  Class K consists of all Non-Obligor Unsecured Claims.

(b) *Treatment*:  Except to the extent that a Holder of an Allowed Non-Obligor Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Non-Obligor Unsecured Claim, each such Holder shall receive their Pro Rata share of:

(i) **[TO COME]**;

(c) *Voting*:  Class K is Impaired.  Holders of Non-Obligor Unsecured Claims in Class K are entitled to vote to accept or reject the Plan.

33

12.    <u>Class L—Section 510(b) Claims</u>.

    (a)    *Classification*:  Class L consists of all Section 510(b) Claims.

    (b)    *Treatment*:    Section 510(b) Claims will be canceled, released, discharged, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Section 510(b) Claims will not receive any distribution on account of such Section 510(b) Claims

    (c)    *Voting*:   Class L is Impaired.  Holders of Section 510(b) Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

13.    <u>Class M—Intercompany Claims</u>.

    (a)    *Classification*:  Class M consists of all Intercompany Claims.

    (b)    *Treatment*:  Intercompany Claims shall be, at the option of the Debtors, either:

        (i)    Reinstated as of the Effective Date; or

        (ii)    cancelled without any distribution on account of such Claims.

    (c)    *Voting*:  Class M is Unimpaired under the Plan.  Holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

14.    <u>Class N—Intercompany Interests</u>.

    (a)    *Classification*:  Class N consists of all Intercompany Interests.

    (b)    *Treatment*:  Intercompany Interests shall be, at the option of the Debtors, either:

        (i)    Reinstated as of the Effective Date; or

        (ii)    cancelled without any distribution on account of such Interests.

    (c)    *Voting*:  Class N is Unimpaired under the Plan.  Holders of Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan.

15.    <u>Class O—CEOC Interests</u>.

    (a)    *Classification*:  Class O consists of all CEOC Interests.

    (b)    *Treatment*:  CEOC Interests will be discharged, canceled, released, and extinguished as of the Effective Date, and shall be of no further force or effect, and Holders of CEOC Interests will not receive any distribution on account of such CEOC Interests; <u>provided</u>, <u>however</u>, that solely for purposes of effectuating the Plan, any CEOC Interests held by CEC may be Reinstated as OpCo Common Stock to the extent that CEC is required to pay Cash to the Debtors pursuant to the CEC OpCo Cash Commitment upon the Holders of Allowed Secured First Lien Notes Claims making the OpCo Common Stock Cash Election.

(c)    *Voting*:  Class O is Impaired.  Holders of CEOC Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders are not entitled to vote to accept or reject the Plan

16.    <u>Class P—Des Plaines Interests</u>.

(a)    *Classification*:  Class P consists of all Des Plaines Interests.

(b)    *Treatment*:  **[TO COME]**.

(c)    *Voting*:  **[TO COME]**.

C.    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.  Unless otherwise Allowed, Unimpaired Claims shall remain Disputed Claims under the Plan.

D.    *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a Holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

E.    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

If a Class for any Debtor contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class with respect to such Debtor.

F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation for the Debtors by acceptance of the Plan by at least one Impaired Class of Claims.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.    *Controversy Concerning Impairment.*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.    *Sources and Uses.*

The Debtors shall fund distributions under the Plan with Available Cash, Cash proceeds from the CEC Contribution and CEC Standby Commitment, Cash proceeds from and the issuance of the New Debt, Cash proceeds

from the Cash Elections, CEC OpCo Cash Commitment, PropCo Common Equity Cash Commitment, the Equity Rights, Cash Proceeds from the Backstop Commitment, and the issuance of the New Interests.

     1.     CEC Cash Contribution.

On the Effective Date, CEC shall pay to the Debtors the CEC Cash Contribution, which shall be used by the Debtors and the Reorganized Debtors, as applicable, to fund general corporate purposes, the Restructuring Transactions, and the distributions under the Plan.  If applicable, on the Effective Date, CEC shall pay to the Debtors the CEC Standby Commitment in Cash to fund the Restructuring Transactions and the distributions under the Plan.

     2.     CPLV Market Debt and Mezzanine Debt.

The Debtors shall use commercially reasonable efforts to finance all of the $2,600,000,000 of the CPLV Market Debt.  On the Effective Date, CPLV Sub shall execute and deliver the CPLV Loan Documents.  On the Effective Date and after execution and delivery of the CPLV Loan Documents, the CPLV Lender shall issue Cash to CPLV Sub, and the Debtors shall pay the Cash proceeds from the CPLV Market Debt to the Holders of Prepetition Credit Agreement Claims and Secured First Lien Notes Claims pursuant to the following terms of the Plan.

In the event the Debtors, after using commercially reasonable efforts, are unable to finance $2,600,000,000 of the CPLV Market Debt, on the Effective Date, CPLV Mezz shall execute and deliver the CPLV Mezzanine Loan Documents, and the Debtors shall distribute the CPLV Mezzanine Debt to the Holders of the Petition Credit Agreement Claims and the Holders of the Secured First Lien Notes Claims pursuant to the following terms:  (a) the first $300,000,000 of CPLV Mezzanine Debt shall be distributed one-third (⅓) to the Holders of Prepetition Credit Agreement Claims and two-thirds (⅔) to the Holders of Secured First Lien Notes Claims, each to be shared Pro Rata among such Holders pursuant to Article III.B hereof; (b) any amounts of CPLV Mezzanine Debt over $300,000,000 shall be distributed equally to the Holders of Prepetition Credit Agreement Claims and Secured First Lien Notes Claims to be shared Pro Rata among such Holders pursuant to Article III.B hereof.

The weighted average yield on the CPLV Market Debt and CPLV Mezzanine Debt will be capped such that the annual debt service shall not exceed $130,000,000, with the cap increased by $2,000,000 for every $100,000,000 of Equitized CPLV Mezzanine Debt.

     3.     OpCo First Lien Financing Option.

If, after using commercially reasonable efforts, the Debtors are able to exercise the OpCo First Lien Financing Option, on the Effective Date, OpCo and its applicable subsidiaries shall execute and deliver the OpCo First Lien Loan Documents.  On the Effective Date and after execution and delivery of the OpCo First Lien Loan Documents, the OpCo First Lien Loan Lenders shall pay Cash to OpCo, and the Debtors shall distribute the Cash proceeds from the OpCo First Lien Market Debt to the Holders of Prepetition Credit Agreement Claims and Secured First Lien Notes Claims pursuant to the terms of the Plan.  If, however, after using commercially reasonable efforts, the Debtors are unable to exercise the OpCo First Lien Financing Option, OpCo and its applicable subsidiaries shall enter into the OpCo First Lien Term Loan and OpCo First Lien Notes as set forth in Article IV.A.4 hereof.

     4.     Issuance of New Debt.

On the Effective Date, and if the Debtors are unable to exercise the OpCo First Lien Financing Option, OpCo and its applicable subsidiaries shall execute and deliver the (a) OpCo First Lien Credit Agreement Documents and (b) OpCo First Lien Notes Indenture Documents, and the Debtors shall distribute the OpCo First Lien Notes and OpCo First Lien Term Loan to, as applicable, the Holders of the Petition Credit Agreement Claims and the Holders of the Secured First Lien Notes Claims pursuant to the terms of the Plan.  In addition, on the Effective Date and regardless of whether the Debtors are able to exercise the OpCo First Lien Financing Option, OpCo and its applicable subsidiaries shall execute and deliver the OpCo Second Lien Notes Indenture Documents, and the Debtors shall distribute the OpCo Second Lien Notes to the Holders of the Petition Credit Agreement Claims and the Holders of the Secured First Lien Notes Claims pursuant to the terms of the Plan.

On the Effective Date, PropCo and its applicable subsidiaries (but not, for the avoidance of doubt, CPLV Sub or CPLV Mezz) shall execute and deliver the (a) PropCo First Lien Credit Agreement Documents, (b) PropCo First Lien Notes Indenture Documents, and (c) PropCo Second Lien Notes Indenture Documents, and the Debtors shall distribute the PropCo First Lien Notes, PropCo First Lien Term Loan, and PropCo Second Lien Notes to, as applicable, the Holders of the Petition Credit Agreement Claims and the Holders of the Secured First Lien Notes Claims pursuant to the terms of the Plan.

Subject to the occurrence of the Effective Date, the New Debt Documents shall constitute legal, valid, and binding obligations of the Reorganized Debtors party thereto and shall be enforceable in accordance with their respective terms.

5.      Cash Elections and Equity Rights.

As further described in Article III hereof and this Article IV.A.5, (a) Holders of Allowed Secured First Lien Notes Claims shall be given the option to elect to receive Cash pursuant to the Cash Elections in lieu of OpCo Common Stock and PropCo Common Equity that would otherwise be issued pursuant to the Plan, and (b) if each of Class F, Class G, Class H, Class I, and Class J vote to accept the Plan, qualified Holders of Non-First Lien Claims that timely executed the Restructuring Support Agreement and irrevocably elected to exercise the Equity Rights shall purchase PropCo Common Equity and CPLV Mezzanine Debt pursuant to the Equity Rights.  The final determination of the amount and type of New Interests purchased from the Reorganized Debtors and/or New Property Entities by CEC and each PropCo Common Equity Commitment Party, and the amount and type of New Interests issued by the Reorganized Debtors and/or the New Property Entities to each applicable Holder shall be made following the making of all elections pursuant to the Cash Elections and Equity Rights.  All such issuances of New Interests shall be made by the Reorganized Debtors and/or the New Property Entities after giving effect to the exercise of all Cash Elections and Equity Rights; provided that, in the event the Plan is implemented through the Spin Structure, (a) the Debtors, the Reorganized Debtors, and/or the New Property Entities, as applicable, shall issue the PropCo Common Equity to Holders Of Allowed Secured First Lien Claims, (b) pursuant to the PropCo Common Equity Cash Election, CEC and the PropCo Common Equity Commitment Parties may purchase PropCo Common Equity from Holders of Allowed Secured First Lien Notes Claims, and (c) any purchases of PropCo Common Equity (and related CPLV Mezzanine Debt) by the Holders of Non-First Lien Claims  pursuant to the Equity Rights may be made directly from CEC, the PropCo Common Equity Commitment Parties, and Holders of Allowed Secured First Lien Notes Claims, as applicable, in accordance with the priorities described in Article IV.A.5(b) hereof (although such purchases and Cash payments may be coordinated by the Reorganized Debtors and/or the New Property Entities on behalf of such parties).

