## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,¹ | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## NOTICE OF FILING OF THE DISCLOSURE STATEMENT FOR THE
## DEBTORS' JOINT PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

**PLEASE TAKE NOTICE** that on March 2, 2015, the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed the *Disclosure Statement for the Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") with the United States Bankruptcy Court for the Northern District of Illinois.

**PLEASE TAKE FURTHER NOTICE** that the Debtors filed the Disclosure Statement as required by the milestones under that certain *Third Amended and Restated Restructuring Support and Forbearance Agreement*, dated as of January 14, 2015, and the Disclosure Statement remains subject to ongoing review and comment from the parties to the RSA. Pursuant to the RSA, the Debtors have until 150 days of the petition date in these chapter 11 cases to obtain approval of the Disclosure Statement. Accordingly, the Debtors have not concurrently filed a motion seeking approval of the Disclosure Statement and are not seeking to set a hearing with respect to approval of the Disclosure Statement at this time.

**PLEASE TAKE FURTHER NOTICE** that copies of the Disclosure Statement as well as copies of all documents filed in these chapter 11 cases are available free of charge by visiting https://cases.primeclerk.com/CEOC or by calling (855) 842-4123 within the United States or Canada or, outside of the United States or Canada, by calling +1 (646) 795-6969. You may also obtain copies of any pleadings by visiting the Court's website at www.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein.

---

¹ The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these jointly-administered chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC.

Dated:  March 2, 2015
Chicago, Illinois

*/s/ David R. Seligman, P.C.*

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022-4611
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |  |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PLAN OF
REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ACCEPTANCES OR REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DRAFT DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

James H.M. Sprayregen, P.C.
David R. Seligman, P.C.
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

- and -

Paul M. Basta, P.C.
Nicole L. Greenblatt
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:      (212) 446-4900

*Proposed Counsel to the Debtors and Debtors in Possession*

Dated: March 2, 2015

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these jointly-administered chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC.

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS AND INTERESTS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE DEBTORS' JOINT PLAN OF REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE. BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE VIII.

THE PLAN IS SUPPORTED BY, AMONG OTHERS, THE DEBTORS, THEIR PARENT, CAESARS ENTERTAINMENT CORPORATION, AND HOLDERS OF MORE THAN [80] PERCENT OF THE APPROXIMATELY $[___] BILLION OF SECURED FIRST LIEN NOTES CLAIMS.

THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND EACH PROPOSED TRANSACTION CONTEMPLATED BY THE PLAN. FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, CERTAIN EVENTS IN THE DEBTORS' CHAPTER 11 CASES, AND CERTAIN DOCUMENTS RELATED TO THE PLAN, ATTACHED HERETO AND/OR INCORPORATED BY REFERENCE HEREIN. ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THEY ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES. FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED. THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

THE DEBTORS HAVE PREPARED THIS DISCLOSURE STATEMENT IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3016(B), AND LOCAL BANKRUPTCY RULE 3016-1 AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THE DEBTORS DID NOT FILE THIS DISCLOSURE STATEMENT WITH THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. NEITHER THE SEC NOR ANY STATE AUTHORITY HAVE PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH THE SEC UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES LAW ("BLUE SKY LAW"). THE SECURITIES TO BE ISSUED WILL BE ISSUED IN RELIANCE ON SECTION 4(A)(2) OF THE SECURITIES ACT AND SIMILAR BLUE SKY LAW PROVISIONS, AS WELL AS, TO THE EXTENT APPLICABLE, THE EXEMPTION FROM THE SECURITIES ACT AND EQUIVALENT STATE LAW REGISTRATION REQUIREMENTS PROVIDED BY SECTION 1145(A)(1) OF THE BANKRUPTCY CODE, TO EXEMPT THE ISSUANCE OF NEW SECURITIES IN CONNECTION WITH THE SOLICITATION AND THE PLAN FROM REGISTRATION UNDER THE SECURITIES ACT AND BLUE SKY LAW.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.  ALTHOUGH THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.  THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND SHOULD NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  THE DEBTORS MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.  ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.  INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.  THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME, SUBJECT TO THE TERMS OF THE PLAN.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE BANKRUPTCY COURT CONFIRMS THE PLAN AND THE EFFECTIVE DATE OCCURS, THE TERMS OF THE PLAN AND THE RESTRUCTURING TRANSACTIONS CONTEMPLATED BY THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS AND INTERESTS THAT DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR THAT ARE NOT ENTITLED TO VOTE ON THE PLAN).

**TABLE OF CONTENTS**

Page

ARTICLE I. INTRODUCTION ........................................................................................................1

ARTICLE II. IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT ...........................3

ARTICLE III. SUMMARY OF THE PLAN ......................................................................................4

    A.    Treatment of Claims and Interests...........................................................................4
    B.    Distributions to Holders of Allowed Claims and Interests......................................6
    C.    The Separation Structure.........................................................................................8
    D.    Funded Debt Obligations upon Consummation of the Plan .....................................8
    E.    Cash Elections, Equity Rights, PropCo Preferred Equity Call and Put Rights, and PropCo
        Common Equity Purchase Commitment Election.....................................................9
    F.    New Boards............................................................................................................11
    G.    Shared Services .....................................................................................................12
    H.    Management and Lease Support Agreement...........................................................12
    I.    Right of First Refusal Agreement ..........................................................................12
    J.    PropCo Call Right Agreement ...............................................................................12
    K.    Releases ................................................................................................................12

ARTICLE IV. QUESTIONS AND ANSWERS REGARDING THIS  DISCLOSURE STATEMENT
    AND THE PLAN ...................................................................................................13

    A.    What is chapter 11?................................................................................................13
    B.    Why are the Debtors sending me this Disclosure Statement?.................................14
    C.    What is the treatment of my Claim(s), if any, under the Plan and am I entitled to vote on
        the Plan? ...............................................................................................................14
    D.    What will I receive from the Debtors if I hold an Allowed Administrative Claim, a
        Priority Tax Claim, or a Professional Fee Claim? ..................................................14
    E.    If the Plan provides that I get a distribution, do I get it upon Confirmation or when the
        Plan goes effective, and what is meant by "Confirmation," "Effective Date," and
        "Consummation"? ..................................................................................................14
    F.    What are the sources of cash and other consideration required to fund the Plan? .........14
    G.    Will there be releases and exculpation granted to parties in interest as part of the Plan? .............15
    H.    What is the deadline to vote on the Plan? ..............................................................15
    I.    How do I vote for or against the Plan?...................................................................15
    J.    Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the
        Confirmation Hearing set to occur? .......................................................................15
    K.    What is the purpose of a Confirmation Hearing?....................................................15
    L.    What is the effect of the Plan on the Debtors' ongoing business?...........................16
    M.    Who do I contact if I have additional questions with respect to this Disclosure Statement
        or the Plan? ...........................................................................................................16
    N.    Do the Debtors recommend voting in favor of the Plan?........................................16
    O.    Who Supports the Plan?.........................................................................................16

ARTICLE V. BACKGROUND TO THESE CHAPTER 11 CASES. ....................................................16

    A.    The Debtors' Business...........................................................................................17
    B.    The Debtors' Corporate Structure, Parent, and Affiliates......................................20
    C.    Management of the Debtors....................................................................................22
    D.    The Debtors' Capital Structure...............................................................................26

i

**ARTICLE VI. EVENTS LEADING TO THE CHAPTER 11 FILINGS** ...................................................**29**

    A.    Economic Challenges.......................................................................................................29
    B.    Out-of-Court Transactions ...............................................................................................31
    C.    Independent Investigation, Disputes with Creditors, and Negotiation of the Restructuring Support Agreement .......................................................................................................35
    D.    Proposed Merger of CEC and CACQ ...............................................................................38
    E.    National Retirement Fund Withdrawal .............................................................................38
    F.    The Debtors' Financial Outlook and Business Strategy Going Forward ..........................39

**ARTICLE VII. MATERIAL EVENTS OF THE CHAPTER 11 CASES** ..............................................**39**

    A.    Commencement of Involuntary Chapter 11 Proceedings...................................................39
    B.    First Day Pleadings and Certain Related Relief ...............................................................39
    C.    Pleadings Related to the Proposed Restructuring..............................................................43
    D.    Rejection and Assumption of Executory Contracts and Unexpired Leases ......................43
    E.    Appointment of Statutory Committees .............................................................................44
    F.    Claims Bar Date ..............................................................................................................44
    G.    Pending Litigation Proceedings .......................................................................................45
    H.    Exclusivity ......................................................................................................................45

**ARTICLE VIII. RISK FACTORS** .....................................................................................................**45**

    A.    Certain Bankruptcy Law Considerations .........................................................................45
    B.    Risk Factors and Considerations Regarding the Companies' Businesses and Operations ..............48
    C.    Risk Factors and Considerations Regarding PropCo's, CPLV Sub's, and the REIT's Businesses and Operations.........................................................................................52
    D.    Risk Factors and Considerations Regarding the Companies' Financial Condition ........................53
    E.    Risk Factors and Considerations Regarding the Separation of the Debtors into OpCo, PropCo, and the REIT ...............................................................................................56
    F.    Risk Factors and Considerations Regarding the Status of the REIT as a Real Estate Investment Trust..............................................................................................58
    G.    Risks Relating to the New Debt .......................................................................................63
    H.    Risks Relating to Equity Securities Under the Plan ..........................................................69
    I.    Disclosure Statement Disclaimer .....................................................................................71
    J.    Liquidation Under Chapter 7 ...........................................................................................73

**ARTICLE IX. SOLICITATION AND VOTING PROCEDURES** ......................................................**73**

    A.    Solicitation Packages .......................................................................................................73
    B.    Voting Rights...................................................................................................................74
    C.    Voting Procedures ...........................................................................................................74
    D.    Ballots and Master Ballots Not Counted..........................................................................75

**ARTICLE X. CASH ELECTION, EQUITY RIGHTS, AND  PROPCO PREFERRED EQUITY CALL AND PUT RIGHT PROCEDURES** ......................................................................**75**

    A.    Procedures Implementing the Cash Elections ...................................................................75
    B.    Procedures Implementing the Equity Rights.....................................................................77
    C.    Procedures Implementing the PropCo Preferred Equity Call and Put Rights ....................78
    D.    Procedures Implementing the PropCo Common Equity Purchase Commitment .........................79

**ARTICLE XI. CONFIRMATION OF THE PLAN** ............................................................................**80**

    A.    Requirements for Confirmation of the Plan ......................................................................80
    B.    Best Interests of Creditors/Liquidation Analysis..............................................................80
    C.    Feasibility........................................................................................................................80
    D.    Acceptance by Impaired Classes ......................................................................................81
    E.    Confirmation without Acceptance by All Impaired Classes..............................................81

**ARTICLE XII. CERTAIN SECURITIES LAW MATTERS** ............................................................................ 82

    A.    Issuance of Securities under the Plan ........................................................................... 82
    B.    Subsequent Transfers of Securities Issued under the Plan ............................................. 83

**ARTICLE XIII. CERTAIN UNITED STATES  INCOME TAX CONSEQUENCES OF THE PLAN** ............. 84

    A.    Introduction ................................................................................................................. 84
    B.    Certain Federal Income Tax Consequences of the Plan to the Debtors ......................... 85
    C.    Certain Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed
        Claims and Interests .................................................................................................... 86
    D.    Certain Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed
        Claims and Interests .................................................................................................... 92
    E.    Certain REIT Tax Considerations, Including Certain Dividend Requirements .............. 94
    F.    Tax Aspects of REITCo's Ownership of PropCo ........................................................ 104
    G.    Ownership and Disposition of the PropCo LP Interests ............................................... 105
    H.    Ownership and Disposition of OpCo Common Stock .................................................. 108
    I.    Withholding and Reporting .......................................................................................... 109

KE 34442788

**EXHIBITS**

| | |
|---|---|
| EXHIBIT A | Debtors' Joint Plan of Reorganization |
| EXHIBIT B | Corporate Structure of the Debtors and Certain Non-Debtor Affiliates as of the Petition Date |
| EXHIBIT C | Disclosure Statement Order |
| EXHIBIT D | Restructuring Support Agreement |
| EXHIBIT E | Financial Projections |
| EXHIBIT F | Liquidation Analysis |
| EXHIBIT G | The Debtors' 10-K for 2014 |
| EXHIBIT H | Backstop Commitment Agreement |
| EXHIBIT I | Projected Corporate Structure as of the Effective Date |
| EXHIBIT J | Preliminary List of Real Property Assets to Be Contributed to PropCo |

KE 34442788

# ARTICLE I.
## INTRODUCTION

This disclosure statement (this "<u>Disclosure Statement</u>") provides information regarding the Debtors' Plan,[1] which the Debtors seek to have confirmed by the Bankruptcy Court.  A copy of the Plan is attached hereto as **Exhibit A**.  All capitalized terms used but not otherwise defined in this Disclosure Statement have the meanings ascribed to them in the Plan.  The rules of interpretation set forth in Article I.B of the Plan govern the interpretation of this Disclosure Statement.[2]

CEOC is the largest majority-owned operating subsidiary of Caesars Entertainment Corporation ("<u>CEC</u>" or "<u>Caesars Entertainment</u>").  The remaining Debtors are direct and indirect subsidiaries of CEOC.  CEC, together with the Debtors and its other affiliates (collectively, "<u>Caesars</u>"), is the world's most geographically diversified casino-entertainment company.  Since its founding in Reno, Nevada more than 75 years ago, Caesars has grown through new development, expansions, and acquisitions.  Caesars now owns, operates, or manages 50 casinos in five countries on three continents, with properties in the United States, Canada, the United Kingdom, South Africa, and Egypt.  Within the United States, Caesars owns, operates, or manages casinos in 14 states, primarily under the Caesars®, Harrahs®, or Horseshoe® brand names.  In total, Caesars oversees approximately 3 million square feet of gaming space, 39,000 hotel rooms, 45 million customer loyalty program participants, and 68,000 employees.

As Caesars' largest operating unit, the Debtors are an integral part of the Caesars enterprise, owning, operating, or managing 38 casinos in 14 states and 5 countries.  For the twelve months ending September 30, 2014, the Debtors contributed approximately $5.4 billion—or 64 percent—of Caesars' $8.4 billion in total net revenues.  Today, the Debtors' core casino offerings are spread across the United States—including strong concentrations in Chicagoland, Nevada, and Atlantic City—as well as throughout the world.  The Debtors employ approximately 32,000 people, including approximately 3,000 in the Chicagoland area and approximately 6,500 in Las Vegas.

Due to issues and events more fully described below, including, with respect to the Debtors' funded debt obligations, the broader economic downturn affecting the U.S. economy since 2008, and increased gaming competition, the Debtors filed for bankruptcy protection on January 15, 2015.  The Debtors entered chapter 11 to protect their assets and to implement a prenegotiated restructuring of their prepetition capital structure.  Before the Petition Date, the Debtors engaged in negotiations with, among others, CEC, certain of the Sponsors'[3] affiliates, and certain Holders of Secured First Lien Notes Claims, regarding the terms of a restructuring transaction that would significantly reduce the Debtors' funded debt.  These negotiations were successful and the agreed-to terms of the restructuring transaction are incorporated in the Third Amended and Restated Restructuring Support and Forbearance Agreement attached hereto as **Exhibit D** (the "<u>Restructuring Support Agreement</u>"), which formed the backbone for the Plan.

If confirmed and consummated, the Plan will eliminate approximately $10 billion in funded debt from the Debtors' balance sheet, permitting the Debtors to maintain ongoing operations without the unsustainable burden of their existing debt load.  To effectuate the Plan, the Debtors will, among other things, cancel the existing Interests in CEOC and convert their prepetition corporate structure into two companies—OpCo and PropCo.  OpCo will

---

[1]    As used herein, "<u>Plan</u>" means the *Debtors' Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, a copy of which is attached as **Exhibit A** to this Disclosure Statement and incorporated herein by reference, as it may be altered, amended, modified, or supplemented from time to time in accordance with the terms of Article X thereof, and including all exhibits thereto and the Plan Supplement.

[2]    The Debtors have proprietary rights to a number of trademarks used in this Disclosure Statement that are important to their businesses, including, without limitation, Caesars, Caesars Entertainment, Caesars Palace, Harrah's, Total Rewards, Horseshoe, Paris Las Vegas, Flamingo, and Bally's. This Disclosure Statement may omit the registered trademark (®) and trademark (™) symbols for such trademarks named herein.

[3]    As used herein, "<u>Sponsors</u>" shall mean, collectively, those affiliates of Apollo Global Management, LLC (together with such affiliates, "<u>Apollo</u>") and affiliates of TPG Capital, LP (together with such affiliates, "<u>TPG</u>") that acquired Caesars Entertainment on January 28, 2008.

manage the Debtors' properties and facilities on an ongoing basis. PropCo will hold certain of the Debtors' real property assets and related fixtures and will lease those assets to OpCo pursuant to the Master Lease Agreement. A real estate investment trust will be formed—the REIT—to own and control PropCo as its general partner. Indebtedness and equity issued with respect to the REIT, PropCo, and OpCo will be used to provide distributions to Holders of Allowed Claims as provided by the Plan, including OpCo Common Stock, PropCo Common Equity, and PropCo Preferred Equity. In addition, the Plan contemplates the formation of a new, unrestricted, wholly owned subsidiary of PropCo—the CPLV Sub—that will own the Debtors' Caesars Palace-Las Vegas property and will incur no more than $2.6 billion of new indebtedness on the Effective Date. The Debtors believe this structure materially improves stakeholder recoveries versus a more traditional "standalone" restructuring given, among other things, the favorable tax treatment afforded to distributions from real estate investment trusts and the corresponding valuations ordinarily associated with real estate investment trusts.

The Plan also implements a global settlement of claims and causes of action the Debtors and certain third parties may have pursued against CEC and certain CEC affiliates, including the Sponsors, on account of transactions occurring prior to the Petition Date. This settlement results from, among other things, the independent investigation and analysis undertaken at the direction of the Debtors' Special Governance Committee (as defined herein), as well as vigorous, arm's-length negotiations among the relevant parties. This settlement is supported by all parties to the Restructuring Support Agreement, and the Debtors believe this settlement fairly reflects the value of such claims and is in the best interests of their chapter 11 estates as a whole.

The Debtors believe that the Restructuring Transactions contemplated by the Plan maximize stakeholder recoveries, preserve the Debtors' ongoing operations for the benefit of numerous parties in interest in these Chapter 11 Cases, and will permit the Debtors to focus on opportunities created by a significantly deleveraged capital structure. Accordingly, the Debtors now seek the Bankruptcy Court's approval of the Plan. Before soliciting acceptances of a proposed plan of reorganization, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of a chapter 11 plan. The Debtors submit this Disclosure Statement in accordance with such requirements. This Disclosure Statement includes information about:

- the Debtors' corporate history and corporate structure, business operations, and prepetition capital structure and indebtedness (Article V hereof);

- events leading to the Chapter 11 Cases, including the Debtors' restructuring negotiations (Article VI hereof);

- the Debtors' proposed OpCo/PropCo structure (Article III hereof);

- material events in the Chapter 11 Cases (Article VII hereof);

- certain risk factors Holders of Claims and Interests should consider before voting to accept or reject the Plan and information regarding alternatives to Confirmation of the Plan (Article VIII hereof);

- the classification and treatment of Claims and Interests under the Plan, including who is entitled to vote and how to vote on the Plan (Article III.A and Article IX.B hereof);

- the (i) cash elections, purchase commitments, call rights, and put rights provided by the Plan with respect to OpCo Common Stock, PropCo Common Equity, and PropCo Preferred Equity, (ii) backstop commitments provided under the Plan with respect to those cash elections, purchase commitments, call rights, and put rights, and (iii) procedures applicable to the foregoing (Article III.E and Article X hereof);

- the Equity Rights contemplated by the Plan in the event each class of Non-First Lien Claims votes to accept the Plan and procedures applicable to the foregoing (Article III.E and Article X hereof);

2

- releases contemplated by the Plan that are integral to the overall settlement of Claims and Interests pursuant to the Plan (Article III.G hereof);

- the statutory requirements for confirming the Plan (Article XI hereof);

- certain securities law matters, including with respect to the issuance of new interests under the Plan (Article XII hereof); and

- certain United States federal income tax consequences of the Plan (Article XIII hereof).

In light of the foregoing, the Debtors believe this Disclosure Statement contains "adequate information" to enable a hypothetical reasonable investor to make an informed judgment about the Plan and complies with all aspects of section 1125 of the Bankruptcy Code.

The Debtors' boards of directors and managers have approved the Plan and the Restructuring Transactions contemplated therein and believe the Plan is in the best interests of the Debtors' Estates.  As such, the Debtors' boards of directors and managers recommend that all Holders entitled to vote accept the Plan by returning their Ballots and Master Ballots, as applicable, so that Prime Clerk LLC, the Debtors' Notice and Claims Agent (the "Notice and Claims Agent"), **actually** **receives** such Ballots or Master Ballots by the Voting Deadline. Assuming the Plan receives the requisite acceptances, the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.[4]

## ARTICLE II.
## IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

The consummation and effectiveness of the Plan are subject to certain material conditions precedent described herein and set forth in Article IX of the Plan.  There is no assurance that the Bankruptcy Court will confirm the Plan or, if the Bankruptcy Court does confirm the Plan, that the conditions necessary for the Plan to go effective will be satisfied or otherwise waived.

You are encouraged to read this Disclosure Statement in its entirety, including Article VIII hereof entitled "Risk Factors," and the Plan before submitting your Ballot to vote on the Plan.

The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein or an endorsement by the Bankruptcy Court of the merits of the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.  The summaries of the financial information and the documents annexed to this Disclosure Statement or otherwise incorporated herein by reference are qualified in their entirety by reference to those documents.  The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to the Plan and one should not rely on such information for any other purpose.  In the event of any inconsistency between the Disclosure Statement and the Plan, the relevant provisions of the Plan will govern.

---

[4]     For the avoidance of doubt, as of the date hereof, and as described in greater detail below, the releases encompassed under the Plan remain subject to the completion of the Special Governance Committee's ongoing investigation.

## ARTICLE III.
## SUMMARY OF THE PLAN

Under the Plan, the Debtors will reorganize pursuant to a dual OpCo and PropCo structure. Subject to certain exclusions, the Debtors will contribute substantially all of their U.S.-based real property assets to PropCo (including PropCo subsidiaries) (the "Contributed Properties"), and PropCo will lease back most of those assets to OpCo in exchange for annual lease payments on the terms set forth in the Master Lease Agreement. A preliminary list of such properties is attached hereto as **Exhibit J** for informational purposes only. The list in **Exhibit J** remains subject to revision in all respects and a final list will be included as part of the Plan Supplement. As discussed in greater detail below, the Debtors' contribution of real property assets to PropCo will be completed through either the Spin Structure or the Partnership Contribution Structure. The REIT will hold and control the general partnership interest in PropCo, and will also hold limited partnership interests in PropCo. The Debtors believe that this real estate investment trust structure will enable them to unlock substantial value for the benefit of their stakeholders given the relatively favorable valuations associated with such entities as opposed to traditional gaming companies.

### A.    Treatment of Claims and Interests

As set forth in Article III of the Plan and in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code, all Claims and Interests (other than Administrative Claims, Priority Tax Claims, and Professional Fee Claims, which are unclassified Claims under the Plan) are classified into Classes for all purposes, including voting, Confirmation, and distributions pursuant to the Plan. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class. A Claim or Interest is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

### 1.    Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Priority Tax Claims, or Professional Fee Claims and, thus, Article III of the Plan does not include such Claims in the Classes of Claims set forth therein. Instead, Article II of the Plan provides for the satisfaction of these unclassified Claims. The treatment and the projected recoveries under the Plan of these unclassified Claims, which are not entitled to vote on the Plan, are described in summary form below for illustrative purposes only.

| Unclassified Claim | Plan Treatment | Estimated Allowed Claims | Estimated Percent Recovery Under the Plan |
|---|---|---|---|
| Administrative Claims | Unimpaired | $[_____] | 100% |
| Priority Tax Claims | Unimpaired | $[_____] | 100% |
| Professional Fee Claims[5] | Unimpaired | $[_____] | 100% |

### 2.    Classified Claims

The table below summarizes the classification and treatment of all classified Claims against and Interests in each Debtor (as applicable) under the Plan. The ability of a Holder of Claims or Interests to vote on, and such Holder's distribution under, the Plan, if any, depends on the type of Claim or Interest held by such Holder (if any) and the treatment afforded any such Claim or Interest. The classification, treatment, voting rights, and projected recoveries of classified Claims are described in summary form below for illustrative purposes only, and are subject to material change. **In particular, recoveries available to the Holders of Claims in Classes [_–_] are estimates and actual recoveries may materially differ based on, among other things, whether the amount of Claims**

---

[5]    The Professional Fee Claims set forth herein and in the Plan constitute the estimated unpaid Professional Fee Claims as of a hypothetical [_____] Effective Date, and this estimate is nonbinding and is subject to material revision

4

actually Allowed against the applicable Debtor exceed the estimates provided below.  In such an instance, the recoveries available to the Holders of these Claims could be materially lower than the following estimates.

| Class | Type of Claim or Interest | Status | Estimated Allowed Claims or Interests | Estimated Percent Recovery Under the Plan |
|---|---|---|---|---|
| **Class A**<br>(Each Debtor) | Secured Tax Claims | Unimpaired<br>(Presumed to Accept) | $[_____] | 100% |
| **Class B**<br>(Each Debtor) | Other Secured Claims | Unimpaired<br>(Presumed to Accept) | $[_____] | 100% |
| **Class C**<br>(Each Debtor) | Other Priority Claims | Unimpaired<br>(Presumed to Accept) | $[_____] | 100% |
| **Class D**<br>(Each Debtor other than Non-Obligor Debtors) | Prepetition Credit Agreement Claims | Impaired<br>(Entitled to Vote) | $[_____] | 100% |
| **Class E**<br>(Each Debtor other than Non-Obligor Debtors) | Secured First Lien Notes Claims | Impaired<br>(Entitled to Vote) | $[_____] | [__]% |
| **Class F**<br>(Each Debtor other than Non-Obligor Debtors) | First Lien Notes Deficiency Claims | Impaired<br>(Entitled to Vote) | $[_____] | 0% – [__]% |
| **Class G**<br>(Each Debtor other than Non-Obligor Debtors) | Second Lien Notes Claims | Impaired<br>(Entitled to Vote) | $[_____] | [__]% – [__]% |
| **Class H**<br>(Each Debtor other than Non-Obligor Debtors) | Senior Unsecured Notes Claims | Impaired<br>(Entitled to Vote) | $[_____] | [__]% – [__]% |
| **Class I**<br>(CEOC and Each Subsidiary Guarantor) | Subsidiary-Guaranteed Notes Claims | Impaired<br>(Entitled to Vote) | $[_____] | [__]% – [__]% |
| **Class J**<br>(Each Debtor other than Non-Obligor Debtors) | General Unsecured Claims | Impaired<br>(Entitled to Vote) | $[_____] | [__]% – [__]% |
| **Class K**<br>(Each Non-Obligor Debtor) | Non-Obligor Unsecured Claims | Impaired<br>(Entitled to Vote) | $[_____] | [__]% – [__]% |
| **Class L**<br>(Each Debtor) | Section 510(b) Claims | Impaired<br>(Deemed to Reject) | $[_____] | [__]% – [__]% |
| **Class M**<br>(Each Debtor) | Intercompany Claims | Unimpaired<br>(Presumed to Accept) | $[_____] | [__]% – [__]% |
| **Class N**<br>(Each Debtor) | Intercompany Interests | Unimpaired<br>(Presumed to Accept) | $[_____] | [__]% – [__]% |
| **Class O**<br>(CEOC) | CEOC Interests | Impaired<br>(Deemed to Reject) | $[_____] | [__]% – [__]% |

KE 34442788

| Class | Type of Claim or Interest | Status | Estimated Allowed Claims or Interests | Estimated Percent Recovery Under the Plan |
|---|---|---|---|---|
| **Class P** (Des Plaines Development Limited Partnership) | Des Plaines Interests | [TO COME] | $[_____] | [__]% – [__]% |

### B.    Distributions to Holders of Allowed Claims and Interests

The Plan contemplates the following distributions to Holders of Allowed Claims and Interests, among other recoveries:

| Claim Holders | Summary of Plan Distributions |
|---|---|
| **Holders of Secured Tax Claims** (Class A) | Unimpaired.  Except to the extent a Holder of an Allowed Secured Tax Claim agrees to less favorable treatment, each such Holder will receive, at the option of the Reorganized Debtors:  (a) payment in full in Cash of such Holder's Allowed Secured Tax Claim as of the Effective Date or as soon as reasonably practicable thereafter or (b) equal semi-annual Cash payments commencing as of the Effective Date or as soon as reasonably practicable thereafter and continuing for five years, in an aggregate amount equal to such Allowed Secured Tax Claim, together with interest at the applicable non-default contract rate under non-bankruptcy law, subject to the option of the Reorganized Debtors to prepay the entire amount of such Allowed Secured Tax Claim during such time period. |
| **Holders of Other Secured Claims** (Class B) | Unimpaired.  Except to the extent a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, each such Holder will receive, at the option of the Reorganized Debtors:  (a) payment in full in Cash of such Holder's Allowed Other Secured Claim; (b) Reinstatement of such Holder's Allowed Other Secured Claim; (c) the collateral securing such Holder's Allowed Other Secured Claim; or (d) such other treatment rendering such Holder's Allowed Other Secured Claim Unimpaired. |
| **Holders of Other Priority Claims** (Class C) | Unimpaired.  Except to the extent a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, each such Holder will receive, at the option of the Reorganized Debtors:  (a) payment in full in Cash on the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; or (b) such other treatment rendering such Holder's Allowed Other Priority Claim Unimpaired. |
| **Holders of Prepetition Credit Agreement Claims** (Class D) | Impaired.  Except to the extent a Holder of an Allowed Prepetition Credit Agreement Claim agrees to less favorable treatment, each such Holder will receive a 100 percent recovery, comprised of such Holder's Pro Rata share of:<br><br>• $705 million in Cash, $883 million of (a) additional Cash out of the proceeds, if any, of the OpCo First Lien Financing Option or (b) if the Debtors are not able to exercise the OpCo First Lien Financing Option the OpCo First Lien Term Loan, $406 million of the OpCo Second Lien Notes, and $1,961 million of the PropCo First Lien Term Loan.<br><br>• As discussed in greater detail below, $1,450 million comprised of (a) CPLV Mezzanine Debt and (b) Cash in the amount of the difference between (i) 1,450 million and (ii) the amount of CPLV Mezzanine Debt issued; provided that $100 million of the CPLV Mezzanine Debt, if any, may be converted to $100 million of OpCo First Lien Term Loan, OpCo Second Lien Notes, PropCo First Lien Term Loan, PropCo Second Lien Notes, or PropCo Common Equity if Holders of Prepetition Credit Agreement Claims elect (on the Class D Ballot) as a Class to cause the CPLV Mezzanine Debt Conversion to occur pursuant to the Prepetition Credit Agreement CPLV Option Procedures. |
| **Holders of Secured First Lien Notes Claims** (Class E) | Impaired.  Except to the extent a Holder of an Allowed Secured First Lien Notes Claim agrees to less favorable treatment, each such Holder will receive approximately an [__] percent recovery, comprised of such Holder's Pro Rata share of:<br><br>• $306 million of (a) the OpCo First Lien Notes or (b) additional Cash, $141 million of the OpCo Second Lien Notes, $431 million of the PropCo First Lien Notes, and $1,425 million of the PropCo Second Lien Notes.<br><br>• $1,107 million comprised of (a) CPLV Mezzanine Debt and (b) Cash in the amount of the difference between (i) 1,150 million and (ii) the amount of CPLV Mezzanine Debt.<br><br>• 100 percent of OpCo Common Stock; provided that each Holder may elect, pursuant to the OpCo |

KE 34442788

| Claim Holders | Summary of Plan Distributions |
|---|---|
| | Common Stock Cash Election, to receive Cash in lieu of their share of OpCo Common Stock in an amount implying a total value of $700 million for 100 percent of the OpCo Common Stock (the "OpCo Common Stock Implied Value"). |
| | • 69.9 percent of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, or the CPLV Mezzanine Debt Conversion, if any); provided that each Holder may elect, pursuant to the PropCo Common Equity Cash Election, to receive Cash in lieu of their share of PropCo Common Equity in an amount implying a total value of $269 million for 14.8 percent of the PropCo Common Equity (the "PropCo Common Stock Implied Value"); provided, further, that such Holders can, in the aggregate, only elect to receive Cash with respect to at most 14.8 percent of the PropCo Common Equity. Additionally, and as described in greater detail below, the Holders' right to receive PropCo Common Equity may be subject to the Equity Rights. |
| | • The PropCo Preferred Equity, subject to the PropCo Preferred Equity Put Right and the PropCo Preferred Equity Call Right. |
| **Holders of First Lien Notes Deficiency Claims** (Class F) | Impaired. Except to the extent a Holder of an Allowed First Lien Notes Deficiency Claim agrees to less favorable treatment: <br><br> • If Holders of Claims in all classes of Non-First Lien Claims and First Lien Notes Deficiency Claims vote to accept the Plan, then Holders of Allowed First Lien Notes Deficiency Claims shall be deemed to waive all distributions in respect of such Claims. <br><br> • If Holders of Claims in any class of Non-First Lien Claims or and First Lien Notes Deficiency Claims vote to reject the Plan, then Holders of Allowed First Lien Notes Deficiency Claims will receive approximately a [__] percent recovery comprised of their Pro Rata share (shared ratably with CEC and the PropCo Common Equity Commitment Parties) of 12.6 percent of PropCo Common Equity, in each case on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, or the CPLV Mezzanine Debt Conversion, if any). |
| **Holders of Non-First Lien Claims** (Classes G, H, I, and J) | Impaired. Except to the extent a Holder of an Allowed Non-First Lien Claim agrees to less favorable treatment: <br><br> • If Holders of Claims in all classes of Non-First Lien Claims and First Lien Notes Deficiency Claims vote to accept the Plan, then Holders of Allowed Non-First Lien Claims will receive approximately a [__] percent recovery comprised of such Holder's Pro Rata share of: <br><br> ○ 30.1 percent of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, or the CPLV Mezzanine Debt Conversion, if any). <br><br> ○ The right to exercise the Equity Rights; provided that Holders that are not an Institutional Accredited Investor or a Qualified Institutional Buyer as of the Voting Record Date shall receive [_____], which shall have the value equal to the value of the Equity Rights such Holder would have been eligible to receive if such Holder were an Institutional Accredited Investor or a Qualified Institutional Buyer; provided further that only Holders of Non-First Lien Claims that, within 60 days of the Petition Date, both (a) executed the Restructuring Support Agreement and (b) agreed to elect, when properly solicited to vote on the Plan, to exercise such Holder's Equity Rights (if any). <br><br> • If Holders of Claims in any class of Non-First Lien Claims or First Lien Notes Deficiency Claims vote to reject the Plan, then such Holders will receive approximately a [__] percent recovery comprised of 17.5 percent of PropCo Common Equity on a fully diluted basis (excluding dilution from Equitized CPLV Mezzanine Debt, PropCo Preferred Equity, or CPLV Mezzanine Debt Conversion, if any). |
| **Holders of Non-Obligor Unsecured Claims** (Class K) | Impaired. Except to the extent a Holder of an Allowed Non-Obligor Unsecured Claim agrees to less favorable treatment, each such Holder will receive approximately a [__] percent recovery, comprised of such Holder's Pro Rata share of [_____]. |
| **Holders of Section 510(b) Claims** (Class L) | Impaired. Each Holder of a Section 510(b) Claim will not receive any distribution on account of such Section 510(b) Claim. |

7

| Claim Holders | Summary of Plan Distributions |
|---|---|
| **Holders of Intercompany Claims** (Class M) | <u>Unimpaired.</u> Intercompany Claims shall be, at the option of the Debtors, either (a) Reinstated as of the Effective Date or (b) cancelled without any distribution on account of such Claims. |
| **Holders of Intercompany Interests** (Class N) | <u>Unimpaired.</u> Intercompany Interests shall be, at the option of the Debtors, either (a) Reinstated as of the Effective Date or (b) cancelled without any distribution on account of such Interests. |
| **Holders of CEOC Interests** (Class O) | <u>Impaired.</u> CEOC Interests will be discharged, canceled, released, and extinguished as of the Effective Date, and Holders of CEOC Interests will not receive any distribution on account of such CEOC Interests; <u>provided, however,</u> that solely for purposes of effectuating the Plan, any CEOC Interests held by CEC may be Reinstated as OpCo Common Stock to the extent that CEC is required to pay Cash to the Debtors pursuant to the CEC OpCo Cash Commitment upon the Holders of Allowed Secured First Lien Notes Claims electing Cash under the OpCo Common Stock Cash Election. |
| **Holders of Des Plaines Interests** (Class P) | [To Come] |

### C.    The Separation Structure

The Debtors intend that the Separation Structure will occur through the Spin Structure, <u>provided</u>, <u>however</u>, that in lieu of the Spin Structure, the separation will be accomplished by the Partnership Contribution Structure if (1) the Company is unable to receive a favorable private letter ruling from the IRS (the "<u>Spin Ruling</u>") or a "should" level opinion of counsel (the "<u>Spin Opinion</u>"), concluding, in either case, based on facts, customary representations, and, in the case of a Spin Opinion, certain customary assumptions, set forth or described in the Spin Ruling or Spin Opinion, that the Spin Structure qualifies under section 368(a)(1)(G) of the Internal Revenue Code, (2) at the election of the Consenting First Lien Noteholders if the Estimated REIT E&P exceeds $1.3 billion, or (3) at the election of the Debtors and CEC, with the consent of the Requisite Consenting Creditors, such consent not to be unreasonably withheld.

If the Partnership Contribution Structure is used, at least 5 percent of the PropCo LP Interests purchased by CEC as a result of the exercise of the PropCo Common Equity Cash Elections (on a fully diluted basis) shall be deemed as OpCo's on account of its contribution of real estate into PropCo. In such case, OpCo shall have the option to participate in future issuances, or purchase additional equity from PropCo at fair market value if participation is not feasible, to maintain its percentage ownership interest in PropCo at 5 percent if it would otherwise decrease below that threshold.

In order to meet the requirement that a real estate investment trust have at least 100 shareholders, and notwithstanding anything herein or in the Plan to the contrary, the REIT will have the right to issue, for Cash, the REIT Series B Preferred Stock.

### D.    Funded Debt Obligations upon Consummation of the Plan

The Plan will eliminate approximately $10 billion in funded debt from the Debtors' balance sheet. If the Plan is confirmed and consummated, the Debtors project that OpCo will be obligated on approximately $1,736 million in funded debt, comprised of:  (a) an $883 million OpCo First Lien Term Loan; (b) $306 million of OpCo First Lien Notes; and (c) $547 million of OpCo Second Lien Notes. The Debtors also project that PropCo (or PropCo's subsidiaries, including CPLV Sub and CPLV Mezz) will be obligated on approximately $6,417 million in funded debt, comprised of:  (w) a $1,961 million PropCo First Lien Term Loan; (x) $431 million of PropCo First Lien Notes; (y) $1,425 million of PropCo Second Lien Notes; and (z) no more than $2,600 million of CPLV Market Debt and/or CPLV Mezzanine Debt.

The Debtors will use commercially reasonable efforts to finance all of the $2,600 million of CPLV Market Debt through a first lien mortgage loan provided by the third-party CPLV Loan Lender. If the Debtors are unable to

finance all of the $2,600 million of CPLV Market Debt, the CPLV Mezzanine Debt will be issued in an initial aggregate amount of the difference between $2,600 million and the amount of CPLV Market Debt actually financed; provided that at least $2,000 million of CPLV Market Debt must be financed by third parties.[6] The Debtors will distribute the Cash proceeds from the CPLV Market Debt and CPLV Mezzanine Debt to Holders of Allowed Prepetition Credit Agreement Claims and Allowed Secured First Lien Notes Claims, as described in greater detail in Article III.B above.  The weighted average yield on the CPLV Market Debt and CPLV Mezzanine Debt will be capped such that the annual debt service shall not exceed $130 million, with the cap increased by $2 million for every $100 million of Equitized CPLV Mezzanine Debt.

The Debtors will also use commercially reasonable efforts to exercise the OpCo First Lien Financing Option.  If, after using commercially reasonable efforts, the Debtors are able to exercise the OpCo First Lien Financing Option, on the Effective Date, OpCo and its applicable subsidiaries shall execute and deliver the OpCo First Lien Loan Documents. On the Effective Date and after execution and delivery of the OpCo First Lien Loan Documents, the OpCo First Lien Loan Lenders shall pay Cash to OpCo, and the Debtors shall distribute the Cash proceeds from the OpCo First Lien Market Debt to the Holders of Prepetition Credit Agreement Claims and Secured First Lien Notes Claims pursuant to the terms of the Plan. If, however, after using commercially reasonable efforts, the Debtors are unable to exercise the OpCo First Lien Financing Option, OpCo and its applicable subsidiaries shall enter into the OpCo First Lien Term Loan and OpCo First Lien Notes.

The following table summarizes the projected funded debt obligations of OpCo and PropCo (or PropCo's subsidiaries, including CPLV Sub and CPLV Mezz) upon consummation of the Plan.

|  | **OpCo** | **PropCo (Or PropCo's Subsidiaries)** |
|---|---|---|
| First Lien Term Loan | $883,000,000 | $1,961,000,000 |
| First Lien Notes | $306,000,000 | $431,000,000 |
| Second Lien Notes | $547,000,000 | $1,425,000,000 |
| CPLV Debt | N/A | $2,000,000 – $2,600,000,000 |
| **Total:** | **$1,736,000,000** | **$6,417,000,000** |

E.    **Cash Elections, Equity Rights, PropCo Preferred Equity Call and Put Rights, and PropCo Common Equity Purchase Commitment Election**

1.    **OpCo Common Stock Cash Election**

Each Holder of a First Lien Notes Claim will be able to elect, pursuant to the OpCo Common Stock Cash Election, to receive Cash instead of OpCo Common Stock in an amount implying a total value of $700 million for 100 percent of the OpCo Common Stock.  This Cash will be proceeds paid by CEC to OpCo pursuant to the CEC OpCo Cash Commitment, and such OpCo Common Stock that would otherwise have been issued to the Holder making the OpCo Common Stock Cash Election will be distributed to CEC (or an equivalent amount of CEOC Interests held by CEC will be Reinstated as OpCo Common Stock).  Upon execution of the Restructuring Support Agreement, Holders of approximately $5.1 billion (or 80 percent) of First Lien Note Claims agreed that they would elect, when properly solicited to vote on the Plan, to receive Cash in lieu of OpCo Common Stock.  Accordingly, OpCo will be majority-owned by CEC upon consummation of the Plan.

---

[6]    As described in greater detail below, the amount of CPLV Mezzanine Debt may be reduced in the event that (a) eligible Holders of Non-First Lien Claims elect to exercise the Equity Rights pursuant to the Equity Rights Procedures, (b) the PropCo Preferred Equity is issued, and/or (c) Holders of Prepetition Credit Agreement Claims elect as a Class to exercise the CPLV Mezzanine Debt Conversion.

###### 2.        PropCo Common Equity Cash Election

Each Holder of a Secured First Lien Notes Claim will be able to elect, pursuant to the PropCo Common Equity Cash Election, to receive Cash instead of PropCo Common Equity, subject to a cap that such Holders can, in the aggregate, only elect to receive Cash with respect to at most 14.8 percent of the PropCo Common Equity.  This Cash will be proceeds paid by CEC and the PropCo Common Equity Commitment Parties to the Debtors pursuant to the PropCo Common Equity Purchase Commitment Agreement, and such PropCo Common Equity that would otherwise have been issued to the Holder making the PropCo Common Equity Cash Election will be distributed to CEC and the PropCo Common Equity Commitment Parties; provided that in the event that the Debtors elect the Spin Structure as anticipated and elect to make distributions of PropCo Common Equity directly to the Holders of Allowed Secured First Lien Notes Claims, then CEC and the PropCo Common Equity Commitment Parties will purchase for Cash the PropCo Common Equity subject to PropCo Common Equity Cash Elections directly from such electing Holders of Secured First Lien Notes Claims.  Moreover, under the Partnership Contribution Structure, Holders of Secured First Lien Notes Claims must elect to receive Cash instead of PropCo Common Equity with respect to at least 5 percent of the PropCo Common Equity.  That 5 percent will be deemed OpCo's on account of the Debtors' contribution of real property assets to PropCo, and will be owned by OpCo in the form of PropCo LP Interests.

###### 3.        Equity Rights

If each class of Non-First Lien Claims votes to accept the Plan, each Holder of a Non-First Lien Claim may elect to exercise the Equity Rights pursuant to the Equity Rights Procedures, provided that such Holder (a) makes any investor representations required for federal and state securities law purposes, including that such Holder is either an Institutional Accredited Investor or a Qualified Institutional Buyer and (b) within 60 days of the Petition date, executes the Restructuring Support Agreement and agrees to elect, when properly solicited to vote on the Plan, to exercise such Holder's Equity Rights (if any).  If a Holder of a Non-First Lien Claim elects to exercise the Equity Rights, such Holder, subject to the terms and conditions set forth in the Plan, may purchase from Holders of Secured First Lien Notes Claims, CEC or the PropCo Common Equity Commitment Parties, as applicable, up to all of the PropCo Common Equity (subject to reduction on a Pro Rata basis based on the amount of Equity Rights actually exercised) distributed to Holders of Secured First Lien Notes Claims pursuant to the Plan or distributed to CEC or the PropCo Common Equity Commitment Parties in the event any Holders of Secured First Lien Notes Claims exercise the PropCo Common Equity Cash Election; provided that under the Partnership Contribution Structure, Holders of Non-First Lien Claims may not exercise their Equity Rights with respect to the 5 percent of PropCo Common Equity that will be distributed to CEC and deemed OpCo's.  Accordingly, if the Equity Rights are exercised in full, those parties exercising the Equity Rights will receive the 69.9 percent of PropCo Common Equity (subject to the 5 percent exclusion under the Partnership Contribution Structure) that would otherwise be distributed to Holders of Allowed Secured First Lien Notes Claims.  If a Holder of a Non-First Lien Claim exercises the Equity Rights, for each $1.00 of PropCo Common Equity purchased such Holder will also be required to purchase $0.25 in face value of CPLV Mezzanine Debt, which CPLV Mezzanine Debt will be equitized as PropCo Common Equity, at a rate of $1 in face amount of CPLV Mezzanine Debt for $1 of PropCo Common Equity at the PropCo Common Equity Implied Value.

###### 4.        Backstop Commitment and PropCo Preferred Equity Put and Call Rights

Under the Plan, each Holder of a Secured First Lien Notes Claim will receive the PropCo Preferred Equity, subject to both the PropCo Preferred Put Right and the PropCo Preferred Call Right.  On the Effective Date, the PropCo Preferred Backstop Investors shall have the right to call up to 50 percent of the PropCo Preferred Equity received by the Holders of Secured First Lien Notes Claims, for Cash, pursuant to the PropCo Preferred Equity Call Right and consistent with the Backstop Commitment Agreement.  Further, each Holder of Secured First Lien Notes Claims that has exercised its right to put PropCo Preferred Equity by the Voting Deadline shall have the right to put such Holders' Pro Rata share of the remaining PropCo Preferred Equity to the PropCo Preferred Backstop Investors for Cash pursuant to the PropCo Preferred Equity Put Right and consistent with the Backstop Commitment Agreement.  If any PropCo Preferred Equity Put or Call Rights are properly exercised, they will be exercised at a price per share implying a total value of $250 million for 100 percent of the PropCo Preferred Equity.

KE 34442788

Proceeds of the issuance of the PropCo Preferred Equity shall be used <u>first</u> to reduce the principal amount of CPLV Mezzanine Debt to be issued to the Holders of Secured First Lien Notes Claims, <u>second</u> to reduce the principal amount of CPLV Market Debt, and <u>third</u> to reduce the principal amount of PropCo Second Lien Notes.

### 5.    PropCo Common Equity Purchase Commitment Election

Under the Plan, each Holder of an Allowed Secured First Lien Notes Claim may exercise its right to elect to become a PropCo Common Equity Commitment Party pursuant to the PropCo Common Equity Purchase Commitment Agreement. Such Holders that make this election in accordance with the PropCo Common Equity Purchase Commitment Election Procedures will then be committed pursuant to the PropCo Common Equity Purchase Commitment Agreement to fund Cash distributions, if any, to Holders of Allowed Secured First Lien Notes Claims that elect, pursuant to the PropCo Common Equity Cash Election to receive Cash instead of up to 14.8 percent in the aggregate of PropCo Common Equity. In exchange, the PropCo Common Equity that would otherwise have been distributed to the Holders making a PropCo Common Equity Cash Election will be distributed to CEC and the PropCo Common Equity Commitment Parties in accordance with the terms of the PropCo Common Equity Purchase Commitment Agreement. Alternatively, in the event that the Debtors elect the Spin Structure as anticipated and elect to make distributions of PropCo Common Equity directly to the Holders of Allowed Secured First Lien Notes Claims, then CEC and the PropCo Common Equity Commitment Parties will purchase for Cash such PropCo Common Equity from the Holders of such Secured First Lien Notes Claims.

### F.    New Boards

#### 1.    OpCo New Board

If CEC owns 90 percent or more of the OpCo Common Stock, then the OpCo New Board shall consist of three voting members to be designated by CEC, one of whom shall be independent and reasonably acceptable to the Requisite Consenting Creditors. The independent director shall be a member of all committees of the OpCo New Board. If CEC owns less than 90 percent of OpCo Common Stock, then the OpCo New Board shall consist of three voting members, two to be designated by CEC and one to be designated by the Requisite Consenting Creditors, which member shall be a member of all committees of the OpCo New Board.

Regardless of CEC's percentage ownership, the OpCo New Board shall have one non-voting observer, reasonably acceptable to OpCo, to be designated by the Requisite Consenting Creditors. The observer shall be given notice of and an opportunity to attend the portion of all meetings, including applicable committee meetings, of the OpCo New Board concerning business and strategy session matters and other matters that would have an adverse material economic impact on PropCo (and receive all materials given to OpCo board members in connection with such matters), including with regards to matters related to capital expenditures, budgeting, planning, and construction of capital improvements for existing and new casino, gaming, and related facilities, subject to appropriate limitations in respect of privilege issues.

#### 2.    REIT New Board

If CEC owns less than 10 percent of PropCo (either directly through PropCo LP Interests or indirectly through OpCo Common Stock or REIT Common Stock), then the REIT New Board shall consist of seven voting members to be designated by the Requisite Consenting Creditors. If CEC owns 10 percent or more of PropCo (either directly through PropCo LP Interests or indirectly through OpCo Common Stock or REIT Common Stock), then the REIT New Board shall consist of seven voting members, six to be designated by the Requisite Consenting Creditors and one to be designated by CEC.

At least three voting members must be licensed by the required regulatory authorities by the Effective Date. If there are not, at the Effective Date, at least three voting members licensed, then to assist with Consummation of the Plan up to two of the independent members of CEOC shall be designated to the REIT New Board so that there will be three voting members at the Effective Date, with such members being removed as the non-voting members are licensed. Until such time as the CEOC independents and members designated by CEC are a minority of the New Board, the REIT shall be prohibited from taking major transactions without shareholder approval. To the extent any members are not so licensed by the Effective Date, they shall be non-voting members until so licensed.

11

### G.      Shared Services

On or before the Effective Date, the CES LLC Agreement and the CES Shared Services Agreement will be amended or modified as necessary or appropriate to reflect the formation of OpCo and PropCo, including: (1) to provide that Total Rewards® and other enterprise-wide and property-specific resources are allocated, and services provided, in a way that does not discriminate against PropCo, (2) for so long as CEC or its affiliates manage PropCo's properties pursuant to the Management and Lease Support Agreement or otherwise, CES shall ensure that, in the event CEC or its subsidiaries cease to provide to PropCo the resources and services provided by such agreements, CES shall provide such resources and services directly to PropCo on equivalent terms to or via an alternative arrangement reasonably acceptable to PropCo; provided that if CEC or its affiliates are terminated as manager under the applicable management agreement other than by or with the consent of PropCo, CES shall provide such resources and services pursuant to a management agreement on substantially the same terms and conditions, notwithstanding such termination, if so elected by PropCo.  In the event PropCo terminates or consents to the termination of the management relationship with CEC or its affiliates, for so long as the transition period under the applicable management agreement(s) continues, PropCo shall continue to have access to such resources and services on no less favorable terms.

CES will at the request of the REIT New Board have meetings or conference calls once a quarter with a designee of the REIT New Board to discuss, and consult on, the strategic and financial business plans, budgeting (including capital expenditures), and other topics as reasonably requested by the REIT New Board. The REIT shall also have audit and information rights with respect to CES.

### H.      Management and Lease Support Agreement

On the Effective Date, OpCo, PropCo, Manager, and CEC shall enter into the Management and Lease Support Agreement, and the Management and Lease Support Agreement will become effective in accordance with its terms and the Plan.  Pursuant to the Management and Lease Support Agreement, a wholly owned subsidiary of CEC, will manage the Contributed Properties on behalf of OpCo and will provide a guaranty in respect of OpCo's monetary obligations under the Master Lease Agreement.

### I.      Right of First Refusal Agreement

On the Effective Date, PropCo and CEC shall enter into the Right of First Refusal Agreement, and the Right of First Refusal Agreement will become effective in accordance with its terms and the Plan.  The Right of First Refusal Agreement will provide, among other things, (a) a grant by CEC to PropCo of a right of first refusal to own and lease to an affiliate of CEC certain non-Las Vegas domestic real estate that CEC or its affiliates may have the opportunity to acquire or develop, and (b) a grant by PropCo to CEC of a right of first refusal to lease and manage certain non-Las Vegas domestic real estate that PropCo may have the opportunity to acquire or develop.

### J.      PropCo Call Right Agreement

On the Effective Date, PropCo, CEC, and CERP shall enter into the PropCo Call Right Agreement, and the PropCo Call Right Agreement shall become effective in accordance with its terms and the Plan.  The PropCo Call Right Agreement will provide PropCo with the right, for up to 180 days following the Effective Date, to enter into a binding agreement to purchase the real property (and lease it back to CERP) and all improvements associated with Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties, and on other customary terms and conditions, with the closing of such purchase(s) to occur following regulatory approvals; provided that such right will be subject to the terms of the CERP debt documents and in no event in a manner that is dilutive of covenant compliance after CEC's and CERP's commercially reasonable efforts to obtain waivers or amendments to permit such transactions; provided further that such 180 day period shall be extended for up to 12 months if the call rights are not exercisable during the initial 180 day period due to CERP covenant issues.

### K.      Releases

Integral to the Plan's overall settlement of Claims and Interests, and as provided by the Restructuring Support Agreement, the Plan provides for releases from the Debtors and third-party Releasing Parties, as more fully

12

set forth in the Plan. Among other things, these releases provide, subject to certain specified carve outs, a full and complete settlement of any claims or causes of action, known or unknown, that the Debtors, their Estates, and the Releasing Parties have or could have against the Released Parties, including the Consenting First Lien Noteholders and the CEC Released Parties.

In exchange for receiving these releases, CEC is making significant contributions that are critical to funding anticipated payments under the Plan, including:

- cash contributions of up to $406 million to fund liquidity, cash recoveries to creditors, and a forbearance fee related to the Restructuring Support Agreement, and a guarantee of up to an additional $75 million of Cash that can be drawn by CEOC under certain circumstances;

- backstopping, with no associated fees, up to $969 million, comprised of the CEC OpCo Cash Commitment and CEC PropCo Common Equity Cash Commitment, to fund Cash distributions, if any, to Holders of Allowed Secured First Lien Notes Claims that elect, pursuant to the OpCo Common Stock Cash Election of PropCo Common Equity Cash Election, to receive Cash instead of OpCo Common Stock and PropCo Common Equity, respectively;

- offering the Debtors certain rights of first refusal for owning and managing all future non-Las Vegas domestic acquisitions; and

- importantly, CEC will also guarantee OpCo's monetary obligations under the Master Lease Agreement, which will help facilitate the creation of the valuable real estate investment trust structure.

Further, the releases encompassed in the Restructuring Support Agreement—which are an important inducement for CEC's contributions—remain subject to the Special Governance Committee's ongoing investigation. The investigation is discussed in detail below. *See* Article VI.C.1 of this Disclosure Statement.

## ARTICLE IV.
## QUESTIONS AND ANSWERS REGARDING THIS
## DISCLOSURE STATEMENT AND THE PLAN

**A.**     **What is chapter 11?**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.**      **Why are the Debtors sending me this Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan.  Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan.  The Plan contemplates a reorganization of the Debtors' businesses, and the Debtors have submitted this Disclosure Statement to provide information about the Restructuring Transactions contemplated by the Plan and related information concerning the Debtors, all in accordance with the requirements of the Bankruptcy Code.

**C.**      **What is the treatment of my Claim(s), if any, under the Plan and am I entitled to vote on the Plan?**

Your ability to vote on, and your distribution under, the Plan, if any, depends on what type of Claim or Interest you hold (if any).  Each category of Holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class."  Each Class's respective treatment and voting status is summarized in the table set forth in Article III.A.2 above, which begins on page 4.

**D.**      **What will I receive from the Debtors if I hold an Allowed Administrative Claim, a Priority Tax Claim, or a Professional Fee Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Claims, Priority Tax Claims, or Professional Fee Claims and, thus, Article III of the Plan does not include such Claims in the Classes of Claims and Interests set forth therein.  Article II of the Plan provides for the satisfaction of Administrative Claims, Priority Tax Claims, and Professional Fee Claims.  The treatment under the Plan of all such unclassified Claims, which are not entitled to vote on the Plan, is summarized in the table set forth in Article III.A.1 above, which begins on page 4.

**E.**      **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan goes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation"?**

"Confirmation" refers to approval of the Plan by the Bankruptcy Court.  Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.  After Confirmation, there are conditions that must be satisfied or waived so that the Plan can go effective.  Initial distributions to Holders of Allowed Claims will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.  *See* Article IX of the Plan titled "Conditions Precedent to Consummation of the Plan" for a discussion of the conditions to consummation of the Plan.  "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (a) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (b) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (c) commencement of distribution under the Plan.

**F.**      **What are the sources of cash and other consideration required to fund the Plan?**

The Debtors shall fund or make distributions under the Plan with (a) Available Cash, (b) Cash proceeds from the CEC Cash Contribution and CEC Standby Commitment, (c) Cash proceeds from the entry into the CPLV Loan Documents, (d) the issuance of the New Debt, (e) Cash Proceeds from the Cash Elections, CEC OpCo Cash Commitment, PropCo Common Equity Cash Commitment, and the Equity Rights, (f) Cash Proceeds from the Backstop Commitment, and (g) the issuance of the New Interests.

**G.      Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan provides for releases by both the Debtors and third parties of, as well as exculpation of, the Debtors, the Consenting First Lien Noteholders, the CEC Released Parties, and other parties in interest as set forth in Article VIII of the Plan.  Among other things, under the Plan and the Restructuring Support Agreement and as discussed in detail in Article III.G below, because of CEC's participation in the Plan through its entry into the Restructuring Support Agreement and performance of its obligations under the Restructuring Support Agreement in facilitating the transactions contemplated by the Plan, the CEC Released Parties will be released (subject to completion of the Special Governance Committee's investigation) from all claims and causes of action that the Debtors or certain third parties have or could have against the CEC Released Parties relating to the Debtors and their businesses.

**H.      What is the deadline to vote on the Plan?**

The Voting Deadline is [_____], 2015, at 5:00 p.m. (prevailing Central Time).

**I.      How do I vote for or against the Plan?**

Detailed instructions regarding how to vote on the Plan are contained on the Ballots distributed to Holders of Claims and Interests that are entitled to vote on the Plan.  For your vote to be counted, you must complete and sign your ballot so that the Debtors' Notice and Claims Agent **actually** **receives** that Ballot by [_____], 2015, at 5:00 p.m. (prevailing Central Time) at the following address:  Caesars Entertainment Operating Company, Inc. Ballot Processing, c/o Prime Clerk LLC, 830 3rd Avenue, 9th Floor, New York, NY 10022.  *See* Article IX of this Disclosure Statement, beginning on page 73.

**J.      Why is the Bankruptcy Court holding a Confirmation Hearing, and when is the Confirmation Hearing set to occur?**

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court to hold a hearing on confirmation of the Plan and recognizes that any party in interest may object to confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing for [_____], 2015, at [__]:[__] [__].m. (prevailing Central Time).  The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice.

Objections to Confirmation of the Plan must be filed and served on the Debtors, and certain other parties, by no later than [_____], 2015, at 5:00 p.m. (prevailing Central Time) in accordance with the notice of the Confirmation Hearing, attached to the Disclosure Statement Order as **Exhibit [__]** and incorporated herein by reference.

**K.      What is the purpose of a Confirmation Hearing?**

The confirmation of a plan of reorganization by a bankruptcy court binds the debtor, any person acquiring property under the plan of reorganization, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code.  Subject to certain limited exceptions, an order issued by a bankruptcy court confirming a plan of reorganization discharges a debtor from any debt arising before the confirmation of the plan of reorganization and provides for the treatment of such debt in accordance with the terms of the confirmed plan of reorganization.

KE 34442788

**L.     What is the effect of the Plan on the Debtors' ongoing business?**

The Plan will eliminate approximately $10 billion in funded debt from the Debtors' balance sheet, permitting the Debtors to continue ongoing operations without the unsustainable burden of their existing debt load. Under the Plan, the Debtors will convert their prepetition corporate structure into OpCo and PropCo, enabling the Debtors to implement a beneficial real estate investment trust structure.  OpCo will hold the Debtors' operating and gaming assets and manage the Debtors' properties and facilities on an ongoing basis.  PropCo will hold certain of the Debtors' real property assets and related fixtures and will lease those assets to OpCo pursuant to the Master Lease Agreement.  The REIT will own and control the general partnership interest of PropCo.  Additionally, CPLV Sub, an unrestricted subsidiary of PropCo, will own Caesars Palace-Las Vegas and (together with CPLV Mezz) will issue its own debt, including CPLV Market Debt and/or CPLV Mezzanine Debt.  The Plan does not provide for a shutdown of any of the Debtors' casino properties.

**M.     Who do I contact if I have additional questions with respect to this Disclosure Statement or the Plan?**

If you have any questions regarding this Disclosure Statement or the Plan, please contact the Debtors' Notice and Claims Agent, Prime Clerk LLC:

> *By regular mail, hand delivery, or overnight mail at:*
> **Caesars Entertainment Operating Company, Inc. Ballot Processing**
> **c/o Prime Clerk LLC**
> **830 Third Avenue, 9th Floor**
> **New York, New York 10022**
>
> *By electronic mail at:*
> **ceocballots@primeclerk.com**
>
> *By telephone at:*
> **(855) 842-4123** (toll-free)

You may also obtain copies of the Plan, this Disclosure Statement, and any other solicitation materials or publicly filed documents in these Chapter 11 Cases (a) for free from the Notice and Claims Agent by (i) visiting https://cases.primeclerk.com/CEOC; (ii) writing to Prime Clerk LLC, Re: Caesars Entertainment Operating Company, Inc. Ballot Processing, 830 Third Avenue, 9th Floor, New York, New York 10022; or (iii) calling (855) 842-4123 (toll free) or (b) for a fee via PACER (except for Ballots or Master Ballots) at https://ecf.ilnb.uscourts.gov.

**N.     Do the Debtors recommend voting in favor of the Plan?**

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe the Plan, which contemplates a reorganization of the Debtors' businesses, serves the best interests of all Holders of Claims and Interests and that other alternatives fail to realize or recognize the value inherent under the Plan.

**O.     Who Supports the Plan?**

The Plan is supported by, among others, the Debtors, CEC, and Holders of First Lien Notes holding more than [80] percent of the approximately $[___] billion of Secured First Lien Notes Claims.

**ARTICLE V.**
**BACKGROUND TO THESE CHAPTER 11 CASES.**

Below is a summary of the Debtors' businesses and operations.  For additional details concerning the Debtors and the background to these Chapter 11 Cases, one may refer to the Debtors' *Memorandum in Support of Chapter 11 Petitions* [Docket No. 4] and the *Declaration of Randall S. Eisenberg, Chief Restructuring Officer of Caesars Entertainment Operating Company, Inc., in Support of First Day Pleadings* [Docket No. 6].

16

A.      **The Debtors' Business**

1.      **The Debtors' Owned and Managed Domestic Properties**

The Debtors were founded in 1937, when William F. Harrah opened a small bingo hall in Reno, Nevada. That casino, now called Harrah's Reno, is still owned and operated by the Debtors.  Since then, the Debtors have grown their businesses across the country and around the globe.  Today, the Debtors' core casino offerings are spread across the United States—including strong concentrations in Chicagoland, Nevada, and Atlantic City—as well as throughout the world.

The Debtors' Chicagoland locations are a significant cash flow driver for their business.  The Debtors own and operate two casinos in the Chicagoland market:  Horseshoe Casino Hammond in Hammond, Indiana—their second-most profitable casino behind Caesars Palace—and Harrah's Joliet in Joliet, Illinois.  Together, these locations include almost 400,000 square feet of gaming space, more than 200 hotel rooms, more than 4,100 slot machines, and more than 130 table games.

In Nevada, the Debtors own and operate four properties, including their flagship property Caesars Palace that is located in the heart of the Las Vegas "Strip."  The Debtors' other Nevada gaming properties are Harrah's Reno, Harrah's Lake Tahoe, and Harveys Lake Tahoe.  In total, the Debtors operate approximately 270,000 square feet of gaming space and 6,400 hotel rooms in Nevada, including over 3,600 slot machines and 350 table games.

The Debtors also have significant operations in Atlantic City.  The Debtors' presence in Atlantic City dates back to 1979—three years after New Jersey authorized legal gambling—when they opened Caesars Atlantic City and Bally's Atlantic City.  The Debtors also owned and operated a third casino in Atlantic City (the Showboat Atlantic City) until August 2014, when that property was closed and then later sold to a New Jersey university.  The Debtors currently have more than 240,000 square feet of gaming space and approximately 2,400 hotel rooms in Atlantic City, including approximately 3,700 slot machines and 320 table games.

Finally, the Debtors own and operate or manage 15 gaming properties in other U.S. locations, including managed properties on reservations and owned river-based casinos.  The majority of these properties are located throughout the Midwest and South.  In total, these locations include more than 1.0 million square feet of gaming space, 5,000 hotel rooms, 23,000 slot machines, and 1,000 table games.

Certain of the material properties that the Debtors own include:

| *Nevada* | | *Illinois and Indiana* | |
|---|---|---|---|
| Caesars Palace-Las Vegas | Las Vegas, NV | Harrah's Joliet | Joliet, IL |
| Harrah's Reno | Reno, NV | Harrah's Metropolis | Metropolis, IL |
| Harrah's Lake Tahoe | Lake Tahoe, NV | Horseshoe Hammond | Hammond, IN |
| Harveys Lake Tahoe | Lake Tahoe, NV | Horseshoe Southern Indiana | Elizabeth, IN |

| *Iowa and Missouri* | | *Louisiana and Mississippi* | |
|---|---|---|---|
| Harrah's Council Bluffs | Council Bluffs, IA | Harrah's Gulf Coast | Biloxi, MS |
| Harrah's North Kansas City | North Kansas City, MO | Harrah's Louisiana Downs | Bossier City, LA |
| Horseshoe Council Bluffs | Council Bluffs, IA | Horseshoe Bossier City | Bossier City, LA |
| | | Horseshoe Tunica | Tunica, MS |
| *New Jersey* | | Tunica Roadhouse Hotel & Casino | Tunica, MS |
| Bally's Atlantic City | Atlantic City, NJ | | |
| Caesars Atlantic City | Atlantic City, NJ | | |

In addition to owning the properties above, the Debtors receive fees from Caesars Enterprise Services, LLC ("CES") for the management of certain properties owned by Caesars Growth Partners, LLC ("CGP"), including Planet Hollywood Resort and Casino in Las Vegas, The Cromwell (formerly Bill's Gamblin' Hall & Saloon) in Las

Vegas, The Quad Resort & Casino in Las Vegas, Bally's in Las Vegas, and Harrah's New Orleans in Louisiana. *See* Article V.B.4 hereof titled "Caesars Enterprise Services, LLC," which begins on page 21, for a discussion of the corporate functions performed by CES.  Additionally, the Debtors receive fees on account of their management of Horseshoe Baltimore in Maryland, which is owned by CGP.  The Debtors also receive management fees on account of their management of other non-Debtor properties, including:  Harrah's Ak-Chin, Phoenix, Arizona; Harrah's Cherokee, Cherokee, North Carolina; Harrah's Rincon, San Diego, California; Harrah's Philadelphia, Chester, Pennsylvania; Horseshoe Cincinnati, Cincinnati, Ohio; Horseshoe Cleveland, Cleveland Ohio; ThistleDown Racino, Cleveland, Ohio; and Conrad Punta del Este Resort and Casino, Uruguay.  Lastly, the Debtor Caesars Entertainment Windsor Limited ("CEWL") operates Caesars Windsor, a casino owned by the Canadian province of Ontario through the Ontario Lottery and Gaming Corporation.

### 2. The Debtors' Partnerships, Multiple-Member LLCs, and Other Strategic Relationships

The Debtors and certain of their non-Debtor subsidiaries are partial equity holders in several strategic relationships, many taking the form of partnerships and limited liability companies, including one of the Debtors—Des Plaines Development Limited Partnership, the owner of Harrah's Joliet.  Des Plaines Development Limited Partnership is a partnership between Debtor Harrah's Illinois Corporation (80 percent equity interest) and non-Debtor Des Plaines Development Corporation (20 percent equity interest).  A riverboat casino located in Joliet, Illinois, Harrah's Joliet primarily draws its customers from the nearby Chicago metropolitan area.  Debtor Harrah's Illinois Corporation manages Harrah's Joliet for a fee pursuant to a management agreement.  Harrah's Joliet consists of nearly 40,000 square feet of gaming space, including over 1,100 slot machines and approximately 31 table games.

The Debtors and certain of their non-Debtor subsidiaries are also partial equity holders in the following entities:

- Atlantic City Express Service, LLC (approximately 33.3 percent owned by Debtor Boardwalk Regency Corporation);

- Baluma Holdings S.A. (approximately 95.23 percent collectively owned by Debtors Harrah's International Holding Company, Inc. and B I Gaming Corporation) and Baluma S.A. (approximately 55 percent owned by Baluma Holdings S.A.);

- Caesars Casino Castilla La Mancha S.A. (approximately 60 percent owned by non-Debtor subsidiary Caesars Spain Holdings Limited);

- Chester Downs and Marina LLC (approximately 99.5 percent owned by Debtor Harrah's Chester Downs Investment Company, LLC);

- Creator Capital Limited (approximately 7.5 percent owned by Debtor Harrah's Interactive Investment Company);

- Emerald Safari Resort (Pty) Limited (approximately 70 percent owned by non-Debtor subsidiary LCI (Overseas) Investments Pty Ltd.);

- LAD Hotel Partners, LLC (approximately 49 percent owned by Debtor Harrah's Bossier City Investment Company, L.L.C.);

- Sterling Suffolk Racecourse, LLC (approximately 4.2 percent owned by Debtor Caesars Massachusetts Investment Company, LLC); and

- Caesars Enterprise Services, LLC (approximately 69 percent owned by Debtor CEOC).[7]

---

[7]   CES is discussed in detail in Article V.B.4 below.

18

### 3.    The Debtors' International Operations

As of the Petition Date, the Debtors and their non-Debtor subsidiaries own and/or operate various non-U.S. casinos.  In Windsor, Ontario, Canada, Debtor CEWL operates Caesars Windsor, a casino owned by the province of Ontario through the Ontario Lottery and Gaming Corporation.  One day after the Petition Date, on January 16, 2015, CEWL filed an application under section 46 of Canada's Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Ontario Superior Court of Justice (the "Canadian Court"), seeking, among other things, recognition of the Chapter 11 Cases as "foreign main proceedings" as such term is defined in section 45 of the CCAA.  The Canadian Court granted the relief requested and designated the Chapter 11 Cases as foreign main proceedings on January 19, 2015.

Additionally, certain of the Debtors' non-Debtor subsidiaries own leasehold interests in and operate three casinos in London:  The Sportman, The Playboy Club London, and The Casino at the Empire.  These casinos primarily draw customers from the London metropolitan area, as well as international visitors. The Debtors also own and operate Alea Nottingham, Alea Glasgow, Manchester235, Rendezvous Brighton, and Rendezvous Southend-on-Sea, each of which are located in the provinces of the United Kingdom, and primarily draw customers from their respective local areas.

In Egypt, certain of the Debtors' non-Debtor subsidiaries manage two casinos:  The London Club Cairo (which is located at the Ramses Hilton) and Caesars Cairo (which is located at the Four Seasons Cairo).  These two casinos primarily draw their customers from countries in the Middle East.  Further, one of the Debtors' non-Debtor subsidiaries maintains a 70 percent ownership interest in and also manages the Emerald Safari casino-resort, which is located in the province of Gauteng in South Africa and primarily draws its customers from South Africa.  Lastly, the Debtors and their subsidiaries own approximately 95.23 percent of Baluma Holdings S.A., a non-Debtor entity that in turn owns 55 percent of Conrad Punta del Este Resort and Casino (the "Conrad").  The remaining 45 percent is owned by third-party Enjoy S.A., which is primarily responsible for managing the Conrad.

### 4.    The Total Rewards® Program

A key component to the competitiveness of the Debtors' business is their industry-leading customer loyalty program, Total Rewards®, which has approximately 45 million members.  Total Rewards® customers are able to earn "Reward Credits" for on-property entertainment expenses, including gaming, hotel, dining, and retail shopping, which they can then redeem for various on-property amenities, merchandise, gift cards, and travel.  Customers earn status within the Total Rewards® program based on their level of engagement with the Debtors and certain of their non-Debtor affiliates in a calendar year through both gaming and hospitality expenditures.  Total Rewards® tiers are designated as Gold, Platinum, Diamond, or Seven Stars, each with increasing sets of customer benefits and privileges.  By structuring the program in tiers with increasing benefits on the amount of the customer's activity, the Debtors provide an incentive for their customers to consolidate their entertainment spending at casinos owned or managed by the Debtors and certain of their non-Debtor affiliates.

Additionally, the Debtors maintain a database containing information about their Total Rewards® customers, aspects of their casino gaming play, and their preferred spending choices outside of gaming. The Debtors use this information for marketing promotions, including through direct mail campaigns, the use of electronic mail, their website, mobile devices, social media, and interactive slot machines.  Through these marketing promotions, the Debtors are able to generate customer play across the properties owned or managed by the Debtors and certain of their non-Debtor affiliates, helping the Debtors capture a growing share of its customers' entertainment spending.

### 5.    Intellectual Property

The development of intellectual property is part of the Debtors' overall business strategy, and the Debtors seek to establish and maintain their proprietary rights in its business operations and technology through the use of patents, copyrights, trademarks, and trade secret laws.  Although the Debtors' business as a whole is not substantially dependent on any one patent or trademark, the Debtors' portfolio of intellectual property assets will form the bedrock for the Debtors' future success.  In particular, Debtors Caesars License Company, LLC and Caesars World, Inc. hold multiple trademarks related to the Debtors' business, including Bally's, Caesars, Caesars Palace, Harveys, Total Rewards, Reward Credits, and Horseshoe.

### 6. Governmental Regulation

The gaming industry is highly regulated, requiring the Debtors to maintain licenses and pay gaming taxes to continue their operations. Each of the Debtors' casinos is subject to extensive regulation under the laws, rules, and regulations of the jurisdiction in which it is located. These laws, rules, and regulations generally concern the responsibility, financial stability, and character of the owners, managers, and persons with financial interests in the gaming operations. Violations of laws in one jurisdiction could result in disciplinary action in other jurisdictions.

Besides laws, rules, and regulations relating to gaming, the Debtors' businesses are also subject to various foreign, federal, state, and local laws and regulations, including restrictions and conditions concerning alcoholic beverages, smoking, environmental matters, employees, currency transactions, taxation, zoning and building codes, construction, land use, and marketing and advertising. Further, because the Debtors deal with significant amounts of cash in the ordinary course of their operations, they are subject to various reporting and anti-money laundering regulations.

### B. The Debtors' Corporate Structure, Parent, and Affiliates

The Debtors' corporate organization as of the Petition Date is depicted on the chart attached hereto as **Exhibit B**, which also identifies CEOC's various Debtor and non-Debtor subsidiaries. As set forth on **Exhibit B**, CEC owns approximately 89 percent of the outstanding shares of CEOC's common stock. Certain institutional investors own approximately 5 percent of CEOC's common stock, and the remaining 6 percent is held by employees who received the stock pursuant to an employee benefit plan that was instituted in May 2014 for CEOC's directors, officers, and other management-level employees. CEOC, in turn, directly or indirectly wholly- or majority-owns its Debtor subsidiaries.

In addition to CEOC, CEC owns casino-entertainment properties indirectly through Caesars Entertainment Resort Properties, LLC ("CERP") and CGP. CERP and CGP are licensed to use Total Rewards®, the industry-leading customer loyalty program to market promotions and generate customer play across the entire network of Caesars properties.

### 1. Caesars Entertainment Corporation

On January 28, 2008, the Sponsors acquired CEC for approximately $30.7 billion (the "2008 LBO"). On February 8, 2012, CEC conducted an initial public offering of its common stock, which now actively trades on the NASDAQ under the ticker symbol "CZR." The Sponsors own or control approximately 60 percent of CEC's common stock, and thus have voting control of the company. CEC's remaining common stock is held by institutional and retail investors not affiliated with the Sponsors. As of the Petition Date, CEC had a market capitalization of $1.8 billion.

### 2. Caesars Entertainment Resort Properties, LLC

After the 2008 LBO, CEC operated through two primary groups of wholly owned subsidiaries: (a) CEOC and (b) a group of six subsidiaries financed with indebtedness incurred through the issuance of by commercial mortgage-backed securities ("CMBS"): Harrah's Atlantic City Holding, LLC; Harrah's Las Vegas, LLC; Harrah's Laughlin, LLC; Flamingo Las Vegas Holding, LLC; Paris Las Vegas Holding, LLC; and Rio Properties, LLC (the "CMBS Properties").

In September 2013, CEC announced that the CMBS Properties would enter into a series of transactions to refinance their outstanding CMBS debt and reposition them as subsidiaries of CERP, a newly-created direct subsidiary of CEC. As discussed more fully below, the Debtors sold certain properties to CERP in conjunction with the refinancing.

### 3. Caesars Growth Partners, LLC

CGP is a partnership that was formed by Caesars Acquisition Company ("CACQ"), a separate publicly traded company that was formed by the Sponsors and public investors in 2013 to raise capital for Caesars, and

20

certain indirect subsidiaries of CEC.[8]  CACQ purchased approximately 42.4 percent of the economic interest and 100 percent of the voting rights in CGP for $457.8 million in cash.  CEC acquired the remaining approximately 57.6 percent economic interest (with no voting rights) in CGP in exchange for $1.1 billion in face value of Senior Unsecured Notes and all of CEC's equity in Caesars Interactive Entertainment ("CIE").

CGP was designed to be a flexible organization that could raise capital necessary to fund Caesars' more capital-intensive growth projects, such as online gaming and certain properties in need of significant investment. CIE, now a CGP subsidiary, operates an online gaming business providing games on social media and mobile applications.  CIE also provides certain real money games in Nevada and New Jersey, "play for fun" offerings in other jurisdictions, and owns the World Series of Poker tournament and brand.

As discussed below, since its formation CGP has purchased several properties and a portion of their associated management fees from CEOC.

### 4.      Caesars Enterprise Services, LLC

CES (sometimes also referred to as "Services Co") is a joint venture among the three companies that own and/or operate Caesars' properties:  CEOC, CERP, and Caesars Growth Properties Holdings, LLC ("CGPH"), an indirect subsidiary of CGP.  Historically, CEOC and its employees managed and funded centralized corporate functions for shared services among all Caesars' branded properties, such as legal, accounting, payroll, information technology, and other enterprise-wide services.  As the Caesars' branded properties expanded since 2008, including with the formation of CACQ and CGP (which did not exist when the initial centralized service structure was put in place), CES was formed in 2014 as a centralized "Services Company" to (a) manage centralized assets, such as certain intellectual property and the Total Rewards® loyalty program, (b) employ personnel who provide services to Caesars' branded properties, and (c) ensure an equitable allocation of costs around centralized services, including capital expenditures for shared services and the prioritization of projects.

CERP and CGPH contributed the initial funding needs of CES with $42.5 million and $22.5 million in cash, in exchange for which they received 20.2 percent and 10.8 percent ownership of CES, respectively.  CEOC owns the remaining 69 percent of CES.  Each of CEOC, CERP, and CGPH have equal 33 percent voting control over CES, rather than in accordance with their ownership stakes.  CES's management and operations are governed by a steering committee, which consists of one member from each of CEOC, CERP, and CGPH.  The steering committee can take action by a majority vote (subject to unanimity requirements for certain material actions) or written consent of the steering committee members.

CES provides the Debtors with substantially all of their corporate, regional, and shared (with CERP, CGPH/CGP, or both) employees, as well as substantially all of their casino-level employees at the director level or above.  As of the Petition Date, the majority of the approximately 2,000 management-level personnel responsible for running the Debtors' businesses are employed by CES, and CES is responsible for all employment-related obligations associated with these employees,  including employment agreements, collective bargaining agreements, and any obligation to bargain and negotiate with a union.

Pursuant to an Omnibus License and Enterprise Services Agreement (the "Omnibus Agreement"), CEOC granted to CES a non-exclusive license to use—but otherwise retained ownership of—certain intellectual property, including Total Rewards®.  In turn, CES generally grants to each entity that owns a property a license in and to the intellectual property relevant to such entity's property.

CES is a cost-allocation center and a not-for-profit entity; all services provided for CEOC, CERP, and CGP are provided on a profit-neutral basis.  The corporate overhead expenses incurred by CES in performing centralized services, employing personnel, and managing intellectual property are allocated among CEOC, CERP, and CGPH,

---

[8]    CACQ was established on October 21, 2013, and initially funded with $457.8 million in cash from the Sponsors.  On November 18, 2013, CACQ closed a public rights offering, which resulted in another $700 million in funding from both non-Sponsor and Sponsor investment.

and generally reimbursed on a weekly basis, with a monthly true-up.[9]  Allocation percentages are based on a complex allocation methodology that takes into account each entity's consumption of the specified service or cost.

Prior to the formation of CES, the Debtors also historically managed payroll and accounts payable functions for CEOC, CERP, and CGP and their predecessor entities, with periodic reimbursements from CERP and CGP.  The formation of CES has shifted these duties from the Debtors to CES as well, with CES processing all payroll data for the Debtors and their non-Debtor affiliates, and in substantially all cases acts as a third-party administrator in making payments to the Debtors' employees and remitting any appropriate deductions on account of payroll taxes or other withholdings to taxing authorities and other third-party benefit providers.  CES provides the same services for CERP and CGP.

With respect to accounts payable, CES generally manages and funds all accounts payable on behalf of the Debtors and their non-Debtor affiliates.  If and when CES makes a payment for any direct expense on behalf of CEOC, CERP, or CGP, CES is reimbursed on a regular basis (usually within 24–48 hours) for those payments.

Finally, CES functions as the governor on all enterprise-wide investments, including capital expenditures.  The CES steering committee must approve all such enterprise-wide capital expenditures and cost allocations relating thereto.

### C.      Management of the Debtors

#### 1.      Board of Directors

The Board of Directors of CEOC currently consists of seven members.  Two of the seven members are independent directors, as defined in the corporate governance standards of the New York Stock Exchange. Set forth below are the directors of CEOC as of the date of this Disclosure Statement.

| Name | Biography |
|---|---|
| David Bonderman | Mr. Bonderman became a member of CEOC's board of directors in June 2014 and has been a director of Caesars Entertainment since January 2008. Mr. Bonderman is a TPG Founding Partner. Prior to forming TPG in 1993, Mr. Bonderman was Chief Operating Officer of the Robert M. Bass Group, Inc. (now doing business as Keystone Group, L.P.) in Fort Worth, Texas. He holds a bachelor's degree from the University of Washington and a law degree from Harvard University. He has previously served on the boards of directors of Gemalto N.V., Burger King Holdings, Inc., Washington Mutual, Inc., IASIS Healthcare LLC, and Univision Communications and Armstrong World Industries, Inc. Mr. Bonderman also currently serves on the boards of directors of JSC VTB Bank, Energy Future Holdings Corp., General Motors Company, CoStar Group, Inc., and Ryanair Holdings PLC, of which he is Chairman. |

---

[9]    From time to time, CES has and may continue to issue capital calls to CEOC, CERP, and CGPH to ensure that CES meets its working capital requirements.

| Name | Biography |
| --- | --- |

**Kelvin Davis**

Mr. Davis became a member of CEOC's board of directors in June 2014 and has been a director of Caesars Entertainment since January 2008. Mr. Davis is a TPG Senior Partner and Head of TPG's North American Buyouts Group, incorporating investments in all non-technology industry sectors. He also leads TPG's Real Estate investing activities. Prior to joining TPG in 2000, Mr. Davis was President and Chief Operating Officer of Colony Capital, Inc., a private international real estate-related investment firm which he co-founded in 1991. He holds a bachelor's degree from Stanford University and an M.B.A. from Harvard University. Mr. Davis currently serves on the boards of directors of AV Homes, Inc., Northwest Investments, LLC (which is an affiliate of ST Residential), Parkway Properties, Inc., Taylor Morrison Home Corporation, Univision Communications, Inc., and Catellus Development Corporation. He is a member of the Executive Committee and Human Resources Committee.

**Gary Loveman**

Mr. Loveman is Chairman of the CEOC board of directors, and has also been the Chairman of the Board of Caesars Entertainment since January 1, 2005. Until recently, Mr. Loveman was Chief Executive Officer of Caesars Entertainment, a position he had held since January 2003, and was formerly President of Caesars Entertainment since April 2001. He has over 15 years of experience in retail marketing and service management, and he previously served as an associate professor at the Harvard University Graduate School of Business. He holds a bachelor's degree from Wesleyan University and a Ph.D. in Economics from the Massachusetts Institute of Technology. Mr. Loveman also serves as a director of Coach, Inc. and FedEx Corporation.

**Marc Rowan**

Mr. Rowan became a member of CEOC's board of directors in June 2014 and has been a director of Caesars Entertainment since January 2008. Mr. Rowan is a co-founder and Senior Managing Director of Apollo Global Management, LLC, a leading alternative asset manager focused on contrarian and value-oriented investments across private equity, credit oriented capital markets, and real estate, a position he has held since 1990. He currently serves on the boards of directors of the general partner of AP Alternative Assets, L.P., Apollo Global Management, LLC, Athene Holding Ltd., Caesars Entertainment Corp., Caesars Acquisition Co., and Beats Music. He has previously served on the boards of directors of AMC Entertainment, Inc., CableCom Gmbh., Countrywide PLC, Culligan Water Technologies, Inc., Furniture Brands International, Mobile Satellite Ventures, National Cinemedia, Inc., National Financial Partners, Inc., New World Communications, Inc., Norwegian Cruise Lines, Quality Distribution, Inc., Samsonite Corporation, SkyTerra Communications, Inc., Unity Media SCA, Vail Resorts, Inc., and Wyndham International, Inc. He is a founding member and Chairman of Youth Renewal Fund and a member of the Board of Overseers of The Wharton School. He serves on the boards of directors of Jerusalem Online and the New York City Police Foundation. Mr. Rowan graduated Summa Cum Laude from the University of Pennsylvania's Wharton School of Business with a BS and an MBA in Finance.

**David Sambur**

Mr. Sambur became a member of CEOC's board of directors in June 2014 and has been a director of Caesars Entertainment since November 2010. Mr. Sambur is a Partner of Apollo Global Management, having joined in 2004. Mr. Sambur has experience in financing, analyzing, investing in, and/or advising public and private companies and their boards of directors. Prior to joining Apollo, Mr. Sambur was a member of the Leveraged Finance Group of Salomon Smith Barney Inc. Mr. Sambur serves on the board of directors of Verso Paper Corp., Verso Paper, Inc., Verso Paper Holdings, LLC, Caesars Acquisition Company, Momentive Performance Materials Holdings, Momentive Specialty Chemical, Inc., and AP Gaming Holdco, Inc. Mr. Sambur graduated summa cum laude and Phi Beta Kappa from Emory University with a BA in Economics. Mr. Sambur is a member of CEOC's Restructuring Committee.

23

| Name | Biography |
|------|-----------|
| Ronen Stauber | Mr. Stauber became a member of CEOC's board of directors in June 2014. He leads the day-to-day activities of Jenro Capital, which provides transaction and consulting services to corporations, private equity firms, and family investment offices. From 1997 to 2006, he was an executive with Cendant Corporation.  While at Cendant, Mr. Stauber served as president and Chief Executive Officer of Cendant Corporation's Consumer Travel, International Markets business unit, as well as Chief Operating Officer of Gullivers Travel Associates.   Mr. Stauber previously led Cendant's strategic development efforts. Mr. Stauber is a member of CEOC's Special Governance Committee and Restructuring Committee. |
| Steven Winograd | Mr. Winograd became a member of CEOC's board of directors in June 2014. Since August of 2011, he has been a managing director in the Financial Sponsors Group of the Investment & Corporate Banking division of BMO Capital Markets, where he is responsible for managing relationships with a number of large-cap and mid-cap private equity clients and their portfolio companies.  Prior to joining BMO Capital Markets, from 2004 through 2011 Mr. Winograd was a Managing Director in the Financial Sponsors Group of Merrill Lynch, which was acquired by Bank of America in 2009.  Prior to joining Merrill Lynch, Mr. Winograd held senior level positions at a number of other investment banking firms including Deutsche Bank, Bear Sterns, and Drexel Burnham.  During over 32 years as an investment banker Mr. Winograd has completed numerous transactions for a wide variety of public and private companies including mergers & acquisitions, debt and equity financings, and restructurings.   Mr. Winograd received a BA from Wesleyan University and an MBA from the Columbia University Graduate School of Business, where he was elected to the Beta Gamma Sigma Honors Society.  Mr. Winograd is a member of CEOC's Special Governance Committee and Restructuring Committee. |

## 2.    Executive Officers

Set forth below are the senior executive officers of CEOC as of the date of this Disclosure Statement and each officer's position within CEOC.

| Name | Biography |
|------|-----------|
| John Payne | Mr. Payne is President and Chief Executive Officer of CEOC.  Mr. Payne joined Caesars Entertainment nearly 19 years ago as a President's Associate. Most recently, he served as President, Central Markets & Partnership Development for Caesars Entertainment. Prior to this role, Mr. Payne was President of Enterprise Shared Services from July 2011 to May 2013. Previously, he was Central Division President. Mr. Payne has held general manager roles of several properties, including Harrah's New Orleans. |
| Mary Elizabeth Higgins | Ms. Higgins is Chief Financial Officer of CEOC.  Ms. Higgins joined CEOC from Global Cash Access Inc., where she served as Chief Financial Officer and Executive Vice President from September 2010 to March 2014 and was responsible for all facets of financial management, including financial controls and reporting, taxation, financial planning, treasury, and investor relations. Prior to this, Ms. Higgins held the Chief Financial Officer role at Herbst Gaming Inc. and Camco Inc., successively. She holds a bachelor's degree in international relations from the University of Southern California and an MBA in finance from Memphis State University. |

| Name | Biography |
|------|-----------|
| Timothy Lambert | Mr. Lambert is General Counsel of CEOC.  Mr. Lambert joined Empress Entertainment, a predecessor of Caesars Entertainment, in 1995.  He was most recently Vice President and Chief Counsel Regional Operations, Regulatory & Compliance for Caesars Entertainment, and continues to retain this position after his appointment as General Counsel. Mr. Lambert graduated Cum Laude from Illinois Wesleyan University with a bachelor's degree in business administration, and received his law degree from the University of Illinois College of Law, where he graduated Magna Cum Laude. |
| Randall S. Eisenberg | Mr. Eisenberg is Chief Restructuring Officer of CEOC.  He is also a Managing Director at AlixPartners where he co-leads the Transformation and Restructuring Advisory group, a part of the Turnaround & Restructuring Services practice.  He has over 20 years of experience advising senior management, board of directors, equity sponsors, and credit constituents in the transformation and restructuring of highly levered or otherwise underperforming companies. Although many of his matters remain confidential, Mr. Eisenberg has been involved with some of the large and most complex restructurings in the recent past, including Delphi Corporation, US Airways Group, Inc., Visteon Corp., Jackson Hewitt, Vertis, Inc., Anthracite Capital, Inc., Momentive Performance Materials, Inc., Kmart Corporation, Planet Hollywood International, Inc., RSL Communications, Ltd., Select Staffing, and Rotech Healthcare, Inc. Mr. Eisenberg is a fellow in both the American College of Bankruptcy and International Insolvency Institute, and is a past Chairman, President, and Board Member of the Turnaround Management Association. |

### 3.        The Special Governance Committee

On June 27, 2014, the Debtors appointed Steven Winograd, Managing Director of BMO Capital Markets, and Ronen Stauber, Managing Director of Jenro Capital, LLC, as independent directors of CEOC.  Winograd and Stauber then formed the Special Governance Committee (the "Special Governance Committee") of the CEOC Board of Directors.  As described in greater detail in Article VI.C below, the Special Governance Committee was charged with, among other things, conducting an independent investigation into potential claims that the Debtors and/or their creditors may have against CEC or its affiliates, including claims that eventually formed the bases of filed creditor complaints.  Further, over the same period, the Special Governance Committee has been actively monitoring the restructuring negotiations with the first lien creditors and has engaged in its own negotiations with CEC to secure substantial contributions by CEC to the restructuring, and improved recoveries for all stakeholders.

### 4.        The Restructuring Committee

On January 14, 2015, a Restructuring Committee (the "Restructuring Committee") of the CEOC Board of Directors was established.  The Restructuring Committee is comprised of David Sambur, Steven Winograd, and Ronen Stauber.  Randall S. Eisenberg, as CEOC's Chief Restructuring Officer, reports directly to the Restructuring Committee, and the Restructuring Committee has the power and authority to oversee certain of the Debtors' restructuring matters and act on behalf of the CEOC Board of Directors with respect to such matters.

KE 34442788

### D. The Debtors' Capital Structure

As of the Petition Date, the Debtors have outstanding funded debt for borrowed money in the aggregate principal amount of approximately $18 billion. These obligations are illustrated below.

| *As of December 31, 2014* | | | |
|---|---|---|---|
| **CEOC Debt ($ in Millions)** | **Maturity** | **Interest Rate** | **Face Value** |
| Term Loan B4 | 2016 | 10.50% | $     376.7 |
| Term Loan B5 | 2017 | 5.95% | 937.6 |
| Term Loan B6 | 2017 | 6.95% | 2,298.8 |
| Term Loan B7 | 2017 | 9.75% | 1,741.3 |
| *Prepetition Credit Agreement* | | | *5,354.4* |
| 11.25% First Lien Notes | 2017 | 11.25% | 2,095.0 |
| 8.50% First Lien Notes | 2020 | 8.50% | 1,250.0 |
| 9.00% First Lien Notes | 2020 | 9.00% | 3,000.0 |
| *First Lien Notes* | | | *6,345.0* |
| 12.75% Second Lien Notes | 2018 | 12.75% | 750.0 |
| 10.00% Second Lien Notes due 2018 | 2018 | 10.00% | 4,484.6 |
| 10.00% Second Lien Notes due 2015 | 2015 | 10.00% | 3.6 |
| *Second Lien Notes* | | | *5,238.2* |
| 10.75% Senior Subsidiary-Guaranteed Notes | 2016 | 10.75% | 478.6 |
| *Subsidiary-Guaranteed Notes* | | | *478.6* |
| 6.50% Senior Unsecured Notes | 2016 | 6.50% | 296.7 |
| 5.75% Senior Unsecured Notes | 2017 | 5.75% | 233.3 |
| *Senior Unsecured Notes* | | | *530.0* |
| Capitalized Lease Obligations | to 2017 | Various | 16.9 |
| Special Improvement District Bonds | 2037 | 5.30% | 46.9 |
| Others Unsecured Funded Debt | 2016–2021 | 0–6.00% | 30.1 |
| *Other General Unsecured Borrowings* | | | *93.9* |
| **Total Funded Debt** | | | **$     18,040.1** |

### 1. First Lien Debt

#### a. Prepetition Credit Agreement Debt

As of the Petition Date, CEOC owed approximately $5.35 billion under four term loans issued pursuant to the Prepetition Credit Agreement. Under the Prepetition Credit Agreement, CEOC has approximately $106.1 million of capacity under a revolving credit facility extended pursuant to the Prepetition Credit Agreement, approximately $100.3 million of which is committed to outstanding letters of credit as of the Petition Date. In

KE 34442788

addition, Prepetition Credit Agreement Claims include the Swap and Hedge Claims, which arose pursuant to certain of CEOC's interest rate swap agreements that it uses to manage certain variable and fixed interest rates.

### b.     First Lien Notes

As of the Petition Date, CEOC owed approximately $6.35 billion in principal amount outstanding to Holders of First Lien Notes issued by CEOC pursuant to the First Lien Notes Indentures, including the 8.50 % First Lien Notes Indenture, the 9.00% First Lien Notes Indentures, and the 11.25% First Lien Notes Indenture.

### c.     First Lien Collateral and Intercreditor Agreements

CEOC's prepetition obligations under the Prepetition Credit Agreement and the First Lien Notes (collectively the "First Lien Debt") are secured by first priority liens in the "Collateral," as defined in that certain Amended and Restated Collateral Agreement (as amended, modified, waived, and/or supplemented from time to time, the "First Lien Collateral Agreement"), dated as of June 10, 2009, by and among CEOC, certain CEOC subsidiaries identified therein (together with CEOC, the "First Lien Pledgors"), and Bank of America, N.A. in its capacity as collateral agent and any successors in such capacity as collateral agent (the "First Lien Collateral Agent").[10]

Pursuant to the First Lien Collateral Agreement, the First Lien Pledgors pledged substantially all of their assets—including, among other things, commercial tort claims and cash—to secure the First Lien Debt. Specifically, section 4.04(b) of the First Lien Collateral Agreement requires the First Lien Pledgors to (a) promptly notify the First Lien Collateral Agent if the First Lien Pledgors at any time hold or acquire any commercial tort claim that the First Lien Pledgors reasonably estimate to be in an amount greater than $15 million and (b) grant to the First Lien Collateral Agent a security interest in such commercial tort claim and in the proceeds thereof.[11]  On September 25, 2014, in compliance with their obligations under the First Lien Collateral Agreement, the First Lien Pledgors granted to the First Lien Collateral Agent, for the benefit of creditors under the Prepetition Credit Agreement ("First Lien Lenders") and Holders of the First Lien Notes (together with the First Lien Lenders, the "First Lien Creditors"), an interest in and lien on all of the First Lien Pledgors' rights, title, and interests in certain commercial tort claims (the "Commercial Tort Claims") and proceeds thereof, to the extent any such claims exist.

Under section 4.01(a) of the First Lien Collateral Agreement, the First Lien Pledgors have pledged to the First Lien Collateral Agent all right, title, and interest in or to substantially all of the First Lien Pledgors' assets, including cash.  Accordingly, as part of ongoing negotiations that ultimately led to the successful adoption of the Restructuring Support Agreement—which includes the Consenting First Lien Noteholders' consent to the use of their cash collateral to finance these Chapter 11 Cases—on October 16, 2014, CEOC entered into certain control agreements with the First Lien Collateral Agent to further perfect the First Lien Creditors' lien on a substantial portion of CEOC's unrestricted cash.  Although entry into these control agreements occurred more than 90 days before the Petition Date, it occurred less than 90 days before the commencement of the Involuntary Proceeding (as defined below).  Therefore, certain parties may contend that any such perfection that occurred as a result of entry into the control agreements is an avoidable preference.  Although the Debtors reserve all rights with respect to such an assertion, the successful avoidance of any liens that may have been granted upon entry into the control agreements could diminish the value of the collateral securing the Prepetition Credit Agreement and Secured First Lien Notes Claims.

---

[10]   On July 25, 2014, Credit Suisse AG, Cayman Islands Branch replaced Bank of America, N.A. as administrative agent and collateral agent under the Prepetition Credit Agreement.

[11]   Generally, a categorical description is insufficient to grant a security interest in commercial tort claims.  See U.C.C. §§ 9-108(e)(1); 9-204(b)(2).

KE 34442788

The First Lien Agents,[12] and other parties from time to time, entered into that certain First Lien Intercreditor Agreement, dated as of June 10, 2009 (as amended, restated, modified, and supplemented from time to time, the "First Lien Intercreditor Agreement"), which was consented to by CEOC and CEC and governs, among other things: (i) payment and priority with respect to holders of claims related to the First Lien Debt; (ii) rights and remedies of First Lien Creditors with respect to debtor-in-possession financing, use of cash collateral, and adequate protection in a chapter 11 case; and (iii) the relative priority of liens granted to holders of "First Lien Obligations" (as defined in the First Lien Intercreditor Agreement).

### 2.     Second Lien Debt

#### a.     Second Lien Notes

As of the Petition Date, CEOC owed approximately $5.24 billion in principal amount outstanding to holders of Second Lien Notes issued pursuant to the Second Lien Notes Indentures, including the 10.00% Second Lien Notes Indentures and the 12.75% Second Lien Notes Indentures.

#### b.     Second Lien Collateral and Intercreditor Agreements

CEOC's prepetition obligations under the Second Lien Notes (the "Second Lien Debt") are secured by second priority liens in the "Collateral," as defined in and subject to the terms of that certain Collateral Agreement (as amended, restated, modified, and supplemented from time to time, the "Second Lien Collateral Agreement"), dated as of December 24, 2008, by and among CEOC, certain CEOC subsidiaries identified therein (together with CEOC, the "Second Lien Pledgors"), and the Second Lien Agent,[13] in its capacity as collateral agent (the "Second Lien Collateral Agent"). Section 4.01 of the Second Lien Collateral Agreement expressly excludes cash and deposit accounts from the collateral package securing the Second Lien Debt.[14]

Section 4.04(b) of the Second Lien Collateral Agreement requires the Second Lien Pledgors to (i) promptly notify the Second Lien Collateral Agent if the Second Lien Pledgors at any time hold or acquire any commercial tort claim the Second Lien Pledgors reasonably estimate to be in an amount greater than $15 million and (ii) grant to the Second Lien Collateral Agent a security interest in such commercial tort claim and in the proceeds thereof. On November 25, 2014, in compliance with the Second Lien Collateral Agreement, the Second Lien Pledgors granted to the Second Lien Collateral Agent a security interest in and lien on all of the Second Lien Pledgors' rights, title, and interests in and to the Commercial Tort Claims and proceeds thereof, to the extent any such claims exist.

The First Lien Agents and the Second Lien Agent entered into that certain Intercreditor Agreement, dated as of December 24, 2008 (as amended, restated, modified, and supplemented from time to time, the "Second Lien Intercreditor Agreement"), which was acknowledged by CEOC. The Second Lien Intercreditor Agreement governs, among other things, the relative priority of the First Lien Debt and the Second Lien Debt and the rights and remedies of First Lien Creditors and creditors under the Second Lien Notes with respect to debtor-in-possession financing, use of cash collateral, and adequate protection.

---

[12]   As used herein, "First Lien Agents" means, collectively: (a) Credit Suisse AG, Cayman Islands Branch, as administrative and collateral agent under the Prepetition Credit Agreement, and any successors in such capacity; and (b) U.S. Bank, National Association, in its capacity as indenture trustee under the First Lien Notes Indentures, and any successors in such capacity.

[13]   As used herein, "Second Lien Agent" means U.S. Bank, National Association, in its capacity as indenture trustee under the Second Lien Notes Indentures and collateral agent under the Second Lien Collateral Agreement, and any successors in such capacities.

[14]   See Second Lien Collateral Agreement § 4.01 ("Notwithstanding anything to the contrary in this Agreement, this Agreement shall not constitute a grant of a security interest in . . . cash, deposit accounts and securities accounts (to the extent that a Lien thereon must be perfected by an action other than the filing of customary financing statements).") Because perfection of a lien on cash or deposit accounts requires control or possession, the Second Lien Collateral Agreement does not provide Second Lien Noteholders with a security interest therein.

### 3.     Subsidiary-Guaranteed Debt

#### a.     Subsidiary-Guaranteed Notes

As of the Petition Date, CEOC owed approximately $479 million in principal amount outstanding to holders of Subsidiary-Guaranteed Notes issued pursuant to the Subsidiary-Guaranteed Notes Indenture. CEOC's prepetition obligations under the Subsidiary-Guaranteed Notes were guaranteed by the Subsidiary Guarantors—a group comprised of certain of CEOC's direct and indirect subsidiaries, all or substantially all of which pledged assets to the First Lien Collateral Agent to secure the First Lien Debt.

#### b.     Guarantor Intercreditor Agreement

The First Lien Agents and the Subsidiary-Guaranteed Notes Indenture Trustee, among others, entered into that certain Intercreditor Agreement, dated as of January 28, 2008 (as amended, restated, modified, and supplemented from time to time, the "Guarantor Intercreditor Agreement"). The Guarantor Intercreditor Agreement governs, among other things, the relative priority of the Subsidiary-Guaranteed Notes and the First Lien Creditors.

### 4.     Senior Unsecured Notes

As of the Petition Date, CEOC owed approximately $530 million in principal amount outstanding to holders of Senior Unsecured Notes issued pursuant to the Senior Unsecured Notes Indentures, including the 5.75% Senior Unsecured Notes Indenture and the 6.50% Senior Unsecured Notes Indenture.

## ARTICLE VI.
## EVENTS LEADING TO THE CHAPTER 11 FILINGS

The Debtors and their non-Debtor affiliates operate one of the largest and most comprehensive portfolios of casino properties in North America. This unique combination of gaming products has allowed the Debtors to offer patrons both local and destination options for gaming or entertainment. Unlike competitors that offer only regional gaming properties, the Debtors have been able to obtain higher than average spending at their regional properties because their industry-leading customer loyalty program, Total Rewards®, provides customers with entertainment and gaming rewards that can be used in Las Vegas and other destinations. And unlike competitors that offer only destination properties, the Debtors' more frequent interactions with their customers at the local level allows them to fashion personally tailored reward packages that enhance their customers' experiences and encourage trips to destinations such as Las Vegas. This business model has resulted in higher customer traffic and spending at both regional and Las Vegas casinos.

### A.     Economic Challenges

#### 1.     The 2008 Recession

The 2008 recession had a significant impact on the Debtors, with enterprise-wide net revenues before promotional allowances falling from $12.7 billion in 2007 to $10.3 billion in 2009. In response to the 2008 recession, the Debtors eliminated hundreds of millions of dollars of corporate, marketing, and operational costs. Despite these efforts, CEC's adjusted EBITDA dropped from $2.1 billion in 2007 to $1.7 billion in 2009, and has continued to decline thereafter.

#### 2.     Changing Consumer Spending Habits

The challenges facing the Debtors were not limited to the 2008 recession. Even though the economy has improved, the Debtors are now facing changing consumer preferences. For example, the "Millennial" generation has shown less interest in gaming than previous generations. Thus, although Las Vegas's tourist numbers have largely rebounded to pre-recession rates, visitors, on average, are younger and less willing to gamble. According to the Las Vegas Convention and Visitors Bureau, 47 percent of Las Vegas visitors in 2012 indicated that their primary

reasons to visit was for vacation or pleasure instead of gambling, which is up from 39 percent in 2008.[15]  To address this changing dynamic and capture this younger crowd, many of the newest gaming properties provide significant non-gaming entertainment options.  The Debtors likewise are pursuing younger customers, including by renovating Caesars Palace's nightclub to drive additional traffic to that property.   But nightlife, restaurants, and other entertainment options are not as profitable as gaming.

### 3.       Increased Competition

The Debtors also face increased competition for gaming dollars.  Since 2001, nine states have legalized gambling (bringing the total to 18), which has resulted in more local casinos.[16]  In Ohio, for example, the first casino opened in 2012—now there are eleven.  Similarly, over the past five years, Pennsylvania, which had almost no gaming at the time the 2008 LBO was signed, has become the second-largest domestic gaming market outside of Nevada.[17]  These additional gaming options have added pressure to existing casinos as the total customer population has remained relatively stable.[18]

Even in Las Vegas, new developments have increased competition for existing casinos.  Since 2008, three new developments have opened on the Las Vegas Strip:  (a) in December 2008, Wynn Resorts Limited opened the $2.3 billion Encore Las Vegas, which includes more than 2,000 hotel rooms, approximately 76,000 square feet of gaming space, and approximately 27,000 square feet of retail and entertainment space; (b) in December 2009, MGM Resorts International opened up CityCenter, a $9.2 billion gaming and residential resort that includes more than 6,000 hotel rooms, approximately 150,000 square feet of gaming space, and 500,000 square feet of retail and restaurant space; and (c) in December 2010, the Cosmopolitan Las Vegas, a $3.9 billion gaming resort, opened, adding approximately 3,000 hotel rooms, 110,000 square feet of gaming space, and 300,000 square feet of retail and restaurant space.  These developments, as well as newly renovated properties by many of Las Vegas's traditional operators, have increased the supply of gaming, hotel, restaurant, and shopping opportunities available to Las Vegas visitors, leading to top-line revenue pressures for Caesars Palace.

### 4.       Challenges in the Atlantic City Market

The Debtors also face significant challenges in the Atlantic City market, where they own Caesars Atlantic City and Bally's Atlantic City.  These challenges are the result of, among other things, the effects of Hurricanes Irene and Sandy on the local economy, an oversaturated local market, and increased competition from casinos on the East Coast.  As the chair of the New Jersey Casino Control Commission noted in the opening to that body's 2010 annual report:

---

[15]   Las Vegas Convention & Visitors Auth., *2012 Las Vegas Visitor Profile* [Page 17] (2012), available at http://www.lvcva .com/includes/content/images/MEDIA/docs/2012-Las_Vegas_Visitor_Profile1.pdf.

[16]   Ryan McCarthy, The End of a Casino Monopoly, in Three Charts, Washington Post (Sept. 23, 2014), http://www .washingtonpost.com/news/storyline/wp/2014/09/23/the-end-of-a-casino-monopoly-in-three-charts/; Matt Villano, All In: Gambling Options Proliferate Across USA, USA Today (Jan. 26, 2013), http://www.usatoday.com/story/travel/destinations/ 2013/01/24/gambling-options-casinos-proliferate-across-usa/1861835.

[17]   IBISWorld: Safe Bet: A rise in tourism and personal expenditure will boost demand for casinos, IBISWorld Industry Report 71321: Non-Casino Hotels in the US, 8 (November 2014).

[18]   Josh Barro, The Strange Case of States' Penchant for Casinos, N.Y. Times (Nov. 5, 2014), http://www.nytimes.com/2014/11/06/upshot/the-strange-case-of-states-addiction-to-casinos.html?abt=0002&abg=1 ("States have gradually expanded legal gambling over the last four decades as a way to generate revenue without unpopular tax increases. But large parts of the American market are now saturated, with revenue in decline in most major casino markets. A majority of Americans already live relatively near casinos, so opening new ones does more to shift revenue around than to generate new business. As supply has outpaced demand, some casinos are closing, and governments have missed their projections for gambling-related revenue.").

Over the years, Atlantic City's gaming industry has gone from enjoying a monopoly in the eastern half of the United States to a fiercely competitive situation today with slot machines or full blown casinos in every neighboring state. Gamblers in the New York, Philadelphia and Baltimore metropolitan areas now have places a lot closer to home than Atlantic City is. The so-called "convenience gambler" has found more convenient places to go to gamble. Similarly, development of casino hotels in Macau and Singapore, as well as the new properties in Las Vegas, has made it harder for Atlantic City to attract the real high-end players.[19]

As a result, Atlantic City has seen several high-profile casino bankruptcies in recent years.[20] Four Atlantic City casinos closed in 2014 alone,[21] including the Debtors' Showboat Atlantic City property. According to the Atlantic City Gaming Industry Report, prepared by the Office of Communications, State of New Jersey Casino Control Commission, gaming revenues for Atlantic City properties have declined more than 40 percent since the 2008 LBO, from $5.2 billion in 2006 to $2.8 billion in 2013.

## B.    Out-of-Court Transactions

Over the past several years, Caesars has executed over 45 asset sales and capital markets transactions in an effort to restructure and manage its debt. As set forth below, the Special Governance Committee has been investigating the controversial transactions over the last six months and certain creditor groups have filed lawsuits challenging various aspects of the transactions.

### 1.    The CIE Transactions

Before 2009, CEOC indirectly owned the World Series of Poker ("WSOP") trademark. The trade name was used to run branded, in-person poker tournaments around the United States, with the final round held at the Rio Hotel and Casino in Las Vegas. The Rio is owned by Rio Property Holding LLC and Cinderlane Inc., non-Debtor subsidiaries of CEC and CERP.

In 2009, CEOC sold the WSOP trademark to CIE, a new CEC subsidiary created to pursue online gaming opportunities.[22] In exchange, CEOC received preferred shares that granted it an economic interest in CIE, and a perpetual, royalty-free right to use the WSOP trademark and intellectual property in connection with the operation of branded, in-person poker tournaments and the sale of branded products. Duff & Phelps, LLC, an independent financial advisor, that was hired by both the CEOC and CEC Boards to advise on the transaction, valued the WSOP IP and License Agreement at $15 million. It also concluded that the transaction was fair from a financial point of view to CEOC, and the terms were no less favorable to CEOC than those that would have been obtained in an arm's-length non-affiliate transaction.

In 2011, CEOC sold the right to host the WSOP-branded poker tournaments (which it owned as part of the 2009 Trademark License Agreement) to CIE for $20.5 million in cash.[23] Following this transaction, CEC (through its majority ownership of CIE) controlled all aspects of the WSOP, including the trademark, the property where the

---

[19]    State of New Jersey Casino Control Comm'n, 2010 Annual Report (2010), available at http://www.state.nj.us/casinos/reports.

[20]    See, e.g., In re Trump Entertainment Resorts, Inc., No. 14-12103 (KG) (Bankr. D. Del.); In re Revel AC, Inc., No. 14-22654 (GMB) (Bankr. D.N.J.); In re Revel AC, Inc., No. 13-16253 (JHW) (Bankr. D.N.J.).

[21]    Mark Berman, Trump Plaza Closes, Making It Official: A Third of Atlantic City's Casinos Have Closed This Year, Wash. Post (Sept. 16, 2014), http://www.washingtonpost.com/news/post-nation/wp/2014/09/16/trump-plaza-closes-making-it-official-a-third-of-atlantic-citys-casinos-have-closed-this-year.

[22]    CEOC's rights with respect to hosting the WSOP Tournament were not transferred at this time.

[23]    CEOC retained certain rights granted to it under the 2009 Trademark License Agreement: the right to maintain WSOP-branded poker rooms on its properties and to sell WSOP-branded merchandise.

WSOP tournament finals were held, and the right to host the tournament. The transaction was approved by CEC's Board. The CEC Board's independent financial advisor, Valuation Research Corporation, provided a fairness opinion concluding, among other things, that the principal economic terms of the transaction were fair from a financial point of view to CEOC and the transaction was on terms that were no less favorable to CEOC than it could obtain in a comparable arm's-length non-affiliate transaction.

### 2. The CERP Transaction

In fall 2013, CEC decided to refinance the debt associated with the six CMBS Properties. Without a refinancing, the CMBS debt was set to mature in early 2015. As discussed above, in October 2013, CEC formed CERP with the six CMBS Properties as part of this refinancing. CEC also contributed $200 million in cash to CERP. CEOC sold to CERP the equity of Octavius Linq Intermediate Hold Co., which owned the Octavius Tower and Project Linq. In exchange, CEOC received approximately $80 million in cash and $53 million in CEOC notes for retirement, and CERP assumed $450 million of debt associated with these properties and continued to fund its then-30% share of corporate costs. These transactions closed on October 11, 2013.

CEOC's Board retained Perella Weinberg Partners ("Perella") as an independent financial advisor to advise it on the CERP transaction. Perella opined that the value of the consideration CEOC received was reasonably equivalent to the value of the assets CEOC transferred.

### 3. The Growth Transaction

As a part of the series of transactions resulting in the formation of CGP in fall 2013, CGP used a portion of the capital invested through CACQ (the minority owner of CGP) to purchase from CEOC Planet Hollywood Resort & Casino in Las Vegas, CEOC's interest in the Horseshoe Baltimore project, and 50 percent of the management fees associated with these two properties from CEOC for $360 million in cash and CGP's assumption of $513 million in debt associated with these properties.

The Growth Transaction was negotiated over several months between representatives of the Sponsors and an independent Valuation Committee of CEC's Board, which was formed to determine the fair market value of the assets and equity exchanged in the Growth Transaction. The CEC Valuation Committee engaged Morrison & Foerster LLP as independent legal counsel, and Evercore Partners L.L.C. as its independent financial advisor. Evercore opined, among other things, that the consideration CEOC received in exchange for these assets was not less than the fair market value of such assets. The CEC Valuation Committee likewise concluded that the consideration paid for the assets represented fair market value. The Growth Transaction closed on October 21, 2013.

### 4. The Four Properties Transaction

In March 2014, CEOC announced that it would sell to CGP four casino properties (The Quad, Bally's Las Vegas, The Cromwell, and Harrah's New Orleans) and 50 percent of the management fees payable by each casino in exchange for approximately $2.0 billion. The final purchase price consisted of approximately $1.8 billion of cash and CGP's assumption of a $185 million credit facility used to renovate The Cromwell.

The Four Properties Transaction was negotiated and unanimously recommended by special committees consisting of independent members of CEC and CACQ's Boards of Directors. The CEC Special Committee engaged Centerview Partners and Duff & Phelps, LLC as independent financial advisors, and Reed Smith LLP as independent legal advisor. Centerview Partners opined that (a) the purchase price was fair to CEOC from a financial point of view, and (b) the purchase price was reasonably equivalent to the value of the transferred casinos plus 50% of their management fee streams. Duff & Phelps, LLC opined that the transaction was on terms that were no less favorable to CEOC than would be obtained in a comparable arm's-length transaction with a non-affiliate. The sale of the Las Vegas properties in the Four Properties Transaction closed on May 5, 2014. The sale of Harrah's New Orleans closed on May 20, 2014.

32

### 5.      The Shared Services Joint Venture

On May 20, 2014, in connection with the Four Properties Transaction, CES was formed as a joint venture among CEOC, CERP, and CGPH to provide centralized property management services and common management of enterprise-wide intellectual property. CEOC has a 69 percent ownership stake, and 33 percent of the voting rights, in CES. CERP and CGPH have a 20.2 percent and 10.8 percent ownership stake in CES, respectively, with each partner having a 33 percent vote. CEOC's primary contribution to CES was a license to certain intellectual property, including Total Rewards®.

Pursuant to CES's limited liability company agreement, certain individuals employed by CEOC and CERP, or their respective subsidiaries, were instead to be employed by CES, and all employment-related obligations associated with these employees were assigned to CES. In addition, the Omnibus Agreement assigned to CES certain duties that CEOC and its subsidiaries historically had performed, such as duties to manage, on a reimbursable basis, the payroll and accounts payable for CEOC, CERP, and CGP and their predecessor entities. Finally, CEOC granted to CES a license to certain intellectual property, including Total Rewards®, which CES then licenses to other entities in the Caesars enterprise.

The CEC Special Committee, established for the Four Properties Transaction, approved the terms of the Shared Services Joint Venture, which Duff & Phelps, LLC opined were no less favorable to CEOC than would be obtained in a comparable arms-length transaction with a non-affiliate. A CEC ad hoc committee ultimately recommended that the CEC Board approve the CES Amended and Restated Limited Liability Company Agreement, as well as the Omnibus Agreement. The CEC and CEOC Boards approved the agreements by unanimous written consents.

### 6.      The B-7 Refinancing

On May 6, 2014, CEC and CEOC announced a financing plan designed to extend CEOC's near-term maturities and provide it with covenant relief and the stability to execute its business plan. Among other things, the plan included the following terms:

- Certain of the First Lien Lenders provided an additional $1.75 billion to CEOC under the Prepetition Credit Agreement via the B-7 Term Loan;

- CEC sold 5 percent (68.1 shares) of CEOC's outstanding common shares to institutional investors unaffiliated with CEC for $6.15 million, indicating a $123 million total equity valuation for CEOC; and

- the Prepetition Credit Agreement was amended to: (a) relax certain financial covenants; (b) make CEC's guarantee of the Prepetition Credit Agreement obligations a guarantee of collection rather than of payment; and (c) limit that guarantee to debt held by consenting lenders under the Prepetition Credit Agreement and approximately $2.9 billion of additional indebtedness.

On July 25, 2014, the B-7 Term Loan was assumed by CEOC after regulatory approvals were obtained and the Prepetition Credit Agreement amendments became effective. CEOC used the proceeds of the B-7 Term Loan to retire virtually all existing debt maturing before 2016. Specifically, CEOC retired: (a) 98 percent of the $214.8 million in aggregate principal amount of the 10.00% Second Lien Notes Due 2015;[24] (b) 99.1 percent[25] of

---

[24]   As used herein, "10.00% Second Lien Notes Due 2015" means those second lien notes due 2015 issued pursuant to that certain Indenture, dated as of December 24, 2008, by and between CEOC, CEC, and the applicable 10.00% Second Lien Notes Indenture Trustee.

[25]   The remaining 0.9% was subsequently retired by the Debtors.

the $792 million in aggregate principal amount of 5.625% Senior Unsecured Notes Due 2015;[26] and (c) 100 percent of the $29 million aggregate principal amount in term loans due 2015.

CEC's sale of CEOC stock to the unaffiliated entities resulted in the automatic release of CEC's guarantee of the Debtors' obligations under the Prepetition Credit Agreement, First Lien Notes, and Second Lien Notes. As noted above, the B-7 Refinancing also modified CEC's guarantee of the obligations under the Prepetition Credit Agreement from a guarantee of payment to a capped guarantee of collection.

## 7.      The Senior Unsecured Notes Transaction

On August 22, 2014, CEC and CEOC consummated the "Senior Unsecured Notes Transaction" with certain holders of CEOC's outstanding Senior Unsecured Notes, who represented $237.8 million in aggregate principal amount of the Senior Unsecured Notes and greater than 51 percent of each series of the Senior Unsecured Notes that were then held by non-affiliates of CEC and CEOC (the "August Noteholders"). As part of the Senior Unsecured Notes Transaction, the August Noteholders sold to CEC and CEOC an aggregate principal amount of approximately $89.4 million of the 6.50% Senior Unsecured Notes Due 2016[27] and an aggregate principal amount of approximately $66 million of the 5.75% Senior Unsecured Notes Due 2017.[28] In return, CEC and CEOC each paid the August Noteholders $77.7 million in cash, and CEOC also paid the August Noteholders accrued and unpaid interest in cash. CEC also contributed Senior Unsecured Notes in the aggregate principal amount of approximately $426.6 million to CEOC for cancellation. Through the Senior Unsecured Notes Transaction, CEOC reduced its outstanding indebtedness by approximately $582 million.

As part of the Senior Unsecured Notes Transaction, and with the consent of the August Noteholders, CEOC and the Senior Unsecured Notes Trustee entered into supplemental Senior Unsecured Notes indentures to remove provisions relating to CEC's guarantee of the Senior Unsecured Notes and to modify the covenant restricting disposition of "substantially all" of CEOC's assets so that future asset sales would be measured against CEOC's assets as of the date of the supplemental indentures (the "August 2014 Indenture Amendments"). In addition, with the consent of the August Noteholders, CEOC and the Senior Unsecured Notes Indenture Trustee amended the Senior Unsecured Notes Indentures to modify a ratable amount of the approximately $82.4 million face amount of the 6.50% Senior Unsecured Notes Due 2016 and 5.75% Senior Unsecured Notes Due 2015 held by the August Noteholders (the "Amended Senior Unsecured Notes") to include provisions that holders of those two series of the Amended Senior Unsecured Notes will be deemed to consent to any restructuring of the Senior Unsecured Notes (including the Amended Senior Unsecured Notes) that has been consented to by holders of at least 10 percent of the outstanding 6.50% Senior Unsecured Notes Due 2016 and 5.75% Senior Unsecured Notes Due 2015, as applicable. The August 2014 Indenture Amendments and the Amended Senior Unsecured Notes were effective as of August 22, 2014, the closing date of the Senior Unsecured Notes Transaction.

## 8.      Recent and Impending Property Closures

The Debtors have considered other options to reduce overhead and improve cash flows. In particular, the Debtors conducted a comprehensive review of their property portfolio to identify their weakest performing casino properties, especially those in markets that are oversupplied with gaming options. As a result of this review, the Debtors closed two U.S. properties in 2014: Harrah's Tunica, which was closed on June 2, 2014, and Showboat Atlantic City, which was closed on August 31, 2014. Subsequently, the Debtors sold the Showboat Atlantic City property to a New Jersey public university in a transaction that closed on December 12, 2014. In addition, the

---

[26]   As used herein, "5.625% Senior Unsecured Notes Due 2015" means those senior unsecured notes due 2015 issued pursuant to that certain Indenture, dated as of May 27, 2005, by and between CEOC, CEC, and U.S. Bank National Association as Trustee, as supplemented from time to time.

[27]   As used herein, "6.50% Senior Unsecured Notes Due 2016" means those senior unsecured notes due 2016 issued pursuant to the 6.50% Senior Unsecured Notes Indenture.

[28]   As used herein, "5.75% Senior Unsecured Notes Due 2017" means those senior unsecured notes due 2017 issued pursuant to the 5.75% Senior Unsecured Notes Indenture.

Debtors are ceasing their greyhound racing activities at the Horseshoe Council Bluffs casino in Council Bluffs, Iowa, effective December 31, 2015.

### C. Independent Investigation, Disputes with Creditors, and Negotiation of the Restructuring Support Agreement

#### 1. Special Governance Committee Investigation

On June 27, 2014, the Debtors appointed Steven Winograd, Managing Director of BMO Capital Markets, and Ronen Stauber, Managing Director of Jenro Capital, LLC, as independent directors of CEOC. Winograd and Stauber are each disinterested directors who are not beholden to CEC, its affiliates other than CEOC, or the Sponsors. They have no current material ties to CEC, its affiliates other than CEOC, or the Sponsors that would compromise their impartiality, and their compensation as directors of CEOC is not contingent upon taking or approving any particular action.

Shortly thereafter, the CEOC Board of Directors formed the Special Governance Committee, comprising Winograd and Stauber. Among other things, the Special Governance Committee undertook an independent investigation into potential claims the Debtors and/or their creditors may have against CEC or its affiliates, including the claims asserted in certain of the then recently filed complaints.

The Special Governance Committee sought assistance from CEOC legal counsel, Kirkland & Ellis LLP ("K&E") and, at the recommendation of counsel, retained Mesirow Financial Consulting, LLC ("Mesirow," and together with K&E, the "Advisors") as an independent financial advisor to assist with various analyses for the investigation.

Beginning in August 2014, the Special Governance Committee issued written requests for documents to CEC, its affiliates, and the Sponsors. The Advisors have reviewed and analyzed approximately 37,000 documents in the course of the independent investigation. In addition, the Advisors have interviewed employees and officers of CEC and its affiliates, as well as CEC's legal and financial advisors. To date, Mesirow alone has worked over 7,500 hours on the investigation.

The members of the Special Governance Committee also have reviewed and considered the allegations made by certain creditors in pending litigation related to challenged transactions (discussed below), nearly all of which transactions pre-dated the appointment of the independent directors and establishment of the Special Governance Committee. As part of that review, the Special Governance Committee reviewed and analyzed documents relating to those transactions, and materials prepared by the Advisors. The Special Governance Committee has consulted extensively with the Advisors concerning the independent investigation.

Based on its investigation to date, and upon the recommendation of the Advisors, the Special Governance Committee determined that it would require a significant contribution from CEC and its affiliates to settle and release certain claims, including an avoidable insider preference, but that prosecuting and collecting on such claims would be subject to significant challenges, including disagreements over the validity and size of the claims. As a result, the Special Governance Committee negotiated for and secured significant contributions from CEC under the Restructuring Support Agreement that the Special Governance Committee believes, subject to completion of its investigation, will be sufficient to address such claims. The Special Governance Committee also required, as a condition to approval of the Restructuring Support Agreement, that the Restructuring Support Agreement include an express "fiduciary out" that permitted the Special Governance Committee to terminate the Restructuring Support Agreement in, among other circumstances, a superior, alternative transaction is available.

#### 2. Litigation Regarding Transactions

The transactions set forth in Article VI.B above are the subject of serious and complicated disputes between CEOC, CEC, and various creditors. Generally speaking, the creditors claim that the transactions were unlawful and/or violated certain covenants under the applicable indentures. More specifically, the noteholders allege that assets were transferred at below-market prices as part of a scheme by CEC and the Sponsors to transfer valuable assets from CEOC to CEC and its affiliates to remove them from the reach of CEOC's creditors. The creditors

KE 34442788

further allege that CEOC's directors and officers are unavoidably conflicted due to their extensive business and commercial ties to CEC and the Sponsors, and that they violated their fiduciary duties by approving the transactions.

On August 4, 2014, the Second Lien Agent, in its capacity as indenture trustee under the Second Lien Notes Indentures, commenced an action in the Court of Chancery of the State of Delaware against, among others, CEC, CEOC, CGP, CERP, CEC's directors, and certain of CEOC's directors in a case captioned *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corporation*, C.A. No. 10004-VCG (the "Delaware Chancery Court Action"). In the Delaware Chancery Court Action, the Second Lien Notes Trustee has alleged claims for, among other things, intentional and constructive fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, corporate waste, and breach of contract. The claims in the Delaware Chancery Court Action are focused on the CIE, CERP, Growth, and Four Properties Transactions, as well as the Shared Services Joint Venture.

On August 5, 2014, CEC and CEOC commenced a lawsuit in the Supreme Court of New York, County of New York, against certain institutional holders of First and Second Lien Notes, which is captioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment Limited Partnership I, et al.*, Index No. 652392/2014 (the "New York State Action"). The members of the Special Governance Committee abstained from the decision to file the New York State Action. CEC, CEC and CEOC assert that the defendants have tortiously interfered with CEC's and CEOC's businesses in an attempt to improve defendants' credit default swap and other securities positions. CEC and CEOC also seek declarations that no defaults occurred under CEOC's First and Second Lien Notes Indentures and that there have been no breaches of fiduciary duty or fraudulent transfers.

On November 25, 2014, the First Lien Notes Indenture Trustee, in its capacity as trustee under the 8.50% First Lien Notes Indenture, commenced an action in the Court of Chancery of the State of Delaware against CEC, CEOC, CGP, CERP, CEC's directors, and all of CEOC's directors in a case captioned *UMB Bank v. Caesars Entertainment Corporation*, C.A. No. 10393-VCG (the "Receiver Action"). In the Receiver Action, the First Lien Notes Indenture Trustee alleges that Caesars has engaged in a fraudulent scheme to strip assets from CEOC, and seeks, among other things, to have the Delaware Chancery Court appoint a receiver to manage CEOC's affairs for the benefit of its noteholders. Pursuant to the Restructuring Support Agreement, the Receiver Action was consensually stayed as to all defendants upon the filing of these chapter 11 petitions.

Finally, on September 3 and October 2, 2014, certain Senior Unsecured Noteholders commenced two actions against CEC and CEOC in the United States District Court for the Southern District of New York, which are captioned *MeehanCombs Global Credit Opportunities Master Fund, LP v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, Case No. 14-cv-07091-SAS (the "MeehanCombs Action"), and *Danner v. Caesars Entertainment Corp. and Caesars Entertainment Operating Co., Inc.*, Case No. 14-cv-07973-SAS (the "Danner Action," and together with the MeehanCombs Action, the "SDNY Actions"). Through the SDNY Actions, these Senior Unsecured Noteholders have asserted that the Senior Unsecured Notes Transaction breached the Senior Unsecured Notes Indentures and violated the Trust Indenture Act of 1939. The SDNY Actions were stayed with respect to CEOC as a result of the automatic stay, but, as of the date hereof, continue to proceed with respect to CEC. On January 15, 2015, CEC's motion to dismiss in the Danner Action was denied in its entirety and CEC's motion to dismiss in the MeehanCombs Action was granted in part and denied in part. The plaintiffs in the MeehanCombs Action filed an amended complaint on January 29, 2015, which, among other changes, added a cause of action against CEC for breaches of contract and guarantees relating to the Debtors' bankruptcy filings. As of the date hereof, the SDNY Actions remain pending.

### 3.      Restructuring Negotiations and Restructuring Support Agreement

The Debtors engaged their stakeholders, including certain First Lien Lenders, certain Holders of First Lien Notes, and CEC, in extensive, multilateral, arm's-length negotiations regarding the terms of a potential restructuring beginning in summer 2014.

These negotiations were complicated by a number of factors. First, certain of the First Lien Lenders and Holders of First Lien Notes also held credit default swap positions, which could have significant value if the Debtors defaulted on their debts. Parties holding credit default swap positions could therefore be incentivized to seek outcomes that maximized recoveries on those derivative positions rather than their interest in the Debtors' indebtedness. Second, CEC, the Debtors, and certain creditors also were engaged in ongoing, contentious litigation

described above.  Third, it was critical that CEC support any potential restructuring given gaming regulatory requirements and the fact that the Caesars' businesses are interrelated through shared services and employees as well as the Total Rewards® program.  Similarly, the Debtors could trigger significant tax obligations—including for the Debtors—by separating from CEC.

The Debtors and certain of their stakeholders examined various structures in an effort to maximize the value of their estates and creditor recoveries.  After significant diligence and hard-fought negotiations, the parties agreed to reorganize the Debtors' businesses as a REIT, which would enhance the value of the Debtors' real estate and allow the Debtors to provide their creditors with improved recoveries, including a 100 percent recovery for Holders of Allowed Prepetition Credit Agreement Claims.  As part of those negotiations, the holders of First Lien Notes agreed to, among other things, receive less than a par recovery and to take a significant portion of that recovery in the form of equity.  The Debtors also focused on maximizing recoveries for Holders of Non-First Lien Claims, and successfully negotiated for improved recoveries for such creditors from the initial proposals while also maintaining recoveries for Holders of Allowed Prepetition Credit Agreement Claims and Holders of Allowed Secured First Lien Notes Claims.

Despite this substantial progress, certain of the Holders of First Lien Notes and each of the First Lien Lenders involved in the negotiations withdrew their support on December 11, 2014.  The Debtors, CEC, and certain of the Holders of First Lien Notes, however, continued negotiating and ultimately reached agreement on the terms of a comprehensive restructuring.  This proposed restructuring is documented in the Restructuring Support Agreement and term sheet attached as **Exhibit B** thereto (the "Restructuring Term Sheet"), which were initially executed on December 19, 2014, by the Debtors, CEC, certain Apollo-affiliated funds, and 38 percent of the Holders of First Lien Notes.  As of the Petition Date, holders of over 80 percent in aggregate principal amount of the Debtors' First Lien Notes, and approximately 15 percent in aggregate principal amount outstanding under the Prepetition Credit Agreement, had signed the Restructuring Support Agreement.  The Restructuring Support Agreement provides certain case milestones that the Debtors are required to meet, including:

- within 5 business days after the Petition Date, entry of an order by the Bankruptcy Court approving the interim use of Cash Collateral on the terms and conditions substantially consistent with those set forth in the Cash Collateral Stipulation;

- within 75 days after the Petition Date, entry of an order by the Bankruptcy Court approving the use of Cash Collateral on a final basis and on terms and conditions substantially consistent with those set forth in the Cash Collateral Stipulation;

- within 150 days after the Petition Date, entry by the Bankruptcy Court of the Disclosure Statement Order that is materially consistent with the Restructuring Term Sheet and otherwise in form, scope, and substance reasonably satisfactory to the Debtors and the Requisite Consenting Creditors;

- within 120 days after the Bankruptcy Court's entry of the Disclosure Statement Order, entry by the Bankruptcy Court of the Confirmation Order that is materially consistent with the Restructuring Term Sheet and otherwise reasonably satisfactory to the Debtors and the Requisite Consenting Creditors; and

- within 120 days after the Confirmation Order becomes a final order (the "Outside Date"), the Effective Date shall have occurred.[29]

---

[29]  In the event the Debtors fail to obtain any required regulatory approvals for certain of their assets as of the Outside Date, the Debtors shall close and proceed to effectiveness with respect to those assets for which it does have regulatory approval, unless the Debtors determine in good faith, after consultation with the Requisite Consenting Creditors, that to do so would have a materially adverse effect on the Debtors, in which case the Debtors shall have an additional 60 days in which to obtain the additional required regulatory approvals and close on those assets; provided that any further extensions of the Outside Date shall require the consent of the Requisite Consenting Creditors.

KE 34442788

The restructuring contemplated by the Plan, the Restructuring Support Agreement, and the Restructuring Term Sheet is in the best interests of the Debtors' estates, maximizes stakeholder recoveries, secures a viable pathway to future growth, and ensures that the Debtors continue to operate on an ongoing basis for the benefit of their customers, vendors, and approximately 32,000 employees.

### D.      Proposed Merger of CEC and CACQ

On December 22, 2014, CEC and CACQ announced that they had entered into a definitive agreement to merge in an all-stock transaction (the "Merger"). The Merger is conditioned on the confirmation and effectiveness of a plan of reorganization on the material terms set forth in the Restructuring Support Agreement, and in a press release issued that same day, CEC expressed that it believed the Merger would "position the merged company to support the restructuring of CEOC without the need for any significant outside financing" and would "position it be a strong guarantor for the restructured CEOC's obligations, including lease payments its 'OpCo' subsidiary will make to 'PropCo.'"[30]   Pursuant to the terms of the merger agreement, each outstanding share of CACQ class A common stock will be exchanged for 0.664 shares of CEC common stock, subject to adjustments set forth in the merger agreement. As a result, CEC stockholders will own approximately 62 percent of the combined company on a fully diluted basis and CACQ stockholders will own approximately 38 percent. The merged company is expected to continue to conduct business as Caesars Entertainment Corporation and is expected to continue trading on the NASDAQ under the ticker "CZR."

On December 30, 2014, certain shareholders of CACQ commenced a class action lawsuit in the Eighth Judicial District Court of Clark County, Nevada, which is captioned *Nicholas Koskie, on behalf of himself and all others similarly situated, v. Caesars Acquisition Company, Caesars Entertainment Corp., Marc Beilinson, Dhiren Fonseca, Philip Erlanger, Karl Peterson, David Sambur, Mark J. Rowan and Don R. Kornstein*, Case No. A-14-711712-C (the "Merger Class Action"). The plaintiffs to the Merger Class Action allege, among other things, that certain of the defendants breached their fiduciary duties in approving the proposed merger of CEC and CACQ. As of the date hereof the Merger Class Action remains pending.

### E.      National Retirement Fund Withdrawal

Prior to the Petition Date, certain of the Debtors were employers within the meaning of ERISA[31] and had contractual obligations to make contributions to the National Retirement Fund ("NRF"), a multiemployer pension fund within the meaning of ERISA. On January 8, 2015, in light of the NRF's stated intention to immediately expel the applicable Debtors (as well as certain of the Debtors' non-Debtor affiliates) from the NRF, CEC commenced an action against NRF and its board of trustees in the United States District Court for the Southern District of New York, which is captioned *Caesars Entertainment Corporation v. Pension Plan of the National Retirement Fund and Board of Trustees of the National Retirement Fund*, Case No. 15-cv-00138 (the "NRF Action"). Through the NRF Action, CEC seeks a declaratory judgment that the NRF lacks the authority or power to (a) refuse pension fund contributions made to the NRF in accordance with the Debtors' obligations or (b) cause the withdrawal from NRF of any of the Debtors.

Notwithstanding the NRF Complaint, on January 12, 2015, the NRF sent a letter to the applicable Debtors (as well as the applicable non-Debtor affiliates) notifying them that, effective immediately, the NRF had terminated their participation in the fund and that the fund would cease accepting their contributions. The Debtors dispute the validity of the NRF's actions and reserve all of their rights with respect to such action, including with respect to any rights they may have to contest such action and/or any asserted liability as a result of such action under applicable bankruptcy and non-bankruptcy laws, rules, and regulations. Nevertheless, if the NRF's action is determined to constitute the Debtors' complete withdrawal from NRF, the Debtors could be subject to withdrawal liability under

---

[30]   Caesars Entertainment Corp., Report on Form 8-K, Ex. 99.1, Dec. 22, 2014.

[31]   As used herein, "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.*

ERISA exceeding $300 million, which could materially reduce the Debtors' estimated recoveries to Holders of Claims and Interests in these Chapter 11 Cases.

### F.     The Debtors' Financial Outlook and Business Strategy Going Forward

Despite the Debtors' substantial prepetition efforts to reduce the amount of their outstanding funded debt, relax financial covenants, and extend maturities, including through various asset sales and refinancings, the Debtors' balance sheet remained unsustainable in light of both present and expected market conditions.  Accordingly, faced with the prospect of a liquidity crisis in late 2015, the Debtors commenced these Chapter 11 Cases to effectuate a restructuring that will right size their balance sheet and address operational issues.  With the balance sheet issues addressed, the Debtors believe they will be positioned to leverage their core operations, business model, and customer base to return to profitability.  Despite the recent downward pressure placed on the Debtors' fundamental business operations, the Debtors remain market leaders in the gaming industry and continue to advantageously leverage the synergies between their regional and destination properties to maximize their share of the gaming market.  The continued strength of the Debtors' fundamental operations, coupled with the deleverage of the Debtors' balance sheet and the structural reorganization into a real estate investment trust structure that will result under the Debtors' proposed Plan, will increase the Debtors' competitiveness and maximize the value of the Debtors' business as a going concern.  The Debtors expect that the efficient and successful consummation of the proposed restructuring will enable the Debtors to profitably operate their business and aggressively pursue opportunities as they arise.

### ARTICLE VII.
### MATERIAL EVENTS OF THE CHAPTER 11 CASES

### A.     Commencement of Involuntary Chapter 11 Proceedings

On January 12, 2015, just three (3) days prior to the Debtors' anticipated commencement of the Chapter 11 Cases in the Northern District of Illinois, certain holders of Second Lien Notes filed an involuntary bankruptcy petition against CEOC, but no other Debtor, in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court") captioned *In re Caesars Entertainment Operating Company, Inc.*, No. 15-10047 (the "Involuntary Proceeding").

On January 14, 2015, certain holders of the Second Lien Notes filed in the Involuntary Proceeding the *Motion of Petitioning Creditors, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1014(b), for an Order (I) Establishing Venue for the Chapter 11 Cases of Caesars Entertainment Operating Company, Inc. and its Debtor Affiliates in the District of Delaware and (II) Granting Related Relief* [Docket No. 26] (the "Venue Motion").  On January 15, 2015, the Delaware Bankruptcy Court entered the *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1014(b), Staying Parallel Proceeding* [Docket No. 47] (the "Stay Order"), which stayed the Debtors' Chapter 11 Cases before the Bankruptcy Court pending the Delaware Bankruptcy Courts' consideration of the Venue Motion.

On January 26 and 27, 2015, the Delaware Bankruptcy Court held an evidentiary hearing to consider the relief requested by the Venue Motion.  On January 28, 2015, the Delaware Bankruptcy Court entered an order in the Involuntary Proceeding [Docket No. 220] lifting the stay imposed by the Stay Order and transferring venue of the Involuntary Proceeding to the Northern District of Illinois.

### B.     First Day Pleadings and Certain Related Relief

The Debtors devoted substantial efforts prior to the commencement of these Chapter 11 Cases to be in position where they could quickly and efficiently stabilize their operations and preserve and restore their relationships with vendors, customers, employees, landlords, and utility providers that have been adversely affected by the commencement of these Chapter 11 Cases.  As a result of these efforts, the Debtors were able to minimize any negative effects on their business that may have resulted from the commencement of these Chapter 11 Cases.

On the Petition Date, in addition to the voluntary petitions for relief filed by the Debtors under chapter 11 of the Bankruptcy Code, the Debtors also filed a number of motions and applications (collectively, the "First Day Motions") with the Bankruptcy Court.  The relief sought in these First Day Motions was necessary to enable the

Debtors to preserve value and efficiently implement their proposed restructuring process with minimal disruption and delay. The relief requested in the First Day Motions, among other things, (a) prevented interruptions to the Debtors' business, (b) eased the strain on the Debtors' relationships with certain essential constituents, and (c) allowed the Debtors to retain certain advisors necessary to assist the Debtors with the administration of the Chapter 11 Cases.

### 1.    Stabilizing Operations

Recognizing that even a brief interruption of the Debtors' business would adversely affect customer and supplier relationships, revenues, and profits, the Debtors filed various First Day Motions to minimize the adverse effects that would otherwise be caused by the commencement of these Chapter 11 Cases. Through these First Day Motions, the Debtors sought authority to, among other things, pay certain prepetition claims and obligations and continue certain existing programs. The relief requested by the following First Day Motions was essential to facilitating the Debtors' smooth transition into chapter 11, allowed the Debtors to continue their business operations without interruption, and maintained (or even bolstered) confidence among the Debtors' suppliers, customers, and creditors as to the likelihood of the Debtors' successful reorganization.

- **Cash Collateral Motion.** On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay to Permit Implementation, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* [Docket No. 22] (the "Cash Collateral Motion"). Prior to the commencement of these Chapter 11 Cases, the Debtors were able to reach an agreement with both an ad hoc group of certain parties to the Prepetition Credit Agreement and an ad hoc group of certain holders of First Lien Notes regarding the consensual use of cash collateral. On January 15, 2015, the Bankruptcy Court entered an order approving the Cash Collateral Motion on an interim basis [Docket No. 47], which, among other things, describes the terms and conditions for the use of the Debtors' cash collateral and provides adequate protection to the prepetition secured creditors. The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **Wages Motion.** On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition (A) Wages, Salaries, and Other Compensation, (B) Reimbursable Employee Expenses, and (C) Obligations Relating to Medical and Other Benefits Programs, and (II) Granting Related Relief* [Docket No. 7] (the "Wages Motion"). On January 15, 2015, the Bankruptcy Court entered an order approving the Wages Motion on an interim basis [Docket No. 54]. The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **Cash Management Motion.** On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue Using Their Cash Management System, (B) Maintain Their Existing Bank Accounts and Business Forms, and (C) Continue Intercompany Transactions, and (II) Granting Related Relief* [Docket No. 8] (the "Cash Management Motion"). On January 15, 2015, the Bankruptcy Court entered an order approving the Cash Management Motion on an interim basis [Docket No. 59]. The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **Critical Vendors Motion.** On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Prepetition Claims of Certain Vendors, (II) Approving and Authorizing Procedures Related Thereto, and (III) Granting Related Relief* [Docket No. 11] (the "Critical Vendors Motion"). On January 15, 2015, the Bankruptcy Court entered an order approving the Critical Vendors Motion on an interim basis [Docket No. 57]. The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **Lienholders, 503(b)(9), and Foreign Vendors Motion.**  On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Payment of (A) Prepetition Claims of Certain Lien Claimants, (B) Section 503(b)(9) Claims, and (C) Foreign Vendor Claims, (II) Approving Procedures Related Thereto, and (III) Granting Related Relief* [Docket No. 9] (the "Lienholders, 503(b)(9), and Foreign Vendors Motion").  On January 15, 2015, the Bankruptcy Court entered an order approving the Lienholders, 503(b)(9), and Foreign Vendors Motion on an interim basis [Docket No. 55].  The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **PACA Motion.**  On the Petition Date, the Debtors filed the *Debtors Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Claims Arising Under the Perishable Agricultural Commodities Act, and (II) Granting Related Relief* [Docket No. 10] (the "PACA Motion").  On January 15, 2015, the Bankruptcy Court entered an order approving the PACA Motion on an interim basis [Docket No. 56].  The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **Customer Programs Motion.**  On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto, and (B) Granting Related Relief* [Docket No. 12] (the "Customer Programs Motion").  On January 15, 2015, the Bankruptcy Court entered an order approving the Customer Programs Motion on a final basis [Docket No. 49].

- **Taxes Motion.**  On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* [Docket No. 13] (the "Taxes Motion").  On January 15, 2015, the Bankruptcy Court entered an order approving the Taxes Motion on an interim basis [Docket No. 58].  The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **Insurance Motion.**  On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Prepetition Insurance Coverage, (B) Satisfy Payment of Prepetition Obligations Related to That Insurance Coverage in the Ordinary Course of Business, and (C) Renew, Supplement, or Enter into New Insurance Coverage in the Ordinary Course of Business, and (III) Granting Related Relief* [Docket No. 14] (the "Insurance Motion").  On January 15, 2015, the Bankruptcy Court entered an order approving the Insurance Motion on an interim basis [Docket No. 91].  The Bankruptcy Court entered a final order granting the relief requested on [_____] [Docket No. __].

- **Surety Bond Motion.**  On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving Continuation of Surety Bond Program, and (II) Granting Related Relief* [Docket No. 15] (the "Surety Bond Motion").  On January 15, 2015, the Bankruptcy Court entered an order approving the Surety Bond Motion on a final basis [Docket No. 50].

- **Utilities Motion.**  On February 2, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Determining Adequate Assurance of Utility Payment, (II) Approving Procedures for Resolving any Disputes Concerning Adequate Assurance, and (III) Granting Related Relief* [Docket No. 204] (the "Utilities Motion").  On February 11, 2015, the Bankruptcy Court entered an order approving the Utilities Motion on an interim basis [Docket No. 341].  The Bankruptcy Court entered a final order granting the relief requested on February 26, 2015 [Docket No. 502].

### 2.    Procedural and Administrative Motions

To facilitate a smooth and efficient administration of these Chapter 11 Cases and to reduce the administrative burden associated therewith, the Debtors filed the following motions seeking authorization to implement certain procedural and administrative relief:

- **Joint Administration Motion.** On the Petition Date, the Debtors filed the Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Related Chapter 11 Cases, and (II) Granting Related Relief (the "Joint Administration Motion"). On January 15, 2015, the Bankruptcy Court entered an order approving the Joint Administration Motion on a final basis [Docket No. 43].

- **Case Management Motion.** On the Petition Date, the Debtors filed the Debtors' Motion for Entry of an Order Approving Case Management Procedures [Docket No. 18] (the "Case Management Motion"). On February 19, 2015, the Bankruptcy Court entered an order approving the Case Management Motion on a final basis [Docket No. 395].

- **Schedules and Statements Extension Motion.** On the Petition Date, the Debtors filed the Debtors' Motion for Entry of an Order (I) Extending Deadline to File Schedules of Assets and Liabilities, Current Income and Expenditures, and Executory Contracts and Unexpired Leases and Statements of Financial Affairs, and (II) Granting Related Relief [Docket No. 19] (the "Schedules and Statements Extension Motion"). On January 15, 2015, the Bankruptcy Court entered an order approving the Schedules and Statements Extension Motion on a final basis [Docket No. 60].

### 3.    Employment and Compensation of Professional Advisors

To assist the Debtors in carrying out their duties as debtors-in-possession and to otherwise represent the Debtors' interests in the Chapter 11 Cases, the Debtors filed several applications to obtain authority to retain and employ the following professionals:

- Prime Clerk LLC, as Notice and Claims Agent to the Debtors, which  retention was approved by the Bankruptcy Court on January 15, 2014 [Docket No. 51];

- Kirkland & Ellis LLP, as counsel to the Debtors, which retention was approved by the Bankruptcy Court on [_____] [Docket No. __];

- AP Services, LLC ("AlixPartners"), to provide the Debtors a chief restructuring officer and certain additional personnel, which retention was approved by the Bankruptcy Court on [_____] [Docket No. __];

- DLA Piper LLP, as special conflicts counsel to the Debtors, which retention was approved by the Bankruptcy Court on [_____] [Docket No. __];

- KPMG LLP, as tax consultants to the Debtors, which retention was approved by the Bankruptcy Court on [_____] [Docket No. __]; and

- Mesirow Financial Consulting, LLC as independent financial advisor to the Special Governance Committee of the Board of Directors of CEOC and as potential expert witness, which retention was approved by the Bankruptcy Court on [_____] [Docket No. __].

On February 18, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 377] (the "Interim Compensation Motion"), which provides for procedures for the interim compensation and reimbursement of expenses of retained Professionals in these Chapter 11 Cases. The Bankruptcy Court entered an order approving the Interim Compensation Motion on [_____] [Docket No. __].



### C.  Pleadings Related to the Proposed Restructuring

#### 1.  Motions to Appoint an Examiner

On January 12, 2015, simultaneously with the commencement of the Involuntary Proceeding, certain holders of Second Lien Notes also filed in the Involuntary Proceeding the *Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* [Docket No. 10] (the "<u>Involuntary Proceeding Examiner Motion</u>").  As of the date hereof, the Involuntary Proceeding Examiner Motion remains pending and has not yet been scheduled for hearing.  At this time, no objection deadline has been set for the Involuntary Proceeding Examiner Motion.

On February 13, 2015, the Debtors filed in these Chapter 11 Cases the *Debtors' Motion for Entry of an Order (I) Appointing an Examiner and (II) Granting Related Relief* [Docket No. 363] (the "<u>Debtors' Examiner Motion</u>") and on February 17, 2015, the Second Priority Notes Committee filed the *Motion of Official Committee of Second Priority Noteholders for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* (the "<u>Second Priority Notes Committee's Examiner Motion</u>").  As of the date hereof, both the Debtors' Examiner Motion and the Second Priority Notes Committee's Examiner Motion have been scheduled for hearing on March 4, 2015.  The objection deadline for both Motions is February 25, 2015, at 4:00 p.m., prevailing Central Time.

#### 2.  Motion to Assume the Restructuring Support Agreement

On February 4, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Assume Restructuring Support Agreement and (B) Granting Related Relief* [Docket No. 260] (the "<u>RSA Assumption Motion</u>").  In the RSA Assumption Motion, the Debtors requested entry of an order authorizing the Debtors to assume the Restructuring Support Agreement.  As of the date hereof, the RSA Assumption Motion remains pending before the Bankruptcy Court and has not yet been scheduled for hearing.  At this time, no objection deadline has been set for the RSA Assumption Motion.

#### 3.  Motion to Approve the Backstop Agreement

On March 2, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order (A) Authorizing CEOC to Enter into the Backstop Commitment Agreement and Pay the Commitment Fee and Indemnification in Connection Therewith and (B) Granting Related Relief* [Docket No. 531] (the "<u>Backstop Agreement Approval Motion</u>").  In the Backstop Agreement Approval Motion, the Debtors requested entry of an order approving the Backstop Commitment Agreement and payment of certain fees and indemnification in connection therewith.  As of the date hereof, the Backstop Agreement Approval Motion remains pending before the Bankruptcy Court and has not yet been scheduled for hearing.  At this time, no objection deadline has been set for the Backstop Agreement Approval Motion.

### D.  Rejection and Assumption of Executory Contracts and Unexpired Leases

Prior to the Petition Date and in the ordinary course of business, the Debtors entered into thousands of Executory Contracts and Unexpired Leases.  The Debtors have reviewed and will continue to review during the Chapter 11 Cases such Executory Contracts and Unexpired Leases to identify contracts and leases for either assumption or rejection.

The Debtors intend to include information in the Plan Supplement regarding the assumption or rejection of certain of their Executory Contracts and Unexpired Leases, but may also elect to file discrete motions seeking to assume or reject various of the Debtors' Executory Contracts and Unexpired Leases.  As of the date hereof, the Debtors have filed the *Debtors' First Omnibus Motion for the Entry of an Order (I) Authorizing the Debtors to Reject Certain Executory Contracts <u>Nunc Pro Tunc</u> to February 23, 2015, and (II) Granting Related Relief* [Docket No. 378] (the "<u>Contract Rejection Motion</u>"), seeking to reject certain of the Debtors' Executory Contracts identified therein.  The Contract Rejection Motion is scheduled for hearing on March 4, 2015.  The objection deadline for the Contract Rejection Motion is February 25, 2015, at 4:00 p.m., prevailing Central Time.

43

### E.       Appointment of Statutory Committees

#### 1.       Official Unsecured Creditors' Committee

On February 5, 2015, the U.S. Trustee filed the *Notice of Appointment of Official Unsecured Creditors' Committee* [Docket No. 264] notifying parties in interest that the U.S. Trustee had appointed the Unsecured Creditors' Committee in these Chapter 11 Cases. Due to a subsequent change in membership, on February 6, 2015, the U.S. Trustee filed the *Amended Notice of Appointment of Official Unsecured Creditors' Committee* [Docket No. 317]. The Unsecured Creditors' Committee is comprised of (a) National Retirement Fund, (b) International Game Technology, (c) US Foods, Inc., (d) Law Debenture Trust Company of New York, (e) MeehanCombs Global Credit, (f) Wilmington Trust, NA, (g) Hilton Worldwide, Inc., (h) Earl of Sandwich (Atlantic City) LLC, and (i) PepsiCo, Inc.

The Unsecured Creditors' Committee filed several applications to obtain authority to retain and employ various professionals to assist the Unsecured Creditors' Committee in carrying out its duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include:

- [To Come], which retention was approved by the Bankruptcy Court on [_____] [Docket No. __];

#### 2.       Official Second Priority Notes Committee

On February 5, 2015, the U.S. Trustee filed the *Notice of Appointment of Official Committee of Second Priority Noteholders* [Docket No. 266] notifying parties in interest that the U.S. Trustee had appointed the Second Priority Notes Committee in these Chapter 11 Cases. The Second Priority Notes Committee is comprised of (a) Wilmington Savings Fund Society, FSB, (b) BOKF, N.A., (c) Delaware Trust Company, (d) Tennenbaum Opportunities Partner V, LP, (e) Centerbridge Credit Partners Master LP, (f) Palomino Fund Ltd, and (g) Oaktree FF Investment Fund LP.

The Second Priority Notes Committee filed several applications to obtain authority to retain and employ various professionals to assist the Second Priority Notes Committee in carrying out its duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include:

- [To Come];

On February 19, 2015, the Debtors filed the *Debtors' Motion for Entry of an Order Disbanding the Official Committee of Second Priority Noteholders, Reconstituting it with the Creditors' Committee or, Alternatively, Limiting its Scope, Fees and Expenses* [Docket No. 384] (the "<u>Motion to Disband</u>"). In the Motion to Disband, the Debtors requested entry of an order disbanding the Second Priority Notes Committee or reconstituting the Unsecured Creditors' Committee and the Second Priority Notes Committee into one committee. Alternatively, if the Second Priority Notes Committee remains in existence, the Motion to Disband seeks an order limiting its scope to acts, investigations, and diligence that (a) do not overlap with those of the Unsecured Creditors' Committee or an anticipated examiner or (b) do not relate to positions or relief that would be prohibited by the Second Lien Intercreditor Agreement, and limiting the Second Priority Notes Committee's fees and expenses to an appropriate budget consistent with its limited scope. The Motion to Disband is scheduled for hearing on March 4, 2015. The objection deadline for the Motion to Disband is February 25, 2015, at 4:00 p.m., prevailing Central Time.

### F.       Claims Bar Date

On [_____], the Debtors filed a motion requesting the Bankruptcy Court to enter an order approving: (a) [_____], at 5:00 p.m. prevailing Eastern Time as the deadline for all non-Governmental Units to File Claims in the Chapter 11 Cases; (b) [_____], at 5:00 p.m. prevailing Eastern Time as the deadline for all Governmental Units to File Claims in the Chapter 11 Cases; (c) procedures for Filing Proofs of Claim; and (d) the form and manner of notice of the bar dates [Docket No. ___] (the "<u>Bar Date Motion</u>").

The Debtors intend to file their Schedules with the Bankruptcy Court pursuant to section 521 of the Bankruptcy Code and the Schedules Extension Motion. The Bankruptcy Code allows a bankruptcy court to fix the time within which Proofs of Claim must be Filed in a chapter 11 case. Any creditor whose Claim is not scheduled in

the Debtors' Schedules or whose Claim is scheduled as disputed, contingent, or unliquidated must File a Proof of Claim.

As of the date hereof, the Bar Date Motion remains pending before the Bankruptcy Court and has not yet been scheduled for hearing.  At this time, no objection deadline has been set for the Bar Date Motion.

### G.    Pending Litigation Proceedings

The Debtors are parties to a number of lawsuits, legal proceedings, collection proceedings, and claims arising out of their business operations, including those lawsuits identified in Article VI.C.2 above.  The Debtors cannot predict with certainty the outcome of these lawsuits, legal proceedings, and claims.

With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the commencement of the Chapter 11 Cases is generally subject to discharge, settlement, and release upon confirmation of a plan under chapter 11, with certain exceptions.  Therefore, certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

### H.    Exclusivity

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief (the "Exclusive Filing Period").  If a debtor files a plan during the Exclusive Filing Period, then the debtor has the exclusive right for 180 days from the commencement date to solicit acceptances of the Plan (the "Exclusive Solicitation Period" and, together with the Exclusive Filing Period, the "Exclusive Periods").  During the Exclusive Periods, no other party in interest may file a competing plan of reorganization.  Additionally, a court may extend these periods upon the request of a party in interest.

The Debtors' initial Exclusive Filing Period and Exclusive Solicitation Period are set to expire on May 15, 2015 and July 14, 2015, respectively.

## ARTICLE VIII.
## RISK FACTORS

Holders of Claims and Interests should read and carefully consider the risk factors set forth below before voting to accept or reject the Plan.  Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A.    Certain Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.  If the Plan is not consummated, any settlement, compromise, or release embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), the assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan, shall be null and void.

### 1.    Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each

45

encompassing Claims and Interests that are substantially similar to the other Claims and Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2.        Failure to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3.        The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting Holder of an Allowed Claim or an Allowed Interest might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that this Disclosure Statement, the balloting procedures and voting results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for Confirmation had not been met.  If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims and Allowed Interests would receive with respect to their Allowed Claims and Allowed Interests.

The Debtors, subject to the terms and conditions of the Plan, reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation. Any such modifications could result in a less favorable treatment of any Class than the treatment currently provided in the Plan.  Such less favorable treatment could include a distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan or no distribution of property whatsoever under the Plan.  Changes to the Plan may also delay the confirmation of the Plan and the Debtors' emergence from bankruptcy.

### 4.        Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation of the Plan may result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise.

### 5.        The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any Holder of a Claim where such Claim is or may be subject to an objection.  Any Holder of a Claim that

KE 34442788

is or may be subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 6.      Risk of Non-Occurrence of the Effective Date

The Debtors can provide no assurance as to the timing or as to whether the Effective Date will, in fact, occur.  The occurrence of the Effective Date is subject to certain conditions precedent as described in Article IX of the Plan, including, among others, those relating to consummation of the Plan, as well as the receipt of certain regulatory approvals.  Failure to meet any of these conditions could result in the Plan not being consummated or the Confirmation Order being vacated.

### 7.      Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims and Allowed Interests to be subordinated to other Allowed Claims and Allowed Interests.  The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims and Allowed Interests under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### 8.      The Actual Amount of Allowed Claims May Differ From the Estimated Claims and Adversely Affect the Percentage Recovery of Claims

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates.  Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement.  Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed.  Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

### 9.      Release, Injunction, and Exculpation Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations.  All of the releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.

### 10.      Certain Liabilities May Not Be Fully Extinguished as a Result of the Confirmation of the Plan

Although a significant amount of the Debtors' current liabilities will be discharged pursuant to the Plan upon emergence from the Chapter 11 Cases, a number of obligations may remain in effect following the Effective Date.  Various agreements and liabilities may remain in place, such as potential employee benefit and pension obligations, potential environmental liabilities related to sites in operation or formerly operated by CEOC, and other contracts or leases that, even if modified during the Chapter 11 Cases, may still subject the Debtors to substantial obligations and liabilities.

**B.      Risk Factors and Considerations Regarding the Companies'[32] Businesses and Operations**

**1.      Undue Delay May Significantly Disrupt the Companies' Businesses and Operations**

Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is not possible to predict the amount of time the Companies may spend in such proceedings or to provide any assurance as to whether or not the Plan will be confirmed or consummated, as further described above.  The continuation of the Chapter 11 Cases, particularly if the Plan is not confirmed or consummated in the time frame currently contemplated, could materially and adversely affect the Companies' operations and relationships with their vendors, service providers, employees, regulators, and partners.  Also, transactions outside the ordinary course of business may be subject to the prior approval of the Bankruptcy Court.  Bankruptcy Court approval of non-ordinary course activities entails preparation and filing of appropriate motions with the Bankruptcy Court, negotiation with various parties-in-interest, including any statutory committees appointed in the Chapter 11 Cases, and one or more hearings. Such committees and parties-in-interest may be heard at any Bankruptcy Court hearing and may raise objections with respect to these motions. This process could delay major transactions and limit the Debtors' ability to quickly respond to opportunities and events in the marketplace. Furthermore, in the event the Bankruptcy Court does not approve a proposed activity or transaction, we could be prevented from engaging in activities and transactions that we believe are beneficial to us.

Further, if Confirmation and consummation of the Plan do not occur expeditiously, the Chapter 11 Cases could result in, among other things, increased expenses and the expiration of any commitment to provide support for the Plan, financially or otherwise, may also make it more difficult to retain and attract management and other key or high-performing employees or executives, and would require senior management to continue to spend a significant amount of time and effort dealing with the Companies' reorganization instead of focusing on the operation of the Companies' businesses.

**2.      The Chapter 11 Cases May Adversely Affect the Companies' Businesses and Operations Going Forward**

The fact that the Companies have been subject to the Chapter 11 Cases may adversely affect the Companies' operations going forward, including their ability to negotiate favorable terms from vendors, suppliers, hedging counterparties, and others.  The failure to obtain such favorable terms could adversely affect the Companies' profitability and financial condition and performance.

**3.      The Companies May Not Achieve the Financial Performance Projected Under the Plan**

The financial projections attached hereto as **Exhibit E** (the "Financial Projections") are the projections of future performance of the Companies' operations, on a [consolidated] basis through fiscal year 20[__], after giving effect to the Plan and the Restructuring Transactions, and do not purport to represent what the Companies' actual financial position will be upon emergence from the Chapter 11 Cases or represent what the fair value of the Companies' assets and liabilities will be at the Effective Date.  The Financial Projections are based on numerous estimates of values and assumptions including the timing, confirmation, and consummation of the Plan in accordance with its terms, the expected terms of the New Debt obligations, the anticipated future performance of the Companies, industry performance, general business and economic conditions, and other matters, many of which are beyond the Companies' control and some or all of which may not materialize.  These estimates and assumptions are based on management's judgment, experience, and perception of historical trends, current conditions, and expected future developments, and are based on facts available and determinations made at the time the Financial Projections were prepared, and over time may turn out to have been incorrect, which could have a material effect on the Companies' ability to meet the Financial Projections.  It is also not possible to predict with certainty that the actions taken in connection with the Chapter 11 Cases will result in an improved financial and operating condition that ensures the long-term viability of the Companies.

---

[32]   As used herein, "Companies" means the Debtors prior to the Effective Date and, collectively, OpCo, PropCo, the REIT, and each of their respective subsidiaries after the Effective Date.

In addition, unanticipated events and circumstances occurring subsequent to the date hereof may affect the actual financial results of the Companies' operations. Except as otherwise specifically and expressly stated herein, this Disclosure Statement does not reflect any events that may occur subsequent to the date hereof and that may have a material impact on the information contained in this Disclosure Statement. The Debtors do not intend to update the Financial Projections; thus, the Financial Projections will not reflect the effect of any subsequent events not already accounted for in the assumptions underlying the Financial Projections.

<div style="text-align:center">

**4.     The Companies Are and Likely Will Continue to Be Subject to Extensive Governmental Regulation and Taxation Policies, the Enforcement of Which Could Adversely Affect Their Businesses, Financial Condition, and Results of Operations**

</div>

The Companies are and likely will continue to be subject to extensive gaming regulations and political and regulatory uncertainty. Regulatory authorities in the jurisdictions where the Companies operate or hold properties have broad powers with respect to the licensing of casino operations and may revoke, suspend, condition, or limit the Companies' gaming or other licenses, impose substantial fines, or take other actions that could adversely affect the Companies' businesses, financial condition, and results of operations. For example, revenues and income from operations were negatively affected from July 2006 in Atlantic City by a three-day government-imposed casino shutdown. Furthermore, in many jurisdictions where the Companies operate or hold properties, licenses are granted for limited durations and require renewal from time to time. For example, in Iowa, the Companies' ability to continue gaming operations is subject to a referendum every eight years or at any time upon petition of the voters in the county in which the Companies operate; the most recent referendum, approving the Debtors' ability to continue to operate their casinos, occurred in November 2010. There can be no assurance that continued gaming activity will be approved in any referendum in the future. If the Companies do not obtain the requisite approval in any future referendum, they will be unable to operate their gaming operations in Iowa, which could negatively affect the Companies' future performance.

From time to time, individual jurisdictions have considered legislation or referendums, such as bans on smoking in casinos and other entertainment and dining facilities, which could adversely affect the Companies' operations. For example, the City Council of Atlantic City passed an ordinance in 2007 requiring that the Debtors segregate at least 75 percent of the casino gaming floor as a nonsmoking area, leaving no more than 25 percent of the casino gaming floor as a smoking area. Illinois also passed the Smoke Free Illinois Act, effective January 1, 2008, and bans smoking in nearly all public places, including bars, restaurants, work places, schools, and casinos. The Smoke Free Illinois Act also bans smoking within 15 feet of any entrance, window, or air-intake area of these public places. These smoking bans have adversely affected revenues and operating results at the Companies' properties. The likelihood or outcome of similar legislation in other jurisdictions and referendums in the future cannot be predicted, though the Debtors would expect any smoking ban to negatively impact their financial performance.

Furthermore, because the Companies are subject to regulation in each jurisdiction in which they operate, and because regulatory agencies within each jurisdiction review the Companies' compliance with gaming laws in other jurisdictions, it is possible that gaming compliance issues in one jurisdiction may lead to reviews and compliance issues in other jurisdictions. For example, events in connection with the Debtors' role with the proposed development of a casino gaming facility by Sterling Suffolk Racecourse, LLC ("Sterling Suffolk")—the owner of Suffolk Downs racecourse in East Boston, Massachusetts—have resulted in reviews in several other jurisdictions arising out of a report issued to the Massachusetts Gaming Commission from the Director of the Investigations and Enforcement Bureau for the Massachusetts Gaming Commission (the "Bureau") in October 2013. That report raised certain issues for consideration when evaluating the Debtors' suitability as a qualifier in Massachusetts and made a recommendation that the Debtors had not met their burden by clear and convincing evidence to establish its suitability. Although the Debtors strongly disagreed with the director's recommendation, the Debtors withdrew their application as a qualifier in Massachusetts at the request of Sterling Suffolk. Neither the Debtors nor their affiliates were found unsuitable by any licensing authority, but other gaming regulatory agencies have asked for information about the issues raised in the report from the Bureau, and the Debtors are in the process of providing that information. The Debtors cannot provide assurance that existing or future jurisdictions will not raise similar questions with respect to the Companies' suitability arising out of the Bureau's report or with respect to other matters that may arise in the future, and the Debtors cannot guarantee that such issues will not adversely affect them or their financial condition.

<div style="text-align:center">49</div>

The casino entertainment industry represents a significant source of tax revenues to the various jurisdictions in which casinos operate.  From time to time, various state and federal legislators and officials have proposed changes in tax laws or in the administration of these laws, including increases in tax rates, that would affect the industry.  If adopted, such changes could adversely affect the Companies' businesses, financial condition, and results of operations.

### 5. The Loss of the Services of Key Personnel Could Have a Material Adverse Effect on the Companies' Business

The Debtors expect that the leadership of their chief executive officer and other executive officers will be a critical element of the Companies' success.  The death or disability of the Debtors' chief executive officer or other executive officers, or other extended or permanent loss of their services, or any negative market or industry perception with respect to them or arising from their loss, could have a material adverse effect on the Companies' businesses.  The Debtors' executive officers and other members of senior management have substantial experience and expertise in the Debtors' businesses that the Debtors believe will make significant contributions to the Companies' growth and success.  The unexpected loss of services of one or more of these individuals could also adversely affect the Companies.  The Debtors do not have key man or similar life insurance policies covering members of their senior management.  The Debtors have employment agreements with their executive officers, but these agreements do not guarantee that any given executive will remain with the Debtors, and there can be no assurance that any such officers will remain with the Debtors.

### 6. If the Companies Cannot Attract, Retain, and Motivate Employees, the Companies May Be Unable to Compete Effectively, and May Lose the Ability to Improve and Expand Their Businesses

The Companies' success and ability to grow depend, in part, on their ability to hire, retain, and motivate sufficient numbers of talented people with the increasingly diverse skills needed to serve clients and improve the Companies' businesses.  The Companies face intense competition for highly qualified, specialized technical, managerial, and consulting personnel.  Recruiting, training, retention, and benefit plans place significant demands on the Companies' resources.  Additionally, the Companies' substantial indebtedness and the recent downturn in the gaming, travel, and leisure sectors have made recruiting executives to the Companies' businesses more difficult.  The inability to attract qualified employees in sufficient numbers to meet particular demands or the loss of a significant number of the Companies' employees could have an adverse effect on the Companies.

### 7. Acts of Terrorism, War, Natural Disasters, Severe Weather, and Political, Economic, and Military Conditions May Impede the Companies' Ability to Operate or May Otherwise Negatively Affect Their Financial Results

Terrorist attacks and other acts of war or hostility have created many economic and political uncertainties.  For example, a substantial number of the customers of the Debtors' properties in Las Vegas use air travel.  Terrorist acts that occurred in the past have severely disrupted domestic and international travel, which resulted in a decrease in customer visits to the Debtors' Las Vegas properties.  The Debtors cannot predict the extent to which disruptions in air or other forms of travel as a result of terrorist acts, security alerts or wars, uprisings, or hostilities in places such as Iraq, Afghanistan, and/or Syria or other countries throughout the world will continue to directly or indirectly affect the Companies' businesses and operating results.  For example, the Debtors' operations in Cairo, Egypt were negatively affected from the uprising there in January 2011.  As a consequence of the threat of terrorist attacks and other acts of war or hostility in the future, premiums for a variety of insurance products have increased, and some types of insurance are no longer available.  If any such event were to occur, the Companies' properties would likely be adversely affected.

In addition, natural and man-made disasters such as major fires, floods, hurricanes, earthquakes, and oil spills could also adversely affect the Companies' businesses and operating results.  Such events could lead to the loss of use of one or more of the Companies' properties for an extended period of time and disrupt the Companies' ability to attract customers to certain of their gaming facilities.  If any such event affected the Companies' properties, the Companies would likely be adversely affected.  Harrah's Atlantic City was closed during a busy summer weekend in August 2011 due to Hurricane Irene and was closed for five days in October and November 2012 due to Hurricane Sandy.  The Debtors' results of operations were significantly affected by the closure due to Hurricane

50

Sandy.  In addition, Hurricane Sandy substantially affected tourism in New Jersey, including Atlantic City, and the level of tourism has not yet recovered.

In most cases, the Debtors have insurance that covers portions of losses from natural disasters, but that insurance remains subject to deductibles and maximum payouts in many cases.  Although the Companies may have insurance coverage for natural disasters, the timing of their receipt of insurance proceeds, if any, is out of their control.  In some cases, moreover, the Companies may receive no proceeds from insurance such as in connection with the August 2011 closing and the October and November 2012 closings in Atlantic City.

Additionally, a natural disaster affecting one or more of the Companies' properties may affect the level and cost of insurance coverage they can obtain in the future, which may adversely affect the Companies' financial position.

Because the Companies' operations depend in part on their customers' ability to travel, severe or inclement weather can also have a negative effect on the Companies' results of operations.

### 8.     The Companies Are or May Become Involved in Legal Proceedings That, If Adversely Adjudicated or Settled, Could Affect Their Financial Condition

From time to time, the Companies have been, currently are, or may become defendants in various lawsuits or other legal proceedings relating to matters incidental to their businesses.  The nature of the Companies' businesses subjects the Companies to the risk of lawsuits filed by customers, past and present employees, competitors, business partners, Native American tribes, and others in the ordinary course of business.  For example, prior to the Petition Date, the Debtors were party to various lawsuits, some of which were discussed above.  As with all legal proceedings, no assurance can be given as to the outcome of these matters and, in general, legal proceedings can be expensive and time consuming.  The Companies may not be successful in the defense or prosecution of lawsuits in which they are involved, which could result in settlements or damages that could significantly affect the Companies' businesses, financial condition, and results of operations.

### 9.     The Debtors May Be Subject to Material Environmental Liability, Including as A Result of Unknown Environmental Contamination

The casino properties business is subject to certain federal, state, and local environmental laws, regulations, and ordinances that govern activities or operations that may have adverse environmental effects, such as emissions to air, discharges to streams and rivers, and releases of hazardous substances and pollutants into the environment, as well as handling and disposal from municipal/non-hazardous waste, and which also apply to current and previous owners or operators of real estate generally.  Federal examples of these laws include the Clean Air Act, the Clean Water Act, the Resource Conservation Recovery Act, the Comprehensive Environmental Response, Compensation and Liability Act and the Oil Pollution Act of 1990.  Certain of these environmental laws may impose cleanup responsibility and liability without regard to whether the owner or operator knew of or caused particular contamination or release of hazardous substances.  Should unknown contamination be discovered on property owned by the Companies, or should a release of hazardous substances occur on such property, the Companies could be required to investigate and clean up the contamination and could also be held responsible to a governmental entity or third parties for property damage, personal injury, or investigation and cleanup costs incurred in connection with the contamination or release, which may be substantial.  Moreover, such contamination may also impair the Companies' ability to use the affected property.  Such liability could be joint and several in nature, regardless of fault, and could affect the Companies even if such property is vacated.  The potential for substantial costs and an inability to use the property could adversely affect the Companies' businesses.

### 10.    The Companies' Insurance Coverage May Not Be Adequate to Cover All Possible Losses the Companies Could Suffer, and, in the Future, the Companies' Insurance Costs May Increase Significantly or the Companies May Be Unable to Obtain the Same Level of Insurance Coverage

The Companies may suffer damage to their properties caused by a casualty loss (such as fire, natural disasters, and acts of war or terrorism) that could severely disrupt the Companies' businesses or subject them to claims by third parties who are injured or harmed.  Although the Companies maintain insurance (including property,

casualty, terrorism, and business interruption insurance), that insurance may be inadequate or unavailable to cover all of the risks to which the Companies' business and assets may be exposed. In several cases the Companies maintain extremely high deductibles or self-insure against specific losses. Should an uninsured loss (including a loss that is less than the deductible) or loss in excess of insured limits occur, it could have a significant adverse effect on the Companies' operations and revenues.

The Companies generally renew their insurance policies on an annual basis. If the cost of coverage becomes too high, the Companies may need to reduce policy limits or agree to certain exclusions from their coverage in order to reduce the premiums to an acceptable amount. Among other factors, homeland security concerns, other catastrophic events, or any change in the current U.S. statutory requirement that insurance carriers offer coverage for certain acts of terrorism could adversely affect available insurance coverage and result in increased premiums on available coverage (which may cause the Companies to elect to reduce their policy limits) and additional exclusions from coverage. Among other potential future adverse changes, in the future the Companies may elect to not, or may be unable to, obtain any coverage for losses due to acts of terrorism.

### C. Risk Factors and Considerations Regarding PropCo's, CPLV Sub's, and the REIT's Businesses and Operations

#### 1. PropCo, CPLV Sub, and the REIT Will Be Dependent on OpCo Until PropCo, CPLV Sub, and the REIT Substantially Diversify Their Portfolios, and an Event That Has a Material Adverse Effect on OpCo's Business, Financial Position, or Results of Operations Could Have a Material Adverse Effect on PropCo's, CPLV Sub's, or the REIT's Business, Financial Position, or Results of Operations

Immediately following the Effective Date, PropCo will own a significant portion of the Debtors' properties and OpCo will be the lessee of such properties pursuant to the Master Lease Agreement and account for a significant portion of PropCo's revenues. Additionally, because the Master Lease Agreement is a triple-net lease, PropCo will depend on OpCo to pay all insurance, taxes, utilities, and maintenance and repair expenses in connection with these leased properties and to indemnify, defend, and hold PropCo harmless from and against various claims, litigation, and liabilities arising in connection with its businesses. Although CEC will guarantee OpCo's monetary obligations under the Master Lease Agreement, there can be no assurance that OpCo and/or CEC will have sufficient assets, income, and access to financing to enable them to satisfy their payment obligations on account of the Master Lease Agreement. The inability or unwillingness of OpCo and/or CEC to meet their rent obligations and other obligations under the Master Lease Agreement could materially adversely affect PropCo's and CPLV Sub's business, financial position, or results of operations, including their ability to pay dividends to the REIT to pay to stockholders of the REIT as required to maintain the REIT's status as a real estate investment trust. For these reasons, if OpCo and/or CEC were to experience a material adverse effect on its gaming business, financial position, or results of operations, PropCo's, CPLV Sub's, and the REIT's business, financial position, or results of operations could also be materially adversely affected.

Due to PropCo's and CPLV Sub's dependence on rental payments from OpCo as a primary source of revenues, PropCo and CPLV Sub may be limited in their ability to enforce their rights under the Master Lease Agreement or to terminate the lease with respect to a particular property. Failure by OpCo to comply with the terms of the Master Lease Agreement or to comply with the gaming regulations to which the leased properties are subject could require PropCo or CPLV Sub to find another lessee for such leased property and there could be a decrease or cessation of rental payments by OpCo. In such event, PropCo and CPLV Sub may be unable to locate a suitable lessee at similar rental rates or at all, which would have the effect of reducing PropCo's and CPLV Sub's rental revenues.

#### 2. PropCo or CPLV Sub May Sell or Divest Different Properties or Assets After an Evaluation of Their Portfolio of Businesses. Such Sales or Divestitures Would Affect Their Costs, Revenues, Profitability, and Financial Position

From time to time, PropCo and CPLV Sub may evaluate their properties and portfolio of businesses and may, as a result, sell or attempt to sell, divest, or spin-off different properties or assets. These sales or divestitures would affect PropCo's and CPLV Sub's costs, revenues, profitability, financial position, liquidity, and their ability to comply with debt covenants. Divestitures have inherent risks, including possible delays in closing transactions

(including potential difficulties in obtaining regulatory approvals), the risk of lower-than-expected sales proceeds for the divested businesses, and potential post-closing claims for indemnification.  In addition, current economic conditions and relatively illiquid real estate markets may result in fewer potential bidders and unsuccessful sales efforts.  Expected cost savings, which are offset by revenue losses from divested properties, may also be difficult to achieve or maximize due to PropCo's and CPLV Sub's largely fixed-cost structure.

### 3. PropCo's, CPLV Sub's, and the REIT's Management Teams May Have Limited Experience Operating as Part of a Real Estate Investment Trust Structure

The requirements for qualifying as a real estate investment trust are highly technical and complex.  The Debtors have never operated as a real estate investment trust, and PropCo's, CPLV Sub's, and the REIT's management teams may have limited experience in complying with the income, asset, and other limitations imposed by the real estate investment provisions of the Internal Revenue Code.  Any failure to comply with those provisions in a timely manner could prevent the REIT from qualifying as a real estate investment trust or could force PropCo or CPLV Sub to pay unexpected taxes and penalties.  In such event, PropCo's, CPLV Sub's, and the REIT's net income could be reduced and PropCo, CPLV Sub, or the REIT could incur a loss, which could materially harm their business, financial position, or results of operations.  In addition, there is no assurance that any past experience with the acquisition, development, and disposition of gaming facilities will be sufficient to enable them to successfully manage PropCo's and CPLV Sub's portfolio of properties as required by their business plan or the real estate investment trust provisions of the Internal Revenue Code.

### D. Risk Factors and Considerations Regarding the Companies' Financial Condition

### 1. The Companies Will Require Significant Financing in Order to Emerge from the Chapter 11 Cases

At or prior to the Confirmation Date, the Debtors expect to raise up to $2.6 billion in CPLV Market Debt.  Financing the CPLV Market Debt, as such debt may be reduced or substituted for CPLV Mezzanine Debt under the terms of the Plan, is a condition precedent to consummation of the Plan.  There can be no assurance at this time that this financing will be available, or that it will be available on terms that are favorable to the Debtors, in which case the Companies' emergence from the Chapter 11 Cases could be delayed indefinitely or the Debtors may be forced to accept unfavorable terms that could affect the Companies' ability to succeed in the future.  As described above, such a delay could have important consequences for creditor recoveries and the Companies' ability to meet the Financial Projections.

Although certain terms and provisions of the CPLV Market Debt and CPLV Mezzanine Debt (including interest rates, maturity dates, amortization schedules, and other significant terms have been negotiated with prospective lenders, the CPLV Market Debt and CPLV Mezzanine Debt will be subject to conditions in the capital markets and other factors that may affect the availability of such financing.  All terms and provisions are likely not to have been definitively determined before the expiration of the Voting Deadline.  As a result, the terms and provisions of the CPLV Market Debt and CPLV Mezzanine Debt (if any) may be significantly different from those described in or contemplated by this Disclosure Statement and the Financial Projections, and CPLV Sub's capital structure may differ significantly from that described in or contemplated by this Disclosure Statement and the Financial Projections.  Furthermore, the agreed-to terms and provisions of the CPLV Market Debt and CPLV Mezzanine Debt (if any) may cause the timing and magnitude of CPLV Sub's interest expense and other debt service obligations to be different from those described in or contemplated by this Disclosure Statement and the Financial Projections, and CPLV Sub may be subject to significant additional covenants or restrictions as a result of negotiations with its prospective lenders or because of market conditions.

The Debtors cannot provide any assurance that the Companies will be able to obtain financing in the future if and when required, or that they will be able to obtain financing on favorable terms.  The Companies' profitability and ability to generate cash flow will likely depend on their ability to successfully implement their business strategy and meet or exceed the results forecasted in the Financial Projections, but the Debtors cannot ensure that the Companies will be able to accomplish these results if they do not have the appropriate financing to do so.

KE 34442788

The Debtors expect that the Companies' future sources of financing, as well as the New Debt, will likely include covenants and other provisions that will restrict the Companies' ability to engage in certain financing transactions and operating activities, as discussed in great detail below.

###### 2.    Covenant Restrictions Under the Companies' Indebtedness May Limit Their Ability to Operate Their Businesses

The Companies are highly leveraged and following the Restructuring Transactions, will continue to have a significant amount of indebtedness.  The substantial indebtedness and restrictive covenants under the agreements governing such indebtedness, including the New Debt, will:

- limit the Companies' ability to borrow money for working capital, capital expenditures, development projects, debt service requirements, strategic initiatives or other purposes;

- require the Companies to dedicate a substantial portion of cash flow from operations to the payment of interest and lease expense and repayment of indebtedness thereby reducing funds available for other purposes;

- limit flexibility in planning for, or reacting to, changes in the Companies' operations or business;

- make the Companies more highly leveraged than some of their competitors, which may place them at a competitive disadvantage;

- make the Companies more vulnerable to downturns in their business or the economy;

- restrict the Companies from making strategic acquisitions, developing new gaming facilities, introducing new technologies, or exploiting business opportunities;

- affect the Companies' ability to renew gaming and other licenses;

- limit, along with the financial and other restrictive covenants in the Companies' indebtedness, among other things, the Companies' ability to borrow additional funds or dispose of assets; and

- expose the Companies to the risk of increased interest rates as certain of their borrowings are, and may be, at variable rates of interest.

These restrictions may affect the Companies' ability to grow in accordance with their plans or adapt to changing business or economic conditions.

In addition, some or all of the agreements governing the New Debt or other indebtedness of the Companies may require the Companies to satisfy and maintain various financial maintenance covenants, such as minimum fixed charge coverage ratios, minimum EBITDA, maximum total leverage ratios, and other similar covenants.  The Companies' ability to meet the required financial ratios may be affected by events beyond their control, and the Companies may not be able to meet these ratios.  A breach of these covenants could result in defaults under the applicable agreements governing the New Debt.

A breach of the covenants under the New Debt or other indebtedness of the Companies could result in an event of default under the applicable indebtedness.  Such default may allow creditors to accelerate the related debt and may result in the acceleration of other debt to which a cross-acceleration or cross-default provision applies.  In addition, an event of default under a debt agreement would likely permit the lenders under the agreement to terminate all commitments to extend further credit under the agreement.  Furthermore, if the Companies were unable to repay the amounts due and payable under the New Debt or other indebtedness for the Debtors, those creditors could proceed against any collateral granted to them to secure that indebtedness.  In the event that creditors accelerate the repayment of any of the Companies' borrowings, the Debtors cannot assure that the Companies and their subsidiaries would have sufficient assets to repay such indebtedness.

3.      **The Companies' Degree of Leverage upon Emergence May Limit Their Financial and Operating Activities**

Although the Debtors are eliminating approximately $10 billion of funded debt under the Plan, the Companies will collectively still be obligated on approximately $8 billion of funded debt upon emergence from the Chapter 11 Cases.  Although the Debtors believe that the Companies will be able to meet or exceed the results forecasted in the Financial Projections, which the Debtors believe would allow the Companies to service the New Debt, the Debtors cannot ensure that the Companies will be able to accomplish these results, and thus the Debtors' significant level of post-emergence indebtedness could adversely affect the Companies' financial health and limit their operations.  The Debtors' historical capital requirements have been considerable, and the Companies' future capital requirements could vary significantly and may be affected by general economic conditions, currency exchange rates, industry trends, performance, interest rates, and many other factors that are not within the Companies' control.  The Debtors' prepetition level of indebtedness had important consequences, including: (a) limiting the Debtors' ability to borrow additional amounts for working capital, capital expenditures, development projects, debt service requirements, strategic initiatives, and other purposes; (b) limiting their ability to use operating cash flow in other areas of their business because they were required to dedicate a substantial portion of these funds to service their debt; (c) increasing their vulnerability to general adverse economic and industry conditions; (d) limiting their ability to capitalize on business opportunities and to react to competitive pressures and adverse changes in government regulation; (e) limiting their ability or increasing the costs to refinance indebtedness; (f) affecting their ability to renew gaming and other licenses; and (g) making them more highly leveraged than some of their competitors, which may have placed them at a competitive disadvantage.  These consequences, and others, could similarly affect the Companies' businesses and operations after the Effective Date.

4.      **Any of the Companies and Their Subsidiaries May Be Able to Incur Substantially More Debt Post-Emergence, Which Could Exacerbate the Risks Associated with the Leverage of Any Such Company upon Emergence**

After the Effective Date, the Companies and their subsidiaries may be able to incur substantial additional indebtedness, including additional secured indebtedness.  The terms of the New Debt and any other indebtedness of the Companies will likely restrict, but will not completely prohibit, any of the Companies from doing so.  If new debt or other liabilities are added to the Companies' post-emergence debt levels, the related risks that they face could intensify.

5.      **The Companies' Respective Financial Results May Be Volatile and May Not Reflect Historical Trends**

Following the Companies' emergence from the Chapter 11 Cases, the Debtors expect that the Companies' financial results may continue to be volatile, as asset impairments, asset dispositions, and restructuring activities (including casino closures), as well as continuing global economic uncertainty, may significantly affect the Financial Projections.  As a result, the Debtors' historical financial performance may not be indicative of the Companies' financial performance post-emergence.  In addition, upon emergence, the amounts reported in the Companies' subsequent financial statements may materially change relative to the Debtors' historical financial statements, including as a result of revisions to its operating plans and changes in the terms and provisions of the New Debt pursuant to the Plan.

In addition, to the extent the Companies' actual results or conditions differ from the assumptions made by the Debtors in preparing the Financial Projections, the actual results and condition of the Companies may materially differ from those presented in the Financial Projections.  Among the factors that may cause actual results or conditions to differ from the assumptions made by the Debtors in preparing the Financial Projections are those risk factors presented in this Article VIII.

**6.**     **Because the Companies' Financial Statements Will Reflect Fresh Start Accounting Adjustments upon Its Emergence from the Chapter 11 Cases, Information Reflecting the Companies' Results of Operations and Financial Condition Will Not Be Comparable to Prior Periods and May Vary Significantly from the Fresh Start Accounting Adjustments Used to Calculate the Financial Projections**

Upon the Companies' emergence from the Chapter 11 Cases, they will apply fresh start accounting.  As a result, book value of the Debtors' long-lived assets and the related depreciation and amortization schedules, among other things, will likely be different from what is reflected in the Debtors' historical financial statements and may be different from what is reflected in the Financial Projections.  Following the Companies' emergence from the Chapter 11 Cases, certain information reflecting the Companies' results of operations and financial condition will not be comparable to that for historical periods prior to emergence from the Chapter 11 Cases.

Under fresh start accounting, the Companies' calculated enterprise value will be allocated to its assets based on their respective fair values.  Any portion not attributed to specific tangible or identified intangible assets will be an indefinite-lived intangible asset referred to as "reorganization value in excess of value" and reported as goodwill.  Accordingly, if fresh-start reporting rules apply, the financial condition and results of operations following emergence from the Chapter 11 Cases would not be comparable to the financial condition and results of operations reflected in the Companies' historical financial statements.

[The Debtors have obtained preliminary valuations of the Companies' tangible and intangible assets at their estimated emergence date, and their reorganization value has been allocated to specific assets in accordance with such preliminary valuations, as reflected in the Financial Projections.  However, updates to such preliminary valuations will be completed as of the date the Debtors emerge from the Chapter 11 Cases and, to the extent such updates reflect a valuation different than estimated, the Debtors anticipate that there may be adjustments in the carrying values of certain assets as a result.  To the extent actual valuations and allocations differ from those used in calculating the Financial Projections, these differences will be reflected on the Companies' balance sheets upon emergence pursuant to fresh start accounting rules and may also affect the amount of depreciation and amortization expense the Companies recognize on their statements of earnings post-emergence.]

**E.**     **Risk Factors and Considerations Regarding the Separation of the Debtors into OpCo, PropCo, and the REIT**

**1.**     **PropCo May Be Unable to Achieve the Benefits That the Debtors Expect to Achieve from the Separation of the Debtors into OpCo and PropCo**

The Debtors believe that as a company independent from OpCo, PropCo will have the ability, subject to the Right of First Refusal Agreement, to pursue transactions with other gaming operators that would not pursue transactions with OpCo as a current competitor, to fund acquisitions with its equity on significantly more favorable terms than those that would be available to OpCo, to diversify into different businesses in which OpCo, as a practical matter, could not diversify, and to pursue certain transactions that OpCo otherwise would be disadvantaged by or precluded from pursuing due to regulatory constraints.  However, PropCo may not be able to achieve some or all of the benefits that the Debtors expect PropCo to achieve as a company independent from OpCo in the time the Debtors expect, if at all.

**2.**     **After the Separation, PropCo and the REIT May Be Unable to Make, on a Timely or Cost-Effective Basis, the Changes Necessary to Operate as a Separate Company Primarily Focused on Owning a Portfolio of Gaming Properties**

The REIT and PropCo have no significant historical operations as an independent company and may not, at the time of the separation of the Debtors into OpCo, PropCo, and the REIT (the "Separation"), have the infrastructure and personnel necessary to operate as a separate company without relying on OpCo to provide certain services on a transitional basis.  If and when the REIT becomes a public entity, the REIT will be subject to, and responsible for, regulatory compliance, including periodic public filings with the Securities and Exchange Commission and compliance with the continued listing requirements for a national securities exchange and with applicable state gaming rules and regulations, as well as compliance with generally applicable tax and accounting rules.  Because PropCo's and the REIT's business have not been operated as a separate publicly traded company, the

Debtors cannot ensure that PropCo and the REIT will be able to successfully implement the infrastructure or retain the personnel necessary to operate PropCo and the REIT as a separate publicly traded company or that PropCo and the REIT will not incur costs in excess of anticipated costs to establish such infrastructure and retain such personnel.

3.  **The Companies May Be Unable to Engage in Desirable Strategic or Capital-Raising Transactions Following the Separation.  In Addition, the Companies Could Be Liable for Adverse Tax Consequences Resulting from Engaging in Significant Strategic or Capital-Raising Transactions**

To preserve the tax-free treatment of the Separation, the Companies may be prohibited from pursuing certain transactions that may otherwise be value-maximizing.  These limitations could include, among other things, entering into certain transactions involving the sale or repurchase of equity, divesting or otherwise ceasing certain business operations, or taking or failing to take any other action that would negatively affect the tax-free treatment of the Separation.

4.  **The Debtors' Inability to Obtain All Material Third-Party Approvals in Connection with the Separation May Have a Material Adverse Effect on the Debtors' Ability to Consummate the Separation**

There are numerous authorizations, consents, approvals, and clearances of third parties including federal, state, and local governmental agencies (the "Third-Party Approvals") that the Debtors must obtain to consummate the Separation and the restructuring of the Debtors' businesses in connection therewith, including approvals by gaming and racing authorities in various jurisdictions.  In some cases, these approvals must be obtained before the Separation can be completed.  The Debtors believe that as of the Confirmation Date, they will not yet have all of the necessary Third-Party Approvals, and that obtaining such necessary Third-Party Approvals may take several months. There is no assurance that the Debtors will be able to obtain these Third-Party Approvals.  The Debtors do not intend to consummate the Separation if it does not receive all required Third-Party Approvals, unless it believes that the inability to obtain one or more Third-Party Approvals would not reasonably be expected to have a material adverse effect on the Companies.  However, there can be no assurance that such a material adverse effect will not occur.

5.  **The Separation Could Give Rise to Disputes or Other Unfavorable Effects, Which Could Have a Material Adverse Effect on the Business, Financial Position, or Results of Operations of the Companies**

Disputes with third parties could arise out of the Separation, and the Companies could experience unfavorable reactions to the Separation from employees, ratings agencies, regulators, or other interested parties. These disputes and reactions of third parties could have a material adverse effect on the business, financial position, or results of operations of the Companies.  In addition, following the Separation, disputes between OpCo and PropCo (and their subsidiaries) could arise in connection with any of the Master Lease Agreement, the Management and Lease Support Agreement, the Right of First Refusal Agreement, or other agreements.

6.  **If the Separation Does Not Qualify as A Transaction that is Generally Tax-Free for U.S. Federal Income Tax Purposes, the Companies Could Be Subject to Significant Tax Liabilities and, in Certain Circumstances, Indemnification Obligations Could Result**

The Debtors are seeking a private letter ruling from the IRS to confirm that, if the Spin Structure is utilized, certain requirements under sections 355 and 368(a)(1)(G) are satisfied, and the Debtors expect that the Tax Opinions (as defined below) will conclude that the Separation, regardless of whether it is consummated via the Spin Structure or the Partnership Contribution Structure, should qualify as a transaction that is generally tax-free for U.S. federal income tax purposes.  However, the Spin Ruling will not address certain requirements for tax-free treatment under sections 355 and 368(a)(1)(G), as the IRS has indicated that it will no longer provide a general ruling that a transaction qualifies for tax-free treatment under those sections, and the the Spin Ruling and the Tax Opinions will rely on, among other things, certain representations, assumptions, and undertakings, including those relating to the past and future conduct of the Companies.

Even if the Spin Ruling is obtained and notwithstanding the Tax Opinions, the IRS could determine that the Separation is a fully taxable event if, (a) in the case of the Spin Structure, it determines any of the representations, assumptions, or undertakings that were included in the request for the Spin Ruling are false or have been violated, or (b) in both the Spin Structure and the Partnership Contribution Structure, it disagrees with any item, including the conclusions in the Tax Opinions, for which no ruling was obtained.

If the Separation fails to generally qualify for tax-free treatment, the Companies would likely incur significant tax liabilities.

**F.    Risk Factors and Considerations Regarding the Status of the REIT as a Real Estate Investment Trust**

**1.    If the REIT Does Not Qualify to Be Taxed as a Real Estate Investment Trust, or Fails to Remain Qualified as a Real Estate Investment Trust, the REIT Will Be Subject to U.S. Federal Income Tax as a Regular Corporation and Could Face a Substantial Tax Liability**

The Debtors intend that the REIT will qualify to be taxed as a real estate investment trust and that the REIT will operate in a manner that will allow the REIT to be classified as and taxed as a real estate investment trust for U.S. federal income tax purposes. The validity of the REIT's qualification as a real estate investment trust, however, will depend on the REIT's satisfaction of certain asset, income, organizational, distribution, shareholder ownership, and other requirements on a continuing basis, which will depend on, among other things, the assets of PropCo. The REIT's ability to satisfy the asset tests depends on the REIT's analysis of the characterization and fair market values of PropCo's assets, some of which are not susceptible to a precise determination.

As discussed below, the Debtors will request a private letter ruling from the Internal Revenue Service (the "IRS") with respect to certain issues relevant to the REIT's qualification as a real estate investment trust. If received, the REIT may generally rely upon the ruling. However, no assurance can be given that the IRS will not challenge the REIT's qualification as a real estate investment trust on the basis of other issues or facts outside the scope of the ruling, if provided.

The REIT may not meet the conditions for qualification as a real estate investment trust. If the REIT were to fail to qualify to be taxed as a real estate investment trust in any taxable year, it would be subject to U.S. federal income tax, including any applicable alternative minimum tax, on its taxable income at regular corporate rates, and dividends paid to the REIT's shareholders would not be deductible by the REIT in computing its taxable income. Any resulting corporate liability could be substantial and would reduce the amount of cash available for distribution to holders of REIT stock, which in turn could have an adverse effect on the value of the REIT stock. Unless the REIT were entitled to relief under certain IRC provisions, the REIT also would be disqualified from reelecting to be taxed as a real estate investment trust for the four taxable years following the year in which the REIT failed to qualify to be taxed as a real estate investment trust.

**2.    The Debtors Have No Operating History as a Real Estate Investment Trust**

The Debtors have no operating history as a real estate investment trust. The REIT's board of directors and senior management will have overall responsibility for the REIT's management, including with respect to the implementation of substantial control systems, policies, and procedures in order to maintain the REIT's qualification as a real estate investment trust. There can be no assurance that the past experience of the Debtors' management will be sufficient to successfully implement these systems, policies, and procedures and to operate the REIT. If a failure occurs, the failure could jeopardize the REIT's status as a real estate investment trust, and the loss of such status would materially and adversely affect the REIT.

**3.    Applicable Real Estate Investment Trust Laws May Restrict Certain Business Activities**

The REIT will be subject to various restrictions on its income, assets, and activities, which are discussed in more detail below. Business activities that could be affected by applicable real estate investment trust laws include, but are not limited to, activities such as developing alternative uses of real estate. Due to these restrictions, the

Debtors anticipate that the REIT may conduct certain business activities through one or more TRSs.  Any such TRSs would be taxable as C corporations and would be subject to federal, state, local, and, if applicable, foreign taxation on their taxable income.

### 4. Qualifying as a Real Estate Investment Trust Involves the Application of Highly Technical and Complex Provisions of the Internal Revenue Code

Qualification as a real estate investment trust involves the application of highly technical and complex Internal Revenue Code provisions for which only limited judicial and administrative authorities exist, certain of which are discussed in more detail below.  Even a technical or inadvertent violation could jeopardize the REIT's real estate investment trust qualification.  The REIT's qualification as a real estate investment trust will depend on its satisfaction of certain asset, income, organizational, distribution, shareholder ownership, and other requirements on a continuing basis.  In addition, the REIT's ability to satisfy the requirements to qualify to be taxed as a REIT may depend in part on the actions of third parties over which it has no control or only limited influence.

### 5. Legislative or Other Actions Affecting Real Estate Investment Trusts Could Have a Negative Effect on the REIT

The rules dealing with U.S. federal income taxation are constantly under review by persons involved in the legislative process and by the IRS and the U.S. Department of the Treasury (the "Treasury").  Changes to the tax laws or interpretations thereof by the IRS and the Treasury, with or without retroactive application, could materially and adversely affect the REIT.  The Debtors cannot predict how changes in the tax laws might affect the REIT.  New legislation, Treasury regulations, administrative interpretations, or court decisions could significantly and negatively affect the REIT's ability to qualify to be taxed as a real estate investment trust or the U.S. federal income tax consequences to the REIT of such qualification.

For example, in early 2014, the Chairman of the Ways and Means Committee, Dave Camp, put forward a proposal that would significantly alter many rules related to real estate investment trusts (the "Camp Proposal").  The Camp Proposal, if implemented, would potentially materially and adversely affect the REIT.  Moreover, the Camp Proposal would prohibit the REIT from being treated as a real estate investment trust for 10 years following the Separation, and there is no way to know to what extent the REIT would be "grandfathered" from that proposal, and it would also prevent the E&P Purging Dividend from being paid in a mixture of cash and stock.  There is no way for the Debtors to predict whether any aspect of the Camp Proposal will be enacted and, if it were to be enacted, to what extent the legislation would have retroactive effect.

### 6. The REIT Could Fail to Qualify to Be Taxed as a Real Estate Investment Trust If Income it Receives from PropCo or Its Subsidiaries Is Not Treated as Qualifying Income

Under applicable provisions of the Internal Revenue Code, the REIT will not be treated as a real estate investment trust unless it satisfies various requirements, including requirements relating to the sources of its gross income.  Rents received or accrued by the REIT from OpCo through PropCo or its subsidiaries will not be treated as qualifying rent for purposes of these requirements if the Master Lease Agreement is not respected as a true lease for U.S. federal income tax purposes and is instead treated as a service contract, joint venture, or some other type of arrangement.  If the Master Lease Agreement is not respected as a true lease for U.S. federal income tax purposes, the REIT may fail to qualify to be taxed as a real estate investment trust.

In addition, subject to certain exceptions, rents received or accrued by the REIT from a tenant (including OpCo) through PropCo or its subsidiaries will not be treated as qualifying rent for purposes of these requirements if the REIT or an actual or constructive owner of 10 percent or more of the REIT stock actually or constructively owns 10 percent or more of the total combined voting power of all classes of OpCo stock entitled to vote or 10 percent or more of the total value of all classes of such tenant's stock.  The REIT's charter will provide for restrictions on ownership and transfer of its shares of stock, including restrictions on such ownership or transfer that would cause the rents received or accrued by the REIT from such tenant through PropCo or its subsidiaries to be treated as non-qualifying rent for purposes of the real estate investment trust gross income requirements.  Nevertheless, there can be no assurance that such restrictions will be effective in ensuring that rents received or accrued by the REIT

through PropCo or its subsidiaries will be treated as qualifying rent for purposes of real estate investment trust qualification requirements.

**7.      Dividends Payable by Real Estate Investment Trusts Do Not Qualify for the Reduced Tax Rates Available for Some Dividends**

The maximum U.S. federal income tax rate applicable to income from "qualified dividends" payable by U.S. corporations to U.S. shareholders that are individuals, trusts, and estates is currently 20 percent (and an additional 3.8 percent tax on net investment income may also be applicable). Dividends payable by real estate investment trusts, however, generally are not eligible for the reduced rates applicable to "qualified dividends." Although these rules do not adversely affect the taxation of real estate investment trusts, the more favorable rates applicable to regular corporate qualified dividends could cause investors who are individuals, trusts, and estates to perceive investments in real estate investment trusts to be relatively less attractive than investments in the stock of other corporations that pay dividends, which could adversely affect the value of the stock of real estate investment trusts, including the REIT's stock.

**8.      Real Estate Investment Trust Distribution Requirements Could Adversely Affect the REIT's Ability to Execute Its Business Plan**

The REIT generally must distribute annually at least 90 percent of its real estate investment trust taxable income, determined without regard to the dividends-paid deduction and excluding any net capital gains, in order for the REIT to qualify to be taxed as a real estate investment trust (assuming that certain other requirements are also satisfied) so that U.S. federal corporate income tax does not apply to earnings that the REIT distributes. To the extent that the REIT satisfies this distribution requirement and qualifies for taxation as a real estate investment trust but distributes less than 100 percent of its real estate investment trust taxable income, determined without regard to the dividends-paid deduction and including any net capital gains, the REIT will be subject to U.S. federal corporate income tax on its undistributed net taxable income. In addition, the REIT will be subject to a 4 percent nondeductible excise tax if the actual amount that the REIT distributes to its shareholders in a calendar year is less than a minimum amount specified under U.S. federal income tax laws. The Debtors intend that the REIT will make distributions to its shareholders to comply with the real estate investment trust requirements of the IRC.

From time to time, the REIT may generate taxable income greater than its cash flow as a result of differences in timing between the recognition of taxable income and the actual receipt of cash or the effect of nondeductible capital expenditures, the creation of reserves, or required debt or amortization payments. If the REIT does not have other funds available in these situations, the REIT could be required to borrow funds on unfavorable terms, sell assets at disadvantageous prices, or distribute amounts that would otherwise be invested in future acquisitions to make distributions sufficient to enable the REIT to pay out enough of its taxable income to satisfy the real estate investment trust distribution requirement and to avoid corporate income tax and the 4 percent excise tax in a particular year. These alternatives could increase the REIT's costs or reduce the value of its equity. Alternatively, and as discussed below, the REIT could elect to satisfy its distribution requirements by making taxable distributions of cash and stock. Thus, compliance with the real estate investment trust requirements may hinder the REIT's ability to grow, which could adversely affect the value of the REIT's stock, or cause holders of the REIT's stock to incur tax liabilities in excess of cash distributions. Restrictions in the New Debt or any other indebtedness of the Companies following the Separation, including restrictions on the REIT's ability to incur additional indebtedness or make certain distributions, could preclude it from meeting the 90 percent distribution requirement. Decreases in funds from operations due to unfinanced expenditures for acquisitions of properties would adversely affect the ability of the REIT to maintain distributions to its shareholders. Moreover, the failure of OpCo, through PropCo or its subsidiaries, to make rental payments under the Master Lease Agreement would materially impair the ability of the REIT to make distributions. Consequently, there can be no assurance that the REIT will be able to make distributions at the anticipated distribution rate or any other rate.

**9.      Even If the REIT Remains Qualified as A Real Estate Investment Trust, the REIT May Face Other Tax Liabilities That Reduce Its Cash Flow**

Even if the REIT remains qualified for taxation as a real estate investment trust, the REIT may be subject to certain federal, state, and local taxes on its income and assets, including taxes on any undistributed income and state or local income, property, and transfer taxes. For example, the REIT will hold some of its assets or conduct certain

60

of its activities through one or more TRSs or other subsidiary corporations that will be subject to federal, state, and local corporate-level income taxes as regular C corporations as well as state and local gaming taxes. In addition, the REIT may incur a 100 percent excise tax on transactions with a TRS if they are not conducted on an arm's-length basis. Any of these taxes would decrease cash available for distribution to the REIT's shareholders.

### 10.  Complying with Real Estate Investment Trust Requirements May Cause the REIT to Forgo Otherwise Attractive Acquisition Opportunities or Liquidate Otherwise Attractive Investments

To qualify to be taxed as a real estate investment trust for U.S. federal income tax purposes, the REIT must ensure that, at the end of each calendar quarter, at least 75 percent of the value of its assets consists of cash, cash items, government securities, and "real estate assets" (as defined in the IRC), including certain mortgage loans and securities. The remainder of the REIT's investments (other than government securities, qualified real estate assets, and securities issued by a TRS) generally cannot include more than 10 percent of the outstanding voting securities of any one issuer or more than 10 percent of the total value of the outstanding securities of any one issuer. In addition, in general, no more than 5 percent of the value of the REIT's total assets (other than government securities, qualified real estate assets, and securities issued by a TRS) can consist of the securities of any one issuer, and no more than 25 percent of the value of the REIT's total assets can be represented by securities of one or more TRSs. If the REIT fails to comply with these requirements at the end of any calendar quarter, it must correct the failure within 30 days after the end of the calendar quarter or qualify for certain statutory relief provisions to avoid losing its real estate investment trust qualification and suffering adverse tax consequences. As a result, the REIT may be required to liquidate or forgo otherwise attractive investments. These actions could have the effect of reducing the REIT's income and amounts available for distribution to its shareholders.

In addition to the asset tests set forth above (which are discussed in more detail below), to qualify to be taxed as a real estate investment trust, the REIT must continually satisfy tests concerning, among other things, the sources of its income, the amounts it distributes to its shareholders, and the ownership of REIT stock. The REIT may be unable to pursue investments that would be otherwise advantageous to the REIT in order to satisfy the source-of-income or asset-diversification requirements for qualifying as a real estate investment trust. Thus, compliance with the real estate investment trust requirements may hinder the REIT's ability to make certain attractive investments.

### 11.  Complying with Real Estate Investment Trust Requirements May Limit the REIT's Ability to Effectively Hedge and May Cause the REIT to Incur Tax Liabilities

The real estate investment trust provisions of the IRC substantially limit the REIT's ability to hedge its assets and liabilities. Income from certain hedging transactions that the REIT may enter into to manage risk of interest rate changes with respect to borrowings made or to be made to acquire or carry real estate assets or from transactions to manage risk of currency fluctuations with respect to any item of income or gain that satisfies the real estate investment trust gross income tests (including gain from the termination of such a transaction) does not constitute "gross income" for purposes of the 75 percent or 95 percent gross income tests that apply to real estate investment trusts, provided that certain identification requirements are met. To the extent that the REIT enters into other types of hedging transactions or fails to properly identify such transaction as a hedge, the income is likely to be treated as non-qualifying income for purposes of both of the gross income tests. As a result of these rules, the REIT may be required to limit its use of advantageous hedging techniques or implement those hedges through a TRS. This could expose the REIT to greater risks associated with changes in interest rates than the REIT would otherwise want to bear or increase the cost of the REIT's hedging activities because the TRS may be subject to tax on gains. In addition, losses in the TRS will generally not provide any tax benefit, except that such losses could theoretically be carried back or forward against past or future taxable income in the TRS.

### 12.  Even If the REIT Qualifies to Be Taxed as a Real Estate Investment Trust, the REIT Could Be Subject to Tax on Any Unrealized Net Built-In Gains in the Assets Held Before Electing to Be Treated as a Real Estate Investment Trust

The REIT will own appreciated assets that were held by the Debtors before the REIT elected to be treated as a real estate investment trust and were acquired by the REIT in a transaction in which the adjusted tax basis of the assets in the REIT's hands is determined by reference to the adjusted tax basis of the assets in the hands of the

61

Debtors.  If the REIT disposes of any such appreciated assets during the ten-year period following the REIT's acquisition of the assets from the Debtors (*i.e.*, during the ten-year period following the REIT's qualification as a real estate investment trust), the REIT will be subject to tax at the highest corporate tax rates on any gain from such assets to the extent of the excess of the fair market value of the assets on the date that they were acquired by the REIT (*i.e.*, at the time that the REIT became a real estate investment trust) over the adjusted tax basis of such assets on such date, which are referred to as built-in gains.  The REIT would be subject to this tax liability even if it qualifies and maintains its status as a real estate investment trust.  Any recognized built-in gain will retain its character as ordinary income or capital gain and will be taken into account in determining real estate investment trust taxable income and the REIT's distribution requirement.  Any tax on the recognized built-in gain will reduce real estate investment trust taxable income.  The REIT may choose not to sell in a taxable transaction appreciated assets it might otherwise sell during the ten-year period in which the built-in gain tax applies in order to avoid the built-in gain tax.  However, there can be no assurances that such a taxable transaction will not occur.  If the REIT sells such assets in a taxable transaction, the amount of corporate tax that the REIT will pay will vary depending on the actual amount of net built-in gain or loss present in those assets as of the time the REIT became a real estate investment trust.  The amount of tax could be significant.

13.    **If PropCo Fails To Qualify as a Partnership for U.S. Federal Income Tax Purposes, the REIT Would Cease to Qualify as a Real Estate Investment Trust and Suffer Other Adverse Consequences**

The Debtors anticipate that PropCo will be treated as a partnership for U.S. federal income tax purposes. As a partnership, PropCo will not be subject to federal income tax on its income.  Instead, each of its partners, including the REIT, will be allocated, and may be required to pay tax with respect to, its allocable share of PropCo's income.  The Debtors cannot assure parties that the IRS will not challenge the status of PropCo or any other subsidiary partnership in which the REIT owns as interest as a partnership for U.S. federal income tax purposes, or that a court would not sustain such a challenge.  If the IRS were successful in treating PropCo or any other subsidiary partnership as an entity taxable as a corporation for U.S. federal income tax purposes, it is likely that the REIT would fail to meet the gross income tests and certain of the asset tests applicable to REITs and, accordingly, the REIT would likely cease to qualify as a real estate investment trust.  Also, the failure of PropCo or any subsidiary partnership to qualify as a partnership could cause it to become subject to federal and state corporate income tax, which would reduce significantly the amount of cash available for debt service and for distribution to its partners, including the REIT.

14.    **The Tax Opinion Regarding the REIT's Status as a Real Estate Investment Trust Does Not Guarantee the REIT's Ability to Qualify as a Real Estate Investment Trust**

As discussed below, the Tax Opinion will provide that the REIT has been organized in conformity with the requirements for qualification as a real estate investment trust and the REIT's proposed method of operation as represented by the Debtors will enable the REIT to satisfy the requirements for such qualification.  The Tax Opinion will be based on representations made by the Debtors as to certain factual matters relating to the REIT's organization and intended or expected manner of operation.  In addition, the Tax Opinion will be based on the law existing and in effect on the date of the Tax Opinion.  The REIT's qualification and taxation as a real estate investment trust will depend on the REIT's ability to meet on a continuing basis, through actual operating results, asset composition, distribution levels, and diversity of stock ownership, the various qualification tests imposed under the IRC.  The party providing the Tax Opinion will not review the REIT's compliance with these tests on a continuing basis.  Accordingly, no assurance can be given that the REIT will satisfy such tests on a continuing basis. Also, the Tax Opinion will represent counsel's legal judgment based on the law in effect as of the date of the Tax Opinion, is not binding on the IRS or any court, and could be subject to modification or withdrawal based on future legislative, judicial, or administrative changes to U.S. federal income tax laws, any of which could be applied retroactively.  The party providing the Tax Opinion will have no obligation to advise the REIT or Holders of REIT stock of any subsequent change in the matters stated, represented, or assumed in the Tax Opinion or of any subsequent change in applicable law.

G.    **Risks Relating to the New Debt**

1.    **The New Debt, as Applicable, of Each of the Companies Is Structurally Subordinated to All Liabilities of Each of Such Company's Subsidiaries That Are Not Asset Pledgors or Guarantors of Such New Debt**

The New Debt, as applicable, of each of the Companies will be structurally subordinated to indebtedness and other liabilities of each of such Company's subsidiaries that are not asset pledgors or guarantors of such New Debt, and the claims of creditors of these subsidiaries, including trade creditors, will have priority as to the assets of these subsidiaries. In the event of a bankruptcy, liquidation, or reorganization of any subsidiaries that are not asset pledgors or guarantors of New Debt, as applicable, such subsidiaries will pay the holders of their debts, holders of their preferred equity interests and their trade creditors before they will be able to distribute any of their assets to the applicable Company. In addition, the guarantee of New Debt by a subsidiary will be structurally subordinated to indebtedness of subsidiaries of that subsidiary guarantor, as well as any other indebtedness incurred in the future by subsidiaries of such subsidiaries, in each case that are not also asset pledgors or guarantors.

The New Debt, as applicable, of each of the Companies will not be secured by the assets of each of such Company's non-U.S. subsidiaries or any other subsidiaries that are not wholly owned by such Company. These subsidiaries are separate and distinct legal entities and will have no obligation, contingent or otherwise, to pay any amounts due pursuant to the applicable New Debt, or to make any funds available therefore, whether by dividends, loans, distributions, or other payments. Any right that the Companies or the Companies' subsidiaries that are asset pledgors or guarantors with respect to the New Debt have to receive any assets of any of these subsidiaries upon their liquidation or reorganization, and the consequent rights of holders of New Debt, as applicable, to realize proceeds from the sale of any of those subsidiaries' assets, will be effectively subordinated to the claims of those subsidiaries' creditors, including trade creditors and holders of the preferred equity interests of those subsidiaries.

2.    **Each Tranche of New Debt of Each Company Is Secured Only to the Extent of the Value of the Assets That Will Be Granted as Security for Such Tranche of New Debt, Which May Not Be Sufficient to Satisfy Such Company's Obligations Under Such Tranche of New Debt**

No appraisals of any of the collateral will be prepared by or on behalf of the Companies in connection with the issuance of the New Debt. The fair market value of the collateral securing each tranche of New Debt is subject to fluctuations based on factors that include, among others, each such Company's ability to implement its business strategy, the ability to sell the applicable collateral in an orderly sale, general economic conditions, the availability of buyers, and similar factors. In addition, courts could limit recoverability if they apply non-New York law to a proceeding and deem a portion of the interest claim usurious in violation of public policy. The amount to be received upon a sale of any collateral would be dependent on numerous factors, including but not limited to the actual fair market value of the collateral at such time, general market and economic conditions, and the timing and manner of the sale.

In addition, the collateral securing each tranche of New Debt will be subject to liens permitted under the terms of the credit agreements and indentures, as applicable, governing the respective tranches of New Debt, whether such permitted liens arise before, on, or after the date the New Debt is issued. The existence of any permitted liens could adversely affect the value of the collateral securing any tranche of New Debt, as well as the ability of the applicable collateral agent to realize or foreclose on such collateral.

There also can be no assurance that any collateral will be saleable and, even if saleable, the timing of any liquidation is uncertain. To the extent that liens, rights, or easements granted to third parties encumber assets located on property securing each tranche of New Debt, such third parties have or may exercise rights and remedies with respect to such property subject to such liens that could adversely affect the value of such collateral and the ability of the applicable collateral agent to realize or foreclose on such collateral. By its nature, some or all of the collateral securing each tranche of New Debt may be illiquid and may have no readily ascertainable market value. In the event that a bankruptcy case is commenced by or against a Company, if the value of the collateral securing a tranche of such Company's New Debt is less than the amount of such Company's principal and accrued and unpaid interest on such tranche of New Debt and all other senior secured obligations, interest may cease to accrue on such tranche of New Debt from and after the date the bankruptcy petition is filed. In the event of a foreclosure, liquidation,

63

bankruptcy, or similar proceeding, there can be no assurance that the proceeds from any sale or liquidation of any collateral will be sufficient to pay the obligations due under the applicable Company's applicable tranche of New Debt.

In addition, not all of the Companies' assets will secure their New Debt.  For example, the collateral securing the New Debt of each Company will not include, among other things:

- any property or assets owned by any foreign subsidiaries;

- certain real property and vessels;

- any vehicles; or

- subject to certain limitations, any assets or any right, title, or interest in any license, contract, or agreement to the extent that taking a security interest in any of them would violate any applicable law or regulation or any enforceable contractual obligation binding on the assets or would violate the terms of any such license, contract, or agreement.

To the extent the claims of the holders of a tranche of New Debt exceed the value of the assets securing such tranche of New Debt and other liabilities, those claims will rank equally with the claims of the holders of the applicable Company's other series of junior lien or unsecured senior indebtedness.  As a result, if the value of the assets pledged as security for a tranche of New Debt and other liabilities is less than the value of the claims of the holders of such tranche of New Debt and other liabilities, the claims of the holders of such tranche of New Debt may not be satisfied in full before the claims of the applicable Company's junior lien and unsecured creditors are paid. Furthermore, upon enforcement against any collateral or in insolvency, under the terms of any intercreditor agreement applicable to the New Debt the claims of the holders of the PropCo Second Lien Notes or the OpCo Second Lien Notes to the proceeds of such enforcement will rank behind the claims of the holders of obligations under, respectively the PropCo First Lien Notes, PropCo First Lien Term Loan, OpCo First Lien Notes, OpCo First Lien Term Loan, and OpCo First Lien Market Debt, which are first-priority obligations and claims of holders of additional secured indebtedness (to the extent permitted to have priority by the applicable intercreditor agreement).

### 3. The Holders of the PropCo Second Lien Notes Will Receive Proceeds from the Collateral Only After the Debt Owed to the Holders of the PropCo First Lien Term Loan and PropCo First Lien Notes Are Fully Repaid

Substantially all of the assets owned by PropCo and its subsidiary asset pledgors and guarantors for the PropCo Second Lien Notes on the date of the indenture governing the PropCo Second Lien Notes or thereafter acquired, and all proceeds therefrom, are subject to first-priority liens in favor of the holders of the PropCo First Lien Term Loan and PropCo First Lien Notes.  PropCo's failure to comply with the terms of the agreements governing the PropCo First Lien Term Loan and PropCo First Lien Notes could entitle such first lien lenders to declare all indebtedness thereunder to be immediately due and payable.  If PropCo was unable to service the PropCo First Lien Term Loan and PropCo First Lien Notes, the collateral agent or agents thereunder could foreclose on PropCo's assets that serve as collateral.  Pursuant to PropCo's intercreditor agreement, the group of lenders under the PropCo First Lien Term Loan will initially control all decisions with respect to the collateral.  In addition, the collateral securing the PropCo First Lien Term Loan and PropCo First Lien Notes will also secure the PropCo Second Lien Notes and may additionally secure certain other future parity lien debt that may be issued in compliance with the terms of any credit agreement or indenture governing the PropCo First Lien Term Loan, PropCo First Lien Notes, or PropCo Second Lien Notes.  Holders of the PropCo Second Lien Notes generally, subject to certain potential exclusions, will have second priority liens on the assets that will secure the PropCo First Lien Term Loan and PropCo First Lien Notes.  As a result, upon any distribution to PropCo's creditors, liquidation, reorganization, or similar proceedings, or following acceleration of PropCo's indebtedness, or an event of default under PropCo's indebtedness, and enforcement of the collateral, the holders of PropCo First Lien Term Loans and PropCo First Lien Notes will be entitled to be repaid in full from the proceeds of all the assets constituting collateral before any payment is made to the holders of the PropCo Second Lien Notes from the proceeds of that collateral.

64

4. **The Rights of Holders of the PropCo Second Lien Notes to the Collateral Securing Such Indebtedness Will Be Governed, and Materially Limited, by the Related Intercreditor Agreement**

Pursuant to the terms of the intercreditor agreement relating to the PropCo Second Lien Notes, the lenders and holders of the PropCo First Lien Term Loans, which are obligations secured by the collateral on a first priority basis, will control substantially all matters related to the collateral. Under the related intercreditor agreement, at any time that PropCo First Lien Term Loan and PropCo First Lien Notes remain outstanding, any actions that may be taken in respect of the collateral (including the ability to commence enforcement proceedings against the collateral and to control the conduct of such proceedings, and to approve amendments to, releases of collateral from the lien of, and waivers of past defaults under, the collateral documents) will be at the direction of the holders of the PropCo First Lien Loans. Under such circumstances, the trustee and collateral agent on behalf of the holders of the PropCo Second Lien Notes will not have the ability to control or direct such actions, even if the rights of the holders of the PropCo Second Lien Notes are adversely affected. Any release of all first priority liens upon any collateral approved by the holders of first priority liens will also release the second priority liens securing the PropCo Second Lien Notes on substantially the same collateral, and holders of PropCo Second Lien Notes will have no control over such release.

Furthermore, because the lenders under the PropCo First Lien Term Loans control the disposition of the collateral securing the PropCo First Lien Term Loans, PropCo First Lien Notes, and PropCo Second Lien Notes, if there were an event of default under the PropCo Second Lien Notes, the lenders under the PropCo First Lien Term Loans could decide not to proceed against the collateral. In such event, the only remedy available to the holders of PropCo Second Lien Notes would be to sue for payment on the PropCo Second Lien Notes. By virtue of the direction of the administration of the pledges and security interests and the release of collateral, actions may be taken under the collateral documents that may be adverse to the holders of the PropCo Second Lien Notes. Unless and until the discharge of the PropCo First Lien Term Loans and PropCo First Lien Notes has occurred, the sole right of the holders of the PropCo Second Lien Notes is to hold a lien on the collateral.

5. **The Holders of the OpCo Second Lien Notes Will Receive Proceeds from the Collateral Only After the Debts Owed to the Holders of the OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes Are Fully Repaid**

Substantially all of the assets owned by OpCo and its subsidiary asset pledgors and guarantors for the OpCo Second Lien Notes on the date of the indenture governing the OpCo Second Lien Notes or thereafter acquired, and all proceeds therefrom, will be subject to first-priority liens in favor of the holders of the OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes. OpCo's failure to comply with the terms of the agreements governing the OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes could entitle such first lien lenders to declare all indebtedness thereunder to be immediately due and payable. If OpCo was unable to service the OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes, the collateral agent or agents thereunder could foreclose on OpCo's assets that serve as collateral. Pursuant to OpCo's intercreditor agreement, the group of lenders under the OpCo First Lien Term Loans or OpCo First Lien Market Debt (as the case may be) initially controls all decisions with respect to the collateral. In addition, the collateral securing the OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes also secures the OpCo Second Lien Notes and may additionally secure certain other future parity lien debt that may be issued in compliance with the terms of any credit agreement or indenture governing the OpCo First Lien Term Loans, OpCo First Lien Market Debt, OpCo First Lien Notes, or OpCo Second Lien Notes. Holders of the OpCo Second Lien Notes generally, subject to certain potential exclusions, will have second priority liens on the assets generally securing the OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes. As a result, upon any distribution to OpCo's creditors, liquidation, reorganization, or similar proceedings, or following acceleration of OpCo's indebtedness, or an event of default under OpCo's indebtedness, and enforcement of the collateral, the holders of OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes will be entitled to be repaid in full from the proceeds of all the assets constituting collateral before any payment is made to the holders of the OpCo Second Lien Notes from the proceeds of that collateral.

KE 34442788

6.      **The Rights of Holders of the OpCo Second Lien Notes to the Collateral Securing Such Indebtedness Will Be Governed, and Materially Limited, by the Related Intercreditor Agreement**

Pursuant to the terms of the intercreditor agreement relating to the OpCo Second Lien Notes, the lenders and holders of the OpCo First Lien Term Loans or OpCo First Lien Market Debt (as the case may be), which are obligations secured by the collateral on a first priority basis, will control substantially all matters related to the collateral.  Under the related intercreditor agreement, at any time that OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes remain outstanding, any actions that may be taken in respect of the collateral (including the ability to commence enforcement proceedings against the collateral and to control the conduct of such proceedings, and to approve amendments to, releases of collateral from the lien of, and waivers of past defaults under, the collateral documents) will be at the direction of the holders of the OpCo First Lien Term Loans or OpCo First Lien Market Debt (as the case may be).  Under such circumstances, the trustee and collateral agent on behalf of the holders of the OpCo Second Lien Notes will not have the ability to control or direct such actions, even if the rights of the holders of the OpCo Second Lien Notes are adversely affected.  Any release of all first priority liens upon any collateral approved by the holders of first priority liens will also release the second priority liens securing the OpCo Second Lien Notes on substantially the same collateral, and holders of OpCo Second Lien Notes will have no control over such release.

Furthermore, because the lenders under the OpCo First Lien Term Loans or the OpCo First Lien Market Debt (as the case may be) control the disposition of the collateral securing the OpCo First Lien Term Loans, OpCo First Lien Market Debt, OpCo First Lien Notes, and OpCo Second Lien Notes, if there were an event of default under the OpCo Second Lien Notes, the lenders under the OpCo First Lien Term Loans or the OpCo First Lien Market Debt (as the case may be) could decide not to proceed against the collateral.  In such event, the only remedy available to the holders of OpCo Second Lien Notes would be to sue for payment on the OpCo Second Lien Notes. By virtue of the direction of the administration of the pledges and security interests and the release of collateral, actions may be taken under the collateral documents that may be adverse to the holders of the OpCo Second Lien Notes.  Unless and until the discharge of the OpCo First Lien Term Loans, OpCo First Lien Market Debt, and OpCo First Lien Notes has occurred, the sole right of the holders of the OpCo Second Lien Notes is to hold a lien on the collateral.

7.      **Each Company Will in Most Cases Have Control over the Collateral Securing Its New Debt, and the Sale of Particular Assets by Such Company Could Reduce the Pool of Assets Securing Its New Debt**

The collateral documents allow each Company to remain in possession of, retain exclusive control over, freely operate, and collect, invest, and dispose of any income from, the collateral securing its New Debt.

[In addition, with respect to the PropCo Second Lien Notes and the OpCo Second Lien Notes, PropCo and OpCo will not be required to comply with all or any portion of Section 314(d) of the Trust Indenture Act of 1939 (the "Trust Indenture Act") if PropCo or OpCo (as the case may be) determines, in good faith based on advice of counsel, that, under the terms of Section 314(d) and/or any interpretation or guidance as to the meaning thereof of the SEC and its staff, including "no action" letters or exemptive orders, all or such portion of Section 314(d) of the Trust Indenture Act is inapplicable to the released collateral.  For example, PropCo or OpCo may, among other things, without any release or consent by the indenture trustee, conduct ordinary course activities with respect to collateral, such as selling, factoring, abandoning, or otherwise disposing of collateral and making ordinary course cash payments (including repayments of indebtedness) so long as no default or event of default under the indenture governing the PropCo Second Lien Notes or the OpCo Second Lien Notes (as the case may be) would result therefrom and such transaction would not violate the Trust Indenture Act.]

8.  **The Pledge of the Capital Stock, Other Securities, and Similar Items of the Companies Subsidiaries That Secure the New Debt Will Automatically Be Released from the Lien on Them and No Longer Constitute Collateral to the Extent and for so Long as the Pledge of Such Capital Stock or Such Other Securities Would Require the Filing of Separate Financial Statements with the SEC for the Subsidiary**

Certain of the New Debt and the related guarantees are secured by pledges of the stock of the Companies and certain of the Companies' subsidiaries.  Under the SEC regulations in effect as of the issue date of the New Debt, if the par value, book value as carried by the respective Company or market value (whichever is greatest) of the capital stock, other securities or similar items of a subsidiary pledged as part of collateral is greater than or equal to 20 percent of the aggregate principal amount of the New Debt it is securing then outstanding, such subsidiary is required to provide separate financial statements to the SEC.  Therefore, the respective credit agreements, indentures, and related collateral documents provide that any capital stock and other securities of the respective Companies' subsidiaries will be excluded from the collateral securing the respective New Debt to the extent and for so long as the pledge of such capital stock or other securities to secure the respective New Debt would cause such subsidiary to be required to file separate financial statements with the SEC pursuant to Rule 3-16 of Regulation S-X (as in effect from time to time).

In addition, the absence of a lien on a portion of the capital stock of any subsidiary pursuant to these provisions in certain circumstances could result in less than a majority of the capital stock of a subsidiary being pledged to secure the respective New Debt, which could impair the ability of the applicable collateral agent, acting on behalf of the holders of the respective New Debt, to sell a controlling interest in such subsidiary or to otherwise realize value on its security interest in such subsidiary's stock or assets.

As a result, holders of certain of the New Debt could lose a portion or all of their security interest in the capital stock or other securities of those subsidiaries during such period.  It may be more difficult, costly, and time-consuming for holders of such New Debt to foreclose on the assets of a subsidiary than to foreclose on its capital stock or other securities, so the proceeds realized upon any such foreclosure could be significantly less than those that would have been received upon any sale of the capital stock or other securities of such subsidiary.

9.  **There Are Circumstances Other Than Repayment or Discharge of the New Debt Under Which the Collateral Securing Such New Debt Will Be Automatically Released, Without the Consent of the Holders of Such New Debt or the Consent of the Applicable Administrative Agent or Trustee**

Under various circumstances, collateral securing the New Debt of each Company will be released automatically, including a sale, transfer or other disposal of such collateral in a transaction not prohibited under the applicable credit agreement or indenture.

The indentures and credit agreements, as applicable, governing the New Debt of each Company permits, subject to certain terms and conditions, that Company to designate one or more of its restricted subsidiaries that is a subsidiary asset pledgor or guarantor as an unrestricted subsidiary.[33]  If a Company designates one of its subsidiary asset pledgors or guarantors as an unrestricted subsidiary for purposes of the applicable indenture or credit agreement governing a tranche of such Company's New Debt, all of the liens on any collateral owned by such subsidiary or any of its subsidiaries will be released under the applicable indenture or credit agreement.  Designation of a subsidiary asset pledgor or guarantor as an unrestricted subsidiary will reduce the aggregate value of the collateral securing the applicable tranche of New Debt of the applicable Company to the extent that liens on the assets of such unrestricted subsidiary and its subsidiaries are released.  In addition, the creditors of the unrestricted subsidiary and its subsidiaries will have a senior claim on the assets of such unrestricted subsidiary and its subsidiaries.

---

[33]  Such terms and conditions will be established by the underlying credit documents.

10. **The Rights of Holders of the New Debt to the Collateral Securing the New Debt May Be Adversely Affected by the Failure to Perfect Security Interests in the Collateral and Other Issues Generally Associated with the Realization of Security Interests in Collateral**

Applicable law requires that a security interest in certain tangible and intangible assets can only be properly perfected and its priority retained through certain actions undertaken by the secured party. The liens on the collateral securing the New Debt of each Company may not be perfected if the applicable collateral agent is not able to take the actions necessary to perfect any of these liens on or prior to the date of the issuance of the New Debt. The Companies and their respective subsidiary asset pledgors or guarantors have limited obligations to perfect the security interest of the holders of their respective New Debt in certain limited specified collateral. There can be no assurance that the applicable trustee or collateral agent will monitor, or that the Companies will inform their applicable trustee or collateral agent of, the future acquisition of property and rights that constitute collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired collateral. The applicable collateral agent for each tranche of New Debt has no obligation to monitor the acquisition of additional property or rights that constitute collateral or the perfection of any security interest. Such failure may result in the loss of the security interest in collateral or the loss the priority of the security interest in favor of the holders of the New Debt against third parties.

In addition, the security interest of each collateral agent will be subject to practical challenges generally associated with the realization of security interests in collateral. For example, each collateral agent may need to obtain the consent of third parties and make additional filings. If a Company is unable to obtain these consents or make these filings, the security interests may be invalid and the holders of the New Debt of such Company will not be entitled to the collateral or any recovery with respect thereto. There can be no assurance that each collateral agent will be able to obtain any such consent. Also, there can be no assurance that the consents of any third parties will be given when required to facilitate a foreclosure on such assets. Accordingly, each collateral agent may not have the ability to foreclose upon those assets and the value of the collateral may significantly decrease.

11. **In the Event of A Company's Bankruptcy, the Ability of the Holders of the New Debt of Such Company to Realize upon the Collateral Will Be Subject to Certain Bankruptcy Law Limitations**

The ability of the holders of the New Debt of each Company to realize upon the collateral will be subject to certain bankruptcy law limitations in the event of such Company's bankruptcy. Under federal bankruptcy law, secured creditors are prohibited from repossessing their security from a debtor in a bankruptcy case, or from disposing of security repossessed from such debtor, without bankruptcy court approval, which may not be given. Moreover, applicable federal bankruptcy laws generally permit debtors to continue to use and expend collateral, including cash collateral, and to provide liens senior to the collateral agent for the New Debt's liens to secure indebtedness incurred after the commencement of a bankruptcy case, provided that the secured creditor either consents or is given "adequate protection." "Adequate protection" could include cash payments or the granting of additional security, if and at such times as the presiding court in its discretion determines, for any diminution in the value of the collateral as a result of the stay of repossession or disposition of the collateral during the pendency of the bankruptcy case, the use of collateral (including cash collateral) and the incurrence of such senior indebtedness. In view of the broad discretionary powers of a bankruptcy court, it is impossible to predict how long payments under the New Debt of a Company could be delayed following commencement of a bankruptcy case, whether or when the collateral agent would repossess or dispose of the collateral, or whether or to what extent holders of the notes would be compensated for any delay in payment of loss of value of the collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the collateral is not sufficient to repay all amounts due on the New Debt of a Company, the New Debt would be "undersecured" and the holders of such New Debt would have unsecured claims as to the difference. Federal bankruptcy laws do not permit the payment or accrual of interest, costs, and attorneys' fees on undersecured indebtedness during a debtor's bankruptcy case.

Pursuant to the terms of the intercreditor agreement for OpCo and PropCo, the holders of OpCo Second Lien Notes and PropCo Second Lien Notes agree not to seek or accept "adequate protection" consisting of cash payments and not to object to the incurrence of additional indebtedness secured by liens that are senior to the liens

KE 34442788

granted to the collateral agent for OpCo Second Lien Notes or PropCo Second Lien Notes (as the case may be) in an aggregate principal amount agreed to be agreed to.  As a result of the limitations under the intercreditor agreement, the holders of the OpCo Second Lien Notes and PropCo Second Lien Notes will not be compensated for any delay in payment or loss of value of the collateral through the provision of "adequate protection," except to the extent of any grant of additional liens that are junior to, as the case may be, the OpCo First Lien Term Loans, OpCo First Lien Market Debt, OpCo First Lien Notes, PropCo First Lien Term Loans, PropCo First Lien Notes, and the second-priority obligations.

In addition to the waiver with respect to adequate protection set forth above, under the terms of the intercreditor agreements, the holders of OpCo Second Lien Notes and PropCo Second Lien Notes also waive certain other important rights that secured creditors may be entitled to in a bankruptcy proceeding.  These waivers could adversely affect the ability of such holders to recover amounts owed to them in a bankruptcy proceeding.

### 12. The Collateral Securing Each Company's New Debt May Be Diluted Under Certain Circumstances

The collateral that secures the New Debt of each Company may secure on a first priority basis additional senior indebtedness that such Company or certain of its subsidiaries incurs in the future, subject to restrictions on their ability to incur debt and liens under the indentures and credit agreements governing the New Debt of such Company.  The rights of the holders of the New Debt of each Company to the applicable collateral would be diluted by any increase in the indebtedness secured on a first priority basis and/or second priority basis by such collateral.

### 13. Delivery of Security Interests in Collateral After the Issue Date of the New Debt Increases the Risk That the Other Security Interests Could Be Avoidable in Bankruptcy

Certain collateral, including mortgages on real property of PropCo and CPLV Sub, will be granted as security after the issue date of the New Debt.  If the grantor of such security interest were to become subject to a bankruptcy proceeding, any mortgage or security interest in collateral delivered after the issue date of the New Debt would face a greater risk than security interests in place on the issue date of being avoided by the pledgor (as debtor in possession) or by its trustee in bankruptcy as a preference under bankruptcy law if certain events or circumstances exist or occur, including if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the New Debt to receive a greater recovery than if the pledge had not been given and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.  To the extent that the grant of any such security interest is voided as a preference, the holders of the New Debt whose security interest was voided would lose the benefit of the security interest.

### 14. OpCo and PropCo May Not Be Able to Repurchase the OpCo First and Second Lien Notes and PropCo First and Second Lien Notes upon a Change of Control

Upon the occurrence of certain specific kinds of change of control events, OpCo and PropCo (as the case may be) will be required to separately offer to repurchase the outstanding OpCo and PropCo First Lien and Second Lien Notes (as the case may be) at 101 percent of the principal amount thereof plus, without duplication, accrued and unpaid interest and additional interest, if any, to the date of repurchase.  However, it is possible that OpCo or PropCo (as the case may be) will not have sufficient funds at the time of the change of control to make the required repurchase of the such notes.  In addition, certain important corporate events, such as leveraged recapitalizations that would increase the level of the indebtedness of OpCo or PropCo executing such transaction, would not constitute a "Change of Control" under the indentures that will govern such notes.

### H. Risks Relating to Equity Securities Under the Plan

### 1. The Plan Exchanges Senior Securities for Equity

If the Plan is confirmed, Holders of certain Allowed Claims and Interests may receive New Interests, including OpCo Common Stock, PropCo LP Interests, PropCo Preferred Equity, REIT Common Stock, or REIT Preferred Stock.  Thus, in agreeing to the Plan, certain of such holders will be consenting to the exchange of their interests in senior debt, which has, among other things, a stated interest rate, a maturity date, and a liquidation

preference over equity securities, for such New Interests, which will be subordinated to all future creditor and non-equity based claims.

> **2.      The REIT May Choose To Pay Dividends With A Combination of Cash and Stock, In Which Case Holders of REIT Stock May Be Required To Pay Income Taxes In Excess of the Cash Dividends They Receive**

As discussed in more detail below, the REIT may seek in the future to distribute taxable dividends that are payable in a combination of cash and REIT stock, including with respect to the E&P Purging Dividend. Taxable stockholders receiving such dividends will be required to include the full amount of the dividend as ordinary income to the extent of the REIT's current and accumulated earnings and profits for U.S. federal income tax purposes. As a result, holders of REIT stock may be required to pay income taxes with respect to such dividends in excess of the cash dividends received. If a holder of REIT stock sells the REIT stock that it receives as a dividend in order to pay this tax, the sales proceeds may be less than the amount included in income with respect to the dividend, depending on the market price of the REIT stock at the time of the sale. In addition, in such case, a Holder of REIT stock could have a capital loss with respect to the common stock sold that could not be used to offset such dividend income. Furthermore, with respect to certain Non-U.S. Holders of REIT stock, the REIT may be required to withhold U.S. federal income tax with respect to such dividends, including in respect of all or a portion of such dividend that is payable in REIT stock. In addition, such a taxable stock dividend could be viewed as equivalent to a reduction in the REIT's cash distributions, and that factor, as well as the possibility that a significant number of Holders of REIT stock could determine to sell REIT stock in order to pay taxes owed on dividends, may put downward pressure on the market price of the REIT stock.

> **3.      There is no existing trading market for the New Interests**

There is no existing trading market for the New Interests nor is it known with certainty whether or when a trading market will develop. The Debtors do not anticipate applying to list or quote certain of the New Interests, including the PropCo LP Interests, nor do they anticipate applying to list or quote the OpCo Common Stock unless more than 30 percent is owned by non-CEC parties as of the Effective Date, on the NYSE or NASDAQ, and there can be no assurance that even if an application is submitted to NYSE or NASDAQ, shares of New Interests would be accepted for listing by the relevant governing body. The possible lack of liquidity for the New Interests may make it more difficult for the Companies to raise additional capital, if necessary, and it may affect the price volatility of the New Interests. There can also be no assurance that a holder will be able to sell its shares of New Interests at a particular time or that the prices such holder receives when it sells will be favorable. Future trading prices of the New Interests will depend on many factors, including the operating performance and financial condition of the Companies.

> **4.      The Companies Payment of Dividends, If Any, With Respect to the New Interests Will Be at the Discretion of the Companies' Boards of Directors or Managers**

Any future determination by the Companies to pay dividends with respect to any of the New Interests will be at the discretion of the board of directors or managers of the Companies and will be dependent on then-existing conditions, including the financial condition, results of operations, capital requirements, contractual restrictions, business prospects, and other factors that the board of directors or managers of the Companies considers relevant (subject to certain considerations with respect to dividend requirements for real estate investment trusts). As a result, the trading price of the New Interests could be materially and adversely affected.

> **5.      Upon consummation of the Plan, there may be significant holders of the New Interests**

Upon consummation of the Plan, certain Holders of Allowed Claims or Interests may receive distributions of the shares of certain New Interests representing a substantial percentage of outstanding shares of such New Interests. If certain Holders of Allowed Claims or Interests obtain a sufficiently sizeable position of a series of New Interests, such Holders could be in a position to influence the outcome of actions requiring shareholder approval, including, among other things, the election of Companies board members. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Companies and, consequently, impact the value of the New Interests. Furthermore, the possibility that one or more holders of a significant number of shares of the New

Interests may sell all or a large portion of its shares of the New Interests in a short period of time may adversely affect the trading prices of the New Interests, as applicable.

> **6.      The Trading Prices for the New Interests May Be Depressed Following the Effective Date**

Following the Effective Date, recipients of the New Interests under the Plan may seek to dispose of such securities to obtain liquidity, which could cause the initial trading prices for these securities to be depressed, particularly in light of the lack of established trading markets for these securities.  Further, the possibility that recipients of New Interests may determine to sell all or a large portion of their shares in a short period of time may adversely affect the market price of the New Interests.

> **7.      The Discussion of Enterprise Valuation and the Estimated Recoveries to Holders of Allowed Claims and Interests Are Not Intended to Represent the Trading Value of the New Interests**

Any discussion of the Companies' enterprise valuation upon the Effective Date is based on the Financial Projections developed by the Debtors with the assistance of management and its financial advisors, as well as certain generally accepted valuation principles.  It is not intended to represent the trading values of the Companies' securities in public or private markets.  Any discussion of the Companies' enterprise valuation upon emergence is based on numerous assumptions (the realization of many of which are beyond the Companies' control), including the Companies' successful reorganization, an assumed Effective Date on or about [_____], the Companies' ability to achieve the operating and financial results included in the Financial Projections, the definitive allocation, sizing, and terms and provisions of the New Debt, and the Companies' ability to maintain adequate liquidity to fund their respective operations.  Even if the Companies realize the Financial Projections, the trading market values for the New Interests could be adversely affected by the lack of trading liquidity for these securities, lack of institutional research coverage, concentrated selling by recipients of these securities, and general market and economic conditions.

> **8.      The New Interests May Be Issued in Odd Lots**

Holders of certain Allowed Claims and Interests may receive odd lot distributions (*i.e.*, less than 100 shares or units) of New Interests under the Plan.  Such Holders may find it more difficult to dispose of odd lots in the marketplace and may face increased brokerage charges in connection with any such disposition.

> **9.      Upon Consummation of the Plan, There May Be Restrictions on the Transfer of the New Interests**

Holders of the New Interests issued pursuant to the Plan who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code, and those holders who are deemed to be "affiliates" or "control persons" within the meaning of the Securities Act and the rules promulgated thereunder, will be unable to freely transfer or sell their New Interests except pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration of such securities under the Securities Act or under equivalent state securities or "blue sky" laws, or (c) pursuant to the provisions of Rule 144 or Regulation S under the Securities Act or another available exemption from the registration requirements of the Securities Act.

> **I.      Disclosure Statement Disclaimer**

> **1.      Information Contained Herein Is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purpose.

2. **This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission**

This Disclosure Statement was not filed with the United States Securities and Exchange Commission under the Securities Act or applicable state securities laws. Neither the United States Securities and Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3. **Reliance on Exemptions from Registration**

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016(b) and is not necessarily in accordance with federal or state securities laws or other similar laws.

4. **No Legal or Tax Advice Is Provided to You by this Disclosure Statement**

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interest should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim or Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

5. **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by the Debtors, nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Companies, Holders of Allowed Claims or Interests, or any other parties in interest, nor (c) be deemed or construed as a finding of fact or conclusion of law with respect to any matter or controversy.

6. **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors or Reorganized Debtors, as the case may be, may seek to investigate, file, and prosecute Claims and may object to Claims and Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or Interests or objections to Claims or Interests.

7. **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

8. **Potential Exists for Inaccuracies, and the Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

9.          **No Representations Outside This Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, these Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtors, the United States Trustee, counsel to the Unsecured Creditors' Committee, and counsel to the Second Priority Notes Committee.

**J.       Liquidation Under Chapter 7**

If no plan can be Confirmed, the Debtors' Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and the Debtors' Liquidation Analysis is described herein and attached hereto as **Exhibit F**.

**ARTICLE IX.**
**SOLICITATION AND VOTING PROCEDURES**

On [_____], the Bankruptcy Court entered the Disclosure Statement Order, which is attached hereto as **Exhibit C**. For purposes of this Article IX, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Disclosure Statement Order. The procedures and instructions for (a) voting on the Plan, (b) exercising an election under the OpCo Common Stock Cash Election, (c) exercising an election under the PropCo Common Equity Cash Election, (d) exercising the Equity Rights, and (e) exercising the PropCo Preferred Equity Call and Put Rights are set forth in the exhibits annexed to the Disclosure Statement Order. **The Disclosure Statement Order is incorporated herein by reference and should be read in conjunction with this Disclosure Statement and in formulating a decision to vote to accept or reject the Plan**.

> **THE DISCUSSION OF THE SOLICITATION AND VOTING, CASH ELECTION,**
> **EQUITY RIGHTS, AND PROPCO PREFERRED EQUITY CALL AND PUT RIGHTS**
> **PROCEDURES FORTH IN THIS DISCLOSURE STATEMENT IS ONLY A SUMMARY.**
>
> PLEASE REFER TO THE DISCLOSURE STATEMENT ORDER
> ATTACHED HERETO AS **EXHIBIT C** FOR A MORE COMPREHENSIVE
> DESCRIPTION OF THE SOLICITATION AND VOTING PROCESS.

**A.       Solicitation Packages**

Pursuant to the Disclosure Statement Order, Holders of Claims who are eligible to vote to accept or reject the Plan will receive appropriate solicitation materials (the "Solicitation Package"), including:

- the Disclosure Statement, as approved by the Bankruptcy Court (with all exhibits thereto, including the Plan and the exhibits to the Plan);

- the Disclosure Statement Order (without exhibits thereto);

- the Solicitation Procedures;

- the Confirmation Hearing Notice;

- an appropriate Ballot or Master Ballot, as applicable, with voting instructions with respect thereto, together with a preaddressed, postage prepaid return envelope;

- a cover letter from the Debtors describing the contents of the Solicitation Package and urging the Holders of Claims in each of the Voting Classes to vote to accept the Plan; and

- any supplemental documents the Debtors may file with the Bankruptcy Court or that the Bankruptcy Court orders to be made available.

Through the Debtors' Notice and Claims Agent, the Debtors intend to distribute the Solicitation Packages to Holders of Claims entitled to vote as of the Voting Record Date in accordance with the Solicitation Procedures. The Solicitation Package may also be obtained: (a) for free from the Notice and Claims Agent by (i) visiting https://cases.primeclerk.com/CEOC; (ii) writing to Prime Clerk LLC, Re: Caesars Entertainment Operating Company, Inc. Ballot Processing, 830 Third Avenue, 9th Floor, New York, New York 10022; or (iii) calling (855) 842-4123 (toll free) or (b) for a fee via PACER (except for Ballots or Master Ballots) at https://ecf.ilnb.uscourts.gov.

### B.    Voting Rights

**Classes Entitled to Vote.** Under the provisions of the Bankruptcy Code, not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. The following Classes (the "Voting Classes") for each Debtor, as applicable, are the only Classes entitled to vote to accept or reject the Plan. The Holders of Claims and Interests in the Voting Classes are Impaired under the Plan and may, in certain circumstances, receive a distribution under the Plan. Accordingly, Holders of Claims in the Voting Classes have the right to vote to accept or reject the Plan. If your Claim or Interest is not included in one of these Classes, you are not entitled to vote and you will not receive a Solicitation Package. Each of the Voting Classes will have accepted the Plan if: (1) the Holders of at least two thirds in dollar amount of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan; and (2) the Holders of more than one half in number of the Allowed Claims actually voting in each Class for each Debtor, as applicable, have voted to accept the Plan.

| CLASS | CLAIM / INTEREST | STATUS UNDER PLAN | VOTING RIGHTS |
|-------|------------------|-------------------|---------------|
| D | Prepetition Credit Agreement Claims | Impaired | Entitled to Vote |
| E | Secured First Lien Notes Claims | Impaired | Entitled to Vote |
| F | First Lien Notes Deficiency Claims | Impaired | Entitled to Vote |
| G | Second Lien Notes Claims | Impaired | Entitled to Vote |
| H | Senior Unsecured Notes Claims | Impaired | Entitled to Vote |
| I | Subsidiary-Guaranteed Notes Claims | Impaired | Entitled to Vote |
| J | General Unsecured Claims | Impaired | Entitled to Vote |
| K | Non-Obligor Unsecured Claims | Impaired | Entitled to Vote |
| [P] | [Des Plaines Interests] | [TO COME] | [Entitled to Vote] |

**Classes Not Entitled to Vote.** Under the Bankruptcy Code, Holders of Claims or Interests are not entitled to vote if such Claims or Interests are Unimpaired under the Plan or if they will receive no distribution of property under the Plan. Based on this standard, the following Classes of Claims and Interest for each Debtor, as applicable, will not be entitled to vote on the Plan and the Holders of such Claims will **not** be solicited to vote on the Plan.

| CLASS | CLAIM / INTEREST | STATUS UNDER PLAN | VOTING RIGHTS |
|-------|------------------|-------------------|---------------|
| A | Secured Tax Claims | Unimpaired | Presumed to Accept |
| B | Other Secured Claims | Unimpaired | Presumed to Accept |
| C | Other Priority Claims | Unimpaired | Presumed to Accept |
| L | Section 510(b) Claims | Impaired | Deemed to Reject |
| M | Intercompany Claims | Unimpaired | Presumed to Accept |
| N | Intercompany Interests | Unimpaired | Presumed to Accept |
| O | CEOC Interests | Impaired | Deemed to Reject |

Additionally, the Disclosure Statement Order provides that certain Holders of Claims in the Voting Classes, such as those Holders whose Claims have been disallowed or are subject to a pending objection, are not entitled to vote to accept or reject the Plan.

### C.    Voting Procedures

**The Voting Record Date is [_____].** The Disclosure Statement Order established Voting Record Date for purposes of determining, among other things, which Holders of Claims and Interests are eligible to vote on the Plan

74

and whether Claims or Interests have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee can vote as the Holder of a Claim or Interest.

**The Voting Deadline is [_____], at 5:00 p.m. (prevailing Central Time).** The Disclosure Statement Order also established the Voting Deadline as the deadline for submitting Ballots and Master Ballots, as applicable. To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots, as applicable, must be properly executed, completed, and delivered by using the return envelope provided or by delivery by (a) first class mail, (b) overnight courier, or (c) personal delivery, so that such Ballots or Master Ballots, as applicable, are **actually** **received** no later than the Voting Deadline by the Notice and Claims Agent. The Ballots and Master Ballots will clearly indicate the appropriate return address (or, in the case of the beneficial holders of the Debtors' [_____] Claims (the "Beneficial Holders") who hold their position through a nominee (the "Nominee"), such Beneficial Holders will be instructed to comply with the return instructions provided by the Nominee). It is important to follow the specific instructions provided on each Ballot or Master Ballot. Ballots and Master Ballots should be sent to the Notice and Claims Agent on or before the Voting Deadline as indicated in the chart below:

<table>
<tr><td>

**DELIVERY OF BALLOTS AND MASTER BALLOTS**

**Caesars Entertainment Operating Company, Inc. Ballot Processing**
**c/o Prime Clerk LLC**
**830 3rd Avenue, 9th Floor**
**New York, NY 10022**

If you received an envelope addressed to your nominee, please allow enough time when you return your Ballot or Master Ballot, as applicable, for your nominee to cast your vote on a Ballot or Master Ballot before the Voting Deadline.

</td></tr>
</table>

    **D.**      **Ballots and Master Ballots Not Counted**

**Except as otherwise provided by the Disclosure Statement Order, no Ballot or Master Ballot will be counted toward Confirmation if, among other things:** (i) it is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (ii) it was transmitted by facsimile, email or other electronic means; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Schedules as contingent, unliquidated or disputed for which the applicable bar date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to the Debtors, the Debtors' agents/representatives (other than the Voting and Claims Agent), an indenture trustee or the Debtors' financial or legal advisors instead of the Voting and Claims Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan. **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan.**

<table>
<tr><td>

**IF YOU HAVE ANY QUESTIONS ABOUT THE SOLICITATION OR VOTING PROCESS,
PLEASE CONTACT THE NOTICE AND CLAIMS AGENT TOLL-FREE AT (855) 842-4123.
ANY BALLOT OR MASTER BALLOT RECEIVED AFTER THE VOTING DEADLINE OR
OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION ORDER WILL NOT BE COUNTED.**

</td></tr>
</table>

<div align="center">

**ARTICLE X.**
**CASH ELECTION, EQUITY RIGHTS, AND**
**PROPCO PREFERRED EQUITY CALL AND PUT RIGHT PROCEDURES**

</div>

    **A.**      **Procedures Implementing the Cash Elections**

    **1.**      **The OpCo Common Stock Cash Election**

Pursuant to the Restructuring Term Sheet, each Holder of Secured First Lien Notes Claims party to the Restructuring Support Agreement was required to elect whether or not to exercise their OpCo Common Stock Cash Election at the time such Holder executed the Restructuring Support Agreement. Any other Holder of a Secured

KE 34442788

First Lien Notes Claim as of the Voting Record Date (each, a "Non-RSA Holder of Secured First Lien Notes Claims") must elect whether to exercise their OpCo Common Stock Cash Election in connection with Solicitation. The Debtors intend to provide, in addition to the Solicitation Package materials provided to each Non-RSA Holder of Secured First Lien Notes Claims, an election form (the "OpCo Common Stock Cash Election Form").  Pursuant to the Disclosure Statement Order, in order for a Non-RSA Holder of Secured First Lien Notes Claims to exercise its OpCo Common Stock Cash Election, its OpCo Common Stock Cash Election Form must be properly executed, completed, and delivered by using the return envelope provided or by delivery by (a) first class mail, (b) overnight courier, or (c) personal delivery, so that such OpCo Common Stock Cash Election Form is **actually** **received** no later than the Voting Deadline by the Notice and Claims Agent.  The OpCo Common Stock Cash Election Form will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each OpCo Common Stock Cash Election Form.  OpCo Common Stock Cash Election Forms should be sent to the Notice and Claims Agent on or before the Voting Deadline as indicated in the chart below:

---

**DELIVERY OF OPCO COMMON STOCK CASH ELECTION FORMS**

**Caesars Entertainment Operating Company, Inc. Ballot Processing**
**c/o Prime Clerk LLC**
**830 3rd Avenue, 9th Floor**
**New York, NY 10022**

[Note regarding Nominee / Master Forms to be added if necessary]

---

2.      **The PropCo Common Equity Cash Election**

Pursuant to the Disclosure Statement Order, each Holder of Secured First Lien Notes Claims as of the Voting Record Date must elect whether to exercise their PropCo Common Equity Cash Election in connection with Solicitation.  The Debtors intend to provide, in addition to the Solicitation Package materials provided to each Holder of Secured First lien Notes Claims, an election form (the "PropCo Common Equity Election Form").  Pursuant to the Disclosure Statement Order, in order for a Holder of Secured First Lien Notes Claims to exercise its PropCo Common Equity Cash Election, its PropCo Common Equity Cash Election Form must be properly executed, completed, and delivered by using the return envelope provided or by delivery by (a) first class mail, (b) overnight courier, or (c) personal delivery, so that such PropCo Common Equity Cash Election Form is **actually** **received** no later than the Voting Deadline by the Notice and Claims Agent.  The PropCo Common Stock Cash Election Form will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each PropCo Common Stock Cash Election Form.  PropCo Common Stock Cash Election Forms should be sent to the Notice and Claims Agent on or before the Voting Deadline as indicated in the chart below:

---

**DELIVERY OF PROPCO COMMON EQUITY CASH ELECTION FORMS**

**Caesars Entertainment Operating Company, Inc. Ballot Processing**
**c/o Prime Clerk LLC**
**830 3rd Avenue, 9th Floor**
**New York, NY 10022**

[Note regarding Nominee / Master Forms to be added if necessary]

---

If Holders of Allowed Secured First Lien Notes Claims exercise PropCo Common Equity Cash Elections with respect to more than 14.8 percent in the aggregate of PropCo Common Equity, the amount of PropCo Common Equity subject to each such Holder's PropCo Common Equity Cash Elections will be reduced Pro Rata so that only 14.8 percent in the aggregate of PropCo Common Equity will be subject to PropCo Common Equity Cash Elections.

If the Debtors elect the Spin Structure as anticipated and elect to make distributions of the PropCo Common Equity subject to the PropCo Common Equity Cash Elections (if any) directly to the Holders of Allowed Secured First Lien Notes Claims, then CEC and the PropCo Common Equity Commitment Parties will, immediately following the Effective Date, purchase for Cash the PropCo Common Equity subject to PropCo Common Equity Cash Elections directly from such electing Holders of Secured First Lien Notes Claims.

KE 34442788

If the Partnership Contribution Structure is used, Holders of Allowed Secured First Lien Notes Claims must exercise PropCo Common Equity Cash Elections with respect to at least 5 percent in the aggregate of PropCo Common Equity (on a fully diluted basis), and this 5 percent of PropCo Common Equity will be issued in the form of PropCo LP Interests and will be purchased solely by CEC pursuant to the CEC PropCo Common Equity Cash Commitment.  Immediately following the Effective Date, this 5 percent of PropCo Common Equity will be deemed as OpCo's on account of its contribution of real estate into PropCo.  If Holders of Allowed Secured First Lien Notes Claims exercise PropCo Common Equity Cash Elections with respect to less than 5 percent in the aggregate of PropCo Common Equity, then each Holder of Allowed Secured First Lien Notes Claims not subject to an exercised PropCo Common Equity Cash Election will be deemed to have exercised a PropCo Common Equity Cash Election with respect to such Holder's Pro Rata portion of Allowed Secured First Lien Notes Claims not subject to an exercised PropCo Common Equity Cash Election necessary to increase the aggregate amount of PropCo Common Equity subject to a PropCo Common Equity Cash Election to 5 percent (on a fully diluted basis).

Other than with respect to the 5 percent of PropCo Common Equity (on a fully diluted basis) that shall be deemed OpCo's if the Partnership Contribution Structure is used (as discussed in the paragraph above), all other PropCo Common Equity that would otherwise be distributed to Holders of Secured First Lien Notes Claims pursuant to the Plan or that would otherwise be distributed to CEC or the PropCo Common Equity Commitment Parties will be subject to reduction:  (a) first, from First Lien Noteholders that elect to exercise their PropCo Common Equity Cash Election, (b) second from CEC, (c) third from First Lien Noteholders that do not elect to exercise their PropCo Common Equity Cash Election, and (d) fourth from PropCo Common Equity Commitment Parties, in each case on a Pro Rata basis within the applicable category based on the amount, if any, of Equity Rights exercised.  The Cash proceeds of such Equity Rights will be distributed to the Holders or CEC that, absent the exercise of the Equity Rights, would have received the PropCo Common Equity subject to the Equity Rights.

### B.       Procedures Implementing the Equity Rights

Under the Plan, if each of the Classes of Non-First Lien Claims (Classes G–J) vote to accept the Plan then Holders of Non-First Lien Claims that, within 60 days of the Petition Date both (a) executed the Restructuring Support Agreement and (b) agreed to elect, when properly solicited to vote on the Plan, to exercise such Holder's Equity Rights (if any) (the "Eligible Equity Rights Holders") will receive, subject to the terms and conditions of the Plan and Disclosure Statement Order, the right to exercise the Equity Rights.  The Debtors intend to provide, in addition to the Solicitation Package materials provided to each Eligible Equity Rights Holder, an election form (the "Equity Rights Election Form").  Pursuant to the Disclosure Statement Order, in order for an Eligible Equity Rights Holder to exercise such Holder's Equity Rights, its Equity Rights Election Form must be properly executed, completed, and delivered by using the return envelope provided or by delivery by (a) first class mail, (b) overnight courier, or (c) personal delivery, so that such PropCo Common Equity Cash Election Form is **actually** **received** no later than the Voting Deadline by the Notice and Claims Agent.  Further, an Eligible Equity Rights Holder may only exercise its Equity Rights if such Holder is an Institutional Accredited Investor or Qualified Institutional Buyer, and such Holder properly indicates as such by checking the appropriate box on the Equity Rights Election Form.  Any Eligible Equity Rights Holder that fails to check the box indicating that such Holder is an Institutional Accredited Investor or Qualified Institutional Buyer shall be deemed to have waived such Holder's right to exercise the Equity Rights, and will instead receive [____] under the Plan.  The Equity Rights Election Form will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each Equity Rights Election Form.  Equity Rights Election Forms should be sent to the Notice and Claims Agent on or before the Voting Deadline as indicated in the chart below:

| DELIVERY OF EQUITY RIGHTS ELECTION FORMS |
|---|
| **Caesars Entertainment Operating Company, Inc. Ballot Processing**<br>**c/o Prime Clerk LLC**<br>**830 3rd Avenue, 9th Floor**<br>**New York, NY 10022** |
| [Note regarding Nominee / Master Forms to be added if necessary] |

KE 34442788

Each Eligible Equity Rights Holder that properly executes, completes, and delivers the Equity Rights Election Form and that elects to exercise such Holders' Equity Rights shall, subject to the terms and conditions of the Plan, be entitled to purchase the amount of the PropCo Common Equity indicated on such Holder's Equity Rights Election Form, which amount shall not exceed 69.9 percent of the PropCo Common Equity (subject to reduction on a Pro Rata basis based on the amount of Equity Rights actually exercised).[34]  By the Voting Deadline, each Eligible Equity Rights Holder that elects to exercise such Holders' Equity Rights will be required to fund into escrow with the [Notice and Claims Agent], the aggregate purchase price for the amount of PropCo Common Equity indicated on such Holder's Equity Rights Election Form.  On the Confirmation date or as soon as reasonably practicable thereafter, a portion of the funds placed into escrow shall be returned, if necessary, to reflect any reductions to the amounts listed on the Equity Rights Election Forms due to the amount of Equity Rights actually exercised.

If an Eligible Equity Rights Holder properly exercises such Holders' Equity Rights, then for each $1.00 of PropCo Common Equity purchased such Holder will also be required to purchase $0.25 in face value of CPLV Mezzanine Debt from Holders of Secured First Lien Notes Claims, which CPLV Mezzanine Debt would be equitized as PropCo Common Equity, at a rate of $1 in face amount of CPLV Mezzanine Debt to $1 of PropCo Common Equity at the PropCo Common Equity Implied Value.

Any purchase of PropCo Common Equity pursuant to the exercise of the Equity Rights must (1) first be from, on a Pro Rata basis, Holders of Secured First Lien Notes Claims electing to exercise their PropCo Common Equity Cash Election, or from the PropCo Common equity that such Holders would otherwise receive; (2) second be from the PropCo Common Equity that otherwise would be purchased by CEC pursuant to the CEC PropCo Common Equity Purchase Commitment (either by a reduction in the CEC PropCo Common Equity PropCo Commitment or, in the case of the Spin Structure, by a purchase of such PropCo Common Equity from CEC); (3) third be from, on a Pro Rata basis, the PropCo Common Equity that otherwise would be received by Holders of Secured First Lien Notes Claims not electing to exercise their PropCo Common Equity Cash Election, in which case such Holders of Allowed Secured First Lien Notes Claims shall receive Cash in lieu of such PropCo Common Equity (or in the case of the Spin Structure, such parties shall sell such PropCo Common Equity directly to the Holders exercising the Equity Rights); and (4) fourth be from, on a Pro Rata basis, the PropCo Common Equity that otherwise would be purchased by the PropCo Common Equity Commitment Parties or, in the case of the Spin Structure, such PropCo Common Equity shall be purchased from the PropCo Common Equity Commitment Parties.

## C.    Procedures Implementing the PropCo Preferred Equity Call and Put Rights

Pursuant to the Plan and the Backstop Commitment Agreement, the PropCo Preferred Backstop Investors shall have, pursuant to their PropCo Preferred Equity Call Rights, the right to call, on the Effective Date, up to 50 percent of the PropCo Preferred Equity that would otherwise be received by the Holders of Allowed Secured First Lien Notes Claims.  The PropCo Preferred Backstop Investors' purchase or PropCo Preferred Equity pursuant to the PropCo Preferred Equity Call Rights will be for Cash and will be consistent with the terms of the Backstop Commitment Agreement.

Additionally, each Holder of Secured First Lien Notes Claims as of the Voting Record Date must elect, subject to the terms and conditions of the Plan and Disclosure Statement Order, whether to exercise their PropCo Preferred Equity Put Rights.  The Debtors intend to provide, in addition to the Solicitation Package materials provided to each Holder of Secured First Lien Notes Claims, an election form (the "PropCo Preferred Equity Put Right Form").  Pursuant to the Disclosure Statement Order, in order for a Holder of Secured First Lien Notes Claims to exercise such Holder's PropCo Preferred Equity Put Right, its PropCo Preferred Equity Put Right Form must be properly executed, completed, and delivered by using the return envelope provided or by delivery by (a) first class mail, (b) overnight courier, or (c) personal delivery, so that such PropCo Preferred Equity Put Right Form is **actually received** no later than the Voting Deadline by the Notice and Claims Agent.  The PropCo Preferred Equity Put Right Form will clearly indicate the appropriate return address.  It is important to follow the specific instructions

---

[34]    For the avoidance of doubt, and as discussed in greater detail above, if the Partnership Contribution Structure is used, 5 percent of the PropCo Common Equity shall not subject to the Equity Rights, thereby capping the amount of PropCo Common Equity that Eligible Equity Rights Holders can purchase at 64.9 percent of the PropCo Common Equity.

provided on each PropCo Preferred Equity Put Right Form.  PropCo Preferred Equity Put Right Forms should be sent to the Notice and Claims Agent on or before the Voting Deadline as indicated in the chart below:

---

**DELIVERY OF PROPCO PREFERRED
EQUITY PUT RIGHT FORMS**

**Caesars Entertainment Operating Company, Inc. Ballot Processing
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, NY 10022**
[Note regarding Nominee / Master Forms to be added if necessary]

---

Any Holder of Secured First Lien Notes Claims that properly elects to exercise such Holder's PropCo Preferred Equity Put Right will be deemed to have put to the PropCo Preferred Backstop Investors such Holder's Pro Rata share of any PropCo Preferred Equity that will be issued on the Effective Date pursuant to the terms of the Plan and PropCo Limited Partnership Agreement and that is remaining after the exercise of any PropCo Preferred Equity Call Rights

All proceeds from the issuance of the PropCo Preferred Equity shall be used (1) first to reduce the principal amount of CPLV Mezzanine Debt (if any) to be issued to Holders of Secured First Lien Notes Claims, (2) second to reduce the principal amount of CPLV Market Debt to be financed by third-party investors, and (3) third to reduce the principal amount of PropCo Second Lien Notes to be issued to Holders of Secured First Lien Notes Claims.

**D.      Procedures Implementing the PropCo Common Equity Purchase Commitment**

Pursuant to the Plan, each Holder of Secured First Lien Notes Claims as of the Voting Record Date must elect, subject to the terms and conditions of the Plan and Disclosure Statement Order, whether to become a backstop party under the PropCo Common Equity Purchase Commitment Agreement.  The Debtors intend to provide, in addition to the Solicitation Package materials provided to each Holder of Secured First Lien Notes Claims, a PropCo Purchase Commitment Election Form.  Pursuant to the Disclosure Statement Order, in order for a Holder of Secured First Lien Notes Claims to commit to become a backstop party under the PropCo Common Equity Purchase Commitment Agreement, its PropCo Purchase Commitment Election Form must be properly executed, completed, and delivered by using the return envelope provided or by delivery by (a) first class mail, (b) overnight courier, or (c) personal delivery, so that such PropCo Purchase Commitment Election Form is **actually received** no later than the Voting Deadline by the Notice and Claims Agent.  Further, a Holder of Secured First Lien Notes Claims may only commit to become a backstop party under the PropCo Common Equity Purchase Commitment Agreement if such Holder is an Institutional Accredited Investor or Qualified Institutional Buyer, and such Holder properly indicates as such by checking the appropriate box on the PropCo Purchase Commitment Election Form. Any Holder of Secured First Lien Notes Claims that fails to check the box indicating that such Holder is an Institutional Accredited Investor or Qualified Institutional Buyer shall be deemed to have waived such Holder's right to commit to become a backstop party under the PropCo Common Equity Purchase Commitment Agreement.  The PropCo Purchase Commitment Election Form will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each PropCo Purchase Commitment Election Form.    PropCo Purchase Commitment Election Forms should be sent to the Notice and Claims Agent on or before the Voting Deadline as indicated in the chart below:

---

**DELIVERY OF PROPCO PURCHASE
COMMITMENT ELECTION FORMS**

**Caesars Entertainment Operating Company, Inc. Ballot Processing
c/o Prime Clerk LLC
830 3rd Avenue, 9th Floor
New York, NY 10022**
[Note regarding Nominee / Master Forms to be added if necessary]

---

79

Any Holder of Secured First Lien Notes Claims that properly commits to become a backstop party under the PropCo Common Equity Purchase Commitment Agreement will then be committed, in accordance with the terms of the PropCo Common Equity Purchase Commitment Agreement, to fund Cash distributions, if any, to Holders of Allowed Secured First Lien Notes Claims that elect, pursuant to the PropCo Common Equity Cash Election to receive Cash instead of PropCo Common Equity.  In exchange, the PropCo Common Equity that would otherwise have been distributed to the Holders making a PropCo Common Equity Cash Election will be distributed to CEC and the PropCo Common Equity Commitment Parties in accordance with the terms of the PropCo Common Equity Purchase Commitment Agreement.  Alternatively, in the event that the Debtors elect the Spin Structure and elect to make distributions of PropCo Common Equity directly to the Holders of Allowed Secured First Lien Notes Claims, then CEC and the PropCo Common Equity Commitment Parties may purchase for Cash such PropCo Common Equity from the Holders of such Secured First Lien Notes Claims.

## ARTICLE XI.
## CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are: (i) the Plan is accepted by all Impaired Classes of Claims, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the Class; (ii) the Plan is feasible; and (iii) the Plan is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court find as a condition to confirmation, that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in the class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that the holder would receive or retain if the debtors liquidated under chapter 7.

Attached hereto as **Exhibit F** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtors with the assistance of Perella Weinberg Partners, the Debtors' investment banker and financial advisor.  As reflected in the Liquidation Analysis, the Debtors believe that liquidation under chapter 7 of the Debtors' businesses would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan. Consequently, the Debtors and their management believe that Confirmation of the Plan will provide a substantially greater return to Holders of Claims than would a liquidation under chapter 7 of the Bankruptcy Code.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in the plan of reorganization).

To determine whether the Plan meets this feasibility requirement, the Debtors have analyzed their ability to meet their respective obligations under the Plan.

Pursuant to the Plan, the Debtors' operating businesses and Assumed Liabilities will be transferred to the Purchaser in exchange for the Sale Proceeds, which shall be used, along with the other sources of funding for the Plan, to fund the orderly wind down of the Debtors' estates.  As such, the Debtors believe that the confirmation of the Plan is not likely to be followed by a further financial reorganization and, therefore, is feasible.

### D.        Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan.  A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[35]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by Holders of at least two-thirds in a dollar amount and more than one-half in a number of allowed claims in that class, counting only those claims that have **_actually_** voted to accept or to reject the plan.  Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually cast their ballots in favor of acceptance.

### E.        Confirmation without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted it; provided, however, that the plan has been accepted by at least one impaired class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as a "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, the Debtors reserve the right to seek to confirm the Plan utilizing the "cramdown" provision of section 1129(b) of the Bankruptcy Code.  To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.

#### 1.        No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan.  The test does not require that the treatment be the same or equivalent, but that treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (_e.g._, classes of the same legal character).  Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly.  A plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

#### 2.        Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (_e.g._, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in the class.  As to the dissenting class, the test sets different standards depending upon the type of claims or equity interests in the class.

The Debtors submit that if the Debtors "cramdown" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly" and satisfies the "fair and equitable" requirement.  With respect to the unfair discrimination requirement, all Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.  The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual Confirmation of the Plan.

---

[35]   A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

## ARTICLE XII.
## CERTAIN SECURITIES LAW MATTERS

The Debtors will issue New Interests and New Debt to certain Holders of Allowed Claims in accordance with the terms of the Plan.  The Debtors believe such New Interests and New Debt to be "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code and any applicable state securities laws.

### A.      Issuance of Securities under the Plan

Pursuant to the Plan:

- Holders of Prepetition Credit Agreement Claims will receive OpCo Second Lien Notes and, in the event of a CPLV Mezzanine Debt Conversion, such Holders may receive additional OpCo Second Lien Notes or PropCo Second Lien Notes or PropCo Common Equity;

- Holders of Secured First Lien Notes Claims will receive OpCo First Lien Notes, OpCo Second Lien Notes, PropCo First Lien Notes, PropCo Second Lien Notes, OpCo Common Stock (subject to an OpCo Common Stock Cash Election), PropCo Common Equity and the PropCo Preferred Equity;

- (1) if Holders of Claims in all classes of Non-First Lien Claims and First Lien Notes Deficiency Claims vote to accept the Plan, then Holders of Allowed Non-First Lien Claims will receive PropCo Common Equity, and the right to exercise the Equity Rights to the extent such Holder can make certain investment representations required for federal and state securities law purposes and certain other conditions, or (2) if Holders of Claims in any class of Non-First Lien Claims and First Lien Notes Deficiency Claims vote to reject the Plan, PropCo Common Equity;

- CEC will receive OpCo Common Stock in connection with its CEC OpCo Cash Commitment and PropCo Common Equity in connection with its CEC PropCo Common Equity Cash Commitment;

- PropCo Common Equity Commitment Parties will receive PropCo Common Equity pursuant to the PropCo Common Equity Purchase Commitment Agreement;

- PropCo Preferred Backstop Investors will receive PropCo Preferred Equity pursuant to the Backstop Commitment Agreement; and

- OpCo may receive PropCo Common Equity in the event of the Partnership Contribution Structure.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under Section 5 of the Securities Act and state laws when such securities are to be exchanged for claims or principally in exchange for claims and partly for cash. In general, securities issued under section 1145 of the Bankruptcy Code may be resold without registration unless the recipient is an "underwriter" with respect to those securities.

In reliance upon this exemption, the Debtors believe that the offer and sale, under the Plan:

- of the OpCo Second Lien Notes and, in the event of a CPLV Mezzanine Debt Conversion, additional OpCo Second Lien Notes or PropCo Second Lien Notes or PropCo Common Equity, to the Holders of Prepetition Credit Agreement Claims;

- of the OpCo First Lien Notes, OpCo Second Lien Notes, PropCo First Lien Notes, PropCo Second Lien Notes, OpCo Common Stock, PropCo Common Equity, and PropCo Preferred Equity to the Holders of Secured First Lien Notes Claims; and

- of the PropCo Common Equity to the Holders of Allowed Non-First Lien Claims,

82

will be exempt from registration under the Securities Act and state securities laws with respect to any such Holder who is not deemed to be an "underwriter" as defined in Section 1145(b) of the Bankruptcy Code.

Each of the (i) OpCo Common Stock and PropCo Common Equity issued pursuant to the CEC OpCo Cash Commitment and the CEC PropCo Common Equity Cash Commitment, respectively; (ii) PropCo Common Equity issued to any PropCo Common Equity Commitment Party pursuant to the PropCo Common Equity Purchase Commitment Agreement; (iii) PropCo Common Equity issued to Holders of Non-First Lien Claims upon exercise of an Equity Right; and (iv) PropCo Common Equity issued to OpCo will be issued without registration in reliance upon the exemption set forth in Section 4(a)(2) of the Securities Act and will be "restricted securities." Any PropCo Preferred Backstop Investor who receives PropCo Preferred Equity from Holders of Secured First Lien Notes Claims in connection with any PropCo Preferred Equity Put Right or any PropCo Preferred Equity Call Right may be deemed an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code with respect to such PropCo Preferred Equity.

## B.     Subsequent Transfers of Securities Issued under the Plan

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who:

- purchases a claim against, an interest in, or a claim for an administrative expense against the debtor, if that purchase is with a view to distributing any security received in exchange for such a claim or interest;

- offers to sell securities offered under a plan of reorganization for the holders of those securities;

- offers to buy those securities from the holders of the securities, if the offer to buy is (i) with a view to distributing those securities; and (ii) under an agreement made in connection with the plan of reorganization, the completion of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization; or

- is an issuer with respect to the securities, as the term "issuer" is defined in Section 2(a)(11) of the Securities Act.

**You should confer with your own legal advisors to help determine whether or not you are an "underwriter."**

To the extent that persons who receive the securities issued under the Plan that are exempt from registration under the Securities Act or other applicable law by Section 1145 of the Bankruptcy Code are deemed to be "underwriters," resales by those persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Securities issued under the Plan that are "restricted securities" may only be sold pursuant to a registration statement or pursuant to exemption therefrom, such as the exemption provided by Rule 144 under the Securities Act.

Persons (i) who receive securities that are exempt under Section 1145 of the Bankruptcy Code but who are deemed "underwriters" or (ii) who receive securities issued under the Plan that are "restricted securities" would, however, be permitted to sell such securities without registration if an available resale exemption exists, including the exemptions provided by Rule 144 or Rule 144A under the Securities Act.

**PERSONS WHO RECEIVE SECURITIES UNDER THE PLAN ARE URGED TO CONSULT THEIR OWN LEGAL ADVISOR WITH RESPECT TO THE RESTRICTIONS APPLICABLE UNDER THE FEDERAL OR STATE SECURITIES LAWS AND THE CIRCUMSTANCES UNDER WHICH SECURITIES MAY BE SOLD IN RELIANCE ON SUCH LAWS.**

**THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES. WE MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES OR THE BANKRUPTCY MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT. IN LIGHT OF THE UNCERTAINTY CONCERNING THE**

AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, WE ENCOURAGE EACH HOLDER AND PARTY-IN-INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS. BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A SECURITY IS EXEMPT FROM THE REGISTRATION REQUIREMENTS UNDER THE FEDERAL OR STATE SECURITIES LAWS OR WHETHER A PARTICULAR HOLDER MAY BE AN UNDERWRITER, WE MAKE NO REPRESENTATION CONCERNING THE ABILITY OF A PERSON TO DISPOSE OF THE SECURITIES ISSUED UNDER THE PLAN.

## ARTICLE XIII.
## CERTAIN UNITED STATES
## INCOME TAX CONSEQUENCES OF THE PLAN

### A.     Introduction

The following discussion is a summary of certain federal income tax consequences of the consummation of the Plan to the Debtors and to certain Holders of Claims.  The following summary does not address the federal income tax consequences to Holders of Claims not entitled to vote to accept or reject the Plan.  This summary is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the IRS and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

As discussed in greater detail herein, pursuant to the Plan, the Debtors will be restructured as a separate operating company (OpCo) and property company (PropCo).  PropCo will be majority owned by a newly-formed real estate investment trust ("REIT" or "REITCo," as the context requires).  The separation of the Debtors into OpCo, PropCo, and the REIT (the "Separation Structure") may be accomplished *either* through (1) a spin-off of the REIT in a transaction intended to generally constitute a tax-free reorganization under section 368(a)(1)(G) of the IRC (the "Spin Structure") or (2) a contribution of assets to a partnership intended to generally qualify as a tax-free contribution under section 721 of the IRC (the "Partnership Contribution Structure").

Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors intend to seek rulings from the IRS with respect to certain, but not all, of the federal income tax consequences of the Spin Structure (the "Spin Ruling") to the Debtors and certain Holders of Claims and with respect to qualification of the REIT as a REIT for federal income tax purposes.  Additionally, the Debtors may obtain one or more legal opinions with respect to the federal income tax consequences of the Spin Structure (the "Spin Opinion") or the Partnership Contribution Structure (the "Partnership Opinion," and together with the Spin Opinion, the "Tax Opinion").  The Debtors also plan to obtain a tax opinion that the REIT's proposed method of operation will enable the REIT to meet the requirements for qualification and taxation as a real estate investment trust under the IRC.

***The following summary assumes that the intended tax treatment of the Separation Structure is respected by the IRS (or, if not by the IRS, by the courts).***  Although the Spin Ruling, if obtained, will bind the IRS with respect to the rulings therein to the extent the representations therein are true, the IRS could attempt to assert that matters not ruled upon, or false representations, cause the Spin Structure to be a taxable transaction.  Moreover, this summary and the Tax Opinion (if any) are not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances.  This discussion does not address tax issues with respect to such Holders subject to special treatment under the federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, Persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, and regulated investment companies and those holding, or who will hold, Claims as part of a hedge, straddle,

conversion, or other integrated transaction). No aspect of state, local, estate, gift, or non-U.S. taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds a Claim as a "capital asset" (within the meaning of section 1221 of the IRC). This summary also assumes that the various debt and other arrangements to which the Debtors and Reorganized Debtors are a party will be respected for federal income tax purposes in accordance with their form.

For purposes of this discussion, a "U.S. Holder" is a holder that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any holder that is not a U.S. Holder other than any partnership (or other entity treated as a partnership or disregarded entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other owner) generally will depend upon the status of the partner (or other owner) and the activities of the entity. Partners (or other owners) of partnerships or disregarded entities that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain Federal Income Tax Consequences of the Plan to the Debtors**

**1.      The Debtors' Tax Attributes and Cancellation of Indebtedness Income**

For federal income tax purposes, the Debtors (and certain non-Debtor affiliates) are (a) members of an affiliated group of corporations (or entities disregarded for federal income tax purposes that are wholly owned by members of such group), of which non-Debtor CEC is the common parent (the "CEC Group"), and (b) partnerships. Each of the Debtors is directly or indirectly wholly-owned by Debtor CEOC, with the exception of a small number of partnerships with unaffiliated third-party investors.

As of December 31, 2014, the CEC Group estimates that it has net operating loss ("NOL") carryforwards of approximately $4.1 billion; approximately $3.9 billion of which amount is attributable to CEOC and CEOC's subsidiaries. CEOC and CEOC's subsidiaries are projected to generate additional NOLs before the Effective Date. The CEC Group also has approximately $4.3 billion of deferred cancellation of indebtedness income net of deferred OID deductions (approximately $3.6 billion of which is attributable to CEOC and CEOC's subsidiaries) that the CEC Group expects will be accelerated in connection with the Restructuring (either pursuant to the Plan or at an earlier time).

In general, absent an exception, a taxpayer will realize and recognize cancellation of indebtedness income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. Under Section 108 of the IRC, a taxpayer is not required to include COD Income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that case (the "Bankruptcy Exception"). Instead, as a consequence of such exclusion, a taxpayer-debtor must reduce its tax attributes by the amount of COD Income that it excluded from gross income. In general, tax attributes will be reduced in the following order: (a) NOLs; (b) most tax credits; (c) capital loss carryovers; (d) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject (the "Liability Floor Rule")); (e) passive activity loss and credit carryovers; and (f) foreign tax credits.

Alternatively, the taxpayer can elect first to reduce the basis of its depreciable assets pursuant to Section 108(b)(5) of the IRC.

The amount of COD Income, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness of the taxpayer issued and (iii) the fair market value of any other consideration. Because the Plan provides that Holders of certain Allowed Claims will receive their pro rata share of cash, new indebtedness issued by OpCo, PropCo, and CPLV Sub (which will be a wholly-owned subsidiary of PropCo that is disregarded for federal income tax purposes), REIT Common Stock, PropCo LP Interests, OpCo New Common Stock, PropCo Preferred Equity, and the Equity Rights, the amount of COD Income will depend on, among other things, the adjusted issue price of the new indebtedness, the final amount of cash distributed to Holders of Claims, and the fair market value of the new equity distributed to Holders of Claims. Certain of these figures cannot be known with certainty until after the Effective Date. Accordingly, the amount of COD Income the Debtors may incur is uncertain. However, it is expected that the amount of COD Income arising to CEOC from the Consummation of the Plan will be significant.

The Debtors expect that the amount of COD Income, together with the anticipated acceleration of Deferred CODI, will result in the use and/or elimination of substantially all of the Debtors' NOL carryforwards. Because the Plan is expected to result in the elimination of the Debtors' NOLs, section 382 of the IRC's limitation on the use of NOLs where a corporation undergoes an "ownership change" is expected to have no material effect. However, as a result of the Liability Floor Rule, the Debtors do not expect to be required to significantly reduce their tax basis in assets.

### C.    Certain Federal Income Tax Consequences of the Plan to U.S. Holders of Allowed Claims and Interests

As discussed below, the tax consequences of the Plan to Holders of Allowed Claims will depend upon a variety of factors. As an initial matter, whether the exchange is fully or partially taxable will depend on whether the debt instruments being surrendered constitute "securities" and whether the debt instruments received constitute stock or "securities" of CEOC or the REIT. Whether a Claim that is surrendered and debt instruments received pursuant to the Plan constitute "securities" is determined based on all the facts and circumstances. Most authorities have held that the length of the term of a debt instrument at initial issuance is an important factor in determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof with respect to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest in the obligor, whether payments of interest are fixed, variable, or contingent, and whether such payments are made on a current basis or accrued.

The character of any recognized gain as capital gain or ordinary income will be determined by a number of factors, including the tax status of the Holder, the nature of the Claim in such Holder's hands (including whether the Claim constitutes a capital asset), whether the Claim was purchased at a discount, whether and to what extent the U.S. Holder has previously claimed a bad debt deduction with respect to its Claim, and whether any part of the Holder's recovery is treated as being on account of accrued but unpaid interest. Accrued interest and market discount are discussed below.

Additionally, the tax consequences to U.S. Holders of Claims may vary depending on whether the Spin Structure or the Partnership Contribution Structure is utilized. In particular, in the Partnership Contribution Structure, the only consideration received under the Plan that may be treated as a "security" for purposes of section 354 and 356 of the IRC is (1) debt issued by OpCo to discharge Claims against CEOC that are not assumed by PropCo and (2) OpCo Common Stock. By contrast, in the Spin Structure, debt issued by PropCo, the PropCo Common Equity, the Mezzanine CPLV Debt, the option to purchase PropCo Preferred Equity, and the option to be a Rights Participant may constitute securities of the REIT for purposes of sections 355 and 356 of the IRC. This is because at the time the Claims against CEOC are discharged, PropCo may be disregarded as an entity separate from the REIT for federal income tax purposes. Importantly, however, although these sources of consideration may be treated as "securities," they may also not be treated as "securities." These considerations are discussed on a Class-by-Class basis below.

1.        **Consequences to U.S. Holders of Prepetition Credit Agreement Claims**

Pursuant to the Plan, in full satisfaction and discharge of their Claims, the Holders of Allowed Class D Claims will exchange such Claims for their pro rata share of (a) Cash; (b) the OpCo First Lien Term Loans; (c) the OpCo Second Lien Notes; (d) the PropCo First Lien Term Loans; and (e) under certain circumstances, the CPLV Mezzanine Debt, PropCo Second Lien Notes, or PropCo Common Equity.

a.        **Spin Structure**

i.        *Treatment if Prepetition Credit Agreement Claims Are "Securities"*

If a Prepetition Credit Agreement Claim is determined to be a "security," and at least some of the consideration received is also determined to be a "security" of CEOC or the REIT (or Class D elects as a Class to receive PropCo Common Equity (if circumstances permit such election)), then the exchange of such Claim for the property described above should be treated as a reorganization under the IRC.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), a U.S Holder of such Claim will recognize gain (but not loss) to the extent of the lesser of (a) the amount of gain realized from the exchange (generally equal to the fair market value of all of the consideration received minus the Holder's adjusted basis, if any, in the Allowed Claim) or (b) the cash or "other property" (including any OpCo First Lien Term Loans, OpCo Second Lien Notes, PropCo First Lien Term Loans, and, if applicable, CPLV Mezzanine Debt, OpCo First Lien Notes, PropCo First Lien Notes, PropCo Second Lien Notes, or PropCo Common Equity not treated as stock or "securities" of CEOC or the REIT) received in the distribution that is not permitted to be received under section 355 of the IRC without the recognition of gain.

With respect to non-Cash consideration that is determined to be stock or a "security" of CEOC or the REIT received in exchange for a Prepetition Credit Agreement Claim, U.S. Holders should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to (1) the tax basis of the surrendered Claim, less (2) cash and the fair market value of "other property" (if any) received, plus (3) gain recognized (if any).  The holding period for such non-Cash consideration should include the holding period for the surrendered Claims.

With respect to non-Cash consideration that is determined not to be stock or a "security" of CEOC or the REIT, U.S. Holders should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to such property's fair market value as of the date such property is distributed to the U.S. Holder.  The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

The tax basis of any non-Cash consideration determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the non-Cash consideration received in satisfaction of accrued but untaxed interest (or original issue discount).  The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

ii.        *Treatment if Prepetition Credit Agreement Claims Are Not Securities or None of the Consideration Received Under the Plan Constitute Securities*

Some of the Prepetition Credit Agreement Claims may not be "securities."  In such case,  A U.S. Holder of such Claims will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the IRC.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the sum of the cash, the issue price of any debt instruments, and the fair market value of the other property received in exchange for the Claim and (b) such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in the non-Cash consideration received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount),

equal to such property's fair market value as of the date such property is distributed to the U.S. Holder.  The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

The tax basis of any non-Cash consideration determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the non-Cash consideration received in satisfaction of accrued but untaxed interest (or original issue discount).  The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

### b.        Partnership Contribution Structure

#### i.        *Treatment if Prepetition Credit Agreement Claims Are "Securities"*

If a Prepetition Credit Agreement Claim is determined to be a "security" and at least some of the consideration received is also determined to be a security of CEOC, then the exchange of such Claims pursuant to the Plan should be subject to treated as a reorganization under the IRC.  The treatment of a U.S. Holder of such Claim should be substantially identical to the treatment of a U.S. Holder of such Claim in the Spin Scenario, except that a greater portion of the consideration received under the Plan in exchange for such Claim will likely be treated as "other property" under sections 354 and 356 of the IRC.  Specifically, of the consideration that Holders of Prepetition Credit Agreement Claims would receive under the Plan, only the OpCo First Lien Term Loans, the OpCo First Lien Notes, and the OpCo Second Lien Term Loans may potentially be treated as "securities" of CEOC in the Partnership Contribution Structure.

#### ii.       *Treatment if Prepetition Credit Agreement Claims Are Not Securities or None of the Consideration Received Under the Plan Constitute Stock or Securities of CEOC*

If a Prepetition Credit Agreement Claim is determined not to be as a "security," then the exchange of such Claims pursuant to the Plan should be subject to the same treatment as such Claims that are not treated as "securities" of CEOC or the REIT in the Spin Structure.  The same result would occur if none of the consideration received under the Plan is treated as stock or a "security" of CEOC.

### 2.        Consequences to U.S. Holders of Secured First Lien Note Claims

Pursuant to the Plan, in full satisfaction and discharge of their Claims, the Holders of Allowed Class E Claims will exchange such Claims for their pro rata share of (a) Cash; (b) the OpCo First Lien Notes; (c) the OpCo Second Lien Notes; (d) the PropCo First Lien Notes; (e) the PropCo Second Lien Notes; (f) the PropCo Common Equity; (g) the PropCo Preferred Equity, and, under certain circumstances, (h) the CPLV Mezzanine Debt; and (i) OpCo Common Stock.

### a.        Spin Structure

#### i.        *Treatment if Secured First Lien Note Claims Are "Securities"*

If a Secured First Lien Note Claim is determined to be a "security," and at least some of the consideration received is also determined to be stock or a "security" of CEOC or the REIT, then the exchange of such Claim for the property described above should be treated as a reorganization under the IRC.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), a U.S Holder of such Claim will recognize gain (but not loss) to the extent of the lesser of (a) the amount of gain realized from the exchange (generally equal to the fair market value of all of the consideration received minus the Holder's adjusted basis, if any, in the Allowed Claim) or (b) the cash or "other property" (including any OpCo First Lien Notes, OpCo Second Lien Notes, PropCo First Lien Notes, PropCo Second Lien Notes, PropCo Common Equity, PropCo Preferred Equity, or CPLV Mezzanine Debt not treated as stock or "securities" of CEOC or the REIT) received in the distribution that is not permitted to be received under section 355 of the IRC without the recognition of gain.

With respect to non-Cash consideration that is determined to be stock or a "security" of CEOC or the REIT received in exchange for a Secured First Lien Note Claim, U.S. Holders should obtain a tax basis in such property,

other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to (1) the tax basis of the surrendered Claim, less (2) cash and the fair market value of "other property" (if any) received, plus (3) gain recognized (if any). The holding period for such non-Cash consideration should include the holding period for the surrendered Claims.

With respect to non-Cash consideration that is determined not to be stock or a "security" of CEOC or the REIT, a U.S. Holder should obtain a tax basis in such property, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to such property's fair market value as of the date such property is distributed to the U.S. Holder. The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

The tax basis of any non-Cash consideration determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the non-Cash consideration received in satisfaction of accrued but untaxed interest (or original issue discount). The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

<p style="text-align:center"><em>ii.      Treatment if Secured First Lien Note Claims Are Not Securities</em></p>

Some of the Secured First Lien Note Claims may not be "securities." In such case, A U.S. Holders of such Claims will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the sum of the cash, the issue price of any debt instruments, and the fair market value of the other property received in exchange for the Claim and (b) such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in the non-Cash consideration received, other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to such property's fair market value as of the date such property is distributed to the U.S. Holder. The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

The tax basis of any non-Cash consideration determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the non-Cash consideration received in satisfaction of accrued but untaxed interest (or original issue discount). The holding period for any such non-Cash consideration should begin on the day following the Effective Date.

<p style="text-align:center"><strong>b.      Partnership Contribution Structure</strong></p>

<p style="text-align:center"><em>i.      Treatment if Secured First Lien Note Claims Are "Securities"</em></p>

If a Secured First Lien Note Claim is determined to be a "security," and either (A) such Holder elects to receive OpCo Common Stock or (B) the OpCo First Lien Notes or OpCo Second Lien Notes are treated as "securities" of CEOC, then the exchange of such Claims pursuant to the Plan should be treated as a reorganization under the IRC. The treatment of a U.S. Holder of such Claim should be substantially identical to the treatment of a U.S. Holder of such Claim in the Spin Scenario, except that a greater portion of the consideration received under the Plan in exchange for such Claim will likely be treated as "other property" under sections 354 and 356 of the IRC.

<p style="text-align:center"><em>ii.      Treatment if Secured First Lien Note Claims And Consideration<br/>Received Are Not "Securities"</em></p>

If a Secured First Lien Note Claim determined not to be a "security," a Holder does not elect to receive OpCo Common Stock, and the OpCo First Lien Notes and OpCo Second Lien Notes are not treated as "securities" of CEOC, then the exchange of such Claims pursuant to the Plan should be subject to the same treatment as such Claims that determined not to be "securities" in the Spin Structure.

<p style="text-align:center">89</p>

**c.    Sale of PropCo Preferred Equity and/or PropCo Common Equity Pursuant to the Plan**

In the event a U.S. Holder of a Secured First Lien Note Claim sells any or all of its PropCo Preferred Equity and/or PropCo Common Equity (as applicable) pursuant to (i) the Equity Rights; (ii) in the Spin Structure, the PropCo Common Equity Cash Election and the PropCo Common Equity Purchase Commitment Agreement; (iii) the PropCo Preferred Equity Call Right; and/or (iv) the PropCo Preferred Equity Put Right, such U.S. Holder will recognize gain or loss equal to the difference between (i) the sum of the cash received in exchange for such PropCo Common Equity and/or PropCo Preferred Equity (as applicable) and (ii) such U.S. Holder's adjusted basis in such PropCo Common Equity and/or PropCo Preferred Equity (as applicable).

**3.    Consequences to U.S. Holders of Non-First Lien Claims**

Pursuant to the Plan, in full satisfaction and discharge of their Claims, the Holders of Allowed Class G, H, I, and J Claims[36] will exchange such Claims for their pro rata share of PropCo Common Equity.  Additionally, if Classes F, G, H, I, and J all vote in favor of the Plan, certain Holders will receive the right to exercise the Equity Rights.

**a.    Spin Structure**

*i.    Treatment if Non-First Lien Claims Are "Securities"*

If a Non-First Lien Claim is determined to be a "security," then the exchange of such Claim for PropCo Common Equity (and the Equity Rights, if applicable) should be treated as a reorganization under the IRC, because, for federal income tax purposes, the only property being received is stock (or an option to purchase stock) of the REIT.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), a U.S Holder of such Claim should not recognize any gain or loss from the exchange.

U.S. Holders should obtain a tax basis in the PropCo Common Equity (and the Equity Rights, if applicable), other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to the tax basis of the surrendered Claim.  The holding period for such property should include the holding period for the surrendered Claims.

The tax basis of any PropCo Common Equity (and the Equity Rights, if applicable) determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the non-Cash consideration received in satisfaction of accrued but untaxed interest (or original issue discount).  The holding period for such property should begin on the day following the Effective Date.

*ii.    Treatment if Non-First Lien Claims Are Not Securities*

Some of the Secured First Lien Note Claims may not be "securities."  In such case, U.S. Holders of such Claims will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the IRC.  Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claim should recognize gain or loss equal to the difference between (a) the fair market value of the PropCo Common Equity (and the Equity Rights, if applicable) and (b) such U.S. Holder's adjusted basis, if any, in such Claim.

U.S. Holders of such Claims should obtain a tax basis in the PropCo Common Equity (and the Equity Rights, if applicable), other than any such amounts treated as received in satisfaction of accrued but untaxed interest (or original issue discount), equal to the fair market value of such property as of the date such property is distributed to the U.S. Holder.  The holding period for any such property should begin on the day following the Effective Date.

---

[36]    Second Lien Notes Claims, Senior Unsecured Notes Claims, Subsidiary Guaranteed Notes Claims, and General Unsecured Claims.

The tax basis of any PropCo Common Equity (and the Equity Rights, if applicable) determined to be received in satisfaction of accrued but untaxed interest (or original issue discount) should equal the amount of such accrued but untaxed interest (or original issue discount), but in no event should such basis exceed the fair market value of the non-Cash consideration received in satisfaction of accrued but untaxed interest (or original issue discount).  The holding period for any such property should begin on the day following the Effective Date.

### b.        Partnership Contribution Structure

Regardless of whether the Non-First Lien Claims are determined to be "securities," in the Partnership Contribution Structure, the exchange of the Non-First Lien Claims for PropCo Common Equity (and the Equity Rights, if applicable) should be treated as a taxable transaction under section 1001 of the IRC.  Accordingly, the exchange of such Claims pursuant to the Plan should be subject to the same treatment as such Claims that are not treated as "securities" in the Spin Structure.

### c.        Exercise of Equity Rights

A U.S. Holder that elects not to exercise the Equity Rights may be entitled to claim a (likely short-term capital) loss equal to the amount of tax basis allocated to the Equity Rights, subject to any limitations on such U.S. Holder's ability to utilize capital losses.  Such U.S. Holders are urged to consult with their own tax advisors as to the tax consequences of electing not to exercise the Equity Rights.

A U.S. Holder that elects to exercise the Equity Rights will be treated as purchasing, in exchange for its Equity Rights and the amount of Cash funded by the U.S. Holder to exercise the Equity Rights, the PropCo Common Equity[37] it is entitled to pursuant to the Equity Rights.  Such a purchase will generally be treated as the exercise of an option under general tax principles, and as such a U.S. Holder should not recognize income, gain or loss for U.S. federal income tax purposes when it exercises the Equity Rights.  A U.S. Holder's aggregate tax basis in the PropCo Common Equity will equal the sum of (i) the amount of Cash paid by the U.S. Holder to exercise its Equity Rights plus such U.S. Holder's tax basis in its Equity Rights immediately before the option is exercised.  A U.S. Holder's holding period for the PropCo Common Equity received on the Effective Date pursuant to the exercise of the Equity Rights should begin on the day following the Effective Date.

### 4.        Consequences to U.S. Holders of Non-Obligor Unsecured Claims and Des Plaines Interests

[To Come].

### 5.        Accrued Interest

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest (or original issue discount) and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income.  Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss to the extent that any accrued interest (or original issue discount) on the debt instruments constituting such Claim was previously included in the Holder's gross income, but was not paid in full by the Debtors.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest (or original issue discount) on the debts constituting the surrendered Allowed Claim is unclear.  Holders of Claims with accrued interest (or original issue discount) should consult with their tax advisors regarding the allocation of the consideration.

---

[37]    And the CPLV Mezzanine Debt, which such loans to be equitized as set forth in Article IV.A.4(b) of the Plan.

### 6.        Market Discount

Under the "market discount" provisions of sections 1276 through 1278 of the IRC, some or all of any gain realized by a Holder exchanging the debt instruments constituting its Allowed Claim may be treated as ordinary income (instead of capital gain), to the extent of the amount of accrued "market discount" on the debt constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the taxable disposition (determined as described above) of debts that it acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include market discount in income as it accrued).  To the extent that the surrendered debts that had been acquired with market discount are exchanged in a tax-free or other reorganization transaction for other property (as may occur here), any market discount that accrued on such debts but was not recognized by the Holder may be required to be carried over to the property received therefor and any gain recognized on the subsequent sale, exchange, redemption or other disposition of such property may be treated as ordinary income to the extent of the accrued but unrecognized market discount with respect to the exchanged debt instrument. These rules are complex, their application is uncertain, and Holders of Allowed Claims should consult their own tax advisors regarding their application.

### D.        Certain Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims and Interests

This following discussion includes only certain U.S. federal income tax consequences of the consummation of the Plan to Non-U.S. Holders, and supplements the discussion of the taxation of Non-U.S. Holders of REITCo stock, PropCo LP Interests, and OpCo Common Stock.  The discussion does not include any non-U.S. tax considerations.  The rules governing the federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is determined in the same manner as set forth above in connection with U.S. Holders.  See the discussion above for information regarding the determination of whether consideration received under the Plan is attributable to accrued interest.

### 1.        Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim or Interest generally will not be subject to U.S. federal income taxation unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the consummation of the Plan occurs and certain other conditions are met or (b) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States (such gain is known as "effectively connected income").

If the first exception applies, to the extent that any gain is taxable and does not qualify for deferral as a recapitalization as described above, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  If both exceptions apply, in order to claim an exemption from withholding tax, such Non-U.S. Holder will

be required to provide properly executed original copies of IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30% (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

### 2.      Accrued Interest

Any amount received by a Non-U.S. Holder of a surrendered Allowed Claim that is attributable to accrued but untaxed interest (which, for purposes of this discussion of Non-U.S. Holders, includes original issue discount) generally will qualify for the so-called "portfolio interest exemption" and, therefore, generally will not be subject to U.S. federal income or withholding tax, provided that the applicable withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E), and provided that:

- the Non-U.S. Holder does not actually or constructively owns 10% or more of the total combined voting power of all classes of CEOC's stock entitled to vote;

- the Non-U.S. Holder is not a "controlled foreign corporation" that is a "related person" with respect to CEOC (each, within the meaning of the IRC);

- the Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the IRC; and

- such interest is not effectively connected income (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (a) generally will not be subject to withholding tax, but (b) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30% rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### 3.      FATCA

Legislation enacted in 2010, along with regulations and administrative guidance, known as the Foreign Account Tax Compliance Act ("FATCA") generally imposes a withholding tax of 30% with respect to certain "withholdable payments" if the payments are made to a foreign entity, unless certain diligence, reporting, withholding and certification obligations and requirements are met.  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, which may include dividends and interest with respect to non-cash consideration received under the Plan, as well as gross proceeds from the sale of assets that can produce U.S. source interest or dividends.  Recently finalized U.S. Treasury regulations and IRS official guidance delay the implementation of withholding under FATCA with respect to payments of gross proceeds until after December 31, 2016, but withholding under FATCA with respect to dividends and interest began on July 1, 2014.

The withholding under FATCA may be avoided if (i) the foreign entity is a "foreign financial institution" (as defined in this legislation) and such institution enters into an agreement with the U.S. government to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which would include certain equity and debt holders of such institution, as well as certain account holders that are foreign

entities with U.S. owners) or (ii) the foreign entity is not a "foreign financial institution" and makes a certification identifying its substantial U.S. owners (as defined for this purpose) or makes a certification that such foreign entity does not have any substantial U.S. owners.  Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.  Under certain circumstances, a non-U.S. Holder might be eligible for refunds or credits of such withholding taxes, and a non-U.S. Holder might be required to file a U.S. federal income tax return to claim such refunds or credits.

Non-U.S. Holders should consult their own tax advisors regarding the implications of this legislation.

### E.  Certain REIT Tax Considerations, Including Certain Dividend Requirements

Following the Effective Date, REITCo will need to comply with certain highly technical tax rules in the IRC and related regulations to qualify as a "real estate investment trust."  Certain of these rules are discussed below. *Holders of Claims receiving REIT Common Stock, REIT Preferred Stock, PropCo Preferred LP Interests, and PropCo LP Interests should consult with their own tax advisors regarding the complex tax rules that govern the operation of REITs and and the potential tax consequences of owning REIT Common Stock, REIT Preferred Stock, PropCo Preferred LP Interests, and PropCo LP Interests.*

### 1.  General REIT Considerations

In any year in which REITCo qualifies as a REIT and has a valid REIT election in place, REITCo will claim deductions for the dividends REITCo pays to Holders of REITCo stock with respect to income earned while REITCo was a REIT.  As a result, REITCo will not be subject to U.S. federal income tax on that portion of REITCo's REIT taxable income or capital gain which is currently distributed to such Holders. REITCo will, however, be subject to U.S. federal income tax at normal corporate rates on any REIT taxable income or capital gain not distributed. Moreover, even if REITCo qualifies as a REIT, REITCo nonetheless would be subject to U.S. federal tax in certain circumstances, including:

(a) REITCo will be taxed at regular corporate rates on any REIT taxable income, including undistributed net capital gains that it does not distribute to stockholders during, or within a specified period after, the calendar year in which REITCo recognizes such income.  REITCo may elect to retain and pay income tax on its net long-term capital gain.  In that case, a Holder of REITCo stock would include its proportionate share of REITCo's undistributed long-term capital gain (to the extent REITCo makes a timely designation of such gain to the stockholder) in such Holder's income, such Holder would be deemed to have paid the tax that REITCo paid on such gain, and such Holder would be allowed a credit for its proportionate share of the tax deemed to have been paid, and an adjustment would be made to increase such Holder's basis in its REITCo stock.

(b) REITCo may be subject to the alternative minimum tax.

(c) If REITCo has net income from prohibited transactions, such income will be subject to a 100% tax.  "Prohibited transactions" are, in general, sales or other dispositions of property held primarily for sale to customers in the ordinary course of business, rather than for investment, other than foreclosure property.

(d) If REITCo fails to satisfy the 75% Gross Income Test or the 95% Gross Income Test (each discussed below), but nonetheless maintains its qualification as a REIT because other requirements are met, REITCo will be subject to a 100% tax on an amount equal to (1) the greater of (A) the amount by which REITCo fails the 75% Gross Income Test or (B) the amount by which REITCo fails the 95% Gross Income Test, as applicable, multiplied by (2) a fraction intended to reflect REITCo's profitability.

(e) If REITCo fails to satisfy any of the Asset Tests, as described below, other than certain de minimis failures, but REITCo's failure is due to reasonable cause and not due to willful neglect and REITCo nonetheless maintains its REIT qualification because of specified cure

provisions, REITCo will be required to pay a tax equal to the greater of $50,000 and 35% of the net income generated by the nonqualifying assets during the period in which REITCo failed to satisfy the Asset Tests.

(f)  If REITCo fails to satisfy other REIT qualification requirements (other than a Gross Income or Asset Test) and that violation is due to reasonable cause and not due to willful neglect, REITCo may retain its REIT qualification, but REITCo will be required to pay a penalty of $50,000 for each such failure.

(g)  If REITCo fails to distribute during each calendar year at least the sum of (1) 85% of REITCo's REIT ordinary income for such year, (2) 95% of REITCo's REIT capital gain net income for such year, and (3) any undistributed taxable income from prior periods, REITCo will be subject to a 4% excise tax on the excess of such required distributions over the sum of (A) the amounts actually distributed (taking into account excess distributions from prior years) plus (B) retained amounts on which federal income tax is paid at the corporate level.

(h)  REITCo may be required to pay monthly penalties to the IRS in certain circumstances, including if REITCo fails to meet record-keeping requirements intended to monitor REITCo's compliance with rules relating to the composition of REITCo's stockholders.

(i)  A 100% tax may be imposed on some items of income and expense that are directly or constructively paid between REITCo, PropCo, or a TRS if and to the extent that the IRS successfully adjusts the reported amounts of such items.

(j)  If REITCo acquires appreciated assets from a C corporation (*i.e.*, a corporation generally subject to corporate income tax) in a transaction in which the adjusted tax basis of the assets in REITCo's hands is determined by reference to the adjusted tax basis of the assets in the hands of the C corporation (as will be the case under the Plan), REITCo may be subject to tax on such appreciation at the highest corporate income tax rate then applicable if REITCo subsequently recognizes gain on a disposition of such assets during the 10-year period following their acquisition from the C corporation. The results described in this paragraph would not apply if the non-REIT corporation elects, in lieu of this treatment, to be subject to an immediate tax when the asset is acquired by REITCo.

(k)  REITCo may have subsidiaries or own interests in other lower-tier entities that are C corporations, such as TRSs, the earnings of which would be subject to federal corporate income tax.

## 2.      General REIT Qualification Tests

The IRC generally defines a REIT as a corporation, trust, or association:

(a)  that elects to be taxed as a REIT;

(b)  that is managed by one or more trustees or directors;

(c)  the beneficial ownership of which is evidenced by transferable shares or by transferable certificates of beneficial interest;

(d)  that would be taxable as a domestic corporation but for its status as a REIT;

(e)  that is neither a financial institution nor an insurance company;

(f)  that meets the gross income, asset, and annual distribution requirements;

95

(g) the beneficial ownership of which is held by 100 or more persons on at least 335 days in each full taxable year, proportionately adjusted for a partial taxable year; and

(h) generally in which, at any time during the last half of each taxable year, no more than 50% in value of the outstanding stock is owned, directly or indirectly, by five or fewer individuals or entities treated as individuals for this purpose.

Conditions (a) through (f) must be met during each taxable year for which REIT status is sought. Conditions (g) and (h) do not have to be met until the year after the first taxable year for which a REIT election is made.

### 3.    Share Ownership Test

REITCo's stock must be held by a minimum of 100 persons (determined without attribution to the owners of any entity owning REITCo stock) for at least 335 days in each full taxable year, proportionately adjusted for partial taxable years.  In addition, at all times during the second half of each taxable year, no more than 50% in value of REITCo stock may be owned, directly or indirectly, by five or fewer individuals (determined with attribution to the owners of any entity owning REITCo stock).  As noted above, these share ownership tests do not apply until after the first taxable year for which REITCo elects REIT status.

REITCo's charter will contain certain provisions intended to enable REITCo to meet these requirements and REITCo will have the right to issue, for cash, non-voting preferred stock to satisfy the requirement that REITCo's stock be held by a minimum of 100 persons.  REITCo's charter will contain provisions restricting the transfer of REITCo stock which would result in any person beneficially owning or constructively owning more than [9.8]% in value or in number of shares, whichever is more restrictive, of any class or series of REITCo's outstanding capital stock.  Certain exceptions to this [9.8]% limitation may be authorized by REITCo's board of directors. REITCo's charter will also contain provisions requiring each holder of REITCo's shares to disclose, upon demand, constructive or beneficial ownership of shares as deemed necessary to comply with the requirements of the IRC. Furthermore, stockholders failing or refusing to comply with REITCo's disclosure request will be required, under regulations of the IRC, to submit a statement of such information to the IRS at the time of filing their annual income tax return for the year in which the request was made.

### 4.    Subsidiary Entities

A qualified REIT subsidiary is a corporation that is wholly owned by a REIT and is not a TRS.  For purposes of the Asset and Gross Income Tests described below, all assets, liabilities, and tax attributes of a qualified REIT subsidiary are treated as belonging to the REIT.  A qualified REIT subsidiary is not subject to U.S. federal income tax, but may be subject to state or local tax.  Although REITCo expects to hold substantially all of its assets (other than certain assets held by a TRS in the Spin Structure) through PropCo, REITCo may hold assets through qualified REIT subsidiaries.  A partnership (which is how PropCo will be classified following the Effective Date) is not subject to U.S. federal income tax and instead allocates its tax attributes to its partners.  The partners are subject to U.S. federal income tax on their allocable share of the income and gain, without regard to whether they receive distributions from the partnership.  Each partner's share of a partnership's tax attributes is determined in accordance with the limited partnership agreement.  For purposes of the Asset and Gross Income Tests, REITCo will be deemed to own a proportionate share of the assets of PropCo, and REITCo will be allocated a proportionate share of each item of gross income from PropCo.

### 5.    Asset Tests

At the close of each calendar quarter of each taxable year, REITCo will need to satisfy a series of tests based on the composition of REITCo's assets (the "Asset Tests").  After initially meeting the Asset Tests at the close of any quarter, REITCo will not lose its status as a REIT for failure to satisfy the Asset Tests at the end of a later quarter solely due to changes in the value of REITCo's assets.  In addition, if the failure to satisfy the Asset Tests results from an acquisition during a quarter, the failure can be cured by disposing of non-qualifying assets within 30 days after the close of that quarter.  The Debtors intend that REITCo will maintain adequate records of the value of

REITCo's assets to ensure compliance with these tests and will act within 30 days after the close of any quarter as may be required to cure any noncompliance.

At least 75% of the value of REITCo's assets must be represented by "real estate assets," cash, cash items (including receivables), and government securities (the "75% Asset Test"). Real estate assets include (a) real property (including interests in real property and interests in mortgages on real property), (b) shares in other qualifying REITs, and (c) any stock or debt instrument (not otherwise a real estate asset) attributable to the temporary investment of "new capital," but only for the one-year period beginning on the date REITCo receives the new capital. Property will qualify as being attributable to the temporary investment of new capital if the money used to purchase the stock or debt instrument is received by us in exchange for REITCo stock or in a public offering of debt obligations that have a maturity of at least five years. If REITCo invests in any securities that do not qualify under the 75% Asset Test, such securities may not exceed either: (a) 5% of the value of REITCo's assets as to any one issuer, or (b) 10% of the outstanding securities by vote or value of any one issuer. A partnership interest held by a REIT (*e.g.*, partnership interests in PropCo held by REITCo) is not considered a "security" for purposes of these 5% and 10% tests; instead, the REIT is treated as owning directly its proportionate interest in the equity interests and certain debt securities issued by a partnership. For all of the other Asset Tests, a REIT's proportionate share is based on its proportionate interest in the capital of the partnership. In addition, as discussed above, the stock of a qualified REIT subsidiary is not counted for purposes of the Asset Tests.

A REIT may own the stock of a TRS. A TRS is a corporation (other than another REIT) that is owned in whole or in part by a REIT, and joins in an election with the REIT to be classified as a TRS. A corporation that is 35% owned by a TRS will also be treated as a TRS. Securities of a TRS are excepted from the 5% and 10% vote and value limitations on a REIT's ownership of securities of a single issuer. However, no more than 25% of the value of a REIT's assets may be represented by securities of one or more TRSs.

In certain instances where a REIT fails to satisfy the Asset Tests but the failure is within a certain threshold, the REIT will not lose its REIT status if it takes certain corrective measures, notifies Treasury, and pays a penalty.

The Debtors expect that REITCo's holdings of securities and other assets comply with the foregoing Asset Tests, and the Debtors intend that REITCo will monitor compliance with such tests on an ongoing basis. The values of some of REITCo's assets, however, may not be precisely valued, and values are subject to change in the future. Furthermore, the proper classification of an instrument as debt or equity for U.S. federal income tax purposes may be uncertain in some circumstances, which could affect the application of the Asset Tests. Accordingly, there can be no assurance that the IRS will not contend that REITCo's assets do not meet the requirements of the Asset Tests.

**6.      Gross Income Tests**

For each calendar year, REITCo will be required to satisfy two separate tests based on the composition of REITCo's gross income, as defined under REITCo's method of accounting (the "Gross Income Tests"). If REITCo fails to satisfy either of the Gross Income Tests discussed below for any taxable year, REITCo may retain its status as a REIT for such year if: (i) the failure was due to reasonable cause and not due to willful neglect, (ii) REITCo attaches to its return a schedule describing the nature and amount of each item of REITCo's gross income, and (iii) any incorrect information on such schedule was not due to fraud with intent to evade U.S. federal income tax. If this relief provision is available, REITco would remain subject to tax equal to the greater of the amount by which REITCo failed the 75% Gross Income Test or the 95% Gross Income Test, as applicable, multiplied by a fraction meant to reflect REITCo's profitability.

**a.      The 75% Gross Income Test**

At least 75% of REITCo's gross income for the taxable year (excluding gross income from prohibited transactions and certain hedging transactions and cancellation of indebtedness income) must result from (i) rents from real property, (ii) interest on obligations secured by mortgages on real property or on interests in real property, (iii) gains from the sale or other disposition of real property (including interests in real property and interests in mortgages on real property) other than property held primarily for sale to customers in the ordinary course of its trade or business, (iv) dividends from other qualifying REITs and gain (other than gain from prohibited transactions) from the sale of shares of other qualifying REITs, (v) other specified investments relating to real property or mortgages thereon, and (vi) income attributable to stock or a debt investment that is attributable to a

97

temporary investment of new capital (as described under the 75% Asset Test above) received or earned during the one-year period beginning on the date such new capital is received (the "75% Gross Income Test"). The Debtors intend that REITCo will invest funds not otherwise invested in real properties in cash sources or other liquid investments which will allow REITCo to qualify under the 75% Gross Income Test.

Income attributable to a lease of real property will generally qualify as "rents from real property" under the 75% Gross Income Test (and the 95% Gross Income Test described below), subject to the rules discussed below. Rent from a particular tenant will not qualify if REITCo, or one or more owners of 10% or more of REITCo's stock, directly or indirectly, owns 10% or more of the voting stock or the total number of shares of all classes of stock in, or 10% or more of the assets or net profits of, the tenant (subject to certain exceptions). The portion of rent attributable to personal property rented in connection with real property will not qualify, unless the portion attributable to personal property is 15% or less of the total rent received under, or in connection with, the lease. Generally, rent will not qualify as "rents from real property" if it is based in whole, or in part, on the income or profits of any person from the underlying property. However, rent will not fail to qualify as "rents from real property" if it is based on a fixed percentage (or designated varying percentages) of receipts or sales, including amounts above a base amount so long as the base amount is fixed at the time the lease is entered into, the provisions are in accordance with normal business practice and the arrangement is not an indirect method for basing rent on income or profits.

Rental income will not qualify if REITCo furnishes or renders services to tenants or manages or operates the underlying property, other than through a permissible "independent contractor" from whom REITCo derives no revenue, or through a TRS. This requirement, however, does not apply to the extent that the services, management or operations provided by REITCo are "usually or customarily rendered" in connection with the rental of space, and are not otherwise considered "rendered to the occupant." If the total amount of REITCo's "impermissible tenant service income" from non-customary services exceeds 1% of REITCo's total income from a property, then all of the income from that property will fail to qualify as rents from real property. If the total amount of impermissible tenant service income from a property does not exceed 1% of REITCo's total income from the property, the services will not "taint" the other income from the property (that is, it will not cause the rent paid to REITCo by tenants of that property to fail to qualify as rents from real property), but impermissible tenant service income will not qualify as rents from real property. The Debtors intend that REITCo's board of directors will hire qualifying independent contractors or utilize one or more TRSs to render services, if any, which the board believes, after consultation with REITCo's tax advisors, are not usually or customarily rendered in connection with the rental of space.

In order for the rent paid pursuant to leases (if any) to constitute "rents from real property," the leases must be respected as true leases for federal income tax purposes. Accordingly, the leases cannot be treated as service contracts, joint ventures or some other type of arrangement. The determination of whether the leases are true leases for federal income tax purposes depends upon an analysis of all the surrounding facts and circumstances. In making such a determination, courts have considered a variety of factors, including the following:

      (a)  the intent of the parties;

      (b)  the form of the agreement;

      (c)  the degree of control over the property that is retained by the property owner (*e.g.*, whether the lessee has substantial control over the operation of the property or whether the lessee was required simply to use its best efforts to perform its obligations under the agreement); and

      (d)  the extent to which the property owner retains the risk of loss with respect to the property (*e.g.*, whether the lessee bears the risk of increases in operating expenses or the risk of damage to the property) or the potential for economic gain (*e.g.*, appreciation) with respect to the property.

In addition, section 7701(e) of the IRC provides that a contract that purports to be a service contract or a partnership agreement is treated instead as a lease of property if the contract is properly treated as such, taking into account all relevant factors. Since the determination of whether a service contract should be treated as a lease is inherently factual, the presence or absence of any single factor may not be dispositive in every case.

KE 34442788

The Master Lease Agreement has been structured with the intent to qualify as a true lease for federal income tax purposes.  For example, with respect to each lease, the Debtors generally expect that:

(a) PropCo and the lessee (as of the Effective Date, OpCo and certain of OpCo's subsidiaries) will intend for their relationship to be that of a lessor and lessee, and that such relationship will be documented by a lease agreement;

(b) the lessee will have the right to exclusive possession and use and quiet enjoyment of the properties covered by the lease during the term of the lease;

(c) the lessee will bear the cost of, and will be responsible for, day-to-day maintenance and repair of the properties, and will generally control how the properties will be operated and maintained;

(d) the lessee will bear all of the costs and expenses of operating the properties, including the cost of any inventory used in the lessees' operation, during the term of the lease, with some limited exceptions;

(e) the lessee will benefit from any savings and will bear the burdens of any increases in the costs of operating the properties during the term of the lease;

(f) the lessee will be at economic risk due to damage to the properties because income from operations may be lost, subject to certain terminations rights (and the potential ability to recover from insurance proceeds, with such insurance policies to be procured by the lessees);

(g) the lessees will have certain indemnification obligations to PropCo;

(h) the lessees will be obligated to pay, at a minimum, substantial base rent for the period of use of the properties under the lease;

(i) the lessees will stand to incur substantial losses or reap substantial gains depending on how successfully the properties are operated; and

(j) upon termination of each lease, the applicable property will be expected to have a substantial remaining useful life and substantial remaining fair market value.

The analysis of whether a lease is a true lease for U.S. federal income tax purposes is inherently factual.  If the Master Lease Agreement (or any leases subsequently entered into) are characterized as services contracts or partnership agreements, rather than as true leases, or disregarded altogether for tax purposes, part or all of the payments that PropCo and its subsidiaries receive may not be considered rent or may not otherwise satisfy the various requirements for qualification as "rents from real property."  In that case, REITCo would not be able to satisfy the Gross Income Tests and, as a result, would lose its REIT status unless it qualifies for relief.

As indicated above, "rents from real property" must not be based in whole or in part on the income or profits of any person. The Master Lease Agreement provides for periodic payments of a specified base rent plus, to the extent that it exceeds the base rent, additional rent which is calculated based upon gross sales, plus certain other amounts.  Payments made pursuant to these leases should qualify as "rents from real property" since they are generally based on either fixed dollar amounts or on specified percentages of gross sales fixed at the time the leases were entered into.  The foregoing assumes that the leases have not been and will not be renegotiated during their term in a manner that has the effect of basing either the percentage rent or base rent on income or profits.  The foregoing also assumes that the leases are not in reality used as a means of basing rent on income or profits.  More generally, the rent payable under the leases will not qualify as "rents from real property" if, considering the leases and all the surrounding circumstances, the arrangement does not conform with normal business practice.  The Debtors intend that REITCo will not renegotiate the percentages used to determine the percentage rent during the terms of the leases in a manner that will have the effect of basing rent on income or profits.  In addition, the Debtors believe that the rental provisions and other terms of the leases conform with normal business practice and generally

99

are not intended to be used as a means of basing rent on income or profits.  Furthermore, the Debtors intend that, with respect to properties that REITCo acquires in the future, no rent for any property will be charged that is based in whole or in part on the income or profits of any person, except by reason of being based on a fixed percentage of gross revenues, as described above.

### b.        The 95% Gross Income Test

In addition to deriving 75% of its gross income from the sources listed above, at least 95% of REITCo's gross income (excluding gross income from prohibited transactions and certain hedging transactions and cancellation of indebtedness income) for the taxable year must be derived from (i) sources which satisfy the 75% Gross Income Test, (ii) dividends, (iii) interest, and (iv) gain from the sale or disposition of stock or other securities that are not assets held primarily for sale to customers in the ordinary course of its trade or business (the "95% Gross Income Test").  The Debtors intend that REITCo will invest funds not otherwise invested in properties in cash sources or other liquid investments which will allow REITCo to satisfy the 95% Gross Income Test.

REITCo's share of income from the properties will primarily give rise to rental income and gains on sales of the properties, substantially all of which will generally qualify under the 75% Gross Income and 95% Gross Income Tests. REITCo's anticipated operations indicate that it is likely that it will have little or no non-qualifying income. As described above, REITCo may establish one or more TRSs.  The gross income generated by these TRSs would not be included in REITCo's gross income.  Any dividends from TRSs to REITCo would be included in REITCo's gross income and qualify for the 95% Gross Income Test.

### 7.       REIT Distribution Requirements

### a.        E&P Purging Dividend in Spin Structure

If the Spin Structure is implemented, REITCo must distribute any "earnings and profits" (as defined in the IRC) ("E&P") that are allocated from CEOC to REITCo in connection with the Spin Structure (the "E&P Purging Dividend").

The E&P Purging Dividend will consist of cash or a mixture of stock and cash.  In the event the E&P Purging Dividend is paid with a combination of stock and cash, each Holder of REIT stock will be entitled to elect to receive all stock, all cash or a combination of the two, but in any event the total aggregate amount of the E&P Purging Dividend will consist of at least 20% cash.  Regardless of any Holder's election and the amount of cash that is included in the E&P Purging Dividend, the full amount of the E&P Purging Dividend will be taxable to Holders of REIT stock.

### b.        Annual Distribution Requirements

REITCo will be required to distribute dividends (other than capital gain dividends) to REITCo's stockholders each year in an amount at least equal to the excess of: (i) the sum of:  (A) 90% of REITCo's REIT taxable income (determined without regard to the deduction for dividends paid and by excluding any net capital gain); and (B) 90% of the net income (after tax) from foreclosure property; over (ii) the sum of some types of items of non-cash income.  Whether sufficient amounts have been distributed is based on amounts paid in the taxable year to which they relate, or in the following taxable year if REITCo: (1) declares a dividend before the due date of REITCo's tax return (including extensions); (2) distributes the dividend within the 12-month period following the close of the taxable year (and not later than the date of the first regular dividend payment made after such declaration); and (3) files an election with REITCo's tax return. Additionally, dividends that REITCo declares in October, November or December in a given year payable to stockholders of record in any such month will be treated as having been paid on December 31 of that year so long as the dividends are actually paid during January of the following year.

In order for REITCo's distributions to be counted as satisfying the annual distribution requirements for REITs, and to provide REITCo with a REIT-level tax deduction for dividends paid, the distributions must not be "preferential dividends."  A dividend is not a preferential dividend if the distribution is (1) pro rata among all outstanding shares of stock within a particular class, and (2) in accordance with the preferences among different classes of stock as set forth in REITCo's organizational documents. If REITCo fails to meet the annual distribution

requirements as a result of an adjustment to REITCo's U.S. federal income tax return by the IRS, or under certain other circumstances, REITCo may cure the failure by paying a "deficiency dividend" (plus penalties and interest to the IRS) within a specified period.

In the event REITCo does not have sufficient cash in a particular year (or elects to retain such cash) to satisfy REITCo's annual distribution requirements, REITCo may elect to borrow cash to fund such distributions. Alternatively, REITCo may elect to utilize taxable stock dividends (or consent dividends, in the event sufficient consent can be obtained) to satisfy its annual distribution requirements. If taxable stock dividends or consent dividends are utilized, regardless of the amount of cash that is included in such dividend, the full amount of such dividend will be taxable to Holders of REITCo stock.

### 8.      Failure to Qualify

If REITCo fails to qualify as a REIT in any taxable year, REITCo may be eligible for relief provisions if the failures are due to reasonable cause and not willful neglect and if a penalty tax is paid with respect to each failure to satisfy the applicable requirements. If the applicable relief provisions are not available or cannot be met, REITCo will not be able to deduct REITCo's dividends and will be subject to U.S. federal income tax (including any applicable alternative minimum tax) on REITCo's taxable income at regular corporate rates, thereby reducing cash available for distributions and potentially having other materially adverse effects on REITCo's finances. In such event, to the extent of current and accumulated earnings and profits, all distributions to stockholders will be taxable as ordinary dividends, and, subject to limitations in the IRC, corporate distributees may be eligible for the dividends-received deduction. Unless entitled to relief under specific statutory provisions, REITCo also would be disqualified from reelecting taxation as a REIT for the four taxable years following the year during which qualification was lost.

In the event that REITCo fails to satisfy one or more requirements for qualification as a REIT, other than the Gross Income Tests and the Asset Tests, each of which is subject to the cure provisions described above, REITCo will retain its REIT qualification if (a) the violation is due to reasonable cause and not willful neglect and (b) REITCo pays a penalty of $50,000 for each failure to satisfy the provision.

### 9.      Prohibited Transactions

REITCo will be subject to a 100% U.S. federal income tax on any net income derived from "prohibited transactions." Net income derived from prohibited transactions arises from the sale or exchange of property held for sale to customers in the ordinary course of REITCo's business which is not foreclosure property. There is an exception to this rule for the sale of real property that has been held for at least two years that: (a) has aggregate expenditures which are includable in the basis of the property not in excess of 30% of the net selling price; (b) in some cases, was held for production of rental income for at least two years; (c) in some cases, substantially all of the marketing and development expenditures were made through an independent contractor; and (d) when combined with other sales in the year, either does not cause the REIT to have made more than seven sales of property during the taxable year, or occurs in a year when the REIT disposes of less than 10% of its assets (measured by U.S. federal income tax basis or fair market value, and ignoring involuntary dispositions and sales of foreclosure property).

The Debtors intend that REITCo's acquisition and operation of properties will result in the production of rental income. Accordingly, the Debtors do not expect that REITCo or PropCo will hold any property for sale to customers in the ordinary course of REITCo's business.

### 10.      Investments in TRSs

REITCo and any entity treated as a corporation for tax purposes in which REITCo owns an interest are allowed to jointly elect to treat such entity as a "taxable REIT subsidiary." In addition, if any of our TRSs owns, directly or indirectly, securities representing 35% or more of the vote or value of an entity treated as a corporation for tax purposes, that subsidiary will also automatically be treated as REITCo's taxable REIT subsidiary.

In the event the Separation is effected through the Spin Transaction, one of REITCo's subsidiaries will elect to be treated as a TRS, and additional subsidiaries may subsequently become TRSs. As REITCo's TRSs, these entities will pay U.S. federal and state income taxes at the full applicable corporate rates on their income (without deduction for payment of any dividends). Such TRSs will attempt to minimize the amount of such taxes, but there

can be no assurance whether or the extent to which measures taken to minimize taxes will be successful.  To the extent any of REITCo's TRSs is required to pay U.S. federal, state or local taxes, the cash available for distribution by such TRS to its stockholders, including REITCo, will be reduced accordingly.

TRSs are subject to full corporate level taxation on their earnings, but are permitted to engage in certain types of activities which cannot be performed directly by REITs without jeopardizing their REIT status.  Other than some activities relating to lodging and health care facilities, a taxable REIT subsidiary generally may engage in any business activity, including the provision of services to a REIT's tenants, without causing the REIT to receive impermissible tenant service income under the Gross Income Tests and without subjecting the REIT to the 100% penalty tax on prohibited transactions.

## 11.    Tax on Built-In Gain

If REITCo (directly or indirectly through PropCo) acquires certain assets in tax-deferred transactions, which assets were held by one or more C corporations before they were held by REITCo, REITCo may be subject to a built-in gain tax on a future disposition of such assets.  This rule will apply to the substantial majority of the properties acquired by REITCo pursuant to the Plan.  If REITCo disposes of any such assets during the ten-year period following acquisition (i.e., during the ten-year period following ownership of such assets by a REIT), REITCo will be subject to U.S. federal income tax (and applicable state and local taxes) at the highest corporate tax rates on any gain recognized from the disposition such assets to the extent of the excess of the fair market value of such assets on the date that they were contributed to or acquired by REITCo in a tax-deferred transaction over the adjusted tax basis of such assets on such date, which are referred to as built-in gains. REITCo would be subject to this corporate-level tax liability (without the benefit of the deduction for dividends paid) even if REITCo qualifies and maintains its status as a REIT.  Any recognized built-in gain will retain its character as ordinary income or capital gain and will be taken into account in determining REIT taxable income and the distribution requirement. Any tax on the recognized built-in gain will reduce REIT taxable income. REITCo may choose to forego otherwise attractive opportunities to sell assets in a taxable transaction during the ten-year built-in gain recognition period in order to avoid this built-in gain tax. However, there can be no assurance that such a taxable transaction will not occur.  The amount of any such built-in gain tax could be material and the resulting tax liability could have a negative effect on REITCo's cash flow and limit REITCo's ability to pay distributions required to maintain our status as a REIT (or cause REITCo to pay such distributions partially in kind, as discussed above).

## 12.    Taxation of Taxable U.S. Holders of REITCo Stock[38]

As long as REITCo qualifies as a REIT, distributions paid to U.S. Holders of REITCo stock out of current or accumulated earnings and profits (and not designated as capital gain dividends) will generally be ordinary income and generally will not be "qualified dividends" in the case of non-corporate U.S. Holders of REITCo stock and will not be eligible for the dividends received deduction in the case of corporate U.S. Holders of REITCo stock. Distributions in excess of current and accumulated earnings and profits are treated first as a tax-deferred return of capital to the stockholder, reducing the stockholder's tax basis in his or her common stock by the amount of such distribution, and then as capital gain.

Because REITCo's earnings and profits are reduced for depreciation and other non-cash items, it is possible that a portion of each distribution will constitute a tax-deferred return of capital.  Additionally, because distributions in excess of earnings and profits reduce Holders' basis in REITCo stock, this will increase Holders' gain on any subsequent sale of REITCo stock.  Distributions that are designated as capital gain dividends will be taxed as long-term capital gains to the extent they do not exceed actual net capital gain for the taxable year, without regard to the period for which the Holder that receives such distribution has held its stock.  Corporate Holders may be required to treat up to 20% of some types of capital gain dividends as ordinary income.  Additionally, REITCo may also decide to retain, rather than distribute, REITCo's net long-term capital gains and pay any tax thereon.  In such instances, Holders would include their proportionate shares of such gains in income, receive a credit on their returns for their

---

[38]   This discussion does not apply to Holders of Claims (if any) that receive PropCo LP Interests rather than REIT stock.  The treatment of such Holders of Claims will be subject to standard partnership taxation principles, as discussed below.

KE 34442788

proportionate share of REITCo tax payments, and increase the tax basis of their shares of stock by the after-tax amount of such gain.

Dividend income is characterized as "portfolio" income under the passive loss rules and cannot be offset by a stockholder's current or suspended passive losses. Although stockholders generally recognize taxable income in the year that a distribution is received, any distribution REITCo declares in October, November or December of any year that is payable to a Holder of record on a specific date in any such month will be treated as both paid by REITCo and received by the Holder on December 31 of the year it was declared if paid by REITCo during January of the following calendar year.

Because REITCo is not a pass-through entity for U.S. federal income tax purposes, Holders may not use REITCo's operating or capital losses to reduce their tax liabilities. As discussed above, in certain circumstances, REITCo may have the ability to declare a large portion of a dividend in REITCo stock. Moreover, the E&P Purging Dividend may be paid up to approximately 80% in stock. In such a case, a Holder would be taxed on 100% of the dividend in the same manner as a cash dividend, even though most of the dividend was paid in shares of REITCo stock. In general, the sale of REITCo stock held for more than 12 months will produce long-term capital gain or loss. All other sales will produce short-term gain or loss. In each case, the gain or loss is equal to the difference between the amount of cash and fair market value of any property received from the sale and the stockholder's basis in the stock sold. However, any loss from a sale or exchange of stock by a Holder who has held such stock for six months or less generally will be treated as a long-term capital loss, to the extent that the Holder treated REITCo distributions as long-term capital gains. REITCo will report to U.S. Holders and to the IRS the amount of dividends paid during each calendar year, and the amount (if any) of U.S. federal income tax REITCo withholds.

### 13.     Taxation of Tax-Exempt Holders of REITCo Stock

The IRS has issued a revenue ruling in which it held that amounts distributed by a REIT to a tax-exempt employees' pension trust do not constitute unrelated business taxable income. Subject to the discussion below regarding a "pension-held REIT," based upon the ruling, the analysis in the ruling and the statutory framework of the IRC, distributions to a domestic stockholder that is a tax-exempt entity by REITCo should also not constitute unrelated business taxable income, provided that the tax-exempt entity has not financed the acquisition of shares of REITCo stock with "acquisition indebtedness" within the meaning of the IRC, that the shares of REITCo stock are not otherwise used in an unrelated trade or business of the tax-exempt entity, and that REITCo, consistent with the Debtors' present intent, does not hold a residual interest in a real estate mortgage investment conduit. Social clubs, voluntary employee benefit associations, supplemental unemployment benefit trusts, and qualified group legal services plans that are exempt from taxation under special provisions of the U.S. federal income tax laws are subject to different unrelated business taxable income rules, which generally will require them to characterize distributions that they receive from REITCo as unrelated business taxable income.

However, if any pension or other retirement trust that qualifies under section 401(a) of the IRC holds more than 10% by value of the interests in a "pension-held REIT" at any time during a taxable year, a portion of the dividends paid to the qualified pension trust by such REIT may constitute unrelated business taxable income. For these purposes, a "pension-held REIT" is defined as a REIT if such REIT would not have qualified as a REIT but for the provisions of the IRC which look through such a qualified pension trust in determining ownership of stock of the REIT and either (i) at least one qualified pension trust holds more than 25% by value of the interests of such REIT or (ii) one or more qualified pension trusts (each owning more than a 10% interest by value in the REIT) hold in the aggregate more than 50% by value of the interests in such REIT.

### 14.     Taxation of Non-U.S. Holders of REITCo Stock

The rules governing the U.S. federal income taxation of beneficial Holders of REITCo stock that are Non-U.S. Holders are complex. Only a summary of such rules is provided in this Disclosure Statement. This summary supplements the discussion in the section of this tax disclosure entitled "Certain Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims and Interests." Non-U.S. Holders should consult their tax advisors to determine the effect that U.S. federal, state and local income tax or similar laws will have on Holders as a result of ownership of REITCo stock.

103

Distributions paid by REITCo that are not attributable to gain from REITCo's sales or exchanges of U.S. real property interests and not designated by REITCo as capital gain dividends will be treated as dividends of ordinary income to the extent that they are made out of REITCo's current or accumulated earnings and profits. Such dividends to Non-U.S. Holders ordinarily will be subject to a withholding tax equal to 30% of the gross amount of the dividend unless an applicable tax treaty reduces or eliminates that tax. However, if income from REITCo stock is treated as effectively connected income, the Non-U.S. Holder generally will be subject to a tax at the graduated rates applicable to ordinary income, in the same manner as U.S. Holders are taxed with respect to such dividends (and may also be subject to the 30% branch profits tax, or such lower rate provided by an applicable tax treaty, in the case of a Non-U.S. Holder that is a foreign corporation). Dividends in excess of REITCo's current and accumulated earnings and profits will not be taxable to a Non-U.S. Holder to the extent they do not exceed the adjusted basis of the Non-U.S. Holder's shares. Instead, such dividends will reduce the adjusted basis of such shares. To the extent that such dividends exceed the adjusted basis of a Non-U.S. Holder's shares, they will give rise to tax liability if the Non-U.S. Holder would otherwise be subject to tax on any gain from the sale or disposition of his shares.

Distributions that are attributable to gain from REITCo's sales or exchanges of U.S. real property interests will be taxed to a Non-U.S. Holder as if such gain were effectively connected income. Non-U.S. Holders would thus be required to file U.S. federal income tax returns and would be taxed at the rates applicable to U.S. Holders, and would be subject to a special alternative minimum tax in the case of nonresident alien individuals. Also, such dividends may be subject to a 30% branch profits tax in the hands of a corporate Non-U.S. Holder not entitled to any treaty exemption. However, generally a capital gain dividend from a REIT is not treated as effectively connected income for a foreign investor if (i) the distribution is received with regard to a class of stock that is regularly traded on an established securities market located in the United States; and (ii) the foreign investor does not own more than 5% of the class of stock at any time during the tax year within which the distribution is received.

Gain recognized by a Non-U.S. Holder upon a sale of shares of REITCo stock generally will not be subject to U.S. federal income taxation, provided that:  (i) such gain is not effectively connected income; (ii) the Non-U.S. Holder is not present in the United States for 183 days or more during the taxable year and certain other conditions apply; and (iii) REITCo is "domestically controlled," which generally means that less than 50% in value of REITCo shares were held directly or indirectly by foreign persons during the five year period ending on the date of disposition or, if shorter, during the entire period of REITCo's existence. The Debtors cannot assure that REITCo will qualify as "domestically controlled."

If REITCo was not "domestically controlled", a Non-U.S. Holder's sale of stock would be subject to U.S. federal income taxation, unless REITCo stock was regularly traded on an established securities market and the selling Non-U.S. Holder has not directly, or indirectly, owned during a specified testing period more than 5% in value of such class of REITCo stock. If the gain on the sale of REITCo stock was subject to taxation, the Non-U.S. Holder would be subject to the same treatment as a U.S. Holder with respect to such gain, and the purchaser of such stock may be required to withhold 10% of the gross purchase price of such shares.

Whether or not REITCo is "domestically controlled", a Non-U.S. Holder generally will incur tax on gain from the sale of REITCo stock if (i) the gain is effectively connected income, in which case the Non-U.S. Stockholder will be subject to the same treatment as U.S. Holders with respect to such gain, or (ii) the Non-U.S. Holder is a nonresident alien individual who was present in the United States for 183 days or more during the taxable year and has a "tax home" in the United States, in which case the Non-U.S. Holder will generally incur a 30% tax on his or her net U.S. source capital gains.

Information relating to withholding considerations for Non-U.S. Holders is discussed below.

**F.      Tax Aspects of REITCo's Ownership of PropCo**

**1.      REITCo Will Be a Partner in PropCo, Which Will Hold The Substantial Majority (Or All) Of REITCo's Assets**

Other than properties or assets owned by the TRS (if any), as of the Effective Date, all of REITCo's properties will be owned through PropCo or subsidiaries thereof. The Debtors intend that PropCo will qualify as a partnership for U.S. federal income tax purposes. In general, a partnership is a "pass-through" entity which is not subject to U.S. federal income tax. Rather, partners are allocated their proportionate share of the items of income,

gain, loss, deduction and credit of a partnership, and are potentially subject to tax thereon, without regard to whether the partner received a distribution from the partnership. REITCo will include its proportionate share of PropCo's partnership items in REITCo's income for purposes of the Gross Income Tests and in the computation of its REIT taxable income.

Each partner's share of PropCo's tax items is determined in accordance with PropCo's limited partnership agreement, although the allocations will be adjusted for tax purposes if they do not comply with the technical provisions of section 704(b) of the IRC and the regulations thereunder. The Debtors intend that PropCo's allocation of tax items will comply with these provisions. Notwithstanding these allocation provisions, for purposes of complying with the Gross Income Tests and Asset Tests applicable to REITs discussed above, REITCo will be deemed to own our proportionate share of each of the assets of PropCo and will be deemed to have received a proportionate share of the income of PropCo, each case based on REITCo's capital interest in PropCo. Accordingly, any increase in REITCo's REIT taxable income from REITCo's interest in PropCo, whether or not a corresponding cash distribution is also received from PropCo, will increase REITCo's distribution requirements.

## 2.  Tax Allocations With Respect to Book Tax Differences for Contributed Properties

Under Section 704(c) of the IRC, income, gain, loss and deductions attributable to appreciated or depreciated property that is contributed to a partnership must be allocated for U.S. federal income tax purposes in a manner such that the contributor is charged with, or benefits from, the unrealized gain or unrealized loss associated with the property at the time of contribution. The amount of unrealized gain or unrealized loss generally is equal to the difference between the fair market value of the contributed property at the time of contribution and the adjusted tax basis of the property at the time of contribution, which is referred to as the book-tax difference. A book-tax difference also can exist with respect to an asset that has not appreciated or depreciated in economic terms if that asset has been depreciated for tax purposes. A substantial book-tax difference exists with respect to certain assets that will be contributed to PropCo pursuant to the Plan.

PropCo's limited partnership agreement will require that allocations of income, gain, loss and deductions attributable to the properties with respect to which there is a book-tax difference to be made in a manner that is consistent with section 704(c) of the IRC. Treasury Regulations under section 704(c) require partnerships to use a reasonable method for allocation of items affected by section 704(c) of the IRC.

PropCo's limited partnership agreement will also require that any gain allocated to PropCo's partners upon the sale or other taxable disposition of any PropCo asset must, to the extent possible after taking into account other required allocations of gain, be characterized as recapture income in the same proportions and to the same extent as the partners previously have been allocated any deductions directly or indirectly giving rise to the treatment of the gains as recapture income.

## 3.  Liquidation of PropCo

If PropCo liquidates and dissolves, a distribution of its property other than money generally will not result in taxable gain to its partners, except to the extent provided in section 704(c)(1)(B), 731, and 737 of the IRC. The basis of any property distributed to a PropCo partner will equal the adjusted basis of the partner's partnership interest, reduced by any money distributed in liquidation. A distribution of money upon the liquidation of PropCo, however, will be taxable to a partner to the extent that the amount of money distributed in liquidation, including any deemed distributions of cash as a result of a reduction in the partner's share of partnership liabilities, exceeds the partner's tax basis in its partnership interest.

## G.  Ownership and Disposition of the PropCo LP Interests

### 1.  General

Under the Treasury Regulations, a domestic entity that has two or more members and that is not organized as a corporation under U.S. federal or state law will generally be classified as a partnership for U.S. federal income tax purposes, unless it elects to be treated as a corporation. Pursuant to the Plan and the limited liability company agreement for PropCo, no election may be made for PropCo to be classified as a corporation for U.S. federal income tax purposes. Thus, subject to the discussion of publicly traded partnerships below, PropCo will be treated as a

partnership for U.S. federal income tax purposes. Each holder of PropCo LP Interests is urged to consult its tax advisor regarding the tax consequences of owning and disposing of membership interests in PropCo.

Under the "publicly traded partnership" provisions of the IRC, an entity that would otherwise be treated as a partnership whose interests are considered to be publicly traded and does not meet a qualifying income test will be taxable as a corporation. It is anticipated that the PropCo limited liability company agreement will prohibit the transfer of membership interests in PropCo if such transfer would jeopardize the status of PropCo as a partnership for U.S. federal income tax purposes (prior to an actual conversion for U.S. federal income tax purposes to corporate status). Any purported transfer in violation of such provisions will be null and void and would not be recognized by PropCo.

This discussion of the U.S. federal income tax consequences of the Plan assumes that PropCo will be treated as a partnership for U.S. federal income tax purposes.

As a partnership, PropCo itself will not be subject to U.S. federal income tax. Instead, PropCo will file an annual partnership information return with the IRS, which form will report the results of PropCo' operations. Each member will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of PropCo' income, gain, loss, deduction and credit for each taxable year of PropCo ending with or within the member's taxable year. Each item generally will have the same character as if the member had realized the item directly. Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from PropCo for such taxable year, and thus may incur income tax liabilities in excess of any distributions from PropCo.

PropCo's tax basis and holding period in its assets contributed directly to PropCo by CEOC (or CEOC's subsidiaries) or indirectly through the REIT would be the same as CEOC's (or CEOC's subsidiaries') basis and holding period with respect to such assets.

A member is allowed to deduct its allocable share of PropCo' losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the IRC may significantly limit a member's ability to deduct its allocable share of deductions and losses of PropCo against other income.

PropCo will provide each member with the necessary information to report its allocable share of the PropCo' tax items for U.S. federal income tax purposes; however, no assurance can be given that PropCo will be able to provide such information prior to the initial due date of the members' U.S. federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The board of directors of PropCo will decide how items will be reported on PropCo's U.S. federal income tax returns, and all members will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of PropCo are audited by the IRS, the tax treatment of PropCo income and deductions generally will be determined at the PropCo level in a single proceeding, rather than in individual audits of the members. The tax matters partner will have considerable authority under the IRC and the limited liability company agreement for PropCo to make decisions affecting the tax treatment and procedural rights of all members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash or property from PropCo (provided that the member is not treated as exchanging such member's share of PropCo' "unrealized receivables" and/or certain "inventory items" (as those terms are defined in the IRC, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from PropCo (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of PropCo) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest, which is described below.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities

106

are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from PropCo generally will be capital gain, but may be taxable as ordinary income under certain other circumstances.  No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (discussed above), increased by the sum of (i) any additional capital contribution such member makes to PropCo, (ii) the member's allocable share of the income of PropCo, and (iii) increases in the member's allocable share of the indebtedness of PropCo, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of PropCo, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of PropCo.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of PropCo and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions (reduced by any recognized gain which the member may have received on the exchange of a Claim for PropCo Interests).  A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the IRC.

The PropCo LLC Agreement will provide that a holder of PropCo LP Interests may elect to have PropCo redeem some or all of such holder's PropCo LP Interests in exchange for, at PropCo's election, either (i) a corresponding number of shares of REIT stock (preferred or common, as the case may be), or (ii) an amount of cash equal to the fair market value of such shares.  In either case such exchange would be taxable to such holder with gain or loss being recognized as described above. In the even such holder received shares of REIT stock, such holder's basis in such shares would equal their fair market value as of the date of the exchange and such holder's holding period would begin the day after the exchange.

## 2.    Non-U.S. Holders

The U.S. federal income tax treatment of a holder of New Holdings Interests that is a nonresident alien, non-U.S. corporation, non-U.S. partnership, non-U.S. estate or non-U.S. trust (a "Non-U.S. Partner") is complex and will vary depending on the circumstances and activities of such holder and PropCo.  Each Non-U.S. Partner is urged to consult with its own tax advisor regarding the U.S. federal, state and local and non-U.S. income, estate and other tax consequences of holding interests in PropCo.  The following discussion assumes that a Non-U.S. Partner is not subject to U.S. federal income taxes as a result of its presence or activities in the United States (other than as a holder of Interests in PropCo).

A Non-U.S. Partner generally will be subject to U.S. federal withholding taxes at the rate of 30 percent (or such lower rate provided by an applicable tax treaty) on its share of PropCo' income from dividends, interest (other than interest that constitutes portfolio interest within the meaning of the IRC), and certain other income that is effectively connected income.

The activities of PropCo are likely to be treated as a U.S. trade or business, and to the extent that such activities are so treated, a Non-U.S. Partner would be deemed to be engaged in that underlying U.S. trade or business. A Non-U.S. Partner's share of PropCo' effectively connected income would be subject to tax at normal graduated U.S. federal income tax rates and, if the Non-U.S. Partner is a corporation for U.S. federal income tax purposes, may also be subject to U.S. branch profits tax. In addition, some or all of the gain on a disposition of a Non-U.S. Partner's interest in PropCo could be treated as effectively connected income to the extent such gain is attributable to assets that generate effectively connected income.  A Non-U.S. Partner generally will be required to file a U.S. federal income tax return if PropCo is deemed to be engaged in a U.S. trade or business (even if no income allocated to the Non-U.S. Partner is effectively connected income).  PropCo would be required to withhold U.S. federal income tax with respect to the Non-U.S. Partner's share of income that is effectively connected income.

107

### H.    Ownership and Disposition of OpCo Common Stock

#### 1.    General

Any distributions made on account of the OpCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of OpCo as determined under U.S. federal income tax principles.  To the extent the U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its shares.  Any such distributions in excess of the U.S. Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain.

Dividends paid to U.S. Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits.  However, the dividends-received deduction is only available if certain holding period requirements are satisfied.  The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales, or similar transactions.  In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

Unless a non-recognition provision applies, U.S. Holders generally will recognize capital gain or loss upon the sale, redemption, or other taxable disposition of OpCo Common Stock.  Such capital gain will be long-term capital gain if at the time of the sale, exchange, retirement, or other taxable disposition, the U.S. Holder held the OpCo Common Stock for more than one year.  Long-term capital gains of an individual taxpayer generally are taxed at preferential rates.

This summary does not consider issues related to Medicare tax, and U.S. Holders of OpCo Common Stock should consult their tax advisors regarding such taxes.

#### 2.    Non-U.S. Holders

Any distributions made with respect to OpCo Common Stock will constitute dividends for U.S. federal income tax purposes to the extent of OpCo's current or accumulated earnings and profits as determined under U.S. federal income tax principles.  Except as described below, dividends paid with respect to OpCo Common Stock held by a Non-U.S. Holder that are not effectively connected with a Non-U.S. Holder's conduct of a U.S. trade or business (or if an income tax treaty applies, are not attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States) will be subject to U.S. federal withholding tax, which is discussed below.  Dividends paid with respect to OpCo Common Stock held by a Non-U.S. Holder that are effectively connected income generally will be subject to U.S. federal income tax in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the dividends.

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any gain realized on the sale or other taxable disposition (including a cash redemption) of OpCo Common Stock unless: (a) such Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year of disposition or who is subject to special rules applicable to former citizens and residents of the United States; (b) such gain is effectively connected income; or (c) OpCo is or has been during a specified period a "U.S. real property holding corporation" for U.S. federal income tax purposes.

If the first exception with respect to sales or dispositions applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30% (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of disposition of OpCo Common Stock.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to such gain in the same manner as a U.S. Holder, and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to earnings and profits effectively connected with a U.S. trade or business that are attributable to such gains.

## I.      Withholding and Reporting

The Debtors will withhold all amounts required by law to be withheld from payments of interest (or original issue discount).  The Debtors will comply with all applicable reporting requirements of the IRC.  In general, information reporting requirements may apply to distributions or payments made to a Holder of a Claim.  Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments unless, in the case of a U.S. Holder, such U.S. Holder provides a properly executed IRS Form W-9 or, in the case of Non-U.S. Holder, such Non-U.S. Holder provides a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption).  Any amounts withheld under the backup withholding rules will be allowed as a credit against such Holder's federal income tax liability and may entitle such Holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.   THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.   ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

KE 34442788

**RECOMMENDATION**

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario.  Accordingly, the Debtors recommend that Holders of Claims and Interests entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: _____ , 2015

<div style="margin-left:45%">

Respectfully submitted,

Caesars Entertainment Operating Company, Inc.
(for itself and all Debtors)

By: _____
Name:
Title:

</div>

## EXHIBITS

**[TO COME]**

KE 34442788