# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
|  | ) |
| Debtors. | ) (Jointly Administered) |
|  | ) |
|  | ) **Re:  Docket No. 1115** |

## ORDER (I) APPROVING SETTLEMENT BY AND AMONG DEBTOR BOARDWALK REGENCY CORPORATION AND  PIER RENAISSANCE LP, BARTON I. BLATSTEIN, AND TOWER  INVESTMENTS, INC., AND (II) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (a) approving and authorizing Debtor Boardwalk Regency Corporation, d/b/a Caesars Atlantic City ("Caesars AC"), to enter into and take all necessary actions to effectuate the settlement (the "Settlement") as set forth in that certain agreement between Caesars AC, on the one hand, and Pier Renaissance LP ("PRLP"), Barton I. Blatstein, an individual ("Blatstein"), and Tower Investments, Inc. ("Tower" and, collectively with PRLP and Blatstein, the "Blatstein Parties"), on the other hand, attached as **Exhibit 1** to this Order, that certain consent to assignment and third amendment to the Ground Lease (the "Third Amendment"), substantially in the form annexed to this Order as **Exhibit 2**, and that certain tax payment agreement (the "Tax Payment Agreement" and, together

---

[1]    The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. Due to the large number of Debtors in these jointly-administered chapter 11 cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

with the Third Amendment, the "Related Agreements"), substantially in the form annexed to this

Order as **Exhibit 3**; and (b) granting related relief, all as more fully set forth in the Motion; and

after due deliberation, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      The Settlement as set forth in the Settlement Agreement and Related Agreements

is approved and authorized.  The Settlement Agreement, substantially in the form attached hereto

as **Exhibit 1**, is approved and Caesars AC is authorized to enter into the Settlement Agreement.

3.      The Third Amendment, substantially in the form attached hereto as **Exhibit 2** is

approved and Caesars AC is authorized to enter into the Third Amendment.

4.      The Tax Payment Agreement, substantially in the form attached hereto as

**Exhibit 3** is approved and Caesars AC is authorized to enter into the Tax Payment Agreement.

5.      Notwithstanding anything in the Settlement Agreement or the Related

Agreements to the contrary, nothing herein constitutes an assumption or rejection of the Ground

Lease and Caesars AC's rights to assume or reject the Ground Lease (including as amended by

the Third Amendment) are fully reserved.

6.      Caesars AC is authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion, including entering the Settlement

Agreement, the Third Amendment, the Tax Payment Agreement, and any and all other

documents or agreements necessary to implement the terms of the Settlement.

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order

shall be immediately effective and enforceable upon its entry.

Dated: _____**2 7 APR 2015**_____, 2015
Chicago, Illinois

_____
The Honorable A. Benjamin Goldgar
United States Bankruptcy Judge

2

KE 35680926

# Exhibit 1

**Settlement Agreement**

KE 35680926

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is made and entered into as of this 1st day of April, 2015, to be effective as of November 17, 2014 (the "Effective Date") by and among BOARDWALK REGENCY CORPORATION d/b/a CAESARS ATLANTIC CITY ("Caesars" or "Landlord") and PIER RENAISSANCE LP ("PRLP"), BARTON I. BLATSTEIN ("Blatstein") and TOWER INVESTMENTS, INC. ("Tower") (PRLP, Blatstein and Tower are sometimes hereinafter referred to as the "Blatstein Parties"; Caesars and the Blatstein Parties together, the "Parties").

## RECITALS

A.      Reference is made to that certain Lease by and between Caesars, as Landlord, and Pier Developers, Inc., as Tenant, dated as of March 1, 2003 with an effective lease commencement date of February 17, 2003 (the "Original Lease"), as amended by that certain First Amendment to Lease dated December 24, 2003 (the "First Amendment") and that certain Assignment and Assumption of Lease, Landlord's Consent and Second Amendment of Lease dated January 28, 2005 (the "Second Amendment"; the Original Lease, as amended by the First Amendment and Second Amendment, referred to herein as the "Lease").

B.      The Lease evidences a long term leasehold estate granted to Tenant in a Property commonly known as The Pier, One Atlantic Ocean, Atlantic City, Atlantic County, New Jersey, more particularly described on the Tax Map of the City of Atlantic City, New Jersey as Block 1, Lots 93 and 93.01 (the "Property").

C.      On or about January 28, 2005 Atlantic Pier Associates, LLC ("APA") became the Tenant under the Lease pursuant to the Second Amendment.

D.      On or about November 9, 2011 HQ13 – 1 Atlantic Ocean LLC ("HQ13") became the Tenant under the Lease by virtue of that certain Receiver's Assignment of Leasehold Interest.

E.      On or about November 17, 2014 PRLP became the Tenant under the Lease by virtue of that certain Quitclaim Deed and Assignment of Ground Lease.

F.      On or about January 15, 2015, Caesars filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code for the Northern District of Illinois (the "Bankruptcy Court"), Case No. 15-01151 (being jointly administered under Case No. 15-01145) (the "Bankruptcy"). As of the date of this Agreement, Caesars remains a Chapter 11 Debtor subject to the jurisdiction of the Bankruptcy Court.

G.      On or about February 20, 2015 Caesars filed an action against the Blatstein Parties, APA, HQ13 and Torchlight Loan Services, LLC ("Torchlight") in the Superior Court of New Jersey, Law Division, Atlantic County, Docket No. L-399-15 (the "Injunction Action") seeking, *inter alia*, the award of equitable relief and damages. On or about February 27, 2015 Caesars filed suit against the Blatstein Parties and HQ13 in the Superior Court of New Jersey

Law Division, Special Civil Part, Atlantic County, Docket No. LT-946-15 (the "Landlord Tenant Action") seeking, *inter alia*, the award of equitable relief.

H.    On or about February 27, 2015, relying on Caesars' status as a Chapter 11 Debtor in the Bankruptcy and the nature of the relative claims of Caesars and the Blatstein Parties, the Blatstein Parties removed the Injunction Action to the United States Bankruptcy Court for the District of New Jersey, at ADV No. 15-01235 (ABA). On or about March 11, 2015, relying on Caesars' status as a Chapter 11 Debtor in the Bankruptcy and the nature of the relative claims of Caesars and the Blatstein Parties, the Blatstein Parties removed the Landlord Tenant Action to the United States Bankruptcy Court for the District of New Jersey, at ADV No. 15-01256 (ABA) (the Injunction Action and the Landlord Tenant Action, as removed to the United States Bankruptcy Court for the District of New Jersey, are referred to collectively herein as the "Litigation").

I.    Caesars and the Blatstein Parties now wish to resolve the Litigation.

**NOW THEREFORE,** for good and valuable consideration, the receipt of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

1.    Execution of Third Amendment. Contemporaneous with the execution of this Agreement, Caesars and PRLP will execute (a) a Consent to Assignment of Lease and Third Amendment to Lease (the "Third Amendment") for the Property substantially in form and substance as attached hereto as Exhibit "B" hereto, and (b) that certain agreement substantially in the form attached hereto as Exhibit "A" (the "Confidential Agreement," and together with the Third Amendment, the "Related Agreements").

2.    Indemnification of Landlord. PRLP and Blatstein shall indemnify, release, and hold harmless Caesars and its parents subsidiaries, affiliates, officers, directors, employees, agents and representatives from and against any and all claims that may be asserted by HQ13, its members, trustees, security holders, servicers (including without limitation Torchlight), and each of their predecessors or successors in interest and any party claiming through any of them in any way arising out of or in connection with the Lease, the Property and Tenant's rights and obligations under the Lease, including without limitation (i) the transfer of Tenant's rights and obligations to PRLP as contemplated by the Quitclaim Deed, and (ii) Landlord's consent to such transfer as provided in the Third Amendment.

3.    Cure of Monetary Defaults.

(a) As of March 1, 2015, HQ13 and Tenant were in default of obligations to pay Rent and Taxes to Landlord in the total amount of Three Million Eight Hundred Forty-Two Thousand Six Hundred Eighty-Six and No/100 Dollars ($3,842,686.00) (the "Prior Monetary Obligation"). The Parties acknowledge and agree that the amount of the Prior Monetary Obligation set forth in the

2

immediately preceding sentence shall be conclusive and binding upon the Parties for all purposes hereunder.

