# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT | ) Case No. 15-01145 (ABG) |
| OPERATING COMPANY, INC., *et al.*,[1] | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
| | ) |
| | ) **Status Hearing Date: May 27, 2015** |
| | ) **Status Hearing Time: 1:30 p.m.** |
| | ) |

**COMBINED SUR REPLY OF THE NATIONAL RETIREMENT FUND TO**

**(A) DEBTORS' REPLY IN SUPPORT OF THEIR MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE AUTOMATIC STAY (II) VOIDING ACTIONS TAKEN IN VIOLATION OF THE AUTOMATIC STAY, (III) FOR CONTEMPT AND SANCTIONS AGAINST THE NRF AND THE NRF TRUSTEES, AND (IV) GRANTING RELATED RELIEF, AND**

**(B) DEBTORS' REPLY TO THE NATIONAL RETIREMENT FUND'S OBJECTION TO MOTION FOR ENTRY OF AN ORDER (I) ENFORCING THE AUTOMATIC STAY WITH RESPECT TO THE DEMAND FOR INTERIM WITHDRAWAL LIABILITY PAYMENTS BY THE NRF, (II) VOIDING SUCH PAYMENT DEMANDS TAKEN IN VIOLATION NOF THE AUTOMATIC STAY, AND (III) GRANTING RELATED RELIEF**

("**362 Withdrawal and Payment Demand Sur Reply**")

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

The NRF[2] hereby responds to the *Debtors' Reply in Support of their Motion for Entry of an Order (I) Enforcing the Automatic Stay (II) Voiding Actions Taken in Violation of the Automatic Stay, (III) for Contempt and Sanctions against the NRF and the NRF Trustees, and (IV) Granting Related Relief*, [Dkt No. 1523] (the "362 Withdrawal Reply") and *Debtors' Reply to the National Retirement Fund's Objection to Motion for Entry of an Order (I) Enforcing the Automatic Stay with Respect to the Demand for Interim Withdrawal Liability Payments by the NRF, (II) Voiding Such Payment Demands Taken in Violation of the Automatic Stay, and (III) Granting Related Relief* [Dkt. No. 1524] (the "362 Payment Demand Reply").

## PRELIMINARY STATEMENT

The Debtors seek an unprecedented extension of Section 362 to invalidate issuance of the Withdrawal Notice (delivered only to the Employers, none of whom were Debtors at the time) and the Payment Demand (delivered only to non-debtors) in order to shield non-debtors CEC and CERP from their statutory obligations to pay withdrawal liability. The Debtors' extraordinary relief must be denied, as a matter of law, for at least four distinct reasons.

1. <u>The Withdrawal Notice and the Payment Demand are Valid as to Non-Debtors.</u> The Withdrawal Notice and the Payment Demand are valid as to all the entities on which they were served, none of which were debtors at the time of delivery. The Debtors assert that both notices are void as to non-debtors, but the Seventh Circuit's <u>Slotky</u> decision expressly holds otherwise.

---

[2] Unless otherwise defined, capitalized terms used herein shall have the meanings ascribed to them in the "*Objection of the National Retirement Fund to Debtors' Motion for Entry of an Order (I) Enforcing the Automatic Stay, (II) Voiding Actions Taken in Violation of the Automatic Stay, (III) For Contempt and Sanctions Against the NRF and the NRF Trustees, and (IV) Granting Related Relief*," (Case No. 15-01145) [Dkt. No. 1141] (the "362 Withdrawal Objection").

1

2. <u>The Withdrawal Notice Did Not Violate the Stay</u>.  The Withdrawal Notice did not violate the CEOC Stay because it was sent only to the Employers, none of which were Debtors at the time.  The Debtors allege that there is a disputed fact question as to whether CEOC was itself a participating employer in the NRF, which the Debtors now claim it was.  There can be no dispute on this point: CEOC cannot have been a participating employer because it has no unionized employees and it is not a signatory to any of the CBAs.  As to CEOC, the Withdrawal Notice merely established the relevant date for calculating the amount of the Caesars Controlled Group's pre-existing contingent withdrawal liability obligation.  Indeed, the Withdrawal Notice specifically carved out any actions against CEOC that would violate the automatic stay.

