**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

---------------------------------------------------------x
                :

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| CAESARS ENTERTAINMENT OPERATING | : | |
| COMPANY, INC., et al.,[1] | : | Case No. 15-01145 (ABG) |
| Debtors. | : | |
| | : | (Jointly Administered) |

---------------------------------------------------------x
                :

| | | |
|---|---|---|
| STATUTORY UNSECURED | : | |
| CLAIMHOLDERS' COMMITTEE, | : | |
| | : | |
| Movant, | : | |
| | : | |
| -against- | : | |
| | : | |
| CAESARS ENTERTAINMENT OPERATING | : | |
| COMPANY, INC., et al., | : | |
| | : | |
| Respondents. | : | |

---------------------------------------------------------x

<u>**NOTICE OF MOTION**</u>

      **PLEASE TAKE NOTICE** that on August 7, 2015, the statutory unsecured claimholders' committee (the "<u>UCC</u>") of Caesars Entertainment Operating Company, Inc., *et al.* (the "<u>Debtors</u>") filed the *Motion of Statutory Unsecured Claimholders' Committee for Order, Pursuant to Bankruptcy Code Sections 1103 and 1109, Granting It Derivative Standing to Commence, Prosecute, and Settle Certain Causes of Action on Behalf of Debtors' Estates* (the "<u>Motion</u>").

      **PLEASE TAKE FURTHER NOTICE** that the UCC has requested a hearing on the Motion on September 28, 2015, at 1:30 p.m. (CT) before the Honorable A. Benjamin Goldgar or any other judge who may be sitting in his place and stead, in Courtroom 2525 in the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, at which time you may appear if you deem fit. **The deadline to object to the Motion is September 21, 2015, at 4:00 p.m. (CT).**

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC.

**PLEASE TAKE FURTHER NOTICE** that the hearing date and time once determined as well as copies of all documents are available free of charge by visiting the case website maintained by Prime Clerk, LLC, the notice and claims agent for the Debtors in these chapter 11 cases, available at https://cases.primeclerk.com/CEOC, or by calling (855) 842-4123.  You may also obtain copies of any pleadings by visiting the Court's website at www.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: August 7, 2015                    Respectfully submitted,
Chicago, Illinois

                                          /s/ *Brandon W. Levitan*

                                         **PROSKAUER ROSE LLP**
                                         Martin J. Bienenstock (*admitted pro hac vice*)
                                         Judy G.Z. Liu (*admitted pro hac vice*)
                                         Philip M. Abelson (*admitted pro hac vice*)
                                         Vincent Indelicato (*admitted pro hac vice*)
                                         Eleven Times Square
                                         New York, New York 10036
                                         Tel: (212) 969-3000
                                         Fax: (212) 969-2900

                                         -and-

                                         **PROSKAUER ROSE LLP**
                                         Mark K. Thomas (IL #6181453)
                                         Jeff J. Marwil (IL #6194054)
                                         Paul V. Possinger (IL #6216704)
                                         Brandon W. Levitan (IL #6303819)
                                         Three First National Plaza
                                         70 West Madison, Suite 3800
                                         Chicago, Illinois  60602
                                         Telephone:  (312) 962-3550
                                         Facsimile:  (312) 962-3551

                                         *Attorneys for the Statutory Unsecured*
                                         *Claimholders' Committee of Caesars Entertainment*
                                         *Operating Company, Inc., et al.*

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---------------------------------------------------------x
:
*In re*                                                          :          Chapter 11
CAESARS ENTERTAINMENT OPERATING       :
COMPANY, INC., et al.,[1]                                    :          Case No. 15-01145 (ABG)
                                          Debtors.       :
:          (Jointly Administered)
---------------------------------------------------------x
:
STATUTORY UNSECURED                               :
CLAIMHOLDERS' COMMITTEE,                       :
:
                                          Movant,      :
:
          -against-                                            :
:
CAESARS ENTERTAINMENT OPERATING       :
COMPANY, INC., et al.,                                    :
:
                                     Respondents.  :
---------------------------------------------------------x

**MOTION OF STATUTORY UNSECURED CLAIMHOLDERS' COMMITTEE FOR
ORDER, PURSUANT TO BANKRUPTCY CODE SECTIONS 1103 AND 1109,
GRANTING IT DERIVATIVE STANDING TO COMMENCE, PROSECUTE, AND
SETTLE CERTAIN CAUSES OF ACTION ON BEHALF OF DEBTORS' ESTATES**

To the Honorable A. Benjamin Goldgar, United States Bankruptcy Judge:

The statutory unsecured claimholders' committee (the "UCC") of Caesars

Entertainment Operating Company, Inc., *et al.* (the "Debtors") respectfully submits this motion

(the "Motion") for entry of an order, pursuant to sections 1103(c)(5) and 1109(b) of title 11 of

the United States Code (the "Bankruptcy Code"), granting the UCC derivative standing to

commence, prosecute, and settle certain actions on behalf of the Debtors' estates challenging

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification
number are 1623. A complete list of the Debtors and the last four digits of their federal tax
identification numbers may be obtained on the website of the Debtors' claims and noticing agent
at https://cases.primeclerk.com/CEOC.

certain claims, and challenging the validity, extent and enforceability of, and seeking to avoid certain prepetition security interests, mortgages and liens that Caesars Entertainment Operating Company, Inc. ("CEOC") and certain of its Debtor-subsidiaries (the "Subsidiary Pledgors," and together with CEOC, the "Pledgors") purported to grant to Credit Suisse AG, Cayman Islands Branch (the "First Lien Collateral Agent" or "Credit Suisse"),[2] on behalf of holders of the First Lien Debt (as defined below), and Delaware Trust Company (the "Second Lien Collateral Agent," and together with the First Lien Collateral Agent, the "Collateral Agents"), on behalf of holders of the Second Lien Debt (as defined below).[3]   In support of this Motion, the UCC respectfully represents as follows:[4]

### Summary of Motion

1.      Lien/Claim Challenges Pursuant to the Final Cash Collateral Order.     In paragraphs E(i)–(v) of the order dated March 26, 2015 [ECF No. 988] (the "Final Cash Collateral Order"), the Debtors stipulated, among other things, that the prepetition first lien claims listed in the Final Cash Collateral Order constituted "allowed claims against each of the CEOC and each of the Subsidiary Pledgors," and the liens securing such claims are "valid, binding, enforceable, non-avoidable, and properly perfected."   The Debtors' stipulations, however, were expressly subject to paragraph 12 of the Final Cash Collateral Order, which protects the right of the UCC to challenge the Debtors' stipulations and to seek to avoid and to

---

[2] Credit Suisse is the successor First Lien Collateral Agent to Bank of America, National Association ("Bank of America").

[3] Delaware Trust Company is the successor Second Lien Collateral Agent to U.S. Bank, National Association.

[4] Simultaneously with the filing of this Motion, the UCC has filed its *Motion of Statutory Unsecured Claimholders' Committee for Order Authorizing the Statutory Unsecured Claimholders' Committee to File Standing Motion in Excess of 15 Pages*, requesting permission to file a motion of extended length for the reasons set forth therein.

object to security interests and claims against property of the Debtors' estates (after procuring derivative standing where necessary).

2.    <u>Deadlines</u>.  The initial deadlines in the Final Cash Collateral Order applicable to the UCC for bringing potential challenges were extended by certain subsequent stipulations filed with the Court in accordance with the Final Cash Collateral Order [ECF Nos. 1420, 1735, 1862, 2015].  The deadline for most of the challenges in this Motion is August 7, 2015.

3.    <u>Standing to Bring Challenges</u>.  The proposed complaint contains many distinct causes of action.  Certain of those causes of action require the UCC to obtain derivative standing, while others may not.  The Final Cash Collateral Order provides that the filing of a standing motion by the deadline to file challenges tolls such deadline until the motion is decided by this Court.  This rule, however, applies only if such standing motion is "necessary" or "required." Final Cash Collateral Order ¶ 12(b).  Thus, out of an abundance of caution and to avoid an inadvertent lapse of the deadline for challenges not requiring derivative standing, the UCC has (i) filed a separate complaint with the counts for which it believes it already has standing to prosecute under Bankruptcy Code sections 502(a) and 1109(b) and (ii) also included such counts in this Motion and the attached proposed complaint.  If the Court finds that derivative standing is needed for the counts included in the already-filed complaint, then the UCC requests that such standing be granted pursuant to this Motion.

4.    <u>The UCC is the Only Fiduciary Appropriate to Bring the Current Challenges</u>. Given the Debtors' stipulations in respect of the first lien security interests and liens, the Debtors cannot bring any challenges.  The first lien lenders and noteholders are the recipients of the Debtors' stipulations and cannot attack their own liens.  The constituency of the statutory second priority noteholders' committee holds liens and claims overlapping with the first lien lenders and

noteholders, received certain liens constituting voidable preferences, and is prohibited by the terms of its intercreditor agreement with the first lien lenders and noteholders from advocating positions adverse to first liens and claims.  Additionally, the challenge deadline applicable to the Debtors, first lien holders and second lien holders expired on June 9, 2015.  Therefore, the UCC remains the only, and certainly the most appropriate, entity to prosecute the challenges listed herein.[5]

5.    <u>The Current Challenges Far Surpass Any Standard of Colorability</u>.  As shown in the body of the Motion, the challenges the UCC has commenced and those it requests authority to commence, are based on solid grounds, as per the following summary:

a.    <u>Commercial Tort Claims</u>.  The Debtors pledged their commercial tort claims to secure the first lien and second lien debt.  Many of those pledges are challenged here for the following reasons:

i.    The pledges purported to include fraudulent transfer claims the Debtors could not pledge prepetition under New York Uniform Commercial Code ("<u>N.Y. U.C.C.</u>") section 9-203(b) because they had no interests in them prepetition;

ii.    The pledges purported to include claims arising after the pledges, which were invalid under N.Y. U.C.C. section 9-204(b)(2) because the Debtors

---

[5] Contemporaneously with the filing of this Motion, a member of the UCC, Wilmington Trust, National Association, as Successor Indenture Trustee for the 10.75% Senior Unsecured Notes issued by CEOC under that certain indenture dated February 1, 2008 ("<u>Wilmington Trust</u>"), is also seeking standing to pursue certain similar challenges on behalf of the Subsidiary Pledgors. As the indenture trustee for holders of the only debt securities in the Debtors' capital structure that have subsidiary guarantees, Wilmington Trust represents an important constituency in these chapter 11 cases.  Should the Court grant the Motion, the UCC will work with Wilmington Trust in a coordinated and efficient fashion to avoid duplication and minimize expense whenever practicable.

