## Exhibit A

## Proposed Order

**UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING COMPANY, INC., et al.,[1] | ) Case No. 15-01145 (ABG) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. __** |

**ORDER (A) APPROVING SETTLEMENT BY AND BETWEEN DEBTOR DESERT PALACE, INC. AND THE U.S. DEPARTMENT OF THE TREASURY FINANCIAL CRIMES ENFORCEMENT NETWORK AND (B) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"): (a) approving the Consent Order, dated as of August 20, 2015, by and between CPLV and FinCEN, a copy of which is attached hereto as **Exhibit 1**; and (b) granting related relief, all as more fully set forth in the Motion; and after due deliberation, it is HEREBY ORDERED THAT:

1. The Motion is granted as set forth herein.

2. The Consent Order is approved.

3. FinCEN is granted, and proof of claim number 5410 filed by FinCEN is amended to reflect, an allowed general unsecured claim against CPLV in the amount of $8 million. Prime

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

Clerk, LLC, the Debtors' claims and noticing agent, is authorized and directed to adjust proof of claim number 5410 in accordance with this paragraph.

4. CPLV is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order, including entry into the Consent Order and any and all other documents or agreements necessary to implement the terms of the Consent Order, including, without limitation, the undertakings required by the Consent Order.

5. The releases set forth in the Consent Order are approved.

6. Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order will be immediately effective and enforceable upon its entry.

Dated: _____, 2015
Chicago, Illinois

The Honorable A. Benjamin Goldgar
United States Bankruptcy Judge

2

KE 37557361

# Exhibit 1

## Consent Order

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
FINANCIAL CRIMES ENFORCEMENT NETWORK

| | |
|---|---|
| IN THE MATTER OF: | ) |
| | ) |
| | ) |
| | ) Number 2015-10 |
| Desert Palace, Inc. d/b/a Caesars Palace | ) |
| Las Vegas, Nevada | ) |

### CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY

**I.   INTRODUCTION**

The Financial Crimes Enforcement Network ("FinCEN") has determined that grounds exist to assess a civil money penalty against Desert Palace, Inc. d/b/a Caesars Palace ("Caesars"),[1] pursuant to the Bank Secrecy Act ("BSA") and the regulations issued pursuant to that Act.[2]

Caesars admits to the facts set forth below and that its conduct violated the BSA. Caesars consents to the assessment of a civil money penalty and enters into this CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY ("CONSENT") with FinCEN.

Caesars is a 3,960-room hotel and casino located on the Las Vegas, Nevada strip. The casino includes 1,371 slot machines, 141 table games, a Race & Sports Book, and private gaming

---

[1] Caesars, along with 172 affiliates (collectively, the "Debtors"), filed for protection under chapter 11 of title 11 of the United States Code on January 15, 2015, in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"), in the jointly administered case captioned In re Caesars Entertainment Operating Company, Inc., Case No. 15-01145 (ABG) (Bankr. N.D. Ill.) (the "Bankruptcy Case").

[2] The Bank Secrecy Act is codified at 12 U.S.C. §§ 1829b, 1951-1959 and 31 U.S.C. §§ 5311-5314, 5316-5332. Regulations implementing the Bank Secrecy Act appear at 31 C.F.R. Chapter X.

salons. Caesars is a subsidiary of Caesars Entertainment Corporation, which reported net revenues of $8.5 billion for 2014.

FinCEN has authority to investigate casinos for compliance with, and violations of, the BSA pursuant to 31 C.F.R. § 1010.810, which grants FinCEN "[o]verall authority for enforcement and compliance, including coordination and direction of procedures and activities of all other agencies exercising delegated authority under this chapter." Caesars was a "financial institution" and a "casino" within the meaning of the BSA and its implementing regulations during the time relevant to this action. 31 U.S.C. § 5312(a)(2)(X); 31 C.F.R. § 1010.100(t)(5). The Internal Revenue Service, through the Small Business/Self-Employed Division ("IRS SB/SE"), examines casinos for compliance with the BSA. In 2012, IRS SB/SE examined Caesars and identified significant BSA violations.

As of the signing of this CONSENT, Caesars remains a debtor in its Bankruptcy Case.

