**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: <br><br> CAESARS ENTERTAINMENT <br> OPERATING COMPANY, INC., *et al.*,[1] <br><br> Debtors. | Chapter 11 <br><br> Case No. 15-01145 (ABG) <br><br> (Jointly Administered) |

**NOTICE OF MOTION OF THE OFFICIAL
COMMITTEE OF SECOND PRIORITY NOTEHOLDERS TO RECONSIDER
ORDER GRANTING DEBTORS' APPLICATION FOR RETENTION OF KIRKLAND
& ELLIS LLP AND KIRKLAND & ELLIS INTERNATIONAL LLP**

  **PLEASE TAKE NOTICE** that on October 30, 2015, the Official Committee of Second Priority Noteholders (the "Noteholder Committee") appointed in the above-captioned cases filed the *Motion Of The Official Committee Of Second Priority Noteholders To Reconsider Order Granting Debtors' Application For Retention Of Kirkland & Ellis LLP And Kirkland & Ellis International LLP* (the "Motion").

  **PLEASE TAKE FURTHER NOTICE** that on **November 18, 2015, at 1:30 p.m. (prevailing Central Time)** or as soon thereafter as counsel may be heard, the Noteholder Committee will appear before the Honorable A. Benjamin Goldgar, or any other judge who may be sitting in his stead, in Courtroom 2525 in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604, and present the Motion.

  **PLEASE TAKE FURTHER NOTICE** that any objection to the Motion must be filed with the Court by **November 11, 2015, at 4:00 p.m. (prevailing Central Time)** and served so as to be actually received by such time by: (a) counsel to the Noteholder Committee; (b) counsel to the Debtors; (c) the Office of the United States Trustee for the Northern District of Illinois; and (d) any party that has requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. A schedule of such parties may be found at https://cases.primeclerk.com/CEOC.

  **PLEASE TAKE FURTHER NOTICE** that copies of the Motion as well as copies of all documents filed in these chapter 11 cases are available free of charge by visiting the case website maintained by Prime Clerk LLC, the claims and noticing agent for these chapter 11 cases, available at https://cases.primeclerk.com/CEOC or by calling (855) 842-4123 within the United States or Canada or, outside of the United States or Canada, by calling +1 (646) 795-6969. You

---

[1]  A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerk.com/CEOC.

may also obtain copies of any pleadings by visiting the Court's website at www.ilnb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:  October 30, 2015
           Chicago, Illinois

Respectfully submitted,

*/s/ Timothy W. Hoffmann*
Timothy W. Hoffmann (No. 6289756)
JONES DAY
77 West Wacker
Chicago, IL  60601-1692
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
thoffmann@jonesday.com

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071

-and-

Geoffrey Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C.  20001

*Counsel for Official Committee of Second Priority Noteholders*

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC., *et al.*<br><br>Debtors. | Chapter 11<br><br>Case No. 15-1145 (ABG)<br><br>(Jointly Administered) |

**MOTION OF THE OFFICIAL COMMITTEE OF SECOND PRIORITY NOTEHOLDERS TO RECONSIDER ORDER GRANTING DEBTORS' APPLICATION FOR RETENTION OF KIRKLAND & ELLIS LLP AND KIRKLAND & ELLIS INTERNATIONAL LLP**

The Noteholder Committee, pursuant to Fed. R. Civ. P. 60(b) (applicable by Fed. R. Bankr. P. 9024) and the Court's inherent power to reconsider its orders as justice requires, moves for reconsideration of the order dated May 28, 2015 [ECF No. 1713] (the "Order"),[1] which granted the Debtors' application to retain Kirkland as counsel. Reconsideration is appropriate because the Noteholder Committee has recently discovered that testimony offered by Kirkland in support of that application was incomplete and misleading. The evidence includes minutes of an August 3, 2014 meeting at which Kirkland advised CEOC's board of directors in connection with its decision to commence an action in New York against certain of CEOC's creditors that would deem numerous challenged transactions as lawful and extinguish CEOC's claims against CEC. As a remedy, Kirkland should be disqualified from any other form of involvement with the estates' claims against CEC and its affiliates, including any investigation or settlement thereof.

---

[1]   The minutes were not timely produced. *See* ¶¶10-13 below.

