**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ------------------------------------------------- | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| **CAESARS ENTERTAINMENT** | ) | **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.,* | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | Hon. A. Benjamin Goldgar |
| | ) | |
| ------------------------------------------------- | ) | |

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS

## March 15, 2016

## VOLUME 2

**(Section I – Procedural Background and Nature of the Investigation)**
**(Section II – Investigation and Preparation of Report)**
**(Section III – Statement of Background Facts)**
**(Section IV – Subjects Investigated by the Examiner)**
**(Section V – Solvency, Unreasonably Small Capital and Inability to Pay Debts as They Come Due)**
**(Section VI – Projections)**

## I.   PROCEDURAL BACKGROUND AND NATURE OF THE INVESTIGATION

### A.   Commencement of the Bankruptcy Cases

On January 12, 2015, certain holders of CEOC Second Lien Notes filed an involuntary petition (the "Involuntary Case") against CEOC (but no other debtor) under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware ("Delaware Bankruptcy Court").

Three days later, on January 15, 2015, CEOC and approximately 172 affiliated Debtors filed voluntary petitions for reorganization (collectively, the "Voluntary Case" and, together with the Involuntary Case, the "Chapter 11 Cases") in the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court"). After motion practice and hearings on the merits of the petitioning creditors' motion in the Involuntary Case to establish venue in the Delaware Bankruptcy Court,[107] which was opposed by the Debtors,[108] on January 28, 2015, the Delaware Bankruptcy Court transferred the venue of CEOC's Involuntary Case to the Bankruptcy Court.[109]  Both of these cases are now being administered in the Bankruptcy Court by the Honorable A. Benjamin Goldgar.  The Debtors continue to operate their businesses and manage their properties under section 1107 of the Bankruptcy Code.[110]

---

[107]  *See Renewed (A) Motion of Petitioning Creditors, Pursuant to Section 105(A) of the Bankruptcy Code and Bankruptcy Rule 1014(b), for an Order Staying any Parallel Proceedings; (B) Motion of Petitioning Creditors, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 1014(B), for an Order (I) Establishing Venue for the Chapter 11 Cases of Caesars Entertainment Operating Company, Inc. and its Debtor Affiliates in the District of Delaware and (II) Granting Certain Related Relief; (C) Emergency Motion of Petitioning Creditors for an Order Shortening Notice and Scheduling an Expedited Hearing on Motion to Stay any Parallel Proceedings; and (D) Emergency Motion of Petitioning Creditors for an Order Shortening Notice and Scheduling an Expedited Hearing on Motion for an Order (I) Establishing Venue for the Chapter 11 Cases of Caesars Entertainment Operating Company, Inc. and its Debtor Affiliates in the District of Delaware and (II) Granting Certain Related Relief, In re Caesars Entertainment Operating Company, Inc.,* Chapter 11 Case No. 15-10047 (KG) (the "Involuntary DE Docket"), Docket No. 35.

[108]  *Objection of Caesars Entertainment Operating Company, Inc. to Motion and Renewed Motion of Petitioning Creditors for an Order Establishing Venue,* Involuntary DE Docket No. 40.

[109]  *Order,* Involuntary DE Docket No. 220.  *See also, Opinion re Determination Pursuant to Federal Rule of Bankruptcy Procedure 1014(b) as to the District in Which the Debtor's Bankruptcy Cases Shall Proceed,* Involuntary DE Docket No. 227.

[110]  The "Bankruptcy Code" shall refer to title 11 of the United States Code.  All references in this Report to a "section," without more, are to sections of the Bankruptcy Code.

**B.   Key Constituents, Including Official Creditors Committees, Ad Hoc Committees, CEC, CAC and the Sponsors**

The key constituents involved in the Debtors' Chapter 11 Cases include, without limitation, the following:

- The Debtors

- The U.S. Trustee

- The Official Committee of Second Priority Noteholders (the "Noteholders Committee")

- The Statutory Committee of Unsecured Claimholders (the "UCC")

- The Ad Hoc Committee of First Lien Noteholders (the "First Lien Notes Committee")

- The Ad Hoc Group of First Lien Bank Lenders (the "First Lien Banks Committee")

- Caesars Entertainment Corporation ("CEC")

- Caesars Acquisition Corporation ("CAC")

- Apollo Global Management, LLC ("Apollo")

- TPG Global, LLC ("TPG")

The Examiner has had numerous meetings and communications with these key constituents during the course of his Investigation.  As discussed below, written and oral presentations by the Debtors, CEC, CAC, the Noteholders Committee, the UCC, Apollo, TPG, and their respective legal and financial advisors were particularly helpful.

**C.   Examiner Motions, Order, Appointment and Mandate**

On February 13, 2015, the Debtors filed a motion seeking the appointment by the U.S. Trustee of an examiner.  The Debtors explained their reasons for seeking such relief as follows:

> One of the key issues in these chapter 11 cases is whether any plan of reorganization proposed by the Debtors adequately compensates these estates for any released claims or causes of action.  Several prepetition transactions undertaken by the Debtors, their ultimate parent . . . [CEC], and affiliated entities have been challenged by various creditors and resulted in contentious litigation . . . .

> As fiduciaries with the duty to maximize estate value for all stakeholders, the Debtors recognize the need for a fair process to review the challenged

transactions, while avoiding the potential for these cases to develop into a value-destructive litigation free-for-all. Thus, by this motion, the Debtors seek the immediate appointment of an independent examiner to thoroughly, expeditiously, and effectively investigate the prepetition transactions. . . . [T]he examiner should evaluate the merits of any claims arising from the prepetition transactions, together with potential recoveries to the Debtors' stakeholders . . . to assist the Court in determining whether the plan of reorganization contemplated by the Debtors proposed prepetition restructuring support agreement (the "RSA") accounts for potential claims arising from the prepetition challenged transactions.

An appropriately tailored independent examination likewise will provide creditors and other parties in interest with important information relevant to confirmation of any plan reorganization based on the RSA, all in a timely, cost-effective manner. Moreover, an examiner . . . will maximize value by having the estate pay once for an examination by a party other than the Debtors, rather than for multiple, duplicative examinations by committees, creditors, and other parties in interest. Thus, as part of the relief requested by this Motion, the Debtors request that the Court, in the interests of justice, fairness, and efficiency, defer concurrent investigations into the Debtors' prepetition conduct. Until the examiner releases its report, the examiner should have the sole authority to investigate these matters. This will enable the independent examiner to conduct its own impartial investigation without distractions and on a timetable that keeps these cases on track for an efficient and expeditious resolution.[111]

The Debtors' motion identified ten specific prepetition transactions that ought to be investigated: (i) the CIE Transaction; (ii) the CERP Transaction; (iii) the Growth Transaction; (iv) the Four Properties Transaction; (v) the Shared Services Joint Venture; (vi) the B-7 Refinancing; (vii) the Senior Unsecured Notes Transaction; (viii) the Intercompany Note Repayment; (ix) the Showboat Closure; and (x) the PIK Toggle Note Repurchase (together the "Challenged Transactions"). The Debtors explained that a CEOC Special Governance Committee, comprised of two "independent" directors, had been established in June 2014 to investigate potential claims the Debtors may have against CEC and/or its affiliates in connection with the Challenged Transactions, and they described the work that had been undertaken to date by the CEOC Special Governance Committee, but advised the Court that "[w]hen it became clear that a more comprehensive restructuring would be required to address the Debtors' significant debt burden, the Debtors recognized that a formal examination of the Challenged Transaction was warranted, given the scope, complexity, timing, and litigation surrounding the Challenged Transactions."[112]

---

[111] *See Debtors' Motion for Entry of an Order (I) Appointing an Examiner and (II) Granting Related Relief* [Docket No. 363], at 1-3. All references to "Docket" in this Report shall refer to the docket of the Voluntary Case.

[112] *Id.* at 6.

On February 17, 2015, the Noteholders Committee filed its own motion for the appointment of an examiner.[113]   Welcoming an independent investigation of the "series of prepetition insider transactions, by which the parent and sponsors of . . . [CEOC] systematically dismantled the Debtors by stripping them of many billions of dollars of assets and cash," the Noteholders Committee requested the immediate appointment of an independent examiner, but urged that the scope of the examiner's investigation include not only the Challenged Transactions "but also any facts or matters, discovered during the course of his or her investigation, that may result in claims benefitting one or more estates," including certain "Insider Transactions" identified therein which were not identified in the Debtors' motion.[114] The Noteholders Committee also urged that the latitude, timetable and budget of any investigation and report not be subject to any constraints, and that the examiner be granted "unfettered access" to all documents and information that could assist in identifying and evaluating potential claims, including materials that may be subject to a claim of privilege by the Debtors.[115]   Other creditor groups, including in particular the UCC, also filed responses to the Debtors' and the Noteholders Committee's motions, largely supporting the position espoused by the Noteholders Committee that the examiner's hands not be tied by arbitrary limitations as to timing, scope or cost, but objecting in certain other respects to the motions, including, in the case of the UCC, any bar to the UCC conducting its own investigation.[116]

On March 22, 2015, following consideration of the arguments of the movants and other parties in interest, and the written joinders and objections thereto, the Bankruptcy Court entered an order (the "Examiner Order") which granted in part the Debtors' and Noteholders Committee's motions, and directed the U.S. Trustee to appoint an Examiner and file a motion seeking approval of the U.S. Trustee's selection within 10 days.[117]   The Examiner Order further directed the Examiner, among other things, to:

- investigate (i) the "Challenged Transactions" as defined and described in the Debtors' Examiner Motion; (ii) the "Insider Transactions" as defined and described in the proposed order accompanying the Noteholder Committee's

---

[113] *See Motion of Official Committee of Second Priority Noteholders for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* [Docket No. 367].  The Noteholders Committee and other creditor groups were wary of the ability of the CEOC Special Governance Committee to conduct a thorough, impartial and truly independent examination, and expressed their misgivings to the Court when supporting the appointment of an examiner.

[114] *Id.* at 1 & ¶4.  For ease of reference in this Final Report, the "Challenged Transactions" shall refer to both the "Challenged Transactions" as defined in the Debtors' motion to appoint an examiner and the "Insider Transactions" in the Noteholder Committee's motion to appoint an examiner.

[115] *Id.* at ¶¶1-6.

[116] *See, inter alia,* Docket Nos. 429, 431, 442, 445-47, 453, 460-61, 470, 472-73, 477, 486, and 488.

[117] *See Order Granting in Part and Denying in Part Motions to Appoint Examiner* [Docket No. 675].

Examiner Motion; (iii) any other transactions involving the Debtors, to the extent those transactions suggest potential claims belonging to the estates, including causes of action against any current officers or directors of the Debtors, any former officers or directors of the Debtors, or any affiliates of the Debtors; and (iv) any apparent self-dealing or conflicts of interest involving the Debtors or their affiliates; and

- file with the Court interim reports on the Investigation every forty-five (45) days from the date his appointment was approved.[118]

In addition, the Examiner's Order provided that "[i]f the examiner or any other party in interest concludes that expanding the scope of the examiner's investigation is reasonably likely to lead to the discovery of potential claims belonging to the estates, the examiner or party in interest may file a motion to modify this order."[119]  The Examiner Order further authorized the Examiner "without further order of court to take discovery under [Bankruptcy] Rule 2004 of the Debtors or any other person or entity through the issuance of subpoenas under Rule 45 of the Federal Rules of Civil Procedure" and directed the Debtors, the Debtors' non-debtor affiliates and subsidiaries, CEC, the UCC, the Noteholders Committee, and all other parties in interest to "cooperate fully with the examiner in connection with the investigation and the performance of the examiner's duties," including "the prompt production of all non-privileged documents and information that the examiner requests relevant to the investigation."[120]  Notably, the Examiner Order did not preclude the official committees from conducting their own investigations.  Rather, it directed the Examiner, the UCC and the Noteholders Committee to use their "best efforts to coordinate their investigations and avoid interference or needless duplication," including "the sharing of documents and other information."[121]  As discussed below, this latter direction necessitated the negotiation of several protocols governing the production of documents and witness interviews that were ultimately presented to and approved by the Court.

Following the entry of the Examiner Order, the U.S. Trustee interviewed potential candidates, reviewed their qualifications, inquired as to their connections with the Debtors, creditors, other parties in interest and their respective attorneys, the Court, the U.S. Trustee and his employees, and consulted with counsel for the Debtors, the Noteholders Committee, the UCC, the Ad Hoc Committee of First Lien Bank Lenders, the Ad Hoc Committee of First Lien Noteholders, and the Ad Hoc Committee of 12.75% Second Priority Senior Secured Noteholders.  The U.S. Trustee thereafter determined to appoint Richard J. Davis as the Examiner, and on March 23, 2015, filed an emergency motion seeking Mr. Davis' appointment

---

[118] *Id.* at ¶¶3 & 5.

[119] *Id.* at ¶3.

[120] *Id.* at ¶7.

[121] Examiner Order, at ¶8.

as Examiner.[122]  On March 25, 2015, following a hearing, the Court entered an order approving the appointment of Mr. Davis as Examiner.[123]

### D.    Retention of Examiner's Professionals

On April 7, 2015, the Examiner sought the retention of (i) Winston & Strawn LLP ("W&S") as his counsel, *nunc pro tunc* to March 25, 2015,[124] and (ii) Luskin, Stern & Eisler LLP ("LSE") as his special conflicts counsel, *nunc pro tunc* to March 25, 2015.[125]  On April 15, 2015, the Court entered orders approving the retention of W&S[126] and LSE.[127]

On April 29, 2015, the Examiner sought the retention of Alvarez & Marsal Global Forensic and Dispute Services, LLC ("A&M") as his financial advisors, *nunc pro tunc* to April 14, 2015.[128]  At a hearing held on May 6, 2015, the Court approved the retention of A&M on the record, which approval was subsequently confirmed by Court order dated May 7, 2015.[129]

### E.    Establishment of Discovery Protocol, Protective Order and Witness Protocol

As noted above, the Examiner Order authorized the Examiner without further order of the Court to take discovery under Bankruptcy Rule 2004[130] from the Debtors or any other person or entity through the issuance of subpoenas under Federal Rule 45.[131]  But it also did not preclude the official committees (and others) from conducting their own investigations.  Rather, the

---

[122]  *See United States Trustee's Emergency Application for Order Approving the Appointment of Examiner* [Docket No. 946]; *see also Emergency Motion to Set Hearing on United States Trustee's Application to Approve the Appointment of Examiner* [Docket No. 941].

[123]  *See Order Approving Appointment of Examiner* [Docket No. 992].

[124]  *See Application for Authorization to Employ and Retain Winston & Strawn LLP as Counsel to the Examiner, nunc pro tunc to March 25, 2015* [Docket No. 1084].

[125]  *See Application for Authorization to Employ and Retain Luskin, Stern, & Eisler LLP as Special Conflicts Counsel to the Examiner nunc pro tunc to March 25, 2015* [Docket No. 1085].

[126]  *See Order Authorizing the Retention and Employment of Winston & Strawn LLP as Counsel to the Examiner nunc pro tunc to March 25, 2015* [Docket No. 1167].

[127]  *See Order Authorizing the Retention and Employment of Luskin, Stern & Eisler LLP as Special Conflicts Counsel to the Examiner nunc pro tunc to March 25, 2015* [Docket No. 1168].

[128]  *See Application for Authorization to Employ and Retain Alvarez & Marsal Global Forensic and Dispute Services, LLC as Financial Advisor to the Examiner, nunc pro tunc to April 14, 2015* [Docket No. 1475].

[129]  *See Order Authorizing the Retention and Employment of Alvarez & Marsal Global Forensic and Dispute Services, LLC as Financial Advisor to the Examiner, nunc pro tunc to April 14, 2015* [Docket No. 1476].

[130]  All references to "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure.  All references to "Federal Rule" shall refer to the Federal Rules of Civil Procedure.

[131]  *See* Examiner Order, ¶6.

Examiner Order required the key parties – including the Debtors, the Debtors' non-debtor affiliates and subsidiaries, CEC, the UCC and the Noteholders Committee – to cooperate fully with the Examiner's Investigation and the performance of the Examiner's duties, and directed the Examiner, the UCC and the Noteholders Committee to use their best efforts to coordinate their investigations and avoid interference or needless duplication.

Certain of the key parties – in particular the UCC – desired to pursue their own concurrent investigations of some, if not all, of the transactions and issues that the Examiner was specifically charged with investigating. These parties raised concerns with the Examiner that, if their investigations were delayed until the completion of the Examiner's Final Report, the parties would not have adequate time to reach conclusions from their own investigations prior to confirmation of the Debtors' proposed plan. In response, the Court said that it was reluctant to enter any order that would preclude the UCC altogether from conducting its own investigation at the same time as the Examiner. Rather, the Court encouraged the parties to work together to develop a protocol to minimize duplication of efforts by the Examiner and other key parties.

A further complicating factor was the pendency of other litigation that had been filed in Delaware and New York by various creditors and/or indenture trustees against both the Debtors and non-debtors seeking relief in connection with certain of the transactions the Examiner was investigating, including, in particular, actions taken in 2014 that purportedly effected a release of CEC's guarantee of certain CEOC debt, which are described in further detail below. The parties to most of those lawsuits were unwilling to stay their own cases pending the outcome of the Examiner's Investigation, and the courts overseeing those cases set pre-trial schedules that contemplated motion practice and discovery that would take place concurrently with the Examiner's Investigation. The Debtors' efforts to stay or enjoin those cases not consensually stayed through commencement of an adversary proceeding were initially unsuccessful in the Bankruptcy Court and the District Court. However, the Seventh Circuit reversed the District Court, and accordingly, the matter was remanded to the Bankruptcy Court, which granted the Debtors' motion in part.

In light of the above, and in an effort to ensure an efficient and orderly Investigation, following consultation with the official committees and other key parties, the Examiner drafted a proposed discovery protocol, which was circulated for comment and extensively negotiated with the Debtors, the official committees and other key parties. The Examiner's proposed discovery protocol encompassed, among other things, streamlined procedures for the production of discovery material, service of subpoenas, deadlines for the service of responses and objections to subpoenas, procedures for resolving discovery disputes, the entry of a Protective Order in the Debtors' cases to which the Examiner would be a party (the Court approved the *Agreed Protective Order* on May 18, 2015),[132] and requirements for parties to begin producing

---

[132]  *See Agreed Protective Order* [Docket No. 1575]. On June 2, 2015, pursuant to the Discovery Protocol Order, the Examiner retained the services of Firmex Inc. as the host for the Document Depository and shortly thereafter the Document Depository was established. As described more fully below, the Document Depository contains all non-privileged and non-EEO Discovery Material provided to the Examiner or produced in the Chapter 11 Cases related to the Investigation and/or the subjects being investigated.

documents on a rolling basis within 10 days from the service of a subpoena. There was no objection to any of these proposed procedures.

The Examiner's proposed discovery protocol also envisioned the establishment of a document depository ("Document Depository"), along with a set of procedures to govern its use and operation, into which all non-privileged material, documents, testimony and other information (whether written or oral) provided to the Examiner or produced in the Chapter 11 Cases related to the Investigation and/or the subjects being investigated by the Examiner would be deposited and made available to the Debtors, the official committees, the Ad Hoc First Lien Bank Lender Committee, the Ad Hoc First Lien Notes Committee, the First Lien Notes Trustee, CEC, the Ad Hoc Committee of Second Lien Bondholders, TPG, Apollo and other interested parties as determined by the Examiner or the Court. Similar document depositories have been used in other large bankruptcy cases.[133]

With regard to privilege, the Examiner's proposed discovery protocol expressly provided (with the Debtors' consent) that the Examiner would be provided with access to all privileged discovery material within the possession, custody or control of the Debtors and their non-debtor affiliates and advisors to the same extent that the Debtors were entitled to access, or could access, such privileged material. The Examiner's protocol proposed that such materials be produced on an "Examiner's Eyes Only" basis, and that such materials be segregated and stored separately from the documents being placed in the Document Depository.

Although agreement was reached with the key parties with respect to the procedures outlined above relating to document production, the Examiner and the UCC were initially unable to reach agreement on certain procedures regarding witness interviews, discussed below. Eager to begin his Investigation and desirous of resolving the remaining issues with the UCC, the Examiner filed a motion on April 22, 2015, seeking approval of his proposed discovery protocol and procedures governing Examiner discovery.[134] In it, the Examiner proposed procedures for handling witness interviews (whether done formally or informally, transcribed and/or under oath) and sought related relief, including an order to the effect that, unless agreed to by the Examiner, no other requests for testimony in the Voluntary Case related to the subject matter of the Examiner's Investigation would be issued by any party until the earlier of 10 days following the issuance of the Examiner's Report, or October 15, 2015.[135] The Examiner sought such relief to enable him to conduct his Investigation in the most cost-effective and time-efficient manner while avoiding simultaneous discovery on the same or similar issues by other parties. The Examiner believed that by deferring witness testimony by other parties until the completion of his Final Report, other parties in interest would have the benefit of his Final Report in

---

[133] *See, e.g.*, *In re Residential Capital, LLC*, Case No. 12-12020 (Bankr. S.D.N.Y.) [Docket No. 1223]; *In re Dynegy Holdings, LLC, et al.*, Case No. 11-38111 (Bankr. S.D.N.Y.) [Docket No. 371]; *In re Lehman Brothers Holdings Inc., et al.*, Case No. 11-38111 (Bankr. S.D.N.Y.) [Docket No. 2804].

[134] *See Motion of the Examiner for an Order (I) Approving Protocol and Procedures Governing Examiner Discovery, (II) Approving Establishment of a Document Depository, and (III) Granting Related Relief* [Docket No. 1279].

[135] *Id.*

determining what additional discovery, if any, was needed.  In this connection, the Examiner indicated that, although he did not believe having representatives of the committees participate or attend witness interviews was desirable, as it would mix neutral with adversarial investigations and chill open communications, he intended to make available to the committees any transcripts of interviews and/or final interview memoranda.

Recognizing that other issues in the Voluntary Case may need to be litigated during the Investigation, the Examiner's proposed order also made clear that: (a) discovery on matters unrelated to his Investigation would not be affected by the order; (b) parties to any other lawsuits pending in any other courts against non-debtors would not be precluded from seeking or opposing discovery on any grounds with respect to the claims and defenses asserted therein; and (c) any party seeking discovery in the Voluntary Case before issuance of the Examiner's Final Report was free to seek a court order permitting such discovery.  Other provisions sought to prevent any party from being "jammed" by the filing of a plan that did not allow for adequate time for the committees and other parties to conduct additional discovery prior to confirmation proceedings.

The UCC filed an objection to the Examiner's proposed discovery protocol, primarily related to proposed procedures regarding witness interviews (among other things, the UCC proposed simultaneous interviews with representatives of the Examiner and the committees present and entitled to ask questions) and the Examiner's proposed limitation on the UCC's right to take Rule 2004 discovery prior to the issuance of the Examiner's Final Report.[136]  Other parties in interest also filed responses and limited objections to the Examiner's motion.  The committees and other parties thereafter engaged in a series of discussions with the Examiner regarding his proposed discovery plan in an effort to resolve the objections.  Following several hearings on, and revisions to, the Examiner's proposed discovery protocol, the parties ultimately agreed to the entry of two orders, one approving the Examiner's proposed document discovery protocol (entered on May 18, 2015),[137] the other containing an agreed witness protocol (which was submitted on May 27, 2015 and approved by the Court at a hearing on June 22, 2015, subject to certain modifications embodied in an order entered on June 25, 2015).[138]  With respect to witness interviews, the parties agreed that the Examiner could conduct his interviews on the subjects of his Investigation prior to any depositions that may be taken by other parties (including the Debtors, the Noteholders' Committee and the UCC), provided that he (i) provide advance notice of any transcribed interviews he intended to conduct, (ii) provide transcripts of any transcribed interviews to the committees on an advisors only basis 10 days after the receipt of such transcripts, and (iii) solicit input from the key parties in advance of any interview with

---

[136] *See Objection of Statutory Unsecured Claimholders' Committee of Caesars Entertainment Operating Company, Inc., et al. to Motion of Examiner for Order (I) Approving Protocol and Procedures Governing Examiner Discovery, (II) Approving Establishment of a Document Depository, and (III) Granting Related Relief* [Docket No. 1302].

[137] *See Order (I) Approving Protocol and Procedures Governing Examiner Discovery, (II) Approving Establishment of a Document Depository, and (III) Granting Related Relief* [Docket No. 1576] (the "Discovery Protocol Order").

[138] *See Agreed Order on Interviews and Depositions by the Examiner* [Docket No. 1831].

respect to the topics that should be covered during the interview.[139]   The Examiner believed that providing these transcripts was an appropriate compromise since he had already determined that he would provide such transcripts to the parties in connection with the release of his Final Report.

### F.   Expansion of Examiner's Scope

The scope of the Examiner's Investigation as originally envisioned did not expressly encompass the LBO.[140]   It was not listed among the "Challenged Transactions" or "Insider Transactions" in either the Debtors' or the Noteholders Committees' motions for the appointment of an Examiner.   Nor was it included in the list of transactions that the Examiner circulated to the key parties during the course of negotiating the terms of the discovery and witness protocols.   As envisioned by the Examiner, questioning of witnesses regarding the LBO would be for purposes of obtaining background information only.

In June 2015, the Debtors requested the Examiner to expand his Investigation to include potential claims relating to the LBO.   Although the Examiner Order broadly defined the scope of the Examiner's authority to include "any other transactions involving the Debtors, to the extent those transactions suggest potential claims belonging to the estates," the Debtors recognized that the LBO was not specifically enumerated as a "Challenged Transaction" or "Insider Transaction," and thus some uncertainty existed as to whether the Examiner was free to add the LBO to his Investigation.   Realizing that issues arising out of the LBO could significantly expand the scope of his Investigation, and potentially delay the delivery of his Final Report, the Examiner expressed reluctance to take on this added responsibility absent notice to, and acquiescence by, the Court.   The Debtors thereafter filed a motion for an order expanding the scope of the Examiner's Investigation to include the LBO,[141] and at the hearing on that motion, the Court made clear that the order appointing the Examiner provided the Examiner with broad discretion to determine what transactions or matters to investigate, including the LBO.[142]   The Examiner subsequently determined to investigate the LBO, focusing first on whether potential avoidance claims are time-barred.   If not, the scope of the inquiry would be a function of his analysis of other key issues.

### G.   Examiner's Interim Reports

Pursuant to paragraph 5 of the Examiner Order, directing the Examiner to file interim reports on the Investigation every forty-five days from the date his appointment was approved, the Examiner has filed seven interim reports, dated May 11, June 23, August 7, September 21, November 5, December 20, 2015 and February 4, 2016.[143]   Each of the Examiner's interim

---

[139]   *See id.*

[140]   For further discussion of the LBO, please see Section XI, *infra*.

[141]   *See Debtors' Motion for an Order Expanding the Scope of the Examiner's Investigation* [Docket No. 1847].

[142]   *See* Docket No. 1981.

[143]   *See* Docket Nos. 1520, 1805, 2022, 2236, 2535, and 3203, respectively.

reports described the progress of, and the steps he and his professionals were taking to complete the Investigation.

## II.  INVESTIGATION AND PREPARATION OF REPORT

### A.  Development of the Examiner's Work Plan

The Examiner's Work Plan consisted of seven primary methods of gathering documents and information: (i) voluntary production of documents from the Debtors and CEOC Special Governance Committee gathered during their prepetition investigation, informal interviews of key witnesses for the purpose of obtaining their perspective with regard with the transactions being investigated, and initial meetings with the Debtors, the official committees, other interested parties, and their respective legal and financial advisors; (ii) document collection and sharing through the issuance of Rule 2004 subpoenas and the establishment of a Document Depository; (iii) transcribed witness interviews; (iv) attendance at depositions in related cases; (v) informal interviews; (vi) site visits; and (vii) ongoing dialogue with, and formal and informal presentations by and to, the Debtors, the official committees, and other key parties in the Chapter 11 Cases.

### 1.  Initial Presentations by and Meetings with the Debtors, Interested Parties and Their Advisors

At the initial stages of the Investigation, the Examiner and/or his counsel and financial advisors attended extensive presentations and meetings with the Debtors, the official committees, other key parties, and their respective legal and financial advisors.  The Examiner and/or his counsel and financial advisors discussed matters relating to discovery, document and witness protocols, the Examiner's work plan, document subpoenas, privilege, and substantive focuses of the Investigation.  Meetings were held with: (i) the counsel for the Debtors and the CEOC Special Governance Committee and their financial advisors; (ii) counsel for the UCC and separately with the full UCC and their advisors; (iii) counsel for the Noteholders Committee and their financial advisors; (iv) counsel for the First Lien Notes Committee; (v) counsel for the First Lien Banks Committee; (vi) counsel for the First Lien Notes Trustee; (vii) counsel for CEC and its financial advisors; (viii) counsel for CAC and one of its independent directors; (ix) counsel for Apollo; and (x) counsel for TPG.

The principal purpose of these meetings and presentations was to provide the Examiner with each party's preliminary views and analyses regarding the issues and transactions central to the Investigation, the manner in which the parties would be expected to cooperate and assist with the Investigation, and the manner in which issues of discovery, confidentiality and privilege would be addressed.  At each of the meetings, the Examiner made clear that he intended to conduct his Investigation in an open and iterative manner, and would be communicating on a regular basis with all key constituencies, testing theories, and seeking clarification regarding the parties' respective positions on important issues.

The Examiner and his professionals also visited Las Vegas, Nevada and Atlantic City, New Jersey to meet with various Caesars employees, tour the sites and observe first-hand the operations of the Caesars enterprise as a whole.  The Examiner's financial advisors also visited

Caesars' sites in New Orleans, Louisiana and Baltimore, Maryland.  The visits substantially enhanced the knowledge base of the Examiner and his professionals and provided them with a better understanding of how Caesars' properties operated on a daily and practical basis.

Finally, in preparing his work plan, the Examiner and/or his professionals conducted preliminary informal interviews of four senior executives who worked or currently work at Caesars or Apollo.  These informal interviews, along with the meetings described above, were very informative and helpful in terms of assisting the Examiner in understanding the business rationales for and circumstances under which the Challenged Transactions were undertaken, in identifying the key players from whom formal discovery should be sought, and in sharpening the focus of the Investigation.

## 2.    Document Collection and Review

The Examiner's legal advisors served 55 separate Rule 2004 subpoenas *duces tecum* seeking the production of documents from 46 parties and parties in interest including, without limitation, the Debtors, CEC, the Sponsors and other key parties and their legal and financial advisors.  A list of the recipients of these subpoenas is attached as Appendix 2.  Given the number and complexity of the transactions being investigated, the volume of responsive materials, the need to negotiate and agree on electronic search terms and an appropriate production protocol, the negotiation and resolution of issues relating to privilege and delays by certain key parties in completing their productions, the document production phase of the Examiner's investigation took months longer to complete than originally anticipated.  The Examiner and his advisors were, however, able to reach agreement eventually with all subpoena recipients on the scope of production without the need to resort to the Court.  Ultimately, the Examiner received and reviewed approximately 1.2 million documents consisting of more than 8.8 million pages.[144]  These documents included, among other things, email, correspondence, transaction documents, board and committee presentations and minutes, spreadsheets, projections, financial work papers, valuation materials, fairness opinions and supporting materials of the financial advisors, legal advice, engagement letters and other relevant materials.  As discussed, however, in the Examiner's Third through Seventh Interim Reports, delays in producing documents extended the time necessary to complete the Examiner's Investigation.  For example, from December 20, 2015 and March 10, 2016, more than 1.5 million pages of documents were produced to the Examiner, a significant portion of which were provided by Apollo and TPG.  In the last two weeks of January alone, the Sponsors (Apollo and TPG) collectively produced 31,495 documents, consisting of 350,718 pages.  Additional significant productions continued to be made by various parties throughout February.  Eventually, all subpoena recipients were able to complete their productions and provide certifications to that effect to the Examiner, but the last certification was not received until March 11, 2016.

---

[144]  These figures do not account for more than one page of the many documents produced in native format, including the many multi-tabbed spreadsheets produced to the Examiner.  In addition, a portion of the document produced related solely to the LBO.  Once the Examiner reached his conclusions in connection with the LBO, the Examiner and his professionals suspended their review of the documents produced in response to the LBO subpoenas referenced in Appendix 2.

### 3.   Establishment and Operation of Document Depository

Pursuant to the Discovery Protocol Order, the Examiner was required to establish and maintain a Document Depository into which all non-privileged documents (the "Discovery Material") produced to the Examiner or in the Chapter 11 Cases relating to the Examiner's Investigation and/or the subjects being investigated by the Examiner have been deposited. In April 2015, counsel for the Examiner, in conjunction with counsel's in-house E-Discovery Support team, identified seven potential vendors that have handled projects of similar size, scope and complexity as the Chapter 11 Cases and/or who were recommended during the Examiner's preliminary discussions with the interested parties. After receiving bids from and having discussions with the potential vendors, counsel for the Examiner selected Firmex, Inc. ("Firmex") as the preferred vendor to host the Document Depository in early May 2015. Firmex was formally retained by the Examiner on June 2, 2015.

The Discovery Protocol Order sets forth the processes and procedures that govern the Document Depository, including the Examiner's, the Initial Depository Access Parties' and the Depository Designees' (as those terms are defined in the Discovery Protocol Order) use of and access to the Document Depository. Pursuant to Paragraph 5 of the Discovery Protocol Order, the Examiner and his advisors were required to post all non-privileged (*i.e.*, non-"Examiner's Eyes Only") Discovery Material that the Examiner received to the Document Depository in the form in which the Discovery Material was produced to the Examiner. The Discovery Material was posted in the Document Depository in separate folders based upon the confidentiality designation assigned to the production by the producing parties ("Non-Confidential," "Confidential" or "Advisors' Eyes Only") pursuant to the terms of the *Agreed Protective Order*, entered May 18, 2015 [Docket No. 1575] (the "Protective Order"), and the Discovery Material then became accessible only to the duly authorized representatives of the Initial Depository Access Parties and Depository Designees to whom access to the appropriate folders under the Protective Order was granted. The Examiner did not post privileged Discovery Material designated as "Examiner's Eyes Only" to the Document Depository. Firmex, on behalf of the Examiner and his advisors, notified the Initial Depository Access Parties and the Depository Designees by e-mail when documents were added to the Document Depository. In addition, there were delays in posting certain documents produced to the Document Depository due to the large volume of documents produced during the latter stages of document production, which the Examiner agreed to accept initially and temporarily on an Examiner's Eyes Only basis on the condition that the producing parties (in particular, the Sponsors) endeavor in good faith to redesignated the documents produced as promptly as possible. Given the substantial volume of documents produced, however, the redesignation process took far longer to complete than was initially expected. In fact, Apollo provided a redesignation of over 60,000 documents just two weeks before this Report was issued.

In addition, copies of all document subpoenas and requests were placed in the Document Depository pursuant to Paragraph 6 of the Discovery Protocol Order. Privilege logs, written responses and objections to document requests and any other writings containing or memorializing any resolution of an objection to any document subpoena or request were also added to the Document Depository. As of March 11, 2016, approximately 890,049 documents have been posted to the Document Depository.

### 4.    Privilege Issues

As noted above, the Discovery Protocol Order expressly directed that the Examiner be provided with access, on an "Examiner's Eyes Only" basis, to all privileged discovery material within the possession, custody or control of the Debtors and their non-debtor affiliates and advisors to the same extent that the Debtors were entitled to access such privileged material. Production of such material, however, was complicated by the fact that from the closing of the LBO in January 2008 through the Petition Date (with certain exceptions), the same outside law firms (initially O'Melveny & Myers LLP ("OMM") and later Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss")) were providing legal advice concurrently to CEC and its subsidiaries, including CEOC, regarding the transactions and issues of focus being investigated by the Examiner.  The Examiner and the Debtors were of the view that the concurrent and/or joint representation of CEC and CEOC by OMM and Paul Weiss entitled them access to all privileged communications to, from or within those firms with respect to the subject matter thereof.  In this connection, the Examiner was advised that no written engagement letter existed that identified Paul Weiss' client(s) or set forth the scope of its representation of CEC, CEOC and other members of the Caesars corporate family.  Paul Weiss also confirmed that during the relevant period an attorney-client relationship existed between the firm and the Sponsors or their affiliates but claimed that such representations were on matters unrelated to Caesars.  As discussed elsewhere in the Report, the Examiner has concluded that conflicts of interest existed with respect to Paul Weiss' dual representation of CEC and CEOC in connection with certain of the Challenged Transactions.

Although confirming the concurrent or joint representation of CEC and CEOC on the vast majority of transactions and issues of focus comprising the subjects of the Examiner's investigation, Paul Weiss took the position that its representation of CEC and CEOC was more "nuanced" and did not extend to every aspect of each transaction and issue of focus under investigation.  Paul Weiss provided the following examples of communications that it believed involved issues as to which Paul Weiss was representing CEC and not CEOC:  (i) advice related to CEC disclosure and/or SEC filing issues; (ii) discussions with counsel regarding draft CEC Board documents or presentation; (iii) advice concerning executive or senior management committees of CEC, including the Disclosure Committee, the Executive Committee, the Capital Committee and the Audit Committee; (iv) confidential communications concerning CEC debt or equity offerings; and (v) advice concerning CEC Directors' fiduciary duties to CEC.  Paul Weiss also took the position that even with respect to transactions as to which CEC and CEOC were co-clients of the same outside counsel, there existed certain limited aspects of those transactions in which CEC and CEOC shared no common legal interest, and that as a result counsel for CEOC (and thus the Examiner) was not entitled to discovery with regard to such matters.

The Examiner advised Paul Weiss that he disagreed with Paul Weiss' position and believed that Paul Weiss' concurrent or joint representation of CEC and CEOC entitled him to obtain and review all documents relevant to his Investigation.  The Examiner also acknowledged that Paul Weiss and its clients had a different view.  Following extensive negotiations and exchange of views, the Examiner and Paul Weiss agreed to resolve their dispute without motion practice, thereby facilitating the Examiner's Investigation.  For their part, Paul Weiss and its clients agreed to produce to the Examiner what they claimed were "CEC-only" privileged documents and information, but only on a "Privileged – Examiner's Eyes Only" basis, without

waiver of or prejudice to (i) Paul Weiss' and its clients' right to maintain that those materials remain privileged as to CEC or its non-debtor affiliates or (ii) the ability of the Examiner (or others) to maintain that he (or they) are entitled to obtain and review such information, on any basis.  Although this agreement extended to all privileged materials in the possession of Paul Weiss and its clients, including communications with other entities and law firms with whom Paul Weiss and its clients shared a common legal interest in connection with the transactions under investigation, the Examiner agreed in the first instance not to seek the production of purely internal Paul Weiss communications (*i.e.*, communications between Paul Weiss attorneys which were never shared with or disclosed in any form to anyone outside of Paul Weiss), while expressly reserving the right to demand the production of discrete documents or subcategories of purely internal Paul Weiss documents based upon information the Examiner concludes would justify such production.  Subsequently, the Examiner did, in fact, request and obtained the production of Paul Weiss time records, invoices and certain purely internal Paul Weiss documents identified as a result of the review of the time records and invoices pertinent to the transactions under investigation, and Paul Weiss attorneys were interviewed by the Examiner and questioned at length about the legal advice Paul Weiss provided to its clients.

Finally, the Examiner and Paul Weiss agreed that the agreement they reached would be extended to other certain other parties who had received subpoenas from the Examiner, including, *inter alia*, the Sponsors, the Special Committees, and their professionals and advisors, who were looking for guidance from Paul Weiss regarding the production of their own allegedly privileged documents containing or reflecting communications with Paul Weiss relating to the Examiner's Investigation.  The Sponsors and certain law firms and financial advisors for CEC subsequently elected to produce privileged documents pursuant to this agreement.  All subpoena recipients who possessed responsive documents and withheld documents on privilege grounds also produced privilege logs, copies of which were placed in the Document Depository.

A further agreement regarding the use of certain Privileged Discovery Material in the Examiner's Final Report was reached between the Examiner, the Debtors, CEC, and the Sponsors in early March.  That agreement, which was embodied in a proposed Order pursuant to Rule 502(d) of the Federal Rules of Evidence (the "Rule 502(d) Order"), provided that, with regard to Privileged Discovery Material designated by the Debtors, CEC, the Sponsors or CEC's or CEOC's counsel, the Examiner would be free without redaction to quote from or refer in his Final Report to: (i) any Privileged Discovery Material marked as an exhibit in any interview of a witness affiliated with the Debtors, CEC, the Sponsors or counsel for CEC or CEOC or (ii) other Privileged Discovery Material designated by CEC, CEOC, the Sponsors or counsel for CEC or CEOC that the Examiner and CEC agree may be disclosed without redaction. The Debtors further agreed to waive privilege with respect to all Privileged Discovery Material they produced.  The Rule 502(d) Order (which was entered by the Bankruptcy Court on March 9, 2016) further provided, *inter alia*, that the disclosure of Privileged Discovery Material pursuant to the Order does not waive (and preserved all rights to challenge), in these cases or in any other federal or state proceeding, any privilege as to any document or communication, and that any Privileged Discovery Material disclosed pursuant to the Order may not be offered or received in evidence or used in discovery in these cases or in any other proceeding without the prior consent of the Designating Party or a subsequent court order.

### 5. Witness Interview Process

Following the completion of document production, the Examiner and his advisors served 62 deposition subpoenas under Rule 2004. A list of the witnesses who received subpoenas and were subsequently interviewed is attached as Appendix 3. In all, a total of 74 witnesses were formally interviewed, and 27 witnesses were only informally interviewed. Although witnesses were not placed under oath, all formal interviews were transcribed by a court reporter to ensure the accuracy and efficiency of the process. While the Examiner believed that there was benefit in terms of witnesses being forthcoming if their interviews were not conducted like sworn depositions with the accompanying inevitable objections, he concluded that transcripts were necessary to avoid disputes as to what was said by particular witnesses. Having transcripts also was both far more efficient from a time perspective than creating detailed interview memoranda and provided a more accessible and useable base for the Examiner's conclusions.

Transcribed witness interviews were conducted from September 15, 2015 through February 25, 2016. Pursuant to the agreed witness protocol,[145] copies of the transcripts containing all non-privileged testimony were made available to counsel for the Noteholders Committee, the UCC and the Ad Hoc Committees within 10 days upon receipt of the final transcript. The Examiner was actively involved in the interview process. He read or attended every formal interview, actively participated in the interviews he attended, and took the lead in questioning a number of the key witnesses. Every interview was attended by one or more attorneys and/or representatives of the Examiner, who took an active role in many of the interviews. The Examiner and his advisors also conducted numerous follow-up interviews of these witnesses. In all, 32 follow-up interviews of 28 witnesses were conducted from November 2015 through February 2016.

In addition, informal interviews were conducted covering a number of topics. Those interviews generally were conducted by the Examiner's financial and legal advisors, although the Examiner did participate in several of those interviews. In total, 33 of these informal interviews were conducted. Some of these individuals also were formally interviewed. A list of the individuals interviewed informally is also included in Appendix 3.

Finally, the Examiner's legal advisors attended, and the Examiner and his legal and financial advisors reviewed the transcripts pertaining to, the depositions of 13 witnesses taken in the related Delaware and New York litigation (described below at Section III.C.3, *infra*) on issues that overlapped the issues that were the subject of the Examiner's Investigation. Many of the same witnesses who were interviewed by the Examiner in the course of his Investigation were also deposed in these cases, and the Examiner was able to use the testimony in the related cases to streamline the examination of the witnesses interviewed in the course of the Examiner's Investigation.

### 6. Additional Presentations by and Meetings with Interested Parties

During the course of his Investigation, the Examiner and his professionals continued regularly to communicate formally and informally with the professionals (including counsel and

---

[145] *See Agreed Order on Interviews and Deposition by the Examiner* [Docket No. 1831].

financial advisors) representing the Debtors, the official committees, CEC, the Sponsors and other key parties with regard to the transactions and issues under investigation. Included among these meetings were special presentations made regarding (i) valuation, (ii) the Total Rewards program, (iii) CEOC's financial condition and solvency issues, (iv) the benefits to CEOC of keeping CEC out of bankruptcy, (v) the value of the consideration being provided by CEC under the RSA, (vi) the process employed and business purposes underlying each transaction under investigation, (vii) the legal theories and potential remedies available, (viii) the potential applicability of section 546(e) of the Bankruptcy Code to certain of the Challenged Transactions, (ix) the potentially applicability of section 548(c) to certain of the transactions, (x) the existence of conflicts of interest, and (xi) other related topics. After forming his preliminary conclusions, the Examiner also met with the key constituents to apprise them of his preliminary views and to provide them with an opportunity to respond and make formal presentations in support of their respective positions and in response to the preliminary views expressed by the Examiner. Many of the key constituents availed themselves of this opportunity. The Examiner was very appreciative of these efforts and the number of presentations he received throughout the process.[146] These presentations helped focus the Investigation and also provided valuable information.[147]

### B. Methodology for Presentation of Findings and Conclusions/Standard Adopted in the Report

As discussed elsewhere in this Report, the Examiner has concluded that in structuring and implementing various transactions between CEOC and other entities controlled by CEC and the Sponsors over the five-year period preceding the chapter 11 filings, during which period it is likely, if not highly likely, that CEOC was insolvent, assets were removed from CEOC for inadequate consideration to the detriment of CEOC and its creditors. As a result, claims of varying degrees of strength arising out of these transactions exist for preferential transfer, constructive or actual fraudulent transfer, breach of fiduciary duty (including usurpation of corporate opportunity), and aiding and abetting breach of fiduciary duty. Recognizing that the Examiner's task is to identify, and not to resolve, such claims, the Examiner has considered in each case the relative strength or weakness of such claims, and the discussion below will endeavor to characterize the claims as (i) strong (having a high likelihood of success), (ii) reasonable (having a reasonable, or better than 50/50 chance of success), (iii) plausible (a claim likely to survive a motion to dismiss but having a less than 50/50 chance of success), (iv) weak (a claim with a reasonable chance of surviving a motion to dismiss but unlikely to succeed) or (v) not viable (either likely to be dismissed on motion or highly unlikely to succeed if litigated). The Examiner will also where feasible be commenting on the potential remedies and range of potential recoveries available for each claim identified. The Examiner recognizes that the parties

---

[146] The Examiner's financial advisors also communicated on a regular basis with the financial advisors for the Debtors, all of the committees and CEC. The financial advisors were very cooperative and provided useful input to the Examiner and his advisors throughout the Investigation. Even where the Examiner disagreed with their positions, all of these advisors acted in good faith in presenting their positions.

[147] The Examiner requested that all interested party submissions be received by no later than January 31, 2016. Some submissions were, however, made in February.

have widely divergent views on the types of claims, relative strength or weakness of such claims, and potential remedies available for such claims. However, one thing is certain, any and all claims, if litigated, will be vigorously contested by the parties represented by very able counsel and financial advisors. Thus, a very real litigation risk exists, making any attempt to predict the outcome of litigation inherently speculative.

### C.    Confidentiality Issues Relating to Report Preparation

The Examiner Order contemplated that this Report may contain references to confidential and/or privileged information that was produced to the Examiner during the course of his Investigation. On December 23, 2015, the Examiner filed a motion with the Bankruptcy Court for an order temporarily authorizing the filing of the Examiner's Final Report and certain documents referenced therein under seal.[148] While the Examiner believes that his Final Report should be a public record open to examination, substantial portions of this Report quotes, paraphrases and otherwise divulges information that was provided to the Examiner subject to claims of confidentiality and privilege (many of which the Examiner believes are not well-founded). In an effort to avoid delay in the filing of this Report, by the motion, the Examiner sought leave to file under seal an unredacted version of the Final Report and exhibits (along with a substantially redacted version on the public docket) on a temporary basis, pending resolution of issues concerning confidentiality and privilege with the parties that have asserted such claims. At the same time, the Examiner sought approval from the Court of a process to allow parties that produced documents and/or were interviewed to determine whether to object to the release of any portion of the unredacted Final Report. On February 1, 2016, the Bankruptcy Court entered an order granting the Examiner's motion to the extent set forth therein.[149] This Report has been filed consistent with such Order and the Examiner and his professionals worked with the key parties to employ methods of de-designation of documents under the Protective Order in an effort to expedite and streamline the process. This Report has also been prepared consistent with the Rule 502(d) Order, discussed previously, relating to the disclosure of certain Privileged Discovery Material by the Examiner.

## III. STATEMENT OF BACKGROUND FACTS

### A.    Corporate History and Organization

The Debtors' corporate origins lie with a small bingo hall in Reno, Nevada founded by William F. Harrah in 1937. Now known as Harrah's Reno, that former bingo hall is owned and operated by the Debtors to this day, along with the Debtors' other core casino offerings which are spread across the United States – including strong concentrations in Chicagoland, Nevada,

---

[148] *Notice of Examiner's Motion for Order Temporarily Authorizing the Filing of the Examiner's Report and Certain Documents Under Seal and Related Procedures* [Docket No. 2834].

[149] *Order Temporarily Authorizing the Filing of Redacted Version of the Examiner's Report and Certain Documents and Related Procedures* [Docket No. 3169] as amended by *Amended Order Temporarily Authorizing the Filing of Redacted Version of the Examiner's Report and Certain Documents and Related Procedures* [Docket No. 3187].

and Atlantic City – and overseas.[150]  In the Chicagoland market, the Debtors own and operate two casinos, the Horseshoe Casino Hammond and Harrah's Joliet.  In Nevada, the Debtors own and operate four casinos: Caesars Palace, which is located on the Las Vegas Strip and is the Debtors' flagship property; Harrah's Lake Tahoe; Harvey's Lake Tahoe; and Harrah's Reno.  In Atlantic City the Debtors own and operate two casinos: (i) Caesars Atlantic City; and (ii) Bally's Atlantic City.  Finally, the Debtors own and operate 12 other regional gaming properties in other United States locations.[151]  In all, these locations provide almost two million square feet of gaming space, 14,000 hotel rooms, 34,400 slot machines, and 1,820 table games.[152]

As of the Petition Date,[153] the Debtors had approximately 32,000 employees throughout their various operations, including 24,000 full-time and 8,000 part-time employees.[154]

The Debtors are part of a much larger "Caesars enterprise."  The Debtors are all direct or indirect subsidiaries of non-debtor CEC, which is a publicly held company.  CEC owns approximately 89% of the outstanding common stock of CEOC.  The remaining 11% of CEOC's common stock is owned by three institutional investors (who acquired 5% of the common stock in a privately negotiated transaction in May 2014 (the "5% Stock Sale")) and certain employees of Caesars, who together own approximately 6% of CEOC's common stock (and received their shares pursuant to the terms of a performance incentive plan that was adopted in May 2014 (the "PIP")).  Both of these transactions are among the transactions that have been investigated by the Examiner.

CEC and its Debtor and non-debtor subsidiaries and affiliates (together "Caesars") together comprise the world's largest and most geographically diversified casino-entertainment company.  From its founding in 1937, Caesars has grown through acquisition and expansion to an enterprise that as of the end of 2014 owned, operated and/or managed 49 casinos in five countries and 13 states, primarily under the Caesars, Harrah's, Horseshoe and Bally's brand

---

[150] *Memorandum in Support of Chapter 11 Petitions* [Docket No. 4] at 12 (the "First Day Memorandum").

[151] The regional-owned properties (excluding managed properties) as of the Petition Date included: Harrah's Council Bluffs; Harrah's Gulf Coast; Harrah's Louisiana Downs; Harrah's Metropolis; Harrah's North Kansas City; Harrah's Philadelphia; Horseshoe Bossier City; Horseshoe Council Bluffs; Horseshoe Southern Indiana; Horseshoe Tunica; and Tunica Roadhouse Hotel & Casino. In addition, the Debtors manage three regional properties: Harrah's Ak-Chin; Harrah's Cherokee; and Harrah's Rincon in the United States. They also own and operate nine international locations: Alea Glasgow; Alea Nottingham; The Casino at the Empire; Emerald Safari; Manchester235; Playboy Club London; Rendezvous Brighton; Rendezvous Southend-on-Sea; and The Sportsman.

[152] *First Day Memorandum* at 14.

[153] For the purposes of this Report, the term "Petition Date" shall refer to January 12, 2015 and January 15, 2015, in the Involuntary Case and Voluntary Case, respectively.

[154] *First Day Memorandum* at 14.

names, 37 of which were associated with the Debtors.[155] For the ███████████████ ███████████████████████████████████████████████████████████ Caesars' Total Rewards customer loyalty program is also the largest and most successful of its kind, having 45 million participants, 7 million of whom are currently active. As discussed in greater detail below, the Total Rewards program provides all members of the Caesars enterprise with a unique platform to direct customers in regional gaming properties to "destination" properties in Las Vegas, Atlantic City and other locations.

Approximately 60% of the common stock of CEC is owned and controlled by affiliates of two private equity firms, Apollo and TPG (together with Apollo, the "Sponsors"), which, along with certain co-investors, acquired Caesars (then known as Harrah's Entertainment, Inc.) in one of the largest leveraged buyouts in history, the terms of which were negotiated in 2006 but, due to the need for regulatory approvals, did not close until January 28, 2008.[157]

To fund the $30.7 billion LBO, the Sponsors and other investors contributed approximately $6.1 billion in cash. The balance of the LBO was funded through approximately $24 billion in debt, approximately $19.7 billion of which was secured by first or second liens on substantially all of the Debtors' assets.[158]

Following the LBO, CEC's corporate structure was primarily organized into two groups of wholly-owned subsidiaries: (i) CEOC; and (ii) six subsidiaries financed by commercial mortgage backed securities, known as the "CMBS Properties": (a) Harrah's Atlantic City Holding, LLC; (b) Harrah's Las Vegas, LLC; (c) Harrah's Laughlin, LLC; (d) Flamingo Las Vegas Holding, LLC; (e) Paris Las Vegas Holding, LLC; and (f) Rio Properties, LLC.[159] In 2009, CEC formed Caesars Interactive Corporation ("CIE"), into which the online gaming business and related trademarks and intellectual property rights, including the rights to the World Series of Poker trademark, were transferred. In late 2013, the six CMBS Properties (along with two CEOC Properties) were sold/transferred to a newly-formed non-debtor subsidiary of CEC, Caesars Entertainment Resort Properties ("CERP"), as part of a refinancing of the CMBS debt.

In addition to the Debtors, CIE and CERP, over time the Caesars enterprise was expanded to include the following additional non-debtor affiliates: (i) Caesars Growth Partners, LLC ("CGP" or "Growth"), a joint venture company owned 57.6% by CEC and 42.4% by CAC,

---

[155] CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31-32. Had the 2013-2014 asset transfers discussed in this Report not taken place, the number of casinos associated with the Debtors at year end 2014 would have been 43.

[156] CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31-32 (for properties) and 118-19 (for revenue and EBITDA). The 2014 revenue and EBITDA were generated by 39 CEOC properties (owned or managed) but two CEOC owned properties were closed in 2014. *Id.* at 15.

[157] *First Day Memorandum* at 4.

[158] *Id.*

[159] *Id.* at 16.

a separate publicly-traded company formed by the Sponsors and public investors in 2013 with the stated purpose to raise capital for Caesars and to fund growth projects that CEOC purportedly was unable to fund on its own;[160] (ii) CAC; and (iii) Caesars Enterprise Services, LLC ("CES"), a joint venture among CEOC, CERP and CGP that was formed in May 2014 to provide centralized property management services and common management of enterprise-wide intellectual property for all Caesars-owned or operated properties.[161] A significant number of the Challenged Transactions involve sales or transfers of assets in 2013 and 2014 from the Debtors to CEC, CERP, CGP and CES.

At a 60,000 foot level, the corporate structure of the Debtors as of the January 15, 2015 Petition Date was as follows:[162]

---

[160] As of the Petition Date, the Sponsors and their co-investors held approximately 66% of the common stock of CAC.  CAC Form 10-K for the period ended Dec. 31, 2014 (Mar. 16, 2015) at 39.

[161] As of the Petition Date, CEOC had a 69% ownership stake, and 33% of the voting rights in CES, while CERP and CGP held 20.2% and 10.8% of the ownership interests and 33% of the voting rights each, respectively.  *First Day Memorandum* at 34-35.

[162] *Id.* at 3.

**Background Figure 1: Caesars Corporate Structure as of Petition Date**



Following the LBO, the Sponsors and CEC management were left with a highly leveraged enterprise (at 9x 2008 EBITDA), with $24 billion in debt, $17.4 billion of which was secured by liens on substantially all of the Debtors' assets. A large percentage of that debt was also guaranteed by CEC. As described below, following the LBO, a number of factors combined that left the Debtors significantly cash flow negative and unable to support their overleveraged capital structure. In response to the financial challenges that the Debtors, CEC and the Sponsors faced, during the post-LBO period, the Sponsors and CEC management engaged in more than 40 capital markets transactions between the closing of the LBO and the Petition Date, including asset sales, re-financings, debt repurchases and exchange and tender offers.[163] A number of these transactions are the subject of the Examiner's Investigation.

As a result of these capital market transactions, the Debtors were left as of the Petition Dates with funded debt obligations totaling approximately $18.4 billion, consisting of:

- Four tranches of First Lien Bank debt totaling approximately $5.35 billion;

- Three series of First Lien Notes totaling approximately $6.35 billion;

---

[163] *Id.* at 6.

- Three series of Second Lien Notes totaling approximately $5.24 billion;

- One series of subsidiary-guaranteed unsecured debt of approximately $479 million; and

- Two series of Senior Unsecured Notes totaling approximately $530 million and other borrowing of $426 million.[164]

As of December 31, 2014, the aforementioned funded debt obligations thus looked as follows:[165]

---

[164] *Id.* at 6.

[165] *Id.* at 21.

**Background Figure 2: CEOC DEBT AS OF 12/31/14**

| As of December 31, 2014 | | | |
|---|---|---|---|
| *(amounts in millions)* | **Maturity** | **Interest Rate** | **Face Value** |
| **Credit Facilities** | | | |
| Term Loan B-4 | 2016 | 10.50% | $ 377 |
| Term Loan B-5 | 2017 | 5.99% | 938 |
| Term Loan B-6 | 2017 | 6.99% | 2,299 |
| Term Loan B-7 | 2017 | 9.75% | 1,741 |
| Term Loans B-1 - B-3 | - | - | - |
| **Credit Facilities Total** | | | **5,355** |
| **Secured Debt** | | | |
| 10.0% Second-Priority senior Secured Notes (due 2015) | 2015 | 10.00% | 3 |
| 10.0% Second-Priority senior Secured Notes (due 2018) | 2018 | 10.00% | 4,485 |
| 12.75% Second-Priority Senior Secured Notes (due 2018) | 2018 | 12.75% | 750 |
| Cromwell Credit Facility | - | - | - |
| Senior Secured Notes (11.25% due 2017) | 2017 | 11.25% | 2,095 |
| Senior Secured Notes (8.5% due 2020) | 2020 | 8.50% | 1,250 |
| Senior Secured Notes (9.0% due 2020) | 2020 | 9.00% | 3,000 |
| **Secured Debt Total** | | | **11,583** |
| **Subsidiary-Guaranteed Debt** | | | |
| 10.75% Unsecured Senior Notes (due 2016) | 2016 | 10.75% | 479 |
| Senior PIK Toggle Notes (due 2018) | 2018 | - | - |
| **Subsidiary-Guaranteed Debt Total** | | | **479** |
| **Unsecured Senior Debt** | | | |
| 5.75% Unsecured Senior Notes (due 2017) | 2017 | 5.75% | 233 |
| 6.50% Unsecured Senior Notes (due 2016) | 2016 | 6.50% | 297 |
| Floating Rate Contingent Convertible Senior Notes | 2024 | 0.24% | - |
| **Unsecured Senior Debt Total** | | | **530** |
| **Other Unsecured Borrowings Total** | | | **424** |
| **Grand Total** | | | $ 18,371 |

The Debtors also hold significant unsecured debts, including the aforementioned unsecured notes, totaling more than $2 billion as of the Petition Date for CEOC alone.[166]

## B. Directors, Management, Counsel and Advisors of the Various Caesars Entities

Historically, CEOC, CEC and their affiliates have had significant overlap of officers and directors, a number of whom have ties to Apollo or TPG. This overlap, and ties to Apollo and TPG, has led creditors to question the decision-making and exercise of fiduciary duties of the Debtors' officers and directors[167] in connection with the transactions in question. As noted previously, until the middle of 2014, CEOC was 100% owned by CEC, and its Board of Directors was comprised of two members of senior management. On June 27, 2014, following the sale of 5% of CEOC's stock to three institutional holders and the issuance of another 6% of CEOC's common stock to key management, CEOC expanded its Board of Directors from two to seven directors, by subtracting one (Eric Hession) and adding six new members: David Bonderman and Kelvin Davis, each of whom also serves as a director of CEC and is affiliated with TPG; Marc Rowan and David Sambur, who also serve as directors of CEC and are affiliated with Apollo; and two independent members, Ronen Stauber and Steven Winograd, who also serve as the sole members of the Special Governance Committee of CEOC.[168]

As a result of creation of CES in May 2014 and the resulting transfer of operational control over the Debtors to a centralized, enterprise-wide shared services venture jointly owned by CEOC, CERP and CGP, CEOC as of the Petition Date had only four officers: John Payne, Chief Executive Officer; Mary Beth Higgins, Chief Financial Officer; Tim Lambert, General Counsel (all three appointed July 30, 2014); and Randall Eisenberg, Chief Restructuring Officer (appointed January 15, 2015).

In terms of outside professionals, as noted above, attorneys from Paul Weiss served as counsel to both CEC and CEOC on many of the transactions that are the subject of the Examiner's Investigation. The appropriateness of this joint representation has been investigated by the Examiner.[169]  In July 2014, CEOC retained Kirkland & Ellis, LLP as restructuring

---

[166] *Schedule of Assets and Liabilities for Caesars Entertainment Operating Company, Inc.* [Docket No. 882], at Schedule F.

[167] *See generally Motion of Official Committee of Second Priority Noteholders for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials [Docket No. 362]; Objection of Statutory Unsecured Claimholders' Committee to Debtors' Application for Entry of an Order Authorizing the Employment and Retention of Mesirow Financial Consulting, LLC as Independent Financial Advisor to the Special Governance Committee of the Board of Directors of Caesars Entertainment Operating Company, Inc.* [Docket No. 435].

[168] Questions have been raised by certain creditors regarding the alleged independence of Mr. Winograd due to his past relationships with Apollo. *See Motion of Official Committee of Second Priority Noteholders for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* at 8 [Docket No. 362]. The Examiner, however, has concluded that such relationships are insufficient to call into question his "independence." *See, infra,* Section XIII.

[169] *See* the Executive Summary above for a more complete discussion of Paul Weiss' role and related issues.

counsel, although, as discussed below, it does appear that Paul Weiss continued to play a key role in certain subsequent transactions.

Various financial advisors provided fairness opinions and related transaction advice and opinions to the Debtors and CEC with respect to the transactions at issue, including Duff & Phelps, Perella Weinberg Partners, Valuation Research Corporation, Evercore Partners and Centerview Partners LLC. It is important to note, however, that CEC and the Sponsors (and their counsel and financial advisors) were solely responsible for planning, structuring, negotiating and approving all but one of the Challenged Transactions, with the CEOC Board (with one exception) playing no meaningful role. At no point (i) were the Debtors (until July 2014) separately represented by independent counsel or financial advisors, (ii) did the Debtors have (until June 2014) any independent directors, or (iii) did the Debtors actively participate in the planning, structuring or negotiation of the terms of any of the Challenged Transactions. Whether independent directors and advisors would have approved or recommended approval of the Challenged Transactions as being in the best interests of CEOC and its creditors is a question various parties and the Examiner have raised. As discussed below, the Examiner investigated the "governance" and conflicts issues surrounding each of the Challenged Transactions.

## C.   Events Leading to Commencement of Case

### 1.   The 2008 Recession, Changing Consumer Habits and Impact of Increased Competition on CEOC's Financial Results and Its Ability to Service Its Substantial Debt

Prior to the LBO, Caesars was a thriving, profitable enterprise with a healthy balance sheet and manageable debt load. The unique combination of geographically dispersed regional and destination properties that operated under the Total Rewards system provided Caesars with a competitive edge over smaller, less geographically diverse gaming companies.

The LBO changed everything. The LBO was highly leveraged, and its success was heavily dependent on the ability of Caesars management to continue to grow revenue and EBITDA to both meet the large interest payments on the LBO debt and provide enough funding to meet the significant capital expenditure requirements of a growing enterprise. Within months of the closing of the LBO, the 2008 Recession became a reality, and the gaming industry was hard hit. Caesars was no exception. Instead of growing, the Debtors' net revenues and EBITDA decreased significantly. From year-end 2007 to the end of 2009, enterprise-wide net revenues decreased from $12.7 billion to $10.3 billion, while adjusted EBITDA dropped from $2.1 billion to $1.7 billion, and continued to decline thereafter.[170] To this day, the financial results of the post-LBO Caesars have not returned to pre-LBO levels. As discussed below, the Examiner has concluded that under the applied legal tests, a strong or reasonable argument exists that at all relevant times beginning from at least January 1, 2009 up to the time of the chapter 11 filings, CEOC was insolvent, undercapitalized and unable to pay its debts when they came due.

Other factors may also have negatively impacted Caesars' post-LBO's financial performance. For example, according to the Debtors, changing consumer preferences (*e.g.*,

---

[170]   *First Day Memorandum* at 28.

younger people less willing to gamble and more interested in other forms of entertainment) and increased competition are other potentially important factors.  The Debtors also point to the fact that online gambling has not been legalized on anywhere near the scale Caesars had hoped, and that in-person gambling, in contrast, has been legalized in several new states, which has added pressure on existing casinos as the total gambling population has remained relatively static.  This is especially true, according to the Debtors, in Atlantic City, where operating results have steadily and dramatically declined for a variety of reasons, due to (i) the effects of Hurricane Irene and Super Storm Sandy, (ii) an oversaturated market and (iii) increased competition from new casinos opening on the East Coast.  And in Las Vegas, since 2008 three new casinos have opened on the Las Vegas Strip (and others have been renovated), adding significant new capacity of gaming, hotel and retail space, placing further pressure on Caesars.

## 2. Appointment, Operations, and Conclusions of the CEOC Special Governance Committee

By mid-2014, CEC and the Sponsors contemplated discussions with certain of CEOC's senior lenders regarding a comprehensive restructuring of the Debtors' capital structure.  To assist them and facilitate such discussions, CEC and the Sponsors retained restructuring advisors and separate bankruptcy counsel for CEOC.  For their part, CEOC's lenders indicated that to gain their support, any restructuring would require substantial financial and operational support from CEC.  CEC, in turn, made it clear that it would only consider providing such support if it and its affiliates received comprehensive third-party releases.[171]  The RSAs, which have undergone several iterations, are the product of those negotiations.

Although the issue of independent directors at CEOC was considered as early as late 2013, and the Sponsors began contacting potential candidates who may have been willing to fulfill that role by February 2014, it was not until June 2014 – after the closing of the Four Properties Transaction, the 5% Stock Sale and the PIP – that CEOC's Board was expanded to include two independent directors, Stauber and Winograd.  Shortly thereafter, the CEOC Board retained its own legal counsel, K&E, and its own independent financial advisors, Mesirow.[172] The CEOC Board of Directors then formed a Special Governance Committee (the "Special Governance Committee"), consisting of the two independent directors, who were tasked with investigating claims that the Debtors and/or their creditors may have against CEC or its affiliates.[173]

The Special Governance Committee, aided by K&E and Mesirow, issued requests for documents to CEC, its affiliates and the Sponsors.  As of the Petition Date, advisors assisting the Special Governance Committee had conducted interviews and reviewed approximately 35,000 documents produced by CEC, its affiliates, and the Sponsors.  The Special Governance Committee also reviewed and considered the allegations made by creditor groups in certain then-pending litigation (described below) relating to certain of the Challenged Transactions.  Based upon their investigation (which remained ongoing), as of the Petition Date, the Special

---

[171]  *Id.* at 7-8.

[172]  Most of the Mesirow team joined Baker Tilly as of January 1, 2016.

[173]  *First Day Memorandum* at 38-39.

Governance Committee had determined that there was sufficient merit to certain potential claims against CEC and its affiliates to require a significant contribution from CEC and its affiliates to settle and release such claims under the RSAs.[174]  How to value that contribution, however, is a matter that to this day remains the subject of significant disagreement.

### 3.   Related Litigation

Certain of the transactions that are the focus of the Examiner's Investigation, in particular the transactions that were consummated in 2014, are the subject of a series of highly contentious lawsuits that have been brought against CEC and others in federal and state courts in Delaware and New York, by or on behalf of noteholders claiming that the transactions were unlawful and/or violated certain covenants under their respective indentures.  In general, the noteholder plaintiffs claim that CEC orchestrated these transactions on terms that were unfair to CEOC as part of an overall scheme to transfer valuable assets from CEOC (which the noteholder plaintiffs claim was, at all relevant times, insolvent) to CEC and its affiliate CGP and thus placed such assets beyond the reach of CEOC's creditors.  In addition, the noteholder plaintiffs claim that CEOC's directors and officers were hopelessly conflicted in light of their extensive relationships with CEC and the Sponsors and breached their fiduciary duties in allowing these transactions to proceed on terms that were unfair to CEOC and its creditors.

The Examiner has closely monitored these actions, reviewing their pleadings and the decisions rendered by the courts, accessing the extensive documentary discovery and deposition testimony taken, and reviewing the briefs submitted by the parties in each action on various substantive issues pertinent to his investigation.  The pendency of these actions made it challenging for the Examiner to schedule witness interviews, and required him to monitor and review the voluminous record while concurrently conducting his own parallel investigation of the same transactions.  In the end, however, the Examiner believes that the record developed in these actions was helpful and confirmatory of his own independent observations and conclusions reached.  The Examiner has not drawn any conclusions with respect to the legal issues and claims that have been asserted in these cases.  Nothing herein should be read to express any view on the merit or lack of merit of any of the claims that are before the federal and state courts in such cases.

### a.   The Wilmington Action[175]

On August 4, 2014 (as supplemented on August 3, 2015), Wilmington Savings Fund Society FSB, as indenture trustee under the 2009 Indenture for certain Second Lien Noteholders, directly and derivatively on behalf of CEOC, filed a complaint in the Delaware Court of Chancery against various defendants,[176] asserting claims for breach of contract, fraudulent

---

[174]  *Id.* at 39.

[175]  *Wilmington Savings Fund Society* FSB *v. Caesars Entertainment Corp., et al.*, C.A. No. 10004-VCG (Del. Ch.).

[176]  The defendants are CEC, CGP, CAC, CERP, CEOC, CES, Eric Hession, Gary Loveman, Jeffrey D. Benjamin, David Bonderman, Kelvin L. Davis, Marc C. Rowan, David B. Sambur and Eric Press.

transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and waste of corporate assets, and to enforce the Guarantee (the "Wilmington Action"). Plaintiff generally alleges that defendants engaged in a series of self-dealing transactions for less than adequate consideration, with intent to hinder or delay CEOC's creditors, and that certain transactions breached the 2009 Indenture. The allegedly self-dealing transactions cited by plaintiff include the Trademarks Transfer, the Online Gaming Transfers, the CERP Transaction, the Growth Transaction, the Four Properties Transaction, the CES/Total Rewards Transaction, the 5% Stock Sale, the Senior Unsecured Notes Transaction, the CEC/CEOC Intercompany Revolver Repayment, the B-7 Transaction and the purported release of the CEC Guarantee.[177]

On September 23, 2014, defendants moved to dismiss or stay the Wilmington Action, arguing that plaintiff had contractually agreed to New York as the exclusive forum for adjudicating this dispute or, alternatively, that New York was the appropriate forum under the doctrine of *forum non conveniens*. The court heard oral argument on the motion on December 5, 2014, and issued a memorandum opinion denying the motion to dismiss on March 18, 2015, finding that plaintiff did not make a clear and unambiguous choice to litigate this dispute in New York, and that dismissal was not warranted under the doctrine of *forum non conveniens*.

The Wilmington Action remains pending before Vice Chancellor Glasscock, although stayed as to the Debtors by the Debtors' bankruptcy filing.

### b.  The CEC/CEOC Declaratory Judgment Action[178]

On August 5, 2014 (as amended on September 15, 2014), CEOC and CEC filed a complaint in New York Supreme Court against various First and Second Lien Noteholders,[179] asserting that defendants had tortiously interfered with CEC's and CEOC's business in an effort

---

[177] The CEC Guarantee is also defined as the Bond Guarantee in the context of the transactions described in Section IX.B below.

[178] *Caesars Entertainment Operating Co., Inc., et al. v. Appaloosa Investment Limited Partnership I, et al.*, Index No. 652392/2014 (N.Y. Sup. Ct. N.Y. Cnty.).

[179] The defendants are Appaloosa Investment Limited Partnership I; Palomino Fund Ltd.; Thoroughbred Fund L.P.; Thoroughbred Master Ltd.; Avenue Credit Strategies Fund; Avenue Investments, LP; Avenue – COPPERS Opportunities Fund, L.P.; Avenue International Master, LP; Lyxor/Avenue Opportunities Fund Limited; Managed Accounts Master Fund Services – MAP10; Avenue SS Fund VI (Master), LP; Avenue Special Opportunities Fund I, L.P.; Canyon Capital Advisors LLC; Caspian Capital LP; Centerbridge Credit Partners, L.P.; Centerbridge Credit Partners Master, L.P.; Centerbridge Special Credit Partners II, L.P.; Contrarian Capital Management L.L.C.; Elliott Management Corporation; Oaktree Value Opportunities Fund Holdings, L.P.; OCM Opportunities Fund VII Delaware, L.P.; OCM Opportunities Fund VIIb Delaware, L.P.; Oaktree Opportunities Fund VIII Delaware, L.P.; Oaktree Opportunities Fund VIIIb Delaware, L.P.; Oaktree FF Investment Fund, L.P. – Class B; Special Value Expansion Fund, LLC; Special Value Opportunities Fund, LLC; Tennenbaum Opportunities Partners V, LP; Third Avenue Focused Credit Fund; and Wilmington Savings Fund Society, FSB.

to enhance their credit default swap and other securities positions.[180]   CEC and CEOC also
sought declarations that the actions and transactions they had taken did not result in a default or
breach of their contractual obligations under the indentures governing CEOC's First and Second
Lien Notes, were not undertaken in breach of any fiduciary duties and were not avoidable as
fraudulent transfers, and that the termination of the CEC Guarantee was effective.   In July 2015,
CEC and CEOC agreed to dismiss all counts in their complaint without prejudice, except for the
claim of tortious interference which was dismissed with prejudice.   The circumstances
surrounding the decision to file this action are discussed in Section IX.D below.

### c.   The MeehanCombs Action;[181] the Danner Action;[182] and the UMB NY Action[183]

On September 3, 2014, certain beneficial holders[184] of CEOC's Senior Unsecured Notes
(*i.e.*, the 6.5% Senior Notes due 2016 and the 5.75% Senior notes due 2017) filed a complaint in
the Southern District of New York against CEC and CEOC (the "MeehanCombs Action").   On
October 2, 2014, a related class action complaint was filed by Frederick Barton Danner in the
Southern District of New York on behalf of all beneficial holders of CEOC's 2016 Notes (the
"Danner Action").[185]   On June 15, 2015, UMB Bank, N.A., as indenture trustee,[186] filed a
complaint against CEC in the Southern District of New York (the "UMB NY Action").
Plaintiffs in these actions (i) allege: (a) breach of contract; (b) breaches of the duties of good
faith and fair dealing; and (c) violations of the Trust Indenture Act ("TIA") in connection with
the Senior Unsecured Notes Transaction, and (ii) seek:  (a) a declaration that CEC's guarantees
are in full force and effect, notwithstanding the Senior Unsecured Notes Transaction, and that
any supplemental indentures issued in connection with the Senior Unsecured Notes Transaction
are void; and (b) damages for violations of the TIA.   These actions are pending before United
States District Court Judge Shira Scheindlin.

---

[180]   It is troubling that CEOC was a plaintiff in a lawsuit alleging that transactions, orchestrated
by CEC at a point in time when CEOC was likely insolvent, were not unfair.   The Examiner also
notes that the members of the CEC Special Governance Committee abstained from the vote to
commence this litigation.

[181]   *MeehanCombs Global Credit Opportunities Master Fund, LP, et al. v. Caesars
Entertainment Corp., et al.*, No. 1:14-cv-07091-SAS (S.D.N.Y.).

[182]   *Danner v. Caesars Entertainment Corp., et al.*, No. 1:14-cv-7973-SAS (S.D.N.Y.).

[183]   *UMB Bank, N.A. v. Caesars Entertainment Corp.*, No. 1:15-cv-4634-SAS (S.D.N.Y.).

[184]   MeehanCombs Global Credit Opportunities Master Fund, LP; Relative Value-Long/Short
Debt Portfolio, a Series of Underlying Funds Trust; SB 4 CF LLC; CFIP Ultra Master Fund, Ltd.
and Trilogy Portfolio Co., LLC.

[185]   A fully briefed motion for class certification is pending before the court.

[186]   The indentures at issue are:  those dated as of June 10, 2009, governing CEOC's 11.25%
Notes due 2017; those dated as of February 14, 2012, governing CEOC's 8.5% Senior Secured
Notes due 2020; those dated August 22, 2012, governing CEOC's 9% Senior Secured Notes due
2020 and those dated February 15, 2013, governing CEOC's 9% Senior Secured Notes due 2020.

On November 12, 2014, defendants in the MeehanCombs and Danner Actions moved to dismiss the complaints for failure to state a claim on which relief can be granted.  On January 15, 2015, the court denied the Danner Action motion in its entirety, but granted the MeehanCombs Action motion with respect to the claim arising under section 316(a) of the TIA.  Amended complaints were thereafter filed in both actions, following which the parties engaged in extensive fact discovery, which concluded on October 13, 2015.  On October 23, 2015, plaintiffs in the MeehanCombs and Danner Actions moved for partial summary judgment on counts in their respective complaints seeking declaratory judgment that CEC's guarantees are in full force and effect, alleging violations of the TIA, and alleging breach of contract.  On December 29, 2015, the court denied plaintiffs' motions, finding that there were genuine disputes of material fact as to whether the 5% Stock Sale resulted in CEOC no longer being a wholly owned subsidiary of CEC (thereby effectuating the release of the CEC Guarantee), which, in turn, precluded summary judgment as to whether the Senior Unsecured Notes Transaction violated either the TIA or the Indenture.  Trial is scheduled to begin in the MeehanCombs and Danner Actions on May 9, 2016.

On June 26, 2015, plaintiff in the UMB NY Action filed a motion for partial summary judgment, seeking a declaration that the purported CEC Guarantee Release violated section 316(b) of the TIA.  The court denied plaintiff's motion on August 27, 2015, finding that questions of fact existed as to whether the overall effect of the disputed transactions was to achieve a debt restructuring that impaired plaintiff's rights to payment, a test the court found applicable to section 316(b) violations.[187]  At the same time, however, the court *sua sponte* certified its order for interlocutory appeal, noting that its opinion addressed several issues of unresolved law.  However, the court did not do so as an alternative to proceeding with the litigation; instead, the court directed the parties to proceed with discovery, with a view to proceeding with summary judgment briefing or a bench trial at the conclusion of discovery.[188]  Plaintiff moved for leave to appeal the partial summary judgment ruling on September 9, 2015.[189]  The Second Circuit denied the motion on December 22, 2015.  On November 20, 2015, plaintiff again filed a motion for partial summary judgment declaring that 5% Stock Sale and the PIP have not resulted in the termination of the CEC Guarantee.  On January 5, 2016, the court denied plaintiff's motion, concluding that the disputed issue of material fact described in its December 29, 2015 order denying summary judgment for the MeehanCombs and Danner plaintiffs – namely, whether 5% Stock Sale resulted in CEOC no longer being a wholly owned subsidiary of CEC – likewise prevented a finding of summary judgment here.  On February 24, 2016, CEC moved for partial summary judgment on plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  Proceedings in the UMB NY action have been stayed until the sooner of:  (i) 60 days after the filing of the Examiner's Report; or (ii) May 9, 2016.  *See* discussion of the "The 105 Litigation," *infra*.

Extensive discovery has occurred in these cases, and has been made available to the Examiner.

---

[187]  No. 1:15-cv-4634-SAS (S.D.N.Y.) [Docket No. 61] (Aug. 27, 2015).

[188]  *Id.* at 34-38.

[189]  *UMB Bank, N.A. v. Caesars Entertainment Corp.*, No. 15-2854 (2d Cir.).

### d.  The UMB Bank Action[190]

On November 25, 2014, UMB Bank, as indenture trustee under the First Lien Notes indenture, filed a complaint in the Delaware Court of Chancery against various defendants,[191] seeking the appointment of a receiver to manage CEOC's affairs for the benefit of its noteholders, and asserting claims for fraudulent transfer, illegal dividends, breach of contract, intentional interference with contractual relations, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, usurpation of corporate opportunities and unjust enrichment (the "UMB Bank Action").  Plaintiff generally alleges that defendants engaged in a fraudulent scheme to strip valuable assets from CEOC on unfair terms in order to enrich themselves at the expense of CEOC's creditors, while subject to conflicts of interest resulting from multiple persons sitting on the boards of both CEOC and CEC (or a CEC affiliate).  The transactions cited by plaintiff in its complaint include the CERP Transaction, the Growth Transaction, the Online Gaming Transfers, the WSOP Transactions, the Four Properties Transaction, the CES/Total Rewards Transaction, the Sponsors' Services Agreements, the B-7 Refinancing, the Tender Offers, the 5% Stock Sale,[192] the Senior Unsecured Notes Transaction, the CEC/CEOC Intercompany Revolver Repayment, the PIK Toggle Notes Transaction, the Showboat Closure and the Atlantic Club Transaction.  In January 2015, the Vice Chancellor Glasscock entered an order consensually staying the action in light of CEOC's bankruptcy filing.

### e.  The BOKF Action[193] and the Wilmington Trust Action[194]

On March 3, 2015, BOKF, N.A., as indenture trustee under the Second Lien Notes indenture, filed a complaint in the Southern District of New York against CEC (the "BOKF Action").  On October 20, 2015, Wilmington Trust, N.A., as successor indenture trustee for the 10.75% Senior Unsecured Notes due 2016, filed a complaint in the Southern District of New York against CEC (the "Wilmington Trust Action").  Plaintiffs in these actions allege (i) breach of contract, (ii) breach of the duty of good faith and fair dealing, (iii) intentional interference with contractual relations and (iv) violations of the TIA, as well as seek (v) a declaration that, notwithstanding the CEC conveyances of CEOC stock, the B-7 financing and the Senior Unsecured Notes Transaction, the CEC Guarantee has not been terminated or released and remains enforceable against CEC.  Plaintiffs further allege that CEC irrevocably guaranteed the Second Lien Notes, and subsequently undertook a series of fraudulent transactions designed to relieve itself of its guarantee obligation.  These actions are pending before Judge Scheindlin.

---

[190] *UMB Bank v. Caesars Entertainment Corp., et al.*, C.A. No. 10393-VCG (Del. Ch.).

[191] The defendants are CEC, CEOC, CERP, CAC, CGP, CES, Gary Loveman, Jeffrey D. Benjamin, David Bonderman, Donald Colvin, Kelvin L. Davis, Fred Kleisner, Eric Press, Marc C. Rowan, David B. Sambur, Lynn Swann, Christopher Williams, Jeffrey Housenbold, Michael Cohen, Eric Hession, Ronen Stauber and Steven Winograd.

[192] Although the UMB Bank Action largely refers to the 5% Stock Sale, it appears to make oblique reference to the 6% PIP as well.  *See* Verified Complaint at ¶286(iv), *UMB Bank v. Caesars Entertainment Corp., et al.*, C.A. No. 10393-VCG (Del. Ch. Nov. 25, 2014).

[193] *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 1:14-cv-01561-SAS (S.D.N.Y.).

[194] *Wilmington Trust, N.A. v. Caesars Entertainment Corp.*, No. 1:15-cv-08280 (S.D.N.Y.).

On June 26, 2015, plaintiff in the BOKF Action filed a motion for partial summary judgment, seeking a declaration that the purported release of CEC's Guarantee violates section 316(b) of the TIA.  The court denied plaintiff's motion on August 27, 2015 in the same order issued in the UMB NY Action, finding that there is a question of fact as to whether the overall effect of the disputed transactions was to achieve a debt restructuring that impaired plaintiff's rights to payment.  Plaintiff filed for leave to appeal the partial summary judgment ruling to the Second Circuit on September 8, 2015.[195]  The Second Circuit denied the motion on December 22, 2015.  On November 20, 2015, plaintiff again filed a motion for partial summary judgment declaring that the 5% Stock Sale and the PIP have not resulted in the termination of the CEC Guarantee.  As in the UMB NY Action, on January 5, 2016, the court denied plaintiff's motion, concluding that the disputed issue of material fact described in its December 29, 2015 order denying summary judgment for the MeehanCombs and Danner plaintiffs – namely, whether the 5% Stock Sale resulted in CEOC no longer being a wholly owned subsidiary of CEC – likewise prevented a finding of summary judgment here.  On February 24, 2016, CEC moved for partial summary judgment on plaintiff's claims for breach of the implied covenant of good faith and fair dealing and intentional interference with contractual relations.  Proceedings in the BOKF have been stayed until the sooner of: (i) 60 days after the filing of the Examiner's Report; or (ii) May 9, 2016.  *See* discussion of the "The 105 Litigation" below.[196]

### f.   The 105 Litigation[197]

On March 11, 2015, the Debtors commenced an adversary proceeding in the Bankruptcy Court against plaintiffs in the Wilmington, MeehanCombs, Danner and BOKF Actions,[198] along with a motion seeking either:   (i) a declaratory judgment under sections 362(a)(1) and/or 362(a)(3) of the Bankruptcy Code extending the automatic stay to the non-Debtor affiliates named as defendants in those actions; or (ii) an injunction under section 105(a) of the Bankruptcy Code enjoining plaintiffs in these actions from pursuing their claims until the effective date of a restructuring plan or further order of the Bankruptcy Court.  Plaintiffs in the

---

[195]  *BOKF, N.A. v. Caesars Entertainment Corp.*, No. 15-2827 (2d Cir.).

[196]  Trial had been scheduled to begin in the UMB NY and BOKF Actions on March 14, 2016.  In February 2016, the parties in the UMB NY and BOKF Actions filed letters with the court regarding a proposed bifurcation of the March 14 trial.  On February 22, 2016, the Court ordered a bifurcated trial in which the first phase would center on plaintiffs' claim that the purported release of the guarantee would violate the TIA, and the second phase would try the remaining claims.

[197]  *Caesars Entertaining Operating Co., et al. v. BOKF, N.A., et al.*, No. 15-00149 (Bankr. N.D. Ill.).

[198]  BOKF, N.A.; Wilmington Savings Fund Society, FSB; MeehanCombs Global Credit Opportunities Master Fund, LP; Relative Value-Long/Short Debt Portfolio, a Series Of Underlying Funds Trust; SB 4 CF LLC; CFIP Ultra Master Fund, Ltd.; Trilogy Portfolio Co., LLC; and Frederick Barton Danner.

Wilmington, MeehanCombs, Danner and BOKF Actions opposed the motion.  On July 22, 2015, following an evidentiary hearing, the Bankruptcy Court denied the Debtors' motion.[199]

The Debtors appealed to the District Court,[200] which affirmed the Bankruptcy Court on October 6, 2015.  The Debtors then appealed to the Seventh Circuit,[201] which vacated and remanded to the Bankruptcy Court on December 23, 2015.  On December 28, 2015, the Debtors filed an application with the Bankruptcy Court for an emergency hearing on a renewed motion to enjoin plaintiffs in the Wilmington, MeehanCombs, Danner and BOKF Actions from prosecuting their cases until 60 days after the issuance of the Examiner's Report.  The Bankruptcy Court denied the motion that same day, holding that, until the Seventh Circuit issues its mandate, the Bankruptcy Court lacks jurisdiction to address the preliminary injunction on remand.

Thereafter, on December 28, 2015, the Debtors filed with the Seventh Circuit a motion for expedited issuance of the mandate so that the Bankruptcy Court could immediately rule on the Debtors' motion for an injunction on the grounds that CEC "faces imminent potentially case-dispositive summary judgment rulings in the guarantee lawsuits."[202]  On December 29, 2015, plaintiffs in the Wilmington, MeehanCombs, Danner and BOKF Actions (*i.e.*, the Appellees) filed with the Seventh Circuit an objection to the request for expedited issuance of the mandate on the grounds that there was no emergency and cause to expedite the mandate as Judge Scheindlin had denied CEC's motions for summary judgment in the Danner and MeehanCombs Actions and, accordingly, the BOKF, UMB, Danner and MeehanCombs Actions were proceeding to trial in March and May 2016.

On January 6, 2016, the Seventh Circuit denied the Debtors' motion.  On January 11, 2016, Appellees' petitioned the Seventh Circuit for a rehearing *en banc* or, alternatively, a rehearing before the panel.  The Seventh Circuit denied appellees' petition on January 25, 2016.  Accordingly, the District Court remanded the action to the Bankruptcy Court on February 18, 2016.  On remand, on February 26, 2016, the Bankruptcy Court granted the Debtors' motion in part.  Specifically, it temporarily enjoined the BOKF Action until the sooner of:  (i) 60 days after the filing of the Examiner's Report; or (ii) May 9, 2016.  The court noted that although the Debtors did not ask to have the UMB NY Action enjoined, UMB Bank, N.A. agreed to be bound by the order addressing the BOKF Action.  Therefore, the court's order effectively enjoined the UMB NY action as well.  As to the Wilmington, MeehanCombs, and Danner Actions, the motion was continued.

---

[199]  No. 15 A 149 (Bankr. N.D. Ill.) [Docket No. 158] (July 22, 2015).

[200]  *Caesars Entertaining Operating Co., et al. v. BOKF, N.A., et al.*, No. 1:15-cv-6504 (N.D. Ill.).

[201]  *Caesars Entertaining Operating Co., et al. v. BOKF, N.A., et al.*, No. 15-3259 (7th Cir.).

[202]  No. 15-3259 (7th Cir.) [Docket No. 48-1, at ¶6] (Dec. 28, 2015).

### g. The Credit Suisse Action[203]

On April 7, 2015 (as amended on April 23, 2015), Credit Suisse AG, Cayman Islands Branch, filed a complaint in New York Supreme Court against (i) certain second lien noteholders,[204] and (ii) BOKF, N.A., Delaware Trust Co. and Wilmington Savings Fund Society, FSB, as indenture trustees, alleging that defendants have taken actions deliberately intended to result in challenges to or the invalidation of the First Lien Bank debtholders' liens (the "Credit Suisse Action").   Plaintiff seeks declaratory and injunctive relief or, alternatively, money damages.

On May 4, 2015, defendants filed a notice of removal of the Credit Suisse Action to the United States District Court for the Southern District of New York, where the action was assigned to Judge Scheindlin.  On May 7, 2015, defendants sent a letter to the court requesting a pre-motion conference for the purpose of bringing a motion to transfer the action to the Bankruptcy Court for the Northern District of Illinois.  On May 12, 2015, plaintiff responded by seeking leave to file a cross-motion for mandatory abstention or equitable remand.  The court held a pre-motion conference on May 26, 2015 and directed the parties to brief the issues.  On September 9, 2015, the court granted defendants' motion to transfer and denied plaintiff's cross-motion to abstain or remand, and ordered the action transferred to the Northern District of Illinois.[205]   On October 14, 2014, the court stayed the action and placed it on the court's suspended calendar until resolution of the pending bankruptcy cases.  Plaintiff is to bring the action before the court within fourteen days of the resolution of the bankruptcy cases or when the automatic stay is lifted.

### 4. The RSAs

In 2014, the Special Governance Committee reached an agreement with certain stakeholders for a reorganization of the Debtors' affairs, memorialized in the Amended and Restated Restructuring and Forbearance Agreement, dated December 19, 2014 (together with a restructuring term sheet attached thereto (the "Original RSA").  Subsequently, the Debtors, CEC and certain of their creditor constituents continued negotiations in order to improve creditor recoveries and obtain enhanced commitments from various parties in interest, resulting in three additional restructuring agreements (collectively with the Original RSA, the "RSAs") reflective of a revised structure:

---

[203] *Credit Suisse AG, Cayman Islands Branch v. Appaloosa Investment Ltd. Partnership I, et al.*, Index No. 651134/2015 (N.Y. Sup. Ct. N.Y. Cnty.).

[204] Appaloosa Investment Limited Partnership I; Centerbridge Credit Partners Master LP; Oaktree FF Investment Fund LP; OCM Opportunities Fund VI, L.P.; Palomino Fund, Ltd.; Special Value Expansion Fund, LLC; and Tennenbaum Opportunities Partner V, LP.

[205] *Credit Suisse AG, Cayman Islands Branch v. Appaloosa Investment Ltd. Partnership I,* No. 1:15-cv-8125 (N.D. Ill.).

- On July 20, 2015, CEOC, CEC and certain second lien noteholders entered into a Restructuring Support and Forbearance Agreement (the "Second Lien RSA");[206]

- On July 31, 2015, CEOC, CEC and more than 80% of the first lien noteholders entered into the Fourth Amended and Restated Restructuring Support Agreement (the "First Lien RSA"); [207] and

- On August 21, 2015, CEOC, CEC and certain beneficial holders (the "First Lien Bank Lenders") of claims pursuant to first lien bank debt ("First Lien Bank Claims") incurred by CEOC under that certain Third Amended and Restated Credit Agreement, dated as of July 25, 2014, and Credit Suisse AG, Caymans Island Branch entered into a Restructuring Support and Forbearance Agreement (the "Bank RSA").[208]

On August 10, 2015, the Official Committee of Second Priority Noteholders (the "Second Lien Committee") commenced an adversary proceeding alleging that the Second Lien RSA constitutes vote procurement by the Debtors in violation of §1126(e) and an attempt to confirm a plan in bad faith in violation of §1129(a)(3).[209]   The Second Lien Committee also argued that a preliminary injunction barring the Debtors from advancing the First Lien RSA and Second Lien RSA was warranted, which relief the court denied on August 13, 2015.[210]   The Second Lien Committee's action remains pending.

Pursuant to the RSAs, CEOC would be restructured as two companies:  (i) an operating company ("OpCo"), which will be owned largely, if not entirely, by CEC; and (ii) a property company ("PropCo") owned and controlled by a REIT, in turn owned by First Lien Noteholders and unsecured creditors, which will be the transferee of substantially all of CEOC's real property, including all of the assets of Caesars Palace Las Vegas ("CPLV").[211]   PropCo's subsidiaries will lease their owned real property to OpCo subsidiaries pursuant to two separate leases, each with one 15 year term, subject to four five-year renewals.[212]   CEC has agreed to guaranty OpCo's performance on the leases.  The rent expense for the non-CPLV facilities is $160 million per year and $475 million per year for CPLV facilities.  All properties will continue to be managed by CEC.

---

[206]  CEC, Current Report (Form 8-K) at Item 10.01 (July 21, 2015).

[207]  CEC, Current Report (Form 8-K) at Item 10.01 (Aug. 3, 2015).

[208]  CEC, Current Report (Form 8-K) at Item 10.01 (Aug. 24, 2015).

[209]  *See generally, Complaint for Declaratory and Injunctive Relief* filed on Aug. 10, 2015, Dkt. No. 2051.

[210]  *Order Denying Oral Application to Set Emergency Motion and Continuing Motion For Preliminary Injunction*, Del. Case No. 15-00578, Dkt. No. 15.

[211]  Restructuring Term Sheet, Exhibit B to First Lien RSA ("Term Sheet") section III.

[212]  Term Sheet Annex II ("Lease and MLSA Term Sheet Summary").

PropCo, OpCo and CPLV will each issue new debt to capitalize their businesses.  The RSAs require CEC to provide the following support for the Debtors' reorganization:[213]

- (i) a $406 million cash contribution to CEOC (including $206 million in forbearance fees to First Lien Noteholders, half of which was paid upfront),[214] (ii) an additional $25 million per month in cash forbearance fees to First Lien Noteholders beginning on February 1, 2016 through the effective date (which must occur by the earlier of July 15, 2016, and 60 days after the Confirmation Order has been entered by the Bankruptcy Court), and (iii) a forbearance fee in favor of Second Lien Noteholders of at least $200 million in CEC's convertible notes;

- a contingent obligation to provide up to $75 million in exit financing;

- up to $700 million for a backstop of the First Lien Noteholders' Put Options for 100% of OpCo common stock;

- up to $269 million for a backstop of 14.8% of REIT common stock;

- a guarantee of OpCo's performance under the intercompany leases;

- a guarantee of OpCo's obligations under new indebtedness;

- an agreement to grant a right of first refusal to PropCo to own, and OpCo or CEC to lease all future non-Las Vegas domestic acquisitions;[215]

- purchase from First Lien Bank Lenders that vote to accept the plan (in order to settle pending litigation) all remaining First Lien Bank Claims in exchange for an amount equal to (i) 6.5% of principal from the petition date until the Effective Date, plus (ii) an incremental 25 basis points per quarter starting October 1, 2015 to the Effective Date (up to a maximum of 8.1%), less (iii) any adequate protection payments, less (iv) Available Cash paid to each lender on the Effective Date; and

- ongoing management services.

CEC's participation is contingent on a release of all existing claims against the Sponsors, CEC, CAC, and their directors, officers and employees, all claims other than claims under the RSAs and future claims.[216]

---

[213]  Term Sheet section IV.

[214]  Term Sheet section IV.

[215]  Term Sheet section IV.  In addition, PropCo is to be granted a 180-day call right with respect to the real property and all improvements associated with Harrah's Atlantic City and Harrah's Laughlin for a cash purchase price equal to ten times the agreed annual rent for such properties. After exercise, such properties shall be leased to CERP.  *Id.* at section IX.

As set forth in the Examiner Order, it was not initially contemplated that the Examiner would investigate any aspect of the RSAs.[217]   Certain parties-in-interest thereafter requested the Examiner to investigate two issues related to the RSAs: (a) the independence of the two members of the Governance Committee of the Board of Directors of CEOC, Ronen Stauber and Steven Winograd, and, by implication, their role in negotiating and approving the RSAs; and (b) the value of the consideration being contributed by CEC under the RSAs.  The Examiner has concluded, however, that he should not investigate or express any views regarding the value of CEC's contribution to the RSAs, given that: (i) the terms of the RSAs have not been finalized and may change materially as a result of ongoing and future negotiations; (ii) certain aspects of the RSAs (*e.g.*, the value of the REIT structure) are extraordinarily difficult to value; and (iii) the value of CEC's contribution will be heavily dependent on the overall enterprise value of CEOC upon plan consummation, which is a valuation exercise that (x) may not be necessary, depending on the outcome of the RSA negotiations, (y) would be expensive and time-consuming, and (z) would significantly delay the issuance of the Examiner's Final Report.  Accordingly, the Examiner has decided to limit his review of the RSAs to a single issue, *i.e.*, whether the two non-Sponsor affiliated members of the Governance Committee of the CEOC Board (Stauber and Winograd) meet the requisite test for "independence" under applicable law.

## IV. SUBJECTS INVESTIGATED BY THE EXAMINER

As noted above, the Examiner has been charged with investigating a significant number of transactions that occurred over a six-year period, with a view to determining whether and to what extent such transactions may by vulnerable to attack under applicable fraudulent transfer laws, as breaches of fiduciary duty or on other grounds.  The principal transactions that were the focus of the Examiner's Investigation are briefly summarized below (and are discussed in greater detail in Sections VII-IX below).  A timetable setting forth the key events relating to the Challenged Transactions over the entire relevant period is attached to this Report as Appendix 4.

### A.  Asset Transfers

#### 1.  2009 WSOP Transaction

In May 2009, through a multi-step transaction, CEOC and CLC sold their rights and/or ownership of the World Series of Poker ("WSOP") sponsorship, media and licensing business and the WSOP trademarks and related intellectual property rights (the "WSOP IP") to CIE, a newly formed indirect subsidiary of CEC that was created to pursue online play for fun and real money gaming opportunities.  In return, CEOC received (i) $15 million worth of preferred stock in a non-operating holding company, HIE Holdings Topco, Inc. ("Holdings Topco") and (ii) a perpetual exclusive, sub-licensable, royalty free license to use the WSOP IP in connection with the operation of the in-person WSOP tournaments and the manufacture, advertisement, promotion, commercialization and sale of WSOP licensed products at CEOC's and its affiliates' properties.  The Examiner has investigated whether this transfer gives rise to claims for actual

---

[216]  *See First Day Memorandum*, at 9.

[217]  The negotiation of and entry into the RSAs are not "Challenged Transactions" or "Insider Transactions" as described in the Examiner Order.  Examiner Order at 3.

fraudulent transfer, constructive fraudulent transfer, breach of fiduciary duty and/or usurpation of corporate opportunity.

### 2.   2011 WSOP Transaction

As noted above, in the 2009 WSOP transaction, CEOC received a perpetual exclusive, sub-licensable, royalty free license to use the WSOP IP in connection with the operation of the in-person WSOP tournaments (the "Tournament Rights").   In September 2011, CEOC sold its Tournament Rights, through a multi-step transaction, to CIE.   In return, CEOC received $20.5 million that was paid via a book entry to reduce CEOC's intercompany debt to CEC.   The Examiner has investigated whether this transfer gives rise to claims for actual fraudulent transfer, constructive fraudulent transfer or breach of fiduciary duty.

### 3.   2010 CMBS Loan Amendments and Trademarks Transfer

On August 31, 2010, through a series of simultaneous transactions, the commercial mortgage backed securitized financing (the "CMBS Financing") that covered the Flamingo, Rio, Paris, Harrah's Laughlin, Harrah's Atlantic City and Harrah's Las Vegas properties (collectively the "CMBS Properties") was amended to provide the right to extend the maturity date for the CMBS Financing by up to two years.   In conjunction with the 2010 amendment to the CMBS Financing, the CMBS lenders received added protections should they want Caesars to continue to manage the CMBS Properties in the event of a default.   At the same time, CLC, a subsidiary of CEOC, was required to transfer its ownership of intellectual property, including trademarks, copyrights and domain names, related to the CMBS Properties (the "CMBS IP") to subsidiaries of CEC that owned the CMBS Properties (the "CMBS PropCos").   The CMBS PropCos then executed trademark and copyright security agreements, pledging the CMBS IP as additional collateral for the amended CMBS Financing and improving the lenders' position so they – rather than Caesars – could continue to operate the CMBS Properties in the event of a default.   In return for the CMBS IP, CLC received (i) $100 for each property-specific transfer, for a total of $600, (ii) limited-use licenses of the CMBS IP, and (iii) a reversionary right to an exclusive, royalty-free, irrevocable, transferable, and sublicensable license to the CMBS IP once the CMBS Financing was repaid in full.   In its 2011 10-K, CEC reported that due to this transfer, $45.3 million in book value associated with the CMBS IP was moved from CLC to the CMBS PropCos.   The Examiner has investigated whether this transfer gives rise to claims for actual fraudulent transfer, constructive fraudulent transfer, or breach of fiduciary duty.

### 4.   Growth Transaction

The Growth Transaction refers to a series of transactions undertaken in conjunction with the creation of two new Caesars entities, CAC and CGP.   Although first conceived of by Apollo in the Summer and Fall of 2012, the Growth Transaction did not close until October 21, 2013.

CAC, a new publicly traded company, was created for the purpose of making an equity investment in CGP.   Equity ownership in CAC was distributed through a subscription rights offering made available to all CEC shareholders.   As of the Petition Date, the Sponsors and their co-investors owned or controlled 66.3% of the common stock of CAC.

CGP, a new limited liability company, was formed as a joint venture between CEC and CAC, with the stated purpose of acquiring and developing a portfolio of high-growth operating assets. CAC used the proceeds from the rights offering – approximately $1.17 billion in total – to purchase a 42% equity interest in CGP.[218]  CEC, in exchange for its contribution of certain assets, acquired the remaining 58% equity interest in CGP.

As consideration for its 58% ownership stake in CGP, CEC contributed to CGP:  (i) its interest in CIE, which included the online and social gaming company Playtika, as well as the WSOP brand and tournament hosting rights; and (ii) approximately $1.1 billion in face value of senior CEOC unsecured notes.

In addition, as part of the Growth Transaction, CEOC, through certain of its debtor subsidiaries, sold to CGP: (i) Planet Hollywood; (ii) a 52% membership interest in Horseshoe Baltimore; and (iii) 50% of CEOC's management fee rights relating to the two properties.  In return for these assets, CEOC received $360 million in cash from CGP, along with CGP's assumption of $513 million in debt associated with the properties.  The terms of the transaction were negotiated between the Sponsors and a Valuation Committee comprised of independent CEC directors.  CEOC, which had no independent directors at the time, was not separately represented or involved in the negotiations.

Questions have been raised as to whether CEOC received fair or reasonably equivalent value for the transfer of these assets and, to the extent it did not, whether the Growth Transaction constituted a breach of fiduciary duty and/or may be avoided on fraudulent transfer grounds.

### 5.    CERP Transaction

In late 2012, Apollo (on behalf of Caesars) began exploring the possibility of refinancing approximately $6.5 billion of debt secured by the six CMBS Properties.  The CMBS debt, which was incurred at the time of the LBO, was set to mature in February 2015.  Both Apollo and the CMBS lenders recognized that, as a result of the economic downturn since 2008, the value of the CMBS Properties had fallen – resulting in a significant "equity gap" that would need to be filled with additional collateral in order to create enough "debt capacity" to facilitate the refinancing. After a series of discussions, Apollo determined that it would plug this equity gap by, *inter alia*, causing CEOC to sell two properties – the LINQ (an indoor/outdoor "party district" featuring a wide variety of retail, dining, drinking and gaming options, as well as the world's largest "observation wheel") and the Octavius Tower (Caesars Palace's fifth and newest tower, containing a number of large rooms, suites and villas meant to cater exclusively to high-end guests).[219]

---

[218] *First Day Memorandum*, at 17; CEC 10-K for the year ended Dec. 31, 2015.  Note that the 2014 CEC Form 10-K states, 42.47% CAC; 57.53%.  CEC Form 10-K for the year ended Dec. 31, 2014, n. 6, at Exhibit 21.

[219] The LINQ was not yet completed at the time of the CERP Transaction, and Octavius had been completed in early 2012.

Pursuant to the transaction, the LINQ and Octavius, along with the CMBS Properties, were transferred to a new wholly owned CEC subsidiary (CERP) and served as collateral to refinance the CMBS debt.

The terms of the CERP Transaction were negotiated and determined primarily by Apollo.  There were no negotiations between CEOC and CEC over the consideration that CEOC would receive in exchange for selling the LINQ and Octavius to CERP, and no special committees were formed at either entity.  CEOC did not have independent counsel, and no one sought to secure the best possible price for the assets on CEOC's behalf.

Questions have been raised as to whether the CERP Transaction is avoidable as a constructive or actual fraudulent conveyance, whether its approval involved a breach of fiduciary duties on the part of CEOC's directors and CEC (as CEOC's controlling shareholder), and whether, if such breach existed, it was aided and abetted by the Sponsors.

### 6. Four Properties Transaction

In May 2014, CEOC, through certain of its subsidiaries, transferred to CGP the following properties:  (i) The Cromwell (f/k/a Bill's Gamblin' Hall & Saloon); (ii) Bally's Las Vegas; (iii) The Quad (later renamed The LINQ Hotel & Casino); and (iv) Harrah's New Orleans (the "Four Properties"), along with 50% of CEOC's management and termination fee rights relating to the Four Properties.  The transaction was completed in two parts for an aggregate purchase price of approximately $2 billion (including $185 million of assumed debt at The Cromwell).

As part of the transaction (and for no additional cash consideration), CEOC also (i) transferred to CGP approximately 31 acres of undeveloped land, some of which was allegedly used for parking, (ii) created CES, a joint venture between CEOC, CERP and CGP, and granted CES, a non-exclusive, fully sublicensable, irrevocable, royalty-free, fully-paid up, worldwide license to Total Rewards and to most of CEOC's intellectual property (the "Total Rewards IP"); and (iii) transferred to CES the company-wide management services which CEOC had previously provided to both CEOC and non-CEOC properties within the Caesars structure.  *See* Sections VIII.D and VIII.F below for further information regarding the CES/Total Rewards aspects of the transaction.

Special committees of independent directors of CEC and CAC negotiated certain key terms with respect to the Four Properties Transaction.  CEOC, which had no independent directors at the time, was not separately represented or involved in the negotiations.

Questions have been raised as to whether CEOC received fair or reasonably equivalent value for the transfer of these assets and, to the extent it did not, whether the Four Properties Transaction constituted a breach of fiduciary duty and/or may be avoided on fraudulent transfer grounds.

### 7. CEOC Multiple Degradation

The transfer of the Las Vegas-based properties out of CEOC in 2013 and 2014 significantly altered the complexion of CEOC.  As a result, certain creditor groups have suggested that such transformation may give rise to additional damage claims (for breach of

fiduciary duty and/or aiding and abetting) based upon the degradation of CEOC's EBITDA multiple (and resulting enterprise value) arising out of this transformation. The Examiner has investigated this claim as well.

### 8.   CES/Total Rewards

As noted above, in May 2014, as part of the Four Properties Transaction, CES was created as a joint venture between CEOC, CERP and CGP to provide centralized property management services and common management of enterprise-wide intellectual property. As part of the transaction, CEOC contributed to CES a non-exclusive, fully sublicensable, irrevocable, royalty-free, fully-paid up, worldwide license for Total Rewards IP. CES subsequently licensed such intellectual property to other property owning entities in the Caesars enterprise. CEOC received a 69% ownership interest in CES and 33% of the voting rights in CES. CERP contributed $42.5 million to CES and in return received 20.2% of the ownership interests and 33% of the voting rights in CES. CGP contributed $22.5 million to CES and in return received 10.8% of the ownership interests and 33% of the voting rights in CES. As a result, almost all employees of CEOC became employees of CES, and CEC assumed operational control over the daily running of the Caesars properties owned by CEOC, CERP and CGP.

Questions have been raised as to whether CEOC received reasonably equivalent value for the license of and loss of control over the Total Rewards IP granted to CES and, to the extent it did not, whether the transaction constituted a breach of fiduciary duty and/or may be avoided as a fraudulent transfer. Additional questions have been raised regarding whether any claims exist by virtue of the fact that as a result of cross-play among Caesars properties, CEOC exports more gaming revenue to CERP and CGP then it receives. The Examiner has investigated all of these assertions.

### 9.   Atlantic City Transactions

#### a.   The Atlantic City Waterfront Conference Center

As early as July 2008, Caesars began to shift its Atlantic City strategy to new revenue sources and customer segments for growth. As part of this strategy, Caesars began development of a major conference center to be located at Harrah's Atlantic City. Caesars completed the construction of the Conference Center at a cost of approximately $126 million. To help fund the project, CEC used a combination of tax credits from the CEOC and CERP owned casinos. Some creditors have questioned the decision to locate the Conference Center at a CERP-owned property, as opposed to next to one of CEOC's Atlantic City casinos, as well as whether CEOC received fair consideration for its contribution of tax credits and land. The Examiner has thus investigated both the decision to build the conference center at Harrah's and the fairness of the consideration CEC received.

#### b.   The Atlantic Club

In December 2013, CEOC acquired the non-gaming assets of the Atlantic Club in a bankruptcy auction for $15 million. The Atlantic Club closed in January 2014. In May 2014, CEOC sold the property with a deed restriction prohibiting it from operating as a casino for $19 million, a price that was subsequently reduced following further negotiations and four

amendments to the original sales agreement to $15.5 million.  The Examiner was asked to investigate whether CEOC had any claims based on this transaction.

### c.  The Showboat

To help stem the declining performance in Atlantic City, CEC announced on June 27, 2014 that it had decided to close the Showboat Atlantic City Casino, one of the four Atlantic City casinos owned by its subsidiaries, the others being Caesars Atlantic City, Bally's Atlantic City, and Harrah's Atlantic City.  The Showboat thereafter closed on August 31, 2014.  On December 12, 2014, CEC sold the Showboat to Richard Stockton College of New Jersey for $18 million.

Various creditors have questioned (i) the decision to close the Showboat instead of one of the other AC Casinos, (ii) whether Showboat customers were improperly directed to Harrah's Atlantic City (a CERP property) rather than to the remaining CEOC properties, and if they were, why CEOC was not compensated for this, (iii) whether the consideration for the sale of Showboat was fair, and (iv) the circumstances surrounding the elimination of a $242 million receivable due to Showboat from CEC nine months before the Showboat was closed.  The Examiner has investigated whether any of these decisions give rise to any cognizable claim(s).

### B.  Debt Transactions

#### 1.  B-7 and Tender Offers Transactions

On May 6, 2014, CEC announced that CEOC had entered into a financing situation (the "B-7 Transaction") pursuant to which CEOC obtained an additional $1.75 billion first lien term loan, along with certain amendments of CEOC's preexisting First Lien Credit Agreement that: (i) extended maturity dates; (ii) provided covenant relief; (iii) modified CEC's guarantee of obligations under the First Lien Credit Agreement from a guarantee of payment to a guarantee of collection; and (iv) provided for the repayment of lower priority debt at par plus accrued interest and a premium.

The negotiation of the B-7 Transaction was undertaken by the Sponsors and CEC. CEOC was not separately represented or involved in the negotiations.  A condition precedent to the funding of the B-7 Transaction was a requirement that CEC sell a portion of its equity in CEOC so that CEOC was no longer a wholly owned subsidiary of CEC.  The intent of the parties to the B-7 Transaction was that the sale of CEOC would result in the release of the CEC Guarantee of CEOC's bonds in accordance with the terms of the bond indentures.  Accordingly, simultaneously with the closing of the B-7 Transaction, CEC sold 5% of CEOC's equity to three institutional investors (the "5% Stock Sale").  As a result of the 5% Stock Sale, CEC has taken the position that its guarantee of $14.8 billion of CEOC Notes was released.[220]

Also, as part of the B-7 Transaction, CEOC entered into purchase agreements and announced tender offers (the "Tender Offers") for (i) 5.625% Senior Notes due 2015, and (ii) 10% Second Priority Notes due 2015.  Using loan proceeds from the B-7 Transaction, CEOC

---

[220]  *See* B-7 Figure 3: CEC Guarantee of CEOC Debt, *infra*.

paid:  (i) $1,048.75 for each $1,000 principal amount of 5.625% Notes due 2015, for a total of $830 million; and (ii) $1,022.50 for each $1,000 principal amount of 10% Notes due 2015, for a total of $193 million.

Over 50% (or over half) of the 5.625% Senior Notes due 2015 that were repurchased as part of the Tender Offers were held by CGP, an affiliate of CEC and CEOC.  As part of the Tender Offers, CEOC paid $452 million to CGP.[221]  Another 40% or so of the 5.625% Senior Notes due 2015 that were repurchased as part of the Tender Offers were held by a single investor (Chatham), which acquired most of these notes in trades just before the B-7 Transaction was announced.  Chatham also held 43% of the 10% Second Priority Notes due 2015 that were repurchased as part of the B-7 Transaction.[222]  Chatham also purchased the majority of CEOC's equity as part of the 5% Stock Sale and was one of the lenders to CEOC as part of the B-7 Transaction.  Chatham's purchase of CEOC equity assisted CEC in its plan to release its guarantee of the CEOC Notes.  Chatham received a total of $411 million from CEOC's repurchase of Chatham's holdings.[223]

The Examiner has investigated whether the B-7 Transaction, related Tender Offers and the purported release of the CEC Guarantee were fraudulent transfers or were otherwise improper or actionable.

### 2.  Guarantee Release Transaction

#### a.  5% Stock Sale

On May 5, 2014, CEC effectuated the sale of 5% of the equity in CEOC (*i.e.*, the "5% Stock Sale") to three institutional investors in a series of three private transactions – a plan that had been contemplated by CEC since October 2013.  The participating investors were Scoggin LLC, Chatham Asset Management LLC, and Paulson & Co., Inc.  Scoggin, Chatham and Paulson purchased approximately  68.1 shares and invested a total of $6.15 million.  After the sale, CEC continued to own 95% of the common stock of CEOC.  According to CEC, the sale of CEOC equity resulted in the release of the CEC Guarantee of certain CEOC bonds in accordance with the terms of certain bond indentures.

Creditors have alleged that the release of the CEC Guarantee – a consequence of the 5% Stock Sale – was a fraudulent conveyance or was otherwise unlawful and improper.  Many of the claims relating to challenges of the purported CEC Guarantee release are being litigated by creditors in actions pending in courts in Delaware and New York.  The Examiner has not investigated the claims being litigated, and has limited his investigation to the issue of whether the release of the CEC Guarantee gives rise to any claims for preference, fraudulent transfer or breach of fiduciary duty arising out of the release of the CEC Guarantee.

---

[221] *See* Appendix 12-3B: B-7 Term Loan Uses To Repurchase 5.625% Senior Notes Due 2015, *infra*.

[222] *See* Appendix 12-3A: B-7 Term Loan Uses To Repurchase 10.0% Second-Priority Notes Due 2015, *infra*.

[223] *See* Appendix 12-6: Total Paid To Noteholders, *infra*.

### b. The Performance Incentive Plan

On May 30, 2014, approximately 6% of CEOC's common stock was conveyed to 376 CEC and CEOC employees pursuant to a hastily adopted Performance Incentive Plan (*i.e.*, the "PIP"). While the PIP was loosely premised on previous employee compensation plans awarded by Caesars, the PIP was atypical given the features of the awarded stock and the hasty implementation of the plan. On June 27, 2014, CEOC reported in its 8-K that the grant of the 6% ownership interest in CEOC common stock resulted in a release of the CEC Guarantee. According to the company, the PIP served as a multi-purpose initiative, including, (i) to align employee interests with those of CEOC, (ii) to better position CEOC for a public listing of its common stock, and (iii) in the event there was still any dispute, to provide further support for the company's position that the CEC Guarantee had been released

Creditors have asserted that the PIP was a sham transaction and that its sole purpose was to bolster CEC's and the Sponsors' arguments that the CEC Guarantee had been released, and that, accordingly, the decision to approve the PIP constituted a breach of fiduciary duty on the part of CEOC's directors and CEC as controlling shareholder. The Examiner has investigated these claims.

### c. Declaratory Judgment Action

In August 2014, the CEC and CEOC Boards of Directors (with the two newly appointed CEOC independent directors abstaining) authorized the filing of a declaratory judgment action in New York state court (the "DJ Action") against certain CEOC Second Lien noteholders asserting that (i) no default had occurred under the terms of various indentures governing CEOC's debt, and (ii) CEOC's officers and directors had not committed any fraudulent transfers or breaches of fiduciary duty in connection with actions taken relating to the release of the CEC Guarantee. The Examiner investigated whether CEOC's directors breached their fiduciary duties in connection with the decision to file the DJ Action.

### 3. Senior Unsecured Notes Transaction

In September 2005, prior to the LBO, CEOC's predecessor Harrah's Operating Company, Inc. ("HOC"), issued $750 million in senior unsecured notes due 2017 with an interest rate of 5.75% (the "5.75% Senior Notes due 2017"). In June 2006, HOC issued another $750 million in unsecured notes due 2016 with an interest rate of 6.50% (the "6.50% Senior Notes due 2016") (collectively, the "Senior Unsecured Notes"). HOC/CEOC's obligations under the Senior Unsecured Notes were guaranteed by CEC.

Following the announcement of the May 6, 2014 5% Stock Sale professing to release the CEC Guarantee, counsel for certain holders of the Senior Unsecured Notes (the "Participating Noteholders") contacted CEC claiming that the purported release of the CEC Guarantee was ineffective as to the holders of the Senior Unsecured Notes and may constitute a default under the terms of the governing indentures. Negotiations between CEC and the Participating Noteholders ensued.

On August 12, 2014, CEC and CEOC consummated a privately negotiated transaction with holders of approximately $237.8 million in aggregate principal amount of the Senior

Unsecured Notes, which represented more than 51% of holders of each series of the Notes held by non-affiliates. Pursuant to the transaction, CEC and CEOC repurchased from such holders an aggregate principal amount of $155.4 million of the 2016 and 2017 Notes at par, with CEC and CEOC each paying $77.7 million. CEOC also paid accrued and unpaid interest on the Senior Unsecured Notes, and all legal and financial advisory fees and expenses of the Participating Noteholders.

The Participating Noteholders agreed to amend the indentures governing the Senior Unsecured Notes. The amended indentures: (i) removed provisions relating to CEC's guarantee of the Senior Unsecured Notes; and (ii) modified the covenant restricting the disposition of "substantially all" of CEOC's assets. Additionally, each indenture was amended so that the Participating Noteholders agreed to support future efforts to restructure CEOC's outstanding debt. CEC and CEOC also agreed that if no restructuring of CEOC occurred within 18 months of the closing of this transaction, CEC would make an additional $35 million payment to CEOC. Finally, CEC agreed, as part of this transaction, to contribute $426.6 million in principal amount of the 2016 and 2017 Notes to CEOC for cancellation. As a result of this transaction, CEOC's outstanding indebtedness with respect to the 2016 and 2017 Notes was reduced by approximately $582 million.

The Examiner has investigated whether the payments by CEOC and the modifications of the 2016 and 2017 Notes indentures made in connection with the Senior Unsecured Notes Transaction constituted fraudulent transfers or were otherwise improper or actionable.

### 4.  PIK Notes Transaction

Pursuant to an indenture dated February 1, 2008, CEOC issued 10.75%/11.5% toggle notes which were due to mature in 2018 (the "PIK Notes"). The notes were toggle notes pursuant to which CEOC was permitted to pay interest either in kind or in cash until February 1, 2013, but thereafter was required to pay interest in cash. In late September 2014, U.S. Bank, the trustee under the PIK Notes Indenture, informed CEOC that interest continued to be paid in kind after February 1, 2013 and that certain holders requested that this non-payment be remedied.

To remedy this default, on December 3, 2014, CEOC redeemed the PIK Notes at a cost of approximately $18 million, including payment of $4.6 million to CEC for PIK Notes it received in connection with the first Growth Transaction. Prior to CEOC's decision to call these notes, they were trading at a steep discount to par.

The Examiner has investigated whether the redemption of the PIK Notes gives rise to claims for breach of fiduciary duty, preference and/or fraudulent transfer.

### 5.  Intercompany Transactions

#### a.  The Sponsors' Services Agreements

As part of the LBO, the Sponsors entered into the Sponsor Services Agreement (the "SSA") with CEC, pursuant to which the Sponsors agreed to provide certain management, advisory and consulting services to CEC to the extent that such services were requested by CEC and were mutually agreed to by the Sponsors. In exchange, CEC agreed to pay the Sponsors (i) a

$200 million "Transaction Fee" upon closing of the LBO, (ii) an annual "Monitoring Fee" equal to the greater of $30 million or 1% of CEC's EBITDA, and (iii) "Subsequent Fees" to be paid in connection with certain financial transactions.

From the LBO through 2014, in addition to the Transaction Fee, the Sponsors were paid $167.6 million in Monitoring Fees. Although CEOC was not a party to the SSA, it was allocated and paid approximately 70% (or $117 million) of the Monitoring Fees to the Sponsors. CEOC, however, was reimbursed by CEC for the amounts it was allocated and paid to the Sponsors as a result of offsetting intercompany balances identified as part of Project Simplification.

The Examiner has investigated whether the SSA fees paid by CEOC to the Sponsors (i) may be avoided and recovered as preferences or constructive and/or actual fraudulent transfers, or (ii) constitute breaches of fiduciary duty or unjust enrichment.

### b. The Intercompany Revolver

In August 2008, CEOC and CEC entered into the Intercompany Revolver, which provided for a committed $200 million unsecured revolving credit facility with a stated maturity date of January 29, 2014. Interest was charged at a rate equal to LIBOR plus 3% per annum and could either be paid annually in arrears or added to outstanding principal. Through a series of amendments, in December 2010 and February 2011, the aggregate principal amount was increased to $500 million and $750 million, respectively. The largest amount outstanding totaled $644.1 million on November 14, 2012.

In November 2012, the agreement was amended and restated whereby the maximum principal amount was increased to $1 billion, the facility became uncommitted, the interest was made payable quarterly and the maturity date was extended to November 17, 2017. In June 2014, CEOC repaid the outstanding balance of $261.8 million, and the Intercompany Revolver was amended pursuant to which, among other things, the facility was converted to a committed facility, the maximum principal amount was reduced to the amount being repaid and the maturity date was shortened from November 2017 to June 2016. Thereafter, there were no further advances under the Intercompany Revolver. Between August 2008 and June 2014, CEC advanced a total of $1.8 billion to CEOC under the Intercompany Revolver, and CEOC repaid the entire principal amount plus over $47 million in accrued interest.

The Examiner has investigated whether CEOC's payments to CEC under the Intercompany Revolver (i) may be avoided and recovered as preferences or constructive and/or fraudulent transfers, or (ii) constituted breaches of fiduciary duty.

### c. CEOC Intercompany Loan

During 2009, CEOC loaned $235 million to CEC from funds it borrowed from its secured revolving credit facility. No written documentation was executed in connection with this loan. On June 25, 2010, CEC repaid the outstanding principal balance of $235 million. Although CEOC incurred approximately $5.8 million in interest expense in respect of such funds, CEC paid no interest to CEOC. The Examiner has investigated whether the CEOC Intercompany Loan (i) may be avoided as a constructive and/or actual fraudulent transfer or (ii) constituted a breach of fiduciary duty.

### d.  Other Intercompany Transactions

The Examiner also investigated additional intercompany transactions, including: (i) 13 Intercompany Notes issued by CEOC and certain of its debtor and non-debtor subsidiaries; and (ii) the effect on CEOC of the "clean up" of various intercompany balances and equity accounts known as Project Simplification.

### C.  Tax Issues

As part of the Examiner's Investigation, the Examiner has also investigated two issues relating to CEC's utilization of certain net operating losses ("NOLs") generated by the Debtors: (i) whether the Debtors are entitled to any additional amounts from CEC with respect to a $276.6 million federal income tax refund that was received by CEC in 2009 attributable to the carryback of certain Debtor NOLs with respect to the taxable years 2005 through 2008; and (ii) whether the Debtors are entitled to future compensation from CEC arising out of the utilization of the Debtors' NOLs by CEC or other non-debtor Caesars entities from 2005 through the date immediately prior to the date of the Debtors' restructuring pursuant to the RSAs and plan of reorganization.

### D.  The LBO

On January 28, 2008, affiliates of Apollo and TPG, along with certain co-investors, acquired Caesars (then known as Harrah's Entertainment, Inc.) for approximately $30.7 billion in a leveraged buyout agreed to in 2006.  The Sponsors and co-investors contributed approximately $6.1 billion in cash to fund the LBO.  The remaining consideration was funded through the issuance of approximately $24 million in debt to CEOC, approximately $19.7 billion of which was (i) guaranteed by CEC and (ii) secured by liens on substantially all of the Debtors' assets.  Of the approximately $24 billion in debt, $7.5 billion repaid existing debt and $4.6 billion was rolled over from pre-LBO debt; thus, approximately $11.9 billion was incremental debt.  A significant portion of the incremental debt was funded through the creation of a CMBS structure whereby six of CEOC's operating casinos were transferred for no consideration at the time of the LBO into the CMBS structure (where they effectively became subsidiaries of CEC).  Certain creditor constituents have suggested that the LBO contains features which could be avoided as fraudulent transfers, including (i) pledges by CEOC subsidiaries of their assets to secure the debt (so-called "*Tousa*" claims), (ii) the transfer of six CEOC properties for no consideration to the CMBS structure, and (iii) the creation of a large payable on CEC's books in connection with the creation of the CMBS structure which was "equitized" in 2012.  Additional gating issues have been raised as to whether CEOC was at the time, or was rendered insolvent as a result of the LBO, and whether any claims relating to or arising out of the LBO would be time-barred or alternatively, whether there exists a so-called "golden creditor" that would extend the statute of limitations for certain claims to 10 years, and, if so, whether the Bankruptcy Court would recognize such an exception.  The Examiner has investigated each of these gating issues.

# V. SOLVENCY, UNREASONABLY SMALL CAPITAL AND INABILITY TO PAY DEBTS AS THEY COME DUE

The Examiner's evaluation of the potential claims resulting from transactions under investigation requires an analysis of CEOC's financial condition at the time of those transactions. This section contains the analysis and conclusions with respect to CEOC's financial condition and solvency during the period 2008 through 2014.

## A. General Introduction to Solvency Analysis

In order to prevail on a preference action under the Bankruptcy Code, the debtor must be insolvent at the time of the transfer.[224]  For an actual fraudulent transfer claim, insolvency is one of the classic badges of fraud.[225]  To prevail on a constructive fraudulent transfer claim, the debtor must, at the time of the transfer:  (i) be insolvent, or rendered insolvent as a result of the transfer; (ii) have unreasonably small capital; or (iii) be unable to pay its debts as they come due.[226]  Each of these financial conditions is discussed below.[227]

A debtor's financial condition may also be relevant in analyzing fiduciary duty claims. Directors and officers of an insolvent Delaware corporation should consider the interests of creditors.[228]  Their fiduciary duties thus require them to operate the insolvent company for the benefit of the entity, but the residual claimants are now creditors.[229]

### 1. Insolvency/Balance Sheet Test

Under the Bankruptcy Code, a debtor is insolvent when "the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."[230]  The UFTA defines insolvency the same way.[231]  Courts employ this "balance sheet test" to determine whether a

---

[224]  *See* Appendix 5, Legal Standards at II.

[225]  *Id*. at III.A.1.

[226]  *Id*. at III.B.

[227]  A plaintiff need establish only one of these three financial conditions.

[228]  *Quadrant Structured Prods. Co., Ltd. v. Vertin*, C.A. No. 6990-VCL, 2015 WL 2062115, at *7 (Del. Ch. May 4, 2015).

[229]  *Id*.

[230]  11 U.S.C. §101(32)(A).

[231]  *See* Del. Code Ann. tit. 6, §1302(a) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."); Nev. Rev. Stats. §112.160(1) (same); N.J. Stat. Ann. §25:2-23 (same); *see also Baldi v. Samuel Son & Co.*, 548 F.3d 579, 581 (7th Cir. 2008) ("Insolvency is defined by both statutes as having a balance sheet on which liabilities exceed assets.").

debtor is insolvent.[232]   The test is a mathematical calculation of whether "the sum of [the transferor's] debts is greater than all of [its] assets at a fair valuation."[233]

Fair valuation "is generally defined as the going concern or fair market value '[u]nless a business is on its deathbed.'"[234]  Fair market value generally means the amount that can be obtained from a sale of the assets within a reasonable amount of time.[235]  Stated otherwise, the fair market value of a going concern is what "an informed willing seller under no compulsion to sell and an informed willing buyer not pressed for an immediate return would attribute to the property."[236]

"Debts" include liabilities on a claim, and the term "claim" has been defined as broadly as possible.[237]  A court need not determine a precise value for each asset or liability; rather, a court need only determine whether the debtor's liabilities exceeded the debtor's assets.[238]

Courts may look to contemporaneous market evidence to determine whether a company is solvent.[239]  Market evidence can include the value of publicly traded stock and debt

---

[232]   *See, e.g.*, *Baldi v. Samuel Son & Co.*, 548 F.3d at 581; *Paloian v. LaSalle Bank Nat'l Assoc. (In re Doctors Hosp. of Hyde Park, Inc.)*, 507 B.R. 558, 632 (Bankr. N.D. Ill. 2013); *Tese-Milner v. Edidin and Assoc., (In re Operations NY LLC)*, 490 B.R. 84, 97 (Bankr. S.D.N.Y. 2013) (citing *Universal Church v. Geltzer*, 463 F.3d 218, 226 (2d Cir. 2006)); *In re Iridium Operating LLC*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007); *In re Total Technical Servs., Inc.*, 150 B.R. 893, 899 (Bankr. D. Del. 1993).

[233]   11 U.S.C. §101(32)(A).

[234]   *Fisher v. Enter. Truck Line, Inc. (In re CXM, Inc.)*, 336 B. R. 757, 760 (Bankr. N.D. Ill. 2006) (quoting *Stationery Stores, Inc. v. Southworth Co. In re Utility Stationery Stores, Inc.*), 12 B.R. 170, 176 (Bankr. N.D. Ill. 1921); *see also Tronox Inc. v. Kerr McGee Corp.*, 503 B.R. 239, 239 (Bankr. S.D.N.Y. 2013) ("*Tronox II*"); *Mellon Bank, N.A. v. The Official Comm. of Unsecured Creditors of R.M.L., Inc., (In re R.M.L., Inc.)*, 92 F. 3d 139, 154-55 (3d Cir. 1996); *In re Solomon*, 299 B.R. 626, 638 (10th Cir. B.A.P. 2003).

[235]   *See Durso Supermarkets, Inc. v. D'Urso (In re Durso Supermarkets, Inc.)*, 193 B.R. 682, 701 (Bankr. S.D.N.Y. 1996); *Lids Corp. v. Marathon Inv. Partners, L.P.*, *(In re Lids Corp.)*, 281 B.R. 535, 541 (Bankr. D. Del. 2002).

[236]   *Durso Supermarkets*, 193 B.R. at 701; *Covey v. Commercial Nat. Bank of Peoria*, 960 F.2d 657, 660 (7th Cir. 1992) ("What would a buyer be willing to pay for the debtor's entire package of assets and liabilities?").

[237]   11 U.S.C. §101(12); *see also Tronox II*, 503 B.R. at 309.

[238]   *In re W.R. Grace & Co.*, 281 B.R. 852, 866 (Bankr. D. Del. 2002); *Briden v. Foley*, 776 F.2d 379, 382 (1st Cir. 1985) ("This balance sheet test focuses on the fair market value of the debtor's assets and liabilities within a reasonable time of the transfers.  Asset valuation need not be exact.").

[239]   *VFB LLC v. Campbell Soup Co.*, 2005 WL 2234606 at *31 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624, 632-34 (3d Cir. 2007); *Iridium Operating LLC*, 373 B.R. at 352 (same).

instruments at the time of the transaction,[240] other valuations resulting from private transactions and market data regarding similar assets or contemporaneous transactions.[241]

While contemporaneous market evidence may, in certain circumstances, be strong evidence of solvency, it is not necessarily conclusive.[242] Contemporaneous market evidence is not always reliable. In summarily rejecting the defendant's evidence that Tronox's issuance of $450 million in bonds was proof of its solvency, the court noted:

At the outset, Defendants' reliance on Tronox's ability to issue $450 million in debts does not deserve any weight in the solvency analysis. The debt that Tronox issued was secured by all of the assets of the Tronox companies, and the sophisticated lenders who bought this debt well knew they would come first in any bankruptcy of liquidation of the enterprise.[243]

Similarly, if a large number of contingent liabilities have to be valued, a company's substantial market capitalization alone is not sufficient to establish solvency.[244]

In addition to market evidence, courts also rely on testimony from valuation experts to determine solvency. This is especially true where, for some specific reason, the market evidence "cannot be relied on to determine solvency or insolvency."[245] The three standard, but not

---

[240] The Seventh Circuit has cautioned, however, that a positive price for a firm's stock does not conclusively establish solvency. *Paloian v. LaSalle Bank, N.A. (In re Doctors Hosp. of Hyde Park, Inc.)*, 619 F.3d 688, 694 (7th Cir. 2010) (positive price is only "very likely" as opposed to "certain" in connection with establishing solvency because even stock of a bankrupt company has option value). Here, of course, as discussed elsewhere in this Report, CEOC had no publicly traded stock and a negative equity value, and its debt, in particular its second lien and unsecured debt, was trading at a deep discount to par when most of the transactions under investigation occurred.

[241] *See, e.g.*, *VFB*, 2005 WL 2234606, at *22 (citing *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002); *Cooper v. Ashley Commc'n Inc. (In re Morris Commc'n NC, Inc., I.D. No. 56-13357778, Debtor)*, 914 F. 2d 458, 469 (4th Cir. 1990); *PHP Liquidating, LLC v. Robbins (In re PHP Healthcare Corp.)*, 128 F. App'x 839, 848 (3d Cir. 2005)). Proof of insolvency can also include "the use of balance sheets, financial statements, appraisals, expert testimony, and other affirmative evidence." A company's GAAP financial statements may "provide a starting point" but they "are not automatically dispositive." *Quadrant Structured Prods. Co., Ltd.*, 2015 WL 6157759, at *16; *Barber v. Prod. Credit Servs. of W. Cent. Ill. (In re KZK Livestock, Inc.)*, 290 B.R. 622, 625 (Bankr. C.D. Ill. 2002) ("[N]o GAAP exist for analyzing the insolvency of a company."); *Lids Corp.*, 281 B.R. at 542-43.

[242] *In re W.R. Grace & Co.*, 446 B.R. 96, 106 (Bankr. D. Del. 2011).

[243] *Tronox II*, 503 B.R. at 298.

[244] *W.R. Grace & Co.*, 446 B.R. at 105-06, and n.11.

[245] *Tronox II*, 503 B.R. at 296 (market did not efficiently determine size of Tronox's environmental liabilities); *W.R. Grace & Co.*, 446 B.R. at 105-06, n.11 (market evidence was "not conclusive" relating to size of asbestos liability).

exclusive, valuation approaches are: (i) a discounted cash flow analysis; (ii) a comparable company analysis; and (iii) a comparable transaction analysis.[246]

The discounted cash flow analysis, which the *Tronox II* court described as the most commonly used approach, determines the company's business enterprise value "by examining the earning capacity of the enterprise over a reasonable period of time, adds a residual or terminal value to extend the analysis beyond the chosen period, and then discounts the results to present value."[247] The comparable company analysis "attempts to determine value by reference to the value of companies in the same line of business."[248] Similarly, the comparable transaction analysis attempts to determine value by reference to comparable transactions in the marketplace.[249]

When determining solvency, "assets and liabilities must be valued based upon information *known or knowable* as of the date of the challenged transfer."[250] The Seventh Circuit has clearly stated that "subsequent events are not considered in fixing fair market value" and "[i]nformation that the willing buyer could not have known is obviously irrelevant . . . ."[251] More recently, the Seventh Circuit reiterated that "[h]indsight bias is to be fought rather than embraced."[252] Accordingly, courts should not use hindsight to evaluate whether a debtor was insolvent at the time of the transfer.[253] Instead, only events that were "reasonably foreseeable" as of the valuation date should be considered.[254]

---

[246] *Tronox II*, 503 B.R. at 316 ("There are three standard approaches that have been used in many cases, and they follow certain well-trod paths.") (citing *In re Granite Broad. Corp.*, 369 B.R. 120, 143 (Bankr. S.D.N.Y. 2010)).

[247] *Id*. at 316.

[248] *Id*. at 317.

[249] *Id*. at 318.

[250] *Sharp v. Chase Manhattan Bank USA, N.A., (In re Commercial Fin. Servs., Inc.)*, 350 B.R. 520, 541 (Bankr. N.D. Okla. 2005).

[251] *First Nat'l Bank of Kenosha v. U.S.*, 763 F.2d 891, 894 (7th Cir. 1985).

[252] *Doctors Hosp. of Hyde Park, Inc.*, 619 F.3d at 688.

[253] *See id.* at 693 ("Hindsight bias is to be fought rather than embraced.") (citing *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 794-95 (7th Cir. 2009)). *In re R.M.L., Inc.*, 92 F.3d 139, 155 (3d Cir. 1996) ("The use of hindsight to evaluate a debtor's financial condition for purposes of the Code's 'insolvency' element has been criticized by courts and commentators alike.").

[254] *Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. 558, 646 (N.D. Ill. 2013) ("[I]nformation that the hypothetical willing buyer could not have known is obviously irrelevant, and subsequent events are not considered in fixing fair market value, except to the extent that they were reasonably foreseeable at the date of the valuation."); *In re Longview Aluminum, L.L.C.*, 2005 WL 3021173, at *8 (Bankr. N.D. Ill. July 14, 2005) (indicating that the expert's report on the expectations of industry observers regarding future electricity prices was not sufficiently

Statements by some courts, however, taken out of context appear to suggest that hindsight evidence may be acceptable in some cases. For example, in *VFB LLC v. Campbell Soup Co.*, the Third Circuit stated, in part, that "[a] company's actual subsequent performance is something to consider when determining *ex post* the reasonableness of a valuation."[255] But the court was looking at the issue in the context of egregious facts impacting the reliability of the contemporaneous available market information. In particular, the Third Circuit found that because the defendant omitted financial information about the debtor at the time of the spin and thereby mislead the market, the district court properly relied on market capitalization data that became available after the omitted financial information was disclosed to investors.[256] Moreover, the court went on to say that the company's actual subsequent performance "is not, by definition, the basis of a substitute benchmark."[257] Quoting from one of its earlier decisions, the Third Circuit underscored that "[t]he use of hindsight to evaluate a debtor's financial condition [is improper]."[258] Instead, "[e]arnings projections 'must be tested by an objective standard anchored in [a] company's actual performance,' but such a test applies to information about a company's performance available 'when [the projection is] made.'"[259]

While condoning the use of subsequent information under the unique facts of the case, the *VFB* court did not hold that a company's subsequent performance statistics should be considered in a valuation analysis. Rather, the court ultimately affirmed the lower court's finding that each of the plaintiff's expert's analysis was flawed due to hindsight bias.[260]

The *VFB* court's analysis is consistent with its earlier decision in *Moody*. The *Moody* court made clear that "[b]ecause projections tend to be optimistic, their reasonableness must be tested by an objective standard anchored in the company's actual performance."[261] The very

---

supported by the evidence that was reasonably knowable on the valuation date); *see also Union Bank of Switz. v. Deutsche Fin. Servs. Corp.*, No. 98 Civ. 3251 (HB), 2000 WL 178278, at *8 (S.D.N.Y Feb. 16, 2000) (declaring there was no evidence of store closings or proposed store closings available on the valuation date, and therefore, reliance on such information was improper); *In re WRT Energy Corp.*, 282 B.R. 343, 383 (Bankr. W.D. La. 2001) (explaining that the failure of the debtor's gas wells foreseeable on the valuation date and the use of such information in the valuation of the debtor's assets was inappropriate hindsight evidence).

[255] *VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (citing *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1073 (3d Cir. 1992)).

[256] *Id.* at 632. ("In light of VFI's $1.1 billion market capitalization nine months after the spin [when the concealed information had been disclosed to the market], the Division businesses were worth indeed far more than $500 million [on the date of the spin.]").

[257] *Id.*

[258] *Id.* (quoting *In re R.M.L., Inc.*, 92 F.3d at 151).

[259] *Id.* (quoting *Moody*, 971 F.2d at 1073).

[260] *Id.* at 629, 633 (citing the lower court opinion which found "Owsley, Titman and Hallman's analyses flawed, primarily due to hindsight bias, that is, their use of assumptions about VFI that were not shared by the informed public markets at the time of and after the spin.").

[261] *Moody*, 971 F.2d at 1073.

next sentence of the court's opinion clarifies that its reference to the company's "actual performance" is to its *historical* performance, not its *future* performance:  "However, reliance on historical data alone is not enough.  To a degree, parties must also account for difficulties that are likely to arise, including interest rate fluctuations and general economic downturns, and otherwise incorporate some margin for error."[262]

While applying a valuation standard based on information available at the time of the transfer, the *Moody* court nonetheless proceeds to validate its valuation conclusion by reference to the debtor's subsequent performance.[263]  Despite this reference, the court does not ultimately adopt a valuation standard based on the use of hindsight.  Rather, like some courts which espouse the familiar "known or knowable" standard, the *Moody* court engages in a form of "stress testing" of the valuation conclusion by reference to subsequent events.

Thus, the decision in *Moody* is entirely consistent with the general rule that projections may be reasonable so long as they include all reasonably foreseeable information even if those projections ultimately prove to be incorrect.  Similarly to *VFB*, the court actually affirmed the decision of the district court to exclude certain expert testimony because the experts improperly used hindsight in their valuations.[264]  Thus, both decisions are consistent with the general rule that hindsight evidence should not be considered.

## 2.  Unreasonably Small Capital Test

Unreasonably small capital is "'a financial condition short of equitable [or balance sheet] insolvency' and . . . the focus of the test is on transfers 'that leave the transferor technically solvent but doomed to fail.'"[265]  "'[U]nreasonably small capital' means 'difficulties which are short of insolvency in any sense but are likely to lead to insolvency at some time in the future.'"[266]  In particular, the term "refers to the inability to generate sufficient profits to sustain operations."[267]

---

[262]  *Id.*

[263]  *Id.* at 1074 (stating "[the company's] actual performance after the acquisition supports the district court's finding that the parties' projections were reasonable.").

[264]  *Id.* at 629 ("The district court also addressed the expert witnesses' valuations in some detail, finding . . . Owsley, Titman and Hallman's analyses flawed, primarily due to hindsight bias.").

[265]  *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 297, 396 (S.D. Tex. 2008).

[266]  *Id.* at 321 (quoting *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 137 (Bankr. D. Mass. 1989)).  Another articulation of this test found in cases decided under the UFTA is "a general inability to generate enough cash flow to sustain operations."  *In re Sheffield Steel Corp.*, 320 B.R. 423, 445 (Bankr. N.D. Okla. 2004); *see also Pioneer Home Builders, Inc. v. Int'l Bank of Commerce (In re Pioneer Home Builders, Inc.)*, 147 B.R. 889, 894 (Bankr. W.D. Tex. 1992).

[267]  *ASARCO*, 396 B.R. at 396 (citing *Peltz v. Hatten*, 279 B.R. 710, 744 (D. Del. 2002)); *Moody*, 971 F.2d at 1070.

Whether the debtor has "unreasonably small capital" must be ascertained based on a review of the capital structure of the debtor's business.[268]   Courts generally examine a debtor's cash flow to determine "whether it [the debtor] was left in a position in which it was unable after the transfer to generate sufficient profits to sustain operations."[269]   Courts focus hard on the debtor's projections, recognizing that "the 'critical question is whether the parties' projections were reasonable,' and that the "projections must be tested by an objective standard anchored in the company's actual performance."[270]   In determining their reasonableness, courts also evaluate whether they left any margin for error.[271]   When undertaking this objective analysis, courts rely on relevant historical data (including cash flow, net sales, gross profit margins and net profits) and any future difficulties likely to arise (including interest rate fluctuations, general economic downturns and other factors).[272]

The concept of capital adequacy recognizes that there is no universal metric applicable in all situations.[273]   Capital needs can vary greatly by company, industry and the condition of the economy.[274]   As a result, the assessment must take into account the nature and circumstances of the company at hand, recognizing that certain businesses in certain industries may need more capital than others and that the need for capital may be affected by the current state of the industry or economy.[275]

### 3.   Inability to Pay Debts Test

A debtor lacks the ability to pay its debts if, at the relevant time, it "intended to or believed that it would incur debts beyond its ability to pay as they matured."[276]   Courts have explained that the inability to pay debts test has both "a subjective and objective component, *i.e.*, that the debtor was objectively unable to pay its debts or reasonably should have come to that

---

[268]   *In re WRT Energy Corp.*, 282 B.R. 343, 411 (Bankr. W.D. La. 2001).

[269]   *Tronox II*, 503 B.R. at 320 (quoting *In re Sheffield Stell Corp.*, 320 B.R. 423, 445 (Bankr. N.D. Okla. 2004)).

[270]   *Tronox II*, 503 B.R. at 320-321 (quoting *Moody*, 971 F.2d at 1073); *In re WRT Energy*, 282 B.R. at 411.

[271]   *Id.* at 321; *Moody*, 971 F.2d at 1073.

[272]   *Id.*

[273]   *Barrett v. Cont'l Ill. Nat'l Bank & Trust Co.*, 882 F.2d 1, 5 (1st Cir. 1989).

[274]   *See, e.g., MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 917, 944 (S.D.N.Y. 1995) (working capital needs vary, and "airport-based businesses that provide fuel, maintenance, hangaring and other services" and are able to "operate with small working capital").

[275]   *MFS/Sun Life*, 910 F. Supp. at 944; 5 Collier on Bankruptcy ¶548.05[3][b].

[276]   11 U.S.C. §548(a)(1)(B)(i)(ii)(III); *see also* Del. Code Ann. tit. 6, §1304(a)(2)(b); 740 Ill. Comp. Stat. Ann. 160/5(a)(2)(b); Nev. Rev. Stat. §112.180.1(b)(2); 28 U.S.C. §304(b)(1)(B)(ii).

conclusion."[277]   Failing to satisfy either the objective or subjective criteria at the time of the transfer is all that is necessary to meet the inability to pay debts test.[278]   The requisite subjective intent can be inferred where "the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured."[279]   While the objective test may be more short-term than the unreasonably small capital test, the subjective test focuses on whether the debtor believed or should have believed that it would be able to pay its debts further into the future as they come due.[280]

Courts consider a variety of factors to determine whether a debtor is not paying debts as they become due, including "(1) the number of debts; (2) the amount of any delinquency; (3) the materiality of non-payment; and (4) the nature of the debtor's conduct of its financial affairs."[281] In evaluating these factors, courts often consider contemporaneous cash flow projections prepared by management, the debtor's payment history and practices, the lapse of time prior to payment of invoices, check holds to vendors, whether there were past due accounts, demand letters or other collection efforts against the debtor and liquidity and leverage issues similar to those analyzed under the unreasonably small capital test.[282]

In their submissions to the Examiner and during their interviews, the Sponsors and CEC have focused on the objective cash flow test to the exclusion of the other tests for determining solvency, unreasonably small capital and ability to pay debts as they come due.   The Examiner has carefully considered these submissions and has concluded that not only do they ignore the other tests, they are contradicted by overwhelming evidence that was known or knowable throughout the relevant period demonstrating that CEOC was insolvent, undercapitalized and unable to pay its debts when they came due.

---

[277]   *Tronox II*, 503 B.R. at 323-24 (citing *ASARCO*, 396 B.R. at 399); *Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. at 635-636 ("the intent requirement can be inferred where the facts and circumstances surrounding the transaction show that the debtor could not have reasonably believed that it would be able to pay its debts as they matured.").

[278]   *Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. at 636 (a fraudulent transfer analysis "focuses on the time of the transfer and on what the debtor's intended at that point, not at some later point in time."); *ASARCO*, 396 B.R. at 399 ("this test has an objective and subjective prong, and the test is satisfied if either prong is met"); *WRT Energy Corp.*, 282 B.R. at 415.

[279]   *WRT Energy Corp.*, 282 B.R. at 415; *see also Braunstein v. Walsh (In re Rowanoak Corp.),* 344 F. 3d 126, 133-34 (1st Cir. 2003); *Doctors Hosp. of Hyde Park, Inc.*, 507 B.R. at 635-36.

[280]   *Tronox II*, 503 B.R. at 324 (although Tronox was paying its debts as they matured in the short run, the defendant should have been aware that Tronox would not be able to satisfy its contingent legacy liabilities even though they might not mature for years to come).

[281]   *ASARCO*, 396 B.R. at 401-02 (citing *In re Reed*, 11 B.R. 755, 759-60 (Bankr. S.D. W.Va. 1981)).

[282]   *Id*. at 399-400 (awareness of inability to pay debts existed because vendors and legal professionals were left unpaid, millions of dollars in asbestos obligations existed and the company maintained extensive "hold lists" during the relevant time period).

### B.   Summary of Findings

#### 1.   Contemporaneous Indicia of CEOC's Insolvency

There were many contemporaneous indicia that CEOC was insolvent at December 31, 2008; December 31, 2009; December 31, 2010; December 31, 2011; December 31, 2012; December 31, 2013; and December 31, 2014 (the "Solvency Dates").[283]  These indicia included the following:

- During the years after the LBO, EBITDA at CEOC was only able to fund an average of 62 cents of every dollar of interest expense.

- From year end 2008 through 2014, CEOC had on average 55% more liabilities per asset, net of goodwill, than the weighted median of CEOC's Industry Peers,[284] ranging from a low of 42% in 2009 to a high of 76% in 2014.

- Between 2008 and 2014, interest expense grew from 23% to 44% of net revenue, three to five times the weighted median of CEOC's Industry Peers.

- From the time of the LBO through December 31, 2014, the cash flow generated from operations was negative $1.908 billion.  In fact, from 2009 through 2014, CEOC did not generate cash sufficient to pay its operating expenses (which includes interest) or repay the principal amount of its debt.

---

[283]   Financial data utilized in analyzing solvency captures cumulative data over a period of time, or particular conditions at a point in time.  By definition a solvency analysis cannot make specific determinations at every point in time over a lengthy period during which challenged transactions may occur.  Accordingly, a concept termed "retrojection" is used to evaluate the intermediate points in time subject to a solvency analysis.  The retrojection rule provides that where a debtor is shown to be insolvent on the first known date and the last relevant date, and there is an absence of any substantial or radical changes in the assets or liabilities of the debtor between the two dates is demonstrated, then the debtor is deemed to be insolvent at all intermediate times.  In the case of CEOC, solvency was determined as of each of the Solvency Dates, and retrojection was used to determine the solvency at various intermediate dates.

[284]   The companies identified and utilized as CEOC's Industry Peers throughout the solvency section of this Report are:  Wynn Resorts, Ltd.; MGM Resorts International; Boyd Gaming Corporation; Penn National Gaming Inc.; Isle of Capri Casinos, Inc.; Pinnacle Entertainment Inc.; Monarch Casino & Resort Inc.; and Churchill Downs Inc. ("CEOC's Industry Peers"). Unless otherwise noted, comparisons made in this section of the Report are to the weighted median of CEOC's Industry Peers.  The weighted median is calculated as the sum of (1) the median of the entities in the Las Vegas market (Wynn and MGM) multiplied by the percentage of CEOC's EBITDA from properties on the Strip in Las Vegas and (2) the median of all other Industry Peers (Boyd, Penn, Isle of Capri, Pinnacle, Monarch and Churchill Downs) multiplied by the percentage of CEOC's EBITDA from properties not on the Strip in Las Vegas.

- Financial analyses created by Apollo in 2011, 2012, 2013 and 2014 demonstrated the dire financial condition of CEOC and Apollo's awareness of that fact. In an analysis dated October 4, 2013, Apollo showed that even in its best case for earnings before interest, taxes, depreciation and amortization ("EBITDA"), CEOC could not come close to paying its creditors in full, and CEOC's equity had no value.

- Analyst commentary as early as 2012 indicated that there was no real equity value to CEOC.[285]

- 

- A June 2013 Deutsche Bank presentation to each of the Sponsors – Apollo and TPG – estimated that the equity value of CEOC was negative $5.8 billion.[287]

- A November 2013 Apollo presentation to the CEC Board of Directors calculated that CEOC's net debt exceeded its enterprise value by $3.7 billion.[288]

Significantly, CEOC's financial condition was projected to deteriorate as a result of the Four Properties Transaction. Although this transaction may have provided some "runway" for CEOC, an internal analysis showed that its financial condition would nonetheless deteriorate following the transaction, including:

- Decreased revenue and EBITDA

- Decreased cumulative cash flow

- Increased leverage ratio

- Decreased interest coverage ratio

---

[285] Aug. 22, 2012 Barclays Report "Patiently Waiting; Initiating coverage at UW" at 11; Jul. 16, 2012 RBC Capital Markets Report "Initiating Coverage with an Underperform Rating and a $6 Price Target" at 4; Apr. 18, 2013 RBC Capital Markets Report "Thoughts on Potential CGVP Transaction" at 4.

[286] "Venture Partners proposal raises questions; 1st liens still preferred" Goldman Sachs Report (Feb. 4, 2013), at APOLLO-Examiner_01221413-17 [APOLLO-Examiner_01221402].

[287] "Discussion Materials" Presentation (Jun. 13, 2013), at CEOC_INVESTIG_00267424 [CEOC_INVESTIG_00267386]; "Discussion Materials" Presentation (Jun. 14, 2013), at CEOC_INVESTIG_00352383; [CEOC_INVESTIG_00352345].

[288] "Caesars Discussion Materials Board of Directors Meeting November 2013" Presentation (Nov. 12, 2013), [CEOC_INVESTIG_00010374] (native file) at 11. ($14.837 - $18.655 = $3.718).

### 2. CEOC Was Balance Sheet Insolvent at All Times from December 31, 2008 Through December 31, 2014

As indicated in Solvency Figure 1, the fair market value of CEOC's assets was less than CEOC's debt at year-end 2008 and at every year end through 2014. Further detail regarding the estimation of the fair market value of CEOC's assets and enterprise value is provided below.

**Solvency Figure 1: Summary of CEOC Solvency – Balance Sheet Test**

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Enterprise Value of CEOC | $14,629 | $14,480 | $14,072 | $11,994 | $12,179 | $11,980 | $6,059 |
| Face Value of Interest-Bearing Debt (a) (b) | 17,885 | 17,354 | 17,795 | 18,766 | 20,529 | 19,288 | 18,371 |
| Solvent / (Insolvent) | ($3,256) | ($2,874) | ($3,722) | ($6,772) | ($8,350) | ($7,308) | ($12,312) |

Note:
(a) Excludes intercompany debt.
(b) The Face Value of Interest Bearing Debt is the stated amount of debt that must be repaid at maturity. The face value may differ from the book value.

### 3. CEOC Was Paying Its Obligations at the Solvency Dates, but Knew or Should Have Known That It Would be Unable to Pay Its Debts Over Time

Although CEOC and its parent, CEC, had or found sufficient liquidity to pay CEOC's debts until the bankruptcy filing in January 2015, it was evident years before then that CEOC was not going to be able to pay its debts as they matured. In addition, the refinancing of certain 2015 debt maturities with the proceeds from the B-7 Transaction in 2014 (and releasing the CEC guarantee) reduced liquidity by around $357.4 million (for B-7 related redemptions, fees and expenses) and increased the annual interest burden by around $44 million a year.[289] It also involved issuance of the most senior debt.

At all Solvency Dates after 2008, CEOC did not generate sufficient cash flow from operations to pay its operating expenses. CEOC's cumulative cash flow from operations from January 28, 2008, to December 31, 2014, was negative $1.908 billion. Other than 2008, CEOC did not generate cash flow from operating activities. As a result, CEOC was only able to pay its operating expenses through a combination of asset sales and additional borrowing. CEOC's internal projections and long-range-plan ("LRP") showed that the company would not be able to pay its operating costs and interest from core operations, let alone maturing debt.

No later than the beginning of 2013, it was explicitly evident that CEOC could not pay its debt obligations when they became due absent an agreement by lenders to reduce the principal amount, such as through a debt to equity exchange. There is a reasonable case that CEOC was insolvent under this test at year ends 2008 through 2011, and a strong case by year end 2012 through 2014.

---

[289] *See*, *infra*, Section IX.B.1.

### 4.    CEOC Was Inadequately Capitalized at All Solvency Dates

CEOC's financial statements as of the end of December 31, 2008, through December 31, 2014, reflected that the book value of its liabilities exceeded the book value of its assets by a wide margin, resulting in negative book equity at each of the Solvency Dates except for 2009. Further, if goodwill is removed as an asset (which is not uncommon in determining a company's asset value), CEOC's liabilities exceeded its book value of assets in all years.  Further, financial reporting impairment charges on various assets were taken in every year from 2008 through 2014.  Solvency Figure 2 reflects that CEOC's book equity or equity cushion evaporated and turned negative.  The negative equity is a result of continued losses and the write down of the carrying value of assets on the books.  As such, CEOC was clearly inadequately capitalized. These were all warning signs that a company in such a financial condition was insolvent.

**Solvency Figure 2:  Summary of CEOC Balance Sheet at Book Value[290]**

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Total Assets | $21,932 | $20,671 | $20,292 | $20,358 | $20,035 | $15,973 | $11,676 |
| Total Liabilities | $22,028 | $20,083 | $20,872 | $21,491 | $22,766 | $21,675 | $19,800 |
| Equity / (Deficit) | ($95) | $588 | ($580) | ($1,133) | ($2,731) | ($5,702) | ($8,123) |
| Less:  Goodwill | ($2,754) | ($1,768) | ($1,732) | ($1,619) | ($1,413) | ($1,271) | ($674) |
| Equity / (Deficit) Without Goodwill | ($2,849) | ($1,179) | ($2,312) | ($2,752) | ($4,144) | ($6,973) | ($8,797) |

Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending:  Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BC  C522/CEOC_Selected_Financial_Information_December_2014.pdf>  (last  visited  Mar.  1, 2016).
Note:  Includes intercompany debt.

### 5.    Results of Solvency Analysis Under the Three Tests

Solvency Figure 3 summarized the results of the solvency analysis under three definitions.

- **Insolvent**:  There is a strong case that CEOC was insolvent.

- **Probable**:  There is a reasonable case that CEOC was insolvent.

- **Remote**:  The chance of CEOC being insolvent is unlikely.

---

[290]   Throughout this Section of the Final Report, CEOC and CEC are used in all time periods in lieu of HOC or HEI.

**Solvency Figure 3:  CEOC Solvency Analysis – Summary of Findings**

|  | LBO | YE2008 | YE2009 | YE2010 | YE2011 | YE2012 | YE2013 | YE2014 |
|---|---|---|---|---|---|---|---|---|
| **Balance Sheet** | Remote | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent |
| **Cash Flow** | Remote | Probable | Probable | Probable | Probable | Insolvent | Insolvent | Insolvent |
| **Adequate Capital** | Remote | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent |

### C.  Overall General Economic Conditions

When evaluating solvency, it is important to understand both the financial condition and performance of a company in the context of both the general economy and the state of the gaming industry in the United States from 2008 through 2014.[291]  This type of analysis helps to gain an understanding of both the current and future environment that a company is, or will be, operating in.  For example, if the economy and industry are expanding, while a specific company is retracting, that dichotomy may be an indication of company specific issues that are retarding that company's financial results, rather than overall economic and/or industry trends.  Conversely, if the economy and/or industry are struggling, it is more difficult for a company to improve its financial condition.

The year leading up to the LBO in January 2008 was a period of general economic expansion and overall prosperity in the United States.  The U.S. economy slowed in the second half of 2007 as turbulence emerged in financial markets, turning negative in 2008 as the turmoil in financial markets intensified in the second half of 2008.  Economic activity in the U.S. improved in the second half of 2009 after a year and a half of decline, and then expanded at a moderate pace in 2010.

Caesars and other gaming companies are heavily impacted by consumer spending/disposable income, the consumer confidence index, travel by U.S. residents and non-U.S. residents and unemployment rates.

The Bureau of Economic Analysis' survey of personal consumption expenditures focuses on households in the United States in order to assess their economic well-being.  As shown in Solvency Figure 4, the survey of personal consumption, shows that the decrease in gambling expenditures was markedly larger than that for total expenditures for goods and services from 2008 through 2010.  In the seven years prior to the LBO, expenditures for casino gambling increased at a faster rate than total expenditures in all years since 2002.  During the seven years

---

[291]  See Appendix 7, Valuation at Exhibit B for a more detailed discussion of the market and economic conditions that existed during the relevant period.

after the LBO, gambling expenditures did not increase at a faster rate than total expenditures other than the more recent years – 2013, by a small margin, and 2014.  The slowdown in growth in gambling revenue suggests a maturing market.

**Solvency Figure 4:  Change in Personal Consumer Expenditures on Casino Gambling and Total Goods & Services**



<u>Source</u>: U.S. Dep't of Commerce, Bureau of Econ. Analysis, Table 2.4.5. Personal Consumption Expenditures by Type of Product, available at <http://www.bea.gov/iTable/iTable.cfm?reqid=12&step=3&isuri=1&1203=2075#reqid=12&step=3&isuri=1&1204=2000&1203=2017&1206=a&1205=2015&1210=x&1211=0> (last visited Dec. 1, 2015).
<u>Note</u>:  The change in Casino Gambling for 2010 is approximately 0%.

Likewise, as shown in Solvency Figure 5, consumer confidence was at or near all-time lows during the latter part of 2008 and early 2009, and again in mid-2011.[292]  The average of the Consumer Confidence Index after the LBO was 30 points lower than the average prior to the LBO.

---

[292]  Historically, from January 1980 through November 2015, the Conference Board Consumer Confidence Index averaged 90.8, reaching a record high of 144.7 in January and May 2000 and a low of 25.3 in February 2009.

**Solvency Figure 5:  Consumer Confidence Index (Jan. 1980 – Nov. 2015)**



Source: Conference Board's Consumer Confidence Index (2015), available at <http://future.aae. wisc.edu/data/monthly_values/by_area/998?area=US&tab=sales> (last visited Dec. 1, 2015).

As shown in Solvency Figure 6, the revenue for the Casino Hotels industry peaked in 2008, dropped 9.8% in 2009, bottomed out in 2011 at 13.2% below the peak and rebounded again starting in 2012.

**Solvency Figure 6:  Industry Revenue ($ in Millions)**



<u>Source</u>: *Casino Hotels in the US: Market Research Report*, IBISWorld Inc., Report NAICS 722112 (Oct. 2015).

The unemployment rate in the United States began a substantial upward trend in mid-2008, peaking at 10% in October 2009.[293]   As shown in Solvency Figure 7, the unemployment rate did not return to pre-Recession levels until mid-2014.

---

[293]   *Labor Force Statistics from the Current Population Survey*, U.S. Dep't of Labor, Bureau of Labor Statistics, available at <http://data.bls.gov/timeseries/LNS14000000> (last visited Mar. 1, 2016).

**Solvency Figure 7:  U.S. Monthly Unemployment Rate 2000 through 2015**



<u>Source</u>: Labor Force Statistics from the Current Population Survey, unemployment rate from series LNS14000000 for ages 16 years and over, U.S. Dep't of Labor Bureau of Labor Statistics, available at <http://data.bls.gov/timeseries/LNS14000000> (last visited Dec. 1, 2015).

The analysis of the overall economy and the industry reflects a very challenging environment for casino gaming companies in the 2008–2010 time period, with a gradual recovery beginning in 2011.

### D.   Financial Condition and Performance of CEOC from the Closing of the LBO Through 2014

An analysis of a company's financial statements and operating results provides insight into the underlying trends of the company's financial health (*e.g.*, whether revenues and profits are growing or declining).  If the trend is decreasing (*i.e.*, profits are declining or negative), the ability to generate sufficient cash from operations and the survivability of the company, both in the short term and long term, comes into question.

A review of CEOC's historical financial condition and operating performance from the date of the LBO through 2014 reflects that CEOC failed to grow revenue, generate profits or cash flow from operations or build equity.  Not surprisingly, over this period of time, CEOC's financial condition deteriorated significantly, a clear indication of potential insolvency. Although the Sponsors and the Boards of CEC and CEOC prepared detailed financial analyses on a regular basis, they failed to address the question of insolvency.

1.   **CEOC's Operating Performance – Revenues and Profitability**

CEOC's operating performance was analyzed for the years 2008[294] through 2014 through an analysis of its revenues and profitability.[295]   As shown in Solvency Figure 8, CEOC's net revenues declined in each year other than 2010 when net revenues were nearly flat.   CEOC generally followed industry trends until 2013 and 2014, when CEOC transferred properties as part of the CERP Transaction, Growth Transaction and Four Properties Transaction, which resulted in significantly decreasing CEOC's overall net revenues.

**Solvency Figure 8:  Industry and CEOC Annual Percent Change in Net Revenues**



<u>Sources</u>:   *Casino Hotels in the US: Market Research Report*, IBISWorld Inc., Report NAICS 722112 (Oct. 2015); Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the years ending:  Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014,    <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).

---

[294]   Unless otherwise noted, CEOC's financial data for 2008 includes the partial year period following the LBO (January 28, 2008, through December 31, 2008).

[295]   The 2007 pro forma financial statements were also evaluated.   These financial statements were provided in the 2008 10-K and provided Harrah's Operating Company on a restructured basis to comport with the structure after the LBO.

From 2007 through 2014, CEOC's net revenues declined at a compound annual rate of negative 6.4%, while the industry declined at a much slower compound annual rate of negative 0.7%.

CEOC's EBITDA and EBITDA as a percentage of net revenue ("EBITDA Margins") declined significantly faster than net revenues.   As shown in Solvency Figure 9, EBITDA declined at a compound annual rate of 15%.   EBITDA Margins for CEOC's Industry Peers improved every year during the five-year period of January 2010 through December 2014, increasing four percentage points from 18.2% at the end of 2009 to 22.2% in both 2013 and 2014.  Over the same time period, CEOC's EBITDA Margin declined nine percentage points from 21.2% to 12.2%.

**Solvency Figure 9:  CEOC EBITDA and EBITDA Margins of CEOC and CEOC's Industry Peers**



Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the years ending:  Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf>        (last visited Mar. 1, 2016); Capital IQ; Monthly Actuals vs Budget (Jun. 17, 2015), at Tab 'Summary' [CEC_Examiner_0145430] (native file).

### 2. CEOC's Financial Condition

To determine CEOC's financial condition, its balance sheets for 2008 through 2014 were analyzed. On average during this entire time period, 57% of CEOC's assets consisted of fixed assets such as its casino/hotel buildings and furniture fixtures and equipment (*e.g.*, slot machines/tables and other property, plant and equipment). As reflected in Solvency Figure 10, the next largest groups of assets were (i) identifiable intangible assets comprising, on average, approximately at 20% of total assets and (ii) goodwill comprising, on average, another 9% of total assets. Cash and current assets comprised 5% at year-end 2008 and increased to 15% by year-end 2012 and remained around that level through 2014.

**Solvency Figure 10:  Summary of CEOC Assets – Book Value**

| *amounts in millions* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | $447 | $569 | $619 | $597 | $1,547 | $1,439 | $1,194 |
| Other Current Assets | 621 | 563 | 671 | 779 | 1,537 | 774 | 515 |
| PP&E, Net | 12,632 | 12,430 | 12,426 | 11,480 | 10,765 | 8,852 | 6,190 |
| Goodwill | 2,754 | 1,768 | 1,732 | 1,619 | 1,413 | 1,271 | 674 |
| Intangible Assets | 4,631 | 4,334 | 4,154 | 3,706 | 3,362 | 2,905 | 2,515 |
| Other Assets | 848 | 1,008 | 691 | 2,177 | 1,411 | 732 | 588 |
| Total Assets | $21,932 | $20,671 | $20,292 | $20,358 | $20,035 | $15,973 | $11,676 |

Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the years ending:  Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).
Note:  The Face Value of Interest Bearing Debt is the stated amount of debt that must be repaid at maturity.  The face value may differ from the book value.

Throughout the time period analyzed, CEOC had significant amounts of long-term, interest-bearing debt. As reflected in Solvency Figure 11, CEOC's long-term debt as recorded on its books ranged from $13.9 billion to $16.8 billion, or approximately 70% to 80% of its total liabilities.

**Solvency Figure 11: Summary of CEOC Liabilities – Book Value**

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Current Liabilities | $1,608 | $1,272 | $1,246 | $1,246 | $2,211 | $1,864 | $1,690 |
| Long-Term Debt[296] | 16,623 | 13,895 | 14,405 | 15,591 | 16,751 | 16,640 | 16,095 |
| Other Liabilities | 3,797 | 4,915 | 5,222 | 4,654 | 3,803 | 3,172 | 2,015 |
| Total Liabilities | $22,028 | $20,083 | $20,872 | $21,491 | $22,766 | $21,675 | $19,800 |

Sources: Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the years ending: Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).
Note: Includes intercompany debt.

Due to CEOC's heavy debt load, the equity portion of CEOC's balance sheet, as shown in Solvency Figure 12, reflected a deficit in retained earnings as of December 31, 2008, turned slightly positive as of December 31, 2009, turned negative again in the third quarter of 2010, and thereafter grew to a deficit exceeding negative $8 billion by year-end 2014. CEOC's equity deficit was the result of total assets declining $10.2 billion or 47% over the time period analyzed (from $21.9 billion to $11.7 billion), while the book value of total liabilities only declined 10% ($22.0 billion to $19.8 billion).

---

[296] Long-Term Debt reflects book value which under GAAP includes unamortized discounts and premiums. Face value of Interest-Bearing Debt is the stated amount of debt that must be repaid at maturity.

**Solvency Figure 12:  Comparison of CEOC Total Assets to Total Liabilities**



<u>Source</u>:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the years ending:  Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, < http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf>        (last visited Mar. 1, 2016).

A significant portion of the $10.2 billion reduction in CEOC's total assets over this time period was due to impairment charges related to tangible and intangible assets, including goodwill.  When the fair value of an asset is less than the amounts noted in the books, Generally Accepted Accounting Principles ("<u>GAAP</u>") requires that the asset be written down and an impairment charge recorded.   As shown in Solvency Figure 13, these impairment charges accounted for almost half of the $10.2 billion reduction.

**Solvency Figure 13:  CEOC Asset Impairments 2009 through 2014**[297]

| Year-Ended | Asset Impairment *(amounts in millions)* |
|:---:|:---:|
| 2009 | $1,179 |
| 2010 | 193 |
| 2011 | 33 |
| 2012 | 1,054 |
| 2013 | 1,809 |
| 2014 | 536 |
| Total 09 – 14 | $4,804 |

Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the year ending Dec. 31, 2014 (Mar. 16, 2015); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/ downloads/ABEA-5FED0N/ 0x0x844647/4752885D-EBCF-46EA-9B93-E57E1 9BCC522/CEOC_Selected_Financial_Information_December_2014.pdf>   (last visited Mar. 1, 2016).

Another significant cause of the decline in CEOC's financial condition was the transfer of assets from CEOC to CERP and CGP as part of (a) the CERP Transaction and Growth Transaction in 2013; and (b) the Four Properties Transaction in 2014.  Although the Growth Transaction and Four Properties Transaction addressed short-term liquidity needs, neither transaction improved the long-term financial condition of CEOC.  As shown in Solvency Figure 14, CEOC's property and equipment decreased by more than 50% from $12.6 billion in 2008 to $6.2 billion in 2014, while the debt balance decreased only 10%.

---

[297]  Asset impairment charges of $3.745 billion were made in 2008.  These write-offs were not summarized in the table since the $10.2 billion reduction in total asset value is from the beginning of 2009 through the end of 2014.

**Solvency Figure 14:  CEOC Property & Equipment**



Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the years ending:  Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_ Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).

The value of CEOC's assets excluding goodwill was also compared to its liabilities in Solvency Figure 15.  Goodwill represents the excess of the purchase price over the fair value of the assets acquired, presumably due to the acquired entity's ability to generate income in excess of normal rates of return, which CEOC had not accomplished since the LBO.  Goodwill cannot be (i) sold, (ii) used as collateral to borrow capital or (iii) used to satisfy a creditor's claim; therefore, CEOC's assets excluding goodwill were compared to its total liabilities.  Solvency Figure 15 demonstrates that CEOC's assets (excluding goodwill) exceeded its liabilities at all times since the LBO, resulting in negative equity value.

**Solvency Figure 15:  CEOC Assets Excluding Goodwill Compared to Total Liabilities**



Source:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending: Dec. 31.  2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014);   CEOC   Selected   Financial   Information   as   of   Dec.   2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_   Financial_Information_December_2014.pdf>   (last visited Mar. 1, 2016).

Furthermore, a comparison to CEOC's Industry Peers using this same methodology highlights how little capital CEOC had.[298]  As shown in Solvency Figure 16, CEOC's ratio of assets (excluding goodwill) to total liabilities ranged from 1.06 to 1.80 (*i.e.*, for every $1 of assets, CEOC had $1.80 of liabilities).  CEOC's ratios of liabilities to assets net of goodwill were significantly higher than CEOC's Industry Peers, which ratio ranged from 0.73 to 1.02.

---

[298]   The companies identified and utilized as peers in this analysis are CEOC's Industry Peers. Companies are identified as Industry Peers as they operate in the same industry facing the same or similar risks from market forces.  However, Industry Peers may not be comparable for valuation purposes.  *See* Appendix 7, Valuation at Ex. A for further discussion of these companies.

**Solvency Figure 16:  CEOC and Industry Peers Ratio of Liabilities to Assets, Net of Goodwill, Compared to Equity**



Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results*, CEC Form 10-K for the years ending:  Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014);    CEOC    Selected    Financial    Information    as    of    Dec.    2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_    Financial_Information_December_2014.pdf>    (last visited Mar. 1, 2016); Capital IQ; Monthly Actuals vs Budget (Jun. 17, 2015), at Tab 'Summary' [CEC_Examiner_0145430] (native file).

### 3.    CEOC's Statement of Cash Flows

Similar to the historical revenue and EBITDA results, CEOC's cash flow from operating activities steadily declined from 2008 through 2014.

Cash flow represents the amount of cash and cash equivalents entering and leaving a company.  Cash flow is what is actually available to pay expenses, including interest, and to make investments.  A business derives its cash flow from operations, meaning its regular business activities, as well as from investing and financing.  (Cash flow from investing consists of activities acquiring or disposing of assets held for or used in the production of goods or services by the entity.  Cash flow from Financing consists of activities involving the entity's owners or creditors.  Financing may include borrowing and repaying money or issuing stock.) The statement of cash flows summarizes these cash inflows and outflows for a company during a specific time frame, usually a one-year period.

On a statement of cash flows, the operational cash flow generally reflects the cash generated from a company's core operations. If the cash flow from operations is negative, the company cannot cover operating expenses solely from operating the business. If a company consistently shows negative cash flow from operations, it can only survive in the long term by selling assets, incurring additional debt or raising equity capital.

CEOC's statement of cash flows, as summarized in Solvency Figure 17, was analyzed to determine whether CEOC was generating cash from operations to cover its operating expenses throughout the time periods analyzed. CEOC's cash flow from operations was negative $98 million in 2009 and decreased every year through 2014, at which time CEOC's cash flow from operations was negative $841 million. Over the time period of 2008 through 2014, CEOC's cumulative cash flow from operations was negative $1.9 billion. Simply stated, CEOC's cash cost to operate its business exceeded its cash collections by $1.9 billion. CEOC was only able to pay its operating expenses due to additional debt financing of $3.5 billion over the same period and asset sales in 2013 and 2014. The ability of an entity to consistently generate positive cash flow from operations is critical to its long-term survival and the ability to pay its debts when due. Conversely, the inability of a company to generate positive cash flow from operations over an extended period is a clear sign of insolvency.

### Solvency Figure 17: CEOC Statement of Cash Flows

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|
| Beginning Cash | $494 | $447 | $569 | $603 | $597 | $1,547 | $1,438 | $494 |
| Cash Flow / (Deficit) from Operations | $323 | ($98) | ($208) | ($236) | ($391) | ($457) | ($841) | ($1,908) |
| Cash Flow / (Deficit) from Investing [a] | ($950) | ($497) | ($257) | ($768) | ($483) | $723 | $1,363 | ($870) |
| Cash Flow / (Deficit) from Financing [b] | $581 | $716 | $516 | $995 | $1,816 | ($378) | ($767) | $3,478 |
| Net Increase / (Decrease) in cash | ($47) | $121 | $50 | ($9) | $941 | ($113) | ($245) | $700 |
| Change in Cash Classified as Assets Held for Sale [c] | $0 | $0 | ($16) | $3 | $9 | $5 | $0 | ($0) |
| Ending Cash Balance | $447 | $569 | $603 | $597 | $1,547 | $1,438 | $1,194 | $1,194 |

Sources: Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending: Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).

Notes:
(a) Cash Flow from Investing is described as activities acquiring or disposing of assets held for or used in the production of goods or services by the entity. Investments may include capital expenditures or monetary investments.
(b) Cash Flow from Financing is described as activities involving the entity's owners or creditors. Financing may include borrowing and repaying money or issuing stock.

(c) The beginning cash balance at January 1, 2011 (*e.g.*, the ending balance at December 31, 2010) was $603.2 million per Exhibit 99.1 in the CEC 2012 10-K, where it had been reported as $619.1 million in the 2011 10-K.  In addition, 'Cash Classified as Assets Held for Sale" was not broken out in the 2011 10-K, but the "Change in cash classified as assets held for sale" was added for the year ended December 31, 2011 in the 2012 10-K.  Therefore, the difference of $15.9 million ($619.1 million – $603.2 million) was shown as "Cash Classified As Assets Held For Sale" in 2010.

Cash flow from operations includes the payment of interest.  As shown in Solvency Figure 18, CEOC has not generated sufficient cash from operations prior to payment of interest to cover its interest expense in each year beginning in 2009.

**Solvency Figure 18:  CEOC Cash Flow from Operations Before and After Interest Expense**

| *amounts in millions* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|
| Cash Flow from Operations Before Interest Expense | $2,117 | $1,580 | $1,574 | $1,795 | $1,611 | $1,688 | $1,388 | $11,752 |
| Interest Expense | | ($1,794) | ($1,679) | ($1,782) | ($2,031) | ($2,002) | ($2,145) | ($2,228) | ($13,661) |
| Cash Flow from Operations | $323 | ($98) | ($208) | ($236) | ($391) | ($457) | ($841) | ($1,908) |

Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending:  Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).

In order to pay its interest expense to its lenders, CEOC had to rely on cash on hand as of the LBO, intercompany borrowings and increased third-party debt.  Refer to Appendix 6-10, Solvency, for the detailed statement of cash flows.  Furthermore, in evaluating the interest expense of CEOC's Industry Peers, the median interest expense as a percent of revenues was fairly consistent across all time periods, ranging between 6.0% and 8.5% (*i.e.*, for every $100 in revenue, they incurred between $6.00 and $8.50 in interest expense).  CEOC's interest expense as a percent of revenue was three to five times the level of CEOC's Industry Peers.  This is the consequence of (i) the high degree of leverage placed on CEOC at the time of the LBO, (ii) declining EBITDA at CEOC and (iii) CEOC having to borrow funds to meet its operating expenses.

As shown in Solvency Figure 19, CEOC's lowest ratio of interest expense to revenue was 23% in 2008 (approximately three times greater than CEOC's Industry Peers' median of 6.1%), and the ratio increased steadily to a high of 44% in 2014 (in excess of four times greater than CEOC's Industry Peers' median of 8.1%).

**Solvency Figure 19:  CEOC and Industry Peers Median of Interest Expense as a Percentage of Net Revenue**



<u>Source</u>:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending:  Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014);    CEOC    Selected    Financial    Information    as    of    Dec.    2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_    Financial_Information_December_2014.pdf>    (last visited Mar. 1, 2016); Capital IQ; Monthly Actuals vs Budget (Jun. 17, 2015), at Tab 'Summary' [CEC_Examiner_0145430] (native file).

In summary, CEOC's financial condition deteriorated substantially following the LBO through 2014.  As evidenced by the information presented herein, CEOC's operations could not generate sufficient cash flow from operations to pay its operating costs, including interest, much less to pay principal and sustain its capital structure.  In short, during the period starting in 2008 through the end of 2014:

- Revenue declined at a compound annual rate of 6.4%;

- EBITDA declined at a compound annual rate of 15%;

- EBITDA margins declined from 23.8% before the LBO to 12.2% in 2014;

- Total assets declined at a compound annual rate of 10%, a portion of which was due to $8.5 billion in asset impairments over the seven-year period;

- Cash flow from operations declined at a compound annual rate of 53.6%;[299]

- Total liabilities declined at a lower compound annual rate of approximately 2%; and

- Interest expense increased at an annual compound rate of 4%.

The result of the foregoing operational changes was that CEOC never generated a profit, leading to a continuing deterioration of CEOC's equity resulting in ever increasing deficits. These conditions should have triggered serious concerns regarding CEOC's solvency. All measures of financial performance were negative and continued to deteriorate at an increasing rate, all of which materially weakened CEOC.

## 4.  The Cyclical Nature of the Casino Gaming Business

A cyclical industry is one that is sensitive to the business cycle, such that revenues are generally higher in periods of economic prosperity and expansion, and lower in periods of economic downturn and contraction. The casino gaming industry is largely regarded as a cyclical industry with the most cyclical component being the destination hotel business on the Las Vegas Strip. As explained by Marc Rowan, Apollo continually believed that once the cycle turned, CEOC could recover, so it focused on extending the "runway," or the time available for the cycle to turn, before CEOC had to refinance its debt. Rowan stated: "In a cyclically challenged business, you extend the runway, you let the cycle play out . . . . This is a business that at every turn we viewed as cyclically challenged rather than secularly challenged."[300] He further testified "[t]hat runway was created through a variety of means, and as the business continued to show that it was still in a cyclical recovery, we went about creating more runway."[301] Whether the time available for the cycle to turn (*i.e.*, the "runway") is extended or not, however, has no bearing on whether a company is solvent or not, even if it may impact a board's judgment on how to conduct a company's business or the timing of a chapter 11 filing. As discussed later, the result of attempting to extend "runway" via the Four Properties Transaction not only left CEOC in a weaker financial position, but increased the degree of insolvency by $2.5 billion.

## E.  Solvency: The Balance Sheet Test

The Balance Sheet Test is a baseline test for the purpose of assessing the solvency of an entity. As discussed previously, the Bankruptcy Code defines insolvency as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ."[302] The definition of insolvency under the Uniform Fraudulent Conveyance

---

[299]  The rate for cash flow from operations was calculated from the end of 2009 through the end of 2014. Cash flow from operations decreased 130% in 2009, going from inflows of $323 million in 2008 to outflows of $98 million in 2009.

[300]  M. Rowan Nov. 17, 2015 Tr. at 444:7-11, 444:23-445:2.

[301]  M. Rowan Nov. 16, 2015 Tr. at 83:3-7.

[302]  11 U.S.C. §101(32).

Act (UFCA) is very similar in that a debtor is insolvent when the "present fair salable value of [its] assets is less than the amount that will be required to pay [its] probable liability on [its] existing debts as they become absolute and matured."[303]    The Uniform Fraudulent Transfer Act (UFTA) states that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."[304]

In other words, a company is solvent when the value of the enterprise exceeds its debt or when the net market equity value is positive.    Therefore, the test for solvency involves a comparison of the assets at a fair value valuation (on a going concern basis), or Fair Market Value, to the entity's debts.    "Fair Market Value" is defined as:

> [T]he price, expressed in terms of cash equivalents, at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arm's length in an open and unrestricted market, when neither is under compulsion to buy or sell and when both have reasonable knowledge of the relevant facts.[305]

There are three established valuation approaches for determining the value of a going concern business:  (i) the income approach, (ii) the market approach and (iii) the asset-based approach.[306]    Within each approach, there are alternative methods or more specific ways to implement a business valuation.  All three approaches to value should be considered, as one or more may be appropriate in valuing the subject business.  While the selection and reliance on more than one method of valuation may provide mutually supportive evidence of valuation conclusions, it is not required.  Value indications developed in applying each of the selected approaches are reconciled with other facts in order to form a conclusive opinion of fair market value.    For additional detail or valuation approaches and methods, refer to Appendix 7, Valuation.

In order to evaluate CEOC's solvency, CEOC's fair market value on an enterprise basis as a going concern was estimated using the market approach and the income approach.  The face value of interest-bearing debt was then deducted to assess whether or not CEOC was solvent at each year end from 2008 through 2014.

The asset-based approach is based on the summation of each individual asset and liability of the subject company, as restated from its historical cost basis to the appropriate standard of value.  This approach can be performed using the "Adjusted Book Value Method,"[307] which

---

[303]    UFCA §2(1).

[304]    UFTA §(2)(a).

[305]    Fair Market Value as defined in *International Glossary of Business Valuation Terms*, American Institute of Certified Public Accountants, American Society of Appraisers, National Association of Certified Valuation Analysts and Institute of Business Appraisers.

[306]    Pratt, Shannon.    Valuing a Business:    The Analysis and Appraisal of Closely Held Companies, 5th Edition at 62.

[307]    *Id.* at 352.

involves analyzing the book value or GAAP financial statements of the company and making adjustments to reflect market value. The method of determining the fair market value of each asset and liability varies widely based on the nature of the asset or liability. This approach is typically used to value individual assets of a company, but not generally to value a company operating as a going concern.

Approximately 30% of CEOC's assets are intangible assets, such as Total Rewards, which, along with the physical assets, form a going concern. Furthermore, the aggregate value of all assets, both tangible and intangible, are captured in the income and market approaches. For these reasons, the asset-based approach was considered but ultimately not utilized to assess CEOC's solvency.

### 1. Market Approach – Guideline Public Company Method

Under the market approach, CEOC's Industry Peers were utilized as guideline public companies ("GPCs"). Refer to Appendix 7, Valuation at Ex. A for additional detail regarding the GPCs.

- Boyd Gaming Corporation (NYSE:  BYD)

- Churchill Downs, Inc. (NASDAQ:  CHDN)

- Isle of Capri Casinos, Inc. (NASDAQ:  ISLE)

- MGM Resorts International (NYSE:  MGM)

- Monarch Casino & Resorts, Inc. (NASDAQ:  MCRI)

- Penn National Gaming (NASDAQ:  PENN)

- Pinnacle Entertainment Inc. (NYSE:  PNK)

- Wynn Resorts, Ltd. (NASDAQ:  WYNN)

The guideline public company method requires the calculation of valuation multiples based on publicly traded guideline companies that are then applied to the subject company's relevant metrics. As summarized in Solvency Figure 20, the multiple of enterprise value to EBITDA was calculated for each fiscal year end for the guideline companies. The median was then calculated for the Las Vegas Strip operators (Wynn and MGM) and for the regional operators (all others). Each median was then weighted based on the percentage of CEOC's EBITDA derived from Las Vegas properties to all other sources in each year in order to calculate a weighted multiple. ███████████████████████████████████████████████████████████████

[308] "Harrah's Valuation Analysis" Presentation (Sep. 24, 2009), at CITI-CZR-EXM-00110103 and CITI-CZR-EXM-00110107 [CITI-CZR-EXM-00110100].

## Solvency Figure 20:  Guideline Company EBITDA Multiples

| EBITDA Multiple = Total Enterprise Value / EBITDA[a] | 12/31/08 | 12/31/09 | 12/31/10 | 12/31/11 | 12/31/12 | 12/31/13 | 12/31/14 |
|---|---|---|---|---|---|---|---|
| Wynn Resorts Ltd. [b] | 13.03 | 12.99 | 14.18 | 10.97 | 10.75 | 14.18 | 12.55 |
| MGM Resorts International [b] | 9.68 | 14.22 | 18.57 | 13.88 | 12.12 | 13.09 | 12.25 |
| Boyd Gaming Corporation | 8.60 | 11.20 | 11.58 | 9.58 | 13.35 | 9.68 | 8.39 |
| Penn National Gaming Inc. [e] | 5.90 | 7.06 | 8.06 | 6.88 | 9.06 | (e) | (e) |
| Isle of Capri Casinos, Inc. | 7.31 | 8.26 | 7.74 | 7.12 | 8.08 | 7.33 | 7.74 |
| Pinnacle Entertainment Inc. | 10.89 | 11.07 | 9.30 | 7.53 | 8.95 | 15.59 | 9.22 |
| Monarch Casino & Resort Inc. | 9.20 | 7.16 | 7.81 | 6.35 | 6.85 | 7.73 | 7.51 |
| Churchill Downs Inc. | 9.13 | 9.23 | 12.33 | 7.47 | 9.10 | 12.33 | 14.71 |
| Low | 5.90 | 7.06 | 7.74 | 6.35 | 6.85 | 7.33 | 7.51 |
| High | 13.03 | 14.22 | 18.57 | 13.88 | 13.35 | 15.59 | 14.71 |
| Mean | 9.22 | 10.15 | 11.20 | 8.72 | 9.78 | 11.42 | 10.34 |
| Median | 9.16 | 10.15 | 10.44 | 7.50 | 9.08 | 12.33 | 9.22 |
| Median − Las Vegas Markets [b] | 11.35 | 13.60 | 16.38 | 12.43 | 11.43 | 13.63 | 12.40 |
| Median − Other | 8.86 | 8.74 | 8.68 | 7.30 | 9.01 | 9.68 | 8.39 |
| CEOC Las Vegas Weighting [c] | 0.26 | 0.24 | 0.29 | 0.35 | 0.34 | 0.38 | 0.29 |
| Industry Peers EBITDA Multiple Weighted Median [d] | 9.52 | 9.90 | 10.95 | 9.07 | 9.83 | 11.18 | 9.57 |
| MULTIPLES USED IN SOLVENCY ANALYSIS (Rounded up to nearest .25x) | 9.75 | 10.00 | 11.00 | 9.25 | 10.00 | 11.25 | 9.75 |

Sources:  Capital IQ; Monthly Actuals vs Budget (Jun. 17, 2015), at Tab 'Summary' [CEC_Examiner_0145430] (native file).

Notes:

(a)  Total Enterprise Value for each Industry Peer was calculated as of 12/31 of each year, except for Isle of Capri, which has a fiscal year end of April 30.  Isle of Capri data as of April 30, 2009 was utilized in calculations at 12/31/2008, with all subsequent years following the same pattern.  Each Industry Peer's Enterprise Value calculated as its Market Capitalization at each fiscal year end, less Cash and Short-Term Investments, plus Debt, plus Preferred Equity, plus Total Minority Interest.  Each Industry Peer's EBITDA at its fiscal year end as reported by Capital IQ was utilized.  Capital IQ calculates EBITDA as operating income plus depreciation and amortization.

(b)  Wynn Resorts, Ltd. and MGM are considered Las Vegas market due to the location of its casino properties in the U.S.

(c)  CEOC's percentage of EBITDA earned from properties located on the strip in Las Vegas was calculated using CEC_Examiner_0145430.xls.  For properties which were sold, the property's EBITDA was not included subsequent to the date of sale.

(d)  The weighted median is calculated as the sum of 1) the median of the entities in the Las Vegas Strip market (Wynn and MGM) multiplied by the percentage of CEOC's EBITDA from properties on the strip in Las Vegas and 2) the median of all other industry peers (Boyd, Penn, Isle of Capri, Pinnacle, Monarch and Churchill Downs) multiplied by the percentage of CEOC's EBITDA from properties not on the strip in Las Vegas.  Example 2009:  LV= 13.6 x 24% = 3.26.  Other = 8.74 x (100% − 24%) = 6.64.  Weighted = 3.26 + 6.64 = 9.90.

(e)  Penn National Gaming was excluded in 2013 and 2014 as a result of Penn's REIT spin-off in Q4 2013.

Using information reported on CEOC's stand-alone financial statements, EBITDA was calculated for each year as shown in Solvency Figure 21.

**Solvency Figure 21:  CEOC EBITDA**

| amounts in millions | 2008 [(a)] | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| (Loss)/Income from operations | ($2,880) | ($370) | $412 | $645 | ($496) | ($1,243) | ($267) |
| Depreciation & Amortization | 521 | 524 | 573 | 522 | 554 | 411 | 303 |
| Amortization of intangible assets | 114 | 115 | 101 | 97 | 106 | 89 | 49 |
| Impairment of intangible assets | 3,745 | 1,179 | 193 | 33 | 1,054 | 1,809 | 536 |
| CEOC EBITDA | $1,500 | $1,448 | $1,279 | $1,297 | $1,218 | $1,065 | $621 |

Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* of CEC's Form 10-K for the years ending:  Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); .CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).

Note:
(a) 2008 is the combination of HOC's results from January 28, 2008 through December 31, 2008 subsequent to the LBO and the pro forma results from January 1, 2008 through January 27, 2008 for "HOC Restructured" as reported in Exhibit 99.1 to the 2008 and 2009 Harrah's Entertainment, Inc. 10-K.  "HOC Restructured" reflects the financial operating results as if the HOC structure after the 1/28/2008 LBO had been in effect as of January 1, 2008.

The annual weighted EBITDA multiples were applied to CEOC's EBITDA in order to estimate the enterprise value of CEOC at each year end.  The face value of CEOC's interest bearing debt was then subtracted to determine whether or not CEOC was solvent according to the Bankruptcy Code.[309]  The Balance Sheet Test notes an "entity's debt;" it does not include the concept of net debt.  Net debt is generally defined as an entity's outstanding debt less cash on hand.  However, in valuing a company on a going concern basis, the assumption is that the company has all the assets necessary to generate income, including working capital which represents the cash necessary to run the business.  For casino hotels, that not only includes cash to pay current liabilities but also the cage cash.  Solvency Figure 32 later in this Report analyzes CEOC's working capital ratio (current assets divided by current liabilities).  In all but 2012 and 2014, CEOC's working capital was less than CEOC's Industry Peers.  The Examiner has not been presented with any evidence that CEOC had excess cash on hand, which if it did exist could be considered in arriving at the value of the company.

As shown in Solvency Figure 22, CEOC was not solvent at any of the Solvency Dates.  CEOC's financial condition was such that for it to break even (*i.e.*, equity value equal to $0), either its EBITDA or the market multiples would have to increase substantially, ranging from 20% to as much as 203%.

---

[309]  Specific methods within the market approach estimate the fair market value of invested capital, which equals the fair market value of assets less non-interest-bearing liabilities.  Therefore, in order to assess CEOC's solvency under the market approach, only interest-bearing debt is subtracted from the fair market value of invested capital.

**Solvency Figure 22:  CEOC Equity Value Based on Fair Market Value of Assets Using Market Approach**

| *amounts in millions* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| CEOC EBITDA | $1,500 | $1,448 | $1,279 | $1,297 | $1,218 | $1,065 | $621 |
| Weighted EBITDA Multiple | 9.75x | 10.00x | 11.00x | 9.25x | 10.00x | 11.25x | 9.75x |
| CEOC Enterprise Value | $14,629 | $14,480 | $14,072 | $11,994 | $12,179 | $11,980 | $6,059 |
| Face Value of Interest-Bearing Debt (a) (b) | 17,885 | 17,354 | 17,795 | 18,766 | 20,529 | 19,288 | 18,371 |
| Net Equity / (Deficit) | ($3,256) | ($2,874) | ($3,722) | ($6,772) | ($8,350) | ($7,308) | ($12,312) |
| Breakeven EBITDA | $1,834 | $1,735 | $1,618 | $2,029 | $2,053 | $1,715 | $1,884 |
| Breakeven Multiple | 11.92x | 11.99x | 13.91x | 14.47x | 16.86x | 18.11x | 29.56x |
| Increase required to reach breakeven EBITDA | 22% | 20% | 26% | 56% | 69% | 61% | 203% |

Note:
(a) Excludes intercompany debt.
(b) The Face Value of Interest Bearing Debt is the stated amount of debt that must be repaid at maturity.  The face value may differ from the book value.

The sensitivity of the selected multiple was evaluated to assess whether if a change in the multiple would change the solvency results.  As shown in Solvency Figure 23, CEOC's enterprise value still would not exceed its interest-bearing debt even if the multiples were raised by 2.0x, with the exception of 2009, which would turn slightly positive.  There is no market basis evidence to support the higher multiple noted in Solvency Figure 23.

**Solvency Figure 23:  Sensitivity of CEOC Equity Value to Multiple**

| *Multiples* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Selected Multiple | 9.75x | 10.00x | 11.00x | 9.25x | 10.00x | 11.25x | 9.75x |
| Multiple + 1.0 | 10.75x | 11.00x | 12.00x | 10.25x | 11.00x | 12.25x | 10.75x |
| Multiple + 2.0 | 11.75x | 12.00x | 13.00x | 11.25x | 12.00x | 13.25x | 11.75x |
| *amounts in millions* | CEOC Equity / (Deficit) | | | | | | |
| Selected Multiple | ($3,256) | ($2,874) | ($3,722) | ($6,772) | ($8,350) | ($7,308) | ($12,312) |
| Multiple + 1.0 | ($1,755) | ($1,426) | ($2,443) | ($5,475) | ($7,132) | ($6,243) | ($11,691) |
| Multiple + 2.0 | ($255) | $22 | ($1,164) | ($4,179) | ($5,914) | ($5,178) | ($11,070) |

## 2. Income Approach

A calculation of the fair market value of CEOC at each year end from 2008 through 2014 using the DCF Method involves (i) estimating net cash flow available to debt and equity, (ii) applying a weighted average cost of capital discount rate to determine the value of the enterprise and (iii) subtracting the amount of debt to establish the value of CEOC's equity (*i.e.*, solvency).

Two CEOC entity-level projections were located.  These projections were used in the DCF analyses below.



Using these Apollo numbers, the values arrived at under the DCF Method using CEOC entity-level projections (Appendix 6-1, Solvency, through Appendix 6-3, Solvency) showed that CEOC was insolvent as of December 31, 2012, by $6.7 billion and $5.7 billion for the Before Actions and After Actions, respectively, and $7.4 billion as of October 31, 2013, for the Base Case projections.

The projected EBITDA for CEOC-owned properties was aggregated and utilized in the DCF analyses contained in Appendix 6-4a, Solvency, through Appendix 6-9b, Solvency.  Caesars employed a budgeting/forecasting process which was constantly being refined and was subject to review by CEC's outside auditors.  Some of the parties involved in CEOC's bankruptcy, including CEC, have taken the position that Caesars' projections were aspirational and overly optimistic.  If the projections in the LRP were adjusted downward to eliminate the alleged "optimism," then CEOC would be rendered even more insolvent.

In addition to estimating the cash flows for a discrete period of time, a DCF assumes a terminal value.  The terminal value is the expected value of the entity as of the end of the company's projection period, representing the remaining value of the entity into perpetuity.  CEOC's terminal value was estimated using the capitalization of earnings method assuming constant growth (also referred to as the Gordon Growth method).  The terminal growth rate was

---

[310] "Caesars Entertainment Discussion Materials August 2012" Presentation (Aug. 12, 2012), at APOLLO-Examiner_00020156 and APOLLO-Examiner_00020160 [APOLLO-Examiner_00020150].

[311] Base Case Models for CEOC, HoldCo and PropCo / CERP (Oct. 31, 2013), at PRIV_INVESTIG_00039673 [PRIV_INVESTIG_00039673].

[312] Deloitte Analysis of Projections used for Impairment for 2009 through 2012 (Aug. 20, 2015), at Tab "4-CEC EBITDA" [DT0029037] (native file); Deloitte Analysis of CEC Projections Long Range Plan for 2013 (Aug. 19, 2015), at Tab "A. Projected EBITDA 12-31" [DT0003746] (native file); Deloitte EBIT Margin Recalculation for 2014 (Aug. 19, 2005), at Tab "2) LRP" [DT0011980] (native file).

based on the expected long-term growth rate of the U.S. economy.  Other information (*e.g.*, the face value of interest-bearing debt, cash balances, depreciation and amortization, capital expenditures, the tax rate and the discount rate) was taken from (i) the projections of CEOC free cash flows, (ii) actual results of CEOC or (iii) estimated based on market data.  The detailed calculations, inputs and assumptions are contained in Appendix 6-1, Solvency through Appendix 6-9c, Solvency.[313]

As summarized in Solvency Figure 24, under the DCF method, using the property-level projections from the LRP (Appendix 6-4a, Solvency, through Appendix 6-9a, Solvency) showed that CEOC was clearly insolvent as of each year from 2009 through 2014.[314]

**Solvency Figure 24:  Summary of CEOC Equity Value Using LRP, 2009 – 2014**

| *amounts in millions* | Enterprise Value | Face Value of Debt | CEOC Equity / (Deficit) |
|---|---|---|---|
| 2009 | $10,540 | (17,354) | ($6,814) |
| 2010 | $11,283 | (17,795) | ($6,511) |
| 2011 | $13,179 | (18,766) | ($5,587) |
| 2012 | $11,518 | (20,529) | ($9,011) |
| 2013 | $7,456 | (19,288) | ($11,832) |
| 2014 | $5,465 | (18,371) | ($12,906) |

Sources:  Appendix 6-4a, Solvency, through Appendix 6-9a, Solvency.

It is thus clear that under the Balance Sheet Test, CEOC was insolvent at all Solvency Dates.

**F.    The Cash Flow Test:  The Ability to Pay Debts as They Come Due**

The cash flow test focuses on the ability of an entity to pay its debts as they come due. For CEOC, this test addressed whether CEOC was unable, or would become unable, to pay its debts in full as they became due.  Although CEOC and its parent, CEC, had or found sufficient liquidity to pay CEOC's debts until the bankruptcy filing in January 2015, it was evident years before then that CEOC was not going to be able to pay its debts as they matured.  By year end 2012, it was evident that CEOC could not pay its debts when they became due, absent an agreement by at least certain creditors to reduce the principal amounts.

---

[313] CEOC forecasts typically did not contain estimates for income taxes, as they had net operating loss carryforwards that could be used to offset its income tax liabilities.  However, there are restrictions associated with transferring these loss carryforwards to a buyer and the buyer's ability to use the loss carryforwards subsequent to acquisition.  Therefore, taxes have been estimated at the U.S. marginal tax rate of 35%.  Even if the payments of taxes are excluded, the equity values using the LRPs would still result in a deficit in every year other than 2011.

[314] A DCF valuation as of year-end 2008 was not able to be performed as no LRP was located from that time period.

The typical starting point for testing the ability to pay debts as they come due is contemporaneously developed cash flow projections. Assessing the reasonableness of the projections based on information known or knowable at the time is used to determine intent. The debt that is coming due and the debtor's liquidity must be evaluated in the context of the debtor's financial projections:

> A projection of the amount of liquidity available to the company to meet its debt requirements is estimated from each set of projections. To calculate a company's liquidity available for debt repayment, the analyst could project each of the following for the company for several periods after the transaction: (1) any excess cash on hand, (2) free cash flows earned during each period, and (3) the company's borrowing availability on each due date to pay its debts.[315]

The essence of the "cash flow test" is to help determine whether or not a company can pay its debts as they become due. It is a forward-looking concept that addresses not only whether a debtor can meet its current obligations, but also whether it can meet its future obligations. Since this focuses on future cash flows, this test lends itself to the income approach, particularly the DCF Method, because this method takes into account all sources and uses of cash, including debt borrowings and repayments. In this context, it may help to recall that "the market value of an asset reflects its earning power and expected cash flows."[316]

### 1. CEOC's Internal Projections

As discussed previously with respect to the Balance Sheet Test, CEOC's earning power and expected cash flows were not sufficient to pay its debts. As shown in Appendix 6-1, Solvency, through Appendix 6-3, Solvency and summarized in Solvency Figure 25, Caesars projected that for years ended 2013 to 2015/2016 that CEOC's cash flow after interest expense but prior to repayment of debt maturity was negative. CEOC's own projections showed that, absent adding additional debt to an already over-leveraged balance sheet or the sales of its core assets, it could not pay its operating expenses, let alone maturing debt.

**Solvency Figure 25: Summary of CEOC Free Cash Flow Prior to Debt Maturities**

| amounts in millions | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Before Actions | ($1,108) | ($947) | ($711) | (a) |
| After Actions | ($984) | ($701) | ($547) | (a) |
| Base Case | ($958) | ($962) | ($593) | ($560) |

Sources: Appendix 6-1, Solvency, and Appendix 6-2, Solvency, dated as of August 12, 2012; Appendix 6-3, Solvency, dated as of October 31, 2013.
Note: (a) 2016 was not projected.

---

[315] Reilly, Robert F. & Robert P. Schweihs, Handbook of Advanced Business Valuation at 341-42.

[316] Aswath Damodaran, Ph.D., Stern School of Business, New York University. <http://pages.stern.nyu.edu/~adamodar/New_Home_Page/lectures/pbv.html>.

### 2. LRPs Adjusted to Arrive at Free Cash Flow

The EBITDA as reflected in the LRPs, shown in Appendices 6-4c, 6-5c, 6-6c, 6-7c, 6-8c and 6-9c, Solvency, were adjusted to arrive at free cash flow available for debt repayment by accounting for actual interest expense and capital expenditures.[317] The adjusted LRPs also show that CEOC's free cash flow after paying interest expense, but before any debt repayment, was negative. In other words, CEOC's projected EBITDA was not sufficient to pay interest expenses and capital expenditures. Solvency Figure 26 summarizes the projected free cash flow utilizing the LRPs. Both of these analyses show CEOC was unable to pay its debts when due from core operating activities.

**Solvency Figure 26: Projected Free Cash Flow Based on the Long-Range Plans**

| amounts in millions | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| 2009 LRP | ($799) | ($914) | ($736) | ($643) | ($510) | ($396) | ($404) | (a) | (a) |
| 2010 LRP | | ($1,133) | ($931) | ($679) | ($526) | ($389) | ($242) | (a) | (a) |
| 2011 LRP | | | ($862) | ($588) | ($346) | ($191) | ($30) | (a) | (a) |
| 2012 LRP | | | | ($1,036) | ($836) | ($650) | ($458) | ($320) | (a) |
| 2013 LRP | | | | | ($1,329) | ($1,246) | ($1,238) | ($1,137) | ($1,032) |
| 2014 LRP | | | | | | ($1,499) | ($1,480) | ($1,443) | ($1,401) |

Sources: Appendices 6-4c, 6-5c, 6-6c, 6-7c, 6-8c and 6-9c, Solvency.
Note: (a) The LRP did not contain projections for this time period.

### 3. Interest Coverage Ratio

Another measure of a company's ability to pay its debts when due is the interest coverage ratio. This ratio measures the ability of an entity to pay its interest payment from its operating cash flow. A ratio of 1.0 or greater is indicative of a company generating sufficient profits to pay interest. CEOC's interest coverage ratio from 2008 through 2014 ranged from 0.86 to 0.28. For this analysis, EBITDA was utilized to compute the interest coverage ratio. An interest coverage ratio of 0.86 reflects that CEOC only generated from operating profits 86% of the amount required to pay its interest expense. Any shortfall would have to be paid out of cash on hand, additional borrowing, sale of assets or infusion of new equity.

As shown in Solvency Figure 27, CEOC was clearly in financial distress as it did not generate sufficient EBITDA to pay the interest on its existing debts, much less the principal balances on its debts.

---

[317] Capital expenditures were set to equal actual depreciation and amortization expenses. Amortization of intangibles was not included.

**Solvency Figure 27:  CEOC Interest Coverage Ratio (Interest Expense / EBITDA)**



Source:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending: Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_ Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).

   In fact, in no year did CEOC generate sufficient EBITDA to cover interest expense entirely.  As calculated in Solvency Figure 28, over the entire period from 2008 through 2014, CEOC was only able to fund on average approximately 62 cents of every dollar of interest expense from its EBITDA.

**Solvency Figure 28:  Calculation of Interest Coverage Ratio**

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|
| CEOC Annual EBITDA | $1,500 | $1,448 | $1,279 | $1,297 | $1,218 | $1,065 | $621 | $8,429 |
| Interest expense, net | $1,794 | $1,679 | $1,782 | $2,031 | $2,002 | $2,145 | $2,228 | $13,661 |
| Interest Coverage Ratio | 0.84 | 0.86 | 0.72 | 0.64 | 0.61 | 0.50 | 0.28 | 0.62 |

Source:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* of CEC Form 10-K for the years ending:  Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016).

### 4.   Internal Analysis

Caesars evaluated its liquidity on a continual basis after the LBO.  The term "runway" was used frequently to discuss how much time Caesars had before debts came due that it would likely not be able to pay.  Management and the Sponsors continually investigated ways to extend the runway further.

Numerous external and internal sources highlighted CEOC's liquidity crisis.

- As early as July 2008, Caesars was analyzing its liquidity position. 

- A 2012 presentation, which is summarized in Solvency Figure 29, also reflected that CEOC would not generate sufficient EBITDA to pay its interest expense as shown below:[319]

---

[318] "Liquidity and Profit Improvement Review July, 2008" Presentation (Jul. 8, 2008), at TPG-Examiner_01258638 [TPG-Examiner_01258634].

[319] "Caesars Entertainment Discussion Material October 2012" Presentation (Oct. 2012), at PRIV_INVESTIG_00047957 [PRIV_INVESTIG_00047907].

**Solvency Figure 29:  CEOC 2012 Projections of Free Cash Flow Prior to Debt Repayment**

| *amounts in millions* | 2013 | 2014 | 2015 |
|---|---|---|---|
| CEOC Projected EBITDA | $1,444 | $1,585 | $1,753 |
| Projected Interest Expense | ($1,754) | ($1,787) | ($1,687) |
| Other Projected Cash Expenses | ($979) | ($450) | ($480) |
| Free Cash Flow Before Debt Repayment | ($1,289) | ($652) | ($414) |

Source:  "Caesars Entertainment Discussion Materials October 2012" Presentation (Oct. 2012), at PRIV_INVESTIG_00047957 [PRIV_INVESTIG_00047907].

- 

- In June 2013, presentations prepared by Deutsche Bank were provided to the Sponsors which reflected that the enterprise value of CEOC was insufficient to pay all of its debt holders.[321]

- 

  - 

  - 

  - 

---

[320] "Venture Partners proposal raises questions; 1st liens still preferred" Goldman Sachs Report (Feb. 13, 2013), at APOLLO-Examiner_01221412-4 [APOLLO-Examiner_01221402].

[321] "Discussion Materials" Presentation (Jun. 13, 2013), at CEOC_INVESTIG_00267424; [CEOC_INVESTIG_00267386]; "Discussion Materials" Presentation (Jun. 14, 2013), at CEOC_INVESTIG_00352383 [CEOC_INVESTIG_00352345].

[322] CEOC Sum-of-the-Parts Recovery Analysis (Oct. 4, 2013), at Tab 'CEOC Recovery' [APOLLO-Examiner_01510733] (native file).

**Solvency Figure 30:  Apollo Estimate of CEOC First Lien and Second Lien Debt Holder Recovery as of October 4, 2013 Based on EBITDA Ranging from $1.2 Billion to $1.5 Billion**



Source:   CEOC Sum-of-the-Parts Recovery Analysis (Oct. 4, 2013), at Tab 'CEOC Recovery' [APOLLO-Examiner_ 01510733] (native file).

### 5.    Centerview's Analysis Supports the Examiner's Findings as to Four Properties

This is consistent with Eric Hession's testimony that asset sales are not an optimum strategy for the long-term prospects and viability of an entity like CEOC because the reduction in long-term cash flows to generate short-term liquidity result in the entity ending up with less cash.[324]

Centerview's analysis specifically identified that the Four Properties Transaction would result in (i) reduced revenue and EBITDA, (ii) lower unlevered and levered free cash flow, (iii) increase in leverage, (iv) lower interest coverage ratio and (v) an immaterial reduction in debt.   Further, the projections reflect that the transaction would only marginally improve

---

[323] "Caesars Entertainment Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004680 [CENTERVIEW_0004670].

[324] E. Hession Jan. 20, 2016 Tr. at 618:2-622:20.

CEOC's liquidity position by pushing out the timeframe when CEOC would run out of cash to 2016 rather than 2014, simply delaying the inevitable with continued unsupportable debt levels. Solvency Figure 31 summarizes the difference between the projected status quo and post-transfer financial metrics for 2014 – 2016, as presented by Centerview.

**Solvency Figure 31:  Key Financial Indicators Between the Status Quo vs Post-Transfer Scenario**

| amounts in millions | Status Quo | Post-Transaction | Difference |
|---|---|---|---|
| Cumulative Net Revenues | | | |
| Cumulative EBITDA | | | |
| Cumulative Unlevered Free Cash Flow | | | |
| Cumulative Levered Free Cash Flow | | | |
| Total Debt/2016 | | | |
| Leverage/2016 | | | |
| Interest Coverage | | | |
| Projected 2015 EBITDA | | | |

Source:  "Caesars Entertainment Confidential Discussion Materials" Presentation (Feb. 7, 2014), at CENTERVIEW_0004680 [CENTERVIEW_0004670].
Note:  Cumulative projections are for the 2014 – 2016 time period.

Furthermore, applying a 10.0x multiple to CEOC's projected 2015 EBITDA implies that at year end 2015, the enterprise value of CEOC would be $2.55 billion less than it would have been in the status quo absent the Four Properties Transaction.  However, debt would only be reduced by $185 million, and no cash would remain in either scenario at the end of 2016.  As a result, the Four Properties Transaction significantly weakened the financial position of CEOC by reducing the enterprise value by approximately $2.5 billion (or 20%), which reduces the eventual recovery to its creditors.  Put simply, CEOC's creditors are in a significantly worse position today as a result of the Four Properties Transaction.  Although this analysis was presented to the CEC Special Committee, it did not deter them from approving the Transaction, which, as discussed in Section VIII.D, *infra*, is something that independent directors at CEOC, advised by independent counsel and financial advisors, would have very likely questioned and, perhaps, resisted.

### 6.  CEOC's Disclosures Regarding CEOC's Ability to Pay Debts When Due

Beginning in 2008, CEC alerted investors that it and CEOC may be unable to pay its obligations when due.  These warnings increased in strength over time and in 2011, CEC was stating that it did not expect to be able to repay its $11.1 billion of debt due in 2015.  In every year from 2008 through 2010, CEC stated in its 10-K:

- "We may not be able to generate sufficient cash to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under our indebtedness that may not be successful."[325]

- "We cannot assure you that our business will generate sufficient cash flows from operations, or that future borrowings will be available to us to fund our liquidity needs and pay our indebtedness.  If we are unable to meet our liquidity needs or pay our indebtedness when it is due, we may have to reduce or delay refurbishment and expansion projects, reduce expenses, sell assets or attempt to restructure our debt.  In addition, we have pledged a significant portion of our assets as collateral under certain of our debt agreements, and if any of those lenders accelerate the repayment of borrowings, there can be no assurance that we will have sufficient assets to repay our indebtedness."[326]

Then, beginning in 2011, CEC increased its warnings from "may not" to "do not expect to" be able to pay its debts.  CEC's public filings continued to contain similar language in every year from 2011 through 2014, stating:

- "As of December 31, 2011, $11.1 billion face value of our indebtedness is scheduled to mature in 2015 (assuming the extension options with respect to the CMBS Financing and PHW Las Vegas senior secured loan are exercised), representing 49% of the total face value of our debt . . . . We do not expect that our cash flow from operations will be sufficient to repay this indebtedness."[327]

- "We may be unable to generate sufficient cash to service all of our indebtedness, and may be forced to take other actions to satisfy our obligations under our indebtedness that may not be successful.  If we are unable to satisfy or refinance our debt obligations as they come due, we cannot assure you that your investment in our company will retain any value."[328]

Further, CEC's 2013 10-K, Exhibit 99.1 Supplemental Discussion of Operating Company Results stated:

---

[325] CEC 10-K for the year ended Dec. 31, 2008 (Mar. 17, 2009), at 11; CEC 10-K for the year ended Dec. 31, 2009 (Mar. 9, 2010), at 13; CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 14-15.

[326] CEC 10-K for the year ended Dec. 31, 2008 (Mar. 17, 2009), at 28; CEC 10-K for the year ended Dec. 31, 2009 (Mar. 9, 2010), at 33; CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 38-39.  Similar language for CEOC in Exhibit 99.1 *Supplemental Discussion of Operating Company Results* of CEC 10-K for the years ending Dec. 31, 2008 (Mar. 17, 2009), at 23 and Dec. 31, 2010 (Mar. 4, 2011), at 29.

[327] CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 19.

[328] CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 18.

- "We do not expect that cash flow from operations will be sufficient to repay CEOC's indebtedness in the long-term and we will have to ultimately seek a restructuring, amendment or refinancing of our debt, or if necessary, pursue additional debt or equity offerings."[329]

As discussed previously, CEOC's EBITDA would have to have increased dramatically in order for its equity to be positive. In a February 2013 Caesars Entertainment Discussion materials presentation,[330] Apollo projected that in order for CEOC to be able to pay its debts from operations in 2015, CEOC's EBITDA would have to more than double to $3.2 billion (a level CEOC never achieved historically) from 2012's $1.4 billion projected EBITDA. This would require EBITDA to grow 32% in every year beginning in 2013 through 2015, a level of growth CEOC had not achieved since the LBO. The Apollo analysis plainly shows that CEOC would not have been able to grow its way out of its problems regardless of how much the "runway" was extended.

CEOC was only able to pay its operating expenses, including interest, by borrowing or issuing net debt by $3.5 billion and selling assets totaling $1.95 billion.[331] There is no credible evidence that CEOC could have achieved the EBITDA levels required to be able to pay its operating expenses.

### 7. Ability to Refinance Maturing Debt

Rowan testified that absent refinancing of maturing debt that "every company in the country wouldn't make it."[332] Refinancing maturing long-term debt in the ordinary course, or refinancing other debt early to take advantage of lower interest rates, or taking on more debt for special projects, all reflect a company managing maturities against its capital needs. However, repeatedly buying debt at a discount in the market or refinancing existing debt, both maturing and non-maturing debt, some at higher interest rates, indicates an inability to meet financial obligations. There is a difference between a healthy/solvent company refinancing its debt at 100% of the face amount which usually means lenders compete to lend versus an overleveraged/ distressed company that relies on lenders agreeing to be repaid at a discount. Lenders agreeing to take less than the face amount of their debt, charging significant fees and/or requiring higher interest rates indicate that the risk of a full recovery is in question. As noted earlier, the fair market value of CEOC's assets were materially less than the face amount of the long-term debt. This is a function of CEOC not being able to generate sufficient cash flow and EBITDA to support a value equal to or in excess of the outstanding debt. The transfer of significant EBITDA producing casino properties to CGP further impacted CEOC's ability to refinance all

---

[329] Exhibit 99.1 *Supplemental Discussion of Operating Company Results* of the CEC 8-K for the year ending Dec. 31, 2013 (Apr. 15, 2014), at 23.

[330] "Caesars Entertainment Discussion Materials February 2013" Presentation (Feb. 15, 2013), at CEOC_INVESTIG_00101196 [CEOC_INVESTIG_00101191].

[331] *See* Appendix 6-10, Solvency, for details.

[332] M. Rowan Jan. 28, 2016 Tr. at 492:5-6.

its debts at par.  A company that must consistently refinance may be doing so because it is spending more than it is making (expenses are exceeding revenues).  For example:

- In 2010, CEC purchased CMBS debt of $361.7 million for $155.3 million (or 43% of the face value);[333]

- In 2011, CEC purchased $158.1 million of CMBS loans for $108.5 million (or 67% of the face value;[334]

- In 2012, CEC purchased (a) CEOC debt of $5.9 million for $3.2 million (or 54% of the face value); and (b) CMBS debt of $367.3 million for $229.3 million (or 62% of face value);[335]

- In 2013, CEC purchased $274.8 million of CMBS debt for $219.7 million (or 79% of the face value);[336] and

- In 2014, CEOC refinanced both near-term and longer-term maturities at a higher interest rate and incurred fees of over $500 million.[337]

CEC had to rely on the lenders agreeing to receive less than 100% of the face amount of the debt.  The fact that lenders agreed to settle for less than 100% of the face amount of their debt is an indicia of a company's insolvency.

## G.  The Capital Adequacy Test

The capital adequacy test is the third independent determination of financial distress recognized in the Bankruptcy Code.  The Bankruptcy Code specifically states that any allegedly fraudulent transfer may be avoided if the debtor "was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital."[338]  CEOC's capital adequacy from 2008 through 2014 was analyzed from a broad perspective, considering both quantitative and qualitative factors.

Capital inadequacy has been described as "a condition of financial debility short of insolvency (in either the bankruptcy or equity [cash flow] sense) but which makes insolvency

---

[333]  CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 79.

[334]  *Id.*

[335]  *Id.* at 79, 81.

[336]  CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 89.

[337]  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 88; *see also* Appendix 12, Debt Transactions.

[338]  11 U.S.C. §548(a)(1)(B)(ii)(II).

reasonably foreseeable.  In other words, a transaction leaves a company with unreasonably small capital when it creates an unreasonable risk of insolvency."[339]

Capital generally refers to financial resources available for use.  Capital should include all reasonably anticipated sources of operating funds, including new equity infusions, cash from operations or cash from secured or unsecured loans.  However, capital is different from cash.  Capital is more durable and is used to generate wealth through investment.  Examples of capital include automobiles, patents, software and brand names.  Inadequate capital means the inability to generate sufficient capital to sustain operations.  Because an inability to generate sufficient capital to sustain operations must precede an inability to pay obligations as they become due, unreasonably small capital encompasses financial difficulties short of cash flow insolvency.

CEOC's financial statements as of the end of December 31, 2008, through December 31, 2014, reflected that the book value of its liabilities exceeded the book value of its assets by a wide margin, resulting in negative book equity at each of the Solvency Dates except for 2009.  As such, CEOC was clearly inadequately capitalized.

## 1.    Short-Term Capital

The working capital ratio is a measure of a company's ability to pay its short-term obligations (*i.e.*, due within one year).  A ratio of 1.0 or greater suggests that a company has current assets equal to or greater than its current liabilities, providing the ability to pay its short-term obligations.  Conversely, a ratio of less than 1.0 indicates that the company does not have sufficient funds to pay its current liabilities.  As reflected in Solvency Figure 32, at year end 2008 and 2009, CEOC's working capital was negative $540 million and $141 million, respectively, meaning CEOC's current liabilities exceeded its current assets.  From 2010 through 2014, CEOC maintained minimal working capital.

---

[339]  "Solvency Tests," J.B. Heaton, The Business Lawyer, May 2007, Volume 62, Number 3, at 995.

**Solvency Figure 32:  CEOC Working Capital**

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | $447 | $569 | $619 | $597 | $1,547 | $1,439 | $1,194 |
| Restricted Cash (a) | 0 | 0 | 0 | 40 | 793 | 14 | 19 |
| Other Current Assets | 621 | 563 | 671 | 739 | 744 | 760 | 496 |
| Current Assets *(CA)* | $1,068 | $1,132 | $1,290 | $1,375 | $3,084 | $2,213 | $1,709 |
| Accounts Payable | $276 | $230 | $219 | $261 | $325 | $344 | $130 |
| Interest Payable | 405 | 195 | 205 | 193 | 236 | 308 | 601 |
| Accrued Expenses | 842 | 773 | 766 | 752 | 774 | 810 | 652 |
| Due to Affiliate, net | 0 | 0 | 0 | 0 | 0 | 0 | 39 |
| Deferred income taxes | 0 | 0 | 0 | 0 | 0 | 288 | 187 |
| Current Portion Long-Term Debt (a,b) | 85 | 74 | 56 | 40 | 876 | 113 | 82 |
| Current Liabilities *(CL)* | $1,608 | $1,272 | $1,246 | $1,246 | $2,211 | $1,864 | $1,690 |
| CEOC Working Capital *(CA − CL)* | ($540) | ($141) | $45 | $129 | $872 | $349 | $18 |
| CEOC Working Capital Ratio *(CA/CL)* | 0.66 | 0.89 | 1.04 | 1.10 | 1.39 | 1.19 | 1.01 |

Sources:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending:  Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19B CC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016); Capital IQ; Monthly Actuals vs Budget (Jun. 17, 2015), at Tab 'Summary' [CEC_Examiner_0145430] (native file); CEOC Form 10-Q for 3Q 2014.

Notes:

(a)  In 2012, $750 million of restricted cash and the current portion of long-term debt are associated with notes offered in December 2012 maturing in 2020, but classified as restricted and short-term because escrow conditions were not met as of December 31, 2012.

(b) The current portion of long-term debt at year end 2014 as noted in Ex. 99.1 to CEC Form 10-K for year end Dec. 31, 2014 was approximately $15.8 billion [in order to comply with GAAP].  It was assumed for purposes of analyzing working capital that CEOC was able to extend or refinance the debt.  Short-term debt was assumed to be the same as it was reported in the 3Q 2014 financials.

As shown in Solvency Figure 33, CEOC's working capital ratio ranged from 0.66 to 1.39 from 2008 through 2014, and was lower than the weighted median of CEOC's Industry Peers at each year end other than 2012 and 2014.  In 2012, CEOC's working capital ratio exceeded the weighted median of CEOC's Industry Peers ratio by 0.24 (1.39 versus 1.15).  CEOC's Industry Peer's working capital ratio at December 31, 2012, ranged from 0.36 to 2.98, so even though CEOC's working capital ratio exceeded the median it, was well within the range of the Industry Peers' working capital ratio.  Further, in 2013, CEOC's working capital ratio was again less than CEOC's Industry Peers, and CEOC's 2014 working capital ratio was essentially equal to CEOC's Industry Peers' ratio.  Working capital, including cash, was at levels necessary to run

the business (paying vendors, interest payments, etc.).  Accordingly, CEOC did not have excess working capital.

**Solvency Figure 33:  CEOC and Industry Peers' Working Capital Ratio**



<u>Source</u>:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending:  Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016); Capital IQ.
<u>Note</u>:  This is a graphical presentation of information in Solvency Figure 32.

## 2.    Long-Term Capital

In  measuring  a  company's  ability  to  meet  its  long-term  obligations  (*i.e.*,  long-term interest-bearing debt), a company's debt to equity ratios are analyzed.  The equity of a company serves as a cushion to protect creditors from short- to mid-term financial stress (in that the assets of  the  company  exceed  its  debts).   When  there  is  no  equity  as  was  the  case  with  CEOC  (or negative equity), there is no cushion to protect the creditors.  As previously shown in Solvency Figure 2, CEOC's book equity was negative in all years aside from 2009, with the deficit growing larger in each year from 2010 through 2014.  When book equity is adjusted to exclude goodwill, an asset that cannot be sold or used as collateral, the deterioration in CEOC's equity is even more pronounced.

Additionally, CEOC's debt to assets ratio was analyzed.  As shown in Solvency Figure 34, the debt to asset ratio shows that, excluding goodwill, total debt exceeded total assets every

year.  A debt to asset ratio of 0.7 reflects $7 in liabilities for every $10 in assets; a debt to asset ratio of 1.25 reflects $12.50 in liabilities for every $10 in assets.  Furthermore, as shown in Solvency Figure 35, compared to CEOC's Industry Peers, CEOC's debt to asset ratio was significantly higher than the median.

**Solvency Figure 34:  CEOC and Industry Peers Debt to Asset Ratios**

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Total Assets | $21,932 | $20,671 | $20,292 | $20,358 | $20,035 | $15,973 | $11,676 |
| Goodwill | $2,754 | $1,768 | $1,732 | $1,619 | $1,413 | $1,271 | $674 |
| Assets Before Goodwill | $19,179 | $18,904 | $18,561 | $18,739 | $18,622 | $14,702 | $11,003 |
| Total Liabilities | $21,867 | $20,083 | $20,372 | $21,169 | $22,219 | $21,374 | $19,761 |
| Debt to Asset Ratio | | | | | | | |
| CEOC | 1.00x | 0.97x | 1.00x | 1.04x | 1.11x | 1.34x | 1.69x |
| Industry Peers - unweighted median | 0.68x | 0.67x | 0.69x | 0.66x | 0.74x | 0.89x | 0.90x |
| Industry Peers - weighted median | 0.66x | 0.68x | 0.69x | 0.66x | 0.74x | 0.87x | 0.89x |
| Debt to Asset Ratio (excluding Goodwill) | | | | | | | |
| CEOC | 1.14x | 1.06x | 1.10x | 1.13x | 1.19x | 1.45x | 1.80x |
| Industry Peers - unweighted median | 0.78x | 0.76x | 0.76x | 0.74x | 0.80x | 0.98x | 1.07x |
| Industry Peers - weighted median | 0.73x | 0.75x | 0.76x | 0.74x | 0.83x | 0.96x | 1.02x |

Source:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending:  Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec.  2014,  <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC5 22/CEOC_Selected_Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016); Capital IQ.

Note:  Excludes CEOC intercompany debt for comparability.

The weighted median is based on the calculated CEOC EBITDA weighted multiple seen in Solvency Figure 9.  The weight is calculated as the sum of (1) the median of the entities in the Las Vegas market (Wynn and MGM) multiplied by the percentage of CEOC's EBITDA from properties on the strip in Las Vegas and (2) the median of all other industry peers (Boyd, Penn, Isle of Capri, Pinnacle, Monarch and Churchill Downs) multiplied by the percentage of CEOC's EBITDA from properties not on the strip in Las Vegas.

**Solvency Figure 35:  CEOC and Industry Peers Debt to Asset Ratios**



Source: Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending: Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014); CEOC Selected Financial Information as of Dec. 2014, <http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_ Financial_Information_December_2014.pdf> (last visited Mar. 1, 2016); Capital IQ.
Note: This is a graphical presentation of information in Solvency Figure 34.  The weighted median is based on the calculated CEOC EBITDA weighted multiple seen in Solvency Figure 9.  The weight is calculated as the sum of 1) the median of the entities in the Las Vegas market (Wynn and MGM) multiplied by the percentage of CEOC's EBITDA from properties on the strip in Las Vegas and 2) the median of all other industry peers (Boyd, Penn, Isle of Capri, Pinnacle, Monarch and Churchill Downs) multiplied by the percentage of CEOC's EBITDA from properties not on the strip in Las Vegas.

Based on the above, the Examiner concludes that CEOC was inadequately capitalized as of December 31, 2008, through December 31, 2014.  In fact, other than at December 31, 2009, CEOC had no equity capital.  In fact, it had negative equity.

## H.  Contemporaneous Market Assessments

In addition to the three tests discussed and the analysis of CEOC's financial results, an evaluation of third parties' contemporaneous views of CEOC's financial condition is informative, though not determinative.  CEC and the Sponsors were actively involved in monitoring the market value of CEOC's debt, analysts' views on CEOC debt and financial conditions and the reaction in the marketplace to debt exchanges.  Based on the market evidence,

CEC and the Sponsors knew, or should have known, that market participants viewed CEOC as insolvent.

### 1.   Market Value of CEOC Debt

A company's debt trading at a discount is an indicator that outside parties anticipate the issuer delaying payment, not paying in full or defaulting on the debt. In analyzing CEOC's tradable debt, it is clear that outside investors were concerned with CEOC's ability to repay its debt, as evidenced by CEOC's debt trading significantly below par. It is a reasonable conclusion that the market viewed CEOC as not being able to repay the debt at face value. As reflected in Solvency Figure 36, at every year-end since the LBO, CEOC's debt has traded below its face value, ranging from a 9% to a 71% discount from par. The discounting of CEOC's debts suggests that creditors holding that debt believed they would not recover the face value of the debt.

**Solvency Figure 36:  CEOC Debt – Face Value and Market Value**

| amounts in millions | Tradable Debt | | | | Non-Tradable Debt | | Total CEOC Debt | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Face | Market | Deficit | Discount | Face & Market | Deficit / Discount | Face | Market | Deficit | Discount |
| YE 2008(a) | $8,822 | $2,528 | ($6,295) | -71% | $9,062 | n/a | $17,885 | $11,590 | ($6,295) | -35% |
| YE 2009 | $9,620 | $7,484 | ($2,136) | -22% | $7,734 | n/a | $17,354 | $15,219 | ($2,136) | -12% |
| YE 2010 | $10,017 | $9,067 | ($950) | -9% | $7,777 | n/a | $17,795 | $16,844 | ($950) | -5% |
| YE 2011 | $12,335 | $9,171 | ($3,164) | -26% | $6,432 | n/a | $18,766 | $15,602 | ($3,164) | -17% |
| YE 2012 | $17,695 | $14,821 | ($2,874) | -16% | $2,834 | n/a | $20,529 | $17,654 | ($2,874) | -14% |
| YE 2013 | $19,134 | $15,874 | ($3,259) | -17% | $155 | n/a | $19,288 | $16,029 | ($3,259) | -17% |
| YE 2014 | $18,277 | $11,126 | ($7,151) | -39% | $94 | n/a | $18,371 | $11,220 | ($7,151) | -39% |
| Other Dates of Interest: | | | | | | | | | | |
| 8/31/2010 (Trademarks) | $10,017 | $7,987 | ($2,030) | -20% | $7,782 | n/a | $17,799 | $15,769 | ($2,030) | -11% |
| 9/30/2013 (CERP) | $19,173 | $15,732 | ($3,442) | -18% | $1,438 | n/a | $20,612 | $17,170 | ($3,442) | -17% |
| 10/31/2013 (PH) | $19,164 | $15,664 | ($3,500) | -18% | $258 | n/a | $19,422 | $15,922 | ($3,500) | -18% |
| 5/31/2014 (Four Properties) | $18,799 | $14,545 | ($4,254) | -23% | $250 | n/a | $19,049 | $14,795 | ($4,254) | -22% |

Sources:  Face value data is from CEOC's consolidated financial statements for the period 2008 Q4 through 2014 Q3; 2008 Q4 par value data is only reported at book value; Price data used to calculate market value is from Bloomberg L.P.; Non-tradeable debt reflects debt for which Bloomberg L.P. did not have pricing information available.
Note:
(a) Face value of each tranche of debt was not available; however, total face value was known.  Book value was used for the tradable debt with the difference between total book value and total face value assumed to be non-tradable debt.

Analysts' commentary evidenced the market's assessment of CEOC. In July 2012, RBC indicated that it was noteworthy that CEOC's second lien and senior unsecured debt was trading at deep discounts resulting in yields of approximately 20%. RBC goes on to state:  "This suggests to us that the high yield market is questioning the equity value and long-term viability

of the company."[340]   Analysts also forecasted that Caesars would not be able to cover the face value of debt and that a portion of the value of the debt was a matter of how many more coupon payments CEOC was likely to distribute.[341]

## 2.   Reaction to Caesars Debt Exchanges

When Caesars announced an exchange offer in late 2008 to extend note maturities, the market's assessment was that it was doing so "to avoid default."[342] ███████ ██████████████████████████████████████████████████████   In January 2009, creditors filed class action litigation over the bond tender offers representing that the ability of only select holders to participate in the tender offer (i) subordinated the class's existing holdings and (ii) "likely rendered [the holdings] worthless as the specter of Harrah's insolvency approaches."[344]   The class asserted that "HEI and HOC are on the verge of bankruptcy, debt default and other events of insolvency."[345]   The claims of forced subordination were ultimately overcome by Caesars' subsequent exchange in 2009, but that did not alleviate the market's concerns regarding CEOC's financial situation.   Even though CEOC was able to exchange debt at a discount and repurchased mortgages and secured loans for 25 to 30 cents on the dollar in early 2010, analysts noted that Caesars wasn't "out of the woods" as it still had $15.5 billion of debt due by 2015.[346]   The fact that CEOC was able to exchange debt at significant discounts was a sign that market participants questioned the ability of CEOC to repay its debts when they came due.

## 3.   Credit Analyst Commentary Regarding CEOC's Liquidity

In the year subsequent to the LBO, market analysts indicated that the economic downturn and the high debt levels at Caesars were of concern regarding Caesars' ability to generate

---

[340]   July 16, 2012 RBC Capital Markets Report "Initiating Coverage with an Underperform Rating and a $6 Price Target" at 3.

[341]   Oct. 30, 2013 Deutsche Bank Report "Reinstating rating on CEOC."   *See also* Appendix 8, Analyst Commentary at 1.

[342]   Moody, Emma and Sala, Caroline, *Apollo's Black Seeks Bond Swaps for Harrah's, Realogy, Bloomberg*, dated Nov. 17, 2008.

[343]   Letter from Davis Polk & Wardwell, Counsel to Baha Mar Joint Venture Holdings Ltd. to Latham & Watkins LLP, Counsel to Caesars (Dec. 5, 2008), at APOLLO-Examiner_0174165 [APOLLO-Examiner_01474165].

[344]   Class Action Complaint, *Murchison v. Harrah's Ent., Inc.*, No. 1:09-cv-00020 (D. Del. Jan. 9, 2009), at APOLLO-Examiner_01313430 [APOLLO-Examiner_01313429].

[345]   *Id.*   According to documents filed Nov. 13, 2009 in this matter, Plaintiff's claims were ultimately mooted by Caesars' subsequent debt exchange in 2009.

[346]   Apr. 12, 2010 Bloomberg Article "Harrah's Debt Rallies to Highest Level Since Apollo, TPG Buyout."

sufficient earnings.[347] Deutsche Bank noted "negative free cash flow and EBITDA levels that do not support interest expense are not sustainable for a long period of time."[348]

Apollo was aware of, and sensitive to, the market's perception of CEOC's financial condition. For example, Apollo considered how outside parties would view the election to pay interest for Toggle Notes/Loans utilizing the payment-in-kind (PIK) method of issuing additional notes rather than cash in the July 2008 payment election. ████[49]██████████████████

Apollo and Caesars' decision to extend CEOC's "runway" as far out as possible in hopes of revenue and EBITDA increasing and market conditions changing enough to allow CEOC to restructure its debt were viewed as unrealistic by a number of analysts. When RBC initiated coverage of Caesars' stock in July 2012, it estimated that CEC's net asset value was approximately negative $1.6 billion.[351] Thus, it is not surprising that RBC stated:

> EBITDA is not growing fast enough, we estimate the company is still free cash flow negative, and asset sales – like the recent sale of Harrah's Maryland Heights – are unlikely to be debt accretive. Too much of EBITDA is eaten up by debt service, and we believe deferred maintenance has become an issue at many of the company's properties. True, there are minimal debt maturities through 2014, but ~$8 billion comes due in 2015. This will be difficult to refinance cheaply given the company's complex capital structure and restrictive covenants, and could potentially result in even higher interest payments . . . . it is noteworthy that its second lien and senior unsecured debt are trading at deep discounts and yielding 19% and 22%, respectively. This suggests to us that the high-yield market is questioning the equity value and long-term viability of the company.[352]

Furthermore, in October 2012, RBC stated that CEOC's "EBITDA is not growing fast enough to offset an increasing debt burden" and that Caesars' "decision to grow out of the capital structure as opposed to reducing absolute levels of debt" did not improve CEOC's capital structure, but rather just increased leverage.[353] The ability to grow revenues and EBITDA were

---

[347]   Aug. 11, 2008 Deutsche Bank Report "Harrah's Q2 2008 Results Review."

[348]   Nov. 7, 2008 Deutsche Bank Report "Harrah's Q3 2008 Results Review."

[349]   Email exchange between M. Cohen and D. Sambur, *et al.* (Jul. 2, 2008), at APOLLO-Examiner_01483783 [APOLLO-Examiner_01483783].

[350]   Email exchange between M. Cohen to G. Thompson, *et al.* (Jul. 2, 2008), at APOLLO-Examiner_01468026 [APOLLO-Examiner_01468026].

[351]   July 16, 2012 RBC Capital Markets Report "Initiating Coverage with an Underperform Rating and a $6 Price Target."

[352]   July 16, 2012 RBC Capital Markets Report "Initiating Coverage with an Underperform Rating and a $6 Price Target."

[353]   Oct. 24, 2012 RBC Capital Markets Report "Caesars Entertainment Corp. 3Q12 Preview."

impacted by CEOC's capital structure, in that Caesars' decision to defer maintenance capital expenditures resulted in "wear and tear" at properties, which in turn was impacting its market share.[354]

By the middle of 2012, analysts valued CEC's equity as "options," meaning that even though the market value of the assets was less than the value of the liabilities, equity can retain a positive value as it can be thought of as an option to purchase the company for the value of the liabilities.[355]  Analyst commentary in this regard included Barclays' view of "Caesars' equity as an 'option' on the legalization of real-money online poker in the United States,"[356] and RBC's assessment that Caesars' "equity essentially trades as an option."[357]  Barclays stated, "Caesars is the most highly levered company in our coverage universe, which not only limits its financial flexibility, but also keeps the risk of bankruptcy high, in our view."[358]

Market analysis continued to view Caesars' equity warily in 2013.  For example:

- Morningstar called Caesars' stock "highly speculative."[359]

- RBC forecasted in February 2013 that "without a substantial increase in earnings," Caesars would burn through its liquidity.[360] While liquidity appeared "strong," limited earnings growth and significant capital expenditures would quickly run through any cash surplus,[361] and Caesars would "effectively run out of cash by the end of 2014."[362]

---

[354]  May 2, 2012 Deutsche Bank Report "New First Lien Issue & Bank Refi Provides Flexibility."

[355]  "An Economist's View of Market Evidence in Valuation and Bankruptcy Litigation", Yaron Nili, Harvard Law School Forum on Corporate Governance and Financial Regulation, posted June 28, 2014.

[356]  Aug. 22, 2012 Barclays Report "Patiently Waiting; Initiating Coverage at UW."

[357]  Oct. 24, 2012 RBC Capital Markets Report "Caesars Entertainment Corp. 3Q12 Preview."

[358]  Aug. 22, 2012 Barclays Report "Patiently Waiting; Initiating Coverage at UW."

[359]  Mar. 19, 2013 Morningstar Report "Caesars is Plagued by a Mountain of Debt and Intensifying Competition in the U.S. Casino Industry."

[360]  Feb. 26, 2013 RBC Capital Markets Report "Q4 Results Uninspiring; Maintaining Underperform."

[361]  *Id.*

[362]  Apr. 18, 2013 RBC Capital Markets Report "Thoughts on Potential CGVP Transaction."

- In February 2013, RBC calculated that Caesars' stock had negative equity.[363] RBC valued the CGP portion of equity at $3 target, calling Caesars' stock an "out-of-the-money call option on online gaming growth".[364]

- In October 2013, Barclays attributed no equity value to the "legacy" Caesars business.[365]

- In October 2013, Deutsche Bank calculated an equity value of negative $3 per share for the CEOC and CERP portion of Caesars.[366]

### 4. Analyst Assessment of Impact of Asset Transfers on CEOC's Financial Condition

Despite the asset sale "levers" Caesars utilized to "extend the runway," RBC Capital indicated these were "short-term solutions" that would "only buy them time until 2015" at which point "a contentious debt-for equity or distressed debt exchange will need to be consummated."[367]  In addition to only delaying the inevitable, analysts indicated that as a result of the asset transfers, CEOC was placed in even poorer financial condition than prior to the sales.

In April 2013, prior to the Growth Transaction, RBC indicated that buying Caesars' stock was "essentially buying a right to participate in CGVP, as we now view the remaining assets as having no equity value" while stating that Caesars would have to restructure in 2014 or early 2015.[368]

The market viewed the Four Properties Transaction unfavorably, ultimately concluding that "bondholders will lose value in the range of $2.0 billion to $2.4 billion."[369]  In Moody's opinion, the EBITDA CEOC lost from the Four Properties sale would cause CEOC's "already high leverage to increase as well as reduce bondholders' recovery prospects . . . [d]espite the approximate $1.8 billion of cash that will be received . . . ."  As a result, Moody's then reduced CEOC's Corporate Family rating to Caa3; the Probability of Default rating to PD-Caa3; CEOC's

---

[363]  Feb. 26, 2013 RBC Capital Markets Report "Q4 Results Uninspiring; Maintaining Underperform."

[364]  Apr. 18, 2013 RBC Capital Markets Report "Thoughts on Potential CGVP Transaction."

[365]  Oct. 29, 2013 Barclays Report "Updating Valuation for CAC."

[366]  Oct. 30, 2013 Deutsche Bank Report "Takeaways from 3Q13."

[367]  May 2, 2013 RBC Capital Markets Report "Q1 Results Did Little to Change Our View."

[368]  Apr. 18, 2013 RBC Capital Markets Report "Thoughts on Potential CGVP Transaction"; Apr. 24, 2013 RBC Capital Markets Report "Crossing the Rubicon."

[369]  Mar. 28, 2014 Moody's Report "Moody's Takes Rating Actions on Several Entities in the Caesars' family."

first lien debt to Caa1; CEOC's second lien debt to Ca and maintained its Ca rating on CEOC's unsecured debt.[370]

Fitch concurred, noting the asset sales "further deteriorate certain debt holders' recovery prospects in an event of default and exacerbate an already weak free cash flow profile at CEOC."[371]  Fitch further viewed the Four Properties Transaction and shared services joint venture (CES) to reflect "another step towards moving assets away from the weaker CEOC into healthier entities and isolating the healthier entities from a potential filing at CEOC."[372]

As further details of the shared services joint venture were released, Deutsche Bank determined the agreement to be "a considerable NEGATIVE for CEOC, as it grants CERP and CGP the irrevocable right to use Total Rewards and other IP for no consideration to CEOC."[373]

It is clear that third-party analysts voiced significant concern regarding CEOC's financial condition and its ability to pay its creditors at par.

**I.    Internal CEOC Solvency/Liquidity Analyses**

   **1.    Liquidity Projections Examples**

Both CEOC and the Sponsors prepared countless numbers of liquidity analyses beginning as early as 2008.  All of the analyses reached a similar conclusion, that CEOC would not generate sufficient free cash flow to pay its debts including interest expense.  Rather, CEOC could only survive by increasing its debt load.  *See* Solvency Figure 37 for a summary of selected liquidity analyses.

---

[370]  *Id.*

[371]  Mar. 3, 2014 Fitch Report "Caesars CGP Related Transactions Positive for Equity Holders and CERP; Negative for CEOC."

[372]  *Id.*

[373]  Mar. 12, 2014 Deutsche Bank Report "Management Plays Another Hand; Investors Wary; Downgrading to a Hold."

**Solvency Figure 37:  CEOC Projected Free Cash Flow**

| (amounts in millions) | | Projected Free Cash Flow[a] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| 2008 | Free Cash Flow | | | | | | | | | |
| | Cumulative | | | | | | | | | |
| 2009 | Free Cash Flow | | | | | | | | | |
| | Cumulative | | | | | | | | | |
| 2010 | Free Cash Flow | | | | | | | | | |
| | Cumulative | | | | | | | | | |
| 2011 | Free Cash Flow | | | | | | | | | |
| | Cumulative | | | | | | | | | |
| 2012 | Free Cash Flow | | | | | | | | | |
| | Cumulative | | | | | | | | | |
| 2013 | Free Cash Flow | | | | | | | | | |
| | Cumulative | | | | | | | | | |

Sources: ███████████████████████████████████████[74]

Note: (a) Free Cash Flow calculated as EBITDA less capital expenditures, interest expense, taxes, working capital requirements and mandatory debt repayments.

Additional liquidity analyses prepared for the CEC Board of Directors prior to the significant asset transfers in 2013/2014 also show that CEOC would not generate sufficient cash flows to pay its debts.



[374] "Harrah's Performance Manager" (May 16, 2008), at TPG-Examiner_00027843 [TPG-Examiner_00027829]; "Harrah's Performance Reporting" (Sept. 10, 2009), at TPG-Examiner_00033142 [TPG-Examiner_00033124]; "Caesars Entertainment Discussion Materials" (Dec. 2011), at APOLLO-Examiner_01520973 [APOLLO-Examiner_01520940]; "Caesars Entertainment Discussion Materials" (Nov. 2012), at TPG-Examiner_00070782 [TPG-Examiner_00070779]; "Caesars Discussion Materials" (Nov. 25, 2013), at TPG-Examiner_0005942 [TPG-Examiner_00005929].

[375] "Caesars Entertainment Discussion Materials August 2012" Presentation (Aug. 12, 2012), at APOLLO-Examiner_00020156 [APOLLO-Examiner_00020150].

In addition, the November 2013 CEC Board of Directors Materials discussed liquidity matters.[376] The presentation showed that CEOC's free cash flow pre-maturity was negative for 2014, 2015 and 2016 as noted below:

- 2014 ($1.8 billion)

- 2015 ($721 million)

- 2016 ($727 million)

As noted in this section, as early as 2012, CEOC's own analysis showed that absent additional borrowing or asset sales, it would not be able to pay its debts when due.

### 2. Value of Equity Examples



In October 2013, Apollo analyzed the equity positions of CEOC and CEC.

In that presentation Apollo analyzed the equity value of CEOC.

---

[376] "Liquidity Discussion Board of Directors Materials November 2013" Presentation (Nov. 25, 2013) [CEOC_INVESTIG_00172963] (native file) at 2.

[377] "Caesars Entertainment Board of Directors Meeting" Presentation (Dec. 10, 2010), at APOLLO-Examiner_01298086 [APOLLO-Examiner_01298046].

[378] CEOC Sum-of-the-Parts Recovery Analysis (Oct. 4, 2013), at Tab "SOTP" [APOLLO-Examiner_01510733] (native file).

[379] CEOC Sum-of-the-Parts Recovery Analysis (Oct. 4, 2013), at Tab 'CEOC model' [APOLLO-Examiner_01510733] (native file); Caesars Analysis Back-Up (Nov. 17, 2013), at Tab 'CEOC model' [PRIV_INVESTIG_00036043] (native file); Caesars Analysis Back-Up (Dec. 19, 2013), at Tab 'CEOC model New' [APOLLO-Examiner_01509714] (native file); Caesars Analysis Back-Up Jan. 29, 2014), at Tab 'CEOC model New' [APOLLO-Examiner_01506523] (native file); Caesars Analysis Back-Up (Jun. 10, 2014), at Tab 'CEOC model New' [APOLLO-Examiner_01507159] (native file).

[380] "Caesars: Discussion Materials" Presentation (Nov. 2013), at APOLLO-Examiner_01526217 [APOLLO-Examiner_01526207].

████████████████████████████████████████████

████████████████████████ In mid-2014
CEOC added its first independent board members.  The Examiner interviewed Steven Winograd
and among other areas, inquired about CEOC's solvency.  Winograd quickly realized after
joining the CEOC board that CEOC was insolvent.  Winograd testified as follows:[384]

> Well, I think the duties – the operating presumption was that you were operating
> in an insolvency situation, that you had broader duties than just to the equity, and
> that's the basis on which we were conducting ourselves.
>
> Okay.  So who did you discuss that operating premise with?  Was it just yours or
> was it part of the broader discussion?
>
> When you say "broader" – I mean certainly K&E, Perella, Mesirow when they
> came on board.  I mean, I think it was just acknowledged.  There wasn't like a
> debate, a question, do we have to go and figure out if we are insolvent.  With
> these kind of numbers it's kind of obvious.

## J.   Analysis of CEC Guarantee

All debt securities and senior secured credit facilities of CEOC were guaranteed by CEC
("CEC Guarantee").[385]  However, the guarantee for all debt other than the first lien debt was
purportedly to be released upon CEOC no longer being a wholly-owned subsidiary of Caesars.[386]
CEC's position has been that the CEC Guarantee was a guarantee of convenience and could be
released at any time, and in fact it did release the guarantee in May 2014.[387]  CEC claims that it
only maintained the CEC Guarantee so it did not have to file stand-alone financial statements for
CEOC and risk a "going concern opinion" on CEOC's financial statement.  To the extent the

---

[381]  "Project Julii Discussion Materials" Presentation (Apr. 10, 2014), at APOLLO-Examiner_ 00692553 [APOLLO-Examiner_00692546].

[382]  *Id.* at APOLLO-Examiner_00692554.

[383]  Text from D. Sambur to M. Rowan (June 6, 2014), at APOLLO-Examiner_00719706 [APOLLO-Examiner_00719706].

[384]  S. Winograd Oct. 21, 2015 Tr. at 44:8-23.

[385]  "CEC currently guarantees all of the debt securities of CEOC and the senior secured credit facilities." Nov. 6, 2012, CEOC Offer to Exchange at 3.

[386]  Nov. 6, 2012 CEOC Offer to Exchange at 70.

[387]  May 6, 2014 CEOC 8-K "Item 1.02 Termination of a Material Definitive Agreement."

CEC Guarantee was a guarantee of convenience and could be released whenever CEC determined, then there was no value to the CEC Guarantee.

Additionally, there currently is litigation pending regarding the validity of the CEC Guarantee.  If it is determined that the CEC Guarantee is no longer in place, then the analysis in this section is moot.  To the extent the court finds that the CEC Guarantee is valid, then this analysis is relevant.

### 1.    Analysis of the Illustrative Value of the CEC Guarantee

The value of the CEC Guarantee was evaluated by analyzing the financial condition of CEC and its subsidiaries including CIE, CMBS/CERP and CGP (excluding CEOC).

CEC is primarily a holding company with no independent operations; therefore, CEC's ability to satisfy the guarantee without monetizing its ownership interest in other entities would be limited to its adjusted working capital.[388]  The concept is that the adjusted working capital represented the unencumbered assets of CEC.  Accordingly, the amount of adjusted working capital at each year end from 2008 through 2014 was assessed.  The calculation of CEC adjusted working capital is shown in Solvency Figure 38.

### Solvency Figure 38:  CEC Adjusted Working Capital

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Total current assets | $0.4 | $122.9 | $139.7 | $19.6 | $42.1 | $145.0 | $424.0 |
| Total current liabilities | 8.2 | 10.4 | 9.4 | 22.7 | 23.5 | 9.0 | 20.0 |
| Working Capital – Gross | ($7.8) | $112.5 | $130.3 | ($3.1) | $18.6 | $136.0 | $404.0 |
| Adjustments:  increase / (decrease) | | | | | | | |
| - Restricted cash | - | - | - | - | - | (31.0) | (11.0) |
| - Due from affiliates | (0.2) | (0.2) | (3.7) | (15.7) | (29.6) | (1.0) | (10.0) |
| + Due to affiliates | - | 1.8 | - | 15.0 | 15.9 | 5.0 | 6.0 |
| Adjusted Working Capital | ($8.0) | $114.1 | $126.6 | ($3.8) | $4.9 | $109.0 | $389.0 |

Source:  Exhibit 99.1 *Supplemental Discussion of Operating Company Results* to CEC Form 10-K for the years ending: Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014).

In addition to CEC's independent ability to satisfy the guarantee, the value CEC could potentially realize by monetizing its ownership interest in CIE, CMBS/CERP and CGP was also considered.  This assumes that CEC (i) could sell its ownership interest in CIE, CMBS/CERP; and/or CGP to satisfy its obligations and (ii) would have the ability to retire any CEOC debt owned by CEC, CIE, CGP, or CERP.  Accordingly, these values were assessed at each year end from 2008 through 2014.

---

[388]   Working capital is current assets, which include cash, accounts receivable and other current assets, less current liabilities, which include accounts payable, interest payable and the current portion of long-term debt.  Adjusted working capital for the purpose of this analysis excludes restricted cash, intercompany receivables and intercompany payables.

The market value of CEC's equity in CMBS/CERP was estimated by applying an EBITDA multiple based upon CEOC's Industry Peers (shown previously in Solvency Figure 20) to CMBS/CERP's EBITDA to estimate the enterprise value.[389]  The market value of CIE prior to its transfer to CGP in late 2013 was estimated in the same manner, except a 15.0x EBITDA multiple was applied.  From the resulting enterprise values of CMBS/CERP and CIE, the face value of the entity's third-party debt was then subtracted.  The market value of equity was then multiplied by each CEC's interest in the entity (*i.e.*, approximately 90% for CIE,[390] and 100% for CERP).

The market value of CEC's interest in CGP was estimated based on the market price of CAC stock.  The market capitalization for CAC, whose only asset is its interest in CGP, was grossed up based on CAC's 42.4% ownership of CGP to estimate the total value of CGP, which was then multiplied by 57.6% to reflect CEC's ownership in CGP.  A 20% discount was then applied since (i) CEC does not control the operations of CGP (CEC's ownership consists of non-voting shares),[391] and (ii) CGP shares are not traded (lack of marketability). [392]  The calculation of CIE, CERP and CGP's equity value, and CEC's portion thereof, at each year end is shown in Solvency Figure 39, Solvency Figure 40 and Solvency Figure 41.[393]

---

[389]  In arriving at the enterprise value for CERP and CGP, this analysis assumed that the Total Rewards program would remain in place with all its benefits.  To the extent both CERP and CGP are not included in Total Rewards, the resulting enterprise value would be less than that shown here.

[390]  CEC's ownership share of CIE changes annually, as the management team receives more stock each year.

[391]  The Sponsors did, however, have effective control over CGP through their ownership of a majority of the voting stock of CAC.

[392]  The market approach is not a meaningful exercise for CEC, as CEC is primarily a holding company and does not generate EBITDA.

[393]  *See* Appendix 7, Exhibit D, for a discussion on discounts for marketability and control.

**Solvency Figure 39:  Market Value of CIE Equity Prior to Transfer to CGP**

| amounts in thousands | 2009 (a) | 2010 | 2011 | 2012 |
|---|---|---|---|---|
| Income/(Loss) from Operations | | | | |
| + Depreciation / Amortization | | | | |
| EBITDA | | | | |
| Adjustments to EBITDA:  (Per CAC) | | | | |
| Stock-Based Compensation Expense | | | | |
| Lobbying Expense | | | | |
| Acquisition and integration costs | | | | |
| Other income / (expense), net | | | | |
| Adjusted EBITDA | | | | |
| x EBITDA Multiple | | | | |
| CIE Enterprise Value | | | | |
| + Cash and Equivalents (b) | | | | |
| - Face Value of Debt (b), (c) | | | | |
| =Market Value of CIE Equity | | | | |
| CEC Ownership of CIE | | | | |
| CEC portion of CIE Equity Market Value | | | | |

Sources:

Note:
(a) Financial Statements for May 2009 through December 2009 were not located in the document production or publicly available information.
(b) Reflects cash paid and intercompany debt assumed in the acquisition of Buffalo Studios.
(c) Excludes debt owed to CEC.

**Solvency Figure 40:  Market Value of CMBS / CERP Equity**

| amounts in millions | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Income/(Loss) from Operations | ($1,296) | ($148) | $191 | $189 | $182 | ($791) | ($44) |
| + Depreciation / Amortization | 224 | 220 | 222 | 216 | 219 | 216 | 200 |
| + Impairment of Assets | $1,744 | $459 | $0 | $0 | $3 | $1,046 | $289 |
| = EBITDA | $673 | $531 | $413 | $404 | $403 | $471 | $445 |
| x EBITDA Multiple | 9.75x | 10.00x | 11.00x | 9.25x | 10.00x | 11.25x | 9.75x |
| CERP Enterprise Value | $6,558 | $5,314 | $4,542 | $3,741 | $4,033 | $5,295 | $4,339 |
| - Book Value of Debt (b) | 6,500 | 5,551 | 5,182 | 5,026 | 4,669 | 4,611 | 4,774 |
| =Market Value of CERP Equity | $58 | ($237) | ($640) | ($1,285) | ($636) | $684 | ($435) |

Sources:  CMBS Properties Audited Financial Statements for the years ending Dec. 31, 2008 through Dec. 31, 2012; CERP 2013 and 2014 10-K.  2008 – 2008 Audit Report – CMBS Combined Entities (Apr. 30, 2009), at CEC_Examiner_0213512-3 [CEC_Examiner_0213508]; 2009 and 2008 – 2009 Audit Report – CMBS Combined Entities (Apr. 29, 2010), at APOLLO-Examiner_00110051-2 [APOLLO-Examiner_00110048]; 2010 and 2009 – 2010 Audit Report – CMBS Combined Entities (Apr. 29, 2011), at CEOC_INVESTIG_00073710-1[CEOC_INVESTIG_00073707]; 2011 and 2010 – 2011 Audit Report – CMBS Combined Entities (Apr. 30, 2012), at CEOC_INVESTIG_00073659-60 [CEOC_INVESTIG_00073656]; 2012 and 2011 – 2012 Audit Report – CMBS Combined Entities (Apr. 30, 2013), at CEOC_INVESTIG_00046870-1 [CEOC_INVESTIG_00046866].
Note:
(a) CEC owns 100% of the CMBS Properties and CERP.
(b) The face value of debt was not available.

**Solvency Figure 41:  Market Value of CGP Equity**

| dollars in millions | 2013 | 2014 |
|---|---|---|
| CAC Shares Outstanding | 135,771,882 | 136,386,894 |
| CAC Share Price (NASDAQ:  CACQ) | $12.06 | $10.31 |
| CAC Market Capitalization | $1,637 | $1,406 |
| CAC Ownership of CGP | 42.4% | 42.4% |
| CGP's Implied Value | $3,862 | $3,316 |
| CEC's Ownership of CGP | 57.6% | 57.6% |
| CEC's Estimated Portion of CGP Implied Value | $2,224 | $1,910 |
| Discount for Lack of Marketability and Control | 20.0% | 20.0% |
| Market Value of CEC's Share of CGP | $1,780 | $1,528 |

Sources:  CAC Form 10-K for the year ending Dec. 31, 2014 (Mar. 16, 2015); Stock prices taken from Yahoo Finance.

The last step in assessing the potential value of the CEC Guarantee was to include CEC's portion of the face value of CEOC debt held by CEC and CGP (shown in Solvency Figure 42) as CEC would not have to pay itself under its guarantee.

**Solvency Figure 42:  Face Value of CEOC Debt Held by Affiliates**

| amounts in millions | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Face Value of CEOC Debt Held By Affiliates, net of intercompany loans | $854 | $1,137 | $1,140 | $1,146 | $1,110 | $290 |
| CEC Ownership Interest | 100% | 100% | 100% | 100.0% | 57.6% | 57.6% |
| CEOC Debt Owed to CEC | $854 | $1,137 | $1,140 | $1,146 | $639 | $167 |

Sources:    Caesars  Entertainment  Board  of  Directors  Board  Book  (Oct.  21,  2013),  at CEOC_INVESTIG_00249794  and  CEOC_INVESTIG_00249803  [CEOC_INVESTIG_00249739]; CAC Form 10-K for the years ending Dec. 31, 2013 (Mar. 28, 2014) and Dec. 31, 2014 (Mar. 16, 2015); CEC 10-K for the years ending:   Dec. 31, 2008 (Mar. 17, 2009); Dec. 31, 2009 (Mar. 9, 2010); Dec. 31, 2010 (Mar. 4, 2011); Dec. 31, 2011 (Mar. 15, 2012); Dec. 31, 2012 (Mar. 15, 2013); Dec. 31, 2014 (Mar. 16, 2015); and Dec. 31, 2013 within Form 8-K (Apr. 15, 2014).
Notes:  From 2009 through 2012, CEOC debt was held by CEC, Harrah's BC, Inc., or other entities 100% owned by CEC.  In 2013, CEC contributed the CEOC debt to CGP, of which CEC owns 57.6%. Excludes intercompany debt.

## 2.    Summary of the Value of the CEC Guarantee

In accordance with the methodologies described herein, the extent of CEC's ability to perform under the CEC Guarantee was determined, and components with positive value were included.

As shown in Solvency Figure 43, to the extent the guarantee was determined to remain in effect the calculated value of the CEC Guarantee was insufficient to cover the equity shortfall of CEOC noted in Solvency Figure 1.

**Solvency Figure 43:  Calculation of Potential Value of CEC Guarantee**

| *amounts in millions* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| CEC Adjusted Working Capital | - | $114 | $127 | - | $5 | $109 | $389 |
| Market Value: | | | | | | | |
|    CMBS / CERP | 58 | - | - | - | - | 684 | - |
|    CIE (a),(b) | n/a | n/a | n/a | 346 | 1,057 | - | - |
|    CEC's Portion of CGP | n/a | n/a | n/a | n/a | n/a | 1,780 | 1,528 |
| Market Value: | $58 | $0 | $0 | $346 | $1,017 | $2,464 | $1,528 |
| CEOC Debt Owed to CEC (c) | n/a | $854 | $1,137 | $1,140 | $1,146 | $639 | $167 |
| Potential Value of CEC Guarantee | $58 | $968 | $1,263 | $1,486 | $2,168 | $3,212 | $2,084 |
| CEOC Equity / (Deficit) per Solvency Figure 1 | ($3,256) | ($2,874) | ($3,722) | ($6,772) | ($8,350) | ($7,308) | ($12,312) |
| CEOC Equity / (Deficit) With the Value of the CEC Guarantee | ($3,198) | ($1,906) | ($2,459) | ($5,286) | ($6,182) | ($4,096) | ($10,228) |

Notes:

(a) PwC valued CIE common stock on a non-marketable basis at $861.4 million in 2012.  The equity market capitalization of CEC for 2012 through 2014 was $882.3 million, $2,994.1 million and $2,306.4 million, respectively.  If the market capitalization of CEC was substituted for the calculated values of CEC's Guarantee in this figure as of 2012 through 2014, the results are the same, the CEC Guarantee is insufficient to cover the equity shortfall of CEOC.

(b) Includes intercompany debt owed to CEC.

(c) Consists of CEOC bond debt held by CEC, however excludes intercompany loans.

A February 2013 CEC presentation estimated that the value of the unencumbered assets at CEC was $1 billion.[394]   This CEC estimate was less than the value estimated in Solvency Figure 43 and was insufficient to cover the shortfall previously noted.  The value of the CEC guarantee was insufficient to render CEOC solvent.

---

[394] "Caesars Entertainment Discussion Materials February 2013" Presentation (Feb. 15, 2013), at CEOC_INVESTIG_00355362-411 [CEOC_INVESTIG_00355362].

### K.  CLC Solvency

In connection with the Trademarks Transfer, the financial conditions and solvency of CLC was analyzed.  There was limited financial information available for CLC.  Audited financial statements were not available and the internal financial statements did not include a statement of cash flow, statement of stockholder's equity as well as footnotes.  The limited financial information provided by the Debtors financial advisor is summarized below.

**Solvency Figure 44:  Caesars License Company Select Financial Data**

| amounts in millions | 2008 | 2009 | 2010 |
|---|---|---|---|
| Cash and cash equivalents | - | $0.2 | $10.4 |
| Receivables, due to related party | $0.2 | - | - |
| Total current assets | $0.2 | $0.2 | $10.4 |
| Intangible assets | $1,711.4 | $1,627.1 | $1,605.6 |
| Total Assets | $1,711.5 | $1,627.3 | $1,615.9 |
| Total current liabilities | $2.9 | ($0.4) | $9.2 |
| Deferred income taxes | $589.8 | $566.4 | $559.5 |
| Total Liabilities | $592.7 | $566.0 | $568.7 |
| Stockholders' Equity | $1,118.8 | $1,061.3 | $1,047.3 |
| Total liabilities & stockholders' equity | $1,711.5 | $1,627.3 | $1,615.9 |
| Net Revenues | $8.3 | $7.4 | $0.7 |
| Property general, administrative, and other | $5.5 | ($1.6) | |
| Write downs, and reserves (a) | $482 | $67.7 | |
| Impairment of intangible (a) | - | - | $20 |
| Amortization of intangible | $1.4 | $1.6 | $1.6 |
| Total operating expenses | $489.0 | $67.7 | $21.6 |
| Income (Loss) from operations | ($480.6) | ($60.2) | ($20.9) |
| Income (Loss) from continuing | ($480.6) | ($60.2) | ($20.9) |
| Benefit/(provision) for income taxes | ($167.9) | ($21.1) | ($7.0) |
| Net Income (Loss) | ($312.8) | ($39.1) | ($13.9) |

Source:  Alix Partners.
Note:
(a) Impairments of intangibles was expensed in the Write downs and reserves, net of recoveries, account in 2008 and 2009 when the company did not have a separate impairment account.

The following observations are noted regarding CLC's financial condition.

- For years 2008, 2009 and 2010, CLC recorded significant losses measured at both the net income and income from operations level.  Cumulative losses are as follows:
    - Net income $365.8mm
    - Income from operating $561.7mm

- For years 2008, 2009 and 2010, CLC revenue was minimal.  In 2010 revenue was $660  thousand and  for the three year period (2008-2010) totaled $16.4mm

- CLC had no operating activity as its assets consisted primarily of intangibles.

- CLC did reflect positive shareholders equity and as of December 31, 2010 the book equity was shown as $1.647mm

- CLC recorded significant write down on its intangible assets, totaling $569.9mm from 2008-2010.

As CLC never generated profits at either the net income or operating level, its value under the Balance Sheet Test would be negative.  CLC, a wholly owned subsidy of CEOC was consolidated into CEOC for financial statement purposes.  Outside of CEOC's operating environment, the intangible assets of CLC would have little value.

CLC was the:  (i) guarantor on the 10.75% Senior Notes due in 2016; (ii) a guarantor on the 10.75%/11.5% Senior Toggle Notes due in 2018; and (iii) an asset pledger to the First Lien and Second Lien creditors.  CEOC's equity interest in CLC was also pledged to the 1L creditors.

Based on the limited financial information provided for CLC, the fact that it did not generate any income, had no operations, its status as guarantor on the debt and its assets were subject to significant write downs, a strong argument exists that CLC was insolvent as of December 31, 2009 and December 31, 2010 and thus as of the date of the 2010 Trademarks Transfer.

## L.  Solvency at LBO Date

Under the Balance Sheet Test, Harrah's Entertainment (CEC and CEOC)[395] was solvent at the time of the LBO in January 2008, as the fair value of its assets exceeded its debt by approximately $14.1 billion.  As shown in Solvency Figure 45, the market EBITDA multiples of CEOC's Industry Peers ranged from 7.8x to 19.9x at December 31, 2007, with the weighted average for CEC (based on the ratio of Las Vegas to other casinos) resulting in a market multiple of 14.0x.

---

[395] Caesars was called Harrah's Entertainment at the time of the LBO, and the operations HOC (the predecessor to CEOC) encompassed the entire company.

**Solvency Figure 45:  Calculation of Industry Peers' Market Multiples at 12/31/2007**

| EBITDA Multiple = Total Enterprise Value/EBITDA | 12/31/07 |
|---|---|
| Wynn Resorts Ltd. (b) | 19.86 |
| MGM Resorts International (b) | 17.44 |
| Boyd Gaming Corporation | 11.33 |
| Penn National Gaming Inc. | 12.32 |
| Isle of Capri Casinos, Inc. | 7.83 |
| Pinnacle Entertainment Inc. | 19.82 |
| Monarch Casino & Resort Inc. | 9.60 |
| Churchill Downs Inc. | 13.96 |
| Low | 7.83 |
| High | 19.86 |
| Mean | 14.02 |
| Median | 13.14 |
| Median – Las Vegas Markets (b) | 18.65 |
| Median – Other | 11.83 |
| CEOC Las Vegas Weighting (c) | 0.28 |
| Industry Peers' EBITDA Multiple Weighted Median (d) | 13.76 |
| MULTIPLE USED IN SOLVENCY ANALYSIS (Rounded up to nearest .25x) | 14.00 |

Sources:   Capital IQ; Monthly Actuals vs Budget (Jun. 17, 2015), at Tab 'Summary' [CEC_Examiner_0145430] (native file).

Notes:

(a) Wynn Resorts, Ltd. and MGM are considered Las Vegas market due to the location of their casino properties in the U.S.

(b) CEOC's percentage of EBITDA earned from properties located on the strip in Las Vegas was calculated using CEC_Examiner_0145430.xls.

(c) The weighted median is calculated as the sum of 1) the median of the entities in the Las Vegas market (Wynn and MGM) multiplied by the percentage of CEOC's EBITDA from properties on the strip in Las Vegas and 2) the median of all other industry peers (Boyd, Penn, Isle of Capri, Pinnacle, Monarch and Churchill Downs) multiplied by the percentage of CEOC's EBITDA from properties not on the strip in Las Vegas.

The LBO closed on January 28, 2008; however, complete financial data as of that date was not available.  The pre-LBO results for the 12 months ended December 31, 2007, were used as a proxy for the financial condition of CEC at the time of the LBO.  As shown in Solvency Figure 46, the calculation of CEC's EBITDA and application of the weighted market multiple indicates that the enterprise value of CEC was approximately $38 billion.  Subtracting the face value of CEC's debt as of January 28, 2008, indicates positive equity value for CEC of $14.1 billion.

**Solvency Figure 46:  Calculation of CEC Equity Value as of LBO**

| amounts in millions | |
| --- | --- |
| (Loss)/Income from Operations | $1,652 |
| Depreciation & Amortization | 817 |
| Amortization of Intangible assets | 74 |
| Impairment of Intangible Assets | 170 |
| EBITDA | $2,712 |
| Market Multiple | 14.0x |
| Enterprise Value | $37,972 |
| Less:  Face Value of Debt | (23,911) |
| CEC Equity Value | $14,062 |

Sources:  CEC Form 10-K for the year ending Dec. 31, 2007
(Feb. 29, 2008); Capital IQ; Monthly Actuals vs Budget (Jun.
17, 2015), at Tab 'Summary' [CEC_Examiner_ 0145430]
(native file).

As such, CEC was comfortably solvent at the time of the LBO.  The Sponsors have questioned how in the course of less than a year CEC could have gone from being comfortably solvent to insolvent.  The answer is simple:  the Recession and the financial crisis, both of which materially impacted not only the overall economy, but the Las Vegas casino hotel industry in particular.

### M.  Witnesses' Definitions of Solvency

The CEC and Sponsor witnesses uniformly took the position that they did not believe CEOC was insolvent during the relevant time frame because it was paying its debts, had not defaulted and "runway" had been created through the extension of maturities of CEOC's debt. In many cases, CEC and Sponsor witnesses either indicated lack of knowledge regarding the relevant legal tests for insolvency or simply seemed to ignore them based on their view that they believed CEOC's long-term debt could be addressed over time.  As discussed above, during the relevant time, and particularly in 2013–2014, there was no realistic possibility that non-trade debt could ever be paid at anything close to face value.  *See* Appendix 6-12, Solvency, for a summary of witness commentary regarding solvency.

### N.  The Examiner's Findings and Conclusions

The Examiner concludes that beginning by December 31, 2008,[396] and continuing through 2014, there is a strong case that CEOC was insolvent, and from the beginning of the last quarter of 2013 through 2014 (when most of the significant transactions took place), CEOC was

---

[396]  One creditor group has argued that CEOC was insolvent as early as June 30, 2008.  Given that none of the Challenged Transactions occurred between June 30 and December 31, 2008, the Examiner has not performed any analysis to assess CEOC's financial condition as of June 30, 2008.

nearly certainly insolvent, undercapitalized and unable to pay its debts when they came due. This is true under all of the basic tests that measure CEOC's financial condition (the Balance Sheet Test, the Cash Flow Test and the Capital Adequacy Test), and is supported by the information available to the participants at the time, what the key witnesses said about the financial condition of CEOC, the contemporaneous market evidence and the valuations and other analyses performed by the Examiner.

As shall be discussed in the ensuing sections of this Report, the conclusion that CEOC was insolvent at all relevant times significantly impacts the Examiner's analysis and conclusions regarding the transactions he investigated. That is because once an entity is insolvent, the fiduciary duties of directors, officers and controlling shareholders change, with the focus of fiduciaries obligations to CEOC changing from what is in the best interests of its shareholders (CEC and the Sponsors) to what is in the best interests of CEOC's creditors. This was explained to CEOC's board of directors in 2009 in connection with the 2009 WSOP Transaction, was known to CEC and CEOC's outside counsel, and was ultimately conceded by most of the key CEC and Sponsor witnesses who were interviewed (while disavowing knowledge or belief that CEOC was, in fact, insolvent).

Once CEOC was insolvent, there was the potential for conflict between CEC and its wholly-owned subsidiary, CEOC. Actions that would have been perfectly permissible if CEOC was solvent have to be evaluated in an entirely different light, as actions that might have been beneficial to CEC and the Sponsors might be less beneficial, or less clearly so, to CEOC and its creditors. Individuals wearing dual hats (as officers or directors of both CEC and CEOC) became inherently conflicted. The same can be said for their counsel and financial advisors. The notion that "what is good for CEC is good for CEOC" – a theme that was echoed by many witnesses – was no longer necessarily the case.

This is why many of the transactions investigated by the Examiner, discussed below, create claims. CEC and the Sponsors, at least until late June 2014, treated CEC and CEOC as if they were one and the same. Decisions on behalf of CEOC were made by the Sponsors and CEC, and all of the key transactions were conceived, negotiated and approved by CEC and the Sponsors without any serious thought being given to appointing independent directors at CEOC and inviting them (along with independent counsel and financial advisors) to participate in the planning, structuring and negotiation of the terms of the transactions. As a result, no one involved in the transactions was looking out solely for the best interests of CEOC and its creditors and the impact such transactions would have on CEOC's long-term viability.

In response, CEC and the Sponsors have advanced a number of arguments. CEC has argued, first, that CEOC was in fact solvent under the Balance Sheet Test, at least through early 2011 (CEC appears to concede that CEOC was insolvent under the Balance Sheet Test from 2012 onward), but the detailed written analysis presented to the Examiner on this issue deducts from CEOC's debt 100% of the cash held by CEOC at the relevant date from the debt. Doing so is inappropriate, as CEOC could not operate without cash to pay trade debt and operating expenses. Although CEOC maintained healthy cash balances at various points during the relevant period, the evidence presented does not support the conclusion that CEOC had excess cash on hand during this period. In short, the concept of "net debt" used by CEC in analyzing

the solvency of CEOC is not a correct measurement of CEOC's debts for the purposes of measuring solvency.

CEC's balance sheet analysis also uses market multiples taken from the overall stock market, as opposed to multiples for comparable casino gaming companies. This misapplication undermines CEC's analysis. CEC also applies EBITDA multiples ranging from 9.3x to as high as 17.2x, while at the same time suggesting that EBITDA multiples used by the financial advisors for the transactions involving CEOC's prime Las Vegas Strip properties should range from 6.0x to 10x. There is an internal inconsistency in CEC's approach to multiples.

Second, CEC and the Sponsors (and their witnesses during interviews) uniformly took the position that they did not believe that CEOC was insolvent until late 2014 (after all of the significant transactions took place). On the contrary, they expressed a belief that CEOC was solvent because it was paying its bills as they came due, had not defaulted on any of its debts or covenants and had been successful in extending maturities and buying "runway" while waiting for the "cyclical downturn" in the gaming industry to reverse itself.[397] There are many examples of this position being taken by witnesses, some of which are cited in the Executive Summary, while others are compiled in Appendix 6-12, Solvency. These witnesses exhibited a surprising lack of knowledge of (or willful blindness to) the relevant legal tests while seemingly being singularly focused on one alternative part of one test – the objective aspect of the Cash Flow Test. This is especially problematic given the sophistication of the Sponsors, their experience in distressed industries and the stark financial picture that every liquidity analysis they performed from 2012 forward painted.

In any event, as the foregoing analyses make clear, although CEOC paid its debts when they came due from 2012 through 2014, CEOC never generated enough cash from its operations to pay its operating expenses, including interest on its debts. CEOC was only able to pay its operating expenses through the sale of assets and taking on additional long-term, interest bearing debt, both of which were short-term fixes to long-term problems. Using added long-term debt and asset sales to pay short-term debt is an indication of insolvency. In short, while the asset sales that occurred in 2013 and 2014 generated cash, the proceeds were not used to reduce CEOC's outstanding debt. Rather, the proceeds were used to pay interest and operating expenses and to build runway. The sale of significant assets (i) stripped CEOC of future EBITDA and cash flow, (ii) significantly reduced the enterprise value of CEOC, (iii) increased CEOC's equity deficit and (iv) made it a virtual certainly that CEOC would not be able to pay its debts in full as they came due in the future.

There were many indicia of CEOC's insolvency that were known and knowable to CEC and the Sponsors. As indicated in the Executive Summary, following the LBO, CEOC's

---

[397] Marc Rowan emphasized in his interview the difference between a cyclical downturn (which is what CEOC and the gaming industry faced) and a "secular event," which in his view was a permanent diminution in value that had not occurred, otherwise he would have just "handed [the creditors] the keys." M. Rowan Tr. Jan. 28, 2016 at 500:21-503:5. The distinction he drew, however, is not particularly relevant to the question of whether CEOC was insolvent during the relevant period. Firms experiencing cyclical downturns can be just as insolvent as firms experiencing secular events.

EBITDA was only able to fund 62 cents of every dollar of interest expense, a sure sign that it would not be able to pay its debts on maturity or refinance them at par. CEOC was cash flow negative by a wide margin. Its ratio of liabilities to assets increased every year (net of goodwill). Its financial condition was worse than its peers. The market understood this. CEOC's Second Lien and Unsecured Debt traded at steep discounts. Analysts regularly commented on the lack of equity value at CEOC. Indeed, the creation of CAC and CGP was necessitated by CEOC's dire financial condition. Virtually every internal analysis prepared by CEC and the Sponsors from mid-2012 onwards showed that under all realistic potential scenarios, CEOC's creditors would not come close to being paid in full at maturity.

CEC and the Sponsors counter by pointing to the fact that CEOC was able to raise $1.75 billion in additional debt through the B-7 Transaction, discussed in Section IX.B.1, *infra*, which they claim lenders would never have agreed to advance had they believed CEOC was insolvent and on the verge of bankruptcy. This argument, however, is misplaced. The B-7 loan created additional senior secured debt and replaced over $1 billion of more junior debt with this most senior debt. Lenders participating in the B-7 had various reasons for participating in the B-7 (some were being taken out of junior positions and gaining a higher-priority status, others had large credit default swap positions or positions in CEC common stock that benefitted by the B-7 and the accompanying guarantee release), but the end result of the B-7 is that CEOC total debt remained essentially the same, its interest expense increased, CEC's guarantee of CEOC's Second Lien and Unsecured Debt was arguably extinguished, CEC's guarantee of CEOC's first lien debt was converted from a guarantee of payment to a guarantee of collection, and creditors of CEOC were no better off (and were arguably worse off) as a result. Buying runway and extending maturities does not automatically create solvency.

CEC and the Sponsors also point to the positive equity value of CEC stock and their and their co-investors' willingness to contribute more than $1 billion in new capital when CGP and CAC were formed, but these arguments, again, miss the point. CEC's common stock had positive "option value" due to CEC's ownership interests in CERP and CAC/CGP, not because the market believed that CEOC was solvent or had positive equity value. Even CEC's own advisors at Blackstone conceded that CEOC had negative equity value, and David Sambur described CEOC's common stock as "pixie dust." And the new investment was in a new entity (CAC), which was not burdened by either CEOC's historical debt or CEC's guarantee.

Finally, Rowan argued that the determination of solvency or insolvency should take into account not just the fact that CEOC had debts it could never pay when they matured (a test Rowan claimed almost every major U.S. corporation would fail), but also whether CEOC would be able, once the cyclical downturn reversed (which is what he claimed occurred in 2015) and CEOC's EBITDA returned to pre-Recession levels, to reduce its debt load and "fix" its balance sheet through the issuance of equity or debt for equity exchanges. This is no doubt what the Sponsors' game plan was. The problem with the argument, however, is that, unlike most U.S. corporations that are highly leveraged and can easily refinance their debt (at full face value) because they have healthy balance sheets and ample collateral to secure all of their debt, CEOC was in a very different position. Through its asset sales, reduced EBITDA and negative cash flows, CEOC was left with a capital structure that was unsustainable absent agreement on the part of creditors (Second Lien and Unsecured Creditors in particular) to accept a significant discount on the face value of their debt.

CEC and the Sponsors have pointed to Caesars' improved financial results in 2015 to support the claim that by growing EBITDA, CEC (and CEOC) will eventually be able to raise equity to pay down debt. However, they have offered no timetable or financial analysis showing how this will be possible, nor have they offered any evidence that 2015's improved results are sustainable or significant enough to allow CEOC to pay its creditors in full. Although it is true that EBITDA at CEOC and CERP increased in 2015, those increases appear to have been driven primarily by cost-cutting, as CEOC's revenues in 2015 actually *decreased* by 5.5% and expenses declined by 14%. Continued increases in EBITDA along the lines achieved in 2015 cannot be achieved solely through cost-cutting. Caesars' EBITDA pre-LBO was approximately $2.7 billion with revenues of approximately $10.8 billion, resulting in an EBITDA margin of approximately 25%. To get back to pre-LBO EBITDA and revenue, CEC would need to increase CEOC's and CERP's revenues by $3.9 billion, or 57% above the 2015 level. In short, Rowan's argument that once the market sees growth in EBITDA, the capital markets will open up is highly speculative and, in the Examiner's view, unachievable.[398]

As of June 27, 2014, CEOC had $19.4 billion of debt outstanding (approximately the same as at the time of the LBO), its interest expense was approximately $1.8 billion, exceeding EBITDA by about $600 million, its net leverage was 16.9x, (as opposed to 9x at the time of the LBO), and as a result of asset sales, CEOC's EBITDA had declined from over $2 billion at the time of the LBO to under $1 billion. CEC's internal analyses projected that just to reach cash flow breakeven, CEOC would need to increase its EBITDA to $2.2 billion – an amount that would appear unachievable given CEOC's diminished asset base. CEOC was running out of assets to sell, and the Examiner believes it was unrealistic to expect in the fourth quarter of 2013 or 2014 that CEOC would be able to fix its balance sheet through future equity issuances or exchanges. The only realistic solution to CEOC's problems was a restructuring (either in or out of court) in which creditors would accept (or be forced to accept) a large haircut. The Debtors' proposed plan of reorganization only confirms this. There is nothing in the plan or the RSAs that suggests that CEOC would ever have been able to pay its debts as they matured. On the contrary, they suggest just the opposite.

The Sponsors and CEOC did not need to commission a formal solvency analysis to draw the conclusion that CEOC was insolvent. This was not rocket science, or a close call. CEC's outside counsel understood the significance that a finding of insolvency on the part of CEOC would have, and engaged in extensive contingency planning beginning in 2012, which accelerated in late 2013 and early 2014 at the request of Apollo in light of CEOC's liquidity problems and increased risk of bankruptcy. The need for independent directors at CEOC was flagged in late 2013 or early 2014, potential candidates were identified and approached in February 2014, but they did not take office until late June 2014. Winograd, one of the independent directors, however, quickly reached the conclusion that CEOC was insolvent, and acted accordingly. CEC and the Sponsors – among the most sophisticated investors in the country – also understood the reality of CEOC's financial condition, and should have proceeded on the same basis.

---

[398] Rowan's argument is also inconsistent with the position taken by CAC, which has argued that the properties CGP purchased from CEOC in the Growth and Four Properties Transactions have "underperformed" since they were purchased, and that CAC thus overpaid for them.

# VI. PROJECTIONS

Projections of future financial performance are one of the critical inputs into the valuation of an income-producing asset.  In fact, the opinions issued by each of the financial advisors in conjunction with the Transferred Assets[399] relied upon projections prepared by Caesars' management.  Because of the importance of financial projections to the determination of value, Caesars' projections were analyzed with respect to:  (i) the process used by Caesars to prepare the projections; (ii) the historical performance compared to the projections; (iii) trends reflected in the projections over time; (iv) Caesars' use of the projections; and (v) other evidence provided in the Investigation.

This analysis also took into consideration the views expressed by certain CEC and CAC personnel, especially in light of the Four Properties Transaction as it was the only asset transfer for which management's original projections were modified during the negotiation and opinion process.[400]

Typically, management's ordinary course projections are utilized in a valuation analysis. A departure from management's ordinary course projections may be warranted in certain circumstances, such as:

- Instances of known fraudulent activity at the company, be it financial statement fraud or otherwise, which would likely cause management's projections to be viewed as unreliable;

- Instances involving a lack of process, or an insufficient process, to create the projections.   This may include (i) not having a basis for the underlying assumptions (such as, for example, if the "process" were simply to take the prior year's results and add 10% without any basis or reasonable analysis), and/or (ii) not having the appropriate checks and balances in place (such as multiple levels of review within management and review by external auditors).

Based upon an analysis of the above considerations, it is clear that:  (i) Caesars engaged in a robust and dynamic projection preparation process, and its long-range projections were utilized for a variety of business purposes; (ii) historical misses from plan were largely driven by misses in Atlantic City and regional properties rather than Las Vegas; (iii) Caesars tempered its projections over time in an effort to create more achievable projections; and (iv) Caesars' external auditors performed an extensive evaluation of the long-range plan ("LRP") projections during the annual audits and in late 2013 determined the LRP could be relied upon and was in line with industry expectations.

---

[399]   "Transferred Assets" refers to the assets transferred in conjunction with the 2009 WSOP Transaction, the 2011 WSOP Transaction, the CERP Transaction, the Growth Transaction and the Four Properties Transaction.

[400]   The change in projections for the Four Properties Transaction is discussed in greater detail in Appendix 7, Valuation, *infra*.

## A. Overview of Caesars' Projection Process

Caesars' Planning and Analysis ("P&A") group constructed two sets of projections each year, an annual plan for the coming year (the "Annual Plan") and the LRP for an additional four-year period.[401]    Robert Brimmer joined Caesars in 2007 and led the P&A group as Vice President, and more recently as Senior Vice President, working with the senior management team[402] to develop the Company's projections using a detailed and comprehensive process.

During the period from 2008 through 2014, the projection process was generally run in a top-down approach with Brimmer and his team constructing the projections, then making adjustments after discussions with all levels of management.    Assets were treated the same regardless of the legal entity ownership.[403]    Caesars grouped its properties on a regional basis: Las Vegas, Atlantic City/Pennsylvania, Other U.S. and Managed and International.

### 1. Annual Operating Plan

The Annual Plan is a one-year projection for all Caesars properties for the upcoming year.    The P&A group would begin creating the Annual Plan in the third or fourth quarter of the prior year.[404]

The baseline for the Annual Plan started with the prior eight to nine months of actual results and three to four months of projections, adjusted to remove non-recurring items.    Then, the P&A team constructed metrics for the Annual Plan based upon the current year results, analyst expectations for the industry, the Caesars enterprise and competitors.[405]    The Annual Plan was based on a detailed build-up of revenues and expenses, incorporating items such as the marketing calendar, specific entertainment shows and conventions, group sales, seasonality and the number of full-time employees.[406]    In 2013 ██████████████████████████████████████████████████████████████████████████████

The P&A group would forecast five broad drivers to derive its recommendation for the coming year including:  (i) market share; (ii) competitive shock; (iii) changes to cost structure not driven by volume; (iv) benefits of capital investments; and (v) management initiatives to be executed.    These drivers were based on information gathered by the P&A group, including

---

[401]    Deloitte Memo "Understanding the Forecast Process & Development of Projections" (Feb. 7, 2015), at DT0008329 [DT0008329].

[402]    R. Brimmer Sept. 29, 2015 Tr. at 8:21-22 and 9:14-19.

[403]    Id. at 10:20-11:6.

[404]    Id. at 9:14-16.

[405]    Id. at 14:20-23.

[406]    E. Boes Sept. 24, 2015 Tr. at 146:11-22.

[407]    "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab "1-D&T Revenue Analysis" [DT0002796] (native file).

internal and external benchmarks as well as industry expectations from Moody's, Fitch and Wall Street. For growth trends, Caesars relied upon ███████████████████████████████████████[408]

Over the past six or seven years, Caesars' econometric models have increased in complexity, moving towards specific market indicators by region.[409] The analytics team also ran regression analyses to estimate organic growth rates and market trends,[410] and the P&A group would then review market trends for the past few years.

██████████████ Caesars' external auditors, Deloitte & Touche ("Deloitte"), noted in 2013 that the projections were ███████████████████[412]

Caesars assumed flat market share unless there was a competitive shock or disruptive event. ████████████ Benefits from capital investments were based on the investment case plans of growth capital projects, some of which required approval from the senior management team and, in some cases, the Sponsors.[414] Management initiatives, such as revenue improvement or addressing cost increases, have been a major component of the Annual Plan for the last several years as well.[415] Operating expenses were based on ███████████████████████████[416]

████████████████████████████████████████████████████ The Regional Presidents would work with individual properties to outline detailed initiatives to achieve the plan.[418] Property leadership would provide preliminary plans and discuss with executive management and the

---

[408] Deloitte Memo "Understanding the Forecast Process & Development of Projections" (Feb. 7, 2015), at DT0008331 [DT0008329].

[409] R. Brimmer Sept. 29, 2015 Tr. at 43:9-22.

[410] E. Boes Sept. 24, 2015 Tr. at 17:22-18:7.

[411] R. Brimmer Sept. 29, 2015 Tr. at 44:8-20.

[412] "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

[413] R. Brimmer Sept. 29, 2015 Tr. at 44:3-45:14.

[414] Brimmer's team pressure tests small to midsize capital projects. Large projects had to be approved by an executive committee or the Board of Directors. *Id.* at 60:12-62:5.

[415] *Id.* at 46:17-23.

[416] Deloitte Memo "Understanding the Forecast Process & Development of Projections" (Feb. 7, 2015), at DT0008331 [DT0008329].

[417] "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

[418] R. Brimmer Sept. 29, 2015 Tr. at 54:7-23; E. Boes Sept. 24, 2015 Tr. at 19:8-23.

Sponsors how they viewed the prospective impacts of various initiatives and capital projects planned.[419] ███████████████████████████████████████ Brimmer would then present the corporate and property level management projections to the senior management team. The senior management team would then review different scenario projections to determine whether any adjustments should be made.[421] The preliminary Annual Plan is provided to the Sponsors for review before going to the Board of Directors for approval. Brimmer indicated that the Sponsors never requested the Annual Plan to be lowered.[422]

The Annual Plan is initially presented to the Board of Directors, which includes members from the Sponsors, in November of each year. The Board of Directors reviews the Annual Plan and any disagreements are discussed with the P&A group and changes would be made as necessary.[423] Once changes are incorporated, ████████████████████████████████

██████████████████████████████████████████████████████████████

The Annual Plan was also utilized as a "base case" for liquidity models used to monitor cash levels. In the liquidity models, certain assumptions were reduced to construct a bearish, or negative, case for liquidity and covenant compliance planning (*i.e.*, the SSLR).[427]

### 2. Long-Range Plan

The LRP was developed at the same time as the Annual Plan during the third or fourth quarter of the prior year. LRP projections were for years 2 through 5 with year 1 being the Annual Plan. The LRP was constructed at a higher level than the Annual Plan and was utilized

---

[419] L. Bird Oct. 2, 2015 Tr. at 204:6-19.

[420] Deloitte Memo "Understanding the Forecast Process & Development of Projections" (Feb. 7, 2015), at DT0008332 [DT0008329].

[421] R. Brimmer Sept. 29, 2015 Tr. at 185:4-22; R. Brimmer Jan. 20, 2016 Tr. at 287:3-11.

[422] R. Brimmer Jan. 20, 2016 Tr. at 284:20-25, 291:11-14.

[423] L. Bird Oct. 2, 2015 Tr. at 204:19-205:9; "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

[424] "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

[425] Deloitte Memo "Understanding the Forecast Process & Development of Projections" (Feb. 7, 2015), at DT0008337 [DT0008329].

[426] R. Brimmer Sept. 29, 2015 Tr. at 27:3-19.

[427] *Id.* at 17:22-18:11.

in strategic business planning.[428]   In the past, Brimmer would update the LRP whenever Jonathan Halkyard or Eric Hession said it was no longer in line with expectations.   During Donald Colvin's tenure, Brimmer became more proactive and reviewed positions quarterly for a need to update projections.[429]

The development of the LRP utilizes a market-level approach.   High-level revenue growth rates and flow-through margins are utilized to derive EBITDA[430] and cash flows.   In developing growth rates and margins, the P&A team would also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   In addition, Caesars reviewed wider metrics such as GDP, unemployment rates, industry expectations and sell-side research analyst reports.   The purported growth rates utilized were generally pre-recession rates observed by the industry.[432] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

## B.  Uses of the Long-Range Plan

Caesars' LRP was created in the ordinary course of business, and it was provided to, and relied upon by, numerous internal and external parties.   At a minimum, Brimmer indicated the LRP was used for:

- Gaming regulators;

- Investment bankers/lenders;

---

[428] *Id*. at 12:11-17; "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

[429] R. Brimmer Sept. 29, 2015 Tr. at 32:9-33:5.

[430] EBITDA represents Earnings Before Interest, Taxes, Depreciation and Amortization. Throughout this Report and in Appendix 7, Valuation, *infra*, the terms EBITDA, EBITDAR (Earnings Before Interest, Taxes, Depreciation, Amortization and Rent) and EBITDARM (Earnings Before Interest, Taxes, Depreciation, Amortization, Rent and Management Fees) are used.   With respect to Caesars' projections (both in its LRP and in its reported "Budget to Actual" comparison), the figures provided by Caesars represent EBITDARM, although they are sometimes cited as EBITDA.   However, for an entity that does not pay rent expense or management fees, EBITDARM represents the same metric as EBITDA.   The metrics only differ when the entity incurs either rent expense (as in the case of the Quad) and/or management fees (as in the case of the properties transferred in the Growth and Four Properties Transactions on a prospective basis after the transaction was completed).

[431] "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

[432] R. Brimmer Sept. 29, 2015 Tr. at 12:18-13:8.

[433] "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

- Auditors;

- Board of Directors presentations; and

- Sponsor presentations.[434]

███████████████████████████████████████████████

While the LRP is not formally approved by the Board of Directors, Brimmer described the existence of controls in place with respect to the LRP, and noted that the LRP is presented to and reviewed by the CFO annually.[436]

### C. Auditors' Testing of the Long-Range Plan

As Caesars' auditors, Deloitte relied upon the Annual Plan and the LRP for its testing of the company's impairment analysis (*i.e.*, the evaluation required under GAAP to ensure the carrying value of specific assets does not exceed the fair value of those assets).[437] As part of its audit procedures for impairment testing, Deloitte assessed the reasonableness of the LRP projections and the process used to create them. During this review, Deloitte would review and "aggressively" challenge[438] the assumptions for revenue growth and EBITDA margins. Further, Caesars was a high-risk client for Deloitte, requiring the auditors' work to go through additional levels of review and analysis by its national specialists. The specialists would also test and challenge projection assumptions to ensure Deloitte could rely on the projections for audit purposes.[439]

As part of its evaluation of the LRP, the auditors would meet with management and Brimmer in order to understand the rationale behind the projections and to benchmark them against past performance.[440]

███████████████████████████████████████████████

---

[434] R. Brimmer Sept. 29, 2015 Tr. at 19:15-22:8.

[435] For example, a May 2014 presentation to the Board of Directors ███████████████████████████████████ *See* Board Package (May 7, 2014), at TPG-Examiner_00770796 [TPG-Examiner_00770636].

[436] R. Brimmer Jan. 20, 2016 Tr. at 290:16-23.

[437] R. Brimmer Sept. 29, 2015 Tr. at 20:6-13.

[438] L. Bird Oct. 2, 2015 Tr. at 223:3-4.

[439] *Id.* at 209:15-211:5.

[440] "Interim Impairment Analysis Projections" (Mar. 31, 2013), at Tab 'Overview' [DT0002796] (native file).

███████████████████[441]   Further corroboration was obtained with historical Las Vegas statistics.

While Deloitte was comfortable with Caesars' ability to project for the Annual Plan, Deloitte partner Larry Bird believed Caesars was less successful with long-range projections.[442] He recalls the LRPs were presented to the Board of Directors but did not require approval. However, Deloitte believed Caesars got better over time at building projection models.[443]

In conjunction with its 2013 audit, Bird spoke with Gary Loveman to ensure he understood, agreed with and believed that Caesars' projections were achievable.[444]   In earlier years, while Deloitte was comfortable with the Annual Plan projections, they had less confidence in the LRPs developed from 2008 to 2011.   However, Bird believed that the earlier period was a difficult time for everyone in the gaming industry to make long-range projections.   Bird's view was that by 2012, the long-range projections improved.[445]

In conjunction with its 2013 audit, Deloitte's testing of the LRP included a statistical analysis as part of a retrospective review of Caesars' performance versus its projections. Deloitte noted the following regarding the Q3 2013 projections:

- ████████████████████████████████████████████████████████████████████████████████████████

- ████████████████████████████████████████████████████████████████████████████

- In hindsight, a review of Caesars' projections demonstrates the company has had difficulty accurately predicting revenue and EBITDA; importantly, it is also noted that analysts and peers had the same difficulty and Caesars does not appear to be an outlier.[448]

- ████████████████████████████████████████████████████████████████████████

[441] *Id.*

[442] L. Bird Oct. 2, 2015 Tr. at 107:14-108:4.

[443] *Id.* at 195:4-12.

[444] *Id.* at 54:23-56:11, 202:8-15.

[445] *Id.* at 111:24-113:11.

[446] Deloitte Memorandum "ASC 350:   Goodwill and Non-amortizing Intangible Assets Impairment Testing" (Nov. 1, 2013), at DT0005246 [DT0005245].

[447] *Id.*

[448] *Id.*



- Management told Deloitte that they believed the Las Vegas projections to be ████,[450] specifically noting:

    o ████████████████████████

    o ████████████████████████

    o ████████████████████████

- Deloitte performed additional procedures and determined that, ██████████

Additional commentary was made by Deloitte in Q4 2013 ████████ ██████████:

- ████████████████████████

- ████████████████████████

---

[449] *Id.* at DT0005255.

[450] *Id.* at DT0005256.

[451] *Id.*

[452] *Id.*

[453] *Id.*

[454] *Id.* at DT0005257.

[455] Deloitte Workpaper "Long-Range Plan Testing" (Q4 2013), at Tab 'Summary' [DT0003746] (native file).



Importantly, the preceding assessment by Deloitte occurred during the same time Caesars was in the process of developing the LRP for 2014. The LRP served as the primary basis for the projections initially utilized in the Four Properties Transaction (*i.e.*, the January Business Plan) before being replaced by alternative, lower projections which were a material departure from the LRP (*i.e.*, the February Business Plan).

### D. Actual Performance Compared to Budget

#### 1. Annual Plan Versus Actual Performance

In order to evaluate Caesars' performance against its Annual Plan, the variances between the Annual Plan and actual performance were analyzed for (i) CEC overall, (ii) specific regions, (iii) individual transferred properties and (iv) the Four Properties in the aggregate (the Quad, the Cromwell, Bally's Las Vegas and Harrah's New Orleans). The time period selected for review was the three-year period immediately preceding the Four Properties Transaction (2011 through 2013), as this represented a more normal, stable economic environment with a fading impact of the Recession. This analysis is presented in Projections Figure 1.

---

456 *Id.*

457 *Id.*

458 *Id.*

**Projections Figure 1:  Budget to Actual Performance (2011-2013)**

| amounts in millions | Actual EBITDARM 2011 - 2013 | Budgeted EBITDARM 2011 - 2013 | EBITDARM Variance 2011 - 2013 | EBITDARM % Variance 2011 - 2013 |
|---|---|---|---|---|
| **CEC by Region:** | | | | |
| Las Vegas Total | | | | |
| New Orleans Total | | | | |
| Atlantic City Total | | | | |
| Other Regional Total | | | | |
| **CEC Total** | | | | |
| **Transferred Assets:** | | | | |
| Four Properties Total | | | | |
| Planet Hollywood | | | | |

Source: Monthly Actual versus Budget Analysis for 2007-Q1 2015 (Undated), at Tab 'Summary' [CEC_EXAMINER_0145430] (native file).

As shown in Projections Figure 1, CEC missed its overall budget for the three-year period by $369 million, or 6.5%.  However, this was largely driven by material misses in Atlantic City and regional properties (excluding New Orleans, "Other Regional").  More than $305 million, or 83%, of the total miss pertained to Atlantic City and Other Regional properties that are not relevant to any of the Transferred Assets.  When looked at in the aggregate, the Four Properties did miss their budget, but by 2.8%, which does not suggest a material miss indicative of a poor projection process for those properties.  Additionally, both Harrah's New Orleans and Planet Hollywood exceeded their respective budgets over the three-year period, and the combined group of transferred properties (including the Four Properties and Planet Hollywood) missed budget by only 1.6%.

More importantly, the misses were not consistent.  That is, in some years certain properties and regions exceeded the budget, and in other years they fell short.  Notably, this analysis demonstrates the following:

- CEC missed its annual budget in every year.

  o Atlantic City missed its budget in every year.

  o Las Vegas exceeded its budget in two of the three years (even with the existence of construction disruption).

  o New Orleans exceeded its budget in two of the three years.

  o Other Regional missed its budget in every year.

- Adjusted to exclude Atlantic City, CEC exceeded its budget in two of the three years.

- Looking at the two regions subject to the asset transfers, the combined three-year variance for Las Vegas and New Orleans was -2.3%.

  o There were 14 instances where a property in these regions exceeded its budget and 15 instances where a property missed its budget.[459]

  o Certain Strip properties were impacted by significant construction disruption in 2011 through 2013.

- For the Four Properties, the combined three-year variance was -2.8%.

  o There were five instances where any of the properties exceeded its budget and 6 instances where a property missed its budget.[460]

  o Several of the Four Properties were impacted by construction disruption in 2011 through 2013.

### 2. Construction Disruption

As previously noted, the performance of certain of the Las Vegas Strip properties was impacted by construction disruption during 2011 through 2013, including (i) construction of LINQ Retail and the Observation Wheel, (ii) early renovations of the Quad, (iii) renovation of the South Tower at Bally's Las Vegas and (iv) renovation of the Cromwell.

Construction disruption inherently makes projecting operating results more challenging, both due to the impact timing and delays can have, as well as greater difficulty in predicting consumer behavior. When asked about some of the variances from budget at the Quad during 2011 through 2013, Brimmer explained, "There was construction disruption right next door at the LINQ. And then I forget when some of the rooms started going out of service at The Quad. That might have affected some of these periods."[461] When asked directly whether it is harder to project during a time period of construction or renovation, Brimmer concurred.[462]

As part of a presentation Caesars prepared regarding the Quad incorporating ███

---

[459]   The Cromwell/Bill's Gamblin' Hall is removed from this analysis during 2013 due to the closure of the property in early 2013 for remodeling and rebranding. However, it is noted that for the limited time the property was open in 2013, it did exceed its budget.

[460]   Again, the Cromwell/Bill's Gamblin' Hall was removed from this analysis during 2013.

[461]   R. Brimmer Sept. 29, 2015 Tr. at 235:11-15.

[462]   *Id*. at 235:16-19.

███████████████████████████████████████████ [463] This estimate was based upon an EBITDA flow through of the Quad's decline in revenue over the period ████████ compared to the corresponding decline in comparable Caesars properties in Las Vegas ██████

Similarly, in early 2014, Caesars estimated the EBITDA impact of the LINQ construction disruption on the Quad to be $14 to $25 million during 2013 alone.[464]   The actual EBITDA for the Quad for the period from 2011 through 2013 ███████████████[465]████████████████ ████████████████████████████████████

### 3. Performance of the Properties Subsequent to Transfer

As discussed in greater detail in Appendix 7, Valuation, *infra*, the financial performance of the properties after the transfers is irrelevant to the value at the time of transfer to the extent that information was not known or knowable as of the transaction date.   However, valuation theory aside, an analysis of 2014 and 2015 actual results confirms the earlier premise that the properties sometimes meet or exceed their projections and sometimes they fall short, as shown in Projections Figure 2.   While CEC overall, the Las Vegas Region, Planet Hollywood, Horseshoe Baltimore and each of the Four Properties all fell short of budgeted EBITDA for 2014, the inverse is true for 2015.   Of the aforementioned individual or groups of properties, only the Cromwell and Harrah's New Orleans missed budget for 2015. ██████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

---

[463]   Presentation "The Quad" (Jan. 15, 2014), at CEOC_INVESTIG_00010286 [CEOC_INVESTIG_00010270].

[464]   CEC 8-K (Mar. 26, 2014), Ex. 99.1, at Section D.

[465]   Monthly Actual versus Budget Analysis for 2007-Q1 2015 (Undated), at Tab 'Summary' [CEC_EXAMINER_0145430] (native file).

[466]   Property P&L Detail 2007-2015 (Undated), at Tab 'NOR' [CEC_EXAMINER_1447621] (native file).

**Projections Figure 2:  Budget to Actual Performance (2014-2015)**

| Subset | Actual EBITDARM 2014 | Budgeted EBITDARM 2014 | EBITDARM % Variance 2014 | Actual EBITDARM 2015 | Budgeted EBITDARM 2015 | EBITDARM % Variance 2015 |
|---|---|---|---|---|---|---|
| **Four Properties:** | | | | | | |
| The Quad | | | | | | |
| The Cromwell | | | | | | |
| Bally's Las Vegas | | | | | | |
| Harrah's New Orleans | | | | | | |
| Four Properties Total | | | | | | |
| Planet Hollywood | | | | | | |
| Horseshoe Baltimore | | | | | | |
| Las Vegas Total | | | | | | |
| CEC Total | | | | | | |

Sources:  Monthly Actual versus Budget Analysis for 2007-Q1 2015 (Undated), at Tab 'Summary' [CEC_EXAMINER_0145430] (native file); Property P&L Detail 2007-2015 [CEC_EXAMINER_1447621] (native file).

Most importantly, it is difficult to judge the performance of the Cromwell and the Quad as they are essentially new properties, and any misses from budget in the early years are not necessarily reflective of future performance over an extended period of time.  The value of a long-lived asset is generally not predicated on one or two years' financial performance.  It is important to understand that the majority of a property's value may be derived from the terminal period, for which actual performance cannot yet be determined or compared.  It is entirely possible that the rebound from the Recession could ultimately exceed Caesars' expectations which, under a hindsight view, could suggest the assets were undervalued.  A meaningful analysis on the impact of actual performance on value cannot be performed until the actual results over the life of the asset are experienced.

### E.  Long-Range Plan Trends

As previously described, in its testing of the LRP in Q4 2013, ███████████ ████████████████████████████████████████████  Brimmer confirmed this effort, describing Colvin's philosophy as "a little more conservative than his predecessors."[468]  This change is evident when analyzing trends in the LRP for the Transferred Assets that would be considered stabilized properties (i.e., no material renovation or rebranding during the period).  Specifically, both the absolute dollars projected as well as the outer-year growth rates have been reduced compared to historical LRPs.

Projections Figure 3 presents the trend of the LRP for Bally's Las Vegas from Q2 2010

---

[467]  Deloitte Workpaper "Long-Range Plan Testing" (Q4 2013), at Tab 'Retrospective Rev' [DT0003746] (native file).

[468]  R. Brimmer Jan. 20, 2016 Tr. at 287:22-288:11.

through Q2 2014, demonstrating that the slope of the projected growth has declined in more recent periods, as has the projected EBITDA to be achieved in the final year of the LRP.

**Projections Figure 3:  Bally's Las Vegas LRP (Projected EBITDA)**

| LRP | Projection Year | | Projected EBITDA | | | |
| | Current Year | Final Year | Current Year | Final Year | Increase | Percent Increase |
| --- | --- | --- | --- | --- | --- | --- |
| Q2 2010 LRP | 2010 | 2015 | | | | |
| Q3 2010 LRP | 2010 | 2015 | | | | |
| Q4 2010 LRP | 2010 | 2016 | | | | |
| Q2 2011 LRP | 2011 | 2016 | | | | |
| Q3 2011 LRP | 2011 | 2016 | | | | |
| Q4 2011 LRP | 2011 | 2016 | | | | |
| Q2 2012 LRP | 2012 | 2017 | | | | |
| Q3 2012 LRP | 2012 | 2017 | | | | |
| Q4 2012 LRP | 2012 | 2017 | | | | |
| Q1 2013 LRP | 2013 | 2018 | | | | |
| Q2 2013 LRP | 2013 | 2018 | | | | |
| Q3 2013 LRP | 2013 | 2018 | | | | |
| Q4 2013 LRP | 2013 | 2018 | | | | |
| Q1 2014 LRP | 2014 | 2018 | | | | |
| Q2 2014 LRP | 2014 | 2018 | | | | |

Sources:[469]

As shown in Projections Figure 3, there was a marked change in the projected growth of Bally's EBITDA in the more recent LRPs.

- The average increase in EBITDA from current year to final year during the projection period for LRPs created from Q2 2010 through Q2 2013 was 101%.  In

[469] Impairment Review (Various), at Tab "CEC EBITDA" [DT0029037] (native file); Impairment Review (Q2 2011), at Tab "LRP" [CEOC_INVESTIG_00458697] (native file); Impairment Review (Q4 2011), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00513745] (native file); Impairment Review (Q2 2012), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00513894] (native file); Impairment Review (Q3 2012), at Tab "INPUTS-LRP" [DT0005005]; Impairment Review (Q4 2012), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508329] (native file); Impairment Review (Q1 2013), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508686] (native file); Impairment Review (Q2 2013), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508687] (native file); Impairment Review (Q3 2013), at Tab "3.2 – INPUTS-LRP" [CEOC_INVESTIG_00513908] (native file); Impairment Review (Q4 2013), at Tab "Q4 LRP" [CEOC_INVESTIG_00491055] (native file); Impairment Review (Q1 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00506564] (native file); Impairment Review (Q2 2014), at Tab "3.2 – INPUTS-LRP" [DT0010706] (native file).

contrast, the increase in EBITDA for the Q1 2014 LRP, the most recent LRP prior to the Four Properties Transaction, was only 45%.

- Similarly, the total EBITDA projected by the final year of the LRPs averaged $134 million from Q2 2010 through Q2 2013, but was reduced to $116 million by Q4 2013 and remained at that level in the Q1 2014 LRP.

Similar observations can be made from examining the LRP for Harrah's New Orleans, as presented in Projections Figure 4.

**Projections Figure 4:  Harrah's New Orleans Long-Range Plan (Projected EBITDA)**

| LRP | Projection Year | | Projected EBITDA | | Increase | Percent Increase |
|---|---|---|---|---|---|---|
| | Current Year | Final Year | Current Year | Final Year | | |
| Q2 2010 LRP | 2010 | 2015 | | | | |
| Q3 2010 LRP | 2010 | 2015 | | | | |
| Q4 2010 LRP | 2010 | 2016 | | | | |
| Q2 2011 LRP | 2011 | 2016 | | | | |
| Q3 2011 LRP | 2011 | 2016 | | | | |
| Q4 2011 LRP | 2011 | 2016 | | | | |
| Q2 2012 LRP | 2012 | 2017 | | | | |
| Q3 2012 LRP | 2012 | 2017 | | | | |
| Q4 2012 LRP | 2012 | 2017 | | | | |
| Q1 2013 LRP | 2013 | 2018 | | | | |
| Q2 2013 LRP | 2013 | 2018 | | | | |
| Q3 2013 LRP | 2013 | 2018 | | | | |
| Q4 2013 LRP | 2013 | 2018 | | | | |
| Q1 2014 LRP | 2014 | 2018 | | | | |
| Q2 2014 LRP | 2014 | 2018 | | | | |

Sources[470]

Like Bally's Las Vegas, there was again a marked change in the projected growth of Harrah's New Orleans' EBITDA in the more recent LRPs.

- The average increase in EBITDA from current year to final year during the projection period for LRPs created from Q2 2010 through Q2 2013 was 43%.  In contrast, the increase in EBITDA for the Q1 2014 LRP, the most recent LRP prior to the Four Properties Transaction, was only 18%.

- Similarly, the total EBITDA projected by the final year of the LRPs averaged $116 million from Q2 2010 through Q2 2013, but was reduced to $106 million by Q1

---

[470] *See* Sources for Projections Figure 3, *supra*.

2014.

The observations noted for Bally's Las Vegas and Harrah's New Orleans ████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

Based upon the above observations, it is evident that by late 2013, Caesars had already tempered the LRP's growth assumptions compared to historical LRPs, calling into question the need to further "sensitize" the projections as was done to create alternative projections for the Four Properties Transaction. This change is not surprising, given the fact that the Recession of 2008 and 2009 was much steeper than past recessions, and the recovery was much slower than past recoveries.

Further, the clear change in Caesars' growth assumptions make an analysis of actual performance compared to historical LRPs irrelevant. For example, while the Company may not have achieved the 2013 EBITDA that was projected in the 2008 or 2009 LRP, those projections are no longer applicable since the more recent projections do not project the same level of EBITDA or future growth. That is, the old LRPs do not adequately inform as to how the properties will perform relative to the current LRP, or the LRPs used in the Growth and Four Properties Transactions.

### F.  Caesars' Impairment Testing Process

Caesars also used the projections in its ongoing impairment analysis to test whether the recorded balance, or book value, for a particular asset (*e.g.*, goodwill, trademarks, gaming rights or long-lived assets) was higher than its fair value, which was based on future projections of the Company's operating performance (*i.e.*, the LRP). Impairment testing is required under GAAP, and the results of this testing directly impact financial statements which are filed publicly with the Securities Exchange Commission (SEC).

As described in CEC's 2013 Form 10-K, the Company reviewed the carrying value of long-lived assets for impairment whenever events or circumstances indicated that the carrying value of an asset may not be recoverable from the estimated future cash flows expected to result from its use and eventual disposition.[472] The Company established that each individual facility or property constituted an asset group for purposes of ASC 360[473] impairment testing due to the interdependency of cash flows at the property level. As such, the Company tested for

---

[471] Deloitte Workpaper "Long-Range Plan Testing" (Q4 2013), at Tab 'Retrospective Rev' [DT0003746] (native file).

[472] CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 79.

[473] ASC 360 is the standard put forth by the Financial Accounting Standards Board (FASB) related to Property, Plant & Equipment, which includes impairment of long-lived assets.

████████████████████████████████████████████████████ [474]

     The Company's impairment analysis consisted of two components. The first component was performed throughout the year and identified whether a triggering event had occurred that would require a detailed analysis. ████████████████████████████████████ ████████████████████████████████████ The second component was an annual impairment test for goodwill and non-amortizing intangible assets, typically done as of September 30th each year.

     Deloitte, as part of its audit procedures, performed quarterly reviews and a more detailed testing for the year-end audit to evaluate management's assertion as to whether or not there had been a triggering event or indicator of a potential impairment.   Deloitte's impairment analysis tested management's projections and calculations to evaluate whether an asset's estimated fair market value was lower than its recorded balance.[476]

     In connection with its impairment testing, Deloitte would assess the reasonableness of the forecasted EBITDA and revenues for each property in the LRP, as well as examine the projections for risks that might indicate the presence of impairment trigger events.  Deloitte also reviewed Caesars' valuation methodologies, which utilized the projections in both a discounted cash flow valuation (income approach) and a guideline public company approach using EBITDA multiples (market approach).[477]

     For its 2013 impairment testing review, Deloitte had identified as an area for inquiry ████ As a  result, ██████████████████████████████████████████████████████████ As previously discussed, after its review of the LRP in late 2013, Deloitte concluded ████████████████ [480]

---

[474]  In 2014, in an exception to this treatment, the Company's two Lake Tahoe properties █████ ████████████  "December 31, 2014 Long Lived Assets Impairment – ASC 360" (Mar. 1, 2015), at DT0012076 [DT0012074].

[475]  Deloitte Workpaper "ASC 360 Impairment Analysis" (Dec. 31, 2012), at Tab "1. D&T Summary" [DT0030529] (native file).

[476]  L. Bird Oct. 2, 2015 Tr. at 116:20-117:10, 190:16:-191:20.

[477]  *See, e.g.*, Impairment Analysis (Oct. 1, 2013), at Tab "4.2 – EBITDA Analysis" [CEOC_INVESTIG_00513908] (native file).

[478]  Deloitte Memorandum "ASC 350:  Goodwill and Non-amortizing Intangible Assets Impairment Testing" (Nov. 1, 2013), at DT0005245 [DT0005245].

[479]  *Id.* at DT0005246.

[480]  Deloitte Workpaper "Long-Range Plan Testing" (Q4 2013), at Tab 'Summary' [DT0003746] (native file).

Caesars utilized the projections for both its income and market approach to valuing its assets for impairment testing purposes. In performing its valuations, Caesars weighted the income approach and the market approach 80% and 20%,[481] respectively.[482] Typically, the resulting values under the income approach were calculated to be much higher than under the market approach. Deloitte explained this difference between the two approaches, and other valuation considerations, as follows:



### G. Commentary Regarding the Preparation and Use of Projections by Caesars

Significant time in many interviews was devoted to inquiring about management's

---

[481]  Impairment Analysis (Oct. 1, 2013), at Tab '4.2 – EBITDA Analysis' [CEOC_INVESTIG_00513908] (native file).

[482]  Impairment testing valuations that were done by Caesars and reviewed by Deloitte are discussed in Appendix 7, Valuation, *infra*, within the respective discussion of the Transferred Assets, as applicable.

[483]  Deloitte Memorandum "ASC 350: Goodwill and Non-amortizing Intangible Assets Impairment Testing" (Nov. 1, 2013), at DT0005264 [DT0005245].

[484]  *Id*.

[485]  *Id*. at DT0005260.

[486]  *Id*. at DT0005263.

[487]  *Id*. at DT0005258-59.

projections process and the resulting Annual Plan and LRP.  Overall, the commentary was mixed, but generally, when pressed, the witnesses conceded that their view was based upon CEC overall, rather than on the performance of any of the individual transferred assets.  Following are certain relevant excerpts from the interviews.  It should be noted that some witnesses provided both critical and positive commentary.

### 1. Management's Views on Projections

- "Did you think the numbers in the January business plan were numbers that were realistically achievable by the company?  THE WITNESS: Yes." (R. Brimmer)[488]

- "I think we expected that we would achieve our goals in each year. Our compensation was tied to achieving those goals. . . . There was a level of stretch where we wanted to push the business." (R. Brimmer)[489]

- "[T]here's kind of an aspirational element where we want to set a target that's not a layup and force ourselves to achieve that number. But I think going into the year, you know, we had a list of things that we planned to do to get us to that number and we thought we could do that." (R. Brimmer)[490]

- "But they were still the goals that the company put forth to the board and said we're going to endeavor to achieve." (R. Brimmer)[491]

- "[T]he goal element, the aspirational element. It's part of the planning process and we've proven that overall we've consistently set goals that we come short of, at least in aggregate." (R. Brimmer)[492]

- "There were certain years where I thought our aggressive projections, the budget that we had put forth, which had kind of goals and was driven by our need to be compliant with covenants and things like that I expressed to certain groups that I thought there was risk in those numbers." (R. Brimmer)[493]

- "And so the rationale for us in our planning model is that we had continually believed that our industry would experience a rebound much like other industries. And that when that happened, we would get growth that was consistent with the prior 10 or 15 years of our industry's growth before the recession. And we didn't know when that was going to occur, but we thought that it would be reasonable to

---

[488]  R. Brimmer Sept. 29, 2015 Tr. at 188:10-14.

[489]  *Id*. at 187:4-12.

[490]  *Id*. at 187:18-25.

[491]  *Id*. at 180:10-12.

[492]  *Id*. at 175:17-22.

[493]  *Id*. at 180:2-9.

include that in a forecast over the next four or five years. . . . So that was in our forecast. We communicated that to the advisers and it was an assumption that although we felt was realistic, it was certainly, by no means, guaranteed or even within our control. It really depended on the economy and how the consumer behaved." (E. Hession)[494]

- "As has happened as we flash forward, the recovery is happening this year. So it seems to be happening earlier than what we put into our forecast." (E. Hession)[495]

- "Generally, our budgets, I would say, are more aspirational or target. They're certainly achievable. . . . But they generally assume that, you know, that the economy is going to be stronger or at least as strong as it is in the current period . . . . They assume a high percentage of our initiatives are executed and are successful and we get support from the economy in the sense that it matches our underlying assumptions." (E. Hession)[496]

- "So typically, you know, when we put out the plan targets and you look historically, we missed plan almost every year." (J. Beato)[497]

- "[W]e never met any forecast." (D. Colvin)[498]

- "[P]lans at the property level were optimistic." (D. Colvin)[499]

**2. The Sponsors' Views on Projections**

- "[T]hat's normal in the process of vetting financial projections in whatever forum that by their very inherent nature rely on judgments and assumptions that people are going to have different points of view on, and I respected their points of view and their experience, which we have to recognize was far greater than my own or anyone at TPG in owning and operating casinos." (K. Davis)[500]

- "That doesn't mean they were wrong or they were ill-intended . . . ." (K. Davis)[501]

---

[494]  E. Hession Nov. 4, 2015 Tr. at 305:21-306:25.

[495]  *Id*. at 312:22-25.

[496]  E. Hession Nov. 3, 2015 Tr. at 178:6-179:5.

[497]  J. Beato Sept. 24, 2015 Tr. at 213:22-25.

[498]  D. Colvin Nov. 6, 2015 Tr. at 129:8-9.

[499]  *Id*. at 168:22.

[500]  K. Davis Oct. 22, 2015 Tr. at 49:19-50:3.

[501]  *Id*. at 51:24-25.

- "[B]ut I will say that the budget was based on a series of assumptions and those assumptions I always thought were based on reasonable judgment of the management team . . . because this was a management team that was putting something out there to be delivered on for the year that would then define their compensation." (G. Kranias)[502]

- "Yeah, there was a lot of analysis put into the creation of the budget and there were a lot of macroeconomic regressions that were run . . . ." (G. Kranias)[503]

- "I worked with a lot of portfolio companies at TPG and the process here felt very reasonable." (G. Kranias)[504]

- "I remember at specific points in time thinking that the budgets for the projections were aspirational." (G. Kranias)[505]

- "[T]he company had a relatively poor record of hitting its projections and, you know, we thought to run a downside case with what we thought at the time may have been more conservative, more reasonable assumptions, was worth looking at." (A. van Hoek)[506]

- "In general I think the model was quite conservative. We were planning for the worst, though in many cases the model wasn't actually conservative enough, because actual performance ended up being worse than the long range plan, but I think there was recognition that at some point the business would turn. We have seen that. I mean, the business turned in 2015 and by just creating time it was worth doing [the Four Properties Transaction]." (A. van Hoek)[507]

- "[T]he longer-term models we have from the company are generally pretty conservative, there is no – you know, there is no huge rebound that's built into the model . . . ." (A. van Hoek)[508]

- "In most cases what I call it would be a stretch." (T. Dunn)[509]

- "Yeah, look, a budget is put together for compensatory purposes and it is not

---

[502]   G. Kranias Oct. 23, 2015 Tr. at 25:16-26:3.

[503]   *Id*. at 26:14-17.

[504]   *Id*. at 27:19-21.

[505]   *Id*. at 24:17-20.

[506]   A. van Hoek Sept. 25, 2015 Tr. at 267:11-16.

[507]   A. van Hoek Jan. 26, 2016 Tr. at 363:13-22.

[508]   *Id*. at 365:16-19.

[509]   T. Dunn Oct. 29, 2015 Tr. at 29:16-17.

uncommon for companies to have budgets that are aggressive to motivate performance and obviously, it pays management based on stretching their performance. I'm not so sure – I don't think that's inconsistent at all with taking a more conservative view of a company's five-year projections." (D. Sambur)[510]

- "The company didn't make a budget so far under our ownership. No, the company continuously missed budget." (M. Rowan)[511]

### 3. The Valuation and Special Committee Members' Views on Projections

- "Some of the properties would do well, others not." (L. Swann)[512]

- "They missed every number previously. . . . It was my opinion and comment to Centerview that they needed to press management on more realistic numbers, that the numbers that they initially present, I didn't have faith would be the actual numbers, I thought they would be lower." (L. Swann)[513]

- "But as a whole, the projections were off  . . . consistently . . . I truly felt that I didn't have a lot of confidence in those particular numbers [January Plan for Four Properties]." (L. Swann)[514]

- "So we relied heavily on the information coming from management and trusted the validity in that." (J. Housenbold)[515]

- "So I didn't have direct conversations with sponsors, so my understanding of the discussion was, we as the valuation committee relied on the projections of management. We trusted in the data and the integrity of that data that we got from management." (J. Housenbold)[516]

- "My general sense was that was the best information we could garner, that management had the deep experience, that they had years of actual operating results, that they were smart and diligent and thoughtful in crafting their annual budget." (J. Housenbold)[517]

- "So my experience was management often put rosy projections out, and then each

---

[510]  D. Sambur Oct. 29, 2015 Tr. at 352:3-13.

[511]  M. Rowan Nov. 16, 2015 Tr. at 163:14-16.

[512]  L. Swann Oct. 12, 2015 Tr. at 67:3-4.

[513]  *Id*. at 66:8-17.

[514]  *Id*. at 67:4-17.

[515]  J. Housenbold Oct. 9, 2015 Tr. at 24:17-19.

[516]  *Id*. at 53:11-17.

[517]  *Id*. at 67:22-68:3.

meeting had reasons why they weren't achieving them." (J. Housenbold)[518]

- "Notwithstanding that, I thought they were overly optimistic at times." (J. Housenbold)[519]

- "I sent them [Centerview] back to revalidate, because, Gary, your guys have never made their numbers even in a single quarter, a single month since this company was taken private and then partially taken public and I am not going to accept that sort of track record unless we test it." (F. Kleisner)[520]

### 4. The Financial Advisors' Views Regarding Management's Projections

While Hession originally thought the financial advisors were building off of the assumptions in Caesars' projections, he noted he later learned the financial advisors were utilizing the assumptions without modification.

> [K]eep in mind that when we presented these projections to each of the advisers, we made it clear what our underlying assumptions were. And so from my perspective, these well-paid advisers who were experts in valuation would listen to management, listen to our assumptions, listen to what we were saying were things that were in our control and out of our control and make adjustments based on what they felt were realistic outcomes. And it appeared that that was not what was happening and instead, they were taking our numbers, copying them into a spreadsheet . . . .[521]

The financial advisors stated the following regarding the projections:



(C. Rucker – VRC)

---

[518] *Id.* at 65:2-5.

[519] *Id.* at 68:4-5.

[520] F. Kleisner Oct. 30, 2015 Tr. at 73:23-74:5.

[521] E. Hession Nov. 4, 2015 Tr. at 304:21-305:13.

[522] C. Rucker Sept. 25, 2015 Tr. at 37:13-20.



(N. Bryson – Evercore)[523]

- (N. Bryson – Evercore)

- (E. Mestre – Evercore)

- (J. Bosacco – Centerview)

### 5. Conflicting Views on Projections

As seen above, several parties presented conflicting views on the projections.  For example, Brimmer described the projections as aspirational and aggressive, but still achievable.  Kranias also called the projections aspirational, but stated they were based on a reasonable process utilizing multiple analyses.  Van Hoek's view varied depending on the context.  In a general sense, Van Hoek iterated that Caesars repeatedly missed projections, but, in the context of liquidity analyses, later described the projections as conservative.  Housenbold called the projections "rosy" and "overly optimistic" yet also stated that management was "smart and diligent and thoughtful" in creating those projections.[527]   Despite the mixed commentary,

---

[523]   N. Bryson Sept. 28, 2015 Tr. at 21:2-15.

[524]   *Id.* at 79:11-22.

[525]   E. Mestre Nov. 6, 2015 Tr. at 13:13-21.

[526]   J. Bosacco Sept. 15, 2015 Tr. at 98:5-11.

[527]   J. Housenbold Oct. 9, 2015 Tr. at 65:2-3, 68:2-5.

[528]   Deloitte Memo "ASC 350:  Goodwill and Non-amortizing Intangible Assets Impairment Testing" (Nov. 1, 2013), at DT0005256 [DT0005245].

**H.  The Views of CEC and CAC**

Both CEC and CAC have suggested to the Examiner that the LRP was "aspirational" and should not be relied upon because Caesars consistently missed its projections.  Specifically, CEC argued that:

- Caesars projections were aspirational and actual results invariably fell short.

- One-year projections for properties sold missed more often than not and on aggregate.

- Long-range plans, which drive valuations, were consistently over-optimistic.

CAC has offered similar views and analysis to the Examiner, contending that:

- The Four Properties had consistently underperformed management's projections.

- The Four Properties had underperformed CEOC's last six annual budgets by an average of 10%.

- The Four Properties had underperformed long-range plan projections by even larger margins.

- Deloitte found that CEOC was "lousy" at projecting.

- Subsequent events have proven CAC right.

CEC's and CAC's views and analyses are flawed for a variety reasons.  Most notably:

- CEC's analysis relies upon comparing actual results to the historical LRP from each year prepared for 2008 through 2013, a number of which were created prior to and in the early stages of the Recession.  An earlier presentation to the Examiner acknowledged that after the LBO Caesars faced an unprecedented market downturn.

- CAC places undue emphasis on comparing actual results for 2012 and 2013 to Year 4 and Year 5 of the 2008 and 2009 LRPs.  CAC presents "corrections" and "adjustments" based upon using the 2008 and 2009 LRPs.  This is an unpersuasive analysis since (i) the 2008 LRP was created in 2007 prior to the Recession and the 2009 LRP was created at the onset of the Recession, and (ii) the projections for Year 4 and Year 5 bear no resemblance to the projections prepared in 2013 and 2014 for the purpose of the property valuations.

- The changes made to the annual budgets and LRPs over time, and particularly in late 2013, in an effort to provide more conservative and more reasonable projections were ignored by both CEC and CAC.

- Both CEC and CAC only selectively consider the impact of construction

disruption. Specifically, while recognizing the disruption from construction at the Cromwell and renovations at the Quad, CEC and CAC do not consider (i) the material impact on the Quad of the construction of LINQ Retail and the Observation Wheel as discussed and even quantified in Caesars' public filings, and (ii) the disruption from the rolling renovations to Bally's South Tower. This construction disruption would not have been factored into early year LRPs, and therefore it is inappropriate to compare actual results to projections that don't account for the disruption.

- CEC's view that actual results invariably fell short and CAC's view that the Four Properties had consistently underperformed management's expectations do not consider that (i) the Four Properties missed budget by only 2.8% in the most recent three year period, (ii) each of the Four Properties met budget in some years and missed in others.

- CAC cites Deloitte as finding that CEOC was "lousy" at projecting, but CAC's own presentation to the Examiner notes that Deloitte's comment related to the period from 2009 through 2012. CAC also quotes Deloitte as indicating, " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In fact, Deloitte's full quote stated:



In the same document, Deloitte also stated:



- While CEC and CAC both emphasize the assets' performance in 2014 and 2015 as purported evidence that the projections were unreasonable, this view is erroneous. Even if it were appropriate to consider hindsight in valuation, the

---

[529] Deloitte Workpaper "Year End ASC 350 & 360 retrospective review" (Sept. 30, 2014), at Tab "3.) HNO" [DT0000169] (native file).

[530] *Id.*

[531] *Id.* at Tab "1.) Summary."

value of a long-lived asset is not determined by one to two years of actual results. Caesars' representatives concede that the projections assume a recovery from the Recession, which ultimately did start to occur in 2015. An asset can easily miss its projections in the first two projection years and still retain its value.

## I. The Examiner's General Observations Regarding the Preparation and Use of Projections by Caesars

While certain elements of Caesars' projections have been aspirational in nature, recent history has shown that Caesars has improved its track record and has been able to exceed its projections almost as frequently as it misses in the relevant markets and properties. The following observations can be made regarding Caesars' projections:

- For the purpose of evaluating solvency, adjusting the LRP projections of CEOC due to an alleged "aspirational" element, as CEC and CAC have contested, would only further increase the degree of CEOC's insolvency under the balance sheet test.

- Caesars engages in a robust and dynamic projections process, utilizing both historical results and macroeconomic indicators to project future performance.

  o Caesars' planning process comprises dedicated staff that review and work on budgets and forecasting throughout the year.

  o The LRP is prepared in the ordinary course of business and is used for numerous internal and external purposes.

  o Caesars' auditors performed an extensive evaluation of the Company's projection process in order to determine that the LRP could be relied upon for its audit procedures.

  o Management represented to its auditors that the projections were "reasonable."

  o There is no evidence that the financial advisors performed any type of quantitative analysis similar to that performed by Deloitte or to the analysis that is contained in this report.

- While CEC historically did consistently miss its annual budget, those misses were largely driven by material misses in Atlantic City and Other Regional properties. However, this pattern of consistent misses does not hold true for the Las Vegas region or for any of the Transferred Assets (Planet Hollywood, Bally's, the Quad, the Cromwell or Harrah's New Orleans).

  o In some years, the Las Vegas region and the transferred properties missed budget and in some they exceeded. There was not a consistent pattern of repeated misses in recent years.

- o Despite significant construction disruption in 2011 through 2013, the Four Properties missed budget during the period from 2011 through 2013 by only 2.8%.

- Caesars tempered its projections over time and made a marked reduction in projected revenue and EBITDA in late 2013.

  - o Over time, Caesars reduced its outer-year growth rates and the absolute projected EBITDA, resulting in more realistic projections (as noted by Deloitte in its testing of the LRP for reasonableness).

  - o Management (Brimmer and Hession) indicated in interviews that one of the reasons for historical misses was due to the assumption of an economic recovery that did not materialize at the time. As noted by Hession, the recovery is now occurring in 2015 ahead of recently forecasted timing. Rowan confirmed this, stating, "And now, with the benefit of hindsight, the recovery happened this year [2015]" and "So, we are right that it was cyclical. What we were wrong about was the timing."[532]

Based upon the above, nothing has come to the attention of the Examiner that would have warranted using projections other than management's ordinary course projections. Therefore, it is reasonable to rely upon the LRP for the purpose of valuing the Transferred Assets that were the subject of the Investigation, including the Four Properties Transaction.

---

[532]  M. Rowan Nov. 17, 2015 Tr. at 334:19-21, 335:3-5.