**United States Bankruptcy Court, Northern District of Illinois**

| Name of Assigned Judge | A. Benjamin Goldgar | **CASE NO.** | 15 B 1145 |
|---|---|---|---|
| **DATE** | March 16, 2016 | **ADVERSARY NO.** | |
| **CASE TITLE** | Caesars Entertainment Operating Co., Inc. | | |
| **TITLE OF ORDER** | Order continuing motion of Unsecured Creditors' Committee for derivative standing to commence, prosecute, and settle claims | | |

**DOCKET ENTRY TEXT**

The motion of the Statutory Unsecured Creditors Committee for an order granting it derivative standing to commence, prosecute, and settle certain claims on behalf of the debtors' estates (Dkt. No. 2029) is continued for further consideration, should that be necessary. A separate scheduling order will be entered.

**[For further details see text below.]**

**STATEMENT**

Before the court in these "immense, and immensely complicated," bankruptcy cases, *Caesars Entm't Operating Co., Inc. v. BOKF, N.A.* (*In re Caesars Entm't Operating Co., Inc.*), 808 F.3d 1186, 1187 (7th Cir. 2015), is the motion of the Statutory Unsecured Creditors Committee (the "Committee") for derivative standing. The Committee wants standing to commence, prosecute, and settle a host of claims on behalf of the debtors' estates.

As explained below, the Committee has failed at this juncture to show that it is entitled to derivative standing. Rather than deny the motion, however, the court will continue it for further consideration later in the case, should that prove necessary.

**1. Jurisdiction**

The court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(b) and the district court's Internal Operating Procedure 15(a). This is a core proceeding. *See* 28 U.S.C. §§157(b)(1)(A), (O); *In re Dzierzawski*, 518 B.R. 415, 417 (Bankr. E.D. Mich. 2014).

**2. Facts**

Although the decision here is straightforward, considerable background is necessary to

## STATEMENT

understand the claims the Committee wants to assert and the reasons its request will not be granted now. The facts below are drawn from the Committee's motion, the responses to it, the Committee's original proposed complaint, and its amended proposed complaint. To provide a complete narrative, additional facts are drawn from the court's docket and papers filed in these cases. *See Independent Trust Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 943 (7th Cir. 2012) (stating that a trial court may take judicial notice of a case's history to "further [the] procedural narrative"). No facts are in dispute.

### a. Background

These jointly-administered chapter 11 cases were filed on January 15, 2015 (the "petition date"). The debtors are the primary operating units of a larger group of companies sometimes described as "the Caesars gaming enterprise" (collectively, "Caesars"). The debtor in the lead case is Caesars Entertainment Operating Co., Inc. ("CEOC"). The other debtors are subsidiaries of CEOC. The majority owner of CEOC is Caesars Entertainment Corp. ("CEC"). CEC is not a debtor.

Caesars owns, operates, or manages fifty gaming and resort properties in five countries, including the United States. The debtors own, operate, or manage thirty-eight of the properties. At least seven of the properties are riverboat or dockside casinos.

To operate their hotels and casinos, the debtors possess liquor and gaming licenses from various government agencies. The debtors also hold insurance policies providing coverage for an array of possible losses.

### b. The Funded Debt Obligations

As of the petition date, the debtors had outstanding funded debt of $18.4 billion in the form of bank loans and notes. Some of the funded debt is secured by first and second liens on personal property such as liquor licenses, gaming licenses, and insurance policies. Some is secured by mortgages on riverboat and dockside casinos as well as other real estate.

### i. The First Lien Bank Debt

The first lien bank debt originated in January 2008, when CEC (then known as Harrah's Entertainment, Inc.) and CEOC (then known as Harrah's Operating Co.) entered into a secured credit agreement (the "first lien credit agreement") with Bank of America, as first lien administrative agent and first lien collateral agent, and an assortment of banks (the "first lien lenders"). Under the first lien credit agreement, CEOC was entitled to borrow up to $9.25 billion. As of the petition date, CEOC's first lien bank debt totaled approximately $5.35 billion.

**STATEMENT**

The first lien credit agreement was amended several times, the last time in July 2014 when CEOC obtained $1.75 billion in new term loans. Around then, Credit Suisse AG, Cayman Islands Branch ("Credit Suisse") succeeded Bank of America as the first lien administrative agent and the first lien collateral agent.

