**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

------------------------------------------------------

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| **CAESARS ENTERTAINMENT** | ) | **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.,* | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) | Hon. A. Benjamin Goldgar |
|  | ) |  |
|  | ) | Re: Docket Nos. 3401 & 3406 |

------------------------------------------------------

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS
## (Substantially Unredacted)

**May 16, 2016**
**(initially filed March 15, 2016)**

## VOLUME I
**(Table of Contents, Table of Charts and Figures)**
**(Introduction and Executive Summary)**

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

EXECUTIVE SUMMARY ............................................................................................... 4

  A. Solvency............................................................................................................... 6

  B. Financial Advisors and Contemporary Valuations ........................................... 11

  C. Attorneys........................................................................................................... 14

  D. Remedies ........................................................................................................... 19

  E. The 2009-Mid 2012 Transactions ..................................................................... 20

    1. The 2009 WSOP Transaction ...................................................................... 20

    2. 2011 WSOP Transaction.............................................................................. 28

    3. 2010 CMBS Loan Amendment and Trademarks Transfer .......................... 30

  F. The 2012-2014 Transactions ............................................................................. 32

    1. The Growth Transaction .............................................................................. 36

    2. CERP Transaction........................................................................................ 42

    3. Four Properties/CES/Total Rewards ........................................................... 47

      a. The Four Properties............................................................................... 48

      b. CES/Total Rewards................................................................................ 54

      c. Claims ................................................................................................... 59

    4. B-7 and Related Financing Transactions ..................................................... 61

      a. The B-7 and the Guarantee Release....................................................... 62

    5. Senior Unsecured Notes Transaction........................................................... 69

    6. PIK Notes Transaction................................................................................. 70

    7. Atlantic City Transactions ........................................................................... 71

      a. The Conference Center .......................................................................... 71

      b. Showboat Closure and Sale ................................................................... 72

      c. Showboat Marketing Plan and Customer Retention Plan...................... 73

      d. Manipulation of Hotel Rates................................................................. 73

      e. The Atlantic Club................................................................................... 74

    8. Intercompany Transactions .......................................................................... 74

      a. Sponsor Fees ......................................................................................... 74

      b. Intercompany Revolver.......................................................................... 75

  G. LBO.................................................................................................................... 76

  H. Tax ..................................................................................................................... 77

I. The RSAs ......................................................................................................... 77

J. Summary of Conclusions Regarding Strength of Claims and Value Ranges .................. 78

I.   PROCEDURAL BACKGROUND AND NATURE OF THE INVESTIGATION ................. 81

A.  Commencement of the Bankruptcy Cases ....................................................... 81

B.  Key Constituents, Including Official Creditors Committees, Ad Hoc
    Committees, CEC, CAC and the Sponsors ...................................................... 82

C.  Examiner Motions, Order, Appointment and Mandate .................................... 82

D.  Retention of Examiner's Professionals ........................................................... 86

E.  Establishment of Discovery Protocol, Protective Order and Witness Protocol ............. 86

F.  Expansion of Examiner's Scope ..................................................................... 90

G. Examiner's Interim Reports ........................................................................... 90

II.  INVESTIGATION AND PREPARATION OF REPORT ...................................... 91

A.  Development of the Examiner's Work Plan ..................................................... 91

    1.  Initial Presentations by and Meetings with the Debtors, Interested Parties and
        Their Advisors ......................................................................................... 91

    2.  Document Collection and Review .............................................................. 92

    3.  Establishment and Operation of Document Depository ............................... 93

    4.  Privilege Issues ....................................................................................... 94

    5.  Witness Interview Process ........................................................................ 96

    6.  Additional Presentations by and Meetings with Interested Parties ............... 96

B.  Methodology for Presentation of Findings and Conclusions/Standard Adopted in
    the Report .................................................................................................... 97

C.  Confidentiality Issues Relating to Report Preparation ..................................... 98

III. STATEMENT OF BACKGROUND FACTS ...................................................... 98

A.  Corporate History and Organization .............................................................. 98

B.  Directors, Management, Counsel and Advisors of the Various Caesars Entities ........ 105

C.  Events Leading to Commencement of Case .................................................. 106

    1.  The 2008 Recession, Changing Consumer Habits and Impact of Increased
        Competition on CEOC's Financial Results and Its Ability to Service Its
        Substantial Debt .................................................................................... 106

    2.  Appointment, Operations, and Conclusions of the CEOC Special
        Governance Committee .......................................................................... 107

    3.  Related Litigation .................................................................................. 108

        a.  The Wilmington Action ..................................................................... 108

b. The CEC/CEOC Declaratory Judgment Action ............................................... 109

c. The MeehanCombs Action; the Danner Action; and the UMB NY Action ..... 110

d. The UMB Bank Action .................................................................................. 112

e. The BOKF Action and the Wilmington Trust Action ..................................... 112

f. The 105 Litigation ......................................................................................... 113

g. The Credit Suisse Action ............................................................................... 115

4. The RSAs ............................................................................................................ 115

IV. SUBJECTS INVESTIGATED BY THE EXAMINER ..................................................... 118

A. Asset Transfers ....................................................................................................... 118

1. 2009 WSOP Transaction .................................................................................... 118

2. 2011 WSOP Transaction .................................................................................... 119

3. 2010 CMBS Loan Amendments and Trademarks Transfer ................................ 119

4. Growth Transaction ........................................................................................... 119

5. CERP Transaction .............................................................................................. 120

6. Four Properties Transaction ............................................................................... 121

7. CEOC Multiple Degradation .............................................................................. 121

8. CES/Total Rewards ............................................................................................ 122

9. Atlantic City Transactions ................................................................................. 122

a. The Atlantic City Waterfront Conference Center ......................................... 122

b. The Atlantic Club .......................................................................................... 122

c. The Showboat ................................................................................................ 123

B. Debt Transactions .................................................................................................. 123

1. B-7 and Tender Offers Transactions .................................................................. 123

2. Guarantee Release Transaction .......................................................................... 124

a. 5% Stock Sale ................................................................................................ 124

b. The Performance Incentive Plan ................................................................... 125

c. Declaratory Judgment Action ........................................................................ 125

3. Senior Unsecured Notes Transaction ................................................................. 125

4. PIK Notes Transaction ....................................................................................... 126

5. Intercompany Transactions ................................................................................ 126

a. The Sponsors' Services Agreements .............................................................. 126

b. The Intercompany Revolver ........................................................................... 127

c. CEOC Intercompany Loan ............................................................................ 127

     d.  Other Intercompany Transactions ................................................................. 128

  C.  Tax Issues ................................................................................................................ 128

  D.  The LBO .................................................................................................................. 128

V.  SOLVENCY, UNREASONABLY SMALL CAPITAL AND INABILITY TO PAY
DEBTS AS THEY COME DUE .......................................................................................... 129

  A.  General Introduction to Solvency Analysis ............................................................ 129

    1.  Insolvency/Balance Sheet Test ......................................................................... 129

    2.  Unreasonably Small Capital Test...................................................................... 134

    3.  Inability to Pay Debts Test ................................................................................ 135

  B.  Summary of Findings ............................................................................................... 137

    1.  Contemporaneous Indicia of CEOC's Insolvency ........................................... 137

    2.  CEOC Was Balance Sheet Insolvent at All Times from December 31, 2008
Through December 31, 2014 ............................................................................ 139

    3.  CEOC Was Paying Its Obligations at the Solvency Dates, but Knew or
Should Have Known That It Would be Unable to Pay Its Debts Over Time ......... 139

    4.  CEOC Was Inadequately Capitalized at All Solvency Dates ............................... 140

    5.  Results of Solvency Analysis Under the Three Tests .......................................... 140

  C.  Overall General Economic Conditions .................................................................... 141

  D.  Financial Condition and Performance of CEOC from the Closing of the LBO
Through 2014............................................................................................................ 145

    1.  CEOC's Operating Performance – Revenues and Profitability........................... 146

    2.  CEOC's Financial Condition ............................................................................ 148

    3.  CEOC's Statement of Cash Flows .................................................................... 154

    4.  The Cyclical Nature of the Casino Gaming Business........................................... 158

  E.  Solvency: The Balance Sheet Test .......................................................................... 158

    1.  Market Approach – Guideline Public Company Method ...................................... 160

    2.  Income Approach............................................................................................... 164

  F.  The Cash Flow Test:  The Ability to Pay Debts as They Come Due .......................... 165

    1.  CEOC's Internal Projections............................................................................. 166

    2.  LRPs Adjusted to Arrive at Free Cash Flow ...................................................... 167

    3.  Interest Coverage Ratio..................................................................................... 167

    4.  Internal Analysis ............................................................................................... 169

    5.  Centerview's Analysis Supports the Examiner's Findings as to Four
Properties ......................................................................................................... 171

6. CEOC's Disclosures Regarding CEOC's Ability to Pay Debts When Due ........... 172

7. Ability to Refinance Maturing Debt ................................................................. 174

G. The Capital Adequacy Test ................................................................................. 175

1. Short-Term Capital ......................................................................................... 176

2. Long-Term Capital .......................................................................................... 178

H. Contemporaneous Market Assessments ............................................................. 180

1. Market Value of CEOC Debt .......................................................................... 181

2. Reaction to Caesars Debt Exchanges ............................................................. 182

3. Credit Analyst Commentary Regarding CEOC's Liquidity ........................... 182

4. Analyst Assessment of Impact of Asset Transfers on CEOC's Financial
   Condition ......................................................................................................... 185

I. Internal CEOC Solvency/Liquidity Analyses ..................................................... 186

1. Liquidity Projections Examples ..................................................................... 186

2. Value of Equity Examples .............................................................................. 188

J. Analysis of CEC Guarantee ................................................................................ 189

1. Analysis of the Illustrative Value of the CEC Guarantee ............................. 190

2. Summary of the Value of the CEC Guarantee ............................................... 194

K. CLC Solvency ..................................................................................................... 196

L. Solvency at LBO Date ......................................................................................... 197

M. Witnesses' Definitions of Solvency ................................................................... 199

N. The Examiner's Findings and Conclusions ........................................................ 199

VI. PROJECTIONS ......................................................................................................... 204

A. Overview of Caesars' Projection Process ........................................................... 205

1. Annual Operating Plan .................................................................................... 205

2. Long-Range Plan ............................................................................................. 207

B. Uses of the Long-Range Plan .............................................................................. 208

C. Auditors' Testing of the Long-Range Plan ......................................................... 209

D. Actual Performance Compared to Budget ........................................................... 212

1. Annual Plan Versus Actual Performance ....................................................... 212

2. Construction Disruption .................................................................................. 214

3. Performance of the Properties Subsequent to Transfer .................................. 215

E. Long-Range Plan Trends ..................................................................................... 216

F. Caesars' Impairment Testing Process .................................................................. 219

G. Commentary Regarding the Preparation and Use of Projections by Caesars ............. 221

   1. Management's Views on Projections ...................................................... 222

   2. The Sponsors' Views on Projections ...................................................... 223

   3. The Valuation and Special Committee Members' Views on Projections .............. 225

   4. The Financial Advisors' Views Regarding Management's Projections ................. 226

   5. Conflicting Views on Projections ......................................................... 227

H. The Views of CEC and CAC .................................................................. 228

I. The Examiner's General Observations Regarding the Preparation and Use of
Projections by Caesars .......................................................................... 230

VII. 2009-2012 ASSET TRANSFERS ............................................................. 232

A. 2009 WSOP Transaction ...................................................................... 232

   1. Introduction ................................................................................ 232

   2. Factual Background ........................................................................ 234

      a. Early Analysis of Caesars' Entry into Online Gaming .............................. 234

      b. Changing Structure and Value from August 2008 to January 2009 .......... 238

      c. Early 2009 ............................................................................ 244

         i. Duff & Phelps Draft Analysis .............................................. 244

         ii. Snapshot of the WSOP Business ......................................... 246

         iii. Garber's Employment Agreement .................................... 247

         iv. OMM's Representation ................................................... 248

         v. Bankruptcy Considerations ............................................. 248

      d. Development of the SuperholdCo Structure ................................... 249

      e. Last-Minute Modification of the Deal Structure .............................. 252

   3. Final Board Materials ...................................................................... 257

   4. Duff & Phelps Fairness Opinion .......................................................... 261

   5. Transaction Approval ...................................................................... 264

   6. Transaction Specifics ...................................................................... 264

   7. Post-Transaction Valuation ............................................................... 267

   8. Shift to Social Gaming ..................................................................... 268

   9. The Examiner's Findings and Conclusions ............................................. 270

      a. Constructive Fraudulent Transfer ............................................. 271

      b. Actual Fraudulent Transfer ..................................................... 275

c. Breach of Fiduciary Duty and Aiding and Abetting Breach of
Fiduciary Duty ...................................................................................... 275

B. 2011 WSOP Transaction .................................................................... 284

1. Introduction .................................................................................... 284

2. Factual Background, Approval of the Transaction, and Key Players ................ 286

a. Initial Consideration and Analysis of CIE Acquiring CEOC's Right to
Host the WSOP Tournaments .................................................. 286

b. CEC Approves CEOC's Sale of the WSOP Tournament Hosting Rights
for $20.5 Million ...................................................................... 298

c. Paul Weiss Served as Outside Counsel to All of the Caesars' Entities ..... 301

d. VRC Served as the Financial Advisor and Issued a Fairness Opinion...... 302

3. The Examiner's Findings and Conclusions .................................... 304

a. Constructive Fraudulent Transfer ............................................ 305

b. Actual Fraudulent Transfer...................................................... 306

c. Breach of Fiduciary Duty ........................................................ 307

C. The 2010 CMBS Loan Amendment and Trademarks Transfer ....................... 308

1. Introduction .................................................................................... 308

2. Factual Background ........................................................................ 309

a. 2008 LBO and the CMBS Structure and Debt ......................... 309

b. Post-2008 Ownership and Use of the CMBS IP....................... 311

c. 2010 CMBS Loan Amendment ................................................ 313

i. CLC Transferrs Ownership of the CMBS IP to the CMBS Prop
Cos........................................................................................ 314

ii. Reorganization of PropCo Structure.................................. 324

3. The Examiner's Findings and Conclusions .................................... 327

a. Constructive Fraudulent Transfer ............................................ 328

b. Actual Fraudulent Transfer...................................................... 332

c. Breach of Fiduciary Duty ........................................................ 332

VIII. 2013-2014 ASSET TRANSFERS.................................................................... 334

A. Overview of Financial Condition of Caesars and Strategy Employed by the
Sponsors Following the 2009-2011 Transactions......................................... 334

1. The Sponsors Recognize Caesars' Financial Condition as "Tenuous".......... 334

2. The Sponsors Consider Strategic Options to Confront Caesars'
Liquidity Problems .................................................................... 335

3. Caesars and the Sponsors Contemplate the Possibility of a CEOC Bankruptcy ............................................................................. 336

4. Increasingly Concerned About Protecting Its Equity Investment in Caesars, Apollo Devises Transactions to Improve the Sponsors' and CEC's Strategic Position in the Event of a Bankruptcy ............................... 338

    a. The August 2012 Apollo Presentation ............................... 338

    b. The October 2012 Apollo Presentation ............................ 340

B. The Growth Transaction ............................................................................. 348

1. Introduction ............................................................................. 348

2. Background of the Growth Transaction ................................................ 352

    a. The Assets Sold and Contributed to CGP ....................................... 352

        i. Planet Hollywood .............................................................. 352

        ii. Horseshoe Baltimore .......................................................... 354

        iii. CIE ............................................................................... 355

        iv. The CEOC Notes .............................................................. 356

    b. Increasingly Concerned About Protecting Its Equity Investment in Caesars, Apollo Devises the Growth Transaction ........................................... 356

    c. The Growth Transaction Is Presented to the CEC Board .............................. 357

    d. Lack of CEOC Involvement or Representation ............................................. 359

    e. CEC Valuation Committee ............................................................. 361

        i. Formation ....................................................................... 361

        ii. The CEC Valuation Committee's Mandate ...................................... 363

        iii. The CEC Valuation Committee Retains Legal and Financial Advisors ............................................................................. 364

            (A) Morrison & Foerster ..................................................... 364

            (B) Evercore ................................................................. 364

            (C) VRC ..................................................................... 365

    f. The Sponsors and the CEC Valuation Committee Negotiate the Transaction ............................................................................. 366

        i. Initial Discussions ............................................................. 366

        ii. Evercore's Preliminary Analysis ............................................... 369

        iii. The Sponsors and the CEC Valuation Committee Exchange Proposals ......................................................................... 370

            (A) The Sponsors' Initial Proposal ........................................... 371

            (B) The Sponsors' First Revised Proposal ................................... 373

(C) The Sponsors Threaten to Withdraw Their Proposal ......... 374

(D) The Sponsors' Second Revised Proposal ........................... 375

(E) The Sponsors' Third Revised Proposal ............................... 376

(F) The Sponsors' Final Proposal ............................................. 377

iv. The CEC Valuation Committee Concludes That the Consideration Paid for the Assets Represents Fair Market Value ......................................................................................... 378

v. Britney Spears and Project Songbird ................................... 379

(A) Background ....................................................................... 379

(B) The Economics of Project Songbird ................................. 380

(C) The Sponsors' Concerns About the Impact of Project Songbird on Evercore's Valuation of Planet Hollywood ...................................................................... 381

(D) Approval of Project Songbird ........................................... 384

(E) Evercore's Consideration of the Impact of Project Songbird .......................................................................... 385

(F) Early Success of Project Songbird .................................... 387

g. The Growth Transaction Is Finalized and Approved .................................... 388

i. The CEC Valuation Committee and Board Approve the Transaction ......................................................................... 388

ii. Evercore's Fairness Opinion ............................................... 388

iii. Criticisms of Evercore's Fairness Analysis ...................... 389

(A) Evercore Was Not Provided with the Most Recent Projections .......................................................................... 389

(B) Evercore Treated Planet Hollywood as a Regional Property, Instead of a Las Vegas Strip Property ................. 392

(C) Evercore Did Not Update the Planet Hollywood Projections for Project Songbird ........................................ 393

(D) Evercore's Valuation of Horseshoe Baltimore Was Flawed in Several Respects ................................................ 393

(E) Evercore Included Estimated Tax Savings in Its Analysis .............................................................................. 394

(F) Sensitivity Analysis .......................................................... 394

iv. VRC's Fairness Opinion ..................................................... 395

h. The Growth Transaction Closes and Takes Effect ....................................... 396

i. The Mechanics of the Growth Transaction ......................... 397

ii. Aftermath of the Growth Transaction ................................................ 400

(A) Market Reaction to the Growth Transaction ...................... 400

(B) CAC Rights Offering.......................................................... 401

(C) Apollo's Post-Transaction Valuations................................ 402

3. The Examiner's Findings and Conclusions .............................................. 403

a. Constructive Fraudulent Transfer........................................................ 403

i. CEOC Did Not Receive Reasonably Equivalent Value ................... 404

(A) Guideline Public Companies Method.................................. 405

(B) Discounted Cash Flow Method .......................................... 406

(C) The Selection of Multiples ................................................. 406

(D) Management Fees................................................................ 407

(E) The Examiner's Valuation Conclusion................................ 407

ii. CEOC Was Insolvent at the Time of the Transaction ...................... 409

iii. The Section 546(e) Safe Harbor Defense Does Not Apply Here ..... 409

iv. Remedies for Constructive Fraudulent Transfer.............................. 412

b. Actual Fraudulent Transfer .................................................................. 413

i. Badges of Fraud and Other Evidence of Intent.................................. 413

ii. Remedies for Actual Fraudulent Transfer ......................................... 418

c. Breach of Fiduciary Duty..................................................................... 418

i. The Process by Which the Growth Transaction Was Negotiated
and Approved Was Flawed ............................................................... 419

ii. CEOC Did Not Receive Fair Value for the Assets........................... 422

iii. Remedies for Breach of Fiduciary Duty.......................................... 422

d. Aiding and Abetting Breach of Fiduciary Duties ................................ 424

C. CERP Transaction ......................................................................................... 427

1. Introduction............................................................................................... 427

2. The Claims and Defenses at Issue ............................................................ 428

3. Background to the CERP Transaction ....................................................... 430

a. The CMBS Properties ........................................................................... 430

i. 2008 CMBS Financing ...................................................................... 430

ii. 2010 CMBS Loan Amendment and 2010 Shared Services
Agreement ......................................................................................... 430

b. Initial Discussions of the CERP Transaction....................................... 433

i. 2013 Refinancing of the CMBS Debt.................................................. 433

ii. The Need to Plug the "Equity Gap" ................................................ 436

c. Structuring the Transaction:  Initial Proposals.............................. 437

d. Description of the Properties ........................................................... 440

    i. The LINQ..................................................................................... 440

    ii. The Octavius Tower ................................................................... 441

e. Structuring the CERP Transaction .................................................. 442

    i. The Decision to Include the LINQ and Octavius ...................... 442

    ii. Rejection of the Co-Borrower Alternative ............................... 443

    iii. TPG's Reservations with Regard to the Proposed Transfer ............. 446

    iv. Possible Contribution of Only the LINQ and Not Octavius............. 447

    v. The Parent Guarantee................................................................ 448

    vi. Apollo Drove the Structuring Decision to Use the LINQ and Octavius ................................................................................... 449

f. Perella's Engagement ...................................................................... 451

    i. Perella's Retention..................................................................... 451

    ii. Perella's Retention of Counsel ................................................. 452

    iii. Perella's Engagement Letter.................................................... 453

    iv. Scope of Perella's Opinion ...................................................... 455

g. Apollo's Proposed Consideration .................................................... 456

    i. August 12, 2013 Draft Apollo Presentation.............................. 456

    ii. August 13, 2013 Draft Apollo Presentation ............................ 459

    iii. August 14, 2013 Final Apollo Presentation to Perella .................... 460

h. Perella's Due Diligence and Discussions About Consideration .................. 462

    i. Release of the CEC Lease Guarantee ....................................... 462

    ii. Avoidance of Corporate Expenses............................................ 463

    iii. Tangible Consideration............................................................ 466

i. Questions from Investors and Citibank's Role ................................ 468

j. Perella's Assumptions and Opinion................................................. 470

    i. Assumptions Negotiated Between Paul Weiss and Weil................... 470

    ii. Paul Weiss' Review of Perella's Draft Opinion ..................... 471

    iii. Perella's Final Assumptions and Final Opinion ..................... 473

k. Board Approval of the CERP Transaction....................................... 478

l.  Transfer Mechanics ........................................................................... 481

m.  Reactions to the Transaction ............................................................ 485

4. The Examiner's Findings and Conclusions ............................................ 486

a.  Constructive Fraudulent Transfer ..................................................... 487

i.  CEOC Transferred an Interest in Property .......................................... 487

ii.  CEOC Was Likely Insolvent at the Time of the Transaction ........... 487

iii.  CEOC Did Not Receive Reasonably Equivalent Value .................. 487

(A)  Perella Undervalued the LINQ and Octavius ..................... 488

(B)  Perella Overvalued the Consideration Received by
CEOC ..................................................................................... 490

(1)  Because the Factual Predicates Underlying the
Decision to Count the Avoidance of Expenses as
Consideration Were Unrealistic, Perella Should Not
Have Accorded These "Savings" Any Value .......... 490

(2)  The Purported Indirect Benefits of Cost Avoidance
Are Too Speculative to be Valued ........................... 491

iv.  Potential Remedies .......................................................................... 494

v.  There Is No Safe Harbor Defense Under Section 546(e) for the
CERP Transaction .............................................................................. 495

b.  Actual Fraudulent Transfer ............................................................... 496

c.  Breach of Fiduciary Duty .................................................................. 499

i.  The CERP Transaction Did Not Involve Fair Dealing ...................... 500

ii.  The CERP Transaction Did Not Involve a Fair Price ....................... 500

d.  Aiding and Abetting Breach of Fiduciary Duty ............................... 501

D.  The Four Properties Transaction ........................................................... 503

1. Introduction of the Transaction ............................................................ 503

2. Background of the Four Properties Transaction ................................... 507

a.  The Assets Sold to CGP ..................................................................... 507

i.  The Cromwell ................................................................................... 507

ii.  Bally's Las Vegas ............................................................................. 509

iii.  The Quad ........................................................................................ 510

iv.  Harrah's New Orleans ..................................................................... 512

v.  Undeveloped Land ........................................................................... 515

b.  Origin of the Four Properties Transaction ....................................... 515

i. CEC and the Sponsors Continue to Address CEOC's Ongoing Solvency Issues ................................................................................. 515

ii. Apollo Recognizes CEOC's Continuing Liquidity Problems in the Fall of 2013 ............................................................................. 516

iii. Apollo Contemplates Selling Additional CEOC Assets ................... 516

iv. CEC's Seven-Step Plan ..................................................................... 522

v. The CEC Board Is Advised of the Need for Immediate Action ........ 522

vi. Caesars' and the Sponsors' Views on CEOC's Financial Position ............................................................................................. 526

c. Formation of the CEC Special Committee ........................................................ 528

i. Selection of CEC Special Committee Members ................................ 528

ii. Lack of CEOC Involvement or Representation ................................. 530

iii. The CEC Special Committee's Mandate .......................................... 531

iv. CEC's Initial Overture to CAC ........................................................ 533

d. The CEC Special Committee Retains Independent Advisors ........................... 533

i. Retention of Reed Smith and Centerview ......................................... 533

ii. The CEC Special Committee Retains D&P ....................................... 535

iii. The CAC Board Forms the CAC Special Committee ....................... 536

e. CEC's December 2013 Presentation to Regulators ......................................... 538

f. Negotiations Between the CEC and CAC Special Committees ....................... 542

i. Initial CEC Special Committee Meetings and Diligence .................. 542

ii. The CEC Special Committee Learns of the Possible Issuance of a Going Concern Qualification .......................................................... 543

iii. The January Business Plan ................................................................ 545

iv. Lazard Adjusts the January Business Plan ....................................... 547

v. The CAC Special Committee's Indication of Interest ....................... 547

vi. The CEC Special Committee's Counter-Offer ................................. 549

vii. The February Business Plan ............................................................. 551

viii. CEC Expresses Optimism Regarding Its Actual and Anticipated Financial Performance ................................................. 559

ix. Final Price Negotiations, Fairness Opinions and Letter of Intent ..... 562

g. Creation of CES .............................................................................................. 567

h. The Four Properties Transaction Is Approved ............................................... 567

i. The CEC Special Committee and Board Approve the
Transaction ....................................................................... 567

ii. Lenders Push for Fairness Opinions to be Issued to CEOC .............. 568

(A) Centerview's Fairness Opinion ............................................. 569

(1) Centerview's Valuation Methodologies .................... 570

(2) Projections ................................................................ 571

(3) Multiples ................................................................. 571

(4) Centerview Deducts $15 Million in Annual Rent
Expense in Valuing The Quad ................................... 573

(5) Centerview Does Not Specifically Value Total
Rewards or Undeveloped Land ................................. 573

(B) D&P's Opinion ................................................................ 573

(1) D&P's Valuation Methodology ................................. 574

(2) Projections ................................................................ 575

(3) Multiples ................................................................. 576

(4) Rent Expense ........................................................... 577

(C) Centerview's and D&P's Valuations of the Four Properties
and Management Fees Were Flawed ................................. 577

(D) Lazard's Opinion ............................................................ 580

i. Execution of the Transaction Agreement and the Bifurcated Closing ........... 581

j. Market Reaction to the Four Properties Transaction ...................................... 582

k. Pre-Closing Creditor Allegations that CEOC Was Insolvent ........................ 584

l. The Las Vegas Properties Close ..................................................................... 585

m. Harrah's New Orleans Closes ....................................................................... 586

n. Transfer of Undeveloped Land ...................................................................... 587

o. Mechanics of the Transaction ........................................................................ 593

i. Las Vegas Properties .................................................................... 593

ii. New Orleans ................................................................................. 601

p. Independent Directors Are Added to the CEOC Board Post-Transaction ..... 604

q. CEOC's Use of the Four Properties Transaction Sale Proceeds ................... 605

r. Performance of the Four Properties Post-Transfer ........................................ 606

3. The CES/Total Rewards Transaction ........................................................................ 607

a. The Creation of CES and Transfer of Control Over Total Rewards and
Related Management Services ....................................................................... 607

i.  Creation of CES ................................................................................. 607

ii.  Evolution of and Rationale for CES ...................................................... 610

b.  Terms of the CES Agreements.................................................................. 618

c.  Governance Rights and Licensing of Intellectual Property – Loss of
Control Over the Total Rewards IP ......................................................... 620

d.  Bankruptcy ............................................................................................ 627

e.  Transfer of Employees and Services ........................................................ 630

f.  Allocation of Expenses ........................................................................... 630

g.  Consideration Received for Total Rewards and Management Services ........ 634

i.  The Value of Total Rewards and Shared Services....................................... 634

h.  The Value of the Management Agreements ............................................... 637

4.  The Impact of the 2013 and 2014 Asset Transfers on CEOC's Profile and
Financial Condition........................................................................................ 638

5.  The Examiner's Findings and Conclusions ......................................................... 640

a.  General Conclusions .................................................................................. 641

b.  Constructive Fraudulent Transfer .............................................................. 644

i.  CEOC Did Not Receive Reasonably Equivalent Value ............................ 644

(A)  Guideline Public Companies Method........................................... 645

(B)  Discounted Cash Flow Method .................................................... 645

(C)  Selection of Multiples................................................................. 646

(D)  Management Fees....................................................................... 647

(E)  Transfer of Land ........................................................................ 647

(F)  Valuation Conclusion................................................................. 647

ii.  CEOC Was Insolvent at the Time of the Transaction ............................ 649

iii.  The Section 546(e) Safe Harbor Defense Does Not Apply Here ........... 649

iv.  Remedies for Constructive Fraudulent Transfer.................................... 650

c.  Actual Fraudulent Transfer ...................................................................... 653

d.  Breach of Fiduciary Duty.......................................................................... 654

i.  The Process by Which the Four Properties Transaction Was
Negotiated and Approved Was Seriously Flawed ................................ 655

ii.  CEOC Did Not Receive Fair Value for the Assets............................... 659

iii.  Remedies for Breach of Fiduciary Duty.............................................. 660

e.  Aiding and Abetting Liability .................................................................... 661

   i. Apollo ........................................................................................ 662

   ii. TPG .......................................................................................... 663

 E. CEOC Multiple Degradation .................................................................. 664

 F. Total Rewards and Property Management ............................................... 669

  1. Total Rewards ....................................................................................... 669

   a. Background – How Total Rewards Works .................................... 670

   b. Total Rewards Point Liability Program ....................................... 675

   c. The Centrality of Total Rewards to the Caesars "Enterprise" ......... 678

   d. The Impact of Total Rewards on the Financial Results of Caesars
    Properties ..................................................................................... 682

   e. The Independent Value of Total Rewards ..................................... 689

   f. Alleged "Manipulation" and Redirection of Customers ................ 694

   g. Plans for Diversion of Business to the CMBS Properties ............. 696

   h. Generation of Cross-Play by CEOC ............................................ 698

   i. CMBS/CERP and CGP Access to the Total Rewards Network ...... 699

    (A) CMBS/CERP ........................................................................ 699

    (B) Growth ................................................................................. 701

  2. Property Management ........................................................................... 702

   a. Property Management of CMBS/CERP Properties ....................... 702

   b. Property Management of Growth Properties ................................ 703

  3. The Examiner's Findings and Conclusions ........................................ 704

   a. Claims Relating to Property Management and License/Access to Total
    Rewards ....................................................................................... 704

    i. Properties Transferred to CGP .............................................. 704

    ii. CMBS Properties/CERP ...................................................... 705

    (A) Remedies ......................................................................... 706

   b. Claims Relating to Diversion of Customers/Cross-Play ............... 709

   c. Claims Relating to Inability to Monetize Total Rewards .............. 710

 G. Atlantic City Transactions ...................................................................... 712

  1. The Atlantic City Market and Caesars' Strategy ............................... 712

   a. Harrah's Atlantic City Waterfront Conference Center ................. 716

    i. Location of the Conference Center ........................................ 716

    ii. Consideration for CEOC's Contribution to the Conference Center .. 719

b. The Atlantic Club ......................................................................... 722

c. The Showboat Atlantic City ........................................................ 724

 i. The Decision to Close the Showboat .................................. 726

 ii. The Sale of the Showboat .................................................. 734

 iii. Removal of Receivable ..................................................... 737

 iv. The Showboat Marketing Plan and Customer Retention Program ... 740

  (A) The Historical Marketing Process ...................................... 741

  (B) The Marketing and Customer Retention Plan ..................... 741

  (C) The Data Used to Develop the Marketing Plan .................. 744

  (D) Results ................................................................................ 747

