**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| **CAESARS ENTERTAINMENT** | ) **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.*, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
| | ) |
| | ) Re: Docket Nos. 3401 & 3406 |

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS
## (Substantially Unredacted)

**May 16, 2016**
**(initially filed March 15, 2016)**

## VOLUME III
**(Section VII – 2009-2012 Asset Transfers)**
**(Section VIII – 2013-2014 Asset Transfers – Part 1)**

## VII.   2009-2012 ASSET TRANSFERS

### A. 2009 WSOP Transaction

#### 1. Introduction

Caesars began exploring creating an online gaming venture prior to the LBO.  Early in the process, Caesars established an internal working group and engaged Booz Allen Hamilton ("BAH") and legal counsel to advise on its entry into the online gaming business.  From its earliest stages in 2007 to the ultimate transaction that transferred specific World Series of Poker ("WSOP") assets from CEOC to Caesars Interactive Entertainment ("CIE") in May 2009, Caesars and its professionals and consultants analyzed various aspects of the online gaming business and multiple structures to hold, own and operate the new online venture.  There were, however, certain constants throughout the process, including:  (i) the WSOP mark was viewed as important to the success of the new venture; (ii) online real money gaming had the potential to be a multi-billion-dollar business; and (iii) play for fun ("PFF") gaming – online gaming where no money was wagered – was a part of the original business plan.

During this process, Caesars and the Sponsors considered whether the new online business should be a division of CEOC, a subsidiary of CEOC, or held in a new entity that was separate and apart from CEOC and that was owned by the Sponsors or CEC.  Ultimately, CEC and the Sponsors elected to create CIE, a new entity that was an indirect CEC subsidiary, and have CEOC transfer, ultimately to CIE, its existing WSOP sponsorship, media and licensing business and its rights in the WSOP marks and related intellectual property (the "WSOP Trademark & IP") in exchange for (i) $15 million worth of preferred stock (the "Preferred Stock") in a non-operating holding company, HIE Holdings Topco, Inc. ("TopCo") and (ii) a perpetual exclusive, sub-licensable, royalty-free license to use the WSOP Trademark & IP in connection with the operation of the in-person WSOP tournaments and the manufacture, advertisement, promotion, commercialization and sale of WSOP licensed products at CEOC's and its affiliates' properties.  Since its inception in 2009, the online venture born through this process has grown based on the WSOP Trademark & IP, CIE's management team, and, principally, subsequent third-party acquisitions in the so called "social gaming space," into an extremely valuable business.

In connection with this transaction, CEOC did not have its own independent directors or legal or financial advisors looking out for its interests.  Instead, O'Melveny & Myers LLP ("OMM") served as counsel to all Caesars entities and Jonathan Halkyard, CEC's then-CFO, signed the transaction documents on behalf of every single CEC entity, including CEOC and CIE.  The testimony is clear:  no one was looking out for CEOC as its own separate entity, but instead, the transaction and prospects for the online venture were viewed through a CEC lens.

Creditors contend that (i) CEOC was insolvent at the time of the transfer of the WSOP Trademark & IP, (ii) the transfer constituted both an actual fraudulent transfer and a constructive fraudulent transfer and (iii) the statute of limitations is extended so that these claims are timely based on the IRS serving as a Golden Creditor.  Creditors also have alleged that the transfer constituted a breach of fiduciary duty, including a usurpation of corporate opportunity, by CEOC and its controlling shareholder CEC and/or constituted aiding and abetting a breach of fiduciary

duty/usurpation of corporate opportunity by the Sponsors.  They aver that the 3 year limitations period applicable to fiduciary duty and usurpation claims was tolled based on, among other things, CEC's public filings erroneously identifying CIE as being owned by CEOC, when in fact CEOC did not have a common equity stake in CIE.

Based on the evidence, subject to the statute of limitations issue discussed below, the Examiner concludes that there is a strong argument that this transaction was a constructive fraudulent transfer.  CEOC was insolvent at the time of the 2009 WSOP Transaction and the evidence establishes that CEOC did not receive reasonably equivalent value for the transfer of the WSOP Trademark & IP.  While an argument can be made that this transaction also constituted an actual fraudulent transfer because of the presence of certain badges of fraud, the Examiner concludes this claim is weak.  When each of the badges of fraud are viewed in context, this transaction, while it does raise concerns, falls short of the standard necessary to prove an actual intent to hinder, delay or defraud CEOC's creditors.  The Examiner also concludes that there is a reasonable argument that the limitations period for the fraudulent transfer claims is extended to 10 years by virtue of the IRS's existence as a Golden Creditor.

Due to the lack of an adequate process, the unfair terms of the transaction to CEOC and the fact that CEOC was insolvent at the time of the transaction, subject to the statute of limitations issue discussed below, the Examiner also concludes that there are reasonable claims for breach of fiduciary duty, including usurpation of a corporate opportunity, in connection with the online gaming business, against CEOC's Directors and CEC as controlling shareholder. Similarly, there are reasonable aiding and abetting breach of fiduciary duty claims against the Sponsors.  The real issue, however, is whether these claims would allow CEOC to recover the value attributed to social gaming.  Doing so is possible, but there are material difficulties to recovery because CIE's online gaming business today has evolved from its initial business model and was built, in part, upon a shift in strategy and additional investments and acquisitions from third parties.  At the same time, while CIE's operations today differ from its original online gaming business model as it existed in 2009, the evolution of CIE's business is arguably a natural progression of PFF online gaming.  As a result, because CEC stripped the PFF online gaming opportunities from CEOC for the benefit of a separate CEC subsidiary, there is a potential, although difficult, usurpation of corporate opportunity claim against CEC and an aiding and abetting usurpation of corporate opportunity claim against the Sponsors to recover the full value of CIE.  Whether these claims survive the expiration of the three-year statute of limitations period also is far from clear, requires resolution of factual questions, and is unlikely to be resolved at the pre-discovery pleading stage.  Overall, however, given these obstacles, the claim based on recovering the full value of CIE is between weak and plausible.  A claim to recover the current value of CIE that is attributable to its real-money online poker and its online gaming that uses the WSOP Trademark & IP is more plausible, though still difficult.

## 2.  Factual Background

### a.  Early Analysis of Caesars' Entry into Online Gaming

By late 2007, Caesars started exploring entry into the online gaming business.[533]   Gary Loveman, Caesars then-CEO, was an early proponent of the entry into online gaming and "quite outspoken about [his] view that the company needed to be in the online gaming business with the World Series of Poker brand."[534]   CEC's vice chairman at the time, Charles Atwood, noted in January 2008 that the WSOP had been a "home-run" for Caesars that needed to be developed online.[535]   This enthusiasm toward online gaming was known to the Sponsors at the time of the LBO, who recognized that an area that Caesars' management was "interested in as a potential exploration of value creation was the whole notion of online."[536]   The Sponsors' view on online gaming appears mixed and changed over time.[537]   Apollo's Marc Rowan said that he was initially enthusiastic about the potential of online gaming in the event of U.S. legalization[538] but that he later viewed the online gaming opportunity less positively and less likely to succeed.[539]

In 2007, under the name "Project Forest,"[540] Caesars hired BAH to help analyze the development of its online gaming business.[541]   This project with BAH was managed by an

---

[533]  *See* "Caesars Interactive Entertainment – The Early Years" (undated), at CACEXAM00373740-42 [CACEXAM00373740].

[534]  G. Loveman Oct. 27, 2015 Tr. at 24:18-21.

[535]  E-mail from C. Atwood to TPG/Apollo Partners, *et al.* (Jan. 18, 2008), at TPG-Examiner_00031188 [TPG-Examiner_00031188].

[536]  M. Rowan Nov. 16, 2015 Tr. at 24:22-25:2.

[537]  *See* K. Davis Oct. 22, 2015 Tr. at 94:14-95:6 ("I recall . . . the focus initially being online gaming, online poker, play-for-fun, real wagering to the extent it was legalized in America, which, of course, it wasn't at the time.  I think in Mitch we saw a real entrepreneur who had real experience in this and I don't think people were trying to constrain what CIE could become, but its focus was going to be the online world, and obviously over time it took some twists and he acquired that interest in Playtika and that ended up being it looks like a very good investment, but I think we knew we were getting hopefully a leader and an entrepreneur who would grow our online presence at Caesars."); K. Peterson Nov. 23, 2015 Tr. at 17:19-20 ("I think we thought [U.S. legalization] was possible, but certainly not probable.").

[538]  *See* M. Rowan Nov. 16, 2015 Tr. at 34:12-19.

[539]  *See id.* at 32:16-19 ("I was one of those people who was quite negative on, at some point, even concluding this investment, based on what we learned over time.").

[540]  Note that this project name continued to be used through late 2008 with respect to Caesars' potential entry into online gaming.

[541]  E-mail from C. Atwood to TPG/Apollo Partners, *et al.* (Jan. 18, 2008), at TPG-Examiner_00031188-89 [TPG-Examiner_00031188].

internal CEOC Online Task Force that included Jeffrey Pollack, the then-Commissioner of the WSOP, and Craig Abrahams, then a Caesars employee involved with the WSOP.[542]  In January 2008, the same month the LBO closed, BAH presented Caesars with an analysis of the best method for Caesars to enter the global online gambling space.[543]  In this analysis, BAH touted the potential value of online gambling and projected that by 2012, online gambling would be a $17.4 billion global market[544] that would represent a $2.1 billion revenue opportunity for CEC.[545]  BAH also opined as to the potential value of PFF poker, which are online poker games that do not involve real money wagering.[546]  BAH's analysis showed that by 2012, the online PFF poker market, even if real-money poker was not legalized, could allow Caesars to generate $22 million in annual EBITDA.[547]  At that time, CEOC already was involved in PFF gaming through licensing the brand to other companies for WSOP poker.  According to BAH, a WSOP game on AOL had experienced over 1 million unique users since September 2006,[548] and an existing "play-for-fun offering [had] ~45,000 unique monthly visitors playing an average of 13 games each."[549]  In connection with this analysis, BAH concluded that the WSOP brand was "the key to success for [CEC] in the online play for fun poker market."[550]  But later, in connection with the new online gaming business opportunity as it was actually developed in 2008-2009, PFF's primary value was viewed as its ability to serve as a marketing tool to attract customers to the WSOP brand in anticipation of the legalization of online real-money poker.[551]

Between January and June 2008, Caesars, through its internal working group (identified above) and with involvement from the Sponsors, continued to examine how to expand and develop an online gaming business.[552]  Rick Press of Apollo and Karl Peterson of TPG appear to

---

[542]  *Id.* at TPG-Examiner_00031188.  Other members included Tim Stanley, Jan Jones, Steve Brammell and John Baker.  *Id.*; *see also* "Caesars Interactive Entertainment – The Early Years" (undated), at CACEXAM00373740-42 [CACEXAM00373740].

[543]  "Project Forest Project Overview" (Jan. 18, 2008), at TPG-Examiner_00016288-413 [TPG-Examiner_00016288].

[544]  *Id.* at TPG-Examiner_00016293.

[545]  *Id.* at TPG-Examiner_00016326.

[546]  *Id.* at TPG-Examiner_00016361.

[547]  *Id.* at TPG-Examiner_00016367.

[548]  *Id.* at TPG-Examiner_00016361.

[549]  *Id.* at TPG-Examiner_00016359.

[550]  *Id.* at TPG-Examiner_00016362.

[551]  *See* M. Garber Nov. 20, 2015 Tr. at 241:20-24; *see also* e-mail from C. Abrahams to B. Bellhouse (Sept. 9, 2008), at APOLLO-Examiner_01034320 [APOLLO-Examiner_01034320]; *infra* note 42.

[552]  *See, e.g.*, "Project Forest NewCo WSOP Transfer Pricing" (Apr. 2, 2008), at CEC_EXAMINER_1234014-18 [CEC_EXAMINER_1234014]; "Project Forest Senior

have been the individuals representing the Sponsor groups during this timeframe in connection with the online gaming.[553]  Their primary focus was on how to use the WSOP brand to develop both real money and PFF online gaming operations.[554]  For instance, a May 14, 2008 Project Forest Senior Management Update noted that "[o]nline rake poker in the US has the potential to materially impact the valuation of [CEC]"[555] and "[c]reate more than $1 billion in value for [CEC] through global online gaming"[556] and that CEC's "strategy is to capture dormant rake players to our PFF game, and convert them to rake upon legalization."[557]  In order to achieve this vision, CEC proposed pursuing a combination of PFF gaming and real-money poker, where legal, as follows:

> 1.  Launch in 2009 a US PFF site that allows us to start building the customer base for a US rake site; 2.  Launch in 2009 a UK rake site that gives us immediate market access and creates an opportunity to "crack the code" on player churn before the US market opens up; 3.  Take an immediate leadership role in the effort to legalize online poker in the US within the next 24 - 36 months; and 4. Launch a rake poker site in the US upon legalization and capture at least 15% market share within the first 12 months.[558]

During this timeframe, Caesars' in-house attorney Michael Cohen engaged outside counsel to provide a 50-state survey on PFF gaming in the U.S. to analyze PFF prize structure variations that could be legally offered and presented the findings to the Sponsors.[559]  Cohen continued to be the main in-house legal contact up through, and including, the final transaction.[560]

---

Management Update" (May 14, 2008), at APOLLO-Examiner_01456767-806 [APOLLO-Examiner_01456767]; e-mail from M. Cohen to C. Abrahams (May 2, 2008), at APOLLO-Examiner_01456765-66 [APOLLO-Examiner_01456765].

[553]  *See* e-mail exchange between R. Press and K. Peterson, *et al.* (Sept. 3-5, 2008), at APOLLO-Examiner_01067060-61 [APOLLO-Examiner_01067060].

[554]  "Project Forest Senior Management Update" (May 14, 2008), at APOLLO-Examiner_01456772 [APOLLO-Examiner_01456767].

[555]  *Id.* at APOLLO-Examiner_01456770.

[556]  *Id.*

[557]  *Id.* at APOLLO-Examiner_01456772.

[558]  *Id.* at APOLLO-Examiner_01456770.

[559]  E-mail from M. Cohen to C. Abrahams (May 2, 2008), at APOLLO-Examiner_01456765-66 [APOLLO-Examiner_01456765].

[560]  *See, e.g.*, M. Cohen Oct. 16, 2015 Tr. at 23:22-24:5; C. Abrahams Oct. 7, 2015 Tr. at 92:9-15; B. Finnegan Nov. 11, 2015 Tr. at 13:14-19.

While continuing to assess their options during this timeframe, Caesars and the Sponsors began a dialogue with Mitch Garber, CEO of PartyGaming Plc, due to his experience and prior success in the online gaming market.[561]   Rowan first met with Garber in March 2008 to discuss the possibility of creating an online gaming organization with the backing of Caesars and the WSOP brand.[562]   Garber subsequently met with Peterson[563] and, in June 2008, Loveman.[564] Apollo was particularly interested in the education that Garber could provide to Caesars regarding the online gambling business.[565]   Garber reinforced the potential value of internet gambling and provided Caesars with insight into how best to compete in the market.   As recounted by Rowan, the takeaways from an early meeting with Garber included:

> Internet gaming is a bigger up for [CEC] than any plan we have seen, unique nature of our asset base gives us interesting competitive advantage, focus on poker only to start is misplaced, spending lots of money to buy anything is misplaced, liquidity 10x more important than site functionality, technology is easily buyable.[566]

Shortly after meeting with top individuals from Caesars and the Sponsors, the constituencies engaged in negotiations for Garber to lead a newly created entity that would focus on online gaming.[567]   Garber initially joined Caesars as a contractor and worked with Abrahams and others to develop a business plan for the new enterprise[568] while, with the assistance of his attorney Sidney Horn, negotiating the terms of a deal with Caesars, including his ownership interest in the new venture.[569]

---

[561]   G. Loveman Oct. 27, 2015 Tr. at 27:11-13.

[562]   M. Rowan Nov. 16, 2015 Tr. at 25:5-24.

[563]   *See id.*; M. Garber Oct. 9, 2015 Tr. at 8:21-9:4.

[564]   "Caesars Interactive Entertainment – The Early Years" (undated), at CACEXAM00373740 [CACEXAM00373740].

[565]   E-mail from R. Press to G. Loveman, *et al.* (Apr. 29, 2008), at TPG-Examiner_00245550 [TPG-Examiner_00245550].

[566]   E-mail from M. Rowan to G. Loveman (Apr. 3, 2008), at APOLLO-Examiner_01158454 [APOLLO-Examiner_01158454].

[567]   E-mail exchange between K. Davis and K. Peterson, *et al.* (Aug. 19, 2008), at TPG-Examiner_00245636 [TPG-Examiner_00245636].

[568]   M. Cohen Oct. 16, 2015 Tr. at 23:22-24:5; C. Abrahams Oct. 7, 2015 Tr. at 12:14-19; M. Rowan Nov. 16, 2015 Tr. at 57:16-20.

[569]   M. Cohen Oct. 16, 2015 Tr. at 70:25-71:5.   Garber signed his employment agreement in January 2009, as discussed more fully below.

### b. Changing Structure and Value from August 2008 to January 2009

By August 2008, Caesars had moved forward with evaluating a potential entry into the online real-money and PFF gaming.  An August 25, 2008 Project Forest presentation repeated Caesars' strategy that the "WSOP will pave the way for an expanded, multi-brand multi-game offering,"[570] a "differentiated WSOP PFF game is a powerful way to engage future casual and serious rake poker players today"[571] and this will allow Caesars to "capture dormant rake players to our PFF game, and convert them to rake upon legalization."[572]  Despite the optimism for the PFF possibilities, this analysis viewed U.S. PFF as being cash flow negative until 2011, with a projected EBITDA of $3.7 million in 2011 and $8 million in 2012.[573]  This appears consistent with Caesars' contemporaneous views about PFF primarily being a marketing tool for real money gaming, as opposed to a substantial, independent revenue generator.  As Abrahams explained at that time, "US PFF is likely not going to generate much revenue since the focus on the near-term may be acquiring as many customers as possible (not maximizing ad revenue).  Any ad revenue may go to fund better prizing, marketing, and content to drive more users to the site."[574]

A September 3, 2008 Project Forest presentation contains a preferred organizational structure for the new business,[575] reflects the desire to partner with Garber, who was already working as a consultant in connection with the new business, and discusses entry into the online gaming business through "both 'play-for-fun' and rake gaming (where legal)."[576]  This presentation advised that the online entity would "require a flexible organization that can pursue and fund opportunities more quickly than the current 'brick & mortar' structure allow[ed]" and that "[r]egardless of the structure, the entity will need to create an entrepreneurial environment, with aligned incentives and flexible compensation."[577]  The presentation offered three potential structures, including:  (i) having online be a division within CEOC; (ii) having online be a separate subsidiary of CEC and license the WSOP brand from CEOC; and (iii) combining the offline WSOP business (*i.e.*, sponsorship and licensing) with online in a separate subsidiary of CEC.[578]  The materials set forth "Advantages" and "Issues to Consider" for each of the

---

[570] "Project Forest Summary Overview" (Aug. 25, 2008), at APOLLO-Examiner_01034325 [APOLLO-Examiner_01034322].

[571] *Id*. at APOLLO-Examiner_01034329.

[572] *Id*. at APOLLO-Examiner_01034330.

[573] *Id*. at APOLLO-Examiner_01034359.

[574] E-mail from C. Abrahams to B. Bellhouse (Sept. 9, 2008), at APOLLO-Examiner_01034320 [APOLLO-Examiner_01034320].

[575] "Project Forest Online Structure Analysis" (Sept. 3, 2008), at APOLLO-Examiner_01478416-22 [APOLLO-Examiner_01478416].

[576] *Id*. at APOLLO-Examiner_01478417.

[577] *Id*.

proposals.[579]   The presentation also set forth the long-term plans for separating the online business, noting that "[s]eparating Online and WSOP from [CEC] is optimal in the long-term."[580]

On September 4, 2008, Cohen transmitted this September 3 presentation to the Sponsors.[581]   By this point in time, Cohen was actively involved in advising Caesars regarding the implications of various potential structures, a role he maintained through the close of the transaction in May 2009.   In his transmittal e-mail, Cohen advised that the third structuring alternative, "(where the offline WSOP is combined with the online business as a subsidiary of [CEC]) is the best alternative" and that that Garber agreed with this assessment.[582]   Cohen also proposed retaining Duff & Phelps to value the WSOP.[583]   Cohen's e-mail and the proposed structure, however, were not warmly received, with both Apollo and TPG expressing disagreement with the company's direction.[584]

By September 10, 2008, at the request of Loveman and the Sponsors, and [i]n an effort to quickly build momentum to launch [the online gaming] business," Caesars established two WSOP Online working groups to focus on different aspects of the transaction.[585]   The Business Plan Working Group was responsible for "develop[ing] a detailed business plan and financial

---

[578]   *Id.*

[579]   *Id.* at APOLLO-Examiner_01478418.   This included, *inter alia,* the implications of moving the WSOP mark/business under CEOC's credit agreements.   *Id.*

[580]   *Id.* at APOLLO-Examiner_01478419.   The deck further surmised that most of the existing valuation associated with WSOP was at the property level and that "[a] combined WSOP/Online entity will likely trade at a higher multiple than [CEC] as a separate entity with ownership of the WSOP mark."   *Id.*

[581]   E-mail from M. Cohen to R. Press, *et al*. (Sept. 4, 2008), at APOLLO-Examiner_01478415 [APOLLO-Examiner_01478415].

[582]   *Id.*   Garber, however, stated that he was not interested in the location of CIE, but was concerned with his equity ownership and upside.   *See* M. Garber Oct. 9, 2015 Tr. at 45:15-20 ("Q. So you didn't know any reason why CIE couldn't have just bought these World Series of Poker assets directly from CEOC in '09? A. I only cared that they landed in CIE."), 50:9-15 ("Q. You have talked about in 2009 that your focus was really on the equity and compensation structure that would allow you to bring in the management you wanted, to incentivize them and to create sort of what you view as a more tech environment.  A. Yes.").

[583]   E-mail from M. Cohen to R. Press, *et al*. (Sept. 4, 2008), at APOLLO-Examiner_01478415 [APOLLO-Examiner_01478415].

[584]   E-mail exchange between K. Peterson and M. Cohen, *et al*. (Sept. 3-5, 2008), at APOLLO-Examiner_01067060-61 [APOLLO-Examiner_01067060].

[585]   E-mail from M. Cohen to J. Halkyard, *et al.* (Sept. 10, 2008), at APOLLO-Examiner_01478446 [APOLLO-Examiner_01478446].

model."[586]    Members included Garber (team leader), David Sambur, Greg Kranias, Abrahams and Katrina Lane.[587]    The Structure Working Group was to "debate and determine the issues necessary to capitalize the WSOP entity, including entity structure, capitalization, equity compensation plan metrics, HR needs, and transfer pricing (Total Rewards, WSOP, corporate allocations, etc.)."[588]    This group included Halkyard (team leader), Mary Thomas, Cohen, Kranias and Sambur.[589]    Both of these working groups reported to the "WSOP Online Gaming Task Force," whose members included Loveman (team leader), Peterson and Press.[590]

Robert Brimmer was not assigned to either of the working groups, but nevertheless played a key role in developing projections during this timeframe.  Indeed, Brimmer built a number of the initial financial models for the transaction.[591]    These models incorporated materials provided by Abrahams, who, at Brimmer's request, supplied "assumptions around the sponsorship, licensing media business in terms of his modeling."[592]

Even after creation of these separate working groups and with Garber's input, both real-money and PFF gaming remained the centerpiece of the online business plan.  Specifically, during the October 2008 timeframe, the business plan continued to involve using PFF poker as a marketing tool.[593]    In connection with this business plan, the presentations reflect a view that "[t]he U.S. online poker market represents the single largest growth opportunity for [CEC] – if legalized"[594] and that "Play-for-fun (PFF) is a proven global tool to create a growing database and convert players to play-for-money in legal jurisdictions."[595]

Despite Caesars' views regarding uncertainty around the future of the online business, a presentation circulated on October 23, 2008 used a multi-scenario approach to conclude that the WSOP business, mark and online real-money gaming opportunity had a present value of $713.5 million,[596] $398 million of which was attributed to the WSOP brand.[597]    Caesars further

---

[586]  *Id.*

[587]  *Id.*

[588]  *Id*.

[589]  *Id.*

[590]  *Id*.

[591]  R. Brimmer Sept. 29, 2015 Tr. at 88:10-12.

[592]  C. Abrahams Jan. 29, 2016 Tr. at 83:16-23.

[593]  *See* "Project Forest Online Gaming Business Plan" (Oct. 2, 2008), at APOLLO-Examiner_00473489, APOLLO-Examiner_00473493 [APOLLO-Examiner_00473479].

[594]  *Id*. at APOLLO-Examiner_00473489.

[595]  *Id*. at APOLLO-Examiner_00473493.

[596]  "Project Forest Review" (Oct. 2008), at TPG-Examiner_00722947 [TPG-Examiner_00722944].  Based on the cover e-mail to which this deck was attached dated October 23, 2008, this deck was version 7 of the presentation.  *Id*. at TPG-Examiner_00722943.

disaggregated the offline value ($130 million) from online value ($186 million) as reflected in 2009 WSOP Transaction Figure 1.

**2009 WSOP Transaction Figure 1:  Disaggregating Pre-Money Value**



Source:  "Project Forest Review" (October 2008), at TPG-Examiner_00722949 [TPG-Examiner_00722944].

Witnesses have told the Examiner that the values in this presentation were unrealistic and not linked to what someone would actually pay.[598]   The Examiner concurs.  They represent earlier analyses by Brimmer and are based on questionable assumptions.[599]   Nonetheless, while these numbers may not be credible, this analysis does provide evidence that the WSOP brand itself does have value, and that in considering how to value that brand, it is appropriate to consider the potential "upside" from reasonably foreseeable ventures in which the WSOP could be used.  The October 23 presentation also appears to reflect a different structural approach. Namely, the "preferred" structure involved the creation of a new entity (ultimately CIE) whose equity would be held by both CEOC and CIE management.[600]

---

[597]  *Id.* at TPG-Examiner_00722948.

[598]  *See* M. Garber Nov. 20, 2015 Tr. 212:4-22; C. Abrahams Jan. 29, 2016 Tr. at 89:16-25; R. Brimmer Jan. 20, 2016 Tr. at 304:4-11.

[599]  *See* R. Brimmer Jan. 20, 2016 Tr. at 299:12-300:2.

[600]  E-mail from R. Brimmer to D. Sambur, *et al.* (Oct. 23, 2008), at TPG-Examiner_00722950 [TPG-Examiner_00722943].

In late October, a presentation was sent to the online steering committee, Press, Peterson and Loveman, in connection with a scheduled call.[601]   According to the e-mail transmitting the analysis, Garber provided an update on the business to the committee and Halkyard discussed "valuation of the WSOP business," "structure of WSOP business with properties" and "capitalization."[602]   In the presentation, the "preferred structure" still involved CEOC transferring the "existing offline business (sponsorship/media)" to a new entity.[603]   The new entity would license the WSOP mark from CEOC.[604]   The proposed structure is similar to that proposed earlier in the month – CEOC and management would own the equity in CIE.[605]   While earlier analyses attribute $398 million of this value to the WSOP brand,[606] this presentation concludes that the present probability-adjusted value of the WSOP Brand was $325 million.[607]   Again, the Examiner does not view the numbers in this valuation as being particularly meaningful.

Brimmer, who created these October and November 2008 valuations, stated that he introduced the concept of attributing brand value to the future business and that the concept "made sense" as of October 2008.[608]   While Garber did not recall these presentations specifically, he did recall "Brimmer throwing crazy numbers at me and me laughing at him and telling him that this is just not the way you value a speculative business asset like this . . . ."[609]   Abrahams also stated that he "remember[ed] laughing with [Garber] that we heard that this guy Rob Brimmer had put together this analysis that says [the WSOP business] was worth 600 million.  We laughed about it and then kind of moved on and it never came up again. . . . I don't think we ever took it seriously."[610]

---

[601] E-mail from M. Cohen to R. Press, *et al.* (Nov. 18, 2008), at APOLLO-Examiner_01027353-64 [APOLLO-Examiner_01027353].

[602] *Id.* at APOLLO-Examiner_01027353.

[603] *Id.* at APOLLO-Examiner_01027356.

[604] *Id.*

[605] *Id.*

[606] E-mail from R. Brimmer to D. Sambur, *et al.* (Oct. 23, 2008), at TPG-Examiner_00722947 [TPG-Examiner_00722943].

[607] E-mail from M. Cohen to R. Press, *et al.* (Nov. 18, 2008), at APOLLO-Examiner_01027358 [APOLLO-Examiner_01027353].  Abrahams stated that this presentation was not in his format and that if he had to guess he would say that it was prepared by Caesars' legal department. C. Abrahams Oct. 7, 2015 Tr. at 52:19-23.

[608] R. Brimmer Jan. 20, 2016 Tr. at 306: 18-25.  Brimmer had no explanation regarding why the concept disappeared later in the process and from the final valuation.  *Id.* at 306:21-307:3.

[609] M. Garber Nov. 20, 2015 Tr. 212:4-22.

[610] C. Abrahams Jan. 29, 2016 Tr. at 89:16-25.

Brimmer confirmed that Garber told him that "he thought this was kind of an interesting approach and framework, but he didn't think the valuations were realistic. . . . he thought the valuations were too high."[611]  But Garber did admit that the WSOP brand itself at the time did have some value and was not worth zero.[612]  Similarly, Abrahams acknowledged that at that time they viewed the WSOP brand as a "differentiator."[613]  And while Garber opined that he "thought [legalization] was a long-shot," he also believed it was "a worthwhile long-shot."[614]  According to Garber, others, including Loveman, were optimistic regarding the possibility of legalization of online poker in the United States.[615]  But by the time the transaction closed, Rowan indicated that he was less sanguine.[616]

By December 2008, Caesars and Garber had agreed to terms for CEOC to sell the entire WSOP business, subject to steering committee approval.[617]  These terms were included in a presentation that reflected a different approach than Brimmer had previously employed and is reflected in a term sheet that was sent to Press, Peterson and Loveman on December 21, 2008.[618]  The presentation valued the "WSOP Business/Mark" at $84.5 million using a DCF analysis of four existing revenue streams, including:  (i) Rio Event EBITDA attributable to the WSOP brand; (ii) Circuit Event EBITDA attributable to the WSOP brand; (iii) sponsorship/media/licensing EBITDA; and (iv) Retail EBITDA attributable to the WSOP brand.[619]  The valuation reflects a 4.8x EBITDA multiple of these revenue streams,[620] despite the fact that prior analyses had used a 10x EBITDA multiple of the sponsorship, licensing and media

---

[611]  R. Brimmer Jan. 20, 2016 Tr. at 304:4-11.

[612]  M. Garber Nov. 20, 2015 Tr. at 216:5-218:21.

[613]  C. Abrahams Jan. 29, 2016 Tr. at 81:16.

[614]  M. Garber Oct. 9, 2015 Tr. at 11:12-15.

[615]  *Id*. at 40:13-19.

[616]  *See* M. Rowan Nov. 16, 2015 Tr. at 32:16-19.

[617]  "Project Forest Review" (Dec. 2008), at APOLLO-Examiner_01060025, APOLLO-Examiner_01060030 [APOLLO-Examiner_01060023].

[618]  E-mail from M. Cohen to R. Press, K. Peterson, G. Loveman, *et al.* (Dec. 21, 2008), at APOLLO-Examiner_01060021 [APOLLO-Examiner_01060021].

[619]  *Id*. at APOLLO-Examiner_01060024; *but see* "Structuring Workstreams Outline" (Dec. 14, 2008), at APOLLO-Examiner_01042280 [APOLLO-Examiner_01042268] (noting that a "recent discounted cash flow valuation estimated the fair market [value for the WSOP trademark and the sponsorship/licensing/media business] at $90-100 million."). Cohen stated that he did not recall any discussion of the price being greater than $85 million.  M. Cohen Feb. 9, 2016 Tr. at 449:8-16.  Moreover, the Examiner has not discovered a copy of this valuation in the course of the examination.

[620]  Project Forest Review" (Dec. 2008), at APOLLO-Examiner_01060024 [APOLLO-Examiner_01060023].

when determining the offline value of the WSOP.[621]  And unlike prior analyses, this analysis did not allocate any value to the future value of online real-money poker or the WSOP brand itself beyond the existing income streams.[622]  So the analysis moved from one extreme – attributing unrealistic value to the potential upside from the use of the WSOP brand and online real money poker – to the other extreme – providing nothing to CEOC for either of these potential sources of value.  The transaction structure also changed.  It involved CEOC selling "the WSOP business and mark at a valuation of $85M to NewCo in exchange for a note."[623]  CEOC would have no equity.[624]  NewCo was to be held "outside" of CEOC's credit.[625]  The terms provided for an initial investment by Garber of $1.5 million and an 8.5% option pool for the new management team.[626]  The presentation stated that Garber had agreed to the terms described therein, including the $85 million price.[627]

### c.  Early 2009

### i.  Duff & Phelps Draft Analysis

The December 2008 deck indicates that by mid-January 2009, Duff & Phelps would prepare a fairness opinion in connection with the proposed transaction.[628]  CEC therefore retained Duff & Phelps on December 22, 2008 to provide the fairness opinion for CEOC.[629]

---

[621] "Project Forest Review" (Oct. 2008), at TPG-Examiner_00722949 [TPG-Examiner_00722943].

[622] *See* J. Halkyard Nov. 2, 2015 Tr. at 45:12-46:23.  Garber also expressed his view that while the value of the WSOP brand contributed to CIE in 2009 was not in the hundreds of millions of dollars, it was worth something.  M. Garber Nov. 20, 2015 Tr. at 216:5-218:21; *see also* G. Loveman Oct. 27, 2015 Tr. at 32:10-34:20; M. Garber Nov. 20, 2015 Tr. at 212:4-22, 214:3-8.

[623] "Project Forest Review" (Dec. 2008), at APOLLO-Examiner_01060025 [APOLLO-Examiner_01060023].

[624] *Id.* at APOLLO-Examiner_01060026.

[625] *Id.*

[626] *Id.* at APOLLO-Examiner_01060027.

[627] *Id.* at APOLLO-Examiner_01060030.

[628] *Id.*

[629] Letter from Duff & Phelps to CEC Board (Dec. 22, 2008) [DP00002127].  As described in the engagement letter, the transaction to be evaluated "involves the transfer of the assets and liabilities that comprise the World Series of Poker franchise . . . currently owned by [CEOC] and its wholly-owned subsidiary, Harrah's License Company, LLC to a newly formed wholly-owned subsidiary of the Company . . . in exchange for a note to be issued from NewCo to [CEOC]."  *Id.*  Ultimately, Duff & Phelps opined on only certain aspects of the transaction (discussed more fully below) and was not tasked with conducting a solvency analysis of CEOC in connection with the 2009 WSOP Transaction.

Abrahams and Brimmer provided management projections and other financial information to Duff & Phelps in connection with its analysis.[630]  Abrahams stated that he was responsible for the projections related to the WSOP business, which included the sponsorship, licensing and media[631] and that he provided feedback to Duff & Phelps as it related to "the accuracy of the projections and the assumptions."[632]  As envisioned by the December deck, Duff & Phelps provided a draft fairness analysis on January 30, 2009, opining on the fairness of a sale of all the WSOP assets for $70 million.[633]  None of the witnesses have been able to explain why the consideration was reduced from $85 million to $70 million.

In preparing its draft fairness opinion, Duff & Phelps used a DCF to value the four WSOP revenue streams: (i) Event Revenue; (ii) Circuit Event Revenue; (iii) Sponsorship/Media/Licensing Revenue; and (iv) License Fee.[634]  The deck concluded that

---

As part of this same engagement, Duff & Phelps also provided a fairness opinion to the CEC Board regarding the fair market value of the common and preferred stock of HIE Holdings that CEC acquired contemporaneously with the 2009 WSOP Transaction.  *See* Letter from Duff & Phelps to CEC Board (Apr. 30, 2009), at CEOC_INVESTIG_00141534-38 [CEOC_INVESTIG_00141534].  However, this opinion is not relevant for purposes of the analysis set forth herein.  Duff & Phelps first prepared an analysis of the transaction as it was contemplated in January 2009.  *See* "World Series of Poker Fairness Analysis" (Jan. 30, 2009) PRIV_INVESTIG_00060392-440 [PRIV_INVESTIG_00060392].

[630] R. Brimmer Sept. 29, 2015 Tr. at 88:10-12; C. Abrahams Oct. 7, 2015 Tr. at 17:18-18:4; e-mail from C. Abrahams to G. Kranias, *et al.* (Oct. 9, 2008), at APOLLO-Examiner_00473478 [APOLLO-Examiner_00473478]; e-mail from R. Brimmer to D. Sambur, *et al.* (Jan. 1, 2009), at CEOC_INVESTIG_00430515 [CEOC_INVESTIG_00430515]; e-mail exchange between C. Abrahams and K. Kushin, *et al.* (Jan. 29-30, 2009), at PRIV_INVESTIG_00060389-90 [PRIV_INVESTIG_00060389].

[631] C. Abrahams Oct. 7, 2015 Tr. at 61:10-16.

[632] *Id.* at 20:4-10.  In contrast, Garber stated that he did not have any involvement in valuing the WSOP mark or business in connection with the transaction, M. Garber Oct. 9, 2015 Tr. at 25:22-26:5, and was not "involved in the criteria that were given to Duff & Phelps and how to value the company and what to take out and what to put in."  M. Garber Nov. 20, 2015 Tr. at 233:2-5.

[633] "World Series of Poker Fairness Analysis" (Jan. 30, 2009), at PRIV_INVESTIG_00060392-440 [PRIV_INVESTIG_00060392].  Note, a Duff & Phelps fairness analysis presentation dated March 31, 2009 has also been produced ("World Series of Poker Fairness Analysis" (Mar. 31, 2009), at APOLLO-Examiner_00760280-328 [APOLLO-Examiner_00760280]) that generally contains the same information as the January 30 presentation, but which states owners' equity at $10 million (as opposed to $21.5 million) and the implied 2008 EBITDA multiple as 3.9x (as opposed to 4.4x).

[634] "World Series of Poker Fairness Analysis" (Jan. 30, 2009), at PRIV_INVESTIG_00060423 [PRIV_INVESTIG_00060392].

the WSOP assets and liabilities had "an enterprise value range of $60.0 to $75.0 million."[635] Duff & Phelps arrived at this valuation, which was almost 20% lower than the $85 million value in the December 2008 deck, by using an increased discount rate.[636]  The Duff & Phelps analysis also attributed no value to the upside associated with the online opportunity or the WSOP mark itself.  Additionally, the Duff & Phelps analysis did not include the concept of CEOC owning the newly formed entity.[637]  Instead, the analysis assumed that the WSOP would be transferred out of CEOC to a "newly formed wholly-owned subsidiary of" CEC.[638]

### ii.  Snapshot of the WSOP Business

A January 2009 presentation provides a comprehensive analysis of the existing WSOP business, including identification of business partners and revenue streams, as well as a discussion of the potential impact that entry into online gaming could have on the existing business.[639]  According to the presentation, broadcasting, sponsorship and media generated $19.7 million in revenue and $9.7 million in gross profit in 2008.[640]  The deck includes a fulsome discussion of the licensing business and the WSOP's licensing partners, including licensing of PFF poker games that used the WSOP mark.[641]  According to the deck, the WSOP had a projected gross profit of $1.274 million associated with this licensing business.[642]  This licensing included use of the WSOP mark in electronic gaming.[643]  For instance, Excalibur Electronics products used the mark in electronic hand-held games, gaming company Activision offered two World Series of Poker games, and Glu Mobile offered "[p]oker games . . . and other content for wireless devices/mobile phones."[644]  Abrahams stated that the Glu Mobile and Activision games

---

[635]  *Id.* at PRIV_INVESTIG_00060400.

[636]  *Id.* at PRIV_INVESTIG_00060407.  It appears that this decreased valuation was a result of increasing the discount rate in response to concerns raised by Duff & Phelps that the proposed discount rate in the valuation materials initially provide by Caesars was too low.  *See* e-mail from M. Cohen to R. Brimmer (Jan. 20, 2009), at CEC_EXAMINER_1234640 [CEC_EXAMINER_1234640]; e-mail from C. Abrahams to M. Garber (Jan. 22, 2009), at CEC_EXAMINER_1236154 [CEC_EXAMINER_1236154].

[637]  "World Series of Poker Fairness Analysis" (Jan. 30, 2009), at PRIV_INVESTIG_00060393 [PRIV_INVESTIG_00060392].

[638]  *Id.*

[639]  "World Series of Poker Business Overview" (Jan. 2009), at CACEXAM00114832-82 [CACEXAM00114832].

[640]  *Id.* at CACEXAM00114842.

[641]  *Id.* at CACEXAM00114860-74.

[642]  *Id.* at CACEXAM00114861.

[643]  *Id.* at CACEXAM00114863, CACEXAM00114865, CACEXAM00114866.

[644]  *Id.*

at this time were single-player games without a multiplayer component.[645]  Glu Mobile alone paid $1.2 million in royalties in 2008.[646]

While most of the deck focused on the existing business, it did discuss the potential cannibalization of existing sponsorship if the WSOP mark entered online gaming.[647]  Namely, it recognized potential impacts on the relationship with Glu Mobile, which had "global mobile PFF rights through 2011" and Activision, whose retail sales could be "cannibalized" by a "compelling US PFF product."[648]

### iii. Garber's Employment Agreement

Garber and Caesars reached agreement as to the terms of his employment agreement on January 26, 2009.  The agreement contemplated that Garber would be the CEO and a board member of a newly created entity formed "for purposes of managing the World Series of Poker Brand."[649]  Garber's duties encompassed three areas:  "U.S. 'Play for Fun,'" "U.S. Lobbying," and the "Global Internet Business.[650]  More specifically, he was tasked with developing a strategy and business plan for U.S. "Play for Fun" and assisting in developing a strategy and roadmap for legalizing poker in the U.S.[651]  The agreement is consistent with Caesars' plans to make PFF gaming a key part of the new business entity.  Moreover, the agreement also included a non-compete provision, which restricted Garber from competing in "the online gaming business, whether it be for rake gaming, subscription gaming or 'play for fun' gaming anywhere

---

[645]  C. Abrahams Jan. 29, 2016 Tr. at 20:7-22.

[646]  "World Series of Poker Business Overview" (Jan. 2009), at CACEXAM00114865 [CACEXAM00114832].  Cohen explained that prior to the 2009 WSOP Transaction, Caesars was a brand licensor, and "WSOP would license its brand to anyone who would take it."  M. Cohen Feb. 9, 2016 Tr. at 451:22-452:8.  He also stated that licensing the brand to companies like Activision and Glu Mobile was a "very different" business than the social gaming business acquired in Playtika in 2011.  *Id.* at 452:2-5.

[647]  "World Series of Poker Business Overview" (Jan. 2009), at CACEXAM00114881 [CACEXAM00114832].

[648]  *Id.* at CACEXAM00114882.  Abrahams stated that there was an expectation that the entry into online gambling would cannibalize existing sponsorship contracts because Caesars would be seen as a competitor.  *See* C. Abrahams Jan. 29, 2016 Tr. at 85:20-23.

[649]  "Employment Agreement" (Jan. 26, 2009), at CACEXAM00328264 [CACEXAM00328264].

[650]  *Id.* at CACEXAM00328279.

[651]  *Id.*

in the world."[652]   Online poker was not legal in the U.S., but both Caesars and Garber were betting that it would be both legal and a lucrative venture.[653]

### iv.  OMM's Representation

OMM was heavily involved in the transaction and served as primary legal counsel by January 2009.[654]   It specifically advised on the structuring of the transaction.[655]   This advice included being "involved in the merger and acquisition or corporate aspects of the deal, including drafting of the transaction agreements, coordinating with intellectual property and other specialty counsel on their roles in the transaction, as well as collaborating on the Board presentation and the related fairness opinion."[656]   Its involvement in the transaction also extended to the financing side and debt covenant issues.[657]

### v.  Bankruptcy Considerations

The development of the transaction did not occur in a vacuum, and, as contemporaneous documents establish, both the overall economy and the financial health of Caesars were issues being discussed by January 2009.   As noted above in Section V, *supra*, within months of the closing of the LBO in January 2008, the 2008 recession became a reality and the gaming industry was hard-hit.   From year-end 2007 to the end of 2009, Caesars' enterprise-wide net revenues decreased from $12.7 billion to $10.3 billion, while adjusted EBITDA dropped from $2.1 billion to $1.7 billion, and continued to decline thereafter.[658]   By December 2008, OMM was providing Apollo with advice and analysis with respect to restructuring Caesars' holding company structure.[659]   And by February 2009, OMM had provided the Sponsors with a presentation providing an overview of a pre-packaged bankruptcy plan.[660]   These issues were not

---

[652]  *Id*. at CACEXAM00328272.

[653]  M. Garber Oct. 9, 2015 Tr. at 11:12-15 ("I was focused more on the opportunity of legalized online poker.  I thought it was a long-shot, but a worthwhile long-shot for me to pursue.").

[654]  *See, e.g.*, B. Finnegan Nov. 16, 2015 Tr. at 11:20-12:3.

[655]  *See id.*

[656]  *Id.*; *see also* M. Cohen Oct. 16, 2015 Tr. at 31:19-20.

[657]  B. Finnegan Nov. 16, 2015 Tr. at 12:11-12.

[658]  Memorandum in Support of Chapter 11 Petitions at 28 [Docket No. 4].

[659]  E-mail exchange between D. Sambur and M. Wlazlo, *et al.* (Dec. 14, 2008) [APOLLO-Examiner_01042267], attaching "Harrah's Structuring Workstreams Outline" (Dec. 14, 2008), at APOLLO-Examiner_01042268-303 [APOLLO-Examiner_01042268].

[660]  *See* e-mail exchange between G. Ezring and G. Kranias, *et al.* (Feb. 12-14, 2009) [APOLLO-Examiner_01287862], attaching "Pre-Packaged Bankruptcy Plan Overview" (Feb. 11, 2009), at APOLLO-Examiner_01287865-77 [APOLLO-Examiner_01287865]; M. Wlazlo Feb. 4, 2016 Tr. at 234:24-235:21 (noting, inter alia, that "this is about the time we started doing the debt

lost on Abrahams and Garber, who, in January 2009 discussed the implications of a CEC bankruptcy on the new online gaming business.[661]   In response to Abrahams' question, "what happens if [CEC] goes bankrupt (with Caesars at 30% occupancy today, seems to be on everyone's mind)," Garber responded that "bankruptcy not terrible for us.  what [sic] creditor would not want us to continue building this business?"[662]   Abrahams then questioned whether bankruptcy would have an impact on CIE "beyond 3rd party financing and change in majority owner?,"[663] to which Garber responded, "it could.  in [sic] theory they could attack the sale of the assets as not for fair market value..[sic] but that's a long battle and we have the fairness opinion."[664]  Abrahams concluded the correspondence by stating, "[t]he asset sale will be at more than fair market value since they are coming in at $80 in their preliminary work . . . ."[665]

### d.  Development of the SuperholdCo Structure

By January 2009, Cohen and the Sponsors were discussing the specific ownership structure of the new online company.  Among other things, Cohen explained that the Sponsors were looking at various alternatives to restructuring the company, including a "superholdco" structure that would put an entity on top of CEC.[666]  Stated differently, the structure would involve the creation of a new entity that would hold CEC and its subsidiaries.  By early February 2009, Cohen had spoken with Press, Peterson and Loveman and reached a consensus to pursue the holdco structure.[667]   Materials prepared by OMM during this timeframe reflect that this structure had advantages for a potential sale of the business and favorably positioned the company for regulatory review including that "[r]egulatory approvals and gaming licenses/permits will be easier to obtain with the cleaner structure."[668]  Cohen stated that "the

---

exchange transactions and one of the items we discussed was doing the debt exchange out of court or potentially through a pre-pack").

[661] E-mail exchange between M. Garber and C. Abrahams (Jan. 15, 2009), at CEC_EXAMINER_1236150-51 [CEC_EXAMINER_1236150].

[662] Id. at CEC_EXAMINER_1236150.

[663] Id.

[664] Id.

[665] Id.

[666] E-mail exchange between C. Cohen and G. Loveman, et al. (Jan. 21-22, 2009), at CEC_EXAMINER_1028409 [CEC_EXAMINER_1028409] ("There are many complications in implementing this structure, including regulatory approvals.  I estimate that it will take 5-6 months to implement the structure.  I have not discussed the superholdco idea with Mitch [Garber] – I fear his reaction to a long delay to finalizing documents.").

[667] E-mail exchange between M. Cohen and D. Sambur, et al. (Feb. 4-6, 2009), at APOLLO-Examiner_00809117 [APOLLO-Examiner_00809117].

[668] "Presentation to HOC Board of Directors – WSOP Transaction" (Feb. 24, 2009), at APOLLO-Examiner_01349973 [APOLLO-Examiner_01349971].

idea of a holdco structure as I recall was that it would make it easier to be able to spin it out if it were successful."[669]

The evidence also reflects that there were discussions about the bankruptcy implications of this new structure. For instance, in connection with discussions about the proposed use of this "super structure outside of [CEC]," Abrahams indicated that it "sound[ed] like a positive from a bankruptcy protection perspective over the long term . . . ."[670]   While Cohen did not remember specific discussions about the bankruptcy protection benefits of the superholdco structure, he did recall that this was a timeframe involving "a lot of uncertainty" at Caesars.[671]   He explained that the company was "playing the what if game, what if this happened, what if that happened, trying to protect the downside . . . think about downside protections as well as what could happen in an upside case."[672]   He nevertheless explained that the proposed structure "was much more about a business opportunity to take this online gaming business, and if it were successful it could be public and trade at a much higher multiple than the bricks and mortar gaming business."[673]

As detailed in a draft April 2009 presentation to CEC's Board, the then-proposed structure involved forming a new holding company by the non-management shareholders of CEC.[674]   This company would form CIE, and CIE would then purchase the WSOP Trademark & IP from CEOC.   CEC would then provide a $10 million note to the new holding company, which would, in turn, invest the same amount in CIE.[675]   CIE would be owned, through a series of holding companies, by the Sponsors.[676]   This holding company structure is reflected in 2009 WSOP Transaction Figure 2.

---

[669] M. Cohen Feb. 9, 2016 Tr. at 451:2-8.

[670] E-mail exchange between C. Abrahams and M. Cohen, *et al.* (Feb. 10, 2009), at CEC_EXAMINER_1236183 [CEC_EXAMINER_1236183].   Abrahams expressed concern, however, about the 4-6 month timeframe for closing.   *See id.*

[671] M. Cohen Feb. 9, 2016 Tr. at 442:19-443:4.

[672] *Id.* at 443:2-23.

[673] *Id.* at 444:2-7.

[674] "HIE/WSOP Discussion" (Apr. 16, 2009), at APOLLO-Examiner_00760272 [APOLLO-Examiner_00760254].

[675] *Id.*

[676] PricewaterhouseCoopers Accounting Topic Discussion Paper (Apr. 22, 2009), at APOLLO-Examiner_00796300 [APOLLO-Examiner_00796299].

**2009 WSOP Transaction Figure 2:  Step 1 – Sale of WSOP to Holdco Structure**



Source:    "HIE/WSOP Discussion" (Apr. 16, 2009), at APOLLO-Examiner_00760275 [APOLLO-Examiner_00760254].

This, however, was only the first part of the structure.  Caesars contemplated that, after regulatory approval, CEC would become a subsidiary of the new holding company.[677]   At that point, both CIE and CEC would be first-tier subsidiaries of this new holding company.[678]  This second step is reflected in 2009 WSOP Transaction Figure 3.

---

[677] "HIE/WSOP Discussion" (Apr. 16, 2009), at APOLLO-Examiner_00760272 [APOLLO-Examiner_00760254].

[678] *Id.* at APOLLO-Examiner_00760276.

**2009 WSOP Transaction Figure 3:  Final Holdco Structure**



Source:    "HIE/WSOP    Discussion"    (Apr.    16,    2009),    at    APOLLO-Examiner_00760276    [APOLLO-Examiner_00760254].

Thus, up until April 2009, Caesars and the sponsors expected that the new business would be neither a subsidiary of CEC nor CEOC.  This meant the new company would not be held by CEOC where the WSOP business was located prior to the transaction.  As evidenced by the final transaction documents discussed below, ultimately the superholdco structure was abandoned and CIE was created as a subsidiary of CEC; however, none of the witnesses have been able to fully explain why this occurred.[679]

### e.  Last-Minute Modification of the Deal Structure

The proposed valuation methodology associated with the sale of the WSOP appears to have changed very little between January 2009 and April 2009.  For instance, a draft March 30, 2009 Duff & Phelps fairness opinion continued to reflect an enterprise range of $60 million to $75 million and a purchase price of $70 million.[680]  The transaction continued to include

---

[679] *See* M. Cohen Dec. 16, 2015 Tr. at 357:13-358:7; M. Rowan Nov. 16, 2015 Tr. at 46:14-47:3; M. Rowan Nov. 17, 2015 Tr. at 424:13-425:5; D. Sambur Nov. 14, 2015 Tr. at 521:7-522:8; J. Halkyard Nov. 2, 2015 Tr. at 53:23-54:4; K. Peterson Nov. 23, 2015 Tr. 11:4-24.

[680] "Fairness Analysis Presentation" (Mar. 31, 2009), at APOLLO-Examiner_00760280-328 [APOLLO-Examiner_00760280].  The March analysis generally contains the same information

CEOC's sale of the entire WSOP business to CIE in exchange for a promissory note from CIE to CEOC.[681]  Notably, however, this analysis did not discuss the holdco structure, and assumed that CIE would be "a newly formed wholly-owned subsidiary of [CEC]."[682]  Other evidence reflects a belief that by the beginning of April, Caesars expected that the transaction would close by the middle of the month.[683]

Much of the work done in the prior months was upended, however, when Caesars' advisors raised issues about the accounting implications of the proposed deal.  Specifically, on April 12, 2009 – less than a week before the expected closing – Caesars' auditors and internal accounting group advised that under the then-contemplated structure CIE would be consolidated into CEOC's financials.[684]  In other words, because CEOC was receiving only a promissory note from CIE, CIE and CEOC would be consolidated for accounting purposes.  This accounting issue led to a number of discussions and analyses regarding consolidation and the proposed structure.  In connection with this, Cohen requested an analysis of "the specifics on the bankruptcy/fraudulent conveyance risk of consolidation.  Just a conversation or a short e-mail of who [sic] consolidation for acctg purposes (even if not consolidated for legal purposes) would affect the analysis."[685]

Cohen initially sought to remedy the consolidation issue by proposing several alternative structures,[686] including recommending that the Sponsors make an additional capital infusion of $70 million – the amount of the proposed sale price of the entire WSOP to CIE.[687]  Sambur balked at this proposal and advised that "$70mm is way too much dough" and that "i [sic] think

---

as the January 30 presentation but states owners' equity at $10 million (as opposed to $21.5 million) and the implied 2008 EBITDA multiple as 3.9x (as opposed to 4.4x).  *See id.* at APOLLO-Examiner_00760285, APOLLO-Examiner_00760288.

[681]  *Id*. at APOLLO-Examiner_00760285.

[682]  *Id*.

[683]  E-mail exchange between M. Cohen and D. Sambur, *et al.* (Apr. 2-3, 2009), at APOLLO-Examiner_00760253 [APOLLO-Examiner_00760253].

[684]  E-mail exchange between M. Cohen and G. Kranias, *et al.* (Apr. 12-13, 2009), at TPG-Examiner_01595284 [TPG-Examiner_01595284].

[685]  Email exchange between M. Cohen, M. Wlazlo and B. Finnegan (Apr. 14, 2009), at APOLLO-Examiner_01350253 [APOLLO-Examiner_01350253].  Bankruptcy risks continued to be analyzed until (and, as discussed below, even after) the transaction structure was deemed ready for CEC Board review.  Indeed, the change in structure in mid-April led to a new round of discussions related to bankruptcy issues associated with new structure.

[686]  *See* e-mail exchange between M. Cohen and G. Kranias, *et al.* (Apr. 12-13, 2009), at TPG-Examiner_01595285-86 [TPG-Examiner_01595284].

[687]  E-mail exchange between M. Cohen and D. Sambur, *et al.* (Apr. 14, 2009), at APOLLO-Examiner_01379174 [APOLLO-Examiner_01379174].

$10mm-$20mm is our max outlay on this."[688]   Cohen understood that the Sponsors were not willing to invest $70 million and finance the transaction and "were not interested a year and a few months after writing a $1.4 billion check and buying this company of putting more cash into it."[689]

In response, Caesars quickly sought to change the transaction structure.  One significant change following this discussion was that the transaction no longer included CEOC selling the entire WSOP business, but instead it would only sell the WSOP Trademark & IP.  Specifically, seemingly based on an analysis prepared by Brimmer, the following existing lines of the WSOP business were eliminated from the transaction and remained with CEOC:  (i) "Rio;" (ii) "Circuit Events;" and (iii) "Retail Licensing."[690]   By eliminating these existing streams of WSOP revenue, it lowered the purchase prices because "[CIE] [did] not have to pay for them."[691]   A financial model Brimmer prepared to account for this change addressed two possible options: Option A, which assumes existing sponsorship/media/licensing contracts move to CIE along with the WSOP trademark, and Option B, which assumes that existing sponsorship/media/licensing contracts stay at CEOC until they expire.[692]   The model valued Option A at $15 million and Option B at $9 million.[693]   The model also provided that the "[a]rbitrary brand value associated with future or unknown applications of the brand is assumed to be de minimis."[694]   Brimmer stated that his recollection of the basis for the zero value was that "other people associated with the process didn't think it was something we could value with any precision."[695]

These changes ostensibly were recognized internally by April 19, 2009, when Cohen e-mailed Duff & Phelps to inform them that Caesars had

> changed what [CEOC] will sell to [CIE] – only the marks and the contracts are
> going to [CIE].  [CIE] will not be receiving any of the larger revenues that we had
> noted in the $70M valuation, namely the circuit event fees, the Rio fees and the
> retail amounts.  Those events will continue to get the WSOP mark for free (as
> they have in the past).  Also, [CIE] will be paying cash to HOC for the WSOP

---

[688]   *Id.*  Sambur stated that while he did not recall the specific interaction, his guess was that his concern was not using too much of the holding company's liquidity in connection with the transaction.  *See* D. Sambur Jan. 14, 2016 Tr. at 799:12-801:23.

[689]   M. Cohen Feb. 9, 2016 Tr. at 459:17-460:9.

[690]   E-mail chain between M. Cohen and R. Brimmer, *et al.* (Apr. 16-17, 2009), at APOLLO-Examiner_01378267 [APOLLO-Examiner_01378267].

[691]   *Id.*

[692]   *Id.*

[693]   *Id.*

[694]   *Id.*

[695]   R. Brimmer Jan. 20, 2016 Tr. at 349:9-11.

assets, so no more worrying about the valuation of the promissory notes issued to HOC.[696]

Philip Wisler of Duff & Phelps stated that he did not recall how the change came about, only that the deal changed.[697]

On April 21, 2009, as part of determining the viability of an unidentified structure being proposed, Cohen and outside bankruptcy lawyers discussed the structure's bankruptcy implications.[698]   On April 25, 2009, Cohen e-mailed Apollo and TPG stating that "[p]er my conversation with Rick last night, I believe the below is a summary of the transaction that Rick and Karl would like to pursue:

--[CEOC] sells WSOP mark to [CIE] for $15M: [CEOC] receives $7M in notes in return and $8M in cash; D&P delivers fairness opinion on transaction

--TPG/Apollo buy [$20M] of common stock of HIE Holdings (parent of [CIE]); [CIE] contributes all the funds to [CIE] in return for common stock

--Garber et al invest $1.5M in [CIE] (and get options in [CIE])

--post-closing, rights offering made to co-investors of [CEC] to invest in HIE Holdings on same terms as TPG/Apollo

--shares of common stock of HIE Holdings is distributed to [CEC] management shareholders in same proportion of ownership in [CEC]

--[CEC] management shareholders get a "deemed dividend" for HIE Holdings shares--need to determine value because taxable

--LLC put in place to hold common stock of HIE Holdings for [CEC] management option holders to mimic [CEC] option plan

---

[696] E-mail exchange between M. Cohen and P. Wisler, *et al.* (Apr. 19-23, 2009), at CACEXAM00121607 [CACEXAM00121606].

[697] P. Wisler Oct. 6, 2015 Tr. at 66:2-20.  While the contemporaneous documentary evidence show that it was accounting issues that led to the elimination of the tournament hosting rights and revenues from the transaction, some witnesses have offered a different reason – opposition by the operators of the tournament.  *See* G. Loveman Oct. 27, 2015 Tr. at 45:6-46:17.

[698] E-mail exchange between M. Cohen and D. Sambur, *et al.* (Apr. 20-21, 2009), at APOLLO-Examiner_01420573-74  [APOLLO-Examiner_01420573].    Cohen  did  not  recall  these discussions specifically, but indicated that "[i]t was very common to involve bankruptcy lawyers in structuring transactions just like we involve litigators in structuring transactions and why we involve tax people in structuring transactions, as we're getting a lot of different disciplines playing the what-if game . . . ."  M. Cohen Feb. 9, 2016 Tr. at 445:18-25.

--[CEOC] provides corporate services to [CIE] at cost+ 10%

--[CIE] gives royalty free, 10 year exclusive license for tournaments and retail to [CEOC] and its affiliates[699]

In correspondence with Press, however, Sambur strongly disagreed with the structure set out in Cohen's e-mail, stating "[t]his isn't going to happen" and characterizing it as "a fool's errand."[700]

Cohen stated that he did not recall how the $7 million in notes and $8 million in cash referenced in the e-mail ultimately became $15 million Preferred Stock.[701] And there remains no evidence that anyone actually negotiated the $15 million price, and certainly no one negotiated on behalf of CEOC.[702] Some witnesses have stated that the price was established by Duff & Phelps.[703] Duff & Phelps, however, denies that this was the case, believing instead that it was opining on an already agreed-upon amount and form of consideration.[704] Rowan, however, stated that "by the time it got toward a closing, [the 2009 WSOP Transaction] was a relatively hotly disputed transaction . . . in terms of what assets were going to go in"[705] and that "in part this was structured this way to appease me."[706] As discussed above, however, what the

---

[699] E-mail exchange between M. Cohen and K. Peterson, *et al.* (Apr. 25, 2009), at APOLLO-Examiner_01379246-47 [APOLLO-Examiner_01379246]. Cohen recalled that Press and Peterson were "very heavily involved in the ultimate structure" along with the Caesars finance team and outside counsel. M. Cohen Feb. 9, 2016 Tr. at 476:3-9. Moreover, Caesars required the Sponsors' approval of the structure. *Id.* at 476:14-23.

[700] E-mail exchange between D. Sambur and R. Press, *et al.* (Apr. 25, 2009), at APOLLO-Examiner_00833788-89 [APOLLO-Examiner_00833788].

[701] M. Cohen Feb. 9, 2016 Tr. at 477:4-9.

[702] One constituency asserted, however, that meaningful negotiations with Mitch Garber led to the WSOP being valued based on existing business. This is not supported by the evidence. It is true that Garber and his counsel did negotiate deal terms regarding his ownership interest in CIE. But the evidence does not support the argument that meaningful negotiations with Mitch Garber led to the WSOP being valued based on existing business. In fact, Garber admitted that he had little interest in or specific knowledge of the valuation of the business and expressed general indifference to the initial valuation. *See* M. Garber Nov. 20, 2015 Tr. at 218:19-21, 232:22-234:14; *see also* B. Finnegan Nov. 16, 2015 Tr. at 17:24-18:18; J. Halkyard Nov. 2, 2015 Tr. at 45:24-46:23.

[703] Cohen stated that his understanding was that the "price was developed based on the fairness opinion that was rendered from, I believe, Duff & Phelps." M. Cohen Oct. 16, 2015 Tr. at 30:11-13; *see also* M. Rowan Nov. 16, 2015 Tr. at 52:21-53:8.

[704] P. Wisler Oct. 6, 2015 Tr. at 104:14-22.

[705] M. Rowan Jan. 28, 2016 Tr. at 473:12-15.

[706] *Id.* at 474:13-14.

documents do show is that the decision on what to sell and for how much was the combined result of concerns over the accounting issue and an internal analysis by Caesars as to the value of selected income streams, with zero value being attributed either to the potential new uses of the WSOP brand or for the upside from the contemplated business.

Overall, recollection on why the ultimate structure of the transfer was chosen, and who made the final decision on it, is limited. But according to Garber and Abrahams, they did not view the decision that CIE would only obtain the WSOP Trademark & IP – as opposed to the entire WSOP – as problematic. Abrahams stated that he discussed the elimination of a number of the revenue streams that constituted the WSOP in its entirety with Garber and that they were okay with the change because "in order to be successful [they] didn't believe [they] needed to own the tournament business."[707] They did, however, want to own the WSOP mark.[708] Garber stated that "owning the brand, trademark was important to [him]" and he "wanted to pursue the legalization of online poker, and if we would be successful, [he] wanted to own the World Series of Poker brand to be able to offer that for real money in the United States."[709] Garber also explained that, given the licensing business that was going to be part of the new business, owning the mark or the rights to the marks and being able to license it was a priority.[710] This is consistent with Cohen's "recollection that it was important to Mitch that the new entity actually own the trademark . . . ."[711]

### 3.  Final Board Materials

CEC's Board received background documents associated with the transaction on April 30, 2009.[712] These included a deck entitled "[C]IE/WSOP Discussion," a Duff & Phelps fairness opinion and a Duff & Phelps PowerPoint deck.

The "[C]IE/WSOP Discussion" deck provided an overview of the process leading to the final proposal for the CEC Board, outlined the various terms of the proposal, and requested

---

[707]  C. Abrahams Oct. 7, 2015 Tr. at 89:3-90:4; *see also id.* at 57:20-58:13, 73:18-74:14.

[708]  *See* M. Cohen Feb. 9, 2016 Tr. at 440:11-14 ("I have a recollection that it was important to Mitch [Garber] that the new entity actually own the trademark because he had this idea, you know, where it would be spun out later.").

[709]  M. Garber Oct. 9, 2015 Tr. at 31:14-24.

[710]  M. Garber Nov. 20, 2015 Tr. at 206:9-16.

[711]  M. Cohen Feb. 9, 2016 Tr. at 440:11-13. As Cohen further explained, Garber wanted to own the trademark "because he has this idea, you know, where it would be spun out later, trade separately, get a higher multiple because it was an online company, and he thought it was very important from a perception standpoint to own the asset versus license it." *Id.* at 440:13-19.

[712]  E-mails and attachments from M. Cohen to D. Bonderman, *et al.* (Apr. 25-30, 2009), at APOLLO-Examiner_01362399 [APOLLO-Examiner_01362399].

Board approval for the transaction.[713]  Initially, the deck gave a very high-level overview of the engagement of Garber, the analysis of various structures, and a conclusion that "contribution of sponsorship/licensing WSOP business by [CEOC] to an indirect subsidiary and [CEC]-affiliated entity carries strategic benefits going forward."[714]  Garber and his team were expected to invest approximately $1.625 million in the aggregate in CIE, giving them a fully diluted ownership interest of 4.4%, and 8.5% with options, and CEC indirectly owning 87.1% of the entity.[715]  The deck advised that the Tournament Rights would be licensed to CEOC, stating:  "to preserve pre-existing relationships, [CIE] to provide a perpetual, royalty free license for use of WSOP marks (for hosting tournaments and production of retail items) to [CEOC] and its affiliates."[716]

The deck noted CEOC's debt agreements permitted a sale for fair market value, and that OMM had provided a compliance memorandum.[717]  The deck contained a fiduciary duties refresher that included a detailed, multi-page discussion of the duties owed when the transferor is insolvent, the definition of when an entity is insolvent,[718] the elements of fraudulent transfer claims, potential parties who could bring fraudulent transfer claims, and the potential remedies of any successful fraudulent transfer claims.[719]  Finnegan stated that he did not specifically recall why these slides were included in the presentation but noted that:

> it may have been a combination of the uncertainty and the macro economy in 2009 and the fact that this is, if not the first, one of the first times that O'Melveny is presenting to the Board and is less familiar with what and how the Board would like to hear these presentations."[720]

When questioned about the restructuring/bankruptcy consideration slides being included in the presentation, Cohen stated that while he did not recall any "specific conversations about bankruptcy per se" or "any ideas or preparations or any discussion of bankruptcy," at the time

---

[713] "HIE/WSOP   Discussion"   (Apr.   30,   2009),   at   CEC_EXAMINER_1081762-90 [CEC_EXAMINER_1081762].

[714] *Id*. at CEC_EXAMINER_1081764.

[715] *Id.* at CEC_EXAMINER_1081766.

[716] *Id*. at CEC_EXAMINER_1081765.

[717] *See* e-mails and attachments from M. Cohen to D. Bonderman, *et al.* (Apr. 25-30, 2009), at APOLLO-Examiner_01362409 [APOLLO-Examiner_01362399].  Despite specific requests to CEC, the Examiner has been unable to locate or review a copy of this memorandum.

[718] *Id*. at APOLLO-Examiner_01362417 ("A corporation is insolvent when (a) it generally can not pay its debts as they come due or (b) the fair market value of its assets is less than its liabilities.").

[719] *Id*. at APOLLO-Examiner_01362411-17.  E-mail communications suggest that Cohen may have requested this analysis.  *See* e-mail exchange between M. Cohen and M. Wlazlo, *et al.* (Apr. 11-15, 2009), at APOLLO-Examiner_01350253 [APOLLO-Examiner_01350253].

[720] B. Finnegan Nov. 16, 2015 Tr. at 38:17-40:2, 42:18-24.

"the downturn in the economy had come" and Caesars' "revenues and EBITDA had dropped fairly significantly, and unexpectedly, and there was active management of the balance sheet, cash on hand, senior secured leverage ratio under the credit agreement."[721]  Abrahams said in his interview that he did not recall discussions about the possibility of the 2009 WSOP Transaction being voided as a fraudulent conveyance or about CEOC being insolvent in the 2009 time period[722] and he did not have an understanding of why slides regarding restructuring or bankruptcy considerations would have been included in the presentation to the CEC Board.[723]

The CEC Board deck advised that the transaction involved the "sale of sponsorship/licensing WSOP business and intellectual property for $15 million in preferred stock."[724]  It did not, however, specify that the Preferred Stock would not be in CIE, or even an entity that has common stock ownership of CIE.

As the various analyses leading up to the final transaction have shown, the location of the new online entity – CIE – changed over time.  Ultimately, however, the new company was not created as a CEOC subsidiary, but was instead located as an indirect subsidiary of CEC.

Neither the documents nor the witness interviews fully explain why this structure was chosen.  Witnesses have suggested variations of three alternative reasons.  First, witnesses have offered that CIE was created as a separate company to free it from Caesars' brick and mortar restrictions and create more of an entrepreneurial environment.[725]  But reasons have not been provided as to why or how being a CEC subsidiary, as opposed to a separate subsidiary of CEOC, provided freedom from brick and mortar restrictions.  A second, related explanation that has been offered is that CIE needed to be separated from CEOC for regulatory purposes.[726] Rowan stated that this explanation was based on his dialogue with attorney Frank Schreck, whom he had dealt with during the licensing process in connection with the LBO.[727]  While others did not recall this issue, an interview with Schreck confirmed Schreck's contemporaneous concerns about legal issues associated with online gaming negatively impacting Caesars and his

---

[721] M. Cohen Oct. 16, 2015 Tr. at 34:23-35:10.

[722] C. Abrahams Oct. 7, 2015 Tr. at 114:3-11.

[723] *Id*. at 115:7-13.

[724] "HIE/WSOP Discussion" (Apr. 30, 2009), at CEC_EXAMINER_1081770 [CEC_EXAMINER_1081762].

[725] M. Rowan Nov. 16, 2015 Tr. at 48:10-18; M. Garber Oct. 9, 2015 Tr. at 13:14-14:3; M. Garber Nov. 20, 2015 Tr. at 221:16-222:15; C. Abrahams Oct. 7, 2015 Tr. at 33:10-34:3, 122:6-24; G. Kranias Oct. 23, 2015 Tr. at 50:24-52:3.

[726] M. Rowan Nov. 16, 2015 Tr. at 46:20-47:3; *but see* T. Donovan Dec. 2, 2015 Tr. at 233:14-25; M. Cohen Dec. 16, 2015 Tr. at 328:18-25.

[727] M. Rowan Nov. 16, 2015 Tr. at 39:13-40:8.  Schreck had previously worked with Apollo and TPG to help them obtain the required licensing approvals in connection with the LBO. F. Schreck Jan. 21, 2016 Tr. at 8:8-11.

general view that online gaming should be separated from gaming operating companies.[728] Schreck, however, was not involved in the structuring of the transaction or the location of CIE in the corporate structure.[729]  But he stated that from a regulatory perspective, locating an online business as a subsidiary of a parent would be better than having it as a subsidiary of an operating company.[730]  He did indicate, however, that wherever an online gaming subsidiary was located, if that subsidiary had separate management, that they could "isolate" any regulatory issues.[731]

There are, however, limited contemporaneous documents that focus on the regulatory concerns and other witnesses do not recall them.  In his second interview, Garber stated that while he was indifferent as to where the new entity was placed in the Caesars' corporate structure he did want to minimize regulatory interference.[732]  However, in his first interview, Garber explained that he was not interested in the location of CIE, but was concerned with his equity ownership and upside.[733]  In the end, what role, if any, regulatory concerns played in CIE being a CEC, as opposed to CEOC, subsidiary is open to question, particularly when CIE was no longer going to be a direct subsidiary of Hamlet Holdings.

The third explanation that has been provided was that CEOC could not afford the necessary investment and CIE could negatively impact CEOC's debt covenants.[734]  Even the witnesses that offered this potential rationale failed to explain how CIE would be subject to CEOC's debt covenants had it been formed as an unrestricted CEOC subsidiary.  Cohen stated that "some of the reasons why we wanted CIE to be separate from CEOC . . . was, this was an entity that was going to lose money in the near term . . . ." and "[c]onsidering CEOC's leverage and its focus on its senior secured leverage ratio, having a money-losing business developed in CEOC was not an idea most people were interested in, because that would be lowering its senior secured leverage ratio, which is something that we are very focused on."[735]  He then acknowledged, however, that "[y]ou could form a subsidiary of CEOC that was an unrestricted subsidiary, and that would not count" toward the senior secured leverage ratio.[736]  And there is

---

[728]  F. Schreck Jan. 21. 2016 Tr. at 12:12-18:3.

[729]  *Id*. at 18:4-12.

[730]  *Id.* at 45:2-13.

[731]  *Id*. at 43:17-22.

[732]  M. Garber Nov. 20, 2015 Tr. at 211:17-24.

[733]  M. Garber Oct. 9, 2015 Tr. at 45:15-20, 50:9-15.

[734]  *See* M. Cohen Oct. 16, 2015 Tr. at 46:12-16, 47:8-14; "Project Forest" (Sept. 3, 2008), at APOLLO-Examiner_01478418 [APOLLO-Examiner_01478416];  M. Wlazlo Oct. 14, 2015 Tr. at 32:20-34:16, 34:24-35:20; G. Kranias Oct. 23, 2015 Tr. at 52:5-25.

[735]  M. Cohen Oct. 16, 2015 Tr. at 46:12-16, 47:8-14.

[736]  *Id.* at 48:14-17.

no evidence that CEOC could not have afforded the then anticipated expenses in establishing CIE and working towards legalization of real-money online poker.[737]

### 4. Duff & Phelps Fairness Opinion

CEC's Board received an April 30, 2009 Duff & Phelps fairness opinion addressed to the Board of Directors of CEOC[738] along with a deck outlining Duff & Phelps' analysis.[739]  Because Cohen advised Duff & Phelps of the change in structure from a sale of the entire WSOP to only the WSOP Trademark & IP on April 19, 2009,[740] Duff & Phelps necessarily prepared this fairness analysis on less than two weeks' notice.  In the opinion, Duff & Phelps, who invoiced $129,468.05, including expenses in connection with this assignment,[741] concluded that:  (i) the transaction in which CEOC exchanges its ownership in the WSOP trademark and related intellectual property, including all existing sponsorship/media/licensing contracts to a newly formed wholly owned subsidiary in return for all of the issued and outstanding preferred stock of such subsidiary and a perpetual, royalty-free license back to CEOC of such trademark and related intellectual property under a license agreement is fair from a financial point of view and is on terms no less favorable than would be obtained in a comparable arm's length transaction and (ii) provided an opinion that the fair market value of the WSOP Trademark & IP, including the license back to CEOC, was $15 million as of April 30, 2009.[742]  In the deck outlining its analysis, Duff & Phelps also concluded that the Preferred Stock that CEOC received in exchange for transferring the WSOP was worth its stated value of $15 million.[743]

The opinion does not, however, address various aspects of the 2009 transaction.  Notably, it does not address the fact that upon receiving the WSOP Trademark & IP, TopCo immediately

---

[737] Between 2008 and 2014, CEOC funded over $3.3 billion in capital expenditures.  So funding the $95 million in expenses estimated in an August 2008 presentation to secure legalization of U.S. online real-money poker would have been feasible.  Also, all of CIE's acquisitions were funded via intercompany credit from CEC.

[738] Duff & Phelps Fairness Opinion (Apr. 30, 2009), at CEOC_INVESTIG_00141524 [CEOC_INVESTIG_00141524].

[739] "Fairness Analysis Presentation" (Apr. 30, 2009), at APOLLO-Examiner_01362465-99 [APOLLO-Examiner_01362465].

[740] E-mail exchange between M. Cohen and C. Abrahams, *et al.* (Apr. 19-23, 2009), at CACEXAM00121606 [CACEXAM00121606].

[741] *See* Duff & Phelps Invoice (Jan. 6, 2009), at CEC_EXAMINER_1029573 [CEC_EXAMINER_1029573]; Duff & Phelps Invoice (Feb. 12, 2009), at CEC_EXAMINER_1234998 [CEC_EXAMINER_1234998].

[742] Duff & Phelps Fairness Opinion (Apr. 30, 2009), at CEOC_INVESTIG_00141524 [CEOC_INVESTIG_00141524].

[743] "Fairness Analysis Presentation" (Apr. 30, 2009), at APOLLO-Examiner_01362492 [APOLLO-Examiner_01362465].

assigned the WSOP Trademark & IP to HIE Holdings, Inc. ("HIE Holdings"), which in turn assigned them to CIE. As such, the opinion did not address whether assets existed at TopCo that would support a finding that CEOC's Preferred Stock in TopCo – an entity that did not own the WSOP Trademark & IP at the end of the integrated transaction – had the value ascribed to them.

The Examiner concludes that the Duff & Phelps opinion, although one piece of evidence to consider, is not definitive or entitled to great weight for several reasons. Initially, consistent with standard practice, Duff & Phelps did not create its own projections or forecasts relating to the WSOP Trademark & IP.[744] Rather, the valuation is based on information and projections provided by Caesars.[745] While not unusual, this is important because, as discussed above, some witnesses suggested that it was Duff & Phelps that determined the purchase price.[746] Duff & Phelps rejected this notion.[747] Further raising alarm with respect to Duff & Phelps relying upon the projections it received from Caesars in rendering its fairness opinion is that the projections Caesars provided to Duff & Phelps were based in large part on information provided by Abrahams, who knew he was going to be employed by the buyer, CIE.[748]

Also, as discussed in Appendix 7, Valuation at Section III.A, the projections are inconsistent with, and materially lower than, the WSOP projections Caesars created in its ordinary course of business. This is because when valuing the WSOP Trademark & IP, Duff & Phelps used EBITDA projections for the existing sponsorship, licensing and media business and, to a lesser extent, poker in Europe, that were adjusted for cannibalization of online poker sponsorships.[749] This is inconsistent with Caesars' own internal valuations. Also, there is

---

[744] *See* Duff & Phelps Fairness Opinion (Apr. 30, 2009), at CEOC_INVESTIG_00141526 [CEOC_INVESTIG_00141524] ("In performing its analyses and rendering this Opinion with respect to the Proposed Transaction, Duff & Phelps, with your consent: 1. Relied upon the accuracy, completeness, and fair presentation of all information, data, advice, opinions and representations obtained from public sources or provided to it from private sources, including management of the Company and the WSOP IP, and did not independently verify such information.").

[745] *Id.*; *see also* P. Wisler Oct. 6, 2015 Tr. at 77:5-22, 80:17-24.

[746] *See* M. Cohen Oct. 16, 2015 Tr. at 20:11-13; M. Rowan Nov. 16, 2015 Tr. at 52:21-53:8.

[747] P. Wisler Oct. 6, 2015 Tr. at 104:14-22.

[748] *See* C. Abrahams Oct. 7, 2015 Tr. at 17:18-18:4; e-mail from C. Abrahams to G. Kranias, *et al.* (Oct. 9, 2008), at APOLLO-Examiner_00473478 [APOLLO-Examiner_00473478]; e-mail from C. Abrahams to K. Kushin, *et al.* (Jan. 29, 2009), at CEC_EXAMINER_1233694 [CEC_EXAMINER_1233694]; M. Garber Oct. 9, 2015 Tr. at 43:7-44:11.

[749] "Fairness Analysis Presentation" (Apr. 30, 2009), at APOLLO-Examiner_01362480 [APOLLO-Examiner_01362465]. As detailed above, this is consistent with Abrahams' testimony that there was an expectation that the entry into online gambling would cannibalize existing sponsorship contracts because Caesars would be seen as a competitor. *See* C. Abrahams Jan. 29, 2016 Tr. at 85:20-23. Moreover, it appears that, by March 2010, Abrahams' views were confirmed in an e-mail that a "majority of [the] sponsorship business from online poker sites is

evidence that the WSOP brand itself had value and that there was value associated with the potential upside of the online real money gaming business opportunity.[750]

Appendix 7, Valuation at Section III.B, also identifies a number of other contemporaneous indicators of value between 2008 and 2010, including the LBO purchase price allocation, the various Project Forest analyses, the impairment testing performed by Caesars and reviewed by Deloitte, and post-transaction projections. These analyses universally attribute higher – in some cases, substantially higher – estimated EBITDA associated with sponsorship, licensing and media revenues than used by Duff & Phelps in its fairness opinion.[751] Most significantly, in September 2009, in a presentation to the CEC Board, Garber and Abrahams reverted to using higher numbers than provided to Duff & Phelps for these revenue streams.[752] While the numbers in some of those valuations were unrealistic, that does not mean that no consideration should be given to them.

As further detailed in Appendix 7, Valuation at Section III.A, the Duff & Phelps opinion is subject to criticism based on its specific approach on other aspects of its fairness opinion. For instance, it uses a 16.5% WACC to discount cash flows, despite Caesars' and its advisors' use of lower rates in other contexts.[753] The opinion additionally fails to account for a number of factors that could materially impact the value of the Preferred Stock including, *inter alia*:

- TopCo and HIE Holding's lack of operating assets;

- the dilution of the stock from the issuance of additional stock;

- the unique risk of the Preferred Stock;

---

going away." E-mail from C. Abrahams to C. Kuller, *et al.* (Mar. 22, 2010), at CEOC_INVESTIG_00040171 [CEOC_INVESTIG_00040171]. Nevertheless, the projections at the time – not the ultimate performance of the company – are ultimately the proper area of inquiry and, as detailed above, the evidence indicates that both pre- and post- transaction projections used for purposes other than the fairness opinion did not confirm this view.

[750] *See* "Project Forest" (Jan. 18, 2008), at TPG-Examiner_00016288-413 [TPG-Examiner_00016288]; "Project Forest" (Oct. 2, 2008), at APOLLO-Examiner_00473479-510 [APOLLO-Examiner_00473479]; "Project Forest Review" (Oct. 15, 2008), at TPG-Examiner_00905213 [TPG-Examiner_00905198]; M. Garber Nov. 20, 2015 Tr. at 216:5-218:21; *supra* note 622. The Examiner notes that valuation range for the WSOP Trademark & IP set forth in Appendix 7, Valuation, was based solely on the then existing, core use of the WSOP Trademark & IP with respect to sponsorship, licensing, and media and does not include the value of alternative manners of exploiting the WSOP brand. *See* Appendix 7, Valuation at III.C.

[751] *See* Appendix 7, Valuation at Section III.A.

[752] *See* "Harrah's Interactive Entertainment" Board Pre-Read (Sept. 22, 2009), at TPG-Examiner_00369717-52 [TPG-Examiner_00369717].

[753] *See* Appendix 7, Valuation at Section III.A.

- the use of dissimilar companies in its comparable company analysis; and

- the numerous differences between the Preferred Stock and the comparables used in the analysis.[754]

### 5. Transaction Approval

CEOC's and CEC's Board approved the transaction on April 30, 2009.[755] CEOC's approval appears to have been a ministerial act with no specific consideration given to whether the transaction benefitted CEOC independent from the purported benefit to the entire Caesars organization.[756] Simply put, it does not appear that this even occurred to those involved.[757] CEOC's process in independently analyzing the fairness of the transaction cannot be critiqued because none existed. No solvency analysis was prepared.[758] No independent directors existed nor were separate counsel or independent advisors retained on CEOC's behalf. There is no evidence that anyone on behalf of CEOC considered whether CEOC should receive any value for the potential upside of the online gaming business if it ultimately proved successful, either through ownership of CIE, through some form of earn-out or through an increased sale price.[759] Finally, no one on CEOC's behalf independently critiqued whether the Preferred Stock CEOC received in exchange for the WSOP Trademark & IP was actually worth $15 million.

### 6. Transaction Specifics

On May 1, 2009, the following contemporaneous and interrelated transactions took place in connection with the sale of the WSOP Trademark & IP:

First, CEOC and CLC transferred their ownership of the WSOP Trademark & IP to TopCo in exchange for CEOC receiving 150,000 non-voting preferred shares of stock in TopCo with a stated value of $100 per share and a perpetual exclusive, sub-licensable, royalty-free license for the WSOP Trademark & IP in connection with the operation of the WSOP

---

[754] *See id.*

[755] "Unanimous Written Consent of the Board of Directors in Lieu of a Meeting" (Apr. 30, 2009) [PW_Informal_00001209]; e-mail exchange between M. Garber and C. Abrahams, *et al.* (Apr. 30, 2009), at CACEXAM00121711-12 [CACEXAM00121711].

[756] *See, e.g.*, C. Abrahams Oct. 7, 2015 Tr. at 116:5-8. In addition, there is no indication that CLC independently approved the transaction.

[757] *See* C. Abrahams Oct. 7, 2015 Tr. at 74:22-75:7; G. Loveman Oct. 27, 2015 Tr. at 71:13-72:14; J. Halkyard Nov. 2, 2015 Tr. at 65:6-17.

[758] *See* C. Abrahams Oct. 7, 2015 Tr. at 114:21-115:2.

[759] *See* e-mail chain between M. Cohen and R. Brimmer, *et al.* (Apr. 16-17, 2009), at APOLLO-Examiner_01378267 [APOLLO-Examiner_01378267]; R. Brimmer Jan. 20, 2016 Tr. at 349:9-11.

tournaments.[760]   TopCo then assigned and transferred the WSOP Trademark & IP to HIE Holdings in exchange for 150,000 shares of non-voting perpetual preferred stock in HIE Holdings.[761]   HIE Holdings then assigned and transferred the WSOP Trademark & IP to CIE in exchange for 5,494,505.49 shares and HIE Holdings purchased an additional 3,663,003.67 shares at a price of $2.73 per share, for a total of 9.157 million shares of common stock in CIE.[762]   CEC then acquired the common equity ownership of, and preferred shares in, HIE Holdings.[763]   At the conclusion of these steps, the structure was as set forth in 2009 WSOP Transaction Figure 4.

---

[760] "Asset Contribution Agreement" (May 1, 2009), at CACEXAM00018963-94 [CACEXAM00018963]; "Trademark License Agreement" (May 1, 2009), at CEOC_INVESTIG_00125452-64 [CEOC_INVESTIG_00125452]; "Preferred Stock Subscription Agreement" (May 1, 2009), at CEOC_INVESTIG_00141123-27 [CEOC_INVESTIG_00141123].

[761] "Preferred Stock Subscription Agreement" (May 1, 2009), at CEOC_INVESTIG_00141248-53 [CEOC_INVESTIG_00141248].

[762] "Subscription Agreement" (May 1, 2009), at CEOC_INVESTIG_00141947-52 [CEOC_INVESTIG_00141947]; "Subscription Agreement" (May 1, 2009), at CEOC_INVESTIG_00141604-09 [CEOC_INVESTIG_00141604].

[763] "Preferred Stock Subscription Agreement" (May 1, 2009), at CEOC_INVESTIG_00141225-30 [CEOC_INVESTIG_00141225].

**2009 WSOP Transaction Figure 4:  Post-Transaction Organization Chart**



Source:   "HIE/WSOP Discussion" Presentation (Apr. 20, 2009), at APOLLO-Examiner_01362422 [APOLLO-Examiner_01362401].

The overall transaction was structured to move the WSOP Trademark & IP out of CEOC. CEOC received only the Preferred Stock and a limited number of shares of common stock in TopCo, which held no common stock equity interest in either HIE Holdings or CIE.  At the conclusion of the transfers and equity issuances:  (i) CEOC held 1,000 shares of common stock and 150,000 preferred shares in TopCo and a license for the WSOP Tournament Rights; (ii) TopCo held 150,000 preferred shares, and no common stock, in HIE Holdings; (iii) CEC held all shares of common stock in HIE Holdings, as well as 90,000 shares of preferred shares in HIE Holdings; (iv) HIE Holdings held 87.1% of the equity of CIE (on a fully diluted basis), with the remainder equity/options held by CIE's executives and management; and (v) CIE held the WSOP Trademark & IP.  Garber and his management team contributed $930,000 and received a 4.4% ownership interest in the newly created CIE on a fully diluted basis.[764]

---

[764] "HIE/WSOP   Discussion"   (Apr.   30,   2009),   at   CEC_EXAMINER_1081766 [CEC_EXAMINER_1081762].

### 7. Post-Transaction Valuation

Less than five months after purchasing the WSOP Trademark & IP, CIE presented its business and growth strategy to the CEC Board.[765]   Monetization of PFF gaming was an area of focus for the September 22, 2009 "Board Pre-Read," not only in the context of existing brand licensing (such as the contract with Glu Mobile) but also via revenue generation through a downloadable poker application, social network poker (*e.g.*, Facebook) and mobile gaming.[766] The deck reflected the planned launch of a PFF poker application on Facebook in 1Q 2010.[767]   It also discussed potential monetization of PFF online gaming through microtransactions and poker leagues.[768]   CIE prepared a chart that recognized a potential EBITDA of $10-15 million from U.S. PFF gaming in 5 years.[769]   Additionally, unlike the reduced figures used with the Duff & Phelps fairness opinion only months earlier, this analysis uses an EBITDA run rate of approximately $7 million per year for the existing sponsorship licensing and media business.[770]

Garber explained that this presentation was his sales pitch regarding the capabilities of CIE, and did not reflect numbers for valuation purposes.[771]   However, Garber also explained that he was "telling [the CEC Board] what I think I can do,"[772] which seems to somewhat contradict the statement that this presentation was merely a sales pitch that did not reflect numbers for purpose of valuing the business.   Abrahams said he was not sure how this increased run rate for sponsorship, licensing and media was determined but believed that it may have been attributable to a new idea that they had developed to "do this new American Idol model, where we were going to basically create new World Series of Pokers [sic] local in each market . . . [a]nd then we

---

[765] "Harrah's Interactive Entertainment" Board Pre-Read (Sept. 22, 2009), at TPG-Examiner_00369717-52 [TPG-Examiner_00369717].

[766] *Id.* at TPG-Examiner_00369719.

[767] *Id.*

[768] *Id.*

[769] *Id.* at TPG-Examiner_00369730.

[770] *Id.*   This EBITDA is consistent with the October 2008 Project Forest decks.   *See* "Project Forest Review" (Oct. 2008), at TPG-Examiner_00722947 [TPG-Examiner_00722944]; e-mail from M. Cohen to R. Press, *et al.* (Nov. 18, 2008), at APOLLO-Examiner_01027353-64 [APOLLO-Examiner_01027353].

[771] M. Garber Nov. 20, 2015 Tr. at 240:11-17 (Q. "[H]ad something happened or changed between the Duff & Phelps presentation and this presentation that made the numbers change or was it just, as you said, you are now the seller as opposed to the buyer? A.   I am now the seller."), 241:2-9 ("My point is this:   That the numbers for the purposes of valuing the business and the numbers to impress board members and to dream about what you might be able to do are not the same, and clearly they are not the same, but I want to be able to explain them to you also using hindsight.").

[772] M. Garber Nov. 20, 2015 Tr. at 239:2.

were taking about we could make 1-$2 million [sic] EBITDA per market doing this expansion plan."[773]   While the numbers in this presentation – other than the $7 million run rate EBITDA – may to some extent be aspirational, it is hard to imagine that CIE would be presenting wholly unrealistic numbers to the CEC Board.[774]   Moreover, this presentation demonstrates that shortly after the transaction, PFF gaming continued to be an important part of CIE's business plan, just as it had been prior to the transaction.

### 8.  Shift to Social Gaming

After the 2009 WSOP Transaction, Caesars continued its lobbying efforts to enact federal legislation legalizing online poker.[775]   While the efforts to legalize gambling at the federal level were unsuccessful, the company did benefit from legalization of online poker in certain states, including Nevada and New Jersey.[776]   It is clear that this was not the success for which CEC and CIE had hoped.[777]   By 2011, CIE's management team recognized a need to "pivot" their focus from online real-money poker to online social gaming.[778]

To further build out its business, CIE acquired the play for fun company Playtika in 2011 for approximately $115 million and engaged in other licensing and acquisitions to increase the profile and profitability of CIE.[779]   In connection with the early discussions regarding the acquisition of Playtika, Tim Dunn of TPG opined that he "[w]ould rather spend $50 million on this than on remodeling [S]howboat.   CIE is the largest potential value creation vehicle and I think we are underinvesting in it."[780]   The acquisition and shift to social gaming were objectively successful and, as of September 30, 2015, in an analysis used by CAC to estimate the value of

---

[773]  C. Abrahams Jan. 29, 2016 Tr. at 99:2-5, 98:14-21.

[774]  *See* "Harrah's Interactive Entertainment" Board Pre-Read (Sept. 22, 2009), at TPG-Examiner_00369717-52 [TPG-Examiner_00369717].

[775]  C. Abrahams Oct. 7, 2015 Tr. at 51:8-11.

[776]  M. Garber Nov. 20, 2015 Tr. at 250:2-10.

[777]  E-mail exchange between M. Garber and G. Loveman, *et al.* (Jan. 21-22, 2011), at CACEXAM00286596-98 [CACEXAM00286596].

[778]  Garber stated that "by the end of 2010 I drew a diagram in Craig Abrahams' office, which is now framed in his office, that this licensing business of licensing the brand of the World Series of Poker and waiting for legislation to pass is making us nothing.   We need to buy a business and operate a business and buy EBITDA in something outside of all of this.   And we brought Playtika who had a slot app.   The slot app became huge.   And two years later, two and a half years later we bought back the rights from EA and then we said, 'you know what, you are so good at all of this, do this,' and they are doing bingo and they are doing poker and they are doing slots."  M. Garber Nov. 20, 2015 Tr. at 254:18-255:9.

[779]  G. Loveman Oct. 27, 2015 Tr. at 65:4-67:20.

[780]  E-mail exchange between M. Garber and K. Peterson, *et al.* (Apr. 7-8, 2011), at TPG-Examiner_00567868 [TPG-Examiner_00567868].

CIE's common stock for the purpose of calculating stock compensation expense,[781] PricewaterhouseCoopers ("PWC") found that CIE's estimated enterprise value on a marketable basis was $██ billion, including $██ billion for social/mobile gaming, $██ million for online real-money gaming where legal and $██ million for WSOP and other.[782]  The Examiner does not adopt these numbers.  The real-money gaming numbers contain assumptions which appear unrealistic.  Also, none of these numbers have been fully analyzed.  What is clear, however, is

---

[781]  PWC has prepared a quarterly analysis of CIE's value starting in Q4 2012 that is used by CAC to estimate the value of CIE's common stock used to compensate and incentivize top management.  While the actual valuations vary, the equity value on a marketable basis of CIE ranges between $██ billion for Q4 2012 and $██ billion for Q3 2015.  *See* "Caesars Interactive Entertainment, Inc. Common Stock Valuation" (Feb. 18, 2013), at CACEXAM00252773 [CACEXAM00252769]; "Caesars Interactive Entertainment, Inc. Common Stock Valuation as of September 30, 2015" (Nov. 2, 2015), at CACEXAM00512583 [CACEXAM00512579].  The value attributed to the WSOP is not broken out individually in certain of these analysis but, including other aspects of CIE's business, its value has ranged between $██ million in Q4 2014 to a high of brand ranges from $██ million (including online money gaming) in Q4 2012 to $██ million in Q3 2015 (valuing WSOP and "other" and separating out real-money gaming).  *See* "Caesars Interactive Entertainment, Inc. Common Stock Valuation" (Feb. 18, 2013), at CACEXAM00252773 [CACEXAM00252769] (Common Stock Valuation as of December 31, 2012); "Caesars Interactive Entertainment, Inc. Common Stock Valuation" (Jan. 31, 2014), at CACEXAM00512258 [CACEXAM00512254] (CIE Common Stock Valuation as of December 31, 2013); "Estimate of the Fair Value of Caesars Interactive Entertainment's Common Stock as of March 31, 2014" (Apr. 8, 2014), at CACEXAM00085360 [CACEXAM00085356] (CIE Common Stock Valuation as of March 31, 2014); "Caesars Interactive Entertainment, Inc. Common Stock Valuation as of June 30, 2014" (July 8, 2014), at CACEXAM00067117 [CACEXAM00067113] (CIE Common Stock Valuation as of June 30, 2014); "Caesars Interactive Entertainment, Inc. Common Stock Valuation" (Dec. 2, 2014), at CACEXAM00512454 [CACEXAM00512450] (CIE Common Stock Valuation as of September 30, 2014); "Caesars Interactive Entertainment, Inc. Common Stock Valuation as of December 31, 2014" (Jan. 4, 2015), at CACEXAM00512517 [CACEXAM00512514] (Common Stock Valuation as of December 31, 2014); "Caesars Interactive Entertainment, Inc. Common Stock Valuation as of March 31, 2015" (Apr. 29, 2015), at CACEXAM00512324 [CACEXAM00512321] (CIE Common Stock Valuation as of March 31, 2015); "Caesars Interactive Entertainment, Inc. Common Stock Valuation as of June 30, 2015" (July 27, 2015), at CACEXAM00512389 [CACEXAM00512385] (Common Stock Valuation as of June 30, 2015); "Caesars Interactive Entertainment, Inc. Common Stock Valuation as of September 30, 2015" (Nov. 2, 2015), at CACEXAM00512583 [CACEXAM00512579] (CIE Common Stock Valuation as of September 30, 2015).

[782]  "Caesars Interactive Entertainment, Inc. Common Stock Valuation as of September 30, 2015" (Nov. 2, 2015), at CACEXAM00512583 [CACEXAM00512579].

that the social gaming portion of CIE's business today is very valuable.[783]  And the vast majority of the value associated with CIE is not specifically linked to the WSOP.

### 9.  The Examiner's Findings and Conclusions

Based on the evidence, the Examiner has analyzed potential claims for constructive fraudulent transfer, actual fraudulent transfer, breach of fiduciary duty, including usurpation of corporate opportunity and aiding and abetting breach of fiduciary duty.  Consistent with the choice of law discussion in Appendix 5, Legal Standards, at I.A and III.D.1, Nevada law likely will govern the fraudulent transfer analysis because Nevada has the most significant relationship to the transaction.[784]  Specifically, a majority of the conduct forming the basis for the claims occurred in Nevada and the Caesars entities and employees were primarily located in Nevada.  In sum, Nevada was the focus of the activities forming the basis of the claims.  An alternative argument can be made that Delaware law applies because CEOC, CEC, CIE, TopCo and HIE Holdings are all Delaware entities.[785]  Nevertheless, for the purposes of this analysis, this appears to be a distinction without a significant consequence because Nevada and Delaware both have adopted versions of the UFTA and generally apply the same substantive law to claims for actual fraudulent transfer[786] and constructive fraudulent transfer.[787]  Therefore, the Examiner's analysis does not change materially regardless of whether Nevada or Delaware law applies.[788]  CEOC's

---

[783] *See* M. Rowan Jan. 28, 2016 Tr. at 470:18-471:7 (Social gaming is "a business that at purchase didn't make a lot of sense to me.  Some days it still doesn't make a lot of sense to me, but over a number of years and now enough people doing it and the amount of money that is being made doing it I am willing to suspend my belief while it's good for us.").

[784] In conducting a choice of law analysis, both Illinois and federal courts rely on the most significant relationship test, which considers: (1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered.  *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996) (citing *Ingersoll v. Klein*, 262 N.E.2d 593 (1970)); *see also Fla. Risk Planning Consultants, Inc. v. Transp. Life Ins. Co.*, 732 F.2d 593, 595 (7th Cir. 1984).  Although the place of injury is the presumptive applicable law, the place of injury is unclear here as CEOC's creditors are located in many jurisdictions.  *See ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 61 (S.D. Tex. 2007).

[785] *See Paloian v. LaSalle Bank Nat'l Ass'n (In re Doctors Hosp. of Hyde Park, Inc.)*, 494 B.R. 344, 370 (Bankr. N.D. Ill. 2013).

[786] *Compare* Nev. Rev. Stat. §112.180(1)(a) *with* Del. Code Ann. tit. 6, §1304(a)(1).

[787] *Compare* Nev. Rev. Stat. §112.180(1)(b) *with* Del. Code Ann. tit. 6, §1304(a)(2).

[788] As discussed in Appendix 5, Legal Standards at Sections I.A and III.D.1, Delaware and Nevada law do differ on the burden of proof for actual fraudulent transfer claims, with Delaware applying a preponderance of the evidence standard and Nevada applying the heightened burden of clear and convincing evidence.  However, the difference in burden of proof does not affect the Examiner's analysis as the record does not support a claim for actual fraudulent transfer under either burden of proof.

breach of fiduciary duty/usurpation of corporate opportunity and aiding and abetting claims are subject to Delaware law because that is CEOC's state of incorporation.[789]

The Examiner has concluded that (i) subject to the statute of limitations issue discussed below, there is a strong claim for constructive fraudulent transfer, (ii) any claim for actual fraudulent transfer is weak and (iii) subject to the statute of limitations issue discussed below, there are reasonable claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty, but that any claim seeking to recover the value of social gaming associated with CIE would be between weak and plausible.

### a. Constructive Fraudulent Transfer

Under Nevada law, as incorporated as "applicable law" under section 544(b) of the Bankruptcy Code,[790] a transfer is constructively fraudulent when the debtor transfers property or incurs an obligation (i) without receiving reasonably equivalent value in return and (ii) (a) "[w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;" (b) "[i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due;" or (c) the debtor was insolvent or became insolvent as a result of the transfer or obligation.[791]  There is no dispute that the WSOP Trademark & IP was transferred out of CEOC in connection with the 2009 WSOP Transaction.  Moreover, as set forth in Section V, Solvency, *supra*, CEOC was insolvent, undercapitalized and likely unable to pay its debts in full when they were scheduled to mature at the time of the 2009 WSOP Transaction.  The constructive fraudulent transfer claim, therefore, rests on whether CEOC received reasonably equivalent value for its transfer of the WSOP Trademark & IP.

In addition to assessing Duff & Phelps' valuation of the WSOP, the Examiner conducted an independent valuation of the WSOP Trademark & IP and the Preferred Stock CEOC received as consideration at the time of the transfer in 2009.  For purposes of valuing the WSOP Trademark & IP, the Examiner utilized the Capitalization of Earnings Method under the income

---

[789] Although Section 9.8 of CEOC's Articles of Incorporation eliminates liability for damages based on a breach of the duty of care by CEOC's directors, that provision was not added until May 2014 and, therefore, has no effect on the liability of CEOC's directors for any acts or omissions occurring prior to that date.  *See* Del. Code Ann. tit. 8, §102(b)(7).

[790] While Bankruptcy Code section 548 also permits avoidance of actual or constructive fraudulent transfers, any potential claims under this provision would be barred by the applicable two-year statute of limitations.  *See* Appendix 5, Legal Standards at Section III; 11 U.S.C. §548(a)(1).

[791] Nev. Rev. Stat. §§112.180(1)(b), 112.190(1).

approach.[792]    Based on this analysis, and as more fully analyzed in Appendix 7, Valuation at III.C., the Examiner concludes that at the time of the transfer, the (i) fair market value of the WSOP Trademark & IP was between $66.2 million and $76.1 million and (ii) estimated marketable value of the Preferred Stock, as of May 1, 2009, was between $9.9 million and $12 million.    Moreover, this valuation is based on the then existing, core use of the WSOP Trademark & IP with respect to sponsorship, licensing, and media and does not include any amount for the intrinsic value of the WSOP brand or for any potential upside from the implementation of the business plan for CIE.[793]    Normally, some of these items would have been secured for the seller, such as through the negotiation of an equity interest or earn-out.  However, because no one was negotiating for CEOC in this transaction, that did not happen.  Even apart from the failure to secure these items, the Examiner concludes that CEOC did not receive reasonably equivalent value in exchange for the transfer of the 2009 WSOP Trademark & IP.

Although the claim arose more than four years prior to the bankruptcy filing, such that it ordinarily would be barred by the Nevada statute of limitations, as discussed in Section XI, *infra*, there is a reasonable argument that the IRS is a viable Golden Creditor for this claim – *i.e.*, a triggering creditor into whose shoes CEOC can step under Bankruptcy Code section 544 for purposes of bringing and prosecuting a fraudulent transfer claim under applicable state law – and, therefore, could extend the statute of limitations such that this claim could be timely filed.[794] Accordingly, subject to the statute of limitations issue, a strong constructive fraudulent transfer claim exists upon which CEOC could seek the return of the WSOP Trademark & IP or its value.[795]

Turning to the remedy, Bankruptcy Code section 550(a) provides for the recovery of either "the property transferred, or, if the court so orders, the value of such property."[796]    In determining the appropriate recovery, the court's primary goal is to "restore the estate to the financial condition that would have existed had the transfer never occurred."[797]    Here, a court

---

[792]   The Capitalization of Earnings Method uses a financial statistic for the subject company to estimate the present value of expected economic income that an investor might anticipate from the business.  *See* Appendix 7, Valuation at Section I.C.

[793]   *See id.* at Section III.C.

[794]   *See infra* Section XI.

[795]   Nev. Rev. Stat. §112.210.  The safe harbor defense under Bankruptcy Code section 546(e) would not apply to this transaction.

[796]   11 U.S.C. §550(a).

[797]   *See* Appendix 5, Legal Standards at Section VI.  *Hebenstreit v. Kaur*, 619 F. App'x 529, 531 (7th Cir. 2015) (noting that purpose of section 550 was "to restore a bankruptcy estate to its pre-transfer financial condition."); *Trout v. Drive Fin. Serv., L.P. (In re Trout)*, 609 F.3d 1106, 1112 (10th Cir. 2010) ("Bankruptcy courts have consistently held that 11 U.S.C. §550 is designed to restore the estate to the financial condition that would have existed had the transfer never occurred." (citation omitted)).

may not order a return of the WSOP Trademark & IP, which is not a standalone asset, but instead is integrated into various parts of CIE's business.  Therefore, to the extent the WSOP Trademark & IP is not returned, the recovery would be the value of the WSOP Trademark & IP at the time of the transfer (which the Examiner has concluded was between $66.2 million and $76.1 million) at the time of judgment (which the Examiner has not calculated).

Also relevant to CEOC's ultimate recovery is the determination of whether, and to what extent, CIE may be entitled to a lien or reduction of CEOC's recovery under section 550(e) of the Bankruptcy Code or applicable state law.[798]   Both the Bankruptcy Code and Nevada law provide that a "good faith" transferee is entitled to certain protections associated with the value given for the transferred property or improvements to the property.[799]   While good faith is not subject to a precise definition, the Examiner finds that there is a reasonable argument that CIE would not qualify as a good faith transferee.  This is because the transfers were made as part of the same consolidated transaction that was orchestrated by Caesars individuals who were acting on all sides of the transaction.  In fact, Caesars employees who invested in CIE and became employees/shareholders of the company after its creation were actively involved in structuring and valuing the transaction, providing valuation inputs and assumptions to Duff & Phelps to use in rendering a fairness opinion for the seller, and knew that the purchase price was determined without anyone independently representing or looking out for CEOC's interest.  CIE also was well aware of CEOC's financial condition.  For instance, CIE's soon-to-be CEO Garber discussed bankruptcy and fraudulent conveyance issues surrounding the transaction, given their view of CEOC's financial difficulties.[800]   Balanced against these factors is the existence of a fairness opinion, as well as CIE's reliance on counsel in structuring the transaction.  With respect to any good faith to be accorded to CIE in connection with the Duff & Phelps fairness opinion, it is important to note that CIE knew that the fairness opinion that justified the purchase price was based on financial inputs created, in part, by Abrahams, a to be CIE employee and ultimately a CIE officer.  Further, CEOC did not have its own, independent counsel, but instead was represented by the same attorneys representing all Caesars entities in the transaction.  As a result, when the record is viewed in its totality, there is a reasonable argument that CIE will not be able to establish that it was a good faith transferee.[801]

Certain creditor groups have argued that a remedy for the fraudulent transfer claim is the recovery of the entire value of CIE, including all improvements made to the WSOP Trademark

---

[798]   *See* Appendix 5, Legal Standards at Sections III.C.1 and VI.B.2.

[799]   *Id.* at Section VI.B.

[800]   *See* e-mail exchange between M. Garber and C. Abrahams (Jan. 15, 2009), at CEC_EXAMINER_1236150-51 [CEC_EXAMINER_1236150].

[801]   *See Smith v. SIPI, LLC (In re Smith)*, 811 F.3d 228, 246 (7th Cir. 2016) (indicating that a court did not err in finding that the transferee proved good faith and lack of knowledge under section 550(b) and that for the transferee "to have had knowledge of the voidability of the transfer, it needed to have had some knowledge of a potential fraudulent conveyance" either through the insolvency or that the transfer was for less than reasonably equivalent value).

& IP since the transfer. They argue that CIE's social gaming business, including Playtika, represents a natural growth of the assets transferred to CIE, and thus is recoverable. The Examiner believes that any claim for recovery of the full value of CIE based on a constructive fraudulent transfer claim is weak.[802] First, CEOC did not transfer CIE; it transferred the WSOP Trademark & IP, which did not itself lead to social gaming. Therefore, a recovery of CIE in its entirety would constitute a recovery of more than CEOC actually transferred. CEOC also faces a difficult argument that this type of recovery accomplishes the primary goal to "restore the estate to the financial condition that would have existed had the transfer never occurred."[803] As will be discussed in more detail in connection with potential breach of fiduciary duty claims, while the WSOP Trademark & IP was transferred to CIE to start the online business, and was viewed as an important component of the new business, CIE's current business is not comprised solely, or even largely, of the WSOP Trademark & IP that was transferred in 2009, but includes, among other things, significant acquisitions of third-party companies that did not involve the WSOP Trademark & IP, and have materially added to the value of CIE.[804] This is especially true today, when, following CIE's pivot to social gaming, the WSOP comprises only a small portion of CIE's overall business and value. It would require a substantial leap to find that a recovery of the entirety of CIE is necessary to place CEOC in the position it would have enjoyed absent the transfer of the WSOP Trademark & IP.[805]

While disputes over recovering the "social gaming" value will be the most strenuously contested, to the extent a court concludes that the value of the transferred WSOP Trademark & IP is too difficult to determine, it could order return of the WSOP Trademark & IP along with damages based on profits earned by CIE from the WSOP Trademark & IP since its transfer. The amount of these profits has not been calculated, but would include all profits associated with the use of the WSOP Trademark & IP on the Playtika platform.

In the end, there is a strong constructive fraudulent transfer claim for the $54.2 million to $66.2 million deficiency in the value between the value of the consideration paid and the value of the asset transferred – the WSOP Trademark & IP – at the time of the transfer. There is also a reasonable argument that CIE would not be able to establish that it was a transferee in good faith. Facts militating against it being able to do so are the Sponsors' (who controlled the decision

---

[802] There likely would, however, be a claim for lost profits (or appreciation in value) derived from the use of the WSOP Trademark & IP in CIE's social games, but that is a relatively modest number (which the Examiner has not calculated).

[803] *See* Appendix 5, Legal Standards at Section VI.

[804] Playtika does use the WSOP IP in some of its games and there would be a reasonable claim for the value of the earnings associated with that use.

[805] One creditor group has argued that the value of CIE (and social gaming) should be recoverable as "improvements" to the WSOP brand, analogizing to section 550(e) of the Bankruptcy Code and arguing that CIE was not a good faith transferee. The Examiner, however, does not believe that the section 550(e) analogy works, for the same reasons set forth above in the text.

making) knowledge of CEOC's financial condition and the manner in which the price was established without any attempt to secure the best possible price. There was, however, a fairness opinion, although various of the assumptions forming the basis for that opinion were supplied by a Caesars employee who was going to join CIE. If good faith was not established, CEOC would be entitled to a judgment in the amount of $66.2 million to $76.1 million, and CEC/CIE would only be allowed an unsecured claim for the value of the consideration.

### b. Actual Fraudulent Transfer

The Examiner has concluded that the 2009 WSOP Transaction presents a weak case for an actual fraudulent transfer claim. First, there is an absence of sufficient direct evidence suggesting that the transaction was done with the intent to hinder, delay or defraud CEOC's creditors. And although certain badges of fraud are present (lack of reasonably equivalent value, CEOC's insolvency and related party transaction), the Examiner has concluded that when these badges of fraud are viewed in connection with the totality of the circumstances of the transaction, they do not satisfy the burden of creating a presumption that the transaction was done with an intent to hinder, delay or defraud CEOC's creditors. That is not to say that the transaction does not raise concerns or suspicions. Despite these concerns and suspicions about how and why the transfer was done, the most likely conclusion is that the transaction was undertaken for the purpose and with the intent to provide a flexible structure for the new business, and not to hinder, delay or defraud creditors.

### c. Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty

In addition to possible fraudulent transfer claims, the Examiner also has analyzed potential claims for breach of fiduciary duty, including usurpation of corporate opportunity, in connection with the 2009 WSOP Transaction. Because CEOC is a Delaware corporation, Delaware law would apply.[806]

The fiduciary duty claims (including usurpation of corporate opportunity) are subject to a three-year limitations period.[807] The creditors have argued that the limitations period was tolled under the doctrines of fraudulent concealment[808] and equitable tolling.[809] They argue that the

---

[806] *See* Appendix 5, Legal Standards at Section XI.A.1.

[807] The creditors acknowledge that these claims are all subject to a three-year statute of limitations, but may be tolled under the doctrines of fraudulent concealment and equitable tolling.

[808] Under the doctrine of fraudulent concealment, the statute of limitations may be disregarded when a defendant has fraudulent concealed from a plaintiff facts necessary to put the plaintiff on notice of the truth. *In re Tyson Foods, Inc.*, 919 A.2d 563, 584-85 (Del. Ch. 2007). A "plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth." *Tyson Foods*, 919 A.2d at 585.

limitations period did not begin running until 2012 at the earliest. This is based on the argument that CEC failed to disclose that CIE was created as a subsidiary of CEC and that CIE in fact was incorrectly identified as a subsidiary of CEOC, not CEC, in CEC's Form 10-K for 2010.[810] In opposition, it has been argued that the transaction was publicly disclosed in press releases announcing the transaction and that CIE was never identified as a subsidiary of CEOC in its publicly filed post-transaction amendments to CEOC's credit agreements.

The determination of whether the statute of limitations should be tolled and/or extended is a fact based inquiry that will be difficult to resolve at the pre-trial pleading stage of any litigation. That is because CEC's second quarter 2009 Form 10-Q did disclose the creation of CIE but did not identify the entity or entities that owned it.[811] CEC's 2009 and 2010 Form 10-Ks

---

[809] Under Delaware law, the statute of limitations is tolled until the time a plaintiff knew or should have known, thorough the exercise of reasonable diligence, of a breach. *Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 395 (D. Del. 2012). To invoke this exception, a plaintiff is required to establish: (i) a fiduciary relationship; (ii) actionable or fraudulent self-dealing; and (iii) lack of inquiry notice. *See End of the Road Tr. v. Terex Corp. (In re Fruehauf Trailer Corp.)*, 250 B.R. 168, 193 (Bankr. D. Del. 2000); *see also Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 302 (Bankr. D. Del. 2012) (same). "[C]ourts have consistently rejected 'equitable tolling' of limitations periods where the facts underlying the claims were disclosed in publicly filed documents." *Marvel Entm't Grp., Inc. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*, 273 B.R. 58, 76 (Bankr. D. Del. 2002); *see, e.g.*, *In re Dean Witter P'ship Litig.*, Case No. CIV.A. 14816, 1998 WL 442456, at *8 (Del. Ch. July 17, 1998), *aff'd mem.*, 725 A.2d 441, 1999 WL 87385 (Del. 1999); *USACAFES L.P. Litig.*, No. CIV.A. 11145, 1993 WL 18769, at *3-6 (Del Ch. Jan. 21, 1993); *U.S. Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 503-04 (Del. Jan 6, 1996). However, whether a disclosure in a public filing is sufficient to toll the statute of limitations is a fact intensive determination.

[810] CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at Exhibit 21. The correct ownership was disclosed in CEC's 2011 Form 10-K. CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 5, Exhibit 21.

[811] CEC 10-Q for the period ended June 30, 2009 (Aug. 13, 2009), at 36 ("we established a new subsidiary, Harrah's Interactive Entertainment, Inc. . . . We own more than 90% of this newly-formed entity"). CEC's Form 10-K for 2009 further fails to identify which entity owns HIE Holdings and CIE, even though ownership of other Caesars subsidiaries is specified. CEC 10-K for the year ended Dec. 31, 2009 (Mar. 9, 2010), at Exhibit 21. In 2011, following the transfer of the WSOP tournament hosting rights to CIE, CEC came a little closer, but still did not explicitly identify CIE as a CEC subsidiary. *See* CEC 10-Q for the quarter ended Sept. 30, 2011 (Nov. 10, 2011), at Exhibit 99.1 (Supplemental Discussion of Pro Forma) at 12 ("In September 2011, the [CEOC] sold the right to operate the World Series of Poker land-based tournaments to a majority owned subsidiary of Caesars Entertainment.").

then confused the issue by incorrectly identifying CIE as a subsidiary owned by CEOC.[812] CIE's ownership structure thereafter was accurately disclosed in CEC's 2011 Form 10-K that was filed in March 2012.[813] While it also is true that CIE was not identified as a CEOC subsidiary in connection with CEOC's credit agreements, that did not serve as sufficient notice of CIE's true ownership because CEOC only identified restricted subsidiaries in connection with its credit agreements and CIE could have been an unrestricted subsidiary. As such, these filings are not adequate corrections of the 10-Ks and 10-Qs as CIE could have been created as an unrestricted subsidiary of CEOC.[814] However, the evidence reflects that Caesars' disclosures about the sale of the WSOP Tournament Rights in 2011 (discussed in Section VII.B) caused inquiry by at least certain of CEOC's creditors about the nature of that transaction, and suggests a potential awareness at that time that CIE was not a subsidiary of CEOC.[815] Considering the evidence in its entirety, the Examiner concludes that a determination of whether the limitations period should be extended on the basis of equitable tolling requires additional factual inquiry/findings into what creditors knew about the transaction, and when, and it is unlikely that this issue would be resolved at the pre-discovery pleading stage. The Examiner has not conducted this inquiry. There is, moreover, no evidence that the mistake in the 10-Ks was intentional, making any tolling on a fraudulent concealment argument difficult. To the extent the limitations period is extended, that would need to occur under the equitable tolling doctrine. This will not be an easy argument.

With respect to the merits of the potential claims, CEOC's directors owed fiduciary duties to CEOC for the benefit of all of its residual claimants – a category that included CEOC's creditors, given its insolvency.[816] Additionally, CEC, as CEOC's controlling shareholder, owed fiduciary duties to CEOC and its residual stakeholders.[817] The heightened "entire fairness"

---

[812] CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at Exhibit 21 (listing CIE as a subsidiary of CEC).

[813] CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 5 ("In May 2011, Caesars Interactive Entertainment Israel, Ltd. ('CIEI'), a subsidiary of Caesars Interactive Entertainment, Inc., which is a majority-owned subsidiary of Caesars Entertainment, acquired 51% of the voting equity interests of Playtika Ltd. ('Playtika'), a social games developer based in Israel. In December 2011, we purchased the remaining outstanding shares of Playtika."); *id.* at Exhibit 21.

[814] *See* M. Cohen Oct. 16, 2015 Tr. at 48:14-17.

[815] *See* e-mail exchange between D. Farber and E. Hession, *et al.* (Nov. 12-15, 2011), at CEOC_INVESTIG_00042409-11 [CEOC_INVESTIG_00042409].

[816] *See* Appendix 5, Legal Standards at Section XI.A.4.

[817] *Abraham v. Emerson Radio Corp.*, 901 A.2d 751, 759 (Del. Ch. 2006); *Blaustein v. Lord Balt. Capital Corp.*, C.A. No. 6685-VCN, 2013 WL 1810956, at *16 (Del. Ch. Apr. 30, 2013); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183-85 (Del. Ch. 2014) (*Quadrant I*) (holding that where a corporation is insolvent, its creditors, as "residual claimants" of the corporation, have standing to assert derivative claims against the controlling shareholder for breaching fiduciary duties owed to the corporation). CEC contends that Delaware law does not recognize any fiduciary duty owed by a controlling shareholder to a 100% wholly-owned

standard likely applies to determine if the CEOC directors or CEC satisfied their fiduciary duties to CEOC under Delaware law, and it is likely that a court would find that neither prong of the entire fairness test – fair process or fair price – exists here.[818]

As noted above, and in light of CEOC's insolvency at the time of the transaction, there are a number of problematic aspects of this transaction, including that (i) no process was put in place to protect CEOC and its creditors, (ii) there was no arm's length negotiation as to the price, (iii) there was no effort to maximize the value paid to CEOC for the WSOP Trademark & IP, (iv) CEOC had no independent directors, (v) CEOC had no independent legal or financial advisors, (vi) no special committees were established for the various entities and (vii) individuals who were going to be employed by and have a financial stake in the buyer were providing the inputs and assumptions for Duff & Phelps to rely upon in preparing its fairness opinion for CEOC.  In the end, Caesars' directors, officers and employees and the Sponsors involved in the 2009 WSOP Transaction made no distinction between the various Caesars entities involved in the transaction or these entities' conflicting interests.[819]  Instead, the transaction was viewed from its impact on CEC and the Sponsors, and not specifically on CEOC or its creditors.[820]  As a result, CEOC did not have any individuals acting solely on its behalf.  It also appears unreasonable to assume that a seller in an arm's length transaction would overlook the possible value of the WSOP brand in the future of online gaming.  While CEC recognized the potential of such value early on in the process, this was not captured in the final purchase price or the Duff & Phelps fairness opinion.

The Examiner thus concludes that subject to the statute of limitations defense discussed above, a reasonable claim for breach of fiduciary duty would exist against CEOC's Board

---

subsidiary (or its residual stakeholders in the event of insolvency).  The *Quadrant* case, however, is to the contrary.  It is also a logical extension of the caselaw involving fiduciary duties owed to minority stockholders and insolvent companies.

[818] Under the heightened entire fairness standard, the burden of proof is on the defendants to prove that the transaction was entirely fair, in terms of both fair dealing and fair price.  *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 24, 34 (Del. Ch. 2014).  However, where a well-functioning special committee has been established, courts applying Delaware law may elect to shift the burden back to the plaintiff to establish that the transaction was not entirely fair.  *Orchard*, 88 A.3d at 34.  Here, the burden would not shift back to plaintiffs as there was no special committee involved in the 2009 WSOP Transaction, much less a well-functioning special committee.

[819] *See* C. Abrahams Oct. 7, 2015 Tr. at 74:22-75:7; G. Loveman Oct. 27, 2015 Tr. at 71:13-72:14; J. Halkyard Nov. 2, 2015 Tr. at 65:6-17.  This lack of distinction is apparent in the execution of the final transaction.  CEOC's directors Jonathan Halkyard and Loveman acted on behalf of CEOC despite their conflicted roles with CEC.  Indeed, it was Halkyard, CEC's then-CFO, who signed the transaction documents on behalf of all parties, including CEC, CEOC, CLC and CIE.

[820] *See, e.g.*, C. Abrahams Oct. 7, 2015 Tr. at 153:15-19; M. Garber Oct. 9, 2015 Tr. at 49:16-22; G. Kranias Oct. 23, 2015 Tr. at 102:11-22.

members and CEC as the controlling shareholder.  The damages arising from this breach of fiduciary duty likely would be consistent with those that are recoverable on a fraudulent transfer claim.

The Examiner also analyzed a possible claim for breach of fiduciary duty (including aiding and abetting) arising from CEC's usurpation of CEOC's corporate opportunity.  Delaware courts have recognized usurpation of corporate opportunity claims against officers, directors and corporate parents.[821]  To establish an usurpation claim, one must show that: "(1) the opportunity is within the corporation's line of business; (2) the corporation has an interest or expectancy in the opportunity; (3) the corporation is financially able to exploit the opportunity; and (4) by taking the opportunity…the corporate fiduciary is placed in a position inimical to [its] duties to the corporation."[822]  When reviewing these elements, "no single factor is dispositive.  Instead the Court must balance all factors as they apply to a particular case."[823]  While courts generally recognize that a corporation's line of business is to be interpreted broadly, resolution of this issue presents a difficult factual question that likely will preclude dismissal of these claims at the motion to dismiss or even summary judgment stages.

Creditors have asserted that the transfer of CEOC's PFF and online gaming businesses to CIE as part of the 2009 WSOP Transaction was a usurpation of CEOC's opportunity to further develop and expand these businesses.  They contend that the PFF and online real-money gaming

---

[821] *See, e.g.*, *Schreiber v. Bryan*, 396 A.2d 512, 518-20 (Del. Ch. 1978); *David J. Greene & Co. v. Dunhill Int'l, Inc.*, 249 A.2d 427, 434-35 (Del. Ch. 1968) (holding that corporate majority shareholder usurped corporate opportunity of its subsidiary); *Dweck v. Nasser*, C.A. No. 1353-VCL, 2012 WL 161590, at **12-17 (Del. Ch. Jan. 18, 2012) (holding that directors and officers breached their duty of loyalty when they establishing competing companies that usurped a corporation's opportunities and converted it resources); *see also Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154 (Del. 1996) ("The doctrine of corporate opportunity represents but one species of the broad fiduciary duties assumed by a corporate director or officer."); *Guth v. Loft, Inc.*, 5 A.2d 503, 511 (Del. 1939) ("[I]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.").

[822] *Repository Techs., Inc. v. Nelson (In re Repository Techs., Inc.)*, 363 B.R. 868, 891 (Bankr. N.D. Ill. 2007) *aff'd*, 381 B.R. 852 (N.D. Ill. 2008) *vacated,* 601 F.3d 710 (7th Cir. 2010) (citing *McGowan v. Ferro*, 859 A.2d 1012, 1038 (Del. Ch. 2004) and *Broz*, 673 A.2d at 154-55)).

[823] *Beam v. Stewart,* 833 A.2d 961, 972 (Del. 2003); *see also Schreiber*, 396 A.2d at 519 ("The application of these principles depends on the facts.  Whether or not the director has appropriated for himself something that in fairness should belong to his corporation is a factual question to be decided by reasonable inference from objective facts.") (internal quotation marks omitted).

business should have been kept in CEOC, and that if CEOC had kept the WSOP Trademark & IP, it would have continued the business plan contemplated by Caesars in 2007, which included both online real-money and PFF gaming.

The Examiner believes that a plausible argument exists that CEOC's directors (who were also the CEO and CFO of CEC) and CEC as controlling shareholder wrongfully allowed this corporate opportunity and 100% of any upside, to be usurped at a time when CEOC was insolvent. The Sponsors would then be subject to aiding and abetting claims. The Examiner has not computed what the resulting damage number would be, but using the most recent PWC valuation of CIE's social gaming and real-money online poker in Nevada and New Jersey businesses, the value would be in the billion-dollar-plus range.[824]   An alternative under this theory of liability would be to award CEOC a percentage interest in Growth based on what portion of CEC's interest in Growth was attributed to CIE. An offset against any damage claim would, at a minimum, be what was spent by CIE on its social gaming acquisitions and amounts invested by CEC in CIE.

There are arguments both in favor of and against these claims. Prior to the 2009 WSOP Transaction, CEOC had an active PFF business, and it had contemplated expanding into a real-money online gaming service.[825]   There was a clear conflict between CEC's fiduciary duties to CEOC and CEC's self-interest in placing these activities in a subsidiary outside of CEOC. The transaction was structured in a way that prevented CEOC from obtaining, while CEC held, any potential upside associated with the growth of the online gaming opportunity. Caesars also recognized the potential value of PFF gaming, which was a business line that generated revenue for CEOC prior to the transaction.[826]   Further, CIE almost immediately undertook plans to monetize online PFF gaming after the 2009 WSOP Transaction.[827]   Despite CEOC's likely insolvency in 2009, it remained a going concern and appears to have been able to financially exploit these opportunities.[828]   In fact, as CIE acquired Playtika for approximately $115 million

---

[824] Although the Examiner has not fully analyzed or adopted PWC's numbers, what is clear is that CIE's business is very valuable.

[825] In addition, that the parties contemplated making CIE a CEOC subsidiary further supports the fact the PFF and online gaming business were within CEOC's line of business. *See Fliegler v. Lawrence*, No. 3647, 1974 WL 2037, at *7 (Del. Ch. Dec. 10, 1974) (holding that an opportunity was within the corporation's line of business where the opportunity was originally placed with the corporation).

[826] *See* M. Garber Nov. 20, 2015 Tr. at 241:20-24; *see also* e-mail from C. Abrahams to B. Bellhouse (Sept. 9, 2008), at APOLLO-Examiner_01034320 [APOLLO-Examiner_01034320]; e-mail from C. Abrahams to B. Bellhouse (Sept. 9, 2008), at APOLLO-Examiner_01034320 [APOLLO-Examiner_01034320].

[827] *See supra* Section VII.A.

[828] *See Stephanis, by Sterianou v. Yiannatsis*, Civ.A. No. 1508, 1993 WL 437487, at *4 (Del. Ch. Oct. 4, 1993) ("[S]uch financial inability must amount to insolvency to the point where the

using intercompany financing from CEC, CEOC also may have been able to finance an acquisition in the same way.[829]  In addition, at the time of the Playtika acquisition, CEOC had over $300 million in unrestricted cash.[830]

Although courts will not hold a fiduciary liable under the usurpation doctrine where the corporation has first rejected the opportunity,[831] this defense appears inapplicable here.  As detailed above, there was no process to protect CEOC in connection with the 2009 WSOP Transaction and, as result, it cannot be said that CEOC rejected anything in connection with transaction.  Therefore, there is a strong argument that CEC's directors usurped the corporate opportunity.  Moreover, the Sponsors, while at various times lukewarm on the transaction, were heavily involved in structuring, directing and approving the transaction and also would be subject to aiding and abetting claims.[832]

Courts have broad discretion to fashion any form of equitable or monetary relief as may be appropriate upon a finding of a breach of fiduciary duty.[833]  Under an entire fairness review, the measure of recoverable loss is typically "the difference between the price offered and the 'true' value as determined under appraisal proceedings."[834]  If a transaction has already been completed, a shareholder may seek rescission of that transaction.  Courts, however, often conclude injunctive or rescissory relief is infeasible or impractical and instead elect to award

---

corporation is practically defunct. Mere technical insolvency, such as inability to pay current bills when due or mere inability to secure credit, will not suffice. The corporation must be actually insolvent."); *see also Norman v. Elkin*, 617 F. Supp. 2d 303, 312-13 (D. Del. 2009) (holding that a corporation with limited available cash was financially able to participate where it could have raised funds to do so); *Gen. Video Corp. v. Kertesz*, C.A. 1922-VCL, 2008 WL 5247120, at *19 (Del. Ch. Dec. 17, 2008) (holding that the corporation was "irremediably insolvent" and could not take advantage of the corporate opportunity as a result).  On appeal, the Delaware Supreme Court refused to adopt the "insolvency-in-fact test" from *Stephanis* and noted that courts should consider "a number of options and standards for determining financial inability, including but not limited to, a balancing standard, temporary insolvency standard, or practical insolvency standard."  *Yiannatsis v. Stephanis, by Sterianou*, 653 A.2d 275, 279 (Del. 1995).

[829]  *See* Appendix 7, Valuation at Section III.C.

[830]  *Id.*

[831]  *See Broz*, 673 A.2d at 157 (citing *Field v. Allyn*, 457 A.2d 1089 (Del. Ch. 1983)).

[832]  Courts have recognized that aiding and abetting liability may lie for entities or individuals who "dominated and controlled" a party alleged to have breached a fiduciary duty.  *E.g., Metro. Life Ins. Co. v. Tremont Grp. Holdings*, No. CIV.A. 7092-VCP, 2012 WL 6632681, *19 (Del. Ch. Dec. 20, 2012).

[833]  *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999), *aff'd,* 766 A.2d 437 (Del. 2000) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983)).

[834]  *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 371 (Del. 1993).

monetary damages,[835] which may be calculated by determining the value of the assets at the time of the transfer, reduced by the amount paid for such assets.[836]

A challenge in determining the appropriate recovery here rests in the two competing views regarding CIE's current business. One view is that only a small portion of CIE's current business relates to the WSOP Trademark & IP and online poker. The recent valuations by PWC appear to support this characterization and most of CIE's value is attributable to social gaming, including the substantial value of the companies CIE has acquired to further its social gaming activities. A competing view is that CEOC is entitled to recover the entire value of CIE's current business, including these social gaming companies. The recovery of the entire business requires a finding that PFF gaming opportunity usurped from CEOC encompassed social gaming. Stated differently, the issue is whether social gaming as it exists at CIE today was within CEOC's line of business in 2009 and whether CEOC had any interest or expectancy in this type of social gaming. CIE opposes the characterization of social gaming as being related to PFF gaming. For instance, Cohen stated that social gaming was a "completely divergent business model" from PFF gaming and "one that really didn't exist in [20]09."[837] Abrahams stated that late 2010 was "really the first timeframe that anyone had done a social casino style game" and that "[p]rior to that, the only other social games that existed were like Farm Build or other games that just weren't relevant to what we were doing at the time."[838]

CIE's current "social gaming" is largely PFF casino gaming involving, for example, slots and roulette. While these are not identical to PFF poker, which was part of the original business plan, they arguably are not entirely dissimilar. PFF non-poker casino games were at least being considered by Caesars at the time of the acquisition.[839] And Loveman stated that "[s]ocial games and play-for-fun games are essentially the same thing."[840] Therefore, there is a plausible argument that the current business, including the acquisition of Playtika, was a natural evolution of the business opportunity transferred to CIE in 2009. In effect, the initial plans were to use PFF as a marketing tool for online real-money poker, but once CIE realized it was unlikely to achieve broad legalizing of real-money gaming, CIE revised its business plans to focus on PFF-style social gaming as the primary source of revenue. That transition has been extremely successful and accounts for most of CIE's current value.

---

[835] *Weinberger*, 457 A.2d at 714.

[836] *See Cede*, 634 A.2d at 371.

[837] M. Cohen Feb. 9, 2016 Tr. at 454:23-25; *see also id.* at 454:2-456:24 (discussion involving Cohen's views on the difference between the pre-transaction business from the social gaming business).

[838] C. Abrahams Jan. 29, 2016 Tr. at 17:11-24.

[839] *See* "Project Forest Online Gaming Business Plan" (Oct. 2, 2008), at APOLLO-Examiner_00473492 [APOLLO-Examiner_00473479].

[840] G. Loveman Oct. 27, 2015 Tr. at 65:14-15.

Another important distinction between the pre-2009 proposed business model and the current model is that PFF gaming originally involved licensing the WSOP brand to third parties which would sell their games to users.[841]  Social gaming, however, generally involves using your own platform to allow people to download the game for free with a relatively small percentage of them then spending money on things like "virtual coins" and other in-game purchases and participating in multiplayer games.[842]  Again, it also can be argued that this type of social gaming simply is part of the natural evolution of the 2009 PFF games business.

Based on all the evidence, the Examiner concludes that there is a plausible argument to recover the value of CIE related to social gaming.  This is due to the numerous hurdles that CEOC would need to clear in order to recover the entire value of CIE.  First, as discussed above, CEOC would have to prove that these claims are not barred by the statute of limitations, which will be a fact-intensive, difficult argument.  Second, CEOC would need to demonstrate that it was a clear corporate opportunity rather than just a speculative bet on U.S. legalization.  While there is some evidence to the contrary, as discussed above, there also is evidence that by May 2009 Apollo did not view this as a truly valuable opportunity.  Third, CEOC would have to prove that it was a corporate opportunity that CEOC was capable of exploiting.  This involves demonstrating that it had the financial wherewithal to do so, and that there were not genuine regulatory reasons which justified CIE being established as a subsidiary of CEC rather than CEOC.  Fourth, CEOC would have to prove that social gaming was the natural progression of the PFF gaming as it existed at CEOC 2009 such that it was a meaningful part of the corporate opportunity.[843]  Fifth, CEOC would have to prove that the then-existing business of licensing to third parties which ultimately sold games using the WSOP Trademark & IP was sufficiently similar to the current CIE business model, which involves downloading games for free from CIE's own platform.  Finally, the court also could simply conclude that awarding such large damages to CEOC is an unjustified windfall, given that in 2009 the business expected to be the driver of profits was real-money online poker.  As a result, the more likely recovery, although it also faces challenges, would be the value of CIE attributable to real-money online poker and the WSOP Trademark & IP.

---

[841]  *See supra* notes 642-646.

[842]  *See* M. Garber Oct. 9, 2015 Tr. at 192:8-16; C. Abrahams Jan. 29, 2016 Tr. at 7:22-25.

[843]  There are two Bankruptcy Court cases which have construed the misappropriation of a corporate opportunity to be transfers and thus fraudulent transfers.  *Rajala v. Gardner*, No. 09-2482-EFM, 2012 WL 1189773, at *15 (D. Kan. Apr. 9, 2012) *aff'd*, 709 F.3d 1031 (10th Cir. 2013) (applying broad definition of transfer under UFTA to conclude that plaintiff's allegations were sufficient to support a fraudulent transfer claim where plaintiffs alleged the transfer of a corporate opportunity); *cf. Smith v. Nicholas/Earth Printing, L.L.C.* (*In re Bob Nicholas Enter., Inc.*)*,* 358 B.R. 693, 701-02 (Bankr. S.D. Tex. 2007) (for transfer of corporate opportunity to support a fraudulent transfer claim, plaintiff must prove existence of a valid corporate opportunity and that transferor had the financial resources to pursue the opportunity). If CEOC were to prevail on such an argument, which is far from certain, it would attempt to rely on the existence of a Golden Creditor to avoid the statute of limitations defense.

Given all these obstacles, the Examiner concludes that a claim to recover the full value of CIE is between weak and plausible – it likely would withstand a motion to dismiss, but there is less than a 50% chance of succeeding.  A recovery limited to the value of CIE attributable to real-money online poker and the use of the WSOP Trademark & IP is more plausible, but still difficult.  PWC most recently valued this portion of CIE at $██ million, but that number is likely too high because it includes aggressive assumptions about the future of the real-money online poker business.

## B.  2011 WSOP Transaction

### 1.  Introduction

In September 2011, CEOC sold its rights to hold live, in-person WSOP events (the "WSOP Tournament Rights") to CIE for $20.5 million.[844]  The transaction involved four contemporaneous, interrelated steps.  First, CEOC – the owners of the WSOP Tournament Rights – sold the WSOP Tournament Rights to Caesars Tournament, LLC ("CT") – a newly created, direct, wholly owned subsidiary of CEC – for $20.5 million.[845]  Next, CT licensed to CEC the right to host certain WSOP events in exchange for a licensing fee of $2 million per year for a term of five years.[846]  Then, CT sold the WSOP Tournament Rights to CIE for $20.5 million, subject to the license to CEC.[847]  Thereafter, CIE and CEC entered into a direct agreement for CEC to pay CIE the $2 million per year licensing fee.  CEC, in turn, licensed certain of these hosting rights to the Rio for $2 million per year.[848]  Finally, CIE and CEC entered into an agreement that permits CEC and its affiliates to host WSOP circuit events in

---

[844] Tournament Rights Purchase Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039818-843 [CEOC_INVESTIG_00039818]; Trademark Sublicense Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039844-878 [CEOC_INVESTIG_00039844]; Tournament Rights Buyback Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039879-883 [CEOC_INVESTIG_00039879]; Trademark License Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039884-919 [CEOC_INVESTIG_00039884]; Tournament Host Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039920-92 [CEOC_INVESTIG_00039920]; Circuit Event Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039923-966 [CEOC_INVESTIG_00039923].

[845] Tournament Rights Purchase Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039818-843 [CEOC_INVESTIG_00039818].

[846] Trademark Sublicense Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039844-878 [CEOC_INVESTIG_00039844].

[847] Tournament Rights Buyback Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039879-883 [CEOC_INVESTIG_00039879].

[848] Tournament Host Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039920-922 [CEOC_INVESTIG_00039920].  It also is noteworthy that although the Rio had hosted WSOP for a number of years prior to the 2011 sale of the WSOP Tournament Rights, it had never paid CEOC a licensing fee.  *See infra* note 96.

exchange for a per-event fee.[849]  The $20.5 million paid to CEOC, which, at the time of this transaction, was insolvent, undercapitalized, and likely unable to pay its debts as they were scheduled to come due, did not reflect reasonably equivalent value for the WSOP Tournament Rights.

This resulted, in part, because, like the 2009 WSOP Transaction, the 2011 WSOP Transaction involved individuals acting on behalf of multiple entities with conflicting interests. CEOC did not have its own independent directors, attorneys or financial advisors in the transaction.  Instead, Paul Weiss served as the outside counsel on the transaction for all of the Caesars entities.  Likewise, Valuation Research Corporation ("VRC"), which was retained by CEC to provide a fairness opinion to CEOC, did virtually no meaningful analysis and based its fairness opinion on assumptions and financial projections created by CEC and CIE that undervalued the WSOP Tournament Rights.  And while CEOC's board members were involved in the transaction, their involvement appears to be in connection with their positions at other Caesars entities.[850]  In fact, there is no evidence that the transaction was presented to or approved by the CEOC Board.  Rather, CEC's Board approved the transaction.

Moreover, no witness was able to identify anyone who ultimately determined or negotiated the sale price of the WSOP Tournament Rights.  Indeed, the sale price was effectively given to VRC via Caesars-prepared DCF models.  And no evidence was presented to suggest that any individuals or entity negotiated the transaction on behalf of CEOC.  In fact, a Caesars' attorney involved in the transaction expressed a belief that the purchase price was determined by VRC,[851] which is incorrect.

Creditors contend that the transfer of the WSOP Tournament Rights constituted both a constructive fraudulent transfer and an actual fraudulent transfer.  They additionally argue that the transfer constituted a breach of fiduciary duty against CEOC's directors and CEC (as the controlling shareholder of CEOC) and aiding and abetting a breach of fiduciary duty by the Sponsors.[852]  Based on the evidence and testimony provided, the Examiner concludes that a

---

[849] Circuit Event Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039923-966 [CEOC_INVESTIG_00039923].

[850] These include CEC's and CEOC's CEO, Gary Loveman, and CEC's and CEOC's CFO, Jonathan Halkyard, who both served as directors for CEOC.

[851] Michael Cohen, one of the key participants in the transaction, indicated that there was no negotiation over price, and that VRC determined a "fair" purchase price for CEOC.  Cohen explained that VRC was tasked with determining the purchase price for the sale:  "I don't recall anyone negotiating.  My understanding was that VRC was determining what the fair value of this was to CEOC and that was going to be the price."  M. Cohen Oct. 16, 2015 Tr. at 100:7-10; *see also* 101:3-7 ("my understanding was VRC was valuing the – what they thought the tournament business was worth to CEOC, and that was going to be the price, the fair value").

[852] Certain creditor groups initially were under the mistaken impression that CIE was originally formed in 2009 as a subsidiary of CEOC, rather than CEC, and that in 2011 the ownership of CIE was moved to CEC for no consideration.  That, however, is not what occurred.

strong constructive fraudulent transfer cause of action exists with regard to this transaction. While an argument can be made that this transaction also constituted an actual fraudulent transfer because of the presence of certain badges of fraud, the Examiner concludes this claim is weak. When each of the badges of fraud is viewed in context, this transaction, while it does raise concerns, falls short of the standard necessary to prove an actual intent to hinder, delay or defraud CEOC's creditors.  Finally, despite CEOC's insolvency at the time of this transaction, the total lack of appropriate process involved in this transaction and the manner in which the price was determined, the Examiner concludes that any breach of fiduciary duty claims would be time-barred.

### 2.  Factual Background, Approval of the Transaction, and Key Players

#### a.  Initial Consideration and Analysis of CIE Acquiring CEOC's Right to Host the WSOP Tournaments

The May 1, 2009 WSOP Transaction separated the online WSOP Trademark & IP (which was transferred to CIE) from the offline WSOP Tournament Rights (which remained with CEOC via a license from CIE).  On the very day that Caesars completed the 2009 sale to CIE of the WSOP Trademark & IP, Craig Abrahams, Mitch Garber, and Garber's attorney, Sidney Horn, began discussing a "mechanism" to get the WSOP Tournament Rights back from CEOC.[853] According to Garber, that "license [for the WSOP Tournament Rights was] almost useless to anyone but [CIE]. . . " and he indicated that CIE would work on a mechanism to get these rights back.[854]  About a year later, on July 9, 2010, Abrahams[855] prepared a one-page presentation for Jonathan Halkyard[856] that outlined the framework of a transaction whereby CIE would acquire the WSOP Tournament Rights from CEOC.[857]  Abrahams' presentation discussed problems associated with having the WSOP Trademark & IP separated from the WSOP Tournament Rights, and outlined a proposal for CIE's purchase of the WSOP Tournament Rights.[858] Abrahams' rationale for the transaction included the need to host offline WSOP events in Europe, the fact that there was ineffective management of the WSOP Circuit Events, and CIE's

---

[853]  E-mail exchange between C. Abrahams, M. Garber, and S. Horn (May 1, 2009), at CACEXAM00121726 [CACEXAM00121725].

[854]  *Id.*

[855]  At the time, Abrahams was a Vice President at CIE.  E-mail from C. Abrahams to M. Garber, *et al.* (July 9, 2010), at CEOC_INVESTIG_00041049-50 [CEOC_INVESTIG_00041049]. Today, he is CIE's President and Chief Financial Officer.  *See Management Team*, Caesars Interactive Entertainment, http://www.caesarsinteractive.com/management/.

[856]  Halkyard was CEC's Chief Financial Officer at that time.  CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 125.  He was also a member of CEOC's board of directors.

[857]  E-mail from C. Abrahams to M. Garber, *et al.* (July 9, 2010), at CEOC_INVESTIG_00041049-50 [CEOC_INVESTIG_00041049].

[858]  *Id.*

inability to control the quality of the WSOP Las Vegas event.  Abrahams averred that "[a]t the time of the original [2009 WSOP T]ransaction there were some concerns with separating the WSOP marks from the tournament, but after 14 months it is becoming clear that these two assets need to be linked together."[859]  He also asserted that the "WSOP Circuit Events have not been effectively managed for the last 14 months and there are currently negative articles being written about the event."[860]  Abrahams then outlined a proposal for CIE's purchase of the WSOP Tournament Rights that included, among other things, CIE buying "the WSOP Tournament license back from [CEOC] for [$40-55] million in cash consideration"[861] and then CIE granting "a more specific license to operate a minimum # of WSOP tournaments for "$[6-8] million license fee annually."[862]  According to Abrahams's proposal, one of the advantages of this transaction was that it would "[m]ove[] cash into [CEOC]."[863]  Garber responded to the proposal by opining that Abrahams should provide additional details on the difficulty separating the "website, people, tournament schedule, PR, decision making, [and] between [CEOC] and [CIE]."[864]

Abrahams did not recall the source of the proposed $40-55 million cash payment to CEOC for the WSOP Tournament Rights noted in his proposal.[865]  Instead, he explained that he was focused on the correlation between what CIE would pay for the WSOP Tournament Rights and what it would receive in licensing fees, because "the two are connected from [CIE's] perspective."[866]  Abrahams emphasized that a higher license fee to CIE would warrant a higher purchase price by CIE.[867]  This view is reflected throughout the presentations.

---

[859]  *Id.* at CEOC_INVESTIG_00041049.

[860]  *Id.*

[861]  *Id.* (brackets around the purchase price in original).

[862]  *Id.* (brackets around the license fee in original).

[863]  E-mail  from  C.  Abrahams  to  M.  Garber,  *et  al.*  (July  9,  2010),  at CEOC_INVESTIG_00041050 [CEOC_INVESTIG_00041049].

[864]  E-mail  exchange  between  M.  Garber  and  C.  Abrahams,  *et  al*.  (July  9,  2010),  at CEOC_INVESTIG_00041052 [CEOC_INVESTIG_00041052].

[865]  C. Abrahams Oct. 7, 2015 Tr. at 150:3-9.  Communications between Abrahams, Garber, and Brimmer that pre-date Abrahams' July 2010 proposal indicate that Abrahams, with the assistance of Brimmer, worked on this initial valuation associated with the WSOP Tournament Rights.  E-mail  from  C.  Abrahams  to  M.  Garber  (July  4,  2010),  at  CACEXAM00171759 [CACEXAM00171759].

[866]  C. Abrahams Oct. 7, 2015 Tr. at 150:8-13.

[867]  *Id.* at 166:4-11 ("I just remember where it ended up, $2 million a year at a 20.5 purchase price for us.  That's all I remember.  And then, as you said, for 6 to 8 million a year I guess we thought it was worth more.  But at 2 million a year we thought it was worth 20.  So that's all I remember in terms of my history with it.").

Abrahams explained CIE's rationale for acquiring the WSOP Tournament Rights as a defensive play to prevent denigration of the WSOP brand, which clearly was viewed by CIE as a valuable asset:

> So this was, as I said earlier, a defensive play to sort of maintain the value of the brand from our perspective. It wasn't strategic in entering a new market. It was to kind of hopefully put a stop to what was happening, which was no marketing, no signage, negative articles were being written about the circuits, bad coordination of sponsors, our sponsorship guys at the Rio. We just had to put a stop to that.[868]

Garber similarly stated that the acquisition was a defensive move to protect against the deterioration of the WSOP brand that he thought was happening.[869] Nevertheless, witnesses also indicated that the transaction was not entirely defensive. For instance, Abrahams acknowledged that the proposed transaction had the potential for equity value creation for CIE.[870] Garber similarly agreed that the reasons for acquiring the tournaments were broader than simply to protect the WSOP brand.[871]

An August 2010 deck, entitled "WSOP Tournament Purchase," was thereafter created by CIE to reflect the ongoing analysis of this transaction.[872] It contained many of the same points and considerations as Abrahams's July e-mail. For instance, one of the advantages of the proposal, according to the deck, was that it "[m]oves cash into [CEOC] in the near-term (which would eventually flow back up to [CEC])."[873] The deck contained two "proposed" deal structures with bracketed amounts associated with the steps of each possible structure. The first proposed deal structure contains three steps and, for each step, identifies whether that step would be "relevant" or "irrelevant" to CEOC's creditors.[874] The first step, designated as "relevant" to CEOC's creditors, involved CEC paying "FMV for right to operate WSOP tournament events" and identified a bracketed range for "Cash – [$25m-30m]."[875] The second step, deemed "irrelevant" to CEOC's creditors, involved a license of the tournament hosting rights to CEOC

---

[868] *Id.* at 152:11-20.

[869] M. Garber Oct. 9, 2015 Tr. at 95:10-12.

[870] C. Abrahams Oct. 7, 2015 Tr. at 153:5-19.

[871] M. Garber Oct. 9, 2015 Tr. at 108:20-109:14.

[872] "WSOP Tournament Purchase" (Aug. 2010), at CEOC_INVESTIG_00039738 (native file). Abrahams stated that the deck "looks like something that was my format, but I would never have done these structure charts, so I can't say specifically." C. Abrahams Oct. 7, 2015 Tr. 159:15-17.

[873] "WSOP Tournament Purchase" (Aug. 2010) CEOC_INVESTIG_00039738 (native file), at 3.

[874] *Id.* at 5.

[875] *Id.* (brackets in original).

"at [$2.5m]/yr."[876]  It also contemplated a perpetual license with "pricing reset after year [7]."[877] Step 3, also deemed irrelevant to CEOC's creditors, involved CIE's purchase of the tournament hosting rights from CEC for "[$10m]."[878]  The second proposed deal structure involved CIE paying CEOC "$[38] mil cash for purchase of tournaments."[879]  It also contemplated a 7-year license agreement between CEOC and CIE wherein CEOC would pay "$[7.5]{sic] mil license fee" to CIE.[880]  Unlike the first proposed deal structure, the second proposed deal structure did not identify what portions of the transaction would be relevant to CEOC's creditors.  The deck also contained draft projections and proposed license terms.[881]  This second proposed deal structure was eliminated from subsequent analyses.

CIE's September 2010 deck focused on only one proposed transaction structure, which was a modified version of the first proposed deal structure in the August deck.[882]  This structure involved the following four steps (compared to the three steps in the August deck):  (i) CEC pays CEOC "FMV for right to operate WSOP tournament events" for "Cash=[$30m];"[883](ii) CEC licenses to the Rio the right to host the Las Vegas tournament for five years with annual license fees for each of the following years at $2 million, $2 million, $2 million, $7 million, and $7 million per year;[884] (iii) CIE purchases the tournament hosting rights from CEC for "[$24m];"[885] and (iv) CIE licenses the circuit events to Caesars' properties for five years for $125k per televised event and $75k per non-televised event.[886]  Instead of identifying whether these steps are "relevant" to CEOC's creditors, this deck indicated that steps 1 and 4 require a fairness opinion.[887]  The deck then values the WSOP Tournament Rights being sold to CIE at $30.777 million.[888]  While this deck includes CEC charging the Rio a multi-million dollar fee to license

---

[876]  *Id.* (brackets in original).

[877]  *Id.* (brackets in original).

[878]  *Id.* (brackets in original).

[879]  *Id.* at 6 (brackets in original).

*[880]*  *Id.* (brackets in original).

[880]  *Id.* (brackets in original).

[881]  *Id.* at 11-12.

[882]  "WSOP Tournament Purchase" (Sept. 2010), at CEOC_INVESTIG_00408282 [CEOC_INVESTIG_00408277].

[883]  *Id.* (brackets in original).

[884]  *Id.* This step also contains marketing fund contributions and a put/call option.  *Id.*

[885]  *Id.* (brackets in original).  This step also contemplates a license agreement defined in Step 2 and licensing of circuit event hosting rights to Caesars properties for five years.  *Id.*

[886]  *Id.*

[887]  *Id.*

[888]  *Id.* at CEOC_INVESTIG_00408283.

the WSOP Tournament Rights,[889] CEOC had never received compensation from the Rio for its historical use of these rights to host WSOP events (which, given CEOC's insolvency, it probably should have been receiving).[890]

In November 22, 2010, Hession advised Sambur that "we want to move forward with the WSOP tournament rights sale to [CIE]" and reminded him of their prior discussions on the topic.[891]   But Sambur responded that he fundamentally did not "understand why this is necessary from a business perspective . . . can we not do these things under the current structure."[892] During his interview, Sambur recalled that management for CIE and Caesars had indicated that they "weren't happy with the structure" and "didn't think it was working the right way."[893] Sambur explained that he ultimately was "convinced that the structure that they were operating under was very cumbersome, and it would be better to actually do the transaction as they were suggesting."[894]   And by January 2011, the transaction appears on track with Abrahams, Cohen and Hession discussing the selection of a valuation firm to provide the necessary fairness opinion and, according to an e-mail from Cohen, "OMM [was] working up a description of what the fairness opinions should say."[895]   In this same time period, a new deck was created that included substantially the same analysis as the September 2010 deck, but reflected a lower potential purchase price and lower value of the WSOP Tournament Rights.[896]   The deck stated CEC's payment of "FMV for right to operate WSOP tournament events" would be for "Cash=[$25m]"[897] compared with the $30 million in the September deck and reduced the value of the WSOP Tournament Rights to $24.878 million – almost the same as the purchase price from CEOC – compared with the $30.777 million from the September deck.[898]

---

[889]   *Id.* at CEOC_INVESTIG_00408282.

[890]   *See infra* note 96.

[891]   E-mail exchange between E. Hession and D. Sambur (Nov. 22, 2010), at CEOC_INVESTIG_00408296 [CEOC_INVESTIG_00408296].

[892]   *Id.*   In his interview, Sambur claimed that he wasn't "resistant" to the proposal, but was asking why the existing structure was not working.  D. Sambur Oct. 19, 2015 Tr. at 67:6-25.

[893]   D. Sambur Oct. 19, 2015 Tr. at 67:6-14.

[894]   *Id.* at 67:21-25.

[895]   E-mail from M. Cohen to E. Hession, *et al.* (Jan. 4, 2011), at OMMCAESARS00000066 [OMMCAESARS00000065].

[896]   "WSOP Tournament Purchase" (Jan. 2011), CEOC_INVESTIG_00043133 (native file).

[897]   *Id.* at 5.

[898]   *Compare* "WSOP Valuation" (undated), at CEOC_INVESTIG_00043132 (native file) *with* "WSOP Tournament Purchase" (Sept. 2010), at CEOC_INVESTIG_00408283 [CEOC_INVESTIG_00408277].

By the end of February, the transaction again appeared to lose momentum and CEC informed the financial advisors that Caesars was "going to pass on the WSOP transaction."[899] For reasons not apparent from the documents or witness interviews, the transaction reawakened and garnered Sponsor support by March 2011, when a new transaction deck was created.[900]  This March 2011 deck uses the same general four-step transaction structure as the January deck, but further decreases the amount to be paid to CEOC for the WSOP Tournament Rights.[901]  The proposed purchase price to be paid to CEOC decreased from $25 million in cash to "[$21m]."[902] And a slide titled "WSOP Tournament Valuation Summary Overview" reduced the value of the WSOP Tournament Rights from the $24.878 million in the January deck to $21.080 million.[903] The licensing rights from CEC to the Rio contemplated in Step 2 no longer increased to $7 million in years 4 and 5 of the 5 year term, but instead remain $2 million per year for the entire 5 year term.[904]

Between March and July 2011, when the transaction was presented to CEC's Board, the proposed transaction structure in Step 1 was modified to have CEOC sell the WSOP Tournament Rights to CT, a newly created, wholly owned CEC subsidiary, instead of having CEOC sell the rights directly to CEC.[905]  The consideration associated with Steps 1 and 3 also decreased

---

[899] E-mail from E. Hession to C. Rucker (Feb. 18, 2011), at CEOC_INVESTIG_00040269 [CEOC_INVESTIG_00040269].

[900] E-mail from C. Abrahams to D. Sambur (Mar. 4, 2011), at CEOC_INVESTIG_00408311 [CEOC_INVESTIG_00408311] ("Attached is the latest WSOP analysis.  So far everyone seems to be on board.  I reached out to TPG to make sure they are good as well."); e-mail exchange between E. Hession and N. Atiqullah (Mar. 16, 2011), at CEOC_INVESTIG_00038935 [CEOC_INVESTIG_00038935]; e-mail from E. Hession to C. Abrahams, *et al.* (Mar. 19, 2011), at CACEXAM00153875 [CACEXAM00153875] (forwarding the e-mail from Hession to Abrahams and Brimmer indicating that he "confirmed with Nafis [Atiqullah of TPG] that TPG is signed off.  At this point, we should go ahead and move forward with the legal documents and I will start the fairness opinion process.").

[901] *Compare* "WSOP Tournament Purchase" (Jan. 2011), CEOC_INVESTIG_00043133 (native file), at 5 *with* "WSOP Tournament Purchase" (Mar. 2011), CEOC_INVESTIG_00002418 (native file), at 5.

[902] WSOP Tournament Purchase" (Mar. 2011), CEOC_INVESTIG_00002418 (native file), at 5.

[903] *Compare* "WSOP Tournament Purchase" (Jan. 2011), CEOC_INVESTIG_00043133 (native file), at 6 *with* "WSOP Tournament Purchase" (Mar. 2011), CEOC_INVESTIG_00002418 (native file), at 6.

[904] *Id.*

[905] "WSOP Tournament Rights Buyback Transaction Responsibility Checklist and Timetable" (June 23, 2011), at CEOC_INVESTIG_00039179 [CEOC_INVESTIG_00039177].

slightly from $21 million to $20.5 million.  The July 2011 CEC Board presentation describes the revised transaction structure as encompassing the following four steps:[906]

1.  CEC forms CT as a subsidiary and CT purchases the WSOP Tournament Rights from CEOC for $20.5 million.

2.  CT sublicenses to CEC the right to operate tournaments in Las Vegas for a license fee of $2 million per year for a term of five years.

3.  CIE purchases the WSOP Tournament Rights, subject to the sublicense in step 2, for $20.5 million using proceeds from a loan from CEC and acquires the right to receive from CEC the annual sublicense revenue from CEC.

4.  CIE licenses the circuit events to CEC and its affiliates under a five-year circuit event agreement.

The various presentations discussed above reflect a continual decline in the amount CEOC was to be paid for the WSOP Tournament Rights.  Nothing suggests that these declining valuations reflected in the decks were the result of negotiations between CEOC and the other parties to the transaction.  Even Cohen, one of the key participants in the transaction, indicated that there was no negotiation over price, and that VRC simply determined a "fair" purchase price for CEOC:[907]   "I don't recall anyone negotiating.  My understanding was that VRC was determining what the fair value of this was to CEOC and that was going to be the price."[908]  This absence of negotiations is consistent with the view expressed by Caesars employees and the Sponsors that, as a general matter, there was no distinction made between the various entities.[909]  Rather, they were all viewed as part of the same family of companies with aligned interests.[910]

---

[906] "World Series of Poker: Tournament Rights Buyback Discussion Materials for Board of Directions" (July 28, 2011), at CEC_Examiner_0911024-31 [CEC_Examiner_0911016].

[907] Actually, as discussed below, the purchase price was effectively determined by a discounted cash flow valuation prepared by Caesars, not as the result of VRC's independent analysis. C. Rucker Sept. 25, 2015 Tr. at 35:15-36:4.

[908] M. Cohen Oct. 16, 2015 Tr. at 100:7-10; *see also* 101:3-7 ("my understanding was VRC was valuing the – what they thought the tournament business was worth to CEOC, and that was going to be the price, the fair value").

[909] *See e.g.*, G. Loveman Oct. 27, 2015 Tr. at 71:13-72:14 ("There was nothing in the company at the time, among any of us who ran it, to try to make distinctions between all of these legal entities.  In fact, I can assure you that if you had asked anyone other than a couple of us to name any number of these legal entities, I think people could have gotten that there was an operating entity and a property-based financing entity, but beyond that, in all the Hamlet Holdings and the VoteCo Holdings and all these other things that appear in these documents, people had no idea. They imagined these to be transactions within a family of common interests with common shareholders, and there just wasn't a great deal of attention to that.").

[910] *Id.*

As David Bonderman summarized the situation, in response to a question about why no one had been able to identify specific negotiations associated with transaction purchase prices:

> While trying to sometimes fairly allocate between the entities, at the end of the day, it didn't make any difference to anybody, because they were all owned by the same people.  And if this pocket paid $10 to the other pocket or paid $8 to the other pocket, it made no difference to the total overall value.[911]

Eric Hession echoed this sentiment when he explained that his role in the transaction was to attempt to arrive as a satisfactory price for all parties involved, but from the perspective of CEC:

> I was looking at the perspective of Caesars, meaning CEC, and we were 92 percent holders of CIE.  We were a hundred percent holders of CEOC and what I saw was an inefficient system that we currently had in place.  And my objective was to come up with a price that would satisfy everybody.[912]

While these sentiments would have been appropriate if CEOC was a solvent 100% owned subsidiary of CEC, that was not the case.

2011 WSOP Transaction Figure 1 reflects the evolution of the key financial terms from the start of the analysis through the final transaction.

**2011 WSOP Transaction Figure 1:  Evolution of Terms**

| Date of the Analysis | License Purchase from CEOC (Step 1) | Las Vegas Royalty fee to CIE (Step 2) | License Purchase by CIE (Step 3) |
|---|---|---|---|
| July 2010[913] | $40-55 million (from CIE)<br><br>Assumed royalty fee range for Las Vegas WSOP used in valuing the WSOP Tournament Rights: N/A | $6-8 million annual | N/A (Step 1 contemplated direct purchase by CIE) |

---

[911] D. Bonderman Nov. 10, 2015 Tr. at 34:17-35:9.

[912] E. Hession Nov. 3, 2015 Tr. at 44:12-19.

[913] E-mail from C. Abrahams to M. Garber, *et al*. (July 9, 2010), at CEOC_INVESTIG_00041049-50 [CEOC_INVESTIG_00041049].

| Date of the Analysis | License Purchase from CEOC (Step 1) | Las Vegas Royalty fee to CIE (Step 2) | License Purchase by CIE (Step 3) |
|---|---|---|---|
| August 2010[914] | $38 million (from CIE)<br><br>Assumed royalty fee range for Las Vegas WSOP used in valuing the WSOP Tournament Rights: $2.5 million per year[915] | $7.5 million annual | N/A (step 1 contemplated direct purchase by CIE) |
| September 2010[916] | $30 million<br><br>Assumed royalty fee range for Las Vegas WSOP used in valuing the WSOP Tournament Rights: $2 million, $2 million, $2 million, $7 million, $7 million per year[917] | $2 million, $2 million, $2 million, $7 million, $7 million | $24 million |
| January 2011[918] | $25 million<br><br>Assumed royalty fee range for Las Vegas WSOP used in valuing the WSOP Tournament Rights: $2 million, $2 million, $2 million, $7 million, $7 million per year[919] | $2 million, $2 million, $2 million, $7 million, $7 million | $24 million |

---

[914] "WSOP Tournament Purchase" (Aug. 2010) CEOC_INVESTIG_00039738 (native file).

[915] *Id.* at 9.

[916] "WSOP Tournament Purchase" (Sept. 2010), at CEOC_INVESTIG_00408277-89 [CEOC_INVESTIG_00408277].

[917] *Id.* at CEOC_INVESTIG_00408282.

[918] "WSOP Tournament Purchase" (Jan. 2011) CEOC_INVESTIG_00043133 (native file).

[919] *Id.* at 5.

| Date of the Analysis | License Purchase from CEOC (Step 1) | Las Vegas Royalty fee to CIE (Step 2) | License Purchase by CIE (Step 3) |
|---|---|---|---|
| March 2011[920] | $21 million<br><br>Assumed royalty fee range for Las Vegas WSOP used in valuing the WSOP Tournament Rights: Range of $2.238 to $2.675 million per year[921] | $2 million per year | $21 million |
| Final Transaction[922] | $20.5 million<br><br>Assumed royalty fee range for Las Vegas WSOP used in valuing the WSOP Tournament Rights: Range of $2.238 to 2.675 million per year[923] | $2 million per year | $20.5 million |

2011 WSOP Transaction Figure 1 reveals that as the assumed Las Vegas royalty fee for the WSOP Tournament Rights ("Assumed Royalty Fee") decreases, the fee paid by CIE to purchase the assets also generally decreases. This is consistent with Abrahams's view that the royalty fee to be paid to CIE for the WSOP Tournament Rights correlated with the amount that CIE would pay for the WSOP Tournament Rights and, therefore, his relative indifference to the actual purchase price CIE paid: "we were relatively indifferent, because, as I said, if the fee was higher, the price would have been higher from our perspective . . . ."[924]

---

[920] "WSOP Tournament Purchase" (Mar. 2011), CEOC_INVESTIG_00002418 (native file).

[921] *Id.* at 6.

[922] "World Series of Poker Land-Based License and Lease Fairness Analysis" (July 21, 2011), at CEOC_INVESTIG_00039700-33 [CEOC_INVESTIG_00039700].

[923] *Id.* at CEOC_INVESTIG_00039715.

[924] C. Abrahams Oct. 7, 2015 Tr. at 235:23-236:2. Sambur echoed this sentiment. D. Sambur Oct. 19, 2015 Tr. at 71:17-72:11.

It appears, however, that Caesars and CIE chose to lower the royalty fee to be paid to CIE to thereby lower CIE's purchase price of the WSOP Tournament Rights, which effectively would result in a lower purchase price being paid to CEOC for the WSOP Tournament Rights.  A July 19, 2011 e-mail from Abrahams suggests that this occurred.[925]   Specifically, after Abrahams directs that the terms of the royalty fee to be paid CIE were $2 million per year for five years, Hession queries, "I thought it was $2m for three and then $5m for two.  Why did we change it other than to reduce the purchase price?"[926]  Abrahams responds that:  "[w]e did it to keep the valuation down and to keep the rights fee below what's in the valuation in the fairness opinion."[927]   As noted above, the correlation between the license fee and the purchase price meant that keeping the license fee down effectively resulted in a lower purchase price to CEOC.

The Assumed Royalty Fee used in VRC's fairness opinion was a key factor in determining the overall valuation of the WSOP Tournament Rights.[928]  Abrahams and the others elected to keep the Rio license fee at $2 million in order to avoid that license fee from exceeding the Assumed Royalty Fee in VRC's valuation.  This calls into question the validity of VRC's actual valuation of the WSOP Tournament Rights, which, as detailed below, was the result of information provided by Caesars and CIE.[929]

What the Examiner was told about the July 19, 2011 e-mail exchange does not provide a satisfactory explanation.  Abrahams claimed that he "misworded" the e-mail and "was reacting to the purchase price."[930]  He continued:  "[s]o from our [CIE's] perspective the purchase price would be lower with a lower rights fee and that rights fee of 2 million, from what I remember, was below the cash flow stream he [Chad Rucker from VRC] was valuing in his analysis."[931]  Additionally, Abrahams stated that, according to the e-mail, he "wanted to keep the purchase price at the lower price as a result of having a lower fee stream and that fee stream is less than what he [Rucker] valued the fee stream."[932]  He further explained his belief that his electing the $2 million license fee "was unfair to CIE in theory and more fair to CEOC."[933]

---

[925] E-mail exchange between C. Abrahams and E. Hession, *et al.* (July 15-19, 2011) [PRIV_INVESTIG_00004744]; *see also* R. Brimmer Sept. 29, 2015 Tr. at 113:21-114:5.

[926] E-mail exchange between C. Abrahams and E. Hession, *et al.* (July 15-19, 2011) [PRIV_INVESTIG_00004744].

[927] *Id.*  Abrahams' e-mail was sent to Hession, Cohen, Brimmer, Carla Michael, Jill Eaton and Finnegan.

[928] "World Series of Poker Land-Based License and Lease Fairness Opinion Analysis" (July 21, 2011), at CEC_EXAMINER_0910999 [CEC_EXAMINER_0910978].

[929] *See* C. Rucker Sept. 25, 2015 Tr. at 35:15-36:4.

[930] C. Abrahams Oct. 7, 2015 Tr. at 213:11-12.

[931] *Id.* at 213:12-17.

[932] *Id.* at 214:18-21.

[933] *Id.* at 215:2-3.

The other recipients of the e-mail did little to clarify the issue. Finnegan did not recall the exchange, and found it "odd" that Abrahams was "keeping a number down, meaning the consideration back to him at CIE is less, in order to be able to get a fairness opinion."[934] Brimmer simply recalled that at one point in time, there was discussion of the Rio paying more than $2 million per year for Las Vegas WSOP licensing rights, but that "the eventual conclusion was to keep that separate arrangement consistent with the royalty rate calculated in the step one, the actual underlying valuation."[935]   Hession and Cohen expressed slightly different views regarding the relationship between the royalty fee paid by CEC in step 2 and the Assumed Royalty Fee relied upon in valuing the WSOP Tournament Rights in connection with step 1. Cohen recalled that VRC was tasked with valuing the WSOP Tournament Rights and that valuation "was irrelevant to what the license fee price was."[936]   This is not accurate. Hession explained his view that the numbers used to value the tournament rights in step 1 reflected VRC's "breakdown of the amount of revenues and profits that are generated and then there was some market work in terms of the reasonable percentage that people pay for a brand and that got to that kind of $2 million range."[937]   But when Caesars was considering a possible sale of the Rio, it proposed charging the new owners a license fee of $2 million for each of the first three years and $7 million for each of the last two years.[938]   Hession also stated that the fee CIE

---

[934]   B. Finnegan Nov. 16, 2015 Tr. at 95:7-13.

[935]   R. Brimmer Sept. 29, 2015 Tr. at 114:6-12.

[936]   M. Cohen Oct. 16, 2015 Tr. at 99:19-21.

[937]   E. Hession Nov. 3, 2015 Tr. at 68:2-14.

[938]   E-mail from E. Hession to M. Cohen (Sept. 13, 2010), at CEC_EXAMINER_1301489 [CEC_EXAMINER_1301489], attaching "World Series of Poker Rio Host Lease Terms" (undated), at CEC_EXAMINER_1301490 [CEC_EXAMINER_1301490]; *see also* e-mail exchange between M. Cohen and K. Davis (Dec. 22-28 2010), at TPG-Examiner_01434594 [TPG-Examiner_01434594]. During 2010, Caesars discussed the possibility of selling the Rio to a number of different parties. E-mail exchange between M. Cohen and G. Loveman, *et al.* (Dec. 22, 2010), at APOLLO-Examiner_00811395 [APOLLO-Examiner_00811395]. Historically, the Rio had hosted the Las Vegas WSOP event and paid no hosting fees to CEOC in connection with these rights. *Id.* By December 2010, two private equity firms requested an exclusive negotiating period to negotiate a purchase and to conduct due diligence. *Id.* One of the terms of the LOI with the potential purchasers related to giving the Rio the right to maintain the WSOP tournament for a term of 5 years for a "to be determined annual fee." *Id.* It is important to note that as early as September 2010, Caesars' internal correspondence regarding the terms of the Rio host license to the potential purchaser was contemplated to be a 5 year license "at a fee of $2MM per year in 2011-2013 and $7MM per year in 2014-2015." E-mail from E. Hession to M. Cohen (Sept. 13, 2010), at CEC_EXAMINER_1301489 [CEC_EXAMINER_1301489], attaching "World Series of Poker Rio Host Lease Terms" (undated), at CEC_EXAMINER_1301490 [CEC_EXAMINER_1301490]. This correspondence also noted that "[i]f there is no sale [of the Rio], we would continue with the other transaction we discussed regarding selling the rights to HIE but would not execute this with the Rio." E-mail from E. Hession to M. Cohen (Sept. 13, 2010), at CEC_EXAMINER_1301489 [CEC_EXAMINER_1301489].

received from the Rio for the WSOP Las Vegas event would impact the amount that CIE would pay for the tournament rights.[939]  Taken together, the evidence indicates that Caesars and CIE controlled the process for the benefit of CIE and to the potential detriment of CEOC, including by artificially holding down the license fee to be paid by the Rio.

### b. CEC Approves CEOC's Sale of the WSOP Tournament Hosting Rights for $20.5 Million

The 2011 WSOP Transaction was presented to CEC's Board on or about July 28, 2011.[940]  The documents provided to the CEC Board included, *inter alia*, a board presentation analyzing the transaction, the VRC fairness opinion, and a VRC presentation associated with its fairness analysis.[941]

In addition to setting out the details of the transaction, the CEC board presentation noted that "[m]anagement has identified operational inefficiencies with existing separation of ownership of marks and handling of tournaments."[942]  It also outlined the rationale for the proposed transaction, including eliminating structural impediments to operating inefficiencies, increasing flexibility to expand WSOP internationally, enabling better brand management and enabling CIE to better control the Las Vegas event in light of the potential sale of the Rio.[943]  The deck further advised on the requirements under CEOC's debt agreements for "affiliate transactions" and the requirement that affiliate transactions be "[f]air, from a financial point of view, to CEOC (requirement under CEOC bonds)" and "[o]n terms no less favorable to CEOC than would be obtained in a comparable arm's length transaction with a person that is not an affiliate (Requirement [sic] under CEOC's credit agreement)."[944]  The presentation further outlines that a fairness opinion "as to FMV of tournament rights [was] also sought to ensure compliance with asset sale covenant."[945]  The presentation includes a placeholder for the separate VRC fairness opinion to be provided in connection with the transaction.[946]

---

[939] E. Hession Nov. 3, 2015 Tr. at 45:18-46:17.

[940] *See generally* "World Series of Poker: Tournament Rights Buyback" (July 28, 2011), at CEC_Examiner_0911016-134 [CEC_Examiner_0911016].

[941] "World Series of Poker: Tournament Rights Buyback" (July 28, 2011), at CEC_Examiner_0911016-134 [CEC_Examiner_0911016]; VRC Fairness Opinion (Sept. 1, 2011), at CACEXAM00011813 [CACEXAM00011806]; "World Series of Poker Land-Based License and Lease Fairness Opinion Analysis" (July 21, 2011), at CEC_EXAMINER_0910978-1011 [CEC_EXAMINER_0910978].

[942] *Id.* at CEC_EXAMINER_0911021.

[943] *Id.* at CEC_EXAMINER_0911033.

[944] *Id.* at CEC_EXAMINER_0911035.

[945] *Id.*

[946] *Id.* at CEC_EXAMINER_0911036.

The CEC Board was also provided a general fiduciary duty refresher, including an overview of the duties of care and loyalty, but, unlike the board presentation materials for the 2009 WSOP Transaction, it did not discuss the duties that may be owed by officers and directors when the transferring entity is insolvent.[947]   The testimony does not fully explain why the substantive discussion related to the zone of insolvency or fraudulent transfer issues discussed in the 2009 WSOP board materials are absent from the July 28, 2011 presentation.   Brian Finnegan, who oversaw the preparation of the discussion of the board's duties contained in the 2011 presentation,[948] did not recall why the 2011 CEC Board Presentation lacked a discussion regarding the duties owed when the transferor is insolvent,[949] other than to speculate that the precarious state of the economy in 2009 may have been a factor.[950]

CEC's Board did not approve the transaction at the July 28, 2011 Board meeting.   Garber and Abrahams continued to advocate for approval of the transaction.[951]   It appears that the CEC Board thereafter gave "verbal approval" for the transaction on or about August 11, 2011.[952]   The executive committee of CEC's Board, through director consents, officially approved the transaction in late August 2011.[953]   Despite the presentations and approval at the CEC level, the record contains no evidence that the sale of the WSOP Tournament Rights was presented to, analyzed or approved by the CEOC Board.   Nevertheless, it is clear that the CEOC Board members – Loveman and Halkyard – were aware of and involved with the transaction in their CEC capacities.   Loveman approved the transaction in his capacity as CEC director.[954]   Halkyard

---

[947] *Id.* at CEC_EXAMINER_0911037-41.

[948] B. Finnegan Nov. 16, 2015 Tr. at 82:3-11 (Q. "Would you have prepared this dec [sic]?  A. It would have been prepared under my supervision, yes.  Q. Do you remember preparing these particular slides on the fiduciary duty refresher?  A. I don't remember them specifically but, again, they would have been prepared under my supervision.").

[949] *Id.* at 83:8-86:8.

[950] *Id.* at 39:8-13 (stating that "in 2009, things were very, very precarious in terms of the macro economy. And I think that in later transactions, in 2009, it wasn't clear when or where the trough of the business might come").  Finnegan also speculated that the 2009 deck may have been more comprehensive because it was one of the first transactions where the OMM attorneys interfaced with CEC's board.  *Id.* at 39:14-40:2.

[951] E-mail exchange between M. Garber and D. Sambur, *et al.* (Aug. 2-3, 2011), at CEOC_INVESTIG_00408473-474 [CEOC_INVESTIG_00408473].

[952] E-mail exchange between C. Abrahams and B. Dalfen (Aug. 12, 2011), at CACEXAM00303291 [CACEXAM00303291].

[953] E-mail from M. Cohen to G. Loveman (Aug. 22, 2011), at CEOC_INVESTIG_00043134 [CEOC_INVESTIG_00043134]; "Consent of the Executive Committee of the Board of Directors" (Aug. 23, 2011), at CEC_EXAMINER_1447919-25 [CEC_EXAMINER_1447919].

signed each of the transaction documents on behalf of all the non-CIE parties to the transaction. Halkyard also indicated that he was the individual from CEC's management who the CIE management team would have come to in order to get the authority to move forward on a transaction.[955]   There is no evidence of any discussion regarding the potential conflict of interest or any protections put in place to protect CEOC's interests based on the overlapping roles and possible responsibilities of CEOC's board members to CEC and CEOC.

On September 1, 2011, Halkyard signed on behalf of all of the non-CIE parties to the transaction, including CEOC, CEC and CT, the following transaction documents:

**Step 1**: CT "paid" CEOC $20.5 million for the WSOP Tournament Rights pursuant to the WSOP Tournament Rights Purchase Agreement, by and between CEOC and CT, dated September 1, 2011.[956]

**Step 2**: CT sublicensed to CEC the right to host the live, in-person Las Vegas WSOP tournaments for five (5) years for a yearly license fee of $2 million pursuant to the Trademark Sublicense Agreement, by and between CT and CEC, dated September 1, 2011.[957]

**Step 3**:

a. CIE purchased from CT the WSOP Tournament Rights, subject to the sublicense CT granted to CEC, for $20.5 million pursuant to the WSOP Tournament Rights Buyback Agreement, by and between CIE and CT, dated September 1, 2011.[958]

b. CIE and CEC terminated the Trademark Sublicense Agreement (in Step 2 above) and replaced it with a direct license from CIE to CEC of the right to host the live, in-person Las Vegas WSOP tournaments for five (5) years for a yearly license fee of $2 million pursuant to the Trademark License Agreement, by and between CIE and CEC, dated September 1, 2011.[959]

---

[954]  *See* "Consent of the Executive Committee of the Board of Directors" (Aug. 23, 2011), at CEC_EXAMINER_1447919-25 [CEC_EXAMINER_1447919].

[955]  *See* J. Halkyard Nov. 2, 2015 Tr. at 114:25-115:11.

[956]  Tournament Rights Purchase Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039818-43 [CEOC_INVESTIG_00039818].

[957]  Trademark Sublicense Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039844-78 [CEOC_INVESTIG_00039844].

[958]  Trademark Rights Buyback Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039879-83 [CEOC_INVESTIG_00039879].

[959]  Trademark License Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039884-919 [CEOC_INVESTIG_00039884].

   c.  CEC granted the Rio the right to operate the live, in-person Las Vegas WSOP tournaments in accordance with the terms of the CIE-CEC License Agreement pursuant to the Tournament Host Agreement, by and between CEC and Rio Properties, LLC, dated September 1, 2011.[960]

**Step 4**:  Pursuant to Circuit Event Agreement, by and between CEC and CIE, dated September 1, 2011: (a) CIE allowed CEC affiliates to operate live, in-person WSOP tournament events operated by various properties, as described in the 2010-2011 WSOP Circuit Event Schedule (the "Circuit Events"); (b) CIE was permitted to offer to non-affiliates of CEC the right to host and operate the number of Circuit Events reserved to CIE plus any events declined by CEC if the non-affiliates are not located within a 75-mile radius of a CEC affiliate; and (c) CIE would receive a license fee of $75,000 per Circuit Event.[961]

Although various documents referenced CEOC receiving $20.5 million in cash for the sale of the WSOP Tournament Rights, the amount was "paid" to CEOC through a $20.5 million write-down of CEOC's outstanding balance on its intercompany note with CEC (leaving an outstanding balance of $289.5 mil).[962]  The correspondence confirms that this was accomplished through book entries without an actual exchange of any cash.[963]

### c.  Paul Weiss Served as Outside Counsel to All of the Caesars' Entities

Paul Weiss served as outside counsel to all Caesars' entities in the 2011 transaction.[964] Many of the Paul Weiss attorneys involved in the representation were former OMM attorneys who previously represented all of the Caesars' entities in the 2009 WSOP transaction.  These attorneys had initially worked on the potential transaction while still at OMM in January 2009, but transitioned their practice to Paul Weiss in late spring 2011.[965]

---

[960] Tournament Host Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039920-22 [CEOC_INVESTIG_00039920].

[961] Circuit Event Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039923-66 [CEOC_INVESTIG_00039923].

[962] E-mail from T. Evans to D. Wilfong, *et al.* (Sept. 1, 2011), at CEOC_INVESTIG_00040162 [CEOC_INVESTIG_00040162].

[963] *Id.*

[964] *See* "Responsibility Checklist and Timetable" (June 23, 2011), at CEOC_INVESTIG_00039177-81 [CEOC_INVESTIG_00039177].

[965] B. Finnegan Nov. 16, 2015 Tr. at 72:2-4 (confirming he joined Paul Weiss in May 2011).

### d.  VRC Served as the Financial Advisor and Issued a Fairness Opinion

Caesars decided to obtain a fairness opinion for CEOC in connection with this transaction.  This was driven by CEOC's various financial covenants.[966]  Accordingly, VRC was retained for the "CEOC Board of Directors" and CEC jointly to provide certain fairness opinions in connection with this transaction pertaining to related party transactions.[967]  Although VRC was not formally engaged until July 2011,[968] it was being consulted and receiving information by March 2011 and working on valuation issues by June 2011.[969]  Rucker, a Managing Director at VRC, was VRC's point person for providing the fairness opinions.[970]  Rucker worked with Caesars, CIE, and Paul Weiss on the transaction.[971]  Rucker's primary contacts at Caesars and CIE were Brimmer, Hession and Abrahams.[972]

VRC provided an initial fairness opinion on July 21, 2011[973] and a presentation regarding the World Series of Poker Land-Based License and Lease Fairness Opinion Analysis.[974]  VRC subsequently re-issued a substantively similar fairness opinion on September 1, 2011, concluding, with respect to step 1, that "(i) the principal economic terms of the License Purchase Transaction are fair from a financial point of view to CEOC and (ii) the License Purchase Transaction in its entirety is on terms that are no less favorable to CEOC and its subsidiaries than would be obtained in a comparable arm's length transaction with a person that is not an affiliate and (iii) the fair market value of the license purchased [from CEOC] . . . is between $18.7

---

[966]  *See* E. Hession Nov. 3, 2015 Tr. at 84:5-14.

[967]  *See generally* VRC Engagement Letter (July 20, 2011), at VRC00005797-807 [VRC00005797].

[968]  *Id.*

[969]  E-mail exchange between C. Abrahams and R. Brimmer, *et al.* (Mar. 1, 2011), at CACEXAM00177103 [CACEXAM00177103], attaching "WSOP Valuation" (undated), CACEXAM00177108 (native file); e-mail from E. Hession to C. Rucker (June 1, 2011), at VRC00016081 [VRC00016081] (advising that Caesars "would like to move forward with this valuation"); *See* "Responsibility Checklist and Timetable" (June 23, 2011), at CEOC_INVESTIG_00039177-81 [CEOC_INVESTIG_00039177]; "WSOP Valuation" (undated), CEOC_INVESTIG_00043132 (native file).

[970]  *See* C. Rucker Sept. 25, 2015 Tr. at 16:20-22.

[971]  "Responsibility Checklist and Timetable" (June 23, 2011), at CEOC_INVESTIG_00039177-81 [CEOC_INVESTIG_00039177].

[972]  C. Rucker Sept. 25, 2015 Tr. at 113:4-11.

[973]  VRC Draft Fairness Opinion (July 21, 2011), at CEC_EXAMINER_0910970-77 [CEC_EXAMINER_0910970].

[974]  "World Series of Poker Land-Based License and Lease Fairness Opinion Analysis" (July 21, 2011), at CEC_EXAMINER_0910978-1011 [CEC_EXAMINER_0910978].

million to $22 million."[975]   VRC's fairness opinion regarding step 4 of the transaction opined that the (i) principal economic terms for the Circuit License Transaction are fair from a financial point of view to CEOC and (ii) Circuit License Transaction in its entirety is on terms that are no less favorable to CEOC and its subsidiaries than would be obtained in a comparable arm's length transaction with a person that is not an affiliate."[976]   VRC received a $125,000 fee for the work performed in connection with the transaction.[977]

The Examiner concludes that VRC's opinion, although possibly serving as one piece of evidence to consider, is not entitled to any meaningful weight for several reasons.  Initially, VRC's valuation was based on information and assumptions, many of which were provided by CIE, the buyer, on which it relied without independent verification or extensive due diligence.[978]   VRC simply accepted the numbers it was given by CIE and Caesars management and applied a discount rate to derive its valuation.[979]   Rucker described VRC's process as follows:

A:  You take the Caesars model or the World Series of Poker model.

Q:  Right. That Caesars prepares?

A:  That they prepare.  And then you build a separate model that is essentially the same as their model, but you take their model and remodel it, essentially.  So it's their models, but you redo their model just to make sure all the math and everything is working.  But the model, for all practical purposes, is their model except for you just remodel it.[980]

---

[975]   VRC Fairness Opinion (Sept. 1, 2011), at CACEXAM00011813 [CACEXAM00011806]. VRC opined only on very discrete portions of the transaction.  For instance, Rucker stated that a change in licensing fees paid in connection with hosting the WSOP tournament in Las Vegas, which changed from $16 million over five years to $10 million over the same timeframe, did not impact the opinion because it was outside the scope of issues VRC was analyzing.  C. Rucker Sept. 25, 2015 Tr. 144:2-146:17 (discussing PRIV_INVESTIG_00004744).

[976]   *Id*.  Notably, CEOC is not a party to the Circuit Event Agreement.  Instead, the Circuit Event Agreement involved CIE licensing rights to CEC to permit its affiliates to host Circuit Events for a 5-year term.  *See* Circuit Event Agreement (Sept. 1, 2011), at CEOC_INVESTIG_00039923-66 [CEOC_INVESTIG_00039923].   While CEOC's subsidiaries may have been implicated under to the extent that they agreed to host circuit events pursuant to Circuit License Agreements, CEOC was not directly involved.

[977]   VRC Engagement Letter (July 20, 2011), at VRC00005802 [VRC00005797].

[978]   C. Rucker Sept. 25, 2015 Tr. at 35:15-36:4.

[979]   *Id*.

[980]   *Id*.

While Rucker initially indicated that all of the inputs into the valuation came from Caesars aside from the discount rate and the growth rate, he later stated that the growth rate was embedded in the projections received from Caesars.[981]

Furthermore, a closer examination of the assumptions, methodologies and ultimate conclusions VRC reached also are subject to criticism, as more fully detailed in Appendix 7, Valuation at Section V.A.  These criticisms include the following:

1.  VRC's reduction of revenues due to a hypothetical move to a strip location;

2.  VRC's failure to account for non-Rio gaming revenue tied to WSOP entrants;

3.  VRC's failure to use reliable comparisons used in calculating an Assumed Royalty Fee;

4.  VRC's introduction of a hotel EBITDA adjustment;

5.  VRC's failure to include non-financial benefits in valuation of the WSOP Tournament Rights;

6.  VRC's use of unsupported incremental gaming revenue percentage calculated at 50%; and

7.  VRC's failure to include spectator revenue in its analysis.

Other than the specific models and inputs Caesars provided to VRC in connection with performing its valuation, VRC does not appear to have requested, received or relied upon many of Caesars' internal valuations of the WSOP, including the valuations prepared by the company regularly since at least 2008.  A more fulsome discussion of these issues, and their potential impact on VRC's calculations is contained in Appendix 7, Valuation at Section V.A.  In the end, however, the VRC opinion is thus not particularly meaningful and more closely resembles a restatement of what the Company told him.

### 3.  The Examiner's Findings and Conclusions

The Examiner has analyzed potential claims for constructive fraudulent transfer, actual fraudulent transfer, breach of fiduciary duty and aiding and abetting breach of fiduciary duty. For the same reasons explained in the Examiner's Findings and Conclusions in connection with the 2009 WSOP Transaction, Nevada law will likely govern the fraudulent transfer analysis because Nevada has the most significant relationship to the transaction.[982]  Additionally, CEOC's breach of fiduciary duty claims are subject to Delaware law because that is CEOC's state of

---

[981]  *Compare id*. at 124:6-11 *with id*. at 125:6-13.

[982]  *See* Section VII.A.  Likewise, selection of Nevada law instead of Delaware law does not substantively affect the instant fraudulent transfer analysis.

incorporation.   The Examiner has concluded that there is a strong claim for constructive fraudulent transfer, any claim for actual fraudulent transfer is weak, and any claim for breach of fiduciary duty would be time-barred.

### a.   Constructive Fraudulent Transfer

As with the 2009 WSOP Transaction, CEOC's claims for both actual and constructive fraudulent transfer arise under Nevada law, as incorporated as "applicable law" under section 544(b) of the Bankruptcy Code.[983]   There is no dispute that the WSOP Tournament Rights were transferred out of CEOC in connection with the 2011 WSOP Transaction.   Moreover, as set forth in Appendix 6, Solvency, CEOC was insolvent, undercapitalized, and likely unable to pay its debts in full when they were scheduled to mature at the time of the 2011 WSOP Transaction. The constructive fraudulent transfer claim, therefore, rests on whether CEOC received reasonably equivalent value for the WSOP Tournament Rights.   As discussed below, CEOC did not receive reasonably equivalent value for the transfer of the WSOP Tournament Rights.

The Examiner conducted an independent valuation to determine the fair market value of the WSOP Tournament Rights at the time of the transfer in 2011.   The Examiner used a DCF method to value the WSOP Tournament Rights as of September 1, 2011.[984]   The WACC calculation was determined by using seven guideline public companies.[985]   The valuation made certain modifications to the projections relied upon by VRC in its analysis, including:   (i) removing reduction in revenue or EBITDA based on an assumed move of the tournament from the Strip; (ii) inclusion of non-Rio gaming revenue tied to WSOP entrants; (iii) no adjustment to eliminate hotel EBITDA; and (iv) inclusion of non-financial benefits from television exposure.[986] A WACC of 11.5% and a capitalization rate of 9.5% were used.[987]   Based on this analysis, more fully analyzed in Appendix 7, Valuation at Section V.C, the Examiner concludes that the fair market value of the WSOP Tournament Rights at the time of the transaction was between $50.3 million and $55.9 million.

CEOC received $20.5 million for the WSOP Tournament Rights.   The shortfall in value CEOC received is therefore between $29.8 million and $35.4 million.[988]   Accordingly, the Examiner has concluded that a strong constructive fraudulent transfer claim exists upon which CEOC could seek the return of the WSOP Tournament Rights or its value.[989]   The Court may

---

[983]   *See* Section VII.A; Appendix 5, Legal Standards at Section I.A.

[984]   *See* Appendix 7, Valuation at Section V.C.

[985]   *Id.*

[986]   *Id.*

[987]   *Id.*

[988]   *Id.*

[989]   Nev. Rev. Stat. Ann. §112.210.   The safe harbor defense under section 546(e) of the Bankruptcy Code would not apply as this transaction involved the transfer of assets, not a settlement payment or transfer made in connection with a securities contract.

also determine that, in order to restore CEOC to the position it would have held had the property not been transferred, CEOC is entitled to recover the current fair market value of the property, minus the value of improvements.[990]  The Examiner has not calculated this figure.

The Examiner also concludes that a reasonable argument can be made that CIE is not a good faith transferee[991] and, therefore, would not be entitled to the benefits of a lien under section 550(e) of the Bankruptcy Code or applicable state law.[992]  CIE's executives orchestrated the transfer, were well aware of CEOC's financial condition as early as 2009,[993] knew that the purchase price was determined without anyone negotiating on CEOC's behalf (and in fact there is evidence that CIE affirmatively sought to reduce the price paid), participated in artificially setting the Las Vegas hosting rights fee, and provided inputs and assumptions to VRC that VRC relied upon without independent verification in rendering a fairness opinion to CEOC. Therefore, CIE was aware of (i) CEOC's potential insolvency, (ii) that this was not a true arm's length transaction, and (iii) that there were no negotiations or efforts to maximize the purchase price paid CEOC to ensure that it would receive reasonably equivalent.  Balanced against this, however, is the fact that CIE relied upon VRC providing a fairness opinion and the fact that counsel was engaged to document and advise on the transaction.  Again, it was CIE, as the buyer, who provided in part inputs and assumptions to VRC that VRC would rely upon in rendering a fairness opinion to CEOC, the seller.  And also again, CEOC did not have its own, independent counsel, but instead was represented by the same conflicted attorneys representing all Caesars entities, including CIE, in the transaction.  In the end, when the record is viewed in its totality, the factors demonstrating a lack of good faith predominate and it will be difficult for CIE to establish that it was a good faith transferee.  Without the benefit of a lien, CEOC's recovery would likely increase by $20.5 million, to $50.3 million to $55.9 million.

### b.  Actual Fraudulent Transfer

The Examiner has concluded that the 2011 WSOP Transaction presents a weak case for an actual fraudulent transfer claim.  First, there is an absence of sufficient direct evidence suggesting that the transaction was undertaken to hinder, delay or defraud CEOC's creditors. Instead, the evidence presents a picture of CIE analyzing ways to protect the WSOP brand and to grow CIE's platform.  It is the evidence that CEC and CIE's executives manipulated the licensing fee for the tournament to keep the purchase price down that raises an issue.  Overall, although certain badges of fraud are present (lack of reasonably equivalent value, CEOC's insolvency and related party transaction), the issue becomes how to balance these facts, including the presence of these badges, against the legitimate business reasons for the transaction, including CIE's desire to develop its online WSOP gaming business and the

---

[990]  *See* Section VII.A.

[991]  11 U.S.C. §502(h); *see also* Appendix 5, Legal Standards at Sections III.C.1 and III.E.1.

[992]  11 U.S.C. §550(e); *see also* Appendix 5, Legal Standards at Sections III.C.1 and III.E.1.

[993]  *See* e-mail exchange between C. Abrahams and M. Garber (Jan. 15, 2009), at CEC_EXAMINER_1236150-51 [CEC_EXAMINER_1236150].

realization by Caesars that having the tournament hosting rights separated from the ownership of the WSOP brand was both undermining the value of the brand, which was a valuable asset, and adversely affecting the tournament's operation.  On balance, the weighing of the various factors leads the Examiner to conclude that an actual fraudulent transfer claim is weak.

### c.  Breach of Fiduciary Duty

As noted above, there are a number of problematic aspects of this transaction.  There was no process put in place to protect CEOC and its creditors, no arm's length negotiation as to the price, and no effort to maximize the value paid to CEOC for the WSOP Tournament Rights (in fact, just the opposite: there is evidence that CEC and CIE affirmatively sought to reduce the price paid).  CEOC had no independent directors or advisors, was likely insolvent, and, for the reasons discussed above, VRC's fairness opinion is not entitled to substantial weight in determining entire fairness.  In short, neither prong of the entire fairness test – fair process or fair price – are present here.  The Examiner thus concludes that but for the statute of limitations, a reasonable to strong claim for breach of fiduciary duty would exist against CEOC's directors and CEC as the controlling shareholder.  Given the limited role of the Sponsors in this transaction, however, an aiding and abetting claim against the Sponsors likely would be weak.  Nevertheless, any claim for breach of fiduciary duty (or aiding and abetting a breach of fiduciary duty) would almost certainly be timed-barred.  The transfer occurred on September 1, 2011 and thus the three-year statute of limitations likely expired on September 1, 2014.[994]

---

[994]  Unlike the 2009 WSOP Transaction, creditors were clearly aware of this transaction no later than November 2011.  CEC 10-Q for the quarter ended Sept. 30, 2011 (Nov. 10, 2011), Exhibit 99.1 (Supplemental Discussion of Pro Forma) at 12 ("In September 2011, the [CEOC] sold the right to operate the World Series of Poker land-based tournaments to a majority owned subsidiary of Caesars Entertainment.").  Accordingly, no reasonable argument exists (or has been advanced by creditors) for equitable tolling in connection with the 2011 WSOP Transaction.

## C. The 2010 CMBS Loan Amendment and Trademarks Transfer

### 1. Introduction

In connection with the August 2010 amendment to the CMBS Loan Agreement, titled the Second Amended and Restated Loan Agreement (hereinafter the "2010 CMBS Loan Amendment"), CEC, through CEOC, required CLC to transfer to Flamingo PropCo, LLC, Paris PropCo, LLC, Rio PropCo, LLC, Harrah's Las Vegas PropCo, LLC, Harrah's Atlantic City PropCo, LLC and Harrah's Laughlin PropCo, LLC (the "CMBS PropCos"), each of which was a CEC-owned company, its ownership of the intellectual property (the "CMBS IP") specifically related[995] to the Flamingo, Paris, Rio, Harrah's Las Vegas, Harrah's Atlantic City and Harrah's Laughlin properties (the "CMBS Properties"). CEC recorded the value of the CMBS IP owned by CLC as of the 2010 time frame at over $204 million.[996] In return for transferring its ownership of the CMBS IP, CLC received (i) $100 from each CMBS PropCo for a total of $600 in cash,[997] (ii) limited use licenses of the CMBS IP and (iii) a reversionary right to an exclusive, royalty free, irrevocable, transferable and sublicensable license to the CMBS IP once the CMBS Financing was repaid in full.[998]

---

[995] The "property-specific" intellectual property transferred in 2010 that was related to the Harrah's Las Vegas, Harrah's Atlantic City and Harrah's Laughlin properties comprised only five trademarks for the ancillary services at these properties, *e.g.* restaurants, pool bars and premium slot areas, none of which contain the term "Harrah's." The transferred trademarks do not relate to the "Harrah's" trademarks, which are not specific to any one property and thus were retained by CLC and licensed for use at the Harrah's properties in separate "system-wide" license agreements, discussed below. The issue with regard to this transfer thus relates to the Flamingo, Paris and Rio intellectual property.

[996] *See* "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004]; *see also* "Trademark Valuation" Spreadsheet (Oct. 2011), at Main Tab [CEC_EXAMINER_0103300] (native file).

[997] "Intellectual Property Assignment Agreement" (cited herein as "IPAA") for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453034 [CEOC_INVESTIG_00453033]; IPAA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452844 [CEOC_INVESTIG_00452843]; IPAA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453139 [CEOC_INVESTIG_00453138]; IPAA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452600 [CEOC_INVESTIG_00452599]; IPAA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00452291 [CEOC_INVESTIG_00452290]; IPAA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00452279 [CEOC_INVESTIG_00452278].

[998] "Amended and Restated License Agreement" (cited herein as "ARLA") for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453736-37 [CEOC_INVESTIG_00453734]; ARLA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453657-58 [CEOC_INVESTIG_00453655]; ARLA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453718-19 [CEOC_INVESTIG_00453716]; ARLA for Harrah's Las

Various constituencies have raised questions about the fairness to CEOC and CLC of this transfer, whether it constituted an actual or constructive fraudulent transfer, and whether the transfer amounted to a breach of fiduciary duty. They claim the transaction is suspect because CLC effectively received no consideration, had no independent board of directors, and was likely insolvent at the time. Other constituents claim that CLC and the CMBS PropCos essentially retained the same rights both before and after the transfer of the CMBS IP and thus there was no material change in position, other than the possible protection against the licenses being terminated in the event of a CEOC bankruptcy. Certain constituents also contend that any claims for breach of fiduciary duty or fraudulent conveyance would be time-barred.

The Examiner has investigated the rationale for the transfer of the CMBS IP, the corporate governance associated with approving the transaction, the fairness of the consideration CLC received in return for the CMBS IP, the solvency of CEOC and CLC at the time of the transfer and whether the transfer was done with an intent to hinder, delay or defraud creditors. Based on this investigation, the Examiner concludes that, despite the strength of the evidence on the elements of the claim, any claim for constructive fraudulent transfer is at best plausible due to statute of limitations issues, any claim for actual fraudulent transfer is weak at best (even if not time-barred) and any claim for breach of fiduciary duty is almost certainly time-barred.

### 2. Factual Background

#### a. 2008 LBO and the CMBS Structure and Debt

In conjunction with the 2008 LBO, CEOC transferred the CMBS PropCos to CEC.[999] CEC then held these properties separate and apart from CEOC.[1000] This was done so that CEC could have the CMBS PropCos raise $6.5 billion in debt (the "<u>CMBS Financing</u>" or "<u>CMBS Debt</u>") through a $4 billion Loan Agreement with JPMorgan Chase Bank, N.A. as lender, which was amended on May 22, 2008[1001] (hereinafter referred to as the "<u>CMBS Loan Agreement</u>"), and

---

Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453406-7 [CEOC_INVESTIG_00453404]; ARLA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453282-83 [CEOC_INVESTIG_00453280]; ARLA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453296-97 [CEOC_INVESTIG_00453294].

[999] *See* CEC Post-Effective Amendment No. 1 to Form S-1 (May 17, 2010), at 42.

[1000] *Id.*

[1001] *See* "Amended and Restated Loan Agreement" (May 22, 2008), at APOLLO-Examiner_00141848 [APOLLO-Examiner_00141843]. The original loan agreement, titled the Loan Agreement, was executed on January 28, 2008 between JP Morgan Chase Bank, N.A. and Harrah's Las Vegas PropCo, LLC, Harrah's Atlantic City PropCo, LLC, Rio PropCo, LLC, Flamingo Las Vegas PropCo, LLC, Tahoe PropCo, LLC and Showboat Atlantic City PropCo, LLC. *See id.* However, pursuant to a "swap provision" in that original Loan Agreement, the parties amended the Loan Agreement on May 22, 2008, titled the Amended and Restated Loan Agreement, to substitute the Paris Las Vegas and Harrah's Laughlin properties into the CMBS Financing for the Harrah's Lake Tahoe, Harvey's Lake Tahoe, Bill's Lake Tahoe and Showboat

$2.5 billion in mezzanine loans with the lenders party thereto.[1002]  To provide the lenders to the CMBS Financing (collectively, including any lender that from time to time was a party thereto, the "CMBS Lenders") with additional security, CEC guaranteed the CMBS lease payments in full (the "CEC Lease Guarantee").  In addition, a Shared Services Agreement was entered into by and among CEOC, CEC and the CMBS Entities (as defined on Exhibit A thereto), dated as of January 28, 2008 (the "2008 Shared Services Agreement").

The Sponsors appear to have sought CMBS Financing for some of the Caesars properties because such a structure provides more limited covenants, the ability to borrow against valuable assets, and the potential for downstream monetization.[1003]  As a result, CEC held CEOC in one line of companies and the CMBS PropCos in a separate line of companies, with each having its own separate and distinct structure and debt as shown in Trademarks Figure 1:

---

Atlantic City properties and the portion of the Flamingo known as "O'Sheas," which were covered by the CMBS Financing in the original Loan Agreement.  *Id.* at APOLLO-Examiner_00141848-49.

[1002] *See* "Letter Agreement" for 2010 Loan CMBS Amendment (Mar. 5, 2010), at CEC_EXAMINER_0512508 [CEC_EXAMINER_0512482].

[1003] "Project Horseshoe" Memorandum and Presentation (Sept. 5, 2006), at TPG-Examiner_01278806 [TPG-Examiner_01278789].

**Trademarks Figure 1:  Post-LBO PropCo/OpCo Structure**



Source: APOLLO-Examiner_00141832 [APOLLO-Examiner_00141831].

### b. Post-2008 Ownership and Use of the CMBS IP

After the 2008 LBO, the CMBS PropCos were wholly owned subsidiaries of CEC.  But CLC, a wholly owned subsidiary of CEOC, owned the CMBS IP (*e.g.*, the trademarks for the Flamingo, Paris and Rio properties) and much of Caesars "system-wide" intellectual property (*e.g.*, Total Rewards).[1004]  CEOC was the sole member of CLC.[1005]  At the time, KPMG calculated the fair value of the CMBS IP at $320.9 million,[1006] the entirety of which was

---

[1004] "CMBS Restructuring IP Items" Presentation (Mar. 23, 2010), at APOLLO-Examiner_00815229 [APOLLO-Examiner_00815229].

[1005] *See, e.g.*, IPAA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453038 [CEOC_INVESTIG_00453033] (signing as CLC's sole member).

[1006] *See* "SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment, Inc. as of January 28, 2008" (Dec. 22, 2008), at CEOC_INVESTIG_00240892-894 [CEOC_INVESTIG_00240748] (the sum of the trade name valuations for the Flamingo Las Vegas ($92.8 million), Paris Las Vegas ($109.4 million) and Rio ($118.7 million) equaling $320.9 million).

recorded as intangible assets other than goodwill on CLC's ledger.[1007]  To facilitate the use of the CMBS IP and "system-wide" marks at the CMBS Properties, two sets of license agreements were executed between CLC, the CMBS PropCos, and the corresponding operating companies for each property.

First, in 2008, CLC and the CMBS PropCos executed a series of license agreements that granted each CMBS PropCo a non-exclusive,[1008] nontransferable, and royalty-free license to use the CMBS IP in connection with the operation, management, promotion, exploitation, or use of the casino, hotel, casino-resort or casino-hotel facility, or other businesses at each specific property in exchange for $100.[1009]  CLC, however, retained ownership of the CMBS IP, quality control rights over the CMBS IP, and the right to terminate the CMBS PropCos' licenses under certain circumstances.[1010]  These license agreements did, however, include a provision whereby, upon an event of foreclosure, the licenses of the CMBS IP to the CMBS PropCos would become exclusive and sublicensable to vendors in connection with the operation of the property.[1011]  At such time, CLC would no longer be able to use the CMBS IP for any purpose that would result in direct competition with the CMBS PropCos, unless such use existed prior to the date of foreclosure.[1012]

---

[1007] *See* "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004]; *see also* "Impairment Summary" Spreadsheet (Oct. 2011), at Tabs 44, 47, 53, 54, 70 and 71 [DT0019572] (native file).

[1008] In the event of a foreclosure on the CMBS Properties, the CMBS PropCos' licenses to the CMBS IP would become exclusive, except as to any CMBS IP not being used at other Caesars properties.  *See* "License Agreement" for Flamingo Las Vegas (Jan. 28, 2008), at CEC_EXAMINER_SUPP_00000479 [CEC_EXAMINER_SUPP_00000477].

[1009] "License Agreement" for Flamingo Las Vegas (Jan. 28, 2008), at CEC_EXAMINER_SUPP_00000477-91 [CEC_EXAMINER_SUPP_00000477]; "License Agreement" for Paris Las Vegas (May 22, 2008), at CEC_EXAMINER_SUPP_00000537-52 [CEC_EXAMINER_SUPP_00000537]; "License Agreement" for Rio (Jan. 28, 2008), at CEC_EXAMINER_SUPP_00000553-69 [CEC_EXAMINER_SUPP_00000553]; "License Agreement" for Harrah's Las Vegas (Jan. 28, 2008), at CEC_EXAMINER_SUPP_00000507-21 [CEC_EXAMINER_SUPP_00000507]; "License Agreement" for Harrah's Atlantic City (Jan. 28, 2008), at CEC_EXAMINER_SUPP_00000492-506 [CEC_EXAMINER_SUPP_00000492]; "License Agreement" for Harrah's Laughlin (May 22, 2008), at CEC_EXAMINER_SUPP_00000522-36 [CEC_EXAMINER_SUPP_00000522].

[1010] *See, e.g.*, "License Agreement" for Flamingo Las Vegas (Jan. 28, 2008), at CEC_EXAMINER_SUPP_00000481-83, 85 [CEC_EXAMINER_SUPP_00000477].

[1011] *See, e.g.*, *id.* at CEC_EXAMINER_SUPP_00000479-80 [CEC_EXAMINER_SUPP_00000477].

[1012] *Id.*

Next, CLC granted the operating companies for each CMBS Property (the "CMBS OpCos") licenses for both the CMBS IP and the system-wide Caesars marks in connection with the operation of each property.[1013]

### c. 2010 CMBS Loan Amendment

In late 2008 and early 2009, the Sponsors began exploring a renegotiation of the CMBS Financing[1014] with the CMBS Lenders.[1015] The Sponsors believed that the CMBS PropCos were overleveraged and that it would be difficult for them to meet their 2013 maturity obligations under the CMBS Loan Agreement.[1016] To address the issue, the Sponsors sought to deleverage the CMBS debt and extend the maturity date in exchange for a cash pay down of the debt at a discount.[1017] David Sambur spearheaded the negotiations for the Sponsors and CEC,[1018] which sought a two-year extension to "provide [Caesars] time to pay down debt and grow out of [the]

---

[1013] "License Agreement" for Flamingo Las Vegas Operating Company (Jan. 28, 2008), at CEC_EXAMINER_0415559 [CEC_EXAMINER_0415558]; "License Agreement" for Paris Las Vegas Operating Company (May 22, 2008), at CEC_EXAMINER_0415571 [CEC_EXAMINER_0415570]; "License Agreement" for Rio Properties (Jan. 28, 2008), at CEC_EXAMINER_1030960 [CEC_EXAMINER_1030959]; "License Agreement" for Harrah's Las Vegas (Jan. 28, 2008), at CEC_EXAMINER_1447672 [CEC_EXAMINER_1447671]; "License Agreement" for Harrah's Atlantic City (Jan. 28, 2008), at CEC_EXAMINER_1447658 [CEC_EXAMINER_1447657]; "License Agreement" for Harrah's Laughlin (May 22, 2008), at CEC_EXAMINER_1447686 [CEC_EXAMINER_1447685].

[1014] E-mail from D. Sambur to K. Peterson, *et al.* (Oct. 17, 2008) [APOLLO-Examiner_01125735], attaching "Sale of Junior Mezz to Apollo/TPG" Memorandum (Oct. 17, 2008), at APOLLO-Examiner_01125739-40 [APOLLO-Examiner_01125739].

[1015] The CMBS Lenders at the time, which were all party to the 2010 CMBS Loan Amendment, were JP Morgan Chase Bank, N.A., Bank of America, N.A., Citibank, N.A., Merrill Lynch Mortgage Lending, Inc., Credit Suisse AG, Cayman Islands Branch, German American Capital Corporation, Morgan Stanley Mortgage Capital Holdings LLC and Goldman Sachs Mortgage Company. *See* "Second Amended and Restated Loan Agreement" (Aug. 31, 2010), at CEOC_INVESTIG_00005478 [CEOC_INVESTIG_00005478].

[1016] E-mail from D. Sambur to M. Rowan (Oct. 26, 2009), at APOLLO-Examiner_00181149 [APOLLO-Examiner_00181149]. At the time, the CMBS Properties were secured under $6.5 billion in debt and produced $630 million in EBITDA. *Id.*

[1017] *Id.*; D. Sambur Oct. 19, 2015 Tr. at 89:24-90:4.

[1018] E-mail from D. Sambur to K. Peterson, *et al.* (Oct. 17, 2008), at APOLLO-Examiner_01125735 [APOLLO-Examiner_01125735]; G. Ezring Feb. 25, 2016 Tr. at 23:17-18 ("On the Caesars' side it was very often David Sambur."); M. Rowan Nov. 16, 2015 Tr. at 86:22-87:7 (testifying that his role in the 2010 CMBS Loan Amendment was primarily as a coach to Sambur).

downturn."[1019]   CEC and the CMBS PropCos were represented by OMM.[1020]   The primary attorneys from OMM were Mark Wlazlo and Greg Ezring.[1021]

In connection with the negotiations to restructure the CMBS Financing, the CMBS Lenders sought, among other things, to clarify and strengthen their rights[1022] by modifying certain aspects of the operational structure and intellectual property framework for the CMBS PropCos.  In particular, the CMBS Lenders wanted, among other things, the option, in the event of a CMBS foreclosure, to improve their position and either (i) require the Caesars organization to continue to operate the CMBS Properties or (ii) withdraw the properties from Caesars' operations and management pursuant to an orderly transition period[1023] and ensure that the CMBS PropCos continued to have a right to the CMBS IP, which they feared could be at risk in the event of a CEOC bankruptcy.[1024]

### i.   CLC Transfers Ownership of the CMBS IP to the CMBS PropCos

A concern of the CMBS Lenders in restructuring the CMBS Loan Financing was that a CEOC bankruptcy could result in the termination of the 2008 agreements whereby CLC provided the non-exclusive, royalty-free license of the CMBS IP to the CMBS PropCos.[1025]  As a result, the Sponsors and OMM engaged in a number of discussions regarding transferring the ownership of these marks to the CMBS PropCos.[1026]  The concept early on was that CLC would

---

[1019]  E-mail from D. Sambur to M. Rowan (Oct. 26, 2009), at APOLLO-Examiner_00181149 [APOLLO-Examiner_00181149].

[1020]  "Second Amended and Restated Loan Agreement" (Aug. 31, 2010), at CEOC_INVESTIG_00005681 [CEOC_INVESTIG_00005478].

[1021]  D. Sambur Oct. 19, 2015 Tr. at 90:16-24.

[1022]  M. Rowan Nov. 16, 2015 Tr. at 90:13-16; D. Sambur Oct. 19, 2015 Tr. at 91:7-17.

[1023]  D. Sambur Oct. 19, 2015 Tr. at 93:24-94:24; M. Cohen Oct. 16, 2015 Tr. at 112:25-113:12; M. Wlazlo Oct. 14, 2015 Tr. at 92:18-93:8; G. Ezring Feb. 25, 2016 Tr. at 20:18-21:24.

[1024]  "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004]; "CMBS Standalone Financial Statements" Memorandum (Sept. 28, 2011), at CEC_EXAMINER_1369629 [CEC_EXAMINER_1369628]. Sambur expressed his view that "[t]he creditors were concerned that they would lose access to that IP due to a foreclosure event."  D. Sambur Oct. 19, 2015 Tr. at 92:7-15.

[1025]  "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004]; "CMBS Standalone Financial Statements" Memorandum (Sept. 28, 2011), at CEC_EXAMINER_1369629 [CEC_EXAMINER_1369628].

[1026]  See, e.g., e-mail from B. Finnegan to D. Sambur, et al. (Mar. 19, 2010) [APOLLO-Examiner_00819051], attaching "CMBS Restructuring IP Proposal" Presentation (Mar. 19, 2010), at APOLLO-Examiner_00819052-62 [APOLLO-Examiner_00819052]; e-mail from A. Melville to D. Sambur, et al. (Mar. 22, 2010), at CEC_EXAMINER_1383486-87 [CEC_EXAMINER_1383486]; e-mail from M. Wlazlo to D. Sambur (Mar. 26, 2010)

assign the CMBS IP to the CMBS PropCos and simultaneously give CEOC the right to repurchase it for $1 if the CMBS Financing was paid in full.[1027]  The CMBS Lenders balked at this proposal, opining that it did "not work from a bankruptcy perspective" because of the risk that "the assignment of Property Specific Trademarks to the PropCos was [something] other than a true sale."[1028]  Wlazlo explained that the transfer was an issue because "it was important to us to make sure the substantive rights as between the two silos didn't change" to remain in compliance with their debt covenants.[1029]  Nevertheless, the CMBS Lenders persisted with their position and the parties began designing a work around to address the CMBS Lenders' concern.

Ultimately, the parties reached agreement on a framework within which CLC would sell the corresponding CMBS IP to each respective CMBS PropCo.[1030]  Because CLC was not a party to the 2010 CMBS Loan Amendment between the CMBS PropCos and the CMBS Lenders, the transaction involved multiple coordinated agreements.  First, the 2010 CMBS Loan Amendment between the CMBS PropCos and the CMBS Lenders contemplated the transfer of the CMBS IP from CLC, a nonparty to the agreement, to the CMBS PropCos through separate

---

[APOLLO-Examiner_01372722], attaching Handwritten Comments to "CMBS Restructuring IP Items" Presentation (Mar. 26, 2010), at APOLLO-Examiner_01372725-28 [APOLLO-Examiner_01372725].

[1027]  "CMBS Restructuring IP Proposal" Presentation (Mar. 19, 2010), at APOLLO-Examiner_00819054 [APOLLO-Examiner_00819052]; "CMBS Restructuring IP Items" Presentation (Mar. 23, 2010), at APOLLO-Examiner_00815229 [APOLLO-Examiner_00815229]; G. Ezring Feb. 25, 2016 Tr. at 29:22-30:7.

[1028]  E-mail from J. Jacobus to S. Grossman, *et al.* (Mar. 26, 2010), at APOLLO-Examiner_01411711 [APOLLO-Examiner_01411711]; M. Wlazlo Feb. 4, 2016 Tr. at 363:7-14 (testifying that "the [CMBS Lenders] were not comfortable with the transfer including that feature").

[1029]  M. Wlazlo Feb. 4, 2016 Tr. at 365:13-17.

[1030]  CEC's Board of Directors approved both the CMBS transaction and the assignment of the IP from CLC.  E-mail from M. Cohen to D. Bonderman, *et al.* (Aug. 22, 2010) [APOLLO-Examiner_01410169], attaching "Unanimous Written Consent of the Board of Directors In Lieu of a Meeting" (Aug. 21, 2010), at APOLLO-Examiner_01410172-74 [APOLLO-Examiner_01410172]; e-mail from C. Taylor to M. Cohen (Aug. 23, 2010) [CEC-EXAMINER_1299633], attaching Consent Signature for D. Bonderman (Aug. 23, 2010), at CEC_EXAMINER_1299636 [CEC_EXAMINER_1299636]; e-mail from L. Skinner to J. Eaton (Aug. 23 2010) [CEC_EXAMINER_1305170], attaching Consent Signature for G. Loveman (Aug. 23, 2010), at CEC_EXAMINER_1305173 [CEC_EXAMINER_1305173]; e-mail from T. Chheda to M. Cohen, *et al.* (Aug. 25, 2010) [CEC_EXAMINER_1294298], attaching Consent Signature for K. Peterson (Aug. 25, 2010), at CEC_EXAMINER_1294301 [CEC_EXAMINER_1294301] and Consent Signature for J. Coslet (Aug. 25, 2010), at CEC_EXAMINER_1294302 [CEC_EXAMINER_1294302].

agreements.[1031]   To accomplish this, CEC had CEOC cause CLC and the CMBS PropCos to engage in a series of transactions to transfer the CMBS IP to the CMBS PropCos and amend existing licensing agreements to reflect the changed ownership.[1032]   Specifically, CLC executed Intellectual Property Assignment Agreements ("IPAA") with each CMBS PropCo wherein CLC, for stated consideration of $100 per CMBS PropCo, assigned all of its right, title and interest in the CMBS IP – reflected on entity specific schedules to each agreement – to each respective CMBS PropCo.[1033]   The parties also agreed to execute short form confirmatory agreements that

---

[1031] "Second Amended and Restated Loan Agreement" (Aug. 31, 2010), at CEOC_INVESTIG_00005514, 48 [CEOC_INVESTIG_00005478].   As contemplated by the 2010 CMBS Loan Amendment, the Flamingo, Paris and Rio PropCos each entered into the Trademark and Copyright Security Agreements wherein Bank of America, N.A., as the collateral agent, was granted a security interest in the CMBS IP.   "Trademark and Copyright Security Agreement (Flamingo Las Vegas)" (Aug. 31, 2010), at PWC-CZR-0016017-21 [PWC-CZR-0016017]; "Trademark and Copyright Security Agreement (Paris Las Vegas)" (Aug. 31, 2010), at PWC-CZR-0015990-96 [PWC-CZR-0015990]; "Trademark and Copyright Security Agreement (Rio)" (Aug. 31, 2010), at PWC-CZR-0016009-16 [PWC-CZR-0016009]; "Trademark and Copyright Security Agreement (Harrah's Las Vegas)" (Aug. 31, 2010), at PWC-CZR-0016003-08 [PWC-CZR-0016003]; "Trademark and Copyright Security Agreement (Atlantic City)" (Aug. 31, 2010), at PWC-CZR-0016022-27 [PWC-CZR-0016022]; "Trademark and Copyright Security Agreement (Harrah's Laughlin)" (Aug. 31, 2010), at PWC-CZR-0015997-6002 [PWC-CZR-0015997].   These agreements were then filed with the U.S. Patent and Trademark Office, perfecting the lien pursuant to the 2010 CMBS Loan Amendment.

[1032] The Unanimous Written Consent of the CEC Board of Directors gave the authority for CEC to enter into and perform additional transactions necessary for the 2010 CMBS Loan Amendment, including, among other things, entering into amended license agreements. "Unanimous Written Consent of the Board of Directors in Lieu of a Meeting" (Aug. 21, 2010), at CEC_EXAMINER_1305178, 81 [CEC_EXAMINER_1305177].   Jonathan Halkyard at CEOC executed the IPAAs for CLC, signing for CEOC, CLC's sole member.   *See, e.g.,* IPAA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453038 [CEOC_INVESTIG_00453033].

[1033] IPAA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453034 [CEOC_INVESTIG_00453033]; IPAA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452844 [CEOC_INVESTIG_00452843]; IPAA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453139 [CEOC_INVESTIG_00453138]; IPAA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452600 [CEOC_INVESTIG_00452599]; IPAA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00452291 [CEOC_INVESTIG_00452290]; IPAA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00452279 [CEOC_INVESTIG_00452278].

would be filed with the United States Patent and Trademark Office and United States Copyright Office.[1034]

CLC's transfer of the ownership of the CMBS IP to the CMBS PropCos also necessitated amending the 2008 license agreements whereby CLC had previously licensed the CMBS IP to the CMBS PropCos.[1035]  As a result, Amended and Restated License Agreements were executed on August 31, 2010, whereby the CMBS PropCos granted both CLC and CEOC non-exclusive, limited-use, royalty-free, and nontransferable licenses to the CMBS IP in exchange for $100.[1036] The Amended and Restated License Agreements also contained a reversionary clause, whereby on repayment in full of the CMBS Financing, CLC would receive an exclusive, royalty-free, irrevocable, transferable and sublicensable license to use the CMBS IP for any lawful purpose, including operation of the specific CMBS Property.  In substance, through these agreements, the

_____

[1034] The short form confirmatory agreements included six Assignment of Trademark and Domain Name Rights, wherein CLC, for unidentified "good and valuable consideration" assigned its entire right, title and interest in the property-specific trademarks and domain names listed in schedules to each assignment, and three Copyright Assignments, whereby CLC transferred property-specific copyrights to the Flamingo, Paris and Rio PropCos for unidentified "good and valuable consideration."  *See, e.g.*, "Assignment of Trademark and Domain Name Rights" for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452594-98 [CEOC_INVESTIG_00452590] (transferring the trademarks and domain names related to the Flamingo property); "Copyright Assignment" for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00451965 [CEOC_INVESTIG_00451962] (transferring the Flamingo Bird copyright).  Copyright Assignments were not executed for the Harrah's Las Vegas, Harrah's Atlantic City and Harrah's Laughlin PropCos because no copyrights were assigned under their respective IPAAs.

[1035] ARLA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453734-51 [CEOC_INVESTIG_00453734]; ARLA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453655-71 [CEOC_INVESTIG_00453655]; ARLA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453716-33 [CEOC_INVESTIG_00453716]; ARLA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453404-17 [CEOC_INVESTIG_00453404]; ARLA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453280-93 [CEOC_INVESTIG_00453280]; ARLA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453294-307 [CEOC_INVESTIG_00453294].

[1036] ARLA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453736-37 [CEOC_INVESTIG_00453734]; ARLA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453657-58 [CEOC_INVESTIG_00453655]; ARLA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453718-19 [CEOC_INVESTIG_00453716]; ARLA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453406-7 [CEOC_INVESTIG_00453404]; ARLA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453282-83 [CEOC_INVESTIG_00453280]; ARLA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453296-97 [CEOC_INVESTIG_00453294].

CMBS PropCos provided CLC and CEOC with limited licenses, which would become exclusive licenses in the event of repayment of the CMBS Financing, to use the very CMBS IP that CLC had contemporaneously sold to each CMBS PropCo.[1037]

The effect of these transfers was that CLC lost ownership of the CMBS IP with a recorded value at that time at over $204 million[1038] and, in return, received (i) $100 per CMBS PropCo, for an aggregate of $600,[1039] (2) non-exclusive, royalty-free and nontransferable licenses to the CMBS IP, for which it paid each CMBS PropCo $100, for an aggregate of $600,[1040] and (iii) a reversionary right to, upon repayment in full of the CMBS Financing, receive

---

[1037] *Compare* IPAA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453040-45 [CEOC_INVESTIG_00453033] *with* ARLA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453746-51 [CEOC_INVESTIG_00453734]; *compare* IPAA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452850-55 [CEOC_INVESTIG_00452843] *with* ARLA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453667-71 [CEOC_INVESTIG_00453655]; *compare* IPAA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453146-52 [CEOC_INVESTIG_00453138] *with* ARLA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453728-33 [CEOC_INVESTIG_00453716]; *compare* IPAA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452606-8 [CEOC_INVESTIG_00452599] *with* ARLA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453416-17 [CEOC_INVESTIG_00453404]; *compare* IPAA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00452297-99 [CEOC_INVESTIG_00452290] *with* ARLA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453292-93 [CEOC_INVESTIG_00453280]; *compare* IPAA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00452285-87 [CEOC_INVESTIG_00452278] *with* ARLA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453306-7 [CEOC_INVESTIG_00453294].

[1038] *See* "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004]; *see also* "Trademark Valuation" Spreadsheet (Oct. 2011), at Main Tab [CEC_EXAMINER_0103300] (native file).

[1039] IPAA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453034 [CEOC_INVESTIG_00453033]; IPAA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452844 [CEOC_INVESTIG_00452843]; IPAA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453139 [CEOC_INVESTIG_00453138]; IPAA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452600 [CEOC_INVESTIG_00452599]; IPAA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00452291 [CEOC_INVESTIG_00452290]; IPAA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00452279 [CEOC_INVESTIG_00452278].

[1040] ARLA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453736-37 [CEOC_INVESTIG_00453734]; ARLA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453657-58 [CEOC_INVESTIG_00453655]; ARLA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453718-19 [CEOC_INVESTIG_00453716]; ARLA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453406-7

an exclusive, royalty-free, irrevocable, transferable, and sublicense license to the CMBS IP.[1041] The before and after status of CLC is depicted below in Trademarks Figure 2:

**Trademarks Figure 2:  CMBS IP Restructuring Aug. 31, 2010**



Source: Comparison of 2008 licenses (*e.g.*, CEC_EXAMINER_SUPP_00000477) with  2010 amended licenses (*e.g.*, CEOC_INVESTIG_00453734).

There is evidence that the possible need for a fairness opinion in connection with CLC transferring the CMBS IP to the CMBS PropCos was considered.[1042]  Ultimately, however, no

---

[CEOC_INVESTIG_00453404]; ARLA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453282-83 [CEOC_INVESTIG_00453280]; ARLA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453296-97 [CEOC_INVESTIG_00453294].

[1041] *See, e.g.*, ARLA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453736-37 [CEOC_INVESTIG_00453734].  As discussed in Section VIII.C, *infra*, the balance of the CMBS Financing that remained outstanding was repaid in full as part of the 2013 CERP Transaction.  However, the CMBS IP did not revert to CLC per the ARLAs because CEC had CLC and the CMBS PropCos amend the license agreements to extend to the reversionary interest to be contingent upon repayment of the new CERP financing documents.  "Second Amended and Restated License Agreement" for Flamingo Las Vegas (Oct. 11 2013), at CEOC_INVESTIG_00152678 [CEOC_INVESTIG_00152675]; "Second Amended and Restated License Agreement" for Paris Las Vegas (Oct. 11, 2013), at CEOC_INVESTIG_00152709 [CEOC_INVESTIG_00152706]; "Second Amended and Restated License Agreement" for Rio (Oct. 11, 2013), at CEOC_INVESTIG_00152732 [CEOC_INVESTIG_00152729]; "Second Amended and Restated License Agreement" for Harrah's Las Vegas (Oct. 11, 2013), at CEOC_INVESTIG_00152194 [CEOC_INVESTIG_00152191]; "Second Amended and Restated License Agreement" for Harrah's Atlantic City (Oct. 11, 2013), at CEOC_INVESTIG_00152261-62 [CEOC_INVESTIG_00152259]; "Second Amended and Restated License Agreement" for Harrah's Laughlin (Oct. 11, 2013), at CEOC_INVESTIG_00152179 [CEOC_INVESTIG_00152176].

[1042]  E-mail from M. Wlazlo to D. Sambur (Apr. 5, 2010), at APOLLO-Examiner_01421638 [APOLLO-Examiner_01421638]; e-mail from M. Wlazlo to D. Sambur (May 18, 2010), at

fairness opinion for the transfers was sought or obtained, and key witnesses do not recall whether one was discussed or completed.[1043]   The recollection of those involved in the decision suggests that they believed at the time of the transfers that a fairness opinion was unnecessary because the transaction effectively preserved the pre-2010 CMBS Loan Amendment status quo.[1044]   Cohen summed up this position during his interview:

> So this – this structuring basically took the ownership of the mark, eliminated that royalty-free license, moved the ownership to a Rio entity, whatever Rio entity it was, and then gave a license back to CEOC that gave all the rights that CEOC previously had on the Rio.
>
> So functionally, nothing changed in the relationship.[1045]

Sambur similarly expressed his view that "the status quo I think was effectively preserved in that the use was maintained where there was a use."[1046]   Wlazlo likewise testified that "the substantive rights did not change from before and after, but the form of the ownership of those rights did."[1047]   Consistent with this view, at the time of the transfers, CEC did not adjust the books of CLC or the CMBS PropCos to reflect a change in intangible assets other than goodwill due to the transfer.[1048]

---

APOLLO-Examiner_01411879 [APOLLO-Examiner_01411879]; e-mail from D. Sambur to M. Wlazlo (May 18, 2010), at APOLLO-Examiner_01382087 [APOLLO-Examiner_01382087].

[1043]   There is no evidence in the record of any fairness opinion having been completed.   Sambur stated that he had no recollection of the discussions about a fairness opinion and Wlazlo could not recall if one was ever done.   D. Sambur Jan. 14, 2016 at Tr. 807:7-12; M. Wlazlo Feb. 4, 2016 Tr. at 366:3-10, 367:18-22.

[1044]   G. Ezring Feb. 25, 2016 Tr. at 30:11-32:15 (recalling that Wlazlo, Sambur, Cohen and he discussed the transfer and considered it "a neutral trade"); D. Sambur Oct. 19, 2015 Tr. at 91:23-92:6; M. Rowan Nov. 16, 2015 Tr. at 93:11-25; M. Cohen Oct. 16, 2015 Tr. at 114:6-21; M. Wlazlo Feb. 4, 2016 Tr. at 363:24-364:9.

[1045]   M. Cohen Oct. 16, 2015 Tr. at 114:15-23.

[1046]   D. Sambur Oct. 19, 2015 Tr. at 91:23-92:6.

[1047]   M. Wlazlo Feb. 4, 2016 Tr. at 363:24-364:9.

[1048]   *See* E-mail from C. Ruck to M. Cohen, *et al.* (Sept. 9, 2011), at CEC_EXAMINER_0862538 [CEC_EXAMINER_0862538] ("The financial statements since the August 2010 transaction all record the [sic] 100% of the book value of the trademarks to CEOC subsidiaries, and none to the CMBS Subs."); *see also* CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 91 ("In August 2010, in conjunction with the amendment of the CMBS Financing, certain trademark assets were transferred from one of the Guarantor subsidiaries of CEOC to the CMBS properties, which are non-guarantor subsidiaries of the Company.   This transfer of trademarks, with a book value of $45.3 million, was not properly recorded in this footnote in our filings since that time.").

About a year later, however, it was determined that this accounting was wrong.[1049]   The documents indicate this issue was of significant concern because of its potential to require a restatement and its impact on Caesars' prior reporting to CEOC's lenders.[1050]   As a result, Caesars had the issue analyzed and reviewed by outside counsel and accountants, including PricewaterhouseCoopers, LLP. ("PWC").[1051]   As part of this 2011 look-back review, Caesars and its counsel discussed and analyzed the accounting of the 2010 CMBS IP transfer.[1052]   One theory CEC considered, similar to what was expressed by Cohen and Sambur in their interviews, was that there was no real transfer of value from CLC to the CMBS PropCos because nothing of substance changed.[1053]   Ultimately, CEC rejected this theory.[1054]   Instead, PWC concluded that

---

[1049]   *See, e.g.*, E-mail exchange between T. Vanke and P. Clements, *et al.* (Aug. 24-25, 2011), at CEOC_INVESTIG_00040375 [CEOC_INVESTIG_00040375]; e-mail from M. Cohen to C. Ruck, *et al.* (Aug. 25, 2011), at CEC_EXAMINER_1368852 [CEC_EXAMINER_1368852]; e-mail from C. Ruck to M. Cohen, *et al.* (Sept. 4, 2011), at CEC_EXAMINER_1364222 [CEC_EXAMINER_1364222]; e-mail from C. Ruck to M. Cohen, *et al.* (Sept. 9, 2011), at CEC_EXAMINER_0862538 [CEC_EXAMINER_0862538].

[1050]   E-mail from C. Ruck to M. Cohen, *et al.* (Sept. 9, 2011), at CEC_EXAMINER_0862538 [CEC_EXAMINER_0862538]; "Talking Points" on CMBS Accounting Issue (Sept. 10, 2011), at CEC_EXAMINER_1364409-13 [CEC_EXAMINER_1364409]; "Talking Points" on CMBS Accounting Issue (Sept. 13, 2011), at CEC_EXAMINER_1347020-25 [CEC_EXAMINER_1347020]; "Talking Points" on CMBS Accounting Issue (Sept. 14, 2011), at CEC_EXAMINER_1347027-35 [CEC_EXAMINER_1347027].

[1051]   E-mail from M. Cohen to C. Ruck, *et al.* (Aug. 25, 2011), at CEC_EXAMINER_1368852 [CEC_EXAMINER_1368852]; e-mail from C. Ruck to M. Cohen, *et al.* (Sept. 4, 2011), at CEC_EXAMINER_1364222 [CEC_EXAMINER_1364222]; e-mail from C. Ruck to M. Cohen, *et al.* (Sept. 9, 2011), at CEC_EXAMINER_0862538 [CEC_EXAMINER_0862538]; e-mail from J. Anderes to M. Cohen, *et al.* (Sept. 9, 2011) [CEC_EXAMINER_0413071], attaching PWC's "Caesars Entertainment SAB 99 Quantitative Analysis – CMBS Stand Alone" Spreadsheet (Sept. 9, 2011), at Sheet 1 [CEC_EXAMINER_0413072] (native file), PWC's "Caesars Entertainment SAB 99 Quantitative Analysis – S-X 3-10 Error" Spreadsheet (Sept. 9, 2011), at Sheet 1 [CEC_EXAMINER_0413073] (native file) and PWC's "Caesars Entertainment Corporation Location Trademark Values" Spreadsheet (Sept. 9, 2011), at Sheet 1 [CEC_EXAMINER_0413074] (native file).

[1052]   "Talking Points" on CMBS Accounting Issue (Sept. 13, 2011), at CEC_EXAMINER_1347020-25 [CEC_EXAMINER_1347020]; "Talking Points" on CMBS Accounting Issue (Sept. 10, 2011), at CEC_EXAMINER_1364409-13 [CEC_EXAMINER_1364409]; "Talking Points" on CMBS Accounting Issue (Sept. 14, 2011), at CEC_EXAMINER_1347027-35 [CEC_EXAMINER_1347027].

[1053]   "Talking Points" on CMBS Accounting Issue (Sept. 13, 2011), at CEC_EXAMINER_1347020-25 [CEC_EXAMINER_1347020]; "Talking Points" on CMBS Accounting Issue (Sept. 10, 2011), at CEC_EXAMINER_1364409-13 [CEC_EXAMINER_1364409]; "Talking Points" on CMBS Accounting Issue (Sept. 14, 2011), at CEC_EXAMINER_1347027-35 [CEC_EXAMINER_1347027]; "Caesars Entertainment

the full asset value of the CMBS IP, which was over $204 million[1055] in 2010, should have been moved from the books of CLC to the CMBS PropCos.[1056]

 In documents dated shortly after receiving PWC's advice, CEC's auditor, Deloitte, also analyzed the issue and concluded that the 2010 accounting was incorrect.[1057]   But Deloitte ultimately determined that only $45.3 million in value associated with the CMBS IP, as opposed to the entire $204.5 million, should have been transferred from CLC to the CMBS PropCos.[1058] Based on Deloitte's workpapers, the book value of $204.8 million was apportioned between the CMBS PropCos and CLC.   Deloitte concluded that approximately 22% of the book value, equaling $45.3 million, should be moved from CLC's column and recorded with the CMBS PropCos.   This 22% value was calculated after considering two scenarios:   (1) the CMBS PropCos would hold the marks in perpetuity; and (2) the value of the mark would revert back to CLC upon repayment of the CMBS Financing in five years when it was due.[1059]   Trademarks Figure 3 below reflects Deloitte and CEC's calculation of the transfer of $45.3 million in value from CLC to the CMBS PropCos based on the 2010 CMBS IP transfer:

---

Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028006 [DT0028004].

[1054] "Talking     Points"     on     CMBS     Accounting     Issue     (Sept.     13,     2011),     at CEC_EXAMINER_1347020-25 [CEC_EXAMINER_1347020]; CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 91.

[1055] CEC's outside counsel and PWC did not attribute value to the minimal property-specific marks related to the three Harrah's properties.

[1056] L&W     Memorandum     on     CMBS     Accounting     (Sept.     25,     2011),     at CEC_EXAMINER_1347073 [CEC_EXAMINER_1347071]; "CMBS Standalone Financial Statements"   Memorandum   (Sept.   28,   2011),   at   CEC_EXAMINER_1369633,   38 [CEC_EXAMINER_1369628]; Proposed Disclosure for 3.10 Footnote (Sept. 20, 2011), at CEC_EXAMINER_0842016 [CEC_EXAMINER_0842016].

[1057] "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028006 [DT0028004]; Deloitte Consultation Response on CMBS Accounting (Oct. 3, 2011), at DT0029289-94 [DT0029289].

[1058] "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028006 [DT0028004].

[1059] "Trademark     Valuation"     Spreadsheet     (Oct.     2011),     at     Main     Tab [CEC_EXAMINER_0103300] (native file).

**Trademarks Figure 3: Allocation of Book Value of CMBS IP**

| amounts in thousands | August 2010 | | | | | | | |
| | Enterprise Valuation | | CMBS Valuation | | % | Total Recorded Book Value | | Allocated Book Value |
| Flamingo | $ | 72,372 | $ | 15,333 | 21% | $ | 68,800 | $ 14,600 |
| Paris | $ | 74,832 | $ | 16,868 | 23% | $ | 69,300 | $ 15,600 |
| Rio | $ | 66,217 | $ | 14,953 | 23% | $ | 66,700 | $ 15,100 |
| **Total** | [1] $ | **213,421** | [1] $ | **47,154** | **22%** | $ | **204,800** | $ **45,300** |

[1] Includes the value of tax amortization benefit. Without the tax amortization the values are $175.2 million and $42.8 million.

<u>Source:</u>  CEC_EXAMINER_0103300 at Main Tab (native file).

Accordingly, CEC's prior reporting was determined to have been wrong, this error was disclosed in CEC's 2011 Form 10-K, and $45.3 million in value associated with the CMBS IP was transferred from CLC to the CMBS PropCos.[1060]

Finally, it is noteworthy that in connection with CLC transferring the CMBS IP to the CMBS PropCos, CLC and CEOC did not appear to have their own legal or financial advisors, no officers or directors or employees appeared to be acting solely on behalf of CEOC or CLC, and no approvals, consents or authorizations by CLC or its board or by CEOC, as CEC's sole member,[1061] for entry into these transfers have been located.[1062]  Instead, the transfers appear to have been approved only at the CEC board level in connection with its broad approval of the 2010 CMBS Loan Amendment.[1063]  CEC then caused CEOC to implement the transfers.[1064]

---

[1060]  CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 91;  L&W Memorandum on CMBS Accounting (Sept. 25, 2011), at CEC_EXAMINER_1347073 [CEC_EXAMINER_1347071]; "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028006 [DT0028004].

[1061]  There were no consents from CEOC's board in the record indicating that there was approval.

[1062]  There is nothing in the record to indicate that CEOC or CLC had anyone representing their interests.

[1063]  E-mail from M. Cohen to D. Bonderman, *et al.* (Aug. 22, 2010), [APOLLO-Examiner_01410169] attaching "Unanimous Written Consent of the Board of Directors In Lieu of a Meeting" (Aug. 21, 2010), at APOLLO-Examiner_01410172-74 [APOLLO-Examiner_01410172]; e-mail from A. Civale to K. Myers (Aug. 22, 2010), at APOLLO-Examiner_01023077 [APOLLO-Examiner_01023077]; e-mail from M. Rowan to E. Irene (Aug. 22, 2010), at APOLLO-Examiner_00863600 [APOLLO-Examiner_00863600]; e-mail from C. Taylor to M. Cohen (Aug. 23, 2010) [CEC_EXAMINER_1299633], attaching Consent Signature for D. Bonderman (Aug. 23, 2010), at CEC_EXAMINER_1299636 [CEC_EXAMINER_1299636]; e-mail from L. Skinner to J. Eaton (Aug. 23, 2010)

### ii. Reorganization of PropCo Structure

In connection with amending the CMBS Loan Agreement, the CMBS Lenders also sought to create optionality for themselves in the event of a foreclosure on the CMBS Properties. They wanted the ability to either continue operating the properties as part of the Caesars enterprise, including being part of the Total Rewards program,[1065] or to "unplug" the properties from the system in the event that they wanted to sell one or more of the properties.[1066] According to Marc Rowan, the CMBS Lenders were creating "a series of options. They could stay in, they could pull out."[1067]   Sambur similarly stated that upon a CMBS foreclosure, the CMBS Lenders did not necessarily want to "unplug" from the Caesars system, but rather, "[t]hey wanted the opportunity to do that."[1068]   Apollo and Caesars, however, believed that the CMBS Lenders ultimately should not exercise any right to unplug the CMBS PropCos from the Caesars system because doing so could decrease the properties' value.[1069]   Nonetheless, the OMM partner involved in these negotiations recalled them as being very difficult with the CMBS Lenders – who at this point in time were the original 2008 lenders – bargaining "very hard" for

---

[CEC_EXAMINER_1305170], attaching Consent Signature for G. Loveman (Aug. 23, 2010), at CEC_EXAMINER_1305173 [CEC_EXAMINER_1305173]; e-mail from K. Harmon to J. Eaton (Aug. 23, 2010) [CEC_EXAMINER_1305156], attaching Consent Signature for R. Press (Aug. 23, 2010), at CEC_EXAMINER_1305163 [CEC_EXAMINER_1305160]; e-mail from L. Cruz to J. Eaton (Aug. 23, 2010) [CEC_EXAMINER_1305135], attaching Consent Signature for C. Williams (Aug. 23, 2010), at CEC_EXAMINER_1305138 [CEC_EXAMINER_1305138]; e-mail from L. Landrum to J. Eaton (Aug. 24, 2010) [CEC_EXAMINER_1305174], attaching Consent Signature for K. Davis (Aug. 24, 2010), at CEC_EXAMINER_1305180 [CEC_EXAMINER_1305177]; e-mail from T. Chheda to M. Cohen (Aug. 25, 2010) [CEC_EXAMINER_1294298], attaching Consent Signature for K. Peterson (Aug. 25, 2010), at CEC_EXAMINER_1294301 [CEC_EXAMINER_1294301] and Consent Signature for J. Coslet (Aug. 25, 2010), at CEC_EXAMINER_1294302 [CEC_EXAMINER_1294302].

[1064] E-mail from M. Cohen to D. Bonderman, *et al.* (Aug. 22, 2010), at [APOLLO-Examiner_01410169], attaching "Unanimous Written Consent of the Board of Directors in Lieu of a Meeting" (Aug. 21, 2010), at APOLLO-Examiner_01410172-76 [APOLLO-Examiner_01410172]; IPAA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453038 [CEOC_INVESTIG_00453033] (signed by CEOC as CLC's sole member).

[1065] M. Cohen Oct. 16, 2015 Tr. at 112:25-113:12.

[1066] D. Sambur Oct. 19, 2015 Tr. at 94:15-24, 103:21-104:12.

[1067] M. Rowan Nov. 16, 2015 Tr. at 90:13-16.

[1068] D. Sambur Oct. 19, 2015 Tr. at 103:21-23.

[1069] D. Sambur Oct. 19, 2015 Tr. at 104:13-17; M. Rowan Nov. 16, 2015 Tr. at 92:3-14; G. Loveman Oct. 27, 2015 Tr. at 124:21-125:3.

rights to enable them to operate the properties in the event of a default without Caesars' involvement.[1070]

To address the CMBS Lenders' concerns regarding optionality, a new management structure was implemented as part of amending the CMBS Loan Agreement. Initially, new management companies (the "CMBS ManageCos"), which were wholly owned subsidiaries of CEC, were created for each CMBS PropCo.[1071]    Each CMBS PropCo then entered a Management Agreement with the CMBS ManageCo for that respective property (*e.g.* Paris CMBS Manager, LLC for Paris PropCo.).    Under the Management Agreements, the CMBS ManageCos agreed to manage the respective property until January 31, 2023.[1072]    In exchange, each CMBS ManageCo received a monthly base fee equal to the "Allocable Percentage"[1073] of revenue for that CMBS Property, multiplied by 2 percent.[1074]    The CMBS ManageCos also received an "incentive fee" equal to the Allocable Percentage multiplied by 5 percent of the EBITDAM for that fiscal month.[1075]    Section 13.4.2 of the Management Agreements specifically provided that the agreement would survive a default on the CMBS Financing unless the CMBS PropCos, which would then be owned by the CMBS Lenders after foreclosure, chose to terminate the agreement and begin the "Transition Period."[1076]    If the CMBS Lenders exercised this termination option for a particular CMBS Property, the Transition Period would last up to two years, during which time the CMBS ManageCos were required to continue performing their duties under the agreement and to provide reasonable cooperation and assistance in conducting any diligence related to the transfer of the management of the property to a replacement management company or the transition of the property to a third party.[1077]

In conjunction with this new management structure, the 2008 Shared Services Agreement also was amended to, among other things, add the CMBS ManageCos as parties pursuant to a new Second Amended and Restated Shared Services Agreement ("2010 Shared Services

---

[1070]  G. Ezring Feb. 25, 2016 Tr. at 22:16-23.

[1071]  *See* "Summary of CMBS Amendment" Memorandum (Aug. 22, 2010), at APOLLO-Examiner_01410179 [APOLLO-Examiner_01410177].

[1072]  *See, e.g.*, "Hotel and Casino Management Agreement" for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00458387 [CEOC_INVESTIG_00458357].

[1073]  *See, e.g.*, *id.* at CEOC_INVESTIG_00458371.  This was defined as the portion of revenue generated by that specific CMBS Property, divided by the total revenue for the CMBS Properties.  *Id.*

[1074]  *See, e.g.*, *id*. at CEOC_INVESTIG_00458371-72.

[1075]  *See, e.g.*, *id*.  These payments did not go to CEOC, which actually provided the services for the company.  *See* Appendix 9, CMBS/CERP (Damages Related to Property Management Fees).

[1076]  *See, e.g.*, "Hotel and Casino Management Agreement" for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00458389-91 [CEOC_INVESTIG_00458357].

[1077]  *See, e.g.*, *id.*

Agreement").[1078]  CEOC, the "service provider," agreed to provide certain services to the CMBS ManageCos for the benefit of the CMBS OpCos.[1079]  These services included providing a complete accounting system, access to the books and records and preparing financial statements.[1080]  In exchange, CEOC received for its services the payment of all "allocated" costs and 30% of all "unallocated" costs incurred performing such services.[1081]  These costs were required to be paid to CEOC as long as the Management Agreements remained in effect.[1082]  CEOC also was required to provide reasonable cooperation and assistance with any transition if the option for the Transition Period in the Management Agreements was exercised.[1083]

This new management structure, along with the transfer of the CMBS IP, also required changes to the licensing structure to allow the CMBS OpCos and new CMBS ManageCos to use the transferred intellectual property when operating the CMBS Properties.  The CMBS PropCos, now the owners of the CMBS IP, granted the necessary licenses to each corresponding CMBS ManageCo and CMBS OpCo through individual Trademark and Copyright License Agreements on August 31, 2010.[1084]  Under these agreements, the CMBS ManageCos and CMBS OpCos were given a non-exclusive, royalty free and nontransferable license to the property-specific trademarks and copyrights (listed in Schedules I and II of each agreement) for use in connection with the operation and management of that property.[1085]  Additionally, CLC and the CMBS PropCos, CMBS ManageCos and CMBS OpCos entered into separate System-Wide Amended and Restated License Agreements ("System-Wide Agreements") on August 31, 2010, that added the respective CMBS ManageCos and CMBS PropCos as parties to the agreement and granted

---

[1078] "Second Amended and Restated Shared Services Agreement" (Aug. 31, 2010), at CEOC_INVESTIG_00307870 [CEOC_INVESTIG_00307870].

[1079] *Id.*

[1080] *Id.* at CEOC_INVESTIG_00307875.

[1081] *Id.* at CEOC_INVESTIG_00307880.

[1082] *Id.* at CEOC_INVESTIG_00307870, 84-85.

[1083] *Id.* at CEOC_INVESTIG_00307884-85.

[1084] "Trademark and Copyright License Agreement" (cited herein as "TM & CR License") for Flamingo (Aug. 31, 2010), at CEOC_INVESTIG_00453698-715 [CEOC_INVESTIG_00453698]; TM & CR License for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453638-654 [CEOC_INVESTIG_00453638]; TM & CR License for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453621-37 [CEOC_INVESTIG_00453621]; TM & CR License for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453433-46 [CEOC_INVESTIG_00453433]; TM & CR License for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453162-75 [CEOC_INVESTIG_00453162]; TM & CR License for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453176-89 [CEOC_INVESTIG_00453176].

[1085] *See, e.g.*, TM & CR License for Flamingo (Aug. 31, 2010), at CEOC_INVESTIG_00453700-01, 710-15 [CEOC_INVESTIG_00453698].

them, along with the CMBS OpCos, a non-exclusive, royalty free and nontransferable license to use the system-wide marks (*i.e.*, Total Rewards) in connection with the operation of each property.[1086]   The effect of the amendments to the system-wide licenses was to allow the CMBS PropCos to continue using the non-property-specific marks and allow their use by the entities managing the CMBS PropCos.

As a result of these structural changes to the management and operation of the CMBS Properties, the CMBS Lenders believed they had created for themselves sufficient optionality, in the event of a CMBS default, to either continue to operate the properties inside the Caesars organization or withdraw the properties from the Caesars organization.[1087]   This optionality is of particular significance to the CERP transaction, discussed in Section VIII.C., of this Report.

### 3.   The Examiner's Findings and Conclusions

Based on the evidence, the Examiner has analyzed potential claims for constructive fraudulent transfer, actual fraudulent transfer and breach of fiduciary duty.   Based on the governing laws,[1088] the Examiner has concluded that any claim for (i) constructive fraudulent transfer is at best plausible, despite the strength of the elements of the claim, because of the statute of limitations, (ii) actual fraudulent transfer is weak (even if not barred by the statute of limitations) and (iii) breach of fiduciary duty would almost certainly be time-barred.

---

[1086] Amended System-Wide Agreement for Flamingo (Aug. 31, 2010), at CEOC_INVESTIG_00453376 [CEOC_INVESTIG_00453374]; Amended System-Wide Agreement for Paris (Aug. 31, 2010), at CEOC_INVESTIG_00453391 [CEOC_INVESTIG_00453389]; Amended System-Wide Agreement for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453420 [CEOC_INVESTIG_00453418]; Amended System-Wide Agreement" for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453488 [CEOC_INVESTIG_00453486]; Amended System-Wide Agreement for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453472 [CEOC_INVESTIG_00453470]; Amended System-Wide Agreement for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453456 [CEOC_INVESTIG_00453454].

[1087] "Letter Agreement" for 2010 CMBS Loan Amendment (Mar. 5, 2010), at CEC_EXAMINER_0512493-94 [CEC_EXAMINER_0512482]; D. Sambur Oct. 19, 2015 Tr. at 103:5-104:20.

[1088] As discussed in Section VII.A., *supra*, the fraudulent transfer claims are likely governed by Nevada law.   However, even if Delaware law applied, they do not have any substantive differences that would affect the Examiner's conclusions.   *See* Appendix 5, Legal Standards at Section I.A; *see also* Section VII.A., *supra*.   CEOC is incorporated in Delaware and thus its breach of fiduciary duty claims are subject to Delaware law.   *See* Appendix 5, Legal Standards at Section XI.A.1.   Because CLC is organized under Nevada law, its breach of fiduciary duty claims are governed by Nevada law.   *Id.*

### a. Constructive Fraudulent Transfer

Under Nevada law, a party commits constructive fraudulent transfer when it transfers its property or incurs an obligation (i) when it is insolvent, undercapitalized or unable to pay its debts and (ii) it fails to receive reasonably equivalent value in return.[1089]   As previously discussed in Section V, Solvency, CEOC was insolvent, undercapitalized and likely unable to pay its debts as they came due since at least December 31, 2008.[1090]   Based on the limited financial information available for CLC, and its status as a subsidiary pledger or obligor on certain CEC and CEOC debt obligations, the Examiner has concluded that CLC was likely insolvent at the time the CMBS IP was transferred.[1091]   Due to CEOC's and CLC's likely insolvency at the time of this transfer, the Examiner concludes that, if not time-barred, a strong constructive fraudulent conveyance claim would exist because, as discussed below, CLC did not receive reasonably equivalent value for the transfer of its ownership of the CMBS IP.

The determination of whether CLC received reasonably equivalent value for its ownership of the CMBS IP requires a comparison of the value of CLC's ownership of the CMBS IP versus the value CLC received in return for its ownership of the CMBS IP, principally (i) $100 from each CMBS PropCo for a total of $600 in cash,[1092] (ii) limited-use licenses of the CMBS IP,[1093] and (iii) a reversionary right to an exclusive, royalty-free, irrevocable, transferable and sublicensable license to the CMBS IP once the CMBS Financing was repaid in full.[1094]

---

[1089]  Nev. Rev. Stat. Ann. §112.180(1)(b) & 112.190(1); *Runvee, Inc. v. United States*, Case No. 2:10-CV-2260-KJD-GWF, 2013 WL 1249602, at *12 (D. Nev. Mar. 26, 2013).

[1090]  *See* Section V, Solvency.

[1091]  *Id.*

[1092]  IPAA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453034 [CEOC_INVESTIG_00453033]; IPAA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452844 [CEOC_INVESTIG_00452843]; IPAA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453139 [CEOC_INVESTIG_00453138]; IPAA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452600 [CEOC_INVESTIG_00452599]; IPAA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00452291 [CEOC_INVESTIG_00452290]; IPAA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00452279 [CEOC_INVESTIG_00452278].

[1093]  ARLA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453736-37 [CEOC_INVESTIG_00453734]; ARLA for Paris Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453657-58 [CEOC_INVESTIG_00453655]; ARLA for Rio (Aug. 31, 2010), at CEOC_INVESTIG_00453718-19 [CEOC_INVESTIG_00453716]; ARLA for Harrah's Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453406-07 [CEOC_INVESTIG_00453404]; ARLA for Harrah's Atlantic City (Aug. 31, 2010), at CEOC_INVESTIG_00453282-83 [CEOC_INVESTIG_00453280]; ARLA for Harrah's Laughlin (Aug. 31, 2010), at CEOC_INVESTIG_00453296-97 [CEOC_INVESTIG_00453294].

[1094]  *See, e.g.*, ARLA for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00453736-37 [CEOC_INVESTIG_00453734].

CEC's records and financial accounting indicate that CLC's ownership of the CMBS IP was worth hundreds of millions of dollars. Specifically, in 2008, CEC retained KPMG in connection with the LBO to provide a valuation report for CEC and its affiliates.[1095] As part of this valuation report, KPMG valued the intellectual property for the various Caesars properties, including the CMBS properties, using the relief from royalty method (the "RFR Method").[1096] Using the RFR Method, KPMG calculated a royalty rate of 1.5% of the projected revenue for the Flamingo, Paris and Rio properties, 2% for the Harrah's Las Vegas and Harrah's Laughlin properties and .75% for the Harrah's Atlantic City property.[1097] Applying these royalty rates, the Flamingo, Paris and Rio trade names alone were valued at $109.4 million, $118.7 million and $92.8 million respectively, for a total value of $320.9 million.[1098] CEC recorded 100% of this value at CLC in its yearly Form 10-K filings.[1099] Further, CEC did not record any value at the CMBS PropCos for the licenses to use the CMBS IP that had been given to them by CLC.[1100] As of 2010, the valuation for the Flamingo, Paris and Rio trademarks had been reduced to $204.8 million, as CEC recorded impairment charges totaling $95.0 million and $21.0 million in 2008 and 2009, respectively.[1101]

As discussed above, in connection with rectifying the accounting error CEC committed in connection with recording the transfer of CLC's ownership of the CMBS IP to the CMBS PropCos., on September 10, 2011, CEC, its outside counsel and PWC discussed accounting issues and PWC determined that the entire recorded value of the CMBS IP, $204.8 million, should have been transferred from CLC to the CMBS PropCos.[1102] Deloitte and CEC then determined that the transfers should be valued at $45.3 million instead.[1103]

---

[1095] "SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment, Inc. as of January 28, 2008" (Dec. 22, 2008), at CEOC_INVESTIG_00240748-1076 [CEOC_INVESTIG_00240748].

[1096] *Id.* at CEOC_INVESTIG_00240808.

[1097] *Id.* at CEOC_INVESTIG_00240808-9.

[1098] *Id.* at CEOC_INVESTIG_00240892-94. While the sum of KPMG's valuations for these marks equals $320.9 million, later accounting documents report the valuation in 2008 to be $320.8 million. *See* "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004]. It is unclear what the reason is for this $100,000 discrepancy.

[1099] *See* "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004]; Deloitte Consultation Response on CMBS Accounting (Oct. 3, 2011), at DT0029291 [DT0029289].

[1100] *See id.*

[1101] *See* "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028005 [DT0028004].

[1102] E-mail exchange between M. Cohen and C. Ruck, *et al.* (Sept. 10-12, 2011) [CEC_EXAMINER_1347011], attaching "Talking Points" on CMBS Accounting Issue (Sept.

CEC's determination that the 2010 trademarks transfers resulted in CLC transferring $45.3 million in recorded value to the CMBS PropCos (i) supports a finding that CLC received less than reasonably equivalent in the transfer and (ii) materially conflicts with the position that CLC did not transfer anything of value through the 2010 intellectual property restructuring and, in effect, CLC remained in the same position both before and after the transfer. The Examiner's independent analysis of this issue similarly concluded that CLC did not receive reasonably equivalent value for its ownership interest in the CMBS IP. Specifically, the Examiner analyzed the intellectual property transferred and determined that based on the RFR Method that a reasonable estimate of the value of the CMBS Trademarks transferred by CLC to the PropCos was between $42.888 million and $122.96 million. The details surrounding this valuation are described in Appendix 7, Valuation at Section IV.D.

The Examiner thus concludes that the evidence supports a strong constructive fraudulent conveyance claim with respect to CLC's transfer of the CMBS IP. But the transfer occurred more than four years prior to the bankruptcy filing and, as such, would be barred by the Nevada statute of limitations.[1104] Further, the IRS did not file a proof of claim against CLC and, therefore, may be unavailable to serve as a Golden Creditor to extend the statute of limitations.[1105] However, there are plausible legal theories, including substantively consolidating CLC and CEOC[1106] or piercing the corporate veil between CLC and CEOC,[1107] that may allow

---

12, 2011), at CEC_EXAMINER_1347012-17 [CEC_EXAMINER_1347012]; "CMBS Standalone Financial Statements" Memorandum (Sept. 28, 2011), at CEC_EXAMINER_1369628-39 [CEC_EXAMINER_1369628]; e-mail exchange between M. Cohen and T. Vanke (Sept. 17-20, 2009), at CEC_EXAMINER_0842014-15 [CEC_EXAMINER_0842014]; e-mail from J. Anderes to M. Cohen, *et al.* (Sept. 9, 2011) [CEC_EXAMINER_0413071], attaching PWC's "Caesars Entertainment SAB 99 Quantitative Analysis – CMBS Stand Alone" Spreadsheet (Sept. 9, 2011), at Sheet 1 [CEC_EXAMINER_0413072] (native file), PWC's "Caesars Entertainment SAB 99 Quantitative Analysis – S-X 3-10 Error" Spreadsheet (Sept. 9, 2011), at Sheet 1 [CEC_EXAMINER_0413073] (native file) and PWC's "Caesars Entertainment Corporation Location Trademark Values" Spreadsheet (Sept. 9, 2011), at Sheet 1 [CEC_EXAMINER_0413074] (native file).

[1103] "Caesars Entertainment Third Quarter 2011 Accounting Considerations" Memorandum (Nov. 6, 2011), at DT0028006 [DT0028004]; CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 91.

[1104] Nevada has a four-year statute of limitation for constructive fraudulent transfer claims. Nev. Rev. Stat. §112.230(1) & (2). *See* Appendix 5, Legal Standards at Sections I.B, III.D and III.E.2. The 2010 CMBS Loan Amendment was publicly filed in its entirety shortly after the agreement closed. *See* CEC 8-K (Sept. 3, 2010).

[1105] *See* Section XI, *infra*.

[1106] *See Gray v. O'Neill Props. Grp. (In re Dehon)*, Case Nos. 02-41045, 04-04286, 2004 WL 2181669, at *6 (Bankr. D. Mass. Sept. 24, 2004) (finding that an order of substantive consolidation overcame standing and statute of limitations issues that existed absent substantive

the proof of claim the IRS filed against CEOC to be treated as filed against both CLC and CEOC such that the IRS could be viewed as a Golden Creditor of CLC for purposes of this claim. The strength of these theories will depend in part on the development of the factual basis to support a substantive consolidation or veil piercing assertion. The Examiner has not undertaken such an analysis but believes, based on the degree of control exercised by CEC and the Sponsors over every aspect of Caesars, and this transaction in particular, that such claims are plausible. As a result, the Examiner concludes that, despite the strength of the claim on the merits, any constructive fraudulent transfer claim for the trademarks transfers is only plausible due to the potential statute of limitations defense.

---

consolidation and recognized that "[u]pon allowance of substantive consolidation *nunc pro tunc*, creditors of the separate entities would become joint creditors of the consolidated entity as of the Petition Date" and that "[c]oupled with the UFTA, §544(b) permits the avoidance of a transfer" and that if "the liabilities and the Affiliates are consolidated, the necessary creditor standing and status will have been achieved"); *see also In re Petters Co., Inc.*, 506 B.R. 784, 849 n.90, 850 (Bankr. D. Minn. 2013) (addressing the argument that "most or all of the [debtors] had no creditors at all when they were put into bankruptcy" and thus there was no creditor from which the Trustee could derive stranding, noting that "consolidation could overcome this defect by making any predicate creditor with a claim against any of the previously-separate estates, the creditor from which the Trustee would derive standing, post-litigation, and granting substantive consolidation"); *Evans Temple Church of God in Christ of Cmty. Ctr., Inc. v. Carnegie Body Co. (In re Evans Temple Church of God in Christ and Cmty. Ctr., Inc.)*, 55 B.R. 976, 983 (Bankr. N.D. Ohio 1986) (permitting consolidated debtors to benefit from the filing date of the first debtor for limitations purposes and averring that "[i]f the parties herein cannot attribute actions to the separate Debtors, it seems to us that the only fair and reasonable conclusion is that Evans and the Church are substantially the same Debtor"); *see also* Appendix 5, Legal Standards at Section VIII.A.

[1107] *See Searcy v. Knight (In re Am. Int'l Refinery)*, 402 B.R. 728, 745-46 (Bankr. W.D. La. 2008) (finding that Nevada law supported a trustee's view that a debtor has the interest in the assets of its alter ego, and a finding of alter ego "would expand the bankruptcy estate because the assets [of the alter ego entities] are deemed 'to be identical and inseparable from each other' under Nevada law and give the trustee standing to assert claims); *see also ASARCO LLC,* 382 B.R. at 67-68 (finding that a parent corporation stated a claim to pursue claims of a subsidiary where the defendant failed to establish that, under Delaware law "a parent corporation cannot enlarge its estate by pursuing its wholly-owned subsidiary's cause of action where the wholly-owned subsidiary acts as a mere instrumentality or alter ego of the parent"); *but see ALT Hotel, LLC v. DiamondRock Allerton Owner, LLC (In re ALT Hotel, LLC)*, 479 B.R. 781, 803 n.14 (Bankr. N.D. Ill. 2012) (Goldgar, J.) (rejecting *ASARCO* and other non-Delaware cases that find Delaware would recognize reverse piercing as "thinly reasoned" and finding it inappropriate for the Court, without sufficient "guidance from any Delaware Court" on reverse veil piercing "to find that Delaware would recognize inside reverse piercing . . . ."); *see also* Section XII and Appendix 5, Legal Standards at Section VIII.B.

### b. Actual Fraudulent Transfer

The 2010 CMBS IP transfers present a much weaker case, if any, for an actual fraudulent transfer claim. To the extent a claim exists, it would also face the same statute of limitations issues. Initially, there is an absence of direct evidence suggesting that the transaction was done with an intent to hinder, delay or defraud CEOC's or CLC's creditors. On the contrary, there is evidence that CEC, in connection with negotiating with the CMBS Lenders for the 2010 CMBS Loan Amendment, sought to ensure that CLC retained certain rights to the CMBS IP, including a reversionary right to an exclusive, transferrable and sublicensable license to the CMBS IP upon repayment in full of the CMBS Financing, and sought to functionally maintain the status quo for CLC with respect to the CMBS IP.[1108] While the relative positions of the parties were ultimately not retained pre and post-transfer, as evidenced by CEC's own after-the-fact accounting analysis, the difference in value does not appear to have been intentional, as CEC was still considering how to account for the transaction over a year later.[1109]

Certain badges of fraud are present, but the record shows that the transfer was done as part of the give-and-take negotiations with the CMBS Lenders to reach agreement on an extension of the CMBS Financing and was not undertaken with any intent to hinder, delay or defraud CEOC or its creditors.[1110]

### c. Breach of Fiduciary Duty

The evidence indicates that (i) the CMBS IP transfers were objectively not an arm's-length transaction between CLC/CEOC and CEC/PropCos, (ii) there was no protection or corporate governance employed to fulfill any duties of loyalty to CLC or CEOC, (iii) the transactions were not fair from a financial perspective to CLC or CEOC and (iv) CLC and CEOC

---

[1108] "CMBS Restructuring IP Proposal" Presentation (Mar. 19, 2010), at APOLLO-Examiner_00819054 [APOLLO-Examiner_00819052]; "CMBS Restructuring IP Items" Presentation (Mar. 23, 2010), at APOLLO-Examiner_00815229-30 [APOLLO-Examiner_00815229]; "Summary of CMBS Amendment" Memorandum (Aug. 22, 2010), at APOLLO-Examiner_01410181-82 [APOLLO-Examiner_01410177]; "CMBS Standalone Financial Statements" Memorandum (Sept. 28, 2011), at CEC_EXAMINER_1369629 [CEC_EXAMINER_1369628]; Deloitte Consultation Response on CMBS Accounting (Oct. 3, 2011), at DT0029291 [DT0029289].

[1109] *See, e.g.*, e-mail from M. Cohen to C. Ruck, *et al.* (Aug. 25, 2011), at CEC_EXAMINER_1368852 [CEC_EXAMINER_1368852]; "Talking Points" on CMBS Accounting Issue (Sept. 13, 2011), at CEC_EXAMINER_1347022-25 [CEC_EXAMINER_1347020].

[1110] "CMBS Restructuring IP Proposal" Presentation (Mar. 19, 2010), at APOLLO-Examiner_00819054 [APOLLO-Examiner_00819052]; "CMBS Restructuring IP Items" Presentation (Mar. 23, 2010), at APOLLO-Examiner_00815229 [APOLLO-Examiner_00815229].

likely were insolvent when the transfers occurred.[1111]   Nevertheless, any claim for breach of fiduciary duty or aiding and abetting a breach of fiduciary duty almost certainly would be barred by the governing three-year statute of limitations.[1112]   The transfers occurred in August 2010 and the 2010 CMBS Loan Amendment detailing the transfer of the CMBS IP was filed with the SEC on September 3, 2010.[1113]   Further, the Assignment of Trademark and Domain Rights and the Trademark and Copyright Security Agreements executed in connection with the 2010 CMBS Loan Agreement and the 2010 CMBS IP transfer were filed with the USPTO in September 2010.[1114] As a result, the transactions have been publicly known since September 2010 and, therefore, the statute of limitations on these claims likely expired in September 2013.[1115]   Nor would the existence of a Golden Creditor operate to extend the statute of limitations for this claim.   Accordingly, the Examiner has concluded that any fiduciary duty or aiding and abetting claim arising out of this transaction would almost certainly be time-barred.

---

[1111]   *See* D. Sambur Oct. 19, 2015 Tr. at 90:12-24 (testifying only to OMM and Wlazlo representing Caesars in the transaction).

[1112]   Both Delaware and Nevada have three-year statute of limitations for breach of fiduciary duty.   *Tyson Foods*, 919 A.2d at 584 (applying Del. Code Ann. tit. 10, §8106); *Glenbrook Capital Ltd. P'Ship v. Dodds (In re Amerco Derivative Litig.)*, 252 P.3d 681, 703 (Nev. 2011) (applying the three-year statute of limitations for fraud in Nev. Rev. Stat. Ann. §11.190).

[1113]   *See* CEC 8-K (Sept. 3, 2010), at Exhibit 10.1.

[1114]   Both sets of agreements were filed with the USPTO in September 2010.   *See, e.g.*, the public filing for "Assignment of Trademark and Domain Name Rights" for Flamingo Las Vegas (Aug. 31, 2010), at CEOC_INVESTIG_00452594-98 [CEOC_INVESTIG_00452590], *available at* <http://assignments.uspto.gov/assignments/assignment-tm-4275-0057.pdf> (filed on Sept. 9, 2010); *see also* the public filing for "Trademark and Copyright Security Agreement (Flamingo Las Vegas)" (Aug. 31, 2010), at PWC-CZR-0016017-6021 [PWC-CZR-0016017], *available at* <http://assignments.uspto.gov/assignments/assignment-tm-4277-0160.pdf> (filed on Sept. 10, 2010).

[1115]   Del. Code Ann. tit. 10, §8106; Nev. Rev. Stat. Ann. §11.190.

## VIII.   2013-2014 ASSET TRANSFERS

### A. Overview of Financial Condition of Caesars and Strategy Employed by the Sponsors Following the 2009-2011 Transactions

Following the 2009 and 2011 WSOP Transactions and the 2010 CMBS Agreement, CEOC's financial condition continued to deteriorate.  Although various transactions through mid-2012 had extended CEOC's debt maturities and created some runway for the company, CEOC continued to face increasing liquidity problems.  Recognizing that CEOC was in dire financial condition, the Sponsors, and Apollo in particular, conceived of a series of transactions, discussed in the next Section of this Report, to, *inter alia*:  (i) extend "runway" for CEOC; (ii) refinance the CMBS maturities; and (iii) better position CEC's and the Sponsors' interests in the event of a restructuring or bankruptcy (which everyone was trying to avoid); while (iv) allowing CEC and the Sponsors to maintain indirect ownership of key assets having significant growth potential.

#### 1. The Sponsors Recognize Caesars' Financial Condition as "Tenuous"

In October 2011, Apollo prepared a presentation, which it shared with TPG, entitled "Caesars Entertainment Discussion Materials," describing Caesars' financial situation as "tenuous" and noting that its "[c]apital structure leaves the business with almost zero margin for error."[1116]   Specifically, the presentation summarized Caesars' prior capital structure interventions from 2008 to 2011 and noted that "[w]ithout these interventions, Caesars would have long ago violated covenants, fallen below critical liquidity thresholds and would have been unable to meet maturity obligations to this point."[1117]   The presentation also provided an overview of Caesars' liquidity, revenue and EBITDA, and forecasts, stating that "Caesars was not expected to survive so long at this level of EBITDA."[1118]   The goal, according to the presentation, was to "avoid the suboptimal: loss of principal," while growing EBITDA "$500mm / year to reach cash flow break even."[1119]

To that end, the Apollo presentation set forth a "roadmap" stating, *inter alia*:  (i) "2012 is a critical year; cut / defer all nonessential capex to 2013/2014"; (ii) "Preserve liquidity at all costs"; (iii) "Be nimble with the capital structure"; (iv) "Focus on any revenue opportunities in the same way one would look at capex projects"; (v) "Fund high return (i.e. sub 5x creation multiple) / small capital need capex"; and (vi) "Need a credible plan to accelerate the day when third party equity (presumably public) can be introduced into the company."[1120]   With regard to

---

[1116] E-mail from T. Dunn to D. Boyce (Oct. 26, 2011) [TPG-Examiner_00575293], attaching "Caesars Entertainment Discussion Materials" (Oct. 2011), at TPG-Examiner_00575296 [TPG-Examiner_00575295].

[1117] "Caesars Entertainment Discussion Materials" (Oct. 2011), at TPG-Examiner_00575297 [TPG-Examiner_00575295].

[1118] *Id.* at TPG-Examiner_00575297-300.

[1119] *Id.*

[1120] *Id.*

the latter point, Apollo concluded that CEC would "need to sell $4bn-$10bn of equity to achieve acceptable leverage levels."[1121]

## 2. The Sponsors Consider Strategic Options to Confront Caesars' Liquidity Problems

In June 2012, the Caesars management team made downward revisions to its long-term financial forecasts, which, according to Alex van Hoek of Apollo, "highlight[ed] the fragility of Caesars' liquidity and covenant cushion situation."[1122]   Under the revised assumptions, Caesars was projected to breach debt covenants "as early as Q1 2013" and to "run[] out of liquidity in Q4 2014."[1123]

In a June 22, 2012 internal Apollo e-mail from van Hoek to Marc Rowan and David Sambur, van Hoek summarized CEOC's financial forecast and concluded that "[t]he bottom line is that in order to reach minimum operating liquidity of $600 million at year-end 2014, Caesars needs to target $725m-$1 billion of incremental liquidity events in 2012-2013."[1124]   Apollo identified a number of potential "strategic options" to address these concerns and protect its own equity investment.   These strategic options were summarized in the June 22, 2012 e-mail and discussed in detail in the attached 53-page deck entitled "Caesars Entertainment Model and Capital Planning Considerations June 2012."[1125]   "Most notably," van Hoek wrote in his cover e-mail, "we believe that a sale of Planet Hollywood," then an unrestricted subsidiary of CEOC, to a third party "could create up to $1.5bn of value after repayment of the current $400m loan balance . . . ."[1126]   The attached deck included a slide entitled "Planet Hollywood:  Impact of Sale to 3rd Party," setting forth Apollo's analysis of the proposed transaction and reiterating the view that an "[o]utright sale of Planet Hollywood could create up to $1.5bn of value after repayment of the current loan balance."[1127]   The third -party sale was contemplated to provide $705 million to $984 million of gross proceeds, or $336 million to $728 million of net proceeds, after

---

[1121] *Id*. at TPG-Examiner_00575300-14.

[1122] E-mail from A. van Hoek to M. Rowan, *et al.* (June 22, 2012), at APOLLO-Examiner_00019592 [APOLLO-Examiner_00019592]; *see also* e-mail from F. Abrao to E. Hession (June 20, 2012), at CEOC_INVESTIG_00115631-34 [CEOC_INVESTIG_00115631].

[1123] E-mail from A. van Hoek to M. Rowan and D. Sambur, *et al.* (June 22, 2012), at APOLLO-Examiner_00019592 [APOLLO-Examiner_00019592].

[1124] *Id.*

[1125] E-mail from A. van Hoek to M. Rowan, *et al.* (June 22, 2012), at APOLLO-Examiner_00019592-93 [APOLLO-Examiner_00019592], attaching "Caesars Entertainment Model and Capital Planning Considerations" (June 2012), at APOLLO-Examiner_00019594-646 [APOLLO-Examiner_00019594].

[1126] E-mail from A. van Hoek to M. Rowan, *et al.* (June 22, 2012), at APOLLO-Examiner_00019592 [APOLLO-Examiner_00019592].

[1127] "Caesars Entertainment Model and Capital Planning Considerations" (June 2012), at APOLLO-Examiner_00019611 [APOLLO-Examiner_00019594].

deducting debt.[1128]    The remainder of the value would be achieved by buying debt at a discount.[1129]  Van Hoek described this option as a "no-brainer."[1130]

Another "no-brainer," according to van Hoek, was conducting an initial public offering of CIE stock, which he predicted would generate "$100-$150m of net proceeds."[1131]  Van Hoek further identified a number of other "[i]ncremental options," including "the sale of other domestic assets."[1132]  These options, he wrote, however, "will require further discussion and should be sequenced following the realization of," *inter alia*, the transactions involving Planet Hollywood and CIE.[1133]

The deck, which was shared with TPG,[1134] recognized the need to sell CEOC assets by 2014 in order to address CEOC liquidity options.[1135]  It also contained an analysis of CEOC debt, which demonstrated that CEOC would be unable to pay its maturing debt with negative free cash flow (from operations) and cumulative debt coming due of $3.385 billion between 2012 and 2015.[1136]  At the same time, the deck assumed that the CMBS debt would be refinanced in 2015.[1137]

### 3.  Caesars and the Sponsors Contemplate the Possibility of a CEOC Bankruptcy

By the end of June 2012, Apollo and Paul Weiss had already begun work on what would eventually become the Growth Transaction.[1138]  Rowan was credited with developing the concept leading to the creation of the Growth Transaction.[1139]  From the earliest documents

---

[1128]  *Id*.

[1129]  *Id*.

[1130]  E-mail from A. van Hoek to M. Rowan, *et al.* (June 22, 2012), at APOLLO-Examiner_00019592 [APOLLO Examiner_00019592].

[1131]  *Id*.

[1132]  *Id*.

[1133]  *Id.*

[1134]  G. Kranias Feb. 18, 2016 Tr. at 318:14-319:19.

[1135]  "Caesars Entertainment Model and Capital Planning Considerations" (June 2012), at APOLLO-Examiner_00019595 [APOLLO-Examiner_00019594].

[1136]  *Id*.

[1137]  *Id*. at APOLLO-Examiner_00019602.

[1138]  E-mail from B. Finnegan to A. Kornberg, *et al.* (July 5, 2012) [PW_EXAMINER_SUPP_00005021], attaching "Caesars Entertainment Summary of Venture Partners Structuring Alternative" (July 5, 2012), PW_EXAMINER_SUPP_00005025-26 [PW_EXAMINER_SUPP_00005022].

[1139]  M. Rowan Nov. 16, 2015 Tr. at 172:22-173:9.

prepared in connection with the proposed transaction, it is clear that bankruptcy issues, including possible claims by CEC and CEOC creditors, were a concern.[1140]

Internal documents from Caesars and the Sponsors during this time frame likewise indicate that a potential CEOC bankruptcy was a sensitive topic. For instance, on July 17, 2012, Caesars executive Geoff Stewart reported to Tim Dunn of TPG that two CEC employees "both independently referenced restructuring."[1141] The next day, one of those employees wrote Gary Loveman to deny having said any such thing: "I assure you I never said anything close to what was relayed by Tim, nor would I stray from the script I've heard you say many times over the recent weeks/months."[1142] Stewart wrote to Dunn that "we need to be very careful with language and tone given that it can be misinterpreted."[1143] Dunn (who was then overseeing Caesars' finance staff in the aftermath of the departure of the Caesars CFO) responded that he would "reinforce at [his] staff meeting."[1144]

Responding to similar concerns, in late July 2012, Sambur, van Hoek, and Eric Hession, who then served as CEOC's treasurer, discussed whether they should plan to sell more CEOC assets in 2013.[1145] In a July 31, 2012 e-mail to Sambur, van Hoek (reiterating a point made in the June 2012 Apollo deck discussed above) wrote that "generating additional proceeds before the [St. Louis casino] proceeds run-out is inefficient and we don't need it until closer to the pinch-point at end of 2014."[1146]

Correspondence between TPG and CEC even jokingly likened CEOC's financial state to that of Greece. Specifically, on August 4, 2012, Dunn wrote Loveman an e-mail to follow up on

---

[1140] *See, e.g.*, "Caesars Entertainment Summary of Venture Partners Structuring Alternative" (July 5, 2012), at PW_EXAMINER_SUPP_00005025-26 [PW_EXAMINER_SUPP_00005022]; *see also* e-mail from D. Sambur to G. Ezring, *et al.* (Oct. 17, 2012) [APOLLO-Examiner_00608680], attaching "Discussion Items," at APOLLO-Examiner_00608681-82 [APOLLO-Examiner_00608681]. Indeed, documents show that, as early as 2009, Apollo and its advisors were contemplating transactions involving Caesars assets and the implications that those transactions might have in the event of a bankruptcy. *See, e.g.*, e-mail from D. Sambur to B. Okun, *et al.* (July 22, 2009), at APOLLO-Examiner_01390200 [APOLLO-Examiner_01390200].

[1141] E-mail from G. Stewart to T. Dunn (July 17, 2012), at TPG-Examiner_00598745 [TPG-Examiner_00598745].

[1142] E-mail from J. Baker to G. Loveman (July 18, 2012), at TPG-Examiner_00239527 [TPG-Examiner_00239527].

[1143] E-mail from G. Stewart to T. Dunn (July 18, 2012), at TPG-Examiner_00239527 [TPG-Examiner_00239527].

[1144] E-mail from T. Dunn to G. Stewart (July 18, 2012), at TPG-Examiner_00239527 [TPG-Examiner_00239527].

[1145] E-mail exchange between D. Sambur, E. Hession, and A. van Hoek (July 30, 2012), at APOLLO-Examiner_00333450 [APOLLO-Examiner_00333450]

[1146] *Id*.; *see also* E. Hession Jan. 20, 2016 Tr. at 619:3-625:25.

their conversation the previous day about the performance of Hession.[1147]  In that conversation, Dunn evidently made a remark comparing CEOC's financial state to that of Greece.[1148]  In his e-mail the next day, he asked Loveman, "Please do not refer to the greece joke.  I would prefer to keep it vague."[1149]

**4. Increasingly Concerned About Protecting Its Equity Investment in Caesars, Apollo Devises Transactions to Improve the Sponsors' and CEC's Strategic Position in the Event of a Bankruptcy**

**a. The August 2012 Apollo Presentation**

By August 2012, Apollo had become increasingly concerned about a possible restructuring of Caesars and the resulting risk that it would pose to Apollo's equity investment. An internal Apollo presentation dated August 2012 observed that, "[d]espite all efforts over the past 4.5 years, Caesars' capital structure and credit situation remain challenging" and predicted a CEOC "liquidity 'crunch point'" in 2014.[1150]  The deck noted that even if the Sponsors "solve[d]" covenant, liquidity, and maturity pressure issues and "survive[d]," "the projected leverage profile of the company will pressure future equity value through the foreseeable projection horizon without the achievement of some upsides."[1151]  It further pointed out that CEOC's annual interest expense was $300 million more than its annual EBITDA.[1152]  The following is a reproduction of the "Situation Overview" slide from the presentation:

---

[1147]  E-mail from T. Dunn to G. Loveman (Aug. 4, 2012), at TPG-Examiner_00239674 [TPG-Examiner_00239674].

[1148]  *Id.*

[1149]  *Id.*

[1150]  E-mail from A. van Hoek to A. van Hoek (Aug. 16, 2012) [APOLLO-Examiner_00031656], attaching "Caesars Entertainment Discussion Materials" (Aug. 2012) at APOLLO_Examiner_00031658 [APOLLO-Examiner_00031657].  According to Sambur, the term "crunch point" refers to running out of liquidity.  D. Sambur Jan. 14, 2016 Tr. at 734:21-735:4.

[1151]  "Caesars Entertainment Discussion Materials" (Aug. 2012) at APOLLO_Examiner_00031658 [APOLLO-Examiner_00031657].

[1152]  *Id.*

**Overview Figure 1:  Situation Overview**

## Situation Overview

- Despite all efforts over the past 4.5 years, Caesars' capital structure and credit situation remain challenging

- Four key areas of focus:

  **1.  Covenants**

  - We believe that Caesars could breach its SSLR covenant in as early as Q4 2012 (assuming no actions are taken in 2012), although CZR can manage through these issues with cures and intercompany loans as necessary

  **2.  Liquidity**

  - Liquidity is challenging given the interest burden, particularly at CEOC (which has $1.8 billion of annual interest expense alone vs. $1.5 billion of EBITDA), however the liquidity "crunch point" is not until 2014 and Caesars has multiple levers it can pull to generate liquidity – at some price – in the interim

  **3.  Maturities**

  - Although near-term maturities have been successfully managed / pushed out to-date, certain maturities (particularly PropCo debt in 2015) will require constant focus and strategizing

    – While covenant and liquidity can be "managed", the maturities cannot be and therefore we need to be proactive

    – August 2012 financing further alleviates maturity pressure in 2014 / 2015 at CEOC, which now only has $[1.0] billion of debt maturing in 2015 (assuming full participation on August A&E)

  **4.  Leverage and equity value**

  - Unfortunately, even if we solve issues 1-3 above and 'survive', the projected leverage profile of the company will pressure future equity value through the foreseeable projection horizon without the achievement of some upsides

- *Key topics for consideration:*

  – *What should Apollo and TPG's strategy be, and is there appetite / thesis around future investment?*

     The key question posed by Apollo in the presentation was:  "What should Apollo and TPG's strategy be, and is there appetite/thesis around future investment?"[1153]  Apollo provided several proposals, including purchasing CEOC debt and providing capital to Caesars in the form of debt, noting that while the latter solution "provides the company with liquidity, it has significant complexity and complications in a restructuring scenario."[1154]  The "New Financing Proposal" slide (reproduced below) identified the uncertainty as to "which direction the situation ultimately goes" and set forth in detail a contemplated limited partnership financing in which Caesars shareholders and Caesars HoldCo would partner "with the aim of providing Caesars with the growth capital that it currently lacks."[1155]  The listed benefits of the proposed transaction included, *inter alia*, that "TPG/Apollo can make an attractive return in a security with favorable risk/reward profile."[1156]

---

[1153] *Id.*

[1154] *Id.* at APOLLO_Examiner_00031673.

[1155] *Id.*

[1156] *Id.*

**Overview Figure 2:  New Financing Proposal**



### b.  The October 2012 Apollo Presentation

Apollo prepared another presentation in October 2012, which made clear that CEC and CEOC were in dire financial condition, and that Apollo understood that a major restructuring of CEOC's debt was a realistic possibility.[1157]  In particular, the presentation observed that "Caesars' capital structure and credit situation remain challenging" and that, as a result, "[o]ur equity investment remains at risk if there is any further deterioration in performance / economic conditions."[1158]  Among other concerns, the presentation explained that CEOC would lack sufficient cash to make mandatory debt repayments to third parties through 2015, and that $2.2 billion of CEOC EBITDA was needed to reach cash flow breakeven versus the $1.4 billion

---

[1157]  E-mail from D. Sambur to M. Howell (Mar. 26, 2013), [PRIV_INVESTIG_00047906] attaching "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047908 [PRIV_INVESTIG_00047907].    Apollo began working on previous versions of this presentation in September 2012.  E-mail from A. van Hoek to B. Finnegan, *et al.* (Sept. 22, 2012), [APOLLO-Examiner_00523750], attaching "Caesars Entertainment Discussion Materials" (Sept. 2012), [APOLLO-Examiner_00523751].

[1158]  "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047908 [PRIV_INVESTIG_00047907].

forecasted for 2012.[1159]  The presentation thus noted that "[i]t is too early to tell whether this is a restructuring or [if] we will earn a return on our equity," "[b]ut we do know there is substantial risk and variability around the outcomes."[1160]

Although Apollo could not "guarantee [Caesars'] ability to avoid a negative event during 2013 and 2014,"[1161] it suggested that "a relatively small amount of capital from Apollo and TPG . . . should ensure that Caesars does not go into a restructuring prior to 2014."[1162]  Describing what would eventually become the Growth Transaction, Apollo set forth a proposal to "invest equity to buy a controlling stake in strategically valuable unencumbered assets."[1163]

One of the primary goals of Apollo's proposed investment appeared to be avoiding a bankruptcy in the near term.  According to the presentation, the investment would "[e]xtend Caesars' runway and ensure no negative events during [a] critical time period over the next 12-24 months."[1164]  At the same time, Apollo appeared focused on enhancing its position in the event a restructuring became necessary.  Indeed, Apollo noted that "[w]e want to strengthen our hand in a potential restructuring with as little capital outlay as possible."[1165]  Thus, according to the presentation, the proposed investment would:

- Be used to support growth, foster deleveraging, and enhance equity value (could facilitate equity issuance for virtuous deleveraging process).[1166]

---

[1159] *Id.* at PRIV_INVESTIG_00047927

[1160] *Id.* at PRIV_INVESTIG_00047936.

[1161] Sambur stated that "negative event" referred to "[a] bankruptcy or a covenant default."  D. Sambur Jan. 14, 2016 Tr. at 723:14-724:19.  Rowan believed it meant "a significant demand for capital, a default, a covenant breach, or anything that is going to interfere with a process that is uncertain."  M. Rowan Jan. 28, 2016 Tr. at 514:24-515:4; *see also* G. Loveman Jan. 28, 2016 Tr. at 318:13-22 (stating that "negative event" could mean bankruptcy, a covenant breach, or a forced sale).

[1162] "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047908 [PRIV_INVESTIG_00047907].

[1163] *Id.*

[1164] *Id.*; *see also id.* at PRIV_INVESTIG_00047936 ("We want to avoid a negative event in the next 12-24 months.").  Notably, Sambur stated that the 12 to 24 month timeframe was important because "things were going to get better, but the company didn't have enough liquidity and covenant headroom to see it through to the other side."  D. Sambur Jan. 14, 2016 Tr. at 727:17-728:5.  Rowan stated that the significance of the one to two-year period was that it was the timeframe in which Caesars wanted to accomplish the CMBS restructuring.  M. Rowan Jan. 28, 2016 Tr. at 536:2-11.

[1165] "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047908 [PRIV_INVESTIG_00047907].

[1166] *Id.*

- Have significant downside protection and earn a return.[1167]

- Could have ancillary benefits in the event of a restructuring.[1168]

The following is a reproduction of the "Situation Overview" and "New Financing Proposal" slides from the presentation:

**Overview Figure 3:  Situation Overview**



---

1167    *Id.*

1168    *Id.*

**Overview Figure 4:  New Financing Proposal**

## New Financing Proposal

- What are we trying to solve for?

    - It is too early to tell whether this is a restructuring or we will earn a return on our equity
        - But we do know there is substantial risk and variability around the outcomes

    - No clear debt securities for Apollo or TPG to purchase today given pricing
        - 1st lien and 2nd lien too expensive; fulcrum unclear

    - Caesars lacks capital to deleverage balance sheet in a meaningful way
        - Equity not valued high enough to foster meaningful amount of deleveraging

    - We want to avoid a negative event in the next 12-24 months
        - Any new capital has to have little risk of loss and earn a reasonable rate of return, given the risks

    - We want to strengthen our hand in a potential restructuring with as little capital outlay as possible

30

The October 2012 Apollo presentation also included a slide entitled "Why At All and Why Now?," in which Apollo specifically noted that "[a] transaction like this is the only way we see it to 'have our cake and eat it too.'"[1169]   In other words, as the presentation explained, the proposed transaction "[g]ets cash into company at a critical time" – thereby "mak[ing] it more likely company avoids restructuring during 2013 and 2014" – and "[i]f things do not work out, our position is substantially improved vs. the status quo."[1170]   In this latter regard, the presentation noted that Apollo's investment in CAC and CGP would "grow[] over time, thereby increasing [in] value and [providing a] 'war chest' upon a potential restructuring."[1171]   The following is a reproduction of the "Why At All and Why Now?" slide from the presentation:[1172]

---

[1169]  *Id.* at PRIV_INVESTIG_00047939.

[1170]  *Id.*

[1171]  *Id.*

[1172]  *Id.*

**Overview Figure 5:  Why At All and Why Now?**



## Why At All and Why Now?

**Why At All**
- Caesars has long-term franchise value
  - Every $100mm of EBITDA is worth $1 billion of equity value or $8 per share
  - Apollo / TPG cost basis of $54 per share vs. current price of $6-7 per share
  - LTM EBITDA is $2.0 billion
  - $250 million added by 2016 by funded growth pipeline (excl. CIE)
  - Base business did $2.8 billion in 2007 vs. $1.9 billion today
- Value of positive investment outcome at Caesars to Apollo and TPG
- A transaction like this is the only way we see it to 'have our cake and eat it too'
  - Gets cash into company at a critical time
    - Deleveraging
    - Improves balance sheet and makes it more likely company avoids restructuring during 2013 and 2014
  - Allows shareholders to invest with substantial downside protection and upside participation
  - If things do not work out, our position is substantially improved vs. the status quo

**Why Now**
- Novel transaction like this more difficult to do should things get more dire
  - Also, we want to incent public shareholders to join in and maximize the amount of money we raise
  - Legal analysis gets more difficult with passage of time
- Public equity at cross-roads; ability to get it back to low double-digits will allow for deleveraging via issuance
  - Structure protects our dilution, to a certain extent, by bifurcating 'option' bet and 'growth' bet
- Cash invested in partnership grows over time, thereby increasing value and 'war chest' upon a potential restructuring event

While the presentation does articulate benefits to CEOC, including in terms of increasing liquidity to repurchase debt and reducing loan covenant risk, it is evidence of a desire by CEC and the Sponsors to improve their position vis-à-vis CEOC's creditors in the event of a restructuring, while acknowledging that a restructuring and a loss of the Sponsors' equity investment was a real possibility.

Rowan told the Examiner that he believed this presentation was prepared for use with TPG,[1173] but no TPG witness recalls reviewing a copy of the presentation, and no copy has been located in the TPG document production.[1174]  TPG witnesses have also denied that they understood the transaction was intended to improve the Sponsors' or CEC's position in a possible CEOC bankruptcy or strengthen their hand in negotiating with creditors (although

---

[1173]  M. Rowan Jan. 28, 2016 Tr. at 512:18-513:2 (Rowan described the deck as an "Apollo-prepared analysis or quantification of an idea that I had been playing with and one version of this appears to be specifically a document to take TPG's temperature and see if I could get TPG enthusiastic for it.").

[1174]  G. Kranias Feb. 18, 2016 Tr. at 329:13-330:11, 333:11-17; D. Bonderman Feb. 24, 2016 Tr. at 176:9-177:18.

David Bonderman said there would be nothing wrong if that was the case).[1175]  Nor did they recall the concept of creating a "war chest" for use in a possible restructuring as being a rationale for the Growth Transaction.  What Bonderman did suggest, however, was an intention to convey assets with strong cash flow to the new entity.  He stated:

> What, as I understood it, we were trying to accomplish was to maximize the ability to pay debt, and to fund the capital needs of the Company.  And the way to do that we were contemplating at that time was to take those assets which had excess cash flow, you might call it, or weren't in need of influx of cash flow, and put those in a place where they may be used to pay debt.  Whereas the entities which had capital needs or didn't have express capital would be in another bucket.  And the idea ultimately was to get cash to places where it could be used most effectively.
>
> Mr. Davis: And as I understand, the cash that would be, could be used most effectively would be for new development projects and things of that nature?
>
> A:  New development projects, cap ex, whatever.  Yes.[1176]

Apollo prepared a modified version of this presentation when the proposed investment was presented by Apollo to Loveman in October 2012.[1177]  While retaining most of the language discussed above, the version provided to Loveman specifically deleted the "strengthen[ing] our hand" language, as well as the entire "Why At All and Why Now?" slide.[1178]

Apollo has argued that this presentation was focused on CEC, not CEOC, since CEOC's maturity profile had already been addressed by extending principal maturities until 2015.[1179]  The evidence, however, does not support this argument.  Although the presentation does discuss CEC financial issues, CEOC's liquidity, negative free cash flow, maturities and covenant issues are repeatedly highlighted as "key areas of focus for the capital structure."[1180]  For instance, the "Four Key Areas of Focus" slide reproduced below specifically addresses each of these capital structure issues facing CEOC:

---

[1175]  D. Bonderman Feb. 24, 2016 Tr. at 205:8-206:21.

[1176]  *Id.* at 195:7-196:4.

[1177]  E-mail from A. van Hoek to D. Sambur (Oct. 25, 2012) [APOLLO-Examiner_00516418], attaching "Caesars Entertainment Discussion Materials" (Oct. 2012), at APOLLO-Examiner_00516448 [APOLLO-Examiner_00516419].

[1178]  "Caesars Entertainment Discussion Materials" (Oct. 2012), [APOLLO-Examiner_00516419].

[1179]  D. Sambur Jan. 14, 2016 Tr. at 729:18-730:3; M. Rowan Jan. 28, 2016 Tr. at 524:2-525:14; A. van Hoek Jan. 26, 2016 Tr. at 341:18-342:12.

[1180]  *See, e.g.*, "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047922 [PRIV_INVESTIG_00047907].

**Overview Figure 6:  Four Key Areas of Focus for the Capital Structure Remain**



## Four Key Areas of Focus for the Capital Structure Remain

1. **Covenants**
   - We believe that Caesars could breach its sole bank covenant (net first lien leverage) as early as mid-2013 (but likely in late-2013)
   - Caesars has more flexibility than a typical company to manage through these issues (i.e., cures from holding company and intercompany loans), though situation is not ideal in any event

2. **Liquidity and Negative Free Cash Flow**
   - Liquidity is challenging given the interest burden, particularly at CEOC (which has $1.6 billion of annual interest expense alone vs. $1.4 billion of EBITDA), however the liquidity "crunch point" is not until 2014/2015+
   - Caesars has a few more levers it can pull to generate liquidity, at some price, in the interim

3. **Maturities**
   - Although near-term maturities have been successfully managed / pushed out to-date, certain maturities (particularly PropCo debt in 2015) will require constant focus and strategizing
     – While covenant and liquidity can be "managed", the maturities are 'absolute' and therefore we need to be proactive
     – August 2012 financing further alleviated maturity pressure in 2014 / 2015 at CEOC, which now only has $1.6 billion of debt maturing in 2015 ($1.0 billion of TL + $215m 2nd liens + $365m unsecured)
     – Focus now shifting to CMBS, given recent CEOC transactions

4. **Leverage and Equity Value**
   - Unfortunately, even if we solve issues 1-3 above and 'survive', the projected leverage profile of the company will pressure future equity value through the foreseeable projection horizon without the achievement of some upsides

16

Apollo's witnesses have also suggested that the proposed transaction was intended to address CEC's exposure to the CMBS debt.[1181]  However, although the CMBS debt was one of the concerns discussed in this presentation, the Sponsors (as acknowledged by Rowan and Bonderman) believed that the CMBS debt would ultimately be refinanced.[1182]  Indeed, the consolidated financial model included in the October 2012 presentation assumes the CMBS debt will be refinanced.[1183]

Apollo has also argued that references to strategic or ancillary benefits in the October 2012 presentation referred to the creation of a "war chest" of new money at CAC that could be used to facilitate a CMBS or CEOC restructuring.[1184]  While the October 2012 presentation does

---

[1181]  M. Rowan Jan. 28, 2016 Tr. at 496:22-497:6, 515:19-23, 517:4-13, 546:19-24.

[1182]  M. Rowan Jan. 28, 2016 Tr. at 583:3-8; D. Bonderman Feb. 24, 2016 Tr. at 187:6-21.

[1183]  "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047956 [PRIV_INVESTIG_00047907].

[1184]  According to Sambur, the "war chest" at CAC was important "because CGP through the merger with CEC is essentially re-contributing that cash to fund the restructuring."  D. Sambur Jan. 14, 2016 Tr. at 729:18-730:3.  Rowan stated that the "war chest" was insurance against "a shortfall on CMBS refinancing," *i.e.*, "Growth Partners is prepared to lean in."  M. Rowan Jan.

include one reference to a "war chest" comprised of the cash invested in CAC, since any such "war chest" would be held outside of CEOC, CEOC's creditors would presumably have to agree to material principal reductions or other concessions before the Sponsors would allow any such funds to be used for the benefit of CEOC. Moreover, since CAC was a public company with independent directors, those directors would have to approve any use of CGP's resources to assist CEOC. Further undermining this argument, other sections of the October 2012 presentation suggest, to the contrary, that the cash invested in CAC would "[p]rovide[] material downside protection to capital provided by Apollo, TPG and other shareholders upfront."[1185]

In addition, Loveman told the Examiner that he recalls "vividly the contrary argument, which was made repeatedly, which was that we needed to put that money to work" and "find high-value investment uses for that money."[1186] According to Loveman, the Sponsors saw the transaction as a way to inject capital into Caesars in a way that would be more defensible to their investors, given the financial condition of CEC and CEOC at the time.[1187]

Finally, CEC and the Sponsors have argued that the creation of CGP and the subsequent transactions were part of an overarching strategy to provide necessary "runway" so that Caesars would have time to recover. For instance, Rowan contrasted "cyclical" problems, where a business is confronting a down cycle but can be expected to recover, with "secular" problems where a business is in a permanent decline.[1188] He argued that, in the former situation, which confronted Caesars here, buying time by creating "runway" helps everyone, including junior creditors who would be harmed by a premature bankruptcy.[1189] As discussed below, however, although extending runway and avoiding bankruptcy are generally desirable goals, the fact that CEOC was almost certainly insolvent at this time required that independent directors of CEOC make these decisions, not conflicted equity holders of the company.[1190] Moreover, as discussed in Sections VIII.B & D, *infra*, creating this runway materially worsened the prospects of CEOC

---

28, 2016 Tr. at 524:11-21. And van Hoek stated that the ancillary benefit discussed was "the flexibility or option to have a pool of capital available to fund a rights offering or assist in the restructuring of CEOC or any other entity." A. van Hoek Jan. 26, 2016 Tr. at 342:4-11. Sambur also denied that moving CEOC and CEC assets into a company unencumbered by CEOC debt and in which the Sponsors were significant shareholders would help the Sponsors – unless "the assets were not conveyed for fair value." D. Sambur Jan. 14, 2016 Tr. at 755:8-11.

[1185] "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047942 [PRIV_INVESTIG_00047907].

[1186] G. Loveman Jan. 28, 2016 Tr. at 335:9-336:9.

[1187] *Id.* at 328:9-329:13.

[1188] M. Rowan Nov. 16, 2015 Tr. at 10:16-11:8, 160:14-162:6; M. Rowan Nov. 17, 2015 Tr. at 335:14-336:12.

[1189] M. Rowan Nov. 16, 2015 Tr. at 241:16-242:13; M. Rowan Nov. 17, 2015 Tr. at 444:7-451:13.

[1190] Notably, during the very period that improving liquidity at CEOC was purportedly a goal, over $400 million of liquidity was drained from CEOC through a series of pre-payments by CEOC to CEC under the Intercompany Revolver. *See infra* Section IX.E.

paying its Second Lien and unsecured creditors.  Thus, while at a certain point extending runway may have been in the interest of Caesars overall, it may not have been in the interest of a deeply insolvent CEOC and its creditors.

### B.  The Growth Transaction

#### 1.  Introduction

The Growth Transaction refers to a series of transactions undertaken in conjunction with the creation of two new Caesars entities, CAC and CGP.[1191]   Although first conceived of by Apollo in the Summer and Fall of 2012, the Growth Transaction did not close until October 21, 2013.  It consisted of:

- **The creation of CAC**:  A new publicly traded company formed for the purpose of making an equity investment in CGP.  Equity ownership in CAC was distributed through a subscription rights offering made available to all CEC shareholders.  The rights offering was ultimately oversubscribed, with over 97% of CEC's public shareholders (including some CEOC creditors) participating.  The Sponsors and their affiliates exercised their subscription rights in full, purchasing $457.8 million worth of CAC Class A common stock.  As of the Petition Date, the Sponsors and their co-investors owned or controlled 66.3% percent of the common stock of CAC and occupied three of CAC's seven board seats.

- **The formation of CGP**:  A new limited liability company, created as a joint venture between CEC and CAC, with the stated purpose of acquiring and developing a portfolio of high-growth operating assets.  CAC used the proceeds from the rights offering – approximately $1.17 billion in total – to purchase a 42.4% equity interest in CGP.  CEC, in exchange for its contribution of certain assets (discussed immediately below), acquired the remaining 57.6% equity interest in CGP.  CAC is CGP's managing member and sole holder of all of its outstanding voting units.  Pursuant to CGP's operating agreement,[1192] after the third anniversary of the closing of the transaction, CEC has the right to acquire all or a portion of the voting units of CGP.[1193]

- **The contribution of CIE and CEOC notes to CGP**:  As consideration for its 57.6% non-voting ownership stake in CGP, CEC contributed to CGP:  (i) its

---

[1191]  From time to time, the Growth Transaction is also referred to in documents and testimony as "Growth I," "CGPI," or "Project Hermes."

[1192]  "Amended and Restated Limited Liability Company Agreement of Caesars Growth Partners, LLC" (Oct. 21, 2013), at CEOC_INVESTIG_00014936-15021 [CEOC_INVESTIG_00014936].

[1193]  CAC would have priority over CEC in connection with recoveries from CGP in the event of a liquidation, partial liquidation or sale of material assets.  CAC Form 424B3 Prospectus (Oct. 21, 2013), at 175.

interest in CIE, which included the online and social gaming company Playtika, as well as the WSOP brand and tournament hosting rights; and (ii) approximately $1.1 billion in face value of senior CEOC unsecured notes, which for purposes of the transaction were valued at $750 million.[1194]

- **The sale of Planet Hollywood and Horseshoe Baltimore to CGP**:  Also in conjunction with the transaction, CEOC, through its subsidiaries, sold to CGP: (i) a 100% equity interest in Planet Hollywood; (ii) a 52% equity interest in Horseshoe Baltimore; and (iii) 50% of CEOC's management fee rights relating to the two properties.  In return for these assets, CEOC received $360 million in cash from CGP, along with CGP's assumption of $513 million in debt associated with Planet Hollywood.

Although the stated rationale for the transactions was to, *inter alia*, fund growth projects and provide "runway" to CEOC while awaiting the expected recovery in the gaming industry, there is, as discussed below, substantial evidence that the transactions were also intended to protect the Sponsors' interests in the event of a CEOC restructuring and improve the Sponsors' bargaining position with creditors.

The figures below show a simplified structure of Caesars before and after the Growth Transaction.

**Growth Figure 1:  Corporate Structure Pre-Transaction**[1195]



---

[1194] As discussed in Section IX.A, *infra*, CEC acquired these notes in November 2010 in connection with a debt-for-equity exchange, by which Paulson & Co. exchanged the notes for the right to purchase CEC equity at a discount.  While contributing these notes to CEOC would have materially improved its balance sheet, that option was never considered.

[1195] CAC Form 424B3 Prospectus (Oct. 21, 2013), at 14.

**Growth Figure 2:  Corporate Structure Post-Transaction**[1196]



The terms of the Growth Transaction were negotiated between the Sponsors and a valuation committee comprised of independent CEC directors created for purposes of the transaction (the "CEC Valuation Committee").  The CEC Valuation Committee retained Evercore Group LLC ("Evercore") and VRC to serve as its financial advisors.  As discussed in greater detail below, Evercore provided an opinion to the CEC Board that, *inter alia*, (i) the consideration to be received by CEOC in exchange for its interests in Planet Hollywood and Horseshoe Baltimore was "reasonably equivalent to the fair market value" of the assets, and (ii) the total consideration to be received in exchange for the assets to be sold and contributed by CEC and CEOC to CGP was fair from a financial point of view to CEC.[1197]  VRC opined, *inter alia*, that the principal economic terms of the Management Agreement, including the services fee, and the sale of the PH Management Fee Stream were "fair from a financial point of view to CEC and CEOC" and "no less favorable to CEC, CEOC and its subsidiaries than would be

---

[1196] *Id.* at 15.

[1197] Evercore Opinion Letter (Oct. 21, 2013), at CEOC_INVESTIG_00171765 [CEOC_INVESTIG_00171760].

obtained in a comparable arm's length transaction with a person that is not an affiliate."[1198]   The CEC Board approved the Growth Transaction on October 21, 2013.

CEOC, which had no independent directors at the time, was not separately represented or involved in the negotiations.  CEOC's only directors at the time of the Growth Transaction were Gary Loveman, Chief Executive Officer and President of CEC, and Michael Cohen, Senior Vice President, Deputy General Counsel and Corporate Secretary of CEC.  Loveman and Cohen, in their capacity as CEOC directors, approved the Growth Transaction *via* written consent.

Creditors have asserted that the Growth Transaction was conceived and executed at a time when CEOC was insolvent as part of a scheme devised by the Sponsors to hinder, delay, or defraud CEOC's creditors by separating Caesars into a "good Caesars" and a "bad Caesars" in order to preserve the Sponsors' equity interests and obtain leverage vis-à-vis CEOC creditors in anticipated restructuring negotiations.  They also contend that the process by which the Growth Transaction was approved was significantly flawed because, *inter alia*:  (i) CEOC lacked its own independent special committee, as well as its own financial and legal advisors, to protect its (and its creditors') interests in connection with the transaction; and (ii) CEC, whose Board formed the CEC Valuation Committee that negotiated and approved the transaction, stood on both sides of the transaction as a controlling shareholder of CEOC and a majority owner of CGP.  Creditors further assert that CEOC did not receive fair or reasonably equivalent value for the assets because, *inter alia*, (i) Planet Hollywood sold for roughly the same price that CEOC paid for it in 2009, despite increased EBITDA since that acquisition, (ii) Horseshoe Baltimore was under construction at the time of its sale and came online in August 2014 and, as such, had no financial performance by which to judge its value, and (iii) the fairness opinions issued in connection with the transaction incorrectly used regional property valuation multiples as comparables (instead of Las Vegas property valuation multiples) and forecasts that were more conservative than CEOC's ordinary course long range plan.

For these reasons, among others, creditors have identified potential claims for:  (i) actual and constructive fraudulent transfer; (ii) breach of fiduciary duty (against CEOC's directors and CEC); and (iii) aiding and abetting breach of fiduciary duty (against the Sponsors).

Certain creditors have stated that they are seeking avoidance and recovery of the properties that were fraudulently transferred.  They also assert that CEC, CAC, and CGP may not qualify as good faith transferees, which would prevent them from retaining the value transferred.  Caesars and the Sponsors dispute these allegations, arguing, *inter alia*, that the Growth Transaction was the result of an arm's length and good faith negotiation between an independent committee and the Sponsors and constituted what they believed at the time to be the best course of action to address CEOC's significant liquidity issues.  In addition to fair process, Caesars and the Sponsors assert that CEOC also received fair and reasonably equivalent value for the assets it sold, as supported by the fairness opinion issued by Evercore and confirmed by subsequent performance of the assets.  CEC and the Sponsors also maintain that there were good reasons to believe that CEOC was solvent at the time of the transaction – namely, because it had paid all of

---

[1198]  VRC Opinion Letter (Oct. 21, 2013), at VRC00003894 [VRC00003889].   VRC also provided an opinion to the CEC board regarding the fair market value of the CAC subscription rights.

its debts as they became due, was able to issue new debt in 2013, and was in compliance with its debt covenants – and that there was no expectation of bankruptcy.

As noted above in Section V, *supra*, the Examiner concludes that there is a strong case that CEOC was insolvent at the time of the Growth Transaction.  As discussed in greater detail below, the Examiner further concludes that the Debtors' estates have (i) a strong claim for constructive fraudulent transfer, (ii) a strong claim for actual fraudulent transfer, (iii) a strong claim for breach of fiduciary duty against CEOC's directors and CEC, and (iv) a reasonable claim for aiding and abetting breach of fiduciary duty against the Sponsors and certain of CEC's directors affiliated with Apollo.

### 2.  Background of the Growth Transaction

#### a.  The Assets Sold and Contributed to CGP

As noted above, in October 2013, as part of the Growth Transaction, CEOC and its affiliates sold to CGP:  (i) a 100% equity interest in Planet Hollywood; (ii) a 52% equity interest in Horseshoe Baltimore; and (iii) 50% of CEOC's management fee rights relating to the two properties.  Apollo, with input from CEC, was primarily responsible for selecting the assets to be sold and contributed by CEOC and CEC.[1199]  TPG took a secondary role.[1200]

#### i.  Planet Hollywood

Prior to the Growth Transaction, Planet Hollywood was 100% owned by CEOC through its unrestricted subsidiary PHW Las Vegas, LLC and was managed by CEOC through its restricted subsidiary PHW Manager, LLC.[1201]  CEOC acquired Planet Hollywood on February 18, 2010 for $654 million and assumed $554 million of Planet Hollywood's debt, for an acquired equity value of $100 million.[1202]  Since it opened in 2007, Planet Hollywood has been one of the leading resort, casino, and entertainment facilities in Las Vegas.[1203]  The 35-acre property on the Las Vegas Strip features over 2,500 guest rooms, a 64,500 square foot casino, 9 restaurants and 6

---

[1199] G. Loveman Oct. 27, 2015 Tr. at 115:22-116:20, 138:21-140-11; *see also* D. Sambur Oct. 29, 2015 Tr. at 325:16-326:7.

[1200] G. Kranias Oct. 23, 2015 Tr. at 170:7-20 (role was in negotiating with Evercore); *id*. at 164:16-165:9 (first became aware of idea through a conversation with Apollo).

[1201] "Caesars Entertainment Venture Partners: Diligence Materials" (Dec. 19, 2012), at PRIV_INVESTIG_00033274 [PRIV_INVESTIG_00033252].  Planet Hollywood was managed pursuant to a management agreement between PHW Manager, LLC and PHW Las Vegas, LLC. *Id*. at PRIV_INVESTIG_00033277.

[1202] "Planet Hollywood Situation Overview," at EVERCORE_0000905 [EVERCORE_0000905].

[1203] "Caesars Entertainment Venture Partners: Diligence Materials" (Dec. 19, 2012), at PRIV_INVESTIG_00033274 [PRIV_INVESTIG_00033252].

bars and clubs, an outdoor pool, and over 75,000 square feet of convention and meeting space.[1204]

After CEOC acquired Planet Hollywood, it had "driven significant outperformance of the property," increasing revenue 27% and EBITDA 186% by December 2012.[1205] As a result of this performance, Planet Hollywood also generated significant free cash flow and reduced net leverage.[1206] Caesars expected "Planet Hollywood to continue to generate significant free cash flow and deleveraging going forward."[1207] Under the Planet Hollywood loan agreement, however, excess cash needed to be retained at the Planet Hollywood level and could not be simply transferred to CEOC.[1208] The table below demonstrates Planet Hollywood's financial performance since CEOC's acquisition of the property, as well as compound annual growth.

### Growth Figure 3:  Planet Hollywood Financial Performance

| amounts in millions | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Net Revenue | $  231 | $  260 | $  307 | $  303 | $  339 |
| EBITDA | $  28 | $  60 | $  92 | $  85 | $  108 |
| EBITDA Margin | 12% | 23% | 30% | 28% | 32% |
| Revenue CAGR Since 2009 | | 13% | 15% | 9% | 10% |
| EBITDA CAGR Since 2009 | | 114% | 81% | 45% | 40% |
| Revenue CAGR Since 2010 | | | 18% | 8% | 9% |
| EBITDA CAGR Since 2010 | | | 53% | 19% | 22% |

Sources:  "Monthly Actual versus Budget Analysis for 2007-Q1 2015" at Tab 'Summary' [CEC_EXAMINER_0145430] (native file); Planet Hollywood Update Materials for KeyCorp (Dec. 2012) at 3, [CEOC_INVESTIG_00116613] (native file).
Note:  2009 represents performance pre-acquisition by Caesars and is presented for comparison purposes only.  Further, 2010 includes two months of pre-Caesars results prior to the acquisition.

As illustrated below, CEOC also increased the amount invested into Planet Hollywood each year from the acquisition through the closing of the Growth Transaction in October 2013.

---

[1204] *Id.* at PRIV_INVESTIG_00033274-76; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015) at 31.

[1205] "Planet Hollywood Update Materials for KeyCorp" (Dec. 2012), CEOC_INVESTIG_00116613 (native file) at 3.  In this presentation, Caesars also refers to Planet Hollywood projections as "conservative internal estimates."  *Id.* at 4.  Notably, the projections referred to as "conservative" are nearly identical to the projections relied upon by Evercore in its valuation.

[1206] *Id.*

[1207] "Caesars Entertainment Venture Partners:  Diligence Materials" (Dec. 19, 2012), at PRIV_INVESTIG_00033282 [PRIV_INVESTIG_00033252].

[1208] A. van Hoek Sept. 25, 2015 Tr. at 230:3-231:17.

**Growth Figure 4:  Planet Hollywood Capital Expenditures**

| *amounts in millions* | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Historical (a) | $ ■ | $ ■ | $ ■ | *$* ■ | *$* ■ | *$* ■ | |
| Projected - Mgmt (b) | | | | $ | $ | $ | $ ■ |
| Projected - Evercore (c) | | | | $ | $ | $ | $ |
| Projected - LRP (d) | | | | $ ■ | $ ■ | $ ■ | $ ■ |

Sources:
(a) Historical Capital Expenditures per CAC at CACEXAM00512644 [CACEXAM00512644]; Historical Capital Expenditure per CAC at CACEXAM00513069 [CACEXAM00513069].
(b) Management projections per "Caesars Valuation Materials, January 3, 2012" (Jan. 3, 2013)[1209] at CEOC_INVESTIG_00285580; [CEOC_INVESTIG_00285549].
(c) Evercore "Project Hermes Valuation Discussion Materials" Presentation (Oct. 21, 2013), at CEOC_INVESTIG_00249973 [CEOC_INVESTIG_00249739].
(d) Impairment Review (Sept. 30, 2013), at Tab "5.17 – PHV GW" [CEOC_INVESTIG_00513908] (native file).

There is no evidence suggesting that, absent the Growth Transaction, CEOC would have been unable to fund ongoing capital expenditures for Planet Hollywood.

### ii.  Horseshoe Baltimore

Horseshoe Baltimore was a joint venture between Caesars, Rock Gaming, and three local partners.[1210]   In October 2012, after obtaining a license to operate a casino in downtown Baltimore, Maryland, Caesars and these other investors entered into the joint venture to build the Horseshoe Baltimore, subject to regulatory approvals and receipt of project financing.[1211] Construction of the casino began in 2013.[1212]   The project was funded with approximately $334 million in debt financing and $107.5 million of equity, and ultimately cost approximately $442 million to construct.[1213]   The property opened in August 2014 and does not feature a hotel, but

---

[1209]  While the document is dated January 3, 2012, the document is mislabeled and should be dated January 3, 2013.  It will be dated herein as January 3, 2013.

[1210]  Caesars Entertainment Venture Partners:  Diligence Materials (Dec. 19, 2012), at PRIV_INVESTIG_00033291 [PRIV_INVESTIG_00033252].

[1211]  CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 73.

[1212]  *Id.*

[1213]  Horseshoe Baltimore Financing Model (native file), at Tab "S&U and PF Cap Public" [PRIV_INVESTIG_00021175]; Jeff Barker, *After Three Months, Horseshoe Casino Baltimore Revenue is Well Below Forecasts*, Baltimore Sun (Dec. 5, 2014).

includes a 122,000 square foot gaming floor, 2,500 slot machines, 150 video poker machines, a 25-table WSOP Poker Room and 150 table games.[1214]

Because it was a new property, maintenance capital expenditures were projected to be minimal beginning in 2016, as presented in the figure below.

**Growth Figure 5: Horseshoe Baltimore Capital Expenditures**

| amounts in millions | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|
| Historical (a) | $ ■ | $ ■ | $ ■ | $ ■ | | | |
| Projected - Sponsors (b) | | | | $ ■ | $ ■ | $ ■ | $ ■ |
| Projected - Evercore (c) | | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |

Sources:
(a) Historical Capital Expenditures Per CAC at CACEXAM00512644 [CACEXAM00512644]; Historical Capital Expenditure per CAC at CACEXAM00513069 [CACEXAM00513069].
(b) Sponsor projections per "Caesars Valuation Materials" at CEOC_INVESTIG_00285589 [CEOC_INVESTIG_00285549].
(c) Evercore "Project Hermes Valuation Discussion Materials" Presentation (Oct. 21, 2013), at CEOC_INVESTIG_00249984 [CEOC_INVESTIG_00249739].

At the time of the Growth Transaction, CEOC held a 52% ownership interest in the Horseshoe Baltimore. A buy-back transaction with one of its co-investors that would have reduced that ownership interest to 40.9% was contemplated at the time of the Growth Transaction, but, as confirmed by CEC's counsel, although CEC received the proceeds from the buy-back, CEOC did not.[1215] Based on CEC's public filings, however, it is evident that Caesars' interest in Horseshoe Baltimore was 52% both before and after the Growth Transaction. CEOC managed the operations of Horseshoe Baltimore pursuant to a management agreement.

### iii. CIE

CIE was formed on April 30, 2009. As detailed in Section VII.A, *supra*, in May 2009, through a series of simultaneous transactions, CEOC transferred ownership of the World Series of Poker trademark and related intellectual property, including all existing sponsorship, media and licensing contracts, to CIE. In return, CEOC received preferred stock with a stated value of $15 million in a holding company and a perpetual exclusive, sub-licensable, royalty-free license to use the WSOP intellectual property in connection with the operation of the in-person WSOP tournaments and the manufacture, advertisement, promotion, commercialization and sale of WSOP licensed products at CEOC's and its affiliates' properties. CIE acquired the right to host the tournament in 2011. Also, in 2011, CIE acquired the online and social gaming company

---

[1214] CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 3.

[1215] "Evercore Project Hermes Valuation Discussion Materials" (Oct. 21, 2013), at CEOC_INVESTIG_00249901 [CEOC_INVESTIG_00249739].

Playtika and engaged in other licensing and acquisitions to increase the profile and profitability of CIE.[1216]

As of December 31, 2013 (shortly after the closing of the Growth Transaction), in an analysis to estimate the value of CIE's common stock for the purpose of calculating stock compensation expense, PwC found that CIE's estimated business enterprise value was approximately $1.65 billion.[1217]   The Examiner has not adopted this valuation.

### iv.  The CEOC Notes

CEC also contributed to CGP $1.1 billion in face value of senior unsecured CEOC 5.625% notes due June 2015, which were owned by Harrah's BC, Inc., a subsidiary of CEC ("HBC").   As discussed in Section IX.A, *infra*, $427 million of the notes owned by HBC were repurchased less than one year later at par plus accrued together with a make whole premium.

### b.  Increasingly Concerned About Protecting Its Equity Investment in Caesars, Apollo Devises the Growth Transaction

As discussed in Section VIII.A, *supra*, Apollo identified a number of potential "strategic options" to address Caesars' liquidity concerns in June 2012, including the sale of Planet Hollywood to a third party and an initial public offering of CIE stock.[1218]

As further discussed in Section VIII.A, *supra*, an internal presentation prepared by Apollo in October 2012 described what would eventually become the Growth Transaction.[1219] Specifically, the presentation proposed a multi-step transaction to "invest equity to buy a controlling stake in strategically valuable unencumbered assets."[1220]   David Bonderman of TPG told the Examiner that the goal was to transfer properties with excess cash flow from CEOC to a newly-created entity.[1221]   The first step, according to the Apollo presentation, would be for the Sponsors and CEC to "contribute cash and assets to [the] new partnership," with the relative "[o]wnership of [the new] partnership [to be] based upon fair value of the contributed assets."[1222]

---

[1216]  G. Loveman Oct. 27, 2015 Tr. at 66:14-67:11.

[1217]  Caesars Interactive Entertainment, Inc. Common Stock Valuation (Jan. 31, 2013), at PWC-CZR-0025771, PWC-CZR-0025789 [PWC-CZR-0025767].

[1218]  *See* e-mail from A. van Hoek to M. Rowan (June 22, 2012), at APOLLO-Examiner_00019592 [APOLLO-Examiner_00019592], attaching "Caesars Entertainment Model and Capital Planning Considerations" (June 2012), [APOLLO-Examiner_00019594].

[1219]  E-mail from D. Sambur to M. Howell (Mar. 26, 2013), [PRIV_INVESTIG_00047906], attaching "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047907-964 [PRIV_INVESTIG_00047907].

[1220]  "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047908 [PRIV_INVESTIG_00047907].

[1221]  D. Bonderman Feb. 24, 2016 Tr. 195:7-196:4.

[1222]  "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG_00047937 [PRIV_INVESTIG_00047907].

It was contemplated that "Apollo and TPG [would] contribute $500 million of cash collectively," with other CEC shareholders being given a "pro-rata right to invest on [the] same basis," and CEC would contribute "its unencumbered assets (*i.e.*, equity interests in CIE, [CEOC] bonds, and other assets to be discussed."[1223]   The newly-formed partnership – CGP – would then use the proceeds of the investment from the Sponsors and other CEC shareholders to "invest[] capital in Caesars strategic growth projects at FMV" – fair market value.[1224]   Specifically, Apollo proposed from the outset that the new entity would purchase Planet Hollywood and "[t]akeover [the] funding liabilities in CEOC development projects," including, *inter alia*, the Horseshoe Baltimore.[1225]   Apollo met with Loveman on October 26, 2012 to discuss the proposed transaction.[1226]

### c.   The Growth Transaction Is Presented to the CEC Board

On November 12, 2012, Loveman, Tim Donovan and Paul Weiss presented the Growth Transaction to the CEC Board.[1227]   A "script" was prepared for Loveman and Donovan to use at the CEC Board Meeting,[1228] and a 29-page deck describing the proposed transaction was provided to the full Board.[1229]   The Growth Transaction was presented to the CEC Board as "an innovative value creation vehicle that will provide access to capital to fund growth, deleverage, and enhance the company's liquidity," all of which, it was stressed, would help to "continue to extend runway" for CEOC.[1230]   Specifically, Loveman's script identified the expected benefits of the proposed transaction as follows:

> First, the transaction helps Caesars's liquidity position at a time when Caesars is spending significant funds for development projects;

> Second, it gives Caesars additional cash to repurchase and retire debt to improve its leverage profile;

---

[1223]   *Id*.

[1224]   *Id.*

[1225]   *Id*.

[1226]   *See* e-mail from A. van Hoek to D. Sambur (Oct. 25, 2012) [APOLLO-Examiner_00516418], attaching "Caesars Entertainment Discussion Materials" (Oct. 2012), at APOLLO-Examiner_00516448 [APOLLO-Examiner_00516419].

[1227]   CEC Board of Directors Meeting Minutes (Nov. 12, 2012), at CEOC_INVESTIG_00163745 [CEOC_INVESTIG_00163745]; E-mail from R. Fieldston to M. Cohen (Nov. 10, 2012), at PW_EXAMINER_00233465 [PW_EXAMINER_00233465].

[1228]   E-mail from R. Fieldston to M. Cohen (Nov. 10, 2012), at PW_EXAMINER_00233465-66 [PW_EXAMINER_00233465], attaching "Outline and Talking Points for Full Board Meeting" (Nov. 10, 2012 ), at PW_EXAMINER_00233467-77 [PW_EXAMINER_00233467].

[1229]   Venture Partners Transaction and Rights Offering, Presentation to the Board of Directors (Nov. 12, 2012), at PW_EXAMINER_00016856-85 [PW_EXAMINER_00016856].

[1230]   *Id*. at PW_EXAMINER_00016857, PW_EXAMINER_00016864.

Third, it improves covenant headroom due to higher liquidity;

Fourth, we believe that this transaction is the lowest cost and least dilutive method of raising this much cash;

[Fifth, we expect that we and [CGP] will be able to leverage existing licenses in the pursuit of new opportunities.][1231]

Neither the script nor the deck provided to the CEC Board made any reference to a possible restructuring of CEOC and/or CEC or the desire to protect the Sponsors' or CEC's interests in the event thereof.  And the independent directors on the CEC Board, who were subsequently appointed to serve on the CEC Valuation Committee for the Growth Transaction, have told the Examiner that they were never told the transaction was intended, even in part, to provide "significant downside protection and ancillary benefits" to the Sponsors or to "strengthen" the Sponsors' or CEC's hand in the event of a restructuring.[1232]

Paul Weiss then walked the CEC Board through the components of the proposed transaction, including:  (i) the details of the rights offering that would create CAC and the Sponsors' corresponding commitment "if the Company proceeds with the transaction on the outlined terms, . . . to subscribe for their full pro rata allocation, amounting to a total of $500 million between them"; (ii) CEC's contribution of its interests in CIE and the CEOC notes to CGP; and (iii) CEOC's sale of "Planet Hollywood and certain joint venture interests to [CGP] in exchange for cash and potentially some additional consideration depending on how much cash is raised from the rights offering."[1233]

Apollo has explained that Planet Hollywood and Horseshoe Baltimore were selected for the Growth Transaction because they (i) were unrestricted subsidiaries of CEOC, and therefore could be sold without negatively impacting Caesar's compliance with debt covenants, and (ii) were not at that time contributing cash flow to service other debt.[1234]  Caesars would have

---

[1231] "Outline and Talking Points for Full Board Meeting" (Nov. 10, 2012), at PW_EXAMINER_00233476-77 [PW_EXAMINER_00233467] (brackets in original); *see also* Venture Partners Transaction and Rights Offering, Presentation to the Board of Directors (Nov. 12, 2012), at PW_EXAMINER_00016869 [PW_EXAMINER_00016856].  Apollo presented the same rationale to Evercore and their counsel in December 2012.  *See* e-mail from A. van Hoek to G. Ezring, *et al.* (Dec. 17, 2012) [PRIV_INVESTIG_00033221], attaching "Venture Partners Transaction and Rights Offering Overview" (Dec. 2012), at PRIV_INVESTIG_00033222-51 [PRIV_INVESTIG_00033222].

[1232] L. Swann Jan. 12, 2015 Tr. 114:16-115:13; C. Williams Jan. 13, 2016 Tr. at 189:7-190:6; J. Housenbold Jan. 22, 2016 Tr. at 7:9-8:13.

[1233] "Outline and Talking Points for Full Board Meeting" (Nov. 10, 2012), at PW_EXAMINER_00233470-72 [PW_EXAMINER_00233467]; *see also* Venture Partners Transaction and Rights Offering, Presentation to the Board of Directors (Nov. 12, 2012), at PW_EXAMINER_00016865-66 [PW_EXAMINER_00016856].

[1234] D. Sambur Oct. 29, 2015 Tr. at 324:22-325:15.

more flexibility in using the proceeds from the sale of an unrestricted subsidiary, and would be free to use the cash without restitution, including to buy back debt.[1235] Apollo considered other unrestricted subsidiaries, including the LINQ, Octavius and joint venture equities in Massachusetts and Ohio, but ultimately decided on Planet Hollywood and Horseshoe Baltimore because they were the largest unrestricted subsidiaries in the Caesars enterprise at the time.[1236]

The evidence indicates that, after the Growth Transaction was proposed to the CEC Board in November 2012, neither CEC nor the Sponsors considered any alternative transactions or other strategic options that might provide the same expected benefits of the Growth Transaction.[1237] Nor, as discussed below, was the CEC Valuation Committee that was subsequently formed authorized to "consider alternative transactions with alternative parties or alternative transactions with the Sponsors" or to "consider alternative sources of equity debt or other financing for Caesars."[1238] Among the alternatives not considered was providing CEOC any equity interest in the new venture instead of some of the cash consideration paid for Planet Hollywood or Horseshoe Baltimore.[1239] It has been suggested that doing so would have defeated one of the purposes of the transaction – providing liquidity to CEOC. That argument is not persuasive , however, given the fact that in late 2012 and 2013, CEOC was called upon to repay to CEC over $400 million of the intercompany loan with CEC.[1240]

### d.  Lack of CEOC Involvement or Representation

The CEC Board was advised to establish a valuation committee "empowered to determine [the] fair value for the assets to be both sold and contributed" to CGP.[1241]No consideration was given to establishing a similar committee of independent CEOC directors to negotiate or evaluate the Growth Transaction; in fact, as noted above, there were no independent CEOC directors at that time or at any time prior to late June 2014. Nor was consideration given to providing CEOC with independent legal and/or financial advisors. Rather, according to CEC

---

[1235]  A. van Hoek Sept. 25, 2015 Tr. at 230:8-231:17.

[1236]  A. van Hoek Sept. 25, 2015 Tr. at 231:18-232:3; M. Rowan Nov. 16, 2015 Tr. at 178:12-180:7; e-mail from D. Sambur to G. Ezring, *et al.* (Oct. 17, 2012), at APOLLO-Examiner_00650929 [APOLLO-Examiner_00650929], attaching "CGVP Discussion Items," at APOLLO-Examiner_00650930 [APOLLO-Examiner_00650930].

[1237]  M. Rowan Nov. 16, 2015 Tr. at 189:15-190:3; D. Sambur Oct. 29, 2015 Tr. at 339:14-25; G. Kranias Oct. 23, 2015 Tr. at 179:3-6; E. Hession Nov. 3, 2015 Tr. at 231:15-17 ("In terms of coming up with a specific alternative for this transaction, no, not to my knowledge.").

[1238]  Letter from CEC Valuation Committee to CEC Board with the "Original Committee Charter" and "Amended Committee Charter" (Apr. 21, 2013), at CEOC_INVESTIG_00514726-27, CEOC_INVESTIG_00514930-32 [CEOC_INVESTIG_00514717].

[1239]  M. Rowan Nov. 16, 2015 Tr. at 182:4-8.

[1240]  *See infra* Section IX.E.

[1241]  G. Loveman Outline and Talking Points for Full Board Meeting (Nov. 10, 2012), at PW_EXAMINER_00233473-74 [PW_EXAMINER_00233467].

and the Sponsors, the transaction was viewed as being in the collective interest of the Caesars enterprise overall.[1242]

No analysis was undertaken to determine whether CEOC was solvent at the time,[1243] and no one was charged with specific responsibility to consider the potential impact of the transaction solely from the point of view of CEOC or CEOC's creditors.[1244] Notwithstanding the documents discussed above, the Sponsors have told the Examiner that they were not concerned at this time about a potential CEOC bankruptcy,[1245] while acknowledging that there were "general discussions" concerning a potential CEOC bankruptcy by the time the transaction closed[1246] and that "the whole puzzle we were trying to solve for years was how to avoid bankruptcy."[1247]   Further, Apollo partner David Sambur indicated that "fraudulent conveyance

---

[1242]  A. van Hoek Sept. 25, 2015 Tr. at 239:2-3 ("I believe that what was good for CEOC would be good for CEC at that time."); G. Kranias Oct. 23, 2015 Tr. at 174:19-21 ("At the time CEOC was a wholly-owned sub of CEC, so we didn't think that CEOC needed its own independent rights."); K. Davis Oct. 22, 2015 Tr. at 158:25-159:4 ("CEOC was a wholly-owned subsidiary of CEC and we were acting in the interests of all CEC shareholders in those – in our roles as director there.").

[1243]  G. Kranias Oct. 23, 2015 Tr. at 179:7-14; K. Davis Oct. 22, 2015 Tr. at 132:24-134:7, 151:22-153:11; T. Dunn Oct. 29, 2015 Tr. at 55:13-57:5, 130:5-131:18; D. Bonderman Nov. 10, 2015 Tr. at 98:22-99:10; E. Hession Nov. 3, 2015 Tr. at 261:19-262:8; D. Sambur Oct. 29, 2015 Tr. at 363:12-364:6 ("[T]he whole puzzle we were trying to solve for years was how to avoid bankruptcy and how to avoid a restructuring.  It was not to liquidate or loot or whatever you want to call it and people can say what they want, but I'm telling you, and I'll keep telling you that that is entirely the puzzle we were trying to solve.  That's why the assets were selected in the manner they were selected.  Never were assets selected that would have a negative impact on covenants, liquidity and ability to service debt at CEOC.  Everything was designed about pushing out maturities, being liquid, reducing debt, building covenant headroom, and for good reason, because there was a constant effort to continue to work our way out of the leverage issues.").

[1244]  L. Swann Oct. 12, 2015 Tr. at 24:7-10; C. Williams Oct. 12, 2015 Tr. at 31:17-21.  Some witnesses stated it was their belief at this time that CEOC was solvent.  T. Donovan Nov. 10, 2015 Tr. at 77:6-78:5; M. Rowan Nov. 16, 2015 Tr. at 230:3-16, 232:3-12, 241:8-244:2.  *See supra* Section V for a further discussion of this issue.

[1245]  D. Sambur Oct. 29, 2015 Tr. at 326:17-328:23 ("It wasn't that there was a concern that there was some impending bankruptcy.").

[1246]  D. Sambur Jan. 14, 2016 Tr. at 655:16-656:22 (Q: "Do you recall having any discussions with anybody in the fall of 2013 about anything, any issues like this that may arise in connection with a potential CEOC bankruptcy?  A: General discussions perhaps, but not this detail, no."); *id.* at 656:6-657:13 ("[T]here was a possibility that there could be a bankruptcy, sure."); *id.* at 718:16-19 ("[A CEOC bankruptcy] was a possibility.  It wasn't a base assumption, but it was definitely a possibility.").

[1247]  D. Sambur Oct. 29, 2015 Tr. at 363:12-14.

was one of the risks" the Sponsors considered in structuring the transaction.[1248]  What witnesses had to say was to some extent inconsistent.  They repeatedly denied using or discussing the buzzwords "insolvency" or "bankruptcy," but their testimony as a whole and the documentary record support the conclusion that the severity of CEOC's financial condition and the risk of bankruptcy was uppermost in the Sponsors' minds at all relevant times, even though it was something they wanted to avoid and did not anticipate happening in the near term.

### e.  CEC Valuation Committee

### i.  Formation

In the months leading up to the November 2012 presentation to the CEC Board regarding the Growth Transaction, Caesars sought advice from two separate law firms – Paul Weiss and Wilson Sonsini – concerning, *inter alia*, whether CEC should establish an independent committee of directors to consider the transaction.[1249]  The evidence makes clear that the sole concern in this regard was insulating the CEC Board and Sponsors from potential claims by CEC shareholders – not by creditors or other stakeholders of CEOC.[1250]  This concern arose out of the fact that the Sponsors were on both sides of the transaction.[1251]

---

[1248]  D. Sambur Jan. 14, 2016 Tr. at 717:3-8 ("I certainly remember when all of these transactions were designed or other transactions were contemplated, we thoroughly looked at all the risks, and certainly fraudulent conveyance was one of the risks and considerations."); *id.* at 718:4-9 ("[I]t certainly was a possibility.  I mean, the company had a large amount of leverage. It was free cash flow negative.  There were several transactions done to avoid this outcome."); *see also* A. Kornberg Nov. 11, 2015 Tr. at 55:7-56:14.

[1249]  *See* T. Donovan Dec. 2, 2015 Tr. at 198:19-202:4.

[1250]  T. Donovan Dec. 2, 2015 Tr. at 231:6-22; e-mail from W. Chandler to T. Donovan, *et al.* (Oct. 10, 2012) [CEC_Examiner_1308267], attaching "Venture Partners Rights Offering Talking Points for Caesars" (Oct. 10, 2012), at CEC_Examiner_1308268-72 [CEC_Examiner_1308268].

[1251]  K. Davis Oct. 22, 2015 Tr. at 136:6-21 ("I think that transaction contemplated the sale of assets from CEC and CEOC to a new entity whose shareholders were going to be – were going to overlap to a certain extent with the shareholders of CEC but were going to include shareholdings in a different composition and perhaps different shareholders altogether in a certain case, so given that the Sponsors were on both sides of that transaction, in fact, I think were the controlling shareholders of both sides of that transaction, it was clearly necessary to have an independent party on behalf of CEC weigh the merits of that transaction in discussions with the Sponsors representing their interests at CAC on the other side of those discussions."); G. Kranias Oct. 23, 2015 Tr. at 168:14-24 (CEC Valuation committee set up "[b]ecause TPG and Apollo were existing shareholders of the company and would participate in the new vehicle, and so we were viewed as being interested parties and needed independent directors to represent Caesars in connection with the transaction.").

Initially, Caesars received advice from Paul Weiss suggesting that CEC did not need to form an independent committee.[1252]  When asked by the Examiner about the advice Caesars had received from Paul Weiss, Donovan stated:

> [W]e were having discussions about what would be the appropriate process given the ownership structure, if you will, and given the fact that we were talking about a transaction where, you know, key shareholders would be on both sides of the transaction.  And I think the initial view, and it was a view because we were having ongoing discussions, was that we did not need to, and this is Paul Weiss's view, we did not need to – they believed it was business judgment and we did not need to have a special committee set up to handle this process because the consideration going through each of the shareholder constituents, both those that own the company or primarily did and those that did not was the same and the opportunities available to all constituents were the same.[1253]

Donovan told the Examiner, however, that he disagreed with Paul Weiss's tentative conclusion:  "I felt quite honestly that this did require a special committee, and . . . I felt that I needed to reach out to [someone of] similar statu[r]e in Delaware law to see . . . what were their thoughts regarding this."[1254]  As a result, Donovan engaged Wilson Sonsini to provide a second opinion.[1255]  Utilizing talking points provided by Wilson Sonsini, Donovan and Cohen had further discussions with Paul Weiss and ultimately agreed to the formation of a valuation committee in connection with the Growth Transaction.[1256]  None of those involved, however, considered the implications of a potential CEOC insolvency on appropriate governance.

On November 14, 2012, the CEC Board approved resolutions to form the CEC Valuation Committee to engage in a process to determine the fair market value of (i) the assets to be sold and contributed to CGP, (ii) the non-voting units of CGP to be received by CEC, and (iii) the service agreements and other support arrangements entered into between CEC and CGP.[1257]  The CEC Valuation Committee consisted of three independent directors:  Jeffrey Housenbold, Lynn Swann and Christopher Williams.[1258]  Williams was named the chair of the CEC Valuation Committee on December 12, 2012.[1259]

---

[1252] *See* T. Donovan Dec. 2, 2015 Tr. at 199:2-21.

[1253] *Id.*

[1254] *Id.* at 199:22-200:15.

[1255] *Id.*

[1256] *See* T. Donovan Dec. 2, 2015 Tr. at 208:16-209:15.

[1257] CEC Board of Directors Meeting Minutes (Nov. 14, 2012), at CEOC_INVESTIG_00125859 [CEOC_INVESTIG_00125856].

[1258] *Id.* at CEOC_INVESTIG_00125860.

[1259] Letter from CEC Valuation Committee to CEC Board (Apr. 21, 2013), at CEOC_INVESTIG_00514718 [CEOC_INVESTIG_00514717].

### ii. The CEC Valuation Committee's Mandate

According to the resolutions of the CEC Board approved on November 14, 2012, the CEC Valuation Committee was authorized to:  (i) determine the fair market value of the assets to be sold and contributed to CGP and the non-voting units to be received by CEC; (ii) engage in any discussions necessary to come to a determination of the fair market value; (iii) evaluate and approve the fairness of any service agreements and other support arrangements between CEC and CGP; and (iv) retain independent financial and legal advisors as necessary to advise the Valuation Committee regarding the transaction at CEC's expense.[1260]

The original Valuation Committee Charter was adopted as of November 14, 2012.[1261]  On February 8, 2013, the Valuation Committee Charter was amended to clarify that the Committee also had the power to negotiate with the Sponsors regarding the pre-selected assets and to reject any proposals made by the Sponsors.[1262]

Even with this amendment, the CEC Valuation Committee was bound by several limitations.[1263]  Notably, the Valuation Committee lacked the ability to propose or consider any equity role for CEOC in CGP, something an independent CEOC committee might have considered and bargained for.  In addition, as the Committee itself observed, because its "work was limited to a determination as to whether the final proposal by the Sponsors reflected fair market value for the acquired assets and the contributed assets," "the following limitations apply with respect to the Committee's work and conclusion":

- "The Committee is not making a recommendation to the board as to whether to approve the Transaction."

- "The Committee is not making a recommendation to any stockholder as to whether to participate in the Transaction."

- "The Committee did not seek to market any of the assets to third parties or seek proposals for the sale of any assets from anyone other than the Sponsors."

- "The Committee did not seek any changes in which assets Growth Partners would receive or acquire from Caesars."

---

[1260] CEC Board of Directors Meeting Minutes (Nov. 14, 2012), at CEOC_INVESTIG_00125859-60 [CEOC_INVESTIG_00125856].

[1261] *Id.* at CEOC_INVESTIG_00125862.

[1262] Letter from CEC Valuation Committee to CEC Board attaching "Amended Committee Charter" (Apr. 21, 2013), at CEOC_INVESTIG_00514931 [CEOC_INVESTIG_00514717].

[1263] E. Hession Nov. 3, 2015 Tr. at 229:5-231:17; M. Rowan Nov. 16, 2015 Tr. at 187:9-188:17; G. Loveman Oct. 27, 2015 Tr. at 145:23-152:17.

- "The Committee did not consider alternate sources of equity, debt or other financing for Caesars."[1264]

The evidence indicates that: (i) neither CEC nor the Sponsors considered giving the CEC Valuation Committee a broader mandate; and (ii) the Valuation Committee did not consider or recommend alternative transactions.[1265]

### iii. The CEC Valuation Committee Retains Legal and Financial Advisors

#### (A) Morrison & Foerster

The CEC Valuation Committee retained Morrison & Foerster LLP ("MoFo") as its legal advisor after considering several law firms recommended by each of the Valuation Committee members.[1266] Housenbold had a prior relationship with the law firm, as MoFo had previously done work for Shutterfly, Inc. (where Housenbold was previously President and CEO).[1267]

#### (B) Evercore

In December 2012, the CEC Valuation Committee met with several potential financial advisors, including Evercore.[1268] Evercore had been invited to pitch for the Growth Transaction by Housenbold, who had a prior business relationship with Evercore.[1269] On December 18, 2012, Evercore was informed that it was selected to function as the CEC Valuation Committee's financial advisor.[1270]

The CEC Valuation Committee, with the assistance of MoFo, and Evercore negotiated the terms of Evercore's engagement letter, which was executed on January 1, 2013. According to the January 2013 engagement letter, Evercore's mandate was to (i) value the assets in connection with the Growth Transaction, as well as the equity received by CEC, (ii) provide financial advisory services to the Valuation Committee, and (iii) prepare a written report

---

[1264] Letter from CEC Valuation Committee to CEC Board (Apr. 21, 2013), at CEOC_INVESTIG_00514725-27 [CEOC_INVESTIG_00514717].

[1265] B. Finnegan Nov. 16, 2015 Tr. at 188:23-193:18; D. Bonderman Nov. 10, 2015 Tr. at 84:24-85:13.

[1266] J. Housenbold Oct. 9, 2015 Tr. at 36:17-39:3; C. Williams Oct. 12, 2015 Tr. at 59:6-16; L. Swann Oct. 12, 2015 Tr. at 26:11-21.

[1267] J. Housenbold Oct. 9, 2015 Tr. at 38:12-39:3; C. Williams Oct. 12, 2015 Tr. at 59:11-12.

[1268] CEC Valuation Committee Meeting Minutes (Dec. 14, 2012), at MORRISON00000001-2 [MORRISON00000001].

[1269] N. Bryson Sept. 28, 2015 Tr. at 8:15-9:18.

[1270] N. Bryson Sept. 28, 2015 Tr. at 10:24-11:4.

summarizing its valuation.[1271]  Evercore also played an important role in the negotiations of the Growth Transaction with the Sponsors.

On April 17, 2013, the CEC Valuation Committee and Evercore entered into a second engagement letter.[1272]  Pursuant to the April 2013 engagement letter, Evercore's mandate was to provide a fairness opinion regarding the Growth Transaction.[1273]

According to both Evercore engagement letters, Evercore's fee structure included:  (i) a $1 million fee upon delivery of a valuation report; (ii) a $1 million advisory fee; (iii) a discretionary fee not to exceed $3 million to be paid at the conclusion of the assignment; (iv) a $3.5 million fee upon delivery of a fairness opinion; and (v) a $500,000 fee for each bringdown opinion rendered by Evercore.[1274]  According to Evercore, its client was CEC and the CEC Valuation Committee, not CEOC.[1275]

### (C)  VRC

On June 4, 2013, the CEC Valuation Committee also engaged VRC as its financial advisor.  VRC's mandate included providing financial advisory services to the Valuation Committee and providing to the Valuation Committee and CEC Board a fairness opinion regarding the management services agreement between CGP and CAC in connection with the Growth Transaction.[1276]  VRC was provided the following facts:

> Under the Management Agreement, CEC, CEOC, and/or certain of its or their subsidiaries will provide corporate and back office support and advisory and management services (the "Management Services") to CAC, CGP and their current and future subsidiaries.  In exchange for the Management Services, CAC and [CGP] will pay a service fee equal to CEC and CEOC's all-in . . . cost of

---

[1271] Evercore Engagement Letter (Jan. 21, 2013), at CEOC_INVESTIG_00128462 [CEOC_INVESTIG_00128462].

[1272] Evercore Engagement Letter (Apr. 17, 2013), at EVERCORE_0059078-83 [EVERCORE_0059078].

[1273] *Id.*

[1274] Evercore Engagement Letter (Jan. 21, 2013), at CEOC_INVESTIG_00128462-63 [CEOC_INVESTIG_00128462]; Evercore Engagement Letter (Apr. 17, 2013), at EVERCORE_0059078-79 [EVERCORE_0059078].  Evercore was, in fact, paid a discretionary fee of $2.25 million and a total of $6.75 million for its engagement in connection with the Growth Transaction.  N. Bryson Sept. 28 Tr. at 28:2-29:7; Evercore Group Invoice (May 24, 2013), at CEOC_INVESTIG_00103741 [CEOC_INVESTIG_00103741].

[1275] N. Bryson Sept. 28, 2015 Tr. at 14:11-22, 29:13-30:9, 66:24-68:7; Letter from Evercore to CEC Board of Directors (Oct. 21, 2013), at CEOC_INVESTIG_00171760 [CEOC_INVESTIG_00171760].

[1276] VRC Presentation to the CEC Valuation Committee (Oct. 21, 2013), at CEOC_INVESTIG_00544483 [CEOC_INVESTIG_00544478]; VRC Engagement Letter (June 4, 2013), at VRC00011146 [VRC00011141].

providing such services plus a margin of 10% (the "Services Fee").   In addition, . . . it is contemplated that the Company will sell to [CGP] a 50% financial stake in the existing management fee stream of PHW Manager, LLC under the Hotel and Casino Management Agreement, by and between PHW Manager, LLC and PHW Las Vegas, LLC, dated as of February 19, 2010.[1277]

VRC's fee structure included:  (i) a report fee of $150,000.00, exclusive of expenses, for delivery of the valuation report; and (ii) an opinion fee of $75,000 for each written opinion related to the Management Agreement or the Planet Hollywood Management Stream.[1278]  In its engagement letter, VRC disclosed its prior relationship with Apollo, which Chad Rucker of VRC described as "significant."[1279]

### f.   The Sponsors and the CEC Valuation Committee Negotiate the Transaction

### i.   Initial Discussions

In December 2012, Apollo made a presentation to the CEC Valuation Committee, Evercore, and MoFo to provide an introduction on the transaction regarding its structure and rationale along the lines of the materials that were initially presented to the Board in November.[1280]   In the presentation, Apollo identified the assets to be sold by CEOC, the proposed structure of the deal, and the ostensible benefits of the transaction.[1281]

On January 3, 2013, the Sponsors made another presentation to Evercore and MoFo, which set forth the Sponsors' initial views on valuation for the Growth assets.[1282]   The presentation contained, *inter alia*, comparisons between management's and the Sponsors' competing financial projections for Planet Hollywood and Horseshoe Baltimore, which are reproduced in Growth Figures 6 and 7 below.[1283]

---

[1277] VRC Presentation to the CEC Valuation Committee (Oct. 21, 2013), at CEOC_INVESTIG_00544482 [CEOC_INVESTIG_00544478].

[1278] VRC Engagement Letter (June 4, 2013), at VRC00011146 [VRC00011141].

[1279] C. Rucker Sept. 25, 2015 Tr. at 52:21-54:16.

[1280] E-mail from A. van Hoek to G. Ezring, *et al.* (Dec. 17, 2012) [PRIV_INVESTIG_00033221], attaching "Venture Partners Transaction and Rights Offering: Overview" (Dec. 2012), at PRIV_INVESTIG_00033222-51 [PRIV_INVESTIG_00033222].

[1281] *Id.*

[1282] "Caesars Valuation Materials" (Jan. 3, 2013), at CEOC_INVESTIG_00272251-305 [CEOC_INVESTIG_00272251].

[1283] *Id.* at CEOC_INVESTIG_00272282, CEOC_INVESTIG_00272289, CEOC_INVESTIG_00272273.

**Growth Figure 6:  Planet Hollywood Comparison**

## Management Case

| ($ in millions) | 2011A | 2012E | 2013E | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|---|
| | | | FYE December 31, | | | |
| Revenue | $307 | $304 | $317 | $331 | $348 | $365 |
| *Revenue Growth* | | *(1.0%)* | *4.3%* | *4.6%* | *5.0%* | *5.0%* |
| | | | | | | |
| EBITDAM | $92 | $86 | $94 | $105 | $118 | $131 |
| *EBITDAM Margin* | *29.9%* | *28.3%* | *29.5%* | *31.7%* | *33.8%* | *35.9%* ❶ |
| | | | | | | |
| Management Fees | (16) | (16) | (17) | (17) | (18) | (18) |
| | | | | | | |
| EBITDA | $76 | $70 | $77 | $88 | $100 | $113 |
| Less: D&A | | (25) | (25) | (25) | (25) | (25) |
| **EBIT** | | **$44** | **$51** | **$63** | **$75** | **$87** |
| Unlevered Taxes  35% | | (16) | (18) | (22) | (26) | (31) |
| D&A | | 25 | 25 | 25 | 25 | 25 |
| Capex | | (9) | (10) | (11) | (12) | (12) ❷ |
| *% of Revenue* | | *2.9%* | *3.0%* | *3.4%* | *3.4%* | *3.3%* |
| Change in Working Capital | | -- | -- | -- | -- | -- |
| **Unlevered Free Cash Flow** | | **$45** | **$49** | **$55** | **$62** | **$70** |

## Sponsor Case

| ($ in millions) | 2011A | 2012E | 2013E | 2014E | 2015E | 2016E |
|---|---|---|---|---|---|---|
| | | | FYE December 31, | | | |
| Revenue | $307 | $304 | $313 | $322 | $332 | $342 |
| *Revenue Growth* | | *(1.0%)* | *3.0%* | *3.0%* | *3.0%* | *3.0%* |
| | | | | | | |
| EBITDAM | $92 | $86 | $91 | $97 | $103 | $109 |
| *EBITDAM Margin* | *29.9%* | *28.3%* | *29.2%* | *30.1%* | *31.0%* | *31.8%* ❶ |
| | | | | | | |
| Management Fees [1] | (16) | (16) | (17) | (16) | (17) | (17) |
| | | | | | | |
| EBITDA | $76 | $70 | $75 | $81 | $86 | $91 |
| Less: D&A | | (25) | (25) | (25) | (25) | (25) |
| **EBIT** | | **$44** | **$49** | **$55** | **$61** | **$66** |
| Unlevered Taxes  35% | | (16) | (17) | (19) | (21) | (23) |
| D&A | | 25 | 25 | 25 | 25 | 25 |
| Capex | | (9) | (19) | (19) | (20) | (20) ❷ |
| *% of Revenue* | | *2.9%* | *6.0%* | *6.0%* | *6.0%* | *6.0%* |
| Change in Working Capital | | -- | -- | -- | -- | -- |
| **Unlevered Free Cash Flow** | | **$45** | **$39** | **$42** | **$45** | **$48** |

❶ Sponsor case assumes a 60% contribution margin on incremental revenue over the prior year

❷ Sponsor case assumes 6% capex as a % of revenue to account for normal renovation cycle

1. Calculated using 4.5% of EBITDAM and using Company's estimates on management fees on gross operating revenue

### Growth Figure 7:  Horseshoe Baltimore Comparison

**Management Case**

| ($ in millions) | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Non-Gaming Revenue | $34 | $39 | $36 | $37 | $38 |
| **Slot Revenue** | **$331** | **$376** | **$353** | **$361** | **$368** |
| Positions | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| WPU | $336 | $381 | $359 | $366 | $373 |
| **Table Revenue** | **$68** | **$78** | **$73** | **$74** | **$76** |
| Positions | 100 | 100 | 100 | 100 | 100 |
| WPU | $1,874 | $2,124 | $1,999 | $2,039 | $2,080 |
| **Poker Revenue** | **$8** | **$9** | **$9** | **$9** | **$9** |
| Less: Promotional Expenses | $44 | $50 | $47 | $48 | $49 |
| **Net Revenue** | **$398** | **$452** | **$424** | **$433** | **$442** |
| | | | | | |
| Gaming Taxes & Fees | $203 | $229 | $194 | $197 | $201 |
| Payroll Expenses | $40 | $41 | $41 | $40 | $40 |
| *% of Net Revenue* | *10%* | *9%* | *10%* | *9%* | *9%* |
| Cost of Goods Sold (F&B) | $7 | $8 | $7 | $8 | $8 |
| *% of Net Revenue* | *2%* | *2%* | *2%* | *2%* | *2%* |
| Other Department Expenses | $78 | $84 | $81 | $83 | $86 |
| *% of Net Revenue* | *20%* | *19%* | *19%* | *19%* | *19%* |
| Total Expenses | $328 | $361 | $323 | $328 | $335 |
| | | | | | |
| **EBITDAM** | **$71** | **$90** | **$101** | **$105** | **$107** |
| *EBITDAM Margin* | *17.7%* | *20.0%* | *23.8%* | *24.4%* | *24.2%* |
| Management Fee | $12 | $14 | $14 | $15 | $15 |
| **EBITDA** | **$58** | **$76** | **$87** | **$91** | **$92** |
| *EBITDA Margin* | *14.7%* | *16.8%* | *20.4%* | *20.9%* | *20.8%* |

**Sponsor Case**

| ($ in millions) | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| Non-Gaming Revenue | $34 | $39 | $36 | $37 | $38 |
| **Slot Revenue** | **$282** | **$319** | **$300** | **$306** | **$313** |
| Positions | 2,700 | 2,700 | 2,700 | 2,700 | 2,700 |
| WPU | $286 | $324 | $305 | $311 | $317 |
| **Table Revenue** | **$68** | **$78** | **$73** | **$74** | **$76** |
| Positions | 100 | 100 | 100 | 100 | 100 |
| WPU | $1,874 | $2,124 | $1,999 | $2,039 | $2,080 |
| **Poker Revenue** | **$8** | **$9** | **$9** | **$9** | **$9** |
| Less: Promotional Expenses | $39 | $45 | $42 | $43 | $44 |
| **Net Revenue** | **$353** | **$401** | **$376** | **$385** | **$392** |
| | | | | | |
| **EBITDAM** | **$53** | **$68** | **$75** | **$77** | **$78** |
| *EBITDAM Margin* | *15.0%* | *17.0%* | *20.0%* | *20.0%* | *20.0%* |
| Management Fee | $11 | $12 | $12 | $12 | $13 |
| **EBITDA** | **$43** | **$56** | **$63** | **$65** | **$66** |
| *EBITDA Margin* | *12.0%* | *14.0%* | *16.8%* | *16.8%* | *16.8%* |

❶ Maryland WPU Sponsor assumption based on comps

❷ Sponsor case assumes 20% EBITDAM run-rate margin after the tax step-down and adjusts EBITDAM margins in prior years proportionally

Note: Portions of the management fee are also paid to Rock and other parties

Moreover, at this time the Sponsors valued CIE at only $459 to $677 million, which was significantly less than the PwC valuation.[1284] As of December 31, 2012, PwC would value the CIE business enterprise at approximately $███ billion.[1285]

After the presentation, Evercore provided the CEC Valuation Committee with a preliminary evaluation of the methods used by the Sponsors, and the Committee directed Evercore to report back with an independent analysis of, and preliminary feedback on, the Sponsors' methodology and inputs.[1286]  In connection with this mandate, Evercore was provided in January 2013 with financial projections prepared by CEC management which, subject to only minor adjustments, were the projections upon which Evercore primarily relied throughout its engagement.[1287]

---

[1284] *Id.* at CEOC_INVESTIG_00272278.

[1285] "Caesars Interactive Entertainment, Inc. Common Stock Valuation" (Feb. 18, 2013), at CACEXAM00119694 [CACEXAM00119673].

[1286] Valuation Committee Meeting Minutes (Jan. 4, 2013), at MORRISON00000008 [MORRISON00000008].

[1287] "Evercore Caesars Valuation Materials Presentation" (Jan. 3, 2013), at CEOC_INVESTIG_00285549-603 [CEOC_INVESTIG_00285549].

Ultimately, the projections Evercore utilized were more than nine months outdated at the time the Growth Transaction closed.[1288]   These outdated projections were used even though numerous more recent sets of projections existed as of the transfer date, including the LRP from Q1, Q2, and Q3 2013.  Evercore sent numerous diligence request lists to Caesars throughout 2013 prior to issuing its final report in October.  In each diligence request, Evercore inquired as to whether or not updated long-term projections were available.[1289]   According to Bryson, Evercore was told that there were not any updated projections.[1290]

However, in reality Caesars continued to modify its long-term projections throughout 2013, with material increases to the projected EBITDA.  Based upon the material increases to the long-range plan during 2013, Evercore should have been provided with, and should have utilized, the most current LRP available as of the time of the transaction rather than continuing to use projections that were more than nine months old.[1291]

### ii.  Evercore's Preliminary Analysis

On January 21, 2013, Evercore presented its preliminary analysis to the CEC Valuation Committee.[1292]   Specifically, Evercore reviewed "the methods and analyses [it] had performed in reaching its preliminary conclusions as to the fair market value of (i) the various assets to be contributed or sold in the transaction and (ii) the equity in [CGP] to be received by Caesars in

---

[1288]  As discussed below, Evercore relied on projections that it received from Caesars management in January 2013, which were nearly identical to those contained in Caesars' Q4 2012 LRP.  Prior to the closing of the Growth Transaction, Evercore made only two adjustments to these projections:  (i) in April 2013, Evercore lowered the expected EBITDA projection for 2013 from $94 million to $88 million based on instruction from management; and (ii) in July 2013, Evercore reallocated the projected capital expenditures due to Project Songbird, but did not make any corresponding adjustment to revenue or EBITDA.  Thus, aside from these two adjustments, Evercore relied on projections that were more than nine months old at the time of closing.

[1289]  "Project   Hermes   Diligence   Question   List"   (Apr.   11,   2013),   at CEOC_INVESTIG_00105999-  6001  [CEOC_INVESTIG_00105999];  "Project  Hermes Diligence   Questions   (July   15,   2013),   at   CEOC_INVESTIG_00107055-58 [CEOC_INVESTIG_00107055]; Project Hermes Diligence Questions (Oct. 6, 2013), at EVERCORE_0054811 [EVERCORE_0054809].

[1290]  N. Bryson Sept. 28, 2015 Tr. at 115:23-116:2.

[1291]  At a minimum, Evercore should have been provided with the Q2 2013 LRP.  However, it is likely that the Q3 2013 LRP would have been available in October 2013, as Robert Brimmer indicated that the LRP was typically provided to the accounting group in the last month of the quarter.  R. Brimmer Sept. 29, 2015 Tr. at 55:25-56:21.

[1292]  *See* Valuation Committee Meeting Minutes (Jan. 21, 2013),  at MORRISON00000013 [MORRISON00000013]; Valuation Committee Memorandum (Apr. 21, 2013), at CEOC_INVESTIG_00514721,                                    CEOC_INVESTIG_00514933-936 [CEOC_INVESTIG_00514717]; *see also* "Project Hermes Discussion Materials" (Jan. 21, 2013), at MORRISON00000418-571 [MORRISON00000418].

exchange for the assets being contributed, taking into consideration the valuation implications of the structural terms of the proposed transaction."[1293]    Evercore also discussed, *inter alia*, "significant factors affecting value for each component and for the equity being received."[1294] At that time, Evercore valued (i) Planet Hollywood at $231-$358 million, (ii) Horseshoe Baltimore at $51-$72 million, and (iii) the Horseshoe Baltimore management fee rights at $18-$27 million.[1295]

The CEC Valuation Committee met again on January 24 and 28, 2013 to discuss Evercore's preliminary analysis.[1296]    In response, "Evercore highlighted for the Committee the sources of the material differences between the values set forth in Evercore's initial analysis . . . and the [Sponsors'] views on valuation of the various assets."[1297]    As discussed below, the largest material difference existed between the Committee's and the Sponsors' valuation of CIE. For each asset, material differences in method or valuation were discussed, and the pros and cons of Evercore's methods were debated.[1298]    Evercore also "explained certain structural aspects of the transaction that Evercore viewed as potentially having a significant impact on value, including liquidity, a lack of governance rights, the 12.5% preferred return that the sponsors had proposed, and the post-closing true-up with respect to the value of the bonds."[1299]

### iii. The Sponsors and the CEC Valuation Committee Exchange Proposals

In late February 2013, the Sponsors and the CEC Valuation Committee, through Evercore, began to negotiate the transaction.  Notably, for the Growth Transaction, the Sponsors took an active role in the negotiation process, which was distinct from their role in the later Four Properties Transaction.[1300]    Unlike the Four Properties Transaction, in which the Sponsors' role

---

[1293]    *See* Valuation Committee Meeting Minutes (Jan. 21, 2013), at MORRISON00000013 [MORRISON00000013].

[1294]    *Id.*

[1295]    "Project Hermes Discussion Materials" (Jan. 21, 2013), at MORRISON00000437 [MORRISON00000418].

[1296]    CEC Valuation Committee Meeting Minutes (Jan. 24, 2013), at MORRISON00000015 [MORRISON00000015]; CEC Valuation Committee Meeting Minutes (Jan. 28, 2013), at MORRISON00000018 [MORRISON00000017].

[1297]    CEC Valuation Committee Meeting Minutes (Jan. 28, 2013), at MORRISON00000018 [MORRISON00000017].

[1298]    *Id.*

[1299]    *Id.*

[1300]    A. van Hoek Sept. 25, 2015 Tr. at 268:11-25 ("I think this is the only transaction where we were – with any active role in determining value or, sorry, where we had an active role in negotiating value.  And the other deals, we were, you know, independent committees who were doing that where we could be helpful in terms of gathering information for Lenders and things we would help to do that.  But this is the only case that I can remember where we took management's numbers, changed them, lowered them, and then ran an analysis to see what the impact was."); M. Rowan Nov. 16, 2015 Tr. at 204:18-205:24 (on the difference between

during negotiations was limited to presenting information, the Sponsors took an active role in the Growth Transaction in analyzing the valuation figures provided by management. They did so because CAC and CGP did not yet exist and so they negotiated on behalf of these entities in formation. The Sponsors did not engage any financial advisors to assist them during the negotiation of the Growth Transaction, but rather analyzed and responded to the proposals from Evercore themselves.[1301] Sambur of Apollo took the lead in negotiating on behalf of the Sponsors.[1302] Van Hoek of Apollo and Greg Kranias, Kendall Garrison, Steven Gao, and Andrew Krumholz of TPG also worked with Sambur on the Sponsors' side.[1303] Nancy Bryson, Marty Cicco, Jonathan Knee, and Eduardo Mestre took the lead on behalf of Evercore.[1304]

The negotiation process would continue through mid-April 2013 and entailed considerable back-and-forth between Evercore and the Sponsors. It was characterized by the Sponsors as a "brutal" and "very tough" negotiation.[1305] Similarly, Evercore considered the negotiation a "long contentious discussion."[1306] However, the source of contention did not appear to be focused on the negotiations concerning the valuation of Planet Hollywood or Horseshoe Baltimore. Indeed, as discussed in greater detail below, even after the purchase price for Planet Hollywood and Horseshoe Baltimore had been reached, negotiations continued over aspects of the rights offering.

### (A) The Sponsors' Initial Proposal

On February 19, 2013, the Sponsors delivered their initial proposal to the CEC Valuation Committee, which included an offer to acquire Planet Hollywood for $225 million and Horseshoe Baltimore for $55 million, inclusive of management fee rights, for a total of $280

---

presenting views and actual negotiations ("[o]ne is passive and one is active. It was as if this is the valuation, if you don't like it, there is no transaction, versus this is a valuation, here is why we like this valuation, we want a higher valuation, maybe we can give you a little more, maybe we can compromise. It was a much more active dialogue.")).

[1301] A. van Hoek Sept. 25, 2015 Tr. at 255:1-256:7 (noting that for Growth, there was no financial advisor on behalf of Apollo or TPG, but rather the Sponsors themselves "were comfortable in [their] ability to analyze the proposals [they] were getting from Evercore and respond to them."); *but see* M. Rowan Nov. 17, 2015 Tr. at 333:7-334:19 ("I don't know if we [engaged a financial advisor], but I am not sure it's because we were skilled. I think the theory was whatever deal was struck would be publicly announced and people could decide on the Growth side whether or not they wanted to invest.").

[1302] *See* M. Rowan Nov. 16, 2015 Tr. at 211:2-215:8.

[1303] A. van Hoek Sept. 25, 2015 Tr. at 257:20-259:8; D. Sambur Oct. 29, 2015 Tr. at 347:17-25.

[1304] D. Sambur Oct. 29, 2015 Tr. at 354:25-355:4.

[1305] *See* M. Rowan Nov. 16, 2015 Tr. at 211:2-215:8.

[1306] N. Bryson Sept. 28, 2015 Tr. at 65:11-17 (characterizing the negotiations with the Sponsors as a "long contentious discussion"); *but see* A. van Hoek Sept. 25, 2015 Tr. at 260:16-22 ("I don't remember any contentions . . . . I remember a desire to keep the process moving along and to try to find some resolution on why things were taking some time.").

million.[1307]  Regarding the contributed assets, the Sponsors proposed a scenario where, assuming a $500 million capital raise, CEC would own 68% of CGP, while CAC would own 32%, and CGP would have $220 million directly on its balance sheet post-closing.[1308]  Assuming a $1.182 billion capital raise, the Sponsors proposed that CEC would own 48% and CAC would own 52% of CGP, and CGP would have $902 million directly on its balance sheet post-closing.[1309]  The total value of the contributed assets would be $1.086 billion, comprised of $400 million for CEC's share of CIE and $686 million for the bond portfolio.[1310]  Not surprisingly, because the Sponsors were negotiating on behalf of CAC, they were advocating low values for the CEC contributed assets, so as to increase CAC's interest in CGP and decrease CEC's interest.

The CEC Valuation Committee met to discuss the Sponsors' proposal, and Evercore presented a comparison of the values set forth in the Sponsors' proposal and Evercore's updated analysis.[1311]  Evercore's analysis as of February 25, 2013, lowered the valuation for Planet Hollywood by $1 million from its previous analysis, but otherwise remained unchanged.[1312]

On February 27, 2013, Evercore delivered the Valuation Committee's response to the Sponsors' initial proposal, which included the following, essentially unchanged, valuation ranges for the assets:  (i) Planet Hollywood at $230 to $357 million; (ii) Horseshoe Baltimore at $52 to $72 million; and (iii) Horseshoe Baltimore management fee rights at $18 to $27 million.[1313]  Evercore valued the CIE enterprise at $559 to $773 million.[1314]

---

[1307]  *See* E-mail from Vasily Ledenev to Brandon Parris, *et al.* (Feb. 19, 2013) [WEIL_EVERCORE_000052], attaching Sponsors' First Proposal, at WEIL_EVERCORE_000054-60 [WEIL_EVERCORE_000054], and "Indicative Terms of Venture Partners Rights Offering," at WEIL_EVERCORE_000061-71 [WEIL_EVERCORE_000061].

[1308]  *Id*. at WEIL_EVERCORE_000054.

[1309]  *Id.*

[1310]  *Id.*

[1311]  *See* Valuation Committee Meeting Minutes (Feb. 25, 2013), at MORRISON00000024 [MORRISON00000024]; Project Hermes Discussion Materials (Feb. 25, 2013), at CEOC_INVESTIG_00452108 [CEOC_INVESTIG_00452107].

[1312]  Evercore's February 25, 2013 analysis valued Planet Hollywood at $230 million to $357 million, which was $1 million less than its previous valuation of $231 million to $358 million. *See* Project Hermes Discussion Materials (Feb. 25, 2013), at CEOC_INVESTIG_00452108 [CEOC_INVESTIG_00452107].

[1313]  Letter from CEC Valuation Committee to CEC Board (Apr. 21, 2013), at CEOC_INVESTIG_00514724 [CEOC_INVESTIG_00514717]; "Project Hermes Discussion Materials" (Feb. 25, 2013), at CEOC_INVESTIG_00452108 [CEOC_INVESTIG_00452107].

[1314]  *Id.*

### (B)  The Sponsors' First Revised Proposal

On March 1, 2013, Evercore and the Sponsors met to discuss the valuation of the assets and to address certain areas of concern raised by the CEC Valuation Committee.[1315]  One such area of concern was the large gap between the Committee's and the Sponsors' valuation of CIE.[1316]  Housenbold told the Examiner that the Valuation Committee believed the valuation for CIE should be higher in part because the online gaming world was viewed as a nascent opportunity with a lot of potential for growth.[1317]  On the other hand, the Sponsors believed that it was difficult to value because they viewed it as a small, yet growing asset with an uncertain growth rate.[1318]  However, by this time CIE had already acquired the online and social gaming business Playtika, which increased both the profile and profitability of CIE.[1319]

The next week, on March 7, 2013, the Sponsors delivered a revised proposal offering to acquire the assets for a total of $345 million – $275 million for Planet Hollywood and $70 million for Horseshoe Baltimore.[1320]  As for the contributed assets, the Sponsors proposed that, assuming a $500 million capital raise, CEC would own 70% of CGP and CAC would own 30%.

---

[1315]  Letter from CEC Valuation Committee to CEC Board (Apr. 21, 2013), at CEOC_INVESTIG_00514722 [CEOC_INVESTIG_00514717].

[1316]  *See* N. Bryson Sept. 28, 2015 Tr. at 61:15-23 ("A.  One that comes to mind was that I think we were coming out quite different valuations for the CIE assets.  Q.  And do you recall some of the underlying issues or reasons for that?  A.  I believe that they – you know, there was a question of, you know, would the business continue to perform.  Would it meet its projections.");  *id.* at 65:4-10 ("Q.  What were some of those differences that you were hoping would improve their proposal?  A.  The cash outlay for both Planet Hollywood and Baltimore as well as the valuation of CIE as well as the valuation of the methodology on the bonds.").

[1317]  J. Housenbold Oct. 9, 2015 Tr. at 77:5-10 ("[G]enerally, we thought the asset's value should be higher, that the guaranteed IRR should be lower, that CEOC should be able to get some upside should these nascent, young assets, particularly in the CIE world, in online gaming, happened.").

[1318]  D. Sambur Oct. 29, 2015 Tr. at 401:2-8 ("[I]t was very hard – it was small and it was growing quickly and it was very hard, especially with the online piece, I forget if it was for social or for real money gaming, I think it was for social, it was very hard to project what the growth rates would be.").

[1319]  G. Loveman Oct. 27, 2015 Tr. at 65:4-67:20.  Also notable is that when CIE was formed, as discussed in detail in Section VII.A., *supra*, CEC refused to give CEOC any upside in the transaction, but in forming CGP, a number of documents produced to the Examiner emphasized the benefits of CIE to CEC and its shareholders given that the manner in which the deal was structured ensured that CEC would obtain significant upside potential.  "Caesars Entertainment Venture Partners:  Diligence Materials" (Dec. 19, 2012), at PRIV_INVESTIG_00033257-72 [PRIV_INVESTIG_00033252].

[1320]  *See* E-mail from V. Ledenev to B. Parris, *et al.* (Mar. 7, 2013) [MORRISON00005196], attaching Sponsors' First Revised Proposal, at MORRISON00005197-98 [MORRISON00005197], MORRISON00005203-09 [MORRISON00005203].

CGP would have $155 million on its balance sheet post-closing.[1321]    Assuming a $1.182 billion capital raise, the Sponsors proposed that CEC and CAC would each own 50% of CGP with $837 million on CGP's balance sheet.[1322]    The total value of the contributed assets would be $1.186 billion, but now with the potential to increase to $1.411 billion by 2015.[1323]    The total value of $1.186 billion would be comprised of:  (i) $500 million for CEC's share of CIE, plus an earn-out equal to 3.5x the amount by which 2015 Social/Mobile EBITDA exceeds $103 million, up to a maximum of $225 million of incremental value; and (ii) $686 million for the bond portfolio, including a discount equivalent to an underwriting fee of 2%.[1324]    The Sponsors also revised their proposed term sheet to modify the call right and its exercisable date.[1325]

Shortly thereafter, on March 11, 2013, the CEC Valuation Committee met again to discuss the revised proposal, during which Evercore presented a comparison of the values put forth by the Sponsors against Evercore's updated analysis, which included a further downward adjustment to the valuation of Planet Hollywood (down to $216 to $330 million).[1326]    Evercore's valuations for the other assets remained the same.[1327]    After the presentation, the Valuation Committee asked Evercore to have another call with the Sponsors to discuss the sources of the ongoing discrepancies in valuation and other areas of concern regarding the transaction's structure.[1328]

### (C)  The Sponsors Threaten to Withdraw Their Proposal

Before the CEC Valuation Committee responded to the Sponsor's revised proposal, the Sponsors sent letters to both Evercore and the Valuation Committee reminding them of the importance of the transaction and its purported benefits.[1329]    In their letter to the Valuation Committee, the Sponsors claimed that if a resolution could not be reached by April 4, 2013, then

---

[1321]    *Id.*

[1322]    *Id.*

[1323]    *Id.*

[1324]    *Id.*

[1325]    *Id.*

[1326]    *See* Valuation Committee Meeting Minutes (Mar. 11, 2013), at MORRISON00000026 [MORRISON00000026]; Valuation Committee Memorandum (Apr. 21, 2013), at CEOC_INVESTIG_00514722 [CEOC_INVESTIG_00514717]; "Project Hermes Discussion Materials" (Mar. 11, 2013), at EVERCORE_0079524 [EVERCORE_0079521]

[1327]    *See* "Project Hermes Discussion Materials" (Mar. 11, 2013), at EVERCORE_0079524 [EVERCORE_0079521].

[1328]    *See* Valuation Committee Meeting Minutes (Mar. 11, 2013), at MORRISON00000026 [MORRISON00000026].

[1329]    *See* Letter from Apollo/TPG to Evercore Partners (Mar. 14, 2013), at CEOC_INVESTIG_00090040-42 [CEOC_INVESTIG_00090040]; Letter from Apollo/TPG to Valuation Committee (Mar. 26, 2013), at CEOC_INVESTIG_00415658-59 [CEOC_INVESTIG_00415658].

the Sponsors may withdraw their proposal to form Growth Venture Partners "in order to permit Caesars the ability to access the capital markets."[1330]  According to Bonderman and Sambur, the letters were sent because the Sponsors were of the view that Evercore and the Valuation Committee were taking too long in responding to their proposal and were not being realistic about the valuation figures.[1331]  As Bonderman put it, "there was a general notion that Evercore was a day late and a dollar short in everything they did, and it took them forever to get anything done."[1332]  A little more than a week after receiving its letter from the Sponsors, on March 26, 2013, Evercore provided an updated presentation to the Valuation Committee that reflected the same valuation of the assets that it had presented on March 11.[1333]

### (D)  The Sponsors' Second Revised Proposal

On March 28, 2013, Evercore delivered the CEC Valuation Committee's response to the Sponsors' first revised proposal.  The response valued (i) Planet Hollywood at $216-$330 million, (ii) Horseshoe Baltimore at $51-$72 million, and (iii) the Baltimore management fee rights at $18-$27 million.  The next day, on March 29, 2013, the Sponsors delivered a second revised proposal to Evercore, which set forth a proposal to acquire the assets for a total of $360 million – $285 million for Planet Hollywood and $75 million for the Horseshoe Baltimore.[1334] Regarding the percentage ownership in CGP, the Sponsors proposed that, assuming a $500 million capital raise, CEC would own 71% and CAC would own 29%, with $140 million on CGP's balance sheet.[1335]  Assuming a $1.182 billion capital raise, they proposed a 51% ownership for CEC and 49% for CAC and $822 million on CGP's balance sheet.  The updated proposal valued the contributed assets at $1.225 billion in the aggregate, with the potential to increase to $1.450 billion by 2015, comprised of $525 million for CEC's share of CIE plus the earnout and $700 million for the bond account.[1336]  The Sponsors also revised their proposal as to the rights offering, now setting a cap on the size of the rights offering to $1.182 billion and

---

[1330] Letter from Apollo/TPG to Valuation Committee (Mar. 26, 2013), at CEOC_INVESTIG_00415658 [CEOC_INVESTIG_00415658].

[1331] D. Bonderman Nov. 10, 2015 Tr. at 92:4-93:6; D. Sambur Oct. 29, 2015 Tr. at 382:4-385:4.

[1332] D. Bonderman Nov. 10, 2015 Tr. at 92:4-93:6.

[1333] See "Project Hermes Valuation Committee Discussion Materials" (Mar. 26, 2013), at MORRISON00000199 [MORRISON00000188].

[1334] See E-mail from V. Ledenev to B. Parris, et al. (Mar. 29, 2013) [WEIL_EVERCORE_000543], attaching Sponsors' Second Revised Proposal, at WEIL_EVERCORE_000546-47 [WEIL_EVERCORE_000546].

[1335] Sponsors' Second Revised Proposal, at WEIL_EVERCORE_000546-47 [WEIL_EVERCORE_000546.

[1336] Id.

imposing restrictions on transferability.[1337]   The Sponsors also further amended certain terms relating to the exercise of the call right and the liquidity conditions.[1338]

Over the following week, the Sponsors delivered further revised proposals that left unchanged the $360 million offer price for the purchased assets, terms regarding ownership in CGP, and the structure of CIE.[1339]   However, negotiations continued with respect to the rights offering and revisions were made to the term sheet as to the exercise of the call right, exercise price and liquidity conditions.[1340]

### (E)   The Sponsors' Third Revised Proposal

On April 4, 2013, the Sponsors provided a third revised proposal to the CEC Valuation Committee.[1341]   Again their proposal contemplated acquiring the assets for $360 million – $280 million for Planet Hollywood and $80 million for Horseshoe Baltimore.[1342]   Regarding the ownership percentages in CGP, the Sponsors proposed, assuming a $500 million capital raise, that CEC would own 77% and CAC would own 23%.[1343]   Assuming a $1.182 billion capital raise, CEC's ownership would be 57% and CAC's 43%.   CGP would have $140 million and $822 million of cash on its balance sheet post-closing, assuming capital raises of $500 million and $1.182 million, respectively.[1344]   The total value of contributed assets would be $1.274 billion with the potential to increase to $1.499 billion by 2015.[1345]   The value of the bond portfolio would be $749 million.[1346]   Additionally, CEC would have the opportunity to increase the value of the contributed assets by $225 million based on an earn-out equal to 3.5x the amount by which the CIE 2015 Social/Mobile EBITDA exceeds $103 million, up to a maximum of $225 million of incremental value.[1347]   The Sponsors also modified certain terms relating to the rights

---

[1337]   *Id.*

[1338]   *Id.*

[1339]   *See* E-mail from V. Ledenev to B. Parris, *et al.* (Apr. 2, 2013), at [CEOC_INVESTIG_00263801], attaching Sponsor's Third Revised Proposal, at CEOC_INVESTIG_00263803-05 [CEOC_INVESTIG_00263803], CEOC_INVESTIG_00263809-16 [CEOC_INVESTIG_00263809].

[1340]   *Id.*

[1341]   E-mail from G. Kranias to E. Mestre, *et al.* (Apr. 4, 2013) [WEIL_EVERCORE_000566], attaching Sponsor's "Final and Best" Proposal, at WEIL_EVERCORE_000567-74 [WEIL_EVERCORE_000567].

[1342]   *Id.* at WEIL_EVERCORE_000567.

[1343]   *Id.*

[1344]   *Id.*

[1345]   *Id.*

[1346]   *Id.*

[1347]   *Id.*

offering, including making revisions to the call right terms, liquidity conditions and conditions of transferability.[1348]

The CEC Valuation Committee met the next day and discussed the Sponsors' third revised proposal.[1349]  Evercore was present at the meeting and described certain quantitative and qualitative changes reflected in the proposal.[1350]  Evercore noted that the Sponsors emphasized that this would be their final proposal.[1351]  The Committee decided that Evercore should respond to the Sponsors to convey the Committee's initial reaction to their proposal in general terms, but to communicate that it would not be in a position to make a determination until it had further opportunity to review and discuss Evercore's analysis of the same.[1352]  Later that day, Evercore provided the Valuation Committee's response to the Sponsors.[1353]

From April 4 through April 17, the Sponsors and Valuation Committee engaged in further communications and negotiations regarding the term sheet for the rights offering.  On April 9 and April 11, the Sponsors sent revised term sheets, which reflected further modifications to, among other things, terms regarding transferability and call and liquidity rights.[1354]

### (F)  The Sponsors' Final Proposal

On April 17, 2013, the Sponsors provided their final proposal and term sheet, offering to acquire the assets for a total of $360 million – $280 million for Planet Hollywood and $80 million for Horseshoe Baltimore, inclusive of management fee rights.[1355]  The ownership percentages in CGP would be as follows:  (i) assuming a $500 million capital raise, CEC would own 77% and CAC would own 23%; and (ii) assuming a $1.182 billion capital raise, CEC's ownership would be 57% and CAC's 43%.  CGP would have $140 million and $822 million of cash on its balance sheet post-closing, assuming capital raises of $500 million and $1.182 billion,

---

[1348]  *Id.* at WEIL_EVERCORE_000568-69.

[1349]  *See* Valuation Committee Meeting Minutes (Apr. 5, 2013), at MORRISON00000032 [MORRISON00000032].

[1350]  *Id.*

[1351]  *Id.*

[1352]  *Id.*

[1353]  *Id.*

[1354]  E-mail from E. Favre to T. Donovan, *et al.* (Apr. 9, 2013) [PW_EXAMINER_00234069], attaching "Indicative Terms of Venture Partners Rights Offering," at PW_EXAMINER_00234070-85 [PW_EXAMINER_00234070], PW_EXAMINER_00234086-99 [PW_EXAMINER_00234086]; e-mail from E. Favre to T. Donovan, *et al.* (Apr. 11, 2013) [PW_EXAMINER_00234133], attaching "Indicative Terms of Venture Partners Rights Offering" (Apr. 10, 2013), at PW_EXAMINER_00234134-48 [PW_EXAMINER_00234134].

[1355]  Letter from CEC Valuation Committee to CEC Board (Apr. 21, 2013), at CEOC_INVESTIG_00514728-37,                              CEOC_INVESTIG_00514738-51 [CEOC_INVESTIG_00514717].

respectively.[1356]  The total value of contributed assets would be $1.274 billion with the potential to increase to $1.5 billion by 2015.  The value of the bond portfolio would be $749 million.[1357]

### iv. The CEC Valuation Committee Concludes That the Consideration Paid for the Assets Represents Fair Market Value

On April 21, 2013, Evercore presented an updated analysis of the transaction to the CEC Valuation Committee, including updated figures regarding the value of the assets to be acquired and contributed.[1358]  Specifically, Evercore presented a comparison of the asset values and structural terms set forth in the Sponsors' initial proposal to the final values and structural terms agreed upon between the Committee and the Sponsors.[1359]  Evercore's updated valuation analysis, which was based on December 31, 2012 management projections, was as follows for the acquired equity in the assets:  (i) Planet Hollywood was valued at $217 million to $331 million, (ii) Horseshoe Baltimore was valued at $51 million to $72 million, and (iii) the 50% Baltimore management rights remained valued at $18 million to $27 million.[1360]  As far as the contributed assets, the bond portfolio was valued at $599 million to $681 million and CIE's components were valued as follows:  (i) CIE – Social/Mobile Gaming at $396 million to $564 million; (ii) CIE – U.S. Real Money Online Gambling at $113 million to $143 million; (iii) CIE – E.U. Real Money Online Gambling at $6 million to $8 million; and (iv) CIE – World Series of Poker at $45 million to $60 million.[1361]  As noted above, however, PWC valued the CIE business enterprise at approximately $██ billion as of December 31, 2012, although the Examiner has not adopted this valuation.[1362]

Evercore also reviewed the assumptions underlying the conclusions set forth in the Evercore analysis, the parameters of its analyses, and the methods used in its valuation, including its treatment of certain non-quantifiable aspects of the proposed transaction.[1363]  Evercore discussed with the CEC Valuation Committee its analysis with respect to certain structural

---

[1356]  *Id.*

[1357]  *Id.*

[1358]  *See* Letter from CEC Valuation Committee to CEC board (Apr. 21, 2013) [CEOC_INVESTIG_00514717], attaching "Project Hermes Valuation Committee Meeting Materials" (Apr. 21, 2013), at CEOC_INVESTIG_00514753 [CEOC_INVESTIG_00514753].

[1359]  *Id.* at CEOC_INVESTIG_00514717; Valuation Committee Meeting Minutes (Apr. 21, 2013), at MORRISON000000132 [MORRISON00000131].

[1360]  *See* Letter from CEC Valuation Committee to CEC board (Apr. 21, 2013) [CEOC_INVESTIG_00514717], attaching "Project Hermes Valuation Committee Meeting Materials" (Apr. 21, 2013), at CEOC_INVESTIG_00514778 [CEOC_INVESTIG_00514753].

[1361]  *See id.*

[1362]  "Caesars Interactive Entertainment, Inc. Common Stock Valuation" (Feb. 18, 2013), at CACEXAM00119694 [CACEXAM00119673].

[1363]  Valuation Committee Meeting Minutes (Apr. 21, 2013), at MORRISON00000132 [MORRISON00000131].

aspects of the transaction, including the call rights to be granted to Caesars and the preferred return and liquidation rights granted to the Sponsors in the proposed transaction.[1364]

On April 21, after having received the updated presentation from Evercore and discussing the terms and structure of transaction at the meeting,[1365] the CEC Valuation Committee unanimously concluded that the consideration proposed to be paid to CEOC for the assets represented fair market value. As discussed above, the Valuation Committee was bound by several limitations, including, among other things, that it could not market any of the assets to third parties or consider alternate sources of equity, debt or financing for Caesars.[1366] The next day, on April 22, 2013, the CEC Board met and Williams provided a report of the CEC Valuation Committee.[1367]

### v. Britney Spears and Project Songbird

#### (A) Background

One complication that emerged was how Caesars' deal with Britney Spears for a long-term residency at a Planet Hollywood theater impacted the valuation of that asset. Planet Hollywood owned a large theater space then known as "PH Live at Planet Hollywood" ("PH Live"),[1368] which was operated under a lease agreement with a third party, Base Entertainment ("Base").[1369] In early 2013, Caesars began exploring the possibility of entering into a contract with Spears for a long-term residency engagement.[1370] The preferred venue for this project was PH Live, though Caesars initially considered alternative theaters, such as the Colosseum or a smaller theater at Planet Hollywood, in the event that Caesars was unable to negotiate an acceptable lease or purchase agreement with Base.[1371] Ultimately, however, Caesars was able to buy out the PH Live lease and planned to refurbish it for use in the Britney Spears and other shows. The deal with Spears and the related efforts to revamp PH Live were referred to as "Project Songbird."

---

[1364] *Id.*

[1365] *See* Letter from CEC Valuation Committee to CEC Board (Apr. 21, 2013), at CEOC_INVESTIG_00514724 [CEOC_INVESTIG_00514717].

[1366] *Id.* at CEOC_INVESTIG_00514725-27 [CEOC_INVESTIG_00514717].

[1367] CEC Board Minutes (Apr. 22, 2013), at CEOC_INVESTIG_00438636 [CEOC_INVESTIG_00438636].

[1368] In conjunction with the Britney Spears residency, the name of PH Live was changed to the AXIS Theater. T. Shaukat Oct. 28, 2015 Tr. at 65:18-66:4.

[1369] D. Sambur Oct. 29, 2015 Tr. at 396:2-14.

[1370] E-mail from J. Gastwirth to M. Rapino (Mar. 27, 2013), at CEOC_INVESTIG_00124219 [CEOC_INVESTIG_00124219].

[1371] T. Shaukat Oct. 28, 2015 Tr. at 107:11-108:19; E-mail from T. Shaukat to G. Loveman, *et al.* (June 5, 2013), at PRIV_INVESTIG_00023589-90 [PRIV_INVESTIG_00023587].

The deal was put together by the Caesars' entertainment team – primarily Tariq Shaukat and Jason Gastwirth – with substantial input from management.[1372] As with other transactions, Caesars had to obtain approval from the Sponsors before finalizing the contract with Spears.[1373] While the Sponsors were not directly involved in the negotiations, Project Songbird was presented to TPG and Apollo as a recommendation from the Caesars management team.[1374]

By June 5, 2013, Caesars' contract with Spears for a period of two years and 96 shows was fully negotiated.[1375]  Project Songbird required an initial investment of $27 million to renovate PH Live and terminate the lease with Base, plus an additional $7.5 million in pre-production capital for the build-out of the show, as well as upfront artist fees of $4.8 million.[1376]

### (B)  The Economics of Project Songbird

Caesars management viewed the Spears deal to have better economics than other similar deals made in the ordinary course of business at Caesars for the following reasons:

- The renovated venue, the AXIS Theater, would be available to other artists;[1377]

- Planet Hollywood would capture the incremental food and beverage revenues;[1378]

- The city-wide marketing of the Spears show would result in greater occupancy of the rooms at the Caesars' casinos;[1379]

- Planet Hollywood would have exclusive North American touring rights for Britney Spears over two years as well as guaranteed nightly artist meet and greets which would help promote the VIP business; and

---

[1372] *See* T. Shaukat Oct. 28, 2015 Tr. at 64:24-65:14; E-mail exchange among J. Gastwirth and D. Sambur, *et al*. (Mar. 7-8, 2013), at APOLLO-Examiner_00037219-21 [APOLLO-Examiner_00037219].

[1373] G. Kranias Oct. 23, 2015 Tr. at 182:10-19; T. Shaukat Oct. 28, 2015 Tr. at 72:8-73:8.

[1374] G. Kranias Oct. 23, 2015 Tr. at 182:10-19; M. Rowan Nov. 16, 2015 Tr. at 226:18-24.

[1375] E-mail from M. Cohen to M. Wlazlo, *et al*. (June 5, 2013), at APOLLO-Examiner_00658467 [APOLLO-Examiner_00658466]; E-mail from E. Hession to N. Romatzick (June 25, 2013), at CEOC_INVESTIG_00048132 [CEOC_INVESTIG_00048132].

[1376] E-mail from E. Hession to N. Romatzick (June 25, 2013), at CEOC_INVESTIG_00048132 [CEOC_INVESTIG_00048132]; Letter from E. Hession to KeyBank (Apr. 23, 2013), at CEOC_INVESTIG_00048143 [CEOC_INVESTIG_00048141].

[1377] E-mail exchange among D. Colvin and J. Beato, *et al*. (July 8, 2013), at CEOC_INVESTIG_00030347 [CEOC_INVESTIG_00030347].

[1378] *Id.*

[1379] *Id.*

- Spears was expected to attract a younger audience than other artists who had signed deals for long-term residency engagements with Caesars.[1380]

An e-mail from Tom Evans to Hession states that "This deal is one of the most favorable residency deals in our history by every measure, whether considering number of years, number of shows, or upfront payment amount."[1381]   Similarly, an e-mail from  Donald Colvin to Jacqueline Beato and Hession states that "Songbird is ███████████████████████ ████████████████████.  The venue will be open to other artists.  A big part of the positive EBITDA is from capturing a lot of incremental F and B revenue at PH.  City wide marketing uplift in Vegas helps fill more rooms.  Positive use of Songbird to help with our city wide meet and greet VIP program.  That is why we are ok with a CEOC LC."[1382]

### (C)  The Sponsors' Concerns About the Impact of Project Songbird on Evercore's Valuation of Planet Hollywood

In addition to other concerns about Spears' ability to fulfill her contract,[1383] the Sponsors feared that Project Songbird might impact Evercore's valuation of Planet Hollywood and the closing of the Growth Transaction.[1384]   Following what the Sponsors viewed as lengthy negotiations, they had come to an agreement with Evercore on a purchase price for Planet Hollywood of $280 million on April 21, 2013 – a figure in line with Evercore's range of fair valuations for the asset.  The Sponsors were concerned that Project Songbird would render Evercore's valuation of Planet Hollywood obsolete and cause the price negotiation to be reopened – specifically, that the deal would raise the price of the asset.[1385]   As Sambur put it,

---

[1380]   E-mail from J. Gastwirth to T. Shaukat (Mar. 6, 2013), at CEC_EXAMINER_0331227-28 [CEC_EXAMINER_0331227]; E-mail exchange among D. Colvin and J. Beato, *et al*. (July 8, 2013), at CEOC_INVESTIG_00030347 [CEOC_INVESTIG_00030347]; D. Colvin Nov. 6, 2015 Tr. at 142:19-143:2; J. Gastwirth Jan. 14, 2016 Tr. at 20:24-21:17.

[1381]   E-mail from T. Evans to E. Hession (June 24, 2013), at CEOC_INVESTIG_00122425 [CEOC_INVESTIG_00122425].

[1382]   E-mail from D. Colvin to J. Beato and E. Hession (July 8, 2013), at CEOC_INVESTIG_00030347 [CEOC_INVESTIG_00030347].

[1383]   TPG, particularly Greg Kranias, believed that Project Songbird █████████████████ ███████████████████ and whether she would be a big enough draw to make the project beneficial for Caesars.  *See* G. Kranias Oct. 23, 2015 Tr. at 182:25-183:9; D. Colvin Nov. 6, 2015 Tr. at 138:15-18; M. Rowan Nov. 16, 2015 Tr. at 226:24-227:3.

[1384]   *See* E-mail from E. Hession to M. Cohen, *et al*. (June 5, 2013), at PRIV_INVESTIG_00023587 [PRIV_INVESTIG_00023587]; E-mail from E. Hession to M. Cohen, *et al*. (June 5, 2013), at PRIV_INVESTIG_00023595 [PRIV_INVESTIG_00023595]; E-mail from D. Colvin to T. Shaukat, *et al*. (Jul. 7, 2013), at PRIV_INVESTIG_00029505 [PRIV_INVESTIG_00029505]; G. Kranias Oct. 23, 2015 Tr. at 184:5-22, 187:16-25.

[1385]   G. Kranias Oct. 23, 2015 Tr. at 185:5-9 ; E-mail from G. Kranias to G. Loveman, *et al*. (June 5, 2013), at CEOC_INVESTIG_00402820 [CEOC_INVESTIG_00402820] ("Can you assure us that there is zero percent chance that entering the Britney contract could result in an

"there was a concern about whether or not [Project Songbird] would cause the proverbial opening up of a Pandora's Box and cause this thing to have to be renegotiated . . . ."[1386]  Marc Rowan of Apollo emphasized that the Sponsors wanted to move forward with the Growth Transaction given that they had just "been through a brutal negotiation and finally agreed on price."[1387]  Similarly, Kranias told the Examiner:

> At this point in time we had just been through a long and protracted negotiation with Evercore around the CGP transaction.  We had a deal agreed to and we were moving towards closing and I was concerned that any changes to any of the assets that were part of the transaction would result in a reopening of the negotiation and I wanted to make sure that the Caesars team had thought through all of those issues and had addressed them.[1388]

Throughout June 2013, Caesars management and the Sponsors exchanged e-mails regarding concerns that Project Songbird would affect the value of Planet Hollywood:

- In a June 3, 2013 e-mail from Hession to Sambur, Cohen, and Paul Weiss attorneys Ezring and Wlazlo, Hession stated that he was "concerned" that the proposed structure of the transaction would "creat[e] some value.  If CEOC contributes funds to PHW manager and then PHW manager uses them to buy out base and develop the show, they are creating an asset.  Could we make the case that it is worth $20m since it is a 3rd party deal or do we need a fairness opinion?"[1389]

- On June 5, 2013, Kranias e-mailed Davis, Garrison, Loveman and Tariq Shaukat: "We are supportive of the Britney deal, but, as you know, do not want to increase the purchase price for the PH asset.  Is there a way to set this up so that we can be 100% guaranteed that happens?"[1390]

---

increase to the PH purchase price?"); E-mail from M. Cohen to T. Shaukat (June 5, 2013), at PRIV_INVESTIG_00023595 [PRIV_INVESTIG_00023595].

[1386]  D. Sambur Oct. 29, 2015 Tr. at 396:15-19.

[1387]  M. Rowan Nov. 16, 2015 Tr. at 226:11-24.

[1388]  G. Kranias Oct. 23, 2015 Tr. at 184:13-22; *see also id*. at 187:16-22 ("I was concerned that this would cause the negotiations with Evercore to reopen and could derail the entire transaction which was in Caesars' best interests.  That was my primary concern at this specific point in time, and changing the purchase price, in my mind, might cause reopening of those negotiations."); *see also* T. Shaukat Oct. 28, 2015 Tr. at 73:9-74:3 ("The only thing that [TPG] had ever told me was a lot of work has been done to date and they don't want to restart that process.").

[1389]  E-mail from E. Hession to D. Sambur, M. Cohen, G. Ezring, M. Wlazlo (June 3, 2013), at PRIV_INVESTIG_00038046 [PRIV_INVESTIG_00038046].

[1390]  E-mail from G. Kranias to T. Shaukat, K. Davis, K. Garrison, G. Loveman (June 5, 2013), at PRIV_INVESTIG_00023597 [PRIV_INVESTIG_00023595].

- On the same day, Cohen raised concerns about Project Songbird increasing the value of Planet Hollywood in an e-mail to Shaukat, Loveman, Colvin, Hession and others: "I don't know the details of how Evercore valued the PH asset, but theoretically the value of PH could increase by (a) buying out the Base contract, and/or (b) entering into the Britney deal. I don't know if the potential of these deals were discussed with Evercore prior the value being set."[1391] Hession responded: "Michael, I recall that we discussed this with evercore and it was uncertain at the time. I don't know how they account for changes in the operations from their point valuation. We continue to manage the property. I do think we should check with them as soon as we can however."[1392]

- On June 5, 2013, Kranias responded to an e-mail from Shaukat about the pending close of the deal by stating: "I know that everyone has been working hard on a structure that would NOT increase the CGP purchase price for PH" and later asked Colvin and Loveman: "Can you assure us that there is zero percent chance that entering the Britney contract could result in an increase to the PH purchase price?"[1393]

- On June 7, 2013, Shaukat e-mailed Hession informing him that "Kelvin agreed to base + britney + ph live if there is no valuation impact on cgp/ph." Hession responded "I don't think we can say that without talking to Evercore unfortunately."[1394]

- A month later, on July 7, 2013, Kranias reiterated: "we are highly sensitive to any changes to the CGP deal, particularly the consideration paid for PH. As best we can tell, no one has run this by Evercore yet to verify that this arrangement will not cause any increase to the PH consideration . . . ."[1395]

---

[1391] E-mail from M. Cohen to T. Shaukat, *et al*. (June 5, 2013), at PRIV_INVESTIG_00023587 [PRIV_INVESTIG_00023587].

[1392] E-mail from E. Hession to M. Cohen, *et al*. (June 5, 2013), at PRIV_INVESTIG_00023587 [PRIV_INVESTIG_00023587].

[1393] E-mail from G. Kranias to T. Shaukat, *et al*. (June 5, 2013), at CEOC_INVESTIG_00402821 [CEOC_INVESTIG_00402820]; E-mail from G. Kranias to G. Loveman and D. Colvin, *et al*. (June 5, 2013), at CEOC_INVESTIG_00402820 [CEOC_INVESTIG_00402820].

[1394] E-mail exchange between T. Shaukat and E. Hession (June 7, 2013), at CEOC_INVESTIG_00094485 [CEOC_INVESTIG_00094485].

[1395] E-mail from G. Kranias to G. Loveman, *et al*. (July 7, 2013), at CEOC_INVESTIG_00470234 [CEOC_INVESTIG_00470234].

### (D)  Approval of Project Songbird

According to Shaukat, TPG refused to sign off on the Spears deal if it would affect Evercore's valuation analysis.[1396]  In reaction to the Sponsors' position, Caesars management concurred.[1397]  In July 2013, efforts increased to obtain assurances from Evercore that Project Songbird would not affect the valuation of Planet Hollywood.  On July 7, 2013, Colvin stated to Shaukat and Hession:  "We can call Evercore tomorrow.  I had a good contact with them and we just cut them a huge check so I am optimistic they will be responsive."[1398]  When asked about this e-mail in his interview, Colvin stated that he was referring only to the likelihood that Evercore would respond quickly to Caesars.[1399]  When presented with the possibility that Caesars expected Evercore to rubber-stamp the Planet Hollywood valuation, Bryson told the Examiner "that is not true.  And we – that's not how we operate.  I mean, if we thought the valuation needed to be updated we would have updated it."[1400]

On July 9, 2013, Colvin described "a preliminary call with Evercore yesterday where we described the Songbird deal and sent them the updated model . . . .On the individual songbird project they see this as having only a nominal positive value and most likely will not change the overall value of PH."[1401]  Hession responded:

> I spoke with Kendall and I think we have to have a call on this with them and Evercore.  His question is if this is immaterial enough to cause them to not change their valuation or do they have to redo the valuation anyway and it will probably end up in the same valuation.  IE, if they are changing other items as well as this one, will they incorporate it.  Ultimately, I think that we should have them speak directly with Evercore to hear it from them and not risk a translating mistake.[1402]

Cicco recalled a phone call with Colvin and Hession in July 2013 in which Evercore was told that Project Songbird would not impact the Planet Hollywood valuation due to uncertainty that revenue would cover the required capital investments.[1403]  Less than an hour after Colvin's

---

[1396]  T. Shaukat Oct. 28, 2015 Tr. at 71:5-21; 73:20-74:5.

[1397]  E-mail from E. Hession to J. Gastwirth, *et al.* (July 8, 2013), at CEOC_INVESTIG_0030324 [CEOC_INVESTIG_00030323] ("we need to confirm with Evercore that this has no impact on CGP valuation.").

[1398]  E-mail from D. Colvin to T. Shaukat and E. Hession (July 7, 2013), at PRIV_INVESTIG_00029509 [PRIV_INVESTIG_00029509].

[1399]  D. Colvin Nov. 6, 2015 Tr. at 149:10-150:3.

[1400]  N. Bryson Sept. 28, 2013 Tr. at 126:5-22.

[1401]  E-mail from D. Colvin to T. Shaukat, *et al.* (July 9, 2013), at CEOC_INVESTIG_00073513 [CEOC_INVESTIG_00073513]; *see also* e-mail from T. Shaukat to K. Davis, *et al.* (July 9, 2013), at CEOC_INVESTIG_00102650 [CEOC_INVESTIG_00102650].

[1402]  E-mail from E. Hession to D. Colvin (July, 9, 2013), at CEOC_INVESTIG_00099304 [CEOC_INVESTIG_00099304].

[1403]  M. Cicco Feb. 5, 2016 Tr. at 47:22-49:15.

e-mail, Hession reported that Evercore "said [Project Songbird] would have an immaterial impact between $0 and $10 million."[1404]    Hession told the Examiner that he believed that someone at Caesars, perhaps Colvin, thereafter obtained Evercore's final agreement that Project Songbird would not affect the Planet Hollywood valuation.[1405]    Colvin stated that he recalled generally speaking to Evercore about the value of Project Songbird and that Caesars management was ultimately able to convince Evercore that the deal would not have a material impact on Planet Hollywood valuation given the "uncertainty" that it would be profitable.[1406]

Apollo and TPG approved Project Songbird on July 10, 2013,[1407] and construction on PH Live began later that month or in early August.[1408]    Tickets for the shows went on sale in late September 2013, with the first shows scheduled for late December of that year.[1409]

### (E)  Evercore's Consideration of the Impact of Project Songbird

Evercore witnesses stated that they were first informed of the involvement of Spears in Project Songbird in July 2013, though they had been earlier informed of a potential project involving theater renovations.[1410]    However, Evercore did not update the Planet Hollywood projections used in their valuation of that asset to include incremental revenue/EBITDA for Project Songbird, though the projections did include capital expenditures associated with the PH Live renovations.[1411]    Cicco stated that when Evercore was provided with the additional detail regarding capital expenditures for Project Songbird, they were told that there were no corresponding EBITDA adjustments.[1412]    Bryson (Evercore) indicated in her interview that she was told that the Project Songbird projected revenue and EBITDA were included in the original Planet Hollywood projections, and that therefore Evercore did not need to change the numbers to incorporate the impact of Project Songbird.[1413]

---

[1404]  E-mail from E. Hession to M. Stein, *et al*. (July, 9, 2013), at CEOC_INVESTIG_00099307 [CEOC_INVESTIG_00099307].

[1405]  E. Hession Nov. 3, 2015 Tr. at 241:7-21.

[1406]  D. Colvin Nov. 6, 2015 Tr. at 150:6-24.

[1407]  T. Shaukat Oct. 28, 2015 Tr. at 71:5-6; E-mail from G. Kranias to T. Shaukat, *et al*. (July 10, 2013), at CEOC_INVESTIG_00102651 [CEOC_INVESTIG_00102651] ("Tariq – We are ok with the deal – nice job getting it to this point!  If you need official executive committee consent, Kelvin can provide.").

[1408]  J. Gastwirth Jan. 14, 2016 Tr. at 37:12-38:15.

[1409]  E-mail exchange between D. Colvin and T. Dunn (Sept. 26, 2013), at TPG-Examiner_00389293 [TPG-Examiner_00389293]; "Planet Hollywood Update" (Feb. 10, 2014), at 6 [CEOC_INVESTIG_00086261] (native file).

[1410]  M. Cicco Feb. 5, 2016 Tr. at 45:13-25; N. Bryson Sept. 28, 2015 Tr. at 119:8-21.

[1411]  *See* Appendix 7, Valuation at Section VII.B.3; N. Bryson Sept. 28, 2015 Tr. at 120:8-22.

[1412]  M. Cicco Feb. 5, 2016 Tr. at 50:19-51:12.

[1413]  N. Bryson Sept. 28, 2015 Tr. at 123:13-124:7.

However, Bryson did not have a clear memory of the events, and her recollection is likely mistaken. The projections used by Evercore in their valuation of Planet Hollywood were Q4 2012 projections.[1414] Yet the first Project Songbird economic model was not created until sometime in February 2013, as suggested by an e-mail from Gastwirth on February 16, 2013, discussing the buyout offer for the lease agreement from Base Entertainment.[1415] And Shaukat stated that because the Spears shows were beginning in January 2014, "the process would be to bake the financials into the 2014 budget" that was prepared in late 2013.[1416] Shaukat did not recall anyone asking him to provide Project Songbird projections prior to that time.[1417] As discussed in Appendix 7,[1418] throughout 2013 Caesars continued to modify its long-term projections, with material increases to the projected EBITDA associated with Planet Hollywood. Cicco recalled "continual[ly] checking" for updated valuations after April 2013, but not receiving any.[1419]

While Evercore's valuation model included a separate Project Songbird valuation indicating an incremental equity value ranging from $10 to $20 million from Project Songbird (based on Caesars' model projecting incremental cash flow from Project Songbird),[1420] this was not included in Evercore's final report or valuation conclusion.[1421] According to Cicco, Project Songbird was presented to Evercore by Caesars management as a "break even" project, *i.e.*, that it would not materially impact the Planet Hollywood projections given the costs associated with

---

[1414] Evercore relied upon the management case projections presented at the Jan. 3, 2012 Evercore Caesars Valuation Materials Presentation (file name indicates the year to be 2013). Appendix 7, Valuation at Section VII.B.3.c.

[1415] E-mail from J. Gastwirth to E. Chavez, *et al*. (Feb. 16, 2013), at CEOC_INVESTIG_00089968-70 [CEOC_INVESTIG_00089968]; Project Songbird Financial Analysis (Feb. 11, 2013), CEOC_INVESTIG_00089971. The earliest version of the Project Songbird economic model located within the document production was labeled as "v9" dated Feb. 11, 2013. However, the Excel "Date Created" was Feb. 8, 2013, for all versions of the model, suggesting the model was initially created on that date.

[1416] T. Shaukat Oct. 28, 2015 Tr. at 80:5-17.

[1417] T. Shaukat Oct. 28, 2015 Tr. at 80:5-17; E. Hession Nov. 3, 2015 Tr. at 244:7-12 (Hession stated that he did not recall any suggestion to Bryson "that whatever impact Britney Spears' contract might have was already in the numbers that had been presented to her earlier in the year").

[1418] Appendix 7, Valuation at Section VII.B.3.c.

[1419] M. Cicco Feb. 5, 2016 Tr. at 49:16-24; *see also* N. Bryson Sept. 28, 2015 Tr. at 115:8-116:2; E. Hession Jan. 20, 2016 Tr. at 611:22-612:5 (stating that he would have been "surprised" if Evercore was told that there were no available updated projections "because we can always get them updates.").

[1420] Project Songbird Financial Analysis version 24 (Feb. 8, 2013), at EVERCORE_0051441 [EVERCORE_0051441].

[1421] Evercore Project Hermes Analysis Workbook v278 (Oct. 21, 2013), EVERCORE_0066497 at Tabs AEV_SB through FF_SB2. (native file).

renovating the theater.[1422]  He described Evercore's analysis as "trying to solve backwards" for the "break even" assumption presented by Caesars management.[1423]  Indeed, Evercore's analysis assumed that the value associated with Project Songbird was offset by the capital expenditures – but those capital expenditures had already been accounted for in the projections Evercore used to value Planet Hollywood, as well as within the projections for Project Songbird.[1424]  As discussed in greater detail in Appendix 7, Valuation,[1425] Evercore's breakeven analysis was materially flawed due to (i) this improper treatment of capital expenditures, (ii) lack of consideration for the fact that it appears that CEOC funded the capital expenditures rather than CGP, and (iii) other unsupported assumptions such as the applicable EBITDA multiples.[1426]

### (F)  Early Success of Project Songbird

E-mail communications from management in late September, just weeks before the close of the Growth Transaction, reflect that ticket sales for the Britney Spears show were tracking above benchmarks.[1427]  An e-mail from Shaukat to the Board, nine days after the announcement of the Growth Transaction, states that the Britney Spears show tickets were selling at "2x the pace of Celine and Elton's shows in the last 2 years, and over 4x Shania's residency launch, making it the fastest residency sale in recent memory."[1428]  The VIP packages were nearly sold out and the show had a substantial impact on the website visitation and hotel booking for Planet Hollywood.[1429]  In his interview, Shaukat noted that "Year 1 [2014] of Britney was a very good year for us . . . we did substantially better than I recall the business case being in year 1 . . . and that to some extent was driven by just a massive amount of media exposure that the deal actually got . . . .  Year 2 [2015] has still been profitable, but at a much lower level of profitability than year 1 has been."[1430]  In addition, the financial results for Spears' first show dates in December of 2013 were much higher than projected.[1431]

---

[1422]  M. Cicco Feb. 5, 2016 Tr. at 46:11-47:13.

[1423]  *Id.* at 55:11-24.

[1424]  *Id.* at 55:25-57:12.

[1425]  Appendix 7, Valuation at Section VII.B.3.

[1426]  M. Cicco Feb. 5, 2015 Tr. at 55:25-57:12.

[1427]  E-mail exchange between D. Colvin and T. Dunn (Sept. 26, 2013), at TPG-Examiner_00389293 [TPG-Examiner_00389293].

[1428]  E-mail from T. Shaukat to J. Benjamin, *et al.* (Sept. 26, 2013), at TPG-Examiner_00389426 [TPG-Examiner_00389426].

[1429]  *Id.*

[1430]  T. Shaukat Oct. 28, 2015 Tr. at 96:21-97:21; *see also* J. Gastwirth Jan. 14, 2016 Tr. at 48:22-49:23.

[1431]  "Planet Hollywood Update" (Feb. 10, 2014), CEOC_INVESTIG_00086261 (native file).

### g.  The Growth Transaction Is Finalized and Approved

#### i.  The CEC Valuation Committee and Board Approve the Transaction

On October 9, 2013, the Sponsors submitted to the CEC Valuation Committee a modified term sheet amending certain terms set forth in their final proposal.  On October 18, 2013, the Valuation Committee met to discuss the changes along with Evercore and MoFo.  The Valuation Committee confirmed that the modified transaction terms did not change the prior conclusion set forth in its April 21, 2013 memo that the consideration proposed represented fair market value.[1432]

The full CEC Board met on October 21, 2013 to approve the transaction.  At that meeting, Evercore and VRC presented their respective financial analyses of the Growth Transaction.  Paul Weiss also gave a presentation to the CEC Board, which, among other things, included a "refresher" on the Board's fiduciary duties.[1433]  Specifically, the presentation reminded the Board of the duty of care and duty of loyalty owed to its stockholders.[1434]  It did not, however, contain any discussion related to solvency or the duties owed to creditors.

Following these presentations, the CEC Board unanimously approved the transaction.[1435]  That same day, the CEOC Board also unanimously approved the transaction via written consents signed by Loveman and Cohen.[1436]  The CAC Board also approved the transaction via written consent signed by Rowan, Sambur, Karl Peterson and Marc Beilinson.[1437]

#### ii.  Evercore's Fairness Opinion

In its fairness opinion, Evercore concluded that the "consideration to be received by or on behalf of CEOC or its subsidiaries" for Planet Hollywood and Horseshoe Baltimore was "reasonably equivalent to the fair market value of each such asset" and "the total consideration to be received in exchanged for the assets to be sold and contributed by the Company and/or its subsidiaries to CGP is fair from a financial point of view to the Company."[1438]  In performing its

---

[1432] *See* Valuation Committee Memorandum (Oct. 18, 2013), at CEOC_INVESTIG_00489731-32 [CEOC_INVESTIG_00489730].

[1433] *See* "Caesars Growth Partners, Presentation to the Board of Directors" (Oct. 21, 2013), at CEOC_INVESTIG_00249740-79 [CEOC_INVESTIG_00249739].

[1434] *Id.* at CEOC_INVESTIG_00249773-75.

[1435] *See* CEC Meeting of the Board of Directors Minutes, (Oct. 21, 2013), at CEOC_INVESTIG_00440955 [CEOC_INVESTIG_00440954].

[1436] *See* CEOC Unanimous Written Consent of Directors (Oct. 21, 2013), at CEOC_INVESTIG_00171579-91 [CEOC_INVESTIG_00171579].

[1437] *See* CAC Unanimous Written Consent of Directors (Oct. 21, 2013), at CEOC_INVESTIG_00186775-85 [CEOC_INVESTIG_00186775].

[1438] Evercore Opinion Letter (Oct. 21, 2013), at CEOC_INVESTIG_00171765 [CEOC_INVESTIG_00171760].

valuation analysis and preparing its fairness opinion, Evercore used three valuation methods to calculate the enterprise value of Planet Hollywood and Horseshoe Baltimore:  (i) the discounted cash flow method; (ii) public company trading analysis; and (iii) precedent transaction analysis. The following table summarizes the value ranges calculated by Evercore under each methodology:

**Growth Figure 8:  Evercore Enterprise Value Ranges by Asset**

| *amounts in thousands* | Selected Value Range | DCF | Trading Peers | Precedent Transactions |
|---|---|---|---|---|
| Planet Hollywood - low | $ 625,000 | $ 717,000 | $ 546,000 | $ 500,000 |
| Planet Hollywood - high | $ 725,000 | $ 935,000 | $ 813,000 | $ 654,000 |
| Horseshoe Baltimore - low | $ 50,000 | $ (15,000) | $ 39,000 | $ 3,000 |
| Horseshoe Baltimore - high | $ 125,000 | $ 138,000 | $ 198,000 | $ 161,000 |

Source:  "Project Hermes Valuation Discussion Materials" (Oct. 21, 2013), at CEOC_INVESTIG_00249974-975, CEOC_INVESTIG_00249985-986 [CEOC_INVESTIG_00249739].

In reaching these conclusions, Evercore relied upon the Q4 2012 financial projections provided by management, noting that it assumed that the projected financial data was "reasonably prepared on bases reflecting the best currently available estimates and good faith judgments of management of the Company as to the future financial performance of the assets . . . ."[1439]  The projections on which Evercore relied reflected increased capital expenditures for Project Songbird in July 2013 with no corresponding revenue or EBITDA increase.[1440] Evercore's valuation of Planet Hollywood did not change from April 21, 2013 to when the Growth Transaction closed on October 21, 2013.

### iii.  Criticisms of Evercore's Fairness Analysis

As discussed in greater detail in Appendix 7,[1441] Evercore's fairness analysis, which formed the basis for its fairness opinion, suffered from several defects and errors, leading Evercore to significantly undervalue the assets CEOC sold as part of the Growth Transaction.

### (A)  Evercore Was Not Provided with the Most Recent Projections

Evercore relied on projections that it received from Caesars management in January 2013, which, as demonstrated in the table below, were nearly identical to those contained in Caesars' Q4 2012 LRP.[1442]

---

[1439]  *Id.* at CEOC_INVESTIG_00171762.

[1440]  T. Shaukat Nov. 9, 2015 Tr. at 81:7-23.

[1441]  Appendix 7, Valuation at Section VII.B.

[1442]  *See* Appendix 7, Valuation at Section VII.B.3.

**Growth Figure 9:  Planet Hollywood Initial Projections**

| amounts in millions | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Valuation Materials (a):** | | | | | |
| Revenue | $   304 | $   317 | $   331 | $   348 | $   365 |
| EBITDAM | $     86 | $     94 | $   105 | $   118 | $   131 |
| | | | | | |
| **Q4 2012 LRP (b):** | | | | | |
| Revenue | $   303 | $   317 | $   333 | $   349 | $   367 |
| EBITDAM | $     85 | $     94 | $   106 | $   119 | $   132 |

Sources:
(a) "Caesars Valuation Materials" (Jan. 3, 2013), at CEOC_INVESTIG_00285580 [CEOC_INVESTIG_00285549].
(b)  Impairment  Review  (Dec.  31,  2012),  at  Tab  "INPUTS-LRP" [CEOC_INVESTIG_00508330] (native file).

Prior to the closing of the Growth Transaction, Evercore made two adjustments to these projections.[1443]  First, in April 2013, Evercore lowered the expected EBITDA projection for 2013 from $94 million to $88 million based on instruction from management.  However, Planet Hollywood significantly outperformed its 2013 projected EBITDA, both year-to-date as of April 2013 and by the time the Growth Transaction closed in October 2013; therefore this reduction was not warranted.  Second, in July 2013, Evercore reallocated the projected capital expenditures due to Project Songbird, but did not make any corresponding adjustment to revenue or EBITDA. Therefore, aside from these two adjustments, Evercore relied on projections that were more than nine months old at the time of closing.

The Examiner finds that Evercore should have been provided with Caesars' Q3 2013 LRP, which included the latest set of projections available prior to closing.[1444]  Indeed, Evercore requested updated projections from Caesars several times throughout 2013, but was told that Caesars did not have any updated projections.[1445]  In reality, however, Caesars continued to

---

[1443]  *See id.*

[1444]  *See, e.g.*, *In re Emerging Commcn's, Inc. S'holders Litig.*, No. Civ. A. 16415, 2004 WL 1305745, at *14 (Del. Ch. June 4, 2004) ("This Court has consistently expressed a preference for the most recently prepared management projections available as of the [transaction] date."). Brimmer confirmed that the updated quarterly LRPs represent the company's current view of the projections and indicated that he could not think of any reason why the updated projections would not have been provided to Evercore.  R. Brimmer Jan. 20, 2016 Tr. at 387:19-22, 382:20-24.

[1445]  "Project Hermes Diligence Question List" (Apr. 11, 2013), at CEOC_INVESTIG_00105999 [CEOC_INVESTIG_00105999]; "Project Hermes Diligence Questions" (Juy. 15, 2013) at CEOC_INVESTIG_00107055  [CEOC_INVESTIG_00107055];  "Project  Hermes  Diligence Questions" (Oct. 6, 2015), at EVERCORE_0054811 [EVERCORE_0054809]; N. Bryson Sept. 28, 2015 Tr. at 115:23-116:2.

modify its LRP throughout 2013 with material increases to the projected EBITDA. These increases are illustrated in the chart below:

**Growth Figure 10: Planet Hollywood Long-Range Plans**



Sources:Impairment Review (Q4 2012), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508329] (native file); Impairment Review (Q1 2013), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508686] (native file); Impairment Review (Q2 2013), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508687] (native file); Impairment Review (Q3 2013), at Tab "3.2 – INPUTS-LRP" [CEOC_INVESTIG_00513908] (native file); Evercore "Project Hermes Valuation Discussion Materials" (Oct. 21, 2013), at CEOC_INVESTIG_00249973 [CEOC_INVESTIG_00249739].

Notably, Caesars' LRP included projections over a five-year period.[1446] Since the projections Evercore relied upon were created in 2012, the last year projected was 2016 – just 3.2 years after the Growth Transaction closed. If, on the other hand, Evercore had used the Q3 2013 LRP, the last year projected would have been 2018. These two additional years have a material impact on the resulting property value, particularly since Planet Hollywood was a high-growth entity and the final year impacts the terminal period in a DCF analysis. Indeed, the Q3 2013 LRP's projection for 2018 EBITDA was $165 million, which was 26% higher than the $131 million used by Evercore for 2016, the final year of its valuation based on the Q4 2012 LRP.

Thus, due to the material changes made to Caesars' LRP in 2013, Evercore should have been provided with, and should have utilized, the most current projections available at the time of the closing rather than relying on outdated projections.

---

[1446] *See* Appendix 7, Valuation at Section VII.B.3.

### (B) Evercore Treated Planet Hollywood as a Regional Property, Instead of a Las Vegas Strip Property

Even though Evercore's public company trading analysis for Planet Hollywood considered seven guideline public companies, including three Las Vegas companies and four regional companies, Evercore only utilized in its valuation three public companies, all of which were regional operators, that had no Las Vegas Strip exposure – Boyd Gaming, Pinnacle Entertainment and Isle of Capri.  The companies considered by Evercore (and the corresponding multiples) are presented below:

**Growth Figure 11:  Evercore Comparables**

| Company | Used by Evercore | 2013 EBITDA Multiple | 2014 EBITDA Multiple |
|---------|------------------|----------------------|----------------------|
| **Las Vegas Operators:** | | | |
| Las Vegas Sands | NO | 14.3 | 12.8 |
| Wynn Resorts | NO | 12.7 | 12.1 |
| MGM Resorts | NO | 12 | 11.1 |
| **Regional Operators:** | | | |
| Penn National Gaming | NO | 10.1 | 9.7 |
| Boyd Gaming | YES | 9.7 | 9.3 |
| Pinnacle Entertainment | YES | 6.3 | 6.1 |
| Isle of Capri Casinos | YES | 7.3 | 6.9 |
| *Average - All* | | *10.3x* | *9.7x* |
| *Average - Regional Only* | | *8.4x* | *8.0x* |
| *Average - Regional (excl. Penn)* | | *7.8x* | *7.4x* |
| Selected Multiple Range - Planet Hollywood | | 7.0x - 9.0x | 6.5x - 8.5x |

Source:    "Project Hermes Valuation Discussion Materials" (Oct. 21, 2013), at CEOC_INVESTIG_00249976 [CEOC_INVESTIG_00249739].

These three regional companies had significantly lower growth prospects than Planet Hollywood, with 2014 expected EBITDA growth ranging from 4.3% to 5.6%, compared to 14.4% for Planet Hollywood.  In fact, Planet Hollywood's projected growth even exceeded the Las Vegas companies that Evercore considered.[1447]

---

[1447]  For Horseshoe Baltimore, Evercore analyzed the same three regional companies, selecting forward-looking multiples of 6.5x to 8.5x applied to 2017 and 2019 projected EBITDA, and discounting the result to present value at a cost of equity ranging from 20% to 30%.  However, Evercore's discounting of forward-looking multiples was not appropriate since Horseshoe Baltimore was expected to be profitable by 2015 and its forecasted growth was inflationary by 2017.  In addition, it was not necessary to discount the result since forward-looking multiples are

In addition, Evercore applied its selected multiples to time ranges that failed to capture the significant growth expected from Planet Hollywood: (i) latest-twelve months ("LTM") EBITDA as of June 30, 2013; (ii) 2013 estimated EBITDA; and (iii) 2014 estimated EBITDA. Moreover, Evercore used the wrong EBITDA metric for the LTM EBITDA as of June 30, 2013 – Evercore used an LTM EBITDA of $77 million, whereas the actual metric was $88 million – resulting in an understatement of the calculated value for the LTM period of $83 million to $105 million. This same error also materially understated the value under Evercore's Precedent Transactions method by $72 million to $94 million.[1448]

### (C) Evercore Did Not Update the Planet Hollywood Projections for Project Songbird

Evercore did not update the Planet Hollywood projections to include incremental revenue and EBITDA for Project Songbird, even though Evercore conducted a separate valuation of Project Songbird that indicated a positive impact on the value of Planet Hollywood ranging from $10 million to $20 million.[1449] Instead, Evercore ultimately relied on a "break even" analysis that assumed the resulting value of $13 million to $36 million was offset by the required capital expenditures of $27 million. This is improper for several reasons. First, the Project Songbird capital expenditures were already accounted for in the DCF for Planet Hollywood as part of the modification to capital expenditures made by Evercore in July 2013. Second, the DCF for Project Songbird also accounted for capital expenditures (which is duplicative of the additional Songbird capital expenditures noted in the Planet Hollywood DCF). Third, the capital expenditures for Project Songbird appear to have been funded while Planet Hollywood was a CEOC property, and thus the capital expenditures would not serve as a reduction to cash flows or value being transferred to CGP.

### (D) Evercore's Valuation of Horseshoe Baltimore Was Flawed in Several Respects

Evercore calculated its valuation of CEOC's interest in Horseshoe Baltimore using an ownership interest of 40.9%, rather than the actual 52% ownership interest that CEOC held at the time of the Growth Transaction. According to Evercore's "Overview of Acquired Assets," this ownership interest was based on the anticipated interest in the joint venture after a contemplated

---

intended to capture stable growth at a future point in time and, therefore, are typically lower than current trading multiples. *See* Appendix 7, Valuation at Section VII.B.2.b.

[1448] Although Evercore used selected multiples from regional properties, it used the unlevered beta for Las Vegas properties to calculate the weighted average cost of capital ("WACC") for Horseshoe Baltimore. The result of this inconsistency was an increase to the discount rate, and a corresponding decrease to the property value. Evercore also applied a development risk premium of 7% to 13% to Horseshoe Baltimore, which was unwarranted for a number of reasons. *See* Appendix 7, Valuation at Section VII.B.2.c.

[1449] Although Evercore was provided with a version of the Project Songbird economic model on April 7, 2013, the latest version of the model available prior to closing of the Growth Transaction was from July 2013. *See* Appendix 7, Valuation at Section VII.B.5.e.

buyback by the other equity owners.[1450]  Counsel for CGP has informed the Examiner that CGP wired the proceeds of the buyback (approximately $12.76 million) to CEC on May 14, 2015.  However, as confirmed by CEC's counsel, CEOC did not receive the proceeds for the anticipated buyback.  Thus, as indicated in CEC's public filings, Caesars' interest in Horseshoe Baltimore at the time of the transaction was still 52%.[1451]

In addition, Evercore's DCF analysis for Horseshoe Baltimore included construction costs in its capital expenditures, even though it is more appropriate to exclude these costs from the DCF and deduct the corresponding debt from the enterprise value.[1452]

### (E)  Evercore Included Estimated Tax Savings in Its Analysis

Evercore included $8 million to $22 million of additional value for the present value of tax savings that it assumed would benefit CEOC.  However, these estimated tax savings should not have been considered for valuation purposes, since economic tax benefits relate to purchase price allocation rather than fair market value.  Importantly, their market multiples and WACC are based upon guideline public company data which do not reflect any such tax benefits.[1453]

### (F)  Sensitivity Analysis

As discussed in greater detail in Appendix 7,[1454] Valuation at Section VII.F., the Examiner performed a sensitivity analysis to determine the financial impact of Evercore's flawed inputs and methodologies.  In particular, the sensitivity analysis made the following corrections to Evercore's financial models:

- Utilized Q3 2013 LRP projections instead of the outdated projections from January 2013;

- Included the incremental cash flows for Project Songbird;

- Extended the length of the DCF period through 2018 to include the entire period covered by the projections in lieu of calculating the terminal period after 2016;

- Excluded LTM and 2013 expected EBITDA from the guideline company trading

---

[1450]  Evercore stated:  "$10mm buy-back expected in Q4 2013 by partners will adjust ownership level to anticipated 40.9% (these funds are to be 100% refunded to Cronus upon receipt)."  CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249901 [CEOC_INVESTIG_00249739].

[1451]  CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 67; CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 73; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 97.

[1452]  Appendix 7, Valuation at Section VII.B.2.a.

[1453]  *Id.*

[1454]  Appendix 7, Valuation Section VII.F.

analysis and precedent transactions analysis as these periods do not adequately capture the growth of Planet Hollywood or the incremental cash flows for Project Songbird;

- Excluded value from the present value of tax savings; and

- Utilized the correct 52% ownership interest for Caesars' equity interest in Horseshoe Baltimore in lieu of the 40.9% interest utilized by Evercore.

The sensitivity analysis accepts all other inputs and methodologies used by Evercore, including the EBITDA multiples. As the table below demonstrates, the sensitized Evercore valuations range from $483 million to $782 million, as compared to Evercore's actual valuations ranging from $268 million to $420 million.[1455]

**Growth Figure 12:  Growth Transaction Sensitivity Analysis**

| | Evercore | | Evercore - Sensitized | |
|---|---|---|---|---|
| *amounts in millions* | **Low** | **High** | **Low** | **High** |
| Planet Hollywood (including mgmt fees) (a) | $  625.0 | $  725.0 | $  834.6 | $  1,087.5 |
| Less: Debt | (513.0) | (513.0) | (513.0) | (513.0) |
| Excess Cash | 88.0 | 88.0 | 88.0 | 88.0 |
| PV of I/O Strip | (8.0) | (8.0) | (8.0) | (8.0) |
| PV of Tax Savings | 7.0 | 20.0 | - | - |
| Total - Planet Hollywood Equity Value | $  199.0 | $  312.0 | $  401.6 | $  654.5 |
| Horseshoe Baltimore | $  50.0 | $  125.0 | $  50.0 | $  125.0 |
| Excess Cash | 66.0 | 66.0 | 66.0 | 66.0 |
| Subtotal | $  116.0 | $  191.0 | $  116.0 | $  191.0 |
| Caesars Ownership Percentage | 40.9% | 40.9% | 52.0% | 52.0% |
| Subtotal | $  48.4 | $  78.1 | $  61.3 | $  99.3 |
| 50% of Management Fee Stream | $  20.0 | $  28.0 | $  20.0 | $  28.0 |
| PV of Tax Savings | 1.0 | 2.0 | - | - |
| Total - Horseshoe Baltimore Equity Value | $  69.4 | $  108.1 | $  81.3 | $  127.3 |
| **Growth Transaction - Equity Value** | **$  268.4** | **$  420.1** | **$  482.9** | **$  781.8** |

<u>Note</u>:  (a) Sensitized values represent the average of the GPC Method and DCF Method.

### iv.  VRC's Fairness Opinion

On October 21, 2013, VRC also issued its fairness opinion regarding the fair market value of the CAC subscription rights. VRC opined that the principal economic terms of the Management Agreement, including the services fee, and the sale of the PH Management Fee Stream were "fair from a financial point of view to CEC and CEOC" and "no less favorable to

---

[1455] As discussed below, the Examiner also performed an independent valuation of the CEOC assets transferred.

CEC, CEOC and its subsidiaries than would be obtained in a comparable arm's length transaction with a person that is not an affiliate."[1456]  As in Evercore's opinion, VRC "assumed and relied upon, without independent verification, that any financial forecasts and projections provided to [it] reflected the best currently available estimates and judgments of Caesar's management as to the expected future financial performance of the Company."[1457]

### h.  The Growth Transaction Closes and Takes Effect

The Growth Transaction closed on October 21, 2013.  As a result of the transaction, CAC was created, a publicly-traded company formed for the purpose of making an equity investment in CGP.  Equity ownership in CAC was distributed through a subscription rights offering made available to all CEC shareholders.  On October 21, 2013, the Sponsors purchased $457.8 million of CAC Class A common stock.  The closing of the CAC rights offering to all CEC shareholders occurred on November 18, 2013.  CAC ultimately received aggregate gross proceeds from the CAC rights offering of approximately $1.2 billion.[1458]

The transaction also resulted in the creation of CGP, a limited liability company formed as a joint venture between CEC and CAC pursuant to a limited liability company agreement dated October 21, 2013 ("LLC Agreement") among managing member CAC and members HIE Holdings, Inc. and Harrah's BC, Inc.  In addition to laying out the structure and powers of the new joint venture, the LLC Agreement set forth the corporate relationship (including the governance arrangements) between CGP and the various members of the new entity.  Pursuant to CGP's operating agreement,[1459] after the third anniversary of the closing of the transaction, CEC has the right to acquire all or a portion of the voting units of CGP.  After the fifth anniversary, CAC would have the right to cause liquidation of CGP, and, if not previously exercised, CGP would be required to liquidate on the eighth and a half anniversary.[1460]

CAC used a portion of the proceeds from the rights offering to purchase its equity interest in CGP.  CEC, in exchange for its contribution of Planet Hollywood and Horseshoe Baltimore, would acquire the remaining equity interest in CGP.  As consideration for its non-voting ownership stake in CGP, CEC contributed to CGP its interest in CIE and approximately $1.1 billion face value of CEOC unsecured notes.

---

[1456]  VRC Opinion Letter (Oct. 21, 2013), at VRC00003892 [VRC00003889].

[1457]  *Id.*

[1458]  CEC 10-K for the year ended Dec. 31, 2012 (Mar. 27, 2013), at 7-8.

[1459]  Amended and Restated Limited Liability Company Agreement of Caesars Growth Partners, LLC (Oct. 21, 2013), at CEOC_INVESTIG_00014961-65 [CEOC_INVESTIG_00014936]; *see* "Modified Term Sheet" attached to Valuation Committee Memorandum (Oct. 18, 2013), at CEOC_INVESTIG_00489748-49 [CEOC_INVESTIG_00489730].

[1460]  "Modified Term Sheet" attached to Valuation Committee Memorandum (Oct. 18, 2013), at CEOC_INVESTIG_00489750 [CEOC_INVESTIG_00489730].  As noted above, CAC would have priority over CEC in connection with recoveries from CGP in the event of a liquidation, partial liquidation, or sale of material assets.

As part of the series of transactions resulting in the formation of CGP, CGP acquired from CEOC:  (i) a 100% equity interest in Planet Hollywood; (ii) a 52% equity interest in Horseshoe Baltimore; and (iii) 50% of CEOC's management fee rights relating to these two properties.  In return, CEOC received $360 million in cash from CGP and CGP's assumption of $513 million in debt associated with Planet Hollywood.[1461]

### i.   The Mechanics of the Growth Transaction

The transfers of CEOC's property interests to CGP in connection with the Growth Transaction were ultimately accomplished in several steps, as CEOC's transfers were actually membership interests in second tier LLCs owned by CEOC.  As such, these transfers were part of a larger series of transactions involving multiple parties, multiple agreements, and multiple transactions.

With respect to sale of Planet Hollywood – which was owned by PHW Las Vegas LLC ("PHW Las Vegas"), a subsidiary of CEOC, and TSP Owner, LLC ("TSP"), a wholly-owned subsidiary of PHW Las Vegas – PHW Las Vegas assigned and transferred all of its assets and liabilities (including its 100% membership interest in TSP) to PHWLV, LLC ("PHWLV"), in which PHW Las Vegas was the sole member, prior to the closing of the Growth Transaction.  Planet Hollywood was managed by PHW Manager, LLC ("PHW Manager"), in which CEOC was the sole member, which oversaw the operations of Planet Hollywood in return for management fees (the "PH Management Fees"), pursuant to a management agreement with PHW Las Vegas.  As part of the Growth Transaction, PHW Las Vegas transferred its sole membership interest in PHWLV (the "PHWLV Membership Interest") to CGP.  CGP subsequently transferred the PHWLV Membership Interest to Caesars Growth PH, LLC ("CGPH"), its wholly-owned subsidiary.  PHW Manager assigned its right, title and interest in 50% of the PH Management fees to CGPH.  These asset transfers are also depicted in the charts below:

---

[1461] *See* Transaction Agreement (Oct. 21, 2013), at CEOC_INVESTIG_00014762 [CEOC_INVESTIG_00014758].

**Growth Figure 13:**

**Part A:  CEOC Structure Prior to Transfer; Part B:  Asset Transfer to PHWLV, LLC**



**Growth Figure 14:  Part C: Transfer to CGP**



With respect to the Horseshoe Baltimore transfer, prior to the closing of the Growth Transaction, Caesars Baltimore Acquisition Company, LLC ("CBAC"), in which CEOC was the sole member, owned 100% of the membership interests in Caesars Baltimore Investment Company, LLC ("CBIC") (the "CBIC Membership Interests"), which, in turn, owned an indirect interest in CBAC Borrower, LLC, which had been awarded the right to operate the Horseshoe Baltimore.  Caesars Baltimore Management Company, LLC ("CBAC Manager") managed the Horseshoe Baltimore in exchange for management fees (the "HB Management Fees").  As part of the Growth Transaction, CBAC transferred 100% of the CBIC Membership Interests to CGP, and CBAC Manager assigned its right, title and interest in 50% of the HB Management Fees to Caesars Growth Baltimore Fee, LLC ("CGP Baltimore Fee"), a subsidiary of CGP.  These asset transfers are also depicted in the chart below:

**Growth Figure 15:  Horseshoe Baltimore Asset Transfer**



### ii.  Aftermath of the Growth Transaction

### (A)  Market Reaction to the Growth Transaction

The market reaction to the Growth Transaction was generally favorable and was greeted by positive commentary from analysts.  For instance, after the transaction was announced, RBC Capital Markets commented, "the company announced its intention to create a new growth entity in which Planet Hollywood, Baltimore Horseshoe (and interests in both management fees), shares of CIE, and $1.1B of debt will potentially be transferred.  Along with several previously completed transactions, Caesars Operating Company (CEOC) has significantly improved its liquidity position and maturity profile.  We view these transactions and the possibility of additional asset monetization avenues (*i.e.*, sales to Caesars Growth Venture Partners) as positives for the OpCo structure."[1462]  Following the transaction, CEC share price increased and there were no negative CEOC bond price movements.

---

[1462]  RBC Capital Markets, "Caesars Entertainment Corp; Positive Capital Structure Transactions and Strategic Announcement" (Feb. 4, 2013) at 1.

The Growth Transaction was disclosed in CEC's October 23, 2013 8-K. Analysts commented on likely future revenue growth driven by Planet Hollywood and Horseshoe Baltimore. For example, immediately following the closing of the Growth Transaction, RBC Capital Markets noted:

> We are anticipating Planet Hollywood to have another strong EBITDA increase over the prior year similar to the first half of the year. Non-gaming revenues should drive revenue growth while operating costs have remained essentially flat. We also look for further improvement in the fourth quarter and 2014, given our view that the Las Vegas market should be relatively healthy given the pick up in the group and convention segment. We anticipate the Baltimore Project will open during 3Q 2014. Our annualized EBITDA estimate for this project is $83.4MM.[1463]

Around that same time, Barclays assumed "a 5% annual EBITDA growth rate for Planet Hollywood. Given the high historical growth rate of Caesars Interactive Entertainment and the recent outperformance of Planet Hollywood (driven by its favorable location and new investments in the facility), we believe these assumptions are fair (and actually conservative. For Horseshoe Baltimore, we assume win/unit/day of $255 and EBITDA margins of 25% to arrive at total EBITDA of $87 million, which is similar to or lower than our estimate for similar casinos in urban areas (such as Hollywood Columbus, Horseshoe Cleveland and MGM Grand Detroit)."[1464]

As the Sponsors and CEC have noted, there were no objections or challenges to the transaction by CEOC's creditors in the six month period between public disclosure and closing. Indeed, at least four CEOC creditors (Canyon Capital Advisors, Deutsche Bank, Arrowgrass, and DE Shaw & Co) participated in the transaction by acquiring CAC equity during or shortly after the rights offering.[1465] As Sambur stated: "The commentary was all very positive on this transaction, and I think most people were generally happy with it."[1466]

### (B) CAC Rights Offering

On November 2, 2013, van Hoek e-mailed Rowan and Sambur, attaching a table summarizing the CGP rights offering, showing that the Sponsors and their co-investors would be

---

[1463] RBC Capital Markets, "3Q13 Preview and Revising 2013, 2014 Estimates" (Oct. 28, 2013) at 6.

[1464] Barclays, "Updating Valuation for CAC" (Oct. 29, 2013) at 3.

[1465] *See* Arrowgrass Capital Partners (US) L.P. 13F for the year ended Dec. 31, 2013 (Feb. 14, 2014), Information Table, at 1; Deutsche Bank AG 13F for the year ended Dec. 31, 2013 (Feb. 14, 2014), Information Table, at 68.; Canyon Capital Advisors LLC 13F for the year ended Dec. 31, 2013 (Feb. 3, 2014), Information Table, at 1; D.E. Shaw & Co., Inc. 13F for the year ended Dec. 31, 2013 (Feb. 14, 2014), Information Table, at 20.

[1466] D. Sambur Oct. 29, 2015 Tr. at 362:9-12.

allocated an estimated 65.6% of the CGP shares, with the remaining 34.4% allocated to the public.[1467]  Van Hoek stated:

> As of last night, the offering was significantly oversubscribed:  95% of all subscription rights were exercised (including 95% of our Hamlet co-investors; the 5% that did not subscribe was primarily funds that are in liquidation or cannot make follow-ons).  Including oversubscription elections received to-date (and these will continue to trickle in through Tuesday), there is over $1.7 billion of aggregate demand at this point.  As a result, our oversubscription will get cut back – ultimately, we'll likely end up owning ~20% of CAC (slightly more than our 19.4% of CEC), and along with TPG and the Hamlet co-investors, we'll control ~66% of the CAC shares.[1468]

Rowan explained the breakdown as follows:  "95 percent of the people – it says of the Hamlet Co. investors elected to exercise.  If you assume that 100 percent of them exercised, that would be about 70 percent of the company, 68 percent.  So, the transaction has been well received, and the initial result is that Apollo and TPG's and our co-investors' ownership interest is roughly the same in each of the two [CEC and CAC] before trading."[1469]

Sambur forwarded this e-mail to Loveman, noting that it was "pretty amazing," then Loveman forwarded to Rowan, stating "I do not know where CAC stands in your personal hierarchy of great ideas, but it was one fu_king good idea.  Thanks."[1470]

The closing of the CAC rights offering to all CEC shareholders occurred on November 18, 2013.  CAC ultimately received aggregate gross proceeds from the CAC rights offering of approximately $1.2 billion.[1471]

### (C)  Apollo's Post-Transaction Valuations

In November 2013, Apollo prepared a presentation for the Board, entitled "Caesars: Discussion Materials, Board of Directors Meeting:  November 2013," which included, *inter alia*,

---

[1467]  E-mail from A. van Hoek to D. Sambur and M. Rowan (Nov. 2, 2013), at CEOC_INVESTIG_00470639 [CEOC_INVESTIG_00470639], attaching "CGP:  Rights offering summary," at CEOC_INVESTIG_00470641 [CEOC_INVESTIG_00470641].

[1468]  E-mail from A. van Hoek to D. Sambur and M. Rowan (Nov. 2, 2013), at CEOC_INVESTIG_00470639 [CEOC_INVESTIG_00470639].

[1469]  M. Rowan Nov. 16, 2015 Tr. at 233:13-22.

[1470]  E-mail from G. Loveman to M. Rowan (Nov. 2, 2013), at CEOC_INVESTIG_00470639 [CEOC_INVESTIG_00470639].

[1471]  CEC 10-K for the year ended Dec. 31, 2012 (Mar. 27, 2013), at 7-8.

a "sum of the parts" analysis of the assets transferred in the Growth Transaction.[1472]  According to Apollo's analysis:

- CIE had a "[f]uture fair value" [as of 2016] of $820 million, increased from the $525 million "[c]urrent transaction value";

- Planet Hollywood had a "[f]uture fair value" of $579 million, increased from the $280 million "[c]urrent transaction value"; and

- Horseshoe Baltimore had a "[f]uture fair value" of $260 million, increased from the $80 million "[c]urrent transaction value."[1473]

### 3.  The Examiner's Findings and Conclusions

Creditors have identified the following potential claims arising from the Growth Transaction:  (i) actual and constructive fraudulent transfer; (ii) breach of fiduciary duty (against CEOC's directors and CEC); and (iii) aiding and abetting breach of fiduciary duty (against the Sponsors).  For the reasons discussed below, the Examiner concludes that there is a strong constructive fraudulent transfer claim, a strong actual fraudulent transfer claim, a strong breach of fiduciary duty claim against CEOC's directors and CEC and a reasonable aiding and abetting claim against the Sponsors and certain of CEC's directors affiliated with the Sponsors.

### a.  Constructive Fraudulent Transfer

The Examiner concludes that there is a strong constructive fraudulent transfer claim arising out of the Growth Transaction because (i) CEOC did not receive reasonably equivalent value in exchange for the assets transferred in connection with the Growth Transaction, and (ii) CEOC was almost certainly insolvent at the time of the transaction.[1474]

CEC and the Sponsors argue that no viable constructive fraudulent transfer claim exists for two reasons.  First, they claim, relying on Evercore's analyses and fairness opinion, that

---

[1472] "Caesars: Discussion Materials, Board of Directors Meeting" (November 2013), at 9 [CEOC_INVESTIG_00010374] (native file).

[1473] *Id.*

[1474] As discussed in Appendix 5, Legal Standards at Section III.B, an action to avoid a transfer as constructively fraudulent may be pursued under section 548(a) of the Bankruptcy Code or other "applicable law," including state law, as incorporated under section 544(b) of the Bankruptcy Code.  The required elements to set aside a conveyance as a constructively fraudulent transfer under federal (as well as state) law are that the debtor:  (i) transferred an interest in a property or incurred an obligation; (ii) received less than reasonably equivalent value in exchange for the transfer or obligation; and (iii) at the time of the transfer or incurrence of the obligation was, or rendered, insolvent, inadequately capitalized, or unable to pay its debts as they came due.  11 U.S.C. §548(a); *see also ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 315-16 (S.D. Tex. 2008); *In re Model Imperial, Inc.*, 250 B.R. 776, 791 (Bankr. S.D. Fla. 2000); *In re Bennett Funding Grp., Inc.*, 232 B.R. 565, 570 (Bankr. N.D.N.Y. 1999).

CEOC received reasonably equivalent value in connection with the sale of Planet Hollywood and Horseshoe Baltimore. Second, they claim that the safe harbor provision of section 546(e) of the Bankruptcy Code would provide a complete defense to this claim.[1475]  As discussed below, the Examiner disagrees with CEC and the Sponsors on both issues.

### i.   CEOC Did Not Receive Reasonably Equivalent Value

As discussed in greater detail in Appendix 7,[1476] the Examiner concludes that the consideration received by CEOC for the assets it sold in connection with the Growth Transaction – *i.e.*, $360 million – did not constitute fair or reasonably equivalent value, despite Evercore's financial analyses and fairness opinion to the contrary.

Evercore, as discussed above, was retained by the CEC Valuation Committee – not by, or for, CEOC – to serve as its financial advisors in connection with the Growth Transaction. In addition to providing advisory services and a fairness opinion regarding the value of the assets transferred in connection with the transaction, Evercore acted as the primary negotiator with the Sponsors, reporting back to the Valuation Committee. One of the most contentious aspects of these negotiations was how to value CIE. Negotiating from the perspective of a desire to minimize CEC's interest in the new entity and maximize CAC's interest, the Sponsors argued for a very low valuation for CIE – their initial proposal valued CIE at only $459 to $677 million, which was significantly lower than the $1.2 billion valuation PwC provided around the same time.[1477] The Sponsors did the same with respect to Planet Hollywood and Horseshoe Baltimore.

In the end, while the Examiner does not believe there to be any evidence that Evercore acted in bad faith or with improper motives or undisclosed conflicts (and thus, no basis exists for any claim against Evercore), the Examiner does not believe that Evercore's analyses and opinions are entitled to any particular deference or weight for several reasons. First, Evercore did not use the most recent projections for Planet Hollywood. It asked for them, but CEC management never provided them. The failure to use the most recent projections in large part accounts for the difference between Evercore's valuation and the results of the Examiner's independent valuation. Second, Evercore treated Planet Hollywood as a regional property, rather than a Las Vegas Strip property, in terms of determining the proper EBITDA multiple to apply. Third, Evercore used the wrong latest twelve-month (LTM) EBITDA number in its analyses. And finally, Evercore did not consider the projected EBITDA increases from Project Songbird in reaching its conclusions, although it did deduct the related capital costs.

---

[1475] Although CEC and various witnesses have also asserted that CEOC was not, in fact, insolvent at the time of the Growth Transaction because CEOC was paying its current debts as they came due, as discussed in Section V, *supra*, that argument is untenable as a matter of fact and is premised on a fundamental misunderstanding of the statutory tests on which a claim of constructive fraudulent transfer may be based.

[1476] Appendix 7, Valuation at Section VII.E.

[1477] The Examiner has not adopted this valuation and, as discussed above, this valuation may have included unrealistically high values for real money online poker.

Based on the assumptions and (stale) information provided to it by management, Evercore concluded that the actual transaction prices for Planet Hollywood and Horseshoe Baltimore – $280 million and $80 million, respectively – were fair. The Examiner, however, has concluded, based on his own independent valuation (using the then most current projections and correct multiples and EBITDA) that as of October 21, 2013, the date the Growth Transaction closed, the actual fair market value for the transferred assets ranged from $797 million to $953 million, including excess cash and net of debt assumed. In reaching these conclusions, the Examiner utilized the guideline public companies and discounted cash flow methods described below and in Appendix 7.[1478]

### (A)  Guideline Public Companies Method

Based upon independent research and a review of companies identified by other financial advisors, the Examiner selected ten guideline public companies comparable to the transferred assets in terms of risk, characteristics, services, products, industry participation and competitive landscape.[1479]  Those ten companies are listed in the figure below.

**Growth Figure 16:  Guideline Public Companies – Growth Transaction**

| Company Name | Ticker Symbol |
| --- | --- |
| Boyd Gaming Corporation | BYD |
| Caesars Entertainment Corporation | CZR |
| Churchill Downs, Inc. | CHDN |
| Isle of Capri Casinos | ISLE |
| Las Vegas Sands Corporation | LVS |
| MGM Resorts International | MGM |
| Monarch Casino and Resort, Inc. | MCRI |
| Penn National Gaming Inc. | PENN |
| Pinnacle Entertainment Inc. | PNK |
| Wynn Resorts Limited | WYNN |

The Examiner then conducted a detailed analysis of each of these companies to determine their relative degree of comparability to the transferred assets. For purposes of selecting the valuation multiples for the Growth Transaction, however, Caesars and Las Vegas Sands were excluded. The results of this analysis are described in greater detail in Appendix 7.[1480]

---

[1478]  *See* Appendix 7, Valuation at Section VII.E

[1479]  *See* Appendix 7, Valuation at Section VII.E.2.

[1480]  *See id.*

### (B)  Discounted Cash Flow Method

For Planet Hollywood, the projections in the Q3 2013 LRP were utilized in the Examiner's DCF model, since these were the latest projections prepared by Caesars in the ordinary course of business prior to the closing of the Growth Transaction.[1481]   Since the Q3 2013 LRP does not include projections for Horseshoe Baltimore, the Examiner used the development model sent to Evercore in August 2013 for the projections and management fees.[1482]

For the terminal period, depreciation and capital expenditures were set equal to a normalized level of capital expenditures.[1483]   With respect to Planet Hollywood, the Examiner determined that a normalized level of capital expenditures was $13.9 million.  This level is in excess of historical capital expenditures for the property and is consistent with projected capital expenditures at the time of the Growth Transaction.  With respect to Horseshoe Baltimore, normalized capital expenditures were set at $7.5 million, an amount in excess of projected capital expenditures since capital expenditures into perpetuity would exceed those in the first few years as a new property.

The projections were then discounted utilizing the appropriate WACC and capitalization rates.[1484]   The resulting WACC for Planet Hollywood and Horseshoe Baltimore was 10.7% and 10.8%, respectively.  In each instance, a long-term growth rate of 2.0% was selected to arrive at capitalization rates of 8.7% and 8.8%, respectively.  For the purpose of the valuation analysis, the enterprise value of each property was calculated using a range of discount rates plus or minus 0.5% from the calculated WACC.

### (C)  The Selection of Multiples

The Examiner selected multiples for his market approach based on the trading multiples of the guideline public companies at or around the date the Growth Transaction closed.[1485]   To value the transferred assets, the Examiner utilized a range of forward-looking EBITDA multiples based on property-specific factors.  Forward-looking multiples were deemed the most appropriate to capture the forecast cash flow growth through operational maturity.

The following table is a summary of the multiples selected for Planet Hollywood and Horseshoe Baltimore:

---

[1481]   An adjustment was made to the Q3 2013 LRP to include the incremental cash flow projected for Project Songbird.  Moreover, since the Planet Hollywood management fees are valued separately, they were deducted from the projected EBITDA.  *See* Appendix 7, Valuation at Section VII.E.3.

[1482]   *See* Appendix 7, Valuation at Section VII.E.3.

[1483]   *See id.*

[1484]   *See id.*

[1485]   *See id.* at Valuation at Section VII.E.4

**Growth Figure 17:  The Examiner's Selected Multiples - Growth Transaction**

| 2014E EBITDA Multiple | Low | High |
|---|---|---|
| Planet Hollywood | 10.0 x | 11.0 x |
| Horseshoe Baltimore | NA | NA |

| 2015E EBITDA Multiple | Low | High |
|---|---|---|
| Planet Hollywood | 9.5 x | 10.5 x |
| Horseshoe Baltimore | 8.5 x | 9.5 x |

| 2016E EBITDA Multiple | Low | High |
|---|---|---|
| Planet Hollywood | NA | NA |
| Horseshoe Baltimore | 8.0 x | 9.0 x |

For Planet Hollywood, the Examiner chose 2014E and 2015E EBITDA multiples, since the property was in a high growth state and to capture the impact of Project Songbird.  For Horseshoe Baltimore, 2015E and 2016E EBITDA multiples were selected because 2014 was the first year of operations and, therefore, was not representative of future expected cash flow. Moreover, as discussed in detail in Appendix 7,[1486] the selected multiples were based on both a qualitative and quantitative analysis of the subject properties as compared to the guideline public companies.

### (D)  Management Fees

In determining the value of the management fees associated with the Growth Transaction, the Examiner used the same projections, discount rates and capitalization rates that were utilized in the DCF analysis.[1487]  The projected management fees for Planet Hollywood were based on 3% of projected revenues and 4.5% of projected EBITDA.  The projected management fees for Horseshoe Baltimore included fees paid to both Caesars and the other joint venture equity holders.  Therefore, only 50% of the Caesars portion of the management fees was included for Horseshoe Baltimore.  The resulting estimated management fees were reduced by the appropriate tax rate and then discounted to present value at a discount rate consistent with the WACC utilized in each of the subject property valuations.

### (E)  The Examiner's Valuation Conclusion

The Examiner's valuation for the transferred assets, after accounting for the appropriate ownership percentages, excess cash, debt assumed by CGP and management fees, is as follows:[1488]

---

[1486]   *See id.*

[1487]   *See id.* at Valuation at Section VII.E.5.

[1488]   *See id.* at Valuation at Section VII.E.6.

**Growth Figure 18:  Valuation Conclusions – Growth Transaction**

| Planet Hollywood | Weighting | Low | | High | |
|---|---|---|---|---|---|
|     Guideline Public Company Method | 50% | $ | 1,095.2 | $ | 1,207.7 |
|     Discounted Cash Flow Method | 50% | | 912.6 | | 1,023.1 |
| Concluded Range | | $ | 1,003.9 | $ | 1,115.4 |
| Add:  Management Fee Stream (50%) | | | 72.6 | | 81.4 |
| Enterprise Value - Planet Hollywood | | $ | 1,076.5 | $ | 1,196.8 |
| Less:  Debt Assumed | | $ | (513.2) | $ | (513.2) |
| Add:  Excess Cash | | | 88.0 | | 88.0 |
| Less:  PV of I/O Strip | | | (8.0) | | (8.0) |
| Equity Value - Planet Hollywood | | $ | 643.3 | $ | 763.6 |
| Horseshoe Baltimore | Weighting | Low | | High | |
|     Guideline Public Company Method | 50% | $ | 512.0 | $ | 575.3 |
|     Discounted Cash Flow Method | 50% | | 491.3 | | 552.3 |
| Enterprise Value - Horseshoe Baltimore | | $ | 501.7 | $ | 563.8 |
| Less:  Debt Assumed | | $ | (332.9) | $ | (332.9) |
| Add:  Excess Cash | | | 66.0 | | 66.0 |
| Total Equity Value - Horseshoe Baltimore (excl. mgmt fee) | | $ | 234.8 | $ | 296.9 |
|     Caesars Equity Interest | | | 51.8% | | 51.8% |
| Equity Value - Planet Hollywood | | $ | 121.6 | $ | 153.8 |
| Add:  Management Fee Stream (50%) | | | 31.8 | | 35.8 |
| Caesars Equity Value - Horseshoe Baltimore | | $ | 153.4 | $ | 189.6 |
| **Total - Growth Transaction** | | **$** | **796.7** | **$** | **953.2** |

Moreover, the table below summarizes the transaction price compared to:  (i) Evercore's valuation; (ii) the sensitivity analysis correcting certain of Evercore's inputs and methodologies; (iii) the values offered by other parties; and (iv) the Examiner's valuation of the assets.[1489]

---

[1489] *See id.* at Valuation at Section VII.G.

**Growth Figure 19: Summary of Values for the Growth Transaction[1490]**

| amounts in millions | Equity Value | |
|---|---|---|
| | Low | High |
| *Transaction Price* | $ 360 | $ 360 |
| Evercore | $ 268 | $ 420 |
| Evercore - Sensitized | $ 483 | $ 782 |
| Baker Tilly | $ 631 | $ 995 |
| Creditor Group 1 | $ 851 | $ 1,081 |
| Creditor Group 2 | $ 826 | $ 1,076 |
| **Examiner Valuations** | **$ 797** | **$ 953** |

When compared to Evercore's range of $268 million to $420 million, the shortfall in consideration received by CEOC, based on the Examiner's independent valuation, is between $529 million and $533 million. When compared to the actual consideration received ($360 million), the shortfall is between $437 million and $593 million. Using the midpoint of the range, the shortfall would be $515 million.

### ii.  CEOC Was Insolvent at the Time of the Transaction

As discussed in Section V, *supra*, there is a strong case that CEOC was insolvent at the time the Growth Transaction closed in October 2013.

### iii.  The Section 546(e) Safe Harbor Defense Does Not Apply Here

As noted above, CAC/CGP, CEC, and the Sponsors have argued that any constructive fraudulent transfer claim asserted in connection with the Growth Transaction would be barred by the so-called section 546(e) "safe harbor." The Examiner disagrees. As discussed in greater detail in Appendix 5,[1491] a transfer that otherwise meets the requirements for avoidance under, *inter alia*, sections 544 and 548(a)(1)(B) of the Bankruptcy Code cannot be avoided if it satisfies the "safe harbor" requirements of section 546(e). The safe harbor prevents the avoidance as a constructive fraudulent conveyance or preference of any transfer made "by or to (or for the benefit of)" a financial institution or financial participant that was either (a) a settlement payment, or (b) made "in connection with a securities contract." Although there is no dispute that the Growth Transaction involved transfers of property interests held by various Debtors, as discussed above, what was ultimately transferred to CGP were membership interests in lower tier

---

[1490] The values calculated by other parties, including creditor groups, were (i) preliminary in nature, (ii) based on incomplete information, (iii) not intended to reflect an opinion, (iv) provided on the express understanding that the views expressed were not binding or admissible as evidence in any litigation and (v) provided on a "not for attribution" basis to the Examiner.

[1491] *See* Appendix 5, Legal Standards at Section V.

LLCs ultimately owned by CEOC – a fact the Examiner believes likely prevents the applicability of section 546(e) to the relevant transfers in the Growth Transaction.

As set forth in detail above, the transfers of Planet Hollywood and Horseshoe Baltimore were accomplished in several steps, and were part of a much larger series of transactions involving multiple parties, multiple agreements and multiple transfers. However, the relevant transfers in connection with the Growth Transaction were of LLC membership interests owned indirectly by CEOC. CEC and the Sponsors were very careful to structure these transactions, and presumably used LLCs, for legitimate tax (and other valid) reasons. But the consequence of doing so, from a fraudulent transfer standpoint, was to remove these transfers from the protections of the safe harbor. As discussed in Appendix 5,[1492] it is likely that the Bankruptcy Court and Seventh Circuit would hold that the LLC membership interests transferred in connection with the Growth Transaction do not constitute "securities" under the Bankruptcy Code and, consequently, that the transfer of such membership interests did not constitute either a "settlement payment" or a transfer "in connection with a securities contract."[1493]

CAC/CGP, CEC, and the Sponsors also face a second impediment to the application of section 546(e) to the Growth Transaction – the absence of any transfer by or to (or for the benefit of) a financial institution or financial participant. No financial institution was involved in the transfer of the LLC membership interests to CGP.[1494] And as discussed in Appendix 5,[1495] the Examiner believes it is likely that the Bankruptcy Court or Seventh Circuit would find that none of the transferors of LLC membership interests qualify as a financial participant.[1496] There is no evidence that either CBAC or PHW Las Vegas were parties to any of the various agreements

---

[1492] *See* Appendix 5, Legal Standards at Section V.E.2.a.

[1493] The fact that the Growth Transaction also involved a rights offering by CAC does not alter this conclusion. Even considering the broad application courts have accorded to the "in connection with a securities contract" language in section 546(e), the Examiner believes it is unlikely a court would "collapse" the Growth Transaction and find that the rights offering (to which neither CEOC nor any of the LLC transferors was a party) somehow transformed the separate sale of LLC membership interests (the substance of which a court would likely view as an asset sale) into a transfer in connection with a securities contract. Indeed, Article IV of the Transaction Agreement was entitled "Sale and Purchase of *Assets*." *See* Transaction Agreement (Oct. 21, 2013), at CEOC_INVESTIG_00014779-80 [CEOC_INVESTIG_00014758] (emphasis added). Moreover, the sale of CEOC's interests in Planet Hollywood and Horseshoe Baltimore to CGP was not dependent on or a condition to the formation of CGP or the rights offering. Rather, they were independent transactions – they were by no means essential to CAC or CGP's formation and capitalization.

[1494] Some constituents, including TPG, have argued that the receipt of cash by CEOC from CGP, which was made through a financial institution, is enough to satisfy this requirement. The Examiner does not agree. As discussed in Appendix 5, Legal Standards at Section V.E.1.a, section 546(e) only applies to transfers *by* the debtor. Transfers *to* the debtor are not relevant under the safe harbor.

[1495] *See* Appendix 5, Legal Standards at Section V.E.2.d.ii.(b).

[1496] *See* 11 U.S.C. §101(22A).

enumerated in the statute that allow an entity to qualify as a financial participant.  For example, there is no evidence that CBAC or PHW Las Vegas held *any* swap agreements or securities contracts in *any* amount, nevertheless any with a value of $1 billion in notional or actual principal amount or $100 million in mark-to-market positions.[1497]  Further, although CEOC may qualify as a financial participant based on the notional value of certain swap agreements it was a party to at such time,[1498] CEOC was not a transferor of the Membership Interests,[1499] and the Examiner believes it is highly unlikely that a court would substantively consolidate the various related debtor entities for purposes of section 546(e).

Nor does the Examiner believe that a court would find that any of the transferees in the Growth Transaction qualify as a financial participant.[1500]  There is no evidence that (i) CGP, as the transferee of the transfer of the LLC interests (or Caesars Growth PH, as the ultimate transferee of the PH Membership Interests), or (ii) CGPH or Caesars Growth Baltimore Fee, as the transferees of the Management Fees, were parties to any of various types of agreements enumerated in the statute that would qualify them as financial participants.[1501]

In sum, any interested party seeking to raise section 546(e) as a defense to the constructive fraudulent transfer claim brought in connection with the Growth Transaction faces a

---

[1497]  *See id.*

[1498]  Because CEOC held swap agreements that valued over $1 billion in notional amount at the time of the Growth Transaction, the issue of whether CEOC qualifies as a financial participant based on being a party to the Four Properties Transaction Agreement and B-7 Transaction Agreement is unnecessary to address for purposes of this transaction.  However, as discussed in Appendix 5, Legal Standards at V.E.2.d.ii(b), the Examiner believes that there is a strong argument that a court would not find that CEOC's entering into qualifying agreements after the closing of the Growth Transaction is sufficient to make CEOC a financial participant.

[1499]  Even if the Growth Transaction were collapsed, the fact that the transaction as a whole involved transfers in the aggregate of more than $1 billion would still be insufficient, in the Examiner's view, to qualify any of the entities as financial participants because the transaction was between affiliates.  *See* Appendix 5, Legal Standards at IV.  As a result, each entity would still need, on its own, (and would, in the Examiner's view, be unable) to establish the existence of a different qualifying agreement as a securities contract in order to satisfy the financial participant requirements.

[1500]  *See* 11 U.S.C. §101(22A); *see* Appendix 5, Legal Standards at Section V.E.2.d.

[1501]  *See id.*  TPG has argued that CGP qualifies as a financial participant because it was a party to two different securities contracts that are worth the requisite value, *i.e.*, the B-7 Transaction Agreement and the Four Properties Transaction Agreement.  These agreements, however, were not in existence at the time of the Growth Transaction and, based on the plain language of the statute, *see* 11 U.S.C. §101(22A), the Examiner believes there is a strong likelihood that a court will find that these agreements cannot retroactively qualify CGP as a financial participant.  There is no evidence that any of the transferees held any swap agreements, or any other types of qualifying agreement, at the time of the Growth Transaction.  Finally, while CAC may have been a financial participant as a result of the CAC rights offering, CAC was not a transferee in connection with the transaction.

series of hurdles that will, in the Examiner's view, be very difficult to overcome. Although the issues will undoubtedly be vigorously litigated, the Examiner has concluded that the most likely outcome (if litigated) would be a determination that section 546(e) does not apply because the transfers of LLC membership interests at issue (i) do not constitute transfers "in connection with a securities contract," (ii) do not qualify as settlement payments and (iii) were not made by, to, or for the benefit of a financial institution or financial participant.

### iv.  Remedies for Constructive Fraudulent Transfer

As discussed in greater detail in Appendix 5,[1502] once a court determines that the debtor has fraudulently transferred property, section 550(a) of the Bankruptcy Code gives the trustee the power to recover, "for the benefit of the estate," "the property transferred" or "the value of such property" from the "initial transferee" or the "entity for whose benefit such transfer was made."[1503]

Although the Bankruptcy Code does not specify when a court should order a return of the property rather than payment of the value of the property, monetary damages are the most common remedy.[1504]  The Examiner concludes that CEOC's monetary damages arising from the Growth Transaction are the greater of:  (i) the value of the transferred assets at the time of transfer (*i.e.*, between $797 million and $953 million); and (ii) the value of the transferred assets at the time of a judgment, plus prejudgment interest.[1505]  The Examiner has not undertaken an analysis of the value of the transferred assets today.

The Bankruptcy Code also provides certain protections for good faith transferees.[1506] CAC/CGP would, therefore, have to establish that they were good faith transferees to obtain a

---

[1502]  Appendix 5, Legal Standards at Section VI.

[1503]  11 U.S.C. §550(a).

[1504]  While monetary damages are the most common remedy, a court in its discretion could also order a return of the assets.  *See Hebenstreit v. Kaur*, 619 F. App'x 529, 532 (7th Cir. 2015) ("the bankruptcy court has discretion to award the trustee the actual property *or* its pre-transfer value."); *USAA Fed. Savings Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010) ("If a bankruptcy court permits the trustee recovery, the court has discretion whether to award the trustee recovery of the property transferred or the value of the property transferred.").

[1505]  As discussed in Appendix 5, Legal Standards at Section IV, if the property appreciated in value after the transfer, a court may award the value of the property at the time of the judgment. *Feltman v. Watmus (In re Am. Way Serv.)*, 229 B.R. 496, 531 (Bankr. S.D. Fla, 1999) ("[W]hen the property has appreciated, the trustee is entitled to recover the property itself, or the value of the property at the time of judgment.  The statute, in prescribing alternatives, is purposefully flexible to accomplish its remedial goal."); *see also Govaert v. B.R.E. Holding Co., Inc. (In re Blitstein)*, 105 B.R. 133, 137 (Bankr. S.D. Fla. 1989); *Riske v. The David Austin Seitz Irrevocable Tr. (In re Seitz)*, 400 B.R. 707, 722 (Bankr. E.D. Mo. 2008).

[1506]  Under section 548(c) of the Bankruptcy Code, a good faith transferee of a fraudulent transfer "has a lien on or may retain any interest transferred" to the extent the transferee gave value for the property.  11 U.S.C. §548(c).  In addition, under section 550(e), a good faith

lien or offset for the amount they paid for the transferred assets (*i.e.*, $360 million) plus, if the property is returned or the current value of the property is awarded, the lesser of the costs of any improvements made (after deducting the amount of any profits received) or any profits or appreciation in value attributable to such improvements. Otherwise, CAC/CGP would only be entitled to a general unsecured claim against the debtor's estate.[1507] This is a difficult issue. It certainly can be argued that the intent of the Sponsors was the intent of CAC/CGP in this transaction – the Sponsors negotiated on behalf of CAC/CGP and controlled the Board of CAC at the time the transaction was approved. The Sponsors, as CGP's agents, plainly knew of the dire financial condition of CEOC, understood there was a risk of bankruptcy and included it in their goals in this transaction. At the same time, the fact that the transaction only proceeded after a fairness opinion from a reputable investment bank was provided after genuine bargaining over the price, is important to the assessment of good faith. Moreover, the intent of the Sponsors to improve their position vis-à-vis CEOC and CEOC's creditors may not be attributable to CAC/CGP since there is a reasonable argument that in doing so they were not acting on behalf of CAC/CGP. On balance, the Examiner concludes that there is only a plausible argument that CAC/CGP were not good faith transferees.

To the extent CAC/CGP is determined to be a good faith transferee, CEOC's damages should be reduced by (i) the amount of the consideration paid pursuant to section 548(c), plus (ii) where there has been an appreciation in value, the lesser of the cost of any improvements or the amount of the appreciation pursuant to section 550(e). As a result, the damages for the constructive fraudulent transfer claim would be reduced to $437 million to $593 million.

### b. Actual Fraudulent Transfer

A more complicated issue is whether the Growth Transaction constitutes an actual fraudulent transfer because of an intent to hinder or delay. The Examiner also concludes that there is a strong actual fraudulent transfer claim arising out of the Growth Transaction based on a number of badges of fraud that suggest an actual intent to hinder or delay[1508] CEOC's creditors, as well as the other factors discussed below.

### i. Badges of Fraud and Other Evidence of Intent

As discussed in greater detail in the Appendix 5,[1509] a debtor can be found liable for an actual fraudulent transfer if the party seeking to set aside the transfer can prove by a preponderance of the evidence that the debtor: (i) transferred an interest in property or incurred

---

transferee has a lien on the property to secure the lesser of (a) the cost of any improvement minus any profit realized and (b) the increase in value as a result of the improvement. 11 U.S.C. §550(e).

[1507] Section 502(h) of the Bankruptcy Code gives a transferee of property that is recovered under section 550 a prepetition claim for the amount recovered. 11 U.S.C. § 502(h).

[1508] There is insufficient evidence on which to conclude that there was an actual intent to defraud.

[1509] Appendix 5, Legal Standards at Section III.A.

an obligation; (ii) with an "actual intent to hinder, delay, or defraud" a creditor.[1510]  An intent to hinder, delay, or defraud may be proven by direct evidence or circumstantially through the presence of so-called "badges of fraud."[1511]

The Examiner finds that there are a number of badges of fraud present here:  (i) CEOC was insolvent at the time of the transaction; (ii) CEOC did not receive reasonably equivalent value for the assets sold; (iii) the assets were transferred to an insider (CGP, which was under common control by CEC and the Sponsors); (iv) CEC and the Sponsors effectively retained possession and/or control of the assets; and (v) the process by which the Growth Transaction was negotiated and approved failed to consider CEOC's insolvency and was plainly deficient.  The latest projections also were not made available to Evercore and, under pressure from the Sponsors, management convinced Evercore not to adjust the value of Planet Hollywood due to Project Songbird.

Also, significantly the Sponsors, and Apollo in particular, conceived of the Growth Transaction in 2012 and made all of the key decisions relating to this transaction on everything other than price.  The articulated purpose of the transaction was to provide liquidity to CEOC and extend debt maturities, so as to create additional "runway" in anticipation of the expected recovery in the gaming industry, while exploiting growth opportunities and improving the overall Caesars structure through the creation of two new entities, CAC and CGP.  The theory was that CGP, with its clean balance sheet, would both develop new opportunities and acquire properties from CEOC, thereby increasing liquidity at CEOC and eliminating the need for CEOC to expend capital on properties requiring significant capital investment.  The Sponsors developed the concept and became the majority stockholders of both CAC and CGP.  No consideration was ever given to providing CEOC with an equity interest in CGP.

The evidence presented to the Examiner reveals, however, that there were other significant goals for the Growth Transaction.[1512]  The October 2012 Apollo presentation, for

---

[1510]  11 U.S.C. §548(a)(1)(A); *accord* Del Code Ann. tit. 6, §1304(a)(1); 740 Ill. Comp. Stat. Ann. 160/5(a)(1); Nev. Rev. Stat. §112.180(1)(a); 28 U.S.C. §3304(b)(1)(A).

[1511]  Courts often recite a list of eight badges of fraud applicable to Bankruptcy Code section 548 claims.  These are:  (i) the lack or inadequacy of consideration; (ii) the family, friendship or close associate relationship between the parties; (iii) the retention of possession, benefit or use of the property in question; (iv) the financial condition of the party sought to be charged both before and after the transaction in question; (v) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (vi) the general chronology of the event and transactions under inquiry; (vii) a questionable transfer not in the usual course of business; and (viii) the secrecy, haste, or unusualness of the transaction.  *See, e.g.*, *Peria v. Grecogas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009).

[1512]  As discussed in greater detail in Appendix 5, Legal Standards at Section III.A.1.b, although it is ordinarily the debtor's intent that is relevant for fraudulent transfer purposes, the intent of a third party can be imputed to the debtor/transferor when the third party is an insider of the debtor or is in a position to control the debtor.  *See, e.g.*, *Andrew Velez v. Consol. Edison Co. N. Y., Inc.*, (*In re Andrew Velez Constr.*), 373 B.R. 262, 269-70 (Bankr. S.D.N.Y. 2007) (noting that

instance, makes clear that at the time the transaction was conceived, CEC and CEOC were in dire financial condition and that it was understood that a major restructuring of CEOC's debt would likely be needed at some point in the future.  According to the presentation, the Growth Transaction was intended to better position CEC and the Sponsors in the event of a restructuring or bankruptcy, and also to allow CEC (but not CEOC) to maintain indirect ownership of assets that the Sponsors believed had significant future growth potential.[1513]  Similarly, Bonderman told the Examiner that the purpose of the Growth Transaction was to transfer assets with excess cash flow from CEOC to CGP.

Although Apollo and TPG witnesses have denied that the goal of the Growth Transaction was to improve the Sponsors' position in a possible CEOC bankruptcy or to strengthen their hand in any restructuring negotiations with creditors, as discussed in the Executive Summary, the most persuasive reading of the October 2012 presentation is that it addressed both CEC and CEOC.  In other words, although the Growth Transaction was part of an overarching strategy to provide necessary "runway" for CEOC so that it would have time to recover from the "cyclical," as opposed to "secular," problems it faced and thus avoid a "premature" bankruptcy (which as a general proposition is a desirable goal), CEC and the Sponsors had a second, more problematic objective – namely, to create a structure that would provide CEOC's equity holders with leverage in dealings with CEOC creditors and control over what were previously CEOC and CEC assets in the event of a later bankruptcy.  Thus, the Growth Transaction had as one of its purposes the provision of "downside protection" to CEC and the Sponsors in the event of a CEOC restructuring or bankruptcy.[1514]  Moreover, the transaction ultimately accomplished these goals by removing high revenue assets (and their earnings) from CEOC and putting them in CGP, an entity controlled by the Sponsors and CEC.

If CEOC was a healthy company, the Growth Transaction would have created no issues.  It would also have been unnecessary.  But CEOC was deeply insolvent, and therein lies the problem.[1515]  From the lens of the Sponsors, the Growth Transaction was undoubtedly viewed as

---

"imputation of the transferee's intent to the transferor [is] justified . . . where the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of ownership, executive office or other insider role") (citing *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 447-49 (S.D.N.Y. 2001)); *Krol v. Wilcek* (*In re H. King & Assocs.*), 295 B.R. 246, 283 (Bankr. N.D. Ill. 2003) ("Where the transferee is an insider of the debtor and is in a position to control the disposition of property of the debtor, the transferee's intent is imputed to the debtor.").

[1513]  Although the October 2012 presentation also articulated benefits to CEOC, it evidenced a desire on the part of the Sponsors to improve their position vis-à-vis CEOC's creditors in the event of a restructuring, while acknowledging that a loss of the Sponsors' equity investment in a restructuring was a real possibility.

[1514]  As discussed in Section VIII.A, *supra*, Apollo argued that one of the goals of the Growth Transaction was to create a "war chest" that could be used to facilitate a CEOC restructuring.

[1515]  A further problem with the Growth Transaction (and the later Four Properties Transaction) is that, while it created runway, it was not a long-term solution, and in fact left CEOC in a far worse position to meet its future maturities.  As a result of these transactions, CEOC was

being in the interests of Caesars as a whole, but looking at it solely from the perspective of the creditors of a deeply insolvent CEOC, a strong argument can be made that the creation of CGP and the sale of assets to CGP in the Growth Transaction involved the necessary intent to hinder or delay creditors.

CEC and the Sponsors have argued that the presence of a legitimate business purpose precludes any finding of an actual fraudulent transfer, even if the transfer at issue also served a purpose of hindering creditors. The Examiner disagrees. Courts have repeatedly stated that if a debtor has the intent to hinder or delay creditors, then the transfer is fraudulent even if the transfer is motivated, in part, by an alternate, legitimate purpose.[1516] In *In re Sentinel Management Group, Inc.*, for instance, the Seventh Circuit held that even if a debtor's primary purpose in making a transfer or incurring an obligation was not to hinder, delay or defraud creditors, the debtor nevertheless intended that result when it was the "natural consequence of [the debtor's] actions."[1517]

The contrary argument made by CEC and the Sponsors appears to be based upon a misunderstanding of the "legitimate supervening purpose" aspect of a badges of fraud analysis that may be conducted to find fraudulent intent. Where several badges of fraud exist, there is a presumption of fraudulent intent, and the burden of proof shifts to the transferee to prove a

---

stripped of some of its most valuable Las Vegas Strip properties, which not only converted CEOC from a predominately Las Vegas based gaming company into a more regional gaming company, but it also permanently removed significant EBITDA from CEOC without reducing its debt load. As a result, CEOC's liquidity gap was only expected to grow. In other words, the cost of creating "runway" was to materially worsen the prospects of CEOC's Second Lien and unsecured creditors ultimately getting paid.

[1516] *See, e.g.*, *Nelmark v. Helms*, No. 02 C 0925, 2003 WL 1089363, at *2 (N.D. Ill. Mar. 11, 2003); *United States v. Engh*, 330 F.3d 954, 956 (7th Cir. 2003); *718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 192 F.3d 88, 97 (3d Cir. 1999); *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986); *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1455 (W.D. Mich. 1988); *Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239, 1247 (D.C. 2012).

[1517] *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) (holding that debtor investment manager's transfers of clients' segregated funds into its clearing accounts as collateral for its own loan demonstrated actual intent, even if the manager's primary purpose may not have been to render funds permanently unavailable to its clients); *see also Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 279-80 (Bankr. S.D.N.Y. 2013) (citing *Sentinel* and holding that "the clear and intended consequence" of an act was that creditors would be hindered or delayed "as the direct consequence of the scheme"); *ASARCO*, 396 B.R. at 386-87 (explaining that "courts have held that a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would inevitably be hindered, delayed, or defrauded"); *cf. Perceptron, Inc. v. Silicon Video, Inc.*, No. 5:06-CV-0412 (GTS/DEP), 2011 WL 4595003, at *12 (N.D.N.Y. Sept. 30, 2011) (analyzing as a badge of fraud the debtor's "knowledge" that a creditor's claims were "so likely to arise as to be certain" and that it would be unable to pay the claims).

"legitimate supervening purpose."[1518]   Thus, it is not sufficient for a transferee to provide evidence of any alternative purpose; rather, the transferee must prove that there is a "supervening" purpose.  This has been described as a "heavy burden"[1519] and requires proof that the transferor "has not committed the objectionable acts with which he has been charged."[1520] Stated differently, evidence of a "legitimate supervening purpose" means evidence that completely rebuts the presumption of fraudulent intent and proves that the sole intent of the transferor was to accomplish the legitimate supervening purpose.  If the evidence shows a "dual" purpose, then the evidence of the alternate legitimate justification will not rise to the level of being a "supervening" purpose.[1521]   The cases provided by CEC and the Sponsors do not support a different conclusion.[1522]

Moreover, the notion that a "legitimate business purpose" of the Growth Transaction was to provide liquidity to CEOC is undermined by the fact that from the third quarter of 2012 through the second quarter of 2013 – the very time when the Growth Transaction was being developed – CEOC repaid over $400 million to CEC under the intercompany revolver and never lent any of that money back to CEOC.[1523]   In other words, if CEOC had not repaid $280 million to CEC, CEOC would have kept the same amount of liquidity it received from the sale of Planet Hollywood without giving up ongoing EBITDA from the transferred properties.  The evidence, as discussed above, therefore indicates that the Sponsors' intent was to improve their leverage in

---

[1518] *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998) (citing *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir. 1994)).

[1519] *Leonard v. Mylex Corp. (In re Northgate Comp. Sys., Inc.)*, 240 B.R. 328, 360-61 (Bankr. D. Minn. 1999); *Cole v. Strauss*, No. 2:13-cv-04200-NKL, 2014 WL 4055787 (D. Mo. Aug. 15, 2014).

[1520] *Kelly*, 141 F.3d at 802 ("'[t]he burden which shifts . . . is not a burden of going forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged.'"); *In re Northgate Comp. Sys., Inc.*, 240 B.R. at 360-61; *Cole,*, 2014 WL 4055787.

[1521] *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 354 (D. Mass. 2012) (there may have been legitimate purpose to transfer patents to sister corporation to consolidate ownership of patents, but this was not a "supervening" purpose because the transfer may also have been done to hinder or delay creditors); *Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 F. App'x 924, 929 (Fed. Cir. 2005) (fact that corporation needed to borrow funds was not sufficient business justification to rebut presumption that security interest was granted to shareholder with actual intent to defraud).

[1522] *See Edgewater Med. Ctr. v. Edgewater Prop. Co. (In re Edgewater Med. Ctr.)*, 373 B.R. 845 (Bankr. N.D. Ill. 2007) (the challenged transfers were lease payments made pursuant to a lease executed five years prior to bankruptcy filing, there was no evidence that lease itself was improper, and debtor was solvent at time rental payments were made); *Klein v. Klein (In re Klein)*, No. 86 B 19937, 88 A 357, 1991 WL 242169 (Bankr. N.D. Ill. June 21, 1991) (no alternate business justification was provided and court never addressed "legitimate supervening purpose" standard).

[1523] *See infra* Section IX.E, Intercompany Transactions at Figure 2.

the event of a restructuring and to transfer high revenue assets to the new entity. This, along with the presence of numerous badges of fraud, provides support for a finding of the necessary intent for an actual fraudulent transfer.[1524]

### ii. Remedies for Actual Fraudulent Transfer

The remedies available for actual fraudulent transfer are the same as the remedies available for constructive fraudulent transfer.

### c. Breach of Fiduciary Duty

The Examiner concludes that there are strong breach of fiduciary duty claims against the CEOC directors who approved the Growth Transaction and CEC, as CEOC's controlling shareholder,[1525] because (i) the process by which the Growth Transaction was negotiated and approved was seriously flawed, and (ii) CEOC did not receive fair value for the assets it sold in connection with the transaction.

As discussed in Appendix 5,[1526] the default standard of review for claims of breach of fiduciary duty under Delaware law[1527] is the business judgment rule.[1528] However, since

---

[1524]  Section 546(e) is not a defense to an actual fraudulent transfer claim. The Sponsors also argue that the presence of counsel obviates the intent required for an actual fraudulent transfer. Again, while that is relevant to the analysis, it is not dispositive, particularly where, as here, many of the factors supporting this claim did not involve legal advice.

[1525]  As discussed in Appendix 5, Legal Standards at Section X, directors and officers of an insolvent wholly-owned corporation owe fiduciary duties of care and loyalty to the corporation for the benefit of its residual claimants, including creditors. *See, e.g.*, *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 546-547 (Del. Ch. 2015). Although Section 9.8 of CEOC's Articles of Incorporation eliminates liability for damages based on a breach of the duty of care by CEOC's directors, that provision was not added until May 2014 and, therefore, has no effect on the liability of CEOC's directors for any acts or omissions occurring prior to the date. *See* Del. Code Ann. tit. 8, § 102(b)(7). Controlling stockholders of an insolvent wholly-owned corporation likewise owe fiduciary duties of care and loyalty to the corporation and its residual claimants. *Quadrant*, 102 A.3d at 184-85.

[1526]  *See* Appendix 5, Legal Standards at Section X.C.3.

[1527]  Under either an Illinois or federal choice-of-law analysis, the Bankruptcy Court will apply the "internal affairs doctrine," which provides that the law applicable to a claim against a director, officer or controlling stockholder for breach of fiduciary duty is that of the state of incorporation. *Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982); *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011); *Paloian v. Lester Lambert, Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696, 702 (N.D. Ill. 2012) (citing *Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000) (assuming that federal choice of law rules would follow internal affairs doctrine for derivative suit)). Because CEOC is incorporated in Delaware, Delaware law would apply to any claim for breach of fiduciary duty against CEOC's directors and officers or against CEC, as CEOC's controlling stockholder. *See* Appendix 5, Legal Standards at Section X.B.

CEOC's directors, CEC and the Sponsors all stood on both sides of the transaction, given CEC's buy-side *and* sell-side interests in the sale of assets by CEOC to CGP,[1529] the "more onerous" entire fairness standard of review applies.[1530]   Accordingly, CEOC's directors and CEC would have the burden in any litigation to demonstrate that the Growth Transaction was entirely fair to CEOC (factoring in the interests of its creditors).[1531]

### i.   The Process by Which the Growth Transaction Was Negotiated and Approved Was Flawed

The Examiner concludes that the process by which the Growth Transaction was negotiated and approved was fatally flawed given the lack of involvement of any independent CEOC directors, coupled with the fact that CEOC did not have access to independent financial or legal advisors.[1532]   Indeed, independent directors were not added to CEOC's Board until June 2014, well after the Growth Transaction closed.   The CEOC directors who did approve the transaction did so only via written consents *after* the transaction had been negotiated and the price had been set.   Both inside directors were, in any event, conflicted given their roles as CEC executives and the fact that CEC stood on both sides of the transaction.[1533]

---

[1528]   *Quadrant*, 102 A.3d at 183.

[1529]   In light of its 100% ownership of CEOC and its 58% equity interest in CGP, CEC stood on both sides of the Growth Transaction.  Likewise, Loveman and Cohen also stood on both sides of the transaction, since in addition to approving the transaction in their capacity as CEOC board members, they served as CEC officers at the time of the transaction.

[1530]   *See Quadrant*, 102 A.3d at 183; *Blackmore Partners v. Link Energy LLC*, Civ. A. No. 454-N, 2005 WL 2709639, at *5 (Del. Ch. Oct. 14, 2005); *Theriault*, 51 A.3d at 1240; *Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 412 (Del. Ch. 1999); *In re Tyson Foods, Inc.*, 919 A.2d 563, 596 (Del. Ch. 2007).

[1531]   *In re Nine Sys. Corp. S'holders Litig.*, No. CIV.A. 3940-VCN, 2014 WL 4383127, at *34 (Del. Ch. Sept. 4, 2014).

[1532]   *See GPC XLI L.L.C. v. Loral Space & Commc'ns, Inc. (In re Loral Space & Commc'ns. Inc.)*, C.A. Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *22 (Del. Ch. June 20, 2008) (fair process prong not met where "[f]or starters, the composition of the Special Committee was flawed"); *Gesoff v. IIC Indus. Inc.*, 902 A.2d 85, 97 (Del. 2006) (finding that process was "crippled by the . . . complete lack of independent legal and financial advice").

[1533]   In reaching his conclusions on these issues, the Examiner is not suggesting or making any finding that CEOC's two inside directors acted with an evil motive or in a manner they did not reasonably believe was in the best interests of CEOC.  On the contrary, at all relevant times Loveman and Cohen appear to have acted in what they believed was the best interests of Caesars as a whole.  They did not differentiate between what is best for CEC vs. CEOC, and apparently were not advised by counsel of the need to draw that distinction given CEOC's dire financial condition.  The evidence is clear that all important strategic decisions regarding the transactions investigated by the Examiner were made by the CEC Board and the Sponsors, and that the inside directors of CEOC were merely "following orders" when approving the transactions (typically by written consent rather than meeting).  Although Loveman was the CEO of CEC and CEOC,

Nor could the CEOC Board abdicate its fiduciary obligations by deferring to the CEC Valuation Committee.[1534]   The CEC Valuation Committee members owed their fiduciary duties to CEC, which, unlike CEOC, stood on both sides of the transaction – it was the 100% owner of the seller and expected to be the majority owner of the buyer.   Although CEC, as CEOC's controlling stockholder, owed a fiduciary duty to CEOC, CEC's directors – including Williams, Swann, and Housenbold – did not.[1535]   In short, even if the CEC Valuation Committee in good faith discharged its duties to CEC's stockholders (and the Examiner does not suggest otherwise), it could not be entrusted with protecting the interests of CEOC's stakeholders, including creditors.[1536]

The foregoing, standing alone, leads the Examiner to conclude that the process associated with the Growth Transaction was not entirely fair.   There were, however, other shortcomings as well.   These included, among other things, the dominant role played by the Sponsors, and Apollo in particular, in conceiving of and driving the transaction in order to better position CEC and the Sponsors in the event of a restructuring or bankruptcy, and to allow CEC (but not CEOC) to maintain indirect ownership of assets that the Sponsors believed had significant future growth potential.[1537]   As discussed above, these goals were ultimately accomplished by removing high revenue assets (and their earnings) from CEOC and putting them in an entity controlled by the Sponsors and CEC, which made it even less likely that CEOC would be able to pay its debts as they matured.

---

he effectively functioned – given the Sponsors' control and influence over all asset sales and financial transactions – as the chief operating officer.   His liability, therefore, would stem from his failure to act, his abdication of responsibility, and adherence to the directions of the Sponsors, as well as from the fact that the transactions he approved do not meet the entire fairness test.   *See Reis v. Hazelett Strip-Casting Corp*., 28 A.3d 442, 459 (Del. Ch. 2011) ("Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.").

[1534]   *Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc*., 532 A.2d 1324, 1338 (Del. Ch. 1987) (the "board, in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder").

[1535]   *See Trenwick Am. Litig. Tr. v. Ernst & Young LLP*, 906 A.2d 168, 194 (Del. Ch. 2006) (emphasizing that, even where a controlling stockholder owes a fiduciary duty to a corporation, the controlling stockholder's individual directors do not).

[1536]   *See Reis*, 28 A.3d at 459 ("Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.").

[1537]   *See, e.g.*, *In re Loral Space & Comms. Inc*., 3022-VCS, 2008 WL 4293781, at *2 (entire fairness standard not met where dominant shareholder "set in motion a process in which the only option that the Special Committee considered was a deal with [the dominant shareholder] itself"); *Sealy Mattress*, 532 A.2d at 1333 (entire fairness standard not met where, *inter alia*, majority stockholder "stood on both sides of the proposed merger and fixed its terms" and directors "[functioned] in a ministerial capacity to carry out the parent [corporation's] bidding").

In addition, aside from the fact that it consisted of independent directors from the wrong board, the limited authority of the CEC Valuation Committee also raises concerns.[1538]  Most notably, the CEC Valuation Committee was not authorized to recommend alternative transactions, make changes to the assets CGP would receive or acquire from CEOC, or market the assets to third parties.  Consequently, the CEC Valuation Committee lacked the ability to propose an equity role for CEOC in CGP, something an independent CEOC committee might have considered.

Also of concern, the evidence indicates that the Sponsors put pressure on management to convince Evercore to conclude that Project Songbird would have no material impact on Planet Hollywood's valuation and price.  So, too, is the fact that Caesars did not provide Evercore with updated projections, despite numerous diligence requests from Evercore throughout 2013.  Finally, a significant portion of Evercore's compensation was contingent on consummation of the transaction envisioned by the Sponsors.  As noted above, Evercore's fee structure included, *inter alia*, a $3.5 million fee upon delivery of a fairness opinion, as well as a discretionary fee not to exceed $3 million to be paid at the conclusion of the assignment (of which, Evercore was ultimately paid $2.25 million).  Although the Delaware Supreme Court has noted that  "[a] contingent compensation arrangement that pays an advisor a percentage of the deal value can have the salutary effect of aligning the interests of the advisor with those of its client in attempting to obtain the best value," that is not the case here where Evercore stood to receive significant additional fees upon consummation that were not tied to the deal price.  As the Delaware Supreme Court has explained, this type of contingent compensation arrangement can create a "misalignment over whether to take a deal in the first instance, and divergence could arise over how to proceed during final negotiations."[1539]

CEOC's directors and CEC have both signaled an intent to rely on an advice of counsel defense.  As set forth in Appendix 5,[1540] where, as here, fiduciaries are accused of having breached their duty of loyalty (as opposed to their duty of care), reliance on advice of counsel – even if reasonable and in good faith – is at most one factor that a court is to consider in assessing the fairness of the process.[1541]   Here, the Examiner concludes that this defense, even if established, would be insufficient to overcome the pervasive process deficiencies detailed above.[1542]

---

[1538] *See In re So. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 797 (Del. Ch. 2011) (finding that process was unfair under entire fairness standard because, among other reasons, the special committee "had a narrow mandate to 'evaluate' a transaction suggested by the majority stockholder"); *In re CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 414 (Del. Ch. 2010) (finding that process was not fair because, among other reasons, "the Special Committee was not provided with authority comparable to what a board would possess in a third-party transaction").

[1539] *RBC Capital Mkts., LLC v. Jervis*, No. 140, 2015 WL 7721882, at *35 (Del. Nov. 30, 2015).

[1540] *See* Appendix 5, Legal Standards at Section X.C.2.b.

[1541] *See Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 751 (Del. Ch. 2007).

[1542] *See id.*

### ii.  CEOC Did Not Receive Fair Value for the Assets

As noted in Appendix 5,[1543] Delaware courts hold that a "grossly unfair process can render an otherwise fair price . . . not entirely fair."[1544]  For the reasons discussed above, the Examiner finds that, process flaws aside, CEOC also did not receive fair market value for the assets it sold as part of the Growth Transaction, which ranged from $797 million to $953 million, including excess cash and net of debt assumed.[1545]  The fatally flawed process by which the transaction was negotiated and approved only reinforces the Examiner's conclusion that CEOC did not receive fair value for the transferred assets.[1546]

### iii.  Remedies for Breach of Fiduciary Duty

As discussed in greater detail in Appendix 5,[1547] courts have broad discretion "in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate."[1548]  Such potential relief includes "actual" or "out of pocket" damages, measured as

---

[1543] *See* Appendix 5, Legal Standards at Section X.C.3.

[1544] *In re Nine Sys.*, 2014 WL 4383127, at *47.

[1545] Courts construe the "reasonably equivalent value" component of a fraudulent conveyance claim and the "fair value" component of the entire fairness test in the breach of fiduciary duty context in "similar" fashion.  *See BFP v. Resolution Tr. Corp*., 511 U.S. 531, 545 (1994). Whether the consideration received in connection with a transaction was "reasonably equivalent" to the value of the assets sold or transferred will turn "on the case-specific circumstances surrounding the debtor's decision to enter in the challenged transaction."  *Am. Tissue, Inc. v. Donaldson Lufkin & Jenrette Secs. Corp*., 351 F. Supp. 2d 79, 105-06 (S.D.N.Y. 2004).  The inquiry of whether the debtor received reasonably equivalent value "is fundamentally one of common sense, measured against market reality."  *In re Northgate Comp. Sys., Inc.*, 240 B.R. at 365.  In making this determination, courts look to, among other things, "(1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee."  *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997). Similarly, the fair price component of the entire fairness test in the breach of fiduciary duty context "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's [assets]."  *Weinberger v. UOP, Inc*., 457 A.2d 701, 711 (Del. 1983).  The fiduciary must establish that the valuation fell within the proverbial "range of fairness," which is one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."  *Reis*, 28 A.3d at 466-67; *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1143 (Del. Ch. 1994).

[1546] *Id*.

[1547] *See* Appendix 5, Legal Standards at Section X.C.4.

[1548] *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) (citing *Weinberger*, 457 A.2d at 714); *accord Theriault*, 51 A.3d at 1251 ("The Court of Chancery has the historic power to grant such . . . relief as the facts of a particular case may dictate" and "has greater

the "difference between the consideration received and the actual value of the asset[s] at the time they were transferred," rescission or rescissory damages.[1549]

As discussed above, the Examiner finds that "out of pocket" damages here would range from $437 million to $593 million, which represents the shortfall in what CEOC received as consideration for the assets transferred in connection with the transaction. These damages figures do not include pre- or post-judgment interest, which courts have the discretion to award in addition to actual damages.[1550] The court could, however, in addition to awarding the actual damage measure noted above, also award damages reflecting the diminution in CEOC's value following the sale of Planet Hollywood and Horseshoe Baltimore.

Where actual or out-of-pocket damages are considered inadequate, a court may instead award rescission or rescissory damages which could include lost profits.[1551] Actual rescission of a consummated corporate transaction is often found to be infeasible, however, due to the "passage of time" and other factors.[1552] Here, the Growth Transaction was completed over two years ago.

---

discretion when making an award of damages in an action for breach of duty of loyalty than it would when assessing fair value in an appraisal action.") (citations and internal quotation marks omitted); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 500 (Del. 1981) (finding that the "choice of relief" is "largely a matter of discretion with the Chancellor").

[1549] *Andra v. Blount*, 772 A.2d 183, 193 (Del. Ch. 2000); *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1187 (Del. 1988) (*Cede I*); *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 224-25 (Del. Ch. 2014); *Poole v. N. V. Deli Maatschappij*, 224 A.2d 260, 262 (Del. Chan. 1966). Rescissory damages seek "(i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised control over the property in the interim and (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property." *Orchard*, 88 A.3d at 39 (citing *Strassburger v. Early*, 752 A.2d 557, 580-81 (Del. Ch. 2000); *Cinerama*, 663 A.2d at 1144-47).

[1550] *In re S. Peru*, 52 A.3d at 814.

[1551] *Orchard*, 88 A.3d at 39 (citing *Strassburger*, 752 A.2d at 581; *Cinerama, Inc.*, 663 A.2d at 1144); *see also Oberly v. Kirby*, 592 A.2d 445, 466 (Del. 1991) (stating that if transaction failed to satisfy entire fairness test, "the stockholders may . . . demand rescission of the transaction or, if that is impractical, the payment of rescissory damages").

[1552] *Orchard*, 88 A.3d at 41 (*citing* Wolfe & Pittenger § 12.04(b) at 12-68); *see also Weinberger*, 457 A.2d at 714 (finding rescission impractical to undo completed cash out merger)); *Universal Ent. Grp., L.P. v. Duncan Petroleum Corp.*, C.A. No. 4948-VCL, 2013 WL 3353743, at *15-16 (Del. Ch. July 1, 2013) (finding rescission unfeasible because over the course of approximately three years, the properties at issue had been sold to third parties); *Lynch*, 429 A.2d at 501 (rescission inappropriate where the passage of time had "brought . . . corporate changes").

### d. Aiding and Abetting Breach of Fiduciary Duties

The Examiner concludes that there are reasonable aiding and abetting breach of fiduciary duty claims against the Sponsors and certain of CEC's directors affiliated with the Sponsors.[1553]

The first two elements of a claim for aiding and abetting breach of fiduciary duty are discussed above.[1554]  CEOC's directors and CEC owed fiduciary duties to CEOC for the benefit of its residual claimants, including creditors, and the Examiner has already concluded that a reasonable argument can be made that these parties breached their fiduciary duties in connection with the Growth Transaction.

With respect to the third element, "knowing participation,"[1555] as detailed above, Apollo designed the Growth Transaction to, *inter alia*, better position CEC and the Sponsors in the event

---

[1553]  The Examiner also concludes that there is no aiding and abetting claim against CAC/CGP, since these entities only came into existence in connection with the Growth Transaction and did not negotiate the terms of the transaction.  For the same reasons, the Examiner concludes that any unjust enrichment claim against CAC/CGP is also weak. *See Glenbrook Capital Ltd. P'ship v. Dodds (In re Am. Deriv. Litig.)*, 252 P.3d 681,703 (Nev. 2011); *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (to prevail on an unjust enrichment claim "the plaintiff is required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit"); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1056 (Del. Super. Ct. 2001) (unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience") (internal citations omitted).

[1554]  Under the "internal affairs doctrine," the law applicable to a claim for aiding or abetting breach of fiduciary duty is likewise the law of the state of incorporation.  *See  Am. Int'l Grp., Inc. v. Greenberg (In re Am. Int'l Gp., Inc.)*, 965 A.2d 763, 817-22 (Del. Ch. 2009), *aff'd sub. nom.*, *Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011); *Jano Justice Sys., Inc. v. Burton*, No. 08-cv-3209, 2010 WL 2012941, at *6 (C.D. Ill. May 20, 2010). As noted above, because CEOC is incorporated in Delaware, Delaware law would apply to any claim that a third-party aided and abetted a breach of fiduciary duty by CEOC's officers, directors or controlling stockholders.  *Id*.; *CDX Liquidating Tr.*, 640 F.3d at 212.  As discussed in Appendix 5, Legal Standards at Section X.D.2, to prevail on a claim for aiding and abetting a breach of fiduciary duty under Delaware law, a plaintiff must establish:  (i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in that breach by the defendants; and (iv) damages proximately caused by the breach.  *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 496 (Del. Ch. 2013) (citing *Malpiede v. Townson*, 780 A.2d 1075 1096 (Del 2001)); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006) (recognizing aiding and abetting claim against parent for breaches of fiduciary duty by directors of subsidiary).

[1555]  As discussed in Appendix 5, Legal Standards at Section X.D.2, for a third party to "knowingly participate" in a fiduciary's breach, the third party must take advantage of a position of trust or conflicts of interest on the part of directors, or otherwise knowingly participate in the directors' breach of fiduciary duties.  *In re Comverge, Inc.*, No. CV 7368-VCP, 2014 WL 6686570, at *17 (Del. Ch. Nov. 25, 2014); *Malpiede*, 780 A.2d at 1097.  In general, "knowing

of a restructuring or bankruptcy, and to allow CEC (but not CEOC) to maintain indirect ownership of assets that the Sponsors believed had significant future growth potential.[1556] These goals were ultimately accomplished by removing high revenue assets (and their earnings) from CEOC and putting them in an entity controlled by the Sponsors and CEC (making it even less likely that CEOC would be able to pay its debts as they matured). The evidence also shows that Apollo did not disclose these underlying goals to the CEC or CEOC Boards.[1557] Moreover, Apollo was actively engaged in the negotiation process on behalf of CGP (the buyer) and, in that capacity, was actively trying to reduce the consideration paid to CEOC for the assets sold to CGP.[1558] Although it appears that TPG had a less significant role in designing the Growth Transaction, the evidence indicates that TPG was aware of the goal of devising the Growth Transaction to, *inter alia*, move high-growth potential assets to CGP, which would protect the Sponsors' interests in the event of a CEOC restructuring. Bonderman, for instance, told the Examiner that the purpose of the Growth Transaction was to transfer properties with excess cash flow from CEOC to a newly-created entity. TPG also urged Caesars management for assurances that Project Songbird would not affect the valuation of Planet Hollywood.

Based on this evidence, the Examiner concludes that there is a reasonable claim that the Sponsors knowingly participated in the CEOC directors' and CEC's breaches of fiduciary duty.[1559] Given their central roles and involvement in the activities by Apollo described above,

participation" is found when the nonfiduciary "act[ed] with the knowledge that the conduct advocated or assisted constitutes a breach." *Mapiede*, 780 A.2d at 1097.

[1556] *See, e.g.*, *In re Loral Space & Comms. Inc.*, 2008 WL 4293781, at *2 (entire fairness standard not met where dominant shareholder "set in motion a process in which the only option that the Special Committee considered was a deal with [the dominant shareholder] itself"); *Sealy Mattress*, 532 A.2d at 1333 (entire fairness standard not met where, *inter alia*, majority stockholder "stood on both sides of the proposed merger and fixed its terms" and directors "[functioned] in a ministerial capacity to carry out the parent [corporation's] bidding").

[1557] Advice of counsel is generally not a recognized defense to a claim for aiding and abetting a breach of fiduciary duty. *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del. Ch. 2011); *In re Rural Metro Corp.*, 88 A.3d 54, 86 (Del. Ch. 2014).

[1558] *RBC Capital*, 2015 WL 7721882, at *32 ("[A] bidder may be liable to the target's [residual claimants]," however, "if the bidder attempts to create or exploit conflicts of interest" on the part of the target's fiduciaries.) (citations omitted); *see also Gilbert v. El Paso Co.*, 490A.2d 1051, 1058 (Del. Chan. 1984) ("[A]lthough an offeror may attempt to obtain the lowest price for stock through arm's length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.").

[1559] In reaching this conclusion the Examiner does not believe that the Sponsors' role as negotiators for the buyer constitutes active participation in a breach by the seller's fiduciaries.

the Examiner concludes that there are also reasonable aiding and abetting breach of fiduciary duty claims against Rowan and Sambur in their individual capacities.[1560]

The potential remedies for an aiding and abetting claim are identical to the remedies available for a breach of fiduciary duty discussed above.[1561]

---

[1560] *See, e.g.*, *In re Advance Nanotech, Inc.*, Case No. 11-10776 (MFW), 2014 WL 1320145, at *7 (D. Del. Bankr. Apr. 2, 2014) (recognizing claims for aiding and abetting breach of fiduciary against both lender and its principal).

[1561] As discussed in Appendix 5, Legal Standards at Section X.D.3, a defendant who aids and abets a breach of fiduciary duty is jointly and severally liable for the damages resulting from the breach and therefore the "injured person is entitled to recover his damages from [any] of the tortfeasors, without distinction, subject to the limitation that his total recovery may not exceed the full amount of his damage." *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d at 220-21.

## C. CERP Transaction

### 1. Introduction

Towards the end of 2012, Apollo (acting on behalf of Caesars) turned its attention to refinancing some $6.5 billion of CMBS debt that had been incurred at the time of the LBO and amended and extended in 2010.  The CMBS debt, which was set to mature in February 2015, was secured by six so-called "CMBS Properties" – the Flamingo, the Paris, the Rio, Harrah's Las Vegas, Harrah's Atlantic City and Harrah's Laughlin – which had been transferred from CEOC (then HOC) to CEC (then HET) at or around the time of the LBO.[1562]  CEOC was not an obligor of the CMBS debt.

Both Apollo and the lenders involved in the refinancing discussions recognized that, as a result of the economic downturn in 2008, the value of the CMBS Properties had fallen, creating a significant "equity gap" that would need to be filled with additional collateral in order to support sufficient "debt capacity" to facilitate a refinancing.  After a series of discussions – some with Caesars management and co-Sponsor TPG, others with the lenders involved in the refinancing discussions – Apollo determined that it would plug this equity gap by, *inter alia*, causing CEOC (which had no involvement in the CMBS financing arrangements at the time) to sell two projects being developed – the LINQ and Octavius (defined below) – to a new wholly-owned CEC subsidiary called Caesars Entertainment Resort Properties ("CERP").[1563]  Those properties, along with the CMBS Properties, would be transferred to CERP and serve, collectively, as additional collateral to refinance the CMBS debt.

The LINQ and Octavius were among CEOC's newest and most ambitious developments.  The former, which was not complete at the time of the CERP Transaction, was designed to be an indoor/outdoor "party district" featuring a wide variety of retail, dining and drinking options (as well as the world's largest "observation wheel") and to serve as a bridge between Harrah's Las Vegas, the Flamingo and the Paris.  Octavius, which had just been completed in early 2012, was Caesars Palace's fifth (and newest) tower, containing a number of large rooms, suites and villas meant to cater exclusively to high-end guests.

There were no negotiations between CEOC and CEC over the consideration that CEOC would receive in exchange for selling the LINQ and Octavius to the new CERP entity, and no one sought to secure the best possible price on behalf of CEOC.  Nor was there a special committee formed – either at CEOC or CEC – to negotiate the transaction.  Both CEOC and CEC were purportedly represented by the same group of lawyers at Paul Weiss, and neither entity retained its own financial advisor to assist it in negotiations.  Instead, CEOC (through Apollo and Paul Weiss) retained Perella Weinberg Partners ("Perella") to provide an opinion that CEOC was receiving "reasonably equivalent" value for the transfer of the two properties to CERP.  Apollo was the principal interlocutor with Perella.

---

[1562]  CEC 10-K for the year ended Dec. 31, 2008 (Mar. 17, 2009), at 33.  *See also* Section XI.

[1563]  As discussed in Section VIII.C.3.l, *infra*, the transaction involved subsidiaries of CEOC transferring LLC interests to CEC, which then contributed the interests down to CERP.

Apollo initially proposed that (i) the assumption of $450 million of remaining debt on the LINQ and Octavius (out of the $878 million spent by CEOC on the projects), in addition to (ii) the purported benefits to CEOC of preventing a default on the CMBS debt by themselves outweighed the value being received by CERP and thus did not warrant CEOC receiving any tangible consideration in exchange for the two properties.  These indirect "benefits" were comprised of (a) the avoidance of certain expenses borne by the CMBS Properties that would ostensibly "bounce back" to CEOC upon the "unplugging" of those properties from the Caesars system (which Apollo informed Perella would occur promptly upon the maturity of the CMBS debt in the event refinancing did not occur), and (b) the release of a guarantee of lease payments held by CEC (not CEOC), purportedly worth around $4.4 billion. When Perella was unwilling to issue an opinion on these grounds, however, Apollo agreed that CEC would contribute to CEOC 2013 and 2018 CEOC bonds that Perella valued between $138 million (market value) and $150 million (face value) as of the date of Perella's valuation.[1564]

Perella issued its final opinion and accompanying presentation regarding the transaction to the CEOC Board on October 10, 2013.  That opinion did not ascribe a monetary value for the release of the CEC lease guarantee as consideration, but did ascribe a value of $378 million to the avoidance of reallocated corporate expenses.  The next morning, the two members of the CEOC Board – Gary Loveman (also CEO and Chairman of the Board of Directors of CEC) and Michael Cohen (also Vice President and Associate General Counsel of CEC) – met with representatives of Perella and attorneys from Paul Weiss to discuss the transaction.  After approximately 45 minutes, the two directors – neither of whom was disinterested or independent – voted to approve the sale of the LINQ and Octavius for the consideration described above (specifically, the assumption of debt, avoidance of corporate expenses that would purportedly "bounce back" to CEOC upon the removal of the CMBS Properties from the Caesars network and the combination of cash and CEOC bonds).  The CMBS refinancing closed the same day, and CERP was born.

## 2.    The Claims and Defenses at Issue

Creditors have asserted that the CERP Transaction, which they allege was conceived and executed while CEOC was insolvent, constituted both a constructive fraudulent conveyance as well as an actual fraudulent conveyance that was intended to hinder, delay, or defraud creditors by removing the LINQ and Octavius from CEOC and putting those properties out of reach of CEOC's creditors in a potential bankruptcy.  They specifically assert that the refinancing of the CMBS debt could have been accomplished without the contribution of the LINQ and Octavius, and that the asset transfer was part and parcel of the same strategy reflected in the Growth and Four Properties Transactions – *i.e.*, to strip CEOC of its prime, EBITDA-generating Las Vegas

---

[1564] Perella    Letter    to    CEOC    Board    of    Directors    (Oct.    11,    2013),    at CEOC_INVESTIG_00404469-73 [CEOC_INVESTIG_00404469].    Ultimately, CEC instead contributed to CEOC $80.7 million in cash and $69.5 million (face value) in bonds that the Examiner has concluded should be valued at an estimated $128.8 million, consisting of $80.7 million in cash and $48.1 million in bonds (market value on the date the CERP Transaction closed). *See* Appendix 7, Valuation at Section VI.E.

assets for the benefit of CEC and its shareholders while severely impairing the ability of CEOC's creditors to realize any recovery on their loans in the future.

In response, CEC asserts that CEOC was solvent at the time of the CERP Transaction and that, as a result, its sale of the LINQ and Octavius could not have constituted a fraudulent transfer.[1565]   CEC also argues that its decision to refinance the CMBS Properties in 2013 was necessary to avoid a foreclosure which could potentially have thrown CEC (and possibly CEOC itself) into bankruptcy and forced CEOC to pay hundreds of millions of dollars in additional shared services expenses formerly borne by the CMBS Properties.   More specifically, CEC asserts that avoidance of these expenses, along with the cash and notes received by CEOC in connection with the CERP Transaction, constituted "reasonably equivalent" value insulating the transaction from attack on constructive fraudulent transfer grounds.   In reaching this conclusion, CEC relies heavily on Perella's "fairness opinion," as well as the economic performance of the LINQ post-closing, which allegedly vindicates the proposition that the consideration received by CEOC was "reasonably equivalent" to the value of the LINQ and Octavius at the time.

The Examiner has concluded that, as a result of CEOC's insolvency and the sale of the LINQ and Octavius for less than reasonably equivalent consideration, there is a strong claim that the CERP Transaction constituted a constructive fraudulent conveyance.   In addition, the Examiner believes that CEOC possesses a strong claim that the CERP Transaction was an actual fraudulent conveyance.   The transaction is characterized by the presence of a number of badges of fraud, and the requisite intent can certainly be inferred from the conduct of Apollo in structuring and negotiating the transaction – in particular, its efforts to ensure that CEOC received the lowest possible price from CEC for the transfer of the LINQ and Octavius.

In addition, creditors have alleged that CEOC's directors and CEC (as CEOC's controlling shareholder) breached their fiduciary duties, and that such breach was aided and abetted by the Sponsors and David Sambur and Marc Rowan in their role as CEC Directors.   The creditors point out that notwithstanding the fact that this was an interested party transaction, the CEOC Board – with no independent directors – was not represented by independent counsel or a special committee and there was no negotiation whatsoever over the consideration to be transferred to CEOC in exchange for its contribution of the LINQ and Octavius.

In response, CEC disputes that the assets were transferred through a flawed process, stressing that CEOC solicited – and received – an independent "fairness opinion" from Perella, which conducted extensive diligence, pushed back against certain of the assumptions urged on it by Apollo and Paul Weiss, and compelled CEC to provide additional tangible consideration to CEOC before agreeing to conclude that the LINQ and Octavius were being transferred for reasonably equivalent value.   CEC also contends that the CEOC Board, after meeting to discuss

---

[1565]   According to CEC, CEOC was solvent because:  (i) CEOC had paid off all of its debts when due; (ii) CEOC was able to issue new debt in 2013; (iii) CEOC was in compliance with its debt covenant; (iv) past experience demonstrated that CEOC was able to successfully manage its debt load; and (v) CEOC had the liquidity and ability to service its debt for the foreseeable future following the transaction.   However, the Examiner notes that these are not the relevant standards for solvency in this context as outlined in Section V, Solvency, *supra*.

the transaction and being advised by counsel regarding its fiduciary duties, independently concluded that the transaction would be beneficial to CEOC.

As discussed below, the Examiner concludes that the breach of fiduciary duty claims against the CEOC Directors and against CEC as controlling shareholder of CEOC are strong. The Examiner concludes that there are also strong aiding and abetting claims against Apollo and Sambur, and a weak aiding and abetting claim against TPG. The Examiner expects that all of these claims would be vigorously contested in any litigation.

### 3. Background to the CERP Transaction

#### a. The CMBS Properties

##### i. 2008 CMBS Financing

As detailed in Section XI, *infra*, and in Section VII.C, *supra*, upon the closing of the LBO in 2008, the CMBS Properties, organized as "PropCos"[1566] under CEC, were pledged as collateral for the CMBS financing, *i.e.*, $6.5 billion of mortgage loans, related mezzanine financing and/or real estate term loans (the "CMBS Financing," also referred to herein as "CMBS debt").[1567]   In connection with the CMBS Financing, to provide the lenders to the CMBS Financing (the "CMBS Lenders") with additional security, CEC (then HET) guaranteed the CMBS lease payments in full (the "CEC Lease Guarantee").

##### ii. 2010 CMBS Loan Amendment and 2010 Shared Services Agreement[1568]

On August 31, 2010, CEC reached agreement with the CMBS Lenders to amend the terms of the CMBS Financing and entered into the Second Amended and Restated Loan Agreement (the "2010 CMBS Loan Amendment").[1569]   Among other things, the 2010 CMBS Loan Amendment provided (a) the right to extend the maturity of the loans encumbering the CMBS Properties, for two successive one-year terms, until February 2015, which right was

---

[1566] The "CMBS PropCos" were Flamingo PropCo, LLC, Paris PropCo, LLC, Rio PropCo, LLC, Harrah's Las Vegas PropCo, LLC, Harrah's Atlantic City PropCo, LLC and Harrah's Laughlin PropCo, LLC.

[1567] CEC 10-K for the year ended Dec. 31, 2008 (Mar. 17, 2009), at 33.

[1568] The events associated with the 2010 CMBS Loan Amendment, including the 2010 Shared Services Agreement, are discussed in Section VII.C, *supra*.

[1569] 2010 CMBS Loan Amendment (Aug. 31, 2010), at APOLLO-Examiner_00025363-666 [APOLLO-Examiner_00025363].

exercised in February 2013 (to extend maturity to 2014);[1570] and (b) additional financing for capital improvements.[1571]

In connection with the 2010 CMBS Loan Amendment, the CMBS Properties and the CMBS Lenders entered into the Second Amended and Restated Shared Services Agreement (the "2010 Shared Services Agreement") as well as certain property-specific management agreements. As discussed in Section VII.C, *supra*, those agreements improved the ability of the CMBS Lenders to use certain trademarks should they decide to separate the CMBS Properties from the Caesars' system following a default. At the same time, however, the CMBS Lenders requested – and received – the ability to require CEOC to continue managing the CMBS Properties in the event of foreclosure.[1572] More specifically, the CMBS Lenders could (a) elect to indefinitely maintain the CMBS Properties as part of the Caesars network and avail themselves of the management services provided by CEOC pursuant to the Management Agreements,[1573] or (b) upon a decision to move the properties out of the Caesars network, elect to have CEOC continue providing management services during a "Transition Period" of up to two years.[1574] The 2010 Shared Services Agreement thus provided the CMBS Lenders with

---

[1570] CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 49. In February 2013, the maturity was extended to 2014, but there was an additional option to extend the maturity from 2014 to 2015, subject to certain conditions. *Id.*

[1571] CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 42.

[1572] 2010 Shared Services Agreement (Aug. 31, 2010), at CEC_EXAMINER_0220178, §10.01 [CEC_EXAMINER_0220164]; J. Beato Sept. 24, 2015 Tr. at 66:6-13; M. Cohen Oct. 16, 2015 Tr. at 112:7-113:12; D. Sambur Oct. 19, 2015 Tr. at 93:24-94:14; E. Hession Nov. 3, 2015 Tr. at 95:24-96:11.

[1573] Management Agreements are defined as "those certain Hotel and Casino Management Agreements, dated as of the date hereof [August 31, 2010], by and between each Manager and its respective Managed Party." 2010 Shared Services Agreement (Aug. 31, 2010), at CEC_EXAMINER_0220167 [CEC_EXAMINER_0220164]. The Managers, Paris CMBS Manager, LLC, Laughlin CMBS Manager, LLC, HLV CMBS Manager, LLC, HAC CMBS Manager, LLC, Rio CMBS Manager, LLC and Flamingo CMBS Manager, LLC, each managed their respective CMBS Properties. Pursuant to the 2010 Shared Services Agreement, CEOC, the Service Provider, was engaged by the Managers to provide services to the Managers, for the Managers' benefit and for the benefit of the Managed Parties. *See id.* at CEC_EXAMINER_0220164.

[1574] Notwithstanding anything to the contrary contained herein . . . for so long as a Management Agreement or Operating Lease remains in effect with respect to any Recipient and its respective Managed Party, and provided that, on or following any foreclosure, deed-in-lieu of foreclosure or similar exercise of remedies under the Mortgage . . . or during the Transition Period there is no Event of Default under Section 9.03(a) of this Agreement with respect to such Recipient or Managed Party where the Event of Default continues for fifteen (15) days following receipt by Recipient, Managed Party and Mortgagee of a written notice identifying such Event of Default, *this Agreement may not be terminated by Services Provider with Respect to such Recipient or Managed Party.*

"optionality," allowing them unilateral control over whether and for how long they would remain within the Caesars system. Under either scenario, the CMBS Properties were required to make all payments required under the 2010 Shared Services Agreement, *i.e.*, to reimburse CEOC for "allocated" costs and 30% of "unallocated" costs.[1575]

Several witnesses, including Sambur, stated that the CMBS Lenders negotiated these terms because they wanted the flexibility to disconnect from Caesars and to sell the assets unencumbered of any management agreements, but at the same time have the ability to continue to access such services while in the process of disconnecting.[1576] Indeed, from Greg Ezring's perspective, the CMBS Lenders were concerned that the day would come when "they would be foreclosing on a business that had no employees, had no intellectual property, had nothing" and, therefore, they negotiated for these rights during the 2010 refinancing discussions.[1577] According to Ezring, "there was no doubt in [his] mind" that the CMBS Lenders negotiating in 2010 had every intention of withdrawing from the system in the event of a default and foreclosure, and that they "negotiated very hard to be able to have all the rights they needed" to do so.[1578] However, others, including members of Caesars management, suggested that it was unlikely that the CMBS Lenders would disconnect the properties from the Caesars system given the benefits of the Total Rewards system and the regulatory implications of disconnecting.[1579] Ultimately, the 2010 CMBS Lenders' main goal seems to have been what Ezring described as "optionality," meaning the maximum amount of flexibility possible to stay within or leave the system on their terms and at their own pace.[1580]

---

*Id.* at CEC_EXAMINER_0220178, §10.01 (emphasis added); s*ee also id.* at §10.04.

[1575] Allocated corporate expenses are ones that are attributed to specific properties, and unallocated corporate expenses, such as the CEO's salary and costs associated with preparing for audits and SEC findings, are not attributed to a specific property. R. Brimmer Sept. 29, 2015 Tr. at 148:22-149:14; A. van Hoek Sept. 25, 2015 Tr. at 186:9-25.

[1576] D. Sambur Oct. 19, 2015 Tr. at 103:20-104:20; M. Rowan Nov. 16, 2015 Tr. at 90:13-91:3; G. Ezring Feb. 25, 2016 Tr. at 20:18-21:24; G. Loveman Oct. 27, 2013 Tr. at 83:18-84:8.

[1577] G. Ezring Feb. 25, 2016 Tr. at 20:12-21:24.

[1578] *Id.* at 22:12-23.

[1579] *See, e.g.*, J. Beato Sept. 24, 2015 Tr. at 30:8-18, 85:22-86:16; M. Cohen Oct. 16, 2015 Tr. at 112:7-113:12; *see also* T. Donovan Nov. 10, 2015 Tr. at 52:18-20 ("[G]enerally speaking, lenders do not want to get licensed to run a property."); *cf.* M. Savino Dec. 15, 2015 Tr. at 95:13-22 (stating that he does not recall speaking with hotel or casino operators about the possibility of bringing them in if there was a default on the CMBS Financing, or any discussions with the other lenders regarding this possibility). Ezring also admitted that the value of the properties would likely decrease if disconnected from Total Rewards. G. Ezring Feb. 25, 2016 Tr. at 23:19-24:15.

[1580] G. Ezring Feb. 25, 2016 Tr. at 20:18-21:24, 25:20-26:2; *see also* E-mail from A. Melville to M. Wlazlo, *et al.* (June 8, 2010), at APOLLO-Examiner_01260994 [APOLLO-Examiner_01260993] (indicating that the CMBS Lenders requested the transition period to be extended from 2 years to 3 years).

### b.  Initial Discussions of the CERP Transaction

### i.  2013 Refinancing of the CMBS Debt

As detailed above, the 2010 CMBS Loan Amendment provided the borrowers with the right to extend the debt maturity until February 2015, which right had been exercised until 2014.[1581]  However, Apollo began exploring the possibility of a CMBS refinancing as early as October 2012.[1582]  At the time, there was "no more CMBS market, no more mortgage financing market for [the CMBS] . . . assets" as a result of the 2008 financial crisis and the collapse of the United States housing market (and the commercial-mortgage-backed securities market).[1583]  As such, Apollo did not have the ability to again restructure the CMBS debt and began exploring its options.  According to Sambur, CMBS discussion materials circulated in October 2012 reflected "an early analysis around ways to refinance the CMBS debt by the end of 2013 so the debt would not come current."[1584]  Alex van Hoek of Apollo, who worked closely with Sambur on the 2010 CMBS refinancing and the CERP Transaction, explained that Apollo was interested in refinancing the CMBS debt in early 2013 because "even though it was two years before the maturity . . . given the market conditions at the time were pretty good . . . it was prudent to not leave [the refinancing] to the last minute."[1585]

The lenders[1586] were also interested in discussing a potential refinancing at this time.[1587]  For example, Paul Aronzon of Milbank – who represented certain of the Potential CERP Lenders – contacted Alan Kornberg of Paul Weiss on June 3, 2013 and told Kornberg that the Potential

---

[1581]  CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 7; *see also supra* note 11.

[1582]  *See* E-mail from M. Wlazlo to D. Sambur, *et al.* (Oct. 24, 2012), at PW_EXAMINER_SUPP_00004753-767 [PW_EXAMINER_SUPP_00004753]; E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355381-385 [CEOC_INVESTIG_00355362].

[1583]  M. Rowan Jan. 28, 2016 Tr. at 515:20-23, 496:22-497:6; A. van Hoek Sept. 25, 2015 Tr. at 16:3-17 (The CMBS "market didn't really exist anymore.").

[1584]  D. Sambur Oct. 19, 2015 Tr. at 120:11-18.

[1585]  A. van Hoek Sept. 25, 2015 Tr. at 75:9-24.

[1586]  The CMBS Lenders and other lenders who were interested in participating in a refinancing in 2013 are referred to herein as the "Potential CERP Lenders."

[1587]  M. Savino Dec. 15, 2015 Tr. at 59:18- 60:21.  Also, in a March 2013 presentation that Apollo drafted in preparation for a discussion with TPG, it states that "[m]any investors do not understand why we are waiting to 'solve' the CMBS situation given the markets are very receptive right now."  *See* E-mail from J. Beato to E. Hession (Apr. 24, 2013) [CEOC_INVESTIG_00034598], attaching "Caesars Capital Structure Discussion" (Mar. 2013), at CEOC_INVESTIG_00034610 [CEOC_INVESTIG_00034599].

CERP Lenders were "interested in participating in a refinancing" and believed "that given the state of the capital markets now would be an advantageous time to refinance . . . ."[1588]

Other witnesses went further, describing the push for a refinancing as originating with the Potential CERP Lenders. For instance, Sambur insisted that "[t]his was really like a lender-led refinancing,"[1589] and Brian Finnegan of Paul Weiss stated that his "understanding is that the lenders reached out on their own initiative and asked about [the] potential to do a refinancing . . . ."[1590] Although there appear to have been some preliminary discussions between certain Potential CERP Lenders and Apollo regarding the need for a refinancing in early 2013,[1591] serious negotiations did not begin until June of 2013,[1592] at which point Oaktree, the largest holder of CMBS debt at the time,[1593] entered into the discussions with Apollo.[1594]

Regardless of which side initiated discussions, Apollo and at least certain of the Potential CERP Lenders believed that a refinancing was both essential and likely to occur, so commencing discussions at this time was appropriate.[1595] This view, at least in part, appears to have stemmed from the assumption that, as Beato put it, "a foreclosure would be mutually destructive to both

---

[1588] E-mail from A. van Hoek to D. Sambur and G. Ezring (June 4, 2013), at APOLLO-Examiner_00651357 [APOLLO-Examiner_00651357].

[1589] D. Sambur Oct. 19, 2015 Tr. 147:18-20.

[1590] B. Finnegan Nov. 16, 2015 Tr. at 103:8-104:15.

[1591] See E-mail from J. Beato to E. Hession (Apr. 24, 2013) [CEOC_INVESTIG_00034598], attaching "Caesars Capital Structure Discussion" (Mar. 2013), at CEOC_INVESTIG_00034611 [CEOC_INVESTIG_00034599].

[1592] M. Savino Dec. 15, 2015 Tr. at 59:18-60:18.

[1593] E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355406 [CEOC_INVESTIG_00355362]. At the time of the 2013 refinancing discussions, the CMBS Lenders included, among others, Oaktree, GSO, BlackRock Funds, Perry Principals LLC, SPCP Group, LLC, Brigade, Marathon Funds, Pentwater Equity Opportunities Master Fund Ltd. and Omega Funds. E-mail from A. van Hoek to D. Sambur (June 13, 2013) [CEOC_INVESTIG_00389564], attaching "CMBS Refinancing June 13, 2013," at CEOC_INVESTIG_00389568 [CEOC_INVESTIG_00389565].

[1594] E-mail from S. Graves to K. Schneider, et al. (June 4, 2013), at Oaktree_CZR_0000375-376 [Oaktree_CZR_0000375].

[1595] See, e.g., J. Beato Sept. 24, 2015 Tr. at 23:14-26:3; see also M. Savino Dec. 15, 2015 Tr. at 82:6-25 (stating that the lenders' focus was not to walk away and take the keys of the CMBS Properties but rather to make the transaction happen and "negotiate a deal. . . ."); E. Hession Nov. 4, 2015 Tr. at 396:19-397:21 ("the belief from the analyst community and from our perspective, as well, was that the most pressing issue that the company had was with respect to the CMBS").

parties,"[1596] or, as Kornberg said, while there were tough negotiations "the holders of [the CMBS] debt really wanted it refinanced."[1597]  As an initial matter (and as discussed below), in the event that the CMBS Lenders "unplugged" the CMBS Properties from the Caesars system upon a default, Caesars (and CEOC in particular) would have had to at least initially cover some portion of the costs previously allocated to the CMBS Properties.[1598]  But the problem ran much more deeply than this, particularly given the existence of the CEC Lease Guarantee and the precarious financial position of Caesars as a whole, which threatened to throw CEC itself into bankruptcy in the absence of a refinancing.[1599]  As Eric Boes, former Director of Corporate Planning at Caesars, put it, a CMBS default would "have been a bad, bad event for the company. . . .  It would have resulted in some sort of restructuring with those six properties, and bad from a kind of synergistic perspective to the company as a whole."[1600]

Marc Rowan went one step further, stating that the "biggest risk to the enterprise [was] the bullet of CMBS coming due . . . for which there [was] no refinancing market, because CMBS itself was a unique transaction that with the benefit of hindsight not only didn't work for us, but didn't work for . . . anyone else."[1601]  Thus, refinancing was "definitely" what Apollo had in mind because without a refinancing, "we would be dead."[1602]  Due to the negative consequences of a CMBS Financing default, no one – including Rowan – believed foreclosure was a likely outcome,[1603] and internal Apollo decks demonstrate that its working assumption as far back as June 2012 was that the CMBS debt would be refinanced.[1604]  Ultimately, Apollo and Caesars had no real choice but to refinance the CMBS debt.[1605]

---

[1596]  J. Beato Sept. 24, 2015 Tr. at 30:8-18; *see also* A. Kornberg Nov. 11, 2015 Tr. at 77:12-78:25.

[1597]  A. Kornberg Nov. 11, 2015 Tr. at 76:24-77:11.

[1598]  A. van Hoek Sept. 25, 2015 Tr. at 79:2-80:6.

[1599]  "Presentation to the Board of Directors:  Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024664 [PRIV_INVESTIG_00024656] ("a successful refinancing will also lower the risk of a premature bankruptcy at CEC"); *see also* J. Beato Sept. 24, 2015 Tr. at 87:9-17; D. Sambur Oct. 19, 2015 Tr. at 108:21-25, 164:19-166:18; A. Kornberg Nov. 11, 2015 Tr. at 49:11-50:15; M. Rowan Nov. 16, 2015 Tr. at 98:19-99:10, 121:18-122:21, 147:3-16; M. Rowan Nov. 17, 2015 Tr. at 298:21-24.

[1600]  E. Boes Sept. 24, 2015 Tr. at 58:25-59:10.

[1601]  M. Rowan Jan. 28, 2016 Tr. at 496:22-497:6.

[1602]  *Id.*

[1603]  *Id.* at 582:22-583:23.

[1604]  "Caesars Entertainment Model and Capital Planning Considerations" (June 2012), at APOLLO-Examiner_00019625 [APOLLO-Examiner_00019594].

[1605]  Indeed, faced with a shortage of market interest in the refinancing, CEC ultimately issued $200 million in equity to enable the CERP Transaction to close.

A default would have been problematic for the CMBS Lenders as well. As discussed above, although there is evidence that the initial CMBS Lenders in 2010 had aggressively bargained for the right to stay in or leave the system, the situation had changed by 2013. For one thing, as a result of intervening transactions, the CMBS Lenders in 2013 were a very different group than those who had done the 2010 deal.[1606] The 2013 group comprised a large number of hedge funds whose appetite or ability to own and/or operate gaming properties was unclear.[1607] Moreover, the economic consequences of default and foreclosure were far from positive. As the CMBS Lenders in 2013 were acutely aware, "the company was in distress and [] had problems."[1608] An internal Apollo analysis from April 2013, for instance, estimated that the CMBS Lenders would only recover 50 to 75% of principal in a foreclosure.[1609] Although at least one of the CMBS Lenders (Oaktree) nevertheless expressed a theoretical willingness to have foreclosed and "taken the keys" upon a default, this appears to have been nothing more than a negotiating tactic, as Oaktree also "knew for sure [the CMBS Lenders] would never be able to foreclose because [a CEC] bankruptcy would have occurred well before" the debt came due.[1610] Overall, a deal on CMBS was in everyone's interest.

### ii.  The Need to Plug the "Equity Gap"

Both Apollo – which led the refinancing discussions on the CEC side – and the Potential CERP Lenders recognized the existence of what "the lenders had identified [and] called an equity hole or gap" at the CMBS Properties.[1611] As van Hoek explained:

> CMBS was, at the time, relatively highly leveraged so its debt to EBITDA was high; higher than what we could reasonably expect . . . [to] raise in the market to refinance it. So there was a kind of financing gap there. . . . [W]e needed an asset that was large enough it could materially, you know, address the gap, and we also needed an asset that was relatively unlevered or whose debt to EBITDA was low so that it was . . . helpful to add in the mix . . . .[1612]

---

[1606]  G. Ezring Feb. 25, 2016 Tr. at 26:3-21.

[1607]  Although it appears that Oaktree may at one point have had regulatory approvals (something they acquired precisely to help them gain negotiating leverage), it is unclear that it had those approvals it would have needed to operate the CMBS Properties and there is no evidence that the other CMBS Lenders in 2013 had the requisite approvals either.

[1608]  K. Liang Jan. 22, 2016 Tr. at 80:18-82:18.

[1609]  *See* "CMBS discussion materials" (Apr. 2013), at CEOC_INVESTIG_00368495 [CEOC_INVESTIG_00368492].

[1610]  K. Liang Jan. 22, 2016 Tr. at 80:18-82:18.

[1611]  B. Finnegan Nov. 16, 2015 Tr. at 103:8-104:15; M. Savino Dec. 15, 2015 Tr. at 65:15-20 ("There was definitely a discussion about the debt capacity of that entity."); K. Liang Jan. 22, 2016 Tr. at 32:10-33:2.

[1612]  A. van Hoek Sept. 25, 2015 Tr. at 16:3-17:16.

Apollo viewed this equity gap as substantial.[1613]  The February 2013 discussion materials valued it at $1.2 billion, smaller than the $1.4 billion at which Apollo had originally pegged it in October 2012.[1614]  As van Hoek explained, in order to effectuate a refinancing, the gap would have to be shrunk or eliminated.[1615]  While the equity gap shrunk during 2013 as a result of CMBS debt buybacks by CEOC, it still amounted to roughly $622 million at the time the CERP Transaction was effectuated.[1616]

### c.  Structuring the Transaction:  Initial Proposals

Apollo considered a number of ideas for plugging the "equity gap" and facilitating the CMBS refinancing.  The February 2013 discussion materials outlined two primary options:  (i) "[d]ebt reduction"; and (ii) "EBITDA increase / transfer."[1617]  In addition, there were "other levers that [could] be pulled to address any shortfalls" resulting from the two aforementioned options, such as:  (i) a sale of the Rio; (ii) the "[c]ontribution of Harrah's AC convention center"; (iii) the "[c]ontribution of Project Linq"; (iv) "[a]dditional cash from CZR equity issuances"; and (v) the "[c]ontribution of Planet Hollywood (if not already contributed to CGVP)."[1618]

---

[1613]  E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355379 [CEOC_INVESTIG_00355362].

[1614]  *Id.* at CEOC_INVESTIG_0035379, 394.

[1615]  A. van Hoek Sept. 25, 2015 Tr. at 63:2-64:6.

[1616]  By June 2013, the equity gap was estimated at approximately $840 million.  "CMBS discussion materials" (June 7, 2013), at CEOC_INVESTIG_00367299, 311 [CEOC_INVESTIG_00367298] (while the presentation lists the gap at $800 million, the correct calculation is $838 million – using the estimated CMBS debt, projected CMBS EBITDA and 7x leverage multiple in the discussion materials).  "Presentation to the Board of Directors: Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024662 [PRIV_INVESTIG_00024656].

[1617]  E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355379 [CEOC_INVESTIG_00355362].  EBITDA "transfer," as used in this document, seems to refer to the possibility of driving traffic from other Caesars properties to the CMBS Properties in order to increase EBITDA and thus facilitate the CMBS refinancing.  D. Sambur Oct. 19, 2015 Tr. at 122:4-123:6.  While Apollo and Caesars management considered this option, it was apparently not pursued "for a variety of reasons."  *Id.*; *see also* G. Loveman Oct. 27, 2015 Tr. at 96:9-98:6.

[1618]  E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355406 [CEOC_INVESTIG_00355362].

With respect to the Rio, van Hoek explained that Apollo had considered selling that property and using the proceeds to repurchase a portion of the CMBS debt below par.[1619]  In fact, van Hoek sent an e-mail on April 16, 2013 in which he noted "that getting the sale process for the Rio up and running [was] a key component of the CMBS strategy."[1620]  The ability of Caesars to use the Rio and its sale proceeds in this fashion required a minimum sale price of $425 million.[1621]  Sambur and others indicated that Caesars made some efforts to market the Rio, but was ultimately unable to sell the property because the bids received fell short of the required minimum purchase price or were not considered legitimate offers.[1622]  However, at least one potential purchaser submitted a Letter of Intent to purchase the Rio for exactly $425 million in May 2013.[1623]  The LOI, which was addressed to Sambur, appears to have prompted negotiations between the bidder, Apollo and Caesars management, including Eric Hession and Cohen. However, TPG opposed a quick sale, seemingly because of price concerns and fears that a Rio sale would make a CMBS refinancing more difficult.[1624]  In June 2013, Deutsche Bank began

---

[1619]  A. van Hoek Sept. 25, 2015 Tr. at 62:10-64:6; *see also* E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355363 [CEOC_INVESTIG_00355362] ("sell Rio and use up to $500 million of cash to get CMBS debt to $3.5 billion to facilitate a refinancing").

[1620]  E-mail from D. Sambur to T. Jenkin (Apr. 16, 2013), at APOLLO-Examiner_00636531 [APOLLO-Examiner_00636530].

[1621]  2010 CMBS Loan Amendment (Aug. 31, 2010), at APOLLO-Examiner_00025451-54 [APOLLO-Examiner_00025363]; *see also* E-mail from M. Wlazlo to D. Sambur, *et al.* (Oct. 24, 2012), at PW_EXAMINER_SUPP_00004763 [PW_EXAMINER_SUPP_00004753].

[1622]  D. Sambur Oct. 19, 2015 Tr. at 128:22-131:24; A. van Hoek Sept. 2, 2015 Tr. at 64:7-66:2; E. Hession Nov. 3, 2015 Tr. at 111:20-115:6; *see also* E-mail from D. Sambur to A. van Hoek (May 7, 2013) [APOLLO-Examiner_00050365], attaching Letter from T. Fertitta (May 6, 2013), at APOLLO-Examiner_00050367-69 [APOLLO-Examiner_00050367]; Letter from S. Scheinthal to CEC (May 8, 2013), at APOLLO-Examiner_0038641-643 [APOLLO-Examiner_00382641].

[1623]  Van Hoek could not recall much about this offer.  A. van Hoek Jan. 26, 2016 Tr. at 293:24-296:24.  Rowan vaguely recalled the letter, but suggested that the offer may not have been serious, given that its amount was exactly equal to the "upset number" – the minimum required sale price described above.  He also alluded to other issues which made the offeror less than ideal as a suitor.  M. Rowan Jan. 28, 2016 Tr. at 600:18-603:19.  Loveman, however – who had not been informed of the offer – was unfamiliar with any such issues, and stated that the bidder had the experience and familiarity with Las Vegas to be taken seriously.  G. Loveman Jan. 28, 2016 Tr. at 360:22-362:5.

[1624]  *See* E-mail from E. Hession to G. Kranias (May 11, 2013), at TPG-Examiner_00805674-75 [TPG-Examiner_00805674]; E-mail from E. Hession to A. van Hoek (May 15, 2013), at APOLLO-Examiner_00051028-32 [APOLLO-Examiner_00051028]; E-mail from G. Kranias to K. Davis (May 19, 2013), at TPG-Examiner_00806294 [TPG-Examiner_00806294]; E-mail from A. van Hoek to D. Sambur (June 6, 2013), at APOLLO-Examiner_00392399 [APOLLO-Examiner_00392399]; E-mail from G. Kranias to K. Davis, *et al.* (June 7, 2013), at TPG-

preparing for a broader market process, with a list of potential buyers, but by late June further steps were delayed until after a July Board meeting – at which point a sale was put on the back burner until after the CMBS refinancing.[1625]

According to van Hoek, the contribution of Harrah's Atlantic City Convention Center[1626] was also unworkable, as "the EBITDA of that facility and the impact of contributing it down . . . [was] relatively small."[1627]  Van Hoek also explained that the convention center was not yet open at the time, making it difficult to ascribe it a precise value:  "So maybe you could pro forma the future EBITDA when it opened, but it was kind of a negative – it was under construction at the time."[1628]  Sambur similarly explained that the facility "was still in the funding stage" and that he was "not so sure it would have been an asset," suggesting that "[i]t may have been more of a liability."[1629]  Of course, the same could be said of the LINQ, which was still under construction in 2013 and was not unveiled until the summer of 2014, more than six months after the CERP Transaction closed.  However, Sambur explained that the LINQ was a "[l]ot closer to being opened" than the convention center, which had its grand opening in September 2015.[1630]

Although CEC ultimately issued $200 million in equity in order to get the refinancing done, it does not appear that a CEC cash contribution was considered as a viable option to plug the equity gap until the end of transaction negotiations.[1631]  Nor did Apollo consider contributing Planet Hollywood, as that property had already been earmarked for inclusion in the Growth Transaction.[1632]  The same was also true of CIE, which was contributed to CGP in November

---

Examiner_00806635 [TPG-Examiner_00806635].  Stuart Dickson at Citibank also raised questions regarding whether the sale of the Rio would in fact solve the problem at the new CERP entity or whether it would still be left with insufficient EBITDA to support a refinancing of the remaining CMBS Properties (excluding the Rio).  E-mail exchange between S. Dickson and D. Sambur (June 6, 2013), at APOLLO-Examiner_00261661 [APOLLO-Examiner_00261661].

[1625] E-mail from E. Hession to D. Sambur (June 24, 2013), at APOLLO-Examiner_00260166 [APOLLO-Examiner_00260166]; E-mail from G. Selesner to E. Hession (July 3, 2013), at CEOC_INVESTIG_00109567 [CEOC_INVESTIG_00109567].

[1626] E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355379 [CEOC_INVESTIG_00355362].

[1627] A. van Hoek Sept. 25, 2015 Tr. at 71:6-20.

[1628] *Id.*

[1629] D. Sambur Oct. 19, 2015 Tr. at 132:2-133:10.

[1630] *Id.* at 134:6-23.

[1631] Caesars was "unable to fill the book for the CERP refinancing" and used the proceeds to "reduce the amount of second lien debt that was needed" for the CERP Transaction to close.  E. Hession Nov. 3, 2015 Tr. 118:13-119:7.

[1632] "Presentation to the Board of Directors:  Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024668 [PRIV_INVESTIG_00024656 ]; *see also* Section VIII.B, *supra*.

2013.  Indeed, no serious consideration was given to contributing any non-CEOC assets to fill the equity gap.[1633]

Instead, discussions at Apollo quickly coalesced around two options, both involving the LINQ and Octavius.  Under the first of these options, the two properties, which were unrestricted subsidiaries of CEOC, would be contributed to a new entity created in connection with the refinancing and housing the former CMBS Properties.[1634]  Under the second, the LINQ and Octavius would remain part of CEOC but provide credit support for the refinanced CMBS debt, either in the form of a guarantee or as co-borrowers.[1635]  Although the LINQ was still under construction and Octavius had only recently been completed, this was not viewed as an impediment to their involvement in the refinancing.

### d.  Description of the Properties

### i.  The LINQ

The "LINQ" is comprised of three component properties:  (i) the "LINQ Retail"; (ii) the "High Roller" observation wheel; and (iii) the "RDE Casino," which is now named "O'Sheas Casino" and is housed within the LINQ Hotel & Casino (formally the Quad Resort & Casino), which is adjacent to the LINQ Retail district.  The LINQ, as described by Caesars, was the company's "single-most important development project in Las Vegas."[1636]  It is located at the heart of the Las Vegas Strip and was "the center" of Caesars' "campus of properties" in Las Vegas.[1637]  It was marketed as the first Las Vegas "Party District" with 260,000 square feet of leasable space as well as the High Roller.[1638]  It includes over 25 retail, dining and entertainment options with close proximity to Harrah's Las Vegas, the Flamingo, the Paris, the Cromwell and the LINQ Hotel & Casino.  The LINQ sits directly across the Strip from Caesars Palace.[1639]

The "LINQ Retail" consists of "mid-range, distinctive lifestyle dining, retail and entertainment" targeted towards Generation X and Y customers.  At the time of the CERP Transaction, Caesars intended to own and operate five spaces within LINQ Retail, with 76% of the remaining space subject to executed leases with third-parties, and the remaining space under

---

[1633]  A. van Hoek Sept. 25, 2015 Tr. at 41:5-42:2, 43:18-44:3.

[1634]  E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308269 [CEOC_INVESTIG_00308268].

[1635]  *Id.*

[1636]  "Employee Video Questions and Talking Points" (Apr. 23, 2013), at CEC_EXAMINER_0215029 [CEC_EXAMINER_0215028].

[1637]  *Id.*

[1638]  "Caesars Entertainment Corporation Investor Presentation" (Sept. 19, 2013), at CEOC_INVESTIG_00005194 [CEOC_INVESTIG_00005190].

[1639]  *Id.* at CEOC_INVESTIG_00005203.

negotiation with potential third party lessors.  Additionally, the 18-acre parking lot behind the LINQ Retail could be used for outdoor events and festivals.[1640]

The High Roller, which rises 550 feet above the ground, is the world's tallest observation wheel and was expected to serve as an "effective anchor and long-term demand generator." Each of the "X cabins" attached to the High Roller holds up to 40 people for a "moving party" complete with "dynamic audio and video entertainment," food and beverages.  As of September 2013, Caesars projected that the High Roller would draw three to four million visitors per year.[1641]

According to marketing materials, as of September 2013, the LINQ was predicted to generate $23 to $28 million of Adjusted EBITDA from the LINQ Retail (of which $9 to 14 million was performance-based rather than fixed-rent), $15 million of Adjusted EBITDA from the Quad lease (i.e., O'Sheas Casino), plus $30 to $60 million of Adjusted EBITDA from the High Roller.[1642]  As of October 2013, the total project cost of the LINQ (including both the LINQ Retail and the High Roller) was between $521 million[1643] and $550 million.[1644]  At the time the CERP Transaction closed, CEOC had spent $421 million on the LINQ; approximately $100 million remained to be spent.[1645]  The LINQ Retail opened preliminarily in December 2013 and fully in the second quarter of 2014, and the High Roller opened on March 31, 2014.[1646] Loveman described the LINQ as being Caesars' single most important development project in Las Vegas.[1647]

### ii.  The Octavius Tower

"Octavius" refers to the Octavius Tower – a newly-constructed 23-story "luxury tower located within Caesars Palace."[1648]  It consists of 662 guest rooms, 60 suites and six luxury villas

---

[1640] *Id.* at CEOC_INVESTIG_00005214.

[1641] *Id.* at CEOC_INVESTIG_00005215.

[1642] *Id.* at CEOC_INVESTIG_00005209.

[1643] CEOC had budgeted $324 million for the Linq Retail and $197 million for the High Roller. "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000013 [CEOC_INVESTIG_00000006].

[1644] "Presentation to the Board of Directors:  Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024680 [PRIV_INVESTIG_00024656 ].

[1645] "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000013 [CEOC_INVESTIG_00000006].

[1646] Exhibit 99.1 to CEC Form 8-K (Sept. 24, 2013), at 4.

[1647] G. Loveman Oct. 27, 2015 Tr. at 94:14-23.

[1648] "Caesars Entertainment Corporation Investor Presentation" (Sept. 19, 2013), at CEOC_INVESTIG_00005199 [CEOC_INVESTIG_00005190].

targeting high-end guests.[1649]  Caesars began construction of the tower in February 2008 but had to suspend the project in 2009 due to the economic downturn and deterioration in Las Vegas market conditions.[1650]  Construction resumed in April 2011 and was completed by the end of 2011 at a total cost of $455 million.[1651]  Accordingly, at the time the CERP Transaction closed, CEOC had spent a total of approximately $878 million on the LINQ and Octavius (consisting of $421 million on the LINQ and $455 million on Octavius).[1652]  Octavius opened in January 2012.

### e.   Structuring the CERP Transaction

### i.   The Decision to Include the LINQ and Octavius

The exact provenance of the idea that the LINQ and/or Octavius be used to fill the equity gap and facilitate the CMBS refinancing is unclear.  As van Hoek explained:

> [W]e had reason to think, from – based on input from market participants, that refinancing CMBS or doing CERP without additional assets or additional EBITDA would not have . . . been possible.  We would not be able to repay the CMBS debt even with the discounts that we ultimately negotiated without something else being in there.  Without some plug or some bridge for that gap.  I don't recall whether, you know, whether I was told specifically, we are only doing this in [sic] Linq and Octavius or [sic] in there.  But, certainly, I do know that without something in there, it wasn't going to work.[1653]

It was Kornberg's understanding that the creditors demanded the LINQ and Octavius transfer, explaining that this "was very much a creditor-driven point."[1654]  A March 2013 presentation that was prepared in advance of a discussion with TPG suggests that the idea to transfer these assets may have originated with BlackRock.  The presentation includes a slide titled "An Investor Proposed Scenario," which states that "BlackRock recently visited our offices to provide their thoughts on what a potential CMBS refinancing could look like . . . .  Proposed structure:  Linq RDE and wheel are contributed to improve collateral (Linq/Octavius debt is callable at 103 in July)."[1655]  By the time Oaktree became involved in the CMBS refinancing

---

[1649]  "Presentation to the Board of Directors:  Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024680 [PRIV_INVESTIG_00024656 ].

[1650]  *Id.*

[1651]  *Id.*

[1652]  "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000013 [CEOC_INVESTIG_00000006].

[1653]  A. van Hoek Sept. 25, 2015 Tr. at 35:10-36:10.

[1654]  A. Kornberg Nov. 11, 2015 Tr. at 65:4-25.

[1655]  *See* E-mail from J. Beato to E. Hession (Apr. 24, 2013) [CEOC_INVESTIG_00034598], attaching "Caesars Capital Structure Discussion" (Mar. 2013), at CEOC_INVESTIG_00034611 [CEOC_INVESTIG_00034599].

negotiations in June 2013, both the LINQ and Octavius were included in Apollo's initial refinancing proposal to Oaktree.[1656]

Van Hoek thought that the decision to contribute the LINQ and Octavius was made "[i]ndependent of any input from the creditors."[1657] He explained that Apollo and Caesars reviewed "various potential assets that could help to bridge that financing gap" and ultimately determined that the LINQ and Octavius were the best fit "in terms of being a significant scale, being relatively low leverage."[1658] Similarly, Matt Savino, who participated in the negotiations on behalf of BlackRock, stated that, although he could not recall precisely where the idea of the contribution of the LINQ and Octavius came from, the lenders by necessity had to rely on the Sponsors to learn which options were possible and which ones were not.[1659] Moreover, while Oaktree accepted the contribution of the LINQ and Octavius to plug the so-called equity gap, Liang explained that Oaktree's focus was that the existing debt be "paid at par," and not on how that would be accomplished.[1660]

### ii.  Rejection of the Co-Borrower Alternative

In connection with the discussions over contributing the LINQ and Octavius to plug the equity gap, internal Apollo presentations from Spring/Summer 2013 suggest that one option being considered was "leaving Linq where it is in the structure and just making [it] a Co-Borrower in the refinancing w/ the 6 CMBS properties."[1661] Van Hoek could not recall whose

---

[1656] K. Liang Jan. 22, 2016 Tr. at 20:13-21:16; *see also* "CMBS discussion materials" (June 2013), at Oaktree_CZR_0000001-9 [Oaktree_CZR_0000001].

[1657] A. van Hoek Sept. 25, 2015 Tr. at 28:15-20.

[1658] *Id.* at 16:3-17:25.

[1659] M. Savino Dec. 15, 2015 Tr. at 72:17-73:7 (Savino explained: "The only other thing I would say on your question is the ability to do asset transfers, like lenders can wonder all day long what's possible. You're not going to know until somebody tells you." When asked who that somebody was in the context of the CERP Transaction, he responded: "The company or its sponsors."). Liang indicated that the Potential CERP Lenders were not really in a position to negotiate with Apollo because Apollo knew "this asset too well." K. Liang Jan. 22, 2016 Tr. at 35:10-36:23. He continued: "There [are] so many things that you [Apollo] know . . . as an operator both in terms of inside information . . . . So there was no way we, as lenders, had the ability to really negotiate the value or really understand truly . . . ." *Id.*

[1660] K. Liang Jan. 22, 2016 Tr. at 30:9-25 ("I think I would put it that you need to pay me off at par, and it's your problem in terms of how you execute on that. So I was not – Oaktree didn't suggest anything in terms of what to do. We just told them that if you are going to pay us off, you have to pay us off at par and, you know, how you do that, that's going to be, you know, the company and, you know Apollo's issue.").

[1661] E-mail from A. van Hoek to D. Sambur (June 13, 2013), at CEOC_INVESTIG_00389569 [CEOC_INVESTIG_00389564].

recommendation this was, but he thought it might have come from Paul Weiss.[1662]  Wlazlo recalled that, as of early July 2013, the co-borrower proposal was CEC's preferred option.[1663]

According to Sambur, the co-borrower structure was "the original proposal to the lenders."[1664]  This is consistent with Liang's recollection, and the June 2013 Apollo presentation to Oaktree included both the LINQ and Octavius as co-borrowers.[1665]  The co-borrower structure was also one of the two structural options that Apollo initially considered presenting to Perella, and it was included in an internal August 12, 2013 Apollo draft of the presentation which ultimately went to Perella on August 14.[1666]  However, this structure, which had been discussed informally with Perella, was removed from consideration between August 12 and August 14.  As Cody Leung[1667] of Perella reported to her colleagues on August 13:  "[Apollo] determined with their lawyers that they are only going to need our opinion on the value of the transfer of equity of LINQ / Octavius (*i.e.* no longer need us to look at the guarantee co-borrower structure)."[1668] Accordingly, Apollo's August 14 presentation to Perella made no mention of a potential co-borrower structure and made clear that the only option under consideration would be the contribution of the LINQ and Octavius to the new CERP entity.[1669]

Various witnesses agreed that it was the Potential CERP Lenders who rejected the proposed co-borrower (or co-guarantee) structure and required that the LINQ and Octavius be

---

[1662]  A. van Hoek Sept. 25, 2015 Tr. at 120:5-121:13.

[1663]  M. Wlazlo Oct. 14, 2015 Tr. at 77:6-10.

[1664]  D. Sambur Oct. 19, 2015 Tr. at 146:11-147:6.

[1665]  K. Liang Jan. 22, 2016 Tr. at 21:3-16; *see also* "CMBS discussion materials" (June 2013), at Oaktree_CZR_0000001-9 [Oaktree_CZR_0000001].

[1666]  *See* E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308269 [CEOC_INVESTIG_00308268] ("Caesars has engaged Perella Weinberg Partners to opine on the value of two alternative structures for the treatment of Linq & Octavius as part of a CMBS refinancing: – Structure 1:  Linq / Octavius equity transferred into New CMBS[;] – Structure 2:  Linq / Octavius equity remains at CEOC but provides credit support for New CMBS (e.g., in the form of a guarantee or as a co-borrower)"); *see also* E-mail from B. Finnegan to A. van Hoek, *et al.* (Aug. 7, 2013), at PRIV_INVESTIG_00036575 [PRIV_INVESTIG_00036575] ("We've told Perella that we're looking for an opinion that the consideration to be received in exchange for the [guarantee] or [transfer of LINQ/Octavius] is fair from a financial point of view to [CEOC].").

[1667]  Cody Leung has since changed her name to Cody Kaldenberg but is referred to herein as Leung.

[1668]  E-mail from G. Barancik to J. Scherer (Aug. 13, 2013), at PWP_CZR_EX_00128454 [PWP_CZR_EX_00128453].

[1669]  *See* E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (August 2013), at PWP_CZE_EX_00000382 [PWP_CZR_EX_00000381].

contributed to CERP if the properties were going to be used to provide credit support for the CMBS refinancing.[1670]   Wlazlo, for instance, testified that the lenders rejected the "cross-guarantee" option because it was not "as good as a subsidiary guarantee from their perspective."[1671]   Similarly, Sambur, who handled negotiations with the Potential CERP Lenders, explained the lenders' position as follows:  "Through discussions with the people that were going to be loaning us the money and their counsel, they . . . favored actually having that entity be bought by CERP.  And more directly being underneath the structure."[1672]   The Potential CERP Lenders' contemporaneous communications confirm this.  As Oaktree put it in an e-mail to other Potential CERP Lenders on August 16, 2013:  "We require the LINQ assets to be moved to a new borrower. . . . [I]t is a condition of our commitment and benefits all lenders in the new structure."[1673]   In addition, Citibank believed it was "a much better marketing story to put the linq in."[1674]

From an economic perspective, it stands to reason that the Potential CERP Lenders preferred a structure where the LINQ and Octavius would actually become part of the collateral securing the new loan to one in which those entities would remain under CEOC and simply provide a guarantee or function as a co-borrower.[1675]   This was particularly true given the challenging financial position that CEOC found itself in at the time, a state of affairs with which many of the lenders were acutely aware.[1676]

CEOC's precarious financial condition appears to have played a role in the Potential CERP Lenders' rejection of a co-borrower or co-guarantor structure for a second reason:  the possibility that such an arrangement could be avoided as a fraudulent conveyance in the event

---

[1670]   A. Kornberg Nov. 11, 2015 Tr. at 64:9-13, 65:2-3 ("I don't think it was acceptable to the creditors."); M. Rowan Nov. 16, 2015 Tr. at 129:10-25 ("My recollection is it was rejected by the lenders."); D. Sambur Oct. 19, 2015 Tr. at 147:21-148:5; G. Kranias Oct. 23, 2015 Tr. at 116:4-16; K. Liang Jan. 22, 2016 Tr. at 38:17-40:13.  However, the Potential CERP Lenders did not require, as an initial matter, that the LINQ and Octavius be included as part of the CMBS refinancing.  Once Apollo decided to include the LINQ and Octavius to provide credit support for the CMBS refinancing, then the Potential CERP Lenders required that the properties be transferred to CERP rather than act as co-borrowers.

[1671]   M. Wlazlo Oct. 14, 2015 Tr. at 55:11-16.

[1672]   D. Sambur Oct. 19, 2015 Tr. at 147:21-148:5.

[1673]   E-mail from K. Liang to B. Woo, *et al.* (Aug. 17, 2013), at Oaktree_CZR_0000801 [Oaktree_CZR_0000790].

[1674]   E-mail from A. Glazer to S. Dickson (July 12, 2013), at CITI-CZR-EXM-00211804 [CITI-CZR-EXM-00211803].

[1675]   M. Savino Dec. 15, 2015 Tr. at 71:7-72:15; K. Liang Jan. 22, 2016 Tr. at 38:17-40:13.

[1676]   K. Liang Jan. 22, 2015 Tr. at 76:13-79:23, 119:17-21; N. Filippelli Nov. 24, 2015 Tr. at 67:16-68:6.

that CEOC filed for bankruptcy.[1677]    Specifically, at least one of the Potential CERP Lenders viewed such a structure as requiring CEOC to give up assets of tangible value for no consideration, whereas it was assumed that any contribution (or sale) of the LINQ and Octavius to the new CERP entity would be conducted "in an appropriate manner and for fair value."[1678] However, neither Oaktree nor any of the Potential CERP Lenders made any independent attempt to verify that the transfer was made at fair value and pursuant to a fair process, instead relying on the assumption that CEOC's Board and Paul Weiss would conduct the necessary diligence and take the necessary actions to effectuate this, as well as Sambur's representation that CEOC would get "some sort of fairness opinion."[1679]    There is no evidence that any of the Potential CERP Lenders, including Oaktree, ever reviewed or commented on the "fairness opinion" provided by Perella.

### iii.    TPG's Reservations with Regard to the Proposed Transfer

TPG did not initially agree with Apollo's decision to use the LINQ and Octavius to facilitate the refinancing.[1680]    On July 8, 2013, Hession wrote to Cohen that TPG should participate in a conference call to discuss the structure of the transaction, because "[t]hey do not agree with the linq contribution at this point."[1681]    Four days later, Hession had a conversation with Ari Glazer of Citibank, in which he informed Glazer that there was "open discussion between David [Sambur] and tpg on whether to contribute the linq" and that TPG was "arguing to keep it out and put cash in."[1682]    Hession asked Sambur about the status of discussions with TPG in connection with the LINQ contribution and Sambur responded:  "We should assume linq

---

[1677]  K. Liang Jan. 22, 2016 Tr. at 44:2-45:3; *see also* E-mail from S. Graves to K. Vazales (June 21, 2013), at Oaktree_CZR_0000909 [Oaktree_CZR_0000907] ("Lenders are being asked to assume the fraudulent conveyance risk under their structure.").

[1678]  K. Liang Jan. 22, 2016 Tr. at 56:2-57:14.

[1679]  *Id.* at 56:2-57:14, 60:20-61:3.

[1680]  In discussing the CMBS refinancing options, various documents refer only to the "Linq" or "LINQ" and not to Octavius.    *See, e.g.*, E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Caesars Entertainment Discussion Materials" (Feb. 2013), at CEOC_INVESTIG_00355379 [CEOC_INVESTIG_00355362] (referring only to "Contribution of Project Linq");  E-mail from A. van Hoek to E. Hession and D. Sambur (June 27, 2013), at CEOC_INVESTIG_00106938 [CEOC_INVESTIG_00106933].    However, these references could be to both assets.  D. Sambur Oct. 19, 2015 Tr. at 133:11-134:5 ("My sense is it probably meant both"); A. van Hoek Sept. 25, 2015 Tr. at 36:14-37:2; K. Liang Jan. 22, 2016 Tr. at 48:4-10 (when Oaktree referred to the LINQ, Liang believed that "it refers to both.").

[1681]  E-mail from E. Hession to M. Cohen (July 8, 2013), at PRIV_INVESTIG_00029529 [PRIV_INVESTIG_00029529].

[1682]  E-mail from A. Glazer to S. Dickson (July 12, 2013), at CITI-CZR-EXM-00211804 [CITI-CZR-EXM-00211803].  Glazer further conjectured that the reason TPG preferred contributing cash rather than the LINQ was so they would have "the flexibility to sell the shopping mall and keep some of the upside."  *Id.*

is included.  They are getting there."[1683]  As of July 26, however, TPG was still "not in alignment" with the idea of contributing the LINQ.[1684]  Witnesses were unable to provide any additional information regarding the nature of TPG's concerns.[1685]  Kranias of TPG simply stated that "[i]t was a complicated transaction and we wanted to better understand it before we could give the company . . . an initial approval on the refinancing."[1686]

In attempting to understand TPG's reluctance to go along with the use of the LINQ and/or Octavius as collateral, it is worth noting that four years earlier, in 2009, in the context of a proposed transaction where the Ritz-Carlton would own or lease Octavius, TPG had stressed to Apollo the importance of Octavius to CEOC's flagship property, Caesars Palace, and had advised against selling it.  In a May 4, 2009 e-mail to Rowan, David Bonderman, of TPG, noted that "alienating the [Octavius] Tower by selling it or leasing it to someone else for a long term is likely to turn out to be a bad idea.  The Octavius Tower was planned and built as an integral part of our core property, and I suspect that losing control of that will be value destructive over time."[1687]

TPG's concern over removing Octavius was echoed by others involved in the transaction.  In a September 22, 2013 e-mail from Filippelli of Citibank forwarding an investor question to Beato, he asks:  "[i]n the event of a CEOC bankruptcy, how would Octavius function vis-à-vis Caesars Palace Las Vegas (which is part of CEOC)."[1688]  This is similar to a point stressed by several of the creditor constituencies in connection with CEOC's bankruptcy proceedings, *i.e.,* that by causing Octavius to be contributed to CERP, CEC ensured that CEOC no longer had complete control over the "crown jewel" of its empire.

### iv.  Possible Contribution of Only the LINQ and Not Octavius

Perhaps because of these concerns, some, including members of Caesars management, questioned whether it was necessary to contribute both the LINQ and Octavius.  On June 27,

---

[1683]  E-mail from D. Sambur to E. Hession and A. van Hoek (July 12, 2013), at CEOC_INVESTIG_00401069 [CEOC_INVESTIG_00401069].

[1684]  E-mail from D. Sambur to A. van Hoek (July 26, 2013), at APOLLO-Examiner_00620272 [APOLLO-Examiner_00620272].

[1685]  Cohen explained that TPG "had some reservations" but could not recall what they were.  M. Cohen Oct. 16, 2015 Tr. at 145:20-146:12.

[1686]  G. Kranias Oct. 23, 2015 Tr. at 122:7-124:11.  Even after being shown documents explicitly referencing TPG's reservations regarding the contribution of the LINQ and/or Octavius, Sambur, van Hoek and Hession could not recall any such concerns being raised by TPG during the CMBS negotiations, notwithstanding that Sambur and Hession had actually authored two of the documents discussing the issue.

[1687]  E-mail from M. Rowan to D. Bonderman, *et al.* (May 4, 2009), at TPG-Examiner_00216265 [TPG-Examiner_00216265].

[1688]  E-mail from J. Beato to N. Filippelli (Sept. 22, 2013), at CEOC_INVESTIG_00050978 [CEOC_INVESTIG_00050977].

2013, after receiving Apollo's preliminary plan detailing the transfer of the LINQ and Octavius, Beato sent Hession an e-mail relaying her concern regarding Apollo's proposal that the LINQ and Octavius both be moved out of CEOC.[1689]   Beato, who was in charge of investor relations for Caesars, conveyed her understanding that BlackRock "only wanted Linq,"[1690] because (as she explained later) including "Octavius kind of made things messy."[1691]

Moreover, on August 7, Hession asked Sambur and van Hoek:   "For the CMBS refinancing, do you think we can remove the Octavius tower from the credit and just move the Linq and Wheel?"  Van Hoek replied:  "Interesting idea.  We'll need to weigh the CEOC benefit vs. ability to raise new debt at CMBS off a lower EBITDA though."[1692]   However, it is unclear whether and to what extent the idea was evaluated by Apollo and/or the Potential CERP Lenders and why it was ultimately rejected.  Apollo's initial draft of the presentation to Perella, dated just five days later, does not mention the possibility of a LINQ-only transfer, and by August 14, the only proposal on the table from Apollo was a transfer of both the LINQ and Octavius.[1693]

### v.   The Parent Guarantee

In addition to the overarching structure of the anticipated transaction, Apollo and the Potential CERP Lenders discussed a number of other terms, including whether CEC would guarantee the new CERP debt.  According to Liang, Oaktree sought to have CEC guarantee the new debt because they "always like to have a guarantee . . . at the parent company where the sponsor's equity is."[1694]   CEC refused, and it was Liang's understanding that there was "some legal or other reason" why CEC could not provide the guarantee.[1695]   Accordingly, Oaktree "ratcheted . . . back [its] commitment" in the new CERP debt to $300 million.[1696]  This reduction in potential exposure enabled Oaktree to become "a lot more flexible" and to compromise with

---

[1689]  E-mail from J. Beato to E. Hession (June 27, 2013), at CEOC_INVESTIG_00014304 [CEOC_INVESTIG_00014304] (noting that removing Octavius and moving it into the new CMBS credit "might create some difficulties").

[1690]  *Id.*

[1691]  J. Beato Sept. 24, 2015 Tr. at 51:18-52:8.

[1692]  E-mail from A. van Hoek to E. Hession (Aug. 7, 2013), at CEOC_INVESTIG_00102211 [CEOC_INVESTIG_00102211].

[1693]  *See* E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308269 [CEOC_INVESTIG_00308269]; E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (August 2013), at PWP_CZE_EX_00000381 [PWP_CZR_EX_00000381].

[1694]  K. Liang Jan. 22, 2016 Tr. at 45:4-46:13.

[1695]  *Id.* at 48:18-25.

[1696]  *Id.* at 49:14-50:4.

CEC on the non-issuance of parent guarantee.[1697]   Liang also explained that the negotiation of the parent guarantee was not linked to the transfer of the LINQ and Octavius.[1698]

### vi.  Apollo Drove the Structuring Decision to Use the LINQ and Octavius

Apollo (as opposed to Caesars management or TPG) drove the structuring of the transaction.  It was Apollo that explored various ideas for plugging the equity gap and negotiated directly with the Potential CERP Lenders.[1699]  And it was Apollo that ultimately determined that "[a]dding in Linq into the credit should be enough to plug the equity gap" and moved forward with that structure.[1700]  Indeed, these decisions appear to have been made without any significant input from Caesars management.  For example, in mid-June 2013, Sambur instructed van Hoek to "make sure" that Citibank, the lead investment banker for the CMBS Refinancing,[1701] "keep[s] utmost confidentiality for now and go[es] through you."[1702]  Van Hoek replied that Citibank "understand[s] that CEC [is] not under the tent yet,"[1703] meaning, as he later explained, that the CEC "management team [was] not yet kind of involved in this idea around having the Linq . . . plug[] the financing gap."[1704]  It appears that Hession first learned of the LINQ potentially being

---

[1697]  *Id.* at 49:6-50:4.

[1698]  *Id.* at 50:9-16.

[1699]  *Id.* at 17:19-18:4; M. Savino Dec. 15, 2015 Tr. at 60:24-62:5.

[1700]  E-mail from A. van Hoek to E. Hession and D. Sambur (June 27, 2013), at CEOC_INVESTIG_00106939 [CEOC_INVESTIG_00106933]; *see also* A. van Hoek Sept. 25, 2015 Tr. at 16:18-17:25, 18:18-19:9.  While Sambur and van Hoek referred to "the Company" having some involvement in analyzing which assets could plug the gap, it is clear that Apollo was, in fact, driving this process.  D. Sambur Oct. 19, 2015 Tr. at 236:10-239:2; A. van Hoek Sept. 25, 2015 Tr. at 18:8-19:9.

[1701]  In June 2013, a number of investment banks provided presentations to Apollo regarding dozens of different proposals and structures that could be used to effectuate a CMBS refinancing, including extending the debt maturities to 2017, a sale-leaseback, taking back PIK notes and having CZR/CGP monetize and borrow against the market value of CEOC notes.  Interestingly, only one of these – Citibank's – made *any* reference to a potential transfer of the LINQ and Octavius, and even that was not listed as a primary option.  E-mail from B. Finnegan to L. Clayton and G. Ezring (Oct. 7, 2013) [PW_EXAMINER_SUPP_00005174], attaching "PropCo Discussion   Materials"   (June   2013),   at   PW_EXAMINER_SUPP_00005231 [PW_EXAMINER_SUPP_00005174].

[1702]  E-mail from A. van Hoek to D. Sambur (June 14, 2013), at CEOC_INVESTIG_00400553 [CEOC_INVESTIG_00400553].

[1703]  *Id.*

[1704]  A. van Hoek Sept. 25, 2015 Tr. at 94:19-95:11.

used as part of the CMBS refinancing on June 12, 2013, sometime after the discussions began.[1705]

Even when Caesars management ultimately became aware that negotiations over the CMBS Financing were taking place, they did not play a direct role in those discussions. Loveman testified that his "job principally was to help David [Sambur] sell the CERP financing to investors once the structure of the financing was confected."[1706]  He further explained that he "was not involved in the discussion as to how the deal would be put together, which assets would go into it, how it would be priced, who would be targeted for purchase of the securities or any of the other considerations associated with it."[1707]  Similarly, Cohen described his role in the transaction as "rather small" and explained that he was not involved in any of the negotiations regarding how the consideration would be determined.[1708]  Indeed, the CEOC directors' involvement in the transaction was minimal, consisting mainly of their participation in the teleconference at which the transaction was presented to the Board for its consideration and approval.[1709]

Nor was TPG involved in negotiating with the Potential CERP Lenders,[1710] or developing the structure of the CERP Transaction.  While Apollo conferred with TPG in connection with what assets would be contributed as part of the deal, it was Apollo that took the lead in structuring decisions.  As Kranias explained:

> As a general matter Apollo took the lead on capital structure matters and then once an idea actually progressed to the point where it looked like they wanted to do real work on it and flesh it out, they would actually raise it with us.  They would continue to lead it and then they would bring it to us very close to the point of approval so that we could understand it and be in a position to recommend it or not.[1711]

---

[1705] *See* E-mail from A. van Hoek to D. Sambur (June 11, 2013), at CEOC_INVESTIG_00401410 [CEOC_INVESTIG_00401410] (asking if it was "ok" to tell Hession "that we're looking at options with Linq and CMBS," because Hession was discussing refinancing the LINQ at the time).  The next day, van Hoek informed Hession:  "We're considering how much the Linq could help a CMBS refi . . . ."  E-mail from A. van Hoek to E. Hession (June 12, 2013), at CEOC_INVESTIG_00403808 [CEOC_INVESTIG_00403808].

[1706] G. Loveman Oct. 27, 2015 Tr. at 98:14-99:13.

[1707] *Id.*

[1708] M. Cohen Oct. 16, 2015 Tr. at 117:4-24, 120:22-121:20.

[1709] *See infra*, at Section VIII.C.3.k.

[1710] G. Kranias Oct. 23, 2015 Tr. at 149:22-150:4.

[1711] *Id.* at 148:24-149:9.  In fact, Kranias sent an e-mail to Dickson of Citibank and others on September 26, 2013 requesting a call "to discuss the latest on the CERP financing," which Dickson forwarded to Sambur asking whether he had spoken with "them" (presumably TPG).  E-mail from D. Sambur to S. Dickson (Sept. 27, 2013), at CEOC_INVESTIG_00397745

###### f.   Perella's Engagement

###### i.   Perella's Retention

In July 2013, Apollo (based on advice provided by Paul Weiss) determined that CEOC needed to procure a "fairness opinion" from a financial advisor with regard to the consideration CEOC would receive in connection with either the contribution of the LINQ and Octavius or their taking on co-borrower status in connection with the contemplated refinancing of the CMBS debt.[1712]   Ultimately, the decision was taken to retain Perella.   Although it is somewhat unclear how Perella was selected, it was Paul Weiss (and, in particular, Kornberg) who initially contacted them about the potential engagement.[1713]

In an early phone call between Perella and Paul Weiss, Clayton and Kornberg stressed the need for an opinion that the consideration was fair to all of CEOC's stakeholders, including creditors.[1714]   In addition, Perella appears to have been told that this was an "interested party transaction," and discussed the "assumption" that a special committee would be involved.[1715] These considerations – which showed care and diligence – would have been unnecessary absent some recognition that CEOC might in fact be insolvent and that the transaction might one day be challenged on fraudulent conveyance grounds.   However, as discussed further below, no independent directors or special committees were ultimately appointed and no consideration appears to have been given as to whether CEOC should retain independent counsel.[1716]

---

[CEOC_INVESTIG_00397745].   Sambur responded:   "no – I didn't waste my time with tpg." *Id.*

[1712] *See* E-mail from B. Finnegan to A. van Hoek, *et al.* (Aug. 7, 2013), at PRIV_INVESTIG_00036575 [PRIV_INVESTIG_00036575]; *see also* B. Finnegan Nov. 17, 2015 Tr. at 121:8-23; J. Scherer Oct. 20, 2015 Tr. at 11:21-12:20; C. Leung Oct. 16, 2015 Tr. at 38:24-39:15.

[1713] J. Scherer Oct. 20, 2015 Tr. at 11:21-12:20, 18:6-20:14; C. Leung Oct. 16, 2015 Tr. at 18:22-19:11.   Although Scherer could not specifically recall any other engagements between Perella and Caesars, he was aware that some of the Perella partners had relationships with individuals at Caesars.   J. Scherer Oct. 20, 2015 Tr. at 13:14-18.   Along those same lines, Scherer believed that if Perella had done any prior work for Apollo or TPG, it would have been very minimal.   *Id.* at 13:21-14:3, 14:14-15:2.   In late June 2013, Perella appears to have pitched for CEOC's bankruptcy work as well.   *See* "Discussion Materials – June 30, 2014" (June 30, 2014), at PWP_CZR_EX_00109881-935 [PWP_CZR_EX_00109881]; "Caesar's [sic] Debtor Pitch" (June 30, 2014), at PWP_CZR_EX_00005868-71 [PWP_CZR_EX_00005868]; *see also* R. Stauber Sept. 30, 2015 Tr. at 30:8-35:15.

[1714] E-mail from J. Mleczko to C. Leung, *et al.* [PWP_CZR_EX_00124566], attaching "Call with Paul Weiss – Sunday, July 28, 2013" (July 28, 2013), at PWP_CZR_EX_00124567 [PWP_CZR_EX_00124567].

[1715] *Id.*

[1716] *See* M. Cohen Oct. 16, 2015 Tr. at 185:19-186:10; T. Donovan Nov. 10, 2015 Tr. at 42:10-13; B. Finnegan Nov. 16, 2015 Tr. at 128:5-21; A. van Hoek Sept. 25, 2015 Tr. at 238:21-239:3.

Once Perella was selected to provide the opinion, Josh Scherer, the lead Perella partner on the transaction, interacted primarily with Sambur and van Hoek, with whom he discussed the structure of the transaction and the form of consideration.[1717]  Perella was not asked to negotiate on behalf of CEOC and did not have any role in structuring the transaction.[1718]  Perella's contact with Caesars management, specifically Hession and Beato, was primarily limited to due diligence and information gathering.[1719]  Nor did Perella professionals have extensive dealings with TPG given that "Apollo was taking the lead" on the transaction.[1720]

### ii.  Perella's Retention of Counsel

As the structure of the transaction took shape, Perella expressed some concern over potential "legal issues" arising out of the transaction, including "[a]ll of the uniqueness of the proposed consideration and the potential assumptions that might need to be associated with that," in particular, whether or not the avoidance of expenses at CEOC was a legally cognizable form of consideration.[1721]  Accordingly, Perella asked Paul Weiss if they "were OK if [Perella] engaged outside counsel now to help them think through the legal issues around the

---

Indeed, it seems that the question of whether involving independent board members or independent counsel was necessary or appropriate was never even raised.  Cohen did not recall any discussions on this issue, but noted that Caesars "would ask [outside counsel] their advice on this, and I don't recall a recommendation of obtaining independent counsel or independent directors of CEOC."  M. Cohen Oct. 16, 2015 Tr. at 185:19-186:10.  In fact, both in-house and outside counsel dismissed this idea on the grounds that CEOC was a wholly-owned subsidiary of CEC and what was good for CEC was good for CEOC and vice versa; indeed as various witnesses stated, CEOC's interest was simply assumed to be the same as the interest of CEC notwithstanding the financial challenges facing CEOC at the time.  T. Donovan Nov. 10, 2015 Tr. at 42:10-13, 206:14-207:5; B. Finnegan Nov. 16, 2015 Tr. at 128:5-21; L. Clayton Feb. 1, 2016 Tr. at 484:4-485:4; D. Sambur Sept. 19, 2015 Tr. at 217:16-22; *cf.* A. van Hoek Sept. 25, 2015 Tr. at 238:21-239:3.  There does not, however, seem to have been any analysis done to determine whether CEC's and CEOC's interests were sufficiently aligned such that there was no need for independent counsel.  *See, e.g.*, T. Donovan Nov. 10, 2015 Tr. at 47:11-48:6.  Interestingly, Paul Weiss recognized that in the event of CEOC's insolvency, a special process would have been appropriate but claimed that such concerns regarding insolvency never existed.  B. Finnegan Nov. 16, 2015 Tr. at 128:5-21.

[1717]  J. Scherer Oct. 20, 2015 Tr. at 23:19-25:2.

[1718]  *Id.* at 32:11-33:22.  Leung indicated that Perella "would have been told exactly what the transaction was, what [Perella] would be opining on."  C. Leung Oct. 16, 2015 Tr. at 38:24-39:15.

[1719]  J. Scherer Oct. 20, 2015 Tr. at 20:22-21:10.

[1720]  *Id.* at 25:12-26:8 (Scherer could only recall one or two conference calls with TPG and he doubted "very much" that those conversations involved any of the diligence); *see also* G. Kranias Oct. 23, 2015 Tr. at 127:2-25.

[1721]  B. Finnegan Nov. 17, 2015 Tr. at 140:9-24; *see also* E-mail from D. Sambur to B. Finnegan, *et al.* (Aug. 12, 2013), at PRIV_INVESTIG_00036652 [PRIV_INVESTIG_00036652].

opinions."[1722]  When Caesars (through Paul Weiss) agreed, Perella – which had a longstanding relationship with Paul Weiss and would have otherwise retained them for this task[1723] – selected Weil, Gotshal & Manges LLP ("Weil") as its counsel for the engagement.[1724]

### iii.  Perella's Engagement Letter

Paul Weiss and Apollo negotiated Perella's engagement letter with Weil and Perella over a period of several months.[1725]  At the same time, Paul Weiss and Perella were also negotiating Perella's opinion itself.[1726]  As Finnegan wrote on August 6, 2013,  "[i]t would be best if we could agree with Perella on the actual opinion before we finalize the engagement letter . . . ."  In that same e-mail, Finnegan stated:  "We've told Perella that we're looking for an opinion that the consideration to be received in exchange for the [guarantee] OR [transfer of LINQ/Octavius] is fair from a financial point of view to [CEOC]."[1727]  He continued:  "We also provided them with some actual (redacted) precedent opinion language to that effect in a prior transaction" but noted that Paul Weiss had not "heard any reaction from them to the specific proposed language yet."[1728]  Finnegan explained that the plan was to present Perella "with proposals on the relative value propositions in each scenario" and to discuss "whether those figures would be within the range(s) that could be supported by a fairness opinion" prior to receiving the opinion itself.[1729]

At his interview, Finnegan explained that the August 6, 2013 e-mail referred to reaching agreement on the form of the opinion prior to engagement and not on what the consideration

---

[1722] E-mail from D. Sambur to B. Finnegan, *et al.* (Aug. 12, 2013), at PRIV_INVESTIG_00036652 [PRIV_INVESTIG_00036652].  On August 14, 2013, Scherer asked Gary Barancik, the head of Perella's Fairness Committee, whether Perella still needed to retain counsel given that Apollo determined that Perella should only opine on one structure – the transfer of the LINQ and Octavius.  E-mail from G. Barancik to J. Scherer (Aug. 13, 2013), at PWP_CZR_EX_00128454 [PWP_CZR_EX_00128453].  Barancik responded:  "Probably.  Given related party and public and distressed."  *Id.*

[1723] E-mail from D. Sambur to B. Finnegan, *et al.* (Aug. 12, 2013), at PRIV_INVESTIG_00036652 [PRIV_INVESTIG_00036652].

[1724] C. Leung Oct. 16, 2015 Tr. at 59:12-61:6; B. Finnegan Nov. 16, 2015 Tr. at 250:20-24. Michael Aiello was the main partner involved in the transaction at Weil, but Michael Walsh and others also worked on the engagement.  B. Finnegan Nov. 16, 2015 Tr. at 250:20-24.

[1725] Finnegan recalled there being "several back and [forths] on the engagement letter," more so with Perella than other financial advisors "since they were not as common a provider as some of the other shops where the form of [the] engagement letter [was] more well-trod [sic]."  B. Finnegan Nov. 16, 2015 Tr. at 124:19-125:4.

[1726] E-mail from B. Finnegan to A. van Hoek, *et al.* (Aug. 7, 2013), at PRIV_INVESTIG_00036575-77 [PRIV_INVESTIG_00036575].

[1727] *Id.* (bracketed language in original).

[1728] *Id.*

[1729] *Id.*

would be.[1730]   He noted, however, that Paul Weiss generally discusses the "description of the transaction and . . . the number or a range of what the consideration would be" with financial advisors prior to engagement.[1731]   Finnegan described this as an "interactive" process.[1732]   Leung explained that, prior to finalizing the engagement letter, Perella wished to understand the scope of the opinion – not its substance and conclusions.[1733]   According to other witnesses, it is not unusual for financial advisors to reach such an agreement prior to finalizing and executing an engagement letter.[1734]

At the end of July and into early August, Paul Weiss and Perella exchanged a number of drafts of Perella's engagement letter.[1735]   However, Perella's engagement letter remained unexecuted until September 9, 2013[1736] – the same day Perella provided a draft of its opinion letter and board presentation to Apollo.[1737]   Under the terms of the engagement, Perella received a fee of $1.75 million payable upon delivery of the opinion or the determination by Perella that it was "not able to deliver an Opinion containing the 'best and final' conclusion sought in the context of the [CERP] Transaction."[1738]

---

[1730]   B. Finnegan Nov. 16, 2015 Tr. at 132:4-133:7.

[1731]   *Id.* at 133:25-135:23.

[1732]   *Id.*

[1733]   C. Leung Oct. 16, 2015 Tr. at 71:4-74:3.

[1734]   M. Rowan Nov. 16, 2015 Tr. at 143:17-144:12; B. Finnegan Nov. 16, 2015 Tr. at 76:2-25.

[1735]   On July 31, 2013, Scherer circulated a draft engagement letter to Apollo, which Apollo (Sambur) forwarded to Paul Weiss.  E-mail from J. Scherer to D. Sambur, *et al.* (July 31, 2013) [PWP_CZR_EX_00011995], attaching July 31, 2013 draft engagement letter [PWP_CZR_EX_00011996].  The next day, Finnegan sent a Paul Weiss mark-up to the engagement letter back to Perella.  *See* E-mail from B. Finnegan to J. Scherer, *et al.* (Aug. 1, 2013) [PWP_CZR_EX_00008891], attaching "PWRW&G COMMENTS 8/01/13" (Aug. 1, 2013 [PWP_CZR_EX_00008893].  On August 5, 2013, Rosenberg sent a markup of the Paul Weiss draft to Finnegan and others, and on August 7, Finnegan circulated another markup of the draft engagement letter.  E-mail from B. Finnegan to E. Rosenberg, *et al.* (Aug. 7, 2013) [PWP_CZR_EX_00131813], attaching "PWRW&G COMMENTS 8/07/13" (Aug. 7, 2013) [PWP_CZR_EX_00131816].

[1736]   Letter from Perella to D. Colvin (Sept. 9, 2013), at PWP_CZR_EX_00005694-5700 [PWP_CZR_EX_00005694].

[1737]   On August 19, 2013, Perella provided Sambur and van Hoek with Perella's draft presentation, titled "Project Citizen" (Perella's internal deal name for the CERP Transaction).  E-mail from D. Sambur to C. D'Amore (Aug. 20, 2013) [CEOC_INVESTIG_00307536], attaching "Project Citizen" draft (Aug. 19, 2013), at CEOC_INVESTIG_00307537-572 [CEOC_INVESTIG_00307537].

[1738]   Letter from Perella to D. Colvin (Sept. 9, 2013), at PWP_CZR_EX_00005695 [PWP_CZR_EX_00005694].

### iv. Scope of Perella's Opinion

Ultimately, Perella opined that CEOC received "reasonably equivalent value" for the assets it transferred in connection with the CERP Transaction; it was not a "fairness opinion," as that term is commonly understood.[1739]   In reaching this conclusion, Perella viewed itself as taking "a more narrow look at what is being given up and what is being received" rather than "whether or not the transfer of value is fair in a holistic sense."[1740]   Certainly, the engagement letter and Perella's conduct does not suggest that Perella was engaged to negotiate the transaction on behalf of CEOC.[1741]   Indeed, notes taken by Jakub Mleczko, a junior employee at Perella, from a July 28, 2013 meeting between Perella and Paul Weiss indicate that Perella asked the "important question" of "who was negotiating the price of [the transfer of the LINQ and Octavius] from a process point of view."[1742]   The inquiry was "punt[ed]" by Paul Weiss at the time, despite the acknowledgement that this was an important question "in light of process and record keeping."[1743]

Nevertheless, certain non-Perella witnesses, such as Sambur, Cohen and Finnegan, suggested that Perella had indeed attempted to negotiate the price on behalf of CEOC.[1744]   This suggestion was directly refuted by the Perella witnesses, who made clear that Perella did not consider any alternatives to the transaction or other ways to accomplish a refinancing of the CMBS debt because Perella "was not given the opportunity to do that."[1745]   Moreover, even Sambur conceded that he did not believe Perella's "job was to structure the transaction or the terms."[1746]   Similarly, Rowan, while initially suggesting that Perella negotiated the price on behalf of CEOC, ultimately concluded that Perella's role was limited to issuing a fairness opinion, and that no one was negotiating price on CEOC's behalf.[1747]   To the extent that Perella pushed back against the consideration proposed by Apollo, it was not attempting to get the best price for CEOC but rather to ensure that, given the various factual assumptions it was asked to make, the consideration being received by CEOC was sufficient to provide Perella enough comfort to issue the requested opinion.   The reality is that no one negotiated on behalf of CEOC.

---

[1739]   C. Leung Oct. 16, 2015 Tr. at 35:3-21.

[1740]   J. Scherer Oct. 20, 2015 Tr. at 56:25-57:5.

[1741]   *Id*. at 38:4-42:3; C. Leung Oct. 16, 2015 Tr. at 56:17-57:7.

[1742]   E-mail from J. Mleczko to C. Leung, *et al.* [PWP_CZR_EX_00124566], attaching "Call with Paul Weiss – Sunday, July 28, 2013" (July 28, 2013), at PWP_CZR_EX_00124567 [PWP_CZR_EX_00124567].

[1743]   *Id.*

[1744]   D. Sambur Oct. 19, 2015 Tr. at 176:13-177:12 (suggesting that Perella was "looking out for CEOC's interest"); M. Cohen Oct. 16, 2015 Tr. at 120:22-121:10, 180:21-181:6; B. Finnegan Nov. 16, 2015 Tr. at 118:4-119:13.

[1745]   J. Scherer Oct. 20, 2015 Tr. at 38:4-42:3, 52:6-53:6; C. Leung Oct. 16, 2015 Tr. at 56:17-57:7.

[1746]   D. Sambur Oct. 19, 2015 Tr. at 168:4-169:9.

[1747]   M. Rowan Nov. 16, 2015 Tr. at 201:18-202:2.

###### g.  Apollo's Proposed Consideration

###### i.  August 12, 2013 Draft Apollo Presentation

In order to familiarize Perella with the details of the proposed transfer of the LINQ and Octavius, including the purchase price being considered, Apollo – with information garnered from Caesars management – began putting together a presentation entitled "CMBS discussion materials" in early August.  The first draft of this presentation was sent from van Hoek to Sambur on August 12, 2013 (the "Aug. 12 Apollo Draft")[1748] and stated that Perella was engaged "to opine on the value of two alternative structures for the treatment of Linq & Octavius as part of a CMBS refinancing."[1749]

The first structure listed ("Structure 1") involved the transfer of the LINQ and Octavius out of CEOC, and the other structure ("Structure 2") was the co-borrower structure.[1750]  In the Aug. 12 Apollo Draft, both the release of the CEC Lease Guarantee and the value of corporate expenses currently allocated to the CMBS Properties that would be reallocated to CEOC in the event of default and foreclosure were included as consideration.[1751]  According to several witnesses, these concepts originated with Apollo.[1752]

The total value assigned to the LINQ and Octavius under Structure 1 – the structure that was ultimately chosen – was calculated as $1.254 billion based in part on the application of a 9x multiple to, among other things, the lease payments expected to be generated by those properties.[1753]  After deducting the $450 million of debt that CERP would assume and the $75

---

[1748]  E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308268-77 [CEOC_INVESTIG_00308268].

[1749]  *Id.* at CEOC_INVESTIG_00308269.

[1750]  *Id.*

[1751]  *Id.*

[1752]  *See, e.g.*, E. Hession Nov. 3, 2015 Tr. at 193:23-194:4; J. Scherer Oct. 20, 2015 Tr. at 83:10-84:2.

[1753]  E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308273 [CEOC_INVESTIG_00308268].  As discussed below and in Appendix 7, Valuation at Section VI.B.2.a, the lease payments were not negotiated and did not represent a market price.  Instead, they were fixed at amounts sufficient to cover the financing costs incurred in connection with the construction of Octavius and the LINQ:  $35 million per year for the Octavius Tower and $15 million per year for the LINQ Retail, for a total of $50 million per year.  Neither Apollo nor Perella ever attempted to calculate what those payments would have been had they resulted from an arm's length negotiation.  J. Scherer Oct. 20, 2015 Tr. at 135:5-138:12.

million in remaining construction spend, the equity value flowing to CERP from CEOC was calculated to be $729 million.[1754]

As for what CEOC would receive in return, the Aug. 12 Apollo Draft focused on the fact that the CMBS Properties, as a result of management services received through CEOC, typically absorbed over $140 million of Caesars' annual corporate expenses.  In particular, it suggested that this expense allocation should also figure into the consideration allegedly being received in exchange for the LINQ and Octavius because "[a] reallocation of these expenses to CEOC (*i.e.*, if CMBS was [sic] 'unplugged' from the Caesars system) would result in over $1 billion of equity value destruction at CEOC based on a reasonable EBITDA multiple."[1755]  To arrive at this number, Apollo assumed that all of those expenses would in fact be reallocated to CEOC in the event of a default and then applied the same 9x multiple, resulting in a projected value to CEOC of almost $1.3 billion in avoided costs.[1756]  According to van Hoek and Sambur, not much thought went into using the 9x multiple, as this presentation was only meant to provide a rough layout of the framework and "there was very little by way of backup information or backup to support assumptions."[1757]  While Apollo is not a valuation firm, the notion that they simply selected a random multiple to use in a presentation made to their financial advisor seems unlikely, especially given the fact that Apollo expended considerable effort to obtain precise numbers when it came to expenses and other items included in the value.

The Aug. 12 Apollo Draft also ascribed value to the release of the CEC Lease Guarantee. After calculating the annual lease obligation owed by the CMBS OpCo entities to the CMBS PropCo entities for 2013 at $771 million (and applying a 3% annual escalator), the draft presentation estimated that the total amount of payments were worth roughly $5.7 billion at maturity and $4.4 billion as of August 2013.[1758]  Accordingly, Apollo concluded that "[a]

---

[1754] E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308273 [CEOC_INVESTIG_00308268].

[1755] *Id.* at CEOC_INVESTIG_00308271.

[1756] *Id.*

[1757] A. Van Hoek Sept. 25, 2015 Tr. at 172:8-25; *see also* D. Sambur Oct. 19, 2015 Tr. at 178:20-179:6 ("I don't think a tremendous amount of thought went into that number versus 8 or 10").

[1758] E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308273 [CEOC_INVESTIG_00308268].  Interestingly, in earlier decks circulated by Apollo, including an October 2012 presentation, the Lease Guarantee had been valued as only a $400 million benefit to CMBS (not to CEOC).  E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Old CMBS materials (October 2012)," at CEOC_INVESTIG_00355392 [CEOC_INVESTIG_00355381] ("Value of CEC Guarantee to CMBS is estimated to be $400m").  Rowan indicated that the $400 million represented a "hypothetical analysis to figure out from a negotiating point of view what the CEC guarantee could be worth to lenders" in a partial refinancing or restructuring."  M. Rowan Nov. 16, 2015 Tr. at 120:12-121:5.

successful refinancing of the existing CMBS capital structure, facilitated by the contribution of Linq and Octavius, will release CEC of this obligation, thereby increasing the value of the CEC guarantee on CEOC's debt."[1759]   Van Hoek explained that "to the extent that CEC was a guarantor of both the leases . . . on the CMBS side and on the CEOC debt, if the lease guarantee went away on the CMBS side, then potentially . . . there wouldn't be dilution . . . of the holding company . . . relative to the guarantee on the CEOC debt."[1760]   Sambur also noted that the CMBS refinancing benefited CEOC, because "it removed the potential risk that the entire Caesars entity would fall into bankruptcy and there would be a restructuring" – so "once the maturity was pushed out, the CEOC debt traded up."[1761]

Together, the value of the release of the CEC Lease Guarantee ($4.4 billion) and the reallocated expenses ($1.3 billion) totaled some $5.7 billion.[1762]   The Aug. 12 Apollo Draft applied a 90% discount for these items (perhaps to account for the estimated chance of a default occurring), yielding a value to CEOC of the consideration being offered at $570 million.[1763]   Van Hoek did not recall why the 10% credit was applied, but he did suggest that it was a possibility that the number reflected Apollo's view on how much of the $5.7 billion should have been credited.[1764]   After subtracting the $729 million equity value of the LINQ and Octavius, Apollo arrived at a net benefit to the CMBS Properties – and a net loss to CEOC – of $159 million under

---

[1759]  E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308270 [CEOC_INVESTIG_00308268].   As discussed in Section IX.B, *infra*, there is some tension between this assertion and the position taken by CEC in litigation that the guarantee of CEOC's bond debt (which was purportedly released in 2014) was merely a "guarantee of convenience." *See* E-mail from S. Anreder to D. Sambur, *et al.* (May 12, 2014), at APOLLO-Examiner_00084924-928 [APOLLO-Examiner_00084924].

[1760]  A. van Hoek Sept. 25, 2015 Tr. at 177:14-178:19.

[1761]  D. Sambur Oct. 19, 2015 Tr. at 181:14-182:12.

[1762]  E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308274 [CEOC_INVESTIG_00308268].

[1763]  It is unclear why the 90% discount was applied.  One theory is that it was meant to account for the (relatively low) chance that a default would actually occur.  It may also have been meant to estimate the value of the CEC Lease Guarantee to CEC (as opposed to CEOC); if that were the case, however, it is difficult to understand why it was applied to the avoided expenses as well. Additionally, it is possible that the 10% credit was applied to account for the CEC distribution analysis undertaken in the earlier October 2012 presentation (in which the CEC Lease Guarantee was valued as a $400 million benefit to CMBS).  *See* E-mail from A. van Hoek to D. Sambur (Feb. 27, 2013) [CEOC_INVESTIG_00355350], attaching "Old CMBS materials (October 2012)," at CEOC_INVESTIG_00355392 [CEOC_INVESTIG_00355381].   Indeed, both the October 2012 and Aug. 12 Apollo Draft valuations calculate the present value of the rent obligations at maturity and then reduce the value in a number of ways to determine the benefit CMBS and CEOC, respectively, would theoretically receive.

[1764]  A. van Hoek Jan. 26, 2016 Tr. at 303:14-304:20.

Structure 1.  This suggested that CEOC would need to receive additional consideration in roughly that amount in order to have the exchange be one of reasonably equivalent value.[1765]

### ii.  August 13, 2013 Draft Apollo Presentation

The following day, on August 13, 2013, van Hoek sent an updated draft of the presentation to Sambur (the "Aug. 13 Apollo Draft").[1766]  In the cover e-mail, van Hoek wrote: "[s]ince the strawman is that Perella confirms that our proposed values for each structure is fair, we should discuss whether $0 for each makes sense here."[1767]  Sambur confirmed that the reference to $0 meant that, because the analysis contained in the enclosed Aug. 13 Apollo Draft placed a greater value on the indirect benefits to CEOC than on the LINQ and Octavius, there was no need for any cash, debt or other consideration to be transferred to CEOC (aside from the indirect benefits outlined above).[1768]

Specifically, although the Aug. 13 Apollo Draft remained relatively unchanged in terms of overall structure, the multiple used to value the CMBS share of corporate expenses increased from 9x to 12.5x, resulting in a total value to CEOC of approximately $1.8 billion – an increase from the $1.3 billion value ascribed in the Aug. 12 Apollo Draft.[1769]  Sambur did not recall any discussions leading to the change in the multiple but pointed to a footnote in the draft, which stated that the 12.5x "[r]epresents Caesars 2013E trading multiple, as of 8/13/2013," as the basis for why such multiple was used.[1770]

Notably, this larger 12.5x multiple was not used to value the lease payments for Octavius and the RDE Casino or the High Roller EBITDA.  Instead, in this analysis Apollo actually decreased the multiple for those payments from 9x to 8x, resulting in a significantly decreased equity value of $585 million (from $792 million) for the LINQ and Octavius under Structure 1.[1771]  During his interview, van Hoek could not explain why the multiples were adjusted in

---

[1765]  E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308274 [CEOC_INVESTIG_00308268].

[1766]  E-mail from A. van Hoek to D. Sambur (Aug. 13, 2013) [CEOC_INVESTIG_00308289], attaching "CMBS discussion materials" (Aug. 2013), at CEOC_INVESTIG_00308290-99 [CEOC_INVESTIG_00308290].

[1767]  *Id.* at CEOC_INVESTIG_00308289.

[1768]  *Id.* at CEOC_INVESTIG_00308293; *see also* D. Sambur Oct. 20, 2013 Tr. at 179:7-180:8.

[1769]  E-mail from A. van Hoek to D. Sambur (Aug. 13, 2013) [CEOC_INVESTIG_00308289], attaching "CMBS discussion materials" (Aug. 2013), at CEOC_INVESTIG_00308293 [CEOC_INVESTIG_00308290].

[1770]  *Id.*; D. Sambur Oct. 20, 2013 Tr. at 180:9-25.

[1771]  E-mail from A. van Hoek to D. Sambur (Aug. 13, 2013) [CEOC_INVESTIG_00308289], attaching "CMBS discussion materials" (Aug. 2013), at CEOC_INVESTIG_00308295 [CEOC_INVESTIG_00308290].

different directions or why they changed at all.[1772]  Nor does there appear to be any principled basis for Caesars' trading multiple to be used for expenses but not for the properties themselves. In addition, the 90% discount on corporate expenses and the CEC Lease Guarantee was removed (thus implicitly reflecting an assumption that CEOC would reap the full benefit of a release of CEC's guarantee).[1773]  As a result, the purported value of the indirect benefits flowing to CEOC now totaled $6.2 billion, and the Aug. 13 Apollo Draft concluded – as van Hoek had suggested in his e-mail – that there was thus no need for CEOC to receive any additional consideration in exchange for the transfer of the LINQ and Octavius.[1774]  Of course, even if the 90% discount from the Aug. 12 Apollo Draft had been applied, the value of these indirect benefits would still have been $620 million – again suggesting that CEOC would not need to receive any additional tangible consideration in connection with the transfer of the LINQ and Octavius.[1775]

### iii.  August 14, 2013 Final Apollo Presentation to Perella

Between August 13 and August 14, 2013, the draft presentation underwent another series of revisions by Apollo and the final presentation (the "Aug. 14 Apollo Presentation") was sent to Perella by Paul Weiss "on behalf of Caesars."[1776]  On that same day, Sambur walked through the materials during a conference call with Perella.  Leung believed this was the first time that Perella learned the details of the transaction.[1777]  The only structure discussed in the Aug. 14 Apollo Presentation was the transfer of the LINQ and Octavius from CEOC to CERP.[1778]  Most of the remaining aspects of the presentation, including the proposed consideration, remained the same as in the Aug. 13 Apollo Draft.[1779]

Although the value of the release of the CEC Lease Guarantee remained at $4.4 billion, the Aug. 14 Apollo Presentation noted that "a successful refinancing will also lower the risk of a

---

[1772]  A. Van Hoek Sept. 25, 2015 Tr. at 216:18-217:2.

[1773]  The text indicating that a 10% credit was being applied remained in the Aug. 13 Apollo Draft, but no such discount is reflected in the final numbers included in that draft, indicating it was probably left in the presentation by accident.

[1774]  E-mail from A. van Hoek to D. Sambur (Aug. 13, 2013) [CEOC_INVESTIG_00308289], attaching "CMBS discussion materials" (Aug. 2013), at CEOC_INVESTIG_00308296 [CEOC_INVESTIG_00308290].

[1775]  *See id.*  $585 million value ascribed to LINQ and Octavius in exchange for $620 million results in a net value of $0.

[1776]  E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (Aug. 2013), at PWP_CZR_EX_00000381-390 [PWP_CZR_EX_00000381].

[1777]  C. Leung Oct. 16, 2015 Tr. at 88:23-91:12, 95:2-96:7.

[1778]  E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (Aug. 2013), at PWP_CZE_EX_00000382 [PWP_CZR_EX_00000381].

[1779]  *See generally id.*

premature bankruptcy at CEC, which would likely significantly reduce the value of CEOC's equity and debt securities."[1780]    The multiple used to value the re-allocation of CMBS's corporate expenses remained at 12.5x, resulting in an estimated equity value destruction to CEOC of approximately $1.8 billion in the event of a default.[1781]    As a result of the remaining construction spend increasing from $75 million to $81 million, the equity value of the LINQ and Octavius again dropped (albeit only slightly) from $585 million in the Aug. 13 Apollo Draft to $578 million[1782] in the Aug. 14 Apollo Presentation.[1783]    The total measurable value of consideration remained at $6.2 billion, and the net transfer value for the LINQ and Octavius in the context of a CMBS refinancing was again listed as $0.[1784]

Van Hoek's reference to this as the "strawman," or base case scenario, makes clear that one of Apollo's goals in preparing this presentation was transferring the LINQ and Octavius to the new CERP entity without CEC having to provide any tangible consideration in return. Indeed, on August 16, Ryan Mollett of GSO circulated an e-mail to certain of the Potential CERP Lenders regarding a conversation that he had with Sambur and noted that Apollo was "exploring a multitude of ways that they can move [the LINQ and Octavius] out without costing the company actual cash."[1785]    At this point, however, it was unclear if Perella would issue an opinion on such grounds.  Soon after receiving the Aug. 14 Apollo Presentation, Barancik (the head of Perella's Fairness Committee) sent an e-mail to Scherer noting that the "implication" of Apollo's calculations was "that they can transfer up to $6.2 billion of assets [from CEOC] for no consideration."[1786]    The tone of his message suggests he was at least somewhat skeptical of that proposition.

---

[1780]  *Id.* at PWP_CZR_EX_00000383.

[1781]  *Id.* at PWP_CZR_EX_00000384.

[1782]  Leung explained that, according to the Apollo Aug. 14 Presentation, the Octavius lease and the O'Sheas Casino lease were valued at $400 million, the High Roller (observation wheel) was valued at $387 million and the LINQ was valued at $322 million, for a total $1.11 billion enterprise value. C. Leung Oct. 16, 2015 Tr. at 100:3-22.  The debt and remaining construction expenditure were subtracted to arrive at the equity value of $578 million.  *Id.*

[1783]  E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (Aug. 2013), at PWP_CZE_EX_00000386 [PWP_CZR_EX_00000381].

[1784]  *Id.* at PWP_CZR_EX_00000387.

[1785]  E-mail from K. Liang to B. Woo (Aug. 17, 2013), at Oaktree_CZR_0000792 [Oaktree_CZR_0000790].

[1786]  E-mail from J. Scherer to E. Rosenberg (Aug. 14, 2013), at PWP_CZR_EX_00128470 [PWP_CZR_EX_00128470].

### h. Perella's Due Diligence and Discussions About Consideration

### i. Release of the CEC Lease Guarantee

On August 20, 2013, Perella and Paul Weiss participated in a call regarding the Aug. 14 Apollo Presentation.  Although none of the witnesses could remember the specifics of that conversation, Scherer did recall that Perella expressed certain concerns about the value ascribed to the release of the CEC Lease Guarantee.[1787]  Finnegan subsequently provided Perella with additional background materials suggesting that the value of that release to CEOC and its creditors in the event of a bankruptcy at CEC and CEOC was actually between $715 million and $762 million (as opposed to the $4.4 billion value to CEOC ascribed to it in the Aug. 14 Apollo Presentation).[1788]  This new, lower range was meant to reflect the actual difference between what CEOC would receive "in the event of a bankruptcy at CEC/CEOC" as a result of CEC's existing guarantees of CEOC debt with and without the CEC Lease Guarantee.[1789]  In other words, the presentation suggested that CEOC's existing parent guarantees would be worth more in the event they did not have to "compete" with the CEC Lease Guarantee should CEOC default on its debt.[1790]

Of course, this range fell well short of the $4.4 billion of value ascribed to the release of the CEC Lease Guarantee in the Aug. 14 Apollo Presentation.  Moreover, the presentation made no mention of Caesars' and the Sponsors' understanding that the existing parent guarantee of CEOC debt – at least insofar as the non-term loan debt was concerned – could be released upon a unilateral decision by CEC.[1791]

Notwithstanding Apollo's continued efforts, Perella repeatedly questioned whether the release of the CEC Lease Guarantee could properly be considered as a benefit to CEOC at all. Specifically, Scherer indicated that Perella "struggled" with valuing the release of the CEC Lease Guarantee and could not "get comfortable [with] placing a value on the release" as there was no

---

[1787]  J. Scherer Oct. 20, 2015 Tr. at 96:1-24.

[1788]  E-mail from B. Finnegan to J. Scherer, *et al.* (Aug. 20, 2013) [PWP_CZR_EX_00001350], attaching "CMBS Follow-up discussion materials" (Aug. 2013), at PWP_CZR_EX_00001353 [PWP_CZR_EX_00001351].

[1789]  *Id.*

[1790]  $715 million represents the purported value to CEOC before closing of the Growth Transaction; $762 million represents the purported value to CEOC afterwards.  *Id.*  It is worth noting that the methodology used by Apollo to value the benefit to CEOC resulting from the release of the CEC Lease Guarantee here is the same as that used in the October 2012 presentation when the release of the guarantee was valued as a $400 million benefit to CMBS, which, by using the same logic applied in the August 20, 2013 materials, would translate into a benefit to CEOC for the same amount.

[1791]  D. Sambur Oct. 19, 2015 Tr. at 173:21-174:11; D. Sambur Oct. 20, 2015 Tr. at 462:18-23; D. Sambur Jan. 14, 2016 Tr. at 680:19-681:6; M. Rowan Jan. 28, 2016 Tr. at 556:8-24; M. Cohen Oct. 16, 2015 Tr. at 132:13-133:10.

appropriate methodology to value this potential form of consideration.[1792]  Leung also objected to valuing the release of the CEC Lease Guarantee as overly speculative, stating that "in order for this value to go to CEOC or CEOC's creditors, there would have to be a default and the guarantee would have to get called upon," which "may or may not have happened."[1793]  Leung also noted that any value of the release would by definition go to CEOC debt holders (as opposed to CEOC), which was not "apples to apples with the fact that these assets, which were a subsidiary of CEOC, were being transferred out" of CEOC.[1794]  Ultimately, Perella held firm, refusing in its final opinion to ascribe any monetary value to the release of the CEC Lease Guarantee.[1795]

### ii.  Avoidance of Corporate Expenses

As discussed above, pursuant to the 2010 Shared Services Agreement, CEOC provided certain services to the CMBS Properties, which, in return, reimbursed CEOC for the expenses that were "allocated" to those properties as well as a percentage of "unallocated" expenses incurred for the benefit of all Caesars properties.[1796]  As reflected in the Aug. 14 Apollo Presentation, Apollo began from the premise that upon a default on the CMBS Financing, there would be a foreclosure on the CMBS Properties, and CEOC would no longer be reimbursed for any of the shared services and would have to absorb 100% of the costs previously allocated to the CMBS Properties as well as the 30% of unallocated expenses attributed to the CMBS entity.[1797]  By this logic, refinancing the CMBS debt would benefit CEOC because the CMBS Properties would continue to reimburse CEOC for both types of expenses rather than decamping from the Caesars system and ostensibly leaving CEOC to bear those extra costs.[1798]

---

[1792]  J. Scherer Oct. 20, 2015 Tr. at 89:10-91:7, 94:6-95:17.

[1793]  C. Leung Oct. 16, 2015 Tr. at 118:6-15.  In particular, Leung and Scherer felt it would be challenging to "ascribe a percentage chance that the guarantee gets called upon."  *Id.* at 118:16-119:7; J. Scherer Oct. 20, 2015 Tr. at 90:6-15, 93:16-23.

[1794]  C. Leung Oct. 16, 2015 Tr. at 119:8-18.

[1795]  *Id.* at 117:25-118:5; J. Scherer Oct. 20, 2015 Tr. at 94:8-19.

[1796]  R. Brimmer Sept. 29, 2015 Tr. at 148:22-149:14.  As noted above, allocated corporate expenses are ones that are attributed to specific properties.  *Id.*  There are hundreds of drivers used to determine how those costs are allocated to each specific property and each cost is allocated differently.  *Id.* at 149:15-150:11.  Expenses that are "unallocated," such as the CEO's salary and costs associated with preparing for audits and SEC findings, are not assigned to a specific property, but rather are reimbursed 30% by the CMBS entity as a whole.  A. van Hoek Sept. 25, 2015 Tr. at 186:9-25.

[1797]  E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (August 2013), at PWP_CZE_EX_00000384 [PWP_CZR_EX_00000381].

[1798]  J. Beato Sept. 24, 2015 Tr. at 144:17-25; M. Wlazlo Oct. 14, 2015 Tr. at 100:10-23.

As a threshold matter, Perella had concerns about whether or not avoided expenses were a legally cognizable form of consideration.[1799]   Finnegan recalled that Paul Weiss had discussions with Perella and its counsel on this topic.[1800]   Both Scherer and Leung indicated that they had never analyzed or valued reallocated corporate expenses before this transaction and had never heard of this form of consideration being used in a transaction or fairness opinion.[1801]   Other witnesses, such as Rowan, Cohen, Kranias, Dickson and Wlazlo similarly had never seen this type of consideration used before.[1802]   However, Leung indicated that she thought that reallocation of corporate expenses was an appropriate form of consideration for the assets being transferred in this case.[1803]   As time went on, Perella became more comfortable with the proposition, but, as described below, Perella still sought to include a formal assumption that allocated expenses did constitute a legally cognizable form of consideration in their opinion.[1804]

Once Perella accepted the inclusion of reallocated expenses, they focused on the appropriate value to ascribe to this form of consideration.  Both Scherer and Leung indicated that the bulk of Perella's due diligence work was performed in connection with the value to be attributed to these reallocated corporate expenses.[1805]   Scherer explained that Perella "went back and forth with management several times over their . . . projections with respect to the overhead

---

[1799]   E-mail from A. van Hoek to D. Sambur and G. Ezring (Aug. 20, 2013), at PRIV_INVESTIG_00036680 [PRIV_INVESTIG_00036680].   Van Hoek also wrote that Perella's midpoint for their valuation of the LINQ and Octavius, which was $250 million at the time, had "NOT been reduced for any benefits to CEOC such as the ones suggested in our pages last week."  *Id.*  Perella's valuation for the properties was significantly less than Apollo's $578 valuation in the Aug. 14 Apollo Presentation.

[1800]   B. Finnegan Nov. 16, 2015 Tr. at 138:15-23, 140:4-24.

[1801]   J. Scherer Oct. 20, 2015 Tr. at 101:16-102:23; C. Leung Oct. 16, 2015 Tr. at 96:22-98:11, 245:19-246:23.

[1802]   *See, e.g.*, M. Cohen Oct. 16, 2015 Tr. at 182:11-184:14 (Cohen recalled asking Paul Weiss questions about the avoidance of cost as consideration as he had not seen that type of consideration before); G. Kranias Oct. 23, 2015 Tr. at 130:5-24 (Kranias had never seen a reallocation of corporate expenses used as consideration or as value in a transaction); M. Wlazlo Oct. 14, 2015 Tr. at 103:5-14 (Wlazlo could not recall any other transaction in his experience in which the avoidance of future expenses counted as consideration); M. Rowan Nov. 16, 2015 Tr. at 274:2-10; S. Dickson Feb. 25, 2016 Tr. at 106:6-108:3.

[1803]   C. Leung Oct. 16, 2015 Tr. at 254:20-255:8.  As discussed in Section VIII.C.4.a.iii.(B)(2), *infra*, there is legal authority supporting the proposition that indirect benefits may constitute consideration in certain instances, but that is likely inapplicable here.  *See, e.g.*, *Mellon Bank v. Metro Commc'ns, Inc.*, 945 F. 2d 635, 646 (3d Cir. 1991) ("In evaluating whether reasonably equivalent value has been given . . . indirect benefits may also be evaluated.").

[1804]   B. Finnegan Nov. 16, 2015 Tr. at 140:-21:141:5.  The debate over this assumption, as well as the other formal assumptions underlying Perella's opinion, are discussed in more detail in Section VIII.C.3.j, *infra*.

[1805]   J. Scherer Oct. 20, 2015 Tr. at 99:21-100:12; C. Leung Oct. 16, 2015 Tr. at 93:19-94:19.

in the event that CERP" separated from Caesars.[1806]  Leung similarly recalled that the most "significant area" of Perella's due diligence was "the corporate expenses where we spent a lot of time diligencing those assumptions" and "went back and forth with the company multiple times."[1807]

Perella and Apollo also had a number of conversations regarding the proper amount of expenses to be included as consideration – with Apollo's proposed value starting off higher than what Perella would eventually accept.  The Aug. 14 Apollo Presentation estimated that a default would force CEOC to swallow the full $142 million in extra costs historically borne by the CMBS Properties immediately upon default (and on an annual basis thereafter), notwithstanding the fact that the CMBS Properties would no longer be part of the Caesars system under such a scenario.[1808]  Perella "pushed back on that" assumption, however, reasoning that "[i]f a property goes away, it didn't seem reasonable . . . that [the] corporate expenses wouldn't be reduced at all."[1809]

Ultimately, after a series of (sometimes contentious) discussions with Caesars management,[1810] Perella reached the conclusion that, assuming a prompt separation of the CMBS

---

[1806] J. Scherer Oct. 20, 2015 Tr. at 45:21-47:14.

[1807] C. Leung Oct. 16, 2015 Tr. at 129:20-131:5.  While Perella interacted with Apollo and Caesars management regarding the reallocated corporate expenses, it does not appear that TPG was involved in these discussions.  Tim Dunn of TPG, who was heavily involved in the operational aspects of Caesars' business, confirmed that he was not involved in – and was never asked to be involved in – any discussions regarding allocation methodology.  T. Dunn Oct. 29, 2015 Tr. at 121:23-122:12.

[1808] E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (Aug. 2013), at PWP_CZE_EX_00000384 [PWP_CZR_EX_00000381]; *see also* C. Leung Oct. 16, 2015 Tr. at 239:7-242:23.

[1809] C. Leung Oct. 16, 2015 Tr. at 129:20-131:5.

[1810] Specifically, after Perella requested that the company provide input on the "impact of PropCo going away," (E-mail from J. Beato to K. Nguyen and A. van Hoek (Aug. 16, 2013), at PWP_CZR_EX_00000174 [PWP_CZR_EX_00000173]), Michael Crome provided Beato with some preliminary analysis.  *Id.* at PWP_CZR_EX_00000173.  Following discussions with Perella, on August 29, 2013, Crome updated his allocation analysis in a purported effort to reach the most realistic numbers of what would actually happen upon the removal of the CMBS Properties from the Caesars system.  E-mail from J. Beato to D. Sambur, *et al.* (Aug. 29, 2013), at CEOC_INVESTIG_00038362 [CEOC_INVESTIG_00038362].  When Beato sent this updated analysis to Sambur, van Hoek and Hession, she noted: "[c]ompared to his more aggressive case 90% of unallocated corporate is expected to remain after 2-4 years, versus 65% in the scenario based on Perella's aggressive assumptions . . . ."  *Id.*  Under Crome's revised analysis, of the $88.5 million in allocated corporate expenses that existed as of August 2013, after six to eight months, $43 million would remain, and after two to three years, $34.3 million would remain.  *Id.* at CEOC_INVESTIG_00038363.  With respect to unallocated corporate expenses, Crome estimated that 95% would remain after six to eight months ($51.3 million) and 90% would remain after two to three years ($48.6 million).  *Id.*  Thus, the total corporate

Properties upon a default (which, as discussed below, was itself a highly questionable assumption), some $94.9 million of total annual CMBS expenses would remain at CEOC six months following such event and that such number would decrease to $83.2 million after two to three years and continue at $83.2 million in perpetuity. Perella felt the new expense numbers were "as realistic as they were going to get."[1811]

### iii. Tangible Consideration

In late August 2013, Perella's deal team and Fairness Committee,[1812] an independent committee made up of Perella partners who were not involved in the CERP Transaction, discussed whether Perella could issue an opinion with the proposed consideration to CEOC, which at that time consisted only of purported savings on reallocated expenses and the purported benefit of releasing CEC's Lease Guarantee.[1813] After deliberating, the Fairness Committee concluded that tangible assets needed to be included in order for Perella "to opine that the transaction was of reasonably equivalent value."[1814] As Scherer explained, Perella thought that "some additional consideration in the form of hard currency, whether cash or bonds, would be appropriate and necessary" in order for Perella to "get comfortable with rendering the opinion."[1815] Scherer called Sambur to inform him that additional consideration in the form of cash or a cash equivalent would be needed.[1816] On August 29, Sambur appears to have sent himself an e-mail summarizing this phone call and wrote that they (presumably Perella) were "[a]sking for $250mm" but had "flexibility."[1817] As discussed below, that number was in fact subsequently reduced.

---

expenses allocated to CMBS that would remain following removal of the CMBS Properties would be $94.3 million in the six to eight months following removal and $82.9 million in the two to three years following removal. *Id.* These numbers were nearly identical to the ultimate analysis included in Perella's final valuation. "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000034 [CEOC_INVESTIG_00000006]; *see also* C. Leung Oct. 16, 2015 Tr. at 239:7-242:23.

[1811] C. Leung Oct. 16, 2015 Tr. at 239:7-242:23; *see also* E-mail from S. MacKenzie to C. Leung (Sept. 5, 2013) [PWP_CZR_EX_00124227], attaching "Combined Allocations 9/5/2013" spreadsheet, at PWP_CZR_EX_00124228 [PWP_CZR_EX_00124228].

[1812] Perella's Fairness Committee for the CERP Transaction consisted of Barancik, David Landman and Darren Solenberg. C. Leung Oct. 16, 2015 Tr. at 24:24-25:3.

[1813] J. Scherer Oct. 20, 2015 Tr. at 126:3-127:20.

[1814] C. Leung Oct. 16, 2015 Tr. at 26:3-29:14. According to Leung, had those assets not been added as consideration, Perella would not have reached the conclusion set forth in Perella's opinion letter. *Id.* at 262:4-9.

[1815] J. Scherer Oct. 20, 2015 Tr. at 125:22-126:11.

[1816] *Id.* at 131:14-18.

[1817] E-mail from D. Sambur to D. Sambur (Aug. 29, 2013), at CEOC_INVESTIG_00396533 [CEOC_INVESTIG_00396533].

In connection with Perella's request, CEC and Apollo initially decided that the additional consideration would take the form of CEOC bonds.[1818]  In a September 5 e-mail, Hession wrote to Wilfong and others that the plan was "to contribute back into CEOC $143m in face value worth of bonds," specifically "all of the 13's and the 10's of 18 that [were] repurchased last quarter."[1819]  Later that day, van Hoek sent an e-mail to Hession and Beato, copying Sambur and others, with an overview of the bond portfolio that Apollo was planning to use for CERP.[1820]  On September 6, van Hoek circulated a revised overview of this bond portfolio to Perella, which included bonds with a face value of $150 million and a market value of $139 million.[1821]

On September 9, 2013, van Hoek noted in an e-mail to Hession, Beato and others that he had spoken with Scherer regarding the proposed consideration:  "Josh reconfirmed that he is confident that the current proposal will work, but we should plan to have a group call with the Perella team once they've had the fairness committee meeting this week."[1822]  Two days later, on September 11, van Hoek relayed another conversation that he had with Perella:  "They met with their committee this morning and are good with our proposal to move Linq / Octavius for the consideration that we shared last week" – the "$60 million market value of existing BondCo bonds (*i.e.* all non-CGP bonds) as well as the remaining $80 million of the 2013s."[1823]  Van

---

[1818] *See generally* E-mail from E. Hession to A. van Hoek (Sept. 11, 2013), at CEOC_INVESTIG_00092225 [CEOC_INVESTIG_00092224]; E-mail from E. Hession to T. Vanke, *et al.* (Sept. 5, 2013), at CEOC_INVESTIG_00033369-371 [CEOC_INVESTIG_00033369].

[1819] E-mail from E. Hession to T. Vanke, *et al.* (Sept. 5, 2013), at CEOC_INVESTIG_00033370 [CEOC_INVESTIG_00033369].

[1820] E-mail from E. Hession to A. van Hoek (Sept. 11, 2013), at CEOC_INVESTIG_00092225 [CEOC_INVESTIG_00092224].

[1821] E-mail from A. van Hoek to E. Hession, *et al.* (Sept. 6, 2013) [APOLLO-Examiner_00039150], attaching "Caesars:  Bond Consideration Overview (Revised)," at APOLLO-Examiner_00039152 [APOLLO-Examiner_00039152].  As previously noted, the Examiner has determined that the bonds had a market value of $129 million.

[1822] E-mail from E. Hession to A. van Hoek (Sept. 11, 2013), at CEOC_INVESTIG_00092224 [CEOC_INVESTIG_00092224].

[1823] *Id.*; *see also* "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000034 [CEOC_INVESTIG_00000006].  It bears noting that the value of the bonds was very similar to the value of tangible consideration the original Aug. 12 Apollo Draft had indicated was appropriate.  Ultimately, the mix of tangible consideration provided to CEOC – roughly $69.5 million (face value) of bonds and $80.7 million in cash – was different than this initial proposal, although the total amount of such consideration was roughly the same.  CEOC Board Meeting Minutes (Oct. 10, 2013), at CEOC_INVESTIG_00452076 [CEOC_INVESTIG_00452075]; CERP Transaction Agreement (Oct. 11, 2013), at CEOC_INVESTIG_00055298 [CEOC_INVESTIG_00055294].

Hoek noted that the "[n]ext and hopefully final step" was to "get [the] formal opinion language agreed upon" and that Paul Weiss and Weil were set to discuss that later that day.[1824]

### i.   Questions from Investors and Citibank's Role

As discussed above, Citibank was retained to promote the transaction to potential lenders with the help of Caesars management and Apollo, and began doing so in earnest in September 2013. Almost immediately, investors began to question the consideration that CEOC was receiving for the transfer of the LINQ and Octavius, directing their inquiries to both Citibank and individuals at Apollo and Caesars management. For instance, on September 19, Neel Tanna of Yost Funds wrote to Jennifer Garrison, who had just taken over the Investor Relations position from Beato at CEOC, that the market was "confused on consideration to OpCo."[1825] Garrison forwarded the e-mail to Hession, Beato and Cohen, giving them a "heads up" that "[t]he question around what compensation we are giving to CEOC for Octavius/Linq is gaining momentum."[1826] Hession and Cohen subsequently agreed to disclose that Caesars had obtained a fairness opinion, but not the actual values in the opinion.[1827]

Tanna was not the only one asking such questions. Beato noted in a September 19, 2013 e-mail that there was a lot of "chatter from folks about that compensation," and Sambur responded that they had to be thoughtful in how the consideration was articulated in the Offering Memorandum.[1828] On September 24, Hession sent an e-mail to Sambur and van Hoek and wrote: "[i]f people do the simple math they get something around $600m for a package that in our materials will generate roughly $100m."[1829] The $600 million number is exactly equal to the face value of the bonds ($150 million) plus the $450 million in debt to be assumed by CERP, while the "materials" referred to appear to be the materials presented to investors in September 2013, specifically the September 2013 Investor Presentation, which suggests that the LINQ and Octavius would generate, on average, an annual incremental $97 million of EBITDA for CERP.[1830] Applying a typical Las Vegas property multiple of 9x to 11x to that number suggests

---

[1824] E-mail from E. Hession to A. van Hoek (Sept. 11, 2013), at CEOC_INVESTIG_00092224 [CEOC_INVESTIG_00092224]; "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000034 [CEOC_INVESTIG_00000006].

[1825] E-mail from E. Hession to J. Garrison *et al.* (Sept. 19, 2013), at CEOC_INVESTIG_00028111 [CEOC_INVESTIG_00028111].

[1826] E-mail from E. Hession to M. Cohen (Sept. 19, 2013), at PRIV_INVESTIG_00019176 [PRIV_INVESTIG_00019176].

[1827] *Id.*

[1828] E-mail from A. van Hoek to D. Sambur *et al.* (Sept. 19, 2013), at CEOC_INVESTIG_00405254 [CEOC_INVESTIG_00405254].

[1829] E-mail from D. Sambur to A. van Hoek *et al.* (Sept. 24, 2013), at CEOC_INVESTIG_00051042 [CEOC_INVESTIG_00051042].

[1830] This calculation includes $15 million for the lease payments for the "Quad Strip-Front Lease," $3.6 million for the full annual lease payments under the Octavius Tower lease, $14.3 million for the run-rate Project LINQ retail rent income, $45 million (midpoint) for the High

that investors believed CERP was underpaying for the properties by between $300 million and $500 million.

In attempting to formulate a response to these sorts of inquiries, van Hoek and Sambur suggested highlighting the indirect benefits that CEOC was receiving, and Sambur – referring to the avoidance of expenses that would ostensibly bounce back from CMBS to CEOC in the event of a default and separation – noted that the focus should be on "the costs times a multiple."[1831] Sambur explained at his interview that the reallocated expenses were amongst the "largest pieces" of consideration and the simplest way to explain the avoidance of reallocated expenses to the market was "to say [$]140 million times whatever multiple you think is appropriate."[1832]

That same day, Sambur forwarded an e-mail to Dickson at Citibank with Hession's proposed approach for answering investors' questions by emphasizing the indirect benefits to CEOC.[1833] Specifically, the plan was to state: "The compensation that CEC is paying to CEOC for the equity in the Linq / Octavius facility is based on a fairness opinion and consists of $69m in bonds, $81m in cash or equivalent valued bonds, the forgiveness of $450m in debt, and benefits that CEOC receives from CERP such as a concentrated Las Vegas presence and the ability to share fixed costs."[1834] Dickson replied that Citibank agreed with such an approach, noting that it was: "[n]ot perfect but you have the fraudulent conveyance basket."[1835] That

---

Roller, $11.5 million (midpoint) of potential income from Project LINQ and $7.5 million in increased gaming revenue expected from the completion of Project LINQ – totally $96.9 million. "Caesars Entertainment Corporation Investor Presentation" (Sept. 19, 2013), at CEOC_INVESTIG_00021524 [CEOC_INVESTIG_00021494].

[1831] E-mail from D. Sambur to A. van Hoek, *et al.* (Sept. 24, 2013), at CEOC_INVESTIG_00051042 [CEOC_INVESTIG_00051042]; *see also* E-mail from J. Garrison to J. Beato and E. Hession (Sept. 24, 2013), at CEOC_INVESTIG_00009655 [CEOC_INVESTIG_00009655] (Garrison writing "[w]e'll need to underscore the indirect value, and potentially have them think through the scenario where CERP didn't happen and the potential impact on CEOC").

[1832] D. Sambur Oct. 20, 2015 Tr. at 208:21-209:16. The Perella Opinion, of course, ascribed a value of only $89.2 million dollars, a percentage of the $140 million dollars, to the avoided expenses.

[1833] E-mail from S. Dickson to D. Sambur (Sept. 24, 2013), at CEOC_INVESTIG_00348301 [CEOC_INVESTIG_00348301].

[1834] *Id.*

[1835] *Id.* When asked about this e-mail, Sambur indicated that he thought it was a "typo," and that Dickson must have meant "investment basket." D. Sambur Oct. 19, 2015 Tr. at 210:9-211:22. Interestingly, Dickson, who had spoken to Sambur before his interview, although ostensibly on a different Caesars-related topic, also initially characterized the phrase – which contains no spelling or punctuation errors – as a "typo." S. Dickson Feb. 25, 2016 Tr. at 98:20-99:3. Upon being informed of this coincidence, Dickson clarified that it was the word "basket" which was a mistake and that his e-mail was likely referring to the risk factor concerning fraudulent conveyance in the Offering Memorandum. *Id.* at 104:3-22.

reaction is consistent with contemporaneous e-mail evidence demonstrating that Citi had, in connection with preparing a list of risk factors for the Offering Memorandum, raised questions internally and with Apollo regarding the consideration that was being provided to CEOC, and the possibility that, in the event of a CEOC bankruptcy, the transaction might be at risk for avoidance on fraudulent conveyance grounds.[1836]   Indeed, the day before his exchange with Dickson, Sambur noted to Ezring that Citibank was "chirping about fraudulent conveyance risk factor."[1837]

### j.   Perella's Assumptions and Opinion

#### i.   Assumptions Negotiated Between Paul Weiss and Weil

In connection with its opinion, Perella was "directed by Caesars management" to make a number of formal and informal assumptions impacting its analysis.   However, reaching agreement on which assumptions would be included in the opinion letter and how exactly they would be described proved a difficult task, with negotiations between Paul Weiss and Weil dragging on for weeks.[1838]

Paul Weiss had several calls with Weil and/or Perella to discuss these issues,[1839] but, as Finnegan noted, "[a]t a certain point, [they] reached a loggerheads."[1840]   In particular, according to Finnegan, Perella insisted on including certain assumptions that Caesars and/or Apollo would not accept because they would "arguably eviscerate the opinion itself."[1841]   For example, Perella – which had earlier questioned whether allocated expenses could constitute a legally cognizable form of consideration – sought to include that as an assumption provided to it by the company.[1842]   According to Finnegan, however, agreeing to that request would have undercut the

---

[1836]   E-mail from S. Dickson to M. Tortora (Sept. 24, 2013), at CITI-CZR-EXM-00239385-86 [CITI-CZR-EXM-00239385].

[1837]   E-mail from G. Ezring to D. Sambur (Sept. 23, 2013), at APOLLO-Examiner_00515252 [APOLLO-Examiner_00515252].

[1838]   B. Finnegan Nov. 16, 2015 Tr. 259:15-24, 259:15-260:19.

[1839]   *Id.* at 251:8-252:16.   To give just one example, on August 26, 2013, Eoghan Keenan of Weil sent an e-mail to Finnegan noting that the Weil attorneys "would like to have a call to better understand the CEC Lease Guaranty from a bankruptcy perspective," and Finnegan responded that he was available to discuss the issue.   E-mail from B. Finnegan to E. Keenan (Aug. 26, 2013), at WEIL_PERELLA_000324 [WEIL_PERELLA_000324].

[1840]   B. Finnegan Nov. 16, 2015 Tr. at 253:25-254:7.

[1841]   *Id.* at 252:24-254:24.

[1842]   In an August 20, 2013 Perella draft of "Project Citizen Key Assumptions," under "Valuation of CEOC share of reallocated corporate expenses," it states that "[a]voidance of cost is a form of consideration."   "Project Citizen" Outline (Aug. 20, 2013), at PRIV_INVESTIG_00036683 [PRIV_INVESTIG_00036683].

value of the opinion, as Perella was, in effect, seeking to simply "assume away" a fundamental part of the opinion they were offering.[1843]

After this dispute and others threatened to hold up the process, Paul Weiss decided that "a more productive path would be" to refer the discussion to the business people at Apollo.[1844]  On September 3, 2013, Finnegan sent an e-mail to Sambur and van Hoek stating that it would be best if Paul Weiss did not participate in a call scheduled with Perella later that day, and that instead Apollo should "deliver the message about their assumptions on a business level . . . ."[1845]  Finnegan explained that the goal was for Apollo to "tell [Perella] the assumptions that were being promulgated didn't work."[1846]  Finnegan also stated that if Perella had insisted on those assumptions, CEOC "might not have obtained the opinion."[1847]  Just days after Apollo weighed in, Paul Weiss and Weil were able to reach agreement on most of the assumptions that Perella would utilize, if not their exact wording.[1848]

### ii.  Paul Weiss' Review of Perella's Draft Opinion

Perella delivered its draft opinion to Paul Weiss on September 9, 2013.  The very next day, Finnegan sent an e-mail to Keenan and Aiello of Weil stating that there were "some things in the opinion we'd like to walk through and discuss with you orally."[1849]  Keenan asked whether they could speak that evening and noted that "Perella would like to get the opinion resolved as quickly as possible."[1850]

Finnegan, Keenan and Aiello spoke on September 11, with Weil apparently agreeing to circulate a revised draft opinion letter reflecting Paul Weiss' comments.  It did so on September 19, 2013.[1851]  The revised version differed from Perella's initial draft in several notable respects:

---

[1843]  B. Finnegan Nov. 16, 2015 Tr. at 256:9-258:14, 266:18-267:24.

[1844]  *Id.* at 259:15-24.

[1845]  E-mail from A. van Hoek to B. Finnegan *et al.* (Sept. 3, 2013), at PRIV_INVESTIG_00036759-760 [PRIV_INVESTIG_00036759].

[1846]  B. Finnegan Nov. 16, 2015 Tr. at 252:24-254:24.

[1847]  *Id.*

[1848]  *Id.* at 266:18-267:24.  As discussed further below, Perella's suggested assumption regarding the legal cognizability of avoided expenses was not one of these.  *Id.*

[1849]  E-mail from E. Keenan to B. Finnegan *et al.* (Sept. 10, 2013), at WEIL_PERELLA_000372 [WEIL_PERELLA_000372].

[1850]  *Id.*

[1851]  Keenan wrote in the cover e-mail:  "Attached please find a revised draft of the Perella Weinberg fairness opinion, clean and marked against the draft we provided on September 9th."  E-mail from E. Keenan to B. Finnegan *et al.* (Sept. 19, 2013) [WEIL_PERELLA_000509], attaching "Weil Draft 9/19/2013," at WEIL_PERELLA_000510 [WEIL_PERELLA_000510].

- ***First***, it deleted language regarding Perella's proposal to include an assumption "that the avoidance of cost is a legally cognizable form of consideration."[1852]

- ***Second***, it softened slightly the assumption that "if the Refinancing does not occur, the PropCos *will default* on certain debt obligations . . . and that such default will result in the *immediate* separation of the PropCos from CEC . . . ." Instead, Perella "assumed that if the Refinancing does not occur, the PropCos will *almost certainly* default on certain debt obligations . . . and that such default will result in the *prompt* separation of the PropCos from CEC . . . ."[1853] This change does not appear to have had any impact on Perella's quantitative analysis, which still assumed as a practical matter that there was a 100% chance of default and foreclosure and did not account for any "lag" time between those events and a separation of the properties leading to a reallocation of CMBS's shared expenses to CEOC.

- ***Third***, Perella's ultimate conclusion that the "[c]onsideration to be received or realized by the Company in connection with the Transaction is *fair from a financial point of view*," was changed to: "the value of the Consideration to be received or realized by the Company in exchange for the transfer of the Assets . . . is *reasonably equivalent to the value* to the Company of the Assets."[1854]

Although Finnegan could not specifically recall the impetus behind this last change,[1855] he did acknowledge that "fairness from a financial point of view speaks to a fiduciary concern at the stockholder level" while "[a] reasonably equivalent value standard is something that is prophylactic against a claim of fraudulent conveyance."[1856] Accordingly, Finnegan indicated that "these words seem to back up the fact that" there might have been concern over a

---

[1852] *Id.* at WEIL_PERELLA_000513.

[1853] *Id.* (emphases added). Hession was asked about the "prompt separation" assumption at his interview, and he stated: "it depends on your definition of 'prompt.'" Hession Nov. 3, 2015 Tr. at 205:7-206:23. He explained: "I would assume that it would take a period of time for that to happen because they're going to have to get licensed . . . and they're going to have to do certain things." *Id.* He continued: "I think they could sell it and get licensed and do that in maybe a year. But not three months." *Id.* Ezring thought that the separation would occur within three to six months. G. Ezring Feb. 25, 2016 Tr. at 68:7-13.

[1854] E-mail from E. Keenan to B. Finnegan *et al.* (Sept. 19, 2013) [WEIL_PERELLA_000509], attaching "Weil Draft 9/19/2013," at WEIL_PERELLA_000516 [WEIL_PERELLA_000510]. (emphases added).

[1855] B. Finnegan Nov. 17, 2015 Tr. at 282:6-22.

[1856] *Id.* at 282:6-283:4.

"fraudulent conveyance claim" at the time.[1857]   The evidence shows that Paul Weiss lawyers were contemporaneously evaluating the strength and existence of such claims.[1858]

On September 19, 2013, Finnegan relayed to van Hoek that Paul Weiss had received a revised draft of Perella's opinion that "accurately reflect[ed]" Paul Weiss' discussions with Weil.[1859]   Finnegan also noted that given the importance of the opinion, he was going to run it by Kornberg, Clayton and Ezring to ensure that they were "signed off as well."[1860]

### iii.  Perella's Final Assumptions and Final Opinion

Perella's final opinion took the form of an October 11, 2013 letter to the CEOC Board of Directors (the "Perella Opinion").[1861]   In that letter, Perella concluded that "[b]ased upon and subject to the . . . various assumptions and limitations set forth herein . . . the value of the Consideration to be received or realized by the Company in exchange for the transfer of the Assets to CEC is reasonably equivalent to the value to the Company of the Assets."[1862]   Perella also prepared an accompanying presentation for the CEOC Board titled "Project Citizen," which Scherer presented telephonically to the CEOC Board on the morning of October 10 ("Perella's Board Presentation").[1863]

The Perella Opinion and Perella's Board Presentation described the final consideration to be received by CEOC in exchange for contributing the LINQ and Octavius to the new CERP entity as:  (i) the transfer by a subsidiary of CEC to CEOC of (a) $25,000,000 face value of the 10.00% Second-Priority Senior Secured Notes due 2018 of CEC, as the issuer, (b) $44,489,000 face value of the 5.375% Senior Notes due 2013 of CEOC, as the issuer, and (c) $80,722,000 cash; (ii) forgiveness of $450 million of debt associated with the LINQ and Octavius; and (iii) intangible consideration consisting of (a) preservation of payment to CEOC of shared service costs allocated to CMBS Properties, to which Perella ascribed a value of approximately $378

---

[1857]  *Id.* at 284:4-285:3.

[1858]  *See generally* E-mail from A. Popova to A. Kornberg (Aug. 27, 2013), at PW_EXAMINER_SUPP_00005685-88 [PW_EXAMINER_SUPP_00005685].   Specifically, Kornberg asked:  "When evaluating 'reasonably equivalent value' for fraudulent conveyance purposes, can one take into account that the transferor would avoid the incurrence of substantial additional expenses by entering into the transaction at issue?"   *Id.* at PW_EXAMINER_SUPP_00005686.

[1859]  E-mail from E. Hession to A. van Hoek and D. Sambur (Sept. 19, 2013), at CEC_EXAMINER_0679180 [CEC_EXAMINER_0679180].

[1860]  *Id.*

[1861]  Perella Letter to CEOC Board of Directors (Oct. 11, 2013), at CEOC_INVESTIG_00404469-473 [CEOC_INVESTIG_00404469].

[1862]  *Id.* at CEOC_INVESTIG_00404473.

[1863]  "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000006-38 [CEOC_INVESTIG_00000006]; *see also*   CEOC Board Meeting Minutes (Oct. 10, 2013), at CEOC_INVESTIG_00452075-79 [CEOC_INVESTIG_00452075].

million, and (b) release of the CEC Lease Guarantee, to which Perella did not ascribe any specific monetary value.[1864]

The Perella Opinion also included the following key assumptions in connection with its conclusion that CEOC had received "reasonably equivalent" value in exchange for the LINQ and Octavius:

- "[T]he transfer of the equity of Caesars Linq and Caesars Octavius (or other assets of equivalent value held directly or indirectly by the Company [CEOC]) to one or more of the PropCos is necessary for the completion of the Refinancing";

- "[T]he current lease structure of each of the tower known as 'Octavius Tower' within Caesars Palace ('Octavius Tower') and the outdoor casino built within the LINQ district (RDE Casino) reflects fair market, arm's length terms," and upon "the expiration of the existing lease agreements relating to each of Octavius Tower and RDE Casino, such lease agreements will be renegotiated and renewed with the Company on substantially similar terms, provided that the lease payments owed relating to such renewed lease agreements will increase at an historical Consumer Price Index average rate of 3.3% going forward";

- "[I]f the Refinancing does not occur, the PropCos will almost certainly default on certain debt obligations upon the maturity of such debt obligations in February 2015 and . . . such default will result in the prompt separation of the PropCos from CEC with no ongoing shared services or relationship"; and

- "[T]he failure of the PropCos to pay their allocated portion of the corporate expenses pursuant to the Shared Services Agreement will result in a significant increase in the allocation of such expenses to the Company, and that the Company Forecasts accurately reflect management's estimate of the most realistic reduction of such corporate expenses and the portion of such reduced corporate expenses that the Company will be obligated to pay."[1865]

Although Perella's Opinion states that these assumptions were made at CEOC's direction, nobody at CEOC played any meaningful role in their negotiation or formulation. It was Apollo, counseled by Paul Weiss, which drove the opinion process and ultimately directed (or allowed) Perella to make the assumptions it did. To the extent Caesars management was

---

[1864] CEOC Board Meeting Minutes (Oct. 10, 2013), at CEOC_INVESTIG_00452076 [CEOC_INVESTIG_00452075]; *see also* "Presentation to the Board of Directors: Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024658 [PRIV_INVESTIG_00024656]; "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000011 [CEOC_INVESTIG_00000006].

[1865] Perella Letter to CEOC Board of Directors (Oct. 11, 2013), at CEOC_INVESTIG_00404471-72 [CEOC_INVESTIG_00404469].

involved at all, its role was limited to assisting Perella in its diligence efforts by answering operational questions and providing documents.[1866]

The assumptions themselves are also substantively problematic.  Each is belied by the best evidence available at the time, and each deviates from the conclusions impelled by such evidence in a manner that either artificially depresses the value of the LINQ and Octavius, or artificially inflates the value of the consideration received by CEOC in exchange.  Put another way, every one of Perella's assumptions seems designed to drive down the price to be paid by CEC and not, as one might expect, to procure the best possible price for CEOC.

First, Perella assumed that the Octavius lease structure reflected fair market, arm's length terms.  But, as Leung indicated, Perella did not know if this was actually the case and never received any information regarding how the lease was negotiated.[1867]  In fact, as multiple witnesses confirmed, there had never been *any* negotiations over the amount of the lease payments.[1868]  To the contrary, they were fixed to exactly cover the costs of financing Octavius and the potential earnings of the RDE Casino.  Nobody – including Perella – ever performed any analysis in an attempt to determine what those payments would have been had they been set by the market.[1869]

Second, with regard to the suggestion that there would be a default in 2015 – and a subsequent "prompt separation of the properties" resulting in added expenses to CEOC – if no deal were reached, Scherer did not actually know "what the timing was" with regard to the CMBS refinancing.[1870]  Leung also noted that Perella did not consider the actual likelihood of a default or consider handicapping the likelihood of a default.[1871]  As discussed previously, both the CMBS Lenders and Caesars had significant incentives to reach a deal, making a foreclosure inherently unlikely.  Moreover, earlier internal Apollo analyses assumed that the refinancing would take place, and CEC ultimately issued $200 million in equity so that the CERP Transaction could close.  Perella, however, was told to assume the opposite.  Indeed, based on the conversations between Perella and Apollo, it was made "clear" to Perella that if CEOC did not transfer the LINQ and Octavius, "there would not be a refinancing of the CMBS debt at CERP and as a result, there would be a default . . . ."[1872]  Moreover, while Perella assumed that if

---

[1866]  J. Scherer Oct. 20, 2015 Tr. at 20:22-21:10.

[1867]  In addition, Perella did not consider any market comps for the Octavius lease.  Leung noted that it was a difficult asset to find comps for as it was a tower within an existing hotel and "would be impossible to physically strip . . . out of the hotel to sell it to somebody other than Caesars."  C. Leung Oct. 16, 2015 Tr. at 140:10-143:22.

[1868]  *See* D. Sambur Oct. 19, 2015 Tr. at 198:14-200:15; E. Hession Nov. 3, 2015 Tr. at 155:16-19, 199:18-202:5; J. Beato Sept. 24, 2015 Tr. at 408:22-409:8.

[1869]  C. Leung Oct. 16, 2015 Tr. at 146:2-21; J. Scherer Oct. 20, 2015 Tr. at 137:19-138:25; E. Hession Nov. 3, 2015 Tr. at 201:23-202:5; D. Sambur Oct. 19, 2015 Tr. at 198:6-12.

[1870]  J. Scherer Oct. 20, 2015 Tr. at 80:3-24.

[1871]  C. Leung Oct. 16, 2015 Tr. at 137:6-138:24.

[1872]  J. Scherer Oct. 20, 2015 Tr. at 119:2-120:11.

the deal did not happen, "CERP would no longer be part of the Caesars empire,"[1873] and that such separation would happen "promptly," the reality is that it is unclear what the lenders would have done in the event of a default. As discussed above, in 2010, the CMBS Lenders had specifically negotiated for the right to continue the CMBS Properties' access to CEOC shared services and IP rights indefinitely upon a default, and – if they did choose to "take the keys" – for a transition period of two years.[1874]

Moreover, in October 2013, the Shared Services Agreement was amended again (the "2013 Shared Services Agreement") so that the CMBS Lenders could preserve this "optionality." Like the 2010 agreement, the 2013 Shared Services Agreement (which does not appear to have occasioned very much discussion or negotiation) contains a nearly identical provision (Section 10.01) allowing the CMBS Lenders to: (a) elect to indefinitely maintain the CMBS Properties as part of the Caesars network and avail themselves of the management services provided by CEOC pursuant to the Management Agreement, or (b) upon a decision to move the properties out of the Caesars network, elect to have CEOC continue providing management services during a "Transition Period" of up to two years.[1875] However, Perella's quantitative analysis failed to consider the likelihood that CEOC would continue to manage the CMBS Properties in the event of default and implicitly assumed that the "prompt" foreclosure and separation would occur right away.

Although Perella had been provided with a copy of the 2010 Shared Services Agreement, both Leung and Scherer were unaware of the CMBS Lenders' right to continue using CEOC to provide services to the CMBS Properties, which went unmentioned by anyone at Caesars or Apollo.[1876] Indeed, the 2010 Shared Services Agreement alone was not enough to advise Perella on what the CMBS Lenders had negotiated for in the event of a default in 2010. Rather, it was important to understand the history of the negotiations,[1877] which provided additional details

---

[1873] *Id.* at 51:7-52:5.

[1874] As Ezring pointed out, the main concern of the CMBS Lenders in 2010 was "optionality," that is, the right to stay in the system or foreclose and disconnect from the system and, if the latter, the right to do so over the maximum time possible. G. Ezring Feb. 25, 2016 Tr. at 66:18-67:14.

[1875] 2013 Shared Services Agreement (Oct. 11, 2013), at CEC_EXAMINER_0082223, §10.01 [CEC_EXAMINER_0082209].

[1876] J. Scherer Oct. 20, 2015 Tr. at 104:24-105:16; C. Leung Oct. 16, 2015 Tr. at 217:16-218:23.

[1877] CEC has suggested that the history of the 2010 negotiations would have lent credence to the idea that the CMBS Lenders would have wanted to foreclose. As discussed above, however, the cumulative evidence suggests that what the 2010 CMBS Lenders really wanted was maximum flexibility, and that any disconnection could take between two and three years – both factors which Perella was not aware of. Moreover, as Ezring recognized, the entities comprising the CMBS Lenders in 2010 were very different than those that participated in the 2013 refinancing. G. Ezring Feb. 25, 2016 Tr. at 26:3-21. Specifically, the former group counted among its members many of the original lenders from the LBO, including banks and institutions with experience foreclosing on properties and (in some cases) operating them, while the latter 2013 group was predominantly comprised of hedge funds that had bought the debt at a discount and

regarding the CMBS Lenders' rights to have Caesars continue operating the CMBS Properties following a default and foreclosure.[1878]  There is no evidence that Perella asked for or received – or that anyone at Caesars, Apollo or Paul Weiss made them aware of – any details regarding the 2010 Shared Services Agreement (other than the agreement itself) or any drafts of or information about the 2013 Shared Services Agreement.  And according to Leung, Perella had not done any diligence in an effort to determine whether the lenders would "come in and take over for CEOC" in the event of a default – because this was "outside the scope" of Perella's work.[1879]

Accordingly, Perella did not give any consideration to the likelihood that the CMBS Lenders might elect to have CEOC continue managing the properties after a default on the CMBS Financing,[1880] or the regulatory hurdles associated with finding new management for gaming properties and thus delaying the CMBS Lenders' ability to "disconnect" from the Caesars system.[1881]  Instead, according to Scherer,[1882] Perella based its assumption of a "prompt" separation on Sambur's representation that, in the event of a default, "CEC would simply hand over the keys of CERP and would do whatever it took to no longer provide services to the CERP entities," thus causing a significant portion of the expenses formerly borne by CMBS to bounce back to CEOC.[1883]  Scherer, who was "not aware" and was never told that CEC "didn't have the

---

(with the possible exception of Oaktree) may not have had the necessary regulatory approvals to operate gaming businesses even if they so chose.

[1878]  *See, e.g.*, "Hotel and Casino Management Agreement" (Aug. 31, 2010), at APOLLO-Examiner_00764000, §13.4.3(b) [APOLLO-Examiner_00763967].

[1879]  C. Leung Oct. 16, 2015 Tr. at 218:13-23.

[1880]  *Id.* at 221:4-24.

[1881]  E. Hession Nov. 3, 2015 Tr. at 205:7-206:23.

[1882]  J. Scherer Oct. 20, 2015 Tr. at 53:25-54:6.

[1883]  *Id.* at 118:12-120:4.  Interestingly, when asked about this assumption during his interview (and in connection with the language of the 2010 Shared Services Agreement allowing the CMBS Lenders to continue sharing services indefinitely), Sambur said nothing about CEC's desire to discontinue services, instead placing the responsibility for any separation of the CMBS Properties squarely at the feet of the CMBS Lenders.  Specifically, he stated that he was "sure there were threats [from the lenders that they would actually foreclose] levied from time to time" during the negotiations.  D. Sambur Oct. 19, 2015 Tr. at 162:15-164:13.  Van Hoek did not "remember one way or the other" whether the CMBS Lenders communicated that they were "willing to take the keys to these properties and walk away if a refinancing on terms acceptable to them was not reached."  A. van Hoek Sept. 25, 2015 Tr. at 81:17-23.  As noted above, Ezring was of the belief that, at least during the 2010 negotiations, the 2010 CMBS Lenders would have been "all too willing to just take the keys."  G. Ezring Feb. 25, 2016 Tr. at 66:18-67:14.  He also acknowledged, however, that the 2010 CMBS Lenders were different than the lenders who ultimately participated in the CERP Transaction.  *Id.* at 26:18-21.  Indeed, although Liang recalled Oaktree threatening foreclosure, he did not think that Oaktree would ultimately foreclose as a bankruptcy filing was more likely if it came to that.  K. Liang Jan. 22, 2016 Tr. at 25:10-26:24, 75:10-78:2.

right to just hand over the keys under the applicable 2010 agreement,"[1884] simply accepted this representation at face value.  Indeed, notwithstanding the importance of the refinancing to Apollo and the CMBS Lenders, there were no discussions surrounding any alternatives to this assumption with Sambur or others at Caesars, including the possibility that the CMBS Properties would simply declare bankruptcy rather than permit a foreclosure.[1885]  Instead, Perella was directed to assume that Caesars (and Apollo) would allow the CMBS Lenders to walk away with some of its most valuable Las Vegas properties, a proposition which is inherently questionable.[1886]

### k.  Board Approval of the CERP Transaction

On October 3, 2013, as the CERP Transaction was being finalized, Cohen sent an e-mail to Loveman explaining that "[t]he CEOC board must approve this [CERP Transaction], which is you and me (very lucky, I know)."[1887]  At this time, CEOC's Board was only comprised of two individuals – Loveman and Cohen – neither of whom was independent.  Cohen noted that, because there was a fairness opinion involved, CEOC had to hold a short board meeting for Perella to present its findings.  The meeting was scheduled to last 30 minutes on October 10.[1888]

On October 8, Finnegan sent an e-mail to Cohen and Jill Eaton, copying Ezring and Clayton, with the materials for the board call, including a board deck, Perella's Board Presentation, and draft resolutions.[1889]  According to Finnegan, he sent Cohen these materials because Cohen was Associate General Counsel, not because he was a director of CEOC.[1890]  Cohen asked a number of questions and provided several comments on the materials.[1891]  After

---

[1884]  J. Scherer Oct. 20, 2015 Tr. at 120:5-11.

[1885]  *Id.* at 118:12-25.

[1886]  J. Scherer Oct. 20, 2015 Tr. at 119:2-120:4.

[1887]  E-mail from M. Cohen to G. Loveman (Oct. 3, 2013), at PRIV_INVESTIG_00030269 [PRIV_INVESTIG_00030269].

[1888]  *Id.*

[1889]  E-mail from M. Cohen to B. Finnegan *et al.* (Oct. 9, 2013), at PRIV_INVESTIG_00019734-35 [PRIV_INVESTIG_00019734].

[1890]  B. Finnegan Nov. 16, 2015 Tr. at 108:21-109:9.

[1891]  Cohen wanted to discuss the following statements:  "[p]reservation of payment to CEOC for shared service costs allocated to CMBS properties"; "[r]elease of CEC guarantee of CMBS operating lease payments"; and "[i]n addition, a successful refinancing will also lower the risk of a premature bankruptcy at CEC, which would likely significantly reduce the value of CEOC's equity and debt securities."  E-mail from M. Cohen to B. Finnegan *et al.* (Oct. 9, 2013), at PRIV_INVESTIG_00019734-35 [PRIV_INVESTIG_00019734].  In the final version of the Board Presentation, a further explanation was added to the statement regarding how a release of the guarantee would lower the risk of bankruptcy at CEC.  "Presentation to the Board of Directors:  Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024664 [PRIV_INVESTIG_00024656].

Finnegan made some relatively minor changes, Eaton circulated the final board materials to Loveman and Cohen on October 9 at 7:56 p.m. PDT – less than eleven hours before the scheduled meeting.[1892]  This was the first time Loveman had seen any of these materials, leaving him with very little time to carefully examine the materials in advance of the meeting.

The following morning, the CEOC Board met telephonically at 6:30 a.m. PDT to approve the CERP Transaction.[1893]  Loveman and Cohen were in attendance by phone, as were Clayton, Finnegan and Ezring from Paul Weiss, and Scherer from Perella.[1894]  Scherer presented Perella's Opinion and Finnegan presented an overview of the transaction to the CEOC Board,[1895] along with a PowerPoint presentation outlining the consideration that CEOC was purportedly receiving for the transfer of the LINQ and Octavius, which included an overview of why the contribution of the LINQ and Octavius was necessary to facilitate the CMBS refinancing and why other transaction alternatives were rejected.[1896]  For his part, Clayton gave the CEOC Board a refresher regarding their fiduciary duties in the context of the CERP Transaction.[1897]  Clayton described this part of the presentation as a "very short statement," which was "directed to the fiduciary duty refresher issues."[1898]

Consistent with Clayton's recollection, the "Fiduciary Duty Refresher" section of the final CEOC Board deck consisted of three slides explaining the duty of care and duty of loyalty owed by the directors to company shareholders.[1899]  The refresher did not mention the possibility

---

[1892] E-mail from J. Eaton to G. Loveman, M. Cohen, *et al.* (Oct. 9, 2013), at PRIV_INVESTIG_00024651 [PRIV_INVESTIG_00024651].

[1893] Notably, this was the only CEOC Board meeting held to discuss or approve any of the Transactions at issue.

[1894] CEOC Board Meeting Minutes (Oct. 10, 2013), at CEOC_INVESTIG_00452075 [CEOC_INVESTIG_00452075].

[1895] *Id.*

[1896] "Presentation to the Board of Directors:  Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024667-69 [PRIV_INVESTIG_00024656].

[1897] L. Clayton Oct. 26, 2015 Tr. at 126:12-127:12.

[1898] *Id.* at 125:13-127:12.

[1899] In the single page description of the duty of care in the board deck, it states that "Directors must act on an informed basis after due consideration of relevant materials and deliberation" but may "rely on reports and opinions from management and experts that they believe are competent (e.g., fairness and/or valuation opinions)."  It notes that the Board must make its own decisions and may not blindly rely on experts and states that the "Courts focus on process" – such as careful deliberation, reasoned decisions and "[i]nput from management, financial advisors and legal counsel."  On the single slide explaining the duty of loyalty, it simply states that directors must act in good faith:  (i) the "[h]onest belief that they are acting in the best interests of the stockholder"; (ii) "[i]ndependent of personal or other interests (e.g., if have personal financial interests or are overly influenced by another party)"; and (iii) "[m]ust disclose any such interests, and potentially take steps to insulate the decision-making process (disclose to Board and stockholder, possible recusal from process)."  "Presentation to the Board of Directors:

of a CEOC insolvency or its potential impact on the directors' duties, and was similarly silent on the impact, if any, of the related-party nature of the deal.  In July 2013, Clayton had noted, however, that using the LINQ and Octavius to facilitate a refinancing could raise fiduciary duty concerns if CEOC was insolvent.[1900]  Specifically, in a July 5, 2013 e-mail, Clayton wrote:  "If the views in 1 and 2 above are right, I think this may come down to the issue of whether CEOC, which has different creditors than the owners of the entities that issued the CMBS, is solvent."[1901]  He continued:  "If it is solvent, then we may have a wholly-owned structure where there are no fiduciary duty problems.  If it isn't, then we may have a fiduciary duty to CEOC creditors that could be violated by using Octavius and Linq assets to support a sister corporation."[1902]  Clayton explained that when he wrote this e-mail his focus was on the issue of whether a fairness opinion would be needed.[1903]

In any event, the CEOC Board was not given information regarding the meaning and applicability of the entire fairness standard,[1904] nor did Paul Weiss attorneys recall doing any analysis to determine whether a discussion of the entire fairness standard with the Board would have been appropriate or necessary.[1905]  In addition, there does not appear to have been any discussion regarding fraudulent transfer law or any bankruptcy-related litigation risks.  This omission is notable in light of the previous decision to obtain a fairness opinion from Perella; after all, there would have been no need for a fairness opinion had CEC and the Sponsors been unconcerned about the possibility of CEOC's potential insolvency.  Loveman, too, did not recall receiving any additional information or guidance on fiduciary duties other than what was reflected in the final CEOC Board deck.[1906]

---

Octavius/Linq   Transfer"   (Oct.   10,   2013),   at   PRIV_INVESTIG_00024673-75 [PRIV_INVESTIG_00024656].

[1900] *See* E-mail from L. Clayton to M. Rosenbaum (July 5, 2013), at PW_EXAMINER_SUPP_00004968 [PW_EXAMINER_SUPP_00004968].

[1901] *Id.*

[1902] *Id.*

[1903] L. Clayton Feb. 1, 2016 Tr. at 384:5-389:7.

[1904] As discussed in Section VIII.C.4.c below, the entire fairness standard, which requires defendants to prove that the transaction at issue was entirely fair in terms of both fair dealing and fair price, applies to claims of breach of fiduciary duty where, as here, the directors of a controlling shareholder "stand on both sides" of a transaction.

[1905] L. Clayton Oct. 26, 2015 Tr. at 129:13-130:15.

[1906] G. Loveman Oct. 27, 2015 Tr. at 119:8-11.  As outlined in Appendix 5, Legal Standards at Section XI.A.4.a, while section 141(e) of the Delaware General Corporation Law insulates directors who reasonably and "in good faith" rely on legal, financial or other expert advisors in fulfilling their fiduciary duties, the reliance must be reasonable, and this defense only applies to a breach of the duty of care – not to a breach of the duty of loyalty.  Del. Code Ann. tit. 8 §141(e).

The October 10, 2013 CEOC Board meeting lasted for 45 minutes and adjourned at 7:15 a.m. PDT.[1907]  Following the presentations, the CEOC Board approved the transfer of the LINQ and Octavius from CEOC in exchange for the consideration outlined in the materials.[1908]

### l.   Transfer Mechanics

Prior to the CERP Transaction, Octavius Linq Holding Co., LLC ("Holdco"), a fourth-tier subsidiary of CEOC, owned all the membership interests in Caesars Linq, LLC ("Linq LLC") and Caesars Octavius, LLC ("Octavius LLC").  Holdco then created a subsidiary, Octavius/Linq Intermediate Holding, LLC ("Intermediate"), in which it held 100% of the membership interests (the "Octavius/Linq Intermediate Interests").  Holdco then transferred its membership interests in Linq LLC and Octavius LLC to Intermediate, in return for the Octavius/Linq Intermediate Interests.  Holdco then transferred all of the Octavius/Linq Intermediate Interests to CEC.  CEC then contributed the Octavius/Linq Intermediate Interests to Rio Properties, LLC ("Rio"), a third-tier subsidiary of CEC and subsidiary of CERP.

The transfers are set forth in CERP Figures 1 through 3 below.

---

[1907] CEOC Board Meeting Minutes (Oct. 10, 2013), at CEOC_INVESTIG_00452079 [CEOC_INVESTIG_00452075].

[1908] *Id.* at CEOC_INVESTIG_00452075-77.

**CERP Figure 1:**
**Step 1 – Formation of and Transfer to Intermediate Company**



* **Debtor entity in the CEOC bankruptcy**

**CERP Figure 2:**
**Step 2 – Transfer of Units to CEC; Transfer of Notes / Cash to CEOC**



* Debtor entity in the CEOC bankruptcy

**CERP Figure 3:**
**Step 3 – Contribution of Intermediate Company Interest to Rio Properties**



**Source Materials**
i)  CEC current report filed 9/24/13
ii)  Transaction Agreement dated October 11, 2013

### m. Reactions to the Transaction

Notwithstanding Caesars' efforts to assuage investors – some of whom, as discussed above, had expressed confusion about the proposed consideration CEOC was to receive – questions regarding the CERP Transaction continued to circulate well after its close.[1909]   In a March 3, 2014 e-mail to Caesars' Investor Inquiries, Shawn Tumulty of Franklin Mutual Advisers wrote:   "Several of the recent asset sales have taken place at EXTREMELY questionable valuations (in fact, the value that CEOC received in the transaction with CERP appears ridiculously low . . . )."[1910]   Beato noted that "there were a lot of people who probably could have said the same thing" and that Tumulty's reaction was "exactly" what she heard from investors after the CERP Transaction was announced.[1911]   According to Beato, this was because the marketplace was only getting "half the story" on valuation, as the cash and bonds received by CEOC had been quantified in public disclosures but the avoidance of reallocated costs had not been.[1912]   This made it difficult, if not impossible, for her to "comfort folks on valuation."[1913]

In a December 17, 2013 e-mail to Cohen, Beato and Hession, Wilfong wrote:   "[T]his will stand out like a sore thumb on the CEOC financials – a hit to equity for the deficit of the Fair Value of Linq/Octavius compared to the Book value of the net assets of the two combined. Just so you are aware, the $150 mm value is far lower than our equity value," which was listed at $551 million.[1914]   At her interview, Wilfong stated that, from an accounting perspective, this $400 million deficit would appear as a decrease in equity rather than a loss to CEOC because there "can't be losses on transactions between entities under common control."[1915]   She explained that the decrease in equity would appear "obvious" in the equity section of the balance sheets that Caesars appended to its periodic reports.[1916]

In the same e-mail, Wilfong asked Beato to discuss Perella's valuation of the LINQ and Octavius to "understand better why it's so much lower than the CEOC equity value for those

---

[1909]  *See, e.g.*, J. Beato Sept. 24, 2015 Tr. at 168:13-169:8.

[1910]  E-mail from J. Chen to E. Hession (Mar. 3, 2014), at CEOC_INVESTIG_00088040 [CEOC_INVESTIG_00088040].

[1911]  J. Beato Sept. 24, 2015 Tr. at 168:13-169:8.

[1912]  *Id.* at 59:14-60:15.

[1913]  *Id.* at 145:17-24.

[1914]  E-mail from J. Beato to M. Byler (Dec. 17, 2013), at CEOC_INVESTIG_00044150 [CEOC_INVESTIG_00044150].   Brock Elliot indicated that CEOC's books showed a net value of $551 million for the LINQ and Octavius.   This value less the $150 consideration CEOC received in cash and bonds amounts to approximately a $400 million deficit.   *Id.*

[1915]  D. Wilfong Oct. 5, 2015 Tr. at 160:12-18.

[1916]  *Id.* at 160:15-23.   Wilfong also indicated that the equity decrease was a "factual matter" that would necessarily appear on balance sheets because of accounting practices.   *Id.* at 163:20-164:20.

entities[.]"[1917]  At her interview, Beato stated that she met with Wilfong and explained "the same thing I had been explaining to all the investors . . . there was [sic] these other value considerations and it wasn't just the cash and bonds."[1918]  Wilfong however, indicated that she never received an explanation as to why the transaction value was so much lower.[1919]  Wilfong noted that, from an accounting standpoint, the fact that the LINQ and Octavius were transferred for less than book value "could be something that could be questioned."[1920]

On February 23, 2014, Wilfong sent an e-mail to Loveman detailing the new impairments the Caesars enterprise had incurred during the fourth quarter of 2013.  She noted that the LINQ and Octavius had been sold from CEOC to CERP for less than the book value of the properties, which resulted in a $287 million impairment.  Wilfong wrote that the difference in values "was largely a result of the very high land book values that accompanied the 2008 LBO . . . ."[1921]  In a February 24, 2014 e-mail, Hession wrote that, with regard to the impairment, CERP investors should be told that it was caused primarily by re-visiting the value of land purchased in 2008.[1922]  It is unclear if there ever had been any such re-visitation of the land value, or whether the impairment was primarily – as Wilfong's prior communications suggested – a function of the transaction price.

### 4.  The Examiner's Findings and Conclusions

There exist strong claims that the CERP Transaction (*i.e.*, the transfer of the LINQ and Octavius from CEOC) constituted both a constructive and actual fraudulent transfer,[1923] that the CEOC Board of Directors and CEC (as CEOC's controlling shareholder) are liable for breach of fiduciary duty, and that the Sponsors and individual members of the CEC Board of Directors affiliated with Apollo aided and abetted this breach of fiduciary duty.

---

[1917]  E-mail from J. Beato to M. Byler (Dec. 17, 2013), at CEOC_INVESTIG_00044150 [CEOC_INVESTIG_00044150].

[1918]  J. Beato Sept. 24, 2015 Tr. at 154:3-15.

[1919]  D. Wilfong Oct. 5, 2015 Tr. at 164:21-165:8.

[1920]  *Id.* at 161:14-21.

[1921]  E-mail from E. Hession to D. Wilfong, *et al.* (Feb. 24, 2014), at CEOC_INVESTIG_00038160 [CEOC_INVESTIG_00038160].

[1922]  *Id.*

[1923]  As discussed in Appendix 5, Legal Standards at I.A, under the applicable choice of law analysis, the laws of Nevada will likely apply to fraudulent transfer claims related to the CERP Transaction.  Because Nevada has adopted a version of the UFTA, those claims will likely be analyzed in a manner similar to that applied by federal courts interpreting the Bankruptcy Code.

### a. Constructive Fraudulent Transfer

#### i. CEOC Transferred an Interest in Property

There is no dispute that the LINQ and Octavius constitute an "interest in property" or that they were transferred to CERP from a wholly-owned CEOC subsidiary.[1924]

#### ii. CEOC Was Likely Insolvent at the Time of the Transaction

As set forth in Section V, *supra*, CEOC was almost certainly insolvent at the time the CERP Transaction closed in October 2013.

#### iii. CEOC Did Not Receive Reasonably Equivalent Value[1925]

As a threshold matter, the Examiner agrees that CEOC did receive some value in the form of approximately $129 million[1926] worth of cash and bonds.[1927]  However, the Examiner does not believe that this value was reasonably equivalent to the net value of the LINQ and Octavius, which, as discussed below and in Appendix 7, Valuation at Section VI.E, was between $329 million and $427 million.[1928]

---

[1924]  The precise entities involved in the transfer are described in CERP Figures 1-3, *supra*.

[1925]  In determining whether a debtor's transfer of property was made for reasonably equivalent value, courts look at the "totality of the circumstances."  *Barber v. Golden Seed Co., Inc.,* 129 F.3d 382, 387 (7th Cir. 1997).  The factors that courts consider in reaching these determinations are discussed in more detail in Appendix 5, Legal Standards at Section III.B.1.

[1926]  As noted above, although Perella valued the bonds between $138 million and $150 million, the Examiner has concluded that the actual estimated value of the cash and bonds is $128.8 million.  *See* Appendix 7, Valuation at Section VI.E.

[1927]  Interestingly, in a September 2013 e-mail to Sambur, Dickson suggested that, as a result of CEC's guarantee of CEOC's bond debt, even this tangible consideration might not have any value to CEOC. E-mail from S. Dickson to D. Sambur (Sept. 19, 2013), at CEOC_INVESTIG_00402914 [CEOC_INVESTIG_00402914] ("CEOC will get 150mm from holdco.  That will show in the financials.  Also if the money is coming from hold co doesn't that guarantee so what benefit is that really to CEOC.");  *see also* S. Dickson Feb. 25, 2016 Tr. at 79:19-80:11.  This is presumably because, by contributing to CEOC bond debt for which CEC was ultimately responsible, CEC was simultaneously lessening its own exposure.  However, the fact that CEC benefited equally from the contribution does not mean that CEOC – which saw its leverage decrease as a result of the contribution – did not also benefit from the bonds.  Moreover, by this time, CEC was of the firm belief that its guarantee of the bond debt was one of "convenience" that could be unilaterally released at any time.  *See* Section IX.B, *infra*.

[1928]  $779 and $877 million for the LINQ and Octavius, respectively, minus $450 million in debt associated with the LINQ and Octavius that was assumed by the new CERP entity.  *See* Appendix 7, Valuation at Section VI.E.

Nevertheless, as described above, Apollo and Paul Weiss sought, and Perella provided, an opinion that the transfer of the LINQ and Octavius had been made for reasonably equivalent value.  There are two principal reasons for this discrepancy.  First, Perella undervalued the LINQ and Octavius assets.   Second, Perella improperly included other consideration, specifically CEOC's avoidance of $378 million in expenses that Perella assumed would have been reallocated to CEOC from the CMBS Properties promptly in the event of a default and separation – *i.e.*, the removal of the CMBS Properties from the Caesars system.[1929]

### (A) Perella Undervalued the LINQ and Octavius

As the detailed analysis undertaken by the Examiner makes clear, Octavius should have been valued between $213.2 million and $239.7 million rather than the materially lower $162 million to $203 million range ascribed to it by Perella.[1930]  The RDE Casino (part of the LINQ) should have been valued between $87.4 million and $98.2 million rather than Perella's lower valuation range of $67 million to $83 million.[1931]

In both cases, Perella's valuations were based on the owner's right to receive lease payments from CEOC under existing operating leases – $35 million per year for Octavius and $15 million per year for the RDE Casino.[1932]  As Perella learned during diligence, the Octavius lease had been set up to provide credit support for the LINQ/Octavius debt, and the RDE Casino lease simply approximated the earnings of the former O'Sheas casino (which the RDE Casino[1933] replaced).  But Perella performed no analysis to determine what the fair market value of either lease would be.  Instead, at Apollo's direction, Perella simply assumed that an arm's length negotiation would have yielded the same exact lease terms.  Perella improperly valued the lease payments, which is evident in an analysis of the lease economics.[1934]  Perella's valuations of

---

[1929]  In addition, the October 10, 2013 presentation to CEOC's Board of Directors suggested that the release of the CEC Lease Guarantee constituted additional intangible consideration, but Perella did not assign this any monetary value to the release of the CEC Lease Guarantee. "Presentation to the Board of Directors:  Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024664 [PRIV_INVESTIG_00024656].  As discussed in Section IX.B, *infra*, the position that the CEC Lease Guarantee constituted consideration is inconsistent with the position taken by CEC in litigation that the guarantee of CEOC's bond debt (which was purportedly released in 2014) was merely a "guarantee of convenience."  *See* E-mail from S. Anreder to D. Sambur, *et al.* (May 12, 2014), at APOLLO-Examiner_00084924-928 [APOLLO-Examiner_00084924].

[1930]  *See* Appendix 7, Valuation at Ex. C-1.

[1931]  *See id.* at Appendix 7, Valuation at Ex. C-2.

[1932]  *See* "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000017-30 [CEOC_INVESTIG_00000006].

[1933]  As noted above, the RDE Casino is now called the O'Sheas Casino but is referred to herein as the RDE Casino.

[1934]  *See* Appendix 7, Valuation at Section VI.B.2.a.

Octavius and the RDE Casino also suffered from a number of technical deficiencies which served to further depress the value that Perella ultimately ascribed to those properties.[1935]

In addition, Perella did not consider whether removing Octavius – an integrated part of Caesars Palace – from the CEOC credit (and thus from CEOC's control) might negatively impact CEOC's value.[1936]   Octavius, which houses 668 of the newest and most high-end rooms in Caesars (including a number of super-luxury villas) is an important part of the total revenue and EBITDA generated at Caesars Palace.   By moving the property out of CEOC, the CERP Transaction effectively gave CERP (and thus CEC) significant leverage in renegotiating lease terms as well as a seat at the table in any potential sale of Caesars Palace.   This leverage derives, in part, from the fact that Octavius is a critical part of Caesars Palace, but at the end of the lease, CERP would have been paid back 100% of original investment, plus a return on that investment, and would still retain ownership of the Octavius Tower.   While this negotiating leverage is difficult to value, it does constitute damage to CEOC.

Perella's valuation of the High Roller was also lower than it should have been. Specifically, Perella ascribed it a valuation range of $265 million to $346 million instead of $324.8 million to $356.3 million.[1937]   As described above, this discrepancy appears principally due to Perella's decision to assume a flat cash flow stream rather than one that kept pace with the rate of inflation.[1938]

Finally, with regard to the LINQ Retail, Perella actually ascribed it slightly higher value than the Examiner (concluding that it was worth between $252 million to $303 million instead of $251.1 million to $280.7 million).[1939]   This discrepancy derives from a number of technical issues with Perella's valuation, including its utilization of improper inputs in its discounted cash flow analysis, but is too insignificant to offset the erroneously low values ascribed to the other components transferred as part of the CERP Transaction.

Taken together, Perella's valuation of the properties being transferred to CERP totaled between $197.8 million and $386.2 million net of debt, as compared to the analysis undertaken by the Examiner, which yielded a range of $328.5 and $426.9 million.   Looking at the midpoints, Perella's analysis undervalued the LINQ and Octavius' true value by some $86 million.[1940]

---

[1935]   These included, *inter alia*, the use of CEOC's cost of debt and a hybrid CEC/CEOC weighted average cost of capital instead of CEC's corresponding figures, which would have been more appropriate.   *See* Appendix 7, Valuation at Section VI.B.2.c.

[1936]   *See* J. Scherer Oct. 20, 2015 Tr. at 142:12-21; C. Leung Oct. 16, 2015 Tr. at 142:6-18.

[1937]   "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000030 [CEOC_INVESTIG_00000006]; *see also* Appendix 7, Valuation at Ex. C-4.

[1938]   "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000030-31 [CEOC_INVESTIG_00000006];  *see also* Appendix 7, Valuation at Section VI.B.4.a.

[1939]   "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000021 [CEOC_INVESTIG_00000006]; *see also* Appendix 7, Valuation at Ex. C-3.

[1940]   *Id.* at CEOC_INVESTIG_00000011.

### (B) Perella Overvalued the Consideration Received by CEOC

#### (1) Because the Factual Predicates Underlying the Decision to Count the Avoidance of Expenses as Consideration Were Unrealistic, Perella Should Not Have Accorded These "Savings" Any Value

Perella ascribed a value of $378 million to the reallocated expenses that CEOC purportedly avoided as a result of the CERP Transaction.  Underlying that conclusion were Perella's assumptions that, without CEOC's contribution of the LINQ and Octavius:  (i) no refinancing would have occurred; (ii) there would have been a default on the CMBS debt; and (iii) this would have led to the CMBS Lenders promptly foreclosing on the CMBS Properties and removing them from Caesars, leaving CEOC holding the bag for the lion's share of the allocated and 30% of unallocated services expenses for which the CMBS Properties were responsible.

As discussed previously, these assumptions were unrealistic.  Both the CMBS Lenders[1941] and Apollo were highly motivated to reach a deal to restructure the CMBS facility, and Apollo's internal calculations and projections uniformly assumed that a deal would get done.  Indeed, both sides viewed a foreclosure as "mutually destructive."[1942]  In fact, CEC ultimately issued $200 million in equity to enable the CERP Transaction to close.

Even had the negotiations – which began almost two years prior to maturity – soured, it is highly speculative that the CMBS Lenders would have tried to foreclose, or that Apollo would have allowed that to occur.[1943]  In 2010, the CMBS Lenders had specifically negotiated for the right to indefinitely continue availing themselves of (and paying for) the shared services and value-enhancing intellectual property provided by CEOC,[1944] and at least one of the CMBS Lenders stated that his working assumption in 2013 was that any attempt to foreclose would have been met by a declaration of bankruptcy on the part of CEC.[1945]  Moreover, as discussed above, the 2010 Shared Services Agreement and the property-specific Management Agreements provided the CMBS Lenders with the negotiated right to require that CEOC continue to manage these properties.   And should the CMBS Lenders have decided (and been allowed) to move on from Caesars, they would have had a Transition Period of up to two full years to do so – during

---

[1941]  M. Savino Dec. 15, 2015 Tr. at 82:6-25.

[1942]  J. Beato Sept. 24, 2015 Tr. at 30:11-18.

[1943]  However, Perella did not discount the avoidance of reallocated corporate expenses based on the probability of default or foreclosure, and Leung defended Perella's decision not to do so on the grounds that its analysis was based on the assumption that there would be a default and foreclosure. C. Leung Oct. 16, 2015 Tr. at 137:24-138:5.  This simply begs the question, as Perella never should have been instructed to make that assumption in the first place.

[1944]  2010 Shared Services Agreement (Aug. 31, 2010), at CEC_EXAMINER_0220178, §10.01 [CEC_EXAMINER_0220164]; E. Hession Nov. 3, 2015 Tr. at 97:7-98:17; G. Loveman Oct. 27, 2015 Tr. at 88:14-24, 124:19-125:15, 236:18-237:3; G. Ezring Feb. 25, 2016 Tr. at 20:12-21:24; *see also* Section VII.C.

[1945]  K. Liang Jan. 22, 2016 Tr. at 80:18-82:18.

which time they would continue receiving and paying for the shared services provided by CEOC.[1946]

Although a separation at some point in time was a theoretical possibility, in reality, precisely handicapping the odds of a default, a subsequent separation, and the timing of any such separation would have been close to impossible. More importantly, the chance that the parade of horribles assumed by Perella would have actually occurred at all – much less "promptly" – was so speculative that it is unlikely that any court would ascribe value to its avoidance.[1947]

### (2) The Purported Indirect Benefits of Cost Avoidance Are Too Speculative to be Valued

Although CEC has cited cases for the general proposition that indirect value can be taken into account as consideration (a proposition that the Examiner does not dispute), those cases have facts very different from those here. Indeed, neither CEC nor Paul Weiss has been able to

---

[1946] Finally, even if one were to accept the premise (as Perella was instructed to do) that a default and separation would have occurred, Perella's calculation of the corporate expenses that would be borne by CEOC under those circumstances was also unreasonably high. It is likely that, faced with such a situation, CEOC would have been able to reduce expenses by trimming staff, cutting the number of organizational "pods," or other means. *See, e.g.,* J. Beato Sept. 24, 2015 Tr. at 96:5-97:18; E. Hession Nov. 3, 2015 Tr. at 166:7-21; E-mail from J. Beato to K. Nguyen and A. van Hoek (Aug. 16, 2013), at PWP_CZR_EX_00000173-75 [PWP_CZR_EX_00000173]. Indeed, during 2015, Caesars was able to reduce costs that they previously viewed as fixed without impacting revenues. E. Hession Nov. 3, 2015 Tr. at 166:7-21 ("I would say we're cutting what we previously considered to be fixed costs. . . . Obviously in hindsight, they were variable because we were able to do it and not impact our revenues. The order of magnitude, it's probably [$]300 to $400 million, maybe [$]500. It's a lot. It's very significant.") Although Perella refused to accept Apollo's initial suggestion that 100% of allocated and unallocated expenses borne by the CMBS Properties would bounce back to CEOC, its assumption that some 67% of those fees would remain after 6-8 months and 58% after two-three years was improperly high. "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000034 [CEOC_INVESTIG_00000006]; C. Leung Oct. 16, 2015 Tr. at 200:7-201:22.

[1947] *See, e.g., Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.),* 92 F.3d 139, 154 (3d Cir. 1996) (holding that the debtor did not receive value reasonably equivalent to the fees it paid to a bank because its loan commitment was subject to so many contingencies that the chances of the loan ever closing were low); *Wessinger v. Spivy (In re Galbreath),* 286 B.R. 185, 211 (Bankr. S.D. Ga. 2002) (avoiding a promissory note signed by the debtor in order to buy him an opportunity to return his company to profitability "was, viewed objectively, nothing more than a roll of the dice which was highly speculative and which, neither prospectively nor in hindsight, provided a 'reasonably equivalent' exchange of value" to the debtor); *see also Gugino v. Rowley (In re Floyd),* 540 B.R. 747, 759 (Bankr. D. Idaho 2015) (holding that the possibility of saving debtor's company was not value reasonably equivalent to transfers removing $75,000 of value in real estate and $10,000 of equity in a truck from debtor's estate and guaranteeing company's debt).

point to a case holding that the avoidance of reallocated corporate expenses – the exact issue here – is a valid form of consideration, and none of the experienced businesspeople or financial advisors involved in the transaction were able to point to a single example of such expense avoidance being counted as consideration in a sale or acquisition.[1948]

In those few cases where bankruptcy courts *have* accepted the avoidance of future expenses as consideration constituting reasonably equivalent value, the costs at issue were much more concrete and certain than those at issue here.[1949]   The vast majority of these cases involve the avoidance of litigation expenses. In *In re Jordan*,[1950] for instance, the court held that the debtors received reasonably equivalent value when, pursuant to a settlement agreement, they transferred a deed of trust on property valued at $7.55 million to secure a promissory note of $4.3 million.   The court specifically relied on the fact that the debtors were certain to incur millions of dollars in litigation costs in the absence of a settlement.   Similarly, in *In re Tower Environmental, Inc.*,[1951] the court found that the payments made by a debtor pursuant to a plea agreement to resolve multiple felony charges pending against him were reasonably equivalent to the value he received, because resolution of the charges against him eliminated the risk of future

---

[1948]  *See, e.g.*, M. Cohen Oct. 16, 2015 Tr. at 182:11-184:14 (Cohen recalled asking Paul Weiss questions about the avoidance of cost as consideration as he had not seen that type of consideration before); G. Kranias Oct. 23, 2015 Tr. at 130:5-24 (Kranias had never seen a reallocation of corporate expenses used as consideration or as value in a transaction); M. Wlazlo Oct. 14, 2015 Tr. at 103:5-14 (Wlazlo could not recall any other transaction in his experience in which the avoidance of future expenses counted as consideration); M. Rowan Nov. 16, 2015 Tr. at 274:2-10; *see also* S. Dickson Feb. 25, 2016 Tr. at 106:6-108:3.

[1949]  *See, e.g., Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp.)*, 6 F.3d 1119 (5th Cir. 1993).  In *Fairchild*, the court found that a debtor airline manufacturer's actions to keep one of its best customers (and affiliated entity) in business – by paying for fuel costs – benefitted the debtor manufacturer because this avoided the manufacturer having to take back three aircrafts that it had previously sold and avoided the debtor manufacturer damaging its relationship with another potential major customer. *Id.* at 1126.  It also kept the commuter airline in business long enough to foster a potential sale, resulting in additional benefits to the debtor. *Id.* Thus, although no tangible consideration was received by the debtor manufacturer, the court found that there was reasonably equivalent value based upon the indirect benefits. *Id.* at 1126-27.  However, the *Fairchild* court based its conclusion on the fact that the customer airline was certain to go out of business without the assistance of the debtor. *Id.* at 1123-24.  Additionally, the likelihood that a sale of the customer airline would occur was "demonstrably high." *Id.* at 1126.  Therefore, the court's analysis relied on the debtor investing in something that was certain to occur and receiving indirect benefits in return.  Here, by contrast, a foreclosure and prompt separation of the CMBS Properties was not only not certain to occur, but was in fact highly unlikely.

[1950]  *Jordan v. Kroneberger (In re Jordan)*, 392 B.R. 428, 446-47 (Bankr. D. Idaho 2008).

[1951]  *Official Comm. of Unsecured Creditors v. State (In re Tower Envtl.)*, 260 B.R. 213, 227-28 (Bankr. M.D. Fla. 1998).

costs associated with defending such charges.  In both these cases, and unlike here, the future legal fees at issue were certain to be incurred had the matters not been settled.[1952]

Where, as here, potentially avoided costs are too speculative, courts have declined to ascribe them any value.  For instance, in *In re Leonard*,[1953] a defendant transferee contended that debtors received reasonably equivalent value in exchange for paying their son's college tuition in part because the transaction would relieve the debtors of any need to financially support their son in the future.[1954]  The court rejected this form of indirect consideration, noting that the defendant did nothing "other than speculate" that the debtors' payment of tuition would alleviate a future cost they may or may not have incurred.[1955]  Because such benefits did not increase the debtors' net worth or increase their assets "in any way that could be used to pay their creditors," the court concluded that they did not receive reasonably equivalent value in exchange for the tuition payments.[1956]  Similarly, *In re Brobeck Phleger and Harrison LLP*,[1957] the court rejected former partners' arguments that, by taking unfinished business to their new firms, the debtor law firm avoided malpractice claims against it and thus received value in exchange for losing the fees, holding that such claims were too speculative to be ascribed any real value.[1958]

---

[1952] *Jordan*, 392 B.R. at 446; *Tower Environ.*, 260 B.R. at 228.  In addition, both courts considered the fact that the settlement and plea agreements were the result of arm's length negotiations.  Here, in contrast, no such arm's length negotiations occurred for the transfer of the LINQ and Octavius out of CEOC.

[1953] *Gold v. Marquette Univ. (In re Leonard)*, 454 B.R. 444 (Bankr. E.D. Mich. 2011).

[1954] *Id.* at 457.

[1955] *Id.*

[1956] *Id.* at 457-58.

[1957] *Greenspan v. Orrick, Herrington & Sutcliffe (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318 (Bankr. N.D. Cal. 2009).

[1958] *Id.* at 344.  Courts have also rejected indirect benefits as consideration when such benefits were not received "in exchange for" the transferred assets.  For instance, in *Official Comm. of Unsecured Creditors v. Citicorp. N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783 (Bankr. S.D. Fla. 2009), *aff'd* 680 F.3d 1298 (11th Cir. 2012), defendants argued that without the transaction in question, its parent company would have gone into bankruptcy and debtor would have been deprived of a variety of services provided by its parent, such as access to a centralized cash management system, purchasing, payroll and benefits administration.  *Id.* at 867-68.  The court rejected this as consideration, reasoning that the parent-provided services being protected were benefits debtor enjoyed before the transfer and therefore could not be regarded as property received "in exchange for" the transfer or obligation.  *Id.*  Here, of course, CEC is arguing that without the CERP Transaction, CEOC would have been deprived of the CMBS Properties' payment of shared expenses – in other words, benefits which CEOC was already receiving prior to its transfer of the LINQ and Octavius.

### iv. Potential Remedies

The total equity value transferred out of CEOC in connection with the CERP Transaction was between $328.5 million and $426.9 million.  Because no value can properly be accorded to the avoidance of reallocated corporate expenses, the only consideration that CEOC received in return for the transfer of the LINQ and Octavius was approximately $129 million worth of cash and bonds paid by CEC, thereby resulting in CEOC being underpaid by between $199.7 million and $298.1 million.  Accordingly, the Examiner has concluded that there exists a strong claim that the CERP Transaction is avoidable as a constructive fraudulent conveyance.

As a general matter, the remedy for a fraudulent transfer is either recovery of the property itself or the value of the property from the "initial transferee" or the "entity for whose benefit such transfer was made."[1959]  As discussed in earlier sections, monetary damages are the most common remedy.  Here, however, an argument can be made for the return of Octavius, which is a fully-integrated and integral part of Caesars Palace, to CEOC.  As discussed above, allowing Octavius to remain part of CERP would give CERP (and thus CEC) leverage in any discussions regarding the disposition of Caesars Palace, and is thus value-destructive to CEOC in a way which is difficult to quantify.  Of course, because Octavius is part of the collateral package for the CERP refinancing and was part of the bargained-for consideration provided to the CMBS Lenders, implementing such a remedy may be difficult.  The CMBS Lenders could potentially be provided with a lien, but that of course would be almost identical to the proposed "Structure 2" they rejected during negotiations with Apollo.  Of course, the situation now that CEOC has already gone into bankruptcy (as opposed to being a bankruptcy risk, as it was in 2013) is different, so such a solution might prove workable.

Whether in connection with a damage award or a return of the properties, CERP will likely be unable to offset the $129 million in value that was transferred because there is a strong case that CERP was not a "good faith transferee."[1960]  As an initial matter, because the transaction was not negotiated at arm's length (to the contrary, Apollo seemed to dictate a price at the lowest level possible), it will be difficult for CEC and/or CERP to establish that they acted in good faith.[1961]  Indeed, CEC – the initial transferee which ultimately contributed the LINQ and Octavius to CERP – possessed knowledge of the events surrounding the CERP Transaction sufficient to put CEC on inquiry notice that (i) CEOC was insolvent at the time of the transaction and/or (ii) the transfer may have been made with a fraudulent purpose – information that would

---

[1959]  11 U.S.C. §550(a).

[1960]  "Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. §548(c).

[1961]  *Bruno Mach. Corp. v. Troy Die Cutting Co. (In re Bruno Mach. Corp.)*, 435 B.R. 819, 834 (Bankr. N.D.N.Y. 2010).

cause a reasonable person to conduct a diligent investigation into these matters.[1962]  Both CEC and CERP should have known that the transfer of the LINQ and Octavius was potentially subject to avoidance, especially considering the lengths to which Apollo went to minimize the tangible benefits received by CEOC.[1963]

Although the Examiner has not undertaken an exhaustive investigation into whether the CMBS Lenders were good faith transferees, based on the available evidence, it appears that they were.  Thus, even if Octavius were returned to CEOC, the CMBS Lenders – who specifically bargained for the additional collateral represented by Octavius as a condition to the CMBS refinancing – would be entitled to the benefit of a lien on the property.

### v.   There Is No Safe Harbor Defense Under Section 546(e) for the CERP Transaction

CEC and the Sponsors have argued that the transfers made in connection with the CERP Transaction are protected from avoidance under constructive fraudulent transfer claims by the "safe harbor" provisions in section 546(e).  The Examiner disagrees.

Like the Growth Transaction, the transfers in question were accomplished in several steps and were part of a larger series of transactions involving multiple parties and agreements.  As described above, with respect to the sale of the LINQ and Octavius, Holdco, a fourth-tier subsidiary of CEOC, owned all of the membership interests in the Linq LLC and Octavius LLC.  Holdco then created a subsidiary, Intermediate, in which it held 100% of the Octavius/Linq Intermediate Interests.  Holdco then transferred its membership interests in the Linq LLC and Octavius LLC to Intermediate, in return for the Octavius/Linq Intermediate Interests.  Holdco then transferred all of the Octavius/Linq Intermediate Interests to CEC.  CEC then contributed the Octavius/Linq Intermediate Interests to Rio, a third-tier subsidiary of CEC and subsidiary of CERP.

Thus, it is clear that the relevant transfers made in connection with the CERP Transaction were of LLC membership interests in fifth-tier LLCs owned by CEOC.  These Octavius/Linq Intermediate Interests most likely do not constitute "securities" under the Bankruptcy Code.  Accordingly, and as discussed in greater detail in Appendix 5 and the Growth Transaction Section, while there is no dispute that the CERP Transaction involved transfers of property interests held by various Debtors, the Examiner has concluded that, if litigated, it is likely that a court would decline to apply section 546(e) as a defense because the transfers of Octavius/Linq Intermediate Interests (i) do not qualify as settlement payments, (ii) do not constitute transfers

---

[1962]  *C.f. Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 897-98 (7th Cir. 1988); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 310-12 (Bankr. S.D.N.Y. 2010).

[1963]  *See, e.g.*, *Holber v. Dolchin Slotkin & Todd, P.C. (In re Am. Rehab & Physical Therapy)*, No. 04-0847, 2006 WL 1997431, at *19 (Bankr. E.D. Pa. May 18, 2006) ("a transferee does not act in good faith when it has sufficient knowledge to place it on inquiry notice of the voidability of the transfer").

made "in connection with a securities contract," and (iii) were not made by or to (or for the benefit of) a financial institution or financial participant.

### b.  Actual Fraudulent Transfer

As noted above, there is no dispute in connection with the first prong of the actual fraudulent transfer test, *i.e.*, that CEOC transferred an interest in property by transferring the LINQ and Octavius to CERP.  As for the second prong, the Examiner believes that there is strong evidence that there existed an intent on the part of Apollo and CEC to hinder or delay creditors.

Specifically, although CEC may have had a legitimate business purpose for the overall transaction – that is, the refinancing of CMBS debt – the Examiner does not believe that this insulates Apollo and CEC from an actual fraudulent transfer claim with respect to the portion of the transaction that affected CEOC.  First, the sale of the LINQ and Octavius is marked by the presence of several badges of fraud, including CEOC's insolvency, the inadequate consideration that CEOC received, and the transfer of the LINQ and Octavius to a closely-related, more financially stable company controlled by the Sponsors.[1964]  The existence of these badges of fraud creates a rebuttable presumption of intent to hinder or delay creditors that is not, in the Examiner's view, rebutted by a supervening legitimate purpose in connection with other aspects of the transaction.  Moreover, the CMBS refinancing was ultimately a business decision that primarily benefitted CEC, not CEOC.  The argument that the avoidance of a CEC bankruptcy and the release of the CEC Lease Guarantee – both of which were, according to CEC, a result of the transaction – benefitted CEOC is not persuasive, because any resulting benefit to CEOC was not the purpose of the CERP Transaction and, as discussed above, was speculative in any event.[1965]  That it may constitute a "dual" purpose is insufficient as the legitimate business purpose of the transaction to CEC does not constitute a supervening purpose strong enough to rebut the presumption of intent created by the badges of fraud.[1966]

---

[1964] *See Kelly v. Armstrong*, 206 F.3d 794, 798-802 (8th Cir. 2000) (where there is a "confluence" of badges of fraud then a rebuttable presumption of actual fraudulent intent arises).

[1965] *See id.* at 802 ("'[t]he burden which shifts . . . is not a burden of going forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged.") (quoting *In re Bateman*, 646 F.2d 1220, 1223 n.4 (8th Cir. 1981)); *Leonard v. Mylex Corp. (In re Northgate Comput. Sys.)*, 240 B.R. 328, 360-61 (Bankr. D. Minn. 1999); *Cole v. Strauss*, No. 2:13-cv-04200-NKL, 2014 WL 4055787, at *6 (D. Mo. Aug. 15, 2014).

[1966] *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 354 (D. Mass. 2012), *aff'd*, 711 F.3d 248 (1st Cir. 2013) (there may have been legitimate purpose to transfer patents to sister corporation to consolidate ownership of patents, but this was not "significantly clear evidence of a legitimate supervening purpose" because the transfer may also have been done to hinder or delay creditors); *Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 Fed. App'x 924, 929 (Fed. Cir. 2005) (the fact that the corporation needed to borrow funds was not a sufficient business justification to rebut the presumption that a security interest was granted to a shareholder with actual intent to defraud).  To the extent that courts find that there is direct evidence of an intent to

Second, and most importantly, the Sponsors (and CEC) were on both sides of the CERP Transaction, and the inadequate consideration received by CEOC from CERP was the direct result of Apollo's efforts to drive down the price as much as possible. Finally, CEC and Apollo knew or should have known that the transfer of the LINQ and Octavius out of CEOC for less than fair value would diminish CEOC's financial well-being and long-term ability to generate EBITDA, with the natural consequence of hindering or delaying creditors.[1967]

In July 2013, the Potential CERP Lenders understood from discussions with Sambur that CEC/Apollo was "exploring a multitude of ways" to move the LINQ and Octavius out of CEOC "without costing the company [CEC] actual cash."[1968] And indeed, Apollo worked hard to make this "strawman," or base case, scenario a reality.

---

hinder or delay creditors, courts have held that a legitimate business purpose for a transaction can still give rise to claims for actual fraudulent transfer where there was also direct evidence of an intent to hinder or delay creditors. *See, e.g.*, *United States v. Engh*, 330 F.3d 954, 956 (7th Cir. 2003) (affirming a finding of actual fraudulent intent and noting that "the record in this case is brimming with evidence supporting the district court's conclusion that the transfer in question was fraudulent . . . . Regardless of what other motivations for the transfer may have been present, a clear intent to avoid a creditor . . . was also present"). Indeed, CEC and the Sponsors do not dispute that where there is direct evidence of actual intent, then a transfer is fraudulent as to creditors even if there is evidence of an alternate legitimate purpose for the transfer.

[1967] *See In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) (holding that where a natural consequence of a debtor's action in transferring segregated funds into its clearing accounts was to render the funds permanently unavailable to some of its clients, actual intent to defraud can still be found). In light of the timing of the CERP Transaction in mid to late 2013 and its close proximity to the Growth Transaction, creditors have argued that CERP was part of an overall strategy to transfer valuable assets out of a deeply indebted CEOC to more stable entities controlled by CEC and the Sponsors. Although there is myriad testimony and documents highlighting Apollo's, CEC's and the lenders' desire to refinance the CMBS debt in 2013 and the purported necessity for doing so, questions still remain as to why CEOC assets had to be used to facilitate that refinancing. Of course, there is evidence that once Apollo and CEC determined that the LINQ and Octavius were to be used to help refinance the CMBS debt, it was the Potential CERP Lenders who insisted that the LINQ and Octavius be sold to the new CERP entity rather than function as a guarantor or a co-borrower. However, both alternatives were present in the earliest Apollo presentations regarding the CMBS refinancing and it could hardly have been a surprise to Apollo that the Potential CERP Lenders would prefer to have the properties themselves as part of the collateral. *See* M. Savino Dec. 15, 2015 Tr. at 71:7-72:15; K. Liang Jan. 22, 2016 Tr. at 38:17-40:13. Moreover, it does not appear that Apollo resisted that demand by the Potential CERP Lenders when it was presented, perhaps because it recognized that tossing the LINQ and Octavius into the CERP "briar patch" could benefit CEC (and the Sponsors) given their control over CERP, its financial stability (once the restructuring was completed) and CEOC's worsening financial condition in 2013.

[1968] E-mail from K. Liang to B. Woo (Aug. 17, 2013), at Oaktree_CZR_0000792 [Oaktree_CZR_0000790] (e-mail chain among lenders from GSO and Oaktree referencing discussion with Sambur over terms of the CMBS refinancing).

On August 14, 2013, Apollo (through Paul Weiss) provided Perella with the Aug. 14 Apollo Presentation, which outlined Apollo's view of the value of the LINQ and Octavius and the consideration that CEOC should "receive" as a result of their transfer.  Notably, those values changed dramatically from the first draft of that presentation to the one that was ultimately provided to Perella.  In the original version, prepared by van Hoek on August 12, Apollo valued the assets at a total of $729 million, using a multiple of 9x to determine the value of Octavius and the RDE Casino.[1969]   By the time the presentation was sent to Perella on August 14, the value had dropped to $578 million due principally to a decrease in the multiple (to 8x).[1970]

At the same time, the value purportedly going to CEOC (according to Apollo) increased in drafts of the Aug. 14 Apollo Presentation and was discussed repeatedly between Perella and Apollo thereafter, with Apollo repeatedly attempting to convince Perella to ascribe the maximum value possible to the intangible consideration.  The Aug. 12 Apollo Draft discounted the value to CEOC of the $4.4 billion CEC guarantee of the CMBS leases by 90%; the Aug. 14 Apollo Presentation counted every dollar as a benefit to CEOC despite the fact that there were no cross-default provisions.  The justification provided to Perella was that eliminating the CEC Lease Guarantee would make CEC's parent guarantees of CEOC debt more valuable in the event of a default, but there is no evidence that Apollo or Paul Weiss ever informed Perella of their long-held view that the parent guarantee of the CEOC bond debt was a "guarantee of convenience" that could be unilaterally released by CEC at any point in time.  Moreover, an internal Apollo presentation from October 2012 estimated that the value of the CEC Lease Guarantee to CMBS was $400 million, less than 10% of the value of the alleged benefit to CEOC of the release of the CEC Lease Guarantee presented to Perella.[1971]  This, too, was never disclosed to Perella.

Moreover, that same Aug. 14 Apollo Presentation also showed an increase from earlier drafts in the value attributed to CEOC's avoidance of reallocated expenses upon a default from $1.3 billion to $1.8 billion.  This was also a result of a change in the multiple applied to these

---

[1969]  E-mail from A. van Hoek to D. Sambur (Aug. 12, 2013) [CEOC_INVESTIG_00308267], attaching "CMBS discussion materials" (Aug. 12, 2013), at CEOC_INVESTIG_00308273 [CEOC_INVESTIG_00308269].

[1970]  E-mail from C. Leung to J. Mleczko, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS discussion materials" (August 2013), at PWP_CZE_EX_00000386 [PWP_CZR_EX_00000381].

[1971]  Although the October 2012 presentation calculated the CEC Lease Guarantee to be worth $400 million to CMBS, not CEOC, based on Apollo's subsequent calculations, discussed above, the implication was that upon a CMBS refinancing, this $400 million benefit would flow to CEOC.  Rowan explained that the $400 million represented "a hypothetical analysis to figure out from a negotiating point of view what the CEC guarantee could be worth to lenders, most likely in a partial refinancing scenario or in a restructuring scenario."  M. Rowan Nov. 16, 2015 Tr. at 120:12-121:5.  Ultimately, of course, Perella declined to attribute any monetary value to the release of the CEC Lease Guarantee in its opinion.  Although Perella concluded that the release was worth something to CEOC, it considered the value speculative and too difficult to calculate with any precision.  C. Leung Oct. 16, 2015 Tr. at 118:4-15; J. Scherer Oct. 20, 2015 Tr. at 90:8-15.

expenses – from 9x in the initial draft presentation (the same as that applied to the value of the properties) to 12.5x in the final.[1972]    And, as discussed above, the assumption underlying attributing any value to these reallocated expenses was highly speculative.

Ultimately, as Perella realized, the implication of Apollo's position was that CEOC could have transferred out $6.2 billion of hard assets to CERP in exchange for no tangible consideration. This alone speaks volumes of the intent underlying Apollo's approach to the transaction.

Perella's Fairness Committee rightly rejected Apollo's attempt to transfer the LINQ and Octavius out of CEOC for no tangible consideration.  However, even after the need for hard consideration in the form of cash or cash equivalent was communicated, Apollo continued to push back and seek the lowest possible price for CEOC, negotiating to reduce Perella's initial request that CEC pay cash consideration worth $250 million.[1973]    Although Scherer acknowledged that Perella originally asked for $250 million merely as a starting point for negotiations with Apollo and Paul Weiss,[1974]  the fact that Perella would feel a need to bargain suggests strongly that neither Apollo nor CEC was acting with CEOC's and its creditors' best interests in mind.

Based upon the foregoing, there is a strong actual fraudulent transfer claim arising out of the CERP Transaction.  The remedies available for actual fraudulent transfer are the same as for constructive fraudulent transfer; return to the debtor of the property transferred or value equivalent to that property.

### c.  Breach of Fiduciary Duty

The Examiner has concluded that a strong breach of fiduciary duty claim exists against CEOC's directors and CEC as CEOC's controlling shareholder.[1975]  Entire fairness, not the more deferential business judgment standard will apply.  Accordingly, the burden will fall on CEOC's

---

[1972] No witness, including van Hoek, could recall why these multiples were changed in opposite directions.

[1973] *See* E-mail from D. Sambur to D. Sambur (Aug. 29, 2013), at CEOC_INVESTIG_00396533 [CEOC_INVESTIG_00396533].

[1974] J. Scherer Oct. 20, 2015 Tr. at 127:21-128:10.

[1975] Under either an Illinois or federal choice of law analysis, the Bankruptcy Court will apply the "internal affairs doctrine," which provides that the law applicable to a claim against a director, officer or controlling shareholder for breach of fiduciary duty is that of the state of incorporation. *CDX Liquidating Trust v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011); *see Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982); *Paloian v. Geneva Seal, Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696, 702 (N.D. Ill. 2012) (citing *Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000) (assuming that federal choice of law rules would follow internal affairs doctrine for derivative suit)).  Because CEOC is incorporated in Delaware, Delaware law would likely apply to any claim for breach of fiduciary duty against CEOC's directors or against CEC as CEOC's controlling stockholder.

directors and CEC in any litigation to establish that the CERP Transaction involved both fair dealing and a fair price.[1976]

### i.   The CERP Transaction Did Not Involve Fair Dealing

The governance process Apollo and CEC engaged in to carry out the CERP Transaction was plagued with inadequacies.  These process issues relate directly to the various considerations underlying the "fair dealing" prong of the entire fairness standard, including how the transaction "was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors" were obtained.[1977]   As discussed above, there was no process at CEOC – no independent directors, no special committee, and no independent counsel.  Instead, Apollo, principally acting through a CEC director, Sambur, was on both sides of the transaction determining the price on behalf of both the seller (CEOC) and the buyer (CEC/CERP), with the clear intent of obtaining the lowest price possible.

### ii.   The CERP Transaction Did Not Involve a Fair Price

Determining whether a fair price has been obtained for a transaction "requires consideration of all relevant factors involving the value of a company."[1978]   As a preliminary matter, the Examiner notes that a sale of the LINQ and Octavius was never tested in the market, and it is therefore difficult to know with certainty what the fair market value of the properties would have been.   And although it provides a useful basis for comparison, Perella's contemporaneous "fairness opinion" actually focused on whether CEOC received "reasonably equivalent value," and not on whether the deal was fair, although this is a distinction without much import here.

That is because it is very clear that the price received by CEOC for the LINQ and Octavius was neither fair nor reasonably equivalent.  Based on the valuation performed by the Examiner,[1979] the Examiner concludes that Perella's analysis undervalued the assets being transferred and erroneously included the highly speculative avoidance of reallocated expenses as consideration, resulting in a shortfall to CEOC in the range of $200 million to $298 million.[1980]

Courts have broad discretion to order any form of equitable or monetary relief in assessing damages related to a breach of fiduciary duty.[1981]   While there is no "specific damage formula" that courts must employ when a transaction is found not to be entirely fair,[1982] generally

---

[1976]   *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 34 (Del. Ch. 2014).

[1977]   *Emerald Partners v. Berlin*, 787 A.2d 85, 97 (Del. 2001) (citing *Weinberger*, 457 A.2d at 711).

[1978]   *Weinberger v. UOP, Inc.*, 457 A.2d 701, 713 (Del. 1983).

[1979]   *See* Appendix 7, Valuation, at Section VI.E.

[1980]   *See id*.

[1981]   *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1184 (Del. Ch. 1999) (citing *Weinberger*, 457 A.2d at 714).

[1982]   *Weinberger*, 457 A.2d at 703-04.

speaking, the plaintiff is entitled to recover what it would have received but for the breach of fiduciary duty.[1983]  Where "the fiduciary breaches . . . ultimately relate to issues of fair value," the appropriate remedy is generally actual or "out-of-pocket" damages, measured as the difference between the consideration received and the actual value of the asset at the time it was transferred.[1984]  This type of damage award approximates "the difference in value between what was paid (the 'give') and the value of what was received (the 'get')."[1985]  Mathematical certainty is not necessary when calculating monetary damages; rather "responsible estimates . . . are permissible as long as the Court has a basis" upon which to make them.[1986]  Further, "uncertainties in awarding damages are generally resolved against the wrongdoer."[1987]

Here, the damages arising from the CERP Transaction are at least between $200 million and $298 million, the amount of the shortfall in what CEOC received as consideration.  CEOC may also pursue rescission of the CERP Transaction.  Although such remedy is rarely granted, the facts here provide another basis for arguing for the return of at least Octavius to CEOC.[1988]

### d.  Aiding and Abetting Breach of Fiduciary Duty[1989]

The Examiner concludes that there exists a strong aiding and abetting breach of fiduciary duty claim against Apollo and Sambur and a weak claim against TPG.

As outlined in Appendix 5, Legal Standards at Section XI.B.2, under Delaware law, to prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must establish: (i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in that breach by the defendants; and (iv) damages proximately caused by the

---

[1983]  *See Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440-441 (Del. 2000).

[1984]  *Andra v. Blount*, 772 A.2d 183, 193 (Del. Ch. 2000); *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 224-25 (Del. Ch. 2014); *Poole v. N. V. Deli Maatschappij*, 224 A.2d 260, 262-265 (1966).

[1985]  *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1252 (Del. 2012); *see also Bomarko*, 794 A.2d at 1184 (holding that plaintiffs were entitled to receive, "at a minimum, what their shares would have been worth at the time of the Merger if [defendant] had not breached his fiduciary duties").  In addition to awarding actual damages, courts also have the authority to grant pre-and post-judgment interest, and to determine the form of that interest.  *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 814 (Del. Ch. 2011).

[1986]  *Bomarko*, 794 A.2d at 1184 (quoting *Red Sail Easter Limited Partners, L.P. v. Radio City Music Hall Prods., Inc.*, No. 12036, 1992 WL 251380, at *7 (Del. Ch. Sept. 29, 1992)).

[1987]  *Thorpe v. CERBCO, Inc.,* No. 11713, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993).

[1988]  *Weinberger*, 457 A.2d at 714 (finding rescission impractical where there was a long ago completed cash out merger).

[1989]  As with any breach of fiduciary duty claims, under the "internal affairs doctrine," the law applicable to a claim for aiding and abetting a breach of fiduciary duty is the law of the state of incorporation, here Delaware.  *See Jano Justice Sys., Inc. v. Burton*, No. 08-cv-3209, 2010 WL 2012941, at *6 (C.D. Ill. May 20, 2010).

breach.[1990]    As set forth above, the first two elements of the claim are present here.  First, CEOC's directors and CEC owed fiduciary duties to CEOC for the benefit of its residual claimants, including creditors.  Second, the Examiner has concluded that a court would likely find that these parties breached their fiduciary duties in connection with the CERP Transaction. The fourth element – establishing damages proximately caused by the breach – is also likely to be met.  As discussed above, CEOC did not receive reasonably equivalent value for the transfer of the LINQ and Octavius, thereby injuring any residual claimants, including CEOC's creditors.

As for the third element of an aiding and abetting claim – knowing participation in the breach – there is little doubt that Apollo's conduct qualifies.  It was Apollo that conceived of the CERP Transaction.  It was Apollo that chose to use the LINQ and Octavius to fill the equity gap, rejecting other alternatives that would not have involved CEOC assets.  It was Apollo that unilaterally set the price that CEOC would receive, and worked actively to ensure that price was as low as possible.  And it was Apollo who provided Perella with the faulty assumptions which led Perella to dramatically overvalue the consideration being received and sign off on that price.

The strength of the claim against Apollo applies equally to Sambur given the dominant role he played in driving the CERP Transaction forward.  Sambur negotiated with the Potential CERP Lenders, developed the proposed structure and consideration presented to Perella and served as their primary contact, and worked to ensure that CEOC would receive the lowest consideration possible in exchange for the LINQ and Octavius.  Given the above, there can be little doubt that Sambur knowingly participated in the breach.

The claim against TPG, however, is much weaker.  TPG was only tangentially involved in the CERP Transaction and was not involved in initial structuring or pricing discussions.  In fact, TPG's initial reluctance to go along with the use of the LINQ and/or Octavius as collateral evidences that it was Apollo – not TPG – driving these discussions and decisions.

The potential remedies for aiding and abetting are identical to the remedies available for a breach of fiduciary duty.

---

[1990] *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 496 (Del. Ch. 2013) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.,* 910 A.2d 1020, 1039 (Del. Ch. 2006) (recognizing aiding and abetting claim against parent for breaches of fiduciary duty by directors of subsidiary).