**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| | ) |
| **CAESARS ENTERTAINMENT** | ) **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.*, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
| | ) |
| | ) Re: Docket Nos. 3401 & 3406 |

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS
## (Substantially Unredacted)

**May 16, 2016**
**(initially filed March 15, 2016)**

## VOLUME IV
**(Section VIII – 2013-2014 Asset Transfers – Part 2)**

### D. The Four Properties Transaction

#### 1. Introduction of the Transaction

In May 2014, CEOC, through certain of its subsidiaries, transferred to CGP 100% of its equity interests in the following properties: (i) The Cromwell (f/k/a Bill's Gamblin' Hall & Saloon); (ii) Bally's Las Vegas; (iii) The Quad (later renamed The LINQ Hotel & Casino); and (iv) Harrah's New Orleans (the "Four Properties"), along with 50% of CEOC's management and termination fee rights relating to the Four Properties.[1991]  The transaction was completed in two parts for an aggregate purchase price of approximately $2 billion (including $185 million of assumed debt at The Cromwell).[1992]

The transaction appears to have been conceived by the Sponsors in late 2013, on the heels of the Growth Transaction.  The stated rationale for the transaction was to further help address CEOC's significant liquidity issues.  Creditors contend, however, that, like the Growth Transaction, the Four Properties Transaction was intended to protect the Sponsors' interests in the event of a restructuring.

As part of the transaction (and for no additional cash consideration), CEOC also (i) transferred to CGP approximately 31 acres of undeveloped land, some of which was allegedly used for parking, (ii) granted Caesars Enterprise Service, LLC (CES), a newly created joint venture between CGP, CEOC and CERP, a non-exclusive, fully-sublicensable, irrevocable, royalty-free, worldwide license to CEOC's intellectual property, including the unique (and uniquely valuable) Total Rewards program; and (iii) transferred to CES company-wide management services which it had previously provided to both CEOC and non-CEOC properties.

The figures below show a simplified structure of Caesars before and after the Four Properties Transaction.

---

[1991] From time to time, the Four Properties Transaction is also referred to in documents and testimony as "CGPII," "Project Positive" and "Project BBQ."  At the time of the Four Properties Transaction, CEC owned 100% of CEOC and, through two of its subsidiaries, a 58% economic interest in CGP with a 0% voting interest.  CAC owned a 42% economic interest in CGP with a 100% voting interest.  Confidential Information Memorandum (Mar. 2014), at CEC_EXAMINER_0095551 [CEC_EXAMINER_0095525].

[1992] In connection with the transaction, Caesars Growth Property Holdings, LLC, an indirect subsidiary of CAC, borrowed approximately $2 billion from a syndicate of banks that included Credit Suisse, Citibank, UBS and Deutsche Bank.  *See* CEC 8-K for the year ended Dec. 31, 2013 (Mar. 3, 2014), at 2.

**Four Properties Figure 1:  Corporate Structure Pre-Transaction**



**Four Properties Figure 2:  Corporate Structure Post-Transaction**



Special committees of independent directors of CEC and CAC negotiated certain key terms with respect to the Four Properties Transaction.  The evidence indicates, however, that Apollo played a role in the transaction, including with respect to conceptualizing the transaction, the selection of the transferred properties and the development and drafting of the CES and Total Rewards aspects of the transaction.  With regard to the creation of CES in particular, it appears that Apollo had independently begun working on the concept of a "bankruptcy-remote" shared services entity[1993] in late 2013 that would prevent a potential Chapter 11 filing by CEOC from jeopardizing the access enjoyed by *all* Caesars entities – including those at CERP and CGP – to the management services and intellectual property for which CEOC was then responsible.

The CEC Special Committee retained Centerview and D&P as financial advisors and to provide fairness opinions with respect to the Four Properties Transaction.  As discussed in

---

[1993]  According to Rowan, a bankruptcy-remote entity is one that "will exist in perpetuity" and is "not subject to cross-collateralization or creditor reach."  M. Rowan Nov. 17, 2015 Tr. at 352:13-22.

greater detail below, Centerview issued an opinion to the CEC Board and CEC Special Committee that, *inter alia*, the transaction was "fair from a financial point of view" to CEC, and (ii) the purchase price was "reasonably equivalent to the aggregate of the enterprise value" of the Four Properties and the value of the related management fee rights.[1994]    D&P issued an opinion to the CEC Special Committee and Boards of CEC and CEOC that, *inter alia*, the transaction was "on terms no less favorable to CEOC or such relevant restricted subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate" of CEC. [1995]    The CEC Special Committee and Board approved the transaction on February 24, 2014.

CEOC, which had no independent directors at the time, was not involved in the negotiations, did not establish its own special committee to evaluate the transaction, and did not have access to its own legal or financial advisors in connection with the transaction.  The CEOC directors who approved the transaction – Gary Loveman and Eric Hession – only did so via written consents *after* the transaction had been negotiated and the price had been set.[1996]

Creditors have asserted that the Four Properties Transaction was conceived and executed at a time when CEOC was insolvent as part of a scheme devised by the Sponsors to hinder, delay or defraud CEOC's creditors by separating Caesars into a "good Caesars" and a "bad Caesars" in order to preserve the Sponsors' equity interests and obtain leverage vis-à-vis CEOC creditors in anticipated restructuring negotiations.   They also contend that the process by which the transaction was approved was significantly flawed because, *inter alia*, (i) CEOC lacked its own independent special committee, as well as its own financial and legal advisors, to protect its interests in connection with the transaction, and (ii) the CEC Special Committee was not disinterested and independent vis-à-vis CEOC given CEC's majority ownership interest in CGP (the buyer).  Creditors further assert that CEOC did not receive fair or reasonably equivalent value for the assets because, *inter alia*, the final purchase price did not reflect (i) a fair price for the Four Properties, (ii) the value of Total Rewards (and CEOC's loss of control over its own IP) and transfer of company-wide management services, (iii) the undeveloped land transfers, and (iv) the diminution in CEOC's value as a result of CEOC's transformation from a large Las Vegas strip property owner to a regional gaming operator that owned only one Las Vegas destination property (Caesars Palace).  CEOC creditors also assert that the Four Properties Transaction was the product of flawed projections and financial analyses performed by Centerview and D&P.

For these reasons, among others, the creditors have identified potential claims that include:  (i) actual and constructive fraudulent transfer; (ii) breach of fiduciary duty (against

---

[1994]  Centerview    Partners    LLC    Fairness    Opinion    (Feb.    24,    2014),    at CEOC_INVESTIG_00171999 [CEOC_INVESTIG_00171994].

[1995]  D&P Fairness Opinion (Mar. 1, 2014), DP00002026 (native file), at 1.

[1996]  Hession replaced Michael Cohen on the CEOC Board in May 2014.  *See* E. Hession Nov. 3, 2015 Tr. at 264:21-265:3.

CEOC's directors and CEC); and (iii) aiding and abetting breach of fiduciary duty (against the Sponsors and certain of CEC's directors).[1997]

Creditors have stated that they are seeking avoidance of the fraudulent transfers and return of the properties and the Total Rewards IP.  They also assert that CEC, CAC and CGP may not qualify as good faith transferees, which would prevent them from retaining the value transferred and/or any appreciation in the value of the properties.  Caesars and the Sponsors dispute these allegations, arguing, *inter alia*, that the Four Properties Transaction was the product of arm's-length negotiations and constituted what they believed at the time was the best course of action to address CEOC's significant liquidity issues.  CEC and the Sponsors also contend that the goal of the Four Properties Transaction was to benefit all CEOC stakeholders, including its creditors, that the process was fair and that the consideration paid, given the fairness opinions obtained at the time and the subsequent performance of the properties, was fair.  CEC and the Sponsors also contend that the value of the undeveloped land that was transferred (which was used or earmarked for parking) was embedded in the purchase price.  Similarly, CEC and the financial advisors to the transaction contend that the value of Total Rewards to the Four Properties was embedded in the purchase price paid by CGP.

As noted above and discussed in greater detail below, the Examiner concludes that it is virtually certain that CEOC was insolvent at the time of the Four Properties Transaction.  The Examiner further concludes that Debtors' estates have (i) a strong claim for constructive fraudulent transfer,[1998] (ii) a strong claim for actual fraudulent transfer (albeit weaker than in the CERP and Growth Transactions), (iii) a strong claim for breach of fiduciary duty against CEOC's directors and CEC and (iv) a reasonable aiding and abetting breach of fiduciary duty claim against the Sponsors and certain of CEC's directors affiliated with Apollo.

## 2.  Background of the Four Properties Transaction

### a.  The Assets Sold to CGP

#### i.    The Cromwell

CEOC acquired the property now known as The Cromwell in 2007 from Boyd Gaming in an exchange transaction.[1999]  Then called the Barbary Coast, the property was renamed Bill's Gamblin' Hall & Saloon immediately following the acquisition.[2000]

In or around November 2012, Caesars commenced efforts to rebrand and renovate the property.[2001]  Caesars had initially pursued an agreement with the Gansevoort Hotel Group to

---

[1997]  To date, no claims against the CAC lenders have been identified by the creditors.

[1998]  This claim becomes even stronger when adding in the value of the 31 acres of undeveloped land and of the Total Rewards license and management services that were transferred to CES.

[1999]  Boyd Gaming Corp. 10-K for the year ended Dec. 31, 2007 (Feb. 29, 2008), at 1.

[2000]  Harrah's Entertainment, Inc. 10-K for the year ended Dec. 31, 2007 (Feb. 29. 2008), at 5.

[2001]  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 52.

rebrand Bill's Gamblin' Hall & Saloon as a Gansevoort property.  In late 2013, however, Caesars terminated its efforts to partner with Gansevoort and began the process of rebranding the property as The Cromwell.[2002]

On February 4, 2013, Bill's Gamblin' Hall and Saloon closed for approximately 15 months for redevelopment.[2003]  The renovations included a full remodel of all hotel rooms and the casino, an extension of the rooftop for a pool and day/nightclub, a renovated façade, a new parking garage and porte-cochere, and a new restaurant.[2004]  Opening in or around April 2014 as The Cromwell, the property's gaming floor featured 450 slot machines and 60 table games.[2005] Its 188 hotel rooms became available to guests starting in May 2014.[2006]

The property's renovation budget was forecasted to be $235 million,[2007] including a first-lien term loan of $185 million.[2008]  CEOC originated the loan and designated completion funds within The Cromwell entity, which were then assumed by and transferred to CGP in the asset sale.[2009]  The Cromwell was materially complete at the time the Four Properties Transaction closed.  Figure 3 below summarizes The Cromwell's historical and projected capital expenditures.

---

[2002] *See* e-mail from J. Garrison to D. Wilfong, *et al.* (Oct. 21, 2013), at CEOC_INVESTIG_00014752-53 [CEOC_INVESTIG_00014752].

[2003] Ron Sylvester, *From Barbary to Bill's: Sun sets today on Las Vegas relic*, Las Vegas Sun (Feb. 4, 2013).

[2004] *Id.*

[2005] CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 3.

[2006] *Id.*

[2007] CEC 8-K for the year ended Dec. 31, 2013 (Mar. 26, 2014), at 21.

[2008] "The Cromwell (f/k/a Bill's Gamblin' Hall & Saloon)" Presentation (Jan. 15, 2014), at CEOC_INVESTIG_00010240 [CEOC_INVESTIG_00010237].

[2009] "Project Positive Closing Documents" (May 5, 2014), at CEOC_INVESTIG_00251699 [CEOC_INVESTIG_00251171].

**Four Properties Figure 3: Bill's Gamblin' Hall & Saloon /
The Cromwell Capital Expenditures**

| amounts in millions | Bill's Gamblin' Hall & Saloon | | | Closed | The Cromwell | | | | |
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Historical (a) | $ ██ | $ ██ | $ ██ | $ ██ | $ ██ | $ ██ | | | |
| Projected - January Plan (b) | | | | | $ ██ | $ ██ | $ ██ | $ ██ | $ ██ |
| Projected - February Plan (b) | | | | | $ ██ | $ ██ | $ ██ | $ ██ | $ ██ |
| Projected - LRP (c) | | | | | $ ██ | | | | |

Sources:
(a) Historical capital expenditures per CAC, at CACEXAM00512644 [CACEXAM00512644] and at CAC EXAM00513069 [CACEXAM00513069].
(b) Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab 'Centerview Sensitivity' [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab 'Q1 LRP' [CEOC_INVESTIG_00162537] (native file).

While the historical performance of Bill's Gamblin' Hall and Saloon is not comparable to the projected performance of The Cromwell, Figure 4 below presents a summary of historical financial results for Bill's prior to the property closing for renovations in early 2013.

**Four Properties Figure 4: Bill's Gamblin' Hall & Saloon Historical Financial Performance**

| amounts in millions | Bill's Gamblin' Hall & Saloon | | | | | | Closed |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $ 49 | $ 57 | $ 52 | $ 51 | $ 53 | $ 51 | NM |
| EBITDA | $ 13 | $ 13 | $ 13 | $ 10 | $ 11 | $ 10 | NM |
| EBITDA Margin | 27% | 23% | 24% | 19% | 21% | 20% | |

Source: Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAM-INER_0145430] (native file).
Note: "NM" means Not Meaningful as property was closed for renovations on February 4, 2013.

### ii.    Bally's Las Vegas

Bally's Las Vegas originally opened in 1973 and benefits from a large convention business and a loyal customer base.[2010]   In 2013, Bally's Las Vegas completed a $32 million rolling renovation of all 756 rooms in its South Tower, rebranded as the Jubilee Tower.[2011]   As a result of the renovation, Bally's Las Vegas expected to increase ADR for the renovated rooms by $40 per unit, resulting in expected incremental EBITDA of $7.5 million annually.[2012]   CEOC fully paid for the South Tower renovation.

In addition, development of the Grand Bazaar, a third-party-owned and operated retail venue located on the Bally's Las Vegas property, commenced in late 2013 with a then-

---

[2010] Confidential Information Memorandum (Mar. 2014), at CEC_EXAMINER_0095584 [CEC_EXAMINER_0095525].

[2011] The South Tower represents more than 25% of the total rooms at Bally's Las Vegas. *Id.*

[2012] *Id.*

anticipated opening in late 2014.[2013]  Bally's Las Vegas received lease payments as well as increased foot traffic and improved food and beverage revenue in connection with the Grand Bazaar.[2014]  Figure 5 below demonstrates Bally's Las Vegas's historical and projected capital expenditures, reflective of the renovations.

**Four Properties Figure 5:  Bally's Las Vegas Capital Expenditures**

| amounts in millions | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Historical (a) | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ | | | |
| Projected - January Plan (b) | | | | | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| Projected - February Plan (b) | | | | | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| Projected - LRP (c) | | | | | $ ■ | | | | |

Sources:
(a) Historical capital expenditures per CAC (Undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b) Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab 'Centerview Sensitivity' [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).

The renovation of the South Tower, during which rooms were taken offline on a rolling basis, likely impacted Bally's Las Vegas's financial results during 2013.  Figure 6 below summarizes the historical results for Bally's Las Vegas.

**Four Properties Figure 6:  Bally's Las Vegas Historical Financial Performance**

| amounts in millions | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $ 376 | $ 336 | $ 264 | $ 257 | $ 271 | $ 260 | $ 252 |
| EBITDA | $ 88 | $ 93 | $ 77 | $ 66 | $ 77 | $ 64 | $ 63 |
| EBITDA Margin | 23% | 28% | 29% | 26% | 28% | 25% | 25% |

Source: Monthly   Actual   versus   Budget   Analysis   for   2007-Q1   2015,   at   Tab   'Summary' [CEC_EXAMINER_0145430] (native file).

### iii.  The Quad

In late 2005, Caesars acquired Imperial Palace for $370 million.[2015]  On December 21, 2012, Imperial Palace was rebranded The Quad as part of a $90 million initial renovation that was completed in December 2013.[2016]  A second large-scale renovation, which included, among other things, the hotel towers, pool, and certain entertainment venues[2017] was divided into two

---

[2013] *Id.*  The Grand Bazaar opened in 2015.

[2014] *Id.*

[2015] HET 8-K for the year ended Dec. 31, 2004 (Aug. 23, 2005), at 2.

[2016] Confidential Information Memorandum (Mar. 2014), at CEC_EXAMINER_0095582-83 [CEC_EXAMINER_0095525].

[2017] *Id.*

phases: (i) a $100 million first phase scheduled to be completed in 2014; and (ii) a $120 million second phase scheduled to be completed in 2015.[2018]

These renovations were aimed at (i) "reposition[ing] the Quad from a lower-tier product to one targeting younger guests and trend seekers"[2019] to a mid-tier destination property,[2020] and (ii) "substantially increas[ing] cash ADR levels and to appeal to the Las Vegas region's Generation X and Generation Y clientele."[2021]

On October 30, 2014, after completion of the first phase of renovations, The Quad was renamed The LINQ.[2022] As of the end of 2014, the property had 1,250 rooms under renovation and out of service.[2023] Figure 7 below sets forth The Quad's historical and projected capital expenditures, reflective of the renovation costs.

### Four Properties Figure 7:  The Quad Capital Expenditures

| amounts in millions | Imperial Palace | | | The Quad | | The LINQ | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| Historical (a) | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ | $ | | | |
| Projected - January Plan (b) | | | | | $ ▮ | $ ▮ | $ | $ ▮ | $ ▮ |
| Projected - February Plan (b) | | | | | $ ▮ | $ ▮ | $ | $ | $ ▮ |
| Projected - LRP (c) | | | | | $ | | | | |

Sources:
(a) Historical capital expenditures per CAC (Undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b) Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab 'Centerview Sensitivity' [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab 'Q1 LRP' [CEOC_INVESTIG_00162537] (native file).

Figure 8 below sets forth The Quad's financial results from 2007 through 2013.

---

[2018] "The Quad" Presentation (Jan. 15, 2014), at CEOC_INVESTIG_00010302 [CEOC_ INVESTIG_00010270].

[2019] Confidential Information Memorandum (Mar. 2014), at CEC_EXAMINER_0095583 [CEC_ EXAMINER_0095525]

[2020] J. Bosacco Sept. 15, 2015 Tr. at 188:23-25.

[2021] CGP estimated the impact of the Quad's full renovation to be $31 to $47 million in incremental EBITDAM. Confidential Information Memorandum (Mar. 2014), at CEC_EXAMINER_0095553 [CEC_EXAMINER_0095525].

[2022] Michelle Rindels, *Two Vegas resorts getting major makeovers*, The Seattle Times (Jul. 2, 2014).

[2023] CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31.

**Four Properties Figure 8:  The Quad Historical Financial Performance**

| amounts in millions | Imperial Palace | | | | | | The Quad |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Net Revenue | $  194 | $  178 | $  134 | $  125 | $  138 | $  119 | $  101 |
| EBITDA | $  62 | $  47 | $  31 | $  21 | $  37 | $  25 | $  13 |
| EBITDA Margin | 32% | 27% | 23% | 17% | 27% | 21% | 13% |

Source: Monthly   Actual   versus   Budget   Analysis   for   2007-Q1   2015,   at   Tab   'Summary'
[CEC_EXAMINER_0145430] (native file).

From 2011 to 2013, The Quad experienced a 27% decline in net revenue, which was significantly larger than the decline experienced by comparable Las Vegas properties. [2024]  CEC management attributed the decline to (i) the ongoing renovation of The Quad, and (ii) the construction of The LINQ outdoor shopping, dining and entertainment promenade and Observation Wheel.[2025]

The estimated revenue impact of The LINQ construction and The Quad renovation disruption was $26 million to $33 million by 2013, with an approximate EBITDA impact of $14 million to $25 million.[2026]  Combined with the incremental EBITDA anticipated from The Quad renovations, this represents total incremental EBITDA of $45 million to $72 million.[2027]

### iv.   Harrah's New Orleans

Harrah's New Orleans opened in 1999 and is the only land-based casino in Louisiana, attracting both tourists and locals.[2028]  In 2012 and 2013, Harrah's New Orleans earned more than 40% of its gaming revenue from tourists and achieved market share as high as 60% in 2013.[2029]

Figure 9 below summarizes Harrah's New Orleans' historical and projected capital expenditures.

---

[2024] "Confidential Information Memorandum" (Mar. 2014), at CEC_EXAMINER_0095556 [CEC_EXAMINER_0095525].

[2025] *Id.*

[2026] *Id.*

[2027] "Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421624, 00421650; [CEOC_INVESTIG_00421632]; *see also* Appendix 7, Valuation at Section  VIII.A.1.

[2028] Confidential Information Memorandum (Mar. 2014), at CEC_EXAMINER_0095585 [CEC_EXAMINER_0095525].

[2029] *Id*. at CEC_EXAMINER_0095585; "Caesars Growth Partners Presentation to Lenders" (Mar. 27, 2014), at CEOC_INVESTIG_00022512 [CEOC_INVESTIG_00022500].  Harrah's New Orleans has had ongoing capital spend and, beginning in or around early 2014, planned a hotel room renovation to be completed in 2016.

**Four Properties Figure 9:  Harrah's New Orleans Capital Expenditures**

| amounts in millions | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Historical (a) | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ | $ | | | |
| Projected - January Plan (b) | | | | | $ | $ ▮ | $ ▮ | $ ▮ | $ ▮ |
| Projected - February Plan (b) | | | | | $ | $ ▮ | $ ▮ | $ ▮ | $ ▮ |
| Projected - LRP (c) | | | | | $ | $ ▮ | | | |

Sources:
(a) Historical capital expenditures per CAC, at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b) Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab "Centerview Sensitivity" [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).

In late 2014, Harrah's New Orleans developed a plan to introduce "resort fees" that would add an additional $15 per room to current rates.[2030] According to certain estimates, this would increase EBITDA by approximately $1 million annually.[2031]

A summary of the historical results for Harrah's New Orleans beginning in 2007 is presented in Figure 10.

**Four Properties Figure 10:  Harrah's New Orleans Historical Financial Performance**

| amounts in millions | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $ 412 | $ 397 | $ 353 | $ 353 | $ 346 | $ 350 | $ 344 |
| EBITDA | $ 98 | $ 86 | $ 77 | $ 68 | $ 84 | $ 92 | $ 84 |
| EBITDA Margin | 24% | 22% | 22% | 19% | 24% | 26% | 25% |

Source: Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAMINER_0145430] (native file).

Figure 11 below provides a summary of the assets sold.

---

[2030] Confidential Information Memorandum (Mar. 2014), at CEC_EXAMINER_0095555 [CEC_EXAMINER_0095525].

[2031] Id. at CEC_EXAMINER_0095553.

**Four Properties Figure 11:  Summary of Assets Sold**

| Metric | The Quad | Bally's Las Vegas | The Cromwell | Harrah's New Orleans |
|---|---|---|---|---|
| Location | Las Vegas Strip | Las Vegas Strip | Las Vegas Strip | New Orleans, LA |
| Casino Space (sq. ft.) | 44,600 | 66,200 | 28,100 | 125,100 |
| Slot Machines | 760 | 1,000 | 450 | 1,820 |
| Table Games | 60 | 70 | 60 | 140 |
| Hotel Rooms | 2,550 | 2,810 | 188 | 450 |

Source:  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 17, 2014), at 30; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31.
Note:  The Quad's casino space increased to 62,200 sq. ft. by year end 2014.

Figure 12 below shows the location of the three Las Vegas strip properties that were part of the transaction.

**Four Properties Figure 12:  Overhead View of Las Vegas Properties**



###### v.    Undeveloped Land

Approximately 31 acres of unimproved adjacent land were transferred from CEOC to CGP along with the three Las Vegas properties, as shown in Figure 13 below.

**Four Properties Figure 13:  Overhead View of Undeveloped Land**



#### b.  Origin of the Four Properties Transaction

###### i.    CEC and the Sponsors Continue to Address CEOC's Ongoing Solvency Issues

Prior to the close of the Growth and CERP Transactions, CEOC's financial condition continued to deteriorate and the Sponsors, led by Apollo, and CEC had already begun considering (i) additional transactions to address CEOC's ongoing liquidity issues and better position their interests in the event of a restructuring or bankruptcy, and (ii) various debt refinancing options, all of which involved releasing all or part of CEC's guarantee of CEOC's bank and bond debt.[2032]    Apollo's own analyses at the time projected that, absent additional action, CEOC would effectively run out of money by the end of 2014 and needed to raise at least

---

[2032]  These transactions are discussed in greater detail below.

$1.7 billion to $2 billion to cover ongoing negative cash flows.[2033]  These analyses describe CEOC as an entity that certainly cannot pay its debts as they mature or refinance those debts without creditors accepting less than they were owed.

### ii.    Apollo Recognizes CEOC's Continuing Liquidity Problems in the Fall of 2013

By October 2013, Apollo realized that CEOC's financial performance was substantially worse than it had anticipated.[2034]  Specifically, on October 4, 2013, Apollo analyzed the equity positions of CEOC and CEC and, applying a "sum of the parts" analysis, determined that, from 2013 through 2015, CEOC's equity would range from negative $2.5 billion to negative $3.2 billion.[2035]  While Apollo updated this analysis multiple times between October 2013 and June 2014, it never reflected a positive equity value for CEOC and always reflected a negative CEOC cash flow.[2036]  This underperformance adversely impacted CEOC's liquidity profile and ability to meet its senior secured leveraged ratio ("SSLR") covenant.  According to Apollo, even though the Growth and CERP Transactions had created some additional runway for CEOC, immediate additional action was required to inject more liquidity into CEOC,[2037] which was projected to "run out of cash" in 2014.[2038]  The sum-of-the parts analysis also stated that CEOC had negative equity value with debt greater than its enterprise value.[2039]

### iii.    Apollo Contemplates Selling Additional CEOC Assets

As discussed below, while Apollo understood as early as June 2012 that CEOC would likely need to sell certain of its assets in 2014, Apollo realized, by the fall of 2013, that immediate action was necessary to inject additional liquidity into CEOC.  On October 18, 2013, Sambur sent an internal e-mail attaching a draft presentation for the CEC Board with EBITDA

---

[2033]    *See, e.g.*, "Caesars Entertainment Discussion Materials" (Nov. 2013), at APOLLO-Examiner_00663445-46 [APOLLO-Examiner_00663444].

[2034]    D. Sambur Oct. 29, 2015 Tr. at 452:5-458:7; e-mail from D. Sambur to C. D'Amore (Oct. 18, 2013), [CEOC_INVESTIG_00338349], attaching "CZR Model Outputs Revised" (Oct. 17, 2013), [CEOC_INVESTIG_00338350] and "CEOC: Discussion Materials" (Oct. 2013), CEOC_INVESTIG_00338354-63 [CEOC_INVESTIG_00338354].

[2035]    This analysis assumed a 12.0x EBITDA multiple.  *See* "CEOC Sum-of-the-Parts Recovery Analysis" (Oct. 4, 2013), at Tab "SOTP" [APOLLO-Examiner_01510733].

[2036]    *See id.*; "Caesars Analysis Back-Up" (Nov. 17, 2013) [PRIV_INVESTIG _00036043] (native); "Caesars Analysis Back-Up" (Dec. 19, 2013) [APOLLO-Examiner_01509714] (native); "Caesars Analysis Back-Up" (Jan. 29, 2014) [APOLLO-Examiner_01506523] (native); "Caesars Analysis Back-Up" (June 10, 2014) [APOLLO-Examiner_01507159] (native).

[2037]    D. Sambur Oct. 29, 2015 Tr. at 425:1-16; M. Rowan Nov. 17, 2015 Tr. at 318:16-319:5.

[2038]    *See* "Caesars Entertainment Discussion Materials" (Nov. 2013), at APOLLO-Examiner _00663445-47 [APOLLO-Examiner_00663444].

[2039]    "CEOC Sum-of-the-parts Recovery Analysis" (Oct. 4, 2013), [APOLLO-Examiner_01510733].

projections based on assumptions that included a sale of (i) The Quad in the first quarter of 2014, and (ii) the Gansevoort (later renamed The Cromwell) in the second quarter of 2014.[2040]

The draft presentation further noted that: (i) "projected financials, particularly as it relates to CEOC and covenant leverage, are significantly lower now vs. the BoD liquidity review in February 2013"; (ii) "[p]rojected CEOC covenant issues have arisen recently in light of a significant decrease in the Company's projected CEOC EBITDA vs. early 2013"; and (iii) the "current base case model projects CEOC covenant issues by H2 2014."[2041]   The draft presentation also acknowledged that "[u]nder the status quo, CEOC is significantly free cash flow negative through 2015+" and that "[t]his is the driving factor for projected pressure on CEOC's [SSLR] as well as Caesars' consolidated liquidity."[2042]

In mid-November 2013, Apollo prepared materials for CEC management to "frame some thoughts around liquidity and asset sales to alleviate potential liquidity shortfalls at CEOC."[2043] As set forth in the reproduced pages below, Apollo projected, among other things, that (i) CEOC was going to run out of cash by the fourth quarter of 2014, and (ii) approximately $1.7 billion of cash inflows was required for CEOC to be cash flow positive.[2044]

---

[2040] E-mail from D. Sambur to C. D'Amore (Oct. 18, 2013), CEOC_INVESTIG_00338349 [CEOC_INVESTIG_00338349], attaching "CZR Model Outputs Revised" [CEOC_INVESTIG_00338350]; "CEOC: Discussion Materials" (Oct. 2013) CEOC_INVESTIG_00338354-63 [CEOC_INVESTIG_00338354].

[2041] "CEOC: Discussion Materials" (Oct. 2013), at CEOC_INVESTIG_00338357 [CEOC_INVESTIG_00338354].

[2042] Id. at CEOC_INVESTIG_00338358.

[2043] E-mail from A. van Hoek to D. Colvin, et al. (Nov. 19, 2013), [PRIV_INVESTIG_00023394], attaching "Caesars Entertainment Discussion Materials" (Nov. 2013), at PRIV_INVESTIG_00023394 [PRIV_INVESTIG_00023395]; see also E. Hession Nov. 3, 2015 Tr. at 249:8-250:9; A. van Hoek Jan. 26, 2016 Tr. at 350:9-352:4 (this deck was prepared "recognizing that CEOC did have a liquidity hole and that without some type of, you know, corrective actions or other actions . . . CEOC . . . would run out of money.").

[2044] "Caesars Entertainment Discussion Materials" (Nov. 2013), at PRIV_INVESTIG_00023396 [PRIV_INVESTIG_00023395]. This presentation further provides that: (i) CEOC required an additional "$2.2 billion to repay 51% of credit facility at par," thus, "$3.9 billion is required (plus a cushion for liquidity)"; and (ii) "CEOC is significantly cash flow negative through 2016. And this is the driving factor for projected pressure on the SSLR." Id. at PRIV_INVESTIG_00023397-403.

**Four Properties Figure 14:  Excerpt 1 from November 2013 CEC Discussion Materials**

## Background

Privileged and Confidential

- CEOC has $1.8bn of cash today (including proceeds listed below)
    - Less $350mm min cash, leaves ~$1.5 billion liquidity
    - This is after receipt of $420mm Macau proceeds, $360mm in CGP asset sale proceeds, and $125mm of Punta sale proceeds
    - Coupon payments ($430mm) and repayment of intercompany loan in Q4 2013 are expected to reduce year-end liquidity to ~$900mm
- CEOC has $2.1-$2.3 billion of fixed charges, as outlined below (see appendix for capex detail)
- CEOC is projected to be $1,100mm negative FCF in 2014 and $700mm in 2015, as per below, excluding existing debt maturities
- Thus, CEOC is projected to run out of cash during Q4 of 2014, absent other actions
- Simply put, to offset this burn, about $1.7 billion of cash inflows are required

| CEOC Free Cash Flow and Liquidity | | | |
|---|---|---|---|
| ($ in millions) | 2014E | 2015E | 2016E |
| EBITDA | $1,273 | $1,340 | $1,352 |
| (-) Capital expenditures | (499) | (258) | (260) |
| (-) Net interest expense | (1,773) | (1,710) | (1,756) |
| (-) Cash taxes | 0 | 0 | 0 |
| (-) Sponsor management fees | 0 | 0 | 0 |
| (-) Non-operating cash flows | (23) | (40) | (14) |
| (-) Insurance captive contributions | (57) | (57) | (57) |
| CEOC FCF pre-maturities | ($1,079) | ($725) | ($735) |
| Memo: fixed charges (i.e. FCF excl. EBITDA) | ($2,353) | ($2,065) | ($2,087) |
| Memo: mandatory debt repayment | ($42) | ($1,026) | ($2,004) |
| | 12/31/13E | 12/31/14E | 12/31/15E | 12/31/15E |
| Memo: CEOC liquidity | $927 | ($194) | ($1,154) | ($1,909) |

**Four Properties Figure 15:  Excerpt 2 from November 2013 CEC Discussion Materials**

## How Much Cash is Needed?

<div align="right">Privileged and<br>Confidential</div>

- Prior page establishes that $1.7 billion is needed to just maintain positive liquidity
  - More is required to build a cushion
- $2.2 billion to repay 51% of credit facility at par
- Thus approximately $3.9 billion is required (plus a cushion for liquidity)

| CEOC Cash Requirement | 12/31/14 | 12/31/15 | 12/31/16 |
|---|---|---|---|
| CEOC Liquidity | ($194) | ($1,154) | ($1,909) |
| Interest Savings on $2.2bn of Bank Debt | | 110 | 220 |
| Net Liquidity Required | | ($1,044) | ($1,689) |
| 51% of Credit Facility | | ($2,200) | ($2,200) |
| Asset Sale Proceeds Needed | | $3,244 | $3,889 |
| Memo: Annual 2L interest expense | $570 | $564 | $546 |
| Cumulative 2L coupons | | 1,134 | 1,680 |

<div align="right">3</div>

    As set forth in the following reproduced pages from the presentation, Apollo listed two "potential sources" of "at least $1.7 billion" in liquidity:  debt issuance and asset sales.[2045]

---

[2045] "Caesars Entertainment Discussion Materials" (Nov. 2013), at PRIV_INVESTIG_00023398 [PRIV_INVESTIG_00023395].  According to Kranias, the Four Properties Transaction was not conceived by TPG, but was possibly conceived by Apollo.  G. Kranias Oct. 23, 2015 Tr. at 196:23-197:15.

**Four Properties Figure 16:  Excerpt 3 from
November 2013 CEC Discussion Materials**

## Potential Sources of Liquidity

<div align="right">Privileged and
Confidential</div>

---

- Having established that CEOC has a liquidity need of at least $1.7 billion, what are practical options to generate that liquidity?

    1. **Debt issuance**

        - CEOC has over $1 billion of 1L capacity

            - It is unclear if CEOC can access debt capital markets, however

            - In addition, we are aiming to reduce leverage and interest expense at CEOC; incremental debt issuance is counter to that goal

    2. **Asset sales**

        - Asset sales allow Caesars to generate significant upfront liquidity as well as relief from ongoing capital requirements                   .

        - Additionally, a sale to CGP would allow Caesars to maintain (i) upside through majority ownership of CGP, (ii) the ability to call the assets back in the future, (iii) continued integration with the Caesars operating system and related synergies, and (iv) the potential for material management fees to Caesars

            - Potential transaction with CGP is consistent with the purposes for which CGP was established

    - The goal is to give ourselves enough liquidity to get by so that we can address balance sheet, interest expense and deleveraging going forward

---

According to Apollo and CEC management, debt issuance was a less viable option because of uncertainty regarding whether CEOC could access debt capital markets (which would add to its existing debt) and because Caesars was aiming to reduce leverage and interest expense at CEOC.[2046]  It was their view that an asset sale, would allow Caesars to generate significant upfront liquidity as well as relief from ongoing capital requirements with respect to those assets.[2047]  Apollo further noted in the presentation materials that selling CEOC assets to CGP was one of the reasons that CGP was created.[2048]

As set forth below, Apollo, in consultation with CEC management, listed The Gansevoort (later rebranded as The Cromwell), The Quad, Bally's Las Vegas and Harrah's New Orleans as "assets [that] should provide approximately $1.7 billion of proceeds to CEOC."[2049]

---

[2046]  "Caesars Entertainment Discussion Materials" (Nov. 2013), at PRIV_INVESTIG_00023398 [PRIV_INVESTIG_00023395].

[2047]  *Id.*

[2048]  *Id.*

[2049]  *Id.* at PRIV_INVESTIG_00023399.   D. Sambur Oct. 29, 2015 Tr. at 423:25-424:20 (selection of the Four Properties was "a collective decision" that involved Apollo, TPG and CEC management).  Hession recalls being asked by Apollo to provide a list of potential assets that would be prime sale candidates.  E. Hession Nov. 3, 2015 Tr. at 252:18-253:2.  He did not recall placing Harrah's New Orleans on the list.  *Id.* at 253:6-11.

**Four Properties Figure 17:  Excerpt 4 from November 2013 CEC Discussion Materials**

## Potential Asset Sales

Privileged and Confidential

- Selected potential asset sales are listed below

- These assets comprise $271mm of CEOC EBITDA or ~20% of CEOC's 2013E EBITDA

  - Please refer to Appendix for list of all operating properties

- These assets should provide approximately $1.7 billion of proceeds to CEOC

### Potential Asset Sale Proceeds

| Property | EBITDA | Mult | TEV | Less: Existing Debt | Proceeds to CEOC | PF Leverage Multiple | Debt | Addtl. Debt | Cash Equity Required |
|---|---|---|---|---|---|---|---|---|---|
| Gansevoort | $40 | 8.00x | $320 | $185 | $135 | 6.0x | $240 | $55 | $80 |
| Quad | 60 | 8.00x | 480 | 170 | 310 | 6.0x | 360 | 190 | 120 |
| Bally's Las Vegas | 78 | 8.00x | 621 | 0 | 621 | 6.0x | 466 | 466 | 155 |
| Harrah's New Orleans | 93 | 7.00x | 654 | 0 | 654 | 6.0x | 561 | 561 | 93 |
| | $271 | 7.66x | $2,076 | $355 | $1,721 | | $1,627 | $1,272 | $449 |

In a November 19, 2013 e-mail to Donald Colvin, Eric Hession and Michael Cohen, cc'ing Sambur, that attached these materials, Alex van Hoek wrote that he wanted to make sure that CEC management was "on the same page" before Apollo took the "next steps on this front."[2050]  On November 20, 2013, Colvin wrote an e-mail to Hession asking whether there was any "news" regarding the potential asset sale.[2051]  Hession responded that "Apollo and TPG appear to be on the same page (a big hurdle down)" and that "[b]oth recognize we need to move very quickly."[2052]  He added that CEC is "preparing asset sale options" and that "[e]veryone agrees we should do this."[2053]

On November 22, 2013, van Hoek sent an e-mail to Greg Ezring and Brian Finnegan to discuss "the nature of the CEC BoD consent to get the asset sale process rolling" by "empowering a CEC Special Committee to "target $1.5-$2.0 billion of asset sale proceeds."[2054]

---

[2050]  E-mail from A. van Hoek to D. Colvin, *et al.* (Nov. 19, 2013), PRIV_INVESTIG_00023394 [PRIV_INVESTIG_00023394].

[2051]  E-mail from D. Colvin to E. Hession (Nov. 20, 2013), at CEOC_INVESTIG_00101668 [CEOC_INVESTIG_00101667].

[2052]  *Id.* at CEOC_INVESTIG_00101667-68.

[2053]  *Id.* at CEOC_INVESTIG_00101667.

[2054]  E-mail from A. van Hoek to G. Ezring, *et al.* (Nov. 22, 2013), CEC_EXAMINER_0526030 [CEC_EXAMINER_0526030].

### iv.    CEC's Seven-Step Plan

CEC, like Apollo, prepared its own analysis regarding a potential plan to address CEOC's recognized liquidity issues.[2055]  In a November 20, 2013 e-mail from Daniel Thaler, a CEC financial analyst, to Hession, Thaler summarized a "sequence of [potential] CEOC transactions" as part of a seven-step plan, where many of the steps aligned with what later became both the Four Properties and B-7 Transactions.[2056]  This plan included:  (i) the issuance of a new term loan and amendment of the credit agreement; (ii) asset sales to CGP, including the Quad, Bill's Las Vegas and Bally's Las Vegas; (iii) a small issuance of an outside equity stake in CEOC; (iv) the issuance of a $1 billion term loan; (v) a second lien debt repayment and exchange offer; (vi) a CGP joint venture with IT assets and Total Rewards (which would yield $300 million for CEOC and avoid $100 million in capital expenditures); and (vii) other transactions that included the issuance of additional CZR equity and transactions with CGP bonds.[2057]  Hession testified that these were a series of steps, "some more speculative than others," that Caesars could employ to help generate liquidity for CEOC.[2058]

That same day, November 20, Hession responded via e-mail to Thaler, stating:  "I attached some analysis that Alex [van Hoek] put together.  I have Jackie [Beato] reviewing the slides for the next step, but we should discuss if our assumptions are not similar to his.  Based on what I was discussing with Rob [Brimmer] on the plane yesterday, we are in the same ball park."[2059]

### v.    The CEC Board Is Advised of the Need for Immediate Action

At a November 26, 2013 CEC Board meeting, CEC management, following its discussions with Apollo, updated the CEC Board regarding CEOC's deteriorating financial condition and steps necessary to address its liquidity issues, presenting many of the same

---

[2055]  E-mail from E. Hession to D. Colvin (Nov. 26, 2013), at CEOC_INVESTIG_00109569 [CEOC_INVESTIG_00109569], attaching "Transactions Summary & Impact" (Nov. 20, 2013), at CEOC_INVESTIG_00109570-71 [CEOC_INVESTIG_00109570]; e-mail from E. Hession to D. Thaler, *et al.* (Nov. 20, 2013), at CEOC_INVESTIG_00009802 [CEOC_ INVESTIG_00009802], attaching "Caesars Entertainment Discussion Materials" Presentation (Nov. 2013), at CEOC_INVESTIG_00009803-18 [CEOC_INVESTIG_00009803].

[2056]  *See* e-mail from D. Thaler to E. Hession, *et al.* (Nov. 20, 2013), at CEOC_ INVESTIG_00109569 [CEOC_INVESTIG_00109569].

[2057]  "Transactions Summary & Impact" (Nov. 20, 2013), at CEOC_INVESTIG_00109570-71 [CEOC_INVESTIG_00109570].

[2058]  E. Hession Jan. 20, 2016 Tr. at 650:23-651:14.  *See also* R. Brimmer Jan. 20, 2016 Tr. at 423:19-424:5.

[2059]  E-mail from E. Hession to D. Thaler, *et al.* (Nov. 20, 2013), at CEOC_INVESTIG_00009802 [CEOC_INVESTIG_00009802].

analyses that were in the earlier Apollo analyses, but indicating that $2 billion of cash flows were required to deal with cash shortfalls through 2016 excluding debt maturities.[2060]

<div align="center">

**Four Properties Figure 18:  Excerpt from
Liquidity Discussion Board of Directors Materials**

</div>

## Liquidity Overview

- CEOC has $1.7bn[(1)] of cash pro forma for $364mm of remaining Macau proceeds
- Minimum cash (including cage cash) is ~$310mm and available revolver capacity is ~$115m[(2)], leaving ~$1.5 billion of liquidity
- Coupon payments ($430mm) in December 2013 are expected to reduce year-end liquidity to ~$1.1bn
- CEOC has $2.1-$2.3 billion of fixed charges, as outlined below (see appendix for capex detail)
- CEOC is projected to be $1,100mm negative FCF in 2014 and $700mm in 2015 and 2016, excluding existing debt maturities
- ***Absent other actions, CEOC is projected to run out of cash during Q4 of 2014***
- To offset this burn through 2016, approximately $2.0 billion of cash inflows are required plus a reasonable cushion

| CEOC Free Cash Flow and Liquidity | | | |
|---|---|---|---|
| ($ in millions) | 2014E | 2015E | 2016E |
| EBITDA (Restricted; excl. Bill's, Chester, etc.) | $1,275 | $1,345 | $1,358 |
| (-) Capital expenditures | (499) | (261) | (262) |
| (-) Net interest expense | (1,775) | (1,708) | (1,752) |
| (-) Cash taxes | - | - | - |
| (-) Sponsor management fees | - | - | - |
| (-) Non-operating cash flows | (23) | (40) | (14) |
| (-) Insurance captive contributions | (57) | (57) | (57) |
| CEOC FCF pre-maturities | ($1,079) | ($721) | ($727) |
| Memo: fixed charges (i.e. FCF excl. EBITDA) | ($2,354) | ($2,066) | ($2,085) |
| Memo: mandatory debt repayment | ($85) | ($1,086) | ($2,068) |

| | 12/31/13E | 12/31/14E | 12/31/15E | 12/31/16E |
|---|---|---|---|---|
| Memo: CEOC liquidity with no action | $1,114 | ($180) | ($1,195) | ($2,006) |

Thus, CEC management advised the Board that, absent immediate action, CEOC was "projected to be $1.100mm negative FCF in 2014" and $700 million in negative cash flow in 2015 and 2016, all without considering maturing debt of those years. [2061]   To offset this cash

---

[2060] "Caesars Entertainment Corporation Meeting of the Board of Directors" (Nov. 26, 2013), at CEOC_INVESTIG_00126808 [CEOC_INVESTIG_00126808]; "Liquidity Discussion Board of Directors Materials" (Nov. 2013), CEOC_ INVESTIG_00172963 (native file).  Colvin delivered the November 26, 2013 presentation on behalf of CEC management.  He stated that "often [his] team would work with [Apollo]" to prepare these types of presentations.  D. Colvin Tr. at 160:22-163:13.  According to Kranias, the Four Properties Transaction was first brought to TPG's attention at the November 26, 2013 CEC Board  meeting.  *See* G. Kranias Oct. 23, 2015 Tr. at 196:23-197:15.

[2061] "Liquidity Discussion Board of Directors Materials" (Nov. 2013), CEOC_ INVESTIG_00172963 (native file), at 2.

burn, $2 billion in additional cash would be required "plus a reasonable cushion."[2062]   CEC management further advised the Board that debt issuance and asset sales were two potential options to "give CEOC enough liquidity runway to allow [CEC] to address balance sheet, interest expense, and deleveraging going forward."[2063]

This presentation cautioned that "[p]lugging the liquidity gap is only one-step of what will have to be a multi-pronged approach to solving CEOC's balance sheet."[2064]   According to CEC management, such further steps might include seeking amendments to existing CEOC debt agreements, selling a percentage of CEOC equity, and pursuing debt exchanges and debt-for-equity transactions.[2065]   CEC management noted, however, that "[g]iven the complexity, risk and cost of executing some of the[se] options . . . it would be prudent to obtain additional liquidity cushion in the near term."[2066]

After discussing with the CEC Board the merits of various options to provide additional liquidity to CEOC, Colvin and Paul Weiss advised the CEC Board to "convene an independent committee to explore raising $1.7 - $2.2bn of additional liquidity through asset sales."[2067]   CEC management identified the Four Properties as "prime sale candidates" because:

---

[2062] *Id.*  An earlier draft of this presentation stated that CEOC is "projected to run out of cash during Q4 of 2014, absent other actions."  "Caesars Entertainment Discussion Materials" Presentation (Nov. 2013), CEC_EXAMINER_1302147 (native file), at 2.

[2063] "Liquidity Discussion Board of Directors Materials" (Nov. 2013), CEOC_INVESTIG_00172963 (native file), at 3.

[2064] *Id.* at 5.  According to CEC and certain members of its Board, proceeds from the Four Properties Transaction would only take CEOC through August 2016 absent other actions.  *See* F. Kleisner Oct. 30, 2015 Tr. at 33:5-17.

[2065] "Liquidity Discussion Board of Directors Materials" (Nov. 2013), CEOC_INVESTIG_00172963 (native file), at 5.  These options are also set forth in CEC's December 2013 Regulatory Discussion Materials.  "Caesars Entertainment Regulatory Discussion Materials" (Dec. 2013), CEC_EXAMINER_0004181 (native file), at 27-28.  According to Sambur, as reflected in the December 2013 Regulatory Discussion, one of the "options" under consideration – but ultimately not pursued – was the sale of 25% of equity of CEOC, which, Sambur stated, would have likely resulted in CEC being released from its guarantee.  D. Sambur Oct. 29, 2015 Tr. at 435:6-437:10.  Sambur further stated that CEC did engage in discussions to pursue exchanges for the second lien and unsecured bonds.  *Id*. at 438:20-439:7.

[2066] "Liquidity Discussion Board of Directors Materials" (Nov. 2013), CEOC_INV-ESTIG_00172963 (native file), at 5 (emphasis removed).

[2067] *Id*. at 4; "Caesars Entertainment Corporation Meeting of the Board of Directors" (Nov. 26, 2013), CEOC_INVESTIG_00126808-09 [CEOC_INVESTIG_00126808].  The November 2013 Liquidity Discussion presentation assumes an EBITDA multiple range of 8.0-10.0x for The Cromwell, The Quad, and Bally's Las Vegas and 6.0-10.0x for Harrah's New Orleans.  "Liquidity Discussion Board of Directors Materials" Presentation (Nov. 2013), CEOC_INVESTIG_00172963 (native file), at 12.  Jacqueline Beato described these multiples as

(i) the Las Vegas assets (*i.e.*, The Quad, The Cromwell, and Bally's Las Vegas) "are high quality operating assets that require significant capital expenditures to complete and/or fully realize their high growth potential";

(ii) Harrah's New Orleans is a "large asset in a stable market with no near-term new competition";

(iii) a "sale to CGP would be beneficial, as it would allow continued integration with the Caesars operating system and related synergies"; and

(iv) "[t]here are restrictions to the use of asset sale proceeds per the CEOC debt documents, which require reinvestment of proceeds in capex or repayment of first lien debt at par."[2068]

While the properties were purportedly selected, at least in significant part, because they required substantial capital expenditures, the evidence indicates that, at this juncture, only The Quad and The Cromwell had any significant planned capital expenditures.[2069]   CEOC had just recently refurbished a major tower at Bally's Las Vegas and CGP has spent only $26 million in capital improvements at that property since the transaction.[2070]   Likewise, Harrah's New Orleans had limited planned capital expenditures in 2014 and 2015 and CGP has only made $16 million in capital expenditures at the property since the acquisition.[2071]   With respect to The Cromwell, CEOC originated the loan for redevelopment, which was then assumed by and transferred to CGP in the asset sale, and the renovations were materially complete at the time of the closing for the Four Properties Transaction.[2072]   Likewise, The Quad was sold prior to the completion of its renovations and the closing documents for the Four Properties Transaction provided for CGP to have a maximum renovation expense of $223.1 million for the renovation, with overage of up to 15% to be covered by CEOC.[2073]

---

"conservative," indicating that most Las Vegas analysts would use a 10.0x multiple for Las Vegas and 7.0-8.0x for regional.  J. Beato Sept. 24, 2015 Tr. at 253:8-21.

[2068] "Liquidity Discussion Board of Directors Materials"   (Nov. 2013), CEOC_INV-ESTIG_00172963 (native file), at 4.  According to Cohen, these properties were also selected because "Nevada was a jurisdiction you could generally get a regulatory approval rather quickly. Louisiana as well."  M. Cohen Oct. 16, 2015 Tr. at 235:24-236:3.

[2069] *See*, *e.g.*, J. Bosacco Sept. 15, 2015 Tr. at 97:14-23; 125:4-22; "Liquidity Discussion Board of Directors Materials" (Nov. 2013), CEOC_INVESTIG_00172963 (native), at 15.

[2070] *See* Four Properties Figure 5, *supra*.

[2071] *See* Four Properties Figure 9, *supra*.

[2072] "Project Positive Closing Documents" (May 5, 2014), at CEOC_INVESTIG_00251699 [CEOC_INVESTIG_00251171].

[2073] *Id.* at CEOC_INVESTIG_00251203 and CEOC_INVESTIG_00251261.

Moreover, the descriptions of the properties that CGP described to its lenders did not convey that the assets to be sold required significant capital expenditures. Specifically, CGP indicated:

- CGP will own "a collection of well-positioned assets in destination markets with diverse revenue streams and significant near-term upside."[2074]

- The properties are "irreplaceable properties located at the center of the Las Vegas Strip and downtown New Orleans."[2075]

- The properties are "strategically located assets" benefitting from tremendous foot traffic (20 million people annually) on the east side of the Strip which was expected to increase upon the opening of The LINQ.[2076]

- The Las Vegas market is strong, with 2013 gaming and lodging performance at or near post-recession highs.[2077]

- The free cash flow generating capacity for the properties is "strong and predictable," with "low maintenance capex requirements."[2078]

Accordingly, one of the stated rationales for the transaction – selling properties that were in need of significant capital expenditures that CEOC could ill-afford – appears to be overstated.

### vi.   Caesars' and the Sponsors' Views on CEOC's Financial Position

Despite what they acknowledge were CEOC's pressing liquidity issues, the Sponsors and CEC maintain that they did not, at any time prior to or during Four Properties sales process beginning in late 2013, believe that CEOC was insolvent or that a large-scale asset transfer to

---

[2074] "Caesars Growth Partners Presentation to Lenders" (Mar. 27, 2014), at CEOC_INVESTIG_00022504 [CEOC_INVESTIG_00022500].

[2075] *Id.* at CEOC_INVESTIG_00022510.

[2076] *Id*.

[2077] *Id.* at CEOC_INVESTIG_00022511.

[2078] *Id.* at CEOC_INVESTIG_00022518.

CGP would render CEOC insolvent.[2079]  Nor did they ever request or receive a solvency opinion with respect to CEOC.[2080]

As set forth below, however, CEOC was almost certainly insolvent years prior to even the Growth and CERP Transactions and there was ample evidence putting the Sponsors and Caesars executives on notice of that fact.  Moreover, as detailed in Section VIII.A, *supra*, there is evidence that the Sponsors and CEC had recognized a CEOC bankruptcy as a real, albeit undesired, possibility at least by mid-2012[2081] and that, by late 2012, Apollo, in particular, was focused on enhancing the Sponsors' and CEC's position in the event of a CEOC bankruptcy or restructuring through a series of transactions that would allow CEC to maintain indirect ownership of key assets.[2082]

---

[2079]  CEC did, however, acknowledge that an asset sale would reduce CEOC EBITDA, "eventually pressuring the SSLR, so any asset sales should take into consideration an integrated strategy to address CEOC's balance sheet."  "Liquidity Discussion Board of Directors Materials" Presentation (Nov. 2013), CEOC_INVESTIG_00172963 (native file), at 3; *see also* F. Kleisner Oct. 30, 2015 Tr. at 111:23-112:15.  Further, Rowan stated that, in early 2014, he became "concerned about [CEOC's] solvency."  M. Rowan Nov. 17, 2015 Tr. at 371:14-24.

[2080]  D. Sambur Oct. 29, 2015 Tr. at 417:18-23 ("Q. [D]o you recall whether . . . as a result of these numbers, there being any discussion with anybody as to whether as a technical matter, CEOC was insolvent? A. No."); *id.* at 485:4-9 (Q. When Deloitte raised the going concern issue, did that cause you to have any discussions with anybody as to whether when we have a going concern issue, do we have to look at the solvency of CEOC?  A. No."); G. Kranias Oct. 23, 2015 Tr. at 204:5-7 (Kranias was not concerned about the reduction in CEOC's EBITDA that might result from a transaction because "over the course of time we had gotten various amendments to the credit facility to deal with the covenant issue and I operated under the assumption that we would continue to go out and get amendment to deal with the covenant."); K. Davis Oct. 22, 2015 Tr. at 186:6-24; J. Beato Sept. 24, 2015 Tr. at 187:13-188:11; G. Loveman Oct. 27, 2015 Tr. at 225:20-25 ("Q. . . . Do you recall in connection with this transaction being given any advice about obligations to creditors, solvency, fraudulent conveyance, or anything of the like? A. No."); *id*. at 78:15-79:5.

[2081]  There is also evidence that these bankruptcy concerns continued through 2014.  *See, e.g.*, e-mail from M. McLellan to R. Brimmer, *et al.* (Feb. 4, 2014), at CEC_EXAMINER_0130915 [CEC_EXAMINER_0130914] ("CGP enables us to raise capital for and inject our own capital into growth areas of our business and protect them from insolvency given $20B+ in debt."); e-mail from J. Thomas to J. Chan, *et al.* (Sept. 2, 2014), at CEC_EXAMINER_0027874 [CEC_EXAMINER_0027873] ("One of the misunderstandings that continues to impact our reputation is that CZR has claim over CGP's assets in an extraordinary event. . . . Could we add one slide [about] how our recent actions have isolated credit risk to specific entities (*i.e.*, CEOC)?"); e-mail from N. Filippelli to J. Beato (Sept. 22, 2013), at CEOC_INVESTIG_00050966 [CEOC_INVESTIG_00050966] ("In the event of a CEOC bankruptcy, how would Octavius function vis-à-vis Caesars Palace Las Vegas""?).

[2082]  "Caesars Entertainment Discussion Materials" Presentation (Sept. 2012), at APOLLO-Examiner_00523751-801[APOLLO-Examiner_00523751]; "Caesars Entertainment Discussion

### c.   Formation of the CEC Special Committee

### i.   Selection of CEC Special Committee Members

At the conclusion of the November 26, 2013 CEC Board meeting, the CEC Board unanimously approved the formation of a special committee consisting of independent CEC directors Fred Kleisner[2083] and Lynn Swann to evaluate a transaction involving the sale of one or more of The Quad, The Cromwell, Bally's Las Vegas, and Harrah's New Orleans to CGP.[2084] As discussed below, no consideration was given to forming a special committee of independent CEOC directors.

It appears that, in forming the CEC Special Committee, CEC was motivated by the same concerns that led to the formation of the Valuation Committee in connection with the Growth Transaction – insulating the CEC Board and Sponsors from potential claims by CEC shareholders (not by creditors or other stakeholders of CEOC).[2085]  This concern apparently arose out of the fact that the Sponsors and CEC stood on both sides of the transaction.[2086]  At the same

---

Materials" Presentation (Oct. 2012), at APOLLO-Examiner_00030861-918 [APOLLO-Examiner_00030861].

[2083]  Kleisner became a member of CEC's Board in July 2013 and is also a member of its Audit Committee.  Kleisner has served as a Senior Advisor of Morgans Hotel Group Co. since 2006, the President and Chief Executive Officer of Hard Rock Hotel Holdings LLC from December 2007 through March 2011, and also the President and Chief Executive Officer of Morgans Hotel Group Co. from September 2007 through April 2011.  He has also served in management positions with Rex Advisors, LLC, Wyndham International, Inc., and Starwood Hotels & Resorts Worldwide, Inc., Westin Hotels and Resorts, Interstate Hotels Company, The Sheraton Corporation, and Hilton Hotels.  Since 2011, Kleisner has served on the Board of Directors of Apollo Residential Mortgage, Inc., an indirect subsidiary of Apollo Global Management, LLC. He also served as an inside director of Wyndham International during the time Marc Rowan served as an outside director of that company.  *See* F. Kleisner Oct. 30, 2015 Tr. at 9:7-21, 11:19-12:18.

[2084]  "Caesars Entertainment Corporation Meeting of the Board of Directors" Presentation (Nov. 26, 2013), at CEOC_INVESTIG_00126808-15 [CEOC_INVESTIG_00126808]. It appears that the CEC Board, pursuant to the advice of its legal counsel, formed the CEC Special Committee in an effort to minimize the risk to CEC and its directors from potential breach of fiduciary duty and other claims asserted by outside shareholders of CEC – not creditors or other stakeholders of CEOC.  *See, e.g.*, K. Davis Oct. 22, 2015 Tr. at 174:23-175:15.

[2085]  T. Donovan Dec. 2, 2015 Tr. at 231:6-22; L. Clayton Feb. 1, 2016 Tr. at 362:16-23; *see also* e-mail from W. Chandler to T. Donovan, *et al.* (Oct. 10, 2012), at CEC_Examiner_1308267-72 [CEC_EXAMINER_1308267].

[2086]  B. Finnegan Nov. 16, 2015 Tr. at 169:16-25 ("[F]or optic benefits as well as for protection and benefit as to the fairness of the consideration, which again we were highly focused on in each and every transaction, we thought it would benefit from having a limited mandate committee with access to its own independent financial and legal counsel who could negotiate and recommend the terms at which, if at all, CEC would transact."); G. Kranias Oct. 23, 2015 Tr.

time, it was understood that, to avoid fraudulent conveyance risks, reasonably equivalent value would need to be paid for the properties.[2087]

Loveman personally requested that Kleisner and Swann serve on the CEC Special Committee because, in addition to being independent directors, they had sufficient time to devote to the committee, which the CEC Board believed needed to act expeditiously in light of CEOC's pressing liquidity issues.[2088]   The CEC Board agreed to pay Kleisner and Swann $50,000 each for their service on the CEC Special Committee.[2089]   Kleisner took the lead in negotiating on behalf of the CEC Special Committee.

According to the Sponsors, upon formation of the CEC Special Committee, they ceased any material involvement in the Four Properties Transaction.   The Sponsors maintain that, apart from certain Sponsor-appointed directors on CEC's Board receiving status updates in their capacity as Board members and approving certain resolutions necessary to complete the transaction, the Sponsors played no further role.[2090]   According to Sambur, "now that [CGP] was

at 168:14-169:3 (CEC Valuation committee set up "[b]ecause TPG and Apollo were existing shareholders of the company and would participate in the new vehicle, and so we were looked at being interested parties and needed independent directors to represent Caesars in connection with the transaction."); K. Davis Oct. 22, 2015 Tr. at 136:6-21 ("I think that transaction contemplated the sale of assets from CEC and CEOC to a new entity whose shareholders were going to be - were going to overlap to a certain extent with the shareholders of CEC but were going to include shareholdings in a different composition and perhaps different shareholders altogether in a certain case, so given that the Sponsors were on both sides of that transaction, in fact, I think were the controlling shareholders of both sides of that transaction, it was clearly necessary to have an independent party on behalf of CEC weigh the merits of that transaction in discussions with the Sponsors representing their interests at CAC on the other side of those discussions.").

[2087]   D. Sambur Jan. 14, 2016 Tr. at 717:3-8 ("I certainly remember when all of these transactions were designed or other transactions were contemplated, we thoroughly looked at all the risks, and certainly fraudulent conveyance was one of the risks and considerations."); *id.* at 718:04-09 ("[I]t certainly was a possibility.   I mean, the company had a large amount of leverage.   It was free cash flow negative.   There were several transactions done to avoid this outcome.").

[2088]   The CEC Board included two additional independent members – Chris Williams and Jeffrey Housenbold.   Williams lacked sufficient time to serve on the Special Committee and Housenbold was in the process of leaving the CEC Board at the time the Committee was formed.

[2089]   "Caesars Entertainment Corporation Meeting of the Board of Directors" (Nov. 26, 2013), at CEOC_INVESTIG_00126811 [CEOC_INVESTIG_00126808].   Pursuant to a June 7, 2014 Written Consent of Directors in Lieu of Meeting, the CEC Board agreed to pay Kleisner and Swann an additional $150,000 each for "fulfilling their duties in connection with consummating the Transaction."   "Caesars Entertainment Corporation Written Consent of Directors" (June 7, 2014), at CEOC_INVESTIG_00165492 [CEOC_INVESTIG_00165491].

[2090]   D. Sambur Oct. 29, 2015 Tr. at 441:11-441:20; M. Rowan Nov. 17, 2015 Tr. at 321:23-24; K. Davis Oct. 22, 2015 Tr. at 177:9-17; Kleisner Oct. 30, 2015 Tr. at 28:24-29:6 (the Sponsors played no role "other than when we ultimately recommended the transaction to the full board").

established," Apollo stood "on both sides" of the transactions and, for this reason, recused itself from the process.[2091]    Kranias described TPG's role in the Four Properties Transaction as follows:  "As soon as the committees got set up, I felt like we were on the sidelines waiting for the two committees to negotiate the deal."[2092]    However, the Sponsors, in addition to identifying the CEOC liquidity gap, conceived of the transaction, at a minimum heavily influenced the selection of the transferred properties, determined that sales to third parties could not be made, and, along with Paul Weiss, developed the concept of a "bankruptcy remote" shared services entity and actively participated in the drafting of the CES term sheets and governing documents.[2093]

### ii.    Lack of CEOC Involvement or Representation

As with the Growth Transaction, no consideration was given to establishing a special committee of independent directors of the CEOC Board to negotiate or evaluate the Four Properties Transaction or to providing CEOC with independent legal and/or financial advisors.[2094]    This was the case even though, as noted above, (i) CEC then owned a 100% interest in CEOC and a 58% non-voting interest in CGP, and (ii) the CEOC directors who approved the transaction, Loveman and Hession, were CEC officers and the former also served

---

[2091]  D. Sambur Oct. 29, 2015 Tr. at 430:20-431:3.

[2092]  G. Kranias Oct. 23, 2015 at Tr. 200:25-201:7.

[2093]  The CEC Special Committee members were apparently unaware that Paul Weiss (i) represented Growth in connection with securing financing for the Four Properties Transaction, and (ii) had provided significant legal services to Apollo on unrelated matters.  *See* F. Kleisner Jan. 28, 2016 Tr. at 34:15-35:2; L. Swann Jan. 12, 2016 Tr. at 122:3-10.  As discussed below, Paul Weiss was having discussions with counsel for the CEC Special Committee, Reed Smith, about the creation of CES before January 26, 2014, when the CAC Special Committee officially requested that the Four Properties Transaction involve assurances that the Four Properties would have continued access to the shared services, including Total Rewards, in the event of a CEOC bankruptcy.  Paul Weiss was also having discussions with Latham & Watkins, counsel for CAC, about the creation of a joint services venture before the CAC Special Committee's request.

[2094]  F. Kleisner Oct. 30, 2015 Tr. at 33:23-34:5; G. Kranias Oct. 23, 2015 Tr. at 237:24-238:5.  As discussed in more detail herein, although Stauber and Winograd were recruited to become independent CEOC directors as early as February 2014, prior to the completion of the Four Properties Transaction, they were evidently told by the Sponsors that it would be preferable to wait until the Four Properties Transaction closed before joining the CEOC Board because injecting new independent CEOC directors into the process would create an unnecessary complication.  R. Stauber Sept. 30, 2015 Tr. at 19:16-20:7.  Notably, however, Kleisner joined the CEC Board as an independent director in July 2013.  F. Kleisner Jan. 28, 2016 Tr. at 12:19-13:12.  Further, CAC added an independent director, Don Kornstein, to the CAC Board and Special Committee in January 2014 – after the CAC Special Committee had been formed to evaluate and negotiate the Four Properties Transaction.  CAC Special Committee Meeting Minutes (Dec. 23, 2013), at CACEXAM00434786-87 [CACEXAM00434786].  Indeed, Kornstein joined the CAC Special Committee.  *Id.*

on the CEC Board. It appears that the CEOC Board had no involvement in the decision to pursue, or negotiations relating to, the Four Properties Transaction.[2095]

Multiple witnesses, including from the Sponsors, CEC management, the CEC Board, and Paul Weiss, told the Examiner that they believed there was a uniformity of interest between CEC and CEOC at the time of the transaction.[2096] Several of these witnesses stated that CEC pursued the Four Properties Transaction, in large part, if not exclusively, to help ameliorate CEOC's liquidity position and commercial posture, which they viewed as also benefitting CEC.[2097] However, as discussed below, the sale of these assets exacerbated the need for CEOC creditors to accept less than face value for their debt. Additionally, any claim that CEC's and CEOC's interests were aligned because a potential bankruptcy could engulf both CEC and CEOC is less persuasive in light of the formation of CGP, which enabled certain assets to be kept out of a CEOC bankruptcy.[2098]

Kleisner told the Examiner that "CEOC and its obligations were not a consideration" of the CEC Special Committee in evaluating and negotiating the Four Properties Transaction.[2099] Rather, CEC was the sole focus. Kleisner reasoned that, because CEOC was a subsidiary of CEC, "there was no daylight between the two."[2100] Swann shared this view.[2101] The evidence indicates that the CEC Special Committee never considered the possibility that CEOC and CEC could have conflicting interests with respect to the Four Properties Transaction, even though, as noted above, CEC stood on both sides of the transaction. It does not appear that company or outside legal counsel ever advised the CEC Special Committee of any fiduciary duty or other obligation to protect CEOC or its creditors in connection with the transaction.

### iii. The CEC Special Committee's Mandate

The scope of authority provided to the CEC Special Committee, while more robust than that provided to the CEC Valuation Committee in connection with the Growth Transaction, was nonetheless limited. The CEC Special Committee was authorized to (i) determine whether to engage in the Four Properties Transaction, (ii) negotiate the terms thereof, (iii) negotiate definitive agreements concerning the transaction, (iv) determine the process that the committee would use in carrying out its responsibilities and (v) retain financial or legal advisors as

---

[2095] As discussed herein, Loveman and Hession were, however, involved in the decision to pursue the Four Properties Transaction in their capacities as CEC officers.

[2096] K. Davis Oct. 22, 2015 Tr. at 175:16-176:11; L. Swann Oct. 12, 2015 Tr. at 14:24-15:11; A. van Hoek Sept. 25, 2015 Tr. at 238:21-239:3 (CEC and CEOC interests aligned at the time of the Growth Transaction).

[2097] K. Davis Oct. 23, 2015 Tr. at 180:9-181:22; B. Finnegan Nov. 16, 2015 Tr. at 219:5-19.

[2098] *See*, *e.g.*, "Caesars Entertainment Discussion Materials" Presentation (Oct. 2012) [APOLLO-Examiner_00030861] at 2.

[2099] F. Kleisner Jan. 28, 2016 Tr. at 39:12-21.

[2100] *Id.* at 38:20-39:5.

[2101] *See* L. Swann Oct. 12, 2015 Tr. at 23:10-19.

necessary to advise the committee regarding the transaction.[2102]  According to Swann, while the
CEC Special Committee had the "authority to say 'no' to [the] transaction," it never actually
considered whether CEOC should "just retain" the Four Properties assets rather than sell
them.[2103]

    As noted above, the CEC Special Committee was not authorized to pursue, negotiate or
approve any transaction with any party not affiliated with CEC.[2104]  As discussed in more detail
below, the Sponsors, Caesars management and the CEC Special Committee were of the view that
third parties outside of the Caesars network and without access to Total Rewards would pay
materially less for the assets than would a CEC affiliate.[2105]  Further, certain of these witnesses
believed that the sale of the assets to an entity outside of the Caesars network would deprive
CEOC of those assets' contributions to the fixed cost of the systemic elements of the business,
thereby increasing the burden on CEOC.[2106]  According to these witnesses, CEOC could
maximize value by selling the assets to CGP and continuing to manage them as part of the
network.[2107]  However, it appears that neither the full CEC Board nor the CEC Special
Committee ever tested the market for interested third party buyers or seriously considered the
possibility of selling the assets to a non-CEC affiliate even though the transaction involved three
properties on the very valuable Las Vegas strip and a "super-regional" property in New Orleans.
It appears that marketing those four properties together would have presented a different value
proposition for a potential buyer than selling a single property.

    The CEC Special Committee also lacked the power to pursue alternative transactions and
strategic options, including the sale of assets other than the Four Properties (though language
was added to the CEC Special Committee's mandate granting the committee authority to "obtain
advice" concerning such alternative transactions and strategic options).[2108]  As discussed herein,

---

[2102] "Caesars Entertainment Corporation Special Committee Charter" (Dec. 18, 2013),
CEOC_INVESTIG_00451873-74 [CEOC_INVESTIG_00451873]; "Liquidity Discussion Board
of Directors Materials" Presentation (Nov. 2013) [CEOC_INVESTIG_00172963] (native), at 9.

[2103] L. Swann Oct. 12, 2015 Tr. at 17:23-18:10.

[2104] "Caesars Entertainment Corporation Special Committee Charter" (Dec. 18, 2013),
CEOC_INVESTIG_00451873-74 [CEOC_INVESTIG_00451873]; "Liquidity Discussion Board
of Directors Materials" Presentation (Nov. 2013), CEOC_INVESTIG_00172963 (native file), at
9.

[2105] "Liquidity Discussion Board of Directors Materials" Presentation (Nov. 2013),
CEOC_INVESTIG_00172963 (native file), at 9.  In its December 2013 Regulatory Discussion
materials, however, CEC appears to contemplate selling the Four Properties to third parties in
addition to CGP.  "Caesars Entertainment Regulatory Discussion Materials" Presentation (Dec.
2013), CEC_EXAMINER_0004181 (native file), at 27.  ("A sale could be to a third party or to
CGP.").

[2106] G. Loveman Oct. 27, 2015 Tr. at 203:17-204:12.

[2107] G. Kranias Oct. 23, 2015 Tr. at 200:3-15.

[2108] "Caesars Entertainment Corporation Special Committee Charter" (Dec. 18, 2013),
CEOC_INVESTIG_00451873-74 [CEOC_INVESTIG_00451873].

the evidence indicates that the CEC Special Committee did not consider or obtain advice regarding alternative transactions and strategic options, including selling the assets to a non-CEC affiliate.  Nor did the CEC Special Committee consider *not* pursuing the transaction because of the long-term negative consequences for CEOC's creditors.[2109]   In particular, no consideration was given to the fact that, by selling four properties with a combined projected 2015 EBITDA of $321.8 million, it would make it more difficult to repay CEOC's debt absent a reduction in the ever-growing principal amount owed.

### iv.    CEC's Initial Overture to CAC

By letter dated November 30, 2013, Loveman, on behalf of the CEC Board, notified Mitch Garber, CEO of CAC, that:  (i) CEC was considering offering to CGP certain properties owned by CEOC; (ii) the CEC Board authorized for inclusion in such potential sale The Quad, The Cromwell, Bally's Las Vegas and/or Harrah's New Orleans; and (iii) CEC's Board had established an independent special committee to evaluate and consider the potential transaction on behalf of CEC.[2110]

### d.  The CEC Special Committee Retains Independent Advisors

### i.    Retention of Reed Smith and Centerview

On December 11, 2013, the CEC Special Committee retained Reed Smith LLP as its independent legal advisor.[2111]   No one at CEOC was consulted or involved in the decision to retain Reed Smith.  According to Kleisner, the CEC Special Committee did not receive "advice from any legal entity other than Reed Smith" in connection with the Four Properties Transaction.[2112]

On December 20, 2013, the CEC Special Committee engaged Centerview Partners LLC ("Centerview") to serve as its financial advisor.[2113]   According to Kleisner, the CEC Special Committee selected Centerview because it was "highly competent" and "[its] proposal was an economically good proposal."[2114]   Swann was of the same view, stating that he had worked with Centerview "on a number of transactions" while on the board of H.J. Heinz Co. and believed they "would do a great job."[2115]   Swann denied that the CEC Special Committee's decision not to

---

[2109]  *See* F. Kleisner Jan. 28, 2016 Tr. at 39:12-41:8.

[2110]  Letter from G. Loveman to M. Garber (Nov. 30, 2013), at CACEXAM00010665 [CACEXAM00010665].

[2111]  L. Swann Oct. 12, 2015 Tr. at 57:22-25.  As noted above, CEOC did not retain independent legal or financial advisors in connection with the transaction.  Nor did it play any role in the CEC Special Committee's retention of Reed Smith.

[2112]  F. Kleisner Jan. 28, 2016 Tr. at 33:4-21.

[2113]  L. Swann Oct. 12, 2015 Tr. at 59:10-23.

[2114]  F. Kleisner Oct. 30, 2015 Tr. at 35:24-36:15.

[2115]  L. Swann Oct. 12, 2015 Tr. at 59:15-60:3; J. Bosacco Sept. 15, 2015 Tr. at 8:6-21.

retain Evercore, which had served as the committee's financial advisor in connection with the Growth Transaction, was due to "dissatisfaction" with Evercore's performance.[2116]   It appears, however, that the Sponsors were dissatisfied with how long the negotiations took in connection with the Growth Transaction, with Sambur describing the process as "brutal."[2117]   As discussed above, Bonderman told the Examiner:  "I recall that there was a general notion that Evercore was a day late and a dollar short in everything they did, and it took them forever to get anything done."[2118]

Centerview's mandate included assisting CEC Special Committee in negotiating and structuring the transaction and providing to the CEC Special Committee and CEC Board an opinion with respect to the (i) "fairness, from a financial point of view," and (ii) "reasonably equivalent value" of "consideration to be received" from the sale of one or more of the Four Properties.[2119]   Centerview played no role in the selection of the Four Properties in connection with the transaction.[2120]

Centerview's fee structure, which had contingent components and provided for fee reductions under certain specified conditions, included:  (i) an "advisory fee" of $1 million; (ii) a $1 million fee upon execution of a "definitive" transaction agreement; (iii) a $2 million fee upon issuance of a fairness opinion; and (iv) a $1 million fee upon consummation of the transaction.[2121]   When asked by the Examiner whether its fee structure impacted its objectivity with respect to negotiating the Four Properties Transaction and assessing its fairness, Centerview responded that it did not.[2122]   John Bosacco, who, along with Marc Puntus, led the Centerview team, explained:

> [M]y response is that Centerview has a business that involves Special Committee work and opinions, we take it extremely seriously.   We have an internal committee that's formed at the outset.   The internal committee has to have, among other people, Robert Pruzan as co-head of the firm, Alan Hartman who is a senior partner.   It meets a number of times throughout the process.   It is actively involved in the back-and-forth, and when we put our name on a letter . . . that opinion letter needs to stand, and so it is something that our integrity is critical at

---

[2116]  L. Swann Oct. 12, 2015 Tr. at 59:10-23.

[2117]  M. Rowan Nov. 16, 2015 Tr. at 214:12-215:8; D. Sambur Oct. 29, 2015 Tr. at 382:14-383:19.

[2118]  D. Bonderman Nov. 10, 2015 Tr. at 92:12-22.

[2119]  Engagement Letter from Centerview Partners LLC to CEC Special Committee (Dec. 20, 2013), at CENTERVIEW_0000304 [CENTERVIEW_0000303].   According to Centerview, its client was the Special Committee.  J. Bosacco Sept. 15, 2015 Tr. at 29:20-22.

[2120]  J. Bosacco Sept. 15, 2015 Tr. at 16:4-8.

[2121]  *See* December 20, 2014 engagement letter, as amended on February 4, 2014, at CENTERVIEW_0000297-302 [CENTERVIEW_0000297].

[2122]  J. Bosacco Sept. 15, 2015 Tr. at 41:15-44:9.

the end of the day and I sincerely believe that we are not incentivized one way or the other and that we look at it objectively . . . .[2123]

Nonetheless, the Examiner believes that having a contingency in this kind of situation undermines the weight to be given to the opinion.  And, Delaware law questions whether such a contingency adversely impacts the independence of a financial advisor.[2124]

Centerview appears to have had no relationship with Caesars prior to being retained by the Special Committee in connection with the Four Properties Transaction.[2125]  Further, according to Centerview, it had not, in the two years prior to its retention by the CEC Special Committee, provided any services to the Sponsors.[2126]  The evidence indicates that neither CEC management nor the Sponsors, either directly or through their respective advisors, influenced the CEC Special Committee's decision to retain Reed Smith or Centerview.[2127]  It appears that no one at CEOC was involved or consulted in connection with the retention of Centerview.[2128]  The CEOC Board also had no role in the decision to retain Centerview.[2129]

### ii.    The CEC Special Committee Retains D&P

On or around January 15, 2014, Reed Smith advised the CEC Special Committee that, in order for CEOC to comply with certain debt covenants, the CEC Special Committee needed to obtain an additional fairness opinion providing that the Four Properties Transaction is on terms no less favorable to CEOC than would be obtained in a comparable arm's-length transaction with a non-affiliate.[2130]  Centerview does not, as a matter of policy, render this type of "arm's length" opinion.[2131]

---

[2123]  *Id*. at 45:20-46:19.

[2124]  *In re Rural Metro Corp.*, 88 A.3d 54, 90 (Del. Ch. 2014).

[2125]  J. Bosacco Sept. 15, 2015 Tr. at 20:20-25.

[2126]  In its February 24, 2014 Fairness Opinion letter to the CEC Board and Special Committee, Centerview disclosed, among other things, that it "may provide investment banking and other services to or with respect to the Company or CAC or their respective affiliates (including Apollo and TPG) and portfolio companies of such affiliates in the future, for which we may receive compensation." Fairness Opinion from Centerview Partners LLC to Caesars Entertainment Corporation Board of Directors (Feb. 24, 2014), at CEOC_INVESTIG_00171994 [CEOC_INVESTIG_00171994].

[2127]  *See* D. Sambur Oct. 29, 2015 Tr. at 442:7-443:17.

[2128]  *See* L. Swann Oct. 12, 2015 Tr. at 59:10-60:3.

[2129]  *See* G. Loveman Oct. 27, 2015 Tr. at 206:19-207:3; M. Cohen Dec. 16, 2015 Tr. at 408:11-22.

[2130]  *See* CEC Special Committee Meeting Minutes (Jan. 15, 2014), CEOC_INVESTIG _00452475-76 [CEOC_INVESTIG_00452475]; M. Cohen Oct. 16, 2015 Tr. at 240:11-241:10; e-mail from M. Cohen to D. Colvin, *et al.* (Jan. 21, 2014), at CEOC_INVESTIG_00469178-79 [CEOC_INVESTIG_00469178], attaching D&P Engagement Letter (Jan. 17, 2014),

On January 17, 2014, the CEC Special Committee engaged D&P to provide an opinion that the Four Properties Transaction was "on terms no less favorable to CEOC . . . than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate of [CEC]."[2132]  D&P, unlike Centerview, was "institutionally . . . comfortable providing these types of opinions."[2133]

D&P had, at the time it was retained by the CEC Special Committee, previously provided services to both the Sponsors and Caesars, though it did not consider them to be "major clients."[2134]   The evidence indicates that neither CEC management nor the Sponsors, either directly or through their respective legal counsel, influenced the CEC Special Committee's decision to select D&P to provide the "arm's-length" opinion.[2135]

### iii.   The CAC Board Forms the CAC Special Committee

On December 23, 2013, the CAC Board approved the formation of a special committee consisting of Marc Beilinson and Philip Erlanger.   The CAC Special Committee was subsequently expanded to include Don Kornstein, who was appointed to the CAC Board as an independent director on January 8, 2014.[2136]  Beilinson took the lead in negotiating with the CEC Special Committee.

---

[CEOC_INVESTIG_00069586]; e-mail from J. Schiedemeyer to H. Schecter, *et al.* (Feb. 8, 2014), REEDSMITH0022134-37 [REEDSMITH0022134].

[2131]  F. Kleisner Oct. 30, 2015 Tr. at 35:2-27:2.

[2132]  D&P   Engagement   Letter   (Jan.   17,   2014),   at   CEOC_INVESTIG_00069586 [CEOC_INVESTIG_00069586].

[2133]  J. Schiedemeyer Sept. 16, 2015 Tr. at 42:13-43:8; L. Swann Oct. 12, 2015 Tr. at 62:21-63:22. In addition, D&Ps' January 17, 2014 engagement letter provided that D&P would be paid $325,000 total, with $162,500 payable immediately and the remaining $162,500 payable after D&P informs the Special Committee "that it is prepared to deliver the opinion."   D&P Engagement Letter (Jan. 17, 2014), at CEOC_INVESTIG_00069587 [CEOC_INVESTIG _00069586]

[2134]  J. Schiedemeyer Sept. 16, 2015 Tr. at 18:15-21:6.  In its January 17, 2014 engagement letter, D&P disclosed that, while it "may represent (in unrelated matters) parties interested in the Company or the Four Properties Transaction, or persons who are the Company's competitors or creditors, or whose interests otherwise conflict with those of the Company," it "has identified no current relationships that would preclude it from accepting this Engagement."   *See* D&P Engagement Letter (Jan. 17, 2014), at CEOC_INVESTIG_00069593   [CEOC_INVESTIG _00069586].

[2135]  F. Kleisner Oct. 30, 2015 Tr. at 35:2-37:2.

[2136]  *See* Caesars Acquisition Company Special Committee Meeting Minutes (Dec. 23, 2013), at CACEXAM00434786-87 [CACEXAM00434786]; Caesars Acquisition Company Special Committee   Meeting   Minutes   (Jan.   20,   2014),   at   CACEXAM00434790-91 [CACEXAM00434790].

According to Beilinson, the CAC Special Committee's mandate was to "make a determination if it was in the best interest of CAC to buy one [of the Four Properties], buy none, buy all four, what the price and the terms would be under which we would do it, if we decided to do it."[2137]

The CAC Special Committee selected Skadden as its legal advisor and Lazard as its financial advisor.[2138]  According to Simon Furie, who led the Lazard team in connection with the Four Properties Transaction, Lazard's mandate was to "assist the [CAC] Special Committee in the evaluation of the Four Property Transaction; assist them in both valuation and negotiation; and ultimately, if requested by the Committee, to provide [to the CAC Special Committee] a fairness opinion of that transaction."[2139]

Furie explained that, under its "buy-side engagement" with the CAC Special Committee, Lazard was "incentivized to get the lowest price possible."[2140]  While Lazard understood that, at the time of the Four Properties Transaction, "CEOC was a highly-leveraged entity," Lazard did not consider the impact of the transaction (or a failure to consummate it) on CEOC or its creditors.[2141]  According to Furie, this "wasn't part of [Lazard's] mandate."[2142]

Furie further noted that, despite Lazard's awareness of "CEC's apparent need to consummate a transaction as soon as possible to address its liquidity needs," he "didn't think there was any sense . . . [that CAC could] pay less [for the Four Properties] for any particular reason."[2143]  As set forth in more detail below, however, there is evidence that the CAC Special

---

[2137] M. Beilinson Oct. 6, 2015 Tr. at 36:7-12.

[2138] According to Furie, Lazard had not been engaged by any Caesars entity "for some meaningful period of time" prior to the Four Properties Transaction.  S. Furie Sept. 18, 2015 Tr. at 14:3-15.  Lazard had, however, performed certain work for Apollo and TPG, as disclosed in its engagement letter with the CAC Special Committee.  *Id.* at 15:8-16:15.  It does not appear, however, that Lazard disclosed that, in presentation materials to the CEC (then Harrah's Entertainment) Board dated September 22, 2009, affiliates of Lazard were identified as potential investors in connection with a structure to help fund CEC.  "Project Sapphire Discussion" (Sept. 22, 2009), at APOLLO-Examiner_01414366, APOLLO-Examiner_01414369 [APOLLO-Examiner_01414361].

[2139] S. Furie Sept. 18, 2015 Tr. at 17:4-11.

[2140] *Id.* at 17:4-18:3.

[2141] *Id.* at 20:14-21:20.

[2142] *Id.* at 21:18-20 ("I understood that [CEOC's solvency] would be a concern of the sellers, but it wasn't – it wasn't part of our mandate.").

[2143] *Id.* at 63:13-25.  The CAC Special Committee did, however, "discuss[] the potential leverage the [CAC] Special Committee has on non-economic terms given CEC's apparent need to consummate the transaction as soon as possible to address its liquidity needs."  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 4, 2014), at CACEXAM00434803 [CACEXAM00434802].

Committee did consider its potential negotiating leverage in light of CEOC's need to expeditiously address its liquidity issues.[2144]

According to Beilinson, neither the Sponsors nor Paul Weiss had any role in selecting the CAC Special Committee's advisors.[2145]  Beilinson told the Examiner that the CAC Special Committee had no "substantive" discussions with Apollo concerning the proposed transaction after the formation of the committee.[2146]  There were, however, discussions among CAC Board members, regarding the formation of the committee.[2147]

### e.  CEC's December 2013 Presentation to Regulators

In December 2013, CEC, in conjunction with its outside legal counsel and the Sponsors, prepared materials for certain regulatory agencies concerning, among other things, CEC's "perspective on Caesars' capital structure and the future plan for CEOC."[2148]  The purpose of the regulatory materials was to "explain[] to regulators transactions that may happen in the future."[2149]  The CEC Special Committee was not provided with these materials.[2150]

The December 2013 regulatory materials provided, among other things, that "annual interest expense at CEOC is $1.7 billion, significantly exceeding EBITDA."[2151]  According to Kleisner, this was consistent with the CEC Special Committee's understanding at the time.[2152] The materials further provided that "[d]espite negative operating metrics and unfavorable industry dynamics, CEOC has been able to sustain itself through active liability management – going forward CEOC needs to take swift action to create a sustainable structure that adjusts to the current operating reality."[2153]  This too was consistent with the CEC Special Committee's understanding at the time.[2154]

---

[2144]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 4, 2014), at CACEXAM00434803 [CACEXAM00434802].

[2145]  M. Beilinson Oct. 6, 2015 Tr. at 31:21-32:23.

[2146]  *Id.* at 34:24-35:17.

[2147]  *Id.* at 34:8-22.

[2148]  "Caesars Entertainment Regulatory Discussion Materials" (Dec. 2013), CEC_EXAMINER_0004181 (native), at 2; M. Cohen Oct. 16, 2015 Tr. at 297:17-298:25; M. Rowan Nov. 16, 2015 Tr. at 260:11-20.

[2149]  M. Cohen Oct. 16, 2015 Tr. at 297:17-298:25.

[2150]  F. Kleisner Oct. 30, 2015 Tr. at 140:2-4.

[2151]  "Caesars Entertainment Regulatory Discussion Materials" (Dec. 2013) [CEC_EXAMINER_0004181] (native), at 21.

[2152]  F. Kleisner Oct. 30, 2015 Tr. at 140:12-20.

[2153]  "Caesars Entertainment Regulatory Discussion Materials" (Dec. 2013), CEC_EXAMINER_0004181 (native), at 21.

[2154]  F. Kleisner Oct. 30, 2015 Tr. at 142:20-143:4.

Under the heading "CEOC's Plan," the December 2013 regulatory materials stated that, to achieve Caesars' "goal of ensuring CEOC is cash flow positive, and improving CEOC's capital structure, we are pursuing the same financing techniques that allowed us to protect and create value for CEC, CERP, and now Growth Partners."[2155]  The following is a reproduction of the pages constituting "CEOC's Plan."[2156]

**Four Properties Figure 19:  Excerpt 1 from December 2013 Regulatory Presentation**

 

CEOC Plan

· *To achieve our goal of ensuring CEOC is cash flow positive, and improving CEOC's capital structure,  we are pursuing the same financing techniques that allowed us to protect and create value for CEC, CERP and now Growth Partners*

1.  **<u>Asset sales to Growth Partners or 3rd parties</u>**

   · Sales of capital-intensive properties should provide CEOC with significant upfront capital as well as relief from ongoing capital expenditure requirements

   · A sale could be to a third party or to CGP

   · A sale of assets to <u>Caesars Growth Partners</u> would allow Caesars to maintain: (i) upside through majority ownership of CGP, (ii) the ability to call the assets back in the future, (iii) continued integration with Caesars loyalty program and related synergies, and (iv) the potential for management fees to CEOC

      – Recent transactions have provided evidence that third parties will price CZR properties based on a reduced EBITDA due to the anticipated loss of synergies (i.e. Total Rewards) that exist within the CZR system; transacting with CGP is advantageous, as it would avoid this discount

      – No change in ultimate control of the assets because Hamlet Holdings controls both CZR and CACQ

      – No change in day-to-day operations or property management teams, since CEOC is expected to manage the properties for CGP (similar to Planet Hollywood currently)

   · <u>We believe the following assets are potential asset sale candidates:  Quad Las Vegas, Bill's Las Vegas, Bally's Las Vegas, Harrah's New Orleans</u>

   · We are also evaluating additional assets that may be optimized for a sale to CGP

---

[2155]    "Caesars    Entertainment    Regulatory    Discussion    Materials"    (Dec.    2013), CEC_EXAMINER_0004181 (native file), at 27.

[2156]    *Id.* at 27-28.

**Four Properties Figure 20: Excerpt 2 from December 2013 Regulatory Presentation**




CEOC Plan (cont.)

2.  **Sale of up to 25% of CEOC equity**
    - As exemplified by CEC, public equity is a valuable currency for financial flexibility
    - We are proposing the sale of a minority equity stake in CEOC to a 3ʳᵈ party (CZR will maintain control)
        - This will provide CEOC with future flexibility to use its equity as currency (e.g. for future debt for equity exchanges at CEOC)
        - This will also likely result in CEC being released of its guarantee obligations of CEOC's bonds (see following page)

3.  **Amendments to existing CEOC debt agreements**
    - Aim is to provide CEOC with relief from certain covenants, including the SSLR covenant (as we've done in the past), to ensure headroom for the company
        - We are also considering pursuing an amendment that removes the CEC guarantee from the CEOC bank debt

4.  **Debt exchanges and debt-for-equity transactions**
    - In order to reduce debt and interest expense at CEOC and preserve liquidity for operations, as we've completed several times in the past
        - 2008 and 2009 debt exchanges successfully reduced debt by over $3 billion and interest expense by over $300 million (see slide 24 for detail)
        - Opportunity currently exists to pursue exchanges for our second lien and unsecured bonds, which are trading at depressed levels

> **The aim of these initiatives is to increase CEOC's free cash flow, lower CEOC's interest expense, extend CEOC's debt-maturity runway, and provide headroom under the SSLR thereby materially improving our capital structure and financial position**

With respect to the first point, "Asset Sales to Growth Partners or 3rd Parties," Kleisner told the Examiner that there was no marketing of the Four Properties assets to third parties. Kleisner explained: "We reserved the right to evaluate the comparison and alternative of a third party transaction, however, speaking for myself, and I know [Swann] was in the same place, once we saw the realities of the extreme value of Total Rewards, we discounted that notion as a useless exercise."[2157]  Kleisner added: "[T]here was significant value found in the contribution that Total Rewards gave to each individual enterprise, each of the four assets, and that without that, selling them unencumbered, they would be worth considerably less . . . ."[2158]

When Kleisner was asked by the Examiner whether the CEC Special Committee discussed whether it could potentially market the three "Strip properties" – The Cromwell, Bally's Las Vegas, and The Quad – to a "large regional player who might be interested in getting a toehold in . . . Las Vegas," he responded:

> We talked about that. The regional players, the usual suspects . . . were all in reorganization or in significant financial difficulties. They did not have the capacity to make such a consideration. And that was considered, but discounted, because we also looked at Total Rewards . . . which was at the core of what

---

[2157]  F. Kleisner Oct. 30, 2015 Tr. at 142:20-143:11.

[2158]  *Id.* at 148:17-149:14.

Caesars brought to the party.[2159]

The CEC Special Committee, however, never tested the market for interested third party buyers and, as discussed above, lacked the authority to sell the properties to non-CEC affiliates in any event.[2160]

According to Cohen, who helped prepare the December 2013 regulatory materials, "it [had not] been decided or determined who the [Four Properties] assets were being sold to."[2161] Rowan, however, acknowledged that there "was no marketing of [the Four Properties] to third parties at the time."[2162] According to Rowan, the presentation was a "marketing document to regulators" to help ensure "regulatory flexibility."[2163]

With respect to the second point of the "CEOC Plan" – "Sale of up to 25% of CEOC equity" – this appears to have been a plan devised by the Sponsors and CEC management. The evidence indicates, however, that independent CEC Board members were unaware of any discussion regarding the sale of CEOC equity until a CEC Board meeting in May 2014 or later.[2164] Sambur told the Examiner that while a sale of CEOC equity "was being considered," he "wouldn't characterize it as a plan."[2165] Rather, it was "one of the options that was being considered."[2166] According to Rowan, CEC and the Sponsors "had just finished the refinancing of CERP, the completion of Growth, [and were now] turning [their] attention to CEOC."[2167] Rowan added:

> We're doing what I would call the housekeeping, the extension of runway, dealing with the covenant, dealing with liquidity, but it also seems to me that with a billion of cash from un-sub sales, that one of the easiest ways for us to de-lever is to come up with an interesting exchange transaction that can further reduce debt

---

[2159] *Id.* at 25:9-24.  Bosacco told the Examiner that Centerview did not "analyze [the transaction] from the perspective of somebody buying three Las Vegas properties on the Strip . . . as a package."  J. Bosacco Sept. 15, 2015 Tr. at 156:12-25.  According to Bosacco, the "assignment was up to four assets to be sold.  So we had to look at them independently, unclear as to whether or not all of them would get sold.  They were valued independently and aggregated . . . ."  *Id.* at 156:14-157:6.

[2160] "Caesars Entertainment Corporation Special Committee Charter" (Dec. 18, 2013), at CEOC_INVESTIG_00451873-74 [CEOC_INVESTIG_00451873]; "Liquidity Discussion Board of Directors Materials" (Nov. 2013) [CEOC_INVESTIG_00172963] (native), at 9.

[2161] M. Cohen Oct. 16, 2015 Tr. at 300:24-301:10.

[2162] M. Rowan Nov. 16, 2015 Tr. at 263:19-24.

[2163] *Id.* at 263:5-264:8.

[2164] F. Kleisner Oct. 30, 2015 Tr. at 143:12-145:24.

[2165] D. Sambur Jan. 14, 2016 Tr. at 660:6-12.

[2166] D. Sambur Oct. 29, 2015 Tr. at 435:16-436:4.

[2167] M. Rowan Nov. 16, 2015 Tr. at 264:9-266:3.

. . . and [Cohen] is being sent out at my request to preview with regulators whether they are going to be okay with that . . . .[2168]

According to Cohen, the sale of CEOC equity was not "intended to provide a large sum of cash. . . .  The goal was to have financial flexibility to . . . sell more equity in the future, which is what CEC did."[2169]  Cohen, Sambur and others maintained that the release of CEC's guarantee of CEOC's bank debt was a consequence – not a goal – of this particular course of action.[2170] Nonetheless, while the presentation, as discussed below, does separately reference debt-equity exchanges, this point describes a plan to "sell" equity.

With respect to the fourth point in the "CEOC Plan" – "Debt exchanges and debt-for-equity transactions" – Loveman did not recall "that idea having been hatched at [that] time," but rather that it "came later in the context of it being the so-called B7 transaction."[2171]  Sambur told the Examiner that this idea "was never pursued," though the Sponsors did "engage in discussions to pursue exchanges for the second lien and unsecured bonds."[2172]

### f.    Negotiations Between the CEC and CAC Special Committees

### i.    Initial CEC Special Committee Meetings and Diligence

On January 8, 2014, Centerview presented to the CEC Special Committee an overview of:  (i) CEC and CGP, including information relating to CGP's formation; (ii) CEC's existing corporate structure; (iii) the recent financial performance of CEC and the assets to be included in the Four Properties Transaction; and (iv) key considerations impacting valuation of the assets to be included in the Four Properties Transaction.[2173]  The CEC Special Committee expressed to Centerview that it was "targeting a rather quick" transaction in light of CEOC's pressing liquidity issues.[2174]

On January 15, 2014, Centerview updated the CEC Special Committee on its site visits to properties located in Las Vegas, the meetings it conducted with CEC management, and property-level management teams of the Four Properties. [2175]  In performing its diligence in connection with the Four Properties Transaction, Centerview interfaced primarily with Hession and

---

[2168]  *Id.*

[2169]  M. Cohen Oct. 16, 2015 Tr. at 301:18-303:13.

[2170]  *See id.* at 303:20-304:9.

[2171]  G. Loveman Oct. 27, 2015 Tr. at 202:10-23.  The B-7 Transaction is discussed in detail in Section IX.B, *infra*.

[2172]  D. Sambur Oct. 29, 2015 Tr. at 436:5-24; 438:20-439:12.

[2173]  "Confidential    Discussion    Materials"    Presentation    (Jan.    8,    2014),    at CENTERVIEW_0000001-43 [CENTERVIEW_0000001].

[2174]  J. Bosacco Sept. 15, 2015 Tr. at 171:18-172:14.

[2175]  CEC Special Committee Meeting Minutes (Jan. 15, 2014), CEOC_INVESTIG _00452475-76 [CEOC_INVESTIG_00452475]

Beato.[2176]  According to Centerview, throughout the process, CEC management and its property-level management teams provided all material information requested by Centerview in connection with its valuation of the Four Properties.[2177]

### ii.    The CEC Special Committee Learns of the Possible Issuance of a Going Concern Qualification

According to Kleisner, in or around January 2014, he was advised by Diane Wilfong, CEC's then Chief Accounting Officer, that (i) Deloitte was considering issuing a going concern qualification with respect to CEC's then upcoming 10-K in March 2014 and, (ii) according to Wilfong, "avoiding a going concern issue assumes that [the CEC Special Committee is] going to deliver a definitive agreement on these properties."[2178]

Rowan acknowledged that the issuance of a going concern qualification would have sent CEOC into bankruptcy, stating:

> [T]he going concern was focused on three things. It was focused on covenant compliance, it was focused on liquidity, and it was focused on maturity and runway, and so . . . the auditors, as I understood, wanted to see concrete steps, if not signed documents, that would lead to resolution of these issues, and while in this company . . . we have been very, very adept at meeting SSLRs and extending runway, going concern is a completely different kettle of fish, because the goalposts are not objective and generally a going concern opinion is not curable. . . .  [Y]ou get one, you go into bankruptcy.  . . .  At the point in time [a going concern opinion is issued], your vendors stop supporting you, and, so, what had started as an exercise that was somewhat leisurely, normal course, became a little bit more intense.  And certainly as a director of CEC, understanding what was going on in CEOC, and potential implications, it was, solve the going concern one of two ways, we finance, exchange, or get ready to file bankruptcy.[2179]

Sambur expressed a similar view, acknowledging that "one of the motivators behind" the Four Properties Transaction was "the need for additional liquidity to avoid a going concern qualification." [2180]  He explained:

> [I]t became a bigger and bigger reason for the transaction as we were getting into the [sic] March and the audit was due.  . . .  Having a going concern qualification would have been a default under the company's credit agreement which would have been bad we think. So that was, that was a big concern and this transaction also took a very long time to get done and it went down to the wire. I think the

---

[2176]  J. Bosacco Sept. 15, 2015 Tr. at 17:24-19:6.

[2177]  *Id.* at 59:2-61:7.

[2178]  F. Kleisner Oct. 30, 2015 Tr. at 131:23-132:15.

[2179]  M. Rowan Nov. 16, 2015 Tr. at 271:10-273:14.

[2180]  D. Sambur Oct. 29, 2015 Tr. at 483:24-484:9.

audit was issued like a week and a half, two weeks after the transaction was announced.[2181]

The fact that Deloitte was considering a going concern qualification in the upcoming 10-K was a tell-tale sign that CEOC was insolvent, and should have alerted the Sponsors, CEC's Board and legal counsel to the issue and its implications in terms of process.

As discussed above, the CAC Special Committee was aware that the CEC Special Committee sought to consummate the transaction quickly. The February 4, 2014 CAC Special Committee Meeting Minutes state, among other things, that the committee "discussed the potential leverage the [CAC] Special Committee has on non-economic terms given CEC's apparent need to consummate a transaction as soon as possible to address its liquidity needs."[2182]

In response to Wilfong, Kleisner stated that the Special Committee is "doing [its] best [and] we may or may not get there."[2183] When asked by the Examiner whether the CEC Special Committee had a "plan B" in the event they could not reach a deal, Kleisner explained:

Plan B was to hand this back, and I was prepared to do so. . . . [I]f I was not convinced, and I remember saying this to [Swann], if we have to go back and say "this can't be done, you guys figure it out," we will have completed our job successfully.[2184]

Kleisner also was unaware of "an existing plan B at the [CEC] board level or the management level if the sale did not go through."[2185] According to Kleisner, there was not a "parallel discussion or alternative discussion, whether it be with legal advisors or otherwise, about if this sale doesn't go though" regarding "what will be our next steps."[2186] Kleisner added: "[M]y own view is there was some road to run, but the exposure – step 1 would be a going concern notation in the 10-K and the auditors letter and the company would have to work from there to find alternatives for liquidity."[2187] It appears that the absence of a "plan B" increased the pressure on the CEC Special Committee to quickly reach a deal with the CAC Special Committee.

---

[2181] *Id.* at 484:6-22.

[2182] Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 4, 2014), CACEXAM00434802-3 [CACEXAM00434802].

[2183] F. Kleisner Oct. 30, 2015 Tr. at 131:23-132:15.

[2184] *Id.* at 149:23-150:8.

[2185] *Id.* at 150:16-23.

[2186] *Id.* at 150:25-151:13.

[2187] *Id.*

### iii.   The January Business Plan

On or around January 17, 2014, CEC management prepared and provided to Centerview financial projections for each of the Four Properties (the "January Business Plan").[2188]   These projections appear to have been derived from CEC's LRP.[2189]   The base-year of the LRP had been approved by the CEC Board in or around November 2013 in the ordinary course as part of the budget process.[2190]   The LRP served as the basis for the projections used by Evercore in connection with the Growth Transaction, and during that time, CEC management stood behind those numbers.[2191]

Centerview discussed with CEC management the January Business Plan and underlying assumptions.[2192]   Consistent with its standard practice, however, Centerview did not independently confirm the accuracy or reliability of the projections.[2193]   Bosacco explained:

---

[2188]   *See* "Caesars Entertainment Confidential Discussion Materials" (Feb. 24, 2014), at CEOC_INVESTIG_00458711 [CEOC_INVESTIG_00458698].   D&P did not consider the January Business Plan in performing its analysis of the Four Properties Transaction but instead relied on, among other things, a subsequent revised set of projections as discussed in more detail below in section C.2.h.ii.(B)(2). J. Schiedemeyer Sept. 16, 2015 Tr. at 80:16-81:23.

[2189]   R. Brimmer Sept. 29, 2015 Tr. at 171:22-172:13.

[2190]   G. Loveman Oct. 27, 2015 Tr. at 209:11-15; L. Swann Oct. 12, 2015 Tr. at 65:11-17; F. Kleisner Oct. 30, 2015 Tr. at 68:14-70:20.   For example, the Bally's Las Vegas and Harrah's New Orleans projected EBITDA in the January Business Plan are consistent with CEC's Q4 2013 long-range plan, and The Cromwell's projected EBITDA is consistent with the Q1 2014 long-range plan.   *See* "Impairment Review" (as of Dec. 31, 2013), CEOC_INVESTIG_00491055 (native), at Tab "Q4 LRP"; "Impairment Review" (as of Mar. 31, 2014), CEOC_INVESTIG_00162537 (native), at Tab "Q1 LRP."   The January Business Plan with respect to The Quad does not appear to have been derived from the LRP.   The source of these projections is unclear.

[2191]   N. Bryson Sept. 28, 2015 Tr. at 21:2-15.   *See also* Section VIII.B.

[2192]   E. Hession Nov. 4, 2015 Tr. at 304:9-307:14 (Centerview was not making "adjustments [to our numbers] based on what they felt were realistic outcomes . . . .   [T]hey were taking our numbers, copying them into a spreadsheet and not listening to our commentary at the same time.").

[2193]   Centerview's December 20, 2013 engagement letter provides, among other things, that "[w]ith respect to any forecasts of projections that may be furnished to Centerview or discussed with the Committee and/or the Company, Centerview will assume that they have been reasonably prepared on bases reflecting the best then currently available estimates and judgments of the management of the Company as to the matters covered thereby."   Centerview Partners LLC Engagement Letter to Caesars Entertainment Corporation Special Committee (Dec. 20, 2013), at CENTERVIEW_0000307 [CENTERVIEW_0000303].   D&Ps' January 17, 2014 engagement letter contains a similar provision. D&P Engagement Letter (Jan. 17, 2014), CEOC_INVESTIG_00069586-88 [CEOC_INVESTIG_00069586].

"Management knows their business. . . . [Centerview] will ask questions [regarding their projections] . . . [and] push back" where appropriate.[2194]

On January 24, 2014, Centerview presented to the CEC Special Committee its preliminary views regarding the value of the Four Properties based on, among other things, the January Business Plan.[2195]

The following page is reproduced from Centerview's presentation summarizing its preliminary valuation summary:

<p align="center">**Four Properties Figure 21:  Excerpt from<br>January 24, 2014 Centerview Discussion Materials**</p>



According to Centerview's preliminary analysis, the estimated aggregate value of the Four Properties and 50% management fee interest ranged from $1.9 billion to $3.5 billion.[2196]

---

[2194] J. Bosacco Sept. 15, 2015 Tr. at 97:24-99:8; *see also* J. Schiedemeyer Sept. 16, 2015 Tr. at 91:14-17 (D&P "specifically do[es] not express opinions on management's projections.").

[2195] J. Bosacco Sept. 15, 2015 Tr. at 104:12-25; "Caesars Entertainment Confidential Discussion Materials" (Jan. 24, 2014) [CENTERVIEW_0002563] (native), at 11.

[2196] "Caesars Entertainment Confidential Discussion Materials" (Jan. 24, 2014) [CENTERVIEW_0002563] (native), at 11.

Centerview assumed, for purposes of valuing the Four Properties, that each property would retain access to Total Rewards post-transaction.[2197]

### iv.   Lazard Adjusts the January Business Plan

According to Furie, Lazard was "firmly of the view that the initial projections [provided by CEC management] were not reasonable for [Lazard] to rely on in [its] analysis."[2198]   Applying its own analysis, Lazard revised CEC management's initial projections in several respects, including by reducing revenue growth and increasing capital expenditures for each projected year with respect to each of the Four Properties.[2199]   Furie shared these downward adjustments with Centerview.[2200]   He described the principal basis for Lazard's adjustments as follows:

> If you look at the properties . . . two of them were undergoing almost complete transformations, the Cromwell and The Quad.   And so we understood that there was . . . going to be significant changes in their operations hopefully initially.   We felt like in the out years, though, the last two years of the projection for those and the other properties, that the growth rates were above market growth rates.   And while it made sense to have high growth in the initial years after you open what would effectively be two new properties . . . those types of growth rates wouldn't and shouldn't persist over the long run.[2201]

### v.   The CAC Special Committee's Indication of Interest

On January 26, 2014, Beilinson, on behalf of the CAC Special Committee, relayed to the CEC Special Committee an "indication of interest" of $1.75 billion for the Four Properties, less assumption of any outstanding indebtedness of approximately $185 million under Bill's' (now The Cromwell) existing credit facility.   Lazard's downward revisions to CEC management's projections were reflected in the proposed purchase price.[2202]

---

[2197] J. Bosacco Sept. 15, 2015 Tr. at 91:12-19.   As discussed in more detail below, while Centerview did not independently value Total Rewards program (*id.* at 166:3-10), it believed that the respective values of the Four Properties would decline if they did not have access to Total Rewards.   *Id.* at 205:18-206:5.

[2198] S. Furie Sept. 18, 2015 Tr. at 68:13-24.   According to Furie, the CEC shared its initial projections (which had "a couple little iterations") and a set of revised projections (discussed below) with Lazard and the CAC Special Committee.   *Id.* at 70:14-21.

[2199] *See* "Follow Up Meeting with Management Key Questions on Business Plan" (Feb. 4, 2014), at CENTERVIEW_0001073-76 [CENTERVIEW_0001073].

[2200] S. Furie Sept. 18, 2015 Tr. at 72:15-73:2.

[2201] *Id.* at 73:18-74:11.

[2202] *Id.* at 71:19-73:2; Caesars Acquisition Company Special Committee Letter of Intent (Feb. 5, 2014), at CEOC_INVESTIG_00452695-700 [CEOC_INVESTIG_00452692].

There was never any discussion between the CAC and CEC Special Committees regarding substituting any other properties for one or more of the Four Properties.[2203]   Beilinson explained to the Examiner:   "I think [the CAC Special Committee] stayed within these four assets.   And the conversation was that we'd make an offer, if so, how many of the properties. We ultimately . . .  decided to make an offer for four."[2204]

The CAC Special Committee's initial proposal also provided, among other things, that:

(i) the transaction agreement must address "the renovation of the Quad," including with respect to "cost control"; and

(ii) any agreement to purchase the Four Properties "will be subject to a mutually satisfactory arrangement to ensure that the [Four Properties] will continue to enjoy the existing benefits of Total Rewards and the intellectual property, such as transferring the assets to a bankruptcy remote entity."[2205]

Beilinson explained to the Examiner the reason for inclusion of the "bankruptcy-remote" term in

the CAC Special Committee's initial proposal:

There was enough . . . noise, whether you believe it or not, that CEOC may at some point in time in the future, or may not, end up in a chapter proceeding.   So you want to protect . . . any possible, even minimal downside that you have when you're potentially doing a transaction of this size.   So I thought it was important to . . . put in an initial offer letter that this was going to be a requirement of any transaction.[2206]

Beilinson told the Examiner that he had not "formalized" his thoughts or "reached any final view" on how the transaction should be structured such that Total Rewards would be in a "bankruptcy remote" entity.[2207]   However, Beilinson "didn't think at that time that putting [Total Rewards] in a subsidiary of CEOC would be sufficient enough [for his] comfort level" because "if CEOC ever did file a chapter proceeding, it's likely that its subsidiaries would, and it wouldn't be sufficiently bankruptcy remote for [his] level of risk tolerance."[2208]

---

[2203]  M. Beilinson Oct. 6, 2015 Tr. at 73:21-74::4.

[2204]  *Id.* at 73:21-74:12.

[2205]  Caesars Acquisition Company Special Committee's Indication of Interest (Jan. 26, 2014), at CEOC_INVESTIG_00452697 [CEOC_INVESTIG_00452693].   *See infra* section at 9.I.X.6.a for a detailed discussion regarding the CAC Special Committee's request to transfer Total Rewards to a bankruptcy remote entity.

[2206]  M. Beilinson Oct. 6, 2015 Tr. at 67:19-69:2.

[2207]  *Id*. at 70:20-25.   As discussed in detail in section VIII.D.3 *infra*, the "bankruptcy remote" concept was developed by Apollo and Paul Weiss prior to the January 26, 2014 initial offer.

[2208]  *Id*. at 71:2-14.

The evidence is that, though not expressly conveyed in the January 26 proposal, the CAC Special Committee also concurrently requested a solvency representation as to CEOC.[2209]

### vi.   The CEC Special Committee's Counter-Offer

On January 27 and 31, 2014, the CEC Special Committee held meetings during which Centerview presented overviews of CAC's initial offer.[2210]   During the January 31 meeting, Centerview advised the CEC Special Committee that the CAC Special Committee, in consultation with its financial advisor, Lazard, made certain downward adjustments to the January Business Plan, which were reflected in the CAC Special Committee's January 26 proposal.   The CEC Special Committee, after discussion with its financial and legal advisors, unanimously rejected CAC's initial proposal and directed Centerview to relay to the CAC Special Committee a counter-offer of $2.75 billion for the Four Properties and related management fees.[2211]

The CEC Special Committee viewed its $2.75 billion counter-offer as a "rhetorical response to the unrealistic nature of [CAC's] opening [bid]."[2212]   According to Kleisner and Swann, the counter-offer was a "message that [the CAC Special Committee] have to get real . . . because [CAC's] coming-out bid [was] totally unrealistic."[2213]   The CEC Special Committee did not, at this juncture, have a "target as to what . . . [they] would be willing to accept."[2214]   The committee was, however, aware of the $2 billion cash inflows target amount that CEOC needed to help address its liquidity issues set forth in the liquidity discussion materials provided to the CEC Board on or around November 26, 2013.[2215]

In addition, members of the CEC Special Committee indicated surprise at the request from their counterparts at CAC for the request to transfer Total Rewards to a "bankruptcy

---

[2209]  *Id*. at 76:7-77:14 (indicating that CAC only pressed the solvency issue after reviewing the CEC Special Committee's counter-offer).

[2210]  During the January 31, 2014 meeting, the CEC Special Committee also directed Centerview to inquire as to the financial impact that the Four Properties Transaction would have on CEOC, including the intended use of the transaction proceeds.   CEC management later responded that the proceeds would be used to "build liquidity" and "fund the operational burn," thereby enabling CEOC to "fund the business on a go-forward basis and provide the ability to continue to pursue refinancing alternatives as required to manage the balance sheet."   J. Bosacco Sept. 15, 2015 Tr. at 117:14-25; Caesars Entertainment Corporation Special Committee Meeting Minutes (Jan. 31, 2014).

[2211]  F. Kleisner Oct. 30, 2015 Tr. at 61:11-62:17.

[2212]  *Id*. at 62:3-7.

[2213]  *Id*. at 62:8-15.

[2214]  *Id*. at 62:24-63:6.

[2215]  *See* "Liquidity Discussion Board of Directors Materials" (Nov. 2013), CEOC_INVESTIG_00172963 (native file), at 2.

remote" entity, which they described as making "very little sense." [2216]  But, as described below, by January 15, 2014, Apollo and Paul Weiss had been involved in drafting a detailed term sheet which included the licensing of Total Rewards to an entity that became CES, a development Reed Smith was aware of by January 20 at the latest.[2217]  Nonetheless, in its counter-offer, the CEC Special Committee specified: [2218]

- "Participation in Total Rewards Program and utilization of CEOC intellectual property that is currently in use by the proposed assets to continue on current terms."

- "The relationship with Total Rewards will be governed by the management agreement (Total Rewards will not be transferred to a bankruptcy-remote third party entity)."

Nevertheless, it appears that Centerview later explained to the CEC Board that the Four Properties Transaction might ultimately require such a new entity, and over the course of negotiations, the concept of CES became an integral part of the transaction.[2219]  The CEC Special Committee's counter-offer further provided that "[CEC] and its subsidiaries will not make any representation regarding solvency other than what is contained in its existing public filings."[2220] According to members of the committee, there was "no reason to make [such] a representation" as CAC had access to "existing public filings at that time that they could reference and either accept or not."[2221]  Kleisner and Swann both maintain that the CAC Special Committee's request for a solvency representation did not cause them to be concerned regarding whether CEOC was, in fact, insolvent at the time of the Four Properties Transaction.[2222]  However, there appears to

---

[2216] F. Kleisner Oct. 30, 2015 Tr. at 47:13-25 ("My actual reaction when I called our legal advisors was I don't know where [Beilinson] is coming from . . . . It made very little sense.  And I was somewhat relieved to see the clause prefaced by the words 'such as.'  That's the first time I saw it come up.  It was entirely understandable that [CAC] wanted to be certain that Total Rewards was connected to the properties, it created great value, but this came as a surprise to me.").

[2217]  D. Sambur Jan. 14, 2016 Tr. at 771:16-772:7, 782:20-786:17.

[2218] Caesars Acquisition Company Special Committee's Indication of Interest (Jan. 26, 2014), at CEOC_INVESTIG_00452695-700 [CEOC_INVESTIG_00452692].

[2219] J. Bosacco Sept. 15, 2015 Tr. at 163:5-164:6; "Caesars Entertainment Confidential Discussion Materials" (Jan. 27, 2014), at CEOC_INVESTIG_00542733 [CEOC_INV-ESTIG_00542731].

[2220] F. Kleisner Oct. 30, 2015 Tr. at 63:13-64:16; "Response to CAC Proposal Dated January 26, 2014" (Jan. 26, 2014), at CENTERVIEW_0000119 [CENTERVIEW_0000119].

[2221] *Id*.

[2222] *Id.* at 66:12-18.  Kleisner and Swann maintain that, throughout the process, they never considered that CEOC might be insolvent nor did they request or receive a solvency opinion with respect to CEOC.  *Id.* at 63:13-66:18; L. Swann Oct. 12, 2015 Tr. at 23:20-24:17.  As discussed elsewhere, the Examiner has difficulty understanding how sophisticated businessmen would

have been no other credible explanation for making such a request other than concerns about solvency.

According to Beilinson, the CEC Special Committee's refusal to provide a solvency representation "gave [the CAC Special Committee] some notice that there might be an issue . . . and . . . we ha[d] to start asking questions about what they plan to utilize the funds for generally."[2223]    Beilinson explained that he "instructed Skadden and Lazard to make those inquiries, and [the CAC Special Committee] got comfortable with the responses."[2224]    Beilinson recalled that Kleisner told these advisors in substance that the purpose of the transaction was to "create a long-term sustainable CEOC" by selling assets that CEC "didn't have a capability of making an improvement on," thereby increasing liquidity and allowing CEOC to "make payments to creditors."[2225]    Beilinson also told the Examiner that while he never considered the possibility of a CEC bankruptcy, he "considered a potential CEOC bankruptcy."[2226]    Sambur also said he believed, around this time, that a CEOC bankruptcy "was a possibility."[2227]    Numerous witnesses ultimately conceded this.[2228]

### vii.    The February Business Plan

According to Kleisner, upon scrutinizing the January Business Plan immediately following what appears to have been Centerview's January 31, 2014 presentation,[2229] he noticed several "red flags" with respect to the reasonableness of the figures.[2230]    This prompted Kleisner to express to Swann that CEC management and Centerview needed to closely review the January Business Plan "to be certain [they were] dealing with good numbers."[2231]    Kleisner believed that,

---

believe this given, CEOC's highly leveraged balance sheet, negative cash flow, declining EBITDA, and compelling evidence that CEOC would never be able to repay its debts when they became due.

[2223]  M. Beilinson Oct. 6, 2015 Tr. at 76:23-77:14.

[2224]  *Id*.  According to Beilinson, Skadden did not, however, perform "due diligence as to the financial condition of CEOC" in connection with the transaction.  M. Beilinson Jan. 25, 2016 Tr. at 182:18-183:8.

[2225]  M. Beilinson Jan. 25, 2016 Tr. at 178:17-179:15.

[2226]  M. Beilinson Oct. 6, 2015 Tr. at 82:11-20.  Beilinson did, however, tell the Examiner that it was his understanding that, absent the transaction, "there would be a going concern qualification . . . on CEC's audited financials."  M. Beilinson Jan. 25, 2016 Tr. at 179:16-25.  He did not recall whether he became aware of this fact during the course of the transaction or after the transaction had closed.  *Id*.

[2227]  D. Sambur Oct. 29, 2015 Tr. at 494:22-495:17.

[2228]  *See, e.g.*, C. Abrahams Oct. 7, 2015 Tr. at 274:16-275:3, 282:2-283:5; M. Rowan Nov. 16, 2015 Tr. at 271:3-272:24.

[2229]  F. Kleisner Oct. 30, 2015 Tr. at 68:14-70:4.

[2230]  *Id.* at 69:24-70:4.

[2231]  *Id.*; L. Swann Oct. 12, 2015 Tr. at 72:14-73:12.

in the context of a "real estate transaction involving the sale of the management enterprises," the underlying projections should be "realistically achievable within a reasonable reach."[2232] Swann agreed, noting to Kleisner that CEC "consistently" missed its annual plan projections by "wide margins."[2233] Several witnesses from CEC management and the Sponsors shared this view,[2234] though they generally acknowledged that it was based on CEC's performance overall, not the individual performance of any of the Four Properties.[2235] Further, CEC's underperformance was significantly impacted by the underperformance of the Atlantic City Region.[2236]

Figure 22 below compares the projected performance of the Four Properties to their actual performance during the three-year period immediately preceding the Four Properties Transaction.

---

[2232] F. Kleisner Oct. 30, 2015 Tr. at 69:3-12.

[2233] *Id.* at 70:5-11; Swann Oct. 12, 2015 Tr. at 65:18-66:17; *see also* J. Bosacco Sept. 15, 2015 Tr. at 181:12-17 (Q: "[D]id you . . . come to the conclusion that[] . . . 'the proposed assets have generally underperformed the budget in 2012 and 2013?' A. "Yes.").

[2234] G. Loveman Oct. 27, 2015 Tr. at 213:4-214:2; D. Colvin Nov. 6, 2015 Tr. at 129:8-9 ("[W]e never met any forecast."); J. Beato Sept. 24, 2015 Tr. at 215:3-16 ("[G]enerally it trickled down that every property missed the plan, therefore, your enterprise missed the plan. . . . [But] I would be surprised if [the individual properties] had hit the plan."); *id.* at 213:22-25 ("[W]hen we put out the plan targets and you look historically, we missed plan almost every year.").

[2235] *See* L. Swann Oct. 12, 2015 Tr. at 67:3-4; G. Loveman Oct. 27, 2015 Tr. at 214:14-215:3. Further, it appears that the individual Four Properties exceeded their projections in some years and missed in others. Moreover, the Four Properties had not, in the aggregate, materially missed budget in three prior years. Appendix 7, Valuation at Section VII.B; *see also* "Caesars Entertainment Corporation Long Range Plan – Q4 2013" (Dec. 31, 2013), DT0003746 (native file), at Tab "Summary" ("Projected revenues for each property for 2014-2018 appeared to be within reason when compared to industry and/or analyst estimates.").

[2236] Board Package (Feb. 20, 2014), at CEC_EXAMINER_1265427-98 [CEC_EXAMINER_1265371]. Caesars had also just reduced the projections in the LRP in Q3 2013, before the creation of the January Business Plan, in order to make them more reasonable and achievable. Deloitte Memorandum – ASC 350: Goodwill and Non-amortizing Intangible Assets Impairment Testing (Nov. 1, 2013), at DT0005256 [DT0005245] and Deloitte Workpaper – Long-Range Plan Testing (Q4 2013), at Tab 'Summary' [DT0003746] (native file).

**Four Properties Figure 22:  Excerpt from February 6, 2014 CEC Discussion Materials**

## Budget Versus Actual Results

The Proposed Assets have had different levels of performance relative to their budget over the past several years

### The Quad

| | | FYE December, | | |
|---|---|---|---|---|
| | | 2011 | 2012 | 2013[(1)] |
| Net Revenue | Budget Net Revenue | $131 | $140 | $110 |
| | Actual Net Revenue | 138 | 119 | 101 |
| | Over/(Under) Budget ($) | $7 | ($21) | ($10) |
| | Over/(Under) Budget (%) | 5% | -15% | -9% |
| EBITDAM | Budget EBITDAM | $23 | $40 | $20 |
| | Actual EBITDAM | 37 | 25 | 13 |
| | Over/(Under) Budget ($) | $14 | ($15) | ($7) |
| | Over/(Under) Budget (%) | 61% | -38% | -35% |

### Bill's Gamblin' Hall & Saloon

| | | FYE December, | | |
|---|---|---|---|---|
| | | 2011 | 2012 | 2013[(1)] |
| Net Revenue | Budget Net Revenue | $53 | $56 | N/M |
| | Actual Net Revenue | 53 | 51 | N/M |
| | Over/(Under) Budget ($) | ($1) | ($5) | N/M |
| | Over/(Under) Budget (%) | -1% | -9% | N/M |
| EBITDAM | Budget EBITDAM | $10 | $13 | N/M |
| | Actual EBITDAM | 11 | 10 | N/M |
| | Over/(Under) Budget ($) | $1 | ($3) | N/M |
| | Over/(Under) Budget (%) | 10% | -23% | N/M |

### Bally's Las Vegas

| | | FYE December, | | |
|---|---|---|---|---|
| | | 2011 | 2012 | 2013[(1)] |
| Net Revenue | Budget Net Revenue | $267 | $289 | $261 |
| | Actual Net Revenue | 271 | 260 | 252 |
| | Over/(Under) Budget ($) | $5 | ($29) | ($9) |
| | Over/(Under) Budget (%) | 2% | -10% | -4% |
| EBITDAM | Budget EBITDAM | $66 | $88 | $66 |
| | Actual EBITDAM | 77 | 64 | 63 |
| | Over/(Under) Budget ($) | $11 | ($24) | ($3) |
| | Over/(Under) Budget (%) | 17% | -27% | -5% |

### Harrah's New Orleans

| | | FYE December, | | |
|---|---|---|---|---|
| | | 2011 | 2012 | 2013[(1)] |
| Net Revenue | Budget Net Revenue | $358 | $359 | $349 |
| | Actual Net Revenue | 346 | 350 | 344 |
| | Over/(Under) Budget ($) | ($12) | ($9) | ($5) |
| | Over/(Under) Budget (%) | -3% | -3% | -1% |
| EBITDAM | Budget EBITDAM | $74 | $86 | $92 |
| | Actual EBITDAM | 84 | 92 | 84 |
| | Over/(Under) Budget ($) | $10 | $6 | ($7) |
| | Over/(Under) Budget (%) | 14% | 6% | -8% |

Source:    Caesars  Entertainment  Confidential  Discussion  Materials"  (Feb.  6,  2014),  at CEOC_INVESTIG_005428008-9, CEOC_INVESTIG_00542811 [CEOC_INVESTIG_00542806].

When examined in the aggregate, the Four Properties missed budget by only 2.8%.  Further, while in some years certain of the Four Properties exceeded the budget, in other years they fell short.[2237]

According to Kleisner, immediately following his conversation with Swann, he instructed Centerview, through its counsel, to "test" the January Business Plan to determine whether these projections were "realistically achievable within a reasonable reach."[2238]   The CEC Special Committee also conveyed this directive to CEC management during a telephonic meeting also attended by Centerview.[2239]   Kleisner told the Examiner that, during the meeting, the CEC Special Committee expressed to both CEC management and Centerview that, despite its

---

[2237] *See* Appendix 7, Valuation at Section VIII.B.

[2238] F. Kleisner Oct. 30, 2015 Tr. at 69:6-12, 73:19-74:12.

[2239] *Id.* at 72:15-73:11.

concerns, it was prepared to adopt the projections embedded in the January Business Plan if CEC management determined that they were, in fact, realistically achievable.[2240]

There is, however, credible evidence indicating that, regardless of Kleisner's intent, CEC management felt pressure to not merely scrutinize the January Business Plan but to revise the projections therein downward. For instance, Schiedemeyer told the Examiner: "My recollection is that a revision was being done in part because Fred Kleisner, our Special Committee member, did not believe the original January projections. He thought they were overly optimistic. And as a result management revised the projections."[2241] According to Brimmer: "We only changed the numbers because – we only presented an alternative case because Fred [Kleisner] asked us to."[2242] Brimmer added that these changes would not have been made in the "ordinary course."[2243] Moreover, when a senior board member questions projections being used by the company, it is not surprising that the company would make adjustments to those projections.

Pursuant to the CEC Special Committee's directive, Hession and Brimmer revisited the January Business Plan.[2244] In a February 4, 2014 e-mail to certain property-level managers and members of CEC management, Brimmer stated: "My view is that the [January Business Plan] we provided was reasonable and something management will endeavor to deliver, but there are a handful of assumptions within the projections that should be pressure tested and sensitized."[2245]

Hession and Brimmer both maintain that they were surprised that Centerview did not more thoroughly scrutinize the January Business Plan and the assumptions underlying those figures. According to Hession:

> [W]hen we presented these projections to each of the advisers [*sic*], [Brimmer and I] made it clear what our underlying assumptions were. And so from my perspective, these well-paid advisers [*sic*] who were experts in valuation would listen to management, listen to our assumptions, listen to what we were saying were things that were in our control and out of our control and make adjustments based on what they felt were realistic outcomes. And it appeared that that was not what was happening and instead, they were taking our

---

[2240] *Id.* at 70:5-74:12; E. Hession Nov. 4, 2015 Tr. at 309:6-25 ("And I even recall [Kleisner] saying if you don't want to change the numbers, don't feel like you have to change the numbers.").

[2241] J. Schiedemeyer Sept. 16, 2015 Tr. at 80:21-81:23.

[2242] R. Brimmer Sept. 29, 2015 Tr. at 193:17-194:15.

[2243] *Id.*

[2244] According to Bosacco, while Centerview did not suggest particular changes, it did identify areas of concern, which they discussed with CEC management until Centerview was "comfortable with all those assumptions." J. Bosacco Sept. 15, 2015 Tr. at 97:24-99:8, 106:22-107:10; J. Schiedemeyer Sept. 16, 2015 Tr. at 80:16-81:18.

[2245] E-mail from R. Brimmer to E. Moore, *et al.* (Feb. 4, 2014), at CEOC_INVESTIG_00068943 [CEOC_INVESTIG_00068943].

numbers, copying them into a spreadsheet and not listening to our commentary at the same time.[2246]

Brimmer likewise told the Examiner:

[I] think Centerview took the projections that we provided in January and probably valued those without – there's no reason for them to be critical of the projections. . . . So they just valued them and said if these operating results are achieved this is what these things are worth. So there was that kind of inconsistency.[2247]

On February 5, 2014, Brimmer circulated revised projections (the "February Business Plan") that, according to Brimmer, "discount[ed] for the optimism that [CEC management had] included in [its] original management case."[2248]  Brimmer believed at the time, however, that the January Business Plan was "realistically achievable."[2249]  The changes in the projections were the result of modifications made to various assumptions, impacting both revenue and EBITDA. The projected EBITDA was reduced for each of the Four Properties in each projected year, resulting in an aggregate EBITDA reduction of more than 12%.[2250]  The projected revenue was also reduced for each of the Four Properties in each projected year.  According to Brimmer, he and his team "went property by property and looked for what [they] thought were areas of risk or too much . . . stretch within the numbers."[2251]

A comparison of the Four Properties' projected EBITDA with respect to the January and February Business Plan is set forth below.

---

[2246]  E. Hession Nov. 4, 2015 Tr. at 304:9-305:14.

[2247]  R. Brimmer Sept. 29, 2015 Tr. at 205:2-25.

[2248]  E-mail from R. Brimmer to G. Loveman, *et al.* (Feb. 5, 2014), at CEOC_INVESTIG_00125021 [CEOC_INVESTIG_00125021].  In response to Brimmer's February 5 e-mail, Colvin wrote that the "revised case looks like a higher probability scenario." E-mail exchange between D. Real and D. Colvin, *et al.* (Apr. 4-5, 2014), at CEOC_INVESTIG_00069649 [CEOC_INVESTIG_00125021].  The Sponsors maintain that they did not influence the change from the January to the February Business Plan.  *See* M. Rowan Nov. 17, 2015 Tr. at 326:8-18; D. Sambur Oct. 29, 2015 Tr. at 445:22-446:7.

[2249]  R. Brimmer Sept. 29, 2015 Tr. at 186:16-188:14.

[2250]  Appendix 7, Valuation at Section VIII.B.1.  *See also* J. Schiedemeyer Sept. 16, 2015 Tr. at 84:3-25 ("[D&P] came to understand why [the projections] changed. We also did a comparison of the magnitude of the changes.  We also did some analysis on how the company has performed relative to past budgets that they prepared.  And I'd point out that they generally performed below where they budgeted or projected the business historically.  And ultimately we got comfortable with the reasons for the changes and the instructions to use the February projections.").

[2251]  R. Brimmer Sept. 29, 2015 Tr. at 208:2-12; "Rationale for Revision to Management Projections" (Feb. 4, 2014), CEOC_INVESTIG_00053658 (native file).

**Four Properties Figure 23:  EBITDA Change from
January Business Plan to February Business Plan**

| | The Quad | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *amounts in millions* | **2014** | | **2015** | | **2016** | | **2017** | | **2018** | | **Total** |
| January Business Plan | $ | 41 | $ | 85 | $ | 87 | $ | 97 | $ | 108 | $ 418 |
| February Business Plan | $ | 26 | $ | 70 | $ | 72 | $ | 77 | $ | 83 | $ 327 |
| % Reduction | | -37% | | -18% | | -18% | | -21% | | -23% | | -22% |

| | Bally's Las Vegas | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *amounts in millions* | **2014** | | **2015** | | **2016** | | **2017** | | **2018** | | **Total** |
| January Business Plan | $ | 79 | $ | 88 | $ | 93 | $ | 105 | $ | 115 | $ 480 |
| February Business Plan | $ | 75 | $ | 83 | $ | 87 | $ | 94 | $ | 99 | $ 438 |
| % Reduction | | -5% | | -6% | | -6% | | -10% | | -14% | | -9% |

| | The Cromwell | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *amounts in millions* | **2014** | | **2015** | | **2016** | | **2017** | | **2018** | | **Total** |
| January Business Plan | $ | 33 | $ | 51 | $ | 54 | $ | 57 | $ | 60 | $ 255 |
| February Business Plan | $ | 28 | $ | 45 | $ | 47 | $ | 50 | $ | 52 | $ 221 |
| % Reduction | | -15% | | -13% | | -13% | | -13% | | -13% | | -13% |

| | Harrah's New Orleans | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *amounts in millions* | **2014** | | **2015** | | **2016** | | **2017** | | **2018** | | **Total** |
| January Business Plan | $ | 88 | $ | 91 | $ | 92 | $ | 99 | $ | 106 | $ 476 |
| February Business Plan | $ | 87 | $ | 89 | $ | 89 | $ | 91 | $ | 93 | $ 449 |
| % Reduction | | -2% | | -3% | | -3% | | -8% | | -12% | | -6% |

| | Four Properties Combined | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *amounts in millions* | **2014** | | **2015** | | **2016** | | **2017** | | **2018** | | **Total** |
| January Business Plan | $ | 241 | $ | 315 | $ | 326 | $ | 358 | $ | 389 | $ 1,629 |
| February Business Plan | $ | 216 | $ | 286 | $ | 295 | $ | 311 | $ | 327 | $ 1,434 |
| % Reduction | | -10% | | -9% | | -10% | | -13% | | -16% | | -12% |

Source: Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab 'Centerview Sensitivity' [CENTERVIEW_0001017] (native file).

Notably, multiple witnesses acknowledged that the February Business Plan was never utilized for any purpose beyond valuing the Four Properties.[2252]  Brimmer, for instance, told the Examiner that CEC "did not update the plan for the year or the LRP or anything as a result of the February Business Plan."[2253]  CEC continued to use the LRP, from which the January Business Plan was derived, for various purposes, including budgeting, compensation and impairment

---

[2252]  E. Hession Nov. 4, 2015 Tr. at 311:16-23; *see*, *e.g.*, G. Loveman Oct. 27, 2015 Tr. at 209:11-21.

[2253]  R. Brimmer Sept. 29, 2015 Tr. at 222:19-223:8.

testing.[2254]  As Brimmer told the Examiner:  "[T]he plan didn't change.  The budget for 2014 didn't change.  The benchmark against which we were providing incentive compensation didn't change.  It was just an alternative view that was more middle of the road, risk adjusted.  That changed."[2255]  Further, as discussed in Section C.2.f.vii, *infra*, CEC management continued to rely on the projections underlying the January Business Plan, as routinely adjusted through changes to the LRP, in presentations to the CEC Board.

When asked by the Examiner whether, from a negotiating perspective, it is unusual for a seller to elect to revise its projections downward and share them with the buyer, Kleisner responded that, in light of CEOC's pressing liquidity issues, the CEC Special Committee "needed to move this faster, not slower."[2256]  According to Kleisner, unrealistic projections would have "slow[ed] down the project." [2257]  Kleisner noted that Lazard was sophisticated and would have "sniffed out" unrealistic projections.[2258]

The CEC Special Committee denies that its request that Centerview and CEC management "test" the January Business Plan was the result of direct pressure applied by the CAC Special Committee or Lazard.[2259]  There is, however, some evidence to the contrary.  For instance, on February 1, 2014, Lazard, at the CAC Special Committee's request:  (i) informed Centerview that the CAC Special Committee was "unlikely to agree to a purchase price at the mid-point" of the CAC Special Committee's initial offer and the Special Committee's counter-offer;  and (ii) "recommended" that the Special Committee "review, and evaluate the reasonableness of, the projections prepared by CEC management in light of the feedback" from the CAC Special Committee.[2260]

---

[2254]  E. Hession Nov. 4, 2015 Tr. at 312:2-10; R. Brimmer Sept. 29, 2015 Tr. at 172:10-173:10; *see also* e-mail from S. Costopoulos to D. Jayaseelan, *et al.* (Apr. 22, 2014), at CEOC_INVESTIG_00053650 [CEOC_INVESTIG_00053650] (stating that the February Business Plan should not be distributed as "'approved' by the banks" because (i) they were "not used in any of the bank materials for the financing," and (ii) the "special committees just used [them] for their negotiations / forming opinions.").

[2255]  R. Brimmer Sept. 29, 2015 Tr. at 193:17-194:15.

[2256]  F. Kleisner Oct. 30, 2015 Tr. at 86:8-87:8.

[2257]  *Id*.

[2258]  *Id*. at 85:13-86:7.

[2259]  *Id.* at 86:8-87:8.

[2260]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 3, 2014), at CACEXAM00434828-30 [CACEXAM00434828].  According to what appears to be an earlier draft of the February 3, 2014 CAC Special Committee Meeting Minutes, Furie informed Centerview that the "CEC Special Committee needed to revisit the projections prepared by CEC management and adjust their valuation accordingly."  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 3, 2014), at CACEXAM00070904-6 [CACEXAM00070904].  Bosacco did not recall having been directed by Furie to "revisit" the projections and "adjust [Centerview's] valuation."  J. Bosacco Sept. 15, 2015 Tr. at 179:15-180:15.

Also, on February 3, 2014, Beilinson reported to the CAC Special Committee that he had received a call from Kleisner to inform him that, among other things, the CEC Special Committee had "agreed to arrange meetings with CEC management and Centerview to review CEC management's projections further and determine whether there was a reasonable basis to sensitize the projections, including based on concerns raised by the [CAC Special Committee] about capital expenditure and revenue growth assumptions."[2261]   Beilinson also reported that, during the call, he told Kleisner that (i) "Centerview should be able to issue a fairness opinion at a lower valuation so long as it remains within Centerview's range," and (ii) CEC "management's internal numbers do not need to, and often do not, form the basis of projections used in connection with a sale process."[2262]

Moreover, on February 4, 2014, Simon Furie of Lazard reported to the CAC Special Committee that it had informed Centerview that the "proposed purchase price of $2.75 billion was well outside Lazard's range based on the financial projections that the Special Committee directed Lazard to use in its preliminary valuation analysis, and that Centerview should continue to scrutinize the financial projections prepared by CEC management which formed the basis of CEC's counter-offer."[2263]   Furie further reported that "Centerview informed Lazard that based on CEC management's current forecast, Centerview would be unable to render a fairness opinion at a valuation lower than the mid-point of the Special Committee's initial offer and the CEC Special Committee's counter-offer (i.e., $2.25 billion)."[2264]

Further, Furie indicated to the Examiner that it was push-back from Lazard that triggered the downward revision to the January Business Plan.  Furie explained:

> I don't know the specific process, but I know that they understood that we didn't buy into the [January Business Plan], and went back and revisited their projections in some form and provided a new set.  . . .   [T]heir [revised] projections . . . were much closer to our projections than their initial projections.[2265]

---

[2261]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 3, 2014), at CACEXAM00434829 [CACEXAM00434828]; M. Beilinson Oct. 6, 2015 Tr. at 82:3-85:17. Beilinson also reported to the CAC Special Committee that Kleisner stated that "Centerview would only issue a fairness opinion at or above the mid-point of Centerview's valuation range." Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 3, 2014), at CACEXAM00434829 [CACEXAM00434828].  Kleisner does not recall having made this statement and believes it likely an example of "Beilinson bargaining with his own committee." F. Kleisner Oct. 30, 2015 Tr. at 90:6-91:15.

[2262]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 3, 2014), CACEXAM00434829 [CACEXAM00434828]; M. Beilinson Oct. 6, 2015 Tr. at 83:24-85:17.

[2263]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 4, 2014), at CACEXAM00434802 [CACEXAM00434802].

[2264]  *Id.* at CACEXAM00434802-3.

[2265]  S. Furie Sept. 18, 2015 Tr. at 58:17-59:7.

While the extent to which pressure by the CAC Special Committee and Lazard led to the February Business Plan is subject to debate, it appears that the revised projections enabled Centerview to value the Four Properties in a range at which Lazard could provide a fairness opinion to the CAC Special Committee and Board, and a transaction could get done.  Moreover, as noted above, the reality was that CEC needed the transaction to be consummated to avoid a going concern qualification on its then pending 10-K.

### viii. CEC Expresses Optimism Regarding Its Actual and Anticipated Financial Performance

Around the same time that the CEC Special Committee and Centerview abandoned the January Business Plan in favor of the February Business Plan, CEC expressed, both internally and to the CEC Board (including Kleisner and Swann), a more positive view of the company's actual and anticipated financial performance than was reflected in the February Business Plan, particularly with respect to the Las Vegas market in which three of the Four Properties operated.

For example, the Financial and Operating Review presented to the CEC Board at its February 20, 2014 meeting contained the following assertions regarding actual and expected financial results for CEC overall and specific to the Las Vegas market,[2266] including:

- While the enterprise missed plan by $61 million in Q4 2013, the miss was attributed "primarily to gaming weakness in AC ($40m) and Tunica ($7m)."

- "Gaming revenue market share has generally improved across the enterprise in the most recent quarter."

- Las Vegas EBITDA exceeded plan for Q4 2013 and the full year 2013 by 6% and 8%, respectively.

- "Adjusted for hold, CEC beat its Las Vegas competitive set in Q4 due to hospitality growth and cost containment."  The competitive set noted includes Las Vegas Sands and Wynn Resorts.

- "On a normalized basis, CEC outperformed its Las Vegas competitive set in 2013."

- In Las Vegas, resort fees added $24 million in incremental EBITDA in the ten months since implementation.

- "After declining 3% in 2013, Las Vegas group revenue will increase 8% in 2014, driven by a strong Q1."

At the same February 20 CEC Board meeting, CEC's directors were also presented with a 2014 Plan and Forecast Review[2267] that noted, among other things, that:

---

[2266] Board Package (Feb. 20, 2014), at CEC_EXAMINER_1265427-65 [CEC_EXAM-INER_1265371].

- Management recommended a reduction in the operating plan for the enterprise from $2.10 billion in adjusted EBITDA to $2.05 billion. Of the $50 million reduction, $30 million was due to Atlantic City and $15 million to Las Vegas. However, the Las Vegas reduction is attributed to a timing difference relating to the Quad renovation, not weaker overall performance in the region.

- "Las Vegas is expected to deliver 14% EBITDA Ex growth in 2014 driven by realization of 5+5 initiatives."

Following the February 20, 2014 CEC Board meeting, Caesars continued to prepare and/or present information reflecting a more positive view of the company's actual and anticipated financial performance than was reflected in the February Business Plan. For example, a May 2014 Las Vegas Update presentation (prepared in April 2014 in apparent anticipation of what appears to be a May 7, 2014 CEC Board meeting) noted:[2268]

- "In 2014, [Las Vegas Market] is projected to grow by $417M (13%) in revenue and EBITDA by $200M (23%) YoY."

- "While the broader market has been growing, fueled by non-gaming and international play, this represents a significant outpacing of market growth."

- Through Q1 CEC has experienced strong performance, beating plan by $13MM (6%) and PY by $21MM (11%), with growth coming from all corners of the business."

- "Las Vegas continues to be a bright spot in domestic gaming, but with dynamics unique from other markets."

- "Despite intense competition, CZR finished 2013 strong, outperforming MGM and Wynn in Net Revenue and EBITDA growth in Q4."

- "Adjusting for hold impact, CZR outperformed MGM, LVS, and Wynn on a EBITDA basis."

A CEC regional presentation focusing on New Orleans prepared in April 2014 likewise noted:[2269]

---

[2267] *Id.* at CEC_EXAMINER_1265466-98.

[2268] E-mail from T. Clapsis to S. Wiegand (Apr. 27, 2014), [CEC_EXAMINER_1438381], attaching "Las Vegas Update" (May 2014), CEC_EXAMINER_1438673-92 [CEC_EXAMINER_1438673]. Nearly all of the following excerpts were also included in the May 7, 2014 Board of Directors package.

[2269] E-mail from T. Clapsis to S. Wiegand (Apr. 27, 2014), [CEC_EXAMINER_1438381], attaching "New Orleans" (May 2014), CEC_EXAMINER_1438563-94 [CEC_EXAM-

- "Harrah's NOR Quarterly EBITDA of $23.2M compares favorably to Plan (8%) but below PY (-16%) as the property's record-setting results in Q1 13 provides a difficult comparison."

- "Regional competitors continue to ramp their operations; however, we've yet to see a material impact to our business (although increased competitive capital investment remains on the horizon in 2014)."

- "Volumes are coming in as planned given loss of Super Bowl from 2013."

- "NOR 'Hybrid' market creates strong national contribution while driving significant local business."

- "Our current view for the market is that it is well positioned to achieve its full year 2014 EBITDA target."

CEC expressed a similarly optimistic review regarding the Las Vegas market in a May 7, 2014 Financial and Operating Review presentation to the CEC Board.[2270]  The presentation stated, among other things, that:

- "CEOC EBITDA was flat to plan as strength in Las Vegas was offset by underperformance in Atlantic City and other regional markets."

- "Lodging Revenue grew 12% domestically, due entirely to Las Vegas."

- "F&B Revenue increased 3% due to new venues in Las Vegas."

- CEC Las Vegas EBITDA growth of 9% outperformed LVS and WYNN.  On a hold-adjusted basis, CEC Las Vegas still outperformed LVS.

- While 20 CEC properties are noted as having fallen short of plan for Q1 2014, Harrah's New Orleans, Bally's Las Vegas and the Quad are all noted as beating plan.  Cromwell is excluded as it had not yet opened.

- "CEC Group Revenue had the best quarter since the 2008 peak, on the strength of banquets and occupancy."

The 2014 Forecast Review was also presented to the CEC Board of Directors on May 7, 2014, noting:[2271]

---

INER_1438563].  All of the following excerpts were also included in the May 7, 2014 Board of Directors package.

[2270]  Board of Directors Meeting Package (May 7, 2014), at TPG-Examiner_00770656-709 [TPG-Examiner_00770636].

[2271]  *Id*. at TPG-Examiner_00770776-808.

- "We expect the enterprise to deliver on-plan 2014 Adjusted EBITDA of $2,050M."

- "The Las Vegas market is expected to deliver 23% EBITDA Ex growth driven by realization of 5+5 initiatives and the openings of The LINQ and The Cromwell."

- "We expect to achieve full year plan."

- "We still expect to achieve plan despite net risk."

- "Las Vegas market trends exceeded expectations for Q1, while Atlantic City and Central markets were weak."

- "Current pacing indicates 60% of initiatives will be realized by 2014 and 90% by 2015."

The issue is not which projections for 2014 ultimately proved to be accurate. Rather, it is that the January Business Plan, as routinely updated, reflected the company's ordinary course projections – and the evidence is that CEC management continued to rely upon it.

### ix.   Final Price Negotiations, Fairness Opinions and Letter of Intent

On February 5, 2014, the CEC Special Committee received a revised proposal from the CAC Special Committee with an increased offer of $1.95 billion for the Four Properties, "less assumption of outstanding indebtedness, plus adjustments for amounts expended after the date hereof for new construction and renovation at The Quad . . . ."[2272]  The revised proposal no longer required that Total Rewards be transferred to a "bankruptcy-remote entity," providing instead that the Four Properties Transaction must "include a mutually satisfactory arrangement to ensure that the Properties will continue to enjoy the existing and future benefits of the Total Rewards program, as well as the continued use of intellectual property that is not part of the Purchased Property."[2273]

According to Centerview, the fact that Total Rewards was ultimately licensed to CES "did not cause any value differential" with respect to the Four Properties.[2274]  Bosacco explained: "I think the value would be the same . . . for those four assets and the property manager as long as they had continued access to in the same way, shape or form to Total Rewards.  So again, we didn't value Total Rewards . . . ."[2275]

---

[2272]  Caesars Acquisition Company Special Committee Letter of Intent (Feb. 5, 2014), at CACEXAM00408001-8 [CACEXAM00408001].

[2273]  *Id*. at CACEXAM00408005-8.  According to Kleisner, the CAC Special Committee had, at this point, "given up on the transfer of Total Rewards to a bankruptcy-remote entity."  F. Kleisner Oct. 30, 2015 Tr. at 94:16-19.

[2274]  J. Bosacco Sept. 15, 2015 Tr. at 164:20-165:12.

[2275]  *Id*. at 164:20-166:10.

On February 6, 2014, Centerview presented to the CEC Special Committee a revised valuation analysis that, at the CEC Special Committee's direction, was based on the February Business Plan.[2276]  The presentation included, among other things, comparisons of (i) the CAC Special Committee's January 26, 2014 and February 5, 2014 proposals, and (ii) the January and February Business Plans.[2277]

**Four Properties Figure 24:  Excerpt 1 to Centerview's**
**February 6, 2014 Confidential Discussion Materials**

## Business Plan Summary

On February 5, 2014, Management of Caesars Entertainment Corporation ("CEC") presented revised projections for the Proposed Assets (the "Business Plans") to Centerview Partners

- The Business Plans include revised assumptions developed by management for revenue growth, profit margin and capital expenditures
- The Business Plans incorporate a number of adjustments to account for execution risk, particularly with respect to the properties in transition

| | January 17, 2014 Projections | | | | | Business Plans | | | | | Change | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014E | 2015E | 2016E | 2017E | 2018E | 2014E | 2015E | 2016E | 2017E | 2018E | 2014E | 2015E | 2016E | 2017E | 2018E |
| Net Revenue | $832 | $982 | $1,007 | $1,055 | $1,102 | $799 | $941 | $964 | $993 | $1,021 | ($33) | ($41) | ($43) | ($62) | ($82) |
| Growth (%) | | 18.0% | 2.5% | 4.8% | 4.5% | | 17.7% | 2.4% | 3.0% | 2.8% | | | | | |
| EBITDAM | $226 | $300 | $311 | $343 | $374 | $201 | $271 | $280 | $296 | $312 | ($25) | ($29) | ($32) | ($47) | ($62) |
| Margin (%) | 27.1% | 30.6% | 30.9% | 32.5% | 33.9% | 25.1% | 28.8% | 29.0% | 29.8% | 30.6% | | | | | |
| EBITDA | $198 | $266 | $276 | $304 | $333 | $175 | $238 | $247 | $261 | $276 | ($23) | ($27) | ($29) | ($43) | ($57) |
| Margin (%) | 23.8% | 27.0% | 27.4% | 28.9% | 30.2% | 21.9% | 25.3% | 25.6% | 26.3% | 27.0% | | | | | |
| Capital Expenditures | $238 | $31 | $39 | $36 | $37 | $189 | $81 | $40 | $36 | $41 | ($50) | $50 | $1 | $1 | $4 |
| % of Net Revenues | 28.6% | 3.2% | 3.9% | 3.4% | 3.4% | 23.6% | 8.6% | 4.1% | 3.7% | 4.0% | | | | | |
| Operating Cash Flow | ($41) | $235 | $237 | $269 | $296 | ($14) | $157 | $207 | $225 | $235 | $27 | ($77) | ($30) | ($44) | ($61) |
| Margin (%) | -4.9% | 23.9% | 23.5% | 25.5% | 26.8% | -1.8% | 16.7% | 21.5% | 22.7% | 23.0% | | | | | |

---

[2276] The February Business Plan was never utilized for any purpose beyond valuing the Four Properties.  E. Hession Nov. 4, 2015 Tr. at 311:16-23.  As noted above, however, CEC continued to use the LRP from which the January Business Plan was derived for various purposes, including budgeting, compensation, impairment testing, disclosure to lenders and regulators, and other purposes.  *Id.* at 312:2-10.

[2277] "Caesars Entertainment Confidential Discussion Materials" (Feb. 6, 2014), at CEOC_INVESTIG_00542808-9, 12 [CEOC_INVESTIG_00542806].

**Four Properties Figure 25:  Excerpt 2 to Centerview's
February 6, 2014 Confidential Discussion Materials**

## Business Plan Summary *(Cont'd)*

| | January 17, 2014 Projections | Business Plans Assumptions |
|---|---|---|
| **Market Growth** | • Las Vegas growth in 2017 and 2018 returns to pre-2007 levels (5.0%)<br><br>• New Orleans growth in 2017 and 2018 predicated on the achievement of several citywide initiatives (4.0%) | • Las Vegas growth in 2017 and 2018 at a slight premium to inflation (3.0%)<br><br>• New Orleans growth in 2017 and 2018 reflective of recent trends (2.0%) |
| **Management Initiatives** | • Management achieves 95% of targeted initiatives<br>  – Above recent achievement levels | • Management achieves 70% of targeted initiatives<br>  – In line with recent achievement levels |
| **Cost Structure** | • Management is able to fully offset inflationary pressures with productivity gains<br>  – Results in aggressive margin expansion | • After some productivity gains, the properties will still bear 1.5% per annum cost inflation<br>  – Resulting margins more achievable |
| **Other Quad Specific Drivers** | • 100% of Linq pedestrian capture is incremental<br><br>• O'Sheas is able to re-capture 100% of prior volumes<br><br>• Quad is able to generate ADR in line with Flamingo, Paris, and Planet Hollywood | • 50% of Linq pedestrian traffic is incremental, 50% is already accounted for in Quad non-lodger gaming revenue<br><br>• Given its new location and smaller footprint, O'Sheas is only able to re-capture 50% of prior volumes<br><br>• Given the smaller square footage per room, Quad will need to charge less than Flamingo, Paris and Planet Hollywood |
| **Other Cromwell Specific Drivers** | • The Cromwell will be able to achieve 95% occupancy<br><br>• Non-lodger gaming revenue will be robust<br><br>• Annual club maintenance capital expenditures is sufficient to maintain market presence | • Given recent experience with Nobu and brand quality considerations, occupancy reduced to 85%<br><br>• 20% discount to WPP to account for risk inherent in non-lodger gaming revenue projections<br><br>• Club will require significant refurbishments every five to seven years |

**Four Properties Figure 26:  Excerpt 3 to Centerview's
February 6, 2014 Confidential Discussion Materials**



Following Centerview's presentation, the CEC Special Committee authorized Reed Smith to relay to the CAC Special Committee a counter-offer to sell the Four Properties for $2.075 billion.[2278]  Kleisner informed Beilinson that the $2.075 billion purchase price was "based on the revised financial projections prepared by CEC management, which had been made available to all parties earlier that day."[2279]  Kleisner told the Examiner that the CEC Special Committee was "racing [against] the clock" because CEC was attempting to "deliver the [10-K] without a going concern issue" by March 14, 2014.[2280]

Also on February 6, 2014, Beilinson reported to the CAC Special Committee that Kleisner had, during a call with Beilinson, "indicated his view that Centerview . . . would be unable to render a fairness opinion at a purchase price below $2.025 billion."[2281]  According to

---

[2278]  Caesars Acquisition Company Special Committee Letter of Intent (Feb. 6, 2014), at CACEXAM00407958-66 [CACEXAM00407958].

[2279]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 6, 2014), at CACEXAM00434843-44 [CACEXAM00434843].

[2280]  F. Kleisner Oct. 30, 2015 Tr. at 96:17-98-8.

[2281]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 6, 2014), at CACEXAM00434843-45 [CACEXAM00434843].

Kleisner, however, Centerview never made this assertion – he was posturing for negotiating purposes.[2282]

On February 9, 2014, the CAC Special Committee relayed to the CEC Special Committee a letter of intent to purchase the Four Properties for $2.0 billion, less assumption of $185 million of debt under Bill's' existing credit facility and assuming construction and renovation costs of The Quad in an amount not to exceed $220 million.[2283]  That same day, February 9, Lazard reported to the CAC Special Committee that (i) Centerview informed Lazard that it "would be able to render a fairness opinion at that value," and (ii) Craig Abrahams, after having reviewed CEC management's revised projections, "continued to be comfortable with the sensitized financial projections that the [CAC] Special Committee directed Lazard to use in its preliminary valuation analysis."[2284]  Furie later advised the CAC Special Committee that "while some of the underlying assumptions were different for each property, the revised financial projections prepared by CEC management were in the aggregate substantially similar to the financial projections that the [CAC] Special Committee directed Lazard to use in its preliminary valuation analysis."[2285]

On February 10, 2014, the CEC Special Committee executed the letter of intent.[2286] Kleisner told the Examiner he was satisfied with the ultimate purchase price:

> I take fiduciary responsibility duties very seriously. . . . I was equally convinced
> that I had for all the right reasons the comfort of recommending the transaction to

---

[2282]  F. Kleisner Oct. 30, 2015 Tr. at 100:3-22.

[2283]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 9, 2014), at CACEXAM00434811-13 [CACEXAM00434811].  The February 10, 2014 letter of intent likewise provided that the Four Properties Transaction "will include a mutually satisfactory arrangement to ensure that the Properties will continue to enjoy full access to the Total Rewards program, as well as the continued use of intellectual property."  Letter of Intent executed by the CAC and CEC Special Committees (Feb. 10, 2014), at APOLLO-Examiner_00021332 [APOLLO-Examiner_00021325]; *see also* e-mail from F. Kleisner to G. Loveman, *et al.* (Feb. 9, 2014), at CEOC_INVESTIG_00470379 [CEOC_INVESTIG_00470379].

[2284]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 9, 2014), at CACEXAM00434811-12 [CACEXAM00434811].

[2285]  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 19, 2014), at CACEXAM00434898-99 [CACEXAM00434898].

[2286]  *See* Letter of Intent executed by the CAC and CEC Special Committees (Feb. 10, 2014) [APOLLO-Examiner_00021325].  When asked by the Examiner to respond to the fact that only roughly two weeks had passed from the date of CAC's initial proposal of $1.75 billion and the CEC Special Committee's initial counter-offer of $2.75 billion to the CEC Special Committee's execution of a letter of intent to sell the assets for $2 billion, Swann responded that it "seems rather quick to me too, in hindsight." L. Swann Oct. 12, 2015 Tr. at 81:2-24.  According to Swann, however, the CEC Special Committee acted appropriately with respect to the valuation process. *See id.*

the full board, that we had achieved in a very short period of time the highest and best price that could be achieved.[2287]

### g.  Creation of CES

Following execution of the letter of intent on February 10, 2014, the respective representatives of the CEC and CAC Special Committees, with substantial input from CAC's lenders, negotiated the terms of a definitive agreement with respect to the Four Properties Transaction.  On February 22, 2014, the CEC Special Committee discussed with Reed Smith the "proposal . . . to create," as part of the Four Properties Transaction, what would become CES, in order to ensure the Four Properties had continued access to Total Rewards.[2288]  A detailed discussion of the creation of CES, including the significant role played by Apollo and Paul Weiss, is set forth below.

### h.  The Four Properties Transaction Is Approved

### i.    The CEC Special Committee and Board Approve the Transaction

On February 24, 2014, Centerview and D&P presented to the CEC Special Committee their respective financial analyses of the Four Properties Transaction[2289] and advised the Committee that they were prepared to render their respective fairness opinions.[2290]  Reed Smith also briefed the CEC Special Committee on its fiduciary duties in connection with the Four Properties Transaction, which does not appear to have included any discussion regarding duties owed to CEOC or its creditors, the entire fairness standard review applicable to the related-party transaction, or the duties owed in the event CEOC was insolvent or would be rendered insolvent by the Four Properties Transaction.[2291]  The CEC Special Committee then "unanimously approved the [Four Properties] Transaction subject to the Special Committee's approval of final Transaction documents, receipt of an executed financing commitment letter and delivery of the final written opinions of Centerview and Duff & Phelps."[2292]

---

[2287]  F. Kleisner Oct. 30, 2015 Tr. at 149:23-150:13.

[2288]  Minutes of the Special Committee of the Board of Directors of CEC (Feb. 22, 2014), at CEOC_INVESTIG_00452692 [CEOC_INVESTIG_00452692].

[2289]  Centerview's and D&Ps' respective valuation methodologies are discussed below in section C.2.h.ii.(B)(2) and in detail in Appendix 7, Valuation at Sections VIII.C, D.

[2290]  Centerview Presentation to the Caesars Entertainment Corporation Special Committee, "Caesars Entertainment Confidential Discussion Materials" (Feb. 24, 2014), at CEOC_INVESTIG_00458698-763 [CEOC_INVESTIG_00458698].

[2291]  L. Swann Oct. 12, 2015 Tr. at 23:20-24:17; F. Kleisner Oct. 30, 2015 Tr. at 32:4-16.

[2292]  CEC Special Committee Minutes (Feb. 24, 2014), at CEOC_INVESTIG_00453616-17 [CEOC_INVESTIG_00453616].  A day prior, on February 23, 2014, the CAC Special Committee unanimously approved the Four Properties Transaction.  Caesars Acquisition Company Special Committee Meeting Minutes (Feb. 23, 2014), at CACEXAM00434927-30 [CACEXAM00434927].

That same day, February 24, the CEC Board received a report from the CEC Special Committee and resolved to take certain actions necessary to complete the Four Properties Transaction, including authorizing certain individuals "execute and deliver a Transaction Agreement on terms previously described to the Board, to perform, or cause the Company to perform, its obligations thereunder and in connection therewith, and to consummate the transactions contemplated thereby."[2293]

### ii.    Lenders Push for Fairness Opinions to be Issued to CEOC

In early February 2014, one of CAC's lenders in connection with the Four Properties Transaction requested that the fairness opinions to be issued by Centerview and D&P to CEC's Board be concurrently issued to CEOC's Board.[2294]

On February 6, 2014, Richard Park from Deutsche Bank told Sambur that he needed his lawyers to connect with Latham & Watkins, counsel for CAC.[2295]   van Hoek explained to Sambur that Deutsche Bank "ha[d] questions about process."[2296]   Park then told Sambur that his counsel was "pushing" CEOC to hire an adviser to render a fairness opinion.[2297]   Sambur responded that CEOC was hiring an advisor to render a fairness opinion.[2298]   On February 11, 2014, Deutsche Bank's counsel again requested that a fairness opinion be directed to CEOC's Board.[2299]

On February 16, 2014, Brian Finnegan from Paul Weiss wrote to Sambur:

Update is that Centerview is still declining to address the opinions to CEOC's board.  As a next and final step, Reed Smith is arranging a direct call between Centerview's Counsel . . . and Cahill (originator of the request), and will be

---

[2293]  Caesars Entertainment Corporation Board of Directors Meeting Minutes (Feb. 24, 2014), CEOC_INVESTIG_00134322-465 [CEOC_INVESTIG_00134322].

[2294]  B. Finnegan Nov. 16, 2015 Tr. at 233:4-13; e-mail exchange between D. Sambur and B. Finnegan, *et al.* (Feb. 8, 2014), at APOLLO-Examiner_00637226-27 [APOLLO-Examiner_00637226]; e-mail from D. Sambur to G. Ezring, *et al.* (Feb. 9, 2014), at CEOC_INVESTIG_00412308-11 [CEOC_INVESTIG_00412308].

[2295]  E-mail from R. Park to D. Sambur (Feb. 6, 2014), at APOLLO-Examiner_00051924 [APOLLO-Examiner_00051924].

[2296]  *Id.*

[2297]  E-mail from D. Sambur to R. Park (Feb. 6, 2014), at APOLLO-Examiner_00049007 [APOLLO-Examiner_000409007].

[2298]  *Id.*

[2299]  E-mail from O. Rezzy to D. Sambur, *et al.* (Feb. 11, 2014), at APOLLO-Examiner_00006901 [APOLLO-Examiner_00006898].

reaching out to Ray to help coordinate.[2300]

These requests did not trigger concerns regarding whether the CEOC Board should have had its own special committee of independent directors and financial advisors evaluate the Four Properties Transaction on its behalf.  Finnegan explained:  "[L]enders have a very, very different business model and risk assessment and view of the world than does a public company . . . ."[2301]

In mid-February 2014, D&P agreed to direct its fairness opinion to the CEOC Board. Centerview declined, however, explaining to the Examiner that (i) it does not, as a matter of company policy, issue fairness opinions to subsidiary corporations, and (ii) all of its interactions in connection with the Four Properties Transaction had, up to that point, been with the CEC Special Committee.[2302]    Deutsche Bank ultimately withdrew its request that Centerview also direct its fairness opinion to the CEOC Board.[2303]

### (A) Centerview's Fairness Opinion

On February 24, 2014, Centerview issued its fairness opinion to the CEC Board and the CEC Special Committee.  It concluded that (i) Four Properties Transaction is "fair, from a financial point of view" to CEC, and (ii) $2.0 billion is "reasonably equivalent to the aggregate of the enterprise value" of the Four Properties and the value of the related management fee stream.[2304]  Figure 27 summarizes the total reference range ultimately determined by Centerview for the Four Properties assets.[2305]

---

[2300] E-mail from B. Finnegan to D. Sambur, *et al.* (Feb. 16, 2014), at PRIV_INVESTIG_00037181 [PRIV_INVESTIG_00037181].

[2301] B. Finnegan Nov. 16, 2015 Tr. at 234:14-235:11.

[2302] J. Bosacco Sept. 15, 2015 Tr. at 67:14-68:10.  In fact, Centerview was not aware that CEOC even had its own board. *Id.*; *see also* e-mail from O. Rezzy to D. Sambur, *et al.*, at APOLLO-Examiner_00006901 [APOLLO-Examiner_00006898].

[2303] *See* e-mail from B. Kelleher to M. Wlazlo (Feb. 17, 2014), at CEOC_INVESTIG_00430799 [CEOC_INVESTIG_00430799]; e-mail from R. Park to D. Sambur (Feb. 17, 2014), at CEOC_INVESTIG_00311527 [CEOC_INVESTIG_00311527]; e-mail from R. Park to D. Sambur (Feb. 18, 2014), at APOLLO-Examiner_00006614 [APOLLO-Examiner_00006614].

[2304] Centerview Partners LLC Fairness Opinion (Feb. 24, 2014), at CEOC_INVESTIG_00171999 [CEOC_INVESTIG_00171994].  Due to the bifurcated closing, discussed below in section C.2.i, Centerview issued additional fairness opinions on May 5 and 19, 2014.  Centerview's fairness opinions did not address fairness in the context of a "distressed sale." *See id.*

[2305] "Caesars Entertainment Confidential Discussion Materials" (May 4, 2014), at CENTERVIEW_0004737 [CENTERVIEW_0004670]. The values calculated by Centerview represent enterprise, not equity, values and therefore do not deduct the $185 million of assumed debt with respect to The Cromwell.

**Four Properties Figure 27:  Centerview Valuation Summary**

| *amounts in thousands* | DCF | Trading Multiples | Precedent Transactions |
|---|---|---|---|
| Reference Range - low | $   1,978,000 | $   1,788,000 | $   1,700,000 |
| Reference Range - high | $   2,491,000 | $   2,312,000 | $   2,202,000 |

Source:  Centerview Partners "Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004687 [CENTERVIEW_0004670].

## (1) Centerview's Valuation Methodologies

In performing its valuation analysis and preparing its fairness opinion, Centerview used three valuation methods with respect to the Four Properties casinos:  (i) the DCF method; (ii) the GPC method; and (iii) the Precedent Transaction Method.  The 50% interest in the management fee stream associated with each of the Four Properties was valued using a DCF method.

Bosacco indicated that Centerview generally weights its valuation methods equally.[2306] In the aggregate, while the low end of the DCF range for the Four Properties assets was in line with the $2 billion purchase price (including the assumption of The Cromwell's $185 million credit facility), the high end of the DCF range was nearly $2.5 billion.  Figure 28 summarizes the value ranges calculated by Centerview under each methodology.[2307]

---

[2306]  J. Bosacco Sept. 15, 2015 Tr. at 192:19-25.

[2307]  Centerview Partners "Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004690 [CENTERVIEW_0004670].

**Four Properties Figure 28:  Centerview Valuation Ranges by Asset**

| amounts in thousands | DCF | Trading Multiples | Precedent Transactions | Management Contract (50%) |
|---|---|---|---|---|
| The Quad - low | $ 218,000 | $ 149,000 | $ 149,000 | $ 31,500 |
| The Quad - high | $ 317,000 | $ 245,000 | $ 245,000 | $ 42,000 |
| Bally's Las Vegas - low | $ 656,000 | $ 588,000 | $ 530,000 | $ 45,000 |
| Bally's Las Vegas - high | $ 806,000 | $ 736,000 | $ 662,000 | $ 59,000 |
| The Cromwell - low | $ 364,000 | $ 324,000 | $ 324,000 | $ 18,500 |
| The Cromwell - high | $ 445,000 | $ 405,000 | $ 405,000 | $ 24,500 |
| Harrah's New Orleans - low | $ 596,000 | $ 582,000 | $ 553,000 | $ 48,500 |
| Harrah's New Orleans - high | $ 735,000 | $ 737,000 | $ 700,000 | $ 64,000 |

Source:  Centerview  Partners  "Confidential  Discussion  Materials"  Presentation  (May  4,  2014),  at CENTERVIEW_0004690 [CENTERVIEW_0004670].

### (2)  Projections

As  discussed  above,  at  the  CEC  Special  Committee's  directive,  Centerview  used  the February  Business  Plan – not  the  January  Business  Plan – to  value  the  Four  Properties.   The projections  underlying  the  February  Business  Plan  were  lower  than  the  values  that  would  have been derived had the January Business Plan or Q1 2014 LRP been utilized.

### (3)  Multiples

Centerview  considered  six  companies  in  its  public  company  trading  analysis:   two  Las Vegas/international  operators  and  four  regional  operators.[2308]   With  respect  to  Harrah's  New Orleans,  however,  only  regional  operators  were  considered.   The  companies  considered  by Centerview, and their corresponding EBITDA multiples, are as follows:

---

[2308]  For  a  more  detailed  discussion  of  Centerview's  public  company  trading  analysis,  see Appendix 7, Valuation at Section VIII.C.

**Four Properties Figure 29:  Centerview Comparables**

| Company | 2015 EBITDA Multiple |
|---|---|
| **Las Vegas Operators:** | |
| Wynn Resorts | 14.7x |
| MGM Resorts | 10.5x |
| **Regional Operators:** | |
| Penn National Gaming | 11.5x |
| Boyd Gaming | 8.5x |
| Pinnacle Entertainment | 9.0x |
| Isle of Capri Casinos | 7.0x |
| *Average - All* | *10.2x* |
| *Average - Regional Only* | *9.0x* |
| Selected Range - Quad | 7.5x - 9.5x |
| Selected Range - Bally's | 8.0x - 10.0x |
| Selected Range - Cromwell | 8.0x - 10.0x |
| Selected Range - Harrah's | 7.5x - 9.5x |

Source:   Centerview Partners "Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004690, 99 [CENTERVIEW_0004670].

For the Las Vegas operators, Centerview analyzed the implied value of the Las Vegas operations for both Wynn Resorts and MGM Resorts by disaggregating the companies' international operations, calculating an implied Las Vegas 2015 EBITDA multiple of 14.7x for Wynn and 10.5x for MGM.  While the implied Las Vegas multiples for MGM and Wynn Resorts are lower than the multiples for the entire international enterprise, they are, however, still considerably higher than the average of the regional operators.  Centerview's analysis appears to show that Las Vegas operators command a higher multiple even when international operations are excluded.  Even after disaggregating the international operations of the Las Vegas operators, Centerview selected a range of multiples for the Las Vegas assets (Bally's Las Vegas, The Quad and The Cromwell) that was below the average of the Las Vegas and regional comparables.

With respect to its precedent transactions analysis, Centerview utilized only Las Vegas properties to value the Las Vegas assets, selecting a range of multiples below the indicated average and median for the Las Vegas-based precedent transactions.  In his interview, Bosacco conceded that "there is not an ideal direct comparable from a comparable company basis" and "there are not a lot of comparable transactions out there."[2309]  Notably, neither D&P nor Lazard appear to have relied on a precedent transaction approach.

---

[2309] J. Bosacco Sept. 15, 2015 Tr. at 191:22-23; *Id.* at 192:14-15.  For a more detailed discussion of Centerview's precedent transactions analysis, see Appendix 7, Valuation at Section VIII.C.2.

### (4) Centerview Deducts $15 Million in Annual Rent Expense in Valuing The Quad

In its valuation of The Quad, Centerview deducted $15 million in annual rent expense for O'Sheas Casino (a/k/a RDE Casino from the CERP Transaction), which physically sits within The Quad Casino and can be accessed either through The Quad Casino or LINQ Retail complex. The RDE Casino itself is managed by The Quad and all revenue and expenses run through The Quad, including the annual rent expense. The rent payment was really a debt service payment and, notably, the debt associated with the RDE Casino lease payments was already deducted in computing the consideration to CEOC in the CERP Transaction. A detailed discussion of this issue is set forth in Appendix 7, Valuation at Section VIII.C.2.d.

### (5) Centerview Does Not Specifically Value Total Rewards or Undeveloped Land

Centerview, while aware that the Four Properties Transaction contemplated that CEOC would license Total Rewards to CES, did not specifically value Total Rewards in connection with its fairness analysis.[2310] Rather, Centerview valued the Four Properties "assum[ing] that they continued to have access to Total Rewards."[2311] Bosacco explained:

> We as an institution, . . . we don't value management services agreements, we don't value licenses, so it would have never been part of our scope and was something that we didn't do. . . . The way [Total Rewards] would have been captured would have to have been through valuing the continued access to it. . . . We valued the cash flow streams coming out of those assets and 50 percent of the management stake under the assumption that they continue to operate as is with access to Total Rewards.[2312]

No consideration was given, however, to the fact that the Total Rewards license was also being provided to non-CEOC properties not part of this transaction. Further, as discussed in more detail below, Centerview did not specifically value any undeveloped land transferred as part of the Four Properties Transaction. Centerview did, however, "value[] the four assets as going-concern businesses . . . so to the extent that [undeveloped land] was part of one of the assets and transferred, it would have been captured in the overall value of the enterprise."[2313] Bosacco did not recall whether any undeveloped land was actually transferred as part of the Four Properties Transaction.[2314]

### (B) D&P's Opinion

---

[2310]   *Id.* at 163:5-12.

[2311]   *Id.* at 159:4-7.

[2312]   *Id.* at 164:20-167:8.   Set forth below is a more detailed discussion regarding the consideration received for Total Rewards and management services.

[2313]   *Id.* at 91:8-19.

[2314]   *Id.* at 91:20-92:12.

On March 1, 2014, D&P issued its opinion to the CEC Special Committee and the Boards of CEC and CEOC.  It concluded that the Four Properties Transaction "is on terms that are no less favorable to CEOC or such relevant restricted subsidiary, as applicable, than would be obtained in a comparable arm's-length transaction with a person that is not an affiliate."[2315]  It selected an overall enterprise value range for the Four Properties of $1.802 billion to $2.191 billion.[2316]

### (1) D&P's Valuation Methodology

D&P considered three valuation approaches in valuing the Four Properties casinos:  (i) the DCF Method; (ii) the GPC Method; and (iii) the Precedent Transaction Method.  It did not, however, rely on the Precedent Transaction Method to specifically select multiples because "our comps [we]re a much better data set," yet it was considered as part of an overall public market approach.[2317]  As noted above, D&P selected an overall enterprise value range for the Four Properties of $1.802 billion to $2.191 billion.  Figure 30 summarizes the value ranges calculated by D&P under each methodology as well as the additional value D&P determined for the management fee stream.

---

[2315]  D&P Fairness Opinion (Mar. 1, 2014) [DP00002026], at 1 (native file).  Due to the bifurcated closing, discussed below in Sections C.2.i, D&P issued additional fairness opinions on May 5, and 20, 2014.  D&P Fairness Opinion (May 5, 2014) [DP00000118]; D&P Fairness Opinion (May 20, 2014), at CEOC_INVESTIG_00451966-72 [CEOC_INVESTIG_00451966].

[2316]  Presentation to the Caesars Entertainment Corporation Special Committee, Caesars Entertainment Corporation Board of Directors and Caesars Entertainment Operating Company, Inc. Board of Directors (Mar. 1, 2014), at 7 [DP00000071].

[2317]  J. Schiedemeyer Sept. 16, 2015 Tr. at 222:10-23.

**Four Properties Figure 30:  D&P Valuation Summary**

| amounts in thousands | Selected Value Range | DCF | Transactions / Trading Multiple |
|---|---|---|---|
| The Quad - low | $ 149,000 | $ 160,000 | $ 138,000 |
| The Quad - high | $ 199,000 | $ 211,000 | $ 186,000 |
| Bally's Las Vegas - low | $ 608,000 | $ 619,000 | $ 596,000 |
| Bally's Las Vegas - high | $ 687,000 | $ 712,000 | $ 662,000 |
| The Cromwell - low | $ 330,000 | $ 335,000 | $ 324,000 |
| The Cromwell - high | $ 373,000 | $ 381,000 | $ 365,000 |
| Harrah's New Orleans - low | $ 517,000 | $ 506,000 | $ 528,000 |
| Harrah's New Orleans - high | $ 589,000 | $ 576,000 | $ 601,000 |
| Management Contract (50%) - low | $ 135,000 | $ 135,000 | |
| Management Contract (50%) - high | $ 154,000 | $ 154,000 | |
| Four Properties Total - low | $ 1,739,000 | | |
| Four Properties Total - high | $ 2,002,000 | | |

Sources:  D&P "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 5, 2014), at DP00000043 [DP00000043]; D&P "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 19, 2014), at DP00000045 [DP00000045].

D&P's final value conclusions for the casino properties represent the midpoint of the DCF analysis and the public market trading analysis.  Schiedemeyer of D&P indicated that it is typical for his firm to apply equal weighting to the methods.[2318]  In addition to the values noted in the table above, D&P also included value related to the present value of a goodwill amortization shield, ranging from $63 million to $189 million.  For a detailed discussion of D&Ps' inclusion of this additional value in its analysis, see Appendix 7, Valuation at Section VIII.D.2.a.

### (2) Projections

D&P, like Centerview, relied upon the February Business Plan in performing its valuation analysis.  While CEC management provided D&P with the January Business Plan, the CEC Special Committee instructed D&P to use the revised projections.[2319]  As noted above, Schiedemeyer told the Examiner that D&P "specifically do[es] not express opinions on management's projections."[2320]

---

[2318]  *Id.* at 223:7-13.

[2319]  *Id.* at 80:25-81:23 and 87:13-17.

[2320]  *Id.* at 91:16-17.

### (3) Multiples

D&P included nine companies in its public company trading analysis: three Las Vegas/international operators and six regional operators. The companies considered by D&P, and the corresponding multiples, are presented in Figure 31:

**Four Properties Figure 31: D&P Comparables**

| Company | TTM EBITDA Multiple | 2014 EBITDA Multiple | 2015 EBITDA Multiple |
|---|---|---|---|
| **Las Vegas Operators:** | | | |
| Las Vegas Sands | 18.8x | 15.5x | 14.1x |
| Wynn Resorts | 18.9x | 16.4x | 15.4x |
| MGM Resorts | 14.1x | 12.9x | 11.9x |
| **Regional Operators:** | | | |
| Penn National Gaming | 6.9x | 7.4x | 7.0x |
| Boyd Gaming | 10.4x | 9.5x | 9.1x |
| Pinnacle Entertainment | 9.3x | 9.6x | 9.4x |
| Isle of Capri Casinos | 7.8x | 7.6x | 7.3x |
| Churchill Downs | 10.3x | 7.9x | 7.6x |
| Monarch Casino | 7.1x | 6.9x | 6.5x |
| *Mean - All* | *11.5x* | *10.4x* | *9.8x* |
| Selected Range - Quad | | | 7.5x - 8.5x |
| Selected Range - Bally's | | 9.0x - 10.0x | |
| Selected Range - Cromwell | | | 8.0x - 9.0x |
| Selected Range - Harrah's | 7.5x - 8.5x | 7.0x - 8.0x | |

Sources: D&P "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 5, 2014), at DP00000043 [DP00000043]; D&P "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 19, 2014), at DP00000045 [DP00000045].

The range of multiples selected by D&P for each asset was below the indicated mean from the guideline public companies. In analyzing the value of the properties, Schiedemeyer stated:

> We see them kind of fitting in between the regionals and the larger Vegas properties with Macau exposure. And that's how we went about selecting our multiples. And then we made a distinction, you know, with growth between the

properties that may have been influenced slightly higher or slightly lower for an individual property based on growth after expectations.[2321]

With the exception of Harrah's New Orleans, Schiedemeyer viewed the Four Properties as destination properties, distinct from regional properties which draw more from their immediate geography.[2322]   He also indicated that Total Rewards impacted the selection of multiples through its impact on the growth expectations of the Four Properties, stating that "investors would attach a lower multiple to a lower growth business."[2323]

### (4) Rent Expense

As discussed in Appendix 7, Valuation at Section VIII.D.2.d, D&P, like Centerview, deducted the $15 million in annual rent expense for O'Sheas Casino in connection with its valuation of The Quad.

### (C) Centerview's and D&P's Valuations of the Four Properties and Management Fees Were Flawed

Centerview's and D&Ps' fairness analysis, which formed the basis of their respective fairness opinions, suffered from several defects, leading them to significantly undervalue the assets transferred by CEOC as part of the transaction.

First, as discussed above, Centerview and D&P should not have relied upon the February Business Plan.  Rather, these advisors should have valued the Four Properties using the Q1 2014 LRP, which represented the latest set of projections as of the transaction closing date.[2324]   The Q1 2014 LRP was similar to the January Business Plan and, as set forth in Appendix 7, Valuation at Section VIII.B, most accurately reflected the actual and anticipated performance of the Four Properties expressed by CEC internally and to various third parties, including auditors and lenders.  Without exception, every modification made to the January Business Plan resulted in lower revenue and/or EBITDA with respect to the Four Properties.[2325]   There was nothing in CEC's financials or internal analyses to justify these substantial downward revisions.

---

[2321]  *Id.* at 212:21-213:5.

[2322]  *Id*. at 213:18-214:17.

[2323]  *Id.* at 213:6-17.

[2324]  *See In re Emerging Comm'ns, Inc. S'Holders Litig.*, CIV.A.16415, 2004 WL 1305745, at *14 (Del. Ch. May 3, 2004).

[2325]   *See* Appendix 7, Valuation at Section VIII.B.

Second, Centerview and D&P selected valuation multiples below the combined average of the Las Vegas and regional guideline public companies they had identified, even with respect to the Las Vegas properties.[2326]

Third, Centerview and D&P both incorrectly deducted $15 million in annual rent expense in arriving at the enterprise value of The Quad.

Fourth, as discussed above, both Centerview and D&P were unaware – and thus failed to consider in their respective analyses – that approximately 31 acres of undeveloped land were transferred in connection with the Four Properties Transaction with an estimated value range between $109 million and $140 million.[2327]

Fifth, D&P erroneously included in its valuation analysis additional value related to the present value of a goodwill amortization tax shield ranging from $63 million to $189 million.[2328]

Sixth, both Centerview and D&P assumed that the properties had access to Total Rewards in assessing the correct multiple to be applied to the assets they were valuing, but failed to consider that CERP also received a free license in this transaction.

The following sensitivity analysis performed by the Examiner quantifies the financial impact of certain defects in Centerview's and D&Ps' respective analyses by making modifications for (i) projections, (ii) RDE rent expense, and (iii) with respect to D&P, goodwill amortization tax shield.[2329]

---

[2326] The multiples selected by Centerview were lower than average even after disaggregating the Macau operations from the Las Vegas operations to remove the impact of international operations. *See id.*

[2327] *Id.* at Section VIII.G.

[2328] *Id.*

[2329] The sensitivity analysis does not modify the multiples used by Centerview and D&P. Nor does it address Centerview's and D&P's failure to value the land transferred in connection with the transaction.

**Four Properties Figure 32:  Four Properties Sensitivity Analysis – Centerview**

| amounts in millions | Centerview | | Centerview - Sensitized | |
|---|---|---|---|---|
| | Low | High | Low | High |
| The Quad | $ 172.0 | $ 269.0 | $ 444.6 | $ 614.1 |
| Cromwell | 337.3 | 418.2 | 391.2 | 484.8 |
| Bally's Las Vegas | 591.3 | 734.4 | 650.4 | 809.0 |
| Harrah's New Orleans | 577.0 | 724.1 | 612.9 | 768.9 |
| Subtotal | $ 1,677.6 | $ 2,145.7 | $ 2,099.1 | $ 2,676.7 |
| 50% of Management Fee Stream | $ 142.4 | $ 188.9 | $ 173.5 | $ 230.9 |
| **Four Properties Enterprise Value** | **$ 1,820.1** | **$ 2,334.6** | **$ 2,272.6** | **$ 2,907.6** |

Note:  Property values reflect the average of the conclusions of value from the income approach (DCF) and market approaches (GPC Method and Precedent Transaction Method).

**Four Properties Figure 33:  Four Properties Sensitivity Analysis – D&P**

| amounts in millions | Duff & Phelps | | Duff & Phelps - Sensitized | |
|---|---|---|---|---|
| | Low | High | Low | High |
| The Quad | $ 149.1 | $ 198.4 | $ 437.3 | $ 528.9 |
| Cromwell | 329.8 | 372.9 | 384.8 | 434.4 |
| Bally's Las Vegas | 607.4 | 687.0 | 686.1 | 778.4 |
| Harrah's New Orleans | 517.0 | 588.5 | 574.5 | 653.0 |
| Subtotal | $ 1,603.2 | $ 1,846.8 | $ 2,082.7 | $ 2,394.7 |
| Goodwill Amortization Tax Shield | $ 62.9 | $ 189.6 | $ - | $ - |
| 50% of Management Fee Stream | $ 134.3 | $ 153.4 | $ 159.8 | $ 182.9 |
| **Four Properties Enterprise Value** | **$ 1,800.4** | **$ 2,189.9** | **$ 2,242.5** | **$ 2,577.6** |

Note:  Property values reflect the average of the conclusions of value from the income approach (DCF) and market approach (GPC Method/Precedent Transaction Method).

As discussed in Appendix 7, Valuation at Section VIII.F, the Examiner's enterprise valuation of these properties is between $2.59 billion and $2.97 billion excluding the transferred land and Total Rewards/CES (and between $2.701 billion and $3.1 billion excluding just Total Rewards/CES).

Figure 34 below summarizes the transaction price compared to the final values determined by the Examiner, Centerview and D&P, the Debtor's financial advisor, and various creditor constituencies:

**Four Properties Figure 34:  Four Properties Summary of Values**[2330]

| amounts in millions | Properties and Mgmt Fees | | Additional Value of Excess Land | | Total Value | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| *Transaction Price* | $ 2,000 | $ 2,000 | | | $ 2,000 | $ 2,000 |
| Centerview | $ 1,820 | $ 2,335 | | | $ 1,820 | $ 2,335 |
| Duff & Phelps | $ 1,802 | $ 2,191 | | | $ 1,802 | $ 2,191 |
| Centerview - Sensitized | $ 2,273 | $ 2,908 | | | $ 2,273 | $ 2,908 |
| Duff & Phelps - Sensitized | $ 2,243 | $ 2,578 | | | $ 2,243 | $ 2,578 |
| Baker Tilly | $ 2,210 | $ 2,930 | | | $ 2,243 | $ 2,578 |
| Creditor Group 1 | $ 3,137 | $ 3,893 | $  256 | $  384 | $ 3,393 | $ 4,277 |
| Creditor Group 2 | $ 2,400 | $ 2,920 | $  129 | $  469 | $ 2,529 | $ 3,389 |
| **Examiner Valuations** | **$ 2,592** | **$ 2,968** | **$  109** | **$  140** | **$ 2,701** | **$ 3,108** |

Note: Values reflected above represent enterprise value and are not presented net of the Cromwell debt assumed. Values also do not include any amount associated with Total Rewards or CES.

## (D) Lazard's Opinion

On February 25, 2014, Lazard issued its fairness opinion to the CAC Special Committee and CAC Board, concluding that the Four Properties Transaction was "fair, from a financial point of view, to CGP."[2331]   While Lazard did not independently value Total Rewards, it, like Centerview, valued the Four Properties assuming that they would remain in the Total Rewards system.[2332]   The following are the value ranges for each methodology utilized by Lazard in valuing the Four Properties:

---

[2330]  The values calculated by other parties, including creditor groups, were (i) preliminary in nature, (ii) based on incomplete information, (iii) not intended to reflect an opinion, (iv) provided on the express understanding that the views expressed were not binding or admissible as evidence in any litigation and (v) being provided on a "not for attribution" basis to the Examiner.

[2331]  Lazard Fairness Opinion to the CAC Special Committee and CAC Board of Directors (Feb. 25, 2014) [LAZARD0002785].  Lazard issued amended fairness opinion letters on February 27 and 28, 2014, and March 1, 2014, that differ from the February 25 letter only with respect to the date.  Lazard Fairness Opinion to the CAC Special Committee and CAC Board of Directors (Feb. 27, 2014) [LAZARD0002773]; Lazard Fairness Opinion to the CAC Special Committee and CAC Board of Directors (Feb. 28, 2014), [SA0035196]; Lazard Fairness Opinion to the CAC Special Committee and CAC Board of Directors (Mar. 1, 2014) [SA0035192].

[2332]  S. Furie Sept. 18, 2015 Tr. at 42:23-43:1; 43:6-7.

**Four Properties Figure 35:  Lazard's Value Ranges**

| amounts in millions | Selected Value Range | | DCF | | Trading Multiples | |
|---|---|---|---|---|---|---|
| Nevada Properties - low | $ | 1,340 | $ | 1,135 | $ | 1,103 |
| Nevada Properties - high | | | $ | 1,513 | $ | 1,369 |
| Harrah's New Orleans - low | $ | 660 | $ | 550 | $ | 606 |
| Harrah's New Orleans - high | | | $ | 705 | $ | 729 |
| Four Properties Total - low | $ | 2,000 | $ | 1,685 | $ | 1,709 |
| Four Properties Total - high | | | $ | 2,218 | $ | 2,099 |

Source:  Lazard "Project Positive Discussion Materials" (May 4, 2014), at LAZARD00000086 and 97-99 [LAZARD00000084].

Note:  Above values represent Lazard's CAC Special Committee Case.

### i.  Execution of the Transaction Agreement and the Bifurcated Closing

On March 1, 2014, CEC and CAC executed the transaction agreement, which was subject to certain regulatory approvals.

On March 20, 2014, CAC obtained regulatory approval from the Nevada Gaming Commission to sell the Las Vegas-based properties (*i.e.*, Bally's Las Vegas, The Cromwell and The Quad) to CGP.[2333]  On April 24, 2014, however, the Louisiana Gaming Control Board ("LGCB") deferred by 30 days its decision regarding approval of the sale of Harrah's New Orleans to CGP in response to a challenge filed by certain Second Lien Noteholders.  The Second Lien Noteholders argued, among other things, that (i) "CEOC was insolvent" and that the Four Properties Transaction would only deepen this insolvency, (ii) Total Rewards was being "moved out of CEOC" without justification and (iii) the CEC Special Committee was precluded from marketing the assets, and in particular Harrah's New Orleans, to third parties.[2334]

In an April 27, 2014 e-mail from Lewis Clayton to various individuals at Paul Weiss, CEC, Apollo and Akin Gump concerning what information should be submitted to the LGCB in support of CEC's request for regulatory approval, Clayton wrote:  "I am reluctant to write much about fraudulent conveyance and insolvency."[2335]  Clayton explained to the Examiner that he believed the "solvency" issue was complicated and would only serve to distract the LGCB from

---

[2333] *See* Caesars Entertainment Operating Company Unanimous Written Consent of the Board of Directors in Lieu of Meeting (May 5, 2014), at CEOC_INVESTIG_00125896 [CEOC_INVESTIG_00125896].

[2334] Louisiana Gaming Control Board Hearing Transcript (Apr. 24, 2014), at CEC_EXAMINER_0824696-98 [CEC_EXAMINER_0824677].

[2335] E-mail from L. Clayton to M. Cohen, *et al.* (Apr. 27, 2014), at CEC_EXAMINER_0280601 [CEC_EXAMINER_0280601].

considering other, less complicated, more compelling reasons for regulatory approval.[2336] Clayton maintains that he was not, at this juncture, concerned that CEOC might be insolvent.[2337]

Clayton also stated in the April 27, 2014 e-mail that (i) the "transaction is for the benefit of CEOC and its creditors, because CEOC's liquidity is being increased by $2 billion which allows CEOC much greater flexibility and stability in its business," and (ii) there was "no 'fraudulent conveyance' here."[2338]

As a result of the LGCB's ruling deferring its decision regarding regulatory approval of the sale of Harrah's New Orleans to CGP, the CEC Special Committee, on May 4, 2014, unanimously approved an amendment to the Four Properties Transaction permitting the parties to bifurcate the sale into two separate closings:  (i) transfer of the Las Vegas-based properties and associated management fee rights (the "First Transaction"); and (ii) transfer of Harrah's New Orleans and associated management fee rights (the "Second Transaction").[2339]  That same day, May 4, the CEC Executive Committee approved the Special Committee's resolution to bifurcate the Four Properties Transaction.[2340]

### j.   Market Reaction to the Four Properties Transaction

The Four Properties Transaction was viewed unfavorably for CEOC by both rating agencies and analysts, as well as CEOC creditors.

Fitch Ratings, Moody's Investor Service and Standard & Poor's all downgraded their ratings of CEOC debt following the March 3, 2014 announcement of the transaction.  That same day, March 3, Brimmer forwarded to other individuals at CEC an internal e-mail from Fitch Ratings stating that the transaction was positive for CEC equity, CAC equity and CERP credit, but "[n]egative for [CEOC]'s credit (roughly neutral for 1st lien; worse for more junior creditors)."[2341]  The e-mail from Fitch Ratings further provided:

> The announced transactions are a negative for CEOC creditors because they
> further deteriorate certain debtholders' recovery in an event of default and

---

[2336]  L. Clayton Oct. 26, 2015 Tr. at 245:6-253:11.

[2337]  *Id.*

[2338]  E-mail from S. Pesner to L. Clayton, *et al.* (Apr. 27, 2014), at CEC_EXAMINER_0280603 [CEC_EXAMINER_0280601]; *see also* e-mail from M. Cohen to D. Sambur, *et al.* (Apr. 27, 2014), at PRIV_INVESTIG_00044770 [PRIV_INVESTIG_00044769], attaching "Presentation to the Louisiana Gaming Control Board" (Apr. 24, 2014), at PRIV_INVESTIG_00044772-84 [PRIV_INVESTIG_00044772].

[2339]  CEC Special Committee Meeting Minutes (May 4, 2014), at CEOC_INVESTIG_00456590-91 [CEOC_INVESTIG_00456590].

[2340]  CEC Executive Committee Consent of the Board of Directors (May 4, 2014), CEC_EXAMINER_0011066 [CEC_EXAMINER_0011066].

[2341]  E-mail from R. Brimmer to D. Thaler, *et al.* (Mar. 3, 2014), at CEOC_INVESTIG_00063248 [CEOC_INVESTIG_00063248].

exacerbate an already weak free cash flow profile at CEOC . . . CEC guarantees the debt of CEOC and could potentially attempt to strip the guarantee as another step to further isolate the parent and its healthier entities from CEOC.[2342]

A Wall Street Journal article published that same day, March 3, stated the following regarding Fitch Ratings' response to the announcement:

> The latest move is positive for equity shareholders of Caesar's [sic] Entertainment because it pushes out the near-term possibility of default, said Fitch Ratings analyst Alex Bumazhny.   But the deal could actually be negative for certain debtholders invested in the weakest unit of that same company, said Michael Paladino of Fitch.  'The transaction is leveraging and it removes assets from that part of the capital structure.'[2343]

In its March 3 report, Fitch noted the asset sales "further deteriorate certain debt holders' recovery prospects in an event of default and exacerbate an already weak free cash flow profile at CEOC."[2344]   Fitch further viewed the Four Properties Transaction and shared services joint venture (CES) to reflect "another step towards moving assets away from the weaker CEOC into healthier entities and isolating the healthier entities from a potential filing at CEOC."[2345]

Moody's placed CEOC on review for a downgrade following the announcement of the transaction.[2346]   On March 19, 2014, Michael Karnas sent an e-mail to various members of CEC management regarding his conversation with a representative of Moody's Investors Service, stating that "Moody's view is that the sale does not benefit the CEOC creditors."[2347]   Moody's concluded that "bondholders will lose value in the range of $2.0 billion to $2.4 billion."[2348]   In Moody's opinion, the EBITDA CEOC lost from the Four Properties sale would cause CEOC's "already high leverage to increase as well as reduce bondholders' recovery prospects . . . [d]espite the approximate $1.8 billion of cash that will be received . . . ."[2349]   As a result, Moody's reduced CEOC's Corporate Family rating to Caa3; the Probability of Default rating to PD-Caa3; CEOC's first lien debt to Caa1; CEOC's second lien debt to Ca and maintained its Ca

---

[2342]  *Id.*

[2343]  E-mail from S. Cohen to M. Rowan, *et al.* (Mar. 3, 2014), at CEOC_INVESTIG_00341316 [CEOC_INVESTIG_00341315].

[2344]  Fitch Report "Caesars CGP Related Transactions Positive for Equity Holders and CERP; Negative for CEOC." (Mar. 3, 2014), at CEOC_INVESTIG_00241217 [CEOC_INVESTIG_00241217].

[2345]  *Id*.

[2346]  E-mail from M. Kamras to J. Thomas, *et al.* (Mar. 19, 2014), at CEOC_INVESTIG_00091048 [CEOC_INVESTIG_00091048].

[2347]  *Id.*

[2348]  Moody's Report "Moody's takes Rating Actions on Several Entities in the Caesars' family." (Mar. 28, 2014), at CEOC_INVESTIG_00050641 [CEOC_INVESTIG_00050641].

[2349]  *Id.*

rating on CEOC's unsecured debt.[2350]  Standard & Poor's also placed all of its ratings for CEC and CEOC on "CreditWatch with negative implications."[2351]

Analysts also viewed the transaction negatively.  Goldman Sachs downgraded CEOC's first lien notes to "In-Line from Outperform."[2352]  The report commented:

> We believe the announced sale of three Las Vegas properties and the proposed formation of a new 'Services JV' is more aggressive than we anticipated which has and, in our view, will continue to put pressure on the top part of the OpCo capital structures.[2353]

Deutsche Bank also downgraded the first lien notes to a hold.[2354]  Deutsche Bank stated that it found the transaction to be "clearly negative from a leverage perspective on CEOC due to the loss of EBITDA from the sale of the three assets."[2355]  J.P. Morgan, on the other hand, did not change any of its recommendations.[2356]  It is fair to say that the market's reaction to the Four Properties Transaction was very negative in terms of its impact on CEOC and its creditors – a reaction that should have come as no surprise to the Sponsors, CEC or the CEC Special Committee.

### k.  Pre-Closing Creditor Allegations that CEOC Was Insolvent

In a March 21, 2014 letter addressed to CEC, CEOC, and CERP (as well as their respective legal counsel), Jones Day, on behalf of the Second Lien Noteholders, asserted that CEOC was "insolvent" and that "CEOC's owners have decided to cede valuable assets of CEOC to affiliated entities for inadequate consideration . . . ."[2357]  Likewise, in an April 3, 2014 letter to the CEC and CEOC Boards, Kramer Levin, on behalf of holders of notes issued under various CEOC first-lien indentures, expressed concerns regarding the "related-party transactions recently announced by the Company" because, among other reasons, "CEC and CEOC were insolvent"

---

[2350] *Id*. at CEOC_INVESTIG_00050642.

[2351] E-mail from TPG News to D. Bonderman, *et al.* (Mar. 7, 2014), at CEOC_INVESTIG_00267288 [CEOC_INVESTIG_00267287].

[2352] "Caesars Entertainment Corporation Company Update" (Mar. 6, 2014), at CEOC_INVESTIG_00312780 [CEOC_INVESTIG_00312780].

[2353] *Id*. at CEOC_INVESTIG_00312784.

[2354] "Management Plays Another Hand; Investors Wary; Downgrading to a Hold" (Mar. 12, 2014), at CENTERVIEW_0007361-73 [CENTERVIEW_0007361].

[2355] *Id.* at CENTERVIEW_0007361-66.

[2356] "Caesars Entertainment Corp. Asset Sales to CACQ: Reduced Recovery, But Estimated Liquidity Extends to 2017" (Mar. 3, 2014), at CEOC_INVESTIG_00327841-49 [CEOC_INVESTIG_00327841].

[2357] *See* Letter from Jones Day (Mar. 21, 2014), at CEOC_INVESTIG_00124824 [CEOC_INVESTIG_00124821].

and there were "no independent directors of CEOC . . .  protecting the interests of CEOC and its creditors."[2358]

Around this time, CAC's lenders raised questions on these issues.  On March 25, 2014, Paul Weiss prepared answers to questions from CAC's lenders in connection with the Four Properties Transaction.  These materials included questions about the risk that the transactions would be rescinded, how CEOC got comfortable that it was receiving fair value for the transferred assets, thoughts as to why the transaction was not a fraudulent conveyance and what would happen if CEOC defaults or files for bankruptcy.[2359]

According to Paul Weiss, no process changes at the CEC or CEOC levels were implemented in response to the Jones Day or Kramer Levin letters.[2360]  Nor did these letters appear to prompt CEC or Paul Weiss to formally analyze whether CEOC was, in fact, insolvent.[2361]  CEC and Paul Weiss were highly concerned that these creditor allegations would derail the Four Properties Transaction, which they contend would have been detrimental to the financial health of CEOC.[2362]

### l.    The Las Vegas Properties Close

On May 5, 2014, Centerview and D&P presented fairness opinions to the CEC Special Committee and Board with respect to the First Transaction.[2363]

---

[2358]  Letter from K. Eckstein and T. Mayer to Board of Directors of CEC and CEOC (Apr. 3, 2014), at CEOC_INVESTIG_00094449-50 [CEOC_INVESTIG_00094448].

[2359]  E-mail from Catherine Goodall to A. van Hoek, *et al.* (Mar. 25, 2014), at APOLLO-Examiner_00098694, attaching "CGP Financing - Q&A" (Mar. 25, 2014), [APOLLO-Examiner_00098696].

[2360]  L. Clayton Oct. 26, 2015 Tr. at 234:19-238:10.

[2361]  *Id.*; G. Loveman Oct. 27, 2015 Tr. at 78:15-79:5 ("I don't recall any discussion of insolvency until after the bankruptcy filing.").  Donovan stated, however, that "during this time frame, in connection with the four-property sale, [we] would have been discussing . . . solvency or insolvency issues as it relates to CEOC at this time. . . . [T]he conclusion, was in my mind, and I believe the minds of the other lawyers, is that CEOC was solvent."  T. Donovan Nov. 10, 2015 Tr. at 97:17-99:21.  As discussed in Section VIII.A, however, this testimony is at odds with (i) the liquidity problems that CEOC was facing and growing realization that CEOC was never going to be able to repay its debts in full, and (ii) the extensive bankruptcy planning and legal analyses that PW was performing at the request of Apollo beginning as early as mid-2012 regarding fraudulent transfer risks, potential breach of fiduciary duty claims against insiders and the impact on such duties in the event of insolvency.

[2362]  L. Clayton Oct. 26, 2015 Tr. at 234:19-238:10.

[2363]  The May 5, 2014 fairness opinions were directed to the same parties as the February 24, 2014 and March 1, 2014 fairness opinions issued by Centerview and D&P, respectively, and contained the same opinion language.  Centerview Fairness Opinion (May 5, 2014) at CENTERVIEW_0001201-7 [CENTERVIEW_0001201]; D&P Fairness Opinion (May 5, 2014)

That same day, May 5, the CEOC Board, consisting of Loveman and Hession, approved via unanimous written consent (i) the First Transaction, and (ii) the CEC Special Committee's decision to bifurcate the Four Properties Transaction.[2364]  It also approved, via a May 5, 2014 written consent, the Incremental Term Loan Transaction, including the B-7 Refinancing.[2365]  No financial advisors made presentations to the CEOC Board regarding any aspect of the Four Properties Transaction, including whether it was fair to CEOC from a financial point of view. According to Loveman, in executing the written consent, he was acting in what he believed were the "best interests of CEC and CEOC."[2366]  No one, however, appears to have advised him (or Hession) of the conflicting or potentially conflicting interests of CEC and CEOC or of the implications of such conflicts or CEOC's financial condition on his fiduciary duties.

Also on May 5, 2014, the First Transaction closed, pursuant to which CGP acquired The Cromwell, The Quad and Bally's Las Vegas, and 50% of the associated management fees, plus certain intellectual property, in exchange for $1.340 billion (inclusive of assumed debt of $185 million).[2367]

### m.  Harrah's New Orleans Closes

On May 19, 2014, the LGCB approved the sale of Harrah's New Orleans to CGP. Immediately thereafter, on May 19 and 20, 2014, Centerview and D&P, respectively, issued fairness opinions with respect to the Second Transaction.[2368]

On May 20, 2014, the CEOC Board, via unanimous written consent, approved the Second Transaction.[2369]  That same day, May 20, the Second Transaction closed, pursuant to

---

[DP00000118].    According to Bosacco, because Centerview "analyzed the properties individually and then aggregated them for purposes of the initial announcement opinion . . . they could be split apart" for purposes of issuing a fairness opinion in connection with the bifurcated closing.  J. Bosacco Sept. 15, 2015 Tr. at 155:19-156:5.

[2364] CEOC Unanimous Written Consent of Board of Directors (May 20, 2014), at CEOC_INVESTIG_00126580- CEOC_INVESTIG_00126596 [CEOC_INVESTIG_00126580].

[2365] CEOC Unanimous Written Consent of Board of Directors (May 5, 2014), at CEOC_INVESTIG_00130895-12 [CEOC_INVESTIG_00130894].

[2366] G. Loveman Oct. 29, 2015 Tr. at 226:16-227:12.

[2367] CEOC also assumed renovation costs of The Quad in an amount not to exceed $220 million. Letter of Intent executed by the CAC and CEC Special Committees (Feb. 10, 2014), at APOLLO-Examiner_00021325-34 [APOLLO-Examiner_00021325].

[2368] These fairness opinions were directed to the same parties as the February 24, 2014 and March 1, 2014 fairness opinions issued by Centerview and D&P, respectively, and contained the same opinion language.  Centerview Fairness Opinion (May 19, 2014) [CEOC_INVESTIG_00452675];  D&P Fairness Opinion (May 20, 2014) [CEOC_INVESTIG_00451966].

[2369] The CEOC Board also approved the formation of Services Co.  *See* CEOC Unanimous Written Consent of the Board of Directors (May 20, 2014) [CEOC_INVESTIG_00126580].

which CGP acquired Harrah's New Orleans and 50% of the associated management fees, plus certain intellectual property, in exchange for $660 million.

### n.   Transfer of Undeveloped Land

In 2011, before the Four Properties Transaction, various Debtor entities granted easements on four lots (containing numerous parcels) totaling approximately 25.8 acres of land that is directly east of The LINQ Hotel & Casino, Flamingo Las Vegas Hotel & Casino and The Cromwell (collectively, the "Easement Lots"):

### Four Properties Figure 36:  Overhead of Easements



The grantees include Flamingo Las Vegas Propco, LLC, Harrah's Imperial Palace Corporation, and Caesars Linq, LLC.  Under the easements, the grantors agree to provide and maintain sufficient parking spaces for the continued compliance of the grantee's operations and also provide for vehicle and pedestrian use through portions of the grantor property.  Sufficient

parking spaces is net of parking provided in other locales (such as the grantees' property or other easements), as defined by each easement.

The Easement Lots provide the grantors with the right to relocate the easements at their sole cost and expense. For example, the grantors could provide structured parking in lieu of the existing surface parking. Fulfilling the parking requirement with structured parking (at the grantors' expense) would free up the remaining land to be developed to its highest and best use as market conditions warrant.

As described in greater detail in Exhibit I to Appendix 7, the granting of easements diminished the value of the grantors' land with a corresponding increase in value to the grantees. However, definitive values for the easements cannot be determined without a full detailed analysis of the regulatory parking requirements and their effect on the easements' parking requirements. The Examiner has been informed that such studies could not be located.

The Examiner did, however, perform an illustrative analysis of the potential value of the land associated with the easements and concluded that the consideration being paid for the easements – $1.7 million per year – was not reasonably equivalent value, with the deficiency in consideration between $18.7 million and $59.6 million. Given the number of assumptions in the analysis, however, it is not sufficient to support more than a plausible claim.

Additionally, concurrently with the May 5 closing of the Four Properties Transaction, 31 acres of undeveloped land east of certain Caesars casino properties were transferred to CGP.[2370] Below is an overhead view of the land in question:

---

[2370] *See* Appendix 7, Valuation at Section VIII.G for a detailed summary of the purportedly transferred land at issue. Notably, several witnesses told the Examiner that they were unaware of or could not recall any transfer of undeveloped land in connection with the Four Properties Transaction. *See*, *e.g.*, F. Kleisner Oct. 30, 2015 Tr. at 109:16-110:13; G. Loveman Oct. 27, 2015 Tr. at 194:25-195:15; T. Jenkin Sept. 30, 2015 Tr. at 92:5-13.

**Four Properties Figure 37:  Overhead View of Undeveloped Land**



Source:  Clark County website (http:gisgate.co.clark.nv.us/openweb/)

Lots A, C and D were transferred from CEOC entities to CGP entities as a consequence of the Four Properties Transaction; Lot B was transferred in an earlier transaction that occurred on August 10, 2011.

Below is a figure summarizing the details for each lot:

**Four Properties Figure 38:  Description of Undeveloped Land**

| Debtor Entities / Grantors | Non Debtor Entities / Grantee | Undeveloped Parcels | Description |
|---|---|---|---|
| 3535 LV CORP & 3535 PARENT LLC | 3535 LV NEWCO LLC | 162-16-301-007 (a) | 9.81 acres directly east of Harrah's Las Vegas (Lot A) (d) |
| OCTAVIUS LINQ HOLDING CO. LLC | CAESARS LINQ, LLC | 162-16-401-007 (b) | 0.99 acres directly east of The Flamingo (Lot B) (e) |
| PARBALL CORPORATION & PARBALL PARENT LLC | PARBALL NEWCO LLC | 162-21-102-002 (c ) | 7.13 acres directly east of Bally's (Lot C) (f) |
| | | 162-21-202-005 (c) | 14.1 acres directly east of Planet Hollywood (Lot D) (g) |

Sources:

(a) May 5, 2014 deed from 3535 LV Corp to 3535 LV Parent LLC recorded as document # 20140505-0003345 [CEC_Examiner_Supp_00000046-50]; May 5, 2014 deed from 3535 LV Parent, LLC to 3535 LV Newco, LLC recorded as document # 20140505-0003346 [CEC_Examiner_Supp_00000051].

(b) Deed requested but not provided.

(c) May 5, 2014 deed from Parball Corporation to Parball Parent, LLC recorded as document # 20140505-0003343 [CEC_Examiner_Supp_000000107]; May 5, 2014 deed from Parball Parent, LLC to Parball Newco, LLC recorded as document # 20140505-0003344 [CEC_Examiner_Supp_000000111].

(d) Clark County Assessor's gis/database. [http://gisgate.co.clark.nv.us/gismoreports/printmap.aspx?mapnumber =1126745&].

(e) Clark County Assessor's gis/database. [http://gisgate.co.clark.nv.us/gismoreports/printmap.aspx?mapnumber =1126741&].

(f) Clark County Assessor's gis/database.  [http://gisgate.co.clark nv.us/gismoreports/printmap.aspx?mapnumber =1126744&].

(g) Clark County Assessor's gis/database. [http://gisgate.co.clark.nv.us/gismoreports/printmap.aspx?mapnumber =1126742&].

Note:  The undeveloped parcels referred to above are currently being utilized as employee parking lots, delivery and construction staging areas or otherwise vacant.

There was no independent valuation of the undeveloped land performed in connection with the Four Properties Transaction.[2371]  Centerview did not individually value any undeveloped land transferred as part of the Four Properties Transaction.  Centerview did, however, "value[] the four assets as going-concern businesses . . . so to the extent that [undeveloped land] was part of one of the assets and transferred, it would have been captured in the overall value of the enterprise," similar to Total Rewards.[2372]  D&P was unaware of any transfer of undeveloped land in connection with the Four Properties Transaction.[2373]  In fact, it appears that almost everyone working on the transaction was unaware of and/or failed to take into account the fact that these undeveloped lands were part of the package of assets being transferred.[2374]  There is no

---

[2371]  VRC was approached about doing a fairness opinion related to 27 acres of land "in front of Bally's," but an engagement letter was never executed.  C. Rucker Sept. 25, 2015 Tr. at 56:16-57:7.  Rucker recalled that this opinion would have been related to a transaction whereby Caesars was "going to set up basically an outdoor flea market or something, outdoor kiosk in front of Bally's."  *Id.* at 57:2-11.

[2372]  J. Bosacco Sept. 15, 2015 Tr. at 92:2-12.

[2373]  J. Schiedemeyer Sept. 16, 2015 Tr. at 74:23-75:5.

[2374]  *See* J. Bosacco Sept. 15, 2015 Tr. at 91:20-25; F. Kleisner Oct. 30, 2015 Tr. at 109:16-110:13; G. Loveman Oct. 27, 2015 Tr. at 194:25-195:15; T. Jenkin Sept. 30, 2015 Tr. at 92:5-13; A. van Hoek Jan. 26, 2016 Tr. at 409:22-410:4.

evidentiary support for the notion that the value of the undeveloped land was included in the EBITDA or purchase price of the Four Properties Transaction.

CEC contends that undeveloped land had to be transferred with the Four Properties to satisfy Clark County parking requirements.[2375]   According to Hession, Clark County requires each casino "to have a certain ratio calculated in some way of available parking that is dedicated to [the casino]," and "to sell the property without any parking wouldn't have been viable."[2376] According to CEC, the Quad/LINQ Hotel requires 2,198 parking spaces, the LINQ Promenade requires 1,568 parking spaces and Bally's requires 2,075 parking spaces.  The undeveloped land is used to satisfy parking requirements as follows:

- Lot A contains 1,018 parking spots and is used to satisfy parking requirements for the Quad/LINQ Hotel, for which there are only 102 excess parking spaces.

- Lot B contains 116 parking requirements and is used to satisfy parking requirements for the LINQ Promenade.  However, the LINQ Promenade has 301 excess parking spaces, and therefore Lot B is not necessary to satisfy parking requirements for the LINQ Promenade.  The LINQ Promenade also was not part of this transaction.

- The exact number of parking spaces in Lots C and D are unknown, but CEC estimates that they contain a total of approximately 2,331 spaces.  Lots C and D are used to satisfy parking requirements for Bally's.  However, Bally's has historically shared a parking garage with the Paris Hotel that contains a total of 7,760 parking spaces.  CEC contends that Bally's cannot currently use these parking spaces to satisfy its parking requirements because Bally's and the Paris Hotel are no longer under the same ownership, and that Lots C and D are the sole sources of parking for Bally's to satisfy Clark County parking requirements. There are approximately 256 more spaces than required by regulation for Bally's in Lots C and D.

Hession compared the undeveloped land to furniture, fixtures and equipment, telling the Examiner that "you can't say you're going to sell something and exclude something that's necessary for it to operate. . . .  [I]f the property needs the parking and the parking has always been available to the property, selling it without the ability to have parking, which is a requirement to operate the property, that wouldn't have been viable."[2377]   He stated that the

---

[2375]  E. Hession Nov. 4, 2015 Tr. at 326:7-11; G. Miller Sept. 22, 2015 Tr. at 50:5-15.

[2376]  E. Hession Nov. 4, 2015 Tr. at 326:12-16, 329:5-23; *see also* G. Miller Sept. 22, 2015 Tr. at 50:10-19 ("there [are] times that we feel very pinched in terms of parking and that's an important element of every one of these hospitality assets").  Hession "assume[d]" that the undeveloped land would be reflected in "an elaborate map" of the back parts that show color-coded which property is using which land for parking and how that calculates and to make sure that every property had enough land."  E. Hession Nov. 4, 2015 Tr. at 331:16-332:3.

[2377]  E. Hession Nov. 4, 2015 Tr. at 331:3-8.  Hession "suspect[s]" that the parking would have been needed for The LINQ and The Cromwell (not Bally's).  *Id.* at 326:17-327:7.

purchased properties' "EBITDA reflected the access to [the undeveloped land] to be able to conduct its business."[2378]   In Hession's view, if the transferred land had been leased, rather than transferred, "the EBITDA of the property would have been lower and the sale price would have been lower."[2379]   In other words, "that lease would have then reduced the profitability of the property and, therefore, that would have been reflected in the purchase price."[2380]

According to Miller, then the Senior Vice-President of Development for CEC, however, certain of the transferred properties had "excess capacity relative to code" – approximately 600 to 1,000 spots that were viewed as a "buffer" – and CEOC had, in the past, "leased some of that land to different general contractors . . . just to make money, because it was an unused asset behind Bally's and Paris."[2381]   Miller added that because the land behind Bally's and Paris was sufficient to "satisfy the code requirements on parking," it allowed them to develop the "land behind The Wheel" for "revenue-generating activities."[2382]   Hession acknowledged that, to comply with certain "fire codes" and to "satisfy the parking issue," CEOC had leased land to The LINQ and/or provided it with an easement.[2383]

Further, there is evidence that Caesars considered whether to use the undeveloped land for other development opportunities, indicating that it was not necessary to reserve this land for parking space.  This is consistent with a 2009 document in which CEC suggested that its undeveloped land could be worth billions.[2384]   For instance, Miller told the Examiner that Caesars had considered building an arena, amphitheater or large meeting facility on the undeveloped land.[2385]   Miller also noted, however, that a deal to build an arena would have been structured such that "the land would have been priced at zero, but they would have had to build an arena, which again we would have found to be a very good complementary use to our surrounding hotel rooms."[2386]   No deal was ever consummated – as Miller explained, "nobody would take our land when we offered to give it to them for free."[2387]   According to Tom Jenkin,

---

[2378]   *Id.* at 328:13-21.

[2379]   *Id.* at 328:22-329:3.

[2380]   *Id.* at 329:18-23.

[2381]   G. Miller Sept. 22, 2015 Tr. at 50:20-51:8, 169:15-20, 195:9-196:25.

[2382]   *Id.* at 51:11-52:4; *see also id.* at 53:5-8.

[2383]   E. Hession Nov. 4, 2015 Tr. at 327:9-328:6.

[2384]   "Harrah's Entertainment, Inc. Investor Presentation" (Oct. 2009), at CITI-CZR-EXM-00084081 [CITI-CZR-EXM-00084071].

[2385]   G. Miller Sept. 22, 2015 Tr. at 52:5-53:5.

[2386]   G. Miller Jan. 15, 2016 Tr. at 181:24-182:9.

[2387]   *Id.* at 182:10-18.   Miller stated that CEOC also considered giving a parcel of land to Marriott for free if Marriott would agree to build "a full service hotel and warrant[] that they would not build a casino and would comply with the design requirements we had." *Id.* at 198:3-199:8.  Marriott passed because "they were very nervous that without a Las Vegas Boulevard address, they wouldn't generate the returns they needed to succeed." *Id.*

Caesars considered, among other things, constructing "a convention center behind Flamingo and Harrah's."[2388]  Ultimately, however, no development ever commenced and, according to Miller, "the most attractive option for [Caesars] has been to continue to use it for surface parking, complementing the resorts on The Strip."[2389]

In short, parking requirements would not prevent development of the land.  Miller stated that if Caesars ever finds a use for the land that is sufficiently attractive, it can build a parking structure to meet the code requirements for parking.[2390]  Likewise, Hession, while noting that development of the transferred land would have required construction of "a vertical parking structure, which would be quite expensive," acknowledged that there had been "thoughts to build something." [2391]

The Examiner estimates that, as of the May 2014, the value of the 31 acres of undeveloped land was $3.5 million to $4.5 million per acre, which totals $109 million to $140 million.[2392]

### o.  Mechanics of the Transaction

### i.  Las Vegas Properties

Prior to the Four Properties Transaction, 3535 LV Corp. ("3535 LV"), a subsidiary of CEOC, created a wholly-owned subsidiary, 3535 LV Parent, LLC ("3535 LV Parent").  3535 LV then transferred all its assets, including those in connection with The Quad, and liabilities to 3535 LV Parent.  Prior to closing, 3535 LV Parent then contributed all of its assets in connection with The Quad to 3535 LV Newco, LLC ("3535 LV Newco").  Then, pursuant to the Interest Transfer Power Agreement, 3535 LV Parent sold, assigned and transferred to Caesars Growth Quad, LLC, a wholly-owned third-tier subsidiary of CGP, 100% of its interest in 3535 LV NewCo.  Prior to the Four Properties Transaction, The Quad was operated by The Quad Manager, a newly formed management entity that was a subsidiary of CEOC, in exchange for management fees (the "Quad Management Fees").  The Quad Manager then contributed the Quad Management Fees to 3535 LV NewCo.  3535 LV Parent then transferred its right, title and interest in 50% of the Quad Management Fees to CGP.

Corner Investment Company, LLC ("CIC") owned the Cromwell.  CEOC owned 100% of the membership interests in CIC (the "Cromwell LLC Membership Interests").  CEOC then transferred the Cromwell LLC Membership Interests to Corner Investment Company NewCo., LLC ("CIC NewCo").  Then, pursuant to the Interest Transfer Power Agreement, CIC NewCo

---

[2388]  T. Jenkin Sept. 30, 2015 Tr. at 92:14-93:2.

[2389]  G. Miller Jan. 15, 2016 Tr. at 199:3-8.

[2390]  Id. at 199:9-200:15.

[2391]  E. Hession Nov. 4, 2015 Tr. at 332:5-19, 333:4-7; see also id. at 333:20-23 ("plans to develop that back land would require a major parking garage to be built and those are 40 to 60 million bucks").

[2392]  Appendix 7, Valuation at Section VII.G.2 and Exhibit I to Appendix 7.

transferred 100% of The Cromwell LLC Membership Interests to Caesars Growth Cromwell, LLC, a wholly-owned third-tier subsidiary of CGP.  Prior to the Four Properties Transaction, The Cromwell was operated by Cromwell Manager, LLC, a newly formed management entity that was a subsidiary of CEOC, in exchange for management fees (the "Cromwell Management Fees").  Cromwell Manager contributed the Cromwell Management Fees to CIC NewCo.  CIC NewCo then transferred its right, title and interest in 50% of the Cromwell Management Fees to CGP.

Parball Corporation ("Parball"), a subsidiary of CEOC, owned Bally's Las Vegas through a series of subsidiaries.  Prior to the Four Properties Transaction, Parball created Parball Parent, LLC ("Parball Parent"), as well as three other new parent entities (together, with Parball Parent, the "Parball NewCo Parents").  Parball then transferred all of its assets, including those in connection with Bally's, and liabilities to the Parball newco Parents, which contributed them to Parball NewCo, LLC ("Parball NewCo") and three other newco entities (together, with Parball NewCo, the "Parball NewCo Entities").  The Parball NewCo Parents then sold, assigned, and transferred to Caesars Growth Bally's LV, LLC, a wholly-owned third-tier subsidiary of CGP, 100% of their interests in the Parball NewCo Entities.  Before the Four Properties Transaction, Bally's was operated by Bally's Las Vegas LLC ("Bally's Manager"), a newly formed management entity that was a subsidiary of CEOC, in exchange for management fees (the "Bally's Management Fees").  Bally's Manager then contributed the Bally's Management Fees to Parball NewCo.  Parball Parent then transferred its right, title and interest in 50% of the Bally's Management Fees to CGP.

These transfers are set forth in the figures below.

**Four Properties Figure 39:  Formation of Management Entities**



**Four Properties Figure 40:  Formation of New Subsidiaries**



**Four Properties Figure 41:  Contribution of Assets to New Subsidiaries**



**Four Properties Figure 42:  Contribution of Stock to NewCos**



* Debtor entity in the CEOC bankruptcy

**Four Properties Figure 43:  Sale of Cromwell to CGP**



* Debtor entity in the CEOC bankruptcy

**Four Properties Figure 44:  Sale of Quad to CGP**



**Four Properties Figure 45:  Sale of Bally's Las Vegas to CGP**



* Debtor entity in the CEOC bankruptcy

### ii.   New Orleans

JCC Holding Company III, LLC ("JCC") owned Harrah's New Orleans.  CEOC owned 100% of the membership interests in JCC (the "Harrah's LLC Membership Interests").  CEOC then transferred the Harrah's LLC Membership Interests to JCC Holding Company II NewCo, LLC ("JCC NewCo").  Then, pursuant to the Interest Transfer Power Agreement, JCC NewCo transferred 100% of the Harrah's LLC Membership Interests to Caesars Growth Harrah's New Orleans, LLC, a wholly-owned third-tier subsidiary of CGP.

Before the Four Properties Transaction, Harrah's was operated by the Harrah's New Orleans Management Company ("Harrah's Manager"), a pre-existing management entity that was a subsidiary of CEOC, in exchange for management fees (the "Harrah's Management Fees").  Harrah's Manager then contributed the Harrah's Management Fees to JCC NewCo.  JCC NewCo then transferred its right, title and interest in 50% of the Harrah's Management Fees to CGP.

**Four Properties Figure 46:  Formation of Management Entities**



**Four Properties Figure 47:  Contribution of Stock to NewCos**



**Four Properties Figure 48:  Sale of Harrah's New Orleans to CGP**



### p.  Independent Directors Are Added to the CEOC Board Post-Transaction

On June 27, 2014, Loveman and Hession, via unanimous written consent, expanded the CEOC Board of Directors from two to seven by adding Stauber, Winograd, Bonderman, Davis, Rowan and Sambur.[2393]  Stauber and Winograd were selected and recruited by the Sponsors to become independent CEOC directors as early as February 2014, prior to completion of the Four Properties Transaction on May 20, 2014.[2394]  It appears that the Sponsors told Stauber and Winograd that it would be preferable to wait until the Four Properties Transaction closed to join the CEOC Board because injecting new independent directors into the process while the

---

[2393]  CEOC Unanimous Written Consent of Directors in Lieu of Meeting (June 27, 2014), at CEOC_2004_0038194-99 [CEOC_2004_0038194].  At the same time, Hession resigned from the board.

[2394]  R. Stauber Sept. 30, 2015 Tr. at 19:16-20:7; S. Winograd Oct. 21, 2015 Tr. at 10:17-11:4 (Winograd was approached by Rowan "in the February 2014 time frame."); M. Rowan Nov. 17, 2015 Tr. at 300:14-25; *see also* G. Loveman Oct. 27, 2015 Tr. at 245:3-18.

transaction was pending would create an unnecessary complication.[2395]   As Stauber told the Examiner:

> Over the months, it was clear [] through conversations with David Sambur that they wanted to attempt to complete what was by then announced as the CGP II transaction, as I mentioned earlier, in order to not inject new individuals into a process previously started.[2396]

### q.   CEOC's Use of the Four Properties Transaction Sale Proceeds

According to Hession, CEOC used the sales proceeds from the Four Properties Transaction first for "general corporate purposes" and then, pursuant to the Sponsors' directive, to pay down "the balance of [its] revolver" in or around June 2014.[2397]   Sambur told the Examiner:  "CEOC had, I think it was like $2 billion of liquidity, there seemed to be very little need to keep this money on the balance sheet of CEOC, when it had so much cash and continue to pay interest on it, so the decision was made to repay it."[2398]

When asked by the Examiner about language in a February 24, 2014 Centerview presentation to the CEC Special Committee providing that (i) "the Company has indicated that it will be able to retain 100% of the proceeds of the Proposed Transaction," and  (ii) "CEOC will not be required to use any proceeds to pay down secured debt,"[2399] Rowan responded:

> [G]enerally, the company had a period of time with respect to the sale of restricted subsidiaries in which to either reinvest in the business or to pay down. So, it was not a requirement that it immediately would be paid down.  However, under the terms of the guarantee – of the bank debt, as I understood them, eventually these proceeds would have to be used to pay down. . . . Centerview wrote what they wrote.[2400]

Kleisner told the Examiner that he did not recall this aspect of Centerview's February 24, 2014 presentation.[2401]

---

[2395]  R. Stauber Sept. 30, 2015 Tr. at 19:16-20:7.

[2396]  *Id*.  While Stauber stated that the need to obtain regulatory approval of the transaction was a reason for the delay in appointing independent directors to the CEOC Board, this does not appear to have been an obstacle for CAC, which added independent directors to its Board in time to consider the transaction.   CAC Special Committee Meeting Minutes (Dec. 23, 2013), at CACEXAM00434786-87 [CACEXAM00434786].

[2397]  E. Hession Nov. 4, 2015 Tr. at 493:20-495:11.

[2398]  D. Sambur Nov. 14, 2015 Tr. at 590:9-591:2.

[2399]  "Caesars Entertainment Confidential Discussion Materials" (Feb. 24, 2014), at CEOC_INVESTIG_00458707 [CEOC_INVESTIG_00458698].

[2400]  M. Rowan Nov. 17, 2015 Tr. at 350:21-352:3.

[2401]  F. Kleisner Jan. 28, 2016 Tr. at 37:20-38:13.

The February 24 presentation also contemplated that CEOC would continue to face substantial liquidity issues post-transaction.  It stated, among other things, that CEOC's "projected total liquidity" would "run down to $353 million by the end of 2015" and that, "[a]bsent meaningful improvement in operating performance, CEOC likely will be required to address its capital structure prior to 2016 when liquidity is projected to run negative."[2402]

The February 24 presentation also compared CEOC's projected financials pre- and post-Four Properties Transaction, making clear that CEOC would be placed in a significantly worse financial situation.[2403]  Over the 2014-2016 period, CEOC's cumulative net revenues, cumulative EBITDA and cumulative free cash flow would all be materially reduced while leverage would jump from an already unsustainable 14.6x to 18.1x.[2404]

### r.  Performance of the Four Properties Post-Transfer

Each of the Four Properties missed their budget EBITDA for 2014.  However, with the exception of The Cromwell and Harrah's New Orleans, these properties exceeded budgeted EBITDA for 2015.  Figure 49 below shows the projected performance and actual performance for each of the properties.

**Four Properties Figure 49:  Budget to Actual Performance (2014-2015)**

| Subset | Actual EBITDARM 2014 | Budgeted EBITDARM 2014 | EBITDARM % Variance 2014 | Actual EBITDARM 2015 | Budgeted EBITDARM 2015 | EBITDARM % Variance 2015 |
|---|---|---|---|---|---|---|
| Four Properties: | | | | | | |
| The Quad | $ | $ | -74% | $ | $ | 44% |
| The Cromwell | $ | $ | -56% | $ | $ | -54% |
| Bally's Las Vegas | $ | $ | -4% | $ | $ | 17% |
| Harrah's New Orleans | $ | $ | -8% | $ | $ | -9% |
| Four Properties Total | $ | $ | -25% | $ | $ | 1% |
| Planet Hollywood | $ | $ | -6% | $ | $ | 1% |
| Horseshoe Baltimore | $ | $ | -15% | $ | $ | 5% |
| Las Vegas Total | $ | $ | -26% | $ | $ | 12% |
| CEC Total | $ | $ | -19% | $ | $ | 12% |

Source:   Monthly Actual versus Budget Analysis for 2007-Q1 2015 (Undated), at Tab 'Summary' [CEC_EXAMINER_0145430] (native file); Property P&L Detail 2007-2015 [CEC_EXAMINER_1447621] (native file).

As discussed in more detail below and in Appendix 5, Legal Standards at Section I.C.2.a and Appendix 7, Valuation at Section I.B, the post-transaction performance of the Four

---

[2402]  "Caesars Entertainment Confidential Discussion Materials" (Feb. 24, 2014), at CEOC_INVESTIG_00458707 [CEOC_INVESTIG_00458698].

[2403]  *Id.*

[2404]  *Id.*

Properties is not relevant in assessing whether CEOC received fair or reasonably equivalent value in return for those properties. Rather, the focus is on what was "known or knowable" at the time of the transaction. Moreover, and in any event, it is too early to assess the long-term performance of these properties, as the performance of a long-lived asset is not predicated on one or two years of financial results. Indeed, as reflected in the table above, the performance of some of the properties has improved during the course of 2015. Others involve new investments (*e.g.*, the Wheel and LINQ retail), which may require a trial-and-error period before their success can be evaluated.

### 3. The CES/Total Rewards Transaction

#### a. The Creation of CES and Transfer of Control Over Total Rewards and Related Management Services

#### i. Creation of CES

On March 1, 2014, as part of the Four Properties Transaction, CEOC entered into a Transaction Agreement providing that the parties would "agree to use reasonable best efforts to establish a mutually satisfactory services joint venture arrangement, based on good faith negotiations, as reflected in the Services Joint Venture Term Sheet attached hereto as Exhibit H" as soon as practicable following the closing date.[2405] The term sheet, however, covered a great deal more than the properties being sold as part of the Four Properties Transaction; it outlined the establishment of a joint venture that would be responsible for providing services across the Caesars enterprise, including to CERP properties and the properties that had been transferred to Growth in October 2013. Additionally, the Transaction Agreement stated that each of the Four Properties would receive "management services to the applicable Casino and access to the Total Rewards Program" pursuant to a Property Management Agreement[2406] and that such services would be provided by a property manager either directly or through the services joint venture.[2407]

---

[2405] Transaction Agreement §8.18 (Mar. 1, 2014), at CEOC_INVESTIG_00066153 [CEOC_INVESTIG_00066086].

[2406] *Id.*

[2407] *Id.* at Ex. D, Management Term Sheet, CEOC_INVESTIG_00055883 [CEOC_INVESTIG_00055876]. Although the Property Agreements for each of the Four Properties were entered into with wholly-owned subsidiaries of CEOC, those agreements were effectively assigned to CES, the services joint venture, as part of the Four Properties Transaction. *See* Omnibus License and Enterprise Services Agreement Execution Version (May 20, 2014), at CEOC_INVESTIG_00059560-624 [CEOC_INVESTIG_00059560] ("[E]ach of the Existing Property Owners desires to engage Service Provider to provide the services provided under the Existing Property Management Agreements in accordance with the terms and conditions set forth in such Existing Property Management Agreements which engagement shall be implemented through an assignment of each Existing Property Management Agreement by the parties thereto in accordance with the terms set forth therein . . . .").

The Transaction Agreement also provided that CGP would purchase 50% of the management fees paid by the Four Properties.[2408]

Finally, the March 1, 2014 Transaction Agreement identified the creation of CES and transfer of Total Rewards as "critical elements of the transaction."[2409]  The agreement indicated that "Growth Partners would not have entered into th[e] Agreement . . . without the fundamental understanding that th[e] Agreement . . . together with the Services Joint Venture Arrangements, taken as a whole, represent a single, integrated transaction."[2410]  There is also evidence that the lenders involved insisted that management employees be moved to CES as part of the transaction, and that they were concerned about the possibility of a CEOC bankruptcy.[2411]

Following the execution of the Transaction Agreement on March 1, Paul Weiss was asked to develop the two-page term sheet used as Exhibit H to the agreement into a longer, more extensive term sheet for the services joint venture that the CAC and CEC Special Committees would use as a basis for their negotiations and later approve.  This Definitive Term Sheet was entered into by the Special Committees on May 5.  Roughly two weeks later, on May 20, 2014, the joint venture, known as CES, was formed pursuant to a limited liability company agreement among CEOC, CERP and CGP (the "LLC Agreement").[2412]  In addition to laying out the structure and powers of the new joint venture, the LLC Agreement set forth the corporate relationship (including the governance arrangements) between CES and the various members of the new entity.

That same day, CEOC, CERP and CGP, as well as CES, Caesars License Company, LLC and Caesars World, Inc. executed an "Omnibus License and Enterprise Services Agreement" (the "License and Services Agreement" and, together with the LLC Agreement, the "CES Agreements") describing, *inter alia*, the services that the new CES entity would provide.[2413]  The License and Services Agreement, which incorporates a complex and interlocking set of licensing arrangements covering existing and future intellectual property, granted CES an extensive, royalty-free license to CEOC's intellectual property, including, most notably, Caesars'

---

[2408] Transaction Agreement, Preamble, Art. 1 (Mar. 1, 2014), at CEOC_INVESTIG_00066090, CEOC_INVESTIG_00066103 [CEOC_INVESTIG_00066086].

[2409] *Id.* at §8.18, CEOC_INVESTIG_00066153.

[2410] *Id.*

[2411] *See* e-mail exchange between D. Sambur, M. Wlazlo, *et al.* (Feb. 15, 2014), at PRIV_INVESTIG_00039708-11 [PRIV_INVESTIG_00039708] (suggesting that the financing will require moving the employees to the management company).

[2412] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC (May 20, 2014), at CEOC_INVESTIG_00059472-540 [CEOC_INVESTIG_00059472].

[2413] Omnibus License and Enterprise Services Agreement (May 20, 2014), at CEOC_INVESTIG_00059560-624 [CEOC_INVESTIG_00059560].

proprietary and closely guarded Total Rewards program.[2414]  CES, in turn, sublicensed this
intellectual property to CERP, CGP, CEOC Property Owners (defined as "CEOC or the owner of
any CEOC Managed Facility that is a subsidiary of CEOC")[2415] and other subsidiaries or
affiliates of CEC.[2416]  Additionally, the License and Services Agreement provided that a number
of CEOC employees responsible for providing management services to both CEOC and non-
CEOC properties would become employees of CES.  This included those senior managers
responsible for the day-to-day management of certain properties, as well as those responsible for
corporate and centralized services for all three of CES's member entities.[2417]

In exchange for these contributions to the new CES entity, CEOC received a 69%
ownership stake in CES.[2418]  CERP contributed $42.5 million in capital to CES and in return
received a 20.2% ownership interest.[2419]  CGP contributed $22.5 million in capital to CES and in
return received a 10.8% ownership interest.[2420]  Notwithstanding their different contributions and
ownership shares, CEOC, CERP and CGP each received equal voting rights over almost every
matter within the purview of the new joint venture.[2421]  The ownership structure of CES is set
forth in Figure 50.

---

[2414] *Id*.  at Ex. A, License A, CEOC_INVESTIG_00059601.  The operation of the Total
Rewards program, as well as the increased value it purportedly generates for Caesars properties,
is discussed in greater detail in Section VIII.F, *infra*.

[2415] *Id*. at Ex. K, CEOC_INVESTIG_00059623.

[2416] *Id*. at Ex. A, Licenses D, E, F, H, K, and L, CEOC_INVESTIG_00059605-13.

[2417] As set forth in Section 8.9 of the License and Services Agreement, these corporate and
centralized services span almost every aspect of Caesars operations, including IT, tax, audit, HR,
regulatory compliance and legal (among many others).

[2418] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise
Services, LLC (May 20, 2014), at CEOC_INVESTIG_00059522
[CEOC_INVESTIG_00059472].

[2419] *Id*.

[2420] *Id.*

[2421] *Id*. at CEOC_INVESTIG_00059496-97.  There are a number of exceptions, which are
discussed in more detail below.

**Four Properties Figure 50:  CES Ownership Structure**



### ii.    Evolution of and Rationale for CES

Since the time of the LBO, there had been intermittent discussions within Caesars about creating a centralized entity outside of CEOC which would provide services to the various entities in the Caesars empire.[2422]  However, these conversations never really gained much traction, in part because until the creation of Growth, the vast majority of properties were located within CEOC and the only ones that were not – CIE and the six CMBS Properties – were managed through a bilateral shared services agreement with CEOC.

By the fall of 2013, however, faced with the worsening financial condition at CEOC and the imminent creation of CGP, Apollo and Paul Weiss began to consider the implications that a CEOC bankruptcy could have on the ability of CGP and CERP to maintain access to shared services and intellectual property.[2423]  As one Paul Weiss lawyer explained, the "risk of a CEOC

---

[2422]  *See* M. Cohen Feb. 9, 2016 Tr. at 513:11-22 ("[T]he idea of a separate services co . . . stems from 2007" when Caesars was "structuring the leveraged buyout by TPG and Apollo");  *see also* T. Donovan Feb. 18, 2016 Tr. at 281:2-282:21 ("[W]e had been talking about" "the concept of shared services" "for some period of time" before 2014).

[2423]  *See, e.g.*, B. Finnegan Feb. 4, 2016 Tr. at 351:3-353:24 (Finnegan began working on Services Co. after a request from the Sponsor directors in late 2013 because of a "perceived

bankruptcy was clearly on everyone's mind" in the fall of 2013.[2424] Indeed, at the time, the lenders in connection with the CERP Transaction were concerned about what would happen to shared services in the event of a CEOC bankruptcy.[2425] A September 23, 2013 e-mail from Sambur to Wlazlo and Ezring – likely prompted by discussions with the CMBS Lenders – succinctly identified the issue, which concerned Sambur as well.[2426] Later, after a November board meeting, bankruptcy lawyers at Paul Weiss circulated to Apollo a preliminary analysis of operational risks in a potential CEOC bankruptcy.[2427] Obviously, in any bankruptcy, debtors have the option of rejecting certain executory contracts that could affect operations, such as those providing access to management services or intellectual property. A follow-up conference call on this topic between Apollo and Paul Weiss was held on December 3, 2013.[2428]

As discussions regarding the operational risks posed by a potential bankruptcy at CEOC continued through the end of 2013, Paul Weiss recommended that these concerns be addressed through the creation of a bankruptcy remote entity that would "guard[] against the contingency of a CEOC bankruptcy."[2429] By early January 2014, this work was in full swing, and Paul Weiss

---

need" that CAC would "expect and demand at some point in time" continued access to Total Rewards); *id.* at 377:22-378:12 (the "request" to put together a Services Co. term sheet "likely originated from . . . the sponsor directors"); *id.* at 382:7-25 (Paul Weiss was "very involved . . . in the design and creation of" Services Co. after a request from the Sponsor directors sitting on the CEC Board "anticipating a demand for some type of structure, not necessarily this, per se, but some type of a structure from CAC"); A. Kornberg Jan. 29, 2016 Tr. at 251:14-18 (work on the structure of the bankruptcy remote entity was an "outgrowth" of the process that was "going on in late 2013"); J. Saferstein Jan. 29, 2016 Tr. at 7:2-16 (Saferstein became "involved in late 2013 . . . with respect to the formation of Services Co."). Paul Weiss' understanding that the CAC Special Committee may make such a request came from the Sponsor directors sitting on both the CEC and CAC Boards. *See* B. Finnegan Feb. 4, 2016 Tr. at 387:18-22.

[2424] A. Kornberg Jan. 29, 2016 Tr. at 224:17-225:4; *see also* M. Wlazlo Feb. 4, 2016 Tr. at 307:23-308:3 (there was an "increased attention" that CEOC was at an "increased risk for a potential filing in late 2013").

[2425] M. Wlazlo Feb. 4, 2016 Tr. at 369:4-370:5 (CERP lenders were "raising issues" on what happens to the shared services in the event of a CEOC bankruptcy "in the fall of 2013").

[2426] E-mail from D. Sambur to M. Wlazlo and G. Ezring (Sept. 23, 2013), at APOLLO-EXAMINER_00664783 [APOLLO-EXAMINER_00664783]; *see also* D. Sambur Jan. 14, 2016 Tr. at 768:10-24; M. Wlazlo Feb. 4, 2016 Tr. at 271:18-272:15 (acknowledging that CES was created as an attempt to come up with a better answer for what happens to the shared services upon a CEOC bankruptcy).

[2427] E-mails from M. Wlazlo and A. Kornberg to J. Saferstein, *et al.* (Nov. 15, 2013), at PW_EXAMINER_SUPP_00003964-65 [PW_EXAMINER_SUPP_00003964].

[2428] E-mail from C. Goodall to B. Finnegan, *et al.* (Dec. 2, 2013), at PW_EXAMINER_SUPP_00005503 [PW_EXAMINER_SUPP_00005503].

[2429] B. Finnegan Feb. 4, 2016 Tr. at 381:14-18; *see also id.* at 383:4-384:5 (there was an "independent desire" to have a bankruptcy-remote entity "to help protect all of the [Caesars] entities from the interruption of services in the event of a CEOC bankruptcy"); T. Donovan Feb.

attorneys reviewed and discussed a number of different proposals for creating such an entity.[2430] As of January 14, Paul Weiss had already put together a Services Co. term sheet, which was shared with Sambur on January 15 and went through several iterations over the next few days.[2431]  Sambur provided extensive comments to the drafts and was an active participant in shaping the contemplated Services Co. entity.[2432]

During this same time period, Sambur was also discussing the disposition of CEOC's management services and intellectual property, including the potential creation of a Services Co., with Raymond Lin of Latham & Watkins, counsel for CAC.  On January 15, 2014, for instance,

---

18, 2016 Tr. at 279:15-24 (acknowledging that "one of the merits of creating CES" was that "if CEOC were to go bankrupt," the CERP and CGP properties "would be able to continue to avail themselves of those services" which would "have been at risk . . . in the event of a CEOC bankruptcy"); A. Kornberg Jan. 29, 2016 Tr. at 249:9-25 (CES was structured as a "bankruptcy remote entity" which is a "very standard arrangement" to protect the services provided by CES in the event of a CEOC bankruptcy); e-mail from T. Donovan to G. Loveman (Sept. 6, 2014), at CEC_EXAMINER_0894978 [CEC_EXAMINER_0894977] (one of the "merits of CES" is "to protect CEC in a bankruptcy of CEOC").

[2430] E-mail from A. Kornberg to G. Ezring, *et al.* (Jan. 11, 2014), at PW_EXAMINER_SUPP_00003605-06 [PW_EXAMINER_SUPP_00003605].

[2431] *See* e-mail exchange between D. Sambur and B. Finnegan (Jan. 15, 2014), at APOLLO-EXAMINER_00643407 [APOLLO-EXAMINER_00643407]; Draft of "Indicative Terms of Services Company Joint Venture" (Jan. 15, 2014), at APOLLO-EXAMINER_00643409-12 [APOLLO-EXAMINER_00643409]; e-mail exchange between D. Sambur, B. Finnegan and G. Ezring (Jan. 16, 2014), at APOLLO-Examiner_00643458-61 [APOLLO-Examiner_00643458]; Paul Weiss Redline of CES Term Sheet (Jan. 16, 2014), at APOLLO-Examiner_00643462-67 [APOLLO-Examiner_00643462]; Paul Weiss Draft of CES Term Sheet (Jan. 16, 2014), at APOLLO-Examiner_00643468-72 [APOLLO-Examiner_00643468]; e-mail exchange between D. Sambur, B. Finnegan and G. Ezring (Jan. 16-17, 2014), at APOLLO-Examiner_00643484-88 [APOLLO-Examiner_00643484]; Paul Weiss Redline of CES Term Sheet (Jan. 17, 2014), at APOLLO-Examiner_00643492-97 [APOLLO-Examiner_00643492]; Paul Weiss Draft of CES Term Sheet (Jan. 17, 2014), at APOLLO-Examiner_00643498-502 [APOLLO-Examiner_00643498]; e-mail from B. Finnegan to D. Sambur (Jan. 18, 2014), at APOLLO-Examiner_00643531 [APOLLO-Examiner_00643531]; Paul Weiss Redline of CES Term Sheet (Jan. 17, 2014), at APOLLO-Examiner_00643540-45 [APOLLO-Examiner_00643540]; Paul Weiss Draft of CES Term Sheet (Jan. 17, 2014), at APOLLO-Examiner_00643546-50 [APOLLO-Examiner_00643546].

[2432] *See, e.g.*, e-mail from D. Sambur to B. Finnegan (Jan. 16, 2014), at APOLLO-Examiner_00659473 [APOLLO-Examiner_00659473]; Draft Indicative Terms of Services Company Joint Venture with Sambur's Handwritten Comments (Jan. 16, 2014), at APOLLO-Examiner_00659475-76 [APOLLO-Examiner_00659475]; e-mail from D. Sambur to B. Finnegan, copying G. Ezring (Jan. 16, 2014) [APOLLO-Examiner_00643427], attaching "Caesars Entertainment Indicative Terms of Services Company Joint Venture" (Jan. 15, 2014), at APOLLO-Examiner_00643430 [APOLLO-Examiner_00643430].

Sambur informed Paul Weiss that he needed a "quick and dirty" term sheet relating to the contemplated Services Co. structure in order to "get [R]ay up to speed."[2433]

Paul Weiss also previewed the draft term sheet for Reed Smith, counsel to the CEC Special Committee.[2434]  Although it is unclear exactly when this occurred, Reed Smith knew no later than January 20 that such a term sheet was in the offing[2435] and made clear that it wanted an outline of the new "Total Rewards entity" by January 23, 2014 in order to discuss it with the CEC Special Committee.[2436]

On January 26, 2014, as discussed above, the CAC Special Committee requested that the Four Properties Transaction involve assurances that the four casinos being sold would continue to be able to access shared services – in particular, Total Rewards – in the event of a CEOC bankruptcy.  Notwithstanding the prior work done by Paul Weiss and Sambur (and shared with others), a number of witnesses told the Examiner that this request was the genesis of the CES

---

[2433]  E-mail from D. Sambur to B. Finnegan (Jan. 15, 2014), at APOLLO-Examiner_00643394 [APOLLO-Examiner_00643394]; *see also* Apollo Privilege Log (Mar. 14, 2016), at CNTRL00253857. *C.f.* e-mail from R. Lin to D. Sambur, *et al.* (Jan. 13, 2014), at APOLLO-Examiner_00656195 [APOLLO-Examiner_00656195].

[2434]  These discussions may have started as early as December 2013.  *See* E-mail from M. Cohen to B. Finnegan (Dec. 25, 2013), at CEC_EXAMINER_0525722 [CEC_EXAMINER_0525722] ("Brian, you might want to be talking to Reed Smith about how we believe the sales should be structured . . . we don't want them to go off an[d] structure in another way that could delay timing."); *see also* B. Finnegan Feb. 4, 2016 Tr. at 353:20-354:6 (soon after Paul Weiss began its work on Services Co., they "began having conversations with counsel to the CEC Special Committee"); *id.* at 384:6-17 (acknowledging discussions with Reed Smith about a term sheet for CES before the CAC Special Committee's request was made on January 26, 2014); E-mail exchange between B. Finnegan and H. Shecter (Jan. 20-21, 2014), at REEDSMITH0029029-30 [REEDSMITH0029029]; M. Cohen Feb. 9, 2016 Tr. at 519:19-22 (Paul Weiss was in "regular communications with Reed Smith" regarding Services Co.).

[2435]  *See* e-mail from J. Shecter to B. Finnegan (Jan. 20, 2014), at REEDSMITH0029030 [REEDSMITH0029029].

[2436]  E-mail from H. Shecter to B. Finnegan (Jan. 22, 2014), at REEDSMITH0029061 [REEDSMITH0029061].  Notably, but hardly surprisingly, the only stakeholders which did not seem to be aware of the work being done on a services joint venture by this time were CEC and CEOC, which also had not been privy to any of the bankruptcy-related analysis done in the fall of 2013.  *See, e.g.*, T. Donovan Feb. 18, 2016 Tr. at 295:12-296:4, 299:10-303:12, 320:2-321:9.  According to Cohen, in-house counsel for CEC was "not involved in this process," nor was in-house counsel aware that Paul Weiss and the Sponsors were working on such a concept before the CAC Special Committee made its request on January 26, 2014.  *See* M. Cohen Feb. 9, 2016 Tr. at 515:4-517:7, 522:2-523:7; *see also* T. Donovan Feb. 18, 2016 Tr. at 290:8-18 (not recalling that Paul Weiss had been working on a Services Co. term sheet before the CAC Special Committee made its official request on January 26, 2014); *id.* at 304:24-305:3 (Cohen and Donovan "were out of the loop" and "weren't involved directly" with Services Co.); *id.* at 306:4-10 (Cohen and Donovan "weren't really involved" with the Services Co. term sheet).

structure.[2437]  It is, of course, possible that the CAC Special Committee came up with the idea for the request independently – as witnesses stated, the possibility of a CEOC bankruptcy was "obvious" by this point in time,[2438] and it made sense that the CAC Special Committee wished to protect its substantial investment.  It is also possible that the work being done by Paul Weiss was intended to be a "material inducement" to the CAC Special Committee to enter into the Four Properties Transaction, a view buttressed by the appearance of that language on certain of the early term sheets shared with Sambur.[2439]  As Finnegan explained, the Sponsor directors sitting on both the CEC and CAC Boards – notably Sambur – may very well have believed that CAC would "expect and demand at some point in time" continued access to Total Rewards,[2440] particularly given the fact that Sambur was discussing the issue of Services Co. with CAC's counsel in the weeks prior to the January 26 request.

The precise details of CES's genesis do not really matter, however.  At the end of the day, it is clear that the creation of CES was driven by an understanding amongst the various constituents that CEOC was at risk for bankruptcy and that there was a need for a "contingency" plan to ensure that enterprise-wide access to necessary services and Total Rewards would continue if that contingency were to occur.[2441]  The issue is not whether the Sponsors or CEC were planning or trying their best to avoid a CEOC bankruptcy, as the creditors (on one hand) and CEC (on the other) have argued.  The issue is that they, as well as CAC, understood that wholly apart from what anyone desired, a CEOC bankruptcy could well become a necessity, and the risk of that was real.  Echoing the CAC Special Committee, Paul Weiss attorneys have admitted that CES was conceived in order to ensure that "there would be uninterrupted use of . . . Total Rewards and the associated intellectual property" in the event of a bankruptcy at

---

[2437] F. Kleisner Oct. 30, 2015 Tr. at 46:20-47:25; L. Swann Oct. 12, 2015 Tr. at 86:7-20; Louisiana Gaming Control Meeting Apr. 24, 2014 Tr. (M. Cohen) at 114:24-115:4; C. Abrahams Oct. 7, 2015 Tr. at 346:17-347:11; M. Cohen Oct. 16, 2015 Tr. at 260:4-20; D. Sambur Oct. 19, 2015 Tr. at 297:20-299:12; G. Kranias Oct. 23, 2015 Tr. at 239:21-240:23; J. Schiedemeyer Sept. 16, 2015 Tr. at 161:7-18.

[2438] *See, e.g.*, D. Colvin Nov. 6, 2015 Tr. at 24:14-25:8 (stating that it was "obvious" CEOC had a liquidity issue at the end of 2014 and that he "had clear concerns about CEOC developing issues as we entered into 2015"); G. Kranias Feb. 18, 2016 Tr. at 364:18-365:4 (stating that, in a bankruptcy of CEOC, the risks that the Four Properties Transaction could potentially be avoided as a fraudulent conveyance was "one of a series of risk factors" that were being discussed with Paul Weiss); D. Sambur Jan. 14, 2016 Tr. at 656:6-657:13 (explaining that, by the fall of 2013, CEOC was "highly levered" and bankruptcy was a "possibility" that was being planned for).

[2439] E-mail exchange between D. Sambur and B. Finnegan (Jan. 15, 2014), at APOLLO-EXAMINER_00643407 [APOLLO-EXAMINER_00643407]; Draft of "Indicative Terms of Services Company Joint Venture" (Jan. 15, 2014), at APOLLO-EXAMINER_00643409 [APOLLO-EXAMINER_00643409].

[2440] *See* B. Finnegan Feb. 4, 2016 Tr. at 351:3-353:24, 382:7-25.

[2441] A. Kornberg Nov. 11, 2015 Tr. at 111:17-112:25.  The Examiner notes that it is unlikely that the Company would have undertaken such a fundamental reorganization merely as a "contingency" rather than because there was a real risk that CEOC would file for bankruptcy.

CEOC.[2442]  According to Kornberg, the existence of several property owners within the Caesars system rendered inadequate the bilateral shared services agreements on which CEOC and CGP had previously relied.[2443]  And indeed, it was CEOC's deteriorating financial condition that led the CAC Special Committee, as well as Paul Weiss and the Sponsors (which had full visibility into CEOC's financial condition), to work towards the creation of a freestanding services entity.

As discussed above, after an initial rejection of the January 26 demand for a Services Co. structure, the CEC Special Committee quickly became comfortable with the idea of the joint venture.  On February 22, the CEC Special Committee "approved the concept of a joint venture entity [between CEOC, CERP and CGP] to accomplish this purpose [of managing the enterprise-level intellectual property assets of the parties] and directed [Reed Smith] to prepare a term sheet."[2444]  The contents of that two-page term sheet were hammered out between the Special Committees over the next week.  Notably, the final version attached to the March 1 Transaction Agreement contained terms very similar to the general terms proposed by Paul Weiss and shared with Reed Smith and Latham in early January 2014.[2445]

After execution of the Transaction Documents on March 1, Paul Weiss was enlisted by the Sponsors to flesh out the terms of the agreed-upon two-page term sheet used as Exhibit H to the March 1 Transaction Agreement into a longer, more extensive term sheet describing in detail the structure and mechanisms of the services joint venture that the CAC and CEC Special Committees would later approve.[2446]

---

[2442]  *Id*.

[2443]  *Id.*

[2444]  Minutes of the Special Committee of the Board of Directors of CEC (Feb. 22, 2014), at CEOC_INVESTIG_00452692 [CEOC_INVESTIG_00452692].

[2445]  *Compare* Draft of "Indicative Terms of Services Company Joint Venture" (Jan. 15, 2014), at APOLLO-EXAMINER_00643409-12 [APOLLO-EXAMINER_00643409], *and* Draft of "Indicative Terms of Services Company Joint Venture" (Jan. 17, 2014), at APOLLO-EXAMINER_00643546-50 [APOLLO-EXAMINER_00643546], *with* e-mail from H. Shecter to B. Finnegan (Feb. 23, 2014), at CEOC_INVESTIG_00062060 [CEOC_INVESTIG_00062059], forwarding Skadden Redline to "Services Company Joint Venture" Term Sheet (Feb. 22, 2014), at CEOC_INVESTIG_00062065-67 [CEOC_INVESTIG_00062065], *and* e-mail from A. Hunter to M. Beilinson, *et al.* (Feb. 25, 2014) [SA0015765], attaching Reed Smith Redline to "Services Company Joint Venture" Term Sheet (Feb. 25, 2014), at SA0015846-48 [SA0015846], *and* Transaction Agreement, Ex. H (Mar. 1, 2014), at CEOC_INVESTIG_00055920-21 [CEOC_INVESTIG_00055920].

[2446]  It appears that Paul Weiss had already begun some of this work earlier; for instance, it prepared a draft of the licensing arrangements to be embodied within the CES structure on February 12.  *See* B. Finnegan Nov. 16, 2015 Tr. at 331:2-8 (confirming that Finnegan was involved in the "creation and the architecture of CES" and that the Paul Weiss IP team drafted the IP license); e-mail from J. Shure (Paul Weiss) to M. Cohen and M. Stein (Feb. 14, 2014), at CEC_EXAMINER_0279362 [CEC_EXAMINER_0279362]; Paul Weiss Draft of "Indicative

Given the greater familiarity with the complex Caesars services and management structure possessed by the Sponsors, Caesars management and Paul Weiss, their involvement in outlining more technical aspects of the new structure makes a good deal of sense.[2447]  However, these entities appear to have been involved in designing all of CES's more substantive terms (including governance and licensing), as well.  On March 18, 2014, Finnegan sent to Sambur, van Hoek, Cohen and other Caesars employees a draft term sheet revising a February 21, 2014 term sheet (not the term sheet agreed to by the Special Committees on March 1).[2448]  On March 26, 2014, Finnegan sent to Sambur, van Hoek, Kranias, Garrison, Cohen and other Caesars employees a further revised term sheet, marked against the prior Paul Weiss version sent on March 18.[2449]  Both these term sheets were far more detailed than the earlier Special Committee drafts, and contained fully fleshed-out provisions regarding governance, cost allocation, initial contributions and intellectual property rights.  This time, Finnegan notes that he would "like to share this with the special committees and their advisors tomorrow," and thus requests "any remaining comments."[2450]

Shortly thereafter, on March 27-28, 2014, Finnegan sent to the Sponsors (including Sambur and Kranias), Cohen and other Caesars employees revised versions of the term sheets, which contained changes to ownership percentages.  As Finnegan explains, the March 28, 2014 draft reflects a new proposal on the ownership allocation based upon concerns that an ownership allocation that matched a member's allocated percentage of unallocated corporate overhead would "optically look like it was disadvantaging CEOC."[2451]  Paul Weiss' new proposal was to "fix ownership percentages at the outset based on initial allocations," which "potentially could

---

Terms of Caesars Omnibus Intellectual Property License Agreement" (Feb. 12, 2014), at CEC_EXAMINER_0279369-72 [CEC_EXAMINER_0279369].

[2447] Paul Weiss also involved a restructuring lawyer to provide advice on the "risks that would potentially exist from a structure and how to insulate those risks from potential challenge," including a potential fraudulent conveyance claim.  B. Finnegan Nov. 16, 2015 Tr. at 338:4-19; *see also* L. Clayton Oct. 26, 2015 Tr. at 201:7-202:4.

[2448] *See* e-mail from B. Finnegan to D. Sambur, *et al.* (Mar. 18, 2014), at PW_EXAMINER_00006813 [PW_EXAMINER_00006813], attaching Paul Weiss Redline to Services Company Joint Venture (Mar. 18, 2014), at PW_EXAMINER_00006822-31 [PW_EXAMINER_00006822].

[2449] *See* e-mail from B. Finnegan to D. Sambur, *et al.* (Mar. 26, 2014), at TPG-Examiner_00921676 [TPG-Examiner_00921676], attaching Paul Weiss Redline to Services Company Venture (Mar. 26, 2014), at TPG-Examiner_00921677-88 [TPG-Examiner_00921677].

[2450] *See id.*

[2451] *See* e-mails from B. Finnegan to D. Sambur, *et al.* (Mar. 27-28, 2014), at PW_EXAMINER_00005342-43 [PW_EXAMINER_00005342], attaching Paul Weiss Redline to Services Company Joint Venture (Mar. 28, 2014), at PW_EXAMINER_00005345-56 [PW_EXAMINER_00005345].

result in a gratuitous benefit to CEOC, for example, if CEOC is unable to fund future capex but retains the same initial ownership interest in that capex.  That may not be a bad thing."[2452]

On March 30, 2014, Paul Weiss sent to Reed Smith a copy of the "expanded Services Co. term sheet" dated March 28, 2014, and asked them to send it to the CEC Special Committee.[2453] Between this March 28, 2014 version of the term sheet and the final version agreed to (and negotiated by) the Special Committees, there appear to have been no real substantive changes.[2454]  For instance, the governance provisions contained within the final CES term sheet – including, most notably, the agreement that any joint venturer in CES would forfeit all substantive governance rights upon a bankruptcy – were introduced by Paul Weiss in the March 18 draft term sheet.[2455]

At a minimum, the fact that Paul Weiss was involved in drafting a term sheet before the CAC Special Committee's request, as well as their communications with Sambur, Reed Smith, Latham and others regarding same, confirms that there existed a parallel desire on the part of the Sponsors and CEC for the creation of such a bankruptcy-remote entity.  And, while the Special Committees were involved in negotiations relating to the CES term sheet and had ultimate responsibility for signing off on the transaction, they ultimately chose to adopt, with few changes, a series of terms drafted by Paul Weiss with input from the Sponsors.[2456]

---

[2452] *See id.*

[2453] *See* e-mail from B. Finnegan to H. Shecter (Mar. 30, 2014), at REEDSMITH0017507-08 [REEDSMITH0017507], attaching Paul Weiss Draft of Services Company Joint Venture (Mar. 28, 2014), at REEDSMITH0017509-19 [REEDSMITH0017509].  On March 28, 2014, however, Reed Smith sent to D&P a copy of the March 20 Paul Weiss draft, which they explained was the latest draft they had received from Paul Weiss, and noted that they expected to receive new drafts that day.  *See* e-mail from K. Siegel to M. Kwilosz, *et al.* (Mar. 28, 2014), at REEDSMITH0019348 [REEDSMITH0019348], attaching Paul Weiss Draft of Services Company Joint Venture (Mar. 20, 2014), at REEDSMITH0019474-83 [REEDSMITH0019474].

[2454] *Compare* Paul Weiss Draft of Services Company Joint Venture (Mar. 28, 2014), at REEDSMITH0017507-19 [REEDSMITH0017507] *with* Services Company Joint Venture (May 5, 2014), at CEOC_INVESTIG_00059625-43 [CEOC_INVESTIG_00059625].

[2455] E-mail from B. Finnegan to D. Sambur, *et al.* (Mar. 18, 2014), at PW_EXAMINER_00006813 [PW_EXAMINER_00006813], attaching Paul Weiss Redline to Services Company Term Sheet (Mar. 18, 2014), at PW_EXAMINER_00006830 [PW_EXAMINER_00006822] and Paul Weiss Draft of Services Company Term Sheet (Mar. 18, 2014), at PW_EXAMINER_00006821 [PW_EXAMINER_00006814].

[2456] Interestingly, after reviewing a March 13, 2014 CGP Rating Agency Presentation prepared by Paul Weiss that describes Services Co. in detail (months before the detailed CES term sheet was agreed to by the Special Committees and two weeks before the Special Committees received Paul Weiss' fleshed out term sheet), Cohen noted in an e-mail to Paul Weiss:  "I think we need to tone back on the services co slide to match what is in the [February 21 Special Committee] term sheet only.  We are taking a lot of liberties with what we expect the services co entity to look like, when the special committee's [*sic*] must determine that." E-mail from M. Cohen to C.

The terms of the CES/Total Rewards Transaction were ultimately approved by the CEC, CAC and CEOC Boards.[2457]   At the time, CEOC's Board was comprised of Loveman and Hession.   No Special Committee was formed at the CEOC level, and CEOC was represented by Paul Weiss, which also represented CEC in connection with the Four Properties Transaction. Nor did anyone solely at CEOC play any role in the negotiation of the terms of the CES Agreements, which was handled by Apollo, Paul Weiss, the CEC and CAC Special Committees and their counsel.

### b.   Terms of the CES Agreements

As an initial matter, there is evidence that the Company considered selling Total Rewards from CEOC to a joint venture with CGP or another entity.[2458]   However, it is likely that such a sale never took place because of asset transfer restrictions in the CEOC debt agreements. Indeed, while analyzing the structure for CES,[2459] Paul Weiss determined that it would have been "harder to comply with" the debt agreements if assets were moved out of CEOC, instead of licensing them to CES, because of "restrictions . . . regarding asset transfers" contained in the CEOC debt agreements.[2460]   With CES, the idea was to keep the assets in CEOC, but "just license their use to CES" to "allow Services Co. to effectively operate the shared services function . . . but doing so through [] contractual rights, rather than actual physical ownership of CEOC's assets."[2461]   As Wlazlo explained, "from CEOC's perspective, the less sort of movement of assets, the better."[2462]

Although CEOC did not transfer ownership over Total Rewards to CES, CEOC granted CES a broad, irrevocable and fully sublicensable license to all of its intellectual property,

---

Goodall, M. Wlazlo, B. Finnegan, A. van Hoek, *et al.* (Mar. 12, 2014), at APOLLO-Examiner_00601320 [APOLLO-Examiner_00601320]; *see also* e-mail from M. Cohen to M. Wlazlo (Mar. 11, 2014), at CEC_EXAMINER_0273341 [CEC_EXAMINER_0273340] ("The special committee's [*sic*] have not agreed to fund cap ex nor take on unallocated costs.   People seem to be confused that the special committee[s] decide this, not anyone on these [*sic*] e-mail chain.").

[2457]   *See* Written Consent of the CEC Ad Hoc Committee of the Board of Directors (May 19, 2014), at CEC_EXAMINER_0051948-53 [CEC_EXAMINER_0051948]; Unanimous Written Consent of the CEOC Board of Directors in Lieu of Meeting (May 20, 2014), at PW_EXAMINER_00283994 [PW_EXAMINER_00283992].

[2458]   *See* Section VIII.F, *infra*.

[2459]   M. Wlazlo Oct. 14, 2015 Tr. at 203:21-204:3.

[2460]   *Id*. at 204:17-205:9; *see also id.* at 207:10-16.

[2461]   *Id.* at 207:2-9; *see also id.* at 204:4-16 (CES would "just ha[ve] contract rights and licenses, but no physical assets [would be] moved" out of CEOC to ensure that the structure was "compliant" with the CEOC debt agreements).

[2462]   *Id.* at 210:21-22.

including Total Rewards.[2463]  CES, in turn, sublicensed this intellectual property to CERP, CGP, CEOC Property Owners (which include CEOC, making this a "license-back" provision), and other subsidiaries or affiliates of CEC.[2464]  Certain constituencies have alleged that due to the breadth of the license granted to CES, along with the governance arrangements enshrined within the CES Agreements, CEOC has alienated many of the attributes of ownership and effectively lost control of the Total Rewards asset.  In fact, at the time of the creation of CES, in-house lawyers at CEC and CEOC questioned whether CEOC's broad and irrevocable license to CES could be considered a "transfer of asset[s]" under the CEOC debt agreements.[2465]  The Examiner does not believe that the CES Agreements actually transfer the Total Rewards IP out of CEOC (which would potentially violate the CEOC debt agreements).[2466]  In fact, they appear to have been carefully constructed to avoid that implication.  For instance, CEOC retains some quality control over its IP (one of the factors courts often look to in determining whether a license is in fact an assignment) and, along those lines, has the right to veto (i) any new acquisition or development by CES, CERP or CGP if the new property would use or include a trademark or brand that is an Enterprise Asset,[2467] and (ii) the entry by CES, CERP and CGP into any New Business Line.[2468]  However, the CES Agreements also contain several provisions that are far

---

[2463]  Omnibus License and Enterprise Services Agreement, Ex. A (License A) (May 20, 2014), at CEOC_INVESTIG_00059601-02 [CEOC_INVESTIG_00059560]; Services Company Joint Venture (May 5, 2014), at CEOC_INVESTIG_00059625-47 [CEOC_INVESTIG_00059625]; *see also* Confidential Discussion Materials (Jan. 27, 2014 ), at CEOC_INVESTIG_00542733 [CEOC_INVESTIG_00542731].

[2464]  Omnibus License and Enterprise Services Agreement, Ex. A, (License D) (May 20, 2014), at CEOC_INVESTIG_00059605-06 [CEOC_INVESTIG_00059560].

[2465]  E-mail from T. Donovan to M. Cohen and J. Simala (Mar. 6, 2014), [CEC_EXAMINER_1180574], attaching "MDC Notes on Services Co" (Mar. 5, 2014), at CEC_EXAMINER_1180575-76 [CEC_EXAMINER_1180575] (M. Cohen's notes including additions from T. Donovan regarding Services Co.).

[2466]  The Examiner notes that "[b]y licensing rather than assigning" its interest in the Total Rewards IP, CEOC "reserve[d] certain rights, including that of collecting royalties." *See, e.g., Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 992 (9th Cir. 2006) (citing *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1334 (9th Cir. 1984)).  However, the license granted to CES was royalty-free.

[2467]  "Enterprise Assets" include all of the intellectual property licensed by CEOC to facilitate the provision of services to any property owned by CEOC, CERP or CGP, including any and all intellectual property "comprising and/or related to the Total Rewards Program."  Omnibus License and Enterprise Services Agreement §1.1(cc) (May 20, 2014), at CEOC_INVESTIG_00059563 [CEOC_INVESTIG_00059560].

[2468]  "New Business Line" is described as any business other than "owning, operating, managing or engaging in any manner in Gaming Activities or any reasonable extension thereof."  Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §8.1 (May 20, 2014), at CEOC_INVESTIG_00059500-01 [CEOC_INVESTIG_00059472].

more typical of an assignment.  Taken as a whole, and as discussed below, the CES Agreements really operate most like an exclusive license with a license-back arrangement.[2469]

Further, certain constituencies have alleged that the licensing structure means that CERP and CGP have the nearly unlimited right to use – free of charge – the Total Rewards software, database, know-how, algorithms, analytical tools and accumulated knowledge that, by Caesars' own estimation, has made the system so successful for nearly 20 years.  But such allegations fail to account for the value embedded in the Four Properties' EBITDA and thus "baked into" the purchase price paid by CGP for the Four Properties (which includes the purchase of 50% of the management fee stream) as discussed above.  However, CERP has not compensated CEOC for use of these rights.

### c.    Governance Rights and Licensing of Intellectual Property – Loss of Control Over the Total Rewards IP

CES is governed by a Steering Committee.[2470]  In their capacity as Members of CES (and despite their different ownership interests), CEOC, CERP and CGP are each entitled to elect one member to the Steering Committee.[2471]  Each Steering Committee member has one vote.[2472]  The Steering Committee is vested with broad authority to adopt any policies or procedures for the implementation of services pursuant to the License and Services Agreement.[2473]  And, whenever the License and Services Agreement requires CES to "(a) take any administrative action contemplated by th[e] Agreement, (b) take any action set forth in the Annual Plan or (c) implement any action previously approved by the Steering Committee," any officer of CES may take such action alone on behalf of the Steering Committee.[2474]

---

[2469] An assignment and license-back to the assignor-licensee (here, CEOC) is a "valid commercial practice which enables the assignor-licensee to continue the same business."  *In re Impact Distributors, Inc.*, 260 B.R. 48, 54 (Bankr. S.D. Fla. 2001) (citing J. McCarthy, *Trademarks and Unfair Competition*, §18:9).

[2470] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §7.1 (May 20, 2014), at CEOC_INVESTIG_00059495 [CEOC_INVESTIG_00059472]; Omnibus License and Enterprise Services Agreement §9.1 (May 20, 2014), at CEOC_INVESTIG_00059581 [CEOC_INVESTIG_00059560].

[2471] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §7.2 (May 20, 2014), at CEOC_INVESTIG_00059495 [CEOC_INVESTIG_00059472].

[2472] *Id*. at §7.7, CEOC_INVESTIG_00059496-97.

[2473] Omnibus License and Enterprise Services Agreement §9.1 (May 20, 2014), at CEOC_INVESTIG_00059581 [CEOC_INVESTIG_00059560].

[2474] *Id.*

Subject to certain restrictions, the vast majority of actions undertaken by the Steering Committee require only a two-thirds majority vote.[2475]  Although these are not specifically enumerated, they generally include the management of Enterprise Assets (including intellectual property licensed to and by CES), the provision of services to the various properties within the Caesars system, and other lawful business activities that are related to or necessary to CES's ability to perform its responsibilities.  This means that, with regard to these powers of CES, CEOC can be outvoted by the two entities to which it transferred its properties in the 2008 LBO, CERP, Growth and Four Properties transactions.

Along with these "majority matters," as that term is defined by the LLC Agreement, a number of "Unanimous Matters" require the written consent of all three CES Members.  These include extraordinary capital expenditures by CES;[2476] liquidation or merger of CES;[2477] bankruptcy filing;[2478] use of Enterprise Assets in a manner inconsistent with the LLC Agreement or the License and Services Agreement;[2479] material amendments to the LLC Agreement or the License and Services Agreement;[2480] material modifications or increases to the operating budget or requests for additional capital contributions from any member;[2481] revisions to the Corporate Allocations Descriptions & Methodology;[2482] and monetization of Guest Data other than where permitted under the applicable property management agreement or in the ordinary course of business, consistent with past practice and subject to the terms of the License and Services Agreement.[2483]

CEOC's ability to separately itself assign or sublicense the Enterprise Assets – including its own intellectual property and Total Rewards – to a third party has been diminished by the CES Agreements.  Although License A is on its face "non-exclusive," meaning that CEOC can

---

[2475] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §7.7(a) (May 20, 2014), at CEOC_INVESTIG_00059496 [CEOC_INVESTIG_00059472] ("[A]ny matter set forth in this Agreement to be determined, decided or acted upon by the Steering Committee shall require the written consent or vote of a majority of the members of the Steering Committee").

[2476] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §7.7(b)(i) (May 20, 2014), at CEOC_INVESTIG_00059496 [CEOC_INVESTIG_00059472].

[2477] *Id.* at §7.7(b)(ii).

[2478] *Id.* at §7.7(b)(x).

[2479] *Id.* at §7.7(b)(v).

[2480] *Id.* at §7.7(b)(vi).

[2481] *Id.* at §7.7(b)(ix).

[2482] *Id.* at §7.7(b)(xii).

[2483] *Id.* at §7.7(b)(xvi).  "Guest Data" includes, among other things, guest or customer profiles obtained or derived from the Total Rewards program.  Omnibus License and Enterprise Services Agreement §1.1(nn) (May 20, 2014), at CEOC_INVESTIG_00059564 [CEOC_INVESTIG_00059560].

continue to use its own IP, CEOC may only sublicense its IP with the "express written consent of the other Parties" to the License and Services Agreement (*i.e.*, it requires the consent of more than just the members of the Steering Committee).[2484]  It is unclear whether CEOC is officially a sublicensee of CES under the agreement (the answer is likely yes),[2485] but it is effectively in the same position.  However, because any new acquisition or development by CEOC automatically receives access to the shared services, this restriction does not affect CEOC's ability to add a new casino or casino resort property and provide it access to Total Rewards.[2486]  Although it is unclear whether the restriction on licenses to third parties would apply to a property that CEOC manages or in which it has a minority equity interest, the silence of the agreement on this point means that it is likely that CEOC would have to seek the permission of the other two members before such an entity could be provided access to the Enterprise Assets.

The CES Agreements also have some practical implications for new acquisitions and developments by CEOC, despite the fact that such properties would automatically receive access to the shared services provided by CES.[2487]  The CES Agreements provide that CES, not CEOC, manages the Enterprise Services, which include all the centralized services provided by CEOC before the creation of CES.[2488]  CES also has the "sole and exclusive right, title and ownership to" the Service Provider Proprietary Information and Systems, which include "certain proprietary information, techniques and methods of operating gaming, hotel and related businesses," as well as the Guest Data.[2489]  And, it is CES, not CEOC that controls the "tangible" IP, without which it

---

[2484] *Id.* at §16.4.

[2485] *Id.* at Exs. A, K (CES sublicenses CEOC's intellectual property to, *inter alia*, CEOC Property Owners, which are defined as "CEOC or the owner of any CEOC Managed Facility that is a subsidiary of CEOC.").

[2486] *See* Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §8.3 (May 20, 2014), at CEOC_INVESTIG_00059501 [CEOC_INVESTIG_00059472].

[2487] *See id.*

[2488] Omnibus License and Enterprise Services Agreement §§8.1-8.15 (May 20, 2014), at CEOC_INVESTIG_00059575-81, [CEOC_INVESTIG_00059560]; *id.* at §9.1, CEOC_INVESTIG_00059581; (such decisions shall be taken "by the affirmative consent of a majority of the Steering Committee members, unless a different standard is set forth herein."); *see also* Services Company Joint Venture (May 5, 2014), at CEOC_INVESTIG_00059626 [CEOC_INVESTIG_00059625] ("Services Co. will manage the Enterprise Assets . . . and the other assets it will own, and will employ the corresponding employees and other employees who provide services to the common enterprise . . ."); Regulatory Discussion Materials Presentation (Apr. 2014), at 2 [CEOC_INVESTIG_00121904] (native file) ("Services Co is expected to: (i) manage certain shared assets, such as Caesars' intellectual property and the Total Rewards system, and (ii) employ Caesars personnel who provide services to the broader enterprise . . . .").

[2489] Omnibus License and Enterprise Services Agreement §§1.1(nn), 1.1(tt), 8.1, 8.8(b) (May 20, 2014), at CEOC_INVESTIG_00059564, CEOC_INVESTIG_00059566, CEOC_INVESTIG_00059575-76, CEOC_INVESTIG_00059578-79 [CEOC_INVESTIG_00059560].

would be extremely difficult to operate Total Rewards.  As one Paul Weiss lawyer explained, "absent the totality of the enterprise services," the Total Rewards IP is "not useful or beneficial" and, in fact, Total Rewards cannot be licensed "without access to the rest of the system."[2490]

Moreover, CES does not require the express written consent of the parties to the License and Services Agreement to sublicense the Enterprise Assets.  Because License A is "fully-sublicensable," CES can sublicense CEOC's intellectual property to any non-Caesars third party upon a majority vote of the Steering Committee (*i.e.*, CEOC need not consent).[2491]  The only restrictions are that the sublicense must be used "in a manner consistent with any types of uses of the Licensed IP as of the Effective Date," or in *any manner* approved by *a majority* of the Steering Committee.[2492]   Therefore, CGP and CERP have control over decisions relating to CES's sublicensing of CEOC's IP.[2493]

---

[2490]  B. Finnegan Feb. 4, 2016 Tr. at 419:10-21.  And as explained by a Caesars employee, even if CEOC could sell access to Total Rewards to another entity, "it would be difficult to execute operationally" because "[t]he people who operate and know all of the intricacies of TR all work for services co and those individuals would not be obligated to provide services to a third party partner that CEOC brought on."  E-mail from M. Crome to G. Loveman (Apr. 24, 2014), at CEOC_INVESTIG_00124317 [CEOC_INVESTIG_00124317].

[2491]  Omnibus License and Enterprise Services Agreement Ex. A (May 20, 2014), at CEOC_INVESTIG_00059601-13 [CEOC_INVESTIG_00059560] (located under column "Licensed Field"); Omnibus License and Enterprise Services Agreement §16.4 (May 20, 2014), at CEOC_INVESTIG_00059592 [CEOC_INV-ESTIG_00059560] ("Except as otherwise expressly set forth herein, . . ."); Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §7.7 (May 20, 2014), at CEOC_INVESTIG_00059496-97 [CEOC_INVESTIG_00059472].

[2492]  Omnibus License and Enterprise Services Agreement Ex. A (May 20, 2014), at CEOC_INVESTIG_00059601-13 [CEOC_INVESTIG_00059560] (located under column "Licensed Field"); Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §7.7 (May 20, 2014), at CEOC_INVESTIG_00059496-97 [CEOC_INVESTIG_00059472].

[2493]  Importantly, the "Licensed Field," which provides the right to sublicense the IP based on a majority vote of the Steering Committee, applies only to CES.  *See* Omnibus License and Enterprise Services Agreement Ex. A (May 20, 2014), at CEOC_INVESTIG_00059601-13 [CEOC_INVESTIG_00059560] (located under column "Licensed Field").   Typically, a trademark owner can exert control over its licensed IP by approving sublicenses, and the licensee does not have an unfettered right to sublicense the IP.  *See, e.g.*, *Miller*, 454 F.3d at 993 ("Common sense suggests that if a trademark licensee could unilaterally sub-license a mark without notifying or obtaining consent from the licensor, then a trademark licensor would lose his ability to police his mark, thereby becoming estopped from enforcing his ownership rights vis-a-vis the licensee.  Such a result is illogical, undesirable, and at odds with the nature of intellectual property rights. . . . copyright and trademark licensors share a common retained interest in the ownership of their intellectual property – an interest that would be severely diminished if a licensee were allowed to sub-license without the licensor's express permission.");

CEOC does, however, have important rights under the CES agreements which limit how CES may use its rights. For instance, CEOC holds a veto right over the ability of CGP or CERP to provide Total Rewards access to new acquisitions or developments that are engaged in Gaming Activities. However, if a new acquisition by CERP or CGP will not benefit from the services provided by CES (which is unlikely), CEOC's vote is not required.[2494] It is unclear if the veto right extends to a property managed by CERP or CGP or in which CERP or CGP has a minority interest. There also are no restrictions on CEOC's entry into a New Business Line. Conversely, the LLC Agreement provides CEOC with veto power over the entry by CES, CERP and CGP into any New Business Line. [2495] Indeed, CEOC may choose to accept the opportunity for itself or decline it entirely for itself, CES, CERP or CGP.[2496]

The LLC Agreement also contains two more specific restrictions governing the acquisition and development of new properties by each of the members. In general, a new acquisition (by CEOC, CGP or CERP) will require two out of three votes if it is intended to benefit from the services provided by CES and it is "reasonably likely" to cause CEOC, CERP or CGP "to be deemed unsuitable to retain or acquire any regulatory approval in any jurisdiction within which such Member is required to be or is otherwise licensed."[2497] Neither the LLC Agreement nor the License and Services Agreement gives any guidance as to what type of acquisition would render CEOC, CERP or CGP "unsuitable" for regulatory approval, but in the event that determination is made, CEOC would need at least one additional vote to proceed. As a practical matter, however, it seems that such a scenario would be unlikely.

Further, each member of CES has the ability to veto "[a]ny transaction or arrangement that imposes a material restraint or encumbrance" on that member's access to CEOC's intellectual property, including Total Rewards.[2498] And, each member of the Steering Committee not party to a "transaction not contemplated by the [License and] Services Agreement between the Company and a Member or any of its Affiliates" may veto such transaction.[2499] The CES Agreements neither define nor explain what type of transaction would impose a material restraint or encumbrance on another member's access to Total Rewards. As some creditors have claimed, even if both CEOC and one of the other members agreed to a transaction where Total Rewards would be made available to a third party, it could be vetoed if either CERP or CGP believed that it would impose any limitations upon their access to the Enterprise Assets, including Total Rewards. But again, it is unclear whether such an assertion would be made as a practical matter.

---

see also id. at 988 (a patent, copyright or trademark licensee "may not sub-license a mark without express permission from the licensor").

[2494] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §8.3 (May 20, 2014), at CEOC_INVESTIG_00059497 [CEOC_INVESTIG_00059472].

[2495] Id. at §7.7(c)(iii), CEOC_INVESTIG_00059497.

[2496] Id. at §8.1, CEOC_INVESTIG_00059500-1.

[2497] Id. at §8.2, CEOC_INVESTIG_00059501.

[2498] Id. at §7.7(c)(i), CEOC_INVESTIG_00059497.

[2499] Id. at §7.7(c)(iii), CEOC_INVESTIG_00059497.

CEOC also retained some role in exercising quality control measures over its own IP,[2500] which, as described above, is one factor courts look to in determining whether an agreement structured as a license is in reality an assignment. But Section 5.3 of the License and Services Agreement expressly provides that CES "*shall* undertake all IP services" with respect to all licenses that CEOC granted to CES and to CES's own intellectual property.[2501] This means that CES is responsible for performing CEOC's obligations, exercising CEOC's rights and managing, maintaining, protecting, enforcing, defending, licensing and sublicensing the Total Rewards IP.[2502] In other words, CES must police itself if there is a question about CES's adherence to the license terms and it is CES (the licensee) that decides how and when to protect CEOC's intellectual property.

In addition to exercising CEOC's rights and obligations, CES has the right to "use, modify, distribute, copy, publish, create Derivative Works of, or otherwise commercialize the Licensed IP," which includes any after-acquired IP by CEOC.[2503] "Derivative Work" is defined as "an enhancement, improvement or modification with respect to any Intellectual Property" within the meaning ascribed to it under U.S. copyright law.[2504] In other words, CES is entitled to develop and create its own intellectual property based on the Total Rewards program. Of course, any and all such derivative works themselves are licensed to, and sublicensable by, CES.[2505] Thus, CEOC does not have complete control over new versions or uses of its intellectual property that are created by CES, CERP, CGP or any other current or future sublicensees (although CES has also irrevocably assigned to CEOC any derivative works it creates from CEOC's IP).[2506]

---

[2500] Omnibus License and Enterprise Services Agreement §4 (May 20, 2014), at CEOC_INVESTIG_00059571-72 [CEOC_INVESTIG_00059560]. In a typical licensing arrangement, the licensor (here, CEOC) bears the burden of ensuring that proper quality control measures are implemented to ensure consistency in the goodwill of the trademark or service. *See, e.g.*, *Miller*, 454 F.3d at 993 ("[A] trademark owner has an affirmative duty to supervise and control the licensee's use of its mark, in order to protect the public's expectation that all products sold under a particular mark derive from a common source and are of like quality.") (citing J. McCarthy, *Trademarks and Unfair Competition*, §§18:42, 18:48).

[2501] Omnibus License and Enterprise Services Agreement §5.3 (May 20, 2014), at CEOC_INVESTIG_00059574 [CEOC_INVESTIG_00059472] (emphasis added).

[2502] *Id*. at §1.1(rr), CEOC_INVESTIG_00059565-66.

[2503] Omnibus License and Enterprise Services Agreement Ex. A (May 20, 2014), at CEOC_INVESTIG_00059601 [CEOC_INVESTIG_00059560] (located under column "License Provisions").

[2504] *Id.* at §1.1(z), CEOC_INVESTIG_00059563.

[2505] *Id*. at Ex. A, License A, at CEOC_INVESTIG_00059501 (located under columns "License Provisions" and "Licensed Field").

[2506] Omnibus License and Enterprise Services Agreement §7.3 (May 20, 2014), at CEOC_INVESTIG_00059575 [CEOC_INVESTIG_00059560].

Further, any improvements that CES makes to Total Rewards and any additional data that CEOC collects about its customers are covered by the license. But CES remains free to create new versions of Total Rewards that fall outside of the agreement's definition of "Derivative Work" by potentially changing the Total Rewards platform or creating another similar feature from source code note originally provided by CEOC. In such a case, it would be CES, not CEOC, that would own the newly created IP (although CEOC would have a license back from CES for this new version of Total Rewards).[2507] It is unclear, however, what changes CES could make to CEOC's intellectual property that are outside of the agreement's definition giving CES ownership over the new IP.

Finally, CEOC's 69% ownership interest in CES is non-transferable and cannot be sold, encumbered or otherwise disposed of, except to "Permitted Transferees," which are defined as CEOC's parent and wholly-owned subsidiaries.[2508] CEOC is also prohibited from assigning or pledging its interest in the License and Services Agreement to any third party without the express written consent of CERP, CGP and the other parties to the agreement.[2509] Notably, an "assignment" includes any sale or corporate reorganization.[2510] Conversely, CEOC has no power to withdraw from CES, either voluntarily or involuntarily, unless CES itself is dissolved.[2511] CEOC is thus unable either to sell its stake in CES or to withdraw from the joint venture.[2512] This is true for both CERP and CGP as well.[2513]

---

[2507] *Id*. at §1.1(www), CEOC_INVESTIG_00059569; *Id*. at Ex. A, License J, CEOC_INVESTIG_00059610.

[2508] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §3.4 (May 20, 2014), at CEOC_INVESTIG_00059480 [CEOC_INVESTIG_00059472].

[2509] Omnibus License and Enterprise Services Agreement §16.4 (May 20, 2014), at CEOC_INVESTIG_00059592-93 [CEOC_INVESTIG_00059560].

[2510] *Id.*

[2511] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §3.3 (May 20, 2014), at CEOC_INVESTIG_00059480, CEOC_INVESTIG_00059500-01 [CEOC_INVESTIG_00059472].

[2512] According to some creditors, the CES Agreements also effectively prevent CEOC from monetizing its interest in Total Rewards or offer continued access to Total Rewards if it sells a casino to a third party because Section 7.7(b)(xvi) of the LLC Agreement specifies that any sale, lease or other monetization of "Guest Data," other than by the owner of a Caesars property in the ordinary course of business and consistent with past practice, requires "unanimous prior consent of the members of the Steering Committee" and "an independent, third-party appraisal of the Fair Market Value of such Guest Data." *Id*. §7.8. Thus, these creditors believe that CEOC's ability to realize the value of the Total Rewards database it compiled is controlled by CGP and CERP.

[2513] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §3.3 (May 20, 2014), at CEOC_INVESTIG_00059480, CEOC_INVESTIG_00059500-01 [CEOC_INVESTIG_00059472].

Taken as a whole, the provisions described above indicate that the license agreed to by the parties is far from a typical "non-exclusive" license.

### d. Bankruptcy

Under the original agreement, CEOC's governance rights with respect to CES were to be extinguished upon a CEOC bankruptcy.  Specifically, the LLC Agreement provided that:

> If a Bankruptcy Event of Default exists with respect to a Member pursuant to Section 5.6(a) or such Member rejects this Agreement in connection with any bankruptcy proceeding, such Member will lose all governance rights applicable to such Member or the member of the Steering Committee appointed by such Member, as applicable, provided for herein and pursuant to the [License and] Services Agreement; provided, that, for the avoidance of doubt, subject to Sections 15.2 and 15.7 of the [License and] Services Agreement, such Member shall not lose any rights to which it is entitled as a Licensee or Recipient thereunder.[2514]

Although CEOC would still be entitled to receive the Enterprise Services,[2515] it would have had no meaningful way to participate in the decisions made at CES, including any decisions impacting control over its own licensed intellectual property.  According to Finnegan, this provision was included because, although CES was allegedly created to benefit CEOC, there needed to be some "penalty" in the event that a member filed for bankruptcy "otherwise it was just unfair to the other members."[2516]  As an initial matter, CES was created to protect CERP and CGP, not to benefit CEOC.  A more likely explanation, particularly in light of the factual record discussed above, is that, at the time of the creation of CES, the other stakeholders thought there was a sufficient risk that CEOC would go bankrupt and wished to minimize any say that CEOC's creditors might have in the operation of CES.  (Indeed, it is possible that both CGP and CERP grew more comfortable with some of the veto rights accorded to CEOC under the CES

---

[2514] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §§5.6(a), (b), 7.12 (May 20, 2014), at CEOC_INVESTIG_00059485, CEOC_INVESTIG_00059499 [CEOC_INVESTIG_00059472]; Omnibus License and Enterprise Services Agreement §14.5(b) (May 20, 2014), at CEOC_INVESTIG_00059589 [CEOC_INVESTIG_00059560]; *see also* Services Company Joint Venture (May 5, 2014), at CEOC_INVESTIG_00059641 [CEOC_INVESTIG_00059625].  Although it is not uncommon for a joint venture agreement to provide for the forfeiture of governance rights upon default or bankruptcy, it is noteworthy here because parties involved were aware that a CEOC bankruptcy was a real possibility.

[2515] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §§5.6(a), (b), 7.12 (May 20, 2014), at CEOC_INVESTIG_00059485, CEOC_INVESTIG_00059499 [CEOC_INVESTIG_00059472]; Omnibus License and Enterprise Services Agreement §14.5(b) (May 20, 2014), at CEOC_INVESTIG_00059589 [CEOC_INVESTIG_00059560]; Services Company Joint Venture (May 5, 2014), at CEOC_INVESTIG_00059641 [CEOC_INVESTIG_00059625].

[2516] *See* B. Finnegan Feb. 4, 2016 Tr. at 411:8-413:22.

agreements precisely because they anticipated that CEOC would eventually forfeit those rights as a result of a bankruptcy or default.)  The CES Agreements also provided that, should a Member fail to make a monetary payment required under either agreement (including of OpEx or CapEx allocations) and fail to cure such default for five days, that Member would lose all governance rights in CES as well as the right to receive Enterprise Services (other than those rights to which it is entitled as a Licensee).[2517]

It is true, of course, that provisions stripping a joint venturer of control (or providing that it may be bought out by its co-venturer) are fairly commonplace.  This makes sense:  a bankruptcy often results in a change in control, and individuals (and entities) wish to preserve their freedom to choose their business partners.  However, the situation surrounding the creation of this particular joint venture was anything but commonplace.  As discussed previously, by the time CES was formed (on May 20, 2014), there had been a number of conversations about the possibility that CEOC would declare bankruptcy, and two major creditors' groups had sent letters to CEOC's attorneys stating in no uncertain terms their belief that CEOC was already insolvent.[2518]  Moreover, one of the driving forces behind the creation of CES was the increased risk of a CEOC bankruptcy.  Accordingly, creditors have alleged that upon CEOC's "inevitable" bankruptcy, the timing of which would be controlled by CEC and Sponsors, the License and Services Agreement was designed to "ensure CGP and CERP's ability to extract fully all rights to the property held by [CES], because CEOC will then have no right to challenge the decisions made by CGP and CERP in managing the property."[2519]  In particular, Section 16.5 of the License and Services Agreement permits CES to retain all of its rights as a licensee under the agreement, notwithstanding the rejection of the agreement by any other party in bankruptcy.[2520]

---

[2517] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §5.5(b) (May 20, 2014), at CEOC_INVESTIG_00059484-85 [CEOC_INVESTIG_00059472]; Omnibus License and Enterprise Services Agreement - Execution Version §14.4 (May 20, 2014), at CEOC_INVESTIG_00059587-88 [CEOC_INVESTIG_00059560]; *see also* Services Company Joint Venture (May 5, 2014), at CEOC_INVESTIG_00059639 [CEOC_INVESTIG_00059625].

[2518] *See* Letter from Second-Priority Senior Secured Notes Holders (Mar. 21, 2014), at CEOC_INVESTIG_00124823 [CEOC_INVESTIG_00124821] ("CEOC is insolvent."); Letter from First Lien Group (Apr. 3, 2014), at CEOC_INVESTIG_00094449 [CEOC_INVESTIG_00094448] (expressing concern about certain transactions that occurred "when CEC and CEOC were insolvent").

[2519] Compl. ¶158, *UMB BANK v. Caesars Entm't Corp., et al.*, Case No. 10393 (Del Ch. Nov. 25, 2014).

[2520] Omnibus License and Enterprise Services Agreement §16.5 (May 20, 2014), at CEOC_INVESTIG_00059593 [CEOC_INVESTIG_00059560]; *see also* Compl. ¶159, *UMB Bank* (Section 16.5 "goes to great lengths in purporting to designate the licenses granted by CEOC for the benefit of CGP and CERP as property that cannot be denied to those entities by a bankruptcy trustee.  If enforceable, CGP and CERP will have effectively denied CEOC's creditors a valuable source of recovery in the event that the entities' common owners cause CEOC to file for bankruptcy.").

Perhaps recognizing that the bankruptcy "penalty" might be viewed as problematic (or even unenforceable) by a bankruptcy court, CEC agreed to amend the LLC Agreement on January 14, 2015, one day before CEOC filed a voluntary petition for bankruptcy that would have triggered the loss of its governance rights under the CES Agreements.[2521]  Finnegan, the author of the "penalty" provision, stated that the agreement was amended "at the demand of CEOC and its governance committee advisors."[2522]  Again, whatever the impetus for the change, the Steering Committee voted to revise the CES Agreements so that CEOC's bankruptcy filing and any transactions under a contemplated RSA with CEC would not result in the loss of CEOC's governance rights.[2523]  However, the amendment did not loosen the reins entirely, as it also provided that should CEOC attempt to consummate any alternative transactions out of bankruptcy (such as a liquidation or corporate reorganization or sale not contemplated by the RSA), it would forfeit its governance rights in CES.[2524]  This, of course, is also consistent with a desire by CGP and CERP to have some future say over who their partner in CES would be.  The result, however, is that CEOC's ability to retain its right to participate in the governance of CES was (and continues to be) dependent on its agreement to an RSA supported by CEC (CERP's parent company).[2525]

---

[2521]  *See* Second Amended and Restated Limited Liability Company Agreement (Jan. 14, 2015), at CEOC_2004_0058660-730 [CEOC_2004_0058660].

[2522]  B. Finnegan Feb. 4, 2016 Tr. at 412:18-24.

[2523]  *See* Second Amended and Restated Limited Liability Company Agreement §5.6 (Jan. 14, 2015), at CEOC_2004_0058674 [CEOC_2004_0058660] (adding the language "provided, however, that neither the occurrence of the CEOC Proceedings nor the transactions contemplated by the Restructuring Support Agreement shall constitute a Bankruptcy Event of Default."); *see also id.* at §7.12, CEOC_2004_0058687 (same).

[2524]  *Id.* at §7.12, CEOC_2004_0058687.

[2525]  The current RSA provides that "each of the Company and CEC . . . shall agree to take those steps that may be necessary or advisable with respect to Caesars Enterprise Services, LLC and its subsidiaries . . . to ensure that the chapter 11 cases or a restructuring consummated thereby shall not impair, modify, or affect in any adverse way under the applicable agreements (i) the Company's rights with respect to governance or administration of CES . . . , (ii) the Company's rights with respect to that certain Omnibus License and Enterprise Services Agreement dated as of May 20, 2014 . . . , (iii) the Company's rights with respect to any or all intellectual property or other business arrangements by and among the Company and CES, whether pursuant to section 365(c) of the Bankruptcy Code, any change of control provisions set forth in those agreements, or other terms of such agreements and (iv) PropCo's and OpCo's right to use and access intellectual property and other rights in the same manner that such rights are currently used and accessed across the enterprise to the extent currently provided under the Omnibus License and Enterprise Services Agreement."  *See Debtors' Motion For Entry of an Order (A) Authorizing the Debtors to Assume Restructuring Support Agreement and (B) Granting Related Relief* [Docket No. 260-2 at 47-48].

### e.  Transfer of Employees and Services

As a practical matter, the creation of CES also means that CEOC has lost significant control over its senior work force, its books and records as well as the administration of Total Rewards.  As a result of the CES/Total Rewards Transaction, almost all senior management-level employees of CEOC became employees of CES, including those managing and operating Total Rewards from CEOC altogether.[2526]  After the transaction, CES employed 3,023 corporate employees; 2,168 regional shared service employees; 265 property leadership employees; and 125 other employees.[2527]  By contrast, aside from a handful of senior management, only two employee groups remain at CEOC:  shared hourly employees and non-leadership employees who work at a single property in Reno, Nevada.[2528]  The License and Services Agreement likewise provides that CES controls the hiring, firing and compensation decisions for all employees performing Enterprise Services, including those who do not even work for CES.[2529]  CEOC also assigned its management contracts to CES, but retained 50% of the management fee stream associated with the CGP properties (via CES) pursuant to existing management agreements.[2530]  But as a practical matter, the transfer of employees and services to CES has not had any discernible impact (to date) on the day-to-day operations of any Caesars property.

### f.  Allocation of Expenses

From January 2008 through the formation of CGP, indirect costs were allocated via a Standard Allocation methodology pursuant to the shared services agreements between CEOC and the CMBS / CERP entities as follows:  CEOC (70%) and CMBS / CERP (30%).[2531]  It is the

---

[2526] *See* Transaction Agreement §8.16(a) (Mar. 1, 2014), at CEOC_INVESTIG_00066149 [CEOC_INVESTIG_00066086]; Omnibus License and Enterprise Services Agreement Ex. F (May 20, 2014), at CEOC_INVESTIG_00059618 [CEOC_INVESTIG_00059560].

[2527] *See, e.g.*, "Services Co. Employees – Overview," at CEOC_INVESTIG_00059466 [CEOC_INVESTIG_00059466] (describing employees that transferred from CEOC, Growth Partners and CERP to CES).

[2528] *Id.*

[2529] Omnibus License and Enterprise Services Agreement - Execution Version §9.3 (May 20, 2014), at CEOC_INVESTIG_00059581-82 [CEOC_INVESTIG_00059560].  This does not mean, however, that CES can fire Higgins or Payne, who do not appear to perform Enterprise Services.

[2530] Omnibus License and Enterprise Services Agreement §9.3 (May 20, 2014), at CEOC_INVESTIG_00059570 [CEOC_INVESTIG_00059560].

[2531] Shared Services Agreement by and among Harrah's Operating Company, Harrah's Entertainment and CMBS Entities (Jan. 28, 2008), at CEOC_INVESTIG_00130801-31 [CEOC_INVESTIG_00130801]; Amended and Restated Shared Services Agreement by and among Harrah's Operating Company, Harrah's Entertainment and CMBS Entities (May 22, 2008), at CEC_EXAMINER_1030942 [CEC_EXAMINER_1030930]; Second Amended and Restated Shared Services Agreement (Aug. 31, 2010), at CEC_EXAMINER_0220174 [CEC_EXAMINER_0220164]; Third Amended and Restated Shared Services Agreement (Oct. 11, 2013), at CEC_EXAMINER_0082219 [CEC_EXAMINER_0082209].

Examiners' understanding that these percentages were generally based on the historical relative Net Revenues of these entities which are shown in Figure 51 below.[2532]

Upon the formation of CGP, CEOC and CGP entered into a management agreement that provided for the allocation of indirect costs on the same basis as such amounts were allocated to other managed properties, with certain costs marked up by 10%.[2533] The actual percentages used to allocate the standard costs from the time of the Growth Transaction through the formation of CES are unknown. Presumably, these cost allocations were based on each entity's relative Net Revenue. The relative Net Revenues during this time period were 69% for CEOC, 25.5% for CERP and 5.5% for CGP, also as shown in Figure 51.

The standard allocation percentages adopted by CES were similar to each entity's relative Net Revenue for the period following the Growth Transaction as shown in Figure 51. Pursuant to the LLC Agreement, CEOC was to bear 70% of the costs attributed to CES (compared to 24.6% for CERP and 5.4% for CGP).[2534] Special CapEx Allocations approved by the Steering Committee are allocated using the same percentages.[2535] Direct, property-level expenses are allocated to each property, while certain other expenses, such as the Operating Expenses and Annual Baseline CapEx for CES, are allocated to the Members based on the Net Revenue or an alternative methodology that is unanimously agreed to by the Steering Committee.[2536] Functionally, CES utilizes the following hierarchy to allocate costs to the properties and parent companies (CEOC, CERP and CGP):[2537]

- Expenses that are solely associated with a single property are 100% allocated or directly billed to that property;

---

[2532] *See* J. Beato Jan. 19, 2016 Tr. at 418:12-22.

[2533] Management Services Agreement between Caesars Entertainment Operating Company, Inc., as provider, Caesars Acquisition Company and Caesars Growth Partners (Oct. 21, 2013), at CEOC_INVESTIG_00013111 [CEOC_INVESTIG_00013098].

[2534] Omnibus License and Enterprise Services Agreement Exhibit G (May 20, 2014), at CEOC_INVESTIG_00059619 [CEOC_INVESTIG_00059560]. The Standard Allocation percentage of 5.4% for CGP was negotiated by the Special Committees in connection with the Four Properties Transaction. *See* E. Hession Nov. 4, 2015 Tr. at 364:19-365:3. Initially, CGP was to bear 10.8% of the costs attributed to CES but was unable to secure a fairness opinion from Lazard based on that allocation. CEC and CEOC have now taken the position that the reduction to 5.4% was intended to be for one year only, while CGP contends that the reduction was permanent. *See id.* at 364:19-366:23, 369:2-14.

[2535] Omnibus License and Enterprise Services Agreement §1.1(yyy) (May 20, 2014), at CEOC_INVESTIG_00059569 [CEOC_INVESTIG_00059560].

[2536] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §6.1(a), (b), (c)(i)(B) (May 20, 2014), at CEOC_INVESTIG_00059486 [CEOC_INVESTIG_00059472].

[2537] CEOC "Corporate Allocation Summaries – 2013 to 2015," at CEOC_2004_0058546 [CEOC_2004_0058541].

- Allocations to properties are made based on established methodologies (*e.g.*, certain human resource expenses are allocated based on the number of full-time employees);[2538] and
- Any remaining expenses are allocated to the parent companies (CEOC, CERP and CGP) according to the Standard Allocation percentages (initially 70% to CEOC, 24.6% to CERP and 5.4% to CGP).

Adjustments to the allocation percentages can be made in light of changes to a Member's Net Revenue and require consent by a majority of the Steering Committee.[2539] In fact, as of July 2015, the cost allocation percentages were adjusted by the Committee to 65.4% for CEOC, 21.8% for CERP and 12.8% for CGP.[2540] However, no adjustment of these expense allocations can result in an increase above certain specified levels without the express agreement of the affected Member.[2541] And any change in the underlying methodology used to calculate allocations requires the unanimous consent of the Steering Committee.[2542] Notably, neither CERP nor CGP may acquire any new properties intended to benefit from the services provided by CES that would result in their receiving an allocation percentage greater than 30% or 16%, respectively, unless an additional property agreement is entered into independently providing the acquired property with CES's services, or the acquiring Member agrees to the increase.[2543] The two agreements also vest decisions about capital expenditure and annual budgets in the Steering Committee.[2544] Finally, if CES were ever sold or liquidated by agreement of its Members, CEOC would receive value only after CGP and CERP were repaid their initial $65 million contribution.[2545]

---

[2538] For example, regional training centers provide access for all employees to organizational e-learning, among other training programs, with related costs allocated based on the number of full-time employees at each property. *Id.*

[2539] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §6.1(c)(i)(A) (May 20, 2014), at CEOC_INVESTIG_00059486 [CEOC_INVESTIG_00059472].

[2540] "CES Allocations YTD 2015 – property and standard allocations methodologies" (Aug. 2015), at CEOC_2004_PRIV_0056445 [CEOC_2004_PRIV_0056445].

[2541] The agreement provides that CERP's allocation percentage shall not exceed 30%; CGP's allocation percentage shall not exceed 16%; and CEOC's allocation percentage shall not exceed 70%. *See* Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §6.1(c)(i)(C)(1) (May 20, 2014), at CEOC_INVESTIG_00059487 [CEOC_INVESTIG_00059472].

[2542] *Id.* at §6.1(c)(i)(B), CEOC_INVESTIG_00059486.

[2543] *Id.* at §6.1(c)(i)(C)(2) & (3), CEOC_INVESTIG_00059487.

[2544] *Id.* at §7.7(b)(i), CEOC_INVESTIG_00059496-97; Omnibus License and Enterprise Services Agreement §8.5 (May 20, 2014), at CEOC_INVESTIG_00059576-78 [CEOC_INVESTIG_00059560].

[2545] Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC §12.2(b) (May 20, 2014), at CEOC_INVESTIG_00059510

As shown in Figure 51, CEOC's relative share of Net Revenue significantly decreased following the Four Properties Transaction to approximately 52.9% for the period from June 2014 through December 2015.

**Four Properties Figure 51:  Net Revenue by Entity**

| (amounts in millions) | Prior to Growth and Four Properties Transactions | | After Growth Transaction and Prior to Four Properties Transaction | | After Four Properties Transaction | |
| | Jan 2008 - Oct 2013 | | Nov 2013 - May 2014 | | June 2014 - Dec 2015 | |
| | Net Revenue | % of Total | Net Revenue | % of Total | Net Revenue | % of Total |
|---|---|---|---|---|---|---|
| CEOC | $      35,096.2 | *74.1%* | $      2,944.1 | *69.0%* | $      6,358.4 | *52.9%* |
| CERP | 12,252.5 | *25.9%* | 1,087.2 | *25.5%* | 3,199.2 | *26.6%* |
| CGP | - | *0.0%* | 235.5 | *5.5%* | 2,467.5 | *20.5%* |
| Total | $      47,348.7 | *100.0%* | $      4,266.9 | *100.0%* | $      12,025.0 | *100.0%* |

Source: Property-Level Financial Statements (FY 2007 to 2015), at CEC_Examiner_1447621 [CEC_Examiner_1447621].

As a result, CEOC was allocated a disproportionate share of the indirect costs.  Using actual allocated cost information for the period of January 2015 through October 2015,[2546] it appears that CEOC has overpaid by roughly $14.5 million based on its share of Net Revenue since the Four Properties Transaction, as shown in Figure 52 below.

---

[CEOC_INVESTIG_00059472].  One creditor group interprets these provisions as granting CGP and CERP control over all matters relating to the future growth and development of Total Rewards.

[2546] The Examiner requested, but was not provided, the amount of costs allocated for the period 2008 through 2014 to each legal entity (CEOC vs. CERP vs. CGP) because the Company has very little ability to query the accounting systems to generate the amounts historically allocated using the Standard Allocation methodology, other than through an arduous manual process.

**Four Properties Figure 52:  Illustrative Analysis of Excessive Cost Allocated to CEOC**

| (amounts in millions) | June 2014 to December 2014 [A] | January to October 2015 [B] | November and December 2015 [C] | Total Amount | Actual % of Net Revenue Total [D] | Cost Allocation based on Net Revenue % | Estimated (Overpayment) Underpayment |
|---|---|---|---|---|---|---|---|
| | Estimated | Actual | Estimated | Estimated/Actual | | | |
| CEOC | $ 24.0 | $ 33.3 | 6.4 | $ 63.7 | 52.9% | $ 49.1 | $ (14.5) |
| CERP | $ 8.4 | $ 11.5 | 2.1 | $ 22.0 | 26.6% | $ 24.7 | $ 2.7 |
| CGP | $ 1.8 | $ 4.2 | 1.3 | $ 7.3 | 20.5% | $ 19.1 | $ 11.8 |
| Total | $ 34.2 | $ 48.9 | 9.8 | $ 92.9 | 100.0% | $ 92.9 | $ - |
| Actual Monthly Average Cost | | $ 4.9 | | | | | |

Sources:  CES Allocations YTD 2015 – Property and Standard Allocations Methodologies (Jan. 2015 to Oct. 2015), at CEOC_2004_PRIV_0056445  [CEOC_2004_PRIV_0056445]; Property-Level Financial Statements (FY 2007 to 2015), at CEC_Examiner_1447621 [CEC_Examiner_1447621].

Note:

[A] Actual allocated costs were only provided for the first 10 months of 2015 and the average monthly total amount allocated was $4.9 million.  This amount was used to derive the total estimate of the allocated costs for June 2014 to December 2014 and November to December 2015 of $34.2 million and $9.8 million, respectively.

[B] Allocation of $34.2 million was based on actual percentages used by CES for January to June 2015 of CEOC (70%); CERP (24.6%) and CGP (5.4%).

[C] Allocation of $9.8 million was based on the actual percentages used by CES for July to October 2015 of CEOC (65.4%); CERP (21.8%) and CGP (12.8%).

[D] See Four Properties Figure 51.

### g.    Consideration Received for Total Rewards and Management Services

#### i.    The Value of Total Rewards and Shared Services

Each of the financial advisors to the CAC and CEC Special Committees valued the Four Properties based on the assumption that they would continue to be a part of the Total Rewards system.[2547]  Accordingly, they viewed the value of Total Rewards to those four assets as "baked into" or embedded in the purchase price.[2548]  D&P, for example, concluded that the value of Total Rewards was "embedded in the overall enterprise value that's determined for the properties."[2549]  And both D&P and Centerview assumed that the properties had access to Total

---

[2547]  J. Schiedemeyer Sept. 16, 2015 Tr. at 50:17-51:4.

[2548]  T. Donovan Nov. 10, 2015 Tr. at 176:23-179-14; see also J. Schiedemeyer Sept. 16, 2015 Tr. at 50:4-20; S. Furie Sept. 18, 2015 Tr. at 43:8-44:16; J. Bosacco Sept. 15, 2015 Tr. at 91:12-19, 165-15-17; C. Abrahams Oct. 7, 2015 Tr. at 331:15-18 (projections of the values of the four assets assumed access to Total Rewards).

[2549]  J. Schiedemeyer Sept. 16, 2015 Tr. at 50:4-22.  D&P had previous experience in working with CEC in connection with the World Series of Poker Transaction, in which it represented Harrah's Operating Company Inc., a wholly-owned subsidiary of CEC.

Rewards in assessing the correct multiple to be applied to the assets they were valuing.[2550]  Both financial advisors testified that they would have utilized a lower multiple in the event the property did not have access to Total Rewards.[2551]  Centerview utilized a similar assumption when performing its discounted cash flow analysis.[2552]  According to Bosasco, without access to Total Rewards, the cash flow assumptions made by Centerview would have decreased.[2553]  And the same was true of the projections provided by CEC management.[2554]

Lazard likewise valued the Four Properties based on the assumption that they would remain in the system and continue to have access to Total Rewards and the other services historically provided by CEOC through its Property Management Agreement.[2555]  The CAC Special Committee would have paid less for the hotels due to lost revenue stream if access to the Total Rewards program and CEOC's infrastructure (workforce, etc.) was revoked.[2556]  But no attempt was made by Lazard to value the properties in the event they did not have continued access to services now provided by CES, including Total Rewards.[2557]  Nor did Lazard perform any independent valuation of the Total Rewards program and/or the license granted to CES.[2558]  According to Beilinson, however, the "cost" of CES did impact Lazard's willingness to issue a fairness opinion.  He explained:

> It wasn't until later that we realized the cost [of CES] was going to be as hefty as it ended up being which, quite frankly, caused a problem later in the process with Lazard who was, in essence, refusing to render a fairness opinion if we didn't get some reduction in our allocation. . . . Lazard made it clear somehow, not sure what exact words they used, but now that we knew what the numbers were of CES and it was embedded that they couldn't provide us with a fairness opinion, i.e., they thought we were overpaying unless I got a reduction in our allocation.[2559]

And, in evaluating comparables for the Four Properties Transaction, Lazard did not evaluate whether other properties with integrated rewards programs were more effective or less

---

[2550] *Id.* at 213:6-17.

[2551] J. Bosasco Sept. 15, 2015 Tr. at 205:18-207:8; J. Schiedemeyer Sept. 16, 2015 Tr. at 213:6-17.

[2552] J. Bosasco Sept. 15, 2015 Tr. at 166:11-167:8.

[2553] *Id.* at 167:9-14.

[2554] J. Schiedemeyer Sept. 16, 2015 Tr. at 50:4-22, 51:5-13.

[2555] S. Furie Sept. 18, 2015 Tr. at 42:23-43:5.

[2556] M. Beilinson Oct. 6, 2015 Tr. at 61:6-62:13.

[2557] S. Furie Sept. 18, 2015 Tr. at 44:2-16.

[2558] *Id.* at 43:6-43:13.

[2559] M. Beilinson Oct. 6, 2015 Tr. at 131:6-132:23.

effective than Total Rewards.[2560]  Lazard did not consider what the Four Properties would have
been worth if they had been sold to a non-affiliate.[2561]

Notably, none of the financial advisors made any attempt to calculate the overall value of
the Total Rewards IP or the management services that had historically been provided by CEOC
or to consider whether any additional consideration should be paid as a result.[2562]  Nor did they
ascribe any value to the broad, royalty-free license granted by CEOC to CES.[2563]  In connection
with the creation of CES, CEOC gave up operations that it took years to build, as well as its
work force and virtually all control over its intellectual property rights.  Yet none of the financial
advisors considered the diminution to CEOC's value from these changes or the consideration it
was receiving as a result of its forfeiture of control over these assets.

As a result, the only consideration received by CEOC in exchange for these contributions
to CES was a 69% economic interest in CES and relief from its former obligation to fund 100%
of the future capital expenditures needed to upgrade the systems to manage the properties.[2564]  In
theory, because CERP and CGP provided 100% of the initial working capital of $65 million to
CES for its ownership interests, CEOC was relieved of the obligation to fund 100% of certain
capital expenditures that were reimbursed over time based on the assets' depreciation or
amortization schedule.[2565]  However, CEOC lost at least a degree of control over its intellectual
property in connection with the transaction.[2566]  And no consideration given to the value as of the
broad license granted to CES.[2567]  Given that no valuation of the Total Rewards IP or the license

---

[2560]  S. Furie Sept. 18, 2015 Tr. at 87:13-22.

[2561]  *Id.* at 44:18-45:16.

[2562]  J. Bosacco Sept. 15, 2015 Tr. at 165:23-166:10; J. Schiedemeyer Sept. 16, 2015 Tr. at
51:14-25, 53:16-54:18.

[2563]  J. Bosacco Sept. 15, 2015 Tr. at 164:7-11.

[2564]  Omnibus License and Enterprise Services Agreement Ex. A (May 20, 2014), at
CEOC_INVESTIG_00059601 [CEOC_INVESTIG_00059560]; Amended and Restated Limited
Liability Company Agreement of Caesars Enterprise Services, LLC (May 20, 2014), at
CEOC_INVESTIG_00059522 [CEOC_INVESTIG_00059472].

[2565]  *See* E. Hession Nov. 4, 2015 Tr. at 353:17-354:18; *see also* Services Company Joint Venture
(May 5, 2014), at CEOC_INVESTIG_00059625-47 [CEOC_INVESTIG_00059625].

[2566]  The extent of this loss of control is discussed above.

[2567]  *See, e.g.*, B. Finnegan Nov. 16, 2015 Tr. at 333:22-336:5 (listing consideration that CEOC
"received," none of which was paid to CEOC); G. Kranias Oct. 23, 2015 Tr. at 243:21-244:20
(stating that he would not be surprised if no consideration was paid to CEOC because he does
not know "how to value" Total Rewards). *See generally* Omnibus License and Enterprise
Services    Agreement    (May    20,    2014),    at    CEOC_INVESTIG_00059560-604
[CEOC_INVESTIG_00059560];  Services  Company  Joint  Venture  (May  5,  2014),  at
CEOC_INVESTIG_00059625-47 [CEOC_INVESTIG_00059625].

itself was performed in connection with the Four Properties Transaction,[2568] this is hardly surprising. Although he was told that "Centerview's [fairness] opinion covered [S]ervices [C]o." (it did not), Cohen did not recall any discussions about the value ascribed to the license granted to CES (as opposed to the Four Properties' access to Total Rewards and the shared services).[2569] In fact, none of the witnesses was aware of any efforts to place a value on Total Rewards or discussions about the possibility of non-CEOC properties licensing Total Rewards from CEOC and pay a licensing fee.[2570]   The lack of consideration paid by CERP for its license to the Total Rewards IP is discussed in Section VIII.F, *infra*.

### h.   The Value of the Management Agreements

In addition to valuing the Four Properties, D&P was also asked to evaluate the management agreements between the parties and to determine whether the management fees associated with these agreements were fair to the parties.[2571]   Specifically, each of the Four Properties was to enter into a property management agreement, pursuant to which it would receive management services and the use of Total Rewards.[2572]   50% of the management fees paid by the Four Properties in exchange for those services was to be purchased by CAC as part

---

[2568]  J. Bosacco Sept. 15, 2015 Tr. at 165:23-166:10; J. Schiedemeyer Sept. 16, 2015 Tr. at 51:14-25, 53:16-54:18; *see also* B. Finnegan Nov. 16, 2015 Tr. at 335:6-14 (the license cannot be "disaggregrate[d]" "because there was no disaggregation done at the time" of the Four Properties Transaction); B. Finnegan Feb. 4, 2016 Tr. at 403:22-404:5 (D&P did not ascribe any independent value to CEOC's "loss of complete control" over the IP that it licensed to CES); *id.* at 407:21-408:16) (no consideration was provided to CEOC for its "loss of control" because there was "no disaggregation of the inputs and outputs to any party" in connection with the Four Properties Transaction); *id.* at 418:8-419:3 (neither CERP nor CGP paid a licensing fee for the Total Rewards IP, other than the payment of their share of the allocated expenses and management fee at the property level); *id.* at 419:10-21 (the license for the Total Rewards IP itself was not valued because  the "IP wasn't offered alone"; according to Finnegan, the IP was "not useful or beneficial absent the totality of the enterprise services behind it" and thus, Total Rewards could not be licensed "without access to the rest of the system.").

[2569]  M. Cohen Feb. 9, 2016 Tr. at 525:11-527:20.

[2570]  *See, e.g.*, T. Shaukat Nov. 9, 2015 Tr. at 36:24-37:20; J. Gastwirth Jan. 14, 2016 Tr. at 71:14-22.

[2571]  J. Schiedemeyer Sept. 16, 2015 Tr. at 25:14-28:10; *see* D&P Letter to the CEC Special Committee, the CEC Board and the CEOC Board (Mar. 1, 2014), at 1 [DP00002026] (native); *see also* J. Bosacco Sept. 15, 2015 Tr. at 164:20-165:22 (Centerview operated with the underlying assumption that the assets would have access to Total Rewards, but it did not give opinions on management services agreements or value licenses, so it was not part of its assessment).

[2572]  Transaction   Agreement   (Mar.   1,   2014),   at   CEOC_INVESTIG_00066153 [CEOC_INVESTIG_00066086].

of the transaction.[2573]   CEOC was to retain the other 50% of those fees, which could also be considered a form of consideration.[2574]

After conferring with partners who had experience reviewing management agreements, D&P agreed to expand their engagement to include those agreements.[2575]   D&P anticipated that the banks would want one of the advisors' opinions to cover the management agreement and the services joint venture, which was not covered by the original draft fairness opinion.[2576]   D&P explained that this evaluation would have entailed two aspects:   (i) considering whether the economics associated with the management fees were reflected in the value of the properties; and (ii) considering whether the fee levels were fair.[2577]   Because of the unique structure of CES, which was to provide management services pursuant to both the joint venture agreement and the management agreements, D&P lacked adequate non-public comparables for assessing the joint venture and management aspects of the transaction.[2578]   Accordingly, D&P evaluated the CES joint venture agreement and the management agreements as though they were part of a single agreement.[2579]

### 4. The Impact of the 2013 and 2014 Asset Transfers on CEOC's Profile and Financial Condition

A June 27, 2014 Power Point presentation (the "June Presentation") prepared by CEC for then-newly added CEOC directors painted a stark picture of how CEOC's financial condition following the 2013 and 2014 asset transfers was worse off than at the time of the LBO. Specifically, the presentation noted, among other things, that (i) "EBITDA for 2013 was $1.2 billion, which is down over 38% since the LBO, and Net Revenues of $5.9 million are down over 26%; and (ii) "Annual interest expense at CEOC is $1.8 billion, exceeding EBITDA by

---

[2573] *Id.*; *see, e.g.*, Fee Stream Agreement (May 5, 2014), at CEOC_INVESTIG_00126148 [CEOC_INVESTIG_00126148].

[2574] *See* Management Agreement Term Sheet, at CEOC_INVESTIG_00055887-91 [CEOC_INVESTIG_00055876] (providing that the Four Properties will be managed by a management entity that is wholly owned by CEOC and receive fees in exchange for that service); Transaction Agreement (Mar. 1, 2014), at CEOC_INVESTIG_00066153 [CEOC_INVESTIG_00066086]; Fee Stream Agreement (May 5, 2014), at CEOC_INVESTIG_00126148 [CEOC_INVESTIG_00126148].

[2575] J. Schiedemeyer Sept. 16, 2015 Tr. at 25:14-27:13; *see* D&P Letter to the CEC Special Committee, the CEC Board and the CEOC Board (Mar. 1, 2014), at 1 [DP00002026] (native).

[2576] J. Schiedemeyer Sept. 16, 2015 Tr. at 165:9-25.

[2577] *Id*. at 28:11-29:9.

[2578] *Id*. at 188:3-189:24; D&P Opinion Letter (May 20, 2015), at 5 [DP00000119] (native).

[2579] J. Schiedemeyer Sept. 16, 2015 Tr. at 189:13-24; D&P Opinion Letter (May 20, 2015), at 5 [DP00000119] (native).

$600 million."[2580]   The June Presentation further acknowledged that CEOC had "~$19.4 billion of debt outstanding, ~16.9x net leverage, and $1.7 billion of annual interest expense," and "need[ed] to continue raising additional capital to pay its expense, pay its interest and pay for capital expenditures at its properties."[2581]   The net leverage at the time of the LBO was 8.8x.

Thus, despite the sales proceeds CEOC received in connection with the Four Properties Transaction and certain transactions that preceded it, CEOC's debt level was essentially the same – $19 billion – in 2014 as it was at the time of the LBO in 2008.[2582]   Rowan told the Examiner that, using "net debt," the "right comparison is probably" $18.4 billion in 2008 to $16 billion in June 2014.[2583]   Rowan added:  "It's still a lot of debt."[2584]   According to Loveman, this was "a result largely of the additional borrowings that took place to address the cash shortfall."[2585]

The June Presentation also stated that "[b]ased on the current interest expense burden and maintenance capital expenditure, CEOC would need to increase EBITDA to ~$2.2 billion (I) (~115% increase) to be cash flow break-even."[2586]   When asked by the Examiner whether he considered this a "reasonable prospect," Loveman responded:

> Not that we could get EBITDA to $2.2 billion, but that wasn't the only way to make the cash flow break even.  The other ways were by bank debt, renegotiate the interest rate on debt, do debt-for-equity swaps.  There were a series of other things.  But I certainly did not believe we could get cash flow to $2.2 billion.[2587]

Rowan maintains that he held a similar view, telling the Examiner:  "[T]his company needed to do three things.  It needed to refinance like every company.  Needed to raise equity,

---

[2580]   E-mail from E. Hession to J. Payne (June 27, 2014) [CEOC_INVESTIG_00088460], attaching "CEC Overview (CEOC Focus)" (June 27, 2014), at 31 [CEOC_INVESTIG_00088461].

[2581]   "Caesars Entertainment, June 27, 2014" (June 27, 2014), at 31, 35 [CEOC_INVESTIG_00088461] (native). While Rowan told the Examiner that he had no reason to believe this information was not accurate, he disputed that CEOC "needed to continuing raising capital," asserting that "CEOC had some $3 billion in cash." M. Rowan Nov. 17, 2015 Tr. at 377:8-378:11.

[2582]   "Caesars Entertainment, June 27, 2014" (June 27, 2014), at 31, 35 [CEOC_INVESTIG_00088461] (native); M. Rowan Nov. 17, 2015 Tr. at 376:22-377:7.

[2583]   M. Rowan Nov. 17, 2015 Tr. at 379:8-380:16.

[2584]   *Id.*

[2585]   G. Loveman Oct. 27, 2015 Tr. at 268:19-271:11.

[2586]   "Caesars Entertainment, June 27, 2014" (June 27, 2014), at 36 [CEOC_INVESTIG_00088461] (native).

[2587]   G. Loveman Oct. 27, 2015 Tr. at 271:12-272:7.

and it needed to show some positive momentum. All of those things I believed would allow us to refi and move forward . . . ."[2588]

CEC and the Sponsors have pointed to Caesars' improved financial results in 2015 to support the claim that by growing EBITDA, CEC (and CEOC) will eventually be able to raise equity to pay down debt. However, they have offered no timetable or financial analysis showing how this will be possible, nor have they offered any evidence that 2015's improved results are sustainable or significant enough to allow CEOC to pay its creditors in full. Although it is true that EBITDA at CEC and CEOC increased in 2015, this increase appears to have been driven primarily by cost-cutting, as CEC and CEOC's revenues in 2015 increased by 1.1% and *decreased* by 5.5%, respectively. While at the same time, expenses at CEC and CEOC declined by 8% and 14% respectively. Continued increases in EBITDA along the lines achieved in 2015 cannot be achieved solely through cost-cutting.

Caesars' EBITDA pre-LBO was approximately $2.7 billion with revenues of approximately $10.8 billion, resulting in an EBITDA margin of approximately 25%. CEC and CEOC's 2015 EBITDA was $1.132 billion and $2.147 billion respectively. To get back to pre-LBO EBITDA and revenue, CEC would have to increase its combined (CEOC, CERP and pro-rata share of CGP) revenue by approximately $2.6 billion, or 32% above the 2015 level, and its EBIDTA by approximately $600 million, or 28% above the 2015 level. CEOC's EBITDA, while improved, was still 50% below what CEC and the Sponsors estimated in June 2015 would be needed ($2.2 billion) in order for CEOC to just reach cash flow breakeven. In short, Rowan's argument that once the market saw growth in EBITDA, the capital markets would have opened up for CEOC and allow it to refinance at par is highly speculative and, in the Examiner's view, simply a theoretical argument rather than a realistic prospect.

## 5. The Examiner's Findings and Conclusions

Creditors have identified potential claims arising from the Four Properties Transaction (including the CES/Total Rewards Transaction) that include: (i) actual and constructive fraudulent transfer; (ii) breach of fiduciary duty (against CEOC's directors and CEC); and (iii) aiding and abetting breach of fiduciary duty (against the Sponsors and certain of CEC's directors). For the reasons discussed below, the Examiner has concluded that the Debtors' estates have (i) a strong claim for constructive fraudulent transfer,[2589] (ii) a strong claim for actual fraudulent transfer (albeit weaker than in the CERP and Growth Transactions), (iii) a strong claim for breach of fiduciary duty against CEOC's directors and CEC, and (iv) a reasonable aiding and abetting breach of fiduciary duty claim against Apollo, TPG, and certain of CEC's Apollo-affiliated directors.

---

[2588] M. Rowan Nov. 17, 2015 Tr. at 381:8-382:2.

[2589] This claim becomes stronger in light of CEOC's transfer of the undeveloped land, Total Rewards license, and management services.

a reasonable claim for aiding and abetting breach of fiduciary duty against Apollo and certain of CEC's Apollo-affiliated directors and (v) a reasonable aiding and abetting breach of fiduciary duty claim against TPG.

### a.   General Conclusions

According to CEC and the Sponsors, the Four Properties Transaction was undertaken primarily for the benefit of CEOC (and its creditors), which was facing a serious liquidity crisis. Absent drastic action, CEOC was going to run out of cash by the end of 2014; it was going to trip the all-important SSLR covenant in its debt agreement; and it (and CEC) was facing a going concern qualification that, if issued, would have led to a certain bankruptcy.  The Four Properties Transaction, together with the B-7 Transaction and other financing transactions that were undertaken in 2014 were thus all designed, according to CEC and the Sponsors, to buy CEOC runway, avoid the going concern issue, eliminate the threat of a covenant default through amendments to CEOC's indentures and "buy time" for the cyclical downturn to reverse itself, thereby opening up avenues for CEOC to issue equity (through stock sales or exchange offers) as a means of reducing CEOC's debt and "fixing" its balance sheet.

The Examiner has considered these arguments and the evidence presented, and has reached the following conclusions (recognizing that, if litigated, these will be hotly contested issues for which there will be conflicting evidence):

First, as discussed in Section V, at the time the Four Properties transaction closed in May 2014, CEOC was almost certainly insolvent, inadequately capitalized and unable to pay its debts when they came due.

Second, while the Sponsors and CEC maintain that the Four Properties Transaction was designed to provide increased "runway" to address CEOC's debt as well as avoid a going concern qualification, there was a substantial and obvious cost in doing so.  By permanently removing the Four Properties from CEOC without materially reducing its debt, it made CEOC less able to service that debt in the future.  Indeed, analyses done by Apollo in 2013 made clear that under the most optimistic of scenarios, CEOC would not be able to pay principal at par when its debt matured and that any refinancing absent a bankruptcy would necessarily involve securing lender agreement – particularly at the second lien and more junior levels – to a substantial reduction in principal.  The Four Properties Transaction only exacerbated this situation since the $1.815 billion in sales proceeds was primarily used to fund operating costs and interest, not to pay down debt. The Examiner finds that, from CEC and the Sponsors' perspective, creating "runway" for CEOC was motivated, in meaningful part, by their desire to avoid an earlier bankruptcy that would have put their equity at risk.

Third, as with the Growth Transaction, creating a special committee of independent CEC directors did not protect CEOC's interests.  While purportedly negotiating on behalf of CEOC as the seller, these individuals were directors of CEC, the majority owner of CGP.   Indeed, Kleisner, the lead CEC Special Committee member, acknowledged that, while he did not see a conflict between CEOC and CEC, "CEOC and its obligations were not a consideration to the

best of [his] recollection."[2590]  Thus, while the CEC Special Committee members appear to have acted with subjective good faith, they were in a conflicted position vis-à-vis CEOC, which was insolvent at the time and had obligations to its creditors.  The CEOC directors who did approve the transaction – Loveman and Hession – did so only via written consents *after* the transaction had been negotiated and the price had been set.  While it appears that Loveman and Hession were not motivated by a desire to benefit themselves to the detriment of CEOC (and, to the contrary, appear to have believed – incorrectly – that CEC's and CEOC's interests were aligned), they were, in any event, interested in the transaction and lacking in independence given their roles as CEC executives and the fact that CEC stood on both sides of the transaction.[2591]  They were also shareholders of CAC, which had a significant equity interest in CGP.  Had a special committee of independent CEOC directors been established to evaluate the transaction, it would have likely weighed the benefits of providing added liquidity and avoiding the risks of an earlier bankruptcy, which could have been necessary absent an agreement with creditors, against the long-term negative effects on CEOC as articulated in, among other documents, the February 24, 2014 Centerview Presentation.[2592]

Fourth, as discussed above, the CEC Special Committee's authority was substantially limited in that it could not, for instance, market the Four Properties to third parties.  As with other transactions, CEC and the Sponsors decided that the properties should remain in the Caesars structure and that selling them to third parties would produce a lower price.  According to CEC and the Sponsors, if the properties were sold to a non-CEC affiliate, they would lose the benefit of Total Rewards and thus yield a lower purchase price.  The transaction, however, involved three properties on the very valuable Las Vegas strip and a "super-regional" property in New Orleans.  The ability to market those four properties together presented a different value proposition than the sale of a single property in that it allowed a buyer to acquire a valuable and significant presence in the heart of Las Vegas.  The CEC Special Committee did not, however, test whether this combination of properties would have generated a higher purchase price.

Fifth, as discussed above, the Examiner believes that there are a variety of weaknesses in Centerview's and D&P's respective analyses that led these advisors to undervalue the Four Properties.  Most significantly, Centerview and D&P should not have abandoned the January Business Plan as updated in the ordinary course in favor of the February Business Plan (which was used for no other purpose).  As a general proposition, valuations should be based on a company's ordinary course projections – not on projections created solely to support a particular valuation or outcome, as was the case here.[2593]  Whether it be in dealing with auditors, lenders, regulators, determining the compensation of Caesars' employees, or making presentations to the CEC Board, CEC management used the January Business Plan as updated in the ordinary course.  While Caesars, as a whole, routinely missed budgets, this was, in material part, driven by failures to forecast the Atlantic City market collapse, where EBITDA declined 78% (from $602 million

---

[2590]  F. Kleisner Jan. 28, 2016 Tr. at 39:12-21.

[2591]  Appendix 5, Legal Standards at Section I.J.1.d.

[2592]  "Caesars Entertainment Confidential Discussion Materials" (Feb. 24, 2014), at CEOC_INVESTIG_00458707-08 [CEOC_INVESTIG_00458698].

[2593]  *See In re U.S. Cellular Operating Co.*, 2005 WL 43994, at *12 n.65 (Del. Ch. Jan. 6, 2005).

to $131 million) between 2008 and 2014.[2594]   In the years preceding the Four Properties Transaction, the Four Properties met projections in some years and not in others.   In the aggregate, they missed budgets by only 2.8%. The reductions reflected in the February Business Plan Projections were, in the aggregate, 12% – a substantially greater reduction. Additionally, the LRP projections had already been tempered by Caesars in late 2013 to become more realistic and achievable.[2595]

Sixth, how the assets have performed since the Four Properties Transaction closed less than two years ago is not relevant from a valuation perspective.   As discussed in Appendix 5, Legal Standards at Section I.C.2.a, the general test for reasonably equivalent value is what is known and knowable at the time, not future performance.[2596]   Further, even if this metric could be considered, the value of long-lived assets such as the Four Properties cannot be determined based on results from one or two years.   The Four Properties are long-lived assets that will produce income for 30-plus years.   Moreover, these properties outperformed expectations in 2015 in the midst of what many witnesses recognized was a broader economic recovery.

Seventh, while CEC maintains that the transfer of 31 acres of undeveloped land was a necessary component of the transaction and the value of the land was embedded in the purchase price of the Las Vegas properties, the CEC Special Committee and its financial advisors were unaware of the inclusion of this land in the transaction and therefore it was not considered in reaching their conclusions.   Further, there is evidence that   Caesars considered using the undeveloped land for other development opportunities, indicating that it was not necessary to reserve this land for parking space.   Moreover, it appears that easements for a substantial portion of this land had already been granted to satisfy some parking requirements.

Eighth, CEOC contributed its intellectual property, including Total Rewards, and its workforce to CES.   Despite the language of the CES Agreements, the license that CEOC granted to CES is not a typical "non-exclusive" license.   While CEOC still owns the Total Rewards IP, CEOC has lost some control over that IP due to the breadth of the license, the transfer of its workforce and the governance arrangements enshrined within the CES Agreements.[2597] However, this does not necessarily equate to an assignment or transfer of an asset (although the CES Agreements certainly share a number of characteristics with such an arrangement).

---

[2594]  *See* Appendix 7, Valuation at Section VIII.B.

[2595]  *See* Appendix 7, Valuation at Section VIII.B.3.

[2596]  Delaware law is also clear that, in the breach of fiduciary context, the "fairness" of the purchase price "must be assessed at of the time it was agreed to, *not on the basis of later events*." *In re Loral Space & Commc'ns Inc.*, Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *32 n.158 (Del. Ch. Sept. 19, 2008) (emphasis added); *see also Gentile v. Rosette*, 2010 Del. Ch. LEXIS 123, at *52 (Del. Ch. May 28, 2010); *In re Emerging*, No. CIV.A.16415, 2004 WL 1305745, at *11, *43 n. 193.

[2597]  *See* S. Winograd Oct. 21, 2015 Tr. at 54:17-55:10 (acknowledging the "whole notion of loss of control" and "how the blocking rights factor into it" with regard to the license of Total Rewards to CES).

There is strong evidence that the value for the Four Properties' access to Total Rewards and shared services was "baked into" or embedded in the purchase price paid by CGP. However, CEOC was not compensated by CGP for the broad, irrevocable license it granted to CES or for CEOC's loss of control over the Total Rewards IP following the creation of CES. CERP, on the other hand, has never compensated CEOC for its access to Total Rewards and shared services, nor did it compensate CEOC for the license it received and the control it gained over the Total Rewards IP through its membership in CES. (Claims relating to Total Rewards accruing before the creation of CES are addressed in Section VIII.F.)

### b. Constructive Fraudulent Transfer

The Examiner concludes that there is a strong constructive fraudulent transfer claim arising out of the Four Properties Transaction because (i) CEOC did not receive reasonably equivalent value in exchange for the properties and other assets transferred as part of the transaction; and (ii) CEOC was insolvent at the time of the transaction.

CEC and the Sponsors argue that no viable constructive fraudulent transfer claim exists because (i) the fairness opinions and special committee process that was put in place demonstrate that CEOC received reasonably equivalent value for the properties, as they contend has been confirmed by the post-transaction performance of the properties, and (ii) the safe harbor provision of section 546(e) of the Bankruptcy Code would provide a complete defense to this claim.[2598] The Examiner disagrees with CEC and the Sponsors on both issues.

### i. CEOC Did Not Receive Reasonably Equivalent Value

The Examiner has, for the reasons discussed above, concluded that, despite efforts to adopt processes designed to create an appearance of fair price and process, in the end (i) the processes utilized were insufficient; (ii) the consideration received by CEOC – $2 billion (including assumption of the Cromwell's $185 million credit facility) – was inadequate because, among other reasons, Centerview's and D&P's respective valuations of the Four Properties and management fees are not entitled to particular deference given their reliance on the January Business Plan and failure to account for the transfer of undeveloped land, the Total Rewards license, and management services; and (iii) other than buying some small additional amount of runway, CEOC was left in an even worse financial condition after the Four Properties Transaction than it was in before.

The Examiner has determined, based on his own independent valuation (using the most reliable projections, correct multiples and EBITDA) that, as of the May 2014 closing: (i) the actual value of the Four Properties (including the value for their continued access to Total Rewards) and management fees at the time of the transaction ranged from $2.59 billion to $2.97 billion (or $2.41 billion to $2.78 billion net of debt assumed), and (ii) the value of the land

---

[2598] Although CEC and various witnesses have also asserted that CEOC was not, in fact, insolvent at the time of the Four Properties Transaction because CEOC was paying its current debts as they came due, as discussed in Section V, *supra*, that argument is untenable as a matter of fact and premised on a fundamental misunderstanding of the statutory tests on which a constructive fraudulent transfer claim may be based.

transferred in connection with the transaction ranged from $109 million to $140 million.[2599]   In reaching these conclusions, the Examiner utilized the guideline public companies ("GPCs") and discounted cash flow ("DCF") methods described below and in Appendix 7, Valuation at Section I.C.  These values do not include any additional value that was transferred in connection with the CES/Total Rewards Transaction, which is discussed in Section VIII.F, *infra*.

### (A) Guideline Public Companies Method

Based on their independent research and review of companies identified by other financial advisors, the Examiner considered the same ten GPCs with respect to the Four Properties Transaction as they did with respect to the Growth Transaction.[2600]   These GPCs were comparable to the Four Properties in terms of risk, characteristics, services, products, industry participation and competitive landscape.

### (B) Discounted Cash Flow Method

The Examiner utilized the projections included in the Q1 2014 LRP in its DCF model.[2601] However, because the LRP did not include multi-year projections for capital expenditures, the Examiner derived those figures from the January Business Plan for projected capital expenditures.[2602]

For the terminal period, depreciation and capital expenditures were set equal to a normalized level of capital expenditures.  With respect to The Quad, Bally's Las Vegas and Harrah's New Orleans, the normalized level of capital expenditures was $11.5 million, $11.2 million and $13.9 million, respectively.  This level is in excess of historical maintenance capital expenditures for the properties and is consistent with projected capital expenditures as of the time of the Four Properties Transaction.  With respect to The Cromwell, normalized capital expenditures were set at $6.2 million, an amount in excess of projected capital expenditures since capital expenditures into perpetuity would exceed those in the first few years as a new property. The projections were then discounted utilizing the appropriate weighted average cost of capital ("WACC") and capitalization rates.

In conducting their respective analyses of the Four Properties Transaction, Centerview and D&P valued the Four Properties as the sale of four individual assets as opposed to four

---

[2599]   *See* Appendix 7, Valuation at Section VIII.I.

[2600]   For a list of these companies, *see id*. at Section VIII.B.

[2601]   The LRP was consistently found to be embedded in the various financial analyses prepared by Caesars, including liquidity-related analyses.  For example, a May 2014 presentation to the Board of Directors evaluated expected plan EBITDA and liquidity following the Four Properties Transaction "based on LRP projections provided to accounting for impairment testing."  Board of Directors Meeting Package (May 7, 2014), at TPG-Examiner_00770796 [TPG-Examiner_00770636].

[2602]   The Examiner utilized the January Business Plan to project capital expenditures because those projections more closely correlate to the LRP than does the February Business Plan relied upon by Centerview and D&P.

assets sold as one cohesive business.  When viewed individually, the size premium for the WACC ranges from 2.47% to 2.87%.  As discussed in detail in Appendix 7, Valuation at Section VIII.F.3, the Four Properties should have been viewed as single business unit for valuation purposes.  When viewed as a single business unit, the size premium is reduced to 1.86%, resulting in a reduction in the WACC and an increase in the enterprise value.  The resulting WACC for The Quad, Bally's Las Vegas, and The Cromwell under this analysis is 8.8%.  The WACC for Harrah's New Orleans is 8.5%.  In each instance, a long-term growth rate of 2.0% was selected to arrive at the 6.8% and 6.5% capitalization rates for the Las Vegas properties and Harrah's New Orleans, respectively.

### (C) Selection of Multiples

The Examiner selected multiples for its market approach based on the trading multiples of the GPCs at or around the time the Four Properties were transferred.  To value the Four Properties, the Examiner utilized a range of EBITDA multiples based on property-specific factors.  As discussed in detail in Appendix 7, Valuation at Section VIII.F.4, because of the construction development and material renovations to the three Las Vegas properties, forward looking EBITDA multiples are most appropriate as these properties' historical operations may not be reflective of future expectations.

The following is a summary of the multiples selected by the Examiner for each of the Four Properties:

**Four Properties Figure 53:  Selected Multiples**

| TTM EBITDA Multiple | Low | High |
|---|---|---|
| The Quad | NA | NA |
| Bally's Las Vegas | NA | NA |
| The Cromwell | NA | NA |
| Harrah's New Orleans | 9.0 x | 10.0 x |

| 2014E EBITDA Multiple | Low | High |
|---|---|---|
| The Quad | NA | NA |
| Bally's Las Vegas | 10.0 x | 11.0 x |
| The Cromwell | NA | NA |
| Harrah's New Orleans | 8.5 x | 9.5 x |

| 2015E EBITDA Multiple | Low | High |
|---|---|---|
| The Quad | 9.5 x | 10.5 x |
| Bally's Las Vegas | 9.5 x | 10.5 x |
| The Cromwell | 9.5 x | 10.5 x |
| Harrah's New Orleans | NA | NA |

Source: See Appendix 7: Valuation Analyses for support.

As discussed in detail in Appendix 7, Valuation at Section VIII.F.4, the selected multiples for the three Las Vegas properties were based on both a qualitative and quantitative analysis of the subject properties as compared to the Las Vegas Strip-based GPCs, as well as the regional GPCs, and are generally bracketed around the median multiples of all the GPCs.  The three Las Vegas properties would command higher multiples than regional properties and would be more in line with the Las Vegas GPCs due to their location on the Las Vegas Strip. Accordingly, the multiples selected by the Examiner take into account both qualitative and quantitative factors, resulting in multiples lower than the Las Vegas GPCs.

### (D) Management Fees

In determining the value of the management fees associated with the Four Properties, the same projections, discount rates, and capitalization rates with respect to the Examiner's DCF analysis were utilized.  The projected management fees were based on 2% of projected revenues and 5% of projected EBITDAM, with 50% of the total management fee values.[2603]  The resulting estimated management fees were reduced by the appropriate tax rate and then discounted to present value at a discount rate consistent with the WACC utilized in each of the subject property valuations.

### (E) Transfer of Land

As discussed above, as part of the Four Properties Transaction, approximately 31 acres of undeveloped land were transferred from CEOC to CGP for no additional consideration.  As set forth in detail in Appendix 7, Valuation at Section VIII.G.2 and Exhibit I to Appendix 7, the Examiner estimates that the value of the transferred land as of May 2014 closing was $3.5 million to $4.5 million per acre, totaling $109 million to $140 million.

### (F) Valuation Conclusion

The Examiner's aggregate valuation determination, which includes the Four Properties (including the value for their continued access to Total Rewards), management fees and transferred land, is as follows:[2604]

---

[2603] EBITDAM stands for earnings before interest, taxes, depreciation, amortization and management fees.

[2604] This does not include the value of Total Rewards and other intellectual property transferred to CES as part of this transaction.  The Examiner considered, but did not rely upon, precedent transactions in reaching his valuation conclusion.

**Four Properties Figure 54:  Valuation Conclusions for
Four Properties, Management Fees and Undeveloped Land**

| Total - Four Properties Transaction | Low | High |
|---|---|---|
| **Total Enterprise Value** | **$ 2,592.4** | **$ 2,968.3** |
| Less:  Cromwell Debt Assumed | $   (185.0) | $   (185.0) |
| **Total Equity Value - Casino Properties** | **$ 2,407.4** | **$ 2,783.3** |
| Add:  Excess Land | $   109.0 | $   140.0 |
| **Total Equity Value - Casino Properties and Excess** | **$ 2,516.4** | **$ 2,923.3** |

Note:  Values reflected above do not include any amount associated with Total Rewards or CES.

Set forth below is a summary of the transaction price compared to:  (i) the values determined by Centerview and D&P; (ii) the values resulting from performing a sensitivity analysis to correct certain of the inputs used by Centerview and D&P; (iii) the values offered by other parties; and (iv) the Examiner's valuation of the assets.[2605]  The values below do not include any additional value that was transferred in connection with the CES/Total Rewards Transaction.[2606]

---

[2605]  The sensitized values do not include any value associated with the excess land or the royalty fees owed by CERP for its access to Total Rewards and the enterprise services.

[2606]  The values calculated by other parties, including creditor groups, were (i) preliminary in nature, (ii) based on incomplete information, (iii) not intended to reflect an opinion, (iv) provided on the express understanding that the views expressed were not binding or admissible as evidence in any litigation and (v) being provided on a "not for attribution" basis to the Examiner.

**Four Properties Figure 55:  Summary of Values**

| *amounts in millions* | Properties and Mgmt Fees | | Additional Value of Excess Land | | Total Value | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| *Transaction Price* | $ 2,000 | $ 2,000 | | | $ 2,000 | $ 2,000 |
| Centerview | $ 1,820 | $ 2,335 | | | $ 1,820 | $ 2,335 |
| Duff & Phelps | $ 1,802 | $ 2,191 | | | $ 1,802 | $ 2,191 |
| Centerview - Sensitized | $ 2,273 | $ 2,908 | | | $ 2,273 | $ 2,908 |
| Duff & Phelps - Sensitized | $ 2,243 | $ 2,578 | | | $ 2,243 | $ 2,578 |
| Baker Tilly | $ 2,210 | $ 2,930 | | | $ 2,243 | $ 2,578 |
| Creditor Group 1 | $ 3,137 | $ 3,893 | $ 256 | $ 384 | $ 3,393 | $ 4,277 |
| Creditor Group 2 | $ 2,400 | $ 2,920 | $ 129 | $ 469 | $ 2,529 | $ 3,389 |
| **Examiner Valuations** | **$ 2,592** | **$ 2,968** | **$ 109** | **$ 140** | **$ 2,701** | **$ 3,108** |

Note:  Values reflected above represent enterprise value and are not presented net of the Cromwell debt assumed. Values also do not include any amount associated with Total Rewards or CES.

### ii.    CEOC Was Insolvent at the Time of the Transaction

As discussed in Section V, Solvency, *supra*, there is overwhelming evidence that CEOC was insolvent at the time the Four Properties Transaction closed in May 2014.

### iii.    The Section 546(e) Safe Harbor Defense Does Not Apply Here

As noted above, CAC/CGP, CEC and the Sponsors have also argued that any constructive fraudulent transfer claim asserted in connection with the Four Properties Transaction would be barred by section 546(e)'s "safe harbor" provisions.  The Examiner disagrees for the same reasons set forth in his discussion of the Growth and CERP transactions. The Four Properties Transaction, like the aforementioned transactions, was accomplished in numerous steps, involving multiple parties and agreements, including among others the transfer of membership interests in limited liability companies, the creation of a joint services company (CES), and the grant of expansive licenses to CEOC's IP to CES (which sublicensed CEOC's IP to CGP and CERP for no additional consideration).  It is unlikely, in the Examiner's view, that any of these transfers would be construed by a court to have been made in connection with a securities contract (or by, to, or for the benefit of, a financial participant).[2607]

---

[2607]  The Sponsors also argue that the presence of legal counsel precludes a finding of the intent required to find an actual fraudulent transfer.  Again, as discussed in Section V.III.B, while advice of counsel is relevant to the analysis, it is not dispositive, particularly where, as here, many of the badges of fraud and other factors discussed above did not involve legal advice.

### iv.   Remedies for Constructive Fraudulent Transfer

Although the Bankruptcy Code does not specify when a court should order a return of the property rather than payment of the value of the property, monetary damages is the most common remedy.[2608]   CEOC's monetary damages for constructive fraudulent transfer arising from the Four Properties Transaction would be greater of the value of the transferred assets at the time of the transfer and the value of the transferred assets at the time of a judgment.   Any recovery would be subject to a lien or offset to any good faith transfer for the value of the consideration and improvements to the properties.

With regard to the Four Properties themselves, the Examiner concludes (assuming that CGS is a good faith transferee) that the shortfall in the value of those assets was between $592 million and $968 million.   The value of the undeveloped land was between $109 million and $140 million.   CEOC, however, is not entitled to any additional damages from CGP for the Four Properties' access to Total Rewards and shared services because (i) this value was embedded in the EBITDA and purchase price paid for the Four Properties, and (ii) CEOC still receives the management fees for the CGP Properties.   By contrast, CERP has never compensated CEOC for its continuous access to Total Rewards and shared services.   Accordingly, there is a strong claim that, upon the creation of CES, CEOC was damaged in an amount equal to the net present value of what it would reasonably have earned from CERP for continued access to Total Rewards and other IP going forward.

A similar, albeit slightly less robust, claim exists with regard to CERP's continued access to management services that were once provided by CEOC but are now within CES's purview. The reason for this difference is that it is theoretically possible that, with regard to such services, CERP may have been able to make alternate arrangements that might have lessened the amount of or even eliminated such management fees on a going forward basis.   CERP's access to and reliance on Total Rewards, on the other hand, is not at all fungible given the uniqueness of that IP.   The value of this part of the claim and other claims arising out of the creation of CES are discussed in Section VIII.F, *infra*.[2609]   Finally, CEOC also possesses a claim against either or both of its co-venturers in CES (most likely, CGP) based on its having been allocated a disproportionate share of indirect costs between January 2015 and October 2015.   Based on its share of Net Revenue, CEOC appears to have overpaid by some $14.5 million during that timeframe.

---

[2608]   While monetary damages are the most likely remedy, a court in its discretion could also order a return of the assets.   *See Hebenstreit v. Kaur*, 619 F. App'x 529, 532 (7th Cir. Oct. 23, 2015) ("the bankruptcy court has discretion to award the trustee the actual property *or* its pre-transfer value"); *USAA Fed. Savings Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010) ("If a bankruptcy court permits the trustee recovery, the court has discretion whether to award the trustee recovery of the property transferred or the value of the property transferred.").

[2609]   In addition, as discussed in Section VIII.F, *infra*, it is possible that CEOC's loss of control over the Total Rewards IP and its ability to provide management services could theoretically give rise to a claim for damages, but any such claim would be too speculative to value based on the current record.

While, as noted above, monetary damages are the most common remedy, certain creditor groups have indicated if litigated, they would seek a return of the assets transferred (the Four Properties, the undeveloped land and the license granted to CES) rather than pursue a damages remedy. If a court orders a return of the assets, CAC/CGP will have to establish that it was a good faith transferee to get a lien for the consideration it paid (*i.e.*, $1.815 billion, plus the assumption of the Cromwell's $185 million credit facility) rather than an unsecured claim for that amount in CEOC's Chapter 11 proceeding.

Ordering a return of the properties would be problematic for several reasons. First, it would be difficult to "unscramble the eggs" and separate out the improvements and place values on those improvements and other enhancements that CAC/CGP have made to the properties over the past two years.

Second, it would be difficult to separate out the license from the CES Agreements and dissolving CES poses serious difficulties given its integral role in the Four Properties Transaction. Indeed, the creation of CES and transfer of Total Rewards were "critical elements of the transaction" and CAC would not have purchased the Four Properties without assurances that the Four Properties would have continued access to Total Rewards.[2610] Thus, to dissolve CES could mean a return of the Four Properties, along with the problems enumerated above. It would also be difficult to replace the license by shared services agreement similar to the ones previously entered into by CEOC, as they are not bankruptcy remote. And courts are reluctant to order forward-looking relief, such as a compulsory license.[2611] However, the sorts of extraordinary circumstances justifying equitable relief may be present here, and it is possible that a court would attempt to impose a remedy by which CEOC's intellectual property is returned, but access to same for CGP (and CERP) continues through some other mechanism.[2612]

Whether CGP qualifies as a good faith transferee is a difficult issue. As discussed above, there is evidence that CAC set up a special committee and retained expert legal and financial advisors in order to ensure that fair value was paid, and that the price the CAC Special Committee ultimately agreed to pay represented the maximum CAC/CGP was willing to pay for the Four Properties and related management fee stream.

---

[2610] Transaction Agreement §8.18 (Mar. 1, 2014), at CEOC_INVESTIG_00066153 [CEOC_INVESTIG_00066086]; M. Cohen Oct. 16, 2015 Tr. at 261:16-262:11; M. Beilinson Oct. 6, 2015 Tr. at 60:8-61:5; 67:19-69:2.

[2611] *See* J. McCarthy, *Trademarks and Unfair Competition*, §30:85 (4th ed.) ("The imposition of a compulsory license, permitting the infringer to continue by paying a court-determined royalty to the trademark owner is not a proper remedy."); *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208 (3d Cir. 1999) ("The objections to the royalty award are well taken. . . . The court's award of a royalty for future sales put the court in the position of imposing a license neither party had requested or negotiated.").

[2612] *See, e.g., In re Blackstone Potato Chip Co., Inc.*, 109 B.R. 557, 561-62 (Bankr. D.R.I. 1990) (granting debtor's motion to reject a licensing agreement and return license and trade name back to debtor and allowing debtor "to negotiate a new licensing agreement" where consideration for the prior license was "less than reasonably equivalent value").

Counterbalancing this evidence, however, are a number of other factors:

- Being aware that CEC refused to provide a representation as to CEOC's solvency, the CAC Special Committee had to assume it was insolvent.

- The CAC Special Committee was certainly aware that CEC/CEOC was under significant pressure to sell assets to plug a liquidity gap and avoid a going concerning qualification, *i.e.*, that this was effectively a "distressed sale." Indeed, while negotiating the transaction, the CAC Special Committee acknowledged its potential negotiating leverage in light of CEOC's need to expeditiously address its liquidity issues.

- The CAC Special Committee was also aware of the fact that there were other important aspects of this transaction, *e.g.*, the creation of CES and the licensing of Total Rewards to the CERP properties, for which no additional consideration was paid to CEOC.

- Although witnesses have said that the CAC Special Committee did not demand the CEC prepare revised projections that would justify paying a lower price, it certainly provided an impetus, was aware it was being done, and was provided the results.

Weighing all of these factors, the conflicting evidence, and the submissions of the parties, the Examiner has concluded that, on balance, there is a weak claim that CAC/CGP was *not* a "good faith" transferee under sections 548(c) and 550(e) of the Bankruptcy Code. Because a special committee of independent CAC directors negotiated the transaction on behalf of CAC/CGP, it is unlikely that a court would impute the Sponsors' intentions in pushing the Four Properties Transaction (which included better positioning of CEC's and the Sponsors' interests in the event of a restructuring or a bankruptcy) to CAC/CGP.[2613]   Further, while, as noted above, the CAC Special Committee was aware of CEOC's pressing solvency issues, the evidence does not demonstrate that the committee had reason to know that it was receiving funds resulting from a fraudulent transfer or was otherwise operating "in bad faith."[2614]

---

[2613] *See Burtch v. Masiz (In re Vaso Active Pharm., Inc.)*, No. 10-10855, 2012 WL 4793241, at *16 (Bankr. D. Del. 2012).

[2614] *See*, *e.g.*, *In re Equip. Acquisition Res., Inc.*, No. 14-2174, 2015 WL 5936354, at *6 (7th Cir. Oct. 13, 2015) (holding that defendant transferee, which the court concluded received sales proceeds "in good faith," was not required to investigate, chase down red flags or inquire as to the nature of the proceeds of the transaction).   Some courts in the Seventh Circuit have, however, adopted what appears to be a more restrictive view of the good faith transferee defense. *See In re Sentinel Mgmt. Grp.*, No. 15-1039, 2016 WL 98601, at *2 (7th Cir. Jan. 8, 2016) (holding that defendant transferee's mere suspicion of fraud put it on inquiry notice and necessitated an investigation).   The facts in *Sentinel* are, however, more egregious than those at issue here.   For instance, in *Sentinel*, there was significant evidence that the defendant transferee suspected that the transfer was fraudulent.   *Id*. at *2-5.

### c.  Actual Fraudulent Transfer

The Examiner also concludes that there is a strong actual fraudulent transfer claim arising out of the Four Properties Transaction based on several badges of fraud and other indicia that suggest an actual intent to hinder or delay CEOC's creditors:  (i) CEOC was insolvent at the time of the transaction; (ii) CEOC did not receive reasonably equivalent value for the assets sold; (iii) the assets were transferred to an insider – CGP, which was under common control by CEC and the Sponsors; (iv) CEC and the Sponsors effectively retained possession and/or control of the assets through their respective interests in CGP and CAC; (v) evidence indicates that the Sponsors, motivated by concerns of a CEOC bankruptcy, contemplated licensing Total Rewards and transferring its system-wide management responsibilities to a new entity (and directed Paul Weiss to draft term sheets, for that reason, and possibly on the assumption that CES would be created as part of the transaction) before the CAC Special Committee demanded that Total Rewards be transferred to a "bankruptcy-remote" entity;[2615] (vi) the process by which the Four Properties Transaction was negotiated and approved was plainly deficient (as discussed herein); and (vii) prior to the May 2014 closing, CEC and the Sponsors were aware of allegations by certain creditors that, *inter alia*, CEOC was insolvent, lacked independent directors to protect its interests, and was transferring the assets for inadequate consideration.

Also, there is evidence that the same goals that motivated the Sponsors and CEC to push the Growth Transaction were again at play with respect to the Four Properties Transaction:  (i) better positioning of CEC's and the Sponsors' interests in the event of a restructuring or a bankruptcy; and (ii) allowing CEC to maintain indirect ownership of the assets.[2616]  Moreover, as discussed above, removing the Four Properties from CEOC made it even less likely that CEOC would be able to pay its debts as they matured – particularly since the proceeds of the transaction

---

[2615]  As discussed above, Apollo and Paul Weiss were actively working on creating CES before the CAC Special Committee demanded its creation in its January 26, 2014 indication of interest. That demand focused only on Total Rewards, not management services.  There is evidence that the lenders to CAC were focused on the latter.  Even if CEC and the Sponsors contend that they began this process in anticipation of a demand by CAC regarding the transfer of these assets to a bankruptcy-remote entity, they understood that this demand would have been because of CAC's concerns regarding a CEOC bankruptcy.  Notably, relevant witnesses deny that the Sponsors participated in the initial agreement to include a services company.

[2616]  While, in analyzing actual fraudulent transfer, courts assess the intent of the transferor (here, CEOC), for the same reasons discussed in Section VIII.B, *supra*, with respect to the Growth Transaction, the Examiner finds that there is a reasonable argument that the motivations of the Sponsors and CEC would be imputed to CEOC, given the extent of their dominance and control over CEOC and its decision-making.  *Grede v. Bank of New York*, No. 08 C2582, 2009 WL 1657578, at *2 (N.D. Ill. June 12, 2009) ("Where 'principal and agent are one and the same,' the agent's knowledge is imputed to the principal regardless of whether the agent has abandoned the corporation's interest.") (quoting *Mediators, Inc. v. Manney* (*In re Mediators, Inc.*), 105 F.3d 822, 827 (2d Cir. 1997)); *Manning v. Wallace* (*In re First Fin. Assocs., Inc.*), 371 B.R. 877, 892-93 (Bankr. N.D. Ind. 2007) ("Many courts have held that in the context of a corporate debtor, courts may look into the fraudulent intent of its controlling members.") (citing *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983)).

were used to fund operating costs and interest, not to pay down debt. The analysis by Centerview which was presented to the CEC Special Committee made clear that the consequences of these transactions was a CEOC that was materially financially weakened.

As noted above, CEC and the Sponsors, among others, have argued that the presence of a legitimate business purpose precludes any finding of an actual fraudulent transfer, even if the transfer at issue also served the purpose of hindering creditors. The Examiner disagrees. As discussed in Appendix 5, Legal Standards at Section I.C.1.a.ii, courts have repeatedly stated that if a debtor has the intent to hinder or delay creditors, then the transfer is fraudulent even if the transfer is motivated, in part, by an alternate, legitimate purpose.[2617]

As with respect to the Growth Transaction, the contrary argument made by CEC and the Sponsors appears to be based upon a misunderstanding of the "legitimate supervening purpose" aspect of a badges of fraud analysis that may be conducted to find fraudulent intent.[2618]

The Examiner finds that, from CEC and the Sponsors' perspective, creating "runway" for CEOC was motivated, in significant part, by their desire to avoid an earlier bankruptcy that would have put their equity at risk. They knew or should have known the inevitable fact that the transaction would make it less likely that CEOC could service its debts and the Centerview analysis, along with the presence of several badges of fraud, provides support for a finding of the necessary intent for an actual fraudulent transfer.

The remedies available for actual fraudulent transfer are the same as the remedies available for constructive fraudulent transfer.

### d. Breach of Fiduciary Duty

As set forth below, the Examiner concludes that, while the process by which the Four Properties Transaction was negotiated and approved was slightly improved as compared to the

---

[2617] *See, e.g., In re Sentinel Mgmt. Grp.*, 728 F.3d at 666 (finding actual fraudulent transfer where the "natural consequence" of defendant investment manager's conduct was to "render funds permanently unavailable to [its] clients" even though this may not have been the investment manager's primary motivation); *Nelmark v. Helms*, No. 02 C 0925, 2003 WL 1089363, at *2 (N.D. Ill. Mar. 11, 2003); *United States v. Engh*, 330 F.3d 954, 956 (7th Cir. 2003); *In re Blatstein*, 192 F.3d 88, 97 (3d Cir. 1999); *In re Adeeb*, 787 F.2d 1339, 1343 (9th Cir. 1986); *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1455 (W.D. Mich. 1988); *Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239, 1247 (D.C. 2012).

[2618] As discussed in Section VIII.B, where several badges of fraud exist, there is a presumption of fraudulent intent, and the burden of proof shifts to the transferee to prove a "legitimate supervening purpose." *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998) (citing *In re Acequia, Inc.*, 34 F.3d 800, 806 (9th Cir.1994)). If the evidence shows a "dual" purpose, then the evidence of the alternate legitimate justification will not rise to the level of being a "supervening" purpose. *See AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 354 (D. Mass. 2012); *Aptix Corp. v. Quickturn Design Systems, Inc.*, 148 F. App'x 924, 929 (Fed. Cir. 2005).

Growth Transaction (where the Sponsors served as the lead negotiators on behalf of CAC/CGP), there are nonetheless strong breach of fiduciary duty claims against the CEOC directors who approved the Four Properties Transaction and CEC, as CEOC's controlling shareholder.[2619]

Because CEOC's directors and CEC stood on both sides of the transaction,[2620] the entire fairness standard of review applies.[2621]    Accordingly, CEOC's directors and CEC have the burden to demonstrate that the transaction was entirely fair to CEOC (factoring in the interests of its creditors).[2622]

### i.    The Process by Which the Four Properties Transaction Was Negotiated and Approved Was Seriously Flawed

The Examiner concludes that the process by which the Four Properties Transaction was negotiated and approved was seriously flawed, given the lack of involvement of any independent CEOC directors, coupled with the fact that CEOC did not have access to independent financial or legal advisors.[2623]    Indeed, independent directors were not added to CEOC's Board until June 2014, after the Four Properties Transaction closed.  As noted above, the CEOC directors who did

---

[2619]  As discussed in Appendix 5, Legal Standards at Section I.J.1, directors and officers of an insolvent wholly-owned corporation owe fiduciary duties of care and loyalty to the corporation for the benefit of its residual claimants, including creditors.  *See, e.g., Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015).  On May 2, 2014, prior to the CEOC Board's execution of written consents approving the Four Properties Transaction, a provision was added to CEOC's Articles of Incorporation eliminating liability for damages based on a breach of the duty of *care* by CEOC's directors.  This exculpation provision does not have any effect on the liability of  CEOC directors for any acts or omissions occurring prior to May 2, 2014.  *See* Del. Code Ann. tit. 8, §102(b)(7).  Nor does this provision apply to (i) breaches of the duty of loyalty (*i.e.*, the type of breach of fiduciary duty at issue here) or intentional misconduct by directors, or (ii) breaches of any fiduciary duties by officers or controlling shareholders.  *See id*. at §102.

[2620]  In light of its 100% ownership of CEOC and its 58% equity interest in CGP, CEC stood on both sides of the Four Properties Transaction.  So too did Loveman and Hession, since in addition to approving the transaction in their capacity as CEOC Board members, they served as CEC officers at the time of the transaction.

[2621]  *See Quadrant Structured Products Co. v. Vertin,* 102 A.3d 155, 183 (Del. Ch. 2014) ; *Blackmore Partners v. Link Energy LLC*, Civ. A. No. 454-N, 2005 WL 2709639, at *5 (Del. Ch. Oct. 14, 2005); *Americas Mining Corp. v. Theriault*, 51 A.3d 1213, 1240 (Del. 2012); *Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 412 (Del. Ch. 1999); *In re Tyson Foods, Inc*., 919 A.2d 563, 596 (Del. Ch. 2007).

[2622]  *In re Nine Sys. Corp. S'holders Litig*., No. CIV.A. 3940-VCN, 2014 WL 4383127, at *34 (Del. Ch. Sept. 4, 2014).

[2623]  *See In re Loral Space*, 2008 WL 4293781, at *22 (fair process prong not met where "[f]or starters, the composition of the Special Committee was flawed"); *Gesoff v. IIC Indus. Inc.*, 902 A.2d 85, 97 (Del. 2006) (finding that process was "crippled by the . . . complete lack of independent legal and financial advice").

approve the transaction – Loveman and Hession – did so only via written consents *after* the transaction had been negotiated and the price had been set. While it appears that Loveman and Hession were not motivated by a desire to benefit themselves to the detriment of CEOC (and, to the contrary, appear to have believed that CEC's and CEOC's interests were aligned), they were, in any event, interested in the transaction and lacking in independence, given their roles as CEC executives and the fact that CEC stood on both sides of the transaction.[2624] They were also shareholders of CAC, which had a significant equity interest in CGP.

Nor could the CEOC Board abdicate its fiduciary obligations by deferring to the CEC Special Committee.[2625] The CEC Special Committee members owed their fiduciary duties to CEC, which, unlike CEOC, stood on both sides of the transaction. Although CEC, as CEOC's controlling stockholder, owed a fiduciary duty to CEOC, CEC's directors – including Kleisner and Swann – did not.[2626] Evidence of this fact came through loud and clear in the evidence presented to the Examiner. For instance, while Kleisner stated that he did not see a conflict between CEC and CEOC, he acknowledged that, to the best of his recollection, CEOC, its obligations and its creditors "were not a consideration" of the CEC Special Committee in evaluating and negotiating the Four Properties Transaction.[2627] In short, even if the CEC Special Committee in good faith discharged its duties to CEC's stockholders (and the Examiner does not suggest otherwise), it could not be entrusted with protecting the interests of CEOC's stakeholders, including creditors.[2628]

The foregoing, standing alone, leads the Examiner to conclude that the process associated with the Four Properties Transaction was not entirely fair. There were, however, other shortcomings as well. These included, among other things, the dominant role played by the

---

[2624]   Under the entire fairness standard, the transaction itself must be objectively fair, regardless of the subjective intent of CEOC's directors. *See Reis v. Hazelett Strip-Casting Corp.*, 28 A.3d 442, 459 (Del. Ch. 2011) ("Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.").

[2625]   *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (the "board, in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder").

[2626]   *See Trenwick Am. Litig. Trust v. Ernst & Young LLP*, 906 A.2d 168, 194 (Del. Ch. 2006) (emphasizing that, even where a controlling stockholder owes a fiduciary duty to a corporation, the controlling stockholder's individual directors do not).

[2627]   F. Kleisner Jan. 28, 2016 Tr. at 39:12-21.

[2628]   *See Reis*, 28 A.3d at 459 ("Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs.").

Sponsors, and Apollo in particular, in conceiving of and driving the transaction, including by identifying the assets to be sold by CEOC.[2629]

Aside from the fact that it consisted of independent directors from the wrong board, the limited authority of the CEC Special Committee also raises concerns.[2630]  Most notably, while certain documents, including the CEC December 2013 Regulatory deck, contemplated marketing the Four Properties to third parties, as discussed above, the Sponsors and CEC mandated that the properties remain in the Caesars network.  Accordingly, the CEC Special Committee was not authorized to market or sell the properties to non-CEC affiliates or to otherwise pursue alternative transactions and strategic options.  While language was added to the committee's mandate granting it authority to "obtain advice" concerning alternative transactions and strategic options, the evidence indicates that the CEC Special Committee did not seriously consider or obtain any such advice.  For the reasons discussed above, the Sponsors', CEC's and the CEC Special Committee's argument in defense that third parties outside of the Caesars network and without access to Total Rewards would have paid materially less for the assets than would a CEC affiliate is not persuasive because, among other reasons, neither CEC nor the CEC Special Committee ever tested the market for interested third party buyers or seriously considered the possibility of selling the assets to a non-CEC affiliate.[2631]

It also appears that the CEC Special Committee, possibly under pressure from the CAC Special Committee and Lazard, directed a reexamination of the management projections, which as discussed above, caused CEC management to lower the financial projections relied upon by Centerview and D&P to value the Four Properties in order to ensure a fairness opinion at the set deal price.  While the intent of the CEC Special Committee may not have been to mandate these changes, the fact that they were made after the committee directed that CEC management review the January Business Plan is hardly surprising.  As discussed above, the CEC Special Committee and its financial advisors ultimately relied upon the projections included in the materially lower February Business Plan instead of the January Business Plan.  The latter, as discussed above, was based on CEC's long-range plan, which had been approved by the board and, as updated in the ordinary course, including in March 2014, continued to be used for all other purposes, including in CEC's dealings with auditors, lenders and regulators (and in presentations to the CEC Board).

---

[2629]  *See, e.g., In re Loral Space*, 2008 WL 4293781, at *2 (entire fairness standard not met where dominant shareholder "set in motion a process in which the only option that the Special Committee considered was a deal with [the dominant shareholder] itself"); *Sealy Mattress*, 532 A.2d at 1333 (entire fairness standard not met where, *inter alia*, majority stockholder "stood on both sides of the proposed merger and fixed its terms" and directors "[functioned] in a ministerial capacity to carry out the parent [corporation's] bidding").

[2630]  *See In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 797 (Del. Ch. 2011) (finding that process was unfair under entire fairness standard because, among other reasons, the special committee "had a narrow mandate" to 'evaluate' a transaction suggested by the majority stockholder"); *CNX Gas Corp. S'holders Litig.*, 4 A.3d 397, 414 (Del. Ch. 2010) (finding that process was not fair because, among other reasons, "the Special Committee was not provided with authority comparable to what a board would possess in a third-party transaction").

[2631]  *In re Loral Space*, 2008 WL 4293781, at *20-22.

The February Business Plan, by contrast, was not used for any other purpose other than Centerview's fairness opinion.

"Delaware courts generally accord greater weight to contemporaneous management forecasts prepared in the ordinary course of business"[2632] and have "consistently expressed a preference for the most recently prepared management projections available as of the [transaction] date."[2633]  Defendants must be able to point to "legitimate reasons" for making "modifications" to such projections.[2634]  Witnesses from CEC, the CEC Special Committee, and CAC maintain that it was appropriate for the CEC Special Committee to abandon the January Business Plan because they were too optimistic, underscored by Caesars' apparent routine failure to make its company-wide budgets.[2635]  The Examiner disagrees.  As discussed above, while Caesars, as a whole, routinely missed budgets, this was, in material measure, due to its failures to forecast the Atlantic City market collapse, where EBITDA declined 78% (from $602 million to $131 million) between 2008 and 2014.[2636]  In the years preceding the Four Properties Transaction, the Four Properties met projections in some years and not in others.  In the aggregate, they missed budgets by only 2.8%.[2637]  The reductions reflected in the February Business Plan were, in the aggregate, 12% – a substantially greater reduction.

Furthermore, the CEC and CAC Special Committees knew (or should have known) that, pursuant to the CES Agreements, CERP would be granted a broad, irrevocable sublicense to the Total Rewards IP in addition to continued access to the shared services, despite the fact that it paid no additional consideration (and, in fact, has never paid any consideration) to CEOC, and that this would be detrimental to CEOC.  Additionally, the CEC Special Committee's evident unawareness of the fact that, as part of the transaction, 31 acres of undeveloped land owned by CEOC were also transferred to CGP is a concern.  So, too, is the fact a significant portion of

---

[2632]  *See In re U.S. Cellular Operating Co.*, 2005 WL 43994, at *12 n.65.

[2633]  *See In re Emerging Comm'ns, Inc. S'Holders Litig.*, No. Civ.A. 16415, 2004 WL 1305745, at *14 (Del. Ch. June 4, 2014).  It is unclear why the Q1 2014 long-range plan projections were not provided to Centerview and D&P.

[2634]  *See id.*

[2635]  *See Merlin Partners LP*, 2015 WL 2069417, at *8 (Del. Ch. 2015) (rejecting use of "indisputably optimistic" projections); *In re Appraisal of Ancestry*, Civ.A No. 8173-VCG, 2015 WL 399726, at *6 (Del. Ch. 2015) (declining to use management projections that were too "optimistic"); *Doft & Co.*, Civ.A. No. 19734, 2004 WL 1152338, at *5-6 (Del. Ch. May 20, 2004) (Delaware courts question projections when there are grounds to do so).

[2636]  *See* Monthly Actual versus Budget Analysis for 2007-Q1 2015 [CEC_EXAMINER_0145430] (native file) (includes Harrah's Atlantic City, Showboat, Bally's Atlantic City, Caesars Atlantic City and Harrah's Philadelphia).

[2637]  *See* Appendix 7, Valuation at Section VIII.B.1.  While CAC makes much of Deloitte's remark that CEOC was "lousy" at projecting future performance, this comment concerned the time period from 2009 through 2012.  Deloitte noted that by 2013, CEC's projections "became much more reasonable."  "Caesars Growth Properties Holding, LLC Year End ASC 350 & 360 Retrospective Review" (Sept. 30, 2014), at "HNO" Tab [DT0000169] (native file).

Centerview's compensation was contingent on consummation of the transaction envisioned by the Sponsors. Although the Delaware Supreme Court has noted that "[a] contingent compensation arrangement that pays an advisor a percentage of the deal value can have the salutary effect of aligning the interests of the advisor with those of its client in attempting to obtain the best value," that is not the case here where Centerview stood to receive a contingent flat fee upon consummation, no matter how high or low the deal price.[2638]   As the Delaware Supreme Court has explained, this type of contingent compensation arrangement can create a "misalignment over whether to take a deal in the first instance, and divergence could arise over how to proceed during final negotiations."[2639]

CEOC's directors and CEC have both signaled an intent to rely on an advice of counsel defense. As set forth in Appendix 5, Legal Standards at Section I.J.1.d, where, as here, fiduciaries are accused of having breached their duty of loyalty (as opposed to their duty of care), reliance on advice of counsel – even if reasonable and in good faith – is at most one factor that a court is to consider in assessing the fairness of the process.[2640]   Here, the Examiner concludes that this defense, even if established, would be insufficient to overcome the pervasive process deficiencies detailed above.

### ii.   CEOC Did Not Receive Fair Value for the Assets

Delaware courts hold that a "grossly unfair process can render an otherwise fair price . . . not entirely fair."[2641]   As discussed above, the Examiner finds that, process flaws aside, CEOC did not receive fair value for the assets it transferred as part of the Four Properties Transaction, including because (i) Centerview's and D&Ps' respective fairness analyses were deficient in several respects, and (ii) the Examiner has determined that the actual value the transferred assets was significantly higher than the $2 billion purchase price (including $185 million of assumed debt at The Cromwell).[2642]   The flawed process by which the transaction was negotiated and approved only reinforces the Examiner's conclusion that CEOC did not receive fair value for the transferred assets.[2643]

CEC, CAC and the Sponsors contend that the $2 billion purchase price (including $185 million of assumed debt at the Cromwell) constituted fair or reasonably equivalent value because there is no evidence that the CAC Special Committee would have agreed to a higher purchase price, let alone within the timetable necessary for CEC to avoid a going concern qualification. The Delaware Court of Chancery rejected a similar argument in *Loral.* There, the defendants argued that the price agreed to in connection with a transaction with a dominant shareholder was

---

[2638]  *RBC Capital Markets, LLC v. Jervis*, No. 140, 2015 WL 7721882, at *35 (Del. Nov. 30, 2015).

[2639]  *Id.*

[2640]  *See Valeant Pharm. Int'l v. Jerney*, 921 A.2d 732, 751 (Del. Ch. 2007).

[2641]  *In re Nine Sys.*, 2014 WL 4383127, at *47.

[2642]  *See* Appendix 7, Valuation at Section VIII.

[2643]  *See id.*

fair because "there was no other source of capital that would have provided [the company] with what it needed on better terms or in the time frame it required."[2644]  The court was not persuaded, and explained that:

> When the process used involves no market check and the resulting transaction is a highly unusual one impossible to compare with confidence to other arm's-length transactions, the court is left with no reasoned basis to conclude that the outcome was fair.[2645]

A court would likely reach a similar conclusion here.  As noted above, the Sponsors and CEC's decision to preclude the CEC Special Committee from marketing the Four Properties to third parties made it impossible to determine amount a third party would have paid for the assets (and on what timetable).

Like they did in defending against potential fraudulent transfer claims, CEC, CAC and the Sponsors likewise contend that the performance of the Four Properties post-closing supports subsequent events confirm that, if anything, the properties transferred have underperformed and CAC/CGP "overpaid" for them.  Delaware law is clear, however, that the "fairness" of the purchase price "must be assessed at of the time it was agreed to, *not on the basis of later events*."[2646]  This argument is unavailing for the additional reasons specified above.

### iii.    Remedies for Breach of Fiduciary Duty

Courts have broad discretion "in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate."[2647]  Such potential relief includes actual or "out-of-pocket" damages, measured as the "difference between the consideration received and the actual value of the asset[s] at the time they were transferred," rescission, or rescissory damages.[2648]  As

---

[2644]  *In re Loral Space,* 2008 WL 4293781, at *20-22.

[2645]  *Id.*

[2646]  *Id.*, at *32, n.158 (emphasis added).

[2647]  *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) (citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983)); *accord Theriault*, 51 A.3d at 1251 ("The Court of Chancery has the historic power to grant such . . . relief as the facts of a particular case may dictate" and "has greater discretion when making an award of damages in an action for breach of duty of loyalty than it would when assessing fair value in an appraisal action.") (citations and internal quotation marks omitted); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 500 (Del. 1981) (the "choice of relief" is "largely a matter of discretion with the Chancellor").

[2648]  As discussed in Appendix 5, Legal Standards at Section I.J.1.f, where actual or out-of-pocket damages are considered inadequate, a court may instead award rescission or rescissory damages.  *In re Orchard Enterprises, Inc. S'holder Litig.*, 88 A.3d 1, 39 (Del. Ch. 2014)(citing *Strassburger v. Earley,* 752 A.2d 557, 581 (Del. Ch. 2000), and *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del. Ch. 1994) *aff'd*, 663 A.2d 1156 (Del. 1995); *see also Oberly v. Kirby,* 592 A.2d 445, 466 (Del. 1991) (stating that if transaction failed to satisfy entire fairness test, "the stockholders may . . . demand rescission of the transaction or, if that is

discussed above, the Examiner finds that CEOC's out-of-pocket damages includes: (i) between $592 million and $968 million, representing the shortfall in what CEOC received as consideration for the Four Properties (including the value for their continued access to Total Rewards) and management fees; (ii) an additional $109 million to $140 million for the undeveloped land transferred in connection with the transaction; and (iii) management/royalty fees for CERP's access to Total Rewards and the enterprise services.[2649] These damages are discussed in Section VIII.F, *infra*. To the extent that out-of-pocket damages are not ascertainable with respect to the CES/TR component of the transaction, this would be an argument in favor of partial or total rescission.[2650]

### e. Aiding and Abetting Liability

As set forth below, the Examiner concludes that there is a reasonable aiding and abetting breach of fiduciary claim against Apollo, and to a lesser extent, TPG, as well as reasonable aiding and abetting claims against the Apollo-affiliated CEC directors (Sambur and Rowan). The potential remedies for an aiding and abetting claim are identical to the remedies available for a breach of fiduciary duty discussed above.[2651]

---

impractical, the payment of rescissory damages"). Actual rescission of a consummated corporate transaction is often found to be infeasible, however, due to the "passage of time" and other factors. *Orchard*, 88 A.3d at 41 (*citing* Wolfe & Pittenger §12.04(b) at 12-68; *see also Weinberger*, 457 A.2d at 714 (finding rescission impractical to undo completed cash out merger); *Univ. Entm't Grp., L.P. v. Duncan Petroleum Corp.*, C.A. No. 4948-VCL, 2013 WL 3353743, at *15-16 (Del. Ch. July 1, 2013) (finding rescission unfeasible because over the course of approximately three years, the properties at issue had been sold to third parties); *Lynch*, 429 A.2d at 501 (rescission inappropriate where the passage of time had "brought … corporate changes"). Rescissory damages seek "(i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised control over the property in the interim and (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property." *Orchard*, 88 A.3d at 39 (citing *Strassburger,* 752 A.2d at 580-81, and *Cinerama*, 663 A.2d at 1144-47).

[2649] This calculation does not include damages related to the transfer of Total Rewards and other CEOC intellectual property to CES.

[2650] *See Orchard*, 88 A.3d at 39 (citations omitted); *Oberly v. Kirby,* 592 A.2d at 466; *Strassberger*, 752 A.2d at 578-579. In addition to the damages specified above, there is a reasonable claim to award rescissory damages to CEOC to cover, among other things, CEOC's diminution in value following the CERP, Growth and Four Properties Transactions. As discussed above, these transactions substantially changed the complexion of CEOC, leaving it with only one Las Vegas Property, Caesars Palace, and reducing its EBITDA in Las Vegas by approximately $330 million. The resulting diminution in CEOC's value as a result of the Growth and Four Properties Transactions was approximately $516 million.

[2651] As discussed in Appendix 5, Legal Standards at I.J.2.c, a defendant who aids and abets a breach of fiduciary duty is jointly and severally liable for the damages resulting from the breach and therefore the "injured person is entitled to recover his damages from [any] of the tortfeasors,

### i.   Apollo

The Examiner concludes that a court would likely find that Apollo, acting primarily through Rowan and Sambur, knowingly participated[2652] in the breaches of fiduciary duty discussed above that were committed by CEOC's directors and CEC.  Although Apollo did not negotiate the Four Properties Transaction (as it did with the Growth Transaction), it identified the CEOC "liquidity gap," conceived of the transaction, dictated the selection of the properties to be sold, and worked with Paul Weiss to develop the concept of a "bankruptcy remote" shared services entity and draft the first versions of the CES term sheets, in an apparent attempt to protect Total Rewards and other assets in the event of a CEOC bankruptcy.  By such active participation in developing and drafting the terms of CES, Apollo undoubtedly played a role in broadening the Total Rewards license and company-wide management services take over so as to benefit CERP:  from protecting the Four Properties' continued access to Total Rewards and the enterprise services to protecting the access enjoyed by *all* Caesars entities and diminishing CEOC's control over its own IP.  While it may have been sensible to protect CERP's access in the event of CEOC bankruptcy, it was not appropriate to do so without compensating a clearly insolvent CEOC.  Further, there is at least some evidence that the transactions during and preceding this time period, including the Growth, CERP and Four Properties Transactions, were part of a coordinated plan by the Sponsors, and Apollo in particular, to strengthen their hand in connection with a potential restructuring or bankruptcy, while allowing CEC to maintain ownership of the assets.  The evidence further shows that Apollo did not disclose these underlying goals to the non-Sponsor members of the CEC or CEOC Boards.

Notably, as with the Growth Transaction, Apollo structured the Four Properties Transaction so that the transferred assets were removed from CEOC and put into other entities controlled by Apollo (as well as TPG and CEC), thus allowing Apollo to effectively retain possession and/or control of these assets.  Further, as discussed above, removing the Four Properties from CEOC made CEOC even less likely to pay its debts as they matured, especially with this transaction coming on the heels of the Growth Transaction, which also removed key assets from CEOC (with the sales proceeds used to fund operating costs and interest, not pay down debt).

Apollo has signaled an intent to rely on an advice of counsel defense.  However, advice of counsel is generally not a recognized defense to a claim for aiding and abetting a breach of fiduciary duty.[2653]

---

without distinction, subject to the limitation that his total recovery may not exceed the full amount of his damage."  *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d at 220-21.

[2652]  As set forth above, for a third party to "knowingly participate" in a fiduciary's breach, the third party must take advantage of a position of trust or conflicts of interest on the part of directors, or otherwise knowingly participate in the directors' breach of fiduciary duties. *See In re Comverge, Inc.*, No. CV 7368-VCP, 2014 WL 6686570, at *17 (Del. Ch. Nov. 25, 2014); *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001).

[2653]  *See In re Del Monte Foods Co*, 25 A.3d at 838; *In re Rural Metro Corp.*, 88 A.3d at 86.

Based on the evidence above, the Examiner concludes that there is a reasonable aiding and abetting claim against Rowan and Sambur individually, given their active involvement in the Four Properties Transaction (and, especially in Sambur's case, the creation of CES) on behalf of Apollo.[2654]

### ii.   TPG

For many of the same reasons discussed above, the Examiner concludes that there is a reasonable aiding and abetting claim against TPG (albeit weaker than the aiding and abetting claim against Apollo). Although it appears that, as with the Growth Transaction, TPG played a less active role that did Apollo with respect to the Four Properties Transaction (especially as compared to Apollo), the evidence indicates that, at the very least, TPG was aware of Apollo's goal of devising a series of transactions, including the Growth and Four Properties Transactions, to, *inter alia*, protect its interests in the event of a CEOC restructuring. For instance, Rowan told the Examiner that Apollo shared its October 2012 presentation with TPG.[2655] Witnesses from TPG, however, deny that they were provided with a copy.[2656] There is also evidence that, like Apollo, TPG did not disclose these underlying goals to the CEC or CEOC Boards.[2657] Further, there is at least some evidence that TPG played a role in selecting the assets transferred as part of the transaction (albeit not a lead role like Apollo), and further did not object to – and indeed benefitted from – the transaction.[2658]

---

[2654] *See, e.g., In re Advance Nanotech, Inc.*, Case No. 11-10776 (MFW), 2014 WL 1320145, at *7 (D. Del. Bankr. Apr. 2, 2014) (recognizing claims for aiding and abetting breach of fiduciary against both lender and its principal).

[2655] M. Rowan Jan. 29 Tr. at 512:18-513:02.

[2656] Bonderman Feb. 24, 2016 Tr. at 191:9-192:10; Kranias Feb. 18, 2016 Tr. at 329:7-330:11.

[2657] *See* Sambur Oct. 29, 2015 Tr. at 423:25-424:20 (selection of the Four Properties was "a collective decision" that involved Apollo, TPG, and CEC management). *But see* G. Kranias Oct. 23, 2015 Tr. at 196:23-197:15 (stating that the Four Properties Transaction was first brought to TPG's attention at the November 26, 2013 CEC board meeting).

[2658] *See* D. Bonderman Feb. 24, 2016 Tr. at 195:7-196:4 (explaining to the Examiner that the goal was to transfer properties with excess cash flow from CEOC to a newly-created entity (CGP)).

### E.  CEOC Multiple Degradation

The transfer of Las Vegas-based assets out of CEOC during 2013 and 2014 significantly altered the complexion of CEOC.  As a result, certain creditor groups have suggested that the Four Properties Transaction may give rise to an additional damages claim based upon the alleged consequent degradation of CEOC's multiple (and resulting enterprise value).  An issue exists as to the legal basis for seeking these damages.  CEC and CAC also argue that there is no factual basis for this claim.

The Examiner believes that the "value degradation" issue is more appropriately considered in the broader context of the CERP, Growth and Four Properties Transactions collectively.  Viewed in that context, the Examiner has concluded that a reasonable argument exists that, above and beyond any damages suffered as a result of the receipt of inadequate consideration, the transfers of assets out of CEOC into CERP and CGP in 2013 and 2014 effected a transformation of CEOC into a predominately regional gaming company that, if sold, would be valued at a lower EBITDA multiple than it would have commanded had it not sold these assets.

None of the analyses performed by the financial advisors retained in connection with these transactions considered this "multiple degradation" impact in the course of their work, nor did the CEC or CEOC Boards, when approving the transactions, consider the impact of these transactions on the value of CEOC's remaining assets.  Given CEOC's precarious financial condition, and the increasing likelihood that a CEOC restructuring or bankruptcy would occur, some consideration should have been given to the overall impact the 2013-2014 asset sales would have on the enterprise value of CEOC's remaining business.  This is another instance in which independent directors and advisors acting solely on behalf of CEOC and its creditors may have asked different questions before approving these transactions.

Absent the 2013 and 2014 transfers, CEOC, on a pro forma basis, would have consisted of 35 casino/hotels[2659] six of which are located in Las Vegas (Caesars Palace, Bally's Las Vegas, the Quad, the Cromwell, Planet Hollywood, and the LINQ Retail/Observation Wheel).  The six Las Vegas properties would have produced a disproportionate percentage of CEOC's total EBITDA.  Based upon the 2015 Annual Plan, on a pro forma basis, these six properties would be expected to generate approximately 41% of CEOC's EBITDA as shown in Degradation Figure 1 below.

After the asset sales, CEOC was left with only one Las Vegas property, Caesars Palace, reducing CEOC's EBITDA in Las Vegas by approximately $330 million:

---

[2659]  Includes LINQ Retail and the Observation Wheel as well as Managed/International.

**Degradation Figure 1: 2015 Pro-Forma Projected EBITDA vs. Actual Projected EBITDA**

| amounts in millions | 2015 Pro-Forma Projected CEOC EBITDA (*i.e.*, assuming no asset transfers) | | | 2015 Projected CEOC EBITDA (post asset transfers) | | |
|---|---|---|---|---|---|---|
| | # of Properties | EBITDA | % | # of Properties | EBITDA | % |
| Las Vegas Properties | 6 | $ 615 | 41% | 1 | $ 285 | 28% |
| Regional Properties | 29 (a) | $ 899 | 59% | 27 (b) | $ 748 | 72% |
| Total | 35 | $ 1,514 | 100% | 28 | $ 1,033 | 100% |

Source: 2015 EBITDA Projections contained within Impairment Review (Dec. 31, 2014), at Tab '2) LRP' [DT0011980] (native file).

Note:

(a) Includes  Horseshoe Baltimore, Harrah's New Orleans, Harrah's Lake Tahoe, Harvey's Lake Tahoe, Harrah's Reno, Bally's Atlantic City, Caesars Atlantic City, Harrah's Philadelphia, Harrah's Joliet, Horseshoe Hammond, Horseshoe Southern Indiana, Harrah's Metropolis, Harrah's North Kansas City, Harrah's Council Bluffs, Horseshoe Council Bluffs, Harrah's Gulf Coast, Horseshoe Tunica, Tunica Roadhouse, Harrah's Louisiana Downs, Horseshoe Bossier City, London Clubs, Conrad Punta del Este, and Managed Properties (Ak-Chin, Rincon, Cherokee, Cleveland, Cincinnati, and ThistleDown and Caesars Windsor).

(b) Includes all of the above except Horseshoe Baltimore and Harrah's New Orleans.

Further, the change in the mix of EBITDA generated by Las Vegas properties versus regional properties from 41% to 28% resulted in CEOC exhibiting the financial attributes of a regional casino operator.

As reflected in Solvency Figure 20 (*see* Section VI, *supra*), regional casino companies, such as Isle of Capri and Pinnacle, command a lower multiple than Las Vegas operators.  For example, in 2014, Las Vegas-based operators traded at an EBITDA multiple of 12.4x compared to 8.4x for regional operators.  Further, a diversified portfolio of regional and Las Vegas properties may command an overall higher multiple than a group of regional properties sold individually or together.  To illustrate this concept, weighting the EBITDA multiples by the percentage of EBITDA generated at Las Vegas versus the regional properties (*i.e.*, 12.4x and 8.4x, respectively) results in a decrease of the multiple by 0.5x.[2660]  If this 0.5x multiple is applied to CEOC's projected 2015 EBITDA of $1.03 billion (*see* Degradation Figure 1), the resulting diminution in value is $516 million.

As noted above, no consideration of this fundamental change in CEOC's profile and enterprise value appears to have been given by the Sponsors, CEC, the CEC and CEOC Boards, or any of the financial advisors that were retained in connection with the Growth, CERP, and/or Four Properties Transactions.  CEC and CAC have nevertheless argued that the sale of the Las Vegas properties (i) were at fair value and (ii) thus did not alter the value of what remained at CEOC.  However, other than arguing that CEOC received fair value – an argument on which the Examiner has reached a different conclusion – CEC offered no real analysis of the issue.

---

[2660]  On a pro forma basis, 41% of CEOC's multiple would at 12.4x and 59% would be at 8.4x, resulting in a weighted multiple of 10.02x.  This is compared to a reduced actual weighted multiple of 9.5x (28% at 12.4x and 72% at 8.4x).  The difference is 0.5x.

CAC, on the other hand, attempted to rebut the creditors' argument with an analysis based on reports from Imperial Capital (dated October 31, 2013 and March 13, 2014) and Barclays (dated October 30, 2013 and March 13, 2014), setting forth their analyses and conclusions regarding the value decline at CEOC resulting from the Four Properties Transaction. But both Imperial and Barclays erroneously used implied multiples (between 8.1x and 8.9x) that do not reflect actual market multiples for regional and Las Vegas Strip properties, and their analyses appear to be based on incomplete information. CAC then made two flawed adjustments to the analysts' already questionable value conclusions. First, CAC added the consideration received in the Four Properties Transaction to the post-transaction enterprise value of CEOC. CAC did so on the theory that the sale proceeds represented "excess cash." Second, CAC subtracted from the before-and-after conclusions of the analysts the values attributed by the analysts to CEOC's Atlantic City properties, as shown in Degradation Figure 2 below.

**Degradation Figure 2: CAC's Pro Forma Analysis of Four Properties Transaction**

| (*millions*) | Barclays | | | | Imperial | | |
|---|---|---|---|---|---|---|---|
| | Before | After | Value Decline | | Before | After | Value Decline |
| **Analyst's conclusion** | $ 18,722.6 | $ 16,132.7 | $ (2,589.9) | | $ 11,545.6 | $ 9,550.0 | $ (1,995.6) |
| **CAC's Flawed Adjustments:** | | | | | | | |
| Four Properties Transaction Consideration - (Cash plus debt assumed of $185 million) | | $ 2,000.0 | | | | $ 2,000.0 | |
| Value attributed to Atlantic City | $ (2,518.2) | $ (1,942.4) | | | $ (906.6) | $ (720.0) | |
| | $ 16,204.4 | $ 16,190.3 | | | $ 10,639.0 | $ 10,830.0 | |

Neither of the adjustments made to the analysts' values by CAC appears justified. The $1.815 billion in cash consideration received in the Four Properties Transaction was not excess cash. Rather, it was working capital CEOC needed to pay its current operating costs, interest expense, and provide liquidity, with no pay-down of debt; as such, it should not have been added back to arrive at a pro forma implied enterprise value. Nor did CAC offer any persuasive explanation or rationale for deducting the values ascribed to Atlantic City, which remains very much a significant aspect of CEOC's remaining assets (and helps explain why CEOC would no longer command a high Las Vegas multiple if sold). Without these two adjustments (and leaving aside the frailties of the analyses performed by the analysts), the analysts' conclusions regarding the impact of the Four Properties Transaction on CEOC's implied consolidated enterprise value (showing a decline in overall enterprise value of between $2 billion to $2.6 billion, as shown in Degradation Figure 2) undercuts, rather than supports, CAC's position.

CAC also ignores other significant conclusions or views expressed by the analysts. For instance:

- Imperial Capital's March 13, 2014 report stated, "we believe that [CEOC] will likely be required to restructure its debt to alleviate its leverage and consistent cash

burn."[2661]

- Imperial Capital's October 31, 2013 report stated that "a relatively conservative valuation of [CEOC] is $11.7 billion."[2662]

- Similarly, at March 13, 2014, Imperial Capital placed an enterprise value on CEOC of $9.9 billion,[2663] substantially below CEOC's outstanding debt.

- The Barclays reports, dated October 30, 2013,[2664] and March 12, 2014,[2665] also estimated that the enterprise value of CEOC, based on 2015 estimated EBITDA, were less than CEOC's outstanding debt, resulting in a negative equity value.

The analyses provided by creditors to the Examiner paint a very different picture regarding the potential value diminution in value resulting from CEOC's 2013-2014 transfers of Las Vegas properties. These creditors assert that, after the sale of the Las Vegas casinos, CEOC became largely a regional operator, and have provided financial analyses to the Examiner suggesting that CEOC's multiple degradation resulted from the Four Properties Transaction. The analyses provided by these creditors argue that the impact of the loss of the Las Vegas properties resulted in a reduction in the CEOC's EBITDA multiple of 1.0x to 3x, and that, based on CEOC's 2015 estimated EBITDA, the value diminution resulting from the Four Properties Transaction alone ranged between $1.0 billion to $3.4 billion. The Examiner has reviewed these analyses, and has concluded that the degradation ranges provided by creditors overstate the impact of the asset sales. A more realistic assessment of the multiple degradation impact, based on a 0.5x decrease in the EBITDA multiple, results in a diminution in value of approximately $500 million when applied to CEOC's estimated 2015 EBITDA.

The more important question, of course, is whether damages are legally recoverable on such a basis. After considering the issue and the various submissions of the parties, the Examiner has concluded that multiple degradation is not a viable remedy for constructive or actual fraudulent transfer. The remedy under sections 548(c) and 550 of the Bankruptcy Code

---

[2661] Analyst Report: Imperial Capital – "Caesars Entertainment Corp. (CZR: $24.10 Underperform; $17 PT) Caesars Acquisition Company (CACQ: $16.19 In-Line; $15PT)" (Mar. 13, 2014) at 3; *see also* Appendix 8, Analyst Commentary at 1.

[2662] Analyst Report: Imperial Capital  – "Caesars Entertainment Corp. (CZR: $17.40 In-Line; $17 PT) Caesars Acquisition Company" (Oct. 31, 2013) at 6; *see also* Appendix 8, Analyst Commentary at 1.

[2663] Analyst Report: Imperial Capital – "Caesars Entertainment Corp. (CZR: $24.10 Underperform; $17 PT) Caesars Acquisition Company (CACQ: $16.19 In-Line; $15PT)" (Mar. 13, 2014) at 7; *see also* Appendix 8, Analyst Commentary at 1.

[2664] Analyst Report: Barclays – "Caesars Entertainment: 3Q13 Review" (Oct. 30, 2013) at 2; *see also* Appendix 8, Analyst Commentary at 1.

[2665] Analyst Report: Barclays – "Caesars Entertainment 4Q13 Review" (Mar. 12, 2014) at 2; *see also* Appendix 8, Analyst Commentary at 1.

(and state fraudulent transfer statutes) is derived from and requires a determination of the value of the property that was transferred – not the value of the property retained by the transferor.  For breach of fiduciary duty, however, courts have broad equitable powers in fashioning the most appropriate remedy, and evidence supports the fact that this loss in value was caused by these transfers, each of which involved a breach of fiduciary duty.  If fair prices had been obtained  in these transactions, it is unlikely that a court would award damages for the negative impact of these sales on the value of the remaining enterprise.  Once a court finds, however, that this is not the case, and a breach of fiduciary duty has occurred, there is a reasonable argument that (unless the properties are returned) a court would award damages for this diminution in value in order to place CEOC in the position it would have been absent the improper transfers.  The Examiner thus believes that while this issue, like others, will be vigorously contested, there exists a reasonable claim that breaches of fiduciary duty in connection with the CERP, Growth and Four Properties Transactions caused CEOC an additional $516 million in damages.

### F. Total Rewards and Property Management

#### 1. Total Rewards

As discussed *supra*, from the time of the 2008 LBO through the creation of CES in May 2014, CEOC was primarily responsible for providing shared services to Caesars properties. Creditors have raised a number of claims pertaining to these services, including access to the Total Rewards network and IP as well as the management of specific properties now owned by CERP or CGP.

Total Rewards is a proprietary and industry-leading customer loyalty program which uses advanced data analytics and behavioral tracking technologies to maximize play and profitability throughout the casino network. Recognized by Caesars witnesses as the "key to the empire," Caesars utilizes Total Rewards to tie together its regional "spoke" casinos with "hub" destination casinos in Las Vegas, New Orleans and (to a lesser extent) Atlantic City. By allowing customers to earn and redeem "credits" for gaming, dining, shopping and hotel stays at any and all Caesars properties, Total Rewards incentivizes customers to consolidate their gaming and non-gaming spending at Caesars.

Behind Total Rewards is a state-of-the-art data tracking system which monitors, collects and stores an incredible amount of detailed information about the spending patterns of Caesars customers who join the program. This allows Caesars to increase profitability across its network by targeting individual customers with specific marketing promotions (often for different properties) disseminated through mail, online advertising and social media. Accordingly, Caesars is able to generate a large amount of cross-market play, *i.e.*, play generated from customers crossing over from one Caesars property to another ("Cross-Play"). Moreover, these same marketing initiatives, based on data collected through Total Rewards and tailored to individual customers' tastes in food, drink, shopping and entertainment, have caused the percentage of non-gaming revenues at Caesars properties in Las Vegas to double. Because of these capabilities, unique among casino loyalty rewards programs, Caesars properties demonstrate an advantageous "network effect," earning significantly more than their "fair share" of revenue in both destination and regional properties.

Caesars believes that its properties are worth more within this "system" than they would be outside of it and that the EBITDA of each property thus reflects the inherent value of Total Rewards. Although there are admittedly few data points, properties new to the Caesars system have shown a demonstrable increase in gaming revenues and profitability upon gaining access to Total Rewards, and properties sold by Caesars and removed from the network have seen a concomitant drop in EBITDA.

Creditors have asserted a number of claims revolving around the Total Rewards system, the intellectual property behind which is owned by CEOC. Specifically, they allege that CEC and/or the Sponsors have: (i) used Total Rewards to divert CEOC's customers (in particular, those who spend significant amounts of money) to properties owned by CGP or CERP without compensation; (ii) allowed CERP and CGP to access Total Rewards and its treasure trove of customer data, and to utilize CEOC's management services, for little or no consideration; and (iii) failed to monetize or license Total Rewards to third parties, thus depriving CEOC of a

lucrative revenue stream to the detriment of creditors. According to various creditor groups, these alleged actions are avoidable as both constructive and intentional fraudulent transfers and also constitute breaches of fiduciary duty by CEOC's directors and CEC (as its controlling shareholder), aided and abetted by, *inter alia*, CEC's board, the Sponsors and CAC.

CEC and the Sponsors dispute these allegations. They contend that Caesars has only ever used Total Rewards in an effort to maximize value for the entire enterprise, and thus that there was never any intentional diversion of customers away from CEOC properties. With regard to the various asset transfers involved in the Growth and Four Properties transactions, they assert that the consideration provided to CEOC for those properties included the value of those properties attributable to their participation in the Total Rewards network. Finally, CEC and the Sponsors point to the now-extinct TRex program as proof that attempts to monetize Total Rewards by licensing it to third parties are (or at least historically have been) doomed to failure.

As discussed below, the Examiner has concluded that there is a strong claim for constructive fraudulent transfer and a weak claim for actual fraudulent transfer with regard to Total Rewards access enjoyed by the CMBS Properties and later CERP from August 31, 2010, the date on which the 2010 Shared Services Agreement was executed, through the creation of CES on May 20, 2014. Claims relating to Total Rewards accruing after the creation of CES, which included claims for breach of fiduciary duty and aiding and abetting, are addressed in Section VIII.D on the Four Properties Transaction, but are valued in this Section. Similar claims against CGP, by contrast, are weak, as the Examiner believes that the consideration received by CEOC for the various properties transferred to CGP, while itself inadequate, was intended to include value for those properties' continued access to Total Rewards. The Examiner believes that claims of fraudulent transfer and breach of fiduciary duty/aiding and abetting claims arising out of the alleged diversion of gaming revenue from CEOC are not viable, at least based on the current evidentiary record. Finally, CEC and the Sponsors' purported failure to monetize Total Rewards for CEOC's benefit is also unlikely to give rise to anything more than weak claims for fraudulent conveyance or breach of fiduciary duty for the time period leading up to the creation of CES.

### a.  Background – How Total Rewards Works

Total Rewards was developed under the guidance of Gary W. Loveman,[2666] an academic who holds a doctorate in economics and taught at Harvard Business School. In 1998, he was hired by Harrah's to become its Chief Operating Officer and implement his marketing and customer loyalty ideas.[2667]

The Total Rewards program, which has approximately 46 million members – 7 million of whom are active at any given time – operates in fairly straightforward fashion.[2668] Customers of

---

[2666] *See* Gary Loveman, *Diamonds in the Data Mine*, Harvard. Bus. Rev. (May 2003), *located at* https://hbr.org/2003/05/diamonds-in-the-data-mine [hereinafter *Diamonds in the Data Mine*].

[2667] G. Loveman Oct. 27, 2015 Tr. at 9:12-10:15.

[2668] *See* CERP Amendment to Form S-4 (Nov. 24, 2014), at 82 (stating that there are over 46 million members); *see also* J. Payne Oct. 22, 2015 Tr. at 89:24-92:3 (estimating that there are 46

Caesars are encouraged to join. Once they do, they are issued membership cards and may present those cards when incurring any on-property entertainment expenses, including gaming, dining, hotel stays and retail shopping.[2669] In return, Total Rewards members receive and accumulate "Reward Credits" according to established rates.[2670] Reward Credits may be redeemed for all gaming and hospitality purposes at Caesars properties, as well as some limited perks at partner companies,[2671] including items offered on an off-property marketplace.[2672] Put another way, Reward Credits are "comps" that may be used "toward room, food and entertainment purchases at any Caesars property"[2673] and with Total Rewards partners. Under the Total Rewards program, customers may select where and when to redeem their Reward Credits.[2674]

Total Rewards members also receive so-called "Tier Credits," which are tied, at least to some extent, to "Reward Credits."[2675] The number of Tier Credits amassed by a member over a

---

million members of TR); "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER0087870 [CEC_EXAMINER_0087868] (stating that there are 45 million members, 6.5 million of whom are active). The program spans nearly 40 Caesars properties across 23 markets. *See* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER0087870 [CEC_EXAMINER_0087868].

[2669] *See* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087871 [CEC_EXAMINER_0087868]; "Total Rewards: Loyalty Has Its Benefits" at 3-4, *available at* https://www.caesars.com/content/cet-global/caesars-com/emag/totalrewards/tr-2016/index.html (last visited Mar. 8, 2016) [hereinafter "Total Rewards: Loyalty Has Its Benefits"]. For example, for each $1 spent on entertainment, a member earns 1 Reward Credit. *See* Total Rewards: Loyalty Has Its Benefits at 4.

[2670] "Total Rewards: Loyalty Has Its Benefits" at 4; *see also* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087871 [CEC_EXAMINER_0087868].

[2671] *See* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087871 [CEC_EXAMINER_0087868]; *see also* e-mail from T. Shaukat (Dec. 17, 2013), at TPG-Examiner_00244466-67 [TPG-Examiner_00244466] (describing deal with Starwood Hotels & Resorts Worldwide, Inc.).

[2672] This off-property marketplace was called the Total Rewards Marketplace; effective September 30, 2015, however, the Total Rewards Marketplace was discontinued and an e-catalog, known as the TR eCatalog, was created. *See* "Total Rewards Frequently Asked Questions: TR Partners – Marketplace – General Information, Total Rewards" *available at* https://totalrewards.custhelp.com/app/answers/detail/a_id/1698 (last visited Mar. 8, 2016).

[2673] *See* "Total Rewards Frequently Asked Questions: Total Rewards – What is the difference between Tier Credits and Reward Credits?, Total Rewards" *available at* https://totalrewards.custhelp.com/app/answers/detail/a_id/18 (last visited Mar. 8, 2016).

[2674] *See* J. Payne Oct. 22, 2015 Tr. at 90:18-91:2.

[2675] When a member uses his Total Rewards card, he earns both Reward Credits and accumulates Tier Credits. For example, a member earns 1 Tier Credit and 1 Reward Credit for

calendar year determines that member's status in one of four tiers, designated as Gold, Platinum, Diamond, or Seven Stars.[2676]  Upon signing up, a customer is accorded "Gold" status.  The highest Tier level, "Seven Stars," requires 150,000 Tier Credits.[2677]  There are additional benefits and privileges that a member may receive based on his or her status (*e.g.*, tickets to events and other promotions), thereby incentivizing members to consolidate both their gaming and non-gaming spending at Caesars properties in order to reach as high a Tier as possible.[2678]

According to surveys commissioned by Caesars of Total Rewards members, the most valuable feature of the program is its extension across the Caesars network of casinos:  Reward Credits can be redeemed at all Caesars properties, regardless of where they were earned.[2679]  Total Rewards also features consistent and transparent earning rates, a multi-brand program, a co-branded credit card and other alliances, and the aforementioned off-property marketplace.[2680]  But the ability to redeem Reward Credits and retain the same membership status across Caesars properties is the "number one thing" differentiating Total Rewards from other casino loyalty

---

each $5 that he plays on a reel slot machine.  *See* "Total Rewards: Loyalty Has Its Benefits" at 4, 5.

[2676] *See* "Total Rewards: Loyalty Has Its Benefits" at 5; *see also* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER0087872 [CEC_EXAMINER0087868]; T. Shaukat Nov. 9, 2015 Tr. at 46:25-47:2 (explaining that Tier Credits "entitle[] [a customer] to status once [that customer] hit[s] certain thresholds").

[2677] *See* "Total Rewards: Loyalty Has Its Benefits" at 5.

[2678] *See id.* at 10; *see also* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087873-74 [CEC_EXAMINER_0087868]; G. Loveman Oct. 27, 2015 Tr. at 228:21-229:7; J. Payne Oct. 22, 2015 Tr. at 89:24-90:17.

[2679] *See* "CEC Investor Presentation" (Sept. 2013), at CEOC_INVESTIG_00001158 [CEOC_INVESTIG_00001143]; J. Payne Oct. 22, 2015 Tr. at 90:18-91:2; *see also* G. Loveman Oct. 27, 2015 Tr. at 229:8-19 (explaining that Total Rewards creates a "portable benefit" that allows for recognition and the ability to be provided scarce resources at all locations).  The appreciation of the transferability of Reward Credits by Total Rewards members is seemingly at odds with the real world application of Reward Credits, where, according to CEC, 75% of Reward Credits are redeemed at the same property they are earned.  *See* CEC Total Rewards – Various Diligence Requests, at CEOC_2004_0058560-61 [CEOC_2004_0058555].

[2680] *See* "Total Rewards: Loyalty Has Its Benefits" at 4-6, 12; "CEC Total Rewards Innovation Task Force Recommendations" (May 24, 2011), CEC_EXAMINER_0260635 (native file) at 6; Offering Memorandum (Sept. 27, 2013), at CEOC_INVESTIG_00000097-98 [CEOC_ INVESTIG_00000083] (the Total Rewards Marketplace comprises 392 online retailers and over 2,000 stores as of June 30, 2013).

programs.[2681]  Members consistently rank Total Rewards as offering more value than any other casino entertainment loyalty program in terms of point redemption.[2682]

For example, Pinnacle Entertainment, Inc.'s loyalty program ("mychoice") allows its members to earn tier points and "mycash" on gaming only,[2683] and customers do not accumulate points or mycash at all locations.[2684]  Likewise, points for MGM Resorts International's customer loyalty program, M Life, are earned only through gaming, and not through other types of spending, which are an increasingly important part of casino revenue.[2685]  Moreover, M Life does not apply at all MGM properties.  And, unlike Total Rewards Tier Credits, M Life status credits are earned at different rates throughout the MGM network, with benefits differing from resort to resort.[2686]

Like mychoice and M Life, Marquee Rewards, the customer loyalty program offered by Penn National Gaming, Inc., is limited to certain resorts within the Penn network.[2687]  "Marquee Comps" may only be earned through gaming and, at some locations, only through table games.[2688]  Marquee Comps and tier points are also earned at variable rates depending on the game type, game denomination and level of play.[2689]  Notably, Marquee Rewards cannot be

---

[2681] J. Payne Oct. 22, 2015 Tr. at 90:18-91:2; *see also* G. Loveman Oct. 27, 2015 Tr. at 228:11-229:19 (explaining that Total Rewards creates a "portable benefit" that allows for recognition and the ability to be provided scarce resources at all locations).

[2682] *See* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER0087882 [CEC_EXAMINER_0087868]; *see also* "CEC Total Rewards Innovation Task Force Recommendations" (May 24, 2011), CEC_EXAMINER_0260635 (native file) at 5-6.

[2683] *See* "My Choice:  Points & mycash" *available at* https://www.pinnaclemychoice.com/points-and-mycash (last visited Mar. 8, 2016).

[2684] *See* "Frequently Asked Questions – mychoice Programs and Rewards:  Will my points and mycash accumulate at all mychoice locations?" *available at*  https://www.pinnaclemychoice.com /frequently-asked-questions (last visited Mar. 8, 2016).

[2685] *See* "About M life:  Frequently Asked Questions – How do I earn points?" *available at* https://www.mlife.com/pages/about_m_life_faq.html (last visited Mar. 8, 2016).

[2686] *See id.* at "About M life:  Frequently Asked Questions – How do I earn Tier Credits?" *available at* https://www.mlife.com/pages/about_m_life_faq.html (last visited Mar. 8, 2016).

[2687] *See* "Marquee Rewards Locations: Entertainment At Its Best" *available at* https://www. marqueerewards.com/locations. (last visited Mar. 8, 2016)

[2688] *See* "Marquee Rewards Frequently Asked Questions:  What are Marquee Comps and How Does a Guest Earn Them?" *available at* https://www.marqueerewards.com/faq#A; *id.* at "Marquee Rewards Frequently Asked Questions:  Can I Earn Marquee Comps and Tier Points on Table Play?" *available at* https://www.marqueerewards.com/faq#A (last visited Mar. 8, 2016).

[2689] *See id.* at "Marquee Rewards Frequently Asked Questions:  What are Marquee Comps and How Does a Guest Earn Them?" *available at* https://www.marqueerewards.com/faq#A (last visited Mar. 8, 2016); *see also id.* at "Marquee Rewards Frequently Asked Questions:  What are

earned at M Resort Las Vegas (currently Penn's only Las Vegas location), and points earned at M Resort cannot be redeemed at other Marquee Rewards locations.[2690]   Accordingly, each of these programs lacks the expansive reach of Total Rewards, through which customers consistently earn Reward Credits on a variety of spending activities at Caesars properties and may redeem those credits at a property of their choosing.

The success of Total Rewards also stems in part from its ability to tailor specific offers to specific customers.   This is a function of its proprietary data tracking system, which allows Caesars to monitor a customer's spending while at a Caesars property.   Specifically, a customer's use of a Total Rewards card allows Caesars to collect detailed information about his spending patterns, including (i) which properties the customer visits; (ii) where he spends money; (iii) what he spends it on; (iv) which days of the week he visits a property; (v) his preference for certain activities (both gaming and non-gaming); and (vi) his anticipated "spend."[2691]   Indeed, underlying Total Rewards is a sophisticated database containing a huge amount of customer information:

> [Total Rewards is a] 300-gigabyte transactional database that record[s] customer activity at various points of sale – slot machines, restaurants, and other retail areas in our properties.   Database managers f[e]ed that information into our enterprise data warehouse, which contain[s] not only millions of transactional data points about customers (such as names, addresses, ages, genders) but also details about their gambling spending and preferences.   The database [is] a very rich repository of customer information.[2692]

This information (of a type known as "Big Data"[2693]) is used on a micro level to determine a customer's average "spend" on a given visit and to identify more valuable customers.   Members who spend more per visit receive higher priority and qualify for better offers.[2694]   On a macro level, Big Data is used to track more general customer preferences,

Tier Points and How Does a Guest Earn Them?" *available at* https://www.marqueerewards.com/faq#A (last visited Mar. 8, 2016).

[2690] *See id.* at "Marquee Rewards Frequently Asked Questions:  What are Marquee Comps and How Does a Guest Earn Them?" *available at*  https://www.marqueerewards.com/faq#A (last visited Mar. 8, 2016).

[2691] *See* J. Payne Oct. 22, 2015 Tr. at 92:4-92:18; G. Loveman Oct. 27, 2015 Tr. at 229:20-24; *see also* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER0087876 [CEC_EXAMINER_0087868].

[2692] *See Diamonds in the Data Mine*,  https://hbr.org/2003/05/diamonds-in-the-data-mine.

[2693] *See* "CEC Investor Presentation" (Sept. 2013), at CEOC_INVESTIG_00001158 [CEOC_INVESTIG_00001143].

[2694] *See* Rich Metters et al., "*The 'Killer Application' of Revenue Management: Harrah's Cherokee Casino and Hotel*" at 7,  http://citeseerx.ist.psu.edu/viewdoc/download?doi= 10.1.1.492.2660&rep=rep1&type=pdf [hereinafter *The Killer Application of Revenue Management*]; *see also* T. Jenkin Sept. 30, 2015 Tr. at 40:15-25; T.  Shaukat Nov. 9, 2015 Tr. at 16:5-17:3.

allowing Caesars to adjust its business and marketing strategies to increase profitability.[2695] Caesars accomplishes this by having its analytics team and marketing team work hand-in-hand: the analytics team evaluates the Big Data and augments customer profiles, which are then used by the marketing team to send out offers to customers.[2696]   In other words, Caesars utilizes its Total Rewards program to target customers with specific marketing promotions or hospitality products, and to create a channel of communication with its customers through direct mailings, social media and real time promotions while customers are gambling.[2697]   Moreover, in generating customer offers, Caesars increases the yield from its fixed inventory (*i.e.*, hotel rooms) by analyzing a customer's worth (defined as a customer's gaming and ancillary spending) against the displacement cost of giving a room to a Total Rewards customer versus selling it on the open market.[2698]   In that regard, it does not appear as if Caesars makes any distinction between specific properties in its portfolio; rather, Caesars seeks to maximize the overall EBITDA of an overall market, as opposed to a particular property.[2699]

### b.  Total Rewards Point Liability Program

As noted above, Total Rewards customers are able to accumulate – or "bank" – Reward Credits over time.[2700]   If, however, a Total Rewards member fails to earn a Reward Credit for a

---

[2695] *See* "*The Killer Application of Revenue Management*" at 8, http://citeseerx.ist.psu.edu/ viewdoc/download?doi=10.1.1.492.2660&rep=rep1&type=pdf; CEC Company Overview (Apr. 27, 2011), at CEOC_INVESTIG_00039793-95 [CEOC_INVESTIG_00039776]; Offering Memorandum (Sept. 27, 2013), at CEOC_INVESTIG_00000138 [CEOC_INVESTIG_ 00000083] ("Participation in the Total Rewards loyalty program is one of our competitive strengths and our business and growth strategy are, in part, based on tracked play and targeted marketing efforts."); *see also* T. Shaukat Nov. 9, 2015 Tr. at 18:21-21:25.

[2696] *See* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087876 [CEC_EXAMINER_0087868]; T. Shaukat Oct. 28, 2015 Tr. at 17:13-24.

[2697] *See* G. Loveman Oct. 27, 2015 Tr. at 229:20-24 (explaining that Total Rewards "provides a distribution channel," through which Caesars may "customize our marketing to them"); "CEC Investor Presentation" (Mar. 2012), at CEOC_INVESTIG_00228721 [CEOC_INVESTIG_ 00228718] (showing that Caesars utilizes online channels and brick and mortar channels); "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087876-77 [CEC_EXAMINER_0087868]; *The Killer Application of Revenue Management* at 8, http://citeseerx.ist.psu.edu/viewdoc/ download?doi=10.1.1.492.2660 &rep=rep1&type=pdf.

[2698] *See* T. Shaukat Nov. 9, 2015 Tr. at 16:11-17:10.

[2699] *See* T. Shaukat Nov. 9, 2015 Tr. at 14:12-15:9, 26:17-29:22; *see also* J. Bosacco Sept. 15, 2015 Tr. at 87:13-88:3; T. Jenkin Sept. 30, 2015 Tr. at 41:16-42:7 (explaining that Las Vegas is marked as a city and thus Caesars is "agnostic from a marketing standpoint on where people stay in Las Vegas other than [what] we yield based on price").

[2700] Offering Memorandum (Sept. 27, 2013), at CEOC_INVESTIG_00000168 [CEOC_ INVESTIG_00000083].

period of six months, all of that customer's Reward Credits are forfeited.[2701]  Caesars accrues the estimated cost of fulfilling the redemption of Reward Credits, after consideration of estimated forfeitures (referred to as 'breakage'), as they are earned.[2702]  The estimated value of Reward Credits is accounted an expense to the property where such credits are earned.[2703]

Between 2012 and 2015, the amount of Reward Credits earned approximated the amount redeemed.  But, despite the purported success of the Total Rewards program, the total amount of Credits earned and redeemed (as well as the beginning balance[2704] each year) declined steadily, partially due to the decrease in revenues each year at Caesars' properties.[2705]  As shown in TR Figure 1 and TR Figure 2 below, the beginning balance in 2012 of 17.8 billion declined to 15.9 billion by the beginning of 2015, for a 10% overall decline.

**TR Figure 1: Aggregate Reward Credit Activity by Year**

| (amounts in millions) | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|
| Beginning Balance | 17,755.8 | 16,530.2 | 15,802.4 | 15,909.6 |
| Earned Reward Credits | 30,634.6 | 28,724.4 | 26,990.4 | 24,655.9 |
| Redeemed Reward Credits | (27,856.2) | (25,352.4) | (23,681.4) | (22,032.0) |
| Expired | (4,004.1) | (4,099.8) | (3,201.8) | (3,455.9) |
| Ending Balance | 16,530.2 | 15,802.4 | 15,909.6 | 15,077.7 |

Sources: CEC Total Rewards – Various Diligence Requests, at CEOC_2004_0058556 [CEOC_2004_0058555]; 2010-2015 TR Activity Rollforward.xlsx, [CEC_Examiner_1447926] (native).
Note: Includes Reward Credits from all properties (CEOC, CERP, CGP and Managed) and Total Reward Partners.

---

[2701]  *Id.*

[2702]  *Id.*

[2703]  *See id.*

[2704]  "Beginning balance" refers to the liability (or inventory of credits) at the beginning of the year for a given property.  Reward Credits are a liability to the property because at some point in time the credits will be exchanged for goods or services in the form of comps to Total Rewards members.  *See* CEC 10-K for the year ended Dec. 31, 2015 (Feb. 29, 2016), at 105.

[2705]  *See* CEC Total Rewards - Various Diligence Requests, at CEOC_2004_0058556 [CEOC_2004_0058555]; *see also* Total Rewards: Reward Credit Activity for 2010 through 2015, at CEC_EXAMINER_1447926.

**TR Figure 2: Earned and Redeemed Reward Credits by Year**



Sources: CEC Total Rewards - Various Diligence Requests, at CEOC_2004_0058556 [CEOC_2004_0058555]; 2010-2015 TR Activity Rollforward.xlsx, [CEC_Examiner_1447926] (native).

As a general matter, Total Rewards members tend to earn and redeem their Reward Credits at the same property.[2706] In 2014, for instance, 89% of the Reward Credits earned at CEOC properties[2707] were redeemed at CEOC properties, and only 20% of the Reward Credits earned at non-CEOC properties were redeemed at CEOC properties, as shown in TR Figure 3:

---

[2706] *See* T. Shaukat Nov. 9, 2015 Tr. at 47:3-25 (customers "overwhelmingly redeem [their Reward Credits] at their home property" and "they generally do it in close proximity to when they earn."); *see also* "CEC Total Rewards – Various Diligence Requests" at CEOC_2004_0058560 [CEOC_2004_0058555].

[2707] Although precise property-by-property figures are not available, the facts that (1) the vast majority of CEOC properties are regional properties, (2) Reward Credits are typically redeemed during the same visit they are earned and (3) Caesars does not have multiple regional casinos in the same market means that the CEOC figures provide a fairly good approximation of what those figures would be. This was confirmed by Tariq Shaukat, Caesars' Chief Commercial Officer and former Chief Marketing Officer, who stated that the vast majority of Reward Credits are typically redeemed by customers at the property at which they were earned, and understood that number to be about 90%. T. Shaukat Nov. 9, 2015 Tr. at 47:3-25, 48:16-19; *see also* "CEC Total

**TR Figure 3: 2014 Reward Credit Redemptions**

| (amounts in millions) | Redemptions | | | Redeem % | |
|---|---|---|---|---|---|
| Entity | CEOC | NON-CEOC | Total | CEOC | NON-CEOC |
| CEOC | 13,960 | 1,650 | 15,610 | 89% | 11% |
| NON-CEOC | 820 | 3,260 | 4,080 | 20% | 80% |
| **Total** | **14,780** | **4,910** | **19,690** | **75%** | **25%** |

Source: CEC Total Rewards – Various Diligence Requests, at CEOC_2004_0058559 [CEOC_2004_0058555].
Note: Reward Credit redemptions only include same-store properties and exclude Total Rewards Partners; the same-store property exclusions are Harrah's Tunica, Showboat, all of the Ohio properties, Baltimore and Cromwell.

Thus, because customers generally earn and redeem Reward Credits at the same property, the net liability for Reward Credits between properties is relatively modest. Still, in 2014, CEOC was a net-exporter of approximately 830 million Reward Credits (earned at CEOC properties but used elsewhere), which equated to an accrued cost of approximately $3.3 million, as shown in TR Figure 4.

**TR Figure 4: 2014 Accrued Cost of 2014 Reward Credit Redemptions**

| (amounts in millions) | |
|---|---|
| CEOC Imports Redemptions | 820 |
| CEOC Exports Redemptions | 1,650 |
| Net Redemptions | **(830)** |
| % of Accrued Cost | 0.40% |
| **Accrued Cost** | **$ (3.3)** |

Source: CEC Total Rewards – Various Diligence Requests, at CEOC_2004_0058559 [CEOC_2004_0058555].

### c. The Centrality of Total Rewards to the Caesars "Enterprise"

Total Rewards is considered by the Company to be the "key" to Caesars' success, such as it is.[2708]  This is in large part because of Caesars' "hub-and-spoke" business model, through

Rewards – Various Diligence Requests" at CEOC_2004_0058560-61 [CEOC_2004_0058555] (stating that 75% of Reward Credits are redeemed at the same property they are earned, and 82% are redeemed in the same market).

[2708] *See, e.g.*, "CEC Company Overview" (Apr. 27, 2011), at CEOC_INVESTIG_00039784 [CEOC_INVESTIG_00039776] (referring to the Total Rewards database as the "Key to the Empire"); CEC Investor Presentation (Mar. 2012), at CEOC_INVESTIG_00228727 [CEOC_INVESTIG_00228718] ("Total Rewards has been the key to Caesars impressive growth . . . .").

678

which Total Rewards attempts to create synergies between Caesars' broad network of properties. Under this model – in which Las Vegas operates as the "hub" to the regional "spokes" – members of Total Rewards accumulate credits in their home market at Caesars' regional properties and are incentivized to travel to destination markets such as Las Vegas.[2709]

According to Caesars, this hub-and-spoke model is intended to "create[] a mutual benefit between business units, allowing both the destination and home market of a guest to benefit from the relationship."[2710]  By allowing customers to earn and redeem Reward Credits anywhere, the Company incentivizes customers to consolidate their play at Caesars properties, thus ostensibly generating "superior results for [all] properties within the network."[2711]  Moreover, the program – which permits customers to redeem Reward Credits at the same rates for all gaming and hospitality purposes – strongly encourages them to travel to Las Vegas:  indeed, Caesars offers free trips to Las Vegas as a potential benefit of Total Rewards membership in and of itself.[2712] While in Las Vegas, members are encouraged not only to gamble at Caesars casinos, but to stay at Caesars hotels, dine at Caesars restaurants and enjoy Caesars entertainment, such as the incomparable Celine Dion.  Thus, while the benefits of this system to the Las Vegas properties are obvious, the Company believes that the regional properties – particularly those which operate in competitive markets – also receive an advantage.[2713]  As CEC itself has put it, "Total Rewards

---

[2709]  *See* J. Beato Sept. 24, 2015 Tr. at 104:12-25, 86:2-15; T. Shaukat Oct. 28, 2015 Tr. at 176:10-179:13.

[2710]  CEC Company Overview (Apr. 27, 2011), at CEOC_INVESTIG_00039788 [CEOC_INVESTIG_00039776]; *see also* T. Shaukat Oct. 28, 2015 Tr. at 182:19-184:23, 187:17-189:18.

[2711]  "CEC Investor Presentation" (Mar. 2012), at CEOC_INVESTIG_00228728 [CEOC_INVESTIG_00228718].  As counsel for CEOC once explained in response to a question about Growth "taking good talent" from a bankrupt CEOC, "[Growth Partners] needs the Total Rewards Program to build its customer base – and not CEOC employees. . . . The Total Rewards Program is very valuable to the company as a whole."  *See* e-mail from Martha Sabol to the Illinois Gaming Board (Aug. 21, 2013), at CEC_EXAMINER_0229558 [CEC_EXAMINER_0229558].

[2712]  "CEC Company Overview" (Apr. 27, 2011), at CEOC_INVESTIG_00039787 [CEOC_INVESTIG_00039776]; *see also id.* at CEOC_INVESTIG_00039788.

[2713]  *See* E. Hession Nov. 4, 2015 Tr. at 351:13-352:8 (explaining that regional properties benefit from being in the Total Rewards system because customers tend to consolidate their play with Caesars as opposed to going to a competitor because of the benefit of being able to redeem their points when they are in Las Vegas); *see also* G. Kranias Oct. 23, 2015 Tr. at 160:3-20 ("In other words, you could unplug [the Las Vegas properties] from Total Rewards because they were all Las Vegas Strip assets and the EBITDA wouldn't decline nearly as much as a riverboat casino where someone was going to accumulate points that they could ultimately redeem in Las Vegas. People don't go to Las Vegas to accumulate points that they can then redeem in Joliet."); M. Rowan Nov. 16, 2015 Tr. at 248:9-16 (explaining that regional properties, such as those that made up the majority of CEOC's portfolio, "existed because they could deliver rewards in destination"); M. Rowan Nov. 17, 2015 Tr. at 362:15-22 (explaining his belief that regional

provides customers with a clear benefit to consolidating their wallet with Caesars across markets," which in turn allows Caesars to maximize profits by channeling its vast regional customer base to Caesars Las Vegas properties.[2714]   In other words, Caesars believes that the regional properties benefit financially from an affiliation with Total Rewards because the appeal of destination rewards provided through the Total Rewards program encourages customers to visit the regional properties in order to earn reward credits.[2715]

Consequently, the Total Rewards program "enables [Caesars] key markets to generate considerable revenues from customers not originally playing at that property," a phenomenon referred to as "[C]ross-[P]lay."[2716]   Such Cross-Play amounts to a significant amount of the gaming revenue earned by Caesars properties on an annual basis.[2717]   Nor is this uplift from Total Rewards limited to gaming revenue.  Indeed, in 2012, Total Rewards "[n]early doubled the percentage of non-gaming revenues that are associated with [Total Rewards] members in Las Vegas."[2718]   Caesars represents that there has been a steady and consistent increase in non-gaming revenues at its Las Vegas properties since 2012,[2719] something the Company attributes to the ability of Total Rewards to match customers with non-gaming options that appeal to them at

---

properties, which depend on frequency, do not "work" without the type of destination rewards provided through Total Rewards).

[2714] "CEC Company Overview" (Apr. 27, 2011), at CEOC_INVESTIG_00039787 [CEOC_INVESTIG_00039776]; *see also id.* at CEOC_INVESTIG_00039788.

[2715] *See* E. Hession Nov. 4, 2015 Tr. at 351:13-352:8; M. Rowan Nov. 17, 2015 Tr. at 362:15-22.

[2716] "CEC Company Overview" (Apr. 27, 2011), at CEOC_INVESTIG_00039787 [CEOC_INVESTIG_00039776]; *see also* "Harrah's Entertainment Casino Development Discussion" (Mar. 2011), CEOC_INVESTIG_00209467 (native file), at 14.

[2717] *See* Appendix 10, Total Rewards.

[2718] "CEC Investor Presentation" (Nov. 2012), at CEOC_INVESTIG_00052005 [CEOC_INVESTIG_00051983].

[2719] *See, e.g.*, "CEOC Lender Meeting: Discussion Materials" (Jan. 28, 2015), at PWP_CZR_EX_00085964 [PWP_CZR_EX_00085958];  Draft CEC Presentation to Lenders (May 2014), at CEOC_INVESTIG_00049702 [CEOC_INVESTIG_00049687];  "CEC $1,500mm Add-On to 9.0% Senior Secured Notes due 2020" (Feb. 4, 2013), at CEOC_INVESTIG_00046794 [CEOC_INVESTIG_00046783].

any number of different properties.[2720]   In this way as well, Caesars believes that the Total Rewards system "provides a measurable competitive advantage."[2721]

According to Caesars, the enterprise-wide emphasis of Total Rewards, which focuses on maximizing the overall EBITDA of Caesars rather than a particular property,[2722] has created a "network effect" that "gives Caesars an advantage over peers."[2723]   Specifically, Caesars contends that Total Rewards has driven up profitability on a property-by-property basis, allowing "Caesars properties [to] earn more than their 'fair share' of gaming revenue in competitive markets[.]"[2724]   Although this premium has fluctuated over the years, Caesars has consistently maintained that Total Rewards has driven Caesars properties to out-earn their competitors on a table-by-table basis.[2725]   For example, for the 12-month period ending on June 30, 2013, CEC

---

[2720] *See, e.g.*, "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087875-77 [CEC_EXAMINER_0087868]; "Total Rewards – Next Generation Overview for Board of Directors" (July 27, 2011), at CEOC_INVESTIG_00133455 (native file) at 5, 10 (describing how Total Rewards was changing to create richer earning and redemption for non-gamers); "Big Data @ Caesars" Presentation (Nov. 2012), at TPG-Examiner_00241695 [TPG-Examiner_00241687] (showing how Total Rewards has impacted non-gaming data).

[2721] CEC Investor Presentation (Nov. 2012), at CEOC_INVESTIG_00051988 [CEOC_INVESTIG_00051983].   For example, David Eyal of Playtika did an analysis of the value of Caesars Casino users that were Total Rewards members in August 2012.   He found that Total Rewards members constituted ■% of Caesars Casino total users, yet ■% of its paying users and that the value of these Total Rewards users was ■% higher than non-Total Rewards users.   The average payment for Total Rewards members was ■% higher than non-Total Rewards users and their average count of transaction was ■% higher than non-Total Rewards members.   *See* e-mail from D. Eyal to E. Anne Hill, *et al.* (Aug. 19, 2012), at CACEXAM00307586 [CACEXAM00307586].

[2722] *See, e.g.*, T. Shaukat Nov. 9, 2015 Tr. at 14:12-15:9; *id.* at 26:17-29:22.

[2723] "Gary Loveman Investor Presentation" (Sept. 25, 2012), at CEOC_INVESTIG_00076374 [CEOC_INVESTIG_00076371]; *see also* Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at   CEC_EXAMINER_00878780-81 [CEC_EXAMINER_ 0087868].

[2724] "CEC Company Overview" (Apr. 27, 2011), at CEOC_INVESTIG_00039788 [CEOC_INVESTIG_00039776]; *see also* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER0087878 [CEC_EXAMINER_ 0087868] ("Total Rewards properties capture more than their fair share of gaming revenues in their markets.").

[2725] *See* "CEC Investor Presentation" (Mar. 2012), at CEOC_INVESTIG_00228729 [CEOC_INVESTIG_00228718] (stating that Caesars properties perform 25% better than competitors in 2011); "CEC Company Overview" (Apr. 27, 2011), at CEOC_INVESTIG_00039797 [CEOC_INVESTIG_00039776] (showing that Caesars properties experienced a 34% fair share premium in destination properties and a 33% fair share local market premium based on 2010 results); Citi Confidential Information Memorandum (Sept. 19,

estimates that it had a 15% and 21% fair share premium versus its competitors in its destination and regional markets, respectively.[2726] Moreover, Caesars claims that Total Rewards enables it "to grow and sustain revenues more efficiently than its largest competitors and generate cross-market play [*i.e.*, Cross-Play.]"[2727] Total Rewards thus plays a significant role in Caesars' ability to generate more incremental revenue (and profits) and gain a competitive advantage.

### d. The Impact of Total Rewards on the Financial Results of Caesars Properties

As discussed above, Caesars witnesses were in uniform agreement that the Company's hub-and-spoke operating model makes its properties more valuable within the Total Rewards "system" than they otherwise would be.[2728] This belief stems from the theory that Total Rewards impacts (and improves) the EBITDA of each individual property connected to the system.[2729] Similarly, CEC management also contends that a property removed from Total Rewards

---

2013), at CEOC_INVESTIG_00000849 [CEOC_INVESTIG_00000819] ("CEC had a 15% and 21% fair share premium in its destination and regional markets, respectively vs. competitors for the last twelve months ending June 30, 2013."); "Harrah's Entertainment Casino Development Discussion" (Mar. 2011), CEOC_INVESTIG_00209467 (native file) at 19 (stating that Harrah's properties earn a 25%-30% premium in revenue driven by Total Rewards based on March 2010 TTM results); *see also* "Big Data @ Caesars" Presentation (Nov. 2012), at TPG-Examiner_00241697-98 [TPG-Examiner_00241687] (showing how Total Rewards has been used to optimize activity at Caesars.com and to raise income from table games).

[2726] Offering Memorandum (Sept. 27, 2013), at CEOC_INVESTIG_00000097 [CEOC_INVESTIG_00000083]. In 2010, the impact was even greater; Caesars estimated that, as a result of Total Rewards, its properties experienced a 34% fair share premium in destination properties and a 33% fair share premium in local markets that year. *See* "CEC Company Overview" (Apr. 27, 2011), at CEOC_INVESTIG_00039797 [CEOC_INVESTIG_00039776] (based on 2010 results); *see also* "Harrah's Entertainment Casino Development Discussion (Mar. 2011), CEOC_INVESTIG_00209467" (native file) at 19 (stating that Harrah's properties earn a 25-30% premium in revenue driven by Total Rewards based on March 2010 TTM results).

[2727] *See* Offering Memorandum (Sept. 27, 2013), at CEOC_INVESTIG_00000091 [CEOC_INVESTIG_00000083]; CEC Company Overview (April 27, 2011), at CEOC_INVESTIG_00039797 [CEOC_INVESTIG_00039776].

[2728] *See, e.g.*, G. Loveman Oct. 27, 2015 Tr. at 196:4-197:8; *id.* at 236:18-237:12.

[2729] C. Williams Oct. 12, 2015 Tr. at 39:7-40:6; A. Kornberg Nov. 11, 2015 Tr. at 99:19-100:11; J. Schiedemeyer Sept. 16, 2015 Tr. at 50:4-22 (stating that the value of Total Rewards "is embedded in the overall enterprise value that's determined for the properties"); R. Stauber Sept. 30, 2015 Tr. at 124:11-18 (the value of each asset being sold in the Four Properties Transaction was "embedded in the EBITDA of the business"); T. Donovan Nov. 10, 2015 Tr. at 179:15-23 (value of Total Rewards was "baked into" the value of the properties); A. van Hoek Sept. 25, 2015 Tr. at 66:12-67:12 (explaining that the EBITDA of a Caesars property "is different and likely higher than it would be if it was operated by [a] buyer"); D. Sambur Oct. 19, 2015 Tr. at 295:18-22; M. Rowan Nov. 17, 2015 Tr. at 361:12-16.

decreases in value,[2730] because the loss of Total Rewards adversely affects the property's "business, financial condition and operating results."[2731]

Historically, Caesars contends properties removed from the Total Rewards system have experienced a drop of approximately 10% in revenues and 20% in EBITDA.[2732] Thus, according to Caesars, it is difficult for the Company to sell assets to third parties for a desirable price because potential buyers believe that a property will perform substantially less effectively without Total Rewards.[2733] For example, Caesars attempted to sell the Rio in or around 2010, but contends that the property was severely undervalued by potential purchasers who thought that they would be unable to produce the same financial results once the property was excluded from the Total Rewards program.[2734]

Casinos with access to Total Rewards have shown a demonstrable increase in gaming revenues and profitability.[2735] In January 2007, for example, Harrah's Chester opened in Pennsylvania as the second casino in the area and in a less desirable location than its competitor.

---

[2730] *See* C. Williams Oct. 12, 2015 Tr. at 40:14-23; G. Loveman Oct. 27, 2015 Tr. at 196:4-197:8, 236:23-237:3; F. Kleisner Oct. 30, 2015 Tr. at 148:17-149:14; C. Abrahams Jan. 29, 2016 Tr. at 331:2-9; J. Schiedemeyer Sept. 16, 2015 Tr. at 51:5-13.

[2731] Offering Memorandum (Sept. 27, 2013), at CEOC_INVESTIG_00000138 [CEOC_INVESTIG_00000083] ("Any failure by our subsidiaries to obtain the operational and management support of CEOC, and particularly any failure by our subsidiaries to obtain CEOC's expertise in operating casinos or maintain access to the Total Rewards loyalty program, would adversely affect our business, financial condition and operating results. The success of our business depends in part on our continued participation in Caesars Entertainment's Total Rewards loyalty program.").

[2732] *See* M. Rowan Nov. 16, 2015 Tr. at 92:17-93:2; *see also* M. Beilinson Oct. 6, 2015 Tr. at 63:12-63:18; e-mail from B. Siegal to D. Sambur, *et al.* (Aug. 5, 2010), at APOLLO-Examiner_00206148 [APOLLO-Examiner_00206148] ("History would suggest that when they takeover [sic] and we remove TR, that revenues would decline double digit %.").

[2733] *See* A. van Hoek Sept. 25, 2015 Tr. at 66:12-67: 12 (explaining that Caesars is a "bad seller of assets" because of the synergy that comes from being part of the Total Rewards system); G. Loveman Oct. 27, 2015 Tr. at 196:4-197:8; *see also* A. Kornberg Nov. 11, 2015 Tr. at 99:19-100:11 (stating that he was told that "when assets were put up for sale that were leaving the system, they were less valuable"); C. Williams Oct. 12, 2015 Tr. at 40:14-23 (explaining that the CEC Board believed that most parties would not pay a full price for a Caesars property based on just empirical data).

[2734] *See* G. Loveman Oct. 27, 2015 Tr. at 196:17-21; M. Rowan Nov. 16, 2015 Tr. at 101:25-102:7 (explaining that the Rio was "hostage to Total Rewards, that no one thought they could produce out of that box what we produced out of that box, and therefore pricing came in low"). Of note, Loveman was never told about Landry's May 6, 2013 $425 million bid for the Rio and why such bid was not pursued. *See* G. Loveman Jan. 28, 2016 Tr. at 360:22-361:10.

[2735] *See* Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087881 [CEC_EXAMINER_0087868].

By leveraging relationships with Total Rewards members, Caesars saw a rapid increase of gaming revenues, with 80% of the property's rated revenues coming from existing customers, including existing Total Rewards members who made more than 1.5 million trips to the property in its first 12 months.[2736]    Thus, Harrah's Chester's first-year revenues and EBITDA "significantly exceeded Plan and outperformed competition by 6%."[2737]

Likewise, when Caesars acquired Planet Hollywood in a distressed sale in 2010,[2738] the property saw immediate and marked improvements in both its EBITDA and net revenues.[2739]  A case study on Planet Hollywood revealed a steady increase in gaming results under the ownership of Caesars, and improvements in gaming revenues, net revenues, EBITDA margin, and EBITDA.   Specifically, Planet Hollywood's gaming revenues went up 34% after its acquisition by Caesars and its EBITDA grew by 162%.[2740]   The study concluded that these results were due largely to the value of the Total Rewards program.[2741]    Loveman later concurred, explaining, "In [Planet Hollywood's] first year of operations as a Caesars Entertainment property, net revenues have increased by 24%, demonstrating the value of our Total Rewards system and our management effectiveness."[2742]

These examples do not appear to be outliers.  Caesars credits the Total Rewards "network effect" with having "powerful impacts on property performance" after acquisition.[2743]

---

[2736] *See*     "Harrah's     Entertainment     Casino     Development     Discussion," CEOC_INVESTIG_00209467 (native file) at 15.

[2737] *Id.*

[2738] *See* "Planet Hollywood Presentation" (Nov. 14, 2013), CEOC_INVESTIG_00028743 (native file) at 3.

[2739] *See* 2010 Fourth Quarter Earnings Conference Call (Feb. 25, 2011), at CEOC_INVESTIG_00040320-21 [CEOC_INVESTIG_00040317]; "CEC Investor Presentation" (July 2012), at CEOC_INVESTIG_00044287 [CEOC_INVESTIG_00044268].

[2740] *See* "CEC Investor Presentation" (July 2012), at CEOC_INVESTIG_00044287 [CEOC_INVESTIG_00044268] (crediting Total Rewards as increasing revenues and profitability).

[2741] *See* "Caesars Entertainment Slides" (2011), CEOC_INVESTIG_00209468 (native file) at 2 (stating results of the Planet Hollywood case study and concluding the value of Total Rewards has allowed Planet Hollywood to see "marked improvements in the ~ 10 months on the Caesars Platform"); *see also* "Harrah's Entertainment, Inc." Presentation (Oct. 2010), at APOLLO-Examiner_00080449 [APOLLO-Examiner_00080424].

[2742] 2010 Fourth Quarter Earnings Conference Call (Feb. 25, 2011), at CEOC_INVESTIG_00040320-21 [CEOC_INVESTIG_00040317]; *see also* C. Williams Oct. 12, 2015 Tr. at 40:6-13 (explaining that Planet Hollywood was a poor-performing company before being incorporated into Total Rewards); F. Kleisner Oct. 30, 2015 Tr. at 26:24-28:14 (same).

[2743] *See* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087881 [CEC_EXAMINER_0087868].

According to a November 2012 Presentation, Total Rewards had recently increased non-gaming entertainment by 270% and had increased food and beverage sales by 96% at Caesars' properties.[2744]    In a 2012 Investor Presentation, Caesars focused on the gaming revenues and EBITDA at three properties:  Planet Hollywood, Caesars Palace, and Flamingo.  In addition to the marked improvements at Planet Hollywood, Caesars Palace showed improvements in gaming revenue of 15% in the four quarters after its acquisition by Harrah's in 2005 and saw its EBITDA grow by 43%.[2745]    Likewise, Flamingo Las Vegas saw its EBITDA increase by 9% after joining the Total Rewards system, with gaming revenues increasing by 12%.[2746]  According to Caesars, the impact of Total Rewards and its "network effect" has increased not only gaming revenues and EBITDA, but also overall retail and dining revenues at the properties.[2747]  A review of four acquired properties in Las Vegas – Caesars Palace, Imperial Palace, Flamingo, and Planet Hollywood – revealed not only significant increases in EBITDA and gaming, but also increases between 5% and 27% in dining and 11% and 29% in retail.[2748]

Conversely, properties that have been sold by Caesars and removed from the Total Rewards program have typically experienced a material drop in gaming revenues.  According to Caesars, when it sold Harrah's East Chicago, there was both a material drop in that property's gross gaming revenues, as well as an increase in play at other Harrah's properties from Total Rewards members who had historically played at Harrah's East Chicago.[2749]    In May 2004, Harrah's Shreveport was sold to Boyd Gaming, and thus was extracted from the Total Rewards program.  In the following one-year period, revenues declined by 12.8%.[2750]  Likewise, in 2012, Caesars sold its Harrah's St. Louis property to Penn National Gaming.  Following the sale, the property experienced a drop in gaming revenues and decrease in market share.  Overall, the "St.

---

[2744]  *See* "Big Data @ Caesars" Presentation (Nov. 2012), at TPG-Examiner_00241695 [TPG-Examiner_00241687].

[2745]  *See* "CEC Investor Presentation" (July 2012), at CEOC_INVESTIG_00044287 [CEOC_INVESTIG_00044268].

[2746]  *See id.*

[2747]  *See, e.g., id.* at CEOC_INVESTIG_00044286.

[2748]  *See* "Overview of Total Rewards: For Discussion with Creditor Committees" (Apr. 2015), at CEC_EXAMINER_0087881 [CEC_EXAMINER_0087868].

[2749]  *See*    "Harrah's    Entertainment    Casino    Development    Discussion" CEOC_INVESTIG_00209467 (native file) at 16.   Because states report gaming revenues, Caesars is able to calculate any changes in gaming revenues for the properties it has sold.  *See* E. Hession Nov. 3, 2015 Tr. at 99:19-100:6.  As discussed below, Caesars cannot calculate whether the property is actually making more money on lower gaming revenues because the EBITDA of the property is not reported.  *See id.* at 100:7-12.

[2750]  *See* "Harrah's Entertainment, Inc. Discussion Materials" (Sept. 2009), at APOLLO-Examiner_00217094 [APOLLO-Examiner_00217084].

Louis property experienced roughly [a] 10% decline in performance after [its] sale to [Penn]."[2751]

The relative success of the Caesars properties is, in part, due to the Cross-Play between and among the Las Vegas and regional properties. As shown in TR Figure 5, which was prepared from the data provided by the Company, the regional properties were net exporters of Theo[2752] gaming revenue from 2011 through 2015. The regional properties recovered an average of 53 cents on the dollar of the exported play to the Las Vegas properties.

**TR Figure 5: Gaming Theo Cross-Play – Regional Properties vs. Las Vegas Market**

| (amounts in millions) | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| Las Vegas Market to Regionals | | | | | | |
| Regionals to Las Vegas Market | | | | | | |
| **Net Regional (Exported) Gaming Theo to Las Vegas** | | | | | | |
| **Return of Every Gaming Dollar Exported** | $0.41 | $0.56 | $0.63 | $0.55 | $0.45 | $0.53 |

Source: Appendix 10, Total Rewards, at 4.

An analysis of the other properties often viewed as destination properties (*i.e.*, Las Vegas, Atlantic City, and New Orleans) versus the regional properties reflects the same "hub and spoke" pattern. As shown in TR Figure 6, the regional properties were net exporters of Theo gaming revenue to the Las Vegas, Atlantic City, and New Orleans destination properties. The regional properties returned an average of 67 cents on the dollar of the exported play to the destination properties.

---

[2751] CEOC Lender Meeting: Discussion Materials (Jan. 28, 2015), at PWP_CZR_EX_00085968 [PWP_CZR_EX_00085958]. Whether or not these properties are making less money, however, is still debatable. While the gross gaming revenues of these companies has decreased, this could technically be for a variety of reasons, ranging from the pullback in marketing or the loss of Total Rewards. Caesars does not, therefore, know if the properties are actually making more money on lower gaming revenues than Caesars was when it ran the property, or if the property is actually making less profits. *See* E. Hession Nov. 3, 2015 Tr. at 99:13-100:19.

[2752] "Theo" or "Theoretical Win" is a "[m]athematical equation used to estimate how much [Caesars] theoretically believe[s] the casino will win from a customer based on probability." Theo represents the expected house advantage from gaming activity. *See* "Relationship Marketing Glossary," at CEOC_2004_0014840 [CEOC_2004_0014825]; *see also* T. Shaukat Nov. 9, 2015 Tr. at 44:4-20 ("[T]heo is a gaming industry standard term [which] basically tells you what on average over a long number of a slot machine's handle pulls what you expect the outcome to be. So it's the expected win . . . or the theoretical win.")

**TR Figure 6: Gaming Theo Cross-Play – Regional Properties vs. Destination Markets**

| *(amounts in millions)* | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| Destination Markets to Regionals | | | | | | |
| Regionals to Destination Markets | | | | | | |
| **Net Regional (Exported) Gaming Theo to Destination Markets** | | | | | | |
| **Return of Every Gaming Dollar Exported** | $0.54 | $0.64 | $0.72 | $0.85 | $0.56 | $0.67 |

Source: Appendix 10, Total Rewards, at 4.

Thus, while Total Rewards impacts the financial results of all the Caesars properties, there are varying views on which type of property (*i.e.*, regional or destination) actually benefits the most from being part of the system. The Sponsors and members of management have expressed their belief that the hub-and-spoke model operates to the benefit of the regional properties, which would be more at risk if they "unplugged" from Total Rewards.[2753] This apparently stems from the assumption that the EBITDA of a Las Vegas property removed from the system would decline less than that of a regional property, which is more likely to be frequented by customers who intend to accumulate points they can ultimately redeem in Las Vegas.[2754] In order to qualify for Las Vegas offers as a regional customer, however, a customer must "be active in the Las Vegas database."[2755] In addition, it is difficult to know whether the customer would have played as much or more at the regional property if he or she was not in the Total Rewards program or if the regional customer belonging to Total Rewards did not go to Las Vegas. It would appear that such determination depends on a host of factors, including that customer's personal preferences as well as the amount of local competition faced by the regional property.

---

[2753] *See* G. Kranias Oct. 23, 2015 Tr. at 160:3-161:11; M. Rowan Nov. 17, 2015 Tr. at 362:15-22 ("The most at risk of unplugging is the guy with the regional properties, CEOC.").

[2754] *See* M. Rowan Nov. 16, 2015 Tr. at 248:9-16 (explaining that regional properties, such as those that made up the majority of CEOC's portfolio, "existed because they could deliver rewards in destination"); M. Rowan Nov. 17, 2015 Tr. at 362:14-22 (explaining his belief that regional properties, which depend on frequency, do not "work[]" without the type of destination rewards provided through Total Rewards); G. Kranias Oct. 23, 2015 Tr. at 160:3-20 ("In other words, you could unplug [the Las Vegas properties] from Total Rewards because they were all Las Vegas Strip assets and the EBITDA wouldn't decline nearly as much as a riverboat casino where someone was going to accumulate points that they could ultimately redeem in Las Vegas. People don't go to Las Vegas to accumulate points that they can then redeem in Joliet."); *see also* E. Hession Nov. 4, 2015 Tr. at 351:13-352:8 (explaining that regional properties benefit from being in the Total Rewards system because customers tend to consolidate their play with Caesars as opposed to going to a competitor because of the benefit of being able to redeem their points when they are in Las Vegas).

[2755] T. Shaukat Nov. 9, 2015 Tr. at 16:17-24.

On the other hand, there are benefits that the Las Vegas hotels receive from being part of the Total Rewards system.  Regional customers are encouraged, through Total Rewards, to go to Las Vegas and are incentivized to visit Caesars properties.[2756]  They are then, through special offers, coupons and the like, encouraged to participate in non-gaming activities at various Caesars properties in Las Vegas.  Over the last two decades, this has caused non-gaming revenues at Las Vegas properties to nearly double – an uplift in revenue and EBITDA Caesars has attributed to Total Rewards.  And, unlike the "bounty system" that exists between CIE and CEOC, discussed in greater detail below, the Las Vegas properties do not have to pay a fee to the regional properties for the visit of Total Rewards member who is dominant at a regional property.

To support their argument that Total Rewards fails to elevate the financial results of Caesars' regional properties, critics of the program have pointed to Caesars' May 2012 opening of Horseshoe Cleveland, the first casino in Ohio.[2757]  The casino was purchased in conjunction with Rock Gaming LLC, a company headed by Dan Gilbert.[2758]  After taking over complete ownership of the casino in February 2015, Rock Gaming announced in November that it would cease to be affiliated with Total Rewards by mid-2016, a development that creditors have suggested was due to a recognition by Rock Gaming that their participation in the system would have had a net detrimental effect on revenue.[2759]

According to Caesars executives, however, the decision was based in large part on a series of promotional disagreements.  In particular, Rock Gaming took issue with what it saw as too low a level of promotional spending allocated specifically to the Cleveland property.[2760]  Gilbert disagreed with the "database marketing" that Caesars uses through Total Rewards; instead, Gilbert wanted to keep marketing local and concentrate on "city advertising," with more Cleveland-specific content.[2761]  This clashed with one of the major extolled benefits of Total Rewards, *i.e.*, the ability to play, earn and redeem points in casinos outside of the immediate area, particularly in Las Vegas.[2762]  More broadly, Caesars has not received complaints from

---

[2756] *See* M. Cohen Oct. 16, 2015 Tr. at 259:4-18; *see also* G. Loveman Oct. 27, 2015 Tr. at 88:14-24; E. Hession Nov. 4, 2015 Tr. at 351:13-352:8 (explaining that the destination properties benefit from Total Rewards because they get regional customers coming in and redeeming their points).

[2757] *See* "Gary Loveman Investor Presentation" (Sept. 25, 2012), at CEOC_INVESTIG_00076373 [CEOC_INVESTIG_00076371].

[2758] *See* 2010 Fourth Quarter Earnings Conference Call (Feb. 25, 2011), at CEOC_INVESTIG_00040320 [CEOC_INVESTIG_00040317].

[2759] *See* Karen Farkas, *Loss of Total Rewards program at Horseshoe Cleveland Casino upsets gamblers*, Cleveland (Nov. 2, 2015, 6:24 PM), http://www.cleveland.com/casino/index.ssf/2015/11/loss_of_total_rewards_program.html (last visited Mar. 8, 2016).

[2760] *See* T. Shaukat Nov. 9, 2015 Tr. at 6:4-14.

[2761] *Id.* at 7:10-16, 8:6-10:9.

[2762] *Id.* at 9:6-18.

regional properties indicating that their participation in Total Rewards was a net detriment to their property.[2763]

### e.    The Independent Value of Total Rewards

There is no doubt that Total Rewards is valuable, and that Caesars knows it.  According to CEC management, the program is the principal reason that Caesars properties are able to earn more than their "fair share" of gaming and non-gaming revenue in competitive markets.  And, as discussed above, it appears to be an article of almost talismanic faith among these same individuals – backed, of course, by the few natural experiments that exist, such as St. Louis, Harrah's Shreveport and Harrah's East Chicago – that a connection to the Total Rewards network increases a property's EBITDA while severance has the opposite effect.[2764]

The question, of course, is *how* valuable.  To date, it appears that no one at the Company has attempted to precisely quantify what the program is worth as a standalone matter.[2765]  This is not altogether surprising.  Both the value of Total Rewards and the difficulty in quantifying it follow, to some extent, from what Total Rewards actually *is*: intellectual property, know-how, customer data and customer relationships.  Some witnesses, of course, have testified that the value of Total Rewards is embedded in the various EBITDAs of the properties within the Caesars system.  Certainly, the value of a property reflects the value of access to Total Rewards to that property, but it does not follow that Total Rewards has no independent value outside of what is "baked in" to the properties.  The issue is whether that value is greater than the EBITDA the Caesars enterprise garners from each of its properties' participation in Total Rewards and, if so, can that value be measured.

In 2008, as part of the LBO, Caesars' (then Harrah's) accountant KPMG actually attempted to value the Total Rewards trademark and customer relationships in a Purchase Price Allocation Study.  KPMG valued the trade names using a Relief From Royalty Method, which "is used to estimate the cost savings that accrue to the owner of an intangible asset who would otherwise have to pay royalties or license fees on revenues earned through the use of that asset."[2766]  Using this method, KMPG valued the subject trade name "by referencing . . . the

---

[2763] *Id.* at 10:17-11:6.

[2764] For a discussion on the impact of Total Rewards on the financial results of the Caesars properties, see *supra*.

[2765] *See* D. Bonderman Nov. 10, 2015 Tr. at 136:20-22; M. Wlazlo Oct. 14, 2015 Tr. at 211:23-212:5; T. Donovan Nov. 10, 2015 Tr. at 179:24-180:12; T. Shaukat Nov. 9, 2015 Tr. at 37:6-20; K. Davis Oct. 22, 2015 Tr. at 180:5-8; S. Costopolous Oct. 20, 2015 Tr. at 74:17-75:2; R. Brimmer Jan. 20, 2016 Tr. 425:7-426:5; E. Hession Jan. 20, 2016 Tr. at 669:21-670:14.  Some witnesses believe that Total Rewards has no independent or separate value.  *See* D. Sambur Oct. 19, 2015 Tr. at 294:22-295:17; G. Kranias Oct. 23, 2015 Tr. at 244:13-246:7 (explaining the only value of Total Rewards was in the context of a national casino company with management assets).

[2766] *See* "SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment, Inc. as of January 28, 2008" (Dec. 22, 2008), at CEOC_INVESTIG_00240892-904 [CEOC_INVESTIG_00240748].

amount of royalty income that could be generated if it was licensed to a third party in an arm's-length transaction."[2767]   The exact royalty rates KPMG used in their analysis "was based on publicly available market royalty rates[,] Management input, analysis of each of the entities, and KPMG judgment."[2768]   For the Total Rewards trade name, KPMG used a 0.5% royalty rate on revenues to calculate its value.[2769]   Their analysis concluded that the Total Rewards trademark alone was worth some $495.1 million.[2770]   The study explained that "[t]he majority of Harrah's trade names [including Total Rewards] are highly recognizable in the casino entertainment industry and carry a reputation for products and service, strong consumer recognition, and positive consumer perception.   These perceptions are supported by internal analyses we reviewed.   As such, the trade names are valuable assets."[2771]   The Total Rewards trademark was written down over time through impairment charges over the years, and, in October 2013, was valued at $301.8 million.[2772]   Similarly, in June 2014, an accounting director at CEC asserted that the value of the Total Rewards trademark was alone worth $304.8 million.[2773]

KPMG also performed a valuation of customer relationships within Total Rewards as of January 2008.   In doing so, KPMG explained:   "Rated player relationships represent a key intangible asset that has a separate and distinct value apart from both the purchased tangible assets and goodwill.   Over time, Harrah's has increased its name recognition and, cultivated relationships with rated players . . . through the Total Rewards program."[2774]   KPMG valued Caesars' rated player relationships using the Excess Earnings Method, which "reflects the present value of the operating cash flows generated by existing rated player relationships after taking into account the cost to realize the revenue, and an appropriate discount rate to reflect the time value and risk associated with the invested capital."[2775]   KPMG based this valuation analysis "on projected revenues and attrition rates," which were based on historical data and "detailed discussions with Management."[2776]   Overall, KPMG valued the rated player

---

[2767] *Id.*

[2768] *Id.*

[2769] *Id.*

[2770] *See id.* at CEOC_INVESTIG_00240892-904.

[2771] *See id.* at CEOC_INVESTIG_00240808.

[2772] *See* "CEC Total Rewards Rollforward, Impairment Analysis" (Oct. 1, 2013), CEOC_ INVESTIG_00513908 (native file) at Total Rewards Tab.

[2773] *See* e-mail from M. Riddick to D. Wilfong (June 2, 2014), at CEOC_INVESTIG_00076672 [CEOC_INVESTIG_00076672].   This number appears to be the beginning balance of the book value of the Total Rewards trademark as of October 1, 2013 (as opposed to the fair market value of the book value).   *See* "CEC Total Rewards Rollforward, Impairment Analysis" (Oct. 1, 2013), at CEOC_INVESTIG_00513908 (native), at Total Rewards Tab.

[2774] *See* "SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment, Inc." as of January 28, 2008 (Dec. 22, 2008), at CEOC_INVESTIG_00240811 [CEOC_ INVESTIG_00240748].

[2775] *Id.*

[2776] *Id.*

relationships at the time of the LBO at $1.455 billion.[2777]   Like other assets, the value of these relationships have been written down through impairment charges over the years.   As of December 31, 2014, the carrying value of these customer relationships (which, significantly, does not take into consideration any new relationships developed after the 2008 LBO) was $529 million.[2778]   In all likelihood, those customer relationships developed after 2008 are worth hundreds of millions of dollars more.

There are two other data points – although they, also, are of limited utility.  In 2013, CEC management considered a number of different "steps"[2779] to allegedly help generate liquidity for CEOC, including the creation of a joint venture with CGP to which CEOC's IT assets and Total Rewards would be transferred.[2780]   Notwithstanding the later creation of CES (to which this "step" bears some similarities), the Company determined that the concept "wasn't feasible" at that time – likely because the contemplated transaction involved a sale and not a license of the IP.[2781]   Notably, the model created in connection with this concept assumes that, in exchange for the transfer of its IT assets (including Total Rewards), CEOC would receive consideration of $300 million in cash.[2782]   In addition, the model also assumes that CEOC would receive additional benefits in the form of $100 million in annual IT CapEx savings as "necessary IT capital investments could be funded by CGP."[2783]   Witnesses, however, have stated that this $300 million valuation for Total Rewards was a "plug" or an "estimate,"[2784] an assessment buttressed by the fact that the $300 million number is almost identical to the book and fair market values of the Total Rewards trademark at the time.[2785]   Loveman, for instance,

---

[2777]  *See id.* at CEOC_INVESTIG_00240814.

[2778]  *See* CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 84.

[2779]  *See* e-mail from D. Thaler to E. Hession, *et al.* (Nov. 20, 2013), at CEOC_ INVESTIG_00009799 [CEOC_INVESTIG_00009799], attaching "Transactions Summary & Impact" Deck, at CEOC_INVESTIG_00009800 [CEOC_INVESTIG_00009800].

[2780]  *See* E. Hession Jan. 20, 2016 Tr. 651:7-14; *see also* "CEC Board of Directors Materials: Liquidity Discussion" (Nov. 2013), at PRIV_INVESTIG_00065458 (native file) at 4.

[2781]  *See* E. Hession Jan. 20, 2016 Tr. 651:23-652:13; *see also* D. Bonderman Nov. 10, 2015 Tr. at 112:23-115:2 (stating that selling an equity interest in Total Rewards would not work because "it's part of the business," meaning that it is responsible, in part, for generating revenue for the property itself).  There were, therefore, concerns that selling Total Rewards would "significantly decrease the value of the entire company."  F. Kleisner Oct. 30, 2015 Tr. at 119:22-120:11.

[2782]  This, of course, contrasts with the CES Transaction, which did not provide to CEOC any direct compensation for the incredibly broad, royalty-free license of Total Rewards and related intellectual property.

[2783]  *See* e-mail from D. Thaler to E. Hession, *et al.* (Nov. 20, 2013), at CEOC_INVESTIG _00009799 [CEOC_INVESTIG_00009799], attaching "Transactions Summary & Impact" Deck, at CEOC_INVESTIG_00009800 [CEOC_INVESTIG_00009800].

[2784]  *See* E. Hession Jan. 20, 2016 Tr. 669:21-670:9; R. Brimmer Jan. 20, 2016 Tr. 425:7-22.

apparently viewed Total Rewards as worth substantially more than $300 million and, according to Colvin, articles in the financial press placed its value in the "billions."[2786]

Caesars' limited attempts to license or sell Total Rewards to third parties have also failed to yield much useful information regarding the program's value, and may in fact suggest that the program's value would be difficult to monetize outside of the Caesars system.[2787]   In 2008, for instance, Caesars management began developing the Total Rewards Externalization Project or "TRex."[2788]   The TRex program was an attempt by the Company to license access to "the whole Total Rewards platform" to other entities in exchange for a fee.[2789]   For example, through the TRex program, Caesars could (i) configure and implement a technology platform that included Total Reward capabilities; (ii) offer marketing, operations and gaming reporting and analysis using data extracts from the affiliate; and (iii) offer support services.[2790]   These resources would "provide analysis and recommendations to affiliate casino management leaders, driving better operational decision making."[2791]   The affiliate would then offer "affiliate points" that could be exchanged into Reward Credits.[2792]

Management hoped TRex would lead to an increase in Total Rewards membership and the creation of an additional, extra-company revenue source for Caesars.[2793]   The TRex pilot program was expected to have a base case value of $100 million in revenue with $30-$40 million

---

[2785]   The book value and fair market value of the Total Rewards trademark as of October 1, 2013 were $304.8 million and $301.8 million respectively.  *See* "CEC Total Rewards Rollforward, Impairment Analysis" (Oct. 1, 2013), CEOC_INVESTIG_00513908 (native file), at Total Rewards Tab.

[2786]   *See* D. Colvin Nov. 6, 2015 Tr. at 187:7-21 ("Q. Do you have any recollection of any valuations of total rewards in the $300 million range or anything along these lines? A. No. I mean, this is obviously some scenario planning, but you know, the articles in the financial press were always talking about billions of dollars so I don't know. If Gary Loveman and Dan Thaler are valuing Total Rewards at 300 million, he would have killed them on the spot. I don't remember seeing that, but had to have been dangerous for that. Q. And that's because you think Mr. Loveman viewed Total Rewards substantially more valuable than 300 million? A. Of course. Value is in the eye of the beholder.").

[2787]   *See* D. Sambur Oct. 19, 2015 Tr. at 291:14-293:16.

[2788]   *See* "Externalizing Total Rewards Pilots" (Apr. 15, 2008), at APOLLO-Examiner_01042192 [APOLLO-Examiner_01042191].

[2789]   *See* G. Loveman Oct. 27, 2015 Tr. at 233:12-234:8.

[2790]   "Delaware North Intro:  Enabling Strategic Growth and Driving Incremental Value by Externalizing Harrah's Capabilities" (June 4, 2009), at APOLLO-Examiner_00210564-71 [APOLLO-Examiner_00210524] (describing "TRex Lite" and "TRex" platforms).

[2791]   *Id.* at APOLLO-Examiner_00210571.

[2792]   *Id.* at APOLLO-Examiner_00210564-65.

[2793]   *See* "Externalizing Total Rewards Pilots" (Apr. 15, 2008), at APOLLO-Examiner_01042192 [APOLLO- Examiner_01042191].

of EBITDA by year five and an overall value of around $400 million using a 15x multiple.[2794] It was also intended to leverage off of the Total Rewards platform, further evidence of the perceived value of Total Rewards to all Caesars properties.[2795]

Caesars initially tested TRex with two pilot partners, the Oneida Tribe and Norwegian Cruise Line.[2796]  Both forays were unsuccessful.  In the case of Norwegian, the cruise company—even though it was an Apollo portfolio company—balked at turning over management of its casinos to Caesars, while Caesars was unhappy with the idea of allowing Norwegian access to its proprietary database.[2797]  Caesars also pursued TRex partnerships with the Cosmopolitan, a newly built luxury gaming hotel in Las Vegas, and Twin Rivers, a casino in Rhode Island.[2798]  But both companies expressed fears that, once a company was "plugged" into the Total Rewards program, it could not leave the Total Rewards program and maintain the same value.[2799]  As properties that share markets with Caesars, they were also concerned that Caesars would use their data to siphon away customers.[2800]  As a result, TRex ultimately failed to get off the ground.[2801]

That the Company ultimately had not yet figured out how to market the intellectual property underlying Total Rewards does not mean that such intellectual property has no value. However, any attempt to ascribe a value to this intellectual property appears to be both more

---

[2794]  *See* "TRex Co Business Plan Enabling Strategic Growth and Driving Incremental Value by Externalizing Harrah's Capabilities" (Feb. 27, 2008), at APOLLO-Examiner_00475209-10 [APOLLO-Examiner_00475208].

[2795]  *Id.*

[2796]  *See* "Externalizing Total Rewards Pilots" (Apr. 15, 2008), at APOLLO-Examiner_01042193 [APOLLO-Examiner_01042191].

[2797]  M. Rowan Nov. 17, 2015 Tr. at 357:14-359:5; D. Sambur Oct. 19, 2015 Tr. at 291:14-293:16.

[2798]  M. Rowan Nov. 17, 2015 Tr. at 355:6-356:5.

[2799]  *See id.* at 356:11-357:13.

[2800]  *See* D. Sambur Oct. 19, 2015 Tr. at 291:14-293:16; G. Loveman Oct. 27, 2015 Tr. at 233:12-234:23.

[2801]  It does appear that the Company has looked into a modified version of TRex, the so-called "TRex Lite," which is less comprehensive and could assuage some of the concerns expressed by potential partners.  *See* "Delaware North Intro:  Enabling Strategic Growth and Driving Incremental Value by Externalizing Harrah's Capabilities" (June 4, 2009), at APOLLO-Examiner_00210567-71 [APOLLO-Examiner_00210524].  And it is conceivable that Caesars could eventually provide customized consulting and software services based on its platform to third parties and especially those involved in the gaming industry.  At this point, however, Caesars' ability to formulate a program along such lines that would experience commercial success is, in the Examiner's opinion, too speculative to value.

theoretical than real and would, ultimately, be speculative.[2802]  The KPMG values appear to be more theoretical than reflective of what price could be obtained in an actual transaction.  An outright sale of Total Rewards (as opposed to a license or an affiliation) could potentially generate value for Caesars, but any such sale would present real challenges to its ability to stay competitive as a gaming company and it is difficult envisioning a scenario where Caesars would be interested in making such a sale and still stay in business.  Moreover, once the gaming aspect of the Total Rewards intellectual property is factored in, the universe of potential acquirers of the Total Rewards system is likely somewhat limited.  And the ability to market Total Rewards to another gaming company is highly speculative.[2803]

## f.   Alleged "Manipulation" and Redirection of Customers

Historically, CEOC provided (and CES now provides) management services, including access to Total Rewards, pursuant to a number of interlocking management agreements.[2804]  As part of these agreements, the property-owning entities acknowledge that their counterparties (typically CEOC and/or its affiliates) own and manage various hotel and casino properties which may directly or indirectly compete on a national, regional and local basis with the managed property, and that, therefore, each property may not benefit equally from use of the Total

---

[2802]  While an attempt to value the Total Rewards algorithm or other aspects of Total Rewards intellectual property may prove to be a theoretical exercise, the customer lists created from Total Rewards have clear value, as discussed in greater detail in Section VIII.G.

[2803]  The massive amounts of customer data generated by the Total Rewards program may very well have some value on both an individualized and aggregate basis, and it appears that Caesars has historically exploited that value to a limited extent (*e.g.*, in connection with cross-promotional initiatives with airlines or car rental companies).  The Examiner believes that any claim relating to that type of monetization for the pre-CES period would be weak, however, and while one could make out at least a plausible claim relating to those opportunities as part of what was transferred to CES in connection with the Four Properties Transaction, determining their precise value (on an NPV basis, for instance) would be a highly speculative endeavor and not one that the Examiner has attempted to undertake in systematic fashion.

[2804]  *See generally* Management Agreement between Parball NewCo, LLC and Bally's Las Vegas Manager LLC (May 5, 2014) at CEOC_INVESTIG_00244579-700 [CEOC_INVESTIG _00244579]; Management Agreement between Corner Investment Company, LLC and Cromwell Manager, LLC (May 5, 2014) at CEOC_INVESTIG_00244209-329 [CEOC_INVESTIG_00244209]; Management Agreement between Jazz Casino Company, L.L.C. and Harrah's New Orleans Management Company (May 5, 2014) at CEOC_INVESTIG_00244452-578 [CEOC_INVESTIG_00244452]; Management Agreement between 3535 LV NewCo, LLC and The Quad Manager, LLC (May 5, 2014) at CEOC_INVESTIG_00244056-177 [CEOC_INVESTIG_00244056].  Although CEOC and its affiliates are still parties to most of these management agreements, the services provided thereunder are now the responsibility of CES pursuant to the License and Shared Services Agreement.  *See* Section VIII.D, *supra*.

Rewards system.[2805]  As a condition of receiving management services, these properties agree to waive any claims that could arise from such an arrangement.[2806]

Given this structure, there is an inherent risk that the Total Rewards program (and accompanying marketing promotional program) could be used to redirect or influence CEOC customers to use other, non-CEOC properties within the Caesars enterprise (*i.e.*, CERP or CGP properties).  Various constituents have alleged as much, asserting that, "[u]nder the system, Caesars can identify its best customers and direct them from regional properties to destination casinos in Las Vegas and New Orleans – which are now principally owned by CGP and CERP."[2807]  To date, however, there is no evidence that Caesars has actually used Total Rewards to intentionally divert business to non-CEOC properties, and witnesses have consistently rejected any such suggestions.[2808]  To the contrary, individuals interviewed by the Examiner maintained that Total Rewards has historically been used to maximize profit for the Caesars entity as a

---

[2805] *See, e.g.*, Management Agreement between Parball NewCo, LLC and Bally's Las Vegas Manager LLC (May 5, 2014), at CEOC_INVESTIG_00244592 [CEOC_INVESTIG_00244579]; Management Agreement between Corner Investment Company, LLC and Cromwell Manager, LLC (May 5, 2014), at CEOC_INVESTIG_00244221 [CEOC_INVESTIG_00244209]; Management Agreement between Jazz Casino Company, L.L.C. and Harrah's New Orleans Management Company (May 5, 2014), at CEOC_INVESTIG_00244465 [CEOC_INVESTIG_00244452]; Management Agreement between 3535 LV NewCo, LLC and The Quad Manager, LLC (May 5, 2014), at CEOC_INVESTIG_00244068 [CEOC_INVESTIG_00244056].

[2806] *See, e.g.*, Management Agreement between Parball NewCo, LLC and Bally's Las Vegas Manager LLC (May 5, 2014), at CEOC_INVESTIG_00244592 [CEOC_INVESTIG_00244579]; Management Agreement between Corner Investment Company, LLC and Cromwell Manager, LLC (May 5, 2014), at CEOC_INVESTIG_00244221 [CEOC_INVESTIG_00244209]; Management Agreement between Jazz Casino Company, L.L.C. and Harrah's New Orleans Management Company (May 5, 2014), at CEOC_INVESTIG_00244465 [CEOC_INVESTIG_00244452]; Management Agreement between 3535 LV NewCo, LLC and The Quad Manager, LLC (May 5, 2014), at CEOC_INVESTIG_00244068 [CEOC_INVESTIG_00244056]; Management and Casino Management Agreement by and Between PHW Manager, LLC and PHW Las Vegas (Feb. 19, 2010), at CEOC_INVESTIG_00121819 [CEOC_INVESTIG_00121801] (stating that the owner has "no right to object to and hereby waives any conflict in the ownership and [o]peration" between the managed property and any other Caesars properties); Hotel and Casino Management Agreement by and among Rio CMBS Manager, LLC and Rio Propco, LLC (Aug. 31, 2010), at CEOC_INVESTIG_00458302-03 [CEOC_INVESTIG_00458289] (acknowledging and waiving potential conflict of interest between the managed property and other Caesars properties and recognizing that the "Manager shall have no obligation to minimize conflict between the Resort and the Other Managed Resorts" but instead will "proceed . . . in a manner reasonably deemed to serve the overall best interests, on a long term basis, of the Managed Resorts as a group").

[2807] *BOKF, N.A. v. Caesars Entm't Corp.*, No. 15-cv-1561, Compl. ¶105, Mar. 3, 2015.

[2808] *See, e.g.*, J. Payne Oct. 22, 2015 Tr. at 100:22-101:12 (not aware of anyone directing Total Rewards customers to one Caesars property over another).

whole.[2809]   Incentives to visit a particular property are not based on the credit to which that property belongs,[2810] and a customer is typically given the option of selecting among various qualifying properties based on his or her Tier level and regardless of corporate ownership.[2811]

### g.   Plans for Diversion of Business to the CMBS Properties

Notwithstanding the lack of evidence that such diversion of business ever actually occurred, it is the case that, in connection with the CMBS refinancing, Caesars and Apollo executives developed a plan to drive business from other Caesars properties to the CMBS properties in order to increase the profitability of the latter.[2812]   As discussed in further detail in Section VIII.C, *supra*, both Apollo and the CMBS Lenders recognized that, as of late 2012, there existed inadequate collateral to fully refinance the CMBS Debt.[2813]   By Apollo's estimation, this "equity gap" amounted to over a billion dollars at the time.[2814]   Consequently, in 2013, Caesars executives and Board members (including Sambur and Kranias) considered using Total Rewards and other marketing initiatives to increase the EBITDA of those CMBS Properties and thus help "fill" the financing gap in order to effectuate a refinancing on better terms.[2815]   According to an August 2013 Financing and Liquidity Review Presentation, CEC management estimated that implementing these "[a]ctions to shift allocations and business toward CMBS" would have

---

[2809]  *Id.* at 99:4-100:16; J. Beato Sept. 24, 2015 Tr. at 108:4-21 ("We operate to maximize the total value of the enterprise which, in effect, optimizes everyone's value in the system."); *see also* T. Shaukat Nov. 9, 2015 Tr. at 26:17-29:22 (explaining that Caesars works to "maximize the EBITDA of the city"). As discussed below, some creditors have asserted that this policy in itself may give rise to claims against CEC.  *See* Section VIII.G, *infra*.

[2810]  T. Shaukat Nov. 9, 2015 Tr. at 15:4-9 (the company does not divert customers to properties within a credit versus another because "[w]ithin a market we are generally agnostic to which credit a property in that market is.").

[2811]  *See* T. Shaukat Oct. 28, 2015 Tr. at 183:2-10, 184:15-18, 187:17-188:5 (the company did not favor one property over another, but has set up the Total Rewards system in order to provide the customer with the choice of where to go); T. Shaukat Nov. 9, 2015 Tr. at 16:5-16 (if customers are diverted from a regional CEOC property to a non-CEOC Las Vegas property, it is not done based on credit but rather based on what the customer qualifies for); *id.* at 17:11-14 (options are given to the customers "without regard to what credit those casinos reside in in Las Vegas"); *see also* J. Payne Oct. 22, 2015 Tr. at 98:19-99:7.  The question of "what the customer qualifies for" and how that is determined by the algorithm is an interesting one, but the Examiner has seen no evidence that the Company put its finger on the scale, and delving into the particulars of the algorithm is beyond the scope of the Examination.

[2812]  Additionally, there have been allegations that following the August 31, 2014 closure of Showboat (a CEOC property) in Atlantic City, Caesars did not do enough to divert those customers only to other CEOC regional properties.  *See* Section VIII.G, *infra*.

[2813]  Caesars Entertainment Discussion Materials (Feb. 2013), at CEOC_INVESTIG_00355379 [CEOC_INVESTIG_00355362].

[2814]  *Id.*

[2815]  D. Sambur Oct. 19, 2015 Tr. at 122:19-128:21.

"negatively impact[ed] CEOC EBITDA in the forecast by [roughly] $19 million annually beginning in 2014."[2816]

As an initial matter, Caesars executives involved with marketing initiatives have uniformly stated that the CMBS plan would not have actually involved manipulation of the Total Rewards program.[2817]  Instead, the plan proposed increasing incremental revenue at the CMBS Properties through special events, such as conventions, trade meetings or shows.[2818] Additionally, Shaukat, who was the former Chief Marketing Officer at Caesars, was adamant that the "intent" of the initiative, as he understood it, was not to depress CEOC's EBITDA but rather to prop up the EBITDA of the CMBS Properties – presumably to effect a restructuring of the CMBS debt on more favorable terms.[2819]

Of course, the forecast contained in the August 2013 Presentation reflected the reality that every hotel asset at Caesars was housed at either CMBS or CEOC at the time, and that even if there were an overall increase in revenue (something not contemplated by the plan), steering customers and/or events to properties housed by CMBS was likely to have a detrimental net effect on CEOC.[2820]  In any event, every witness asked about this initiative has claimed that it was ultimately abandoned, and there is no evidence to the contrary.  From Sambur's perspective, this was because such steering would have been difficult to achieve and probably "not something [they] should be doing."[2821]  Loveman, on the other hand, felt the perceived need for the plan

---

[2816] Financial and Liquidity Review (Aug. 14, 2013), at CEOC_INVESTIG_00227052 [CEOC_INVESTIG_00227050].

[2817] *See* D. Sambur Oct. 19, 2015 Tr. at 125:17-127:16; T. Shaukat Nov. 9, 2015 Tr. at 17:15-18:13.

[2818] *See* D. Sambur Oct. 19, 2015 Tr. at 126:25-127:16.

[2819] T. Shaukat Oct. 28, 2015 Tr. at 45:17-47:3; T. Shaukat Nov. 9, 2015 Tr. at 17:15-18:13.

[2820] For instance, the presentation specifically mentions moving events from Planet Hollywood (a CEOC entity at that time) to Paris (a CMBS entity) in order to increase the number of "responders" (or customers) at the Paris.  Shaukat explained that this was driven by a recognition that Planet Hollywood was somewhat "underpriced" due to previous marketing initiatives meant to drive business there, but whatever the reason, the net effect was forecasted to be more customers at the Paris and less at Planet Hollywood.  T. Shaukat Oct. 28, 2015 Tr. at 45:17-50:11.  Interestingly, Planet Hollywood had by then been "earmarked" as a future Growth property (*see* "CEOC Presentation to the Board of Directors: Octavius/Linq Transfer" (Oct. 10, 2013), at PRIV_INVESTIG_00024668 [PRIV_INVESTIG_00024656]), meaning that a decrease in its EBITDA could have benefitted the Sponsors by driving down the purchase price.  *See* Section VIII.C, *supra*.  Again, however, each witness denied that this was a potential driving force behind the marketing plan.  *See, e.g.,* T. Shaukat Oct. 28, 2015 Tr. at 45:17-47:3, 49:3-11 (explaining that the intent of the proposal was not to increase the revenues of a property at the expense of other parties, but "to steer incremental business to the properties"; for Planet Hollywood, the intent was to "raise the value of the average customer in Planet Hollywood," leading to less "responders" than the Paris but a "higher-average-quality customer").

[2821] D. Sambur Oct. 19, 2015 Tr. at 125:20-126:23.  Sambur's statement only makes sense in a situation where there is some concern about CEOC's solvency or financial condition.  In the

disappeared because the Company realized it would be able to achieve the CMBS refinancing without it.[2822]

#### h. Generation of Cross-Play by CEOC

It does appear that, given the "hub-and-spoke" system and the various asset transfers during 2013 and 2014 between and among the Caesars entities, net Cross-Play inures more to the benefit of CGP and CERP than it does to CEOC, which is now made up predominantly of regional properties. As shown in TR Figure 7, the net Theo gaming Cross-Play between all the CEOC properties and all the CGP and CERP properties (combined) indicates that CEOC exported more customer dollars to CGP and CERP properties than vice versa. Specifically, CEOC recovered an average of 72 cents on the dollar of its exports to CGP and CERP combined.

**TR Figure 7: Gaming Theo Cross-Play - CEOC vs. CGP/CERP Properties**

| *(amounts in millions)* | 2011 | 2012 | 2013 | 2014 | 2015 | Total |
|---|---|---|---|---|---|---|
| CEOC Imports from CGP/CERP | [redacted] | | | | | |
| CEOC Exports to CGP/CERP | | | | | | |
| **Net CEOC (Exported) Gaming Theo to CGP/CERP** | | | | | | |
| **Return of Every Gaming Dollar Exported** | **$0.74** | **$0.85** | **$0.83** | **$0.59** | **$0.63** | **$0.72** |

Source: Appendix 10, Total Rewards, at 5.

Additionally, CEOC has historically received no consideration in exchange for customers sourced at CEOC regional properties who visit non-CEOC properties in Las Vegas or elsewhere.[2823] By contrast, for example, where customers are referred by CEOC to CIE, Caesars' online, mobile and social gaming company, a "Cross-Marketing Agreement" between those two entities obligates CIE to pay a fee to CEOC for such referrals.[2824] This "bounty system" has two components. Under the first, CIE pays CEOC 3% of revenue earned where the "primary brand of the game or the URL on which such game is located is one or more Licensed

---

ordinary course, there should be no issue with moving business between financially healthy, wholly-owned subsidiaries.

[2822] Interview of G. Loveman, Apr. 16, 2015 (not transcribed); Interview of G. Loveman, June 23, 2015 (not transcribed).

[2823] *See, e.g.*, T. Shaukat Nov. 9, 2015 Tr. at 17:15-18:13 (not aware of any discussions about whether any consideration should be paid to CEOC in exchange for the customers that come from CEOC regional properties and stay/spends money at non-CEOC properties in Las Vegas). Until the creation of CES, however, certain Caesars properties managed by CEOC paid management fees to CEC.

[2824] *See* Cross-Marketing and Trademark License Agreement (Sept. 29, 2011), at CEOC_INVESTIG_00060339 [CEOC_INVESTIG_00060327]; T. Shaukat Nov. 9, 2015 Tr. at 35:20-36:13.

Marks."[2825]  The second provides, *inter alia*, for CEOC to share in 20% of CIE Net Sales and to receive up to 20% revenue for new CIE customers who purchase a CEOC nongaming product or service online.[2826]   No similar arrangements benefitting CEOC exist within the Caesars enterprise.[2827]

Certain constituents have suggested that CEOC should be compensated in a similar manner for the Cross-Play it generates from its regional properties to those non-CEOC properties in Las Vegas.  This position stems, in part, from the recent metamorphosis of CEOC from a fully integrated casino operator into a more regional casino operator with a single destination property, and the consequently greater likelihood that CEOC customers will visit non-CEOC destination properties owned by CERP or CGP when they travel to Las Vegas.  Indeed, these constituents declare that CERP and CGP now have "unfettered access" to Total Rewards, allowing them to market directly to CEOC's customers, including those who have never visited a non-CEOC property.  They assert that such access has increased CEOC's net exportation of theoretical gaming revenue by nearly $30 million in 2014 (for an estimated "loss" of value for CEOC of $506 million to $671 million).  However, as discussed below, even if this were the case, this analysis ignores the benefits CEOC properties receive from participation in Total Rewards and makes speculative assumptions about customer choice.  Moreover, even if such "loss" could be proven, it should have been taken into account as consideration for the properties transferred in those transactions (particularly Growth and Four Properties), and thus any separate recovery would constitute "double counting."  The issue as to CERP is discussed below.

### i.   CMBS/CERP and CGP Access to the Total Rewards Network

#### (A)  CMBS/CERP

After the 2008 LBO, CEOC provided management services for the then six CMBS properties[2828] for no compensation other than the reimbursement of allocated and unallocated

---

[2825] Cross-Marketing and Trademark License Agreement (Sept. 29, 2011), at CEOC_INVESTIG_00060336 [CEOC_INVESTIG_00060327].

[2826] *Id.* Alternatively, the parties could agree upon a traffic exchange on a click-for-click basis.

[2827] *See* T. Shaukat Nov. 9, 2015 Tr. at 35:20-36:13 (there is no such arrangement with CERP or any other entity that utilizes Total Rewards).

[2828] On May 22, 2008, two CEOC properties were moved under the CMBS structure in exchange for four of the original CMBS properties as contemplated under the LBO transaction. *See* "2008 Leverage Buyout – Reclassification of Intercompany account 2995 to accurately present CEOC standalone financial statements," at CEOC_INVESTIG_00012033 [CEOC_INVESTIG_00012031].  At the same time, CEOC, CEC and the CMBS Entities entered into the Amended and Restated Shared Services Agreement to reflect the property exchange – all other terms appear to remain consistent.  *See* Amended and Restated Shared Services Agreement by and among Harrah's Operating Company, Inc., and Harrah's Entertainment, Inc., and CMBS Entities (May 22, 2008), at CEC_EXAMINER_1030930-58 [CEC_EXAMINER_1030930].

expenses.[2829]    Through these management services, the CMBS properties were permitted to access and use certain proprietary information and systems, including Total Rewards.[2830]

Thereafter, as part of the 2010 extension of the CMBS Loans, *see* Section VIII.C, *supra*, CEOC entered into the Second Amended and Restated Shared Services Agreement with, *inter alia*, the CMBS Properties (the "2010 CMBS Services Agreement").[2831]    Like the other shared services agreements, the 2010 CMBS Services Agreement provided the CMBS properties with access to Total Rewards and the right to use its customer database, including CEOC's "proprietary Business Processes and methodologies related to customer predictive modeling, Offers systems and processes, CRM and Customer marketing techniques."[2832]    And, through the 2010 CMBS Services Agreement, CEOC was obligated to continue to manage these properties in the event of a default, either for a transition period or a longer term.[2833]

As with the earlier shared services agreements, CEOC received no compensation, profit margin or any other type of royalty for allowing the CMBS entities access to the entirety of the Total Rewards program.[2834]    Rather, CEOC was only reimbursed for allocated costs and a 30% portion of unallocated costs through a "services fee,"[2835] neither of which covered Total Rewards.    Finally, in connection with the CERP Transaction, CEOC entered into a Third Amended and Restated Shared Services Agreement (the "2013 CERP Services Agreement") with the newly formed CERP entity.    Under that agreement, Octavius and LINQ, which had been transferred from CEOC to CERP in order to help collateralize the refinancing of the former CMBS debt, were entitled to remain part of the Total Rewards program without additional compensation to CEOC.    In all other relevant respects, the 2013 CERP Services Agreement was identical to the 2010 CMBS Services Agreement.[2836]

In May 2014, in connection with the CES Transaction, services previously provided by CEOC pursuant to the 2013 CERP Services Agreement became the responsibility of CES, a newly formed joint venture among CEOC, CERP and CGP.[2837]    CES, which obtained a "[n]on-

---

[2829]    *See* Shared Services Agreement by and among Harrah's Operating Company, Inc., and Harrah's Entertainment, Inc. and CMBS Entities (Jan. 28, 2008), at CEOC_INVESTIG_00130813 [CEOC_INVESTIG_00130801].

[2830]    *See id.* at CEOC_INVESTIG_00130810-11 [CEOC_INVESTIG_00130801].

[2831]    *See* Second Amended and Restated Shared Services Agreement (Aug. 31, 2010), at CEC_EXAMINER_0220164-96 [CEC_EXAMINER_0220164].

[2832]    *See id.* at CEC_EXAMINER_0220170-71.

[2833]    *See id.* at CEC_EXAMINER_0220178.

[2834]    *See id.* at CEC_EXAMINER_0220174.

[2835]    *Id.*

[2836]    *See* Third Amended and Restated Shared Services Agreement (Oct. 11, 2013), at CEC_EXAMINER_0082209-39 [CEC_EXAMINER_0082209].

[2837]    *See* Omnibus License and Enterprise Services Agreement (May 20, 2014) at CEOC_INVESTG_00059560-624 [CEOC_INVESTIG_00059560].

exclusive, non-assignable . . ., fully-sublicensable, royalty-free, fully-paid up worldwide" license to the Total Rewards IP (and other intellectual property) owned by CEOC, granted a sublicense of similar scope to CERP (and CGP) "to use, modify, distribute, copy, publish, create Derivative Works of, or otherwise commercialize" that same intellectual property.[2838]    CERP did not pay any additional consideration for this license to access Total Rewards at the time of the CES Transaction, ostensibly because CERP had an "existing right" to use CEOC's IP pursuant to the shared services agreement.[2839]    Of course, this right was one that had been provided to CERP (and its CMBS predecessors) for free since the time of the LBO.

Creditor groups have claimed that CEOC should be compensated for CERP's "unfettered" access to Total Rewards since 2008.    They assert that this arrangement has harmed CEOC, both because it was never fairly compensated for its intellectual property and because a majority of the rated play at CERP and CGP has come from CEOC's customers as a result of the existence of the Total Rewards network.    Caesars and the Sponsors have emphasized that the CERP refinancing allowed CEOC to continue to receive the Total Rewards benefits of the CMBS/CERP properties and that the shared services contract obligated CMBS to cover 30% of unallocated corporate expenses.    These "unallocated" corporate expenses, however, are incurred on an annual basis and are not allocated to a specific property;[2840] they, accordingly, do not cover a license fee.    There is no evidence, however, that CEOC received any compensation in exchange for the benefit to CMBS/CERP of Total Rewards as part of either the 2008 (or 2013) property transfers or that CEOC was otherwise ever compensated for allowing CMBS/CERP to access Total Rewards before the formation of CES.

## (B) Growth

On October 21, 2013, CEOC, CAC and Growth Partners entered into a management services agreement, pursuant to the Growth Transaction Agreement.    Like the shared services arrangement with CMBS, this agreement obligated CEOC to perform management duties for the properties it had transferred and allowed the Growth properties to use and access certain proprietary information and services, including, *inter alia*, Total Rewards (the "Service Provider Proprietary Information and Systems").[2841]    In return, CEOC was reimbursed allocated expenses

---

[2838]   *Id.* at CEOC_INVESTIG_00059605-06.

[2839]   B. Finnegan Feb. 4, 2016 Tr. at 404:19-406:23.    Finnegan felt that CERP did not have to pay additional consideration for the sublicense granted by CES because CERP was already paying 30% of the "corporate allocation, which was in excess of its actual pro rata share" and that, after the CES Transaction, the economics for CERP were the "same or worse" "because CEOC expressly had the ability not to fund capital expenditures if it had less than a required minimum level of liquidity."  *Id.* at 405:15-407:9.

[2840]   *See, e.g.*, Second Amended and Restated Shared Services Agreement (Aug. 31, 2010), at CEC_EXAMINER_0220174 [CEC_EXAMINER_0220164] (explaining that the 30% fee is for "costs that have been historically 'unallocated'" and have been "incurred in performance[] of the Services"); E. Hession Nov. 4 Tr. at 353:17-356:3 (explaining that the 30% allocation was allocated to the CMBS properties for all "non-property-specific capital expenditures").

[2841]   *See* Management Services Agreement among CEOC and CAC and CGP (Oct. 21, 2013), at CEOC_INVESTIG_00013106-09 [CEOC_INVESTIG_00013098].

and "actual out of pocket costs," and (unlike the CMBS shared services agreements) was compensated with a 10% profit margin on certain costs in addition to management fees tied to the performance of the properties.[2842]   Moreover, as discussed in Section VIII.D, *supra*, after the creation of CES, CEOC assigned its management contracts to CES but retained 50% of the management fee stream associated with the CGP properties pursuant to these existing management agreements.[2843]   CEOC, of course, had never received management fees from the CMBS Properties or from CERP.

Finally, in Four Properties, CAC/CGP expressly considered access to Total Rewards as a necessary condition to closing any deal.[2844]   Thus, there is strong evidence that Growth paid consideration to CEOC in both Growth and Four Properties based on an EBITDA of each of the properties that had Total Rewards embedded within it.  If Total Rewards was not to be included, then the price for the assets would nearly certainly have been reduced.[2845]

## 2.  Property Management

As discussed, following the 2008 LBO and through the formation of CES, CEOC provided management services to all Caesars properties through shared service agreements and/or property management contracts.[2846]   While these agreements provided the properties with access to Total Rewards, they also provided that CEOC would provide the corporate, management and administrative functions necessary to operate the properties.[2847]   Upon the formation of CES, CEOC assigned its management responsibilities and underlying agreements to CES but, as discussed above, retained 50% of the management fee stream associated with the CGP properties pursuant to these existing management agreements.[2848]

### a.  Property Management of CMBS/CERP Properties

In August 2010, as part of the extension of the CMBS Loans, each of the CMBS/CERP properties or subsidiaries that operates each respective CMBS/CERP property entered into a management agreement with certain subsidiary management companies of CEC.  As discussed

---

[2842]   *See id.* at CEOC_INVESTIG_00013111-12.

[2843]   *See* Omnibus License and Enterprise License and Services Agreement (May 20, 2014), at CEOC_INVESTIG_00059570 [CEOC_INVESTIG_00059560].

[2844]   While there is no evidence that continued access to Total Rewards was considered necessary for the closing of the CERP Transaction, one witness testified that there was a "brief discussion" regard "the value of keeping the network intact.'"  G. Kranias Oct. 23, 2015 Tr. at 145:12-146:5.

[2845]   *See supra* Section VIII.D.

[2846]   *See* Appendix 9, CMBS/CERP Damages, for a description of the shared service agreements and property management contracts between CEOC, CMBS/CERP CGP, and other third-party entities.

[2847]   *Id*.

[2848]   *See* Omnibus License and Enterprise License and Services Agreement (May 20, 2014), at CEOC_INVESTIG_00059570 [CEOC_INVESTIG_00059560].

in greater detail in Appendix 9, CMBS/CERP Damages, each management company received a monthly management fee equal to 2% of the CMBS/CERP property's revenues, plus 5% of the property's EBITDAM for providing its services, in addition to the reimbursement of expenses.[2849]  The management agreements, however, provided that each management company was simultaneously entering into the shared services agreements, through which CEOC would provide "certain shared (including centralized) services to and on behalf of [the management company] (among others)."[2850]  The shared services agreements gave CEOC responsibility for a vast array of corporate functions, including nearly every aspect of property management.[2851] CEOC was not compensated for providing these management services, but rather (as discussed above) simply received 30% of the unallocated corporate costs, which was the Company's original estimate of the CMBS Properties' "share" of expenses incurred.  Instead, the various CMBS/CERP properties paid management fees to CEC subsidiaries (which then flowed up to CEC and the Sponsors) for CEOC's management of the properties.[2852]

### b.  Property Management of Growth Properties

As discussed in detail in Appendix 9, CMBS/CERP Damages, the management of the Growth properties was handled differently.  The Growth properties had management agreements with CEOC or its subsidiaries directly, and paid management fees directly to CEOC or its subsidiaries for the same management services.  For example, under its management agreement with Planet Hollywood, CEOC's subsidiary was paid a base management fee of 3% adjusted gross operating revenue and an incentive fee calculated as 4.5% of EBITDAM.[2853]  Likewise, in connection with the Four Properties Transaction, subsidiaries of CEOC entered into management agreements with the subsidiaries of CGP that acquired the various transferred properties.  These management agreements obligated CEOC to perform management duties for the properties it had transferred as part of the Four Properties Transaction that were similar in scope to those management duties that CEOC provided to the CMBS/CERP properties.[2854]  But, pursuant to the terms of these management agreements, the subsidiaries of CGP did compensate the subsidiaries

---

[2849]  *See, e.g.*, Hotel and Casino Management Agreement by and among Rio CMBS Manager, LLC and Rio Propco, LLC (Aug. 31, 2010), at CEOC_INVESTIG_00458303-04 [CEOC_INVESTIG_00458289]

[2850]  *See id.* at CEOC_INVESTIG_00458298.

[2851]  *See* Second Amended and Restated Shared Services Agreement (Aug. 31, 2010), at CEC_EXAMINER_0220169-72 [CEC_EXAMINER_0220164].

[2852]  *See* Appendix 9, CMBS/CERP Damages.  As discussed therein, it appears that these management fees reflected an agreement with the CMBS lenders to allow certain funds to flow to CEC.

[2853]  Management and Casino Management Agreement by and Between PHW Manager, LLC and PHW Las Vegas (Feb. 19, 2010), at CEOC_INVESTIG_00121820 [CEOC_INVESTIG _00121801].

[2854]  *See, e.g.*, Management Agreement between Jazz Casino Company, L.L.C. and Harrah's New Orleans Management Company (May 5, 2014) at CEOC_INVESTIG_00244469-70 [CEOC_INVESTIG_00244452];

of CEOC for the management services they provided with a base management fee of 2% of net operating revenue and an incentive management fee equal to 5%.[2855]

### 3. The Examiner's Findings and Conclusions

#### a. Claims Relating to Property Management and License/Access to Total Rewards

##### i. Properties Transferred to CGP

The Examiner has concluded that the transfer to CES of management services relating to the CGP properties and the provision of Total Rewards access to properties currently owned jointly by CEC, CAC and CGP (in particular, the Horseshoe Baltimore, Planet Hollywood, the Quad, Bally's Las Vegas, Harrah's New Orleans and the Cromwell) will likely give rise only to non-viable claims for actual or intentional fraudulent conveyance or for breach of fiduciary duty.

As discussed in Sections VIII.B and VIII.D, at the time of the Growth and Four Properties transactions, CEOC was almost certainly insolvent, the consideration received by CEOC was less than "reasonably equivalent" to the value of the assets transferred to CGP, and there is a good deal of evidence that the transfers were made with the intent to hinder or delay CEOC's creditors. Moreover, both transactions took place between related parties and involved neither fair process nor a fair price. However, the properties transferred had access to Total Rewards before those transactions took place, and it seems clear that the value attributed to those properties in those transactions, though ultimately inadequate, was intended to account for the "baked in" contribution to EBITDA for which Total Rewards is responsible on a property-by-property basis. Indeed, there is considerable evidence that, without guaranteed access to Total Rewards, CAC/CGP would not have closed the Four Properties Transaction. Additionally, the management services agreement between CEOC and CGP that was entered into as part of the Growth Transaction – which governed CEOC's provision of Service Provider Proprietary Information and Systems, including Total Rewards until the creation of CES – expressly compensated CEOC with a 10% profit margin on certain costs, in addition to management fees tied to each property's performance.[2856]

These facts militate against any conclusion that there exist any claims – independent of those the Examiner has found in connection with the Growth Transaction – for constructive fraudulent conveyance, actual fraudulent conveyance or breach of fiduciary duty.[2857]

---

[2855] *See, e.g.*, Management Agreement between Jazz Casino Company, L.L.C. and Harrah's New Orleans Management Company (May 5, 2014) at CEOC_INVESTIG_00244539, CEOC_INVESTIG_0024457 [CEOC_INVESTIG_00244452]; Appendix 9, CMBS/CERP Damages, Exhibit C-2.

[2856] Management Services Agreement between CEOC and CAC and CGP (Oct. 21, 2013), at CEOC_INVESTIG_00013111 [CEOC_INVESTIG_00013098].

[2857] Certain creditors have also charged that the creation of CES damaged CEOC by stripping it of control over its own IP and ability to provide management services, including the know-how of its former employees who moved over to CES. As a theoretical matter, such a claim would lie

### ii. CMBS Properties/CERP

Conversely, the Examiner concludes that there is a strong management and services claim against CERP for constructive fraudulent transfer based on the free access to Total Rewards enjoyed by the CMBS Properties (which, along with the LINQ and Octavius, became part of CERP in October 2013) since the 2010 CMBS Services Agreement was entered into in 2010.[2858]

The first two prongs of the constructive fraudulent transfer inquiry – a transfer of an interest in property and insolvency – are easily met.  The Examiner has concluded that CEOC was insolvent no later than 2009.  And there is no dispute that, under the Bankruptcy Code, access to the Total Rewards program constitutes an "interest in property" capable of being fraudulently transferred.

As for the third prong, that of "reasonably equivalent" value, it is undisputed that CEOC did not receive *any* compensation from the CMBS Properties in exchange for access to Total Rewards (including its database, analytics and marketing capabilities) or management services granted it as part of the 2010 CMBS Services Agreement,[2859] or from CERP in exchange for the same access memorialized in the 2013 CERP Services Agreement, the amended and restated version of the 2010 CMBS Services Agreement.[2860]  Although the CMBS Properties (and later CERP) did pay management fees, those were owed to certain property management companies which were in turn owned by CEC, not CEOC – despite the fact that it was CEOC which actually provided the management services for those properties.

---

against both CGP and CERP, as the value of that loss of autonomy (as opposed to *access* to IP or shared services) was not embedded in the properties sold to CGP; to the contrary, no consideration was provided to CEOC in exchange for the broad license it granted to CES.  However, damages for any loss of control over the IP would be speculative.  *See, e.g.*, "Project Rubicon, Overview of Limited Scope Caesars Enterprise Services, LLC Valuation, Presented to Alvarez & Marsal" (Nov. 5, 2015) (Informal) (Baker Tilly, financial advisor to the CEOC Governance Committee, estimated that the value for that loss of control was between 0 and $200 million).  Furthermore, damages arising from the transfer of employees and services to CES are not warranted at this point because there has been no discernible impact (to date) on the day-to-day operations of any Caesars property.

[2858]  Although the CMBS Properties were part of the Total Rewards network before September 2010 (the date on which the CMBS Services Agreement was entered), the agreement pursuant to which they were receiving access to Total Rewards was entered into when CEOC was still solvent.

[2859]  Third Amended and Restated Shared Services Agreement (Oct. 11, 2013), at CEC_EXAMINER_0082209-39 [CEC_EXAMINER_0082209].

[2860]  If the statute of limitations applies to claims starting in 2010, the Examiner believes that damages can at least be calculated as of October 11, 2013, *i.e.*, the date on which the CERP Services Agreement was executed, as this constitutes a new triggering event.

There is a weak claim for avoidance based on an actual fraudulent transfer. It is true that CEOC's entry into the 2010 CMBS Services Agreement and later into the 2013 CERP Services Agreement for no consideration evinces a number of badges of fraud.[2861] First, CEOC was likely insolvent in late 2010 and almost certainly insolvent at the time of the CERP Transaction. Second, CEOC also failed to receive any consideration, much less reasonably equivalent value, for the Total Rewards access it provided to the CMBS Properties CERP. Further, the transfer was to insiders (first the CMBS Properties, later to CERP, both of which were controlled by CEC, CEOC's parent company). In addition, statements made by the Sponsors and CEC Management, as well as contemporaneous documents, make very clear that both groups were well aware of the considerable value represented by access to the Total Rewards program. However, the Examiner has not uncovered any evidence that the Sponsors or CEC entered into the 2010 or 2013 Services Agreements – or, more generally, agreed to provide access to Total Rewards to the CMBS/CERP Properties – because of an intent to hinder, delay or defraud creditors. Given the nature of the 2010 and 2013 negotiations with the CMBS Lenders the presence of the two badges of fraud simply are not sufficient to make out a plausible claim for actual fraudulent transfer.[2862]

### (A)   Remedies

Based on these claims, the Examiner has concluded that the proper remedy would be to compensate CEOC for the benefit CERP and its predecessor entities received as a result of the access they were given to Total Rewards and/or the management services CEOC provided. The Examiner believes that there is a strong argument that CEOC is entitled to recover royalty and management fees for the period from September 1, 2010 to May 19, 2014, and royalty fees for the period beginning on May 20, 2014. There is only a reasonable argument that CEOC can recover for the management fees that it would have received post-May 20, 2014, but for the creation of CES.

Thus, the royalties or management fees CMBS/CERP should have paid were calculated for (a) the period from September 1, 2010 (based on access from the 2010 CMBS Services Agreement), through the formation of CES on May 20, 2014, assuming that CES took on the management role (the "Historical Period"), and (b) the value on May 20, 2014, representing the future royalties or management fees CES would earn as a result of taking over the contracts (the "Future Period").[2863]   Based on the above, an estimate of the damages related to the royalty

---

[2861]   *See* Appendix 5, Legal Standards at III.A.2.

[2862]   The Examiner does not believe that the there exists a freestanding breach of fiduciary duty claim against CEOC Board of Directors relating to the access to Total Rewards. However, the failure of The CEOC Board or Apollo to consider the issue in connection with the CERP Transaction (which included the approval of the 2013 Shared Services Agreement and memorialized continued access to Total Rewards) certainly contributed to the conclusion that, in connection with that transaction, there exists a strong claim with regard to breach of fiduciary duty and aiding and abetting. *See* Section VII.C, *supra*.

[2863]   The analysis is based on the date of the formation of CES (as opposed to a later date in 2014 when CES was implemented) because that is when the contractual obligations changed and the rights to manage the properties were assigned to CES.

scenario and the management fee scenario total $172 million and $829 million, respectively, as shown in TR Figure 8:[2864]

**TR Figure 8: Illustrative Damages Analysis**

| Scenario *(amounts in millions)* | | Historical Period Damages | Future Period Damages | Total |
|---|---|---|---|---|
| **1** | Damages based on access to Total Rewards only | $ **39.1** | $ **132.9** | $ **172.0** |
| **2** | Damages based on Management Services provided (which includes Total Rewards access) | $ **237.3** | $ **592.1** | $ **829.3** |

Source: Appendix 9, CMBS/CERP Damages at 12 (providing sources and the approach used to prepare the analysis).
Note: The damage amounts do not consider interest on historical amounts or incremental costs, if any.

While certain creditor groups have provided the Examiner with preliminary analyses related to the shared services agreements to assist the Examiner in determining the damages related to the total benefit gained by CMBS/CERP through its use of Total Rewards, the Examiner has found certain flaws with these methodologies that prevent their use.

One such approach, for instance, determines the value obtained by the CMBS/CERP properties due to "its unfettered access to Total Rewards," by deriving an illustrative contribution margin for the period 2008 through Q3 of 2015, applying an interest rate of 5% to derive the past lost profits owed, and then applying a multiple to the LTM of 2015, for a total benefit derived by the CMBS/CERP properties to be approximately $4.2 billion. This methodology is flawed, however, for several reasons. First, the analysis begins in 2008 – a period of time when CEOC was still solvent. Second, it is unreasonable to assume that CERP would have paid, or CEOC would have received, the full value of the benefit CERP received from Total Rewards, when CEOC almost certainly also derived a significant benefit from being part of that system.

A second approach (suggested by the same creditor group) estimates damages to CEOC based on a hypothetical management fee stream which CERP would have had to pay CEOC, had CEOC and CERP negotiated a management agreement pursuant to which CEOC operated the properties and provided access to Total Rewards. Although the Examiner agrees that, as a theoretical matter, such a management fee approach is a reasonable one, the assumptions underlying the analysis made by this creditor group – which yield a management fee in the amount of 6.1% percent of Net Revenues, adding up to a total value of $2.8 billion – are flawed. Again, the analysis erroneously begins in 2008. More importantly, however, the 6.1% management fee is based on an average that includes contracts with Tribes (*i.e.*, Harrah's Ak-Chin, Cherokee and Rincon) and thus fail to provide a reasonable benchmark to derive a management fee. The management agreements of the Tribes have existed for decades and, as part of these agreements, Caesars has loaned the Tribes money to build and remodel each

---

[2864] *See* Appendix 9, CMBS/CERP Damages.

development.[2865]   Further, the Tribal agreements contain non-traditional provisions, such as contributing to scholarship/education fees and health care endowments.  The management fees paid by the Tribes, which comprise 15% - 17% of Net Revenues, are likely much higher as a result.[2866]

Another creditor group provided the Examiner with two preliminary analyses to calculate the damages suffered by CEOC from the free access to Total Rewards granted to CERP.  The first is based on a theory which assumes CEOC is owed a royalty of somewhere between 20% to 40% of the "Diverted Gaming Revenue," meaning the portion of the historical gaming revenue attributed to CEOC's customers who played at CERP properties.  According to this creditor group, as much as 50% of the rated play at CERP's Nevada casinos comes from CEOC's regional network.[2867]   This analysis of allegedly improperly diverted revenue was conducted for varying time periods, starting at the time of the LBO (January 2008) and the dates when the first, second and third shared services agreements were amended (which included the Total Rewards licenses), and ending on June 30, 2015.  The damages are calculated to be between $65 million and $575 million, depending on time period and rate.  The same creditor group also claims that there is a claim for the future use of the Total Rewards by CERP.  It calculated this value by capitalizing an estimate of the CERP annual royalty payment using an 11x multiple and the same royalty rates to derive a value range of between $391 million and $783 million.

Considering that CERP's access to Total Rewards (and its customer database and data analytics) has led to an increase in cross-property play at its properties, and the CERP has enjoyed the benefits of CEOC's management, the Examiner believes, as discussed above, that a royalty or a management fee approach may indeed provide a reasonable remedy for CERP's free access to these services.  However, the methodology used by the creditor groups also has flaws, including (i) that it too begins in 2008 (when CEOC was solvent);  (ii) that it is based on the unsupported assumption that 50% or more of the rated play at CERP's Nevada casinos historically derive from CEOC's regional network, when the average exports are in fact around 16% overall, as shown in TR Figure 9;[2868] and (iii) that the analysis again does not take into consideration the significant benefit CEOC receives from imported play from CERP as shown in Appendix 9, Ex. B, *infra*.

---

[2865]   *See* G. Loveman Oct. 27, 2015 Tr. at 235:6-236:16; Third Amendment to Management Agreement (Casino) between the Ak-Chin Indian Community and Harrah's Arizona Corporation (Oct. 1, 2014), at CEOC_2004_0058060-61 [CEOC_2004_0058060]; *id.* at CEOC_2004_ 0058079.

[2866]   For a summary of each management contract, see Appendix 9, CMBS/CERP Damages.

[2867]   Gaming revenue was net of assumed gaming tax of 7%.

[2868]   TR Figure 9 was based on the assumption that 85% of gaming revenue is associated with rated play.  *See* T. Shaukat Nov. 9, 2015 Tr. at 32:4-10.

**TR Figure 9: Cross-Play – CEOC Regionals Exports to CERP Nevada vs. CERP Nevada Gaming Revenues**

| (amounts in millions) | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|
| CEOC Regionals Exports to CERP Nevada Estimated Rated Play (85% of CERP Gaming Revenues) | | | | | |
| CEOC Regionals Exports to CERP / Rated Play CERP Nevada Gaming Revenues | 13.5% | 17.6% | 17.4% | 16.6% | 16.3% |

Source: Appendix 10, Total Rewards at 5 (providing sources and the approach used to prepare the analysis); Monthly Property Level Profit and Loss (P&Ls) from January 2007 through December 2015, at CEC_EXAMINER_1447621 (native).

### b. Claims Relating to Diversion of Customers/Cross-Play

As a separate claim, some creditor groups have also asserted that Caesars has used Total Rewards to identify CEOC's best customers and direct them to CERP and CGP through marketing offers for the benefit of CERP and CGP, without compensating CEOC for generating this cross-property revenue.

Despite evidence that the net Cross-Play between the Caesars properties has been more beneficial to CERP/CGP than to CEOC, the Examiner has concluded that there is no viable claim based on such allegations. As an initial matter, there is no evidence that Caesars ever intentionally manipulated Total Rewards to divert customers to CERP/CGP properties. Although it appears that such a course of action was considered by the Sponsors and CEC in connection with the CMBS refinancing that led to the CERP transaction, that plan (i) dealt with marketing initiatives, as opposed to Total Rewards; and (ii) does not appear to have been implemented.

Moreover, although there is evidence that CEOC was a net exporter of Theo gaming revenue, this too is insufficient to give rise to anything more than a speculative claim for damages. For one thing, CEOC properties, including regional properties, have benefited from being part of Total Rewards, although the extent of that benefit is difficult to measure. For instance, many of CEOC's customers – particularly in competitive markets – may only have gamed at its regional properties in order to earn enough Reward Credits so that they could use them at a destination property. Moreover, it is simply too speculative to assume that the benefit of Cross-Play to CERP and CGP properties was something that could have been controlled by CEC, as CEOC's majority shareholder.[2869] At the end of the day, as a number of witnesses

---

[2869] Damages that are speculative in nature are not, as a general principle, recoverable. *See, e.g.*, 22 Am. Jur. 2d Damages § 14 ("To authorize a recovery of more than nominal damages, facts must exist that afford a basis for measuring the plaintiff's loss with reasonable certainty; the evidence must be such that the jury may find the amount of this loss by reasonable inferences from the facts established, not by conjecture, speculation, and surmise."); *see also id.* at § 18; *Fargo Glass & Paint Co. v. Globe Am. Corp.*, 201 F.2d 534, 540-41 (7th Cir. 1953) ("Damages to be recoverable must be actual not speculative, remote or uncertain.").

stated, it is the customer's choice as to which property (or properties) he games at, and there is no evidence that Caesars attempted or was able to manipulate customer choice.

Further, the CGP properties recognized and expressly waived the conflict of interest that arose from participation in the Total Rewards program.[2870]  These agreements were then assigned to CES by CEOC, in return for 50% of the management fee stream.[2871]  Thus, the CGP properties already compensate CEOC for any potential damage caused by Cross-Play, and such damages would be included in the damages based on the management fee/royalty stream calculated for CERP above.  Consequently, based upon the fact that any damages would be speculative (at best) and the fact that CEOC will already be compensated for Cross-Play issues as a result of the management agreements or royalty payments, the Examiner has concluded that there can be no additional relief awarded to CEOC, and thus there are no viable claims premised on an alleged diversion of customer business.

### c.   Claims Relating to Inability to Monetize Total Rewards

Finally, there have been certain claims made concerning the inability to monetize or otherwise license Total Rewards to third parties in order to generate capital for CEOC.  Although there is clear evidence that Total Rewards is valuable, there exists enormous disagreement as to how to assign a monetary amount to this value.  Caesars and the Sponsors have all claimed that there is essentially no independent value that can be ascribed to Total Rewards, other than what amount it embeds into the EBITDA of the properties.  Certain creditors, on the other hand, have ascribed a huge independent value to Total Rewards, particularly given its proprietary nature and its capacity to increase profitability at a given property.

As described above, there is no question that some of the value of the intellectual property is in fact embedded in the value of those properties that are part of the Total Rewards network given that connecting to the system historically results in uplift to a property's EBITDA and vice versa.  However, the fact that Total Rewards is independently able to generate such incremental value at new properties added to the system – and in particular, the fact that such properties earn more than their "fair share" – provides support for the notion that Total Rewards has some inherent worth separate and apart from what is "baked in" to current Caesars properties.

There is, however, no need to definitively resolve this dispute at this stage.  The fact is that CEC has on several occasions attempted to monetize the Total Rewards program and has simply been unable to do so in situations where CEOC (and now CES) is not managing the property or where Caesars does not have an equity interest.  Although CES may figure out a way to monetize the asset in the future, such a possibility is too speculative at this point in time to

---

[2870] *See, e.g.*, Management and Casino Management Agreement by and Between PHW Manager, LLC and PHW Las Vegas (Feb. 19, 2010), at CEOC_INVESTIG_00121819 [CEOC_INVESTIG_00121801] (stating that the owner has "no right to object to and hereby waives any conflict in the ownership and [o]peration" between the managed property and any other Caesars properties).

[2871] *See id.*

assign it value.  Moreover, although it might be possible to sell the Total Rewards intellectual property, it is unclear as to whether this is something Caesars could ever consider and, if it did, whether the market would be (as seems likely) somewhat limited.  Accordingly, at this point in time and absent further evidence, the Examiner believes that any claims premised on a failure to monetize the intellectual property constituting Total Rewards would be weak or not viable.[2872]

---

[2872] This is different, of course, than claims relating to the value of customer data generated and/or collected by the Total Rewards programs and discussed in note 145, *supra*, which the Examiner believes are speculative but has not specifically analyzed.

### G. Atlantic City Transactions

The Examiner investigated (i) Caesars' decision to build a conference center at Harrah's Atlantic City (a CERP property); (ii) the fairness of the consideration CEOC received for its contribution to the conference center (including both CRDA credits and undeveloped land); Caesars' decisions first to purchase and then to sell the Atlantic Club; (iv) Caesars' decision to close the Showboat and its subsequent sale; the reconciliation of an intercompany receivable involving the Showboat; and (v) Caesars' marketing and customer retention plans following the Showboat closure.   These decisions were all made against the backdrop of a steep, protracted decline in Atlantic City gaming revenue, oversupply in the Atlantic City gaming market, and increased competition from gaming in neighboring states.   Various constituencies have raised questions about the wisdom and fairness to CEOC of some of these decisions and have made a number of submissions to the Examiner suggesting that as a result there are significant claims available to CEOC.   As explained in detail below, the Examiner has concluded that with one exception, these transactions do not give rise to viable claims.   The exception is Caesars' marketing and customer retention program following its closing of the Showboat, which had the effect of giving Harrah's Atlantic City – a CERP property – an incremental benefit related to Showboat's customer information and other data.[2873]   The Examiner has concluded that CERP should have paid some consideration for this incremental benefit, and the CEOC estate has a strong constructive fraudulent transfer claim against CERP to recover the benefit that CERP received as a result of the Showboat marketing and customer retention program.   The Examiner estimates the damages related to this claim are between $3.0 and $7.0 million.

### 1.   The Atlantic City Market and Caesars' Strategy

Between 2006 and 2014, total gaming revenue in the Atlantic City market fell more than 47% and showed no sign of recovering.[2874]   The supply of casinos far exceeded the demand, and many properties, not just Caesars' properties, were experiencing financial difficulty.   A December 17, 2013, analyst report issued by Union Gaming Research noted:

> Gaming revenues ultimately peaked at $5.2bn in 2006, declined ~42% since then to $3.1bn (2012), and are currently on pace to decline 5.6% in 2013 to $2.9bn in 2013.  The Atlantic City market at one point had a virtual monopoly on Northeast gaming; however, the introduction of gaming in a host of neighboring states, as well as limited capital invested in the market has clearly impacted results.  We

---

[2873]   The Showboat customer information includes customer contact information and other data collected by the Total Rewards program, including customer preferences, predicted value, and historical activity, among other information.

[2874]   "Atlantic City Gaming Revenue – Annual Statistics for Total Slot, Table & Internet Win, 1978-2015" UNLV Center for Gaming Research Report (Jan. 2015), at 2-3 *available at* http://gaming.unlv.edu/reports/ac_hist.pdf (last visited Mar. 10, 2016).

think the major brunt of the revenue declines likely are in the rearview mirror and the market should stabilize somewhere around the ~$2.8bn to ~$3.1bn range.[2875]

Even this prediction proved to be overly optimistic, and in 2014, the Atlantic City gaming market experienced its lowest gaming revenues since 1988, as total gaming revenue decreased an additional 4.5% from 2013.[2876]  This continued market contraction resulted in the closure of four properties (Showboat, Atlantic Club, Trump Plaza and Revel).[2877]  Matthew Levinson, Chairman of the New Jersey Casino Control Commission, stated that the "closure of four casinos last year was a traumatic contraction of the industry, but it clearly left us with a casino industry that is better positioned for growth in the future."[2878]  Indeed, although the size of the Atlantic City market continued to decline, the remaining casinos actually experienced an 8% increase in their collective total revenue for 2014.[2879]

On its quarterly investors' calls, company management regularly highlighted the depressed situation in Atlantic City and discussed strategies for dealing with the struggling market.[2880]  For example, on the May 7, 2014 earnings call, Gary Loveman stated, "Well AC has been the biggest problem the Company has faced in the last several years.  The business in AC, all the businesses in AC are under tremendous pressure."[2881]

As shown in AC Figures 1 and 2 below, net revenue and EBITDA for the Caesars Atlantic City properties declined during the period 2008 through 2014 and constantly missed budget goals.

---

[2875] "Key Takeaways from our visit to Atlantic City" Report by Union Gaming Research (Dec. 17, 2013), at CACEXAM00137974 [CACEXAM00137969].

[2876] Donald Wittkowski, *Most A.C. Casinos Show Gains for 2014*, Press of Atlantic City (Jan. 15, 2015), http://www.pressofatlanticcity.com/news/most-a-c-casinos-show-gainsfor/article_0ffa8bda-9c21-11e4-a915-4b52747cf1ff.html?mode=story.

[2877] *Id*.

[2878] *Id.*

[2879] *Id*.

[2880] Examples include: "HET – Q2 2011 Caesars Entertainment Earnings Conference Call" transcript prepared by Thomson StreetEvents (Aug. 9, 2011), at 7; "CZR – Q1 2012 Caesars Entertainment Earnings Conference Call" transcript prepared by Thomson StreetEvents (May 1, 2012), at 3; "CZR – Caesars Entertainment at Citi North American Credit Conference" transcript prepared by Thomson StreetEvents (Nov. 5, 2013), at 5; and "CZR – Q1 2014 Caesars Entertainment Earnings Conference Call" transcript prepared by Thomson StreetEvents (May 7, 2014), at 8.

[2881] "CZR – Q1 2014 Caesars Entertainment Earnings Conference Call" transcript prepared by Thomson StreetEvents  (May 7, 2014), at 8.

**AC Figure 1: Atlantic City – Budget vs. Actual**

| (amounts in millions) | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| **BALLY'S ATLANTIC CITY** | | | | | | | |
| *NET REVENUE* | | | | | | | |
| Actual | $ 555.5 | $ 465.0 | $ 416.9 | $ 370.9 | $ 304.1 | $ 257.2 | $ 228.4 |
| Budget | 655.3 | 525.5 | 470.9 | 417.8 | 365.1 | 278.2 | 248.0 |
| Variance % | -15.2% | -11.5% | -11.5% | -11.2% | -16.7% | -7.6% | -7.9% |
| *EBITDA* | | | | | | | |
| Actual | $ 104.5 | $  79.3 | $  47.2 | $  23.9 | $  33.0 | $   9.6 | $  (4.9) |
| Budget | 148.0 | 82.3 | 80.7 | 47.6 | 29.1 | 24.7 | 2.9 |
| Variance % | -29.4% | -3.6% | -41.4% | -49.7% | 13.4% | -60.9% | -268.9% |
| **CAESARS ATLANTIC CITY** | | | | | | | |
| *NET REVENUE* | | | | | | | |
| Actual | $ 527.8 | $ 436.6 | $ 390.1 | $ 383.2 | $ 347.5 | $ 328.4 | $ 312.6 |
| Budget | 599.9 | 509.7 | 447.8 | 407.5 | 377.7 | 343.8 | 319.3 |
| Variance % | -12.0% | -14.3% | -12.9% | -6.0% | -8.0% | -4.5% | -2.1% |
| *EBITDA* | | | | | | | |
| Actual | $ 133.5 | $  87.3 | $  50.8 | $  59.2 | $  55.2 | $  44.7 | $  33.9 |
| Budget | 179.4 | 115.4 | 88.2 | 69.7 | 55.2 | 64.4 | 27.4 |
| Variance % | -25.6% | -24.4% | -42.4% | -15.1% | 0.1% | -30.5% | 23.4% |
| **HARRAH'S ATLANTIC CITY** | | | | | | | |
| *NET REVENUE* | | | | | | | |
| Actual | $ 539.9 | $ 497.8 | $ 482.3 | $ 469.9 | $ 442.9 | $ 404.8 | $ 405.1 |
| Budget | 592.9 | 553.4 | 524.2 | 495.2 | 489.2 | 414.2 | 399.3 |
| Variance % | -8.9% | -10.0% | -8.0% | -5.1% | -9.5% | -2.3% | 1.5% |
| *EBITDA* | | | | | | | |
| Actual | $ 143.4 | $ 124.2 | $ 108.9 | $  87.3 | $  89.9 | $  69.8 | $  58.0 |
| Budget | 188.5 | 138.9 | 127.0 | 116.8 | 104.1 | 83.7 | 49.4 |
| Variance % | -23.9% | -10.5% | -14.3% | -25.2% | -13.7% | -16.6% | 17.2% |
| **SHOWBOAT ATLANTIC CITY** | | | | | | | |
| *NET REVENUE* | | | | | | | |
| Actual | $ 341.8 | $ 287.5 | $ 265.0 | $ 244.5 | $ 227.7 | $ 199.3 | $ 115.4 |
| Budget | 423.3 | 328.4 | 309.3 | 267.4 | 255.6 | 219.7 | 195.7 |
| Variance % | -19.2% | -12.5% | -14.3% | -8.6% | -10.9% | -9.3% | -41.0% |
| *EBITDA* | | | | | | | |
| Actual | $  63.9 | $  48.4 | $  29.8 | $  31.3 | $  25.1 | $  16.7 | $  (1.2) |
| Budget | 110.7 | 57.2 | 48.3 | 28.8 | 38.5 | 30.6 | 7.6 |
| Variance % | -42.2% | -15.3% | -38.5% | 8.6% | -34.8% | -45.4% | -116.4% |

Source:   CEOC and CERP Property Net-Revenue and EBITDA Monthly Budget to Actuals (Mar. 2015), [CEC_EXAMINER_0145430].

**AC Figure 2: Cumulative Annual Decline**

| Cumulative Annual Decline | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|---|
| **BALLY'S ATLANTIC CITY** | | | | | | | |
| Net Revenue | -15.2% | -26.7% | -38.2% | -49.4% | -66.1% | -73.7% | -81.6% |
| EBITDA | -29.4% | -33.0% | -74.4% | -124.1% | -110.8% | -171.6% | -440.6% |
| **CAESARS ATLANTIC CITY** | | | | | | | |
| Net Revenue | -12.0% | -26.3% | -39.2% | -45.2% | -53.2% | -57.6% | -59.7% |
| EBITDA | -25.6% | -50.0% | -92.4% | -107.6% | -107.5% | -138.0% | -114.6% |
| **HARRAH'S ATLANTIC CITY** | | | | | | | |
| Net Revenue | -8.9% | -19.0% | -27.0% | -32.1% | -41.5% | -43.8% | -42.4% |
| EBITDA | -23.9% | -34.4% | -48.7% | -73.9% | -87.6% | -104.2% | -87.0% |
| **SHOWBOAT ATLANTIC CITY** | | | | | | | |
| Net Revenue | -19.2% | -31.7% | -46.0% | -54.6% | -65.5% | -74.8% | -115.8% |
| EBITDA | -42.2% | -57.5% | -96.0% | -87.4% | -122.1% | -167.5% | -283.9% |

Source: CEOC and CERP Property Net Revenue and EBITDA Monthly Budget to Actuals [CEC_EXAMINER_0145430].

As a result, Caesars recorded impairments against the long-lived assets of the Atlantic City properties as shown in AC Figure 3 below, writing down the fair value of the assets recorded at the time of the LBO by over 78% by the calendar year ending December 31, 2013.

**AC Figure 3: Impairment of Long-Lived Assets for the Atlantic City Properties**

| (amount in millions) | Bally's AC | Caesars AC | Showboat | Harrah's AC | Total |
|---|---|---|---|---|---|
| **Fair Value as of January 28, 2008** | **$ 795.8** | **$ 787.0** | **$ 660.8** | **$ 1,318.4** | **$3,561.9** |
| Impairment Charges: | | | | | |
| 2008 - 2011 | - | - | - | - | - |
| 2012 | - | - | 450.0 | - | 450.0 |
| 2013 | 575.8 | 675.8 | 71.5 | 1,027.9 | 2,351.0 |
| **Total Impairment Charges** | **$ 575.8** | **$675.8** | **$ 521.5** | **$1,027.9** | **$2,801.0** |
| *Percentage Impaired* | *72.4%* | *85.9%* | *78.9%* | *78.0%* | *78.6%* |

Sources: KPMG SFAS 141 Valuation Study and Deloitte & Touche Impairment Workpapers.[2882]

---

[2882] Fair values as of January 28, 2008 based on "SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment" (Jan. 28, 2008), at CEOC_INVESTIG_00240962, CEOC_INVESTIG_00240967, and [CEOC_INVESTIG_00240981 [CEOC_INVESTIG_00240748] ("KPMG 141 Valuation Study"); "Showboat ASC360 Write-off" Deloitte Audit Work Paper (Dec. 31, 2012), at Tab 21b [DT0030529]; "ASC 360 - Bally's Impairment Loss Allocation" Deloitte Audit Work Paper (Sep. 30, 2013) at Tab 3 [DT0002071]; "ASC 360 –

CEC and the Sponsors were well aware of Atlantic City market trends, and strategies to cope with the decline in revenue, oversupply, and increased competition from neighboring states were a topic of nearly constant analysis and discussion. For example, in a February 2013 presentation to the CEC Board of Directors, management noted three key ways to improve Caesars' Atlantic City business: continue cost savings; stimulate new market demand (*e.g.*, through the Harrah's Waterfront Conference Center); and align capacity with declining gaming demand through property sales or closures.[2883] Then, in a December 2013 presentation to the CEC Board of Directors,[2884] management provided an overview of the Atlantic City strategy to improve the supply-demand imbalance. This strategy included rationalizing supply through property closures and inducing mixed-use (non-gaming) real estate investment to improve the performance of the remaining assets in the market.[2885]

Consistent with this strategy, CEC built a conference center, closed and sold the Showboat, and bought and sold the Atlantic Club in 2014. These transactions are described below.

### a. Harrah's Atlantic City Waterfront Conference Center

### i. Location of the Conference Center

As early as July 2008, Caesars recognized that Atlantic City's traditional slot revenue business had been cannibalized by more convenient local options in Pennsylvania and New York.[2886] With core revenue streams declining and other types of revenue streams emerging, Caesar's shifted its Atlantic City strategy to new revenue sources and customer segments for growth.[2887] This strategy included proceeding with the development of a major conference facility for which Harrah's Atlantic City was well suited.[2888] The idea was to grow the meeting

---

Bally's Atlantic City – Impairment Loss Allocation" at Tab 5 and "ASC 360 – Showboat Atlantic City – Impairment Loss Allocation" (Dec. 31, 2013) at Tabs 5 and 6 [DT0002646]; "ASC 360 Analysis – Caesars AC – Impairment Allocation" and "ASC 360 Analysis – Harrahs AC – Impairment Allocation" Deloitte Audit Work Papers (Dec. 31, 2013) at Tabs ws 4 and ws 7 [DT0002650].

[2883] "Atlantic City Update - Board of Directors Meeting" Presentation (Feb. 21, 2013), at CEOC_INVESTIG_00439665 and CEOC_INVESTIG_00439668 [CEOC_INVESTIG_004-39663].

[2884] "AC Strategy/Atlantic Club Analysis" Presentation (Dec. 2013), at CEOC_INVESTIG_00057875 [CEOC_INVESTIG_00057875].

[2885] *Id*. at 2.

[2886] "Board of Directors Meeting - Atlantic City" Presentation (July 1, 2008), at APOLLO-Examiner_01199645 [APOLLO-Examiner_01199638].

[2887] *Id.* at APOLLO-Examiner_01199656.

[2888] *Id.* at APOLLO-Examiner_01199673. *See also* E. Hession Jan. 20, 2016 Tr. at 557:15-558:7 ("We felt [the Conference Center] was worth the investment, because we have such an exposure to the city. And so that was an effort to really change the customer mix . . . .").

group business to drive mid-week volume where there was an opportunity to generate higher revenue per occupied room.[2889]    Caesars believed that the Harrah's Waterfront Conference Center and the continued use of maintenance capital at the center Boardwalk would position Harrah's Atlantic City and Caesars Atlantic City within the top tier properties in the future.[2890] Maintenance capital at Bally's Atlantic City and Showboat would enable them to compete with the mid-tier.[2891]    From 2008 until 2015, Caesars followed this overall strategy, despite the decline in the Atlantic City market.[2892]

Although some constituencies have questioned Caesars' decision to build the Conference Center at Harrah's Atlantic City (a CERP property) rather than at Bally's Atlantic City or Caesars Atlantic City (both CEOC properties), the Examiner has concluded that this was a well-considered exercise of business judgment and gives rise to no viable claims.  The Examiner's conclusion is based on the following findings:

- CEC's strategy was established back in 2008, based on study of the market and the competition showing a declining market which only worsened in the following seven years.[2893]

- CEC was not legally required to select a CEOC property for the Conference Center, and CEC was providing the initial funding for this project.  This would be true even if CEOC was insolvent in July 2008.

- Harrah's Atlantic City was the largest hotel among the Caesars Atlantic City properties,[2894] and it was the only location with a large enough parcel of undeveloped land for a conference center, which required roughly 250,000 square feet.[2895]  In addition, its rooms had been updated in 2007 and 2008 and the hotel's amenities would be attractive to convention customers.[2896]

---

[2889]  *Id.* at APOLLO-Examiner_01199668.

[2890]  *Id.* at APOLLO-Examiner_01199677.

[2891]  *Id.*

[2892]  *Id.* at APOLLO-Examiner_01199673 and APOLLO-Examiner_01199677; G. Miller Jan. 15, 2016 Tr. at 188:9-191:25.

[2893]  *Id.* at APOLLO-Examiner_01199657.

[2894]  Harrah's Atlantic City has 2,590 hotels rooms with 154,800 sq. ft. of casino space, compared to Caesars Atlantic City with 1,140 hotel rooms and 115,200 sq. ft. of casino space and Bally's Atlantic City with 1,260 hotel rooms and 119,500 sq. ft. of casino space.  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31-32.

[2895]  Interview of K. Ortzman, July 21, 2015 (not transcribed).

[2896]  T. Jenkin Sept. 30, 2015 Tr. at 77:19-23, 78:12-15; G. Miller Sept. 22, 2015 Tr. at 124:11-125:5; Interview of K. Ortzman, July 21, 2015 (not transcribed) (stating that approximately $500 million had been invested in Harrah's Atlantic City between about 2006 and 2008).

- Building the Conference Center near the Boardwalk properties would have entailed substantial additional costs (estimated at approximately $70 million), particularly to raze and prepare an appropriate site for construction.[2897]

- Harrah's Atlantic City was the best Caesars property in Atlantic City.[2898] Tom Jenkin, CEC's Global President, summarized management's views succinctly: "[Y]ou would have to be out of your freakin' mind to build a convention center attached to Bally's . . . [b]ecause the room products [sic] is old and rundown" and "the boardwalk is not the greatest experience in the world. Take your mother, you would not let her walk on the boardwalk at night by herself."[2899]

- The nicest casino properties in Atlantic City were in the Marina District, which is where Harrah's Atlantic City is located.[2900]

Caesars completed the construction of the Conference Center at a cost of approximately $126 million.[2901] Its official grand opening was on September 17, 2015.[2902] It is the largest, most technologically advanced meeting facility between Baltimore and Boston and can host up to 20 groups or 5,000 attendees at a time.[2903] Caesars senior vice president Michael Massari explained:

> It's a whole new customer we're attracting—the business traveler. . . . If you don't introduce the business traveler into this market in a meaningful way, you're going to see more of what you've seen in the last four to five years. The [Harrah's Conference C]enter will not be in competition with the [Atlantic City] Convention Center, which focuses mainly on trade shows and similar events. For now, the

---

[2897] Interview of K. Ortzman, July 21, 2015 (not transcribed).

[2898] G. Miller Sept. 22, 2015 Tr. at 106:14-15; Interview of K. Ortzman, July 21, 2015 (not transcribed); E. Hession Nov. 4, 2015 Tr. at 520:17-25.

[2899] T. Jenkin Sept. 30, 2015 Tr. at 78:2-5, 78:7-11.

[2900] G. Miller Sept. 22, 2015 Tr. at 106:6-18.

[2901] The CRDA website notes Harrah's Waterfront Conference Center was completed in August 2015 for approximately $126 million (CRDA contributed $45 million and Harrah's Atlantic City contributed $80 million to the project. Additionally, the NJ Economic Development Authority provided $24.1 million in tax breaks over 20 years.), CRDA, *Caesars Entertainment Opens Atlantic City Conference Center*, NJCRDA.com (Sept. 17, 2015, 6:10 PM), http://www.njcrda.com/?s=conference+center.

[2902] Tom Halligan, *Grand Opening Unveils Harrah's New Conference Center*, LCT Magazine (Sept. 18, 2015), http://www.lctmag.com/industry-research/news/410114/grand-opening-unveils-harrahs-new-conference-center.

[2903] David Zuba, *CRDA Investment Series: Harrah's Waterfront Conference Center*, Atlantic City Press Release (Mar. 12, 2015), http://www.atlanticcitynj.com/media/press-release/details.aspx?-NewsID=869.

> [Harrah's Conference] center is drawing many of its customers from the northeast region, but hopes to attract business groups nationwide.[2904]

The witnesses interviewed on this topic were unanimous on these reasons for locating the Conference Center at Harrah's Atlantic City, and the Examiner's personal observation of all of the possible sites in July 2015 confirms the appropriateness of Caesars' decision.

Creditor groups have suggested that the Conference Center should have been built on one of CEOC's Boardwalk properties. However, as discussed above, nothing could change the reality that Caesars' 2008 overall capital plan for the Atlantic City was based on the reasoned business judgment that a new, safe, upscale and spacious Marina District site was preferable to the Boardwalk, that building at Caesars/Bally's Atlantic City would have been more costly, and that, in any event, there was no legal requirement that CEC decide to attach the new Conference Center to a CEOC property. The Examiner accordingly sees no viable claim arising out of this decision.

#### ii. Consideration for CEOC's Contribution to the Conference Center

Creditor groups asked the Examiner to determine whether CEOC received fair consideration for the CRDA credits and land it contributed as part of the financing for the Conference Center. For the reasons described below, the Examiner has concluded that CEOC received "reasonably equivalent value"[2905] in exchange for the transfer and that there are no viable claims arising out of the transaction.

After the decision was made to construct the Conference Center adjacent to Harrah's Atlantic City, Daniel Epstien (Vice President, Finance & Strategy) began working to secure the necessary financing.[2906] Given the declining performance of the Atlantic City market, the financing efforts took several years, and Harrah's Atlantic City did not generate adequate cash flows from operations to build the facility.[2907] In conjunction with this effort, Caesars looked to CRDA's grant program[2908] to provide a portion of the total capital required of over $126 million.[2909]

---

[2904] Casino Connection Staff, *Caesars Unveils Atlantic City Conference Center*, Casino Connection AC (Sept. 24, 2015), http://casinoconnectionac.com/issue/vol-12-no-10-october-2015/article/caesars-unveils-atlantic-city-conference-center.

[2905] 11 U.S.C. §548(a)(B).

[2906] Interview of D. Epstien, July 30, 2015 (not transcribed).

[2907] *Id*.

[2908] CRDA, or the New Jersey Casino Reinvestment Development Authority, is the "only agency of its kind nationwide. . . . Under the 2011 Tourism District Act, CRDA's mission evolved from statewide projects to becoming the state's key economic development agency for Atlantic City . . . . CRDA responsibilities expanded to include land use regulation . . . tourism marketing, ownership and oversight of the Atlantic City Convention Center and Boardwalk Hall, and partnership with the Atlantic City Alliance to brand and market Atlantic City." Elaine Zamansky, *New Jersey Taxpayers Big Winners in Atlantic City's Boardwalk Hall and*

On September 25, 2012, CEC submitted an application to CRDA for a $45 million grant toward the overall funding of $126 million.[2910] CEC offered to contribute $55.7 million in CRDA tax credits: $23.4 million in credits from CEC itself and $32.3 million in credits from CEOC.[2911]

After the application was submitted, negotiations ensued, and very late in the process, CRDA requested and CEC agreed to contribute certain land parcels owned by CEOC to be used as part of the city's future Marketplace development project, as well as a "donation" of CRDA credits owned by CEOC.[2912] The land was detached from Caesars' Atlantic City properties, and Caesars did not think it had much value.[2913]

On June 14, 2013, CEC entered into an agreement with CRDA pursuant to which CRDA agreed to provide $45 million for the Conference Center project.[2914] In return, CEC agreed to contribute assets totaling $63 million, of which CEOC's share was $39.6 million and Harrah's Atlantic City's share was $23.4 million, as shown in AC Figure 4 below:

---

*Convention Center*, CRDA (Dec. 17, 2015), http://www.njcrda.com/featured-news/new-jersey-taxpayers-big-winners-in-atlantic-citys-boardwalk-hall-and-convention-center/. CRDA is funded, in part, by tax revenues derived from the Atlantic City gaming market.

2909 Interview of D. Epstien, July 30, 2015 (not transcribed). *See also* Casino Connection Staff, *Caesars Unveils Atlantic City Conference Center*, Casino Connection AC (Sept. 24, 2015), http://casinoconnectionac.com/issue/vol-12-no-10-october-2015/article/caesars-unveils-atlantic-city-conference-center.

2910 Letter from CRDA to Bally's Atlantic City Re: Harrah's Project Grant Agreement and fully executed Project Grant Agreement (June 26, 2013), at CEOC_2004_0040568 [CEOC_2004_0040566].

2911 The CEC credits were actually held by a CEC indirect subsidiary that owns Harrah's Atlantic City, Harrah's Atlantic City Propco, LLC. They were earned as a result of tax deposits in prior years that were based on a percentage of gross gaming revenue, as prescribed by the New Jersey Casino Control Act. "Harrah's Resort, Atlantic City Quarterly Report For the Quarter Ended December 31, 2014 Submitted to the Division of Gaming Enforcement of the State of New Jersey" at 19-21.

2912 Interview of K. Ortzman, July 21, 2015 (not transcribed). *See also* Resolution of the CRDA in Grant Approval (Feb. 19, 2013), at CEOC_2004_0040481 [CEOC_2004_0040480].

2913 T. Jenkin Sept. 30, 2015 Tr. at 79:4-19.

2914 Letter from CRDA to Bally's Re: Harrah's Project Grant Agreement and fully executed Project Grant Agreement (June 26, 2013), at CEOC_2004_0040566 [CEOC_2004_ 0040566].

## AC Figure 4: Assets Contributed to the CRDA

*(amounts in millions)*

| Asset Contribution | Showboat | Bally's AC | Caesars AC | Total CEOC | Harrah's AC | Total |
|---|---|---|---|---|---|---|
| CRDA Credit Transfer | $    5.2 | $    10.6 | $    7.0 | $    22.8 | $    23.4 | $    46.2 |
| CRDA Credit Donation | 9.5 | - | - | 9.5 | - | 9.5 |
| **Credits: Subtotal** | **14.7** | **10.6** | **7.0** | **32.3** | **23.4** | **55.7** |
| Land Donation | - | 4.6 | 2.7 | 7.3 | - | 7.3 |
| **Total** | **$    14.7** | **$    15.2** | **$    9.7** | **$    39.6** | **$    23.4** | **$    63.0** |

Sources:  Letter from CRDA to Bally's Atlantic City Re: Harrah's Project Grant Agreement and fully executed Project Grant Agreement (June 26, 2013), at CEOC_2004_0040566-601 [CEOC_2004_0040566]; "Master Transaction Agreement" (Dec. 31, 2013), at CEOC_2004_0040490-541 [CEOC_2004_0040490].

On December 31, 2013, CEC and the subsidiaries of CEOC that owned the CRDA credits and land entered into an agreement to assign the CRDA credits to CEC and compensate CEOC for the land donated to the CRDA.[2915]   In that exchange, CEC paid CEOC $29.2 million, allocated between the fair market value of the credits of $21.9 million and the land of $7.3 million.[2916]  The amount allocated to the CRDA credits was based on the net book value of these assets and equated to the fair value of the credits ($32.3 million less a reserve of $10.7 million = $21.6 million).[2917]  The land had been appraised on May 11, 2012, by Integra Realty Resources – Coastal, New Jersey ("IRR") at $7.3 million.[2918]

Creditors have questioned whether CEOC received fair value for the land it contributed to the CRDA.  They point out that Caesars had "recently" acquired a smaller similar parcel for $9.4 million.  It appears this allegation is based on a summary of land acquisitions totaling 30,456 square feet used to derive the fair market value of the land CEOC contributed to CRDA, included in the IRR Appraisal Report dated May 23, 2012, prepared a year earlier in connection

---

[2915]  Master Transaction Agreement among Harrah's AC, Bally's AC, Caesars AC, Showboat and CEC (Dec. 31, 2013), at CEOC_2004_0040490-541 [CEOC_2004_0040490].

[2916]  *Id.*

[2917]  "Atlantic City Transaction with CRDA" Presentation (undated), at CEOC_2004_0040451-53 [CEOC_2004_0040445].  Historically, Caesars recorded a reserve of 33% of the balance of the credits on its balance sheet in order to account for the poor investment performance of the funds managed by CRDA.  The "initial obligation deposits are marked down by approximately 33 percent to represent their fair value and eventual expected conversion into bonds by the CRDA."  Notes to Financial Statements of the "Harrah's Resort, Atlantic City Quarterly Report For the Quarter Ended September 30, 2014 Submitted to the Division of Gaming Enforcement of the State of New Jersey" at 10.

[2918]  "Appraisal of Real Property" Report (May 11, 2012), at CEOC_2004_0040355 [CEOC_2004_0040352].

with another transaction.[2919] However, IRR determined that the amounts paid for these earlier land acquisitions (which were in 2006-08) were not comparable, as the land had been acquired at the height of the real estate market in Atlantic City and potentially for other strategic reasons. As explained by IRR:

> A 30,456/s.f. portion of the property was assembled in the 2006/2007 timeframe at a price of $9.44M ($310/s.f.). As discussed within the report, . . . these acquisitions were initiated as part of a strategic assemblage at the peak of the City's land market. The cost of these sites even in that timeframe were 200% to 300% higher than the highly fueled real estate market. Applying our more market based adjustments would imply $130/s.f. as a current reflected unit value ($310/s.f. x .70 x .60). Based on the timing of these acquisitions, we are convinced there was additional motivation to these transactions related to the Pinnacle Entertainment effort (CIRCA 2006/2007) for redevelopment of the nearby Sands Casino property.[2920]

There is no evidence that land values materially increased between the May 2012 appraisal date and the end of 2013, when the CRDA transaction closed.

Creditors have also suggested that, given that the land parcels are located across the street from Bally's Atlantic City, they might have been of strategic value to CEOC (either currently or in the future), or could have been used to construct a conference center that would have benefited Caesars Atlantic City and Bally's Atlantic City. However, the Conference Center built at Harrah's Atlantic City required approximately 250,000 square feet of land,[2921] significantly larger than the 30,456 square feet of land available near Bally's Atlantic City. This suggestion is thus highly speculative, and there is no evidence that CEOC considered using the land for any such purpose or that it would have been feasible to build a second conference center any time in the foreseeable future.

The Examiner has accordingly concluded that CEOC was fairly compensated for its contributions of CRDA credits and land as part of the funding package for the Conference Center, and thus does not believe that this transaction gives rise to any viable claim.

**b. The Atlantic Club**

The Examiner also investigated whether Caesars' decisions to buy and then sell the Atlantic Club were appropriate, and whether CEOC paid and received fair consideration for the transactions. The Examiner has concluded that both the purchase and sale were sound exercises of Caesars' business judgment and give rise to no viable claim.

---

[2919] *Id.* at (CEOC_2004_0040358) includes a list of land acquisitions by Bally's Park Place, Inc. and AC Country Club I, LLC between December 11, 2006 and January 17, 2008 totaling $9,442,000.

[2920] *Id.* at CEOC_2004_0040396.

[2921] Interview of K. Ortzman, July 21, 2015 (not transcribed).

In December 2013, CEOC purchased the non-gaming assets of the Atlantic Club at a bankruptcy auction for $15 million, including property, plant, equipment, and certain inventory items.[2922]   Separately, Tropicana Atlantic City Corp. purchased the Atlantic Club's customer data and gambling equipment for $8.4 million.[2923]   Caesars' strategy from the outset was to close the Atlantic Club, thereby helping to reduce Atlantic City gaming capacity; to restrict its future use to non-gaming activities; and then to develop or sell the property as circumstances warranted as Caesars evaluated its Atlantic City strategic options.[2924]   As one analyst reported when the purchase was announced:

> The sale of Atlantic Club assets to Caesars Entertainment and Tropicana represents an inevitable reduction of capacity in the struggling market.  We do not expect Caesars' acquisition of the hotel and fixtures to be very material to the company in the near term.  Longer term, we would not be surprised to see additional casino assets in Atlantic City sold and either closed or otherwise restructured, which could mean less competition for the remaining properties in the market.[2925]

The Atlantic Club was closed in January 2014.  On April 3, 2014, CEOC imposed a declaration of restrictive covenants on the property, limiting its use to non-gaming activities.[2926] Finally, in May 2014, CEOC sold the Atlantic Club for $19 million, a price that was subsequently reduced to $15.5 million following further negotiations and four amendments to the original sales agreement.[2927]   CEOC ended up realizing a modest gain ($527,300, net of closing costs) on the sale.[2928]

---

[2922] "Asset Purchase Agreement" (Dec. 23, 2013), at CEC_EXAMINER_0517238-288 [CEC_EXAMINER_0517238].

[2923] Tropicana Asset Purchase Agreement (Dec. 20, 2013), at  9, *In re RIH Acquisitions NJ, LLC* No. 13-34483-JNP (Bankr. D.N.J.) (Docket No. 194).

[2924] G. Miller Sept. 22, 2015 Tr. at 111:24-112:14, 133:10-19.   Miller, the Executive Vice President of Domestic Development of CEC, stated that Caesars expected to sell the property at a loss with a deed restriction, but even so the transaction was "attractive" because it would reduce casino capacity in Atlantic City and Caesars expected to receive revenue from the Atlantic Club's former customers who moved to a Caesars casino.  *Id.* at 135:6-18.  *See also* "AC Strategy Atlantic Club Analysis" Presentation (Dec. 2013), at 1-8 [CEOC_INVESTIG_00057875].

[2925] Analyst Report: Barclays – Caesars Entertainment (Dec. 23, 2013), at 1.  *See also* Appendix 8, Analyst Commentary.

[2926] "Declaration of Restrictive Covenants" (Apr. 3, 2014), at CEOC_2004_0040603 [CEOC_2004_0040602] (prohibiting the Atlantic Club property from being used for gaming or gambling for a period of 15 years).

[2927] Amendment No. 1 to Asset Purchase Agreement" (Apr. 23, 2014), at CEOC_2004_0040429-431 [CEOC_2004_0040429];  "Amendment No. 2 to Asset Purchase Agreement" (Apr. 25, 2014) [CEOC_2004_0067576];  "Amendment No. 3 to Asset Purchase Agreement" (not fully executed) (May 2, 2014), at CEOC_0040442-444

Based on his investigation, the Examiner has concluded that the decisions to buy the Atlantic Club and take it out of the gaming market were sound exercises of business judgment, as was the later decision to sell the Atlantic Club with the restriction prohibiting its use for gaming activities. The Examiner also notes that CEOC realized a modest gain on the transaction, and that the transaction as a whole was of modest size and had no adverse effect on CEOC's business.[2929] The Examiner believes that there is no viable claim arising out of the purchase and sale of the Atlantic Club.

### c. The Showboat Atlantic City

The Examiner also investigated the decisions to close the Showboat (as opposed to another Caesars property in Atlantic City) and later to sell it for a price significantly less than book value. The CEC Board of Directors approved the Showboat closure in February 2014,[2930] announced its decision on June 27, 2014,[2931] and closed the property on August 31, 2014.[2932] Caesars then sold the Showboat to Stockton College for $18 million on December 12, 2014.[2933] A time line summarizing those events follows:

- February 2013 to February 2014 – Caesars performs substantial analysis and evaluates options with respect to the deteriorating conditions in the Atlantic City market.[2934]

---

[CEOC_2004_0040442]; "Amendment No. 4 to Asset Purchase Agreement" (May 6, 2014) at CEOC_2004_0040422-425 [CEOC_2004_0040422].

[2928] This amount was determined as follows: gross proceeds from the sale of the property, less acquisition costs, plus the value of acquired beverage inventory retained by Caesars [$15,393,367 - $15,000,000 + $133,934 = $527,300]. "Sale of the Atlantic Club" Memorandum (June 13, 2014), at CEC_EXAMINER_0070812-815 [CEC_EXAMINER_0070812].

[2929] Caesars did not disclose the Atlantic Club transactions in its SEC filings. The Examiner investigated whether Caesars was obligated to do so. Applicable SEC and accounting rules require disclosure of transactions like this only if they are material, and these were not. *See* SEC Reg. S-X, Rule 4-02.

[2930] "CEC Consent of the Executive Committee of the Board of Directors" (Feb. 26, 2014), at CEC_ EXAMINER_0051256-259 [CEC_EXAMINER_0051256].

[2931] "Caesars Entertainment Announces Closure of Showboat Atlantic City" Press Release (June 27, 2014).

[2932] *Id.*

[2933] "Purchase and Sale Agreement and Joint Escrow Instructions" (Dec. 12, 2014), at CEOC_2004_0035289-323 [CEOC_2004_0035289].

[2934] "Atlantic City Update - Board of Directors Meeting" Presentation (Feb. 21, 2013), at CEOC _INVESTIG_00439663-673 [CEOC_INVESTIG_00439663]; "AC Strategy/Atlantic Club Analysis" Presentation (Dec. 2013), at CEOC_INVESTIG_00057875 [CEOC_INVESTIG _00057875]; "BoD Transaction Updates" Presentation (Feb. 2014), at CEOC_2004_0024901 [CEOC_2004_0024901].

- February 26, 2014 – CEC Executive Committee consents to the Showboat closure.[2935]

- June 27, 2014 – CEC announces the Showboat closing.[2936]

- August 31, 2014 – Showboat is closed to the public.[2937]

- October 29, 2014 – Stockton College submits a letter of intent to purchase Showboat.[2938]

- December 12, 2014 – Showboat is sold to Stockton College for $18 million.[2939]

Some creditors have made the following assertions regarding the closure and sale of the Showboat:

- The Showboat was an operationally profitable property which was closed without sufficient analysis or evaluation of the benefit of closing the Showboat or consultation with independent directors;[2940]

- The Showboat was not marketed appropriately to third party casino operators or investors;[2941]

- The sales price of the Showboat was significantly less than the book value in 2011 or 2012;[2942] and

- A $242 million receivable owed to the Showboat from CEC was erased from CEOC's balance sheet in 2013 without adequate explanation.[2943]

---

[2935] "CEC Consent of the Executive Committee of the Board of Directors" (Feb. 26, 2014), at CEC_ EXAMINER_0051256-259 [CEC_EXAMINER_0051256].

[2936] "Caesars Entertainment Announces Closure of Showboat Atlantic City" Press Release (June 27, 2014).

[2937] *Id.*

[2938] Caesars Entertainment Letter of Intent regarding Sale to Stockton College (Oct. 29, 2014), at CEOC_2004_0040209-218 [CEOC_2004_0040209].

[2939] "Purchase and Sale Agreement and Joint Escrow Instructions" (Dec. 12, 2014), at CEOC_2004_0035289-323 [CEOC_2004_0035289].

[2940] *See*, *e.g.*, Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials (Jan. 12, 2015) at 29-30, *In re: Caesars Entm't Operating Co., Inc.*, Case No. 15-10047-KG (Bankr. D. Del.), [Dkt. No. 10].

[2941] *Id.* at 29.

[2942] *Id.* at 30.

[2943] *Id.* at n. 100

The Examiner has investigated all of these assertions and, as described below, has concluded that the decisions to close and then to sell the Showboat were sound exercises of business judgment. Management undertook a reasonable approach to sell the property and was open to selling the property to a third-party casino operator. Moreover, the sales price was fair. Also, the receivable was properly accounted for and did not represent a write-down of the asset. The Examiner believes that these transactions do not give rise to any viable claims.

#### i. The Decision to Close the Showboat

As described above, profits from all of the AC casinos declined dramatically after 2008 due to, among other reasons, the expansion of gaming markets and casino capacity in the Northeast and increased competition.[2944] The performance of Caesars' Atlantic City properties was "really terrible" and was putting financial pressure on the company as a whole.[2945] In January 2014, at the direction of Loveman, Miller spearheaded a substantial assessment of the Atlantic City market.[2946] It concluded that the "market was going to inevitably continue to shrink. . . . [W]e believed that the market could support a sustained level of performance from five to seven [casinos] . . . ."[2947]

It was clear that market consolidation in Atlantic City was necessary to improve the performance of all of the Caesars casinos.[2948] Management actively evaluated, analyzed and discussed a variety of options and scenarios without regard to whether a particular property was a CERP or a CEOC property,[2949] including:

---

[2944] G. Miller Sept. 22, 2015 Tr. at 80:18-81:6, 87:19-88:5; E. Hession Jan. 20, 2016 Tr. at 556:7-23; Interview of K. Ortzman, July 21, 2015 (not transcribed).

[2945] G. Loveman Oct. 27, 2015 Tr. at 105:16-24.

[2946] G. Miller Sept. 22, 2015 Tr. at 87:6-88:5. *See also* e-mail from G. Miller to D. Satz (Jan. 17, 2014) [CEC_EXAMINER_0191127].

[2947] G. Miller Sept. 22, 2015 Tr. at 88:12-89:11.

[2948] G. Miller Sept. 22, 2015 Tr. at 87:19-89:11. *See also* G. Loveman Jan. 28, 2016 Tr. at 366:18-368:6.

[2949] Although the main focus in deciding to close the Showboat appears to have been retaining Showboat customers within the Caesars enterprise, Brimmer indicated that the company did consider the relative impacts on CEOC versus CERP:

> Most of the analysis that we do, we operate the business as one company. So we were making sure that it was accreted and profitable from a cash flow perspective to the overall CEC enterprise through retention – given that we had, you know, three CEOC assets in the market and one CMBS or CERP asset, we also wanted to be certain that closing the Showboat would be accreted to not only CEC, but also to CEOC. And in both cases, our analysis, we believe that it was profitable in both ways we looked at it.

R. Brimmer Jan. 20, 2016 Tr. at 400:24-401:11.

- A timeshare hotel deal with Wyndham for the Showboat;[2950]

- Selling versus closing the Showboat;[2951]

- Closing all or a portion of Bally's Atlantic City;[2952]

- Acquiring Revel and retaining the Showboat;[2953] and

- Acquiring Trump Plaza with the Showboat sale versus closure.[2954]

Bally's Atlantic City, another CEOC property, was a potential initial target for closing because it had the lowest EBITDA of Caesars' four Atlantic City properties in 2013. Ultimately, however, CEC determined that the Showboat was the most logical property to close because of its location, declining earnings and other practical considerations including potential impact on other Caesars Atlantic City properties. This was supported by considerable analysis, as discussed below.

First, it is important to consider the geographic layout of Atlantic City and the locations of the AC Casinos properties. As is apparent from the accompanying map (AC Figure 5), there are two distinct casino areas in Atlantic City: the Boardwalk and the Marina District.

---

[2950] "AC BOD Materials" Presentation (Nov. 2013), at 2 [CEOC_INVESTIG_00187959] ) ("We are currently pursuing three options in parallel for the Showboat": a Timeshare and Hotel Deal with Wyndham; a sale to Nick Ribis; and closing the property). The potential sale to Nick Ribis for $120 million ($95 million cash plus $25 million seller financing) fell through in December 2013. "BOD Transaction Updates" Presentation (Feb. 2014), at 2 [CEOC_2004_0024901].

[2951] "BoD Transaction Updates" Presentation (Feb. 2014), at 5 [CEOC_2004_0024901].

[2952] "Atlantic City Assessment–Board of Directors Meeting" Presentation (July 31, 2014), at 7 [CEOC_INVESTIG_00103795].

[2953] *Id.* at 6; e-mail from B. Gu to M. Riddick, *et al.* (Feb. 6, 2014), at CEC_EXAMINER_0103649 [CEC_EXAMINER_0103649] ("Please note that CEC has not made any decision regarding the AC market yet. There are lots of possibilities, and none of them are materialized yet. You might have heard the public news that CEC is bidding on the Revel. If that goes through, it will totally change the dynamic in AC, and we might not close or sell [S]howboat anymore.").

[2954] "Value Creation Showboat Closure vs. Sale" Presentation (Feb. 19, 2014), at CEC_EXAMINER_0126729 [CEC_EXAMINER_0126726].

**AC Figure 5: Map of Atlantic City**

Source: *Map of Atlantic City*, PressOfAtlanticCity.com, *available at*, http://www.pressofatlanticcity.com/app/club-finder/Atlantic_City_Tourist_map.jpg (last visited Mar. 11, 2016).

The traditional tourist area – the Boardwalk – is on the beach and includes Caesars Atlantic City, Bally's Atlantic City, and the Showboat. Four miles long, the Boardwalk is comprised of different geographic areas including "center Boardwalk," where Caesars Atlantic City and Bally's Atlantic City are located, and "Pauline's Prairie," roughly a mile removed from the center Boardwalk, where the Showboat was located.[2955] While the beach, Boardwalk, and casinos remain popular draws, much of the area surrounding the Boardwalk properties is depressed and crime-ridden.[2956] The newer Marina District includes Harrah's Atlantic City, the Borgata, and the Golden Nugget, as well as the boutique Water Club hotel.[2957] The properties in the Marina District are generally more upscale than those on the Boardwalk.[2958] This segmentation of the local market, as noted, was not only confirmed by every witness the

---

[2955] Interview of K. Ortzman, July 21, 2015 (not transcribed).

[2956] *See, e.g.*, Elliot Jager, *Atlantic City's Decline Weighs on NJ Gov. Chris Christie*, Newsmax, (Feb. 16, 2015), http://www.newsmax.com/Politics/chris-christie-atlantic-city-economy-newjersey/2015/02/16/id/624978/.

[2957] *Marina District*, AtlanticCityNJ.com, *available at* http://www.atlanticcitynj.com/atlantic-city-stories/details.aspx?story=Marina-District (last visited Mar. 10, 2016).

[2958] G. Miller Sept. 22, 2015 Tr. at 106:6-18 and 125:21-126:14.

Examiner interviewed about Atlantic City – it was also reinforced by the Examiner's visit to Atlantic City in July 2015.

With this context in mind, the Examiner considered the following significant factors:

- The Showboat's earnings had declined precipitously since 2007 and were projected to continue to decline, as shown in the following AC Figures 6 and 7:

**AC Figure 6: Revenue by Property for Atlantic City Properties**



Source: Detailed Property Financials, [CEC_Examiner_1447621].

**AC Figure 7: EBITDA by Property for Atlantic City Properties**



Source: Detailed Property Financials [CEC_Examiner_1447621].

The Showboat was one of three CEOC properties that were "barely making any money," "crashing towards zero" along with Bally's Atlantic City.[2959] As Eric Hession explained:

> our business is so fixed cost-oriented that we had the Showboat making, say 300 and something million dollars of revenue and making roughly zero EBITDA and so we were spending 300 plus million dollars to service that. Shutting it down eliminated all those expenses and, yes, the business got distributed across the entire city, including Harrah's, but also to Bally's and Caesars. And as a result of the revenues rising at those properties and the fixed costs staying the same, they're having tremendous years.[2960]

- The Showboat was located a significant distance from the center Boardwalk area, and center Boardwalk was a more desirable location, with the highway flowing directly into it.[2961] There was also significant existing and proposed non-gaming development in the heart of the Boardwalk (where Caesars Atlantic City and

---

[2959] E. Hession Nov. 4, 2015 Tr. at 518:2-3, 21-23. *See also* J. Payne Oct. 22, 2015 Tr. at 120:8-14. As Hession noted, "[t]he [Atlantic City] market had been declining for seven years in a row. Unless capacity was reduced, given that there's an incremental regional capacity coming on even today – in today's environment, I don't see any reason why you would expect that trend . . . to be reduced." E. Hession Jan. 20, 2016 Tr. at 556:7-13.

[2960] E. Hession Nov. 4, 2015 Tr. at 518:6-23.

[2961] G. Miller Sept. 22, 2015 Tr. at 103:6-11,105:6-20.

Bally's Atlantic City were located), including the Pier, a possible park, the Bass Pro Shops retail development, and the Marketplace,[2962] all of which would have the potential to benefit those two casinos, but not the Showboat. As Tom Jenkin stated, "if anyplace on the boardwalk was going to survive, it's going to be center boardwalk."[2963]

- Approximately 25% of Caesars Atlantic City's gross gaming revenue was from lodgers at Bally's Atlantic City,[2964] and closing Bally's Atlantic City would have removed this source of Caesars Atlantic City casino customers and, in Jenkin's words, "would have killed Caesars. If you're going to close Bally's you might as well close Caesars."[2965] Indeed, Bally's Atlantic City is physically connected to Caesars,[2966] and closing Bally's Atlantic City would have been "too complicated."[2967]

- At the time that Caesars decided to close the Showboat, two properties near the Showboat – Trump Taj Mahal and the Revel – were distressed and likely to close.[2968] Their closing would have left the Showboat alone in "Pauline's Prairie."[2969] The undesirability of leaving the Showboat in this troubled location

[2962] Interview of K. Ortzman, July 21, 2015 (not transcribed); T. Jenkin Sept. 30, 2015 Tr. at 68:16-25. The Marketplace, conceived as a sort of "Eataly" including local vendors, was likely to have gone in front of Bally's Atlantic City. *See also* Jennifer Bogdan, *Atlantic City Marketplace Project one of CRDA's goals this year*, NJCRDA.com (Jan. 15, 2013), http://www.njcrda.com/articles/atlantic-city-marketplace-project/.

[2963] T. Jenkin Sept. 30, 2015 Tr. at 68:20-22

[2964] *Id.* at 68:4-6; Interview of K. Ortzman, July 21, 2015 (not transcribed). This capacity included The Claridge Hotel, a former casino but by that time a hotel only, connected to Bally's Atlantic City on the side opposite Caesar's Atlantic City.

[2965] T. Jenkin Sept. 30, 2015 Tr. at 68:2-10.

[2966] G. Miller Sept. 22, 2015 Tr. at 102:5-15; Interview of K. Ortzman, July 21, 2015 (not transcribed); Interview of J. Solomon, Aug. 27, 2015 (not transcribed).

[2967] J. Payne Oct. 22, 2015 Tr. at 120:15-121:4.

[2968] In fact, Revel closed on September 2, 2014, and Trump Taj Mahal filed for bankruptcy on September 9, 2014, both within a two-week span of the Showboat closure. Resorts, another hotel in this location, was losing roughly $1 million a year. Wayne Parry, *A.C.'s Revel Starts Closing After 2 Years*, USA Today (Sept. 1, 2014), http://www.usatoday.com/story/money /business/2014/09/01/atlantic-citys-revel-starts-closing-after-2-years/14932507/; Bloomberg News, *Trump Entertainment Files for Bankruptcy; Taj Mahal Could Close in November* (Sept. 9, 2014), https://web.archive.org/web/20140911211519 /http:/www.nj.com/business/index .ssf/2014/09/trump_entertainment_files_for_bankruptcy_taj_mahal_could_close_in_november.ht ml.

[2969] Interview of K. Ortzman, July 21, 2015 (not transcribed).

was affirmed by all of the witnesses the Examiner interviewed on this topic and
was obvious to the Examiner on his personal observation of the site.

- Closing Caesars Atlantic City, the "flagship," was not a feasible option,[2970]
  because, among other reasons, Caesars Atlantic City had a "draw because of its
  brand."[2971]   Closing Harrah's Atlantic City was not an option because of the
  extensive investments already made in that property, it was the best Caesars hotel
  property in Atlantic City, it had historically performed relatively well, the Marina
  District attracted more upscale customers, and because the Conference Center was
  to be located in the Marina District next to Harrah's Atlantic City.[2972]

In short, as Miller noted about closing the Showboat:

> [I]t was something that was discussed for several years and it was against an
> objective or an agenda of optimizing the profitability from our portfolio of assets,
> maximizing the profitability from Atlantic City, and at some point it just tipped
> over where it became, okay, that is the right thing for us to do . . . .[2973]

These reasons were all reflected in Caesars' press releases and SEC filings.[2974]

---

[2970]  *Id.*

[2971]  E. Hession Nov. 4, 2015 Tr. at 521:2-3.

[2972]  G. Miller Sept. 22, 2015 Tr. at 105:23-106:18; E. Hession Nov. 4, 2015 Tr. at 520:17-25;
Interview of K. Ortzman, July 21, 2015 (not transcribed).

[2973]  G. Miller Sept. 22, 2015 Tr. at 92:12-25.  *See also* E. Hession Jan. 20, 2016 Tr. at 549:10-11
(decision to close the Showboat "had been percolating for a very long time.").

[2974]  The corporate rationales for this decision stated in the official press releases and the
disclosures in Caesars' SEC 8-K and 10-K filings included the following:

- Since 2006, revenue in Atlantic City has declined by more than $3 billion and
  competition in the city has increased.  The dynamic in Atlantic City has led [Caesars]
  to the difficult but necessary decision to close Showboat in an effort to help stabilize
  [the] business there and support the viability of [Caesars] remaining operations in the
  vicinity. (G. Loveman, Chairman and CEO of CEC).

"Caesars Entertainment Announces Closure of Showboat Atlantic City" Press Release (June
27, 2014).

- The Atlantic City gaming market has seen a decline of nearly 50% compared with
  2006 levels, primarily due to the addition of gaming and room capacity associated with
  the expansion of gaming in Maryland, New York, and Pennsylvania. This has resulted
  in several casino closings in recent years, including our Showboat Atlantic City casino
  and three competitor casinos in 2014.

CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31-32.

The financial performance of Caesars' Atlantic City properties overall and the ones owned by CEOC following the closure of the Showboat improved. While the total revenue of the properties located in Atlantic City decreased by approximately $110.5 million, EBITDA increased by approximately $102.0 million. Further, while the total revenue of the CEOC Atlantic City properties decreased by approximately $141.8 million after the closing, CEOC's EBITDA increased by approximately $69.2 million, or 72%, as compared to CERP, whose property's (Harrah's Atlantic City's) EBITDA increased by approximately $32.8 million, or 62%, as shown in AC Figure 8 below:

**AC Figure 8: Financial Results 12 Months Prior to and After the SAC Closure**

| (amounts in thousands) Property | 12 Months Prior to SAC Closure (Q4 2013 - Q3 2014) | | 12 Months After SAC Closure (Q4 2014 - Q3 2015) | | Variance | |
|---|---|---|---|---|---|---|
| | Revenue | EBITDA | Revenue | EBITDA | Revenue | EBITDA |
| CEOC: | | | | | | |
| Bally's AC | $ 227,636 | $ (10,844) | $ 228,289 | $ 17,446 | $ 653 | $ 28,290 |
| Caesars AC | 307,123 | 23,889 | 321,583 | 61,273 | 14,459 | 37,384 |
| Showboat | 156,924 | (3,538) | - | - | (156,924) | 3,538 |
| CEOC Total | 691,683 | 9,507 | 549,872 | 78,719 | (141,811) | 69,211 |
| Harrah's AC | $ 396,786 | $ 52,942 | $ 428,086 | $ 85,779 | $ 31,301 | $ 32,836 |
| Total | $ 1,088,469 | $ 62,450 | $ 977,958 | $ 164,497 | $ (110,511) | $ 102,048 |

Source:  Detailed Property Financials [CEC_Examiner_1447621].

Based upon the review of the written record, his interviews of all of Caesars' personnel with significant responsibility for the decision, financial analysis and his personal observation,[2975] the Examiner has concluded that the decision to close the Showboat was a reasonable exercise of business judgment.

The decision to close the Showboat was based upon a detailed analysis which considered the three CEOC properties and the one CERP property. The Examiner also notes that if the decision had been made solely considering the three CEOC properties (i.e., Showboat, Bally's Atlantic City and Caesars Atlantic City) and excluding CERP's property (Harrah's Atlantic City), it is hard to imagine a different result. First, Harrah's Atlantic City would not have been on the table as an option, since it is not a CEOC property. Second, and in any event, it still would have been desirable for CEOC to close one of its properties, and the Showboat remained the logical choice.

Accordingly, the decision to close the Showboat does not give rise to any viable claim.

---

- "The difficult decision to close the Showboat follows persistent declines in business levels in the area exacerbated by the high property-tax burden in Atlantic City."

"Caesars Entertainment Announces Closure of Showboat Atlantic City" Press Release (June 27, 2014).

[2975]  The Examiner and his professionals visited the properties in Atlantic City on July 21, 2015.

### ii. The Sale of the Showboat

Caesars considered several options in the course of deciding to close the Showboat, including selling the Showboat as a functioning casino, selling it with a deed restriction preventing its use as a casino, partially closing the property, and demolishing and maintaining ownership of an empty property.[2976] The property, however, was considered to be a "hard sell" in a down market.[2977] In addition, the neighboring Revel was also in distress and was placed on the market before the Showboat.[2978]

The sales process began after the public announcement of the closure.[2979] On June 30, 2014, Caesars distributed a letter to prospective buyers detailing the timing and procedures for proposals.[2980] The process was run solely with internal resources, and Epstien, Vice President of Finance and Strategy, noted that he responded to all inbound inquiries.[2981] Epstien indicated that he "had constant conversations" and that the company was "willing to hear any and all offers . . . ."[2982] The Showboat's cash "burn" was approximately $1.8 million per month following its closure, making carrying the property very expensive.[2983] And although Caesars marketed the Showboat with the primary objective of selling to a non-casino operator, Caesars entertained the option of selling the property to a casino developer if it produced a significantly higher price.[2984]

There was a very limited pool of legitimate potential buyers, and the process was drawn out due to the fact that a number of buyers turned out not to be serious.[2985] In total, Caesars

2976 Interview of D. Epstien, July 30, 2015 (not transcribed).

2977 *Id.*

2978 Interview of K. Ortzman, July 21, 2015 (not transcribed).

2979 D. Epstien Jan. 22, 2016 Tr. at 19:5-13.

2980 Letter to potential buyers outlining sales process (June 30, 2014), at CEOC_2004_0040205-07 [CEOC_2004_0040205].

2981 D. Epstien Jan. 22, 2016 Tr. at 14:9-21; Letter of Intent from R. Meruelo to D. Epstien (Sept. 17, 2014), at CEC_EXAMINER_0435839 [CEC_EXAMINER_0435839]; E-mail from H. Lam to D. Epstien (Sept. 25, 2014), at CEC_EXAMINER_0435994 [CEC_EXAMINER_0435994]; Confidential Disclosure Agreement (Sept. 24, 2014), at CEC_EXAMINER_0436120-162 [CEC_EXAMINER_0436120]; Non-binding Letter of Intent (July 25, 2014), at CEC_EXAMINER_0828198-200 [CEC_EXAMINER_0828198]; Letter of Intent from Richard Stockton College (Oct. 29, 2014), at CEC_EXAMINER_0945531-540 [CEC_EXAMINER_0945531]; List of Potential Buyers Submitted to the Division of Gaming Enforcement at CEC_EXAMINER_1447433 [CEC_EXAMINER_1447433].

2982 D. Epstien Jan. 22, 2016 Tr. at 20:3-11, 22:6-8.

2983 *Id*. at 26:7-10.

2984 Interview of D. Epstien, July 30, 2015 (not transcribed); "Project Mardi Gras" Presentation (July 2014), [CEC_EXAMINER_0053242].

2985 Interview of D. Epstien, July 30, 2015 (not transcribed).

received 15 inbound inquiries from potential buyers or brokers and reached out to three other possible purchasers. Preliminary offers ranged from $16 million to $95 million, but in the end all the original potential buyers were deemed not legitimate, could not come up with funds, failed to respond, or simply were not interested.[2986] Ultimately, Stockton College, which expressed interest only late in the process, was the best viable option, especially since state and local officials were promoting the deal, which helped Stockton College obtain financing. Stockton College was prepared to move quickly to open in time for the beginning of the fall semester, and Caesars was able to sell the Showboat as a non-gaming property.[2987]

On October 29, 2014, Stockton College provided Caesars with a Letter of Intent to purchase the Showboat for $18 million.[2988] Stockton College and Caesars were familiar with each other, as Stockton College had been under two prior nondisclosure agreements with Caesars for other properties in Atlantic City (*i.e.*, The Claridge Hotel and the Atlantic Club).[2989] Epstien explained that the turnaround time on the sale was rather fast, and he believed that Stockton College was able to obtain financing because state and local authorities were promoting the deal.[2990]

In connection with the sale, Caesars engaged VRC to provide an appraisal of the Showboat. VRC concluded that the fair market value of the Showboat property as of December 12, 2014, was between $17.5 million and $19 million, and the purchase price of $18 million was within that range.[2991] In reaching this conclusion, VRC (a) retained a third-party MAI appraiser who had Atlantic City experience; (b) had discussions with Caesars' management; (c) reviewed data on the Atlantic City gaming industry; and (d) made an onsite visit to the Showboat.[2992] The values ascribed in the VRC report appear to be based solely on the

---

[2986] Interview of K. Ortzman, July 21, 2015 (not transcribed); Interview of D. Epstien, July 30, 2015 (not transcribed); C. Rucker Sept. 25, 2015 Tr. at 203:16-204:7; D. Epstien Jan. 22, 2016 Tr. at 21:7-24, 27:24-30:10, 31:23-32:20, 34:24-35:15, 42:5-43:6, 44:21-46:4, 49:3-13, 49:19-50:17, 50:25-53:3, 56:18-24, 57:2-20; Three potential purchasers contacted by Caesars – Great Wolf, Dave and Busters, and Tom Scannapieco – declined. Finally, several of the potential buyers could not make use of the space, presented untenable closing requirements, or were not reputable. *Id*. These bids are reflected in the tracking sheets that Caesars submitted as a courtesy to the Division of Gaming Enforcement. List of Potential Buyers Submitted to the Division of Gaming Enforcement of the State of New Jersey (undated) at CEC_ EXAMINER_1447433 [CEC_EXAMINER_1447433].

[2987] Interview of D. Epstien, July 30, 2015 (not transcribed); D. Epstien Jan. 22, 2016 Tr. at 58:4-62:2; CEC_EXAMINER_0945531.

[2988] Letter of Intent from Richard Stockton College (Oct. 29, 2014), at CEC_EXAMINER_0945531-540 [CEC_EXAMINER_0945531].

[2989] Interview of D. Epstien, July 30, 2015 (not transcribed).

[2990] *Id*.

[2991] "Presentation to: Caesars Showboat Atlantic City" by Valuation Research Corporation (Dec. 12. 2014), at VRC00008804 [VRC00008800].

[2992] *Id.*; C. Rucker Sept. 25, 2015 Tr. at 201:23-202:7, 207:7-208:2.

MAI appraisal report of the third party.[2993]   The Examiner and his consultants reviewed VRC's work and interviewed VRC, and found no issues with its valuation.

On December 12, 2014, the transaction closed, and Caesars sold the Showboat to Stockton College for $18 million.[2994]

Some creditors asked that the Examiner consider whether the $18 million price was fair in light of the fact that CEOC carried the property on its books at $577.8 million and $116.8 million as of December 31, 2011 and 2012, respectively.[2995]   The Examiner concluded that this comparison is not appropriate.   Book value based on the assumption that the property would be used as an operating casino does not reflect the fair market value for the property when used for a different purpose (*i.e.*, as a non-gaming asset, as was the case with the sale to Stockton College).

Moreover, in 2012 and 2013, Caesars recorded impairment charges that substantially reduced the book value of the Showboat's Long-Lived Assets.[2996]

Caesars' 2012 10-K notes that due to competitive pressures in surrounding markets and significant hurricane-related closures in 2011 and 2012, the company engaged a third-party valuation firm to determine the fair market value of the Showboat (among other properties).[2997] This valuation concluded that an impairment charge was appropriate and resulted in Caesars taking a $450 million impairment charge, reducing the book value of the Showboat to $147.8 million.[2998]   The book value of the Showboat's long-lived assets was written down further

---

[2993]   "Appraisal Report - Showboat Atlantic City" by CBRE (Dec. 9, 2014), at VRC00047694-768 [VRC00047694].

[2994]   Settlement Statement (Dec. 12, 2014), at CEOC_2004_0035259 [CEOC_2004_0035259].

[2995]   *See*, *e.g.*, Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials (Jan. 12, 2015) at 29-30, *In re: Caesars Entm't Operating Co., Inc.*, Case No. 15-10047-KG (Bankr. D. Del.), [Dkt. No. 10].   The Examiner has been unable to verify these stated book values.   The book values should be $597.8 million and $147.8 million as of December 31, 2011 and 2012, respectively, according to Deloitte's Impairment Analysis. "Showboat ASC360 Write-off" Deloitte Audit Work Paper (Dec. 31, 2012), at Tab 21b [DT0030529].

[2996]   *See* AC Figure 3, *supra*.

[2997]   CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 71.

[2998]   *Id.*, which mentions "one Atlantic City property", and references a "$450 million impairment related to the property, comprised of $251.0 million related to building and improvements and $190 million for land..." These figures correspond to the Deloitte Impairment Analysis which shows this property was the Showboat. "Showboat ASC360 Write-off" Deloitte Audit Work Paper (Dec. 31, 2012), at Tab 21b [DT0030529].

in subsequent years and, as of September 30, 2014, was recorded at $28 million, based on Deloitte's independent analysis of the fair value as of that date.[2999]

Based on the foregoing, the Examiner has concluded that the Showboat was appropriately marketed and that the price received was fair, particularly since the Showboat was being sold as a non-gaming property. The Examiner has also concluded that the variance between the sale price ($18 million) and the book value immediately before the sale ($28 million) does not undercut the fact that the Showboat was appropriately marketed and that the consideration received was the result of arm's length negotiations and that the sale price was therefore at fair market value.

The Examiner has accordingly concluded that there is no viable claim arising out of the sale.

### iii. Removal of Receivable

The Showboat's June 30, 2013 financial statements included in its quarterly report submitted to the Division of Gaming Enforcement of the State of New Jersey showed that a $249 million receivable balance owed to the Showboat by "Caesars Entertainment" as of the end of the previous quarter had been removed from the balance sheet, as shown in AC Figure 9 below.[3000]

**AC Figure 9: Intercompany Receivable Balance per the Showboat Balance Sheets**

*(amounts in thousands)*

| Due from Caesars Entertainment (i.e., CEOC) | |
|---|---|
| **Quarter ended:** | **Balance** |
| Q1 2012 | $    229,167 |
| Q2 2012 | 234,060 |
| Q3 2012 | 247,243 |
| Q4 2012 | 242,006 |
| Q1 2013 | 249,318 |
| Q2 2013 | $    - |

---

[2999] "CEC and CEOC Third Quarter 2014 ASC 350 and 360 Accounting Considerations Summary Memo" from Deloitte (Nov. 8, 2014), at 25 [DT0010964].

[3000] Notes to Financial Statement of the "Atlantic City Showboat, Inc. Quarterly Report for the Quarter Ended March 31, 2013 Submitted to the Division of Gaming Enforcement of the State of New Jersey" at 7; "Atlantic City Showboat, Inc. Quarterly Report For the Quarter Ended June 30, 2013 Submitted to the Division of Gaming Enforcement of the State of New Jersey" at 7 of the Notes to Financial Statements (reflecting receivables "Due from Caesars Entertainment" in the amount of $249 million and $0, respectively).

Source: Atlantic City Showboat, Inc. Quarterly Reports for the Quarters Ended, March 31, 2012, June 30, 2012, September 30, 2012, December 31, 2012 and March 31, 2013 Submitted to the Division of Gaming Enforcement of the State of New Jersey.

Some creditor groups asked that the Examiner investigate the removal of this receivable.[3001]

Michael Winterscheidt, CEC Corporate Controller, explained that the "Due from Caesars Entertainment" above refers to CEOC[3002] and that this balance relates to transactions with CEOC (the parent company). The transactions are recorded in Intercompany Account 2995 within the equity section, "which may be a due to or a due from within equity that is never going to be settled in cash. . ."[3003] and that are eliminated within CEOC's standalone financial statements.

Winterscheidt further explained that this balance was reflected as a receivable on the Division of Gaming Enforcement of the State of New Jersey financial statements due to a reclassification made to comply with certain required reporting.[3004] More specifically, Showboat's audited financial statements prepared in accordance with GAAP correctly reflect the Due from CEOC balance as "Due from Affiliate, net" within the Statement of Equity. However, when the non-GAAP financial statements are prepared for the Division of Gaming Enforcement of the State of New Jersey to conform with the relevant guidelines, this balance is reclassified onto the balance sheet as a receivable, and the equity balance is "grossed up" by the same amount.[3005] This reclassification is shown in AC Figure 10 using the GAAP (audited) and government (unaudited) Showboat financial statements as of December 31, 2012. The equity balance and the receivable balances in the unaudited financial statements are higher primarily

---

[3001] *See, e.g.,* Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials (Jan. 12, 2015) at 30 n.100 [Dkt. No. 10] *In re: Caesars Entm't Operating Co., Inc.*, Case No. 15-10047-KG (Bankr. D. Del.), ("Showboat Casino's financial statements also reflected a receivable owed to Showboat by Caesars Parent of $242 million, which thereafter disappeared without any apparent explanation."). The referenced balance of $242 million agrees with the "Due from Caesars Entertainment" amount noted in the Atlantic City Showboat, Inc. Quarterly Report For the Quarter Ended Dec. 31, 2012 Submitted to the Division of Gaming Enforcement of the State of New Jersey, at 8 of the "Notes to Financial Statements."

[3002] M. Winterscheidt Jan. 19, 2016 Tr. at 83:22-84:13 ("I looked in the general ledger . . . to make sure that as of December 31st, 2012, the balances that we had in the due to/due from were not balances with a Caesars Entertainment Corporation, a CEC company, but they were with CEOC companies.").

[3003] *Id*. at 76:25-77:3; 79:9-80:11; 81:4-23

[3004] *Id*. at 76:13-80:11.

[3005] These statements are required to be prepared in conformity with the Division's Quarterly Report Instructions and Uniform Chart of Accounts. M. Winterscheidt Jan. 19, 2016 Tr. at 76: 22-24.

due to the reclassification of the "Due from affiliate" balance of $242.0 million to the balance sheet as shown in AC Figure 10 below:

**AC Figure 10: Reclassification of the "Due from Affiliate" CEOC Balance**

| | Showboat Financial Statements as of | | |
|---|---|---|---|
| | **GAAP F/S Audited** | **Reclassificatio to Statutory** | **Statutory F/S Filed with NJ Division of Gaming** |
| *(amounts in* | **Audited** | | **Unaudited** |
| *Due from Caesars Entertainment (CEOC)* | $           - | $       242.0 | $       242.0 |
| **Increase to Assets** | | **$       242.0** | |
| Due to Affiliates, Long-Term | $           - | $         83.0 | $         83.0 |
| Equity Balance at 12/31/11 | 687.4 | (8.8) | 678.7 |
| Net loss | (380.7) | - | (380.7) |
| Due from affiliates, net | (167.8) | 167.8 | - |
| Equity Balance at 12/31/12 | $       139.0 | $       159.0 | $       298.0 |
| **Increase to Liabilities and Equity** | | **$       242.0** | |

<u>Sources</u>:  Audited & Unaudited financial results for the Showboat.[3006]

Finally, the balance was eliminated from the unaudited Showboat financial statements during the second quarter of 2013 as a result of Project Simplification,[3007] which included "a review and clean-up of historical Infinium [accounting software] account balances requiring Intercompany eliminations."[3008]

---

[3006] "Ocean Showboat, Inc. and Subsidiaries – Consolidated Financial Statements as of and for the Years Ended December 31, 2012 and 2011, and Independent Auditors' Report" (Apr. 30, 2013), at CEC_EXAMINER_1152522-41 [CEC_EXAMINER_1152522]; Atlantic City Showboat, Inc. Quarterly Report for the Quarter ended Dec. 31, 2012 Submitted to the Division of Gaming Enforcement of the State of New Jersey.

[3007] Winterscheidt stated that "through the Simplification, we moved it out of that 2995 account and we moved it down to APIC [Additional Paid In Capital].  As soon as we moved it out of that 2995, which in the DGE [Division of Gaming Enforcement of the State of New Jersey] report shows up as a due-to or a due-from, . . . they no longer presented it as a due-to or due-from."  M. Winterscheidt Jan. 16, 2016 Tr. at 79:24-80:11.

[3008] PwC "Intercompany Elimination Simplification" Statement of Work (Feb. 14, 2014), at CEOC_INVESTIG_00102181-83 [CEOC_INVESTIG_00102181].

In March 2013, Caesars engaged PwC to undertake an intercompany transaction review project to enable CEOC to prepare and file stand-alone financial statements.[3009] In fact, the financial statements submitted to the Division of Gaming Enforcement of the State of New Jersey for the second quarter of 2013 included the following disclosure:

> During June 2013, the Company elected to equitize certain intercompany balances with its parent and affiliates that were previously classified as a receivable/liability. Offset to this was Additional Paid in Capital. This is separately shown on the Statement of Changes in Stockholder's Equity.[3010]

The offset to the reduction of the receivable appears to be included in a $441.5 million reduction to total stockholders' equity reflected on the Q2 2013 Statement of Changes in Stockholders' Equity.[3011]

Based on his review of the record, the Examiner has concluded that this receivable did not represent a receivable from CEC to CEOC, but rather an intercompany balance between CEOC and the Showboat, its subsidiary, and that the elimination of this receivable balance resulted from its clean-up or elimination of certain historical equity account balances. Consequently, the Examiner has concluded that there are no viable claims arising out of the elimination of this intercompany receivable.

### iv.  The Showboat Marketing Plan and Customer Retention Program

In connection with the closure of the Showboat, Caesars developed and implemented a detailed marketing plan in order to retain the Showboat's customers within the Caesars network. Various creditor groups have criticized Caesars for failing to ensure that CEOC (the owner of the Showboat) was compensated for any of its customers who ended up at a CERP property – Harrah's Atlantic City – or, put another way, for including Harrah's Atlantic City in the Showboat's customer retention marketing effort and for allowing Harrah's Atlantic City access to the Showboat customer data.  As set forth below, the Examiner has concluded that while it made perfect business sense from an overall Caesars enterprise perspective for Caesars to try to retain the Showboat's customers anywhere within the Caesars network, given CEOC's insolvency, CEOC was entitled to compensation by CERP for the incremental benefits Harrah's Atlantic City received from the Showboat customer retention effort.

---

[3009] For further description, *see* Section IX.G, Project Simplification, *infra*.  *See also* PwC "Intercompany Elimination Simplification" Statement of Work (Feb. 14, 2014), at CEOC_INVESTIG_00102181-83 [CEOC_INVESTIG_00102181]; "CEOC Intercompany Project Update" Presentation (June 19, 2013), at 4 [CEC_EXAMINER_1005122].

[3010] Atlantic City Showboat, Inc. Quarterly Report for the Quarter ended June 30, 2013, Submitted to the Division of Gaming Enforcement of the State of New Jersey, at 5. Audited financial statements were prepared for all the Atlantic City properties on a consolidated basis starting in 2013.

[3011] *Id.*

**(A) The Historical Marketing Process**

As was the case with the decision to close one or more casinos in Atlantic City, it was clear that Caesars employees viewed marketing efforts for Atlantic City as a means to benefit the entire Caesars network, irrespective of the corporate ownership of any property.[3012] This approach was also consistent with the explicit philosophy of Caesars management to operate all the Caesars properties as if they were part of one entity despite their separate corporate structures.[3013]

Marketing for all of the Caesars properties was organized by region, and all of Caesars' Atlantic City properties were part of the "Eastern Region."[3014] Jeff Boorjian, Regional Vice President of marketing for all of the AC Casinos at the time of the Showboat closure, developed and executed marketing plans for the Atlantic City market as a whole, as opposed to individually by casino or corporate entity.[3015] Compensation and bonuses for Caesars Atlantic City marketing employees were based on operating income and metrics for all of the operating AC Casinos.[3016] Compensation and bonuses for the Atlantic City general managers is partially based on these same metrics as well as on the property-specific metrics in Atlantic City related to customer service.[3017]

**(B) The Marketing and Customer Retention Plan**

The marketing plan implemented to retain the Showboat's customers was designed without regard to the corporate ownership of any of the properties involved.[3018] Caesars personnel considered it essential for Caesars to dedicate resources to retaining existing customers because of the high cost of acquiring new customers.[3019] The plan focused primarily on customers dominant to the Showboat within the Total Rewards program because those were the

---

[3012] G. Loveman Jan. 28, 2016 Tr. at 363:13-364:2 ("The argument was the effort should be made to retain the largest amount of business in the Caesars complex as possible and not to try to favor one property or the other, but to let customers choose. . . . [W]e knew it would be very hard to cajole them to do something that their own pattern had suggested they didn't wish to do.").

[3013] Interview of G. Loveman, June 23, 2015 (not transcribed).

[3014] In addition, Caesars' Philadelphia and Baltimore properties also became part of the Eastern Region, or "pod." J. Payne Oct. 22, 2015 Tr. at 42:17-43:15. *See also* J. Boorjian Feb. 19, 2016 Tr. at 7:13-8:20.

[3015] *See, e.g.*, "'Upping the Ante' in Atlantic City" Presentation (Dec. 2013), at CACXAM00200124-218 [CACEXAM00200124].

[3016] T. Shaukat Oct. 28, 2015 Tr. at 51:22-53:3

[3017] T. Jenkin Sept. 30, 2015 Tr. at 69:10-70:10

[3018] J. Boorjian Feb. 19, 2016 Tr. at 37:21-38:16; J. Payne Oct. 22, 2015 Tr. at 122:13-123:10; T. Jenkin Sept. 30, 2015 Tr. at 70:20-71:4; G. Loveman Jan. 28, 2016 Tr. at 363:7-364:6.

[3019] Interview of D. Koloski, Aug. 26, 2015 (not transcribed).

customers most at risk of leaving the Caesars network.[3020]    According to the data made available to the Examiner, there were approximately 560,811 Caesars customers who were dominant to Showboat within the Total Rewards program at the time of the closure announcement in June 2014, of which 245,205 were active within the preceding 12-month period.[3021]

The Showboat customer marketing program was developed and implemented under the auspices of Boorjian, in collaboration with Luann Pappas, former Regional Vice President, Casino Marketing, who headed up the VIP marketing, and Kevin Ortzman and Rick Maser, who were Presidents of the CEOC and CERP Atlantic City properties, respectively.[3022]    In addition, other individuals at Caesars, including senior management, had input and involvement in the Atlantic City marketing strategy.[3023]    Loveman was actively involved; Boorjian met with Loveman on essentially a monthly basis to discuss strategy and performance.[3024]

Pappas "was the driver of the analytics behind the plan and the execution of the plan."[3025] However, development of the Showboat marketing plan was a "very collaborative process" that was designed to "keep as much revenue as possible among the three casinos that we have."[3026]

During the first phase of the marketing plan following the closing announcement in June, all Showboat customers received the same offers to visit the other three locations.[3027]    The goal for the first 60 days after the announcement was to take a "very, very aggressive approach" to preserve revenues at the Showboat while assuring customers that Caesars was not abandoning the market and that they would have plenty of options with the three remaining properties.[3028] During this phase, Showboat customers thus received promotions that were good only at the Showboat, and they were invited to events at Caesars' other Atlantic City properties, including Harrah's Atlantic City.[3029]

---

[3020]  T. Shaukat Oct. 28, 2015 Tr. at 210:13-211:3; G. Loveman Jan. 28, 2016 Tr. at 363:7-364:6. *See also* J. Payne Oct. 22, 2015 Tr. at 122:13-123:10.

[3021]  Caesars Cross-Play Analysis produced to the Examiner on Aug. 15, 2015 [CEOC_2004_0040620].

[3022]  J. Payne Oct. 22, 2015 Tr. at 121:15-122:5; J. Boorjian Feb. 19, 2016 Tr. at 12:8-13:8.  *See also* T. Shaukat Oct. 28, 2015 Tr. at 209:13-210:2.

[3023]  These individuals included Loveman, Jenkin, Solomon, Shaukat, Ellis, and Sigala and, to a lesser extent, Brimmer, Hession and Miller.  J. Boorjian Feb. 19, 2016 Tr. at 8:21-9:14, 13:19-16:7, 22:11-23:20, 78:9-79:7.

[3024]  *Id*. at 15:13-16:7.

[3025]  J. Payne Oct. 22, 2015 Tr. at 121:15-20.

[3026]  J. Boorjian Feb. 19, 2016 Tr. at 19:15-20:6, 20:14-22:3, 23:9-20.

[3027]  Interview of L. Pappas, July 21, 2015 (not transcribed).

[3028]  J. Boorjian Feb. 19, 2016 Tr. at 23:22-25:21.

[3029]  "SAC Marketing Plan" Presentation at CEOC_2004_0033197 [CEOC_2004_0033180]; T. Shaukat Oct. 28, 2015 Tr. at 212:20-214:19.

Subsequently, Caesars moved toward a more targeted approach.[3030]  The marketing team "let the data guide the decision-making process."[3031]  Generally, the marketing strategy in the more targeted phase was to identify the secondary property preference for each Showboat-dominant customer and to provide the customer with marketing offers for that property.  To the extent that a Showboat-dominant customer did not have a secondary preference, the customer was provided with offers to all three remaining properties.[3032]  For customers whose historical secondary preference was the Showboat, the marketing plan was to direct these customers to the opposite location in Atlantic City, *i.e.*, the Marina District versus the Boardwalk.[3033]

In addition, as part of the Showboat marketing plan, many of the casino "hosts" who had relationships with the Showboat VIP customers were moved to Harrah's Atlantic City.[3034]  All of the Asian hosts, however, were moved to Bally's Atlantic City because the data suggested that the Asian Showboat customers would naturally migrate there.[3035]  By moving hosts in this way, Caesars management attempted to maximize the chance of retaining those customers.[3036]  By one estimate, approximately 5% of Caesars' customers are VIP customers, but they account for roughly 40% of revenues.[3037]

A number of considerations factored into the decision to transfer the non-Asian hosts to Harrah's Atlantic City.  As discussed above, the marketing team looked at data on historical play.  In addition, a significant factor in the decision was the value of the Showboat VIP customers vis-à-vis the Caesars Atlantic City (and Harrah's Atlantic City) VIP customers.  Showboat VIPs did not generate nearly as much revenue as those at Caesars Atlantic City, but at the Showboat, those less valuable VIPs were able to get a suite each time they played.  Those Showboat VIPs were not likely to get a suite at Caesars Atlantic City, which might sell for more

---

[3030]  Interview of L. Pappas, July 21, 2015 (not transcribed); Interview of K. Ortzman, July 21, 2015 (not transcribed).

[3031]  J. Boorjian Feb. 19, 2016 Tr. at 25:22-27:12.

[3032]  "SAC Marketing Plan" Presentation at CEOC_2004_0033193-94 [CEOC_2004_0033180].

[3033]  *Id.* at CEOC_2004_0033195 .

[3034]  T. Shaukat Oct. 28, 2015 Tr. at 213:24-214:19; Interview of L. Pappas, July 21, 2015 (not transcribed); R. Sigala Jan. 19, 2016 Tr. at 36:7-37:21; G. Loveman Jan. 28, 2016 Tr. at 364:7-365:4.

[3035]  T. Shaukat Oct. 28, 2015 Tr. at 213:24-214:19; Interview of L. Pappas, July 21, 2015 (not transcribed).

[3036]  R. Sigala Jan. 19, 2016 Tr. at 35:21-25 ("The general sense is that if we have a one-on-one relationship with a customer, the chance that a customer will remain our customer is much higher than if we don't have that one-on-one relationship.").  The marketing team understood that VIP customers tended to follow their hosts. J. Boorjian Feb. 19, 2016 Tr. at 56:24-57:11.  However, the team also understood that it could not simply move Showboat VIP customers to any of the other three Atlantic City properties at will.  As Boorjian noted, "I've always learned in my career any time you want to force behavior you get burned.  It does not work."  *Id.* at 26:5-7.

[3037]  R. Sigala Jan. 19, 2016 Tr. at 36:19-37:21.

than twice as much as a suite at the Showboat, especially when there was limited capacity at Caesars Atlantic City.[3038]

In describing the factors that went into the decision to transfer the hosts to Harrah's Atlantic City, Boorjian also stated:

> I think historical play is a big one. I think then you have to balance it with the brand and the capacity and what you can deliver on. The experience you came [sic] deliver. So meaning specifically hotel rooms. Again, I keep going back to it because it is the big driver. Hotel revenue and the ability to get a nice clean hotel room or a suite is very attractive to our VIP customers.[3039]

Loveman also explained the decision to transfer the non-Asian hosts to Harrah's Atlantic City:

> Bally's, other than the Asian facility that we built there, didn't have an offering that could attract a high-end player. We didn't have the room accommodations. We didn't have the restaurants. It just wasn't gonna work to take a thousand-dollar-a-day player and try to convince them to go to Bally's, which at that time particularly was a really out-of-date, rundown place. So the choices would be between Caesars on the one hand and Harrah's on the other, and my recollection of this is that given the depth of the existing VIP team at Caesars, which had been large and substantial for a long time, that the idea was that we could best use them where we had a thinner team, which was at Harrah's.[3040]

**(C) The Data Used to Develop the Marketing Plan**

Caesars analyzed historical customer data for Showboat-dominant customers to evaluate gaming preferences and to develop a marketing strategy based on that data.[3041] The customer data was segmented by the percentage of market Theo in the Atlantic City market.[3042]

Customers with greater than 75% of their market theoretical revenue at the Showboat were identified as not having a secondary property preference in the Atlantic City market. These customers received offers to all three remaining properties in Atlantic City.[3043]

---

[3038] J. Boorjian Feb. 19, 2016 Tr. at 50:14-51:5. Boorjian explained, "VIPs, they have a mind set they're going to get treated to white glove service." *Id.* at 60:21-23.

[3039] *Id*. at 59:3-61:20.

[3040] G. Loveman Jan. 28, 2016 Tr. at 364:13-365:4.

[3041] Interview of L. Pappas, July 21, 2015 (not transcribed).

[3042] "SAC Marketing Plan" Presentation (undated), at CEOC_2004_0033193 [CEOC _2004_0033180].

[3043] *Id*.

For customers with less than 75% of their theoretical revenue at the Showboat, Caesars identified the customer's secondary property preferences.[3044]  To the extent a customer had only one secondary preference, this secondary property became the customer's dominant property and he or she  received offers to that property.[3045]  For customers with more than one historical secondary preference, Caesars assigned the new dominant property and provided offers based on the customer's highest average daily win ("ADW") among the secondary properties.[3046]

The overall Cross-Play (*i.e.*, import/export) based on Theo gaming revenue[3047] for dominant customers between Showboat and the other three CEC Atlantic City properties prior to the closure announcement is shown in AC Figure 11:

---

[3044] *Id.*

[3045] *See Id.* at CEOC_2004_0033194 [CEOC_2004_0033182].

[3046] *Id.* at CEOC_2004_0033194.

[3047] "Theo" or "Theoretical Win" is a "mathematical equation used to estimate how much [Caesars] theoretically believe[s] the casino will win from a customer based on probability." Theo represents the expected house advantage from gaming activity.  *See* "Relationship Marketing Glossery" (2009) at 16 [CEOC_2004_0014825].  *See also* T. Shaukat Nov. 9, 2015 Tr. at 44:4-20 ("[T]heo is a gaming industry standard term" which "basically tells you what on average over a long number of a slot machine's handle pulls what you expect the outcome to be. So it's the expected win . . . or the theoretical win.").  *See* Appendix 10 – Total Rewards for a further discussion of Cross-Play.

**AC Figure 11: Gaming Theo Cross-Play – Atlantic City**

| (amounts in millions) | 2011 | 2012 | 2013 | Jan-14 through Jun-14 | Total | % of Total |
|---|---|---|---|---|---|---|
| **Showboat Imports:** | | | | | | |
| *Harrah's to Showboat* | *$15.6* | *$18.3* | *$15.5* | *$5.7* | *$55.1* | *33.4%* |
| Caesars to Showboat | $12.9 | $15.6 | $13.5 | $6.0 | $47.9 | 29.1% |
| Bally's to Showboat | $18.3 | $22.1 | $15.4 | $6.0 | $61.8 | 37.5% |
| **Total Showboat Imports** | **$46.7** | **$55.9** | **$44.4** | **$17.6** | **$164.7** | **100.0%** |
| **Showboat Exports:** | | | | | | |
| *Showboat to Harrah's* | *$14.7* | *$18.8* | *$16.7* | *$7.4* | *$57.5* | *37.6%* |
| Showboat to Caesars | $10.5 | $16.3 | $14.1 | $6.4 | $47.3 | 30.9% |
| Showboat to Bally's | $13.3 | $15.5 | $13.7 | $5.8 | $48.3 | 31.5% |
| **Total Showboat Exports** | **$38.5** | **$50.6** | **$44.4** | **$19.6** | **$153.1** | **100.0%** |
| **Net Atlantic City Imported / (Exported) Gaming Theo to Showboat:** | | | | | | |
| *Harrah's to Showboat* | *$0.9* | *($0.5)* | *($1.1)* | *($1.7)* | *($2.5)* | *-21.1%* |
| Caesars to Showboat | $2.3 | ($0.8) | ($0.6) | ($0.4) | $0.6 | 5.0% |
| Bally's to Showboat | $5.0 | $6.6 | $1.8 | $0.1 | $13.5 | 116.2% |
| **Net Atlantic City Imported / (Exported ) Gaming Theo to Showboat** | **$8.3** | **$5.3** | **$0.0** | **($2.0)** | **$11.6** | **100.0%** |

Sources: *See* Appendix 10, Total Rewards for data sources.

Based on the Theo gaming revenue data shown above, is appears that the Cross-Play between Showboat and Harrah's Atlantic City was about even. Further, the Cross-Play between Showboat and the other two Atlantic City properties benefited Showboat on a net basis. That is, more Caesars Atlantic City and Bally's Atlantic City customers visited the Showboat than vice versa. The data also shows that 38% of the total exported Theo gaming revenue associated with the Showboat dominant customers was exported to Harrah's Atlantic City during the period 2011 through June 2014.

Caesars believed that Showboat customers had historically demonstrated an affinity for Harrah's Atlantic City as their first alternative.[3048] Part of the explanation for this "loyalty"

---

[3048] Interview of J. Solomon, Aug. 27, 2015 (not transcribed); Interview of L. Pappas, July 21, 2015 (not transcribed); G. Loveman Jan. 28, 2016 Tr. at 366:9-17; J. Boorjian Feb. 19, 2016 Tr.

seems to be that Harrah's Atlantic City and the Showboat had a long-standing relationship given both were part of HET prior to the merger with Caesars, as well as the fact that both were more slot-focused, in comparison to Caesars Atlantic City and Bally's Atlantic City, which were more table game oriented.[3049] Asian Showboat-dominant customers, on the other hand, had shown a preference for Bally's Atlantic City, and they were targeted for that casino.[3050]

**(D) Results**

Harrah's Atlantic City received what appears to be a disproportionate share of Showboat's customers after the closure, very likely as a result of the marketing plan employed. AC Figure 12, below, details the Theo Cross-Play behavior of the 560,378 customers who were dominant to Showboat as of June 2014 and segments the data to capture the Theo Cross-Play activity of those same customers for the period of September 2013 through August 2014 (12 months prior to closure) compared to September 2014 through August 2015 (12 months after closure):

**AC Figure 12: Cross-Play Summary for SAC Dominant Guest**

*(amounts in thousands)*

| Theo | SAC Dominant Guest Activity | | | |
|---|---|---|---|---|
| **Date Range** | **Harrah's AC** | **Bally's AC** | **Caesars AC** | **Total** |
| 9/13 - 8/14 | $ 11,339 | $ 9,100 | $ 9,452 | $ 29,891 |
| *% of Total* | *37.9%* | *30.4%* | *31.6%* | *100.0%* |
| 9/14 - 8/15 | $ 44,805 | $ 21,311 | $ 22,071 | $ 88,187 |
| *% of Total* | *50.8%* | *24.2%* | *25.0%* | *100.0%* |
| Retained SAC Theo | $ 33,465 | $ 12,210 | $ 12,619 | $ 58,294 |

Source: "SAC Dominant Guests Activity" (June 2014), at CEC_EXAMINER_1447701 [CEC_EXAMINER_1447701].

at 26:23-27:8. In addition, Loveman explained that it made more sense to direct Showboat customers, ". . .who probably by virtue of them having frequented the Showboat are not worth as much as a high-end Caesars guest. . ." to Harrah's Atlantic City which had a much greater capacity than Caesars and was often near or at capacity during summer weekends, in order to avoid "los[ing] them to Revel or someone else." G. Loveman Jan. 28, 2016 Tr. at 365:11-366:8. One creditor group found this historic affiliation unconvincing as a rationale for directing the Showboat customers to Harrah's Atlantic City or an explanation for the movement of the Showboat customers to Harrah's Atlantic City, but did not explain why.

3049 Interview of J. Solomon, Aug. 27, 2015 (not transcribed).

3050 Interview of L. Pappas, July 21, 2015 (not transcribed); T. Shaukat Oct. 28, 2015 Tr. at 213:24-215:10.

As shown in AC Figure 12, the remaining Caesars properties in the Atlantic City market captured approximately $88.2 million of the Theo revenue associated with the Showboat-dominant customers.  Of this amount, approximately 50.8% of the Theo revenue went to Harrah's Atlantic City after the closure, as compared to 37.9% prior to the closure.[3051]

However, it is very difficult to draw firm conclusions from this data.  In particular, it is not clear what actually caused Showboat customers to move to a particular replacement casino – marketing, prior experience and a host of other factors could have been the motivating factors.[3052]

## (E)  Creditors' Positions

Some creditors have asserted that Caesars implemented a marketing plan to direct Showboat customers to Harrah's Atlantic City.  In particular, they point to the transfer of almost all of the Showboat VIP hosts – and thus the customers with the highest value – to Harrah's Atlantic City.  As an initial matter, approximately 50.8% – certainly not "all" – of the theoretical revenue associated with the Showboat-dominant customers ended up at Harrah's Atlantic City, and measuring how many customers selected Harrah's as their new dominant property due to the Showboat's marketing program is not an exact science.  Moreover, as Boorjian noted, a number of external factors could have had an impact on Showboat customers' decisions to move to Harrah's Atlantic City, including Showboat customers' aversion to traffic, crowds, and noise in the Center Boardwalk, the "vibe" of a casino, and simple luck.[3053]

Creditors have also asserted that all of Harrah's Atlantic City increased business and improvement in performance after Caesars announced the Showboat closure should be attributed to the Showboat's marketing program.  The Examiner has seen no proof of this, and indeed, while some customers might have chosen Harrah's Atlantic City as a result of the Showboat's marketing program, the increase in Harrah's Atlantic City business could also have been due to other factors such as the closure of the other AC Casinos and the improvement in the economy in general and gaming in particular.

Creditors have also asserted that Caesars manipulated room rates at Caesars' three remaining Atlantic City hotels, making the rates at Harrah's Atlantic City the lowest, in order to drive more customers to that property in an attempt to enrich CERP.[3054]  The analysis on which this assertion is based, however, appears flawed, because it takes into account only a short period

---

[3051]  *See* AC Figure 11, *supra*.

[3052]  As Caesars' Tom Jenkin put it, "If you try to do it [divert customers to one property over another], you probably won't be successful and you'll spend a bunch of money in the process.  So when we market a destination market, we market it as a whole and let the customer choose."  T. Jenkin Sept. 30, 2015 Tr. at 74:5-17.  *See also* J. Boorjian Feb. 19, 2016 Tr. at 26:2-22.

[3053]  J. Boorjian Feb. 19, 2016 Tr. at 61:21-63:8.

[3054]  The creditors believed this asserted business practice symptomatic of a broader scheme by Caesars to direct customers to properties owned and operated by CERP and CGP.  The Examiner has seen no evidence supporting that claim.

(primarily from May 14, 2015 through October 31, 2015) and does not consider other related factors. For example, because of their location on the center Boardwalk and easy access to the beach, Caesars Atlantic City and Bally's Atlantic City are both much more popular destinations during the summer months.[3055] In fact, during the summer months of May 2015 through September 2015, both Caesars Atlantic City and Bally's Atlantic City were operating at near maximum capacity with occupancy rates averaging approximately 97% and 94%, respectively.[3056] Ruben Sigala, Director of Marketing Analytics for CEC, noted that Caesars Atlantic City had the highest occupancy level of any property in the Caesars network during this time frame and that all the Atlantic City properties had high occupancy rates, as shown in AC Figure 13 below:

### AC Figure 13: Atlantic City Hotel Occupancy Levels

|  | 2015 Occupancy Rates | | | | | |
|---|---|---|---|---|---|---|
|  | **May** | **June** | **July** | **August** | **September** | **Average** |
| **Caesars AC** | 94.9% | 96.5% | 98.2% | 98.4% | 95.7% | **96.7%** |
| **Bally's AC** | 89.5% | 93.9% | 96.8% | 96.8% | 91.7% | **93.7%** |
| **Harrah's AC** | 84.9% | 89.9% | 96.5% | 96.5% | 85.7% | **90.7%** |

Sources: All Property Revenue financial data provided to the Examiner on January 23, 2016. [CEC_EXAMINER_1447983]

As a result of the strong demand for the Boardwalk properties during the summer months, these properties typically yield room rates at their highest levels for the year,[3057] whereas Harrah's Atlantic City does not enjoy the same seasonal increased demand given that it is not located on the Boardwalk.[3058] Sigala noted that the internal discussions during this time period likely revolved around whether the Boardwalk properties were priced highly enough to maximize revenue.[3059]

This seasonality effect is demonstrated by the average room rate offer data presented by one of the creditor groups. The room rates offered by Caesars Atlantic City and Bally's Atlantic City during the summer months of 2015 were 83.3% and 44.2%, respectively, higher than the prices offered in October 2015. By comparison, the room pricing for Harrah's Atlantic City was only 15.9% higher than the prices offered in October 2015, as shown in AC Figure 14:

---

[3055] R. Sigala Jan 19, 2016 Tr. at 56:21-23 (the time period covered by the creditors' analysis "happens to coincide with the highest demand season for the boardwalk properties.").

[3056] *See* AC Figure 13, *infra.*

[3057] "Atlantic City Hotel Pricing" Presentation to the Examiner (Jan. 19, 2016), at CEC_EXAMINER_1447704 [CEC_EXAMINER_1447702].

[3058] R. Sigala Jan. 19, 2016 Tr. at 57:20-25.

[3059] *Id.* at 57:16-19

**AC Figure 14: Seasonality Effect on Average Room Rate Offer**

| Time Period | Average Room Rate Offer | | |
|---|---|---|---|
| | Caesars AC | Bally's AC | Harrah's AC |
| 10/1/2015 - 10/31/2015 | $ 126.50 | $ 122.95 | $ 127.51 |
| 5/14/2015 - 9/30/2015 | $ 231.86 | $ 177.28 | $ 147.81 |
| **Change in Room Pricing** | 83.3% | 44.2% | 15.9% |

Source: "Atlantic City Room Rate Analysis" for the period May 14, 2015 through October 31, 2015 gathered by one of the creditors' advisors (Dec. 12, 2015).

Indeed, during the month of October 2015, the average room rates offered at the three Atlantic City hotels were much closer than in prior months, with Harrah's Atlantic City offering the highest average room rate of the three properties during this month, as shown above.

Finally, the ADR's for the three properties (*i.e.*, the average daily cash rate for the hotel room) during this time frame reflect that Harrah's Atlantic City typically yielded the highest room rates during the summer months, as shown in AC Figure 15 below:

**AC Figure 15: Atlantic City Hotel Average Rate Per Occupied Room**

| | 2015 ADR | | | | | |
|---|---|---|---|---|---|---|
| | May | Jun | Jul | Aug | Sep | Oct |
| **Caesars AC** | $ 98.60 | $ 101.42 | $ 113.73 | $ 113.26 | $ 102.25 | $ 97.39 |
| **Bally's AC** | $ 96.07 | $ 97.18 | $ 102.77 | $ 105.54 | $ 93.90 | $ 89.70 |
| **Harrah's AC** | $ 101.02 | $ 101.69 | $ 114.69 | $ 118.32 | $ 99.48 | $ 103.45 |

Source: All Property Revenue financial data provided to the Examiner on January 23, 2016. [CEC_EXAMINER_1447983].

The higher ADR for Harrah's Atlantic City is a product of Caesars "preserving" hotel rooms at the Atlantic City properties for their VIP customers and the additional hotel room capacity of this property compared to the other Atlantic City properties.[3060] As a result, Harrah's Atlantic City sells more hotel rooms at the premium, weekend rates to non-VIP customers, while Caesars Atlantic City and Bally's Atlantic City sell fewer rooms at the premium rates due to the VIP customers occupying a greater percentage of their available inventory.[3061]

This is also reflected in the TotalPar data for these properties (*i.e.*, the cash rate for the hotel room plus Theo revenue for the Total Rewards member occupying each room), as shown in AC Figure 16:

[3060] Interview of Bobby Duck, Feb. 8, 2016 (not transcribed).

[3061] *Id.*

**AC Figure 16: Atlantic City Hotel TotalPar**

*(amounts in thousands)*

|  | 2015 TotalPar | | | | | |
|---|---|---|---|---|---|---|
|  | **May** | **Jun** | **Jul** | **Aug** | **Sep** | **Oct** |
| **Caesars AC** | $  871.8 | $  924.6 | $  924.6 | $  992.4 | $ 1,001.0 | $  942.6 |
| **Bally's AC** | $  549.8 | $  558.8 | $  679.3 | $  698.9 | $  580.4 | $  614.0 |
| **Harrah's AC** | $  494.2 | $  503.4 | $  553.8 | $  555.4 | $  489.2 | $  519.5 |

Source: ATCHotelAndFinancialSummary20160204. [CEC_EXAMINER_1447984].

As shown in AC Figure 16, both Caesars Atlantic City and Bally's Atlantic City realized higher TotalPar than Harrah's Atlantic City, thus supporting the proposition that these properties house more VIP customers as a percentage of their total available inventory than Harrah's Atlantic City.

Based on this analysis of occupancy rates, seasonality, and VIP customer patterns, the Examiner has concluded that there are no viable claims related to the alleged manipulation of room rates in the Atlantic City market.

Finally, one creditor group has asserted that CEOC absorbed a disproportionate share of marketing expenses for Showboat customers.[3062]   In a November 11, 2014 earnings call, Loveman explained:

> The increase in marketing expenses was largely a result of programs aimed at retaining guests in Atlantic City, following the closure of our Showboat property. These incentives increased guest reinvestment in an effort to entice loyal customers to visit our other properties in the market, especially CERP member, Harrah's Atlantic City.  We are encouraged by the increased visitation, and hope to retain these players at more normalized reinvestment levels, going forward.[3063]

Actual property level financial statements show total marketing expenses for all of the Atlantic City properties increased from $19.9 million in 2013 to $24.3 million in 2014.[3064]  The marketing expenses related to the Showboat closure were comprised of direct expenses and shared expenses that were allocated to each property based on budgeted net revenues.[3065]  The

---

[3062]  Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials (Jan. 12, 2015) at 29, *In re: Caesars Entm't Operating Co., Inc.*, Case No. 15-10047-KG (Bankr. D. Del.), [Dkt. No. 10].

[3063]  "CZR – Q3 2014 Caesars Entertainment Corp. Earnings Call" transcript prepared by Thomson Street Events (Nov. 10, 2014), at 4.

[3064]  "Detailed       Property       Historicals       &       Projections"       (2007-2014)       at CEOC_INVESTIG_00224479,   CEOC_INVESTIG_00224484,   CEOC_INVESTIG_00224489 and CEOC_INVESTIG_0224494 [CEOC_INVESTIG_00224412].

expenses relating specifically to the Showboat closure by property in 2014 are shown in AC Figure 17 below:

### AC Figure 17: Showboat Marketing Plan Related Expenses

*(amounts in thousands)*

| Expense Type | Showboat | Bally's AC | Caesars AC | Harrah's AC | Total |
|---|---|---|---|---|---|
| **Direct Marketing Expenses** | $    129.8 | $    71.1 | $    92.5 | $    114.2 | $    407.5 |
| **Direct Marketing Expenses Shared** | $    14.9 | $    50.2 | $    64.7 | $    80.9 | $    210.7 |
| **Sept - Oct Play Redemption ($500 on us)** | $    - | $    1,286.8 | $    1,271.5 | $    2,394.6 | $    4,952.8 |
| **Parties held for SAC Customers** | $    385.1 | $    46.4 | $    - | $    83.1 | $    514.6 |
| **Total Costs** | **$    529.7** | **$    1,454.4** | **$    1,428.7** | **$    2,672.8** | **$    6,085.6** |
| **% of Total** | 9% | 24% | 23% | 44% | 100% |

Source: SAC Promotion Costs provided to the Examiner on August 24, 2015 [CEOC_2004_0058535].

The Examiner has concluded that the allocations reasonably correspond to each property's share of customers, and that there are no viable claims related to them.

### d.  Potential Claims and Remedies

The Examiner has concluded that the Showboat marketing plan appears to have been a thoughtful, reasonable plan that attempted to capitalize on historical customer preferences and to retain as many Showboat customers as possible within the Caesars network. The "network" view of all of the Caesars employees interviewed made good business sense from an overall Caesars perspective. In addition, the Examiner has concluded that the marketing expense allocations were reasonable and done in accordance with standing agreements.

However, because CEOC was clearly insolvent at the time of the Showboat closure, the Examiner has concluded that, to the extent Caesars's marketing plan resulted in an incremental benefit to CERP relative to customers' historical preferences (in part because of the movement of VIP hosts), CEOC was adequately compensated. This was not done.

Based on CEOC's insolvency and the complete lack of consideration for the benefit to CEOC arising out of the marketing program, the Examiner believes that CEOC has a strong constructive fraudulent transfer claim against CERP as the transferee and beneficiary of Showboat's marketing and customer retention efforts following the closure.

---

[3065] "Expense allocation methodologies and amounts incurred by AC property for marketing and promotion expenses related to the Showboat closure and customer retention marketing efforts to the Showboat customers." Spreadsheet provided to the Examiner on Aug. 24, 2015 [CEOC_2004_0058535].

The Examiner has also concluded that there are no viable claims for actual fraudulent transfer or breach of fiduciary duty arising out of the Showboat marketing and customer retention program. Regarding actual fraudulent transfer, Showboat's marketing and customer retention program benefited CERP (and ultimately CEC) by giving it access to the Showboat's customers. This constitutes the kind of interest in property that falls within section 548 of the Bankruptcy Code.[3066] However, the transfer (free access to the Showboat's customers) was not made with any intent to hinder, delay or defraud any of the Showboat's or CEOC's creditors; it was an operational decision made to benefit the entire Caesars system. In addition, the actual impact was not material either to CEOC or to CERP or for that matter, to the entire enterprise, given that the Examiner's best estimate is that the value CEOC received was less than $7 million. Under these circumstances, the Examiner does not believe that a Court would infer actual intent from the "badges of fraud" that were present (*e.g.*, related parties, no consideration, insolvency), nor would it find that the "natural consequence" of the transfer was material harm to creditors. Accordingly, the Examiner believes that CEOC has a no viable claim for actual fraudulent transfer.[3067]

Finally, regarding breach of fiduciary duty, notwithstanding CEOC's insolvency, neither CEOC's directors nor CEC implemented any procedures to ensure that CEOC's particular interests (as opposed to those of the overall Caesars network) were protected. Although CEOC's and CEC's top management knew of and discussed the plan with those who were implementing it, they did not establish special committees at either CEC or CEOC to consider the Showboat marketing and customer retention program and whether CERP should pay for any benefits it received, and although CEOC did have two independent directors on its board beginning in June 2014, there is no evidence that they considered this issue on their own or that the board as a whole did so. The board minutes are silent on this point. However, it is also clear that there was no formal board action of any kind at CEC or CEOC with respect to the Showboat marketing plan. All who testified about it spoke of it as an operational decision designed to benefit the

---

[3066] *See, e.g.*, *Del Mastro v. Grimado*, Case No. L-2746-10, 2013 WL 4746486 at *10 (N.J. App. Div. Sept. 5, 2013) (*per curiam*) (in a case involving a service business, a customer list was an "asset" under the New Jersey Uniform Fraudulent Transfer Act ("UFTA") for purposes of a claim of fraudulent transfer); *Newhouse v. Wes-Tech Logistics, Inc. (In re Electran Logistics Ltd.)*, Adv. Proceeding No. 07-3004, 2008 WL 410235 at *2-3 (Bankr. N.D. Tex. Feb. 11, 2008) (customer list can be trade secret under the Texas UFTA, although not where customer names are publicly available); *cf. Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.)*, No. 06 cv 4228, 2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006). In *Cross Media Mktg.*, the District Court upheld the Bankruptcy Court's award of both compensatory and punitive damages, determining that, in order to compute actual damages, it was appropriate to look at the plaintiff's loss, which could be calculated by determining the development cost of the customer lists. *See also, id.* at *1 (stating that, within a month of receiving the case, the bankruptcy court granted an injunction for debtor on the basis that debtor's "customer lists were deemed to be property of Debtor's estate pursuant to Section 541 of the Bankruptcy Code" ) (internal quotation marks and citation omitted).

[3067] The elements of an actual fraudulent transfer claim under the New Jersey and Delaware UFTA are virtually identical to those under the Bankruptcy Code. Thus, the Examiner believes that CEOC also has no viable actual fraudulent transfer claim against CERP under state law.

entire Caesars enterprise, and the evidence is that the plan and its implementation were handled by management, not the board. It therefore does not appear that directors' fiduciary duties were implicated. Accordingly, the Examiner has concluded that there is no viable claim for breach of fiduciary duty.

Regarding remedies, the property interest CEOC transferred to CERP – access to and exploitation of the Showboat's customer data – is not susceptible to being returned, and even if it were, the Showboat no longer exists and could not make use of it. Therefore, the only possible remedy for constructive fraudulent transfer would be money damages equal to the value of the interest transferred. The Examiner believes that the best approach for a court to follow would be to compensate CEOC for the incremental business that CERP's Harrah's Atlantic City enjoyed by reason of the transfer. A calculation follows.

As previously discussed, Caesar's maintains and extends its relationships with rated players through the Total Rewards Program.[3068] In the ordinary course, the properties import and export Total Rewards members between and among the properties as provided for in the Shared Services Agreement and management contracts between CEOC and the other Caesars properties.[3069] Therefore, it is reasonable to assume that Harrah's Atlantic City would have received the benefit of Showboat customers' gaming and other revenue in the ordinary course based on the customers' historical preferences. As noted earlier, the expected (or Theo) amount of gaming revenue to be retained by Harrah's Atlantic City related to Showboat's customers during the twelve months after the closure was approximately $33.5 million.[3070]

At least partly as a result of the Showboat marketing plan, it appears that Harrah's Atlantic City received the benefit of Showboat customer play in the 12 months following the Showboat closure in an amount above what would have been expected based on historical preferences. An illustrative analysis of the damages, based on the amount CEOC might expect to receive and the amount CERP might expect to pay for this incremental value is included in Appendix 11.

More specifically, in the year prior to the closure, Harrah's Atlantic City received 37.9% of Theo gaming revenue associated with the Showboat's customers, compared to 50.8% during

---

[3068] "SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment" (Jan. 28, 2008), at CEOC_INVESTIG_00240811 [CEOC_INVESTIG_00240748]. This study reflected, as of January 2008, the rated player value allocated to Bally's Atlantic City ($24.7 million), Harrah's Atlantic City ($54.7 million), Caesars Atlantic City ($106.2 million), and Showboat (zero).

[3069] Harrah's Atlantic City was provided access to the Total Rewards database pursuant to paragraph 3.07 of the SSA. "Shared Services Agreement by and among Harrah's Operating Company, Inc. and Harrah's Entertainment, Inc. and CMBS Entities" (Jan. 28, 2008), at CEOC_INVESTIG_00130810-811 [CEOC_INVESTIG_00130801].

[3070] *See* AC Figure 12, *supra*.

the year after the closure.[3071]   This additional 12.9% of Showboat customer play (50.8% - 37.9%) equates to around $11.4 million in incremental Theo revenue ($88.2 million x 12.9%).[3072]   The $11.4 million incremental Theo revenue was increased for other related revenue (*i.e.*, food, lodging) and decreased for promotional allowances (*e.g.*, free rooms) to derive estimated incremental net revenue to Harrah's Atlantic City from the Showboat-dominant customers of between $11 million and $13 million a year.[3073]

Using this derived incremental net revenue range, an estimate of net cash flows was derived, assuming that revenue would continue for ten years, adjusting for predicted customer attrition, and applying a contribution margin (*i.e.*, the incremental after-tax profit) ("Net Cash Flows").   The present value of the Net Cash Flows was then used to quantify the value of this incremental net revenue if it had stayed at CEOC and CERP as $12.1 million and $16.2 million, respectively.   Given that Harrah's Atlantic City would not have paid the gross or total value of the incremental revenue associated with the Showboat customers, factors of 25% and 50% were applied to derive the range of value. The average of these analyses, which assumes a hypothetical negotiation between CEOC and CERP, reflects a range of damages of $3.0 million to $7.0 million, as shown in Appendix 11.[3074]

Some creditors provided the Examiner with a damage theory related to the closure of the Showboat and "migration" of the Showboat customers to Harrah's Atlantic City.   That group set forth a potential "value grab" of $331 million to $384 million based on the assumption that CEOC would be entitled to recover the estimated EBITDA that CERP received in the twelve months following the closure of Showboat related to the revenue from former Showboat Customers, forever; they then valued it at an 11.5 multiple.   The EBITDA following the closure is based on the faulty premise that CEOC's 2.8% drop in revenues was a direct result of the Showboat marketing plan, and that absent that plan, CEOC's revenue would have increased by either the same rate as the rest of the market (5.9%) or the increase in Harrah's Atlantic City's revenue (7.3%).   Their calculation thus attributes all of Harrah's Atlantic City's increase in business to the Showboat closure.

---

[3071]  *See* AC Figure 12*, supra,* and Appendix 11, Atlantic City.  According to Ruben Sigala, "As a general rule of thumb, 12 months is a pretty good gauge to determine the expected value of customers."  R. Sigala Jan. 19, 2016 Tr. at 44:11-13; J. Boorjian Feb. 19, 2016 Tr. at 34:13-25.

[3072]  *See* AC Figure 12, *supra.*

[3073]  The Examiner estimated the incremental net revenue attributable to the Showboat-dominant customers based on the 2013 financial results for both Harrah's Atlantic City and the CEOC Atlantic City properties.  *See* Appendix 11, Atlantic City.

[3074]  Customer attrition data for the Atlantic City properties was produced to the Examiner on Feb. 22, 2016 at CEC_EXAMINER_1447927 [CEC_EXAMINER_1447927].  This data appears to suggest that current first and second year attrition rates are much higher than those used in the 2008 KPMG SFAS 141 Valuation Study.  If the average attrition rates from this recently provided data were used, the damages would significantly decrease.  However, given that this data appears to be inconsistent with the KPMG SFAS 141 Valuation Study information and other data received in this matter, the damages estimate utilized the attrition data from the 2008 KPMG SFAS 141 Valuation Study.

The Examiner does not believe that a court would adopt this theory because it is highly speculative and is based on unrealistic assumptions.  For example, as discussed earlier, not all of the drop in CEOC's revenues or the increase in Harrah's Atlantic City's business can be attributed to the Showboat closure.  There were two casino closures around the same time, and the market was under intense competitive pressure.  This creditor theory also fails to take into account the data that shows what many Showboat customers' likely second choices would have been.  Finally, it ignores the fact that under ordinary circumstances CERP would have been entitled to the benefit of Showboat's customers through the Shared Services and Marketing Agreements that were in place between the entities.