**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **CAESARS ENTERTAINMENT** | ) **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.*, | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
| | ) |
| | ) Re: Docket Nos. 3401 & 3406 |

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS
# (Substantially Unredacted)

**May 16, 2016**
**(initially filed March 15, 2016)**

**VOLUME V**
**(Section IX – 2014 Financial Transactions)**
**(Section X – Tax Issues)**
**(Section XI – The LBO)**
**(Section XII – Veil Piercing)**
**(Section XIII – The RSAs)**

# IX. 2014 FINANCIAL TRANSACTIONS

## A. Introduction

As discussed in earlier sections of this Report, prior to the LBO, Caesars had a healthy balance sheet, with long-term debt of $12.4 billion [3075] and positive cash flow sufficient to both service that debt and provide a reasonable equity cushion. Its pre-LBO debt level was consistent with other gaming companies.[3076] The LBO was proposed at a time of increasing revenues for Caesars, and the Sponsors mistakenly believed that, based on historical performance, the gaming industry was largely recession-proof.[3077] The LBO changed Caesars' debt profile dramatically, as Caesars' long-term debt nearly doubled from $12.4 billion as of December 31, 2007,[3078] to $23.9 billion as of March 31, 2008.[3079] Following the LBO, CEOC alone had $17.4 billion of that debt, consisting of approximately $14.0 billion in new post-LBO debt and other rollover pre-LBO debt.[3080]

By early 2009, the recession had taken its toll on CEOC. Revenues and earnings declined precipitously to the point where CEOC properties were no longer generating sufficient EBITDA to pay interest, let alone principal, on its debt, or to fund any significant capital expenditure projects. In short, CEOC was insolvent.[3081] In response, the Sponsors sprang into action. Between 2008 and mid-2013, the Sponsors (Apollo in particular) aggressively engineered over 40 financial transactions to help address CEOC's financial problems.[3082] These transactions included strategic debt-for-debt and debt-for-equity exchanges, new financings and re-financings of existing debt, open market and privately negotiated repurchases of debt and multiple negotiated amendments to existing credit facilities and indentures.[3083] The objective of these transactions was to create "runway," *i.e.*, to extend payment and maturity dates, in the hope, and with the expectation, that Caesars would soon emerge from the "cyclical downturn"

---

[3075] CEC 10-K for the year ended Dec. 31, 2008 (March 17, 2008), at 57. Long-term debt is reported at book value.

[3076] *See* Interview of J. Payne, July 1, 2015 (not transcribed).

[3077] *See* Interview of M. Rowan, June 18, 2015 (not transcribed).

[3078] CEC 10-K for the year ended Dec. 31, 2007 (Feb. 29, 2008), at 66.

[3079] CEC 10-Q for the period ended Mar. 31, 2008 (May 16, 2008), at 3. Long-term debt is reported at book value.

[3080] CEC 10-Q for the period ended March 31 2008 (May 16, 2008), at 3; CEC 8-K (Feb 1, 2008), at 5. *See also UMB Bank v. Caesars Entm't Corp. & Caesars Entm't Operating Co., Inc.*, Ver. Compl. ¶60 (Nov. 25, 2014). Long-term debt is reported at face value.

[3081] *See* Section V.

[3082] *See* Appendix 14, Capital Structure and Financing.

[3083] *Id.* Many of the 40-plus transactions to create runway were uncontroversial, and the Examiner has not been asked, and found no reason, to investigate them. *See* CEC Deck (June 27, 2014), CEOC_INVESTIG_00088461 (native file) at 34.

that had engulfed the gaming industry, and return to its pre-LBO growth pattern and strong earnings.[3084]

The recession in the gaming industry, however, lasted longer than expected. As depicted on Financial Figure 1 below, by the end of 2013, CEOC's outstanding debt increased to $19.3 billion (excluding CEOC's intercompany debt), virtually all of which was guaranteed by CEC.

**Financial Figure 1: CEOC Total Debt to EBITDA Leverage Ratio[3085]**

*(amounts in millions)*

|  | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Total Debt at Face Value, Net of Intercompany Note(s) Payable to CEC | $  17,884.5 | $17,354.3 | $17,794.5 | $18,766.4 | $20,528.9 | $19,288.3 |
| EBITDA | 1,500.4 | 1,448.0 | 1,279.3 | 1,296.7 | 1,217.9 | 1,064.9 |
| Leverage Ratio | 12.03x | 11.99x | 14.30x | 14.72x | 17.28x | 18.40x |

Source: Exhibit 99.1 to CEC 10-K for the year ended Dec. 31, 2008 (Mar. 17, 2009), at 25; Exhibit 99.1 to CEC 10-K for the year ended Dec. 31, 2009 (Mar. 9, 2010), at 27; Exhibit 99.1 to CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 30; Exhibit 99.1 to CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 16; Exhibit 99.1 to CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 18; CEOC Financial Statements for the period ended Dec. 31, 2013, Exhibit 99.1 to CEC 8-K (Apr. 15, 2014), at 27. *See also* EBITDA figures sources in Solvency, Section V.

By the end of 2013, CEOC was in dire financial condition. Its EBITDA for 2013 was $1.1 billion, which was a decline of over 40% since the LBO, and its annual interest expense was $2.1 billion, exceeding EBITDA by over $1 billion. The situation had reached the point where CEC and the Sponsors were projecting that, absent immediate action, by the end of 2014, CEOC would run out of cash, trip a key financial covenant in its loan agreements, and potentially end up in bankruptcy. The Four Properties Transaction was only one of the steps that was taken in an effort to address CEOC's (and CEC's) desperate financial problems.

In addition to the asset transfers, between May and December 2014, CEOC and CEC engaged in a series of financial transactions involving the debt and equity interests of CEOC in an effort to shore up CEOC's balance sheet and extend runway. Among the financial transactions that were undertaken in 2014 (which the Examiner was asked to investigate) were:

- The B-7 Transaction;

- The Tender Offers;

- The 5% Stock Sale;

---

[3084] D. Sambur Jan. 14, 2016 Tr. at 746:12-18; T. Donovan Nov. 10, 2015 Tr. at 68:2-5; G. Loveman Oct. 27, 2015 Tr. at 280:7-10; *Wilmington Savs.*, E. Hession Sept. 17, 2015 Tr. at 170:12-18; *Wilmington Savs.*, M. Rowan Aug. 26, 2015 Tr. at 185:19-22.

[3085] Total CEOC debt for the year 2008 is derived by adding total debt at book value $16.9 billion plus unamortized discounts of $1.3 billion and less unamortized premium of $77.4 million, and excludes intercompany notes payable to CEC totaling $160.6 million.

- The Performance Incentive Plan;

- The Senior Unsecured Notes Transaction; and

- The PIK Notes Transaction.

As discussed below and elsewhere in this Report, the 2014 transactions did not solve CEOC's liquidity problems, nor did they result in a sufficiently meaningful reduction in CEOC's long-term debt.  Overall, as shown in Financial Figure 2 below , CEOC debt decreased by $917 million, and, as discussed below, that debt reduction was due in significant part to the Senior Unsecured Notes Transaction, not the B-7 Transaction, which merely exchanged maturing junior debt for First Lien debt..

**Financial Figure 2: CEOC Debt Change from 2013 to 2014**[3086]

*(amounts in millions)*

| Debt Tranche | Face Value | | Variance |
|---|---|---|---|
| | 12/31/2013 | 12/31/2014 | |
| **First Lien Credit Facilities** | $       4,412.6 | $       5,355.0 | $        942.4 |
| First Lien Secured Notes | 6,860.0 | 6,675.0 | (185.0) |
| Second Lien Secured Notes | 5,492.9 | 5,238.0 | (254.9) |
| CEOC Subsidiary-Guaranteed Notes | 493.3 | 479.0 | (14.3) |
| Unsecured Senior Notes | 1,904.0 | 530.0 | (1,374.0) |
| **Subtotal of Notes** | **14,750.2** | **12,922.0** | **(1,828.2)** |
| **Other Debt** | **125.5** | **94.0** | **(31.5)** |
| **Total CEOC Debt  (Excluding Intercompany)** | **$    19,288.3** | **$    18,371.0** | **$      (917.3)** |

Source: CEOC Financial Statements for the period ended Dec. 31, 2013, Exhibit 99.1 to CEC 8-K (Apr. 15, 2014), at 27; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015) at 88; *see* "CEOC Selected Financial Information December 2014," *available at* <http://files.shareholder.com/downloads/ABEA-5FED0N/1577754820x0x876897/3E683451-5E50-4D90-AF88-E8C10790263F/CEOC_Selected_Financial_Information_December_2015.pdf> (last visited March 7, 2016).

On an overall basis, as discussed below, the actions taken in 2014 only exacerbated CEOC's problems. The 2014 asset transactions effected a significant reduction in EBITDA, thus making it more likely that CEOC would eventually default on its obligations.  Nor did the financial transactions provide any additional liquidity to CEOC.  On the contrary, its leverage increased and the 2014 financial transactions reduced CEOC's liquidity by draining $416.9

---

[3086] 2013 long-term debt is reported at face value and includes the current portion.  $1,146.6 million of debt issued by CEOC is held by other consolidating entities, substantially all of which is held by CGP.  CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 84.

million in cash from CEOC that could have been used for other corporate purposes, as shown in Financial Figure 3 below:

**Financial Figure 3: CEOC Cash Used for 2014 Financial Transactions**[3087]

*amounts in millions*

| CEOC 2014 Debt Repurchases | | |
|---|---:|---:|
| B-7 Transaction -  June/July 2014 | $ | 315.0 |
| Senior Unsecured Notes Transaction - August 2014 | | 84.3 |
| PIK Notes Transaction - October - December 2014 | | 17.7 |
| **Total Cash** | **$** | **416.9** |

Source: Appendix 12-1.

The 2014 financial transactions did provide some benefits to CEOC. Maturities were extended, runway was created, covenant relief was obtained and immediate going concern qualifications that would have triggered a bankruptcy at both CEC and CEOC were avoided (at least temporarily). But they came at a cost. CEOC was left with less cash, $44 million in higher annual interest expense (*see* B-7 Figure 4) and way too much debt, with less earning power to pay for it. The primary beneficiaries of the 2014 financial transactions were CEC, CGP (which was paid $452 million out of the B-7 Loan proceeds) and certain junior creditors whose obligations were paid in full. As a result of these transactions (and assuming their effectiveness), CEC's Bond Guarantee (as defined below) was released, thereby reducing CEC's guarantee exposure from $19.2 billion to $5.4 billion.[3088]  In addition, CEC's Bank Guarantee (defined below) was modified from a payment guarantee to one of collection.

In order to obtain the B-7 Loan (defined below), Apollo first sought a commitment from GSO Capital Partners LP ("GSO") and Blackrock Inc. ("BlackRock"). The agreement reached with GSO and BlackRock required, as a condition precedent to committing funding for the B-7 Loan, that CEOC no longer be a wholly owned subsidiary of CEC. According to CEC, once CEOC was no longer a wholly owned subsidiary, the Bond Guarantee was automatically released. There is a difference among the parties as to whether the release of the Bond Guarantee was proposed by CEC and Apollo or was demanded by GSO and BlackRock.

---

[3087] *See* Appendix 12, Debt Transactions for a detailed analysis of the sources and uses of the Redemptions (defined below), the B-7 Transaction, the Senior Unsecured Notes Transaction and the PIK Notes Transaction. Total Cash shown above does not include $78.5 million provided by CEOC for the mandatory redemptions in Q2 2014 and other redemptions of CEOC debt through Q4 2014.

[3088] *See* B-7 Figure 3; CEOC Financial Statements for the period ended Dec. 31, 2013, Exhibit 99.1 to CEC 8-K dated April 15, 2014 (April 15, 2014), at 5.

Creditors have alleged that the purported release of the Bond Guarantee was a fraudulent transfer or was otherwise unlawful and improper. Certain of these claims are being litigated by creditors in actions pending in courts in Delaware and New York. The Examiner has not investigated, and takes no position regarding the merits of, the claims asserted in those cases. Rather, the Examiner's investigation has been limited to whether the release of the Bond Guarantee, if effective, provides a legally cognizable basis for a claim on the part of the Debtors' estate for fraudulent transfer, breach of fiduciary duty or on other grounds.

In a nutshell, creditors have stressed the following facts with respect to the B-7 Transaction in support of their claims:

- CEOC was deeply insolvent;

- As a result of incurring additional debt, CEOC's annual interest expense increased by approximately $44 million;

- Maturities on the B-5 and B-6 Term Loans were shortened by nine months;

- CEOC paid $219 million in transaction-related fees (more than half of which went to GSO and BlackRock as an inducement to backstop the B-7 Loan and secure the necessary amendments to the First Lien Credit Agreement (defined below));

- CEOC repaid junior unsecured debt (including affiliate-owned debt) at a premium to par;

- CEOC lacked an independent board to consider the B-7 Transaction; and

- CEC sought to limit its guarantee exposure for its own benefit and to the detriment of CEOC.

CEC and the Sponsors disagree with the creditors' assertions. They claim that the B-7 Transaction was necessary to keep CEOC alive, and provided significant, tangible benefits to CEOC (and its creditors). According to CEC and the Sponsors, the B-7 Loan had the following salutary effects: maturities were extended, covenant relief and other modifications to the First Lien Credit Agreement were obtained, a going concern qualification was avoided, and additional runway was created. The B-7 Loan was, according to CEC and the Sponsors, merely a necessary step in solving CEOC's larger balance sheet problems. CEC and the Sponsors also argue that the Bond Guarantee release was not the objective of the B-7 Transaction, nor was it something they affirmatively sought, but rather it was a condition demanded by the B-7 lenders. The evidence, however, suggests that the Bond Guarantee release and the conversion of the Bank Guarantee to a guarantee of collection were more than mere afterthoughts or requirements of the lenders: they were the essential elements of the B-7 Transaction.

As set forth in detail below, after considering all of the evidence, the Examiner concludes that:

- Claims for actual or constructive fraudulent transfer against holders of Term Loans that were paid in the B-7 Transaction are between not viable and weak;

- Claims for constructive fraudulent transfer and state law actual fraudulent transfer against holders of 5.625% Senior Notes due 2015 and 10% Second Priority Notes due 2015 that were repurchased in the B-7 Transaction are between not viable and weak;

- Claims for actual fraudulent transfer against noteholders (other than CGP and Chatham Asset Management LLC ("Chatham"))[3089] for repurchase of 5.625% Senior Notes due 2015 and 10% Second Priority Notes due 2015 are between not viable and weak;

- Claims for actual fraudulent transfer against CGP, which received over $452 million for repurchase of its 5.625% Senior Notes due 2015, are reasonable;

- Claims for actual fraudulent transfer against Chatham, which received $106.8 million for repurchase of its 10% Second Priority Notes due 2015 and $328.2 million for repurchase of its 5.625% Senior Notes due 2015, are plausible (but, with further investigation, may be stronger); and

- Claims for breach of fiduciary duty against the CEOC Board and CEC as a controlling shareholder of CEOC, and for aiding and abetting a breach of fiduciary duty against the Sponsors, arising out of the B-7 Transaction and the Bond Guarantee release are reasonable.[3090]

## B. The B-7 Loan and CEC Guarantee Release Transactions

### 1. The B-7 Transaction

As it entered 2014, CEOC's debt included approximately $4.4 billion in first lien bank loans outstanding under the Credit Agreement dated as of January 28, 2008, which was subsequently amended as part of the B-7 Transaction (the "First Lien Credit Agreement").[3091]

---

[3089] Chatham also includes Chatham Asset High Yield Master Fund Ltd. and Chatham Eureka Fund L.P.

[3090] The Examiner did not investigate whether there were any violations of securities laws in connection with the B-7 Transaction.

[3091] *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay to Permit Implementation, (IV) Scheduling a Final Hearing and (V) Granting Related Relief*, Docket No. 22 at ¶16; First Day Memo at 21-22.  The First Lien Credit Agreement provides CEOC with term loans (each a "Term Loan B" and collectively, the "Term Loans") and other financial accommodations, including revolving credit facilities and interest rate swaps pursuant to an ISDA Master Agreement with Goldman Sachs dated as of January 28, 2008 (collectively, the "First Lien Credit Facility").  As of the Petition Date, CEOC owed not less than $5.35 billion in

CEOC's obligations under the First Lien Credit Agreement were guaranteed by CEC (the "Bank Guarantee").[3092]  CEC also was a guarantor of CEOC's (and its subsidiaries') obligations under approximately $14.75 billion of first and second lien notes and senior unsecured notes (the "Bond Guarantee" or the "CEC Guarantee"),[3093] as depicted in B-7 Figure 1 below.

---

respect of the First Lien Credit Facility (including $25.4 million in respect of First Lien Interest Swaps, the "First Lien Debt").

[3092] Guaranty and Pledge Agreement by Harrah's Entertainment, Inc., to Bank of America, N.A., as agent for the lenders (Jan. 28, 2008) at CEOC_INVESTIG_00144507-521 [CEOC_INVESTIG_00144507].

[3093] The "CEOC Notes" include approximately $14.5 billion in obligations, as follows:  (i) $2.095 billion in aggregate principal amount of 11.25% Senior Secured Notes due 2017 (the "11.25% Senior Secured Notes due 2017"); (ii) $1.25 billion in aggregate principal amount of 8.5% Senior Secured Notes due 2020 (the "8.5% Senior Secured Notes due 2020"); (iii) $3 billion in aggregate principal amount of 9% Senior Secured Notes due 2020 (the "9% Senior Secured Notes due 2020"); (iv) $330.0 million in aggregate principal amount of Chester Downs Senior Secured Notes due 2020 (the "Chester Downs Senior Secured Notes due 2020" and together with the 11.25% Senior Secured Notes due 2017, the 8.5% Senior Secured Notes due 2020 and the 9% Senior Secured Notes due 2020, the "Senior Secured Notes"); (v) $189.9 million in aggregate principal amount of 10% Second-Priority Senior Secured Notes due 2015 (the "10% Second Priority Notes due 2015"); (vi) $4.5 billion in aggregate principal of 10% Second Priority Notes due 2018 (the "10% Second Priority Notes due 2018"); (vii) $750 million in aggregate principal amount of Second Priority Senior Notes due 2018 (the "12.75% Second Priority Notes due 2018," and together with 10% Second Priority Notes due 2015 and the 10% Second Priority Notes due 2018, the "Second Priority Notes"); (viii) $791.8 million in aggregate principal amount of 5.625% Senior Notes due 2015 (the "5.625% Senior Notes due 2015"); (ix) $573 million in aggregate principal amount of 6.5% Senior Notes due 2016 (the "6.5% Senior Notes due 2016"); (x) $478.6 million in aggregate principal amount of the 10.75% Senior Notes due 2016 (the "10.75% Senior Notes due 2016"); (xi) $538 million in aggregate principal amount of 5.75% Senior Notes due 2017 (the "5.75% Senior Notes due 2017," and together with the 5.625% Senior Notes due 2015, 6.5% Senior Notes due 2016 and 5.625% Senior Notes due 2015, the "Senior Notes"); (xii) $15.5 million in aggregate principal amount of 10.75%/11.5% PIK Toggle Notes due 2018 (the "10.75%/11.5% PIK Notes due 2018" or the "PIK Notes").

**B-7 Figure 1: CEOC Debt Guaranteed by CEC as of December 31, 2013[3094]**

*(amounts in millions)*

| | Face Value |
|---|---|
| **Debt Tranche by Priority Ranking** | **12/31/2013** |
| **First Lien Credit Facilities (Bank Guarantee)** | $    4,412.6 |
| **Bond Guarantee** | |
| First Lien Secured Debt | 6,860.0 |
| Second Lien Secured Debt | 5,492.9 |
| Subsidiary-Guaranteed Debt | 493.3 |
| Unsecured Senior Debt | 1,904.0 |
| **Subtotal Bond Guarantee** | **14,750.2** |
| **Other** | **125.5** |
| **Total CEOC Debt (Excluding Intercompany)** | **$    19,288.3** |
| **CEC Guaranteed Debt** | **$    19,162.8** |

Source: CEOC Financial Statements for the period ended Dec. 31, 2013, Exhibit 99.1 to CEC 8-K (Apr. 15, 2014), at 27.

As discussed in Section VIII.D, the Four Properties Transaction, which occurred contemporaneously with the B-7 transaction, was designed to provide additional liquidity to CEOC in order, among other things, to prevent CEOC from running out of cash in 2014 and tripping a key financial covenant. It was also designed to satisfy CEC's auditors, who were threatening to include a going concern qualification in their audit opinion issued in connection with CEC's 2013 audited year-end financial statements.[3095] The Four Properties Transaction, however, was merely a short-term fix. Early 2014 projections forecast that despite the Four Properties Transaction, CEOC was likely to default on an important financial covenant in its First Lien Credit Agreement. That covenant, which is defined in the First Lien Credit Agreement as the "Senior Secured Leverage Ratio" or "SSLR," required CEOC not to exceed a ratio of senior secured debt (consisting of First Lien bank and Senior Secured Note debt) to Adjusted EBITDA of 4.75x to 1.[3096] The First Lien Credit Agreement required CEOC to

---

[3094] 2013 total debt is reported at face value and includes the current portion and $1,146.6 million of debt issued by CEOC is held by other consolidating entities, substantially all of which is held by CGP. CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 84.

[3095] *See Wilmington Savs.,* M. Rowan Aug. 26, 2015 Tr. at 49:1-8.

[3096] First Lien Credit Agreement Section 6.10 (Jan. 28, 2008), at PW_EXAMINER_00288433 [PW_EXAMINER_00288270].

calculate the SSLR and certify its compliance with the SSLR covenant on a quarterly basis.[3097] The Sponsors closely monitored the SSLR, and by early 2014, as the likelihood of a breach of this covenant increased, it became a source of grave concern.[3098]   Something had to be done. The solution was the B-7 Loan and corresponding amendments to the SSLR to eliminate this concern.

To assist it in addressing these issues, in March 2014 Apollo retained Blackstone Group LLC ("Blackstone") as financial advisor for CEC.   On April 21, 2014, Blackstone made a presentation to the CEC Board, in which it stated that "[a]n amendment to the SSLR Covenant and the New B-7 Term Loan, together, will provide increased runway to execute CEC's strategic plan for maximizing value," and that "[a]bsent an amendment to the 4.75x SSLR Covenant, CEOC is projected to default under the covenant in 2H 2014."[3099]

A projected breach of the SSLR covenant was not just a CEOC issue; because of the Bank Guarantee, this was also a critical issue for CEC.   Deloitte advised CEC that any projected breach of the SSLR would necessitate Deloitte including a going concern qualification in CEC's financial statements.   In addition, because CEOC used CEC's audited financial statements in connection with the CEOC Notes, a going concern qualification by CEC's auditors would be an additional Event of Default for CEOC under its First Lien Credit Facility and certain of CEOC's indentures for the CEOC Notes.[3100]   And, of course, nothing good would happen to CEC's market capitalization or ability to finance operations upon the issuance of a going concern qualification.

Another significant issue for CEOC was that certain of the CEOC Notes and certain of the Term Loans were set to mature in 2015.   CEOC either needed to repay or refinance those obligations in order to avoid a payment default.   Any payment default by CEOC would result in the Bank Guarantee and Bond Guarantee being called upon, so CEOC maturing debt was also a problem for CEC.   And Deloitte would also likely have included a going concern qualification on this basis.   Since CEOC was generating negative cash flow, it did not have the ability to repay its 2015 maturities.   A refinancing was thus the only realistic option.   Faced with CEOC's looming maturities and projected SSLR covenant breach, Apollo embarked on a plan to address the 2015 maturities, going concern and SSLR issues, which also involved the release of the Bond Guarantee and the conversion of the Bank Guarantee from a payment guarantee to a guarantee of collection.   Achieving all this, however, came at a price.

---

[3097] *Id.*

[3098] *Id.*, D. Wilfong, Oct. 5, 2015 Tr. at 28:3-29:21.

[3099] Project Julii Discussion Materials (Apr. 21, 2014), at CEOC_INVESTIG_000111442 [CEOC_INVESTIG_00111438].

[3100] First Lien Credit Agreement (Jan. 28, 2008), at PW_EXAMINER_00288434 [PW_EXAMINER_00288270]; Indenture dated June 9, 2006 among CEOC, CEC and U.S. Bank N.A., at PW_EXAMINER_00144323 [PW_EXAMINER_00144396]; Indenture dated September 28, 2005 between CEOC, CEC and U.S. Bank National Association, at CEC_EXAMINER_0428519-20 [CEC_EXAMINER_0428486].

On May 6, 2014, following extensive negotiations, CEC announced that it had entered into a seventh amendment of the 2008 First Lien Credit Agreement (the "B-7 Amendment").[3101] The B-7 Amendment modified the Bank Guarantee to a guarantee of collection but only if no more favorable Bond Guarantee remained in effect.  In addition, CEC announced it had entered into an agreement for an additional Term Loan B (the "B-7 Loan" and together with the B-7 Amendment, the "B-7 Transaction"), with each prior Term Loan B being referred as B-1, B-2 and so on.[3102]  Pursuant to the B-7 Loan, CEOC borrowed an additional $1.75 billion of First Lien bank debt.[3103]  At the same time, CEC announced the sale of 5% of the shares of CEOC (the "5% Stock Sale"), which would purportedly result in the automatic release of the Bond Guarantee.[3104]

The $1.75 billion in B-7 Loan proceeds plus an additional $315 million in cash from CEOC was used to pay (i) over $800 million in Term Loans B-1, and B-3 through B-6, which were set to mature in 2015 through 2017; (ii) over $1 billion in more junior CEOC Notes set to mature in 2015; and (iii) over $219 million in amendment and other fees and expenses associated with the B-7 Transaction, as set forth in  B-7 Figure 2:

### B-7 Figure 2: B-7 Term Loan and Cash Sources and Uses

*(amounts in millions)*

| B-7 Term Loan - Sources & Uses | | |
|---|---|---|
| **Sources** | | |
| 9.75% Incremental B-7 Term Loan due 2017 | $ | 1,750.0 |
| Less: Original Issue Discount (OID) | | (13.1) |
| CEOC Cash Contribution | | 315.0 |
| **Total Sources** | **$** | **2,051.9** |
| **Uses** | | |
| 10.00% Second-Priority Notes due 2015 | $ | 193.1 |
| 5.625% Senior Notes due 2015 | | 830.1 |
| B-1 and B-3 Term Loans due 2015 | | 29.1 |
| B-4 through B-6 Term Loans due 2016 - 2017 | | 780.4 |
| Fees and Expenses of B-7 Transaction | | 219.1 |
| **Total Uses** | **$** | **2,051.9** |

Source: *See* Appendix 12-3 B-7 Term Loan Sources & Uses.

---

[3101]  CEC 8-K (May 6, 2014), at 8.

[3102]  *Id.*

[3103]  *Id. See also* Appendix 12-6, Total Paid to Noteholders.

[3104]  CEC 8-K (May 6, 2014), at 5.

As shown above, over \$1 billion in payments were made through the Tender Offers and related note purchase agreements to holders of junior CEOC Notes and included a "make whole" premium and accrued interest.[3105]  None of the B-7 Loan proceeds were used to fund operations or growth capital projects at CEOC, and CEOC was left with less cash, higher interest expense and substantially the same amount of debt.

Negotiations of the B-7 Transaction commenced in early 2014.  Apollo led the negotiations with GSO and BlackRock.[3106]  Hession was the primary Caesars employee involved,[3107] working in a back-up role with members of Apollo and the CEC Board, particularly Sambur.[3108]  Ultimately, approximately \$1.1 billion of the B-7 Loan was backstopped by GSO and BlackRock for a consent fee of \$129.3 million.[3109]  Although Credit Suisse operated as the lead arranger, Credit Suisse's role was purely mechanical in nature.  It was not heavily involved in the negotiations.[3110]

### a.  Modifications of the First Lien Credit Agreement

From the outset of the negotiations, Apollo sought to obtain several critical modifications of the First Lien Credit Agreement.  Amendments to the First Lien Credit Agreement required the approval of First Lien Lenders holding more than 50% of the outstanding First Lien

---

[3105] *Id.* at Ex. 99.1.

[3106] *Wilmington Savs.*, K. Garrison Oct. 1, 2015 Tr. at 112:14-18, 127:22-25; M. Savino Dec. 15, 2015 Tr. at 17:16-22.

[3107] *Wilmington Savs.*, G. Loveman Oct. 13, 2015 Tr. at 163:4-5.

[3108] *Wilmington Savs.*, E. Hession Sept. 17, 2015 Tr. at 19:12-20:18.

[3109] BlackRock and GSO initially committed to invest \$1.1 billion in the B-7 Term Loan, but ultimately invested a combined amount of \$820 million.  M. Savino Dec. 12, 2015 Tr. at 22:11-15.  *See* List of B-7 Lenders (June 25, 2014), at CEOC_INVESTIG_00087794 [CEOC_INVESTIG_00087794].  The amount includes consent fees to BlackRock (\$82.25 million) and GSO (\$47.00 million), totaling \$129.25 million. "Fee Letter" between CEOC and BlackRock (May 12, 2014), at PRIV_INVESTIG_00029460 [PRIV_INVESTIG_00029460]; "Fee Letter" between CEOC and GSO Capital Partners LP (May 12, 2014), at PRIV_INVESTIG_00029464 [PRIV_INVESTIG_00029464].  *See also* e-mail from K. Kuick to D. Sambur *et al.* (Nov. 10, 2014) [APOLLO-Examiner_00967865], attaching "Term Loan Fees" Spreadsheet, APOLLO-Examiner_00967867 (native file), at 1; e-mail from H. Dalton to C. Keith *et al.* (Dec. 9, 2014) [CEC_EXAMINER_0994143], attaching "Discount and Fees" Spreadsheet, CEC_EXAMINER_0994149 (native file), at Discount and Fees Tab; e-mail from A. van Hoek to E. Hession (Nov. 11, 2014) [APOLLO-Examiner_00959990] attaching "Term Loan Fees" Spreadsheet, APOLLO-Examiner_00959993 (native file), at 1; R. Mollett Dec. 2, 2014 Tr. at 13:18-24; "Incremental Term Loan, Summary Terms" Draft (Apr. 14, 2014), at APOLLO-Examiner_00129126-27 [APOLLO-Examiner_00129126].

[3110] M. Lee Nov. 17, 2015 Tr. at 62:18-25; 86:18-87:23.

obligations.[3111]  To ensure that it would obtain the requisite majority approval, Apollo sought to
have the backstop lenders, GSO and Blackrock, "pre-fund," or lend under the existing First Lien
Credit Agreement, so as to be able to vote in favor of the modifications of the First Lien Credit
Agreement sought by CEC and Apollo.[3112]

The most critical amendment sought by Apollo was a modification of the Bank
Guarantee from a guarantee of payment to a guarantee of collection.  As explained by Mark
Wlazlo of Paul Weiss:

> A: [A] guarantee of collection is a relatively rare thing. We don't have them.
> Normally when you do a financing, it's a full unconditional guarantee that you can
> go after the guarantor directly for the full amount of the claim upon any, you
> know, guarantee trigger, any default.  A guarantee of collection, on the other
> hand, is almost a secondary guarantee where you have to pursue the initial
> obligor, the direct obligor first and exhaust all your remedies against it before you
> can pursue remedies against the guarantor.
>
> Q. And why was that beneficial to CEC to obtain?
>
> A. It's, for example, the reason CEC is not in bankruptcy right now.[3113]

In late 2013, there was increasing concern about the implications of a CEOC
bankruptcy.[3114]  The desire to convert the Bank Guarantee to a guarantee of collection was
reflective of that concern, since it would avoid the need for CEC to immediately file for
bankruptcy if CEOC had to do so.  A second critical amendment sought by Apollo was an
amendment to the SSLR covenant that would eliminate what in effect had become a Sword of
Damocles hanging over both CEOC and CEC.  Apollo succeeded in this effort, as the SSLR
covenant ratio was increased as part of the B-7 Loan from 4.75x to 7.25x,[3115] which, at least in
the short term, eliminated this concern.[3116]  The third critical amendment sought (and obtained)
by Apollo was to eliminate an Event of Default from the First Lien Credit Agreement based on
the inclusion of a going concern qualification in the audited financial statements.[3117]

---

[3111]  First Lien Credit Agreement (Jan. 28, 2008), at   PW_EXAMINER_00288451-52
[PW_EXAM-INER_00288270].

[3112]  M. Wlazlo Feb. 4, 2016 Tr. at 327:25-328:9.

[3113]  *Id.* at 331:15 to 332:7.

[3114]  *See* Section VIII.D.

[3115]  Section 6.10, Incremental Facility Amendment and Term B-7 Agreement (June 11, 2014) at
CEOC_INVESTIG_00084267 [CEOC_INVESTIG_00084090].

[3116]  L. Bird Oct. 2, 2015 Tr. at 294:12-294:17.

[3117]  M. Wlazlo Feb. 4, 2016 at 331:3 to 331:7.

### b.  The Release of the Bond Guarantee

The release the Bond Guarantee was effectuated through a condition included in the Incremental Facility Amendment and Term B-7 Agreement dated as of June 11, 2014 (the "B-7 Funding Agreement").[3118]  Section 4.01(b)(6) of the B-7 Funding Agreement required that, as a condition to committing to fund the B-7 Loan, CEOC no longer be a wholly-owned subsidiary of CEC, which CEC and the backstop lenders believed would automatically release the Bond Guarantee under the operative indentures.[3119]  The Bond Guarantee could also purportedly be released upon (i) the release or discharge of certain described debt, (ii) an election by CEOC for the Bond Guarantee to be released and (iii) notice of such election to the relevant Indenture Trustee, which method of purported release has been commonly referred to as the "Election."[3120]

As early as 2012, market analysts recognized the possibility that CEC could release the Bond Guarantee of CEOC pre-LBO debt if CEOC was no longer a wholly-owned subsidiary of CEC.[3121]  As explained by the *Covenant Review*, a provision in the operative indentures created a "possible loophole" by which a "sliver of [CEOC] equity" could be sold, thereby releasing the

---

[3118] B-7 Funding Agreement (June 11, 2014), at CEOC_INVESTIG_00054112-14 [CEOC_INVESTIG_00053934].

[3119] *See* Indenture dated May 27, 2005 among CEOC, CEC and U.S. Bank National, at CEOC_2004_PRIV_0031373 [CEOC_2004_PRIV_0031314] ("The Guarantor shall be released from all of its obligations under the Bond Guarantee and under this Indenture if: (c) the Company ceases for any reason to be a "wholly owned subsidiary" of the Guarantor (as such term is defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC)."); Indenture dated Dec. 24, 2008 among CEOC, CEC, and U.S. Bank N.A., at CEOC_INVESTIG_00150011 [CEOC_INVESTIG_ 00149893] ("The Parent Guarantee shall terminate and be of no further force or effect and the Parent Guarantor shall be deemed to be released from all obligations under this Article XII upon: (1) the Issuer ceasing to be a Wholly Owned Subsidiary of Harrah's Entertainment . . . ."); Indenture dated June 9, 2006 among CEOC, CEC, and U.S. Bank National, at PW_EXAMINER_00144446 [PW_EXAMINER_00144396] ("The Guarantor shall be released from all of its obligations under the Guarantee with respect to Securities of any series and under this Indenture if: (3) the Corporation ceases for any reason to be a 'wholly owned subsidiary' of the Guarantor (as such term is defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC)."); Indenture dated Sept. 28, 2005 among CEOC, CEC, and U.S. Bank National, at CEC_EXAMINER_0428545 [CEC_EXAMINER_0428486] ("The Guarantor shall be released from all of its obligations under the Guarantee and under this Indenture if: (c) the Company ceases for any reason to be a "wholly owned subsidiary" of the Guarantor (as such term is defined in Rule 1-02(z) of the Regulation S-X promulgated by the SEC).").

[3120] Indenture dated Dec. 24, 2008 among HOC, HET and U.S. Bank N.A. at CEOC_INVESTIG_00150011-12 [CEOC_INVESTIG_0149893].

[3121] Covenant Review, "Caesars: Could a repayment of the 5.375% Senior Notes due 2013 result in a release of the parent guarantee for other Caesars bonds?" (Dec. 31, 2012), at CEOC_INVESTIG_00073498 [CEOC_INVESTIG_00073489].

Bond Guarantee.[3122]    Articles concerning the release of the Bond Guarantee subsequently appeared in other publications.[3123]

The nature of the Bond Guarantee had been the subject of debate among the Sponsors, CEC and Deloitte since at least October 2012.  The debate focused on whether the Bond Guarantee constituted a "full and unconditional" release under SEC Regulation S-X, given that the Bond Guarantee was subject to release in a variety of ways.  Deloitte advised CEC and the Sponsors that if the Bond Guarantee did not qualify as a "full and unconditional" guarantee under SEC Regulation S-X, CEOC would no longer be able to use CEC's audited financial statements in its public filings and would be required to file its own standalone audited financial statements as an issuer of registered securities.  This was a source of great consternation to the Sponsors and CEC, and, indeed, TPG contacted its own relationship partner at Deloitte for assistance in resolving this issue.[3124]  Ultimately, for the 2012 and 2013 audits, Deloitte relied on advice and assurances provided by Paul Weiss that a guarantee could both be subject to release and nevertheless be "full and unconditional" under SEC Regulation S-X.[3125]

In October 2013, Apollo and Paul Weiss began analyzing potential CEOC bank and bond debt exchange offers and other refinancing options.  Central to each of these options was releasing the Bond Guarantee (with or without such exchange offers).[3126]  The concept of converting the Bank Guarantee to one of collection was also a topic of discussion.  Apollo recognized that if the Bank Guarantee was one of collection and not of payment, claims could not be made against CEC until any CEOC restructuring or bankruptcy concluded and the extent

---

[3122] *Id.*  CEC noted that it did not preview stories with the media regarding the CEC Guarantee Release.  *See* J. Beato Jan. 19, 2016 Tr. at 347:4-25.

[3123] *Xtract Covenant Intelligence*, "Will Caesars Strip the Parent Guarantee at Opco?," (Sept. 27, 2013), at CEOC_INVESTIG_00267354-55 [CEOC_INVESTIG_00267354]; "Parent Guarantee and Potential Debt for Equity Exchange Considerations," (Nov. 18, 2013), at CEOC_INVESTIG_00313900 [CEOC_INVESTIG_00313898]. The company was aware of this public perception and highlighted it for regulators. *See* "Regulatory Discussion Materials" (Dec. 2013), at PRIV_INVESTIG_00030526 [PRIV_INVESTIG_00030497].

[3124] L. Bird Oct. 2, 2015 Tr. at 49:18-50:21; e-mail from T. Dunn to E. Harrison (Oct. 12, 2012), at TPG-Examiner_01110521 [TPG-Examiner_01110521]; *see also* e-mail exchange between M. Cohen and D. Wilfong, *et al.* (Aug. 13, 2012), at CEOC_INVESTIG_00051605-06 [CEOC_INVESTIG_00051605];  CAQ SEC Regulations Committee Highlights (Sept. 27, 2011), at CEOC_INVESTIG_00051595 [CEOC_INVESTIG_ 00051595].

[3125] D. Wilfong Oct. 5, 2015 Tr. at 100:20-101:4 ("Q: As far as you know, was Deloitte satisfied with these management rep letters? A: They were, because it was deemed to be a legal matter, which is why we sought legal input on the conclusion and they relied on legal input to the conclusion because it was ultimately a legal matter, not an accounting matter."); Representation Letter (Oct. 19, 2012), at DT0100863-64 [DT0100863].

[3126] E-mail from C. Goodall to A. Kornberg, et al. (Oct. 23, 2013) [PW_EXAMINER_SUPP_00004125], attaching "CEOC Structuring Workstreams Outline" (Oct. 23, 2013), at PW_EXAMINER_SUPP_00004130-31, PW_EXAMINER_SUPP_ 00004136 [PW_EXAMINER_SUPP_00004127].

of the creditors' deficiency claims was determined.  From CEC's and the Sponsors' perspective, that was a highly desirable objective.

As discussed in other parts of this Report, work in earnest began in November 2013 on a multi-step plan to shore up CEOC's short-term liquidity while preparing for a potential restructuring or bankruptcy, which CEC and the Sponsors wanted to avoid.  A key element of this "plan" as presented to regulations was the sale of CEOC equity, which would result in the release of the Bond Guarantee.[3127]  Caesars and Apollo witnesses claim that the "plan" was not to sell CEOC equity; instead, the plan was to see if there could be CEOC debt for equity exchanges with the holders of the CEOC Notes. [3128]  However, the relevant documents have separate sections on "sale" of CEOC equity and debt for equity exchanges.

A number of Caesars and Apollo witnesses told the Examiner that the release of the Bond Guarantee was never part of any "plan" and that no decision to release the Bond Guarantee was made until GSO and BlackRock demanded it during the B-7 negotiations.[3129]  All of them stated, however, that their source of knowledge concerning this demand was David Sambur.  For example, Loveman indicated that, based on conversations with Sambur and a presentation by Blackstone at an April 21, 2014 meeting of the CEC board, Loveman came to understand that the sale of CEOC shares was a requirement of the B-7 backstop lenders.[3130]  Kendall Garrison of TPG also learned from counsel and Apollo that the prospective lenders required the release of the Bond Guarantee as a condition to fund.[3131]

Sambur was emphatic that the release of the Bond Guarantee was a condition required by GSO and BlackRock and expressly not an idea that originated with CEOC, CEC or the

---

[3127] *See* "Regulatory Discussion Materials" (Dec. 2013), at PRIV_INVESTIG_00030527 [PRIV- _INVESTIG_00030497;  "Regulatory Discussion Materials" November 2013 (Nov. 2013) [PRIV_INVESTIG_00017915] (native file)  at 28.

[3128]  M. Rowan Nov. 17, 2015 Tr. at 288:22-290:9.

[3129]  D. Sambur Jan. 14, 2016 Tr. at 684:25-685:14 ("[W]e had made no determination internally whether [releasing the guarantee] was something that was advisable to do, if we were going to do it, how we were going to do it or when we were going to do it. . . . It was something that was undoubtedly being considered, but it was certainly not something that was the plan."), M. Rowan Jan. 28, 2016 Tr. at 558:11-20 ("Q: So what caused you at that point to change your view as to the release of the guarantee?  A: Lack of choice.  Q: We will come back to that.  A: Lack of choice.  Q: Because the creditors insisted on it?  A: Because the creditors insisted on it, yes."). *See also Wilmington Savs,.* G. Loveman Oct. 13, 2015 Tr. at 53:1-53:14, 54:5-10; *Wilmington Savs.*, M. Rowan Aug. 26, 2015 Tr. at 48:25-49:10.  *See also Wilmington Savs.*, E. Hession Sept. 17, 2015 Tr. at 170:18-24, 219:23-220:3. Hession noted, for the record, that the lenders did not require a sale of equity so much as they simply required that the Bond Guarantee be released. *Wilmington Savs.*, E. Hession Sept. 17, 2015 Tr. at 220:5-18.  Hession did not recall which specific lenders required the release of the Bond Guarantee.  *Wilmington Savs.*, E. Hession Sept. 18, 2015 Tr. at 515:4-7.

[3130]  *Wilmington Savs.,* G. Loveman Oct. 13, 2015 Tr. at 53:15-22, 54:5-10.

[3131]  *Wilmington Savs.,* K. Garrison Oct. 1, 2015 Tr. at 127:5-18.

Sponsors.[3132]  According to Sambur, GSO and Blackrock "only got comfortable with loaning the money if the guarantee would be changed so that it would be solely focused on the bank debt and not shared with the bonds."[3133]

However, GSO and BlackRock recall the facts somewhat differently.[3134]  Ryan Mollett of GSO stated that when discussions with Apollo commenced, Sambur informed GSO and Blackrock that Apollo intended to strip the Bond Guarantee.[3135]  According to GSO, Sambur was "intent upon stripping the [Bond] Guarantee."[3136]  Mollett was questioned about Sambur's statements to the contrary:

> Q. [T]here has been evidence given to the Examiner that it was GSO and Blackrock who insisted that as a condition to funding that the [Bond] Guarantee be released. . . .  [D]o you believe that is accurate?

> A.  No, I believe that is categorically false.  Number one, I don't think GSO or Blackrock could tell Apollo or TPG what to do with their company.  They are going to do – they are incredibly sophisticated investors . . . .  In terms of the Guarantee release, you know, it was clearly brought up in the meetings of the principals that they made the decision they were going to strip the Guarantee. . . .[3137]

Similarly, Matthew Savino of BlackRock stated that it was Apollo who first raised the release of the Bond Guarantee through the sale of CEOC stock and stated that the "sale of the [CEOC] stock beforehand was . . . something that Apollo said they were going to pursue in conjunction with this transaction."[3138]  Sambur expressly rejected the version of events proffered by Savino and Mollett.  Sambur maintained that while in the initial conversation a guarantee release was recognized as a possibility, he did not tell GSO and BlackRock that Apollo intended to do so; rather, Sambur explained that the Bond Guarantee release became a condition of funding based on the demands of GSO and BlackRock on April 10 and 11, 2014, and Sambur then agreed to those demands in a telephone call on April 11, 2014.[3139]

---

[3132]  D. Sambur Nov. 14, 2015 Tr. at 541:25-542:11.

[3133]  Id. at 543:10-14.

[3134]  Blackrock and GSO apparently had other significant investments which would benefit if there was no near-term CEOC bankruptcy.

[3135]  R. Mollett Feb. 2, 2016 Tr. at 82:15-83:2.

[3136]  Id. at 14:25-15:3.

[3137]  Id. at 20:3-21:5.

[3138]  M. Savino Dec. 15, 2015 Tr. at 29:17-30:22.  Counsel for CEC has asserted that both GSO and BlackRock invested in credit default swaps ("CDS"), and lost substantial sums when CEOC filed bankruptcy and therefore GSO and BlackRock may now be biased against CEC and Apollo.  The Examiner did not investigate this allegation.

[3139]  D. Sambur Jan. 14, 2016 Tr. at 541:25-542:11, 681:2-18, 691:8-693:2.

A review of the pre-April 11, 2014 term sheets used to negotiate the B-7 Loan Transaction does not reveal any express provision relating to the Bond Guarantee release. Instead, there are provisions for modification of the Bank Guarantee to a guarantee of collection, but there is also a "most favored nations" clause whereby the first lien lenders would receive the benefit of any more favorable guarantee in any of CEOC's bond indentures.[3140]  In other words, the Bank Guarantee would not be modified to a guarantee of collection while the Bond Guarantee remained in effect.  Thus, as initially drafted, the release of the Bond Guarantee only would go into effect post-closing and only at CEC's option.[3141]  Sambur explained that while early drafts of the term sheets provided that the Bank Guarantee would be modified to be a guarantee of collection, Sambur, on behalf of Apollo and CEC, subsequently revised the term sheet to provide that the Bank Guarantee would be modified to a guarantee of collection only if the Bond Guarantee was released.[3142]

According to Sambur:

> [T]he structure was basically that the amendment would cause the guarantee on the bank debt to change from a guarantee of payment to a guarantee of collection. . . . [T]he structure was that there would be an MFN [most favored nations clause] on the bank debt, tied to whatever the best guarantee was in the structure, including the existing bonds, and the assumption explicitly and implicitly was, therefore, that the bond guarantee would be in place through all of this, because why therefore, would you need an MFN.[3143]

As noted above, it was critical for CEC and the Sponsors to modify the Bank Guarantee to a guarantee of collection.  In the event of a CEOC bankruptcy, which was increasingly seen as a potential, albeit not desired, event, lenders with a guarantee of collection could not seek to enforce the guarantee against CEC until their remedies against CEOC had been exhausted. According to Savino, it was Apollo that first indicated it wanted to amend the First Lien Credit

---

[3140] *See* CEOC Incremental Term Loan Sheet (Mar. 21, 2014), at CZR_GSO0006027 [CZR_GSO0006026] ("[CEC] will provide a guarantee of collection and not of payment, on terms consistent with the modified Holdings guarantee established pursuant to the Amendment Transactions. In addition, the Term B-7 Loans will receive a 'most favored nation' provision, which will provide that the Term B-7 Loans will receive the benefit of any other Holdings guaranty that is provided an any other tranche of the Borrower's existing or future bank or bond debt that is otherwise more favorable to the holders of such debt than the guaranty of the Term B-7 Loans.").

[3141] *Compare* Amendment Term Sheet (March 4, 2014), at APOLLO_Examiner_00087477 [APOLLO_Examiner_00087477], *with* Amendment Term Sheet (May 5, 2014), at CZR_GSO0042276 [ CZR_GSO0042276].  *See also* e-mail exchange between D. Sambur and M. Wlazlo, *et al.* (Apr. 9-10, 2014), at APOLLO-Examiner_00720193 [APOLLO-Examiner _00720193].

[3142] D. Sambur Jan. 14, 2016 Tr. at 709:10-711:7.

[3143] *Id.* at 666:18-668:20.

Agreement to modify the Bank Guarantee to a guarantee of collection, stating that "the guaranty of collection concept is not one I had ever heard of before."[3144]

CEC's obligations under the Bank Guarantee and Bond Guarantee are *pari passu* regardless of whether the debt is first lien, second lien or unsecured debt of CEOC. If the Bond Guarantee as eliminated, CEC's guarantee obligations for CEOC debt would be reduced by almost $14 billion.[3145] Thus, the ability of the B-7 lenders to make a recovery on the Bank Guarantee would be enhanced if the Bond Guarantee was eliminated. This was an incentive for the B-7 lenders to agree to modify the Bank Guarantee to a guarantee of collection. Eliminating the Bond Guarantee also potentially allowed CEOC to receive a lower rate of interest than would otherwise be available.

As negotiations ensued, attorneys for GSO and Blackrock advised Paul Weiss that having the modification of the Bank Guarantee spring into place only when or if the Bond Guarantee was released was not acceptable.[3146] GSO and Blackrock wanted more certainty as to the release of the Bond Guarantee prior to funding and insisted on the release of the Bank Guarantee as a condition to funding.[3147] As a result, during a telephone conversation on April 11, 2014, involving Sambur, Alex van Hoek (who was not involved in some of the earlier discussions), GSO and Blackrock, Sambur agreed that the release of the Bond Guarantee would be a condition precedent to the lenders committing to fund the B-7 Loan,[3148] and language was added to the term sheets conditioning the lenders' requirement to fund the B-7 Loan on CEOC no longer being a wholly owned subsidiary of CEC.[3149]

Having interviewed the witnesses and reviewed the relevant documents, the Examiner believes that the most credible version of events is as follows: (i) in initial conversations with GSO and Blackrock, Sambur indicated in some manner that CEC intended to release the Bond Guarantee; (ii) that a release of the Bond Guarantee was also in the interest of lenders as it improved their credit position and was a factor in the pricing of the loan; (iii) initially, the release of the Bond Guarantee was addressed as something which would happen after funding by GSO and Blackrock at CEC's option; (iv) the likelihood of the option to release the Bond Guarantee

---

[3144] M. Savino Dec. 15, 2015 Tr. at 29:17-30:22. Wlazlo noted in his interview with the Examiner that "a guarantee of collection is a relatively rare thing." M. Wlazlo Feb. 2, 2016 Tr. at 331:15-21.

[3145] *See* B-7 Figure 3.

[3146] Interview of P. Aronzon, Feb. 29, 2016 (not transcribed); *see also* e-mail between D. Sambur and M. Wlazlo at APOLLO-Examiner_00720193 [APOLLO-Examiner_00720193].

[3147] Interview of P. Aronzon, Feb. 29, 2016 (not transcribed).

[3148] D. Sambur Jan. 14, 2015 Tr. at 690:19-694:2, 696:11-697:11; Handwritten Notes at APOLLO-Examiner_00984289-90 [APOLLO-Examiner_00984289].

[3149] Draft of B-7 Amendment Term Sheet (Apr. 15, 2014), at APOLLO-Examiner_00129129 [APOLLO-Examiner_00129128] ("The issuance of the Term B-7 Loans will be subject to the following conditions: . . . Prior to or substantially concurrently with the incurrence of the Term B -7 Loans, the Borrower shall not be a wholly-owned subsidiary of Holdings . . . .").

was a virtual certainty since the Bank Guarantee would not be modified to a guarantee of collection until the Bond Guarantee was released, and that was a critical modification of the First Lien Credit Agreement for CEC; however, (v) Blackrock and GSO subsequently insisted that the Bond Guarantee be released prior to funding the B-7 Loan so as to ensure that the Bank Guarantee release actually occurred, given that it had been factored into the rates and credit quality being committed to by GSO and Blackrock.  This view is supported by, among other things, the following:

- Documents indicating that CEC had been discussing the release of the Bond Guarantee and modification of the Bank Guarantee since at least October 2013,[3150] prior to negotiations between Apollo and GSO/Blackrock, which commenced in March 2014.

- A November 2013 "Liquidity Discussion" presentation for the CEC Board which refers to "potential debt/equity raises, including CEOC equity sale which would release the CEC parent guaranty" as one method to increase liquidity.[3151]

- November 2013 and December 2013 presentations prepared for state gaming regulators which summarize a "CEOC Plan" that proposes "the sale of a minority equity stake in CEOC to a 3rd party" and states that the sale will "likely result in CEC being released of its guarantee obligations of CEOC's bonds."  CEC and Apollo witnesses have indicated that this plan was intended to be accomplished through debt for CEOC equity exchanges, although the documents refer to a sale.

- Privileged communications, including, without limitation

    o Discussions between Paul Weiss and Apollo in November 2013 regarding the effect of the CEC Guarantee Release on CEC.[3152]

    o Discussions between Paul Weiss and Apollo regarding the possibility of adding directors to CEOC in late 2013, early 2014.[3153]

---

[3150] E-mail from C. Goodall to A. Kornberg, *et al.* (Oct. 23, 2013) [PW_EXAMINER_SUPP_00004125], attaching "CEOC Structuring Workstreams Outline" (Oct. 23, 2013) at PW_EXAMINER_SUPP_00004130-31 (proposing amendment to release guarantee) and PW_EXAMINER_SUPP_00004136 (proposing modifying the guarantee) [PW_EXAMINER_SUPP_00004127]; e-mail from C. Goodall to D. Sambur, *et al.* (Oct. 1, 2013) at APOLLO-Examiner_00495022-00495025 [APOLLO-Examiner_00495022].

[3151] "Liquidity Discussion Materials" (Nov. 2013), CEOC_INVESTIG_00172963 (native file) at 5.

[3152] E-mail from D. Sambur to A. Kornberg *et al.* (Nov. 7, 2013) at PRIV_INVESTIG_00031467 [PRIV_INVESTIG_00031466].

[3153] G. Ezring Feb. 25, 2016 at Tr. 104:13-105:23 (explaining that the discussions took place and the rationale behind the discussion); *id.* at 106:20:-24 (stating that the discussions probably happened in the January/February 2014 timeframe); A. Kornberg Jan. 29, 2016 at Tr. 213:6-10

      o  A Paul Weiss analysis in March 2014 regarding the potential liability of CEC directors in connection with the 5% Stock Sale and resulting release of the Bond Guarantee.[3154]

- The importance to CEC of eliminating the Bond Guarantee was demonstrated by the fact that Apollo later negotiated for CEOC to pay unsecured debt not due until 2017-2018 as part of the Senior Unsecured Notes Transaction and PIK Notes Transaction in order to ensure the CEC guarantee was released under the different language of the indentures for the Senior Unsecured Notes and PIK Notes. Without the Senior Unsecured Notes Transaction and the PIK Notes Transaction, under the MFN provision in the B-7 Amendment, the Bank Guarantee would not be modified to a guarantee of collection.

- As described by CEC's restructuring advisor, Blackstone, in an April 21, 2014 presentation to the CEC Board, releasing the guarantee "[c]ontractually releases CEC from liability for approximately $14.9 billion CEOC debt, protecting approximately $2.5 billion CEC equity value (current trading value) for all shareholders."[3155]

- Because of concerns over a possible CEOC bankruptcy, it was critical for Apollo and CEC to modify the Bank Guarantee to a guarantee of collection.

- Eliminating the Bond Guarantee and modifying the Bank Guarantee enhanced CEC's equity value, which was critical to protecting CEC's equity interests in CERP and CAC.[3156]

- As a result of the Bond Guarantee release, CEC's parent company guarantee liability for CEOC dramatically decreased from $19.2 billion to $5.4 billion, and what remained was modified to a guarantee of collection.

CEC disagrees with these points and argues that the evidence supports the conclusion that CEC did not stimulate the demand by GSO and Blackrock that the Bond Guarantee be released. CEC points to evidence that in January 2014, GSO planned to offer $300 million to $400 million in new first lien debt, and references the upside of having the Bond Guarantee stripped from all but the Term Loans. That evidence also makes clear, however, that any stripping of the Bond Guarantee should only come after the loan is made and GSO's analysis was that Apollo's goal

---

(explaining that discussions took place); *id.* at 215:4-10 (stating that he could not pinpoint the timing of the discussions but that they were "substantially before the two [independent directors] were appointed.").

[3154] "Liability of CEC Directors for Approval of Subject Transaction" Memorandum (Mar. 10, 2014) at PW_EXAMINER_SUPP_00003221-35 [PW_EXAMINER_SUPP_00003221].

[3155] "Project Julii Discussion Materials" (Apr. 21, 2014), at CEOC_INVESTIG_00111441 [CEOC_INVESTIG_00111438].

[3156] *Id.*

was to reduce the value of the Second Priority Notes to facilitate a debt for equity exchange. This evidence is consistent with the early term sheets where the Bond Guarantee is released after the B-7 Loan is closed in order to enable Apollo to achieve an important goal in the negotiations – the modification of the Bank Guarantee to a guarantee of collection.  In addition, it makes clear that at least GSO also wanted the Bond Guarantee released.[3157]  It does not address whether in the initial meeting CEC made clear that it intended to release the Bond Guarantee or the position of BlackRock, which testified about the initial conversations in a manner consistent with GSO.[3158]

### c.  Approval of the B-7 Transaction

On April 17, 2014, Paul Weiss drafted "bullet points" for the CEC Board on the Bond Guarantee release and Board Members' fiduciary duties.[3159]   The bullet points state that the "release of the [Bond] guaranty is a positive development for both CEC and CEOC," and that "it eliminates a significant contingent liability and the benefits are obvious," and "[a]s to CEOC – it is a condition to a new financing for CEOC that is a key for CEOC to have the runway to fully consider and implement balance sheet and other initiatives that will maximize value for the company. . . ."[3160]   The bullet points further state that:

- Given the existence of the guaranty, some might question whether CEC is insolvent and whether the fiduciary duties should take into account the interests of the corporation's creditors.[3161]

- We don't believe so:

    o First, market cap suggests that there is significant equity value for shareholders.

---

[3157] A May 13, 2013 e-mail exchange indicates that Sambur and Mollett were actually discussing the CEC Guarantee Release months before the B-7 negotiations began, with Mollett proposing lunch to discuss a strategy with Sambur to release the Bond Guarantee. E-mail from R. Mollet to D. Sambur (May 13, 2014), at APOLLO-Examiner_0043618 [APOLLO-Examiner_00043618].

[3158] While not directly relevant to the B-7 Transaction, the analysis of this issue impacts the Examiner's assessment of credibility and, as discussed below, is relevant to the analysis of claims with respect to breach of fiduciary duty and aiding and abetting breach of fiduciary duty.

[3159] E-mail from J. Saferstein to L. Clayton *et al.* (Apr. 17, 2014), PW_EXAMINER_SUPP_00003617 [PW_EXAMINER_SUPP)_00003617], attaching "Board Members' Fiduciary Duties" outline at PW_EXAMINER_SUPP_00003618-19 [PW_EXAM-INER_SUPP_00003618].

[3160] "Board Members' Fiduciary Duties" outline at PW_EXAMINER_SUPP_00003618 [PW_EXAMINER_SUPP_00003618].

[3161] *Id.* at PW_EXAMINER_SUPP_00003619.

     o  Second, when you take into account contingent obligations such as the guaranty, you take into account the probable liability. Given that the guaranty can be released at any time – which appear to be priced into the equity of CEC by the market – we think that the probable liability is relatively small and that is another factor that suggests that CEC is not insolvent.[3162]

CEC's Board provided preliminary approval for the B-7 Transaction on April 21, 2014,[3163] and final approval on April 28, 2014, along with approval of the Stock Purchase Agreements (defined below)[3164] relating to the 5% CEOC Stock Sale.[3165] On May 5, 2014, the CEOC Board, acting via unanimous written consent, approved the B-7 Transaction and the Tender Offers, which are described in greater detail below.[3166]

The notable terms of the B-7 Transaction included:

- CEOC's SSLR covenant ratio was increased from 4.75x to 7.25x,[3167] which in the short term eliminated the SSLR as a factor from a CEC going concern perspective.[3168] This was a benefit to both CEOC and CEC.

- B-7 Loan proceeds and CEOC cash were used to pay over $1 billion in respect of 5.625% Senior Notes due 2015 and 10% Second Priority Notes due 2015.[3169] Included in this amount were approximately $427 million in

---

[3162] *Id.*

[3163] CEC Meeting of the Board of Directors (Apr. 21, 2014), at CEC_EXAMINER_0028154 [CEC_EXAMINER_0028153].

[3164] "Stock Purchase Agreement" (May 5, 2014), at CEOC_INVEST-IG_00125495 [CEOC_INVESTIG_00125495] ("Scoggin SPA"); "Stock Purchase Agreement" (May 5, 2014), at CEOC_INVESTIG_00125981 [CEOC_INVESTIG_00125981] ("Chatham SPA"); "Stock Purchase Agreement" (May 5, 2014), at CEOC_INVESTIG_00127403 [CEOC_INVEST-IG_00127403] ("Paulson SPA") (collectively, the Scoggin SPA, the Chatham SPA and the Paulson SPA are referred to as the "Stock Purchase Agreements").

[3165] CEC Meeting of the Board of Directors (Apr. 28, 2014), at CEOC_INVESTIG_00126010-12 [CEOC_INVESTIG_00126009].

[3166] Exhibits to Incremental Term Loan and Bank Amendment Transactions, at CEOC_INVESTIG_00130895-96 [CEOC_INVESTIG_00130894].

[3167] Section 6.10, Incremental Facility Amendment and Term B-7 Agreement (June 11, 2014), at CEOC_INVESTIG_00084267 [CEOC_INVESTIG_00084090].

[3168] L. Bird Oct. 2, 2015 Tr. at 293:11-294:17.

[3169] *See* Appendix 12-3, B-7 Term Loan Sources & Uses. *See also* Incremental Facility Amendment and Term B-7 Agreement (June 11, 2014), at CEOC_INVESTIG_00084297 [CEOC_INVESTIG_00084090].

principal amount of (and another $25 million in accrued interest on) the 5.625% Senior Notes due 2015 owned by CGP.[3170]

- Certain maturity dates for consenting Term Loan lenders were extended to March 1, 2017, although in some cases the maturity date was shortened presumably so as to obtain the consent of requisite lenders.[3171]

- Modification of the Bank Guarantee from a guarantee of payment to a guarantee of collection.

- Fees to lenders, advisors and attorneys in the approximate amount of $219 million were paid by CEOC out of the proceeds from the B-7 Transaction, and CEOC's additional cash payment of $315 million.[3172]

- Nearly $800 million of outstanding Term Loans held by consenting lenders were paid.[3173]

- Any Event of Default based on a going concern qualification was eliminated.

Despite reaching agreement in May, the B-7 Transaction came to a temporary halt when holders of certain CEOC Notes protested the B-7 Transaction to state gaming regulators, particularly in Louisiana and Illinois. However, the regulators eventually approved the B-7 Transaction. On July 27, 2014, the B-7 Transaction formally closed.[3174]

As a result of the B-7 Transaction, CEOC's overall debt balance was relatively unchanged. CEOC's overall debt balance decreased by $15.7 million, which is the net result of

---

[3170] *See* CGP NPA Schedule A (May 5, 2014), at CEOC_INVESTIG_00452402 [CEOC_INVESTIG_ 00452390]. On May 5, 2014, CGP entered into a Note Purchase Agreement with CEOC, to account for the redemption of approximately $427 million in aggregate principal held by CGP in the 5.625% Senior Notes due 2015.

[3171] Maturities of the term B-5 and B-6 loans were shortened to March 1, 2017 from January 28, 2018.

[3172] *See* Appendix 12-3, B-7 Term Loan Sources & Uses.

[3173] *Id.*

[3174] Because the B-7 Transaction was not able to close until July 27, 2014, in June 2014, CEOC was required to pay a total of $78.5 million in mandatory and other redemptions (collectively, the "Redemptions") on the CEOC Notes that were repurchased as part of the Tender Offers. Notice of Mandatory Redemption (May 14, 2014) at PRIV_INVESTIG_00018884 [PRIV_INVESTIG_00018884]; Chatham Amended & Restated Note Purchase Agreement (Jul. 25, 2014), at CEOC_INVESTIG_00126373 [CEOC_INVESTIG_00126362]; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015) at 88; CEOC Notice of Full Redemption of 5.625% Senior Notes due 2015 (Aug. 15, 2014) at CEOC_2004_0029216 [CEOC_2004_0029216]; CEOC Notice of Full Redemption of 5.625% Senior Notes due 2015 (Aug. 15, 2014) at CEOC_2004_PRIV_0036814 [CEOC_2004_PRIV_0036793].

an increase in debt under the First Lien Credit Facility and a reduction in junior debt following consummation of the Tender Offers.[3175]   CEC's exposure, however, under its Bank and Bond Guarantees was substantially reduced, as shown in B-7 Figure 3 below:

### B-7 Figure 3: CEC Guarantee of CEOC Debt

($ in millions)

| Debt Tranche by Priority Ranking | CEC Guarantee | | Face Value | |
| --- | --- | --- | --- | --- |
| | Per Original Agreements | As Revised | 12/31/2013 | 12/31/2014 |
| **First Lien Credit Facilities** | | | | |
| Term Loans B-1, B-3 through B-6 | Guarantee of Payment | Guarantee of Collection | $   4,412.6 | $   3,614.0 |
| Term Loan B-7 | n\|a | Guarantee of Collection | - | 1,741.0 |
| | | | **$   4,412.6** | **$   5,355.0** |
| **Secured Debt** | | | | |
| First Lien | Guarantee of Payment | Released with 5% Equity Sale | 6,860.0 | 6,675.0 |
| Second Lien | Guarantee of Payment | Released with 5% Equity Sale | 5,492.9 | 5,238.0 |
| | | | **$ 12,352.9** | **$ 11,913.0** |
| **Subsidiary-Guaranteed Debt** | | | | |
| **Subsidiary-Guaranteed Debt** | Guarantee of Payment | Released with 5% Equity Sale | **$   493.3** | **$   479.0** |
| **Unsecured Senior Debt** | | | | |
| **Unsecured Senior Debt** | Guarantee of Payment | Debt extinguished or Removed Pursuant to August Amendment | **$   1,904.0** | **$   530.0** |
| **Other Unsecured Borrowings & Capitalized Lease Obligations** | | | | |
| **Other** | n\|a | n\|a | **$   125.5** | **$   94.0** |
| **Total CEOC Debt  (Excluding Intercompany)** | | | **$ 19,288.3** | **$ 18,371.0** |
| **CEC Guaranteed Debt** | | | **$ 19,162.8** | **$ 5,355.0** |

Source: CEOC Financial Statements for the period ended Dec. 31, 2013, Exhibit 99.1 to CEC 8-K (Apr. 15, 2014), at 27; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015) at 88.

Although CEOC's overall debt balance remained essentially the same, its interest obligations increased under the Term Loans by approximately $44 million annually, as depicted on B-7 Figure 4 below:

---

[3175]   CEC 8-K (May 6, 2014), at CEOC_INVESTIG_00126749 [CEOC_INVESTIG_00126743].

**B-7 Figure 4: Increase in Interest Expense Due to B-7 Transaction**[3176]

*(in millions)*

| CEOC Debt Tranche | Aggregate Principal Paid Down via B-7 | Pre B-7 Rate | B-7 Rate | Increase in Interest Expense |
|---|---|---|---|---|
| B-1 | $         16.4 | 3.24% | 9.75% | $        1.1 |
| B-3 | 12.6 | 3.24% | 9.75% | 0.8 |
| B-4 | 578.3 | 9.50% | 9.75% | 1.4 |
| B-5 | 54.3 | 4.49% | 9.75% | 2.9 |
| B-6 | 133.1 | 5.49% | 9.75% | 5.7 |
| **Paydown on B-Series Loans** | **$        794.6** | | | **$       11.9** |
| 10.00% Second-Priority Senior Secured Notes (2015) | $        186.2 | 10.00% | 9.75% | $       (0.5) |
| 5.625% Unsecured Senior Notes (2015) | 784.9 | 5.625% | 9.75% | 32.4 |
| **Note Repurchases** | **$        971.0** | | | **$       31.9** |
| **Annual Increase in Interest Expense** | | | | **$       43.8** |

Source: Appendix 12-3, B-7 Term Loan Sources & Uses; CEC 10-Q for the period ended Mar. 31, 2014 (May 9, 2014) at 18.

As noted above, the B-7 Transaction did not provide CEOC with any additional liquidity. B-7 Loan proceeds were required to be used by CEOC to repay 10% Second Priority Notes due 2015 and 5.625% Senior Notes due 2015 with the balance being used to pay fees and expenses and refinance other Term Loans.[3177] The end result, as previously discussed, was that CEOC was required to pay an additional $315 million in cash in order to consummate the B-7 related Transactions.[3178] Its liquidity thus declined, rather than improved, as a result.

### d. The Going Concern Qualification for CEOC

One of the principal reasons given for the B-7 Transaction was to avoid a going concern qualification for CEC. Once CEOC was no longer a wholly-owned subsidiary as a result of the

---

[3176] CEOC Financial Statements for the period ended Dec. 31, 2013, Exhibit 99.1 to CEC 8-K (Apr. 15, 2014), at 27; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 88; CEC 10-Q for the quarter ended May 31, 2014 (Mar. 9, 2014), at 18.

[3177] *See* Sections 3.5(c) and 4.2(d), Incremental Facility Amendment and Term B-7 Agreement (June 11, 2014), at CEOC_INVESTIG_00084100 [CEOC_INVESTIG_00084090].

[3178] CEOC Amendment Funds Flow document workbook (native file) at Tab CEOC Amendment Funds Flow [CEOC_INVESTIG_00101651.

5% Stock Sale, CEOC would be required to file its own audited financial statements instead of relying on the audited financial statements of its parent, CEC.[3179]   However, after the B-7 Transaction closed, CEOC's inability to continue as a going concern was a virtual certainty, as CEOC could no longer rely on the credit support provided by CEC's Bond Guarantee.  It was just a matter of time.  Indeed, the 10-Q filed with CEOC's unaudited financial statements for the second quarter of 2014 painted a very bleak picture for CEOC:

> We experienced negative operating cash flows of $376.2 million for the six months ended June 30, 2014, and we expect to experience negative operating cash flows for the remainder of 2014 and the foreseeable future, and do not expect that our cash flow from operations will be sufficient to repay our indebtedness in the long-term and we will ultimately seek a refinancing, amendment, or restructuring of our debt, or if necessary, pursue additional debt or equity offerings.[3180]

And a going concern disclosure was included in the September 30, 2014 unaudited financial statements issued on November 14, 2014, which, in addition to these disclosures added that there was "substantial doubt" as to the ability for CEOC to continue as a going concern beyond the fourth quarter of 2015, stating:

> [W]e estimate, that absent a refinancing, amendment, private restructuring or a reorganization under Chapter 11 of the Bankruptcy Code, based on our current operating forecasts and their underlying assumptions, we will require additional sources of liquidity to fund our operations and obligations beginning during the fourth quarter of 2015. These factors raise substantial doubt as to our ability to continue as a going concern beyond the fourth quarter of 2015.[3181]

And while the B-7 Amendment eliminated the issuance of a going concern qualification as an Event of Default, it remained a default under various indentures for the CEOC Notes if included in audited financial statements, and an Event of Default under those indentures could then lead to a cross-default under the First Lien Credit Agreement.[3182]   The B-7 Amendment on this issue was thus of marginal, if any, benefit to CEOC.

### e.   The Tender Offers

As part of the B-7 Transaction, CEOC repaid the 5.625% Senior Notes due 2015 and the 10% Second Priority Notes due 2015 in Tender Offers using proceeds of the B-7 Transaction and $315 million in cash from CEOC.  With accrued and unpaid interest and a make whole premium, CEOC paid $1,048.75 for each $1,000 in principal amount of 5.625% Senior Notes due 2015 and

---

[3179]  D. Wilfong Oct. 5, 2015 Tr. at 58:3-8.

[3180]  CEOC 10-Q for the period ended June 30, 2014 (Aug. 14, 2014), at 12.

[3181]  CEOC 10-Q for the period ended September 30, 2014 (November 14, 2014), at 10.

[3182]  First Lien Credit Agreement §7.01(f) at 154 (Event of Default if any event or condition occurs that results in any Material Indebtedness becoming due prior to its scheduled maturity, with "Material Indebtedness" being defined (insofar as is relevant here) as any bond debt in an aggregate principal amount exceeding $150 million.

up to $1,022.50 for each $1,000 in principal amount of 10% Second Priority Notes due 2015.[3183] 94% of the 5.625% Senior Notes due 2015 that were repurchased were held by CGP and Chatham.[3184]

Although the Sponsors had purchased back debt at a discount in other situations, no apparent effort was made to do so as part of the Tender Offers. By contrast, in the CERP Transaction the "equity gap" had been partially filled by convincing the CMBS lenders to accept less than the face amount of their debt.[3185] And in other situations, Caesars had negotiated discounted exchanges and "successfully reduced debt by over $3 billion and annual interest expense by over $300 million," including (i) a debt-for-debt exchange of $2.2 billion unsecured debt exchanged at a discount for a net reduction in debt of $900 million; (ii) a debt-for-debt exchange of $6.0 billion exchanged at a discount for a net reduction in debt of $2.2 billion; and (iii) a debt-for-equity exchange with Paulson[3186] (which is discussed below) for a discounted purchase of CEC equity.[3187] Here, however, where CGP, an affiliate of CEOC that is controlled by the Sponsors, and Chatham (which purchased CEOC equity to facilitate the Bond Guarantee release) collectively held 94% of the 5.625% Senior Notes due 2015, and Chatham held 43% of the 10% Second Priority Notes due 2015, there was no attempt at a discounted exchange. Indeed, rather than seeking a discount, CEOC paid over $219 million in fees and expenses to arrange for a loan used to fund these premium over par transactions.[3188]

### f.  CGP

On November 23, 2010, Paulson, the Sponsors and CEC entered into a debt-for-equity exchange, where Paulson exchanged over $1.1 billion in aggregate principal amount of certain CEOC Notes (the "Paulson Notes") for the right to purchase CEC equity at a discount.[3189] In October 2013, the Paulson Notes, plus some additional CEC Notes that were held by CEC, were contributed by CEC to CGP as part of CEC's capital contribution into CAC.[3190] The Paulson Notes and other CEOC Notes contributed by CEC to CGP are shown in the following Figure:

---

[3183]  CEC 8-K (May 6, 2014), Ex. 99.1.

[3184]  *See* Appendix 12-3, B-7 Term Loan Sources & Uses.

[3185]  *See* Section VIII.C.

[3186]  "Paulson" includes Paulson & Co., Inc., Paulson Advantage Master Ltd., Paulson Advantage Plus Master Ltd., Paulson Credit Opportunities Master Ltd. and Paulson Recovery Master Ltd.

[3187]  "Caesars Entertainment" Presentation (June 27, 2014), [CEOC_INVESTIG_00088461] (native file), at 36 & 43.

[3188]  *See* Appendix 12-3, B-7 Term Loan Sources and Uses.

[3189]  CEC 8-K (Nov. 19, 2010), at 3.

[3190]  Exhibit 10.1 to CEC 8-K (Oct. 22, 2013); *id.* at Annex A.

**B-7 Figure 5: Paulson Notes and CEC Notes Contributed to CGP**

*(amounts in millions)*

| Debt Tranche | Paulson Notes | | Notes Contributed to CGP | |
|---|---|---|---|---|
| 5.625% Senior Notes due 2015 | $ | 419.9 | $ | 427.3 |
| 6.50% Senior Notes due 2016 | | 319.9 | | 324.5 |
| 5.75% Senior Notes due 2017 | | 378.5 | | 391.0 |
| PIK Notes | | - | | 3.4 |
| **Total Principal** | **$** | **1,118.3** | **$** | **1,146.2** |

<u>Source</u>: Paulson Notes: Exhibit 10.1 to CEC 8-K (June 3, 2010), at I-1, I-2 and I-3; Exhibit 10.1 to CEC 8-K (Oct. 22, 2013) Transaction Agreement (Oct. 21, 2013) among CEC, CAC, CGP and others at 1 and at Annex A; Exhibit 10.1 to CEC 8-K (Oct. 22, 2013), at Annex A.

As of December 31, 2012, the contributed Paulson Notes were valued by CAC at 69 cents on the dollar and the 5.625% Senior Notes due 2015 were valued at 88 cents on the dollar.[3191]   Approximately $427 million in principal amount of the Paulson Notes (plus an additional $25 million in accrued interest and a make whole premium, for a total of $452 million paid to CGP) were then purchased by CEOC as part of the B-7 Transaction, not as part of the Tender Offer but pursuant to a stand-alone agreement between CEOC and CGP,[3192] which provided that CGP (i) would be paid on its Paulson Notes upon the closing of the B-7 Transaction and (ii) would participate as a lender in the B-7 Transaction on a dollar-for-dollar basis, meaning that for each dollar of Paulson Notes purchased by CEOC, CGP would agree to lend one dollar to CEOC as part of the B-7 Transaction.[3193]

However, despite this provision, *i.e.*, consideration for tendering notes held by affiliate CGP, CGP ultimately did not participate as a lender in the B-7 Loan.[3194]   According to Credit Suisse,[3195] the B-7 Loan was oversubscribed by parties other than CGP in the amount of $4.598

---

[3191]  CAC 10-K for the period ended December 31, 2013 (Mar. 28, 2014), at 129.  The stated fair value of the notes contributed to CGP, which include the Paulson Notes and prior investments in notes, was $790.6 million on $1,146.4 million in aggregate principal amount.

[3192]  CGP NPA with CEOC §2.3 (May 5, 2014), at CEOC_INVESTIG_000452391 [CEOC_INVESTIG_00452390].  *See also* Appendix 12-3, B-7 Term Loan Sources & Uses.

[3193]  *Id.* ("Growth Partners hereby agrees that it will participate as a lender of Term B-7 Loans under the Company's Second Amended and Restated Credit Agreement dated as of March 1, 2012. . . .").

[3194]  List of B-7 Lenders (June 25, 2014), at CEOC_INVESTIG_00087794 [CEOC_INVESTIG_00087794].

[3195]  "CEOC Regulatory Discussion" Materials (May 20, 2014), CEOC_INVESTIG_00024128 (native file), at 3.

billion (including the $1.1 billion committed by BlackRock and GSO[3196]) for the $1.75 billion B-7 Loan. As a result, Credit Suisse determined that CGP should not receive any allocation and that it was more desirable to allocate to other lenders that could contribute liquidity to the secondary market.[3197]

If CGP had become a lender in the B-7 Transaction, that would have made this related party transaction only marginally better. Had it participated, CGP would have benefitted as having obtained a high-paying loan at the top of CEOC's capital structure while having its junior debt that was trading at a discount purchased at par plus accrued interest and a make whole premium. The significant issue is CEC causing CEOC to repay the 5.625% Senior Notes due 2015 to its affiliate CGP at a premium while CEOC was insolvent.

### g. Chatham

Chatham received $435 million as a result of CEOC's repurchase of (i) $102 million in principal amount of 10% Second Priority Notes due 2015 and (ii) $310 million in principal amount of 5.625% Senior Notes due 2015 held by Chatham, plus interest and a make whole premium.[3198]

Chatham's holdings in Caesars were significant. In addition, the CEOC Note holdings described above and other positions within the Caesars capital structure were acquired over several years prior to the B-7 Transaction. Chatham had short positions and CDS positions (according to Chatham, as a "hedge") and was one of a number of lenders to CGPH in the Four Properties Transactions.[3199] And, as described below, Chatham became a CEOC B-7 lender and a stockholder as part of the 5% Stock Sale. Chatham's holdings in Caesars constituted approximately 14.46% of Chatham Asset High Yield Fund's and 17.49% of Chatham Eureka Fund's investments.[3200] While Chatham held a portion of the 10% Second Priority Notes due 2015 and 5.625% Senior Notes due 2015 as early as December 2013, Chatham acquired a significant portion during the period January 2014 through April 2014.[3201]

---

[3196] BlackRock and GSO initially committed to invest $1.1 billion in the B-7 Loan, and ultimately invested a combined amount of $820 million. *See* List of B-7 Lenders (June 25, 2014), at CEOC_INVESTIG_00087794 [CEOC_INVESTIG_00087794].

[3197] E-mail from Joel H. Levitin of Cahill Gordon & Reindel LLP, counsel to Credit Suisse (Feb. 19, 2016) to counsel for the Examiner.

[3198] Chatham Amended and Restated Note Purchase Agreement (July 25, 2014), at CEC_EXAMINER_0062350, [CEC_EXAMINER_0062339]; *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 178:6-179:5.

[3199] *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 237:13-238:7, 240:5-6, 246:3-17.

[3200] *Id.* at 306:18-309:3.

[3201] *See* Appendix 12-8, Chatham Repurchase at Premium Over Market and Chatham's Gain; Chatham Eureka Fund Portfolio Appraisal" (Dec. 31, 2013), CHATHAMCES041463 (native file); "Chatham Asset High Yield Master Fund Portfolio Appraisal" (Jan. 17, 2014), at CHATHAMCES041855-56 [CHATHAMCES041855]; Chatham Eureka Fund Portfolio

Only a portion of Chatham's notes were purchased as part of the Tender Offers; the majority of Chatham's notes were purchased pursuant to a separate note purchase agreement entered into between Chatham and CEOC. [3202]  When asked why Chatham had executed a separate note purchase agreement, Roselli (of Chatham) indicated that he did not know why they had an agreement separate and apart from the Tender Offer to all holders.[3203]

As a result of its involvement in the Redemptions and the Tender Offers, Chatham realized a gain of $▓▓ million on its CEOC Notes.[3204]

Chatham was one of three institutional purchasers of 5% of CEOC stock, which is discussed below, and the 5% CEOC Stock Sale resulted, purportedly, in the release of the Bond Guarantee.

The timeline of events with respect to Chatham is summarized as follows:

| January 6, 2014: | Chatham holds $264.8 million in principal amount of 5.625% Senior Notes due 2015 and $9.9 million of 10% Second Priority Notes due 2015.[3205] |
| --- | --- |
| January 7 to January 31, 2014: | Chatham purchases $0.2 million of 10% Second-Priority Notes due 2015.[3206] |
| January 24 to January 31, | Chatham purchases $4.8 million of 5.625% Senior Notes due |

---

Appraisal (Jan. 21, 2014) at CHATHAMCES041872-73 [CHATHAMCES041870]; "Chatham Asset Management, LLC Portfolio Appraisal – Chatham Asset High Yield Master Fund, Ltd." (May 1, 2014), at CHATHAMCES090258 [CHATHAMCES090256]; "Chatham Asset Management, LLC Portfolio Appraisal – Chatham Eureka Fund, L. P." (May 1, 2014), CHATHAMCES090273 [CHATHAMCES090271].

[3202] *See* Section 6.3, Chatham NPA at CEC_EXAMINER_0078033 [CEC_EXAM-INER_0078029].  Chatham also entered into an Amended and Restated Note Purchase Agreement with CEOC dated as of July 25, 2014, for payment of approximately $23,424,000 to account for certain of the notes that were redeemed on June 16, 2014 in connection with the Redemptions.  *See* e-mail from T. Evans to Z. Muhammad (Aug. 8, 2014) [CEC_EXAMINER_0062337], attaching Amended and Restated Note Purchase Agreement (July 25, 2014), at CEC_EXAMINER_0062339-50 [CEC_EXAMINER_0062339].

[3203] *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 186:11-14.

[3204] *See* Appendix 12-8, Chatham Repurchase at Premium Over Market and Chatham's Gain.

[3205] Chatham Eureka Fund Portfolio Appraisal (Dec. 31, 2013), at CHATHAMCES041463 [CHATHAMCES041463]; Chatham Asset High Yield Master Fund Portfolio Appraisal (Jan. 17, 2014) at CHATHAMCES037207-8 [CHATHAMCES037205].

[3206] *See* e-mail from M. Kokot to counsel for the Examiner (Mar. 3, 2016), attaching trade data regarding Chatham's purchases of 5.625% Senior Notes due 2015 and 10% Second-Priority Notes due 2015 during 2014.

| 2014: | 2015.[3207] |
|---|---|
| February 1 to February 28, 2014: | Chatham purchases $3.0 million of 5.625% Senior Notes due 2015.  Chatham does not purchase any positions in the 10% Second-Priority Notes due 2015.[3208] |
| February 11, 2014: | Greg Roselli, a Senior Analyst at Chatham ("Roselli"), writes to one of his contacts, Michael Lawton, an official with the Nevada Gaming Control Board ("Lawton"), that "the new spin-off company [which is CGP] is going to start picking the best properties out of Opco [which is CEOC] to help force the lenders to take a haircut."[3209] |
| March 1 to March 31, 2014: | Chatham purchases $4.9 million of 5.625% Senior Notes due 2015 and $36.8 million of 10% Second-Priority Notes due 2015.[3210] |
| March 3, 2014: | Following the announcement of the Four Properties Transaction, Roselli writes to Evan Ratner, a Principal and Portfolio Manager at Chatham ("Ratner"), that the transaction "[e]xtends the liquidity profile but doesn't change the story for the 2nds in the long run; and now they've [CGP] stripped the best assets (New Orleans does very well)."[3211]  Roselli confirmed at a deposition that "they've" in the prior sentence refers to CGP and the best assets refers to the Four Properties Transaction.[3212] <br><br> Roselli writes to Lawton that "re czr – they're using cash and new debt at their spinoff company (caesars growth partners) to pretty much cherry-pick the best assets out of Opco, which opco will then manage for a fee.  basically, it's the next step in |

---

[3207] *Id.*

[3208] *Id.*

[3209] E-mail from G. Roselli to M. Lawton (Feb. 11, 2014), at CHATHAMCES019865 [CHATHAMCES019865].

[3210] *See* e-mail from M. Kokot to counsel for the Examiner (Mar. 3, 2016), attaching trade data regarding Chatham's purchases of 5.625% Senior Notes due 2015 and 10% Second-Priority Notes due 2015 during 2014.

[3211] E-mail from G. Roselli to E. Ratner (Mar. 3, 2014) at CHATHAMCES020096 [CHATHAMCES020096].

[3212] *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. 279:5-279:17.

| | |
|---|---|
| | the continued extraction of value from opco into new entities that actually generate equity value for opco."[3213] |
| March 12, 2014: | Roselli sent Ratner and Anthony Melchiorre, Chatham's Managing Partner ("Melchiorre"), an excerpt from an RBC analyst's note on Caesars that states, "We do not see a bankruptcy filing in sight, as we believe existing liquidity and the need for CZR to extend operations beyond a 'look-back' period for potential litigation keep this story going for at least another couple of years."[3214] |
| March 27, 2014: | Melchiorre writes to Sambur asking for his help in being able to buy second lien securities in CGP from Citi. Melchiorre also advises Sambur that Chatham will be "going in early on the bridge," likely referring to a loan commitment for the CGPH Loan requested by Sambur.[3215] |
| April 1 to April 30, 2014: | Chatham purchases $45.7 million of 5.625% Senior Notes due 2015 and $61.7 million of 10% Second-Priority Notes due 2015.[3216]<br><br>Though the purchases occur over the course of the month, over 25% of the purchases of 5.625% Senior Notes due 2015 purchases occur on April 29 and April 30 and nearly 50% of the purchases of 10% Second-Priority Notes due 2015 occur on April 2 and April 3. |
| April 27 to May 3, 2014: | On or about April 30, 2014, Sambur requests that Chatham become restricted.[3217]  Sambur advises Melchiorre and Roselli of the 5% Stock Sale and the proposed B-7 Transaction.[3218] |

---

[3213]  E-mail exchange between G. Roselli and M. Lawton (Mar. 3, 2014), at CHATHAMCES-035199 [CHATHAMCES035199].

[3214]  E-mail from G. Roselli to A. Melchiorre and E. Ratner quoting "RBC CZR note intro" (Mar. 12, 2014) at CHATHAMCES000002 [CHATHAMCES000002]; *see also* "Caesars Entertainment Corporation – In line with guidance but still a rough quarter" (Mar. 12, 2014), at CHATHAMCES005619 [CHATHAMCES005617].

[3215]  E-mail from A. Melchiorre to D. Sambur (Mar. 27, 2014), at CHATHAMCES021904 [CHATHAMCES021904].

[3216]  See e-mail from counsel for the Examiner (Mar. 3, 2016), attaching trade data regarding Chatham's purchases of 5.625% Senior Notes due 2015 and 10% Second-Priority Notes due 2015 during 2014. [Informal]

[3217]  *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 47:6-49:16, 179:25-181:11.

[3218]  *Id.* at 49:17-53:23.

| | |
|---|---|
| | Sambur asks Chatham to purchase CEOC equity and for a bridge for the B-7 Loan, *i.e.*, "looking to have commitments for a term loan prior to announcing it." Sambur also references the resulting release of the Bond Guarantee and advises Melchiorre and Roselli that the B-7 Loan will be used to repurchase the 5.625% Senior Notes due 2015 at par plus accrued interest plus a make whole premium.[3219]<br><br>Several days later, Melchiorre and Roselli tell Sambur they will agree to purchase $4 million in CEOC equity and to provide a commitment of $100 million for the B-7 Loan after discussing the price of the repurchases of the 5.625% Senior Notes due 2015.[3220] Chatham eventually purchases $50 million of the B-7 Loan.[3221] |
| April 30, 2014: | Jim Ruggerio, Chatham's COO, writes an e-mail to Ray Del Nero, Chatham's CFO, to the effect that Chatham is restricted in Caesars probably until Monday May 5, 2014.[3222]<br><br>Sambur sends Melchiorre draft documents, including a draft stock purchase agreement for CEOC equity and a note purchase agreement.[3223] |
| May 1, 2014: | Chatham's ending position (aggregate principal amount) is $316.2 million in 5.625% Senior Notes due 2015 and $103.7 million of 10% Second-Priority Notes due 2015.[3224] |
| May 5, 2014: | CEOC and Chatham enter into a Note Purchase Agreement ("NPA") under which CEOC purchases $310.4 million in |

---

[3219] *Id.* at 46:6-53:23.

[3220] *Id.* at 55:12-59:2, 77:18-78:24.

[3221] *Id.* at 80:6-80:12; List of B-7 Lenders (June 25, 2014), at CEOC_INVESTIG_00087794 [CEOC_INVESTIG_00087794].

[3222] E-mail from J. Ruggerio to R. Del Nero (Apr. 30, 2014), at CHATHAMCES0136853 [CHATHAMCES0136853].

[3223] E-mail from D. Sambur to A. Melchiorre *et al.* (Apr. 30, 2014), at CHATHAMCES0040397 [CHATHAMCES0040397].

[3224] "Chatham Asset Management, LLC Portfolio Appraisal – Chatham Asset High Yield Master Fund, Ltd." (May 1, 2014), at CHATHAMCES090258 [CHATHAMCES090256]; "Chatham Asset Management, LLC Portfolio Appraisal – Chatham Eureka Fund, L. P." (May 1, 2014), at CHATHAMCES090273 [CHATHAMCES090271].

| | |
|---|---|
| | principal amount of Chatham's 5.625% Senior Notes due 2015[3225] and $79.7 million in principal amount of Chatham's 10% Second Priority Notes due 2015 plus interest and a make whole premium.[3226] The source of funds used by CEOC to purchase Chatham's notes was to be obtained from the B-7 Transaction.[3227] |
| May 6, 2014: | Caesars announces the B-7 Transaction and the 5% Stock Sale. Melchiorre tells Sambur that Chatham will commit to do $125 million - $150 million on the bridge that Sambur requested from Chatham.[3228]   Had CEC not agreed to purchase Chatham's Notes pursuant to the NPA, the announcement of the 5% Stock Sale that purportedly released the Bond Guarantee would have resulted in a decrease in their market value. |

---

[3225] NPA (May 5, 2014), at CEC_EXAMINER_0078040 [CEC_EXAMINER_0078029] (Schedule A of the NPA identifies the following principal amount of the outstanding 5.625% Senior Notes due 2015 held by the following as Chatham entities: (i) Chatham Asset High Yield Master Fund, Ltd. holds $184.2 million; (ii) Chatham Eureka Fund, L.P. holds $126.8 million; (iii) Blackstone Alternative Multi-Manager Sub Fund III LLC holds $1.5 million; and (iv) Franklin K2 Alternative Strategies Fund holds $1.287 million; for a total amount of $319.052 million.  Chatham's combined holdings were $310.352 million.).  *See also* Appendix 12-3, B-7 Term Loan Sources & Uses.

[3226] NPA (May 5, 2014),   at CEC_EXAMINER_0078040 CEC_EXAMINER_0078029] (Schedule A of the NPA identifies the following principal amount of the outstanding 10% Second Priority Senior Secured Notes due 2015 held by the following as Chatham entities: (i) Chatham Asset High Yield Master Fund, Ltd. holds $49.694 million; (ii) Chatham Eureka Fund, L.P. holds $30.030 million; (iii) Blackstone Alternative Multi-Manager Sub Fund III LLC holds $2.286 million; and (iv) Franklin K2 Alternative Strategies Fund holds $1.130 million; for a total amount of $108.724 million.  Chatham's combined holdings were $79.725 million.).  *See also Wilmington Savs.*, D. Sambur Sept. 10, 2015 Tr. at 442:13-25 ("Q. Right.  All of which CEC bought back pursuant to an agreement which was signed the very same day as the agreement that Chatham signed agreeing to buy the CEOC shares; right? MR. CLAYTON:  Objection to the form. A. Yeah, it was effectively – it was part of the B-7 Transaction, which I reviewed yesterday.  Refinanced all the 2015 maturities.  They were a large holder of 2015 debt, so yes, they did participate in that, in that sell-back to the company of the debt.").  *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 186:7-10.  *See also* Appendix 12-3, B-7 Term Loan Sources and Uses.

[3227] *See* Appendix 12-8, Chatham Repurchase at Premium Over Market and Chatham's Gain.  A portion of the 10% Second Priority Notes due 2015 held by Chatham were redeemed via the Redemptions.

[3228] E-mail from A. Melchiorre to D. Sambur (May 6, 2014), at APOLLO-Examiner_00086802 [APOLLO-Examiner_00086802].

| | |
|---|---|
| | Chatham becomes unrestricted once the B-7 Transaction and 5% Stock Sale are announced.[3229] |

In addition, a series of e-mails between Caesars, Paul Weiss and Chatham between July 23 and July 29, 2014 indicate that the 5% Stock Sale (discussed below) and the purchases of Chatham's CEOC Notes were highly coordinated and was not simply part of the Tender Offers.[3230]

## 2.  The 5% Stock Sale

On May 5, 2014, CEC sold 5% of the equity in CEOC to three institutional investors in privately negotiated transactions.  The participating investors were Scoggin,[3231] Chatham and Paulson.[3232]  Scoggin, Chatham and Paulson purchased in the aggregate approximately 68.1 shares in exchange for a total of $6.15 million.[3233]  After the 5% Stock Sale, CEC owned 95% of the common stock of CEOC. The amount was further reduced to 89% by the PIP, which is discussed in Section IX.C.[3234]  According to CEC, the sale of CEOC equity automatically resulted in the release of the Bond Guarantee in accordance with the terms of certain bond indentures.

In materials prepared for its state gaming regulators, CEC identified two reasons for the sale: (1) to provide CEOC with future flexibility to use its equity as currency, *e.g.*, "for future debt for equity exchanges at CEOC;" and (2) to release the Bond Guarantee.[3235]  The plan was to create a currency in CEOC stock that was "liquid and tradeable" and could be used "to help facilitate further deleveraging."[3236]  According to Rowan, "one of the easiest ways for us to de-

---

[3229] E-mail J. Ruggerio to R. Del Nero (May 6, 2014), at CHATHAMCES092268 [CHATHAMCES092268].

[3230] E-mail exchange between D. Sobel and T. Evans (July 29, 2014), at CEC_EXAMINER_ 0087594-612 [CEC_EXAMINER_0087594].

[3231] Scoggin includes Scoggin Capital Management II LLC and Scoggin International Fund Ltd.

[3232] *See* "CEOC Regulatory Discussion Materials" Presentation (May 20, 2014) at 5, [CEOC _INVESTIG_00024128]; Scoggin SPA (May 5, 2014), at CEOC_INVEST-IG_00125495 [CEOC_INVESTIG_00125495]; Chatham SPA (May 5, 2014), at CEOC_INVESTIG_00125981 [CEOC_INVESTIG_00125981]; Paulson SPA (May 5, 2014), at CEOC_INVESTIG_00127403 [CEOC_INVESTIG_00127403].

[3233] "CEOC    Regulatory    Discussion    Materials"    (May    20,    2014),    at    5 [CEOC_INVESTIG_00024128].

[3234] CEC Form 8-K (May 6, 2014), at 4.

[3235] "CEOC Regulatory Discussion Materials" (May 1, 2014), at CEOC_INVEST-IG_00412721 [CEOC_INVESTIG_00412704].

[3236] E. Hession Nov. 3, 2015 Tr. at 271:2-8.

lever is to come up with an interesting exchange transaction that can further reduce debt."[3237]  As discussed above, however, the primary reason for the 5% Stock Sale was to release the Bond Guarantee.  Indeed, as discussed below, Blackstone recognized that given the magnitude of CEOC's debt, it was unrealistic to think that CEOC equity could be used as currency in the near term.

### a.  Retention of Blackstone

In March 2014, Rowan and Sambur met with Blackstone,[3238] and Colvin[3239] executed an engagement letter on behalf of CEC, whereby Blackstone was retained in connection with a broad assignment in providing financial and strategic restructuring advice to CEC.  The work performed by Blackstone was titled "Project Julii," which was a name coined by Blackstone.[3240]

Blackstone subsequently attended two CEC Board Meetings on April 10, 2014 and April 21, 2014.[3241]  At each meeting, Blackstone circulated a presentation titled "Project Julii Discussion Materials" in connection with CEC's concerns regarding its capital structure, as discussed *infra*.[3242]

### i.  Project Julii

On April 10, 2014, the CEC Board held a meeting at Apollo's New York office.[3243] Zelin and Genereux of Blackstone attended the meeting and presented a report, "Project Julii Discussion Materials" (the "April 10, 2014 Blackstone Presentation").[3244]  This presentation sought to focus the Company's efforts on creating "currency for deleveraging initiatives" and

---

[3237]  M. Rowan Nov. 16, 2015 Tr.at  265:12-15.

[3238]  *Wilmington Savs,.* M. Genereux Sept. 30, 2015 Tr. at 90:10-15.

[3239]  *Wilmington Savs.,* D. Colvin Sept. 29, 2015 Tr. at 202:10-203:15.

[3240]  M. Rowan Nov. 17, 2015 Tr. at 383:12-14.

[3241]  CEC Meeting of the Board of Directors (Apr. 10, 2014) at CEC_EXAMINER_1447970-71 [CEC_EXAMINER_1447970], CEC Meeting of the Board of Directors (Apr. 21, 2014), at CEC_EXAMINER_0028153 [CEC_EXAMINER_0028153].

[3242]  "Project Julii Discussion Materials" Presentation (Apr. 21, 2014) at CEC_EXAMINER_0272384-94 [CEC_EXAMINER_0272384].

[3243]  CEC Meeting of the Board of Directors (Apr. 10, 2014) at CEC_EXAMINER_1447970-71 [CEC_EXAMINER_1447970].

[3244]  "Project Julii Discussion Materials" Presentation (Apr. 21, 2014) at CEC_EXAMINER_0272384-94 [CEC_EXAMINER_0272384].

providing runway to ultimately maximize CEC's "enterprise value."[3245]  The presentation also stated that it would "[e]valuate the sale of CEOC common stock."[3246]

The April 10, 2014 Blackstone Presentation states that a sale of "10-20% of common stock stake in CEOC is being considered by CEC."[3247] The sale of CEOC stock was purportedly expected to benefit CEC by: (i) continuing the implementation of CEC's overall strategic plan to maximize value; (ii) "clarifying" the fall-away of the Bond Guarantee for the public market; (iii) creating liquid and tradable currency to facilitate future capital markets transactions and to lengthen runway; (iv) creating a currency for liability management and debt reduction initiatives; and (v) creating a potential management compensation component in the future.[3248]

On April 21, 2014, the CEC Board held a telephonic meeting,[3249] during which Genereux presented a financial analysis performed by Blackstone in connection with the proposed sale of CEOC equity.[3250]  Blackstone's findings are set forth in the "Project Julii Discussion Materials" dated April 21, 2014 (the "April 21, 2014 Blackstone Presentation").[3251]

The April 21, 2014 Blackstone Presentation reiterates that a "sale by CEC of a portion of its stake in CEOC is highly beneficial for CEC" for both financial and strategic reasons.[3252] Blackstone identifies the following reasons for the sale: (i) it contractually releases CEC from liability for approximately $14.9 billion CEOC debt and thus protects $2.5 billion CEC equity value for all shareholders;[3253] and (ii) it serves as a potential catalyst for constructive debt reduction negotiations in the future, although there may be hostile responses from CEOC creditors.[3254]  While Blackstone's presentation contemplated that the sale of CEOC common stock might have future benefits to CEC, such as affording liquid currency for capital market transactions, it appreciated the reality of CEOC's financial situation and conveyed that such future benefits "may not materialize in the near-term largely as a result of the approximate $19.3 billion of debt that stands ahead of any potential equity sale."[3255]  Later in June, reflecting his

---

[3245] "Project Julii Discussion Materials" Presentation (Apr. 10, 2014), at BAP-021269 [BAP-021266].

[3246] *Id.* at BAP-021270.

[3247] *Id.* at BAP-021271.

[3248] *Id.*

[3249] "CEC Meeting of the Board of Directors" (Apr. 21, 2014), at CEC_EXAMINER_0028153 [CEC_EXAMINER_0028153].

[3250] *Id.* at CEC_EXAMINER_0028154.

[3251] "Project Julii Discussion Materials" (Apr. 21, 2014), at CEC_EXAM-INER_0272384-94 [CEC_EXAMINER_0272384]

[3252] *Id*. at CEC_EXAMINER_0272387.

[3253] *Id.* at CEC_EXAMINER_ 0272391.

[3254] *Id*.

[3255] *Id.* at CEC_EXAMINER_0272389.

own understanding of the lack of value of CEOC stock in debt exchanges, Sambur compared CEOC stock to "pixie dust" in an e-mail to Rowan.[3256]   The presentation also states that Blackstone was advised that prospective lenders had made the release of the Bond Guarantee a condition precedent to the B-7 Loan.[3257]   In reviewing the Blackstone presentation, Bonderman of TPG had a different perspective on the purpose of the Bond Guarantee release, stating that the release of the Bond Guarantee was a "catalyst for constructive debt reduction negotiations in the future" because it "changes the leverage dramatically if you are not liable for $15 billion worth of debt."[3258]

In addition, Blackstone outlined a marketing and sale process for the CEOC common stock transaction.[3259] As of April 21, 2014, CEC and Paul Weiss were in the process of assembling an offering memorandum and confidentiality agreement for prospective investors.[3260] CEC identified nine potential investors, including Scoggin, Chatham and Paulson.[3261]

During its presentation, Blackstone indicated that it faced some difficulty in determining the value of the shares but that it was testing both traditional and non-traditional financial models to value the stock.[3262]   Blackstone projected that the buyers of CEOC common stock would likely be existing CEC investors who would "anticipate realizing a financial gain on their CEC common stock position by virtue of the guarantee failing away on $14.9 billion of CEOC debt."[3263]   Though Blackstone recognized that "some investors may ascribe option value to the CEOC stock," it stated that "any such option value cannot be reliably quantified today."[3264]   In support, Blackstone explained that option value required a number of assumptions that could not be readily identified with a reasonable degree of precision, such as the impact of CEOC's remaining reduction initiatives and the subsequent dilution of CEOC stock.[3265]   Because such assumptions would serve as inputs, Blackstone explained that it was facing some difficulty in building a reliable financial model to determine valuation.[3266]

---

[3256] E-mail from D. Sambur to M. Rowan's cell phone (June 6, 2014), at APOLLO-Examiner_00719706 [APOLLO-Examiner_00719706].

[3257] "Project Julii Discussion Materials" (Apr. 21, 2014), at CEC_EXAM-INER_0272387 [CEC_EXAMINER_0272384].

[3258] D. Bonderman Nov. 10, 2015 Tr. at 145:19-24.

[3259] "Project Julii Discussion Materials" Presentation (Apr. 21, 2014), at CEC_EXAMINER_ 0272390 [CEC_EXAMINER_0272384].

[3260] *Id.*

[3261] *Id.* at CEC_EXAMINER_0272392-93.

[3262] *Id.* at CEC_EXAMINER_0272389.

[3263] *Id.* at CEC_EXAMINER_0272391.

[3264] *Id.* at CEC_EXAMINER_0272389.

[3265] *Id.*

[3266] *Id.*

During the April 21, 2014 CEC Board meeting,[3267] Paul Weiss also provided an overview of the proposed B-7 Transaction and the 5% Stock Sale [3268] and a refresher on the fiduciary duties of the board members under the business judgment standard of review.[3269]  There was no reference to the entire fairness standard of review or the possible insolvency of CEOC or the implications of that insolvency on the board's fiduciary obligations.  Also discussed were the rationale for the proposed transactions and the impact they would have on the Bond Guarantee. At the conclusion of the meeting, the CEC Board approved the preliminary terms of the proposed transactions and authorized "management to continue discussions with lenders and related parties and to solicit other potential purchasers of CEOC stock."[3270]

On April 28, 2014, another meeting of the CEC Board was held.  Paul Weiss and Hession presented an overview of the 5% Stock Sale and Paul Weiss presented "an informational report on fiduciary duties of the Board."[3271]  There was no discussion of the implications of CEOC's financial condition on the fiduciary duties owed by CEOC directors or CEC as Controlling Shareholder.  The CEC Board resolutions reflect the following justifications for the 5% Stock Sale:

- "to help implement an overall strategic plan to maximize total enterprise value";[3272]

- "to make possible the Incremental Term Loan Transaction [*i.e.*, the B-7 Transaction] following demand by the prospective lenders thereof that CEC's guarantee of CEOC's bonds not be extant";[3273] and

- "[that] such termination [of the Bond Guarantee] being required as a condition to the willingness of the lenders thereof to enter into the Incremental Term Loan Transaction, as noted above[.]"[3274]

### b.  Discussions with Prospective Investors

As noted above, at the April 21, 2014 CEC Board meeting, Blackstone indicated that CEC had identified nine prospective purchasers of CEOC common equity, including Scoggin,

---

[3267]  CEC Meeting of the Board of Directors (Apr. 21, 2014), at CEC_EXAMINER_0028153-4 [CEC_EXAMINER_0028153] (Confidential).

[3268]  *Id*. at CEC_EXAMINER_0028153

[3269]  *Id*. at CEC_EXAMINER_0028154.

[3270]  *Id*.

[3271]  CEC Meeting of the Board of Directors and Resolutions of the Board of Directors (Apr. 28, 2014), at CEOC_INVESTIG_00126737 [CEOC_INVESTIG_00126737].

[3272]  *Id.* at CEOC_INVESTIG_00126738.

[3273]  *Id.*

[3274]  *Id.* at CEOC_INVESTIG_00126739.

Chatham and Paulson.[3275]   Apart from Scoggin, Chatham and Paulson, the Examiner has found little evidence of Blackstone's or CEC's marketing efforts to the remaining six prospective investors.[3276]   Consistent with Blackstone's comments in the April 21, 2014 Blackstone Presentation, Scoggin and Paulson both held CEC equity prior to the stock purchase.[3277]

The initial discussions between Apollo and each of the investors – Scoggin, Chatham and Paulson – commenced and developed in a similar fashion.  In late April 2014, Sambur reached out to representatives from each of the purchasing entities and informed them that CEC was selling CEOC stock.[3278]   He also communicated that the sale of CEOC stock would lead to a release of the Bond Guarantee, although Chatham and Scoggin could not recall when that conversation occurred.[3279]   The initial efforts by Sambur were fairly brief and the three purchasers executed their respective Stock Purchase Agreements on May 5, 2014, approximately two weeks after Sambur reached out to each of them.[3280]

The Stock Purchase Agreements entered into by Scoggin, Chatham and Paulson are substantially the same.  While the price per share was valued consistently as $90,308, each investor purchased a different number of shares.  Specifically, Scoggin purchased 11.073 shares for $1 million;[3281] Chatham purchased the majority of the 5% stock, purchasing 3.25%, or 44.293 shares for $4 million;[3282] and Paulson purchased 12.734 shares for $1.15 million.[3283]   The

---

[3275] "Project Julii Discussion Materials" Presentation (Apr. 21, 2014), CEC_Examiner_0272392-93 [CEC_EXAMINER_0272384].

[3276] *See Wilmington Savs.*, D. Sambur Sept. 9, 2014 Tr. at 215:3-6; *id.* at 215:19-21; *Wilmington Savs.*, E. Hession Sept. 17, 2015 Tr. at 278:16-279:3.  The Examiner subpoenaed and received few responsive documents from the prospective investors that did not ultimately become CEOC equity purchasers.

[3277] *Wilmington Savs.*, G. Dhingra Sept. 29, 2015 Tr. at 47:10-12, 112:24-113:2, 157:2-8, 264:6-10, *Wilmington Savs.*, T. Wallach Sept. 28, 2015 Tr. at 30:16-20.

[3278] *See Wilmington Savs.*, D. Sambur Sept. 9, 2015 Tr. at 251:10-14 (Paulson); *id.* at 254:19-23 (Chatham); *id.* at 255:14-20 (Scoggin).

[3279] *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 76:13-24; *Wilmington Savs.*, T. Wallach Sept. 28, 2015 Tr. at 55:25-56:19.

[3280] Scoggin SPA (May 5, 2014), at CEOC_INVESTIG_00125495 [CEOC_INVESTIG_0012-5495]; Chatham SPA (May 5, 2014), at CEOC_INVESTIG_00125981 [CEOC_INVESTIG_001-25981]; Paulson SPA (May 5, 2014), at CEOC_INVESTIG_00127403 [CEOC_INVESTIG_00127403].

[3281] Scoggin SPA (May 5, 2014), at CEOC_INVESTIG_00125495 [CEOC_INVESTIG_0012-5495].

[3282] Chatham SPA (May 5, 2014), at CEOC_INVESTIG_00125981 [CEOC_INVESTIG_0012-5981].

[3283] Paulson SPA (May 5, 2014) at CEOC_INVESTIG_00127403 [CEOC_INVESTIG_0012-7403].

Paulson Stock Purchase Agreement permitted it to acquire additional shares at the same purchase price within one week following the closing.[3284]

In accordance with the resolutions approved by the CEC Board on April 28, 2014, each of the Stock Purchase Agreements required CEC to use its best efforts to list CEOC stock on a national exchange.[3285]   Section 5.4 of the Stock Purchase Agreements imposed a covenant stating that CEC promised "to use its reasonable efforts to (i) effect the registration of the Purchased Shares for resale [] and (ii) to cause the Purchased Shares to be listed for trading on a national or other securities exchange."[3286]

The Stock Purchase Agreements also included an indemnification clause.   While it is unclear whether Scoggin or Chatham requested an indemnification clause, Dan Kamensky of Paulson requested that an indemnity from CEC be added to the stock purchase agreement.[3287] Paulson specifically requested to be indemnified by the seller in the event there was any litigation regarding the stock purchase.[3288]   Section 7.10 stated in relevant part that, "CEC shall indemnify and hold harmless the Investor . . . from, against and in respect of any Expenses incurred or suffered" as a result of the stock purchase agreement.[3289]

### c.   Discussions with Chatham

As summarized earlier, Sambur personally telephoned Melchiorre, Managing Partner at Chatham, regarding the stock sale about a week before the May 6, 2014 announcement of the transaction.[3290]   Chatham was a creditor of CEOC, holding, among other things, $310.4 million in principal amount of the 5.625% Senior Unsecured Notes due 2015 and approximately $102.4 million in principal amount of the outstanding 10% Second Priority Notes due 2015.[3291]   During the phone call, Sambur informed Melchiorre and Roselli, *inter alia*, that CEC was selling 5% of CEOC stock and requested that Chatham participate in the B-7 Transaction as a lender, and that

---

[3284]   *Id.* at CEOC_INVESTIG_00127405.

[3285]   *Compare* Scoggin SPA (May 5, 2014), at CEOC_INVESTIG_00125501 [CEOC_ INVESTIG_00125495], Chatham SPA (May 5, 2014), at CEOC_INVESTIG_00125-987 [CEOC_INVESTIG_00125981], *and* Paulson SPA (May 5, 2014) at CEOC_INVESTIG_ 00127410 [CEOC_INVESTIG_00127403] *with* CEC Meeting of the Board of Directors" and "Resolutions of the Board of Directors" (Apr. 28, 2014) at CEOC_INVESTIG_00126738 [CEOC_INVESTIG_00126737].

[3286]   *See, e.g.,* Chatham SPA (May 5, 2014), at CEOC_INVESTIG_00125987 [CEOC_INVEST-IG_00125981].

[3287]   *Wilmington Savs.*, T. Wallach Sept. 28, 2015 Tr. at 75:16-76:14.

[3288]   *Id.* at 75:22-23, 78:7-9.

[3289]   *See* Chatham SPA (Chatham) (May 5, 2014), at CEOC_INVESTIG_00125990 [CEOC_ INVESTIG_00125981].

[3290]   *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 48:5-8.

[3291]   *See* Appendix 12-8, Chatham Repurchase at Premium Over Market and Chatham's Gain.

the B-7 Loan would result in a purchase of CEOC Notes held by Chatham.[3292]   According to Roselli, Sambur informed Chatham of CEOC's plans to repurchase the 5.625% Senior Notes due 2015 and the 10% Second Priority Notes due 2015 at par during the same call that Sambur proposed the equity sale.[3293]

According to Roselli, Sambur informed Chatham during one of their phone conversations that the equity sale would release the Bond Guarantee, and Roselli confirmed that he knew that based on his review of the indentures.[3294]   However, during his deposition in the *Wilmington Savings* litigation, Sambur denied telling Chatham that the Bond Guarantee would be released as a result of the stock sale.[3295]

Chatham states that it viewed the stock sale as an "attractive investment."[3296] While Chatham knew that CEOC was running at a negative cash flow, Chatham says it focused on the fact that CEOC had cash on its balance sheet and was paying its interest.[3297]   Notwithstanding its optimistic outlook on the equity sale, the only material Chatham was provided relating to the stock sale was the actual stock purchase agreement.[3298]   Additionally, Chatham did not conduct an independent valuation of the CEOC stock before it decided to purchase it because Chatham felt that it was only making a small investment and that the 2008 and 2009 exchanges qualified as a strong, comparable precedent.[3299]   Chatham had a vested interest in keeping CEOC out of bankruptcy.   As discussed above, Chatham held CDS positions in CEOC with a stake in seeing CEOC not default in its obligations and had committed to invest funds in the B-7 Loan and the loan for CGPH in the Four Properties Transaction.   In addition, Chatham received payments on its 5.625% Senior Notes due 2015 and 10% Priority Notes due 2015, whose market value would have declined upon the announcement of the Bond Guarantee Release.   Indeed, less than two months prior to entering into the 5% Stock Sale, on March 12, 2014, an e-mail exchange between Roselli and Melchiorre refers to a statement by an RBC analyst that notes the "need for CZR to extend operations beyond a 'look-back' period for potential litigation keep [sic] this story going for at least another couple of years."[3300]

---

[3292]   *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 50:11-22.

[3293]   *Id.* at 48:11-15; Tr. 174:21-25.   *See also* e-mail exchange between G. Roselli and A. Melchiorre (Apr. 23, 2014) at PRIV_INVESTIG_00058546 [PRIV_INVESTIG_00058546].

[3294]   *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 76:13-77:5.

[3295]   *Wilmington Savs.*, D. Sambur Sept. 9, 2015 Tr. at 257:10-15.

[3296]   *Wilmington Savs.*, G. Roselli Sept. 30, 2015 Tr. at 57:23-25; 58:3-12; 58:23-59:21; 59:22-60:6; 69:6-7.

[3297]   *Id.* at 70:13-23.

[3298]   *Id.* at 81:6-9.

[3299]   *Id.* at 137:3-11.

[3300]   E-mail from G. Roselli to A. Melchiorre and E. Ratner quoting "RBC CZR note intro" (Mar. 12, 2014) at CHATHAMCES000002 [CHATHAMCES000002]; *see also* "Caesars

### d. Discussions with Paulson

In early 2010, Paulson purchased the Paulson Notes, which had a face value of approximately $1.1 billion, on the public market.[3301]   On November 23, 2010, Paulson exchanged the Paulson Notes for the right to purchase approximately 9.9% of CEC's common equity at a discount.[3302]   Paulson was subsequently viewed by CEC and Apollo as a proponent of CEC.[3303]   However, despite the financial issues confronting CEOC, the Sponsors and CEC never considered exchanging the Paulson Notes for CEOC equity.   Nor, for that matter, did CGP when it received the Paulson Notes from CEC as CEC's capital contribution.

In early May 2014, Sambur reached out to Wallach to inquire whether Paulson would be interested in purchasing CEOC stock in connection with the 5% Stock Sale.[3304]   At the time of the 5% Stock Sale, Paulson held at least 9.9% of CEC equity and had equity in CAC as well, and also had an investment in CEOC Notes.[3305]   Accordingly, Wallach indicated that any purchase of stock by Paulson would be limited by gaming regulatory issues, *i.e.,* staying below 10% ownership.[3306]   Sambur informed Wallach that the 5% Stock Sale was important for the B-7 Loan and the potential B-7 lenders refused to share the guarantee with second lien bondholders.[3307]   Wallach understood that one benefit of removing the Bond Guarantee, which was one of the results of purchasing the CEOC equity, was that it would facilitate bank financing.[3308]   Sambur, however, during his deposition in the *Wilmington Savings* litigation and his interview with the Examiner, denied discussing with Wallach the release of the Bond Guarantee in connection with the stock sale, although Sambur recognized that the link might have been obvious.[3309]

Paulson was interested in purchasing CEOC stock because it was priced at option value and as CEC equity holders, Paulson's holdings in CEC equity would benefit from the Bond Guarantee release.[3310]   Paulson placed a value on the Bond Guarantee release.   According to Paulson, since the market already thought the Bond Guarantee would be released, Paulson did

---

Entertainment Corporation – In line with guidance but still a rough quarter" (Mar. 12, 2014), at CHATHAMCES005619 [CHATHAMCES005617].

[3301]   *See* CEC Form 8-K (June 3, 2010), at Ex. 99.1; *Wilmington Savs.*, T. Wallach Sept. 28, 2015 Tr. at 31:8-32:11.   *See also* B-7 Figure 5.

[3302]   *See* Harrah's Entertainment Form 8-K (June 3, 2010), at Ex. 99.1.

[3303]   J. Beato Sept. 24, 2015 Tr. 80:8-21.

[3304]   *Wilmington Savs.*, T. Wallach Sept. 28, 2015 Tr. at 54:12-55:18.

[3305]   *Id.* at 30:16-20.

[3306]   *Id.* at 59:18-22.

[3307]   *Id.* at 55:25-56:19.

[3308]   *Id.* at Tr. 57:16-58:7.

[3309]   *Wilmington Savs.*, D. Sambur Sept. 9, 2015 Tr. at 253:10-15.

[3310]   *Wilmington Savs.*, T. Wallach Sept. 28, 2015 Tr. at 65:25-66:6.

not expect significant overnight value added to the equity as a result of a transaction to officially effectuate the release.[3311]

Wallach spoke to Sambur about the terms of the sale[3312] and characterized it as a "quick back and forth"[3313] that resulted in an agreed upon price.[3314] Similar to the negotiations of Scoggin and Chatham, no one within Caesars management provided Paulson with any information on the valuation of the stock prior to the equity purchase.[3315]

### e. Discussions with Scoggin

In April 2014, Sambur reached out to Curtis Schenker of Scoggin[3316] to inquire whether Scoggin would be interested in purchasing CEOC stock as a part of the 5% Stock Sale.[3317] Scoggin was a holder of CEC equity.[3318] Schenker or Craig Effron (of Scoggin) was informed by Apollo, namely Sambur or Rowan, that CEC was going to use the stock sale as a basis to terminate or otherwise release the Bond Guarantee.[3319] Though Sambur denied telling Scoggin that the Bond Guarantee would be released as a result of the stock sale during his deposition in the *Wilmington Savings* litigation,[3320] Scoggin believed that the 5% Stock Sale would release the Bond Guarantee, which, in turn, would cause CEC's stock to increase in value.[3321]

Scoggin's belief was supported by an internal valuation that analyzed the impact that the stock sale would have on Scoggin's holdings of CEC's stock.[3322] The analysis showed that the accretion to the CEC stock would be far in excess of the amount that Scoggin would use to

---

[3311] *Id.* at 94:2-20.

[3312] *Id.* at 63:6-10.

[3313] *Id.* at 97:16-21.

[3314] *Id.* at 61:25-62-5.

[3315] *Id.* at 87:9-88:13.

[3316] *See Wilmington Savs.*, D. Sambur Sept. 9, 2015 Tr. at 255:14-20.

[3317] *See id.* at 693:14-19; *Wilmington Savs.*, G. Dhingra Sept. 29, 2015 Tr. at 70:25-71:6, 91:18-23.

[3318] *Wilmington Savs.*, G. Dhingra Sept. 29, 2015 Tr. at 53:16-24.

[3319] Gautam Dhingra, an analyst at Scoggin, testified that he had conversations with Effron and Schenker prior to the May 2014 stock sale concerning Apollo's desire to have Scoggin participate in the stock sale transaction, with the understanding that the sale would release the Bond Guarantee under the various indentures. *See Wilmington Savs.*, G. Dhingra Sept. 29, 2015 Tr. at 49:2-5, 72:11-15, 74:2-3.

[3320] *Wilmington Savs.*, D. Sambur Sept. 9, 2015 Tr. 257:10-15 ("Q. I asked you this about Paulson but not about Chatham or Scoggin. Did you discuss with either Chatham or Scoggin the release of the parent guarantee that might ensure from the purchase of this equity?  A. No.").

[3321] *Wilmington Savs.*, G. Dhingra Sept. 29, 2015 Tr. at 49:2-5, 110:19-25.

[3322] *Id.* at 96:1-9.

purchase the CEOC stock.[3323]  The valuation model, however, does not include any analysis as to the value of CEOC's common equity.[3324]

Ultimately, Scoggin committed to pay $1 million for shares of CEOC stock.[3325]

### f.   Impact of the Sale and Release of the Bond Guarantee on the Market Price

On May 6, 2014, CEC announced the completion of the 5% Stock Sale in a press release.[3326]  CEC expressed that the "sale of [CEOC] equity could, once listed, result in a liquid and tradable equity currency that may facilitate future capital markets transactions."[3327]  CEC also stated that the 5% Stock Sale resulted "in the release of the [CEC] [G]uarantee of CEOC's bonds in accordance with the terms of the bond indentures."[3328]  The announcement further stated that CEC "may seek to expand the group of investors with a goal of increasing the number of holders of CEOC equity in order to help qualify the CEOC equity for listing on a national securities exchange."[3329]

Immediately after the sale was announced, market analysts commented on the impact to the bondholders and to CEC.  With respect to the bondholders' diminishing leverage, Bloomberg reported that the sale "means some bond investors will no longer hold a claim to the parent company's assets and will have less bargaining power in debt restructuring negotiations."[3330]  The 9% Senior Secured Notes due 2020 "plummeted 9.25 cents" after the sale to "78 cents on the dollar" because "the parent guarantee evaporates if the borrower [*i.e.*, CEOC] is no longer wholly owned."[3331]

In contrast, shares of CEC rose a total of 14% from the time of the announcement on May 6, 2014 to the following day, May 7, 2014.[3332]  Also on May 7, 2014, the trading volume was more than four times the previous day's trading volume.[3333]

---

[3323]  *Id.* at 98:7-13.

[3324]  *Id.* at 115:3-12.

[3325]  *Id.* at Tr. 46:16.

[3326]  CEC Form 8-K (May 6, 2014) at Ex. 99.3.

[3327]  *Id.*

[3328]  *Id.*

[3329]  *Id.*

[3330]  E-mail from TPG News to D. Bonderman, *et al.* (May 7, 2014) at CEOC_INVESTIG_00265775 [CEOC_INVESTIG_00265775].

[3331]  E-mail from TPG News to D. Bonderman, *et al.* (May 13, 2014) at CEOC_INVESTIG_00265881 [CEOC_INVESTIG_00265880].

[3332]  *See* e-mail from TPG News to D. Bonderman, *et al.* (May 7, 2014) at CEOC_00265776 [CEOC_INVESTIG_00265775]; NASDAQ.com Caesars Entertainment Corporation Historical

### 3.  The Examiner's Findings and Conclusions

Based on his review of the evidence, the Examiner concludes that:

The B-7 Transaction.  Claims against the B-7 lenders for actual or constructive fraudulent transfer in providing first lien loan proceeds to CEOC to pay off its maturing junior debt and for fees and expenses associated with the B-7 Transaction are between not viable and weak.  The B-7 lenders provided $1.75 billion in loans to CEOC in exchange for liens of $1.75 billion, with almost $800 million of the B-7 Loan simply refinancing other Term Loan B debt.  Accordingly, the B-7 Lenders provided reasonably equivalent value.  In addition, constructive fraudulent transfer claims and state law actual fraudulent transfer claims brought under section 544 of the Bankruptcy Code against the B-7 lenders are likely protected under Bankruptcy Code section 546(e), although some creditors have disputed this.[3334]

With respect to claims of actual fraudulent transfer under the Bankruptcy Code, while the lenders knew that B-7 Loan proceeds would be used in part to pay maturing junior debt, that fact alone is insufficient to state a claim that the B-7 lenders somehow hindered, delayed or defrauded CEOC's creditors.  The payment of maturing junior debt, without more, is generally not an actual fraudulent transfer.[3335]  In addition, the B-7 lenders may well have an affirmative good faith defense under section 548(c) of the Bankruptcy Code, which the Examiner has not fully investigated.

Because, as set forth below, there is no estate fraudulent transfer claim for the purported release of the Bond Guarantee, the B-7 lenders' alleged role in the stripping of the Bond Guarantee also does not result in an estate claim.

Tender Offers for Second Priority Notes.  The Examiner similarly concludes that claims against holders of Second Priority Notes due 2015 for constructive fraudulent transfer are between not viable and weak.  These noteholders were simply repaid on their outstanding notes

---

Stock Prices, *available at* http://www.nasdaq.com/symbol/czr/historical (last visited Mar. 7, 2016).

[3333] *Id.*

[3334] *See, e.g., Official Comm. Of Unsecured Creditors v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings, Inc.)*, 469 B.R. 415 (Bankr. S.D.N.Y. 2012).  New York law would likely apply to state fraudulent transfer claims for the B-7 Transaction, as it was negotiated, arranged for, agreed to and consummated in New York, and the B-7 Amendment and First Lien Credit Agreement are governed by New York law.  However, choice of law is likely irrelevant here.  As discussed in Appendix 5, Legal Standards at Section III.D, all state law fraudulent transfer claims, whether actual or constructive, would be barred under Bankruptcy Code section 546(e).

[3335] *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005) ("[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors. . . . " (quoting *HBE Leas. Corp.* v. *Frank*, 48 F.3d 623, 634 (2d Cir. 1995)).

more than 90 days prior to the Petition Date. In addition, with respect to constructive fraudulent transfer claims and state law actual fraudulent transfer claims, payment of these notes by CEOC is likely protected under Bankruptcy Code section 546(e).[3336]

Claims for actual fraudulent transfer under the Bankruptcy Code against these noteholders (other than Chatham) are between not viable and weak. A payment of pre-existing debt outside the preference period, without more, is not a fraudulent transfer.[3337] These noteholders simply tendered their notes in response to an offer to repurchase by CEOC. Accordingly, noteholders (other than Chatham) likely have an affirmative good faith defense pursuant to Bankruptcy Code section 548(c) to any actual fraudulent transfer claim, which the Examiner has not fully investigated.

<u>Tender Offer for 5.625% Senior Notes due 2015</u>. The Examiner has also concluded that claims for constructive fraudulent transfer against holders of the 5.625% Senior Notes due 2015 are between not viable and weak. These noteholders were simply repaid on their outstanding notes more than 90 days prior to the Petition Date. In any event, this transaction is likely protected under Bankruptcy Code section 546(e) from constructive fraudulent transfer claims and state law actual fraudulent transfer claims.

Claims for actual fraudulent transfer under the Bankruptcy Code against these noteholders (other than CGP and Chatham) are also between not viable and weak. These noteholders simply tendered their notes in response to an offer to repurchase by CEOC, and, accordingly, they likely have a good faith defense pursuant to Bankruptcy Code section 548(c) to any actual fraudulent transfer claim, which the Examiner has not fully investigated.

<u>CGP</u>. Based on a review of the evidence, the Examiner concludes that a claim for actual fraudulent transfer against CGP, an affiliate which received $452 million for repurchase of its 5.625% Senior Notes due 2015, is reasonable. The B-7 Loan was arranged by Apollo, which along with TPG, controlled CGP through their majority ownership in CAC. CGP, an affiliate of CEOC, obtained these notes from CEC when CGP was formed. Eight months later, CEOC paid $452 million to repurchase these junior priority Notes at a premium at a time when CEOC was deeply insolvent and the Notes were trading at a discount. And in a break from past practices, rather than seek an agreement for a reduction in principal, Apollo and CEC offered CGP a small premium. If these notes had not been repurchased by CEOC, they would have declined in value following the announcement of the Bond Guarantee release.

Various badges of fraud are thus present, including insolvency, related party transaction and no independent process at CEOC to approve the B-7 Transaction. Moreover, CEC and Apollo arranged the B-7 Transaction with the specific intent that these notes be repurchased and caused CEOC to enter into a stand-alone agreement with CGP to repurchase these notes. As part of that agreement, CGP had agreed to participate in the B-7 Transaction as a lender on a dollar-

---

[3336] As noted above, New York law would likely apply to fraudulent transfer claims, but Bankruptcy Code section 546(e) would preclude all actual or constructive fraudulent transfer claims regardless of which state law applies.

[3337] *See Sharp Int'l* , 403 F.3d at 54.

for-dollar basis, meaning that for each dollar of notes repurchased by CEOC, CGP would agree to lend as part of the B-7 Transaction. In the end, however, this did not happen. The B-7 Loan was oversubscribed, and a decision was made not to allocate any portion of the loan to CGP, but CGP's notes were nevertheless repurchased for $452 million. While paying 2015 maturities may have been a legitimate purpose, there is a good argument that, given all the related transactions, the financial condition of CEOC, the need for CEOC to use $315 million of its own cash in connection with this and related transactions, and the lack of any independent board to approve the transaction at CEOC, the natural consequence of this payment to CGP was to hinder other CEOC creditors from being paid.

There are arguments against actual fraudulent transfer claims against CGP. CGP validly acquired its 5.625% Senior Notes due 2015 from CEC. These notes had been acquired by CEC as part of a debt for equity exchange with Paulson. The amounts received by CGP were no greater than amounts received by other holders of the 5.625% Senior Notes due 2015. However, it is important to note that 94% of the 5.625% Senior Notes due 2015 purchased by CEOC at a premium as part of the B-7 Transaction were owned by CGP, an insider, and Chatham, which purchased the largest amount of CEOC stock as part of the 5% Stock Sale. Other holders of CEOC Notes that were paid as part of the B-7 Transaction would have an affirmative defense under Bankruptcy Code section 548(c). However, CGP does not likely have such a defense given its knowledge of CEOC's insolvency – in the Four Properties Transaction, for example, it had been unable to obtain a solvency representation for CEOC. In addition, CGP would likely be unable to demonstrate that it participated in the B-7 Transaction without knowledge of the potential voidability of the transfer, given the fact that CGP obviously knew that it was receiving a premium on notes that were trading below par, and that it was receiving this payment from an entity controlled by its largest shareholders (CEC and the Sponsors).

Chatham. Claims for actual fraudulent transfer against Chatham, which received $420 million as part of the B-7 Transaction for repurchase of its 10% Second-Priority Notes due 2015 and its 5.625% Senior Notes due 2015, are plausible, and could be stronger with additional investigation. Chatham purchased a portion of these notes after December 2013, and its investments in Caesars during this period reportedly increased to 31% of all of Chatham's investments. Chatham purchased many these notes in the period shortly before the B-7 Transaction was announced.

While CEC had already determined to redeem the notes maturing in 2015, from Chatham's perspective, it was as if it was being offered a *quid pro quo*, namely, that Chatham agree to purchase CEOC stock and commit to being a B-7 lender, and in exchange the B-7 Loan would be used to purchase Chatham's substantial holdings of CEOC Notes at par plus accrued interest together with a make whole premium. Moreover, if the Bond Guarantee had been released without these notes having been paid, their value would have materially declined.

Given its e-mails about CEOC's financial condition discussed above, at the time of Sambur's proposal, Chatham was aware that serious questions regarding CEOC's solvency had been raised, and understood that CGP was "cherry-picking" the best assets from CEOC, thereby threatening its future viability and value. In other words, Chatham was aware that Sambur was offering to Chatham the opportunity to purchase stock that the Examiner believes was clearly worthless as part of the 5% Stock Sale. Given its knowledge of CEOC's precarious financial

condition and that Chatham was receiving repayment at par for notes trading at a discount to par, if this is an actual fraudulent transfer, Chatham may not have an affirmative good faith defense under Bankruptcy Code section 548(c).  It is certainly suspicious that a large volume of CEOC Notes, particularly the 5.625% Senior Notes due 2015, were purchased by Chatham just prior to the B-7 Transaction.  As discussed above, in the month prior to the announcement of the B-7 Transaction, Chatham nearly doubled its holdings of aggregate principal amount of the 10% Second Priority Notes due 2015 (increasing from $62 million to approximately $104 million), and increased its holdings of aggregate principal amount of the 5.625% Senior Notes due 2015 (increasing 17% from $270 million to $316 million).[3338]

Chatham's purchase of CEOC equity aided the release of the Bond Guarantee.  The release of the Bond Guarantee would have devalued Chatham's notes but for the agreement by CEOC to purchase them as part of B-7 Transaction at par plus accrued interest together with a make whole premium.  Chatham also apparently shorted other CEOC Notes which had their Bond Guarantee stripped as a result of the 5% Stock Sale.

In addition, a majority of Chatham's CEOC Notes were not purchased as part of the Tender Offer; rather, they were purchased pursuant to a stand-alone note purchase agreement, and no explanation was provided as to why such an agreement was entered into, since it does not provide Chatham with any better terms than those that were part of the Tender Offer.

There are potential defenses to these claims.  The B-7 Transaction had many other aspects to it than simply paying off the CEOC Notes held by Chatham and CGP, including some benefits to CEOC, such as modifying the negative covenant in the First Lien Credit Agreement with respect to the issuance of a going concern qualification.  And these CEOC Notes were nearing maturity at the time they were paid off.  Moreover, the amounts received by Chatham were no greater than amounts received by other holders of the Senior Notes due 2015.

On balance, the payment to Chatham from an insolvent CEOC with no independent board to approve the process, Chatham's trading activity just prior to the announcement of the B-7 Transaction, and the fact that Chatham purchased the majority of the CEOC equity that was sold as part of the 5% Stock Sale which released the Bond Guarantee at the same time it was told its holdings would be purchased at par plus accrued interest, provide a plausible basis for an actual fraudulent transfer claim against Chatham.  This claim could become stronger with additional investigation, particularly with regard to the Senior Notes purchased in April 2014.

<u>The Bond Guarantee Release</u>.  The release of a parent company guarantee cannot, as a matter of law, constitute an actual or constructive fraudulent transfer claim on behalf of the estate

---

[3338] "Chatham Eureka Fund" portfolio statement (Apr. 2, 2014), at CHATHAMCES004541 [CHATHAMCES004539]; "Chatham Asset High Yield Fund" portfolio statement (Apr. 2, 2014), at CHATHAMCES004526 [CHATHAMCES004524]; "Chatham Eureka Fund" portfolio statement (May 1, 2014), at CHATHAMCES090273 [CHATHAMCES090271]; "Chatham Asset High Yield Fund" portfolio statement (May 1, 2014), at CHATHAMCES090258 [CHATHAM-CES090256].

of a debtor.  The Bond Guarantee is not property of the Debtors' estates.[3339]  Accordingly, the Examiner concludes that the purported release of the Bond Guarantee is not a fraudulent transfer that can be pursued by or on behalf of the Debtors and their estates.  The Bond Guarantee is an asset of CEC that *creditors* of CEOC, and not CEOC, can look to for payment if CEOC fails to pay its obligations.[3340]  Indeed, if the courts eventually rule that the Bond Guarantee remains in effect notwithstanding its release, CEOC will arguably be no better off, as any payments made by CEC in respect of the Bond Guarantee would result in a subrogation claim by CEC against CEOC in equal amount to any payment on the Bond Guarantee.[3341]  Simply put, no damages are suffered by the Debtors' estates as a result of the CEC Guarantee Release.

In addition, with respect to the purported release of the Bond Guarantee based on the Election, it is possible that fraudulent transfer claims can be pursued, but such claims are between not viable and weak.  Although property of estate is broadly construed, the so-called Election is an election and a notice to indenture trustees by CEOC taken after other events not in CEOC's control had occurred, and therefore, in the Examiner's view, is not property of the estate which has somehow been conveyed, fraudulently or otherwise, even if it is correct that the Bond

---

[3339]   *See, e.g.,* Appendix 5, Legal Standards at Section III.A.I.a. *See also Covey v. Commercial Nat'l Bank of Peoria (In re V. Jobst & Sons, Inc.)*, 960 F.2d 657, 661 (7th Cir. 1992); *In re Asia Global Crossing, Ltd.*, 333 B.R. 199, 204 (Bankr. S.D.N.Y. 2005) (explaining that a guarantee "gave [defendant] a chose in action against [the guarantor], conditioned on the default of GC Bandwidth.  It did not grant [the defendant] any interest in or right to [the guarantor's] property.  As such, it was an 'obligation' rather than a 'transfer.'"); *Silverman v. Paul's Landmark, Inc. (In re Nirvana Rest. Inc.)*, 337 B.R. 495, 508 (Bankr. S.D.N.Y. 2006).

[3340]   *See* 11 U.S.C. §541(a)(1) (defining a debtor's property in pertinent part as "all legal or equitable interests of the debtor"); *Indus. Enters. Of Am. v. Tabor Academy (In re Pitt Penn Holding Co., )*, No. 09-11475 (BLS), 2011 WL 4352373, at *5 (Bankr. D. Del. Sept. 16, 2011) (quoting *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983)) (construing the definition to include "a broad range of property to be included in the estate"); 5 Collier on Bankruptcy, ¶547.03[2] (16th ed. rev. 2015) [hereinafter *Collier*] (stating that when considering whether property is an asset of the debtor, "[t]he fundamental inquiry is whether the transfer diminished or depleted the debtor's estate").  *See Indep. Nissan,Inc. v. Vogue Coach Co. (In re Vogue Coach Co.)*, 132 B.R. 454, 457 (Bankr. N.D. Okla. 1991) (citing *Collier*, ¶547.03[2], 15th ed. 1991) ("Essentially, the transfer must diminish directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one."); *see also Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.)*, 16 F.3d 313, 316 (9th Cir. 1994) (applying the "diminution of estate" doctrine to determine if property that is transferred belongs to the debtor); *Danning v. Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1217 (9th Cir. 1988) ("Generally, property belongs to the debtor for purposes of §547 if its transfer will deprive the bankruptcy estate of something which could otherwise be used to satisfy the claims of creditors."); *Coral Petroleum, Inc. v. Banque Paribas-London (In re Coral Petroleum, Inc.)*, 797 F.2d 1351, 1355-56 (5th Cir. 1986) (holding that debtor has an interest in property under § 547 if the transfer diminishes the bankruptcy estate) (citations omitted).

[3341]   11 U.S.C. §509.

Guarantee would not be released if the election was not made and notice was never sent.  In addition, the Bond Guarantee Release could arguably have been effectuated through the 5% Stock Sale and other methods, and therefore there would be no damages caused by use of the Election.  And, as discussed above, there are no fraudulent transfer claims with respect to the Bond Guarantee release.[3342]

The 5% Stock Sale.  No actual or constructive fraudulent transfer claims can be stated with respect to the 5% Stock Sale.  No damages were suffered by CEOC in connection with the transfer by CEC of worthless CEOC stock.  Even if the stock had value, because common stock of a company is not property of that company, transfer of common stock by CEC does not result in an estate claim as a matter of law.[3343]

Breach of Fiduciary Duty.  The issue as to whether breach of fiduciary duty and aiding and abetting claims arising out of the B-7 exist against CEC, CEOC directors and the Sponsors is more complex.  First, it is difficult to disaggregate the B-7 loan from the covenant and guarantee changes which occurred and the use of the proceeds from the loans.  They were all negotiated at the same time.  Looking at the package as a whole, there were clear benefits to CEOC – the elimination of 2015 maturities, the material improvement of the SSLR covenant and the elimination of a going concern event of default.  The latter change, however, was less meaningful since it applied only to the Term Loan and not the indentures, thereby still leaving the potential for a cross default on the Term Loan in the event of a going concern qualification.

---

[3342] One of the positions asserted by CEC is that the Election properly terminated the Bond Guarantee with respect to certain of the CEOC Notes.  Whether this position under the indentures is correct is part of the ongoing litigation on which the Examiner takes no position. However, certain holders of the CEOC Notes have asserted that because an action was required by CEOC to effectuate the Election, namely, CEOC was required to make the Election and provide a formal notice of the Election to the indenture trustee of the affected CEOC Notes, the Election by CEOC was a property interest of CEOC that was transferred for no consideration, and therefore constitutes a fraudulent transfer.  The other purported methods to release the Bond Guarantee all relate to acts only performed by CEC, such as the 5% Stock Sale; the Election is the one purported method that involved an action by CEOC to arguably cause the Bond Guarantee to be released.

[3343] *See* Appendix 5, Legal Standards at Section III.A.1.a. Courts are in general agreement that the transfer of debtor stock, once held by stockholders, does not constitute a transfer of debtor property because "a corporation has no such interest in shares of its stock held by stockholders." *Victor v. Riklis*, No. 91 CIV. 2897 (LJF), 1992 WL 122911, at *4 (S.D.N.Y. May 15, 1992) (citing *In re Journal–News Corp.*, 193 F.2d 492 (2d Cir. 1951); *In re  Calamity Jane's, Inc.*, 22 B.R. 5, 7 (D.N.J. 1982)); *see also Uranga v. Geib (In re Paso Del Norte Oil Co.)*, 755 F.2d 421, 424 (5th Cir. 1985) ("It is widely recognized, and we have previously held, that a corporation, even if a debtor in bankruptcy, has no property interest in the shares of its stock owned by shareholders." (citing *In re Texas Consumer Fin. Corp.*, 480 F.2d 1261, 1266 (5th Cir. 1973); *Journal-News Corp.,* 193 F.2d at 492 ); *Global Crossing Estate Rep. v. Winnick*, No. 04-CIV-2558 (GEL), 2006 WL 2212776, at *8 n.10 (S.D.N.Y. Aug. 3, 2006) (differentiating between cases that establish a corporation has no property interest in shares held by its shareholders, compared to stock held by the corporation).

At the same time these benefits came at a significant cost – increased interest expense, very significant fees and expenses and over $1 billion was paid to more junior creditors, including more than $850 million in the aggregate to an affiliate in which the Sponsors had a majority economic interest and to an entity who at the request of the Sponsors was buying CEOC equity to release the Bond Guarantee. While the Sponsors regularly sought to capture the discount in CEOC debt including, for example, by negotiating for such discounts in the CERP transaction, no apparent effort was made to negotiate a discount here. Indeed, premiums were paid over market price, including to CGP. Also, and most significantly, while paying over $795 million in debt not maturing until 2016-2017, $315 million of cash was used from a deeply insolvent CEOC which would need to do the impossible – to increase EBITDA to $2.2 billion in 2015 (a 115% increase) – just to be cash flow break-even. There was no reason from CEOC's perspective to use this $315 million to pay 2016-2017 maturities. While doing so arguably encouraged lenders to agree to the conversion of the Bank Guarantee to one of collection – this change primarily benefited CEC and its equity holders. And Bonderman told the Examiner that a benefit of releasing the Bond Guarantee was that it increased the leverage on CEOC's creditors. It has been argued, however, that these changes to the guarantee gave CEC more flexibility in assisting CEOC in resolving its debt issues and the Debtors' proposed plan of reorganization does include material support from CEC. Releasing the Bond Guarantee also presumably allowed for a lower interest rate than otherwise would have existed, although having the Bank Guarantee become one of collection could have had the opposite effect.

In evaluating whether entering into the B-7 loan and using the proceeds in the manner discussed above give rise to breach of fiduciary duty and aiding and abetting claims, it is clear that if CEOC had independent directors, it is likely no such claims would be viable. That was not the case here. Rather, a Sponsor and CEC director negotiated these agreements and only the CEC Board meaningfully considered them. The CEOC Board approved them through a written consent process. But the Sponsors and CEC were heavily conflicted, particularly given the link of the guarantee provisions to the B-7 loan. Moreover, independent directors were added to the CEOC Board in June 2014 – before these transactions closed – but no effort was made to see if they would ratify these transactions. Based on all the relevant facts, the Examiner has concluded that pursuant to the entire fairness standard there are reasonable breach of fiduciary duty claims against the CEOC directors who approved the B-7 Transaction and CEC (as controlling shareholder), and reasonable aiding and abetting claims against Apollo and an Apollo CEC Director arising out of the B-7 Transaction and accompanying use of proceeds, including in particular the $452 million paid to CGP, whose largest shareholders (directly or indirectly) were CEC and the Sponsors.[3344] The strongest element of damages from such a claim would be the $452 million paid to CGP and the $315 million in cash used by CEOC paid in connection with the B-7 loan. The one clear benefit from the B-7 Loan – the payment of 2015 maturities – could have been achieved without expending this $315 million, and the later maturities did not have to be prepaid other than potentially to garner support from the lenders to agree to modification of the Bank Guarantee. Additional damages could arguably be the present value of the added interest expense ($111 million), but that assumes no loan was made, rather than simply not paying more maturities and expenses than could be paid from the proceeds of the B-7 loan.

---

[3344]    After the announcement, CEC's stock price increased by approximately 14%.

## C.  The 2014 Performance Incentive Plan

On May 30, 2014, less than a month after the 5% Stock Sale, approximately 6% of CEOC's common stock was conveyed to 376 CEC and CEOC employees pursuant to a newly, and hastily, created Performance Incentive Plan (the "PIP").[3345]  As discussed below, the PIP differed from other Caesars employee incentive plans in a number of material respects.  Although CEC witnesses have sought to justify the creation of the PIP as an ordinary course business decision that was designed to align Caesars employees' interests with the interests of CEOC and better position CEOC for a public listing of its stock, there is persuasive evidence that in May 2014 CEOC common stock had a negative equity value (*i.e.* deficit).[3346]  It thus appears that a principal, if not the primary, purpose of the PIP was to provide additional support for CEC's and the Sponsors' position that the CEC Guarantee had been released.

As is the case with the 5% Stock Sale, creditors have asserted that the PIP was a sham transaction and that the CEC Guarantee has, accordingly, not been released.  Creditors have also argued that the CEOC Board breached its fiduciary duties in adopting the PIP.  As discussed below, the Examiner has concluded that the adoption of the PIP, and the issuance of essentially worthless CEOC common stock thereunder, does not give rise to any legally cognizable claim on behalf of the Debtors' estates.

### 1.  Implementation of the PIP

The PIP was first proposed by Marc Rowan[3347] at a meeting of the Human Resources Committee (the "HRC") of the CEC Board of Directors on May 7, 2014,[3348] the day after the public announcement of the B-7 Transaction and the 5% Stock Sale.  Attending the meeting were Rowan, Kelvin Davis of TPG and CEC independent director Lynn Swann.[3349]

Rowan and Sambur thereafter advised Mary Thomas, CEC's Executive Vice President of Human Resources, on how the PIP should be structured.[3350]  On May 17, 2014, Rowan directed

---

[3345]  CEOC 8-K filed on June 27, 2014, at 2.

[3346]  *See* Section VI.

[3347]  S. Wiegand Nov. 6, 2015 Tr. at 99:11-18.

[3348]  CEC HRC Meeting Minutes (May 7, 2014), at CEC_EXAMINER_0011339 [CEC_EXAMINER_0011337]; *Wilmington Savs.*, M. McLellan Sept. 2, 2015 Tr. at. 266:21-267:10; *Wilmington Savs.*, M. Rowan Aug. 26, 2015 Tr. at 244:20-246:2.

[3349]  CEC HRC Meeting Minutes (May 7, 2014), at CEC_EXAMINER_0011339 [CEC_EXAMINER_0011337].

[3350]  *Wilmington Savs.*, D. Sambur Sept. 10, 2015 Tr. at 523:4-13 ("A:  I'm a board member of CEC and CEOC, as well as an employee of Apollo.  And Mary [Thomas] frequently reaches out to me for advice regarding human resources matter.  Q:  Would you have been acting as a representative or agent of Mr. Rowan who was a member of the human resources committee?  MR. CLAYTON [Counsel for Mr. Sambur]:  Objection to the form.  A:  I don't know."); R. Goldich Sept. 18, 2015 Tr. at 27:16-28:20 (stating that he believed that Apollo was involved in developing the plan because "as one of [Caesars'] most important shareholders, they advise us

Thomas to prepare a preliminary list of the PIP's eligible recipients for the Sponsors by May 19, 2014.[3351] Thomas was also told that "the timing of the employee grants is a consideration."[3352] When Thomas asked about the potential size of the eligible participants, Sambur responded that Apollo's preference was to award shares to a large number of employees.[3353]

Later that day, Michael McLellan, CEC's Vice President of Compensation and Leadership Development, prepared three possible structures for the PIP based on the number of eligible participants for the Sponsor's review.[3354] Each structure presumed a total value of $6 million of CEOC stock would be distributed,[3355] but contemplated a different number of recipients, ranging from a low of 129 to a high of 392.[3356]

Ultimately, the Sponsors (with the assistance of Paul Weiss) decided that the grant should (i) equal 6% of the total shares, (ii) be extended to the largest of the three groups identified by McLellan[3357] (which necessitated a stock split), and (iii) be limited to CEC and CEOC employees (as opposed to directors or CAC employees).[3358] According to Rowan, the underlying rationale for choosing both CEC and CEOC employees was based on the fact that other recently adopted plans, *i.e.*, the Crossover Incentive Plan and the Long Term Incentive Plan, had included both CEC and CAC[3359] employees as participants, and that doing so helped align the interests of

---

on all of [our] equity plans" and recalling that Rowan had spoken to either Thomas or McLellan "about the need for the plan or that the plan was happening").

[3351] E-mail exchange between M. McLellan and K. Wendtland (May 19, 2014), at CEC_EXAMINER_0027141 [CEC_EXAMINER_0027141]; E-mail exchange between D. Sambur, A. van Hoek, M. Thomas, and M. McLellan (May 18, 2014), at CEC_EXAMINER_0027161-62 [CEC_EXAMINER_0027161].

[3352] E-mail exchange between D. Sambur, A. van Hoek, M. Thomas, and M. McLellan (May 18, 2014), at CEC_EXAMINER_0027162 [CEC_EXAMINER_0027161].

[3353] *Id*. at CEC_EXAMINER_0027161.

[3354] E-mail from M. McLellan to M. Thomas (May 18, 2014), at CEC_EXAMINER_0027164 [CEC_EXAMINER_0027164] (attaching three proposed structures).

[3355] *Id*.; Attachment to E-mail from M. McLellan to M. Thomas (May 18, 2014), at CEC_EXAMINER_0027166 [CEC_EXAMINER_0027166] (native file).

[3356] E-mail from M. McLellan to M. Thomas (May 19, 2014), at CEC_EXAMINER_ 0027133 [CEC_EXAMINER_0027133]; attachment to e-mail from M. McLellan to M. Thomas (May 19, 2014), at CEC_EXAMINER_0027135-40 [CEC_EXAMINER_0027135].

[3357] E-mail exchange between A. van Hoek and M. McLellan (May 28, 2014), at APOLLO-Examiner_00128620 [APOLLO-Examiner_00128620].

[3358] *Id.*

[3359] *See Wilmington Savs.*, M. McLellan Sept. 2, 2015 Tr. at 77:6-18 (asserting, without certainty, that CAC employees were not involved because CAC employees "ha[d] their own plan"); *Wilmington Savs.*, A. van Hoek Sept. 21, 2015 Tr. at 257:3-5 (notwithstanding his instruction to remove all CAC employees, he was unable to provide any reason at his deposition why CAC direct employees were removed from the list of potential recipients).

employees within the diversified Caesars enterprise by giving them a stake in the overall success of "Caesars."[3360]

It was only after these structural decisions were made by the Sponsors that the PIP was presented first to the CEC HRC and then to the CEOC Board for approval by written consent. The resolutions presented to the HRC advised the members (Davis, Swann and Rowan) that the purpose of the PIP was "to promote the success of the Company and CEOC by providing an additional means, through the grant of CEOC equity-based compensation awards, to motivate, retain and reward selected employees, officers directors, consultants and advisors of the Company, CEOC and their respective subsidiaries."[3361] No mention was made of the fact that increasing the number of owners and further diluting CEC's equity stake would also have the beneficial effect of enhancing CEC's position that its guarantee of CEOC's debt no longer existed.

The Sponsors and the HRC proceeded quickly to finalize the terms of the PIP, far faster than it took to develop and implement other incentive plans. While these other incentive plans were developed (in some cases with the assistance of external consultants)[3362] and effectuated over a period of three to six months,[3363] the PIP was developed internally and executed in approximately one month.[3364] McLellan confirmed that the Sponsors pressured him to execute the PIP as quickly as possible.[3365] In their haste to get the PIP approved, the HRC proceeded by written consent rather than abide by company policy and wait until their next quarterly

---

[3360] *Wilmington Savs.*, M. Rowan. Aug. 26, 2015 Tr. at 179:5-16 ("Q: What were the reasons for the creation of the PIP? A: I can't be certain. From my point of view there were two reasons. One was to increase the number of holders of CEOC stock so as to facilitate listing on an exchange, and the second was that there was a lot of worry, suspicion on the part of management, particularly diversified management of the company, that they participate in each of the equities to make sure that they were in, quote, the right place."); *Wilmington Savs.*, A. van Hoek Sept. 21, 2015 Tr. at 243:4-7 ("My understanding is that the purpose of the PIP was to incentivize certain employees of CEC and/or CEOC such that they were aligned with the success of CEOC.").

[3361] CEC HRC Resolutions (May 28, 2014), at CEOC_INVESTIG_00177930 [CEOC_ INVESTIG _00177930].

[3362] R. Goldich Sept. 18, 2015 Tr. at 32:14-33:2.

[3363] *Id.* at 31:24-32:17 ("Th[e large equity grant] process can take months. In terms of working out with our board, . . . the actual specifics of the grant, in terms of the number of shares that we'll grant to employees . . . that process can take 90 days or more.").

[3364] Goldich stated that the PIP was implemented while he was on medical leave. R. Goldich Sept. 18, 2015 Tr. at 13:17-22. He further stated that his leave lasted approximately one month. *Id.* at 34:11-12. He did not recall any conversation about a plan that would involve granting CEOC equity to employees prior to his leave. *Id.* at 35:6-11.

[3365] *Wilmington Savs.*, M. McLellan Sept. 2, 2015 Tr. at 68:2-5.

meeting.[3366]   Goldich was unable when asked to articulate the reason the HRC was asked to approve the PIP off-cycle by written consent.[3367]

On May 30, 2014, Wiegand forwarded an e-mail to the members of the HRC – along with a form requesting their written consent authorizing CEOC to adopt the PIP and approving a grant of shares of thereunder to a list of CEC and CEOC employees listed in an attachment thereto.[3368]   On the same day, Rowan,[3369] Davis[3370] and Swann[3371] approved the request via e-mail, and they signed and returned the signature pages on June 2, 2014.[3372]   Later that day, and despite the fact that the CEOC Board had not yet approved the PIP or any grants thereunder, McLellan e-mailed approximately 377 Caesars employees and notified them of their eligibility to participate in the PIP.[3373]   The eligible participants were instructed to sign and return the executed forms within a three-day period.[3374]   In all, CEOC issued 86,836 shares of stock to 376

---

[3366]   R. Goldich Sept. 18, 2015 Tr. at 30:13-22, 111:23-112:12.

[3367]   *Id.* at 114:17-21.

[3368]   E-mail from S. Wiegand to M. Rowan, L. Swann, K. Davis, *et al*. (May 30, 2014), at CEC_EXAMINER_0143682 [CEC_EXAMINER_0143682]; attachments to e-mail from S. Wiegand to M. Rowan, L. Swann, K. Davis, *et al*. (May 30, 2014), at CEC _EXAMINER_0143683-721 [CEC_EXAMINER_0143683; CEC_EXAMINER_0143691; CEC _EXAMINER_0143692; CEC_EXAMINER_0143716].

[3369]   E-mail from M. Rowan to S. Wiegand (May 30, 2014), at APOLLO-Examiner_00085269 [APOLLO-Examiner_00085269].

[3370]   E-mail from K. Davis to S. Wiegand (May 30, 2014), at CEC_EXAMINER_0010734 [CEC_EXAMINER_0010734].  Upon receipt of Weigand's May 30 e-mail, Davis forwarded it to Jim Williams, Kendall Garrison and Greg Kranias of TPG asking whether Wiegand's request was "something we have been anticipating."  E-mail from K. Davis to G. Kranias, *et al*. (May 30, 2014), at TPG-Examiner_00007922 [TPG-Examiner_00007922].  Williams responded that he had not been copied on the request but that he would speak to Thomas about it. E-mail exchange between K. Davis and J. Williams, *et al*. (May 30, 2014), at TPG-Examiner_00007924 [TPG-Examiner_00007924].  Davis then asked Williams to "let me know what you think we should do after speaking with her."  *Id.*  After Kranias interjected that this was "an important plan," Williams responded to the group that the plan was "fine to approve."  E-mail exchange between K. Davis and J. Williams, *et al*. (May 30, 2014), at TPG-Examiner_00007927-28 [TPG-Examiner_00007927].

[3371]   E-mail from L. Swann to S. Wiegand (May 30, 2014), at APOLLO-Examiner_00085270 [APOLLO-Examiner_00085270].

[3372]   CEC HRC Resolutions (May 28, 2014), at CEOC_INVESTIG_00177930-00177979 [CEOC_INVESTIG_00177930].

[3373]   *See* e-mail from M. McLellan to R. Goldich (June 2, 2014), at CEC_EXAMINER_0016826 [CEC_EXAMINER_0016826]; attachments to e-mail from M. McLellan to R. Goldich (June 2, 2014), at CEC_EXAMINER_0016827 [CEC_EXAMINER_0016827] and CEC_EXAMINER _0016851 [CEC_EXAMINER_0016851].

[3374]   Multiple individuals within the Caesars family noted the urgency with which the PIP was

CEC and CEOC employees under the PIP and recorded a $7.851 million compensation expense in connection therewith.[3375]   The CEOC Board, however, did not get around to formally adopting the PIP and ratifying the grants that had been previously awarded until July 30, 2014.[3376]

There were a number of other features of the PIP that are noteworthy.   Unlike other employee incentive plans, the recipients of awards under the PIP received shares for which there was no public market.[3377]   In addition, unlike the other plans, the PIP involved the grant of shares that vested immediately.[3378]   Finally, because the shares vested immediately, each grantee became personally liable for taxes on his or her grant.[3379]   Given that the shares were not listed, were not transferable and were thus illiquid, CEC and CEOC employees did not know "when and if [the CEOC stock] w[ould] ever have value for participants."[3380] Some thought the stock was "worthless."[3381]   Even Sambur appears to have shared this view.   As discussed above,

---

pushed toward implementation. *See* R. Goldich Sept. 18, 2015 Tr. at 35:3-5 ("I don't recall the reason for the urgency.   Just that there was some urgency"); *Wilmington Savs.*, G. Loveman Oct. 13, 2015 Tr. at 133:11-15 (recalling that there was a push to complete the distribution of shares very quickly at the end of May and beginning of June).   On June 2, McLellan sent e-mails to employees eligible to participate in PIP alerting them that they had three days to complete and return their grant agreements.   E-mail exchange between M. McLellan and E. Hession (June 2, 2014), at CEC_EXAMINER_0004949-50 [CEC_EXAMINER_0004949].   When Hession responded that he was out of the office and would like to return the form the following week, McLellan replied that there was a "[f]ull court press from sponsors to get a lot of these done quickly." *Id.*   Hession responded "I wonder what the rush is." *Id.*   Likewise, Goldich stated in his interview that the company would "typically give employees a week to ten days" to sign an agreement for a plan like the PIP.   R. Goldich Sept. 18, 2015 Tr. at 29:19-30:3.

[3375] Internal Caesars Memorandum (June 6, 2014), at CEC_EXAMINER_0014603 [CEC_EXAMINER_0014603].

[3376] Proposed CEOC Resolutions (July 30, 2014), at CEOC_INVESTIG_00172695 [CEOC_INVESTIG_00172694]; e-mail from S. Wiegand to C. Dohony (Nov. 12, 2014), at CEC_EXAMINER_0010972-73 [CEC_EXAMINER_0010972]; attachment to e-mail from S. Wiegand to C. Dohony (Nov. 12, 2014), at CEC_EXAMINER_0010975-11003 [CEC_EX-AMINER_0010975].

[3377] *Wilmington Savs.*, M. McLellan Sept. 2, 2015 Tr. at 235:6-13.

[3378] *See, e.g.*, CEOC PIP Stock Award Agreement (May 30, 2014), at CEC_EXAMINER_0001230 [CEC_EXAMINER_0001225] (explaining that the awarded shares are 100% vested as of the date of grant); *Wilmington Savs.*, M. McLellan Sept. 2, 2015 Tr. at 233:16-19 ("Q: The CEOC grant was the only grant where the grant did not take the form of either options or RSU; true? A: True").

[3379] *Wilmington Savs.*, E. Hession Sept. 17-18, 2015 Tr. at 317:7-11.

[3380] E-mail from M. McLellan to R. Goldich (Sept. 8, 2014), at CEC_EXAMINER_0026881 [CEC_EXAMINER_0026881] ("CEOC is not liquid and we do not know when or of it will ever have value for participants.").

[3381] E-mail from D. Wilfong to C. Stieglitz, *et al.* (Aug. 2, 2014), at CEC_EXAMINER_0002694 [CEC_EXAMINER_0002694]; D. Wilfong Oct. 5, 2015 Tr. at 118:18-

Sambur told Rowan on June 6, 2014, that "[n]o one wants [CEOC] stock nor values it.  It's like saying we will pay them with *pixie dust*" (emphasis added).[3382]  And, as noted previously, just prior to the 5% Stock Sale, Blackstone advised the CEC Board of its view that, when applying traditional valuation methods, CEOC common stock had a negative equity value.[3383]

Others, however, believed that the awards under the PIP had some "option value" reflective of their future potential value as opposed to their present value.[3384]  No one, however, was able to identify any analysis undertaken to determine the future potential value of those shares, should they become liquid or in the event of a successful CEOC restructuring.[3385]

Rowan went one step further.  Despite Blackstone's conclusion that its valuation analysis yields a negative equity value for CEOC common stock, and that the three purchasers of the 5% of CEOC stock received financial benefits from this related transaction unrelated to the value of the CEOC stock, Rowan said he believed "the market" had set the value of CEOC common stock by virtue of the price paid by investors in the 5% Stock Sale.[3386]  Accordingly, for tax reporting

---

119:7 ("A.  Because it was August of 2014 and it seemed likely to me that I would never get much value out of that by that time.  Q.  The CEOC stock?  A.  Correct.  Q.  And why did you think that the stock was really worthless?  A.  It was my perception of . . . what value I would ultimately realize from the grant of that stock . . . so I didn't at that time believe I would get any value from the grant of that stock."); *id.* at 120:2-7 ("A.  That was my perception of whether I would ever realize its value.  They would have to list their stock, and I would have to wait some period of time.  I knew I was interviewing for jobs at that time, and I never thought I would realize any value.").

[3382]  E-mail from D. Sambur to M. Rowan (June 6, 2014), at APOLLO-Examiner_00719706 [APOLLO-Examiner_00719706].

[3383]  E-mail from T. Donovan to E. Hession, *et al.* (Apr. 21, 2014), at CEOC_INVESTIG_00111436 [CEOC_INVESTIG_00111436]; attachment to e-mail from T. Donovan to E. Hession, *et al.* (Apr. 21, 2014), at CEOC_INVESTIG_00111443 [CEOC_INVESTIG_00111438].

[3384]  R. Goldich Sept. 18, 2015 Tr. at 23:12-22 (explaining that the PIP award was valuable, notwithstanding the fact that the PIP award was illiquid and could not be traded or transferred, because of the "future potential to become liquid," for example, "either the stock could be repurchased by the company or it could be an independent IPO"); *Wilmington Savs.*, E. Hession Sept. 17-18, 2015 Tr. at 318:17-25; *id.* at 274:17-24 (Option value is "value inherent in nearly any security that is not directly tied to the assets underlying the security, but is more tied to the potential associated with that security above and beyond some normal course of operations."); *id.* at 275:4-276:6 (stating that CEOC was a highly levered entity and the option value on a small piece of CEOC equity "is very high, because small changes in the overall enterprise value of the assets create large swings in the value of the equity" and "because had a restructuring gone through and been successful and the CEOC stock ultimately remained, it would have a lot of value").

[3385]  *See* R. Goldich Sept. 18, 2015 Tr. at 23:23-24:8.

[3386]  *Wilmington Savs.*, M. Rowan Aug. 26, 2015 Tr. at 247:22-248:12.

purposes, the issuance of the shares under the PIP, which was pegged at the same strike price,[3387] created an immediate, and unwelcome, taxable event for participants. To mitigate the tax burden on the PIP participants, Apollo initiated the idea of a tax "gross-up," by which CEOC agreed to increase each participant's compensation by the amount necessary to cover the taxes due.[3388] This was another atypical feature of the PIP.[3389]

Although the stated purpose of the PIP (as described to the HRC and as set forth in the resolutions sent to the CEOC Board) was to "promote the success of [CEOC]" and incentivize CEC and CEOC employees to work alongside each other to promote the overall success of the Caesars enterprise, the timing and speed within which the PIP was proposed, adopted and implemented, coupled with the strong evidence that CEOC stock was essentially worthless at the time, leads the Examiner to the conclusion that the adoption of the PIP had an additional purpose: to increase the number of shareholders to improve CEC's chances of listing CEOC stock on a national exchange and bolster CEC's assertion the CEC Guarantee had been released since as a result of CEC's ownership interest being diluted under 89%, CEOC could no longer be considered a wholly-owned subsidiary of CEC.[3390]

---

[3387] *Wilmington Savs.*, E. Hession Sept. 17-18, 2015 Tr. at 318:3-5 ("I believe it was the same valuation methodology on a per-share basis that was used for the initial sale of the 5 percent."); R. Goldich Sept. 18, 2015 Tr. at 19:21-25 ("Q: Do you remember hearing anything about the fact that it has been the price paid by certain institutional investors for CEOC shares recently? A: That sounds correct, yes."); *Wilmington Savs.*, M. McLellan Sept. 2, 2015 Tr. at 132:22-25; *see also* E-mail from M. McLellan to R. Goldich (Sept. 8, 2014), at CEC_EXAMINER_0026881 [CEC_EXAMINER_0026881] ("For tax reporting purposes, shares were valued based on the prior private transaction at $90/share").

[3388] *Wilmington Savs.*, M. McLellan Sept. 2, 2015 Tr. at 137:22-24 ("So, I believe that it was the sponsors' idea to gross up the employees. I don't know who specifically that means"); *id.* at 91:3-7; *Wilmington Savs.*, D. Wilfong Oct. 9, 2015 Tr. at 61:4-7. ("The effect of a gross-up should be that the recipient of the gross-up owes no taxes on whatever compensation they have been provided."); *see also* e-mail from M. McLellan to R. Goldich (June 1, 2014), at CEC_EXAMINER_0014835 [CEC_EXAMINER_0014835] ("[P]er Apollo we grossed up $7.2M for reasons I'm still figuring out"); e-mail from M. McLellan to R. Goldich (Sept. 8, 2014), at CEC_EXAMINER_0026881 [CEC_EXAMINER_0026881].

[3389] *Wilmington Savs.*, E. Hession Sept. 17-18, 2015 Tr. at 322:15-23; R. Goldich Sept. 18, 2015 Tr. at 21:20-21 (stating that Caesars "do[es]n't typically gross up equity awards").

A month after the PIP was implemented, it was discovered that the initial gross-up calculations were inaccurate because they did not take account of the actual tax bracket of each participant, with the result that some participants had to go out-of-pocket to pay taxes on the awarded stock. E-mail exchange between D. Wilfong and M. McLellan, *et al.* (Aug. 2, 2014), at CEC_EXAMINER_0026884-86, [CEC_EXAMINER_0026881]. It is unclear whether the gross-ups were ever corrected. D. Wilfong Oct. 5, 2015 Tr. at 112:20-22.

[3390] M. Rowan Nov. 17, 2015 Tr. at 416:20-24 ("And, also, it had the advantage of further dilution, which gave more support to the extent there was still an argument over 'wholly owned' under S-X. It's kind of a trifecta."); S. Wiegand Nov. 6, 2015 Tr. at 91:21-92:2; 93:23-94:12

### 2.  The Examiner's Findings and Conclusions

As noted above, various creditors groups have asserted that the adoption of the PIP and issuance of shares thereunder was a sham transaction and that the CEC Guarantee has, accordingly, not been released.  The Examiner's investigation has been limited to considering whether the PIP gives rise to any cognizable claim on behalf of the Debtors' estates.[3391]  Without expressing any views on the issues that are before the courts in the Guarantee Litigation with respect to the PIP, the Examiner has concluded that the adoption and implementation of the PIP does not give rise to a cognizable claim on behalf of the Debtors' estates for fraudulent transfer (actual or constructive) for the same reasons that the purported release of the CEC Guarantee pursuant to the 5% Stock Sale does not give rise to such claims, as discussed in section IX.B, namely, the inability to demonstrate that either the CEC Guarantee release or the conveyance of CEOC Stock by CEC involved the transfer of any interest in property of the Debtors.

Moreover, as discussed above, CEOC Stock was worthless at the time it was conveyed. Indeed, David Sambur accurately described the value of CEOC Stock being conveyed to employees as "pixie dust."[3392]  As a result, although there are troubling aspects of this transaction, the Examiner has been unable to identify any material damage that may have been suffered by the Debtors in connection with the adoption and implementation of the PIP.

Although preference claims and fraudulent conveyance claims could potentially be asserted against CEC and CEOC employees who within one year of the Petition Date received tax "gross-up" payments from CEOC while it was insolvent, many of the participating employees will likely have valid defenses to such claims.  Many of the participants do not fall within the statutory definition of "insider."  Others will claim that they were unaware that CEOC was insolvent, did not know that the stock was worthless (and that the "value" ascribed by management to the shares for tax purposes was grossly inflated), and accepted the gross up payments in good faith as consideration for their services as employees.  Up to 376 separate actions would have to be brought by the Debtors' estates to recover such payments, with a maximum potential recovery of under $1 million.  In short, it is highly unlikely that the Debtors' estates would elect to pursue such claims.

---

(explaining that the PIP would be equal to roughly 6% of the CEOC stock owned at the time by CEC because "when coupled with 5[%] already sold, would result in 11[%] of CEOC being owned by third parties" and which helped with "arguments that third parties might make that the termination of the guaranty was not effective at 5[%]").  While there is testimony reflecting CEC's objective to increase the number of stockholders to list CEOC stock, that plainly does not explain the speed and timing in connection with the implementation of the PIP.  *See also* M. Rowan Nov. 17, 2015 Tr. at 416:17-20 (explaining that the PIP "was a way to count toward the holders rule for the purpose of listing, and to do that, they needed to own stock, not options").

[3391]  The Examiner has not been asked to investigate, and expresses no views herein, with respect to the merits of the claims being litigated by creditors in the Guarantee Litigation with respect to the PIP.

[3392]  E-mail from D. Sambur to M. Rowan (June 6, 2014), at APOLLO-Examiner_00719706 [APOLLO-Examiner_00719706].

### D. The Declaratory Judgment Action

On August 5, 2014, the Boards of Directors of CEC and CEOC (with the two newly appointed CEOC independent directors abstaining) authorized the commencement of a declaratory judgment action (the "DJ Action") against certain creditors noteholders asserting that no default had occurred under the terms of various indentures governing CEOC's debt. According to the complaint that was later filed, Caesars charged that noteholders had defamed Caesars and tortiously interfered with Caesars' business by objecting to the approval of certain transactions by state gaming regulators.  Significantly, the complaint also sought a declaration that CEC and CEOC and their directors and officers had not committed any fraudulent transfers or breaches of fiduciary duty.

As discussed in Section IX.D, the DJ Action followed the receipt of letters from counsel representing holders of First Lien Notes[3393] (the April 3, 2014 Kramer Levin Letter)[3394] and Second Lien Notes (the March 21, 2014 Jones Day Letter)[3395] asserting that CEOC was insolvent and that recent transactions involving the transfer of CEOC assets constituted fraudulent transfers and breaches of fiduciary duty.[3396]  Following receipt of these letters, Paul Weiss, acting as counsel for CEC and CEOC, determined to engage the firm of Friedman Kaplan Seiler & Adelman LLP ("Friedman Kaplan") because some of the noteholders were also Paul Weiss clients in unrelated matters.[3397]  Although the initial concern that noteholders would instruct their indenture trustees to declare a default and pursue contractual and/or statutory remedies subsided somewhat when the Four Properties Transaction closed, the Second Lien Noteholders continued to object to approval by Caesars' state gaming regulators of certain transactions.[3398]  As a result, Paul Weiss asked Friedman Kaplan to draft a declaratory judgment complaint to have on hand, if

---

[3393] In the letter dated April 3, 2014, Kramer Levin states that it is representing the "First Lien Group" which is defined as the "(i) 'Lenders' under Caesars Entertainment Operating Company's ('CEOC') Second Amended and Restated Credit Agreement, dated as of March 1, 2012 (as amended, modified, or otherwise supplemented, the 'Credit Agreement'), and/or (ii) holders of notes issued under various CEOC first-lien senior secured Indentures (as amended, modified, or otherwise supplemented, the 'First Lien Indentures')."  Letter from Kramer Levin to members of the CEC and CEOC Boards (Apr. 3, 2014), at CEOC_INVESTIG_00094448-52 [CEOC_INVESTIG_00094448].

[3394] *Id.* at CEOC_INVESTIG_00094448.

[3395] Letter from Jones Day to CEOC (Mar. 21, 2014), at CEOC_INVESTIG_00124821-25 [CEOC _INVESTIG_00124821].

[3396] *Id.*

[3397] E. Seiler Nov. 12, 2015 Tr. at 15:23-16:5 ("Well, the Jones Day letter was written on behalf of individual entities, and some of those entities were entities that Paul, Weiss could not act in the litigation adverse to, or at least wouldn't act in the litigation adverse to, and we were hired because of that.").

[3398] E. Seiler Nov. 12, 2015 Tr. at 29:2-4.

needed, in the event restructuring negotiations broke down and a noteholder suit appeared imminent.[3399]

The complaint underwent many revisions by Paul Weiss and Friedman Kaplan lawyers before it was finalized. It was not until late July, however, that the draft complaint (which initially only sought declaratory relief that no breach or default had occurred under the relevant indentures) was revised to include an additional count seeking a declaration that CEC and CEOC "have not breached their fiduciary duties or engaged in fraudulent transfers."[3400]

Certain events that were occurring at the time the complaint was being revised call into question the addition of a count seeking a declaration that no fraudulent transfers had occurred or breaches of fiduciary duty had been committed. As discussed *supra*, in late June 2014, the CEOC Board was expanded to include two independent directors (something that had been in the works since late 2013 or early 2014 but did not happen until the Four Properties Transaction, the B-7 Transaction, the 5% Stock Sale and the PIP had all been approved by the interested directors on the CEOC Board).[3401] In early July, those independent directors – Ronen Stauber and Steven Winograd – selected Kirkland & Ellis to advise CEOC and the CEOC Board in connection with its "structuring and [implementation of] a potential restructuring."[3402] On that same day, the CEOC Board held a telephonic meeting to discuss, among other things, the establishment of a governance committee.[3403]

Based on advice from Kirkland & Ellis, in late July 2014, the CEOC Board approved the formation of a Governance Committee that consisted of Stauber and Winograd. The committee was charged with representing CEOC's interests on any issues where CEOC had a potential conflict with its parent, CEC, or any of its affiliates.[3404] The Governance Committee thereafter

---

[3399] E. Seiler Nov. 12, 2015 Tr. at 29:22-24 (describing the "genesis of the lawsuit in June").

[3400] E-mail from P. Adler to L. Clayton (July 31, 2014) [FKSA_EXAMINER_00004841], attaching draft complaint (July 31, 2014), at FKSA_EXAMINER_00004881 [FKSA_EXAMINER_00004881].

[3401] CEOC Press Release (July 30, 2014), at CEOC_INVESTIG_00045046 [CEOC_IN-VESTIG_00045045]; *see* R. Stauber Sept. 30, 2015 Tr. at 12:3-6; S. Winograd Oct. 21, 2015 Tr. at 16:25-17:2.

[3402] CEOC Board Meeting Agenda and Proposed Resolutions (July 30, 2014), at CEOC_INVESTIG_00172696 [CEOC_INVESTIG_00172694] ("RESOLVED, that the advisors selected by the independent directors, including Kirkland & Ellis LLP [], to provide services to the Company and the Board, shall also be available to advise, and provide services to the Governance Committee."); *see also* Retention Letter from Kirkland to J. Suydam (July 3, 2014), at KE_000231-234 [KE_000231]; Retention Letter from Kirkland to M. Higgins (Sept. 2, 2014), at KE_000287-97 [KE_000287].

[3403] E-mail from J. Eaton to D. Bonderman, *et al.* (July 2, 2014), at CEOC_2004_0037403 [CEOC_2004_0037403].

[3404] May 28, 2015 Order Granting Retention Application [Dkt. No. 1713], at 6; *see also* Kirkland & Ellis' June 2014 Pitchbook to CEOC, KE_000946, at p. 14 (discussing the

retained Professor Jack Williams of Mesirow Financial Consulting LLC ("Mesirow") to begin an investigation into related party transactions to determine whether fraudulent transfers had been committed or breaches of fiduciary duty had occurred.[3405]

Friedman Kaplan never engaged in discussions with Mesirow or the Governance Committee while drafting the DJ Action complaint. Nor was Friedman Kaplan ever advised by Paul Weiss that the Governance Committee and Mesirow had been tasked with investigating whether fraudulent transfers had been committed or breaches of fiduciary duty had occurred.[3406] In addition, Friedman Kaplan did not engage in any substantive discussions with the CEC or CEOC Boards regarding the claims in the draft complaint.

Both Boards met telephonically to approve the filing of the complaint on August 3, 2014. The CEC Board meeting to authorize the filing of the DJ Action lasted about an hour, while the CEOC Board meeting lasted a mere 13 minutes. Both Boards authorized the filing of the DJ Action,[3407] although in the case of the CEOC Board, the independent directors (properly, in the view of the Examiner) abstained from the vote. As explained by Stauber and Winograd, the independent directors abstained because, as members of the Governance Committee, they had just begun (and had not yet concluded) their investigation into whether fraudulent transfers had occurred or breaches of fiduciary duty had been committed.[3408] However, this did not deter other directors, including those who were members of both the CEC and CEOC Boards. One of the directors said he understood that the Governance Committee was simultaneously investigating the claims involved in the DJ Action but said that he was nevertheless "comfortable voting to authorize the lawsuit" because whether he was a "CEOC director or CEC director [he] thought

---

importance of establishing and maintaining appropriate corporate governance and decision-making processes).

[3405] Mesirow Retention Letter (Seiler Ex. 8).

[3406] E. Seiler Nov. 12, 2015 Tr. at 63:21-64:8.

[3407] CEOC    Board    Consent    (Aug.    3,    2014),    at    CEOC_2004_0045832-43 [CEOC_2004_0045832]; *see also* Unsigned CEC Board Meeting Minutes (Aug. 3, 2014), at CEC_EXAMINER_0011004-06 [CEC_EXAMINER_0011004].

[3408] R. Stauber Sept. 30, 2015 Tr. at 68:10-24 ("[A]nd hence, the reasons that Steve and I abstained from this, was that roughly at this time as we began and kind of decided that we do, in fact, need to do an actual investigation. And so we couldn't possibly come to that conclusion of what the lawsuit actually said, whether it was true or not, so we didn't have an actual opinion at the time. And so that was what the advice that Kirkland had provided in terms of that distinction. So that was advice that they had provided separately to the governance committee as it relates to our discussion around, surrounding what the investigation would, in fact, do."); *id.* at 72:6-14; S. Winograd Oct. 21, 2015 Tr. at 72:21-24 ("I think the simple answer to that is we didn't have a view as to the merits of the cases. We were just starting our investigation and could not opine.").

that [CEOC] had received fair value and the transactions were actually beneficial to the company."[3409]

The first of the noteholder complaints was filed the following day, on August 4, 2014, in the Delaware Court of Chancery, asserting claims for breach of the indentures, fraudulent transfer, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and waste of corporate assets, and to enforce the CEC Guarantee.[3410]   The next day (August 5), Sambur e-mailed Friedman Kaplan, Paul Weiss, TPG, and members of Caesars instructing Friedman Kaplan to file the complaint immediately:  "Pls file asap.  Don't wait."[3411]   The complaint was filed later that day in the New York Supreme Court but remained dormant until July 2015, when it became clear that the claims in the DJ Action were going to be adjudicated elsewhere, at which point CEC and CEOC voluntarily withdrew their complaint in the DJ Action.

The Examiner believes that it was inappropriate for the interested directors of the CEOC Board to authorize the filing of a complaint on behalf of CEOC to allege that no fraudulent transfers had been committed, and no breaches of fiduciary duty had been committed by them (or at least some of them), at the same time the independent directors of the CEOC Board were commencing an investigation into those very same subjects.  The interested members of the CEOC Board were conflicted and should not have authorized the filing of a complaint on the part of CEOC seeking to exonerate themselves in connection with, for example, the purported release the CEC Guarantee and approval of the Four Properties Transaction.  If damages had flowed from the filing of the complaint authorizing its filing on behalf of CEOC, it would have been a strong breach of fiduciary duty claim.  However, because the DJ Action was ultimately dismissed, the Examiner is unable to identify any legally cognizable claim that may be pursued by CEOC's estate, other than, perhaps, some or all of the legal fees expended by CEOC in filing the DJ Action.

---

[3409]  D. Sambur Nov. 14, 2015 Tr. at 540:16-22 ("A.  I will give my answer again.  I thought, as I have said, the transactions were beneficial to CEOC and its creditors.  Whether I was a CEOC director or CEC director, my belief didn't change.  Therefore, I was comfortable voting to authorize that lawsuit."); *id.* at 537:7-19 ("A.  Yes, and there was an investigation underway by independent third parties who would form their own conclusions.  This is my point.  Sorry if I'm not making it clearly.  Whether I was a CEOC director or a CEC director, I thought that the company had received fair value and that the transactions were actually beneficial to the company, as we have discussed, for many hours at this point.  It doesn't change whether I was a CEOC director or CEC director.  My belief was the same.").

[3410]  The named defendants in *Wilmington Savings* are CEC, CGP, CAC, CERP, CEOC, CES, Eric Hession, Gary Loveman, Jeffrey Benjamin, David Bonderman, Kelvin Davis, Marc Rowan, David Sambur and Eric Press.  *See Wilmington Savs.* Compl. (Aug. 4, 2014), at CEC_EXAMINER_0032003-82 [CEC_EXAMINER_0032003].

[3411]  E-mail from D. Sambur to P. Adler, *et al.* (Aug. 5, 2014), at FKSA_EXAMINER00004006-07 [FKSA_EXAMINER_00004006].

### E.  The Senior Unsecured Notes Transaction

#### 1.  Introduction

Prior to the LBO, CEOC's predecessor, Harrah's Operating Company, Inc., ("HOC") issued (i) $750 million in aggregate principal amount of senior unsecured 6.50% notes due 2016, (the "6.50% Senior Notes due 2016"); and (ii) $750 million in aggregate principal amount of senior unsecured 5.75% notes due 2017, (the "5.75% Senior Notes due 2017"; collectively the "Senior Unsecured Notes").  The obligations of HOC/CEOC under the Senior Unsecured Notes were guaranteed by CEC.[3412]  During the period 2008 through 2009, CEOC reduced the Senior Unsecured Notes balance to $1,112 million through debt buybacks.[3413]

As discussed in Section IX.B.2, on May 6, 2014, CEC announced that it had completed the 5% Stock Sale, purporting to release the CEC Bond Guarantee.[3414]  That same day, Andrew Dietderich of Sullivan & Cromwell LLP ("S&C"), counsel for certain holders of the Senior Unsecured Notes, sent a copy of the disclosure to his clients, stating that it creates "an immediate issue whether to sue for a declaration that [the CEC] guarantee is valid (a tactical question), as well as the need to be ready to negotiate an exchange offer in the best interests of the 2016 and 2017 bondholders."[3415]  On May 15, 2014 Dietderich sent a letter to CEC (copying Paul Weiss), asserting that the purported release of the Bond Guarantee was ineffective with respect to the holders of the Senior Unsecured Notes and may constitute a default under the terms of the governing indentures.[3416]

Negotiations ensued, following which holders of a majority of the outstanding Senior Unsecured Notes (the "Participating Noteholders") held by third parties entered into a privately negotiated Note Purchase and Support Agreement (the "NPA") dated August 12, 2014 with CEC and CEOC pursuant to which, among other things:

- Participating Noteholders (shown in SUN Figure 1 below) representing $237.8 million aggregate principal amount of the Senior Unsecured Notes, (greater than 51% required) of each class of the Notes held by non-affiliates of CEC and CEOC agreed to sell a portion of their holdings to CEC and CEOC at par (the notes were

---

[3412] CEC 8-K (June 14, 2006) attaching Indenture among HOI, Harrah's Entertainment, Inc. ("HET") and U.S. Bank National Association, at 44; Indenture among HOI, HET and U.S. Bank National Association (Sept. 28, 2005), at CEC_EXAMINER_0428542-43 [CEC_EXAM-INER_0428486].

[3413] In 2008, $98.8 million of 6.50% Senior Notes due 2016 and $140.2 million of 5.75% Senior Notes due 2017 were retired through purchase or exchange.  CEC 10-K for the year ended Dec. 31, 2008 (Mar. 19, 2009), at 30; *see also* SUN Figure 1 for balance as of Q2 2014.

[3414] CEOC 8-K (May 6, 2014), at 5-6.

[3415] E-mail from A. Dietderich to D. McCarty, *et al.* (May 6, 2014), at SC_CZR00020814 (Dietderich *Wilmington Savs.* Ex. 16).

[3416] Letter from S&C to CEC and Paul Weiss, *et al.* (May 15, 2014), at CEC_EXAMINER_0010759 [CEC_EXAMINER_0010758].

trading at approximately 47 cents and 57 cents on the dollar prior to the sale)[3417] for an aggregate principal amount of $155.4 million of Notes.[3418]

**SUN Figure 1: Senior Unsecured Notes Outstanding as of 6/30/2014**

| *(amounts in millions)* | 6.5% Notes due 2016 | | 5.75% Notes due 2017 | | Total Holdings |
| | Amount | % of Total | Amount | % of Total | |
|---|---|---|---|---|---|
| **Participating Noteholders** | $ 130.2 | 52.4% | $ 107.6 | 72.8% | $ 237.8 |
| Non-Participating Noteholders | $ 118.5 | 47.6% | $ 40.2 | 27.2% | $ 158.7 |
| Total Notes Held by Third Parties | $ 248.7 | 100.0% | $ 147.8 | 100.0% | $ 396.5 |
| Related Parties | $ 324.5 | | $ 391.0 | | $ 715.5 |
| **Total** | $ 573.2 | | $ 538.8 | | $ 1,112.0 |

Source: NPA (Aug. 12, 2014), at CEC_EXAMINER_0035405-29 [CEC_EXAMINER_0035405]; Closing Memorandum (Aug. 21, 2014), at CEC-EXAMINER_0012424-34 [CEC_EXAMINER_0012424]; CEOC Form 10-Q for the Period Ending June 30, 2014; CEOC Form 10-Q for the Period Ending Sept. 30, 2014; CEC Form 10-K for the Period Ending Dec. 31, 2014.

- CEC and CEOC each agreed to pay such Participating Noteholders a ratable amount of $77.7 million of cash, shown in SUN Figure 2;[3419]

---

[3417] Bloomberg L.P., CUSIPs 413627AWO and 413627AX8, Aug. 1, 2014 (retrieved on July 29, 2015).

[3418] *See* SUN Figure 5.

[3419] CEC 8-K (Aug. 22, 2014), at 2; CEOC 8-K (Aug. 22, 2014), at 2. CEOC also funded $4.3 million of accrued interested and $2.3 million in fees and expenses. NPA (Aug. 12, 2014), at CEC_EXAMINER_0035406 [CEC_EXAMINER_0035405].

**SUN Figure 2: Cash Contributed for Repurchase of Senior Unsecured Notes**

| (amounts in millions) | Consideration For Notes | | Accrued & Unpaid Interest | | Fees & Expenses | | Total Paid | |
|---|---|---|---|---|---|---|---|---|
| CEC | $ | 77.7 | $ | - | $ | - | $ | 77.7 |
| CEOC | $ | 77.7 | $ | 4.3 [1] | $ | 2.3 | $ | 84.3 |
| **Total** | **$** | **155.4** | **$** | **4.3** | **$** | **2.3** | **$** | **162.0** |

Sources: NPA (Aug. 12, 2014), at CEC_EXAMINER_0035405-29 [CEC_EXAMINER_0035405]; Closing Memorandum (Aug. 21, 2014), at CEC-EXAMINER_0012424-34 [CEC_EXAMINER_0012424]; CEOC Form 10-Q for the Period Ending Sept. 30, 2014; CEC Form 10-K for the Period Ending Dec. 31, 2014.

Note: $4.3 million in total interest was comprised of $2.8 million in accrued interest on the redeemed notes and $1.5 million in accrued interest on the Amended Notes.

- CEOC agreed to pay all accrued and unpaid interest on the Senior Unsecured Notes in cash, together with all legal and financial advisory fees and expenses of the Participating Noteholders; and

- CEC agreed to contribute to CEOC for cancellation no less than $393 million in aggregate principal amount of the Senior Unsecured Notes (and ultimately, CEC contributed $426.6 million).[3420]   As a result of the transaction (the "Senior Unsecured Notes Transaction"), CEOC's outstanding indebtedness was reduced by approximately $582 million in aggregate principal amount,[3421] leaving some $530 million in aggregate principal amount of Senior Unsecured Notes (including approximately $290 million held by CAC) outstanding.[3422]

The NPA contained a number of other material terms, including an agreement by Participating Noteholders to amend (i) the indentures governing the Senior Unsecured Notes; and (ii) approximately $82.4 million face amount of the Senior Unsecured Notes held by the Participating Noteholders.[3423]   The indenture amendments included a consent to the removal of the Bond Guarantee of CEOC's obligations to the remaining Senior Unsecured Noteholders and a modification of the covenant restricting the disposition of "substantially all" of CEOC's

---

[3420]  NPA (Aug. 12, 2014), at CEC_EXAMINER_0035427 [CEC_EXAMINER_0035405]; CEC 8-K (Aug. 22, 2014), at 2; CEOC 8-K (Aug. 22, 2014), at 3; see also Appendix 12-4, Senior Unsecured Notes Sources & Uses.

[3421]  First Day Memorandum at 37; CEC 8-K (Aug. 22, 2014), at 2.

[3422]  As of September 30, 2014, CAC held approximately $290 million in aggregate principal amount of CEOC Notes with fixed rates of interest.  CEC 10-Q for period ending September 30, 2014, at 25.

[3423]  NPA (Aug. 12, 2014), at CEC_EXAMINER_0035406 [CEC_EXAMINER_0035405].

assets.[3424]  The Senior Unsecured Notes amendments included, among others, an agreement on the part of the Participating Noteholders to support future efforts to restructure CEOC's outstanding debt.[3425]  Finally, in connection with this transaction, CEC and CEOC agreed that if no restructuring of CEOC is consummated within 18 months of the closing of the transaction, and certain other terms and conditions are satisfied, CEC will be obligated to make an additional payment to CEOC of $35 million.[3426]

In the Examiner's view, this was an ugly transaction.  The Participating Noteholders – a small group of sophisticated investors – took advantage of the circumstances and purported differences in language in the indentures governing the Senior Unsecured Notes to cause CEC and CEOC to repurchase their Senior Unsecured Notes at par, which was substantially higher than the market prices available.  To make matters worse, the Participating Noteholders agreed as part of the transaction to amend the indentures in ways that saddled the remaining noteholders with no Bond Guarantee and substantially diminished rights.  Non-participating noteholders were neither given notice, nor the opportunity to participate in this debt buyback or to agree to the amendment to the note indentures (although the participating note holders were willing to allow others to participate).  For their part, the Sponsors (Apollo in particular) negotiated this transaction on behalf of both CEC and CEOC, declined the opportunity to extend the offer to participate to all non-affiliated Senior Unsecured Noteholders, and frankly admitted during interviews that a principal, if not primary, purpose in entering into the transaction was to remove any uncertainty with respect to the release of the Bond Guarantee (as opposed to acting in the best interests of CEOC and its creditors).  The Sponsors knew that if the Bond Guarantee was not removed, the Bank Debt Guarantee would not be converted from a payment guarantee to a guarantee of collection, and thus CEC would be exposed, in the event CEOC filed for bankruptcy, to the prospect that First Lien Bank lenders would immediately seek to enforce their rights under the Bank Debt Guarantee, thus dragging CEC into bankruptcy as well.

Promptly following the announcement of this transaction, non-participating noteholders sued CEC, asserting that the Senior Unsecured Notes Transaction, to the extent it purported to release the Bond Guarantee and amend the indentures in ways that adversely affected them, was a fraudulent transfer and was otherwise unlawful or improper.  That litigation is still pending.[3427]

Despite the "ugliness" of this transaction, the Examiner has concluded that, although the payments of principal and interest by CEOC within one year of the Petition Date in exchange for the release of the Bond Guarantee would likely, under *In re Deprizio*[3428] and its progeny,

---

[3424]  *Id*. at CEC_EXAMINER_0035427.

[3425]  *Id*. at CEC_EXAMINER_0035411.

[3426]  *Id*. at CEC_EXAMINER_0035427; Recovery Agreement (Aug. 12, 2014), at CEC_EXAM-INER_0062623-28 [CEC_EXAMINER_0062623].

[3427]  The Examiner did not investigate the breach of contract claims and claims under the Trust Indenture Act of 1939 that are being pursued in that litigation, and expresses no opinion herein with respect to the merits of such claims.

[3428]  *Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio)*, 874 F.2d 1186 (7th Cir. 1989) (hereinafter *Deprizio*); *see* Appendix 5, Legal Standards at Section II.

constitute a preference in favor of an insider under Bankruptcy Code section 547, such payments are not actionable since they fall within the safe harbor protection set forth in Bankruptcy Code section 546(e).  In addition, because the Bond Guarantee is not "property" of CEOC's estate, no estate claims for actual or constructive fraudulent transfer can be asserted.  Similarly, the Examiner has been unable to identify any cognizable claim for breach of fiduciary duty against the CEOC Board or CEC (and thus no aiding and abetting claim) arising out of the release of the Bond Guarantee and other terms of this transaction.  The payment to certain holders of the Senior Unsecured Notes is also not an actual or constructive fraudulent transfer.  Preferring some creditors or another outside of the preference period generally cannot be brought as an actual or constructive fraudulent transfer.[3429]

Although, as noted above, credible evidence exists that the Senior Unsecured Notes Transaction was negotiated primarily by David Sambur on behalf of CEC and CEOC with the aim to reduce CEC's litigation risk and exposure under the Bond Guarantees and to improve CEC's position that the Bank Guarantee had been modified to a guarantee of collection, this is the one transaction investigated by the Examiner that was ultimately approved by a fully informed committee of independent directors at CEOC, represented by its own separate counsel and financial advisors advising them on the transaction, who exercised their business judgment in what they believed to be the best interests of CEOC and its creditors.  Further, CEOC benefited from the substantial reduction of its debt and future interest obligations.  Based on these considerations, the Examiner has concluded that a breach of fiduciary duty claim against CEIC's directors (or against CEC as controlling shareholder) would be weak.

## 2.  Negotiations Between Certain Participating Noteholders, CEC, and CEOC

On May 15, 2014,[3430]  S&C's Andrew Dietderich, counsel for the Participating Noteholders, sent a letter to the attention of the General Counsel of CEC and copying Paul Weiss partners Lewis Clayton, Alan Kornberg and Jeffrey Saferstein, in which Dietderich asserted that the release of the Bond Guarantee via the 5% Stock Sale on May 5, 2014, was ineffective as to the Senior Unsecured Notes.[3431]  Dietderich asserted in his letter that the Bond Guarantee "[is] irrevocable and remain[s] in full force and effect."[3432]  He went on to say that "[t]o avoid a

---

[3429]  *Sharp Int'l Corp. v. State Street Bank & Trust Co.* (*In re Sharp Int'l Corp.*), 403 F.3d 43, 54 (2d Cir. 2005).

[3430]  Dietderich had conversations relating to the Senior Unsecured Notes with Paul Weiss before sending this written communication, including one that took place prior to the 5% Stock Sale.  *Wilmington Savs.*, A. Dietderich Aug. 17, 2015 Tr. at 32:6-34:11; 116:2-119:19.  Dietderich explained that he knew Caesars "was a capital structure that was very much in flux" prior to the 5% Stock Sale and that the Senior Unsecured Notes were "an interesting piece of the capital structure because of the perception that the release of guarantees on our bonds had . . . potential positive effects for them . . . ."  *Id*. at 119:8-19.  The communication, however, "went nowhere" because Caesars was "contemplating the May transaction, and [S&C] didn't engage again with them until after that transaction had been announced."  *Id*. at 118:21-119:3.

[3431]  *Id*. at 32:6-9.

[3432]  S&C letter to CEC and Paul Weiss, *et al.* (May 15, 2014), at CEC_EXAMINER_0010759 [CEC_EXAMINER_0010758].

potential default, which we believe would occur by the purported discharge of the [Bond Guarantee] as described in the [May 6] release [announcing the 5% Stock Sale]," his clients "demand that you promptly (and in no event later than May 19, 2014) correct the misstatements in your May 6, 2014, release as they apply to the [Bond Guarantee]."[3433]

Dietderich's position was in part predicated on a difference between the language in the indentures governing the Senior Unsecured Notes and the provisions of other indentures governing CEOC's outstanding debt. The indentures for the Senior Unsecured Notes provide that CEC may be released from the Bond Guarantee if, among other things:

> (1) CEOC or CEC transfers all or substantially all of its properties and assets to another transferee and
>
> > (a) the transferee assumes the liabilities; and
> >
> > (b) immediately before and immediately after giving effect to such transfer, no Event of Default, and no event or condition which, after notice or lapse of time or both, would become an Event of Default, shall have occurred; or
>
> (2) CEOC ceases to be a "wholly owned subsidiary" of CEC under SEC Reg. S-X.[3434]

The above-reference to SEC Regulation S-X in the indentures governing the Senior Unsecured Notes does not exist in the other indentures governing CEOC's debt, which merely provide for a release of the Bond Guarantee if and when CEOC ceases to be a "wholly owned subsidiary" of CEC. Dietderich asserted, among other things, that the reference to Regulation S-X in the indentures governing the Senior Unsecured Notes was significant, and meant that the 5% Stock Sale did not operate to release the Bond Guarantee of CEOC's obligations under the Senior Unsecured Notes, because the definition of "wholly owned subsidiary" in Regulation S-X[3435] "created an argument that a greater amount of stock had to be sold" to release the Guarantee.[3436]

CEC disagreed. On May 19, 2014, CEC's counsel, Lewis Clayton, wrote back to Dietderich and denied the allegations, stating "[w]e know of no reason why [CEC's] statements require correction, or why the making of such statements could be considered a default."[3437]

---

[3433] *Id.*

[3434] CEC 8-K (June 14, 2006) attaching Indenture among HOI, HEI, and U.S. Bank National Association, at 46-47; Indenture among HOI, HEI, and U.S. Bank National Association (Sept. 28, 2005), at CEC_EXAMINER_0428544-45 [CEC_EXAMINER_0428486].

[3435] "The term *wholly owned subsidiary* means a subsidiary substantially all of whose outstanding voting shares are owned by its parent and/or the parent's other wholly owned subsidiaries." 17 C.F.R. §210.1-02.

[3436] *Wilmington Savs.*, A. Dietderich Aug. 17, 2015 Tr. at 294:24-295:22.

[3437] Letter from Paul Weiss to A. Dietderich (May 19, 2014), at CEC_EXAMINER_0048372 [CEC_EXAMINER_0048372].

Clayton went on to say that "[r]ather than debate these issues in correspondence, we think it would be more constructive for your clients and [CEC] to meet," which they did.[3438]   Clayton thereafter conferred with Rowan, Sambur, van Hoek, Kranias, and Donovan regarding the parameters of a potential transaction.   No one from CEOC participated in the negotiations. Loveman and Hession, CEOC's sole directors at the time negotiations commenced, did not participate.[3439]   CEOC did not have independent counsel participating in the negotiations on its behalf either.   Dietderich testified that he was not aware at the time if Paul Weiss represented CEOC as well as CEC, and he did not feel it was necessary to make a distinction.[3440]

The negotiations, which were led by Sambur and Dietderich, were protracted and difficult, as there were numerous issues that needed to be sorted out and addressed in terms of structure, price and other material terms.   Dietderich initially proposed a cash tender offer to all holders of Senior Unsecured Notes held by non-affiliates at an agreed discount to par.[3441]   He also argued that a deal with all of the pre-LBO noteholders could provide CEC with an additional argument that the Bond Guarantee had been terminated – an argument that was not persuasive to CEC.[3442]   A document titled CEC's "Negotiation Strategy," circulated by Sambur on June 19, 2014, emphasized that the goal with respect to the Senior Unsecured Notes was to "[f]ocus on getting [the] cheapest deal to accomplish [the] goal (i.e. structure as consent)," and noted that it would likely be "more effective" to "cut [a] deal with the 16s/17s" "in advance of the multi-tier exchange offer."[3443]   Indeed, by the time the term sheet was sent on August 5, 2014 by van Hoek of Apollo to CEOC's recently retained bankruptcy counsel, Paul Basta at K&E, the proposed transaction no longer contemplated the possibility of 100% participation.[3444]   Sambur ran the numbers at 51% and 100% participation, but the decision was made not to extend the offer to all

---

[3438]   *Id.*

[3439]   *Wilmington Savs.*, G. Loveman Oct. 13, 2015 Tr. at 75:12-16, 74:18-22; *Wilmington Savs.*, E. Hession Sept. 17, 2015 Tr. at 337:1-338:3.

[3440]   *Wilmington Savs.*, A. Dietderich Aug. 17, 2015 Tr. at 35:4-11.

[3441]   Sullivan & Cromwell initial discussion note (June 27, 2014), at APOLLO-Examiner_00700652; e-mail from D. Zylberg to J. Saferstein, *et al.* (July 15, 2014), at APOLLO-Examiner_00128855-56 [APOLLO-Examiner_00128855]; *Wilmington Savs.*, A. Dietderich Aug. 17, 2015 Tr. at 182:12-14, 184:1-185:5.

[3442]   E-mail from A. Dietderich to L. Clayton, *et al.* (May 29, 2014), at CEC_EXAMINER_0144471 [CEC_EXAMINER_0144470].

[3443]   E-mail from D. Sambur to G. Ezring, *et al.* (June 19, 2014) [APOLLO-Examiner_00697549], attaching Negotiation Strategy (June 19, 2014), at APOLLO-Examiner_00697550-51.

[3444]   E-mail from A. van Hoek to D. Sambur and P. Basta (Aug. 5, 2014) [APOLLO-Examiner_00129979], attaching draft term sheet (Aug. 5, 2014), at APOLLO-Examiner_00129980-81 [APOLLO-Examiner_00129980].   Earlier that day however, van Hoek sent Saferstein and Kendell Garrison of TPG a document setting out past proposals that included 100% participation as late as Aug. 2, 2014.   E-mail from A. van Hoek to J. Saferstein and K. Garrison (Aug. 5, 2014) [TPG-Examiner_01639060], attaching "CEOC: 16s and 17s proposal comparison," at TPG-Examiner_01639061-62 [TPG-Examiner_0163901].

noteholders.  In the end, Sambur accomplished his goals by negotiating a transaction in which CEC and CEOC purchased only 39% of the Senior Unsecured Notes held by non-affiliates, but with enough votes to amend the indentures.[3445]

When questioned as to why CEC and CEOC did not proceed with a tender or exchange offer open to all noteholders, Sambur stated that "[i]t was the business judgment of the company that it was preferable to do a private transaction."[3446]  When asked if he was concerned that parties that did not participate in the transaction would ultimately recover less than the parties that did, Sambur explained that he was focused on the parties to the transaction, "not on the implications to other people that wouldn't be a part of the transaction."[3447]  Given CEOC's financial condition at the time, Sambur's focus should have been on all of CEOC's creditors, not just the ones with whom he was negotiating.

Sambur and others have claimed that the transaction benefitted CEOC as well as CEC by reducing the amount of outstanding debt and interest expense at CEOC, and obtaining the Participating Noteholders' support in future restructuring efforts with CEOC's creditors.[3448] However, the evidence presented to the Examiner strongly suggests that, while the transaction did provide benefits to CEOC, the principal motivating force behind the Sponsors' willingness to enter into the Senior Unsecured Notes Transaction was to strengthen CEC's hand regarding the release of the Bond Guarantee, and to ensure the Bank Guarantee was modified to a guarantee of collection.[3449]  As Mark Rowan put it, from CEC's point of view, the transaction was entered into in order to "remov[e] uncertainty with respect to the release of the [CEC] guarantee."[3450] Gary Loveman echoed that sentiment.[3451]  In addition, as discussed in Section IX.B.1, in connection with the B-7 Transaction, it was imperative to the Sponsors that the Bond Guarantee of CEOC's obligations under the Senior Unsecured Notes be released; otherwise, all of the efforts to transform CEC's Guarantee of the First Lien Bank debt from a guarantee of payment to a guarantee of collection would have been for naught under the Most Favored Nations clause.

Dietderich acknowledged that the consensual amendments "seemed to be valuable to [CEC], and seemed to be something that we could do and they would pay for."[3452]  Thus, from the outset, a key term of the proposed transaction, to the extent there would be remaining noteholders, was the inclusion of a provision requiring all Participating Noteholders to agree to

---

[3445] CEOC 8-K (Aug. 22, 2014), at 2.  Although the Participating Holders represented 51% of each class of the Notes held by non-affiliates, in the end, CEOC and CEC only purchased 39% of the Senior Unsecured Notes held by them.

[3446] *Wilmington Savs.*, D. Sambur Sept. 10, 2015 Tr. at 412:6-413:1.

[3447] *Id*. at 413:15-25.

[3448] *Id.* at 419:17-420:7.

[3449] M. Higgins Oct. 14, 2015 Tr. at 37:16-38:2.

[3450] *Wilmington Savs.*, M. Rowan Aug. 26, 2015 Tr. at 20:18-21.

[3451] *Wilmington Savs.*, G. Loveman Oct. 13, 2015 Tr. at 81:15-20.

[3452] *Wilmington Savs.*, A. Dietderich Aug. 17, 2015 Tr. at 77:12-18.

amendments to the applicable indentures that stripped the Bond Guarantee and provided that the restriction on a sale of "substantially all" of CEOC's assets had not been triggered by the CERP, Growth and Four Properties transactions (which would have required a payment in full of the Senior Unsecured Notes).[3453]   Absent such "exit consents," there would have been no deal.

### 3.   Board Approvals

On August 10, 2014, the transaction was approved by both the CEC Board of Directors and the Governance Committee of the CEOC Board comprised of the two recently appointed independent directors.[3454]   The latter approval is significant, since, as noted above, the Senior Unsecured Notes Transaction is the only transaction investigated by the Examiner in which independent directors of CEOC, represented by separate counsel and separate financial advisors, were asked to approve a transaction with a third party.   Thus, unlike other related party transactions as to which the entire fairness standard of review applied, in the case of the Senior Unsecured Notes Transaction, the applicable standard of review is the more deferential business judgment standard.[3455]

Ronan Stauber and Steven Winograd were appointed to the CEOC Board on June 27, 2014.[3456]   As discussed in Section XIII. of this Report, the Examiner has concluded that both Stauber and Winograd qualify as "independent" directors.   At their first CEOC Board meeting on June 27, K&E made a pitch to the Board to be retained as restructuring counsel.[3457]   On July 3, K&E was retained as restructuring counsel for CEOC,[3458] and Perella Weinberg Partners was retained as financial advisor shortly thereafter.[3459]   On July 30, 2014, the CEOC Board formed

---

[3453] Sullivan & Cromwell Initial Discussion Note (June 27, 2014), at APOLLO-Examiner_00700652 [APOLLO-Examiner_00700652].

[3454] C. Leung Kaldenberg Oct. 16, 2015 Tr. at 45:21-22; CEC Board Minutes (Aug. 10, 2014), at CEC_EXAMINER_0028151-52 [CEC_EXAMINER_0028151]; CEOC Board Minutes (Aug. 10, 2014), at CEC-NOTEHOLDER_00010426 [CEC-NOTEHOLDER_00010426].

[3455] Appendix 5, Legal Standards at Section XI.F.

[3456] CEOC Unanimous Written Consent of Directors in Lieu of Meeting (June 27, 2014), at CEOC_INVESTIG_00165056 [CEOC_INVESTIG_00165056].

[3457] K&E Presentation to CEOC (June 2014), at KE_000961-1057 [KE_000946].

[3458] Certain creditors have questioned K&E's independence given its prior relationship with Apollo, and have sought to disqualify K&E as a result.   The Examiner has not been asked to, and takes no position, on the K&E "conflict" issue, other than to note that with respect to the Senior Unsecured Notes Transaction, the advice provided by K&E to the Governance Committee was clear, detailed and appropriate, and fully informed the independent directors of their fiduciary duties and the risks and benefits of the proposed transaction to CEOC and its creditors.

[3459] C. Leung Kaldenberg Oct. 16, 2015 Tr. at 46:21-24; *see* e-mail from M. Stein to CEOC Board, *et al.* (July 18, 2014) [CEC_EXAMINER_0298604], attaching CEOC Board Written Consent at CEC_Examiner_0298605-07 [CEC_EXAMINER_0298605].

the CEOC Governance Committee, consisting of Stauber and Winograd.[3460]  The principal duties of the Governance Committee were to (1) act on behalf of the CEOC Board regarding any related party transaction or matter involving a material conflict of interest, and (2) evaluate and make recommendations to the CEOC Board regarding potential material debt, financial or other restructuring transactions.[3461]

By the time the CEOC Governance Committee was created, the material terms of the proposed Senior Unsecured Notes Transaction had already been substantially negotiated.  Thus, although the Governance Committee ultimately reviewed and approved the Senior Unsecured Notes Transaction with modifications, it did not participate in the negotiations.[3462]  K&E also relied on Paul Weiss for information about the transaction rather than participate in the negotiations.[3463]  Moreover, it was not until August 8, 2014 – just three days before the transaction was finalized and within days of the commencement of the first lawsuits arising out of other recent transactions that are the subject of the Examiner's investigation[3464] – that the Governance Committee was formally apprised of the details of the proposed transaction during the first of three telephonic meetings with K&E and Perella Weinberg.[3465]  During the initial call, K&E outlined the general terms of the anticipated transaction structure, explaining that it contemplated: (i) the purchase for cash by CEC of a significant amount of Senior Unsecured Notes from the holders of a majority of each class of Notes outstanding, (ii) amending the indentures governing the Senior Unsecured Notes to strip material covenants and to expressly acknowledge the termination and release of the Bond Guarantee, (iii) the contribution and cancellation of a significant amount of Senior Unsecured Notes held by CEC to reduce the total outstanding obligations of CEOC, and (iv) obtaining the Participating Noteholders' support for a comprehensive restructuring at CEOC with covenants to cooperate and forbear from suing or otherwise participating in pending litigation.[3466]  Following extensive discussion, the Governance Committee directed K&E and Perella Weinberg to obtain additional information

---

[3460] CEOC Board of Directors Meeting Agenda and Resolutions (July 30, 2014), at CEOC_INVESTIG_00172696 [CEOC_INVESTIG_00172694].

[3461] *Id.* at CEOC_INVESTIG_00172713.

[3462] *Wilmington Savs.*, A. Dietderich Aug. 17, 2015 Tr. at 36:17-37:2.

[3463] *Wilmington Savs.*, D. Sambur Sept. 9, 2015 Tr. at 316:9-317:9.

[3464] On August 4, certain Second Lien noteholders filed an action in Delaware Chancery Court asserting claims against CEOC, CEC and certain directors for, among other things, breach of fiduciary duty and fraudulent transfer.  The next day (August 5), CEOC and CEC filed suit in New York state court seeking a declaration that no defaults existed under the secured notes indentures and no breaches of fiduciary duty had occurred.  *See* Section IX.B.3 for a more complete discussion of this litigation.

[3465] E-mail from K&E to S. Winograd and R. Stauber, *et al.* (Oct. 31, 2014) [CEOC_2004_PRIV_0009616], attaching draft Minutes of the Special Telephonic Meetings of the Governance Committee of the Board of Directors of CEOC (Aug. 8, and Aug. 10, 2014), at CEOC_2004_PRIV_0009618 [CEOC_2004_PRIV_0009618].

[3466] *Id.*

regarding the current negotiations and to discuss potential transaction modifications with counsel for CEC.[3467]

Later that afternoon, the CEOC Governance Committee, K&E and Perella Weinberg reconvened telephonically.[3468]   K&E explained that the current proposal contemplated a total cash payment to the participating noteholders of $130 million.[3469]   Following discussions, the Governance Committee directed K&E to propose certain modifications to the proposed transaction to provide that (i) CEC contribute an appropriate amount of its own cash towards the total cash payment required, and (ii) some portion of CEOC's cash contribution be recoverable by CEOC from CEC in the event that CEOC could not achieve a comprehensive restructuring of its capital structure in the near term.[3470]   Both of these proposed modifications, which benefitted CEOC, were accepted by CEC.

The next day (August 9), negotiations appeared to reach an impasse related to the Participating Noteholders' resistance to extending their trading restrictions.[3471]   Jeffrey Saferstein of Paul Weiss and Dietderich discussed the content of the Form 8-K that CEC would file disclosing the existence and termination of the confidential discussions.[3472]   Dietderich asserted that his "securities guys" would "make us say at a min[imum] that discussions are ongoing with a respect to a potential private transaction involving a repurchase for cash and/or securities and a release of guarantee in settlement."[3473]   Saferstein objected, stating that "[w]e can't say we're having discussions involving the release of the guarantee.  That puts us in a terrible position.  I don't see why you need that.  If we have no deal, then there's no deal. . . ."[3474]   Ultimately, negotiations resumed, an agreement in principle was reached the next day, and the debate over what to disclose in a "no deal" press release was rendered moot.

On August 10, 2014, Scott Wiegand, Deputy General Counsel, Senior Vice President, and Corporate Secretary at CEC and CEOC, contacted the entire CEOC Board requesting the members' availability for an urgent meeting to consider the Senior Unsecured Notes

---

[3467]  *Id.*

[3468]  *Id*. at CEOC_2004_PRIV_0009619.

[3469]  *Id*.

[3470]  *Id.*  The Examiner notes that the modifications proposed by the Governance Committee are precisely the kind of value that having independent members could have added to the CEOC Board on earlier transactions had they been appointed.  PI

[3471]  *Wilmington Savs.*, D. Sambur Sept. 9, 2015 Tr. at 334:21-335:4.

[3472]  E-mail from J. Saferstein to A. Dietderich (Aug. 9, 2014), at SC_CZR00008353 [SC_CZR00008351] (Sambur *Wilmington Savs.* Ex. 128).  The purpose of the disclosure was to "cleanse" Dietderich's clients so that they were no longer restricted from trading in CEOC debt.

[3473]  *Id*. at SC_CZR00008352.

[3474]  *Id.*

Transaction.[3475]  A telephonic meeting was scheduled for later that evening and Wiegand circulated a draft term sheet to the board members.[3476]  The key terms of the agreement in principle that had been reached (involving the purchases by CEC and CEOC of approximately $160 million of Senior Unsecured Notes from the holders of a majority of the Notes outstanding, the contribution to CEOC by CEC of at least $393 million of CEOC outstanding Senior Unsecured Notes for cancellation, the release of the Bond Guarantee, the modification of other terms of the Notes and indentures, and the agreement to support CEOC's restructuring efforts) were summarized in a cover note to the directors.[3477]

Loveman opened the August 10 CEOC Board meeting and reported his "favorable view" of the transaction.[3478]  Basta from K&E then reported on the work previously done to familiarize the Board with respect to the transaction.[3479]  The meeting was then opened up to questions and certain Board members reported that the transaction had already been approved by the CEC Board.[3480]  The CEOC Board then referred consideration of the transaction to the Governance Committee and adjourned the meeting.

Immediately thereafter, the Governance Committee had another call with K&E and Perella Weinberg.[3481]  K&E presented a deck on the proposed transaction jointly prepared by K&E and Perella Weinberg to guide the Committee's discussion.[3482]  The deck summarized the

---

[3475] E-mail from S. Wiegand to the CEOC Board (Aug. 11, 2014) APOLLO-Examiner_00087472 attaching term sheet (Aug. 10, 2014), [APOLLO-Examiner_00087474].

[3476] *Id.* at APOLLO-Examiner_00087474-75

[3477] *Id.*

[3478] CEOC Meeting of the Board of Directors and Governance Committee Minutes (Aug. 10, 2014), at CEC_EXAMINER_0011007 [CEC_EXAMINER_0011007].

[3479] *Id.*

[3480] On August 10, 2014, the CEC Board of Directors had a telephonic meeting to discuss the Senior Unsecured Notes Transaction.  The independent members of the Board in attendance, having received a report on the proposed Transaction from Saferstein prior to the meeting, voted unanimously in favor of the Transaction.  The non-independent members of the CEC abstained from voting.  *See* CEC Board Minutes (Aug. 10, 2014), at CEC_Examiner_0028151-52 [CEC_Examiner_0028151]; *Wilmington Savs.*, S. Wiegand Sept. 16, 2015 Tr. at 153:12-154:2; CEOC Meeting of the Board of Directors and Governance Committee Minutes (Aug. 10, 2014), at CEC_EXAMINER_0011007 [CEC_EXAMINER_0011007].

[3481] E-mail from K&E to S. Winograd and R. Stauber, *et al.* (Oct. 31, 2014), [CEOC_2004_PRIV_0009616], attaching draft Minutes of the Special Telephonic Meetings of the Governance Committee of the Board of Directors of CEOC (Aug. 8 and Aug. 10, 2014), at CEOC_2004_PRIV_0009620 [CEOC_2004_PRIV_0009618]; CEOC Meeting of the Board of Directors and Governance Committee (Aug. 10, 2014), at CEC_EXAMINER_0011007 [CEC_EXAMINER_0011007].

[3482] E-mail from Perella Weinberg (Aug. 10, 2014) [CEOC_2004_PRIV_0008806], attaching "Discussion Materials" deck prepared by Perella Weinberg and K&E (Aug. 10, 2014), at CEOC_2004_PRIV_0008808 [CEOC_2004_PRIV_0008808].

material terms of the transaction, the negotiation history, considerations, and next steps.[3483]  With regard to the material terms of the transaction, K&E and Perella Weinberg described, *inter alia*, the cash components of the transaction (including CEC's agreement to pay CEOC an additional $35 million if no comprehensive restructuring deal was reached with secured creditors within 18 month), the contribution from CEC of at least $393 million in notes for cancellation, the amendments to the indentures and the Senior Unsecured Notes acknowledging the elimination of the Bond Guarantee, the waiver of claims based on the transactions to date and the modification of the "substantially all" sale covenant to measure future asset sales based on CEOC's assets and the fact that the proposed transaction would result in at least a $563 million reduction in the amount of CEOC's debt in return for a cash payment not to exceed $80 million.[3484]

The advisors also reminded the members of the Governance Committee that the transaction would likely be viewed as a "Related Party Transaction," requiring the evaluation and approval by the two members of the Governance Committee.[3485]  They also noted that, in addition to providing "multiple updates to the members" of the Governance Committee and obtaining significant feedback from them as the process has developed, they had participated in multiple communications with the advisors and representatives of CEC regarding the terms of the proposed transaction, that CEC's advisors had shared their analyses with K&E and Perella, who, in turn, had performed their own legal and financial analyses, and that, as a result, the terms of the proposed transaction "have improved significantly (from CEOC's perspective) from those in the original transaction contemplated by CEC and [the Participating Noteholders]."[3486]  In this connection, they noted that under the proposed transaction, the $45 million of irretrievable CEOC cash that would be paid would be offset by $17 million in interest savings over six months, $34 million over twelve months and $51 million over eighteen months.[3487]  In addition, they noted that in the event there was no comprehensive restructuring deal reached, CEOC would end up contributing 28% of the new consideration whereas CEC would be contributing 72% (which was an improvement over the terms of the original proposal).[3488]

The following benefits of the proposed transaction to CEOC were also identified and explained:[3489]

---

[3483]  *Id.* at CEOC_2004_PRIV_0008809.

[3484]  *Id.* at CEOC_2004_PRIV_0008811.

[3485]  *Id.* at CEOC_2004_PRIV_0008810.

[3486]  *Id.* at CEOC_2004_PRIV_0008813.

[3487]  *Id.* at CEOC_2004_PRIV_0008814.

[3488]  *Id.* at CEOC_2004_PRIV_0008814.

[3489]  *Id.* at CEOC_2004_PRIV_0008815.

## SUN Figure 3: Excerpt from K&E and Perella Weinberg Deck

- Benefits

  - Helps facilitate an out of court restructuring

    - Resolves guarantee litigation risk regarding senior unsecured bonds (thus eliminating potential default risk for CEOC)

    - Significantly resolves disputes with major stakeholder group, thereby freeing up time and resources to devote to other stakeholders in capital structure

    - Provides greater flexibility and ease in dealing with secured stakeholder groups

    - Should result in remaining senior unsecured bonds trading towards a price better reflective of value, thereby improving chances of overall resolution

  - Material liquidity/deleveraging benefits

    - Addresses nearest term maturities in capital structure

    - Reduces interest by $34 million annually

    - Deleverages CEOC by $563 million

The advisors also identified a series of other important considerations for the Committee members to weigh before deciding whether to approve the proposed transaction:[3490]

## SUN Figure 4: Excerpt from K&E and Perella Weinberg Deck

- Considerations

  - Includes $80 million payment to junior creditors now, when there is no overall comprehensive deal

    - Cost is "mitigated" because $35 million is repaid absent a comprehensive deal

    - Even $45 million non-repaid portion offset by $17 million semi-annual interest savings to be achieved by the time of any comprehensive deal

  - Payment is potentially a preference

    - But that should not deter a payment that potentially helps achieve a comprehensive restructuring that would be in the best interests of CEOC and its stakeholders as a whole

    - Authorizing a payment that may, with 20/20 hindsight, be avoidable as a preference, but that does not, in and of itself, mean that the payment is prohibited by fiduciary duties

    - In fact, fiduciary duties may dictate otherwise if it would be in company's best interests

  - CEC benefits through release of the guarantee

    - But this also materially benefits CEOC, as the disaffirmance of the guarantee, if improper, is a default under CEOC's debt and could result in cross-defaults and cross-acceleration under other senior CEOC debt

    - Also, CEC is making its own significant contributions to the consideration paid to the noteholders

  - May result in litigation from non S&C Group over form of note amendment

  - Communication with other stakeholders must be managed appropriately to keep them focused on overall transaction

---

[3490] *Id.* at CEOC_2004_PRIV_0008816.

Finally, as reflected in the minutes, K&E advised the members of the Governance Committee of their fiduciary duties. Following extensive discussion with their advisors, the Governance Committee approved the proposed transaction, subject to receipt and review of final documentation consistent with the terms outlined in the materials presented and discussed at the meeting.[3491]

On August 17 (before the closing but after the Governance Committee's approval), K&E gave the Governance Committee an extensive written presentation with regard to: the background of the Senior Unsecured Notes Transaction; the status of proposals to CEOC's First Lien Bondholders regarding a proposed out of court consensual restructuring of CEOC's debt; the existence of an independent basis under the terms of the First and Second Lien indentures to terminate the Bond Guarantee upon the election of CEOC;[3492] the existence of disputes and the filing of lawsuits by CEC, CEOC and various constituents in connection with the Senior Unsecured Notes Transaction and other matters; and the independent investigation being conducted by the Governance Committee into all matters that were the subject of pending litigation.[3493] The K&E presentation contained 12 pages of legal advice regarding the fiduciary duties of CEOC's officers and directors, with particular emphasis on the need for the members of the Governance Committee to establish and follow a proper decision-making process, the protective standards applicable to their decisions (business judgment rule v. entire fairness), the role of solvency and the shifting duties of directors of a clearly insolvent company (even where no bankruptcy case has been commenced), and the impact on those duties where a controlling shareholder is present.[3494] The Examiner has concluded that the advice provided to the Governance Committee in connection with their review and approval of the Senior Unsecured

---

[3491] E-mail from K&E to S. Winograd and R. Stauber, *et al.* (Oct. 31, 2014) [CEOC_2004_PRIV_0009616], attaching draft Minutes of the Special Telephonic Meetings of the Governance Committee of the Board of Directors of CEOC (Aug. 8 and Aug. 10, 2014), at CEOC_2004_PRIV_0009620 [CEOC_2004_PRIV_0009618].

[3492] Prior to the appointment of the independent directors of CEOC, CEOC had sent notices to the trustees of the First and Second Lien and subsidiary guaranteed notes exercising CEOC's "election" to release CEC's Guarantee of the respective debt under Section 12.02(c) of the indentures on the grounds that the Bond Guarantee of the relevant underlying debt had been released by virtue of CEOC's no longer being a wholly owned subsidiary of CEC. A second set of notices of election were sent (again before the appointment of the independent directors) following the issuance of another 6% of CEOC's shares under the PIP. It thus appears that what K&E was suggesting at the August 17 meeting was that that the independent directors consider sending a similar set of notices of "election" once the Senior Unsecured Notes Transaction closed. The CEOC Governance Committee voted to approve the making of an election under the "election" under the bond indentures as a result of the Transaction, *see* CEC_EXAMINER_0910078, and formal election notices were sent on August 22, 2014. Election notices for Indentures dated Dec. 2008, Apr. 2009, June 2009, Apr. 2010, Feb. 2012, and Aug. 2012 (Aug. 22, 2014), at CEOC_2004_0067553-570 [CEOC_2004_0067553].

[3493] K&E Presentation to the Governance Committee of the Board of Directors of CEOC (Aug. 17, 2014), at CEOC_2004_PRIV_0021699-733 [CEOC_2004_PRIV_0021699].

[3494] *Id.*

Notes Transaction was thorough, appropriate and enabled Stauber and Winograd to exercise their business judgment in a fully informed manner.

Stauber testified that he approved the Senior Unsecured Notes Transaction for several reasons. *First*, he believed that CEC's substantial contribution to the transaction's funding was beneficial to CEOC.[3495]   He expected that CEC would be a significant contributor to CEOC's potential restructuring, and recognized that if the Bond Guarantee was enforced CEC may not be able to fulfill that role.[3496]   Stauber also believed that the transaction resolved any question from CEOC's perspective as to whether the Bond Guarantee had been released,[3497] and that, as a result, it significantly reduced the risk of a free-fall bankruptcy at CEOC.[3498]   As Stauber explained:

> In this sort of hospitality services arena where customers . . . can decide whether they land a plane here or somewhere else with one of our competitors, reading articles about certain things may come to conclusions that aren't favorable.  So the notion of a free-fall bankruptcy would be something that we preferred not to happen to us.[3499]

Stauber added that they were successful in negotiations with CEC in getting them to fund the majority of the transaction, "[a]nd so generally, we felt that it was a very good thing to continue the deleveraging process step by step based on whichever creditors we can actually come to closure with."[3500]  He added:

> We also felt that . . . we can really see a game plan forming where in order to push forward on the restructuring that we were hoping, and ultimately proved to be correct, that we would be successful in getting CEC to be a major contributor and funder of . . . the plan.  And the downside of the guarantees being enforced would mean that they couldn't be that vehicle for us.  And so we thought that was generally a good thing from CEOC's perspective to ensure that we had that possibility as one of the options that, as we continued to look forward, would be something that would be better to have than not to have in the context of purely a stand-alone bankruptcy versus having someone that could be a major contributor as it relates to that.[3501]

With respect to CEOC's solvency at the time of the transaction, Stauber explained that although the Company never undertook a technical solvency analysis, in his view, CEOC was

---

[3495]  R. Stauber Sept. 30, 2015 Tr. at 86:23-87:12.

[3496]  *Id.* at 87:13-88:8.

[3497]  *Id.* at 85:8-13.

[3498]  *Id.* at 85:19-21.

[3499]  *Id.* at 85:22-86:6.

[3500]  *Id.* at 87:2-12.

[3501]  *Id.* at 87:13-88:7.

insolvent.[3502]   Stauber understood that his duty as a director of an insolvent company was to consider the interests of the corporation, as well as the interests of the community of creditors.[3503]

Winograd cited similar reasons for his approval of the Senior Unsecured Notes Transaction.  *First*, Winograd explained that there "was the desire to . . . stabilize . . . remove or cauterize any potential defaults that might have been going on,"[3504] as well as the desire to address the question of whether the Bond Guarantee had been released.[3505]  With respect to this concern, Winograd said that the CEOC Board discussed that there was a general possibility of litigation by the noteholders who were not given the opportunity to participate in the transaction, but that the deal was "an important incremental step" and the view was that if 50% of the notes were participating, "it was a pretty good case that it would be upheld, but by no means a certainty."[3506]

*Second*, Winograd considered the "purely financial aspects of the transaction from CEOC's point of view," meaning the amount of debt CEOC was retiring compared to the amount of money it was spending to do so.[3507]  Winograd explained that through negotiations, which started with CEC offering to pay $0.20 on the dollar while CEOC would pay $0.80 on the dollar,[3508] the Governance Committee "got to a place where . . . it was less than $0.10 on the dollar," which he thought "was a reasonable financial transaction in and of itself."[3509]  Winograd noted that this figure accounted for CEC's agreement to pay CEOC $35 million in the absence of a restructuring within 18 months.[3510]

*Third*, Winograd considered what he termed the "strategic non-purely financial aspects of how did this help or hinder the restructuring efforts and discussions and negotiations that were under way."[3511]  He explained:

---

[3502] *Id.* at 80:19-81:12.

[3503] *Id.* at 97:1-25.

[3504] S. Winograd Oct. 21, 2015 Tr. at 77:13-17.

[3505] *Id.* at 77:17-19.

[3506] *Id.* at 88:24-89:16.

[3507] *Id.* at 79:19-23.

[3508] *Id.* at 81:8-20.

[3509] S. Winograd Oct. 21, 2015 Tr. at 79:23-80:2.

[3510] *Id.* at 80:3-23.

[3511] *Id.* at 77:22-78:12.

[W]ithout the release of the guarantees there was a lot lower probability that CEC would be able to make any contributions, because if they were going to be hit on the guarantee, then they might well have to file themselves and there would be no contribution from them.   So, in effect we are sort of competing against the guarantee claims.[3512]

Prior to joining the CEOC Board, Winograd was aware that CEOC was highly leveraged. He knew that CEOC had $18 billion face amount in debt and around a billion in EBITDA, which he understood was"[c]learly not sustainable."[3513]   He had also been told that CEOC was "likely going to go through a restructuring."[3514]   He explained that "if CEOC wasn't insolvent now it was going to be at some point in the future,"[3515] and that "the operating presumption was that you were operating in an insolvency situation, that you had broader duties than just to the equity . . . ."[3516]   In short, Winograd, like Stauber, reviewed the Senior Unsecured Notes Transaction with the understanding that CEOC was insolvent and that his fiduciary duties as a director had thus shifted to include creditors and the estate more broadly.[3517]   However, he did not recall insolvency being a specific part of the discussions surrounding the Senior Unsecured Notes Transaction.[3518]

The Examiner finds the explanations provided by Stauber and Winograd to be credible. Although reasonably prudent individuals may have reached the same, similar or different subjective business judgments regarding the relative risks and benefits of the transaction to CEOC and its creditors, there is persuasive evidence that, despite what may have been motivating those at the CEC/Sponsor level, the independent directors of CEOC: (i) retained and were ably advised by separate counsel and financial advisors, (ii) were fully informed of the pros and cons of the proposed transaction, (iii) were not coerced in any way into making a decision, and (iv) concluded, after weighing the plusses and minuses to CEOC, that the proposed transaction was in the best interests of CEOC and its creditors (and not just in the best interest of "Caesars," CEC or the Sponsors).[3519]   This sets the Senior Unsecured Notes Transaction apart from the other transactions investigated by the Examiner.

---

[3512]   *Id.* at 82:23-83:6.

[3513]   *Id.* at 25:17-19.

[3514]   S. Winograd Oct. 21, 2015 Tr. at 25:21.

[3515]   *Id.* at 43:14-17.

[3516]   *Id.* at 44:8-11.

[3517]   *Id.* at 43:20-25.

[3518]   *Id.* at 94:16-19.

[3519]   Although the Governance Committee was advised in the August 10, 2014 presentation that the transaction "should result in remaining senior unsecured bonds trading towards a price better reflective of value, thereby improving chances of overall resolution," neither Stauber nor Winograd cited that consideration as a basis for their decision to approve the Transaction.

On August 12, 2014, CEOC, CEC, and the four Participating Noteholders – Aurelius Capital Management, LP, BlueCrest Capital Management (New York) LP, Angelo Gordon & Co, L.P., and Goldman Sachs & Co. – collectively representing a majority of the outstanding 2016 Senior Notes and 2017 Senior Notes, executed the NPA.[3520]    Appendix 12, Debt Transactions contains a list of all noteholders.  A Form 8-K was filed later that day, announcing the principal terms of and parties to the agreement, including the fact that the Participating Holders had agreed to amendments of the indentures and their notes acknowledging the termination of the Bond Guarantee and modifying other terms[3521] in ways that affected non-participating noteholders.[3522]

Non-participating noteholders were understandably upset.  Following the announcement of the transaction, the 6.5% Senior Notes due 2016 "was the leading weekly high yield bond loser in secondary trading for the week ended Aug. 20 . . . ."[3523]  The Notes traded $16.25 lower than the week before.[3524]  Also, the price of the 5.75% Senior Notes due 2017 dropped 19.3% between August 13 and August 26.[3525]

On August 14, Sean O'Brien of O'Brien LLP sent a letter to Scott Wiegand at CEC on behalf of MeehanCombs LP and other holders of the 6.5% Senior Notes due 2016 and the 5.75% Senior Notes due 2017, expressing his clients' "deep concerns" with respect to the Senior Unsecured Notes Transaction.[3526]  The letter raised a number of issues, including: (i) alleged deficiencies in the disclosures concerning the terms of the transaction; (ii) the assertion that the proposed transaction, if consummated, would constitute a preferential redemption of notes at a premium from a select number of noteholders, thus violating the express terms of the governing indentures and the implied covenant of good faith and fair dealing; and (iii) the claim that the purported release of the Bond Guarantee and other modifications of the indenture in ways that

---

[3520]  NPA (Aug. 12, 2014), at CEC_EXAMINER_0035420-25 [CEC_EXAMINER_0035405].

[3521]  Although Goldman, Sachs & Co. was a party to the NPA, it did not receive any amended notes.  It appears that, in conjunction with this transaction, the balance of the Senior Unsecured Notes it held was transferred to BlueCrest Capital Management (New York) LP. The consideration exchanged between the two parties, if any, was not disclosed. *Id.* at CEC_EXAMINER_0035406 and Schedule B at CEC_EXAMINER_0035429.

[3522]  CEC 8-K (Aug. 12, 2014), at 2.

[3523]  E-mail from C. Luz to D. Bonderman, *et al.* (Aug. 22, 2014), at TPG-Examiner_00006482 [TPG-Examiner_00006478].

[3524]  *Id.* Whereas the $16.25 figure could not be verified, it was noted, for example, that the quoted market prices dropped from Aug. 11, 2014 (at $51.75) to Aug. 21 (at $33.50) by $18.25 for a decrease of around 35%. Bloomberg L.P., Stock Prices for CUSIPs 413627AX8 and 413627AWO Jan. 1, 2008 to Dec. 31, 2014.  Retrieved July 29, 2015.

[3525]  The quoted market price dropped from $38.250 on Aug. 13, 2014 to $30.865 on August 26, for a decrease of around 19.3%. Bloomberg L.P., Stock Prices for CUSIPs 413627AW0 and 12768RH0 Jan. 1, 2008 to Dec. 31, 2014.  Retrieved July 29, 2015.

[3526]  Letter from S. O'Brien to S. Wiegand and K. O'Brien (Aug. 14, 2014), at CEC_EXAMINER_0085211-13 [CEC_EXAMINER_0085211].

adversely affected non-participating noteholders was ineffective and invalid absent the consent of each noteholder.[3527]  On August 19, outside counsel for CEC responded, claiming that the assertions in the August 14 letter were "baseless" and that there is nothing in the law and the contracts, or in the Trust Indenture Act, that prohibits this transaction.[3528]  MeehanCombs and others thereafter sued – that litigation is still pending.[3529]

Between gaining approval from the CEOC Governance Committee on August 10 and the closing on August 22, the terms of the final transaction changed in a number of respects that were generally beneficial or neutral to CEOC.  The principal changes from the term sheet that was approved by the CEOC Governance Committee on August 10 are listed below[3530]:

- The participation amount was reduced to $238 million (decreased from $245 million).

- CEC and CEOC agreed to purchase $155.4 million face value of the Notes (instead of $160 million as originally contemplated), with each paying $77.7 million (decreased from $80 million).

- CEC agreed to contribute an additional $426.6 million in Senior Unsecured Notes (instead of $393 million as initially proposed) to CEOC for cancellation.

- Participating Holders and CEOC entered into supplemental indentures amending a ratable amount of approximately $82.4 million face amount of the 2016 and 2017 Notes held by the Participating Holders (rather than $75 million as originally contemplated.

- Participating Noteholders agreed to a voting/lock-up agreement pursuant to which for the period from the closing date until the earlier of (1) the 181st day after the closing date and (2) the occurrence of an ISDA credit event, they agreed (a) to consent or approve any restructuring on the terms contemplated by the Indenture Voting Arrangements and (b) not to sell, transfer or assign any beneficial ownership interest in the Senior Notes except to a transferee that agreed in writing to be bound by the same covenant.

- Finally, CEC agreed to indemnify the Participating Noteholders from all losses, liabilities, causes of action, demands, claims, damages, judgments, costs, and

---

[3527]  *Id.*

[3528]  Letter from L. Clayton to S. O'Brien (Aug. 19, 2014), at CEC_EXAMINER_0029684-85 [CEC_EXAMINER_0029684].

[3529]  MeehanCombs filed suit on September 3, 2014. *MeehanCombs Global Credit Opportunities Master Fund, LP, et al. v. Caesars Entm't Corp. and Caesars Entm't Operating Co., Inc.*, 14-cv-07091-SAS (S.D.N.Y. Sept. 3, 2014).

[3530]  NPA (Aug. 12, 2014), at CEC_EXAMINER_0035405-29 [CEC_EXAMINER_0035405]; CEC 8-K (Aug. 22, 2014), at 2.

expenses arising out of, related to, or in connection with the NPA or the Supplemental Indentures.[3531]

The Senior Unsecured Notes Transaction formally closed on August 22, 2014.[3532]  As a result of the transaction, $89.4 million of the 2016 Senior Notes and $66 million of the 2017 Senior Notes held by Participating Noteholders were purchased by CEC and CEOC at par plus accrued interest.  Appendix 12, Debt Transactions outlines the sources and uses and includes a flow chart of the Senior Unsecured Notes Transaction.[3533]  In addition to paying one half of the purchase price for the Senior Unsecured Notes that were acquired from Participating Noteholders (and potentially another $35 million), CEC also contributed approximately $426.6 million in aggregate principal amount of Senior Unsecured Notes ($187.1 million of 2016 Senior Notes and $239.6 million of 2017 Senior Notes)[3534] to CEOC.  These Senior Unsecured Notes were among the notes that had originally been exchanged for CEC equity by Paulson, as discussed in Section IX.B.1.  In short, in return for a payment of $77.7 million (subject to further reduction in the event no restructuring agreement was reached within 18 months) and fees of $2.3 million, CEOC was able to reduce its outstanding Senior Unsecured Notes debt by approximately $582 million. (See SUN Figure 5).

SUN Figure 5 illustrates the amounts cancelled and redeemed and the remaining balances outstanding of the Senior Unsecured Notes following the closing of the transaction:

---

[3531] NPA (Aug. 12, 2014), at CEC_EXAMINER_0035414 [CEC_EXAMINER_0035405]. Dietderich explained that he wanted the indemnification provision to be from CEC, rather than CEOC, because "CEC was a better credit." *Wilmington Savs.*, A. Dietderich Aug. 17, 2015 Tr. at 86:14-20.  Dietderich added that he understood CEOC had a lot of debt and needed to have a conversation with a lot of creditors, and he had no idea where those conversations would lead. *Id.* at 87:4-8.  Ultimately however, Dietderich did not believe "the indemnity was really at issue in the negotiation in a meaningful way."  *Id.* at 88:11-12.

[3532] CEC 8-K (Aug. 22, 2014), at 2.

[3533] Appendix 12-4, Senior Unsecured Notes Sources & Uses; Appendix 12-4A, Sun Transaction Flow Chart.

[3534] Amounts reflected in SUN Figure 2; *see also* Appendix 12-4, Senior Unsecured Notes Sources & Uses.

**SUN Figure 5: Senior Unsecured Notes Cancelled, Redeemed
and Amended Notes Outstanding as of 9/30/14**

| (amounts in millions) | Total Holdings as of 6/30/2014 | | Notes Cancelled or Redeemed | | Amended Notes Outstanding as of 9/30/2014 | |
|---|---|---|---|---|---|---|
| **Participating Noteholders[1]** | | | | | | |
| 6.50% due 2016 | $ | 130.2 | $ | 89.4 | $ | 40.8 |
| 5.75% due 2017 | $ | 107.6 | $ | 66.0 | $ | 41.6 |
| **Subtotal** | **$** | **237.8** | **$** | **155.4** | **$** | **82.4** |
| **Non-Participating Noteholders** | | | | | | |
| 6.50% due 2016 | $ | 118.4 | | | $ | 118.4 |
| 5.75% due 2017 | $ | 40.3 | | | $ | 40.3 |
| **Subtotal** | **$** | **158.7** | | | **$** | **158.7** |
| **Related Parties[2]** | | | | | | |
| 6.50% due 2016 | $ | 324.5 | $ | 187.0 | $ | 137.5 |
| 5.75% due 2017 | $ | 391.0 | $ | 239.6 | $ | 151.4 |
| **Subtotal** | **$** | **715.5** | **$** | **426.6** | **$** | **288.9** |
| **Total** | **$** | **1,112.0** | **$** | **582.0** | **$** | **530.0** |

Sources:    NPA (Aug. 12, 2014), at CEC_EXAMINER_0035405-429 [CEC_EXAMINER_0035405]; Closing Memorandum (Aug. 21, 2014), at CEC-EXAMINER_0012424-34 [CEC_EXAMINER_0012424]; CEOC Form 10-Q for the Period Ending June 30, 2014; CEOC Form 10-Q for the Period Ending Sept. 30, 2014.

Notes: [1] Goldman fully exited their position in the Senior Unsecured Notes. NPA (Aug. 12, 2014), at CEC_EXAMINER_0035405-29 [CEC_EXAMINER_0035405]; *see also* Appendix 12-4, Senior Unsecured Notes Sources & Uses.

[2] CAC held the full position of notes outstanding as of Dec. 31, 2014.  CAC continued to hold this position through June 30, 2015.  CEC Form 10-K for the Period Ending Dec. 31, 2014.  CAC Form 10-Q for the Period Ending June 30, 2015, at 62.

## 4.    The Examiner's Findings and Conclusions

As noted previously, the Examiner has concluded that, despite their "ugliness," the Debtors' estates do not possess any plausible fraudulent transfer or breach of fiduciary duty claims arising out of the Senior Unsecured Notes Transaction.  There are certainly very troubling aspects of this Transaction.  There was no prior public announcement, no notice to holders of

Senior Unsecured Notes, and no notice to the indenture trustees for the Senior Unsecured Notes prior to entering into the Senior Unsecured Notes Transaction. The offer by CEC and CEOC to purchase the Senior Unsecured Notes was provided exclusively, and secretly, to the Participating Noteholders that first contacted CEC through counsel, who thereafter agreed to amend the indentures to release the Bond Guarantee and modify other provisions in ways that adversely affected the non-participating noteholders without their consent.

As described elsewhere in this Report, creditors have commenced litigation asserting a variety of claims relating to the contractual and statutory duties that they allege were owed to them in connection with this transaction, as to which the Examiner takes no position. In addition, in the course of his Examination, certain creditor groups have maintained that: (a) the Senior Unsecured Notes Transaction is an avoidable transfer, in that certain of CEOC's junior creditors were treated favorably at the expense of more senior creditors of the same Debtor and because it was part of a larger scheme to improperly release the Bond Guarantee (which they claim did not benefit CEOC), and (b) entering into the Senior Unsecured Notes Transaction was a breach of the CEOC Board's fiduciary duties to its shareholders and creditors. In support of their claim that the Participating Holders received preferential treatment, creditors point to the fact that "[t]he par purchase price for Favored Noteholders' Notes represented more than a 100% premium over market. By way of reference, prior to the Agreement, the 2016 Notes were trading at approximately 48 cents on the dollar."[3535] Creditors have also asserted that the driving, if not the sole, factor behind the Senior Unsecured Notes Transaction was to solidify CEC's litigation and bargaining position vis-à-vis the release of the Bond Guarantee.

There is no question but that the Participating Holders received preferential treatment. Their Notes were purchased at a substantial premium to market, two to three years prior to their maturity dates. The Senior Unsecured Notes were junior debt. Under the circumstances, one may legitimately question the wisdom of paying junior creditors at all, let alone early or at a premium, given CEOC's insolvency and liquidity constraints. The amendments to the indentures clearly inured to CEC's benefit, and to the detriment of non-participating noteholders. There is also little doubt about CEC's and the Sponsors' main objective in agreeing to this transaction, which was to improve its arguments with regard to the release of the Bond Guarantee, and its position that the bank guarantee of payment had been converted to a guarantee of collection with respect to the first lien banks. Rowan and Loveman candidly conceded that this was the objective, at least from their perspective. The fact that Apollo turned down the opportunity to proceed by way of a tender or exchange offer open to all noteholders, as opposed to a privately negotiated transaction with four institutions holding a bare majority of the 2016 and 2017 Notes, is also very troubling. CEOC was clearly insolvent at the time, and CEC's fiduciary duty as controlling shareholder required it to take into account the interests of CEOC and its creditors in general, not just a favored few.

But there are other countervailing (and, in the end, dispositive) factors regarding this transaction that, on balance, outweigh the negative factors described above. CEOC clearly benefitted from the Senior Unsecured Notes transaction. It paid $77.7 million (plus interest and

---

[3535] *MeehanCombs*, 1:14-cv-07091-SAS. (Compl. at ¶72).

fees) in order to reduce its total debt by $582 million.[3536]   The reduction in CEOC's future interest payments alone may justify this transaction.   But regardless of whether reasonable people may agree or disagree with the wisdom of this transaction, unlike many of the other challenged transactions, the Senior Unsecured Notes Transaction was ultimately presented to and approved by a fully informed committee of independent board members at CEOC, advised by independent counsel and financial advisors, who do not appear to have been motivated by any intent to hinder, delay or defraud creditors, and acted instead in what they reasonably believed to be the best interests of CEOC and its creditors.

The Examiner thus concludes that:

- Although the payment by CEOC to Participating Noteholders in exchange for, among other things, a release of the Bond Guarantee within one year of the Petition Date may give rise to a voidable preference claim under *Deprizio* and its progeny against CEC,[3537] any such claim would almost certainly be barred by the safe harbor afforded settlement payments and transfers by, to (or for the benefit of) a financial institution in connection with a securities contract under Bankruptcy Code section 546(e).[3538]   The Examiner, accordingly, believes that such a claim is not viable.

- The release of the Bond Guarantee also cannot serve as basis for a constructive fraudulent transfer claim of the Debtors' estates because, as a matter of law, and as discussed in Section IX.E.4, the Bond Guarantee is not property of the Debtors' estate.   In addition, any constructive fraudulent transfer claim based on the payments made to Senior Unsecured Noteholders in the Senior Unsecured Notes Transaction would be precluded under Bankruptcy Code section 546(e).

- The Bond Guarantee is a contingent asset of CEOC that *creditors* of CEOC, and not CEOC, can look to directly for payment if CEOC fails to pay its

---

[3536] *See* Appendix 12-4, Senior Unsecured Notes Sources and Uses.

[3537] Appendix 5, Legal Standards at Section II; 11 U.S.C. §547(i) (providing that if a transfer made to a non-insider between 90 days and one year pre-petition is avoided because it was made for the benefit of an insider creditor, the transaction would be deemed avoided only as to the insider); 11 U.S.C. §550(c) (prohibiting the trustee from recovering from the non-inside creditor if the transfer was made more than 90 days prior to the petition date); 5 *Collier on Bankruptcy*, ¶550.LH [38-39] (16th ed. rev. 2015) (commenting that sections 547(i) of and 550(c) of the Bankruptcy Code were added to overrule the holdings in *Deprizio*, 874 F.2d at 1200-01  and its progeny); *id.* at n.12 (stating that section 547(i) was added to "broaden the immunity for non-insider creditors and more completely overrule the *Deprizio* line of cases by providing that the 'transfer shall be considered to be avoided [under section 547] only with respect to the creditor that is an insider'"); *id.* at n.8 (stating that section 550(c) overrules *Deprizio* and "clarifies that non-insider transferees should not be subject to the preference provisions of the Bankruptcy Code beyond the 90-day statutory period").

[3538]  11 U.S.C. §546(e); Appendix 5, Legal Standards at Section V.E.

obligations.[3539]   Indeed, if the courts eventually rule that the Bond Guarantee
remains in effect notwithstanding its purported release, CEOC will arguably be no
better off, as any payments made by CEC in respect of the Bond Guarantee would
result in a subrogation claim of CEC against CEOC in equal amount to any
payment on the Bond Guarantee.[3540]   Simply put, no damages are likely be
suffered by the Debtors' estates as a result of the Bond Guarantee release.

- A claim for actual fraudulent conveyance with respect to the $77.7 million in
  payments made by CEOC to the Participating Noteholders in the Senior
  Unsecured Notes Transaction would most likely not be viable.  These payments
  were made by CEOC in respect of junior debt prior to its maturity date when
  CEOC was deeply insolvent, but they were made prior to the 90-day preference
  period.  These are estate claims, but, generally, payments preferring one creditor
  over another in respect of valid debt obligations outside the applicable preference
  period cannot be asserted as fraudulent transfer claims.[3541]

- Finally, any breach of fiduciary duty claim would also likely fail.  The Debtors'
  estate likely suffered no damages as a result of the release of the CEC Guarantee.
  With respect to the $77.7 million ($84.3 million with interest and fees) in

---

[3539]   Appendix 5, Legal Standards at Section III.A.1; 11 U.S.C. §541(a)(1) (defining a debtor's
property in pertinent part as "all legal or equitable interests of the debtor"); *Indus. Enters. of Am.
v. Tabor Acad. (In re Pitt Penn Holding Co., Inc.)*, No. 09-11475 BLS, 2011 WL 4352373, at *5
(Bankr. D. Del. Sept. 16, 2011) (quoting *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204
(1983)) (construing the definition to include "a broad range of property to be included in the
estate"); 5 *Collier on Bankruptcy* ¶547.03[2] (16th ed. rev. 2015) (stating that when considering
whether property is an asset of the debtor, "[t]he fundamental inquiry is whether the transfer
diminished or depleted the debtor's estate"). *See Indep. Nissan v. Vogue Coach Co. (In re Vogue
Coach Co.)*, 132 B.R. 454, 457 (Bankr. N.D. Okla. 1991) (citing 4 *Collier on Bankruptcy*,
¶547.03[2] (15th ed. rev. 1991)) ("Essentially, the transfer must diminish directly or indirectly
the fund to which creditors of the same class can legally resort for the payment of their debts, to
such an extent that it is impossible for other creditors of the same class to obtain as great a
percentage as the favored one."); *see also Hansen v. MacDonald Meat Co., (In re Kemp Pac.
Fisheries, Inc.)*, 16 F.3d 313, 316-17 (9th Cir. 1994) (applying the "diminution of estate"
doctrine to determine if property that is transferred belongs to the debtor); *Danning v. Buzek (In
re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1217 (9th Cir. 1988) ("Generally, property
belongs to the debtor for purposes of §547 if its transfer will deprive the bankruptcy estate of
something which could otherwise be used to satisfy the claims of creditors."); *Coral Petroleum,
Inc. v. Banque Paribas-London (In re Coral Petroleum)*, 797 F.2d 1351, 1355-56 (5th Cir. 1986)
(holding that debtor has an interest in property under §547 if the transfer diminishes the
bankruptcy estate).

[3540]   11 U.S.C. §509.

[3541]   *See Sharp Int'l Corp.*, 403 F.3d at  54 ("[E]ven the preferential repayment of pre-existing
debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices
other creditors. . . . " (quoting *HBE Leas. Corp.* v. *Frank*, 48 F.3d 623, 634 (2d Cir. 1995))).

payments made by CEOC on junior debt while it was insolvent, the Senior Unsecured Notes Transaction was ultimately approved by a fully informed committee of independent directors that was given appropriate legal and financial advice by separate counsel and financial advisors.  As noted above, there is some evidence that the architects of the Senior Unsecured Notes Transaction at CEC and Apollo were motivated primarily to enter into this transaction to further reduce CEC's litigation risk and exposure under the Bond Guarantee, and to improve CEC's position that the First Lien Bank Debt guarantee of payment had been converted to a guarantee of collection.  However, the Examiner believes that it is the intent and testimony of the fully informed members of the CEOC Governance Committee – in approving a transaction that substantially reduced CEOC's debt and future interest obligations that a court would find most relevant in assessing any breach of fiduciary duty claim.  Although this is in part a related-party transaction, it stands in marked contrast to the other transactions investigated by the Examiner, where there were no independent directors with independent advisors reviewing the transaction.  Here, in addition to independent directors and advisors, there were express and cogent business reasons for CEOC to approve this transaction independent of any reason that may have led CEC and the Sponsors to approve it as well.  The Examiner this concludes that any breach of fiduciary duty claims against CEOC's directors (and CEC as controlling shareholder) arising out of this transaction are simply not viable.[3542]

---

[3542]   Absent a viable breach of fiduciary duty claim, there can be no aiding and abetting claim.

### F.  The PIK Notes Transaction

The Examiner investigated CEOC's November 2014 redemption of approximately $18 million in PIK Notes.  Various constituencies have raised concerns about the propriety of the above-par redemption, particularly given that the transaction occurred at a time when the notes were trading at a steep discount to par and CEC held approximately $4.5 million in of the notes. Creditors have asserted that the PIK Notes Transaction gives rise to claims for (i) breach of fiduciary duty, (ii) preference, and (iii) actual fraudulent transfer, given that (a) the PIK Notes were repaid at a substantial premium to their trading value, (b) the debt did not mature until 2018 and therefore there was no imminent need to satisfy the notes, (c) a significant percentage of the debt repaid by CEOC was held by insiders, and (d) the majority of holders were paid on December 3, 2014, 43 days prior to the January 15, 2015 Petition Date.  The Debtors and other Caesars entities have countered, arguing that there was a valid business purpose for redeeming the PIK Notes, and that, in any event, section 546(e) of the Bankruptcy Code protects all repayments made pursuant to the PIK Notes Transaction.  For the reasons explained below, the Examiner has concluded that any claims relating to the PIK Notes Transaction would be weak or not viable.

### 1.  Description and Relevant Facts

The PIK Notes were issued by CEOC pursuant to an indenture dated February 1, 2008.[3543]  The notes were due to mature in 2018 and were originally guaranteed by CEC and certain of CEC's subsidiaries.[3544]  In June 2014, CEOC notified U.S. Bank, the trustee under the PIK Notes Indenture, that CEOC elected to release the CEC Guarantee of the PIK Notes.[3545]

Under the indenture, the notes were toggle notes pursuant to which CEOC was permitted to pay interest either in kind or in cash until February 1, 2013, but thereafter was required to pay interest in cash.[3546]  However, on September 25, 2014, U.S. Bank informed CEOC that interest continued to be paid in kind after February 1, 2013 and that the majority noteholders, Beacon Enterprises Limited and Yorktown Holdings, through the investment firm PSQ Capital, requested that this non-payment be remedied.[3547]  In an e-mail to Tom Evans, the Vice President and Assistant Treasurer of CEC, Deborah Ibrahim at U.S. Bank stated that a redemption would be one way of handling the default, but that U.S. Bank was open to other suggestions.[3548]

---

[3543]  PIK Notes Indenture (Feb. 1, 2008), filed with Harrah's Entertainment Inc. Form 8-K on Feb. 1, 2008.  CEOC also issued certain senior notes due 2016 with an interest rate of 10.75% (the "Cash Pay Notes") along with the PIK Notes under the PIK Notes Indenture.

[3544]  *Id.*

[3545]  CEC Form 8-K for the year ended Dec. 31, 2013 (filed June 27, 2014), at 3.

[3546]  PIK Notes Indenture (Feb. 1, 2008), at A-2-6, 7, filed with Harrah's Entertainment Inc. Form 8-K on Feb. 1, 2008.

[3547]  E-mail from D. Ibrahim to T. Evans (Sept. 25, 2014), at APOLLO-Examiner_00938311 [APOLLO-Examiner_00938311]; *see* M. Wlazlo Feb. 4, 2016 Tr. at 348:4–349:15.

[3548]  E-mail from D. Ibrahim to T. Evans (Sept. 25, 2014), at APOLLO-Examiner_00938311 [APOLLO-Examiner_00938311].

Consideration was given to "tak[ing] out just the complaining holder"[3549] and CEC suggested "com[ing] up with a way of cancelling [the PIK Notes it held] to get the debt balance back down to where it should be."[3550]  U.S. Bank further suggested doing "a tender offer for cash at par in an amount equal to the miss, so anyone who wants the cash they would have received can get it."[3551]  Ultimately, "the company decided the best course of action was to just redeem the whole thing pursuant to the redemption provisions in the document."[3552]

The basis for this decision appears to have been at least partially due to the fact that the majority holders had threatened to commence a lawsuit against CEOC relating to the default.  As Wlazlo explained:

> we were in payment default because the failure to pay the cash when the cash was due was quite old . . . and so doing anything less than taking out the whole thing would not have cured the default.  It may have, you know, put people back where they would have been or things like that and then you are just sort of in a damages argument . . . but it was in a state where it could be sued upon, immediately accelerated, and we had no defenses.[3553]

He further explained that:

> I think the last thing people needed was to be sued on [the small amount of PIK Notes] with no defenses and taken to court in the middle of trying to . . . put together a many-billion-dollar restructuring and it wasn't worth any savings to do anything less than just take it out.  I'm not sure who ultimately made that decision.  I think there was sign off by all the parties, CEOC -- I believe at this point in time Kirkland was involved already as CEOC counsel, so between CEOC, CEC and sponsors, the board, everyone sort of approved that course of action.[3554]

In June 2014 – approximately three months before learning of the default and four months before making the decision to redeem the PIK Notes – Caesars sought to identify the holders of the approximately 74% of outstanding notes not held by CEC.[3555]  This effort was

---

[3549]  M. Wlazlo Feb. 4, 2016 Tr. at 348:22-23.

[3550]  E-mail from M. Wlazlo to J. Saferstein, *et al.* (Sept. 26, 2014), at PW_EXAMINER _SUPP_00012216 [PW-EX-AMINER_SUPP_00012216].

[3551]  *Id.*

[3552]  M. Wlazlo Feb. 4, 2016 Tr. at 340:25-341:4.

[3553]  *Id.* at 343:3-16. S*ee* PIK Notes Indenture (Feb. 1, 2008), at 6.01(a) and 6.02, filed with Harrah's Entertainment Inc. Form 8-K on Feb. 1, 2008.

[3554]  M. Wlazlo Feb. 4, 2016 Tr. at 343:19-344:7.

[3555]  *See* e-mail from P. Schlakman to K. Glassman (June 16, 2014), at APOLLO-Examiner_ 00711526 [APOLLO-Examiner_00711526] ("We recently fielded a call from a firm who was apparently hired by the company to track down who the owners of this class of bonds are."); Ipreo Bondholder Intelligence Report (Sept. 2014), at CEC_EXAMINER_0439077

undertaken in order to allow for "the broader restructuring that ultimately resulted in the RSA."[3556]  Upon learning of Caesars' efforts to identify them, the majority holders notified the Sponsors that they "would be quite happy to tender [the PIK Notes] at an attractive offer."[3557]  The Sponsors did not accept the offer at that time.  The effort to identify the PIK noteholders suggests that the Sponsors, CEC and/or CEOC were contemplating a redemption or some other form of offer even prior to their learning of the payment default in September 2014.

When Mary Beth Higgins, the CFO of CEOC, was asked why CEOC elected to redeem the PIK Notes, she explained that, after learning of the payment default, the majority noteholders warned that they needed to be "paid off or we'll put you in default."[3558]  David Sambur further indicated that there were efforts to negotiate with the holders for repayment at a discount since the notes were trading at a discount, "but the [holders] wouldn't take it."[3559]  He also stated that "there was a concern that this very small amount would be an incurable default that would force the company into bankruptcy."[3560]  Marc Rowan, a member of the CEOC Executive Committee, further explained:

> to the extent that payment, which was relatively small, and 20 million was missed, and it would constitute a default, people who were interested in a precipitous bankruptcy, primarily to collect on their CDS bets, would have been able to throw the company into bankruptcy in a chaotic fashion, and so, at least from my point of view and from the presentation I remember, it seemed like a small payment to forestall that possibility.[3561]

Wlazlo further explained that "[t]he chaotic bankruptcy" mentioned by Rowan "refer[red] to sort of a free-fall bankruptcy where there is a filing in the absence of an RSA or an agreement on . . . [the] terms of . . . a restructuring."[3562]  David Sambur agreed, stating that "[the redemption amount] was a really small amount in the context of the company, and the view of the directors, I think including the CEOC independent directors, was that the amount was well worth it because there hadn't been a determination at the time to not pay the interest to the second lien creditors and to file."[3563]  Higgins concurred, stating that "had we let these default we would have ended

---

[CEC_EXAMINER_0439077].

[3556]  M. Wlazlo Feb. 4, 2016 Tr. at 352:10-19.

[3557]  E-mail from P. Schlakman to K. Glassman (June 16, 2014), at APOLLO-Examiner_00-711526 [APOLLO-Examiner_00711526].

[3558]  M. Higgins Oct. 14, 2015 Tr. at 43:12-13.

[3559]  D. Sambur Nov. 14, 2015 Tr. at 577:17-25.

[3560]  *Id.* at 576:21-24.

[3561]  M. Rowan Nov. 17, 2015 Tr. at 418:5-15.

[3562]  M. Wlazlo Feb. 4, 2016 Tr. at 347:8-12.

[3563]  D. Sambur Nov. 14, 2015 Tr. at 578:10-17.

up with just a small little inadvertent note trip, tripping a whole series of dominos, and that would have been just a ridiculous result from this."[3564]  Higgins admitted, however, that:

> I didn't research all of this, but it's my understanding if you have a default on one piece of debt, a cash default like that, that there are repercussions in other areas of the financial structure.  And certainly it was complicated enough that you don't want to start what might be a questionable default.  And at that time, certainly this was October/November [2014], and we were really trying to get through a fairly comprehensive restructuring plan with much, much bigger implications.[3565]

While not believing it would trigger a cross-default, Wlazlo shared this concern, stating "I think at this time we were dealing with the creditors on sort of billions of dollars of debt and trying to work towards . . . a broader restructuring and the company did not need to be sued on a relatively small tranche of debt that would potentially . . . put a wrench into the much broader restructuring."[3566]  Wlazlo added:

> I think the concern I just mentioned, if you are failing to pay your . . . debts as they come due . . . it has implications if . . . people are suing you. . . . Any unfriendly creditor to get leverage, for example, I think, could take the position that you are failing to pay your debts and sort of lead to . . . a chain of events that would result in a filing before . . . the restructuring which was sort of in the works at the time, was agreed to and documented.[3567]

Although Sambur believed that CEOC's independent directors were of the view that the redemption was warranted, the evidence is that "the independent directors were not part of the decision-making process."[3568]  Rather, on October 2, 2014, the CEOC Executive Committee, which was comprised of Rowan,[3569] Kelvin Davis and Gary Loveman, approved repayment of

---

[3564]  M. Higgins Oct. 14, 2015 Tr. at 44:24-45:5.

[3565]  *Id.* at 46:6-19.  The Examiner understands that the PIK Notes were not, in fact, redeemed because of a concern about the PIK Notes cross-defaulting to CEOC's other debt documents.

[3566]  Wlazlo Feb. 4, 2016 Tr. at 341:19-342:2.

[3567]  *Id.* at 346:16-347:8.

[3568]  Feb. 12, 2016 e-mail from S. Lerner to counsel for the Examiner; *see also* R. Stauber Sept. 30, 2015 Tr. at 104:20-107:2; S. Winograd Oct. 21, 2015 Tr. at 91:12-23.

[3569]  In addition to the litigation risk resulting from CEOC's payment default, Rowan also suggested that the decision to authorize the redemption was based on the fact that the PIK Notes were applicable high-yield debt obligations ("AHYDO").  Tax rules applicable to such high-yield obligations limit a company's ability to deduct interest on instruments issued with significant original issue discount.  As is typical in the case of PIK toggle notes, Section 6(b) of the Form of PIK Notes provided that CEOC was required to partially redeem the notes in 2013 in order to avoid application of the AHYDO rules and the loss of its ability to deduct interest expenses on the notes.  Such partial redemption payments are referred to as "AHYDO saver payments" or "AHYDO catch-up payments."  It does not appear that CEOC made any partial redemption (or "catch-up") payments at any time prior to full redemption of the PIK Notes in

the PIK Notes either (i) through a redemption at 103.583% (the redemption price specified in the PIK Notes Indenture),[3570] and/or (ii) a repurchase of the PIK Notes "directly from the holders at a price not to exceed the redemption price."[3571]   Higgins signed both agreements on behalf of CEOC.[3572]

As discussed above with respect to the B-7 Transaction and the Senior Unsecured Notes Transaction, CEC was able to obtain a modification of its Bank Guarantee of obligations under the First Lien Credit Agreement from a guarantee of payment to a guarantee of collection.  This was critical to CEC; without any modification, CEC would likely be in bankruptcy right now.[3573] However, the modification of the Bank Guarantee was subject to a "most favored nations" clause, so that the First Lien lenders would have the benefit of any more favorable guarantee provided by CEC.  The CEC guarantee of the PIK Notes was a guarantee of payment, and therefore it was critical for CEC to avoid a demand on its guarantee of the PIK Notes.  Such a demand could result in CEC forfeiting the modification of the Bank Guarantee to a guarantee of collection, which would be disastrous for CEC.  Interestingly, none of the witnesses identified the threat to CEC's Bank Guarantee as a reason the PIK Notes had to be defeased by CEOC.

---

December 2014.  Moreover, although issuers generally make AHYDO saver payments to avoid having their interest expense deductions deferred and/or disallowed under the AHYDO rules, CEOC had accumulated significant net operating losses in 2013 and 2014.  As such, CEOC's failure to make the AHYDO saver payments on the PIK Notes did not have a material adverse Federal income tax consequence because CEOC could not have utilized the interest expense deductions preserved by such saver payments for the referenced years.  Accordingly, although Rowan correctly identified the PIK Notes as AHYDO, it does not appear that this characterization formed the basis for the decision to authorize the full redemption of the PIK Notes.

[3570] PIK Notes Indenture (Feb. 1, 2008), at A-2-8, filed with Harrah's Entertainment Inc. Form 8-K on Feb. 1, 2008.

[3571] *See* e-mails among M. Rowan, S. Wiegand, and K. Davis *et al.* (Oct. 2, 2014), at CEOC_2004_PRIV_0024687 [CEOC_2004_PRIV_0024686]; *see also* e-mail from G. Loveman to S. Wiegand *et al.* (Oct. 2, 2014), at CEC_EXAMINER_0903575 [CEC_EXAMINER _0903575].

[3572] *See* Note Purchase Agreement (Oct. 14, 2014), at CEOC_2004_PRIV_0033824 [CEOC_20-04_PRIV_0033814]; Agreement with U.S. Bank (Oct. 15, 2014), at CEOC_2004_PRIV_00-33830 [CEOC_2004_PRIV_0033827].

[3573] M. Wlazlo Feb. 4, 2016 Tr. at 331:15 to 332:7.

At the time this transaction was approved, the more valuable Cash Pay Notes were trading at approximately 34.063% of their face value.[3574]  It does not appear that the CEOC Executive Committee, the independent directors or the Sponsors investigated the trading prices of the PIK Notes (or the Cash Pay Notes as a proxy for the PIK Notes) between the time they learned of the potential default and the time they approved the transaction.

The PIK Notes were redeemed at 103.583% of their face amount at a cost of $17,669,147.72,[3575] including payment of $4.6 million in notes held by CEC, as follows:

---

[3574]  Although the PIK Notes did not trade in October 2014, the Cash Pay Notes issued under the PIK Notes Indenture did trade at that time.  Given the more favorable terms of the Cash Pay Notes, the trading value would have been higher than the trading value of the PIK Notes.  This conclusion is confirmed by (i) CEC's memorandum to regulators dated July 2, 2008, which reflects that the markets priced the PIK Notes at a discount in anticipation of interest being paid in kind rather than in cash, *see* APOLLO-Examiner_01488067 [APOLLO-Examiner_01488066]; and (ii) the fact that the PIK feature on the notes required an interest rate step-up of 75 bps over the interest rate payable on the Cash Pay Notes.  Both factors indicate the market's preference for interest paid in cash rather than in kind.

[3575]  The last PIK of interest occurred as of August 1, 2014.  The calculation of the cash payment was based on the PIK 11.5% coupon rate rather than the cash coupon rate of 10.75% for the period August 2, 2014 through the redemption date of December 3, 2014.  The differential is approximately $58,000.

| PIK Noteholders as of 9/8/14[3576] | Face Value as of 9/8/14 | PIK Interest 9/8/14 to 12/3/14 | Face Value as of 12/3/14[3577] | Premium over Par Paid[3578] | Estimate of Total Paid[3579] |
|---|---|---|---|---|---|
| Beacon Enterprises Limited[3580] | $ 3.9 | $ 0.1 | $ 4.1 | $ 0.1 | $ 4.2 |
| Yorktown Holdings Limited | 3.9 | 0.1 | 4.1 | 0.1 | 4.2 |
| Elliott Management Corporation | 4.3 | 0.2 | 4.5 | 0.2 | 4.6 |
| CEC | 4.3 | 0.2 | 4.5 | 0.2 | 4.6 |
| **Total** | **$16.5** | **$0.6** | **$17.1** | **$0.6** | **$17.7** |

In connection with the redemption, the majority holders sought to avoid the 30-day waiting period required under the PIK Notes Indenture and requested that the funds come directly from U.S. Bank,[3581] presumably for reasons related to preference periods in a potential bankruptcy scenario. Wlazlo stated that the holders were "making noise and wanted to be taken out and wanted to be taken out quickly."[3582] Thus, under the Note Purchase Agreement dated October 14, 2014, the majority holders' notes were to be redeemed within 30 days of the date of

---

[3576] The September 2014 Ipreo Bondholder Intelligence Report reflects the noteholders' position as of September 8, 2014. Ipreo Bondholder Intelligence Report (Sept. 2014), at CEC_EXAMINER_0439077 [CEC_EXAMINER_0439077].

[3577] The Face Value of the PIK Notes as of December 3, 2014 is calculated as the sum of the face value of the notes as of September 8, 2014 and the PIK interest accumulated from the previous PIK payment in August 2014 through December 2014, as identified in Caesars' general ledger activity for this transaction.

[3578] Premium over par is calculated as the amount of consideration paid less the amount of principal and interest due and payable.

[3579] The total amount paid to noteholders was $17,669,148. The amount paid to each noteholder was estimated pro rata based on the percentage of principal outstanding per the September 2014 Bondholder Intelligence Report.

[3580] PSQ Capital LLC was the custodian of the PIK Notes held by Beacon Enterprises Limited ($3,911,957) and Yorktown Holdings Limited ($3,911,960) as of October 14, 2014 (total $7,823,917). Schedule A of the Note Purchase Agreement (Oct. 14, 2014), at CEOC_2004_PRIV_0033826 [CEOC_2004_PRIV_0033814].

[3581] *See* Note Purchase Agreement (Oct. 14, 2014), at CEOC_2004_PRIV_0033815 [CEOC_2004 _PRIV_0033814].

[3582] M. Wlazlo Feb. 4, 2016 Tr. at 356:2-5.

the agreement (*i.e.*, by November 13, 2014).[3583]   Despite this, all noteholders, including the majority holders, were paid on December 3, 2014 in accordance with the Agreement with U.S. Bank.[3584]   Using the Cash Pay Notes issued under the PIK Notes Indenture as a proxy for the trading value of the PIK Notes, the market price of the PIK Notes on December 3, 2014 was 14.250%,[3585] which means that the 103.583% redemption price that was paid is a 627% premium over the market value on the redemption date.

## 2.   The Examiner's Findings and Conclusions

As noted above, certain creditor groups have asserted that the PIK Notes Transaction may be avoided as a preference under section 547(b) of the Bankruptcy Code and/or as fraudulent transfers under section 548 of the Bankruptcy Code and the New York UFCA, and is otherwise actionable as a breach of fiduciary duty.   As discussed below, the Examiner has concluded that, although there are aspects of this transaction that are troublesome (paying a substantial premium to holders of PIK Notes, including $4.6 million to CEC, when the notes did not mature until 2018), any claims relating to the PIK Notes Transaction would be weak or not viable.

The payments made pursuant to the PIK Notes Transaction meet all of the requirements of Bankruptcy Code section 547(b) (avoidable preferences) insofar as:   (i) they were transfers of CEOC's interest in property (*i.e.,* cash); (ii) they were made for or on account of CEOC's antecedent obligations under the PIK Notes; (iii) CEOC was insolvent at the time of the transfers;[3586] (iv) the transfers were made on December 3, 2014, *i.e.*, within the 90-day period applicable to non-insiders and within the one year period applicable to insiders;[3587] and (v) the transfers enabled the transferees, who held only unsecured obligations, to receive more than they would have received in a hypothetical chapter 7 case because such noteholders would not be paid in full, with interest and a premium given the economics of CEOC's chapter 11 case.[3588]

---

[3583]   *See* Note Purchase Agreement (Oct. 14, 2014), at CEOC_2004_PRIV_0033815 [CEOC _2004 _PRIV_0033814].

[3584]   *See* Agreement with U.S. Bank (Oct. 15, 2014), at CEOC_2004_PRIV_0033827-33 [CEOC _2004_PRIV_0033827]; Notice of Full Redemption of PIK Notes (Feb. 1, 2014), at PW_EXAMINER_SUPP_00011896   [PW_EXAMINER_SUPP_00011896];   PIK   Notes Transaction Journal Entries at p. 3.   Although there was some disagreement between U.S. Bank and Paul Weiss regarding whether the majority noteholders' PIK Notes could be redeemed early, the parties ultimately agreed that all notes would be redeemed on December 3, 2014.   *See* e-mail correspondence between Paul Weiss lawyers and counsel for the U.S. Bank (Oct.-Nov. 2014), at PW_EXAM-INER_SUPP_00011875-87 [PW_EXAMINER_SUPP_00011875].

[3585]   Bloomberg L.P., CUSIPs 413627AY6, EH1863099, 413627BE9, Oct. 1, 2014 (retrieved July 29, 2015).

[3586]   *See* Section V for the Examiner's analysis and conclusions concerning CEOC's solvency.

[3587]   *See* Appendix 5, Legal Standards at Section II.

[3588]   Pursuant to Article III, Section B.7 of the *Debtors' First Amended Joint Plan of Reorganizat-ion Pursuant to Chapter 11 of the Bankruptcy Code*, Dkt. No. 2402, Class G – Subsidiary-Guaranteed Notes Claims, which include notes issued under the PIK Notes Indenture, are impaired and will not be paid in full, with interest or a premium.   Additionally, the Debtors

Moreover, none of the defenses set forth in section 547 appear to apply to the PIK Notes transfers.[3589]  The payments were also preferences under the New York UFCA.[3590]

They are not, however, in all likelihood actionable by virtue of section 546(e) of the Bankruptcy Code, which, as discussed previously,[3591] creates a safe harbor defense to any preference or constructive fraudulent transfer claim involving "settlement payments" or transfers by, to or through a financial institution "in connection with a securities contract."  Under 11 U.S.C. §741(8), the redemption of a debt security constitutes the completion of a transaction in securities, which is how courts have interpreted the term "settlement payment."[3592]  Similarly, because CEOC's redemption was undertaken pursuant to a Note Purchase Agreement with the

---

state in Article VIII, Section B.2 of the *Disclosure Statement for the Debtors' First Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code*, Dkt. No. 2403, that "the Debtors believe that liquidation under chapter 7 of the Bankruptcy Code of the Debtors' businesses would result in substantial diminution in the value to be realized by Holders of Claims as compared to distributions contemplated under the Plan."  Accordingly, given that the Debtors assert that the impaired treatment of Subsidiary-Guaranteed Notes under the Debtors' Plan is superior to a hypothetical distribution in a chapter 7 liquidation, the redemption of the PIK Notes at 103.583% clearly enabled the transferees to receive more than they would have received in a hypothetical chapter 7 case.

[3589]  *See* Appendix 5, Legal Standards at Section III.C discussing the affirmative defenses likely to be relevant to the transactions at issue, which include, *inter alia*:  (i) the contemporaneous exchange for new value defense provided by section 547(c)(1) of the Bankruptcy Code; (ii) the ordinary course of business defense provided by section 547(c)(2) of the Bankruptcy Code; and (iii) the subsequent new value defense provided by section 547(c)(4) of the Bankruptcy Code.

[3590]  The payments may also be avoided as an insider preference under the Nevada UFTA.  *See* Nev. Rev. Stat. §112.190(2).

[3591]  *See* Appendix 5, Legal Standards at Section III.C.3.

[3592]  *See Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 337 (2d Cir. 2011) (citing Group of Thirty, *Clearance and Settlement Systems in the World's Securities Markets* 86 (1989)) (holding that the early redemption of commercial paper constituted a "settlement payment"); *see also Grede v. FCStone, LLC*, 746 F.3d 244, 252 (7th Cir. 2014) ("Regardless of how Sentinel chose to fund customer redemptions, the redemptions were meant to settle, at least partially, the customers' securities accounts with Sentinel.  The pre-petition transfer to FCStone thus qualified as a 'settlement payment' under §546(e)."); *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 749 (7th Cir. 2013) (finding that a transaction involving the early redemption of shares was a "settlement payment"); *Peterson v. Enhanced Investing Corp. (Cayman) Ltd. (In re Lancelot Investors Fund L.P.)*, 467 B.R. 643, 652-56 (Bankr. N.D. Ill. 2012)*, aff'd sub nom. Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013) (rejecting a trustee's argument that redemption payments were not "settlement payments" due to the taint of fraud resulting from a Ponzi scheme); *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 366 (W.D. Pa. 2006) (finding that redemption of stock by shareholders in bankrupt foundry corporation were "settlement payments" for purposes of the safe harbor).

majority holders and related redemption agreement with U.S. Bank – both of which were "contracts for the purchase or sale of a security" – the transfers were made "in connection with a securities contract."[3593]  It is equally clear that that the redemption was "made by or to (or for the benefit of) . . . a financial institution" since U.S. Bank, the initial transferee, qualifies as a "financial institution."[3594]

The same analysis dooms any claim for constructive fraudulent transfer under federal or state[3595] law (even though a reasonable argument exists that CEOC overpaid for the PIK Notes and thus did not receive reasonably equivalent value at the time of the redemption).[3596]  The claims for actual fraudulent transfer and breach of fiduciary duty, however, require a more nuanced analysis, although in the end the Examiner has concluded that any such claims are weak at best.  With regard to actual fraudulent transfer, at least three badges of fraud are present:[3597] (i) the transfer occurred when CEOC was clearly insolvent;[3598] (ii) $4.6 million of the redemption payments were made to CEC, an insider of CEOC;[3599] and (iii) a reasonable argument exists that cancellation of the notes in exchange for CEOC's above-par redemption resulted in a transfer for less than fair or reasonably equivalent value.  In addition, the process employed for approval of the PIK Notes Transaction was far from ideal.  The decision to redeem the PIK Notes was made by the CEOC Executive Committee (Rowan, Davis and Loveman) and

---

[3593]  *See* 11 U.S.C. §741(8) (defining a "securities contract" as "a contract for the purchase, sale or loan of a security . . . ."); 11 U.S.C. §101(49)(A)(i) (defining a "security" as a note); *see also* PIK Notes Indenture (Feb. 1, 2008), filed with Harrah's Entertainment Inc. Form 8-K on Feb. 1, 2008; Note Purchase Agreement Section 1.1 (Oct. 14, 2014), at CEOC_ 2004_PRIV_0033814 [CEOC_2004_PRIV_0033814]; Agreement with U.S. Bank Section 1 (Oct. 15, 2014), at CEOC_2004_PRIV_0033827 [CEOC_2004_PRIV_0033827].

[3594]  *See* U.S. Bancorp 10-K for the year ended Dec. 31, 2014 (Feb. 27, 2014), at 2-4 (stating that U.S. Bank is a commercial and savings bank and regulated by the Federal Reserve).  Section 101(22)(A) of the Bankruptcy Code defines a "financial institution" as including a "Federal reserve bank or an entity that is a commercial or savings bank" 11 U.S.C. §101(22)(A).

[3595]  The New York UFCA, unlike section 548 of the Bankruptcy Code, requires a plaintiff asserting a constructive fraudulent transfer claim to establish lack of good faith on the part of the transferee.  Here, a reasonable argument can be made that CEC was not a good faith transferee to the extent it received $4.6 million in proceeds upon redemption.

[3596]  Whether the establishment of a litigation trust, the abandonment of claims or other provision of a confirmed plan of reorganization could be successfully implemented as an "end run" around section 546(e) is a plan issue, and thus beyond the scope of this report.

[3597]  *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005). (stating that "[d]ue to the difficulty of proving actual intent to hinder, delay, or defraud creditors [under the New York UFCA], the pleader is allowed to rely on 'badges of fraud' to support his case") (internal quotation marks and citations omitted).

[3598]  *See* Section V for the Examiner's analysis and conclusions concerning CEOC's solvency during the period of October-December 2014.

[3599]  *See* 11 U.S.C. §101(31)(B).

not by the full board or Governance Committee.[3600]  Indeed, the independent directors do not appear to have been consulted about, or even informed of, the transaction before it closed.[3601]  Nor does it appear that Kirkland & Ellis was consulted by the CEOC Executive Committee, even though it had supplanted Paul Weiss as counsel for CEOC and was deeply involved in restructuring negotiations and bankruptcy planning.[3602]  Instead, it was Rowan and Sambur, working with Paul Weiss, that put this transaction together.  CEC needed the PIK Notes to be paid off; otherwise CEC could lose the modification of the Bank Guarantee to a guarantee of collection.

Weighing all of the available evidence and inferences to be drawn from the documents and witness interviews, the Examiner believes that a reviewing court would most likely conclude that the overarching intent in approving the PIK Notes Transaction was to avoid the adverse consequences of losing the modification of the Bank Guarantee to a guarantee of collection, a preexisting payment default and/or threatened litigation.[3603]  Although it is easy to argue that, in a perfect world, CEOC should not have defaulted in the first place, or having defaulted, should have found some way to accomplish the result at a more reasonable price (such as through a tender offer or privately negotiated purchases, or by "curing" the default by paying all past-due interest in cash), and without any payment to CEC, under the circumstances, the decision-makers made a reasonable choice: the majority PIK noteholders made it clear they would not accept less than the full redemption price, and U.S. Bank advised counsel for CEOC that all noteholders had to be treated equally under the terms of the indenture, and it refused to compromise on this point.[3604]  Thus, even if CEOC could have technically cured the default, (i) it likely would not have silenced or satisfied the majority holders, (ii) litigation may have ensued, (iii) CEC would have lost its modification of the Bank Guarantee to a guarantee of collection and (iv) restructuring negotiations may have stalled or broken down, resulting in an earlier CEOC bankruptcy filing.  In short, although CEOC funds were used to solve CEC's problem, unlike other transactions investigated by the Examiner, any claim that the Sponsors or CEC engaged in an actual fraudulent transfer is weak.

The same factors come into play in analyzing any breach of fiduciary duty claim arising out of this transaction.  As noted above, the decision-making process followed was far from ideal, and the decision-makers (Rowan, Sambur, Davis and Loveman) were all conflicted

---

[3600]  *See* e-mails from M. Rowan to S. Wiegand *et al.* (Oct. 2, 2014), at CEOC_2004_PRIV_0024687 [CEOC_2004_PRIV_0024686]; *see also* e-mail from G. Loveman to S. Wiegand, *et al.* (Oct. 2, 2014), at CEC_EXAMINER_0903575 [CEC_EXAMINER _0903575].

[3601]  E-mail from S. Lerner to counsel for the Examiner (Feb. 12, 2016); *see* R. Stauber Sept. 30, 2015 Tr. at 104:20-107:2; S. Winograd Oct. 21, 2015 Tr. at 91:12-23.

[3602]  E-mail from S. Lerner to counsel for the Examiner (Feb. 12, 2016).

[3603]  The Examiner also finds that there is inconclusive evidence to establish that the PIK Notes Transaction was done with actual intent "to hinder, delay or defraud" creditors under the Nevada UFTA.  *See* Nev. Rev. Stat. §112.180(1)(a).

[3604]  *See* e-mail correspondence between Paul Weiss lawyers and counsel for the U.S. Bank (Oct.-Nov. 2014), at PW_EXAMINER_SUPP_00011875-87 [PW_EXAMINER_SUPP_00011-875].

fiduciaries wearing multiple hats.  As a result, they owed fiduciary duties to both CEC and
CEOC, related parties that were sitting on opposite sides of the bargaining table in terms of the
ongoing RSA negotiations.[3605]  At a very minimum, the independent directors and Kirkland &
Ellis should have been consulted before CEC and its counsel decided to enter into this
transaction.  The independent directors, however, were not part of the decision-making process
and were not advised that CEC had determined to use CEOC funds to protect the modification of
the Bank Guarantee to a guarantee of collection.[3606]  The decision may have been the same, but
the fact that they were not consulted or informed is troubling.  This is particularly true with
respect to the payment of $4.6 million to CEC.  Independent directors and advisors may well
have insisted that the deal be structured without any payment being made to CEC, or upon
assurances from CEC that it would contribute the proceeds back to CEOC immediately upon
closing.  The transaction was also negotiated at breakneck speed – from beginning to end, it took
a little over a week.

Because CEC (and the members of the Executive Committee) stood on both sides of this
transaction, whether the decision-makers breached their fiduciary duties of care and loyalty will
likely be judged under the entire fairness standard.  Fair process will be difficult to prove.  As to
fair price, however, the evidence is less clear.  Fair price "relates to the economic and financial
considerations of the proposed [transaction]."[3607]  "A fair price is a price that is within a range
that reasonable men and women with access to relevant information might accept."[3608]  Although
there is no evidence that the CEOC Executive Committee was provided with or inquired about
the market value of the PIK Notes (or other financial information relevant to the transaction), in
light of (i) the potential consequences resulting from litigation with the majority holders, (ii) the
need to promptly cure the payment default and focus on the larger restructuring, and (iii) the
relatively small size of the transaction, the record does establish that the above-par redemption
was "within a range that reasonable men and women with access to relevant information might
accept" under all of the circumstances present.  Accordingly, while not free from doubt, the
Examiner has concluded that, viewing all of the facts and circumstances in a holistic manner, any
breach of fiduciary duty claim seeking to recover the $4.6 million paid to CEC in connection
with the PIK Notes Transaction would be only plausible.

---

[3605] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710-11 (Del. 1983)*, aff'd after remand,* 497
A.2d 792 (Del. 1985); *Warshaw v. Calhoun,* 221 A.2d 487, 492 (Del. 1966).

[3606] E-mail from S. Lerner to counsel for the Examiner (Feb. 12, 2016); *see* R. Stauber Sept. 30,
2015 Tr. at 104:20-107:2; S. Winograd Oct. 21, 2015 Tr. at 91:12-23.

[3607] *Bomarko, Inc. v. Int'l Telecharge, Inc*., 794 A.2d 1161, 1180 (Del. Ch. 1999)*, aff'd,* 766
A.2d 437 (Del. 2000) (citation omitted); *see Solar Cells, Inc., v. True N. Partners, LLC*, No.
Civ.A. 19477, 2002 WL 749163, at *5 (Del. Ch. Apr. 25, 2002).

[3608] *Kahn v. Tremont Corp.*, C.A. No. 12339, 1996 WL 145452, at *1 (Del. Ch. Mar. 21, 1996)
(Allen, C.), *rev'd on other grounds*, 694 A.2d 422 (Del. 1997).

### G.  Intercompany Transactions

The Examiner was asked to investigate certain specified intercompany transactions between CEOC and CEC, the Sponsors, and certain CEOC affiliates, as well as any other intercompany transactions that the Examiner believed warranted investigation.  The Examiner has investigated (i) the fees paid to the Sponsors under the services agreement between CEC and the Sponsors ("SSA"), (ii) the intercompany revolver between CEC and CEOC ("Intercompany Revolver"), (iii) the intercompany loan from CEOC to CEC ("CEOC Intercompany Loan"), (iv) certain intercompany notes issued between CEOC and certain of its debtor and non-debtor subsidiaries ("Intercompany Notes") and (v) the effect on CEOC of the "clean up" of various intercompany balances and equity accounts known as Project Simplification.

During the course of the Investigation, various constituencies identified potential claims related to these transactions, including:

- With respect to the SSA:  (i) avoiding CEOC's payment of fees under the SSA as preferential transfers; (ii) avoiding the payment of those fees as constructive and/or actual fraudulent transfers; (iii) breaches of fiduciary duty arising from CEOC's payment of those fees; and (iv) unjust enrichment of CEC resulting from CEOC's payment of those fees;

- With respect to the Intercompany Revolver:  (i) avoiding $289.0 million paid by CEOC to CEC in the year prior to the Petition Date as preferential transfers; (ii) avoiding earlier repayments as constructive and/or actual fraudulent transfers; and (iii) breaches of fiduciary duty related to CEOC's repayments; and

- With respect to the CEOC Intercompany Loan:  (i) avoiding the transaction as constructive and/or actual fraudulent transfer; and (ii) breach of fiduciary duty arising from CEC's failure to pay interest to CEOC.

Based upon the Examiner's Investigation and review of available documents and interviews, the Examiner does not believe any viable claim exists to recover the SSA fees CEOC paid to the Sponsors.  Except for the $200 million Transaction Fee paid in connection with the LBO, CEC has, in effect, reimbursed CEOC for all other SSA fees initially paid by CEOC.  This reimbursement was effected through a reduction of the outstanding intercompany balances between CEC and CEOC identified as part of Project Simplification.  Although the Transaction Fee was not reimbursed by CEC, the Examiner does not believe any viable claim exists to recover that payment.

With regard to the Intercompany Revolver, the Examiner has concluded that a strong preference claim exists under the Bankruptcy Code and UFTA to avoid and recover the $289.0 million paid by CEOC to CEC during the year prior to the Petition Date.  In addition, the Examiner believes a reasonable actual fraudulent transfer claim exists under the Bankruptcy Code to avoid and recover that same $289.0 million, plus an additional $257.4 million repaid by CEOC during the two years prior to the Petition Date, for a total of $546.5 million.  The same evidence also supports an actual fraudulent transfer claim under the UFTA, which provides for a four-year look-back period, to avoid and recover all $662.5 million transferred by CEOC to CEC

859

during the four years prior to the Petition Date.  The Examiner further believes that a reasonable breach of fiduciary duty claim exists for this same $662.5 million against certain of CEOC's directors and officers who participated in and authorized these payments while CEOC was insolvent, and against CEC, as CEOC's controlling shareholder.  The Examiner also concludes (i) that a reasonable aiding and abetting breach of fiduciary duty claim exists against the Sponsors in connection with the $261.8 million repayment made to CEC in June 2014, and (ii) that a potential aiding and abetting breach of fiduciary duty claim exists against the Sponsors (Apollo in particular) in connection with the remaining $400.7 million transferred to CEC during the three years prior to the Petition Date, although such claim would require further factual development with regard to each particular repayment made during such period.

The Examiner has also concluded that a plausible constructive fraudulent transfer claim exists to avoid the CEOC Intercompany Loan.  Any recovery, however, would be limited to $5.8 million, which is the amount of interest CEOC paid on the funds it borrowed under its Bank Credit Agreement and loaned to CEC.

Based upon limited available information regarding the Intercompany Notes, the Examiner does not believe that any CEOC claim exists relating to them as they are all between CEOC and certain of its debtor and non-debtor subsidiaries.  As such, these intercompany notes do not impact the financial condition of CEOC.[3609]

Finally, while the Examiner does not believe any viable claim exists regarding Project Simplification, the Examiner was not provided with documentation evidencing the *bona fides* of the outstanding intercompany balances between CEC and CEOC that, the Examiner was told, should have been settled in cash on a regular basis.  Assuming the veracity of that information, the net effect of adjustments recorded by CEOC as a result of Project Simplification was an $18 million increase to CEOC's Additional Paid in Capital ("UNDERLINE_APIC"), and a settlement of $19 million of CEOC obligations paid by CEC.

### 1.  The SSA

As part of the LBO, CEC and the Sponsors, through certain of their affiliates, entered into the SSA on January 28, 2008.[3610]  CEOC was not a party to that agreement.

### a.  General Provisions of the SSA

Under the SSA, the Sponsors agreed to provide "management, advisory and consulting services" to CEC, but only to the extent that such services are "requested by [CEC] and mutually agreed by [CEC] and each [of the Sponsors]."[3611]  In exchange, CEC agreed to pay the Sponsors the following:  (i) a $200 million "Transaction Fee" upon execution of the SSA; (ii) an annual

---

[3609]  The Debtors were unable to locate two of the 13 Intercompany Notes that were identified by the time the Examiner was ready to issue this Report.

[3610]  Services Agreement (Jan. 28, 2008), at CEOC_INVESTIG_00272387 [CEOC_INVESTIG_00272387].

[3611]  *Id.* (Section 1).

"Monitoring Fee" equal to the greater of $30 million or 1% of CEC's consolidated EBITDA; and (iii) "Subsequent Fees" to be paid in connection with certain financial transactions, including any "financing or refinancing (equity or debt), dividend, recapitalization, acquisition, disposition, spin-off or split-off transactions . . . ."[3612]  Apollo and TPG were each entitled to one-half of the Transaction Fee and Monitoring Fees.[3613]

The SSA had an initial 10-year term, but it could be terminated at any time upon the unanimous consent of the Sponsors.[3614]  The SSA would automatically terminate upon an initial public offering of CEC stock,[3615] or at such time when the Sponsors no longer held the majority voting power of CEC.[3616]  In the event of an automatic termination, the Sponsors were entitled a lump sum payment equal to the net present value of all remaining fees due under the SSA.[3617]

The SSA also provided significant protections to the Sponsors. First, CEC agreed to broadly indemnify the Sponsors, their partners, directors, officers, and employees from damages or losses arising from all causes of action, claims, and investigations relating in any way to the LBO, the SSA, any transaction to which CEC is a party, and for any services the Sponsors may

---

[3612] *Id.* at CEOC_INVESTIG_00272388-89 (Section 2(a)-(c)).  The Sponsors never requested and have not been paid any Subsequent Fees under the SSA.  *See* Letter from VRC to the Special Committee of the Board of Directors Harrah's Entertainment, Inc. (Nov. 16, 2010), at VRC00004083 [VRC00004081] ("[S]ince the Merger, Harrah's has not paid a Subsequent Fee for investment banking services that have been provided by the Managers and does not anticipate on engaging the Managers to provide any services in the future that will require the payment of a Subsequent Fee."); "Special Committee of the Board of Directors Harrah's Entertainment, Inc. Fairness Opinion" Presentation (Nov. 16, 2010), at VRC00004070 [VRC00004067] (same).

[3613] Services Agreement (Jan. 28, 2008), at CEOC_INVESTIG_00272388 (Section 2(d)) [CEOC_INVESTIG_00272387].  The initial 50% allocation of the Monitoring Fees to each of the Sponsors would be reallocated if the Sponsors' ownership share of CEC changes.  *Id.*

[3614] *Id.* at CEOC_INVESTIG_00272390 (Section 4).

[3615] *Id.*  The Stockholders' Agreement defines an initial public offering as "the first bona fide firm commitment underwritten public offering and sale of common stock, limited liability company interests or other equity securities of the Company or its successors for cash pursuant to an effective registration statement (other than Form S-4, S-8 or a comparable form) under the Securities Act, and in which such shares of common stock, limited liability company interests or other equity securities are listed on the New York Stock Exchange, the NASDAQ Stock Market or another internationally recognized stock exchange."  Stockholders' Agreement, Exhibit 10.14, CEC 8-K (Jan. 28, 2008), at 4.

[3616] Services Agreement (Jan. 28, 2008), at CEOC_INVESTIG_00272390 (Section 4) [CEOC_INVESTIG_00272387].

[3617] *Id.*  The Sponsors deferred or waived whatever right they may have had to receive such a lump sum payment as a result of both (i) CEC's initial public offering in 2012, and (ii) the subsequent sale of CEC equity in 2013.  *See* Form of Amended and Restated Services Agreement, Exhibit 4.4, CEC S-1/A (Nov. 16, 2010); Acknowledgement and Waiver (Oct. 1, 2013), at CEOC_INVESTIG_00166561-2 [CEOC_INVESTIG_00166561].

provide under the SSA.[3618]  The only exception to this broad indemnity was if the Sponsors engaged in willful misconduct.[3619]  Second, CEC agreed that except for willful misconduct, the Sponsors would not be liable to CEC and its affiliates for any of the Sponsors' acts or omissions.[3620]  Third, the Sponsors have no liability, regardless of any willful misconduct, for any indirect, special, incidental or consequential damages, whether or not foreseeable, relating to any services the Sponsors may provide under the SSA.[3621]  Finally, CEC agreed that the Sponsors have the right to, among other things, engage directly or indirectly in the same lines of business as CEC for their own benefit.[3622]

### b.  Fees Paid to the Sponsors

From the LBO through 2013,[3623] the Sponsors received a total of $392.9 million of which $367.6 million appear to relate to fees under the SSA and $25.3 million were for other Sponsor fees as reflected in Intercompany Figure 1 below by entity.

### Intercompany Figure 1: Summary of Fees Paid to Sponsors by Year[3624]

| Intercompany Figure 1: Summary of Fees Paid to Sponsors by Year | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| *(amounts in millions )* | **2008** | **2009** | **2010** | **2011** | **2012** | **2013** | **Total Fees** | **CEC Credit Recorded in October 2013** | **Total Fees** |
| CEOC Transaction Fee | $ 200.0 | $    - | $    - | $    - | $    - | $    - | $    200.0 | $         - | $    200.0 |
| CEOC Monitoring Fees | 19.5 | 20.1 | 20.0 | 21.0 | 21.0 | 15.8 | 117.3 | (117.3) | - |
| CMBS / CERP Monitoring Fees | 8.4 | 8.6 | 8.6 | 9.0 | 9.0 | 6.8 | 50.3 | (50.3) | - |
| Subtotal | $ 227.9 | $   28.7 | $   28.5 | $   30.0 | $   30.0 | $   22.5 | $    367.6 | $   (167.6) | $    200.0 |
| Other Fees | (1.1) | 12.6 | 6.5 | 5.0 | 1.0 | 1.3 | 25.3 | (25.3) | - |
| **Total Fees** | **$ 226.8** | **$   41.3** | **$   35.0** | **$   35.0** | **$   31.0** | **$   23.8** | **$    392.9** | **$   (192.9)** | **$    200.0** |

### i.  Transaction Fee

At the time of the LBO, CEOC paid $100 million to each of Apollo and TPG representing their allocable share of the $200 million of the Transaction Fee.[3625]  The

---

[3618]  Services Agreement (Jan. 28, 2008), at CEOC_INVESTIG_00272391 (Section 5(b)) [CEOC_INVESTIG_00272387].

[3619]  *Id*.

[3620]  *Id*. at CEOC_INVESTIG_00272392 (Section 6(a)).

[3621]  *Id*. at CEOC_INVESTIG_00272393 (Section 6(c)).

[3622]  *Id*. at CEOC_INVESTIG_00272392-93 (Section 6(b)).

[3623]  The Sponsors granted a waiver of the Monitoring Fees due for the fourth quarter of 2013, *see* CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 110, as well as for 2014 and 2015, *see* CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 115.

[3624]  *See* (a) "Sponsor Payments" Spreadsheet, CEC_EXAMINER_1447951 (native file), at "By Entity" tab; Draft Memo to Accounting Files (Oct. 2013), at CEOC_INVESTIG_00151745 [CEOC_INVESTIG_00151733] (describing CEC credit for Sponsor fees); (b) CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 105; CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 110.

Transaction Fee has been referred to by some as the equivalent of a "deal fee" for the LBO.[3626] The SSA, however, expressly provides that the Transaction Fee is "consideration" for the Sponsors' "agreement to render the services" described in the SSA. Consequently, this fee should be evaluated in that context.[3627] As discussed above, the Sponsors are not required to provide any services to CEC – they are only required to provide those services requested by CEC to which the Sponsors mutually agree. In addition, "no minimum number of hours is required to be devoted by [the Sponsors] on a weekly, monthly, annually or other basis."[3628] Rather, the Sponsors need only "devote such time and efforts" that they "deem reasonably necessary or appropriate."[3629] Because the SSA does not include any controlling standards requiring the Sponsors to provide any specific services, but simply provides that the parties may (or may not) reach agreement on services to be provided in the future, the SSA is at best an "agreement to agree." As a matter of contract law, such agreements are generally unenforceable.[3630]

---

[3625] Services Agreement (Jan. 28, 2008), at CEOC_INVESTIG_00272388 [CEOC_INV-ESTIG_00272387]; G. Kranias Oct. 23, 2015 Tr. at 41:17-23; CEC 10-K for the year ended Dec. 31, 2008 (Mar. 17, 2009) at 128 ("[CEC] paid the Sponsors a one-time transaction fee of $200 million for structuring the [LBO]").

[3626] *See, e.g.*, M. Rowan Nov. 16, 2015 Tr. at 18:7-20:19. The SSA, itself, provides some support for the assertion that $200 million was the deal fee for the LBO. First, the SSA was entered into at the time of and in connection with the LBO. The SSA also defines the fee as a Transaction Fee and provides that the Sponsors "shall not be paid any separate fees in connection with the [LBO] other than the fees contemplated by [the SSA.]" Services Agreement (Jan. 28, 2008), at CEOC_INVESTIG_00272389 [CEOC_INVESTIG_00272387]. Rowan explained that deal fees are generally "a way for limited partners to defray their own costs by charging third-party investors who would otherwise be free riders on the management fees that the limited partners pay." M. Rowan Nov. 16, 2015 Tr. at 19:12-16.

[3627] No cause of action exists to avoid the Transaction Fee, as the Examiner has concluded that the LBO was not an actual fraudulent transfer, *see* Appendix 5, Legal Standards at Section III.A, and CEOC was not insolvent as the time of, or as a result of, the LBO, *see* Section XII.

[3628] Services Agreement (Jan. 28, 2008), at CEOC_INVESTIG_00272388 [CEOC_IN-VESTIG_00272387].

[3629] *Id.*

[3630] *See Ramone v. Lang*, Case No. Civ.A. 1592-N, 2006 WL 905347, at *13 n.56 (Del. Ch. Apr. 3, 2006) ("[A]n agreement is not enforceable if it is nothing but an agreement to agree in the future without any reasonably objective controlling standards.") (internal quotation marks omitted); *Hammond & Taylor, Inc. v. Duffy Tingue Co.*, 161 A.2d 238, 239 (Del. Ch. 1960) (explaining that a provision requiring "terms to be mutually agreed on" is "almost the classic example of a legally unenforceable provision"); *Indep. Cellular Tel., Inc. v. Barke*r, C.A. No. 15171, 1997 WL 153816, at *4 (Del. Ch. Mar. 21, 1997) ("The material terms of a contract will be deemed fatally vague or indefinite if they fail to provide a reasonable standard for determining whether a breach has occurred and the appropriate remedy."); *see also Richie Co., LLP v. Lyndon Ins. Grp., Inc.*, 316 F.3d 758, 762 (8th Cir. 2003) (assessing a document that stated the parties "will enter into a[n] . . . agreement," and finding that these future-oriented

### ii. Monitoring Fees

From the LBO through the Petition Date, the Sponsors were paid $167.6 million in Monitoring Fees.[3631]   The Monitoring Fees are described as "compensation for the services provided" by the Sponsors, but just as with the Transaction Fee, the SSA did not require the Sponsors to actually provide any services in order to receive this annual fee.  Since the LBO, however, the Sponsors have been deeply involved in virtually all aspects of Caesars' business operations and financial planning.[3632]  Hession described Apollo as the "prime mover" in respect of virtually every transaction under investigation – it was the primary financial strategist, negotiated directly with CEOC's bank lenders and noteholders, and provided other services in connection with the various transactions investigated.[3633]  Indeed, as noted in the Executive Summary and throughout this Report, Apollo effectively acted as Caesars' *de facto* CFO at all relevant times.

While not as actively engaged as Apollo, TPG executives played a significant role on the operational side of the business.  According to Kranias, TPG at one point had "somewhere between five or ten members of its operations team involved with Caesars trying to cut costs and help the company boost profitability."[3634]  In June 2012, when Halkyard resigned as CFO, TPG's Dunn stepped in and provided interim support for Caesars' "finance function" until Colvin was appointed CFO in November 2012.[3635]  In addition, TPG provided access to its "capital markets team to facilitate debt and equity transactions" and "deal team" to facilitate a number of the

---

terms indicated that the agreement was not final and binding); *Joseph Martin, Jr., Delicatessen, Inc. v. Schumacher*, 52 N.Y.2d 105, 109-110, 436 N.Y.S.2d 247, 249  ( 1981) (holding that an agreement to agree was unenforceable for uncertainty since it contained no methodology for determining the to-be-agreed-upon terms, and noting that "it is rightfully well settled in the common law of contracts . . . that a mere agreement to agree, in which a material term is left for future negotiations, is unenforceable").

[3631]  *See* Intercompany Figure 1.  As Caesars' EBITDA was never sufficient to result in a larger fee under the formula, no more than $30 million in annual Monitoring Fees was ever paid.  *See* G. Kranias Oct. 23, 2015 Tr. at 43:8-19; *see also* E. Hession Nov. 4, 2015 Tr. at 513:13-24.

[3632]  *See* Section XII.

[3633]  *See, e.g.*, E. Hession Nov. 3, 2015 Tr. at 94:15-23 (explaining that for the extension of the CMBS debt "the actual negotiations were handled by Apollo"); M. Rowan Nov. 16, 2015 Tr. at 99:22-100:13 (explaining that Apollo took the lead in liquidity modeling).

[3634]  G. Kranias Oct. 23, 2015 Tr. at 40:11-22.

[3635]  T. Dunn Oct. 29, 2015 Tr. at 24:17-25:18.  Dunn's role in 2012 has been described as effectively being Caesars' "interim CFO" during this period.  *See, e.g.*, E. Hession Nov. 4, 2015 Tr. at 390:8-17.  Dunn, however, explained that "interim CFO" would be a "misnomer."  T. Dunn Oct. 29, 2015 Tr. at 26:13-14.  Rather, Dunn described that he was there on a daily basis at Loveman's request, making sure the work was getting done and trying to deploy resources to get the various initiatives that needed to get done.  *Id.* at 26:14-21, 27:6-8.

major transactions.[3636]   Whether and to what extent the Sponsors' services actually provided a material benefit to CEOC is a different question.[3637]

Although CEOC was not a party to the SSA, CEOC was likely allocated and paid 70% in Monitoring Fees plus other Sponsor fees, totaling $157.3 million.[3638]   In 2013, the Sponsors agreed to waive payment of the Monitoring Fee beginning with the third quarter of 2013.[3639] According to Sambur, the Sponsors agreed to this wavier to create "an incentive for the management team to cut expenses."[3640]   Kranias further explained that the Sponsors waived the Monitoring Fee because "the management team requested that [the Sponsors] chip in on helping the company boost its profitability and boost its liquidity . . . ."[3641]

The Examiner has concluded that CEOC has no viable claim for damages or to avoid and recover the Monitoring Fees it paid to the Sponsors because, as discussed below, CEC, in effect, reimbursed CEOC as a result of offsetting intercompany balances identified as part of Project Simplification.[3642]

## 2.   The Intercompany Revolver

In August 2008, CEOC and CEC entered into the Intercompany Revolver, a committed unsecured revolving credit facility pursuant to which CEC was required to lend funds to CEOC up to the maximum principal amount of $200 million.[3643]   The Intercompany Revolver provided

---

[3636]   G. Kranias Oct. 23, 2015 Tr. at 40:11-22.

[3637]   Had CEOC not been reimbursed for the Monitoring Fees it paid, the Examiner believes that at least a plausible constructive fraudulent transfer claim under the Bankruptcy Code and UFTA would exist against the Sponsors to recover a portion of those fees.   While the Sponsors' services in the early years may have provided CEOC with reasonably equivalent value, many of the major transactions structured by the Sponsors ultimately harmed CEOC and its creditors.

[3638]   *See* Intercompany Figure 1.

[3639]   The Sponsors extended this waiver through the end of 2015.   CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 115.

[3640]   D. Sambur Oct. 19, 2015 Tr. at 266:14-25; *see also* e-mail exchange between T. Dunn and D. Sambur (Oct. 29, 2013), at TPG-Examiner_00026171-2 [TPG-Examiner_00026171] (discussing Sponsor challenge to management to reduce costs by $45 million in exchange for reduction in monitoring fees; CEC 10-Q for the quarterly period ended Mar. 31, 2014 (May 9, 2014), at 29 ("Due to attaining certain cost savings measures during the fourth quarter of 2013, the Sponsors granted a waiver of the monitoring fee due for the first quarter of 2014.").

[3641]   G. Kranias Oct. 23, 2015 Tr. at 42:12-25.   Kranias also noted that the types of services the Sponsors provided at this time changed from being "involved with strategy, operations, [and] reviewing capital spending" to being "more focused on the balance sheet, and so TPG was much less involved with the company and providing less services."   *Id.*

[3642]   M. Winterscheidt Jan. 19, 2016 Tr. at 50:2-51:4.

[3643]   *See* 2008 Credit Agreement (undated), at CEC_EXAMINER_1443561-64 [CEC_ EXAMINER_1443557]; *see also* "Intercompany Unsecured Revolving Credit Facility"

for interest at a rate equal to LIBOR plus 3% per annum, which CEOC could either pay annually in arrears or have it added to outstanding principal.[3644]   The maturity date of the Intercompany Revolver was January 29, 2014, but CEOC had the option to prepay any or all amounts outstanding at any time "without premium or penalty."[3645]   CEOC's payment obligation to CEC was expressly subordinated to CEOC's other obligations for borrowed money and was subject in right of payment to the prior satisfaction of such other obligations.[3646]

According to Hession, the Intercompany Revolver provided CEOC with additional liquidity and was "set up as a way to continue to fund CEOC's activities using [CEC's] cash."[3647]   Hession further explained that the Intercompany Revolver was utilized essentially as part of Caesars cash management system as it provided a "very easy way [for CEOC] to borrow and repay" cash.[3648]

While Hession could not remember the period of time during which the Sponsors' approval was required to borrow under the Intercompany Revolver, he believed that "for some period of time" their approval was needed.[3649]   Sambur, however, stated their approval was not required.[3650]   Regardless, the Sponsors at some point made clear they were to be included in decisions regarding the use of the Intercompany Revolver. According to Sambur, "there came a point in time where we became aware of this [activity on the Intercompany Revolver], and we wanted to get a little bit more visibility and reporting around when they were doing this [borrowing under the Intercompany Revolver], and what the amounts were."[3651]   Sambur appeared irritated that he had not been informed of CEOC's Intercompany Revolver activity from inception:

---

Spreadsheet, CEOC_INVESTIG_00544776 (native file).   The terms of the undated credit agreement were approved by CEOC's board.   *See* Written Consent of the Board of Directors (Aug. 1, 2008), at CEC_EXAMINER_1443557-8 [CEC_EXAMINER_1443557].

[3644]   2008 Credit Agreement (undated), at CEC_EXAMINER_1443561-62 [CEC_EXAMINER_ 1443557] (Section 3.01).

[3645]   *Id.* at CEC_EXAMINER_1443561 (Section 2.01(b)) ("[CEOC] shall pay [CEC] the entire outstanding amount of the Revolving Loans, together with any accrued and unpaid interest incurred in accordance with this Agreement, on January 29, 2014 (the 'Maturity Date').").

[3646]   *Id.* at CEC_EXAMINER_1443563 (Section 10.01).

[3647]   E. Hession Nov. 4, 2015 Tr. at 485:25-486:20.

[3648]   *Id*.   As Hession explained, Caesars would "look at the cash that [it] had available within [its] systems," "[l]ook at the rules in terms of being able to use the various cash for different things and then figure out the most effect way to do that."   *Id.* at 486:13-20.

[3649]   *Id*. at 482:16-17.

[3650]   D. Sambur Nov. 14, 2015 Tr. at 587:5-16 ("[F]irst of all, the sponsors weren't required to approve anything.").

[3651]   *Id*. at 588:6-19.

[L]et's just be clear.  I think in general, they should have been keeping us more informed about this from the start. . . . [I]t wasn't like there was some magic point in time where this became more important. . . .  [T]hese are very large amounts of money, and for some reason I think they thought they didn't have to keep – keep us informed.  I disagreed with that.

I mean, there is a corporate authority matrix that lays out very clearly what management can and can't do, in terms of borrowing third-party debt.   For whatever reason, I guess this fell out of bounds with that, because we never really contemplated intercompany borrowings like this.  So, I guess they felt that they should just keep doing this without giving people visibility on it.

I would have liked to have had visibility on this from the start.[3652]

Hession explained that "Apollo had asked us to notify them whenever we made intercompany revolver changes, either borrows [sic] or repayments.  And unless it was on a very large item, then we would generally notify them after we had made the decision and moved the cash."[3653]  By at least November 2012, Hession regularly communicated with Apollo regarding the use of the Intercompany Revolver.[3654]

As shown in Intercompany Figure 2 below, from August 2008 through the Petition Date CEC advanced a total of $1.8 billion to CEOC under the Intercompany Revolver.  During this period, CEOC repaid the entire principal amount of these advances, plus over $47 million in interest.

---

[3652] *Id*. at 591:13-592:21.

[3653] E. Hession Jan. 20, 2016 Tr. at 569:9-19.

[3654] *See* E. Hession Nov. 4, 2015 Tr. at 482:4-10; *see also* e-mail from E. Hession to D. Sambur (Nov. 24, 2012), at CEOC_INVESTIG_00115978 [CEOC_INVESTIG_00115978]; e-mail exchange between E. Hession and D. Sambur (Nov. 25, 2012), at CEOC_INVESTIG_00115980 [CEOC_INVESTIG_00115980]; e-mail exchange between E. Hession and D. Sambur (Jan. 29, 2013), at CEOC_INVESTIG_00123301 [CEOC_INVESTIG_00123301]; e-mail exchange between E. Hession and D. Sambur (June 12, 2013), at CEOC_INVESTIG_00401590 [CEOC_INVESTIG_00401590]; e-mail from E. Hession to D. Sambur (Feb. 10, 2014), at CEOC_INVESTIG_00090751 [CEOC_INVESTIG_00090751].  At least one e-mail exchange indicates that the Sponsors asked to be involved in discussions regarding the use of the Intercompany Revolver well before November 2012.  *See* e-mail from D. Sambur to T. Evans, *et al.* (Dec. 31, 2008), at CEC_EXAMINER_1024532 [CEC_EXAMINER_1024530] ("I thought we weren't going to loan $ intercompany without discussing first.").

**Intercompany Figure 2: Intercompany Revolver Activity By Quarter[3655]**

| Intercompany Revolver Activity by Quarter | | | | | | | |
|---|---|---|---|---|---|---|---|
| Year | Quarter | Beginning Balance | Advances | Principal Payments [*] | Accrued Interest | Interest Payments | Ending Balance |
| 2008 | Q3 | $ - | $ 473,500,000 | $ (273,500,000) | $ 618,163 | $ (618,163) | $ 200,000,000 |
| | Q4 | $ 200,000,000 | $ 176,567,203 | $ (200,000,000) | $ 168,372 | $ (60,708) | $ 176,674,866 |
| 2009 | Q1 | $ 176,674,866 | $ - | $ (176,567,203) | $ 128,442 | $ (236,105) | $ - |
| | Q2 | $ - | $ - | $ - | $ - | $ - | $ - |
| | Q3 | $ - | $ - | $ - | $ - | $ - | $ - |
| | Q4 | $ - | $ - | $ - | $ - | $ - | $ - |
| 2010 | Q1 | $ - | $ - | $ - | $ - | $ - | $ - |
| | Q2 | $ - | $ 200,000,000 | $ - | $ 92,978 | $ - | $ 200,092,978 |
| | Q3 | $ 200,092,978 | $ - | $ - | $ 1,688,354 | $ - | $ 201,781,332 |
| | Q4 | $ 201,781,332 | $ 300,000,000 | $ - | $ 2,069,236 | $ - | $ 503,850,568 |
| 2011 | Q1 | $ 503,850,568 | $ - | $ (220,827,634) | $ 3,807,040 | $ - | $ 286,829,974 |
| | Q2 | $ 286,829,974 | $ 82,000,000 | $ (51,000,000) | $ 2,540,000 | $ - | $ 320,369,974 |
| | Q3 | $ 320,369,974 | $ - | $ (20,500,000) | $ 2,511,517 | $ - | $ 302,381,491 |
| | Q4 | $ 302,381,491 | $ 76,000,000 | $ (43,600,000) | $ 2,524,538 | $ - | $ 337,306,029 |
| 2012 | Q1 | $ 337,306,029 | $ 177,000,000 | $ (84,000,000) | $ 3,337,605 | $ - | $ 433,643,635 |
| | Q2 | $ 433,643,635 | $ 140,500,000 | $ (80,000,000) | $ 2,984,711 | $ - | $ 497,128,346 |
| | Q3 | $ 497,128,346 | $ 190,800,000 | $ (50,000,000) | $ 3,710,131 | $ - | $ 641,638,477 |
| | Q4 | $ 641,638,477 | $ - | $ (100,000,000) | $ 4,819,902 | $ - | $ 546,458,379 |
| 2013 | Q1 | $ 546,458,379 | $ - | $ (59,343,996) | $ 4,120,046 | $ (2,472,968) | $ 488,761,460 |
| | Q2 | $ 488,761,460 | $ - | $ (200,000,000) | $ 3,614,632 | $ - | $ 292,376,092 |
| | Q3 | $ 292,376,092 | $ - | $ (6,996,625) | $ 2,382,276 | $ (2,382,276) | $ 285,379,465 |
| | Q4 | $ 285,379,465 | $ - | $ - | $ 2,313,422 | $ (2,320,520) | $ 285,372,366 |
| 2014 | Q1 | $ 285,372,366 | $ - | $ (25,000,000) | $ 2,152,260 | $ (2,152,260) | $ 260,372,366 |
| | Q2 | $ 260,372,366 | $ - | $ (260,372,366) | $ 1,436,033 | $ (1,436,033) | $ - |
| | Total | | $ 1,816,367,203 | $ (1,851,707,824) | $ 47,019,656 | $ (11,679,034) | |

*In March 2011, CEC received a tax refund which was credited to CEOC through the $220.8 million principal payment recorded in Q1 2011. (CEOC_INVESTIG_382197; CEOC_INVESTIG_731695; APOLLO-Examiner_00731695).

Source:    Schedule of CEOC's Intercompany Unsecured Revolving Credit Facility. (APOLLO – Examiner_00925324).

CEOC first accessed the Intercompany Revolver on August 1, 2008, borrowing $125 million. Between August 1, 2008 and January 7, 2009, CEOC borrowed and repaid various amounts under the Intercompany Revolver.[3656] CEOC did not access the Intercompany Revolver throughout the remainder of 2009 and into the second quarter of 2010.[3657]

---

[3655] *See* "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_INV-ESTIG_00544776 (native file). In March 2011, CEC received a tax refund which was credited to CEOC through the $220.8 million principal payment recorded in Q1 2011. *See* e-mail from T. Vanke to R. Brimmer, *et al.* (Apr. 6, 2011), at CEOC_INVESTIG_382197 [CEOC_INVESTIG_382197].

[3656] During this time, the maximum advanced to CEOC was $200 million on September 30, 2008, which was then immediately repaid with interest just two days later. *See id.* Additional borrowings in late December 2008 were fully repaid by January 8, 2009. *Id.* It is not clear why CEOC accessed and then immediately repaid the Intercompany Revolver at the end of the third

On December 10, 2010, the Intercompany Revolver was amended to increase the maximum principal amount to $500 million ("December 2010 Amendment").[3658]  Although all of the other terms of the Intercompany Revolver remained the same, including CEOC's sole principal payment obligation on the maturity date, CEOC contemporaneously executed a "Demand Intercompany Note" in favor of CEC.[3659]  The Demand Intercompany Note required CEOC "to pay on demand" of CEC the "unpaid principal amount of all loans and advances or other credit extensions."[3660]  This provision was directly inconsistent with CEOC's contractual right under the Intercompany Revolver and December 2010 Amendment to wait until the maturity date to repay any amounts outstanding.[3661]

The Demand Intercompany Note also provided that its terms would remain in "effect . . . until modified by agreement between" CEOC and CEC.[3662]  Subsequent amendments to the Intercompany Revolver, including an amendment just two months later, modified the demand nature of the Intercompany Revolver as they granted CEOC the right to repay the outstanding principal amount at any time prior to or solely upon the maturity date.[3663]  Consequently, and as

and fourth quarters of 2008.  There were contradictory explanations as to whether the additional liquidity at the end of these quarters was for purposes of assuring compliance with the SSLR covenant contained in the CEOC's Bank Credit Agreement.  *Compare* D. Sambur, Nov. 14, 2015 Tr. at 569:24-571:12, *with* L. Bird Oct. 2, 2015 Tr. at 87:1-88:17.

[3657] *See* "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_INVESTIG_00544776 (native file).

[3658] *See* Amended Credit Agreement (Dec. 10, 2010), at CEC_EXAMINER_1443566 [CEC_EXAMINER_1443566].  The CEC and CEOC boards approved the December 2010 Amendment on December 10, 2010. CEC Board Meeting Minutes (Dec. 10, 2010), at CEC_EXAMINER_0407884 [CEC_EXAMINER_0407883]; CEOC Board Meeting Minutes (Dec. 10, 2010), at CEC_Examiner_1447964 [CEC_Examiner_1447963].  On December 14, 2010, CEOC borrowed an additional $210 million, bringing the total indebtedness under the Intercompany Revolver to $410 million.  Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_INVESTIG_00544776 (native file).  One week later, CEOC borrowed the remaining $90 million in availability under the Intercompany Revolver.  *Id.*

[3659] *See* Demand Intercompany Note (Dec. 20, 2010), at CEC_EXAMINER_1443570-1 [CEC_EXAMINER_1443570].

[3660] *Id.* at CEC_EXAMINER_1443570.

[3661] *See* 2008 Credit Agreement (undated), at CEC_EXAMINER_1443561 [CEC_EXAMINER_1443557] (Section 2.01); Amended Credit Agreement (Dec. 10, 2010), at CEC_EXAMINER_1443566 [CEC_EXAMINER_1443566] (Section 2.01).

[3662] *See* Demand Intercompany Note (Dec. 20, 2010), at CEC_EXAMINER_1443570 [CEC_EXAMINER_1443570].

[3663] *See, e.g.*, Second Amended Credit Agreement (Feb. 24, 2011) at CEC_EXAM-INER_1443573 [CEC_EXAMINER_1443573] (Section 2.01(b)) ("[CEOC] shall pay [CEC] the entire outstanding amount of the Revolving Loans, together with any accrued and unpaid interest incurred in accordance with this Agreement, on January 29, 2014 (the 'Maturity Date').").

discussed below, in considering whether the amounts advanced by CEC under the Intercompany Revolver should be recharacterized as equity, the Examiner does not place significant weight on the existence of the Demand Intercompany Note.[3664]

The Intercompany Revolver was amended on February 24, 2011, to further increase the maximum principal amount to $750 million ("February 2011 Amendment").[3665] Like the December 2010 Amendment, all other terms of the Intercompany Revolver remained the same, including the January 29, 2014 maturity date.[3666] Throughout 2011 and the third quarter of 2012, CEOC periodically accessed and repaid various amounts, with the largest amount outstanding of $644.2 million on November 14, 2012.

On November 14, 2012, the Intercompany Revolver was again amended and restated to, among other things, increase the maximum principal amount to $1 billion and to extend the maturity date to November 17, 2017 ("November 2012 Amendment").[3667] The increased availability, however, was somewhat illusory as the November 2012 Amendment converted the Intercompany Revolver from a committed facility to an uncommitted facility. The initial Intercompany Revolver and subsequent two amendments each provided that CEC "*shall make*

---

[3664] CEC never made a demand under the Demand Intercompany Note and CEOC did not make any repayments to CEC while the Demand Intercompany Note was in effect. *See* "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_INVESTIG_00544776 (native file).

[3665] Second Amended Credit Agreement (Feb. 24, 2011), at CEC_EXAMINER_1443573 [CEC_EXAMINER_1443573]. The CEC and CEOC boards approved the February 2011 Amendment on February 24, 2011. CEC Board Meeting Minutes (Feb. 24, 2011), at CEC_EXAMINER_1447968 [CEC_EXAMINER_1447967]; CEOC Board Written Consent (Feb. 24, 2011), at CEC EXAMINER 1447975 [CEC EXAMINER 1447925]. Although the availability under the Intercompany Revolver had now increased to $750 million, the outstanding principal balance before capitalized interest never exceeded $500 million until September 28, 2012, when CEOC drew an additional $190.8 million, bringing the total outstanding balance to $631.6 million. "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC INVESTIG 00544776 (native file). On November 13, 2012, $12.5 million of accrued interest was added to principle, bringing the total amount outstanding under the Intercompany Revolver on November 14, 2012 to $644.2 million – the largest amount ever outstanding under the Intercompany Revolver. *Id.*

[3666] Second Amended Credit Agreement (Feb. 24, 2011), at CEC_EXAMINER_1443573 [CEC_EXAMINER_1443573] (Section 2.01(b)).

[3667] Amended and Restated Credit Agreement (Nov. 14, 2012), at CEC_EXAMINER_0087834 (Section 2.01) [CEC_EXAMINER_0087833]. The CEC board approved the November 2012 Amendment on November 14, 2012. CEC Board Meeting Minutes (Nov. 14, 2012), at CEC_EXAMINER_1447956 [CEC_EXAMINER_1447955]. The CEOC board approved the November 2012 Amendment on November 15, 2012. CEOC Board Written Consent (Nov. 15, 2012), at CEC_EXAMINER_1447979 [CEC_EXAMINER_1447976].

one or more unsecured loans" to CEOC.[3668]   The November 2012 Amendment provided that CEC "*may* agree, *in its sole discretion*, to make Loans" to CEOC.[3669]

   In addition to this significant change, interest was no longer payable annually, but was now payable quarterly.[3670]   The form of the Intercompany Revolver, as amended and restated, also changed considerably and now contained a multitude of additional provisions that made it appear more like an arm's length third-party credit agreement.   Whereas the prior Intercompany Revolver and first two amendments were only four pages long, the November 2012 Amendment was 29 pages long.   The November 2012 Amendment contained numerous additional events of default and, for the first time, now required CEOC to make various representations and warranties as of the date it was entered into as well as each time CEOC sought to borrow under it.[3671]   In each instance, CEOC was required to represent and warrant that, on a consolidated basis with its subsidiaries, CEOC was solvent, would be able to pay its debts and liabilities as they become due, and would not have unreasonably small capital to conduct its business.[3672]

   The evidence is unclear why the Intercompany Revolver was amended in November 2012 to increase the maximum amount available under it (should CEC choose to fund CEOC's requests to draw under it).   At the time of this amendment, $644.2 million was outstanding.[3673]   After this amendment, no further amounts were drawn.[3674]   It also is unclear whether CEC would have been able to advance funds on demand.[3675]

---

[3668] 2008 Credit Agreement (undated), at CEC_EXAMINER_1443561 [CEC_EXAM-INER_1443557] (Section 1.01); Amended Credit Agreement (Dec. 10, 2010), at CEC_EXAMINER_1443566 [CEC_EXAMINER_1443566] (Section 1.01); Second Amended Credit Agreement (Feb. 24, 2011), at CEC_EXAMINER_1443573 [CEC_EXAMINER_1443573] (Section 1.01).

[3669] Amended and Restated Credit Agreement (Nov. 14, 2012), at CEC_EXAMINER_0087843 (Section 2.01) [CEC_EXAMINER_0087833] (emphasis added).

[3670] *Id.* at CEC_EXAMINER_0087845 (Section 2.08(c)).   CEOC could still elect to add accrued interest to the principal loan balance.   *Id.* (Section 2.08(d)).

[3671] *Id.* at CEC_EXAMINER_00874848-53 (Articles III-IV).

[3672] *Id.* at CEC_EXAMINER_0087851-52 (Section 3.13).

[3673] "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_INVESTIG_00544776 (native file).

[3674] *Id.*

[3675] Hession explained that CEC needed the funds it previously advanced to CEOC to help with the CMBS refinancing.   *See* E. Hession, Nov. 3, 2015 Tr. at 126:8-127:8.   In addition, following the CERP transaction, CEC no longer had access to encumbered cash from the CERP properties.   *See* D. Sambur, Oct. 19, 2005 Tr. at 161:2-162:10; A. van Hoek Sept. 25, 2015 Tr. at 49:4-50:9; M. Rowan Jan. 28, 2016 Tr. at 515:14-517:13.   As a result, that cash would no longer be available for CEC to fund the Intercompany Revolver.

Between November 14, 2012 and May 30, 2014, CEOC repaid CEC principal and interest which totaled $400.7 million.  Of that amount, $320 million was used by CEC to either repurchase CMBS debt in the market at a discount or to provide necessary cage cash to the CMBS Properties.[3676]  Thus, the funds that CEC had been using to support CEOC were now being used to benefit and shore up the financial condition of other subsidiaries.

On May 30, 2014, the CEOC Board of Directors approved the repayment of all amounts then outstanding under the Intercompany Revolver, which by then had been reduced to approximately $261.8 million.[3677]  This repayment, which occurred on June 3, 2014, was made at the express request of, if not direction from, the Sponsors.[3678]  In connection with this repayment, the Sponsors certainly played a more active role in managing the Intercompany Revolver as opposed to simply monitoring changes in the outstanding balance.  According to Hession, it was "unusual but not unheard of" for the Sponsors to suggest repayment of a portion of the Intercompany Revolver,[3679] but this was "the only time" where Hession "felt" that CEOC was "asked to repay the revolver."[3680]  Sambur attempted to justify the repayment request by arguing that CEOC had approximately "$2 billion in liquidity" as a result of the Four Properties and B7 transactions and there was no reason why CEOC should incur the interest expense associated

---

[3676] *See* e-mail from E. Hession to D. Sambur (Nov. 24, 2012), at CEOC_INVESTIG_00115978 [CEOC_INVESTIG_00115978] ("FYI – we repaid $100m of the intercompany loan between CEOC and CEC to ensure we had sufficient funds at the CEC level to execute the CMBS repurchase with Barclay's."); e-mail from E. Hession to A. van Hoek, *et. al* (Nov. 25, 2012), at CEOC_INVESTIG_00115980 [CEOC_INVESTIG_00115980] ("We moved the $100m last week to get ready for the CMBS trade."); e-mail from E. Hession to D. Sambur (Jan. 29, 2013), at CEOC_INVESTIG_00123301 [CEOC_INVESTIG_00123301] ("FYI – we may move $20m from CEOC to CEC due to cage cash increases at the CMBS properties for Superbowl."); e-mail from E. Hession to D. Sambur (June 12, 2013), at CEOC_INVESTIG_00401590 [CEOC_INVESTIG_00401590] ("Due to the pending closing of the CMBS trades, we are planning to repay $200m of the loan.").

[3677] CEOC Board Written Consent (May 30, 2014), at CEOC_INVESTIG_00484005 [CEOC_INVESTIG_00484005].  Hession and Loveman, as the sole directors of CEOC, approved the June 2014 repayment to CEC.  *Id.* at CEOC_INVESTIG_00484008-009.  As of June 2, 2014, the total outstanding principal was $260,372,365.88 and the outstanding cumulative interest was $1,436,033.15, for a total of $261,808,399.03.  "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_INVESTIG_00544776 (native file).  CEOC repaid the full outstanding amount under Intercompany Loan to CEC on June 3, 2014.  *Id.*

[3678] E. Hession Nov. 4, 2015 Tr. at 494:24-495:20.  Hession noted that the specific individuals who requested that the Intercompany Revolver be repaid included Kranias of TPG and Sambur and van Hoek of Apollo.  *Id.* at 495:12-17.  Sambur confirmed that he participated in the decision to repay the Intercompany Revolver.  D. Sambur Nov. 14, 2015 Tr. at 590:4-591:2.

[3679] E. Hession Nov. 4, 2015 Tr. at 495:22-496:7.

[3680] E. Hession Jan. 20, 2016 Tr. at 569:20-570:4.  Hession confirmed that CEOC was "asked" to make the payment but was not required or demanded to make the payment.  *Id.* at 570:5-14.

with the outstanding balance.[3681]  This explanation, however, ignores the fact that the $2 billion in liquidity was committed to other uses and was needed because CEOC had been projected to run out of cash by the end of 2014.[3682]

Because the November 2012 Amendment relieved CEC from any obligation to advance funds to CEOC, management was concerned that this source of liquidity would no longer be available to CEOC.[3683]  Consequently, as part of the $261.8 million repayment, they requested that the Intercompany Revolver be amended to provide CEOC with a committed facility of up to $260.4 million.[3684]  On June 3, 2014, the Intercompany Revolver was amended to include a committed facility of up to $260.4 million – the amount of principal that CEOC repaid ("June 2014 Amendment").[3685]  The maturity date also was shortened by over a year from November 17, 2017 to June 3, 2016.[3686]  All other terms of the November 2012 Amendment remained in place, including the requirement that CEOC represent that it was solvent, could pay its debts as they came due, and did not have unreasonably small capital.

While the Intercompany Revolver now included a committed credit facility up to $260.4 million as a result of the June 2014 Amendment, the Examiner does not believe that CEC would have been legally obligated to advance any additional funds to CEOC.  As noted above, CEOC was required to represent that it passed all three tests related to its financial condition each time it requested access to the Intercompany Revolver.  By June of 2014, CEOC was clearly insolvent, was not able to pay its debts as they came due, and had unreasonably small working capital.  Whether CEC would have advanced any further funds to CEOC under the Intercompany Revolver is left unanswered as CEOC never requested access.

CEOC transferred $289.0 million in principal and interest payments to CEC in the year prior to the Petition Date, and $546.5 million in the two years prior to the Petition Date.[3687]  During the three and four years prior to the Petition Date, CEOC made over $863.5 million and $1.2 billion, respectively, in principal and interest payments under the Intercompany Revolver,

---

[3681]  D. Sambur Nov. 14, 2015 Tr. at 590:4-591:2; *see also* S. Wiegand Nov. 6, 2015 Tr. at 73:14-24.

[3682]  *See* "Liquidity Discussion" Presentation (Nov. 2013) [CEOC_INVESTIG_00172963], at 2.

[3683]  *See* E. Hession Jan. 20, 2016 Tr. at 570:5-14.

[3684]  S. Wiegand Nov. 6, 2015 Tr. at 73:14-24; E. Hession Nov. 4, 2015 Tr. at 523:7-525:13.

[3685]  Amendment to Amended and Restated Credit Agreement (June 3, 2014), at CEOC_INVESTIG_00540648 [CEOC_INVESTIG_00540648].  The CEOC board approved the June 2014 Amendment on May 30, 2014.  CEOC Board Written Consent (May 30, 2014), at CEOC_INVESTIG_00484005-6 [CEOC_INVESTIG_00484005].  The CEC board approved the June 2014 Amendment on May 31, 2014.  CEC Board Written Consent (May 31, 2014), at CEC_EXAMINER_1443181 [CEC_EXAMINER_1443178].

[3686]  Amendment to Amended and Restated Credit Agreement (June 3, 2014), at CEOC_INVESTIG_00540648 [CEOC_INVESTIG_00540648].

[3687]  *See* Intercompany Figure 2.

but CEC also made significant subsequent advances during those periods.[3688]   Given that CEOC's maximum outstanding balance was $644.2 million on November 14, 2012 and CEC made no additional advances after that date,[3689] the Examiner believes this amount, plus the interest accrued and paid thereon, for a total of $662.5 million, is the maximum amount that could be recovered under any possible claim.

### 3. The CEOC Intercompany Loan

In 2009, CEOC loaned CEC $235 million from funds CEOC borrowed under its Bank Credit Agreement.[3690]   No written credit agreement or promissory note was executed, and CEC paid no interest to CEOC for the use of these funds.   On June 24, 2010, CEC repaid CEOC the $235 million loan.[3691]   CEOC paid approximately $5.8 million in interest for the funds it borrowed to lend to CEC.[3692]

### 4. Intercompany Notes

The Examiner has reviewed the following 13 Intercompany Notes outstanding as of the Petition Date issued by CEOC and certain of its various debtor and non-debtor subsidiaries.

---

[3688] *Id.* Over $1.2 billion was also paid in the six years preceding the Petition Date, as CEOC did not make any repayments between January 2009 and January 2011.

[3689] *See* "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_ INVESTIG_00544776 (native file).

[3690] *See* "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_ INVESTIG_00544776 (native file) ("HOC borrowed funds from revolving credit facility and loaned the amount to HET.").

[3691] *Id.*

[3692] The Bank Credit Agreement provided for a rate of interest of between 3.23% to 3.75% during the period of the loan. *See* CEC 10-K for the year ended Dec. 31, 2009 (Mar. 9, 2010), at 27 ("3.23%-3.75%"); CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 41 ("3.23%-3.75%"); *see also* CEC 10-Q for the quarterly period ended June 30, 2009 (Aug. 13, 2009), at 11 ("3.29%-3.47%"); CEC 10-Q for the quarterly period ended Sept. 30, 2009 (Nov. 12, 2009), at 12 ("3.25%-3.5%"); CEC 10-Q for the quarterly period ended Mar. 31, 2010 (May 10, 2010), at 38 ("3.23%-3.25%"); CEC 10-Q for the quarterly period ended June 30, 2010 (Aug. 16, 2010), at 13 (3.23%-3.75%).   Interest was calculated using the midpoint of the quarterly interest rates for the Revolving Credit Facility disclosed in CEC's 10-Q and 10-K filings.   Using the lowest and highest rate for each quarter, the interest range is $5.5 million to $6.1 million.

**Intercompany Figure 3: Intercompany Notes**[3693]

| Lender | Borrower | Property Name | Loan Inception | Loan Balance Outstanding as of 1/14/15 (amounts in thousands) | | |
|---|---|---|---|---|---|---|
| | | | | Principal Balance | Interest | Total |
| Horseshoe Gaming Holding, LLC | Horseshoe Entertainment | Horseshoe Bossier City | 4/1/1996 | $   141,415 | $   138,486 | $   279,900 |
| Roman Holding Corp of Indiana | Caesars Riverboat Casino, LLC | Horseshoe Southern Indiana | 3/1/1998 | 118,000 | 10,434 | 128,434 |
| Caesars Entertainment Finance Corp. | Bally's Park Place, Inc. | Bally's Atlantic City | $500M on 1/1/99, assignment on 7/1/2000; $83.5M on 5/31/11 | 583,500 | 348,292 | 931,792 |
| Caesars Entertainment Finance Corp. | Boardwalk Regency Corporation | Caesars Atlantic City | 12/31/2000 | 518,330 | 308,579 | 826,909 |
| CEOC | HEI Holding Company Two, Inc. | N/A | 12/29/2006 | 585,417 | 161,178 | 746,595 |
| CEOC | Biloxi Hammond, LLC | Harrah's Gulf Coast | 12/31/2013 | 184,032 | 6,347 | 190,380 |
| CEOC | Grand Casinos of Biloxi, LLC | Harrah's Gulf Coast | 12/31/2013 | 304,840 | 10,514 | 315,354 |
| CEOC | Grand Casinos, Inc. | Harrah's Gulf Coast | 12/31/2013 | 310,309 | 10,703 | 321,012 |
| CEOC | Robinson Property Group Corp. | Horseshoe Tunica | 12/31/2013 | 759,747 | 26,204 | 785,951 |
| CEOC | Tunica Roadhouse Corporation | Tunica Roadhouse | 12/31/2013 | 166,304 | 5,736 | 172,040 |
| Players International, LLC | Players Resources, Inc. | Harrah's Metropolis | | 196,000 | - | 196,000 |
| **Notes between Debtor Entities** | | | | **$   3,867,894** | **$   1,026,473** | **$   4,894,367** |
| HEI Holding Company Two, Inc. | Harrah's International C.V. * | N/A | 7/6/2007 | $   585,417 | $   139,089 | $   724,506 |
| CEOC | London Clubs International Ltd * | UK entities | 12/28/07, Amended on 2/15/12 | 213,149 | 783 | 213,931 |
| **Notes between Debtor and Non-Debtor Entities** | | | | **$   798,566** | **$   139,871** | **$   938,437** |
| **Total Notes** | | | | **$   4,666,460** | **$   1,166,344** | **$   5,832,804** |

\* Recipient entity holding the liability is a non-Debtor.

The Examiner understands that these Intercompany Notes fall into the following general categories:  (i) those existing prior to the LBO; (ii) those executed to facilitate tax efficiencies; and (iii) those created in connection the acquisition of and to provide working capital for London Clubs.[3694]  While agreements related to 11 of the 13 notes were provided, the Debtors could not locate documents to support the notes between Players International, LLC and Players Resources, Inc., and between Horseshoe Gaming Holding, LLC and Horseshoe Entertainment. The Examiner has been told that with respect to the London Clubs note, which requires the payment of interest only until maturity, the payment of interest is current.[3695]  With regard to the

---

[3693]  Intercompany Notes Summary (Jan. 14, 2015), at CEOC_2004_0056422 [CEOC_2004_0056422].

[3694]  *Id*.  It appears that a majority of the Intercompany Notes were executed to facilitate tax efficiencies.  *See id.*

[3695]  *Id*.; E. Hession Nov. 4, 2015 Tr. at 508:7-509:5.

Intercompany Notes created to minimize tax liabilities or to create tax efficiencies, the Examiner has also been told that they do not represent funds actually lent requiring repayment.[3696]  Given that all these Intercompany Notes are between or among CEOC and certain of its debtor and non-debtor subsidiaries, they do not impact CEOC's financial condition and, therefore, the Examiner did not further investigate them.

### 5.  Intercompany Project Simplification

The Examiner's interest in Project Simplification first arose after learning of a $10.5 billion journal entry recorded by CEOC allegedly to clean-up equity and intercompany accounts.[3697] The Examiner has been asked to investigate (i) whether the $10.5 billion entry was evidence of a legally enforceable debt being issued by CEC to CEOC in connection with the CMBS Distributions (as defined below) and (ii) whether the elimination of such entry in 2013 should be treated as the cancellation of such debt without adequate consideration.  In addition, concerns were raised regarding Project Simplification such as:  (i) its purpose and scope; (ii) the net impact to CEOC's equity, cash and other balance sheet accounts; and (iii) the impact to Caesars' non-debtor entities.

These questions were partially addressed in a Caesars memorandum to its Accounting Files dated November 4, 2015, which states:

> In order to ensure that the financial statements for Caesars Entertainment Operating Company ("CEOC") were SEC compliant on a standalone basis, in 2013 we undertook a general ledger maintenance initiative ("GLMI") [also referred to as Project Simplification] to bring all subsidiary equity accounts into compliance with SEC reporting requirements.  This is often referred to as a "classified" equity section.  In short, this simply means that an equity section must be broken into its components (additional paid-in capital, other comprehensive income, retained earnings, etc.).

> [T]he general ledger entries made in the GLMI related to the LBO had no net impact on the CEC, CEOC or CERP financial statements . . . .  These journal entries both debited and credited equity accounts and therefore had no net impact on equity.  The entries did not represent a change in ownership or an exchange of economic value.  They had no impact on, nor did they represent an exchange of

---

[3696] In an informal interview with Carol Tabrizi, Senior Vice President in Caesars' Tax Department, Tabrizi explained that eliminating certain intercompany balances between CEOC and a Caesars property in Mississippi would result in significantly increased franchise taxes. Interview of C. Tabrizi, Aug. 26, 2015 (not transcribed).  In order to limit the Company's franchise tax liability, these intercompany balances were converted to five intercompany notes between CEOC and the property.  *Id.*  Tabrizi further explained that these intercompany notes would be "cleared out" through CEOC's bankruptcy.  *Id.*

[3697] Draft Memo to Accounting Files (June 2013), at CEC_EXAMINER_0203710-11 [CEC_EXAMINER_0203707].

assets, liabilities, and/or equity (including intercompany receivable and payables).[3698]

Based on interviews and review of documents, the Examiner did not find evidence contradicting those conclusions correcting journal entries specifically "related to the LBO." Project Simplification, however, was not limited to general ledger balances resulting from the LBO. Project Simplification was a broader initiative to review and settle intercompany balances within and outside of CEOC.

### a. Purpose and Scope

In March 2013, CEC engaged PwC to assist it in analyzing the historical intercompany balances within CEOC intercompany equity accounts – referred to as intercompany 2995 accounts – to determine appropriate eliminations for the years 2010, 2011 and 2012. Stanley Oldoerp, PwC Risk Assurance Partner, described Project Simplification and the work performed by his team during its thirteen month engagement as follows:

> So the process was to assist the company in reconciling their intercompany out of balance. I did that through obtaining general ledger data from their Infinium general ledger for the period in question, from 2008 through 2013. And we confirmed the completeness and accuracy of that data. My team then interrogated the data looking for the debits and credits that were mismatched, and then we would have interviews with management to understand the nature of the transactions, obtain any other artifacts or support for those original entries, and then made recommendations on how they could correct the out of balance. Management then took those recommendations, did their further analysis, and would have executed them as they saw fit.[3699]

### b. The 2008 $10.5 Billion Entry

On January 28, 2008, in connection with the LBO, CEOC (i) contributed certain assets to six subsidiaries and (ii) distributed to CEC all of the stock of each such subsidiary. In addition, on May 22, 2008, (i) all of the stock of two additional CEOC subsidiaries were distributed by CEOC to CEC and (ii) all of the stock of four of the six subsidiaries distributed by CEOC to CEC on January 28, 2008 were then contributed by CEC back to CEOC. As a result of these transactions, the stock of six CEOC subsidiaries (the "CMBS Entities") were distributed by CEOC to CEC (the "CMBS Distributions").

Each of the CMBS Distributions was structured to qualify as a tax free spin-off pursuant to IRC section 355.[3700] In this regard, Apollo and TPG received certain tax opinions from PwC concluding that each CMBS Distribution should be treated as a non-taxable distribution pursuant

---

[3698] Memo to Accounting Files (Nov. 4, 2015), at 2.

[3699] S. Oldoerp Dec. 23, 2015 Tr. at 33:12-34:9.

[3700] *See* Draft Memo to Accounting Files (June 2013), at CEC_EXAMINER_0203707-8 [CEC_EXAMINER_0203707].

to IRC section 355 (the "PwC Tax Opinions").[3701]  In reaching such conclusion, PwC relied on representations from the CEC Group that no part of the stock in the six CMBS Entities distributed by CEOC to CEC was received by CEC as a creditor, employee, or in any capacity other than that of a shareholder of CEOC.[3702]

The Examiner, however, was advised that (i) LBO purchase accounting entries created intercompany activity relating to $10.5 billion of goodwill associated with properties transferred from CEOC to CMBS as an accounting matter in 2008 and (ii) in 2013, such intercompany activity was reclassified within equity.[3703]

### c. Sponsor Fees Paid by CEOC Reimbursed by CEC Through a Reduction of Certain Intercompany Balances

As a result of Project Simplification's detailed review of intercompany balances recorded since the LBO, a total of $252 million in cash payments were identified as having been funded by CEC that related to CEOC's regular operations and payroll taxes.[3704]  Winterscheidt described this as "probably the most substantive piece of the entire Project Simplification from it actually having impact."[3705]  Winterscheidt explained how this intercompany activity was reconciled and settled, which resulted in CEC, in effect, reimbursing CEOC for the SSA fees it had previously paid:

> So we had [$]252 [million] that CEC funded that were CEOC expenses.  Then we looked through CEOC expenses and we had the sponsor fees. So you had $192 million in sponsor fees from 2008 until 2013 that had been paid by CEOC . . . . But we looked at that and said, hold on, do we want CEOC to pay all the sponsor fees?  And the conclusion was reached that, no, in fact, CEOC, we won't make them pay all the sponsor fees even though they had actually paid the cash for that. We said we'll reimburse CEOC for that.  So you had [$]252 [million] that CEOC was due to CEC.  Then we say, well, if there's [$]192 [million] that we're going to reimburse to CEOC for all of the sponsor fees, hundred percent of the sponsor fees since the LBO, that offsets it.[3706]

---

[3701] *See, e.g.*, PwC Opinion Letter (Aug. 7, 2008), at CEOC_INVESTIG_00154943 [CEOC_INVESTIG_00154943].

[3702] *Id.*

[3703] *See* Draft Memo to Accounting Files (June 2013), at CEC_EXAMINER_0203709 [CEC_EXAMINER_0203707].

[3704] On February 26, 2016, CEC's counsel responded to a document request from the Examiner and explained (i) that CEC's accounting department was not aware that these payments were being made at the time, as CEC did not intend to make them and (ii) that gathering this material would be nearly impossible to locate.

[3705] M. Winterscheidt Jan. 19, 2016 Tr. at 54:8-19.

[3706] *Id.* at 55:10-56:3.

Although CEC was unable to provide any details on the $252 million of expenses paid on behalf of CEOC, a schedule of the credits CEOC received by year was provided to support the $192 million reimbursement described by Winterscheidt.[3707]   This resulted in a $60 million net due from CEOC to CEC which was reduced through a $41 million contribution from CEC that was recharacterized as equity and the remaining $19 million was offset against future cash payments CEC owed CEOC for regular payment processing.[3708]

### d.   Impact to CEOC's Financial Statements

In addition to the offset of the intercompany balances between CEC and CEOC, Project Simplification analyzed, among other things, activity in the intercompany equity accounts to determine whether that activity should be reclassified to APIC or whether it should be cash settled.   If the reclassification were to CEOC's APIC, that activity was reclassified within the equity section of CEOC's balance sheet.   Winterscheidt explained that "equitization was our word for moving [activity] from intercompany 2995 and moving it down to permanent APIC so that you have a zero ending balance in the 2995."[3709]   Winterscheidt also quantified the net impact of Project Simplification's adjustments to the intercompany 2995 accounts to CEOC's Financial Statements as an increase in CEC's equity in CEOC of $18 million:

> We [CEC] had a $40 million net contribution to CEOC, and then we had $19 million that was subsequently repaid by CEOC to CEC.   Then there were some other small, very small amounts.   I think there was [$]3 million between CMBS and CEOC that subsequently got settled in cash. . . .   Other than that, it's classification within equity and there was no net impact to CEOC's financials.[3710]

### 6.   The Examiner's Findings and Conclusions

Various constituencies have identified potential claims related to these transactions, including:   (i) preference claims under the Bankruptcy Code and state fraudulent transfer laws; (ii) constructive and actual fraudulent transfer claims under the Bankruptcy Code and state fraudulent transfer laws; (iii) breach of fiduciary duty claims (including aiding and abetting claims); and (iv) unjust enrichment claims.   The Examiner's findings and conclusions with respect to each transaction is set forth below.

### a.   The SSA

The Examiner believes that any claim to recover the $200 million Transaction Fee would be not viable because although CEOC received no value for this payment, at the time it was paid CEOC was solvent, thus precluding a constructive fraudulent transfer claim.   There is no evidence supporting an actual fraudulent conveyance claims and any potential breach of

---

[3707] *See* "Sponsor Payments" Spreadsheet, CEC_EXAMINER_1447951 (native file), at "By Entity" tab.

[3708] M. Winterscheidt Jan. 19, 2016 Tr. at 61:11-18.

[3709] *Id*. at 28:17-29:11.

[3710] *Id*. at 12:5-20.

fiduciary duty claim would be both weak and time-barred.  In addition, the Examiner does not believe any viable claim exists to recover the Monitoring Fees paid by CEOC to the Sponsors as CEOC was, in effect, reimbursed by CEC as a result of the offset of the intercompany balances identified through Project Simplification.  Simply stated, no unreimbursed Monitoring Fees remain to be avoided and recovered as preferences or fraudulent transfers, nor would there be any damages to recover through breach of fiduciary duty or unjust enrichment claims.

### b.  The Intercompany Revolver

#### i.  Avoidance Claims

A strong cause of action exists under section 547 of the Bankruptcy Code to avoid and recover as preferential transfers the $289.0 million of Intercompany Revolver repayments to CEC in the year prior to the Petition Date.[3711]  The payments were transfers of CEOC's interest in property (*i.e.*, cash) that "would have been [property] of the estate had it not been transferred" to CEC.[3712]  The payments were made to CEC as a creditor, on account of an antecedent debt, at a time CEOC was clearly insolvent.[3713]  CEC was an insider of CEOC at the time of the transfers.[3714]  Finally, given estimated recoveries on unsecured claims, CEC has received more as a result of these payments than it would otherwise receive in a hypothetical Chapter 7 liquidation.[3715]  The Examiner does not believe any viable defenses exist to this section 547 preference claim or to the insider preference claim under the UFTA discussed below.[3716]

A strong cause of action also exists under the UFTA to avoid and recover the same $289.0 million in repayments to CEC during the year prior to the Petition Date.  Both Nevada's and Delaware's UFTA,[3717] as incorporated by section 544(b) of the Bankruptcy Code, contain an insider preference cause of action virtually identical to section 547 of the Bankruptcy Code,

---

[3711]  11 U.S.C. §547(b).

[3712]  11 U.S.C. §547(b); *see also Mahern v. Merchants Grain, Inc. (In re Merchants Grain Inc.)*, 93 F.3d 1347, 1352 (7th Cir. 1996).

[3713]  11 U.S.C. §547(b)(1), (2).  In addition, CEC and the Sponsors, knew or were willfully blind in not knowing that CEOC, given it dire financial condition, was insolvent.  *See* Section XI.A.

[3714]  *See* Appendix 5, Legal Standards at Section II.

[3715]  11 U.S.C. §547(b)(5); *Maxwell v. IDC (In re marchFirst, Inc.)*, 381 B.R. 689, 695 (Bankr. N.D. Ill. 2008).

[3716]  There were no advances, or subsequent new value, made by CEC under the Intercompany Revolver subsequent to any repayments made by CEOC in the year prior to bankruptcy.  *See* "Intercompany Unsecured Revolving Credit Facility" Spread-sheet, CEOC_INVESTIG _00544776 (native file).  The Debtors have acknowledged that there a no applicable defenses to this claim.

[3717]  The Examiner believes that a choice of law analysis would result in the application of either the Nevada UFTA or Delaware UFTA to these repayments.  Given that the result would be the same regardless of which state's UFTA applies, a court need not determine which of these two states' law applies.

which would allow CEOC to avoid and recover the $289.0 million in Intercompany Revolver repayments to CEC in the year prior to the Petition Date.[3718]

Actual fraudulent transfer claims may be brought under section 548 of the Bankruptcy Code and pursuant to state law as incorporated by Bankruptcy Code section 544(b). The Examiner concludes that a reasonable actual fraudulent transfer claim exists under the Bankruptcy Code to avoid and recover CEOC's transfer of $546.5 million to CEC under the Intercompany Revolver during the two years prior to the Petition Date. A reasonable actual fraudulent transfer claim also exists under the UFTA to avoid and recover CEOC's transfer of $662.5 million to CEC during the four years prior to the Petition Date.[3719]

Some direct evidence exists that CEOC's repayments of the Intercompany Revolver were made with the actual intent to hinder or delay creditors. CEOC began prepaying the Intercompany Revolver beginning in November 2012, at the very time when CEOC was purportedly trying to raise new capital through a new entity (Growth) because of CEOC's liquidity problems and distressed financial condition and planning the sale of Planet Hollywood and its interest in a joint venture in Baltimore.[3720] By selling those properties CEOC lost ongoing EBITDA which would help support CEOC's debt. Instead of keeping these assets they were sold to provide needed liquidity to CEOC when these liquidity needs could have been more than met by simply not prepaying the Intercompany Revolver. In addition, CEC significantly enhanced its position through the November 2012 Amendment, which transformed the

---

[3718] *See* Appendix 5, Legal Standards at Section II. It has been suggested that New York's enactment of the UFCA is the applicable law and that CEOC's repayments of the Intercompany Revolver going back six years from the Petition Date are voidable as *per se* fraudulent transfers to an insider in discharge of antecedent debts. *See* N.Y. Debt. & Cred. Law §§272, 273; *see also Bank of Commc'ns v. Ocean Dev. Am., Inc.*, 904 F. Supp. 2d 356, 361 (S.D.N.Y. 2012); *Allen Morris Commercial Real Estate Servs. Co. v. Numismatic Collectors Guild, Inc.*, Case No. 90 CIV. 264, 1993 WL 183771, at *9 (S.D.N.Y. May 26, 1993)). The Examiner recognizes that the Intercompany Revolver is governed by New York law, but contractual choice of law provisions alone do not govern state law claims to avoid payments as insider preferences. CEOC's repayments' only nexus to New York is that is where Apollo is located, and while Sambur may have closely monitored CEOC's borrowings and repayments under the Intercompany Revolver, there is insufficient evidence for the Examiner to conclude that Apollo directed any repayments other than the final repayment of $261.8 million in June of 2014, which repayment is otherwise recoverable as an insider preference regardless of which state law applies. Even if New York law with its six-year look-back period were to apply, the Examiner believes, for the reasons discussed above, that the maximum amount that could be avoided would be limited to the $662.5 million repaid since the Intercompany Revolver reached its maximum outstanding balance on November 14, 2012 as opposed to the total repayments of $1.2 billion made during the six years preceding the Petition Date.

[3719] The Debtors maintain that these payments are unlikely to be avoided as fraudulent transfers or illegal dividends.

[3720] *See* "Caesars Entertainment Discussion Materials" (Oct. 2012), at PRIV_INVESTIG _00047909 [PRIV_INVESTIG_00047907].

Intercompany Revolver into an uncommitted facility. CEC no longer had any obligation to advance funds to CEOC and, for the first time, the November 2012 Amendment required CEOC to make solvency representations to request funds. In fact, CEC made no additional advances to CEOC under the Intercompany Revolver. Moreover, rather than preserving those funds for possible future use by CEOC, CEC used $320 million of the $400.7 million of funds repaid by CEOC between November 2012 and March 2014 to benefit the CMBS Properties, primarily by purchasing CMBS debt in the market. The Examiner notes that the November 2012 Amendment was entered into and the prepayment of the Intercompany Revolver began within weeks of Apollo's detailed review of CEOC's severely distressed financial condition.[3721]

Finally, in June 2014, when the Sponsors and CEC had to have known that CEOC would not be able to satisfy all of its debts in full, the Sponsors insisted that CEOC repay the outstanding balance of $261.8 million. Even if CEOC had some other purpose for paying down the Intercompany Revolver, such as to avoid the incurrence of interest as suggested by Sambur, a court could reasonably find that the "natural consequence" of its actions was to render these funds permanently unavailable to CEOC's creditors, especially in light of the fact that CEOC could not meet the financial condition representation allowing it to re-borrow.[3722] Combined, these facts provide evidence indicating an intent to hinder or delay creditors.

In addition to this direct evidence, certain badges of fraud are present. The Examiner believes that they further support his conclusion that a reasonable actual fraudulent transfer claim to avoid and recover these repayments exists. The first two badges of fraud are easily satisfied: (i) the payments were made to an insider, CEC; and (ii) the transfers were made while CEOC was insolvent. With regard to the final $261.8 million payment in June of 2014, this payment was made shortly after CEC and CEOC were implicitly threatened with litigation by the First Lien Noteholders in connection with the CERP and Four Properties Transactions if a consensual resolution could not be reached.[3723] This represents a third badge of fraud with regard to this payment.

---

[3721] *Id.* at PRIV_INVESTIG_00047908.

[3722] *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013); *F.D.I.C. v. FBOP Corp.*, Case No. 14 C 4307, 2015 WL 1538802, at *7 (N.D. Ill. Mar. 31, 2015) ("natural consequence" of the parent's placing tax refunds into accounts subject to its creditors liens was to render the refunds unavailable to the their rightful owners); *ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 386-87 (S.D. Tex. 2008) (courts have held that a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would be hindered, delayed, or defrauded).

[3723] *See* Letter from Kramer Levin Naftalis & Frankel, LLP to the CEC and CEOC Boards of Directors (Apr. 3, 2014), at CEOC_INVESTIG_00094451-2 [CEOC_INVESTIG_00094448]. Although not directly threatening litigation, two other creditor groups also communicated their concerns about the CERP, Growth, Four Properties, and Guarantee Release transactions. *See* Letter from Jones Day to CEC, *et al.* (Mar. 21, 2014), at CEOC_INVESTIG_00124824 [CEOC_INVESTIG_00124821]; Letter from Sullivan & Cromwell LLP to CEC (May 15, 2014), at CEC_EXAMINER_0010758-9 [CEC_EXAMINER_0010758].

Finally, while a fourth badge of fraud – inadequacy of consideration – would be present if the repayments of the Intercompany Revolver could be recharacterized as dividends, the Examiner concludes, as discussed below, that it is unlikely that such an argument would succeed. Nonetheless, the Examiner believes the presence of these badges of fraud, combined with the direct evidence, would be sufficient to make this a reasonable actual fraudulent transfer claim.

Whether CEOC's repayment of the Intercompany Revolver could be avoided as a constructive fraudulent transfer depends upon whether the advances by CEC to CEOC should be recharacterized as capital contributions and, correspondingly, CEOC's repayments to CEC recharacterized as dividends.[3724]   If the repayments were determined to be dividends, CEOC would not have received reasonably equivalent value and the repayments could be avoided as constructive fraudulent transfers under the Bankruptcy Code and the UFTA.[3725]   Analysis of the *Autostyle Plastics* recharacterization factors, however, demonstrates that the Intercompany Revolver would more likely than not be considered a *bona fide* credit facility and that the amounts loaned and repaid under it would not be subject to recharacterization.[3726]   This thus would be a weak claim.

At the time the Intercompany Revolver was established and during the period when CEC was obligated to and actually made advances – from August 2008 to September 2012 – the Examiner has not uncovered any direct evidence suggesting that CEC and CEOC did not intend the Intercompany Revolver to be treated as a *bona fide* credit facility.   Application of the following *Autostyle Plastics* factors further support this conclusion:   (i) the Intercompany Revolver was documented in the 2008 Credit Agreement;[3727] (ii) subsequent amendments were similarly documented;[3728] (iii) the Intercompany Revolver had a fixed maturity date (except possibly for the short period of time during which the Demand Intercompany Note was in effect);[3729] (iv) interest was charged at a stated interest rate, first annually and then quarterly;[3730]

---

[3724]   It is unclear whether the Bankruptcy Court would recognize the recharacterization remedy and, if recognized, whether it would apply federal or state law to the recharacterization analysis. *See* Appendix 5, Legal Standards at IX.

[3725]   *See id* at Section III.A.

[3726]   *See Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 749-50 (6th Cir. 2001).

[3727]   *See* 2008 Credit Agreement (undated), at CEC_EXAMINER_1443561-64 [CEC_EXAM-INER_1443557].

[3728]   *See, e.g.*, Amended Credit Agreement (Dec. 10, 2010), at CEC_EXAMINER_1443566 [CEC_EXAMINER_1443566]; Second Amended Credit Agreement (Feb. 24, 2011), at CEC_EXAMINER_1443573 [CEC_EXAMINER_1443573]; Amended and Restated Credit Agreement (Nov. 14, 2012), at CEC_EXAMINER_0087833 [CEC_EXAMINER_0087833]; Amendment to Amended and Restated Credit Agreement (June 3, 2014), at CEOC_INVESTIG_00540648 [CEOC_INVESTIG_00540648].

[3729]   *See* Amended and Restated Credit Agreement (Nov. 14, 2012), at CEC_EXAMINER_0087844 [CEC_EXAMINER_0087833] (Section 2.06); Amendment to Amended and Restated Credit Agreement (June 3, 2014), at CEOC_INVESTIG_00540648 [CEOC_INVESTIG_00540648] (Section 1.1).

(v) periodic principal and interest payments were made;[3731] and (vi) the advances were not used to acquire capital assets, but were used as part of a general cash management system.

The Examiner acknowledges, however, that certain other *Autostyle Plastics* factors might support recharacterization:  (i) the Intercompany Revolver was unsecured and subordinated; (ii) CEOC was not obligated to make any principal repayments to CEC until the maturity date and principal repayments were not made on a regular basis; and (iii) CEOC did not have a sinking fund to support its repayments obligations.[3732]  While the November 2012 Amendment that transformed the Intercompany Revolver into an uncommitted facility might further raise recharacterization concerns with regard to any funds borrowed thereafter, "the determinative inquiry in classifying advances as debt or equity is the intent of the parties as it existed at the time of the transaction."[3733]   And even though Hession and Wlalzo may have believed that the Intercompany Revolver was an uncommitted credit facility from its inception, the terms of the pre-November 2012 Intercompany Revolver are unambiguous and CEC, in fact, never refused a funding request by CEOC.  Accordingly, as all of the advances to CEOC were made when CEC was contractually obligated to make advances, the November 2012 Amendment is not sufficient to support recharacterization.  As a result, advances made under the Intercompany Revolver are unlikely to be recharacterized and, consequently, CEOC's repayments are unlikely to be avoidable as constructive fraudulent transfers.

### ii.  Fiduciary Duty Claims

With respect to CEOC's repayment of the Intercompany Revolver during the three years prior to the Petition Date, reasonable breach of fiduciary duty claims exist against certain CEOC officers and directors and against CEC, as CEOC's controlling shareholder.[3734]  The liability for these claims would be joint and several, and the potential damages recoverable likely would be $662.5 million, the amount CEOC paid back in principal and interest from November 14, 2012

---

[3730]  *See, e.g.*, 2008 Credit Agreement (undated), at CEC_EXAMINER_1443561 [CEC_ EXAMINER_1443557] (Section 2.01); Amended and Restated Credit Agreement (Nov. 14, 2012), at CEC_EXAMINER_0087844-5 [CEC_EXAMINER_0087833] (Section 2.08).

[3731]  *See* Intercompany Figure 2.

[3732]  CEC's control over CEOC's decisions whether to draw down or make payments on the Intercompany Revolver might also support recharacterization.  *See Moglia v. Quantum Indus. Partners, LDC (In re Outboard Marine Corp.)*, Nos. 02 C 1594, 01A0471, 00B3704, 2003 WL 21697357 at *2 (N.D. Ill. July 22, 2003) (noting two additional recharacterization factors – "the ratio of shareholder loans to capital" and "the amount or degree of shareholder control").

[3733]  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 457 (3d Cir. 2006); *see also Anderson v. Commonwealth Renewableable Energy, Inc. (In re Commonwealth Renewableable Energy, Inc.)*, 540 B.R. 173, 181-82 (Bankr. W.D. Pa. 2015) ("The [recharacterization] factors are aimed at determining the intent of the parties at the time they entered into the loan transaction.") (internal quotation marks omitted).

[3734]  As discussed in Appendix 5, Delaware law would likely apply to any claim for breach of fiduciary duty and any such claims would likely be the governed by the three-year statute of limitations.  Appendix 5, Legal Standards at IX.A.2.; *see also* Del. Code Ann. tit. 10, §8106.

to the Petition Date.[3735]  In addition, a reasonable claim exists against the Sponsors for aiding and abetting that breach of fiduciary duty, especially in connection with the final $261.8 million repayment in June 2014.

With respect to the Intercompany Revolver, a court would likely apply the "entire fairness" standard of review since the CEOC directors and officers involved in the repayments "stood on both sides" of the determinations to make payments on the Intercompany Revolver.[3736] With respect to CEOC's Intercompany Revolver repayments, no processes or systems were put in place at CEOC to make sure that the decision to make a repayment was in the best interests of CEOC and its creditors, as opposed to CEC and the Sponsors.  This is a major failing on the part of CEOC's directors and officers, CEC, and the Sponsors, all of whom from at least late 2013 knew or were willfully blind in not knowing that CEOC would not be able to repay its debts in full.  As a result, a court is not likely to find that there was fair dealing with respect to CEOC's payments to CEC on the Intercompany Revolver to CEC.[3737]

The decisions to make payments on the Intercompany Revolver should be grouped into two categories:  (i) the $400.7 million in principal and interest payments made between November 2012 and March 2014; and (ii) the final repayment of $261.8 million in June 2014. There is no evidence that anyone ever considered the best interests of CEOC and its creditors in connection with the decisions to make such repayments.  In fact, the following evidence indicates that the decisions to make the payments were not "entirely fair" with respect to CEOC and did not mirror arm's length dealing:  (i) the repayments were made at time when CEOC was almost certainly insolvent, was continuing to project negative cash flow and purportedly was trying to raise new capital;[3738] (ii) CEOC was not obligated to repay the loans until the then effective maturity date in November 2017;[3739] (iii) the interest rate on the Intercompany Revolver was lower than the interest rate on CEOC's other outstanding debt;[3740] (iv) no

---

[3735]  This amount would also be limited by any payment under the Intercompany Revolver that is avoided pursuant to the preference or fraudulent transfer claims discussed above.

[3736]  See Ams. Mining Corp. v. Theriault, 51 A.3d 1213, 1240 (Del. 2012); Quadrant Structured Prods. Co. v. Vertin, 102 A.3d 155, 183 (Del. Ch. 2014).

[3737]  Courts generally consider two prongs under the "entire fairness" standard – fair dealing and fair price.  See Appendix 5, Legal Standards at XI.A.4.  The discussion here will focus on the fair dealing prong as the "price" that CEOC paid to CEC is not determinative.  See In re Nine Sys. Corp. S'holders Litig., No. CIV.A. No. 3940-VCN, 2014 WL 4383127, at *47 (Del. Ch. Sept. 4, 2014) (A "grossly unfair process can render an otherwise fair price . . . not entirely fair.").

[3738]  "Caesars Entertainment Discussion Materials" Presentation (Oct. 2012), at PRIV_INVESTIG_00047909 [PRIV_INVESTIG_00047907].

[3739]  See Amended and Restated Credit Agreement (Nov. 14, 2012), at CEC_EXAM-INER_0087844 [CEC_EXAMINER_0087833] (Section 2.06).

[3740]  Compare "Intercompany Unsecured Revolving Credit Facility" Spreadsheet, CEOC_INVESTIG_00544776 (native file) with "Summary of Investments & Outstanding Debt" Spreadsheet (Sept. 11, 2013), CEOC_INVESTIG_00025071 (native file), at "Summary" tab; CEOC Capital Structure Summary (Dec. 31, 2013), CEOC_INVESTIG_00053878 (native file),

independent directors, officer or financial advisors reviewed or approved the payments from CEOC to its controlling parent, CEC; and (v) the reasons described in connection with the actual fraudulent claim.  With respect to the $261.8 million repayment in June of 2014, the claim is even stronger given the financial condition of CEOC and the fact that independent directors for CEOC – who could have been left to make the decision regarding the repayment – were in place and about to join the CEOC Board.  Moreover, even though Loveman and Hession, the then CEOC directors, were successful in amending the Intercompany Revolver to create a committed facility of $260.4 million, this was significantly less than the $750 million committed facility available to CEOC prior to the November 2012 Amendment, and the maturity date was shortened by over a year.  Most importantly, moreover, CEOC would not be able to make the required representations regarding its financial conduction to satisfy the drawing conditions.

As a result, a court is likely to find that none of the $662.5 million in payments made between November 2012 and June 2014 meet the "entire fairness" standard and thus a reasonable claim exists for breach of fiduciary duty against those who were involved in authorizing or directing such payments, including, in particular, CEC as controlling shareholder.

A reasonable claim also exists against the Sponsors for aiding and abetting the various breaches of fiduciary duty with respect to the $261.8 million repayment in June of 2014 as the Sponsors "knowingly participated" in the decision to make that repayment.[3741]  At the time of that repayment and amendment, the Sponsors were well aware of CEOC's financial distress and liquidity problems and that CEOC was not obligated to make any repayment under the Intercompany Revolver until November 2017.

With respect to the $400.7 million paid to CEC between November 2012 and March 2014, a potential claim exists against the Sponsors (Apollo in particular) for aiding and abetting breach of fiduciary duty although such claim would require further factual development with regard to each particular repayment made during such period.[3742]

### c.  The CEOC Intercompany Loan to CEC

The Examiner has concluded there is a plausible constructive fraudulent transfer claim under the UFTA related to the interest-free CEOC Intercompany Loan to CEC in 2009.[3743]  All

---

at 1; *and* "Summary of Investments & Outstanding Debt" Spreadsheet (June 16, 2014), CEOC_INVESTIG_00073421 (native file), at "Summary" tab.

[3741] *See* E. Hession Nov. 4, 2015 Tr. at 494:24-495:20 (explaining that the Sponsors, specifically Kranias, Sambur, and van Hoek, asked that the Intercompany Revolver "be paid down to zero").

[3742] Claims for aiding and abetting breach of fiduciary duty also may be raised in the alternative against CEC if it is found that CEC did not owe a fiduciary duty to CEOC with respect to the Intercompany Revolver repayment decisions.  *See Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (allowing plaintiff to bring aiding and abetting claims in addition to breach of fiduciary duty claims as alternative pleadings).

[3743] The Examiner believes that a choice of law analysis would result in the application of either Nevada or Delaware UFTA to these claims.  Given that the application of these two state statutes

of the elements of a constructive fraudulent transfer claim are present:  (i) CEOC transferred $235 million to CEC without charging any interest; (ii) CEOC did not receive reasonably equivalent value as CEC did not pay any interest to CEOC, despite the fact that CEOC paid approximately $5.8 million in interest on the cash it borrowed to fund the loan to CEC; and (iii) CEOC was likely insolvent at the time of the CEOC Intercompany Loan.[3744]

Generally, under section 550 of the Bankruptcy Code, when a transfer is constructively fraudulent the debtor's estate may recover "the property transferred, or . . . the value of such property."[3745]  Here, however, CEC returned a portion of the initial transfer when it paid off the $235 million in June 2010.  Where transferees have returned some or all of the money directly to the debtor prior to the petition and there is no evidence of actual fraud, courts have provided for an "equitable credit" to reduce the estate's recovery.[3746]  As section 550 was "designed to restore

---

would not change the outcome, a court does not need to decide which would apply, but can analyze the claims under either or both statutes.

[3744] Although such a claim would generally be barred by the four-year statute of limitations under the UFTA, as discussed in more detail with respect to the LBO, there was a "Golden Creditor" at all relevant times, and as a result, a constructive fraudulent transfer claim with respect to the CEOC Intercompany Loan is not untimely.  *See* Section XI .

[3745] 11 U.S.C. §550(a); *see* Appendix 5, Legal Standards at Section III.B.

[3746] Baket *v. Wetzel (In re Kingsley)*, 518 F.3d 874, 878 (11th Cir. 2008); *see also Silverman v. A–Z RX LLC (In re Allou Distribs. Inc.)*, No. 04-08369-ESS , 2012 WL 6012149, at *24 (Bankr. E.D.N.Y. Dec. 3, 2012) ("The determination whether to permit a credit for funds that are returned to a transferor is based on principles of equity that a court . . . may apply . . . with considerable discretion.") (internal quotation marks omitted); *Dobin v. Presidential Fin. Corp. of Del. Valley (In re Cybridge Corp.)*, 312 B.R. 262, 273 (D.N.J. 2004) ("Section 105(a) empowers bankruptcy courts to grant equitable credits to transferees of avoided postpetition transfers where doing so does not otherwise conflict with the Code."); *Bakst v. Clarkston* (*In re Clarkston*), 387 B.R. 882, 891 (Bankr. S.D. Fla. 2008) ("It would be inequitable to allow the Trustee to recover payments made by the Defendant to the Debtor simply because they were made after the transfer.").  Where payments have been made by the transferee to a debtor's creditors on behalf of the debtor, and where is evidence of actual fraud, courts have split on whether the transferee should receive a credit for those payments. *Compare Nostalgia Network, Inc. v. Lockwood*, 315 F.3d 717, 720 (7th Cir. 2002) (affirming award of full recovery where the debtor transferred money to his fiancée, who used it to pay his personal and business expenses, when case indicated the likelihood of actual fraud"); *and Goldman Sachs Execution & Clearing, L.P. v. Official Unsecured Creditors' Comm. of Bayou Grp., LLC*, 758 F. Supp. 2d 222, 228-29 (S.D.N.Y. 2010) (comparing cases of innocent transferees with the case at bar), *with Bakst v. Sawran (In re Sawran)*, 359 B.R. 348, 354 (S.D. Fla. 2007) (transferees who returned to debtor part of transfer were "innocent of wrongdoing and deserve protection"); *and Dahar v. Jackson (In re Jackson)*, 318 B.R. 5 (Bankr. D. N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) (exercising equitable powers to adjust the amount of recovery to the bankruptcy estate where the transferee used proceeds from the sale of fraudulently transferred property to pay the debtor's business and family expenses).

the estate to the financial condition that would have existed had the transfer never occurred,"[3747] for the CEOC Intercompany Loan where there is no evidence of actual fraud, CEOC's recovery should be limited to the $5.8 million in interest that CEC should have paid to CEOC.

### d.  Project Simplification

Generally, when a corporation distributes appreciated property to its shareholders, (i) the corporation will be taxed on the built-in gain of the property, *i.e.*, the amount the property has appreciated and (ii) the shareholders will be taxed on the value of the distributed property.[3748] However, under IRC section 355, the distribution of stock in a subsidiary corporation by the parent corporation to the parent's shareholders may not be subject to tax to either the parent corporation or the recipient shareholders if certain requirements are met.  Among other requirements, for a distribution to qualify under IRC section 355, the parent corporation must distribute the stock or securities of the subsidiary corporation to the parent corporation's shareholders with respect to their stock, and to the parent corporation's security holders in exchange for their securities and not in either case with respect to a related party debt.[3749]

In the instant case, the PwC Tax Opinions concluded that each CMBS Distribution should be treated as a non-taxable distribution pursuant to IRC section 355.  In providing such tax opinion, PwC relied on representations from the CEC Group that that no part of the stock in the CMBS Entities distributed by CEOC to CEC was received by CEC as a creditor, employee, or in any capacity other than that of a shareholder of CEOC.  Accordingly, based on the foregoing, it would appear that the PwC Tax Opinions concluded that each of the CMBS Distributions was made by CEOC to CEC  with respect to CEC's stock in CEOC, consistent with the requirements of IRC section 355(a)(1)(A).

In addition, the Examiner has been advised that the $10.5 billion entry likely was a hypothetical accounting entry resulting from the CEC Group's use of the "push-down" accounting method for financial accounting purposes, which should have no tax or legal consequences on the relevant parties.[3750]  Accordingly, the Examiner concludes that (i) the 2008 Entry should not be treated as a legally enforceable debt instrument issued by CEC to CEOC in connection with any CMBS Distribution and (ii) the elimination of such entry from CEOC's

---

[3747] *Kingsley*, 518 F.3d at 877; *see also Hirsch v. Gersten (In re Centennial Textiles, Inc.)*, 220 B.R. 165, 176 (Bankr. S.D.N.Y. 1998) (collecting cases); *cf. In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 527 (7th Cir. 1986) ("It is not the objective of the bankruptcy laws to confer windfalls on debtors.").

[3748] *See* IRC §§301, 311.

[3749] IRC §355(a)(1)(A).

[3750] *See* Giles Sutton & Jeffrey M. Vesely, Dealing with Debt in Related Entity Groups at 13, Presentation Before the COST 44th Annual Meeting (Oct. 23, 2013), *available at* http://www.pillsburylaw.com/siteFiles/Events/DealingwithDebtinRelatedEntityGroups.pdf ("Such ['push down' accounting] does not change the legal/tax obligations of the entities involved!").

books in 2013 should not be treated as a legally enforceable debt cancelled without consideration.

# X. TAX ISSUES

## A. Introduction

As part of the Examiner's investigation, the Examiner has reviewed the following two issues relating to the Non-Debtors' utilization of certain net operating losses ("NOLs") generated by the Debtors: (i) whether the Debtors are entitled to any additional amounts from CEC with respect to the 2009 Refund (as defined below), which was primarily attributable to the carryback of certain Debtor-generated NOLs against Federal income taxes that the CEC Group had paid or reported as due with respect to the taxable years 2005 through 2008; and (ii) whether the Non-Debtors utilized any portion of the NOLs generated by the Debtors during the period from January 1, 2005 through the Restructuring (as defined below) and, if so, whether the Debtors should be entitled to compensation from the Non-Debtors, either as part of the Restructuring or at appropriate future dates, for such NOL utilization by the Non-Debtors, to the extent that the Debtors otherwise would have been able to utilize such NOLs against their own future taxable income.

As discussed below, the Examiner concludes that the Debtors have a strong argument that approximately $55.8 million of the 2009 Refund was not properly credited to them by CEC, and that as a result, the Debtors are entitled to such amount from CEC. In addition, the Examiner concludes, although there is no legal authority that has considered a directly analogous situation, that the Debtors also have a reasonable argument that they are entitled to compensation from the Non-Debtors, either as part of the Restructuring or at appropriate future dates, for the utilization by the Non-Debtors of certain NOLs generated by the Debtors during the period from January 1, 2005 through the Restructuring, provided that the Debtors would be able to utilize such NOLs against their own future taxable income had such NOLs not been previously utilized by the Non-Debtors.

## B. 2009 NOL Carryback

### 1. Description and Relevant Facts

In 2009, the CEC consolidated group (the "CEC Group") reported an NOL of approximately $1.25 billion (the "2009 NOL"), attributable to the operations of the Debtors, primarily CEOC.[3751]  The CEC Group carried back approximately $800 million of the 2009 NOL[3752] to the 2006 and 2008 taxable years by filing a tentative refund claim on Form 1139 (Corporation Application for Tentative Refund) on or about October 28, 2010.[3753]

---

[3751] CEC 2009 Form 1120 (U.S. Corporation Income Tax Return), Schedule M-3, at CEC_Examiner_0368751 [CEC_Examiner_0368591] indicates that CEOC generated approximately $1.5 billion in operating losses for the 2009 taxable year. The other Debtors generated net taxable income of approximately $163 million and the Non-Debtors generated net taxable income of approximately $106 million for the 2009 taxable year, which resulted in a consolidated taxable loss of approximately $1.25 billion for the 2009 taxable year.

[3752] The amount of the 2009 NOL carryback was limited to approximately $800 million because more than $400 million of the 2009 NOL was attributable to "corporate equity reduction interest

From 2005 to 2008, the CEC Group reported approximately $883.1 million in Federal income taxes: (i) approximately $545.7 million attributable to the Debtors; and (ii) approximately $337.4 million attributable to the Non-Debtors.[3754] According to CEC Form 1139, the CEC Group (i) reported $53,229,004 of Federal income taxes as due on its 2008 Form 1120, (ii) filed Form 1138 (Extension of Time for Payment of Taxes by a Corporation Expecting a Net Operating Loss Carryback) on March 10, 2009, and (iii) had not paid such $53,229,004 of taxes for 2008 by the date when the CEC Group filed Form 1139 on or about October 28, 2010.[3755]

The 2009 NOL carryback generated a total Federal income tax refund of approximately $276.6 million (the "2009 Refund"), of which $55.8 million was applied as a credit against the CEC Group's unpaid 2008 Federal income tax liability and $220.8 million was received by CEC

---

losses," as defined in IRC section 172(g), which generally cannot be carried back under IRC section 172(b)(1)(D). Broadly speaking, such losses cannot be carried back to the extent such losses were attributable to excess interest deductions arising as a consequence of the borrowings to finance the 2009 leveraged buy-out.

[3753] CEC 2009 Form 1139, which shows a date of October 28, 2010 on the signature line, contains no indication of the date when it was filed. CEC 2009 Form 1139 (Corporation Application for Tentative Refund), at CEC_Examiner_0368533-34 [CEC_Examiner_0368533].

In the tentative refund claim filed on CEC Form 1139, $630,305,509 of NOLs were carried back against taxable income for 2006 and $170,945,125 of NOLs were carried back against taxable income for 2008, resulting in tentative refunds or credits of $188,982,454 for 2006 and $53,229,004 for 2008, or a total of $242,211,458 of tentative refunds and credits for 2006 and 2008. On such Form 1139, the tax credits claimed for 2005 and 2007 were increased by $34,366,639, compared to the tax credits previously claimed for such years, whereas the tax credits claimed for 2006 and 2008 were reduced by $25,302,324, compared to the tax credits previously claimed for such years, for a $9,064,315 net increase in tax credits for the years 2005 through 2008. The tentative refunds of $10,727,846 for 2005 and of $23,638,793 for 2007, or a total of $34,366,639 of tentative refunds for 2005 and 2007, were attributable to such $34,366,639 of increased tax credits for 2005 and 2007. See CEC 2009 Form 1139 (Corporation Application for Tentative Refund), at CEC_Examiner_0368533–34 [CEC_Examiner_0368533].

[3754] See Appendix 13-1, CEC Allocation of Actual Tax Paid Between Debtor and Non-Debtor Entities, which sets forth the allocation of the CEC Group Federal income taxes between the Debtors and the Non-Debtors.

[3755] See CEC 2009 Form 1139 (Corporation Application for Tentative Refund), Lines 6c and 6d, at CEC_Examiner_0368533 [CEC_Examiner_0368533]. In general, a corporation that expects an NOL in the current tax year can file Form 1138 to extend the time of payment of tax for the immediately preceding tax year to the extent of the expected overpayment of tax arising from the carryback of the current year NOL. See IRC section 6164. The extension of time to pay tax under section 6164 is disregarded in determining the interest payable by the taxpayer on such unpaid taxes. See Treas. Reg. §1.6164-9.

as a cash refund and credited to CEOC on March 17, 2011, as discussed below.[3756]  Under the relevant provisions of the consolidated return regulations, the 2009 Refund was received by CEC in its capacity as the common parent of the CEC Group.  On March 17, 2011, the $220.8 million cash portion of the 2009 Refund was credited by CEC to CEOC to offset a portion of certain indebtedness owed by CEOC to CEC, which is discussed in Section IX.G [See Intercompany Figure 2: Intercompany Revolver Activity by Quarter].[3757]  CEOC did not enter into any written

---

[3756]  While the $220.8 million refund is referred to herein as a "refund," it appears to have been processed by the IRS as an application for tentative adjustment (*i.e.*, "quickie refund") under section 6411.  Such an application for tentative adjustment generally does not constitute a refund claim for Federal income tax purposes.  Because IRS audits of the CEC Group for the relevant years determined various adjustments to the Group's tax returns for such years, the amount of the total refund received was not the same as that claimed on the CEC 2009 Form 1139.

CEC was notified by the IRS in June 2012 of the approval of the settlement for the net operating loss carryback from 2009 to 2008. *See* Letter from M. Drury, IRS Appeal Team Case Leader, to C. Tabrizi (June 7, 2012), at CEC_Examiner_0366069 [CEC_Examiner_0366069] (stating in part that "[w]e have been advised that the Joint Committee on Taxation has completed its consideration of our request for pre-approval of the settlement in advance of the special report (made to satisfy the requirements of section 6405 of the Internal Revenue Code) require4d [sic] for the net operating loss carry back tentatively allowed for the tax period ended December 31, 2008 and has taken no exception to the conclusions reached by the Internal Revenue Service." and that "[t]he agreement we reached has been approved and we will complete our processing of your case.") (emphasis added).  With respect to the IRS examination of 2009 and the carryback of the 2009 NOL to 2005, 2006 and 2007, CEC received from the IRS Form 4549-A (Income Tax Discrepancy Adjustments), marked "Agreed Issues" and signed by an IRS Examiner and dated November 7, 2012.  *See* 2009 Form 4549-A (Nov. 7, 2012), at CEC_Examiner_0370616–19 [CEC_Examiner_0370616].  Form 4549-A states in part that "[y]our tentative refund filed on Form 1139 for 200512 – 200712 has been partially disallowed," and that an additional "Form 1120X, or an informal claim for refund" was filed for 2005 on each of June 21, 2010 and December 22, 2010, both of which refund claims have been "disallowed".  *Id.* at CEC_Examiner_0370617 [CEC_Examiner_0370616].

[3757]  *See* E-mail from T. Vanke to R. Brimmer, *et al.* (April 6, 2011), at CEC_Examiner_0382197–99 [CEC_Examiner_0382197] ("[W]e concluded our evaluation, and ultimately contributed the funds received on the income tax refund to CEOC through the forgiveness of a portion of the intercompany loan."); e-mail from B. Okun to M. Rowan (March 30, 2014), at APOLLO-Examiner_00731695 [APOLLO-Examiner_00731695] ("The company has confirmed that a Debtor NOL generated in 2009, was carried back to prior years 2005, 2006 and 2007 and generated a total tax refund of approximately $220.8 million.  The refund was credited to CEOC, but was paid to CEC to offset a portion of the intercompany loan that CEOC then owed to CEC."); *See* Spreadsheet relating to an intercompany unsecured revolving credit facility between CEC and CEOC, at CEC_Examiner_0037807 [CEC_Examiner_0037807] (a payment of $220,827,634.12 was applied on March 17, 2011 to the principal outstanding on an intercompany loan from CEC to CEOC).

tax sharing agreement with CEC or any other member of the CEC Group during the relevant period.[3758]

The Examiner has reviewed whether the Debtors are entitled to any additional amounts from CEC with respect to the 2009 Refund, which was primarily attributable to the carryback of the 2009 NOL against approximately $883.1 million of Federal income taxes that the CEC Group had paid or reported as due with respect to the taxable years 2005 through 2008.[3759]

## 2.  Summary

As discussed below, the Debtors have a strong argument, based on precedent, that they are entitled to receive the full amount of the $276.6 million refund, rather than merely the $220.8 million amount that was credited by CEC to offset debt owed to CEC by CEOC. Accordingly, the Debtors may claim that they are entitled to the additional $55.8 million portion of the 2009 Refund that was credited toward the CEC Group's 2008 Federal income tax liability.  This issue was discussed during a telephone call on March 1, 2016, with outside tax counsel to CEC, who was unable to provide any substantive justification for CEC's not providing to CEOC a refund or credit of the $55.8 million portion of the 2009 Refund.

## 3.  Applicable Legal Standard

The common parent corporation of an affiliated group filing consolidated returns for Federal income tax purposes generally has the authority to act as the sole agent for all corporate members of the group with respect to matters relating to the tax liability of the consolidated group.[3760]  In particular, the common parent is authorized to file claims for tax refund on behalf of the consolidated group, and any such tax refund generally is paid directly to the common parent, discharging the IRS of any liability in respect thereof to any subsidiary member of the consolidated group.[3761]

While the common parent is considered the agent for its subsidiaries for purposes of collecting a Federal income tax refund, there is no provision in the IRC or the consolidated return regulations that determines which member of the consolidated group is entitled to such a tax refund, including whether the common parent is entitled to retain for its own use a refund from an NOL carryback attributable to losses incurred by a subsidiary during a consolidated return year.  Moreover, no provision of the Federal income tax law requires the members of an affiliated group to enter into a written tax sharing agreement which allocates how the members of the affiliated group will share the benefits of losses or tax refunds attributable to such losses.

---

[3758] *See* e-mail from B. Rogers to D. Zerhusen (Oct. 1, 2014), at PW_Examiner_00301832–33 [PW_Examiner_00301832].

[3759] In this regard, the Examiner notes that based on the refund claims, the 2009 NOL was carried back only against CEC Group taxable income from the 2006 and 2008 taxable years.

[3760] Treas. Reg. §1.1502-77(a)(1), (c).

[3761] Treas. Reg. §1.1502-77(d)(5).

However, cases that have addressed this question have concluded that, absent an agreement to the contrary, *e.g.*, a tax sharing agreement, it is the loss subsidiary that is entitled to the tax refund to the extent that the loss claimed and the prior year's income against which such loss is offset are *both* attributable to the subsidiary which generated the loss, based on the principle of "unjust enrichment."  For example, in *W. Dealer Mgmt., Inc. v. England (In re Bob Richards Chrysler-Plymouth Corp., Inc)*, 473 F.2d 262 (9th Cir. 1973), a bankrupt subsidiary sued the common parent of its consolidated group for a tax refund received by the parent.[3762] The refund was attributable to the carryback of NOLs incurred by the subsidiary to offset the subsidiary's income in prior taxable years in which the subsidiary was a member of the group. The Ninth Circuit found that to allow the parent to keep the tax refund would unjustly enrich the parent, and concluded that "[a]bsent any differing agreement we feel that a tax refund resulting solely from offsetting the losses of one member of a consolidated filing group against the income of that same member in a prior year or subsequent year should inure to the benefit of that member."[3763]

---

[3762] *See also Superintendent of Ins. v. First Cent. Fin. Corp. (In re First Cent. Fin. Corp.)*, 269 B.R. 481, 489 (Bankr. E.D.N.Y. 2001), *aff'd*, 377 F.3d 209 (2d Cir. 2004) ("Some courts have held that, in the absence of a tax allocation agreement, principles of unjust enrichment dictate that when a subsidiary pays the original tax, and incurs NOLs that generate a refund, the subsidiary is entitled to the resulting tax refund."); *Cohen v. Un-Ltd. Holdings, Inc. (In re Nelco Ltd.)*, 264 B.R. 790, 809 (Bankr. E.D. Va. 1999) ("Under the general rule, a member of an affiliated group is entitled to that portion of the refund generated by the member's losses but only to the extent of the taxes previously paid by the member."); *Capital Bancshares, Inc. v. FDIC*, 957 F.2d 203, 210 (5th Cir. 1992) (tax refund held to be property of the bank subsidiary and payable by the IRS to the FDIC as receiver where the losses carried back were entirely attributable to the bank and the bank could have used such losses to claim the refund if it had filed separate returns); *In re FDIC v. Brandt (In re Florida Park Banks, Inc.)*, 110 B.R. 986, 989 (Bankr. M.D. Fla. 1990) (holding that a subsidiary was entitled to an entire tax refund resulting from NOL carryback applied against its own income); Chief Counsel Adv. 201310039 (March 8, 2013) (where common parent corporation received a tax refund attributable to a carryback of NOLs generated by former subsidiaries in the group, common parent was required to include its portion of the refund in gross income because the subsidiaries were treated as owners of such refund).

Although private letter rulings and general counsel memoranda may not be cited as precedent in a U.S. court under section 6110(k)(3) of the IRC, such rulings and memoranda provide valuable indications of the IRS's views on specific issues. *See, e.g.*, *Rowan Cos., Inc. v. United States*, 452 U.S. 247, 261 n.17 (1981).  Private letter rulings also constitute "substantial authority" for purposes of certain tax understatement penalty provisions of the IRC.  *See* Treas. Reg. §1.6662-4(d)(3)(iii).  Similarly, Chief Counsel advice also may provide indications of the IRS's views on specific issues and may constitute "substantial authority" for purposes of certain tax understatement penalty provisions of the IRC.

[3763] 473 F.2d at 265.  As is the case here, the members of the consolidated group in *Bob Richards* did not enter into a written tax sharing agreement.

Courts also have considered whether a loss subsidiary is entitled to a refund resulting from the carryback of its NOL against income of other members of the consolidated group. In such an event, the loss subsidiary may be entitled only to the portion of the refund attributable to the taxes the subsidiary paid in the prior years. In *Jump*,[3764] the Eighth Circuit held that, absent an agreement to the contrary, an insolvent subsidiary is entitled to receive only that portion of the tax refund attributable to the taxes the subsidiary paid for the years to which the NOL was carried back, and not to any portion of the tax refund attributable to taxes paid by other members of the consolidated group.[3765] In reaching this decision, the Eighth Circuit found that the loss was not a valuable asset of the insolvent subsidiary because the subsidiary (i) was liquidated and, therefore, could not use its losses in future years, and (ii) was not in a position to bargain with the other consolidated group members for compensation for the use of its losses since, after having agreed to file consolidated returns for prior years, the subsidiary could not refuse to file consolidated returns.[3766]

Recent cases generally have followed *Bob Richards* and *Jump*, applying the unjust enrichment doctrine to find that in a consolidated group context and in the absence of a contrary written or implied agreement, a tax refund is the property of the corporation whose net operating losses generated such refund. However, an alternative view has been suggested by some courts, applying the fraudulent transfer doctrine, that absent an express or implied agreement stating otherwise, stand-alone NOLs are not property of the debtor because such stand-alone NOLs do not exist under the consolidated return regulations.[3767] For example, in *In re Marvel Entertainment Group, Inc.*, the U.S. District Court for the District of Delaware, citing the Supreme Court's decision in *United Dominion Industries, Inc., v. U.S.*, held that, "[i]n the context of the consolidated tax filing group, the *hypothetical* stand-alone NOLs that were calculated for the purposes of the Tax Sharing Agreement were not property of the debtor because they were a legal fiction."[3768] In this regard, the Examiner notes that the district court's reliance on *United Dominion* may have been misplaced. In *United Dominion*, the sole issue decided by the Supreme Court was "the method of calculating the product liability loss of an

---

[3764] *Jump v. Manchester Life & Cas. Mgmt. Corp.*, 579 F.2d 449 (8th Cir. 1978).

[3765] *Id.* at 454; *See also Jump*, 438 F. Supp. 185, 188-89 (E.D. Mo. 1977) ("This Court holds that the conservator of a bankrupt subsidiary has a right to recover an income tax refund channeled through a parent company filing a consolidated return, and that this right is limited to the recovery which the subsidiary would have had if it had filed individual returns throughout, so that plaintiff's recovery here is limited to the amount previously paid in taxes.").

[3766] *Jump*, 579 F.2d at 453, 454.

[3767] *See, e.g.*, *Marvel Entm't Grp., Inc. v. MAFCO Holdings, Inc. (In re Marvel Entm't Grp., Inc.)*, 273 B.R. 58, 85 (D. Del. 2002); Stanziale *v. CopperCom, Inc. (In re Conex Holdings, LLC)*, 518 B.R. 792, 808-09 (Bankr. D. Del. 2014). The members of the consolidated groups in these two cases entered into tax sharing agreements, unlike the members of the CEC Group in the instant case.

[3768] 273 B.R. 58, 85 (D. Del. 2002) (citing *United Dominion*, 532 U.S. 822 (2001)).

affiliated group of corporations electing to file a consolidated federal income tax return."[3769]  The Supreme Court in *United Dominion* did not address the broader question of whether a member of a consolidated group had a property right to its losses or any tax refund generated by such member's losses.  In addition, the Examiner notes that a majority of courts have applied the unjust enrichment doctrine and followed the *Bob Richards* reasoning that in a consolidated group context, a tax refund is the property of the corporation whose net operating losses generated such refund in the absence of a contrary written or implied agreement.[3770]

In the current circumstances, the question is whether CEC's retention of a $55.8 million portion of the 2009 Refund attributable to the losses generated by CEOC properly can be viewed as "unjust enrichment" within the meaning of *Bob Richards*, and analogous authorities.  If CEOC and the other Debtors were a separate affiliated group filing consolidated returns, all of the losses sustained by CEOC in 2009 could have been carried back against the taxable income of CEOC and the other Debtors, and the full amount of the $276.6 million tax refund would have been received by the Debtors.  Thus, the Debtors may have a claim that they are entitled to keep the full amount of such refund.  On this theory, it was inappropriate for CEC to retain the benefit of $55.8 million of the 2009 Refund.

On the other hand, in quoting *Bob Richards*, the United States District Court for the Eastern District of Missouri in *Jump* stated that the relevant test is whether the tax refund resulted *solely* from offsetting the losses of one member of an affiliated group filing consolidated returns against the income of that same member in a prior or subsequent year.[3771]  In this situation, CEC may argue that the 2009 Refund of $276.6 million should be viewed as attributable to the Debtors and Non-Debtors in proportion to their relative percentages of positive income in the taxable years to which the 2009 NOL was carried back.  Since only $545.7 million of the $883.1 million of Federal income taxes due in the carryback years was attributable to the income of the Debtors, CEC may take the position that the loss carryback generated by CEOC should be allocated to the Debtors and Non-Debtors in proportion to the respective amounts of Federal income taxes attributable to the Debtors as a group and the Non-Debtors as a group.

---

[3769]  *United Dominion*, 532 U.S. at 824.  *See* Dale L. Ponikvar & Russell J. Kestenbaum, *Aspects of the Consolidated Group in Bankruptcy: Tax Sharing and Tax Sharing Agreements*, 58 Tax Law. 803, 837 (2005).

[3770]  *See, e.g.*, *FDIC v. AmFin Fin. Corp.*, 757 F.3d 530, 539-40 (6th Cir. 2014) (Gilman, R., concurring) ("I believe that all of these cases can be reconciled with the following protocol: First look to the tax-sharing agreement (TSA) to settle the refund issue.  But if the TSA is ambiguous, then determine whether an agreement between the parties can be implied under state law.  And if that inquiry also proves inconclusive, then the loss belongs to the entity that generated the tax refund because federal tax law does not change the ownership of the refund.  This protocol is based on the foundational case of *Bob Richards* and has essentially been followed by all of our sister circuits that have weighed in on the issue.").

[3771]  438 F. Supp. at 189.  However, on appeal, the Eighth Circuit in *Jump* expressly stated that "we stress that our holding is a limited one," and that "we have no occasion to deal with the question of whether and under what circumstances a subsidiary is entitled to its pro rata portion of a consolidated refund paid to the parent."  *Jump*, 579 F.2d at 454.

Since $545.7 million of $883.1 million equals approximately 62 percent of such Federal income taxes,[3772] CEC may argue that only approximately 62 percent of the 2009 Refund should have been paid to CEOC, *i.e.*, approximately $171.5 million.   As $220.8 million was credited to CEOC, CEC may take the position that CEOC was "overpaid" for the carryback of its 2009 net operating losses.   However, CEC's crediting of the full approximately $220.8 million cash refund to CEOC in March 2011 may be viewed as in effect an acknowledgment by CEC that CEOC was entitled to the full amount of the refund rather than only a pro rata portion of such refund.

Of these two positions, it appears that the Debtors have the stronger argument.   As noted above, the Eighth Circuit in *Jump* did not address the specific issue presented here.   The question can be appropriately stated as: What is the amount of the refund to which the Debtors would have been entitled if they had been a separate affiliated group filing consolidated returns?   The correct answer to that question is the full $276.6 million of the 2009 Refund.   To the extent that CEOC and the other Debtors received less than that amount, CEC can be viewed as having been "enriched" at their expense.[3773]

### 4.   Applicable Non-Tax Law Doctrines

The Examiner has considered what legal remedies are available to the Debtors to seek reimbursement from CEC with respect to the $55.8 million portion of the 2009 Refund and whether such legal remedies are barred by the relevant statute of limitations.

The Examiner has concluded that any unjust enrichment claim would likely be governed by Nevada law.[3774]   "Unjust enrichment" under Nevada law "occurs whenever a person has and

---

[3772]   $545,709,791 ÷ $883,061,661 = approximately 61.8%.

[3773]   The Examiner notes that the 2009 NOL was principally attributable to the operations of one Debtor Entity – CEOC.   In each of the 2005 to 2008 taxable years, CEOC generated no positive taxable income.   Accordingly, none of the 2009 Refund was attributable to the carryback of the 2009 NOL against taxes attributable to taxable income of CEOC.   In addition, in 2011, when CEC received the 2009 Refund from the IRS, CEOC was likely insolvent and unable to utilize its operating losses currently or in the foreseeable future.   *See* Section VI, *supra*.   Therefore, if the preceding analysis were applied to CEOC, on a separate entity basis rather than to the Debtors as a group, the argument could be made that CEOC was not entitled to the 2009 Refund.   However, the Examiner believes it is the better view to apply the test of whether the NOL could have been used by the subsidiary generating the NOL to the Debtors as a group rather than to CEOC on a separate entity basis.

[3774]   The Bankruptcy Court likely would apply the "most significant relationship" test under Illinois or federal choice of law rules to determine which substantive law should apply.   *See In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F. Supp. 747, 753 (N.D. Ill. 1996) (explaining that both "federal common law" and Illinois choice of law rules apply the "most significant relationship" test drawn from the Restatement (Second) of Conflict of Laws); *see also* Appendix 5, Legal Standards at Sections I.A.1 and III.D.1.   In the context of an unjust enrichment claim, courts have applied the following factors to determine the forum with the most significant relationship:   "(a) the place where the relationship between the parties was centered,

retains a benefit which in equity and good conscience belongs to another."[3775]   The Nevada statute of limitations for unjust enrichment is four years and accrues "[w]hen the plaintiff knew or in the exercise of proper diligence should have known of the facts constituting the elements of his cause of action," the determination of which "is a question of fact for the trier of fact."[3776]

The Examiner concludes, based on his review of the record and applicable law, that the Debtors would have a strong argument that any unjust enrichment claim brought by or on behalf of the Debtors would be timely under the Nevada statute.  CEOC was not credited with a portion of the 2009 Refund until March 17, 2011.  In addition, although further fact development may be needed, it is likely that CEOC did not know that a portion of the 2009 Refund had been paid to CEC until at least March 2011, when CEC filed its 2010 Form 10-K disclosing that a portion of the 2009 NOL was carried back to 2008 "to offset federal taxable income recognized and tax payable from that year."[3777]   The Examiner has found no evidence of any publicly available document existing prior to March 2011 that would have provided the Debtors with sufficient information to know that CEC was intending to credit only $220.8 million, *i.e.*, the cash amount of the 2009 Refund, to CEOC, and not giving CEOC a further credit of $55.8 million for the balance of the 2009 Refund.  The Examiner thus concludes that a strong argument exists that any cause of action for unjust enrichment relating to the balance of the 2009 Refund would have accrued in March 2011 (within the four-year statute of limitations) or, if it accrued earlier, would have been equitably tolled until CEC filed its 2010 Form 10-K.

In addition, it is possible that a turnover action under Bankruptcy Code section 542 may be commenced by the Debtors for the $55.8 million.  Unlike the $220.8 million for which the prepetition Debtors purportedly received credit for in March 2011, no justification has been

---

provided that the receipt of the enrichment was substantially related to the relationship; (b) the place where the benefit or enrichment was done; (c) the place where the act conferring the benefit or enrichment was done; (d) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (e) the place where the physical thing, such as the land or chattel, which was substantially related to the enrichment, was situated at the time of the enrichment."  *Paris v. Amoco Oil Co.*, 149 F. Supp. 2d 478, 480 (N.D. Ill. 2001) (citing Restatement (Second) Conflict of Laws §221).  Based on these factors, Nevada law likely will apply as the relationship between the relevant parties is primarily centered in Nevada, the entities' principal places of business largely are in Nevada, and the benefit was conferred through acts and decisions made in Nevada.

[3775]   *Glenbrook Capital Ltd. P'ship v. Dodds (In re AMERCO. Derivative Litig.)*, 252 P.3d 681, 703 (Nev. 2011) (citation omitted).

[3776]   *Id*. (citing, *inter alia*, NRS 11.190(2)(c)).

[3777]   CEC Form 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 36.  In addition, the Form 10-K disclosed that, "[CEC] received an income tax refund of approximately $220.8 million, net of interest due on the 2008 tax payable, in the fourth quarter 2010."  Without examining the CEC Federal income tax returns or the CEC 2009 Form 1139, creditors of the Debtors would not have been able to determine from the Form 10-K that the amount of additional tax refund that CEC would have received from the IRS had CEC not credited such amount against its 2008 Federal income tax liability.

provided to the Examiner with respect to the $55.8 million.  There is no statute of limitations on a debtor's cause of action to recover property of a debtor's estate under section 542 of the Bankruptcy Code.[3778]

In light of this conclusion, the Examiner has not investigated whether a separate basis exists to recover the balance of the 2009 Refund under applicable state fraudulent transfer law, which would likely be Nevada law.[3779]  It is likely that any fraudulent transfer claim would also be within Nevada's four-year statute of limitations period for fraudulent transfer claims.  While some of the unjust enrichment cases cited and discussed above also involved fraudulent transfer claims, the courts in almost every case found it unnecessary to reach the fraudulent transfer claims once a viable unjust enrichment claim was found to exist.  The Examiner expects that any court presented with the issue here would reach the same conclusion.

### C.  Debtor NOL Utilization/Attribute Reduction

#### 1.  Summary

Set forth below is a discussion of the following issues: (i) whether during the period from January 1, 2005 through the day immediately prior to the date of the Debtors' reorganization pursuant to the RSAs (the "Restructuring"),[3780] the Non-Debtors utilized any portion of the NOLs generated by the Debtors; and (ii) to the extent such NOLs had not been so utilized, and

---

[3778]  *See, e.g.*, *Burtch v. Ganz (In re Mushroom Transp., Co.)*, 382 F.3d 325, 337 (3d Cir. 2004) ("The Bankruptcy Code does not impose a statute of limitations on turnover claims"); *Solow v. Am. Airlines, Inc. (In re Midway Airlines, Inc.)*, 221 B.R. 411, 458 (Bankr. N.D. Ill. 1998) ("Bankruptcy Code does not contain a statute of limitations for turnover actions pursuant to §542").

[3779]  To prevail on a fraudulent transfer claim, a plaintiff would need to establish that the Non-Debtors' utilization of the NOLs constituted a "transfer" within the meaning of Bankruptcy Code section 101(54).  Subsection (D) of that provision includes within the definition of a transfer "each mode, direct or indirect . . . of disposing of or parting with . . . property . . . or an interest in property."  The Examiner believes that utilization of the Debtors' NOLs by a Non-Debtor would likely qualify as a "transfer" since such utilization resulted in the Debtors "parting with property or an interest in property," the property being the NOLs (and rights to any refunds attributable thereto) themselves.  Given the Examiner's conclusion that CEOC was at all relevant times insolvent, inadequately capitalized and/or unable to pay its debts as they came due, a strong argument can be made that the Debtors received less than reasonably equivalent value for the use by the Non-Debtors of the Debtors' NOL, and that, as a result, a strong constructive fraudulent transfer claim exists.  As noted earlier, some courts have ruled that NOLs of a debtor subsidiary that is part of a consolidated group for tax purposes are not a property interest.  *Marvel Entm't Grp., Inc.*, 273 B.R. at 85; *Conex Holdings, LLC*, 518 B.R. at 808-09.  However, the debtor subsidiaries in those cases had entered into prepetition tax sharing agreements with their non-debtor parents and may therefore be distinguishable.

[3780]  For purposes of the analysis set forth herein, the Examiner has assumed that the Debtors will emerge from the Restructuring on December 31, 2016.

would be available to be applied by the Debtors against future taxable income for periods following the Restructuring, whether the Debtors potentially would be entitled to compensation from the Non-Debtors under the relevant legal authorities.  The Examiner estimates that during the period from January 1, 2005 through the Restructuring, a total of approximately $4.02 billion of NOLs generated by the Debtors were utilized by the Non-Debtors.[3781]  To the extent such NOLs had not been so utilized, and would be available to be applied by the Debtors against future taxable income, if any, the Examiner concludes that the Debtors have a reasonable argument that they will be entitled to compensation from the Non-Debtors for the value of the lost economic benefit from the utilization of such NOLs by the Non-Debtors.  Based on information currently available, and subject to certain assumptions discussed below, the Examiner estimates that the gross value of the NOLs that the Debtors would have retained following the recognition of the relevant "cancellation of indebtedness" income is approximately $610 million and that the potential Federal income tax savings from the possible utilization of such NOLs over time would be approximately $213.5 million, calculated at a 35 percent Federal income tax rate.[3782]  Whether this actually is a claim as to which relief should be granted, however, depends on future events, and in particular whether the Debtors have taxable income in future years and in what amount.

### 2.  Description and Relevant Facts

#### a.  Debtor NOL

From January 1, 2005 to December 31, 2014, the Debtors generated approximately $6.06 billion in NOLs from their operations.[3783]

In 2015, the Debtors generated approximately ▮▮▮▮▮▮ of taxable income.[3784]  This taxable income takes into account the election by the CEC Group to recognize approximately $4 billion of CEOC's cancellation of indebtedness ("COD") income realized in 2009 and 2010 which was deferred in accordance with an election under IRC section 108(i) (the "Suspended

---

[3781]  The analysis set forth below is based on calculations prepared by the Examiner, and is set forth in Appendices 13-2 and 13-3 for illustrative purposes only.  *See* Appendix 13-2, CEC 2009 Through 2014 Net Operating Loss Analysis; Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis.  Such calculations are based in part on certain assumptions discussed herein regarding the income and expenses of the CEC Group in 2016 and any future period in which the Restructuring occurs.  If the actual income and expenses for 2016 or such future periods differ from the income and expenses assumed in accordance with such assumptions, a different conclusion may be reached under this analysis.

[3782]  Such estimate depends on whether the Debtors will be able to establish that it would be reasonable to expect them to generate at least $610 million of taxable income in years following the Restructuring.  *See* Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis.

[3783]  *See* Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis.

[3784]  *See* Caesars 2015 Sub/Consolidated Provision Tax Report, at CEC_Examiner_1447917 [CEC_Examiner_1447917].  All dollar amounts set forth herein with respect to 2015 are based on estimated amounts provided by CEC.

COD Income") and which generally was required, under such election, to be reported on a pro rata basis in each of the years from 2014 through 2018.[3785]  In each of 2014 and 2015, CEOC recognized approximately $1 billion of the Suspended COD Income.[3786]  The Examiner has been advised that in 2015, CEC elected under Treas. Reg. §1.108(i)-1(b)(3) to accelerate the remaining amount of the Suspended COD Income.

The Debtors would have had an NOL carryforward of approximately $6.06 billion as of December 31, 2014, as determined on a separate group basis (*i.e.*, if it had not been utilized to offset taxable income of the Non-Debtors).  Such NOL carryforward would have been approximately $5.06 billion as of December 31, 2015, after being offset by $1 billion of estimated taxable income of the Debtors in 2015).[3787]

The Examiner has been advised that neither CEC nor CEOC has prepared any estimates or projections of the taxable income or losses for 2016 of the CEC Group, the Debtors or the Non-Debtors.  In the absence of any such information with respect to 2016, analysis prepared by the Examiner for purposes of this Report and set forth in Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis, assume that the Debtors will generate approximately ▮▮▮▮▮ of operating losses for Federal income tax purposes in the portion of the 2016 year prior to the Restructuring.[3788]  Based on the foregoing, prior to the Restructuring, the Debtors would be projected to have a total NOL of approximately $8.06 billion (approximately $5.06 billion of NOLs as of December 31, 2015, increased by approximately $3 billion of additional losses in 2016 prior to the Restructuring) (the "Debtors' NOL").[3789]

---

[3785] IRC section 108(i) provided taxpayers with a temporary election to defer all or part of the income from discharge (or cancellation) of indebtedness in connection with certain reacquisitions of debt instruments in 2009 and 2010.  The deferred COD income generally must be included in the taxpayer's gross income ratably over (i) the five taxable years beginning in the fifth taxable year following the taxable year in which the reacquisition occurred, in the case of a reacquisition occurring in 2009, and (ii) the four taxable years beginning in the fourth taxable year following the taxable year in which the reacquisition occurred, in the case of a reacquisition occurring in 2010.  *See* IRC section 108(i)(1).

[3786] *See, e.g.*, CEC 2014 Form 1120 (U.S. Corporation Income Tax Return), at CEC_Examiner_1319615 [CEC_Examiner_1319178].  Under Treas. Reg. §1.108(i)-1(b)(3), the taxpayer may elect at any time to accelerate in full the remaining deferred COD income with respect to all applicable debt instruments.

[3787] *See* Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis.

[3788] This ▮▮▮▮▮ assumed operating loss equals CEOC's estimated 2015 taxable income of ▮▮▮▮▮ set forth in the Caesars 2015 Sub/Consolidated Provision Tax Report, which takes into account ▮▮▮▮▮ of suspended COD income.  *See* Caesars 2015 Sub/Consolidated Provision Tax Report, at CEC_Examiner_1447917 [CEC_Examiner_1447917].

[3789] *See* Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis.

### b.   Utilization of Debtors' NOL by Non-Debtors

The Examiner estimates that, during the period from January 1, 2005 through the Restructuring, approximately $4.02 billion of the approximately $8.06 billion Debtor NOL has been, or is projected to be, used by the Non-Debtors.[3790]  Accordingly, immediately prior to the Restructuring and after accounting for its partial utilization by the Non-Debtors during the period from January 1, 2005 until the Restructuring, the actual NOL of the CEC Group is projected to be approximately $4.04 billion (approximately $8.06 billion of total Debtor NOL less approximately $4.02 billion of Debtor NOL utilized by Non-Debtors).[3791]  But this is not the amount of the NOL with which the Debtors would emerge from the Restructuring.  Instead, as discussed below, that amount is approximately $610 million.

### c.   Restructuring Attribute Reduction

As a result of the Restructuring, the Examiner has been advised by Kirkland & Ellis that the Debtors are projected to take into account (i) approximately $4.2 billion of income resulting from previously accrued and deducted interest expense on certain indebtedness that will be cancelled by reason of the Restructuring ("Disallowed Interest Expenses"),[3792] and (ii) approximately $3.25 billion of additional COD income.[3793]  IRC section 108(a)(1)(A) provides that such income incurred by a taxpayer pursuant to a discharge of debt occurring in a Chapter 11 bankruptcy case is not included in the taxpayer's taxable income, but is instead applied to reduce the taxpayer's tax attributes.  The tax attributes subject to reduction include, in the following priority: (i) NOLs, (ii) certain tax credits and (iii) tax bases of property.[3794]

As set forth below, the Examiner finds that following such attribute reduction, the Debtors would have emerged from the Restructuring with an NOL of approximately $610 million if such NOL had not been utilized by the Non-Debtors.

### 3.   The Examiner's Findings and Conclusions

In the absence of a written tax sharing agreement, no provision in the IRC or Treasury Regulations entitles a loss member of an affiliated group filing consolidated returns to recoup the tax benefit derived by the group from using the NOLs of the loss member.  However, as discussed above, in *Jump*, the Eighth Circuit held that, absent an agreement to the contrary, a

---

[3790]  *See* Appendix 13-2, CEC 2009 Through 2014 Net Operating Loss Analysis.

[3791]  *See* Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis.

[3792]  A debtor corporation generally is required to recognize income upon the cancellation of indebtedness with respect to interest deductions previously claimed by the debtor for accrued but unpaid interest with respect to such indebtedness.  *See* IRC sections 108 and 111; Rev. Rul. 67-200, 1967-1 C.B. 15, as clarified by Rev. Rul. 70-406, 1970-2 C.B. 16.

[3793]  *See* Kirkland & Ellis, CEOC COD Income Analysis, based on the assumption that the Debtors will emerge from the Restructuring on July 1, 2016, at CEOC_2004_0067574 [CEOC_2004_0067574].

[3794]  *See* IRC §108(b)(2).

subsidiary which generated an NOL carryback is entitled to receive that portion of a tax refund attributable to the taxes the subsidiary had paid with respect to the years to which the NOL was carried back, although not to any portion of the tax refund attributable to taxes paid by other members of the consolidated group.[3795]

Following the Eighth Circuit's reasoning in *Jump*, the Bankruptcy Court in *White Metal* concluded that, absent an agreement requiring payment to the bankrupt subsidiary with respect to the utilization of its tax losses by other corporations in the affiliated group of which it is a member, the bankrupt subsidiary is entitled to compensation from other group members for the use of its NOLs only if such bankrupt subsidiary can prove that the tax losses it generated were valuable to the bankrupt subsidiary because the bankrupt subsidiary either (i) had prior or current taxable income that could have been offset by carrying back such losses, or (ii) had prospects of generating future income.[3796]  In *White Metal*, the bankrupt subsidiary failed to prove that it (i) had taxable income which could have been offset by carrying back the losses utilized by the other profitable group members, or (ii) was likely to generate future income.  Accordingly, the court concluded that the operating losses of the bankrupt subsidiary had no value to such subsidiary, and, thus, the bankrupt subsidiary was not entitled to compensation for the group members' use of its losses.[3797]

While the courts in *Jump* and *White Metal* concluded that, absent a tax sharing agreement, a bankrupt subsidiary of a consolidated group would not be entitled to compensation for tax losses utilized by other group members where the bankrupt subsidiary cannot demonstrate that its losses have or will have value to it, neither case addresses the legal conclusion which would apply in the event that the losses would be valuable to the bankrupt subsidiary in the future.[3798]  In the latter situation, it would be reasonable to conclude from the courts' decisions in *Jump* and *White Metal* that such bankrupt subsidiary may be entitled to compensation for the utilization of losses by other members of the group on a theory of "unjust enrichment."[3799]

Therefore, in the instant case, the relevant inquiry should be whether the Debtors would be able to utilize against their own future taxable income, if any, all or any portion of the NOLs

---

[3795] *Jump*, 579 F.2d at 454.

[3796] *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 424 (Bankr. S.D.N.Y. 1998) ("Although the NOL belongs to the loss corporation, its value to the loss corporation and its creditors depends upon the loss corporation's ability to use the NOL to reduce its past or future tax liabilities.").

[3797] The debtor in *White Metal* also argued that the consolidated group's use of the debtor's NOLs constituted a fraudulent transfer of the debtor's property.  The Court concluded that there was no fraudulent transfer of the debtor's property since the NOLs had no value to the debtor. 222 B.R. at 427.

[3798] *See* Carl M. Jenks et al., BNA Portfolio 791-1st: Corporate Bankruptcy—Special Topics, at V.E; Ponikvar & Kestenbaum, *supra* note 20, at 58.

[3799] *See* Ponikvar & Kestenbaum, *supra* note 20, at 58.  In addition, Ponikvar and Kestenbaum note in their article that, "[t]he manner in which the debtor should be compensated, however, is not clear."

generated by the Debtors if the Debtors had retained the benefit of such NOLs. The Examiner concludes that the Debtors have a reasonable argument that they should be entitled to compensation from the Non-Debtors, either as part of the Restructuring or at appropriate future dates, for the utilization by the Non-Debtors of the Debtors' NOL on a theory of "unjust enrichment." Such compensation would be payable only if the Debtors are able to establish that their future taxes would be reduced by utilization of the actual amount of the NOLs the Debtors would have retained when they emerged from bankruptcy had the NOLs not been used by the Non-Debtors. As set forth in the calculations in Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis, the Debtors would have emerged from bankruptcy (under the Restructuring contemplated by the RSAs) with an NOL of approximately $610 million if none of their NOLs had been utilized by the Non-Debtors.

Consequently, the Debtors (and their creditors) would appear to have a reasonable argument, if they are able to establish that it would be reasonable to expect them to generate approximately $610 million of future taxable income, that they would be entitled to receive, either as part of the Restructuring or at appropriate future dates, compensation from the Non-Debtors for the utilization by the Non-Debtors Entities of approximately $610 million of the Debtor NOL on the same theories of unjust enrichment, turnover or potentially fraudulent transfer that was applied to the 2009 Refund claim. The Examiner notes that this analysis relies on certain estimates and assumptions that are being used for illustrative purposes only, particularly because CEC and CEOC have not provided to the Examiner any estimates or projections of income and expenses of the Debtors or the Non-Debtors for 2016 through the Restructuring. For example, if the Debtors generate operating losses for Federal income tax purposes in the portion of the 2016 year prior to the Restructuring of approximately $610 million less than the approximately $3 billion amount projected in Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis, the Debtors' NOL would have been eliminated in its entirety. The amount of the NOL also could be affected by differences in the estimated results for 2015 or in the actual results for 2016 compared to the results reflected in Appendix 13-3, CEC 2015 and 2016 Net Operating Loss Analysis, and Appendix 13-4, CEC 2015 and 2016 Net Operating Loss Analysis (3 Scenarios).[3800]

---

[3800] In the event that the Restructuring does not entirely eliminate the Debtors' NOL, the Examiner has considered whether any remaining NOL would be subject to limitation under IRC section 382, which generally applies in the event that there is an "ownership change" with respect to a loss corporation within the meaning of IRC section 382.

Under IRC section 382(a), the amount of a loss corporation's taxable income that can be offset each year following an "ownership change," as defined in IRC section 382(g), by pre-change losses generally is limited to a prescribed rate multiplied by the value of the loss corporation's stock immediately prior to the ownership change. In general, an ownership change occurs if the percentage of stock of the loss corporation owned by any one or more "5 percent shareholders" has increased by more than 50 percentage points when compared to the lowest percentage of stock of the loss corporation owned by those 5 percent shareholders at any time during the applicable testing period.

The Examiner has been advised by counsel for the Debtors that, at the present time, it is not expected that an IRC section 382 ownership change will occur.

## XI.  THE LBO

### A.  Introduction

Beginning in late 2006, Apollo and TPG made a series of unsolicited buyout offers to Harrah's Entertainment, Inc.[3801] (collectively, the "LBO").  These offers increased over time and a joint offer of approximately $90 per share was accepted by Harrah's board in December 2006.  This transaction would result in Harrah's going private via a leveraged buyout, majority owned and controlled jointly by the Sponsors.  Due to the LBO's regulatory complexity, the LBO did not close for another 13 months.

The LBO closed on January 28, 2008 (the "LBO Date"), when affiliates of Apollo and TPG, along with certain co-investors, acquired Harrah's and brought it private for approximately $30.7 billion, of which approximately $6.1 billion was equity contributed by the Sponsors and co-investors, with the balance financed with debt issued by Harrah's and its affiliates.[3802]

Concurrently with taking it private, the Sponsors reorganized Harrah's corporate structure.  Upon and after the consummation of the LBO, in a series of cashless, consideration free transactions, the Sponsors reorganized the Debtors' and their non-debtor affiliates' corporate structure into two separate entities existing side by side under CEC, the entity acquired by the Sponsors in the LBO.

Forty-five properties and casinos were given to CEOC's myriad subsidiaries, which properties and casinos were used as credit support for financing obtained by CEOC.  Separately, through a series of cash and consideration free contribution, distribution and merger transactions described in greater detail above (collectively, the "CMBS Transactions"), ultimately six properties (the "CMBS Properties") were spun off from CEOC and financed in the commercial mortgage-backed securities market.

Pursuant to the LBO, CEOC borrowed approximately $14 billion in new bank debt and bonds, secured by liens on substantial assets of, and guarantees by, CEC and CEOC's various subsidiaries.[3803]  In addition to the $14 billion of new debt issuances, CEOC also rolled over approximately $3.4 billion book value in pre-LBO long term debt, for total outstanding bank debt and bonds of $17.4 billion.[3804]  Separately, the CMBS Properties borrowed approximately $6.5 billion secured by liens on the CMBS Properties and the underlying property leases on the CMBS Properties, bringing the total long-term debt of the entire enterprise to $23.9 billion ($14 billion new issuances by CEOC plus $3.4 billion in rollover debt plus $6.5 billion in CMBS

---

[3801]  Harrah's Entertainment, Inc. adopted the Caesars name in 2010.

[3802]  CEC 10-K for the year ended Dec. 31, 2008 (Mar. 17, 2008) at 2.

[3803]  CEC 10-K for the year ended Dec. 31, 2007 (Mar. 17, 2009) at 67.

[3804]  *Id.* at 66 (summary of Unsecured Senior Notes, Unsecured Senior Subordinated Notes Other Secured Borrowings, Other Unsecured Borrowings and Capitalized Lease Obligations on the chart of long term debt under "HOC and Subsidiaries").  The rolled-over debt has a face value of approximately $4.6 billion.  CEC 8-K Mar. 25, 2008 at 7-8 n.5.

financing).  This resulted "in a very different debt structure for the successor entity,"[3805] as Caesars' long-term debt nearly doubled from $12.4 billion as of December 31, 2007, to $23.9 billion as of March 31, 2008.[3806]

A summary of the new long-term debt[3807] and equity financing for the LBO is as follows:

### LBO Figure 1:  LBO Financing Sources

*(amounts in millions)*

| LBO Financing Source | Amount |
|---|---|
| New Term Loan B Facility | $    7,250.0 |
| Senior Unsecured Cash Pay Indebtedness | 5,275.0 |
| Senior Unsecured PIK Notes | 1,500.0 |
| Total New CEOC Debt at Face Value | **$    14,025.0** |
| CMBS Properties Financing | **6,500.0** |
| Sponsor Equity Investment | **6,100.0** |
| Total Sources | **$    26,625.0** |

---

[3805]  CEC 10-Q for the period ended Mar. 31, 2008 (May 16, 2008) at 13.

[3806]  CEC 10-Q for the period ended Mar. 31, 2008 (May 16, 2008) at 3 & 7.  Total debt values of $17.4 billion and $23.9 billion are reported at book amount.

[3807]   This represents new borrowings and equity only; it excludes the rollover debt.

Harrah's post-LBO corporate and capital[3808] structure was as follows:

**LBO Figure 2:  Post-LBO Corporate and Capital Structures**



Thus the Sponsors created a corporate structure where certain assets were organized under CEOC and certain other assets were organized as the CMBS Properties, with the two pools of assets organized "side by side" on the corporate structure, all below CEC, the holding company majority-owned and controlled by the Sponsors.  No consideration was paid to CEOC when creating this structure.

The CMBS Transactions were consummated in a series of contribution, distribution and merger transactions occurring on January 28, 2008 and May 22, 2008, the net result of which was to spin off and finance (through the commercial mortgage-backed securities market) six separate properties.  The first step of the CMBS Transactions, which took place on January 28, 2008, resulted in the following casino properties being distributed by CEOC to CEC:

- Harrah's Las Vegas

- Harrah's Atlantic City

- Bill's Casino Lake Tahoe & Harrah's Lake Tahoe

- Rio Las Vegas

---

[3808]  Includes both the long-term debt listed above that was incurred or rolled over in connection with the LBO; CEOC also had a $2 billion new revolver which was largely undrawn at and around the time of the LBO.  CEC 8-K Mar. 25, 2008 at 7.

- Flamingo Las Vegas & O'Sheas

- Showboat Atlantic City

The second step in the CMBS Transactions, which occurred on May 22, 2008, involved the swapping of properties between CEOC and CEC (and the financing to which such swapped entities pledged their assets as security).  Entities owning Paris Las Vegas and Harrah's Laughlin were distributed by CEOC to CEC, while Showboat Atlantic City and Bill's Casino Lake Tahoe & Harrah's Lake Tahoe were contributed by CEC to CEOC.  Thus, after completion of the CMBS Transactions (and a series of related contribution, distribution and corporate cleanup transactions), the resultant CMBS Properties owned by CEC were:

- Harrah's Las Vegas

- Harrah's Atlantic City

- Rio Las Vegas

- Flamingo Las Vegas & O'Sheas

- Paris Las Vegas

- Harrah's Laughlin

Various creditor constituents have suggested the LBO contains features which could be avoided as fraudulent transfers.  Principally:

1.  Did the transfer of the CMBS properties from CEOC to CEC for no consideration constitute a fraudulent transfer?

2.  Did the guaranteeing of debt issued in connection with the LBO by certain CEOC subsidiaries constitute a fraudulent transfer?

In considering these questions, the Examiner determined that there were two gating issues that should be addressed before embarking on a further investigation of either of these possible claims.  First, given that the applicable state law statute of limitations for commencing a fraudulent transfer action based on these transactions had expired at the time the Debtors' bankruptcy cases were commenced, the Examiner needed to determine the likelihood that the Internal Revenue Service (the "IRS") or another creditor could serve as a so-called "Golden Creditor" permitting CEOC to obtain the benefit of a longer statute of limitations for pursuing fraudulent transfer claims related to the LBO.

Second, if a Golden Creditor exists, the Examiner determined that he should also evaluate the likelihood that CEOC or any of its subsidiaries were insolvent at the time of closing of the LBO.  Absent proof of insolvency (or another prerequisite for avoiding a transfer as a fraudulent

transfer such as unreasonably small capital), no basis would exist for avoiding any of the LBO related transactions as a constructively fraudulent transfer.[3809]

As discussed below, although the matter is not free from doubt, there is a reasonable argument that the IRS could serve as a "Golden Creditor," thus permitting CEOC to pursue a fraudulent transfer claim notwithstanding the expiration of applicable statute of limitations under the relevant state law fraudulent transfer statutes. However, there is a strong likelihood that CEOC was solvent at the time the LBO transaction closed on January 28, 2008. In addition, the Examiner does not believe there is a strong claim that CEOC was operating with unreasonably small capital immediately following the closing of the LBO transaction or had placed itself in a position where it was or would be unable to pay its debts when they came due. Accordingly, the Examiner does not believe that a viable claim exists on any of the fraudulent transfer claim theories in connection with the LBO to warrant further investigation into the merits of such claims.

## B. The Existence of a Golden Creditor

Bankruptcy Code section 544(b) permits a debtor or trustee to avoid any transfer of the debtor's property, or obligation the debtor incurs, that is "voidable under applicable law by a creditor holding an [allowable] unsecured claim."[3810] Typically, the "applicable law" utilized by a debtor is state fraudulent transfer law.[3811]

In order for a debtor to bring a fraudulent transfer cause of action under section 544(b) based on state law, it must first prove the existence of a "triggering creditor" or "Golden Creditor," *i.e.*, an actual unsecured creditor who (i) holds an allowable claim under section 502 on the date the bankruptcy petition was filed and (ii) has the ability and power to void a transfer or obligation of the debtor as either constructively or actually fraudulent under the applicable state fraudulent transfer law.[3812] If the debtor fails to prove the existence of a triggering creditor, the debtor is prohibited from pursuing a section 544(b) actual or constructive fraud claim under applicable state law, regardless of the potential merits of the claim.[3813]

If the debtor does prove the existence of such a triggering creditor, it then can step into that creditor's shoes to bring and prosecute the fraudulent transfer action under applicable state law.[3814] Further, the debtor can use the single triggering creditor's standing and cause of action

---

[3809]  The Examiner is not aware of any evidence the LBO was done with actual intent to hinder, delay or defraud creditors, a fact which appears unlikely given the roughly $6 billion of equity invested by the Sponsors at closing. Accordingly, the Examiner did not analyze the LBO transactions as potentially avoidable for actual fraud in his investigation.

[3810]  11 U.S.C. §544(b)(1).

[3811]  *See In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014).

[3812]  *Id.* at 746. There is no such limitation in section 548 because "[t]he trustee stands in its own shoes and exercises rights bestowed by the Bankruptcy Code itself"). *Id.*

[3813]  *See Karnes v. McDowell (In re McDowell)*, 87 B.R. 554, 558 (Bankr. S.D. Ill. 1988).

[3814]  *See Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 709 (Bankr. N.D. Ill. 2014).

under applicable law to avoid the entire transaction or obligation for the benefit of all creditors.[3815]  Even if, for example, the IRS held only a small claim, or a claim that was later paid in full, the trustee could still step into the IRS's shoes under section 544 to avoid a transfer for the benefit of all creditors:

> §544(b) simply does not require an estate representative to demonstrate that the creditor into whose shoes she steps as of the petition date will benefit from the recovery, nor does it recognize an equitable defense on those grounds to recovery of otherwise avoidable transfers of assets.  Even if the IRS and HHS claims had been paid in full mere hours after commencement of the case, that would not alter the estate representative's ability to invoke §544(b).[3816]

Because the debtor steps into the shoes of the triggering creditor for purposes of prosecuting the fraudulent transfer claim under applicable law, it is subject to the defenses and limitations that the defendant could have asserted against the triggering creditor outside of bankruptcy.[3817]  If the triggering creditor into whose shoes the trustee or debtor seeks to step is barred from asserting the fraudulent transfer claims under the applicable law, the debtor likewise is barred from prosecuting the claims.[3818]

The debtor therefore can be prohibited from recovering based on the triggering creditor's constructive or actual fraud claims due to defenses that exist as to the triggering creditor, such as the statute of limitations, ratification, estoppel, waiver, etc., under applicable law.

---

[3815]  *Silverman v. Sound Around, Inc. (In re Allou Distribs., Inc.)*, 392 B.R. 24, 32 (Bankr. E.D.N.Y. 2008) ("When a trustee establishes standing to recover a transfer under Section 544(b) based on the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate."); *In re Refco, Inc. Sec. Litig.*, 2009 WL 7242548, at *9 (S.D.N.Y. Nov. 13, 2009) (same).

[3816]  *Alberts v. HCA Inc. (In re Greater Southeast Cmty. Hosp. Corp. I)*, 365 B.R. 293, 301 (Bankr. D.D.C. 2006); *see also Finkel v. Polichuk (In re Polichuk)*, 506 B.R. 405, 417 n.7 (Bankr. E.D. Pa. 2014) ("[E]ven though the trustee's claim under §544(b) derives from a claim held by an individual creditor [here the IRS], once the trustee undertakes the avoidance action, any recovery inures to the benefit of all creditors."); *Gordon v. Harrison (In re Alpha Protective Servs., Inc.)*, 531 B.R. 889, 905 (Bankr. M.D. Ga. 2015) (citing *In re Kaiser* for the proposition that a government claim can be used to avoid a transfer for the benefit of the estate).

[3817]  *Musicland Holding Corp. v. Best Buy Co. (In re Musicland Holding Corp.)*, 424 B.R. 95, 102-03 (Bankr. S.D.N.Y. 2010).

[3818]  *In re Equip. Acquisition Res., Inc.*, 742 F.3d at 746 ("[T]he trustee stands in the shoes of an actual unsecured creditor. And if the actual creditor could not succeed for any reason—whether due to the statute of limitations, estoppel, res judicata, waiver, or any other defense—then the trustee is similarly barred and cannot avoid the transfer.") (citing 5 Collier on Bankruptcy ¶544.06[3]).

With respect to the statute of limitations, the applicable law upon which the debtor bases the fraudulent transfer claim generally provides the limitations period that applies to those claims.[3819]  For instance, the UFTA generally includes a limitations period ranging from one to four years, depending on the type of claim asserted.[3820]  Therefore, if the statute of limitations contained in the applicable law would bar the triggering creditor's fraudulent transfer claims, it likewise bars the debtor's claims.[3821]  This example is highly relevant to the LBO-related claims in the Debtors' cases.

The LBO transaction closed on January 28, 2008.  The Debtors' voluntary bankruptcy cases were commenced on January 15, 2015.[3822]  Under relevant state law, the statute of limitations for bringing a claim under the UFTA to avoid any of the LBO related transactions as a constructively fraudulent transfer is four years.[3823]  The state law statute of limitations for bringing a claim under the UFCA to avoid any of the LBO related transactions as a constructively fraudulent transfer is six years in New York.[3824]  Thus, if CEOC seeks to step in the shoes of a creditor subject to the applicable state law statutes of limitations for bringing a fraudulent transfer claim, such a claim would be time-barred as a result of the petition date being beyond the limitations period provided by applicable state law fraudulent transfer statutes. Therefore, CEOC can only pursue a fraudulent transfer claim related to the LBO transactions if it can step into the shoes of a creditor not subject to the state law limitations period.

Under IRC §6901, the IRS is able to collect taxes from parties other than the original taxpayer if it can establish that the party is a transferee liable under state fraudulent transfer laws, principally the UFTA and UFCA.[3825]  While the IRS must establish liability under applicable state law to pursue a transferee, it is not bound by the statute of limitations found in applicable state fraudulent transfer law.

Instead, the IRS is subject to a federal 10-year statute of limitations, measured from the date of assessment.[3826]  Given that the LBO took place within ten years of the Petition Date, if the IRS held a valid claim against CEOC at the time of the LBO and was a creditor of CEOC at the Petition Date, a fraudulent transfer action by the IRS against a transferee from CEOC with respect to the LBO likely would be considered timely on the Petition Date.  Likewise, using its

---

[3819]  *Kaiser*, 525 B.R. at 708.

[3820]  UFTA §9.

[3821]  *Equip. Acquisition Res.*, 742 F.3d at 746.

[3822]  An involuntary case was commenced against CEOC on January 12, 2015 (Del. Case No. 15-10047), which case was transferred to the Northern District of Illinois on January 28, 2015.

[3823]  Nev. Rev. Stat. §112.230(1) & (2); Del. Code Ann. tit. 6, §1309(1) & (2); N.J. Stat. Ann. §25:2-31(a) & (b).

[3824]  N.Y. C.P.L.R. §213; Md. Code Ann., Cts. & Jud. Proc. §5-101.

[3825]  *Kaiser*, 525 B.R. at 710.

[3826]  IRC §6502(a)(1).

ability to step into the shoes of the IRS under section 544, a fraudulent transfer action under state law by CEOC would also be timely if the IRS held a valid claim at the time of the LBO and on the Petition Date.[3827]   Where transfers were made by subsidiaries of CEOC it will be necessary to determine if (i) there is a "Golden Creditor" as to that entity or (ii) the applicable IRS claim is joint and several such that a claim against CEOC may also allow the assertion of such claim against CEOC's subsidiaries.

As detailed above, the IRS held claims against CEOC both at the time of the LBO and at the Petition Date.  Accordingly, it is likely that the IRS can serve as a Golden Creditor, allowing CEOC to step into the IRS's shoes under section 544 of the Bankruptcy Code and bring a timely claim under state fraudulent transfer laws with respect to the LBO.

Although the Examiner believes that it is likely that the IRS could serve as a Golden Creditor and thus the relevant state law statutes of limitation would not apply to any action by CEOC challenging the LBO, the matter is not free from doubt.  CEC has taken the position that the Golden Creditor rule should not apply, and hence CEOC should not be permitted to avail itself of the 10-year statute of limitations under IRC §6502.  CEC also argued that the Golden Creditor rule is designed to assist the government in collecting as a sovereign, and should not be available to a trustee seeking to vindicate private rights on behalf of creditors of a debtor.

In support of this position, CEC cites *In re Brannon*, 476 F.3d 170 (3d Cir. 2007), a case which involved a limit on the trustee's ability to take advantage of rights granted to the IRS, but in a context wholly unrelated to the application of section 544(b) and the Golden Creditor issue. Specifically, *Brannon* dealt with the scope of an individual debtor's exemptions with respect to property held as tenants by the entirety, and "whether, under §522(d)(5) of the Bankruptcy Code, a spouse's 'aggregate interest' in entireties property is only half of the value of the property, . . . the full value of the property, or some other sum."[3828]   *Brannon* addresses whether a spouse, who is a 50% owner of the entirety of an article of property under Pennsylvania state law, can claim greater than 50% of that property as exempt under section 552 of the Bankruptcy Code.  The court held that the spouse could claim greater than 50% as exempt.

Separately, the court noted that, under Pennsylvania law, property held in the entireties can only be levied upon by creditors of both spouses, not a creditor of only one spouse.[3829]   In *dicta*, the court observed that, unlike the IRS outside of bankruptcy, the trustee in bankruptcy has no authority for avoiding the requirement that a creditor be a creditor of both spouses to reach property held in the entireties:

> The trustee cites *United States v. Craft*, 535 U.S. 274, 122 S.Ct. 1414, 152 L.Ed.2d 437 (2002), which held that entireties property may be subject to a tax lien against one spouse.  But that case is inapposite because it was concerned with the power of the Internal Revenue Service under a statute authorizing a lien on all "'property' or 'rights to property'" of a delinquent taxpayer.  *Id.* at 276, 122 S.Ct.

---

[3827]   *Id.*

[3828]   *Brannon*, 476 F.3d at 176.

[3829]   *Id.* at 173.

1414 (quoting 26 U.S.C. §6321).  Such sweeping authority is not granted to the
trustee, who is bound in the circumstances here by state property law rather than a
federal statute.  *See Schlossberg v. Barney*, 380 F.3d 174 (4th Cir. 2004); *In re:
Sinnreich*, 391 F.3d 1295 (11th Cir. 2004).[3830]

Thus, the reference to the powers of the IRS in *Brannon* had nothing to do with standing in the
shoes of the IRS under section 544 of the Bankruptcy Code.  The fact that a trustee cannot take
advantage of all non-bankruptcy rights of all creditors is not disputed, but that fact is not relevant
to the Golden Creditor issue.  Section 544(b) of the Bankruptcy Code grants the trustee specific
rights to step into the shoes of creditors for purposes of bringing avoidance actions.  The fact that
the trustee cannot step into creditors' shoes in other contexts does nothing to vitiate the rights
granted to the trustee under section 544.

CEC has also suggested that the Golden Creditor rule is derived from the principle of
*nullum tempus occurrit regi* (time does not run against the king), and that the government can
take advantage of the *nulllum tempus* rule only when acting as a litigant vindicating public
rights.[3831]   The Golden Creditor rule, however, does not derive from the *nullum tempus* rule.
*Nullum tempus* is a common law concept that only applies in situations where there is no express
Congressional action imposing a statute of limitations on the government.  As the court in *Dole*
explained, *nullum tempus* provides that "no statute of limitations will be applied in civil actions
brought by the Government, *unless Congress explicitly imposes such time limitations.*"[3832]

The use of the Golden Creditor rule by a debtor or trustee does not involve *nullum
tempus*; it involves the trustee stepping into the shoes of the IRS under the authority of section
544(b) of the Bankruptcy Code to utilize the statute of limitations found at IRC section 6502.
The Golden Creditor rule thus involves the application of an express federal statute of limitations
that has not run; it does not involve the invocation of the common law *nullum tempus* principle
to avoid the impact of a statute of limitations that has expired.

One case, *Wagner v. Ultima Homes, Inc.* (*In re Vaughan Co.*), 498 B.R. 297 (Bankr.
D.N.M. 2013), does cast doubt on the ability of a trustee to step into the shoes of the IRS under
section 544 for purposes of avoiding state law statutes of limitation.  In *Vaughn*, the bankruptcy
court refused to permit a trustee to step into the shoes of the IRS under section 544 to utilize the
10-year statute of limitations found in IRC §6502 in connection with a fraudulent transfer action
that would otherwise be barred by the state law statute of limitations under the UFTA.

After noting the many cases to the contrary, the court concluded that:  (i) the IRS may
only utilize the 10-year statute of limitations when exercising its "sovereign power" granted to it
in connection with enforcing public rights; (ii) the trustee seeking to step into the creditor's shoes
under section 544 is pursuing purely private rights, and hence cannot utilize the 10-year
limitations period; and (iii) Congress intended section 544 to incorporate state law, so trustees

---

[3830]  *Id.* at 177.

[3831]  *Dole v. Local 427*, 894 F.2d 607, 611 (3rd Cir. 1990).

[3832]  *Id.* at 610 (emphasis added).

should be bound by state law statutes of limitation.[3833]   The *Vaughan* court relied heavily on the intent of Congress in reaching its conclusion.

If the Bankruptcy Court were to follow *Vaughan*, CEOC could not take advantage of the 10 year statute of limitations under IRC §6502 to avoid any of the transactions related to the LBO.

The court in *Kaiser* considered the reasoning in *Vaughan,* but found it to be at direct odds with the plain language of section 544:

> The plain language of section 544(b) does simply not support the view permitting a trustee to claim a larger statute of limitations by stepping into the shoes of the IRS as an unsecured creditor would somehow override Congressional intent by superseding state law.   Section 544(b) refers to "applicable law" and does not limit applicable law to state fraudulent-transfers law, even if the applicable law that would permit an unsecured creditor to avoid a transaction is usually the state's fraudulent-transfer law.[3834]

Simply put, Judge Barnes found, like almost all courts who have faced the issue, that the "view that the statute of limitations available to the IRS may not be invoked by a bankruptcy trustee has no basis in the plain language of section 544(b)."[3835]   The Examiner finds this reasoning persuasive.

### C.   CEOC's Solvency at the Time of the LBO

There is a well-established line of cases holding that LBO-related transactions may constitute fraudulent transfers to the extent that the target company is rendered insolvent as a result of the LBO (UFTA §5(a)), left with unreasonably small capital (UFTA §4(a)(2)(A)), or the target intended to incur, or believed that it would incur, debts that would be beyond the target's ability to pay as such debts matured (UFTA §4(a)(2)(B)).[3836]   Based on the evidence reviewed by the Examiner, there does not appear to be a viable argument, however, that CEOC was insolvent before or immediately following the LBO Date.   *See* Section V, *supra*.

Without evidence of insolvency, the Examiner believes no viable basis would exist to avoid the transfers of the CMBS Properties to CEC.   If CEOC remained solvent following the CMBS Transactions, the value received by CEOC is not relevant, as the requirements for bringing a constructive fraudulent transfer claim will not be met.

---

[3833]   *Vaughan Co.*, 498 B.R. at 304-05.

[3834]   *Kaiser*, 525 B.R. at 714.

[3835]   *Id.* at 713.

[3836]   *See, e.g.*, *Boyer v. Crown Stock Distrib., Inc., et al.*, 587 F.3d 787 (7th Cir. 2009); *Weisfelner v. Fund 1 (In Re Lyondell Chem. Co.)*, 503 B.R. 348 (Bankr. S.D.N.Y. 2014);  *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310 (S.D.N.Y. 2013); *Dev. Specialists, Inc. v. Kaplan (In re Irving Tanning Co.)*, No. 12–01024 (Bankr. D. Me. Feb. 17, 2013), ECF No. 43 (Kornreich, J.).

The following snapshot summarizes the approximate equity value of CEOC following the LBO Date:

**LBO Figure 3: Calculation of HEI Equity Value as of the LBO Date**

| amounts in millions | |
| --- | ---: |
| (Loss)/Income from operations | $1,652 |
| Depreciation & Amortization | 817 |
| Amortization of intangible assets | 74 |
| Impairment of intangible assets | 170 |
| **EBITDA** | **$2,712** |
| Market Multiple | 14.0x |
| Enterprise Value | $37,972 |
| Less: Face Value of Debt | (23,911) |
| **HEI Equity Value** | **$14,062** |

Sources: CEC 2007 10-K. Capital IQ; CEC_Examiner_0145430.

While there have been suggestions that the amount by which CEOC was solvent is less than the amount estimated by the Examiner, there has been no meaningful evidence presented to the Examiner demonstrating insolvency on the LBO Date. The strong evidence of solvency and the absence of contrary evidence lead the Examiner to conclude that there is a high likelihood that CEOC was solvent at the LBO Date.[3837]

### D. Subsidiary Pledges

Notwithstanding CEOC's likely solvency around the LBO Date, it has been suggested to the Examiner that each of CEOC's subsidiaries (the "CEOC Subsidiaries") which granted liens on its assets and issued guarantees to support CEOC's indebtedness to effectuate the LBO are potential targets of fraudulent conveyance claims. Thus, the Examiner has been asked to evaluate whether the asset pledges and guarantees issued in favor of CEOC's lenders by these CEOC Subsidiaries, as credit support for debt incurred by CEOC in conjunction with the LBO, are avoidable as fraudulent conveyances or transfers.

---

[3837] While the LBO involved the addition of approximately $11.9 billion of additional debt to CEOC, it also involved the infusion of approximately $6 billion in equity capital by the Sponsors. The Sponsors are sophisticated people; it simply does not make sense for the Sponsors to have invested such a significant amount of equity into CEOC at a time when CEOC was insolvent. In addition, as noted above, the Examiner has not found evidence which suggests the LBO was entered into with any intent to hinder, delay or defraud creditors.

This is a legal, not factual question, and can be answered without analyzing the solvency of each individual CEOC Subsidiaries or researching factual issues surrounding the LBO.

### 1. Savings Clauses and *Tousa*

Parties seeking to avoid the CEOC Subsidiaries' grant of liens and guarantees have referenced *In re TOUSA*[3838] as support for their claims. In *Tousa*, an unsecured creditors committee challenged as fraudulent conveyances the liens and guarantees granted by various subsidiaries in financing acquired by their parent, a home builder which filed for bankruptcy following the 2008 real estate crash.

In *Tousa*, the unsecured creditors committee successfully argued that the subsidiaries did not receive reasonably equivalent value for the granting of the liens on their assets and guarantees of their parents' indebtedness, notwithstanding their parent having received proceeds of loans intended to benefit the entire enterprise. Instead, the *Tousa* bankruptcy court ruled (and the Eleventh Circuit agreed) that the term "value" includes "some kind of enforceable entitlement to some tangible or intangible article."[3839] The bankruptcy court found that the *Tousa* subsidiaries received no such value because loan proceeds did not flow to the *Tousa* subsidiaries and the subsidiaries did not directly benefit from the transactions giving rise to the financing incurred.

The Eleventh Circuit found no clear error, and accordingly deferred to the bankruptcy court's decision, reinstating the bankruptcy court order, which avoided the subsidiaries' grant of liens and issuance of guarantees, and which found the subsidiaries to have been rendered insolvent as a result of the financing (an issue which was not before or directly considered by the Court of Appeals).

*Tousa* has been met with skepticism generally, and has been roundly criticized in lending communities.[3840] This is due in large part to the bankruptcy court's finding that the subsidiaries were insolvent. In order to accomplish this, the bankruptcy court declared unenforceable the "savings clauses" included in *Tousa's* financing documents. Savings clauses are routinely included in upstream guarantees (like those issued by the Debtors' Subsidiaries) in order to mitigate fraudulent conveyance risk; savings clauses are drafted to contractually reduce the guarantor's obligations by the amount necessary to prevent the guarantee, and the amount secured by any liens securing the guarantee, from subsequent avoidance as a fraudulent transfer.

---

[3838] *Senior Transeastern Lenders v. Official Comm. Of Unsecured Creditors (In re TOUSA, Inc.)*, 680 F.3d 1298 (11th Cir. 2012).

[3839] Bridget Marsh & Ted Basta, *The Loan Syndications and Trading Association: the 2010 Loan Market Update*, Commercial Law Newsletter (Fall 2010), *available at* <http://www.americanbar.org/content/dam/aba/publications/blt/2011/02/inside-buslaw-loan-syndications-201102.authcheckdam.pdf> (last visited Mar. 12, 2016); Christopher W. Frost, *Inter-Corporate Obligations, Reasonably Equivalent Value, and Beneficiary Liability: In re TOUSA, Inc.*, 32 No. 9 Bankruptcy Law Letter 1 (September 2012).

[3840] *TOUSA*, 422 B.R. at 868, n. 55.

The relevant loan documents, executed by the subsidiaries granting liens on their assets and issuing guarantees included savings clauses, are summarized below.

### LBO Figure 4:  Summary of Savings Clauses

| Debt Tranche | Comments |
|---|---|
| Senior Unsecured Cash Pay Notes ($4.9B) | Guarantee includes savings clause: " . . . the maximum aggregate amount . . . guaranteed hereunder . . . shall not exceed the maximum amount that can be . . . guaranteed without rendering this Indenture . . . voidable under applicable law relating to fraudulent conveyance or fraudulent transfer . . . ."[3841] |
| Senior Unsecured PIK Toggle Notes ($1.4B) | |
| Term Loan B Facility ($7.25B) | Collateral agreement to which subs are party includes a limitation on the obligations secured tied to the amount permitted by existing notes.[3842] |

Had the *Tousa* bankruptcy court enforced the savings clauses, and thereby found *Tousa's* subsidiaries solvent, it is unlikely the liens and guarantees would have been avoided.  Thus, although the Eleventh Circuit did not have before it, and accordingly did not address, the legal effectiveness of savings clauses, the decision reinstating the bankruptcy court's order made the bankruptcy court's *Tousa* decision – including its finding the savings clauses ineffective – the effective law in that circuit.  There are no reported decisions in the Seventh Circuit addressing the savings clause ruling in *Tousa*.

Finding the CEOC Subsidiaries savings clauses unenforceable, thereby rendering the Debtors' Subsidiaries insolvent as a result of the LBO, would bolster potential fraudulent conveyance claims against CEOC's subsidiaries.  But in light of the skepticism of *Tousa's* bankruptcy court decision being followed in any other jurisdiction, and the lack of direct Eleventh Circuit endorsement, the Examiner believes it questionable that the Seventh Circuit (or any other applicable jurisdiction) will adhere to or follow the *Tousa* bankruptcy court's ruling.  In sum, the Examiner believes the CEOC Subsidiaries savings clauses more likely are enforceable notwithstanding *Tousa*.

### 2.  Contingent Assets and Liabilities in the Seventh Circuit

Finding the CEOC Subsidiaries insolvent around the LBO becomes even less likely in light of prevailing Seventh Circuit law regarding the value of contingent assets and liabilities.

---

[3841]  Indenture dated as of February 1, 2008, by and among HOC, the Guarantors and U.S. Bank N.A., Exhibit 4.33 to CEC 10-K for year ended 2007 (Feb. 29, 2008), at §11.02.

[3842]  Collateral Agreement (as of January 28, 2008), at CEOC_INVESTIG_00146846-47 (§3.01) [CEOC_INVESTIG_00146839].

By their nature, each CEOC Subsidiary's guarantee was a contingent liability when delivered; had CEOC paid its debts when due, its subsidiaries would owe nothing and the guarantees would expire in accordance with their terms. If that contingency was removed, and a guarantee demand was validly made on a single subsidiary for the full amount borrowed by CEOC, that guarantor would almost certainly be rendered insolvent because the amount borrowed by CEOC (and therefore, the amount secured by the assets of each subsidiary) was substantially in excess of the value of the assets of each single subsidiary. But that demand liability was a contingency on the LBO Date, and its effect on the CEOC Subsidiaries' solvency on the LBO Date must be evaluated in light of the legal standards for contingent liabilities.

Prevailing law in the Seventh Circuit dictates that the "probability discount rule" should be used to evaluate present-day *contingent* assets and liabilities. Thus, this standard must be used when analyzing the effect of guarantee liability on the solvency of the CEOC Subsidiaries on the LBO Date. As originally set forth in *Xonics Photochemical, Inc. v. Mitsui & Co.(U.S.A.), Inc.* (*In re Xonics Photochemical, Inc.*), 841 F.2d 198 (7th Cir. 1988) and further developed in *Covey v. Commercial Nat'l Bank of Peoria (In re V. Jobst & Sons, Inc.)*, 960 F.2d 657 (7th Cir. 1992), the Seventh Circuit has held that a contingent liability should be valued as a liability somewhere between zero and the full face amount thereof, discounted by the probability that the contingency will occur, causing the contingent liability to become liquidated.

Following the same logic, one must evaluate the CEOC Subsidiaries' contingent assets – contribution claims against all other subsidiaries – similarly. In other words, the amount of contingent liabilities held by a subsidiary should be offset by the amount of contingent assets – contribution claims against sister entities – held by that entity.

Thus, the CEOC Subsidiaries can be viewed as insolvent on the LBO Date only if the discounted contingent liability risk of the guarantees issued is in excess of the discounted assets inherent in their contribution rights against each other subsidiary. In light of the solvency of CEOC on the LBO Date, the risk of a guarantee draw presumably was quite low and the likelihood of successful contribution claims was likely high.

Stated differently, if CEOC were solvent on the LBO Date, there was a low risk that any particular subsidiary would be called on to satisfy its guarantee, and a high likelihood that it would be able to collect on contribution claims against CEOC and the other subsidiary guarantors. On balance, then, the value of any liability arising for the guarantee given by any particular subsidiary should be negated by its contribution rights against other related entities, leaving the subsidiary guarantor solvent. Thus, Seventh Circuit authority on contingent assets and liabilities further suggests the CEOC Subsidiaries were solvent on the LBO Date.

Given the foregoing, the Examiner has concluded that there is an insufficient basis for challenging either the LBO or the CEOC Subsidiary's grants of security interests and guarantees to warrant further additional investigations by the Examiner.

## XII.   VEIL PIERCING

During the course of his investigation, the Examiner has heard from numerous witnesses inside and outside of Caesars that as a practical matter, the various Caesars entities were run as a single enterprise, without regard to the complex legal structure that in fact exists.   However, Caesars' legal, regulatory and financial personnel were always cognizant of the separateness of the various Caesars entities, and they consistently maintained the requisite separate books, records, agreements and other documents that one would expect in order for an enterprise the size and complexity of Caesars to preserve its corporate formalities.   Nevertheless, given the infirmities the Examiner found with the transactions he investigated – they were for the most part related-party transactions done while CEOC was insolvent and in many cases for inadequate consideration and in breach of board members' and shareholders' fiduciary duties – and given that the Examiner concluded that several of these transactions give rise to fraudulent transfer and breach of fiduciary claims of varying strength, the Examiner considered whether CEOC's corporate veil could be pierced so as to allow aggrieved parties (including, potentially, CEOC and various of CEOC's creditors) to seek redress directly against CEOC's controlling shareholder, CEC, in connection with these claims.

The doctrine of piercing the corporate veil is discussed in further detail in the Legal Standards Appendix.[3843]   As a general matter, it is an extraordinary equitable remedy that applies where the corporation and its controlling shareholder operate as a single economic unit and where its application will redress an overall element of injustice or unfairness.[3844]   In all of the relevant jurisdictions, proof of the elements supporting veil piercing must be made by clear and convincing evidence, not merely a preponderance of the evidence.[3845]   Given the strong policy in

---

[3843]   *See* Appendix 5, Legal Standards at Section VIII.B.

[3844]   *See, e.g.*, *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (applying Delaware law).

[3845]   *Brown v. GE Capital Corp.* (*In re Foxmeyer Corp.*), 290 B.R. 229, 237 (Bankr. D. Del. 2003).   The Examiner believes that under the internal affairs doctrine, Delaware law will apply to any court's consideration of veil piercing of CEOC to reach CEC.   Both are organized under Delaware law.   *See* CEC 10-K for the year ended Dec. 31, 2013 (Mar. 11, 2014); Exhibit 3.1 to CEC Form 8-K (May 6, 2014).   Specifically, the internal affairs doctrine "governs the choice of law determinations involving matters *peculiar* to corporations, that is, those activities concerning the relationships *inter se* of the corporation, its directors, officers and shareholders."   *Am. Int'l Grp., Inc. v. Greenberg (In re Am. Int'l Grp., Inc.)*, 965 A.2d 763, 817 (Del. Ch. 2009), *aff'd sub. nom.*, *Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011).   The doctrine seems particularly applicable with respect to veil piercing between a Delaware parent (CEC) and its wholly-owned Delaware subsidiary (CEOC).   Some Caesars entities as to which veil piercing might be applicable (for instance, CLC) are organized under Nevada law, and Nevada also imposes a heavy burden of proof.   *Truck Ins. Exch. v. Palmer J. Swanson, Inc.*, 189 P.3d 656, 660 (Nev. 2008).   Nevada's requirements for veil piercing have been codified.   Nev. Rev. Stat. §§ 78.747(1)-(2).   If the law of the current bankruptcy forum (Illinois) were to apply, the result would be the same.   *See, e.g., Kelsey Axle & Brake Div. v. Presco Plastics, Inc.*, 543 N.E.2d 239, 243 (Ill. Ct. App. 1989).

favor of limited shareholder liability, the remedy is available only in exceptional circumstances.[3846]

While courts consider a variety of factors, and every case stands on its particular facts, the factors most relevant here are (a) whether the controlled company (CEOC) was insolvent at the time of the transaction in question;  (b) whether the controlling shareholder (CEC) treated the controlled company as a separate entity or whether it ignored its separate "corporateness," exercising dominion and control over it and treating it as its own "instrumentality";[3847] and (c) whether the transaction was unjust or unfair to the subsidiary and its creditors and the equities therefore favor piercing the veil.[3848]

The Examiner's conclusions regarding insolvency at the time of each of the transactions he investigated are covered in Section V and Appendix 6 of this Report.  While it is clear that mere insolvency is not enough to allow piercing of the corporate veil,[3849] it is nevertheless the case that:

> [I]nsolvency is one factor to be considered in assessing whether the corporation engaged in conduct that unjustly shields its assets from its creditors.  If so, and especially if particular shareholders benefited from and controlled that conduct, then justice would require the piercing of the corporate veil in order to hold the benefiting shareholders responsible.[3850]

As noted in detail in Section V of this Report, the Examiner has concluded that CEOC was likely insolvent under one or more of the relevant tests (balance sheet, capitalization, ability to pay debts as they come due) beginning in late 2008, and by late 2013 through 2014 (when the most significant transactions took place), CEOC was almost certainly insolvent.   Establishing insolvency is important because it is an element of the constructive fraudulent transfer claims the Examiner has identified and shapes the contours of the fiduciary duties CEOC's directors, and CEC as CEOC's controlling shareholder, owed to CEOC when the various transactions were done.

With respect to dominance and control, there is no question that until May 2014, CEC owned 100% of CEOC and thereafter owned at least 89% of CEOC.  In addition, until the end of June 2014, CEOC had no independent directors;  its directors were all also directors or officers of CEC.  Its directors included, notably, Gary Loveman (a CEOC director, a CEC director and CEC's CEO);  Eric Hession (a CEOC director and CEC's CFO);  and Michael Cohen (a CEOC

---

[3846] *Mason v. Network of Wilmington, Inc.*, No. Civ. A. 19434-NC, 2005 Del. Ch. LEXIS 99, at *9-10 (Del. Ch. July 1, 2005); *Truck Ins. Exch.*, 189 P.3d at 660; *Kelsey Axle & Brake Div.*, 543 N.E.2d at 243.

[3847] *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL2130607, at *9 (Del. Ch. Aug. 26, 2005); *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987-88 (Del. Ch. 1987).

[3848] *Trevino*, 583 F. Supp. 2d at 528.

[3849] *Mason*, 2005 Del. Ch. LEXIS 99, at *12.

[3850] *Id.* at *12-13.

director and CEC's Vice President and Associate General Counsel).  More importantly, until the very last transaction investigated (the Senior Unsecured Notes transaction described in Section IX.E of this Report, which occurred during the summer of 2014), CEOC's board appointed no board committees of any kind (independent or otherwise) to represent CEOC's interests in connection with any of the related-party transactions the Examiner investigated.  Nor did CEOC have truly independent legal counsel or financial advisors for any of the related-party transactions the Examiner investigated until the Senior Unsecured Notes transaction, when CEOC's independent directors hired their own.  In some instances, CEC's financial advisors addressed their opinions to both the CEOC and the CEC Boards, but prior to June 30, 2014, the CEOC Board was made up of interested directors only, and when the CEOC Board acted to approve the related-party transactions, its approvals were pro forma.  The one exception was the Senior Unsecured Notes transaction, in which CEOC's independent directors were able to negotiate for and obtain tangible benefits for CEOC.  As Eric Hession, the current CFO of CEC has acknowledged, until the CEC sale of CEOC stock in May 2014 decisions for CEOC were made at the CEC level.[3851]

In addition to CEC's legal and board dominance and control of CEOC, there is the fact, acknowledged by all, that as a practical business matter Caesars operated as a single, unified enterprise, and there was no secret about it.  Casinos and hotels were operated seamlessly without regard to which legal entity owned which property in a common effort to increase occupancy and gaming revenue.  At his initial interview with the Examiner, Gary Loveman, chairman and CEO of CEC and many of CEC's affiliates, described this view as follows:

> There was nothing in the company at the time, among any of us who ran it, to try to make distinctions between all of these legal entities.  In fact, I can assure you that if you had asked anyone other than a couple of us to name any number of these legal entities, I think people could have gotten that there was an operating entity and a property-based financing entity, but beyond that, in all the Hamlet Holdings and the VoteCo Holdings and all these other things that appear in these documents, people had no idea.

> They imagined these to be transactions within a family of common interests with common shareholders, and there just wasn't a great deal of attention to that.

> Those of us who were the executives of the business spent all of [sic] our time worrying about the business, not about the machinations of these various ownership structures and the way in which consideration was passed between them.  Because, as far as we knew, they were commonly owned.

> In fact, we worked very hard – the casino business has a natural tendency toward centrifugal movement, so people tend to be isolated and only worry about their own little box and their own little property.  We worked very hard to overcome that.

---

[3851] *Wilmington Savs. Fund Society FSB v. Caesars Entm't Corp. et al.* C.A., No. 10004-vcg (Del) ("*Wilmington Savs.*"), E. Hession Sept. 17, 2015.  *Id.* at 63:25-64:7.

So the pressure within the company led by me was to be integrative and not divisive, not worry is this in this pocket, that in that pocket.[3852]

Throughout the many additional meetings and interviews that Caesars management and advisors had with the Examiner, this view never changed.  At Loveman's final interview, he confirmed again that "we viewed this [CEC and CEOC] as one company,"[3853] that "day-to-day, . . . [the Caesars enterprise] was the entity we worked with."[3854]

This view was shared by other members of Caesars management.  For instance, Tariq Shaukat, Chief Commercial Officer at Caesars, pointed out that "the vast majority . . . of my team didn't understand which properties were in which credit.  I can't say that I fully understood which properties were within each credit."[3855]  And further: "within a market we are generally agnostic as to which credit property in that market is."[3856]  This view was also shared by the Sponsors, who controlled CEC.[3857]  It was followed in practice in many ways – for instance, as Shaukat testified, "in the markets where we have got multiple credits, take Las Vegas as an example, the marketing team and the operating team . . . are incentivized on a market basis as opposed to a specific property basis."[3858]  Regional markets were treated the same way:  regional marketing managers (like those responsible for Atlantic City and other East Coast properties) were compensated on the basis of the performance of the whole "pod" of properties in their market no matter the ownership (*e.g.*, CEOC or CERP), not by the performance of any one.[3859]  Conventions, shows and other events were scheduled and staffed centrally.[3860]  Likewise, employment is run centrally for all the Caesars properties in Las Vegas.[3861]  And of course the overriding example is the Caesars Total Rewards program, described in detail in Section VIII.F of this Report.  Total Rewards is run as a single operation for the benefit of all Caesars properties, without regard to their legal ownership.  For example, a Caesars customer who earns Total Rewards at a regional property owned by CEOC is then given the opportunity to stay for free at a Las Vegas property owned by CAC.  Both entities bear costs and receive benefits from this arrangement.  Indeed, no one the Examiner interviewed about Total Rewards even admitted to knowing Caesars' corporate structure.[3862]

---

[3852]  G. Loveman Oct. 27, 2015 Tr. at 71:13-72:25.

[3853]  G. Loveman Jan. 28, 2016 Tr. at 329:16-17.

[3854]  *Id*. at 330:7-8.

[3855]  T. Shaukat Oct. 28, 2015 Tr. at 34:22-35:2.

[3856]  T. Shaukat Nov. 9, 2015 Tr. at 15:5-6.

[3857]  A. van Hoek Sept. 25, 2015 Tr. at 238:2-239:3.

[3858]  T. Shaukat Oct. 28, 2015 Tr. at 51:24-52:5.

[3859]  *Id*. at 52:11-13.

[3860]  J. Gastwirth Jan. 14, 2016 Tr. at 11:9-16.

[3861]  J. Payne Oct. 22, 2015 Tr. at 57:13-17.

[3862]  *See, e.g.,* T. Shaukat Oct. 28, 2015 Tr. at 15:16, 16:17, 34:21-35:4; G. Loveman Oct. 27, 2015 Tr. at 71:16-25.  As noted above and in the Atlantic City section of this Report, this was not

With respect to unified operations other than Total Rewards, it comes as no surprise that Caesars has various centralized corporate functions, including cash management systems, that cover the entire enterprise and whose costs are allocated among the various entities that are part of Caesars. These systems are well documented,[3863] and intercompany transactions all appear to be accounted for properly.[3864] Centralized management of these types of functions are common in large companies organized as Caesars is (with a top-level holding company and numerous direct and indirect subsidiary operating companies) and its presence here does not support veil piercing.[3865]

The real question then, is whether any of the particular transactions the Examiner investigated were so unfair and unjust to CEOC and its creditors that a court would consider piercing the veil to reach CEC. The Examiner believes that, based on the overwhelming reluctance of courts to pierce corporate veils except in the most extraordinary circumstances,[3866] the only transactions that might give rise to veil piercing are those that give rise to claims of actual fraudulent transfer and breach of fiduciary duty. The claims that the Examiner has identified that might be appropriate for veil piercing are:

- Actual fraudulent conveyance and breach of fiduciary duty claims arising out of the Growth Transaction against (among others) the CEOC directors and CEC as controlling shareholder.[3867]

- Actual fraudulent transfer claims and breach of fiduciary duty claims against (among others) the CEOC director and CEC as controlling shareholder arising out of the CERP Transaction.[3868]

---

an issue except in connection with the closing of the Showboat Atlantic City. *See* Section VIII.G, *supra*.

[3863] Though one apparent exception is the absence of a tax sharing agreement among the related companies. *See* Section X, Tax Issues.

[3864] *See, e.g.*, the description of "Project Simplification" in Section IX.G.

[3865] *See In re Acushnet River & New Bedford Harbor Proceedings*, 675 F. Supp. 22, 34-35 (D. Mass. 1987). While some creditors have asserted that Caesars should have prevented CEOC from operating its business in this manner, charging, for example, that CEOC should not refer customers to hotels, restaurants and casinos in non-CEOC properties, the Examiner has found no fault in the manner in which Caesars runs its hotel and gaming businesses. Except for the marketing and customer retention program implemented at the Showboat Atlantic City following the announcement of its closing in 2014 (*see* Section VIII.G of this Report), the Examiner has found no evidence that the way Caesars runs its businesses is unfair to creditors of any of the various Caesars entities.

[3866] *Trevino*, 583 F. Supp. 2d at 528. *See also Midland Interiors, Inc. v. Burleigh*, No. Civ. A. 18544, 2006 WL 3783476 (Del. Ch. Dec. 19, 2006); *Gadsden v. Home Pres. Co., Inc.*, No. Civ. A. 18888, 2004 WL 485468 (Del. Ch. Feb. 20, 2004).

[3867] *See supra* Section VIII.B.

[3868] *See supra* Section VIII.C.

- Actual fraudulent conveyance and breach of fiduciary duty claims arising out of the Four Properties Transaction against (among others) the CEOC directors and CEC as controlling shareholder.[3869]

Next, even if a court were to consider these potential actual fraudulent transfer and breach of fiduciary duty claims as the basis for veil piercing, the question remains, what would this remedy add?  The breach of fiduciary claim against CEC in the Growth transaction would be brought directly against CEC, and piercing the veil would add nothing.  In CERP, the direct claim would be against CERP, not CEC, and if CERP is a sufficiently viable defendant capable of returning the transferred properties or their value to CEOC, veil piercing to reach CEC should not be necessary, though the remedy would be theoretically available.  In any event, CEC would be a defendant in any breach of fiduciary duty action in connection with the CERP transaction, so veil piercing would be superfluous.  The situation is similar with regard to the Four Properties Transaction.

Recognizing that the standard for veil piercing is rigorous based on all of the evidence the most that can be said is that the ability to pierce the corporate veil with regard to these claims is between plausible and reasonable.  The need to resort to this remedy is, however, unclear.

---

[3869]  *See supra* Section VIII.D.

## XIII.  THE RSAs

### A.  Introduction

A centerpiece of the Debtors' reorganization efforts has been the ongoing discussions with the primary creditor constituencies regarding the form of a restructuring of the Debtors' balance sheet and corporate affairs to be reflected in a plan of reorganization as memorialized in the RSAs.  The Examiner Order did not suggest that the Examiner investigate any aspect of the RSAs.[3870]  Certain parties-in-interest requested that the Examiner investigate two issues related to the RSAs: (i) the independence of the members of the Governance Committee, Ronen Stauber and Steven Winograd, and, by implication, their role in negotiating and approving the RSAs; and (ii) the value of the consideration contributed by CEC under the RSAs.

As discussed herein, the Examiner has investigated the independence of the members of the Governance Committee.  The Examiner has concluded, however, that he should not investigate or express any views regarding the value of CEC's contribution to the RSAs, given that: (i) the terms of the RSAs have not been finalized and may change materially as a result of ongoing and future negotiations; (ii) certain aspects of the RSAs (*e.g.*, the value of the REIT structure) are extraordinarily difficult to value; and (iii) the value of CEC's contribution will be heavily dependent on the overall enterprise value of CEOC upon plan consummation, which is a valuation exercise that (a) may not be necessary, depending on the outcome of the RSA negotiations, (b) would be expensive and time-consuming, and (c) would significantly delay the issuance of the Examiner's Final Report.

### B.  Director "Independence"

Certain creditor groups have raised questions regarding the "independence" of the two non-insider members of the Governance Committee due to alleged long-standing ties to Apollo, in particular with regard to Winograd.  Creditors have argued that both directors are inextricably linked to Apollo by both history and joint business interests, making it exceedingly unlikely that either of them would contradict or oppose the interests of their close colleagues and long-time business partners there.[3871]  The Examiner, however, has reviewed the evidence, interviewed both directors and concluded that (i) both directors meet the applicable test for "independence," and (ii) their prior relationships with Apollo are insufficient to raise a serious question regarding their ability to exercise independent business judgment on behalf of the Debtors.

Stauber and Winograd were appointed as independent directors of CEOC on June 27, 2014.  A month later, on July 30, the CEOC Board (then comprised of seven directors – Kelvin Davis, David Bonderman, Marc Rowan, David Sambur and Gary Loveman, in addition to

---

[3870]  The negotiation of and entry into the RSAs are not "Challenged Transactions" or "Insider Transactions" as described in the Examiner Order.  *See* Examiner Order at 3.

[3871]  *See, e.g.*, *UMB Bank v. Caesars Entm't Corp. et al.*, No. 10393-VCG (Del. Ch. Filed Nov. 25, 2014), Verified Compl., at ¶¶239-43; *Motion of Official Committee of Second Priority Noteholders for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* [Docket No. 367] at ¶15.

Stauber and Winograd) authorized the formation of the Governance Committee, comprised of the two outside directors (Stauber and Winograd), who were granted the sole authority and responsibility for, *inter alia*: (i) the consideration, negotiation and approval of any "Related Party Transaction" or other transaction or matter involving a material conflict of interest affecting any of the directors of CEOC or any person or group beneficially owning, directly or indirectly, more than 5% of the outstanding equity of CEOC; and (ii) considering and evaluating any material debt, financial or other restructuring transactions involving CEOC.[3872]  Stauber and Winograd have thus played, and continue to play, a central role in the restructuring negotiations with CEC, the Sponsors, and certain creditor groups that have been memorialized in the RSAs.

Winograd, a 1982 Columbia Business School graduate, has more than 33 years of experience in the investment banking industry.[3873]  At the time of his interview, he was working at a buy-side, mid-market investment banking firm called Pennant Park Capital Advisors.[3874]  Winograd spent the early years of his career working at Drexel Burnham, where he became very familiar with leveraged financings, bank and bond deals and leveraged buyouts.[3875]  Winograd met Leon Black (one of Apollo's founders) and Rowan (another Apollo founder) when they worked together in Drexel Burnham's M&A group in the 1980s.[3876]  Black headed the group, Winograd was a Vice President, and Rowan was an Associate.[3877]

A year before Drexel went bankrupt, Winograd decided to leave Drexel "to take a stab at being on the private equity side."[3878]  From that time forward, Winograd concentrated his work on private equity firms and their portfolio companies.  Initially he joined Blackstone, and then he formed his own advisory boutique where he worked on a number of restructurings, including with former clients of Drexel.[3879]  When that work "dried up" in the early 1990s, he joined Bear Stearns, first as a senior managing director and then running the financial sponsors group.[3880]  He remained at Bear Stearns for about six years and then, in or around 2000, Winograd was recruited to join Deutsche Bank, where he continued to work with financial sponsors until 2004, when he joined Merrill Lynch (which was acquired by Bank of America in 2009).[3881]  In 2011,

---

[3872]  *See* CEOC Board Minutes and Charter of Governance Committee (July 30, 2014), at CEOC_ INVESTIG_00172694-2740 [CEOC_INVESTIG_00172694]; *see also* S. Winograd Oct. 21, 2015 Tr. at 10:17-22; R. Stauber Sept. 30, 2015 Tr. at 12:3-6.

[3873]  S. Winograd Oct. 21, 2015 Tr. at 7:3-8.

[3874]  *Id.* at 7:8-11.

[3875]  *Id.* at 7:14-18.

[3876]  *Id.* at 19:7-23.  *See also UMB Bank v. Caesars Entm't Corp. et al.*, C.A. No. 10393-VCG (Del. Ch. Nov. 25, 2014), Verified Compl., at Ex. 3.

[3877]  S. Winograd Oct. 21, 2015 Tr. at 19:13-19.

[3878]   *Id.* at 8:9-17.

[3879]  *Id.*

[3880]  *Id.* at 8:17-22.

[3881]  *Id.* at 8:22-9:25.

Winograd joined Bank of Montreal, where he remained until 2015, when he joined Pennant
Park.[3882]

Winograd told the Examiner that, other than his work with Rowan and Black at Drexel in
the 1980s, the only other business interactions he has had with either one of them was (i) in
connection with his work at Bear Stearns and Merrill Lynch, where he served as the financial
coverage banker working with Apollo and other private equity firms;[3883] and (ii) in connection
with his service as a director of Rare Medium, an Internet web development company.[3884]  In or
around 1999, Apollo became a controlling shareholder (and Rowan joined the board) of Rare
Medium.  Their joint service as directors at that company lasted about a year.[3885]

Winograd and Rowan also maintained a cordial relationship through their work for a
charity to which they were both donors.[3886]  Other than that, he described their relationship as
"the kind of relationship if you saw each other at a party or at the street, you would say hello,
you would talk, you would chat, you would be friendly, cordial . . . . I have invited Marc to
parties at my place, he showed up, you know, so I would say, socially friendly, but it's not like
he is one of my close friends or anything like that."[3887]  Winograd identified no other prior
business or personal relationships with anyone at Apollo, TPG or Caesars.

In February 2014, Rowan asked Winograd to join CEOC's Board.[3888]  Winograd later
met with Alex van Hoek and David Sambur, who explained that Winograd would be sitting on
the board of CEOC, the parent's operating subsidiary, rather than on the board of the parent.[3889]
Winograd did not meet with anyone else at Caesars before agreeing to join the board.[3890]
Sambur told Winograd that CEOC would probably be going through a restructuring,
necessitating the need for independent directors to opine and decide on potential conflict
matters.[3891]  When asked about what he knew or was told about CEOC's financial condition
before he joined the board, Winograd explained:

> It was obvious the company was leveraged.  I think they had 18 billion face
> amount of debt and plus or minus a billion of EBITDA.  Clearly not sustainable.
> They had mentioned that they were likely going to go through a restructuring,
> that's why they needed independent directors. . . . My understanding at that point

---

[3882]  S. Winograd Oct. 21, 2015 Tr. at 9:25-10:5.

[3883]  *Id.* at 21:25-22:6, 22:7-17.

[3884]  *Id.* at 22:24-23:17.

[3885]  *Id.* at 23:14-15.

[3886]  *Id.* at 24:6-18.

[3887]  S. Winograd Oct. 21, 2015 Tr. at 23:25-24:18.

[3888]  *Id.* at 10:23-11:10.

[3889]  *Id.* at 13:10-15.

[3890]  *Id.* at 25:2-10.

[3891]  *Id.* at 13:22-14:14.

was that they were open to all options . . . they were trying to right-size the balance sheet. If it could be done out of court, great. If not . . . they might have to go the bankruptcy route . . . . [T]he conversations, again, were not very specific on what the strategy or route it might take. I mean, I had the impression that they hadn't really figured that out and it would kind of depend on how things evolved.[3892]

Before agreeing to join the board, Winograd discussed the opportunity and its responsibilities with his friends and colleagues, who explained the duties of care and loyalty, and the responsibilities he would have as a director.[3893] One former business school classmate who had experience sitting on the board of a significant public company connected Winograd with an attorney who advised that if he was diligent and careful, he would not have any personal exposure.[3894]

Stauber, like Winograd, has extensive prior experience in the financial industry. Prior to joining the CEOC Board, Stauber, a Wharton graduate, had been in the M&A transaction arena for almost 25 years, having worked as an analyst at Salomon Brothers, at HFS/Cendant Corp. (where he held several positions), at Pegasus Capital Advisors (where he was an Advisory Professional), and at Berggruen Holdings (where he was a Managing Director and Head of Private Equity), and Berggruen Residential Ltd. (where he was Chairman).[3895] Stauber is currently a Managing Director at Jenro Capital, a private investment and advisory firm that specializes in advisory assignment and direct investments in established businesses.[3896]

Prior to being asked to join the CEOC Board, Stauber had never met with or spoken to Sambur.[3897] Stauber, however, knew Rowan. Their relationship dated back to approximately 1997 when Apollo invested in a joint venture involving Cendant, Stauber's employer at the time.[3898] Stauber became involved in the negotiations regarding that investment as part of his responsibilities in the M&A group at Cendant.[3899] After leaving Cendant, Stauber and Rowan communicated approximately three to four times a year about various investment opportunities and transactions.[3900] In addition, Stauber and Rowan had contacts through a charity Rowan co-

---

[3892] S. Winograd Oct. 21, 2015 Tr. at 25:16-26:17.

[3893] *Id.* at 27:19-28:8.

[3894] *Id.* at 27:19-28:25.

[3895] R. Stauber Sept. 30, 2015 Tr. at 6:23-7:4. *See also Ronen Stauber Biography*, Jenro Capital, LLC, http://www.jenrocapital.com/#%21managing-partner (last visited Feb. 25, 2016).

[3896] R. Stauber Sept. 30, 2015 Tr. at 7:13-19 ("Jenro is a fundless sponsor and advisory vehicle. So I source transactions on behalf of investors on behalf of companies. I advise companies. I advise boards on typically improvements, strategic transactions, tuck-in transactions, international expansion, and the like.").

[3897] *Id.* at 13:25-14:3.

[3898] *Id.* at 14:6-10.

[3899] *Id.* at 14:10-18.

founded.[3901] Stauber has never invested in Apollo or TPG funds or worked at either company or any of the companies in their portfolios.[3902] Like Winograd, prior to joining the CEOC Board, Stauber had no prior business or personal relationship with anyone at TPG or Caesars.

Rowan and Sambur contacted Stauber by telephone in late February 2014 about the possibility of Stauber joining CEOC's Board.[3903] In a subsequent conversation, Sambur explained that Stauber would be an independent director at CEOC.[3904] Stauber understood generally from public information that CEOC was going through a deleveraging process, pushing out maturities and extending runway.[3905] He was told by Sambur that CEOC's parent was going through certain transactions, including the sale of assets, and that once those transactions were completed, independent directors would be added to the CEOC Board.[3906] Stauber officially joined CEOC's Board on June 27, 2014.[3907]

## C. The Examiner's Findings and Conclusions

As discussed in greater detail in the Legal Standards Appendix,[3908] there is a distinction between director "interestedness" (which is relevant to assessing whether directors who stand on both sides of a transaction have breached a duty of loyalty by deriving some personal financial benefit from a transaction)[3909] and "independence," which is a concept that measures whether a director is so "beholden" to a controlling stockholder or some other interested party that he or she is incapable of rendering an independent business judgment with regard to board decisions. The fact that a director has some past or current business or personal relationship is not sufficient to establish lack of independence. Rather, to establish lack of independence, a plaintiff must allege with specificity facts demonstrating that the financial ties, familial affinity, or personal or business relationship are such as to call into serious question the director's ability to exercise his or her own independent and objective judgment in considering a corporate transaction. Moving in the same social circles, sitting on other boards together, contributing to the same charities, and describing each other as friends, is insufficient, without more, to rebut the presumption of independence.[3910]

---

[3900] *Id.* at 14:25-15:19.

[3901] R. Stauber Sept. 30, 2015 Tr. at 14:18-21.

[3902] *Id.* at 15:20-24.

[3903] *Id.* at 7:20-8:8.

[3904] *Id.* at 8:25-9:3.

[3905] *Id.* at 13:3-8.

[3906] R. Stauber Sept. 30, 2015 Tr. at 10:2-11, 19:25-20:7.

[3907] *Id.* at 12:3-5.

[3908] *See* Appendix 5, Legal Standards at Section XI.A.4.

[3909] This is especially relevant where, as here, there are "dual capacity" board members.

[3910] *Beam*, 845 A.2d 1040, 1049-50 (Del. 2004) (the fact that directors "moved in the same social circles, attended the same weddings, developed business relationships before joining the

Here, the evidence presented to the Examiner does not rebut that presumption.  The fact that Winograd worked with some of the Apollo principals at Drexel back in the 1980s is too remote to call into question his ability to act independently.  There are former Drexel employees everywhere.  The occasional business contacts Winograd had with Apollo at Bear Stearns, Merrill Lynch and on the board of an Apollo portfolio company more than a decade ago are similarly unconvincing, as is the fact that Winograd and Rowan have a cordial relationship and contribute to the same charity.  These are precisely the kinds of personal and business ties that Delaware courts have repeatedly found insufficient to rebut the presumption of independence.

The same can be said for Stauber, whose past ties with Rowan and Apollo are even more limited, remote in time and attenuated.  The Examiner met and interviewed both directors and is satisfied that their past relationships with Rowan and Apollo do not come close to compromising their independence.[3911]

---

board, and described each other as 'friends' . . . are insufficient, without more, to rebut the presumption of independence"); *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A. 3d 1, 25-26 (Del. Ch. 2014) ("past business and social connections between [director and top executive] . . . in isolation would not be sufficient to raise a triable issue about [director's] independence" (quoting *In re MFW S'holders Litig.*, 67 A.3d 496, 509-10 (Del. Ch. 2013))).

[3911] Winograd and Stauber would, in the Examiner's view, likewise satisfy the NYSE and NASDAQ tests for director independence. Under those rules, a director is generally not considered independent if, *inter alia*, he/she is or was an employee of the company or otherwise has or recently had significant business ties with the company, an affiliated entity or a controlling stockholder.  *See* NYSE Rule 303A.02 and NASDAQ Rule 5605(a)(2).