**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| **CAESARS ENTERTAINMENT** | ) **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.*, | ) (Jointly Administered) |
|  | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
|  | ) |
|  | ) Re: Docket Nos. 3401 & 3406 |

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS
## (Substantially Unredacted)

**May 16, 2016**
**(initially filed March 15, 2016)**

## APPENDICES 1-6

# APPENDIX 1: GLOSSARY OF DEFINITIONS

"10-K" means the annual Form 10-K filing required by the United States Securities and Exchange Commission.

"10% Second-Priority Notes due 2015" means those certain 10% Second-Priority Senior Secured Notes due 2015 in the aggregate principal amount of $189.9 million.

"10% Second-Priority Notes due 2018" means those certain 10% Second Priority Senior Secured Notes due 2018 in the aggregate principal amount of $4,502.1 million.

"105 Litigation" means the action fashioned *Caesars Entertainment Operating Company et al. v. BOKF, N.A., et al.*, No. 15-00149 (Bankr. S.D.N.Y. Mar. 11, 2015).

"10.75% Senior Notes due in 2016" means those certain 10.75% Senior Notes due in 2016 in the aggregate principal amount of $573.2 million.

"11.25% Senior Secured Notes due 2017" means those certain 11.25% Senior Secured Notes due 2017 in the aggregate principal amount of $2,095.0 million.

"12.75% Second Lien Committee" means the Ad Hoc Committee of 12.75% Second Priority Senior Secured Noteholders.

"12.75% Second Priority Notes due 2018" means those certain Second Priority Senior Notes due 2018 in the aggregate principal amount of $750 million.

"2008 CMBS Financing" means the transaction in which the CMBS PropCos were pledged as collateral for $6.5 billion of mortgage loans, related mezzanine financing and/or real estate term loans.

"2009 Refund" means the $276,578,097 income tax refund resulting from the 2009 NOL carryback of approximately $801,230,654 to tax years 2006 and 2008.

"2009 Trademark License Agreement" means the agreement in or about May 2009 whereby CEOC retained the right to use the WSOP Trademark & IP in connection with the operation of the in-person WSOP tournaments pursuant to a perpetual, royalty-free license.

"2009 WSOP Transaction" means the transfer of CEOC's rights and interests in the WSOP Trademark & IP to CIE in or about May 2009.

"2010 CMBS Loan Amendment" means the August 31, 2010 Agreement to amend the CMBS Financing, titled the Second Amended and Restated Loan Agreement.

"2010 Shared Services Agreement" means the Second Amended and Restated Shared Services Agreement, dated as of August 31, 2010, entered into by and among HOC, HET, certain PropCos (*i.e.* Harrah's Las Vegas Propco, LLC, Harrah's Atlantic City Propco, LLC, Rio

1

Propco, LLC, Flamingo Las Vegas Propco, LLC, Harrah's Laughlin Propco, LLC, Paris Las Vegas Propco, LLC), certain managed properties (*i.e.* Paris Las Vegas Operating Company, LLC, Harrah's Laughlin, Inc., Harrah's Las Vegas, Inc., Harrah's Atlantic City Operating Company, LLC, Rio Properties, Inc., Flamingo Las Vegas Operating Company, LLC) and certain managers (*i.e.* Paris CMBS Manager, LLC, Laughlin CMBS Manager, LLC, HLV CMBS Manager, LLC, HAC CMBS Manager, LLC, Rio CMBS Manager, LLC, and Flamingo CMBS Manager).

"2011 WSOP Transaction" means the transfer of the WSOP Tournament Rights by CEOC to CIE in or about September 2011.

"5.625% Senior Notes due 2015" means those certain 5.265% Senior Notes due 2015, in the aggregate principal amount of $791.8 million issued by CEOC.

"5.75% Senior Notes due 2017" means those certain 5.75% Senior Notes due 2017 in the aggregate principal amount of $538.8 million.

"6.5% Senior Notes due 2016" means those certain $750 million in unsecured notes due 2016 with an interest rate of 6.50%, issued by CEOC in or about June 2006.

"8.5% Senior Secured Notes due 2020" means those certain 8.5% Senior Secured Notes due 2020 in the aggregate principal amount of $1,250.0 million.

"9.% Senior Secured Notes due 2020" means those certain 9.0% Senior Secured Notes due 2020 in the aggregate principal amount of $3,000.0 million.

"A&M" means Alvarez & Marsal Global Forensic and Dispute Services, LLC.

"AC Casinos" means the four Atlantic City Casinos owned by CEC subsidiaries: Caesars Atlantic City, Bally's Atlantic City, Showboat Atlantic City Casino, and Harrah's Resort Atlantic City.

"ACSI" means Atlantic City Showboat, Inc.

"Advisors' Eyes Only" means the term as defined in the Protective Order.

"ADR" means average daily rate.

"Akin Gump" means Akin Strauss Hauer & Feld LLP.

"Annual Plan" means the annual plan projections that Caesars' Planning and Analysis group constructed for the coming year.

"Apollo" means Apollo Global Management, LLC.

"APIC" means Additional Paid in Capital.

"Atlantic Club" means the assets directly or indirectly owned, managed, licensed, leased, comprised of or related to The Atlantic Club Casino Hotel located in Atlantic City, New Jersey.

"Atlantic Club Transaction" means the purchase and subsequent sale of the Atlantic Club in or about December 2013.

"B-7 Term Loan" means the new term loans resulting from the B-7 refinancing.

"B-7 Transaction" means the refinancing by CEOC of the short-term maturities with $1.75 billion of new term loans and the amendment of the first lien credit agreement to extend maturities and provide covenant relief in May and June 2014.

"Baker Tilly Report" means the January 25, 2016 report entitled Project Rubicon, First Amended Interim Report Presented to: The Governance Committee of Caesars Entertainment Operating Company, Inc.

"Bally's Atlantic City" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Bally's Atlantic City Hotel and Casino located in Atlantic City, New Jersey.

"Bally's Las Vegas" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Parball Corporation and Bally's Las Vegas Hotel and Casino located in Las Vegas, Nevada.

"Bank RSA" means the Restructuring Support and Forbearance Agreement entered into by CEOC, CEC, First Lien Bank Lenders, Credit Suisse AG, and Caymans Island Branch on August 21, 2015.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Rule(s)" means the Federal Rules of Bankruptcy Procedure.

"Bill's Lake Tahoe" means the assets directly or indirectly owned, managed licensed, leased, comprising or related to Bill's Lake Tahoe Hotel and Casino located in Lake Tahoe, Nevada.

"BlackRock" means BlackRock, Inc.

"Blackstone" means Blackstone Advisory Partners L.P.

"BOKF Action" means the case fashioned *BOKF, N.A. v. Caesars Entertainment Corporation.*, No. 1:14-cv-01561 (S.D.N.Y. Mar. 3, 2015).

"Bond Guarantee" means collectively, the guarantees provided by CEC to CEOC under the CEOC Notes.  In this Report, the term Bond Guarantee is synonymous with CEC Guarantee.

"CAC" means Caesars Acquisition Company.

"CAC Equity Plan" means the CAC Equity-Based Compensation Plan adopted by the CAC board of directors in April 2014 for officers, employees, directors, individual consultants and advisers of CEC and its subsidiaries.

"Caesars" means the enterprise that consists of Debtors and non-debtors utilizing the Caesars name and/or brand, including without limitation, CEC, CEOC, CERP, CGP, CAC, CIE, CES, and their respective subsidiaries and affiliates.

"Caesars Atlantic City" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Caesars Atlantic City Hotel and Casino located in Atlantic City, New Jersey.

"Caesars Palace" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Caesars Palace Las Vegas Hotel and Casino located in Las Vegas, Nevada.

"CAGR" means compound annual growth rate.

"CAPM" means the capital asset pricing model.

"Cap Method" means the capitalization of earnings method.

"Case" means the jointly administered chapter 11 case fashioned *In re Caesars Entertainment Operating Company, Inc., et al.*, Case No. 15-01145 (ABG), pending before the Illinois Bankruptcy Court.

"Cash Pay Notes" mean those certain senior notes due 2016 with an interest rate of 10.75% issued by CEOC under the PIK Notes Indenture.

"CEC" means Caesars Entertainment Corporation.

"CEC Group" means the consolidated group of entities consisting of Debtors and Net Debtors, with CEC as the parent of the consolidated group for federal income tax purposes

"CEC Guarantee" means collectively, the guarantees provided by CEC to CEOC under the CEOC Notes. In this Report, the term CEC Guarantee is synonymous with Bond Guarantee.

"CEC Guarantee Release" means the purported release(s) of CEC's guarantees of the Debtors' obligations, as described in CEC's Form 8-Ks dated May 6, 2014, June 27, 2014, and August 22, 2014, filed with the United States Securities and Exchange Commission.

"CEC Valuation Committee" means the independent valuation committee of CEC's Board of Directors.

"Centerview" means Centerview Partners LLC.

4

"CEOC" means Caesars Entertainment Operating Company, Inc.

"CEOC 2014 Performance Incentive Plan" means the 2014 Performance Incentive Plan described in CEC's Form 8-K, dated June 27, 2014.

"CEOC Industry Peers/Industry Peers" means those companies identified and utilized as peers of CEOC (*i.e.*, Wynn Resorts, Ltd.; MGM Resorts International; Boyd Gaming Corporation; Penn National Gaming Inc.; Isle of Capri Casinos, Inc.; Pinnacle Entertainment Inc.; Monarch Casino & Resort Inc.; and Churchill Downs Inc.

"CEOC Intercompany Loan" means the $235 million that CEOC loaned to CEC in 2009 and was repaid on June 24, 2010.

"CEOC Notes" means the approximately $14.5 billion in obligations in connection with the 11.25% Senior Secured Notes due 2017, 8.5% Senior Secured Notes due 2020, 9% Senior Secured Notes due 2020, Chester Downs Senior Secured Notes due 2020, 10% Second-Priority Notes due 2015, 10% Second-Priority Notes due 2018, 12.75% Second-Priority Notes due 2018, 5.625% Senior Notes due 2015, 6.5% Senior Notes due 2016, 10.75% Senior Notes due 2016, 5.75% Senior Notes due 2017, and 10.75%/11.5% PIK Notes due 2018 or the PIK Notes.

"CERP" means Caesars Entertainment Resort Properties, LLC.

"CERP Transaction" means CEOC's transfer of equity in the Octavius Tower and LINQ to CEC, and CEC's subsequent transfer to CERP of those assets, along with the transfer to CERP of the Paris, Harrah's Las Vegas, the Flamingo, the Rio, Harrah's Laughlin, and Harrah's Atlantic City, in or about September and October 2013.

"CES" means Caesars Enterprise Services, LLC, a joint venture formed pursuant to a limited liability company agreement among CEOC, CERP and CGP on May 20, 2014.

"CES Agreements" mean the Amended and Restated Limited Liability Company Agreement of Caesars Enterprise Services, LLC and the Omnibus License and Enterprise Services Agreement, both dated as of May 20, 2014.

"CES/Total Rewards Transaction" means the formation of CES, the grant to CES of a non-exclusive, fully sub-licensable, irrevocable, royalty-free, worldwide license to the Total Rewards IP and transfer to CES of company-wide management services which CEOC had previously provided to both CEOC and non-CEOC properties within the Caesars structure.

"CGP" or "Growth" means Caesars Growth Partners, LLC, and, in the context of the CES/Total Rewards Transaction, its subsidiary Caesars Growth Properties Holdings, LLC.

"Challenged Transactions" means the term as defined in *Debtors' Motion for Entry of an Order (I) Appointing an Examiner and (II) Granting Related Relief* [Docket No. 363], at 6-8, filed in the Voluntary Case, referring to ten specific prepetition transactions:  (1) CIE Transaction; (2)

CERP Transaction; (3) Growth Transaction; (4) Four Properties Transaction; (5) Shared Services Joint Venture; (6) B-7 Refinancing; (7) Senior Unsecured Notes Transaction; (8) Intercompany Note Repayment; (9) Showboat Closure; and (10) PIK Toggle Note Repurchase.

"Chapter 11 Cases" means the Involuntary Case and the Voluntary Case, collectively.

"Chester Downs Senior Secured Notes due 2020" means those Chester Downs Senior Secured Notes due 2020 in the aggregate principal amount of $330.0 million.

"CIE" means Caesars Interactive Entertainment, Inc.

"CLC" means Caesars License Company, LLC.

"CMBS ManageCos" means wholly owned subsidiaries of CEC created for each CMBS PropCo in relation to the 2010 CMBS Loan Amendment, including but not limited to, Paris CMBS Manager, LLC for Paris PropCo.

"CMBS Financing" or "CMBS Debt" means the $6.5 billion in debt raised by the CMBS PropCos through the $4 billion CMBS Loan Agreement with JP Morgan Chase Bank, N.A., and $2.5 billion in mezzanine loans from other lenders.

"CMBS IP" means the intellectual property related to the CMBS Properties which was originally owned by CLC and was subsequently transferred to the CMBS PropCos as part of the 2010 CMBS Loan Amendment.

"CMBS Lenders" means the lenders from time to time party to the CMBS Financing.

"CMBS Loan Agreement" means the $4 billion loan agreement with JP Morgan Chase Bank, N.A., which was executed on January 28, 2008, and amended on March 22, 2008.

"CMBS OpCos" means the Operating Company for each CMBS Property.

"CMBS PropCos" means Rio PropCo, LLC, Paris PropCo, LLC, Flamingo PropCo, LLC, Harrah's Las Vegas PropCo, LLC, Harrah's Atlantic City PropCo, LLC, and Harrah's Laughlin PropCo, LLC.

"CMBS Properties" means Harrah's Atlantic City Holdings, LLC; Harrah's Las Vegas, LLC; Harrah's Laughlin, LLC; Flamingo Las Vegas Holdings, LLC; Paris Las Vegas Holding, LLC; and Rio Properties, LLC.

"CMBS Transactions" means the January 28, 2008 transfer of eight properties, including Harrah's Las Vegas, Harrah's Atlantic City, Harrah's Lake Tahoe, the Rio, the Flamingo, Harvey's Lake Tahoe, Bill's Lake Tahoe and the Showboat Casino, and their related assets from CEOC to CEC for the stated purpose of securing $6.5 billion in mortgage loans and/or related mezzanine financing and/or real estate term loans; the May 22, 2008 transfer of the Paris, Harrah's Laughlin and their related assets from CEOC to CEC; and the May 22, 2008 transfer of Harrah's Lake Tahoe, Harvey's Lake Tahoe, Bill's Lake Tahoe and the Showboat Casino.

"COD" means Cancellation of Indebtedness.

"CPI" means the consumer price index.

"CPLV" means Caesars Palace Las Vegas.

"Court" means the United States Bankruptcy Court for the Northern District of Illinois.

"CRDA" means the New Jersey Casino Reinvestment Development Authority.

"Credit Suisse Action" means the case fashioned *Credit Suisse AG, Cayman Islands Branch v. Appaloosa Investment Limited Partnership I et al.*, Index No. 651134/2015 (N.Y. Sup. Ct. N.Y. Cnty. Apr. 7, 2015).

"Cross-Over Incentive Plan" means the CEC board's adoption, in or about April 2014, of an equity-based compensation plan providing for certain CEC and/or CEOC directors, officers, employees, consultants, advisors and others to be compensated through shares of stock in CAC.

"Cross-Play" means the amount of Theo imported to or exported from a certain CEC property.

"CZR" means Caesars and is the stock symbol for Caesars Entertainment Corporation.

"D&P" or "Duff& Phelps" means Duff & Phelps Corporation.

"Danner Action" means the case fashioned *Danner v. Caesars Entertainment Corporation. et. al.*, No. 1:14-cv-7973-SAS (S.D.N.Y. Feb 19, 2015).

"DCF" means the net present value of the future cash flows.

"DCF Method" means a valuation methodology under the income approach utilizing a discounted cash flows analysis.

"Debtors" (and each a "Debtor") means all debtors and debtors-in-possession in the jointly-administered chapter 11 case fashioned *In re Caesars Entertainment Operating Company, Inc., et al.*, Case No. 15-01145 (ABG) (Bankr. N.D. Ill.). A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.primeclerks.com/CEOC.

"Debtors' April 7th Presentation" means Debtors' Presentation to the Examiner, dated April 7, 2015.

"Debtors' Examiner Motion" means the *Debtors' Motion for an Order (A) Appointing an Examiner and (B) Granting Related Relief* [Docket No. 363], filed in the Voluntary Case.

"Debtors' NOL" means the NOL generated by the Debtors for tax years 2005 through 2014.

"Debtors' Subsidiaries" means the Debtors' subsidiaries, whether or not each of those subsidiaries is a Debtor.

"Delaware Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware, Judge Kevin Gross presiding.

"Deloitte" means Deloitte Touche Tohmatsu Limited.

"Depository Access Parties" means the Initial Depository Access Parties and the Depository Designees as defined in the Discovery Protocol Order.

"Discounted Cash Flow" means the net present value of the future cash flows.

"Discovery Material" means the term as defined in the Discovery Protocol Order.

"Discovery Protocol Motion" means the *Motion of the Examiner for an Order (I) Approving Protocol and Procedures Governing Examiner Discovery, (II) Approving Establishment of a Document Depository, and (III) Granting Related Relief* [Docket No. 1279], filed in the Voluntary Case.

"Discovery Protocol Order" means the *Order (I) Approving Protocol and Procedures Governing Examiner Discovery, (II) Approving Establishment of a Document Depository, and (III) Granting Related Relief* [Docket No. 1576], entered in the Voluntary Case.

"DJ Action" means the case fashioned *Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation v. Appaloosa Investment LP et al.*, Index No. 652392/2014 (N.Y. Sup. Ct. N.Y. Cnty. Aug. 5, 2014).

"Docket" means the docket in the Voluntary Case, Case No. 15-1145(ABG) (Bankr. N.D. Ill.).

"Document Depository" means the depository into which all non-Privileged documents provided to the Examiner were deposited as set forth in the Discovery Protocol Order.

"Easement Lots" means the easements on four lots (containing numerous parcels) totaling approximately 25.8 acres of land that is directly east of the LINQ Hotel & Casino, Flamingo Las Vegas Hotel & Casino, and the Cromwell.

"EBIT" means Earnings Before Interest and Taxes.

"EBITDA" means Earnings Before Interest, Taxes, Depreciation, and Amortization.

"EBITDAM" means Earnings Before Interest, Taxes, Depreciation, Amortization and Management fees.

"EBITDAR" means Earnings Before Interest, Taxes, Depreciation, Amortization and Rent expense.

"EBITDARM" means Earnings Before Interest, Taxes, Depreciation, Amortization, Rent expense and Management fees.

"EBITDA margin" means EBITDA as a percentage of net revenue.

"Evercore" means Evercore Group LLC.

"Examiner" means Richard J. Davis, in his capacity as the court-appointed examiner in the Case.

"Examiner's Eyes Only" means the term as defined in the Protective Order.

"Examiner Order" means *Order Granting in Part and Denying in Part Motions to Appoint Examiner* [Docket No. 675], filed on March 12, 2015, in the Voluntary Case.

"Fairness Committee" means Perella Weinberg Partners LP's Fairness Committee in connection with the CERP Transaction.

"FASB" means Financial Accounting Standards Board.

"February Business Plan" means the business plan containing projections provided by management on February 5, 2014 with respect to the Four Properties Transaction.

"Federal Rule(s)" means the Federal Rules of Civil Procedure.

"Firmex" means Firmex, Inc., the Document Depository vendor.

"Final Report" means the Report of Richard J. Davis, Examiner, dated March 15, 2016.

"First Day Memorandum" means *Memorandum in Support of Chapter 11 Petitions* [Docket No. 4], dated January 15, 2015, filed in the Voluntary Case.

"First Lien Bank Claims" means certain claims held by First Lien Bank Lenders

"First Lien Banks Committee" means the Ad Hoc Group of First Lien Bank Lenders.

"First Lien Bank Lenders" means certain beneficial holders of claims pursuant to first lien bank debt incurred by CEOC under the Third Amended and Restated Credit Agreement, dated as of July 25, 2014.

"First Lien Notes Committee" means the Ad Hoc Committee of First Lien Noteholders.

"First Lien Notes Trustee" means the UMB Bank, N.A., solely in its capacity as successor indenture trustee for the Debtors' first lien notes.

"First Lien RSA" means the Fourth Amended and Restated Restructuring Support Agreement entered into by CEOC, CEC, and more than 80% of the first lien noteholders on July 31, 2015.

"Flamingo" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Flamingo Las Vegas Holding, LLC and the Flamingo Las Vegas Hotel and Casino located in Las Vegas, Nevada.

"FMV" means fair market value, the amount at which a property would change hands between a willing seller and willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts.

"Friedman Kaplan" means Friedman Kaplan Seiler & Adelman LLP.

"Four Properties Transaction" means the transfer to CGP, in or about May 2014, of The Cromwell, The Quad, Bally's Las Vegas, Harrah's New Orleans and the rights to certain related management fees for each of the above assets.

"Funding of Construction" means the funding of construction of the LINQ, Octavius, and Horseshoe Baltimore.

"GAAP" means Generally Accepted Accounting Principles.

"GAFO" means the sales at stores that sell merchandise normally sold in department stores (*i.e.*, retail businesses) per the United States Census Bureau.

"GDP" means Gross Domestic Product.

"GLMI" means the general ledger maintenance initiative which commenced in 2013 to bring all subsidiary equity accounts into compliance with SEC reporting requirements.  This initiative was also referred to as Project Simplification.

"Governance Committee" means the governance committee of the CEOC Board of Directors, formed in or after June 2014, consisting of two independent directors that were tasked to investigate potential claims the Debtors and their creditors may have against CEC and/or its affiliates.

"GPCs" means guideline public companies.

"GPC Method" means the guideline public company method.

"Growth Assets" means the assets CEOC sold to CGP as part of the Growth Transaction: Planet Hollywood, equity interest in Horseshoe Baltimore, and a 50% stake in the management fee stream associated with each property.

"Growth Transaction" means the formation of CGP, the transfer to CGP in or about October 2013 of certain assets of both CEOC and CEC, including but not limited to (1) Planet Hollywood, an interest in Horseshoe Baltimore, and related management services agreements, (2) the CEC stake in CIE, and (3) approximately $1.1 billion of CEOC's senior unsecured notes owned by Harrah's BC, Inc.

"GSO" means GSO Capital Partners LP.

"Harrah's Ak-Chin" means the resort and casino owned by the Ak-Chin Indian Community and operated by CEC, located near Maricopa, Arizona.

"Harrah's Atlantic City" or "HAC" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Atlantic City Holding, LLC and Harrah's Resort Atlantic City located in Atlantic City, New Jersey.

"Harrah's Cherokee" means the resort and casino owned by the Eastern Band of Cherokee Indians and operated by CEC, located on the Qualla Boundary in Cherokee, North Carolina.

"Harrah's Council Bluffs" means assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Council Bluffs Casino & Hotel located in Council Bluffs, Iowa.

"Harrah's Gulf Coast" means assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Gulf Coast Casino & Hotel located in Biloxi, Mississippi.

"Harrah's Joliet" means the riverboat casino substantially owned and operated by CEC, located in Joliet, Illinois.

"Harrah's Lake Tahoe" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Lake Tahoe Hotel and Casino located in Lake Tahoe, Nevada.

"Harrah's Las Vegas" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Las Vegas, LLC and the Harrah's Las Vegas Hotel and Casino located in Las Vegas, Nevada.

"Harrah's Laughlin" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Laughlin, LLC and the Harrah's Laughlin Hotel and Casino in Laughlin, Nevada.
**"**Harrah's Louisiana Downs" means the thoroughbred racetrack with slot machines substantially owned and operated by CEC, located in Bossier City, Louisiana.

"Harrah's Metropolis" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Metropolis, a dockside casino located in Metropolis, Illinois.

"Harrah's New Orleans" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to JCC Holding Company II, LLC, JCC NewCo Parent (as that term is defined and described in the May 6, 2014 Form 8-K filed with the United States and Exchange Commission by CEC and CEOC), and Harrah's New Orleans Hotel and Casino located in New Orleans, Louisiana.

"Harrah's North Kansas City" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's North Kansas City, a dockside casino located in North Kansas City, Missouri.

"Harrah's Philadelphia" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Chester Downs & Marina and the Harrah's Philadelphia Casino and Racetrack in Chester, Pennsylvania.

"Harrah's Reno" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Reno Hotel and Casino in Reno, Nevada.

"Harrah's Rincon" means the resort and casino, presently known as Harrah's Resort Southern California, owned by the Eastern Band of Cherokee Indians and operated by CEC, located in Valley Center, California.

"Harvey's Lake Tahoe" means the assets directly or indirectly owned managed, licensed, leased, comprising or related to Harvey's Lake Tahoe Hotel and Casino located in Lake Tahoe, Nevada.

"HET" means Harrah's Entertainment, Inc.

"HIE" means Harrah's Interactive Entertainment, Inc.

"HIE Holdings" means HIE Holdings, Inc.

"High Roller" is the 550 foot observation wheel located in the LINQ.

"HOC" means Harrah's Operating Company, Inc.

"Horseshoe Baltimore" means the assets and operations directly or indirectly owned, managed, licensed, leased at any time by CEC, CBAC Gaming, LLC, CBAC Borrower, LLC, CR Baltimore Holdings LLC, CVPR Gaming Holdings, LLC, CGP, Caesars Baltimore Acquisition Company LLC and Caesars Baltimore Management Company, LLC, and comprising or related to Horseshoe Baltimore Casino.

"Horseshoe Council Bluffs" means assets directly or indirectly owned, managed, licensed, leased, comprising or related to Horseshoe Council Bluffs Casino & Hotel located in Council Bluffs, Iowa.

"Horseshoe Casino Hammond" means assets directly or indirectly owned, managed, licensed, leased, comprising or related to the Horseshoe Casino Hammond located in Hammond, Indiana.

"Horseshoe Southern Indiana" means assets directly or indirectly owned, managed, licensed, leased, comprising or related to Horseshoe Southern Indiana, a dockside casino complex located in Elizabeth, Indiana.

"Horseshoe Tunica" means assets directly or indirectly owned, managed, licensed, leased, comprising or related to Harrah's Casino Tunica located in Tunica, Mississippi.

"HRC" means the Human Resources Committee of the CEC Board.

"Illinois Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois.

"Industry Peer" means those companies identified and utilized as peers of CEOC (*i.e.*, Wynn Resorts, Ltd.; MGM Resorts International; Boyd Gaming Corporation; Penn National Gaming Inc.; Isle of Capri Casinos, Inc.; Pinnacle Entertainment Inc.; Monarch Casino & Resort Inc.; and Churchill Downs Inc.

"Initial Public Offering" means the first bona fide firm commitment underwritten public offering and sale of common stock, limited liability company interests or other equity securities of the Company or its successors for cash pursuant to an effective registration statement (other than Form S-4, S-8 or a comparable form) under the Securities Act, and in which such shares of common stock, limited liability company interests or other equity securities are listed on the New York Stock Exchange, the NASDAQ Stock Market or another internationally recognized stock exchange.

"Insider Transaction" means the term as defined in Exhibit A to the *Motion of Official Committee of Second Priority Noteholders for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* [Docket No. 367], at 2-3, filed in the Voluntary Case.

"Intellectual Property Assignment Agreements" or "IPAAs" means collectively, the individual agreements with each CMBS PropCo and CLC for stated consideration of $100 per CMBS PropCo whereby CLC assigned all of its right, title and interest in the CMBS IP to each respective CMBS PropCo.

"Intercompany Notes" means the 13 notes outstanding as of the Petition Date (defined below) issued between CEOC and certain of its debtor and non-debtor subsidiaries.

"Intercompany Loan/Note Repayments" means the purchase, repayment or extinguishment of intercompany loans, notes or bonds held by Caesars and the Sponsors.

"Intercompany Revolver" means the unsecured revolving credit facility entered into by CEOC and CEC on or about August 1, 2008, as amended and restated.

"Intercompany Transactions" means transactions and agreements by and between Caesars, including Debtors and non-Debtor subsidiaries of the Debtors, other than the Intercompany Loan/Note Repayments that would rise to the level of being disclosed in an audited financial statement prepared in accordance with the generally accepted accounting principles (GAAP) adopted by the United States Securities and Exchange Commission.

"Investigation" means the investigation in the Chapter 11 Cases conducted by the Examiner and his counsel, consultants, accountants, financial advisors, appraisers or other agents.

"Involuntary Case" means the involuntary case fashioned *In re Caesars Entertainment Operating Company, Inc.*, Chapter 11 Case No. 15-10047 (KG) (Bankr D. Del.), which was, upon transfer to the Illinois Bankruptcy Court, appointed Case No. 15-3193 (ABG), where it is now pending.

"Involuntary DE Docket" means the docket in the Involuntary Case as filed in the Delaware Bankruptcy Court, Case No. 15-10047(KG) (Bankr. D. Del.)

"Involuntary Docket" means the docket in the Involuntary Case as transferred to the Illinois Bankruptcy Court, Case No. 15-3193 (ABG) (Bankr. N.D. Ill.).

"Involuntary Petition Date" means January 12, 2015.

"IPAA" means Intellectual Property Assignment Agreements.

"IRC" means Internal Revenue Code.

"IRR" means Integra Realty Resources – Coastal, NJ.

"IRS" means the Internal Revenue Service.

"January Business Plan" means the business plan containing projections initially provided to Centerview and CAC on January 17, 2014 with respect to the Four Properties Transaction.

"Kirkland & Ellis" means Kirkland & Ellis, LLP.

"KPMG" means KPMG LLP, the audit and tax advisory firm which is the US member firm of KPMG International Cooperative.

"Kramer Levin" means Kramer Levin Naftalis & Frankel LLP.

"Latham" means Latham & Watkins LLP.

"LBO" means the Sponsors' acquisition of CEC in a $30.7 billion leveraged buyout that closed on January 28, 2008.

"LBO Date" means January 28, 2008.

"LINQ" means the retail, dining and entertainment corridor owned by Octavius LINQ Intermediate Hold Co. that is centrally located on the Las Vegas strip.

"LINQ/Octavius" means the collective assets involved in the CERP Transaction: Octavius Tower, RDE Casino (O'Sheas), LINQ Retail, and the Observation Wheel (High Roller).

"LINQ/Octavius Credit Agreement" means the credit agreement that CEC, Caesars LINQ, LLC, and Caesars Octavius, LLC entered into on April 25, 2011.

"LINQ Retail" means the dining, retail and entertainment component of LINQ.

"LRP" means long-range plan, the five year projections that the Caesars' Planning and Analysis group constructed each year along with the Annual Plan.

"LSE" means Luskin, Stern, & Eisler LLP.

"LTM" means the last twelve months.

"Management Agreement(s)" means any agreement by and between any of the Caesars entities, and by and between any Caesars entity and the Sponsors as to any of the Properties.

"MeehanCombs Action" means the action fashioned *MeehanCombs Global Credit Opportunities Master Fund, LP et al. v. Caesars Entertainment Corp. et al.*, No. 1:14-cv-07091-SAS (S.D.N.Y. Sept. 3, 2014).

"Mesirow" means Mesirow Financial Consulting, LLC.

"MFC Report" means The Project Rubicon Interim Report Presented to the Governance Committee of Caesars Entertainment Operating, Inc., dated December 14, 2014, presented by Mesirow Financial Consulting, LLC.

"Monitoring Fees" were paid to the Sponsors and described in the SSA as "compensation for the services provided" by the Sponsors, but just as with the Transaction Fee (defined below), the SSA did not require the Sponsors to actually provide any services in order to receive this fee.

"NOL" means Net Operating Loss.

"Noteholder Committee" means the Official Committee of Second Priority Noteholders.

"Noteholders Committee April 9th Presentation"  means Materials Prepared for Richard J. Davis Examiner Presented by The Official Committee of Second Priority Noteholders, dated April 9, 2015.

"Noteholders' Committee Examiner Motion" means the *Motion of the Official Committee of Second Priority Noteholders for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* [Docket No. 367], filed on February 17, 2015, in the Voluntary Case.

"November 2012 Amendment" means the Amended and Restated Credit Agreement dated as of November 14, 2012, among CEOC and CEC.

"Octavius" means the Octavius Tower within Caesars Palace owned by Octavius LINQ Intermediate Hold Co.

"Octavius Tower" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to the Octavius Tower, located in Las Vegas, Nevada.

"OMM" means O'Melveny & Myers LLP.

"OpCo" means a separate operating company as contemplated by the RSA to reorganize the Debtors' prepetition corporate structure.

"Original RSA" means the *Third Amended & Restated Restructuring Support and Forbearance Agreement* [Docket No. 260], dated December 19, 2014, together with a restructuring term sheet attached thereto.

"OCSPN Materials" means *Materials Prepared for Richard J. Davis, Examiner*, dated April 9, 2015, presented by The Official Committee of Second Priority Noteholders.

"P&A" means Caesars' Planning and Analysis group.

"Parcels" means the 31 acres of unimproved land that were transferred from CEOC to CGP along with the three Las Vegas Properties as part of the Four Properties Transaction.

"Paris" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Paris Las Vegas Holding, LLC and the Paris Las Vegas Hotel and Casino located in Las Vegas, Nevada.

"Paul Weiss" means Paul, Weiss, Rifkind, Wharton & Garrison LLP.

"Perella" means Perella Weinberg Partners LP.

"Perella Opinion" means Perella's final opinion letter to the CEOC Board of Directors in connection with the CERP Transaction, dated October 11, 2013.

"Petition Dates" means January 12, 2015, and January 15, 2015, respectively, the Voluntary Petition and Involuntary Petition Dates.

"Petitioning Creditors" means Appaloosa Investment Limited Partnership I, OCM Opportunities Fund VI, L.P. and Special Value Expansion Fund, LLC.

"Petitioning Creditors' Examiner Motion" means the *Motion for Appointment of Examiner with Access to and Authority to Disclose Privileged Materials* [Docket No. 10], filed in Case No. 15-10047-KG (Bankr. D. Del.), on January 12, 2015, by the Petitioning Creditors.

"PIK" means Payment-In-Kind notes.

"PIK Notes" means that certain $17 million in senior PIK toggle notes with rates of 10.75% or 11.5% due 2018, issued by CEOC.

"PIK Notes Indenture" means that certain Indenture dated as of February 1, 2008 pursuant to which CEOC issued the PIK Toggle Notes and the Cash Pay Notes..

"PIK Notes Transaction" means the repurchase of PIK Toggle Notes in or about November or December 2014.

"PIP" means  the CEOC 2014 Performance Incentive Plan.

"Planet Hollywood" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Planet Hollywood Resort & Casino in Las Vegas, Nevada, and other assets directly or indirectly owned, managed, licensed and/or leased by PHW Las Vegas, LLC and PHW Manager, LLC.

"Preferred Stock" means the stated face value of $15 million in preferred stock in Topco that CEOC received as consideration for the transfer of the WSOP Trademark and IP.

"Project BBQ" means the project and related advisory work that gave rise to the Four Properties Transaction.

"Project Citizen" means the project and related advisory work that gave rise to the CERP Transaction.

"Project Forest" means the project through which Booz Allen Hamilton was hired to advise Caesars on its entry into the online gaming business and gave rise to the 2009 WSOP Transaction.

"Project Hermes" means the project and related advisory work that gave rise to all or any part of transactions, agreements, and/or relationships involving Planet Hollywood and/or CIE.

"Project LINQ" means the construction project giving rise to The LINQ Hotel & Casino and/or LINQ Las Vegas, located in Las Vegas, Nevada.

"Project Positive" means the project and related advisory work that gave to the Four Properties Transaction.

"Project Simplification" also referred to as GLMI was a review of general ledger to determine out of balance intercompany accounts to determine appropriate eliminations for the years 2010, 2011 and 2012.

"Project Songbird" means the project, deal and subsequent efforts to revamp PH Live at Planet Hollywood, including the contract with Britney Spears.

"PropCo" means a separate property company as contemplated by the RSA and in an effort to reorganize the Debtors' prepetition corporate structure.

"Properties" means each real property asset, casino, hotel, or operating unit, that were or are owned or managed by Caesars during the period from the LBO Date to the Petition Date, including, without limitation, LINQ, Octavius, Planet Hollywood, Horseshoe Baltimore, Atlantic Club, The Cromwell, The Quad, Bally's Las Vegas, Harrah's New Orleans, Showboat Casino, Harrah's Las Vegas, the Flamingo, Paris, Harrah's Atlantic City, Harrah's Lake Tahoe, the Rio, Harvey's Lake Tahoe, Bill's Lake Tahoe, Caesars Palace, and any undeveloped real estate

"Property Management Fees" means any and all fees, whether paid to the Debtors, CEC, Sponsors or Affiliates, periodically or otherwise, for the property management and operation services.

"Proskauer" means Proskauer Rose LLP.

"Protective Order" means the *Agreed Protective Order* [Docket No. 1575], entered on May 18, 2015.

"PwC" means PricewaterhouseCoopers.

"Quad" means the casino currently known as "O'Shea's Casino," which is housed within the LINQ Hotel & Casino, adjacent to the LINQ Retail district.

"REIT" means real estate investment trust.

"Recession" means the recession the United States economy experienced from January 2008 through June 2009.

"RevPAR" means Revenue Per Available Room.

"Rio" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Rio Properties, LLC, and the Rio Property located in Las Vegas, Nevada.

"RFR Method" means the relief from royalty method utilized by KPMG when valuing the intellectual property for various Caesars Properties including the CMBS Properties.

"RSA" means the *Third Amended & Restated Restructuring Support and Forbearance Agreement* [Docket No. 260], dated December 19, 2014, as amended and restated from time to time.

"RSA Transaction" means the independence and disinterestedness of the directors who directed the investigation performed by the CEOC Governance Committee and approved the RSA.

"SAC" means Showboat Atlantic City or Showboat Casino.

"Sale of Equity" means the sale of a portion of CEC's equity in CEOC in or after May 2014.

"SEC" means the United States Securities and Exchange Commission.

"Second Lien Committee" means the Official Committee of Second Priority Noteholders.

"Second Lien RSA" means the Restructuring Support and Forbearance Agreement entered into by CEOC, CEC and certain second lien noteholders on July 20, 2015.

"Senior Unsecured Notes Transaction" means the agreement announced in or about August 2014 with holders of CEOC's 6.50% Senior Notes due 2016 and CEOC's 5.75% Senior Notes due 2017.

"Showboat" or "Showboat Casino" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to The Showboat Atlantic City located in Atlantic, City, New Jersey.

"Showboat Closure" means the closing of CEOC's Showboat Atlantic City in Atlantic City, New Jersey in or about June 2014 and to the subsequent sale of the Showboat Casino.

"SLCFC" means state law constructive fraudulent conveyance claims.

"Solvency Dates" means the end of each calendar year 2008 through 2014.

"Solvency Tests" means the balance sheet test, inadequate capital test, and cash flow/inability to pay test.

"Sponsor(s)" means either or all of Apollo Global Management, Inc. and TPG Capital, LP.

"Sponsor Management Fees" means any investment and portfolio management fees relating to Caesars entities and paid to the Sponsors their Affiliates or representatives (including, without limitation, CEC).

"Sponsor Payments" means any payment to the Sponsors, other than Sponsor Management Fees, including but not limited to fees paid to the Sponsors arising out of any services or other similar agreements.

"SSA" means the Services Agreement entered into by the Sponsors, through certain of their affiliats, and CEC's predecessor, Harrah's Entertainment Inc., as part of the LBO, dated January 28, 2008.

"SSLR" means Senior Secured Leverage Ratio.

"Stockton College" means Stockton University, formerly known as, The Richard Stockton College of New Jersey.

"Subject Transactions" means the transactions and subjects within the scope of the Examiner's Investigation, including, without limitation, the "Challenged Transactions" and "Insider Transactions."

"Suspended COD Income" means the amount of COD income realized in 2009 and 2010 which was deferred in accordance with an election under IRC section 108(i) and which was required,

under such election, to be reported on a pro rata basis in each of the years from 2014 through 2018.

"System-Wide Agreements" means collectively, the System-Wide Amended and Restated License Agreements dated August 31, 2010 entered into by CLC and the CMBS ManageCos, CMBS OpCos and CMBS PropCos, granting the CMBS ManageCos, CMBS OpCos and CMBS PropCos non-exclusive, royalty free and nontransferable licenses to use, *inter alia*, Total Rewards in connection with the operation of each CMBS Property.

"Tender Offers" means those certain cash tender offers for CEOC's 5.625% Senior Notes due 2015 and 10% Second Lien Notes due 2015, announced in or about May 2014.

"The Cromwell" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to Corner Investment Company, LLC and/or CIC NewCo Parent (as that term is defined and described in the May 6, 2014 Form 8-K filed with the United States Securities and Exchange Commission by CEC and CEOC), and the casino and hotel previously known as Bill's Gamblin' Hall & Saloon located in Las Vegas, Nevada.

"The Quad" means the assets directly or indirectly owned, managed, licensed, leased, comprising or related to 3535 LV Corporation and The Quad Resort & Casino located in Las Vegas, Nevada, before it was renamed the LINQ Hotel & Casino.

"Theo" means the mathematical equation to estimate how much CEC theoretically believes the casino will win from a customer based on probability (luck is removed from the equation).

"TopCo" means HIE Holdings Topco, Inc.

"TotalPar" means total per available room and includes the total cash rate earned per occupied hotel room and the Theo revenue associated with the Total Rewards member occupying each room.

"Total Rewards" means the customer loyalty program owned, operated, or utilized by CEC and CEOC, that provides information about past, present or prospective customers and their preferences in connection with gaming and non-gaming activities.

"Total Rewards IP" means a non-exclusive perpetual license for certain intellectual property, including Total Rewards, that was contributed by CEOC to CES.

"TPG" means TPG Global, LLC.

"Trademarks Transfer" means the transfer of certain of the Debtors' trademarks to CEC subsidiaries in or about August 2010.

"Transaction Fee" means the $200 million fee the Sponsors received at the time of the LBO and has been referred to by some as the equivalent of a "deal fee".

"Transactions" means the following transactions: (1) 2009 World Series of Poker Transaction; (2) Trademarks Transfer; (3) 2011 World Series of Poker Transaction; (4) CERP Transaction;

(5) CMBS Transactions; (6) Growth Transaction; (7) Atlantic Club Transaction; (8) Four Properties Transaction; (9) Undeveloped Land Transfers; (10) CES/Total Rewards Transaction; (11) B-7 Transaction; (12) Tender Offers; (13) Intercompany Loan/Note Repayments; (14) Showboat Closure; (15) Senior Unsecured Notes Transaction; and (16) PIK Notes Transaction.

"Transferred Assets" means those assets transferred in conjunction with the 2009 WSOP Transaction, the 2011 WSOP Transaction, the CERP Transaction, the Growth Transaction, and the Four Properties Transaction.

"TTM" means trailing twelve months.

"Tunica Roadhouse Hotel & Casino" means assets directly or indirectly owned, managed, licensed, leased, comprising or related to Tunica Roadhouse Hotel & Casino located in Tunica, Mississippi.

"UCC" means the Official Committee of Unsecured Claimholders.

"UCC Monitoring Fees Memo" means UCC Memo re Potential Claim to Recover Monitoring Fees Charged by Sponsors Under Services Agreement, dated December 17, 2015.

"UFCA" means the Uniform Fraudulent Conveyances Act.

"UFTA" means the Uniform Fraudulent Transfer Act.

"UMB Bank Action" means the action fashioned *UMB Bank v. Caesars Entertainment Corp. et al.*, C.A. No. 10393-VCG (Del. Ch. Nov. 11, 2014).

"UMB NY Action" means the action fashioned *UMB Bank, N.A. v. Caesars Entertainment Corp.*, No. 1:15-cv-4634-SAS (S.D.N.Y. June 15, 2015).

"Undeveloped Land Transfers" means the sale of any parcels of undeveloped land in Las Vegas, Nevada, or elsewhere from certain Debtor entities to non-Debtor entities.

"USPTO" means the United States Patent and Trademark Office.

"U.S. Trustee" means the United States Trustee.

"Voluntary Case" means the jointly administered chapter 11 cases fashioned *In re Caesars Entertainment Operating Company, Inc.*, Chapter 11 Case No. 15-1145(ABG), pending before the Illinois Bankruptcy Court.

"Voluntary Petition Date" means January 15, 2015.

"VRC" means Valuation Research Corporation.

"W&S" means Winston & Strawn LLP.

"WACC" means the weighted average cost of capital.

"<u>Weil</u>" means Weil, Gotshal & Manges LLP.

"<u>Wilmington Savings</u>" means the action fashioned *Wilmington Savings Fund Society FSB v. Caesars Entm't Corp. et al.*, C.A. No. 10004-VCG, pending before the Delaware Court of Chancery.

"<u>Wilmington Trust Action</u>" means the action fashioned *Wilmington Trust Nat'l Assoc. v. Caesars Entm't Corp.*, No. 1:15-cv-08280, pending before the Southern District of New York.

"<u>Working Capital Ratio</u>" means current assets divided by current liabilities.

"<u>WPU</u>" means win per unit.

"<u>WSOP</u>" means the World Series of Poker.

"<u>WSOP Trademark & IP</u>" means the existing WSOP sponsorship, media, and licensing business and the rights in the WSOP marks and related intellectual property that CEOC sold to CIE in or about May 2009.

"<u>WSOP Tournament Rights</u>" means the rights to hold live, in-person WSOP events that CEOC transferred, through a series of steps, in the 2011 WSOP Transaction.

# APPENDIX 2: LIST OF SUBPOENAS SERVED

| Date Served | Entity |
|---|---|
| May 18, 2015 | Caesars Entertainment Operating Company |
| May 18, 2015 | Caesars Acquisition Company |
| May 18, 2015 | Caesars Growth Partners, LLC |
| May 18, 2015 | Caesars Entertainment Corporation |
| May 18, 2015 | Caesars Interactive Entertainment |
| May 18, 2015 | Caesars Entertainment Resort Properties, LLC |
| May 18, 2015 | Caesars Enterprise Services, LLC |
| May 18, 2015 | Harrah's BC |
| May 18, 2015 | HIE Holdings |
| May 18, 2015 | Apollo Global Management, LLC |
| May 18, 2015 | TPG Capital, L.P. |
| May 26, 2015 | Centerview Partners |
| May 26, 2015 | Evercore Partners |
| May 26, 2015 | Lazard Ltd. |
| May 26, 2015 | Moelis & Company |
| May 29, 2015 | Perella Weinberg Partners L.P. |
| May 29, 2015 | Valuation Research Corporation |
| June 1, 2015 | Duff & Phelps |
| June 5, 2015 | Latham & Watkins LLP |
| June 5, 2015 | O'Melveny & Myers LLP |
| June 5, 2015 | Reed Smith LLP |
| June 5, 2015 | Weil, Gotshal & Manges LLP |
| June 5, 2015 | Kirkland & Ellis LLP |
| June 5, 2015 | Morrison & Foerster LLP |
| June 5, 2015 | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| June 8, 2015 | Skadden, Arps, Slate, Meagher, & Flom LLP |
| June 24, 2015 | Caesars Entertainment Operating Company |
| June 24, 2015 (LBO) | Caesars Growth Partners, LLC |
| June 24, 2015 (LBO) | Caesars Entertainment Corporation |
| June 24, 2015 (LBO) | Caesars Entertainment Resort Properties, LLC |
| June 24, 2015 (LBO) | Apollo Global Management, LLC |
| June 24, 2015 (LBO) | TPG Capital, L.P. |
| July 1, 2015 | Citigroup, Inc. |
| July 10, 2015 | Deloitte & Touche LLP |
| July 20, 2015 | KPMG LLP |
| July 24, 2015 | Credit Suisse Securities |
| July 28, 2015 | PricewaterhouseCoopers LLP |
| July 31, 2015 (Depo) | Caesars Entertainment Operating Company |

| July 31, 2015 (Depo) | Caesars Entertainment Corporation |
|---|---|
| July 31, 2015 (Tax) | Caesars Entertainment Operating Company |
| July 31, 2015 (Tax) | Caesars Entertainment Corporation |
| August 6, 2015 | Paulson Credit Opportunities Master |
| August 6, 2015 | Paulson Recovery Master |
| August 6, 2015 | Scoggin Int'l Fund |
| August 6, 2015 | Scoggin Capital Management II |
| August 7, 2015 | Chatham Asset High Yield Master Fund |
| August 7, 2015 | Chatham Eureka Fund |
| August 12, 2015 | GSO Capital Partners |
| August 12, 2015 | Mason Capital Management |
| August 12, 2015 | Nokota Management |
| August 12, 2015 | Omega Advisors |
| August 12, 2015 | Perry Capital |
| August 12, 2015 | Pointstate Capital |
| August 12, 2015 | Rockbridge Growth Equity |
| August 19, 2015 (LBO) | O'Melveny & Myers LLP |
| August 19, 2015 (LBO) | Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| August 21, 2015 | Friedman Kaplan Seiler & Adelman LLP |
| September 1, 2015 | Blackstone Group |

# APPENDIX 3: WITNESS INTERVIEW LIST

| FORMAL INTERVIEWS | | |
| --- | --- | --- |
| CAESARS | | |
| Witness Name | Interview Date(s) | Title(s) |
| Abrahams, Craig | 10/07/2015; 01/29/2016 | President of Caesars Interactive Entertainment since February 2015;<br><br>Chief Financial Officer of Caesars Interactive Entertainment since January 2011;<br><br>Vice President of Caesars Interactive Entertainment from May 2009 to February 2015;<br><br>Associate Director of Broadcasting and New Media of CEC from May 2006 to May 2009 |
| Beato, Jacqueline | 09/24/2015; 01/19/2016 | Senior Vice President of Finance and Treasurer of Caesars Enterprise Services beginning in May 2014;<br><br>Director of Investor Relations of CEC from 2011 to May 2014 |
| Boes, Eric | 09/24/2015 | Director of Corporate Planning of Caesars Entertainment Corporation from June 2012 to October 2013 |
| Boorjian, Jeff | 02/19/2016 | Vice President of Property Marketing of Caesars Entertainment Corporation from July 2007 to October August 2011;<br><br>Vice President of Marketing of Caesars Entertainment Corporation from August 2011 to June 2012;<br><br>Regional Vice President of Marketing in the Eastern Division of  Caesars Entertainment Corporation from July 2012 to July 2015 |

1

| | | |
|---|---|---|
| Brimmer, Robert | 09/29/2015;<br>01/20/2016 | Senior Vice President of Corporate Planning and Analysis of Caesars Enterprise Services since August 2014;<br><br>Vice President of Corporate Planning and Analysis of Caesars Enterprise Services prior to August 2014;<br><br>Various roles at Caesars Entertainment Corporation since 2007 |
| Cohen, Michael | 10/16/2015;<br>12/16/2015;<br>02/09/2016 | General Counsel for Caesars Acquisition Company beginning in April 2014;<br><br>Member of Board of Directors of Caesars Entertainment Operating Company from July 2012 to April 2014;<br><br>Corporate Secretary of Caesars Entertainment Corporation from February 2006 to April 2014 |
| Colvin, Donald | 11/06/2015 | Consultant for Caesars Entertainment Corporation since December 2014;<br><br>Chief Financial Officer and Executive Vice President of Caesars Entertainment Corporation from November 2012 to December 2014 |
| Costopoulos, Spyro | 10/20/2015 | Vice President & Executive Associate to President of Hospitality of Caesars Entertainment Corporation beginning May 2014;<br><br>Manager Enterprise Effectiveness and Director of Planning Model Financial Planning Analysis of Caesars Entertainment Corporation from January 2012 to May 2014 |

| | | |
|---|---|---|
| Donovan, Timothy | 11/10/2015; 12/02/2015; 02/18/2016 | Executive Vice President of Caesars Entertainment Corporation since November 2011;<br><br>Chief Regulatory and Compliance Officer of Caesars Entertainment Corporation since January 2011;<br><br>General Counsel of Caesars Entertainment Corporation since April 2009;<br><br>Senior Vice President of Caesars Entertainment Corporation from April 2009 to November 2011 |
| Epstien, Daniel | 01/22/2016 | Vice President of Finance and Strategy of Caesars Entertainment Corporation since January 2015;<br><br>Director of Corporate Finance of Caesars Entertainment Corporation since January 2014;<br><br>Executive Associate of Finance of Caesars Entertainment Corporation from August 2012 to December 2013 |
| Garber, Mitch | 10/09/2015; 11/20/2015 | Chief Executive Officer of Caesars Interactive Entertainment since May 2009;<br><br>Chief Executive Officer of Caesars Acquisition Company since May 2009 |
| Gastwirth, Jason | 01/14/2016 | Senior Vice President of Marketing and Entertainment of Caesars Entertainment Corporation since February 2011 |
| Goldich, Russell | 09/18/2015 | Vice President of Compensation for Caesars Enterprise Services from since October 2014;<br><br>Director of Compensation of Caesars Entertainment Operating Company from 2012 to October 2014;<br><br>Compensation Manager of Caesars Entertainment Operating Company from 2009 to 2012 |

| Halkyard, Jonathan | 11/02/2015 | Chief Financial Officer of Caesars Entertainment Corporation from August 2006 to May 2012;<br><br>Head of Planning and Analysis of Investor Relations and Treasurer of Caesars Entertainment Corporation from 2002 to August 2006;<br><br>Director of Finance and Assistant General Manager at Harrah's in Lake Tahoe from March 2009 to 2002 |
|---|---|---|
| Hession, Eric | 11/13/2015; 11/14/2015; 01/20/2016 | Chief Financial Officer and Executive Vice President of Caesars Entertainment Corporation since January 2015;<br><br>Treasurer of Caesars Entertainment Corporation from November 2011 to January 2015;<br><br>Senior Vice President of Finance of Caesars Entertainment Corporation from November 2011 to December 2014;<br><br>Vice President of Finance of Caesars Entertainment Corporation from February 2011 to November 2011 |
| Higgins, Mary Beth | 10/14/2015 | Chief Financial Officer of Caesars Entertainment Operating Company since July 2014 |
| Jenkin, Tom | 09/30/2015 | Global President of Caesars Entertainment Corporation since May 2013;<br><br>President of Operations of Caesars Entertainment Corporation from November 2011 to May 2013;<br><br>Western Regional President of Caesars Entertainment Corporation from 2003 to November 2011;<br><br>Senior Vice President and General Manager of the Rio from 2000 to 2002;<br><br>Senior Vice President and General Manager of Harrah's Las Vegas from 1998 to 1999;<br><br>Senior Vice President General Manager of Harrah's Laughlin from 1993 to 1998 |

| Loveman, Gary | 10/27/2015; 01/28/2016 | Chief Executive Officer of Caesars Entertainment Corporation from January 2003 to July 2015;<br><br>President of Caesars Entertainment Corporation from April 2001 to June 2015;<br><br>Member of the Board of Directors Caesars Entertainment Corporation from 2003 to July 2015;<br><br>Chairman of the Board of Directors Caesars Entertainment Corporation from 2005 to July 2015;<br><br>Chief Operating Officer of Harrah's from 1998 to 2003 |
|---|---|---|
| Miller, Greg | 09/22/2015; 01/15/2016 | Executive Vice President of Domestic Development of Caesars Entertainment Corporation since 2013;<br><br>Senior Vice President of Domestic Development of Caesars Entertainment Corporation from 2012 to 2013;<br><br>Senior Vice President of Resort Development of Caesars Entertainment Corporation from February 2009 to April 2012;<br><br>Vice President of Property Development of Caesars Entertainment Corporation from September 2004 to January 2009 |
| Payne, John | 10/22/2015 | Chief Executive Officer of Caesars Entertainment Operating Company beginning July 2014;<br><br>President of Central Markets of Caesars Entertainment Corporation from May 2013 to July 2014;<br><br>President of Enterprise Shared Services of Caesars Entertainment Corporation from July 2011 to May 2013;<br><br>Regional President of Central Division of Caesars Entertainment Corporation from January 2007 to July 2011;<br><br>President of the Atlantic City Region of Caesars Entertainment Corporation from January 2006 to December 2006 |

5

| | | |
|---|---|---|
| Sigala, Ruben | 01/19/2016 | Chief Analytics Officer of Caesars Entertainment Corporation since 2012;<br><br>Director of Pricing of Las Vegas Market; Head of Revenue Management and Business Intelligence for Western Division; and Head of Analytics of Western Division of Caesars Entertainment Corporation from August 2005 to 2012 |
| Shaukat, Tariq | 10/28/2015; 11/09/2015 | Chief Commercial Officer of Caesars Entertainment Corporation since October 2014;<br><br>Chief Marketing Officer of Caesars Entertainment Corporation from March 2012 to September 2014 |
| Vanke, Troy | 09/25/2015 | Chief Accounting Officer of Caesars Acquisition Company since January 2014;<br><br>Chief Accounting Officer of Caesars Interactive Entertainment since July 2012;<br><br>Vice President, Associate Controller of Caesars Entertainment Corporation from July 2009 to January 2014 |
| Wiegand, Scott | 11/06/2015 | Senior Vice President, Deputy General Counsel and Corporate Secretary to Caesars Entertainment Corporation, Caesars Entertainment Operating Company and Caesars Enterprise Services since May 2014;<br><br>Senior Vice President and Chief Counsel of Enterprise Development of Caesars Entertainment Corporation since January 2006 to May 2014;<br><br>Vice President, Associate General Counsel and Corporate Secretary of Caesars Entertainment Corporation since February 2003 to November 2004 |
| Wilfong, Diane | 10/05/2015 | Senior Vice President, Controller and Chief Accounting Officer of Caesars Entertainment Corporation from July 2009 to August 2014 |
| Winterscheidt, Michael | 01/19/2016 | Vice President and Corporate Controller of Caesars Entertainment Corporation since October 2013 |

| SPONSORS | | |
|---|---|---|
| **Witness Name** | **Interview Date(s)** | **Title(s)** |
| Bonderman, David | 11/10/2015; 02/24/2016 | Co-Founder, Founding Partner, Managing Partner, and Chairman at TPG Capital, L.P. since December 1992;<br><br>Member of the Board of Directors of Caesars Entertainment Corporation since January 2008;<br><br>Member of the Board of Directors of Caesars Entertainment Operating Company since June 2014 |
| Davis, Kelvin | 10/22/2015; 02/24/2016 | Partner at TPG Capital, L.P. since 2000;<br><br>Member of the Board of Directors of Caesars Entertainment Corporation since January 2008;<br><br>Member of the Board of Directors of Caesars Entertainment Operating Company since June 2014 |
| Dunn, Timothy | 10/29/2015 | Operating Partner at TPG Capital, L.P. since 2005 |
| Kranias, Greg | 10/23/2015; 02/18/2016 | Principal at TPG Capital, L.P. from September 2005 to January 2015 |
| Peterson, Karl | 11/23/2015 | Partner at TPG Capital, L.P. since 2004;<br><br>Member of the Board of Directors of Caesars Acquisition Company since July 2013;<br><br>Member of the Board of Directors of Caesars Entertainment Corporation from 2008 to 2013 |
| Press, Rick | 01/15/2016 | Partner at Apollo Global Management, LLC, since 1998;<br><br>Member of the Board of Directors of Caesars Entertainment Corporation since January 2008 |
| Rowan, Marc | 11/16/2015; 11/17/2015; 01/28/2016 | Co-founder, Senior Managing Director and Director of Apollo Global Management, LLC, since 1990;<br><br>Member of the Board of Directors of Caesars Entertainment Corporation since January 2008; |

| | | Member of the Board of Directors of Caesars Entertainment Operating Company since June 2014;<br><br>Member of the Board of Directors of Caesars Acquisition Company since July 2013 |
|---|---|---|
| Sambur, David | 10/19/2015; 10/29/2015; 11/14/2015; 01/14/2016 | Partner of Apollo Global Management, LLC, since 2004;<br><br>Member of the Board of Directors of Caesars Entertainment Corporation since November 2010;<br><br>Member of the Board of Directors of Caesars Entertainment Operating Company since June 2014;<br><br>Member of the Board of Directors of Caesars Acquisition Company since July 2013 |
| van Hoek, Alex | 09/25/2015; 01/26/2016 | Principal of Apollo Global Management, LLC, since June 2014;<br><br>Associate of Apollo Global Management, LLC, from August 2010 to June 2014 |

| OUTSIDE DIRECTORS | | |
|---|---|---|
| **Witness Name** | **Interview Date(s)** | **Title(s)** |
| Beilinson, Marc | 10/06/2015; 01/25/2016 | Independent Director of the Board of Directors of Caesars Acquisition Company from October 2013, and also serves as a Member of the Board's Audit Committee and Nominating and Governance Committee |
| Housenbold, Jeffrey | 10/09/2015; 01/22/2016 | Independent Director of the Board of Directors of Caesars Entertainment Corporation from December 2011 to March 2014, and also served as a Member of the Board's Audit Committee |
| Kleisner, Fred | 10/30/2015; 01/28/2016 | Independent Director of the Board of Directors of Caesars Entertainment Corporation since July 2013 and also as a member of the Board's Valuation Committee |
| Stauber, Ronen | 09/30/2015 | Independent Director of Caesars Entertainment Operating Company Board of Directors since June 2014, and serves as a Member of the Board's Governance Committee since August 2014 |
| Swann, Lynn | 10/12/2015; 01/12/2016 | Independent Director of the Board of Directors of Caesars Entertainment Corporation since April 2008, and serves as a Member of the Board's Audit Committee, Corporate and Governance Committee, and Human Resources Committee |
| Williams, Christopher | 10/12/2015; 01/13/2016 | Independent Director of the Board of Directors of Caesars Entertainment Corporation since April 2008 and serves as Chairman of the Board's Audit Committee |
| Winograd, Steve | 10/21/2015 | Independent Director of Caesars Entertainment Operating Company Board of Directors since June 2014, and also a Member of the Board's Governance Committee since August 2014 |

| PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP | | |
|---|---|---|
| **Witness Name** | **Interview Date(s)** | **Title(s)** |
| Clayton, Lewis | 10/26/2015; 02/01/2016 | Partner in the Litigation Department at Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Ezring, Brian | 02/25/2016 | Partner in the Corporate Department at Paul, Weiss, Rifkind, Wharton & Garrison LLP since 2011, and previously a lawyer at O'Melveny & Myers LLP |
| Finnegan, Brian P. | 11/16/2015; 02/04/2016 | Partner in the Corporate Department at Paul, Weiss, Rifkind, Wharton & Garrison LLP since 2011, and previously a lawyer at O'Melveny & Myers LLP |
| Kornberg, Alan | 11/11/2015; 01/29/2016 | Partner in the Bankruptcy and Corporate Reorganization Department at Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Lamb, Stephen P. | 01/11/2016 | Partner in the Bankruptcy and Corporate Departments at Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Saferstein, Jeffery | 01/29/2016 | Partner in the Bankruptcy and Corporate Reorganization Department at Paul, Weiss, Rifkind, Wharton & Garrison LLP |
| Wlazlo, Mark | 10/14/2015; 02/04/2016 | Partner in the Corporate Department at Paul, Weiss, Rifkind, Wharton & Garrison LLP since 2011, and previously a lawyer at O'Melveny & Myers LLP |

| OTHERS | | |
|---|---|---|
| **Witness Name** | **Interview Date(s)** | **Title(s)** |
| Bauduin, Valerie<br><br>*Also known as Bao Giang* | 09/22/2015 | Partner at Deloitte Touche Tohmatsu Limited from August 2011 to May 2014;<br><br>Senior Manager at Deloitte Touche Tohmatsu Limited from June 2005 to August 2011 |
| Bird, Larry R. | 10/02/2015 | Audit Partner at Deloitte Touche Tohmatsu Limited since 2011;<br><br>Various roles at Deloitte Touche Tohmatsu Limited since 1976 |
| Bosacco, John | 09/15/2015 | Partner at Centerview Partners since January 2012 |
| Bryson, Nancy | 09/28/2015 | Managing Director of Evercore Partners Inc. since 2008 |
| Capasso, Mark | 09/29/2015 | Executive Director and National Practice Leader for Hospitality and Gaming Group at Cushman & Wakefield since February 2003 |
| Chandler, William | 01/15/2016 | Partner at Wilson Sonsini Goodrich & Rosatti, P.C. since June 2011 |
| Cicco, Marty | 02/05/2016 | Senior Managing Director at Evercore Partners Inc. since 2010 |
| Dickson, Stuart | 02/25/2016 | Managing Director at Citigroup Global Markets Inc. since 2013 |
| Filippelli, Nicolas | 11/24/2015 | Vice President of Technology, Media and Telecom Group at Citigroup Inc. |
| Furie, Simon | 09/18/2015 | Managing Director at Lazard Freres & Co., LLC, since February 2003 |
| Golden, Timothy P. | 09/29/2015 | Managing Director in Valuation Advisor Practice at Duff & Phelps LLC since 2005 |
| Lee, Min | 11/17/2015 | Director in Investment Banking and Gaming, Lodging and Leisure Division at Credit Suisse since |

| | | November 2014;<br><br>Vice President in Investment Banking and Gaming, Lodging and Leisure Division at Credit prior to 2014 |
|---|---|---|
| Leung-Kaldenberg, Cody | 10/16/2015 | Director at Perella Weinberg Partners from January 2009  to February 2015 |
| Liang, Ken | 01/22/2016 | Managing Director and Head of Restructurings at Oaktree Capital Management L.P. since 2001 |
| Mestre, Eduardo | 11/06/2015 | Senior Advisor at Evercore Partners Inc. since 2012;<br><br>Vice Chairman at Evercore Partners Inc. from 2004 to 2012 |
| Mollett, Ryan | 12/02/2015;<br>02/02/2016 | Managing Director at GSO Capital Partners LP since 2011 |
| Oldoerp, Stanley | 12/23/2015 | Partner of Internal Audit Services at PricewaterhouseCoopers LLP since July 2005 |
| Pinsky, Reuven | 12/22/2015 | Valuation Director at PricewaterhouseCoopers LLP since September 2005;<br><br>Corporate Development Manager at PricewaterhouseCoopers LLP from July 2010 to August 2011 |
| Rucker, Chad | 09/25/2015;<br>01/29/2016 | Managing Director of Valuation Research Corporation since September 2005 |
| Savino, Matt | 12/15/2015 | Managing Director of Capital Markets BlackRock since September 2010 |
| Scherer, Joshua | 10/20/2015 | Partner at Perella Weinberg Partners June 2007 to February 2015 |
| Schiedemeyer, Jeffrey | 09/16/2015 | Managing Director at Duff & Phelps LLC since June 1998 |
| Schreck, Frank | 01/21/2016 | Partner in the Gaming Law Group of Brownstein Hyatt Farber Schreck LLP |
| Seiler, Eric | 11/12/2015 | Managing Partner at Friedman Kaplan Seiler & Adelman LLP since January 1986 |

12

| Wisler, Phil | 10/06/2015; 11/16/2015; 12/02/2015 | Managing Director at Duff & Phelps LLC from October 2005 to March 2012 |
| --- | --- | --- |

| INFORMAL INTERVIEWS | | |
|---|---|---|
| **Witness Name** | **Interview Date(s)** | **Title(s)** |
| Atwood, Charles | 09/01/2015 | Vice Chairman of the Board of Directors of Caesars Entertainment Corporation from 2006 to December 2008; <br><br> Chief Financial Officer of Caesars Entertainment Corporation 2001 to 2006 |
| Auerbach, Phil | 08/27/2015 | Senior Vice President of Hospitality & Entertainment Marketing of Caesars Entertainment Corporation since July 2013 |
| Brimmer, Robert | 05/13/2015; 08/27/2015; 02/10/2016 | Senior Vice President of Corporate Planning and Analysis of Caesars Enterprise Services since August 2014; <br><br> Vice President of Corporate Planning and Analysis of Caesars Enterprise Services prior to August 2014; <br><br> Various roles at Caesars Entertainment Corporation since 2007 |
| Carson, Brian | 05/13/2015 | Senior Director of Accounting of Caesars Entertainment Operating Company since August 2014 |
| Chen, Jennifer | 09/15/2015 | Director of Investor Relations of Caesars Entertainment Corporation since January 2014; <br><br> Director (VIP Analytics) in Enterprise Analytics of Caesars Entertainment Corporation from September 2012 to December 2013; <br><br> Manager (Marketing Analytics) in Enterprise Analytics of Caesars Entertainment Corporation from September 2011 to August 2012; <br><br> Senior Financial Analyst in various departments at Caesars Entertainment Corporation from August 2008 to August 2011 |
| Duck, Bobby | 02/08/2016 | Revenue Manager of Caesars Entertainment Corporation since 2005; |

| | | |
|---|---|---|
| | | Hotel Manager of Harrah's Shreveport Hotel & Casino from May 2004 to June 2005;<br><br>Guest Services Manager of Harrah's Shreveport Hotel & Casino from June 2003 to May 2004;<br><br>Executive Housekeeper of Harrah's Shreveport Hotel & Casino from March 2001 to June 2003 |
| Epstien, Daniel | 07/30/2015 | Vice President of Finance and Strategy of Caesars Entertainment Corporation since January 2015;<br><br>Director of Corporate Finance of Caesars Entertainment Corporation since January 2014;<br><br>Executive Associate of Finance of Caesars Entertainment Corporation from August 2012 to December 2013 |
| Evans, Tom | 08/27/2015 | Vice President of Assistant Treasurer of Caesars Entertainment Corporation since 1981 |
| Halkyard, Jonathan | 06/15/2015 | Chief Financial Officer of Caesars Entertainment Corporation from August 2006 to May 2012;<br><br>Head of Planning and Analysis of Investor Relations and Treasurer of Caesars Entertainment Corporation from 2002 to August 2006;<br><br>Director of Finance and Assistant General Manager at Harrah's in Lake Tahoe from March 2009 to 2002 |
| Higgins, Mary Beth | 05/13/2015 | Chief Financial Officer of Caesars Entertainment Operating Company since July 2014 |
| Koloski, David | 08/26/2015 | Regional Vice President of Marketing in the Las Vegas Region at Caesars Entertainment Corporation since December 2015;<br><br>Vice President of VIP Marketing at Caesars Entertainment Corporation January 2015 to November 2015;<br><br>Vice President of VIP Sales & Operations at Caesars Entertainment Corporation from July 2012 to December 2014; |

| | | Vice President of VIP Innovation & Operations at Caesars Entertainment Corporation from September 2011 to June 2012; |
| | | |
| | | Director of Digital Marketing in the Las Vegas Region at Caesars Entertainment Corporation from February 2010 to August 2011; |
| | | Director or Marketing of Flamingo, Harrah's, Imperial Palace, Bill's Gamblin' Hall & Saloon and O'Shea's from October 2008 from February 2010; |
| | | Director of Marketing of Imperial Palace, Bill's Gamblin' Hall & Saloon from October 2007 to September 2008; |
| | | Director of Strategic Marketing of Paris, Bally's, Rio All-Suite Hotel & Casino from October 2006 to September 2007; |
| | | Strategic Marketing Manager of Paris, Bally's, Rio All-Suite Hotel & Casino from July 2005 to October 2006 |
| Kuick, Ken | 05/13/2015 | Vice President and Chief Accounting Officer of Caesars Entertainment Operating Company since November 2014 |
| | | Vice President, Assistant Controller of Caesars Entertainment Corporation 2011 to November 2014 |
| Loveman, Gary | 06/23/2015 | Chief Executive Officer of Caesars Entertainment Corporation from January 2003 to July 2015; |
| | | President of Caesars Entertainment Corporation from April 2001 to June 2015; |
| | | Member of the Board of Directors Caesars Entertainment Corporation from 2003 to July 2015; |
| | | Chairman of the Board of Directors Caesars Entertainment Corporation from 2005 to July 2015; |
| | | Chief Operating Officer of Harrah's from 1998 to 2003 |
| Lynch, Jerry | 08/26/2015 | Director of Accounts Payable & Inventory Control of |

| | | |
|---|---|---|
| | | Caesars Entertainment Corporation since June 2010 |
| Marino, Michael | 05/13/2015 | Senior Vice President of Loyalty & Digital of Caesars Entertainment Corporation since March 2015;<br><br>Vice President of Customer Loyalty of Caesars Entertainment Corporation from February 2014 to March 2015;<br><br>Vice President & Executive Associate to Caesars Entertainment Corporation's Chairman, President & Chief Executive Officer from December 2012 to January 2014;<br><br>Director of Marketing Analytics of Caesars Entertainment Corporation from April 2012 to December 2012 |
| Ortzman, Kevin | 07/21/2015 | President, Caesars Atlantic City & Bally's Atlantic City beginning April 2012;<br><br>Assistant General Manager and Regional Chief Financial Officer and Vice President of Finance of Caesars Entertainment Corporation from August 2004 to April 2012 |
| Pappas, LuAnn | 07/21/2015; 08/04/2015 | Regional Vice President of Casino Marketing at Caesars Entertainment Corporation from September 2013 to November 2015;<br><br>Regional Vice President of Marketing, Biloxi, Tunica, New Orleans, Bossier City from September 2011 to September 2013;<br><br>Vice President of Marketing, Harrah's New Orleans from July 2010 to September 2011;<br><br>Vice President of Marketing & Non-Gaming Operations, Grand Biloxi from July 2007 to July 2010;<br><br>Regional Vice President of VIP Marketing, Atlantic City from June 2004 to July 2007 |
| Payne, John | 05/13/2015; 07/01/2015; 08/04/2015 | Chief Executive Officer of Caesars Entertainment Operating Company beginning July 2014;<br>President of Central Markets of Caesars |

17

| | | Entertainment Corporation from May 2013 to July 2014;<br><br>President of Enterprise Shared Services of Caesars Entertainment Corporation from July 2011 to May 2013;<br><br>Regional President of Central Division of Caesars Entertainment Corporation from January 2007 to July 2011;<br><br>President of the Atlantic City Region of Caesars Entertainment Corporation from January 2006 to December 2006 |
|---|---|---|
| Rodriguez, Christy | 08/26/2015 | Vice President of Internal Audit of Caesars Entertainment Corporation since 2013;<br><br>Various Internal Audit Roles at Caesars Entertainment Corporation  from April 1999 to 2013 |
| Rowan, Marc | 06/18/2015 | Co-founder, Senior Managing Director and Director of Apollo Global Management, LLC, since 1990;<br><br>Member of the Board of Directors of Caesars Entertainment Corporation since January 2008;<br><br>Member of the Board of Directors of Caesars Entertainment Operating Company since June 2014;<br><br>Member of the Board of Directors of Caesars Acquisition Company since July 2013 |
| Rubenstein, Sam | 08/26/2015 | Vice President of Financial Assurance at Caesars Entertainment Corporation since November 2014 |
| Schatz, Joe | 08/04/2015 | Senior Vice President of Marketing Strategy and Regional Marketing Officer at Caesars Entertainment Corporation since December 2015;<br><br>Regional Vice President of Marketing in the East Region at Caesars Entertainment Corporation from July 2011 to December 2015;<br><br>Vice President of Marketing in the Central Division at Caesars Entertainment Corporation from June 2009 to June 2011; |

| | | |
|---|---|---|
| | | Vice President, International Marketing at Caesars Entertainment Corporation from December 2007 to January 2009;<br><br>Regional Vice President of Marketing, Tunica Resorts from September 2005 to November 2007;<br><br>Vice President of Marketing, Harrah's New Orleans from August 2002 to September 2005;<br><br>Regional Vice President of Marketing, Harrah's Lake Charles & Harrah's Shreveport from September 2000 to July 2002 |
| Shaukat, Tariq | 05/13/2015;<br>07/14/2015 | Chief Commercial Officer of Caesars Entertainment Corporation since October 2014;<br><br>Chief Marketing Officer of Caesars Entertainment Corporation from March 2012 to September 2014 |
| Sigala, Ruben | 08/27/2015 | Chief Analytics Officer of Caesars Entertainment Corporation since 2012;<br><br>Director of Pricing of Las Vegas Market; Head of Revenue Management and Business Intelligence for Western Division; and Head of Analytics of Western Division of Caesars Entertainment Corporation from August 2005 to 2012 |
| Solomon, Jeff | 08/27/2015 | Senior Vice President of Marketing Strategy  Caesars Entertainment Corporation since January 2013;<br><br>Vice President and General Manager, Rio All-Suite Hotel & Casino from February 2010 to January 2013;<br><br>Assistant General Manager, Imperial Palace from January 2007 to February 2010;<br><br>Vice President, Special Projects of Caesars Entertainment Corporation from October 2005 to December 2006;<br><br>Executive Associate to Caesars Entertainment Corporation's Chief Operating Officer & Chief Financial Officer from January 2004 to September 2005 |

| Tabrizi, Carol | 08/27/2015 | Senior Vice President of Tax of Caesars Entertainment Corporation since May 2010 |
|---|---|---|
| Thomas, Mary | 08/27/2015 | Executive Vice President of Human Resources at Caesars Entertainment Corporation since November 2011;<br><br>Senior Vice President of Human Resources at Caesars Entertainment Corporation from February 2006 to November 2011 |
| Winterscheidt, Michael | 08/26/2015 | Vice President and Corporate Controller of Caesars Entertainment Corporation since October 2013 |

# APPENDIX 4: TIMELINE OF EVENTS[1]

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *December 2006* | LBO | Sponsors agreed to acquire CEC for approximately $30.7 billion (including the assumption of $12.4 billion in debt). |
| *January 28, 2008* | LBO / CMBS | LBO consummated on January 28, 2008.  In connection with LBO closing:<br>• CEOC debt backed by irrevocable and unconditional CEC guarantee;<br>• CEC entered into Sponsor Services Agreement;<br>• CEOC transferred to CEC the CMBS Properties; and<br>• Gary Loveman (CEO and Chairman of the Board of CEC) and Michael Cohen (Deputy General Counsel and Corporate Secretary of CEC) elected as CEOC Directors. |
| *July 2008* | Atlantic City | CEC Board presentation discussing the construction of a Conference Center at Harrah's Atlantic City. |
| *August 2008* | Intercompany | CEC and CEOC entered into Intercompany Revolver with an initial maximum principal amount of $200 million. |
| *September 11, 2008* | 2009 WSOP | CEC engaged Duff & Phelps to provide an assessment of the fair value of the WSOP business segment. |
| *December 2008* | 2009 WSOP | CEC report regarding the reorganization of WSOP business and trademarks; WSOP business valued at $85 million. |
| *December 22, 2008* | 2009 WSOP | Duff & Phelps Engagement Letter with CEC executed. |
| *February 24, 2009* | 2009 WSOP | Presentation to CEC Board regarding reorganization of WSOP business; WSOP business valued at $70 million. |
| *April 2009* | 2009 WSOP | Moelis & Company presentation to CEC Board regarding separating WSOP "non-tournament assets" from CEC. |
| *April 8, 2009* | 2009 WSOP | CIE Board held first meeting.  CIE Board officers elected, including:  Mitch Garber - CEO; Loveman - Chairman of the Board and President; Jonathan Halkyard - SVP and Treasurer; Cohen – Secretary; and Anthony McDuffie- Assistant Secretary. |
| *April 28, 29 & October 20, 2009* | Intercompany | CEOC Intercompany Loan funded in an aggregate principal amount of $235 million. |

---

[1] Capitalized terms used and not otherwise defined herein shall have the meaning set forth in Appendix 1, the Appendix of Defined Terms.  Support for each of the entries herein is set forth in the applicable sections of the Report.

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *April 30, 2009* | 2009 WSOP | CEC and CEOC Boards approved 2009 WSOP Transfer. Duff & Phelps issued fairness opinion to CEOC Board regarding sale of WSOP Trademark & IP to HIE Holdings TopCo; combined WSOP Trademark & IP and WSOP Trademark License Agreement valued at a fair market value of $15.0 million. |
| *May 1, 2009* | 2009 WSOP | 2009 WSOP Transaction closed, and WSOP Trademark & IP was transferred. |
| *February 19, 2010* | Growth | CEOC acquired Planet Hollywood Las Vegas. |
| *June 24, 2010* | Intercompany | CEOC Intercompany Loan repaid. |
| *August 2010* | Intercompany | CEOC transferred its ownership in various trademarks related to the Flamingo, Rio and Paris, with a book value of $45.3 million, to various CEC subsidiaries in connection with an amendment of the commercial mortgage-backed securities financing. |
| *August 31, 2010* | CMBS / CERP | CMBS Loan amended to, among other things, provide right to extend the maturity date by up to 2 years to February 2015 and amend other significant terms regarding reserves, release prices, management fees, mandatory repurchase offers, minimum amortization and distribution of excess cash flow. Second Amended and Restated Services Agreement entered into in connection with this transaction providing for, among other things, in the event of a foreclosure, the right of CMBS lenders to continue to require CEOC to continue managing the CMBS Properties– either indefinitely or for a Transition Period of up to two years. |
| *November 23, 2010* | Intercompany | Sponsors and Paulson & Co., Inc. exchanged CEOC senior notes due 2015, 2016, and 2017 for shares of CEC voting common stock. |
| *December 10, 2010* | Intercompany | Intercompany Revolver increased to maximum principal amount of $500 million pursuant to Amended Credit Agreement. CEOC issued to CEC Demand Intercompany Note. |
| *February 24, 2011* | Intercompany | Intercompany Revolver increased to maximum principal amount of $750 million pursuant to Second Amended Credit Agreement. |
| *March 17, 2011* | Intercompany | Tax refund received by CEC related to, among other things, CEOC NOL. $220.8 million of the refund relating to CEOC NOL credited to CEOC under Intercompany Revolver. |
| *April 25, 2011* | CERP | VRC issued fairness opinion to CEC and CEOC regarding the valuation of the Linq and Octavius. CEC, together with certain indirect, wholly-owned subsidiaries of CEOC, entered into a $450 million credit agreement to finance the completion of the Linq and Octavius. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *April 27, 2011* | General | Individuals appointed by CEC to committees, as follows:<br>• Executive Committee:  Loveman, Kelvin Davis, Marc Rowan;<br>• Audit Committee:  Christopher Williams, Chairman, Karl Peterson, Eric Press, Jinlong Wang;<br>• Human Resources Committee:  Davis, Rowan, Lynn Swann;<br>• Finance Committee:  Karl Peterson, Rowan;<br>• 162(m) Plan Committee:  Swann, Williams; and<br>• Capital Committee:  Halkyard – Chairman, Timothy Donovan, Katrina Lane, David Norton, John Payne. |
| *May 2011* | 2011 WSOP | CIEI (a wholly-owned subsidiary of CIE) closed Playtika Acquisition, funded by unsecured revolving credit facility provided by CEC. |
| *July 2011* | 2011 WSOP | CEC Board proposed sale of WSOP Tournament Rights to CIE for $20.5 million. |
| *July 20, 2011* | 2011 WSOP | VRC engaged by CEC and CEOC to provide financial advisory services in connection with the 2011 WSOP Transaction. |
| *July 21, 2011* | 2011 WSOP | VRC presentation in support of its fairness opinion to the CEC and CEOC Boards; Tournament Rights valued between $18.7 million and $22 million. |
| *July 28, 2011* | 2011 WSOP | CEC Board approved additional equity investment in CIE of $7.5 million at a per share purchase price of $273 per share, and investment of $770,000 by CIE management. |
| *September 1, 2011* | 2011 WSOP | CEOC transferred Tournament Rights to Caesars Tournament LLC for $20.5 million. VRC issued fairness opinion to the CEOC Board. |
| *September 22 - 29, 2011* | 2011 WSOP | VRC issued fairness opinion to CEOC Board regarding the Cross-Marketing and Trademark License Agreement. CEC Executive Committee approved the Cross-Marketing and Trademark License Agreement. CIE entered into the Cross-Marketing and Trademark License Agreement. |
| *November 29, 2011* | 2011 WSOP | CIE Board approved purchase of remaining 49% voting equity interest of Playtika. |
| *December 2011* | 2011 WSOP | CIE purchased remaining Playtika equity interest. |
| *September 25, 2012* | Atlantic City | Caesars submitted application to CRDA for $45 million grant toward construction of Conference Center at Harrah's Atlantic City. |
| *October 1, 2012* | Guarantee Release | Initial discussion held about nature of parent guarantee, including whether release provisions of CEC guarantees are considered "full and unconditional" pursuant to SEC's subsidiary filing requirements. |
| *October 24, 2012* | CMBS | Apollo presentation discussing, among other things, potential strategies to refinance or restructure CMBS debt. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *November 12, 2012* | Growth | Growth Transaction proposal submitted to CEC Board. |
| *November 14, 2012* | Intercompany | Intercompany Revolver amended.   Among other things, maximum principal amount increased to $1 billion, facility became uncommitted, interest made payable quarterly and maturity date extended to November 17, 2017. |
| *November 14, 2012* | Growth | CEC Valuation Committee formed with CEC Independent Directors Jeffrey Housenbold, Swann, and Williams. |
| *December 14, 2012* | Growth | CEC Valuation Committee selected Evercore as its financial advisor. |
| *January 21, 2013– April 21, 2013* | Growth | CEC Valuation Committee met at least 29 times, attended by Morrison Foerster LLP, its counsel, and Evercore. |
| *December 2012* | 2011 WSOP | CIE purchased substantially all of the assets of Buffalo Studios, LLC. |
| *December 2012* | CMBS | UBS presentation regarding potential strategic alternatives to reduce CMBS Debt. |
| *December 18, 2012* | CMBS | JPMorgan presentation regarding potential CMBS Debt refinancing options. |
| *December 31, 2012* | Guarantee | Market analysts recognized possibilities that CEC Guarantee could be released on CEOC's pre- and post-LBO debt. |
| *January 3, 2013* | 2011 WSOP | Unsigned presentation in which CIE equity valued at between $239 million and $837 million, fully-liquidated, based on a range of EBITDA multiples from 3.0x to 10.0x. |
| *January 21, 2013* | Growth | Evercore engaged as financial consultant by CEC Valuation Committee. |
| *January 21, 2013* | Growth | CEC Valuation Committee meeting attended by MoFo and Evercore. Evercore presented preliminary findings regarding the value of assets to be acquired and contributed. (PHWLV = $231 million to $358 million, CBAC = $51 million to $72 million, 50% management rights of CBAC = $18 million to $27 million.) |
| *February 2013* | CMBS | CEC exercised option to extend maturity of CMBS financing to 2014. |
| *February 2013* | CMBS / CERP | Presentation by Apollo regarding CMBS debt refinancing or restructuring options.  CMBS equity gap valued at $1.2 billion. |
| *February 2013 – February 2014* | Atlantic City | Caesars performed substantial analysis and evaluated options with respect to the deteriorating conditions in the Atlantic City market. |
| *February 1, 2013* | Atlantic City | CEC Board discussed property closures as a lever to improve Atlantic City supply/demand. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *February 5, 2013* | Growth | CEC Valuation Committee mandate expanded to include negotiation with Sponsors over valuation, power to reject the Sponsors' proposals. CEC agreed not to complete transaction at the rejected values unless subsequently approved by the CEC Valuation Committee. |
| *February 14, 2013* | Growth | Sponsors delivered initial valuation proposal to CEC Valuation Committee to acquire assets for $280 million in cash. |
| *February 25, 2013* | Growth | CEC Valuation Committee determined that the Sponsors' offer did not represent fair market value. |
| *February 27, 2013* | Growth | Evercore delivered response to Sponsors; valued Planet Hollywood at $230 - $357 million, Horseshoe Baltimore at $52-$72 million, and Horseshoe Baltimore mgmt. rights at $18-27 million. |
| *March 2013* | CERP | Apollo presentation reflecting a meeting with a lender. |
| *March 7, 2013* | Growth | Sponsors delivered first revised proposal to the CEC Valuation Committee for $345 million cash. |
| *March 28, 2013* | Growth | Evercore met with Sponsors and provided CEC Valuation Committee's response to Sponsors' first revised proposal. |
| *March 29, 2013* | Growth | Sponsors delivered second revised proposal to CEC Valuation Committee for $360 million cash. |
| *March 31, 2013* | Growth | Evercore met with Sponsors and provided CEC Valuation Committee's response to Sponsors' second revised proposal. |
| *April 4, 2013* | Growth | Sponsors delivered third revised proposal to CEC Valuation Committee (identified as a final valuation) for $360 million in cash. |
| *April 5, 2013* | Growth | CEC Valuation Committee provided response to Sponsors' third revised proposal. |
| *April 10, 2013* | CMBS | CEC Finance Committee approved repurchase of $165 million of CMBS Debt. |
| *April 17, 2013* | Growth | Sponsors delivered fourth revised and final proposal for Growth Transaction. |
| *April 17, 2013* | Growth | Evercore engaged by CEC with respect to Growth Transaction. |
| *April 21, 2013* | Growth | CEC Valuation Committee met and concluded that $360 million represented fair market value. |
| *April 22, 2013* | Growth | CEC Board approved engagement of Evercore with respect to Growth Transaction. |
| *May 2013* | 2011 WSOP | CIE acquired the WSOP social and mobile gaming assets and intellectual property owned by Electronic Arts. |
| *June 14, 2013* | Atlantic City | CRDA approved grant application for development of Conference Center. |
| *Q3 2013* | Intercompany | Sponsors agreed to waive payment of the Monitoring Fee through the end of 2015. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *July 2013* | CERP / CMBS | • CEC Management advised of potential transaction.<br>• Citibank retained in connection with refinancing.<br>• Perella contacted and begins diligence. |
| *July 23, 2013* | General | Fred Kleisner elected to CEC Board. |
| *August 12, 2013* | CERP / CMBS | Apollo CMBS draft discussion materials prepared valuing the equity of Linq and Octavius at $729 million. |
| *August 13, 2013* | CERP / CMBS | Apollo CMBS draft discussion materials prepared valuing the equity of Linq and Octavius at $585 million. |
| *August 14, 2013* | CERP / CMBS | Apollo CMBS draft discussion materials provided to Perella valuing the equity of Linq and Octavius at $578 million. |
| *August 21 – September 8, 2013* | CERP / CMBS | • On September 3, Apollo delivered message about assumptions to Perella on a "business level" after Weil/Paul Weiss reach impasse.<br>• Perella requested that additional "tangible" consideration be included as part of the deal and determined that the release of the CEC Lease Guaranty should not be included as consideration in Perella's opinion.  Perella completed its initial analysis. |
| *September 9 - 21, 2013* | CERP / CMBS | • Perella delivered draft opinion letter and presentation to Apollo and Paul Weiss.<br>• Engagement letter between CEOC and Perella is executed.<br>• Paul Weiss provided Perella comments to draft opinion; Perella incorporates comments and recirculates revised (and near-final) version on September 19. |
| *September 16, 2013* | CERP / CMBS | CEC Finance Committee approved CMBS refinancing. |
| *September 27, 2013* | CERP / CMBS | CEC Finance Committee consented to pursue negotiations and effect the CERP Transaction. |
| *October 9, 2013* | Growth | Sponsors submitted modified term sheet for Growth Transaction to the CEC Valuation Committee. |
| *October 10, 2013* | CERP / CMBS | CEOC Board meeting held to approve CERP Transaction. Loveman and Cohen attended by phone, as well as Lewis Clayton, Brian Finnegan and Greg Ezring from Paul Weiss, and Joshua Scherer from Perella.  CEOC Board approved the transaction. |
| *October 11, 2013* | CERP / CMBS | Perella opinion issued to CEOC with respect to CERP Transaction. |
| *October 11, 2013* | CERP / CMBS | CERP Transaction closed. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *October 18, 2013* | Growth | CEC Valuation Committee concluded that Services Agreement between CEOC, CGP and CAC is fair. Advisors included VRC and MoFo. VRC report presented concluding that the agreement was fair. |
| *October 21, 2013* | Growth | Evercore issued fairness opinion to CEC Board. VRC issued fairness opinion to CEC Board regarding fair market value of CAC subscription rights. CEOC Board approved Growth Transaction. Growth Transaction closed. |
| *October 21, 2013* | 2011 WSOP | Evercore presentation to CEC Valuation Committee estimated implied equity value attributed to CIE assets owned by CEC of $610 million to $825 million, which represented 72.8% of CIE on a fully diluted basis. |
| *November 26, 2013* | Four Properties | CEC Board formed CEC Special Committee, consisting of Independent Directors Swann and Kleisner, to evaluate proposed Four Properties Transaction. |
| *November 30, 2013* | Four Properties | CEC Board formally advised CGP that CEC was considering offering for sale to CGP The Cromwell, The Quad, Bally's Las Vegas, and Harrah's New Orleans. |
| *December 2013* | Atlantic City | CEOC agreed to purchase Atlantic Club for $15 million. Separately, CEC and the subsidiaries of CEOC that owned the CRDA credits and land entered into an agreement to assign the CRDA credits to CEC and compensate CEOC for the land donated to the CRDA in exchange for $29.2 million of compensation. |
| *December 2013* | Tender Offers / B-7 Refinancing; Guarantee Release – 5% Sale | CEC presentation prepared for state gaming regulators advising regulators of its plan to sell up to 25% of CEOC equity to third parties that may result in the release of the CEC guarantee in order create a liquid and tradeable currency in CEOC stock and facilitate deleveraging of CEOC debt. |
| *December 1, 2013* | Four Properties | CAC Board established Special Committee. |
| *December 11, 2013* | Four Properties | CEC Special Committee retained Reed Smith as counsel. |
| *December 20, 2013* | Four Properties | CEC Special Committee retained Centerview Partners as financial advisor. |
| *December 20, 2013* | Four Properties | CAC Special Committee retained Lazard as financial adviser. |
| *December 23, 2013* | Four Properties | CAC Special Committee retained Skadden, Arps, Slate, Meagher & Flom LLP as legal adviser. |
| *January 8, 2014 – February 24, 2014* | Four Properties | CEC Special Committee held at least eleven meetings; attended by Centerview and Reed Smith. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *January 15, 2014* | CES & Total Rewards | Paul Weiss shared first draft of the CES/Services Co. term sheet with Apollo. |
| *January 17, 2014* | Four Properties | CEC management provided January business plan to Centerview. CEC Special Committee retained Duff & Phelps as independent financial advisor. |
| *January 26, 2014* | Four Properties / CES & Total Rewards | CAC made an initial offer of $1.75 billion to CEC for the Four Properties Transaction, subject to a mutually satisfactory arrangement to ensure that the properties will continue to enjoy the existing benefits of Total Rewards. |
| *January 31, 2014* | Four Properties | CEC submitted a counter-offer to CAC of $2.75 billion. |
| *February 2014* | General | Ronen Stauber and Steven Winograd contacted by Marc Rowan and/or David Sambur to determine interest in serving as CEOC independent directors. |
| *February 5, 2014* | Four Properties | CAC increased its offer to CEC to $1.95 billion. CEC management circulated proposal for revised asset sale management case. |
| *February 6, 2014* | Four Properties | CEC submitted a counter-offer to CAC of $2.075 billion. |
| *February 10, 2014* | General | CAC Board meeting held. CAC Special Committee Charter approved. Appointed to committees are the following:<br>• Audit Committee: Marc Beilinson, Philip Erlanger, and Don Kornstein;<br>• Executive Committee: Rowan and Peterson;<br>• Human Resources Committee: Peterson, Rowan, and Kornstein; and<br>• Nominating and Corporate Governance Committee: Beilinson, Sambur, and Erlanger. |
| *February 10, 2014* | Four Properties | CAC increased its offer to CEC to $2.0 billion. |
| *February 10, 2014* | Four Properties | CEC and CAC Special Committees entered into a letter of intent and began to negotiate definitive documentation. |
| *February 23, 2014* | Four Properties | Lazard presented its fairness opinion to the CAC Special Committee. |
| *February 24, 2014* | Four Properties | CEC Special Committee approved Four Properties Transaction. |
| *February 24, 2014* | Four Properties | CEC Board approved Four Properties Transaction. Centerview provided a fairness opinion to CEC. |
| *February 26, 2014* | Atlantic City | CEC Executive Committee approved Showboat Closure. |
| *March 1, 2014* | Four Properties | Duff & Phelps provided fairness opinion to CEC and CEOC Boards on Four Properties Transaction. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *March 1, 2014* | Four Properties / CES & Total Rewards | CEC, CAC and CGP (and various affiliates) executed Four Properties Transaction Agreement, including as an exhibit thereto a proposed Service Company Joint Venture term sheet among CEOC, CERP, and CGPH. |
| *March 19, 2014* | Four Properties | Duff & Phelps amended engagement letter with CEC and CEOC executed. |
| *April 21, 2014* | Tender Offers / B-7 Refinancing | CEC Board preliminarily approved B-7 Refinancing. |
| *April 28, 2014* | Tender Offers / B-7 Refinancing; Guarantee Release – 5% Sale | CEC Board approved Tender Offers, B-7 Refinancing and Guarantee Release – 5% Sale. |
| *May 4, 2014* | Tender Offers / B-7 Refinancing; Guarantee Release – 5% Sale | CEC Executive Committee consented to 5% Stock Sale, revised term sheets in connection with B-7 Refinancing and CGP reinvestment. CEC Offering Memorandum prepared in connection with the sale of 68.1 shares of CEOC's common stock, par value $0.01 per share, to third party investors. |
| *May 4, 2014* | Four Properties | CEC Special Committee approved amendment to bifurcate Four Properties Transaction; "Transaction A" included Bally's Las Vegas, The Quad and The Cromwell, and "Transaction B" included Harrah's New Orleans. |
| *May 5, 2014* | Four Properties | • Centerview issued fairness opinion to CEC Board with respect to Four Properties "Transaction A."<br>• Duff & Phelps issued fairness opinion to CEC and CEOC Boards with respect to Four Properties "Transaction A."<br>• Four Properties purchase agreement finalized and unanimously recommended by CEC and CAC Special Committees.<br>• CEC and CAC Boards approved Four Properties Transaction.<br>• Four Properties "Transaction A" closed. |
| *May 5, 2014* | Four Properties | First Amendment to Four Transaction Agreement executed. |
| *May 5, 2014* | Tender Offers / B-7 Refinancing | CEOC Board approved the terms of B-7 Transaction. |
| *May 5, 2014* | CES & Total Rewards | Services Company Joint Venture Term Sheet entered into among CEOC, CERP, and CGPH in connection with Four Properties Transaction. |
| *May 5, 2014* | Guarantee Release – 5% Sale | Scoggin, Chatham and Paulson each executed stock purchase agreements in connection with 5% Sale. |
| *May 6, 2014* | Tender Offers / B-7 Refinancing | CEOC announced B-7 Transaction and cash tender offer for its 5.625% and 10% Notes. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *May 6, 2014* | Guarantee Release – 5% Sale | CEC announced sale of 5% of CEOC's common stock to unidentified investors and asserted it released CEC Guarantee. |
| *May 7, 2014* | Tender Offers / B-7 Refinancing | CEOC presented to lenders proposed terms of B-7 Agreement. |
| *May 8, 2014* | General | Eric Hession elected as a CEOC Director. |
| *May 15, 2014* | Senior Unsecured Notes | Andrew Dietderich of Sullivan & Cromwell LLP, counsel for certain holders of Senior Unsecured Notes, sent the first demand letter to CEC asserting that the purported release of the CEC Guarantee was ineffective with respect to holders of Senior Unsecured Notes and constituted a default under the terms of the governing indentures. |
| *May 19, 2014* | Four Properties | Centerview issued fairness opinion to CEC Special Committee with respect to Four Properties "Transaction B." |
| *May 19, 2014* | General | CEC Board approved the Amended & Restated CES LLC Agreement and Omnibus Agreement. |
| *May 20, 2014* | CES & Total Rewards | CEOC, CERP and CGPH entered into services joint venture with CES. |
| *May 20, 2014* | CES & Total Rewards | CEOC, CERP and CGPH entered into Omnibus Agreement. CEOC contributed to CES all employees, equipment, technology and other intangibles used for shared services. CEOC received a 69.0% ownership interest and 33% of the voting rights in CES. |
| *May 20, 2014* | Four Properties | Duff & Phelps issued fairness opinion to CEC and CEOC Boards with respect to Four Properties "Transaction B." CEOC Board approved Four Properties "Transaction B" which then closed. CEOC transferred its interest in Harrah's New Orleans. |
| *May 25, 2014* | Atlantic City | CEOC sold the Atlantic Club to TJM Properties for $15.5 million. |
| *May 28, 2014* | Guarantee Release – 6% PIP | CEC Human Resources Committee approved the PIP. |
| *May 30, 2014* | General | CEOC appointed officers and governance committee. |
| *June 2014* | Intercompany | Intercompany Revolver outstanding balance of $261.8 million repaid, agreement amended, among other things, decreased to maximum principal amount of amount repaid, converted into a committed facility and maturity date shortened to June 2016. |
| *June 2, 2014* | Guarantee Release | CEOC delivered certificate of election to release CEC Guarantee. |
| *June 11, 2014* | B-7 Refinancing | B-7 Loan Agreement executed. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *June 27, 2014* | Atlantic City | CEC announced that it would close the Showboat; Marketing plan to retain Showboat customers within the Caesars' network is implemented. |
| *June 27, 2014* | General | Hession resigned from CEOC Board.  CEOC Board expanded to seven.  In addition to Loveman, six new directors are added: Rowan; Davis; Sambur; Bonderman; Stauber; and Winograd.  CEOC established the following committees and adopted related charters:<br>• Governance Committee, initially consisting of Stauber and Winograd;<br>• Executive Committee, initially consisting of Davis, Loveman, and Rowan; and<br>• Human Resources Committee, initially consisting of Davis, Loveman, and Rowan. |
| *June 27, 2014* | General | CEOC Board presented with Caesars overview orientation. |
| *July 2014* | General | Kirkland & Ellis selected as CEOC's counsel. |
| *July 25, 2014* | B-7 Refinancing | B-7 Transaction closed. |
| *July 29, 2014* | Guarantee Release | CEOC and CEC file separate 8-K forms. |
| *July 30, 2014* | General | CEOC adopted the following actions:<br>• CEOC adopted  Company Code of Business Conduct and Ethics Policies;<br>• CEOC adopted Corporate Governance Guidelines;<br>• CEOC established a Governance Committee, initially consisting of Sambur and Stauber; and<br>• Loveman is appointed Chairman. |
| *August 1, 2014* | General | Mesirow Financial Consulting retained as financial advisor to assist CEOC Governance Committee in investigating potential claims. |
| *August 3, 2014* | General | Filing of CEC/CEOC Declaratory Judgment Action approved by CEOC Directors (with independent directors abstaining). |
| *August 4, 2014* | General | WSFS commenced suit against Caesars entities relating to CEC Guarantee issues in Delaware. |
| *August 5, 2014* | General | CEC/CEOC commenced DJ Action against certain Second Lien Noteholders. |
| *August 10, 2014* | Senior Unsecured Notes | CEC and CEOC Boards approved Senior Unsecured Notes Transaction. |
| *August 12, 2014* | Senior Unsecured Notes | Note Purchase Agreements relating to Senior Unsecured Notes Transaction are executed. |
| *August 17, 2014* | General | Presentation to CEOC Governance Committee by Kirkland. |

| Date | Applicable Transaction(s) | Description of Event |
|---|---|---|
| *August 22, 2014* | Senior Unsecured Notes | CEOC entered into Senior Unsecured Notes Transaction. |
| *August 31, 2014* | Atlantic City | Showboat closed to the public. |
| *September 3, 2014* | Guarantee Release | Meehan Combs et al. filed suit against CEC and CEOC for allegedly breaching the Trust Indenture Act. |
| *September 15, 2014* | Guarantee Release | CEC and CEOC filed amended complaint in DJ Action. |
| *October 2, 2014* | PIK Notes | CEOC Executive Committee approved redemption/repurchase of PIK Notes. |
| *October 14-15, 2014* | PIK Notes | PIK Notes Transaction agreements executed. |
| *October 29, 2014* | Atlantic City | Stockton College submits a letter of intent to purchase Showboat. |
| *November 14, 2014* | Intercompany | CEOC repaid the $260.4 million balance on the Intercompany Revolver by CEC. |
| *December 3, 2014* | PIK Notes | CEOC completed redemption of PIK Notes. |
| *December 12, 2014* | Atlantic City | • VRC engaged by CEC to provide certain financial services.<br>• VRC issued a Certificate of Fair Value to CEOC and CEC with respect to the sale of the Showboat property.<br>• Showboat is sold to Richard Stockton College. |
| *January 12, 2015* | General | Involuntary Chapter 11 petition filed against CEOC in District of Delaware. |
| *January 14, 2015* | RSA | CEOC filed Restructuring Support Agreement. |
| *January 15, 2015* | General | CEOC filed voluntary Chapter 11 in the Northern District of Illinois. |
| *January 28, 2015* | General | Delaware Bankruptcy Court ruled that the voluntary chapter 11 case would proceed in the Northern District of Illinois. |
| *July 20, 2015* | RSA | CEOC, CEC and certain second lien noteholders entered into Second Lien RSA. |
| *July 31, 2015* | RSA | CEOC, CEC and more than 80% of the first lien noteholders entered into First Lien RSA. |
| *August 21, 2015* | RSA | CEOC, CEC and certain First Lien Bank Lenders and Credit Suisse AG, Caymans Island Branch entered into Bank RSA. |
| *March 12, 2015* | General | The Court entered the Examiner Order [Docket No. 675] directing the United States Trustee to appoint an examiner. |
| *March 25, 2015* | General | Court Order entered approving appointment of Richard J. Davis as the Examiner [Docket No. 992]. |

# APPENDIX 5:  LEGAL STANDARDS

# APPENDIX 5:  LEGAL STANDARDS

## TABLE OF CONTENTS

I.  Assumptions Applicable to All Analyses and Conclusions...................................................... 1

    A.  Choice of Law Analysis: Determining the Applicable Substantive Law ....................... 1

    B.  Choice of Law Analysis: Determining the Applicable Procedural Law......................... 4

II.  Avoidance Actions: Preferential Transfers ........................................................................ 5

III.  Avoidance Actions: Fraudulent Transfers ........................................................................ 9

    A.  Actual Fraudulent Transfer Law Under Section 548 of the Bankruptcy Code.............. 10

        1.  Elements.......................................................................................................... 10

            a.  Broad Definition of Transfer of an Interest in Property ...................... 10

            b.  Determination of Intent...................................................................... 13

                i.  Applicable Standard for Determining Intent............................. 13

                ii.  Determining Intent of a Corporation....................................... 15

                iii.  Impact of Belief of Solvency ................................................. 18

                iv.  Impact of Advice of Counsel ................................................. 19

            c.  Intent Must Be to Defraud or Hinder .................................................. 20

        2.  Badges of Fraud .............................................................................................. 21

        3.  Standard of Proof ............................................................................................ 25

    B.  Constructive Fraudulent Transfer Under Section 548 of the Bankruptcy Code............ 25

        1.  Reasonably Equivalent Value .......................................................................... 26

        2.  Insolvent, Inadequately Capitalized, or Unable to Pay Debts .............................. 30

        3.  Standard of Proof ............................................................................................ 30

    C.  Defenses to Actual and Constructive Fraudulent Transfer Claims under the
        Bankruptcy Code ................................................................................................. 31

        1.  Good Faith Transferees..................................................................................... 31

        2.  Statute of Limitations Defense.......................................................................... 37

        3.  Safe Harbor ..................................................................................................... 37

    D.  State Fraudulent Transfer Laws ............................................................................. 37

        1.  Choice of Law Analysis................................................................................... 39

            a.  Both Illinois and Federal Courts Rely on the "Most Significant
                Relationships" Test for Choice of Law Analysis............................ 40

            b.  Application of the Most Significant Relationship Test...................... 40

            c.  Inapplicability of Contractual Choice of Law Provisions................ 42

        2.  Fraudulent Transfer Under the UFTA ................................................................ 43

a.   Actual Fraudulent Transfer Under the UFTA...................................................... 44

b.   Constructive Fraudulent Transfer Under the UFTA........................................ 46

3.   Fraudulent Transfers Under the UFCA.................................................................. 48

a.   Actual Fraudulent Transfer Under the UFCA ................................................. 48

b.   Constructive Fraudulent Transfer Under UFCA............................................. 49

E.  Defenses to State Fraudulent Transfer Claims................................................................ 51

1.   Good Faith Defense .................................................................................................. 51

a.   Good Faith Defense Under the UFTA .............................................................. 51

b.   Good Faith Defense Under the UFCA .............................................................. 52

2.   Statutes of Limitations Defense .............................................................................. 53

3.   Safe Harbor ............................................................................................................... 54

4.   Summary of Differences Between UFTA and UFCA ............................................ 54

IV.   Collapsing Transactions for Fraudulent Transfer Claims ...................................................... 55

A.  Consolidation of Multiple Debtor Entities....................................................................... 57

B.  Effect of Collapsing Transfers on an Actual Fraudulent Transfer Analysis.................. 59

C.  Effect of Collapsing Transfers on a Constructive Fraudulent Transfer Analysis.......... 60

D.  Effect of Collapsing Transfers on a Statute of Limitations Analysis ............................ 61

V.   Bankruptcy Code Section 546(e) Safe Harbor Defense ...................................................... 61

A.  Introduction...................................................................................................................... 61

B.  Overview of Section 546(e) ............................................................................................. 62

C.  Purposes of the Safe Harbor ............................................................................................ 63

D.  Application of Section 546(e)........................................................................................... 64

E.  Statutory Requirements for Safe Harbor Protection ....................................................... 64

1.   The Existence of a Transfer ..................................................................................... 64

a.   A Qualifying Transfer Stems from the Debtor ............................................... 65

2.   The Substance of the Transfer:  Whether It Qualifies as a Settlement
Payment or One in Connection with a Securities Contract.................................... 67

a.   What Constitutes a Security............................................................................. 67

b.   Meaning of a "Settlement Payment"................................................................ 73

i.   Application to Privately Held Securities.................................................. 74

ii.   Asset Sales and One-Way Payments ...................................................... 75

c.   Meaning of "In Connection with a Securities Contract" ................................ 76

d.   "By," "To," or "For the Benefit of" a "Financial Institution" or
"Financial Participant"...................................................................................... 78

i.   "By" or "To" or "for the Benefit of" Requirement................................... 78

(a)  Mere Conduit .................................................................. 79

(b)  "Notes" transactions.......................................................... 80

ii.  The Requirement of a "Financial Institution" or a "Financial Participant" ......................................................................... 82

(a)  Financial Institution ........................................................ 82

(b)  Financial Participant ....................................................... 82

(1)  The "Other Human Affiliate" Limitation ............................... 83

(2)  15-Month Period Limitation .................................... 87

(3)  Contracts That May Be Considered Towards the Requisite Statutory Amount.................................... 88

F.  Interaction with State Law ........................................................... 88

VI.  Remedies for Avoidance Actions ......................................................... 91

A.  Recovery of Property or Damages ................................................... 91

B.  Ability of Transferee to Reduce Liability by Purchase Price Paid or Cost of Improvements ................................................................................ 93

1.  Protection for Good Faith Transferees.................................. 93

a.  Value Given for Property........................................... 93

b.  Cost or Value of Improvements ................................. 94

2.  Offset for Purchase Price ................................................. 95

3.  Unsecured Claim for Transferee Under Section 502(h) .................. 95

C.  Lost Profits and Prejudgment Interest............................................ 97

D.  Relevant Transferees.................................................................... 97

E.  Excess Recovery: "For the Benefit of the Estate" ........................... 99

F.  Equitable Power to Reduce Recovery of Certain Creditors....................... 100

VII.  Avoidance Actions: Aiding and Abetting Liability ......................................... 101

A.  Aiding and Abetting a Fraudulent Transfer ...................................... 102

1.  Fraudulent Transfer Claims under Section 548 of the Bankruptcy Code........... 102

2.  Fraudulent Transfer Claims Under Section 544 of the Bankruptcy Code ......... 103

3.  Bankruptcy Code Section 550 and Aiding and Abetting Liability .................... 104

VIII.  Single Entity Theories of Liability ................................................... 105

A.  Substantive Consolidation ......................................................... 105

1.  Legal Standards for Substantive Consolidation.............................. 106

a.  Single Economic Unit and Entanglement .................................. 107

b.  *Owens Corning* Test ................................................... 108

c.  Identity and Consolidation.............................................. 109

B.  Piercing the Corporate Veil ........................................................................ 111

    1.  Legal Standards for Piercing the Corporate Veil ................................. 111

        a.  New York .......................................................................... 111

        b.  Delaware .......................................................................... 112

        c.  Nevada ............................................................................. 113

IX.  Recharacterization ............................................................................................. 114

   A.  The Authority of Bankruptcy Courts to Recharacterize Claims ................. 114

      1.  Recharacterization Standards Under Bankruptcy Law ....................... 118

      2.  Recharacterization Standards Under State Law ................................. 119

X.  Claims for Unjust Enrichment ........................................................................ 121

XI.  Causes of Action Against Directors and Officers ........................................... 122

   A.  Breach of Fiduciary Duty .......................................................................... 122

      1.  Choice of Law ................................................................................. 123

      2.  Statute of Limitations ...................................................................... 123

      3.  Creditor Standing to Assert Breach of Fiduciary Duty Claims ......... 124

      4.  The Fiduciary Duties Owed To CEOC By Its Directors And CEC .................. 125

        a.  The Duty of Care ............................................................... 127

        b.  The Duty of Loyalty ........................................................... 129

        c.  Discharging Fiduciary Duties in the Context of Insolvency ......... 133

      5.  Standard of Review .......................................................................... 133

      6.  Remedies for Breach of Fiduciary Duty ........................................... 137

   B.  Aiding and Abetting Breach of Fiduciary Duty .......................................... 140

      1.  Choice of Law ................................................................................. 140

      2.  Elements .......................................................................................... 140

      3.  Remedies for Aiding and Abetting Breach of Fiduciary Duty ........... 143

## I.   Assumptions Applicable to All Analyses and Conclusions

### A.   Choice of Law Analysis: Determining the Applicable Substantive Law

Choice of law rules will determine which underlying state substantive laws apply to the transactions investigated by the Examiner.  Even so, "[a] court need not conduct a choice of law determination unless there is an actual conflict in the substantive law such that the case could have a different outcome depending on which law is applied."[1]  If there is such a conflict, and the parties disagree on which state's law applies, a court must perform an independent choice of law analysis.[2]  Given that the outcome of certain causes of action (in particular, fraudulent transfer, breach of fiduciary duty and aiding and abetting these causes of action) could vary depending on which substantive state law applies, a choice of law analysis will be necessary to conduct for many of the transactions in question.[3]

The choice of law analysis also may depend on whether the forum state or federal choice of law rules apply to an action brought in the bankruptcy case.[4]  If a suit is brought pursuant to a court's federal question jurisdiction, the choice of law inquiry is considered to be a question of federal law,[5] and is referred to as "federal common law" or the "most significant contacts" approach.[6]  Although "[f]ederal law may well look to state law for substantive principles . . .

---

[1]   *In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F. Supp. 747, 750 (N.D. Ill. 1996); s*ee also In re Stoecker*, 5 F.3d 1022, 1029 (7th Cir. 1993) (stating that a court need not conduct a choice of law analysis when the parties do not dispute which state's substantive law applies).  Nonetheless, one district court in the Northern District of Illinois has *sua sponte* disregarded the parties' agreement to utilize what it viewed as an inapplicable state's substantive law.  *See Paloian v. Geneva Seal, Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696, 702-03 (N.D. Ill. 2012).

[2]   *Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 425-26 (7th Cir. 1991).  Here, the Examiner understands that certain parties do not agree on which non-bankruptcy law applies to the various transfers and transactions.  For example, Wilmington Savings Fund Society, FSB, as successor Indenture Trustee for the Second Priority Senior Secured Notes due 2018, has alleged intentional and constructive fraudulent transfer claims under Delaware's enactment of the UFTA.  *See Wilmington Savings Fund Society, FSB v. Caesars Entertainment Corp.*, C.A. 10004-VCG, Complaint ¶¶ 155-166 (dated August 4, 2015).  The Ad Hoc Committee of First Lien Noteholders, however, maintains that New York's Debtor-Creditor laws, which mirror in large part the UFCA, apply to the transfers at issue.  The Debtors have indicated that the UFTA as adopted by either Nevada or Delaware may apply.

[3]   *Aircrash*, 948 F. Supp. at 750.

[4]   *Jones v. Morris (In re Morris)*, 30 F.3d 1578, 1581 (7th Cir. 1994).  For purposes of this Report, the Examiner assumes that any action to avoid an investigated transfer will be brought in the Bankruptcy Court.  The choice of law analysis, however, would be the same if the action were filed in the United States District Court for the Northern District of Illinois.

[5]   *Resolution Trust Corp. v. Chapman*, 29 F.3d 1120, 1124 (7th Cir. 1994).

[6]   *Aircrash*, 948 F. Supp. at 753.

which law to select is itself a question of federal law."[7]   Alternatively, when a federal court sits in diversity jurisdiction, the choice of law inquiry is governed by the choice of law rules of the forum state in which it sits.[8]   Because the forum state will often apply the "most significant contacts" approach, the forum state's choice of law inquiry may yield the same result as the federal choice of law inquiry.

Because a bankruptcy court's jurisdiction does not arise from diversity or federal question jurisdiction, but from 11 U.S.C. §1334, a case grounded on bankruptcy jurisdiction does not fit neatly within the choice of law rules applicable to diversity and federal question cases. Courts differ as to whether forum state or federal choice of law rules apply to an action based on bankruptcy jurisdiction.[9]   The Seventh Circuit has not yet decided which choice of law analysis applies in bankruptcy cases because in the three cases in which the issue was discussed, the court determined that the outcome would be the same regardless of which choice of law rule applied.[10]

---

[7]   *Resolution Trust Corp.*, 29 F.3d at 1124.

[8]   *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

[9]   The Ninth and Federal Circuits are the only circuit courts to have definitively held that courts should apply a federal choice of law analysis in bankruptcy cases.  *See Lindsay v. Beneficial Reinsurance Co.* (*In re Lindsay*), 59 F.3d 942, 948 (9th Cir. 1995) ("In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."); *Wordtech Sys., Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1318 (Fed. Cir. 2010) (same).  The Second, Fourth and Eighth Circuits have adopted an approach that follows *Klaxon* and applies the forum state's choice of law rules unless a compelling federal interest dictates otherwise.  *See Bianco v. Erkins (In re Gaston & Snow)*, 243 F.3d 599, 606-07 (2d Cir. 2001); *Compliance Marine, Inc. v. Campbell (In re Merritt Dredging Co.)*, 839 F.2d 203, 206 (4th Cir. 1998); *Amtech Lighting Servs. Co. v. Payless Cashways, Inc. (In re Payless Cashways)*, 203 F.3d 1081, 1084 (8th Cir. 2000).  The remaining circuit and lower courts are undecided.  *See, e.g., Jafari v. Wynn Las Vegas, LLC (In re Jafari)*, 569 F.3d 644, 649-51 (7th Cir. 2009); *Smith v. Quizno's Master LLC (In re Bouley)*, 503 B.R. 524, 530-31 (Bankr. D.N.H. 2013); *Global Indus. Tech., Inc. v. Ash Trucking Co., Inc. (In re Global Indus. Tech., Inc.)*, 333 B.R. 251, 256-57 (Bankr. W.D. Pa. 2005); *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530, 536 (5th Cir. 2012); *Hill v. Gibson Dunn & Crutcher LLP (In re MS55, Inc.)*, 420 B.R. 806, 820 (Bankr. D. Colo. 2009); *Perkins v. Champagne (In re Int'l Mgmt. Assocs., LLC)*, 495 B.R. 96, 100-02 (Bankr. N.D. Ga. 2013).

[10]   *See Jafari*, 569 F.3d at 651 ("[W]e need not decide whether state or federal law supplies the choice-of-law rules in a bankruptcy case because Nevada substantive law would apply either way."); *Fogel v. Zell* (*In re Madison Mgmt. Grp., Inc.*), 221 F.3d 955, 966 (7th Cir. 2000) (acknowledging the "persisting uncertainty as to whether state or federal law supplies the choice of law rules in a bankruptcy case"); *Morris*, 30 F.3d at 1582 ("This controversy need not be resolved here, however, since under either approach Iowa's substantive law would be applied to determine Morris, Inc.'s capacity to convey land after dissolution.") (internal citations omitted).

Consequently, the Bankruptcy Court will be required to determine which choice of law rules apply on a transaction by transaction basis.[11]

Courts that have favored application of the federal choice of law or most significant contacts test have generally relied on *Vanston Bondholders Protective Comm. v. Green*, a case in which the Supreme Court explained:

> A purpose of bankruptcy is so to administer an estate as to bring a ratable distribution of assets among the bankrupt's creditors. What claims of creditors are valid and subsisting obligations against the bankrupt at the time a petition in bankruptcy is filed, is a question which, in the absence of overruling federal law, is to be determined by reference to state law. But obligations . . . often have significant contacts in many states so that the question of which particular state's law should measure the obligation seldom lends itself to simple solution. In determining which contact is the most significant in a particular transaction, courts can seldom find a complete solution in the mechanical formulae of the conflicts of law. Determination requires the exercise of an informed judgment in the balancing of all the interests of the states with the most significant contacts in order to best accommodate the equities among the parties to the policies of those states.[12]

Notwithstanding *Vanston*, several courts have held that bankruptcy courts should apply the forum state's choice of law rules under the Supreme Court's holding in *Klaxon* unless a compelling federal interest dictates otherwise.[13] As noted above, however, if the outcome of the analysis would be the same under either a forum state or federal choice of law analysis, a bankruptcy court need not decide which choice of law rules apply.[14] Whether the outcome of the various causes of action relevant to the transactions investigated by the Examiner would differ depending upon application of the forum state or federal choice of law rules is discussed in the

---

[11] While not controlling, one bankruptcy court in the Northern District of Illinois has utilized a variation of the federal choice of law analysis in a fraudulent transfer context, stating as follows: "[T]he Court is not obliged to decide the matters at bar as would a federal district trial court using state substantive law in a diversity case, as *Erie* requires, because the federal questions under Bankruptcy Code sections 363(h), 522 and 544(b) must be decided utilizing federal bankruptcy jurisdiction along with the Illinois state exemption and fraudulent conveyance avoidance issues." *Voiland v. Gillissie (In re Gillissie)*, 215 B.R. 370, 377-78 (Bankr. N.D. Ill. 1998).

[12] *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161-62 (1946) (internal citations omitted).

[13] *See, e.g., Bianco*, 243 F.3d at 605-06 (noting that the above-quoted portion of *Vanston* is merely *dicta*); *see also Merrit Dredging Co.*, 839 F.2d at 206; *Amtech Lighting*, 203 F.3d at 1084; *ASARCO LLC v. Americas Mining Corp.*, 382 B.R. 49, 61 (S.D. Tex. 2007).

[14] *Jafari*, 569 F.3d at 649-51.

Report in connection with the analysis of each transaction and the potential cause of action related thereto.

### B.   Choice of Law Analysis: Determining the Applicable Procedural Law

In addition to determining the applicable *substantive* law, choice of law rules also determine the applicable *procedural* law. "Under traditional choice of law principles, the law of the forum state controls procedural questions, and the law of the state in which the cause of action accrued governs substantive issues."[15]   One such procedural question is the applicable statutes of limitation. "Statutes of limitation are procedural, merely fixing the time in which the remedy for a wrong may be sought, and do not alter substantive rights."[16]

Although Illinois law would generally control the determination of the appropriate limitations period, this general rule may be modified in instances where the forum state has a "borrowing statute." The Illinois "borrowing" statute provides as follows: "When a cause of action has arisen in a state or territory out of this State, or in a foreign country, and, by the laws thereof, an action thereon cannot be maintained by reasons of the lapse of time, an action thereon shall not be maintained in this State."[17]   Illinois applies this "borrowing" statute when "(1) the cause of action accrued in another jurisdiction; (2) the limitations period of that jurisdiction has expired; and (3) all parties were non-Illinois residents at the time the action accrued and remained so until the foreign limitations period expired."[18]

As discussed in the Report in connection with each of the transactions and causes of action analyzed, none of the causes of action identified arose in Illinois, and the likely parties to these causes of actions are not Illinois residents.  Accordingly, even if a cause of action were timely under the applicable Illinois statute of limitations, that action will be untimely and subject to a statute of limitations defense if the limitations period of the state in which the cause of action accrued has expired when the action is filed.  Accordingly, the Bankruptcy Code and any shorter

---

[15]   *Hernandez v. Cottrell, Inc.*, No. 10-cv-1522, 2014 WL 1292336, at *2 (N.D. Ill. 2014) (quoting *Cox v. Kaufman*, 571 N.E.2d 1011, 1015 (Ill. App. Ct. 1st Dist. 1991)).

[16]   *Id.* (quoting *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.* 770 N.E.2d 177, 194 (Ill. 2002)).  Some courts have ruled that the time limitations for fraudulent transfer laws are statutes of repose and as such are substantive law, not procedural law.  *See, e.g. Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 676 (S.D. Tex. Mar. 10, 2007) (holding that Texas UFTA is a statute of repose); *cf., In re Werner*, 386 B.R. 684, 698-99 (Bankr. N.D. Ill. 2008) ("Werner argues that the Uniform Fraudulent Transfer Act's four year statute of limitations is like a statute of repose, operating as a bar regardless of when the injury was discovered.  This cannot be true, because the UFTA allows actions to be brought 'within 4 years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant.'").

[17]   735 ILCS 13/210.

[18]   *Cottrell*, 2014 WL 1292336, at *3 (quoting *Newell Co. v. Petersen*, 758 N.E.2d 903, 908 (Ill. App. Ct. 2d Dist. 2001).

applicable state limitations period will likely govern the pertinent limitations periods applicable to the various causes of action applicable to each transaction.

## II. Avoidance Actions: Preferential Transfers

One of the primary purposes of the Bankruptcy Code is to promote equitable distributions among all similarly situated creditors. To help accomplish this goal and to prevent a debtor from preferring one creditor over another, the Bankruptcy Code provides that certain transfers made to creditors in the period leading up to the bankruptcy filing may be avoided and recovered for the benefit of the bankruptcy estate. Specifically, under section 547 of the Bankruptcy Code, payments made to creditors within the 90 days prior to the bankruptcy filing are subject to avoidance. This 90-day look-back period is extended to one year for payments made to insiders.

To state a preference claim, the trustee must show that there was:

(1) a transfer[19] of an interest of the debtor in property;[20]

(2) to or for the benefit of a creditor;[21]

(3) for or on account of an antecedent debt[22] owed by the debtor before such transfer was made;

---

[19]   The Bankruptcy Code defines a "transfer" to be "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property." 11 U.S.C. §101(54).

[20]   The Bankruptcy Code does not define "an interest of the debtor in property," but the Supreme Court has interpreted the phrase to mean "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Mahern v. Merchants Grain, Inc. (In re Merchants Grain, Inc.)*, 93 F.3d 1347, 1352 (7th Cir. 1996) (quoting *Begier v. U.S.*, 496 U.S. 53, 58 (1990)).

[21]   The Bankruptcy Code defines a "creditor" as, *inter alia*, an entity holding "a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. §101(10)(A).

[22]   A "debt" is defined by the Bankruptcy Code as a "liability on a claim." *See* 11 U.S.C. §101(12). The Seventh Circuit has recognized that by defining debt to mean "liability on a claim," Congress intended to give "debt" the same broad meaning it gave the term "claim." *Steinberg v. SOCAP Int'l, Ltd. (In re Energy Coop., Inc.)*, 832 F.2d 997, 1001 (7th Cir. 1987) (recognizing that the broad definition of a claim includes "all legal obligations of the debtor, *no matter how remote or contingent*"). Thus, "when a creditor has a claim against a debtor – even if the claim is unliquidated, unfixed, or contingent – the debtor has incurred a debt to the creditor." *Id.*; *see also WARSCO v. Preferred Technical Grp.*, 258 F.3d at 557, 569 (7th Cir. 2001) ("An antecedent debt exists when a creditor has a claim against the debtor, even if the claim is unliquidated, unfixed, or contingent.").

    (4) made while the debtor was insolvent;[23]

    (5) made on or within 90 days before the date of the filing of the petition, within 1 year before the date of the filing of the petition, if the creditor was an insider[24] at the time of the transfer; and

    (6) that enables such creditor to receive more than it would receive in a chapter 7 case.[25]

The trustee or debtor-in-possession bears the burden of proving the elements of Bankruptcy Code section 547(b) by a preponderance of the evidence.[26]

---

[23]  A debtor "is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." *See* 11 U.S.C. §547(f). This presumption requires the defendant to present rebuttal evidence, but it does not relieve the plaintiff of the ultimate burden of proof on the issue. *See Fisher v. Enter. Truck Linc, Inc. (In re Cxm, Inc.)*, 336 B.R. 757, 760 (Bankr. N.D. Ill. 2006) (citing *In re Taxman Clothing Co., Inc.*, 905 F.2d 166, 168 (7th Cir. 1990)). The standards for evaluating whether a debtor was solvent at the time of a particular transfer are discussed in more detail in Section V of the Final Report.

[24]  If the debtor is a corporation, the term "insider" includes a director, officer, or person in control of the debtor, a partnership in which the debtor is a general partner, a general partner of a debtor, or a relative of any of the foregoing. 11 U.S.C. §101(31)(B). The Bankruptcy Code's definition of an insider is intended to be illustrative rather than exhaustive. *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996). Therefore, the definition may include persons who are not expressly enumerated in the statute, *i.e.*, "non-statutory insiders." Courts focus on two factors in determining whether a person is a non-statutory insider: (1) the closeness of the relationship between the parties; and (2) whether the transaction was negotiated at arm's length. *In re S. Core Beach Sec, Inc.*, 606 F.3d 366, 377 (7th Cir. 2010); *Krehl*, 86 F.3d at 741.

Insiders also include affiliates or insiders of affiliates "as if such affiliate were the debtor" and managing agents of the debtor. 11 U.S.C. §101(31)(E) & (F).

An "affiliate" is defined as an entity that "directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor" or a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor," subject to some exceptions. 11 U.S.C. §101(2).

Based on these definitions, CEC, Apollo, TPG, CERP, CAC, and CGP are all likely to be characterized as statutory or non-statutory insiders.

[25]  11 U.S.C. §547(b).

[26]  11 U.S.C. §547(g) ("[T]he trustee has the burden of proving the avoidability of a transfer under subsection (b) of this section . . . ."); *Comput. World Sol. v. Apple Fund LP (In re Comput. World Sol., Inc.)*, 427 B.R. 680, 696 (Bankr. N.D. Ill. 2010) (finding that "the Debtor has met its

Because the statute provides for the avoidance of transfers "to or for the benefit of" a creditor, a creditor does not have to be the recipient of the transfer to be subject to a preference claim so long as the transfer was made for the benefit of the creditor.[27]   Indeed, because preferential transfers may be recovered either from the "initial transferee" or "the entity for whose benefit such transfer was made,"[28] guarantors are commonly targeted where guaranteed debt has been repaid during the applicable period.[29]   This issue may be relevant because certain

---

burden . . . and has proved by a preponderance of the evidence that the Transfers were in fact preferential.").

[27]   See, e.g., Crafts Plus+ Foothill Capital Corp. (In re Crafts Plus+, Inc.), 220 B.R. 331, 334 (Bankr. W.D. Tex. 1998) ("These sections require neither that the transfer, in order to be avoided, be only to a creditor, nor that the avoided transfer be recovered only from a creditor."); Warsco, 258 F.3d at 564 (recognizing that indirect transfers made by third parties to a creditor on behalf of the debtor may qualify as preferential).

[28]   11 U.S.C. §550(a)(1).

[29]   See Bonded Fin. Servs., Inc. v. European Am. Bank (In re Bonded Fin. Servs., Inc.), 838 F.2d 890, 895 (7th Cir. 1988) ("The paradigm 'entity for whose benefit such transfer was made' is a guarantor . . . who receives the benefit but not the money."); see also Marwil v. Oncale (In re Life Fund 5.1 LLC), No. 10A42, 2010 WL 2650024, at *5 (Bankr. N.D. Ill. June 30, 2010) ("The guarantor benefits from the initial transfer to the creditor because the transfer has the effect of reducing the guarantor's obligations on the guaranty.").   Some guarantees contain so-called "Deprizio waivers" pursuant to which a guarantor waives its right of contribution or subrogation against the debtor.   These waivers became prevalent after the Seventh Circuit's decision in Levit v. Ingersoll Rand Fin. Corp. (In re Deprizio), 874 F.2d 1186 (7th Cir. 1989) in which the court held that transfers by a debtor to a lender which had the effect of benefiting an insider-guarantor could be recovered from the lender if the transfers were made within the one-year recovery period applicable to insiders.   The effect of the Deprizio decision was to subject lenders to the one-year lookback period applicable to insiders if the debt was guaranteed by an insider.   To avoid this result, lenders began to include "Deprizio waivers" in guarantee agreements so that the insider-guarantor would not be considered a "creditor" of the debtor.   The Bankruptcy Code was subsequently amended to clarify that non-insiders would not be subject to the one-year lookback period applicable to insiders even if they received a payment that benefited the insider.   See 11 U.S.C. §547(i) and §550(c).   Despite these amendments, many loan documents continue to include Deprizio waivers, and courts remain divided on the issue of whether Deprizio waivers are enforceable.   Compare Stahl v. Simon (In re Adamson Apparel, Inc.), 785 F.3d 1285, 1294 (9th Cir. 2015) (holding that a guarantor's waiver of its subrogation right was enforceable, at least where it could be shown that the waiver was not a "sham" intended solely to avoid potential preference liability) with Telesphere Liq. Trust v. Galsei (In re Telesphere Commc'ns, Inc.), 229 B.R. 173, 176 n.3 (Bankr. N.D. Ill 1999) ("[T]he 'Deprizio waiver' could only be seen as an effort to eliminate, by contract, a provision of the Bankruptcy Code.   The attempted waiver . . . was thus . . . unenforceable as a matter of public policy."); see also Linnemann v. Post (In re Mission Bay Ski & Bike, Inc.), 398 B.R. 250, 255 (Bankr. N.D. Ill. 2008) (Goldgar, J.), (questioning, without deciding, whether a waiver provision designed to prevent insider-guarantors from incurring preference liability would be enforceable).

of the debts of CEOC were guaranteed by CEC.  Thus, to the extent a payment by CEOC within the year prior to its bankruptcy filing reduced CEC's liability on a guarantee, then the payment could be viewed as a payment "for the benefit" of CEC and, therefore, CEC could be liable for the preferential transfer.

Section 547(c) provides a list of affirmative defenses that may be asserted by a transferee. The most common defenses are (i) the contemporaneous exchange for new value defense provided by section 547(c)(1) of the Bankruptcy Code,[30] (ii) the ordinary course of business defense provided by section 547(c)(2) of the Bankruptcy Code[31] and (iii) the subsequent new value defense provided by section 547(c)(4) of the Bankruptcy Code.[32]  The additional defense provided by the safe harbor provision of Bankruptcy Code section 546(e) is discussed more thoroughly in Section V of this Appendix.

State law may also provide for the recovery of preferential transfers.  Under the Uniform Fraudulent Transfers Act ("UFTA"), transfers *to insiders* are avoidable where: (i) the transfer was for an antecedent debt, (ii) the debtor was insolvent at the time of the transfer and (iii) the insider had reasonable cause to believe the debtor was insolvent.[33]  Similarly, under the Uniform Fraudulent Conveyance Act ("UFCA") adopted in New York, payments to insiders by an insolvent individual or entity are deemed not to be transfers for fair consideration and, therefore,

---

[30]  Under this defense, transfers are not subject to avoidance if the transfer was intended to be a contemporaneous exchange for new value given to the debtor and was in fact a substantially contemporaneous exchange.  "New value" is defined to include "money or money's worth in goods, services, or new credit" but does not include "an obligation substituted for an existing obligation."  11 U.S.C. §547(a)(2).  In the Seventh Circuit, the issue of whether a transfer is a "substantially contemporaneous" exchange is determined on a case by case basis.  *See Pine Top Ins. Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 969 F.2d 321, 328 (7th Cir. 1992) (determining that an exchange was substantially contemporaneous even though approximately two to three weeks had elapsed based on the following factors: (i) the length of delay, (ii) the reason for the delay, (iii) the nature of the transaction, (iv) the intentions of the parties and (v) the possible risk of fraud).

[31]  To establish this defense, a transferee must show that the debt was incurred in the ordinary course of business and that the transfer was made either (a) in the ordinary course of business of the debtor and the transferee or (b) according to ordinary business terms.  The purpose of the defense is to "leave undisturbed normal commercial and financial relationships and protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of both the debtor and the debtor's transferee."  *Kleven v. Household Bank, F.S.B.*, 334 F.3d 638, 642 (7th Cir 2003).

[32]  For this defense to apply, "(1) the creditor must have received a transfer which is avoidable as a preference, (2) after receiving the preferential transfer, the creditor must advance unsecured credit, goods or services to the debtor and (3) that additional credit must remain unpaid as of the petition date."  *Maxwell v. IDC (In re marchFirst, Inc.)*, 381 B.R. 689, 697-98 (Bankr. N.D. Ill. 2008).

[33]  Nev. Rev. Stat. §112.190(2); Del. Code Ann. tit. 6, §1305(b); N.J. Stat. Ann. §25:2-27.

are subject to avoidance.[34]   The UFTA and UFCA provide some defenses similar to those provided by the Bankruptcy Code.[35]

After evaluating whether any of the transactions constituted preferential transfers, the Examiner determined that the only transfer avoidable as a preference was the repayment of $260.4 million under the Intercompany Revolver on May 30, 2014.  As discussed in more detail in Section IX.E of the Final Report, no party has identified any applicable defense to a preference claim to recover this payment, and there does not appear to be any dispute that this transfer is subject to avoidance as a preference.  There were other payments on CEOC indebtedness that, to the extent CEC was a guarantor of the debt, could be characterized as payments to the benefit of CEC.[36]  However, as discussed in more detail in Section IX of the Final Report, these transfers are likely protected from avoidance pursuant to the safe harbor provided by section 546(e).

## III. Avoidance Actions: Fraudulent Transfers

Transfers made or obligations incurred by a debtor may be avoided if they were either actually or constructively fraudulent.  The vast majority of the transactions investigated by the Examiner were alleged by numerous creditor constituencies to be either actual or constructive fraudulent transfers.  The Bankruptcy Code provides two separate avenues for a debtor to assert a fraudulent transfer claim.  The first is under Bankruptcy Code section 548, which enables a debtor to avoid certain transfers and obligations incurred within two years of the date of the filing of the bankruptcy petition.[37]  The second avenue is section 544(b) of the Bankruptcy Code, which allows a debtor to avoid any transfer of the debtor's property, or obligation incurred, that is voidable under "applicable law" by an unsecured creditor.[38]  The phrase

---

[34]  *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 634 (2d Cir. 1995).

[35]  For instance, the UFTA provides a defense "[t]o the extent the insider gave new value to or for the benefit of the debtor after the transfer was made unless the new value was secured by a valid lien" and if the transfer was "made in the ordinary course of business or financial affairs of the debtor and the insider."  *See* Nev. Rev. Stat. §112.220(6); Del. Code Ann. tit. 6, §1308(f); N.J. Stat. Ann. §25:2-30(f).  The UFTA also provides a defense for transfers "made pursuant to a good faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor."  *Id.*  The UFCA provides a defense where the transfer is given for contemporaneous new value.  *HBE Leasing Corp.,* 48 F.3d at 623; *see also, e.g.*, *Cilco Cement Corp. v. White*, 55 A.D. 2d 668, 668, 390 N.Y.S.2d 178, 178 (2d Dep't 1976).

[36]  Preferential transfers may be recovered either from the "initial transferee" or "the entity for whose benefit such transfer was made."  *See* 11 U.S.C. §550(a)(1).  A guarantor of a debt is considered to be an entity that benefits from the transfer.  *See Bonded Fin. Serv.*, 838 F.2d 890, 895 (7th Cir. 1988) ("The paradigm 'entity for whose benefit such transfer was made' is a guarantor . . . who receives the benefit but not the money.").

[37]  11 U.S.C. §548(a) (2015).

[38]  11 U.S.C. §544(b) (2015).

"applicable law" in Bankruptcy Code section 544(b) generally refers to state and other federal fraudulent transfer laws.[39]

This Section first considers fraudulent transfer law under section 548 of the Bankruptcy Code and then proceeds to analyze state fraudulent transfer laws as incorporated by section 544(b) of the Bankruptcy Code.   Subsequent sections will analyze whether multi-step transactions may be collapsed for fraudulent transfer purposes, common defenses, and liability (or non-liability) for aiding and abetting a fraudulent transfer.

### A.   Actual Fraudulent Transfer Law Under Section 548 of the Bankruptcy Code

A transfer of the debtor's property, or the incurrence of an obligation by the debtor, that is made with the intent to hinder, delay or defraud creditors may be avoided as an actual fraudulent transfer pursuant to section 548(a)(1)(A) of the Bankruptcy Code.  Similarities in state fraudulent transfer laws will be noted here, but discussed more in depth in subsequent sections.

### 1.   Elements

The required elements to set aside a transfer as actually fraudulent under Bankruptcy Code section 548 (as well as state law) are that the debtor:  (i) transferred an interest in property or incurred an obligation (ii) with "actual intent" (iii) to hinder, delay, or defraud" a creditor.[40]

### a.   Broad Definition of Transfer of an Interest in Property

The first element, the term "transfer" is broadly defined to include "(A) the creation of a lien; (B) the retention of title as a security interest; (C) the foreclosure of a debtor's equity of redemption; or (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."[41]  As a result, under both state and federal law, a transfer of the debtor's property includes any type of

---

[39]  *Dicello v. Jenkins (In re Int'l Loan Network, Inc.)*, 160 B.R. 1, 17 n.25 (Bankr. D.D.C. 1993).

[40]  11 U.S.C. §548(a)(1)(A) (2015) (emphasis added); *accord* Del. Code Ann. tit. 6, §1304(a)(1) (West 2015); 740 Ill. Comp. Stat. Ann. 160/5(a)(1); Nev. Rev. Stat. §112.180(1)(a) (2015); 28 U.S.C. §3304(b)(1)(A).

[41]  11 U.S.C. §101(54) (2015); *see also* Del. Code Ann. tit. 6, §1301(12) (West 2015) ("'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance. . . ."); 740 Ill. Comp. Stat. Ann. 160/2(l) (same); Nev. Rev. Stat. §112.150(12) (2015) (same); 28 U.S.C. §3301(6) (same); 5 Collier on Bankruptcy ¶548.03[1], [2][a] ("[N]ot all transfers are within §548's scope; only those that affect property that would have been property of the estate but for the transfer.") (citing *Begier v. IRS*, 496 U.S. 53, 59 (1990)).

transfer that reduces the assets available or makes it less likely that such assets will be available to satisfy the debtor's creditors.[42]

Given the breadth of the definition of transfer, two courts have indicated that a transfer of a corporate opportunity may constitute a fraudulent transfer.[43]  Whether a transfer of a corporate opportunity constitutes a fraudulent transfer is relevant to the Examiner's investigation of CEOC's transfer of various trademarks, including the World Series of Poker, and the creation of CIE and CGP.  An "obligation" incurred by the debtor includes any transaction that increases the claims against estate assets and thereby proportionately decreases creditor dividends.[44]

The second element, "interest in property," is a threshold inquiry with respect to any preference or fraudulent transfer claim.[45]  Property of a debtor does not include property in which a debtor does not possess legal or equitable title.[46]  When considering whether property is an asset of

---

[42]  *See Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1282 (9th Cir. 1996) ("A transfer is a disposition of an interest in property.  The definition of transfer is as broad as possible. Many of the potentially limiting words in current law are deleted, and the language is simplified.  Under this definition, any transfer of an interest in property is a transfer, including a transfer of possession, custody, or control even if there is no transfer of title, because possession, custody, and control are interests in property.") (quoting S. Rep. No. 989, 95th Cong., 2d Sess. 27 (1978)); 5 Collier on Bankruptcy ¶548.03[1] ("[T]he Bankruptcy Code's concept of 'transfer' includes more than ordinary transactions in which goods and services are voluntarily exchanged for consideration.  It also includes transactions in which title to property is changed in a way that could affect creditors although ultimate ownership remains intact as well as transactions in which the debtor terminates or modifies intangible property rights, such as contract rights or releases causes of action.") (footnote omitted).

[43]  *Rajala v. Gardner (In re Generation Res. Holding Co.)*, No. 09-2482-EFM, 2012 WL 1189773, at *15 (D. Kan. Apr. 9, 2012) *aff'd*, 709 F.3d 1031 (10th Cir. 2013) (applying broad definition of transfer under UFTA to conclude that plaintiff's allegations were sufficient to support a fraudulent transfer claim where plaintiffs alleged the transfer of a corporate opportunity); *cf*. *Smith v. Nicholas/Earth Printing, L.L.C. (In re Bob Nicholas Enter., Inc.),* 358 B.R. 693, 701-02 (Bankr. S.D. Tex. 2007) (for transfer of corporate opportunity to support a fraudulent transfer claim, plaintiff must prove existence of a valid corporate opportunity and that transferor had the financial resources to pursue the opportunity).

[44]  5 Collier on Bankruptcy ¶548.03[4][a] ("Just as avoiding a transfer brings back assets to the estates to increase distributions, avoiding an obligation decreases the claims against the already existing estate assets, which then proportionately increases creditor dividends.").

[45]  *See Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d 1111 (5th Cir. 1995); *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enter., Ltd.)*, 859 F.2d 561, 564 (8th Cir. 1988).

[46]  11 U.S.C. §541(a).

the debtor, "[t]he fundamental inquiry is whether the transfer diminished or depleted the debtor's estate."[47]

The Supreme Court has stated that property of a debtor's estate is "best understood as that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings."[48] Thus, "if the debtor transfers property that would not have been available for distribution to his creditors in a bankruptcy proceeding, the policy behind the avoidance power is not implicated."[49]

The Examiner has concluded that the 5% Stock Sale, PIP and CEC Guarantee Release did not constitute transfers of a debtor's property interest, and therefore no fraudulent transfer claim can be asserted with respect to those transactions. The 5% Stock Sale and PIP transactions both involve a transfer of previously issued stock by a stockholder, CEC, which is a non-debtor. Courts are in general agreement that the transfer of debtor stock held by a non-debtor does not constitute a transfer of debtor property because "a corporation has no such interest in shares of its stock held by stockholders."[50] Similarly, the CEC Guarantee was issued by CEC, a non-debtor.

_____

[47] 5 *Collier on Bankruptcy*, ¶ 547.03[2] (16th ed. Rev. 2015); *see also Hansen v. MacDonald Meat Co.(In re Kemp Pac. Fisheries, Inc.)*, 16 F.3d 313, 316 (9th Cir. 1994) (explaining courts apply the "diminution of estate" doctrine to determine if property that is transferred belongs to the debtor); *Nordberg v. Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1180-82 (11th Cir. 1987); *Coral Petroleum, Inc. v. Banque Paribas-London (In re Coral Petroleum, Inc.)*, 797 F.2d 1351, 1355 (5th Cir. 1986) (for any avoidance action "it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished.") (internal quotations omitted).

[48] *Begier v. IRS*, 496 U.S. 53, 58-59 (1990).

[49] *Id.* at 58. *See* 5 *Collier on Bankruptcy*, ¶ 547.03[2] (16th ed. Rev. 2015) ("[t]he fundamental inquiry is whether the transfer diminished or depleted the debtor's estate."); *see also Hansen v. MacDonald Meat Co. (In re Kemp Pac. Fisheries, Inc.)*, 16 F.3d at 316 (courts apply the "diminution of estate" doctrine to determine if property that is transferred belongs to the debtor); *Coral Petroleum*, 797 F.2d at 1355 ("For a preference to be voided under section 547, 'it is essential that the debtor have an interest in the property transferred so that the estate is thereby diminished.'").

[50] *Victor v. Riklis*, No. 91 CIV. 2897 (LJF), 1992 WL 122911, at *4 (S.D.N.Y. May 15, 1992) (citing *In re Journal–News Corp.*, 193 F.2d 492 (2d Cir. 1951)); *In re Calamity Jane's, Inc.*, 22 B.R. 5, 7 (Bankr. D.N.J. 1982); *see also Uranga v. Geib (In re Paso Del Norte Oil Co.)*, 755 F.2d 421, 424 (5th Cir. 1985) ("It is widely recognized, and we have previously held, that a corporation, even if a debtor in bankruptcy, has no property interest in the shares of its stock owned by shareholders.") (citing *First Sw. Corp. v. Texas Consumer Fin. Corp. (In re Texas Consumer Fin. Corp.)*, 480 F.2d 1261, 1266 (5th Cir. 1973)); *In re Journal-News Corp.*, 193 F.2d 492, 492 (2nd Cir. 1951); *Global Crossing Estate Representative v. Winnick*, No. 04 Civ.2558(GEL), 2006 WL 2212776, at *8 n.10 (S.D.N.Y. Aug. 3, 2006) (differentiating between cases that establish a corporation has no property interest in shares held by its shareholders, compared to stock held by the corporation).

The CEC Guarantee Release may have impacted creditors of CEOC, but the CEC Guarantee itself was not property of the Debtors.  Indeed, had CEC paid CEOC creditors on the CEC Guarantee, CEC would have a subrogation claim against CEOC for the same amount any such payment.[51]  The Debtors' estates would be no better or worse off had payments been made by CEC on the CEC Guarantee.

### b.  Determination of Intent

#### i.  Applicable Standard for Determining Intent

In the case of *In re Sentinel Mgmt. Grp., Inc.*, the Seventh Circuit held that even if a debtor's primary purpose in making a transfer or incurring an obligation was not to hinder, delay, or defraud creditors, the debtor nevertheless intended that result when the result was the "natural consequence of its actions."[52]   In *Sentinel*, an investment management company pledged customer assets to secure an overnight loan instead of maintaining the assets in segregated accounts as required by the Commodity Exchange Act (the "CEA").[53]  The trial court found that Sentinel was "driven by a desire to stay in business" and the pledge was "not an attempt 'to drain its assets and make them unavailable to other creditors.'"[54]   However, the Seventh Circuit rejected the trials court's conclusion that "such motivation was insufficient to constitute actual intent to hinder, delay, or defraud" its clients.[55]  The Seventh Circuit explained that, as a "natural consequence of its actions," assets were rendered permanently unavailable to Sentinel's clients and that, under the CEA, Sentinel "knowingly exposed its . . . clients to a substantial risk of loss of which they were unaware" by pledging the assets as collateral for a loan "in an unlawful

---

[51]  11 U.S.C. §509(a).

[52]  *In re Sentinel Mgmt. Grp., Inc.*, 728 F.3d 660, 667 (7th Cir. 2013) (holding that debtor investment manager's transfers of clients' segregated funds into its clearing accounts as collateral for its own loan demonstrated actual intent, even if the manager's primary purpose may not have been to render funds permanently unavailable to its clients); *see also Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 503 B.R. 239, 279-80 (Bankr. S.D.N.Y. 2013) )(*Tronox II*) (citing *Sentinel* and holding that "the clear and intended consequence" of an act that creditors would be hindered or delayed "as the direct consequence of the scheme"); *ASARCO LLC v. Ams. Mining Corp. (In re ASARCO, LLC)*, 396 B.R. 278, 386-87 (S.D. Tex. 2008) (explaining that "courts have held that a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would inevitably be hindered, delayed, or defrauded"); *cf. Perceptron, Inc. v. Silicon Video, Inc.*, No. 5:06-CV-0412 (GTS/DEP), 2011 WL 4595003, at *12 (N.D.N.Y. Sept. 30, 2011) (analyzing as a badge of fraud the debtor's "knowledge" that a creditor's claims were "so likely to arise as to be certain" and that it would be unable to pay the claims).

[53]  *Sentinel*, 728 F.3d at 662-63.

[54]  *Id.* at 667-68.

[55]  *Id.* at 667.

manner."[56]   A number of courts have followed the Seventh Circuit's *Sentinel* holding.[57]   This "natural consequence" standard is relevant to most, if not all, of the transactions investigated by the Examiner.

There is, however, some question regarding the meaning of the "natural consequences" standard.   For instance, in *Lyondell II*,[58] the court stated that "natural consequences" on its own was "too ambiguous to constitute a standard upon which a court can rely."[59]   Instead the court followed the decisions of other courts and adopted the standard for intent from the *Restatement (Second) of Torts*.[60]   Under the *Restatement* standard, a person acts with intent when "the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."[61]   The court explained that "natural consequences" can be understood two ways – (i) "to be simply a different way of saying what the *Restatement* says – that even if a person didn't form the actual intent to cause particular consequences, liability can be imposed if that outcome was inevitable from the outset;" or (ii) "as a different way of saying that the consequences are merely 'foreseeable.'"[62]   The *Lyondell II* court refused to adopt the latter, broader meaning of "natural consequences" because the court concluded that to do so

---

[56]   *Id.* at 667-68.

[57]   *See, e.g.*, *F.D.I.C. v. FBOP Corp.*, No. 14C4307, 2015 WL 1538802, at *7 (N.D. Ill. Mar. 31, 2015) ("natural consequence" of the parent's placing tax refunds into accounts subject to its creditors liens was to render the refunds unavailable to the their rightful owners); *Tronox II*, 503 B.R. at 279-80 (citing *Sentinel* and holding that "the clear and intended consequence" of an act was that creditors would be hindered or delayed "as the direct consequence of the scheme"); *ASARCO*, 396 B.R. at 386-87 ("[C]ourts have held that a transfer may be made with fraudulent intent even though the debtor did not intend to harm creditors but knew that by entering the transaction, creditors would be hindered, delayed, or defrauded.") (citing *In re Am. Props., Inc.*, 14 B.R. at 643); *Ritchie Capital Mgmt., L.L.C. v. Stoebner*, No. 12-3038 (SRN), 2014 WL 1386724, at *31 (D. Minn. Jan. 6, 2014), *aff'd*, 779 F.3d 857 (8th Cir. 2015) (holding that when an owner "raided" its debtor company by pledging "assets that should have been available for [the company's] own financing needs, and ultimately, for its creditors," the owner "either intended to render those assets unavailable . . . or at the very least, should have seen this result as a natural consequence of [his] actions.") (internal quotation marks omitted).

[58]   *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.),* 541 B.R. 172, 184-85 (Bankr. S.D.N.Y. 2015) ("*Lyondell II*").

[59]   *Id.* at 185.

[60]   *Id.* at 184 n.59 (citing *ASARCO LLC v. Am. Mining Corp.*, 396 B.R. 278, 387 (S.D. Tex. 2008)); *Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 12 n.16 (S.D.N.Y. 2007); *Tronox II*, 503 B.R. at, 279; *see also* 5 Collier on Bankruptcy ¶ 548.04 (16th ed. 2015) ("many courts look to the Restatement (Second) of Torts to refine the concept of intent under section 548").

[61]   *Lyondel II* at 183 n.57 (quoting *Restatement (Second) of Torts* (1965) §8A).

[62]   *Id.* at 185.

"would effectively impose a standard quite a bit short of actual intent, leaving too much potential for a finding of liability based solely on negligence."[63]

It is not required that the intent to hinder, delay, or defraud creditors be directed to a particular creditor, "as long as the intent is generally directed toward present or future creditors of the debtor."[64]  In addition, courts have found that a fraudulent transfer claim exists even where a debtor has "dual purposes" for a transfer, one of which is proper and one that shows an actual intent to hinder, delay or defraud creditors.[65]

## ii.   Determining Intent of a Corporation

It is ordinarily the debtor's intent that is relevant for this inquiry.[66]  When the debtor is a corporate entity, courts look to the intent and knowledge of the entity's officers, directors, and

---

[63]  *Id.*  The *Lyondell II* court explained that the Seventh Circuit in *Sentinel* "never made mention of the *Restatement* —much less did it reject the *Restatement* as a standard—and could have reached the same bottom-line conclusion (which was probably correct) under the *Restatement*'s second prong."  *Id.*  The court also noted that it could "find no instance in which the *Restatement* standard has been rejected."  *Id.*  With respect *Tronox II*, which as noted above cited *Sentinel*, the court explained that the "clear and intended consequence" standard was in line with the Restatement.  *Id.* at 186 n.64 (citing *Tronox II*, 503 B.R. at 279-80).

[64]  *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Grp., LLC)*, 439 B.R. 284, 304 (S.D.N.Y. 2010).

[65]  *Nelmark v. Helms*, No. 02 C 0925, 2003 WL 1089363, at *2 (N.D. Ill. Mar. 11, 2003) ("actual intent is shown where the debtor's transfers are motivated even in part by a desire to hinder, delay, or defraud creditors"); *United States v. Engh*, 330 F.3d 954, 956 (7th Cir. 2003) (affirming a finding of actual fraudulent intent and noting that "[r]egardless of what other motivations for the transfer may have been present, a clear intent to avoid a creditor . . . was also present"); *718 Arch St. Assocs., Ltd. v. Blatstein (In re Blatstein)*, 192 F.3d 88, 97 (3d Cir. 1999) ("Our inquiry . . . is whether [debtor] intended to hinder or delay a creditor.  If he did, he had the intent penalized by the statute notwithstanding any other motivation he may have had for the transfer.") (quoting *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986)); *Kelley v. Thomas Solvent Co.*, 725 F. Supp. 1446, 1455 (W.D. Mich. 1988) (intent to hinder, delay, or defraud need not be "the sole reason for the conveyance" so long as it "is motivated wholly or in part by a desire to hinder delay, or defraud creditors"); *Bertram v. WFI Stadium, Inc.*, 41 A.3d 1239, 1247 (D.C. 2012) ("[E]ven if a debtor has at least one non-fraudulent motive for a transaction, the additional motive of effecting the transaction to hinder a creditor is a sufficient ground for an unassailable conclusion of fraudulent intent.") (internal quotation marks and changes omitted).

[66]  *See, e.g.*, *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) ("Cases under §548(a)(1)(A) indicate that it is the intent of the transferor and not the transferee that is relevant for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy Code.") (citing cases); 5 Collier on Bankruptcy ¶ 548.04[2] ("Section 548(a)(1)(A) does not contain any reference to the state of mind or knowledge of the transferee.  The only inquiry concerning actual intent that matters is that of the

agents.[67]  In *Lyondell I*, the court held that in order for the knowledge or intent of directors to be imputed to a corporation, it must be shown that either (i) the knowledge or intent belonged to the "critical mass" of the directors or (ii) if the directors with the knowledge or intent were not a "critical mass," then the officers or directors nevertheless had the ability to "control the disposition" by influence on the other directors.[68]

The court in *Lyondell I*, did not define what it meant by a "critical mass" of directors. However, based on the discussion in the case, it appears to refer to the number of directors that would be required to direct the corporation to take a particular action.[69]  Even if it cannot be shown that the knowledge or intent was possessed by a "critical mass" of directors, intent can still be imputed to a corporation if it can be shown that the directors with the knowledge or intent had the ability to control the corporation through their influence on other directors.[70]

Although it is the debtor's intent that is relevant for fraudulent transfer purposes, the intent of a third party, such as the transferee, can be imputed to the debtor/transferor when the

---

debtor: whether the debtor causing the transfer or incurring the obligation intended to hinder, delay or defraud its creditor.  As a result, 'for the purposes of avoidance pursuant to §548 the transferee's good faith or lack of it does not matter.'") (footnotes omitted).

[67]  *Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital LLC)*, 716 F.3d 355, 368 (4th Cir. 2013); *see also McNamara v. PFS (In re Pers. & Bus. Ins. Agency)*, 334 F.3d 239, 243 (3d Cir. 2003) ("[I]f an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests.  The rationale for this rule is that the sole agent has no one to whom he can impart his knowledge, or from whom he can conceal it, and that the corporation must bear the responsibility for allowing an agent to act without accountability."); *Grede v. Bank of New York*, No. 08 C2582, 2009 WL 1657578, at *2 (N.D. Ill. June 12, 2009) ("Where 'principal and agent are one and the same,' the agent's knowledge is imputed to the principal regardless of whether the agent has abandoned the corporation's interest.") (quoting *Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822, 827 (2d Cir. 1997)); *Manning v. Wallace (In re First Fin. Assocs., Inc.)*, 371 B.R. 877, 892-93 (Bankr. N.D. Ind. 2007) ("Many courts have held that in the context of a corporate debtor, courts may look into the fraudulent intent of its controlling members.") (citing *In re Roco Corp.*, 701 F.2d 978, 984 (1st Cir. 1983)).

[68]  *Weisfelner v. Fund 1 (In re Lyondell Chem. Co.)*, 503 B.R. 348, 388-389 (Bankr. S.D.N.Y. 2014) ("*Lyondell I*").

[69]  *Id.* at 388 (citing *Armstrong v. Ketterling (In re Anchorage Marina, Inc.)*, 93 B.R. 686, 691 (Bankr. D.N.D. 1988)) for the proposition that the intent of shareholders that were also directors could be imputed to the corporation where the shareholders together controlled the majority of the voting rights of the debtor).

[70]  *Id.* at 389 ("If the Creditor Trust cannot plead facts supporting intent to hinder, delay or defraud on the part of a critical mass of the directors who made the decisions in question, the Creditor Trust must then allege facts plausibly suggesting that Smith (who was only one member of a multi-member Board) or others could nevertheless 'control the disposition of [Lyondell's] property'—by influence on the remaining Board members or otherwise.").

third party is an insider of the debtor or is in a position to control the debtor.[71] The most common situation where this occurs is where the transferor is controlled by a sole shareholder that also controls the transferee.[72] Courts have adopted a three-factor test to determine when the intent of a transferee should be imputed to the transferor: (i) the controlling transferee must possess the requisite intent to hinder, delay or defraud the debtor's creditors, (ii) the transferee must be in a position to dominate or control the debtor, and (iii) the pertinent domination and control must relate to the transfer at issue.[73]

In the case of *In re Elrod Holdings*, the court applied this test and held that it must be shown that the transferee had formal, legal control of the transferor.[74] The court thus concluded that the transferee's intent should not be imputed to the debtor where the shareholders of the transferee held only two of five of the seats on the debtor's board of directors.[75] In comparison, in the case of *In re Vaso Active Pharmaceuticals, Inc.*, the trustee sought to impute the intent of a transferee onto a debtor where the transferee owned 77% of the shares of the debtor.[76] Even though the transferee was the majority shareholder of the debtor, the debtor had an independent board of directors.[77] Ultimately, the court concluded that an issue of fact remained on the issue of control, and declined to issue summary judgment in favor of the trustee.[78]

---

[71] *Andrew Velez Constr. v. Consol. Edison Co. (In re Andrew Velez Constr.)*, 373 B.R. 263, 269-70 (Bankr. S.D.N.Y. 2007) (noting that "imputation of the transferee's intent to the transferor [is] justified . . . where the person or entity exercising control over the disposition of the debtor's property stands in a position to do so by reason of a relationship of ownership, executive office or other insider role") (citing *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 447-49 (S.D.N.Y. 2001)); *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 283 (Bankr. N.D. Ill. 2003) ("Where the transferee is an insider of the debtor and is in a position to control the disposition of property of the debtor, the transferee's intent is imputed to the debtor.") (citing *Carmel v. River Bank of Am. (In re FBN Food Servs., Inc.)*, 185 B.R. 265, 275 (Bankr. N.D. Ill. 1995)).

[72] *Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.)*, 263 B.R. 406, 447 (S.D.N.Y. 2001).

[73] *Id.* at 443.

[74] *Elway Co. v. Miller (In re Elrod Holdings Corp.)*, 421 B.R. 700, 712 (Bankr. D. Del. 2010).

[75] *Id.* at 708 (noting that transferees held only 2 of 5 seats on the board) and *id.* at 712 (refusing to impute transferee's intent to transferor where transferees did not have formal, legal control).

[76] *Burtch v. Masiz (In re Vaso Active Pharm., Inc.)*, No. 11-52005, 2012 WL 4793241, at *16 (Bankr. D. Del. 2012).

[77] *Id.*

[78] *Id.* ("Based on the existence of an independent Board of Directors and Masiz's legal inability to bind Vaso there is a genuine issue of material fact as to whether Defendants dominated or controlled Debtor as that term is used under the imputation doctrine. . . . [T]he bulk of the evidence weighs in favor of finding Defendants dominated and controlled Debtor but that evidence is not sufficient to support entry of summary judgment.").

The issue of whether the intent of the Sponsors can be imputed to CEOC, or the various transferees, is obviously an important issue.  Based on the principles above, the intent of the Sponsors may be imputed to a corporation in those situations where the Sponsors were majority shareholders with the ability to control the corporation through appointment of a majority of the board of directors.  In those cases where the corporate entity appointed a special committee, as was done for CAC, the existence of the special committee may help rebut a claim that the Sponsor's intent should be imputed to the corporation, but as shown in *Verso*, the existence of a special committee, by itself, is not dispositive.

### iii.    Impact of Belief of Solvency

Where an actual intent to "hinder, delay, or defraud creditors" is found, "it is not necessary to show that the debtor was insolvent for the conveyance to be avoidable as fraudulent."[79]  When weighing direct evidence of actual intent, however, courts have looked to whether the debtor and its insiders "believed that [the debtor] was going to be a viable company."[80]  Consideration of these beliefs is also consistent with the standard for intent adopted by the *Restatement (Second) of Torts* – "that the actor desires to cause consequences of his act, or that he believes that the consequences are substantially certain to result from it."[81]  Thus, the relevance of an actor's belief may depend upon whether a court adopts the *Restatement* standard for intent or adopts a broader interpretation of the "natural consequences" standard.[82]

In *Lippe v. Bairnco*, the court held that there was insufficient evidence to conclude that the debtor's management "believed it would be rendered insolvent as a result of the transactions" and that this "undercuts the claim of intent to defraud, hinder, or delay creditors."[83]  In contrast,

---

[79]  *Forman v. HBK Master Fund L.P. (In re Glencoe Acquisition, Inc.)*, No. 14-5064 (KG), 2015 WL 3777972, at *5 (Bankr. D. Del. June 16, 2015) (quoting *Pirrone v. Toboroff (In re Vaniman Int'l, Inc.)*, 22 B.R. 166, 185 (Bankr. E.D.N.Y. 1982)); *see also Grochocinski v. Schlossberg (In re Eckert)*, 388 B.R. 813, 830 (Bankr. N.D. Ill. 2008), *aff'd*, 402 B.R. 825 (N.D. Ill. 2009) ("The focus in the inquiry into actual intent is on the state of mind of the debtor.  Neither malice nor insolvency [is] required.").

[80]  *VFB LLC v. Campbell Soup Co.*, No. Civ.A.02-137 KAJ, 2005 WL 2234606, at *32 (D. Del. Sept. 13, 2005), *aff'd*, 482 F.3d 624 (3d Cir. 2007); *see also MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 935 (S.D.N.Y. 1995).

[81]  *Restatement (Second) of Torts* (1965) §8A.

[82]  As discussed above in Section III.A.1.b.i of this Appendix, the *Restatement* standard was adopted by the court in *Lyondell II* whereas the Seventh Circuit in *Sentinel* adopted the "natural consequence" standard.  The *Lyondell II* court commented that the "natural consequences" standard could be viewed as either an adoption of the *Restatement* standard or adoption of a lesser standard that imposes liability where consequences are merely foreseeable rather than substantially certain to occur.  *Lyondell II*, 541 B.R. at 184-85.

[83]  *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 382 (S.D.N.Y. 2003) (*Lippe II*), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *see also id.* at 379 ("No reasonable jury could find that Keene actually

in *Tronox II*, the court considered testimony from the debtor's executives that they believed the debtor was solvent and would be a successful company, but the court concluded that the ultimate question was whether the belief was held in good faith and based on reasonable analysis.[84]   In *MFS/Sun Life*, the court concluded that testimony of the insiders' optimistic beliefs was bolstered by evidence of their continued investments in the company.[85]   Accordingly, courts do consider evidence of an actor's beliefs when evaluating actual intent, but a statement of belief, by itself, is insufficient.   Rather, courts will look to whether the belief was held in good faith, based on reasonable analysis, and evidenced by other actions consistent with that belief.

### iv.   Impact of Advice of Counsel

When evaluating whether the transferor had the actual intent to defraud or hinder creditors, courts may also consider whether a transferor was acting on advice of counsel.[86]   However, advice of counsel is not an "impenetrable shield."[87]   Instead, it must be shown that the attorney was fully informed before giving the advice,[88] and the transferor's reliance on the advice must have been reasonable and in good faith.[89]   Advice of counsel is not a defense when

---

believed its *probable* liabilities would exceed the amount of insurance coverage, the reserve fund, and its other substantial assets.") (emphasis in original).

[84]   *Tronox II*, 503 B.R. at 285.

[85]   *MFS/Sun Life*, 910 F. Supp. at 935 (stating that "it is unlikely that [the insiders] would retain a financial stake in the business if they believed that it would fail").

[86]   *See Onbank & Trust Co. v. Siddell (In re Siddell)*, 191 B.R. 544, 554 (Bankr. N.D. N.Y. 1996) ("[B]ecause fraudulent intent is inferred from the totality of circumstances, reliance on advice of counsel may be considered as a factor in determining intent.   As such, where the debtor's reliance is reasonable and in good faith, 'the advice of counsel may . . . negate the inference of fraudulent intent.'") (quoting *Atena Ins. Co. v. Nazarian (In re Nazarian)*, 18 B.R. 143, 147 (Bankr. D. Md. 1982)); *see also O'Connor v. Leone (In re Leone)*, 463 B.R. 229, 243-44 (Bankr. N.D.N.Y. 2011) (considering the debtor's reasonable and good faith reliance upon advice of counsel).   These and other decisions that address the impact of advice of counsel typically arise in cases where it is claimed that an individual debtor should be denied a bankruptcy discharge under section 727(a)(2) of the Bankruptcy Code because the debtor transferred property within one year prior to the bankruptcy filing with intent to hinder, delay or defraud a creditor.   These cases are nevertheless relevant to an analysis of intent under section 548 because "the issue of intent under Section 727(a)(2)(A) is identical to the issue of intent under Section 548(a)(1)." *Cohen v. Bucci*, 103 B.R. 927, 930 (N. D. Ill. 1989), *aff'd*, 905 F.2d 1111 (7th Cir. 1990).

[87]   *Leone*, at 243.

[88]   *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1202 (9th Cir. 2010) ("A client reasonably relies on an attorney's advice only when the client provides to the attorney all of the pertinent facts in the client's possession.") (quoting *Adell v. John Richards Homes Bldg. Co. (In re John Richards Homes Bldg. Co.)*, 439 F.3d 248, 260 (6th Cir. 2006)).

[89]   *Siddell*, 191 B.R. at 554.

it is transparently clear that the advice is improper.[90]  In addition, advice of counsel is no defense where there is direct evidence of actual intent.[91]

### c.  Intent Must Be to Defraud or Hinder

The statutory requirement of the intent to hinder, delay or defraud creditors is disjunctive such that the "intent to hinder or delay creditors is sufficient, and intent to defraud need not be proven."[92]  As the courts have explained, "[t]he intent to defraud is something distinct from the mere intent to delay or hinder."[93]  "A scheme to defraud creditors, in the fraudulent transfer context, means a scheme to avoid paying them."[94]

"A scheme to hinder or to delay does not require an intent not to pay creditors at all."[95] Instead, "[a] debtor may adopt a scheme to hinder or to delay creditors while intending to pay

---

[90] *Leone*, 463 B.R. at 243.

[91] *First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d 1339, 1343 (9th Cir. 1986) ("Adeeb's claim that he lacked actual intent to hinder or delay his creditors because he relied on the advice of his attorney is mistaken. . . .  In this case, the bankruptcy court found that both Cooper and Adeeb 'knew that the purpose of the transfers was to hinder or delay creditors of the debtor.' Such a finding precludes the defense of good faith reliance on the advice of an attorney . . . ."); *Hines v. Marchetti*, 436 B.R. 159, 169 (M.D. Ala. 2010), *aff'd*, 418 F. App'x 797 (11th Cir. 2011) ("reliance on outside professionals must be in good faith and not part of a scheme that the debtor knows will hinder or delay creditors"); *Kaler v. McLaren (In re McLaren)*, 236 B.R. 882, 901 (Bankr. D.N.D. 1999) ("This Court is not of the belief that the McLarens' actions were motivated by attorney advice, rather, and to the contrary, the Court believes the McLarens' [sic] to have been wholly motivated by their own fraudulent inclinations.").

[92] *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 402-03 (Bankr. S.D.N.Y. 2007); *see also Lippe II*, 249 F. Supp. 2d at 374; *Whitaker v. Mortg. Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002) ("The elements of hinder, delay and defraud are three distinct elements which are viewed in the disjunctive, and a finding of any one would satisfy the requirements of the statute."); *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932) ("A conveyance is illegal if made with an intent to defraud the creditors of the grantor, but equally it is illegal if made with an intent to hinder and delay them. Many an embarrassed debtor holds the genuine belief that, if suits can be staved off for a season, he will weather a financial storm, and pay his debts in full.") (citing *Means v. Dowd*, 128 U.S. 273, 281 (1888)).

[93] *In re Braus*, 248 F. 55, 64 (2d Cir. 1917).

[94] *In re Duncan & Forbes Dev., Inc.*, 368 B.R. 27, 35 (Bankr. C.D. Cal. 2006); *see also Klein v. Rossi (In re Midwest S.S. Agency, Inc.)*, 251 F. Supp. 1, 2 (E.D.N.Y. 1966) (explaining that a debtor intends to defraud creditors by putting assets "beyond [their] reach" "for the very purpose of defeating their writs of execution" and "to . . . defeat the collection of a known debt").

[95] *Duncan & Forbes*, 368 B.R. at 36.

them ultimately."[96]  As a result, a debtor acts with an intent to hinder "if he or she acts with an intent to impede or obstruct creditors" and an intent to delay "if he or she acts with an intent to slow or postpone creditors."[97]  Given the overlap in the application of the terms hinder and delay, some courts blur the distinction between them and inquire generally as to whether the debtor acted "improperly [to] make it more difficult for creditors to reasonably collect on their debts."[98]

### 2.   Badges of Fraud

A plaintiff generally may prove an intent to hinder, delay or defraud creditors in two ways.  One way is by producing direct evidence of the requisite intent.[99]  Most cases, however, do not involve direct evidence because defendants rarely admit to making a transfer or incurring an obligation with the intent to hinder, delay, or defraud creditors.[100]  As a result, courts also allow plaintiffs to prove intent by the use of circumstantial evidence known as the "badges of fraud" or "circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."[101]  While the badges of fraud are not conclusive, they

---

[96]  *Id.*

[97]  *Wiggains v. Reed (In re Wiggains)*,  No. 14-03064-SGJ, 2015 WL 1954438, at *17 (Bankr. N.D. Tex. Apr. 28, 2015) (internal citations and quotation marks omitted).

[98]  *Pher Partners v. Womble (In re Womble)*, 289 B.R. 836, 854 (Bankr. N.D. Tex. 2003), *aff'd*, 299 B.R. 810 (N.D. Tex. 2003) ("For example, a debtor who transfers funds on the eve of bankruptcy to newly created bank accounts under a name difficult to connect with the debtor may properly be held to have had the intent to hinder or delay his creditors, as discovering the new bank account has the effect of hindering or delaying the creditor's ability to collect from such account.") (citing *Barclays/Am. Bus. Credit Inc. v. Adams (In re Adams)*, 31 F.3d 389, 392-94 (6th Cir. 1994)); *see also Klein*, 251 F. Supp. at 2 (stating that one intends to hinder or delay creditors by "putting property beyond their reach . . . only to wrest from them time to restore the debtor's affairs").

[99]  *Klein v. Klein (In re Klein)*, Nos. 86 B 1997, 88 A 357, 1991 WL 242169, at *9 (Bankr. N.D. Ill. June 21, 1991); *First Nat'l Bank v. Davison (In re Davison)*, 296 B.R. 841, 845 (Bankr. D. Kan. 2003), *aff'd*, 2004 WL 2852352 (B.A.P. 10th Cir. June 29, 2004) ("The court must find actual intent to hinder, delay, or defraud a creditor, proven either by direct evidence or by inference from the facts and circumstances of the [debtor's] conduct.").

[100]  *Grochocinski v. Knippen (In re Knippen)*, 355 B.R. 710, 722 (Bankr. N.D. Ill. 2006);  *Dahar v. Jackson (In re Jackson)*, 318 B.R. 5, 13 (Bankr. D.N.H. 2004), *aff'd*, 459 F.3d 117 (1st Cir. 2006) ("In determining whether a conveyance is made with actual intent, . . . , direct evidence of fraudulent intent is not essential and, indeed, in most circumstances, not likely to be available.") (quoting *Toledo Trust Co. v. Poole (In re Poole)*, 15 B.R. 422, 431-32 (Bankr. N.D. Ohio 1981)).

[101]  *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (quoting *Wall St. Assocs. V. Brodsky*, 257 A.D. 526, 529 (1st Dep't 1999).

"appropriately focus the inquiry on the circumstances that suggest a conveyance was made with fraudulent intent. . . ."[102]

Courts often recite a list of eight badges of fraud applicable to Bankruptcy Code section 548 claims.  (The UFTA, adopted by Delaware, Nevada, New Jersey, and many other states, lists eleven badges as discussed in more detail below.)  These are:

> (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry; (7) a questionable transfer not in the usual course of business; and (8) the secrecy, haste, or unusualness of the transaction.[103]

There is no exact number of badges of fraud that must be shown to establish the presumption of actual intent to hinder, delay or defraud creditors.[104]  In many cases courts have concluded that a transferor acted with actual intent to defraud based on evidence of unlawful conduct.[105]  However, there is no support for the proposition that a transferor's conduct must be unlawful for there to be an actual fraudulent transfer, and the presence or absence of any one

---

[102]   *Sharp Int'l Corp. v. State St. Bank & Trust Co* (*In re Sharp Int'l Corp.*), 302 B.R. 760, 784 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005).

[103]   *See, e.g.*, *Pereira v. Grecogas Ltd.* (*In re Saba Enters., Inc.*), 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009).

[104]   *In re Stanton*, 457 B.R. 80, 94 (Bankr. D. Nev. 2011) ("no particular badge is necessary, nor is any combination sufficient") (quoting 5 Collier on Bankruptcy ¶544.06[4][1][b][ii]); *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254-55 (1st Cir. 1991) ("the confluence of several [badges] can constitute conclusive evidence of an actual intent to defraud").

[105]   *See, e.g.*, *Picard v. Estate of Stanley Chais* (*In re Bernard L. Madoff Inv. Sec. LLC*), 445 B.R. 206, 220-21 (Bankr. S.D.N.Y. 2011) (establishing intent as a matter of law pursuant to a "Ponzi scheme presumption"); *Martino v. Edison Worldwide Capital* (*In re Randy*), 189 B.R. 425, 440 (Bankr. N.D. Ill. 1995) ("Collateral estoppel prevents the relitigation of issues as to Randy's intent already decided in Randy's criminal case.").

"badge" of fraud is not dispositive.[106]   Where there is a "confluence" of these badges then a rebuttable presumption of actual fraudulent intent arises.[107]

Where sufficient badges of fraud are found to be present, the presumption created by the badges may be rebutted by proving that there was a supervening and independent legitimate business purpose for the transaction.[108]   Based on this, CEC and the Sponsors have argued that there cannot be a finding of fraudulent intent under a badges of fraud analysis whenever there is evidence of an alternate business purpose.  This contention is incorrect and misstates the burden of proof that must be satisfied to rebut the presumption of fraudulent intent.

A presumption of fraudulent intent cannot be rebutted merely by evidence of *any* alternative purpose.[109]   Instead, the transferee must show that there was a legitimate "supervening" purpose. [110]  This has been described as a "heavy burden"[111] and requires proof

---

[106]   *See, e.g.*, *Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 545 (Bankr. D. Del. 2009) ("The presence or absence of any single badge of fraud is not conclusive.").

[107]   *Kelly v. Armstrong*, 206 F.3d 794, 798-802 (8th Cir. 2000); *Max Sugarman*, 926 F.2d at 1254-55.

[108]   *Acequia, Inc. v. Clinton* (*In re Acequia, Inc.*), 34 F.3d 800, 806 (9th Cir. 1994) ("[T]he confluence of several can constitute conclusive evidence of actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose."); *Max Sugarman*, 926 F.2d at 1254-55 (same); *Fogel v. Chevrie (In re Chevrie)*, No. 00-A-38, 2001 WL 120132, at *10 (Bankr. N.D. Ill. Feb. 13, 2001) (same); *ASARCO*, 396 B.R. at 391 ("Once a plaintiff puts forth sufficient evidence that the defendant had the requisite intent, the defendant may avoid liability by demonstrating a "legitimate supervening purpose" for the transfer) (citation omitted). Although several courts state that there must be "significantly clear" evidence of a legitimate supervening purpose, the Eighth Circuit has stated that this is intended to mean direct evidence rather than indirect evidence and that the phrase is not intended to create a higher burden of proof.  *Kelly*, 206 F.3d at 801 ("when the court speaks of needing 'significantly clear evidence' it means direct evidence rather than indirect evidence. . . . [W]e do not believe that the court intended to create a new level of proof, and the district court's instruction putting forth a preponderance of the evidence standard was correct.").

[109]   As discussed in Section III.A.1.b.ii. of this Appendix, courts have found that a fraudulent transfer claim exists even where a debtor has "dual purposes" for a  transfer, one of which is proper and one of which demonstrates fraudulent intent.

[110]   The phrase "legitimate supervening purpose" was first used by the First Circuit in *Max Sugarman*, 926 F.2d at 1255.  In that case, there was no evidence of any alternative purpose for the challenged transaction, so the *Max Sugarman* court did not need to articulate what it meant by "legitimate supervening purpose."

[111]   *Leonard v. Mylex Corp. (In re Northgate Comput. Sys., Inc.)*, 240 B.R. 328, 360-61 (Bankr. D. Minn. 1999); *Cole v. Strauss*, No. 2:13-cv-04200-NKL, 2014 WL 4055787, at *7 (D. Mo. Aug. 15, 2014).

that the transferor "has not committed the objectionable acts with which he has been charged."[112] In other words, evidence of a "legitimate supervening purpose" means evidence that completely rebuts the presumption of fraudulent intent and proves that the sole intent of the transferor was to accomplish the legitimate supervening purpose.[113]  If the evidence shows a "dual" purpose, then the evidence of the alternate legitimate justification will not rise to the level of being a "supervening" purpose. [114]

The case of *In re Summit Place* is indicative of the type of case where a court finds the existence of a legitimate supervening purpose.[115]  In *Summit Place*, the trustee sought to avoid a mortgage granted in favor of an unaffiliated secured lender.  The court noted that the transaction was a valid arm's-length transaction[116] and that the debtor was motivated by the debtor's desire to continue in business.[117]  A similar result was reached in the case of *In re Cushman Bakery*.[118]

In comparison, in *Tronox II*, the court rejected the defendants' argument that the challenged IPO and spinoff were motivated by the legitimate supervening purpose of separating, and thereby enhancing the value, of two very distinct businesses by "creating two successful standalone companies, and thereby maximizing shareholder value."[119]  The court noted that "Defendants are not being sued because they made a business decision to spin off [the companies].  They are being sued because of their decision to spin off 'substantially all the

---

[112]  *Kelly v. Armstrong*, 141 F.3d  at 802 ("'[t]he burden which shifts . . . is not a burden of going forward with the evidence requiring the bankrupt to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged.'") (quoting *Bateman v. City Nat'l Bank of Fort Smith*, 646 F.2d 1220, 1223 n.4 (8th Cir. 1981)); *Northgate Comput. Sys.,* 240 B.R. at 360-61; *Cole,* 2014 WL 4055787, at *6.

[113]  *Aptix Corp. v. Quickturn Design Sys., Inc.*, 148 F. App'x 924, 929 (Fed. Cir. 2005), (stating that the issue is whether the presumption of fraud has been adequately rebutted.).

[114]  *AngioDynamics, Inc. v. Biolitec AG*, 910 F. Supp. 2d 346, 354 (D. Mass. 2012), *aff'd*, 711 F.3d 248 (1st Cir. 2013) (there may have been legitimate purpose to transfer patents to sister corporation to consolidate ownership of patents, but this was not a "supervening" purpose because the transfer may also have been done to hinder or delay creditors); *Aptix Corp.*, 148 F. App'x at 929 (fact that corporation needed to borrow funds was not sufficient business justification to rebut presumption that security interest was granted to shareholder with actual intent to defraud).

[115]  *Summit Place, LLC*, 298 B.R. at 72.

[116]  *Id*. at 68.

[117]  *Id*. at 73.

[118]  *In re Cushman Bakery*, 526 F.2d 23, 33 (1st Cir. 1975) (declining to avoid a lien granted as part of a loan transaction that "was the result of extended negotiations between the officers of independently controlled and nonaffiliated corporations, all of whom were knowledgeable and sophisticated businessmen.").

[119]  *Tronox II*, 503 B.R. at 288.

assets' of the enterprise . . . and impose 85 years of the legacy liabilities on a fraction of the assets."[120]   Thus, once the rebuttable presumption of actual fraudulent intent was established, Defendants' "burden was not to prove whether there was some legitimate business reason for the challenged transactions.   The burden was to prove a legitimate supervening purpose for the 'manner in which the transfer was structured.'"[121]   Having found that defendants failed to meet this burden, the court rejected their legitimate supervening purpose defense.[122]

### 3.   Standard of Proof

For claims made pursuant to section 548 of the Bankruptcy Code, a majority of courts have held that "actual intent under 11 U.S.C. §548(a)(1)(A) need only be shown by a preponderance of the evidence."[123]   For states that have adopted the UFTA, there is a split concerning the appropriate burden of proof to establish actual intent, as discussed below.

### B.   Constructive Fraudulent Transfer Under Section 548 of the Bankruptcy Code

An action to avoid a transfer as constructively fraudulent may be pursued under section 548(a) of the Bankruptcy Code or other "applicable law," including state law, as incorporated under section 544(b) of the Bankruptcy Code.   The required elements to set aside a constructive fraudulent transfer under federal (as well as state) law are that the debtor (i) transferred an interest in property or incurred an obligation, (ii) received less than reasonably equivalent value in exchange for the transfer or obligation; and (iii) at the time of the transfer or incurrence of the obligation was, or was rendered, insolvent, inadequately capitalized, or unable to pay its debts as they came due.[124]

---

[120]   *Id.* at 289.

[121]   *Id.* (citing *ASARCO*, 396 B.R. at 393 ("[E]ven though there was a legitimate business purpose for the transfer . . . the Court finds that the presumption of fraud has not been adequately rebutted" because "there was no legitimate business reason for other aspects of the transactions.")).

[122]   *Id.*

[123]   *ASARCO*, 396 B.R. at 367; *see also, e.g.*, *Silagy v. Gagnon* (*In re Gabor*), 280 B.R. 149, 155 (Bankr. N.D. Ohio 2002) (trustee must meet preponderance of the evidence standard in actual fraudulent transfer action); *Dev. Specialists, Inc. v. Hamilton Bank, N.A.* (*In re Model Imperial, Inc.*), 250 B.R. 776, 791 (Bankr. S.D. Fla. 2000) (same); *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp., Inc.),* 232 B.R. 565, 570 (Bankr. N.D.N.Y. 1999) (same).   *But see ASARCO*, 396 B.R. at 367 (noting that a "minority of courts, [however,] have continued to adhere to the clear and convincing standard in section 548(a)(1)(A) cases") (citation omitted); *Morse Operations, Inc. v. Goodway Graphics of Va., Inc. (In re Lease-A-Fleet, Inc.),* 155 B.R. 666, 674 (Bankr. E.D. Pa. 1993) (clear and convincing standard applies in Bankruptcy Code section 548(a) (1)(A) cases); *Bumgardner v. Ross* (*In re Ste. Jan-Marie, Inc.*)*,* 151 B.R. 984, 987 (Bankr. S.D. Fla. 1993) (same).

[124]   11 U.S.C. §548(a) (2015).

## 1. Reasonably Equivalent Value

A necessary condition to avoid a transfer or obligation as constructively fraudulent is that the debtor must have "received less than a reasonably equivalent value in exchange for such transfer or obligation."[125]  Courts generally hold that, for purposes of fraudulent transfer law, whether a transfer or obligation provided the debtor with reasonably equivalent value must be analyzed from the perspective of the debtor's creditors.[126]

"[B]efore determining whether the value was 'reasonably equivalent' to what the debtor gave up, the court must make an express factual determination as to whether the debtor received any value at all."[127]  If a debtor received value in a transaction, the court must next determine whether the value received was "reasonably equivalent" to what the debtor transferred.[128]  This is normally a question of fact,[129] as valuation factors will turn "on the case-specific circumstances surrounding the debtor's decision to enter in the challenged transaction."[130]  On a basic level, the inquiry of whether the debtor received reasonably equivalent value "is fundamentally one of common sense, measured against market reality."[131]  In making this determination, courts look to, among other things, "(1) whether the value of what was transferred is equal to the value of

---

[125]  11 U.S.C. §548(a)(B)(i) (2015).

[126]  *See, e.g.*, *Harman v. First Am. Bank of Md.* (*In re Jeffrey Bigelow Design Grp., Inc.*), 956 F.2d 479, 484 (4th Cir. 1992) ("The purpose of fraudulent transfer law is the preservation of the debtor's estate for the benefit of its unsecured creditors.  Consequently, what constitutes reasonably equivalent value must be determined from the standpoint of the debtor's creditors."); *Stanley v. U.S. Bank Nat'l Assoc.* (*In re TransTexas Gas Corp.*), 597 F.3d 298, 306 (5th Cir. 2010) ("Importantly, we measure value from the standpoint of the creditors, not from that of a buyer in the marketplace.").

[127]  *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors* (*In re R.M.L., Inc.*), 92 F.3d 139, 149 (3d Cir. 1996).

[128]  5 Collier on Bankruptcy ¶548.05[2][a].

[129]  *Tex. Truck Ins. Agency, Inc. v. Cure* (*In re Dunham*), 110 F.3d 286, 288-89 (5th Cir. 1997); *Jacoway v. Anderson* (*In re Ozark Rest. Equip. Co.*), 850 F.2d 342, 344 (8th Cir. 1988); *Klein v. Tabatchnick*, 610 F.2d 1043, 1047 (2d Cir. 1979) ("Fairness of consideration is generally a question of fact.") (citations omitted); *Daley v. Chang* (*In re Joy Recovery Tech. Corp.*), 286 B.R. 54, 75 (Bankr. N.D. Ill. 2002).

[130]  *Am. Tissue, Inc. v. Donaldson Lufkin & Jenrette Secs. Corp. (In re Am. Tissue, Inc.)*, 351 F. Supp. 2d 79, 105-06 (S.D.N.Y. 2004) ("'Whether a transfer is for 'reasonably equivalent value' is largely a question of fact,' the determination of which perforce 'depends on all the circumstances surrounding the transaction.'") (quoting *Jackson v. Miskin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 466 (S.D.N.Y 2001)).

[131]  *Northgate Comput. Sys., Inc.*, 240 B.R. at 365; *accord Sullivan v. Schultz* (*In re Schultz*), 368 B.R. 832, 836 (Bankr. D. Minn. 2007); *Lindquist v. JNG Corp. (In re Lindell)*, 334 B.R. 249, 256 (Bankr. D. Minn. 2005).

what was received; (2) the market value of what was transferred and received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee."[132]

Both direct and indirect benefits received by the debtor may be considered in determining whether reasonably equivalent value was received.[133]  Courts generally consider a direct benefit to be when the debtor directly receives the consideration of the transaction.[134]  This would include the satisfaction or securing of an antecedent debt.[135]  Thus, a debtor who receives a dollar-for-dollar debt reduction receives reasonably equivalent value, provided that the debt reduction occurs at or about the time of the transfer.[136]  Outside of the applicable preference period, payment of one creditor versus another is not a fraudulent transfer so long as the debtor's obligations to the creditor are reduced by the payment made.[137]  In contrast, courts consistently

---

[132]  *Barber v. Golden Seed Co (In re Ostrom-Martin, Inc.).*, 129 F.3d 382, 387 (7th Cir. 1997); *Wachovia Sec., LLC v. Jahelka*, 586 F. Supp. 2d 972, 1015 (N.D. Ill. 2008), *aff'd in part, vacated in part*, 674 F.3d 743 (7th Cir. 2012)

[133]  *Join-In Int'l (U.S.A.) Ltd. v. New York Wholesale Distribs. Corp.* (*In re Join-In In*), 56 B.R. 55, 559-60 (Bankr. S.D.N.Y. 1986); *Pereira v. Wells Fargo Bank, N.A.* (In *re Gonzalez*), 342 B.R. 165, 173 n.7 (Bankr. S.D.N.Y. 2006) (citing *Rubin v. Mfrs. Hanover Trust Co.*, 661 F.2d 979, 991 (2d Cir. 1981)); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991).

[134]  *Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc.* (*In re TOUSA, Inc.),* 422 B.R. 783, 866 (Bankr. S.D. Fla. 2009), *quashed in part*, 444 B.R. 63 (S.D. Fla. 2011), *aff'd in part, rev'd in part*, 680 F.3d 1298 (11th Cir. 2012); *Rubin v. Mfrs. Hanover Trust Co. (In re U.S.N. Co., Inc.)*, 661 F2d. 979, 991 (2d Cir. 1981).

[135]  11 U.S.C. §548(d)(2)(A) (2015); *see also, e.g.*, *Butler Aviation Int'l, Inc. v. Whyte (In re Fairchild Aircraft Corp)*, 6 F.3d 1119, 1126; (5th Cir. 1993); *Walker v. Sonafi Pasteur* (*In re Aphton Corp.*), 423 B.R. 76, 89 (Bankr. D. Del. 2010) (noting that "when a transfer is made to pay an antecedent debt, the transfer may not be set aside as constructively fraudulent"); *see also Pardo v. Gonzaba (In re APF Co.*), 308 B.R. 183, 187 (Bankr. D. Del. 2004) (dismissing constructive fraudulent transfer claim, holding "the payments made on the promissory note were made for value—satisfaction of an antecedent debt").

[136]  *See Lisle v. John Wiley & Sons, Inc.* (*In re Wilkinson*), 196 F. App'x 337, 343 (6th Cir. 2006).  In *Wilkinson*, the debtor, while insolvent, paid $1 million to a publisher on behalf of a bookstore in which the debtor owned a majority interest. *Id.* at 339.  In exchange, the bookstore reduced by $1 million the debt owed to it by the debtor. *Id.*  The court held that, as appropriately measured on the date of the transfer, the debtor received reasonably equivalent value for its transfer to the publisher through the dollar-for-dollar debt reduction, and that the debtor's net worth was unaffected by the transfer. *Id.* at 343.

[137]  *See Sharp,* 403 F.3d at 54 ("[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors. . . . " (quoting *HBE Leasing Corp.* v. *Frank*, 48 F.3d at 634).

hold that corporate dividends and the redemption of equity interests are not transfers for reasonably equivalent value or fair consideration.[138]

Courts also hold that, under certain circumstances, indirect benefits received by a debtor can be included in analyzing whether it received reasonably equivalent value.[139]   As a result, courts have found indirect benefits such as the maintenance of the debtor's financial strength, including the ability to obtain credit, the ability to cover or avoid certain expenditures, or synergies resulting from a transaction to confer value on the debtor for purposes of determining whether it received reasonably equivalent value.[140]

Whether indirect benefits may be included when determining whether reasonably equivalent value was given is directly relevant to the CERP Transaction where it has been argued that CEOC benefited from the transaction by avoiding the foreclosure and prompt separation of

---

[138]   *See, e.g.*, *Fisher v. Hamilton* (*In re Teknek, LLC*), 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (a dividend is "not a transfer in exchange for reasonably equivalent value"); *Fid. Bond & Mortg. Co. v. Brand* (*In re Fid. Bond & Mortg. Co.*), 340 B.R. 266, 286-88 (Bankr. E.D. Pa. 2006), *aff'd* 371 B.R. 708 (E.D. Pa. 2007) (debtor did not receive reasonably equivalent value for a dividend as "[o]ther courts have held that a dividend or reduction in capital through the purchase of stock adds no value for creditors"); *Brandt v. Hicks, Muse & Co.* (*In re Healthco Int'l, Inc.*), 195 B.R. 971, 980 (Bankr. D. Mass. 1996) (distributions in termination of stock interests, by their very nature, are not for consideration).

[139]   *See, e.g.*, *Leibowitz v. Parkway Bank & Trust Co.* (*In re Image Worldwide, Ltd.*), 139 F.3d 574, 578 (7th Cir. 1998); *HBE Leasing Corp.,* 48 F.3d at 638-39;  *Doctors Hosp. of Hyde Park, Inc.v. Desnick* (*In re Doctors Hosp. of Hyde Park, Inc.*), 376 B.R. 242, 251 (Bankr. N.D. Ill. 2007); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co. of Del.*), 274 B.R. 71, 82 (D. Del. 2002).

[140]   *See, e.g.*, *Frontier Bank v. Brown* (*In re N. Merch., Inc.*), 371 F.3d 1056, 1059 (9th Cir. 2004) (holding that, although the debtor was not a party to a loan, it received reasonably equivalent value in return for paying the principal's debt as the principal had turned the loan proceeds over to the debtor); *Mellon Bank*, 945 F.2d at 647 (holding that indirect benefits included "the ability to obtain substantial credit" and "the synergy expected to result from [the transaction]"); *Fairchild Aircraft Corp.*, 6 F.3d at 1125-27 ("Courts have considered such indirect financial effects as, for example, the synergy realized from joining two enterprises, the increase in a credit line, and the increased monetary 'float' resulting from guarantying the loans of another, as constituting value received under §548." (footnotes omitted)); *Cordes & Co., LLC v. Mitchell Cos.*, 605 F. Supp. 2d 1015, 1022 (N.D. Ill. 2009) ("Indirect benefits can include a wide range of intangibles such as a . . . 'synergy' within a corporate group as a whole . . . ."); *Lawrence Paperboard Corp. v. Arlington Trust Co. (In re Lawrence Paperboard Corp.*), 76 B.R. 866, 874 (Bankr. D. Mass. 1987) ("[I]ndirect benefits in the form of funds flowing from the parent to the guarantor subsidiary, or intangible benefits in the form of maintenance of the parent's financial strength, may constitute fair consideration."); *Fid. Bond & Mortg.*, 340 B.R. at 287 ("economic benefits resulting from the synergies" must be considered as part of the reasonably equivalent value analysis), *aff'd*, 371 B.R. 708 (E.D. Pa. 2007).

the CMBS Properties from the Caesars empire.   While it is true that indirect benefits may
constitute value to a debtor, the benefit received by the debtor, although indirect, must still be
"fairly concrete" and quantifiable.[141]   Thus, where indirect benefits are purely speculative, they
do not constitute reasonably equivalent value.[142]

Once the court determines that the debtor has received a direct or indirect benefit, it must
then determine whether these benefits are of reasonably equivalent value to what the debtor gave
up or transferred.   The exchange need not be strictly equivalent.[143]   "There is no set minimum
percentage or monetary amount necessary" for a court to find that the debtor received reasonably
equivalent value.[144]   Even so, the Seventh Circuit has stated that, "[r]easonably equivalent should
be understood to mean not part payment but that the debtor received or will receive value for the
property that he transferred that is as close to true equivalence as circumstances permit."[145]   If
after considering all facts and circumstances, there is a large disparity between the "market

---

[141]   *Heritage Bank Tinley Park v. Steinberg* (*In re Grabill Corp.*), 121 B.R. 983, 995 (Bankr.
N.D. Ill. 1990); *see also Wilkinson*, 196 F. App'x at 342 ("The [defendant's] burden of showing
that the benefit is concrete and quantifiable can be challenging in a case where the alleged
benefit is goodwill, corporate synergy, a business opportunity, the continuation of a business
relationship, or some other intangible benefit.") (citation omitted); *Henshaw v. Field* (*In re
Henshaw*), 485 B.R. 412, 422 (D. Haw. 2013) ("Although the court may determine 'value' based
on both direct and indirect benefits received, the value of the benefit must be tangible and
quantifiable.").

[142]   *Gold v. Marquette Univ. (In re Leonard)*, 454 B.R. 444, 447 (Bankr. E.D. Mich. 2011)
(potential benefit of not having to financially support child in the future was too speculative to
provide reasonably equivalent value to parents in exchange for payment of child's tuition);
*Greespan v. Orrick, Herrington & Sutcliffe (In re Brobeck Phleger and Harrison LLP),* 408 B.R.
318, 344 (Bankr. N.D. Cal. 2009) (avoidance of potential malpractice liability was too
speculative to provide reasonably equivalent value to law firm for loss of fees).

[143]   *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 538 n.4 (1994) ("Our discussion assumes
that the phrase 'reasonably equivalent' means 'approximately equivalent,' or 'roughly
equivalent.'"); *see also Fairchild Aircraft Corp.*, 6 F.3d at 1125-26; *Rubin*, 661 F.2d at 994;
*Lowe v. B.R.B, Enters., Ltd.* (*In re Calvillo*), 263 B.R. 214, 220 (W.D. Tex. 2000); *MFS/Sun Life*,
910 F. Supp. at 937; *Coan v. Fleet Credit Card Servs., Inc.* (*In re Guerrerra*), 225 B.R. 32, 36
(Bankr. D. Conn. 1998) ("It is not necessary that there be 'mathematical precision' or a 'penny-
for-penny' exchange . . . .") (citing *Rubin*, 661 F.2d at 994).

[144]   *Calvillo*, 263 B.R. at 220.   Some courts have found reasonably equivalent value where the
consideration received by the debtor was less than 70% of the market value of the property
transferred.   *See, e.g.*, *Walker v. Littleton* (*In re Littleton*), 888 F.2d 90, 92 (11th Cir. 1989),
*abrogated by BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (63.5% of fair market value);
*In re Barrett*, 118 B.R. 255, 256 (E.D. Pa. 1990) (69.5%); *Hussey v. Haider* (*In re Haider*), 126
B.R. 796, 798-99 (Bankr. D. Mont. 1991) (62%).

[145]   *1756 W. Lake St. LLC v. Am. Chartered Bank*, 787 F.3d 383, 387 (7th Cir. 2015).

value" of what the debtor gave and received, [146] the debtor will not have received reasonably equivalent value.[147]

Where the benefit received was an indirect benefit, there is disagreement among courts about how precise the quantification of the benefit must be. Some courts hold that value must be quantified with "reasonable precision"[148] while others hold that intangible benefits that are "incapable of precise measurement" can confer value so long as the benefit can be shown to have "realizable commercial value."[149]

## 2.   Insolvent, Inadequately Capitalized, or Unable to Pay Debts

The legal standards applicable to the three tests related to a debtor's financial condition are discussed at length in Section V of the Final Report and will not be repeated herein.

## 3.   Standard of Proof

The party seeking to challenge a transfer bears the burden of proving constructive fraud.[150] The Bankruptcy Code and state constructive fraudulent transfer statutes uniformly

---

[146] For voluntary transactions, the most important factor is often "fair market value." 5 Collier on Bankruptcy ¶548.05[2][a] ("'[B]ook value' representing historic cost is not the relevant metric; market value, representing present value, controls.") (citing *Creditor's Comm. of Jumer's Castle Lodge, Inc. v. Jumer*, 472 F.3d 943, 948 (7th Cir. 2007)); *see also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 633 (3d Cir. 2007) ("Absent some reason to distrust it, the market price is "a more reliable measure of the stock's value than the subjective estimates of one or two expert witnesses."). For involuntary transactions, the price in fact received for the property at the foreclosure sale is a reasonably equivalent value. *BFP*, 511 U.S. at 545. For non-public market transactions, where the fair market value may not be easily determined, the focus is "whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank*, 945 F.2d at 647 ("When the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.").

[147] *See, e.g.*, *Grissom v. Johnson* (*In re Grissom*), 955 F.2d 1440, 1445-46 (11th Cir. 1992), *abrogated by BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994); *In re Winshall Settlor's Trust*, 758 F.2d 1136, 1139 (6th Cir. 1985).

[148] *Blixseth v. Kirschner* (*In re Yellowstone Mountain Club, LLC*), 436 B.R. 598, 666 (Bankr. D. Mont. 2010).

[149] *See Mellon Bank*, 945 F.2d at 646-47; *R.M.L.*, 92 F.3d at 151.

[150] *Nordberg v. Arab Banking Corp.* (*In re Chase & Sanborn Corp.*), 904 F.2d 588, 593-94 (11th Cir. 1990); *Kidder Skis Int'l v. Williams*, 60 B.R. 808, 811 (W.D. Mo. 1985); *First Fed. Sav. Ass'n of Bismark v. Hulm* (*In re Hulm*), 45 B.R. 523, 526 (Bankr. N.D. 1984); *Kanasky v. Randolph* (*In re R. Purbeck & Assocs., Ltd.*), 27 B.R. 953, 954-55 (Bankr. D. Conn. 1983).

require the movant to demonstrate the elements of constructive fraudulent transfer by a preponderance of evidence.[151]

### C.  Defenses to Actual and Constructive Fraudulent Transfer Claims under the Bankruptcy Code

#### 1.  Good Faith Transferees

The issue of whether a transferee qualifies as a "good faith transferee" is relevant to the Examiner's investigation of the WSOP transfers, the CERP, Growth and Four Property Transactions as well as certain aspects of the B-7 transaction.  Under section 548(c) of the Bankruptcy Code, a good faith transferee who returns property to the estate based on the avoidance of a fraudulent transfer "has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."[152]  In other words, a good faith transferee is entitled to the value that it gave to the debtor in exchange for the fraudulently transferred property.  Because section 548(c) provides an affirmative defense, the transferee has the burden of proof.[153]

Significantly, section 548(c) requires a showing of both good faith and value.  Section 548(c) requires that "value" be given, but it need not be reasonably equivalent value.  Of course, if reasonably equivalent value was paid, then there can be no constructive fraudulent transfer claim.  But there may still be a claim of actual fraudulent transfer.  Although CEC, the Sponsors and CAC/CGP have asserted that the receipt of reasonably equivalent value precludes a finding of intent to hinder, delay or defraud under section 548(a)(1)(A), there is ample precedent to the contrary.[154]  Thus, the mere provision of reasonably equivalent value, by itself, does not provide a defense to an actual fraudulent transfer claim.[155]

---

[151]  *See* Section III.D.2.b of this Appendix.

[152]  "Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation."  11 U.S.C. §548(c) (2015). Value is defined as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor."  11 U.S.C.§548(d)(2)(A) (2015).

[153]  *Bayou Superfund LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense.").

[154]  *Hayes v. Palm Seedlings Partners* (*In re Agric. Research and Tech. Grp. Inc.*), 916 F.2d 528, 535 (9th Cir. 1990) ("Even if the transferee gave reasonably equivalent value in exchange for the transfer avoided on either of the alternate theories, the transferee may not recover such value if

"The Code does not define 'good faith,' a term which is not susceptible of precise definition and which is generally determined on a case-by-case basis."[156]   However, good faith is obviously lacking in a situation where the transferee was an active participant in the scheme or accepted the transfer with actual knowledge of the transferor's fraudulent intent.[157]   This raises imputation issues similar to those discussed in Section III.A.1.b.ii of this Appendix regarding whether the knowledge or intent of the Sponsors may be imputed to the applicable transferees. For instance, CAC has asserted that it acted in good faith and that the knowledge or intent of the Sponsors may not be imputed to CAC based on the existence of a special committee.   As discussed above in Section III.A.1.b.ii of this Appendix, the issue of whether the knowledge or intent of the Sponsors may be imputed to CAC depends on whether the Sponsors controlled a majority of CAC's board notwithstanding the existence of the special committee.

Even if it cannot be shown that the transferee acted either with intent to help effectuate a fraudulent transfer, or with knowledge of a transferor's intent, the transferee may still be unable to prove that it acted in good faith.   As noted above, the Bankruptcy Code does not define "good faith"[158] and the legislative history relating to section 548(c) on this point is quite thin.[159]

---

the exchange was not in good faith because good faith is 'indispensable' for the transferee who would recover any value given pursuant to 11 U.S.C. Sec. 548(c)"); *Consumer Credit Union v. Widett* (*In re Health Gourmet, Inc.*), 29 B.R. 673, 677 (Bankr. D. Mass. 1983) (denying summary judgment because "[e]ven if the court were to find that the debtor received equivalent value for its grant of a security interest. . . there remains the outstanding factual question whether the bank was a 'good faith transferee'").

[155]   *Levit v. Spatz* (*In re Spatz*), 222 B.R. 157, 169 (N.D. Ill. 1998) ("[F]ull consideration is not, as a matter of law, an absolute defense" to an actual fraudulent transfer claim.); *see also ASARCO*, 396 B.R. at 393 (rejecting defendant's argument that a finding of reasonably equivalent value precludes a finding of actual intent to hinder or delay creditors).   Both *Spatz* and *ASARCO* addressed the issue under the UFTA, but both courts noted the similarities between the UFTA and section 548 of the Bankruptcy Code.   *Spatz*, 222 B.R. at 164 ("the provisions of the UFTA parallel §548 of the Bankruptcy Code."); *ASARCO*, 396 B.R. at 336 (noting that courts will look to decisions under section 548 when interpreting the UFTA).

[156]   *Collins v. Sellis* (*In re Lake States Commodities, Inc.*), 253 B.R. 866, 878 (Bankr. N.D. Ill. 2000).   As discussed in the Report, the Examiner has concluded that CEOC did not receive reasonably equivalent value for any of the asset transfers subject to his investigation.

[157]   *See, e.g.*, *Bank of Am., N.A. v. Veluchamy (In re Veluchamy)*, 524 B.R. 277, 310 n.17 (Bankr. N.D. Ill. 2014) ("knowing participants" in a fraudulent transfer lack good faith); *Strauss v. Cole (In re Mamtek US), Inc.*, No. 12-2009, 2013 WL 4602657 (Bankr. W.D. Mo. Aug. 29, 2013) (granting summary judgment to trustee when transferee participated in and knew about misstatements made by debtors in order to receive financing, a portion of which was used to pay transferee).

[158]   *Helms v. Roti (In re Roti)*, 271 B.R. 281, 295-96 (Bankr. N.D. Ill. 2002) (noting that "good faith" is a "term which is not susceptible to precise definition").

Consequently, based on the "manifold variables" considered in the context of examining "good faith," "there is little agreement among courts as to what conditions ought to allow a transferee this defense."[160]    Due to the distinctive facts of a given bankruptcy case, courts review the meaning of "good faith" on a case-by-case basis.[161]

Courts typically "have applied an 'objective' or 'reasonable person standard'" when analyzing "good faith."[162] As discussed below, however, the Seventh Circuit also considers a subjective component of good faith.[163]

The objective good faith standard under section 548(c) requires a court to evaluate whether a transferee "is on inquiry notice as to *either* the debtor's fraudulent intent or the debtor's possible insolvency."[164]    At least one court from the Southern District of New York and

---

[159]    *Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 800 (5th Cir. 2002) (citing 5 Collier on Bankruptcy ¶548.07[2][a] (2002)).  *See also Brincko v. Rio Properties, Inc.* (*In re Nat'l Consumer Mortg., LLC)*, No. 2:10-CV-00930-PMP-PAL, 2013 WL 164247, at *18 (D. Nev. Jan. 14, 2013) (citing *Jobon v. McKay (In re M&L Bus. Mach. Co. Inc.)*, 84 F.3d 1330, 1335 (10th Cir. 1996)) and noting, in the context of claims under state law uniform fraudulent conveyance law and sections 544, 548(a), and 550 of the Bankruptcy Code, "courts are reluctant to establish a singular test for good faith given the unpredictable circumstances in which the courts may find its presence or absence.").

[160]    *Hannover Corp.*, 310 F.3d at 800.

[161]    *Roti*, 271 B.R. at 295-96 (noting, in the context of section 548(c), that courts analyze "good faith" on a case-by-case basis).

[162]    *Gowan v. Patriot Grp., LLC (In re Dreier LLP)*, 452 B.R. 391, 447 (Bankr. S.D.N.Y. 2011) (citing cases).

[163]    *See Covey v. Commercial Nat'l Bank of Peoria (In re V. Jobst & Sons, Inc.)*, 960 F.2d 657, 662 (7th Cir. 1992) (upholding a good faith transferee defense to a constructive fraudulent transfer even though, at the time certain loans were made, the debtor-borrowers were found to be insolvent and unlikely to be able to repay the loans to third-party lenders because the loans were made "in the expectation that [the debtor corporations] could be restored to profitable operation"); *Stites v. Dunnahoo (In re Soudan Mfg. Co.)*, 113 F. 804, 809 (7th Cir. 1902) (holding that the lender had acted in good faith under [the Bankruptcy Act], despite the precarious financial condition of the debtor, because the lender made the advances in an honest effort to assist the debtor in carrying out its business).

[164]    *Nat'l Consumer Mortg., LLC*, 2013 WL 164247 at *18 (emphasis added).  *See also Gowan v. Westford Asset Mgmt. LLC (In re Dreier LLP)*, 462 B.R. 474, 490 (Bankr. S.D.N.Y. 2011) ("Under Bankruptcy Code § 548(c), a transferee lacks good faith if . . . it has information placing it on inquiry notice that the transferor was insolvent, or that the transfer might be made with a fraudulent purpose. . . ."); *Bayou Grp.*, 439 B.R. at 312 (a showing that the transferee was on inquiry notice of either transferor's possible insolvency or the possibility of fraudulent purpose of the transfer is sufficient to trigger a "diligent investigation" requirement); *Enron Corp. v. Bear Stearns & Co. (In re Enron Corp.)*, No. 05-01105, 2005 WL 3832053 (Bankr. S.D.N.Y. Nov. 28, 2005) ("courts have further found a transferee does not act in good faith when he has sufficient

the Fifth Circuit have espoused the use of the following two-step test for the objective consideration of "good faith:"

> The good faith test under Section 548(c) is generally presented as a two-step inquiry. The first question typically posed is whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose. While the cases frequently cite either fraud or insolvency, these two elements are consistently identified as the triggers for inquiry notice. The fraud or insolvency predicate is set forth in countless cases. . . .

> . . . The weight of the authority . . . indicates that a court should focus on the circumstances specific to the transfer at issue – that is, whether a transferee reasonably should have known . . . of the fraudulent intent underlying the transfer.

> Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a "diligent investigation" requirement. Once again, the case law is not clear as to the nature of this requirement. One line of authority holds that the transferee must demonstrate that it conducted a diligent investigation of the facts that put it on inquiry notice. The test is most commonly phrased, however, as whether "diligent inquiry would have discovered the fraudulent purpose" of the transfer.[165]

In addition to the Fifth Circuit, the Tenth Circuit and courts in the Second, Fourth, Sixth, and Eleventh Circuits have cited a similar two-part test in analyzing "good faith" in the context

---

knowledge to place him on inquiry notice of the debtor's possible insolvency") (internal citations and quotation marks omitted); *Roti*, 271 B.R. at 295-96 ("With respect to good faith, courts agree that if a transferee reasonably should have known of a debtor's insolvency or the fraudulent intent underlying a transfer, the transferee is not entitled to the defense under §548(c)"); *Jobin v. McKay (In re M & L Bus. Mach. Co. Inc.)*, 84 F.3d 1330,1335-36 (10th Cir. 1996) ("Prominent bankruptcy scholars agree: the presence of any circumstance placing the transferee on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment.") (citing 4 Collier on Bankruptcy ¶548.07 at 548-73 (Lawrence P. King ed., 15th ed. 1996) (internal quotation marks omitted).

[165] *Bayou Grp.*, 439 B.R. at 310–12 (citations omitted). *See also Templeton v. O'Cheskey (In re Am. Hous. Found.)*, 785 F.3d 143, 164 (5th Cir. 2015), *as revised* (June 8, 2015) (citing *Horton v. O'Cheskey (In re Am. Hous. Found.)*, 544 F. App'x 516, 520 (5th Cir. 2013) (unpublished) (quoting *Bayou* and holding that the bankruptcy court failed to apply the proper test for inquiry notice of insolvency or fraud under section 548(c) of the Bankruptcy Code).

of section 548(c).[166]  Although the Seventh Circuit has not expressly adopted such a two-part test, its recent decision in *In re Sentinel Management Group, Inc.* suggests a similar approach.[167]

In addition to the objective component of good faith, some courts, including the Seventh Circuit and bankruptcy courts in the Northern District of Illinois have also considered the subjective component of good faith.  As explained by one court, "the mere fact that a transferee is on notice of the precarious financial condition of the transferor does not preclude a finding of

---

[166]  *Jobin v. McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1338 ("we conclude that the bankruptcy court and the district court properly held that good faith under § 548(c) should be measured objectively and that 'if the circumstances would place a reasonable person on inquiry of a debtor's fraudulent purpose, and a *diligent* inquiry would have discovered the fraudulent purpose, then the transfer is fraudulent.'");  *Perkins v. Crown Fin., LLC (In re Int'l Mgmt. Assocs., LLC)*, No. 06-6421-(PWB, 2016 WL 552491, at *12 (Slip Copy) (Bankr. N.D. Ga. Feb. 10, 2016) (denying summary judgment that the transferee failed to take the debtor's property in good faith, noting that "[w]hat is reasonable and prudent under the circumstances for purposes of the good faith test is a matter of fact.  Factual disputes exist on matters including, but not limited to, the timing of [the transferee's] knowledge about [the debtor]; the nature and quality of the information [the transferee] obtained from its sources; and what [the transferee] could have or should have known or discovered about [the debtor's] insolvency or fraud.");  *Redmond v. NCMIC Fin. Corp. (In re Brooke Corp.)*, No. 12-6043, 2016 WL 74796, at *2 (Slip Copy) (Bankr. D. Kan. Jan. 4, 2016) (denying summary judgment noting, among other things, issues of fact regarding the existence of "red flags" to trigger further inquiry by the transferee as to the debtor's fraudulent intent or insolvency"); *Ivey v. Cole (In re Whitley)*, Case No. 11-2024, 2013 WL 1910381, at *2-3 (Bankr. M.D.N.C. May 1, 2013) (applying the standard set forth by the Fourth Circuit in *Goldman v. Capital City Mort. Corp. (In re Nieves)*, 648 F.3d 232 (4th Cir. 2011) in the context of section 550(b)(1) to a case involving section 548(c) denying summary judgment as to whether the defendant was placed on inquiry notice of the debtor's fraudulent purpose in consummating the subject transfer); *Dreier LLP,* 462 B.R. at 490 "Under Bankruptcy Code § 548(c), a transferee lacks good faith if (1) it has information placing it on inquiry notice that the transferor was insolvent, or that the transfer might be made with a fraudulent purpose, and (2) a diligent inquiry would have discovered the fraudulent purpose of the transfer"); *Tabor v. Kelly (In re Davis)*, No. 07-5181-L, 2011 WL 5429095, at *24-25 (Bankr. W.D. Tenn. Oct. 5, 2011) (quoting *Bayou*).

[167]  *Grede v. Bank of New York Mellon*, *(In re Sentinel Mgmt. Grp, Inc.)*, 809 F.3d 958, 961 (7th Cir. 2016) (stating that a transferee does not act in good faith if it had "inquiry notice" and explaining that the term inquiry notice "signifies awareness of suspicious facts that would have led a reasonable firm, acting diligently, to investigate further and by doing so discover wrongdoing.").  In *Sentinel*, the Seventh Circuit concluded that the bank was not a good faith transferee because it "had a reason to disbelieve Sentinel's assurances, and an investigation would have discovered their falsity."  *Id*. at 963.

good faith under all circumstances."[168]   The subjective component of good faith was explained
by the *In re First Nat'l Parts Exch., Inc.*[169] court as follows:

> The *Telesphere* court's rejection of a purely objective test for determining good
> faith was proper . . . .   If, as in *Telesphere*, the transferee proceeds after
> reasonably accounting for those warning signs, and in full awareness and
> acknowledgment of the corresponding risks, the court may be justified in finding
> good faith.   Conversely, a transferee cannot stick its head in the sand, clinging to
> its subjective belief while purporting to ignore signs of fraud or insolvency on the
> part of the transferor.[170]

The court noted that in the earlier *Telesphere* decision, a lender had been found to have
acted in good faith despite knowing of the borrower's financial distress where it had conducted
adequate due diligence, including obtaining opinion letters from legal counsel and reports from
independent consulting firms, and believed that the debtor would be able to repay the loan.[171]   In
finding that the third party lender-transferees were good faith transferees under section 548(c),
the *Telesphere* court explained that:

> There is no evidence whatever that the Lenders were engaged in any effort to
> defraud creditors, and . . . there is no evidence that the borrower was engaged in
> any such effort.   Moreover, the Lenders made their loans in the ordinary course of
> their business, after performing an extensive due diligence investigation into
> numerous aspects of the . . . transaction, including the financial condition of
> Telesphere and the value to be received by Telesphere as a result of the . . .
> transaction.   That investigation generated several opinion letters from legal
> counsel and at least three reports from independent consulting firms.   Though
> those letters and reports identified legal and economic risks with the . . .
> transaction, they also disclosed a reasonable prospect of success of the NTS
> transaction and the eventual repayment of the Lenders' loan.   The Lenders
> apparently relied on these opinion letters and reports in extending the Lenders'
> loan.   Their reliance on such documents may have been negligent, but it hardly
> negates the substantial likelihood that the Lenders made their loans in a good faith
> expectation of being repaid from a successful transaction.[172]

The court conceded, however, that "[f]inding good faith by the transferee in spite of the
transferor's known financial difficulties may be more likely where the transferee is a lender.   As

---

[168]   *Moglia v. Universal Auto., Inc. (In re First Nat'l Parts Exch., Inc.)*,No. 98C5915 2000 WL
988177, at *6 (N.D. Ill.   July 18, 2000).   *See also V. Jobst & Sons, Inc.*, 960 F.2d at 662;   *Soudan
Mfg. Co.*, 113 F. at 809.

[169]   *First Nat'l Parts Exch., Inc.*, 2000 WL 988177, at *6.

[170]   *Id.*

[171]   *Id.* (citing *In re Telesphere Commc'ns, Inc.*, 179 B.R. 544, 557-58 (Bankr. N.D. Ill. 1994)).

[172]   *In re Telesphere Commc'ns, Inc.*, 179 B.R 544, 559 (Bankr. N.D. Ill. 1994).

[the trustee] points out, lenders may be attempting to help an insolvent or distressed debtor overcome its difficulties."[173]

In addition, some cases suggest that the issue of whether a transaction is an arm's-length transaction may be relevant to the issue of whether the transferee is a good faith transferee.[174] It has been stated, albeit in a different context, that an arm's-length transaction "between two parties, however closely related they may be, [must be] conducted as if the parties were strangers, so that no conflicts of interest arise."[175]

## 2.   Statute of Limitations Defense

Section 548(a)(1) of the Bankruptcy Code allows the avoidance of actual and constructive fraudulent transfers (and the incurrence of actually and constructively fraudulent obligations) made (or incurred) on or within two years before the date of the filing of the petition.[176]   A transfer or obligation incurred outside that period is time-barred.

## 3.   Safe Harbor

The safe harbor provision of section 546(e) of the Bankruptcy Code applies to certain fraudulent transfers and is discussed in Section V of this Appendix.

## D.   State Fraudulent Transfer Laws

Section 544(b) of the Bankruptcy Code permits an estate representative to pursue fraudulent transfer claims under applicable non-bankruptcy law.  In particular, the trustee "may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable [.]"[177]   This provision allows a trustee to apply state law to avoid certain transfers.[178] The majority of states, including Delaware,[179] Nevada[180] and New Jersey[181], have adopted

---

[173]  *First Nat'l Parts Exch., Inc.,* at *6 n.4.

[174]   *Bullard v. Alum. Co. of Am. (In re Kritzer Radiant Coils, Inc.)*, 468 F.2d 11, 13 (7th Cir. 1972) (addressing good faith issue under prior Bankruptcy Act and stating that "the question of good faith depends under the circumstances on whether the 'transaction carries the earmarks of an arms-length bargain'"); *Brown v. Third Nat'l Bank* (*In re Sherman*), 67 F.3d 1348, 1355 (8th Cir. 1995) ("[T]o determine whether good faith exists [under section 549(c) of the Bankruptcy Code], the court looks to whether 'the transaction carries the earmarks of an arms-length bargain.'") (citation omitted).

[175]   *Bruno Mach. Corp. v. Troy Die Cutting Co.* (*In re Bruno Mach. Corp*)*.*, 435 B.R. 819, 834 (Bankr. N.D.N.Y. 2010).

[176]   11 U.S.C. §548(a)(1) (2015).

[177]   11 U.S.C. §544(b)(1) (2015).

[178]   *Image Worldwide, Ltd.*, 139 F.3d at 576-77.

[179]   Del. Code Ann. tit. 6 §§1301-11 (West 2015).

versions of the UFTA that include fraudulent transfer provisions similar to those contained in the Bankruptcy Code.[182]  Some states – including New York, whose laws could be applied to the transfers investigated by the Examiner – have retained the older UFCA.

While the UFTA generally follows the structure and organization of the UFCA, the statutes contain several important differences.[183]  Those differences include: (1) the burden of proof; (2) statutes of limitations; (3) statutorily enumerated "badges of fraud"; (4) definitions of insolvency; (5) the requirement of "good faith"; (6) provisions making transfers to insiders voidable; (7) defenses available to transferees; and (8) creditors' remedies.[184]  This section examines the elements of, and differences between, the fraudulent transfer statutes in the following states: Nevada (UFTA), New York (UFCA), Delaware (UFTA), New Jersey (UFTA) and Maryland (UFCA), each of which has a connection with one or more of the investigated transfers.  As more fully discussed in the next section, a choice of law analysis could result in the application of any of the preceding state's laws and, accordingly, all such state laws are discussed herein.[185]

For the debtor to bring an avoidance action under section 544(b) of the Bankruptcy Code, it must prove the existence of an actual creditor who held an allowable claim "at the time the bankruptcy petition was filed."[186]  Once the existence of this triggering creditor is demonstrated,

---

[180]  Nev. Rev. Stat. §§112.140-.250 (2015).

[181]  N.J. Stat. Ann. §25:2-20-34 (West 2015).

[182]  *See Wiand v. Morgan*, 919 F. Supp. 2d 1342, 1354 (M.D. Fla. 2013).

[183]  Peter A. Alces & Luther M. Dorr, Jr., *A Critical Analysis of the New Uniform Fraudulent Transfer Act*, 1985 U. Ill. L. Rev. 527, 537 (1985).  However, courts have held that the "substantive provisions of state statutes under the Uniform Fraudulent Transfer Act and the earlier Uniform Fraudulent Conveyance Act are largely the same as §548" and most of the opinions under the UFCA are generally good authority under the UFTA.  *See Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 464 B.R. 606, 613 (Bankr. S.D.N.Y 2012) ("*Tronox I*"); *Advest, Inc. v. Rader*, 743 F. Supp. 851, 853-54 (S.D. Fla. 1990).

[184]  Michael L. Cook & Richard E. Mendales, *The Uniform Fraudulent Transfer Act: An Introductory Critique*, 62 Am. Bankr. L.J. 87, 87-88 (1988).

[185]  The Debtors and many of the Caesars transferees are incorporated or formed under the laws of Delaware; they have their principal place of business in Nevada and three of the casinos transferred in May 2014 are located in Nevada, while others were located in Maryland, New Jersey and Louisiana.  Apollo, which effectively acted as Caesar's *de facto* CFO, is headquartered in New York, as is Caesars' principal outside counsel.  Many of the banks, noteholders, and creditors also have their principal place of business in New York, and many of the negotiations related to the key asset transfers and financial transactions took place in New York.

[186]  *Karnes v. McDowell* (*In re McDowell*), 87 B.R. 554, 558 (Bankr. S.D. Ill. 1988) (trustee's action against the defendant depends on whether there was a creditor existing at the time the transfers were made that still had a viable claim against the debtor at the time the bankruptcy

a plaintiff may seek to avoid a transfer even if the amount of the transfer exceeds the value of the triggering creditor's claim.[187]

### 1. Choice of Law Analysis

As noted earlier, to determine which state law applies, the court must undertake a choice of law analysis. Because the transfers investigated touch several different states, the outcome of potential fraudulent transfer claims could vary depending on whether the relevant state law derives from the UFTA, the UFCA, or another applicable statute.[188]

---

petition was filed); *Musicland Holding Corp. v. Best Buy Co.* (*In re Musicland Holding Corp.*), 424 B.R. 95, 103 (Bankr. S.D.N.Y. 2010) (standing to bring a fraudulent transfer cause of action under Bankruptcy Code section 544(b) is derivative of the existence of an actual unsecured creditor of the transferor who could have avoided the transfers); *Universal Church v. Geltzer*, 463 F.3d 218, 222 n.1 (2d Cir. 2006) (noting that the trustee steps into the shoes of a creditor who could have avoided the transfers); *Ries v. Wintz Props., Inc.* (*In re Wintz Cos.*), 230 B.R. 848, 859 (B.A.P. 8th Cir. 1999) (noting that the trustee's standing depends on that of the triggering creditor; *Lippe v. Bairnco Corp.*, 225 B.R. 846, 852 (S.D.N.Y. 1998) ("*Lippe I*") (requiring plaintiffs to "demonstrate that an actual unsecured creditor exists who could avoid the Transactions under New York law"). For a fraudulent transfer claim brought pursuant to Bankruptcy Code section 548, a triggering creditor may not be required. *Tomsic v. Pitocchelli* (*In re Tri-Star Techs. Co.*), 260 B.R. 319, 324 (Bankr. D. Mass. 2001) ("For avoidance of the challenged payments pursuant to UFTA §6(a), the Trustee's derivative standing under [Bankruptcy Code] §544(b) is dependent on the existence of at least one actual unsecured creditor who could have avoided the challenged transfers. Section 548(a)(1)(B) does not require the existence of such a creditor."). However, some courts have held that there must be some unsecured creditor who would benefit from the Bankruptcy Code section 548 avoidance action. *See, e.g.*, *Wellman v. Wellman*, 933 F.2d 215, 217-18 (4th Cir. 1991); *see also Strauss v. Town of Harrison* (*In re Murphy*), 331 B.R. 107, 122 (Bankr. S.D.N.Y. 2005) ("Courts have consistently held that an avoidance action can only be pursued if there is some benefit to creditors and may not be pursued if it would only benefit the debtor."); *Join-In Int'l (U.S.A.) Ltd. v. New York Wholesale Distribs. Corp.* (*In re Join-In Int'l (U.S.A.) Ltd.*), 56 B.R. 555, 561 (Bankr. S.D.N.Y. 1986) ("[I]f the recovery of the alleged fraudulent conveyance will solely benefit the debtor it will not be permitted to maintain the proceeding.").

[187]   *Silverman v. Sound Around, Inc.* (*In re Allou Distribs., Inc.*), 392 B.R. 24, 32 (Bankr. E.D.N.Y. 2008) ("When a trustee establishes standing to recover a transfer under Section 544(b) based on the existence of a triggering creditor, the trustee may seek to avoid a fraudulent transfer not only for the benefit of that creditor, but also for the benefit of all of the unsecured creditors of the estate."); *Miller v. CSFB, Lab Morgan Corp.* (*In re Refco, Inc. Sec. Litig.*), Nos. 07 MDL 1902 GEL, 09 Civ. 2885 GEL, 09 Civ. 2990 GEL, 09 Civ. 2922 GEL, 2009 WL 7242548, at *9 (S.D.N.Y. Nov. 13, 2009) (same).

[188]   *See Paloian v. Gen. Seal, Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696, 702-03 (N.D. Ill. 2012).

### a.  Both Illinois and Federal Courts Rely on the "Most Significant Relationships" Test for Choice of Law Analysis

The first step in a choice of law analysis is to determine whether the forum state or federal choice of law rules apply to the asserted claims.[189]  Regardless of which test applies, the result is likely the same.

As discussed above, for conflicts purposes, the law of the forum determines whether the action is characterized as tort or contract.[190]  In Illinois, a fraudulent transfer is considered a tort for purposes of performing a choice of law analysis.[191]  For tort actions, Illinois has adopted the *Restatement (Second) Conflict of Laws* to determine which state has the "most significant relationship" to the occurrence.[192]  The *Restatement*'s "most significant relationship" test considers "(1) where the injury occurred; (2) where the injury-causing conduct occurred; (3) the domicile of the parties; and (4) where the relationship of the parties is centered."[193]  Similar to Illinois state courts, federal courts have adopted the *Restatement* for purposes of determining which state's law applies to tort claims.[194]  Accordingly, regardless of whether the forum state or federal choice of law rules apply, the *Restatement*'s "most significant relationship" test will determine the state law applicable to the transactions at issue.[195]

### b.  Application of the Most Significant Relationship Test

In applying the "most significant relationship" test, "it is not the number of contacts, but the qualitative nature of those particular contacts that determines which state has the most

---

[189]  *See Jones v. Morris* (*In re Morris*), 30 F.3d 1578, 1581 (7th Cir. 1994).

[190]  *Restatement (Second) of Conflict of Laws* §124, cmt. a (1971) ("The local law of the forum determines such questions as whether . . . the action shall be in tort or contract[.]"); *see also Forsyth v. Cessna Aircraft Co.*, 520 F.2d 608, 611 (9th Cir. 1975) ("the characterization of an action must be made in accordance with the law of the forum."); *Fahs v. Martin*, 224 F.2d 387, 396-97 (5th Cir. 1955) ("in deciding how the matter should be characterized for conflict of laws purposes, it is clear that the law of the forum should control."); *Insteel Indus., Inc. v. Costanza Contracting Co.*, 276 F. Supp. 2d 479, 484 (E.D. Va. 2003) ("[A] court must apply the law of the forum to determine the character of an action for conflicts of law purposes.").

[191]  *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 476 F. Supp. 2d 913, 932 (N.D. Ill. 2007) (citing *Fidelity Nat'l Title Ins. Co. of N.Y. v. Howard Sav. Bank*, 436 F.3d 836, 840 (7th Cir. 2006)), *aff'd in relevant part*, 529 F.3d 371, 378 (7th Cir. 2008).

[192]  *Esser v. McIntyre*, 661 N.E.2d 1138, 1141 (Ill. 1996); *Ingersoll v. Klein*, 262 N.E.2d 593, 596 (Ill. 1970); *Ruiz v. Blentech Corp.*, 89 F.3d 320, 323 (7th Cir. 1996).

[193]  *Esser*, 661 N.E.2d at 1141 (citing *Ingersoll*, 262 N.E.2d 593); *see also Fla. Risk Planning Consultants, Inc. v. Transp. Life Ins. Co.*, 732 F.2d 593, 595 (7th Cir. 1984).

[194]  *See, e.g.*, *F.D.I.C. v. Wabick*, 214 F. Supp. 2d 864, 870-71 (N.D. Ill. 2002).

[195]  *Id.*

significant relationship to the occurrence and the parties."[196]   In *Ruiz v. Blentech Corp.*, the district court conducted a choice of law analysis and determined that California and Illinois had "essentially equal" contacts with the case.[197]   Because there is a presumption in favor of applying the laws of the state where the alleged tort occurred, the district court concluded that Illinois law should apply to all issues in the case.[198]   On appeal, the Seventh Circuit determined that the district court should have applied different choice of law analyses for issues of successor and tort liability.[199]   Although the district court was found to have correctly applied the law of Illinois with respect to the tort claim,[200] it was found to have incorrectly applied such law to the issue of successor liability because "California clearly ha[d] the most significant contacts with a sale of corporate assets by one California corporation to another."[201]

Similarly, in the *ASARCO* case, the court performed a choice of law analysis with respect to fraudulent transfer claims and found it especially difficult to discern where the injury had occurred because the injured creditors were located in many jurisdictions.[202]   However, because the main asset transferred was stock in a Delaware corporation, the court determined that this consideration pointed toward the application of Delaware law.[203]   After applying the remaining factors, and considering jurisdictions including New Jersey, Arizona, New York, Peru and New Mexico, the court ultimately concluded that Delaware law should govern the fraudulent transfer claim based primarily on the state of incorporation of the relevant entities.[204]

Finally, while "the law of the place of injury controls unless Illinois has a more significant relationship with the occurrence and with the parties,"[205] when the allegedly wrongful conduct occurs in a place different from the place of injury, the more well-reasoned cases hold that the substantive law of the place where the allegedly wrongful conduct occurs should apply.[206]

---

[196]   *ASARCO*, 382 B.R. at 61.

[197]   *Ruiz*, 89 F.3d at 325.

[198]   *Id.*

[199]   *Id.* at 325-26.

[200]   *Id.*

[201]   *Id.*

[202]   *ASARCO*, 382 B.R. at 58.

[203]   *Id.*

[204]   *Id.* at 64.

[205]   *Esser*, 661 N.E.2d at 1141.

[206]   *Hosking v. TOG Capital Mgmt., L.P.* (*In re Hellas Telecomms. (Luxembourg) II SCA*), 535 B.R. 543, 574 (Bankr. S.D.N.Y. 2015) (when the allegedly wrongful conduct occurs in a place different from the place of injury, the Second Circuit dictates that "it is the place of the allegedly wrongful conduct that generally has superior 'interests in protecting the reasonable expectations of the parties who relied [on the laws of that place] to govern their primary conduct and in the

Based on these standards, the Examiner has concluded that Nevada law will typically apply to any state law fraudulent transfer claims that may exist with respect to the transactions that were investigated. The majority of the transactions involved ownership of properties located in Nevada. Although some of the transactions involved properties located outside of Nevada, even in those transactions where some of the properties were located outside of Nevada, the transactions typically involved property located in Nevada as well.[207] In addition, a majority of the conduct forming the basis for the claims occurred in Nevada, and the Caesars entities and employees were primarily located in Nevada. To the extent that the transactions involve entities formed under Delaware law, it could be argued that Delaware applies. However, both Delaware and Nevada have adopted the UFTA, and other than a difference with respect to the burden of proof for an actual fraudulent transfer claim, there is no material difference between the law of Delaware or Nevada.[208] Accordingly, except where otherwise indicated in the Final Report, the Examiner has applied Nevada state law when analyzing state law fraudulent transfer claims.

### c. Inapplicability of Contractual Choice of Law Provisions

Most, if not all, of the transfers investigated by the Examiner are governed by contracts containing choice of law provisions designating the state law applicable to any dispute among the parties. Ordinarily, a choice of law provision, "which is made during an arm's-length negotiation between experienced and sophisticated businessmen, should be honored by the parties and enforced by the courts, absent some 'compelling and countervailing reason'" for not doing so.[209] Even so, "a choice of law or forum clause in a contract is not applicable to a

---

admonitory effect that applying its law will have on similar conduct in the future.'") (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL,* 739 F.3d 45, 50-51 (2d Cir. 2013) (quoting *Schultz v. Boy Scouts of Am., Inc.,* 65 N.Y.2d 189, 491 N.Y.S.2d 90, 480 N.E.2d 679, 684-85 (1985)); *see also Lyman Commerce Sols., Inc. v. Lung,* No. 12-cv-4398, 2014 WL 476307, at *3 (S.D.N.Y. Feb. 6, 2014) (concluding that for fraudulent conveyance claims, "the location of injury does not control; instead, it is the location of the defendant's conduct that controls" (quoted in *Hellas,* citation omitted); *see also United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F. Supp. 2d 198, 215-16 (S.D.N.Y. 2002) (holding that Canadian law applied to fraudulent conveyance claim because "the conveyance alleged by [the plaintiffs] to be fraudulent—the transfer of funds held by [one defendant] to the [other defendants]—took place in Canada").

[207] For example, the Four Properties Transaction involved ownership interests in three properties located in Nevada and one property located in Louisiana. The Growth Transaction involved ownership interests in one property in Nevada and one property in Maryland.

[208] As discussed in Section III.D.2.a of this Appendix, Delaware appears to apply a preponderance of the evidence standard to actual fraudulent transfer claims whereas Nevada appears to apply a clear and convincing evidence standard.

[209] *Calanca v. D&S Mfg. Co.,* 510 N.E.2d 21, 23 (1st Dist. 1987) (quoting *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12 (1972)).

nonparty,"[210] unless the nonparty can be considered a "closely related third party."[211]   The "closely related" doctrine only applies where it was foreseeable, based on the nonparty's proximity to the transaction, that the clause might have application to disputes arising under the contract that involve the non-party.[212]   Because creditors typically lack any proximity to alleged fraudulent transfers, the choice of law provisions in the Debtors' agreements effectuating the transfers at issue will not likely govern potential fraudulent transfer claims.[213]

## 2.   Fraudulent Transfer Under the UFTA

Nevada, Delaware and New Jersey have adopted the UFTA, and their respective legislatures have instructed their courts to interpret their respective UFTAs in accordance with other states' interpretations of the UFTA.[214]   Accordingly, each state's case law generally can be applied to any other UFTA state.[215]   The UFTA contains provisions for actual fraudulent transfers, constructive fraudulent transfers and transfers made by insolvent debtors.[216]   The UFTA contains a four-year statute of limitation that generally applies from the date the transfer was made or the obligation was incurred.[217]   If four years have passed, the UFTA permits claims

---

[210] *Paloian v. LaSalle Bank Nat'l Ass'n* (*In re Doctors Hosp. of Hyde Park, Inc.*), 494 B.R. 344, 370 (Bankr. N.D. Ill. 2013) (quoting *Maldonado v. Creative Woodworking Concepts, Inc.*, 796 N.E.2d 662, 666 (3d Dist. 2003)); *see also Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 108 n.16 (Bankr. D. Mass. 1992) ("absent an overriding choice of law in the release agreement, the Court would likely apply federal common law").

[211]   *Transp. Alliance Bank, Inc. v. Arrow Trucking Co.*, 766 F. Supp. 2d 1188, 1197 (N.D. Okla. 2011).

[212]   *Id.*; *see also Firefly Equities, LLC v. Ultimate Combustion Co.*, 736 F. Supp. 2d 797 (S.D.N.Y. 2010).

[213]   *Transp. Alliance Bank*, 766 F. Supp. at 1198 (holding that a choice of law provision is inapplicable to a creditor's claim for fraudulent transfer).

[214]   *Herup v. First Boston Fin., LLC*, 162 P.3d 870, 876 (Nev. 2007); *Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc.*, No. 3601-VCS, 2010 WL 720150, at *3 (Del Ch. Mar. 3, 2010); *Meiselman v. Hamilton Farm Golf Club LLC*, No. 11-0653 (AET), 2011 WL 3859846, at *7-11 (D.N.J. Sept. 1, 2011).

[215]   *Herup*, 162 P.3d at 876; *Edgewater*, 2010 WL 720150, at *3; *Meiselman*, 2011 WL 3859846, at *7-11.

[216]   *See* Nev. Rev. Stat. §§112.180, 112.190 (2015); Del. Code Ann. tit. 6, §§1304, 1305 (West 2015); N.J. Stat. Ann. §§25:2-25, 25:2-26, 25:2-27 (West 2015); *Herup*, 162 P.3d at 873; *Runvee, Inc. v. United States*, No. 2:10-CV-2260-KJD-GWF, 2013 WL 1249602, at *10 (D. Nev. Mar. 26, 2013).

[217]   Nev. Rev. Stat. §112.230(1) & (2) (2015); Del. Code Ann. tit. 6, §1309(1) & (2) (West 2015); N.J. Stat. Ann. §25:2-31(a) & (b) (West 2015).

within one year of the time when "the transfer or obligation was or could reasonably have been discovered by the claimant."[218]

### a. Actual Fraudulent Transfer Under the UFTA

Under the UFTA, a transfer made or obligation incurred is fraudulent as to an existing or future creditor if the debtor made the transfer or incurred the debt "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor."[219] As with the federal provision, (i) the UFTA's use of the disjunctive means that the presence of an intent to hinder or delay alone is sufficient to sustain a claim[220] and (ii) actual fraud is rarely established by direct evidence.[221] The UFTA contains a non-exclusive list of eleven "badges of fraud" – three more than are typically cited under Bankruptcy Code section 548 – that historically have been associated with the element of intent to defraud creditors. These factors may also be used to establish intent to hinder or delay.[222] They are:

(a) The transfer or obligation was to an insider;

(b) The debtor retained possession or control of the property transferred after the transfer;

(c) The transfer or obligation was concealed or not disclosed;[223]

---

[218] Nev. Rev. Stat. §112.230(1) (2015) (2015); Del. Code Ann. tit. 6, §1309(1) (West 2015); N.J. Stat. Ann. §25:2-31(a) (West 2015).

[219] Nev. Rev. Stat. §112.180(1)(a) (2015); Del. Code Ann. tit. 6, §1304(a)(1) (West 2015); N.J. Stat. Ann. §25:2-25(a) (West 2015).

[220] *Leonard v. Coolidge (In re Nat'l Audit Def. Network)*, 367 B.R. 207, 221 (Bankr. D. Nev. 2007) ("Given the alternative phrasing of the requisite intent—a fraudulent transfer exists if there is an intent to hinder, delay *or* defraud") (emphasis in original); *Scarpone v. Dionisio*, No. 04-3140 (SRC), 2007 WL 869548, at *4 (D.N.J. Mar. 20, 2007) (denying summary judgment where issue of fact remained as to intent to hinder or delay).

[221] *Nat'l Audit Def. Network*, 367 B.R. at 219-20; *Fedders N. Am., Inc.*, 405 B.R. 527, 545 (Bankr. D. Del. 2009) ("Because direct evidence of fraudulent intent is often unavailable, courts usually rely on circumstantial evidence to infer fraudulent intent."); *Dobin v. Hill (In re Hill)*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006) ("Because actual fraud is rarely proven by direct evidence, as individuals are rarely willing to admit such an intent, courts may infer actual intent by examining the circumstances and considering whether various 'badges of fraud' are present.").

[222] *Stanton*, 457 B.R. at 93.

[223] At least one decision has held that the provision of misleading information may satisfy this "badge" even if the transfer is disclosed. *ASARCO,* 396 B.R. at 373 ("Although the transfer itself was not concealed, . . . the dissemination of inaccurate information might have misled interested parties regarding the transaction and constitutes some evidence of [the debtor]'s intent.").

(d) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(e) The transfer was of substantially all of the debtor's assets;

(f) The debtor absconded;

(g) The debtor removed or concealed assets;

(h) The value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(i) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(j) The transfer occurred shortly before or shortly after a substantial debt was incurred; and

(k) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[224]

As with Bankruptcy Code section 548, none of the above-identified badges standing alone is necessary, nor is there a minimum number of badges that must be present, to establish the debtor's intent to hinder, delay or defraud.[225] The existence of several badges, however, will raise a presumption of actual fraudulent intent.[226] As with Bankruptcy Code section 548, "'significantly clear' evidence of a legitimate supervening purpose" can counter evidence of fraud.[227]

---

[224] Nev. Rev. Stat. §112.180(2)(a)-(k) (2015); Del. Code Ann. tit. 6, §1304(b)(1)-(11) (West 2015); N.J. Stat. Ann. §25:2-26(a)-(k) (West 2015). This list of commonly considered badges of fraud is not exhaustive. *Nat'l Audit Def. Network*, 367 B.R. at 220 ("[T]he range of activities that fraudsters may use to commit fraud cannot and should not be definitively cataloged.").

[225] *Nat'l Audit Def. Network*, 367 B.R. at 219-20 ("[N]one of the badges standing alone are necessary or sufficient; the range of activities that fraudsters may use to commit fraud cannot and should not be definitively cataloged."); *see also* UFTA §4, Comment (5) ("Proof of the existence of any one or more of the factors . . . may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer or incurred a fraudulent obligation.").

[226] *Nat'l Audit Def. Network*, 367 B.R. at 220 (citing *Fleming Cos., Inc. v. Rich*, 978 F. Supp. 1281, 1297-98 (E.D. Mo. 1997) (applying Missouri UFTA)).

[227] *Stanton*, 457 B.R. at 94 (quoting *Max Sugarman Funeral Home, Inc. v. A.D.B. Inv'rs*, 926 F.2d 1248, 1254-55 (1st Cir. 1991)).

"There is a split among the states that have adopted the UFTA concerning the appropriate burden of proof to apply to establish actual [fraudulent transfer claims], with the standard varying in many cases depending on the State's pre-UFTA fraudulent conveyance law."[228] "Prior to the enactment of the UFTA, jurisdictions were split as to whether clear and convincing evidence or a preponderance of the evidence was the proper standard of proof in an actual-intent fraudulent transfer [case]."[229] The split remains today because the UFTA is silent on the burden of proof to be applied, and courts look to each state's pre-UFTA fraudulent transfer law to determine issues undecided by the UFTA.[230] Although there is no controlling authority, Delaware likely applies the preponderance of the evidence standard,[231] while Nevada and New Jersey appear to require a creditor to establish a claim by clear and convincing evidence.[232]

### b. Constructive Fraudulent Transfer Under the UFTA

The UFTA, like its federal counterpart, prohibits constructive fraudulent transfers.[233] A present creditor can avoid a transfer not made for reasonably equivalent value if the debtor was insolvent or became insolvent as a result of the transfer.[234] The focus of this inquiry is the balance sheet test: a debtor is considered balance sheet insolvent "if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation," and is presumed to be insolvent if the debtor "is generally not paying his or her debts as they become due."[235] Assets for insolvency purposes do not include property that has been transferred, concealed, or removed with the intent to hinder, delay, or defraud, or are otherwise voidable under the UFTA.[236]

---

[228] *Tronox II*, 503 B.R. at 282 n.52 (collecting cases).

[229] *ASARCO*, 396 B.R. at 365-66.

[230] *Id.*

[231] *ASARCO*, 396 B.R. at 278 (relying on two unpublished opinions from the Delaware Chancery Court which applied a preponderance of the evidence and noting that the default burden of proof in Delaware is preponderance of the evidence unless a statute or other controlling authority requires otherwise.

[232] *Town & Country Bank v. SPS Invs., Inc.*, No. 12A664628, 2013 WL 6832131, at *1 (Nev. Dist. Ct., Clark County Nov. 26, 2013) (trial order); *Jecker v. Hidden Valley, Inc.*, 27 A.3d 964, 969, 422 N.J. Super. 155, 164 (Super. Ct. App. Div. 2011).

[233] *Runvee, Inc.*, 2013 WL 1249602, at *10.

[234] Nev. Rev. Stat. §112.190 (2015) ; Del. Code Ann. tit. 6, §1305 (West 2015); N.J. Stat. Ann. §25:2-27 (West 2015).

[235] Nev. Rev. Stat. §§112.160(1)-(2) (2015); *see also* Del. Code Ann. tit. 6, §1302(a)-(b) (West 2015); N.J. Stat. Ann. §25:2-23(a)-(b) (West 2015).

[236] Nev. Rev. Stat. §112.160(4) (2015); Del. Code Ann. tit. 6, §1302(d) (West 2015); N.J. Stat. Ann. §25:2-23(d) (West 2015).

Similarly, debts for insolvency purposes do not include obligations secured by a valid lien "on property of the debtor not included as an asset."[237]

A creditor may avoid a transfer made or obligation incurred – as to present *or future* creditors – if the debtor made the transfer or incurred the debt "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation."[238]   If the debtor does not receive reasonably equivalent value for the transfer, a creditor must also establish that the debtor "(1) [w]as engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (2) [i]ntended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond his or her ability to pay as they became due."[239]

The UFTA does not define "reasonably equivalent value" and whether such value was given is a factual determination.[240]   Courts use the same two-step analysis for Bankruptcy Code section 548 claims to determine whether reasonably equivalent value was given in exchange for a transfer under the UFTA: first, a court must determine whether the transferor received any "value" at all for the transfer; and second, if the transferor received some value, a court must then determine whether the value received was reasonably equivalent to the value that was transferred.[241]   Courts look to cases interpreting their own and other states' versions of the UFTA to determine whether reasonably equivalent value was exchanged.[242]   Courts also look to section 548 of the Bankruptcy Code for guidance on the proper interpretation of "reasonably equivalent value" under the UFTA.[243]   The analysis of reasonably equivalent value discussed above thus applies to a constructive fraudulent transfer claim brought under the UFTA.

---

[237]   Nev. Rev. Stat. §112.160(5) (2015); Del. Code Ann. tit. 6, §1302(e) (West 2015); N.J. Stat. Ann. §25:2-23(e) (West 2015).

[238]   Nev. Rev. Stat. §112.180(1)(b) (2015); Del. Code Ann. tit. 6, §1304(a)(2) (West 2015); N.J. Stat. Ann. §25:2-25(b) (West 2015).

[239]   Nev. Rev. Stat. §112.180(1)(b) (2015); Del. Code Ann. tit. 6, §1304(a)(2) (West 2015); N.J. Stat. Ann. §25:2-25(b) (West 2015).

[240]   *Safety Indus., Inc. v. Perkins*, Case Nos. 61671, 63014, 2014 WL 4922870, at *2 (Nev. Sept. 29, 2014) (citing *Herup*, 162 P.3d at 876); *ASARCO*, 396 B.R. at 336.

[241]   *ASARCO*, 396 B.R. at 336 (citing *In re MDIP Inc.*, 332 B.R. 129, 133 (Bankr. D. Del. 2005)).

[242]   *See, e.g.*, *Official Comm. Of Unsecured Creditors v. Jumer (In re Jumer's Castle Lodge, Inc.)*, 472 F.3d 943, 947 (7th Cir. 2007); *Quad City Bank v. Berstler (In re Chapman Lumber Co.)*, Case No. 06-09112, 2007 WL 2316528, at *2 (Bankr. N.D. Iowa Aug. 8, 2007).

[243]   *See, e.g., VFB LLC*, 482 F.3d at 631 (3d Cir. 2007); *Smith v. Am. Founders Fin., Corp.*, 365 B.R. 647, 666 (S.D. Tex. 2007); *Official Comm. Of Asbestos Personal Injury Claimants v. Sealed Air Corp. (In re W.R. Grace & Co.)*, 281 B.R. 852, 857 (Bankr. D. Del. 2002) (noting that the court could seek guidance from cases interpreting similarly worded statutes, like the Bankruptcy Code).

Most courts have concluded that a creditor bears the burden of establishing constructive fraudulent transfer claims brought under the UFTA by a preponderance of the evidence.[244]

### 3.   Fraudulent Transfers Under the UFCA

New York and Maryland have not adopted the UFTA.  Rather, the UFCA remains in effect.[245]  The statute of limitations to bring a claim under the UFCA is six years in New York and three years in Maryland.[246]  Despite differences in the limitations periods, New York and Maryland have adopted policies aimed at creating unity with other states' versions of the UFCA.[247]

### a.   Actual Fraudulent Transfer Under the UFCA

Similar to the UFTA, the UFCA contains a provision whereby a transfer made or obligation incurred is voidable – as to existing and future creditors – if done "with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud."[248]  The actual fraudulent transfer provision of the UFCA may be utilized by a creditor even if the transfer was supported by "fair consideration" (the UFCA's conceptual counterpart to reasonably equivalent value).[249]  Unlike the UFTA, the UFCA does not contain an illustrative list of badges of fraud that courts should consider in determining whether the requisite intent exists.  Rather, courts have developed a list of common law badges of fraud, many of which form the basis of the badges of fraud contained in the modern UFTA.[250]

---

[244]   *ASARCO*, 396 B.R. at 335 n.45 (interpreting Delaware's constructive fraudulent transfer statute's burden of proof as preponderance of the evidence); *Town & Country Bank*, 2013 WL 6832131, at *2 (trial order) (noting that for constructive fraudulent transfer claim "the burden of proof is likely preponderance of the evidence, not clear and convincing evidence."); *Grochocinski v. Zeigler (In re Zeigler)*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005) (burden of proof for constructive fraud under UFTA is preponderance of evidence).

[245]   N.Y. Debt. & Cred. Law §§270-281 (McKinney 2016); Md. Code Ann., Com. Law §§15-201-214 (West 2016).  Kentucky and Tennessee are the only other states that have retained the UFCA.

[246]   N.Y. C.P.L.R. §213 (McKinney 2016); Md. Code Ann., Cts. & Jud. Proc. §5-101 (West 2016).

[247]   N.Y. Debt. & Cred. Law §281 (McKinney 2016); Md. Code Ann., Com. Law §15-212 (West 2016).

[248]   N.Y. Debt. & Cred. Law §276 (McKinney 2016); Md. Code Ann., Com. Law §15-207 (West 2016).

[249]   *HBE Leasing Corp.,* 48 F.3d at 633.

[250]   *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987).

Examples of the badges of fraud under the UFCA include:

(i)     the inadequacy of consideration received in the allegedly fraudulent conveyance;

(ii)    the close relationship between parties to the transfer;

(iii)   the retention of possession, benefit, or use of the property in question;

(iv)    the financial condition of the party sought to be charged both before and after the transaction in question;

(v)     the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency, or threat of suits by creditors; and

(vi)    the general chronology of the events and transactions under inquiry.[251]

Although the states diverge on the burden of proof under the UFTA, "[a]ctual fraudulent intent [under the UFCA] must be proven by clear and convincing evidence."[252]  Even so, such intent may "be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."[253]  The burden establishing clear and convincing evidence of actual fraudulent intent is upon the creditor seeking to have the transfer set aside.[254]

### b.  Constructive Fraudulent Transfer Under UFCA

Unlike actual fraudulent transfers under the UFCA, constructive fraudulent transfers need only be established by a preponderance of the evidence, and the party seeking to have the transfer set aside bears the burden of proof.[255]

"A transfer is deemed constructively fraudulent under [the UFCA] if it is made without 'fair consideration,' and one of the following conditions is met: (i) the transferor is insolvent or will be rendered insolvent by the transfer in question; (ii) the transferor is engaged in or is about to engage in a business transaction for which its remaining property constitutes unreasonably

---

[251]  *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, No. 07 Civ. 4628 (TPG), 2010 WL 768881, at *7 (S.D.N.Y. Mar. 8, 2010) (citing *In re Kaiser*, 722 F.2d 1574, 1582-83 (2d Cir. 1983)); *see also Southern Indus., Inc. v. Jeremias*, 66 A.D.2d 178, 181, 411 N.Y.S.2d 945, 948 (2d Dep't 1978).

[252]  *HBE Leasing Corp.*, 48 F.3d at 639.

[253]  *Id.*

[254]  *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 126, 508 N.Y.S.2d 17, 20 (2d Dep't 1986).

[255]  *Dreier LLP*, 452 B.R. at 442.

small capital; or (iii) the transferor believes that it will incur debt beyond its ability to pay."[256] These are the three requirements applicable under section 548 of the Bankruptcy Code and the UFTA.  Under the UFCA, however, "fair consideration" is established "[w]hen in exchange for such property, or obligation, as a fair equivalent therefor, ***and in good faith***, property is conveyed or an antecedent debt is satisfied."[257]

The UFCA's constructive fraudulent transfer statute thus differs from the UFTA insofar as it requires the plaintiff to establish the transferee's lack of good faith, whereas good faith is an affirmative defense under the UFTA.[258]  Under this lack-of-good-faith requirement, constructive knowledge suffices and "will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry."[259]  Importantly, where a transferee is an insider of the transferor, a rebuttable presumption exists against good faith.[260]

Additionally, once a lack of fair consideration is demonstrated, the court may presume the debtor's insolvency and the burden shifts to the transferee to rebut it.[261]  No such presumption exists for challenges based on "unreasonably small capital."[262]  "Instead, the plaintiff must plead facts asserting that the transfers left the debtor with unreasonably small capital regardless of whether the plaintiff sufficiently pleads a lack of fair consideration."[263]

---

[256] *Id.* at 441; N.Y. Debt. & Cred. Law §§273-75 (McKinney 2016); Md. Code Ann., Com. Law §§15-204-06 (West 2016).

[257] N.Y. Debt. & Cred. Law §272(a) (McKinney 2016); *see also* Md. Code Ann., Com. Law §15-203(1) (West 2016) (emphasis added).

[258] *Dreier LLP*, 452 B.R. at 442.

[259] *Id.* at 446 (quotations omitted).

[260] *Jacobs v. D'Alessandro (In re Dewey & LeBoeuf LLP)*, Case No. 14-01919 (MG), 2014 WL 4746209, at *12 (Bankr. S.D.N.Y. Sept. 23, 2014) (citing *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, 904 F. Supp. 2d 356, 361 (S.D.N.Y. 2012)).

[261] *Official Comm. of Unsecured Creditors v. Leucadia Nat'l Corp. (In re Vivaro Corp.)*, 524 B.R. 536, 551 (Bankr. S.D.N.Y. 2015); *see also MFS/Sun Life,* 910 F. Supp. at 938 (noting that the burden of persuasion remains with the claimant).

[262] *Vivaro Corp.*, 524 B.R. at 551.

[263] *Id.* (citing *Tese-Milner v. Edidin & Assocs. (In re Operations N.Y. LLC)*, 490 B.R. 84, 98 (Bankr. S.D.N.Y. 2013)) ("Th[e unreasonably small capital] test denotes a financial condition short of equitable insolvency, and is aimed at transferees that leave the transferor technically solvent but doomed to fail.  The relevant factors include the transferor's debt to equity ratio, historical capital cushion, and the need for working capital in the transferor's industry.") (internal citations and quotations omitted)).

### E.  Defenses to State Fraudulent Transfer Claims

#### 1.  Good Faith Defense

##### a.  Good Faith Defense Under the UFTA

Mirroring section 548(c) of the Bankruptcy Code, the UFTA provides that in the case of a constructive fraudulent transfer, a transferee (or obligee) that takes for value and in good faith is entitled to a lien on, or may retain any interest transferred (or may enforce any obligation incurred) to the extent the transferee paid value.[264]  Stated differently, a good faith transferee is entitled to reduce any judgment amount by the value of the consideration paid for the fraudulently transferred property.  In the case of an actual fraudulent transfer, however, if a good faith purchaser paid full value for the transferred property (or incurred obligation) – that is, reasonably equivalent value was given – then the UFTA permits the transferee simply to keep the transferred property or the value thereof.[265]  Moreover, while a money judgment may be collected against an initial transferee and a subsequent transferee who lacks good faith, it is not available against a good faith subsequent transferee.[266]  A majority of courts hold that good faith is an objective, not a subjective, inquiry, meaning that the issue depends upon what the transferee "knew or should have known."[267]

The transferee bears the burden of establishing the good faith purchaser defense under the UFTA.[268]  "Good faith" is not defined under the UFTA, and courts have been hesitant to supply a precise definition, preferring instead to make such determinations on a case-by-case basis.[269]  Under the UFTA, "a plausible, non-fraudulent explanation for a transfer may be indicative of good faith."[270]  However, "[i]t is often an easier task to determine the absence, as opposed to presence, of good faith."  Clearly, an active participant in the fraud does not possess good faith.  Moreover, there is an absence of good faith when transferees knew or should have known from

---

[264]  Nev. Rev. Stat. §112.220(4) (2015); Del. Code Ann. tit. 6, §1308(d) (West 2015); N.J. Stat. Ann. §25:2-30(d) (West 2015).

[265]  Nev. Rev. Stat. §112.220(1) (2015); Del. Code Ann. tit. 6, §1308(a) (West 2015); N.J. Stat. Ann. §25:2-30(a) (West 2015).  *See generally Zeigler*, 320 B.R. at 373-74 (defense to actual fraudulent transfer under UFTA requires both good faith and reasonably equivalent value).

[266]  Nev. Rev. Stat. §112.220(2) (2015); Del. Code Ann. tit. 6, §1308(b) (West 2015); N.J. Stat. Ann. §25:2-30(b) (West 2015).

[267]  *Herup,* 162 P.3d at 876 ("[I]n order to establish a good faith defense to a fraudulent transfer claim, the transferee must show objectively that he or she did not know or had no reason to know of the transferor's fraudulent purpose to delay, hinder, or defraud the transferor's creditors."); *Agric. Research & Tech. Grp., Inc.*, 916 F.2d at 535-36.

[268]  *See, e.g., Herup*, 162 P.3d 870; *Spatz*, 222 B.R. at 168-69.

[269]  *Steinberg v. Schneider (In re Schneider)*, 417 B.R. 907, 916 (Bankr. N.D. Ill. 2009).

[270]  *Id.*

the things going on in the transferor's life that the transfer was suspicious.[271]  "For example, it has been held that transferees did not possess good faith if they took the transfer notwithstanding their knowledge that a creditor had sued the transferor."[272]  Courts also look to cases interpreting section 548(c) of the Bankruptcy Code to assist in the analysis of the good faith purchaser defense under the UFTA.[273]  The analysis under section 548(c) is discussed above in Section III.C.1 of this Appendix.

### b.  Good Faith Defense Under the UFCA

Under the UFCA, a creditor has the right to have a transfer set aside, to attach or issue a levy of execution upon the property conveyed or to obtain a personal judgment if the transferee has disposed of the property or damaged it.[274]  However, such remedies are not available if the property was transferred to a "purchaser for fair consideration without knowledge of the fraud at the time of the purchase."[275]  Most courts have concluded that constructive notice of the fraud is sufficient to eliminate the defense.[276]  Accordingly, a creditor may seek to have a transfer avoided or property levied under the UFCA if the purchaser (or subsequent transferee) had constructive notice of the fraudulent transfer.[277]

---

[271]  *Id.* (internal citations omitted).

[272]  *Id.* (citing *Kennedy v. Four Boys Labor Serv., Inc.*, 664 N.E.2d 1088, 1093 (Ill. Ct. App. 1996) (interpreting Illinois' version of the UFTA)).

[273]  *See Warfield v. Byron*, 436 F.3d 551, 559-60 (5th Cir. 2006); *Agric. Research & Tech. Grp., Inc.*, 916 F.2d at 535-36.

[274]  N.Y. Debt. & Cred. Law §278 (McKinney 2016); Md. Code Ann., Com. Law §15-209 (West 2016); *Irving Trust Co. v. Conte*, 22 F. Supp. 94, 95 (S.D.N.Y. 1937); *Marine Midland Bank*, 120 A.D.2d at 131-33, 508 N.Y.S.2d at 24-25.

[275]  N.Y. Debt. & Cred. Law §278 (McKinney 2016); Md. Code Ann., Com. Law §15-209 (West 2016).

[276]  *Fick v. Perpetual Title Co.*, 694 A.2d 138, 145, 115 Md. App. 524, 537-38 (Md. Ct. Spec. App. 1997) ("While there is authority to the contrary in some jurisdictions, the general rule is that if a purchaser had knowledge of facts and circumstances naturally and justly calculated to excite suspicion in the mind of a person of ordinary prudence, and which would naturally prompt him to pause and inquire before consummating the transaction, and such inquiry would have necessarily led to a discovery of the fact with notice of which he is sought to be charged, he will be considered to be affected with such notice, whether or not he made the inquiry.  Under these circumstances it is immaterial that the purchaser did not have actual knowledge of the fraudulent intent of the seller or did not participate therein."); *see also United States v. McCombs-Ellison*, 826 F. Supp. 1479, 1499 (W.D.N.Y. 1993) (same); *aff'd in part, vacated in part,* 30 F.3d 310 (3d Cir. 1994).

[277]  *Fick v. Perpetual Title Co.*, 694 A.2d at 145.

### 2.    Statutes of Limitations Defense

An avoidance action under section 544(b) of the Bankruptcy Code is timely if the unsecured creditor could timely bring the applicable non-bankruptcy law action at the time the bankruptcy petition was filed, and the trustee brings the action within the time specified in section 546(a) of the Bankruptcy Code, which is two years after entry of the order for relief.[278] The statutes of limitations that are potentially applicable under the various state laws are summarized as follows:

| Jurisdiction | Statute | Statute of Limitations |
|---|---|---|
| Nevada | N.R.S. 112.230 | 4 years, or, in the case of an actual fraudulent transfer, 1 year after transfer could reasonably have been discovered, if later. |
| New York | N.Y. C.P.L.R. §213 | 6 years[279] |
| Louisiana | La. Civ. Code §2041 | 1 year of learning of transfer, but never after 3 years, however, the 3 year limitation period does not apply in cases of actual fraudulent transfer. |
| Delaware | 6 Del. Code §1309 | 4 years, or, in the case of an actual fraudulent transfer, 1 year after transfer could reasonably have been discovered, if later. |
| Maryland | Md. Code Ann Cts. & Jud. Proc. §5-101 | 3 years |

Because the UFTA as adopted in Delaware and Nevada expressly includes a one-year tolling provision only in cases of actual fraudulent transfers, courts have generally held that the

---

[278]   11 U.S.C. §546(a) (2015); *Boyer v. Crown Stock Distrib., Inc.*, 587 F.3d 787, 791 (7th Cir. 2009).

[279]   The UFCA adopted in New York does not contain a statute of limitation but courts have held that the six-year "catch-all" statute of limitations provided in N.Y. C.P.L.R. §213(1) applies to fraudulent conveyance actions.  *See Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993).

UFTA does not allow for equitable tolling "over and above the tolling period explicitly contained in the statute."[280]

In addition to these state law statutes of limitation, it may be possible for the bankruptcy estate to rely upon the ten year statute of limitations provided by the Internal Revenue Code if it can show that the IRS would be entitled to bring such an action under IRC §6901.  This issue is discussed in more detail in Section XI of the Final Report, which discusses issues related to the original LBO transaction.

### 3.    Safe Harbor

The safe harbor provision of section 546(e) of the Bankruptcy Code applies to certain fraudulent transfers.  This defense is discussed below in Section V of this Appendix.  As explained in that section, section 546(e) may provide a defense to claims for constructive fraudulent transfer under section 548(a)(1)(B) as well as state law claims for actual and constructive fraudulent transfer asserted under section 544.

### 4.    Summary of Differences Between UFTA and UFCA

|  | **UFTA** | **UFCA** |
|---|---|---|
| Burden of Proof | I. Actual Fraudulent Transfer – Clear and convincing evidence in Nevada and New Jersey. Preponderance of the evidence in Delaware. II. Constructive Fraudulent Transfer – Preponderance of the evidence. | I. Actual Fraudulent Transfer – Clear and convincing evidence. II. Constructive Fraudulent Transfer – Preponderance of the evidence. |

---

[280] *Pereyron v. Leon Constantin Consulting, Inc.*, No. Civ.A. 20509-NC, 2004 WL 1043724, at *2 (Del. Ch. Apr. 29, 2004).  Although the issue has not been expressly addressed in Nevada, courts in other states also hold that claims under the UFTA are not subject to equitable tolling. *See, e.g.*, *Lewis v. Taylor*, Case No. 13CA0239, 2014 WL 974893, at *3 (Colo. App. May 22, 2014), *cert. granted,* No. 14SC469, 2015 WL 4623618 (Colo. Aug. 3, 2015) (holding that the CUFTA "imposes a jurisdictional time limitation" that is not subject to tolling); *Nathan v. Whittington*, 408 S.W.3d 870, 873 (Tex. 2013) (holding that Texas' UFTA is a statute of repose and not subject to tolling because the extinguishment provision is absolute); *Rafuse v. Stryker*, No. 090107, 2010 WL 2431921, at *5 (Mass. Super. Ct. Apr. 21, 2010) (holding that Massachusetts UFTA is a statute of repose and not subject to discovery rule except as expressly provided for within statute).

| | UFTA | UFCA |
|---|---|---|
| Statute of Limitations | I. Four years for all claims (except those described below) from the date the transfer was made or obligation incurred.<br>II. For actual fraudulent transfer claims where the four-year statute of limitations has expired, one year after the transfer or obligation was or reasonably could have been discovered by the claimant. | I. Six years in New York. |
| Badges of Fraud | Statutorily enumerated. | Governed by common law. |
| Statutory Definition of Insolvency | Balance-sheet insolvency and equitable insolvency. | Balance-sheet insolvency. |
| "Good Faith" | Affirmative defense available to transferees. | Plaintiff must establish a lack of transferee's good faith. |
| Defenses | Statutory defenses for good faith transferee, limitations periods, and safe harbors. | Statutory good faith purchaser provision. |
| Creditors' Remedies | Avoidance of transfer; attachment or garnishment against the property transferred; injunction against future transfers of the property; appointment of a receiver to take charge of the asset; money judgment against transferee or subsequent transferee if such transferee did not take in good faith; or any other relief the circumstances may require. | Avoidance of transfer or attachment/levy of property transferred.<br>If the property was purchased for less than fair consideration, the purchaser may retain the property or obligation as security for repayment. |

Despite these differences, the Examiner has concluded that these differences do not impact his conclusions.

## IV. Collapsing Transactions for Fraudulent Transfer Claims

When applying fraudulent transfer laws, courts may collapse multiple transfers or transactions and treat them as one, single transfer or transaction by application of the

"collapsing" doctrine.[281]   The "collapsing" doctrine is relevant to the Four Properties, CES, and B-7 transactions.

In *Orr v. Kinderhill Corp.*, the Second Circuit explained that "an allegedly fraudulent conveyance must be evaluated in context; [w]here a transfer is only a step in a general plan, the plan must be viewed as a whole with all its implications."[282]   Thus, "under appropriate circumstances, multiple transactions will be collapsed and treated as steps in a single transaction for analysis under the fraudulent conveyance laws."[283]   This can result in collapsing transfers or transactions into one transaction even though the various steps or transfers of the transaction did not occur at the same time.[284]

While the collapsing doctrine historically has been applied most often in connection with leveraged buyouts,[285] courts can "collapse" other forms of transfers into one transaction "when it appears that despite the formal structure erected and the labels attached, the segments, in reality, comprise a single integrated scheme when evaluated focusing on the knowledge and intent of the

---

[281]   *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302-03 (3d Cir. 1986); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 934 (S.D.N.Y. 1995); *Joy Recovery Tech. Corp.*, 286 B.R. at 74.

[282]   *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir. 1993) (internal quotation marks and citations omitted); *cf. also Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 793 (7th Cir. 2009) ("[F]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights, while ensuring that the debtor can continue to do business and assuring third parties that transactions done with the debtor at arm's length will not be second-guessed.") (citing Douglas G. Baird, Elements of Bankruptcy 153-54 (4th ed. 2006)).

[283]   *Official Comm. of Unsecured Creditors v. JP Morgan Chase Bank, N.A. (In re M. Fabrikant & Sons, Inc.)*, 394 B.R. 721, 731-32 (Bankr. S.D.N.Y. 2008) (citing *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635 (2d Cir. 1995)); *see also* 5 Collier on Bankruptcy ¶548.03[6] ("[C]ourts will slice through complicated transactions to compare what value the debtor gave and what value the debtor got.").

[284]   *See Official Comm. of Unsecured Creditors v. CIT Grp. (In re Jevic Holding Corp.)*, No. 08-51903, 2011 WL 4345204, at *5 (Bankr. D. Del. Sept. 15, 2011) ("The passage of some time between the various transactions sought to be collapsed is not fatal if they are sufficiently related.") (citing *Boyer*, 587 F.3d at 795-96 (collapsing transactions that were about three years apart, finding that they were all "an integral part of the LBO")).

[285]   *See, e.g.*, *In re Best Prods. Co., Inc.*, 157 B.R. 222, 229-30 (Bankr. S.D.N.Y. 1993) (citing rationale in leveraged buyout cases as basis for collapsing sublease between subsidiary and parent that was really a financing vehicle, and treating it as a loan directly to parent); *CPY Co. v. Ameriscribe Corp. (In re Chas. P. Young Co.)*, 145 B.R. 131 (Bankr. S.D.N.Y. 1992) (citing leveraged buyout cases); *see also* Jonathan P. Friedland & Elizabeth B. Vandesteeg, Commercial Bankruptcy Litigation §11:40 ("The single, unified transaction theory arose in the context of leveraged buyouts.") (citing *Mellon Bank, N.A. v. Metro Comm's, Inc.*, 945 F.2d 635, 645 (3d Cir. 1991)).

parties in the transaction."[286]   In determining whether to collapse multiple transfers into one transaction, courts generally consider the following three factors: "(1) whether all of the parties involved had knowledge of the multiple transactions; (2) whether each transaction would have occurred on its own; and (3) whether each transaction was dependent or conditioned on other transactions."[287]   Courts have explained that the requisite knowledge by the parties can be actual or constructive knowledge.[288]   In addition, some courts use the interdependence of the transactions to prove the requisite knowledge for purposes of collapsing.[289]   Based on these factors, courts have collapsed distinct transactions for fraudulent transfer purposes where they find the separate transactions "appear to be component parts of something undertaken to reach a particular result" or "it is unlikely that any one step would have been undertaken except in contemplation of the other integrating acts."[290]

## A.   Consolidation of Multiple Debtor Entities

When multiple transfers are at issue, multiple entities may have acted as transferors and transferees.  In addressing this issue, courts do not generally consolidate or collapse the various transferor or transferor entities for purposes of analyzing fraudulent transfer claims.[291]   For

---

[286]   *Official Comm. of Unsecured Creditors v. Morgan Stanley & Co., Inc. (In re Sunbeam Corp.)*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002).

[287]   *Mervyn's LLC v. Lubert-Adler Grp. IV, LLC (In re Mervyn's Holdings)*, 426 B.R. 488, 497-98 (Bankr. D. Del. 2010) (citations omitted); *see also Liquidation Trust v. Fleet Retail Fin. Grp. (In re Hechinger Inv. Co. of Del., Inc.)*, 327 B.R. 537, 546-47 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008)

[288]   *See Silverman v. K.E.R.U. Realty Corp. (In re Allou Distrib., Inc.)*, 379 B.R. 5, 22 (Bankr. E.D.N.Y. 2007); *Hechinger*, 327 B.R. 537, 546 (D. Del. 2005), *aff'd*, 278 F. App'x 125 (3d Cir. 2008); *see also, e.g., Lippi v. City Bank (In re Pacific Indus. Distrib., Inc.)*, 955 F.2d 599, 611-12 (9th Cir. 1992); *Murphy v. Meritor Sav. Bank (In re O'Day Corp.)*, 126 B.R. 370, 394 (Bankr. D. Mass. 1991) (collapsing transaction where all parties were aware of the structure of the transaction, and participated in implementing it).

[289]   *Buchwald Capital Advisors LLC v. JPMorgan Chase Bank, N.A. (In re M. Fabrikant & Sons)*, 447 B.R. 170, 187 (Bankr. S.D.N.Y. 2011) ("In assessing a collapsing claim, a court must focus on the interdependence of the multiple transactions and whether the participants knew or should have known that no transaction would occur unless all of the other transactions occurred.").

[290]   *See, e.g., Big V Supermarkets v. Wakefern Food Corp. (In re Big V Holding Corp.)*, 267 B.R. 71 (Bankr. D.N.J. 2001) (holding that sale of all company's equity interests in supermarket chain through a series of transactions was collapsible into one transaction where purpose of each sale was to completely divest company of supermarket chain and none of the sales would have taken place but for the company's undertaking of all the sales) (citations and internal quotes omitted).

[291]   *See Official Comm. of Unsecured Creditors v. Citicorp N. Am., Inc. (In re TOUSA, Inc.)*, 422 B.R. 783, 868 (Bankr. S.D. Fla. 2009), *quashed in part*, 444 B.R. 613 (S.D. Fla. 2011), *aff'd in part, rev'd in part*, 680 F.3d 1298 (11th Cir. 2012).

instance, the relevant federal and state fraudulent transfer statutes all state that reasonably equivalent value must be received by the "debtor."[292]  Similarly, it is generally each debtor's solvency, capital adequacy, and ability to pay debts that are relevant.[293]

Courts do have the power, however, to overlay other theories, including veil piercing,[294] alter ego[295] and/or substantive consolidation,[296] to collapse or treat multiple transferors or transferees as one transferor or transferee entity for fraudulent transfer purposes.[297]  For instance,

---

[292]  *See, e.g.*, 11 U.S.C. §548 ("if the debtor . . . received less than a reasonably equivalent value in exchange for such transfer or obligation"); 740 Ill. Comp. Stat. Ann. 160/5 ("if the debtor made the transfer or incurred the obligation . . . without receiving a reasonably equivalent value in exchange for the transfer or obligation"); *Kittay v. Peter D. Leibowits Co., Inc. (In re Duke & Benedict, Inc.)*, 265 B.R. 524, 531 (Bankr. S.D.N.Y. 2001) ("[A] court must determine the 'interest of the debtor' that was transferred.  In other words, the measuring test does not examine the value of the property that was conveyed, but the value of the debtor's interest in the property conveyed.").  *But see Tronox II,* 503 B.R. at 293-95 (rejecting defendant's argument that reasonably equivalent value analysis must "be performed on a strict entity-by-entity basis" and holding that the debtor "as a consolidated entity received less than reasonably equivalent value").

[293]  *See TOUSA*, 422 B.R. at 861 ("The statute, however, requires consideration of whether 'the debtor' was insolvent and, because each of the Conveying Subsidiaries is a separate and distinct 'debtor,' each must be considered separately."); *Rubin v. Mfr. Hanover Trust Co.*, 661 F.2d 979, 994 (2d Cir. 1981) (considering solvency of each debtor).

[294]  *See, e.g.*, *Xyan.Com, Inc. v. Banta Corp. (In re Xyan.Com, Inc.)*, 299 B.R. 357, 364-65 (Bankr. E.D. Pa. 2003) (explaining that "[t]here is nothing in the jurisprudence which informs veil piercing to suggest a bright line or litmus test limitation" from consolidating affiliated entities for purposes of determining their financial condition as part of the constructive fraud analysis).  Veil piercing is discussed further in Section VIII.B of this Appendix.

[295]  *See, e.g.*, *Farmers Bank & Trust of Magnolia v. Conine (In re Ark-La Concrete Co., Inc.)*, 74 F.3d 1236, at *1 (5th Cir. 1995).  The alter ego theory is discussed further in Section VIII.B of this Appendix.

[296]  *Crawforth v. Wheeler (In re Wheeler)*, 444 B.R. 598, 608 (Bankr. D. Idaho 2011) ("collapsing the assets of a non-debtor entity into those of the Debtor" for purposes of avoiding fraudulent transfers "is tantamount to a request for substantive consolidation of Debtor's estate with that of a non-debtor"); *In re Garden Ridge Corp.*, 386 F. App'x 41, 43 (3d Cir. 2010) (substantive consolidation "treats separate legal entities as if they were merged into a single survivor left with all the cumulative assets and liabilities") (quoting *In re Owens Corning*, 419 F.3d 195, 205 (3d Cir. 2005)).  Substantive consolidation is discussed further in Section VIII.A of the Legal Appendix.

[297]  5 Collier on Bankruptcy ¶548.03[6]; *see also, e.g.*, *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. 344, 349 (Bankr. D. Del. 2011) (explaining that "because the relevant [debtor] entities have been substantively consolidated, Trustee's allegations of the insolvency of the unified [debtor] enterprise is sufficient to meet the insolvency criteria for fraudulent transfer analysis"); *Xyan.Com, Inc.*, 299 B.R. at 365 (holding that where the plaintiff can establish the affiliated

in cases where "there was such a degree of identity and commingling of affairs" between a non-debtor entity and the debtor, "they cannot be regarded as separate legal entities" for purposes of analyzing fraudulent transfers.[298]   Likewise, "if affiliated entities are functionally identical such that bestowing value to one entity equates to giving value to the other, . . . funds advanced to one will be equivalent value for a payment made or security interest given" by the other.[299]   But absent the application of these or similar types of theories, each separate transferor and transferee generally will be treated as distinct entities for fraudulent transfer purposes.[300]

### B.   Effect of Collapsing Transfers on an Actual Fraudulent Transfer Analysis

In analyzing whether a collapsed series of transfers was actually fraudulent, courts will evaluate whether the transfers were entered into by the debtor with the intent to hinder, delay or defraud its creditors.[301]   In doing so, the court may consider the circumstance surrounding each transfer and aggregate them together in deciding whether there are a sufficient number of badges of fraud or direct evidence to establish fraudulent intent.[302]   In certain circumstances, courts consider the intent of both the transferor and the intent of its controlling and insider

---

entities were alter egos, there was no bar from prosecution of constructive fraudulent transfer claims by reason of the configuration of the assets and liabilities of the two entities).

[298]   *Mayo v. Pioneer Bank & Trust Co. (In re Twin City Constr. Co., Inc.)*, 270 F.2d 823, 830 (5th Cir. 1959); *see also In re Nelsen*, 24 B.R. 701, 702 (Bankr. D. Or. 1982) ("Where there is sufficient commingling of the affairs of a debtor with the affairs of a third party to establish 'identity of interest', the Court may, under compelling circumstances, ignore the separate existence of two debtors for the purpose of finding a transfer to both debtors of equivalent value.").

[299]   *O'Cheskey v. Herring Nat'l Bank (In re Am. Hous. Found.)*, 520 B.R. 208, 232 n.3 (Bankr. N.D. Tex. 2014) (explaining that where the court collapses transactions, it may also be appropriate to consolidate affiliated entities in determining whether the debtor received reasonably equivalent value) (quoting 5 Collier on Bankruptcy ¶548.03[6]).

[300]   *Cf. Official Comm. of Unsecured Creditors v. UMB Bank, N.A.(In re Residential Capital, LLC)*, 501 B.R. 549, 598 (Bankr. S.D.N.Y. 2013) ("[A]bsent substantive consolidation, a court will not pool the assets of multiple debtors . . . .").

[301]   *See, e.g.*, *Ferrari v. Barclays Bus. Credit, Inc. (In re Morse Tool, Inc.)*, 148 B.R. 97, 138-39 (Bankr. D. Mass. 1992) (upholding Trustee's allegations that the debtor, "by entering into the buyout transactions, deliberately depleted [its] equity and 'thrust an undercapitalized company into the market place to attract unwary creditors to inevitable loss.") (internal citations omitted); *Kupetz v. Wolf*, 845 F.2d 842, 846 (9th Cir. 1988) ("[W]here the parties in an LBO fully intend to hinder the general creditors and benefit the selling shareholders[,] the conveyance is fraudulent."); *M. Fabrikant & Sons*, 394 B.R. at 733 (reviewing actual intent in connection with the collapsing analysis).

[302]   *See, e.g.*, *Sullivan v. Kodsi*, 373 F. Supp. 2d 302, 307 (S.D.N.Y. 2005) (noting that several of the badges of fraud were present).

shareholders.[303]   Accordingly, collapsing transfers into one transaction for actual fraudulent transfer claims provides the court with a broader set of facts and circumstances to consider when determining whether there is sufficient proof of an intent to hinder, delay or defraud creditors.[304]

## C.   Effect of Collapsing Transfers on a Constructive Fraudulent Transfer Analysis

In determining whether a collapsed series of transfers was constructively fraudulent, courts will review the collapsed transfers collectively to determine whether the debtor received reasonably equivalent value.[305]   For example, where one party received a mortgage from the debtor in connection with a loan and the debtor immediately passed the borrowed funds to an insider, the court collapsed the transfers into one transaction and found that the debtor itself received no value in exchange for the mortgage.[306]   Thus, the first prong of a constructive fraudulent transfer claim, that the debtor did not receive reasonably equivalent value, was satisfied.[307]

Conversely, a series of transactions can also be collapsed to show that reasonably equivalent value was received for one transfer, by virtue of a separate transfer that occurred later in time.[308]   For example, where a single transaction involving the sale of assets in the U.S. was part of a series of transactions involving the sale of assets globally, the court found that "the

---

[303]   *See, e.g.*, *Official Comm. of Unsecured Creditors v. Schottenstein (In re Wieboldt Stores, Inc.)*, 94 B.R. 488, 504 (N.D. Ill. 1991) (discussing leverage buyout cases).

[304]   *See, e.g.*, *Allou Distribs.*, 379 B.R. at 12; *Bachrach Clothing, Inc. v Bachrach (In re Bachrach Clothing, Inc.)*, 2012 WL 4838998, at *29 (Bankr. N.D. Ill. Oct. 10, 2012) ("[C]ourts look to whether there was an overall scheme to defraud creditors.") (citation and internal quote marks omitted).

[305]   *See HBE Leasing*, 48 F.3d at 636-37; *see also Kipperman v. Onex Corp.*, 411 B.R. 805, 837 (N.D. Ga. 2009) ("A court determines reasonably equivalent value in an LBO case by 'collapsing' the transaction and ascertaining what the target, rather than any third party, ultimately received in terms of debt retirement, working capital, etc., in exchange for taking on additional debt."); *MFS/Sun Life*, 910 F. Supp. at 937 (under the New York UFCA, the issues of fair consideration "is determined after 'collapsing' the transaction and ascertaining what the target, rather than any third party, received.").

[306]   *See HBE Leasing*, 48 F.3d at 636-37.

[307]   *Id.* at 637.

[308]   *See, e.g.*, *Pereira v. WWRD US, LLC (In re Waterford Wedgwood USA, Inc.)*, 500 B.R. 371 (Bankr. S.D.N.Y. 2013); *Chrysler LLC v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 186-87 (Bankr. S.D.N.Y. 2010) (dismissing claim for constructive fraudulent transfer where "the allegations of the Complaint do not account for all of the elements of value that were received" from a series of transactions and therefore "do[es] not properly allege the lack of fair consideration"); *Reaves v. Comerica Bank (In re GTI Capital Holdings, LLC),* 373 B.R. 671 (Bankr. D. Ariz. 2007) (holding that two legally separate loan transactions were really one single transaction, resulting in reasonably equivalent value).

value of the U.S. assets alone is not relevant."[309]  Rather, the court reviewed the price paid for all assets transferred in connection with the integrated transaction, and concluded that reasonably equivalent value was received for the assets.[310]

Although the collapsing doctrine is most often implicated in connection with determining whether the debtor received reasonably equivalent value, courts have also evaluated whether collapsed transactions rendered the transferor insolvent or inadequately capitalized.[311]

### D.  Effect of Collapsing Transfers on a Statute of Limitations Analysis

When fraudulent transfer claims are asserted with respect to multiple transfers, some of those transfers may have occurred within the statute of limitations and others outside of that period.  In this scenario, plaintiffs have attempted to use the collapsing doctrine to roll forward the time-barred transfers so that they may qualify as being timely.  Courts generally have rejected this argument and found that it "would be illogical and contrary to the spirit of the law to treat a series of transfers as one transaction for the purpose of determining when the statute of limitations was triggered."[312]  It therefore is unlikely that the collapsing of transactions can be used to revive transfers that occurred outside of the limitations period.[313]

## V.  Bankruptcy Code Section 546(e) Safe Harbor Defense

### A.  Introduction

A number of the transactions subject to the Examiner's investigation involved the purchase, sale or transfer of securities or assets, including transfers of membership interests in various limited liability companies, by CEOC and its affiliates with related and, in several instances, unrelated parties.  During the course of investigation, certain parties raised the argument that section 546(e) of the Bankruptcy Code provided a complete defense to potential constructive fraudulent transfer claims arising out of such transactions.  Specifically, the transactions for which various parties have asserted that section 546(e) may potentially be

---

[309]  *Waterford Wedgwood USA*, 500 B.R. at 380-81, 382 n.7.

[310]  *Id.* at 381-82.

[311]  *See O'Day Corp.*, 126 B.R. at 398 (explaining that "most courts analyze LBOs by 'reconstituting' balance sheets as of the date an LBO is consummated"); *see also, e.g.*, *Lyondell I*, 503 B.R. at 354; *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1302-03 (3d Cir. 1986) (upholding district court's decision to collapse a series of transactions and its determination that the collapsed transactions rendered the debtor insolvent).

[312]  *See, e.g.*, *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 255 (S.D.N.Y. 2006).

[313]  *See, e.g.*, *LaRosa v. LaRosa*, 482 F. App'x 750, 755 n.3 (4th Cir. 2012) ("[W]e do not think it appropriate in this case to use the collapsing doctrine to count the dates of the withdrawals from the annuity accounts, or some other . . . transfer date, as the start of the statute of repose for the challenged series of transactions.").  *But see Tronox II,* 503 B.R. at 268-72 (collapsing transactions for statute of limitations purposes).

applicable are: (i) the Growth Transaction; (ii) the CERP Transaction; (iii) the Four Properties Transaction; (iv) the B-7 Loan and Release of the CEC Guarantee; (v) the Senior Unsecured Notes Transaction; and (vi) the PIK Notes Transaction.  Set forth below is a general discussion of the applicable legal principles relating to the section 546(e) safe harbor that are relevant to these transactions.

## B.  Overview of Section 546(e)

With certain exceptions, a transfer that otherwise meets the requirements for avoidance under sections 544, 545, 547 and 548 of the Bankruptcy Code cannot be avoided if it satisfies the "safe harbor" requirements of section 546(e) of the Bankruptcy Code.  Section 546(e) provides:

> Notwithstanding sections 544, 545, 547, 548(a)(1)(B), and 548(b) of this title, the trustee may not avoid a transfer that is a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract, as defined in section 741(7), commodity contract, as defined in section 761(4), or forward contract, that is made before the commencement of the case, except under section 548(a)(1)(A) of this title.[314]

Thus, in short, the safe harbor prevents the avoidance of any transfer (1) made by or to (or for the benefit of) a financial institution or financial participant that was (2) either (i) a settlement payment[315] or (ii) made in connection with a securities contract.[316]  Courts, including those in the Seventh Circuit, have found that this safe harbor is "fully applicable to businesses that engaged in fraud,"[317] although claims for actual (as opposed to constructive) fraudulent transfer brought under section 548(a)(1)(A) are not protected by the safe harbor provision

---

[314]  11 U.S.C. §546(e).

[315]  A settlement payment is defined as "a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, or any other similar payment commonly used in the securities trade."  11 U.S.C. §741(8).

[316]  A "securities contract" is "a contract for the purchase, sale, or loan of a security, a certificate of deposit, a mortgage loan, a group or index of securities, certificates of deposit, or mortgage loans or interests therein . . . or option on any of the foregoing . . . ."  11 U.S.C. §741(7)(A)(i).

[317]  *Peterson v. Somers Dublin Ltd. (In re Lancelot Investors Fund, LP)*, 729 F.3d 741, 749 (7th Cir. 2013) (holding that, despite allegations of underlying fraudulent scheme, section 546(e) applied, thereby defeating the trustee's action) (citing *In re Quebecor World (USA) Inc.,* 719 F.3d 94 (2d Cir. 2013); *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.,* 651 F.3d 329 (2d Cir. 2011)).

because the language of the statute expressly exempts such claims from its protection.  Section 546(e) does not, however, expressly exempt actual fraudulent transfer claims brought under state law counterparts pursuant to section 544(b)(1), and therefore section 546(e) may apply to protect such claims from avoidance.[318]

## C.   Purposes of the Safe Harbor

In enacting section 546(e), Congress sought "to minimize the displacement caused in the commodities and securities markets in the event of a major bankruptcy affecting those industries."[319]  Specifically, Congress had become "concerned about the volatile nature of the commodities and securities market,"[320] and sought to avoid the "danger of a 'ripple effect' on the entire market" that could stem from attempts to unwind a debtor's prior securities transactions after a bankruptcy filing.[321]

As explained by the Seventh Circuit, the safe harbor is designed:

> to ensure that honest investors will not be liable if it turns out that a leveraged buyout (LBO) or other standard business transaction technically rendered a firm insolvent.  Otherwise, one firm's bankruptcy could cause a domino effect as its clients could similarly default on their obligations, which in turn would trigger further bankruptcies, and so on.  By preventing one large bankruptcy from rippling through the securities industry in this way, the Bankruptcy Code section 546(e) safe harbor protects the market from systemic risk and allows parties in the securities industry to enter into transactions with greater confidence.[322]

---

[318]   *See* Section V.F. of this Appendix.

[319]   *Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990) (quoting H.R. Rep. No. 420, 97th Cong., 2d Sess. 2 (1982), *reprinted in* 1982 U.S. Code Cong. & Admin. News 583, 583).

[320]   *Id.* (quoting *Bevill, Bresler & Schulman Asset Mgmt. Corp. v. Spencer Sav. & Loan Ass'n*, 878 F.2d 742, 747 (3d Cir. 1989).

[321]   *Id.* (quoting H.R. Rep. No. 420); *see also Enron Corp. v. Bear, Stearns Int'l, Ltd. (In re Enron Corp.)*, 323 B.R. 857, 864 (Bankr. S.D.N.Y. 2005) ("In enacting the section 546(e) exception to the avoidance powers, the goal was to preserve the stability of these settled transactions to the extent that they are not fraudulent as defined in section 548(a)(1)(A) of the Bankruptcy Code.  If settled transactions could be reversed, it would undermine confidence in the system of guarantees and could lead to the 'ripple effect' of bankruptcy filings by other participants in the chain of guarantees.") (citing *In re Adler, Coleman Clearing Corp.*, 263 B.R. 406, 476 n.47 (S.D.N.Y. 2001).

[322]   *Grede v. FCStone, LLC*, 746 F.3d 244, 252 (7th Cir. 2014) (internal citation and quotation marks omitted).

Thus, the Seventh Circuit has explained that section 546(e) "applies only to the securities sector of the economy, where large amounts of money must change hands very quickly to settle transactions."[323]

### D.  Application of Section 546(e)

Despite the underlying purpose of section 546(e), courts, including the Seventh Circuit, have applied the plain language of the statute, even if this application is broader than Congress may have intended.[324]  As the Seventh Circuit has explained, "[a]mbiguity sometimes justifies resort to legislative history, but it is used to decipher the ambiguous language, not to replace it. The text [of section 546(e)] is what it is and must be applied whether or not the result seems equitable."[325]  In a later decision, the Seventh Circuit reiterated its interpretation of section 546(e) according to its plain, broad terms, but noted that, "[a]s important as the statutory text is, we hope we are not understood as applying a wooden textualism to the issue."[326]  Thus, while the Seventh Circuit has emphasized its adherence to the plain language of section 546(e), it has made clear that it will not blindly apply the text of the statute.

### E.  Statutory Requirements for Safe Harbor Protection

As previously discussed, a party must establish three elements under section 546(e) in order to protect a transfer from avoidance:  (1) the existence of a "transfer"; (2) that the transfer was, *inter alia*, a "settlement payment" or made in connection with a securities contract; and (3) that the transfer was made by or to (or for the benefit of), *inter alia*, a financial institution or financial participant.

#### 1.  The Existence of a Transfer

As a preliminary matter, for section 546(e) to apply, there must be a "transfer" that the trustee is seeking to avoid.  A "transfer" is defined under the Bankruptcy Code as including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with – (i) property; or (ii) an interest in property."[327]  Courts have found this

---

[323]  *Id.* at 253.

[324]  *See, e.g.*, *Enron Creditors Recovery Corp.*, 651 F.3d at 329; *Contemporary Indus. Corp v. Frost*, 564 F.3d 981, 986 (8th Cir. 2009) (quoting *In re Resorts Int'l, Inc.*, 181 F.3d 505, 515-16 (3d Cir. 1999)); *QSI Holdings v. Alford (In re QSI Holdings)*, 571 F.3d 545, 548-50 (6th Cir. 2009); *Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.)*, 590 F.3d 252, 257-58 (3d Cir. 2009); *Wyle v. Howard, Weil, Labouisse, Freidrichs Inc. (In re Hamilton Taft & Co.)*, 114 F.3d 991, 993 (9th Cir. 1997); *Kaiser Steel Corp. v. Pearl Brewing Corp. (In re Kaiser Steel Corp.)*, 952 F.2d 1230, 1237-40 (10th Cir. 1991).

[325]  *Peterson*, 729 F.3d at 749.

[326]  *Grede*, 746 F.3d at 253.

[327]  *See* 11 U.S.C. §101(54)(D).

"intentionally broad"[328] definition to be "all-encompassing."[329]  Notably, while sections 544 and 548 allow a trustee to avoid both "transfers" and "obligations" of the debtor, section 546(e) *only* expressly prevents the avoidance of "transfers."[330]  Thus, courts have found that section 546(e) does not, "by its plain terms, extend the safe harbor to the trustee's avoidance of the incurrence of an obligation."[331]  However, the incurrence of obligations in connection with a transfer, such as a loan where funds are borrowed by a debtor in exchange for liens (as is the case in the B-7 Transaction), courts have held that the entire transaction is protected by the safe harbor under Bankruptcy Code section 546(e).[332]

### a.  A Qualifying Transfer Stems from the Debtor

Under sections 544(b) and 548(a), a trustee may only avoid a transfer *by the debtor*. Thus, when considering the applicability of section 546(e), it is the debtor's transfer (which would otherwise be avoided) that must qualify for the safe harbor, and not the transfer received

---

[328]  *Raymond Prof'l Grp. Inc. v. William A. Pope Co. (In re Raymond Prof'l Grp., Inc.)*, No. ADV. 07 A 00639, 2010 WL 2036371, at *6 (Bankr. N.D. Ill. May 20, 2010), *aff'd*, No. 09 C 6037, 2011 WL 528551 (N.D. Ill. Feb. 8, 2011) (citing S. Rep. No. 95–989, at 27 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5811 ("The definition of transfer is as broad as possible.")).

[329]  *Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd.)*, 240 B.R. 195, 201 (Bankr. S.D.N.Y. 1999) ("With a definition as all-encompassing as this one, it is evident that Congress intended its sweep to be broad.") (citing cases); *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, No. 3:10-CV-1842-G, 2012 WL 3100778, at *5 (N.D. Tex. July 31, 2012) ("The Bankruptcy Code defines 'transfer' very broadly.").

[330]  *Compare* 11 U.S.C. §544(b) ("[T]he trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor  . . . .") *and* 11 U.S.C. §548(a) ("The trustee may avoid any transfer . . . of an interest of the debtor in property, or any obligation . . . incurred by the debtor . . . ."), *with* 11 U.S.C. §546(e) ("[T]he trustee may not avoid a transfer. . . .").

[331]  *Geltzer v. Mooney (In re MacMenamin's Grill Ltd.)*, 450 B.R. 414, 429 (Bankr. S.D.N.Y. 2011); *see also S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff)*, 531 B.R. 439, 475 (Bankr. S.D.N.Y. 2015)  ("By its terms, [section 546(e) limits a trustee's right to avoid a 'transfer' but not his power to avoid fraudulent obligations.") (citing *In re Lehman Bros. Holdings Inc.*, 469 B.R. 415, 444-45 (Bankr. S.D.N.Y. 2012); *Tronox II*, 503 B.R. at 340 ("Moreover, it is accepted that §546(e) applies only to transfers of property, not to the incurrence of obligations."); *U.S. Bank Nat. Ass'n v. Verizon Commc'ns Inc.*, 892 F. Supp. 2d 805, 826 (N.D. Tex. 2012), *aff'd*, 761 F.3d 409 (5th Cir. 2014) ("Section 546(e) uses the word 'transfer' to mean that the safe harbor applies only to transfers of property, and not the incurrence of obligations.").

[332]  *Lehman Bros. Holdings Inc.*, 469 B.R. at 445 ("any payments and any lien that the [bank] received in connection with the securities contract would not be avoidable, because they were transfers" protected under Bankruptcy Code section 546(e)) (quoting *MacMenamin's Grill*, 450 B.R. at 430).

by the debtor from the transferee.[333]  This is in keeping with the general judicial application of the statute,[334] including by courts in the Seventh Circuit.[335]  This is important to keep in mind

---

[333]  *See, e.g., Quebecor World (USA) Inc. v. Am. United Life Ins. Co. (In re Quebecor World)*, 719 F.3d at 98-99 (transfer of funds *by* the debtor to the bank to repurchase notes was a transfer made to a financial institution); *Enron*, 651 F.3d at 339 ("payments at issue" were redemption payments made by the debtor to the DTC and then to a broker-dealer who transferred the payment to the individual noteholders and thus constituted a transfer made to and by a financial institution); *Woodward v. PSEG Energy Techs., Inc. (In re Tougher Indus., Inc.)*, No. 06-12960, 2013 WL 5592902, at *5 (Bankr. N.D.N.Y. Oct. 10, 2013) (payments made by the debtor as part of an LBO to the bank account of the defendant-shareholders were made to a financial institution); *AP Servs. LLP v. Silva*, 483 B.R. 63, 68-70 (S.D.N.Y. 2012) (payments made by a purchaser in the context of an LBO directly to the bank accounts of the shareholders via wire transfer were protected as it was a transfer made to a financial institution for safe harbor purposes); *Brandt v. B.A. Capital Co. (In re Plassein Int'l Corp.)*, 366 B.R. 318, 323-24 (Bankr. D. Del. 2007), *aff'd*, 388 B.R. 46 (D. Del. 2008), *aff'd*, 590 F.3d 252 (3d Cir. 2009) (payments made *via* wire transfer to selling shareholders in the context of an LBO by the bank of the debtor were payments made by a financial institution).

[334]  *See, e.g., Munford v. Valuation Research Corp. (In re Munford, Inc.)*, 98 F.3d 604, 610 (11th Cir. 1996) ("Although the payments were presumptively settlement payments, section 546(e) is not applicable unless the transfer (or settlement payment) was 'made by or to a [financial institution].'"); *Enron*, 651 F.3d at 334 ("The safe harbor limits this risk by prohibiting the avoidance of "settlement payments" made by, to, or on behalf of a number of participants in the financial markets."); *Official Comm. of Unsecured Creditors v. Fleet Retail Fin. Grp.* (*In re Hechinger Inv. Co. of Del.*), 274 B.R. 71, 88 (D. Del. 2002) ("Section 546(e) thus represents Congress's determination that the type of transfer at issue here – settlement payments to shareholders, made by or to a financial institution – should remain unavoidable . . . ."); *Walsh v. Toledo Hosp. (In re Fin. Mgmt. Scis., Inc.)*, 261 B.R. 150, 154-55 (Bankr. W.D. Pa. 2001); *Lehman Bros. Holding Inc.*, 469 B.R. at 451 ("This decision enforces a blanket exemption taken directly from the language of section 546(e): notwithstanding the right that otherwise exists to avoid transfers under the Bankruptcy Code, no transfer may be avoided that is made by or to a financial institution in connection with a securities contract."); *Official Comm. of Unsecured Creditors v. Am. United Life Ins. Co. (In re Quebecor World (USA) Inc.)*, 453 B.R. 201, 215 (Bankr. S.D.N.Y. 2011); *Rushton v. Bevan (In re D.E.I. Sys., Inc.)*, No. 09-02082, 2011 WL 1261603, at *3 (Bankr. D. Utah Mar. 31, 2011) ("Because this element [of a transfer being made to or by a financial institution] is necessary for both safe harbors, a finding that a transfer did not satisfy this element would preclude the application of § 546(e) in this case.").  Although the Third Circuit, in *Resorts*, discusses the transfer from the debtor, it is clear from the language of the case and subsequent decisions in the Third Circuit that the court's holding was based on the transfer by the debtor through the financial institution.  *See In re Resorts Int'l, Inc.*, 181 F.3d 505, 515 (3d Cir. 1999) (describing "this transfer" in support of its holding); *see also Plassein*, 366 B.R. at 323 (describing the "unavoidable settlement payments in *Resorts*" to be the debtor's "wire transfer to be paid to a shareholder through Chase Manhattan Bank").

[335]  *See Grede*, 746 F.3d at 250 (certain pre- and post-petition transfers made by the debtor to the defendants were protected by the safe harbor); *Peterson*, 729 F.3d at (transfers by the debtors to

---

when reviewing the transactions that were the subject of the Examiner's investigation, many of which did not involve the principal Debtor (CEOC) itself, but rather first and second tier subsidiaries of CEOC organized as LLCs.

### 2. The Substance of the Transfer:  Whether It Qualifies as a Settlement Payment or One in Connection with a Securities Contract

To qualify for protection, a transfer must fall into one of two categories.  It must either be (1) "settlement payment" or (2) made "in connection with a securities contract."  A "settlement payment" has been defined as "the transfer of cash or securities made to complete a securities transaction."[336]  Similarly, a "securities contract" has been defined as "a contract for the purchase, sale or loan of a security."[337]  Thus, under either category, there is the threshold question of whether the transaction involved a "security."  If there is no "security," then there is no "settlement payment" and no "securities contract."  If a security is involved in the transaction, it is then necessary to consider whether the transfer itself was either a "settlement payment" or "in connection with" a securities contract.  As discussed below, the law regarding what constitutes a "settlement payment" is sufficiently developed such that the applicability of the section 546(e) safe harbor to the transactions at issue does not, in the Examiner's view, turn on this issue.

### a. What Constitutes a Security

Whether a transfer qualifies as a settlement payment or one made in connection with a securities contract turns on whether or not there was an exchange of securities (*i.e.* whether there

---

redeeming investors fell into the safe harbor); *FTI Consulting v. Merit Mgmt. (In re Centaur LLC)*, 541 B.R. 850, 853-54 (N.D. Ill. 2015) (transfer made by the debtor to the defendant through a financial intermediary constituted a payment made to or by a financial institution); *Krol v. KeyBank, N.A. (In re MCK Millennium Ctr. Parking, LLC),* 532 B.R. 716, 727-28 (Bankr. N.D. Ill. 2015) (payments made *by* the debtor to a bank, which then released the payments to a trust, were made to and by a financial institution).  In *MCK Millennium*, the Bankruptcy Court issued proposed findings of fact and conclusions of law for consideration by the District Court.  Before the District Court completed its review of the Bankruptcy Court's proposed order, the Bankruptcy Court vacated its decision based on newly discovered evidence which suggested that the transfers at issue were actually not made to a bank but to an affiliate of the bank that did not constitute a financial institution.  *See*  Order Granting Plaintiff's Motion for Reconsideration and for an Indicative Ruling, *Krol v. KeyBank, N.A. (In re MCK Millennium Ctr. Parking, LLC)*, Adv. No. 14-00392, ECF No. 120 (Bankr. N.D. Ill. Sept. 11, 2015).

[336] *See Enron,* 651 F.3d at 334; *Frost*, 564 F.3d at 985-86 (quoting *Resorts*, 181 F.3d at 515-16); *QSI Holdings*, 571 F.3d at 549-50; *Plassein*, 590 F.3d at 258 (citing *Resorts*, 181 F.3d at 515-16) (a settlement payment is "the transfer of cash or securities made to complete a transfer payment"); *Hamilton Taft & Co.*, 114 F.3d at 993; *see also Kaiser Steel Corp. v. Charles Schwab & Co.*, 913 F.2d 846, 849 (10th Cir. 1990) (explaining that a "settlement" is defined in the securities industry as "the completion of a securities transaction").

[337] 11 U.S.C. §741(7).

was a securities contract). The definition of securities contract includes "a contract for the purchase, sale or loan of a security."[338] As the Bankruptcy Court for the Southern District of New York has explained, "[t]he plain language of section 741(7) is very broad in its application and encompasses virtually any contract for the purchase or sale of securities . . . and a wide array of related contracts."[339]

A "security" is defined under the Code as including, *inter alia*, notes, stocks, bonds, transferable shares and "other claim[s] or interest[s] commonly known as 'securit[ies].'"[340] Notably, the definition of security does not expressly include LLC membership interests. This is significant because a number of the transactions investigated by the Examiner involve the transfer of membership interests in limited liability companies owned, directly or indirectly, by CEOC, including the CERP, Growth and Four Properties transactions.

The Seventh Circuit has noted that the definition of security in the Bankruptcy Code "comes almost verbatim from the Securities Act of 1933 and the Securities Exchange Act of 1934."[341] In *Peterson*, the Seventh Circuit looked to the federal securities laws in order to bolster its decision that the existence of fraud did not prevent an instrument from being a "security" under the Code. As the court explained, "[n]o one doubts that shares of stock issued by crooked mutual funds or hedge funds are 'securities' for the purpose of the 1933 and 1934 Acts. They are 'securities' for the purpose of §546(e) as well."[342] There is a strong argument, therefore, that to determine whether an LLC membership interest constitutes a security for purposes of the Bankruptcy Code, the Seventh Circuit would consider whether the LLC

---

[338] *See* 11 U.S.C. §741(7).

[339] *Lehman Bros. Holdings Inc.*, 469 B.R. at 438.

[340] 11 U.S.C. §101(49) of the Bankruptcy Code defines a "security" as including a:

(i) note; (ii) stock; (iii) treasury stock; (iv) bond; (v) debenture; (vi) collateral trust certificate; (vii) pre-organization certificate or subscription; (viii) transferable share; (ix) voting-trust certificate; (x) certificate of deposit; (xi) certificate of deposit for security; (xii) investment contract or certificate of interest or participation in a profit-sharing agreement or in an oil, gas, or mineral royalty or lease, if such contract or interest is required to be the subject of a registration statement filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933, or is exempt under section 3(b) of such Act from the requirement to file such a statement; (xiii) interest of a limited partner in a limited partnership; (xiv) other claim or interest commonly known as "security"; and (xv) certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase or sell, a security[.]

[341] *See Peterson*, 729 F.3d at 750. Notably, the Seventh Circuit reiterated this in *Grede*, when it stressed that section 546(e) "applies only to the securities sector of the economy[.]" 746 F.3d at 253.

[342] *See Peterson*, 729 F.3d at 750.

membership interests would constitute securities for purposes of the federal securities laws.  The parties have offered differing views to the Examiner on this issue.

Just like the Bankruptcy Code, the federal securities statutes do not specifically list LLC interests in their definitions of "security."[343]  But numerous cases have addressed the issue of whether an LLC membership interest constitutes a security under the federal securities laws.  To make this determination, courts generally consider whether the LLC interest at issue falls within the definition of an "investment contract."[344]  The Supreme Court, in *S.E.C. v. W.J. Howey, Co.*, defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."[345]  Since *Howey*, courts have "held that the word 'solely' should not be construed as a literal limitation"[346] and that "complete passivity is not required for an individual to be an investor."[347]  Rather, courts look to see "whether an investor, as a result of the investor agreement itself or the factual circumstances that surround it, is left unable to exercise meaningful control over his investment."[348]  After all, "[i]t is the passive investor 'for whose

---

[343]  Under section 3(a)(10) of the Securities Exchange Act of 1934, a "security" is defined as

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security[.]'

15 U.S.C. §78c(a)(10).  The corresponding definition in section 2(1) of the Securities Act of 1933 contains a slightly different formulation, but the Supreme Court has instructed that the definitions of "security" under the 1934 Act and 1933 Act "are virtually identical and will be treated as such in our decisions dealing with the scope of the term."  *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 n.1 (1985).

[344]  *Ave. Capital Mgmt. II, L.P. v. Schaden*, No. 14-CV-02031-PAB-KLM, 2015 WL 5451021, at *4 (D. Colo. Sept. 17, 2015); *see also Affco Invs. 2001, LLC. v. Proskauer Rose, LLP.*, 625 F.3d 185, 189 (5th Cir. 2010); *United States v. Leonard*, 529 F.3d 83, 87 (2d Cir. 2008); *Robinson v. Glynn*, 349 F.3d 166, 170 (4th Cir. 2003); *Shirley v. Jed Capital, LLC*, 724 F. Supp. 2d 904, 910 (N.D. Ill. 2010); *Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F. Supp. 2d 376, 389 (D. Del. 2000) (finding that LLC interests must either qualify as an investment contract in order the interests to qualify as a security).

[345]  328 U.S. 293, 298-99 (1946).

[346]  *Leonard*, 529 F.3d at 88 (citing *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 482 (9th Cir. 1973)).

[347]  *Rodeo v. Gillman*, 787 F.2d 1175, 1177 (7th Cir. 1986); *see also Robinson*, 349 F.3d at 170.

[348]  *Robinson*, 349 F.3d at 170.

benefit the securities laws were enacted,'" and thus, "where there is a reasonable expectation of significant investor control, 'the protection of the 1933 and 1934 Acts would be unnecessary.'"[349]  As the Seventh Circuit has explained, "[w]hile the transfer of some control has not prevented courts from finding a security, courts have also held that if a transaction is designed primarily to transfer control to the purchaser, the deal is commercial and outside the ambit of the securities laws."[350]

Applying this test to LLC interests, courts, including those within the Seventh Circuit, have recognized that "because of the sheer diversity of LLCs, membership interests therein resist categorical classification.  Thus, an interest in an LLC is the sort of instrument that requires 'case-by-case analysis' into the 'economic realities' of the underlying transaction."[351]  As the Northern District of Illinois has explained, "[i]f an LLC is very closely held and member-managed, where each member is financially sophisticated and participates actively in the venture, the LLC interest is probably not a security under the *Howey* test."[352]  On the other hand, if the LLC more closely resembles a corporation or limited partnership where an investor is a passive participant, then it is more likely to be considered a security.[353]  "The 'legal right' to a voice in partnership matters' is a key issue in determining activity or passivity."[354]  And, "when the partners are so dependent on a particular manager that they cannot replace him or otherwise

---

[349]  *Leonard*, 529 F.3d at 88 (quoting *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 585 (2d Cir. 1982)).

[350]  *Rodeo*, 787 F.2d at 1177.

[351]  *Leonard*, 529 F.3d at 89; *see also Shirley*, 724 F. Supp. 2d at 910 ("Whether an LLC interest is a security depends on the particular facts of the investment arrangement and is a question that courts must determine on a case-by-case basis after taking into account the particular facts and circumstances of the investment arrangement.") (citing *Cogniplex, Inc. v. Ross*, No. 00 C 7463, 2001 WL 436210, at *9 (N.D. Ill. Apr. 27, 2001)).

[352]  *Cogniplex, Inc.*, 2001 WL 436210, at *10; *see also Robinson*, 349 F.3d at 170-71 (explaining that it was clear that an investor "was no passive investor heavily dependent on the efforts of others" where he had the power to appoint two board members, was himself the board's vice president, was a member of the executive committee, and was the company's treasurer).

[353]  *Id.*; *see also Leonard*, 529 F.3d at 89-90 ("In actuality, the Little Giant and Heritage members played an extremely passive role in the management and operation of the companies . . . . Of the 250-300 investors in Little Giant, five served on the management committee and seven served on the financial committee.  Of the 350-400 investors in Heritage, ten served on the management committee and seven served on the financial committee.  Thus, the vast majority of the investors in both companies did not actively participant in the venture, exercising almost no control.").

[354]  *Shirley*, 724 F. Supp. 2d at 910-11 ("Interest in an LLC may be a security where the members are so dependent on a manager that they cannot replace him or exercise ultimate control without him" and an "interest in a manager-managed LLC is more likely to be security where the members' ability to exercise management control is effectively non-existent[.]").

exercise ultimate control," an LLC interest cannot be considered a security.[355]   Thus, in situations where plaintiffs have held 60% of the membership interest and had sole control over management decisions and ultimate control over the LLC interests, the LLC interests were held not to be "securities" within the meaning of federal securities laws.[356]   Therefore, that some courts have held that the LLC interests in front of them constitute "securities" does not create a categorical classification for every LLC interest,[357] and does not mean that a different type of LLC interest would, as a matter of law, qualify as a security.

In other words, LLC interests that confer control of the LLC are not "securities" for purposes of the federal securities law.  Accordingly, if the same rule that applies for purposes of the federal securities laws also applies for purposes of determining what constitutes a security under the Bankruptcy Code definition, then an LLC interest that provides total control over the LLC likely would not constitute a "security."

The issue, however, is not free from doubt. There are a few cases where LLC interests have been treated as "securities" under the Code.  In one case, the court applied the section 546(e) safe harbor to a transaction involving the transfer of an LLC membership interest.  But the court did so without addressing the issue of whether a membership interest was, in fact, a "security."  Instead, the parties simply assumed that the LLC interest constituted a security under the Code, and thus the issue of whether the LLC interest qualified as a security was never considered by the court.[358]

Both the Ninth and Fifth Circuit have found – outside the context of section 546(e) and with no explanation –  that an LLC membership interest may qualify as either a "'transferable share' or fall[] within the broad residual category" of the definition of security.[359]   The conclusion reached by these cases is questionable.  For instance, the Uniform Commercial Code specifically provides that an "interest in a . . . limited liability company is not a security unless it is dealt in or traded on securities exchanges or in securities markets, its terms expressly provide

---

[355] *Williamson v. Tucker*, 645 F.2d 404, 424 (5th Cir. 1981).

[356] *Nelson v. Stahl*, 173 F. Supp. 2d 153, 165 (S.D.N.Y. 2001).

[357] *See Leonard*, 529 F.3d at 89.

[358] *See Bensimon v. Duke Energy Corp. (In re Crescent Res.)*, 500 B.R. 464, 473-76 (W.D. Tex. 2013) (holding that the transfer of membership interests in an LLC in return for term loan proceeds and pursuant to a transaction agreement was both a "settlement payment" and a transfer "in connection with a securities contract" for purposes of section 546(e), but not directly deciding whether such a membership interest constitutes a "security").

[359] *See Pensco Trust Co. v. Tristar Esperanza Props., LLC (In re Tristar Esperanza)*, 782 F.3d 492, 495 (9th Cir. 2015) (finding that membership interests in an LLC constitute a "security" because, "[a]mong the non-exclusive list of items defined as securities under the Bankruptcy Code, '[an] LLC interest either qualifies as a 'transferable share' or falls within the broad residual category'") (quoting *In re SeaQuest Diving, LP*, 579 F.3d 411, 418 (5th Cir. 2009)); *see also In re SeaQuest Diving, LP*, 579 F.3d at 418 (citing 11 U.S.C. §101(49)(A)(viii), (xiv)).

that it is a security governed by this Article, or it is an investment company security."[360]  Thus, the Examiner does not believe it is correct to say that an LLC interest is commonly referred to as a security so as to fall into the general residual definition of a "security," particularly given the realities of LLCs, which are "hybrid business entities that combine features of corporations, general partnerships, and limited partnerships," making them "particularly difficult to categorize under securities laws."[361]  In addition, these cases did not address the established body of case law under federal securities law and made no attempt to explain why an LLC interest that is not a security for purposes of the federal securities laws should be considered a security for purposes of the Bankruptcy Code.[362]

As a general principle, statutes that have similar purposes, similar goals and identical definitions should be interpreted coextensively.[363]  As recognized by the Seventh Circuit, the purpose of section 546(e), like the federal securities laws, is to protect the "securities sector of the economy."[364]  As a result, there is no reason for the definition of security under the Bankruptcy Code to be interpreted broader than the nearly identical definition of security under the federal securities laws because both statutes are explicitly designed to protect the securities market.[365]  Thus, considering that the definitions of "security" under the Bankruptcy Code and the federal securities laws are nearly identical and that the Seventh Circuit has explicitly considered the definition of "security" under the federal securities laws as an aid in interpreting the definition of "security" under the Bankruptcy Code,[366] the Examiner has concluded that it is likely that the Seventh Circuit would find that the LLC membership interests that transfer control would likely not constitute a security.

---

[360]  U.C.C. §8-103(c) (1994).

[361]  *Robinson*, 349 F.3d at 174.

[362]  In *ALFA, S.A.B. de C.V. v. Enron Creditors Recovery Corp.(In re Enron Creditors Recovery Corp.)*, 422 B.R. 423, 434-35 (S.D.N.Y. 2009), the court stated that "[c]ourts interpreting section 546(e)'s reach . . . have routinely rejected this argument" to consider federal securities laws when determining the scope of what constitutes a "security" under the Code.  Not only is this statement at odd with the Seventh Circuit's decision in *Peterson*, but the court was also discussing this issue in a scenario where the Code's definition of security covered the short-term notes at issue, but the 1934 Act's definition did not.  This is therefore inapposite to the situation here, where the securities laws are being used to shed light on a term that does not expressly fall into the definition of "security."

[363]  *See, e.g.*, *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 233 (2005) ("[W]e begin with the premise that when Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.").

[364]  *Grede*, 746 F.3d at 252.

[365]  *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975) (explaining that the "primary purpose" of the federal securities laws was to protect the securities market).

[366]  *See Peterson*, 729 F.3d at 750; *see also Grede*, 746 F.3d at 253.

Here, the LLC interests transferred in the Growth, CERP and Four Properties transactions were the sole membership interests in the entities, representing 100% control of the entities being transferred.  There were no passive members.  In light of this, and based on the above, the Examiner has concluded that that it is likely that the Bankruptcy Court and/or the Seventh Circuit would find that LLC membership interests that were transferred in the Growth, CERP and Four Properties transactions would not qualify as "securities" for purposes of section 546(e) (and thus, that the contracts providing for the purchase and sale of such membership interests would not be found to be securities contracts for purposes of section 546(e) either).[367]  Thus, the Examiner believes that the "LLC" issue presents a very significant hurdle that will be difficult for CEC and CGP/CAC to overcome in terms of the section 546(e) safe harbor.

### b.  Meaning of a "Settlement Payment"

If the transaction at issue does involve a security, then 546(e) will apply if the transfer at issue (*i.e.*, the transfer made by the debtor) is a "settlement payment."  Courts have interpreted the definition of "settlement payment" broadly, finding that it constitutes any transfer of cash or securities made to complete a securities transaction.  As long as the "fundamental character" of the transfer of money and securities is that of a "securities transaction," courts have found that the requirement is satisfied.[368]  The Seventh Circuit has not directly adopted this definition; however, it has held, relying on *Enron*, that a settlement payment "means what it ordinarily does in the securities business: the financial settling-up after a trade."[369]  Thus, it appears that the Seventh Circuit has implicitly embraced the broad interpretation of "settlement payment" followed by the majority of the Circuits.  Notably, while the majority of cases addressing settlement payments discuss the transfer of cash for securities, courts also have expressly held that the reverse is true, *i.e.*, that a transfer of securities for cash constitutes a settlement payment.[370]

---

[367]  *See Peterson*, 729 F.3d at 750.

[368]  *Greektown Litig. Trust v. Papas (In re Greektown Holdings, LLC)*, No. 08-53104, 2015 WL 8229658, at *4 (Bankr. E.D. Mich. Nov. 24, 2015) (emphasis added) (citing *In re Quebecor World (USA) Inc.,* 453 B.R. at 205-06 (payments made weeks or months before some notes were delivered)).

[369]  *Peterson*, 729 F.3d at 749 (citing *Enron*, 651 F.3d at 339).

[370]  *Jonas v. Resolution Trust Corp. (In re Comark)*, 971 F.2d 322, 326 (9th Cir. 1992) (finding that a transfer of securities – specifically, government securities known as 'Ginnie Maes' – needed to complete a reverse repurchase agreement was a "settlement payment," as well as "any transfers that occur during the settlement process," and thus the trustee could not recover the value of the transferred securities); *Kaiser Steel Corp.*, 913 F.2d at 850 (finding that the transfer of money and preferred stock as a settlement of an LBO that was protected from avoidance under section 546(e)); *Wyle v. Howard, Weil, Labouisse, Friedrichs, Inc. (In re Hamilton Taft & Co.)*, 176 B.R. 895, 899 (Bankr. N.D. Cal. 1995), *aff'd*, 196 B.R. 532 (N.D. Cal. 1995), *aff'd*, 114 F.3d 991 (9th Cir. 1997) (finding that the transfer of a T-Bill was a settlement payment despite not "completing" the reverse repurchase agreement, because "[t]he clear thrust of [Ninth Circuit law]

### i.    Application to Privately Held Securities

While there is some dispute over whether a "settlement payment" in the context of section 546(e) applies to both public and nonpublic transactions, the vast majority of courts have found that "the relevant text has a sufficiently plain and unambiguous meaning" and "[n]othing in the relevant statutory language suggests Congress intended to exclude these payments from the statutory definition of 'settlement payment' simply because the stock at issue was privately held."[371]    Thus, these courts have found that the transfer of cash in exchange for private securities is a "settlement payment" for safe harbor purposes.    There are, however, a small number of decisions that have found, based on the legislative history of section 546(e), that a "settlement payment" only arises in transactions involving publicly traded shares.[372]    These cases are not compelling, however, as they depend on the finding of an ambiguity within the statute itself – a finding with which most courts now disagree.

The Seventh Circuit has not directly addressed this issue.    A recent decision from the United States Bankruptcy Court for the Northern District of Illinois, which was affirmed by the Seventh Circuit (without addressing this issue), held that section 546(e) is not limited to transactions made on public exchanges.[373]    Considering that the Seventh Circuit has relied on the federal securities laws (which do not distinguish between private and public securities) as an aid when interpreting the Bankruptcy Code,[374] it seems logical that the Seventh Circuit would not limit transactions to those on public exchanges.    There is, however, an early decision from the

---

is that [a] 'settlement payment' includes any transfer of cash or securities **toward** completion of a securities transaction") (emphasis in original).

[371]    *Contemporary Indus.*, 564 F.3d at 986; *see also Plassein*, 590 F.3d at 258-59; *QSI Holdings, Inc.,* 571 F.3d at 549-50; *Williams v. Morgan Stanley Capital Grp. (In re Olympic Natural Gas Co.)*, 294 F.3d 737, 742 (5th Cir. 2002).

[372]    *Kipperman v. Circle Trust (In re Grafton Partners)*, 321 B.R. 527, 538-39 (B.A.P. 9th Cir. 2005) (finding that a capital withdrawal from the debtor by the defendant in a "non-public, non-market transaction" did  not constitute a "settlement payment" because the transaction "did not occur on a public market and did not involve the process of clearing trades); *Kapila v. Espirito Santo Bank (In re Bankest Capital Corp.)*, 374 B.R. 333, 346 (Bankr. S.D. Fla. 2007) (refusing to apply the safe harbor provision to a payment of $10 million from the debtor to the defendant in exchange for an assignment of 50% of the defendant's membership interests in another company because the transfer "did not involve the utilization of public markets or publicly traded securities").    While *MacMenamin's Grill Ltd.*, 450 B.R. at 414 and *Fashion Cents v. Lattman (In re Norstan Apparel Shops, Inc.)*, 367 B.R. 68, 76-77 (Bankr. E.D.N.Y. 2007), both held that section 546(e) did not protect a transfer in the context of an LBO because it did not involve a public securities market or pose any threat to the functioning of the securities market, these were decided pre-*Enron*, and are most likely no longer good law.

[373]    *Peterson v. Enhanced Inv. Corp. (In re Lancelot Inv'rs Fund, L.P.)*, 467 B.R. 643, 655 (Bankr. N.D. Ill. 2012), *aff'd sub nom. Peterson v. Somers Dublin Ltd.*, 729 F.3d 741 (7th Cir. 2013).

[374]    *See Peterson*, 729 F.3d at 750.

Northern District of Illinois, *Wieboldt Stores, Inc. By & Through Raleigh v. Schottenstein*, 131 B.R. 655 (N.D. Ill. 1991), in which the court found, based on the legislative history of section 546(e), that the payments that the shareholders received from the debtor for their shares in a private company in the context of an LBO were not protected under section 546(e) because requiring the shareholders to return those payments would not pose a threat to the clearance and settlement chain nor would any financial intermediary involved in the process be affected by the order to avoid the payment.[375]

Based on *Peterson* and *Grede*, the Examiner believes it unlikely that the Seventh Circuit would follow the earlier *Wieboldt* decision, but would more likely than not favor the broad and literal reading of "settlement payment" followed by the vast majority of Circuits, whereby section 546(e) is applied to privately and publicly held securities.[376] This conclusion is particularly bolstered by the fact that *Peterson* affirmed (but did not discuss) the district court's finding that the statute is not limited to transactions made on public exchanges[377] and that *Grede* explicitly reversed the district court's policy-based determination that a party must establish that the securities market would be impacted in order for section 546(e) to be implicated.[378] In addition, as discussed above, the Seventh Circuit has looked to federal securities law to aid in the determination of what constitutes a security for purposes of 546(e).[379] The federal securities laws apply both to public and private securities transaction.[380] This suggests that the public/private distinction should also not be relevant for purposes of section 546(e) and, instead, the primary determinant should be whether the transaction involved a security, regardless of whether the security is publicly or privately traded.

### ii.   Asset Sales and One-Way Payments

While courts have applied a broad interpretation of settlement payment in a series of scenarios, including the transfer of cash and debt to a parent company in connection with a "spin off" of a subsidiary business[381] and a payment for the redemption of commercial paper,[382] there

---

[375]   *Wieboldt Stores*, 131 B.R. at 664-65.

[376]   Note, however, that the Seventh Circuit has stated that it will not apply a "wooden" textualism when analyzing section 546(e).  *Grede*, 746 F.3d at 253.

[377]   *See Peterson*, 729 F.3d at 749 (advocating a plain language reading of section 546(e), as opposed to a policy-orientated result).

[378]   *See Grede*, 746 F.3d at 253 ("We understand the district court's powerful and equitable purpose, but its reasoning runs directly contrary to the broad language of § 546(e).").

[379]   *See* Section V.E.2.a of this Appendix.

[380]   *Landreth Timber Co,* 471 U.S. at 692  (noting that privately traded securities are not exempted from the antifraud provisions of the federal securities laws).

[381]   *U.S. Bank Nat. Ass'n,* 892 F. Supp. 2d at 824-25.

[382]   *Enron*, 651 F.3d at 336-37.  In *Enron*, the Second Circuit held that a "settlement payment" does not require a purchase or sale of securities – a holding that is the broadest interpretation of a "settlement payment" to date.  *See id.*

are limits to such broad application.  Notably, because the transfer may only qualify if it occurs in the context of a *securities transaction*,[383] an asset sale, by itself, does not qualify for protection as a settlement payment under section 546(e).[384]   Courts also have found that the payment of dividends are not "settlement payments" because "the dividend transaction was not an exchange, but a one-way payment."[385]   In other words, a settlement payment requires that "both parties exchange[] some value," and not just the corporation-debtor distributing cash or securities.[386]  Where, however, a distribution is part of a larger securities transaction and thus "there exists a more or less *quid pro quo* exchange, it is improper to view the *quo* in isolation."[387]

### c.   Meaning of "In Connection with a Securities Contract"

As noted above, to qualify for protection under the section 546(e) safe harbor, a transfer must either constitute a "settlement payment" or  a transfer made "in connection with a securities

---

[383]   *See, e.g.*, *Enron*,  651 F.3d at 336-37; *Kaiser Steel Corp.*, 913 F.2d at 848.  As the Seventh Circuit has stated, "Section 546(e) applies only to the securities sector of the economy[.]" *Grede*, 746 F.3d at 253.

[384]   *Optical Datacom, LLC v. Majestic Mgmt., Inc. (In re OODC, LLC)*, 321 B.R. 128, 145 (Bankr. D. Del. 2005) (where payments at issue "were not even related to the purchase or sale of stock" because "the sale at issue was an asset sale," section 546(e) was not implicated).

[385]   *Michaelson v. Farmer (In re Appleseed's Intermediate Holdings, LLC)*, 470 B.R. 289, 302 (D. Del. 2012); *see Weinman v. Fidelity Capital Appreciation (In re Integra Realty Res., Inc.)*, 198 B.R. 352, 357-58 (Bankr. D. Colo. 1996) (finding that a parent company's distribution of subsidiary's stock to the parent company's shareholders without any real exchange nor any consideration given by the recipients of the dividend for the exchange did not fall into the broad interpretation of settlement payment), *aff'd*, 354 F.3d 1246 (10th Cir. 2004); *Global Crossing Ltd. v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.)*, 385 B.R. 52, 56 n.1 (Bankr. S.D.N.Y. 2008) (finding that the receipt of a dividend was not a "settlement payment" immune from avoidance); *see also Greektown Holdings*, 2015 WL 8229658, at *6 ("The focus of this analysis is whether the Wire Payments were indeed gratuitous transfers for no consideration, or were or involved exchanges of consideration.").

[386]   *Appleseed's Intermediate*, 470 B.R. at 302.

[387]   *Greektown Holdings*, 2015 WL 8229658, at *13 (citing *Duke Energy*, 500 B.R. at 472-73). In *Greektown*, the court found that the payments at issue were settlement payments, and not dividends, because they were "part and parcel" of the overall transaction and thus "there existed a clear triangular exchange of benefits and burdens, each aspect being reciprocal and supported by consideration."  *Id.* at *7.  Likewise, in *Duke Energy*, the court stressed that the transfer was "necessary" for the "completion of the securities transaction described in the Formation and Sale Agreement."  *See Duke Energy*, 500 B.R. at 473.  *See also Calyon New York Branch v. Am. Home Mortg. Corp (In re Am. Home Mortg., Inc.)*, 379 B.R. 503,  521-23 (Bankr. D. Del. 2008) (severing portion of transaction where it was clear from the "unambiguous terms of the [c]ontract" that the servicing of a mortgage loan were a separate agreement from the sale of the mortgage loan, but finding that the safe harbors of sections 555 and 559 did not protect the transfer because the servicing of a mortgage loan was not a securities contract).

contract."    This latter provision is of particular relevance to several of the transactions investigated by the Examiner (*e.g.*, the Growth, CERP and Four Properties transactions), in which the property that was "transferred" by CEOC (or by first or second tier subsidiaries of CEOC) consisted of membership interests in limited liability companies and licenses for intellectual property.

The definition of securities contract includes "a contract for the purchase, sale or loan of a security."[388]    As the Bankruptcy Court for the Southern District of New York has explained, "[t]he plain language of section 741(7) is very broad in its application and encompasses virtually any contract for the purchase or sale of securities . . . and a wide array of related contracts."[389] Courts have broadly interpreted the term "securities contract" as including "contracts for the purchase or sale of securities, as well as any agreements that are *similar* or *related to* contracts for the purchase or sale of securities."[390]    There are, however, some limitations to what courts have considered securities contracts.    According to the Second Circuit, simple loans are not "securities contracts."[391]    And, while bonds are "securities" under the Bankruptcy Code, at least one court has found that, without an overarching agreement, bonds are not "securities contracts" within the definition of the Bankruptcy Code.[392]

Courts, including those within the Seventh Circuit, have held that the phrase "in connection with" should be construed "broadly to mean 'related to.'"[393]    Any narrower interpretation of the phrase is "plainly inconsistent with . . . the plain, unambiguous, and

---

[388]  *See* 11 U.S.C. §741(7).

[389]  *Lehman Bros. Holdings Inc.*, 469 B.R. at 438.

[390]  *Picard v. Fishman (In re Bernard L. Madoff Inv. Sec. LLC)*, 773 F.3d 411, 418 (2d Cir. 2014) (emphasis in original); *see also Quebecor World*, 719 F.3d at 98-99; *Rushton v. Bevan (In re D.E.I. Sys., Inc.)*, 996 F. Supp. 2d 1142, 1148 (D. Utah 2014).

[391]  *Enron*, 651 F.3d at 334 (differentiating between safe harbor protection for "tradable debt securities" and "avoidance on payments made on ordinary loans" and stating that "[i]nterpreting the term 'settlement payment' in the context of the securities industry will exclude from the safe harbor payments made on ordinary loans).    Historically, payments on long-term and short-term unsecured debt are avoidable as preferences unless they qualify for the ordinary course of business exception.    *See Union Bank v. Wolas*, 502 U.S. 151, 162 (1991).

[392]  *EPLC I, LLC v. Citibank (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 323 (Bankr. D. Del. 2012).    *Compare Quebecor World*, 719 F.3d at 98-99 (finding that note purchasing agreements were securities contracts, because they "provided for the original purchase and the 'repurchase' of the [n]otes").

[393]  *Lehman Bros. Holding Inc.*, 469 B.R. at 442 (citing cases); *see also Greektown Holdings*, 2015 WL 8229658, at *16 (citing *Picard v. Flinn Invs., Inc.*, 463 B.R. 280, 285-86 (S.D.N.Y. 2011)); *MCK Millennium Ctr. Parking*, 532 B.R. at 731; *Lancelot Inv'rs Fund, L.P.*, 467 B.R. at 656 ("The term 'in connection with' is by its own terms very broad; in the context of avoidance of transfers it has been interpreted to mean 'related to an agreement.'") (citing *In re Casa de Cambio Majapara S.A. de C.V.*, 390 B.R. 595, 599 (Bankr. N.D. Ill. 2008)).

unmistakably broad language of §546(e)."[394]   Thus, the concept of a "securities contract" "is broadened even farther because §546(e) also protects a transfer that is 'in connection' with a securities contract."[395]   As the Bankruptcy Court for the Southern District of New York has noted:

> The "in connection with" requirement of section 546(e) does not contain any temporal or existential requirement that a transfer must be "in connection with" then-outstanding legal exposure.   Indeed, section 546(e) does not include any language that refers either to exposure or timing.   The formulation is quite simple: a transfer is safe-harbored if it is "in connection with" a securities contract.   And the words "in connection with" are to be interpreted liberally.

When a transfer of funds is made "in the amount and manner prescribed by" an agreement for the purchase of securities, the transfer has been made "in connection with a securities contract."[396]   The Seventh Circuit has found the requirement to be met where a partial redemption was made to an investor without selling securities because the redemption was done to satisfy the debtor's obligations under a securities contract, and thus was made "in connection with a securities contract."[397]

### d.   "By," "To," or "For the Benefit of" a "Financial Institution" or "Financial Participant"

### i.   "By" or "To" or "for the Benefit of" Requirement

Even if a transfer is made in connection with a securities contract, the safe harbor of section 546(e) will only apply if the transfer at issue is "by," "to" or "for the benefit of" certain enumerated entities, including a financial institution or a financial participant.   The most common issues that arises in the context of this requirement are (i) whether a financial intermediary can be a "mere conduit" in the course of a transfer and still satisfy the statutory condition of the transfer being made "to" or "by" that financial intermediary and (ii) whether an entity fits the definition of "financial participant."

---

[394]   *Greektown Holdings*, 2015 WL 8229658, at *16-17.

[395]   *Bernard Madoff Inv. Sec., LLC*, 773 F.3d at 418.

[396]   *Quebecor World*, 719 F.3d at 98-99 (payment to repurchase a series of private placement notes made pursuant to a note repurchase agreement could not be avoided as it "fits squarely into the plain wording of the securities contract exemption")

[397]   *Grede*, 746 F. 3d at 252-53; *see also MCK Millennium Ctr. Parking*, 532 B.R. at 731 (where loan payments were maintained, held, and distributed pursuant to a security agreement, the payments were made "in relation to a securities agreement" and thus qualified as a transfer made in connection with a securities contract, even though the payments were not necessarily made for the purchase or sale of securities).

### (a) Mere Conduit

When considering the "by" or "to" or "for the benefit of" requirement, a majority of courts have found that a financial institution or participant need not take possession of the transferred funds or have an interest in the transfer for section 546(e) to apply. Rather, the vast majority of courts have found, based on the plain reading of the statute, that a financial institution or participant need only be a mere conduit in the transfer, and does not need to hold dominion or control over the transferred securities.[398]  While there is a minority position (followed only in the Eleventh Circuit) that requires a financial institution or participant to acquire a beneficial interest in the transferred funds or securities for the safe harbor to apply,[399] this analysis of the requirement goes against the more recent trends to apply the statutory language according to its broad, literal terms.

While the Seventh Circuit has not directly addressed this issue, a recent decision from the United States District Court for the Northern District of Illinois held that a financial institution need not obtain a beneficial interest in the transfer in order for the safe harbor to apply; rather, it can be a mere conduit.[400]  Considering the Seventh Circuit's holding that the safe harbor should be interpreted by its broad, plain language, it seems almost certain that the Seventh Circuit would follow the majority of the Circuits and find that a financial intermediary may act as a mere

---

[398]   The Second, Third, Sixth and Eighth Circuits have held that a financial institution or participant whose role is merely as a conduit in a transfer is sufficient for safe harbor purposes. *See Quebecor World*, 719 F.3d at 99-100 (rejecting argument that payments made to a financial institution that was merely a conduit was not subject to safe harbor of section 546(e)); *Enron*, 651 F.3d at 338 (payments made through "financial intermediaries who serve[] only as conduits" and do not take title qualify as settlement payments protected by section 546(e)); *Plassein*, 590 F.3d at 257-58 (bank's facilitation of a wire transfer was sufficient for section 546(e) application and rejecting the notion "that 'settlement payments' must travel through the system of intermediaries and guarantees that normal securities transactions employ"); *QSI Holdings*, 571 F.3d at 550-51 (role played by a bank, which acted as an exchange agent and held no dominion or control over the transferred funds, "was sufficient to satisfy the requirement that the transfer was made to a financial institution"); *Resorts*, 181 F.3d at 516 (expressly rejecting any sort of "intermediary or conduit" exception to section 546(e) payments made through debtor's bank); *Contemporary Indus.*, 564 F.3d at 987.

[399]   *See Munford, Inc.*, 98 F.3d at 610 ("Although the payments were presumptively settlement payments, section 546(e) is not applicable unless the transfer (or settlement payment) was 'made by or to a [financial institution or participant].'").

[400]   *See FTI Consulting, Inc.* 541 B.R. at 856-60; *see also MCK Millennium Ctr. Parking, LLC*, 532 B.R. at 728 (applying safe harbor to a $5 million transfer of funds when the financial institution acted as an intermediary). While the *MCK Millennium* decision was recently vacated, *see supra* note 321, the United States District Court for the Northern District of Illinois, in *FTI Consulting* (a later decision), still relied upon the reasoning in *MCK Millennium* when holding that a financial institution need only be a conduit for purposes of section 546(e).

conduit and satisfy the safe harbor's requirements.[401]   While this is not a disputed issue, it is relevant for the B-7, the Senior Unsecured Notes and the PIK Notes transactions.

### (b)  "Notes" transactions

The issue of whether a transfer has been made "for the benefit of" a financial institution or participant is a less defined area of law and is an issue that arises in connection with the Growth, Four Properties and CERP transactions.  By its plain language, the contested transfer will not qualify for the safe harbor solely by establishing that the transfer "benefits" an entity involved with or related to the transaction.  Such an interpretation would allow anyone involved with or related to the transaction to claim that they received a benefit from the transfer.  Rather, the clause "for the benefit of" requires something more tangible; it, unlike the "made by or to" language, "embraces a beneficial interest in the securities."[402]  Thus, ordinary consideration paid during the course of a transaction is not sufficient to establish that a transfer was made for an entity's benefit.

Accordingly, it has been held that the words "for the benefit of" "imply some intent-to-benefit on the part of either the initial transferee or the debtor: that is, either of the parties to the initial transfer must have contemplated that defendants would benefit from the transfer."[403]  The Southern District of New York has expressly disagreed with an "expansive reading of 'for the benefit of' that merely requires that the initial transfer ultimately benefit a financial participant."[404]  According to the court, "[t]he notion that a transfer is ultimately made 'for the benefit of' anyone who happens to receive the transfer down the line (who, one must assume, benefited, and was not harmed, by receiving those funds) extends the statutory language beyond a reasonable understanding of the words 'for the benefit of.'"[405]

Thus, incidental benefits are not sufficient for safe harbor purposes.  Rather, the relevant consideration for purposes of determining if a transfer was made for an entity's benefit is whether the transferee received an asset for itself or if the transferee is holding the asset in trust for someone else, who is ultimately obtaining title to the asset.  This interpretation is in accord with the definition of a "beneficial owner" in the securities realm, wherein a "beneficial owner" includes an owner who receives distributions through the holders of record of their shares.  In such a relationship, a transferee may receive an asset, but the asset would pass on to the

---

[401]  *See Grede*, 746 F.3d at 253; *Peterson*, 729 F.3d at 749.

[402]  *D.E.I. Sys.,* 996 F. Supp. 2d at 1150.

[403]  *S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Sec.)*, 505 B.R. 135, 149 (S.D.N.Y. 2013).  This decision was in the context of section 546(g), which is the safe harbor equivalent to section 546(e) for swap agreements.

[404]  *Id.*

[405]  *Id.*

beneficial owner who actually has the ultimate right to the asset.[406]  This is the type of transfer made for an entity's benefit that would qualify that transfer for protection under section 546(e).

Courts have reached similar conclusions when analyzing what it takes for a transfer to be made for an entity's benefit in the context of section 550(a).  In that context, courts have explained that an "unquantifiable advantage is not the sort of 'benefit' contemplated" by the statute[407] and that "[i]t is not enough that an entity benefit from the transfer; the transfer must have been made for his benefit."[408]  The Seventh Circuit, in *Bonded Financial Services, Inc. v. European American Bank*, while not directly answering what it takes for a transfer to be made for an entity's benefit, provided some guidance on the issue by explaining that the "paradigm 'entity for whose benefit such transfer was made' is a guarantor or debtor – someone who receives the benefit but not the money."[409]

Thus, in order for a transfer to be made "for the benefit" of an entity, that entity must receive more than an "unquantifiable advantage."[410]  Indeed, the fact that the entity may have ultimately received a benefit by a transfer is not sufficient and "extends the statutory language beyond a reasonable understanding of the words 'for the benefit.'"[411]  Rather, there must be some intent to benefit the entity by either the debtor or the initial transferee, and that entity must have "receiv[ed] the benefit but not the money."[412]

---

[406]  *See, e.g.*, *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 955-56 (S.D. Ohio 2009) (describing what a beneficial owner is under federal securities laws) (citing 17 C.F.R. §240.13d-3 *and Rosenberg v. XM Ventures*, 274 F. 3d 137, 143-44 (3d Cir. 2001)), *aff'd*, 712 F.3d 321 (6th Cir. 2013); *SEC v. Teo*, No. 2:04-CV-01815, 2010 WL 3184349, at *6 (D.N.J. Aug. 10, 2010) (citing 17 C.F.R. §240.13d-3); *Ivax Corp. v. Frost*, 474 F. Supp. 2d 520, 522-23 (S.D.N.Y. 2007) (analyzing whether an entity qualified as a beneficial owner for securities purposes) (citing 17 C.F.R. §240.16a-1(a)(2)); *see also In re THCR/LP Corp.*, No. 04-46898/JHW, 2006 WL 530148, at *3 (Bankr. D.N.J. Feb. 17, 2006) (describing generally the difference between beneficial owners and record owners).

[407]  *Reilly v. Kapila (In re Int'l Mgmt. Assoc.)*, 399 F.3d 1288, 1292 (11th Cir. 2005).

[408]  *Danning v. Miller (In re Bullion Reserve of N. Am.)*, 922 F.2d 544, 547 (9th Cir. 1991); *see also Shapiro v. Leather (In re Connolly N. Am., LLC)*, 340 B.R. 829, 834 (Bankr. E.D. Mich. 2006) (following *Bullion*); *Merrill v. Dietz (In re Universal Clearing House Co.)*, 62 B.R. 118, 128 n.12 (D. Utah 1986)) (emphasis in original).

[409]  *See* 838 F.2d 890, 895 (7th Cir. 1988); *see also Baldi v. Lynch (In re McCook Metals, LLC)*, 319 B.R. 570, 590, 592, 592 n.18 (Bankr. N.D. Ill. 2005).

[410]  *See Int'l Mgmt. Assoc.*, 399 F.3d at 1292.

[411]  *See Madoff Sec.*, 505 B.R. at 149.

[412]  *Bonded Fin Servs., Inc. v. European Am. Bank (In re Bonded Fin. Servs., Inc.)*, 838 F.2d 890, 895 (7th Cir. 1988).

### ii.    The Requirement of a "Financial Institution" or a "Financial Participant"

In order to qualify for the safe harbor, a transfer must have been made by, to, or for the benefit of (among other things)[413] a financial institution or a financial participant.

### (a)    Financial Institution

A financial institution is defined under the Bankruptcy Code as including "a federal reserve bank, or an entity that is a commercial or savings bank."[414]  "So long as a financial institution is involved, the payment is an unavoidable 'settlement payment.'"[415]  Courts have held that, where funds are transferred directly to a selling shareholder's bank account, the role of a financial institution has been satisfied.[416]  This is not a disputed issue, but is relevant for the B-7, Senior Unsecured Notes and PIK Notes transactions.

### (b)    Financial Participant

Whether or not a transferee or transferor qualifies as a "financial participant" is a murkier area of law, but it is an important issue for the Growth, Four Properties and CERP transactions. According to the Bankruptcy Code, an entity may qualify as a financial participant if, at the time it enters into a qualifying agreement, or at the petition date, it holds one or more such contracts "with the debtor or any other entity (other than an affiliate)" that (i) have a value of $1 billion (either at the time it enters into the agreement or at any point during the 15-month period preceding the date of the filing of the petition) in notional or actual principal amount outstanding (in the aggregate), or (ii) have a value of $100 million (either at the time it enters into the agreement or at any point during the 15-month period preceding the date of the filing of the petition) in gross mark-to-market positions (in the aggregate).[417]  While the essential requirement for qualifying as a financial participant is the holding of certain qualifying contracts, including securities contracts and swap agreements,[418] there are three other essential aspects of these

---

[413]    These other entities include a commodity broker, forward contract merchant, stockbroker, and securities clearing agency.  11 U.S.C. §546(e).

[414]    11 U.S.C. §101(22)(A).  As discussed, a financial institution need not obtain a beneficial interest over the payment or securities; rather, a payment need only pass from, to, or through a bank or broker.  *See supra* Section V.E.2.d.1(a); *see Plassein*, 590 F.3d at 258.

[415]    *Hechinger*, 274 B.R. at 86-89.

[416]    *See AP Servs. LLP v. Silva*, 483 B.R. 63, 68-70 (S.D.N.Y. 2012); *see also Tougher Indus., Inc.*, 2013 WL 5592902, at *5-6 (payments made directly from the debtor to the defendant's bank account were payments made by or to a financial institution).

[417]    11 U.S.C. §101(22A).  A swap agreement is defined in 101 U.S.C. §101(53B), and includes, among numerous things, "any agreement . . . which is an interest rate swap, option, future, or forward agreement[.]"  *Id.* §101(53B)(A)(i)(I).

[418]    The other agreements mentioned in the statute are commodities contracts, forward contracts, repurchase agreements, and master netting agreements.  *See* 11 U.S.C. §561(a)(1)-(6).

contracts that must be met; specifically, the contracts (i) must be with an entity "other than an affiliate"; (ii) must have a certain value during two specific time periods; and (iii) must otherwise qualify towards the requisite monetary amount.

## (1)   The "Other Human Affiliate" Limitation

For the agreements to qualify towards the requisite statutory amount, the agreements must be "with the debtor or any other entity (other than an affiliate)."[419]   Courts have not opined on whether the "(other than an affiliate)"[420] language modifies both "debtor" and "any other entity" or only "any other entity."   This issue is relevant here because certain of the Debtor's affiliates contend that they constitute a "financial participant" based on the existence of agreements they have with certain of the Debtors.   If the phrase "other than an affiliate" is intended to modify the word "debtor" as well as "any other entity," then these non-Debtor affiliates could not use their contracts with a Debtor to qualify as a financial participant.

There are multiple rules of construction that could apply when analyzing this statutory language.   None are dispositive; however, the Examiner believes, for the reasons set forth below, that it is more likely than not that the Bankruptcy Court and the Seventh Circuit would find that the words "other than an affiliate" modify both "debtor" and "any other entity."

Under the last antecedent doctrine, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows."[421]   This doctrine has been used by courts when construing the Bankruptcy Code,[422] and courts have applied the

---

[419]   11 U.S.C. §101(22A).

[420]   An affiliate is defined as, in relevant part:

> (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote; (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote[.]

11 U.S.C. §101(2)(A), (B).

[421]   *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003).

[422]   *See, e.g.*, *Enron*, 651 F.3d at 335-36 (applying last antecedent doctrine to definition of "settlement payment" under section 741(8) because "both the modifier and its immediate antecedent are set off from the preceding terms in the series"); *Gagne v. Fessenden (In re Gagne)*, 394 B.R. 219, 229 (B.A.P. 1st Cir. 2008) (applying the doctrine to 11 U.S.C. §1328(f), but noting that the "final  rule of statutory interpretation that the parties address is the canon that

doctrine to a modifier set off by a parenthetical.[423]   However, because the last antecedent doctrine is a "grammatical rule and not a legal command," courts have not applied it woodenly, especially where "evident sense and meaning require a different construction."[424]   As the Supreme Court has explained, the presumption of applying the last antecedent doctrine can also be "overcome by other indicia of meaning."[425]   Further, courts have refused to apply the last antecedent doctrine where its application would lead to an "absurd result."[426]   For example, the Ninth Circuit declined to apply the doctrine when considering the clause "except a shotgun or

---

a statute should not be construed in such a manner that would render any words contained therein superfluous") (citing cases).

[423]   *See Desai v. Mukasey*, 520 F.3d 762, 766 (7th Cir. 2008) (without mentioning the last antecedent doctrine, the court explained that parenthetical in "any law or regulation of a state, the United States, or a foreign country relating to a controlled substance (as defined in section 802 of title 21 [the Controlled Substances Act] )" could only "be read to modify 'controlled substance,' its immediate antecedent"); *Jones v. Fleetwood Motor Homes*, 127 F. Supp. 2d 958, 969-70 (N.D. Ill. 2000) (Hart, J.) (applying doctrine of last antecedent to phrase "cost and expenses (including attorneys' fees based on actual time expended)" and finding that "the plain meaning of such statutory language is that attorney fees are not defined as 'costs,'. . . [but] are defined as 'expenses'"); *see also Rojas v. Attorney Gen. of U.S.*, 728 F.3d 203, 209, 214 (3d Cir. 2013) (en banc) (following the Seventh Circuit's decision in *Desai*, explaining that "[r]eading the statute as written, it is clear that the parenthetical . . . is a restrictive modifier that affects only its immediate antecedent term" but stating that the Department of Homeland Security had offered "'no other indicia of meaning' from the text to convince us not to follow it").

[424]   *Payless Shoesource, Inc. v. Travelers Cos., Inc.*, 585 F.3d 1366, 1371-72, 1372 n.2 (10th Cir. 2009) (refusing to apply the last antecedent doctrine for various reasons, including that its application would create an unreasonable interpretation that went against the purpose of the statute); *see also Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 832-33 (9th Cir. 1996) (acknowledging that the application of the doctrine of last antecedent is flexible).

[425]   *Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 355 (2005) (quoting *Barnhart*, 540 U.S. at 26).   The Supreme Court recently refused to apply the rule of last antecedent where applying it would "require [them] to accept two unlikely premises" based on the text of the statute.   *United States v. Hayes*, 555 U.S. 415, 425-26 (2009).   There, the Supreme Court reversed the Fourth Circuit's application of the last antecedent doctrine, finding that the modifier at issue modified the defining term itself because "other indicia of meaning" in the statute overcame the rule.   *See id.*

[426]   *United States v. One Sentinel Arms Striker-12 Shotgun Serial No. 001752*, 416 F.3d 977, 979 (9th Cir. 2005); *Express Scripts, Inc. v. Maury County, Tennessee*, No. 4:09CV00585 ERW, 2010 WL 1838459, at *2-3 (E.D. Mo. May 6, 2010) (refusing to apply the last antecedent doctrine to the interpretation of "No county, city or other political corporation or subdivision of the state. . ." because doing so would create an "absurd result," which would "violate the very notion of state sovereignty"); *see also Squillacote v. United States,* 747 F.2d 432, 433-34 (7th Cir. 1984) (suggesting that the doctrine of the last antecedent is inapplicable when it creates absurd or otherwise conflicting results).

shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes" under 26 U.S.C. §5845(f)(2).   As the court reasoned, applying the last antecedent doctrine would "have the incongruous effect that no shotgun could be a 'destructive device,' but all shotgun shells (except those generally recognized as particularly suitable for sporting purposes) would be 'destructive devices,'" and thus the Ninth Circuit refused to follow it.[427]   Under this doctrine, the term "(other than an affiliate)" would apply only to "any other entity" and not "debtor."   Said otherwise, a qualifying securities contract with a non-debtor affiliate would not count towards the amount necessary to qualify an entity as a financial participant, but a contract with a debtor affiliate *would* count towards the amount necessary to qualify an entity as a financial participant.

Alternatively, there is a contradictory grammatical rule, known as the "series-qualifier" doctrine,[428] which "provides that a modifier at the beginning or end of a series of terms modifies all the terms."[429]   Courts have recognized the tension between the last antecedent and series-qualifier doctrines, and the Seventh Circuit has even expressed its concern about how to decide which doctrine to apply when "either [doctrine] could apply. . . ."[430]   Where, however, the intent and purpose of the provision at issue are better served by the series-qualifier doctrine, the

---

[427]   *One Sentinel Arms Striker-12 Shotgun Serial No. 001752*, 416 F.3d at 979 (quoting *Demko v. United States*, 216 F.3d 1049, 1053 (Fed. Cir. 2000)).

[428]   While most of these cases apply to a "series" of at least three, *see, e.g.*, *United States v. Lockhart*, 749 F.3d 148, 151-52 (2d Cir. 2014) (discussing application of series-qualifier canon of statutory construction to list of three), there is no indication that it would necessarily not apply to a "series" of two.   The Supreme Court applied the rule, after all, to two phrases in *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345 (1920).   One court has applied the doctrine when considering a "series" of two words in a statute, *see Carroll v. Nationwide Prop. & Cas. Co.*, No. 2:14-CV-02902-STA, 2015 WL 3607654, at *6 (W.D. Tenn. June 8, 2015) (internal citation omitted), and one court has considered the canon in analyzing a contract with a "series" of two options, but ultimately found it unnecessary to apply a grammatical rule because the statute was unambiguous.   *See Eastham v. Chesapeake Appalachia, LLC*, No. 2:12-CV-0615, 2013 WL 5274576, at *1 (S.D. Ohio Sept. 18, 2013) *aff'd sub nom.*, 754 F.3d 356 (6th Cir. 2014).   These cases, however, have not included the use of a parenthetical modifier.

[429]   *United States v. Laraneta*, 700 F.3d 983, 989 (7th Cir. 2012); *see also Porto Rico*, 253 U.S. at  348 ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all.").

[430]   *See Laraneta*, 700 F.3d at 989-90.   In *Laraneta*, the Seventh Circuit found that "there [was] no rational basis for omitting [the] qualification from" the other words in the series, and thus found that choosing a rule of construction to follow was not necessary.   *Id.* at 989-90.   Whether or not both modes of construction should be considered when analyzing a statute is an issue of debate within the Circuits.   *See United States v. Mateen*, 764 F.3d 627, 633 (6th Cir. 2014) (Clay, J., concurring) (specifically noting that courts should consider the competing modes in order to see if both modes "would be virtually equally plausible").

Seventh Circuit has utilized that mode of construction.[431]   Similarly, the Second Circuit has recognized a "rule of construction under which a modifier set off from a series of antecedents by a comma should be read to apply to each of those antecedents."[432]   In such a scenario, the term "(other than an affiliate)" would apply only to both "debtor" and "any other entity."   Said otherwise, a securities contract with an affiliate would not count towards the amount necessary to qualify an entity as a financial participant, whether the affiliate is a debtor or any other entity.

In the Examiner's view, it is more logical for the modifier to apply to both "debtor" and "affiliate."   First, "affiliate" is just as applicable to both words, and thus "the natural construction of the language demands that the clause be read as applicable to all."[433]   Further, while courts have applied the last antecedent doctrine to clauses modified by a parenthetical, it seems more likely than not that the Bankruptcy Court and Seventh Circuit would not apply it here.   The application of the last antecedent doctrine here would lead to an absurd result wherein a contract with a non-debtor affiliate would not count towards the amount necessary to qualify as a financial participant, but a contract with a debtor affiliate *would* count towards the amount necessary to qualify as a financial participant.   Such a result counsels against following the doctrine.[434]   Thus, while there is no case law directly addressing this issue, the Examiner has concluded that it is more likely than not that the Bankruptcy Court and the Seventh Circuit would apply the modifier "(other than an affiliate)" to both "debtor" and "any other entity."[435]   This would mean that if the only contract that potentially qualifies an entity as a financial participant is a contract with the debtor, and the debtor is an affiliate of the entity, then that entity would not be a financial participant.   The effect of this, as discussed below, will likely preclude CEC and

---

[431]   *See Bigelow v. Twentieth Century-Fox Film Corp.*, 183 F.2d 60, 63 (7th Cir. 1950) (following *Porto Rico* and using the rule of series-qualifier where it better served the intent and purpose of the provision).

[432]   *Enron*, 651 F.3d at 335 (internal quotations marks and alterations omitted).

[433]   *Porto Rico*, 253 U.S. at 348.

[434]   This would mean that, if a parent company and its subsidiaries are all debtors, then the parent company would not be an affiliate of its subsidiary if it was the "debtor" for purposes of section 101(2), but would be an affiliate of the subsidiary if the "debtor" for purposes of section 101(2) is one of its subsidiaries.   Or, in layman's terms, it is akin to telling siblings that he is not her brother, but she is his sister.

[435]   Any argument that the debtor can never be an affiliate is unlikely to be found to be persuasive by a court, in no small part because there are cases in which courts have used "affiliate" in connection with a debtor.   *See In re Lettick Typografic, Inc.*, 103 B.R. 32, 38 n.7 (Bankr. D. Conn. 1989) ("As noted, both the debtor and TEL are wholly owned by Wright, so that they are "affiliates[.]"); *In re H & S Transp. Co., Inc.*, 55 B.R. 786, 791 (Bankr. M.D. Tenn. 1982) (explaining that "all three of these debtor corporations are affiliates" under the "broad definition of affiliate" under §101(2)(B)).   While these cases are not in connection with the definition of a "financial participant," it still provides persuasive guidance that a debtor can qualify as an affiliate.

CGP/CAC from relying on section 546(e) as a defense to a constructive fraudulent transfer claim arising out of the Growth, CERP and Four Properties transactions.

## (2)  15-Month Period Limitation

An entity may qualify as a financial participant only if, either at the time of the relevant transaction or at the petition date, it holds one or more qualifying contracts[436] that (i) have a notional value or principal amount outstanding of at least $1 billion (either at the time it enters into the agreement or at any point during the 15-month period preceding the petition date) or (ii) have a gross mark-to-market value of $100 million (either at the time it enters into the agreement or at any point during the 15-month period preceding the date of the filing of the petition).

There are two ways to interpret this requirement.   Under one interpretation, an entity could qualify as a financial participant even if it was not party to a qualifying contract at the time the transfer was made so long as the entity subsequently became a party to a qualifying contract during the 15-month period prior to the petition date.   The alternative interpretation is that to be a financial participant, the entity must be a party to the qualifying contract at the time the transfer was made and that the value of that qualifying contract must exceed the minimum threshold at some point during the 15-month period prior to the petition date.   The difference in these interpretations is whether the 15-month look back period refers to the date that an entity enters into the qualifying contract (the first interpretation) or whether the look back period refers instead to the fluctuating value of a *pre-existing* qualifying contract (the second interpretation).

While there is no case law directly addressing the impact of this 15-month "look back" period, the second interpretation appears to be the better interpretation of the statute. A plain reading of the statute suggests that this "look back" period provides a window in time to analyze the *value* of *pre-existing* agreements for purposes of meeting the $1 billion or $100 million value.   This interpretation allows for a clean parallel in the statute between the first part of the statute (which relates to the qualifying time period for the agreement) and the second part of the statute (which relates to the value of the underlying agreements).   This interpretation gives parties the opportunity to include pre-existing contracts that may fluctuate in value (such as swaps) during the 15-month time period.

The alternative reading – in which the 15-month period relates to the period of time in which the entity may enter into a qualifying contract – appears less plausible because it would mean that an entity would not need to be a party to any qualifying contract at the time of the transfer at issue, as long as it entered into one at some point in the 15 months preceding the filing of the petition.   This interpretation would allow an entity to retroactively become a financial participant by entering into a qualifying contract months after the date of the transfer at issue. This appears inconsistent with the language of the statute that is focused more on the fluctuation of value of a contract.

---

[436]  The qualifying contracts are defined in paragraphs (1), (2), (3), (4), (5) and (6) section 561(a) of Bankruptcy Code,  and include securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, and master netting agreements.

Accordingly, it seems more likely than not that a court would conclude that the 15-month period of time in the statute creates a window of time during which an entity can establish that a pre-existing contract had the requisite value. Under this interpretation, an entity that was not a party to any qualifying contract at the time of the transfer would not constitute a financial participant solely by entering into a qualifying contract after the date of the transfer.

### (3) Contracts That May Be Considered Towards the Requisite Statutory Amount

There is little case law discussing whether the agreement underlying a challenged transfer may be used by an entity to establish the requisite statutory amount under the statutory definition of "financial participant." At least one case, from the Southern District of New York, has included the value of the contested swap agreements towards reaching the requisite $100,000,000 mark-to-market amount for financial participant purposes.[437] The statutory language, however, allows for two equally plausible interpretations, wherein an entity qualifies as a financial participant if (i) it already "has" an agreement in place when it enters into a qualifying contract or (ii) it "has" any qualifying contract at such time, *including* the underlying agreement.[438] However, under either meaning, the requirement of holding certain qualifying contracts that value the requisite statutory amount presents yet another hurdle for any party seeking to invoke section 546(e) as a defense.

Here, as discussed in Sections VIII.B – D of the Final Report, the entities involved in with the transfer of LLC membership interest in the Growth, Four Properties and CERP transactions most likely do not satisfy these four requirements necessary to qualify as a financial participant because they either hold no qualifying contracts at all or, if they do, these contracts do not qualify them as financial participants because they are (i) with an affiliate; (ii) fail to meet the requisite value amount during the two enumerated periods of time; or (iii) cannot qualify towards the requisite monetary amount.

## F.   Interaction with State Law

Section 546(e) is a defense to certain fraudulent transfer claims brought under state law pursuant to section 544. Courts generally agree that state law constructive fraudulent transfer

---

[437] *See Madoff Sec.*, 505 B.R. at 148 (using swap agreements through which the contested transfers were made in order to calculate if the defendants had $100,000,000 in mark-to-market positions "in one or more such agreements or transactions with the debtor or any other entity . . . at such time or on any day during the 15-month period preceding the date of the filing of the petition"); *see also Sher v. JPMorgan Chase Funding Inc. (In re TMST, Inc.)*, 518 B.R. 329, 341-42 (Bankr. D. Md. 2014).

[438] *See* 11 U.S.C. §101(22A) (a financial participant as an entity that, "at the time it enters into a [qualifying contract], *has one or more agreements or transactions*").

clams brought pursuant to section 544(b) may be barred by section 546(e).[439]  Likewise, many courts have also found that state law claims for actual fraudulent transfer brought under section 544(b) are also barred by section 546(e).  These courts reason that a plain language reading of section 546(e) requires that the defense applies to all fraudulent transfer claims brought under section 544, whether actual or constructive.[440]

However, a recent decision from the United States Bankruptcy Court for the Northern District of Illinois – ultimately vacated on other grounds by the same court – held that section 546(e) does not bar state law claims for actual fraudulent transfer brought under section 544.[441]

Generally speaking, courts have barred state law claims seeking to recover the same payments as a barred fraudulent transfer claim, finding that such claims are impermissible "end runs" around section 546(e).[442]  Claims for fraudulent transfer brought directly under state law

---

[439] *See, e.g.*, *Contemporary Indus.*, 564 F.3d at 984-87; *Bond v. Nat'l Fin. Servs. & JP Turner & Co. (In re U.S. Mortg. Corp.)*, 491 B.R. 642, 675 (Bankr. D.N.J. 2013); *Hechinger*, 274 B.R. 82-88.

[440] *See U.S. Bank Nat. Ass'n*, 892 F. Supp. 2d at 817 ("If Congress wished to exclude state law 'actual intent' fraudulent transfer claims from the operation of Section 546(e), it could have expressly done so.  The fact that Congress did expressly exclude Section 548(a)(1)(A) implies that it did not want to exclude state "actual intent" fraudulent transfer claims."); *AP Servs*, 483 B.R. at 68-70; *S.I.P.C. v. Madoff*, 476 B.R. 715, 722 (S.D.N.Y. 2012), *aff'd sub nom.*, *In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411 (2d Cir. 2014) ("The Trustee offers no explanation for why Congress, if it had in fact wanted to enact the general fraud exception the Trustee advocates, did not express that intention in the statute, when it did express its desire to exempt §548(a)(1)(A)."); *Picard v. Katz*, 462 B.R. 447, 453 (S.D.N.Y. 2011); *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 344 B.R. 340, 370 (W.D. Pa. 2006) ("[I]f Congress had intended to exempt from Section 546(e)'s protection allegations of actual fraud under state law fraudulent transfer theories, it could have easily done so."); *Hechinger,* 274 B.R. at 98 (finding it "clear" that Congress intended to exempt from section 546(e) state law fraudulent transfer claims brought under section 544).

[441] *See MCK Millennium Ctr. Parking*, 532 B.R. at 734 (allowing plaintiff to amend its complaint to plead a claim for actual fraudulent transfer under state law pursuant to section 544 because "[t]he safe harbor does not apply to these actual fraud claims").  As discussed in note 321, *supra*, this proposed conclusion of law was never reviewed by the district court and has since been vacated.

[442] *See, e.g.*, *Contemporary Indus.*, 564 F.3d at 988 ("Through its state law claims, CIC seeks to recover the same payments we have already held are unavoidable under §546(e). Allowing recovery on these claims would render the §546(e) exemption meaningless, and would wholly frustrate the purpose behind that section. Thus, CIC's state law claims must fail"); *U.S. Bank Nat. Ass'n*, 892 F. Supp. 2d at 824-25 (explaining that allowing recovery on an unlawful dividend claim "would render section 546(e) meaningless"); *Hechinger*, 274 B.R. at 96 ("Claims that Congress deemed unavoidable under sections 544(b) and 546(e) of the Bankruptcy Code

are a more divisive issue.  Some courts have barred these claims, finding that they qualify for section 546(e)'s safe harbor.[443]  And, it would seem logical that, if a trustee's fraudulent transfer claim brought under section 544(b) is barred by section 546(e), then the same claim brought directly under state law would be similarly barred.  After all, section 544(b) allows the trustee the right to bring any *creditor's* state law fraudulent transfer claim for the benefit of all creditors, and not some sort of federal cause of action that is independent of state law claims.  However, the application of section 546(e) to bar state law causes of action brought by a trustee or litigation trust on behalf of creditors has been sharply criticized by certain courts.

This issue of whether fraudulent transfer claims brought directly under state law (and not section 544) and state law claims such as unjust enrichment are preempted by section 546(e) is *sub judice* in the Second Circuit in multiple cases.  Specifically, in *Whyte v. Barclays Bank PLC*, the district court dismissed state law claims brought on behalf of the creditors by a litigation trust (who was also asserted federal avoidance claims), finding that such claims were implicitly preempted by section 546(e).[444]  Subsequently, another district court, also in the Southern District of New York, refused to dismiss state law fraudulent conveyance claims based on section 546(e)'s safe harbor where the creditors committee had abandoned the estate's constructive fraudulent conveyance claims and the creditors were asserting such claims individually.[445]  Thereafter, the Bankruptcy Court for the Southern District of New York aligned with the reasoning of *Tribune*, finding that section 546(e) did not bar a creditors committee or litigation trust from asserting a state law claim for fraudulent conveyance brought on behalf of the individual creditors when the estate affirmatively abandoned section 544 claims.[446]  The

---

cannot be avoided by simply re-labeling avoidance claims as unjust enrichment claims; if they could, the exemption set forth in section 546(e) would be rendered useless.").

[443]  *See AP Servs.*, 483 B.R. at 68-70 (dismissing intentional and constructive fraudulent transfer claims under section 544(b) and state law because the transfer was protected under section 546(e)); *Picard*, 462 B.R. at 453 (dismissing "all claims predicated on principles of preference or constructive fraud under the Bankruptcy Code, *as well as all claims under New York law*," where Section 546(e) barred all such claims) (emphasis added); *cf. In re Hellas Telecomms. (Luxembourg) II SCA*, 526 B.R. 499, 510 (Bankr. S.D.N.Y. 2015), (state common law claims that are based upon "facts substantially identical to *actual* fraudulent conveyance claim[s] under section 548(a)(1)(A)" not protected under Bankruptcy Code section 546(e)) (emphasis in original); *Lyondell I*, 503 B.R. at 356 (agreeing with lower court in *Tribune and holding that* §546(e) did not bar a litigation trust from bringing a state law claim for fraudulent transfer brought on behalf of the individual creditors); *Lehman Bros. Holdings Inc.*, 469 B.R. at 415 ("The plain language of section 546(e), read literally, provides limited immunity but does not bar Plaintiffs from maintaining all common law claims, intentional fraud claims and any other claims not expressly embraced by section 546(e).").

[444]  494 B.R. 196, 200-01 (S.D.N.Y. 2013).

[445]  *In re Tribune Co. Fraudulent Conveyance Litig.*, 499 B.R. 310 (S.D.N.Y. 2013).

[446]  *Lyondell I*, 503 B.R. at 356.

*Tribune* and *Whyte* cases were both appealed and jointly consolidated.[447]   On March 29, 2016, the Second Circuit issued decisions in both the *Tribune* and *Whyte* appeals.   *In re Tribune Company Fraudulent Conveyance Litigation*, ___ F.3d ___, 2016 WL 1226871, No. 13-3992-cv (2d Cir. Mar. 29, 2016), *petition for rehearing filed* (Apr. 12, 2016); *Whyte v. Barclays Bank PLC*, ___ F. App'x ___, 2016 WL 1138642, Case No. 13-2653-cv (2d Cir. Mar. 24, 2016). *Tribune* affirmed the district court's dismissal of the complaint on preemption rather than standing grounds, and *Whyte* affirmed the district court's decision "for substantially the reasons stated in [*Tribune*]."   Particularly, in *Tribune*, the Second Circuit held that section 546(e) preempts and precludes the assertion of state law constructive fraudulent conveyance claims.   In *Whyte,* the Second Circuit affirmed the district court's decision that both actual and constructive state law fraudulent conveyance claims are precluded by section 546(e).   The Examiner expresses no view on the outcome of these cases or on the likelihood that, in the absence of a confirmed plan that is supported by all classes of creditors, any creditor groups will seek, or be successful in seeking, to pursue any of these mechanisms for pursuing state law fraudulent transfer claims and/or which entity would be the proper entity to pursue such claims.

## VI. Remedies for Avoidance Actions

Avoidance of a preferential or fraudulent transfer does not automatically result in a recovery of damages by the bankruptcy estate.   Instead, avoidance of a transfer results only in nullification of the transfer.[448]   In some cases, such as the avoidance of a lien, avoidance by itself is a sufficient remedy.[449]   However, in cases where the debtor no longer has possession of the property transferred, avoidance by itself is not a sufficient remedy.[450]   Thus, section 550(a) of the Bankruptcy Code provides that "to the extent a transfer is avoided . . . the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property . . . ."[451]

### A.   Recovery of Property or Damages

Under section 550(a), the bankruptcy estate may recover either "the property transferred, or, if the court so orders, the value of such property."   The section does not specify when a court should order a return of the property rather than payment of the value of the property.   Although some cases state that the statutory language indicates a preference for the return of property,[452]

---

[447]   *See* Civil Action No. 13-2653 (2d Cir.) (argued Nov. 5, 2015).

[448]   *Yoppolo v. Liberty Mortg.* (*In re Morgan*), 276 B.R. 785, 790 (Bankr. N.D. Ohio 2001).

[449]   *In re Burns*, 322 F.3d 421, 428 (6th Cir. 2003)

[450]   *Id.* ("In the case of creditors who have possessory interests in the debtor's property, the trustee will generally have to pursue recovery, because mere avoidance would not bring the property back into the estate's possession.").

[451]   11 U.S.C. §550(a).

[452]   *Rodriguez v. Drive Fin. Servs., L.P.* (*In re Trout*), 609 F.3d 1106, 1113 (10th Cir. 2010) ("[T]he language of §550(a) suggests that the default rule is the return of the property itself, whereas a monetary recovery is a more unusual remedy to be used only in the court's

other courts, including the Seventh Circuit, state that the decision of whether to order a return of the property or recovery of damages is within the court's discretion.[453]

In exercising its discretion, the primary goal of the court is to "restore the estate to the financial condition that would have existed had the transfer never occurred."[454]   Factors to be considered include (i) whether there is evidence of the property's market value, or the evidence conflicts, [455] (ii) whether the property is unrecoverable or its value diminished by conversion or depreciation courts,[456] or (iii) value is readily determinable and a monetary award would work a savings for the estate.[457]

---

discretion."); *see also Terry v. Meredith (In re Meredith),* 367 B.R. 558, 563 (E.D. Va. 2007), *aff'd,* 527 F.3d 372 (4th Cir. 2008) ("This language evinces a Congressional preference that the property itself be returned to the estate, the value of the property being an alternative only available by court order."); *ASARCO LLC v. Ams. Mining Corp.*, 404 B.R. 150, 162 (S.D. Tex. 2009) ("it is clear that courts favor a return of the property itself if at all possible so as to avoid speculation over its value.") (citation omitted).

[453]   *Hebenstreit v. Kaur*, 619 F. App'x 529, 531 (7th Cir. 2015) ("the bankruptcy court has discretion to award the trustee the actual property *or* its pre-transfer value.").  In *Hebenstreit*, the Seventh Circuit cited to the Tenth Circuit's decision in *Trout*, but it did not discuss whether a return of property was the preferred remedy.  *See also USAA Fed. Savs. Bank v. Thacker (In re Taylor)*, 599 F.3d 880, 890 (9th Cir. 2010) ("If a bankruptcy court permits the trustee recovery, the court has discretion to award the trustee recovery of the property transferred or the value of the property transferred."); *Bank of Am., N.A. v. Veluchamy (In re Veluchamy)*, 535 B.R. 783, 800 (N.D. Ill. 2015) ("The Court reviews the bankruptcy court's decision to award money in place of the transferred property for an abuse of discretion.").

[454]   *Hebenstreit*, 619 F. App'x at 531 (noting that purpose of section 550 was "to restore a bankruptcy estate to its pre-transfer financial condition."); *Trout*, 609 F.3d at 1112 ("Bankruptcy courts have consistently held that 11 U.S.C. §550 is designed to restore the estate to the financial condition that would have existed had the transfer never occurred.").

[455]   *Taylor*, 599 F.3d at 892 (If the value of the property "cannot be easily or readily determined . . . the correct remedy is to return the property, not award an estimate of the value[.]"); *McLaughlin v. Sec. Pac. Hous. Servs. (In re McLaughlin)*, 183 B.R. 171, 176 (Bankr. W.D. Wis. 1995); *Gen. Indus., Inc. v. Shea (In re Gen. Indus., Inc.)*, 79 B.R. 124, 135 (Bankr. D. Mass. 1987); *Harris v. Scotsman Queen Prods. Div.* (*In re Handsco Distrib., Inc.*), 32 B.R. 358, 360 (Bankr. S.D. Ohio 1983); *Slutsky v. Michel Tire Co.* (*In re Vann*), 26 B.R. 148, 149 (Bankr. S.D. Ohio 1983)).

[456]   *Morris v. Kansas Drywall Supply Co.* (*In re Classic Drywall, Inc.*), 127 B.R. 874, 877 (D. Kan. 1991) ("Where the property is unrecoverable or its value diminished by conversion or depreciation, courts will permit the recovery of value.").

[457]   *Id*. ("Certainly, the term 'for the benefit of the estate' in Section 550(a) guides the court in exercising its discretion.  Presumably, the recovery of the estate will be enlarged by eliminating both the expenses of administering a sale and the risk of obtaining a lower price at the sale.")

If the value of the property declined after the transfer, then the court may award the value of the property at the time of the transfer.[458]  However, if the property appreciated in value after the transfer, the court may award either a return of the property, or the value of the property at the time of the judgment.[459]  Where the property has appreciated in value, the value is determined at the time of the judgment rather than the date of the transfer because that will "restore the estate to the position it would have occupied had the property not been transferred."[460]

### B.  Ability of Transferee to Reduce Liability by Purchase Price Paid or Cost of Improvements

#### 1.  Protection for Good Faith Transferees

##### a.  Value Given for Property

The Bankruptcy Code does provide some protections for good faith transferees. As noted in Section III.C.1 of this Appendix, under section 548(c), a good faith transferee of a fraudulent transfer "has a lien on or may retain any interest transferred" to the extent the transferee gave value for the property.[461]  Thus, to the extent a good faith transferee was the recipient of a fraudulent transfer, it may reduce the amount of any liability by the amount it paid for the property.[462]

Significantly, the protection of section 548(c) is only available to a good faith transferee.[463]  For example, in the case of *In re Veluchamy*, the court held that transferees were

<hr />

[458]  *Feltman v. Warmus (In re Am. Way Serv. Corp.)*, 229 B.R. 496, 531 (Bankr. S.D. Fla. 1999) ("If the value of the property has declined following the fraudulent transfer, returning the devalued property itself would not make the estate whole. In such instances, the courts have awarded money judgment.").

[459]  *Am. Way Serv.*, 229 B.R. at 531 ("[W]hen the property has appreciated, the trustee is entitled to recover the property itself, or the value of the property at the time of judgment.  The statute, in prescribing alternatives, is purposefully flexible to accomplish its remedial goal."); *see also Govaert v. B.R.E. Holding Co., (In re Blitstein)*, 105 B.R. 133, 137 (Bankr. S.D. Fla. 1989); *Riske v. Seitz (In re Seitz)*, 400 B.R. 707, 722 (Bankr. E.D. Mo. 2008).

[460]  *Joseph v. Madray (In re Brun)*, 360 B.R. 669, 674-75 (Bankr. C.D. Cal. 2007)

[461]  11 U.S.C. §548(c).

[462]  *Bank of Am., N.A. v. Veluchamy (In re Veluchamy)*, 524 B.R. 277, 310 n.17 (Bankr. N.D. Ill. 2014), *aff'd in part and rev'd in part*, 535 B.R. 783 (N.D. Ill. 2015) (noting that under 548(c), a good faith transferee can receive credit for any value given to the transferor).

[463]  *Hayes v. Palm Seedlings Partners-A* (*In re Agric. Research and Tech. Grp. Inc.),* 916 F.2d 528, 535 (9th Cir. 1990) ("Even if the transferee gave reasonably equivalent value in exchange for the transfer avoided on either of the alternate theories, the transferee may not recover such

not entitled to any reduction of liability based on the amount paid for the transferred property because they were active participants in the scheme to defraud creditors and, therefore, were not good faith transferees.[464]   The court provided the following example:

> [I]f A transfers a car to B, and B pays A $1,000 for the car, knowing that the transfer is intended to defraud creditors, B is liable for the value of the car, with no reduction for the $1,000 payment, even though this imposes a cost greater than the net benefit to the transferee.[465]

### b.   Cost or Value of Improvements

In addition, under section 550(e), a good faith transferee has a lien on the property to secure the lesser of (a) the cost of any improvement minus any profit realized and (b) the increase in value as a result of the improvement.[466]   As with section 548(c), the protection provided by section 550(e) is only available to good faith transferees.[467]

For purposes of section 550(e), the term "improvement" is defined to include physical additions or changes to the property transferred, repairs, payment of any tax on the property, payment of any debt secured by a lien on the property, and preservation of the property.[468]   The defined improvements all relate to real property, and the Examiner has not located any case addressing how section 550(e) applies where the property transferred was intellectual property. However, because the definition of "improvement" is non-exclusive,[469] improvements should not be limited solely to the types listed in the statute, and a good faith transferee of intellectual property should be entitled to the lien provided by section 550(e) to the extent necessary to prevent the estate from obtaining a windfall.[470]   Alternatively, as noted above, if the property at issue has been transformed so that the original property is no longer recoverable, the court would

---

value if the exchange was not in good faith because good faith is 'indispensable' for the transferee who would recover any value given pursuant to 11 U.S.C. Sec. 548(c)"); *Grant v. Podes* (*In re O'Connell*), 119 BR 311, 317 (Bankr. M.D. Fla. 1990) (denying benefit of section 550(e) to transferee that was not a good faith transferee).

[464]   *Veluchamy*, 524 B.R. at 310; *see also Ahlgren v. Dailey* (*In re Schnoor*), 510 B.R. 868, 875 (Bankr. D. Minn. 2014) ("The defendant is not a good faith transferee and therefore she is not afforded the benefit of a lien under §548(c).").

[465]   *Id.* at 310 n.17.

[466]   11 U.S.C. §550(e).

[467]   *O'Connell*, 119 BR at 317 (denying benefit of section 550(e) to transferee that was not a good faith transferee).

[468]   11 U.S.C. §550(e)(2).

[469]   *See* 11 U.S.C. §102(3) (stating that the terms "includes" and "including" are not limiting).

[470]   *Beck v. Amato (In re Amato)*, 10 B.R. 120, 123 (Bankr. S.D. Fla. 1981) (granting good faith transferee a lien to prevent windfall to the estate.).

have the discretion to award damages equal to the value of the property at the time of the transfer.

## 2.   Offset for Purchase Price

In some cases, courts have stated that the measure of recovery under section 550 is "the market value of the property at the time of the transfer, less the consideration received."[471]  The rationale for these courts is that the purpose of section 550 is to restore the estate to the financial condition it would have been in had the transfer not occurred.[472]  These cases typically do not address whether the transferee was a good faith transferee.  In *ASARCO*, however, the court allowed a transferee that had conspired with the transferor to reduce the amount of its liability by the amount of consideration paid.[473]  To the extent these decisions allow an offset even in a situation where the transferee was not a good faith transferee, the decisions would appear to be inconsistent with section 548(c) and the cases which hold that the protection of section 548(c) is available only to a good faith transferee.  Nevertheless, the statements in these cases do provide some support for the argument that where a court awards damages rather than a return of property, then the court has discretion to reduce the amount of the damages by the amount of the consideration paid by the transferee without a showing by the transferee that it took the property in good faith.

## 3.   Unsecured Claim for Transferee Under Section 502(h)

Under section 502(h) of the Bankruptcy Code, a claim arising from the recovery of property under section 550 is to be treated as a general unsecured claim.[474]  Where the recipient of a fraudulent transfer is forced to return either the transferred property or its value, then the transferee is entitled to assert a pre-petition claim in the amount of the consideration it paid for the property.[475]  Thus, to the extent a transferee is unable to take advantage of the protections

---

[471]  *Hirsch v. Stenberg (In re Colonial Realty Co.)*, 226 B.R. 513, 525 (Bankr. D. Conn. 1998) ("Courts generally agree that the market value of the property at the time of transfer, less the consideration received, is the proper measure of recovery under § 550."); *Shape, Inc. v. Midwest Eng'g, Inc. (In re Shape, Inc.)*, 176 B.R. 1, 3 (Bankr. D. Maine 1994) (allowing the trustee to recover the difference between the value of the property on the transfer date less the consideration received by the debtor).

[472]  *Colonial Realty*, 226 B.R. at 525.

[473]  *ASARCO*, 404 B.R. at 176.  Notably, in *ASARCO*, the debtor conceded that the transferee was entitled to an offset equal to the consideration paid, and it does not appear that the court ever considered the application of section 548(c).

[474]  11 U.S.C. §502(h) ("A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed . . . or disallowed . . . the same as if such claim had arisen before the date of the filing of the petition.").

[475]  *Gowan v. HSBC Mortg. Corp.* (*In re Dreier LLP*), No. 10-5456, 2012 WL 4867376 at *3 (Bankr. S.D.N.Y. 2012) ("Section 502(h) is based on the principle of fraudulent transfer law that

provided by section 548(c) or is otherwise denied the ability to offset its damages by the amount of the consideration paid, then the transferee will be entitled to a general unsecured claim against the debtor's estate pursuant to section 502(h).

There is some uncertainty regarding whether a 502(h) claim may be subject to equitable subordination.[476]  Although there is no clear answer to this question, there are several reasons why it appears that a 502(h) claim should not be subject to equitable subordination, at least where the only "misconduct" of the transferee was to receive the transfer.  First, equitable subordination is an alternative to a monetary recovery, and a plaintiff may not obtain both monetary recovery and equitable subordination based upon the same wrong.[477]  Similarly, equitable subordination of a 502(h) claim is inconsistent with the remedial nature of avoidance actions[478] and the fact that once the property (or its value) has been returned, then the estate has been restored to its original position, and there is no harm to creditors to support equitable subordination.[479] Finally, equitable subordination is only appropriate where it is not inconsistent with the provisions of the Bankruptcy Code.[480]  To allow equitable subordination based solely on

---

the return of a fraudulent transfer restores the parties to the status quo. . . . The rule of restoration only applies, however, where the transferee gave consideration for the avoided transfer.  In that circumstance, the return of the transfer entitles the transferee to the return of the consideration it paid, and the Bankruptcy Code gives the transferee an allowable unsecured claim in the amount of that consideration.  But if the transferee did not give any consideration for the fraudulent transfer, there is nothing to reinstate, and the return of the fraudulently transferred funds does not give rise to an allowable claim.") (citations and quotations omitted).

[476]   A court is allowed to subordinate claims based on the doctrine of equitable subordination pursuant to section 510(c) of the Bankruptcy Code.  For equitable subordination to apply, the claimant must have engaged in some inequitable conduct, the misconduct must have resulted in injury to creditors or conferred an unfair advantage on the claimant, and equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.  *See, e.g.*, *Benjamin v. Diamond* (*In re Mobile Steel Co.*), 563 F.2d 692 (5th Cir. 1977).

[477]   *Hirsch v. Pa. Textile Corp.* (*In re Centennial Textiles, Inc.*), 227 B.R. 606, 611 (Bankr. S.D.N.Y. 1998) (holding that equitable subordination "is an alternative remedy to monetary recovery from the wrongdoing claimant.  Consequently, a trustee cannot recover damages and equitably subordinate a claim based upon the same wrong.") (citing *ABF Capital Mgmt. v. Kidder Peabody & Co.* (*In re Granite Partners, L.P.*), 210 B.R. 508, 517 (Bankr. S.D.N.Y. 1997) (holding that "a plaintiff cannot recover damages and obtain equitable subordination for the same wrong")).

[478]   *In re Best Prods. Co.*, 168 B.R. 35, 57 (Bankr. S.D.N.Y. 1994) ("Fraudulent transfer laws . . . are remedial, rather than punitive.").

[479]   *Gowan v. Wachovia Bank, N.A.* (*In re Dreier LLP*), 453 B.R. 499, 517 (Bankr. S.D.N.Y. 2011) ("Wachovia will not be entitled to any distribution unless it returns the fraudulent transfer. In that event, the estate will have been made whole, and will not be entitled to the additional remedy of equitable subordination.").

[480]   *Mobile Steel*, 563 F.2d at 700.

receipt of an avoidable transfer would be inconsistent with section 502(h).  For these reasons, the Examiner has concluded that any claim of a transferee under 502(h) likely would not be subject to equitable subordination.

### C.   Lost Profits and Prejudgment Interest

In addition to a return of the property or its value, courts have also awarded damages based on lost profits and prejudgment interest.  This is based on the principle that the purpose of fraudulent transfer law is to restore the estate to the position it would have been in had the transfer not occurred.[481]  In *ASARCO*, in addition to ordering a return of the stock at issue, the court awarded damages equal to the amount of dividends earned on fraudulently transferred stock.[482]  The *ASARCO* court also awarded pre-judgment interest on the dividends.[483]  Other courts have similarly awarded prejudgment interest.[484]

### D.   Relevant Transferees

The trustee may only recover from the initial transferee "or the entity for whose benefit such transfer was made," or "any immediate or mediate transferee of such initial transferee."[485] An initial transferee at minimum must have "dominion over the money or other asset, the right to put the money to [its] own purposes."[486]  Therefore, an agent such as a bank or other like "financial intermediary" may be disregarded.[487]

Courts in the Seventh Circuit have differed over whether an entity with a controlling equity interest "receives a benefit" when a transfer is made to a corporate transferee.  In *In re McCook Metals, L.L.C.*, a Northern District of Illinois Bankruptcy Court held that holders of

---

[481]  *Rudin v. Steinbugler*, 103 F.2d 323, 326 (2d Cir. 1939) ("The profit, if any, which she earned from operating the pony track was derived from use of the fraudulently transferred chattels as well as from the privileges obtained from the Commissioner of Parks, and the purpose of operating in her name was to put such profits beyond the reach of her husband's creditors. Such profits equitably belonged to the husband's creditors.").

[482]  *ASARCO*, 404 B.R. 150 at 163.

[483]  *Id.*

[484]  *See, e.g., McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1339-40 (5th Cir. 1995) ("Furthermore, an award of prejudgment interest furthers the congressional policies of the Bankruptcy Code.  Section 548 allows the estate to recover fraudulent transfers made within a year before the filing of the bankruptcy petition.  The purpose of the Section is to make the estate whole.  Prejudgment interest compensates the estate for the time it was without use of the transferred funds.  We determine that the bankruptcy court did not abuse its discretion by awarding prejudgment interest.").

[485]  11 U.S.C. §550(a), quoted *supra*.

[486]  *Bonded Fin. Servs. Inc. v. European Am. Bank*, 838 F.2d 890, 893 (7th Cir. 1988).

[487]  *Id.*

equity interests in an entity that received fraudulently transferred property, can be subject to a claim to recover fraudulently transferred property when the shareholder received an actual benefit (its "share of the value of the assets"), the benefit is quantifiable, and the shareholder has a controlling interest in the corporate transferee.[488]    Other courts have agreed with *McCook Metals* or suggested similar reasoning.[489]

In *In re Hansen*, Judge Goldgar explicitly rejected the *McCook Metals* holding.[490]    He explained that *McCook Metals* "ignore[d] the fundamental nature of corporations" and that "[n]othing in section 550(a)(1) indicates that corporate form can be thrust aside and all voidable transfers to a corporation recovered from its shareholders on the mere assumption that shareholders somehow automatically 'benefit' from such transfers."[491]    Thus, Judge Goldgar held that "shareholders, officers, and directors are not liable for transfers to their corporation unless they actually received distributions of the transferred property (in which case they would be subsequent transferees under section 550(a)(2)), or a showing can be made to pierce the corporate veil."[492]    A number of courts have citied *Hensen* with approval or applied similar reasoning.[493]

An entity "for whose benefit [such] transfer was made" is mutually exclusive from the actual transferee, and must receive the benefit *at the time* of the initial transfer; thus, a subsequent transferee is never the entity for whose benefit a transfer is made.[494]    That is because

---

[488]    *Baldi v. Lynch* (*In re McCook Metals, LLC*), 319 B.R. 570, 592 (Bankr. N.D. Ill. 2005) (Wedoff, J.).

[489]    *See, e.g.*, *Terry v. Meredith* (*In re Meredith*), 357 B.R. 374, 384 (Bankr. E.D. Va. 2006), *aff'd*, 367 B.R. 558 (E.D. Va. 2007); *Felt Mfg. Co. v. Foss* (*In re Felt Mfg. Co.*), 371 B.R. 589, 643 (Bankr. D.N.H. 2007).    But these cases are in a "distinct minority."    *Brown Publ'g Co. v. Brown* (*In re Brown Publ'g Co.*), No. 12-08193-reg, 2015 WL 1009177, at *8 (Bankr. E.D.N.Y. Mar. 4, 2015) (rejecting "a broad view of section 550(a)(1) that would effectively eliminate the purpose and protection of the corporate form").

[490]    *Schechter v. 5841 Bldg. Corp.* (*In re Hansen*), 341 B.R. 638, 645 (Bankr. N.D. Ill. 2006).

[491]    *Id.*; *see also Peterson v. Hofmann* (*In re Delta Phones, Inc.*) No. 04 B 823, 2005 WL 3542667, at *6 n.4 (Bankr. N.D. Ill. Dec. 23, 2005) (Goldgar, J.) ("*McCook* fails to give corporate form—the critical legal distinction between corporations and their directors, officers, and shareholders—its due. Something more than mere "control" must be shown.").

[492]    *Hansen*, 341 B.R. at 645-46.

[493]    *See, e.g.*, *Brown Publ'g Co.*, 2015 WL 1009177, at *8; *Dietz v. Spangenberg*, 11-2600 ADM/JJG, 2013 WL 4610530, at *18 (D. Minn. Aug. 29, 2013); *Janvey v. Libyan Inv. Auth.*, 3:11-CV-1177-N, 2012 WL 1059028, at *3 (N.D. Tex. Feb. 29, 2012), *aff'd*, 478 F. App'x 233 (5th Cir. 2012); *Sher v. SAF Fin., Inc.*, No. RDB 10-1895, 2011 WL 4835700, at *2-3 (D. Md. Oct. 11, 2011); *Seidel v. Byron*, 405 B.R. 277, 292 (N.D. Ill. 2009).

[494]    *Bonded Fin. Servs.*, 838 F.2d at 894.

such a subsequent transferee is already contemplated by the statute as an "immediate or mediate" transferee.[495]

### E.   Excess Recovery:  "For the Benefit of the Estate"

As explained above, if a transfer is successfully avoided, the estate may recover under section 550(a) of the Bankruptcy Code, "for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property."[496]  The debtor therefore may seek to recover either the property or the value of the property.

The question then arises whether either form of recovery may exceed the amount of creditors' claims against the estate.  While the provision permits recovery of the property or its value, such recovery must be "for the benefit of the estate."  Parties have litigated in recent bankruptcies whether this qualification limits the recovery to the amount of unpaid creditor claims.  Most courts generally agree that so long as there is some benefit to the estate, the entire transfer can be *avoided*, and that the question of the *recovery* of the avoided transfer is separate and distinct.[497]  The legislative history supports this reading: the Bankruptcy Code "enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee."[498]  Specifically, so long as any unsecured claims exist, a trustee may recover whatever is necessary to satisfy all these claims, regardless of the amount of the claim of the particular creditor in whose shoes the trustee stepped so as to have standing to bring the particular avoidance action.[499]  But if all creditors have already been paid in full and no other benefit to the estate or its creditors can be had from additional proceeds, some courts find that no additional recovery may be had.[500]  At least one court has found no such limitation.[501]

---

[495]   *Id.* at 895; 11 U.S.C. §550(a)(2).

[496]   11 U.S.C. §550(a).

[497]   *See also Gecker v. Flynn (In re Emerald Casino), Inc.*, 11 C 4714, 2014 WL 4954453, at *139 (N.D. Ill. Sept. 30, 2014) (stating that avoidance and recovery are distinct).

[498]   H.R. Rep. No. 595, 95th Cong. 1st Sess. 375 (1977).

[499]   *Acequia, Inc. v. Clinton* (*In re Acequia, Inc.*), 34 F.3d 800, 811-12 (9th Cir. 1994).

[500]   *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 390 B.R. 80, 95 (S.D.N.Y. 2008), *aff'd*, 379 F. App'x 10 (2d Cir. 2010).

[501]   *Tronox I*, 464 B.R. at 611.  In *Tronox I*, environmental and tort creditors sought to avoid transfers of oil and gas assets, which they valued at approximately $15 billion.  The total amount of their environmental and tort claims, however, were many billions of dollars less than that amount.  The parties litigated what would happen with the excess recovery if the entire transfer were to be avoided, with the litigation trust arguing that recovery could not be capped and the defendants arguing that the plaintiffs were seeking a windfall of billions of dollars.  The *Tronox I* court held that damages could not be capped based on the amount of unpaid creditor claims.  *Id.* at 613-15.

The Seventh Circuit has held that if all creditors' claims are satisfied, then the distribution of any excess proceeds from a transfer avoided under state law pursuant to section 544(b) of the Bankruptcy Code is properly governed by state law.  In *In re FBN Foods Serv., Inc.*, the Seventh Circuit noted that many state fraudulent transfer laws require that, at least with respect to transfers involving constructive fraud, "once outside creditors have been satisfied, the transaction remains valid between the transferor and transferee."[502] In such event, any excess is retained by the transferee.  The rationale for this conclusion is that once the purpose of the Bankruptcy Code has been achieved (*i.e.*, full payment to creditors), remaining entitlements are determined by state law.[503]  In *Boyer v. Crown Stock Distribution*, the Seventh Circuit again reaffirmed this principle, stating: "[T]he fact that the debtor receives any surplus obtained by the trustee in his efforts to maximize the debtor's estate doesn't mean that the money stays there.  It can't stay there for long, since the estate is dissolved at the conclusion of the bankruptcy proceeding.  The ultimate recipients of assets remaining in the estate when it is closed depend on state law, because any federal interest has been exhausted."[504]

The rule of *FBN Food* and *Boyer* is therefore that in cases of constructive fraudulent transfers, and possibly also in cases of actual fraudulent transfers, the recovery should be sufficient to satisfy all unpaid creditor claims, and thereafter, the distribution of any excess recovery should be determined by applicable state law.  Because state law generally requires the return of any excess recovery to the transferee upon the satisfaction of all creditor claims (on the theory that the transfer is no longer a fraud against creditors), the result in the Seventh Circuit is that a constructive fraudulent transfer recovery (and possibly also an actual fraudulent transfer recovery) will generally be limited to the amount of unpaid creditor claims.[505]

## F.   Equitable Power to Reduce Recovery of Certain Creditors

Some cases have relied on equitable principles to deny recovery where the amounts recovered will be used to satisfy select creditor claims.  In the *Crescent Resources* case, the Western District of Texas held that the trustee could not avoid a transfer made by the debtor where the secured creditors to whom the recovery would be paid had full knowledge of, and in fact participated in, the challenged transfer.[506]  "Whether the [state-law] defense is consent, ratification, or estoppel, the undisputed evidence shows the original lending banks participated in the . . . [transfer] with full knowledge of the transaction they helped design."[507]  A different class

---

[502]  *In re FBN Food Servs., Inc.*, 82 F.3d 1387, 1395 (7th Cir. 1996) (Easterbrook, J.).

[503]  *Id.* at 1396 (stating "[o]nce the rules established by the Code have been exhausted, remaining entitlements come from outside bankruptcy, which is to say from state law).

[504]  *Boyer v. Crown Stock Distribution, Inc.,* 587 F.3d 787, 797 (7th Cir. 2009) (internal citation to *FBN Foods* omitted).

[505]  *See, e.g.*, *Boyer*, 587 F.3d at 797 ("If and when [the creditors] are paid in full, the wrong committed by the shareholders will have been righted and there will [be] no reason to deny their claims to whatever money is left over." (citing state-law cases)).

[506]  *Crescent Res. Litig. Trust v. Duke Energy Corp.*, 500 B.R. 464 (W.D. Tex. 2013).

[507]  *Id.* at 479.

of unsecured lenders, however, could avoid the transfer, and so the question became whether the secured lenders would nonetheless be entitled to a recovery from whatever excess existed after the unsecured lenders were paid.[508]  The court held that section 550(a) of the Bankruptcy Code provided for implied equitable powers to reduce the recovery so that the secured lenders would not benefit.[509]

Although the Seventh Circuit has not addressed such a factual scenario, in *dicta* it has repudiated "equitable" interpretations of section 550(a) of the Bankruptcy Code that are inconsistent with the section's plain language.  In *Bonded Financial Services*, the court noted, in its discussion of the meaning of "initial transferee," that some courts had relieved lenders of a strict construction of the text in certain apparently inequitable circumstances.[510]  The court expressed "serious doubts . . . about the propriety of judges' declining to enforce statutes that produce inequitable results."[511]

## VII.  Avoidance Actions: Aiding and Abetting Liability

Given the Examiner's findings that many of the transactions investigated may be subject to avoidance under the Bankruptcy Code and the UFTA, the issue of aiding and abetting liability is relevant.  Most courts have held that a debtor in bankruptcy does not have a cause of action to recover damages for "aiding and abetting" a fraudulent transfer under state or federal law.[512]  One bankruptcy court in Illinois, however, has found that the Illinois UFTA does recognize such a claim.[513]  The recognition of this cause of action may be of no practical significance, however, because Bankruptcy Code section 550 governs the remedy for both federal and state fraudulent transfer claims, and it does not authorize recovery against an aider or abettor who did not receive the wrongfully transferred property or its benefit.[514]  For these and the reasons discussed below,

---

[508]  *Id.* at 480.

[509]  *Id.* at 480-83.

[510]  *Bonded Fin. Servs. Inc. v. European Am. Bank (In re Bonded Fin. Servs., Inc.)*, 838 F.2d 890, 894 (7th Cir. 1988).

[511]  *Id.*

[512]  *See Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 203 (Del. Ch. 2006), *aff'd sub nom.*, *Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) ("Despite the breadth of remedies available under state and federal fraudulent conveyance statutes, those laws have not been interpreted as creating a cause of action for 'aiding and abetting.'  Rather . . . the only proper defendants in a fraudulent conveyance action under federal bankruptcy law or [the UFTA] are the transferor and any transferees.").

[513]  *Paloian v. Greenfield (In re Rest. Dev. Grp., Inc.)*, 397 B.R. 891, 897 (Bankr. N.D. Ill. 2008).

[514]  11 U.S.C. §550(a) ("[T]o the extent that a transfer is avoided under section 544, . . . [or] 548 . . . of this title, the trustee may recover . . . from—(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."); *see also Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners L.P.* (*In re Fedders N. Am., Inc.*), 405 B.R. 527, 548-49 (Bankr. D. Del. 2009)

the Examiner does not believe any viable claim for aiding and abetting a fraudulent transfer can or should be asserted by or on behalf of the Debtors' estates.

## A.   Aiding and Abetting a Fraudulent Transfer

### 1.   Fraudulent Transfer Claims under Section 548 of the Bankruptcy Code

Courts have held that "the authorities are . . . clear that there is no such thing as liability for aiding and abetting a fraudulent conveyance or conspiracy to commit a fraudulent transfer as a matter of federal law under the [Bankruptcy] Code."[515]  This is consistent with opinions under the prior Bankruptcy Act, where the courts held that "the general rule . . . is that one who did not actually receive any of the property fraudulently transferred . . . will not be liable for its value, even though he may have participated or conspired in the making of the fraudulent transfer."[516]  The rationale for this holding is that the fraudulent transfer provisions of the Act are "clearly to preserve the assets of the bankrupt; they are not intended to render civilly liable all persons who may have contributed in some way to the dissipation of those assets."[517]  As a result, there is no

---

(noting that courts have pointed to section 550 as support for denying the trustee's ability to bring a claim for aiding and abetting).

[515]  *Fedders N. Am., Inc.*, 405 B.R. at 549; *accord Buchwald v. The Renco Grp., Inc.* (*In re Magnesium Corp. of Am.*), 399 B.R. 722, 771 (Bankr. S.D.N.Y. 2009) (citing *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 n.4 (2d Cir. 1979) (construing predecessor language under former Bankruptcy Act, stating that district court acted properly in dismissing claim against individual who did not hold or receive allegedly fraudulently transferred property); *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 738 (1st Cir. 1982) (same); *Jackson v. Star Sprinkler Corp. of Fla.*, 575 F.2d 1223, 1234 (8th Cir. 1978) (same)); *GATX Corp. v. Addington*, 879 F. Supp. 2d 633, 644 (E.D. Ky. 2012) (same); *see also Krol v. Wilcek* (*In re H. King & Assocs.*), 295 B.R. 246, 293 (Bankr. N.D. Ill. 2003) ("[A] trustee cannot succeed in an action brought under section 548 against a party who has not received any property or benefit from either the debtor or the debtor's transferee, immediate or mediate."); *Liebmann v. Pucci* (*In re Ampat S. Corp.*), 128 B.R. 405, 411 (Bankr. D. Md. 1991) (holding that the trustee could not succeed in an action against a defendant that did not receive the property transferred).

[516]  *Mack v. Newton*, 737 F.2d 1343, 1357-58 (5th Cir. 1984) (citing *Elliott v. Glushon*, 390 F.2d 514 (9th Cir. 1967)); *see also Jackson*, 575 F.2d at 1234 (holding that "recovery under the Bankruptcy Act does not extend to permit a judgment against 'conspirators' who did not receive the property transferred").  A number of courts have cited Bankruptcy Act cases as authority for actions under the Bankruptcy Code.  *See, e.g.*, *Miller v. McCown De Leeuw & Co.* (*In re Brown Sch.*), 386 B.R. 37, 59 (Bankr. D. Del. 2008) (citing *Mack*, 737 F.2d at 1357; *Jackson*, 575 F.2d at 1234; *Elliott*, 390 F.2d at 516); *Magten Asset Mgmt. Corp. v. Paul Hastings Janofsky & Walker LLP*, No. Civ.A.04-1256-JJF, 2007 WL 129003, at *2 (D. Del. Jan. 12, 2007) (citing *Mack*, 737 F.2d at 1357; *Robinson*, 685 F.2d at 737 n.10; *Jackson*, 575 F.2d at 1234); *H. King & Assocs.*, 295 B.R. at 293 (citing *Mack*, 737 F.2d at 1357).

[517]  *Mack*, 737 F.2d at 1358 (quoting *Elliott*, 390 F.2d at 516).

cause of action for aiding and abetting a Bankruptcy Code section 548 fraudulent transfer claim against a person or entity that did not receive the transferred property or its benefit.[518]

## 2.  Fraudulent Transfer Claims Under Section 544 of the Bankruptcy Code

A majority of courts similarly hold that no cause of action for aiding and abetting fraudulent transfers exists under the applicable state law fraudulent conveyance statutes and have declined to impose liability for fraudulent transfers on third parties who did not receive the transferred assets.[519]  New York, Delaware and Nevada in particular have expressly declined to recognize such a claim.[520]

A minority of courts, however, have recognized such a claim.[521]  For instance, in *In re Restaurant Dev. Group, Inc.*, the Northern District of Illinois Bankruptcy Court explained that

---

[518]  *Fedders N. Am., Inc.*, 405 B.R. at 548-49; *Magnesium Corp.*, 399 B.R. at 771; *GATX Corp.*, 879 F. Supp. 2d at 644; *Fundacion Presidente Allende v. Banco de Chile*, No. 05 CV 9771 (GBD), 2006 WL 2796793, at *3 (S.D.N.Y. May 29, 2006) (citing *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 737 (S.D.N.Y. 1993)); *Atlanta Shipping Corp. v. Chem. Bank*, 631 F. Supp. 335, 348 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 240 (2d Cir. 1987).

[519]  *Bank of Am., N.A. v. F.D.I.C.*, 908 F. Supp. 2d 60, 89 (D.D.C. 2012) (citing cases for the proposition that "a majority of courts interpreting state UFTA statutes have declined to impose liability for fraudulent transfers on third parties who did not receive the assets in question"); *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.*, No. 1:03-CV-0132-DFH, 2004 WL 771230, at *14 (S.D. Ind. 2004) (surveying several cases holding that there is no accessory liability for fraudulent transfers under the UFTA and noting that the court is not permitted to assign liability where the Act did not); *Freeman v. First Union Nat'l Bank*, 865 So. 2d 1272, 1275-77 (Fla. 2004) (the UFTA was not intended "to serve as a vehicle by which a creditor may bring a suit against a non-transferee party . . . for monetary damages arising from the non-transferee's alleged aiding-abetting of a fraudulent money transfer").

[520]  *Mendelsohn v. Paragon Mortg. Bankers Corp.* (*In re Parker*), 399 B.R. 577, 580-81 (Bankr. E.D.N.Y. 2009) (citations omitted) ("The weight of authority holds that New York law does not recognize a cause of action against parties for aiding and abetting a fraudulent conveyance because . . . the parties were neither transferees of the assets nor beneficiaries of the conveyance."); *Edgewater Growth Capital Partners, L.P. v. H.I.G. Capital, Inc.*, No. 3601-VCS, 2010 WL 720150, at *3 (Del. Ch. Mar. 3, 2010); *Trenwick*, 906 A.2d at 203; *Brown Sch.*, 386 B.R. at 58 (dismissing a claim for aiding and abetting fraudulent transfers, because such a claim was not permitted under Delaware law (citing *Trenwick*, 906 A.2d at 203) or the Bankruptcy Code (citing *Jackson*, 575 F.2d at 1234 and *Elliott*, 390 F.2d at 516)); *Cadle Co. v. Woods & Erickson, LLP*, 345 P.3d 1049, 1052 (Nev. 2015) ("nontransferees, *i.e.*, those who have not received or benefited from the fraudulently transferred property, are not subject to accessory liability for fraudulent transfer claims").

[521]  *See, e.g., GATX Corp.*, 879 F. Supp. 2d at 648; *see, e.g., Rest. Dev. Grp.*, 397 B.R. at 897; *Wyle v. Howard, Weil, Labouisse, Friedrichs Inc.* (*In re Hamilton Taft & Co.*), 176 B.R. 895, 902, *aff'd*, 196 B.R. 532 (Bankr. N.D. Cal. 1995) (citing *Taylor v. S & M Lamp Co.*, 190 Cal.

"Illinois courts . . . have recognized aiding and abetting liability for fraudulent conveyances."[522] Under Illinois law, to state a claim for aiding and abetting, one must allege "(1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation."[523]   Similarly, one New Jersey state court decision suggests, without much analysis, that a claim for aiding and abetting a fraudulent transfer exists under New Jersey law.[524] As a result, it may be possible to assert a cause of action for aiding and abetting a fraudulent transfer under the state UFTA laws in a minority of states, including Illinois and New Jersey.

### 3.   Bankruptcy Code Section 550 and Aiding and Abetting Liability

Sections 544 and 548 of the Bankruptcy Code authorize a debtor to assert fraudulent transfer claims only to avoid the fraudulent transfer.[525]   As explained above, once a transfer is avoided under either of these sections, Bankruptcy Code section 550 provides that the recovery of the property transferred, or its value, can be had from "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee."[526]   This provision, therefore, limits the universe of

---

App. 2d 700, 706, 12 Cal. Rptr. 323 (1961); *Hickson v. Theilman*, 147 Cal. App. 2d 11, 15, 304 P.2d 122 (1956)).

[522] *Rest. Dev. Grp.*, 397 B.R. at 897 (citing *Firstar Bank, N.A. v. Faul*, 2001 WL 1636430, at *6-7 (N.D. Ill. Dec. 20, 2001) ("Illinois law permits a cause of action for fraud against any party who participates in a fraud, and we see no reason not to extend this rule to fraudulent conveyances."); *Colman v. Greenfield*, No. 05 C 3894, 2005 WL 2592538, at *1-3 (N.D. Ill. Oct. 11, 2005) (denying the non-transferee defendants' motion to dismiss the aiding and abetting fraudulent transfer claims "[b]ecause the court concludes that a cause of action exists under Illinois law for aiding and abetting")).  *But see Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.)*, 377 F. Supp. 2d 390, 417 (S.D.N.Y. 2005) (holding that aiding and abetting claims do not exist under the Illinois UFTA and recognizing that courts have been reluctant to impose such liability absent statutory authorization).

[523] *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. Ct. App. 2003)).

[524] *Gilvey v. Creative Dimensions in Educ., Inc.*, No. L-11-09, 2012 WL 3656332, at *4 (N.J. Super. App. Ct. Div. 2012) (permitting plaintiff to amend complaint to add claim for aiding and abetting a fraudulent transfer because state law recognized a claim for aiding and abetting fraud).

[525] *Fedders N. Am., Inc.*, 405 B.R. at 549-49; *Official Unsecured Claims Rep. v. BLR Servs. SAS (In re Teligent, Inc.)*, 307 B.R. 744, 749 (Bankr. S.D.N.Y. 2004) (quoting *Goldin v. Primavera Familienstiftung, Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 324 (Bankr. S.D.N.Y. 1996)); *Hamilton Taft*, 176 B.R. at 902; *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 656 (Bankr. S.D. Ohio 2006) ("It is only the power 'to avoid' transfers or obligations that the trustee receives through §544(b).") (quoting *Kleven v. Stewart (In re Myers)*, 320 B.R. 667, 669 (Bankr. N.D. Ind. 2005)).

[526] *See* 11 U.S.C. §550(a).

defendants against whom a recovery can be had on a 544 or 548 fraudulent transfer claim to the transferees who received the fraudulently transferred property or its benefit.[527]

As a result, even where courts have recognized the existence of an action for aiding and abetting a fraudulent transfer under state law, "bankruptcy courts have refused to permit trustees [debtors] to use section 544(b) to pursue such a claim":[528]

> Courts have also cited the language of Bankruptcy Code section 550 as support for the idea that Congress did not intend to empower trustees to assert damage claims under state law for aiding and abetting a fraudulent transfer . . . . [U]nder the Code, the trustee's remedy for an avoided transfer is addressed by a specific statutory provision, section 550, and that provision only allows the trustee to recover up to the amount of the transfer from a transferee, or a party for whose benefit the transfer was made. . . . [T]o allow any other recovery could lead to a result that expands remedies beyond section 550, and . . . the court cannot invoke state law remedies to circumvent or undermine the specific remedy legislated by Congress for the avoidance of a fraudulent transfer.[529]

Accordingly, it is highly unlikely, in the Examiner's view, that the Debtors' estates would be able to pursue a damages claim for aiding and abetting a fraudulent transfer premised on either Bankruptcy Code sections 544(b) or 548.

## VIII.   Single Entity Theories of Liability

### A.   Substantive Consolidation

Substantive consolidation is an equitable doctrine which results in "the assets and liabilities of separate and distinct legal entities [being] combined in a single pool and treated as if

---

[527] *Fedders N. Am., Inc.*, 405 B.R. at 548-49; *Cf. Sherman v. FSC Realty LLC* (*In re Brentwood Lexford Partners, LLC*), 292 B.R. 255 (Bankr. N.D. Tex. 2003) (holding a trustee's remedy for an avoided transfer under the Texas UFTA is limited by section 550 which only allows the trustee to recover up to the amount of the transfer from a transferee, or a party for whose benefit the transfer was made); *Fisher v. Knoppe* (*In re Fisher*), No. 12-2226, 2014 WL 8276560, at *11 (Bankr. S.D. Ohio Dec. 22, 2014) (limiting recovery under Bankruptcy Code section 550(a) to parties who are direct or indirect transferee or for whose benefit the transfer was made.).

[528] *Fedders N. Am., Inc.*, 405 B.R. at 548-49 (citing *Hamilton Taft*, 176 B.R. at 895 (holding that a bankruptcy trustee is not authorized to pursue every state law action that creditors of the debtor might pursue, only those that the Bankruptcy Code expressly allows the trustee to pursue and Bankruptcy Code section 544(b) "only permits the trustee to avoid a fraudulent transfer")); *see also Indus. Enters. of Am. v. Mazzuto* (*In re Pitt Penn Holding Co.*), 484 B.R. 25, 48 (Bankr. D. Del. 2012); *Tronox*, 429 B.R. at 10; *Canyon Sys. Corp.*, 343 B.R. at 656; *Myers*, 320 B.R. at 669.

[529] *Fedders N. Am., Inc.*, 405 B.R. at 549 (discussing *Brentwood Lexford Partners*, 292 B.R. at 255) (internal citations and quotation marks omitted); *see also Tronox*, 429 B.R. at 103; *Pitt Penn Holding*, 484 B.R. at 48.

they belong to one entity."[530]   Substantive consolidation is designed to ensure the equitable treatment of creditors.[531]   Although the Bankruptcy Code does not expressly address substantive consolidation, the authority to order substantive consolidation has been held to derive from section 105(a) of the Bankruptcy Code, which gives judges the power to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[532] Because substantive consolidation is not derived from the express language of the Bankruptcy Code, much of the case law is fact specific and, at times, inconsistent.[533]

While courts generally recognize a bankruptcy court's equitable power to substantively consolidate debtor entities – at least where extraordinary circumstances are present – there is a split of authority over whether a bankruptcy court also has the authority to consolidate a debtor and a non-debtor.   While not as commonly requested as substantive consolidation of multiple debtor entities (and far more controversial), most courts which have addressed the issue have held that substantive consolidation of non-debtor entities is permissible.[534]   The Seventh Circuit has not yet had the opportunity to address this issue, but it has stated that "[t]he fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness."[535]

## 1.   Legal Standards for Substantive Consolidation

There are three competing approaches to determining the propriety of substantive consolidation, represented by the decisions of the Second, Third and Eleventh Circuits in *Union*

---

[530]   *Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (Babcock & Wilcox Co.),* 250 F.3d 955, 959 n.5 (5th Cir. 2001).

[531]   *See Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 764 (9th Cir. 2000).

[532]   11 U.S.C. §105(a); *Bonham*, 229 F.3d at 764 (Bankruptcy Code section 105(a) confers power to order substantive consolidation).

[533]   *See In re Crown Mach. & Welding*, 100 B.R. 25, 27-28 (Bankr. D. Mont. 1989).

[534]   *See, e.g.*, *Kapila v. S & G Fin. Servs. (In re S & G Fin. Servs. of S. Fla., Inc.)*, 451 B.R. 573 (Bankr. S.D. Fla. 2011); *Simon v. New Center Hosp. (In re New Center Hosp.0)*, 187 B.R. 560 (E.D. Mich. 1995); *White v. Creditors Serv. Corp. (In re Creditors Serv. Corp.)*, 195 B.R. 680 (Bankr. S.D. Ohio 1996); *Bracaglia v. Manzo (In re United Stairs Corp.)*, 176 B.R. 359 (Bankr. D.N.J. 1995); *see also Bonham,* 229 F.3d at 764 ("Without the check of substantive consolidation, debtors could insulate money through transfers among intercompany shell corporations with impunity.").   *But see In re Pearlman,* 462 B.R. 849, 853 (Bank. M.D. Fla. 2012) (collecting cases where courts hold they do not have the power to order substantive consolidation of non-debtor entities).

[535]   *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 791 F.2d 524, 528 (7th Cir. 1986).

*Savings Bank v. Augie/Restivo Baking Co,*[536] *In re Owens Corning*[537] and *Eastgroup Props. v. S. Motel Ass'n.*[538]

### a. Single Economic Unit and Entanglement

In *Augie/Restivo*, the Second Circuit identified two factors relevant to evaluating a request for substantive consolidation: "(i) whether creditors dealt with the entities as a single economic unit and did not rely on their separate identity in extending credit or (ii) whether the affairs of the debtors are so entangled that consolidation will benefit all creditors."[539]

In discussing the first factor, the Second Circuit noted that substantive consolidation is improper when creditors "do not anticipate either having the assets of a more sound company available in the case of insolvency or having the creditors of a less sound debtor compete for the borrower's assets."[540] These expectations are "important to the efficiency of credit markets" and "[s]uch efficiency will be undermined by imposing substantive consolidation in circumstances in which creditors believed they were dealing with separate entities."[541] In discussing the second factor, the court explained that commingling can justify substantive consolidation "only where the time and expense necessary even to attempt to unscramble them is so substantial as to threaten the realization of any net assets for all the creditors, or where no accurate identification and allocation of assets is possible."[542] "In such circumstances, all creditors are better off with substantive consolidation."[543]

---

[536] *Union Savs. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515 (2d Cir. 1988).

[537] *In re Owens Corning*, 419 F.3d 195 (3d Cir. 2005).

[538] *Eastgroup Props. v. S. Motel Ass'n, Ltd.*, 935 F.2d 245 (11th Cir. 1991).

[539] *Augie/Restivo*, 860 F.2d at 518 (citations omitted). Note that the Ninth Circuit has adopted the *Augie/Restivo* test. *See Bonham*, 229 F.3d at 766.

[540] *Id.* at 518-19.

[541] *Id.*

[542] *Id.* at 519 (citation omitted). However, a recent bankruptcy court decision held that it was not mandatory for a party seeking substantive consolidation to establish either of the Bonham factors to successfully motion for substantive consolidation. *In re Bashas' Inc.*, 437 B.R. 874, 929 (Bankr. D. Ariz. 2010) ("[Bonham] did not require bankruptcy courts to look only to the two [factors]."). Instead, the court focused on whether consolidation was "reasonable under the circumstances" based on a balancing of equities. *Id.* The court granted the debtors' request for substantive consolidation because the creditors had failed to show that consolidation would cause them any prejudice, even though "the reason for the consolidation request [was] purely for convenience." *See id.* at 928-29.

[543] *Id.*

Although only one of these rigorous factors need be satisfied,[544] the Second Circuit has clearly cautioned that courts may not order substantive consolidation merely because it will benefit creditors of both debtors.[545]   Rather, it is viewed as an extraordinary remedy that is rarely applied in chapter 11 cases.[546]

**b.** *Owens Corning* **Test**

In a second test for substantive consolidation, the Third Circuit in *Owens Corning* stated that the principles to be advanced when considering substantive consolidation include:

1.   Limiting the cross-creep of liability by respecting entity separateness . . . absent compelling circumstances calling equity (and even then only possibly substantive consolidation) into play;

2.   The harms substantive consolidation addresses are nearly always those caused by the *debtors* . . . who disregard separateness;

3.   Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play;

4.   Indeed, because substantive consolidation is extreme (it may affect profoundly creditors' rights and recoveries) and imprecise, this "rough justice" remedy should be rare and, in any event, one of last resort after considering and rejecting other remedies (for example, the possibility of more precise remedies conferred by the Bankruptcy Code); and

5.   While substantive consolidation may be used defensively to remedy the identifiable harms caused by entangled affairs, it may not be used offensively (for example, having a primary purpose to disadvantage tactically a group of creditors in the plan process or to alter creditor rights).[547]

In addition to considering these principles, the Third Circuit specifically requires that "(i) prepetition [the debtors must have] disregarded separateness so significantly [that] their creditors relied on the breakdown of entity borders and treated them as one legal entity";[548] or

---

[544]   *Bonham*, 229 F.3d at 766 ("[t]he presence of either factor is a sufficient basis to order substantive consolidation"); *see also Reider v. F.D.I.C. (In re Reider)*, 31 F.3d 1102, 1108 (11th Cir. 1994) ("presence of either factor justifies substantive consolidation"); *Standard Brands*, 154 B.R. at 572 ("[t]he two prongs of the Augie/Restivo test are in the alternative").

[545]   *Augie/Restivo*, 860 F.2d at 520.

[546]   *Bonham*, 229 F.3d at 766.

[547]   *Owens Corning*, 419 F.3d at 211.

[548]   *Id.*

that "(ii) postpetition [the debtors'] assets and liabilities [must be] so scrambled that separating them is prohibitive and hurts all creditors."[549] Opponents only need to show that "they are adversely affected and actually relied on debtors' separate existence" in order to defeat a *prima facie* showing.[550]

### c. Identity and Consolidation

In a third test for substantive consolidation, the Eleventh Circuit has held that the remedy is appropriate where "(1) there is substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit."[551] Both elements are required. Once the proponent has established these elements, the burden then shifts to the objecting creditor to show that (a) it reasonably relied on the separate credit of one of the entities and (b) it will be prejudiced by consolidation.[552] If the creditor makes the required showing, the court may order consolidation, but "only if it determines that the demonstrated benefits of consolidation 'heavily' outweigh the harm."[553] Shortly after the *Eastgroup Properties* case was decided, the Eighth Circuit adopted a very similar test.[554]

Given the absence of any Seventh Circuit rulings on substantive consolidation, lower courts have been at liberty to adopt their own approach. Many appear to follow the approach adopted by the Third Circuit in *Owens Corning*.[555] While substantive consolidation is viewed as an extraordinary remedy "vitally affecting substantive rights, [and which is] to be used sparingly,"[556] it is occasionally employed in chapter 11 cases. For example, in *In re Schwinn Bicycle Co.*,[557] the estates were consolidated in a limited manner. In particular, the court clarified that such consolidation did not have retroactive effect, nor did it have the effect of actually merging the identities of separate debtors.[558] The ruling was issued in response to

---

[549] *Id.*

[550] *Id.* at 212.

[551] *Eastgroup Props.*, 935 F.2d at 249.

[552] *Id.*

[553] *Id.*

[554] *See First Nat'l Bank of El Dorado v. Giller (In re Giller)*, 962 F.2d 796, 799 (8th Cir. 1992) stating ("[f]actors to consider when deciding whether substantive consolidation is appropriate include (1) the necessity of consolidation due to the interrelationship among the debtors; (2) whether the benefits of consolidation outweigh the harm to creditors; and (3) prejudice resulting from not consolidating the debtors") (citation omitted).

[555] *See, e.g.*, *In re Bauman*, Nos. 12-81285, 12-81287, 2015 WL 4627951, at *5 (Bankr. C.D. Ill. Aug. 3, 2015); *Paloian v. LaSalle Nat'l Ass'n* (*In re Doctors Hosp. of Hyde Park, Inc.*), 507 B.R. 558, 717 (Bankr. N.D. Ill. 2013).

[556] *Augie/Restivo*, 860 F.2d at 518 (internal citation omitted).

[557] 205 B.R. 557 (Bankr. N.D. Ill. 1997).

[558] *Id.* at 571-72.

arguments made by a preference defendant who urged that it should be permitted to assert a new value defense by aggregating all new value it provided to the various merged entities. The court disagreed:

> The Defendant asserts not merely that the Court's December 22, 1993, Consolidation Order should have retroactive effect back to the Petition Date despite prospective application by its terms, but also that it should be effective to warrant treating the several separate Debtors as if they had actually merged prior to or during the preference period.[559]

The court described the defendant's argument as "misplaced," because it failed to recognize that avoidance actions and their corresponding defenses are determined by the transactions as they actually happened among creditors and separate debtors during the prepetition period.[560] These transactions are unaffected by subsequent order for substantive consolidation.[561]

In *In re Kimball Hill, Inc*., another bankruptcy court from the Northern District of Illinois also applied substantive consideration pursuant to a plan which was initially accepted by creditors.[562] Thereafter, the plan administrator objected to all but one of each creditor's claims on the ground they were duplicative since the plan provided for a recovery against a single Kimball Hill entity rather than multiple such entities. Creditors opposed the administrator's claim objections in what the court characterized as a "very, very late objection" to substantive consolidation.[563] In rejecting the creditors' arguments, the court held that even though there is a "well-established presumption against the use of substantive consolidation," it nonetheless should be applied in the instant case because the plan had been confirmed without objection by creditors.[564]

While substantive consolidation was permitted in these two instances, the remedy remains highly disfavored and rarely applied.[565]

---

[559] *Id.*

[560] *Id.*

[561] *Id.*

[562] *Fid. & Deposit Co. of Md. v. U. S. Bank Nat'l Ass'n* (*In re Kimball Hill, Inc.*), No. 13 C 07146, 2014 WL 5615650 (Bankr. N.D. Ill 2014).

[563] *Id.* at *2.

[564] *Id.* at *3.

[565] *See Raymond Prof'l Grp., Inc., v. William A. Pope Co. (In re Raymond Prof'l Grp., Inc.*), 438 B.R. 130, 138 (Bankr. N.D. Ill. 2010); *aff'd*, Nos. 09 C 6037, 10 C 5325, 2011 WL 528551 (N.D. Ill. Feb. 8, 2011); *$R^2$ Invs. LDC v. World Access, Inc. (In re World Access, Inc.)* 301 B.R. 217 (Bankr. N.D. Ill. 2003).

## B. Piercing the Corporate Veil

The doctrine of piercing the corporate veil allows a plaintiff to hold a person or entity behind a company (i.e., a shareholder) liable for the company's obligations.[566]  This remedy is often sought to be applied where one entity is merely the "alter ego" or business conduit of another.[567]  Piercing the corporate veil is not an independent cause of action, but an equitable remedy which is used to shift liability from one entity to another.[568]

It is a fundamental principle of corporate law that a corporation is a separate legal entity from its shareholders.[569]  Thus, shareholders generally have the protection of limited liability for the acts of any corporation in which they have interests.[570]  Even so, piercing the corporate veil is an equitable doctrine which courts should invoke "reluctantly," "with caution," and only after the creditor has met a "substantial burden."[571]

### 1. Legal Standards for Piercing the Corporate Veil

#### a. New York

Under New York law, "the party seeking to pierce a corporate veil [must] make a two-part showing: (i) that the owner [*or officer*] exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil."[572]  Even if the fraud required by the second prong of the test is absent, however, piercing may still apply in certain circumstances.  In particular, "[t]he corporate veil will be pierced to achieve equity, even absent fraud, when a corporation has been so dominated by an individual or another corporation and its separate entity so ignored that it primarily transacts the dominator's business instead of its own and can be called the other's alter ego."[573]  New York courts consider the following factors when deciding whether or not an owner has abused the privilege of conducting business in the corporate form:

---

[566] *Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009).

[567] *Brown v. Real Estate Res. Mgmt.* (*In re Polo Builders, Inc.*), 388 B.R. 338, 383 (Bankr. N.D. Ill. 2008).

[568] *See, e.g.*, *United States v. All Meat & Poultry Prods. Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823, 833 (N.D. Ill. 2007).

[569] *Swartz v. Billingsley* (*In re Billingsley*), 338 B.R. 372, 375 (Bankr. D. Ill. 2006).

[570] *Secon Serv. Sys. v. St. Joseph Bank & Tr.*, 855 F.2d 406, 413 (7th Cir. 1988).

[571] *See, e.g.*, *In re Wallen*, 633 N.E. 2d 1350, 1357 (Ill. Ct. App. 1994); *Superior Coal Co. v. Dep't Fin.*, 36 N.E. 2d 354, 360 (Ill. 1941); *Kelsey Axle & Brake Div. v Presco Plastics, Inc.*, 543 N.E. 2d 239, 243 (Ill. Ct. App. 1989).

[572] *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997) (citation omitted); *see also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 138 (2d Cir. 1991).

[573] *John John, L.L.C. v. Exit 63 Dev. LLC*, 826 N.Y.S. 2d 657, 658 (N.Y. App. Div. 2006).

(1) failure to adhere to corporate formalities, (2) inadequate capitalization, (3) commingling of assets and (4) use of corporate funds for personal use.[574]

### b. Delaware

Delaware courts may also recognize veil piercing "when one seeks to hold liable an . . . owner who controls the [company]."[575]  Even some courts only allow the remedy "where there is fraud or where [the corporation] is in fact a mere instrumentality or alter ego of its owner."[576] The state's "alter ego" theory requires (1) that the corporation and its principals operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present.[577]  In applying these factors, courts must determine that the corporate form was used to perpetuate fraud or injustice[578] and the degree of control must be "exclusive domination and control . . . to the point that [the person sought to be held liable] no longer ha[s] legal or independent significance of [his] own."[579]

To determine the propriety of applying a veil piercing remedy, Delaware courts consider whether (1) the debtor was undercapitalized; (2) there was a failure to observe corporate formalities; (3) a dividend was paid; (4) the debtor was insolvent; (5) the dominant stockholder siphoned funds from the debtor; (6) there was an absence of corporate records; and (7) the debtor was a facade for the operations of its stockholder.[580]  All of these factors may be weighted differently depending on the circumstances of the case and Delaware decisions are generally fact-intensive.

Respect for the corporate form is so fundamental in Delaware that the usual preponderance of the evidence test is not used.  Rather, "the appropriate standard of proof by which one must prove a case for piercing of the corporate veil under Delaware law is, if not a

---

[574] *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 127 (2d Dep't 2009) (citation and quotation marks omitted).

[575] *Burtch v. Opus, L.L.C.* (*In re Opus E., L.L.C.*), 480 B.R. 561, 570 (Bankr. D. Del. 2012) (quoting *E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 333 n.7 (3d Cir. 2000)).

[576] *See, e.g., Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 793 (Del. Ch. 1992).

[577] *See, e.g., Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (applying Delaware law).

[578] *See Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 267 (D. Del. 1989); *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 473 (D. Del. 2010).

[579] *Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) (citing *Hart Holding Co. v. Drexel Burnham Lambert, Inc.*, No. 11514, 1992 WL 127567 (Del. Ch. May 28, 1992)).

[580] *United States v. Pisani*, 646 F.2d 83, 88 (3d Cir. 1981); *see also Nat'l Elevator Indus. Pension Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir. 2003).

clear and convincing evidence standard, at least somewhat greater than merely a preponderance of the evidence standard."[581]

### c. Nevada

Although Nevada courts recognize the doctrine of veil piercing, the remedy is very rarely applied.[582]  The state did not adopt the doctrine until 1949 and from 1987 to 2007, there was only one successful case in which a veil was pierced.  Where requested, the Nevada Supreme Court applies a three-part test for deciding whether to allow for veil piercing: (1) the corporation must be influenced and governed by the person asserted to be its alter ego; (2) there must be such unity of interest and ownership that one is inseparable from the other; and (3) the facts must be such that adherence to the fiction of separate entity would, under the circumstances, sanction a fraud or promote injustice.[583]  Nevada precedent clarifies that "it is not necessary that the plaintiff prove actual fraud[; rather,] [i]t is enough if the recognition of the two entities would result in an injustice."[584]

The preceding test has since been codified by Nevada statute and reads as follows:

(1)    Except as otherwise provided by specific statute, no stockholder, director or officer of a corporation is individually liable for a debt or liability of the corporation, unless the stockholder, director or officer acts as the alter ego of the corporation.

(2)    A stockholder, director or officer acts as the alter ego of a corporation if:

(a)    The corporation is influenced and governed by the stockholder, director or officer;

(b)    There is such unity of interest and ownership that the corporation and the stockholder, director or officer are inseparable from each other; and

---

[581]    *Brown v. GE Capital Corp. (In re FoxMeyer Corp.)*, 290 B.R. 229, 237 (Bankr. D. Del. 2003); *see also  Linear Films, Inc.*, 718 F. Supp. 260 at 270.

[582]    The "corporate cloak is not lightly thrown aside"; however, the court will disregard that "cloak" if "adherence to the fiction of a separate entity . . . [would] sanction a fraud or promote injustice."  *Baer v. Amos J. Walker*, Inc., 452 P.2d 916 (Nev. 1969); *N. Arlington Med. Bldg., Inc. v. Sanchez Constr.*, 471 P.2d 240, 243 (Nev. 1970).

[583]    *LFC Mktg. Group, Inc. v. Loomis*, 8 P.3d 841, 846 (Nev. 2000); *see also Frank McCleary Cattle Co. v. Sewell*, 317 P.2d 957, 959 (Nev. 1957), o*verruled by Callie v. Bowling,* 160 P.3d 878 (Nev. 2007).  Note that these factors were adopted from an early California decision.  *See Minifie v. Rowley*, 202 P. 673 (Cal. 1921).

[584]    *Frank McCleary Cattle Co.*, 317 P.2d at 959 (quoting Gordon v. Aztec Brewing Co., 203 P.2d 522, 527 (Cal. 1949).

(c)     Adherence to the corporate fiction of a separate entity would sanction fraud or promote a manifest injustice.[585]

The elements must be proven by a preponderance of the evidence.[586]  In addition to these elements, some Nevada courts have focused on "the element of reliance, or more particularly, on 'reasonable reliance' by the complaining creditor upon debtor conduct which would indicate either the absence of a corporate form or the assumption of liability by a person or entity controlling an openly visible corporation."[587]

The Nevada courts have identified a number of factors in evaluating a request for veil piercing, including: (1) the comingling of funds; (2) undercapitalization;  (3) unauthorized diversion of funds; (4) failure to observe corporate formalities; (5) the existence (or non-existence) of separate bank accounts; (6) whether sister corporations had independent headquarters; (7) whether separate corporations had separate business responsibilities and operations; and (8) whether dividends were paid to shareholders.[588]

## IX. Recharacterization

Among the intercompany transactions investigated by the Examiner was the Intercompany Revolver between CEOC and CEC.  As part of his investigation, the Examiner reviewed whether the Intercompany Revolver represented a *bona fide* credit facility as opposed to disguised equity contributions.  Debt recharacterization alters the priority of a claim. Specifically, recharacterization recharacterizes a purported debt as equity, and thus effectively subordinates the debt to equity.  Recharacterization does not focus on misconduct, but rather on whether the substance of the transaction created an equity interest rather than a debt.  No inequitable conduct or harm is necessary.

### A.   The Authority of Bankruptcy Courts to Recharacterize Claims

The Seventh Circuit has not addressed the authority of a bankruptcy court to recharacterize a claim as an equity interest.  The circuits that have addressed the issue fall into one of two groups:

---

[585]  Nev. Rev. Stat. §§78.747(l)-(2).

[586]  *Truck Ins. Exch. v. Palmer J. Swanson. Inc.*, 189 P.3d 656, 660 (Nev. 2008).

[587]  *In re Twin Lakes Village, Inc.*, 2 B.R. 532, 542 (Bankr. D. Nev. 1980).

[588]   *See, e.g.*, *Polaris Indus. Corp. v. Kaplan*, 747 P.2d 884, 887 (Nev. 1987); *Mosa v. Wilson-Bates Furniture Co.*, 583 P.2d 453, 454 (Nev. 1978); *Bonanza Hotel Gift Shop, Inc. v. Bonanza No. 2*, 596 P.2d 227, 230 (Nev. 1979); *Rowland v. Lepire*, 662 P.2d 1332, 1338 (Nev. 1983); *Truck Ins. Exch.*, 189 P.3d 656 at 661.

- The Third, Fourth, Sixth and Tenth Circuits rely on the equitable powers granted to bankruptcy courts under section 105(a) of the Bankruptcy Code[589] to find that the recharacterization analysis is an issue of federal bankruptcy law.[590]

- The Fifth and Ninth Circuits find that the issue of whether claims should be recharacterized as equity is determined by applicable state law.[591]

The threshold issue of whether the recharacterization analysis is governed by bankruptcy law or state law is important for at least two reasons. First, if state law applies, a choice of law analysis must ensue. Second, because state law on debt recharacterization is much less developed than federal bankruptcy law, any determination concerning the applicability of state law will likely result in there being less legal guidance.

The Sixth Circuit in *Autostyle Plastics, Inc.* was the first circuit court to expressly hold, as a matter of federal law, that a bankruptcy court has the equitable authority to recharacterize claims.[592] The Fourth Circuit in *Dornier Aviation, (N. Am.), Inc.*, expanded on this holding by finding not only that recharacterization is authorized by section 105(a) of the Bankruptcy Code, it is necessary to preserve the priority scheme established by the Bankruptcy Code.[593] Similarly,

---

[589]   Note also that while the Eleventh Circuit has recharacterized debt as equity, it did not identify the source of this authority. *Estes v. N & D Props., Inc.* (*In re N & D Props, Inc.*), 799 F.2d 726, 733 (11th Cir. 1986).

[590]   *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 n.6 (3d Cir. 2006); *Fairchild Dornier GMBH v. Official Comm. of Unsecured Creditors* (*In re Dornier Aviation, (N. Am.), Inc.)*, 453 F.3d 225 (4th Cir. 2006); *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748-49 (6th Cir. 2001); *Hedged-Invs. Assocs., Inc. v. Bronze Grp., Ltd.* (*In re Hedged-Invs. Assocs. Inc.)*, 380 F.3d 1292, 1298 (10th Cir. 2004).

[591]   *Grossman v. Lothian Oil, Inc.* (*In re Lothian Oil, Inc.)*, 650 F.3d 539, 542-43 (5th Cir. 2011); *Official Comm. of Unsecured Creditors v. Hancock Park Capital II, L.P.* (*In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141 (9th Cir. 2013).

[592]   *Autostyle Plastics, Inc.*, 269 F.3d at 748 ("The source of the court's general equitable powers is section 105 of the Code, which states that bankruptcy judges have the authority to 'issue any order, process or judgment that is necessary or appropriate to carry out the provisions' of the Code.").

[593]   *Dornier Aviation, (N. Am.), Inc.*, 453 F.3d at 231 ("In our view, recharacterization is well within the broad powers afforded a bankruptcy court in §105(a) and facilitates the application of the priority scheme laid out in §726. The Code establishes a system in which contributions to capital receive a lower priority than loans because the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied. Thus, implementation of the Code's priority scheme requires a determination of whether a particular obligation is debt or equity. Where, as here, the question is in dispute, the bankruptcy court must have the authority to make this determination in order to preserve the Code's priority scheme.").

the Third Circuit in *SubMicron Systems Corp.* stated that the recharacterization remedy was grounded in the equitable authority granted to bankruptcy courts by the Bankruptcy Code.[594] None of these cases considered the question of whether the recharacterization analysis should be governed by state law.

In *Lothian Oil, Inc.*, the Fifth Circuit became the first Circuit to hold that a recharacterization analysis should be governed by state law.[595]   The court reasoned that the allowability of a claim under section 502(b)(1) of the Bankruptcy Code is determined pursuant to "applicable law."[596]   Because "applicable law" has long been held to mean state law,[597] the recharacterization analysis (which also determines the allowability of a claim) must also be governed by state law.[598]

The Ninth Circuit followed the reasoning of *Lothian* in *Fitness Holdings Int'l, Inc.*[599]   In that case, the Ninth Circuit relied on the Supreme Court's decision *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*[600] to hold that a bankruptcy court could recharacterize debt to the extent allowed by applicable state law.   In *Travelers*, the Supreme Court had held that the issue of whether a creditor was entitled to include attorneys' fees as part of its unsecured claim was to be determined by applicable state law.[601]   The Supreme Court stated that "when the Bankruptcy Code uses the word 'claim' – which the Code itself defines as a 'right to payment' – it is usually referring to a right to payment recognized under state law."[602]   The Ninth Circuit extended the reasoning of *Travelers* to the debt recharacterization analysis, and thereby concluded that state law should govern.[603]

---

[594]   *SubMicron Sys. Corp.*, 432 F.3d at 454.

[595]   *Lothian Oil, Inc.* 650 F.3d at 543.

[596]   *Id.* (citing 11 U.S.C. §502(b)(1)).

[597]   *Id.* ("The Supreme Court has held that the 'applicable law' is *state* law: 'Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.'" (quoting *Butner v. United States,* 440 U.S. 48, 54 (1979))).

[598]   *Id.*

[599]   *Fitness Holdings Int'l, Inc.*, 714 F.3d at 1148-49.   Note that prior to this decision, the Bankruptcy Appellate Panel for the Ninth Circuit had held that section 105(a) of the Bankruptcy Code did not authorize the recharacterization of debt, and, as such, the remedy was not available in the Ninth Circuit.   *See Unsecured Creditors' Comm., v. Pioneer Commercial Funding Corp.* (*In re Pacific Express, Inc.*), 69 B.R. 112, 115 (B.A.P. 9th Cir. 1986).

[600]   *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443 (2007).

[601]   *Id.* at 450-52.

[602]   *Id.* at 451.

[603]   *Fitness Holdings Int'l, Inc.*, 714 F.3d at 1147 ("[T]herefore, a court may not fashion a rule 'solely of its own creation' in determining what constitutes a 'claim' for purposes of bankruptcy.

The Tenth Circuit recently reconsidered whether the recharacterization analysis should be governed by federal or state law and reaffirmed its prior holding that bankruptcy law properly governs the inquiry.[604]   According to the Tenth Circuit, the Supreme Court's decision in *Travelers* does not apply to recharacterization, because a determination concerning the propriety of awarding attorneys' fees is unlike a determination concerning whether a claim should be characterized as debt or equity.[605]   Unlike the former, the latter issue is so fundamental to the bankruptcy process that is properly governed by applicable bankruptcy law.[606]   No other circuit that has previously determined that recharacterization is a matter of bankruptcy law has revisited the issue since the Supreme Court's decision in *Travelers*.

At least one court from the Northern District of Illinois has also applied bankruptcy law to the recharacterization analysis.[607]   That decision, however, predates the recharacterization decisions of the Fifth and Ninth Circuits.   More recent decisions from the Northern District of Illinois have split on the issue.   In *In re SGK Ventures*, Bankruptcy Judge Wedoff stated that "it is unlikely that the Seventh Circuit would find that the equitable power of a bankruptcy court" authorizes the recharacterization of a claim.[608]   Nevertheless, Judge Wedoff cited *Lothian* for the proposition that recharacterization may be available under applicable state law.[609]   In contrast, District Judge Pallmeyer recently stated that courts applying bankruptcy law to the recharacterization analysis were more persuasive.[610]   Based on these conflicting decisions and because the Seventh Circuit has not addressed the issue, it is unclear whether a bankruptcy court would recognize the recharacterization remedy and, if recognized, whether it would apply federal or state law to the recharacterization analysis.

---

Rather, . . .  a court must determine whether the asserted interest in the debtor's assets is a 'right to payment' recognized under state law.").

[604]  *Redmond v. Jenkins* (*In re Alternate Fuels, Inc.*), 789 F.3d 1139, 1146 (10th Cir. 2015).

[605]  *Id*. at 1148.

[606]  *Id*. at 1146-47 ("Recharacterization under §105(a) is essential to a court's ability to properly implement the priority scheme of the Bankruptcy Code.").

[607]  *Moglia v. Quantum Indus. Partners, LDC* (*In re Outboard Marine Corp.),* Nos. 02 C 1594, 01 A 0471, 00 B 3704, 2003 WL 21697357, at *2 (N.D. Ill. July 22, 2003).

[608]   *Official Comm. of Unsecured Creditors v. NewKey Grp. LLC* (*In re SGK Ventures, LLC*), 521 B.R. 842, 861 (Bankr. N.D. Ill. 2014).

[609]  *Id*.

[610]   *Gecker v. Flynn* (*In re Emerald Casino, Inc.*), No. 08 A 00972, 2015 WL 1843271, at *10 (N.D. Ill. April 21, 2015).   The court in *Emerald City* ultimately concluded that the source of authority did not matter because Illinois courts applied factors similar to those used in *Autostyle*. *Id*.

### 1.   Recharacterization Standards Under Bankruptcy Law

In *Autostyle Plastics*, the Sixth Circuit held that a recharacterization analysis should be guided by the following eleven factors:

(1) the names given to any instruments evidencing the indebtedness;

(2) the presence or absence of a fixed maturity date and schedule of payments;

(3) the presence or absence of a fixed rate of interest and interest payments;

(4) the source of repayments;

(5) the adequacy or inadequacy of capitalization;

(6) the identity of interest between the creditor and the stockholder;

(7) the security, if any, for the advances;

(8) the corporation's ability to obtain financing from outside lending institutions;

(9) the extent to which any advances were subordinated to the claims of outside creditors;

(10) the extent to which any advances were used to acquire capital assets; and

(11) the presence or absence of a sinking fund to provide repayments.[611]

The court stated that "[t]hese factors should be considered within the facts of the particular case, and no single factor is determinative."[612]   These factors have also been considered by each of the other circuits that view the recharacterization analysis as a matter of bankruptcy law.[613]   The Seventh Circuit has denied recharacterization where the transferee is not an equityholder of the debtor.[614]

---

[611]   *Autostyle Plastics*, 269 F.3d at 749-50.  The AutoStyle factors have been relied on by lower courts in the Second Circuit.  *Official Comm. of Unsecured Creditors v. Bay Harbour Master Ltd., (In re BH S & B Holdings LLC)*, 420 B.R. 112, 157-60 (Bankr. S.D.N.Y. 2009), *aff'd as modified*, 807 F. Supp. 2d 199 (S.D.N.Y. 2011) ("the court may dismiss a recharacterization claim if the plaintiff fails to plead facts [that] trigger the applicability of the *AutoStyle* factors, or a meaningful subset of them.") (internal citation omitted).

[612]   *Id.* at 750.

[613]   *Hedged-Invs. Assocs.*, 380 F.3d at 1298; *Dornier Aviation*, 453 F.3d at 233-234; *SubMicron Sys. Corp.*, 432 F.3d at 455-56 (stating that *Autostyle* provided the "pertinent factors" that "devolve to an overarching inquiry: the characterization as debt or equity is a court's attempt to

In one of the earlier decisions from the Northern District of Illinois, *In re Outboard Marine Corp.*, the court considered the *Autostyle* factors, but also added two others: (1) the ratio of shareholder loans to capital and (2) the amount or degree of shareholder control.[615] All courts agree that the more the transaction appears to be at arm's length, the more likely it is that the transaction should be characterized as a loan rather than an equity contribution.[616]

## 2. Recharacterization Standards Under State Law

The state law standards applicable to a recharacterization analysis are much less clear. This is in part due to the fact that the cases do not clearly elucidate which state's law applies. In *Lothian*, the Fifth Circuit, without discussion, applied Texas law because the agreements at issue were governed by Texas law.[617] But other possibilities include the state of incorporation of the debtor or the state where the transfers occurred.[618] It is also unclear whether applying state law would lead to differing results. For instance, in both *Lothian* and *Emerald Casino*, the courts held that applicable state law would have applied factors similar to those used by bankruptcy

---

discern whether the parties called an instrument one thing when in fact they intended it as something else").

[614] *See Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),* 212 B.R. 898, 932 (Bankr. N.D. Ill. 1997) (refusing to recharacterize loan where lender "was to receive no [equity] interests . . . and never received any such interests."), *aff'd*, 233 B.R. 409 (N.D. Ill. 1999), *aff'd*, 200 F.3d 1070 (7th Cir. 2000).

[615] *Outboard Marine Corp.*, 2003 WL 21697357, at *5.

[616] *See, e.g.*, *Autostyle*, 269 F.3d at 749; *Dornier Aviation*, 453 F.3d at 234; *Outboard Marine Corp.*, 2003 WL 21697357, at *5.

[617] *Lothian Oil*, *Inc.,* 650 F. 3d at 544; *see also Gernsbacher v. Campbell* (*In re Equip. Equity Holdings, Inc.*), 491 B.R. 792, 852-53 (Bankr. N.D. Tex. 2013) (following *Lothian* and applying Massachusetts law based on a choice of law provision contained in the applicable agreement).

[618] *See, e.g.*, *Goodman v. H.I.G. Capital, LLC* (*In re Gulf Fleet Holdings, Inc.*), 491 B.R. 747 (Bankr. W.D. La. 2013). In conducting a choice of law analysis in connection with a fraudulent transfer claim, the *Gulf Fleet* court recognized that "[w]hen the issue at hand involves the internal affairs of a business entity, the law of the state of formation usually controls the court's choice of law analysis." *Id.* at 765. The court held that application of the internal affairs doctrine was not necessary, however, in the context of a fraudulent transfer claim, and instead applied Louisiana law in lieu of Delaware law (the state of incorporation) because the debtors' principal place of business was in Louisiana, and the challenged transactions were centered in Louisiana. *Id.* When the court considered the recharacterization issue, it again applied Louisiana law without further explanation. *Id.* at 773.

courts.[619]   However, because state recharacterization law is much less developed than federal law, there is greater uncertainty concerning the likely outcome of such analysis.[620]

Despite this uncertainty, certain Delaware cases suggest that the proper characterization of an instrument as either debt or equity should be determined solely by reference to the governing documents.[621]   Other Delaware courts consider factors such as whether the company was obligated to pay principal and interest; whether the holder had any voice in the management of the company; whether the holder had a right to share in profits; the priority upon dissolution; and the evidence of other surrounding circumstances.[622]   These factors are similar to the considerations set forth in *Autostyle*.

Courts in Nevada do not appear to have addressed the appropriate factors to be considered in a recharacterization analysis.   Courts in New York apply the following three factors when characterizing an instrument as either debt or equity: (1) whether there exists an express or implied agreement to repay, (2) the presence or absence of interest, and (3) the

---

[619]   *Lothian Oil, Inc.* 650 F. at 544 (applying Texas law); *Emerald Casino, Inc.*, 2015 WL 1843271, at *10 (applying Illinois law).

[620]   For example, in *Alternate Fuels*, the defendant argued that recharacterization would not have been allowed under Kansas law and therefore no such remedy was available.   The court did not address this argument because it applied the multi-factor *Autostyle* test.   *Alternate Fuels, Inc.*, 789 F.3d at 1146.

[621]   *Wolfensohn v. Madison Fund, Inc.*, 253 A.2d 72, 75 (Del. 1969) ("The question of whether or not the holder of a particular instrument is a stockholder or a creditor depends upon the terms of his contract."); *see also* R. Franklin Balotti and Jesse A. Finkelstein, *Balotti and Finkelstein's Delaware Law of Corporate And Business Organization*, §5.1 (3d ed. Supp. 2016) ("The characterization of the security as debt or equity may have various implications under Delaware law.   The relative rights of the holders of the securities will be determined by the terms of the certificate of incorporation that Delaware law treats as a contract between the corporation and its stockholders.") (citing *Wolfensohn*).

[622]   *Moore v. Am. Fin. & Sec. Co.*, 73 A.2d  47, 47-48 (Del. Ch. 1950); *Official Comm. of the Unsecured Creditors v. Blackstone Family Inv. P'ship* (*In re Color Tile, Inc.*), Nos. 96-76, 96-80, Civ. A. 98-358-SLR, A-98-90, 96-77, 96-78, 96-79, 2000 WL 152129 (D. Del. Feb. 9, 2000) (citing *Moore v. Am. Fin. & Secs. Co.*, 73 A.2d  47, 47-48 (Del. Ch. 1950) and applying multi-factor test).

parties' tax treatment of the payment.[623]  The first factor appears to carry the most weight under New York law.[624]

Other state courts have applied a three-factor test, which considers whether: (1) the claimant was in a position to control corporate affairs at least to the extent of determining the form of the transaction; (2) the advances were intended to be repaid in the ordinary course of the corporation's business; and (3) the paid-in stated capital of the business was unreasonably small in view of the nature and size of the business in which the corporation was engaged.[625]  This three-factor test appears to put more weight on undercapitalization and the status of the creditor as an insider than the multi-factor test articulated by the *Autostyle* court.

As discussed in Section IX.E of this Final Report, the Examiner considered whether the Intercompany Revolver should be recharacterized as equity and determined that recharacterization was not appropriate.

## X.  Claims for Unjust Enrichment

Creditors have also signaled an intent to pursue state law claims for unjust enrichment. The bankruptcy court likely would apply the "most significant relationship"[626]  In the context of an unjust enrichment claim, courts have applied the following factors to determine the forum with the most significant relationship: "(a) the place where the relationship between the parties was centered, provided that the receipt of the enrichment was substantially related to the relationship; (b) the place where the benefit or enrichment was done; (c) the place where the act

---

[623]  *Spitzer v. Grasso*, 13 Misc. 3d 1227(A), 831 N.Y.S.2d 349, 2006 WL 3016952, at *22 (Sup. Ct. N.Y. Cty. 2006), *aff'd as mod. on other grounds*, 54 A.D. 3d 180, 861 N.Y.S.2d 627 (1st Dep't 2008); *see also Fernandez v. Hencke*, 93 A.D.3d 440, 440, 941 N.Y.S.2d 36, 37 (1st Dep't 2012); *NorthWinds Renewables LLC v. Rheuben*, 42 Misc. 3d 135(A),  984 N.Y.S.2d 633, 2014 WL 300812, at *1 (App. Term N.Y. Cty. 2014).

[624]  *Grasso*, 2006 WL 3016952, at *22 ("Where the obligation to repay is established, the law regards the transaction as a loan, regardless of form…[and] [u]ltimately [] where the obligation to repay the amount extended is deduced, the law will regard the transaction as a loan."); *NorthWinds*, 2014 WL 300812,  at *1 (reversing order awarding summary judgment on claim to recover alleged loan because triable issue of fact was raised as to whether the agreement included an obligation to repay); *Fernandez*, 93 A.D.3d at 441, 941 N.Y.S.2d at 37 ("The evidence establishes that both parties intended the advances to be repaid when the restaurant opened, and thus the trial court properly concluded that the advances were loans.").

[625]  *Tanzi v. Fiberglass Swimming Pools Inc.*, 414 A.2d 484, 489-90 (R.I. 1980) (citing *In re Mader's Store for Men*, 254 N.W.2d 171, 186 (Wis. 1977)).

[626]  *See In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F. Supp. 747, 753 (N.D. Ill. 1996) (explaining that both "federal common law" and Illinois choice of law rules apply the "most significant relationship" test drawn from the Restatement (Second) of Conflict of Laws)).

conferring the benefit or enrichment was done; (d) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (e) the place where the physical thing, such as the land or chattel, which was substantially related to the enrichment was situated at the time of the enrichment."[627]   Based on these factors, Nevada law would most likely apply to unjust enrichment claims based on a majority of the transactions at issue.

"Unjust enrichment," under Nevada law, "occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another."[628]   The Nevada statute of limitations for unjust enrichment is four years and accrues "[w]hen the plaintiff knew or in the exercise of proper diligence should have known of the facts constituting the elements of his cause of action," the determination of which "is a question of fact for the trier of fact."[629]

## XI.  Causes of Action Against Directors and Officers

### A.  Breach of Fiduciary Duty

As discussed in the Report, CEOC was at all relevant times up until the 5% Stock Sale in May 2014 a wholly owned subsidiary of CEC.  Prior to June 2014, CEOC's board of directors was comprised solely of two members of Caesars management, Gary Loveman and, depending on the time frame, either Michael Cohen or Eric Hession.  CEOC had no independent directors throughout nearly the entire period under investigation, beginning with the 2009 WSOP Transaction up to and including the Four Properties and B-7 transactions in May 2014, nor did it have access to independent legal or financial advisors in connection with any of those transactions.

All decisions to approve the asset sales or transfers from CEOC to CEC or CGP were made at the CEC/Sponsor level, with the CEOC board having no meaningful input or role.  To be sure, if CEOC was and remained a solvent wholly owned subsidiary of CEC during the relevant time frame, there would be nothing inappropriate about the level of domination and control that CEC and the Sponsors exercised over CEOC.  Given the Examiner's conclusion, however, that CEOC was likely insolvent as of December 31, 2008, and almost certainly insolvent in late 2013 and 2014 when many of the transactions took place, legitimate questions have been raised as to whether claims for breach of fiduciary duty can be asserted against

---

[627]   *Paris v. Amoco Oil Co.*, 149 F. Supp. 2d 478, 480 (N.D. Ill. 2001) (citing Restatement (Second) Conflicts of Laws §221).

[628]   *Kahn v. Dodds (In re Amerco Derivative Litig.)*, 252 P.3d 681, 703 (Nev. 2011) (citations omitted).  The standard under Delaware law is substantially similar.  *See Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (to prevail on an unjust enrichment claim "the plaintiff is required to show that the defendants were unjustly enriched, that the defendants secured a benefit, and that it would be unconscionable to allow them to retain that benefit"); *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1056 (Del. Super. Ct. 2001) (unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience") (internal citations omitted).

[629]   *Id.* (citing, *inter alia*, Nev. Rev. Stat. 11.190(2)(c)).

CEOC's directors and CEC, as CEOC's controlling stockholder, in connection with the various related party transactions that occurred and, if so, under what legal standard those claims should be assessed. The following discussion sets forth the legal standards the Examiner believes would likely be applied by a reviewing court in evaluating breach of fiduciary duty claims against CEOC's directors and CEC, as well as aiding and abetting claims against the Sponsors and possibly others.

### 1.  Choice of Law

Under either an Illinois or federal choice-of-law analysis, the Bankruptcy Court will apply the "internal affairs doctrine," which provides that the law applicable to a claim against a director, officer or controlling stockholder for breach of fiduciary duty is that of the state of incorporation.[630]  Because CEOC is incorporated in Delaware, Delaware law would apply to any claim for breach of fiduciary duty against CEOC's directors and officers or against Caesars Entertainment Company, as CEOC's controlling stockholder.

### 2.  Statute of Limitations

Claims for breach of fiduciary duty under Delaware law are subject to a three-year statute of limitations.[631]  The limitations period may be tolled under the doctrines of fraudulent concealment and/or equitable tolling.[632]

Under the doctrine of fraudulent concealment, "[t]he statute of limitations may be disregarded when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth.  Under this doctrine, a plaintiff must allege an affirmative act of 'actual artifice' by the defendant that either prevented the plaintiff from gaining knowledge of material facts or led the plaintiff away from the truth."[633]  Under the doctrine of equitable tolling, the limitations period is tolled "while a plaintiff has reasonably relied upon the competence and good faith of a fiduciary.  No evidence of actual concealment is necessary in such a case, but the statute is only tolled until the investor 'knew or had reason to know of the facts constituting the wrong.'"[634]

---

[630]  *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982); *CDX Liquidating Tr. v. Venrock Assocs.*, 640 F.3d 209, 212 (7th Cir. 2011); *Paloian v. Geneva Seal, Inc. (In re Canopy Fin., Inc.)*, 477 B.R. 696, 702 (N.D. Ill. 2012) (citing *Fogel v. Zell*, 221 F.3d 955, 966 (7th Cir. 2000) (assuming that federal choice of law rules would follow internal affairs doctrine for derivative suit)).

[631]  Del. Code Ann. tit. 10, §8106.

[632]  *Eugenia VI Venture Holdings, Ltd. v. Maplewood Holdings LLC (In re AMC Inv'rs, LLC)*, 524 B.R. 62, 80-81 (Bankr. D. Del. 2015); *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008).

[633]  *In re Tyson Foods, Inc.*, 919 A.2d 563, 585 (Del. Ch. 2007); *see also Microsoft Corp. v. Amphus, Inc.*, C.A. No. 8092-VCP, 2013 WL 5899003, at *17 (Del. Ch. Oct. 31, 2013).

[634]  *Tyson Foods, Inc.*, 919 A.2d at 585 (citing *In re Dean Witter P'ship Litig.*, No. Civ. A. 14816, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999)).

Under either of these tolling doctrines, the statute begins to run "upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery of such facts."[635]

### 3.    Creditor Standing to Assert Breach of Fiduciary Duty Claims

Under Delaware law, a creditor lacks standing to assert *direct* claims for breach of fiduciary duty against a corporation's directors, officers or controlling stockholders.[636]   As the Delaware Supreme Court explained in *Gheewalla*, "creditors' existing protections – among which are the protections afforded by their negotiated agreements, their security instruments, the implied covenant of good faith and fair dealing, fraudulent conveyance law, and bankruptcy law – render the imposition of an additional, unique layer of protection through direct claims for breach of fiduciary duty unnecessary."[637]

After a corporation becomes insolvent, however, a creditor gains standing to assert *derivative* breach of fiduciary duty claims.[638]   In order to pursue such a claim, the creditor must establish insolvency "at the time the suit was filed" under either the "traditional balance sheet" test or the "cash flow" test.[639]   Under the balance sheet test, "an entity is insolvent when it has liabilities in excess of a reasonable market value of assets held."[640]   Under the cash flow test,

---

[635]   *AMC*, 524 B.R. at 80-81; *Microsoft*, 2013 WL 5899003, at *17 (a party is on inquiry notice "when they have sufficient knowledge to raise their suspicions to the point where persons of ordinary intelligence and prudence would commence an investigation that, if pursued would lead to the discovery of the injury") (internal citations omitted).

[636]   *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 94 (Del. 2007) ("[C]reditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against the corporation's directors."); *id.* at 103 ("[W]e hold that individual *creditors* of an *insolvent corporation* have *no right to assert direct* claims for breach of fiduciary duty against corporate directors.") (emphasis in original).

[637]   *Id.* at 100-01; *see also id.* at 103 ("To recognize a new right for creditors" to bring direct fiduciary claims against directors of an insolvent corporation "would create conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the newly recognized direct fiduciary duty to individual creditors.").

[638]   *Quadrant Structured Prods. Co. v. Vertin*, 115 A.3d 535, 546 (Del. Ch. 2015) (*Quadrant II*). Although creditors of an insolvent corporation may sue derivatively, it is unclear whether, under Delaware law, creditors suing derivatively are subject to the same demand futility and demand refusal requirements for derivative suits that apply to stockholders. *See Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 177-78 (Del. Ch. 2014) (*Quadrant I*).

[639]   *Quadrant II*, 115 A.3d at 539.

[640]   *Id.*; *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784, 789 (Del. Ch. 1992).

"[a]n entity is insolvent when it is unable to pay its debts as they fall due in the usual course of business."[641]   A creditor need not "demonstrate that the corporation continued to be insolvent until the date of the judgment" or that the corporation is "irretrievably insolvent."[642]   As discussed elsewhere in this Report, the Examiner has concluded that it is likely (if not substantially certain) that CEOC was insolvent at all relevant times under both tests, thereby providing creditors with standing to pursue derivative claims for breach of fiduciary duty.

Even where creditors have such standing, however, Delaware courts have counseled that "deploying fiduciary duties to protect creditors should be a final resort, not a first response."[643] Creditors and courts should first look to the "panoply" of other remedies available to protect creditors, most notably, contractual protections, the implied covenant of good faith and fair dealing and fraudulent conveyance laws.[644]

### 4.   The Fiduciary Duties Owed To CEOC By Its Directors And CEC

Delaware courts have stressed that directors of an insolvent Delaware corporation still "do not owe any particular duties to creditors."[645]   Rather, "[t]hey continue to owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category which now includes creditors."[646]  The two fiduciary duties that directors owe to the corporation are the duty of care and the duty of loyalty, each of which is discussed in detail below.[647]

Controlling stockholders owe the corporation the same fiduciary duties.[648]   Of course, while controlling stockholders must refrain from exploiting minority stockholders, they need not

---

[641]  *Geyer*, 621 A.2d at 789.

[642]  *Quadrant II*, 115 A.3d at 554, 558-559.

[643]  *Quadrant Structured Prods. Co. v. Vertin*, C.A. No. 6990-VCL, 2015 WL 6157759, at *10 (Del. Ch. Oct. 20, 2015) ("*Quadrant III*").

[644]  *Id*. at *11.

[645]  *Quadrant II*, 115 A.3d at 546.

[646]   *Id*. at 546-47; *Prod. Res. Grp., LLC v. NCT Grp., Inc*., 863 A.2d 772, 790-791 (Del. Ch. 2004) (where a corporation is insolvent, fiduciary duties are owed for the benefit of all residual claimants, which include creditors).

[647]  *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009).

[648]   *Abraham v. Emerson Radio Corp*., 901 A.2d 751, 759 (Del. Ch. 2006) ("[T]he premise for contending that the controlling stockholder owes fiduciary duties in its capacity as a stockholder is that the controller exerts its will over the enterprise in the manner of the board itself."); *Blaustein v. Lord Balt. Capital Corp.*, C.A. No. 6685-VCN, 2013 WL 1810956, at *16 (Del. Ch. Apr. 30, 2013), *aff'd*, 84 A.3d 954 (Del. 2014) (the "fiduciary duties that a controlling stockholder owes to minority stockholders are those duties that directors . . . owe to all stockholders generally"); *In re Crimson Expl. Inc. Stockholder Litig*., C.A. No. 8541-VCP, 2014 WL 5449419, at *12 (Del. Ch. Oct. 24, 2014); *In re KKR Fin. Holdings LLC S'holder Litig*., 101 A.3d 980, 998 (Del. Ch. 2014) , *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC,* 125 A.3d 304

"sacrifice their own financial interest in the enterprise for the sake of the corporation or its minority stockholders."[649] And, indeed, where a controller owns 100% of a *solvent* corporation, it is free to act entirely in its own self-interest (given that there are no minority stockholders to exploit), and the controlled corporation's board is "expected to operate for the benefit" of its lone stockholder. [650] As such, creditors of a solvent wholly-owned corporation are foreclosed from asserting breach of fiduciary duty claims – direct or derivative – against the company's controlling stockholder. Where, however, a wholly-owned corporation is *insolvent*, the Delaware Court of Chancery has recognized the standing of the company's creditors, as "residual claimants" in that context, to pursue derivative claims for breach of fiduciary duty against the company's controlling stockholder.[651]

Notably, although a controlling stockholder owes fiduciary duties to the controlled corporation, the members of the controlling stockholder's own board of directors do not.[652] Accordingly, the individuals who served on the CEC special committees for the Growth and Four Properties transactions – collectively, Messrs. Williams, Housenbold, Swann and Kleisner – did not owe fiduciary to CEOC, and therefore could not be relied upon to adequately safeguard the interests of CEOC and its residual claimants, including creditors.[653]

Individuals who serve in a dual capacity – for instance, as an officer and/or director of both a parent and a subsidiary – must fulfill their duties of loyalty and care to *both*

---

(Del. 2015); *In re Sanchez Energy Derivative Litig.*, C.A. No. 9132-VCG, 2014 WL 6673895, at *8 (Del. Ch. Nov. 25, 2014), *rev'd on other grounds sub nom. Delaware Cnty Emp. Ret. Fund v. Sanchez*, 124 A.3d 1017 (Del. 2015).

[649]  *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 598 (Del. Ch. 1986); *Odyssey Partners, L.P. v. Fleming Cos., Inc.*, C.A. No. 14770, 1994 WL 422377, at *3 (Del. Ch. July 24, 1994) ("[F]iduciary obligation does not require self-sacrifice."); *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840, 845 (Del. 1987) ("It is not objectionable that [a controlling stockholder's] motives may be for personal profit . . . so long as they violate no duty owed to other [stock]holders.").

[650]  *See Trenwick Am. Litig. Tr. v. Ernst & Young L.L.P.*, 906 A.2d 168, 173 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Trust v. Billett*, 931 A.2d 438 (Del. 2007) ("Wholly owned subsidiary corporations are expected to operate for the benefit of their parent corporations; that is why they are created.").

[651]  *Quadrant I*, 102 A.3d at 184-85*; but see ASARCO LLC v. Ams. Mining Corp.*, 396 B.R. 278, 414-16 (S.D. Tex. 2008) (predicting that New Jersey likely would not recognize that a parent owes a fiduciary duty to its wholly owned insolvent subsidiary and its creditors).

[652]  *See Trenwick*, 906 A.2d at 194; *Anadarko Petroleum Corp. v. Panhandle E. Corp.*, 545 A.2d 1171, 1177 (Del. 1988).

[653]  *See Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1338 (Del. Ch. 1987) (the "board, in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder").

corporations.[654]  This was the case with respect to Messrs. Loveman, Cohen and Hession, each of whom, in addition to being a CEOC board member, served as an officer of CEC.  The duties of such "dual capacity" fiduciaries must be "exercised in light of what is best for both [corporations]."[655]  If a dual capacity director cannot fulfill his or her duties to both corporations, that director must recuse himself or herself with respect the matter at issue or, if necessary, resign from one or both boards.[656]

### a.  The Duty of Care

The duty of care requires directors and controlling stockholders to exercise the "care which ordinarily careful and prudent men would use in similar circumstances."[657]  They must act on an informed basis after considering relevant information, including the input of financial and legal experts.[658]  Notably, the failure to retain independent financial or legal advisors or other experts is not a per se breach of a director's duty of care, but rather one factor courts consider in determining whether such a breach occurred.[659]

Fiduciaries are generally protected from duty of care claims by the presumptions afforded them under the "business judgment rule."  Under the business judgment rule, directors and officers of a corporation are presumed in approving a transaction to have acted "in good faith, on an informed basis, and in the honest belief that [it was] in the corporation's best interest."[660]  It is a rebuttable presumption, but the party challenging the transaction must plead and prove facts demonstrating that the fiduciary's actions have risen to the level of gross negligence, which has

---

[654]  *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710-11 (Del. 1983), *aff'd after remand,* 497 A.2d 792 (Del. 1985); *Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1106 (Del. 1985), *aff'd after remand, sub nom. Rabkin v. Olin Corp.,* 586 A.2d 1202 (Del. 1990) ("There is no dilution of this [fiduciary] obligation where one holds dual or multiple directorships . . . [t]hus, individuals who act in a dual capacity as directors of two corporations, one of whom is parent and the other subsidiary, owe the same duty of good management to both corporations.").

[655]  *Weinberger*, 457 A.2d at 710-11.

[656]  *See id.*; *Warshaw v. Calhoun*, 221 A.2d 487, 492 (Del. 1966).

[657]  *In re Walt Disney Co. Derivative Litig.* (*Disney I*), 907 A.2d 693, 749 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[658]  *In re Walt Disney Co. Derivative Litig.* (*Disney II*), 906 A.2d 27, 60 (Del. 2006); *Blackmore Partners, L.P. v. Link Energy LLC*, No. Civ. A. 454-N, 2005 WL 2709639, at *8 (Del. Ch. Oct. 14, 2005) (the duty of care requires directors and officers to consider all material information reasonably available to them in making business decisions).

[659]  *See Merchs.' Nat'l Props., Inc. v. Meyerson*, No. Civ. A. 13139, 2000 WL 1041229, at *6 (Del. Ch. July 24, 2000); *Smith v. Van Gorkom*, 488 A.2d 858, 881 (Del. 1985).

[660]  *Blackmore Partners*, 2005 WL 2709639, at *5; *Van Gorkom*, 488 A.2d at 872.

been defined as "reckless indifference to or a deliberate disregard of the whole body of stockholders or actions which are without the bounds of reason."[661]

Under Delaware law, a corporation may, in its certificate of incorporation, limit or eliminate the personal liability of its directors for breaches of the duty of care.[662] Such exculpation provisions do not apply, however, to (i) any act or omission occurring prior to the date when such provision became effective, (ii) breaches of the duty of loyalty or intentional misconduct by directors,[663] (iii) breaches of any fiduciary duties by officers or controlling stockholders,[664] or (iv) claims against aiders and abettors.[665]   Notably, although Section 9.8 of CEOC's Articles of Incorporation contains an exculpation provision, that priovision was not added until May 2014 and, therefore, has no effect on the liability of CEOC's directors for any acts or omissions occurring prior to the date.[666]

Section 141(e) of the Delaware General Corporation Law further insulates directors who reasonably and "in good faith" rely on legal, financial or other expert advisors in fulfilling their duty of care.[667]   Generally, to rely on an advice of counsel defense under Section 141(e), directors must produce "some evidence of their counsel's legal conclusions," although they "need not provide the substantive details of the advice they received."[668]   Where advice of counsel is "material to the question of whether the board acted with due care," courts "have held

---

[661]   *See Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 192 (Del. Ch. 2005), *aff'd,* 906 A.2d 114 (Del. 2006) (internal citations omitted).

[662]   *See* Del. Code Ann tit. 8, §102; *Malpiede v. Townson*, 780 A.2d 1075, 1095 (Del. 2001).

[663]   *See* Del. Code Ann tit. 8, §102.

[664]   *Id*.

[665]   *In re Rural Metro Corp. Stockholders Litig*, 88 A.3d 54, 87 (Del. Ch. 2014) ("Section 102(b)(7) does not extend to an aider and abettor.").

[666]   *See* Del. Code Ann tit. 8, §102(b)(7).

[667]   *See* Del. Code Ann tit. 8, §141(e) ("A member of the board of directors, or a member of any committee designated by the board of directors, shall, in the performance of such member's duties, be fully protected in relying in good faith … upon such information, opinions, reports or statements presented to the corporation … by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.").   Delaware courts hold that this provision applies only to disinterested directors in duty of care cases and does not insulate officers or controlling stockholders.   *See Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 367 (Del. 2006); Del. Code Ann. tit. 8, §102 (7).

[668]   *Encite LLC v. Soni*, C.A. No. 2476-VCG, 2011 WL 5920896, at *22 (Del. Ch. Nov. 28, 2011) ("Relevant advice for an entire fairness analysis might … include whether counsel advised the defendant that the business judgment rule would operate or that the bidding process was thorough and fair.").

that it is the existence of legal advice . . . , not the substance of that advice," that matters.[669]  In other words, whether or not the advice itself is correct is of no moment.[670]  A fiduciary is entitled to act in good faith on the advice of counsel, even if that advice is incorrect.[671]  Whether and to what extent directors can be said to have relied in good faith on *silence* from their legal counsel, however, requires a fact-specific inquiry.[672]  For example, a defendant's contention that counsel made him "very comfortable in terms of the process" and "never said the process was improper" does not establish an advice of counsel defense without "credible evidence that [counsel] ever told [the board] that the transaction was fair or that the business judgment rule would operate."[673]  Likewise, defendants cannot rely on an advice of counsel defense where they "fail[] to demonstrate that [they] were told by counsel that they could exercise independent business judgment" and "offer[] no evidence suggesting that counsel advised them of what a fair bidding process requires."[674]

## b.  The Duty of Loyalty

The duty of loyalty obligates a fiduciary to act in "good faith" and refrain from putting his or her interests ahead of the corporation.[675]  A plaintiff can challenge a fiduciary's loyalty by demonstrating that he or she (i) "was interested in the transaction under consideration or not independent of someone who was,"[676] or (ii) otherwise "failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith."[677]

The relationship between "interestedness" and "independence" is frequently misunderstood.[678]  Delaware courts define an "interested" director as one who – either directly or through his affiliation with another entity – "appear[s] on both sides of a transaction [or] expect[s] to derive [a] personal financial benefit from it in the sense of self-dealing, as opposed

---

[669] *In re Comverge, Inc. S'holders Litig.*, C.A. No. 7368-VCP, 2013 WL 1455827, at *4 (Del. Ch. Apr. 10, 2013).

[670] *Heizer v. Hackbarth (In re Heizer Corp.)*, C.A. No. 7949,1988 WL 58272, at *22 (Del. Ch. Jun. 6, 1988) ("Whether . . . the Court may agree with that advice is not controlling. The fact is that the Trustee was entitled to rely upon advice of counsel and did so.").

[671] *See id.*; *see also* Del. Code Ann. tit. 8, §141(e) (directors are "*fully protected* in relying *in good faith*" upon advice of experts selected "*with reasonable care*") (emphasis added).

[672] *See, e.g., Encite LLC*, 2011 WL 5920896, at *22.

[673] *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 744, 751 (Del. Ch. 2007).

[674] *Encite LLC*, 2011 WL 5920896, at *22.

[675] *Quadrant II*, 115 A.3d at 549; *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993).

[676] *Quadrant II*, 115 A.3d at 549 (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)).

[677] *Id.* (citing *Disney II*, 906 A.2d at 53).

[678] *See, e.g.*, *In re Dow Chem. Co. Derivative Litig.*, C.A. No. 4349-CC, 2010 WL 66769, at *8 n.38 (Del. Ch. Jan. 11, 2010).

to a benefit which devolves upon the corporation or all stockholders generally."[679]   Such concerns are particularly acute where "dual capacity" board members, such as Messrs. Loveman, Cohen and Hession here, are put in the position of considering related party transactions.[680]

"To establish lack of independence," meanwhile, a plaintiff "must show that the directors are 'beholden' to [a controlling stockholder or other interested party] or so under their influence that their discretion would be sterilized."[681]   The key inquiry is "independent from whom and independent for what purpose?"[682]   As courts have explained, "[t]he simple fact that the director has some financial ties or personal relationships is not sufficient.   'Rather, the question is whether those ties are material, in the sense that the alleged ties could have affected the impartiality of the director.'"[683]   Stated another way, "to support an inference that a particular relationship jeopardized a director's ability to exercise his own independent and objective judgment in considering a corporate transaction, a plaintiff must make specific factual allegations of such material connections as 'financial ties, familial affinity, a particularly close or intimate personal or business affinity or . . . evidence that in the past the relationship caused the director to act non-independently *vis-à-vis* an interested director.'"[684]   The fact that directors "moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as 'friends' . . . are insufficient, without more, to rebut the presumption of independence."[685]   "[W]here there is no director who is interested in the transaction, there is no need to consider the independence of the remaining directors."[686]

---

[679] *Id.* at *7 (citing *Aronson*, 473 A.2d at 812).

[680] *E.g., Krasner v. Moffett*, 826 A.2d 277, 283 (Del. 2003) (finding directors serving on boards of both the parent and subsidiary were interested in the transaction); *Sealy,* 532 A.2d at 1337 (finding directors of parent company, who were also directors of   subsidiary, were not disinterested when making decisions on behalf of the subsidiary); *Rabkin*, 498 A.2d at 1106 (holding that parent corporation's directors on subsidiary board faced conflict of interest); *Weinberger*, 457 A.2d at 710 (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent).

[681] *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993); *Aronson*, 473 A.2d at 816 (a director is independent provided his or her "decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences").

[682] *Beam v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004).

[683] *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A. 3d 1, 25-26 (Del. Ch. 2014) ("past business and social connections between [director and top executive] . . . in isolation, would not be sufficient to raise a triable issue about [director's] independence") (quoting *In re MFW S'holders Litig.*, 67 A.3d 496, 509-10 (Del. Ch. 2013)).

[684] *Zimmerman v. Crothall*, C.A. No. 6001-VCP, 2012 WL 707238, at *13 (Del. Ch. Mar. 5, 2012).

[685] *Beam*, 845 A.2d. at 1051.

[686] *Dow*, 2010 WL 66769, at *7; *see also id.* at *8 n.38 ("the independence of directors is only relevant when there exists an interested person").

Typically, to establish a breach of the duty of loyalty, a plaintiff must plead and prove facts demonstrating that a majority of the directors who approved a disputed transaction were either personally interested in the transaction or lacked independence.  The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by the director, officer or controlling shareholder and not shared by the stockholders generally."[687]  Here, the duty of loyalty is implicated in the vast majority (if not all) of the transactions under investigation, as CEC and the Sponsors were on both sides of the transactions and CEOC's board at nearly all relevant times was comprised solely of CEC officers – again, CEOC had no independent directors on its Board until late June 2014.

A breach of the duty of loyalty may, as noted, also be predicated on a failure to act in good faith.  A failure to act in good faith may be shown where, for instance, a fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation."[688]  Claims that a director or officer "knowingly abdicated" or "consciously disregarded" his or her fiduciary duties, however, are exceedingly difficult to plead and prove. Indeed, it has been said that a duty of loyalty claim predicated on inaction (knowing abdication) or a failure to exercise oversight (conscious disregard) is "possibly the most difficult theory in corporation law upon which a plaintiff may hope to win," requiring, as it does, proof of facts demonstrating a "sustained or systematic failure of the board to exercise oversight."[689]  As the Delaware Supreme Court has explained, "[i]n the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties."[690]

A fiduciary may also violate the duty of loyalty by usurping a corporate opportunity.  It appears that creditors assert this theory – which applies equally to controlling stockholders, not just officers and directors[691] – only in connection with the 2009 WSOP Transaction.  Delaware courts have held that usurping a corporate opportunity occurs when (i) the entity to which a fiduciary duty is owed is "'financially able to undertake' the opportunity, (ii) the opportunity falls within 'the line of the [entity's] business,'(iii) the entity 'has an interest or a reasonable expectancy' in the opportunity; and (iv) the fiduciary's interests conflict with those of the entity."[692]  Where the allegedly wronged entity lacks the resources or capacity to undertake the

---

[687]   *Cede,* 634 A.2d at 361.

[688]   *Quadrant II*, 115 A.3d at 549; *see also In re Walt Disney Co. Derivative Litig.*, 825 A.2d 275, 287 (Del. Ch. 2003).

[689]   *In re Caremark, Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967, 971 (Del. Ch. 1996).

[690]   *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243 (Del. 2009) (quoting *In re Lear Corp. S'holder. Litig.*, No. 2728-VCS, 2008 WL 4053221, at *11 (Del. Ch. 2008)).

[691]   *See, e.g.*, *In re Digex, Inc. S'holders Litig.*, 789 A.2d 1176, 1190-92 (Del. Ch. 2000); *Castleman v. CERBCO, Inc.*, 676 A.2d 436, 442-445 (Del. 1996); *Schreiber v. Bryan*, 396 A.2d 512, 518-19 (Del. Ch. 1978).

[692]   *Cancan Dev., LLC v. Manno*, C.A. No. 6429-VCL, 2015 WL 3400789, at *26 (Del. Ch. May 27, 2015), *aff'd*, __A.3d __, 2016 WL 363519 (Del. Jan. 28, 2016) (citing *Guth v. Loft, Inc*., 5 A.2d 503, 511 (Del. 1939)); *see also Gagliardi v. TriFoods Int'l, Inc*., 683 A.2d 1049, 1055 (Del.

opportunity, there can be no usurpation claim.[693]  Delaware courts have observed that each of the prongs listed above will generally present a question of fact.[694]

Reliance on advice of counsel is relevant to, but by no means outcome determinative of, the defense of a breach of loyalty claim.[695]  "Although 'reasonable reliance on expert counsel is a pertinent *factor* in evaluating whether corporate directors have met a standard of fairness in their dealings with respect to corporate powers,' its existence is not outcome determinative of entire fairness."[696]  "This is particularly true where the person claiming the defense . . . is interested in the challenged transaction."[697]  In short, "the advice given by counsel is relevant to the issue of fair dealing, a question of process."[698]  To the extent an advice of counsel defense is asserted, it will generally result in a waiver of the attorney-client privilege with respect to communications relating to the subject matter at issue.[699]

---

Ch. 1996) (the vehicle for remedying a violation of the corporate opportunity doctrine is a derivative suit).

[693]  *Cancan*, 2015 WL 3400789, at *26.

[694]  *Schreiber*, 396 A.2d at 518.

[695]  *See Valeant Pharms. Int'l*, 921 A.2d at 732, 751 (citing *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1142 (Del. Ch. 1994), *aff'd*, 663 A.2d 1156 (Del. 1995)); *Owen v. Cannon*, C.A. No. 8860-CB, 2015 WL 3819204, at *31 n.329 (Del. Ch. Jun. 17, 2015); *Encite LLC*, WL 5920896, at *22 ("generalized contentions" that director defendants relied on expert counsel were "insufficient to establish fair dealing"); *Paradee v. Paradee*, C.A. No. 4988-VCL, 2010 WL 3959604, at *11 (Del. Ch. Oct. 5, 2010) ("Obtaining advice of counsel provides some evidence that a fiduciary is not acting disloyally, but it is not dispositive."); *Boyer v. Wilmington Materials, Inc.*, 754 A.2d 881, 900 (Del. Ch. 1999) (memoranda prepared by counsel did not support a finding of procedural fairness because counsel represented the personal and business interests of two individual shareholders (not the interests of the corporation) and the memoranda were not presented to the board).

[696]  *Valeant Pharms. Int'l*, 921 A.2d at 751 (quoting *Cinerama, Inc.*, 663 A.2d at 1142) (emphasis in original); *accord Owen*, 2015 WL 3819204, at *31 n.329 (same); *Encite LLC*, 2011 WL 5920896, at *22 ("generalized contentions" that director defendants relied on expert counsel were "insufficient to establish fair dealing"); *see also Paradee*, 2010 WL 3959604, at *11 ("Obtaining advice of counsel provides some evidence that a fiduciary is not acting disloyally, but it is not dispositive.").

[697]  *Valeant Pharms. Int'l*, 921 A.2d at 751.

[698]  *Encite LLC*, 2011 WL 5920896, at *22; *see also Boyer*, 754 A.2d at 900 (memoranda prepared by counsel did not support a finding of procedural fairness because counsel represented the personal and business interests of two individual shareholders (not the interests of the corporation) and the memoranda were not presented to the Board of Directors).

[699]  *Mennen v. Wilmington Tr. Co.*, C.A. No. 8432-ML, 2013 WL 5288900, at *5 (Del. Ch. Sept. 18, 2013).

### c.  Discharging Fiduciary Duties in the Context of Insolvency

Delaware courts have made clear that fiduciaries of an insolvent corporation are not required to cause the company to cease operations, liquidate or declare bankruptcy.[700]  On the contrary, although the "efficient liquidation of an insolvent [corporation] might well be the method by which the firm's value is enhanced in order to meet the legitimate claims of its creditors,"[701] disinterested and independent fiduciaries of an insolvent corporation are "free to pursue value maximizing strategies, while recognizing that the [corporation's] creditors have become its residual claimants."[702]  Indeed, even when a corporation is insolvent, "its directors may, in the appropriate exercise of their business judgment, take action [including the incurrence of more debt] that might, if it does not pan out, result in the [corporation] being painted in a deeper hue of red."[703]  In other words, Delaware law does not recognize a cause of action for "deepening insolvency."[704]

As the foregoing suggests, Delaware courts will not second guess such business decisions so long as they are made in good faith, and disinterested and independent fiduciaries of an insolvent company who, in good faith, undertake a strategy intended to benefit the company's residual claimants will not be held liable "just because the strategy failed."[705]

### 5.  Standard of Review

The default standard of review with respect to claims for breach of fiduciary duty under Delaware law is the business judgment rule (discussed above), which courts characterize as a

---

[700]  *See Trenwick*, 906 A.2d at 204; *Official Comm. of Unsecured Creditors v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 542 (Bankr. D. Del. 2009) ("the decision whether to file for bankruptcy protection or not is generally a matter of directors' business judgment").

[701]  *Quadrant I*, 102 A.3d at 186.

[702]  *Quadrant II*, 115 A.3d at 547 n.13, (citing *Trenwick*, 906 A.2d at 174-75).

[703]  *Quadrant I*, 102 A.3d at 185; *see also Nelson v. Emerson*, C.A. No. 2937-VCS, 2008 WL 1961150, at *2 (Del. Ch. May 6, 2006) ("The directors of an insolvent company who, in good faith, undertake a strategy to benefit the company's equity holders cannot be held liable just because the strategy failed.").

[704]  *See Trenwick*, 906 A.2d at 204; *Official Comm. of Unsecured Creditors v. Tennenbaum Capital Partners, LLC (In re Radnor Holdings Corp.)*, 353 B.R. 820, 842 (Bankr. D. Del. 2006) ("[C]alling a discredited deepening insolvency cause of action by some other name does not make it a claim that passes muster."); *Fedders*, 405 B.R. at 541 ("Simply alleging that a corporation was insolvent and took on further debt to continue operating is not enough to plead a claim for breach of fiduciary duty.").

[705]  *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 124-125 (Del. Ch. 2009) (recognizing that "to impose liability on directors for making a 'wrong' business decision would cripple their ability to earn returns for investors by taking business risks").

"principle of non-review that reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation."[706]   The rule presumes that, in reaching a business decision, the directors are informed, operating in good faith, and believe that the "action taken was in the best interests of the company."[707]   Under this forgiving standard, a business decision must "lack[] any rationally conceivable basis" for a court to "infer bad faith and a breach of duty."[708]

Where, as here, however, a controlling stockholder or other fiduciary "stands on both sides" of a transaction, the "more exacting" entire fairness standard of review applies.[709]   This is the case even if the directors are operating with a good faith belief that the transaction is in the corporation's best interests.[710]   As Delaware courts have explained, "[a] controlling stockholder transaction 'of course is the context in which the greatest risk of undetectable bias may be present.'"[711]   This is "because of the risk that when push comes to shove, directors who appear to be independent and disinterested will favor or defer to the interests and desires of the majority stockholder.'"[712]   "Although in theory a special committee of independent directors 'is best positioned to extract a price at the highest possible level,'" courts have observed that "the men and women who populate the committees are rarely individuals 'whose own financial futures depend importantly on getting the best price and, history shows, [they] are sometimes timid [or] inept.'"[713]   In short, there is a risk "that the outside directors might be more independent in appearance than in substance."[714]   The entire fairness standard is intended to "uncover situations where facially independent and disinterested directors have failed to act loyally and in good faith to protect the interests of the corporation and [its residual claimants] as a whole and instead have given in to or favored the interests of the controller."[715]

---

[706]   *Quadrant I*, 102 A.3d at 183 (citation and internal quotation marks omitted).

[707]   *Id.*; *see also Blackmore Partners*, 2005 WL 2709639, at *5.

[708]   *Quadrant I*, 102 A.3d at 183 (citations and internal quotation marks omitted).

[709]   *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1240 (Del. 2012) (citation omitted); *Quadrant I*, 102 A.3d at 183, 185; *Odyssey Partners, L.P. v. Fleming Cos., Inc.*, 735 A.2d 386, 412 (Del. Ch. 1999); *Tyson Foods, Inc.*, 919 A.2d at 596; *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1115, 1117 (Del. 1994), *aff'd after remand*, 669 A.2d 79 (Del. 1995).

[710]   *See id.*

[711]   *Orchard*, 88 A.3d at 36 (quoting *Kahn v. Tremont Corp.*, C.A. No. 12339, 1996 WL 145452, at *7 (Del. Ch. Mar. 21, 1996) *rev'd*, 694 A.2d 422 (Del. 1997)).

[712]   *Id.*, 88 A.3d at 36 (citing *Lynch Commc'n Sys., Inc.*, 638 A.2d at 1116-17 ).

[713]   *Id.* at 36-37 (quoting *In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 619 (Del. Ch. 2005)).

[714]   *Id.* at 37.

[715]   *Id.* (citing *Kahn v. Tremont Corp.*, 694 A.2d 422, 428-29 (Del. 1997).

Under this heightened standard, the burden of proof lies with the defendants to demonstrate that the transaction was entirely fair – *i.e.*, that it mirrored an arm's-length negotiated transaction. This standard has two well-established components: fair dealing and fair price – from which courts "reach a unitary conclusion on the entire fairness" of the transaction at issue.[716]

Fair dealing involves "questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained."[717] "[I]ndependence is the *sina qua non* of the entire negotiation process."[718] Accordingly, "the composition of [any] special committee" formed for purposes of the transaction "is of central importance," as is the board's and/or committee's "access to knowledgeable and independent advisors, including legal and financial advisors."[719] Here, as noted, the only committees formed for purposes of the transactions under investigation consisted solely of CEC, not CEOC, directors, and CEOC did not have access to its own independent legal or financial advisors. As discussed in the Report, these facts – standing alone – rendered the process for each of the transactions seriously flawed given CEC's conflicting interests as a party (unlike CEOC) on both sides of the transactions. "Other factors that have shown fair dealing in the past" – such as seeking "alternative, third-party buyers" for the assets in question – were likewise "inapplicable here," as also discussed in the Report.[720]

Fair price "relates to the economic and financial considerations of the proposed [transaction], including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of [the asset]."[721] Though it "relates closely to the determination of fair value under the Delaware appraisal statute,"[722] courts have

---

[716] *In re Nine Sys. Corp. S'holders Litig.*, C.A. No. 3940-VCN, 2014 WL 4383127, at *34 (Del. Ch. Sept. 4, 2014*), aff'd sub nom. Fuchs v. Wren Holdings, LLC*, __A.3d __, 2015 WL 8528870 (Del. Dec. 11, 2015) (citing *Tremont*, 694 A.2d at 432); *see also GPC XLI LLC v. Loral Space & Commc'ns Inc. (In re Loral Space & Commc'ns Inc.)*, C.A. Nos. 2808-VCS, 3022-VCS, 2008 WL 4293781, at *22 (Del. Ch. Sept. 19, 2008) (explaining that "the test for an entire fairness is not bifurcated between fair dealing and price"; rather, "[a]ll aspects of the issue must be examined as a whole since the question is one of entire fairness") (citation and internal punctuation omitted).

[717] *Emerald Partners v. Berlin*, 787 A.2d 85, 97 (Del. 2001), *aff'd after remand,* 840 A.2d 641 (Del. 2003) (citing *Weinberger*, 457 A.2d at 711).

[718] *Gesoff v. IIC Indus. Inc.*, 902 A.2d 1130, 1145-46 (Del. Ch. 2006).

[719] *Id.* at 1145-47, 1150 (finding that process was "crippled by the . . . complete lack of independent legal and financial advice").

[720] *Id.* at 1148-49.

[721] *Weinberger*, 457 A.2d at 711; *Bomarko, Inc. v. Int'l Telecharge, Inc.*, 794 A.2d 1161, 1180 (Del. Ch. 1999), *aff'd,* 766 A.2d 437 (Del. 2000).

[722] *In re Sunbelt Beverage Corp. S'holder Litig.*, C.A. No. 16089-CC, 2010 WL 26539, at *5 (Del. Ch. Jan. 5, 2010), *as revised* (Feb. 15, 2010) (citing Del. Code Ann. tit. 8, §262).

explained that "the fair price aspect of the entire fairness test is not itself a remedial calculation."[723] Rather, it is "flexible enough to accommodate the reality that '[t]he value of a corporation is not a point on a line, but a range of reasonable values.'" "The analysis of price can draw on any valuation methods or techniques generally accepted in the financial community."[724] "When conducting a fair price inquiry as part of the entire fairness standard of review, the court asks whether the transaction was one 'that a reasonable seller, under all circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept.'"[725] Courts have made clear that the "fairness" of the price "must be assessed as of the time it was agreed to, not on the basis of later events."[726]

Notably, while the price component "may be the preponderant consideration for most non-fraudulent decisions or transactions," a "grossly unfair process can render an otherwise fair price . . . not entirely fair."[727] Conversely, Delaware courts hold that a "fair process usually results in a fair price."[728]

Where a transaction subject to entire fairness review is challenged, defendants bear the burden of proof.[729] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[730]

Courts applying Delaware law have routinely found that transactions initiated and dominated by a parent corporation, controlling stockholder or other interested party fail to satisfy

---

[723]   *Orchard*, 88 A.3d at 30 (quoting *Cede & Co. v. Technicolor, Inc*., No. Civ.A. 7129, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003)).

[724]   *Id.*; *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1, 42 (Del. Ch. 2010).

[725]   *Orchard*, 88 A.3d at 30 (quoting *Cinerama, Inc.*, 663 A.2d at 1143).

[726]   *Loral*, 2008 WL 4293781, at *32, n.158; *see also, e.g., Gentile v. Rossette*, C.A. No. 20213-VCN, 2010 WL 2171613, at * 9 (Del. Ch. May 28, 2010); *In re Emerging Commc'ns, Inc. S'holders Litig.*, No. Civ. A. 16415, 2004 WL 1305745, at *11, *43 n.193 (Del. Ch. May 3, 2004).

[727]   *Nine Sys.*, 2014 WL 4383127, at *47, (citing *Weinberger*, 457 A.2d at 711) (internal quotation omitted).

[728]   *Theriault*, 51 A.3d at 1213, 1243-44.

[729]   *Orchard*, 88 A.3d at 24.  However, where a properly constituted, fully-empowered special committee of independent directors has been established, courts applying Delaware law may elect to shift the burden back to the plaintiff to establish that the transaction is not entirely fair. *Id*. at 24-25. Here, this would have required, at a minimum, the formation of a special committee of independent *CEOC – not CEC –* directors.

[730]   *Reis v. Hazelett Strip-Casting Corp*., 28 A.3d 442, 459 (Del. Ch. 2011) (*citing Gesoff*, 902 A.2d at 1145).

the entire fairness standard.[731] This is particularly so where the controlled company's board, in approving the transaction, fails to rely on an independent special committee and/or does not have access to its own independent advisors.[732] Here, as noted, no special committees of independent CEOC directors were created for any of the challenged transactions – indeed, as noted, there were no CEOC independent directors until late June 2014 – nor did CEOC have independent financial or legal advisors for any of the transactions.

### 6. Remedies for Breach of Fiduciary Duty

Under Delaware law, courts have broad discretion "in fashioning equitable and monetary relief under the entire fairness standard as may be appropriate."[733] There is no "specific damage

---

[731]   *See, e.g., Loral*, 2008 WL 4293781, at *2 (entire fairness standard not met where dominant shareholder "set in motion a process in which the only option that the Special Committee considered was a deal with [the dominant shareholder] itself"); *Sealy*, 532 A.2d at 1333, 1337 (entire fairness standard not met where, *inter alia*, majority stockholder "stood on both sides of the proposed merger and fixed its terms" and directors "[functioned] in a ministerial capacity to carry out the parent [corporation's] bidding") (brackets in original); *id.* at 1338 (the "board, in carrying out its affirmative duty to protect the interests of the minority, could not abdicate its obligation to make an informed decision on the fairness of the merger by simply deferring to the judgment of the controlling stockholder"); *Gesoff*, 902 A.2d at 1152 (finding that both process and price relating to transaction between parent and subsidiary were unfair where, although subsidiary was represented by one independent director and had its own financial and legal advisors, the evidence showed that the parent "orchestrate[d] an unfair process with a predetermined result"); *Emerging Comm'ns, Inc.*, 2004 WL 1305745, at *33-35 (directors of target company were beholden to controlling stockholder who sought to take company private and, therefore, were not independent for purposes of considering transaction).

[732]   *See*, *e.g.*, *NL Indus., Inc. v. Maxxam, Inc. (In re Maxxam, Inc./Federated Dev. S'holders Litig.)*, 659 A.2d 760, 772-75 (Del. Ch. 1995) (holding that transactions between parent and subsidiary were not "entirely fair" because, *inter alia*, special committee was not "disinterested and independent"); *Gesoff*, 902 A.2d at 1148-52 (merger between parent and subsidiary was not the product of fair dealing, where, *inter alia*, special committee that negotiated price consisted of only independent member of subsidiary's board and special committee's financial and legal advisors were selected by parent); *Sealy*, 532 A.2d at 1337 (entire fairness standard not met where, *inter alia*, "No independent directors were put on the [company's] board, no steps were taken to appoint independent representatives to negotiate on behalf of the minority, and no independent investment banker or other financial expert or legal counsel was retained to represent the minority interests").

[733]   *Int'l Telecharge, Inc. v. Bomarko, Inc.*, 766 A.2d 437, 440 (Del. 2000) (citing *Weinberger*, 457 A.2d at 714); *accord Theriault*, 51 A.3d at 1251-52 ("The Court of Chancery has the historic power to grant such . . . relief as the facts of a particular case may dictate" and "has greater discretion when making an award of damages in an action for breach of duty of loyalty than it would when assessing fair value in an appraisal action.") (citations and internal quotation marks omitted); *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 500 (Del. 1981) (the "choice of relief" is

formula" that courts must employ when a transaction is found not to be entirely fair.[734] Generally speaking, however, the plaintiff or corporation is entitled to recover what it would have received but for the breach of fiduciary duty.[735]

Where "the fiduciary breaches . . . ultimately relate to issues of fair value," the appropriate remedy is generally actual or "out-of-pocket" damages, measured as the difference between the consideration received and the actual value of the asset at the time it was transferred.[736]   This type of "damage award . . . approximates the difference between the price that the Special Committee would have approved had the [transaction] been entirely fair (*i.e.*, absent a breach of fiduciary duties) and the price that the Special Committee actually agreed to pay."[737]   In other words, "the difference in value between what was paid (the 'give') and the value of what was received (the 'get')."[738]   "Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages."[739]  Further, "uncertainties in awarding damages are generally resolved against the wrongdoer."[740]   In addition to awarding actual damages, courts also have the authority to grant pre-and post-judgment interest, and to determine the form of that interest.[741]

Where "out-of-pocket" or "actual" damages are considered to be inadequate to remedy a breach of the duty of loyalty, a plaintiff may instead seek rescission or rescissory damages.[742] Actual rescission of a consummated corporate transaction is often found to be infeasible,

---

"largely a matter of discretion with the Chancellor") *overruled on other grounds*, *sub nom.* *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

[734]  *Weinberger*, 457 A.2d at 703-704.

[735]  *See Int'l Telecharge, Inc.*, 766 A.2d at 440-441.

[736]  *Andra v. Blount*, 772 A.2d 183, 193 (Del. Ch. 2000); *In re Rural/Metro Corp. Stockholders Litig.*, 102 A.3d 205, 224-25 (Del. Ch. 2014); *Poole v. N. V. Deli Maatschappij*, 224 A.2d 260, 262-265 (Del. 1966).

[737]  *In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 815 (Del. Ch. 2011).

[738]  *Theriault*, 51 A.3d at 1252; *see also Bomarko*, 794 A.2d at 1184 (holding that plaintiffs were entitled to receive, "at a minimum, what their shares would have been worth at the time of the Merger if [defendant] had not breached his fiduciary duties").

[739]  *Bomarko*, 794 A.2d at 1184 (citations and internal quotation marks omitted); *S. Peru*, 52 A.3d at 814 ("Unlike the more exact process followed in an appraisal action, damages resulting from a breach of fiduciary duty are liberally calculated.").

[740]  *Thorpe v. CERBCO, Inc.*, C.A. No. 11713, 1993 WL 443406, at *12 (Del. Ch. Oct. 29, 1993).

[741]  *S. Peru*, 52 A.3d at 814.

[742]  *Orchard*, 88 A.3d at 39; *see also Oberly v. Kirby,* 592 A.2d 445, 466 (Del. 1991) (stating that if transaction failed to satisfy entire fairness test, "the stockholders may . . . demand rescission of the transaction or, if that is impractical, the payment of rescissory damages").

however, due to the "passage of time" and other factors.[743]   Here, the challenged transactions were all completed between nearly two and six years ago, making true rescission difficult, if not impracticable.   "Rescissory damages are 'the monetary equivalent of rescission' and may be awarded where 'the equitable remedy of rescission is impractical.'"[744]   Rescissory damages seek "(i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised control over  the  property in  the  interim and (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property."[745]   The court "may incorporate elements of rescissory damages into [its] determination of fair price, if [it] considers such elements: (1) susceptible to proof; and (2) appropriate under the circumstances."[746]   In certain circumstances, an award of consequential damages[747] or incidental damages[748] may be appropriate.

Transactional damages, such as those described above, may not be adequate or appropriate, however, to remedy a claim that a fiduciary usurped a corporate opportunity, as has been alleged in connection with the 2009 WSOP Transaction.[749]   In such cases, courts have held that restitution and disgorgement of profits are generally appropriate remedies, so long as there is a sufficient causal relationship between the fiduciary's breach and the profits to be disgorged.[750]

---

[743]   *Orchard*, 88 A.3d at 41 (*citing* Wolfe & Pittenger § 12.04(b) at 12-68); *see also Weinberger*, 457 A.2d at 714 (finding rescission impractical to undo completed cash out merger); *Lynch*, 429 A.2d at 501 (rescission inappropriate where the passage of time had "brought . . . corporate changes").

[744]   *Orchard*, 88 A.3d at 38 (quoting *Lynch,* 429 A.2d at 501); *accord S. Peru*, 52 A.3d at 815 ("Rescissory damages are the economic equivalent of rescission . . . ."); *Cinerama,* 663 A.2d at 1144 (explaining that rescissory damages are warranted "when equitable rescission of a transaction would be appropriate, but is not feasible").   *See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.04 [b] (2012).

[745]   *Orchard*, 88 A.3d at 38-39 (citing *Strassburger,* 752 A.2d at 580−81, and *Cinerama,* 663 A.2d at 1144-47.)

[746]   *Cede*, 634 A.2d at 371 (citing *Weinberger*, 457 A.2d at 714); *see also Bomarko*, 794 A.2d at 1185, n.9 ("out-of-pocket damages" were "insufficient" because the defendant's pre-merger misconduct caused additional injury).

[747]   *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 168 (Del. Ch. 2004) (award of consequential damages may be appropriate where the defendant's breach of fiduciary duties caused the corporation to suffer a diminution in value).

[748]   *Castleman*, 676 A.2d at 445 (awarding incidental damages where directors' breach of the duty of loyalty did not cause any transactional damages).

[749]   *See id* at 444-45.

[750]   *See id.* (requiring directors to disgorge profits resulting from their usurpation of a corporate opportunity for their own benefit); *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 837-38 (Del. 2011) (equity requires disgorgement of profits "[e]ven if the corporation did not

### B.   Aiding and Abetting Breach of Fiduciary Duty

#### 1.   Choice of Law

Under the "internal affairs doctrine," the law applicable to a claim for aiding or abetting breach of fiduciary duty is likewise the law of the state of incorporation.[751]   As set forth above, because CEOC is incorporated in Delaware, Delaware law would apply to any claim that a third-party aided and abetted a breach of fiduciary duty by CEOC's officers, directors or controlling stockholders.[752]

#### 2.   Elements

Under Delaware law, to prevail on a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must establish: (i) the existence of a fiduciary relationship; (ii) a breach of the fiduciary's duty; (iii) knowing participation in that breach by the defendants; and (iv) damages proximately caused by the breach.[753]   The Delaware Supreme Court has explained that "[k]nowing participation in a board's fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach."[754]   That is, the aider and abettor must act with *scienter* – "knowingly, intentionally, or with reckless indifference," in other words, an "illicit state of mind."[755]   For instance, "[i]f the third party knows that the board

---

suffer actual harm"); *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, C.A. No. 3290-VCP, 2009 WL 1387115, at *28 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) ("all profits obtained from a breach of the duty of loyalty should be disgorged") (citation omitted); *In re Mobilactive Media, LLC*, C.A. No. 5725-VCP, 2013 WL 297950, at *23 (Del. Ch. Jan. 25, 2013) ("In cases where the defendant breaches the duty of loyalty, the infringing party must disgorge all profits and equity from the usurpation.") (internal citation omitted).   *But see Boyer*, 754 A.2d at 907 (holding that disgorgement is not an appropriate remedy where the profits sought to be disgorged were "neither a product of a breach of fiduciary duty nor representative of a profit earned at [the corporation]'s expense").

[751]   *See Am. Int'l Grp., Inc. v. Greenberg (In re Am. Int'l Grp., Inc.)*, 965 A.2d 763, 817-22 (Del. Ch. 2009), *aff'd sub. nom.*, *Teachers' Ret. Sys. of La. v. PricewaterhouseCoopers LLP*, 11 A.3d 228 (Del. 2011); *Jano Justice Sys., Inc. v. Burton*, No. 08-cv-3209, 2010 WL 2012941, at *6 (C.D. Ill. May 20, 2010).

[752]   *Id.*; *CDX Liquidating Trust*, 640 F.3d at 212.

[753]   *In re Primedia, Inc. S'holders Litig.*, 67 A.3d 455, 496 (Del. Ch. 2013) (citing *Malpiede*, 780 A.2d at 1096); *see also Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006) (recognizing aiding and abetting claim against parent for breaches of fiduciary duty by directors of subsidiary).

[754]   *RBC Capital Markets, LLC v. Jervis*, No. 140, 2015, 2015 WL 7721882, at *32 (Del. Nov. 30, 2015) (citing *Malpiede*, 780 A.2d at 1097).

[755]   *Id.* at 33; *In re Comverge, Inc. S'holders Litig.*, C.A. No. 7368-VCP, 2014 WL 6686570, at *19 (Del. Ch. Nov. 25, 2014) (for a third party to "knowingly participate" in a fiduciary's breach, the third party must take advantage of a position of trust or conflicts of interest on the

is breaching its duty of care and participates in the breach by misleading the board or creating [an] informational vacuum, then the third party can be liable for aiding and abetting."[756]   As noted above, aiding and liability can exist even where the company's directors are exculpated under the corporate charter for damages for the underlying breach of fiduciary duty.[757]

Delaware courts have held, as a matter of law, that "aiding and abetting liability generally cannot attach to defendants who themselves owe fiduciary duties to the relevant entity and plaintiff."[758]   "The reason is that wrongful conduct on the part of the defendant fiduciary simply would give rise to direct liability for a breach of the duties he owes, rather than secondary liability on the theory of aiding and abetting."[759]   A plaintiff may, however, plead in the alternative claims for breach of fiduciary duty and aiding and abetting should the defendant ultimately be found not to have owed any fiduciary duties.[760]

Here, the Examiner has concluded that CEOC's directors and CEC, as CEOC's controlling stockholder, owed fiduciary duties to CEOC.   Accordingly, they cannot also be liable for aiding and abetting breach of fiduciary duty.   Viable aiding and abetting claims may, however, be asserted against the Sponsors and other parties who did not owe fiduciary duties to CEOC.   Indeed, courts have recognized that aiding and abetting liability may lie for entities or individuals who "dominated and controlled" a party alleged to have breached a fiduciary duty, as the Sponsors are alleged to have done with respect to CEC here.[761]

With respect to buyers generally, however, Delaware courts have long adhered to the rule that a "'bidder's attempts to reduce the sale price through arm's-length negotiations cannot give rise to liability for aiding and abetting,' so long as the bidder does not induce the target's fiduciaries to sell out the target's stockholders by creating or exploiting self-interest on the part of the fiduciaries."[762]   Courts have recognized that, in this context, "both sets of negotiating parties have a duty to seek the best deal available for the residual claimants they represent."[763]

---

part of directors); *Malpiede*, 780 A.2d at 1097 (a third party cannot aid and abet a breach of fiduciary duty unless it acts "with the knowledge that the conduct advocated or assisted constitutes such a breach").

[756]   *RBC Capital*, 2015 WL 7721882, at *32 (citation omitted).

[757]   *Rural Metro Corp.*, 88 A.3d at 87 ("Section 102(b)(7) does not extend to an aider and abettor.").

[758]   *CMS Inv. Holdings, LLC v. Castle*, C.A. No. 9468-VCP, 2015 WL 3894021, at *20 (Del. Ch. June 23, 2015).

[759]   *Id.*

[760]   *See, e.g., Wallace v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

[761]   *E.g., Metro. Life Ins. Co. v. Tremont Grp. Holdings, Inc.,* C.A. No. 7092-VCP, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012).

[762]   *Comverge*, 2014 WL 6686570, at *19 (quoting *Malpiede*, 780 A.2d at 1097).

[763]   *Id.*

"[A] bidder may be liable to the target's [residual claimants]," however, "if the bidder attempts to create or exploit conflicts of interest" on the part of the target's fiduciaries.[764]

Delaware courts have, in recent years, demonstrated an increased willingness to hold financial advisors liable for aiding and abetting breaches of fiduciary duty, reasoning that the "threat of liability helps incentivize [these] gatekeepers to provide sound advice, monitor clients, and deter client wrongs."[765]   Liability of financial advisors for aiding and abetting is most often based on undisclosed conflicts of interest.[766]

With respect to legal advisors, Delaware courts have noted that "[i]n most fiduciary duty cases, it will be exceedingly difficult for plaintiffs to state an aiding and abetting claim against corporate counsel."[767]   That said, Chief Justice Strine of the Delaware Supreme Court (writing as a Vice Chancellor) has explained that:

---

[764]   *RBC Capital*, 2015 WL 7721882, at *32 (citations omitted); *see also Gilbert v. El Paso Co.*, 490 A.2d 1050, 1058 (Del. Ch. 1984), *aff'd*, 575 A.2d 1131 (Del. 1990) ("[A]lthough an offeror may attempt to obtain the lowest possible price for stock through arm's-length negotiations with the target's board, it may not knowingly participate in the target board's breach of fiduciary duty by extracting terms which require the opposite party to prefer its interests at the expense of its shareholders.").

[765]   *Rural Metro Corp.*, 88 A.3d at 88-89, 95-97 (holding that financial advisor aided and abetted board's breach of fiduciary duty by, among other things, providing inconsistent and inaccurate valuations); *Pontiac Gen. Emps. Ret. Sys. v. Ballantine*, C.A. No. 9789-VCL, 2014 WL 5242135, Tr. at 76-77 (Del. Ch. Oct. 14, 2014) (transcript ruling) (denying motion to dismiss aiding and abetting claim where plaintiff alleged that the financial advisor agreed to implement "highly suspect" proxy put).

[766]   *See, e.g.*, *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 817 (Del. Ch. 2011) (reasonable likelihood of success on merits of claim that financial advisor aided and abetted breaches of fiduciary duty where advisor protected its own interests by withholding information from board and "secretly and selfishly manipulated the sale process to engineer a transaction that would permit [it] to obtain lucrative buy-side financing fees"); *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 435 (Del. Ch. 2012) (reasonable likelihood of success on merits of aiding and abetting claim against seller's financial advisor which also had an ownership interest in buyer); *Rural Metro Corp.*, 88 A.3d at 96-97, 99-101 (seller's financial advisor liable for aiding and abetting breach of fiduciary duty where, *inter alia*, advisor failed to disclose its interest in buy-side financing and knowingly created an informational vacuum regarding corporation's value that misled the board); *In re Zale Corp. Stockholders Litig.*, C.A. No. 9388-VCP, 2015 WL 5853693, at *22 (Del. Ch. Oct. 1, 2015), *opinion amended on reargument*, 2015 WL 6551418 (Del. Ch. Oct. 29, 2015) (permitting claim to proceed against seller's financial advisor for aiding and abetting a breach of fiduciary duty where advisor failed to disclose that member of its team had also sought to represent the buyer).

[767]   *Sample v. Morgan*, 935 A.2d 1046, 1065 (Del. Ch. 2007); *accord Abrams v. McGuireWoods, LLP*, 518 B.R. 491, 503-04 (N.D. Ind. 2014) (the provision of "routine legal services" in connection with a transaction that gives rise to a claim against officers and directors will not

. . . Delaware has no public policy interest in shielding corporate advisors from responsibility for consciously assisting the managers of Delaware corporations in breaching their fiduciary duties.  If well-pled facts can be pled that support the inference that a corporate advisor knowingly assisted corporate directors in breaching their fiduciary duties, Delaware has a public policy interest in ensuring that its courts are available to derivative plaintiffs who wish to hold that advisor accountable to the corporation.[768]

### 3.    Remedies for Aiding and Abetting Breach of Fiduciary Duty

A defendant who aids and abets a breach of fiduciary duty is jointly and severally liable for the damages resulting from the breach.[769]   Accordingly, "the injured person is entitled to recover his damages from [any] of the tortfeasors, without distinction, subject to the limitation that his total recovery may not exceed the full amount of his damage."[770]

---

support an "aiding and abetting" claim against the lawyers).  The standard for any malpractice claim in this context (which, here, would likely be governed by New York law) is likewise difficult to meet, requiring as it does proof of professional negligence, "but for" causation and ascertainable damages.  *See Diamond v. Sokol*, 468 F. Supp. 2d 626, 632-33 (S.D.N.Y. 2006) (mere error in judgment in "selection of one among several reasonable courses of action does not constitute malpractice"); *Bernstein v. Oppenheim & Co. P.C.*, 160 A.D.2d 428, 431, 554 N.Y.S.2d 487, 490 (1st Dep't 1990) ("dissatisfaction with strategic choices" does "not support a malpractice claim as a matter of law").  To satisfy the causation requirement, a plaintiff must establish that "it is more probable that the [complained of] event was caused by the defendant than that it was not."  *Diamond*, 468 F. Supp. 2d at 633; *Stonewell Corp. v. Conestoga Title Ins. Co.*, 678 F. Supp. 2d 203, 211-12 (S.D.N.Y. 2010) (failure to establish that attorney's conduct proximately caused harm requires dismissal of malpractice action, even where attorney was in fact negligent)

[768]   *Sample*, 935 A.2d at 1065; *see also, e.g., CMS Invest. Holdings*, 2015 WL 3894021, at *21 (denying motion to dismiss aiding and abetting claim against law firm which "presumably would have benefitted" if insiders were able to reassert control over entity in question); *Royal Indem. Co. v. Pepper Hamilton LLP*, 479 F. Supp. 2d 419, 431 (D. Del. 2007) (denying motion to dismiss aiding and abetting breach of fiduciary duty claim against law firm based on plaintiff's allegation "that [company] was insolvent . . . that such insolvency led to a fiduciary duty" and that defendant "knowingly participated" in the breach of fiduciary duty and gave company "substantial assistance through its . . . legal services").  *But see Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 519 (D. Del. 2012) (granting motion to dismiss aiding and abetting breach of fiduciary duty claim against law firm based on failure to adequately plead "knowing participation"); *Miller v. McCown De Leeuw & Co., Inc. (In re Brown Sch.)*, 368 B.R. 394, 413 (Bankr. D. Del. 2007) (same).

[769]   *Rural/Metro Corp. Stockholders Litig.*, 102 A.3d at 220-21.

[770]   *Id.* (brackets in original) (citing *Brown v. Comegys*, 500 A.2d 611, 613 (Del. Super. 1985)).

# APPENDIX 6:  SOLVENCY

# APPENDIX 6:  SOLVENCY

<u>Contents</u>:                                                                          <u>Page</u>

**Appendix 6-1:**     **Discounted Cash Flow Model with**          **6**
                    **Estimated Equity Value from Apollo Model**
                    **of CEOC, Dated as of August 2012, "Before**
                    **Actions"**

**Appendix 6-2:**     **Discounted Cash Flow Model with**          **7**
                    **Estimated Equity Value from Apollo Model**
                    **of CEOC, Dated as of August 2012, "After**
                    **Actions"**

**Appendix 6-3:**     **Discounted Cash Flow Model with**          **8**
                    **Estimated Equity Value from Apollo Model**
                    **of CEOC, Dated as of October 31, 2013,**
                    **"Base Case Scenario"**

**Appendix 6-4a:**    **Discounted Cash Flow Model with**          **9**
                    **Estimated Equity Value Based on EBITDA**
                    **in Long Range Plans Prepared at the Year-**
                    **End 2009**

**Appendix 6-4b:**    **Projected Property Level EBITDA from the**  **10**
                    **Long Range Plan Prepared at Year-End**
                    **2009**

**Appendix 6-4c:**    **Free Cash Flow Prior to Scheduled Debt**    **11**
                    **Payments Based on EBITDA in the Long**
                    **Range Plans Prepared at Year-End 2009**

**Appendix 6-5a:**   **Discounted Cash Flow Model with**                    **12**
                     **Estimated Equity Value Based on EBITDA**
                     **in Long Range Plans Prepared at the Year-**
                     **End 2010**

**Appendix 6-5b:**   **Projected Property Level EBITDA from the**            **13**
                     **Long Range Plan Prepared at Year-End**
                     **2010**

**Appendix 6-5c:**   **Free Cash Flow Prior to Scheduled Debt**              **14**
                     **Payments Based on EBITDA in the Long**
                     **Range Plans Prepared at Year-End 2010**

**Appendix 6-6a:**   **Discounted Cash Flow Model with**                    **15**
                     **Estimated Equity Value Based on EBITDA**
                     **in Long Range Plans Prepared at the Year-**
                     **End 2011**

**Appendix 6-6b:**   **Projected Property Level EBITDA from the**            **16**
                     **Long Range Plan Prepared at Year-End**
                     **2011**

**Appendix 6-6c:**   **Free Cash Flow Prior to Scheduled Debt**              **17**
                     **Payments Based on EBITDA in the Long**
                     **Range Plans Prepared at Year-End 2011**

**Appendix 6-7a:**   **Discounted Cash Flow Model with**                    **18**
                     **Estimated Equity Value Based on EBITDA**
                     **in Long Range Plans Prepared at the Year-**
                     **End 2012**

**Appendix 6-7b:**   **Projected Property Level EBITDA from the**            **19**
                     **Long Range Plan Prepared at Year-End**
                     **2012**

**Appendix 6-7c:**   **Free Cash Flow Prior to Scheduled Debt Payments Based on EBITDA in the Long Range Plans Prepared at Year-End 2012**   **20**

**Appendix 6-8a:**   **Discounted Cash Flow Model with Estimated Equity Value Based on EBITDA in Long Range Plans Prepared at the Year-End 2013**   **21**

**Appendix 6-8b:**   **Projected Property Level EBITDA from the Long Range Plan Prepared at Year-End 2013**   **22**

**Appendix 6-8c:**   **Free Cash Flow Prior to Scheduled Debt Payments Based on EBITDA in the Long Range Plans Prepared at Year-End 2013**   **23**

**Appendix 6-9a:**   **Discounted Cash Flow Model with Estimated Equity Value Based on EBITDA in Long Range Plans Prepared at the Year-End 2014**   **24**

**Appendix 6-9b:**   **Projected Property Level EBITDA from the Long Range Plan Prepared at Year-End 2014**   **25**

**Appendix 6-9c:**   **Free Cash Flow Prior to Scheduled Debt Payments Based on EBITDA in the Long Range Plans Prepared at Year-End 2014**   **26**

**Appendix 6-10:**   **CEOC Statement of Cash Flows for the Years Ending 2008 Through 2014**   **27**

**28**

**Appendix 6-11:**    **CEOC Sum-of-the-Parts Recovery Analysis
Created by Apollo, Dated as of October 4,
2013**

**Appendix 6-12:**    **Witnesses' Definitions of Solvency and                29
Insolvency**

**Solvency Appendix 6-1**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Discounted Cash Flow Model (DCF) with Estimated Equity Value
### Apollo CEOC Model as of August 2012: *Before Actions*
(Millions of $USD)

| | | Fiscal Year Ending December 31 | | | | | Terminal Period | |
|---|---|---|---|---|---|---|---|---|
| | | 2013 | | 2014 | | 2015 | | |
| **EBITDA** | $ | 1,438 | $ | 1,554 | $ | 1,710 | | |
| Less: Capital Expenditures | | (563) | | (527) | | (420) | | |
| Less: Net interest expense | | (1,764) | | (1,820) | | (1,859) | | |
| Less: Cash Taxes | | (73) | | (7) | | (8) | | |
| Less: Changes in working capital | | - | | - | | - | | |
| Less: Sponsor management fees | | (22) | | (22) | | (22) | | |
| Less: Non-operating cash flows & other [a] | | (124) | | (125) | | (112) | | |
| Free Cash Flow before Debt Maturities | | (1,108) | | (947) | | (711) | | |
| Plus: Net interest expense | | 1,764 | | 1,820 | | 1,859 | | |
| Unlevered-Free Cash Flow | $ | 656 | $ | 873 | $ | 1,148 | $ | 1,171 [b] |
| Capitalization Rate | | | | | | | | 10.0% [c] |
| Terminal Value | | | | | | | $ | 11,710 |
| | | | | | | | | |
| Discount periods to 12/31/12 | | 0.5 | | 1.5 | | 2.5 | | 2.5 |
| Discount Rate | | 12.0% | | 12.0% | | 12.0% | | 12.0% |
| Discount Factor | | 0.9449 | | 0.8437 | | 0.7533 | | 0.7533 |
| Present Value | $ | 620 | $ | 737 | $ | 865 | $ | 8,821 |
| | | | | | | | | |
| Enterprise Value @ 12/31/12 | $ | 11,042 | | | | | | |
| Less: Interest Bearing Debt @ 12/31/12 | | (17,787) | | | | | | |
| Plus: Cash @ 12/31/12 | | - | | | | | | |
| **Estimated Equity Value @ 12/31/12** | **$** | **(6,745)** | | | | | | |

**Source**:
"Caesars Entertainment Discussion Materials August 2012" Presentation (Aug. 12, 2012), at APOLLO-Examiner_00020156 [APOLLO-Examiner_00020150].

**Notes:**
(a) Includes change in project opening / integration costs and non-operating cash flows (remediation, severance, contingency).

(b) Free Cash Flow in the Terminal Period was projected to grow at the long-term growth rate of 2% from the prior year's free cash flow.

(c) Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-2**

## Caesars Entertainment Operating Company, Inc. (CEOC)
## Discounted Cash Flow Model (DCF) with Estimated Equity Value
## Apollo CEOC Model as of August 2012: *After Actions*
### (Millions of $USD)

| | | Fiscal Year Ending December 31 | | | Terminal Period |
|---|---|---|---|---|---|
| | | 2013 | 2014 | 2015 | |
| **EBITDA** | $ | 1,438 | $ 1,554 | $ 1,701 | |
| Less: Capital Expenditures | | (442) | (323) | (318) | |
| Less: Net interest expense | | (1,761) | (1,778) | (1,788) | |
| Less: Cash Taxes | | (73) | (7) | (8) | |
| Less: Changes in working capital | | - | - | - | |
| Less: Sponsor management fees | | (22) | (22) | (22) | |
| Less: Non-operating cash flows & other [(a)] | | (124) | (125) | (112) | |
| Free Cash Flow before Debt Maturities | | (984) | (701) | (547) | |
| Plus: Net interest expense | | 1,761 | 1,778 | 1,788 | |
| Unlevered-Free Cash Flow | $ | 777 | $ 1,077 | $ 1,241 | $ 1,266 [(b)] |
| Capitalization Rate | | | | | 10.0% [(c)] |
| Terminal Value | | | | $ | 12,658 |
| Discount periods to 12/31/12 | | 0.5 | 1.5 | 2.5 | 2.5 |
| Discount Rate | | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount Factor | | 0.9449 | 0.8437 | 0.7533 | 0.7533 |
| Present Value | $ | 734 | $ 909 | $ 935 | $ 9,535 |
| | | | | | |
| Enterprise Value @ 12/31/12 | $ | 12,113 | | | |
| Less: Interest Bearing Debt @ 12/31/12 | | (17,787) | | | |
| Plus: Cash @ 12/31/12 | | - | | | |
| **Estimated Equity Value @ 12/31/12** | $ | **(5,674)** | | | |

**Source**:
"Caesars Entertainment Discussion Materials August 2012" Presentation (Aug. 12, 2012), at APOLLO-Examiner_00020160 [APOLLO-Examiner_00020150].

**Notes:**
(a) Includes change in project opening / integration costs and non-operating cash flows (remediation, severance, contingency).

(b) Free Cash Flow in the Terminal Period was projected to grow at the long-term growth rate of 2% from the prior year's free cash flow.

(c) Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-3**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Discounted Cash Flow Model (DCF) with Estimated Equity Value
### Apollo CEOC Model as of October 31, 2013: *Base Case Scenario*
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | Terminal Period |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | |
| **EBITDA** | $ 1,273 | $ 1,349 | $ 1,447 | $ 1,499 | |
| Less:  Capital Expenditures | (585) | (366) | (159) | (140) | |
| Less:  Net interest expense | (1,735) | (1,787) | (1,748) | (1,773) | |
| Less:  Cash Taxes | (36) | (4) | (4) | (4) | |
| Less:  Changes in working capital | 88 | (0) | - | - | |
| Less:  Sponsor management fees | (22) | - | - | - | |
| Plus:  Asset Sales | 780 | - | - | - | |
| Less:  Non-operating cash flows & other [a] | (722) | (153) | (128) | (141) | |
| Free Cash Flow before Debt Maturities | (958) | (962) | (593) | (560) | |
| Plus:  Net interest expense | 1,735 | 1,787 | 1,748 | 1,773 | |
| Unlevered-Free Cash Flow | $ 777 | $ 825 | $ 1,155 | $ 1,213 | $ 1,237 [b] |
| Capitalization Rate | | | | | 10.0% [c] |
| Terminal Value | | | | | $ 12,375 |
| | | | | | |
| Discount periods to 12/31/12 | 0.5 | 1.5 | 2.5 | 3.5 | 3.5 |
| Discount Rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount Factor | 0.9449 | 0.8437 | 0.7533 | 0.6726 | 0.6726 |
| Present Value | $ 734 | $ 696 | $ 870 | $ 816 | $ 8,323 |

| | | |
|---|---|---|
| | Enterprise Value @ 12/31/12 | $ 11,439 |
| Less: | Interest Bearing Debt @ 12/31/12 | (18,814) |
| Plus: | Cash @ 12/31/12 | - |
| | **Estimated Equity Value @ 12/31/12** | **$ (7,375)** |

**Source**:
CEOC Discussion Material and Model Outputs (Oct. 31, 2013 ), at PRIV_INVESTIG_00039673; ApolloCZR-KE00139419 [PRIV_INVESTIG_00039673; ApolloCZR-KE00139419].

**Notes:**
(a) Includes change in project opening / integration costs and non-operating cash flows (remediation, severance, contingency).
(b) Free Cash Flow in the Terminal Period was projected to grow at the long-term growth rate of 2% from the prior year's free cash flow.
(c) Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-4a**

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Discounted Cash Flow Model (DCF) with Estimated Equity Value**
**Based on EBITDA in Long Range Plans Prepared at Year End 2009**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | | Terminal Period |
|---|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | |
| **EBITDA Per Long Range Plan** | $ 1,556 | $ 1,638 | $ 1,820 | $ 1,913 | $ 2,021 | $ 2,136 | |
| | | | | | | | |
| Depreciation and amortization | 573 | 522 | 554 | 411 | 303 | 303 | |
| Amortization of intangibles | 101 | 97 | 106 | 89 | 49 | 49 | |
| Total Depreciation & Amortization [a] | $ 675 | $ 619 | $ 660 | $ 500 | $ 352 | $ 352 | |
| | | | | | | | |
| EBIT (EBITDA - DA) | 881 | 1,020 | 1,161 | 1,413 | 1,669 | 1,783 | |
| Taxes @ 35% | 308 | 357 | 406 | 495 | 584 | 624 | |
| EBIT After Tax | $ 573 | $ 663 | $ 754 | $ 919 | $ 1,085 | $ 1,159 | |
| | | | | | | | |
| Plus:  Total Depreciation & Amortization | 675 | 619 | 660 | 500 | 352 | 352 | |
| Less:  Capital Expenditures [b] | (573) | (522) | (554) | (411) | (303) | (303) | |
| Unlevered-Free Cash Flow | $ 674 | $ 760 | $ 860 | $ 1,007 | $ 1,134 | $ 1,208 | $ 1,232 [c] |
| Capitalization Rate | | | | | | | 10.0% [d] |
| Terminal Value | | | | | | | $ 12,324 |
| Discount periods to 12/31/09 | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 5.5 | 5.5 |
| Discount rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount factor | 0.9449 | 0.8437 | 0.7533 | 0.6726 | 0.6005 | 0.5362 | 0.5362 |
| Present Value | $ 637 | $ 641 | $ 648 | $ 677 | $ 681 | $ 648 | $ 6,608 |

| | | |
|---|---|---|
| | Enterprise value @ 12/31/2009 | $ 10,540 |
| Less: | Interest Bearing Debt @ 12/31/2009 | (17,354) |
| Plus: | Cash @ 12/31/2009 | - |
| | **Estimated Equity Value @ 12/31/2009** | **$ (6,814)** |

**Sources**:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-Ks:  for the year ended Dec. 31, 2011 (Mar. 15, 2012); for the year ending Dec. 31, 2012 (Mar. 15, 2013); and for the year ended Dec. 31, 2013 (Mar. 17, 2014).  CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**

[a]   Depreciation and amortization, and Amortization of intangibles used in this DCF are the amounts reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were used for all periods subsequent to 2014.

[b]   Capital expenditures were set to equal Depreciation and amortization.

[c]   Free Cash Flow in the Terminal Period was projected  to grow at the long-term growth rate of 2% from the prior year's free cash flow.

[d]   Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-4b**

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Projected Property Level EBITDA from Long Range Plan Prepared at Year End 2009**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| **Las Vegas Properties** | | | | | | |
| Bally's Las Vegas | $    81 | $    89 | $   102 | $   108 | $   114 | $   121 |
| Caesars Palace Las Vegas | 221 | 245 | 281 | 298 | 317 | 337 |
| The Quad (Formerly Imperial Palace) | 33 | 37 | 42 | 44 | 47 | 49 |
| The Cromwell (Formerly Bill's Las Vegas) | 14 | 16 | 18 | 19 | 20 | 21 |
| Planet Hollywood [a] | N/A | N/A | N/A | N/A | N/A | N/A |
| **Other Nevada Properties** | | | | | | |
| Harrah's Tahoe | $    57 | $    63 | $    70 | $    74 | $    78 | $    83 |
| Harrah's Reno | 11 | 12 | 13 | 14 | 15 | 16 |
| **Atlantic City Properties** | | | | | | |
| Showboat Atlantic City | $    48 | $    51 | $    58 | $    62 | $    66 | $    71 |
| Bally's Atlantic City | 80 | 85 | 96 | 102 | 110 | 118 |
| Caesars Atlantic City | 88 | 93 | 105 | 112 | 120 | 129 |
| Harrah's Philadelphia (formerly Harrah's Chester) | 65 | 58 | 55 | 55 | 54 | 54 |
| **Illinois/Indiana Properties** | | | | | | |
| Joliet, IL | $    54 | $    45 | $    51 | $    52 | $    54 | $    56 |
| Horseshoe - Hammond, IN | 110 | 93 | 101 | 106 | 111 | 117 |
| Caesars Indiana | 61 | 68 | 78 | 82 | 87 | 92 |
| Players Metropolis, IL | 18 | 20 | 24 | 25 | 26 | 28 |
| **Iowa/Missouri Properties** | | | | | | |
| N Kansas City, MO | $    62 | $    65 | $    70 | $    73 | $    77 | $    81 |
| Harrah's St. Louis | 79 | 85 | 94 | 98 | 103 | 109 |
| Harrah's (Harvey's) Council Bluffs | 23 | 25 | 28 | 29 | 31 | 33 |
| Horseshoe Council Bluffs | 67 | 73 | 81 | 85 | 90 | 94 |
| **Mississippi/Louisiana Properties** | | | | | | |
| Grand Biloxi | $    19 | $    22 | $    27 | $    29 | $    30 | $    32 |
| Grand Casino Tunica, MS | 35 | 38 | 43 | 45 | 48 | 51 |
| Horseshoe - Tunica, MS | 80 | 87 | 99 | 104 | 110 | 116 |
| Sheraton Tunica | 19 | 21 | 23 | 25 | 26 | 28 |
| Louisiana Downs | 16 | 17 | 19 | 20 | 21 | 22 |
| Horseshoe - Bossier City, LA | 58 | 63 | 68 | 71 | 74 | 78 |
| Harrah's New Orleans | 80 | 86 | 90 | 95 | 100 | 106 |
| **International/Managed** | | | | | | |
| LCI | $    23 | $    24 | $    25 | $    25 | $    26 | $    27 |
| Punta | 22 | 22 | 23 | 24 | 25 | 26 |
| Ak-Chin | 7 | 7 | 8 | 8 | 8 | 8 |
| Rincon | 16 | 16 | 17 | 18 | 18 | 19 |
| Cherokee | 11 | 12 | 12 | 12 | 13 | 13 |
| **TOTAL EBITDA** | $ 1,556 | $ 1,638 | $ 1,820 | $ 1,913 | $ 2,021 | $ 2,136 |

<u>Source</u>:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].

<u>Note</u>:
(a) Planet Hollywood was acquired in 2010; therefore, there are no projections in the long range plans prepared in 2009.

**Solvency Appendix 6-4c**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Free Cash Flow Prior to Scheduled Debt Payments
### Based on EBITDA in Long Range Plans Prepared at Year End 2009
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
| **EBITDA Per Long Range Plan** | $ 1,556 | $ 1,638 | $ 1,820 | $ 1,913 | $ 2,021 | $ 2,136 |
| | | | | | | |
| Depreciation and amortization | 573 | 522 | 554 | 411 | 303 | 303 |
| Amortization of intangibles | 101 | 97 | 106 | 89 | 49 | 49 |
| Total Depreciation & Amortization [(a)] | $ 675 | $ 619 | $ 660 | $ 500 | $ 352 | $ 352 |
| | | | | | | |
| Interest Expense [(a)] | $ 1,782 | $ 2,031 | $ 2,002 | $ 2,145 | $ 2,228 | $ 2,228 |
| | | | | | | |
| Earnings Before Taxes | (901) | (1,011) | (841) | (732) | (559) | (445) |
| Taxes @ 35% | - | - | - | - | - | - |
| Earnings After Tax | $ (901) | $ (1,011) | $ (841) | $ (732) | $ (559) | $ (445) |
| | | | | | | |
| Plus:  Total Depreciation & Amortization | 675 | 619 | 660 | 500 | 352 | 352 |
| Less:  Capital Expenditures [(b)] | (573) | (522) | (554) | (411) | (303) | (303) |
| Free Cash Flow | $ (799) | $ (914) | $ (736) | $ (643) | $ (510) | $ (396) |

**Sources:**
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-Ks:  for the year ended Dec. 31, 2011 (Mar. 15, 2012); for the year ending Dec. 31, 2012 (Mar. 15, 2013); and for the year ended Dec. 31, 2013 (Mar. 17, 2014).  CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**

(a) Depreciation and amortization, Amortization of intangibles, and interest expense used in this DCF are the amounts reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were used for all periods subsequent to 2014.

(b) Capital expenditures were set to equal Depreciation and amortization.

**Solvency Appendix 6-5a**

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Discounted Cash Flow Model (DCF) with Estimated Equity Value**
**Based on EBITDA in Long Range Plans Prepared at Year End 2010**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | | Terminal |
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Period |
|---|---|---|---|---|---|---|---|
| **EBITDA Per Long Range Plan** | $ 1,420 | $ 1,625 | $ 1,877 | $ 2,006 | $ 2,142 | $ 2,289 | |
| | | | | | | | |
| Depreciation and amortization | 522 | 554 | 411 | 303 | 303 | 303 | |
| Amortization of intangibles | 97 | 106 | 89 | 49 | 49 | 49 | |
| Total Depreciation & Amortization [(a)] | $ 619 | $ 660 | $ 500 | $ 352 | $ 352 | 352 | |
| | | | | | | | |
| EBIT (EBITDA - DA) | 801 | 965 | 1,377 | 1,654 | 1,790 | 1,937 | |
| Taxes @ 35% | 280 | 338 | 482 | 579 | 627 | 678 | |
| EBIT After Tax | $ 521 | $ 628 | $ 895 | $ 1,075 | $ 1,164 | $ 1,259 | |
| | | | | | | | |
| Plus:   Depreciation & Amortization | 619 | 660 | 500 | 352 | 352 | 352 | |
| Less:   Capital Expenditures [(b)] | (522) | (554) | (411) | (303) | (303) | (303) | |
| Unlevered-Free Cash Flow | $ 618 | $ 733 | $ 984 | $ 1,124 | $ 1,213 | $ 1,308 | $ 1,334 [(c)] |
| Capitalization Rate | | | | | | | 10.0% [(d)] |
| Terminal Value | | | | | | | $ 13,344 |
| Discount periods to 12/31/10 | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 5.5 | 5.5 |
| Discount rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount factor | 0.9449 | 0.8437 | 0.7533 | 0.6726 | 0.6005 | 0.5362 | 0.5362 |
| Present Value | $ 584 | $ 619 | $ 741 | $ 756 | $ 728 | $ 701 | $ 7,154 |

|  |  |  |
|---|---|---|
| | Enterprise value @ 12/31/2010 | $ 11,283 |
| Less: | Interest Bearing Debt @ 12/31/2010 | (17,795) |
| Plus: | Cash @ 12/31/2010 | - |
| | **Estimated Equity Value @ 12/31/2010** | **$ (6,511)** |

**Sources**:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-Ks: for the year ending Dec. 31, 2012 (Mar. 15, 2013); and for the year ended Dec. 31, 2013 (Mar. 17, 2014). CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**
[(a)]    Depreciation and amortization, and Amortization of intangibles used in this DCF are the amounts reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC. 2014 amounts were used for all periods subsequent to 2014.

[(b)]    Capital expenditures were set to equal Depreciation and amortization.

[(c)]    Free Cash Flow in the Terminal Period was projected to grow at the long-term growth rate of 2% from the prior year's free cash flow.

[(d)]    Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-5b**

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Projected Property Level EBITDA from Long Range Plan Prepared at Year End 2010**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| **Las Vegas Properties** | | | | | | |
| Bally's Las Vegas | $ 66 | $ 83 | $ 102 | $ 112 | $ 121 | $ 132 |
| Caesars Palace Las Vegas | 212 | 268 | 331 | 361 | 392 | 426 |
| The Quad (Formerly Imperial Palace) | 23 | 29 | 35 | 38 | 42 | 45 |
| The Cromwell (Formerly Bill's Las Vegas) | 10 | 13 | 16 | 17 | 18 | 20 |
| Planet Hollywood [(a)] | N/A | N/A | N/A | N/A | N/A | N/A |
| **Other Nevada Properties** | | | | | | |
| Harrah's Tahoe | $ 50 | $ 60 | $ 72 | $ 80 | $ 88 | $ 96 |
| Harrah's Reno | 4 | 6 | 9 | 11 | 13 | 16 |
| **Atlantic City Properties** | | | | | | |
| Showboat Atlantic City | $ 29 | $ 32 | $ 38 | $ 41 | $ 45 | $ 48 |
| Bally's Atlantic City | 48 | 53 | 63 | 68 | 74 | 79 |
| Caesars Atlantic City | 70 | 76 | 87 | 93 | 99 | 105 |
| Harrah's Philadelphia (formerly Harrah's Chester) | 82 | 83 | 90 | 94 | 97 | 101 |
| **Illinois/Indiana Properties** | | | | | | |
| Joliet, IL | $ 43 | $ 47 | $ 51 | $ 53 | $ 55 | $ 57 |
| Horseshoe - Hammond, IN | 130 | 141 | 155 | 162 | 170 | 178 |
| Caesars Indiana | 59 | 71 | 78 | 83 | 87 | 91 |
| Players Metropolis, IL | 19 | 24 | 27 | 28 | 30 | 31 |
| **Iowa/Missouri Properties** | | | | | | |
| N Kansas City, MO | $ 60 | $ 57 | $ 66 | $ 71 | $ 76 | $ 81 |
| Harrah's St. Louis | 85 | 92 | 99 | 102 | 106 | 110 |
| Harrah's (Harvey's) Council Bluffs | 21 | 22 | 24 | 25 | 26 | 27 |
| Horseshoe Council Bluffs | 73 | 79 | 85 | 88 | 91 | 94 |
| **Mississippi/Louisiana Properties** | | | | | | |
| Grand Biloxi | $ 11 | $ 15 | $ 19 | $ 22 | $ 24 | $ 27 |
| Grand Casino Tunica, MS | 21 | 32 | 46 | 53 | 61 | 70 |
| Horseshoe - Tunica, MS | 76 | 88 | 101 | 106 | 111 | 117 |
| Sheraton Tunica | 11 | 13 | 15 | 16 | 16 | 17 |
| Louisiana Downs | 10 | 12 | 16 | 17 | 19 | 22 |
| Horseshoe - Bossier City, LA | 47 | 57 | 69 | 76 | 83 | 91 |
| Harrah's New Orleans | 74 | 82 | 90 | 95 | 99 | 104 |
| **International/Managed** | | | | | | |
| LCI | $ 31 | $ 32 | $ 33 | $ 34 | $ 35 | $ 36 |
| Punta | 29 | 30 | 31 | 33 | 34 | 35 |
| Ak-Chin | 6 | 7 | 7 | 7 | 7 | 8 |
| Rincon | 11 | 11 | 12 | 12 | 12 | 13 |
| Cherokee | 9 | 9 | 9 | 10 | 10 | 10 |
| **TOTAL EBITDA** | **$ 1,420** | **$ 1,625** | **$ 1,877** | **$ 2,006** | **$ 2,142** | **$ 2,289** |

<u>Source</u>:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].

<u>Note</u>:
(a) Planet Hollywood was acquired in 2010; however, there are no projections for Planet Hollywood in the long range plans prepared in 2010.

**Solvency Appendix 6-5c**

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Free Cash Flow Prior to Scheduled Debt Payments**
**Based on EBITDA in Long Range Plans Prepared at Year End 2010**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
| **EBITDA Per Long Range Plan** | $ 1,420 | $ 1,625 | $ 1,877 | $ 2,006 | $ 2,142 | $ 2,289 |
| | | | | | | |
| Depreciation and amortization | 522 | 554 | 411 | 303 | 303 | 303 |
| Amortization of intangibles | 97 | 106 | 89 | 49 | 49 | 49 |
| Total Depreciation & Amortization [a] | $ 619 | $ 660 | $ 500 | $ 352 | $ 352 | $ 352 |
| | | | | | | |
| Interest Expense [a] | $ 2,031 | $ 2,002 | $ 2,145 | $ 2,228 | $ 2,228 | $ 2,228 |
| | | | | | | |
| Earnings Before Taxes | (1,230) | (1,036) | (768) | (575) | (438) | (291) |
| Taxes @ 35% | - | - | - | - | - | - |
| Earnings After Taxes | $ (1,230) | $ (1,036) | $ (768) | $ (575) | $ (438) | $ (291) |
| | | | | | | |
| Plus: Depreciation & Amortization | 619 | 660 | 500 | 352 | 352 | 352 |
| Less: Capital Expenditures [b] | (522) | (554) | (411) | (303) | (303) | (303) |
| Free Cash Flow | $ (1,133) | $ (931) | $ (679) | $ (526) | $ (389) | $ (242) |

**Sources**:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-Ks:  for the year ending Dec. 31, 2012 (Mar. 15, 2013); and for the year ended Dec. 31, 2013 (Mar. 17, 2014).  CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**

(a)    Depreciation and amortization, Amortization of intangibles, and interest expense used in this DCF are the amounts reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were used for all periods subsequent to 2014.

(b)    Capital expenditures were set to equal Depreciation and amortization.

**Solvency Appendix 6-6a**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Discounted Cash Flow Model (DCF) with Estimated Equity Value
### Based on EBITDA in Long Range Plans Prepared at Year End 2011
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | Terminal Period |
|---|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 | |
| **EBITDA Per Long Range Plan** | $ 1,693 | $ 1,968 | $ 2,186 | $ 2,341 | $ 2,502 | |
| | | | | | | |
| Depreciation and amortization | 554 | 411 | 303 | 303 | 303 | |
| Amortization of intangibles | 106 | 89 | 49 | 49 | 49 | |
| Total Depreciation & Amortization [a] | $ 660 | $ 500 | $ 352 | $ 352 | $ 352 | |
| | | | | | | |
| EBIT (EBITDA - DA) | 1,034 | 1,468 | 1,834 | 1,989 | 2,150 | |
| Taxes @ 35% | 362 | 514 | 642 | 696 | 752 | |
| EBIT After Tax | $ 672 | $ 954 | $ 1,192 | $ 1,293 | $ 1,397 | |
| | | | | | | |
| Plus:  Depreciation & Amortization | 660 | 500 | 352 | 352 | 352 | |
| Less:  Capital Expenditures [b] | (554) | (411) | (303) | (303) | (303) | |
| Unlevered-Free Cash Flow | $ 778 | $ 1,043 | $ 1,241 | $ 1,342 | $ 1,446 | $ 1,475 [c] |
| Capitalization Rate | | | | | | 10.0% [d] |
| Terminal Value | | | | | | $ 14,752 |
| Discount periods to 12/31/11 | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 4.5 |
| Discount rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount factor | 0.9449 | 0.8437 | 0.7533 | 0.6726 | 0.6005 | 0.6005 |
| Present Value | $ 735 | $ 880 | $ 935 | $ 902 | $ 869 | $ 8,859 |

| | |
|---|---|
| Enterprise value @ 12/31/2011 | $ 13,179 |
| Less:  Interest Bearing Debt @ 12/31/2011 | (18,766) |
| Plus:  Cash @ 12/31/2011 | - |
| **Estimated Equity Value @ 12/31/2011** | **$ (5,587)** |

**Sources**:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014).  CEOC Selected Financial Information
December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-
E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**
(a)   Depreciation and amortization, and Amortization of intangibles used in this DCF are the amounts reported in Exhibit
      99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were used for all periods
      subsequent to 2014.
(b)   Capital expenditures were set to equal Depreciation and amortization.
(c)   Free Cash Flow in the Terminal Period was projected  to grow at the long-term growth rate of 2% from the prior
      year's free cash flow.
(d)   Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-6b**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Projected Property Level EBITDA from Long Range Plan Prepared at Year End 2011
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| **Las Vegas Properties** | | | | | |
| Bally's Las Vegas | $ 88 | $ 112 | $ 127 | $ 138 | $ 150 |
| Caesars Palace Las Vegas | 310 | 393 | 446 | 483 | 523 |
| The Quad (Formerly Imperial Palace) | 40 | 51 | 64 | 70 | 76 |
| The Cromwell (Formerly Bill's Las Vegas) | 14 | 18 | 21 | 23 | 26 |
| Planet Hollywood | 115 | 142 | 160 | 174 | 187 |
| **Other Nevada Properties** | | | | | |
| Harrah's Tahoe | $ 52 | $ 59 | $ 65 | $ 69 | $ 73 |
| Harrah's Reno | 6 | 8 | 10 | 11 | 13 |
| **Atlantic City Properties** | | | | | |
| Showboat Atlantic City | $ 41 | $ 50 | $ 54 | $ 59 | $ 64 |
| Bally's Atlantic City | 32 | 34 | 40 | 47 | 54 |
| Caesars Atlantic City | 56 | 59 | 65 | 72 | 80 |
| Harrah's Philadelphia (formerly Harrah's Chester) | 77 | 86 | 91 | 97 | 102 |
| **Illinois/Indiana Properties** | | | | | |
| Joliet, IL | $ 53 | $ 57 | $ 61 | $ 63 | $ 65 |
| Horseshoe - Hammond, IN | 108 | 122 | 133 | 140 | 148 |
| Caesars Indiana | 66 | 74 | 82 | 86 | 90 |
| Players Metropolis, IL | 24 | 27 | 29 | 31 | 32 |
| **Iowa/Missouri Properties** | | | | | |
| N Kansas City, MO | $ 53 | $ 58 | $ 63 | $ 66 | $ 69 |
| Harrah's St. Louis | 87 | 95 | 103 | 107 | 112 |
| Harrah's (Harvey's) Council Bluffs | 19 | 21 | 23 | 24 | 26 |
| Horseshoe Council Bluffs | 81 | 87 | 92 | 95 | 98 |
| **Mississippi/Louisiana Properties** | | | | | |
| Grand Biloxi | $ 16 | $ 19 | $ 21 | $ 23 | $ 25 |
| Grand Casino Tunica, MS | 18 | 24 | 29 | 32 | 35 |
| Horseshoe - Tunica, MS | 74 | 81 | 87 | 91 | 96 |
| Sheraton Tunica | 9 | 11 | 12 | 13 | 14 |
| Louisiana Downs | 8 | 11 | 13 | 15 | 16 |
| Horseshoe - Bossier City, LA | 58 | 65 | 70 | 74 | 78 |
| Harrah's New Orleans | 86 | 93 | 102 | 108 | 114 |
| **International/Managed** | | | | | |
| LCI | $ 41 | $ 46 | $ 51 | $ 56 | $ 62 |
| Punta | 36 | 39 | 42 | 45 | 48 |
| Ak-Chin | 7 | 7 | 7 | 7 | 7 |
| Rincon | 11 | 12 | 12 | 12 | 12 |
| Cherokee | 8 | 8 | 8 | 8 | 8 |
| **TOTAL EBITDA** | **$ 1,693** | **$ 1,968** | **$ 2,186** | **$ 2,341** | **$ 2,502** |

<u>Source:</u>
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].

**Solvency Appendix 6-6c**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Free Cash Flow Prior to Scheduled Debt Payments
### Based on EBITDA in Long Range Plans Prepared at Year End 2011
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | |
|---|---|---|---|---|---|
| | 2012 | 2013 | 2014 | 2015 | 2016 |
| **EBITDA Per Long Range Plan** | $ 1,693 | $ 1,968 | $ 2,186 | $ 2,341 | $ 2,502 |
| | | | | | |
| Depreciation and amortization | 554 | 411 | 303 | 303 | 303 |
| Amortization of intangibles | 106 | 89 | 49 | 49 | 49 |
| Total Depreciation & Amortization [a] | $ 660 | $ 500 | $ 352 | $ 352 | $ 352 |
| | | | | | |
| Interest Expense [a] | $ 2,002 | $ 2,145 | $ 2,228 | $ 2,228 | $ 2,228 |
| | | | | | |
| Earnings Before Taxes | (968) | (677) | (395) | (240) | (79) |
| Taxes @ 35% | - | - | - | - | - |
| Earnings After Taxes | $ (968) | $ (677) | $ (395) | $ (240) | $ (79) |
| | | | | | |
| Plus: Depreciation & Amortization | 660 | 500 | 352 | 352 | 352 |
| Less: Capital Expenditures [b] | (554) | (411) | (303) | (303) | (303) |
| Free Cash Flow | $ (862) | $ (588) | $ (346) | $ (191) | $ (30) |

<u>Sources</u>:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014). CEOC Selected Financial Information
December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-
E57E19BCC522/CEOC Selected Financial Information December 2014.pdf.

<u>Notes:</u>
[a]   Depreciation and amortization, Amortization of intangibles, and interest expense used in this DCF are the amounts
      reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC. 2014 amounts were
      used for all periods subsequent to 2014.
[b]   Capital expenditures were set to equal Depreciation and amortization.

Solvency Appendix 6-7a

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Discounted Cash Flow Model (DCF) with Estimated Equity Value**
**Based on EBITDA in Long Range Plans Prepared at Year End 2012**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | Terminal Period |
|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **EBITDA Per Long Range Plan** | $ 1,520 | $ 1,695 | $ 1,881 | $ 2,073 | $ 2,212 | |
| | | | | | | |
| Depreciation and amortization | 411 | 303 | 303 | 303 | 303 | |
| Amortization of intangibles | 89 | 49 | 49 | 49 | 49 | |
| Total Depreciation & Amortization [a] | $ 500 | $ 352 | $ 352 | $ 352 | $ 352 | |
| | | | | | | |
| EBIT (EBITDA - DA) | 1,020 | 1,343 | 1,529 | 1,721 | 1,859 | |
| Taxes @ 35% | 357 | 470 | 535 | 602 | 651 | |
| EBIT After Tax | $ 663 | $ 873 | $ 994 | $ 1,119 | $ 1,209 | |
| | | | | | | |
| Plus:  Depreciation & Amortization | 500 | 352 | 352 | 352 | 352 | |
| Less:  Capital Expenditures [b] | (411) | (303) | (303) | (303) | (303) | |
| Unlevered-Free Cash Flow | $ 752 | $ 922 | $ 1,043 | $ 1,168 | $ 1,258 | $ 1,283 [c] |
| Capitalization Rate | | | | | | 10.0% [d] |
| Terminal Value | | | | | | $ 12,828 |
| Discount periods to 12/31/12 | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 4.5 |
| Discount rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount factor | 0.9449 | 0.8437 | 0.7533 | 0.6726 | 0.6005 | 0.6005 |
| Present Value | $ 710 | $ 778 | $ 786 | $ 785 | $ 755 | $ 7,703 |

| | | |
|---|---|---|
| | Enterprise value @ 12/31/2012 | $ 11,518 |
| Less: | Interest Bearing Debt @ 12/31/2012 | (20,529) |
| Plus: | Cash @ 12/31/2012 | - |
| | **Estimated Equity Value @ 12/31/2012** | **$ (9,011)** |

**Sources**:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014).  CEOC Selected Financial Information
December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-
E57E19BCC522/CEOC Selected Financial Information December 2014.pdf.

**Notes:**
(a)     Depreciation and amortization, and Amortization of intangibles used in this DCF are the amounts reported in Exhibit
         99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were used for all periods
         subsequent to 2014.
(b)     Capital expenditures were set to equal Depreciation and amortization.
(c)     Free Cash Flow in the Terminal Period was projected  to grow at the long-term growth rate of 2% from the prior
         year's free cash flow.
(d)     Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

Solvency Appendix 6-7b

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Projected Property Level EBITDA from Long Range Plan Prepared at Year End 2012**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | | 2014 | | 2015 | | 2016 | | 2017 | |
| **Las Vegas Properties** | | | | | | | | | | |
| Bally's Las Vegas | $ | 69 | $ | 87 | $ | 102 | $ | 119 | $ | 130 |
| Caesars Palace Las Vegas | | 292 | | 345 | | 402 | | 464 | | 504 |
| The Quad (Formerly Imperial Palace) | | 33 | | 44 | | 51 | | 59 | | 65 |
| The Cromwell (Formerly Bill's Las Vegas) | | 0 | | 40 | | 46 | | 49 | | 53 |
| Planet Hollywood | | 94 | | 111 | | 129 | | 149 | | 161 |
| **Other Nevada Properties** | | | | | | | | | | |
| Harrah's Tahoe | $ | 42 | $ | 42 | $ | 46 | $ | 50 | $ | 53 |
| Harrah's Reno | | 4 | | 4 | | 5 | | 6 | | 7 |
| **Atlantic City Properties** | | | | | | | | | | |
| Showboat Atlantic City | $ | 37 | $ | 35 | $ | 39 | $ | 43 | $ | 44 |
| Bally's Atlantic City | | 31 | | 29 | | 33 | | 38 | | 40 |
| Caesars Atlantic City | | 79 | | 77 | | 82 | | 88 | | 91 |
| Harrah's Philadelphia (formerly Harrah's Chester) | | 66 | | 64 | | 68 | | 72 | | 77 |
| **Illinois/Indiana Properties** | | | | | | | | | | |
| Joliet, IL | $ | 54 | $ | 56 | $ | 59 | $ | 62 | $ | 64 |
| Horseshoe - Hammond, IN | | 109 | | 121 | | 134 | | 148 | | 155 |
| Caesars Indiana | | 65 | | 71 | | 77 | | 83 | | 87 |
| Players Metropolis, IL | | 19 | | 19 | | 20 | | 21 | | 22 |
| **Iowa/Missouri Properties** | | | | | | | | | | |
| N Kansas City, MO | $ | 60 | $ | 64 | $ | 69 | $ | 73 | $ | 77 |
| Harrah's St. Louis [a] | | - | | - | | - | | - | | - |
| Harrah's (Harvey's) Council Bluffs | | 19 | | 21 | | 23 | | 25 | | 26 |
| Horseshoe Council Bluffs | | 87 | | 91 | | 96 | | 101 | | 105 |
| **Mississippi/Louisiana Properties** | | | | | | | | | | |
| Grand Biloxi | $ | 16 | $ | 17 | $ | 19 | $ | 20 | $ | 22 |
| Grand Casino Tunica, MS | | 19 | | 19 | | 21 | | 24 | | 27 |
| Horseshoe - Tunica, MS | | 69 | | 69 | | 72 | | 76 | | 79 |
| Sheraton Tunica | | 9 | | 9 | | 10 | | 11 | | 11 |
| Louisiana Downs | | 6 | | 6 | | 7 | | 8 | | 10 |
| Horseshoe - Bossier City, LA | | 52 | | 46 | | 49 | | 52 | | 55 |
| Harrah's New Orleans | | 98 | | 106 | | 115 | | 124 | | 130 |
| **International/Managed** | | | | | | | | | | |
| LCI | $ | 42 | $ | 44 | $ | 45 | $ | 47 | $ | 52 |
| Punta | | 32 | | 34 | | 35 | | 37 | | 40 |
| Ak-Chin | | 5 | | 6 | | 6 | | 6 | | 6 |
| Rincon | | 9 | | 13 | | 13 | | 14 | | 14 |
| Cherokee | | 4 | | 4 | | 5 | | 5 | | 5 |
| **TOTAL EBITDA** | $ | 1,520 | $ | 1,695 | $ | 1,881 | $ | 2,073 | $ | 2,212 |

Source:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].

Note:
(a) Harrah's St. Louis was sold to Penn in 2012.

Solvency Appendix 6-7c

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Free Cash Flow Prior to Scheduled Debt Payments
### Based on EBITDA in Long Range Plans Prepared at Year End 2012
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 |
| **EBITDA Per Long Range Plan** | $ 1,520 | $ 1,695 | $ 1,881 | $ 2,073 | $ 2,212 |
| | | | | | |
| Depreciation and amortization | 411 | 303 | 303 | 303 | 303 |
| Amortization of intangibles | 89 | 49 | 49 | 49 | 49 |
| Total Depreciation & Amortization [a] | $ 500 | $ 352 | $ 352 | $ 352 | $ 352 |
| | | | | | |
| Interest Expense [a] | $ 2,145 | $ 2,228 | $ 2,228 | $ 2,228 | $ 2,228 |
| | | | | | |
| Earnings Before Taxes | (1,125) | (885) | (699) | (507) | (369) |
| Taxes @ 35% | - | - | - | - | - |
| Earnings After Taxes | $ (1,125) | $ (885) | $ (699) | $ (507) | $ (369) |
| | | | | | |
| Plus:  Depreciation & Amortization | 500 | 352 | 352 | 352 | 352 |
| Less:  Capital Expenditures [b] | (411) | (303) | (303) | (303) | (303) |
| Free Cash Flow | $ (1,036) | $ (836) | $ (650) | $ (458) | $ (320) |

**Sources**:
Deloitte Analysis of Projections used for Impairment (Aug. 20, 2015) [DT0029037 at Tab '4-CEC EBITDA'].
Exhibit 99.1 to CEC Form 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014).  CEOC Selected Financial Information
December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-
E57E19BCC522/CEOC Selected Financial Information December 2014.pdf.

**Notes:**

[a]     Depreciation and amortization, Amortization of intangibles, and interest expense used in this DCF are the amounts
         reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were
         used for all periods subsequent to 2014.

[b]     Capital expenditures were set to equal Depreciation and amortization.

**Solvency Appendix 6-8a**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Discounted Cash Flow Model (DCF) with Estimated Equity Value
### Based on EBITDA in Long Range Plans Prepared at Year End 2013
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | | Terminal Period |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | |
| **EBITDA Per Long Range Plan** | $ 1,203 | $ 1,286 | $ 1,294 | $ 1,394 | $ 1,500 | |
| | | | | | | |
| Depreciation and amortization | 303 | 303 | 303 | 303 | 303 | |
| Amortization of intangibles | 49 | 49 | 49 | 49 | 49 | |
| Total Depreciation & Amortization [a] | $ 352 | $ 352 | $ 352 | $ 352 | $ 352 | |
| | | | | | | |
| EBIT (EBITDA - DA) | 851 | 934 | 942 | 1,042 | 1,148 | |
| Taxes @ 35% | 298 | 327 | 330 | 365 | 402 | |
| EBIT After Tax | $ 553 | $ 607 | $ 612 | $ 677 | $ 746 | |
| | | | | | | |
| Plus:  Depreciation & Amortization | 352 | 352 | 352 | 352 | 352 | |
| Less:  Capital Expenditures [b] | (303) | (303) | (303) | (303) | (303) | |
| Unlevered-Free Cash Flow | $ 602 | $ 656 | $ 661 | $ 726 | $ 795 | $ 811 [c] |
| Capitalization Rate | | | | | | 10.0% [d] |
| Terminal Value | | | | | | $ 8,110 |
| Discount periods to 12/31/13 | 0.5 | 1.5 | 2.5 | 3.5 | 4.5 | 4.5 |
| Discount rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount factor | 0.9449 | 0.8437 | 0.7533 | 0.6726 | 0.6005 | 0.6005 |
| Present Value | $ 569 | $ 553 | $ 498 | $ 489 | $ 477 | $ 4,870 |

| | | |
|---|---|---|
| | Enterprise value @ 12/31/2013 | $ 7,456 |
| Less: | Interest Bearing Debt @ 12/31/2013 | (19,288) |
| Plus: | Cash @ 12/31/2013 | - |
| | **Estimated Equity Value @ 12/31/2013** | **$ (11,832)** |

**Sources**:

Deloitte Analysis of CEC Projections Long Range Plan (Aug. 19, 2015) [DT0003746 at Tab 'A. Projected EBITDA 12-31'].
CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**

(a)    Depreciation and amortization, and Amortization of intangibles used in this DCF are the amounts reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were used for all periods subsequent to 2014.

(b)    Capital expenditures were set to equal Depreciation and amortization.

(c)    Free Cash Flow in the Terminal Period was projected  to grow at the long-term growth rate of 2% from the prior year's free cash flow.

(d)    Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-8b**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Projected Property Level EBITDA from Long Range Plan Prepared at Year End 2013
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | |
|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| **Las Vegas Properties** | | | | | |
| Bally's Las Vegas | $ 79 | $ 88 | $ 93 | $ 105 | $ 116 |
| Caesars Palace Las Vegas | 287 | 312 | 327 | 361 | 397 |
| The Quad (Formerly Imperial Palace) | 49 | 91 | 95 | 106 | 117 |
| The Cromwell (Formerly Bill's Las Vegas) | - | - | - | - | - |
| Planet Hollywood [a] | N/A | N/A | N/A | N/A | N/A |
| **Other Nevada Properties** | | | | | |
| Harrah's Tahoe | $ 56 | $ 58 | $ 58 | $ 61 | $ 64 |
| Harrah's Reno | 5 | 6 | 6 | 7 | 8 |
| **Atlantic City Properties** | | | | | |
| Showboat Atlantic City | $ 8 | $ 4 | $ - | $ - | $ - |
| Bally's Atlantic City | 3 | (2) | (9) | (7) | (5) |
| Caesars Atlantic City | 27 | 22 | 13 | 16 | 19 |
| Harrah's Philadelphia (formerly Harrah's Chester) | 53 | 45 | 44 | 44 | 45 |
| **Illinois/Indiana Properties** | | | | | |
| Joliet, IL | $ 55 | $ 57 | $ 57 | $ 60 | $ 63 |
| Horseshoe - Hammond, IN | 92 | 95 | 96 | 102 | 109 |
| Caesars Indiana | 54 | 55 | 56 | 60 | 65 |
| Players Metropolis, IL | 14 | 17 | 17 | 17 | 18 |
| **Iowa/Missouri Properties** | | | | | |
| N Kansas City, MO | $ 54 | $ 56 | $ 57 | $ 60 | $ 64 |
| Harrah's St. Louis [b] | N/A | N/A | N/A | N/A | N/A |
| Harrah's (Harvey's) Council Bluffs | 22 | 22 | 23 | 24 | 26 |
| Horseshoe Council Bluffs | 82 | 84 | 85 | 89 | 93 |
| **Mississippi/Louisiana Properties** | | | | | |
| Grand Biloxi | $ 15 | $ 18 | $ 18 | $ 19 | $ 20 |
| Grand Casino Tunica, MS | 1 | 0 | (0) | 0 | 2 |
| Horseshoe - Tunica, MS | 58 | 59 | 58 | 60 | 63 |
| Sheraton Tunica | 5 | 5 | 5 | 5 | 5 |
| Louisiana Downs | 5 | 5 | 6 | 6 | 6 |
| Horseshoe - Bossier City, LA | 39 | 41 | 41 | 43 | 44 |
| Harrah's New Orleans | 88 | 91 | 92 | 99 | 106 |
| **International/Managed** | | | | | |
| LCI | $ 32 | $ 32 | $ 32 | $ 32 | $ 32 |
| Punta [c] | - | - | - | - | - |
| Ak-Chin | 6 | 6 | 6 | 6 | 6 |
| Rincon | 13 | 13 | 13 | 13 | 13 |
| Cherokee | 5 | 5 | 5 | 5 | 5 |
| **TOTAL EBITDA** | $ 1,203 | $ 1,286 | $ 1,294 | $ 1,394 | $ 1,500 |

<u>Source:</u>
Deloitte Analysis of CEC Projections Long Range Plan (Aug. 19, 2015) [DT0003746 at Tab 'A. Projected EBITDA 12-31'].

<u>Notes:</u>
(a) Planet Hollywood was sold to CGP in 2013.
(b) Harrah's St. Louis was sold to Penn in 2012.
(c) Punta does not contain projections.  See note from Deloitte work papers below.
"Deloitte noted the Company does not have any EBITDA projections included in its LRP for Conrad Punta del Este as the Company sold a 45% stake in this property to Enjoy S.A. in Q2 of 2013.  Under the terms of the sale, Enjoy S.A. will operate and manage the casinos.  Based on this agreement, Enjoy S.A. will repurchase the remaining 55% interest in the property at some time between year 3 and 5 of the agreement.  As a reasonable estimated forecast is not able to be made, we determined it was appropriate to not include this property in the analysis."

**Solvency Appendix 6-8c**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Free Cash Flow Prior to Scheduled Debt Payments
### Based on EBITDA in Long Range Plans Prepared at Year End 2013
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 |
| **EBITDA Per Long Range Plan** | $ 1,203 | $ 1,286 | $ 1,294 | $ 1,394 | $ 1,500 |
| | | | | | |
| Depreciation and amortization | 303 | 303 | 303 | 303 | 303 |
| Amortization of intangibles | 49 | 49 | 49 | 49 | 49 |
| Total Depreciation & Amortization [a] | $ 352 | $ 352 | $ 352 | $ 352 | $ 352 |
| | | | | | |
| Interest Expense [a] | $ 2,228 | $ 2,228 | $ 2,228 | $ 2,228 | $ 2,228 |
| | | | | | |
| Earnings Before Taxes | (1,378) | (1,295) | (1,287) | (1,186) | (1,081) |
| Taxes @ 35% | - | - | - | - | - |
| Earnings After Taxes | $ (1,378) | $ (1,295) | $ (1,287) | $ (1,186) | $ (1,081) |
| | | | | | |
| Plus:  Depreciation & Amortization | 352 | 352 | 352 | 352 | 352 |
| Less:  Capital Expenditures [b] | (303) | (303) | (303) | (303) | (303) |
| Free Cash Flow | $ (1,329) | $ (1,246) | $ (1,238) | $ (1,137) | $ (1,032) |

**Sources**:
Deloitte Analysis of CEC Projections Long Range Plan (Aug. 19, 2015) [DT0003746 at Tab 'A. Projected EBITDA 12-31'].
CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-
5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-
E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**

[a]     Depreciation and amortization, Amortization of intangibles, and interest expense used in this DCF are the amounts
        reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC.  2014 amounts were
        used for all periods subsequent to 2014.

[b]     Capital expenditures were set to equal Depreciation and amortization.

**Solvency Appendix 6-9a**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Discounted Cash Flow Model (DCF) with Estimated Equity Value
### Based on EBITDA in Long Range Plans Prepared at Year End 2014
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | | Terminal |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | Period |
| **EBITDA Per Long Range Plan** | $ 1,033 | $ 1,051 | $ 1,088 | $ 1,130 | |
| | | | | | |
| Depreciation and amortization | 303 | 303 | 303 | 303 | |
| Amortization of intangibles | 49 | 49 | 49 | 49 | |
| Total Depreciation & Amortization [(a)] | $ 352 | $ 352 | $ 352 | $ 352 | |
| | | | | | |
| EBIT (EBITDA - DA) | 681 | 699 | 736 | 778 | |
| Taxes @ 35% | 238 | 245 | 258 | 272 | |
| EBIT After Tax | $ 442 | $ 454 | $ 479 | $ 506 | |
| | | | | | |
| Plus: Depreciation & Amortization | 352 | 352 | 352 | 352 | |
| Less: Capital Expenditures [(b)] | (303) | (303) | (303) | (303) | |
| Unlevered-Free Cash Flow | $ 491 | $ 503 | $ 528 | $ 555 | $ 566 [(c)] |
| Capitalization Rate | | | | | 10.0% [(d)] |
| Terminal Value | | | | | $ 5,658 |
| Discount periods to 12/31/14 | 0.5 | 1.5 | 2.5 | 3.5 | 3.5 |
| Discount rate | 12.0% | 12.0% | 12.0% | 12.0% | 12.0% |
| Discount factor | 0.9449 | 0.8437 | 0.7533 | 0.6726 | 0.6726 |
| Present Value | $ 464 | $ 425 | $ 397 | $ 373 | $ 3,806 |

| | | |
|---|---|---|
| | Enterprise value @ 12/31/2014 | $ 5,465 |
| Less: | Interest Bearing Debt @ 12/31/2014 | (18,371) |
| Plus: | Cash @ 12/31/2014 | - |
| | **Estimated Equity Value @ 12/31/2014** | **$ (12,906)** |

**Sources**:
Deloitte EBIT Margin Recalculation (Aug. 19, 2005) [DT0011980 at Tab '2) LRP'].
CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**
(a)   Depreciation and amortization, and Amortization of intangibles used in this DCF are the amounts reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC. 2014 amounts were used for all periods subsequent to 2014.
(b)   Capital expenditures were set to equal Depreciation and amortization.
(c)   Free Cash Flow in the Terminal Period was projected to grow at the long-term growth rate of 2% from the prior year's free cash flow.
(d)   Capitalization rate is the discount rate (12%) less the long-term growth rate (2%).

**Solvency Appendix 6-9b**

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Projected Property Level EBITDA**
**from Long Range Plan Prepared at Year End 2014**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | |
|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 |
| **Las Vegas Properties** | | | | |
| Bally's Las Vegas [a] | N/A | N/A | N/A | N/A |
| Caesars Palace Las Vegas | 285 | 305 | 323 | 342 |
| The Quad (Formerly Imperial Palace) [a] | N/A | N/A | N/A | N/A |
| The Cromwell (Formerly Bill's Las Vegas) [a] | N/A | N/A | N/A | N/A |
| Planet Hollywood [b] | N/A | N/A | N/A | N/A |
| **Other Nevada Properties** | | | | |
| Harrah's Tahoe | $   45 | $   46 | $   47 | $   48 |
| Harrah's Reno | 2 | 2 | 2 | 3 |
| **Atlantic City Properties** | | | | |
| Showboat Atlantic City | $    - | $    - | $    - | $    - |
| Bally's Atlantic City | 9 | 6 | 5 | 6 |
| Caesars Atlantic City | 41 | 37 | 37 | 39 |
| Harrah's Philadelphia (formerly Harrah's Chester) | 47 | 40 | 37 | 33 |
| **Illinois/Indiana Properties** | | | | |
| Joliet, IL | $   50 | $   50 | $   51 | $   53 |
| Horseshoe - Hammond, IN | 99 | 99 | 102 | 105 |
| Caesars Indiana | 57 | 58 | 60 | 62 |
| Players Metropolis, IL | 16 | 16 | 16 | 16 |
| **Iowa/Missouri Properties** | | | | |
| N Kansas City, MO | $   53 | $   54 | $   56 | $   58 |
| Harrah's St. Louis [c] | N/A | N/A | N/A | N/A |
| Harrah's (Harvey's) Council Bluffs | 24 | 24 | 25 | 26 |
| Horseshoe Council Bluffs | 78 | 87 | 89 | 91 |
| **Mississippi/Louisiana Properties** | | | | |
| Grand Biloxi | $   17 | $   17 | $   17 | $   18 |
| Grand Casino Tunica, MS | - | - | - | - |
| Horseshoe - Tunica, MS | 53 | 48 | 48 | 49 |
| Sheraton Tunica | 6 | 6 | 6 | 6 |
| Louisiana Downs | 3 | 3 | 3 | 4 |
| Horseshoe - Bossier City, LA | 39 | 37 | 38 | 39 |
| Harrah's New Orleans [a] | N/A | N/A | N/A | N/A |
| **International/Managed** | | | | |
| LCI | $   38 | $   41 | $   45 | $   48 |
| Punta [d] | 34 | 35 | 37 | 39 |
| Ak-Chin | 6 | 7 | 7 | 7 |
| Rincon | 14 | 15 | 15 | 16 |
| Cherokee | 7 | 8 | 8 | 8 |
| Cleveland Consolidating [e] | 2 | 2 | 3 | 3 |
| Cincinnati Consolidating [e] | 1 | 2 | 2 | 3 |
| Thistledown Consolidating [e] | 2 | 2 | 2 | 3 |
| Windsor [e] | 6 | 6 | 6 | 6 |
| **TOTAL EBITDA** | **$  1,033** | **$  1,051** | **$  1,088** | **$  1,130** |

**Source:**
Deloitte EBIT Margin Recalculation (Aug. 19, 2005) [DT0011980 at Tab '2) LRP'].

**Notes:**
(a) Properties were sold as part of the Four Properties transaction in 2014.
(b) Planet Hollywood was sold to CGP in 2013.
(c) Harrah's St. Louis was sold to Penn in 2012.
(d) 45% of the property was sold in 2013 and the 2013 LRP did not contain projections for the proper
However, projections reappear in the LRP prepared in Q4 2014.  No reason for the change is noted.
(e) New property appearing for first time as a consolidating entity.

**Solvency Appendix 6-9c**

**Caesars Entertainment Operating Company, Inc. (CEOC)**
**Free Cash Flow Prior to Scheduled Debt Payments**
**Based on EBITDA in Long Range Plans Prepared at Year End 2014**
(Millions of $USD)

| | Fiscal Year Ending December 31 | | | |
| --- | --- | --- | --- | --- |
| | 2015 | 2016 | 2017 | 2018 |
| **EBITDA Per Long Range Plan** | $ 1,033 | $ 1,051 | $ 1,088 | $ 1,130 |
| | | | | |
| Depreciation and amortization | 303 | 303 | 303 | 303 |
| Amortization of intangibles | 49 | 49 | 49 | 49 |
| Total Depreciation & Amortization [a] | $ 352 | $ 352 | $ 352 | $ 352 |
| | | | | |
| Interest Expense [a] | $ 2,228 | $ 2,228 | $ 2,228 | $ 2,228 |
| | | | | |
| Earnings Before Taxes | (1,548) | (1,529) | (1,492) | (1,450) |
| Taxes @ 35% | - | - | - | - |
| Earnings After Taxes | $ (1,548) | $ (1,529) | $ (1,492) | $ (1,450) |
| | | | | |
| Plus:  Depreciation & Amortization | 352 | 352 | 352 | 352 |
| Less:  Capital Expenditures [b] | (303) | (303) | (303) | (303) |
| Free Cash Flow | $ (1,499) | $ (1,480) | $ (1,443) | $ (1,401) |

**Sources**:
Deloitte EBIT Margin Recalculation (Aug. 19, 2005) [DT0011980 at Tab '2) LRP'] for 2015-2018.
CEOC Selected Financial Information December 2014, http://files.shareholder.com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014.pdf.

**Notes:**
(a)   Depreciation and amortization, Amortization of intangibles, and interest expense used in this DCF are the amounts reported in Exhibit 99.1 to CEC's 10-Ks and the 2014 Selected Financial information of CEOC. 2014 amounts were used for all periods subsequent to 2014.
(b)   Capital expenditures were set to equal Depreciation and amortization.

**Solvency Appendix 6-10**

### Caesars Entertainment Operating Company, Inc. (CEOC)
### Statement of Cash Flows
### ($ in Millions)

| | 1/1-1/27 2008 (a) | 1/28-12/31 2008 | Total 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Flow from Operations** | | | | | | | | | | |
| Continuing Operations | ($50) | $367 | $318 | ($98) | ($208) | ($299) | ($371) | ($413) | ($768) | ($1,839) |
| Discontinued Operations | 1 | 5 | 5 | 0 | 0 | 63 | (21) | (44) | (73) | (69) |
| **Total Cash Flows Provided/(Used) By Operations** | **($49)** | **$372** | **$323** | **($98)** | **($208)** | **($236)** | **($391)** | **($457)** | **($841)** | **($1,908)** |
| **Cash Flow from Investing** | | | | | | | | | | |
| **Continuing Operations:** | | | | | | | | | | |
| Acquisition of Land, Buildings, Riverboats and Equipment, net of changes in payables | ($81) | ($1,031) | ($1,112) | ($438) | ($135) | ($238) | ($425) | ($616) | ($352) | ($3,317) |
| Investments in and advances to nonconsolidated affiliates and other | | (6) | (6) | (67) | (64) | (76) | (28) | (14) | (2) | (256) |
| Payments for acquisition of businesses, partnership interests and gaming rights (c) | 0 | | 0 | | (67) | (23) | | | | (89) |
| Proceeds received from sale of subsidiaries, net | | | | | | | 42 | 50 | 1,624 | 1,716 |
| Proceeds received for sale of assets | 0 | 5 | 5 | 20 | 22 | | | 158 | 33 | 238 |
| Insurance proceeds for hurricane losses | | 181 | 181 | | | | | | | 181 |
| Change in restricted cash | | | | | | (417) | (684) | 744 | 54 | (303) |
| Other | (1) | (17) | (19) | (12) | (13) | (4) | 12 | (9) | 6 | (39) |
| Cash (Used In)/Provided by Investing Activities (Continuing Operations) | ($82) | ($868) | ($950) | ($497) | ($257) | ($758) | ($1,083) | 314 | 1,363 | ($1,869) |
| Cash flows from investing activities (Discontinued Operations) | | | | | | (11) | 600 | 409 | 1 | 999 |
| **Total Cash Flows Provided/(Used) By Investing Activities** | **($82)** | **($868)** | **($950)** | **($497)** | **($257)** | **($768)** | **($483)** | **$723** | **$1,363** | **($870)** |
| **Cash Flow from Financing** | | | | | | | | | | |
| Proceeds from issuance of long-term debt | | $15,025 | $15,025 | $2,260 | $781 | $864 | $3,662 | $1,804 | $1,528 | $25,923 |
| Debt issuance costs | | (474) | (474) | (76) | (18) | (18) | (51) | (58) | (176) | (872) |
| Borrowings under lender agreements | 11,316 | 433 | 11,749 | 3,077 | 1,175 | 358 | 453 | | | 16,812 |
| Repayment under lending agreements | (11,289) | (6,761) | (18,049) | (3,535) | (1,626) | (203) | (608) | | | (24,021) |
| Cash paid in connection with early extinguishments of debt | (88) | (2,167) | (2,255) | (545) | (220) | (18) | (1,804) | (1,791) | (1,719) | (8,352) |
| Scheduled debt retirements | | (7) | (7) | (46) | (237) | (44) | (16) | (93) | (109) | (550) |
| Repayments under notes payable to affiliates | | | | | | | | (266) | (301) | (567) |
| Purchase of additional interest in subsidiary | | | | | (84) | | (10) | | | (93) |
| Payment to bondholders for debt exchange | | (289) | (289) | | | | | | | (289) |
| Non-controlling interests' distribution, net of contributions | (2) | (9) | (10) | (15) | | | | 22 | (9) | (13) |
| Other (d) | (1) | 1 | 1 | (1) | (22) | (8) | (18) | (11) | 18 | (41) |
| Transfers (to) / from affiliates | 133 | (5,242) | (5,109) | (318) | 682 | 63 | 207 | 15 | | (4,459) |
| **Total Cash Flows Provided/(Used) By Financing Activities** | **$71** | **$510** | **$581** | **$716** | **$516** | **$995** | **$1,816** | **($378)** | **($767)** | **$3,478** |
| Cash and cash equivalents, beginning of period | $494 | $434 | $494 | $447 | $569 | $603 | $597 | $1,547 | $1,438 | $494 |
| Net (decrease)/increase in cash and cash equivalents | (60) | 14 | (46) | 121 | 50 | (9) | 941 | (113) | (245) | 700 |
| Change in cash classified as assets held for sale (b) | | | | | (16) | 3 | 9 | 5 | | 0 |
| Cash and cash equivalents, end of period | $434 | $447 | $447 | $569 | $603 | $597 | $1,547 | $1,438 | $1,194 | $1,194 |

**Sources:** Exhibit 99 1 to CEC Form 10-Ks: for the year ended Dec 31 2009 (Mar 9, 2010), at 10-12; for the year ended Dec 31, 2010 (Mar 4, 2011), at 12-15; for the year ended Dec 31, 2011 (Mar 15, 2012), at 4; for the year ending Dec 31, 2012 (Mar 15, 2013), at 4; and for the year ended Dec 31, 2013 (Mar 17, 2014), at 6   CEOC Selected Financial Information December 2014, http://files shareholder com/downloads/ABEA-5FED0N/0x0x844647/4752885D-EBCF-46EA-9B93-E57E19BCC522/CEOC_Selected_Financial_Information_December_2014 pdf, at 7

**Notes:**
(a) January 1 through January 28, 2008 figures are for "HOC Restructured" as reported in Exhibit 99 1 to the 2008, 2009 and 2010 CEC Form 10-Ks  "HOC Restructured" reflects the financial operating results as if the HOC structure after the 1/28/2008 LBO had been in effect as of January 1, 2008  The company structure prior to the LBO date is referred to as "Historical HOC "

(b) The beginning cash balance at January 1, 2011 (*e.g.*, the ending balance at December 31, 2010) was $603 2 million per Exhibit 99 1 in the CEC 2012 10-K, where it had been reported as $619 1 million in the 2011 10-K  In addition, 'Cash Classified As Assets Held For Sale' was not broken out in the 2011 10-K, but the 'Change in cash classified as assets held for sale' was added for the year ended December 31, 2011 in the 2012 10-K  Therefore, the difference of $15 9 million ($619 1 - $603 2) was shown as 'Cash Classified As Assets Held For Sale' in 2010

(c) Amounts are net of transaction costs and cash acquired

(d) Includes proceeds from the exercise of stock options from January 28 through December 31, 2008, in addition to the amounts shown as "Other" in the cash flow provided by financing activities section

**Solvency Appendix 6-11**

# SOTP (Sum-Of-The-Parts) Analysis

*($ in millions)*

| | 2013 | 2014 | 2015 |
|---|---|---|---|
| **CEOC value** | | | |
| 1L Debt | $11,001 | $11,087 | $11,912 |
| 2L Debt | 5,518 | 5,443 | 6,014 |
| Unsecured + Other Debt | 3,221 | 3,291 | 2,453 |
| Cash | (1,341) | (389) | (405) |
| CEOC Net Debt | $18,399 | $19,432 | $19,973 |
| *Memo: Net 1L Debt* | *9,660* | *10,698* | *11,506* |
| *Memo: Net 2L Debt* | *15,178* | *16,141* | *17,520* |
| EBITDA | $1,280 | $1,349 | $1,452 |

| TEV | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | EBITDA | | | |
| Mult. | $1,200 | $1,250 | $1,300 | $1,350 | $1,400 | $1,450 | $1,500 |
| 8.0x | $9,600 | $10,000 | $10,400 | $10,800 | $11,200 | $11,600 | $12,000 |
| 8.5x | 10,200 | 10,625 | 11,050 | 11,475 | 11,900 | 12,325 | 12,750 |
| 9.0x | 10,800 | 11,250 | 11,700 | 12,150 | 12,600 | 13,050 | 13,500 |
| 9.5x | 11,400 | 11,875 | 12,350 | 12,825 | 13,300 | 13,775 | 14,250 |
| 10.0x | 12,000 | 12,500 | 13,000 | 13,500 | 14,000 | 14,500 | 15,000 |
| 10.5x | 12,600 | 13,125 | 13,650 | 14,175 | 14,700 | 15,225 | 15,750 |
| 11.0x | 13,200 | 13,750 | 14,300 | 14,850 | 15,400 | 15,950 | 16,500 |

| Recovery on 1L (assuming 2015 year-end balance) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | EBITDA | | | |
| Mult. | $1,200 | $1,250 | $1,300 | $1,350 | $1,400 | $1,450 | $1,500 |
| 8.0x | 81% | 84% | 87% | 91% | 94% | 97% | 100% |
| 8.5x | 86% | 89% | 93% | 96% | 100% | 100% | 100% |
| 9.0x | 91% | 94% | 98% | 100% | 100% | 100% | 100% |
| 9.5x | 96% | 100% | 100% | 100% | 100% | 100% | 100% |
| 10.0x | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 10.5x | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 11.0x | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| Recovery on 2L (assuming 2015 year-end balance) | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | EBITDA | | | |
| Mult. | $1,200 | $1,250 | $1,300 | $1,350 | $1,400 | $1,450 | $1,500 |
| 8.0x | 0% | 0% | 0% | 0% | 0% | 0% | 1% |
| 8.5x | 0% | 0% | 0% | 0% | 0% | 7% | 14% |
| 9.0x | 0% | 0% | 0% | 4% | 11% | 19% | 26% |
| 9.5x | 0% | 0% | 7% | 15% | 23% | 31% | 39% |
| 10.0x | 1% | 10% | 18% | 26% | 35% | 43% | 51% |
| 10.5x | 11% | 20% | 29% | 38% | 46% | 55% | 64% |
| 11.0x | 21% | 31% | 40% | 49% | 58% | 67% | 76% |

Source:  CEOC Sum-of-the-Parts Recovery Analysis (Oct. 4, 2013) [APOLLO-Examiner_01510733 at Tab 'CEOC Recovery'].

In re: Caesars Entertainment Operating Co., Inc., *et al.*

**Witnesses' Definitions of Solvency/Insolvency**

| Interviewee | Definition of Solvency/Insolvency | Cite |
|---|---|---|
| Sambur | Q:   If you look down here it says, "A corporation is insolvent when, A, it generally cannot pay its debts when they come due; or B, the fair market value of its assets is less than its liabilities."   Is that consistent with the understanding that you had at the time, that definition?<br>A:   As you mentioned, I don't know if this is the exact definition, but it seems to be certain indicias of insolvency, yes. | D. Sambur Oct. 19, 2015 Tr. at 88:06-16. |
| Sambur | A:   No, I thought CEOC was solvent.  I thought that it had substantial liquidity, substantial room under its covenants, maturity room.  So no.  Just because of this calculation, no.   Q:   So it didn't -- the fact that its net debt -- and net debt is total debt minus cash?<br>A:   Yes.<br>Q:   The fact that its net debt was over $3 billion more than the enterprise value did not cause you to think about issues relating to solvency?  I just want to make sure that --<br>A:   I mean, going back to what you said earlier, I think that's a highly technical topic, but no. I mean, as I thought about things -- first of all, this is just, you know, a slide put together.  I'm not sure this is like a definitive analysis, but no.  I mean, I think that we thought the company had substantial runway. | *Id* . at 227:04-228:02. |
| Rowan | Q    And what was your understanding of the more technical concept of solvency?    A    I'm not sure that I had a technical understanding.  I think of them very similarly, solvency being the ability to meet its obligations going forward, and at some point assets greater than liabilities.<br>Q    So, if I understand the last part of what you said, if liabilities were greater than assets, that would be an indication of insolvency, based on your understanding?<br>A    It's probably a more complicated answer again.  That at any point in time, liabilities can be greater than assets, and particularly with the kinds of businesses that Apollo invests in, which are cyclical businesses, to the extent a business is going through a cyclical challenge, versus a secular challenge, to me I look at normalized EBITDA, and normalized growth rates, does the company have an opportunity to have assets equal or exceed liabilities as it turns, versus businesses that are, you know, at their capacity. | M. Rowan Nov. 16, 2015 Tr. at 10:09-11:08. |
| Rowan | A:   Absent going concern, I don't think you have solvency.  If you are not a going concern, you ar insolvent.<br>Q   But can you -- but if you don't have a going concern, but -- do you have an understanding that you could satisfy the going concern test and still be insolvent?<br>A    Generally, yes. | M. Rowan Nov. 17, 2015 Tr. at 372:15-22. |
| Van Hoek | MS. RYAN:  Did you ever do a solvency analysis?<br>THE WITNESS:  No.  You know, at that point, although CEOC was -- had a lot of leverage and a lot of debt, obviously, and lot of interest expense, it had been highly levered, you know, since the LBO, and this was over five years later, and the company had demonstrated an ability to continue to pay its obligations that became due. | A. Van Hoek Sept. 25, 2015 Tr. at 116:14-25. |
| Kranias | THE WITNESS:  As a financial person to me being solvent means being able to continue as a going concern.  So being able to meet your debts as they come due.<br>MS. RYAN:  So with that definition, did you have any concerns at any point in time that the company, Caesars, couldn't  meet their debts as they came due?<br>THE WITNESS:  No.<br>BY MR. SCHREIBER: Q.   Would you have thought there were any other reasons an entity could be insolvent, even if it is paying its debts as they come due?<br>A.   No. | G. Kranias Oct. 23, 2015 Tr. at 81:23- 82:13. |
| Davis | Q.   Do you have an understanding of the difference between solvency and the ability to pay debts as they come due."<br>A.   No. | K. Davis Oct. 22, 2015 Tr. at 31:19-22. |

In re: Caesars Entertainment Operating Co., Inc., *et al.*

**Witnesses' Definitions of Solvency/Insolvency**

| Interviewee | Definition of Solvency/Insolvency | Cite |
|---|---|---|
| Bonderman | MR. DAVIS:  No.  What is his – as a businessman, what is his understanding    as to what it is that would make an   entity insolvent.<br>A    Well, candidly, I'm not sure I ever thought about it that way.  I mean, in the sense that those issues, when they arise, tend to get posed by lawyers about whether something that happened at some particular time, as opposed to what the definition or understanding of solvency is.  I guess in a lay sense, it's you can't pay your bills on time.<br>Q    Well, I guess that may answer my question.  Did you have any understanding that an entity could be paying its bills but still, as a technical matter, be insolvent?<br>A    Yes.  You could have enough cash to pay a bill in the short term and be insolvent in the sense of having debts exceeding your assets. | D. Bonderman Nov. 10, 2015 Tr. at 10:14- 11:14. |
| Williams | Q.    So in your view is the company, CEOC, insolvent at this point in time?<br>A.    No, not insolvent.  There are questions -- there are questions with respect to the company's ability to continue as a going concern based on the tests that are required for these disclosure purposes. It doesn't mean that the company -- first of all, it was still current on its debt, current on its payments to vendors.  And there were various transactions being proposed.  I mean, I think that the sponsors and the company were constantly trying to come up with new ways to increase liquidity or bring liquidity in and keep the company going because the view was the longer you can keep the company going, the better your opportunity or chances of finding you're there when the performance starts to recover. And that was it.  So just trying to get as much -- I call it runway.  But get as much time as possible to continue the operations. So I don't think any of us – we knew they were in significant -- in a period where they had significant financial constraints and concerns, but I don't know that any of us ever considered it insolvent at that point. | C. Williams October 12, 2015 Tr. at 162:06- 163:10. |
| Swann | Q: Do you recall earlier in 2014 issues being raised, that Deloitte had raised questions then about the possibility of a going concern qualifier under financial statements it was working on for 2013?<br>A: You know, I recall -- I don't recall when that discussion took place. You know, most of what I recall is it always seemed to be about liquidity. | L. Swann Oct. 12, 2015 Tr. at 95:7-17. |
| Housenbold | Q: What does the word "insolvency of CEOC" mean to you?<br>A: Generally, solvency to me means that your assets are greater than your liabilities. | J. Housenbold Oct. 9, 2015 Tr. at 36:7-11. |
| Kleisner | Q: Did you understand that an entity could be paying its bills but still be as a legal matter insolvent<br>A: Actually, no. Having never sat for the Bar, I tend to look at cash flows as cash flows and that was the extent of my view relative to there was no discussion of insolvency. The discussion was how do we plan ahead to avoid anyone –any number of issues that the company could face if we just sat back and said let's see how it goes. | F. Kleisner Oct. 30, 2015 Tr. at 32:17-33:4. |
| Kleisner | Q. Before we look at a document, and we are only going to look at a couple of them in here, but can you just give in your understanding of the difference between going concern and solvency, how you understand those terms to mean?<br>A. Well, I will emphasize that I am neither a lawyer, nor an accountant, but in business terms solvency, if I put it in just very simple business terms, you can't pay your bills. You just don't have the cash. Going concern -- and that's the time now, at a point in time. Going concern is a projective analysis over in this case the year that is be being looked at retrospectively and the year that is being looked upon prospectively, so the closing process is going on for 2013 and it's considering where are we headed in 2015 for the preparation of the 10-K.<br>Q. Do you mean '13 and '14?<br>A. '13 to '14. What did I say?<br>Q. '15.<br>A. I'm sorry. '13 to '14. And that's my best understanding.<br>Q: So you did not understand that you can actually be paying your bills and be insolvent under some other test?<br>A: No, I did not. | *Id.* at 132:16-133:21. |

In re: Caesars Entertainment Operating Co., Inc., *et al.*

Witnesses' Definitions of Solvency/Insolvency

| Interviewee | Definition of Solvency/Insolvency | Cite |
|---|---|---|
| Hession | Q Now, during that same period, did you have any understanding of what the concept of solvency was and how it may have differed from going concern?<br>MR. HURWITZ: "Same period," meaning sort of through the summer of '14?<br>MR. DAVIS: Right. Summer '14. I'm trying to do during relevant time period, not things he has learned in preparation for this or things of that nature.<br>MR. HURWITZ: Exactly. That's exactly what I was –<br>A So we didn't have specific discussions about solvency. It just wasn't something that we would come up with. However, as part of my job, much like with the going concern effort, I was always looking at what I consider to be the three main problems that we had. We had liquidity potential issues, we had maturity issues and then we had covenant issues. And so what I would do is look at our models, look out in the future and try to identify which of the three or which two out of the three or which combination and when were going to cause us problems. And then work towards a plan to fix<br>those problems.<br>Q Did you have any more refined understanding of what the legal definition of "solvency" or "insolvency" was or how it would be tested?<br>23 A No. | E. Hession Nov. 3, 2015 Tr. at 22:12-23:23. |
| Hession | Q Did you have any understanding at that time whether if an entity was solvent it either would potentially impact governance issues and/or obligations to who you were obligated fiduciary duties to?<br>A No, I didn't. | *Id.* at 262:3-8. |
| Colvin | And what I'm wanting to talk about is, in that role and in your experience, did you ever or do you have your own view or interpretation of what it means for an entity to be insolvent?<br>A. Well, I mean, having worked with companies, including the one here, that have difficulty, my interpretation of insolvency is essentially based upon a liquidity test. And if there is adequate liquidity, my general belief is the company's solvent. If the liquidity dries up or is projected to dry up in the near-term, then I'm concerned about solvency. So it's a liquidity-based test I would do. | D. Colvin Nov. 6, 2015 Tr. at 23:24-24:13. |
| Colvin | Q. Do you draw any distinction between a going concern issue and potential insolvency?<br>A. Personally, if you look at how the company was performing, and if you look at overall, a lot of debt was trading at a huge discount. So I and my team, my senior team, always believed that if rationality was to prevail, then the owners of the bonds trading at a discount, many of whom hadn't owned the bonds for a long time, would have an economic interest to do some kind of exchange offering, and that would result in a relief of the bonding of the debt to the company and a good solution for both partners. So that's what we were concerned. And if you like, we thought of liquidity as being the fuel that gained us time to have these discussions. And I do know there were many, many discussions, starting in the beginning of 2014, with different groups of lenders to look at some kind of voluntary reorganization of the company's debt. | *Id.* at 25:14-26:9. |
| Colvin | Q. Have you or are you aware of insolvency being determined, not on the liquidity basis that you described, but on a basis of whether or not the fair market value of the liabilities exceeds the fair market value of the assets of the entity?<br>A. That was not a calculation that I ever remember doing. And I mean, as I say, I have been involved in many. Indeed this one here is a tough one. And even this morning, I was negotiating with Senior Secured Credit group, successfully I may add. | *Id.* at 29:3-12. |
| Halkyard | Q Do you recall if either CEC or its advisers or the sponsors ever performed any type of solvency analysis of CEOC during your time with Caesars?<br>A Well, we performed analysis around the company's liquidity and its compliance with debt covenants. We did that frequently.<br>Q And --<br>A So I don't know if that qualifies as a solvency analysis, but we never did anything I recall being called a solvency analysis, but we certainly did a lot of analysis around the company's liquidity and compliance with debt covenants. | J. Halkyard Nov. 2, 2015 Tr. at 88:25-89:15. |

In re: Caesars Entertainment Operating Co., Inc., *et al.*

**Witnesses' Definitions of Solvency/Insolvency**

| Interviewee | Definition of Solvency/Insolvency | Cite |
|---|---|---|
| Halkyard | Q In connection with what I think you referred to when I said "solvency analysis," and whether or not it was a solvency analysis or not, as I understand it, what you're talking about is whether or not CEOC was going to be able to meet obligations on debts coming due at some point in the future and whether or not it was in compliance with its debt instruments. Is that what you guys were looking at?<br>A Yes, that's what I meant by that kind of analysis.<br><br>Q Do you remember at any point in your tenure at CEC or at Caesars reaching the conclusion or having concerns that CEOC was going to be unable to meet its financial obligations at some point?<br><br>A No. Never became -- never reached that conclusion. | *Id.* at 90:3-22. |
| Loveman | Q. And looking further down, it says, "The corporation is insolvent when it generally cannot pay its debts as they come due or the fair market value of assets is less than its liabilities." And again, without getting into a legal debate as to the exact standard, either as a result of this or more generally, did you understand that an entity could be insolvent even if it is paying its debts?<br>A. Yes. | G. Loveman Oct. 27, 2015 Tr. at 59:12-23. |
| Loveman | Assuming that those numbers are accurate, did that -- knowing those numbers, did that ever raise an issue for you as to whether the entity was solvent or not as a matter of law?<br>A. No, uh-uh. The fact that the company was burning cash at a point in time did not suggest to me that insolvency was threatened. There are lots of companies that burn cash at a point in time or several points of time. Amazon has burned cash almost from the outset of its operations. The issue is what alternatives are available to us to address the problem while the company is still meeting its obligations. | *Id.* at 141:2-18. |
| Loveman | Q. Did you have any conversations with anybody, including any lawyers – and I'm obviously talking about during the time here at Caesars, not talking about anything recent -- about how one would compute solvency as a legal matter?<br>A. No. I had just seen the two-part calculation that you had proposed, which was unable to pay one's debts -- we had paid all of our debts -- and this deficiency of assets when compared to liabilities. The assets and liabilities were not book assets and book liabilities. They were actual assets or market value assets and market value liabilities.<br>Q. So you believe the test is market value debt?<br>A. I believe that is certainly one of the tests. Not just literally book value of debt to book value of assets.<br>Q. Did you get that understanding from any conversations during this period with anybody --<br>A. Well, I think it was an inference that I drew. Remember, I was surrounded by people who had reasons to have opinions about this, and none of them were telling me there was an issue of insolvency, not public accountants, not innumerable attorneys, not my own finance team. We were going to market with debt deals without a great deal of difficulty. We were selling stock. The stock was going<br>up. None of these, in my view, were indicative of a solvency problem. | *Id.* at 171:21-173:8. |

In re: Caesars Entertainment Operating Co., Inc., *et al.*

Witnesses' Definitions of Solvency/Insolvency

| Interviewee | Definition of Solvency/Insolvency | Cite |
|---|---|---|
| Loveman | And that is, you talked about you thought that solvency would be a function of comparing market value of the debt, and the reason I'm confused about that is because, in some sense, the worse financial condition a company is in, the lower the market value. So that seems to be counterintuitive on a solvency sense, because it suggests that if you are really in bad shape, you won't be insolvent because if your debt is trading at 2 dollars, that you are not insolvent. So I'm trying to see if I understood you correctly.<br><br>A. You understood me correctly, but the argument you are raising raises an important distinction between distress that is as a result of a bad business versus distress that's as a result of a bad balance sheet. So take a business like an airline, over many years, which can't operate day to day profitably before interest expense. It spends more to fly a plane than it takes in. That's a company that has very fundamental problems.  A company like mine makes money in its casinos virtually every day before interest expense. But because it has a very bad balance sheet, it has a capital market problem, has a leverage problem of the sort you described.  The remedy that's available to the latter company is to go after the discount available in the – particularly the junior portion of the capital structure, in an effort to remedy its health, and that's very often overlooked by people who talk about the distress of the company.  One of the remedies is to go in and buy back, either through the issuance of equity or through use of cash or other means, the discounted and subordinated debt that sits in the capital structure. And you will recall one of the things that you haven't asked about that was a key part of this whole story is, right after the crisis, as part of the Economic Recovery Act, we got the cancellation of indebtedness legislation introduced that allowed companies like us to buy back discounted debt without an immediate tax obligation.  That accrued massively to the benefit of CEOC. It reduced 5 billion dollars face value of CEOC obligation within the first year and a half after the LBO. It put us in a much, much better spot than we would have been otherwise. We felt like we had lots of things available to us to do that would remedy this problem. | *Id.* at 185:12-187:25. |