(a)      Cash Elections.

Each Holder of Secured First Lien Notes Claims shall have the option to exercise the OpCo Common Stock Cash Election and the PropCo Common Equity Cash Election, provided, that in the event the Partnership Contribution Structure is used, the Holders of Secured First Lien Notes Claims shall be required to elect to receive Cash in lieu of at least 5% of the PropCo Common Equity, which 5% of PropCo Common Equity shall be issued to OpCo in exchange for the Debtors' contribution of assets to PropCo (after taking into account any conversion of CPLV Mezzanine Debt acquired pursuant to the Equity Rights).

Pursuant to the OpCo Common Stock Cash Election, Holders of Secured First Lien Notes Claims shall be entitled to receive their Pro Rata share of the Cash proceeds paid by CEC to OpCo pursuant to the CEC OpCo Cash Commitment, at a price per share implying a total value of $700 million for 100% of the OpCo Common Stock, and OpCo shall issue to CEC the OpCo Common Stock, provided that the CEOC Interests held by CEC may be Reinstated as OpCo Common Stock to the extent that CEC is required to pay Cash to the Debtors pursuant to the CEC OpCo Cash Commitment upon the Holders of Allowed Secured First Lien Notes Claims making the OpCo Common Stock Cash Election.

Pursuant to the PropCo Common Equity Cash Election, Holders of Secured First Lien Notes Claims shall be entitled to receive their Pro Rata share of the Cash proceeds paid by CEC and the PropCo Common Equity Commitment Parties to the Debtors pursuant to the PropCo Common Equity Commitment Agreement (including the CEC PropCo Common Equity Cash Commitment), and the Debtors or PropCo, as applicable, shall distribute to

CEC and the PropCo Common Equity Commitment Parties the applicable PropCo Common Equity, subject to the exercise of the Equity Rights with respect thereto by Holders of Non-First Lien Claims in accordance with the terms of this Plan.

If the Holders of Secured First Lien Notes Claims fully exercise the Cash Elections, such Holders, on an aggregate basis, will receive an additional $969 million in Cash and a corresponding decrease in their equity recoveries.

(b)     Equity Rights.

Each Holder of a Non-First Lien Claim that has, within 60 days of the Petition Date, executed the Restructuring Support Agreement and irrevocably elected to exercise the Equity Rights, shall exercise the Equity Rights pursuant to the Equity Rights Procedures, provided that any Holder of a Non-First Lien Claim exercising an Equity Right must make any required investor representations required for federal and state securities law purposes, including that such Holder is either an Institutional Accredited Investor or a Qualified Institutional Buyer; provided, further, that the ability to exercise the Equity Rights shall be subject to each of Class F, Class G, Class H, Class I, and Class J accepting the Plan.  For every $1 of PropCo Common Equity purchased pursuant to the Equity Rights, the applicable Holder shall also purchase $0.25 of CPLV Mezzanine Debt to be received by the Holders of Secured First Lien Notes Claims, and such CPLV Mezzanine Debt then be converted into PropCo Common Equity as provided herein at the same price per share as the PropCo Common Equity Cash Election.

To the extent any Holders of Non-First Lien Claims exercise Equity Rights to purchase PropCo Common Equity, such PropCo Common Equity shall be purchased: (i) first, from Holders of Allowed Secured First Lien Notes Claims that elect to exercise the PropCo Common Equity Cash Election and instead receive PropCo Common Equity, or from the PropCo Common equity that such Holders would otherwise receive; (ii) second, by reducing the PropCo Common Equity that otherwise would be purchased by CEC pursuant to the CEC PropCo Common Equity Purchase Commitment (either by a reduction in the CEC PropCo Common Equity PropCo Commitment or, in the case of the Spin Structure, by a purchase of such PropCo Common Equity from CEC); (iii) third, by reducing the amount of PropCo Common Equity that would otherwise be received by Holders of Allowed Secured First Lien Notes Claims that have not elected to exercise the PropCo Common Equity Cash Election, in which case such Holders of Allowed Secured First Lien Notes Claims shall receive Cash in lieu of such PropCo Common Equity (or in the case of the Spin Structure, such parties shall sell such PropCo Common Equity directly to the Holders exercising the Equity Rights), in each case Pro Rata among such Holders of Allowed Secured First Lien Notes Claims; and (iv) fourth, by reducing the amount of PropCo Common Equity purchased by the PropCo Common Equity Commitment Parties pursuant to the PropCo Common Equity Purchase Commitment Agreement or, in the case of the Spin Structure, such PropCo Common Equity shall be purchased from the PropCo Common Equity Commitment Parties, in each case Pro Rata among such parties on the basis of their purchase commitments. For the avoidance of doubt, if the Partnership Contribution Structure is used, OpCo's interest in PropCo Common Equity shall not be reduced below 5% (after taking into account any conversion into PropCo Common Equity of CPLV Mezzanine Debt acquired pursuant to exercise of the the Equity Rights).

6.     Backstop Commitment and PropCo Preferred Equity Put and Call Rights.

On the Effective Date, the PropCo Preferred Backstop Investors shall have the right, pursuant to the PropCo Preferred Equity Call Right and consistent with the Backstop Commitment Agreement, to purchase for Cash from the Holders of Secured First Lien Notes Claims up to 50% of the PropCo Preferred Equity received by such Holders.  Each Holder of Secured First Lien Notes Claims that has exercised its right to put PropCo Preferred Equity by the Voting Deadline shall have the right to put such Holders' Pro Rata share of the remaining PropCo Preferred Equity to the PropCo Preferred Backstop Investors for Cash pursuant to the PropCo Preferred Equity Put Right and consistent with the Backstop Commitment Agreement.

Proceeds of the issue of the PropCo Preferred Equity shall be used first to reduce the principal amount of CPLV Mezzanine Debt to be issued to the Holders of Secured First Lien Notes Claims, second to reduce the principal amount of CPLV Market Debt, and third to reduce the principal amount of PropCo Second Lien Notes.

KE 33843292

7.      Issuance of New Interests.

On the Effective Date, CEOC Interests shall be cancelled, and the Reorganized Debtors and New Property Entities shall issue all Securities, notes, instruments, certificates, and other documents required to be issued pursuant to the Plan, including (a) OpCo shall issue the OpCo Common Stock, (b) PropCo shall issue the PropCo LP Interests and PropCo Preferred Equity, and (c) the REIT shall issue REIT Common Stock and REIT Preferred Stock; provided that the CEOC Interests held by CEC may be Reinstated as OpCo Common Stock to the extent that CEC is required to pay Cash to the Debtors pursuant to the CEC OpCo Cash Commitment upon the Holders of Allowed Secured First Lien Notes Claims making the OpCo Common Stock Cash Election, and to the extent CEC is entitled to PropCo Common Equity as a result of the CEC PropCo Common Equity Cash Commitment, CEC may choose to permit CEOC to retain such PropCo Common Equity and to increase the percentage of OpCo Common Stock held by CEC consistent with the Plan value of both such PropCo Common Equity and OpCo Common Stock.   The issuance of such documents is authorized without the need for any further corporate action or without any further action by the Holders of Claim or Interests.

If any of Class F, Class G, Class H, Class I, or Class J vote to reject the Plan, then on the Effective Date, pursuant to the PropCo Common Equity Purchase Commitment Agreement, CEC and the PropCo Common Equity Commitment Parties will also receive their Pro Rata share (shared ratably with the Holders of Allowed First Lien Notes Deficiency Claims) of 12.6% of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, and/or CPLV Mezzanine Debt Conversion, if any).

As set forth in more detail in Plan Supplement, after taking into account all of the Cash Elections, Equity Rights, and the PropCo Preferred Equity Puts and Calls, all PropCo Common Equity and all PropCo Preferred Equity will be issued as REIT Common Stock and REIT Series A Preferred Stock respectively except to the extent that an ultimate holder of such PropCo Common Equity or PropCo Preferred Equity would (a) end up owning more than 9.8% of either the REIT Common Stock or the REIT Series A Preferred Stock and (b) is not willing to sign an Ownership Limit Waiver Agreement (as defined in the Certificate of Designation), in which case such amounts in excess of 9.8% shall be issued as PropCo LP Interests and PropCo Preferred LP Interests as applicable.

B.      *Master Lease Agreement.*

On the Effective Date, OpCo (and/or its applicable subsidiaries) and PropCo (and/or its applicable subsidiaries) shall enter into the Master Lease Agreement, and the Master Lease Agreement shall become effective in accordance with its terms and the Plan.

C.      *Management and Lease Support Agreement.*

On the Effective Date, OpCo, PropCo, Manager, and CEC shall enter into the Management and Lease Support Agreement, and the Management and Lease Support Agreement shall become effective in accordance with its terms and the Plan.