(b) PRLP, as Tenant, acknowledges and accepts responsibility for the Prior Monetary Obligation without claim or offset, and shall satisfy the Prior Monetary Obligation in accordance with the following:

(1) On or about March 23, 2015, PRLP delivered by wire transfer to Landlord the sum of Six Hundred Forty-Two Thousand Six Hundred Eighty-Six and No/100 Dollars ($642,686.00), representing Tenant's obligation for Taxes due and owing from and after the Effective Date to and including March 31, 2015. Landlord acknowledges receipt of these funds.

(2) PRLP shall pay to Landlord the balance of the Prior Monetary Obligation, or Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00) (the "Outstanding Balance"), or such portion thereof as is required by this paragraph, in accordance with the terms of this Paragraph.

(i) On or before August 1, 2015, PRLP shall pay to Landlord either (y) the sum of One Hundred Thirty-Three Thousand and 33/100 Dollars ($133,333.33), or (z) an amount less than One Hundred Thirty-Three Thousand and 33/100 Dollars ($133,333.33), but at least One Hundred Thousand and No/100 Dollars ($100,000.00). If PRLP makes the payment described in clause (y) above, PRLP shall be deemed to have irrevocably elected the "12-Month Amortization Option" described below; if PRLP makes the payment described in clause (z) above, PRLP shall be deemed to have irrevocably elected the "24-Month Amortization Option" described below. If PRLP fails to make either of the payments described in clauses (y) or (z) above, in the amount and when required hereby, then without notice to PRLP or an opportunity for PRLP to cure such failure, Landlord shall be entitled to exercise its rights described in Paragraph 3(c)(2).

(A) 12-Month Amortization Option. If PRLP shall elect the 12-Month Amortization Option, PRLP shall pay to Landlord, in twelve (12) equal monthly installments of One Hundred Thirty-Three Thousand Thirty Three and 33/100 ($133,333.33) each, due on the first day of each month to and including July 1, 2016, the sum of One Million Six Hundred Thousand and No/100 Dollars ($1,600,000.00). If PRLP shall fail to make any monthly payment as and when required hereby, then

3

without notice to PRLP, Landlord shall be entitled to exercise its rights described in Paragraph 3(c)(2); provided, however, that in the case of the first such failure only, PRLP shall be entitled to cure such failure within 30 days after Landlord's delivery of written notice of such failure to PRLP, except that no such right to notice and cure shall apply if PRLP fails to make the first installment payment due August 1, 2015, as described in Paragraph 3(b)(2)(i).

(B) 24-Month Amortization Option.  If PRLP shall elect the 24-Month Amortization Option, PRLP shall pay to Landlord, in twenty-four (24) equal monthly installments of One Hundred Thousand and No/100 Dollars ($100,000.00) each, due on the first day of each month to and including July 1, 2017, the sum of Two Million Four Hundred Thousand and No/100 Dollars ($2,400,000.00).  If PRLP shall fail to make any monthly payment as and when required hereby, then without notice to PRLP, Landlord shall be entitled to exercise its rights described in Paragraph 3(c)(2); provided, however, that in the case of the first such failure only, PRLP shall be entitled to cure such failure within 30 days after Landlord's delivery of written notice of such failure to PRLP, except that no such right to notice and cure shall apply if PRLP fails to make the first installment payment due August 1, 2015, as described in Paragraph 3(b)(2)(i).

(ii) If PRLP shall have paid to Landlord each and every installment as required by the terms of Paragraph 3(b)(2)(i)(A) or (B), as applicable (subject in either case to PRLP's one-time notice and cure rights as described in Paragraph 3(b)(2)(i)(A) or (B), as applicable), then PRLP shall be deemed to have satisfied the Outstanding Balance in full.

(c) As security for PRLP's obligation to pay to Landlord the Outstanding Balance, not later than June 1, 2015, PRLP shall deposit with an escrow agent mutually and reasonably acceptable to the Parties (the "Escrow Agent") an irrevocable letter of credit in the amount of Three Million Two Hundred Thousand and No/100 Dollars ($3,200,000.00) in a form reasonably acceptable to Landlord (the "PMO Security"). The PMO Security shall be held and disbursed in accordance with the terms of an Escrow Agreement in form and substance mutually and reasonably acceptable to the Parties and Escrow Agent and in accordance with the terms of this Agreement.

4

(1)  If PRLP shall have satisfied the Outstanding Balance as contemplated by Paragraph 3(b)(2)(ii), then the PMO Security shall be returned by Escrow Agent to PRLP.

(2)  If PRLP shall fail to pay to Landlord each and every installment as required by the terms of Paragraph 3(b)(2)(i)(A) or (B), as applicable (subject in either case to PRLP's one-time notice and cure rights as described in Paragraph 3(b)(2)(i)(A) or (B), as applicable), then Escrow Agent shall deliver the PMO Security to Landlord upon receipt of demand therefor by Landlord. Landlord shall not be required to provide notice of any kind to PRLP prior to serving such demand upon Escrow Agent, and Escrow Agent shall be entitled to rely on such demand as authorization for the release of the PMO Security without further action by any of the Parties.  Upon Landlord's receipt of the PMO Security, Landlord shall be entitled to retain for its own account the full amount of the PMO Security; provided, however, that the total of all payments made by PRLP under the terms of Paragraph 3(b)(2)(i)(A) or (B), if any, shall be returned to PRLP. Upon Landlord's receipt of the PMO Security, PRLP shall be deemed to have satisfied the Outstanding Balance in full.

(3)  If the PMO Security shall, by its terms, require periodic renewal, then no later than thirty (30) days prior to the expiration date of the PMO Security (and each renewal or extension thereof until such time as the PMO Security has been released by Landlord), PRLP shall deliver to Escrow Agent a renewal or extension of the PMO Security for a term of not less than one year, in form, content and issued by a bank acceptable to Landlord in its sole discretion.  If a renewal or extension of the PMO Security is not provided to Escrow Agent at least thirty (30) days prior to the expiration date of the PMO Security, then Landlord shall be entitled to draw upon the PMO Security, and apply the proceeds of the PMO Security to the Outstanding Balance.

(d)  PRLP's failure to deposit the PMO Security with Escrow Agent by not later than June 1, 2015 in accordance with the terms of Paragraph 3(c), shall constitute a default by PRLP under this Agreement.  Time is of the essence of PRLP's obligation in this regard.  Blatstein's death or incapacity prior to the deposit by PRLP of the PMO Security shall also be deemed a default by PRLP under this Agreement.  Upon the occurrence of any default under this Paragraph 3(d), PRLP shall also immediately, irrevocably and without the need for any action by Landlord, be deemed in default of its obligations under the Lease. No Blatstein Party shall be entitled to any notice or any opportunity to cure any such default under either this Agreement or the Lease.

(e)  From and after the date of this Agreement, and unless the PMO Security is timely deposited with Escrow Agent in accordance with the terms of

5

Paragraph 3(c), PRLP's obligations to pay and satisfy the Outstanding Balance shall be absolutely and unconditionally guaranteed by Blatstein, which guaranty shall be a guaranty of payment and not a guaranty of collection. If PRLP timely deposits the PMO Security with Escrow Agent, then Blatstein shall be released from his guaranty obligations imposed under this Paragraph 3(e).

4.    Dismissal of Litigation. Not later than seven (7) days after the date this Agreement is approved by the Bankruptcy Court pursuant to a final order not subject to appeal, Caesars and the Blatstein Parties will mark the Litigation as Dismissed, with Prejudice, as to all parties.

5.    Reservation of Rights. Nothing herein shall constitute nor be deemed to constitute an assumption or rejection of the Lease. Notwithstanding anything herein to the contrary, Caesars' rights with respect to any such assumption or rejection are fully reserved.

6.    Costs. Caesars and the Blatstein Parties shall each be responsible for its own costs in connection with the Litigation and this Settlement Agreement.

7.    Representation of Authority. Caesars and the Blatstein Parties each represent and warrant that they have the right, power and authority to enter into this Settlement Agreement and to consummate the transactions and agreements contemplated herein; provided that with respect to Caesars, such right, power and authority is subject to approval by the Bankruptcy Court.

8.    Choice of Law and Jurisdiction. Caesars and the Blatstein Parties agree that this Agreement is made in and to be interpreted in accordance with the laws of the State of New Jersey. The Parties agree that the Bankruptcy Court shall have jurisdiction over this matter for the purpose of resolving disputes relating to or arising out of this Settlement Agreement.