3. <u>The Payment Demand Did Not Violate the Stay</u>.  The Payment Demand did not violate the automatic stay because it was addressed only to non-debtors.  The Debtors have cited no case in which a court has held that a withdrawal liability payment demand sent to non-debtors violates the stay.  They also are incorrect in claiming that the Payment Demand had the effect of liquidating the NRF's claim of withdrawal liability against the Debtors, inasmuch as the Payment Demand expressly excluded the Debtors and is applicable only to the non-debtor entities to whom it was addressed.  The NRF will file proofs of claim in these cases against the Debtors independent of the Payment Demand, without relying on it in any way, and will submit to this Court's jurisdiction with respect to those claims.  The NRF also reiterates that it will not seek to bind the Debtors to the outcome of any proceedings with non-debtors concerning withdrawal liability.

4. <u>Sanctions are Unwarranted.</u>  Even if the Withdrawal Notice violated the stay, sanctions are unwarranted because there plainly was no willful violation.

2

In sum, the 362 Withdrawal Motion and the 362 Payment Demand Motion must be denied as a matter of law.[3]

I.  **Both the Withdrawal Notice and the Payment Demand are Valid as to Those Who Were Non-Debtors at the Time They Were Sent**

Pursuant to the Seventh Circuit's decision in Cent. States, Se. & Sw. Areas Pension Fund v. Slotky, 956 F.2d 1369 (7th Cir. 1992), the analysis as to whether the NRF violated Section 362 is legally irrelevant to the effectiveness as to non-debtors of the Withdrawal Notice and Payment Demand, both of which were only served on non-debtors.  Id. at 1376 ("even if the [payment demand served on the debtor] violated the stay… [it] would still be effective against nonbankrupt members of the controlled group.").  Slotky recognized that the "pension fund filed a claim in the bankruptcy proceeding in order to preserve its rights against [the debtor], and then *as was its right* proceeded against another member of the controlled group outside of bankruptcy.")  Id. at 1377 (emphasis added).  The court explicitly held that the non-debtor controlled group member owed withdrawal liability, including interest, liquidated damages and attorney's fees.  Id. at 1377.  This court has confirmed that this was Slotky's holding, and not *dicta* as the Debtors argue.  See Great Am. Mgmt. & Inv., Inc. v. Paper Indus. Union Mgmt. Pension Fund (In re Bankruptcy Case No. 91 B 23969), Adv. No. 94 C 6226, 1994 WL 673055, at *4, n.2 (Bankr. N.D. Ill. 1994) ("The Slotky court *did hold that*, even if the notice and demand violated the automatic stay provision … *the demand would still be effective against nonbankrupt members of the control group*.")

---

[3]  Contrary to the Debtors' claim, the NRF is not proceeding inconsistently with the Standstill Agreement (as defined in the *Order Establishing Certain Briefing Dates and Deadlines as Set Forth in the Standstill Agreement with the NRF and the NRF Trustees* [Dkt. No. 1020]), which contemplates the NRF moving to dispose of the various proceedings brought by the Debtors against the NRF "on matters of law." Arguments based on the legal effect of facts that are asserted to be indisputable *are* arguments made as a matter of law, so there is no issue as to the NRF's compliance with the Standstill Agreement.  Moreover, to the extent the NRF is relying on facts, they are indeed undisputed or are admissions.  As such, there is no basis for the Debtors' further assertion that discovery or an evidentiary hearing is required.

(citations omitted) (emphasis added). The only *dicta* in Slotky is the portion of the decision indicating that even the service of the demand at issue on the *debtor* was likely not a stay violation. Slotky's holding squarely affirmed the effectiveness of payment demands on non-debtor members of a control group, thereby precluding the Debtors' claim that ERISA's "notice to one, notice to all" provision extends the automatic stay to all members of controlled group. See Slotky, 956 F.2d at 1376; Great Am. Mgmt.,1994 WL 673055, at *4, n.2.