did not own them at the time of the pledge and they could not be reasonably identified, as required by the N.Y. U.C.C.;

iii.  The commercial tort claims were only identified by type in violation of N.Y. U.C.C. section 9-108(e); and

iv.  The commercial tort claims that were not identified on a schedule to the pledge agreements also lack the reasonable identification required by N.Y. U.C.C. section 9-108(e).

b.  <u>Second Lien Pledge of Commercial Tort Claims was a Preference</u>.  The Debtors granted second lien holders a lien against commercial tort claims on November 25, 2014, which was less than ninety days before these chapter 11 cases were filed and thus such grant is avoidable as a preference under Bankruptcy Code section 547.

c.  <u>No Liens against any Claims Under Insurance Policies</u>.  The Pledgors have purchased certain insurance policies.  The first lienholders and second lienholders were granted liens on "general intangibles," which include insurance policies. Uniform Commercial Code section 9-109(d)(8) excludes interests in and any claim under any insurance policy from the scope of Article 9.  Therefore, to create and perfect their purported security interests against claims under insurance policies that fall outside the scope of Article 9, the first lienholders and second lienholders must satisfy applicable non-Article 9 law.  To date, the UCC has not received any indication the first lienholders and second lienholders have perfected security interests under non-Article 9 law in an interest in or a claim under an insurance policy.  Accordingly, any purported liens against "general intangibles"

5

do not entitle the first lienholders and the second lienholders to any claims under insurance policies.

d. <u>Ineffective Security Interests in Gaming Licenses, Liquor Licenses, and Equity of Entities that Hold Gaming Licenses</u>.  With limited exceptions, the states in which the Debtors operate prohibit the grant of liens against gaming or liquor licenses, as well as the equity of entities that hold gaming licenses, unless approval of the state is obtained for such grant.  The UCC has not found, and the Debtors have not provided, any governmental approvals of liens against the gaming and liquor licenses, and only a limited number of approvals for the pledge of equity of entities that hold such gaming licenses as listed in **Schedule 1** attached hereto.

e. <u>Ineffective Mortgages against Riverboat Casinos</u>.  The Debtors own many riverboat or dockside casinos that may constitute vessels under applicable law. For certain of these casinos, irrespective of whether they are considered vessels or real property, the UCC has not located a recorded mortgage against such properties.  These casinos are listed in **Schedule 2** attached hereto.

f. <u>Unencumbered Real Property</u>.  The UCC has not located and the Debtors have not provided a recorded real estate mortgage against the properties listed in **Schedule 3** attached hereto.

g. <u>Ineffective Security Interests in Intellectual Property</u>.  The UCC has found no record of perfection of the copyrights with the United States Copyright Office for the following works:

   i.  A Course of Study for Pai Gow (TXU191246); and

   ii.  Alligator Sculpture (VAU420946).

6

h. <u>Invalid Stipulations</u>.  The UCC seeks judicial declarations that certain of the Debtors' stipulations in the Final Cash Collateral Order are inaccurate, do not expand the scope of, or otherwise alter, rights in any collateral and are not binding on the Debtors' estates and all parties in interest.

i. <u>No Allowable Section 1111(b) Unsecured Deficiency Claims</u>.  The first lienholders and second lienholders were granted liens by the Subsidiary Pledgors to secure all their debt on a nonrecourse basis.  The security agreements provide no recourse shall be had "under any law" for the payment of the obligations, except from the pledged collateral.  Accordingly, the first lienholders and second lienholders expressly waived all unsecured deficiency claims arising pursuant to Bankruptcy Code section 1111(b)(1) against the Subsidiary Pledgors.

6.     <u>Reservation of Rights</u>.  The UCC has marshalled the challenges described herein based on its own investigation and its multiple requests of the Debtors over many months for all evidence of perfection of the liens it is challenging.  If, hereafter, the UCC identifies estate property that was previously not disclosed as owned by the Debtors, or if the Debtors furnish evidence of perfected liens, the UCC reserves its rights to assert more challenges and/or to eliminate challenges, depending on what new data the Debtors provide.

**Factual Background**

**A.  The First Lien Debt**

**(i)     First Lien Bank Debt**

7.     CEOC incurred approximately $5.35 billion of first lien bank indebtedness under several prepetition term loans and revolver commitments.  On or about January 28, 2008, Harrah's Entertainment Inc., now Caesars Entertainment Corporation ("<u>CEC</u>"), and Harrah's Operating Company, Inc. ("<u>HOC</u>"), now CEOC, entered into a secured credit agreement (as

7

amended, modified, or supplemented, the "First Lien Credit Agreement") with Bank of America, as predecessor administrative agent, and certain lenders (the "First Lien Lenders").  Pursuant to the First Lien Credit Agreement, HOC borrowed up to $9.25 billion in principal amount of secured debt, including a fully funded term loan of $7.25 billion and a revolving credit line of $2 billion.

8.     On May 20, 2011, CEC and CEOC amended and restated the First Lien Credit Agreement to, among other things, extend the maturity of existing term loans or convert revolver commitments into extended term loans.  The First Lien Credit Agreement was further amended in 2012 again to extend the maturity of existing term loans or convert certain revolver commitments into extended term loans, among other things.  On July 25, 2014, CEC and CEOC amended the First Lien Credit Agreement a third time and CEOC obtained $1.75 billion of new term loans.

### (ii)     First Lien Interest Rate Swaps and Obligations

9.     In connection with the First Lien Credit Agreement, CEOC entered into a Swap Agreement pursuant to that certain ISDA Master Agreement with Goldman Sachs Capital Markets, L.P., as succeeded by Goldman Sachs Bank USA (the "First Lien Swap Counterparty"), dated as of January 28, 2008 (the "First Lien Interest Rate Swaps").  CEOC owes the First Lien Swap Counterparty on account of the First Lien Interest Rate Swaps a principal amount of $25,363,800.00 (the "Prepetition First Lien Swap Obligations").

### (iii)     First Lien Notes

10.     CEOC also issued notes in the amount of approximately $6.35 billion in principal to holders (the "First Lien Noteholders," and together with the First Lien Lenders and the First Lien Swap Counterparty, the "First Lien Secured Parties") of four series of first lien notes (the "First Lien Notes"), pursuant to various indentures (the "First Lien Notes Indentures") by and

among CEOC, CEC, and UMB Bank, National Association, in its capacity as successor

indenture trustee under the First Lien Notes Indentures (the "First Lien Notes Indenture

Trustee").

### (iv)    The First Lien Collateral Agreement

11.    The Debtors' obligations under the First Lien Credit Agreement (including the

Prepetition First Lien Swap Obligations) and the First Lien Notes Indentures (collectively, the

"First Lien Debt") are secured by purported first priority liens against the collateral as defined in

the First Lien Credit Agreement and that certain Amended and Restated Collateral Agreement

(as amended, modified, or supplemented, the "First Lien Collateral Agreement), dated as of June

10, 2009, by and among the Pledgors and Bank of America, in its capacity as predecessor First

Lien Collateral Agent.  By its terms, the First Lien Collateral Agreement grants to the First Lien

Collateral Agent a security interest in certain Uniform Commercial Code Article 9 collateral and

other collateral that any Pledgor at any time shall hold or acquire.  The Subsidiary Pledgors

pledged to the First Lien Collateral Agent on a nonrecourse basis substantially all their assets to

further secure CEOC's obligations under the First Lien Credit Agreement and First Lien Notes

Indentures.

12.    Moreover, pursuant to Section 7.18 of the First Lien Collateral Agreement, the

First Lien Collateral Agent waived recourse against the Subsidiary Pledgors "under any law" for

payment of the First Lien Debt.  *See* First Lien Collateral Agreement § 7.18 ("[N]o recourse shall

be had . . . ***under any law*** . . . for the payment of any of the [First Lien] Obligations, against any

Pledgor or any of the assets of any Pledgor, ***other than the Collateral***, it being expressly

understood that the sole remedies available to the [First Lien Collateral] Agent and the [First

Lien] Secured Parties pursuant to this [First Lien Collateral] Agreement with respect to the [First

Lien] Obligations shall be against the Collateral." (emphasis added)).

9

### (v)     Commercial Tort Claims

13.     Pursuant to the First Lien Collateral Agreement, the Pledgors have pledged commercial tort claims to secure the First Lien Debt.  Specifically, section 4.04(b) of the First Lien Collateral Agreement requires the Pledgors to (i) promptly notify the First Lien Collateral Agent if the Pledgors at any time hold or acquire any commercial tort claim the Pledgors reasonably estimate to be in an amount greater than $15 million (collectively, the "Commercial Tort Claims") and (ii) grant to the First Lien Collateral Agent a security interest in such Commercial Tort Claim and the proceeds thereof.

## B.  The Second Lien Debt

### (i)     Second Lien Notes

14.     CEOC issued notes in the amount of approximately $5.24 billion in principal to holders (the "Second Lien Noteholders," and together with the First Lien Secured Parties, the "First and Second Lien Secured Parties") of three series of second lien notes (the "Second Lien Notes"), pursuant to three indentures (the "Second Lien Notes Indentures") by and among CEOC, CEC, and the indenture trustees under the Second Lien Notes.  The Second Lien Notes are secured by second priority liens against certain collateral as defined in the Second Lien Notes Indentures and that certain Collateral Agreement (as amended, modified, or supplemented, the "Second Lien Collateral Agreement" and collectively with the First Lien Collateral Agreement, the "Collateral Agreements"), dated as of December 24, 2008, by and among the Pledgors and the Second Lien Collateral Agent.  The Subsidiary Pledgors pledged to the Second Lien Collateral Agent on a nonrecourse basis substantially all their assets to further secure CEOC's obligations under the Second Lien Notes Indentures.  Notably, the Second Lien Collateral Agreement (Section 7.17) also contains the same provision waiving recourse against the

Subsidiary Pledgors "under any law" that appears in the First Lien Collateral Agreement. *See supra* ¶ 12.