## II.  DETERMINATIONS

FinCEN has conducted an investigation and determined that since February 1, 2012, Caesars has willfully violated the BSA's requirements to develop and implement a reasonably designed anti-money laundering program and to report suspicious activity.[3]

As further described below, Caesars maintained severely deficient internal controls on its private gaming salons, which are exclusive gaming areas authorized under Nevada law that are reserved only for Caesars' wealthiest clientele. Despite the obvious elevated risks presented in these

---

[3] In civil enforcement of the BSA under 31 U.S.C. § 5321(a)(1) to establish that a financial institution or individual acted willfully, the government need only show that the financial institution or individual acted with either reckless disregard or willful blindness. The government need not show that the entity or individual had knowledge that the conduct violated the BSA, or that the entity or individual otherwise acted with an improper motive or bad purpose. Caesars admits to "willfulness" only as the term is used in civil enforcement of the BSA under 31 U.S.C. § 5321(a)(1).

2

salons, which openly allowed wealthy patrons to gamble anonymously, Caesars failed to impose appropriate anti-money laundering scrutiny on its private gaming salons to meet these heightened risks. This created the potential for the individuals allowed to gamble in these salons to circumvent certain BSA recordkeeping and reporting requirements. Caesars also marketed these private gaming salons through branch offices located in the United States and abroad (particularly Asia), but failed to adequately monitor transactions conducted through these marketing offices for suspicious activity. These significant internal control deficiencies caused Caesars to fail to detect and report a number of instances of suspicious activity.

Several failures at Caesars caused these compliance deficiencies, which were both systemic and severe. The casino did not supply sufficient resources to its BSA compliance department. More importantly, Caesars allowed a blind spot to exist in its compliance program – private gaming salons – enabling some of the most lucrative, and riskiest, financial transactions to avoid the scrutiny of Caesars' compliance program. These failures compromised Caesars, exposing the casino and the U.S. financial system to illicit activity.

A. **Violations of the Requirement to Develop and Implement an Effective Anti-Money Laundering Program**

A casino is required to develop and implement an effective written anti-money laundering program that is reasonably designed to prevent the institution from being used to facilitate money laundering and the financing of terrorist activities. 31 U.S.C. §§ 5318(a)(2), 5318(h); 31 C.F.R. § 1021.210. At a minimum, the program must provide for: (a) a system of internal controls to assure ongoing compliance; (b) internal and/or external independent testing for compliance; (c) training of casino personnel; (d) designation of an individual to assure day-to-day compliance; (e) procedures for using all available information to determine and verify the name, address, social security or tax identification number, and other identifying information for a person, to the extent

that determining and verifying the information is otherwise required under the BSA; (f) procedures for using all available information to determine the occurrence of any transactions or patterns of transactions required to be reported as suspicious; (g) procedures for using all available information to determine whether any records must be made and maintained pursuant to the BSA; and (h) for casinos with automated data processing systems, use of such systems to aid in assuring compliance. 31 C.F.R. § 1021.210(b)(2). Caesars failed to develop and implement an effective anti-money laundering program that adequately addressed several of these requirements.

### 1. Internal Controls

Caesars maintained highly deficient internal controls on its private gaming salons and branch office locations, both of which catered to the casino's wealthiest – and riskiest – clientele. As a result, Caesars failed to detect and report a wide range of suspicious transactions. In fact, Caesars would still be unaware that these transactions were potentially suspicious had IRS SB/SE not flagged them during the 2012 exam.

#### a. Private Gaming Salons

For its highest-end clientele, Caesars offers private gaming salons exclusively for patrons with a front money deposit or line of credit of at least $300,000. Some of these patrons may gamble millions of dollars in a single visit. While private gaming salons are authorized under Nevada state law, they pose significant money laundering risks because of the wealthy nature of the clientele and the significant levels of gambling. Compliance with the Nevada law that allows casinos to operate private gaming salons neither supersedes nor satisfies the casino's obligation to comply with the BSA and operation of a private gaming salon authorized under state law must also comply with all Federal BSA regulations. By creating the opportunity for unknown patrons – many of whom were wealthy individuals from overseas – to gamble significant sums anonymously, which potentially

4

totaled millions of dollars, Caesars' private gaming salons presented a significantly higher level of money laundering risk than ordinary gaming areas. Despite this obviously higher level of risk inherent in the private gaming salons, Caesars failed to impose appropriate anti-money laundering controls calibrated to this heightened risk.

Maintaining such deficient internal controls potentially enabled individuals in the private gaming salons to circumvent other BSA requirements. Caesars permitted the guests of private gaming salon patrons to play using the primary patron's credit or front money instead of their own (i.e., "team play"). This potentially enabled guests to conceal their identity and transactions, thereby frustrating recordkeeping and reporting requirements. 31 C.F.R. §§ 1021.410 and 1021.311. By failing to identify these guests, Caesars allowed some of the guests to gamble significant sums anonymously. Caesars also would not have been able to identify these anonymous guests as a subject in a SAR had the casino filed SARs to report their team play as suspicious.