## BACKGROUND

**A.    CEOC's Retention of Kirkland and Formation of the SGC**

1.    In "2013 and 2014, CEOC and its affiliates" engaged in "approximately 50 transactions," which transactions the Noteholder Committee asserts were "intended … to loot CEOC of valuable assets, transferring them to CEC and related companies." Order at 2. In March and April 2014, CEOC's creditors wrote separately to CEC and CEOC, alleging that the transactions constituted voidable fraudulent transfers and represented breaches of fiduciary duty. Declaration of Joshua Mester ("Mester Decl."), Exs. A, B.

2.    CEOC retained Kirkland as restructuring counsel in July 2014. Immediately upon Kirkland's retention, a Special Governance Committee of the CEOC board (the "SGC") – comprised of the two directors that were described as independent – began an "investigation of the 50 or so challenged transactions." Order at 6. "Kirkland led the investigation," which "involved the review of hundreds of thousands of pages of documents and the examination of 15 to 20 witnesses." *Id*. The SGC "formed interim conclusions that a number of the transactions were problematic," and that "CEOC had received insufficient consideration" – the transfers, in other words, "were constructively fraudulent." *Id*.

**B.    The New York Action**

3.    Despite the fact that CEOC's board created the SGC to investigate the bona fides of the challenged transactions, the Sponsors, CEC and CEOC decided to defeat the work of the SGC before it could get started. Accordingly, in June or July, CEC and CEOC jointly hired a New York law firm to prepare a complaint against various CEOC creditors asking to have the challenged transactions deemed lawful. *Id.* at 6–7; Mester Decl., Ex. C. The ultimate object of the suit was "a declaration that neither company had breached any fiduciary duties or engaged in any fraudulent transfers." Order at 6. This relief, of course, would benefit CEC to the detriment

of CEOC—since the breach of fiduciary duty and fraudulent transfer allegations, if proven, would result in CEC owing damages and repatriating assets to CEOC. Although the "CEOC board authorized the filing of the action," the "two independent board members abstained," leaving the four CEOC directors associated with CEC or its owners voting in favor. *Id*. at 7.

**C.    The Hearing on Kirkland's Retention**

4.    In January 2015, CEOC entered bankruptcy, and it applied in February 2015 to retain Kirkland as counsel in the bankruptcy cases. *Id*. at 8. The Noteholder Committee objected, asserting that Kirkland was not disinterested. *Id*. At the hearing on this application, one of the primary arguments made by the Noteholder Committee in support of its position was Kirkland's acquiescence to the filing of the New York suit, which was, at bottom, an effort to have CEOC exonerate CEC from any liability to CEOC and, therefore, reduce the assets of CEOC's estate. The circumstances under which the suit was authorized were therefore explored at the hearing and in the parties' submissions to the Court. *Id*. at 15.

5.    At the hearing, Kirkland denied that it had anything to do with the New York suit. James Sprayregen, "Kirkland's only witness at the hearing," *id*. at 2, specifically denied that Kirkland had advised the CEOC board on the New York lawsuit. Although he admitted that he had telephonically participated in a board meeting at which the complaint was discussed, he insisted that he "heard about it" only shortly before the meeting and denied remembering whether he even saw the complaint at the time – because, he testified, "Kirkland & Ellis was not representing CEOC with respect to that." Transcript of April 23, 2015 Hearing ("4/23 Tr.") at 196:6–14 ("I don't know if I saw the complaint").

6.    Sprayregen was then shown the Complaint and asked whether "CEC and CEOC together brought this case," to which he responded only: "That's what the caption says." 4/23

3

Tr. 198:20.  When asked if that had been his understanding *at the time*, Sprayregen said that he "didn't have an understanding at the time."  4/23 Tr. at 198:22.  He went on to say that he had only "a general understanding" of the lawsuit – not "deep" enough even to say whether the lawsuit sought a declaration that "others involved in the challenged transactions also had not violated the law."  4/23 Tr. at 199:14–20.  He denied whether he could confirm that, "if this lawsuit prevailed," it would "result in a decree that CEOC did not have claims against its parent corporation," demurring only that "it would result in whatever the request for relief was."  4/23 Tr. at 199:25–200:4.  "Kirkland & Ellis did not represent the company on this lawsuit," Sprayregen flatly insisted.  4/23 Tr. at 200:8–10.  When the question was put to him in another way, Sprayregen volunteered: "And I'll let you know again, Kirkland & Ellis doesn't represent CEOC in connection with that action."  4/23 Tr. at 204:6–8.