### ii. The First Lien Note Debt

CEOC's current first lien note debt arose under four indentures between June 2009 and February 2013. The parties to all four indentures were CEOC, CEC (as guarantor), debtors Caesars Operating Escrow LLC and Caesars Escrow Corp. (as escrow issuers), and U.S. Bank, N.A., as first lien indenture trustee. At some point, UMB Bank, N.A. ("UMB") succeeded U.S. Bank as trustee under the indentures.

CEOC issued about $6.3 billion of notes under the four indentures (the "first lien note debt"). As of the petition date, CEOC's first lien note debt totaled approximately $6.35 billion.

### iii. The First Lien Collateral Agreement, Security Interests, and Mortgages

To secure repayment of its first lien bank and note debt, CEOC and some of its subsidiaries (the "subsidiary pledgors") entered into a collateral agreement (the "first lien collateral agreement") with the first lien collateral agent, the first lien administrative agent, and the first lien indenture trustee (together with the first lien lenders, the "first lien secured parties").

In the first lien collateral agreement, the first lien secured parties were granted security interests in substantially all of CEC and the subsidiary pledgors' personal property, including insurance policies, gaming licenses, and liquor licenses. The first lien secured parties were also granted security interests in "commercial tort claims" of CEC and the subsidiary pledgors.[1] And the first lien secured parties were granted first mortgages in real estate of CEC and the subsidiary pledgors, including riverboat and dockside casinos.

---

[1]   It appears CEOC and the subsidiary pledgors not only granted security interests in existing commercial tort claims but also agreed to notify the first lien collateral agent of any later-acquired commercial tort claim estimated at more than $15 million. The first lien secured parties would then be granted a security interest in any such claim. (The parties never actually describe what a "commercial tort claim" is for these purposes. The first lien collateral agreement apparently defines the term, but no party has submitted a copy, nor has any party quoted the definition in its papers.)

**STATEMENT**

### iv. The Second Lien Note Debt

CEOC's current second lien debt also consists of notes. From 2008 to 2010, CEOC issued approximately $5.24 billion of second lien notes under three indentures (the "second lien note debt"). As of the petition date, the second lien note debt totaled approximately $5.24 billion.

Each indenture has a different trustee. Delaware Trust Company, FSB ("Delaware Trust") is indenture trustee under an indenture dated December 24, 2008, pursuant to which CEOC issued 10.00% second priority senior secured notes due 2015 and 10.00% second priority senior secured notes due 2018. Wilmington Savings Fund Society, FSB ("Wilmington Savings") is successor indenture trustee under an indenture dated April 15, 2009, pursuant to which CEOC issued 10.00% second priority senior secured notes due 2018. BOKF, N.A. ("BOKF") is indenture trustee under an indenture dated April 16, 2010, pursuant to which CEOC issued 12.75% second priority senior secured notes due 2018.

### v. The Second Lien Collateral Agreement, Security Interests, and Mortgages

To secure repayment of its second lien note debt, CEOC and the subsidiary pledgors entered into a second lien collateral agreement with U.S. Bank, as second lien collateral agent (the "second lien collateral agent"), and all three of the second lien indenture trustees (together with the holders of the second lien debt, the "second lien secured parties"). At some point, Delaware Trust succeeded U.S. Bank as the second lien collateral agent. Delaware Trust is therefore both the second lien collateral agent and one of the three second lien indenture trustees.

In the second lien collateral agreement, the second lien secured parties were granted security interests in much the same real and personal property that CEOC and the subsidiary pledgors had pledged to the first lien secured parties. Among other things, CEOC and the subsidiary pledgors made the same commitment about later-acquired "commercial tort claims."

### c. The Challenged Transactions and Subsequent Pledges of Commercial Tort Claims Arising from Them

CEOC and the subsidiary pledgors eventually acquired commercial tort claims estimated at more than $15 million. The claims arose from certain transactions CEC undertook in the late 2000s in response to difficulties resulting in part from the 2008 financial crisis.

Although the economy began to recover after the financial crisis, CEOC did not. CEOC's revenues continued to decline, and, according to the debtors, Caesars was in danger of losing its ability to compete in the gaming business. CEOC's massive funded debt did not help matters, and in the years that followed CEC sought to restructure CEOC's debt. To that end, in

-4-

**STATEMENT**

May 2009, and then again from 2013 to 2014, CEC engaged in more than forty-five transactions, including asset transfers, debt repurchases, refinancings, and exchange and tender offers (the "challenged transactions"), all designed to restructure the debt.