  (E) Creditors' Positions ............................................................ 748

d. Potential Claims and Remedies .................................................... 752

IX. 2014 FINANCIAL TRANSACTIONS ......................................... 757

A. Introduction ....................................................................................... 757

B. The B-7 Loan and CEC Guarantee Release Transactions ................. 762

1. The B-7 Transaction ..................................................................... 762

a. Modifications of the First Lien Credit Agreement ....................... 767

b. The Release of the Bond Guarantee ............................................. 769

c. Approval of the B-7 Transaction .................................................. 777

d. The Going Concern Qualification for CEOC ............................... 781

e. The Tender Offers ........................................................................ 782

f. CGP ............................................................................................. 783

g. Chatham ...................................................................................... 785

2. The 5% Stock Sale ........................................................................ 791

a. Retention of Blackstone .............................................................. 792

 i. Project Julii ........................................................................ 792

b. Discussions with Prospective Investors ....................................... 795

c. Discussions with Chatham ........................................................... 797

d. Discussions with Paulson ............................................................ 799

e. Discussions with Scoggin ............................................................ 800

f. Impact of the Sale and Release of the Bond Guarantee on the Market Price. 801

3. The Examiner's Findings and Conclusions ................................... 802

C. The 2014 Performance Incentive Plan ............................................................. 809

    1. Implementation of the PIP ..................................................................... 809

    2. The Examiner's Findings and Conclusions ............................................ 816

D. The Declaratory Judgment Action .................................................................. 817

E. The Senior Unsecured Notes Transaction ....................................................... 821

    1. Introduction ............................................................................................ 821

    2. Negotiations Between Certain Participating Noteholders, CEC, and CEOC ............ 825

    3. Board Approvals ..................................................................................... 829

    4. The Examiner's Findings and Conclusions ............................................ 842

F. The PIK Notes Transaction ............................................................................. 847

    1. Description and Relevant Facts .............................................................. 847

    2. The Examiner's Findings and Conclusions ............................................ 854

G. Intercompany Transactions ............................................................................. 859

    1. The SSA ................................................................................................. 860

        a. General Provisions of the SSA .......................................................... 860

        b. Fees Paid to the Sponsors ................................................................. 862

            i. Transaction Fee ............................................................................ 862

            ii. Monitoring Fees .......................................................................... 864

    2. The Intercompany Revolver ................................................................... 865

    3. The CEOC Intercompany Loan .............................................................. 874

    4. Intercompany Notes ............................................................................... 874

    5. Intercompany Project Simplification ..................................................... 876

        a. Purpose and Scope ........................................................................... 877

        b. The 2008 $10.5 Billion Entry .......................................................... 877

        c. Sponsor Fees Paid by CEOC Reimbursed by CEC Through a Reduction of Certain Intercompany Balances ................................................... 878

        d. Impact to CEOC's Financial Statements .......................................... 879

    6. The Examiner's Findings and Conclusions ............................................ 879

        a. The SSA ............................................................................................ 879

        b. The Intercompany Revolver ............................................................. 880

            i. Avoidance Claims ........................................................................ 880

            ii. Fiduciary Duty Claims ................................................................ 884

        c. The CEOC Intercompany Loan to CEC ........................................... 886

d.  Project Simplification ........................................................................................ 888

X.  TAX ISSUES ............................................................................................................ 890

A.  Introduction ........................................................................................................... 890

B.  2009 NOL Carryback ............................................................................................ 890

1.  Description and Relevant Facts ...................................................................... 890

2.  Summary ........................................................................................................ 893

3.  Applicable Legal Standard ............................................................................. 893

4.  Applicable Non-Tax Law Doctrines .............................................................. 897

C.  Debtor NOL Utilization/Attribute Reduction ...................................................... 899

1.  Summary ........................................................................................................ 899

2.  Description and Relevant Facts ...................................................................... 900

a.  Debtor NOL ............................................................................................. 900

b.  Utilization of Debtors' NOL by Non-Debtors ................................... 902

c.  Restructuring Attribute Reduction .................................................... 902

3.  The Examiner's Findings and Conclusions ............................................... 902

XI.  THE LBO .................................................................................................................. 905

A.  Introduction ........................................................................................................... 905

B.  The Existence of a Golden Creditor ..................................................................... 909

C.  CEOC's Solvency at the Time of the LBO ........................................................... 914

D.  Subsidiary Pledges ................................................................................................ 915

1.  Savings Clauses and *Tousa* ......................................................................... 916

2.  Contingent Assets and Liabilities in the Seventh Circuit ......................... 917

XII.  VEIL PIERCING .................................................................................................... 919

XIII.  THE RSAs ............................................................................................................. 925

A.  Introduction ........................................................................................................... 925

B.  Director "Independence" ....................................................................................... 925

C.  The Examiner's Findings and Conclusions .......................................................... 929

## TABLE OF CHARTS AND FIGURES

ES Figure 1: Results of Balance Sheet, Cash Flow and Adequate Capital Tests ........................................................................8

ES Figure 2: Results of Solvency Analysis .........................................8

ES Figure 3: Strength of Claims and Value Ranges ........................80

Background Figure 1: Caesars Corporate Structure as of Petition Date......................................102

Background Figure 2: CEOC DEBT as of 12/31/14 ................................104

Solvency Figure 1: Summary of CEOC Solvency – Balance Sheet Test ...................139

Solvency Figure 2: Summary of CEOC Balance Sheet at Book Value......................140

Solvency Figure 3: CEOC Solvency Analysis – Summary of Findings......................141

Solvency Figure 4: Change in Personal Consumer Expenditures on Casino, Gambling and Total Goods & Services ........................142

Solvency Figure 5: Consumer Confidence Index (Jan. 1980 – Nov. 2015) ...............143

Solvency Figure 6: Industry Revenue ($ in Millions) ........................144

Solvency Figure 7: U.S. Monthly Unemployment Rate 2000 Through 2015 ...........145

Solvency Figure 8: Industry and CEOC Annual Percent Change in Net Revenues .........................146

Solvency Figure 9: CEOC EBITDA and EBITDA Margins of CEOC and CEOC's Industry Peers .......................147

Solvency Figure 10: Summary of CEOC Assets – Book Value...............148

Solvency Figure 11: Summary of CEOC Liabilities – Book Value ...........149

Solvency Figure 12: Comparison of CEOC Total Assets to Total Liabilities..........................150

Solvency Figure 13: CEOC Asset Impairments 2009 through 2014........................151

Solvency Figure 14: CEOC Property & Equipment........................152

Solvency Figure 15: CEOC Assets Excluding Goodwill Compared to Total Liabilities........................153

Solvency Figure 16: CEOC and Industry Peers Ratio of Liabilities to Assets, Net of Goodwill, Compared to Equity ........................154

Solvency Figure 17: CEOC Statement of Cash Flows ........................155

Solvency Figure 18: CEOC Cash Flow from Operations Before and After Interest Expense........................156

Solvency Figure 19: CEOC and Industry Peers Median of Interest Expense as a Percentage of Net Revenue ........................157

Solvency Figure 20: Guideline Company EBITDA Multiples........................161

Solvency Figure 21: CEOC EBITDA.........................................................................162

Solvency Figure 22: CEOC Equity Value Based on Fair Market
Value of Assets Using Market Approach ...............................................................163

Solvency Figure 23: Sensitivity of CEOC Equity Value to Multiple..........................163

Solvency Figure 24: Summary of CEOC Equity Value Using LRP,
2009 – 2014.........................................................................................................165

Solvency Figure 25: Summary of CEOC Free Cash Flow Prior
to Debt Maturities ...............................................................................................166

Solvency Figure 26: Projected Free Cash Flow Based
on the Long-Range Plans .....................................................................................167

Solvency Figure 27: CEOC Interest Coverage Ratio
(Interest Expense/EBITDA)...................................................................................168
Solvency Figure 28: Calculation of Interest Coverage Ratio ....................................169

Solvency Figure 29: CEOC 2012 Projections of Free Cash Flow
Prior to Debt Repayment .....................................................................................170

Solvency Figure 30: Apollo Estimate of CEOC First Lien and
Second Lien Debt Holder Recovery as of October 4, 2013 Based on
EBITDA Ranging from $1.2 Billion to $1.5 Billion ................................................171

Solvency Figure 31: Key Financial Indicators Between the Status Quo vs
Post-Transfer Scenario..........................................................................................172

Solvency Figure 32: CEOC Working Capital...........................................................177

Solvency Figure 33: CEOC and Industry Peers' Working Capital Ratio....................178

Solvency Figure 34: CEOC and Industry Peers Debt to Asset Ratios.......................179

Solvency Figure 35: CEOC and Industry Peers Debt to Asset Ratios.......................180

Solvency Figure 36: CEOC Debt – Face Value and Market Value............................181

Solvency Figure 37: CEOC Projected Free Cash Flow .............................................187

Solvency Figure 38: CEC Adjusted Working Capital ...............................................190

Solvency Figure 39: Market Value of CIE Equity Prior
to Transfer to CGP ...............................................................................................192

Solvency Figure 40: Market Value of CMBS/CERP Equity......................................193

Solvency Figure 41: Market Value of CGP Equity ..................................................193

Solvency Figure 42: Face Value of CEOC Debt Held by Affiliates ..........................194

Solvency Figure 43: Calculation of Potential Value of CEC Guarantee ...................195

Solvency Figure 44: Caesars License Company Select Financial Data .....................196

Solvency Figure 45: Calculation of Industry Peers' Market
Multiples at 12/31/2007 ......................................................................................198

Solvency Figure 46: Calculation of CEC Equity Value as of LBO ..............................................199

Projections Figure 1: Budget to Actual Performance (2011-2013) ............................................213

Projections Figure 2: Budget to Actual Performance (2014-2015) ............................................216

Projections Figure 3: Bally's Las Vegas LRP (Projected EBITDA) ..........................................217

Projections Figure 4: Harrah's New Orleans Long-Range Plan (Projected EBITDA) ............................................................................................218

2009 WSOP Transaction Figure 1: Disaggregating Pre-Money Value .....................................241

2009 WSOP Transaction Figure 2: Step 1 – Sale of WSOP to Holdco Structure .........................................................................................251

2009 WSOP Transaction Figure 3: Final Holdco Structure  ....................................................252

2009 WSOP Transaction Figure 4: Post-Transaction Organization Chart .................................266

2011 WSOP Transaction Figure 1: Evolution of Terms...........................................................293

Trademarks Figure 1: Post-LBO PropCo/OpCo Structure ......................................................311

Trademarks Figure 2: CMBS IP Restructuring Aug. 31, 2010..................................................319

Trademarks Figure 3: Allocation of Book Value of CMBS IP .................................................323

Overview Figure 1: Situation Overview ..................................................................................339

Overview Figure 2: New Financing Proposal ..........................................................................340

Overview Figure 3: Situation Overview ..................................................................................342

Overview Figure 4: New Financing Proposal ..........................................................................343

Overview Figure 5: Why At All and Why Now? ......................................................................344

Overview Figure 6: Four Key Areas of Focus for the Capital Structure Remain ......................................................................................................346

Growth Figure 1: Corporate Structure Pre-Transaction.............................................................349

Growth Figure 2: Corporate Structure Post-Transaction ..........................................................350

Growth Figure 3: Planet Hollywood Financial Performance .....................................................353

Growth Figure 4: Planet Hollywood Capital Expenditures .......................................................354

Growth Figure 5: Horseshoe Baltimore Capital Expenditures ..................................................355

Growth Figure 6: Planet Hollywood Comparison ....................................................................367

Growth Figure 7: Horseshoe Baltimore Comparison ...............................................................368

Growth Figure 8: Evercore Enterprise Value Ranges by Asset..................................................389

Growth Figure 9: Planet Hollywood Initial Projections ...........................................................390

Growth Figure 10: Planet Hollywood Long-Range Plans .........................................................391

Growth Figure 11: Evercore Comparables ..............................................................................392

Growth Figure 12: Growth Transaction Sensitivity Analysis....................................................395

Growth Figure 13: Part A: CEOC Structure Prior to Transfer; Part B: Asset Transfer to PHWLV, LLC ................................................................398

Growth Figure 14: Part C: Transfer to CGP ................................................................399

Growth Figure 15: Horseshoe Baltimore Asset Transfer ..........................................400

Growth Figure 16: Guideline Public Companies – Growth Transaction.....................405

Growth Figure 17: The Examiner's Selected Multiples – Growth Transaction ................................................................407

Growth Figure 18: Valuation Conclusions – Growth Transaction .............................408

Growth Figure 19: Summary of Values for the Growth Transaction .........................409

CERP Figure 1: Step 1 - Formation of and Transfer to Intermediate Company................................................................482

CERP Figure 2: Step 2 - Transfer of Units to CEC; Transfer of Notes/Cash to CEOC ................................................................483

CERP Figure 3: Step 3 - Contribution of Intermediate Company Interest to Rio Properties ................................................................484

Four Properties Figure 1: Corporate Structure Pre-Transaction ...............................504

Four Properties Figure 2: Corporate Structure Post-Transaction ..............................505

Four Properties Figure 3: Bill's Gamblin' Hall & Saloon/ The Cromwell Capital Expenditures................................................................509

Four Properties Figure 4: Bill's Gamblin' Hall & Saloon Historical Financial Performance ................................................................509

Four Properties Figure 5: Bally's Las Vegas Capital Expenditures ...........................510

Four Properties Figure 6: Bally's Las Vegas Historical Financial Performance ................................................................510

Four Properties Figure 7: The Quad Capital Expenditures.........................................511

Four Properties Figure 8: The Quad Historical Financial Performance .....................512

Four Properties Figure 9: Harrah's New Orleans Capital Expenditures.....................513

Four Properties Figure 10: Harrah's New Orleans Historical Financial Performance ................................................................513

Four Properties Figure 11: Summary of Assets Sold .................................................514

Four Properties Figure 12: Overhead View of Las Vegas Properties.........................514

Four Properties Figure 13: Overhead View of Undeveloped Land ............................515

Four Properties Figure 14: Excerpt 1 from November 2013 CEC Discussion Materials ................................................................518

Four Properties Figure 15: Excerpt 2 from November 2013 CEC Discussion Materials ................................................................519

Four Properties Figure 16: Excerpt 3 from November 2013 CEC Discussion Materials ...........................................................520

Four Properties Figure 17: Excerpt 4 from November 2013 CEC Discussion Materials ...........................................................521

Four Properties Figure 18: Excerpt from Liquidity Discussion Board of Directors Materials .....................................................523

Four Properties Figure 19: Excerpt 1 from December 2013 Regulatory Presentation ................................................................539

Four Properties Figure 20: Excerpt 2 from December 2013 Regulatory Presentation ................................................................540

Four Properties Figure 21: Excerpt from January 24, 2014 Centerview Discussion Materials ....................................................546

Four Properties Figure 22: Excerpt from February 6, 2014 CEC Discussion Materials ...........................................................553

Four Properties Figure 23: EBITDA Change from January Business Plan to February Business Plan .........................................556

Four Properties Figure 24: Excerpt 1 to Centerview's February 6, 2014 Confidential Discussion Materials ................................563

Four Properties Figure 25: Excerpt 2 to Centerview's February 6, 2014 Confidential Discussion Materials ................................564

Four Properties Figure 26: Excerpt 3 to Centerview's February 6, 2014 Confidential Discussion Materials ................................565

Four Properties Figure 27: Centerview Valuation Summary ...................570

Four Properties Figure 28: Centerview Valuation Ranges by Asset .........571

Four Properties Figure 29: Centerview Comparables.............................572

Four Properties Figure 30: D&P Valuation Summary.............................575

Four Properties Figure 31: D&P Comparables......................................576

Four Properties Figure 32: Four Properties Sensitivity Analysis – Centerview.......................579

Four Properties Figure 33: Four Properties Sensitivity Analysis – D&P ..................................579

Four Properties Figure 34: Four Properties Summary of Values .............580

Four Properties Figure 35: Lazard's Value Ranges...............................581

Four Properties Figure 36: Overhead of Easements .............................587

Four Properties Figure 37: Overhead View of Undeveloped Land ...........589

Four Properties Figure 38: Description of Undeveloped Land.................590

Four Properties Figure 39: Formation of Management Entities ...............595

Four Properties Figure 40: Formation of New Subsidiaries ...................596

Four Properties Figure 41: Contribution of Assets to New Subsidiaries ....................................597

Four Properties Figure 42: Contribution of Stock to NewCos ...................................................598

Four Properties Figure 43: Sale of Cromwell to CGP ...............................................................599

Four Properties Figure 44: Sale of Quad to CGP ......................................................................600

Four Properties Figure 45: Sale of Bally's Las Vegas to CGP...................................................601

Four Properties Figure 46: Formation of Management Entities .................................................602

Four Properties Figure 47: Contribution of Stock to NewCos ...................................................603

Four Properties Figure 48: Sale of Harrah's New Orleans to CGP ............................................604

Four Properties Figure 49: Budget to Actual Performance (2014-2015) ...................................606

Four Properties Figure 50: CES Ownership Structure................................................................610

Four Properties Figure 51: Net Revenue by Entity....................................................................633

Four Properties Figure 52: Illustrative Analysis of Excessive
Cost Allocated to CEOC ............................................................................................................634

Four Properties Figure 53: Selected Multiples ..........................................................................646

Four Properties Figure 54: Valuation Conclusions for Four Properties,
Management Fees and Undeveloped Land .................................................................................648

Four Properties Figure 55: Summary of Values ........................................................................649

Degradation Figure 1: 2015 Pro-Forma Projected EBITDA vs.
Actual Projected EBITDA .........................................................................................................665

Degradation Figure 2: CAC's Pro Forma Analysis of
Four Properties Transaction .......................................................................................................666

TR Figure 1: Aggregate Reward Credit Activity by Year.........................................................676

TR Figure 2: Earned and Redeemed Reward Credits by Year ...................................................677

TR Figure 3: 2014 Reward Credit Redemptions .......................................................................678

TR Figure 4: 2014 Accrued Cost of 2014 Reward Credit Redemptions ....................................678

TR Figure 5: Gaming Theo Cross-Play – Regional Properties vs.
Las Vegas Market ......................................................................................................................686

TR Figure 6: Gaming Theo Cross-Play – Regional Properties vs.
Destination Markets ...................................................................................................................687

TR Figure 7: Gaming Theo Cross-Play – CEOC vs.
CGP/CERP Properties ...............................................................................................................698

TR Figure 8: Illustrative Damages Analysis..............................................................................707

TR Figure 9: CEOC Regionals Exports to CERP Nevada vs.
CERP Nevada Gaming Revenues...............................................................................................709

AC Figure 1: Atlantic City – Budget vs. Actual .......................................................................714

AC Figure 2: Cumulative Annual Decline ...................................................................715

AC Figure 3: Impairment of Long-Lived Assets for the
Atlantic City Properties .............................................................................................715

AC Figure 4: Assets Contributed to the CRDA ...........................................................721

AC Figure 5: Map of Atlantic City ..............................................................................728

AC Figure 6: Revenue by Property for Atlantic City Properties ..................................729

AC Figure 7: EBITDA by Property for Atlantic City Properties .................................730

AC Figure 8: Financial Results 12 Months Prior to and
After the SAC Closure ...............................................................................................733

AC Figure 9: Intercompany Receivable Balance per the
Showboat Balance Sheets ..........................................................................................737

AC Figure 10: Reclassification of the "Due from Affiliate"
CEOC Balance ............................................................................................................739

AC Figure 11: Gaming Theo Cross-Play – Atlantic City ............................................746

AC Figure 12: Cross-Play Summary for SAC Dominant Guest ...................................747

AC Figure 13: Atlantic City Hotel Occupancy Levels .................................................749

AC Figure 14: Seasonality Effect on Average Room Rate Offer ..................................750

AC Figure 15: Atlantic City Hotel Average Rate Per Occupied Room ........................750

AC Figure 16: Atlantic City Hotel TotalPar ................................................................751

AC Figure 17: Showboat Marketing Plan Related Expenses .......................................752

Financial Figure 1: CEOC Total Debt to EBITDA Leverage Ratio .............................758

Financial Figure 2: CEOC Debt Change from 2013 to 2014 .......................................759

Financial Figure 3: CEOC Cash Used for 2014 Financial Transactions ......................760

B-7 Figure 1: CEOC Debt Guaranteed by CEC as of December 31, 2013 ...................764

B-7 Figure 2: B-7 Term Loan and Cash Sources and Uses ..........................................766

B-7 Figure 3: CEC Guarantee of CEOC Debt .............................................................780

B-7 Figure 4: Increase in Interest Expense Due to B-7 Transaction ............................781

B-7 Figure 5: Paulson Notes and CEC Notes Contributed to CGP ..............................784

SUN Figure 1: Senior Unsecured Notes Outstanding as of 6/30/2014 .........................822

SUN Figure 2: Cash Contributed for Repurchase of
Senior Unsecured Notes .............................................................................................823

SUN Figure 3: Excerpt from K&E and Perella Weinberg Deck ..................................834

SUN Figure 4: Excerpt from K&E and Perella Weinberg Deck ..................................834

SUN Figure 5: Senior Unsecured Notes Cancelled, Redeemed
and Amended Notes Outstanding as of 9/30/14 ...........................................................842

Intercompany Figure 1: Summary of Fees Paid to Sponsors by Year .........................................862

Intercompany Figure 2: Intercompany Revolver Activity By Quarter ........................................868

Intercompany Figure 3: Intercompany Notes ...........................................................875

LBO Figure 1: LBO Financing Sources ...........................................................906

LBO Figure 2: Post-LBO Corporate and Capital Structures ...........................................................907

LBO Figure 3: Calculation of HEI Equity Value as of the LBO Date ........................................915

LBO Figure 4: Summary of Savings Clauses ...........................................................917

# INTRODUCTION

The Examiner investigated over fifteen sometimes related transactions between CEOC (the Debtor)[1] and other entities controlled by CEC (its parent) and the LBO Sponsors (Apollo and TPG). These transactions took place over a more than five-year period and continued through 2014. The principal question being investigated was whether in structuring and implementing these transactions assets were removed from CEOC to the detriment of CEOC and its creditors.

The simple answer to this question is "yes." As a result, claims of varying strength arise out of these transactions for constructive fraudulent transfers, actual fraudulent transfers (based on intent to hinder or delay creditors) and breaches of fiduciary duty by CEOC directors and officers and CEC. Aiding and abetting breach of fiduciary duty claims, again of varying strength, exist against the Sponsors and certain of CEC's directors.[2] None of these claims involve criminal or common law fraud.

The potential damages from those claims considered reasonable or strong[3] range from $3.6 billion to $5.1 billion. Monetary damages are the most common remedy in fraudulent transfer cases, but in certain cases the Court could require that the property that was subject to transfer be returned to CEOC, particularly where damages are difficult to calculate.[4] In addition, one uncertainty of potentially significant magnitude is the ability of CEOC to recover all or some of the value of the social gaming business of CIE, an entity created in 2009 in connection with the transfer of the World Series of Poker trademark (WSOP) out of CEOC. A potential recovery of these damages is not included in the above numbers. Also excluded from the above numbers

---

[1] References to CEOC or the Debtor should be read to include debtor subsidiaries and affiliates.

[2] In reaching these conclusions the Examiner is not opining on regulatory issues in any jurisdiction or whether any regulatory inquiries are appropriate. Indeed, his findings are largely based on bankruptcy related issues where the issues do not necessarily correspond to regulatory requirements. For example, as discussed below, conduct which might involve no claims if CEOC was solvent become the basis for claims in large part because CEOC was insolvent. Neither the allegations investigated nor conduct giving rise to claims set forth in this Report had any adverse impact on the day-to-day operation of the casinos. Moreover, none of these findings apply to purely operational executives (*e.g.*, John Payne, the current CEO of CEOC) who played no material role in the transactions at issue.

[3] Claims are being characterized as strong (a claim having a high likelihood of success), reasonable (a claim having a reasonable, or better than 50/50, chance of success), plausible (a claim likely to survive a motion to dismiss but having less than a 50/50 chance of success), weak (a claim with a reasonable chance of surviving a motion to dismiss but unlikely to succeed) or not viable (either likely to be dismissed on motion or highly unlikely to succeed if litigated).

[4] If the transferee cannot establish its good faith, the transferee will only be entitled to an unsecured claim for the amount of the consideration it paid. Where good faith is not established and monetary damages are awarded, the damage award thus would be based on the value of the asset transferred and the transferee would not be entitled to an offset in the amount of the consideration.

are (i) lost profits or other appreciation in the value of properties transferred, and related potential liens or offsets to which good faith transferees may be entitled in connection with such increases in value, and (ii) interest. While the various claims discussed in this Report exist, and the Examiner believes many of them are reasonable or strong, it is clear that they will be vigorously contested by the affected parties and all of them thus are subject to litigation risk.

As to constructive fraudulent transfer claims, one defense involves the so-called safe-harbor provisions for securities transactions under section 546(e) of the Bankruptcy Code. The Examiner believes that a court will not find these provisions applicable to the facts surrounding the asset transfers at issue.[5]  Nonetheless, this is a complex issue which, like others, will be the subject of intense litigation. At the same time, the availability of this defense likely will not impact the overall quantum of potential damages since it is not applicable to either breach of fiduciary duty or actual fraudulent transfer claims which also arise from these transactions, and which involve the same or similar damages (albeit in the case of breach of fiduciary duty against different parties).

Central to these claims is the fact that throughout this period CEC and the Sponsors treated CEOC as if it was a solvent 100% owned subsidiary when the reality, confirmed in much of the contemporaneous analyses they themselves created, was very different. By December 31, 2008, and continuing through 2014, there is a strong case that CEOC was insolvent, and from the last quarter of 2013 through 2014 (when the most significant transactions took place) it was certainly insolvent.   Moreover, precisely because of CEOC's very problematic financial condition, by sometime in late 2012 the Sponsors adopted and began to implement a strategy, which while providing some benefit to CEOC, was designed, among other things, to strengthen CEC's and the Sponsors' position in a potential restructuring negotiation with creditors and improve their position in the event of a CEC or CEOC bankruptcy. Indeed, by the Fall of 2013, while hoping to avoid a CEOC bankruptcy, the Sponsors began planning for what would happen in the event of such a bankruptcy. A consequence of CEOC's insolvency was that CEOC should have had independent directors and advisors in connection with these transactions, but that did not occur until late June 2014.

In assessing the actions of CEC and the Sponsors, it is important to remember that the Sponsors are among the most financially savvy investors in the country, and both TPG and Apollo have extensive experience in dealing with financially troubled companies. This expertise was applied in connection with their investment in Caesars and, indeed, during the relevant period Apollo was the *de facto* chief financial officer of CEOC. In the transactions at issue, the Chief Executive Officer of CEC and CEOC and other senior management also deferred to the Sponsors on key issues, including the selection of which CEOC properties should be sold to

---

[5]  Principally, the asset transactions that were undertaken here involved sales or transfers of intellectual property interests or membership interests in limited liability companies, and thus do not qualify as "settlement payments" or as transfers made "in connection with a securities contract," as required under section 546(e). Nor do such transfers appear to have been made, in most instances, "by or through (or for the benefit of)" a "financial participant" (as that term is defined in the Bankruptcy Code). Section 546(e) does, however, provide a defense to a number of the financial transactions that were investigated.

other affiliated companies controlled by CEC and the Sponsors.  Indeed, it appears that the Sponsors' past success in successfully negotiating resolutions involving financially troubled companies was a factor in their assuming they could do so here without the need to pay adequate attention to the requirements associated with being fiduciaries of an insolvent entity.

Analysis of the solvency of CEOC and the valuation of assets transferred in connection with the transactions that were investigated are central to the conclusions in this Report.  Since it therefore is important for everyone to have a clear understanding of the underlying analyses relied on by the Examiner, the main body of the report contains an extensive discussion of these subjects.  Moreover, Appendix 7 provides a detailed explanation of how the Examiner arrived at his conclusions about both the value of the assets transferred and his disagreements with the opinions provided in connection with these transactions by various financial advisors.

In reaching these conclusions the Examiner and his Advisors reviewed over 8.8 million pages of documents and conducted interviews of 92 individuals, with some individuals being interviewed on multiple occasions.[6]  The interviews of 74 individuals were transcribed.  Of great value to the Examiner also was the input – both at meetings and through written presentations – received from various key parties, including CEC, the Sponsors, the two Official Committees, CAC and the Ad Hoc Committees of First Lien Note Holders and First Lien Bank Debt, and their advisors.   Some of this input was through frequent interaction between the Examiner's professionals and those retained by these groups.  The Examiner also, however, met personally with these constituencies on multiple occasions.  In late 2015 he also made detailed presentations of his preliminary views to each of these groups so that he could receive their further input.  In response he had follow-up meetings with key interested parties, and received extensive written and oral submissions on a wide range of factual and legal issues.  The Examiner found this process to be extremely helpful in assisting him in understanding and analyzing the critical issues being investigated.   At the same time, the extensive presentations received from interested parties, as well as the volume and delays in the production of documents, undoubtedly lengthened the investigative process.

---

[6] One reason individuals had to be interviewed a second time was that document production took far longer than expected.

## EXECUTIVE SUMMARY

The period since the Sponsors' acquisition of Caesars in January 2008 can be divided into three phases: the LBO itself and its immediate aftermath; the late 2008-mid 2012 period; and the period since mid-2012 leading up to the CEOC bankruptcy filing.

The first phase involved the LBO itself and continued until the 2008 economic downturn that severely impacted the gaming business, including in its primary location, Las Vegas. One of the rationales for the Sponsors' investment in Caesars was that the gaming business was generally recession proof. The recession in 2008 proved this rationale to be wrong, and by the end of 2008 Caesars was plainly a troubled investment.

The 2008 LBO had converted CEOC into a highly leveraged entity, and following the LBO the Caesars corporate structure involved CEC[7] as the parent entity with two subsidiaries which incurred the debt. First was the Debtor, CEOC, which owned approximately 40 properties and had $17.4 billion of interest bearing debt. Second was the CMBS structure, comprised of six properties which were separately financed through $6.5 billion in debt secured by those properties. CEOC provided the management services for the CMBS properties, and did so for no compensation other than the reimbursement of allocated and unallocated expenses. The only transaction investigated during this period was the LBO itself and related fees. The Examiner did not find a basis for challenging the LBO or the fees paid in connection with the LBO, principally because CEOC was solvent at the time of the LBO, and the LBO did not render it insolvent.

During the second period – from late 2008 through mid-2012 – the principal activities appeared to focus on, as the Sponsors and CEC described it, creating "runway." This was accomplished through a number of CEOC debt exchanges which extended maturities, securing amendments to existing credit facilities, an agreement with the CMBS lenders which, among other things, extended the maturity of the CMBS debt until early 2015, and buying both CEOC and CMBS debt in the market at discounted prices. During this period there were over 30 financial transactions. As a result of these transactions, by the end of August 2012, the maturity dates of CEOC debt had been extended to 2015 and beyond. The hope was that the economy, and the gaming business, would recover by then. While the late 2008, early 2009 crisis did ease, that recovery was not sufficient to materially reduce the longer term financial problems afflicting CEOC, which remained insolvent, continued to experience negative cash flows and whose EBITDA remained well below pre-LBO levels. The transactions investigated during this period are transfers in 2009 and 2011 involving the World Series of Poker and the 2010 CMBS Loan Amendment and Trademarks Transfer. The latter, among other things, transferred ownership of certain trademarks from CEOC to the CMBS entities should the CMBS lenders want to remove the CMBS properties from the Caesars system after a default, while also providing the CMBS lenders with an enhanced ability for the CMBS properties to stay within the Caesars system even in the event of such a default. The Examiner identified claims arising out of each of these

---

[7] At the time of the LBO and for some period thereafter, CEC was HET, CEOC was HOC and the entity created in 2009, CIE, was HIE. For convenience, this Report uses the later titles and abbreviations for all entities.

transactions, although there is a possible statute of limitations issue with regard to the Trademarks Transfer claim.