D.      *Right of First Refusal Agreement.*

On the Effective Date, PropCo and CEC shall enter into the Right of First Refusal Agreement, and the Right of First Refusal Agreement shall become effective in accordance with its terms and the Plan.

E.      *PropCo Call Right Agreement.*

On the Effective Date, PropCo, CEC, and CERP shall enter into the PropCo Call Right Agreement, and the PropCo Call Right Agreement shall become effective in accordance with its terms and the Plan.

F.      *The Separation Structure.*

The Separation Structure will occur through the Spin Structure, provided, however, that in lieu of the Spin Structure, the separation will be accomplished by the Partnership Contribution Structure if (1) the Company is

unable to receive a favorable private letter ruling from the IRS (the "Spin Ruling") or a "should" level opinion of counsel (the "Spin Opinion"), concluding, in either case, based on facts, customary representations (and certain customary assumptions, in the case of a Spin Opinion) set forth or described in the Spin Ruling or Spin Opinion, that the Spin Structure qualifies under section 368(a)(1)(G) of the Internal Revenue Code, (2) at the election of the Consenting First Lien Noteholders if the Estimated REIT E&P exceeds $1.3 billion, or (3) at the election of the Debtors and CEC, with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld.

If the Partnership Contribution Structure is used, at least 5% of the PropCo LP Interests purchased by CEC under the PropCo Common Equity Put Options (on a fully diluted basis) shall be deemed as CEOC's on account of its contribution of real estate into PropCo.  In such case, CEOC shall have the option to participate in future issuances, or purchase additional equity from PropCo at fair market value if participation is not feasible, to maintain its percentage ownership interest in PropCo at 5% if it would otherwise decrease below that threshold.

In order to meet the requirement that a real estate investment trust have at least 100 shareholders and notwithstanding anything herein to the contrary, the REIT will have the right to issue, for Cash, the REIT Series B Preferred Stock.

G.    *Restructuring Transactions.*

On the Effective Date, the Debtors, the Reorganized Debtors, and/or the New Property Entities, as applicable, shall enter into the Restructuring Transactions, including those transactions set forth in the Restructuring Transactions Memorandum, and shall take any actions as may be necessary or appropriate to effect a corporate restructuring of their respective businesses or a corporate restructuring of the overall corporate structure of the Debtors, to the extent provided therein, including the Spin Structure and the Partnership Contribution Structure set forth in Article IV.F of the Plan.  The Restructuring Transactions may include one or more intercompany mergers, consolidations, amalgamations, arrangements, continuances, restructurings, conversions, dissolutions, transfers, liquidations, or other corporate transactions as may be determined by the Debtors, the Reorganized Debtors, and/or the New Property Entities, as applicable, to be necessary or appropriate.  The actions to implement the Restructuring Transactions may include:  (1) the execution and delivery of appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, arrangement, continuance, dissolution, sale, purchase, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or provincial law; (4) the execution and delivery of the New Debt Documents, and any filings related thereto; and (5) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law in connection with the Plan.

H.    *New Corporate Governance Documents.*

On or immediately before the Effective Date, the Debtors, the Reorganized Debtors, and/or the New Property Entities, as applicable, will file their respective New Corporate Governance Documents, OpCo Organizational Documents, or the New Property Entity Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.  The New Corporate Governance Documents and OpCo Organizational Documents will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors and the New Property Entities may amend and restate their respective New Corporate Governance Documents, OpCo Organizational Documents, or New Property Entity Organizational Documents, as applicable, as permitted by such documents and the laws of their respective states, provinces, or countries of incorporation.

KE 33843292

*I.      New Boards.*

As of the Effective Date, all directors, managers, and other members of existing boards or governance bodies of the Debtors, as applicable, shall cease to hold office or have any authority from and after such time to the extent not expressly included in the roster of the applicable New Board.  Pursuant to section 1129(a)(5) of the Bankruptcy Code, to the extent known, the Debtors will disclose in the Plan Supplement the identity and affiliations of any Person proposed to serve on the New Boards.  To the extent any such director or officer of the Debtors is an "insider" under the Bankruptcy Code, the Debtors also will disclose the nature of any compensation to be paid to such director or officer.  Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the applicable New Corporate Governance Documents, OpCo Organizational Documents, New Property Entity Organizational Documents, and other constituent documents of the Reorganized Debtors and the New Property Entities.

1.      <u>OpCo</u>.

If CEC owns 90% or more of the OpCo Common Stock, then the OpCo New Board shall consist of three (3) voting members to be designated by CEC, one (1) of whom shall be independent and reasonably acceptable to the Requisite Consenting Creditors.  The independent director shall be a member of all committees of the OpCo New Board.  If CEC owns less than 90% of OpCo Common Stock, then the OpCo New Board shall consist of three (3) voting members, two (2) to be designated by CEC and one (1) to be designated by the Requisite Consenting Creditors, which member shall be a member of all committees of the OpCo New Board.

Regardless of CEC's percentage ownership, there shall be one non-voting observer, reasonably acceptable to OpCo, to be designated by the Requisite Consenting Creditors.  The observer shall be given notice of and an opportunity to attend the portion of all meetings, including applicable committee meetings, of the OpCo New Board concerning business and strategy session matters and other matters that would have an adverse material economic impact on PropCo (and receive all materials given to OpCo board members in connection with such matters), including with regards to matters related to capital expenditures, budgeting, planning, and construction of capital improvements for existing and new casino, gaming, and related facilities, subject to appropriate limitation in respect of privilege issues.

2.      <u>REIT</u>.

If CEC owns less than 10% of PropCo (either directly through PropCo LP Interests or indirectly through OpCo Common Stock or REIT Common Stock), then the REIT New Board shall consist of seven (7) voting members to be designated by the Requisite Consenting Creditors.  If CEC owns 10% or more of PropCo (either directly through PropCo LP Interests or indirectly through OpCo Common Stock or REIT Common Stock), then the REIT New Board shall consist of seven (7) voting members, six (6) to be designated by the Requisite Consenting Creditors and one (1) to be designated by CEC.

At least three (3) voting members must be licensed by the required the required regulatory authorities by the Effective Date.  If there are not at the Effective Date at least three (3) voting members licensed, then to assist with Consummation of the Plan up to two (2) of the independent members of CEOC shall be designated to the REIT New Board so that there will be three (3) voting members at the Effective Date, with such members being removed as the non-voting members are licensed.  Until such time as the CEOC independents and members designated by CEC are a minority of the New Board, the REIT shall be prohibited from taking major transactions without shareholder approval.  To the extent any members are not so licensed by the Effective Date, they shall be non-voting members until so licensed.

*J.      Shared Services.*

On or before the Effective Date, the CES LLC Agreement and the CES Shared Services Agreement shall be amended or modified as necessary or appropriate to reflect the formation of OpCo and PropCo, including:  (1) to provide that Total Rewards® and other enterprise-wide and property specific resources are allocated, and services provided, in a way that does not discriminate against PropCo, (2) for so long as CEC or its affiliates manages

PropCo's properties pursuant to the Management and Lease Support Agreement or otherwise, CES shall ensure that, in the event CEC or its subsidiaries cease to provide to PropCo the resources and services provided by such agreements, CES shall provide such resources and services directly to PropCo on equivalent terms to or via an alternative arrangement reasonably acceptable to PropCo; provided that if CEC or its affiliates are terminated as manager under the applicable management agreement other than by or with the consent of PropCo, CES shall provide such resources and services pursuant to a management agreement on substantially the same terms and conditions, notwithstanding such termination, if so elected by PropCo.  In the event PropCo terminates or consents to the termination of the management relationship with CEC or its affiliates, for so long as the transition period under the applicable management agreement(s) continues, PropCo shall continue to have access to such resources and services on no less favorable terms.

CES shall at the request of the REIT New Board have meetings or conference calls once a quarter with a designee of the REIT New Board to discuss, and consult on, the strategic and financial business plans, budgeting (including capital expenditures), and other topics as reasonably requested by the REIT New Board.  The REIT shall also have audit and information rights with respect to CES.

K.      Section 1145 Exemption.

To the maximum extent permitted by law, the offering, issuance, and distribution of the New Interests and the New Debt, as applicable, shall be exempt from the registration and prospectus delivery requirements of the Securities Act and any other applicable state and federal law requiring registration and/or delivery of a prospectus prior to the offering, issuance, distribution, or sale of securities pursuant to section 1145 of the Bankruptcy Code, consistent with this Article IV.J of the Plan.

L.      New Interests.

Before the Effective Date, the Boards of Directors of CEOC, and on and after the Effective Date, the OpCo New Board and the REIT New Board shall each use its reasonable best efforts to have the OpCo Common Stock, if more than 30% of the OpCo Common Stock is owned by the Holders of Secured First Lien Notes Claims and Non-First Lien Claims, and the REIT Common Stock, respectively, (a) registered under Securities Act and any other applicable law and (b) listed on a nationally recognized exchange, as soon as practicable subject to meeting applicable listing requirements following the effective date of the Plan.  A registration statement covering the REIT Common Stock (and if applicable, a registration statement covering the OpCo Common Stock) shall be filed as soon as practicable following the effective date of the Plan and in any event within 75 days thereafter.

The Board of Directors of CEOC shall consult with Requisite Consenting Creditors on the form and substance of the registration statement(s). The parties shall enter into a customary registration rights agreement providing for among other things a re-sale registration statement for any Holder of Secured First Lien Notes Claims that cannot freely transfer its equity pursuant to section 1145 of the Bankruptcy Code and keeping any registration statements that do not automatically incorporate the U.S. Securities and Exchange Commission filings by reference up to date.