9.    Execution in Counterparts. This Settlement Agreement may be signed in one or more separate counterparts, each of which, when so executed, shall be deemed to be an original. In the event that any signature is delivered by facsimile transmission or by e-mail delivery of a ".pdf" format data file, such signature shall be deemed to be an original. Such counterparts shall together, constitute and be one and the same instrument.

10.    Effectiveness. (a) This Agreement shall be immediately effective and binding upon the Blatstein Parties upon execution hereof; provided that if this Agreement is not approved by the Bankruptcy Court by May 30, 2015 pursuant to a final order not subject to appeal, this Agreement shall be null and void ab initio and of no force or effect with respect to the Blatstein Parties. (b) This Agreement shall be effective upon Caesars upon approval by the Bankruptcy Court pursuant to a final order not subject to appeal; provided that if this Agreement is not approved

6

by the Bankruptcy Court by May 30, 2015 pursuant to a final order not subject to appeal, this Agreement shall be null and void ab initio and of no force or effect with respect to Caesars.

*Signatures appear on the next page*

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first above written.

BOARDWALK REGENCY CORPORATION
d/b/a CAESARS ATLANTIC CITY, a New Jersey
corporation

By: _____
      Kevin C. Ortzman, Senior Vice President
      and General Manager


PIER RENAISSANCE, LP, a New Jersey limited
partnership

By: Pier Renaissance, Inc., a New Jersey
corporation, its General Partner


By: _____
      Barton I. Blatstein, President


BARTON I. BLATSTEIN



_____
Barton I. Blatstein


TOWER INVESTMENTS, INC.


By: _____
      Barton I. Blatstein, Chief Executive Officer

IN WITNESS WHEREOF, the Parties have executed this Settlement Agreement as of the date first above written.

BOARDWALK REGENCY CORPORATION
d/b/a CAESARS ATLANTIC CITY, a New Jersey
corporation

By: _____
      Kevin C. Ortzman, Senior Vice President
      and General Manager


PIER RENAISSANCE, LP, a New Jersey limited
partnership

By: Pier Renaissance, Inc., a New Jersey
corporation, its General Partner

By: _____
      Barton I. Blatstein, President


BARTON I. BLATSTEIN

_____
Barton I. Blatstein


TOWER INVESTMENTS, INC.

By: _____
      Barton I. Blatstein, Chief Executive Officer

**<u>Exhibit 2</u>**

**Third Amendment to the Ground Lease**

## CONSENT TO ASSIGNMENT OF LEASE AND
## THIRD AMENDMENT TO LEASE

THIS CONSENT TO ASSIGNMENT OF LEASE AND THIRD AMENDMENT TO LEASE (this "Agreement") dated April 1, 2015 by and among PIER RENAISSANCE, LP, a New Jersey limited partnership ("PRLP") having an address at 1 Atlantic Ocean, Atlantic City, New Jersey 08401 and BOARDWALK REGENCY CORPORATION d/b/a CAESARS ATLANTIC CITY, a New Jersey corporation ("Landlord"; Landlord and the PRLP are sometimes collectively referred to as the "Parties") having an address at 2100 Pacific Avenue, Atlantic City, New Jersey 08401.

BACKGROUND:

A.      Landlord is a party to a lease dated May 1, 2003 (the "Original Lease"), as heretofore modified by that certain First Amendment of Lease, dated December 24, 2003 (the "First Amendment") and that certain Assignment and Assumption of Lease, Landlord's Consent and Second Amendment of Lease, dated January 28, 2005 (the "Second Amendment"; and together with the Original Lease and the First Amendment, collectively, the "Lease"). All capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Lease.

B.      The Lease demises to the Tenant the land and improvements thereon commonly referred to as the Pier at Caesars located in Atlantic City, New Jersey, as more particularly described on Exhibit A attached hereto (the "Property").

C.      On April 6, 2010, Bank of America, as Trustee, instituted a mortgage foreclosure action against then-tenant under the Lease, Atlantic Pier Associates, LLC, in the United States District Court for the District of New Jersey, captioned *Bank of America, N.A., as successor trustee to Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Morgan Stanley Capital I Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-HQ13*, Docket No.: 1:10-cv-01755-JHR-JS (the "Foreclosure Action") due to APA's default of a loan secured by APA's interest in the Property (the "Tenant's Interest"). On March 31, 2011, the court in the Foreclosure Action entered a Consent Judgment in Mortgage Foreclosure (the "Foreclosure Judgment") in favor of Bank of America, as Trustee, and against APA.

D.      On October 28, 2011, the Tenant's Interest was sold at foreclosure sale by the court-appointed receiver in the Foreclosure Action, and on November 9, 2011, the court in the Foreclosure Action entered an Order Confirming Receiver's Sale approving the sale of Tenant's Interest to U.S. Bank, as Trustee, or its nominee or assignee. U.S. Bank, as Trustee, assigned its rights with respect to the sale of the Property to HQ13 – 1 Atlantic Ocean LLC ("HQ13 – 1") as reflected by an Assignment of Bid filed in the Foreclosure Action on November 10, 2011. Thereafter, the receiver executed and delivered to HQ 13 – 1 that certain Receiver's Assignment of Leasehold Interest dated as of November 9, 2011, which was recorded on April 16, 2012 with the Atlantic County Clerk's Office as instrument number 2012023379.

E.    Under the terms of that certain Purchase and Sale Agreement dated October 7, 2014, HQ13 – 1, as seller, and PRLP, as buyer, agreed to the sale of Tenant's Interest by HQ13 – 1 to PRLP (the "Sale"). The Sale closed on November 17, 2014. In connection with the closing of the Sale, HQ13 – 1 and PRLP executed, among other documents, that certain Quitclaim Deed and Assignment of Ground Lease (the "Quitclaim Deed"). Pursuant to the Quitclaim Deed, HQ13 – 1 purported to assign to PRLP all of the Tenant's Interest.

F.    On January 15, 2015, Landlord filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), Case No. 15-01151 (being jointly administered under Case No. 15-01145) (the "Bankruptcy"), and as of the date of this Agreement, remains a Chapter 11 Debtor subject to the jurisdiction of the Bankruptcy Court.

G.    The Parties have determined to enter into this Agreement to memorialize the assignment to and assumption by PRLP of all of Tenant's rights and obligations under the Lease and to provide for certain modifications of the Lease, all in accordance with the terms of this Agreement.

NOW, THEREFORE, for and in consideration of the mutual covenants and conditions hereinafter contained, the parties hereby agree as follows:

1.    Effective Date of Agreement. The effective date of this Agreement ("Effective Date") shall be November 17, 2014, which is the date of the Quitclaim Deed and is the date that PRLP first took possession of and exercised Tenant's right and interests under the Lease.

2.    Approval of Assignment and Assumption of Lease.

(a)    Landlord shall recognize the effectiveness of the assignment to and assumption by PRLP of Tenant's rights and obligations under the Lease, as described in and in accordance with the terms of the Quitclaim Deed. Landlord shall be deemed to have approved such assignment and assumption retroactive to the Effective Date, upon the express condition that neither such consent nor the collection of rent from PRLP shall be deemed a waiver of the provisions of Section 12 of the Lease with respect to future assignments or subletting.

(b)    Without limiting the generality of Paragraph 2(a), above, from and after the Effective Date, PRLP shall assume and shall promptly and faithfully keep, fulfill, observe, perform and discharge each and every covenant and obligation that may accrue and become performable, due or owing under the Lease on PRLP's part to be performed as Tenant under the Lease accruing from and after the Effective Date.

3.    Pending Real Estate Tax Appeals; PILOT Implications.

2

(a)    Notwithstanding the terms of Section 4.3 of the Lease to the contrary, the Parties acknowledge and agree that for all periods prior to the Effective Date, PRLP does not have, shall not assert and shall not be entitled to the benefit of any right of appeal regarding the validity or amount of any Taxes assessed against the Property, and shall not be entitled to any refund or credit on account of any appeal of Taxes assessed against the Property for any periods prior to tax year 2015. PLRP shall withdraw any pending appeals of Taxes assessed against the Property for any tax year prior to 2015. For all periods from and after tax year 2015, Tenant's rights under Section 4.3 of the Lease shall be in full force and effect.