Slotky's holding is entirely consistent with established precedent that the automatic stay does not bar actions against non-debtors who are jointly and severally liable with debtors. See Teachers Ins. & Annuity Ass'n of Am. v. Butler, 803 F.2d 61, 65 (2d Cir. 1986) ("Chapter 11, unlike Chapter 13, contains no provision to protect non-debtors who are jointly liable on a debt with the debtor."), citing Royal Truck & Trailer v. Armadora Maritima Salvadorena, 10 B.R. 488, 491 (Bankr. N.D. Ill. 1981); Cano v. DPNY, 287 F.R.D. 251, 262 (S.D.N.Y. 2012) ("Here, the plaintiffs allege that the Proposed Defendants are joint employers and, therefore, are jointly and severally liable to the plaintiffs for violations of the FLSA and NYLL. Accordingly, the automatic stay in the bankruptcy case would not extend to the Proposed Defendants…"); Fleet Bus. Credit, L.L.C. v. Wings Rest., Inc., 291 B.R. 550, 553 (D. N.D. Okla. 2003) ("in situations where a co-defendant is independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests on his own breach of a duty, then the protection afforded a debtor under the automatic stay would clearly not extend to such nondebtor") and In re Kmart Corp., 285 B.R. 679, 689 (Bankr. N.D. Ill. 2002) (same).[4]

---

[4] The Debtors also cite Trs. of Chi. Truck Drivers, Helpers and Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp. Inc., 888 F.2d 1161, 1163 (7th Cir. 1989), for the proposition that controlled group members' legal processes and timetables for disputing withdrawal are equitably tolled by the automatic stay. See 362 Payment Demand Reply at ¶ 21. However, equitable tolling is irrelevant to determining whether the NRF can proceed against

4

The Debtors also claim that the NRF has "asserted that ERISA necessarily trumps the automatic stay" (362 Withdrawal Reply at ¶ 24), but the NRF has made no such claim. What the NRF *has* argued is that extending the automatic stay to cover non-debtors, whether by construing Section 362 unduly broadly or entering a Section 105 injunction, would impermissibly eviscerate a core purpose of imposing withdrawal liability under ERISA. The Debtors have no effective response to this point. See 105 Sur Reply[5] at p. 9.

The Debtors also seek to distinguish Slotky on the basis that there the debtor had initiated the withdrawal, whereas here the NRF initiated the withdrawal. There is no distinction under ERISA, however, between the liability imposed by a voluntary or involuntary termination. See 362 Payment Demand Objection at p. 8. The Debtors' additional point that "unlike Slotky, here the NRF has stated its intention to file a proof of claim" and subject itself to bankruptcy court's jurisdiction is equally unavailing. 362 Payment Demand Reply at ¶ 21. In Slotky, the pension plan also filed a proof of claim in the bankruptcy case. The fact that a plan submits itself to the

---

non-debtor controlled group members. That doctrine is concerned with timing, not with stays. In any case, the legal processes and timetables for seeking arbitration would only be tolled *as to the Debtors*, not as to any non-debtors. In Cent. Transp., the court found that because the non-debtors had objected to the pension plan's proofs of claim in the bankruptcy case, they had not given up their rights to contest the liability and the period to initiate arbitration had been tolled. However, the Seventh Circuit has subsequently questioned this decision. Slotky, 956 F.2d at 1377 (questioning the propriety of the Cent. Transp. decision to equitably toll because "the other members of the alleged controlled group were not in bankruptcy," and suggesting that the result may have been different if not for legal uncertainties at the time that led judges to "hesitate to penalize [the non-debtors] for having made questionable procedural choices."); see also McDonald v. Centra, Inc., 946 F.2d 1059, 1062-65 (4th Cir. 1991) ("allowing a [nondebtor] defendant to toll the period for arbitration during bankruptcy proceedings … undercuts the purpose of the statute, the timely adjudication of withdrawal liability disputes to insure the security of multiemployer plans. Thus, we hold that equitable tolling is inapplicable in the MPPAA context.").