**(ii)    Commercial Tort Claims**

15.    Like the First Lien Collateral Agreement, the Second Lien Collateral Agreement (Section 4.04(b)) requires the Pledgors to provide notice of any Commercial Tort Claim reasonably estimated to exceed $15 million and grant to the Second Lien Collateral Agent a security interest in such Commercial Tort Claim and the proceeds thereof.

**C.  The Controversial Transactions and Execution of the 2014 Pledge Agreements**

16.    Over the course of years, certain of the Debtors engaged in a series of the Debtors' self-described "controversial transactions" through which certain of the Debtors are alleged to have fraudulently transferred the most valuable assets of CEOC and its Debtor-subsidiaries for no or insufficient consideration to other entities owned and controlled by Apollo Global Management, LLC and TPG Capital L.P. and (ii) other insider transactions, including debt repurchases and refinancings, and exchange and tender offers (collectively, the "Controversial Transactions").

17.    On or about August 12, 2014, the First Lien Collateral Agent and certain First Lien Secured Parties identified for the Pledgors certain Commercial Tort Claims reasonably estimated to exceed $15 million that, among other things, relate to the Controversial Transactions.  The list of Commercial Tort Claims specifically pledged to secure the First Lien Debt is embodied in Exhibit A to an Amended and Restated Waiver Agreement, dated August 12, 2014, executed by CEOC and CEC for the benefit of the First Lien Notes Indenture Trustee under the First Lien Notes Indentures (the "First Lien Notes Waiver Agreement").

18.    Thereafter, on September 25, 2014, the Pledgors granted to the First Lien Collateral Agent for the benefit of First Lien Secured Parties a security interest in and lien

against certain Commercial Tort Claims substantially similar to those listed in the First Lien

Notes Waiver Agreement (the "2014 First Lien Pledge").  On or about September 26, 2014, the

First Lien Collateral Agent filed on behalf of the First Lien Secured Parties 141 separate UCC-1

financing statements to perfect the purported security interest in the Commercial Tort Claims.

19.     On November 25, 2014, within ninety days prior to the commencement of the

Pledgors' chapter 11 cases (regardless of whether the petition date for CEOC is ultimately ruled

to be the involuntary or voluntary petition date),[6] the Pledgors granted to the Second Lien

Collateral Agent for the benefit of the Second Lien Noteholders a security interest in and lien

against certain Commercial Tort Claims substantially similar to those listed in the First Lien

Waiver Agreement (the "2014 Second Lien Pledge," and together with the 2014 First Lien

Pledge, the "2014 Pledge Agreements").

20.     On or about November 26, 2014, the Second Lien Collateral Agent filed 143

separate UCC-1 financing statements to perfect the purported security interest of those holders in

the Commercial Tort Claims.

21.     Notably, Schedule A to the 2014 Pledge Agreements lists the Commercial Tort

Claims purporting to arise from or relate to the Controversial Transactions and includes alleged

Commercial Tort Claims with vague and general descriptions.  The following listed Commercial

Tort Claims fall into these categories:

- "Commercial Tort Claims arising out of, in connection with, or otherwise relating to any transfer of value by Caesars Entertainment Operating Company, Inc., or any of its subsidiaries to any insider or affiliates, including but not limited to, any transfers made in connection with or related to the transactions identified on this Schedule." Pledge Agreements, Sched. A., No. 22.

---

[6] The dispute over the petition date for CEOC's chapter 11 case will be determined by the Court in proceedings scheduled to be heard in October 2015 in the involuntary case pending against CEOC.  Case No. 15-03193 (ABG).

- "Commercial Tort Claims against any entity premised upon theories of alter ego, piercing the corporate veil, substantive consolidation and other similar theories, including, but not limited to those arising out of or otherwise relating to the Commercial Tort Claims identified on this Schedule."  Pledge Agreements, Sched. A., No. 23.

Furthermore, the Pledge Agreements purport to grant the Collateral Agents a security interest in claims that did not exist at the time of the execution of the 2014 Pledge Agreements.

## D.  <u>The Chapter 11 Cases</u>

22.     On January 12, 2015, certain Second Lien Noteholders filed an involuntary chapter 11 petition against CEOC with the United States Bankruptcy Court for the District of Delaware.  On January 15, 2015 (the "<u>Petition Date</u>"), the Debtors commenced with this Court these voluntary chapter 11 cases.  On January 28, 2015, the Delaware Bankruptcy Court transferred venue of CEOC's involuntary case to this Court.

23.     On February 5, 2015, pursuant to Bankruptcy Code section 1102(a), the United States Trustee for the Northern District of Illinois Eastern Division appointed the members of the UCC.  *Notice of Appointment of Official Unsecured Creditors' Committee* [ECF No. 264].  The UCC is vested with, among other things, the powers described in Bankruptcy Code section 1103, including the power to investigate the acts, conduct, assets, liabilities, and financial condition of the Debtors.

## E.  <u>The Debtors' Waivers and Stipulations</u>

24.     On March 25, 2015, this Court entered the Final Cash Collateral Order.  In the Final Cash Collateral Order, among several stipulations made, the Debtors stipulated to the validity, extent and enforceability of the security interests, liens, and claims granted to the First

Lien Collateral Agent.  *See* Final Cash Collateral Order ¶ E(iv).  Upon entry of the Final Cash

Collateral Order, the stipulation became binding on the Debtors.  *Id.* ¶ 27.[7]

## F.  **The Challenge Deadline**

25.     The Final Cash Collateral Order originally established May 6, 2015 as the

deadline by which the UCC must "seek to avoid liens, object to claim allowance, or otherwise

challenges . . . the Debtors' Stipulations or to challenge, initiate any proceeding, or assert any

claim or cause of action with respect to (i) the validity, enforceability, extent, priority, or

perfection of the First Lien Documents or any of the mortgages, security interests, and liens

(including the Prepetition First Priority Liens) of any Prepetition Secured Agent or Prepetition

Secured Creditor;[8] (ii) the validity, allowability, priority, secured status or amount of the

Prepetition First Lien Obligations, or (iii) the Prepetition First Lien Creditors arising under or in

connection with the First Lien documents or the Prepetition First Lien Obligations. . . ."  *Id.* ¶

12(b).  Certain other potential challenges were subject to later deadlines.  *Id.*  The Final Cash

Collateral Order also provided the May 6, 2015 deadline remained subject to further extension

by written agreement of the required First Lien Lenders and requisite First Lien Noteholders.  *Id.*

For challenges requiring derivative standing, the UCC's May 6, 2015 deadline could be tolled by

the filing of a standing motion.  *Id.*

---

[7] As described more fully below, the Debtors did not make any stipulations with respect to the
security interests and liens granted to the Second Lien Collateral Agent (and the Second Lien
Secured Parties), but failed to bring certain challenges within the required seventy-five days after
the entry of the Final Cash Collateral Order.  Accordingly, the Debtors are now time-barred from
bringing such challenges.

[8] The Final Cash Collateral Order defines "Prepetition Secured Creditors" as "the Second Lien
Noteholder Parties together with the Prepetition First Lien Creditors."  *Id.* ¶ E(iii)(a).  The
"Second Lien Noteholder Parties" means the holders under the Second Lien Notes Indentures
and the Second Lien [Collateral] Agent.

14

26.     On May 1, 2015, the UCC, the First Lien Secured Parties, and Wilmington Trust entered into the *Stipulation Pursuant To Final Cash Collateral Order Extending Challenge Period* [ECF No. 1420] (the "Initial Stipulation") which, among other things, extended the May 6, 2015 deadline, solely for the UCC and Wilmington Trust, through and including July 6, 2015; *provided*, *however*, that any potential challenges related to the perfection of any of the mortgages, liens, or security interests asserted by the First Lien Secured Parties were extended to June 5, 2015.[9]

27.     On June 4, 2015, the UCC, the First Lien Secured Parties, and Wilmington Trust entered into the *Second Stipulation Pursuant to Final Cash Collateral Order Extending Challenge Period* [ECF No. 1735] which, among other things, extended the July 6, 2015 deadline to July 10, 2015, and also extended the June 5, 2015 deadline, except with respect to certain challenges that were specifically disclaimed, to July 10, 2015.

28.     On July 7, 2015, the UCC, the First Lien Secured Parties, and Wilmington Trust entered into the *Third Stipulation Pursuant to Final Cash Collateral Order Extending Challenge Period* [ECF No. 1862] which extended all outstanding challenge deadlines, except with respect to certain challenges that were specifically disclaimed, to August 7, 2015 (the "Operative Challenge Deadline").

29.     On August 6, 2015, the UCC and the First Lien Secured Parties entered into the *Fourth Stipulation Pursuant to Final Cash Collateral Order Extending Challenge Period* [ECF No. 2015] (the "Fourth Stipulation"), which extended certain challenge deadlines, except with respect to certain challenges that were previously disclaimed, to thirty days after the Court-

---

[9] The Initial Stipulation was later amended on May 15, 2015. *See Amended Stipulation Pursuant To Final Cash Collateral Order Extending Challenge Period* [ECF No. 1577].

appointed examiner issues a final report on his investigation, or confirmation of a chapter 11 plan, depending on the nature of the specific challenge.

30.     Unless the UCC seeks to prosecute the challenges identified in the Final Cash Collateral Order by the Operative Challenge Deadline, "(x) any and all such Challenges by any party . . . shall be deemed to be forever waived, released, and barred, and (y) all of the Debtors' Stipulations, waivers, releases, affirmations, and other stipulations as to the grant, creation, attachment, perfection, priority, extent, and validity as to the Prepetition First Lien Agents' and Prepetition First Lien Creditors' claims, liens, and interests shall be of full force and effect and forever binding upon the Debtors, the Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases."  Final Cash Collateral Order ¶ 12(b).

31.     Notably, while the Debtors did not make any stipulations with respect to the security interests and liens granted to the Second Lien Collateral Agent (and the Second Lien Secured Parties), the Debtors are time-barred from bringing any challenges to the mortgages, security interests, and liens of the Second Lien Collateral Agent (and the Second Lien Secured Parties).  Pursuant to section 12(b) of the Final Cash Collateral Order, the Debtors, as "other parties in interest," had seventy-five days after the entry of the Final Cash Collateral Order to bring such challenges against any Prepetition Secured Creditor, which includes the Second Lien Collateral Agent (and the Second Lien Secured Parties).  The seventy-five days expired in early June, and the Debtors failed to bring any such challenges.