### b. Branch Offices

Caesars also failed to implement effective internal controls to detect and report suspicious activity occurring at its branch office locations. Caesars maintains branch offices domestically and abroad, including in Hong Kong, Singapore, Tokyo, and Monterey Park, CA, to promote and market the casino (including its private gaming salons) to wealthy prospective patrons. Despite the elevated risks associated with promoting high-end gambling to wealthy non-U.S. persons, Caesars did not consistently monitor these branch offices for suspicious activity. As a result, Caesars failed to detect and report a number of suspicious transactions associated with the casino's wealthiest foreign clientele. One foreign patron, for example, deposited 50,000 USD in cash into Caesars' Hong Kong bank account without the marketing executives at that branch office or Caesars' BSA compliance staff deeming the transaction suspicious or conducting any inquiry regarding the source of funds.

Caesars also routinely accepted third-party checks at its Hong Kong branch office for marker payments without seeking to verify the relationship between the third-party and the patron receiving the marker.[4] In general, the marketing executives at these branch offices rarely, if ever, referred suspicious activity to Caesars' BSA compliance department. They also lacked a basic understanding of the types of activity that should be considered suspicious.

### c. Detecting and Reporting Other Suspicious Activities

Caesars' inadequate internal controls directly contributed to its failure to file a large number of SARs on a broad range of suspicious activity, as further described below. In fact, not only did Caesars not file SARs on the activity, it never even flagged the underlying transactions as potentially suspicious. Even when Caesars had procedures to detect and report suspicious activity, the casino failed to follow them. Caesars' anti-money laundering program specifically highlighted wire transfers over $10,000 for a patron from an unaffiliated business as a red flag potentially requiring a SAR. Despite this explicit warning, Caesars failed to file SARs – or even flag the activity for review – on dozens of these types of transactions.

Caesars also failed to maintain effective procedures to detect and report "bill stuffing" – a form of minimal gaming that is commonly understood as suspicious – until September 2012.[5] Importantly, IRS SB/SE identified this compliance failure four years earlier during a 2008 Caesars exam.

### 2. Independent Testing

Caesars also failed to conduct adequate independent testing of its anti-money laundering compliance program. Rather than determining whether its procedures were actually effective in

---

[4] A marker generally refers to an extension of credit to a patron by a casino.
[5] An example of bill stuffing is a patron inserting currency into a slot machine and later redeeming the slot tickets without actually having played the slots.

6

achieving compliance with the BSA, Caesars' independent tests merely assessed whether the casino was implementing its already established anti-money laundering procedures. For example, Caesars conducted an internal audit during the IRS SB/SE exam period, but this audit did not seek to identify potentially suspicious activity independently from the casino's existing procedures. This audit also overlooked the fact that Caesars was not implementing its own anti-money laundering procedures for detecting suspicious activity.

### 3. Training

Caesars also failed to provide adequate BSA training for its employees, including staff who are key to BSA compliance. This deficient training resulted in fundamental misunderstandings of the types of transactions that should be considered suspicious. For example, some of these Caesars employees mistakenly believed that the requirement to report suspicious activity related to cash transactions only. Even more egregious was their erroneous belief that filing a CTR (which merely identifies the existence of a particular transaction above a certain monetary threshold) relieves a casino from filing a SAR (which notifies FinCEN and law enforcement about suspicious financial transactions). The marketing executives at Caesars' branch offices similarly lacked a basic understanding about the types of activities that should be considered suspicious.

### 4. Procedures for Using All Available Information

Caesars failed to implement procedures for using all available information to determine: (a) identifying information when required under the BSA; (b) the occurrence of any transactions or patterns of transactions required to be reported on a SAR; and (c) whether certain records are required to be maintained. 31 C.F.R. § 1021.210(b)(2)(v). Caesars' marketing department would typically obtain information about the casino's wealthy patrons for marketing purposes, but Caesars did not use this information to identify and evaluate potentially suspicious activity or otherwise

incorporate it into the casino's anti-money laundering controls. For example, many of the SAR violations described below involved suspicious third-party payments occurring at Caesars' foreign branch offices. These branch offices did not use the patron information they collected for marketing purposes to verify the relationship between the third-party sending the funds and the patron receiving them. Similarly, the BSA compliance department did not seek this information from the branch offices in order to evaluate the potentially suspicious transactions.