7.     When asked on direct examination if Kirkland was "counsel in this lawsuit *in any way*," Sprayregen replied: "We are not."  4/23 Tr. at 86:20–22 (emphasis added).  In closing statements, Kirkland's counsel argued, based on Sprayregen's testimony, that "the fact that CEC, which owns 90 percent of CEOC, says we're bringing a lawsuit … that's not a Kirkland problem," and that Kirkland had been powerless to "stop [CEOC] … from bringing a lawsuit."  Transcript of April 24, 2015 Hearing at 443:14–444:6.

8.     Sprayregen's testimony at the hearing was consistent with what he had said at his deposition.  He was asked, at that deposition, whether "you or anybody else at Kirkland & Ellis" was "consulted by CEOC with respect to the filing of that lawsuit in New York state court," to which the entirety of his response was: "Don't know."  Mester Decl. Ex. D at 142:18.  He testified that he did not see a copy of the complaint "at any time," and that to the extent he was "aware" of the suit, it was because he "read a summary of the lawsuit in Reorg Research," a

4

trade publication. *Id.* at 144:9–10. *See* Mester Decl. Ex. E.

9.  The Court relied on Sprayregen's testimony in its decision granting the Debtors' application to retain Kirkland. The Court stated in its oral remarks that "there was no evidence Kirkland was involved in the decision to file the action." Transcript of May 27, 2015 Hearing at 9:7-22. In its written opinion, the Court concluded that while the "New York action does indicate that CEOC believed the challenged transactions were proper," it "gives no indication of Kirkland's views," because "there was no evidence that Kirkland played *any role* in the decision to file it." Order at 15 (emphasis added). Because the New York action was one "in which Kirkland [had] no involvement," it could not indicate "that Kirkland is other than disinterested in these cases." *Id.* Although the Court noted that Kirkland's "pitch book's reference to 'defending against' bondholder challenges might raise eyebrows," the Court ultimately relied upon what it found Kirkland did, rather than what it said, in concluding that "[n]o evidence showed that Kirkland had ever advised CEOC or its officers or directors (or anyone else) in efforts to 'defend against' bondholder challenges." *Id*. at 16.

**D.    Subsequent Discovery of Evidence of Kirkland's Involvement**

10.  It has now come to light that what Kirkland told this Court was, at best, incomplete and misleading. That is because of the subsequent production, in discovery in other proceedings, of the minutes of the August 3, 2014 board meeting at which CEOC authorized the filing of the New York action.[2] Mester Decl., Ex. G ("Original Minutes"). The Original

---

[2]    On August 4, 2014, Wilmington Savings Fund Society, FSB, the indenture trustee for certain Second Priority Notes, filed an action in Delaware Chancery Court. Complaint, *Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corporation*, No. 10004-VCG (Del. Ch. Aug. 4, 2014). Discovery has proceeded on the claims against CEC, which resulted in production to WSFS of the Original Minutes in May 2015, at a time when CEC alone had produced more than 4,000 documents consisting of more than 32,000 pages. Mester Decl. at ¶13. By the end of July 2015, CEC also produced the Original Minutes to the Examiner,

Minutes were approved by the CEOC board at a meeting held on November 12, 2014. Mester Decl., Ex. I. The Original Minutes demonstrate that Kirkland's involvement in the decision to file the New York lawsuit was far greater than described to the Court.

11. The Original Minutes reveal that the decision whether to file the New York lawsuit was put to a vote at back-to-back board meetings of CEC and CEOC, respectively, on August 3, 2014. Mester Decl., Ex. G at 1. The Original Minutes indicate that the CEOC board meeting began at 5:01 p.m., and was attended by six directors and five invited participants, one of whom was James Sprayregen – the only identified "Representative of Kirkland & Ellis" in those minutes.[3] According to the Original Minutes, Gary Loveman – the Chairman of the board of both CEC and CEOC – informed the CEOC board that the CEC board "had considered the advisability of initiating litigation against certain of [CEOC's] debt holders, and had approved doing so." Mester Decl., Ex. G at 1. The CEOC board then "discussed the rationale for the proposed litigation" from CEOC's perspective. *Id.*

12. As might be expected, at that point in the meeting an outside lawyer was consulted. That lawyer was Kirkland. No other outside counsel was present at the meeting. The Original Minutes report: "Kirkland & Ellis summarized certain legal risks, including the potential that commencing litigation may lead certain debt holders to assert certain claims." *Id.* "Kirkland & Ellis advised that in its view such potential claims were not supportable and the risks were manageable risks." *Id.* The speaker from Kirkland was Sprayregen, since he was the

---

which were then made available to the Noteholder Committee, at which time CEC and CEOC had produced in excess of 65,000 documents consisting of more than 670,000 pages. Mester Decl. at ¶14. The Original Minutes were not produced to the Noteholder Committee in advance of the hearing or the Court's decision on the Kirkland application.