Or so Caesars has said. In the view of the Committee and others, the transactions were really part of a fraudulent scheme that Caesars' owners orchestrated to escape their bad investment by transferring the debtors' most valuable assets to CEC and other insiders for less than reasonably equivalent value, leaving CEOC a debt-ridden shell.

In June 2014, a special governance committee of the CEOC board (the "SGC") began investigating whether CEOC had fraudulent transfer or other commercial tort claims against CEC and its affiliates arising out of the challenged transactions. The SGC has determined, at least preliminarily, that CEOC has claims of significant value. In the view of the first and second lien collateral agents, these claims are "commercial tort claims" with a value of more than $15 million.

The first and second lien collateral agents acted to protect their interests in these commercial tort claims. In accordance with the collateral agreements, they demanded that CEOC and the subsidiary pledgors grant the first and second lien secured parties security interests in the claims.

CEOC and the subsidiary pledgors obliged. On September 25, 2014, they entered into an agreement in which they granted the first lien secured parties a first priority security interest in at least twenty-three claims arising from challenged transactions (the "2014 first lien pledge"). The next day, the first lien collateral agent filed on behalf of the first lien secured parties 141 separate UCC-1 financing statements to perfect the security interests in the claims subject to the 2014 first lien pledge.

Two months later, CEOC and the subsidiary pledgors granted the second lien secured parties second priority security interests in the same commercial tort claims (the "2014 second lien pledge"). The second lien collateral agent filed 143 separate UCC-1 financing statements perfecting security interests in the claims subject to the 2014 second lien pledge.

### d. The Notes RSA

Although the SGC had determined preliminarily that CEOC had substantial claims against CEC, it advised the board that "prosecuting and collecting on such claims would be subject to significant challenges, including disagreement over the size of the claims." Rather than pursue litigation against CEC, the SGC suggested that the better course would be for CEOC to settle the claims with CEC in exchange for a large sum of money.

**STATEMENT**

Meanwhile, in the summer of 2014 the debtors began negotiations with CEC, the first lien lenders, and first lien noteholders over a comprehensive restructuring. The goal, according to the debtors, was to arrive at a "global balance-sheet restructuring that benefits not only the Debtors' senior secured creditors, but also returns significant value to their unsecured creditors." (Bankr. Dkt. No. 2654 at 2). In December 2014, the debtors, CEC, and a large percentage of the first lien noteholders (but not the first lien lenders) agreed on the terms of a restructuring. The terms were memorialized in a "Restructuring Support and Forbearance Agreement" and accompanying term sheet (the "Notes RSA").

The Notes RSA was designed to form the basis of a chapter 11 plan under which the debtors' businesses could be reorganized as a real estate investment trust. In the debtors' view, the REIT structure would "enhance the value of the Debtors' real estate and provide their creditors with improved recoveries through additional cash and debt securities." (*Id.* at 4). The Notes RSA also required CEC to make a significant financial contribution toward the restructuring, a contribution valued at more than $2.5 billion. That contribution would settle CEOC's potential claims against CEC. and CEOC's plan in turn would release all claims the estates had against CEC, its affiliates, shareholders, officers, directors, and others.

The parties to the Notes RSA consented to both the CEC contribution and the release. The consenting first lien noteholders also agreed to make significant concessions of their own toward a consensual resolution. Among others, the first lien noteholders agreed to waive or assign at the debtors' direction distributions they would receive on their deficiency claims.

### e. The Bankruptcy Cases

On January 12, 2015, less than a month after the Notes RSA was signed, three second lien noteholders filed an involuntary chapter 11 petition against CEOC in the bankruptcy court in Delaware. Three days later, the debtors filed voluntary chapter 11 petitions in this court. The Delaware court later transferred venue of CEOC's involuntary case here. The involuntary case is still pending.

### f. Events in the Voluntary Bankruptcy Cases

#### i. The Final Cash Collateral Order

The Notes RSA not only provided the framework for a plan of reorganization but also contemplated the debtors' use of cash collateral for their operations during the bankruptcy cases. As a result, the debtors were prepared at the petition date to request (and did request) entry of a final cash collateral order. In the order, the first lien lenders and noteholders consented to the debtors' use of their cash collateral to operate according to an agreed budget. That permission, however, was conditioned on adequate protection of the first lien lenders and note holders'

**STATEMENT**

interests and numerous stipulations on the part of the debtors. The final cash collateral order was entered on March 26, 2015, and the debtors have been operating under it ever since.