The third and final period was defined by a more all-encompassing strategic approach to addressing the balance sheet of CEOC and CMBS, accompanied by a goal of improving through various transactions CEC's and the Sponsors' strategic position both in negotiating with CEOC's creditors and in the event of a CEOC (or CEC) bankruptcy. By the end of 2013 there also was increasing concern about a possible CEOC bankruptcy. This led to transactions to make certain that in the event of such a bankruptcy it would not interfere with the operations of non-CEOC properties owned directly or indirectly by CEC, and that prior to any CEOC bankruptcy CEC's guarantees of CEOC debt would be either eliminated or modified so that a CEOC bankruptcy did not inevitably cause a CEC bankruptcy.

One fact, however was clear: while as a result of the transactions during this period debt maturities were extended and runway was created, there was never any realistic chance that CEOC would ever pay all of its creditors at par through a refinancing of CEOC's debt or otherwise, and CEC and the Sponsors, in light of their own analyses, could not reasonably have thought differently. Given CEOC's ongoing negative cash flows, the level of its EBITDA and the amount it owed, any resolution of CEOC's debt obligations would require significant numbers of creditors to accept material reductions in the amount of principal repayment to which they were entitled. Indeed, significant asset sales designed to enhance short term liquidity reduced CEOC's potential ongoing EBITDA, making it even more difficult for CEOC to service its debt obligations, and only served to reduce further its ability to pay its debts on maturity. An independent CEOC board would have been in an unconflicted position to decide whether to proceed with these transactions, but such a board did not exist. Among the transactions (some of which are related to each other) which took place during this period are: (i) the CMBS refinancing (the CERP transaction); (ii) the creation of Caesars Growth Partners (CGP or Growth), a new entity owned by CEC and CEC's shareholders (including principally the Sponsors and their co-investors) through a new public company (CAC); (iii) the sale to that entity of CEOC assets; (iv) the creation of a new joint services company (CES) in the Spring of 2014 and the transfer to that entity of CEOC's management responsibilities as well as a broad, royalty-free, irrevocable license to Total Rewards (Caesars' highly valued customer loyalty program) and; (v) the so-called B-7 loan; (vi) the purported release of the CEC guarantee of CEOC's bond debt;[8] and (vii) several additional note repurchases. The Examiner identified claims arising out of virtually all of these transactions.

During all of these periods, the Sponsors and management took the view that Caesars was one company and decisions were made from that perspective, not from the perspective of CEOC. As discussed below, once CEOC became insolvent that should no longer have been the prevailing mindset in considering potential transactions.

---

[8]  That guarantee release is the subject of a pending litigation by various CEOC creditors. This Report does not address the principal issues in those cases: compliance with the Trust Indenture Act and breach of the Indenture. Instead, it focuses on whether CEOC has claims arising from the release of the guarantee.

### A. Solvency

There are three aspects to the analysis of CEOC's solvency.  First, is a determination of whether at the relevant time CEOC was insolvent or failed the other tests discussed below for measuring financial condition.  Second, is what the principal participants said about the issue of CEOC's insolvency, and third, what information was available to them at the time which should have informed their judgment on this subject.

Before discussing the solvency of CEOC, however, it is necessary to understand why whether a company is solvent is important, particularly for a highly leveraged entity like CEOC, whose leverage increased from 8.8x EBITDA at the time of the LBO to, according to a June 27, 2014 Caesars' analysis, 16.9x EBITDA.  Once an entity is insolvent the fiduciary obligations of officers, directors and controlling shareholders change.  While their obligation remains to the entity, the residual beneficiaries of an insolvent entity are no longer limited to its equity holders, but also include its creditors.  Thus, how particular actions impact creditors should become a core consideration.  As discussed below, this change of obligations was explained to the CEC Board in April 2009 by O'Melveny & Myers in connection with the initial World Series of Poker transaction and by Kirkland & Ellis to the independent directors of CEOC in August 2014.

Once CEOC became insolvent there thus was the potential for conflict between CEC, the equity owner of CEOC, and CEOC itself.  CEC, and its officers and directors, owed their duties to CEC's equity holders, but that was not the case for CEOC's officers and directors.  Actions that might have been beneficial to CEC might have been less clearly, or potentially not, in the interest of CEOC and its creditors.  Those who were officers and directors of both entities were in an inherently conflicted position.  CEC, the Sponsors and their advisors, however, at least until late June 2014, never acted as if this were the case.  Decisions on behalf of CEOC were effectively made by CEC and the Sponsors, and in none of the investigated transactions prior to August 2014 did CEOC have independent directors or advisors looking out for its interests.  As Eric Hession, the current CEC CFO, testified in a recent deposition in a related case, for so long as CEOC was wholly owned by CEC (until May 2014) decisions on behalf of CEOC were made at the CEC level:[9]

Q:    Was there a period of time when decisions for CEOC were made at the CEC level?

A:    Yes.

Q:    When was that time period?

A:    That would have been the time period during which CEOC was a wholly-owned subsidiary.

---

[9] *Wilmington Savs. Fund Society FSB v. Caesars Entm't Corp. et al.,* C.A. No. 10004-VCG (Del.) ("*Wilmington Savs.*"), E. Hession Sept. 17, 2015 Tr. at 63: 25-64:7.

Instead, CEOC should have had its own independent directors and advisors in connection with each of the challenged transactions.  The need for such independent directors and advisors was particularly clear for those transactions that took place in 2013-14.

In assessing the financial condition of a company for purposes of fraudulent transfer, preference and breach of fiduciary duty, courts engage in three separate inquiries.  While often lumped together as all relating to the solvency of an entity, they are, in reality, different tests. Failing any one of these tests is the predicate for a variety of claims.  The tests are:

1. Balance Sheet Test – This test measures solvency and asks: Is the fair value of CEOC's assets in excess of its debts?

2. Cash Flow Test – Did CEOC have the ability to pay its debts as they came due?  This test has both an objective component which focuses more on whether obligations are being paid in the short term, and a subjective component which focuses on the longer term ability of a company to pay its debts when they mature.  Failing either the subjective or the objective aspects of the test forms the basis for potential liability.[10]

3. Capital Adequacy – Did CEOC have adequate capital for the business in which it was engaged?

As reflected in ES Figure 1 below, there is a strong case that CEOC was insolvent at the end of 2008, 2009, 2010, 2011, 2012, 2013, and 2014 under the Balance Sheet Test, a strong case that it failed the capital adequacy test in each of those years, a reasonable case that it failed the cash flow test through year end 2011, and a strong case that it failed that test in all subsequent years.[11]

---

[10]  For breach of fiduciary duty claims, Delaware courts will apply only the balance sheet or cash flow tests.

[11]  By definition a solvency analysis cannot make specific determinations at every point in time over a lengthy period during which challenged transactions may occur.  Accordingly, a concept termed "retrojection" is used to evaluate the intermediate points in time subject to a solvency analysis.  The retrojection rule provides that where a debtor is shown to be insolvent on the first known date and the last relevant date then, absent any substantial or radical changes in the assets or liabilities of the debtor between the two dates, the debtor is deemed to be insolvent at all intermediate times.  In the case of CEOC, solvency was determined as of each of the Solvency Dates, and retrojection was used to determine solvency as of various intermediate dates.

**ES Figure 1:  Results of Balance Sheet, Cash Flow and Adequate Capital Tests**

|  | LBO | YE2008 | YE2009 | YE2010 | YE2011 | YE2012 | YE2013 | YE2014 |
|---|---|---|---|---|---|---|---|---|
| Balance Sheet | Remote | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent |
| Cash Flow | Remote | Probable | Probable | Probable | Probable | Insolvent | Insolvent | Insolvent |
| Adequate Capital | Remote | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent | Insolvent |

The details supporting these conclusions are set forth in Section V, *infra*.  For the Balance Sheet Test, as set forth in the following chart, for every year-end beginning December 31, 2008 the fair market value of CEOC's assets was materially less than CEOC's debt, as reflected in ES Figure 2 below:

**ES Figure 2:  Results of Solvency Analysis**

| *amounts in millions* | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| Enterprise Value of CEOC | $14,629 | $14,480 | $14,072 | $11,994 | $12,179 | $11,980 | $6,059 |
| Face Value of Interest-Bearing Debt (a) (b) | 17,885 | 17,354 | 17,795 | 18,766 | 20,529 | 19,288 | 18,371 |
| Solvent / (Insolvent) | ($3,256) | ($2,874) | ($3,722) | ($6,772) | ($8,350) | ($7,308) | ($12,312) |

Sources:
− Ex. 99.1, Supplemental Discussion of Operating Company Results, CEC Form 10-K, 2008-2013.
− CEOC Selected Financial Information as of Dec. 2014.
Notes:
(a) Excludes intercompany debt.
(b) The face value of Interest Bearing Debt is the stated amount of debt that must be repaid at maturity.  The face value may differ from the book value.

CEC has maintained that CEOC was solvent under the Balance Sheet Test, at least through early 2011.  In its analysis under the Balance Sheet Test presented to the Examiner, however, it deducts from CEOC's debt 100% of the cash held by CEOC at the relevant date.  Doing so, however, is inappropriate as CEOC could not operate without cash to pay trade debt and other expenses (including having the required amount of "cage cash").  As discussed in Section V, *infra*, the evidence does not show that CEOC had excess cash during this period.  To compute enterprise value, CEC's analysis also used EBITDA numbers higher than reported in their 10-Ks, and then applied multiples to that EBITDA ranging from 9.3x to as high as 17.2x, while in other contexts they relied on the lower multiples for Las Vegas strip properties (ranging from 6x-10x) used by the financial advisors in the various transactions.

The CEC and Sponsor witnesses uniformly took the position that they did not believe CEOC was insolvent because it was paying its debts, had not defaulted and had created "runway" by extending maturities on its debt.[12] This view ignores everything but the objective aspect of the cash flow test and bears no relationship to the actual solvency test. Also, in many cases CEC and the Sponsors either indicated ignorance of the relevant legal tests or simply seemed to ignore them based on their view that they believed CEOC's long-term debt could be addressed over time, although as discussed above during the relevant time, and particularly in 2013-2014, there was no realistic possibility that the debt could ever be repaid at anything close to face value.

Examples of the positions taken are:

- Marc Rowan of Apollo, a CEC director, stated that while he understood that a company could be a going concern and still be insolvent, he looked at the solvency issue as being whether in the future a company had the "opportunity to have assets equal or exceed liabilities."

- David Sambur, another Apollo CEC director, thought the issue was addressed by the existence of current liquidity and the creation of "runway."

- David Bonderman of TPG, a CEC director, articulated a lay understanding of solvency as being an ability to pay bills on time, while also acknowledging that even in that circumstance an entity could be insolvent if its debts exceeded its assets.

- Chris Williams, an independent CEC Director and Chair of the Audit Committee, viewed solvency as being essentially the same as "going concern" so that an entity would be solvent if it had an ability to meet obligations over a defined period of time, and he focused on the fact that CEOC was current on its debt obligation and current on its payments to creditors.

- Gary Loveman, CEO and Chairman of the Board of CEC and CEOC, thought both that the issue was what alternatives were available to address the Company's

---

[12] They have also claimed that CEOC's solvency was evidenced by the willingness of new lenders to participate in the B-7 financing in 2014, the positive equity value in CEC stock and the willingness of the Sponsors, their co-investors and other CEC Shareholders to contribute more than $1 billion in new capital when CAC and Growth were formed. The Examiner, however, did not find these arguments particularly persuasive or probative on the issue of insolvency. The B-7 financing was first lien debt, the value of CEC stock was described by many as premised on the value of its investment in Growth, the Sponsors' own contemporaneous analyses showed CEOC had no equity value and the investment in CAC and Growth was part of an attempt to salvage value in their Caesars' investment given the dire financial condition of CEOC. The new investment also was in a new entity – CAC – which was not burdened by either CEOC's or CEC's historical debt. Moreover, as structured, CAC had priority over CEC in connection with recoveries from Growth, which was jointly owned by CEC and CAC.

problem in the future while it met its current obligations, and that in calculating solvency you looked at the market value, not the face value, of the debt.[13]

A fact finder would not, however, find these positions to be credible, particularly given that in an April 2009 presentation the CEC Board was explicitly advised about the legal definition of insolvency and, more importantly, the numerous facts available to CEC, its Board and the Sponsors which were clear signs of insolvency.  For example:

- During the years after the LBO (2008-14), EBITDA at CEOC was only able to fund an average of 62¢ of every dollar of interest expense, a sure sign that it would not be able to refinance or pay its non-trade debt at maturity.  Apollo and CEC analyses and Board presentations also described CEOC as being free cash flow negative by a wide margin for the foreseeable future absent extraordinary – and wholly unrealistic – increases in CEOC EBITDA, even without considering repayment of principal.

- From 2008-14 the ratio of liabilities to assets (net of goodwill which cannot be sold or used as collateral) increased every year and averaged 128% compared to CEOC's peer group, which averaged 83%.  In effect, this means that for every $1.00 of assets CEOC owed $1.28 to creditors.  CEOC thus was not only in worse financial condition than its peers; it was in extremely poor condition on an absolute basis.

- The Sponsors and Caesars created numerous analyses which described the dire financial condition of CEOC.  For example, a June 2012 Apollo analysis demonstrated that CEOC would be billions of dollars short if it paid debts as they became due.[14]  Moreover, the stated rationale for the creation of Growth was that CEOC lacked the financial resources to develop new opportunities and invest the necessary capital in its existing properties.

- Certain of CEOC's debt instruments were trading at a significant discount, and commentators regularly discussed the lack of equity value of CEOC.[15]  CEC also regularly captured discounts *via* open market purchases or exchange offers in CEOC/CMBS debt since the holders of that debt understood it could not be refinanced at par.[16]

---

[13]  If this was true, the worse the financial condition of a company, the less likely it would be insolvent since such a company's debt would be trading at an ever increasing discount.  Mr. Loveman was plainly wrong.

[14]  *See* "Caesars Entertainment Model and Capital Planning Considerations" (June 2012), at APOLLO_Examiner_0019594-646 [0019594].

[15]  *See* Section V, *infra*.

[16]  *See* Section IX.B, *infra*.

- Beginning with securities filings in early 2012, CEC stated that cash flow from operations would not be sufficient to repay indebtedness maturing in 2015.

- CEC and the Sponsors understood by no later than late 2013 that CEOC would need to sell significant assets simply to avoid running out of cash by the end of 2014, even without paying principal on its debt, a clear sign of insolvency.

- An October 2013 analysis showed that under all remotely realistic scenarios CEOC's creditors would not come close to being paid in full on maturity.

- Potential transactions were regularly analyzed from the perspective of what would happen in a CEOC bankruptcy.

- In the late Fall of 2013/early Winter of 2014, Apollo began actively planning the creation of a new entity to take over CEOC's management responsibilities and Total Rewards because of concerns about a CEOC bankruptcy and a belief that CAC would want such an entity to be created because of similar concerns.

- In late 2013 or very early 2014, the Sponsors began to consider the need for independent directors at CEOC because of a recognition that CEOC likely would need a major restructuring or a bankruptcy filing.

- In the Four Properties Transaction, CEC refused to provide a solvency representation as to CEOC requested by CAC.

The issue is not whether the Sponsors and CEC should have commissioned some form of solvency analysis, although that certainly would have been prudent. Rather, given all the available information, they – among the most sophisticated investors in the country – should have understood the reality of CEOC's financial condition, and acted on that basis. As one of the independent directors appointed to the CEOC Board in late June 2014 said in his interview, he did not need a formal solvency analysis; he just looked at the available information and concluded that his operating assumption had to be that CEOC was insolvent. If the Sponsors and CEC did not want to undertake some more complete analysis of solvency, they, at a minimum, should have followed the same approach. Instead, the governance implications of CEOC being insolvent were ignored.

## B.  Financial Advisors and Contemporary Valuations

In most of the challenged transactions CEC, Apollo or CEC Special Board Committees retained financial advisors to provide "fairness" opinions[17] to the CEC Board and, in some cases

---

[17]  The language of the opinions obtained was not uniform. In some instances, financial advisors opined on the "fairness" of the consideration received "from a financial point of view," which is standard terminology for investment banker fairness opinions. In other instances, financial advisors were retained to render opinions as to whether the value of the consideration represented "reasonably equivalent value" or was consistent with the value a hypothetical buyer would have paid in an arm's-length transaction negotiated between unrelated parties. In some

at the request of lenders, to the CEOC Board.  Such opinions were sought in recognition of the fact that if CEOC was insolvent, such an opinion would be important in avoiding fraudulent transfer claims and, in some cases, to comply with credit agreement requirements for related party transactions.  In certain of these cases the retained financial advisor actively participated in the negotiation of the price on which it was opining.   While issues involving particular transactions are described in the context of the discussions of specific transactions, some general observations relating to the financial advisors and the valuations used in connection with those transactions are:

- While disagreeing with certain of the analyses underlying various of these opinions, there does not appear to be any basis for a claim against the financial advisors providing the opinions.  There is no evidence that any of them acted in bad faith or with improper motives or undisclosed conflicts of interest.

- The opinions rendered by the advisors relied heavily on the accuracy of information and assumptions provided by management.  While in some cases meaningful due diligence was undertaken before relying on the assumptions and information, that was not always the case, particularly as to opinions provided by non-investment banks.  Moreover, even when due diligence was performed the opinions explicitly disclaimed responsibility for the reliability of information central to the opinions.  These disclaimers (which reflect regular practice by those providing opinions), and the lack of meaningful due diligence by the non-investment banks, undermine the value of these types of opinions when being considered by a neutral fact finder seeking to determine the value of an asset.

- In certain instances a portion of the fee for a financial advisor's opinion was contingent on the consummation of the transaction.  While such fee arrangements are not unusual for investment banks, Delaware law recognizes that the existence of such a contingency may undermine the independence of the entity providing the opinion.    Lack of independence is particularly clear where, as here, the contingency is not linked to obtaining a higher price for the seller.

- While the persuasiveness to a neutral fact finder of the valuation contained in an opinion by an investment bank opining that the price it itself negotiated was fair is subject to question, it does appear that such a bank would be considered independent under Delaware law.  Thus, an independent Board committee could rely on such an opinion in fulfilling its responsibilities even if a neutral trying to actually determine the value of an asset might not place great weight on that opinion.

- An argument has been advanced by CAC and CEC that the properties sold to Growth in late 2013 and mid-2014 and to CERP in late 2013 have not performed

cases the language chosen was dictated by the requirements of CEOC's indentures; in others, the language chosen was the product of negotiations with CEC and the Sponsor or a function of a particular advisor's internal policies.

as well as expected, and that how they have performed should be considered in analyzing whether adequate consideration was paid at the time of the transactions. First, it is too early to assess the long-term performance of these properties as the value of a long-lived asset is not predicated on one or two years' financial performance.  Indeed, the performance of some of them has improved in 2015. Others involve the type of new investments (*e.g.*, the Wheel and LINQ retail) which may well require a trial and error period before their success can be evaluated.  More importantly, while there may be some limited exceptions in special circumstances, the general rule is that in performing a retrospective valuation and in assessing prior valuations, one looks at what was "known or knowable" at the time.  Later performance may have some value as an equitable argument; it is not the legal test.  This issue is discussed in more detail in Section V, Solvency, *infra*, and in Appendix 7, Valuation at Section I.B.

- Generally speaking, the projections that should be used in valuations are the most recently available ordinary course company projections, and not projections created solely for the purpose of securing a fairness opinion.[18]  That was not always the case in the transactions investigated.  In one instance the financial advisor did not use the most recent projections because the company did not provide them despite being requested to do so (*see* Section VIII.B, *infra*).  In a 2014 transaction, the financial advisors were told to rely on revised projections created solely for their use because the company's budget numbers were considered too optimistic (*see* Section VIII.D, *infra*).  The company's ordinary course numbers, however, continued to be used for all other purposes, including with lenders, with auditors for impairment analyses and in ongoing presentations to the CEC Board.  In addition, in 2013 management made a concerted effort to reduce long-term projections and make them more reasonable and achievable. Thus, while Caesars' auditors had in earlier years raised some questions about the company's projection process, at the time of this transaction the auditors had endorsed the quality of the process by which projections were developed.

- CEC has offered the opinion of Professor Lehn that rather than undervaluing the casinos transferred in these various transactions, the relevant financial advisors overvalued them by almost $700 million.[19]  The Examiner has reviewed this analysis and it is not persuasive.  For example, Professor Lehn's conclusion is largely based on his view that the terminal values estimated by the financial advisors retained by CEC and the Valuation and Special Committees of the CEC Board were artificially inflated because they assumed that capital expenditures would equal depreciation in perpetuity.  Not only does Professor Lehn's view contradict (and thus undermine) the very analyses that were performed by CEC's own financial advisors – on which CEC and the Sponsors rely to support their argument that CEOC received fair or reasonably equivalent value for the assets transferred – it is inconsistent with widely accepted business valuation theory and

---

[18]  *See* Section VI, *infra*, for a detailed discussion concerning projections.

[19]  They offered his opinion initially in a July 2015 meeting and in a February 2016 submission.

practice. Moreover, his underlying assumption seems to be that matching anticipated capital expenditures to depreciation means no new investment will be made. That does not appear to be accurate. Rather, it means that the level of new investment going forward will be at the same level as in the past. In any event, in performing his own valuations, the Examiner increased the capital expenditure projections used by CEC's original financial advisors as appropriate. Deloitte, CEC's auditors, also has explicitly stated that CEC's use of the depreciation amount as the amount for projected capital expenses in its own valuations was appropriate. Professor Lehn also advocates reliance on only one method of valuation – the discounted cash flow (DCF) method – while customary valuation methodology considers three valuation methodologies, including the DCF method. If that approach was followed by the financial advisors retained by CEC in connection with the valuations they performed, in a number of the challenged transactions the advisors would not have been able to opine that the consideration met the applicable "fairness" or "reasonably equivalent value" standard since the DCF calculations yielded the highest valuation numbers among the three methods.

## C. Attorneys

Prior to July 2011 CEOC had been represented by O'Melveny & Myers LLP (OMM), who had represented the Sponsors in the LBO. The lawyers involved in that representation moved to Paul, Weiss, Rifkind, Wharton & Garrison LLP (Paul Weiss) in late spring 2011, and since that time Paul Weiss represented CEOC in virtually every transaction investigated by the Examiner. In each of these transactions, first OMM, and then Paul Weiss, also represented CEC, CEOC's then 100% shareholder. During this entire period Apollo also was a very significant client of Paul Weiss on matters unrelated to Caesars. This fact was not known to the independent directors of CEC. The Caesars General Counsel was aware of this, and believed that Paul Weiss was more responsive to the Apollo (and TPG) directors than they were to him. Neither OMM nor Paul Weiss has identified any retention letter relating to its representation of CEOC, and it appears that none exists.

Certain creditors raised questions about the role of Paul Weiss in various of the transactions which were investigated. In analyzing the relevant transactions, the Examiner thus considered whether there are any claims that CEOC has against Paul Weiss.[20] In this regard, issues of conflict of interest, malpractice and aiding and abetting breach of fiduciary duty were analyzed. While the Examiner has concluded that probably by the Fall of 2012 and more clearly by the Fall of 2013 Paul Weiss did have a conflict of interest in representing both CEOC and CEC in at least some of the relevant transactions, for the reasons discussed below the Examiner believes that any claim by CEOC against Paul Weiss would be weak.

It is important to understand that it is not unusual for lawyers to represent portfolio companies of their private equity clients, although doing so can raise some ethical issues once there are public shareholders. Nor is it unusual for the same law firm to represent a parent

---

[20] Given when their representation ended, the Examiner does not believe there are any potential claims against OMM.

corporation and its 100% owned subsidiary.  In each of these circumstances, however, the situation changes once the company being represented becomes insolvent.

Once insolvent, a company's residual beneficiaries change from its equity holders to its creditors.  When the subsidiary is insolvent, actions that may be in the interest of the parent may not be in interest of the subsidiary.  Nonetheless, there certainly are circumstances where a parent and its insolvent subsidiary can be represented by the same counsel, such as when they are litigating against a common defendant.  The situation is different, however, when the parent and insolvent subsidiary are on opposite sides of the same transaction and the same law firm purports to represent both entities.  In that case the interests of the two entities diverge.  And, once such a divergence of interest occurs, a lawyer can only undertake or continue representing multiple clients if it is clear that the lawyer can competently represent both clients and if both clients provide informed consent based on a full disclosure by the lawyer of the issues involved in the simultaneous representation.[21]  Here it does not seem that either requirement was satisfied.  The issues then are when was Paul Weiss adequately on notice of CEOC's potential insolvency, and in what transactions did such a divergence of interest occur.

The two instances where the interests of CEC and CEOC most clearly diverged were in the negotiations over the CERP transaction and in the creation of CES.  As to CERP, the transaction involved the sale of assets by CEOC to CEC which then transferred them to the new CERP entity, a 100% owned CEC subsidiary.  Thus by representing both CEC and CEOC, Paul Weiss was representing both the buyer and the seller in this transaction.  A seller's counsel might have considered a variety of issues.  One mixed legal and business issue involved in the transaction was the extent to which certain purported indirect benefits to CEOC from the transaction could or should be counted as consideration.  These indirect benefits accounted for over 70% of the consideration received by CEOC.  While whether to consider these indirect benefits as consideration was ultimately a judgment made by Perella Weinberg, the financial advisor involved in the transaction, whether on the facts of this case it was appropriate to do so also involved a legal issue (which Paul Weiss in fact analyzed).  A zealous advocate for CEC would argue that including these benefits as consideration was legally justified.  A zealous advocate for CEOC could well have taken the opposite position.  This issue is discussed at length in Section VIII.C, *infra*.

The creation of CES in the Spring of 2014 involved the transfer to CES by CEOC of a broad license to Caesars' unique loyalty program, Total Rewards, as well as its enterprise-wide management responsibilities.  CES then licensed Total Rewards to CERP and Growth.  *See* Sections VIII.D & F, *infra*.  The expressed reason for the creation of CES was concern over a possible CEOC bankruptcy.  How to structure the rights of CEOC, CERP and Growth under this structure was a complex task involving competing interests of CEC (which owned CERP and had a 58% interest in Growth) and CEOC.  Paul Weiss represented CEC and CEOC in these negotiations; the negotiations also included counsel for a special committee of outside CEC directors and counsel for a similar committee of CAC directors.  Paul Weiss thus represented both the licensor and the owner of the sublicensee.  A clear example of the adversity of CEC and CEOC in this transaction was the inclusion in the CES Agreements of provisions under which

---

[21]  *See* N.Y.R. Prof'l Conduct 1.7.

CEOC would forfeit all its governance rights in CES should it file for bankruptcy, which was then a known risk, and indeed the rationale for the transaction. A zealous advocate for CEOC most likely would have resisted such a provision. The Paul Weiss partner involved in the transaction explained the rationale for its inclusion as being the "penalty" "they" felt needed to be imposed on CEOC should there be a bankruptcy risking CEOC's ability to perform under the agreement because otherwise that would be unfair to the other CES members.[22]

The extent of the adversity in the Growth, Four Properties and B-7 Transactions is somewhat less pronounced. In the first two cases, properties owned by CEOC were being sold to Growth, in which CEC had a majority ownership interest, and where CEC special board committees were purportedly acting on behalf of CEOC. Similarly, in the B-7 related transactions, CEC and Apollo negotiated the terms of new CEOC loans and the modification of the terms of existing loans, including the release by CEC of its guarantee of certain CEOC debt. (*See* Section IX.B, *infra*.) While CEC and CEOC shared a common interest in aspects of these transactions, their interests were not completely aligned and a separate CEOC counsel could have considered whether independent directors at CEOC were required to evaluate whether proceeding with these transactions was in the interest of CEOC and its creditors. Moreover, in the B-7 Transaction a significant issue was the release of CEC's guarantee of CEOC's bond debt where the interests of CEC and an insolvent CEOC could easily have diverged. While the divergence of interest in these transactions is less clear, the fact remains that in those transactions no one was focused on CEOC's interest alone as opposed to how transactions impacted Caesars as a whole.

Since, as discussed above, CEOC had been insolvent since December 31, 2008, the real issue is when did, or should have, Paul Weiss recognized that there was a sufficient risk of CEOC being insolvent to trigger any of the above potential conflicts. Lawyers, after all, are not financial advisors and have neither the responsibility, nor likely the skill, to perform solvency analyses themselves. But whether an entity is solvent is a mixed question of law and fact.

Here Paul Weiss has argued first that it did not believe a conflict existed because CEC and the Sponsors were proposing transactions which were designed to benefit CEOC as well as CEC, and CEOC was paying its bills as they came due. A conflict, they argued, would only arise when they understood that a bankruptcy was sufficiently probable which, they say, was not the case at the time of any of these transactions. Paying current bills, however, is not the legal definition of solvency, and saying transactions were in the interests of creditors begs the real question since an independent counsel might have assessed the merits of these transactions, from CEOC's perspective, differently. Moreover, insolvency creates a potential conflict before a bankruptcy becomes probable.

Paul Weiss also argues that it was not on notice of CEOC's insolvency. Assessing when it was on notice of CEOC's potential insolvency is a complex issue. Based on the following, the earliest there is a reasonable case that it was on such notice is in the Summer/Fall of 2012 and a stronger case exists it was on notice in the Fall of 2013:

---

[22] This provision was amended on the eve of CEOC's Chapter 11 filing.

- Paul Weiss was intimately involved since 2011 in all aspects of CEC's response to the financial problems confronting CEC and CEOC, and the OMM partners who joined Paul Weiss in 2011 had been doing so since 2009.

- As discussed above, beginning in 2012 CEC's securities filings explicitly stated it would be unable to pay debts maturing in 2015.

- In June 2012, Paul Weiss was doing analyses of the potential implications of a CEC/CEOC bankruptcy on what became the Growth Transaction. While doing such analyses for a highly levered company is neither unusual nor proof of insolvency, the entire premise of the Growth Transaction was the very weak financial condition of CEOC.

- At least one Paul Weiss partner had in his possession an October 2012 Apollo presentation which made clear that absent an increase in CEOC's EBITDA from $1.4 billion to $2.2 billion – an extraordinary leap – CEOC would have negative cash flow every year. That same deck made clear CEOC could not pay maturing debt in the coming years.[23]

- In connection with the CERP Transaction, in July 2013 Paul Weiss did research on the implications of a CEOC insolvency.

- Numerous Paul Weiss partners had in their possession an October 2013 Caesars analysis which states that CEOC then was billions of dollars short of being able to pay debt maturities in the coming years.

- In October 2013, Paul Weiss was doing legal analyses of bankruptcy risks associated with transactions being considered by Apollo and advising on the implications of a CEOC insolvency on directors' fiduciary duties.

- In November and December 2013, Paul Weiss was advising Apollo on the potential operational impacts of a CEOC bankruptcy.

- In late 2013 or very early 2014, Paul Weiss was recommending independent directors be considered for CEOC because of the financial challenges relating to CEOC's debt or, potentially, a bankruptcy filing. It is difficult to argue that CEOC would need independent directors, but not its own counsel.

None of these facts may constitute definitive proof that CEOC was insolvent. Absent doing an actual solvency analysis, which Paul Weiss did not recommend, they are, however, plain indicia that CEOC was insolvent. Based on these facts, the Examiner believes there is a reasonable case that a Court would find that a conflict existed in one law firm representing both CEC and CEOC in at least the CERP and the CES transactions, if not all of the 2013-2014 transactions through June 2014.

---

[23] There are multiple versions of the presentation. The version that was in Paul Weiss' possession was the one that went to Gary Loveman.

The existence of a conflict, however, does not automatically create liability.  First, based on the evidence any claim against Paul Weiss for aiding and abetting a breach of fiduciary duty by either CEOC's directors[24] or CEC would be weak.  For there to be aiding and abetting liability there needs to be a "knowing participation" in the breach.[25]  A lawyer providing routine legal services does not meet that standard.[26]  Though difficult, however, pleading such a claim is not theoretically impossible.[27]  Delaware courts, however, have found lawyers potentially liable for aiding and abetting where they were alleged to have affirmative knowledge of some fraud or where their involvement in the breach went beyond their role as counsel.[28]  This simply is not the case here.

Even if a disabling conflict did exist, that would not by itself give rise to a claim for malpractice.  *Schafrann v. N.V. Famka, Inc.*, 14 A.D.3d 363, 364 (N.Y.A.D. 2005).  To establish liability in the non-aiding and abetting context, New York law would require clear proof that the conflict caused non-speculative damages.[29]  Establishing that in this case would be difficult.  For example:

- In the Growth and Four Properties Transactions, special committees were established at the CEC level and it would be speculative to conclude that a different result would have occurred if such committees were created at CEOC;

---

[24]  This would be a Delaware law issue.