M.      Cancellation of Existing Securities and Agreements.

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, instruments, certificates, and other documents evidencing Claims or Interests, including the Prepetition Credit Agreement Claims, Secured First Lien Notes Claims, Second Lien Notes Claims, Senior Unsecured Note Claims, Subsidiary Guaranteed Note Claims, and CEOC Interests, shall be deemed cancelled and surrendered without any need for a Holder to take further action with respect thereto and the obligations of the Debtors or Reorganized Debtors, as applicable, thereunder or in any way related thereto shall be deemed satisfied in full and discharged, provided that the CEOC Interests held by CEC may be Reinstated as OpCo Common Stock to the extent that CEC is required to pay Cash to the Debtors pursuant to the CEC OpCo Cash Commitment upon the Holders of Allowed Secured First Lien Notes Claims making the OpCo Common Stock Cash Election; provided, however, that notwithstanding Confirmation or Consummation, any such agreement that governs the rights of the Holder of a Claim shall continue in effect solely for purposes of allowing Holders to receive distributions under the Plan; provided, further, however, that the preceding proviso shall not affect the discharge of Claims or Interests pursuant to the Bankruptcy Code, the

Confirmation Order, or the Plan, or result in any expense or liability to the Debtors or Reorganized Debtors, as applicable.

### N.     Corporate Action.

Upon the Effective Date, all actions contemplated under the Plan shall be deemed authorized and approved in all respects, including:  (1) adoption or assumption, as applicable, of the agreements with existing management; (2) rejection or assumption, as applicable, of Executory Contracts and Unexpired Leases; (3) selection of the directors, managers, members, and officers for the Reorganized Debtors and the New Property Entities; (4) implementation of the Restructuring Transactions; (5) the applicable Reorganized Debtors' and New Property Entities' entry, delivery, and performance of the New Debt Documents; (6) the distribution of New Interests as provided herein; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors, the Reorganized Debtors, or the New Property Entities, as applicable, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors, the Reorganized Debtors, or the New Property Entities, as applicable.  On or, as applicable, prior to the Effective Date, the appropriate officers of the Debtors, the Reorganized Debtors, or the New Property Entities, as applicable, shall be authorized and, as applicable, directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effect the transactions contemplated under the Plan) in the name of and on behalf of the Reorganized Debtors and/or the New Property Entities, including the New Debt Documents, and any and all other agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article IV.N shall be effective notwithstanding any requirements under nonbankruptcy law.

### O.     Effectuating Documents; Further Transactions.

On and after the Effective Date, as applicable, the Debtors, the Reorganized Debtors, the New Property Entities, and the directors, managers, officers, authorized persons, and members thereof, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, the New Debt Documents, the New Corporate Governance Documents, the OpCo Organizational Documents, the New Property Entity Organizational Documents, and any Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors and the New Property Entities (including the OpCo Common Stock, PropCo LP Interests, PropCo Preferred Equity, PropCo GP Interests, and REIT Common Stock), without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

### P.     Exemption from Certain Taxes and Fees.

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property or any Interests pursuant to the Plan, including the recording of any amendments to such transfers, or any new mortgages or liens placed on the property in connection with such transfers, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment.  Pursuant to section 1146 of the Bankruptcy Code, any transfers of property pursuant hereto or pursuant to the New Debt Documents shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, or other similar tax or governmental assessment, and the Confirmation Order shall direct and shall be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.  Such exemption specifically applies to:  (1) the creation of any mortgage, deed of trust, Lien, or other security interest; (2) the making or assignment of any lease or sublease; (3) any Restructuring

Transaction; (4) the issuance, distribution, and/or sale of any of the New Interests, the New Debt, and any other Securities of the Debtors, the Reorganized Debtors, or the New Property Entities; and (5) the making or delivery of any deed or other instrument of transfer in furtherance of or in connection with the Plan, including (i) any merger agreements, (ii) agreements of consolidation, restructuring, disposition, liquidation, or dissolution, (iii) deeds, (iv) bills of sale, and (v) assignments executed in connection with any Restructuring Transaction occurring under the Plan.

Q.      *Corporate Existence.*

Except as otherwise provided in the Plan (including as necessary and/or advisable to implement the Separation Structure), each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

R.      *Vesting of Assets.*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate, all Causes of Action (unless otherwise released or discharged pursuant to the Plan), and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor and the New Property Entities, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens securing obligations under the New Debt Documents and the Liens securing obligations on account of Other Secured Claims that are Reinstated pursuant to the Plan, if any).  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtors and New Property Entities may operate their business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

S.      *General Settlement of Claims.*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies resolved pursuant to the Plan.

T.      *Retention of Causes of Actions.*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, the Debtors and the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Debtors' and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

**No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against such Entity as any indication that the Debtors and the Reorganized Debtors will not pursue any and all available Causes of Action against such Entity.  The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action, including with respect to rejected Executory Contracts and Unexpired Leases, against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court Final Order, the Debtors and the

44

Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

## ARTICLE V.
### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption of Executory Contracts and Unexpired Leases.*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, Executory Contracts and Unexpired Leases shall be deemed rejected as of the Effective Date, regardless of whether such Executory Contract or Unexpired Lease is identified on the Rejected Executory Contracts and Unexpired Leases Schedule, unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) previously expired or terminated pursuant to its own terms; (3) is the subject of a motion to reject Filed on or before the Effective Date; or (4) is identified as an Executory Contract or Unexpired Lease on the Assumed Executory Contract and Unexpired Lease Schedule, if any.  Any motions to assume or reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date by a Final Order.

Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions, assumption and assignment, or rejections, as applicable, of such Executory Contracts or Unexpired Leases as set forth in the Plan, the Assumed Executory Contract and Unexpired Lease Schedule, and the Rejected Executory Contract and Unexpired Lease Schedule, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law.

To the maximum extent permitted by law, to the extent any provision in any Executory Contract or Unexpired Lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Reorganized Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Rejected Executory Contract and Unexpired Lease Schedule at any time through and including 45 days after the Effective Date.

B.      *Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases.*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such Executory Contract or Unexpired Lease.

C.      *Rejection of Executory Contracts and Unexpired Leases.*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Notice and Claims Agent no later than thirty (30) days after the effective date of such rejection.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Reorganized Debtors, the New Property Entities, the Estates, or their property, without the need for any objection by the Debtors or Reorganized Debtors, or further notice to, action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII.E of the Plan, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.**

All Claims arising from the rejection by any Debtor of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code shall be treated as a General Unsecured Claim pursuant to Article III.B of the Plan and may be objected to in accordance with the provisions of Article VI of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

D.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.*

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the default amount in Cash on the Effective Date, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (1) the amount of any payments to cure such a default; (2) the ability of the Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, the cure amount required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption; underlined that the Reorganized Debtors may settle any dispute regarding the amount of any such cure amount without any further notice to any party or any action, order, or approval of the Bankruptcy Court; provided, further, that, notwithstanding anything to the contrary herein, prior to the entry of a Final Order resolving any dispute and approving the assumption and assignment of such Executory Contract or Unexpired Lease, the Reorganized Debtors reserve the right to reject any Executory Contract or Unexpired Lease which is subject to dispute, whether by amending the Rejected Executory Contract and Unexpired Lease Schedule in accordance with Article V.A of the Plan or otherwise.

At least fourteen (14) days prior to the Confirmation Objection Deadline, the Debtors shall provide for notices of proposed assumption and proposed cure amounts to be sent to applicable third parties and for procedures for objecting thereto and resolution of disputes by the Bankruptcy Court; provided that the Debtors reserve all rights with respect to any such proposed assumption and proposed cure amount in the event of an objection or dispute. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount must be filed, served, and actually received by the Debtors no later than thirty (30) days after service of the notice providing for such assumption and related cure amount.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or cure amount will be deemed to have assented to such assumption or cure amount.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall constitute and be deemed to constitute the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.  **Any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed disallowed and expunged, without further notice to, action, order, or approval of the Bankruptcy Court**.

E.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided in the Plan, each assumed or assumed and assigned Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and all Executory Contracts and Unexpired Leases related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options,

rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or is rejected under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.     *Indemnification Provisions.*

On and as of the Effective Date, the Indemnification Provisions will be assumed and irrevocable and will survive the effectiveness of the Plan and the Reorganized Debtors' governance documents shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, the Debtors' and the Reorganized Debtors' current and former directors, officers, employees, or agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the respective Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors will amend and/or restate their respective governance documents before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights; provided that, for the avoidance of doubt, each of the Reorganized Debtors shall be jointly and severally liable for the foregoing obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the Indemnification Provisions.  Notwithstanding anything to the contrary contained herein, (1) Confirmation shall not discharge, impair, or otherwise modify any obligations assumed by the foregoing assumption of the Indemnification Provisions, (2) each such obligation shall be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed, and (3) as of the Effective Date, the Indemnification Provisions shall be binding and enforceable against the Reorganized Debtors.

The New Property Entities' governance documents shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, the New Property Entities' directors, officers, employees, or agents to the fullest extent permitted by law and at least to the same extent as the organizational documents of each of the Debtors on the Petition Date, against any claims or Causes of Action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the New Property Entities shall amend and/or restate their respective governance documents before or after the Effective Date to terminate or materially adversely affect any of the New Property Entities' obligations to provide such indemnification rights or such directors', officers', employees', or agents' indemnification rights.

G.     *Treatment of D&O Liability Insurance Policies.*

Notwithstanding anything in the Plan to the contrary, CEC shall maintain all of its unexpired D&O Liability Insurance Policies for the benefit of the Debtors' directors, members, trustees, officers, and managers, which coverage shall be through the Effective Date of the Plan, and all directors, members, trustees, officers, and managers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.  Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations related to the foregoing the D&O Liability Insurance Policies.