(b)    The Parties acknowledge and agree that at the time of the execution of this Agreement, the New Jersey Legislature is considering the adoption of legislation that would create a program under which New Jersey casino licensees would be required to make payments in lieu of real estate taxes ("PILOT") that may or may not include the Property. If such a PILOT program is established and the Property is included in such program, then notwithstanding any provision of the Lease to the contrary, Tenant's obligation to pay Taxes shall include Tenant's obligation to pay a prorated portion of the PILOT assessed against Landlord, in accordance with the formula established by the enabling legislation establishing such program.

4.    Landlord's Support. Landlord hereby approves of Tenant's conceptual plans for modifications, alterations, improvements and renovations to the Property reflected in that certain conceptual rendering booklet titled PLAYGROUND – One Atlantic Ocean, prepared by Steelman Partners dated February 6, 2015 provided to Landlord by Tenant, a copy of which is attached hereto as Exhibit 3.1.4 and Landlord shall cooperate with Tenant and provide Tenant with such support as Tenant may reasonably request; provided, that Landlord shall not be required to make any out of pocket expenditure in connection such cooperation or support. Notwithstanding the foregoing, nothing contained in this Paragraph 4 shall be deemed to constitute any approval by Landlord of any modifications, alterations, improvements and renovations to the Property, and Tenant shall be required to obtain Landlord's approval for any such actions as and when required under all applicable provisions of the Lease, including without limitation, Section 7.3, such approval not to be unreasonably withheld; provided that in the case of any modifications, alterations, improvements and renovations relating to the addition of lodging space to the extent permitted hereby, Landlord may grant or withhold such approval in its sole discretion.

5.    Amendments to Lease. Upon the Effective Date, the Lease is hereby amended as follows (all references in this Paragraph 5 to "Section(s)" shall be deemed references to the corresponding Section(s) of the Lease). For avoidance of any doubt, if and to the extent any inconsistencies exist between the Lease and amendments to the Lease as evidenced by this Third Amendment, this Third Amendment shall control:

(a)    *Section 1.6.2*. Section 1.6.2 is hereby amended by adding the following sentence at the end of the Section::

Landlord further covenants to exercise its good faith efforts to provide any such recognition and non-disturbance agreement within three (3) business days of Tenant's written request for same.

(b)    **_Section 1.6.3_**. Section 1.6.3 is hereby amended by adding the following sentence at the end of the Section:

Notwithstanding the foregoing, in the event that Landlord fails to comply with the requirements of the immediately preceding sentence, Tenant's only remedy for such failure shall be an abatement of Tenant's obligation to pay Rent and Taxes, such abatement to be effective from and after the date of Landlord's failure to comply with such requirements and ending on the date that Landlord is again in compliance with such requirements.

(c)    **_Section 3.1_**. In consideration of the significant improvements to the Complex to be implemented by Tenant, Landlord and Tenant have agreed to modify the Minimum Annual Rental structure. Accordingly, Section 3.1 is hereby deleted and in its place is substituted the following:

3.1    Minimum Annual Rental.

3.1.1    Tenant shall pay to Landlord for each Lease Year of the Term, a minimum annual rent ("Minimum Annual Rental") which shall be subject to adjustment over time as determined in accordance with the following:

(i)    Beginning on August 1, 2015, Tenant shall pay to Landlord without abatement, deduction or offset (except as expressly provided for under this Lease), in equal, consecutive monthly installments of Twenty Thousand Eight Hundred Thirty-Three and 33/100 Dollars ($20,833.33) each, in advance on or before the first day of each calendar month, a Minimum Annual Rental of Two Hundred Fifty Thousand Dollars ($250,000.00);

(ii)    Upon the earlier to occur of Tenant's opening for business of Phase II of Tenant's Planned Renovation or June 1, 2016, Tenant shall pay to Landlord without abatement, deduction or offset (except as expressly provided for under this Lease), in equal, consecutive monthly installments of Forty-One Thousand Six Hundred Sixty-Six and 67/100 Dollars ($41,666.67) each, in advance on or before the first day of each calendar month, a Minimum Annual Rental of Five Hundred Thousand Dollars ($500,000.00);

(iii)    Upon the earlier to occur of Tenant's opening for business of Phase IIIA of Tenant's Planned Renovation or January 1, 2017, Tenant shall pay to Landlord without abatement, deduction or offset (except as expressly provided for under this Lease), in equal, consecutive monthly installments of Fifty Thousand and No/100 Dollars ($50,000.00) each, in advance on or before the first

4

day of each calendar month, a Minimum Annual Rental of Six Hundred Thousand Dollars ($600,000.00);

(iv)    In the event Tenant completes Phase IIIB of Tenant's Planned Renovation, as Phase IIIB is identified below, then upon Tenant's completion of Phase IIIB of Tenant's Planned Renovation, Tenant shall pay to Landlord without abatement, deduction or offset (except as expressly provided for under this Lease), in equal, consecutive monthly installments of Fifty-Eight Thousand Three Hundred Thirty-Three and 33/100 Dollars ($58,333.33) each, in advance on or before the first day of each calendar month, a Minimum Annual Rental of Seven Hundred Thousand Dollars ($700,000.00); and

(v)    If Tenant has failed to complete Phase I and Phase II of Tenant's Planned Renovation on or before January 1, 2017, Tenant shall pay to Landlord without abatement, deduction or offset (except as expressly provided for under this Lease), in equal, consecutive monthly installments of Eighty Three Thousand Three Hundred Thirty-Three and 33/100 Dollars ($83,333.33) each, in advance on or before the first day of each calendar month, a Minimum Annual Rental of One Million and No/100 Dollars ($1,000,000.00).

For purposes of clarity, the Minimum Annual Rental provided in each of Sections 3.1.1(i) through (v) shall be in the alternative, and shall not be cumulative. For avoidance of any doubt, if despite Tenant's exercise of its commercially reasonable, good faith efforts to obtain all permits and approvals from any Governmental Entity necessary to construct Phase IIIB of Tenant's Planned Renovation, such permits and approvals are denied rendering construction of Phase IIIB of Tenant's Planned Renovation impossible or impracticable, it shall not be a default by Tenant hereunder should Tenant not undertake and/or complete Phase IIIB of Tenant's Planned Renovation.

3.1.2    The Minimum Annual Rental shall be increased after every five years of the Term, starting on January 1, 2020, by a percentage equal to the increase in the CPI (the "Increase in CPI") measured (i) from the Effective Date until June 30, 2019; and (ii) every five (5) years thereafter (e.g., July 1, 2019 through June 30, 2024), but subject to a cap of seven and one-half percent (7.5%) in any 5-year period.

3.1.3    Tenant shall be responsible and pay for security, utilities, insurance and maintenance of the Property, and shall pay one hundred percent (100%) of the Taxes (hereinafter defined) subject to the limitations set forth in Section 4.1.

3.1.4    For purposes of Section 3.1.1, the term "Tenant's Planned Renovations" shall mean Tenant's conceptual plans for modifications, alterations, improvements and renovations to the Property reflected in that certain conceptual rendering booklet titled PLAYGROUND – One Atlantic Ocean, prepared by Steelman Partners dated February 6, 2015 provided to Landlord by Tenant and

attached hereto as Exhibit 3.1.4. Tenant's Planned Renovations are estimated by Tenant to be completed in the following phases:

   (i) Phase I – completion of renovations and improvements located on the first level of the Property;

   (ii) Phase II – completion of renovations and improvements located on the second and third levels of the Property;

   (iii) Phase IIIA – completion of renovations and improvements for the outside stage/public entertainment area on the north side of the Property; and

   (iv) Phase IIIB - completion of renovations and improvements for the outside pool area on the south side of the Property.

Notwithstanding the foregoing, nothing contained in this Section 3.1 shall be deemed to constitute any approval by Landlord of any modifications, alterations, improvements and renovations to the Property, including Tenant's Planned Renovation, and Tenant shall be required to obtain Landlord's approval for any such actions as and when required under all applicable provisions of this Lease, including without limitation, Section 7.3, such approval not to be unreasonably withheld; provided that in the case of any modifications, alterations, improvements and renovations relating to the addition of lodging space to the extent permitted hereby, Landlord may grant or withhold such approval in its sole discretion.