[5]    "105 Sur Reply" refers to the "*Sur Reply of the National Retirement Fund to Debtors' Reply to the Objection of the National Retirement Fund to Debtors' Motion for Entry of an Order Extending the Automatic Stay to Enjoin Certain Payments and Legal Processes*" filed contemporaneously in Adv. Pro. No. 15-00131.

bankruptcy court's jurisdiction with respect to its claims against debtors does not give the bankruptcy court jurisdiction over actions solely involving non-debtors.

Thus, the Withdrawal Notice and the Payment Demand were, and are, effective as to non-debtors.

## II. The Withdrawal Notice Did Not Violate the CEOC Stay

The Debtors assert that the Withdrawal Notice violated the stay for two reasons. In each instance, the Debtors are incorrect.

### A. CEOC is Not a Participating Employer

The Debtors claim that delivery of the Withdrawal Notice violated the CEOC Stay because CEOC was a participating employer under both the CBAs and ERISA and, as such, was "directly impacted" by the Withdrawal Notice. 362 Withdrawal Reply at ¶ 12.

The Withdrawal Notice was addressed solely to participating employers — which were named in the notice and which, properly, did not include CEOC. The Debtors' assertion that CEOC is a participating employer in the Legacy Plan under the CBAs, with concomitant "rights" and "interests" thereunder, is demonstrably incorrect. CEOC employs no union employees, and the Debtors have not claimed, and cannot claim, that CEOC is a signatory to any of the CBAs, or to any other agreement with the NRF requiring contribution payments. While CEOC may be defined in certain instances as an Employer under the CBAs, it only has a secondary obligation to make a contribution, solely to the extent that the participating employer — which is a signatory — does not contribute. The Debtors also argue that CEOC is an employer under ERISA, which treats controlled group members "as a single employer," and must contribute to the Legacy Plan. However, unlike its imposition of withdrawal liability on all members of a controlled group, ERISA imposes no independent obligation to contribute to a pension plan on all members of a controlled group; it merely enforces the contractual obligations created by the CBAs. See 29

6

U.S.C. § 1392(a); Mass. Laborers' Health & Welfare Fund v. Starrett Paving Corp., 845 F.2d 23, 25 (1st Cir. 1988) (ERISA does not impose an independent obligation on an owner to make contributions when the owner had no contractual obligations to do so).[6]

Even if CEOC were a participating employer — which it is not — that in no way means the Withdrawal Notice violated the CEOC Stay. The Withdrawal Notice was not addressed to CEOC and expressly carved out from its effect any "action that would be a violation of the automatic stay in" CEOC's involuntary bankruptcy case. See Hackney Decl. II, Ex. C. There is nothing "cagey" or otherwise inappropriate about that, as the Debtors claim.[7] CEOC alternatively asserts that the exclusion of CEOC resulted in a withdrawal that was not "complete." 362 Withdrawal Reply at ¶ 15. That assertion (which is incorrect) is not an issue for today; CEOC is free to raise the issue of whether the Withdrawal Notice was incomplete and defective during the claims adjudication process.

**B. The Withdrawal Notice Did Not Impose Withdrawal Liability**

The Debtors' further argument that the Withdrawal Notice violated the CEOC Stay because the Withdrawal Notice imposed withdrawal liability on CEOC as a controlled group member is also incorrect. The Withdrawal Notice did not impose any liability. Rather, it merely established the relevant date for calculating the amount of the Caesars Controlled Group's (including CEOC's) pre-existing, contingent withdrawal liability obligation.

---

[6] The Debtors also posit that the Withdrawal Notice could cause CEOC to breach its obligations under the CBAs. 362 Withdrawal Reply at ¶ 23. As discussed on pp. 6-7 of the 105 Sur Reply, as a result of sending the Withdrawal Notice, the NRF is no longer accepting contributions. Accordingly, CEOC cannot be faulted for not making them — to the extent it ever had such an obligation (which it did not).

[7] The Debtors nonetheless reference a memorandum entitled "Caesars Fact Sheet" as purported evidence that the NRF intentionally sought to assess withdrawal liability against CEOC in violation of the stay. As the memorandum reflects on its face, however, it was dated January 11, 2015, *before* CEOC's involuntary bankruptcy and *before* the delivery of the Withdrawal Notice that expressly carved out CEOC.