### Relief Requested

32.     The UCC respectfully requests the entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Bankruptcy Code sections 1103(c)(5) and 1109(b),

granting the UCC standing to commence, prosecute, and settle certain actions on behalf of the

Debtors' estates challenging the validity, extent and enforceability, and seeking to avoid certain

prepetition security interests, mortgages, liens, and claims the Pledgors purported to grant to the

Collateral Agents, all as more fully set forth herein, and in the draft complaint attached hereto as

**Exhibit B**.

33.    As mentioned in the Summary of Motion above, out of an abundance of caution,

the UCC is requesting authority to bring all the actions it is describing, including the actions for

which it believes it already has standing to prosecute pursuant to Bankruptcy Code sections 502

and 1109(b), that are included in the separate already-filed complaint.

### Basis for Relief

34.    Pursuant to Bankruptcy Code sections 1103 and 1109, the UCC should be granted

derivative standing to challenge certain of the security interests, mortgages and liens pledged to

secured the First Lien Debt and the Second Lien Debt.    In the first instance, a debtor in

possession has standing to prosecute causes of action on behalf of its estate.    *See* 11 U.S.C. §§

323, 1107, 544.    Additionally, the United States Court of Appeals for the Seventh Circuit has

> repeatedly recognized the availability of derivative trustee standing.    Nor
> is this recognition merely dicta.    In *Fogel*, the court directed that if the
> creditor in that case were unable to procure the trustee's agreement to
> prosecute a claim on behalf of the estate, the creditor can prosecute the
> claim itself, in conformity with the procedure set forth in *In re Perkins*.

*In re SGK Ventures, LLC*, 521 B.R. 842, 848 (Bankr. N.D. Ill. 2014) (citing *In re Consol. Indus.*

*Corp.*, 360 F.3d 712, 716 (7th Cir. 2004); *Fogel v. Zell*, 221 F.3d 955, 965–66 (7th Cir. 2000); *In*

*re Perkins*, 902 F.2d 1254, 1258 (7th Cir. 1990)) (internal quotations omitted).    Many other

courts have found that a statutory creditors' committee has an implied right to sue on behalf of a

bankruptcy estate pursuant to Bankruptcy Code sections 1103 and 1109.    *See* 7 *Collier on*

17

*Bankruptcy* ¶ 1103.05[6][a] (16th ed. 2014) ("Nearly all courts considering the issue have permitted creditors' committees to bring actions in the name of the debtor in possession . . . .").

35.     Generally, a statutory committee's ability to obtain derivative standing to pursue an action on behalf of the estate requires: (1) the existence of a colorable claim; (2) the debtor's failure or unjustifiable refusal to pursue the claim; and (3) the permission of the bankruptcy court to initiate the action.  *See SGK Ventures, LLC*, 521 B.R. at 851 (citing *In re Perkins*, 902 F.2d at 1258); *In re Auto. Prof'ls, Inc.*, 389 B.R. 630, 634 (Bankr. N.D. Ill. 2008).

## A.  <u>The UCC Has Colorable Claims</u>

36.     A party seeking derivative standing must establish that it has asserted a claim for relief that on appropriate proof would support a recovery.  This Court has equated the colorable claim analysis with the inquiry undertaken when a defendant moves to dismiss a complaint for failure to state a claim.  *SGK Ventures, LLC*, 521 B.R. at 857–58.  This is consistent with how courts in other districts view the analysis.  *See, e.g., In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005) ("Caselaw construing requirements for 'colorable' claims has made it clear that the required showing is a relatively easy one to make.").

37.     Notably, several courts have cautioned against conducting a mini-trial to determine whether the proposed claims are colorable.  *See, e.g., In re Racing Servs., Inc.*, 540 F.3d 892, 901 (8th Cir. 2008) ("We do not suggest, however, that the bankruptcy court undertake a mini-trial in evaluating a creditor's request for derivative standing.").  This Court must simply determine "that the committee is not embarking on a senseless enterprise."  *Adelphia*, 330 B.R. at 376.  Below are the claims the UCC seeks derivative standing to prosecute, all of which exceed the colorability standard.

**(i)    The Security Interests and Liens Granted to Each of the Collateral Agents against Commercial Tort Claims Are Invalid to the Extent They Purport to Encumber Fraudulent Transfer Claims Because the Debtors Never Owned Such Claims**

38.    Section 9-203 of the Uniform Commercial Code governs the attachment and enforceability of a security interest.  Pursuant to subsection 9-203(a), a security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral.  A security interest is enforceable against the debtor with respect to the collateral only if, among other requirements, "the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party." *See* N.Y. U.C.C. Law § 9-203(b).[10]   As such, the Pledgors' purported grant in late 2014 to the Collateral Agents of a security interest in and lien against Commercial Tort Claims could not, as a matter of law, have included any fraudulent transfer claims arising as a result of the Controversial Transactions or any other transactions.   The fraudulent transfer claims belong to the unsecured claimholders the UCC represents—not the Pledgors.

39.    It is well-settled law that debtors cannot encumber fraudulent transfer claims arising from transfers made by the debtor because the transferor (the debtor) does not own them. *See In re Pierport Dev. & Realty, Inc.*, 491 B.R. 544, 550 (N.D. Ill. 2013) (prepetition lien did not attach to proceeds received for trustee's release of fraudulent transfer claims); *In re Tek-Aids Indus., Inc.*, 145 B.R. 253, 256 (Bankr. N.D. Ill. 1992) (chapter 5 causes of action could not be part of debtor's estate before the commencement of bankruptcy case and therefore cannot be part of prepetition collateral); *Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 245 (3d Cir. 2000) ("We reach the inescapable conclusion that the

---

[10] The 2014 Pledge Agreements are governed by New York law.  *See* First Lien Collateral Agreement § 7.08; Second Lien Collateral Agreement § 7.08.

fraudulent transfer claims, which state law provided to Cybergenics' creditors, were never assets of Cybergenics . . . ."); *Official Comm. of Unsecured Creditors v. UMB Bank (In re Residential Capital LLC)*, 497 B.R. 403, 414 (Bankr. S.D.N.Y. 2013) ("[B]ecause the Debtor does not own the right to pursue a fraudulent transfer action in bankruptcy (since that action belongs to the trustee post-petition under section 554(b) [sic]), the Debtor could not have encumbered or assigned that right prepetition." (citations omitted)); *Myers v. First Source Fin. LLP (In re Demma Fruit Co. Ltd.)*, 2002 Bankr. LEXIS 1781, at *9–10 (D. Neb. May 28, 2002) ("[F]raudulent transfer actions do not belong to a debtor and cannot be considered an asset of the debtor or the debtor in possession, and therefore cannot be transferred or sold by a debtor." (citing *In re Cybergenics Corp.*, 226 F.3d at 245)).

40.    Here, pursuant to Uniform Commercial Code section 9-203(b), the Pledgors never had any "rights" in any fraudulent transfer claims that constitute Commercial Tort Claims and, therefore, lacked the power to grant security interests in and liens against them.  Accordingly, the security interests the Pledgors granted to the Collateral Agents never attached to the fraudulent transfer claims, and therefore, the liens against Commercial Tort Claims that purport to encumber fraudulent transfer claims are not valid or enforceable.

**(ii)    The Security Interests and Liens Granted in Late 2014 to the Collateral Agents Do Not Extend to Any Commercial Tort Claims Arising Thereafter Because Those Claims Did Not Exist at the Time of the Grant**

41.    As a general rule, section 9-108(a) of the Uniform Commercial Code requires a security agreement to contain a description that reasonably identifies the collateral.  Pursuant to Uniform Commercial Code section 9-108(b), "a description of collateral reasonably identifies the collateral if it identifies the collateral by (1) specific listing; (2) category; (3) except as provided in [section 9-108(e)], a type of collateral defined in [Article 9]; (4) quantity; (5) computational or allocational formula or procedure; or (6) except as otherwise provided in [section 9-108(c)], any

other method, if the identity of the collateral is objectively determinable." Notably, however, a

description only "by type" of collateral defined in Article 9 is insufficient if the collateral

consists of a commercial tort claim. *See* N.Y. U.C.C. Law § 9-108(e)(1).

42.     Moreover, under Uniform Commercial Code section 9-204(b)(2), an after-

acquired collateral clause in a security agreement will not encumber future commercial tort

claims. "It follows that when an effective security agreement covering a commercial tort claim

is entered into the claim already will exist." *Id.* § 9-108, cmt. 5; *accord City Sanitation, LLC v.

Burdick (In re Am. Cartage, Inc.)*, 438 B.R. 1, 14 (D. Mass. 2010) (citing comment 5 to the

Massachusetts Uniform Commercial Code), *aff'd on other grounds*, 656 F.3d 81 (1st Cir. 2011).

Indeed, "in order for a security interest in a [commercial] tort claim to attach, the claim must be

in existence when the security agreement is authenticated. In addition, the security agreement

must describe the [commercial] tort claim with greater specificity than simply 'all [commercial]

tort claims.'" N.Y. U.C.C. Law § 9-204, cmt. 4; *accord Shirley Med. Clinic, P.C. v. United

States*, 446 F. Supp. 2d 1028, 1033 (S.D. Iowa 2006) (citing comment 5 to the Iowa Uniform

Commercial Code), *aff'd per curiam,* 243 Fed. App'x 191 (8th Cir. 2007); *Waltrip v. Kimberlin*,

164 Cal. App. 4th 517, 528 (Cal. Ct. App. 2008) (citing comment 5 to the California Uniform

Commercial Code).[11]

43.     Here, the Pledgors purportedly granted to the First Lien Collateral Agent and the

Second Lien Collateral Agent a security interest in and lien against Commercial Tort Claims as

of September 25, 2014 and November 25, 2014, respectively. Notably, however, the security

interests and liens would not attach to Commercial Tort Claims arising ***after*** the respective grants

because (i) the description in the 2014 Pledge Agreements lacks the reasonable identification

---

[11] Each of the different states' Uniform Commercial Code sections cited herein has been adopted
in New York, in the uniform form, with the same Official Comments.

21

required by Uniform Commercial Code section 9-108(e) (claims that do not exist cannot be identified) and (ii) pursuant to Uniform Commercial Code section 9-204(b)(2), an after-acquired collateral clause in the 2014 Pledge Agreements does not encumber Commercial Tort Claims that did not yet exist at the time of the grant.