Caesars also failed to use all of its available information to monitor for potentially suspicious minimal gaming.[6] Like many other casinos, Caesars issues computer generated tickets for high-end slot machine players. As a matter of convenience, patrons might prefer to purchase these tickets from the casino cage rather than inserting large volumes of cash into a slot machine. However, many of these computer-generated tickets were issued and then redeemed without any evidence that a patron actually used the ticket to play a slot machine. This activity potentially indicated suspicious minimal gaming, but Caesars was unable to evaluate the activity because the casino did not record whether a patron actually purchased the computer-generated ticket or whether Caesars pre-printed the computer-generated ticket and then redeemed it after no patron purchased it. This distinction is critical in evaluating whether the activity was potentially suspicious, but Caesars was unable to make this determination because it did not keep sufficient records on these tickets.

B. **Violations of Suspicious Activity Reporting Requirements**

The BSA and its implementing regulations require a casino to report a transaction that the casino "knows, suspects, or has reason to suspect" is suspicious, if the transaction is conducted or attempted by, at, or through the casino, and the transaction involves or aggregates to at least $5,000

---

[6] Minimal gaming generally refers to instances in which a patron buys chips or deposits funds into their casino front money account and then cashes out after little or no play. Money launderers frequently engage in this practice to launder their illicit proceeds.

8

in funds or other assets. 31 C.F.R. § 1021.320(a)(2). A transaction is "suspicious" if the transaction: (a) involves funds derived from illegal activity, or is conducted to disguise funds or assets derived from illegal activities; (b) is designed to evade any requirement of the BSA or its implementing regulations; (c) has no business or apparent lawful purpose or is not the sort in which the particular customer would normally be expected to engage; or (d) involves use of the casino to facilitate criminal activity. 31 C.F.R. §§ 1021.320(a)(2)(i)-(iv).

During the period covered by the IRS SB/SE 2012 exam, Caesars failed to file over 100 SARs to report a variety of suspicious activities, including: (a) "team play" among unidentified guests in Caesars' private gaming salons; (b) suspicious transactions at Caesars' branch offices; (c) third-party payments from unrelated individuals and businesses; (d) structuring; (e) minimal gaming and bill stuffing; (f) chip walking;[7] and (g) observed suspicious behavior of individual patrons. Moreover, Caesars did not detect these transactions as potentially suspicious at the time they occurred and conducted no diligence on them in order to evaluate their legitimacy.

For instance, Caesars failed to file approximately 30 SARs to report transactions in which the casino received wire transfers for patrons from unaffiliated third-parties, including unrelated businesses. In one example, Caesars did not file a SAR when a patron received wires totaling over $300,000 from two unaffiliated individuals and four different businesses located in two different countries. Nor did the casino file a SAR when a patron received seven different wires within three weeks totaling about $200,000 from a banking institution, a business, and two unaffiliated individuals. In none of these cases did Caesars attempt at the time of the transactions to ascertain

---

[7] Chip walking generally refers to a patron leaving the casino with a significant amount of chips without redeeming them.

the nature of the relationship between the individuals and businesses sending the funds and the patrons receiving them.

Caesars also failed to consistently detect and report potential minimal gaming – a common money laundering technique whereby a patron buys chips or deposits funds into their casino front money account and then cashes out after little or no play. For example, Caesars did not file a SAR when one patron took out $35,000 in cage markers and then risked only 1% of those funds or when a patron took out a slot marker, engaged in minimal play, and then wired in external funds to pay off the credit balance rather than using the funds he had just taken out. Caesars also failed to file a SAR when this same patron engaged in bill stuffing, activity the IRS SB/SE cited Caesars for not reporting during its 2008 exam. Caesars also failed to file four SARs on patrons who walked from the pit with chips worth over $10,000, and 22 SARs on patrons who structured their gaming transactions between $9,000 and $10,000.

### III. CIVIL MONEY PENALTY

FinCEN has determined that Caesars willfully violated the anti-money laundering program and suspicious activity reporting requirements of the BSA and its implementing regulations, as described in this CONSENT, and that grounds exist to assess a civil money penalty for these violations. 31 U.S.C. § 5321(a)(1); 31 C.F.R. § 1010.820.