[3] Other than Mr. Loveman, the other present directors were David Sambur, Marc Rowan, Kelvin Davis, Ronen Stauber, and Steve Winograd. David Bonderman was absent, and the Original Minutes note (but do not describe) four other "invitees": Alex Van Hoek, Timothy R. Donovan, Greg Kranias, and Kendall Garrison. Mester Decl. Ex. G at 1.

only "Representative of Kirkland & Ellis" identified in the Original Minutes. *Id.* at 1 & n. 1. After a short deliberation, the CEOC board voted to authorize the suit, with both independent members abstaining. *See Id.* at 3. In particular, the CEOC board resolved that it "has determined that it is necessary or desirable for [CEOC] to initiate litigation against or involving certain creditors of [CEOC] and/or its subsidiaries on behalf of [CEOC] and/or its subsidiaries on behalf of [CEOC] and/or its subsidiaries, as previously discussed by the Board." *Id.* at 1.

13. The document requests issued by the Noteholder Committee to Kirkland included two requests as to which the Original Minutes were directly responsive. Request No. 10 called for "All Documents Concerning any *Conflicts between Your work for the Special Governance Committee and Your work for* any other Person, including without limitation Apollo, *CEOC*, the Other Caesars Entities, or TPG." Mester Decl., Ex. H, at 9 (emphasis added). Request No. 11 sought "All Documents Concerning any Conflicts between *Your work for the CEOC and* Your work for any other Person, including without limitation Apollo, *Other Caesars Entities* [which include CEC], TPG, or *the Special Governance Committee.*" *Id.* (emphasis added). Kirkland's advice to the CEOC board concerned a lawsuit that was intended to extinguish rights of CEOC against CEC – claims that the SGC was created to investigate. Accordingly, the Original Minutes were responsive to those document requests and should have been produced.

E.   **Revision of the August 3 Board Minutes**

14. Although probative of the matters at issue in the hearing on CEOC's application to retain Kirkland, the Original Minutes were not produced to the Noteholder Committee prior to the evidentiary hearing on that matter. Instead, the hearing on the retention application proceeded without the Noteholder Committee or the Court having the benefit of the evidence.

7

15. The Court granted CEOC's application on May 28, 2015. Two weeks later – and more than ten months after the August 3 board meeting, and six months after the board unanimously approved the Original Minutes prepared by CEOC's corporate secretary – the CEOC board issued a set of revised minutes for its August 3, 2014 meeting. Mester Decl. Ex. I (the "Revised Minutes"). The Revised Minutes recite that Kirkland "recommended certain clarifying changes to the minutes of the August 3, 2014 meeting." *Id.* at 8. In fact, based on Kirkland's time entries, it appears that Kirkland lawyers (David Zott and Nicole Greenblatt) prepared a revised draft of the August board minutes on May 12, 2015 – more than two weeks before this Court granted the application. Mester Decl. Ex. J. Thereafter , on May 28 (the day of this Court's decision) and May 29 (the day after), Kirkland lawyers (including Sprayregen, Greenblatt, Paul Basta, and David Zubricki, among others) billed 13.7 hours to calls and correspondence concerning the minutes. *Id*. The August 3 meeting itself lasted only 13 minutes.

16. The Revised Minutes state that, in addition to Sprayregen, three other Kirkland partners (Basta, Greenblatt and David Seligman) were also on the phone during the August 3 meeting. Mester Decl. Ex. I at 10 & n. 1. The Revised Minutes added the statement that Kirkland responded to "inquiries from the Board" about the risks of "commencing the litigation." *Id*. The Revised Minutes also deleted, without explanation, the statement in the Original Minutes that Kirkland told the CEOC board that the creditors' potential claims were "not supportable." *Compare* Mester Decl. Ex. G at 1 to Mester Decl. Ex. I at 10. The Revised Minutes now state "in [Kirkland's] view any incremental risks associated with commencement of the declaratory judgment action were manageable risks." Mester Decl. Ex. I at 10.[4]

17. At Kirkland's request, the CEOC board approved the Revised Minutes on June

---

[4] CEOC produced the Original Minutes and the Revised Minutes to the Petitioning Creditors in the involuntary proceeding on September 23, 2015.