Five stipulations in the final cash collateral order are relevant here. Four concern the liens securing the first lien debt, the second lien debt, or both (the "four cash collateral stipulations"). First, the debtors stipulated that CEOC as well as each subsidiary pledgor was "indebted and liable" for all of the first lien debt as of the petition date. Second, the debtors stipulated that as of the petition date, all security interests, liens, and mortgages granted to the first lien collateral agent on behalf of the first lien secured parties were "valid, binding, enforceable, non-avoidable, and property perfected." Third, the debtors stipulated that as of the petition date, all obligations of the subsidiary pledgors were "legal, valid, binding, enforceable, and non-avoidable." Fourth, the debtors stipulated that both the first and second lien debt included certain fees, costs, and other charges, in particular default interest, premiums, professional fees, and indemnities.

The fifth stipulation was procedural. It set two deadlines for parties to challenge the liens of the first and second lien secured parties – one deadline for the Committee, another for all other "parties in interest." The deadlines would apply only to challenges for which the Committee or other parties in interest required derivative standing. Specifically, the final cash collateral order said:

> Nothing in this Final Order prejudices the right of the Unsecured Committee or other party in interest . . . in each case, if and to the extent granted derivative standing by the Court to the extent, if any, derivative standing is necessary beyond the rights granted to any party in interest pursuant to Bankruptcy Code section 502(a), to seek to avoid liens, . . . challenge . . . [the debtors' stipulations in the final cash collateral order] or to challenge, initiate any proceeding, or assert any claim or cause of action with respect to (i) the validity, enforceability, extent, priority, or perfection of . . . mortgages, security interests, and liens [of the first lien secured parties or second lien secured parties].

(Bankr. Dkt. No. 988 at 57).

If derivative standing were required, the Committee would have until May 6, 2015 (the "Committee challenge deadline") to bring challenges, and other parties in interest would have until June 9, 2015, seventy-five days after entry of the final cash collateral order. The parties to the final cash collateral order also agreed that if the Committee moved for derivative standing before expiration of the Committee challenge deadline, the deadline would be tolled "from the date the [Committee] so moves until such time as standing is granted or denied." If the standing motion were denied, in other words, the Committee challenge deadline would terminate.

**STATEMENT**

The Committee received three extensions of its challenge deadline, the last until August 7, 2015.

### ii. Continued Plan Support Negotiations and Extensions of Exclusivity

The Notes RSA was amended several times, most recently in October 2015. The debtors also sought to negotiate restructuring support agreements for the first lien bank debt and the second lien note debt and met with some success. On August 21, 2015, CEC and CEOC entered into a Restructuring Support and Forbearance Agreement with certain first lien bank lenders (the "Banks RSA"). Meanwhile, on July 20, 2015, CEC and CEOC announced a Restructuring Support and Forbearance Agreement with certain second lien note claimants (the "Second Lien RSA"). The second lien RSA, though, did not become effective because too few second lien noteholders executed it by the deadline of September 18, 2015.

On October 7, 2015, the debtors filed a modified chapter 11 plan that incorporated the terms of the Notes RSA and Banks RSA. Although the Second Lien RSA had not become effective, the debtors also included many of its terms in the modified plan.

The modified plan takes the same basic form as its predecessor. It envisions the reorganization of the debtors' businesses as a REIT. It calls for a substantial financial contribution from CEC and in exchange grants CEC and others a release of the estates' claims. And it contemplates the agreement of the first lien secured parties to waive, or assign at the debtors' direction, their distributions on deficiency claims.

To gain support for a plan premised on a controversial release of CEC, early in the bankruptcy cases the debtors sought and obtained the appointment of an independent examiner. The examiner was charged with investigating the challenged transactions, among others, and filing a final report that detailed his findings. The report was meant to help the parties gauge whether CEC's contribution under the plan was a fair price to pay to settle the claims arising from the challenged transactions.

Because progress had been made on a plan and the examiner's investigation was continuing, the debtors twice sought extensions of the exclusive periods during which only they could file and solicit acceptances of a plan. *See generally* 11 U.S.C. § 1121. Both extensions were granted over the objections of creditors. In February 2016, the debtors sought a third and final extension, allowing them until July 15 to file a plan and until September 15 to solicit acceptances, the statutory maximums. *See* 11 U.S.C. § 1121(d)(2)(A), (B). This time, no party objected, and the extension was granted.