[25]  *In re Nine Systems Corp. Shareholders Litig.*, 2014 WL 4383127, at *48 (Del Ch. Sept. 4, 2014).

[26]  *Heartland Memorial Hosp., LLC v. McGuire Woods, LLP*, 518 B.R. 491, 503-4 (N.D. Ill. 2014); *Sample v. Morgan*, 935 A.2d 1046, 1065 (Del. Ch. 2007)("[i]n most fiduciary duty cases, it will be exceedingly difficult for plaintiffs to state an aiding and abetting claim against corporate counsel").

[27]  *Sample*, 935 A.2d at 1065 ("Delaware has no public policy interest in shielding corporate advisors from responsibility for consciously assisting the managers of Delaware corporations in breaching their fiduciary duties.  If well-pled facts can be pled that support the inference that a corporate advisor knowingly assisted corporate directors in breaching their fiduciary duties, Delaware has a public policy interest in ensuring that its courts are available to derivative plaintiffs who wish to hold that advisor accountable to the corporation.").

[28]  *See Sample,* 935 A.2d at 1065 (Del. Ch. 2007); *CMS Inv. Holdings, LLC v. Castle*, C.A. No. 9468-VCP, 2015 WL 3894021, at *21 (Del. Ch. June 23, 2015); *Royal Indemnity Co. v. Pepper Hamilton LLP*, 479 F. Supp. 2d 419, 431 (D. Del. 2007); *but see Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 519 (D. Del. Bankr. 2012); *In re Brown Schools*, 368 B.R. 394, 413 (D. Del. Bankr. 2007).

[29]  To prevail in a malpractice action under New York law, a plaintiff would have to establish that Paul Weiss failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession, and that the firm's breach of that duty proximately causes the plaintiff to sustain actual and ascertainable damages.  *Carrasco v. Pena & Kahn*, 48 A.D.3d 395, 396 (N.Y.A.D. 2008).

- In connection with CES, the "penalty" provision described above was eliminated on the eve of bankruptcy, and concluding that other provisions of the relevant agreement would have been different again requires a fact finder to engage in speculation; and

- In CERP it is difficult to know whether a CEOC attorney advocating that the indirect benefits should not be considered would have impacted the assumptions that were provided to Perella for its opinion or Perella's conclusions; Perella had its own counsel to consult with on the issue and came to the considered view that they did provide value to CEOC.[30]

In sum, while a conflict existed which Paul Weiss should have recognized, any claim against Paul Weiss for damages would be weak. Although the conflict was real, and Paul Weiss lawyers should have recognized the need for independent directors and advisors at CEOC by no later than late 2012 – early 2013, and advised its clients accordingly,[31] the evidence does not support a conclusion that Paul Weiss lawyers knowingly acted at any time to injure or prejudice CEOC or its creditors.

### D. Remedies

This Report identifies a number of potential fraudulent transfer claims. The remedy for such a claim can include either an order for a return of the property or money damages. In practice, courts most often award damages but that is in part due to the fact that this is the most common remedy sought by plaintiffs. Where valuing an asset is particularly difficult, that is a factor that could cause a court to order return of the property. In general, this Report identifies the remedies available under particular claims but does not predict how a court would exercise its discretion in crafting a remedy. Where monetary damages can be calculated, the Report does so.

If the value of the property has increased since the time of the fraudulent transfer, the monetary remedy would be for the value of the property at the time of the judgment as opposed to the value at the time of the transfer. A good faith transferee would be entitled to a lien in the amount of the cost of any improvements which contributed to the increase in value. A good faith transferee also is entitled to a lien for any consideration paid.

The Examiner has not computed the current value of the properties subject to fraudulent transfer claims. Instead, his damage calculations are based on the value of the properties at the

---

[30] Perella told the Examiner that it never focused on the 2010 Management and Shared Services Agreements which were relevant to the validity of those assumptions. A separate CEOC counsel might well have brought those agreements to their attention.

[31] Paul Weiss' conflict, and failure to advise CEC and CEOC of the need for independent directors and advisors and the fraudulent transfer and other risks arising out of CEOC's financial condition and unsustainable debt loan sooner, are factors that a court would likely consider in assessing any reliance on advice of counsel defense that may be asserted by or on behalf of CEOC's directors, CEC or the Sponsors.

time of the transfer, which is the same valuation used to determine whether fair or reasonably equivalent value was provided in connection with the transfer. Calculating new valuations would require extensive additional work and would need to be based on the most recently available results and projections. Moreover, if ultimately there is litigation, the correct current number would need to be calculated as of the time of any future judgment. As discussed above, the transferees of these properties have argued as to a number of them that the value has not increased, and indeed is lower.[32]

Remedies for breach of fiduciary duty[33] and aiding and abetting are joint and several and typically determined on an out-of-pocket loss basis. Courts have wide discretion in fashioning equitable remedies, and in appropriate cases have awarded rescission or rescissionary damages (including potentially lost profits). A complete discussion of the legal standards applicable to remedies can be found in Appendix 5, Legal Standards, at Sections VI, XI.A.6 and XI.B.3.

### E. The 2009-Mid 2012 Transactions

Three transactions during the 2009-mid 2012 period were investigated. Two of them involved the structuring of a business venture focused principally on online poker and the WSOP brand (the 2009 and 2011 WSOP transactions). These transactions did not address CEOC's balance sheet issues; rather they involved how to structure a business venture involving the transfer of a CEOC asset to a new subsidiary of CEC. The third transaction – the 2010 CMBS Amendment – was designed to address financial issues confronting CEC and CMBS, but transferred some CEOC assets (trademarks) for no consideration. During this period, Apollo also implemented a series of financial transactions to address balance sheet issues, including a significant exchange offer in the Spring of 2009.

#### 1. The 2009 WSOP Transaction

In May 2009, through a complex series of steps, CEOC transferred to CIE, a newly created subsidiary of CEC, its WSOP existing sponsorship, media and licensing business and rights in the WSOP trademark and related intellectual property (WSOP Trademark and IP), and received back a license which allowed it to continue to use the WSOP Trademark and IP for in-person WSOP tournaments and in connection with the sale of WSOP branded products at CEOC's and its affiliates' properties.[34] CEOC also received preferred shares in a holding company with a stated value of $15 million. The purpose of creating CIE was to allow it to use the WSOP Trademark and IP as the basis for creating an online poker business. Online poker was viewed by some at Caesars (including CEO Loveman) as a potentially multi-billion dollar opportunity if legalized by the federal government, although the ability to secure such legislation

---

[32] If the value is lower, CEOC would still be entitled to the value at the time of transfer.

[33] In addition, breach of fiduciary duty claims against CEOC directors pre-June 27, 2014 are principally premised on the failure of transactions to satisfy the entire fairness doctrine rather than on the subjective bad faith of those individuals.

[34] The Las Vegas based WSOP tournament, which was the primary tournament, was actually held at the Rio, a CMBS property. CEOC received no compensation from the Rio for allowing it to host the tournament.

was understood to be a major uncertainty.  In addition, Marc Rowan of Apollo, a CEC director, has stated that while initially enthusiastic about the potential of an online poker business, by the time of the May 2009 closing he was far less sanguine about the prospects for this business.

When online gaming did not become legal throughout the U.S., CIE in 2011 acquired Playtika, which had a mobile play for fun gaming platform.  The CAC-CIE-CEC witnesses referred to the Playtika acquisition (and other later acquisitions) as involving "social gaming" and constituting a major strategic shift from the originally contemplated business plan for CIE.  Largely as a result of this acquisition CIE is now hugely successful.[35]  A December 31, 2014 valuation of CIE by PwC valued CIE at $███ billion.  While certain aspects of this valuation are based on speculative assumptions, including about the potential for online poker in Nevada and New Jersey (where it is now legal) and elsewhere in the U.S. (where it is illegal), $███ billion of value is attributed to the social gaming business.  The WSOP Trademark and IP are used for some of Playtika's games.  While the Examiner has not adopted any aspect of this valuation, it is indicative of the fact that CIE has become a very valuable asset.

Two related issues were investigated by the Examiner in connection with the 2009 WSOP transaction.  The first issue was whether there are any claims arising out of this transaction.  And second, if such claims by CEOC exist, is there a basis for obtaining all or some of the value associated with the success of CIE outside the real money online poker space?

In considering these issues certain facts provide important background:

- Mitch Garber, a successful entrepreneur, was recruited during the Summer of 2008 to lead the online real money poker venture.  While he wanted the venture to be housed in a new standalone entity into which he and his management team could invest, in his interviews he was clear that he was indifferent as to where within the Caesars structure – as a subsidiary of CEC or of CEOC – that entity was placed.  In a follow-up interview he added that one of his stated goals was to have an entity where regulatory scrutiny was minimized.

- An October 2008 presentation contemplated the new entity as being a subsidiary of CEOC.  By December that was no longer the case.  Later presentations contemplated CIE being a direct subsidiary of Hamlet Holdings (the entity through which the Sponsors and their co-investors own CEC), but that concept was abandoned at the last minute.  One rationale offered for having the new entity as a Hamlet Holdings subsidiary was that separating CIE out from the "bricks and mortar" business would allow it to trade at a higher multiple.  Witnesses did not recall why this structure was not pursued.

---

[35]  While Marc Rowan told the Examiner that he considered CIE's success to be at risk from a legal perspective, Mitch Garber – the CEO of CIE – disagreed.  It also is clear that TPG has viewed CIE as a valuable asset warranting added investment.  In an October 2012 presentation prepared by Apollo, expanded online poker also continued to be described as one of the "[c]ompelling upside opportunities."

- In the end, CIE became a subsidiary of CEC. Three reasons were presented for not having CIE as a subsidiary of CEOC: the ongoing costs, the potential pressure near term losses would place on loan agreement covenants, and a desire from a regulatory perspective to have CIE as far removed as possible from the regulated gaming entities. Some contemporaneous documents do reference covenant issues, although it was acknowledged by Caesars' witnesses that these issues could have been avoided by creating CIE as an unrestricted subsidiary of CEOC, and thus free of credit agreement restrictions. It also appears that CEOC could have afforded the then contemplated investment.[36] The regulatory explanation was first provided by Marc Rowan in his interview. Other witnesses do not recall this concern, although regulatory references are included in a document created when CIE was planned as a subsidiary of Hamlet Holdings. This regulatory concern may be another reason for the plan to create the new entity as a subsidiary of Hamlet Holdings. A gaming regulatory attorney used by Caesars and who had worked with Marc Rowan prior to 2009, but was not consulted about structuring this transaction, said that he regularly voiced general unease about the whole notion of real money online poker and as a general matter believed that it was preferable to separate that business from a bricks and mortar gaming operating company. Once it no longer was going to be a subsidiary of Hamlet Holdings, there is at least a question, however, as to whether there is a material difference from a regulatory perspective between CIE being a subsidiary of CEC or of CEOC.

- Play for fun online poker was part of the CIE business plan. CEOC previously had licensed the WSOP name for these purposes and was forecasted to receive about $1.2 million annually in gross profit from this source at the time of this transaction through a series of licensing arrangements with third parties. A January 2008 Booz-Allen report prepared for Caesars contemplated that some meaningful revenue would be earned from play for fun and described the then current business as having 45,000 unique monthly visitors playing an average of 13 games each. As of September 2008, however, it was understood within Caesars that play for fun would primarily be used to market real money online poker. It thus was not expected that play for fun would be a material source of revenue. Despite this assumption, in a post-transaction September 2009 presentation to the CEC Board, CIE contemplated that play for fun could produce $10-15 million in annual EBITDA after 5 years. While CIE witnesses have asserted that this document was just an attempt to "sell" the CEC Board on its businesses prospects, it is unlikely that CIE management would present to the Board numbers they viewed as meaningless.

---

[36] Between 2008-2014, CEOC funded over $3.3 billion in capital expenditures. So funding the $95 million in expenses estimated in an August 2008 CEC presentation to secure legalization of U.S. online real money poker would have been feasible. Also, all of CIE's acquisitions were funded via intercompany credit from CEC.

- At the time of the transaction Caesars did not have a business based on play for fun casino games other than poker, although Gary Loveman stated that as of that time such a business was still being considered.[37]

- The originally contemplated transaction would also have had the tournament hosting rights being assigned to CIE. Several witnesses stated the reason the hosting rights were dropped from this transaction was resistance from operators of the WSOP. An April 2009 e-mail exchange indicates a different reason. Prior to this April e-mail exchange, it had been contemplated that the then anticipated $70 million consideration for WSOP would be provided through a note. Apparently because of accounting issues, it was considered important for cash to be used instead of a note, and a proposal had been made that the Sponsors loan the $70 million to fund the transaction. In response, Apollo's David Sambur said no more than $10-20 million would be available for this transaction. This led to an internal analysis which determined that for $15 million all that could be acquired was the existing income streams from use of the WSOP Trademark and IP and not the tournament hosting rights. Following this analysis, tournament hosting rights were dropped from the transaction.

- No witness acknowledged actually negotiating the consideration of non-participating preferred shares with a stated value of $15 million, or explained how that number was developed and why it was paid in the form of preferred shares. Some witnesses, including Marc Rowan and Michael Cohen (the CEC Associate General Counsel active in this transaction) suggested that the price was set by Duff & Phelps through its fairness opinion. That was not Duff & Phelps' understanding. September and October 2008 documents valued the WSOP brand being transferred at $325 million and $398 million, while valuing the existing WSOP business at over $100 million and the potential new real money gaming business at $180 million or more. Garber rejected these numbers as fanciful, but acknowledged that the brand itself – which was then viewed as being an important asset for the online poker business – had some value. The Examiner agrees that these numbers are not realistic, although they do reflect a judgment that the WSOP brand and the upside potential of the new business did (and do) have value. By December 2008, a presentation valuing only the then existing streams of income (and attributing nothing to the WSOP brand or any potential future upside) valued the business being transferred (including the hosting rights) at $85 million and noted that Garber had agreed to this number. A later presentation reduced the value to $70 million. In the end it appears that the price was the function of the April 2009 internal Caesars valuation of selected streams of income discussed above. No value was attributed in this analysis to any potential upside from real money online poker or from exploiting the WSOP Trademark and IP in new ways.

---

[37] He explained that poker was the preferred business since Caesars had a strong poker brand in WSOP, but did not have that kind of differentiating brand for other casino games.

- No independent directors existed at CEOC to evaluate or negotiate this transaction. Thus, while what would have occurred if such directors had been in place cannot be determined with certainty, their absence meant there was no one to advocate, among other things, for CEOC to receive an equity interest or some other way to capture some of the upside (*e.g.*, an earn-out provision) in the new venture. Indeed, all decisions regarding this transaction were made by the Sponsors and the CEC Board. The two person insider Board of CEOC simply ratified the results by executing a written consent. CEOC also lacked its own counsel for this transaction as the same internal counsel and external counsel (OMM) represented CEC and CEOC. All this took place at a time when CEOC was under significant financial stress.[38]

As discussed above, there is a strong case that CEOC was insolvent at the time of this transaction under the balance sheet and adequate capital tests and a reasonable argument that it failed the cash flow test. As discussed in Section VII.A, *infra*, it also appears that the reasonably equivalent value for the WSOP Trademark and IP (even without attributing any value for the potential upside from real money online gaming) was between $66.2 million and $76.1 million, and (assuming this is the value of the WSOP Trademark and IP) that the preferred stock was only worth between $9.9 million and $12 million. Thus, subject to the statute of limitations issue discussed below, there is a strong argument that this transaction was a constructive fraudulent transfer. While CEC did obtain a fairness opinion from Duff & Phelps, that opinion substantially relied on numbers provided by a CEC employee who was going to join CIE, the buyer. Moreover, as discussed in Section VII.A and Appendix 7, Valuation at Sections III.A & D, even without including any potential upside as part of the consideration, the opinion overvalued the preferred shares and undervalued what was transferred.

As discussed at Appendix 5, Legal Standards at Section III.A, for there to be an actual fraudulent transfer there needs to be evidence of an intention to hinder, delay or defraud creditors. That evidence can be provided by direct evidence or circumstantially and, as part of their analysis courts look at the presence of so-called badges of fraud. While an argument can be made that the 2009 WSOP transaction also constituted an actual fraudulent transfer because of the presence of certain badges – insolvency and transfer to a related party under the control of CEC – a claim that the transaction was intended to hinder, delay or defraud creditors would be weak. Among other things, this transaction involved decisions on how to advance a particular line of business and, although creditor groups have argued to the contrary, there is no persuasive evidence of any act intended to impact creditors.

Again subject to the statute of limitations issue, there also is a reasonable breach of fiduciary duty claim against CEOC's Board members and CEC, and a reasonable aiding and abetting breach of fiduciary duty claim against the Sponsors arising out of this transaction. CEOC was insolvent, there was no process to protect the interests of CEOC, and there was no

---

[38] Early 2009 was a difficult period for CEOC and until the completion of an April exchange offer there were concerns about the need for a bankruptcy. And in discussing the proposed creation of CIE as a subsidiary of Hamlet Holdings, Craig Abrahams (a Caesars soon-to-be CIE employee) noted that this structure was a positive from a bankruptcy perspective.

negotiation over the price. Under the entire fairness standard, which in these circumstances would apply, a reasonable claim exists based on the CEOC directors' failure to take measures designed to ensure that CEOC received fair value (including the upside potential) presented by this corporate opportunity.

As to the fraudulent transfer claim there is a reasonable argument that the statute of limitations is extended to 10 years by virtue of the existence of a so-called "Golden Creditor." *See* Sections VII.A and XI, *infra*. That argument does not apply to the breach of fiduciary duty claim. An argument also can be made that the breach of fiduciary duty statute of limitations should be tolled under the doctrine of equitable tolling. The press releases announcing the transaction were imprecise as to the location of the new entity in the Caesars structure (simply saying that CEC had created a new entity) and in organization charts the 2009 and 2010 10-K's mistakenly identified CIE as a subsidiary of CEOC. That mistake was not corrected until the filing of the 2011 10-K in 2012.[39] CAC has argued that filings relating to CEOC's loan agreement provided disclosure because they did not list CIE as one of CEOC's subsidiaries. These filings, however, only listed restricted subsidiaries of CEOC. Such notices thus are not adequate corrections of the 10-Ks since CIE could have been created as an unrestricted subsidiary of CEOC. There is, however, no evidence that the mistake in the 10-Ks was intentional, making a tolling argument premised on concealment difficult. Thus, CEOC's creditors would have to establish that they were not on adequate notice that the subsidiary created in 2009 was a CEC, not a CEOC, subsidiary. This will be a fact intensive dispute which will involve discovery of key creditors. The Examiner did not conduct this discovery.

The most significant issue, however, is what would the appropriate remedy be under either a fraudulent transfer or breach of fiduciary duty claim, and can CEOC recover any of the value of CIE attributed to "social gaming." As discussed at Section VII.A, *infra*, a variety of arguments have been advanced in support of such a recovery. For example, it has been argued that the Playtika business represents the natural growth of the asset transferred and thus is recoverable under the fraudulent transfer claim. It is difficult, however, to argue that social gaming is simply an improvement on what was transferred when it was not CIE itself that was transferred. What was transferred was the WSOP Trademark and IP, which did itself not lead to social gaming. There likely would, however, be a claim for profits derived from the use of the WSOP Trademark and IP in CIE's social games, but that is a relatively modest number.[40] The strongest potential argument to recover the value of "social gaming" is based on a breach of fiduciary duty/usurpation of corporate opportunity claim against CEC and aiding and abetting claims against the Sponsors. In considering a remedy for such a breach, a court would have wide discretion. In evaluating such a claim, certain facts seem particularly important:

- What has been referred to as Playtika's "social gaming" is largely play for fun casino gaming involving, for example, slots and roulette. It can be argued that these types of games are just different types of gaming and, while not the same, they are not dissimilar from play for fun poker which was part of the original

---

[39] The 2011 3rd Quarter 10-Q filed in November 2011 did, however, state that in 2011 the WSOP hosting rights were sold to an unidentified subsidiary of CEC.

[40] The Examiner does not have sufficient data to calculate this number.

business plan, even though only limited revenue was then expected. As discussed above, play for fun non-poker casino games were at least being considered by Caesars at the time of the acquisition. While the play for fun business as it existed and was contemplated pre-transaction is in many ways different than the business developed through the Playtika acquisition, there is a plausible argument that the later business was a natural evolution from the earlier business. Indeed, Loveman told the Examiner that social games and play for fun games were essentially the same. Under this argument, what really happened is that the original business plan envisioned real money online poker to be the significant source of revenue with play for fun providing immaterial added revenue, but in light of the failure to secure broad based legalization of online poker, the roles of these contemplated revenue sources were reversed.

- There also is another type of difference between the play for fun business as it existed pre-transaction and social gaming. The former involved licensing the WSOP brand to third parties who simply would sell their games to users. Social gaming involves using your own platform to allow people to download the game for free with a relatively small percentage of them then spending money on things like "virtual coins." These games also can be played with multiple players. There is, however, a plausible argument that the social gaming form of play is part of the evolution of the games business generally, and that a company in the 2009 play for fun business would have naturally transitioned to the "social gaming" style of play along with others in the computer/mobile game industry.[41]

- The way this transaction was structured, CEOC transferred the WSOP Trademark and IP to an intermediate entity for the $15 million in preferred shares and moments later in a later step in this transaction, Holding Company (which then became a subsidiary of CEC) transferred that same WSOP Trademark and IP for 5.5 million shares out of the 9.16 million CIE shares that the Holding Company received. The remaining shares were allocated to Holding because of CEC's $10 million investment in CIE. At the time CEOC had the ability to contribute this $10 million.

- In 2013 CEC contributed all its CIE shares to Growth in return for its interest in Growth. In doing so, CEC retained an equity interest in CIE to capture a portion of the upside. This contribution now amounts to a meaningful interest in Growth.

Based on these facts, an argument exists that CEOC's directors (who were also the CEO and CFO of CEC) and CEC as controlling shareholder wrongfully allowed this corporate opportunity, and 100% of any upside, to be usurped by CEC at a time when CEOC was insolvent. The Sponsors would then be subject to aiding and abetting claims. Damages under such a theory could be lost profits or, possibly, the current value of CIE. The Examiner has not computed what the resulting damage number would be, but using the most recent PwC valuation

---

[41] While play for fun in 2009 used a licensing model, there is evidence that at least for on line real money poker, the original plan involved CIE ultimately operating its own platform.

of CIE's social gaming and real money online poker in Nevada and New Jersey businesses, the value would be in excess of the billion dollar plus range.[42]   An alternative under this theory of liability would be to award CEOC a percentage interest in Growth based on what portion of CEC's interest in Growth was attributed to CIE.   An offset against any damage claim would, at the minimum, be what was spent by CIE on its social gaming acquisitions and amounts invested by CEC in CIE.[43]

In sum, there are potential theories under which CEOC could recover the full value of CIE.   Doing so, however, will be difficult.   For example:

- CEOC would first have to demonstrate that it was a clear corporate opportunity rather than just a speculative bet on U.S. legalization.   While there is evidence to support the view that it was a genuine opportunity, as discussed above, there also is evidence that by May 2009 Apollo did not view this as a truly valuable opportunity.

- CEOC would have to prove that it was a corporate opportunity that CEOC was capable of exploiting.   While it may have had the financial wherewithal to do so, more importantly it would have to establish that there were no genuine regulatory reasons that justified CIE being established as a subsidiary of CEC rather than CEOC.   It might be able to do so, but these are real issues.

- CEOC would have to prove that social gaming was the same as play for fun poker and then that in 2009 play for fun was a meaningful part of the corporate opportunity when the clear driver of future profits was without question then perceived to be real money online poker.   Again, CEOC might be able to do so, but these too are real issues.

- CEOC would have to prove that the then existing business of licensing to third parties who sell a WSOP game was sufficiently similar to the current business model involving downloading games for free from CIE's own platform for use by multiple players at the same time.   Here too, it may be able to do so, but real issues exist.

- CEOC would have to prove that this claim is not barred by the statute of limitations which again, though possible, will not be easy and would require further fact finding.[44]

---

[42]   Although the Examiner has not fully analyzed or adopted PwC's numbers, what is clear is that CIE's business is very valuable.

[43]   Playtika was acquired in two stages in 2011 for a combined amount of approximately $115 million in cash.

[44]   There are two Bankruptcy Court cases which have construed the misappropriation of a corporate opportunity to be transfers and thus to be fraudulent transfers.   *Rajala v. Gardner*, No. 09-2482-EFM, 2012 WL 1189773, at *15 (D. Kan. Apr. 9, 2012); *Smith v. Nicholas/Earth*

- A court also could simply conclude that awarding such large damages to CEOC is an unjustified windfall given that in 2009 the business expected to be the driver of profits was real money online poker.

Given all of these obstacles, the Examiner believes that the claim based on recovering the full value of CIE is between weak and plausible – it likely would withstand a motion to dismiss, but there is less than a 50% chance of succeeding. A claim limited to the value of CIE attributable to real money online poker is more plausible, though still difficult. PwC most recently valued this portion of CIE at $██ million, but that number is likely too high because it includes aggressive assumptions about the future of the real money on line poker business.

While disputes over recovering the "social gaming" value will be the most strenuously contested, to the extent a court concludes that the value of the transferred WSOP Trademark and IP is too difficult to determine, it could order return of the WSOP Trademark along with damages based on profits earned by CIE from the WSOP Trademark and IP since its transfer. The amount of these profits has not been calculated, but would include all profits associated with the use of the WSOP Trademark and IP on the Playtika platform.

In the end, there is a strong constructive fraudulent transfer claim for the $54.2 million to $66.2 million deficiency in value between the value of the consideration paid and the value of the asset transferred – the WSOP – at the time of the transfer. There also is a reasonable argument that CIE would not be able to establish that it was a good faith transferee. Facts militating against it being able to do so are the Sponsors' (who controlled the decision making) knowledge of CEOC's financial condition, and the manner in which the price was established without any attempt to secure the best possible price. There was, however, a fairness opinion, although various of the assumptions forming the basis for that opinion were supplied by a Caesars' employee who was going to join CIE. If good faith is not established, CEOC would be entitled to a judgment in the amount of $66.2 million to $76.1 million, and CEC/CIE would only be allowed an unsecured claim for the value of the consideration it paid. [45]

## 2. 2011 WSOP Transaction

The September 2011 transfer of the hosting rights to CIE was a much more straightforward transaction. The transfer was completed in September 2011 and the consideration was $20.5 million, which was paid by reducing the then outstanding amount owed by CEOC under the revolving loan from CEC. Once again, while CEOC was likely insolvent, no consideration was given to having independent directors at CEOC and the same law firm –

---

*Printing, L.L.C.* (*In re Bob Nicholas Enter., Inc.*), 358 B.R. 693, 701-02 (Bankr. S.D. Tex. 2007). If CEOC were to prevail on such an argument, which is far from certain, it could attempt to rely on the existence of a Golden Creditor to avoid the statute of limitations argument.

[45] To the extent the value of what was transferred has increased, CEOC could be entitled to its value as of the time of the judgment. Because computing this value for this and other transactions would involve conducting extensive and time consuming new valuation analyses based on 2015 (or later) results, the Examiner has not undertaken this effort.

Paul Weiss[46] – represented all the relevant parties.   And once again no one acknowledges negotiating the $20.5 million consideration on behalf of CEOC.   Although the Sponsors' approval was needed for this transaction, they played a less significant role in its structuring than was the case with the 2009 transaction.   The motivation behind the transfer was concern by CIE that the tournaments were being operated in a manner which undermined the value of the WSOP brand, something which they continued to believe was an important asset.

As part of this transaction, it was necessary to determine what fee the Rio – the CMBS property where the main tournament was held – would pay to CIE for the right to host the tournament since CEOC had never received any compensation from the Rio.[47]   The fee to be charged was the subject of discussion among, at least, Craig Abrahams of CIE, Eric Hession, CEC Treasurer, and Michael Cohen.   What an appropriate fee would be is obviously a significant factor in evaluating the fairness of the price being paid to CEOC, and that was understood by those at Caesars involved in this transaction.   The higher the fee CIE could receive, the higher the price it should pay for the hosting rights.   In this connection, there is a troubling exchange of e-mails which suggests the fee was reduced in order to hold down the purchase price.   In this e-mail exchange Cohen questioned why the then draft VRC fairness opinion still had the fee at $2 million per year for three years and $7 million a year for two years.   Abrahams responded that it is $2 million a year for 5 years.   Hession then said:

> I thought it was $2M for three and $5M for two.  Why did we change it other than to reduce the purchase price.

Abrahams then responded:

> We did it to keep the valuation down and to keep the rights fee below what's in the valuation in the fairness opinion.  I would like to see it grow for various reasons (set precedent for future, etc.) but the fair thing is to keep it at $2M a year.

While the witnesses offer varying explanations for this exchange (*see* Section VII.B, *infra*), they would not be persuasive to a fact finder in explaining why it was appropriate to reduce the rights fee from what had previously been discussed.   Moreover, when CEC was contemplating selling the Rio to a third party and allowing the Rio to still host the tournament, it contemplated a licensing fee of $2 million a year for three years and $7 million a year for two years.

There are other problematic aspects to this transaction.   VRC, as permitted under its engagement letter, relied on information from Caesars but did little, if any, analysis or meaningful diligence in reaching its opinion.   Also, as discussed in Appendix 7, Valuation at

---

[46]   The lawyers at OMM who worked on the 2009 WSOP transaction moved to Paul Weiss in late spring  2011.

[47]   A small fraudulent transfer claim exists against the Rio for uncharged fees for the years CEOC was insolvent – 2009-11.   The ability to pursue such a claim would depend on the existence of a Golden Creditor so as to avoid a statute of limitations defense.

Section V.A, the VRC valuation relies upon a number of flawed or unsupported assumptions,[48] and reasonably equivalent value for the hosting rights was between $50.3 million and $55.9 million, not $20.5 million.

Consistent with the conclusions concerning the 2009 WSOP Transaction, there appear to be a strong constructive fraudulent transfer claim and a weak actual fraudulent transfer claim with damages being the difference in value between what was transferred and what was received, which is between $29.8 million and $35.4 million. Any breach of fiduciary duty claim would be time-barred. In light of the negotiating history, there is a reasonable argument that CIE was not a good faith transferee – it knew that CEOC was in a weak financial position and it knew that the price was set without anyone negotiating on behalf of CEOC and that an important element in that price, the rights fee to be paid by the Rio, was artificially set. While there was a fairness opinion in connection with this transaction, CIE knew, or should have known, that some of the key assumptions underlying that opinion were erroneous. In these circumstances CIE would only receive a $20.5 million unsecured claim in the CEOC bankruptcy and would not receive a lien or offset against the $50.3 million to $55.9 million damage award to CEOC. While damages are the most common remedy, CEOC could also seek a return of the hosting rights.

### 3. 2010 CMBS Loan Amendment and Trademarks Transfer

The 2009 to mid-2012 period also saw various steps being taken under the leadership of Apollo to address the balance sheet problems at Caesars. In connection with CEOC, those steps principally involved a number of debt exchanges which had the effect of extending maturities and purchasing CEOC debt in the market at discounts and securing amendments to credit facilities. For example, during the first eight months of 2012 CEOC entered into transactions which extended various maturities of its term loan from early 2013 until early 2018. In doing so, it paid down between 40% and 50% of the loans held by participating lenders at par and funded that pay down with $2 billion of first lien notes due in 2020.[49]

A major effort was also made to extend the maturities for the debt secured by the CMBS properties. This effort, led by Apollo, resulted in the 2010 CMBS Agreement. As background, it is important to remember that CEOC was not an obligor or guarantor under the CMBS loans. The CMBS entities were the obligors and CEC was the guarantor of the lease payments in the CMBS structure. At the same time, as a general proposition, a default on the CMBS debt would undoubtedly have a negative impact on CEOC.

The 2010 Amendment had three primary components. The first was an agreement to extend the maturities on this debt from 2013 to 2015. Second, CEC agreed to a program to use excess cash flow to purchase CMBS debt at negotiated discounts with some protection for the

---

[48] For example, it assumed that the tournament would be moved from the Rio to a Las Vegas strip property, when there were no plans to do so, and then inappropriately assumed that such a transfer would reduce the revenue associated with the tournament.

[49] "Caesars Entertainment Discussion Materials" Presentation (Oct. 2012), at PRIV_INVESTIG_00047921 [PRIV_INVESTIG_00047907].

sellers if circumstances improved.  And third, the lenders secured various benefits designed to increase their flexibility in the event of a default on the CMBS debt.