The Debtors, the Reorganized Debtors, and/or the New Property Entities, as applicable, are authorized to purchase D&O Liability Insurance Policies for the benefit of the Debtors' directors, members, trustees, officers, and managers, which D&O Liability Insurance Policies shall be effective as of the Effective Date.

KE 33843292

H.       *Insurance Policies.*

Each of the Debtors' insurance policies (other than the D&O Liability Insurance Policies, which shall receive the treatment set forth in Article V.G of the Plan) and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan.  Unless otherwise provided in the Plan or the Plan Supplement, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed all insurance policies and any agreements, documents, and instruments relating to coverage of all insured Claims.

I.       *Benefit Programs.*

Except and to the extent previously assumed by an order of the Bankruptcy Court on or before the Confirmation Date, and except for (1) Executory Contracts or plans specifically rejected pursuant to the Plan (to the extent such rejection does not violate sections 1114 or 1129(a)(13) of the Bankruptcy Code) and (2) Executory Contracts or plans as have previously been rejected, are the subject of a motion to reject, or have been specifically waived by the beneficiaries of any plans or contracts:  all employee compensation and benefit programs of the Debtors, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, if any, entered into before or after the Petition Date and not since terminated, shall be deemed to be, and shall be treated as though they are, Executory Contracts that are assumed under this Article V, but only to the extent that rights under such programs are held by the Debtors or Persons who are employees of the Debtors as of the Confirmation Date, and the Debtors' obligations under such programs to Persons who are employees of the Debtors on the Confirmation Date shall survive Confirmation of the Plan; provided, however, that the Debtors' obligations, if any, to pay all "retiree benefits" as defined in section 1114(a) of the Bankruptcy Code shall continue; provided, further, however, that nothing herein shall extend or otherwise modify the duration of such period or prohibit the Debtors or the Reorganized Debtors from modifying the terms and conditions of such employee benefits and retiree benefits as otherwise permitted by such plans and applicable nonbankruptcy law.

J.       *Reservation of Rights.*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease Schedule, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any of the Debtors has any liability thereunder.  In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors shall have 90 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease, including by rejecting such contract or lease nunc pro tunc to the Confirmation Date.

K.       *Nonoccurrence of Effective Date.*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

L.       *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by any Debtor, including any Executory Contracts and Unexpired Leases assumed by such Debtor, will be performed by the applicable Debtor liable thereunder in the ordinary course of its business (and will be vested in the applicable Reorganized Debtor or New Property Entity). Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order.

KE 33843292

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A.      *Timing and Calculation of Amounts to Be Distributed.*

Unless otherwise provided in the Plan, on the Initial Distribution Date or as soon as reasonably practicable thereafter (or if a Claim or Interest is not an Allowed Claim or Interest on the Initial Distribution Date, on the next Quarterly Distribution Date after such Claim or Interest becomes, as applicable, an Allowed Claim or Interest, or as soon as reasonably practicable thereafter), and except as otherwise set forth herein, each Holder of an Allowed Claim or Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Interests in the applicable Class from the Disbursing Agent.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise provided in the Plan, Holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Initial Distribution Date.

The New Interests and the New Debt shall be deemed to be issued as of the Effective Date to the Holders of Claims or Interests entitled to receive the New Interests and New Debt pursuant to Article III of the Plan.

B.      *Distributions on Account of Obligations of Multiple Debtors.*

For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan.  Any such Claims shall be released and discharged pursuant to Article VIII of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay U.S. Trustee Fees until such time as a particular case is closed, dismissed, or converted.

C.      *Distributions Generally.*

All distributions under the Plan shall be made by the Disbursing Agent.  The Disbursing Agent shall not be required to give any bond or surety or other Security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

D.      *Rights and Powers of Disbursing Agent.*

1.      <u>Powers of the Disbursing Agent</u>.

The Disbursing Agent shall be empowered to:  (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

2.      <u>Expenses Incurred On or After the Effective Date</u>.

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable, actual, and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and

KE 33843292

any reasonable compensation and expense reimbursement claims (including reasonable, actual, and documented attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

E.      *Distributions on Account of Claims or Interests Allowed After the Effective Date.*

      1.      <u>Payments and Distributions on Disputed Claims</u>.

Distributions made after the Effective Date to Holders of Disputed Claims or Interests that are not Allowed Claims or Interests as of the Effective Date, but which later become Allowed Claims or Interests, as applicable, shall be deemed to have been made on the applicable Quarterly Distribution Date after they have actually been made, unless the Reorganized Debtors and the applicable Holder of such Claim or Interest agree otherwise.

      2.      <u>Special Rules for Distributions to Holders of Disputed Claims</u>.

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Reorganized Debtors, on the one hand, and the Holder of a Disputed Claim or Interest, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim or Interest until the Disputed Claim or Interest has become an Allowed Claim or Interest, as applicable, or has otherwise been resolved by settlement or Final Order; <u>provided</u> that if the Debtors do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim, the Holder of such Disputed Claim shall be entitled to a distribution on account of that portion of such Claim, if any, that is not disputed at the time and in the manner that the Disbursing Agent makes distributions to similarly-situated Holders of Allowed Claims pursuant to the Plan.

F.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

      1.      <u>Record Date for Distributions</u>.

On the Distribution Record Date, the Claims Register shall be closed and any party responsible for making distributions shall instead be authorized and entitled to recognize only those record Holders listed on the Claims Register as of the close of business on the Distribution Record Date.  Notwithstanding the foregoing, with respect to Holders of Prepetition Credit Agreement Claims, Secured First Lien Notes Claims, First Lien Notes Deficiency Claims, Second Lien Note Claims, Subsidiary Guarantee Note Claims, and Unsecured Note Claims, distributions shall be made to such Holders that are listed on the register or related document maintained by, as applicable, the Prepetition Credit Agreement Agent, the First Lien Notes Indenture Trustee, the Second Lien Notes Indenture Trustee, the Subsidiary Guarantee Notes Indenture Trustee, or the Senior Unsecured Notes Indenture Trustee as of the Distribution Record Date.

      2.      <u>Delivery of Distributions in General</u>.

          (a)      Initial Distribution Date.

Except as otherwise provided herein, on the Initial Distribution Date, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Interests as of the Distribution Record Date at the address for each such Holder as indicated on the Debtors' books and records or the register or related document maintained by, as applicable, the Prepetition Credit Agreement Agent, the First Lien Notes Indenture Trustee, the Second Lien Notes Indenture Trustee, the Subsidiary Guarantee Notes Indenture Trustee, or the Senior Unsecured Notes Indenture Trustee as of the date of any such distribution; <u>provided</u> that the manner of such distributions shall be determined at the discretion of the Disbursing Agent; <u>provided</u>, <u>further</u>, that the address for each Holder of an Allowed Claim or Interest shall be deemed to be the address set forth in, as applicable, any Proof of Claim or Proof of Interest Filed by such Holder, or, if no Proof of Claim or Proof of Interest has been Filed, the address set forth in the Schedules.  If a Holder holds more than one Claim in any one Class, all Claims of the Holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

(b)      Quarterly Distribution Date.

Except as otherwise determined by the Reorganized Debtors in their sole discretion, on each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Disbursing Agent shall make the distributions required to be made on account of Allowed Claims and Interests under the Plan on such date.  Any distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that distribution is not an Allowed Claim or Interest on such date, shall be distributed on the first Quarterly Distribution Date after such Claim or Interest is Allowed.  No interest shall accrue or be paid on the unpaid amount of any distribution paid on a Quarterly Distribution Date in accordance with Article VI.A of the Plan.

3.      De Minimis Distributions; Minimum Distributions.

No fractional units of New Interests or New Debt shall be distributed and no Cash shall be distributed in lieu of such fractional amounts.  When any distribution pursuant to the Plan on account of an Allowed Claim or Interest would otherwise result in the issuance of a number of units of New Interests or New Debt that is not a whole number, the actual distribution of units of New Interests or New Debt shall be rounded as follows:  (a) fractions of one-half (½) or greater shall be rounded to the next higher whole number; and (b) fractions of less than one-half (½) shall be rounded to the next lower whole number with no further payment thereto. The total number of authorized units of New Interests or New Debt, as applicable, to be distributed to holders of Allowed Claims and Interests shall be adjusted as necessary to account for the foregoing rounding.

No Cash payment valued at less than $100.00, in the reasonable discretion of the Disbursing Agent, shall be made to a Holder of an Allowed Claim on account of such Allowed Claim.

4.      Undeliverable Distributions and Unclaimed Property.

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Disbursing Agent has determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the Effective Date.  After such date, all unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall be discharged and forever barred.

5.      Manner of Payment Pursuant to the Plan.

At the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by check or wire transfer or as otherwise required or provided in applicable agreements.

G.      Compliance with Tax Requirements/Allocations.

In connection with the Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Authority, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary or appropriate to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.  The Reorganized Debtors reserve the right, in their sole discretion, to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

KE 33843292

H.      *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for in the Plan or the Confirmation Order, postpetition interest shall not accrue or be paid on any Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.

I.      *Setoffs and Recoupment.*

The Debtors or Reorganized Debtors, as applicable, may, but shall not be required to, setoff against or recoup from a Claim any claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim it may have against the Holder of such Claim.