(d) **_Section 3.2_**.  Section 3.2 is hereby amended by adding the following sentence as a new paragraph at the end of the Section:

Notwithstanding any provision of this Lease to the contrary, including without limitation the terms of this Section 3.2, Tenant shall have no obligation to pay Percentage Rent.

(e) **_Section 4.1_**.  The second full paragraph of Section 4.1 is hereby deleted and in its place is substituted the following:

 From and after tax year 2015, Tenant shall be responsible for all Taxes without limitation.

(f) **_Section 5.1_**.  The first paragraph of Section 5.1 is hereby deleted and in its place is substituted the following:

 Except for gaming activities that are conducted by Landlord or its Affiliates, the Property is leased to Tenant solely for any legal use included on Exhibit 5.1 hereto, to include a selective, first class, retail shopping and entertainment complex consistent with the quality and reputation of the Hotel.

6

The retail component of the Property shall be consistent with the standard of the King of Prussia® Mall located in King of Prussia Pennsylvania as of April 1, 2015, including without limitation, the quality of the tenants at the King of Prussia® Mall as of April 1, 2015 (collectively the "KOP Standard"). A list of the current tenants at King of Prussia® Mall is attached as Exhibit E. Tenant shall not use or suffer to be used the Property, or any portion thereof, for any other purpose or purposes whatsoever. Tenant is aware that the ambiance and aesthetic qualities of the Property are of paramount importance to Landlord. Without limiting the generality of the foregoing, (1) no portion of the Property shall be subleased to retail Subtenants other than Subtenants that satisfy the KOP Standard, (2) no portion of the Property shall be used for the selling of pornography of any type, adult book stores, fortune telling, palm reading, phrenology and similar businesses, or massage (other than fully-clothed, open-room, chair massage), pharmacies or the provision of social or medical services, and (3) no portion of the Property shall be used for the provision of live or recorded musical entertainment of a genre other than jazz, blues, country, classical, opera, rock, pop, comedy, magic without the prior written consent of Landlord, and (4) Tenant shall not and shall not permit any Subtenants to establish and/or operate any cart, kiosk or other temporary or "pop-up" location for any purpose within the Complex without the prior written consent of Landlord. In order to ensure that Tenant is pursuing Subtenants that meet or exceed the standards set forth above, Tenant shall provide to Landlord every one hundred eighty (180) days an updated or supplemental list of prospective subtenants until seventy (70%) percent occupancy by subtenants has been achieved. Further, Tenant shall not enter into any sublease with a "quick serve" or "fast food" restaurant. Tenant shall not use or permit the use of the Property or exercise any of its rights hereunder in any manner which creates a nuisance or violates any applicable laws, rules, ordinances, orders and regulations of (i) federal, state, county, municipal, or other governmental agencies and bodies having jurisdiction or any respective departments, bureaus, and officials; (ii) the insurance underwriting board or insurance inspection bureau having or claiming jurisdiction; or (iii) any insurance company insuring all or any part of the Property, Hotel or Hotel Parcel or any of them. Tenant shall not commit or allow to be committed any waste upon the Property. Any Subtenant in place at the Property as of the Effective Date of this Third Amendment shall be deemed to have been approved by Landlord.

(g)    **Section 5.2.** Section 5.2 is hereby amended by adding the following sentence at the end of the first full paragraph:

Without limiting the generality of the foregoing, it is expressly understood that the term "Approvals" shall include applications for any and all grants, credits, financial aid or other sources of financial assistance, provided that any such applications may reasonably be deemed by Landlord to adversely effect Landlord if a result of any such applications might bind, detract from, or otherwise limit Landlord's eligibility for or ability to obtain similar or alternative assistance for any purpose of Landlord or its affiliates.

7

(h)    **_Section 5.3_**.  Section 5.3 is hereby deleted and in its place is substituted the following:

   5.3    Use of Beach Areas.

      5.3.1    Except with the prior written consent of Landlord (which consent may be granted or withheld in Landlord's sole discretion), neither Tenant nor any Affiliate of Tenant shall submit or otherwise offer a bid for or accept a lease of, license regarding or other use agreement relating to those certain beach parcels currently designated by the City of Atlantic City as Lots 25 through 28, as such parcels may be reconfigured or redesignated from time to time.  The Parties agree that Tenant may only acquire an interest in any such beach parcels through Landlord or its Affiliates.

      5.3.2    Except with the prior written consent of Landlord (which consent may be granted or withheld in Landlord's sole discretion), Tenant shall not construct or operate any permanent or semi-permanent bar structure or provide for the service of alcoholic beverages on the north side of the Property, except that Tenant may employ temporary bar structures and serve alcoholic beverages during the conduct of paid-ticketed, live entertainment events conducted from such location.

(i)    **_Section 5.4_**.  Section 5.4 is hereby deleted and in its place is substituted the following:

   Tenant shall be permitted to use a portion of the Property for transient lodging not to exceed twenty 20 rooms, to the extent the Property shall support such a use and to the extent permitted by law.

(j)    **_Section 5.9_**.  The first paragraph of Section 5.9 is hereby deleted and in its place is substituted the following:

   To the extent under Tenant's control or right of control, no portion of the Premises nor any signage or billboards on or about the Premises may be subleased to or used by or on behalf of any Gaming Competitor, or any Affiliate of any Gaming Competitor, in the gaming and/or hotel business including, without limitation, promoting a Gaming Competitor, except a Person which is an Affiliate of a competitor of Landlord, provided that the Affiliate is not itself (i) in the gaming and/or hotel business, (ii) identified (whether because of name, products or otherwise) with a person in the gaming and/or hotel business or (iii) providing services ancillary to or supportive of the gaming and/or hotel business.

(k)    **_Section 5.11(a)_**.  Section 5.11(a) is hereby deleted and in its place is substituted the following:

8

5.11    (a)    Operating Hours

Landlord acknowledges that different Subtenants shall have different operating hours depending upon each Subtenants' particular business and use. Accordingly, the operating hours for the Property shall vary depending upon the particular Subtenant and its use such that, for example, retail shopping tenants will be open for business on dates and times normally associated with retail shopping establishments, while live music venues will be open for business on dates and times normally associated with live music venues. All common areas of the Property shall be fully open to the public at all times, seven days a week, every day of the year (subject to Force Majeure) except that portions of such areas may be shut from time to time as required for repair, maintenance, special events and other necessary temporary purposes provided that (i) at all times there is reasonable ingress and egress to and from the Hotel and the Property, except for any necessary temporary closings, and (ii) such repair, maintenance or other activity is conducted in such a manner as to minimize disruption to the fullest extent possible. In the event of any such temporary closings, to the extent the same is practicable and will not impose any cost, expense or liability on Tenant, Tenant will provide alternate pedestrian ingress and egress between the Hotel and the Property during such temporary changes. Fully open means, without limitation, that there shall be reasonably adequate security, air conditioning, lighting and other utilities; and in general that at all hours such areas shall be maintained, but not necessarily staffed, in the same manner as when all stores are open for business. Subject to force majeure, failure by Tenant to comply with the covenant to operate for more than (i) ten (10) consecutive days or (ii) thirty (30) days in any one "rolling" calendar year shall be deemed an Event of Default and Landlord shall have the right to exercise any and all of its rights and remedies hereunder, excluding termination, and may seek recovery of all of its damages hereunder in accordance with Section 10 of this Lease. Notwithstanding the foregoing, for the first ten "Events of Default" relating to operating hours, Landlord shall have the right to receive as liquidated damages, and not as a penalty, for each of the first five such "Events of Default", the sum of Five Thousand ($5,000) Dollars per Event of Default and for the sixth through tenth Events of Default the sum of Ten Thousand ($10,000) Dollars per Event of Default. Tenant further agrees to use commercially reasonable efforts to enforce such obligations

(l)    ***Section 5.11(b)***.  Section 5.11(b) is hereby amended by the deletion of the words "the Grand Opening" in the first line of the first paragraph and replacing it with the words "June 1, 2016."

(m)    ***Section 5.12***.  Section 5.12 is hereby deleted.