7

### III. The Payment Demand on Non-Debtors Did Not Violate the Stay

The Debtors argue that the Payment Demand sought to assess and collect money from the Debtors in violation of Section 362(a)(6), despite being addressed only to non-debtor entities, because of the joint and several liability imposed on controlled group members by ERISA. They also argue that the Payment Demand violated Section 362(a)(3) because it "would liquidate otherwise contingent withdrawal liability against the Debtors" and it "starts a process whereby the Debtors' liability … will be determined." 362 Payment Demand Reply at ¶¶ 13, 15. The Debtors are wrong. The Payment Demand was addressed only to non-debtors and expressly carved out *any* potential effect on the Debtors or their property. Proofs of claim — not the Payment Demand — will serve as the statutory notice and demand under ERISA with respect to the Debtors. The Payment Demand will not be used by the NRF to recover any amounts from the Debtors, and thus has no effect on them. Further, the NRF will not assert that the Debtors are bound by any proceeding against the non-debtors that does not involve the Debtors.

#### A. The Payment Demand Did Not Assess a Claim Against the Debtors in Violation of Section 362(a)(6)

The Payment Demand did not assess a claim against the Debtors in violation of Section 362(a)(6) because it was addressed only to non-debtors[8] and carved out any effect on the Debtors. The NRF's proofs of claim against the Debtors will be entirely independent of, and will not rely in

---

[8] The Debtors' claim that the Payment Demand "was sent to CEOC" because it was received by Timothy Donovan, CEOC's Chief Regulatory and Compliance Officer is specious. 362 Payment Demand Reply at ¶ 12, n.4. The Payment Demand plainly addressed Mr. Donovan in his capacity as General Counsel *to CEC and CERP*. It is not a stay violation to send a letter to an executive in his or her capacity as an officer of a non-debtor, even if the executive is also an officer of an affiliated debtor entity. See In re Koop, No. 00–B–24471, 2002 WL 1046700, at **4-6 (Bankr. N.D. Ill. May 23, 2002) (citation directed to non-debtor's registered agent — which happened to be a debtor — did not violate automatic stay because the stay "does not provide a shield under § 362(a) to any entities in which the debtor was an officer, director, partner or agent.").

any way whatsoever on, the Payment Demand.  See Chi. Truck Drivers v. El Paso CGP Co., 525 F.3d 591, 598 (7th Cir. 2008) ("In Slotky and Central Transport, we recognized proofs of claim in Chapter 11 bankruptcies as meeting [ERISA's requirement to send payment demands].… [W]e have held that a proof of claim is, by definition, a demand for payment.") (citations omitted).

The Debtors also argue that the Payment Demand "was an attempt to increase the size of the claim" held by the NRF against the Debtors' estates.  362 Payment Demand Reply at ¶ 12.  Their argument, however, is premised on a faulty analogy to the make-whole premiums in AMR, Solutia and MPM Silicones.  362 Payment Demand Reply at ¶¶ 10, 13.  In each of those cases, the creditors either sent post-petition, or sought bankruptcy court permission to send, a notice *to the debtor* rescinding acceleration of a debt to capture the prepayment premium.  See In re AMR Corp., 730 F.3d 88 (2d Cir. 2013); In re MPM Silicones, LLC, No. 14-22503, 2014 WL 4436535 (Bankr. S.D.N.Y. Sept. 9, 2014); In re Solutia, 379 B.R. 473 (Bankr. S.D.N.Y. 2007).  The courts all held that the rescission notice *to the debtor* would violate the debtor's "contractual right … to repay its accelerated debt without" the prepayment premium, and would increase the lender's claims against the debtors.  In re AMR Corp., 730 F.3d at 102.