### (iii)    The Security Interests in and Liens against Commercial Tort Claims Are Invalid to the Extent Such Claims Were Not Sufficiently Described in the Pledge Agreements

44.    As noted above, pursuant to Uniform Commercial Code section 9-203(b), a party granting a security interest has the power to do so only with respect to property in which it has an interest and, then, only to the extent of its interest.  Moreover, section 9-108(a) and (e)(1) of the Uniform Commercial Code provide that commercial tort claims must be described more than by type and with reasonable identification in security agreements (unlike other types of collateral). Here, Schedule A to the 2014 Pledge Agreements purports to grant to the Collateral Agents security interests in and liens against: "Commercial Tort Claims arising out of, in connection with, or otherwise relating to any transfer of value by Caesars Entertainment Operating Company, Inc., or any of its subsidiaries to any insider or affiliate, including but not limited to, any transfers made in connection with or related to the transactions identified on this Schedule [A]."  The description of the collateral as "any transfer of value" from CEOC to any insider or affiliate does not suffice under Uniform Commercial Code section 9-108(e)(1) as it is both vague and broad.  *See Shirley Medical Clinic*, 446 F. Supp. 2d at 1034 (ruling the collateral description "proceeds from any lawsuit due or pending" is not sufficient for purposes of reasonable identification under Uniform Commercial Code section 9-108(e)(1)).  Since the description here lacks the reasonable identification required by Uniform Commercial Code section 9-108(e)(1), the security interests and liens granted with respect to this purported Commercial Tort Claim did not attach.

45.     Similarly, the 2014 Pledge Agreements purport to grant the Collateral Agents security interests in and liens against: "Commercial Tort Claims against any entity premised upon theories of alter ego, piercing the corporate veil, substantive consolidation and other similar theories, including, but not limited to those arising out of or otherwise relating to the Commercial Torts Claims identified on this Schedule [A]."  This description does not suffice because it does exactly what the statute says is insufficient, namely, identify claims by type— alter ego, veil piercing, etc.—without any description of underlying facts.  *See Shirley Medical Clinic* at 1034 ("Some additional description [beyond the type alone] is necessary . . . .").  Here, it describes potential ***theories*** of liability.  Notably, piercing the corporate veil and alter ego are not independent claims, and substantive consolidation is a concept that only exists inside of bankruptcy.  Accordingly, given the absence of reasonable identification required by Uniform Commercial Code section 9-108(e)(1), any security interests and liens granted with respect to these purported Commercial Tort Claims did not attach.

46.     Finally, the 2014 Pledge Agreements purport to grant the Collateral Agents security interests in and liens against the purported Commercial Tort Claims identified on Schedule A of the 2014 Pledge Agreements.  The Collateral Agents do not have valid liens and security interests against any purported Commercial Tort Claims that are **not** listed on Schedule A of the 2014 Pledge Agreements because, as stated above, Uniform Commercial Code section 9-108(e)(1) requires reasonable identification of commercial tort claims.  Here, the Collateral Agents could have never reasonably identified commercial tort claims that existed at the time of the 2014 Pledge Agreements but are **not** listed on Schedule A of the 2014 Pledge Agreements because the omission of such commercial tort claims makes reasonable identification impossible.

### (iv)    The Security Interests in and Liens against Commercial Tort Claims Granted to the Second Lien Collateral Agent Are Avoidable as Preferential Transfers

47.    The Pledgors granted the Second Lien Collateral Agent a security interest in and lien against Commercial Tort Claims within ninety days before the commencement of these chapter 11 cases.  Bankruptcy Code section 547(b) permits a trustee to avoid any transfer of an interest of the debtor in property:  (i) to or for the benefit of a creditor; (ii) for or on account of an antecedent debt owed by the debtor before such transfer was made; (iii) made while the debtor was insolvent; (iv) made on or within ninety days before the date of the filing of the petition; and (v) that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the provisions of this title.

48.    Significantly, Bankruptcy Code section 101(54) defines "transfer" to include "the creation of a lien," as well as the voluntary disposition of "an interest in property."  *See Biase v. Cong. Fin. Corp. (In re Tops Appliance City, Inc.)*, 372 F.3d 510, 516 n.2 (3d Cir. 2004); *In re Ulrich*, 203 B.R. 691, 693 (Bankr C.D. Ill. 1997).  Here, the Pledgors granted the Second Lien Collateral Agent a security interest in and lien against the Commercial Tort Claims on November 25, 2014—well within ninety days before the commencement of the Pledgors' chapter 11 cases (whether the involuntary or voluntary petition date ultimately applies to CEOC's case).  Further, Bankruptcy Code section 547(f) specifically provides that "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date . . . of the petition."  Given that the Pledgors granted to the Second Lien Collateral Agent a security interest in and lien against Commercial Tort Claims to further secure the Pledgors' existing obligations under the Second Lien Notes Indentures, the transfers were made on account of antecedent debt.  *See Mark A. Warsco v. Preferred Technical Grp.*, 258 F.3d 557, 569 (7th Cir. 2001) ("An antecedent debt

24

exists when a creditor has a claim against the debtor, even if the claim is unliquidated, unfixed,

or contingent.").  Since the Second Lien Noteholders are indisputably undersecured, the new lien

against Commercial Tort Claims would enable them to receive more than they would receive if

these were cases under chapter 7, the pledges had not been made, and they received payment in

respect of the Second Lien Debt to the extent provided by the provisions of the Bankruptcy

Code.  Therefore, the Pledgors' grant of a security interest in and lien against Commercial Tort

Claims to the Second Lien Collateral Agent is avoidable as preferential transfers.

### (v) The Collateral Agents' Asserted Liens against General Intangibles do not Entitle Them to any Claims Under Insurance Policies

49.    The Pledgors have purchased certain insurance policies.    The Collateral

Agreements purport to grant the Collateral Agents security interests in and liens against "general

intangibles," which includes insurance policies.   Even if the collateral descriptions in the

Collateral Agreements nominally include interests in and claims under such insurance policies,

Uniform Commercial Code section 9-109(d)(8) excludes interests in and any claim under an

insurance policy from the scope of Article 9 except for (i) health care insurance receivables and

(ii) insurance that constitutes "proceeds" arising from damage to other collateral in which the

grantor has granted an effective security interest under Article 9.  *See* N.Y. U.C.C. Law § 9-

109(d)(8) (excluding from the scope of Article 9 of the Uniform Commercial Code "a transfer of

an interest in or an assignment of a claim under a policy of insurance . . . .").  Therefore, to create

and perfect their purported security interests against claims under insurance policies that fall

outside the scope of Article 9, the Collateral Agents must satisfy applicable non-Article 9 law.

To date, the UCC has not received any indication that the Collateral Agents have perfected

security interests under non-Article 9 law in an interest in or a claim under a policy of insurance

25

that complies with applicable non-Article 9 law. Accordingly, the Collateral Agents' asserted

liens against General Intangibles do not entitle them to any claims under insurance policies.

**(vi)    Liens against Regulatory Licenses**

(a) **The Security Interests and Liens Asserted against General Intangibles Do Not Extend to Regulatory Licenses that Violate State Law and Pertinent Regulations**

50.    The Debtors' business operations are subject to numerous regulatory licenses

(collectively, the "<u>Regulatory Licenses</u>").   Regulatory Licenses fall within the "general

intangibles" category of collateral governed by Article 9 of the Uniform Commercial Code.  *See*

Uniform Commercial Code § 9-102(a)(42).  Pursuant to Uniform Commercial Code Section 9-

401(a), a debtor's ability to transfer rights in collateral is governed by applicable state law and

pertinent regulations.  Additionally, the Collateral Agreements (i) permit the grant of a security

interest in the Pledgors' property only to the extent such a grant would not violate applicable

gaming laws and (ii) make explicit the Collateral Agreements remain subject to all necessary

regulatory approvals.[12]  The UCC seeks to challenge assertions of the Collateral Agents that their

security interests in and liens against general intangibles extend to the Regulatory Licenses, on

the grounds that applicable state law and pertinent regulations either (i) prohibit the encumbrance

or assignment of the Regulatory Licenses or (ii) prohibit such encumbrance or assignment absent

regulatory approval.

---

[12] *See, e.g.,* First Lien Collateral Agreement § 4.01 ("[T]his Agreement shall not constitute a grant of a security interest in . . . (f) any Pledgor's right . . . in [property] . . ., but only to the extent, that such a grant would violate applicable Gaming Laws . . . ."; *Id.* § 7.24 ("[T]he Secured Parties acknowledge that . . . [their] rights . . . may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of the Gaming Laws and Liquor Laws and only to the extent that required approvals, if any, (including prior approvals) are obtained from the relevant Gaming Authorities and Liquor Authorities.").

(b) **Liens against Gaming Licenses**

51.    The UCC's investigation has identified that in Illinois, Indiana, Iowa, Louisiana, Mississippi, Missouri, Nevada and New Jersey, encumbrances or assignments[13] (among other things) of gaming licenses are either per se ineffective or require prior approval of the applicable state gaming authority to make them effective.  *See, e.g.,* 11 CSR 45-10.040 (no licensee may pledge, hypothecate or transfer any license or interest in a license); LSA-R.S. § 26:68(A) (the transfer of a license or an interest in a license issued by this Chapter is prohibited); N.R.S. § 463.300, Nevada Gaming Commission Regulation 8A.040 (it is unlawful to sell, purchase, lease, hypothecate, borrow or loan money, or create any agreement with a licensee in connection with any gaming operation, except in accordance with the commission's regulations); Miss. Code § 75-76-97 (cannot sell, purchase, lease, hypothecate, borrow or loan money, or create any agreement with any licensee in connection with any gaming operation except with commission's approval).[14]

---

[13] *See* Uniform Commercial Code § 9-102, cmt. 26 ("This Article generally follows common usage by using the terms 'assignment' and 'assign' to refer to transfers of rights to payment, claims, and liens and other security interests . . . . Depending on the context, each term may refer to the assignment of transfer of an outright ownership interest or to the assignment or transfer of a limited interest, such as a security interest.").