FinCEN has determined that the penalty in this matter will be $8 million. This penalty will be allowed as a general unsecured claim, subject to the United States's setoff and recoupment rights as described below, in Caesars' Bankruptcy Case, effective upon the Bankruptcy Court's approval of this CONSENT. In the event that the CONSENT is not approved for any reason, FinCEN retains all rights to proceed in this matter for the full amount of Caesars' liability.

IV. UNDERTAKINGS

Caesars agrees to undertake, or continue to undertake, several improvements made to its BSA/AML Program, including those with respect to fostering a culture of compliance, complying with all applicable BSA program, recordkeeping, and reporting requirements, including implementing risk-based "Know Your Customer" (KYC) measures and preventing and detecting money laundering. By execution of this CONSENT, Caesars agrees to the following UNDERTAKINGS:

A. <u>External Independent Reviewer</u>. Caesars will engage and retain an independent, external, qualified, and experienced external auditor (the "Third-Party Reviewer"), not subject to any conflict of interest, and subject to FinCEN's determination of non-objection after FinCEN's review of the engagement contract, to examine Caesars' Bank Secrecy Act compliance program and to conduct risk-based independent testing of Caesars' BSA/AML Program. Independent testing will include program governance, compliance structure and staffing; risk assessments; compliance with all BSA recordkeeping and reporting requirements, including CTR, SAR, and KYC policies, procedures and controls; transaction monitoring; and training and communications. The independent testing will test remedial steps taken to address all criticisms in the IRS Examination. Four reviews will occur: the first will commence within 60 days of this agreement, and the remaining will commence annually thereafter for the next three years. Each review will cover the prior year, with no less than three months' worth of transactional analysis. In 2018, upon request and with the approval of FinCEN, Caesars' internal audit staff may conduct the independent review of activity occurring in 2017. After the 2018 review, FinCEN, in its sole discretion, will determine whether it is appropriate to extend this requirement into additional years. The Third-Party Reviewer will prepare a written report for each Caesars' audit committee and the board of directors, setting forth its findings, and will transmit the report and all draft reports to FinCEN and

IRS SB/SE simultaneously with any transmission to Caesars or it agents. To the extent that the report identifies any material deficiencies in Caesars' programs and procedures, Caesars will address and rectify the deficiencies as soon as is reasonably practicable and will advise FinCEN and IRS SB/SE of the remedial steps taken.

B.   <u>AML Program Report</u>. Within 180 days from the date of the CONSENT, and annually thereafter for the next three years, Caesars will provide a comprehensive report to FinCEN of the implementation of its BSA/AML Program which will include all initiatives to improve BSA/AML compliance and any material breakdowns or deficiencies in internal controls, and management's responses and action plan to address any issues raised in the Third Party-Reviewer's report. The report also will include the most recent AML risk assessment methodology and risk assessment; the status of BSA staffing and organization and governance initiatives; any revised policies and procedures, including with respect to CTR, SAR, KYC and recordkeeping compliance; and the quality assurance (compliance testing) program.

C.   <u>Training Plan</u>. Within 90 days of the date of this CONSENT, and annually thereafter for the next three years, Caesars will provide to FinCEN and IRS SB/SE a copy of its training program provided to employees; attendance records of all employees and officers who attended the program; and the results of any testing to ensure knowledge of BSA/AML program, recordkeeping, and reporting requirements.

D.   <u>SAR Look-Back</u>. Within 180 days of the date of this agreement, Caesars will conduct, or engage a third party to conduct, a review of all transactions conducted through Caesars branch offices in Asia and in Monterey Park, California, for the period of January 1, 2012, through December 31, 2014, consistent with the SAR regulations for casinos. Based on the results of this review, Caesars will file SARs or amend previously filed SARs, as appropriate, consistent with the

SAR regulations for casinos, and will advise FinCEN and IRS SB/SE of the filings. Any third-party must be subject to FinCEN's determination of non-objection after FinCEN's review of the engagement contract.

## V. CONSENT TO ASSESSMENT

To resolve this matter, and only for that purpose, Caesars consents to the assessment of a civil money penalty in the sum of $8 million, and to the undertakings set forth in Part IV above, and admits that it violated the BSA's anti-money laundering program and suspicious activity reporting requirements. This civil money penalty will be allowed as a general unsecured claim in Caesars' Bankruptcy Case subject to the rights of the United States to assert its setoff and recoupment rights. Caesars reserves all rights and defenses in connection with any and all assertions of such setoff or recoupment rights.