8

10, 2015, more than six weeks after the evidentiary hearing on the Noteholder Committee's objection to Kirkland's representation of CEOC and two weeks after the Court granted CEOC's application to retain Kirkland.

18. The Petitioning Creditors sought to use the Original Minutes in the deposition of Steven Winograd, one of the two outside CEOC directors, in the involuntary proceeding. Kirkland immediately claimed that the Original Minutes were privileged, and demanded their return. Mester Decl. at ¶15. The Petitioning Creditors refused to do so on, among other grounds, the fact that CEOC waived the privilege when it shared the minutes with its auditors. At that point, CEOC dropped its privilege claim.

19. On October 1, 2015, Mr. Winograd provided a written response to supplement his deposition testimony in the involuntary proceeding. In this response, Mr. Winograd stated that "Because the members of the Governance Committee had recently joined the Board and because we and CEOC's restructuring counsel, Kirkland & Ellis, were just beginning an investigation into issues related to the underlying fraudulent transfer and fiduciary duty claims, we abstained from the decision to file the suit." Mester Decl. Ex. K. Mr. Winograd further stated his recollection that "neither the members of the Governance Committee nor K&E opined on the merits of the underlying fraudulent transfer or fiduciary duty claims" at the August 3 board meeting. *Id.* That statement is difficult to reconcile with the fact that the CEOC board voted to initiate the lawsuit and that, according to the Revised Minutes, Kirkland provided advice regarding the "incremental risks" associated with bringing the New York action.

**ARGUMENT**

A. **Standard for Reconsideration**

20. A court has the inherent power to reconsider its orders as the interests of justice

9

require. That is simply a part of the courts' power "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Today, that inherent power of the bankruptcy courts is expressed, among other places, in Federal Rule of Civil Procedure 60(b) (which is "expressly applicable to bankruptcy"). *Matter of Met-L-Wood Corp.*, 861 F.2d 1012, 1018 (7th Cir. 1988). In particular, a court has an inherent power to reconsider its decisions when a litigant's misrepresentations – even unintentional misrepresentations – have produced an inequitable result. *Chambers*, 501 U.S. at 44.

21. The exercise of that power is necessary because "tampering with the administration of justice" by making material misrepresentations to a court "involves far more than an injury to a single litigant." *Id.* at 246. "It is a wrong against the institutions set up to protect and safeguard the public." *Id.* Rule 60(b)(3) expresses this principle by providing that a court may set aside an order because of "misrepresentation" or "misconduct by an opposing party." That Rule applies "to both intentional and unintentional misrepresentations," and does not require a "determination of whether the alleged misrepresentation altered the result of the case," because the purpose of the rule is to protect "the fairness of the proceedings." *Lonsdorf v. Seefeldt*, 47 F.3d 893, 897 (7th Cir. 1995).

22. Accordingly, this Court need not find that Sprayregen's representations to this Court regarding the New York action were intentional in order to reconsider the Order. All this Court need conclude is that Kirkland did not accurately or fully present its role in the New York action to the Court. Although "the bankruptcy court has an affirmative duty to exercise vigilance in avoiding impermissible conflicts of interest on the part of court-appointed professionals," it is normally "the professional, especially counsel," who is presumed to have "ready access to, if not full awareness of, the facts material to any existing or potential competing interest which might

conflict with the interests court-appointed counsel must represent." *Rome v. Braunstein*, 19 F.3d 54, 59 (1st Cir. 1994). Put differently, "[i]f a lawyer is desirous of benefiting" from an appointment as counsel in a bankruptcy case, "he has a responsibility to leave no reasonable stone unturned" in his disclosures to the court of potential conflicts. *In re Martin*, 817 F.2d 175, 182 (1st Cir. 1987). A "[d]efective disclosure is not a minor matter," as the "Bankruptcy Code as a whole is very concerned with conflicts of interest." *In re Griffin*, 313 B.R. 757, 764 (Bankr. N.D. Ill. 2004).