In February 2016, the debtors announced their desire to have plan confirmation issues mediated and moved for appointment a mediator. All parties in interest who weighed in

**STATEMENT**

supported the concept. The motion was denied only because mediation is a private matter over which bankruptcy courts have no power. At the beginning of March, the debtors filed a notice that Joseph J. Farnan, Jr., retired chief judge of the U.S. District Court for the District of Delaware, had agreed to serve as mediator.

Three days later, the examiner indicated that he had finished his investigation and would shortly file his report. A redacted version of the report was filed on March 15. All parties expect the examiner's report to play a central role in their mediation.

### g. The Motion for Derivative Standing

Seven months earlier, meanwhile, the Committee had filed the motion for derivative standing now at issue. In the motion – filed despite the first lien secured parties' willingness to extend the Committee challenge deadline – the Committee asked permission to file and prosecute on behalf of the estates a fifteen-count complaint (which the Committee attached). The proposed defendants were Credit Suisse, Delaware Trust, UMB Bank, and BOKF, all named in their various capacities as collateral agent or administrative agent for the first lien or second lien secured parties or as indenture trustees. Some proposed defendants were agents for some of the same secured parties who were willing to make, and are still willing to make, concessions under the debtors' plan.

The proposed complaint sought to avoid the liens securing the debt held by the defendants and requested declarations that the four cash collateral stipulations were not binding. Seven counts were claims under section 544 of the Bankruptcy Code, 11 U.S.C. § 544,[2/] to avoid the first and second priority liens on the debtors' personal property: (i) the commercial tort claims mentioned in the 2014 first and second lien pledges; (ii) insurance policies; (iii) gaming licenses held by nineteen debtors; (iv) liquor licenses held by nineteen debtors; (v) the equity of certain debtors holding gaming licenses; and (vi) certain copyrights. One count was a claim under section 547, 11 U.S.C. § 547,[3/] to avoid the grant of the security interest under the 2014

---

[2/]   Section 544 empowers a debtor in possession (who exercises the power of a trustee, *see* 11 U.S.C. 1107(a)) to avoid liens that did not attach or were not perfected under applicable nonbankruptcy law. *See generally State Bank of Toulon v. Covey* (*In re Duckworth*), 776 F.3d 453 (7th Cir. 2014) (defective security interests); *In re Crane*, 742 F.3d 702 (7th Cir. 2013) (defective mortgage liens). The avoidance power under section 544 is known as the "strong-arm power." *Duckworth*, 776 F.3d at 458.

[3/]   Under section 547(b), a debtor in possession "can avoid a transfer that (1) was made to or for the benefit of a creditor, (2) was for or on account of an antecedent debt, (3) was made while the debtor was insolvent, (4) was made on or within 90 days before the date of the

-9-

**STATEMENT**

second lien pledge as a preferential transfer. Two counts were claims under section 544 to avoid liens on the riverboat or dockside casinos of seven debtors and the real estate of twenty-two other debtors.

The remaining five counts did not seek to avoid liens, at least directly. Four of the five were aimed at the four cash collateral stipulations, asking to have the stipulations declared inaccurate and non-binding because the underlying liens were invalid. The fifth and final count sought a declaration that the defendants could not assert unsecured deficiency claims against the subsidiary pledgors because the defendants had waived their rights under section 1111(b), 11 U.S.C. § 1111(b),[4/] in the collateral agreements.

After the Committee filed its derivative standing motion, the debtors furnished evidence that some of the questioned liens were perfected. The evidence was evidently enough to convince the Committee to amend its proposed complaint. The amended proposed complaint dropped counts seeking to avoid liens on the equity of debtors holding gaming licences and on copyrights. Other counts were amended to remove requests to avoid liens no longer in question and mortgages on certain properties. The count asserting the waiver of section 1111(b) rights was deleted because the claim is the subject of a separate contested proceeding.[5/]

The proposed amended complaint now contains just twelve counts. Five are section 544 claims to avoid the liens granted to the first and second lien secured parties on the commercial tort claims, liquor licenses, gaming licenses, and insurance policies. One is a section 547 claim to avoid as preferential the grant to the second lien secured parties of the security interest in

---

filing of the petition, and (5) allowed the creditor to receive more than it otherwise would have through the bankruptcy." *Grede v. FCStone, LLC*, 746 F.3d 244, 251 (7th Cir. 2014).