One of the benefits that the CMBS lenders secured was that even in the event of a default, they could require CEOC to continue to manage these properties, either for a transition period or for the longer term.  In these circumstances the CMBS properties also would continue to pay their share of allocated and unallocated expenses in addition to a management fee, although that fee was effectively paid to CEC, not CEOC, even though CEOC was providing the services. This ability to stay in the system was valuable, because as Gary Loveman, CEC CEO, stated, the CMBS Las Vegas properties were particularly reliant on Total Rewards, the Caesars loyalty program.  The agreement also included a license for the CMBS properties to continue to use Total Rewards.[50]

At the same time, the lenders wanted to enhance their ability to leave the Caesar's system in the event of a default.  In the view of the OMM lawyer (now Paul Weiss lawyer) involved in the transaction, the attitude of the lenders at that time, who were largely the original 2008 lenders, was that separating from Caesars in the event of a default was a real possibility. Consistent with wanting to make this option easier, the lenders secured ownership of the property-specific trademarks (Rio, Paris, Flamingo).  In 2008, they had received a license to use these trademarks, but by securing title to them, the lenders improved their position.  What the CMBS lenders did in 2010 thus was to improve their position, whether or not they chose to allow CEOC upon a default to continue to manage the CMBS properties.

CEOC (and its subsidiary owning the trademarks, CLC) received no consideration for this transfer and no fairness opinion was secured in connection with this transaction.  As discussed in Section V, Solvency, *infra*, CLC was likely insolvent on the date of the transfer.  As calculated by the Examiner, the value of what was transferred was between $42.9 million and $123 million.

The transfer was structured so that CEOC, as sole member of its subsidiary CLC, caused CLC, which owned the trademarks, to make the transfers.  CEOC acted at the direction of CEC. Because there is a Golden Creditor as to CEOC, but not as to CLC, in order to avoid a statute of limitations defense a constructive fraudulent transfer claim would need to be structured as a claim by CEOC against CEC for directing the fraudulent transfer through a substantive consolidation or veil piercing theory.  The Examiner believes that such an argument would be plausible and thereby would allow the CEOC Golden Creditor to apply to this transaction.  Thus while there otherwise would be a strong constructive fraudulent transfer claim based on the transfer of these trademarks, because of the statute of limitations issue this is only a plausible claim.  *See* Section VII.C, *infra*.

A statute of limitations defense likely would apply to any breach of fiduciary duty claim. These transfers were discussed in public filings in 2010, and there does not appear to be any viable argument that the statute of limitations should be tolled under equitable tolling or

---

[50] The entering into a 2010 Amended Shared Services Agreement and the issuance of this license, and the claims flowing from doing so are discussed in Sections VII.C and VIII.D, *infra*.

fraudulent concealment doctrines. And, as discussed above, the Golden Creditor doctrine does not apply to a breach of fiduciary duty claim.

## F. The 2012-2014 Transactions

Following the transactions discussed above, CEOC, acting through CEC and the Sponsors (primarily Apollo), began the process which led to a series of transactions which closed in late 2013 and in the first eight months of 2014. The articulated purpose of these transactions was to provide added liquidity to CEOC and extend debt maturities so as to create additional "runway" while awaiting the expected recovery in the gaming industry, to refinance the CMBS debt and, through the creation of two new entities, to secure new investment into the overall Caesars structure while better positioning that structure to exploit development projects.

The two new entities created were Caesars Acquisition Corporation (CAC), a new public company, and Growth. The concept was that the Sponsors and, to the extent they desired, other shareholders of CEC, would invest new capital into CAC, and CEC and CAC would become the shareholders of Growth. The former would hold a majority economic interest in Growth while CAC would be the managing member of this joint venture. The Sponsors and their co-investors were the majority shareholders of both CEC and CAC. No consideration was ever given to providing CEOC with an equity interest in Growth. The theory was that Growth, with its "clean" balance sheet (*i.e.*, not affected by CEOC's debt), would both develop new business opportunities and acquire properties from CEOC thereby increasing liquidity at CEOC and eliminating the need for CEOC to expand capital on properties requiring capital investment. Ultimately $1.1 billion was invested in CAC, with approximately $458 million coming from the two Sponsors. Marc Rowan of Apollo was credited with developing the concept leading to the creation of Growth. When announced, the market reaction to the creation of CAC and Growth was positive.

While these were the articulated goals in creating Growth, an October 2012 presentation prepared by Apollo provides evidence, strongly contested by Apollo and CEC, that there were other very significant goals as well.

First, this document makes clear that CEC and CEOC were in dire financial condition and that it was understood that a major restructuring of CEOC's debts was a real possibility. For example, while noting that increased liquidity could allow CEOC to repurchase debt at a discount it also made clear that CEOC would lack sufficient cash to make mandatory debt repayments to third parties through 2015 and that:

> $2.2 billion of CEOC EBITDA need to reach FCF [Free Cash Flow] breakeven (vs $1.4 billion today).

The presentation in articulating "what are we trying to solve for" goes on to state:

> It is too early to tell whether this is a restructuring or we will earn a return on our equity.

- But we do know there is substantial risk and variability around the outcome.

A key goal seemed to be to avoid a bankruptcy in the near term:

> Extend Caesars' runway and ensure no negative events during critical time period over the next 12-24 months.[51]

Among other things the new investment would:

> Invest equity to buy a controlling stake in strategically valuable unencumbered assets.

At the same time, through the creation of Growth, CEC and the Sponsors would enhance their position should a restructuring become necessary:

> The investment would

$$* \qquad * \qquad *$$

> Be used to support growth, foster deleveraging, and enhance equity value (could facilitate equity issuance for virtuous deleveraging process)

> Have significant downside protection and earn a return

> Could have ancillary benefits in the event of a restructuring.

And more:

> We want to strengthen our hand in a potential restructuring with as little capital outlay as possible.

$$* \qquad * \qquad *$$

> A transaction like this is the only way we see it to "have our cake and eat it too"

> Gets cash into Company at a critical time

$$* \qquad * \qquad *$$

> If things do not work out, our position is substantially improved vs the status quo.

In describing the advantages of this "partnership solution," benefits flow to CEC:

> CEC maintains ownership and upside participation

>> Less dilutive to CEC.

---

[51] Apollo witnesses have said this time period was important to allow for a refinancing of the CMBS debt. Another version of the deck refers to this as allowing time for a "turnaround."

And among the reasons for creating CGP at this time:

> Cash invested in partnership grows over time, thereby increasing value and "war chest" upon a potential restructuring event.

While this presentation does articulate benefits to CEOC, including in terms of increasing liquidity to repurchase debt and reducing loan covenant risk, it is evidence of a desire by CEC and the Sponsors to improve their position *vis à vis* CEOC's creditors in the event of a restructuring, while acknowledging that a restructuring and a loss of the Sponsor's equity investment was a real possibility.

Rowan stated he believed this presentation was prepared for use with TPG. No TPG witness recalls seeing this document and no copy of this document has been located in the TPG production. TPG witnesses have also denied that they understood that the transaction was intended to improve the Sponsors' or CEC's position in a possible CEOC bankruptcy or strengthen their hand in negotiating with creditors (although David Bonderman said there would be nothing wrong if that was the case). Nor did they recall the concept of creating a "war chest" for use in a possible restructuring as being a rationale for the Growth transaction. What Bonderman did suggest, however, was an intention to convey assets with strong cash flow to the new entity. He stated:

> What, as I understand it, we were trying to accomplish was to maximize the ability to pay debt, and to fund the capital needs of the Company. And the way to do that we were contemplating at that time was to take those assets which had excess cash flow, you might call it, or weren't in need of influx of cash flow, and put those in a place where they may be used to pay debt. Whereas the entities which had capital needs or didn't have express capital would be in another basket. And the idea ultimately was to get cash to places where it could be used most effectively.

> Mr. Davis: And as I understand, the cash that would be, could be used most effectively would be for new development projects and things of that nature.

> A: New development projects, capex, whatever. Yes.[52]

A modified version of this presentation was prepared when the concept of the Growth transaction was presented by Apollo to Gary Loveman in October 2012. While containing some of the language discussed above, deleted from what was presented to Loveman was the reference to strengthening CEC's and the Sponsors' hand in a potential restructuring and all of page 33, which contained the "have our cake and eat it too" and "war chest" language.

Apollo has argued that this presentation is focused on CEC, not CEOC, that CEOC's maturity profile had been addressed by extending principal maturities until 2015, and that the real crisis being solved for was CEC's exposure in connection with the CMBS debt. Apollo adds that the references to strategic or ancillary benefits only referred to the creation of a "war chest"

---

[52] D. Bonderman Feb 24, 2016 Tr. at 195:7-196:4.

of new money at CAC which could be used to facilitate a CMBS or CEOC restructuring.  Such funds, Rowan stated,[53] also could be used for such things as purchasing CMBS or CEOC debt at a discount.

It is true that this document does discuss CEC financial issues, but in the discussion of remaining areas of capital structure concern, covenant breach and liquidity problems at CEOC are two of the three areas discussed.  The CMBS maturity was the third area discussed.  And while it was widely understood that the CMBS structure would need to be refinanced in a different form, with inevitable difficult negotiations, the Sponsors, as acknowledged by Rowan and Bonderman, believed that it would be refinanced.  Indeed, the consolidated financial model included in the presentation assumes the CMBS debt would be refinanced.[54]  Because the CMBS debt maturities were coming due before CEOC's, the Sponsors decided to tackle the former first.

It is also true that there is one reference to the cash invested in Growth becoming a "war chest."  In context this appears to be a reference to the hope that by making this investment at that time the value of Growth would increase over time and ultimately create such a "war chest."  The operating assumption was that properties transferred to Growth were those that would increase in value.  Since any "war chest," however, was not in CEOC, but was in Growth, CEOC's creditors presumably would in any restructuring have to agree to material principal reductions or other concessions before the Sponsors would allow any funds in Growth's "war chest" to be used for the benefit of CEOC.  Moreover, since CAC was a public company with independent directors, those directors would have to approve any use of Growth's resources to assist CEOC.  There is, moreover, a later reference in the presentation about the benefits flowing from the increasing value of the assets in what became Growth.  It was described there not as a "war chest" available to facilitate a restructuring, but as something that "[p]rovides downside protection to capital provided by Apollo, TPG and other shareholders upfront."

As noted above, the concept of a "war chest" is used in only one place in the document, and that is in the discussion of why to undertake this transaction "now."  The other language quoted above is contained in the portions of the presentation describing the rationale for proceeding with such a transaction at all.  It thus does not seem credible that all the other statements are only intended to repeat the same advantage flowing from the creation of a war chest at Growth.  Moreover, others, including the CEO Gary Loveman and the principal internal counsel involved in these transactions, had no understanding that a purpose of creating Growth was to have a "war chest" for use in a possible restructuring.  Gary Loveman also stated that the notion of a "war chest" was inconsistent with what he was told at the time about the funds raised in the Growth transaction.  Rather than being told that Growth funds should be used potentially to facilitate a restructuring, he was instructed by the Sponsors to find ways to spend the money on investments so that expected returns could be earned for the shareholders.  Such investments

---

[53]  Sambur also described the benefits of "cash" being available.

[54]  *See also* discussion in Section VII.C, *infra*, regarding the expectations with regard to the CMBS refinancing – the lenders and sponsors all understood that a refinancing was in everyone's interest.

were expected to be in illiquid development projects, making it unclear how this "war chest" could be used later to do such things as buying CEOC or CMBS debt in material amounts. [55]

The most persuasive reading of this document is that it addressed both CEC and CEOC, that the Sponsors' and CEC's positions would be enhanced by having gaming assets and funds at Growth and by giving them a significant equity interest in Growth. This would better position them both in any restructuring negotiations, and if there was a CEC or CEOC bankruptcy (which the Sponsors plainly wanted to avoid), the Sponsors would be better able to preserve some value for their investment by having an equity interest in meaningful assets expected to increase in value, including CIE and whatever assets Growth acquired from CEOC. It was also believed by the Sponsors that the value of the assets acquired by Growth would increase over time.

CEC and the Sponsors have also argued that the creation of CGP and all the subsequent transactions were part of an overarching strategy to provide necessary "runway" so that the business would have time to recover. Rowan contrasted "cyclical" problems, where a business is confronting a down cycle but can be expected to recover, with "secular" problems where a business is in a state of permanent decline. In the former situation, which was what confronted Caesars, buying time by creating "runway," he argued, helps everyone, and particularly more junior creditors who would be harmed by a premature bankruptcy. In the latter situation, he said, an early bankruptcy may be more desirable.

There is no doubt that as a general proposition creating "runway" and avoiding bankruptcy are both desirable. These, however, are not the issues involved in these transactions. The fact that an entity was confronting a cyclical challenge does not mean that it was not insolvent, and here CEOC was plainly insolvent. Once that is the case, it is independent directors, not heavily conflicted equity holders and Sponsors, who should be making the judgments as to whether the price of creating more runway is justified and, if so, the structure and terms of the transactions designed to secure that added breathing space. Here, for example, as discussed in Sections VIII.A, B and D, *infra*, the cost of creating runway was to materially worsen the prospects of CEOC's Second Lien and unsecured creditors ultimately getting paid. At a certain point, runway may well have been in the interest of Caesars overall, including CERP and Growth, but may not have been in the interest of a deeply insolvent CEOC and its creditors.

### 1. The Growth Transaction

The transaction presented to the board in November 2012 had been designed by the Sponsors, including as to which assets were to be contributed and sold to Growth. Gary Loveman told the Examiner that it was the Sponsors who selected the assets to be contributed or sold to Growth, although he agreed with those decisions. Work by Paul Weiss and Apollo had been going on in connection with this potential transaction for months, including work relating to the implications for this transaction of a potential CEC or CEOC bankruptcy. Given that CEOC

---

[55] In reality, the contemplated development projects have not materialized and Growth has largely purchased more properties from CEOC and invested in CIE. As of December 31, 2013 it had $1.09 billion in available cash and as of December 31, 2014 it had $944 million and cash equivalents, including $452 million it received from CEOC in July of 2014 in the tender offer transaction discussed below.

was a highly leveraged entity in fragile financial condition, factoring in what would happen to the new entity in the event of a CEC or CEOC bankruptcy is hardly surprising and not proof that such a bankruptcy was then considered desirable or likely to occur in the near term. Nonetheless, the fragile financial condition of CEOC was the motivating factor for the creation of Growth and, as reflected in the October 2012 Apollo presentation, it was understood that there was a real risk that the Sponsors' equity could be wiped out in a bankruptcy or major debt restructuring.

When the potential Growth Transaction was described to the CEC Board on November 12, 2012, the goals of the transaction were more straightforward than those described in the October 2012 presentation:

- We want to continue to extend runway, exploit growth opportunities and improve cap structure

- We want to raise maximum proceeds at minimal cost and dilution, without increasing debt load

- Additional debt would likely be prohibitively expensive (junior or first lien debt)

- Significant common equity raise would likely be extremely dilutive and difficult to achieve in current environment

- We want to balance and manage liquidity through investments in capital projects and development that will grow EBITDA[56]

Neither the written materials nor the script prepared for Gary Loveman, Tim Donovan, the CEC General Counsel, and a Paul Weiss partner, referenced any of the "improve our position in the event of a restructuring" or "war chest" rationales discussed above.  And none of the CEC independent directors has indicated that he understood that these goals were part of the rationale for the creation of Growth and the related transactions.

The Board was told that to secure CEC's interest in Growth it would contribute a portfolio of CEOC senior notes (with a face value of $1.1 billion) and its interest in CIE, and that Growth would purchase from CEOC Planet Hollywood, its interest in a Baltimore joint venture then being developed, and 50% of the management fees associated with these properties.[57]  The presentation's fiduciary duty refresher made no reference to the potential insolvency of CEOC or the implications that would flow from such an insolvency, or to the entire fairness standard of review applicable to related party transactions.  Instead, it simply briefly summarized the standard duty of care and duty of loyalty obligations under Delaware law.

---

[56] "Venture Partners Transaction and Rights Offering, Presentation to the Board of Directors," (Nov. 12, 2012) PW_EXAMINER_002334786 [PW_EXAMINER_00233478].

[57] In early October 2012, in anticipation of the Growth Transaction, Apollo insisted, at the last minute and to the annoyance of Gary Loveman, that the Baltimore joint venture agreement allow CEOC to transfer its interest to an affiliated company.

There were two key components to the negotiations surrounding the Growth Transaction. First, there needed to be a negotiation over the value of the assets being contributed by CEC to Growth, as well as the management fees. The more valuable those assets, the higher the ownership percentage CEC, as opposed to CAC, would have in Growth. And second, there needed to be a negotiation over the price Growth would pay to CEOC for Planet Hollywood and the Baltimore joint venture interest. Moreover, the terms of the rights offering under which CEC shareholders and the Sponsors would be given the opportunity to purchase shares in CAC, CEC's public company partner in Growth, also needed to be finalized. Since CAC did not yet exist, the Sponsors negotiated on its behalf against CEC. Because the Sponsors had financial interests on both sides of the transactions, there were concerns about potential claims by CEC shareholders who might choose not to invest in CAC. A committee of independent directors thus was created at CEC – the Valuation Committee – to interact with the Sponsors. There is no evidence that this committee was created because of any perceived obligation involving or concern about CEOC or its creditors.

Caesars' General Counsel and Associate General Counsel have described certain differences of opinion over whether there was a need to create the Valuation Committee at CEC. Indeed, it was only created after the General Counsel of CEC who, uncomfortable with the advice he was receiving from Paul Weiss, that no such committee was required, sought a second opinion from another firm. There is no evidence, however, that those analyzing this issue considered how an insolvency of CEOC would impact an appropriate process for this transaction, or whether independent directors at CEOC would be required.

The CEC Valuation Committee did not adequately address governance issues, at least from the perspective of an insolvent CEOC. Thus:

- While the directors on the Committee were disinterested from the perspective of CEC, they were not disinterested insofar as CEOC was concerned. CEC was going to have a majority economic interest in Growth, the buyer of assets from CEOC. As such, whatever their subjective intent, CEC directors were not the right individuals to be entrusted with protecting CEOC's interests as the seller. Independent directors should have been put in place at CEOC, but this was not done until late June 2014, after all of the most significant transactions were completed.

- The Valuation Committee had limited authority. While as a result of a change in its original charter it was agreed that the CEC Board would not approve a transaction the Committee did not recommend, the Committee could not consider alternate structures, changes in what Growth would receive or acquire or market any assets to third parties. Thus, for example, it was not in a position, as independent directors at CEOC might have been, to argue that CEOC itself should receive some equity interest in Growth. This, among other things, would have been a way for CEOC to capture some of the value of CIE. There is no evidence that this possibility was ever considered.

- Final approval of the transaction rested with the full CEC Board, including the conflicted Sponsor directors. The Committee only could recommend the

transaction.  This weakness was partially mitigated when it was made explicit that the Board would not approve a transaction that the Committee rejected.

The Valuation Committee hired its own professional advisors, Evercore (as financial advisor) and Morrison & Foerster (as legal advisor).  Evercore was the primary negotiator with the Sponsors, reporting back to the Valuation Committee.  One of the most contentious aspects of the negotiation was over how to value CIE.  Negotiating from the perspective of a desire to minimize CEC's interest in the new entity and maximize CAC's interest, the Sponsors argued for a very low valuation for CIE.  Its initial proposal valued CIE at $400 million while at the same time PwC valued it at $ ██ billion.[58]  In the end, CIE's value was placed at $525 million plus an earnout of up to another $225 million of incremental value.  The notes contributed (having a face value of $1.146 billion) were valued at $749 million.

Ultimately, the price paid to CEOC for Planet Hollywood, the CEOC interest in the Baltimore joint venture and 50% of the management fees for these properties was $360 million. Based on the Examiner's analysis, that amount is between $437 million and $593 million less than what would have been reasonably equivalent value.  The principal reasons for this difference are:

- Evercore did not use the most recent projections for Planet Hollywood revenue.  It had asked to be provided with them, but management did not do so.

- Evercore treated Planet Hollywood as a regional property.  While it may not be the equivalent of the most valuable Las Vegas properties, it was a highly profitable Las Vegas hotel-casino, and should have been valued as such.

- Evercore used an erroneous latest twelve month EBITDA number.

- Evercore did not consider the projected EBITDA increases from Project Songbird, the new Brittney Spears-Planet Hollywood contract and the renovation of the Planet Hollywood theatre, although it did deduct the related capital costs.  They did so even though they had analyses indicating that the positive impact on the value of Planet Hollywood from Project Songbird could range from $13 million to $36 million.  As discussed in Section VIII.B, *infra*, TPG had stressed how important it was that this agreement, which was reached after the price for Planet Hollywood was agreed but before closing, not cause the purchase price to increase. Caesars' management understood this concern and, while the evidence is not wholly consistent on this point, spoke to Evercore and convinced them that Project Songbird would not have a material effect on EBITDA or their value. Contemporaneous company analyses, however, projected an annual EBITDA uplift of $8 million per year from Project Songbird.

---

[58]  The Examiner has not adopted this valuation and, as discussed above, this valuation may have included unrealistically high values for real money online poker.  The social gaming business was valued at $ ██ million.  The PwC valuation was used to calculate the value of stock used to compensate and incentivize top CIE management.

The Growth Transaction closed in October 2013, and generally was well received in the marketplace.  In recognition of the fact that Planet Hollywood and Baltimore were viewed at the time as assets of increasing value, an analysis done by Apollo and presented to CEC management shortly after the close of the transaction compared the transaction prices for Planet Hollywood and Baltimore, $280 million and $80 million respectively, with their estimated value in 2016, $579 million and $260 million.  Also, as this transaction was closing, Apollo was doing analyses demonstrating that CEOC was likely to run out of cash by the end of 2014 and that additional CEOC assets needed to be sold to Growth to deal with a $1.9 billion cash shortfall at CEOC through 2016.  Indeed, CEC had understood as early as 2012 that CEOC would need to sell assets in 2014 to avoid running out of money.

Based on CEOC's insolvency and its failure to receive reasonably equivalent value for the assets being sold, there is a strong constructive fraudulent transfer claim arising out of this transaction.  As with all such claims, however, the key issues revolve around valuations, and expert opinions on this subject will undoubtedly be contested.  CEC and the Sponsors also have asserted that the safe harbor provision of section 546(e) of the Bankruptcy Code would provide a defense to this claim, but there are a number of reasons why a court would likely find section 546(e) inapplicable, including the fact that the transfers of CEOC assets here were accomplished through transfers of membership interests in lower tier LLCs and thus were not made in connection with a securities contract.  (*See* Appendix 5, Legal Standards at Section V).

A more complicated issue is whether the Growth Transaction constitutes an actual fraudulent transfer because of an intent to hinder or delay.[59]  Such an intent can be established through direct evidence or circumstantially, including through the presence of so-called "badges of fraud."  Here a number of such badges are present: CEOC was insolvent, the consideration was inadequate, the transfer was to an insider (Growth, under common control by the Sponsors and CEC), and while the debtor did not retain possession or control, CEC and the Sponsors effectively did.  The process used for this transaction also failed to consider CEOC's insolvency and was plainly deficient as a matter of corporate governance.  The latest projections also were not made available to Evercore and, under pressure from the Sponsors, management convinced Evercore not to adjust the value of Planet Hollywood due to Project Songbird.  More significantly, as discussed above, the Sponsors designed this transaction and they effectively made the key decisions relating to this transaction on everything other than price.

There also is documentary evidence that the goals of the transaction included better positioning CEC and the Sponsors in a restructuring negotiation, improving their position in the event of a bankruptcy and allowing CEC to maintain ownership of the assets.  Bonderman also told the Examiner that the thought behind Growth included transferring to the new entity properties generating large amounts of cash.  And, as structured, the transaction accomplished all of these goals by removing assets from CEOC and putting them in another entity controlled by the Sponsors.  Moreover, by removing Planet Hollywood and its earnings from CEOC, it began the process of making CEOC even less likely to be able to pay its debts as they matured.  This process was accelerated by the later Four Properties Transaction.  The notion that a "legitimate purpose" was to provide liquidity to CEOC is undermined by the fact that from the third quarter

---

[59]  There is insufficient evidence to argue an intent to defraud.

of 2012 through the second quarter of 2013 – the very time when the Growth Transaction was being developed – CEOC repaid before the maturity date over $400 million to CEC under the Intercompany Revolver, and CEC never re-lent any of that money back to CEOC.[60]  If, for example, $280 million of the Intercompany Revolver had not been repaid CEOC could have retained Planet Hollywood and its ongoing growing EBITDA and had the same liquidity that the sale of that property provided.  *See* Section IX.G, *infra*.  Based on all of these considerations, there appears to be a strong actual fraudulent transfer claim based on the Growth Transaction.

The Sponsors, among others, have argued that courts will not find the intent required for an actual fraudulent transfer absent egregious facts, and that if there is a legitimate business purpose for a transaction there cannot be the intent required for an actual fraudulent transfer.  As to the latter, the presence of some legitimate business purpose is a factor weighing against a finding that there was an actual fraudulent transfer and, in appropriate circumstances, can offset the presence of badges of fraud.  The presence of a legitimate business purpose is not, however, dispositive and does not necessarily offset evidence of an intent to hinder or delay creditors.  The Seventh Circuit in addressing the issue of whether the requisite intent is present also looks to what the "natural consequences" were of the actions taken.  In sum, it does appear that courts look for something more than the ability to identify a few badges as being present, particularly where there is some legitimate business purpose for the transaction.   The evidence here, including the October 2012 deck and the various facts discussed above, along with the presence of a number of badges of fraud, provide support for a finding of the necessary intent and there is a strong claim for an actual fraudulent transfer.[61]

There also is a strong breach of fiduciary duty claim against CEOC's directors and CEC, as well as a reasonable aiding and abetting claim against the Sponsors and certain of CEC's directors affiliated with Apollo.  CEOC was insolvent, the process was inadequate, those making the decisions in designing and approving the transaction (particularly the Sponsors) were conflicted and as discussed in the Legal Standards Appendix, the entire fairness standard would apply this transaction.  Given the facts discussed above and the deficiency in the consideration, there is a strong case that this standard would not be met.

The amount of damages associated with these claims is the deficiency in the amount of the consideration – between $437 million and $593 million.  Monetary damages are the most common remedy although as discussed in the Legal Standards Appendix, a court could order return of the properties.  Growth also will have to establish that it was a good faith transferee if it is to get the benefit of Bankruptcy Code section 548(c) and obtain a lien for the amount of the consideration it paid ($360 million for the assets), and thus an offset to the value of the property

---

[60]  At the same time, changes in the agreement relating to this Intercompany Revolver were made which would make it more difficult for CEOC ever to re-borrow the money.  First, the facility was converted from one where CEC was obligated to lend on request to one where lending was at CEC's discretion.   Second, in order to borrow under the facility CEOC would have to represent that it was solvent.

[61]  The Sponsors also argue that the presence of counsel obviates the intent required for an actual fraudulent transfer.  Again, while that is relevant to the analysis, it is not dispositive, particularly where, as here, many of the factors supporting this claim did not involve legal advice.

rather than an unsecured claim for that amount. Here, Growth's agents for negotiating the transaction were the Sponsors who, among other things, knew of the dire financial condition of CEOC, understood there was a risk of bankruptcy and included as part of their goals in this transaction was the enhancement of CEC's and their position in a restructuring. At the same time, the fact that the transaction only proceeded once a fairness opinion from a reputable investment bank was provided, after genuine bargaining over the price, is important to the assessment of Growth's good faith. Moreover, the intent of the Sponsors to improve their position *vis à vis* CEC and CEOC's creditors may not be attributable to CAC/Growth since there is a reasonable argument that in doing so they were not acting in their capacities as agents of CAC/Growth. There thus is only a plausible argument that good faith will not be able to be established by Growth with regard to this transaction.

## 2. CERP Transaction

The October 2012 memorandum contemplated that CEC's and the Sponsors' next priority, apart from the creation of Growth, would be the refinancing of the CMBS debt. That refinancing ultimately closed in October 2013 and involved the creation of a new entity, Caesars Entertainment Resort Properties (CERP), which became the borrower on the debt used to replace the CMBS debt. Apollo, acting principally through Apollo CEC director David Sambur, took the lead in all aspects of this transaction, including negotiations with the lenders, and consulted with TPG on the key decisions.

Prior to the 2013 refinancing, CEC had purchased CMBS debt at a discount as part of a successful strategy to reduce the burden of that debt.[62] Nonetheless, as of June 2013 approximately $4.5 billion in CMBS debt remained outstanding and the existing CMBS properties did not have value sufficient to support debt in that amount. This so-called "equity gap" varied in amounts over time and as of June 2013 was estimated at $840 million. Ultimately, this gap was filled in significant part through the transfer by CEOC of the Octavius Tower (Octavius) and the LINQ project to the new CERP entity.[63] The Octavius was a recently completed luxury tower in Caesars Palace designed to cater to high-end guests. The LINQ was an ambitious project designed to create a retail-entertainment strip adjacent to CERP and CEOC Las Vegas properties. It also included a casino and the world's largest "observation wheel." As of the time of the transfer CEOC had spent approximately $875 million on these projects and it was subject to $450 million in debt which was ultimately assumed by CERP.

No serious consideration was given to using any non-CEOC assets to fill this "equity gap." This was true even though, as discussed above, CEOC was neither an obligor nor a guarantor of the CMBS debt. Other possible sources of equity – CIE and the bond portfolio of over $1 billion of CEOC debt – were deemed unavailable for the CERP transaction because CEC had already decided to contribute those assets to Growth in order to purchase CEC's majority interest in that entity. The decision to use the Octavius and the LINQ project to fill this equity

---

[62] As discussed in Section IX.G, *infra*, at times CEC required CEOC to repay amounts outstanding under the intercompany loan in order to fund these debt purchases.

[63] The remainder of this gap was filled by CMBS lenders agreeing not to be repaid at face value and the contribution of $200 million in cash by CEC with proceeds from a sale of equity in CEC.

gap was made by the Sponsors and presented to the lenders.  Initially, Apollo proposed that the Octavius and the LINQ just become co-borrowers, and that they not be transferred to CERP. The lenders rejected this structure and insisted that title be transferred to CERP.

While CEOC thus was central to the transaction, its directors  played no meaningful role in its structuring and negotiation with the lenders.  CEC, which owned the CMBS properties and then owned CERP, acting through David Sambur, was on the "buy side" in the sale of the Octavius and the LINQ, but it also effectively controlled decisions on the "sell side."  This included being the interlocutor with the firm Apollo/CEC retained to provide a "fairness" opinion to the CEOC Board – Perella Weinberg (Perella).  And, once again, there is no evidence that anyone negotiated over the amount of consideration CEOC should receive for these properties. It was suggested by some witnesses that Perella negotiated on behalf of CEOC.  That is not accurate.  All Perella did was negotiate over what would be enough consideration for it to provide its  opinion. That is very different.  All of this might have been appropriate if at the time CEOC was solvent, but by the time this transaction closed in October 2013, there is a strong case that CEOC was insolvent and, as discussed above, those involved in this transaction should have treated it as such.

Apollo initially argued to Perella that no monetary consideration was required to be paid to CEOC, and that two types of indirect benefits would be sufficient.  Acting principally through Sambur, Apollo presented the following as providing sufficient consideration:

- CEC was the guarantor of the lease payments under the CMBS structure and in the CERP agreement there was no CEC guarantee.  Apollo asserted that removal of this CEC lease guarantee provided a $4.4 billion benefit to CEOC.[64]

- Apollo assumed that absent an agreement, the CMBS lenders would immediately declare a default in 2015 and remove the CMBS properties from the Caesars system, and the properties would then promptly stop paying their portion of allocated and unallocated costs.  Apollo calculated those costs at $140 million annually and assumed that they would never be reduced, despite the departure of six significant properties from the system.  It then applied a 12.5 multiple to that number.  The result was a purported $1.8 billion benefit to CEOC.  Apollo also argued that a CMBS default would be generally harmful to CEOC.

Perella concluded that the lease guarantee indirect benefit was too speculative and difficult to value to be counted as consideration.  Not only is this true, but the release of this guarantee really is primarily a benefit to CEC.