J.      *Allocation Between Principal and Accrued Interest.*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest.

K.      *Claims Paid or Payable by Third Parties.*

1.      <u>Claims Paid by Third Parties.</u>

The Reorganized Debtors, after the Effective Date, shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor, as applicable.  To the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or Reorganized Debtors, as applicable, on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy.  To the extent that one or more of the Debtors' insurers agrees to satisfy in full a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, such Claim may be expunged without a Claims objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      <u>Applicability of Insurance Policies.</u>

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Notwithstanding anything to the contrary contained herein (including Article VIII of the Plan), nothing contained in the Plan shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers, under any policies of insurance or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

KE 33843292

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A.      *Resolution of Disputed Claims.*

      1.      <u>Allowance of Claims.</u>

On or after the Effective Date, each of the Reorganized Debtors shall have and shall retain any and all rights and defenses the applicable Debtor had with respect to any Claim immediately prior to the Effective Date.

      2.      <u>Claims Objections and Settlements.</u>

The Reorganized Debtors shall have the authority to:  (a) File objections to Claims, settle, compromise, withdraw, or litigate to judgment objections to any and all Claims, regardless of whether such Claims are in a Class or otherwise; (b) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

      3.      <u>Claims Estimation.</u>

On or after the Effective Date, the Reorganized Debtors may (but are not required to), at any time, request that the Bankruptcy Court estimate any Claim pursuant to applicable law, including pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction under sections 157 and 1334 of the Judicial Code to estimate any such Claim, including during the litigation of any objection to any Claim or during the pendency of any appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions and discharge) and may be used as evidence in any supplemental proceedings, and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has Filed a motion requesting the right to seek such reconsideration on or before 14 days after the date on which such Claim is estimated.  Each of the foregoing Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

B.      *Adjustment to Claims Without Objection.*

Any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.  Additionally, any Claim that is duplicative or redundant with another Claim against the same Debtor or another Debtor may be adjusted or expunged on the Claims Register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Time to File Objections to Claims.*

Any objections to Claims shall be Filed no later than the Claims Objection Bar Date.

D.      *Disallowance of Claims.*

Any Claims held by any Entity from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE REORGANIZED DEBTORS, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE CLAIMS BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

E.      *Amendments to Claims.*

On or after the Effective Date, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court or the Reorganized Debtors, and any such new or amended Claim Filed shall be deemed disallowed in full and expunged without any further notice to or action, order, or approval of the Bankruptcy Court to the maximum extent provided by applicable law.

F.      *No Distributions Pending Allowance.*

If an objection to a Claim or Interest or portion thereof is Filed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest, unless otherwise agreed to by the Reorganized Debtors.

G.      *Distributions After Allowance.*

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim or Interest, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim or Interest becomes a Final Order, the Disbursing Agent shall provide to the Holder of such Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law.

**ARTICLE VIII.
SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.      *Discharge of Claims and Termination of Interests.*

To the maximum extent provided by section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Reorganized Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before

the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors prior to the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  Any default by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately prior to or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests, and is fair, equitable, and reasonable.   In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against the Debtors and their Estates and Causes of Action against other Entities.

B.     **Debtor Release.**

**Effective as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is deemed released by the Debtors, the Estates, and the Reorganized Debtors from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted on behalf of the Debtors or the Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Estates, or the Reorganized Debtors would have been legally entitled to assert in their own right (whether individually or collectively), or on behalf of the Holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including, for the avoidance of doubt,  all claims, Causes of Action, or liabilities arising out of or relating to the Challenged Transactions, the Caesars Cases, and the Prepetition Caesars Guarantees; <u>provided</u> that the foregoing Debtor Release shall not operate to waive or release any right, Claim, or Cause of Action (1) in favor of any Debtor or Reorganized Debtors, as applicable, arising under any contractual obligation owed to such Debtor or Reorganized Debtor or (2) as expressly set forth in the Plan or the Plan Supplement.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained herein, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims released by the Debtor Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.**

C.      *Third-Party Release.*

Effective as of the Effective Date, the Releasing Parties (regardless of whether a Releasing Party is a Released Party) conclusively, absolutely, unconditionally, irrevocably, and forever discharge and release (and each Entity so discharged and released shall be deemed discharged and released by the Releasing Parties) the Released Parties and their respective property from any and all claims, interests, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including with respect to any rights or Claims that could have been asserted against the Released Parties with respect to the Guaranty and Pledge Agreement, any derivative claims, asserted on behalf of the Debtors or Reorganized Debtors, as applicable, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale, transfer, or rescission of the purchase, sale, or transfer of any security, asset, right, or interest of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests prior to or in the Chapter 11 Cases, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including, for the avoidance of doubt,  all claims, Causes of Action, or liabilities arising out of or relating to the Challenged Transactions, the Caesars Cases, and the Prepetition Caesars Guarantees.  Notwithstanding anything to the contrary in the foregoing, the Third-Party Release shall not release any obligations of any party under the Plan or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the claims released by the Third-Party Release; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Releasing Parties asserting any claim or cause of action released pursuant to the Third-Party Release.

D.      *Exculpation.*

Effective as of the Effective Date, to the fullest extent permissible under applicable law, and except as otherwise specifically provided in the Plan, each Debtor, each Reorganized Debtor, each Estate, and each Exculpated Party is hereby released and exculpated from any claim, obligation, Cause of Action, or liability for any prepetition or postpetition action taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, confirming, or implementing the Plan, or consummating the Plan, the Disclosure Statement, the New Governance Documents, the Restructuring Transactions, and/or the Separation Structure or selling or issuing the New Debt, the New Interests, and/or any other Security to be offered, issued, or distributed in connection with the Plan, the Chapter 11 Cases, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, except for actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction; <u>provided</u>, <u>however,</u> that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Debtors, the Reorganized Debtors, the Estates, and each Exculpated Party have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the restructuring of Claims and Interests in the Chapter 11 Cases and in connection with the Restructuring Transactions, the negotiation, formulation, or preparation of the Restructuring Documents or related agreements, instruments, or other documents pursuant to the Plan, and the solicitation and distribution of the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any

56

time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.     **Injunction.**

Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold claims, interests, or Liens that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to Article VIII.B or Article VIII.C of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the New Property Entities, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such claims or interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right prior to the Effective Date in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan.

F.     **Release of Liens.**

Except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, except for any Secured Claims that the Debtors elect to Reinstate in accordance with Article III.B of the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall automatically revert to the applicable Debtor and its successors and assigns.

G.     *Setoffs.*

Except as otherwise expressly provided for in the Plan or in any court order, each Debtor, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, may set off against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Allowed Claim (before any distribution is made on account of such Allowed Claim), any claims, rights, and Causes of Action of any nature that such Debtor may hold against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided that neither the failure to effect such a setoff nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by such Debtor of any such claims, rights, and Causes of Action that such Debtor may possess against such Holder.  In no event shall any Holder of Claims be entitled to setoff any Claim against any claim, right, or Cause of Action of any of the Debtors unless such Holder has timely Filed a Proof of Claim with the Bankruptcy Court preserving such setoff.

H.      *Recoupment.*

In no event shall any Holder of a Claim be entitled to recoup any Claim against any claim, right, or Cause of Action of any of the Debtors unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

I.      *Subordination Rights.*

The classification and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and any such rights shall be settled, compromised, and released pursuant to the Plan.

J.      *Document Retention.*

On and after the Effective Date, the Debtors, the Reorganized Debtors, or the New Property Entities, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Debtors or the Reorganized Debtors, as applicable.

K.      *Protections Against Discriminatory Treatment.*

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the United States Constitution, all Entities, including Governmental Units, shall not discriminate against, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, any Debtor, any Reorganized Debtor, and New Property Entities, or another Entity with whom the Debtors have been associated solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

L.      *Reimbursement or Contribution.*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

M.     *Term of Injunctions or Stays.*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### ARTICLE IX.
### CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date.*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied on or prior to the Effective Date or waived pursuant to the provisions of Article IX.B of the Plan:

KE 33843292

1.      the Confirmation Order shall have been entered and such order shall not have been stayed, modified, or vacated on appeal;

2.      the Professional Fee Escrow shall have been established and funded with Cash in accordance with Article II.B.1 of the Plan;

3.      the Plan Supplement, including any amendments, modifications, or supplements to the documents, schedules, or exhibits included therein shall have been filed with the Bankruptcy Court pursuant to the terms of the Plan;

4.      the Debtors shall have received both the PropCo Tax Letter and the REIT Opinion Letter;

5.      CEC shall have paid the CEC Cash Contribution and, if applicable, the CEC Standby Commitment, to the Debtors;

6.      OpCo shall have been formed and the OpCo Governance Documents shall be effective;

7.      PropCo shall have been formed and the PropCo Governance Documents shall be effective;

8.      the REIT shall have been formed and the REIT Organizational Documents shall be effective;

9.      CPLV Mezz shall have been formed and the CPLV Mezz Organizational Documents shall be effective;

10.     CPLV Sub shall have been formed and the CPLV Sub Organizational Documents shall be effective;

11.     the TRS(s) shall have been formed and the TRS Organizational Documents shall be effective;

12.     OpCo shall have deeded or assigned, as applicable, to PropCo (and/or its applicable subsidiaries) the property to be transferred to PropCo (and/or its applicable subsidiaries) as set forth in the Restructuring Transactions Memorandum;

13.     OpCo (and/or its applicable subsidiaries) and PropCo (and/or its applicable subsidiaries) shall have entered into the Master Lease Agreement, and such Master Lease Agreement shall be effective in accordance with its terms;

14.     OpCo, PropCo, Manager, and CEC shall have entered into the Management and Lease Support Agreement, and such Management and Lease Support Agreement shall be effective in accordance with its terms;

15.     PropCo and CEC shall have entered into the Right of First Refusal Agreement, and such Right of First Refusal Agreement shall be effective in accordance with its terms;

16.     PropCo, CEC, and CERP shall have entered into the PropCo Call Right Agreement, and such PropCo Call Right Agreement shall be effective in accordance with its terms;