(n)    ***Section 5.14.1***.  Section 5.14.1 is hereby amended by the addition of the following sentences at the end of the first sentence:

Landlord acknowledges that Tenant contemplates the opening of a sports bar as part of Phase II and that the sports bar will emphasize, among other things, fantasy sports and fantasy sports leagues. Landlord further acknowledges that unless determined by a Federal or State authority of competent jurisdiction to constitute gambling, any such use or any other use typical or incident to a sports bar shall not be violations of this Section 5.14.1.

(o)    ***Section 5.25 and 5.26***. Section 5.25 and Section 5.26 are hereby deleted.

(p)    ***Section 5.28***. Section 5.28 is hereby deleted and in its place is substituted the following:

5.28    Landlord's Complimentary Programs

Tenant acknowledges that Landlord and certain of Landlord's Affiliates have initiated, and may hereafter initiate, customer loyalty promotional programs (the "Promotional Programs"). To the extent Landlord deems the Promotional Program as having value and effects one or more Promotional Programs at the Hotel, then Tenant will cooperate and participate with the Promotional Programs for use in the Complex. Tenant will endeavor to cause its subleases leases with Subtenants to provide for the participation of such Subtenants in such Promotional Programs for the benefit of patrons and guests of the Hotel.

(q)    ***Section 5.29***. Section 5.29 is hereby deleted and in its place is substituted the following:

5.29    Parking

5.29.1 Landlord will provide, in its existing employee and guest parking facilities, the number of employee and guest parking spaces necessary to meet the legal parking requirement of the Complex as of the Effective Date. Tenant shall be responsible for the impact of any additional parking requirements that may be occasioned by Tenant's contemplated improvements to and renovation of the Complex.

5.29.2 Landlord will provide parking in its existing guest parking facilities at the flat rate of $5.00 to Tenant's employees showing valid employer identification. Landlord will provide free parking in its existing guest parking facilities to PRLP's principal, Barton I. Blatstein. Notwithstanding the foregoing, should any Governmental Entity impose additional Taxes or fees on Landlord measured by or on the basis of the number of automobiles entering or occupying Landlord's parking garage(s), then Landlord may increase the flat fee described above to offset any such additional impositions.

5.29.3 Landlord covenants to provide reasonable cooperation to Tenant in Tenant's efforts to obtain approvals for parking and access schemes designed to provide more convenient vehicular access to the Property, including but not

limited to a Porte Cochere and valet parking on Arkansas Avenue; provided, however, that Landlord shall not be obligated to support or otherwise cooperate with Tenant in the pursuit of any such parking or access schemes that Landlord, in its sole discretion, determines will or may be detrimental to any of Landlord's operations or business objectives.

(r)    ***Section 10.1.1***.  Section 10.1.1 is hereby deleted and in its place is substituted the following:

10.1.1  Failure to Pay

Failure to pay Rent or any other payment required to be made by Tenant hereunder within thirty (30) days after the delivery of notice of such failure to Tenant which failure is not cured within such 30-day period; provided, however, if Tenant shall be in monetary default more than one (1) time in any consecutive eighteen (18) month period, regardless if any such default is cured within the applicable notice and cure period, then there shall be deemed to be an Event of Default as of the second (2nd) occurrence of such default, without the requirement that Landlord deliver a notice of such default, and Landlord shall have the right to exercise any remedies it may have at law or in equity or under this Lease.

(s)    ***Section 10.1.5***.  Section 10.1.5 is hereby amended by replacing the phrase "Sections 10.2.2 or" in the second line of the first paragraph with the word "Section".

(t)    ***Section 10.1.7***.  Section 10.1.7 is hereby deleted.

(u)    ***Section 10.2.2.4***.  Section 10.2.2.4 is hereby deleted.

(v)    ***Section 10.3.3.6***.  Section 10.3.3.6 is hereby deleted.

(w)    ***Section 12.1.2.1(c)***.  Section 12.1.2.1(c) is hereby amended by deleting the phrase ", including, but not limited to, Section 10.2.2.4" in the second and third lines.

(x)    ***Section 12.1.2.2(b)***.  Section 12.1.2.2(b) is hereby amended by deleting the phrase ", except as permitted in Section 10.2.2.4" in the second and third lines.

(y)    ***Section 12.4***.  Section 12.4 is hereby amended by replacing the phrase "Sections 10.2.2.4 and/or" in the first and second lines with the word "Section".

(z)    ***Section 17.1, 17.1(A) and Section 17.1(B)***.  Section 17.1 is amended to provide that in addition to the methods of delivery of notice set forth in the Lease shall include delivery by a nationally recognized overnight mail courier such as Federal Express or the United Parcel Service. The addresses located in Section 17.1(A)

11

and Section 17.1(B) are hereby deleted and in their place is substituted the
following:

| | |
|---|---|
| Notice to Landlord: | Boardwalk Regency Corporation<br>2100 Pacific Avenue<br>Atlantic City, New Jersey 08401<br>Attn:  General Manager<br>Facsimile: 609-343-2707 |
| With a copy to: | Boardwalk Regency Corporation<br>Park Place and the Boardwalk<br>Atlantic City, New Jersey 08401<br>Attn:  Law Department<br>Facsimile: 609-340-2410 |
| Notice to Tenant: | Pier Renaissance, LP<br>1 Atlantic Ocean<br>Atlantic City, NJ 08401<br>Attention: Bart Blatstein<br>Facsimile: _____ |
| With a copy to: | Dinsmore & Shohl LLP<br>1200 Liberty Ridge Drive, Suite 310<br>Wayne, PA 19087<br>Attention: Richard A. O'Halloran<br>Facsimile: 610-408-6021 |

(aa)   ***Section 17.2***. Section 17.2 is hereby amended by adding the following sentence
as a new paragraph at the end of the Section:

Notwithstanding the foregoing, Landlord and Tenant covenant to exercise their
good faith efforts to provide any requested estoppel certificate within three (3)
business days of Tenant's written request for same.

(bb)   ***Section 17.4.1***. Section 17.4.1 is hereby deleted and in its place is substituted the
following:

Either party may require the arbitration of (i) any matter which pursuant to any
provision of this Lease is subject to arbitration in accordance with this Section
17.4; (ii) the reasonableness of either Landlord's or Tenant's position with respect
to whether any retail shopping portion of the Property is being operated consistent
with the KOP Standard, including without limitation, any operational or quality of
management issues in connection therewith; (iii) whether the parties have
provided reasonable Directional Signage; (iv) the amount to be reimbursed to
Landlord for services or utilities pursuant to section 5.16; (v) increases in
insurance coverage over the amounts originally provided in this Lease; (vi) the

matters provided in Section 9.6.2; and (vii) whether Landlord has unreasonably withheld, delayed or conditioned its approval to a particular subtenant as described in Section 12.8.1.6.

(cc)     **Section 19**. Section 19 is hereby deleted and in its place is substituted the following:

19.     Tenant Licensing and Landlord's Compliance Review.

Tenant acknowledges that Landlord conducts a business that is subject to and exists because of a privileged license issued by governmental authorities and is required to adhere to strict laws and regulations regarding vendor and other business relationships. If this Lease requires that Tenant be licensed by a Gaming Authority, then Tenant shall secure said licensing at its sole cost and expense. It is fully understood by and between the parties that licensure of Tenant with any applicable Gaming Authority, if required, shall be and is a condition that must be met before Landlord can proceed with this Lease. Landlord reserves the right to require Tenant, either before or during the term of this Lease, to complete and submit to Landlord a Business Information Form ("BIF") and to undergo Landlord's background investigation process to comply with Landlord's compliance policies. If such a request is made by Landlord, Tenant acknowledges and agrees to submit a BIF as well as undergo a background investigation.

If at any time Landlord determines, in its sole discretion, that its association with Tenant, its principals or any key employees could violate any applicable statutes and/or regulations regarding prohibited relationships with gaming companies, or if Landlord determines, in good faith, that it would be in its best interest to terminate its relationship with Tenant in order to protect its license, Landlord shall have the right to immediately (regardless as to any other provision of this Lease requiring Notice) terminate this Lease at no cost to Landlord, at which time this Lease shall be of no further force or effect. Thereafter, Landlord shall have no further obligation to Tenant, and Tenant agrees to release and hold harmless Landlord from and against any and all claims of damage or injury arising out of or relating to termination of the Agreement pursuant to this Section.