Moreover, the Payment Demand did not increase the NRF's claims against the Debtors, because it did not affect those claims at all.  The Debtors' withdrawal liability obligations do not flow from — and in fact, are unrelated to — the Payment Demand.  Rather, they were prepetition contingent liabilities that first arose when employee benefits vested in excess of the Legacy Plan's assets, and they became non-contingent upon withdrawal.  See 362 Withdrawal Objection at p. 13. Delivery of the Payment Demand simply provided formal notice to the non-debtors of the amount of withdrawal liability owed, see Section 4219(b)(1) of ERISA, 29 U.S.C. § 1399(b)(1), which the NRF will do for the debtors by means of a proof of claim.

9

The Debtors simply have not cited — and cannot cite — any case that says a payment demand served on *non-debtors* violates any provision of Section 362. Indeed, the Seventh Circuit has gone so far as to say "'the demand for payment of withdrawal liability is probably an exception to' the automatic stay" even as to *debtors*. Cent. States, Se. & Sw. Areas Pension Fund v. Basic Am. Indus., Inc., 252 F.3d 911, 918 (7th Cir. 2001). The logic is unassailable — if a payment demand on non-debtors would violate the stay, there could be no collection of withdrawal liability under ERISA.

As one court has noted in the analogous surety context, if the surety's obligations did not arise until a termination, but a termination would violate the stay, it would "create an absurd catch–22 situation that would undermine the very purposes for which … [sureties are required] in the first place." Am-Haul Carting, Inc. v. Contractors Casualty and Surety Co., 33 F.Supp.2d 235, 242-43 (S.D.N.Y. 1998); see also In re Advanced Ribbons and Office Prods., Inc., 125 B.R. 259, 264 (B.A.P. 9th Cir. 1991) ("[A]n act to collect against a guarantor or surety is not within the scope of section 362(a)(6) because it is an act to collect a claim against the surety or guarantor rather than a claim against the debtor."); In re White, 415 B.R. 696, 699 (Bankr. N.D. Ill. 2009) (section 362(a)(6) did not prevent creditor from repossessing a vehicle from a nondebtor corporation where debtor guaranteed loan because "[t]he liability of a guarantor to the creditor is separate from the liability of the primary debtor."). In the ERISA context, all members of the controlled group, not just employers, are jointly and severally liable for withdrawal liability and thus act as co-obligors or guarantors. Because § 362(a)(6) does not protect non-debtor co-obligors, the Payment Demand served only on non-debtors could not and did not violate the § 362(a)(6) stay.

10

> **B. The Payment Demand Did Not Violate Section 362(a)(3) Because any Withdrawal Liability Proceeding to Determine Non-Debtors' Withdrawal Liability Will Not be Binding on the Debtors**

The Debtors also argue that the Payment Demand violated Section 362(a)(3) because they would be bound by a determination against CEC and CERP. 362 Payment Demand Reply at ¶¶ 16, 23. The Debtors' purported fears are baseless. As the NRF has already stated — and reiterates here — it *will not* assert that the results of any withdrawal liability proceeding involving non-debtors bind Debtors that do not participate. 362 Payment Demand Objection at pp. 3, 6; the NRF's *Motion to Dismiss Adversary Proceeding* (Adv. Pro. 15-00131) [Adv. Dkt. No. 31] at pp. 8-9; see also 105 Sur Reply at pp. 4-5. That is consistent with the explicit statements in both the Withdrawal Notice and the Payment Demand that nothing in those notices would constitute an action in violation of the automatic stay.

The Debtors' purported authorities in support of their argument that the Debtors would be automatically bound by the outcome of an arbitration with the non-debtors are wholly inapplicable. See Cent. States, Se. & Sw. Areas Pension Fund v. Rogers, 843 F. Supp. 1135, 1140 (E.D. Mich. 1992), aff'd 14 F.3d 600 (6th Cir. 1993) (employers and their controlled group members, none of whom were debtors, were obligated to pay the withdrawal liability set forth in the demand *because they did not timely challenge the demand*); I.A.M. Nat'l Pension Fund, Plan A, A Benefits v. Slyman Indus., Inc., 901 F.2d 127, 129 (D.C. Cir. 1990) (debtors were bound to withdrawal liability calculation because they *never sought review of, or otherwise contested*, the pension plan's claim, either in or out of the bankruptcy court). In any case, as indicated, the NRF is waiving any binding effect on the Debtors of the non-debtor proceedings.