[14] *See also, e.g.,* 86 Ill. Adm. Code § 3000.250 (licenses issued by the Board may not be transferred by a licensee to another person or entity); 68 IAC 2-1-10 (ownership interest in a license can only be assigned with approval of the commission); 68 IAC 5-3-2(a) & (c) (casino licensee may not enter into a debt transaction, which means a transaction in which the licensee issues, incurs, or assumes debt, including bank financing, without receiving commission approval); 491 IAC 5.4(8)(a)(1) (all contracts and business arrangements, which and include any obligation that expends, encumbers, or loans facility assets, entered into by a licensee are subject to commission jurisdiction); N.J.S.A. 5:12-1(b)(8) (the Casino Control Act does not allow the transfer of any license).

(c) **Liens against Liquor Licenses**

52.     Additionally, the UCC's investigation has identified that in certain states where the Debtors hold liquor licenses, encumbrances or assignments (among other things) of liquor licenses are either per se ineffective or require prior approval of the applicable state liquor board to make them effective.  *See, e.g.,* 235 ILCS 5/6-1 ("A [liquor] license shall be purely a personal privilege . . . and shall not constitute property, nor shall it be subject to attachment, garnishment or execution, nor shall it be alienable or transferable, voluntarily or involuntarily, or subject to being encumbered or hypothecated.").[15]

(d) **Regulatory Approvals**

53.     Given that in certain states regulatory approvals are required to grant security interests in and liens against gaming licenses and liquor licenses, the UCC has requested that the Debtors provide the UCC with information as to the existence of any such approvals, but to date has not received all requested information.  If the requisite regulatory approvals were not obtained, or if a state proscribes encumbrances or assignments of regulatory licenses, any purported security interests in and liens against the gaming licenses and liquor licenses are invalid and unperfected.  Therefore, the Pledgors either lacked the power to grant security

---

[15] *See also* Council Bluffs, Iowa Code of Ordinances § 3.08.140; Iowa Code § 123.38 (liquor licenses are personal privileges not subject to attachment and execution, and not alienable or assignable); KRS § 243.630(2) (any license issued under KRS § 243.020 to 243.670 (includes NQ-1 Retail Drink License) may not be transferable or assignable unless the transfer or assignment is authorized by the state director); Bossier City, Louisiana Code of Ordinances Sec. 6-40 (all alcoholic beverage permits issued are personal and nontransferable); Miss. Code §§ 67-3-23, 67-1-67 (beer permits are not transferable, and liquor licenses are only transferable with the commission's consent); R.S. Mo. § 311.250 (no transfer or assignment of a liquor license other than in exceptions non applicable here); NRS 369.220 (each license shall be nontransferable, except that upon prior written notice to the department the location of the premises for which it was issued may be changed); N.J. Stat. § 33:1-26 (a license or rights thereunder are not property subject to inheritance, sale pledge, lien, levy, attachment, execution, seizure for debts, or any other transfer or disposition whatsoever).

interests in and liens against them or failed to obtain state approvals necessary for such liens and security interests to attach.

**(vii)    The First Lien Collateral Agent's Asserted Liens against Equity of a Debtor-Subsidiary Holding Gaming Licenses are Invalid Absent Regulatory Approvals**

54.    The UCC's investigation has established that in certain states in which the Debtor-subsidiaries hold gaming licenses, a pledge of the equity of a Debtor-subsidiary holding a gaming license and the foreclosure of such pledge is ineffective without the prior approval of the applicable gaming authorities. *See, e.g.,* Nev. Rev. Stat. § 463.510 ("The sale, assignment, transfer, pledge, option exercise, or other disposition of a security issued by a licensee corporation (other than a publicly traded corporation) is void unless approved in advance by the Commission.").[16] Here, certain Pledgors pledged to the First Lien Collateral Agent the equity of numerous Debtor-subsidiaries. The Debtors' schedules reflect that a number of such entities

---

[16] Other states in which the Debtors hold gaming licenses, including Illinois, Louisiana, Mississippi, Missouri, and New Jersey, have statutes similar to Nevada's prohibition on pledges of stock of entities holding gaming licenses absent regulatory approval. *See* 86 Ill. Adm. Code § 3000.235 (ownership interest in a holder of a license may only be pledged as collateral with leave of the Board); La. R.S. § 27:68(B) (the sale, assignment, transfer, pledge, or disposition of a security or securities which represents five percent or more of the total outstanding shares issued by a licensee is conditional and requires approval); Miss. Code § 75-76-207 (the purported sale, assignment, transfer, pledge or other disposition of any security issued by a corporation which holds a state gaming license (or the granting of the option to purchase) is void except with prior commission approval); 11 CSR 45-10.040 (Missouri) (ownership interest in a gaming licensee that is not a publicly held entity or a holding company that is not a publicly held entity may not be pledged or hypothecated to any entity or person other than a financial institution without prior approval of the commission); N.J.S.A. § 5:12-105 (the sale, assignment, transfer, pledge or other disposition of any security issued by a corporation which holds a casino license shall be effective five business days after the commission receives notice from the licensee of such sale, assignment, transfer, pledge or other disposition, unless within the five business day period, the commission disapproves of such sale, assignment, transfer, pledge or other disposition). In Indiana, the applicable statute requires approval for any debt transaction a casino licensee enters in, which would encompass approval for either a pledge of a gaming license or the pledge of the licensee's stock. 68 IAC 5-3-2(a) & (c) (casino licensee may not enter into a debt transaction, which means a transaction in which the licensee issues, incurs, or assumes debt, including bank financing, without receiving commission approval).

29

hold gaming licenses.  The UCC has requested information from the Debtors as to the existence

of any such regulatory approvals.  From information the Debtors have produced, the UCC has

confirmed the existence of regulatory approvals for the pledge of the equity of entities holding

gaming licenses in New Jersey, Indiana, and Mississippi.  To date, however, the UCC has not

been able to confirm the existence of regulatory approvals for the pledge of the equity of entities

holding gaming licenses in Nevada, Iowa, Illinois, and Louisiana.[17]  If the requisite regulatory

approvals were not obtained in connection with the pledge of the equity of any of the Debtor-

subsidiaries holding gaming licenses in these states, any purported security interests in and liens

against such security have never attached and the liens granted on such security of Debtor-

subsidiaries holding gaming licenses are not valid.

### (viii) The Collateral Agents Failed to Properly Perfect Their Purported Security Interests in Certain of the Debtors' Riverboat Casino Properties

55.     The Debtors conduct a substantial part of their gaming operations on riverboat or

dockside casinos (the "Riverboat Casinos").  The Collateral Agents assert security interests in

and liens against the Riverboat Casinos.  If the Riverboat Casinos constitute "vessels" under

federal law, perfection of security interests therein is accomplished by filing a ship mortgage.

*See* 46 U.S.C. § 31321(a)(1) (A mortgage "must be filed with the Secretary to be valid, to the

extent the vessel is involved, against any person . . . ."); *see also* N.Y. U.C.C. Law § 9-109(c)

("This article does not apply to the extent that . . . a statute, regulation, or treaty of the United

States preempts this article.").  The Rules of Construction Act defines "vessel" as any watercraft

---

[17] For example, the Debtors produced revised orders of registration from the Nevada Gaming
Commission that indicate approvals of the pledge of equity by entities holding gaming licenses
in Nevada, but the effectiveness of such orders is conditioned upon the satisfaction of other
closing obligations the Debtors have not confirmed have been satisfied.  Moreover, the
regulatory filings the Debtors delivered with respect to entities in Iowa, Illinois, and Louisiana
did not contain any approvals related to the pledge of equity of entities holding gaming licenses
in those states.

or artificial contrivance capable of being used as a means of transportation on water.  1 U.S.C. §

3.  In *Lozman v. City of Riviera Beach, Fla.*, 133 S. Ct. 735, 741 (2013), the United States

Supreme Court ruled an "artificial contrivance" qualifies as a "vessel" as that term is defined in

the Rules of Construction Act (1 U.S.C. § 3) if "a reasonable observer, looking to [the

contrivance's] physical characteristics and activities, would consider it designed to a practical

degree for carrying people or things over water."  *Lozman* applies this test by examining several

characteristics of the contrivance (with answers in the affirmative weighing in favor of

characterization as a "vessel"): (1) Does it have a rudder or other steering mechanism?; (2) Does

it have a raked hull?; (3) Can it store or generate electricity without a connection to the land?; (4)

Are its windows watertight?; and (5) Does it have self-propulsion (i.e., capability of being

towed)? *Id.*

56.    Based on publicly available information, it is likely that at least several of the

Riverboat Casinos are "vessels" subject to federal law.  Here, however, the UCC's investigation

thus far has identified only two ship mortgages that have been filed in respect of the Riverboat

Casinos.  If the Riverboat Casinos for which ship mortgages have not been identified constitute

"vessels" under federal law and the Collateral Agents have failed to file a ship mortgage for each

such vessel, any purported security interests in and liens against the Riverboat Casinos that

certain of the Pledgors granted to the Collateral Agents have not been properly perfected and are

voidable.

57.    To further its investigation of the Riverboat Casinos, the UCC has requested from

the Debtors (i) information as to the existence of any additional ship mortgages, and (ii) answers

for each Riverboat Casino to the questions set forth in *Lozman*.  Based on certain information

provided by the Debtors, it is very likely that the Riverboat Casino located at the Horseshoe

Casino in Hammond, Indiana (the "<u>Hammond Riverboat</u>") is a "vessel" under federal law.  The Debtors have provided affirmative answers to three of the five questions considered by the reasonable observer test set forth in *Lozman*, confirming that the Hammond Riverboat (i) has self-propulsion, (ii) can generate electricity on its own without a connection to the land, and (iii) has a rudder or steering mechanism.  The Debtors, however, have not produced evidence of a recorded ship mortgage filed by the Collateral Agents against the Hammond Riverboat. Therefore, any purported security interests in the Hammond Riverboat that the Pledgors granted to the Collateral Agents have not been properly perfected and are avoidable.

58.     If the Riverboat Casinos for which ship mortgages have not been identified are not "vessels" but instead "real property," "fixtures," or "ordinary personal property," then other means of perfection govern.  *See, e.g.,* N.Y. Real Property Law § 291; Uniform Commercial Code §§ 9-501(a)(2), 9-310.  In order to make this determination, the UCC must analyze boat-specific facts, leases, and licenses.  The UCC has requested this documentation from the Debtors, but, as of the filing of this Motion, has not received all information.  In addition, the Riverboat Casinos located in man-made moats appear to constitute "real property" in which a security interest may only be perfected by filing a real estate mortgage.  The UCC's review of real estate mortgages filed against the Pledgors, however, has not uncovered a clear indication that those Riverboat Casinos fall within the scope of such mortgages and their corresponding land title surveys.  Therefore, the UCC has a colorable claim to challenge the validity of the security interests and liens granted to the Collateral Agents on certain of the Riverboat Casinos.