Caesars recognizes and states that it enters into this CONSENT freely and voluntarily and that no offers, promises, or inducements of any nature whatsoever have been made by FinCEN or any employee, agent, or representative of FinCEN to induce Caesars to enter into this CONSENT, except for those specified in this CONSENT.

Caesars understands and agrees that this CONSENT embodies the entire agreement between Caesars and FinCEN relating to this enforcement matter only, as described in Section II above. Caesars further understands and agrees that there are no express or implied promises, representations, or agreements between Caesars and FinCEN other than those expressly set forth or referred to in this document and that nothing in this CONSENT or in the ASSESSMENT OF CIVIL MONEY PENALTY ("ASSESSMENT") is binding on any other agency of government, whether Federal, State or local.

This CONSENT is subject to, and shall become effective upon, approval of the Bankruptcy Court. Nothing in this CONSENT or the ASSESSMENT shall preclude any proceedings brought by FinCEN to enforce the terms of this CONSENT or the ASSESSMENT. To the extent that FinCEN finds it necessary to enforce the terms of this CONSENT or the ASSESSMENT, Caesars agrees that such proceeding(s) may be withdrawn to the District Court for adjudication pursuant to 28 U.S.C. § 157(d).

## VI. PUBLIC STATEMENTS

Caesars expressly agrees that it shall not, nor shall its attorneys, agents, partners, directors, officer, employees, affiliates, or any other person authorized to speak on its behalf, make any public statement contradicting either its acceptance of responsibility set forth in this CONSENT or any fact in the DETERMINATIONS section of this CONSENT. FinCEN has sole discretion to determine whether a statement is contradictory and violates the terms of this CONSENT. If Caesars, or anyone claiming to speak on behalf of Caesars makes such a contradictory statement, Caesars may avoid a breach of the agreement by repudiating such statement within 48 hours of notification by FinCEN. If FinCEN determines that Caesars did not satisfactorily repudiate such statement(s) within 48 hours of notification, FinCEN may void, in its sole discretion, the releases contained in this CONSENT and reinstitute enforcement proceedings against Caesars. Caesars expressly agrees to waive any statute of limitations defense to the reinstituted enforcement proceedings and further agrees not to contest any admission or other findings made in the DETERMINATIONS section of this CONSENT. This paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of Caesars in the course of any criminal, regulatory, or civil case initiated against such individual, unless Caesars later ratifies such claims, directly or indirectly. Caesars further agrees that, upon notification by FinCEN, Caesars will repudiate such

statement to the extent it contradicts either its acceptance of responsibility or any fact in the DETERMINATIONS section of this CONSENT.

## VII. RELEASE

Execution of this CONSENT, upon it being effective, and compliance with all of the terms of the ASSESSMENT and this CONSENT, settles all claims that FinCEN may have against Caesars for the conduct described in Section II of this CONSENT. Execution of this CONSENT, and compliance with the terms of the ASSESSMENT and this CONSENT, does not release any claim that FinCEN may have for conduct by Caesars other than the conduct described in Section II of this CONSENT, or any claim that FinCEN may have against any current or former director, officer, owner, or employee of Caesars, or any party other than Caesars. Upon request, Caesars shall truthfully disclose to FinCEN all factual information not protected by a valid claim of attorney-client privilege or work product doctrine with respect to the conduct of its current or former directors, officers, employees, agents, or others.

## VIII. WAIVERS

Nothing in this CONSENT or the ASSESSMENT shall preclude any proceedings brought by FinCEN to enforce the terms of this CONSENT or the ASSESSMENT, nor shall it constitute a waiver of any right, power, or authority of any other representatives of the United States or agencies thereof, including but not limited to the Department of Justice.

In executing this CONSENT, Caesars stipulates to the terms of this CONSENT and waives:

a. All defenses to this CONSENT and the ASSESSMENT which can be waived;

b. Any claim of Double Jeopardy based upon the execution of this CONSENT or the ASSESSMENT, or the payment of any civil money penalty herein or therein;

c. Any claim that this CONSENT, the ASSESSMENT or the civil money penalty is unlawful or invalid, or violates the Constitution of the United States of America; and,

15

d.  All rights to seek in any way to contest the validity of this CONSENT, the ASSESSMENT, or payment of the civil money penalty, on any grounds.

Desert Palace, Inc. d/b/a Caesars Palace

_____
Name: *[signature]* Date: 8/19/15
Title: President

Accepted by:

_____
Jennifer Shasky Calvery   Date: 8/20/15
Director
FINANCIAL CRIMES ENFORCEMENT NETWORK
U.S. Department of the Treasury

16