**B.     The Court Should Reconsider its Prior Decision Granting the Kirkland Application**

23.     The information provided to this Court at the hearing was misleading and incomplete as to a crucial issue. One of the Noteholder Committee's principal objections was that Kirkland was not disinterested, because that firm had participated in the authorization of the New York action filed by CEC and CEOC, and certainly had not taken any steps to prevent the filing of the suit. Sprayregen, however, testified that Kirkland had no involvement "at all" in that suit – it did not represent CEOC, was not consulted by CEOC, and so on. *See* 4/23 Tr. at 198:6–200:10. Sprayregen even suggested in his deposition that he did not know whether he or Kirkland was consulted with respect to the filing of the lawsuit in New York and that he knew nothing about the lawsuit other than what he had read in the trade press. *See* Mester Decl. Ex. D at 142:18; 144:9-10. This Court expressly relied upon this testimony. Order at 12.

24.     The subsequently discovered evidence demonstrates that Sprayregen's testimony was not accurate. Contrary to Sprayregen's testimony, he – and perhaps others from Kirkland – did indeed play a role in the CEOC board's decision to file the lawsuit. Sprayregen must have known about the substance of the proposed lawsuit, since he opined to CEOC's board about the incremental risks to CEOC if the lawsuit were filed. The Original Minutes state that Kirkland –

11

and Sprayregen was identified as the only Kirkland lawyer who spoke at the meeting – "summarized certain legal risks." Mester Decl., Ex. G at 1. He alerted the CEOC board that "commencing litigation may lead certain debt holders to assert certain claims." *Id*. Sprayregen opined that, in Kirkland's view, "such potential claims were not supportable" and that "the risks were manageable risks." *Id*. The fact that four Kirkland partners, and no other outside lawyers, attended the August 3 board meeting confirms Kirkland's substantive role at the meeting.

25. The import of Sprayregen's role goes beyond simply pointing out to the CEOC board that the board and CEOC might face claims from debt holders if CEOC joined CEC in filing the lawsuit. First, it belies Sprayregen's testimony that he played no role in CEOC's decision to file the lawsuit. Sprayregen had the confidence of the CEOC board: he could have advised them against bringing the lawsuit at all or, at a minimum, to think about it more carefully. He could have remained silent, suggested that the board consult other counsel, or – like the two independent directors who chose to abstain from the vote – simply stayed out of it. Instead, as reflected in the Original Minutes, he occupied a pivotal position as the *only* lawyer who advised the board that day to bring a lawsuit intended to extinguish claims worth billions of dollars to CEOC.

26. Second, his advice to the board obviously gave it the green light to proceed: he told the board that the risks of bringing the lawsuit, which presumably included the risk that the directors could be sued for attempting to extinguish one of CEOC's most value assets, were "manageable." Sprayregen could not have advised the board about the risks they faced unless he also knew just what it was CEOC was proposing to do. Nor could he have opined that the risks to CEOC were "manageable" without forming a view on the merits of the potential claims for fraudulent transfer and breach of fiduciary duty.

27. Third, Sprayregen and Kirkland knew that they had conflicting obligations. They were already advising the SGC, which was tasked with determining whether the challenged transactions were fraudulent transfers. Sprayregen and Kirkland faced hopeless conflicts between their roles as counsel to CEOC and to the SGC's investigation into the challenged transactions and their role as advisors to a board that was considering filing a complaint that would moot that investigation and extinguish CEOC's claims against CEC and other insiders.

28. Fourth, Sprayregen and Kirkland were "restructuring counsel" to a client that was approaching bankruptcy. It was certainly known to the Kirkland bankruptcy lawyers that the CEOC board it was advising was operating in the "vicinity of insolvency" during which the "board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise" – including creditors. *See Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 17 Del. J. Corp. L. 1099, 1155 (Del. Ch. 1991) (Allen, C.); s*ee also In re Montalbano*, 486 B.R. 436, 444 (Bankr. N.D. Ill. 2013) (citing *Credit Lyonnais*). Yet the substance of the advice given was that the "risks" of "debt holders" asserting claims were "manageable" and that CEC and CEOC should go ahead with a lawsuit aimed at extinguishing the CEOC estate's most valuable claims.