[4/] The collateral agreements made the obligations of the subsidiary pledgors non-recourse. Section 1111(b)(1)(A) addresses non-recourse claims, providing in part that "[a] claim secured by a lien on property of the estate shall be allowed or disallowed under section 502 of this title the same as if the holder of such claim had recourse against the debtor on account of such claim, whether or not such holder has such recourse . . . ." 11 U.S.C. § 1111(b)(1)(A). The Committee took the position that the collateral agreements waived this protection because the non-recourse provisions in the agreements declared that the subsidiary pledgors' obligations were non-recourse "under any law."

[5/] Wilmington Trust, N.A., indenture trustee for certain unsecured noteholders with claims against the subsidiary pledgors, has objected to the claims of the first lien noteholders based on the same waiver theory asserted in the Committee's original proposed complaint. The Committee deleted the section 1111(b) count from its complaint after joining Wilmington Trust's claim objections.

### STATEMENT

commercial tort claims. Two are section 544 claims directed at mortgage liens granted to the first and second lien secured parties on certain real property, including riverboat and dockside casinos. The remaining four counts attack the four cash collateral stipulations.[6]

The Committee's request for derivative standing was met with objections from all sides.[7] Although the objectors raised a wide variety of arguments, a principal objection was that the Committee failed to explain why the debtors' refusal to pursue the claims was unjustified. On the contrary, the objectors said, the refusal was justified because debtors could reasonably believe that the plan of reorganization towards which the parties are working will result in a better recovery for unsecured creditors than the extensive litigation the Committee would like to pursue.

### 3. Discussion

The Committee's motion will be continued for further consideration. By rights, the motion could be denied right now. As the objectors correctly argue, the Committee has failed to explain why the debtors' decision not to pursue the claims was unjustified. In fact, as the objectors also argue, the decision was justified: the debtors have declined to pursue the claims in the interest of attempting to reach a global settlement with the lien holders, a settlement that will lead to a consensual plan. But that justification will vanish if the debtors do not achieve a settlement. To avoid the loss of the Committee's right to request derivative standing (since the Committee challenge deadline has passed), the motion will be continued rather than denied.

---

[6] Although the amended proposed complaint requests derivative standing to challenge the cash collateral stipulations, the Committee contends it does not need it. In fact, the Committee is already pursuing a separate adversary proceeding challenging the stipulations. *See Statutory Unsecured Claimholders' Committee v. BOKF, N.A., et al.*, No. 15 A 571 (Bankr. N.D. Ill.). The Committee says it took this approach – asking permission to challenge the stipulations and then challenging them anyway – "out of an abundance of caution and to avoid an inadvertent lapse of the deadline for challenges not requiring derivative standing" should derivative standing prove necessary. Because the Committee's motion will be continued, whether standing is necessary is a question that need not be addressed yet.

[7] Objecting to the motion were the debtors; the ad hoc bank lender committee; Credit Suisse, as first lien administrative agent and first lien collateral agent; the ad hoc first lien noteholder committee; UMB Bank, as first lien indenture trustee; the Official Committee of Second Priority Noteholders; two of the three second lien indenture trustees, BOKF and Wilmington Savings; and Delaware Trust, as second lien indenture trustee and second lien collateral agent.

# STATEMENT

### a. Derivative Standing

Ordinarily, the debtor in possession is the only party in a chapter 11 case entitled to pursue claims belonging to the bankruptcy estate. *See Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000); *In re Perkins*, 902 F.2d 1254, 1257-58 (7th Cir. 1990); *In re Home Casual LLC*, 534 B.R. 350, 353 (Bankr. W.D. Wis. 2015); *Gecker v. Marathon Fin. Ins. Co. (Automotive Prof'ls, Inc.)*, 389 B.R. 630, 634 (Bankr. N.D. Ill. 2008). As the court of appeals has observed, the debtor in possession "has the sole responsibility to represent the estate, by bringing actions on its behalf to marshal assets for the benefit of the estate's creditors." *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998).