Perella, which was represented by its own counsel, did accept as consideration the avoidance of having costs reallocated back to CEOC upon a CMBS default.  Following

---

[64]  In an earlier analysis, unrelated to the CERP Transaction, Apollo had valued the benefit to the CMBS Properties of the release of this guarantee at $400 million.  After Perella pushed back on Apollo's $4.4 billion proposal, Apollo used a similar methodology to conclude that release of the lease guarantee provided a benefit to CEOC of between $715 million and $762 million even though CEOC was not an obligor of the debt.  This too was rejected by Perella.

diligence, however, they concluded that some of those costs could be eliminated over time and that the value of this consideration was $329 million to $426 million. In reaching this conclusion, Perella stated in its opinion addressed to the CEOC Board of Directors that "At your direction, we have assumed that if the refinancing does not occur, the Propcos will almost certainly default on certain debt obligations upon the maturity of such debt obligations in February 2015 and that such default will result in the prompt separation of the Propcos from CEC with no ongoing shared services or relationship." In reality, however, the "direction" to make this assumption came from Apollo, not from the CEOC Board. More significantly, these assumptions were each very questionable:

- No witness – not from Perella, CEC or the Sponsors – was able to identify any precedent for including avoidance of these kind of costs as consideration in a transaction or fairness opinion.

- The valuation was being conducted in the context of an overall agreement. Also, everyone recognized that a refinancing was in everyone's interest and virtually certain to occur. While there undoubtedly were disagreements during the process, testimony and contemporaneous documents make clear that the lenders were constructive during the negotiations and, indeed, the refinancing was described by some witnesses as being lender instigated. Although CEC witnesses told the Examiner that they believed the threat the lenders would foreclose was real, a key lender involved in these negotiations has told the Examiner that it was not a realistic possibility that the CMBS lenders would ever end up foreclosing on the properties and assumed Caesars would continue to manage them no matter what occurred.[65] Another of the principal lenders told the Examiner the lenders' focus was not to take over management of the CMBS properties but to negotiate a deal. A Paul Weiss lawyer, describing these negotiations, said he was told by lenders' counsel that the lenders wanted to reach a consensual refinancing. Internal Apollo analyses assume and TPG and Apollo witnesses acknowledged that they expected the CMBS debt to be refinanced. And Marc Rowan stated that if in 2015 – when the debt matured – CEC continued to make the lease payments, they would not necessarily be in a restructuring. The actual chances of a default thus were far from "almost certain."

- Perella ignores the fact that while also securing additional rights should they want to leave the Caesars' system, in 2010 the lenders also negotiated for the right after a default to remain in the Caesars system, with CEOC still managing the properties, either for a transition period or for the long term. These rights were embodied in an Amended Shared Services Agreement and new management agreements. Presumably the lenders wanted the ability to do so because, as the Caesars' witnesses have uniformly maintained, the value of these properties would be materially diminished without the benefit of Total Rewards. While the Amended Shared Services Agreement was in their files, Perella witnesses told the Examiner they did not focus on it in connection with their valuation. They also

---

[65] The holders of the CMBS debt had changed since the 2010 negotiations.

were unaware that the lenders had the right to have the properties remain under the management of CEOC for a two year transition period or longer (and thus responsible for these allocated and unallocated costs) even after a CEC/CMBS default.  No one at the Sponsors or Caesars ever raised the existence of this right with Perella, and there is no evidence that Perella considered either of these agreements in performing its valuation.  In short, providing Perella with this assumption that formed the basis for their opinion is problematic given the existence of agreements which made the prompt separation of these properties from Caesars with the benefits from Total Rewards far from certain.[66]

- Perella's due diligence focused on the value to be attributed to the reallocated expenses rather than on the validity of the assumptions.

In the end, the issue is not whether the lenders actually would have stayed or left the Caesars system or whether they would have stayed for two years and then left upon a default.  The reality is that anyone trying to determine what would have happened was engaging in pure speculation.  In 2010 the then CMBS lenders received both improved rights should they later separate from Caesars and assurances they would be able to continue to have CEOC manage the properties after a default.  What occurred here is that smart people trying to minimize the cash paid to CEOC created a theoretical construct which was premised on a degree of virtual certainty which simply did not exist.  Based upon all the facts this indirect benefit thus was very speculative, and there thus is a strong argument that, like the release of the lease guarantee, this is not the kind of indirect benefit that would properly be considered to constitute consideration.[67]

Initially, Perella determined that it would not be able to issue an opinion based solely upon the value of "indirect benefits" to CEOC.  While Perella indicated there needed to be $250 million in cash or bonds for it to be able to render its opinion, following conversations with Apollo, they agreed to accept CEOC bonds with a face value of $150 million and a market value of $138 million at the time.  Ultimately, the consideration became $81 million in cash with the remainder in bonds.  The CEOC Board then approved the transaction at a 45 minute meeting on October 10, 2013.  In considering the transaction, they had before them a CEC/Apollo presentation (which still included the lease guarantee release as a benefit) and a Perella presentation (which did not).  Although Paul Weiss provided advice at this meeting, there is no evidence that the Board considered the possibility that CEOC was insolvent or the implications if that were the case.

Perella concluded that the transaction provided a net benefit to CEOC of $230 million.[68] It reached this conclusion by attributing $378 million to the value of avoiding the reallocated costs to CEOC, and valuing the contribution of cash and CEOC bonds at $144 million, the midpoint between the face value and market value of the bonds.  These benefits, it opined, more

---

[66] For some lenders taking control of the properties would at least initially be difficult for regulatory reasons.

[67] That is not to say that less speculative indirect benefits can never serve as consideration. They plainly can in appropriate circumstances.  *See* Section VIII.C, *infra*.

[68] This number represents the midpoint of their range of values and indirect benefits.

than offset what they computed to be the $292 million in equity value of the LINQ/Octavius assets being transferred.  As discussed above, no value should have been attributed to the reallocated costs.  In addition, while the Examiner's analysis attributes less value to the LINQ retail then does Perella, on an overall basis the equity value of the assets transferred as determined by the Examiner was between $329 million and $427 million, with a midpoint of $378 million.[69]  Thus, the Examiner's conclusion is that rather than a net benefit, CEOC suffered a net loss in the CERP Transaction of between $200 million and $298 million, with a midpoint loss of $249 million.  As discussed in Section VIII.C, *infra*, there were investor complaints about the adequacy of the consideration at the time this transaction was announced.

Although from the overall Caesars' perspective it was reasonable for CEC to refinance the CMBS debt, the manner in which it was accomplished gives rise to various claims by CEOC. First, there is a strong constructive fraudulent transfer claim arising from this transaction which, due to the way it was structured, does not fall within the section 546(e) safe harbor.  There is a strong likelihood that CEOC was insolvent at the time of this transaction and a strong argument that the consideration received by CEOC did not constitute reasonably equivalent value.

There also is a strong actual fraudulent transfer claim arising out of this transaction. First, there are a number of badges of fraud present – inadequacy of consideration, insolvency and transfer to an entity 100% owned by CEOC's parent.  Second, like the Growth transaction, this transaction involved removing potentially valuable assets from control of a financially troubled CEOC to a more stable entity controlled by CEC and the Sponsors.[70]  Third, Apollo presented assumptions to Perella involving the allocated costs issue which it knew or should have known were highly questionable.  And most importantly, CEC and the Sponsors were on both sides of the transaction – buyer and seller – and actively sought to secure the lowest price for the seller, CEOC, thereby clearly harming CEOC's creditors.  Not only did Apollo first propose that no consideration for CEOC was required beyond the purported indirect benefits discussed above, but they bargained down the amount of the consideration that Perella said would be required for it to be able to render an opinion that CEOC was receiving reasonably equivalent value, and provided questionable assumptions which were critical to Perella's opinion.  While there may have been a legitimate business purpose from CEC's and CMBS' perspective for this transaction, any such benefit to CEOC was less direct.  In any event, any legitimate business purpose was far outweighed by the evidence of intent discussed above.

There also is a strong breach of fiduciary duty claim arising out of this transaction against CEOC directors and CEC as controlling shareholder of CEOC.  In addition, strong aiding and abetting claims exist against Apollo and one of the Apollo CEC directors and a weak claim exists against TPG.  The corporate governance process surrounding this transaction was more than deficient; it was non-existent.  As discussed above, the same people acted for CERP and CEOC and actively sought to minimize the consideration paid to CEOC.  The CEOC directors were also

---

[69]  The Examiner's analysis for example, values the Octavius as worth between $213 million and $240 million.  Perella valued it at between $162 million and $203 million.  In August 2013, Apollo valued the Octavius at $280 million, more than the Examiner's valuation.

[70]  As a result of the refinancing of the CMBS debt, CERP, according to Perella, was in a financially secure position.

officers of or counsel to CEC. All this occurred at a time when CEOC was insolvent. Moreover, CEOC had no independent advisors. Perella, which provided the opinion to the CEOC Board, was not selected by the Board and its substantive interactions were with Apollo and Paul Weiss, who represented CEC, CEOC and CERP at the same time.[71] There thus is a strong argument that the entire fairness standard would not be satisfied.

The damages arising from this transaction begin at between $329 million and $427 million, the value of the property transferred. It has been argued that another aspect of damages to CEOC flowing from this transaction flows from the fact that CEOC no longer owns the most modern and luxurious tower of the hotel which is part of its crown jewel – Caesars Palace in Las Vegas. Instead, it has a 15 year lease for Octavius, with no contractual right to a renewal or certainty as to the terms of any renewal. The economics of this arrangement – Octavius is a critical source of revenue to CEOC, but CERP's actual investment plus a significant return is earned by CERP within the initial lease term – gives CERP leverage in any actual lease extension negotiation. There thus is a reasonable claim that the substitution of a lease for ownership of the Octavius adversely impacts the value of Caesars Palace. While it may not be practical for CERP to operate Octavius as an independent property, its agreement would necessarily be required in connection with any sale or refinancing of Caesars Palace. Valuing what thus could become a "hold up" right is, however, very difficult, and no monetary value has been ascribed to this "right" in the above damages calculation. Although the difficulty of quantifying this damage might suggest that a court could order as a remedy the return of Octavius instead of awarding damages for the transfer of this asset, returning the Octavius would be problematic from the perspective of the lenders, which expressly bargained for the inclusion of the Octavius as part of their collateral package. While the Examiner has not undertaken an exhaustive investigation of whether the CERP lenders were transferees in good faith, based on the available evidence it appears that they would be good faith transferees entitled to the benefit of their lien.

There also is at least a reasonable case that CERP will not be able to establish that it was a good faith transferee in this transaction given the manner in which the price was determined, including an effort to obtain the lowest price possible, and the fact that the knowledge of the Sponsors and CEC as to the financial condition of CEOC will be attributed to CERP for which they acted. Under these circumstances, CERP would not be entitled to a lien for the consideration it did pay – the cash and bonds valued by the Examiner at $129 million – and would instead receive an unsecured claim for that amount in CEOC's chapter 11 proceeding.

### 3. Four Properties/CES/Total Rewards

While the CERP and Growth transactions were being closed, work was already underway by Apollo on potential additional transactions. Analyses being done in the Fall of 2013 made clear that by the end of 2014 CEOC would effectively run out of money absent additional actions. And, as early as mid-2012, the Sponsors understood that CEOC would face a liquidity crisis by the end of 2014. The amount needed to avoid such a result and ensure liquidity going forward, as described in a CEC Board presentation prepared in November 2013 time frame, was

---

[71] Perella Weinberg's contact with CEC/CEOC financial staff was limited to due diligence type issues.

around $1.9 billion.  Given the already existing leverage at CEOC, issuing new debt that did not largely replace existing debt was not considered to be a viable option.  Attention thus turned to additional asset sales.   During this same period Apollo also was exploring various debt refinancing options, all of which involved releasing all or part of CEC's guarantee of CEOC's bond debt.  These potential transactions, and the transactions involving the later release of the bond debt, are discussed below and in Sections IX.A-C, *infra*.

Apollo, apparently with some input from some Caesar's management, identified four properties to be sold – Bally's Las Vegas, Bill's (now the Cromwell), the Quad (now the LINQ) and Harrah's New Orleans.  Once again, the CEO of CEC and CEOC has stated that he had no role in the selection of these assets for sale; it was, according to him, a decision made by the Sponsors.  Ultimately, this process led to the sale in May 2014 of the Four Properties plus 50% of the management fees that CEOC would otherwise charge to manage these properties to Growth for $1.815 billion in cash and the assumption of $185 million in debt.  Also part of this transaction was the transfer of 31 acres of undeveloped land and the creation of a services company, CES, to which CEOC transferred a broad irrevocable, royalty free license to Total Rewards and the property and company-wide management services which it previously had provided both to CEOC and non-CEOC properties within the Caesars structure.  The details of the CES and Total Rewards aspects of this transaction will be discussed following an analysis of the overall transaction.

### a.  The Four Properties

The concept of CEOC selling these properties to Growth was presented to the CEC Board on November 26, 2013.  Consistent with how the initial Growth Transaction was presented to the Board, it was described as a management proposal, although it was conceived by Apollo, which then secured the agreement of TPG.  The CEC Board approved proceeding with this potential transaction, and Gary Loveman then wrote to Mitch Garber, CEO of Growth and CAC inviting a proposal.   Each of the CEC and CAC Boards created special committees of independent directors to negotiate the transaction.   No independent directors were appointed at CEOC although the subject of having such directors was discussed by Paul Weiss at least with Apollo in late 2013 or very early 2014.  Before discussing the ensuing negotiations, some preliminary observations are:

- As with the Growth Transaction, creating a special committee of CEC independent directors did not protect CEOC's interest.  While purportedly negotiating to sell CEOC assets, they were directors of a company which was the majority owner of the buyer.  And CEOC was an insolvent entity with obligations to its creditors.  Thus while the involved CEC directors acted with subjective good faith, as an objective and legal matter they were in a hopelessly conflicted position.  Indeed, the lead independent CEC director on this committee acknowledged that while he did not see a conflict between CEOC and CEC, "CEOC and its obligations were not a consideration to the best of my recollection."

- While a few documents, including a December 2013 deck used for presentations to regulators, suggested the sale of these properties could be to third parties, that was not the plan.  As with other transactions, the decision was made by CEC and the

Sponsors both that they wanted the properties to remain in the Caesars structure and that selling them to third parties would produce a lower price. As discussed above, the latter belief was based on the view that if the properties lost the benefit of Total Rewards, they would be less valuable. For both of these reasons, the CEC Special Committee was not given the right to market these properties to third parties.[72] This transaction, however, involved three properties on the very valuable Las Vegas strip and a "super-regional" property in New Orleans. The ability to market those four properties together presents a different value proposition for a potential buyer than selling a single property. Such an acquisition would allow a buyer to acquire a valuable and significant presence in the heart of Las Vegas. Whether this combination of properties would produce a higher price was, however, never tested. And while in general an owner of a property is not required to sell that property to an unrelated party, once the entity owning that property is insolvent, those with fiduciary duties to the entity must take a broader view and consider the interests of creditors, which should involve at least marketing to third parties. A committee of independent CEOC directors could well have considered this alternative.

- A stated justification by some witnesses for the creation of Growth was that it would acquire from CEOC properties which had capital needs that CEOC could not afford. In addition, properties could be selected for sale if needed to generate enough proceeds to meet CEOC's cash needs. As implemented, there is a question, however, as to the validity of the "capital needs" justification. First, as discussed above, Bonderman told the Examiner that the properties to be transferred to Growth were those best able to generate cash, not those most in need of capital expenditures. Harrah's New Orleans also had no special unmet capital needs that could not have been funded by CEOC, and Growth has not made out of the ordinary capital expenditures at that property since the acquisition. Indeed, Growth spent less in 2014-2015 on capital expenditures at this property than was contemplated in the pre-transaction Long Range Plan. While the Cromwell was the subject of a $200 million plus modernization in process at the time of the acquisition, CEOC had financed this renovation and $185 million of associated debt was transferred to Growth in the transaction. CEOC had just recently refurbished a major tower at Bally's and since the acquisition Growth has spent only $26 million in capital improvements at that property. The Quad did require over $200 million in investment for a major renovation and Growth did assume this obligation, but to the consternation of some in Caesars management, the CEC Special Committee agreed that CEOC would be responsible for cost overruns. Moreover, in a March 27, 2014 Growth presentation to potential lenders for this transaction discussing all of the properties, Growth stated that as to maintenance capital these properties had "low maintenance capex requirements."

---

[72] They did have the right to consider what a third party would pay for these properties. Fred Kleisner, the principal negotiator for the CEC Special Committee, said that they performed this analysis through obtaining fairness opinions.

- CEC, the Sponsors and the CEC Special Committee were aware of the necessity of completing the Four Properties sale to avoid CEOC running out of cash. The problem was exacerbated, however, when before negotiations commenced between the Special Committees in January 2014, CEC learned that absent agreement on this sale Deloitte would have to include a going concern qualification in CEC's 2013 audit opinion scheduled to be completed in late February 2014. While Fred Kleisner told the Examiner that the CEC Special Committee felt it could decide not to do a transaction if the terms were not satisfactory, he also said that there was no "Plan B" to deal with the going concern issue should that occur. And Rowan indicated that the issuance of such a qualification, which then was an event of default under CEOC's credit agreement, could well lead to a free fall bankruptcy.[73]

- The Four Properties Transaction, along with the B-7 Transaction discussed below, was designed to provide increased "runway" to address CEOC's debt as well as avoid the going concern qualification. There was a cost, however, to doing so – by permanently removing the Four Properties from CEOC without materially reducing its debt, it made CEOC less able to service that debt in the future (which itself would raise going concern issues). Analyses done by Apollo in 2013 make clear that under the most optimistic of scenarios, CEOC would not be able to pay principal at par when its debts matured and that any refinancing absent a bankruptcy would necessarily involve securing lender agreement – particularly at the second lien and more junior levels – to a substantial reduction in principal. The Four Properties Transaction only made this situation worse since the $1.815 billion was primarily used to fund operating costs and interest, not to pay down debt. In February 2014 Centerview, the CEC Special Committee's financial advisor, presented to the Committee and the CEC Board an analysis which made clear that the cash proceeds from this transaction would be used to meet liquidity needs and not pay secured debt, and that the transaction would place CEOC in a significantly worse financial position. As reported by Centerview, over the 2014-2016 period, as a consequence of this transaction, CEOC's cumulative net revenues, cumulative EBITDA and cumulative free cash flow would all be materially reduced while leverage would jump from an already unsustainable 14.6x to 18.1x. An independent CEOC Board thus might have decided to do or not to do this transaction; it would have weighed the benefits of providing added liquidity and avoiding the risks of an earlier bankruptcy, which might have been necessary absent an agreement with creditors, against these long-term negative effects on those creditors. From CEC's and the Sponsors' position, creating this runway was perceived as a way to avoid such a potential earlier bankruptcy which would have put their equity at risk. There is no evidence that they considered not pursuing this transaction because of the long-term negative consequences for CEOC's creditors. The CEC Special Committee certainly did not consider this possibility. And, as a factual matter, this transaction enabled the Sponsors and

---

[73] M. Rowan Nov. 16, 2015 Tr. 271:10-273:19.

CEC to retain an equity interest in these properties through their interest in CAC and Growth, even if there were a CEOC bankruptcy.[74]

The CAC Special Committee retained Lazard as its financial advisor and Skadden Arps as its counsel.  The CEC Special Committee retained Centerview as its financial advisor[75] and Reed Smith as its counsel.  Because of the need under certain debt covenants that CEOC, and not just CEC, obtain an opinion that any transaction was on terms no less favorable then would be obtained in a comparable arms-length transaction – an opinion which as a matter of policy Centerview does not provide – Duff & Phelps was also retained by the CEC Special Committee to provide that opinion to the CEC and CEOC Boards.

On January 26, 2014 the CAC Special Committee conveyed an offer of $1.75 billion less assumption of the $185 million under the Bill's credit facility.  It also conditioned that offer on satisfactory assurances regarding access to Total Rewards, such as by transferring the assets underlying that program to a bankruptcy remote entity.  As discussed below in the discussion about CES and Total Rewards, a term sheet for a new services company to take over CEOC's system-wide management responsibilities and Total Rewards had already been created for Apollo prior to this demand being made.  The evidence is that Apollo began this process in late 2013 because of concerns about a possible CEOC bankruptcy or in anticipation that CAC would demand that such an entity be created for the same reasons.  The CAC Special Committee's offer also required that a solvency representation be provided for CEOC.

The CEC Special Committee considered the CAC offer to be unrealistically low and responded with a counter-offer of $2.75 billion which it hoped would cause CAC to become more realistic.[76]  At the time of this counter-offer, Centerview, using the January Business Plan which was largely based on the existing Board approved Caesars budget and the existing long range plan numbers, valued the Four Properties and 50% of the management fees as worth between $1.9 billion to $3.5 billion.  The CEC Special Committee also rejected the request for a solvency representation.

Lazard, on behalf of the buyer, believed that the January Business Plan was premised on unrealistically optimistic projections, and that view was passed on to Centerview with a clear message: that CAC would not likely agree to a transaction at the midpoint between the two offers and that CEC should review the reasonableness of the CEC management projections.  At

---

[74]  It has been argued that if fair market value was paid for the assets then creditors cannot be adversely affected.  That may be true if one only considers the financial condition of CEOC at the moment of closing.  But since proceeds were quickly used to fund cash shortfalls, the loss of EBITDA means creditors are less likely to be paid back principal although it did allow them to receive some interest.

[75]  While the Sponsors indicated varying degrees of unhappiness over how Evercore performed in connection with the Growth Transaction, there is no evidence that this influenced the decision not to retain them for this transaction.

[76]  The counter-offer also rejected the idea of creating a bankruptcy remote entity to hold the Total Reward assets.

the same time Kleisner[77] (who says he did this independently from any such communications from Lazard) asked CEC to review its projections. He told the Examiner that he did so because of certain "red flags" he saw upon reviewing the numbers and because of input from fellow committee member, and longer serving CEC Board member, Lynn Swann, that Caesars consistently missed its budgets. Following a review by the CEC finance team, a set of revised projections was created – the February Business Plan – which in the aggregate reduced the EBITDA projections by more than 12%. The February Business Plan was then provided to Lazard, which noted that as a whole it closely approximated Lazard's own views. Even if a seller lowered its projections for internal use, it would not necessarily provide them to the prospective buyer. Kleisner stated, however, that in these circumstances doing so was just being realistic and would facilitate a negotiated resolution. It is clear that the CEC Special Committee understood that there were time pressures to get a deal done quickly in order to avoid a going concern qualification. While the CAC Special Committee may not have been aware of the going concern issue, they plainly knew that CEOC needed cash and there is evidence in the CAC Special Committee minutes that they knew that CEOC was under time pressure to get a deal completed.

The February Business Plan numbers thereafter formed the basis for the CEC Special Committee's negotiating position. Moreover, the financial advisors' opinions relied on them. Indeed, Centerview stated in its Board presentation that it had been directed by CEC to use these numbers. After some back and forth, on February 10, 2014 the two Special Committees agreed on a price of $1.815 billion plus assumption of the Bill's debt of $185 million.

As discussed in Section VIII.D, *infra* and Appendix 7, Valuation at Sections XIII.C-D, the Examiner believes that there are a variety of weaknesses in the Centerview and Duff & Phelps analyses which led to the undervaluing of these properties. A significant cause of their doing so was their reliance on the February Business Plan rather than on the January Business Plan as updated in the ordinary course (which became the March Long Range Plan). CEC and CAC argue (among other things) that it was appropriate for them to do so because Caesars regularly failed to make budgets and the properties have thus far underperformed the ordinary course numbers. CAC particularly stressed that the Lazard numbers have been the most accurate predictor of future performance. The Examiner disagrees for the following reasons, while recognizing that in any litigation this will be a vigorously contested issue.

- As a general proposition, valuations should be based upon a company's ordinary course numbers, and not on numbers created solely to support a particular valuation or outcome. (*See* Section VI, Projections). This is precisely what happened here. The February Business Plan was used for no other purpose. Whether in dealing with auditors, lenders, regulators or for Caesars' compensation, it was the January Business Plan as updated in the ordinary course that was used. Indeed, as the January Business Plan was regularly updated, it was those updated numbers, not the February Business Plan, which formed the basis for presentations by CEC management to the CEC Board and which generally reported positive results (except as to Atlantic City).

---

[77] Kleisner is an experienced hotel executive.

- While it is true that Caesars as a whole routinely missed budgets, that was in material measure driven by failures to forecast accurately the Atlantic City market collapse, where between 2008 and 2014 EBITDA declined from $602 million to $131 million. Over the years 2011-13, the properties being sold met projections in some years and failed to do so in others. In the aggregate the properties missed budgets during this period by 2.8%; the reductions in the February Business Plan were more than 12% in the aggregate.[78] Further, Caesars had already reduced its revenue and EBITDA projections in Q3 2013, prior to the creation of the January Business Plan.

- While Deloitte had earlier raised questions concerning the Caesars projection process, by 2013-2014 it considered that process to be appropriate and was told by management that the projections process was reasonable.

- As discussed above, generally speaking the test for projections is what is known and knowable at the time, not future performance.[79] Here this is particularly true, since these properties were transferred in mid-2014 and in 2015 performance as to some of them improved.

Included in this transaction were 31 acres of undeveloped land. CEC has maintained that this land was a necessary component of this transfer because it was needed to satisfy county parking requirements for the transferred properties. But easements for 25.8 acres of land had already been granted for parking for use by the Flamingo, the Quad and the LINQ project.[80] None of the financial advisors (Centerview, Duff & Phelps and Lazard) knew that the 31 acres were included in the transaction and therefore none of them considered its value in reaching their conclusions. Among the others who were unaware or were unable to recall that this land was part of this transaction were Kleisner (the lead CEC Special Committee negotiator), Beilinson (the lead CAC Special Committee negotiator), and Loveman (the CEO).

---

[78] CAC presented an analysis going back to 2009 (based on the long range plan developed in 2008) showing the percentage by which budgets were missed was significantly more than 2.8%. Given the nearly unprecedented collapse in the overall economy during those years, including budget misses from that period, this analysis does not seem to be an appropriate way to measure the general accuracy of management projections.

[79] A good example of this is the smoking ban that went into effect in April 2015 for New Orleans: it was not known or knowable at the time and has had a negative impact on results there.

[80] These easements were granted in 2011 in exchange for a payment to CEOC of $1.7 million a year plus an annual increase of 3%. As discussed in Section VIII.D, *infra*, and Appendix 7, Valuation at Section VIII.G.1, this payment does not constitute payment of reasonably equivalent value with the deficiency being between $18.7 million and $59.6 million. Those numbers, however, rely on a number of assumptions. The failure to pay reasonably equivalent value for these easements would constitute a fraudulent transfer, but because of the uncertainty about the valuation related to this easement, the most that can be said is that it involves a plausible claim.

The Examiner believes that the value of these properties at the time of transfer was between $2.4 billion to $2.9 billion, after deducting the Cromwell debt of $185 million. This is between $592 million and $968 million (with a midpoint of $780 million) more than the $1.8 billion purchase price. In addition, the Examiner has valued the 31 acres at between $109 million and $140 million. These numbers do not consider any loss to CEOC associated with the creation of CES and the Total Rewards license discussed below although these numbers take into account the Four Properties' continued access to Total Rewards and management services.

CAC has also argued that it would not under any circumstances pay more than $2 billion and that it was difficult to secure a fairness opinion from Lazard even at that number. The Examiner has found no evidence showing that CAC would have paid materially more than this amount. At the same time, as discussed above, an independent CEOC Board balancing the pluses and minus as of this transaction might have decided not to agree to it if this truly was the maximum price.

Certain creditor groups have argued that as a result of this transaction, the CERP Transaction and the initial Growth Transaction, CEOC was transformed from a more Las Vegas centric entity to a more regional entity, and that this reduced the value of CEOC as an entity. It does appear to be the case that the more a gaming company earns from Las Vegas, the higher the multiple that the market will be applied to its EBITDA, *i.e.*, the higher the value. Caesars witnesses have acknowledged that this is true. The Examiner has determined that if the CERP, Growth and Four Properties Transactions had not occurred, 41% of CEOC's EBITDA would have been from Las Vegas. After this transaction, the percentage of Las Vegas EBITDA was only 28%. The Examiner has calculated the resulting degradation of value as being $516 million. *See* Section VIII.E, *infra*.

Once this transaction was announced, creditor groups objected. In early March a group of second lien creditors sent a letter to CEC alleging both that CEOC was insolvent and that the price did not constitute reasonably equivalent value. A letter making similar complaints was sent on behalf of a group of first lien note holders. The transaction nonetheless closed in two closings in May 2014.

### b. CES/Total Rewards

The creation of CES became an integral part of the Four Properties transaction. It was a newly created joint venture between CEOC, CERP and Growth. CEOC transferred to this entity a non-exclusive, fully sub-licensable, irrevocable, royalty-free, fully-paid up worldwide license to all of CEOC's intellectual property, including Caesar's Total Rewards program (Total Rewards IP). CES then granted sublicenses to Growth and CERP allowing them access to this intellectual property. Also transferred to CES were all of CEOC's enterprise wide and property specific management resources and responsibilities.

CES was intended to be a non-profit making joint services company. CEOC received a 69% ownership stake in CES. In exchange for a $42.5 million capital contribution, CERP received a 20.2% ownership interest, and in exchange for a $22.5 million capital contribution, Growth received a 10.8% ownership interest. Significantly, however, while CEOC has a 69% interest in CES, it only has 1 of 3 votes on most matters. In addition, while this provision was

eliminated on the eve of CEOC's bankruptcy, the CES agreement provided that CEOC would lose all its governance rights should it file for bankruptcy. *See* Section VIII.D, *infra*. While CES expenses incurred solely on behalf of a particular property are allocated 100% to that property, other expenses (such as the operating expenses and annual baseline capex for CES) are allocated to the three members pursuant to formulas based on relative Net Revenues or an alternative methodology that is unanimously agreed to by the Steering Committee. The allocation percentages were 70% to CEOC, 24.6% to CERP and 5.4% to Growth.[81]

Total Rewards was universally recognized by all the Caesars and Sponsor witnesses as being an extraordinarily successful proprietary and industry leading customer loyalty program. It uses advanced data analytics and behavioral tracking technologies to incentivize customers to use Caesars properties wherever they gamble and thereby to maximize overall enterprise profitability. By treating all of Caesars as a unified entity, without regard to whether a property is part of CEOC, CMBS/CERP or Growth, the philosophy is that all properties perform better.

Customers who play at regional casinos earn points which enable them to have benefits at destination properties (*e.g.*, Las Vegas and, to some extent, New Orleans). This both funnels customers from the regional to the destination casinos and encourages patronage of the regional casinos, as customers know that by doing so they will earn benefits at the destination properties. Caesars also uses the data accumulated through Total Rewards to adjust its business and marketing strategies and target customers with specific marketing promotions, direct mail and social media. One consequence of these efforts is that a significant percentage of the gaming "play" in its casinos is cross-market play, where customers who have a dominant location within the Caesars' network play at other Caesars' properties.

Through Total Rewards Caesars has been able not only to earn more than its "fair share" of revenue in regional and destination markets, but also to significantly increase the amount of its non-gaming revenue in Las Vegas. Because of the impact of Total Rewards, there is evidence – and this is certainly what Caesars and the Sponsors believe – that properties are materially more profitable within the Caesars' system than outside it. Examples have been provided where regional properties have been sold and suffered meaningful EBITDA declines. Planet Hollywood is a good example of a pre-existing property joining the system and then seeing its EBITDA significantly increase.[82]

The creation of CES raises a number of issues, many of them revolving around Total Rewards. For no consideration beyond that attributed to the value of the Four Properties themselves, CEOC granted an extremely broad license to a very valuable intellectual property

---

[81] There is a dispute as to whether the 5.4% allocation to Growth (with CERP picking up the other 5.4%) was a one year or permanent commitment.