17.     if the Partnership Contribution Structure is used, at least 5% of the PropCo LP Interests shall have been issued to CEOC in exchange for CEOC assets, as and to the extent provided in the Plan;

18.     the New Debt shall have been issued by, as applicable, OpCo, PropCo, CPLV Sub, and, if applicable, CPLV Mezz;

19.     the New Interests shall have been issued by, as applicable, OpCo, PropCo, and the REIT;

KE 33843292

20.    new D&O Liability Insurance Policies shall be in effect for the Reorganized Debtors' and the New Property Entities' directors, officers, members, and managers;

21.    the Restructuring Support Agreement shall not have been terminated;

22.    all Gaming Approvals shall have been obtained;

23.    all other authorizations, consents, and regulatory approvals required for the Plan's effectiveness shall have been obtained; and

24.    all documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery, and (b) been effected or executed by all Entities party thereto, or will be deemed executed and delivered by virtue of the effectiveness of the Plan as expressly set forth herein, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

B.    *Waiver of Conditions.*

Without limiting the respective rights of each party to the Restructuring Support Agreement, the Debtors, with the reasonable consent of CEC and the Requisite Consenting Creditors, may waive any of the conditions to the Effective Date set forth in Article IX.A of the Plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

C.    *Substantial Consummation of the Plan.*

The Effective Date shall be the first Business Day upon which all of the conditions specified in Article IX.A of the Plan have been satisfied or waived.  Consummation of the Plan shall be deemed to occur on the Effective Date.

D.    *Effect of Nonoccurrence of Conditions to the Effective Date.*

If the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or the Disclosure Statement shall:  (a) constitute a waiver or release of any Claims, Interests, or any claims held by the Debtors; (b) prejudice in any manner the rights of the Debtors or any other Person or Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Person or Entity.

### ARTICLE X.
### MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments.*

Except as otherwise specifically provided in the Plan, the Debtors reserve the right to modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, unless otherwise ordered by the Bankruptcy Court, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights to alter, amend, or modify the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such

modification or supplement shall be considered a modification of the Plan and shall be made in accordance with this Article X of the Plan.

B.      *Effect of Confirmation on Modifications.*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date and to file subsequent plans of reorganization.  If the Debtors revoke or withdraw the Plan, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption or rejection of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or Disclosure Statement shall:  (a) constitute a waiver or release of any claims held by the Debtor, Claims, Interests, or Causes of Action; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, to the extent legally permissible, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including cure amounts pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Reorganized Debtors amending, modifying, or supplementing, after the Effective Date, pursuant to Article V of the Plan, the Rejected Executory Contract and Unexpired Lease Schedule; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

KE 33843292

6.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Disclosure Statement, the Restructuring Support Agreement, or the Plan;

7.      enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

8.      resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

9.      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

10.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the discharge, releases, injunctions, Exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such discharge, releases, Exculpations, injunctions, and other provisions;

11.      resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.K.1 of the Plan;

12.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

13.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

14.      adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

15.      consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

16.      determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

17.      hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

18.      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.      hear and determine all disputes involving the existence, nature, or scope of all releases set forth in the Plan, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

20.      enforce the injunction, release, and Exculpation provisions set forth in Article VIII of the Plan;

21.      enforce all orders previously entered by the Bankruptcy Court;

22.      hear any other matter not inconsistent with the Bankruptcy Code; and

23.      enter an order concluding or closing the Chapter 11 Cases.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.     *Immediate Binding Effect.*

Subject to Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all Holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.     *Additional Documents.*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.     *Payment of Statutory Fees.*

All fees payable pursuant to section 1930(a) of the Judicial Code, including U.S. Trustee Fees, shall be paid by the Reorganized Debtors for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed, or a final decree closing the Chapter 11 Cases is issued, whichever occurs first.

D.     *Dissolution of the Second Lien Notes Committee and Unsecured Creditors Committee.*

On the Effective Date, both the Second Lien Notes Committee and the Unsecured Creditors Committee shall dissolve and all members, employees, or agents thereof, including the Second Lien Notes Committee Members and the Unsecured Creditors Committee Members, shall be released and discharged from all rights and duties arising from or related to the Chapter 11 Cases, except the Second Lien Notes Committee and the Unsecured Creditors Committee will remain intact solely with respect to (1) the preparation, filing, review, and resolution of applications for Professional Fee Claims; and (2) a pending appeal, motion to reconsider, or motion to vacate, if any, related to Confirmation (including with respect to the Plan or the Confirmation Order).  On the Effective Date, subject to the forgoing proviso, the Second Lien Notes Committee Members and the Unsecured Creditors Committee Members shall be released and discharged from all rights and duties from or related the Chapter 11 Cases, and neither the Debtors, the Reorganized Debtors, nor the New Property Entities, as applicable, shall be liable or responsible for paying any fees or expenses incurred after the Effective Date by the Second Lien Notes Committee, the Unsecured Creditors Committee, the Second Lien Notes Committee Members, the Unsecured Creditors Committee Members, or any advisors to either the Second Lien Notes Committee or the Unsecured Creditors Committee.

E.     *Reservation of Rights.*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  Neither the Plan, filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, the

Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

F.      *Successors and Assigns.*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

G.      *Service of Documents.*

All notices hereunder shall be deemed given if in writing and delivered, if sent by facsimile, courier, or registered or certified mail (return receipt requested) to the following addresses and facsimile numbers (or at such other addresses or facsimile numbers as shall be specified by like notice):

If to the Debtors, to:

        Caesars Entertainment Operating Company, Inc.
        One Caesars Palace Drive
        Las Vegas, Nevada 89109
        Attention:  General Counsel
        with copies to:

        Kirkland & Ellis LLP
        300 North LaSalle
        Chicago, Illinois 60654
        Attn.:  James H.M. Sprayregen, P.C. and David R. Seligman, P.C.
        Facsimile:  (312) 862-2200

        -and-

        Kirkland & Ellis LLP
        601 Lexington Avenue
        New York, New York 10022
        Attn.:  Paul M. Basta, P.C. and Nicole L. Greenblatt, Esq.
        Facsimile:  (212) 446-4900

If to the Second Lien Notes Committee, to:

        Jones Day
        555 South Flower Street, Fiftieth Floor
        Los Angeles, California 90071
        Attn.:  Bruce Bennett, Esq. and Sidney Levinson, Esq.
        Facsimile:  (212) 373-2053

If to the Unsecured Creditors Committee, to:

        Proskauer Rose LLP
        Eleven Times Square
        New York, New York 10035
        Attn.:  Martin Bienenstock, Esq., Judy G.Z. Liu, Esq., and Philip M. Abelson, Esq.
        Facsimile:  (212) 969-2900

-and-

Proskauer Rose LLP
70 West Madison Street, Suite 3800
Chicago, Illinois 60602
Attn.: Jeffrey J. Marwil, Esq., Paul V. Possinger, Esq., and Mark K. Thomas, Esq.
Facsimile: (312) 962-3551

If to the counsel for CEC, to:

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn.: Jeffrey D. Saferstein, Esq. and Samuel E. Lovett, Esq.
Facsimile: (212) 373-2053

If to the counsel for the Consenting First Lien Noteholders, to:

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Attn.: Kenneth H. Eckstein, Esq. and Daniel M. Eggermann, Esq.
Facsimile: (212) 715-8229

H.      *Entire Agreement.*

Except as otherwise indicated, on the Effective Date, the Plan supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations with respect to the subject matter of the Plan, all of which will have become merged and integrated into the Plan on the Effective Date. To the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.

I.      *Exhibits.*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Notice and Claims Agent at https://cases.primeclerk.com/CEOC or the Bankruptcy Court's website at http://www.ilnb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

J.      *Votes Solicited in Good Faith.*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous chapter 11 plan(s).

KE 33843292

K.      *Waiver or Estoppel.*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court prior to the Confirmation Date.

L.      *Nonseverability of Plan Provisions.*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.   Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is:   (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

M.      *Conflicts.*

To the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control in all respects, including with respect to any component of the Plan Supplement.   For the avoidance of doubt, to the extent the Confirmation Order is inconsistent with the Plan, the Confirmation Order shall control for all purposes.