It is understood and agreed by and between the parties that if, at any time, either prior to or subsequent to the initiation of this Lease, a Gaming Authority renders a final determination disapproving the terms and conditions of this Lease or denying the application of Landlord, its agents, and/or assignee(s), and/or its transferee(s), for any applicable license, or if Landlord makes a determination upon investigation that Tenant is unsuitable, then this Lease shall be deemed terminated as of the date of such disapproval, denial, or determination as though such date were the date originally fixed herein for termination of this Lease. In the event of such termination, Landlord shall not be deemed in default under any provision of this Lease.

13

(dd)    *New Section 21*.  The Lease is hereby amended by adding a new Section 21 as follows:

21.    Right of First Refusal.

21.1    Definitions.  As used herein, the following terms shall have the meanings set forth below, unless the context clearly requires otherwise:

(i)    "Affiliate" or "affiliated" shall mean, with respect to any party, any person or entity which, directly or indirectly, owns any interest in or manages or controls, is to any extent owned by or is managed or controlled by, or is under common ownership to any extent, or common management or control with, such party.

(ii)    "Transfer" shall mean the sale of all or any portion of Landlord's interest in the Property to a party that is not an Affiliate of Landlord.

21.2    Transfer Notice.  If at any time Landlord proposes to make a Transfer, then the Landlord shall promptly provide to Tenant written notice of such intended Transfer (the "Transfer Notice").  The Transfer Notice shall include (i) a summary of the material terms and conditions upon which the proposed Transfer is to be made, (ii) the proposed consideration, and (iii) a copy of any agreement, term sheet, letter of intent or other writing evidencing the proposed Transfer (which may be redacted to protect the identity of the prospective transferee(s).  The Transfer Notice shall certify that the Landlord has received a firm offer from the prospective transferee(s) and in good faith believes a binding agreement for the Transfer is obtainable on the terms set forth in the Transfer Notice.

21.3    Grant of Right.  For so long as Landlord holds the Property or any interest therein, Tenant shall have the right and option, for a period of seven (7) business days from delivery of the Transfer Notice, to elect to purchase the Property, or otherwise to engage as transferee with respect to the Transfer as described in the Transfer Notice, at the same price and subject to the same material terms and conditions as described in the Transfer Notice (the "Right of First Refusal").

21.4    Exercise; Non-exercise.  The Right of First Refusal may be exercised by Tenant's notifying the Landlord in writing before expiration of the seven (7) day period provided by the Transfer Notice.  If Tenant fails timely to exercise the Right of First Refusal, then Landlord shall be free to complete the proposed Transfer with the transferee identified in the Transfer Notice; provided, however, that if the Transfer is not completed with such transferee, then the Property and Landlord shall nonetheless remain subject to the Right of First Refusal, and Landlord shall thereafter be required to comply with the provisions hereof with respect to any Transfer.  If Tenant timely exercises the Right of First Refusal, then the Transfer shall be completed with Tenant or its designee, under

14

and subject to the terms and conditions set forth in the Transfer Notice, as soon as reasonably practicable.

6.      Exhibit E.  Exhibit E to the Lease (Mohegan Sun Tenant List) is hereby deleted and in its place is substituted a new Exhibit E, attached hereto as Schedule 1.

7.      Exhibit F.  Exhibit F to the Lease (List of Approved Subtenants) is hereby deleted.

8.      Exhibit J.  Exhibit J to the Lease (Tenant's Right to Assign Without Landlord Approval) is hereby deleted and in its place is substituted a new Exhibit J, attached hereto as Schedule 2.

9.      New Exhibit 3.1.4.  The Lease is hereby amended to add Exhibit 3.1.4 to the Lease (Conceptual Rendering Booklet, PLAYGROUND – One Atlantic Ocean), attached hereto as Exhibit 3.1.4.

10.     New Exhibit 5.1.  The Lease is hereby amended to add Exhibit 5.1 to the Lease (Permitted Uses), attached hereto as Exhibit 5.1.

11.     Certain Second Amendment Provisions.  Section 7 is amended to provide that the air rights and licenses referenced therein remain in full force and effect and Section 8 of the Second Amendment is hereby deleted and shall have no further force or effect.

12.     Effectiveness.  (a) This Agreement shall be immediately effective and binding upon PRLP upon execution hereof; provided that if this Agreement is not approved by the Bankruptcy Court by May 30, 2015 pursuant to a final order not subject to appeal, this Agreement shall be null and void ab initio and of no force or effect with respect to PRLP. (b) This Agreement shall be effective upon Landlord upon approval by the Bankruptcy Court pursuant to a final order not subject to appeal; provided that if this Agreement is not approved by the Bankruptcy Court by May 30, 2015 pursuant to a final order not subject to appeal, this Agreement shall be null and void ab initio and of no force or effect with respect to Landlord.

13.     Miscellaneous.

        (a)     Each provision of this Agreement shall extend to and shall bind and inure to the benefit of the PRLP and Landlord and their respective successors and assigns, including without limitation successor assignees of the Lease.

        (b)     In the event that any provision of this Agreement is deemed to be invalid or unenforceable for any reason, this Agreement shall be construed as not containing such provision, and the invalidity or unenforceability thereof shall not render any other provision of this Agreement invalid or unenforceable.

        (c)     Each provision of this Agreement has been mutually negotiated, prepared and drafted; each party has been represented by legal counsel; and, in connection with

the construction of any provision hereof or deletion herefrom, no consideration shall be given to the issue of which party actually prepared, drafted, requested or negotiated any such provision or deletion.

(d)     This Agreement shall be governed by the laws of the State of New Jersey.

(e)     Section and other headings contained in this Agreement are for convenience of reference only and shall not affect, in any way, the meaning or interpretation of this Agreement.

(f)     This document contains the entire understanding and agreement of the Parties upon the subject matter hereof.  There is no agreement, oral or otherwise, which is not set forth in this document.  This Agreement may be amended only by a written agreement of the Parties.

(g)     Waiver by any Party of a breach or violation of any provision of this Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach or violation hereof.

(h)     This Agreement may be executed in counterparts.  Each counterpart shall be deemed an original, but all originals shall together constitute one and the same instrument.

(i)     Nothing herein shall constitute nor be deemed to constitute an assumption or rejection of the Lease.  Notwithstanding anything herein to the contrary, the Landlord's rights with respect to any such assumption or rejection are fully reserved.

*Signatures appear on the next page*

16

IN WITNESS WHEREOF, the Parties have executed this Consent to Assignment of Lease and Third Amendment to Lease the day and year first above written.

PIER RENAISSANCE, LP, a New Jersey limited partnership

By:    Pier Renaissance Inc., a New Jersey corporation, its General Partner

By: _____

Barton L. Blatstein, President

BOARDWALK REGENCY CORPORATION d/b/a CAESARS ATLANTIC CITY, a New Jersey corporation

By: _____

Kevin C. Ortzman, Senior Vice President and General Manager

IN WITNESS WHEREOF, the Parties have executed this Consent to Assignment of Lease and Third Amendment to Lease the day and year first above written.

PIER RENAISSANCE, LP, a New Jersey limited partnership

By:    Pier Renaissance Inc., a New Jersey corporation, its General Partner

By: _____
       Barton I. Blatstein, President

BOARDWALK REGENCY CORPORATION
d/b/a CAESARS ATLANTIC CITY, a New Jersey corporation

By: _____
       Kevin C. Ortzman, Senior Vice President
       and General Manager

## SCHEDULE 1

See new <u>Exhibit E</u>, List of King of Prussia® Mall Tenants, attached hereto.

## SCHEDULE 2

See new <u>Exhibit J</u>, Tenant's Right to Assign Without Landlord Approval, attached hereto.