The Debtors also raise a concern about the risk of "inconsistent adjudications" from dual litigation tracks. See 362 Payment Demand Reply at ¶ 16. As is further discussed on pp. 6-7 of

11

the 105 Sur Reply, that risk is purely hypothetical and is always present under ERISA, as well as in every bankruptcy involving jointly and severally liable debtors and non-debtors. The Debtors cite no authority suggesting that any such risk would constitute a violation of Section 362(a)(3), nor could they. Whatever the result as to the non-debtors' liability, it will not impact this Court's jurisdiction over the claims adjudication process.

### IV.     Nortel and Havlik are Unavailing

The Debtors' reliance on In re Nortel Networks Corp., 426 B.R. 84, 91 (Bankr. D. Del. 2010) is misplaced. The Debtors suggest that the stay violation in that case was based on the delivery of a payment demand-like notice to non-debtors, stating that in Nortel, the "[U.K.] Pension Regulator sent a notice *to the U.S. debtor's [sic] foreign affiliates (none of which were debtors in the U.S. bankruptcy case)* assessing certain funding amounts on those foreign entities …. The bankruptcy court found that the notice violated the automatic stay…." 362 Payment Demand Reply at ¶ 11 (emphasis added). That is not true. The notice was sent directly to two U.S. *debtors* and several non-U.S. entities, and the court's holding on the automatic stay applies only to the U.S. debtors. See Nortel, 426 B.R. at 89, 96. In fact, the bankruptcy judge expressly interlineated in his order that the automatic stay was "enforced… *with respect to the Debtors…*" and did not order the stay be imposed on non-debtors. (A copy of the order is attached as Exhibit A). Nortel thus does not support the proposition that this Court can extend the automatic stay to enjoin proceedings against non-debtors.

Similarly, Nat'l Tax Credit Partners, L.P. v. Havlik, 20 F.3d 705 (7th Cir. 1994), provides no support for the proposition that serving the Withdrawal Notice or the Payment Demand on non-debtors wrongly exercised control over estate property. In Havlik, investors in a debtor limited partnership sued the non-debtor general partners to provide additional money to the debtor

12

partnership to fund shortfalls in the limited partnership's accounts. Id. at 706-708. Because the general partners had promised to contribute to the debtor limited partnership (and not to contribute to the investors), the court held that the right to collect from the general partners was property of the estate and the investors' suit against the general partners was barred by the automatic stay. Id. at 708. Here, the NRF is asserting no right against the non-debtors that belongs to the Debtors, and thus Havlik is inapplicable.[9]

### V.  The Withdrawal Notice and Payment Would be Valid as to Non-Debtors Even if Void or Voidable as to Debtors

Further, the Debtors' reliance on Middle Tenn. News Co., Inc. v. Charnel of Cincinnati, Inc., 250 F.3d 1077, 1082 (7th Cir. 2001) to argue that the Withdrawal Notice was void ab initio (as opposed to voidable) as to all members of the Caesars Controlled Group is unavailing, as is their contention that the stay voids the Payment Demand.

As reflected above, neither the Withdrawal Notice nor the Payment Demand violated the automatic stay as to any Debtor. Even if they did, Debtors' claim that they would be "void ab initio" as opposed to "voidable" gets Debtors nowhere. First, the Seventh Circuit has questioned the void ab initio concept. See Kimbrell v. Brown, 651 F.3d 752, 755 (7th Cir. 2011) (plaintiff "may or may not be correct that his lawsuit against [the defendant] was void *ab initio*.") More fundamentally, the issue of whether an action is void or voidable as to debtors has nothing to do with whether it permissibly affects non-debtors. Deeming an action void as to debtors does *not* mean it is void as to non-debtors. See In re Eugene L. Pieper, P.C., 202 B.R. 294, 300 (Bankr. D. Neb. 1996) (judgment against debtor voided by the automatic stay was still valid on jointly and severally liable non-debtor); Credit Alliance Corp. v. Penn Hook Coal Co., Inc., 77 B.R. 57 (D.