**(ix)     Liens against Real Estate**

59.     The UCC's investigation has confirmed that certain parcels of real property described in **<u>Schedule 3</u>** hereto are not encumbered by mortgage interests in favor of the Collateral Agents.  Confirmation that such properties are not encumbered by recorded mortgages

in favor of the Collateral Agents was determined by, among other things, review of recent title reports. Therefore, to the extent the Collateral Agents assert that they have mortgage interests in these properties, the UCC has a colorable claim to challenge such purported mortgage interests.

60. Despite the UCC's diligent efforts to complete by the Operative Challenge Deadline its investigation of properties identified by the Debtors' counsel as owned by the Debtors, the UCC's investigation with respect to certain of the Debtors' properties remains ongoing. If it is determined that the Debtors own properties beyond those properties identified by Debtors' counsel prior to the date hereof as owned by the Debtors, then, until the UCC has an opportunity to investigate the existence of mortgage interests in favor of the Collateral Agents, the UCC has a colorable claim to challenge any purported mortgage interests in these properties.

**(x)     Liens against Copyrights**

61. The UCC's investigation has identified two registered copyrights owned by the Debtors that have not been properly perfected. To perfect a security interest in a registered copyright, the security interest must be recorded with the United States Copyright Office. 17 U.S.C. § 205; *see In re World Auxiliary Power* Company, 303 F.3d 1120, 1128 (9th Cir. 2001) (emphasizing "there can be no question that, when a copyright has been registered, a security interest can be perfected only by recording the transfer in the [United States] Copyright Office."); *In re Peregrine Entm't, Ltd.*, 116 B.R. 194, 203 (C.D. Cal. 1990) ("Recording in the U.S. Copyright Office, rather than filing a financing statement under Article Nine, is the proper method for perfecting a security interest in a copyright."). The Collateral Agents failed to record their security interests in the following two copyrights with the United States Copyright Office: (i) *A Course of Study for Pai Gow* (TXU191246) and (ii) *Alligator Sculpture* (VAU420946). Therefore, security interests in these two copyrights have not been properly perfected.

33

(xi)      **Challenges to the Debtors' Stipulations**

(a) **The Recourse Stipulation**

62.      In the Final Cash Collateral Order, the Debtors stipulated that CEOC and each of the Subsidiary Pledgors (one stipulation references "the Debtors" as a whole) were "***indebted and liable***" to the First Lien Collateral Agent and the First Lien Secured Parties ***for the full amount*** of the First Lien Debt as of the Petition Date (the "Recourse Stipulation").  *See* Final Cash Collateral Order ¶ E(i)(d), (i)(e), (ii)(c), and (iv)(c) (emphasis added).  The UCC disputes the Recourse Stipulation as inaccurate with respect to the Subsidiary Pledgors' obligations under the First Lien Debt given the unambiguous non-recourse provision set forth in Section 7.18 of the First Lien Collateral Agreement.[18]  That provision makes explicit that the Subsidiary Pledgors were liable to the First Lien Collateral Agent and the First Lien Secured Parties as of the Petition Date **only** to the extent of the assets they pledged as collateral for the loans made to CEOC.  Contrary to the Recourse Stipulation, the Subsidiary Pledgors are not "indebted" to the First Lien Collateral Agent and the First Lien Secured Parties "for the full amount" of the First Lien Debt, as they did not guarantee the debt, and only pledged their assets.  Thus, the Recourse Stipulation is inconsistent with the First Lien Collateral Agreement and improperly purports to expand the scope of, or otherwise alter, rights beyond those provided for in the underlying documentation and applicable law as of the Petition Date with respect to the Subsidiary Pledgors' obligations under the First Lien Debt.  Absent the UCC's challenge, the Recourse Stipulation would become binding on the Debtors' estates and all parties in interest.

---

[18] An identical non-recourse provision also appears in the Second Lien Collateral Agreement.

34

### (b) **The Lien Stipulation**

63.     The Debtors also stipulated that as of the Petition Date all liens granted to the First Lien Collateral Agent and the First Lien Secured Parties were "valid, binding, enforceable, non-avoidable, and properly perfected" (the "Lien Stipulation").  *See* Final Cash Collateral Order ¶ E(iv).  The UCC disputes the Lien Stipulation as inaccurate because, as evidenced by the numerous challenges to the validity, binding effect, enforceability, non-avoidability, and proper perfection of the security interests, liens, and mortgages identified in this Motion, the First Lien Collateral Agent and the First Lien Secured Parties do not have perfected and enforceable liens, security interests, and mortgages against all of the assets upon which they purportedly received the grant of a lien, security interest, or mortgage.

### (c) **The Subsidiary Pledgor Stipulation**

64.     The Debtors further stipulated that as of the Petition Date all obligations, including mortgages, of the Subsidiary Pledgors were "legal, valid, binding, enforceable, and non-avoidable" (the "Subsidiary Pledgor Stipulation").  *Id*.  Importantly, the Final Cash Collateral Order does not specifically identify any Subsidiary Pledgors.  The UCC's investigation, however, identified at least thirty-two Debtors who are not parties to the First Lien Collateral Agreement and against whom no UCC financing statements have been filed (the "Non-Pledgor Debtors").  The UCC disputes the Subsidiary Pledgor Stipulation with respect to the Non-Pledgor Debtors as inaccurate and inconsistent with the First Lien Collateral Agreement because it purports to expand the scope of, or otherwise alter, rights beyond those provided for in the underlying documentation and applicable law as of the Petition Date with respect to the Non-Pledgor Debtors' obligations under the First Lien Debt.

(d) **The Fees and Charges Stipulations**

65.     Relatedly, the Debtors stipulate that both the First Lien Debt and the Second Lien Debt included certain fees, costs, and other charges (including without limitation (a) default interest, (b) premiums, (c) professional fees, and (d) indemnities as secured claims (the "<u>Fees and Charges Stipulations</u>")).    *See* Final Cash Collateral Order ¶ E(i)(d), (ii)(c), (iii)(c), and (iv)(c).   The UCC disputes the Fees and Charges Stipulations as inaccurate given the treatment required by the Bankruptcy Code.   Bankruptcy Code section 506(b) only permits postpetition fees, costs, and other charges to be treated as secured claims to the extent they are owed to an ***oversecured*** claimholder.   If the First Lien Secured Parties and/or the Second Lien Secured Parties are found to be oversecured on a debtor-by-debtor basis and otherwise entitled by the underlying documentation and applicable law to default interest, premiums, indemnities, and reasonable fees, such postpetition fees, costs, and other charges may be allowed as secured claims solely to the extent of the excess value of the collateral.   Absent such a showing, the First and Second Lien Secured Parties are unable to recover any amounts on account of the postpetition fees, costs, and other charges described in the Fee and Charges Stipulations.   Given the First and Second Lien Secured Parties have not proven they are oversecured on a debtor-by-debtor basis and otherwise entitled to such fees and charges by the underlying documentation and applicable law, the UCC disputes the Fees and Charges Stipulations as inaccurate.

### (xii)     The Collateral Agents Expressly Released 1111(b) Unsecured Deficiency Claims against the Subsidiary Pledgors

66.     As stated above, in connection with the prepetition issuances of the First Lien Debt and the Second Lien Debt, the Subsidiary Pledgors pledged their assets to the Collateral Agents on a nonrecourse basis.   *See supra* ¶¶ 11, 14. Importantly, as stated in the First Lien Collateral Agreement and the Second Lien Collateral Agreement, a lack of recourse means the

First and Second Lien Secured Parties may not pursue the Subsidiary Pledgors for payment of the First Lien Debt and Second Lien Debt beyond the value of the pledged Collateral. *See supra* ¶¶ 12, 14. Ordinarily, pursuant to Bankruptcy Code section 1111(b)(1)(A), "[a] claim secured by a lien on property of the estate [is treated] the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse." Here, however, the Collateral Agents, acting on behalf of the First and Second Lien Secured Parties, voluntarily waived recourse against the Subsidiary Pledgors "under any law," and by doing so expressly released any potential unsecured deficiency claims against the Subsidiary Pledgors afforded by Bankruptcy Code section 1111(b)(1)(A).

67. The treatise *Collier on Real Estate and Bankruptcy Code* emphasizes that courts should enforce a prepetition waiver of section 1111(b) recourse claims:

> [A] fully informed creditor should be able to waive rights as part of consensual transactions involving arrangements with other creditors and there seems to be no Bankruptcy Code policy that would favor disregarding those intercreditor agreements, at least in situations where the bankruptcy estate is not adversely affected in a manner any different than if the contracted for section 1111(b) election were made in such manner even without such agreement. Indeed, section 510(a) expressly recognizes the enforceability in Bankruptcy Code cases of subordination agreements among creditors to the same extent that such agreements are enforceable under applicable state law. A waiver of recourse treatment or advance election of fully secured treatment under section 1111(b)(2) bears a substantial resemblance to a contractual subordination agreement among creditors. Therefore, there are sound reasons for believing that the suggested section 1111(b) waiver or election provision would be upheld.

*1-2 Collier Real Estate and Bankruptcy Code* P 2.01[9]. Moreover, courts have construed the phrase "any law" to include the Bankruptcy Code. *See Walsh v. Dively*, 522 B.R. 780, 783 (Bankr. W.D. Pa. 2014) ("A plain reading of the phrase 'any law of the United States' . . . included . . . the Bankruptcy Code."); *Anderson v. Dalkon Shield Claimants Trust*, 996 F.2d 716, 716-9 (4th Cir. 1993) (interpreting the phrase "any law" in a federal statute as encompassing the

Bankruptcy Code).  Indeed, with the exception of section 1111(b), the UCC is aware of no other law that provides automatic recourse treatment to nonrecourse claims.  Therefore, the Collateral Agents' waiver of recourse "under any law" could only have been intended to capture section 1111(b).