29. Thus, Sprayregen's advice to the CEOC board that day does give an indication of Kirkland's views on the New York litigation, because Kirkland did play a role in the decision to file it and, having agreed to play such a role, was in a position to oppose, if not prevent, its filing. At the CEOC board meeting, the only subject to be discussed was whether the lawsuit should be filed and the only lawyer who spoke there was Sprayregen.

30. It is fair to conclude that Kirkland was not disinterested as the law requires. This Court said, correctly, that the Noteholder Committee's "main objection" to Kirkland's retention

13

was that the firm "is not disinterested because it has a bias against the debtors' bankruptcy estates." Order at 13. This objection was founded, in large part, on an analysis of Kirkland's "conduct," which "shows it will favor the interests of CEC and ultimately Apollo and TPG over the interests of the bankruptcy estates." *Id*. at 14. Kirkland's professed lack of involvement about the New York suit was not just a reason, but rather the reason, why the Court regarded the New York action as offering no cause for worry: "Kirkland has no involvement" in the "New York action," and thus that action did not indicate "that Kirkland is other than disinterested in these cases." *Id*. at 15. Moreover, like any form of misleading conduct, both Sprayregen's omissions, especially when coupled with the timing of the Revised Minutes, give rise to at least some suggestion of consciousness of guilt. *See Shager v. Upjohn Co.*, 913 F.2d 398, 401 (7th Cir. 1990) (when a misleading explanation is given for certain conduct, "the inference that the real reason was a forbidden one … may rationally be drawn"). Put differently: If Sprayregen's advising the Board to go ahead with the New York suit was innocent, why be "bashful about presenting" the fact of that advice to *this* Court? *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997). And why wait until the day this Court granted the application to press ahead with implementing revisions to the Original Minutes?

31.     *Peacock Records, Inc. v. Checker Records, Inc.*, 365 F.2d 145 (7th Cir. 1966), is illustrative. That case featured serious allegations that a judgment had been procured through misleading testimony. The court of appeals regarded the crucial factual question of "[w]as the judgment obtained" (even "in part") because the court had been misled. *Id*. at 147. "If it was, then it was clearly the duty of the district court to set aside the judgment, because poison had permeated the fountain of justice." *Id.* To be sure, the misleading conduct must go "to the heart of the issue" before the court. *Metlyn Realty Corp. v Esmark, Inc.*, 763 F.2d 826, 832 (7th Cir.

14

1985). But that is precisely the case here. This is a case in which it is "unmistakable" that, but for the deceptive conduct, the "proceeding would come much closer to the truth." *Id.*, at 833–34.

**C.    The Court Should Impose an Appropriate Remedy**

32.    "[C]ounsel who fail to disclose timely and completely their connections [rendering them interested] proceed at their own risk because failure to disclose is sufficient grounds to revoke an employment order." *In re Crivello*, 134 F.3d 831, 836 (7th Cir. 1988). The Noteholder Committee acknowledges that it may now be impractical to disqualify Kirkland altogether from this case. But there are nonetheless a range of remedies available to the Court when it discovers that a litigant has engaged in misleading conduct. *Id.* Specifically, Kirkland should be disqualified from prosecuting, settling, or any other form of involvement (broadly construed) with the estates' claims against CEC and its affiliates. Because Kirkland is not disinterested, disqualification is one of the only solutions to the problem of "allow[ing] the fox to guard the proverbial hen house," whereby this Court only knows about the conflicts that the interested party chooses to reveal. *Id.* Conflicts counsel has already been appointed, as this Court observed in its Order, and can more than adequately manage claims involving CEC or its affiliates. Order at 16–17 (retention of conflicts counsel serves as an alternative to "depriving CEOC of its choice of counsel"). For this same reason, Kirkland should be disqualified from doing any further work for the SGC, given that neither the Court nor CEOC's creditors can have any confidence in the credibility of the SGC's investigation and its recommendations.

WHEREFORE, the Noteholder Committee requests that the Court modify the Order as set forth herein, and grant such other relief as the Court deems proper.

15

Dated: October 30, 2015
Chicago, Illinois

Respectfully submitted,

*/s/ Timothy W. Hoffmann*
Timothy W. Hoffmann (No. 6289756)
JONES DAY
77 West Wacker
Chicago, IL  60601-1692
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585
thoffmann@jonesday.com

Bruce Bennett
James O. Johnston
Sidney P. Levinson
Joshua M. Mester
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071

-and-

Geoffrey Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C.  20001

*Counsel for Official Committee of Second Priority Noteholders*