In "narrow circumstances," however, *Perkins*, 902 F.2d at 1258, a creditor or creditors' committee can be granted derivative standing to pursue estate claims, *Official Comm. of Unsecured Creditors of SGK Ventures, LLC v. NewKey Group, LLC (In re SGK Ventures, LLC)*, 521 B.R. 842, 847-48 (Bankr. N.D. Ill. 2014). Derivative standing will be granted when (a) the debtor in possession refuses a demand to pursue the action and the refusal is unjustified; (b) the claim to be pursued in the action is colorable; and (c) the third party seeks and obtains permission from the court to pursue the claim. *Perkins*, 902 F.2d at 1258; *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 203 (7th Cir. 1988); *SGK Ventures*, 521 B.R. at 847-48; *NBD Park Ridge Bank v. SRJ Enters., Inc. (In re SRJ Enters.)*, 151 B.R. 189, 194 (Bankr. N.D. Ill. 1993); *see also In re USA Baby, Inc.*, 424 F. App'x 558, 563 (7th Cir. 2011) (noting that the court has "permitted this relief").

Only two of these requirements, unjustifiable refusal and colorable claims, are at issue on the Committee's motion, and only the first, unjustifiable refusal, requires discussion.

### b. Unjustified Refusal

A creditor's request for derivative standing to bring an estate claim challenges the debtor in possession's decision not to pursue it. *See USA Baby*, 424 F. App'x at 562. For that challenge to succeed, the creditor must demonstrate that in refusing to pursue the claim, the debtor in possession is shirking its responsibilities to the estate. *Xonics*, 841 F.2d at 203; *see also Adelphia Commc'ns Corp. v. Bank of Am. N.A. (In re Adelphia Commc'ns Corp.)*, 330 B.R. 364, 374 (Bankr. S.D.N.Y. 2005) (noting that derivative standing is appropriate when "the debtor in possession unjustifiably failed to bring suit or abused its discretion in not suing"). The creditor seeking derivative standing therefore bears "the initial burden to allege facts showing that the refusal to file suit is unjustified." *Canadian Pac. Forest Prods. Ltd. v. J.D. Irving, Ltd. (In re The Gibson Group, Inc.)*, 66 F.3d 1436, 1438-39 (6th Cir. 1995) (internal quotation omitted).

Whether the refusal is justified is gauged in light of a debtor in possession's statutory obligations and fiduciary duties. *Id.* at 1438. One of those duties is to "wisely manage the

**STATEMENT**

estate's legal claims." *In re Smart World Techs., LLC*, 423 F.3d 166, 175 (2d Cir. 2005).  But wise management does not mean the debtor in possession must always pursue a claim.  Sometimes the better course is to settle.  *Id.* (citing *In re Energy Coop., Inc.*, 886 F.2d 921, 927 (7th Cir. 1989).  As the court of appeals has observed in these very bankruptcy cases, "successful resolution of disputes . . . is one of the Code's central objectives."  *Caesars*, 808 F.3d at 1189; *see also In re Keck, Mahin & Cate*, 241 B.R. 583, 598-99 (Bankr. N.D. Ill. 1999) (noting that "[c]hapter 11 has as its central goal the resolution of competing claims to scarce resources by a negotiated plan").

To determine whether a debtor in possession is justified in deciding not to pursue claims, courts typically conduct a cost-benefit analysis.  *In re Archdiocese of Milwaukee*, 483 B.R. 855, 869 (Bankr. E.D. Wis. 2012).  Among the factors courts consider in conducting this analysis are "'(1) the probabilities of legal success and financial recovery in event of success; (2) the creditor's proposed fee arrangement; and (3) the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce.'"  *Id.* (quoting *In re Racing Servs., Inc.*, 540 F.3d 892, 901 (8th Cir. 2008).

Here, the Committee has not explained in its motion why the debtors' decision to forego pursuing the claims was unjustified.  The Committee has not shown that recovery on the claims is probable or what that recovery might be.[8/]  Nor has the Committee provided even a rough estimate of how much it might cost to pursue the claims (although the cost would doubtless be considerable).  Because the Committee has addressed neither potential recovery nor potential cost, the Committee has not shown that the recovery might justify the cost.

Indeed, the Committee barely discusses unjustifiable refusal at all, devoting a single page of its 43-page motion to the question.  In that page, the Committee pins its entire argument on the four cash collateral stipulations, asserting that those stipulations make the debtors "incapable of objectively pursuing actions" to avoid the liens.  The debtors' refusal to pursue the claims, in other words, is unjustified because the debtors have refused to pursue them.  A tautology is all the Committee offers.[9/]

---

[8/]    Although the Committee argues at length that its claims are at least colorable (a question that need not be reached here), it says little about possible defenses to the claims, making the probability of success impossible to gauge.