[82] Section VIII.F, *infra*, contains a more complete description of Total Rewards and how it compares with other customer loyalty programs.

and, at the same time, lost a degree of control over how that intellectual property could be further developed and used.[83]

The first issue is whether CEOC should have received compensation for the license. The answer to this question is different for Growth and for CERP. As to the former, the four properties were valued on the assumption that their EBITDA reflected the benefits of Total Rewards, and that they would continue to have access to it. Moreover, it was an explicit condition to the CAC bid that continued access to Total Rewards be ensured. Thus, CEOC, in essence, was compensated through the purchase price[84] for these properties being able to use Total Rewards in the future. While the negotiations over the sale of Planet Hollywood and Baltimore did not explicitly address access to Total Rewards, it is clear that access to Total Rewards was assumed in determining the purchase prices for those properties. Thus, any claim against Growth relating to its receipt through CES of a license for Total Rewards for these properties is not viable. To the extent Growth seeks to acquire or develop new properties and allow them access to Total Rewards, under the CES operating agreement CEOC has a veto right. It thus can at that time demand that it be paid a fee for allowing that access (although in practice, such a demand may be unlikely). If Growth is a minority owner, the agreement is silent as to the applicability of the veto right, but theoretically there is nothing stopping CEOC from demanding a fee.[85]

The situation as to CERP is different. CEOC never received any compensation for the transfer of those properties to the CMBS entities in 2008. Moreover, it was never compensated for providing management services to those properties beyond receiving reimbursement for allocated and unallocated costs. Analysis of this issue requires consideration of the facts as they existed both before and after the creation of CES. In 2010 the CMBS entities did start to pay management fees, but those payments went to CEC. Given the fact that CEOC was insolvent from December 31, 2008, CEOC should not have been providing either uncompensated management services or free access to Total Rewards. Originally it was doing so based upon an agreement entered into in connection with the LBO when CEOC was solvent. In August 2010, however, it entered into new agreements which required the provision of these services and the access by the CMBS properties to Total Rewards, again without compensation. It is common in the hospitality industry for management agreements to include access to loyalty programs. As discussed in Section VIII.D, *infra*, the Examiner has calculated what an appropriate management fee would be for CEOC to have charged the CMBS/CERP entities. That fee is tied to the performance of the CMBS/CERP properties and includes a base fee of 2% of net revenues and an incentive fee of 5% of EBITDA. Damages from September 2010 through May 20, 2014

---

[83] A license was used instead of simply transferring Total Rewards to avoid potential issues under the CEOC credit agreements.

[84] This assumes the purchase price was reasonably equivalent value. As noted in Section VIII.D, *infra*, the Examiner has concluded that CEOC should be compensated for the deficiency in that price through fraudulent transfer and breach of fiduciary duty claims.

[85] *See* Section VIII.D, *infra*, for a full discussion of CEOC's rights following the creation of CES.

when CES was created is $237.3 million.[86]  The Examiner has concluded that this is a strong claim against CERP.  This claim is unrelated to the Four Properties Transaction.  *See* Appendix 9, CMBS/CERP Damages.

CERP did receive a sub-license for Total Rewards from CES.  Moreover, CES took over CEOC's management responsibilities for the CERP properties, again without compensation.  Doing so was, in effect, transferring CEOC's ongoing management business out of CEOC to CES.  Thus, there is a reasonable claim that CEOC as to CERP should have been compensated in connection with the Four Properties Transaction for the licensing of Total Rewards and the loss of the management services revenue it should have continued to receive from CERP after the creation of CES.  Using the same management fee structure as for the pre-CES period the amount owed to CEOC for both Total Rewards and management services post-CES would be $592.1 million.  If a court were to conclude that CEOC was not entitled to compensation for management services post-CES, it would still have a strong claim against CERP for reasonable royalty damages of $132.9 million based on a 11% royalty rate just for Total Rewards.  *See* Section VIII.F, *infra*, and Appendix 9, CMBS/CERP Damages.

Various creditor groups have also argued that by virtue of the creation of CES and the Total Rewards license, CEOC lost control over Total Rewards and thereby suffered additional damage.  In analyzing the license and the CES operating agreement, the following seem to be the key points:

- To the extent there are improvements to Total Rewards, CEOC's only rights to the improvements are through CES.

- CEOC has the unilateral right to use Total Rewards in new properties it develops or acquires, but those properties will receive that access through CES.

- It is not clear that properties that CEOC manages and in which it has a minority interest would have access to Total Rewards absent the consent of either CERP or Growth.

- CEOC has a veto right over CERP or Growth using Total Rewards in connection with properties they acquire or develop that are engaged in gaming activities.  It is unclear whether that veto right applies to properties they manage in which they have a minority interest.

- CEOC also has a veto right over the entry by CES, CERP or CGP into any new business line.

- None of CEOC, CERP or CGP can sublicense Total Rewards to a third party without the express written consent of the parties to the License and Services Agreement.  CES, however, may sublicense Total Rewards to a third party as long as it is used in a manner consistent with how the IP was used at the time of the

---

[86]  Recovery of damages going back to 2010 would depend on the existence and availability of a Golden Creditor.

agreement, or in any manner approved by a majority of the CES Steering Committee (*i.e.*, it does not require CEOC's consent). In the past, however, CEOC has not been successful in licensing Total Rewards to third parties.

While CEOC thus has lost some of the attributes of ownership by virtue of the CES agreement and the Total Rewards license, the Examiner has not identified any nonspeculative way to measure any resulting damage. At the same time prior to the creation of CES, CEOC was responsible for advancing 100% of the capital costs associated with Total Rewards improvements[87] and 100% of the operating costs. After the creation of CES, it is responsible for only 70% of those costs.

It also has been argued that CEOC transferred the intellectual property underlying Total Rewards to CES without compensation. It is true that this intellectual property arguably has its own independent value apart from its contribution to the EBITDA of participating properties. The issue, however, is whether such intellectual property is capable of being sold. Past efforts to license it to non-Caesars properties has not proved successful. Selling it as an overall system for use in someone else's loyalty program is very problematic. Apart from the fact that doing so is not consistent with continuing to operate as an ongoing business, the market of potential buyers for a system so tailored to gaming is really only other gaming companies. And the willingness of those companies to acquire Total Rewards is highly speculative.[88] Thus, the Examiner does not believe that this aspect of claimed damage produces anything more than a weak claim.

Two other categories of claims have been raised relating to the creation of CES. First, it has been suggested that CEOC in effect transferred a property management business. While it is not clear that CEOC's providing services to other parts of the Caesars' system constitutes a management business, CEOC continues to receive 50% of the management fees for the properties now owned by Growth (even though it is not providing these services) and was compensated for the other 50% in connection with the sales to Growth. As to the CERP properties, any potential loss would be compensated through the combined management services/Total Rewards remedy discussed above.

Second, it has been alleged that by divesting CEOC of general management services and senior property level management, CEOC has been made less saleable. Any strategic buyer would, however, likely want to provide its own centralized services and senior management. While that may not be the case for a financial buyer, any resulting damage is very speculative.

Creditors have also articulated another potential claim for damages arising out of the operation of the Total Rewards system unrelated to the Four Properties Transaction. The claim is based on the fact that over time CEOC properties export more gaming revenue through Cross-Play to non-CEOC properties than they receive. This is true because CERP and Growth

---

[87] It would recoup those costs via depreciation deductions.

[88] CEOC had previously entered into joint marketing agreements with non-gaming companies which used the Total Rewards customer list. Although after the creation of CES they can no longer do so, the Examiner did not analyze any resulting loss, since the amount of such loss is not likely to be material.

properties are largely destination properties while CEOC has far more regional properties and, indeed after the Four Properties Transaction, its only remaining destination property is Caesars Palace.  The Examiner does not believe any claims based on this discrepancy are viable or produce added damage because:

- They ignore the benefits CEOC's regional properties receive from increased patronage from customers who choose them over competitors because of the ability to earn Total Rewards credits there which they can use in Las Vegas.

- Assuming that customers choosing to go to Las Vegas would instead spend those same dollars at their dominant CEOC regional property is both speculative and unlikely to be true.

- The enhanced revenue from such gaming play exported to Growth properties was embedded in the purchase price of those properties.

- Any additive revenue for the CERP properties will be compensated through the management fee/Total Rewards remedy discussed above.

### c.  Claims

As discussed above, it is virtually certain that CEOC was insolvent at the time of the Four Properties Transaction.  It also seems clear that for purposes of analyzing fraudulent transfer claims the sale of the Four Properties and the creation of CES will be treated as a single transaction.  Here, based on the Examiner's assessment of value of the properties transferred (with or without the 31 acres of undeveloped land), there is a strong case that this transaction was a constructive fraudulent transfer.  This claim becomes even stronger when adding in the value of the 31 acres and of the Total Rewards license and the management services that were transferred to CES.  None of the fairness opinions considered what would be required to compensate for these transfers.  As with the Growth and CERP Transactions, the Examiner does not believe that the way the Four Properties Transaction was structured would fall within the section 546(e) safe harbor.

The presence of a CEC Special Committee complicates the analysis both of potential actual fraudulent transfer claims and breach of fiduciary duty claims.  While there is evidence from which one can argue that there was Sponsor involvement in the selection of the properties and the inclusion of CES in this transaction,[89] the evidence is that they did not actively participate in the price negotiations.  The initial issue then is whose intent should be attributed to CEOC for purposes of assessing an actual fraudulent transfer claim – the CEOC Directors, the Sponsors' Board members of CEC or the CEC Special Committee.  No matter whose intent is controlling, there plainly are badges of fraud present – insolvency, transfer to a related party,

---

[89]  A discussed above and in Section VIII.D, *infra*, Apollo was actively working on creating CES before CAC demanded its creation.  That demand initially focused only on Total Rewards, not management services.  There is evidence that the lenders to CAC were focused on the latter. Nonetheless the relevant witnesses deny that the Sponsors participated in the initial demand by the CAC Special Committee and ensuing negotiations to include a services company.

CEC and the Sponsors retaining control over the transferred property insufficient consideration, and the threat of litigation by creditors.  Moreover, all the relevant parties knew or should have known that removing these properties from CEOC would make it even more difficult for CEOC to service its debt.  Centerview's analysis told them precisely that.  Moreover, lower projections were created solely for this transaction, which enabled it to go forward.  Thus, there is a reasonable argument that irrespective of whose intent should be considered, this transaction constituted an actual fraudulent transfer intended to hinder and delay, albeit not defraud, creditors.

Since they effectively controlled CEOC's decisions, there is a reasonable argument that the Sponsors' knowledge and intent would be imputed to CEOC.  If one then attributes to CEOC the intent of the Sponsors' CEC Board members who designed this transaction and controlled the decision-making at CEOC, the actual fraudulent transfer claim becomes stronger.  The Apollo representatives were the driving force in the decision to undertake the transaction and in the selection of the properties.  This transaction also was consistent with the Sponsors' goals as expressed in the October 2012 memorandum: the transaction was undertaken at the time they knew that a CEOC bankruptcy was at least possible, and even before this transaction the available information made clear that CEOC would not be able to pay its debts and that a refinancing requiring large numbers of creditors to accept materially less than face value of their debt would be necessary.[90]

In sum, it was (or should have been) clear to all involved that in the language of the Seventh Circuit in *Sentinel*,[91] the "natural consequence" of this transaction was to buy short term runway at the expense of CEOC's creditors.  Moreover, given that very little, if any,[92] of the proceeds of this transaction were used to reduce CEOC's debt, the transaction exposed CEOC's creditors to a substantially greater risk of loss than they previously faced.  Thus, while, as argued by the Sponsors, there are countervailing arguments including the presence of counsel[93] and the public nature of the transaction, when one considers the evidence as a whole (including the market and creditor reaction), the actual fraudulent transfer claim is strong, albeit weaker than in the CERP and Growth transactions.

The fact that CEC's independent directors negotiated this price with an independent CAC committee and that the evidence does not support the conclusion that CAC would have paid materially more than $2 billion suggests that this is not quite as strong a breach of fiduciary duty case as exists in earlier transactions.  Nonetheless, given CEOC's insolvency and the failure to

---

[90]  The involvement of counsel and other outside advisors is not a complete defense, but only a factor, in an actual fraudulent transfer analysis.

[91]  *Crede v. Bank of N.Y. Mellon Corp. (In re Sentinel Mgmt. Grp. Inc.)*, 809 F.3d 958 (7th Cir. 2016).

[92]  The Examiner's analysis suggests that virtually all of the proceeds were used to fund ongoing losses, although Hession said that some $200 million plus of the proceeds was used to pay down the Intercompany Revolver to CEC.

[93]  As discussed above, the only counsel available to CEOC had a conflict of interest by virtue of its concurrent representation of CEC.

have independent directors at CEOC, this transaction will be analyzed under the entire fairness standard. CEOC's non-independent directors approved the transaction without considering whether removing this amount of ongoing revenue would adversely affect CEOC's ability to repay its creditors. CEOC was insolvent, no attempt was made to value the 31 acres or the Total Rewards license, projections were created solely for use in this transaction, and the consideration was significantly deficient. While some process was put in place at CEC (primarily to protect against CEC shareholder claims), no process was put into place at CEOC to protect its creditors. Thus, since this transaction both fails to involve a fair process or a fair price there is a strong breach of fiduciary duty claim against the CEOC directors and CEC, and a reasonable aiding and abetting claim against the Sponsors and the Apollo CEC directors given their central roles and activities on behalf of CEC and Apollo.

Based on the Examiner's analysis discussed above, the fraudulent transfer damages arising out of these claims are between $592 million and $968 million for the value shortfall of the properties, plus $109 million to $140 million for the undeveloped land, plus the CES related damages. The diminution of the overall value of CEOC would not be recoverable under the fraudulent transfer claims. A reasonable claim exists that CEOC's multiple degradation damages, along with the same damages as would be recoverable under the fraudulent transfer claims, would, however, be recoverable under a breach of fiduciary duty claim. That claim would be based on the Growth, CERP and Four Properties Transactions and is valued at $516 million. If fair prices had been obtained in these transactions, it is unlikely that a court would award damages for the negative impact of these sales on the value of the remaining enterprise. Once a court finds, however, that this is not the case, and a breach of fiduciary duty has occurred, there is a reasonable argument that (unless the properties are returned) a court would award damages for this diminution in value in order to put CEOC in the position it would have been absent the improper transfers. *See* Section VIII.E, *infra*.

Any claim, however, that CAC/Growth is not a good faith transferee would be weak. It operated through a Special Committee of non-Sponsor directors. While it certainly knew (or had to assume) that CEOC was insolvent and was under some time-pressure to sell, it also knew that (i) the CEC Special Committee had received multiple fairness opinions, (ii) its own financial advisor would not have given them a fairness opinion at a price above (or at least materially above) $2 billion, and (iii) it was advised that the proceeds of the sale would be used by CEOC to meet liquidity needs, including to pay creditors. While it can be argued that its awareness that new projections were created for this transaction is evidence of bad faith, unlike as to CEC or CEOC, there is no evidence they were aware that the so-called February Business Plan was used for no other purposes, and it relied on Lazard's analysis of, and adjustments to, the January Business Plan (not the February Business Plan) in making its decisions.

### 4. B-7 and Related Financing Transactions

While the Four Properties Transaction was proceeding, CEC was also working on a series of related financing transactions which provided additional "runway" for CEOC, and also purported to release the guarantee by CEC of certain CEOC notes (the Bond Guarantee). These related transactions ultimately involved the following: the B-7 loan which provided $1.75 billion under CEOC's term loan; certain tender offers through which proceeds of the term loan were used to pre-pay at par or at a premium over par various categories of debt, including junior debt,

maturing in 2015, 2016 and 2017; the sale by CEC of 5% of the equity in CEOC in order to release CEC's guarantee of $14.75 billion face value of CEOC non-first lien bank debt (the Bond Guarantee); the distribution of 6% of CEOC's equity to employees of Caesars' entities; a material modification of the senior secured leveraged ratio in the CEOC term loan; the conversion of the CEC guarantee of the term loan (the Bank Guarantee) from a payment guarantee to a guarantee of collection; and the pre-payment of a portion of senior unsecured notes due in 2016 and 2017. All of these transactions, other than the senior unsecured notes transaction, were essentially part of a single integrated financing transaction. And the senior unsecured notes transaction only became necessary in order to ensure that the Bond Guarantee was, in fact, released as the Sponsors and CEC intended. One of the issues addressed by the B-7 transaction was that while the Four Properties Transaction addressed one going concern issue, covenant issues and the existence of 2015 CEOC maturities again raised the possibility of another going concern qualification for the 2014 10-K from CEC's auditors.

The principal architect of all of these transactions was Apollo, and David Sambur was the principal business negotiator in all of them. Other than in connection with the senior unsecured notes transaction, CEOC had no independent counsel or directors to assist in evaluating them from the perspective of a clearly insolvent CEOC. In connection with the senior unsecured notes transaction, CEOC did have two independent directors and its own counsel as it considered in August 2015 whether to approve what Apollo/CEC and Paul Weiss had negotiated, and their presence made a difference.

### a. The B-7 and the Guarantee Release[94]

In the Fall of 2013 consideration had been given to the possibility of negotiating a series of transactions with CEOC's creditors, including possible debt exchanges with holders of second lien debt. A subject of each of these potential transactions was the elimination of the Bond Guarantee. By the early part of 2014, it did not appear that these or other transactions could then be successfully negotiated, and in the first quarter of 2014 Apollo began meeting with lenders in an attempt to negotiate new loans under the existing CEOC Term Loan and modifications of that loan. The initial parties to these negotiations were Sambur and representatives of GSO and BlackRock, which were prepared to provide $1.1 billion in backstop financing for what became the B-7 loan.[95]

Among the goals in these negotiations were the modification in the Term Loan of the Senior Secured Leveraged Ratio (SSLR) covenant which had been a cause of ongoing concern, the elimination of a going concern qualification as an event of default, and the conversion of the Bank Guarantee to a guarantee of collection. The last of these goals was understood to be particularly important in the context of a CEOC bankruptcy since it would defer the ability of lenders to pursue CEC on its guarantee until the conclusion, rather than at the commencement, of a CEOC chapter 11 proceeding. What is in dispute is the extent to which eliminating the Bond

---

[94] As noted previously, the Examiner has not investigated and expresses no views on the issues being litigated in the guarantee litigation.

[95] BlackRock and GSO apparently had other significant investments which would benefit if there was no near-term CEOC bankruptcy.

Guarantee was an initial goal of the Sponsors and of CEC in connection with the B-7 loan.  What is clear is that by eliminating the Bond Guarantee and by changing the form of the Term Loan guarantee, CEC greatly reduced the risk that it would be dragged into a CEOC bankruptcy.  And as discussed above, by the end of 2013 the risk of an unwanted CEOC bankruptcy was perceived to be increasing.

While it is clear that release of Bond Guarantee through the sale of some of CEC's equity in CEOC ultimately became a condition to funding of the $1.75 billion B-7 loan, the Examiner heard two versions about how that condition came to exist.

According to Sambur, in initial meetings with BlackRock and GSO the most that was said about the Bond Guarantee was that CEC may release it.  The two BlackRock and GSO participants, however, each told the Examiner that they were expressly told at the outset that CEC had made the decision to release the Bond Guarantee and that their pricing of the loan was always based on that assumption.  Sambur denies that this took place.  GSO said that it would have proceeded even without the guarantee release, albeit on different financial terms, but BlackRock was uncertain as to how it ultimately would have proceeded.

The early term sheets did not state that the loan was conditioned on the Bond Guarantee being released.  Instead through the use of a Most Favored Nation (MFN) provision they provided, in effect, that the Bank Guarantee only became a guarantee of collection when and if the Bond Guarantee was released.  In a communication between counsel in early April, however, counsel to GSO/BlackRock stated that his clients wanted certainty as to the Bond Guarantee release prior to funding.  This led to a telephone conference between Apollo (Sambur and a more junior colleague)[96] and BlackRock/GSO in which Apollo agreed to this request, and to release the Bond Guarantee through the sale by CEC of CEOC equity as a condition to funding.  While there is a dispute as to the contents of the earlier conversations it seems clear that this was the conversation where agreement was reached on the condition to funding.

Based on listening to the witnesses and reviewing the documents, the Examiner believes that the most credible version of the events is that in initial conversations with Blackrock and GSO the issue of the guarantee was discussed; that in those conversations Sambur, in some way, made it clear that CEC was going to exercise what it believed to be its right to release the Bond Guarantee; that the lenders plainly understood that this would be beneficial to them; that initially this release was addressed as something which would happen after funding; that the likelihood of that happening was extraordinarily high since the release of the Bond Guarantee was necessary for CEC to achieve another important goal – the conversion of the Bank Guarantee from one of payment to one of collection; that having factored the guarantee release into its pricing and being unable to secure other ways to ensure their priority at least over holders of the existing Bank Guarantee,[97] BlackRock and GSO insisted that the previously discussed Bond Guarantee release become a condition to funding; and that Sambur then told everyone that the Bond Guarantee

---

[96]  Alex van Hoek, Sambur's subordinate, was not involved in the initial discussions, but stated that releasing the Bond Guarantee as a condition to funding was not agreed to until April 2014 at the lenders' request.

[97]  They had wanted their guarantee to have some priority over the existing Bank Guarantee.

release as a condition to funding was a lender demand.  Among other things supporting this view are the following:

- Releasing the Bond Guarantee was the subject of all the various potential debt exchange and related transactions being considered by Apollo in the Fall of 2013.

- In the November 26, 2013 Board presentation focusing on the Four Properties Transaction, selling stock to release the Bond Guarantee was identified as a potential next step.

- In a December 2013 presentation prepared for regulators, the "Plan" for CEOC included releasing the Bond Guarantee through the sale by CEC of CEOC stock. Rowan said this was intended to be accomplished through debt for CEOC equity exchanges although the document refers to a sale and a separate subsection of the Plan discusses debt for equity exchanges.

- As concern over a possible CEOC bankruptcy increased in the late Fall of 2013, the importance of converting the Bank Guarantee to a guarantee of collection increased.

- Taking steps to avoid CEC to be automatically drawn into a CEOC bankruptcy was important to CEC and the Sponsors and eliminating the Bond Guarantee and modifying the Bank Guarantee were necessary to accomplish this goal.

- Paul Weiss was providing advice in early March 2014 on the topic of potential CEC director liability for release of the Bond Guarantee by selling equity in CEOC.

- The importance to CEC of eliminating the Bond Guarantee was demonstrated by the fact that Apollo later negotiated for CEOC to pay unsecured debt not due until 2017-18 in order to ensure the Bond Guarantee was released under the different language of the indentures relating to that debt.  Otherwise the MFN clause also would mean that the Bank Guarantee remained a guarantee of payment.

- As described by CEC's restructuring advisor, Blackstone, in an April 21, 2014 presentation to the CEC Board, releasing the Bond Guarantee "[c]ontractually releases CEC from liability for approximately $14.9 billion CEOC debt, protecting approximately $2.5 billion CEC equity value (current trading value) for all shareholders."

CEC and Apollo disagree, and argue that the evidence supports the conclusion that CEC did not instigate the demand by the lenders that the Bond Guarantee be released.  They particularly focus on GSO and place particular emphasis on evidence that in January 2014 GSO planned to offer $300-$400 million in new first lien debt, and references in a GSO document to the upside of having the guarantee stripped from all but the Term Loan.  That evidence also makes clear, however, that any stripping of the guarantee should only come after the new Term Loan was funded and their view that Apollo's goal was to force the value of the second lien debt

lower to facilitate a debt exchange.  This evidence is consistent with the early term sheets where the Bond Guarantee is released after the B-7 money is lent in order to enable Apollo then to achieve an important goal in the negotiations – the conversion of the Bank Guarantee to one of collection.  This evidence makes clear that at least GSO also wanted the Bond Guarantee released.  It does not address whether in the initial meeting CEC made clear that it intended to do so.  It also does not address the position of BlackRock, which testified about the initial conversations in a manner consistent with GSO.

Ultimately, the negotiations led to a $1.75 billion new term loan (the B-7), which had two clear benefits to CEC – the release of the Bond Guarantee through the sale to three investment funds of a total of 5% of CEOC equity (another 6% was distributed to CEOC/CEC employees under a hastily adopted performance incentive plan), and the conversion of the Bank Guarantee to one of collection.  The other covenant changes that were being sought by CEC were also secured.  Some other key aspects of the B-7 loan were:

- An increase in CEOC's annual interest expense by approximately $44 million due to the higher rate.

- In other transactions the Sponsors and CEC had sought, and often received, the benefits of discounts on Caesars' debt, but in this transaction no apparent effort was made to do so.  Instead, the proceeds of new senior Term Loan Debt were used to pay over $1 billion in more junior debt maturing in 2015 at par plus a premium and accrued interest.  Of this amount, $452 million was paid to Growth for notes that it held and $420 million was paid to Chatham who at the same time agreed to purchase CEOC equity to facilitate the release of the Bond Guarantee.

- In addition to paying over $43 million in premium on these more junior notes, CEOC paid fees and expenses associated with this transaction of over $219 million.  BlackRock and GSO alone received almost $129 million in fees.

- In order to pay these fees and expenses, make the payments on this more junior debt, and redeem over $795 million in Credit Agreement Debt ($578 million of which was not due until 2016 and $187 million of which was not due until 2017) ,over $315 million of CEOC cash needed to be used in addition to the proceeds of the B-7 loan.

- While deferring the 2015 maturities eliminated the immediate going concern issue for CEC and added "runway" for CEOC, the sale of CEOC equity and release of the Bond Guarantee would require CEOC to file its own audited financial statements.  It then was only a matter of time before CEOC would receive a going concern qualification.  Indeed, going concern language was added to CEOC's unaudited financial statements as of September 30, 2014 (filed in November of that year).  A going concern qualification in audited financial statements did, however, remain an event of default under certain indentures, which could lead to a cross default under the Term Loan.

The Examiner first considered whether any claims exist based on the B-7 loan itself. Insofar as the lenders are concerned, the Examiner has not identified any viable claim against them. While various lenders knew that more junior creditors would receive some of the proceeds of the loan, that alone is not sufficient to establish that they acted with intent to hinder, delay or defraud creditors. And, while they received liens, they provided $1.75 billion in consideration for those liens. Any constructive fraud claim also would be precluded by section 546(e).

The issue as to whether breach of fiduciary duty and aiding and abetting claims arising out of the B-7 exist against CEC, CEOC directors and the Sponsors is more complex. First, it is difficult to disaggregate the B-7 loan from the covenant and guarantee changes which occurred and the use of the proceeds from the loans. They were all negotiated at the same time. Looking at the package as a whole, there were clear benefits to CEOC – the elimination of 2015 maturities, the material improvement of the SSLR covenant, and the elimination of a going concern event of default. The latter change, however, was less meaningful since it applied only to the Term Loan and not the indentures, thereby still leaving the potential for a cross default on the Term Loan in the event of a going concern qualification. At the same time these benefits came at a significant cost – increased interest expense, very significant fees and expenses, and over $1 billion being paid to more junior creditors, including more than $850 million in the aggregate to an affiliate in which the Sponsors had a majority economic interest and to an entity who at the request of the Sponsors was buying CEOC equity to release the Bond Guarantee. While the Sponsors regularly sought to capture the discount in CEOC debt including, for example, by negotiating for such discounts in the CERP transaction, no apparent effort was made to negotiate a discount here. Indeed, premiums were paid over market price, including to Growth. Also, and most significantly, while paying over $795 million in debt not maturing until 2016-17, $315 million of cash was used from a deeply insolvent CEOC which would need to do the impossible – to increase EBITDA to $2.2 billion in 2015 (a 115% increase) – just to be cash flow break-even. There was no reason from CEOC's perspective to use this $315 million to pay 2016-17 maturities. While doing so arguably encouraged lenders to agree to the conversion of the Bank Guarantee to one of collection – this change primarily benefited CEC and its equity holders. And Bonderman told the Examiner that a benefit of releasing the Bond Guarantee was that it increased the leverage on CEOC's creditors. It has been argued, however, that these changes to the guarantees gave CEC more flexibility in assisting CEOC in resolving its debt issues and the Debtors' proposed plan of reorganization does include material support from CEC. Releasing the Bond Guarantee also presumably allowed for a lower interest rate than otherwise would have existed, although having the Bank Guarantee become one of collection could have had the opposite effect.

In evaluating whether entering into the B-7 loan and using the proceeds in the manner discussed above give rise to breach of fiduciary duty and aiding and abetting claims, it is clear that if CEOC had independent directors, it is likely no such claims would be viable. That was not the case here. Rather, a Sponsor and CEC director negotiated these agreements and only the CEC Board meaningfully considered them. The CEOC Board approved them through a written consent process. But the Sponsors and CEC were heavily conflicted, particularly given the link of the guarantee provisions to the B-7 loan and the fact that Growth was going to be a major beneficiary of this transaction. Moreover, independent directors were added to the CEOC Board in June 2014 – before these transactions closed – but no effort was made to see if they would ratify these transactions. Based on all the relevant facts, the Examiner has concluded that

pursuant to the entire fairness standard there are reasonable breach of fiduciary duty claims against the CEOC directors who approved the B-7 Transaction and CEC (as controlling shareholder) and reasonable aiding and abetting claims against Apollo and an Apollo CEC Director arising out of the B-7 loan and the accompanying use of proceeds, including in particular the $452 million paid to Growth whose largest shareholders (directly or indirectly) were CEC and the Sponsors.[98]  The strongest element of damages from such a claim would be the $452 million paid to Growth and the $315 million in cash used by CEOC paid in connection with the B-7 loan.  The one clear benefit from the B-7 loan – payment of 2015 maturities – could have been achieved without spending this $315 million, and the later maturities did not have to be pre-paid other than potentially to garner their support to agree to modification of the Bank Guarantee.  Additional damages could arguably be the present value of the added interest expense ($112 million), but that assumes no loan was made at all, rather than simply not paying more maturities and expenses than could be paid from the proceeds of the B-7 loan.

The Examiner also considered whether the release of the Bond Guarantee standing alone gives rise to a claim on behalf of CEOC apart from direct claims of creditors.  Because as a matter of law, the Bond Guarantee is not property of the estate, there is no viable fraudulent transfer claim arising from its release.  Since from CEOC's perspective payment by CEC on the Bond Guarantee would simply substitute CEC for the beneficiary of the guarantee as CEOC's creditor, the release of the guarantee also does not produce any cognizable damage to CEOC. Thus there is no breach of fiduciary duty claim solely based on the Bond Guarantee release.

There is a reasonable actual fraudulent transfer claim involving the use of B-7 proceeds to pre-pay $452 million to Growth for notes maturing in 2015 that it held ($427 million in principal and $25 million in interest and premiums).  If these notes had not been prepaid their market value would have declined based on the release of the Bond Guarantee.  Growth had acquired these notes in connection with CEC's initial investment and the 5.625% Senior Notes due 2015 were valued at 88 cents on the dollar as of December 31, 2012.  Growth had entered into a note purchase agreement with CEOC under which it would receive payment on these notes, but would participate in the B-7 loan in an amount equal to its principal amount being repaid.  When the facility was oversubscribed, however, Growth was told that it did not need to participate.  That decision was made by CSFB, agent for the loan.  Once it did not need to participate, apparently no consideration was given to not having Growth accept the $452 million it received, despite the fact that it was a related party and, as Sambur stated in an e-mail, it would have been desirable to be able to use some portion of the B-7 to help meet CEOC's cash needs.  Moreover, even if Growth had participated in the loan, it would have benefited by receiving $452 million in cash and trading junior debt for senior debt.  There thus is a reasonable claim that the payment to Growth would constitute an actual fraudulent transfer.  It involved intentionally using senior debt to pay junior debt held by an affiliated entity, and did so at a premium.  There also were no independent directors or advisors at CEOC to decide whether to enter into the transaction.  The 2015 maturities held by third parties still could have been redeemed.[99]  Based on these same

---

[98]  After the announcement, CEC's stock price increased by approximately 14%.

[99]  While the perceived inability to redeem these notes, which matured in 2015, could have led to a going concern issue for CEOC (which would now have standalone audited financial statements), that was no longer an event of default under the Term Loan, although it remained

facts there are also reasonable breach of fiduciary duty claims against the CEOC directors and CEC and an aiding and abetting claim against Apollo and an Apollo CEC Director for this prepayment of junior debt held by Growth.

The Examiner also considered whether any claims arose out of the CEC sale of the 5% of CEOC equity for $6.15 million to three investment funds, implying a market capitalization of $123 million.  While CEOC shares were valued at $90,308 per share for these sales, that value was plainly artificial.  Blackstone on April 21, 2014 told the CEC Board that traditional valuation methods produced a negative equity value and in a June e-mail Sambur equated the value of CEOC shares to "pixie dust."  Two of the funds were pre-existing CEC shareholders who stood to benefit from an increase in CEC's stock price once the Bond Guarantee was eliminated.  The third fund was a holder of junior debt maturing in 2015 which was paid from the proceeds of the B-7 loan.  Since the sale of CEOC stock was by CEC, however, there can be no fraudulent transfer claim based on the purchase of this stock.  The Examiner thus concluded that any estate claims (as opposed to direct creditor claims) focused solely on this sale of CEOC equity to the three investors are not viable.