N.      *Closing of Chapter 11 Cases.*

The Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

KE 33843292

Respectfully submitted, as of the date first set forth above,

Caesars Entertainment Operating Company, Inc. (for itself and all Debtors)

By: _____

Name:

Title:

**Exhibit A**

**Debtors**

| DEBTOR | CASE NO. |
|---|---|
| Caesars Entertainment Operating Company, Inc. (f/k/a Harrah's Operating Company, Inc.) | 15-01145 |
| 190 Flamingo, LLC | 15-01263 |
| 3535 LV Corp. | 15-01146 |
| 3535 LV Parent, LLC | 15-01149 |
| AJP Holdings, LLC | 15-01297 |
| AJP Parent, LLC | 15-01264 |
| B I Gaming Corporation | 15-01147 |
| Bally's Las Vegas Manager, LLC | 15-01265 |
| Bally's Midwest Casino, Inc. | 15-01315 |
| Bally's Park Place, Inc. | 15-01148 |
| Benco, Inc. | 15-01152 |
| Biloxi Hammond, LLC | 15-01156 |
| Biloxi Village Walk Development, LLC | 15-01208 |
| BL Development Corp. | 15-01150 |
| Boardwalk Regency Corporation | 15-01151 |
| BPP Providence Acquisition Company, LLC | 15-01180 |
| Caesars Air, LLC | 15-01267 |
| Caesars Baltimore Acquisition Company, LLC | 15-01268 |
| Caesars Baltimore Development Company, LLC | 15-01183 |
| Caesars Baltimore Management Company, LLC | 15-01165 |
| Caesars Entertainment Canada Holding, Inc. | 15-01158 |
| Caesars Entertainment Finance Corp. | 15-01153 |
| Caesars Entertainment Golf, Inc. | 15-01154 |
| Caesars Entertainment Retail, Inc. | 15-01157 |
| Caesars Entertainment Windsor Limited | 15-01190 |
| Caesars Escrow Corporation | 15-01155 |
| Caesars India Sponsor Company, LLC | 15-01194 |
| Caesars License Company, LLC | 15-01199 |
| Caesars Marketing Services Corporation | 15-01203 |
| Caesars Massachusetts Acquisition Company, LLC | 15-01270 |
| Caesars Massachusetts Development Company, LLC | 15-01166 |
| Caesars Massachusetts Investment Company, LLC | 15-01168 |
| Caesars Massachusetts Management Company, LLC | 15-01170 |
| Caesars New Jersey, Inc. | 15-01159 |
| Caesars Operating Escrow LLC | 15-01272 |
| Caesars Palace Corporation | 15-01161 |
| Caesars Palace Realty Corp. | 15-01164 |
| Caesars Palace Sports Promotions, Inc. | 15-01169 |
| Caesars Riverboat Casino, LLC | 15-01172 |
| Caesars Trex, Inc. | 15-01171 |
| Caesars United Kingdom, Inc. | 15-01174 |

| DEBTOR | CASE NO. |
|---|---|
| Caesars World Marketing Corporation | 15-01176 |
| Caesars World Merchandising, Inc. | 15-01160 |
| Caesars World, Inc. | 15-01173 |
| California Clearing Corporation | 15-01177 |
| Casino Computer Programming, Inc. | 15-01162 |
| CG Services, LLC | 15-01179 |
| Chester Facility Holding Company, LLC | 15-01313 |
| Christian County Land Acquisition Company, LLC | 15-01274 |
| Consolidated Supplies, Services and Systems | 15-01163 |
| Corner Investment Company Newco, LLC | 15-01275 |
| Cromwell Manager, LLC | 15-01276 |
| CZL Development Company, LLC | 15-01278 |
| CZL Management Company, LLC | 15-01279 |
| DCH Exchange, LLC | 15-01281 |
| DCH Lender, LLC | 15-01282 |
| Des Plaines Development Limited Partnership | 15-01144 |
| Desert Palace, Inc. | 15-01167 |
| Durante Holdings, LLC | 15-01209 |
| East Beach Development Corporation | 15-01175 |
| FHR Corporation | 15-01178 |
| FHR Parent, LLC | 15-01212 |
| Flamingo-Laughlin Parent, LLC | 15-01216 |
| Flamingo-Laughlin, Inc. | 15-01219 |
| GCA Acquisition Subsidiary, Inc. | 15-01181 |
| GNOC, Corp. | 15-01184 |
| Grand Casinos of Biloxi, LLC | 15-01221 |
| Grand Casinos of Mississippi, LLC - Gulfport | 15-01223 |
| Grand Casinos, Inc. | 15-01186 |
| Grand Media Buying, Inc. | 15-01187 |
| Harrah South Shore Corporation | 15-01224 |
| Harrah's Arizona Corporation | 15-01213 |
| Harrah's Bossier City Investment Company, L.L.C. | 15-01218 |
| Harrah's Bossier City Management Company, LLC, a Nevada limited liability company | 15-01220 |
| Harrah's Chester Downs Investment Company, LLC | 15-01283 |
| Harrah's Chester Downs Management Company, LLC | 15-01314 |
| Harrah's Illinois Corporation | 15-01182 |
| Harrah's Interactive Investment Company | 15-01189 |
| Harrah's International Holding Company, Inc. | 15-01192 |
| Harrah's Investments, Inc. | 15-01193 |
| Harrah's Iowa Arena Management, LLC | 15-01284 |
| Harrah's Management Company | 15-01195 |
| Harrah's Maryland Heights Operating Company | 15-01286 |
| Harrah's MH Project, LLC | 15-01288 |
| Harrah's NC Casino Company, LLC | 15-01280 |

KE 33843292

| DEBTOR | CASE NO. |
|---|---|
| Harrah's New Orleans Management Company | 15-01222 |
| Harrah's North Kansas City LLC | 15-01266 |
| Harrah's Operating Company Memphis, LLC | 15-01269 |
| Harrah's Pittsburgh Management Company | 15-01197 |
| Harrah's Reno Holding Company, Inc. | 15-01198 |
| Harrah's Shreveport Investment Company, LLC | 15-01225 |
| Harrah's Shreveport Management Company, LLC | 15-01185 |
| Harrah's Shreveport/Bossier City Holding Company, LLC | 15-01188 |
| Harrah's Shreveport/Bossier City Investment Company, LLC | 15-01262 |
| Harrah's Southwest Michigan Casino Corporation | 15-01201 |
| Harrah's Travel, Inc. | 15-01202 |
| Harrah's West Warwick Gaming Company, LLC | 15-01271 |
| Harveys BR Management Company, Inc. | 15-01204 |
| Harveys C.C. Management Company, Inc. | 15-01205 |
| Harveys Iowa Management Company, Inc. | 15-01206 |
| Harveys Tahoe Management Company, Inc. | 15-01191 |
| H-BAY, LLC | 15-01273 |
| HBR Realty Company, Inc. | 15-01207 |
| HCAL, LLC | 15-01196 |
| HCR Services Company, Inc. | 15-01210 |
| HEI Holding Company One, Inc. | 15-01211 |
| HEI Holding Company Two, Inc. | 15-01214 |
| HHLV Management Company, LLC | 15-01277 |
| HIE Holdings Topco, Inc. | 15-01215 |
| Hole in the Wall, LLC | 15-01285 |
| Horseshoe Entertainment | 15-01200 |
| Horseshoe Gaming Holding, LLC | 15-01227 |
| Horseshoe GP, LLC | 15-01230 |
| Horseshoe Hammond, LLC | 15-01232 |
| Horseshoe Shreveport, L.L.C. | 15-01233 |
| HTM Holding, Inc. | 15-01217 |
| JCC Holding Company II Newco, LLC | 15-01287 |
| Koval Holdings Company, LLC | 15-01289 |
| Koval Investment Company, LLC | 15-01235 |
| Las Vegas Golf Management, LLC | 15-01237 |
| Las Vegas Resort Development, Inc. | 15-01231 |
| Laundry Parent, LLC | 15-01239 |
| LVH Corporation | 15-01234 |
| LVH Parent, LLC | 15-01241 |
| Martial Development Corp. | 15-01236 |
| Nevada Marketing, LLC | 15-01290 |
| New Gaming Capital Partnership, a Nevada Limited Partnership | 15-01244 |
| Ocean Showboat, Inc. | 15-01238 |
| Octavius Linq Holding Co., LLC | 15-01246 |
| Parball Corporation | 15-01240 |

KE 33843292

| DEBTOR | CASE NO. |
|---|---|
| Parball Parent, LLC | 15-01248 |
| PH Employees Parent, LLC | 15-01249 |
| PHW Investments, LLC | 15-01291 |
| PHW Las Vegas, LLC | 15-01251 |
| PHW Manager, LLC | 15-01312 |
| Players Bluegrass Downs, Inc. | 15-01242 |
| Players Development, Inc. | 15-01253 |
| Players Holding, LLC | 15-01255 |
| Players International, LLC | 15-01292 |
| Players LC, LLC | 15-01307 |
| Players Maryland Heights Nevada, LLC | 15-01257 |
| Players Resources, Inc. | 15-01243 |
| Players Riverboat II, LLC | 15-01309 |
| Players Riverboat Management, LLC | 15-01226 |
| Players Riverboat, LLC | 15-01228 |
| Players Services, Inc. | 15-01229 |
| Reno Crossroads LLC | 15-01293 |
| Reno Projects, Inc. | 15-01245 |
| Rio Development Company, Inc. | 15-01247 |
| Robinson Property Group Corp. | 15-01250 |
| Roman Entertainment Corporation of Indiana | 15-01252 |
| Roman Holding Corporation of Indiana | 15-01254 |
| Showboat Atlantic City Mezz 1, LLC | 15-01295 |
| Showboat Atlantic City Mezz 2, LLC | 15-01296 |
| Showboat Atlantic City Mezz 3, LLC | 15-01298 |
| Showboat Atlantic City Mezz 4, LLC | 15-01300 |
| Showboat Atlantic City Mezz 5, LLC | 15-01302 |
| Showboat Atlantic City Mezz 6, LLC | 15-01303 |
| Showboat Atlantic City Mezz 7, LLC | 15-01305 |
| Showboat Atlantic City Mezz 8, LLC | 15-01306 |
| Showboat Atlantic City Mezz 9, LLC | 15-01308 |
| Showboat Atlantic City Operating Company, LLC | 15-01256 |
| Showboat Atlantic City Propco, LLC | 15-01258 |
| Showboat Holding, Inc. | 15-01261 |
| Southern Illinois Riverboat/Casino Cruises, Inc. | 15-01143 |
| Tahoe Garage Propco, LLC | 15-01310 |
| The Quad Manager, LLC | 15-01294 |
| TRB Flamingo, LLC | 15-01299 |
| Trigger Real Estate Corporation | 15-01259 |
| Tunica Roadhouse Corporation | 15-01260 |
| Village Walk Construction, LLC | 15-01304 |
| Winnick Holdings, LLC | 15-01311 |
| Winnick Parent, LLC | 15-01301 |

4