# EXHIBIT 3.1.4
Conceptual Rendering Booklet

PLAYGROUND – One Atlantic Ocean

**EXHIBIT 5.1**
Permitted Uses

Restaurants

Sports bars

Retail stores

Recording studio(s)

Radio and/or television studio(s)

Auction house services

Live sporting events

Studio kitchen(s)

Cigar lounge(s)

Art studio(s)

Fashion show(s)

Speaker series(s)

Transient lodging (not to exceed 20 rooms)

Wedding chapels

## Exhibit 3

**Tax Payment Agreement**

KE 35680926

2015 Tax Payment & Credit Agreement

This 2015 Tax Payment and Credit Agreement ("Tax Agreement") dated April 1, 2015, by and between Boardwalk Regency Corporation ("BRC") and Pier Renaissance, L.P. ("Tenant") is intended to memorialize the intentions of BRC and Tenant in regard to the payments to be made and credits to be received relating to the 2015 real property taxes on the properties shown on the Atlantic City tax maps as Block 1, lots 93 (including all lot 93 qualifiers) and 93.01 (collectively, the "Property"). It shall become effective as of the date of the Amendment as defined below. BRC and Tenant may be referred to herein individually as a "Party" or collectively as "Parties". In consideration of the mutual covenants made herein the Parties agree as follows:

Whereas, BRC and Tenant are executing, concurrently with this Tax Agreement, an Amendment ("Amendment") to an existing lease agreement (together with the Amendment, the "Lease") providing the Tenant with certain rights and responsibilities regarding the Property; and

Whereas, among those rights and responsibilities, the Amendment requires the Tenant to reimburse BRC for all real property tax payments paid by BRC to the City of Atlantic City ("City") for the Property; and

Whereas, BRC paid all of the real property tax payments for the Property for 2014; and

Whereas, BRC has also paid the real property tax payments that were due on February 1, 2015 and which covered the period from January 1 through March 31, 2015 (the "First Quarter Tax Payment") in the amount of $641,147.90 (schedule of payments attached); and

Whereas, Tenant has reimbursed BRC for that part of its 2014 real property tax payment corresponding to the portion of time that Tenant occupied the Property in 2014 in the amount of $257,074 and has partially reimbursed BRC, in the amount of $385,612, for BRC's payment of the First Quarter Tax Payment, leaving a balance of reimbursement for that First Quarter Tax Payment due and owing from Tenant to BRC in the amount of $255,535.90; and

Whereas, the total tax assessment for 2015 on the Property was reduced by the City so significantly from the 2014 amount that the total real property tax liability for all of 2015 will very likely be less than the First Quarter Tax Payment and therefore no further taxes should be due for the 2015 tax year (the "Credit Status"); and

Whereas, the Parties agree that because the amount of the First Quarter Tax Payment is likely in excess of the total 2015 tax liability, no further tax payments shall be made to the City until the 2015 tax bills are distributed; and

Whereas, the parties acknowledge that the failure to make the upcoming real property tax payment due on May 1, 2015 ("Second Quarter Tax Payment") may result in an additional amount owed to the City as interest and penalties.

**NOW, THEREFORE,** in consideration of the foregoing premises and the mutual promises hereinafter contained, it is agreed by and between the Parties as follows:

1.  Tenant shall pay to BRC, within thirty (30) days of the execution of this Tax Agreement, the amount of $255,535.90 representing the balance of the First Quarter Tax Payment made to the City by BRC and not yet reimbursed by Tenant. Upon making that payment to BRC, except as otherwise provided herein, Tenant's obligations for future tax payment reimbursement to BRC shall be governed by the Amendment.

2.  Provided that Tenant reimburses BRC for the full amount of the First Quarter Tax Payment in accordance with the provisions of Paragraph 1 above, any credit ("Credit") resulting from an overpayment of the First Quarter Tax Payment shall be applied to future taxes of the Property and BRC shall not seek to have the Credit amount refunded to it or applied to any different property.

3.  In light of the Credit Status, BRC and Tenant agree that BRC shall not pay the Second Quarter Tax Payment to the City and that any penalty or interest cost resulting from the non-payment of the Second Quarter Tax Payment shall be satisfied by the Credit so long as the Credit is sufficient to both satisfy such penalty and interest and the balance of real property tax liability on the Property for 2015. To the extent the Credit is not sufficient to satisfy the penalty and interest obligations resulting from the non-payment of the Second Quarter Tax Payment after the Credit is first applied to the balance of the 2015 tax liability on the Property, BRC shall reimburse Tenant for one half of any such remaining portion of the penalty and interest amount.

4.  The default provisions in the Lease shall be available as applicable to both BRC and Tenant for the non-performance by either Party of any obligation under this Tax Agreement and a breach of any obligation under this Tax Agreement shall be deemed a default under the Lease.

5.  Confidentiality.

    a.  The Parties agree not to disclose, either directly or indirectly, (i) any information whatsoever relating to the this Tax Agreement, (ii) the facts and circumstances underlying or leading up to the execution of this Tax Agreement, and (iii) the existence or substance of this Tax Agreement, to any person or entity, including, but not limited to, members of the media. Notwithstanding the preceding sentence to the contrary, the Parties reserve the right to disclose the terms of this Tax Agreement to: (A) their respective accountants or counsel with whom they choose to consult or seek advice regarding their consideration of the decision to execute this Tax Agreement; provided, however, that those to whom either Party makes such a disclosure must first agree to keep such information confidential and not disclose it to others; and/or (B) any regulatory body or agency if required to do so by law; and/or (C) if otherwise required by law.

    b.  This Tax Agreement shall not be filed with any court and shall remain confidential except in an action to enforce or for breach of this Tax Agreement;

provided that BRC may (x) file this Tax Agreement with the United States Bankruptcy Court for the Northern District of Illinois administering BRC's pending chapter 11 case (the "Bankruptcy Court") and provide this Tax Agreement to the Office of the United States Trustee (the "UST") and, on a professional eyes only basis, to any statutory committee appointed in BRC's pending chapter 11 case and such other parties in interest in BRC's pending chapter 11 case that BRC may determine in its reasonable discretion in consultation with Tenant; provided further that BRC shall otherwise use commercially reasonable efforts to cause this Tax Agreement to be filed under seal with the Bankruptcy Court.

6. Effectiveness. (a) This Tax Agreement shall be immediately effective and binding upon Tenant upon execution hereof; provided that if this Tax Agreement is not approved by the Bankruptcy Court by May 30, 2015 pursuant to a final order not subject to appeal, this Tax Agreement shall be null and void ab initio and of no force or effect with respect to Tenant. (b) This Tax Agreement shall be effective upon BRC upon approval by the Bankruptcy Court pursuant to a final order not subject to appeal; provided that if this Tax Agreement is not approved by the Bankruptcy Court by May 30, 2015 pursuant to a final order not subject to appeal, this Tax Agreement shall be null and void ab initio and of no force or effect with respect to BRC.

7. Nothing herein shall constitute nor be deemed to constitute an assumption or rejection of the Lease. Notwithstanding anything herein to the contrary, BRC's rights with respect to any such assumption or rejection are fully reserved.

*Signatures appear on the next page*

ACTIVE 29506489v2

IN WITNESS WHEREOF, the Parties have executed this 2015 Tax Payment & Credit Agreement the day and year first above written.

PIER RENAISSANCE, LP, a New Jersey limited partnership

By:    Pier Renaissance Inc., a New Jersey corporation, its General Partner

By: _____
       Barton I. Blatstein, President


BOARDWALK REGENCY CORPORATION
d/b/a CAESARS ATLANTIC CITY, a New Jersey corporation


By: _____
       Kevin C. Ortzman, Senior Vice President
       and General Manager

IN WITNESS WHEREOF, the Parties have executed this 2015 Tax Payment & Credit Agreement the day and year first above written.

PIER RENAISSANCE, LP, a New Jersey limited partnership

By:    Pier Renaissance Inc., a New Jersey corporation, its General Partner


By: _____
        Barton I. Blatstein, President


BOARDWALK REGENCY CORPORATION d/b/a CAESARS ATLANTIC CITY, a New Jersey corporation

By: _____
        Kevin C. Ortzman, Senior Vice President
        and General Manager

First Quarter Tax Payment

Schedule of Payments

| Block | Lot | Qual | Amount Paid |
|-------|-------|------|-------------|
| 1 | 93 | | $627,750.00 |
| 1 | 93.01 | | $251.10 |
| 1 | 93 | B01 | $986.83 |
| 1 | 93 | B02 | $986.83 |
| 1 | 93 | B03 | $1,897.48 |
| 1 | 93 | B04 | $683.00 |
| 1 | 93 | B05 | $1,186.03 |
| 1 | 93 | B06 | $534.01 |
| 1 | 93 | B10 | $672.11 |
| 1 | 93 | B11 | $672.11 |
| 1 | 93 | B12 | $1,264.71 |
| 1 | 93 | B13 | $1,644.71 |
| 1 | 93 | B14 | $2,618.98 |
| | | | $641,147.90 |