---

[9]  The NRF has already discussed the other cases cited by the Debtors in the 362 Payment Demand Reply at ¶ 14 and will not repeat that discussion here. See 362 Withdrawal Objection at p. 10, n.18.

W.D. Va. 1987) (judgment against debtor and non-debtor guarantors was void as to debtor, but not as to non-debtors).[10]

## VI. Sanctions are Inappropriate Because the Withdrawal Notice Did Not Violate, Let Alone, Willfully Violate, the CEOC Stay

As explained above, there has been no violation of the CEOC Stay. Even if there were, however, the Debtors have failed to show that sanctions would be warranted. 362 Withdrawal Objection at p. 15. In response, the Debtors suggest that the Caesars Fact Sheet is somehow evidence of an intent to violate the stay. However, that memorandum makes no reference to the stay, nor could it do so inasmuch as it preceded any bankruptcy. See p. 7, n.7, supra. The NRF's actions were clearly distinguishable from the actions found to constitute willful violations of the stay in the cases cited by the Debtors. See In re Morris Senior Living, LLC, No. 13 C 2457, 2013 WL 5753834 (N.D. Ill. Oct. 22, 2013) (third party commenced action to enjoin state agency from processing chapter 11 trustee's application for change in ownership of operating license); Paloian v. Grupo Serla S.A. de C.V., 433 B.R. 19 (N.D. Ill. 2010) (bank's sale of promissory notes destroyed debtor's rights under notes). Indeed, the NRF carved out CEOC from the Withdrawal Notice — precisely to avoid implicating the stay with respect to CEOC. Thus, any violation would have been unintentional. Accordingly, sanctions are not warranted here even if there was a stay violation, which there was not.

---

[10] Unlike here, the actions in the cases cited by the Debtors in their 362 Payment Demand Reply that were deemed in violation of the stay, and therefore void, had a clear impact on those debtors. In re Garcia, 109 B.R. 335, 340 (N.D. Ill. 1989) (public sale of delinquent real estate taxes owed on debtor's property violated stay, which creditor did not dispute, and was void); Raymark Indus., Inc. v. Lai, 973 F.2d 1125, 1132 (3d Cir. 1992) (post-petition state court dismissal of debtor's appeal for lack of prosecution violated stay and was void); In re Soares, 107 F.3d 969, 976 (1st Cir. 1997) (post-petition state court entry of foreclosure judgment against debtor's property void); In re Schwartz, 954 F.2d 569, 571 (9th Cir. 1992) (IRS' penalty assessment on debtors in violation of stay was void). Here, there is no such impact.

## CONCLUSION

WHEREFORE, the NRF respectfully requests that the Court deny the 362 Withdrawal Motion and the 362 Payment Demand Motion as a matter of law for the reasons set forth above, and grant the NRF such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: May 21, 2015<br>Chicago, Illinois | **THE BOARD OF TRUSTEES OF THE NATIONAL RETIREMENT FUND, THE NATIONAL RETIREMENT FUND and THE PENSION PLAN OF THE NATIONAL RETIREMENT FUND (F/K/A THE LEGACY PLAN OF THE NATIONAL RETIREMENT FUND)** |

By: /s/ Ronald Barliant
    One of Their Attorneys

Ronald Barliant (Ill. Bar No. 0112984)
**GOLDBERG KOHN LTD.**
55 E. Monroe, Suite 3300
Chicago, Illinois 60603
(312) 201-4000 (Phone)
(312) 332-2196 (Fax)

*Local Counsel for the Board of Trustees of the NRF, the NRF and the Legacy Plan of the NRF*

-and-

Ronald E. Richman
Lawrence V. Gelber
Alan R. Glickman
David M. Hillman
**SCHULTE ROTH & ZABEL LLP**
919 Third Ave.
New York, New York 10022
(212) 756-2000 (Phone)
(212) 593-5955 (Fax)

*Lead Counsel for the Board of Trustees of the NRF, the NRF and the Legacy Plan of the NRF*