68.     Notwithstanding the foregoing, the First Lien Secured Parties filed proofs of claim reserving rights to seek unsecured deficiency claims under Bankruptcy Code section 1111(b).[19]  Indeed, as explained above, the Debtors' erroneously stipulated in the Final Cash Collateral that the Subsidiary Pledgors are "indebted and liable" for the full amount of the First Lien Debt.  The UCC challenges the Recourse Stipulation, which would otherwise become binding on the Debtors' estates.  *See supra* ¶ 30.  While the UCC believes its challenge of the Recourse Stipulation alone will demonstrate the First Lien Secured Parties expressly released all

---

[19] *See* Proof of Claim No. 2797 (Credit Suisse) ¶ 15 ("Without limiting the generality of the foregoing, the Agent, on behalf of itself and each of the [First Lien] Lenders, expressly reserves: . . . (ii) its and the [First Lien] Lenders' respective rights under Bankruptcy Code section 1111(b) . . . ."); Proof of Claim No. 4822 (UMB Bank, N.A.) ¶ 30 ("Without limiting the generality of the foregoing, the First Lien Indenture Trustee, on behalf of itself and each of the First Lien Note Claimants, expressly reserves: . . . (ii) its and the First Lien Note Claimants' respective rights under section 1111(b) of the Bankruptcy Code . . . .").

Two proofs of claim filed on behalf of the Second Lien Secured Parties included claims asserted against the Subsidiary Pledgors, but did not specifically reserve 1111(b) recourse claims.  *See* Proof of Claim No. 3629 (Wilmington Savings Fund Society, FSB) at 3 (secured claim asserted against CEOC and the Subsidiary Pledgors, but unsecured claim asserted only against CEOC); Proof of Claim No. 3344 (BOKF, N.A.) at 4-7 (secured claim asserted against Obligor Debtors, which includes the Subsidiary Pledgors).

Tellingly, two proofs of claim filed on behalf of the Second Lien Secured Parties do assert unsecured deficiency claims against the Subsidiary Pledgors.  *See* Proof of Claim No. 2806 (Delaware Trust Company) (proof of claim filed only against CEOC); Proof of Claim No. 2849 (Delaware Trust Company) (proof of claim filed only against CEOC).

For the avoidance of doubt, the UCC is not required to commence, or seek standing to commence, any action or proceeding to challenge any proofs of claim filed by any party on account of the First Lien Debt and Second Lien Debt by August 7, 2015.  The UCC reserves all rights to challenge and object to such proofs of claim at a later date, as permitted by the Fourth Stipulation.

unsecured deficiency claims against the Debtors (which includes the Subsidiary Pledgors), it separately requests that the Court enter a declaratory judgment that the Collateral Agents expressly released unsecured deficiency claims under Bankruptcy Code section 1111(b)(1) against the Subsidiary Pledgors because both Collateral Agreements contain the identical waiver of recourse "under any law."  *See* First Lien Collateral Agreement § 7.18; Second Lien Collateral Agreement § 7.17.

**B. The Debtors Have Failed or Unjustifiably Refused to Challenge the Validity, Extent and Enforceability of the Security Interests, Liens, and Claims Granted to the Collateral Agents and Demand Upon the Debtors Would Be Futile**

69.     Derivative standing is generally granted where a debtor fails or unjustifiably or unreasonably refuses to pursue claims that the bankruptcy court finds would benefit the estate. *See In re Xonics Photochemical, Inc.*, 841 F.2d 198, 203 (7th Cir. 1998) (creditor can seek permission to bring derivative suit if it shows the debtor in possession was "shirking his statutory responsibilities").  Alternatively, where it is "plain from the record that no action on the part of the debtor would have been forthcoming," any demand that the Debtors themselves assert such claims would be futile.  *Id.* at 544; *see also SGK Ventures, LLC*, 521 B.R. at 852.

70.     Here, the Debtors' stipulations for the First Lien Secured Parties and Restructuring Support Agreement (the "RSA") with the First Lien Noteholders render the Debtors incapable of objectively pursuing actions that contradict their stipulations and may show their RSA is based on erroneous assumptions about the degree to which the First Lien Lenders and First Lien Noteholders are secured.  It is indisputable that the Debtors will not assert these claims as to the First Lien Secured Parties (or the First Lien Collateral Agent) since the Debtors are bound by their stipulations as to the validity, extent and enforceability of such claims and liens in the Final Cash Collateral Order, thereby rendering futile any demand upon the Debtors to pursue such claims.   Indeed, courts have determined stipulations constitute failure or

unjustifiable refusal for the purposes of derivative standing.  *See Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214, 222 (Bankr. W.D. Pa. 2004) (In response to objection from statutory creditors' committee, Debtor "posited" it would not pursue cause of action as part of chapter 11 plan; court determined creditors' committee did not need to obtain "formal refusal" "which would surely be refused.").  Moreover, the Debtors failed to bring any claims against the Second Lien Secured Parties (or the Second Lien Collateral Agent) by the June 9, 2015 challenge deadline established by the Final Cash Collateral Order for parties in interest other than the UCC and, therefore, waived such claims.[20]  Thus, the UCC is the only party that can bring certain claims against the Second Lien Secured Parties (and the Second Lien Collateral Agent).

## C.  **The UCC Seeks Prior Court Approval**

71.    By the filing of this Motion, the UCC seeks approval from this Court prior to asserting causes of action on behalf of the Debtors' estates that the UCC believes require derivative standing.

## D.  **The UCC Should be Granted Exclusive Authority to Settle, Subject to Court Approval**

72.    Most courts acknowledge or assume that standing to sue includes standing to settle, so long as the settlement is subject to bankruptcy court approval.  *In re Adelphia Commc'ns Corp.*, 361 B.R. 337, 355 (S.D.N.Y. 2007).  To avoid the types of disputes after the fact that occurred in *Adelphia*, however, it should be made clear up front that the power to prosecute the action includes the power to settle it.  As shown below, after *Adelphia*, courts in

---

[20] The deadline for parties in interest other than the UCC (and Wilmington Trust) to bring their challenges under the Final Cash Collateral Order was seventy-five days after the entry of the Final Cash Collateral Order, which expired on June 9, 2015.  Final Cash Collateral Order ¶ 12(b).

New York and Delaware routinely specified that the entity granted derivative standing has power to settle.

73.     The UCC is the appropriate party to pursue and settle these claims.  Since the Debtors have already waived these claims with respect to the First Lien Secured Parties and certain claims with respect to the Second Lien Secured Parties (including the Collateral Agents), the UCC is the only party in these chapter 11 cases that can bring the challenges.  Moreover, the Debtors have little incentive to negotiate maximum settlement value on behalf of unsecured claimholders for claims the Debtors either have already stipulated they will not pursue or failed to bring by the challenge deadline established by the Final Cash Collateral Order for parties in interest other than the UCC.  Similar relief has been granted by other bankruptcy courts.  *See*, *e.g.*, *In re Evergreen Solar, Inc.*, No. 11-12590 (MFW) (Bankr. D. Del. Oct. 28, 2011), ECF No. 382, ¶¶ 1–3 (granting the UCC's standing motion and exclusive authority to prosecute and settle certain causes of action); *In re Majestic Capital, Ltd.*, No. 11-36225 (CGM) (Bankr. S.D.N.Y. Dec. 12, 2011), ECF No. 211, ¶ 3 (granting the UCC the exclusive right to prosecute and settle certain claims against directors and officers on behalf of the estates); *In re Old CarCo LLC (f/k/a Chrysler LLC)*, No. 09-50002 (AJG) (Bankr. S.D.N.Y. Aug. 13, 2009), ECF No. 5151, ¶ 2 ("The Creditors' Committee is granted the exclusive right to prosecute and settle these claims on behalf of the . . . estate.").

### E.  The UCC Should be Granted Fourteen Days to File a Complaint

74.     If the Court grants the UCC derivative standing to prosecute the claims described in the Motion, the UCC requests a period of fourteen days after entry of the order within which to file the proposed complaint attached as **Exhibit B** to the Motion.  The request derives from a provision in the Final Cash Collateral Order that tolls the challenge period from the date the UCC filed the Motion to the date the Court determines the Motion.  *See* Final Cash Collateral

41

Order ¶ 12(b).  Absent a further extension within which to file the proposed complaint, the challenge period may expire on the date the order is entered, cutting off the UCC's ability to prosecute the actions it was just granted derivative standing to bring.  Additionally, the proposed complaint may need to be amended to conform to the Court's ruling.  Accordingly, the Court should grant the UCC fourteen days to finalize the proposed complaint and commence the adversary proceeding to prosecute the challenges.

### Notice

75.    The UCC has provided notice of this Motion to: (a) the Office of the United States Trustee for the Northern District of Illinois; (b) the Debtors and their counsel; (c) counsel to the Second Priority Noteholder Committee; (d) the administrative agent for the Debtors' prepetition credit facility; (e) the indenture trustees for each of the Debtors' secured and unsecured notes; (f) the Collateral Agents; (g) counsel to certain holders of claims against the Debtors regarding each of the foregoing referenced in clauses (d) and (f); (h) the state attorneys general for states in which the Debtors conduct business; (i) the Office of the United States Attorney for the Northern District of Illinois; (j) the Internal Revenue Service; (k) the Securities and Exchange Commission; (l) the gaming commissions for each of the states in which the Debtors operate or manage a casino; (m) counsel to CEC; and (n) any party that has requested notice pursuant to Bankruptcy Rule 2002.  The UCC submits that, in light of the nature of the relief requested, no other and further notice need be given.


*[Remainder of Page Intentionally Left Blank]*

### Conclusion

WHEREFORE the UCC respectfully requests that this Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein, and granting the UCC such other and further relief as this Court deems just and proper.

Dated: August 7, 2015
Chicago, Illinois

/s/ Brandon W. Levitan

**PROSKAUER ROSE LLP**
Martin J. Bienenstock (*admitted pro hac vice*)
Judy G.Z. Liu (*admitted pro hac vice*)
Philip M. Abelson (*admitted pro hac vice*)
Vincent Indelicato (*admitted pro hac vice*)
Eleven Times Square
New York, New York 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

-and-

**PROSKAUER ROSE LLP**
Mark K. Thomas (IL #6181453)
Jeff J. Marwil (IL #6194054)
Paul V. Possinger (IL #6216704)
Brandon W. Levitan (IL #6303819)
Three First National Plaza
70 West Madison, Suite 3800
Chicago, Illinois  60602
Telephone:  (312) 962-3550
Facsimile:  (312) 962-3551

*Attorneys for the Statutory Unsecured Claimholders' Committee of Caesars Entertainment Operating Company, Inc., et al.*