[9/]    The Committee believes that whether the debtors' refusal was unjustified is irrelevant because the debtors never had a choice, at least where the first lien secured parties were concerned.  The debtors had stipulated in the final cash collateral order that all security interests, liens, and mortgages granted to the first lien secured parties were "valid, binding, enforceable, non-avoidable, and property perfected."  The debtors could not have challenged the

**STATEMENT**

Although the Committee's failure to address unjustifiable refusal would be reason alone to deny the motion, it should be noted that the debtors have supplied an adequate justification for their decision not to pursue the claims. The debtors made that decision, they say, because they favor resolving the claims through a comprehensive plan of reorganization that will provide distributions to creditors. And efforts at such a resolution are under way in earnest, with the parties (including the Committee) about to begin mediation. As the debtors and other objectors point out, prosecution of the proposed amended complaint now could stymie those efforts. The debtors' decision to forego pursuing the claims in favor of settling them through a plan is a reasonable exercise of the debtors' judgment. *Cf. Village of Overland Pointe, LLC v. Terry Bentley II, LLC (In re Terra Bentley II, LLC)*, Nos. 09-23107-11, 10-6025, 2011 WL 808190, at *6 (Bankr. D. Kan. Mar. 2, 2011) (finding debtor's refusal to pursue estate's avoidance claim was justified where debtor sought to treat the claim in its proposed plan).

At no point in its motion does the Committee even suggest that the estates would be better off litigating the claims than negotiating their resolution through a plan of reorganization. In fact, the Committee itself recognizes the possibility that "negotiations might consensually resolve" its challenges. (Bankr. Dkt. No. 2740 at 25). If the motion is granted, the Committee says, the court should not require the proposed amended complaint to be filed right away or by a certain date. The Committee instead asks leave to file the complaint at its discretion – "to potentially avoid unnecessary litigation if it appears its discussions with the parties may yield progress." (*Id.*).[10/] That the litigation could prove unnecessary given the parties' settlement discussions is justification enough for the debtors' not to pursue it. *Cf. Caesars*, 808 F.3d at 1188-89 (holding that this court could enjoin litigation in another court if doing so would promote settlement of disputes in these bankruptcy cases).

The debtors' justification, though, might not hold off the Committee's standing request forever. The justification is tied to the parties' settlement efforts. At some point, those efforts may prove unsuccessful and come to an end. If they do, the debtors' justification for not pursuing the claims will disappear. In that event, the Committee could be granted derivative standing – assuming at that point the debtors have no other justification for not pursuing the

---

liens had they wanted to. But the stipulation itself represents the debtors' refusal to challenge the liens. The question still remains whether the refusal was justified. *See Official Comm. of Unsecured Creditors v. Hudson United Bank (In re America's Hobby Ctr., Inc.)*, 223 B.R. 275, 282-83 (Bankr. S.D.N.Y. 1998).

[10/]     Given the willingness of the first lien secured parties to extend the Committee challenge deadline and the Committee's intention not to pursue the litigation yet, it is unclear why the Committee filed its derivative standing motion in the first place. The entire exercise – motion, briefing, and decision – appears to have been needless.

| STATEMENT |
|---|

claims, and the claims are colorable.

But the Committee will be able to obtain derivative standing only if its challenge deadline has not passed – and because the Committee declined the first lien secured parties' offer to extend the deadline, the deadline passed nearly eight months ago. The Committee's pending motion alone preserves its right to request standing. Denying the motion now would rule out derivative standing even if circumstances in these cases later changed. To preserve the Committee's ability to seek derivative standing should circumstances change, the best course is to continue the motion.[11]

### 4. Conclusion

For these reasons, the motion of the Statutory Unsecured Creditors Committee for an order granting it derivative standing to commence, prosecute, and settle certain claims on behalf of the debtors' estates is continued for further consideration, should that be necessary. A separate scheduling order will be entered.

Dated: March 16, 2016

_____
A. Benjamin Goldgar
United States Bankruptcy Judge

---

[11] Continuing the motion preserves the possibility, not only that the Committee will be able to seek derivative standing later on, but that (a) standing will be granted, (b) the Committee will file its action, (c) the Committee and the lien holders will litigate the claims (at great effort and expense), and (d) the Committee will ultimately prevail. Or not. Uncertainty about these matters should aid the parties' efforts to achieve a consensual plan. (*See Caesars Entm't Operating Co., Inc., et al. v. BOKF, N.A., et al.*, No. 15 A 149 (Bankr. N.D. Ill.), Dkt. No. 214 at 13 (observing that "uncertainty produces settlements")).