The issue as to Chatham Asset Management LLC presents a larger more difficult issue. In the same series of conversations Chatman was asked to purchase CEOC stock to release the guarantee on CEOC debt that Chatham held, asked to participate in the B-7 and told, in effect, that by doing so not only would they avoid a loss on the previously guaranteed debt that they held, but that this debt would be redeemed at par plus a premium.  While Chatham had owned a significant portion of this debt prior to the B-7 negotiations commencing, some of this debt was purchased in April 2014, shortly before the announcement of the B-7 loan on May 6, 2014.  And the Examiner has not been able to determine precisely when the Sambur-Chatham discussions on their participation in these transactions took place.  It does appear, however, that generally speaking Chatham was supportive of Apollo's efforts with regard to Caesars and that they had a cooperative relationship.  Based on this evidence, the Examiner believes there is at least a plausible claim against Chatham, and that further investigation of this claim may be warranted, particularly with regard to the debt purchases in April.

In addition to the sale of equity to the three investment funds on May 30, 2014, approximately 6% of CEOC's equity was transferred to 376 CEC and CEOC employees pursuant to a newly created Performance Incentive Plan (PIP).  The evidence strongly suggests that this plan was created solely to provide added support for the release of the Bond Guarantee. The stock was essentially worthless and likely to remain so for an extended period.  The idea for PIP was first presented by the Sponsors the day after the announcement of the 5% stock sale and the plan was created with unusual speed – within less than a month – and the shares vested immediately.  While aspects of the transaction thus are unusual, the Examiner does not believe there are any viable claims arising from the creation of the PIP and the issuance of additional stock to Caesars employees.

---

one under certain indentures.  Moreover, a CEOC going concern qualification was inevitable and, as discussed above, CEOC's third quarter financials contained a going concern qualification.

### 5. Senior Unsecured Notes Transaction

Immediately after the announcement of the sale of 5% of CEOC equity and the release of the Bond Guarantee, a group of holders of Senior Unsecured Noteholders (SUN), maturing in 2016 and 2017, notified CEC that because of different language in its indentures their guarantee had not been released. The notes involved had been issued prior to the LBO. The face amount of the still outstanding notes covered by these indentures was $1.1 billion; those raising this issue held $238 million in face amount of the notes (although they were trading at 47 cents on the dollar), and CEC affiliates held $716 million of these notes.

This complaint led to an Apollo/Paul Weiss-led negotiation with the complaining group of noteholders. During these negotiations Apollo rejected the suggestion that any agreement include all the now affiliated affected noteholders, concluding that broadening those participating in the agreement would be too expensive. Two things are clear about the ultimate agreement. First, it was motivated solely by Apollo's and CEC's desire to ensure that the Bond Guarantee was eliminated on any CEOC debt. If the guarantee relating to these notes was not eliminated then the Bank Guarantee also would remain one of payment. Second, the transaction can only be described as "ugly" with one group of noteholders (constituting a slight majority of the notes held by non-related parties) getting paid at a premium over market in exchange for agreeing to prejudice the remaining noteholders by eliminating the Bond Guarantee from the governing indentures.

As ultimately concluded in August 2015, the SUN agreement included the following key elements:

- The holders of the notes received payment on $155.4 million of notes at par, with CEC and CEOC each paying $77.7 million. CEOC also paid $6.6 million in accrued interest and advisory fees and expenses.

- CEC contributed $426.6 million of these notes for cancellation.

- The participating noteholders (who controlled slightly over 50% of the outstanding notes held by non-Caesars affiliates under the indentures) approved amendments to the indentures which, among other things, eliminated the CEC guarantee from the indentures. They also agreed to support an overall CEOC restructuring plan.

- CEC agreed to repay CEOC $35 million if a CEOC restructuring was not completed within 18 months.

What distinguishes this transaction from all the earlier transactions is that by the time it was approved by the CEOC Board in August there were independent directors on the CEOC Board. Those independent directors comprised a Governance Committee, which alone acted for CEOC in approving the transaction and in doing so had the benefit of its own legal and financial advisors. Moreover, the record is clear that the Committee was provided with complete advice as to fiduciary duties of directors of a potentially insolvent company and of the business considerations involved in making a judgment about the proposed transaction. The Committee also had directed its advisors to negotiate with CEC and, among other things, secured CEC's

agreement to the potential $35 million repayment, the contribution of $77.7 million, and the cancellation of other notes.   While one could argue that they should not have authorized the $77.7 million payment and agreed to the transaction, they acted well within their business judgment in deciding to proceed.   Among other benefits perceived by the independent directors was that in return for paying $77.7 million (which could later be reduced to $42.5 million), approximately $582 million in debt was cancelled with ongoing interest savings of $36 million a year.   Based on this record the Examiner concluded that any breach of fiduciary duty claim would be either not viable or, at best, weak.   He also has concluded that any constructive fraudulent transfer would be barred by section 546(e).

### 6. PIK Notes Transaction

In November 2014, CEOC redeemed approximately $17.1 million of PIK Notes, including $4.5 million of such notes held by CEC.   While trading at a steep discount, they were redeemed at the full redemption price specified in the indenture well prior to their maturity date in 2018.   The Examiner investigated whether there were any claims arising out of the redemption.

Under the indenture, CEOC was able to pay interest in kind until February 1, 2013. Thereafter, CEOC was required to pay interest in cash, but neglected to do so.   As a result, in September 2014 the indenture trustee advised CEOC that the majority holders wanted the situation remedied and a redemption was proposed as a possible solution.   Ultimately, the decision to redeem was motivated in large part by the threat by the majority holders to commence a lawsuit based on the default.   As explained by a Paul Weiss attorney involved in this transaction, the concern was that risking a lawsuit in the fall of 2014 on a default where the company had no defenses, and the amount involved was relatively small, would be an unnecessary complication that could jeopardize ongoing restructuring efforts.   Such a lawsuit also could support arguments that CEOC was not paying its debts as they came due, bolstering potential efforts to force CEOC into an involuntary bankruptcy.   At the same time, while not acknowledged by the witnesses, an important reason for redeeming these notes would be that they were the beneficiaries of the Bond Guarantee, and so their redemption preserved the conversion of the Bank Guarantee to a guarantee of collection.

The Examiner concluded that any preference or constructive fraud claims would not be viable due to the existence of a defense under section 546(e) of the Bankruptcy Code.   The Examiner also concluded that any actual fraudulent transfer claim would be weak due to the existence in this case of a supervening legitimate business purpose – to avoid an unwanted bankruptcy or complicating restructuring negotiations.   *See* Section IX.F, *infra*.

The decision to redeem these notes was made by the CEOC Executive Committee comprised of CEC directors; the CEOC independent directors were not consulted.   Given CEOC's insolvency and the fact that CEC was a party to the transaction, the "entire fairness" standard thus applies.   While there certainly were questionable aspects to how this redemption was implemented, particularly in terms of the price paid and the speed with which it was accomplished, given the overall rationale for the transaction, a breach of fiduciary duty claim is only plausible.

### 7. Atlantic City Transactions

As referenced above, between 2008 and 2014 Caesars Atlantic City properties experienced a 81% decline in EBITDA. This decline was recognized by Caesars not to be temporary, but instead to be reflective of an eroding customer base as competitive casinos opened in nearby states. During this period, Caesars operated four properties in this market. Three – Bally's Atlantic City, Caesars and Showboat – were under the CEOC umbrella, and one – Harrah's – was a CMBS and then a CERP property. Creditors provided a number of submissions to the Examiner asserting claims arising out of efforts by Caesars to address its declining fortunes in Atlantic City. With one exception, these claims were premised on allegations that Caesars favored the one CMBS/CERP property at the expense of the CEOC properties. These claims relate to the building of a conference center at Harrah's; the closing and sale of the Showboat; the Showboat marketing and customer retention program Caesars put in place; the alleged manipulation of room rates; and the elimination of an intercompany receivable from the Showboat to CEOC. Also within the Examiner's mandate was CEOC's purchase and sale of the Atlantic Club.

### a. The Conference Center

Beginning in 2008, Caesars began planning a conference center at Harrah's in an attempt to reverse the decline of midweek traffic to Atlantic City. That conference center opened in September 2015. Two issues have been raised: the selection of Harrah's as opposed to a CEOC property as the site for the conference center and the use of CEOC assets to facilitate its financing. The Examiner has found no viable claims arising out of either of these decisions.

As to the selection of Harrah's as the site for the conference center location there is no legal requirement that CEC choose a CEOC property as opposed to a CMBS/CERP property as its location, even if CEOC was insolvent. Moreover:

- Harrah's was the largest of the Caesars' Atlantic City properties; its rooms had been updated in 2007-08.

- Harrah's was the only one of Caesars' Atlantic City properties with sufficient attached undeveloped land on which to build a conference center. As a result, building a conference center at Caesars or Bally's would have been significantly more expensive and disruptive.

- Based on the credible testimony of Caesars' operations executives and the personal observation of the Examiner, Harrah's was the most attractive of the Caesars Atlantic City properties and its location – the Marina rather than the Boardwalk – was the most logical location for a conference center.

The Conference Center was financed by CEC and through grants from the New Jersey Casino Reinvestment Development Authority (CRDA). In connection with the CRDA grant, Caesars agreed to contribute various assets back to the CRDA. These included CRDA credits that CEOC properties had earned with a book value of $21.6 million and a strip of land across from Bally's Atlantic City which had been appraised at $7.3 million approximately a year earlier.

71

CEC paid CEOC $29.2 million for these assets. The Examiner has concluded that the land was appropriately valued and that CEOC received reasonably equivalent value for the assets it contributed. Therefore, there is no viable claim arising from the financing of the Conference Center. *See* Section VIII.G, *infra*.

### b. Showboat Closure and Sale

Caesars announced the closure of the Showboat on June 27, 2014. Creditors have challenged that decision, its later sale, and the program implemented to retain Showboat customers for Caesars as a whole, as opposed to for CEOC alone.

The decision to close the Showboat does not create a viable claim for the following reasons:

- The process leading to the decision was a reasonable one involving evaluation of the relevant considerations.

- Along with Bally's, the Showboat was the least profitable of the four Atlantic City properties and was likely to begin to lose money in the near future.

- The Showboat was neither in the center of the Boardwalk nor in the more attractive Marina district, but instead was located in a more remote Boardwalk location surrounded by other properties which were at risk of closing, and did in fact close shortly after the Showboat closed.

- The only other rational choice for closure was Bally's Atlantic City (another CEOC property) whose closure would have negatively impacted Caesars Atlantic City, to which it was attached.

- Harrah's was the best and most profitable Caesars property in Atlantic City.

Closing the Showboat benefitted both CEOC and CERP. Comparing the 12 months before the closing with the 12 months after its closing, CEOC's overall Atlantic City revenues declined by approximately $141 million, but its Atlantic City EBITDA increased by approximately $69 million or 72%. Harrah's EBITDA increased by approximately 62% during the same period.

The Examiner also did not identify any viable claims arising from the post-closing sale of the Showboat. After a reasonable sales process the property was sold to Stockton College for $18 million in a deal promoted by state and local officials. The price was supported by an appraisal conducted through VRC, and the Examiner has identified no issues with the methodology and conclusions in that appraisal. In selecting Stockton College, Caesars considered, among other things, the ability of Stockton College to close quickly (carrying costs for the closed property were approximately $1.8 million a month) and the desirability of selling it as a non-gaming property. Moreover, other potential bids for the property turned out not to be viable.

72

### c.  Showboat Marketing Plan and Customer Retention Plan

The principal issue related to the Showboat closing involves the plan to retain the Showboat customers for Caesars.  Three things are clear about that plan.  First, while it was a reasonable, well-crafted marketing plan, it focused on retaining customers for Caesars generally, not just CEOC, even though the Showboat was a CEOC property.  Second, the plan was designed by executives whose compensation was based (as it had been before the closure) on the performance of all the Caesars Atlantic City properties irrespective of who owned them.  Third, as a result of the implementation of this plan a greater percentage of Showboat dominant customers played at Harrah's than had done so prior to the closing.

None of this would be an issue but for the insolvency of CEOC.  Given that insolvency, there is a strong fraudulent transfer claim based on the use of the Showboat's customer data to transfer customers and gaming revenue from the Showboat to Harrah's.  In effect, a customer list (or customer data) was transferred to Harrah's without any consideration.  The Examiner has calculated the value of this claim to be between $3 million and $7 million.  *See* Appendix 11, Showboat Customer List Analysis.

Certain creditors have valued this claim in the hundreds of millions of dollars.  They arrive at this result by arguing that 100% of the increased revenue at Harrah's was, in effect, CEOC property, that this revenue was permanently lost and that a multiple of 11.5 should be placed on this number.  The Examiner disagrees with this analysis.  Other casinos also closed at around this time and some of their customers likely went to Harrah's; no matter what the marketing plan some percentage of Showboat customers would have spent some gaming dollars at Harrah's and while the marketing plan may have benefitted Harrah's, under pre-existing Shared Services and Marketing Agreements, Harrah's would have been entitled to the benefit of an operating Showboat's customers.

### d.  Manipulation of Hotel Rates[100]

Certain creditors submitted an analysis showing that from May 14, 2015 to October 31, 2015 room rates at Harrah's were materially lower than those at Caesars and Bally's.  They argue that this was done to direct business from CEOC properties to Harrah's.  The Examiner investigated this claim and determined the following:

- Room rates are set through a complex formula by revenue yield management personnel and the process does not contemplate the owner of each property making any adjustments.

- Caesars and Bally's are on the Boardwalk and thus are more popular during the summer because of access to the beach.  Room rates thus were increased during this period to try to capture additional revenue.  In fact, during May – September

---

[100]  The Examiner also investigated the removal of an approximately $250 million receivable shown as due from the Showboat to CEOC on the Showboat's balance sheet.  His investigation showed that the receivable was properly eliminated as part of a clean-up or elimination of certain historical equity balances, and gives rise to no viable claims.

2015 Caesars and Bally's were operating at near maximum capacity with occupancy rates averaging approximately 97% and 94% respectively.

- In October 2015 Harrah's rather than Caesars or Bally's had the highest room rates.

Based on this review the Examiner concluded that there is no viable claim that these room rates were improperly manipulated. Based on his interviews and the other evidence reviewed, the Examiner also is not aware of any manipulation of room rates in a broader context.

### e. The Atlantic Club

CEOC purchased the non-gaming assets of the Atlantic Club at a bankruptcy auction for $15 million in December 2013. The property closed the next month, and in May 2014 CEOC sold it for $15.5 million with a restriction prohibiting its use for gaming activities. While on the original list of transactions to be investigated, the Examiner did not receive creditor submissions on this issue. The Examiner has concluded that the decision to buy, close and sell the Atlantic Club were reasonable business judgments, and that there is thus no viable claim arising out of these decisions.

### 8. Intercompany Transactions

Among other intercompany transactions, the Examiner investigated fees paid to the Sponsors under the 2008 Sponsor Services Agreement (SSA), the Intercompany Revolver between CEC and CEOC and the CEOC Intercompany Loan to CEC.[101]

### a. Sponsor Fees

In connection with the LBO, CEC and the Sponsors (not CEOC) entered into an agreement under which CEC could later ask the Sponsors to provide "management, advisory and consulting services" to CEC, but the Sponsors would only be obligated to provide those services should they later agree to do so and then only through using the resources that they deemed necessary. Pursuant to this agreement, the Sponsors received an initial payment of $200 million and $192.9 million in additional quarterly monitoring and other fees. CEOC was likely allocated 70% of these monitoring fees plus other Sponsor fees – approximately $157.3 million. Beginning in the third quarter of 2013, the Sponsors agreed to waive payment of the quarterly monitoring fees.

The SSA is, in effect, an "agreement to agree" – in exchange for $200 million and future monitoring fees, the Sponsors are not bound to do anything unless they later agree to do so. There thus is a strong argument that it is unenforceable. While there might have been claims arising from CEOC's payment of a portion of the monitoring and other Sponsor fees, CEOC was effectively reimbursed for those payments in 2013 through cancellation of a CEOC payable to CEC on account of various expenses that CEC had advanced on behalf of CEOC. Any claim

---

[101] As discussed in Section IX.G, *infra*, the Examiner also investigated certain Intercompany Notes and Project Simplification.

relating to the payment of any portion of the initial $200 million would not be viable since CEOC was solvent at the time and thus no constructive fraudulent transfer claim exists.

### b. Intercompany Revolver

In August 2008, CEC and CEOC entered into the Intercompany Revolver. While originally in the amount of $200 million, the maximum amount was adjusted over time through a series of amendments. The maximum amount was increased to $1 billion in 2012, but the maximum amount ever outstanding was $644.2 million in the fourth quarter of 2012. After that point, no further monies were lent to CEOC. Indeed, from the third quarter of 2012 through the second quarter of 2013 over $409 million was repaid by CEOC, principally for use by CEC to buy back CMBS debt at a discount or to provide cash for use at the CMBS Properties. Then, in May 2014, the Sponsors requested that the remaining amount outstanding – $261.8 million – be repaid, and it was on June 3, 2014. At the same time, purportedly at the request of the CEOC Board (Hession and Loveman), the terms of the Intercompany Revolver were amended to require (as opposed to permit) CEC to advance funds in response to a CEOC request. Because, however, in order to draw on the Intercompany Revolver, CEOC, among other things, would have been required to represent that it was solvent (which have previously not been a requirement for borrowing by CEOC), that change ultimately would have prevented CEOC from accessing the Intercompany Revolver, and, indeed, CEOC never did request a draw on the Intercompany Revolver.

In reviewing the lending and repayments under the Intercompany Revolver, the Examiner first considered whether it was a bona fide credit facility or should be recharacterized so that repayments would be treated as dividends voidable as constructive fraudulent transfers. Based largely on the manner in which it was documented, the Examiner concluded that any claim that the Intercompany Revolver should be recharacterized is weak.

Since CEC was an insider of CEOC, there is a strong preference claim relating to the repayments made within 12 months of CEOC's bankruptcy filing – $289 million, including the June 3, 2014 repayment. There also are reasonable actual fraudulent transfer claims under both the Bankruptcy Code and applicable state law relating to repayments made within the four years prior to the bankruptcy filing. Under the Bankruptcy Code, the claim would be for $546.5 million, including the $289 million discussed above (repayments during two years before the bankruptcy filing). Under applicable state law, recovery would go back four years and would be $662.5 million (which includes interest paid by CEOC), again including the $289 million, plus interest.

In connection with the actual fraudulent transfer claims, certain badges of fraud are clearly present. CEOC was insolvent and the payments were made to an insider. The repayments also were made before the maturity date and there was no independent process at CEOC to decide whether it was appropriate to do so. The repayments were made beginning in 2012 around the time that the terms of the Intercompany Revolver were changed so that CEC would no longer be required to re-lend the money, and it never did so despite CEOC's liquidity needs and the fact that the interest rate on the Intercompany Revolver was lower than on CEOC's other available credit. Moreover, the liquidity needs of CEOC was one of the purported rationales for the creation of Growth during the same period that over $409 million was being

repaid by CEOC to CEC.  While there may have been a legitimate business reason from CEC's perspective to have the money repaid in order to assist the CMBS properties, that benefited the CMBS properties and does not necessarily mean that there was the same benefit from CEOC's perspective.  If Planet Hollywood and Baltimore needed to be sold to provide CEOC with liquidity, that liquidity could have been secured by not prepaying the Intercompany Revolver, thereby preserving the ongoing EBITDA from these properties to pay creditors.  And there was no legitimate purpose for the June 2014 repayment.[102]  In sum, the actual fraudulent transfer claims are reasonable.

In connection with these repayments, the Examiner also considered whether there are breach of fiduciary claims against CEOC directors and CEC.  Given CEOC's insolvency and the absence of any independent directors or officers who were involved in these repayments, a court would apply the entire fairness standard.  Based on the facts described above, the Examiner concludes such claims would be strong as to the repayment of the $289 million and reasonable as to the remainder.  The damages from such claims are $662.5 million, which includes principal and interest payments.[103]  There is a reasonable aiding and abetting claim against the Sponsors for the last repayment.

## G. LBO

While not included in the original list of transactions to be investigated, at the request of the Debtor the Examiner commenced a review of the January 2008 LBO transaction through which Caesars was acquired by Apollo, TPG and their co-investors.  In connection with the LBO Apollo, TPG and their co-investors invested $6.1 billion in equity.  The primary focus of this review was to determine if claims existed out of the transfer for no consideration from CEOC to the CMBS entities of six properties, including four Las Vegas properties (Harrah's, Paris, Flamingo and the Rio), one Atlantic City property (Harrah's Atlantic City) and Harrah's Laughlin, Nevada.

Since the transaction occurred in 2008, the initial question was whether any LBO related claim was barred by the statute of limitations.  In order to address this issue it was necessary to determine if the IRS or another "Golden Creditor" with the ability to avail itself of a longer statute of limitations existed.  If such a creditor existed, there is authority that CEOC would be able to take advantage of that longer statute of limitations in connection with a fraudulent transfer claim.  It was determined as to CEOC (but only as to some of the subsidiaries) that the IRS was such a creditor – it had claims against CEOC and various of its subsidiaries both at the time of the LBO and on CEOC's bankruptcy petition date in January 2015.  Thus, there is a

---

[102]  One Apollo witness said that the rationale was to save interest expense for CEOC given its receipt of the Four Properties proceeds.  Given the negative cash flow at CEOC that reason is not credible.  More likely is that this "request" was based on a desire not to leave that cash at a CEOC that faced an uncertain future.

[103]  There also is a plausible constructive fraud claim for $5.8 million based on the failure of CEC to pay interest on the CEOC Intercompany Loan which was repaid in 2010.  The ability to pursue this claim depends on the existence of a Golden Creditor.

reasonable argument that a fraudulent transfer claim relating to the LBO would withstand a statute of limitations challenge. *See* Section XI, *infra.*

The Examiner next considered whether CEOC was insolvent at the time of the LBO. An analysis of CEOC's financial condition at that time demonstrated that there was a high likelihood that it was then neither insolvent nor subject to failing the other tests as to its financial condition required to maintain a fraudulent transfer claim. *See* Sections V and XI, *infra.* The Examiner thus concluded that a fraudulent transfer claim based on the LBO would not be viable.

In light of this conclusion, the Examiner determined that no further investigation of the LBO was warranted.[104]

## H. Tax

The Examiner has also investigated potential claims arising from CEOC's participation in the CEC group tax return. Both issues relate to CEC's utilization of certain net operating losses (NOLs) generated by the Debtors. They are: (i) whether the Debtors are entitled to any additional amounts from CEC with respect to a $276.6 million federal income tax refund that was received by CEC in 2009 attributable to the carryback of certain Debtor NOLs with respect to the taxable years 2006 and 2008, and (ii) whether the Debtors are entitled to future compensation from CEC arising out of the utilization of the Debtors' NOLs by CEC or other non-debtor Caesars entities from 2005 through the date immediately prior to the date of the Debtors' restructuring pursuant to the RSAs and plan of reorganization. *See* Section XIII, *infra.*

As to the first issue, the Examiner has concluded that there is a reasonable argument that while $220.8 million of a tax refund was credited to CEOC in March 2011, an additional $55.8 million of that tax refund also should have been credited to it. The failure to do so gives rise to reasonable claims against CEC for constructive fraudulent transfer, turnover and unjust enrichment.

As to the second issue, there is a reasonable argument that as a result of the use by non-Debtors of NOLs attributable to CEOC losses that CEOC might in the future have a claim should CEOC in future years have income which could have been offset by such NOLs. That is not, however, a claim that can likely be pursued today.

## I. The RSAs

A centerpiece of the Debtors' reorganization efforts has been the ongoing discussions with the primary creditor constituencies regarding the form of a restructuring of the Debtors' balance sheet and corporate affairs to be reflected in a plan of reorganization as memorialized in the RSAs. The Examiner Order did not suggest that the Examiner investigate any aspect of the

---

[104] The Examiner also considered whether LBO related claims would be pursued based on the liens granted by CEOC subsidiaries in connection with the debt used to finance the LBO. This is largely a legal issue and, as discussed in Section XI, *infra*, would be a difficult claim to pursue.

RSAs.[105]  Certain parties-in-interest thereafter requested the Examiner to investigate two issues related to the RSAs:  (i) the independence of the members of the Governance Committee, Ronen Stauber and Steven Winograd, and, by implication, their role in negotiating and approving the RSAs; and (ii) the value of the consideration being contributed by CEC under the RSAs.

As discussed herein, the Examiner has investigated the independence of the members of the Governance Committee.  The Examiner has concluded, however, that he should not investigate or express any views regarding the value of CEC's contribution to the RSAs, given that:  (i) the terms of the RSAs have not been finalized and may change materially as a result of ongoing and future negotiations; (ii) certain aspects of the RSAs (*e.g.*, the value of the REIT structure) are extraordinarily difficult to value; and (iii) the value of CEC's contribution will be heavily dependent on the overall enterprise value of CEOC upon plan consummation, which is a valuation exercise that (a) may not be necessary, depending on the outcome of the RSA negotiations, (b) would be expensive and time-consuming, and (c) would significantly delay the issuance of the Examiner's Final Report.

The two independent directors of CEOC – Stauber and Winograd – were appointed as directors of CEOC on June 27, 2014.  On July 30, 2014, they became the two members of the CEOC Governance Committee which, among other things, has overseen the investigation by the Debtors of potential claims against CEC, CAC/Growth, CERP and the Sponsors.  Each of them is an experienced finance professional and each of them had some prior relationship with individuals associated with Apollo.  As a matter of Delaware law, the fact that a director has some past or current business relationship does not compromise that director's independence.  Moreover, here the past and current relationships of Stauber and Winograd are also not of a nature that would raise any serious questions about their independence.  The Examiner thus has concluded that the directors are independent.[106]

## J.  Summary of Conclusions Regarding Strength of Claims and Value Ranges

ES Figure 3 below sets forth a summary of the Examiner's conclusions regarding the relative strength of the claims that have been investigated, as well as the projected range of damage recoveries the Examiner has calculated for each transaction in which the Examiner has found there are strong or reasonable claims.  No values have been included for claims determined to be plausible or weak.  In addition, for fraudulent transfer claims, the value ranges take into account liens or offsets to which the transferee may or may not be entitled with respect to the value of any consideration paid to CEOC based on the Examiner's conclusions regarding whether the transferee was a good faith transferee.  The values thus have been adjusted upward only in these instances where the Examiner has concluded that a strong or reasonable argument exists that the transferee would not qualify as a good faith transferee.  The value ranges contain no adjustments for post-transfer improvements or changes in value, lost profits or pre-judgment interest.  Claims are listed as:  S (Strong), R (Reasonable), P (Plausible), W (Weak) or NV (Not

---

[105]  The negotiation of and entry into the RSAs are not "Challenged Transactions" or "Insider Transactions" as described in the Examiner Order.  Examiner Order at 3.

[106]  The Examiner takes no position on what entity under applicable law should pursue any claims against related parties.

Viable).  As discussed above, and in further detail in the Report, for certain transactions multiple arguments have been advanced by the parties.  In reviewing ES Figure 3 below, a listing of S (Strong) or R (Reasonable) does not mean that the Examiner has concluded that all arguments advanced are Strong or Reasonable, only that at least some aspect of the claim has been found to be strong or reasonable, and the value ranges relate solely to that aspect of the claim.  Finally, with regard to certain transactions, the low and high values reflect the Examiner's conclusions regarding the claims assessed as strong versus those assessed as reasonable.

## ES Figure 3: Strength of Claims and Value Ranges

*(amounts in millions)*

| ## | Transaction | Constructive Fraudulent Transfer[1] | Actual Fraudulent Transfer[2] | Breach of Fiduciary Duty[3] | Aiding and Abetting[4] | Other[5] | Value Range Low | Value Range High |
|---|---|---|---|---|---|---|---|---|
| **A** | *Asset Transfers* | | | | | | | |
| 1 | 2009 WSOP Transaction | S (CIE) | W | R (but for SOL)[6] | R (but for SOL) | None | $  66.20 | $  76.10 |
| 2 | 2011 WSOP Transaction | S (CIE) | W | R (but for SOL) | R (but for SOL) | None | 50.30 | 55.90 |
| 3 | 2010 CMBS Loan Amendments & Trademarks Transfer | P (due to SOL) | W | SOL | SOL | None | 0 | 0 |
| 4 | Growth Transaction | S (CGP) | S | S | R | None | 437.00 | 593.00 |
| 5 | CERP Transaction | S (CERP) | S | S | S | None | 328.50 | 426.90 |
| 6 | Four Properties Transaction | S (CGP) | S | S | R | None | 592.00 | 968.00 |
|  | (a) Undeveloped Land | S (CGP) | S | S | R | None | 109.00 | 140.00 |
|  | (b) CES/Management/Total Rewards | S (CERP) | S | S | R | None | 132.90 | 592.10 |
| 7 | CEOC Multiple Degradation | NV | NV | R | W | None | 516.00 | 516.00 |
| 8 | Easements | P | W | NV | NV | None | 0 | 0 |
| 9 | CMBS/CERP/Total Rewards Management Fees | S (CERP) | W | R | NV | None | 237.30 | 237.30 |
| 10 | CES Excess Cost Allocation | S (CEC, CERP) | W | R | N/A | None | 14.50 | 14.50 |
| 11 | Atlantic City Transactions | S (CERP) | NV | NV | NV | None | 3.00 | 7.00 |
|  | **Asset Transfers Subtotal** | | | | | | $  2,486.70 | $  3,626.80 |
| **B** | *Financial Transactions* | | | | | | | |
| 1 | B-7 and Tender Offers Transactions | NV | NV | R | R | None | 315.00 | 315.00 |
|  | (a) CGP | NV | R | R | R | None | 452.00 | 452.00 |
|  | (b) Chatham | NV | P | NV | NV | None | 0 | 0 |
| 2 | 5% Stock Sale and Guarantee Release | NV | NV | NV | NV | None | 0 | 0 |
| 3 | 6% PIP | NV | NV | NV | NV | None | 0 | 0 |
| 4 | Declaratory Judgment Action | NV | NV | NV | NV | None | 0 | 0 |
| 5 | Senior Unsecured Notes Transaction | NV | NV to W | NV to W | NV to W | None | 0 | 0 |
| 6 | PIK Notes Transaction | NV | W | W | W | Preference (NV) | 0 | 0 |
| 7 | Intercompany Transactions | P to W | R | R | R to P | Preference (S)[7] | 289.00 | 662.50 |
|  | **Financial Transactions Subtotal** | | | | | | $  1,056.00 | $  1,429.50 |
| **C** | *Tax Issues* | R | W | NV | NV | Unjust Enrichment (S), Turnover (S) | $  55.80 | $  55.80 |
| **D** | *LBO* | NV | NV | NV | NV | NV | 0 | 0 |
|  | **GRAND TOTAL** | | | | | | $  3,598.50 | $  5,112.10 |

**Notes**

[1] Potential defendants on each claim determined to be strong or reasonable are noted in parenthesis after the strength of the claim. For instances in which the constructive and actual fraudulent transfer claims have the same strength, the defedants are identical and thus not repeated in the actual fraudulent transfer column. The potential defendants for all breach of fiduciary duty claims are CEOC's directors and CEC as controlling shareholder. Aiding and abetting claims where identified would be against the Sponsors and in some cases certain CEC Board members affiliated with the Sponsors.

[2] Without taking into account potential duplication of recoveries, the range of potential recoveries for constructive or actual fraudulent transfer on claims determined to be strong or reasonable (i) against CAC/CGP/CIE is approximately $1.71 billion to $2.29 billion; and (ii) against CERP is approximately $716 million to $1.28 billion.

[3] Without taking into account potential duplication of recoveries, the range of potential recoveries against the CEOC directors and CEC for breach of fiduciary duty on claims determined to be strong or reasonable is approximately $3.19 billion to $4.68 billion.

[4] Without taking into account potential duplication of recoveries, the range of potential recoveries against the Apollo for aiding and abetting a breach of fiduciary duty on claims determined to be strong or reasonable is approximately $2.63 billion to $3.77 billion. As to TPG, the range is $1.56 billion to $2.58 billion.

[5] "Other" includes additional claims that were considered by the Examiner.

[6] "SOL" refers to statute of limitations defense.

[7] The preference claim only applies to $289 million, which was the amount repaid during the 12 months prior to the Petition Date. The balance of the Intercompany claim is for amounts paid on the Intercompany Revolver prior to the preferred period. Value range between low and high is based on the varying strength of preference and fraudulent transfer claims, although both claims have at least a reasonable chance of succeeding.