**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| **CAESARS ENTERTAINMENT** | ) **Case No. 15-01145 (ABG)** |
| **OPERATING COMPANY, INC.** *et al.,* | ) (Jointly Administered) |
| | ) |
| Debtors. | ) Hon. A. Benjamin Goldgar |
| | ) |
| | ) Re: Docket Nos. 3401 & 3406 |

# FINAL REPORT OF EXAMINER, RICHARD J. DAVIS
## (Substantially Unredacted)

**May 16, 2016**
**(initially filed March 15, 2016)**

**APPENDIX 7**

# APPENDIX 7:  VALUATION ANALYSES

# Table of Contents

**I.   OVERVIEW OF VALUATION AND VALUATION METHODOLOGIES** ................. 1

A.   STANDARD OF VALUE ............................................................................. 1
B.   RELIANCE ON INFORMATION SUBSEQUENT TO VALUATION DATE ................... 1
C.   VALUATION APPROACHES AND METHODS ................................................ 2
   1.   Asset Approach .......................................................................... 3
   2.   Income Approach ........................................................................ 3
      a.   Discounted Cash Flow Method .................................................. 3
      b.   Capitalization of Earnings Method ............................................ 5
   3.   Market Approach ........................................................................ 5
      a.   The Guideline Public Company Method ....................................... 5
      b.   The Precedent Transactions Method ........................................... 7
      c.   The Subject Company Transaction Method .................................... 8
D.   WEIGHTING OF METHODOLOGIES .......................................................... 8
E.   ADDITIONAL VALUATION CONSIDERATIONS .............................................. 9
   1.   Single Asset Valuation ................................................................. 9
   2.   The Use of the Asset Approach ...................................................... 10
   3.   The Use of Precedent Transactions ................................................. 10
   4.   Gordon Growth Model ................................................................. 11
   5.   Terminal Year Capital Expenditures and Depreciation ........................ 12

**II.   MARKET AND ECONOMIC OVERVIEW SUMMARY** ........................................... 15

A.   THE RECESSION ................................................................................ 15
B.   LAS VEGAS MARKET DATA .................................................................. 15
C.   NEW ORLEANS MARKET DATA .............................................................. 16
D.   INDUSTRY AND ECONOMIC OUTLOOK (2013-2014) ................................... 17
   1.   United States Economic Overview ................................................... 17
   2.   Casino Hotels Industry ................................................................. 17
   3.   New Orleans .............................................................................. 17

**III.   THE 2009 WSOP TRANSACTION** ............................................................. 18

A.   DUFF & PHELPS FAIRNESS OPINION ...................................................... 20
   1.   Valuation Methodology ................................................................ 20
      a.   Methodology ........................................................................ 20
      b.   Discount Rate ...................................................................... 20
   2.   Preferred Stock Attributes ............................................................ 21
B.   CONTEMPORANEOUS INDICATORS OF VALUE ........................................... 24
   1.   LBO Purchase Price Allocation ...................................................... 24
   2.   Project Forest ........................................................................... 24
   3.   Impairment Testing Values ............................................................ 28
   4.   Other Post-Transaction Projections ................................................. 29
   5.   Summary of Relevant Projections ................................................... 29
C.   EXAMINER'S VALUATION RANGE FOR WSOP TRADEMARK & IP ................... 30
   1.   Valuation Date .......................................................................... 30
   2.   Valuation Methodology ................................................................ 30

3.   Guideline Public Companies.................................................................. 30
4.   Income Approach – Capitalization of Cash Flows ............................... 31
D.   EXAMINER'S VALUATION RANGE FOR THE PREFERRED STOCK ........................ 32
1.   Value of Preferred Stock Using the Examiner's Value of WSOP Trademark & IP..... 32
2.   Implied Value of the Preferred Stock Using the Duff & Phelps Value of WSOP
Trademark & IP ...................................................................................... 32
E.   VALUATION CONCLUSIONS ............................................................................. 33
F.   SENSITIVITY ANALYSIS .................................................................................. 33
G.   ILLUSTRATIVE POTENTIAL VALUE OF UPSIDE................................................. 34
H.   SUMMARY OF VALUES ................................................................................... 37

IV.   THE 2010 TRADEMARKS TRANSFER........................................................... 37

A.   VALUATION METHODOLOGY .......................................................................... 38
B.   FINANCIAL REPORTING REQUIREMENTS ......................................................... 39
C.   CEC'S APPROACH TO CALCULATE THE BOOK VALUE OF THE CMBS IP TO BE
TRANSFERRED TO CERP FOR FINANCIAL REPORTING PURPOSES ............................. 40
D.   CALCULATED VALUE OF CMBS IP................................................................. 41

V.   THE 2011 WSOP TRANSACTION................................................................. 43

A.   VRC FAIRNESS OPINION................................................................................ 44
1.   Methodology and Discounting.............................................................. 44
2.   WSOP Tournament Assumptions......................................................... 44
a.   Reduction in Revenues Due to a Hypothetical Move to a Strip Location ............... 45
b.   Non-Rio Gaming Revenue Tied to WSOP Entrants................................. 48
c.   Las Vegas Event Royalty Rate .............................................. 49
d.   Hotel EBITDA Adjustment .................................................. 50
e.   Non-Financial Benefits .................................................... 51
f.   Incremental Gaming Revenue Percentage ................................. 51
g.   Spectator Revenue .......................................................... 52
B.   CONTEMPORANEOUS INDICATORS OF VALUE ................................................. 52
1.   Impairment Testing Values.................................................................. 53
2.   Internal Valuations.............................................................................. 55
C.   EXAMINER'S VALUATION RANGE FOR WSOP TOURNAMENT RIGHTS............... 57
1.   Valuation Date ..................................................................................... 57
2.   Valuation Methodology ....................................................................... 57
3.   Guideline Public Companies................................................................ 57
4.   Income Approach – DCF ..................................................................... 58
5.   Valuation Conclusions ........................................................................ 58
D.   SENSITIVITY ANALYSIS .................................................................................. 59
E.   SUMMARY OF VALUES ................................................................................... 59

VI.   THE CERP TRANSACTION ......................................................................... 60

A.   CONSTRUCTION COSTS AND STATUS AT TIME OF TRANSFER ........................... 60
B.   PERELLA OPINION......................................................................................... 62
1.   Opinion Overview................................................................................ 62
2.   Octavius Tower and RDE Casino ........................................................ 63
a.   Lease Terms ................................................................... 63

b.   Valuation Methodology ........................................................................ 66
c.   Discount Rate .................................................................................... 67
3.   LINQ Retail ................................................................................................ 68
a.   Valuation Methodology ........................................................................ 68
b.   Discount Rate .................................................................................... 69
4.   Observation Wheel .................................................................................... 70
a.   Valuation Methodology ........................................................................ 70
b.   Discount Rate .................................................................................... 71
5.   CEOC Debt Contribution ............................................................................ 71
6.   Reallocated Corporate Expenses. ................................................................. 72
C.   CONTEMPORANEOUS INDICATORS OF VALUE ................................................. 74
D.   ANALYST REPORT COMMENTARY ................................................................. 75
E.   THE EXAMINER'S VALUATION RANGE FOR LINQ/OCTAVIUS ASSETS ............... 76
1.   Valuation Date .......................................................................................... 76
2.   Guideline Public Companies. ...................................................................... 76
3.   Income Approach – DCF Method. ................................................................. 78
4.   Market Approach - Selected Multiples ........................................................... 78
5.   Valuation Conclusions ................................................................................ 79
F.   IMPACT OF OCTAVIUS TOWER LEASE ON CAESARS PALACE ........................... 80
G.   SENSITIVITY ANALYSIS ............................................................................... 82
H.   SUMMARY OF VALUES ................................................................................ 84

VII.   THE GROWTH TRANSACTION ............................................................ 85

A.   HISTORICAL FINANCIAL RESULTS AND CAPITAL EXPENDITURES ..................... 86
1.   Planet Hollywood ...................................................................................... 86
2.   Horseshoe Baltimore .................................................................................. 88
B.   EVERCORE FAIRNESS OPINION ..................................................................... 89
1.   Opinion Overview ...................................................................................... 89
2.   Valuation Methodology .............................................................................. 91
a.   Methodologies ................................................................................... 91
b.   Multiples ........................................................................................... 92
c.   Discount Rate .................................................................................... 94
3.   Projections ................................................................................................ 95
a.   Planet Hollywood Projections ................................................................ 95
b.   Lowering of Expected 2013 EBITDA ..................................................... 96
c.   Outdated Projections ........................................................................... 98
4.   Horseshoe Baltimore Ownership Interest ....................................................... 100
5.   Project Songbird ........................................................................................ 101
a.   Overview of Project Songbird ................................................................ 101
b.   Impact on Evercore's Valuation ............................................................. 102
c.   Project Songbird Economics .................................................................. 105
d.   Sponsor Views ................................................................................... 106
e.   Incremental EBITDA .......................................................................... 106
f.   Actual Results as of Transaction Date ...................................................... 107
C.   CONTEMPORANEOUS INDICATORS OF VALUE ................................................. 108
1.   Cushman & Wakefield Appraisal ................................................................. 108
2.   Impairment Testing Values .......................................................................... 110

3.    Other Indicators ................................................................................... 111
D.    ANALYST REPORT COMMENTARY ........................................................... 112
E.    EXAMINER'S VALUATION RANGE FOR GROWTH ASSETS ............................. 113
1.    Valuation Date .................................................................................. 113
2.    Guideline Public Companies ............................................................... 114
3.    Income Approach – DCF Method ......................................................... 115
4.    Market Approach – Selected Multiples ................................................. 115
5.    Management Fees .............................................................................. 117
6.    Valuation Conclusion ......................................................................... 117
F.    SENSITIVITY ANALYSIS .......................................................................... 119
G.    SUMMARY OF VALUES ........................................................................... 120

VIII.    THE FOUR PROPERTIES TRANSACTION ........................................ 122

A.    HISTORICAL PERFORMANCE AND CAPITAL EXPENDITURES ........................ 124
1.    The Quad .......................................................................................... 124
2.    Bally's Las Vegas ............................................................................. 126
3.    The Cromwell .................................................................................... 127
4.    Harrah's New Orleans ........................................................................ 129
B.    PROJECTIONS FOR THE FOUR PROPERTIES TRANSACTION ......................... 131
1.    Change in Projections ........................................................................ 131
2.    Contemporaneous View of Performance ............................................... 135
3.    Unfounded Use of February Business Plan ............................................ 138
C.    CENTERVIEW FAIRNESS OPINION ........................................................... 139
1.    Opinion Overview .............................................................................. 139
2.    Valuation Methodology ...................................................................... 140
       a.    Methodologies ........................................................................... 140
       b.    Projections ................................................................................. 141
       c.    Multiples ................................................................................... 141
       d.    Rent Expense ............................................................................. 142
D.    DUFF & PHELPS OPINION ....................................................................... 144
1.    Opinion Overview .............................................................................. 144
2.    Valuation Methodology ...................................................................... 145
       a.    Methodologies ........................................................................... 145
       b.    Projections ................................................................................. 146
       c.    Multiples ................................................................................... 146
       d.    Rent Expense ............................................................................. 148
E.    CONTEMPORANEOUS INDICATORS OF VALUE ........................................... 148
1.    Impairment Testing Values ................................................................. 148
2.    Other Indicators ................................................................................ 149
F.    VALUATION RANGE FOR THE FOUR PROPERTIES ...................................... 150
1.    Valuation Date .................................................................................. 150
2.    Guideline Public Companies ............................................................... 150
3.    Income Approach - DCF ..................................................................... 150
4.    Market Approach - Selected Multiples ................................................. 151
5.    Management Fees .............................................................................. 153
6.    Valuation Conclusion ......................................................................... 153
G.    FOUR PROPERTIES LAND TRANSFERS AND EASEMENTS ............................. 155

1.  Easement Lots ................................................................. 155
2.  Unimproved Land ............................................................. 157
H.  SENSITIVITY ANALYSIS ........................................................ 161
I.  SUMMARY OF VALUES ........................................................... 163

**IX. CEOC MULTIPLE DEGRADATION** ................................................ **164**

**X.  SUMMARY OF VALUATION ANALYSES** ........................................... **165**

# List of Tables

Valuation Table 1:  CAPM Formula ................................................. 4
Valuation Table 2:  WACC Formula ................................................. 5
Valuation Table 3:  CEC Long-Lived Assets ....................................... 14
Valuation Table 4:  WSOP Trademark & IP Pre and Post-Transaction Projections .... 30
Valuation Table 5:  Guideline Public Companies – WSOP Trademark & IP ............ 31
Valuation Table 6:  Fair Market Value of Preferred Stock Based Upon $71 Million Value ....... 32
Valuation Table 7:  Implied Value of the Preferred Stock Based Upon Duff & Phelps Value .... 33
Valuation Table 8:  Valuation Conclusion – WSOP Trademark & IP .................. 33
Valuation Table 9:  2009 WSOP Transaction Sensitivity Analysis .................. 34
Valuation Table 10:  CIE Revenue and EBITDA ..................................... 35
Valuation Table 11:  PwC CIE Valuations ......................................... 35
Valuation Table 12:  Value of CEC's Interest in CIE ............................. 36
Valuation Table 13:  Illustrative Summary of Values for WSOP Trademark & IP ..... 37
Valuation Table 14:  Allocation of Book Value of CMBS IP ........................ 41
Valuation Table 15:  CMBS IP Value .............................................. 42
Valuation Table 16:  Guideline Public Companies – WSOP Tournament Rights ........ 57
Valuation Table 17:  Valuation Conclusion – WSOP Tournament Rights .............. 58
Valuation Table 18:  Illustrative Summary of Values for WSOP Tournament Rights .. 59
Valuation Table 19:  Perella Valuation Summary – Assets Transferred ............. 63
Valuation Table 20:  Perella Valuation Summary – Consideration .................. 63
Valuation Table 21:  Octavius/RDE Casino Calculation of Return to Buyer ......... 65
Valuation Table 22:  Octavius Tower and RDE Casino Adjusted Lease Economics ..... 66
Valuation Table 23:  August 14, 2013 Final CMBS Discussion Materials ............ 74
Valuation Table 24:  Guideline Public Companies – LINQ/Octavius/RDE ............. 77
Valuation Table 25:  Guideline Public Companies – Observation Wheel ............. 77
Valuation Table 26:  Selected Multiples – LINQ Retail ........................... 79
Valuation Table 27:  Valuation Conclusions – CERP Transaction ................... 79
Valuation Table 28:  Value of CERP Consideration ................................ 80
Valuation Table 29:  Incremental Value Associated with Octavius Tower ........... 81
Valuation Table 30:  CERP Transaction Sensitivity Analysis ...................... 83
Valuation Table 31:  Illustrative Summary of Values for LINQ/Octavius Assets and
                     Consideration ............................................. 84
Valuation Table 32:  Growth Transaction – Summary of Assets ..................... 85
Valuation Table 33:  Planet Hollywood Financial Performance ..................... 87

Valuation Table 34: Planet Hollywood Capital Expenditures ...................................................... 88
Valuation Table 35: Horseshoe Baltimore Capital Expenditures ................................................. 89
Valuation Table 36: Evercore Valuation Summary ...................................................................... 90
Valuation Table 37: Evercore Enterprise Value Ranges by Asset ............................................... 91
Valuation Table 38: Evercore Comparables ................................................................................. 92
Valuation Table 39: Planet Hollywood Initial Projections .......................................................... 96
Valuation Table 40: Project Songbird Projected Incremental Cash Flows................................. 107
Valuation Table 41: Planet Hollywood Impairment Testing Values.......................................... 110
Valuation Table 42: Guideline Public Companies – Growth Transaction ................................. 114
Valuation Table 43: Selected Multiples – Growth Transaction.................................................. 116
Valuation Table 44: Valuation Conclusions – Growth Transaction........................................... 118
Valuation Table 45: Growth Transaction Sensitivity Analysis .................................................. 120
Valuation Table 46: Illustrative Summary of Values for Growth Assets ................................... 121
Valuation Table 47: Four Properties – Summary of Assets ....................................................... 122
Valuation Table 48: The Quad Capital Expenditures ................................................................. 125
Valuation Table 49: The Quad Historical Financial Performance.............................................. 126
Valuation Table 50: Bally's Las Vegas Capital Expenditures.................................................... 127
Valuation Table 51: Bally's Las Vegas Historical Financial Performance ................................ 127
Valuation Table 52: The Cromwell Capital Expenditures.......................................................... 129
Valuation Table 53: Bill's Gamblin' Hall & Saloon Historical Financial Performance ........... 129
Valuation Table 54: Harrah's New Orleans Capital Expenditures............................................. 130
Valuation Table 55: Harrah's New Orleans Historical Financial Performance ......................... 131
Valuation Table 56: EBITDA Change from January Business Plan to February
                    Business Plan....................................................................................... 133
Valuation Table 57: Centerview Valuation Summary................................................................ 140
Valuation Table 58: Centerview Valuation Ranges by Asset..................................................... 140
Valuation Table 59: Centerview Comparables ........................................................................... 141
Valuation Table 60: Duff & Phelps Valuation Summary .......................................................... 145
Valuation Table 61: Duff & Phelps Comparables ...................................................................... 147
Valuation Table 62: Bally's Las Vegas Impairment Testing Values ......................................... 148
Valuation Table 63: Harrah's New Orleans Impairment Testing Values................................... 149
Valuation Table 64: Selected Multiples – Four Properties Transaction ..................................... 152
Valuation Table 65: Valuation Conclusions – Four Properties, Management Fees, and Land . 154
Valuation Table 66: Illustrative Value of Easement Lots........................................................... 157
Valuation Table 67: Four Properties Transaction – Undeveloped Land .................................... 158
Valuation Table 68: Four Properties Sensitivity Analysis – Centerview ................................... 162
Valuation Table 69: Four Properties Sensitivity Analysis – Duff & Phelps ............................. 162
Valuation Table 70: Illustrative Summary of Values for Four Properties and Excess Land..... 163
Valuation Table 71: 2015 Pro-Forma Projected CEOC EBITDA vs. Projected CEOC
                    EBITDA ............................................................................................... 164

# List of Figures

Valuation Figure 1:  October 2008 Project Forest Valuation (v7)................................................ 26
Valuation Figure 2:  October 2008 Project Forest Valuation (v11).............................................. 27
Valuation Figure 3:  RDE Casino Asset and Rent Flowchart...................................................... 143
Valuation Figure 4:  Map of Easement Lots.............................................................................. 156
Valuation Figure 5:  Map of Undeveloped Land ....................................................................... 158

# List of Charts

Valuation Chart 1:  Planet Hollywood 2013 Budget to Actual Performance ............................... 97
Valuation Chart 2:  Planet Hollywood Long-Range Plans .......................................................... 99

# List of Exhibits

Exhibit A:  Guideline Public Company Summaries
Exhibit B:  Market and Economic Overview
Exhibit C:  Valuation of WSOP Trademark & IP
Exhibit D:  Valuation of Preferred Stock
Exhibit E:  Valuation of WSOP Tournament Rights
Exhibit F:  CERP Transaction Valuation
Exhibit G:  Growth Transaction Valuation
Exhibit H:  Four Properties Transaction Valuation
Exhibit I:  Land Analysis

## I.      OVERVIEW OF VALUATION AND VALUATION METHODOLOGIES

### A.  Standard of Value

Standards of value include fair market value, fair value, investment value, and intrinsic value, among others.   Fair market value ("FMV"), as defined by the American Society of Appraisers, is "the amount at which a property would change hands between a willing seller and willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts."[1]   This definition is consistent with the FMV definition contained within the Internal Revenue Code and Revenue Ruling 59-60.[2]

Most valuation professionals interpret the willing buyer and willing seller requirement to be hypothetical individuals rather than a particular buyer.  A hypothetical buyer is not assumed to be influenced by special motivations or special benefits that might accrue through the purchase or sale of the asset.

The FMV definition also implies that the parties have an ability and willingness to purchase or sell the business interest.  Relevant market multiples are based on transactions of interests that could be purchased and sold by willing and able investors.  Neither the buyer nor the seller can be acting under any compulsion to buy or sell in order for the price to be considered a proper measure of FMV.  Further, FMV is the price at which a transaction could take place based on the conditions that exist at the valuation date.

The Financial Accounting Standards Board Accounting Standards Codification, Topic 820, *Fair Value Measurements and Disclosures* (ASC 820), defines fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date."

### B.  Reliance on Information Subsequent to Valuation Date

Generally, a valuation analysis should only consider information and circumstances that were known or knowable at the valuation date and events occurring up to the valuation date.[3]  "Subsequent events are indicative of conditions that were not known or knowable at the valuation date, including conditions that arose subsequent to the valuation date.  The valuation would not be updated to reflect those events or conditions."[4]  Subsequent events, or information or conditions, that were not known or knowable as of the valuation date would generally not be considered in a business valuation.  Subsequent events can include the loss of a customer, changes in regulation that affect a company's operations, unexpected industry or economic downturns, changes in management, or other information, including financial results, that were

---

[1]  Shannon P. Pratt & Alina V. Niculita, Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at 41-42.

[2]  *Id.*

[3]  Statement of Standards for Valuation Services No. 1. VS Section 100 Valuation of a Business, Business Ownership Interest, Security, or Intangible Asset.

[4]  *Id.*

not known or knowable as of the valuation date. Stated another way, it is not appropriate to use hindsight to determine the value of a business under generally accepted valuation principles.

The four main valuation groups that govern professional standards in business valuation (*i.e.*, (i) the American Society of Appraisers, (ii) the American Institute of Certified Public Accountants, (iii) the National Association of Certified Valuation Analysts, and (iv) the Institute of Business Appraisers) discourage considering subsequent events in the analysis that would not have been reasonably foreseeable as of the valuation date.

The valuation date utilized in a business valuation assignment is important due to a number of factors. The valuation date itself will typically determine the information to be analyzed for the subject company and operating results and other factors, which can change from one period to another. Also, the value indication for a business can change substantially based on external factors that are different at different points in time.[5] Typically, in a retrospective valuation, post valuation date information is available; however, any information or event unforeseen as of the valuation date is generally not considered.[6]

If subsequent information would have been reasonably foreseeable as of the valuation date, the use of the information might be appropriate. Such foreseeable information could include agreements that are signed prior to the valuation date but do not become effective until after the valuation date. Information that is not foreseeable, and therefore, should typically not be included in a valuation assignment includes fraudulent acts or natural disasters, as they would not be foreseeable prior to occurring. Therefore, if the occurrence took place after the valuation date, such occurrences would generally not be considered in the valuation conclusion.

### C. Valuation Approaches and Methods

In general, there are three approaches typically employed when determining the value of a privately held business interest: (i) the asset approach, (ii) the income approach, and (iii) the market approach.[7] Each of these general approaches should be considered. These conventional approaches typically include some form of earning power appraisal, asset appraisal, a comparison to similar companies or transactions or a combination of the three.

In valuing a company under the income and market approaches, an estimate is made of the present value of the company's projected future cash flow. Employing a comparison to other publicly traded companies or private and public transactions, the valuator will interpret the data for guidance in determining applicable valuation parameters, such as discount or capitalization rates for earnings or cash flow. In an asset appraisal, an estimate of value of the assets is made (as opposed to the employment of those assets in a going concern business).

---

[5] Shannon P. Pratt & Alina V. Niculita, Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at 39.

[6] George B. Hawkins, Business Valuation Review: Why Time Travel in Business Valuation is Wrong.

[7] Shannon P. Pratt & Alina V. Niculita, Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at 62.

In assessing the valuation of a company, a variety of factors are taken into consideration, including:

    i.    The nature and history of the business, its current position, and its outlook.

    ii.    The general and relevant economic conditions prevailing at the time of the appraisal.

    iii.    The current conditions and outlook of the specific industry in which the subject company participates.[8]

### 1.  Asset Approach[9]

The asset approach is a type of business valuation that focuses on a company's net asset value, or the value of its total assets minus its total liabilities.  The asset approach essentially assesses what it would cost to replace the assets of a company.  There is some room for interpretation in the asset approach in terms of deciding which of the company's assets and liabilities to include in the valuation, and how to measure the value of each.

### 2.  Income Approach[10]

The income approach utilizes an economic benefit stream of the subject company, typically based on historical or projected cash flow, which is reasonably reflective of the subject asset's most likely future operations.  The selected benefit stream is then discounted to the present value with an appropriate risk-adjusted discount rate or capitalization rate.

A measure of earning power that is often used is "net cash flow," which represents the amount that an owner could take out of the business over time without jeopardizing the business as a going concern.  There are several valuation methods within the income approach, including the discounted cash flow method and capitalization of earnings method.

### a.  Discounted Cash Flow Method[11]

The Discounted Cash Flow Method ("DCF Method") uses a financial forecast for a subject company to estimate the present value of expected economic income that an investor could anticipate from the business.  The DCF Method estimates value based on future cash flows over an investment horizon using empirical market data, macroeconomic and industry evidence, and the underlying fundamental trends for the subject company.

The starting point in the DCF is determining the debt-free cash flow.  Debt-free cash flow is computed by first tax-effecting a company's forecasted earnings before interest and taxes

---

[8]  *Id*. at 68.

[9]  *Id*. at 63.

[10]  *Id*. at 62.

[11]  *Id*. at ch. 9.

("EBIT") to arrive at debt-free earnings. Then, depreciation expense is added, capital expenditures are deducted, and net changes in non-cash working capital are added to arrive at debt-free cash flow.

Once debt-free cash flow has been determined, an appropriate discount rate or capitalization rate is selected and used to convert the forecast debt-free cash flow into an estimated enterprise value. A discount rate is used to convert a future stream of cash flows into value, whereas a capitalization rate, equal to the discount rate minus the cash flow growth rate, is utilized to convert a single period's cash flow into value.[12]

When utilizing debt-free cash flow, the most appropriate discount rate is the weighted average cost of capital ("WACC").[13] The WACC is estimated by determining the cost of equity and the cost of debt for the subject company as adjusted for the weight of each based on an appropriate capital structure. The cost of equity can be estimated utilizing a broad market, historically based approach commonly referred to as the capital asset pricing model ("CAPM").[14] The CAPM can be expressed as shown in Valuation Table 1.

**Valuation Table 1: CAPM Formula**

$$\text{Re} = \text{Rf} + \text{ß} \times (\text{MRP}) + \text{Rs}$$

| | |
|---|---|
| Re | = The security's expected return |
| Rf | = An appropriate risk-free rate |
| ß | = The security's beta statistic |
| MRP | = The market's return premium over the risk free return |
| Rs | = Size Premium |

The CAPM has some restrictive assumptions. One critical assumption is that investors can, by investing in a diversified portfolio of securities, effectively eliminate specific company or unsystematic risk from return expectations. CAPM incorporates systematic risk, or the risk of the market, by using the beta factor noted above, where beta measures the relationship of a particular company's rate of return with that of the market as a whole. A beta of 1.0 suggests the risk or volatility for a company or an industry equal to that of the market. Betas of more than 1.0 suggest greater relative risk, higher capitalization rates, and lower price/earnings multiples, other things being equal; betas of less than 1.0 imply lower relative risk, lower capitalization rates, and correspondingly higher price/earnings ratios. Beta multiples incorporate the capital structure, or financial leverage, of the individual company and therefore need to be un-levered and re-levered to conform with the capital structure of the subject company.

---

[12] *Id*. at 240.

[13] *Id*. at 216.

[14] Shannon P. Pratt & Roger J. Grabowski, Cost of Capital: Applications and Examples (4th ed. 2010), at ch. 8.

WACC is calculated by multiplying the cost of each capital source, both debt and equity, by its relevant weight, and then adding the products together to determine the overall WACC.[15] The formula for calculating the WACC is shown in Valuation Table 2.

### Valuation Table 2: WACC Formula

$$WACC = (E/V * Re) + (D/V * Rd * (1 - Tc))$$

| | | |
|---|---|---|
| Re | = | Cost of equity |
| Rd | = | Cost of debt |
| E | = | Market value of the firm's equity |
| D | = | Market value of the firm's debt |
| V | = | E + D |
| E/V | = | Percentage of financing that is equity |
| D/V | = | Percentage of financing that is debt |
| Tc | = | Corporate tax rate |

### b.  Capitalization of Earnings Method[16]

The Capitalization of Earnings Method, or Single Period Capitalization Method, is similar to the DCF Method in that it uses a financial statistic for the subject company to estimate the present value of expected economic income that an investor might anticipate from the business ("Cap Method").  The Cap Method is frequently used to value a business whenever current operations approximate those expected to be realized in the long-term, assuming a sustainable growth rate.  In other words, the forecasted short-term growth of a subject company is expected to be equal to long-term growth expectations.  This analysis applies a capitalization rate to normalized economic income, resulting in an indication of the value of the going-concern entity.

### 3.  Market Approach

The market approach consists of three primary methodologies: the guideline public company method, the precedent transaction method, and the subject company transaction method.

### a.  The Guideline Public Company Method[17]

The Guideline Public Company Method ("GPC Method") involves identifying and selecting publicly traded companies with financial and operating characteristics similar to the company being valued.  Once companies are identified, valuation multiples can be synthesized,

---

[15] *Id*. at ch. 18.

[16] Shannon P. Pratt & Alina V. Niculita, Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at ch. 10.

[17] *Id*. at ch. 11.

adjusted for comparability, and then applied to the subject company's economic basis to estimate the value of its equity or invested capital.

The GPC Method is typically based on value measure calculations. A value measure relates a stock's price to various underlying fundamental data, such as EBITDA[18] or revenue. Each pricing multiple provides an easily identifiable basis for ascertaining the public market's perception of a stock's value, or, stated in investment terms, the market's capitalization or discounting of a company's underlying financial fundamentals. Pricing multiples generally take into account the trends in growth, performance, and stability of these underlying fundamental data. In this manner, the business and financial risk associated with an industry or group of companies can be viewed in relation to return expectations.

The numerator used in deriving the multiples of the pricing ratios is the company's enterprise value. The value of the company is ultimately allocated to the forms of capital comprising its capital structure (*i.e.*, common equity, preferred equity – if any, and interest-bearing debt) in preference to their claims on the company's capital. Once the pricing multiples have been calculated, additional analysis on the underlying data is necessary to arrive at the selection of the appropriate pricing multiple to apply to the subject company.

Pricing multiples can be either historical or forward-looking. In an industry or business with relatively uniform growth prospects, it is generally appropriate to rely on historical multiples since they are based on factual, historical results. In order to derive a historical price to earnings ratios, it is typical to utilize latest twelve months ("LTM") earnings (also referred to as trailing twelve months, or "TTM"). However, when growth prospects differ for the subject company compared to the GPCs, or when the subject company's current years' profits are unrepresentative of the longer term expectations, historical multiples lose some of their relevance and forward multiples may be more appropriate.

Forward multiples allow companies to be compared based on a metric of future, rather than historical, cash flow. The concept behind the use of forward multiples is that companies are more comparable when they have reached a mature phase with stable growth, at which time differences between companies are most likely to be the result of true differences in value rather than where they sit on the lifecycle curve.

---

[18] EBITDA represents Earnings Before Interest, Taxes, Depreciation, and Amortization. Throughout this Appendix and as discussed previously in Section VI of the Final Report, *supra*, the terms EBITDA, EBITDAR (Earnings Before Interest, Taxes, Depreciation, Amortization, and Rent), and EBITDARM (Earnings Before Interest, Taxes, Depreciation, Amortization, Rent, and Management Fees) are used. With respect to Caesars' projections (both in its LRP and in its reported "Budget to Actual" comparison), the figures provided by Caesars represent EBITDARM, although they are sometimes cited as EBITDA. However, for an entity that does not pay rent expense or management fees, EBITDARM represents the same metric as EBITDA. The metrics only differ when the entity incurs either rent expense (as in the case of the Quad) and/or management fees (as in the case of the properties transferred in the Growth and Four Properties Transactions on a prospective basis after the transaction was completed).

### b.   The Precedent Transactions Method[19]

The precedent transactions method is also referred to as the merged and acquired company method, guideline company transaction method, or guideline transactions method ("Precedent Transactions Method").

This method is very similar to the GPC Method, with the distinction that rather than relying upon publicly traded companies for the multiples, this methodology relies upon the pricing information from the transaction prices paid for merged or acquired companies with similar services, products, and industry exposure as the subject company or asset.

Under the market approach, the Precedent Transactions Method requires identifying transactions involving companies that are sufficiently comparable to the subject company. Adjustments to the valuation multiples derived from the guideline transactions should be considered for size, growth, and other operating ratios.  Unlike guideline public companies, financial data for the acquired company can be difficult to obtain, as there is no centrally organized mechanism for collecting information on business transactions.

Business transactions include a number of differentiating factors such as the price to be paid, structure of the deal, tax implications, and possible synergies, among others.  The actual price paid in a transaction may be representative of fair market value, investment value, or somewhere in between.[20]  A financial buyer often determines a purchase price based on the expected return on investment of the stand-alone company while a competitor or other strategic buyer can benefit from synergies that can be derived based on the transaction.  The specifics of both the acquired company and the transaction itself need to be examined by the valuation analyst in order to best utilize the implied valuation multiples.

A major difference between the GPC Method and the Precedent Transactions Method is the proximity of the financial data to the valuation date.  Market prices for publicly traded companies are derived on a continual basis based on trading activity.  The data available from guideline transactions is based on the specific date that the transaction occurred.  Many times, guideline transactions occurred several years prior to the valuation date.  If enough comparable transactions are available, the valuation analyst could eliminate those that occurred prior to a specified date, possibly three or five years prior to the valuation date.  If the valuation analyst does not wish to omit the older transactions, then adjustments might be necessary to account for any changes that have occurred in the industry and market as a whole over the specified time.

The most common way to adjust for time differences is to determine industry average stock price or valuation multiple changes.  Accounting for these changes over time also requires a comparability of the subject company profitability and other operating characteristics to the guideline companies.  Other industry factors, including changes in regulation, technology factors, and competition should be reviewed and considered when making time-based

---

[19]  Shannon P. Pratt & Alina V. Niculita, Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at ch. 12.

[20]  *Id.*

adjustments, although these factors are likely already incorporated into changes in valuation multiples.

Overall, precedent transactions, whether external or internal, can provide relevant valuation multiples that are useful to a valuation analyst.  However, much care must be taken in researching and interpreting the guideline transactions, with additional consideration made to account for the passage of time.

### c.  The Subject Company Transaction Method[21]

The Subject Company Transaction Method involves the utilization of a company's own relevant stock transactions.  Utilizing the price at which a recent equity class was issued by the company or transacted between third parties, the aggregate equity value which results in a value being assigned to the identified equity class consistent with the issue or transacted price can be calculated using appropriate allocation methodologies.

Similar to precedent transactions, the terms of the past subject company transactions need to be analyzed and understood in order to properly apply the implied valuation metrics.  The valuation multiples indicated by the past transactions need to be adjusted to reflect growth, internal operating changes, and changes in industry and market conditions that may have occurred since the transaction or transactions.

### D.  Weighting of Methodologies

In arriving at a conclusion of value, the valuation analyst should correlate and reconcile the results obtained from the various valuation approaches and methods used.  In determining the appropriate correlation, the valuation analyst must assess the reliability of the results based on the nature of the company, information available, industry of the subject entity, and comparability of the subject company to its peers, among other things.  The ultimate value conclusion reached can reflect one valuation approach and method or a combination of the results of more than one valuation approach and method.

When different valuation approaches result in materially different value indications, the inconsistencies must be reviewed, understood, and/or reconciled.  Among the considerations when faced with widely varied conclusions are whether the valuation encompasses all assets of the business, controlling versus non-controlling ownership interests, marketable securities versus non-marketable securities, and so on.  Another consideration when faced with widely varied conclusions is whether the value indications are mutually supportive or mutually contradictory.

While there is no guidance for selecting which valuation approach or method is most applicable in a given situation, there are many common factors to be considered by the valuation analyst.  These factors include:

- The quantity and quality of the available financial and operational data;

---

[21]  *Id*. at 318.

- The degree of the analyst's access to the available financial and operational data;

- The supply of industry private sale transactional data;

- The supply of industry publicly traded company data;

- The type of business, nature of the business assets, and type of industry subject to the valuation;

- The nature of the business interest subject to the valuation;

- Statutory, judicial, and administrative considerations;

- The informational needs of the valuation audience;

- The purpose and objective of the valuation; and

- The professional judgment and expertise of the analyst.[22]

With specific regard to the supply of quality industry transactional data and publicly traded company data, the comparability of the subject company to those by which valuation multiples are being derived is of critical importance. While there may not be many, if any, "pure play" comparable companies for given industries, the relevance and application of valuation statistics based on the degree of comparability can be critical in ultimately reconciling multiple valuation approaches and methods.

Ultimately, the final value conclusion may be based on a single value indication from one of the valuation approaches and methods used, heavily weighted toward a particular valuation approach and method, or another number that falls within the indicated range of values. Using an arithmetic average assumes that all of the valuation methods utilized have equal merit. The ultimate value conclusion may be based on an average of the valuation approaches and methods employed, but should be based on the consideration of all pertinent factors.

### E. Additional Valuation Considerations

### 1. Single Asset Valuation

The generally accepted valuation approaches and methods discussed can be used to value a large enterprise such as Caesars or individual properties within it, such as Bally's Las Vegas or Harrah's New Orleans. In both instances, what is being valued is a going concern business which possesses all of the requisite components to provide a service or product to customers. These components include (i) the physical assets (*e.g.*, building, furniture, equipment), (ii) intangible assets (*e.g.*, trademarks, IT), and (iii) labor and management, all of which, when combined, form a going concern business.

---

[22] *Id.*

In all instances, the various assets at issue in this Investigation (the "Transferred Assets")[23] possess the requisite components to be valued as a going concern. A pure "asset" valuation would pertain to specific assets, such as a piece of kitchen equipment (*e.g.*, stoves) or slot machines. If these assets are valued independent of a going concern, a pure market approach would be used, based on the sale of similar assets or the cost to acquire new assets.

### 2. The Use of the Asset Approach

As previously stated, the asset approach involves the summation of each individual asset and liability of the subject company, as restated from the assets' historical cost to the appropriate standard of value. The asset approach is typically used to value individual assets of a company, but not generally to value a company operating as a going concern. Because each of the Transferred Assets is either intellectual property or a going concern business, the asset approach was considered but ultimately not utilized to assess the fair market value of the Transferred Assets. The asset approach would not adequately capture the value of the Transferred Assets' expected future cash flow.

### 3. The Use of Precedent Transactions

For the purpose of valuing the Transferred Assets, generally accepted methodologies under the market approach and income approach were relied upon. Within the income approach, the DCF Method as well as the Cap Method were employed where appropriate. Under the market approach, the GPC Method (discussed in detail with respect to each of the individual transactions) was relied upon. The Precedent Transactions Method was considered but not ultimately relied upon in determining the concluded values for the Transferred Assets.

As discussed later in this Appendix, *infra*, with respect to the Four Properties Transaction and Growth Transaction, certain advisors (Centerview and Evercore) identified and utilized precedent transactions in arriving at their conclusion of value for the casino properties. Other advisors (Lazard and Duff & Phelps) reviewed precedent transactions but did not ultimately rely upon them in arriving at their conclusion.

There are a number of factors that support the premise that reliance on the precedent transactions noted by certain of the financial advisors at arriving at their value conclusion is without merit.

First, the Growth Transaction and Four Properties Transaction occurred in October 2013 and May 2014, respectively. The precedent transactions used by the financial advisors in those transactions included transactions with closing dates between 2008 and March 2014. Of the precedent transactions noted, 53% occurred prior to 2012.[24] The economy and financial markets in the time period from 2008 through 2011 were significantly different from those in the period from 2012 through 2014, as the 2008 through 2011 time period included the that period's

---

[23] Includes the assets transferred in conjunction with the 2009 WSOP Transaction, the 2011 WSOP Transaction, the CERP Transaction, the Growth Transaction, and the Four Properties Transaction.

[24] The transfer of Planet Hollywood to CGP in 2013 has been excluded from this figure.

recession and subsequent recovery, while the 2013 and 2014 timeframe was generally a period of more stable growth and economic conditions. The financial advisors made no attempt to analyze and adjust the older transactions for the passage of time. Under generally accepted valuation theory, transactions that occurred significantly prior to the subject transaction should be analyzed to determine whether the industry and general economic conditions are sufficiently comparable to the subject company in arriving at a value indication.[25]

Second, of the remaining 47% of the transactions noted, none of the acquired properties were located on the Las Vegas Strip. The vast majority of the acquired properties were smaller than the subject casino properties and located in smaller, regional markets. The financial advisors provided no analysis or explanation to determine whether these precedent transactions were comparable to the subject properties, nor did they provide any adjustments for the purpose of valuation.

Third, the financial information obtained under the GPC Method is derived from a company's publicly filed Form 10-K, which is subject to an independent audit as well as certification by the company's CEO and CFO. As such, many valuators consider such financial statements more reliable than the limited financial information derived from the precedent transactions.

Unlike the GPC Method, the financial data obtained from the precedent transactions are generally not subject to audit and cannot be easily verified otherwise. There is no evidence to suggest that the financial advisors verified the accuracy of the financial information or the terms of the transactions, both of which can have significant impacts on value indications. Further, the data does not disclose whether other assets were included in the sale (*e.g.*, non-core assets such as excess land, non-compete agreements, or employment agreements). The financial advisors also do not disclose the terms of the transactions, such as seller financing or the issuance of common or preferred stock in lieu of cash. Under generally accepted valuation practices, if precedent transactions are identified, they must be analyzed to determine whether they can be utilized in the valuation process.[26]

A review of the precedent transactions identified by the financial advisors suggests that due to the lack of proximity of many of the precedent transactions to the subject company, size differences of the properties, competitive position of the properties, the time period compared to the subject transactions, and lack of verified financial data, the precedent transactions do not provide reliable insight in arriving at an indication of value for the subject casino properties. Accordingly, this methodology was considered but not ultimately relied upon.

### 4. Gordon Growth Model[27]

The Gordon Growth Model is an input into an overall valuation model that is used by valuators to calculate the value of a company under the Cap Method or as a component in the

---

[25] Appraisal Institute: The Appraisal of Real Estate (11th ed. 1996), at 411.

[26] Shannon P. Pratt & Alina V. Niculita, Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at 323.

DCF Method.  The Gordon Growth Model is a single-period technique that calculates the present value of future cash expected over the firm's infinite life, or terminal forecast year, discounted at the company's cost of capital depending on the methodology used.

The Gordon Growth Model is the appropriate method to calculate the terminal value of the Transferred Assets under the DCF Method.  Instead, the financial advisors typically used an EBITDA multiple to calculate the terminal value in their DCF models.[28]  When using a DCF analysis to value an asset, the Gordon Growth Model captures a company's tax rate and capital expenditures, whereas the use of an EBITDA terminal multiple is ambiguous in this regard.  Using an EBITDA terminal multiple in a DCF analysis mixes methods under the income and market approaches to arrive at a company's value whereas the theory behind the Gordon Growth Model is consistent with the purpose of a DCF by using a company's specific cost of capital and growth to value future cash flow rather than relying on a single multiple (*i.e.*, EBITDA) to accomplish the same.[29]  Using an EBITDA multiple in the terminal year of a multi-year forecast would only capture the specific aspects of the subject company by chance.

### 5.  Terminal Year Capital Expenditures and Depreciation

If the perpetual growth rate equals the nominal growth in the economy, which assumes that a company has achieved stable cash flows and is the basis and theory behind the Gordon Growth Model, then capital expenditures in the terminal year should be set to a normalized level.  As noted by Professor Aswath Damodaran, a leading authority in the field of business valuation, "stable growth firms tend to reinvest less than high growth firms and it is critical that we capture the effect of lower growth on reinvestment . . . ."[30]  Accordingly, the terminal year depreciation is set to equal the normalized capital expenditures as future depreciation will be based, in large part, on normalized capital expenditures.

None of the six casino properties transferred were expected to expand or grow their capacity, such as number of rooms, casino floor space, retail outlets, food and beverage, meeting space, etc.  As such, capital expenditures would primarily reflect maintenance (*e.g.*, new carpet, new gaming machines, new room furnishings, paint, or a new roof) as opposed to a new tower or expanded casino and or convention space.  To the extent the casino properties do build additional facilities that expand their capacity, the projections would have to include the revenue and EBITDA associated with the additions in the discrete years of the forecast.

The theory behind the Gordon Growth Model is that the expected capital expenditures into perpetuity would be set at a level necessary to achieve the estimated long-term growth rate.

---

[27]  *Id*. at 242.

[28]  The use of a terminal multiple implies a sale of the asset or exit from the investment at a future point in time.  There is nothing to suggest that CEC or the Sponsors contemplated a future sale of any of the Transferred Assets to a third party.

[29]  Shannon P. Pratt & Alina V. Niculita, Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at 251.

[30]  Aswath Damodaran, Invision Valuation (2002), at 311.

In the case of the Transferred Assets, the long-term growth rate applied in the Examiner's valuations ranges from 2.0% to 2.5%, which essentially reflects inflationary growth. The corresponding depreciation into perpetuity would be an offset to those same capital expenditures required to achieve long-term growth. The condition of the six casino properties at the time of, or shortly after, the transfers is summarized below.

- Horseshoe Baltimore – new property and new construction; however, the property has no hotel rooms, just gaming and food & beverage;

- The Quad – property completely renovated and repositioned;

- The Cromwell – property completely renovated and repositioned;

- Bally Las Vegas – South Tower completely renovated;

- Planet Hollywood – relatively new property, original construction in 2000, with recent renovations in 2007; and

- Harrah's New Orleans – no recent significant renovations; the property consists primarily of casino space with minimal food & beverage and rooms compared to Las Vegas properties.

Given the recent significant improvements to the casino properties, capital expenditures over the near term would be minimal. Depreciation includes long-lived assets (*e.g.*, the steel skeleton of the building, concrete and rebar in the floors/foundation, most of the plumbing, HVAC, elevator shafts, and the various soft costs associated with those assets such as the architectural and engineering costs, construction management fees, and capitalized interest and taxes) for which the functional economic life significantly exceeds the depreciable life. These types of assets are typically depreciated over 35 years; however, until the building is demolished they would not be expected to be replaced. Accordingly, historical depreciation expense is not a valid proxy for normalized capital expenditures in the terminal year. As Professor Damodaran notes "the accounting depreciation that is computed on the original historical cost often bears little resemblance to the actual economic depreciation."[31]

At year end December 31, 2014, CEC's audited financial statements reflect the long-lived tangible fixed assets, exclusive of construction in progress, summarized in Valuation Table 3.[32]

---

[31] Aswath Damodaran, Invision Valuation (2002), at 42.

[32] Amounts represent book value before depreciation and amortization.

### Valuation Table 3:  CEC Long-Lived Assets

| amounts in millions | Amount | Percent |
|---|---|---|
| Land and Land Improvements | $    6,218 | 37.9% |
| Buildings, Riverboats, and Improvements | 7,506 | 45.7% |
| Furniture, Fixtures, and Equipment ("FF&E") | 2,685 | 16.4% |
| Total | $   16,409 | |

Source:  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 81.

The total capital assets of $16.4 billion include $6.2 billion of land and land improvements, which are not typically assets which require replacement.  Land improvements are a depreciable asset.  The remaining $10.2 million in fixed assets consists of (i) $7.5 million in Buildings, Riverboats, and Improvements, and (ii) $2.7 million of FF&E.  Over an infinite life, FF&E would be replaced several times.  FF&E represents 26% of the non-land fixed assets.  The balance of the long-lived assets consists of buildings and other fixed assets that, by and large, would be replaced only over an extremely long period of time, if ever.

As of the valuation dates, the six casino properties are not going to require significant future investments in fixed assets in order to grow the overall business.  Basically, the six casinos are fixed as to their footprint and productive capacity.

Caesars has stated that it does not compete by building large capital-intensive attractions (*e.g.*, volcanoes, lakes, or canals), but rather by knowing their customers through the use of Total Rewards.  As such, significant capital projects in these properties would not be expected.  If in the future any of these properties completely remodel their rooms or public spaces, such as was done at the South Tower of Bally's Las Vegas, then you would expect growth in room revenue above normal levels.  Similarly, if a property is completely renovated and repositioned, such as was done with the Cromwell and the Quad, you would expect increases in revenue from rooms, food & beverage, and gaming above that of nominal growth.

Given the above, an appropriate approach to determine the normalized terminal capital expenditures for the six casino properties is to utilize the greater of (i) the projected capital expenditures in the last year of the projection period, grown by the long-term growth rate, or (ii) an annual amount of capital expenditures sufficient to replace 50% of the value of the casino property over a 30 year period.  In the Examiner's valuations, this level of terminal capital expenditures, on average, approximates 3.5% of the terminal year's net revenue, suggesting that, on average, 3.5% of revenue would be reinvested in the Transferred Assets for each year into perpetuity.

It should also be noted that Caesars' external auditors, Deloitte, reviewed the amounts and methodology used by Caesars with respect to (i) projected capital expenditures and (ii) terminal period assumptions regarding capital expenditures and depreciation used for impairment testing purposes.  Specifically, Deloitte noted:

We evaluated the Company's historical capital expenditures and projected capital expenditures and believe the Company wide cap ex rate applied by the Company to each of the reporting units is reasonable based on historical trends and expected deferred capital expenditures. We noted the Company projected the capital expenditures and the depreciation expense in the terminal year as the same amount, which is appropriate.[33]

## II.   MARKET AND ECONOMIC OVERVIEW SUMMARY

Valuation standards require an analysis of the economy and industry in which the subject company operates. Specifically, IRS Revenue Ruling 59-60 notes that certain factors are fundamental and require careful analysis, including "the economic outlook in general and the condition and outlook of the specific industry in particular." Understanding the economic and industry environment provides context and a means to evaluate the reasonableness of the subject company's expected future performance.

As part of the valuation process for the Transferred Assets, the casino gaming market for both the Las Vegas Strip and New Orleans were analyzed. In addition, a brief review of the U.S. economy is included.

Complete detail of the market and economic overview is attached hereto as Exhibit B.

### A.  The Recession

During the last 25 years, the United States economy has endured three recessions: (i) an eight month long recession in July of 1990; (ii) another eight month long recession in 2001; and (iii) an 18 month recession that began in January 2008 and ended in June 2009 (the "Recession").[34] The 2008–2009 Recession was the longest and deepest recession since the Great Depression; the economy was slow to recover from this Recession and did not start seeing a recovery until July 2009.[35]

### B.  Las Vegas Market Data

The Recession significantly impacted the Las Vegas Strip market. During the Recession, casinos saw occupancy rates fall from 2008 to 2010 but began rebounding in 2011 and continued rising through 2014.[36] The industry was not able to weather the Recession as it had in previous recessions in the early 1990s and early 2000s. In order to entice casino visitors, room rates were often discounted or provided on a complimentary basis. The casino hotels in the United States saw a reduction in their non-gaming revenue.

---

[33] Deloitte Memorandum – ASC 350: Goodwill and Non-amortizing Intangible Assets Impairment Testing (Nov. 1, 2013), at DT0005260 [DT0005245].

[34] UNLV Economic Outlook Report for 2011 (Dec. 2010), at 1.

[35] *Id.*

[36] Nevada Gaming Control Board (Abstract Reports) – Clark County – Las Vegas Strip Area with Gaming Revenues of $72 million and over.

As a result of the Recession and compounded by high unemployment rates, the Las Vegas Strip area gaming revenues per square foot decreased from a high in 2007 of approximately $2,600 per square foot to a low of $1,900 per square foot in 2010.[37]   The Las Vegas Strip properties transferred from CEOC (Bally's Las Vegas, the Cromwell, Planet Hollywood, and the Quad; collectively the "Las Vegas Transferred Properties") also saw a significant decline in gaming revenue per square foot during and following the Recession.  Much like the other casinos on the Strip, the Las Vegas Transferred Properties experienced their most drastic decline in 2009.  For both table games and slot machines, the Las Vegas Strip area casinos experienced a decrease in average win per unit ("WPU")[38] in 2008 and 2009 but steadily increased from 2010 to 2013.[39]   The Las Vegas Transferred Properties saw a similar decline but registered a much larger percentage increase than the Las Vegas Strip area casinos.

### C.  New Orleans Market Data

Harrah's New Orleans opened in October of 1999 as the only land-based casino in New Orleans and grew rapidly until 2005 when Hurricane Katrina swept through the Gulf Coast, flooding much of New Orleans.[40]   In addition to flooding, New Orleans also experienced a significant decrease in tourism impacting casino revenues at Harrah's New Orleans in 2005; however, the revenues quickly rebounded in 2006 and exceeded pre-Hurricane Katrina levels.[41] Much like the rest of the economy, New Orleans was negatively impacted by the Recession. Harrah's New Orleans saw its casino revenues decline from 2008 to 2011 with the largest decrease occurring in 2009 with a rebound finally occurring in 2012.[42]

The number of locations and devices of video poker, a significant component of the Louisiana and New Orleans gaming industry, steadily grew from 2006 to 2011 but continuously declined from 2011 onward.[43]

A city-wide smoking ban in New Orleans went into effect on April 22, 2015,[44] which did ultimately have an impact on the revenues at Harrah's New Orleans.[45]  However, the first draft of

---

[37] *Id.*

[38] WPU represents the total daily win divided by the number of units (*i.e.*, number of slot machines or tables).

[39] Nevada Gaming Control Board (Gaming Revenue Reports) – Clark County – Las Vegas Strip Area with Gaming Revenue of $72 million and over.

[40] Hurricane Katrina Facts & Summary (2016), https://www.history.com/topics/hurricane-katrina (last visited Mar. 11, 2016).

[41] Louisiana Gaming Control Board – Land-based Casino Revenue Reports (Louisiana State Police).

[42] *Id.*

[43] Louisiana Gaming Control Board – Annual Report New Orleans (Louisiana State Control Board – Video Gaming Division).

[44] TMG Consulting, "Smoking Ban at Harrah's New Orleans," https://tmgconsulting.wordpress.com/2015/05/06/smoking-ban-at-harrahs-new-orleans/ (last

the smoking ordinance was not released until November 2014;[46] therefore, the potential impact of a smoking ban in New Orleans was not known or knowable at the time of the Four Properties transaction in May 2014.

### D. Industry and Economic Outlook (2013-2014)

#### 1. United States Economic Overview

General economic indicators, such as employment, consumer spending, and tourism activity, have an impact on the expected operations of the Transferred Assets.

The unemployment rate is a key statistic in determining the relative health of the economy. In 2013, the year began with an unemployment rate of 8.0%, and as of the end of September 2013, the unemployment rate was 7.2%.[47] The decrease in the unemployment rate of 0.8% from January 2013 to September 2013 was a sign of improving economic conditions.

#### 2. Casino Hotels Industry

In 2014, the Casinos Hotels industry was continuing to recover from the Recession and benefited from the improvement in the broader economy which spurred increased discretionary spending on gambling. The economy began its recovery from year-end 2009 to 2012, and as it improved, consumers' fears subsided allowing consumer spending to increase. For the next five years, the industry was expected to continue improving and see increased discretionary spending at casinos, facilitated by higher incomes and lower unemployment rates.

#### 3. New Orleans

While the New Orleans economy suffered from the effects of the Recession, the market continued to recover and rebuild. The New Orleans economy grew modestly in 2012 with total nonfarm employment increasing slightly, and the economy continued to improve in 2013.

---

visited Mar. 11, 2016).

[45] CEC 10-Q for the quarter ended June 30, 2015 (Aug. 6, 2015), at 42; CEC 10-K for the year ended December 31, 2015 (Feb. 29, 2016), at 39.

[46] Gainbit weekly, http://www.bestofneworleans.com/blogofneworleans/archives/2014/11/20/first-draft-of-new-orleans-no-smoking-ordinance-bans-all-tobacco-products-from-public-areas (last visited Mar. 11, 2016).

[47] Bureau of Labor Statistics, http://data.bls.gov/timeseries/LNS14000000 (last visited Mar. 11, 2016).

## III.    THE 2009 WSOP TRANSACTION

In April 2009, Harrah's Interactive Entertainment (now CIE) and HIE Holdings, Inc. ("HIE Holdings") were formed in anticipation of the proposed transfer of the WSOP Trademark & IP from HOC and its affiliates to HIE Holdings Topco, Inc. and its affiliates ("TopCo").[48] On May 1, 2009, TopCo acquired the WSOP Trademark & IP from HOC and Harrah's License Company, LLC (now CLC) in the 2009 WSOP Transaction.

In exchange for this asset transfer, TopCo delivered to HOC 150,000 shares of its non-voting perpetual preferred stock with a stated value of $100 per share and a perpetual, royalty-free license.[49]  Also, concurrent with the transaction, there were a number of other stock transfers that took place:

(i)   HIE Holdings issued 90,000 of preferred stock to Harrah's Entertainment, Inc.[50] ("HET") for $9 million cash.[51]  HIE Holdings also issued 10,000 shares of Common Stock to HET for $1 million cash.[52]

(ii)  HIE Holdings issued 150,000 shares of preferred stock to TopCo in consideration for the transactions contemplated by the Bill of Sale, Assignment and Assumption Agreement,[53] and the License Assignment and Assumption Agreement,[54] both dated May 1, 2009.[55]

(iii) TopCo issued 1,000 shares of common stock to HOC for $1.[56]

---

[48] HIE Certificate of Incorporation (Apr. 7, 2009), at CEOC_INVESTIG_00140015-17 [CEOC_INVESTIG_00140015]; HIE Holdings Certificate of Incorporation (Apr. 30, 2009), at CEOC_INVESTIG_00144815-17 [CEOC_INVESTIG_00144815].

[49] TopCo Preferred Stock Subscription Agreement (May 1, 2009), at CEOC_ INVESTIG_00141123 and 127 [CEOC_INVESTIG_00141123]; Asset Contribution Agreement (May 1, 2009), at CEOC_INVESTIG_00472149-50 [CEOC_INVESTIG_00472148].

[50] HET subsequently became CEC.

[51] HIE Holdings Preferred Stock Subscription Agreement (May 1, 2009), at CEOC_INVESTIG_00141219 and 224 [CEOC_INVESTIG_00141219].

[52] HIE Holdings Common Stock Subscription Agreement (May 1, 2009), at CEOC_ INVESTIG_00141225 and 230 [CEOC_INVESTIG_00141225].

[53] Bill of Sale, Assignment and Assumption Agreement (May 1, 2009), at CEOC_INVESTIG _00139890-92 [CEOC_INVESTIG_0039890].

[54] License Assignment and Assumption Agreement (May 1, 2009), at CEOC_INVESTIG _00140484-86 [CEOC_INVESTIG_00140484].

[55] HIE Holdings Preferred Stock Subscription Agreement (May 1, 2009), at CEOC_INVESTIG _00141248 and 253 [CEOC_INVESTIG_00141248].

[56] TopCo Common Stock Subscription Agreement (May 1, 2009), at CEOC_INVESTIG _00141254 and 258 [CEOC_INVESTIG_00141254].

(iv) HIE issued 5,494,505 shares of common stock to HIE Holdings on account of the transfer of the WSOP Trademark & IP.[57]    HIE also issued 3,663,003 shares of common Stock to HIE Holdings.[58]

Duff & Phelps was engaged by the HOC Board of Directors to opine on the fairness of the 2009 WSOP Transaction and by the HET Board of Directors to opine on the fairness of the value assigned to the HIE Holdings Common Stock interest and the HIE Holdings Preferred Interest transferred.  In both instances, Duff & Phelps opined that the value assigned was fair.[59]

The fairness opinion issued by Duff & Phelps concluded that the fair market value of the WSOP Trademark & IP was $15 million.  Duff & Phelps further concluded that the fair market value of the preferred stock issued to HOC in consideration for the WSOP Trademark & IP was equivalent to its $15 million face value.  However, the projections utilized by Duff & Phelps were inconsistent with projections utilized in impairment testing for financial reporting and for other internal purposes, and the valuation of the preferred stock did not take into account critical attributes that would impact both the liquidity and value thereof.

The following sections describe the analysis performed to derive an estimate of the fair market value of the WSOP Trademark & IP sold in May 2009, as well as the preferred stock received as consideration.  A detailed review was performed of the assumptions impacting the projected cash flows, as well as various other information prepared historically and contemporaneously.   Using this analysis and information, generally accepted valuation approaches and methods were used to derive value estimates, and these values were analyzed against other value indicators and information.

In conjunction with deriving the fair market value of the WSOP Trademark & IP, the opinion and valuation prepared by Duff & Phelps was analyzed, and the related interview commentary and submissions by the various parties were considered.

Based on this analysis, it is reasonably estimated that the fair market value of the WSOP Trademark & IP ranged from $66 million to $76 million, and the fair market value of the preferred stock received in exchange was $10 million to $12 million.

---

[57] HIE Subscription Agreement (May 1, 2009), at CEOC_INVESTIG_00141604 and 609 [CEOC_INVESTIG_00141604].

[58] HIE Subscription Agreement (May 1, 2009), at CEOC_INVESTIG_00141947 and 952 [CEOC_INVESTIG_00141947].

[59] Duff & Phelps "WSOP IP Fairness Analysis" Presentation (Apr. 30, 2009), at CEOC_INVESTIG_00457956-90 [CEOC_INVESTIG_00457956].

### A. Duff & Phelps Fairness Opinion

#### 1. Valuation Methodology

##### a. Methodology

In order to arrive at the fair market value of the WSOP Trademark & IP, Duff & Phelps utilized the DCF Method, using projections for the WSOP Trademark & IP existing sponsorship, licensing, and media contracts that were adjusted for assumed cannibalization of online poker sponsorships due to a hypothetical entry into online poker via a royalty agreement with a third party in Europe. The adjusted projections included revenue from the hypothetical royalty agreement, but still reflected a marked decline in the overall sponsorship, licensing, and media business over time. For example, the total projected EBITDA utilized by Duff & Phelps declined from $5.9 million in 2009 to $1.9 million in 2011, then increased to $3.3 million in 2013 at which point it stabilized.

The valuation by Duff & Phelps did not take into consideration any upside from the potential legalization of online gaming, nor did it include any other use of the WSOP Trademark & IP aside from the status quo use for sponsorship, licensing, and media.

##### b. Discount Rate

Duff & Phelps utilized a 16.5% WACC to discount the cash flows projected from the WSOP Trademark & IP. The fairness opinion provides no additional detail regarding the WACC calculation or how the 16.5% rate was derived.

Duff & Phelps' discount rate was higher than the 13.3% discount rate utilized by Caesars to value the WSOP Trademark & IP for impairment testing purposes,[60] and materially higher than the 8.5% discount rate used by KPMG in its purchase price allocation after the LBO.[61] Further, given that the projected cash flows for the WSOP Trademark & IP were largely based upon existing contracts, there was significantly less risk in achieving those cash flows than there would have been if, for instance, the potential upside from online gaming were included. Typically a lower discount rate is used when the cash flows are, as described by Abrahams, based on "a contractual business, so it's relatively easy to project, because you have contracts. . . ."[62]

Internal work papers produced by Duff & Phelps show that the primary driver of the high discount rate was the relatively high 8% size premium selected. Given that the WSOP Trademark & IP rolled up into a large capitalization company on the side of both buyer and

---

[60] Impairment Review as of Sept. 30, 2008 (Sept. 30, 2008), at Tab "WSOP TM" [CEOC_INVESTIG_00123028] (native file).

[61] KPMG SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment, Inc. as of Jan. 28, 2008 (Dec. 22, 2008), at CEOC_INVESTIG_00240881 [CEOC_INVESTIG_00240748].

[62] C. Abrahams Oct. 7, 2015 Tr. at 54:4-9.

seller, and that a similarly large capitalization company would be the most likely hypothetical buyer, a lower size premium is warranted.

### 2. Preferred Stock Attributes

As consideration for the transfer of the WSOP Trademark & IP, CEOC received preferred stock in TopCo, with a stated face value of $15 million ("Preferred Stock"). As noted in the Duff & Phelps fairness opinion, the Preferred Stock had the following attributes:

- Dividend rate: 15.5% Payment-In-Kind ("PIK") coupon, payable upon the liquidation of TopCo;

- Senior ranking to common stock and any other class of capital or preferred stock unless expressly provided otherwise;

- Perpetual;

- Non-voting; and

- Non-participating.[63]

Based on the review of the Duff & Phelps analysis, documents produced by Duff & Phelps, and interview commentary, the Duff & Phelps valuation of the Preferred Stock did not take into account several factors that would materially impact the value of the Preferred Stock as of April 2009 including:

- TopCo transferred the WSOP Trademark & IP to HIE Holdings for 150,000 shares of preferred stock of HIE Holdings. As such, TopCo did not have any operating assets that generate cash flow.

- HIE Holdings then transferred the WSOP Trademark & IP to CIE for 9,157,509 shares of CIE's common stock valued at $15 million. As such, HIE Holdings did not have any operating assets that generate cash flow.

- The dilution of the Preferred Stock resulting from the issuance of additional common stock and common stock options of TopCo, HIE Holdings, and CIE was not considered by Duff & Phelps.

- By relying on average returns of publicly traded preferred stock, the unique risk of the Preferred Stock was not considered.

- No analysis was provided related to the contractual coupon of the comparable preferred stock instruments, which is necessary to determine the comparability of the market yield.

---

[63] Duff & Phelps "WSOP IP Fairness Analysis" Presentation (Apr. 30, 2009), at CEOC_INVESTIG_00457981 [CEOC_INVESTIG_00457956].

- The restrictions placed on the ability to transfer the Preferred Stock were not considered. The discount could be significant and could materially impact its value. The market places a premium on liquidity and/or marketability and often discounts the value of restricted stock or assets for a lack of marketability.[64]

- Neither TopCo nor HIE Holdings own operating assets that would generate cash. The only source of cash would come from dividends that would be paid by CIE to

---

[64] Preferred Stock Subscription Agreements for TopCo (May 1, 2009), at CEOC_INVESTIG_00141123 and 124 [CEOC_INVESTIG_00141123]; Preferred Stock Subscription Agreements for HIE Holdings (May 1, 2009), at CEOC_INVESTIG_00141220 [CEOC_INVESTIG_00141219] and CEOC_INVESTIG_00141249 [CEOC_INVESTIG_ 00141248]. The Preferred Stock Subscription Agreements for both TopCo and HIE Holdings have similar provisions on restrictions of transfer.

The Preferred Stock Subscription Agreement (*id.* at CEOC_INVESTIG_00141123-24) contains the following restrictions on transfer of the Preferred Stock:

> As evidence of the restrictions on transfer, the following legend (or a substantially similar legend) will be placed on the certificate or certificates evidencing the Shares:
>
> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY APPLICABLE STATE LAW, AND NO INTEREST THEREIN MAY BE SOLD, DISTRIBUTED, ASSIGNED, OFFERED, PLEDGED OR OTHERWISE TRANSFERRED UNLESS (A) THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS COVERING ANY SUCH TRANSACTION INVOLVING THESE SECURITIES OR (B) THE COMPANY RECEIVES AN OPINION OF LEGAL COUNSEL FOR THE HOLDER OF THESE SECURITIES (CONCURRED BY LEGAL COUNSEL FOR THE COMPANY) STATING THAT SUCH TRANSACTION IS EXEMPT FROM REGISTRATION OR THE COMPANY OTHERWISE SATISFIES ITSELF THAT SUCH TRANSACTION IS EXEMPT FROM REGISTRATION.

The Company may give appropriate stop-transfer instructions to any transfer agent for the Shares.

The Certificate of Incorporation of both TopCo (Apr. 30, 2009), at CEC_EXAMINER_1235800 [CEC_EXAMINER_1235797] and HIE Holdings HIE Holdings Certificate of Incorporation (Apr. 30, 2009), at CEOC_INVESTIG_00144819-20 [CEOC_INVESTIG_00144815] have similar provisions regarding the Preferred Stock:

> (i)   Shares of Preferred Stock shall accumulate dividends at a rate per annum equal to fifteen and one-half percent (15.5%). . . .
>
> (ii)   Dividends shall be paid only when, as and if declared by the Board of Directors of the Corporation out of funds at the time legally available for the payment of dividends. . . ."

HIE Holdings and in turn to TopCo.  The documents anticipated that the dividends would be paid with PIK notes.

- The repayment of Preferred Stock is predicated on a defined Liquidity Event which impacts the value.[65]   The limited nature of the Liquidity Event raises uncertainties as to both the timing and probability of actual repayment of the Preferred Stock.[66]

In analyzing the Preferred Stock, Duff & Phelps calculated the average return on a list of publicly traded preferred stock issuance ("Preferred Comps") which paid on average a dividend rate of 14%.  Duff & Phelps concluded that a 1.5% premium over the average return of 14% accounts for the PIK nature of the dividends, lack of marketability of the underlying security, and the uncertainty of repayment of the face amount of the Preferred Stock.  The type of analysis and procedures employed by Duff & Phelps are not in conformance with generally accepted valuation methodologies.

By comparing the average interest rate on the Preferred Stock noted in Duff & Phelps' analysis to the interest rates on the Preferred Comps, Duff & Phelps failed to account for the following:

- The Preferred Comps were freely traded whereas the Preferred Stock was not;

- The Preferred Comps paid regular cash dividends whereas the Preferred Stock contemplated the payment of dividends via PIK notes;

- The Preferred Comps' interests were in operating companies as opposed to a holding company with no operations;

- The Preferred Comps were much larger companies operating in dissimilar industries, many without reported credit ratings.  The equivalent credit risk of the Preferred Stock was not considered in Duff & Phelps analysis; and

- The repayment of the principal of the Preferred Comps was not predicated on a specific event whereas the Preferred Stock would only be paid upon the occurrence of the Liquidity Event.

---

[65] *Id.* at CEC_EXAMINER_1235801-02 [CEC_EXAMINER_1235797].  "Liquidity Event" is defined as: "(A) any consolidation or merger of the Corporation in which the Corporation is not the surviving entity, to the extent that (x) in connection therewith, the holders of Common Stock of the Corporation receive as consideration, whether in whole or in part, for such Common Stock, (1) cash, (2) notes, debentures or other evidences of indebtedness or obligations to pay cash or (3) preferred stock of the surviving entity. . . ."

[66] Based on a review of Appendix 16, Schedule B-13 to CEOC's Appendix 16, Schedule of Assets and Liabilities, filed in connection with the bankruptcy, TopCo is listed as a legal entity.  As such, it does not appear that a Liquidity Event has occurred.

These factors, along with the dividend-paying capacity of HIE Holdings, need to be analyzed in valuing the Preferred Stock. These factors have been analyzed by the Examiner in arriving at the appropriate value of the Preferred Stock, as detailed later in this Appendix.

### B. Contemporaneous Indicators of Value

Caesars valued WSOP in a number of ways going back to at least 2008. Prior to the 2009 WSOP Transaction, the valuation of WSOP was typically performed for the combined businesses of WSOP Trademark & IP and the WSOP Tournament Rights. After the sale, the WSOP Tournament Rights were often valued separately. Below is a list of various WSOP valuations performed by Caesars or other third parties between 2008 and 2010.

### 1. LBO Purchase Price Allocation

In conjunction with the LBO, KPMG was hired to value the various reporting entities of Harrah's as part of its SFAS 141 Valuation Study.[67] KPMG determined that, as of January 28, 2008, the fair value of the WSOP brand was $125.7 million.[68] KPMG's valuation included the entire WSOP enterprise (*i.e.*, IP, tournament rights and retail) and assumed a discount rate of 8.5% and a long-term growth rate of 4%.[69]

### 2. Project Forest

Booz Allen Hamilton ("BAH") was hired to develop a strategy for Caesars to enter the global online gaming space in January 2008.[70] This project was referred to as "Project Forest." Numerous Project Forest presentations were created by BAH and internally at Caesars, demonstrating a wide range of views regarding the potential value of online and play-for-fun gaming and the potential value attributable to the WSOP brand under such alternative uses. For example:

- January 18, 2008 Project Forest Presentation (prepared by BAH):[71] BAH identified $2.1 billion of revenue opportunities associated with online gaming by 2012, including UK multi-gaming, U.S. play-for-fun, and online sports betting exchange.[72] This presentation addressed the synergies between U.S. play-for-fun

---

[67] KPMG SFAS 141 Valuation Study Related to the Acquisition of Harrah's Entertainment, Inc. as of Jan. 28, 2008 (Dec. 22, 2008), at CEOC_INVESTIG_00240748-1076 [CEOC_INVESTIG_00240748].

[68] *Id.* at CEOC_INVESTIG_00240881 and CEOC_INVESTIG_00240892.

[69] *Id.* at CEOC_INVESTIG_00240881.

[70] E-mail from J. Baker to G. Kranias, *et al.* (Jan. 18, 2008), at TPG-Examiner_00031188-89 [TPG-Examiner_00031188], attaching BAH "Project Forest – Project Overview" Presentation (Jan. 18, 2008), at TPG_Examiner_00031191 [TPG-Examiner_00031190].

[71] *Id.*

[72] BAH "Project Forest – Project Overview" Presentation (Jan. 18, 2008), at TPG_Examiner_00031228 [TPG-Examiner_00031190].

and the WSOP offline business and identified $65 million of annual revenue and $22 million of EBITDA from play-for-fun by 2012 even absent legalization of online gaming.[73]

- <u>August 2008 Project Forest Presentation</u> (prepared by Caesars):[74]  This presentation focused on the vision statement to "legitimize online gaming while reinventing the WSOP"[75] and the strategic plan to change Federal laws regarding online gaming within the next 24 to 36 months.[76]  While this presentation indicated a net present value of $28 million for U.S. play-for-fun,[77] Abrahams indicated in a related e-mail that these economics were dated and that U.S. play-for-fun would likely not generate much revenue.[78]

- <u>October 15, 2008 Project Forest Review Presentation</u> (prepared by Caesars, marked v5):[79]  In this presentation, WSOP's existing business was valued at $320 million and future online business was valued an additional $2.1 billion.[80]  It also stated that the uncertainty regarding European Union and U.S. legislation regarding online gaming could be mitigated by valuing the existing business and adding probability-weighted value of online WSOP business.[81]

- <u>October 2008 Project Forest Review Presentation</u> (prepared by Caesars, marked v7):[82]  The objective was to determine the pre-money valuation of WSOP

---

[73] *Id.* at TPG_Examiner_00031271.

[74] E-mail from C. Abrahams to B. Belhouse (Sept. 9, 2008), at APOLLO-Examiner_01034320-21 [APOLLO-Examiner_01034320], attaching "Caesars Project Forest – Summary Overview" Presentation (Aug. 25, 2008), at APOLLO-Examiner_01034322-71 [APOLLO-Examiner_01034322].

[75] "Caesars Project Forest – Summary Overview" Presentation (Aug. 25, 2008), at APOLLO-Examiner_01034325 [APOLLO-Examiner_01034322].

[76] *Id.* at APOLLO-Examiner_01034332.

[77] *Id.* at APOLLO-Examiner_01034359.

[78] E-mail from C. Abrahams to B. Belhouse (Sept. 9, 2008), at APOLLO-Examiner_01034320 [APOLLO-Examiner_01034320].

[79] E-mail from R. Brimmer to D. Sambur and G. Kranias (Oct. 16, 2008), at TPG-Examiner_00337497 [TPG-Examiner_00337497], attaching "Project Forest Review" Presentation (Oct. 15, 2008), at TPG-Examiner_00337498-512 [TPG-Examiner_00337498].

[80] "Project Forest Review" Presentation (Oct. 15, 2008), at TPG-Examiner_00337503 [TPG-Examiner_00337498].

[81] *Id.* at TPG-Examiner_00337510.

[82] E-mail from R. Brimmer to D. Sambur and G. Kranias (Oct. 23, 2008), at TPG-Examiner_00722943 [TPG-Examiner_00722943], attaching "Project Forest Review" Presentation (Oct. 2008), at TPG-Examiner_00722944-51 [TPG-Examiner_00722944].

Enterprise at which the management team could invest alongside Caesars and to disaggregate new entity value attributable to WSOP brand, offline business, and online business plan. At this point in time, it appears to have been contemplated that CEOC would have equity in the new WSOP entity (CIE).[83] Further, this presentation assigned a total value to the WSOP enterprise of $714 million based on a valuation of the new entity under probability-adjusted scenarios, including (i) $398 million attributable to the WSOP brand, (ii) $70 million to sponsorship/licensing/media, (iii) $60 million to the WSOP tournament, and (iv) the residual $186 million to online.[84] The allocation of value is depicted in Valuation Figure 1. This analysis, and other similar analyses, was prepared by Brimmer who was relatively new to Caesars at the time, and the valuation was dismissed by Garber as unrealistic and too high.[85]

**Valuation Figure 1:  October 2008 Project Forest Valuation (v7)[86]**



[83] "Project Forest Review" Presentation (Oct. 2008), at TPG-Examiner_00722950 [TPG-Examiner_00722944].

[84] *Id*. at TPG-Examiner_00722949.

[85] R. Brimmer Jan. 20, 2016 Tr. at 303:14-304:11.

[86] "Project Forest Review" Presentation (Oct. 2008), at TPG-Examiner_00722949 [TPG-Examiner_00722944].

- October 2008 Project Forest Review Presentation (prepared by Caesars, marked v11):[87]  This updated version of the October 2008 presentation no longer considered a structure in which CEOC would have ownership of the new entity. Using a similar probability-adjusted valuation approach, this presentation assigned a total value to the WSOP enterprise of $596 million, including (i) $325 million attributable to the WSOP brand, (ii) $70 million to sponsorship/licensing/media, and (iii) the residual $201 million to online.[88]  The allocation of value, which does not appear to include value attributed to the WSOP tournament, is depicted in Valuation Figure 2.

**Valuation Figure 2:  October 2008 Project Forest Valuation (v11)[89]**



- December 2008 Project Forest Review Presentation (prepared by Caesars):[90]  This presentation provided the revenues and EBITDA from the Rio and circuit WSOP tournament events, IP (sponsorship, licensing, and media) and retail, resulting in a

---

[87] E-mail from M. Cohen to G. Loveman, *et al.* (Nov. 18, 2008), at APOLLO-Examiner_01027353 [APOLLO-Examiner_01027353], attaching "Project Forest Review" Presentation (Oct. 2008), at APOLLO-Examiner_01027354-64 [APOLLO-Examiner_01027354].

[88] *Id.* at APOLLO-Examiner_01027359.

[89] *See* "Project Forest Review" Presentation (Oct. 2008), at APOLLO-Examiner_01027359 [APOLLO-Examiner_01027354].

[90] "Project Forest Review" Presentation (Dec. 2008), at 1-8 [CEOC_INVESTIG_00126374] (native file).

total value for WSOP of $84.5 million using a discount rate of 12%.[91]   This valuation did not include any potential revenues and EBITDA associated with U.S. online gaming.

### 3.   Impairment Testing Values

As part of the regular impairment analysis conducted by Caesars and reviewed by Deloitte, the WSOP trademark was valued at least annually, including revenues and expenses associated with (i) sponsorship/licensing/media, (ii) the tournament, (iii) retail (although no revenue or expenses were attributed to retail), and (iv) online/international (beginning in 2010). Below is a summary of the relevant impairment analyses performed both pre and post-transaction.

- September 30, 2008 Impairment Analysis:[92]   The total WSOP trademark was valued at $145.7 million, using a discount rate of 13.3% and a long-term growth rate of 3%.  In his interview, Abrahams indicated his belief that the projections in this document did not make sense given the declining nature of the sponsorship business, suggesting that the figures appeared to be old numbers from prior years.[93]   However, it should be noted that the impairment analysis included a footnote indicating that "2008 through 2013 Net Sales were traced and agreed to projections prepared for WSOP."[94]

- Review of potential impairment arising after the WSOP Trademark & IP sold for $15 million:[95] Caesars performed an analysis in July 2009 which split the pre-transaction September 30, 2008, WSOP trademark value as noted above into two pieces: (i) WSOP Trademark & IP – $91.5 million; and (ii) WSOP tournament – $54.2 million.[96]

- September 30, 2009 Impairment Analysis:[97]   The value for WSOP Trademark & IP is simply assumed to be $15 million based upon the sales price noted by Duff &

---

[91]  *Id.* at 2.

[92]  Impairment Review as of Sept. 30, 2008 (Sept. 30, 2008), at Tab "WSOP TM" [CEOC_INVESTIG_00123028] (native file).

[93]  C. Abrahams Oct. 7, 2015 Tr. at 66:22-25.

[94]  Impairment Review as of Sept. 30, 2008 (Sept. 30, 2008), at Tab "WSOP TM" [CEOC_INVESTIG_00123028] (native file).

[95]  Caesars ultimately recorded a $27 million impairment charge for the WSOP trademark as of May 31, 2009.   Caesars Memo to File – WSOP Trademark Impairment Evaluation (July 8, 2009), at DT0019682 [DT0019681].

[96]  WSOP Trademark Analysis (Aug. 20, 2015), at Tab "Summary" [DT0019684] (native file).

[97]  Impairment Review as of Sept. 30, 2009 (Sept. 30, 2009), at Tab "74-WSOP TM" [DT0019572] (native file).

Phelps. No projections are included for cash flows from sponsorship/ licensing/media.

### 4. Other Post-Transaction Projections

In September 2009, Caesars prepared a HIE Board Pre-Read.[98] The presentation indicated that WSOP Trademark & IP had a current EBITDA run rate of $7 million per year, with the potential to grow by 10% to 15% per year to reach a run rate of $10 million to $16 million in annual EBITDA by year five.[99]

This HIE Board presentation, dated only four months after the close of the 2011 WSOP Transaction, reflects a run rate EBITDA consistent with that presented in the October 2008 Project Forest presentations for the status quo sponsorship/licensing/media EBITDA. When questioned regarding this EBITDA potential, Garber responded "My salesmanship and my desire to impress my board and tell them 'don't worry, I am going to make this huge,' is not a financial projection, it's not a valuation projection, I didn't pay a third party to put it together and audit it. This is me telling them what I think I can do."[100]

Overall, the presentation estimated an enterprise value for HIE in 2013 of $550 million to $900 million excluding the U.S. and European Union, and $3.6 billion to $4.9 billion including those markets.[101] The presentation also reflected market comparables with EBITDA multiples ranging from 10.0x to 11.6x, and for the HIE business a 10.0x EBITDA multiple was noted both with and without the inclusion of new U.S. and EU markets.[102]

### 5. Summary of Relevant Projections

Valuation Table 4 compares the WSOP Trademark & IP projected EBITDA reflected in Duff & Phelps' fairness opinion compared to the impairment testing projections in 2008 and the projected EBITDA reflected in the September 2009 Board presentation. As shown, the projections bracketing either side of the 2009 WSOP Transaction are materially higher than what was used by Duff & Phelps.

---

[98] "HIE Board Pre-Read" Presentation (Sept. 22, 2009), at CACEXAM00456459-94 [CACEXAM00456459].

[99] Id. at CACEXAM00456472.

[100] M. Garber Nov. 20, 2015 Tr. at 238:20-239:2.

[101] "HIE Board Pre-Read" Presentation (Sept. 22, 2009), at CACEXAM00456473 [CACEXAM00456459].

[102] Id.

**Valuation Table 1: WSOP Trademark & IP Pre and Post-Transaction Projections**

| amounts in thousands | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 |
|---|---|---|---|---|---|---|
| **2008 Impairment Testing:** | | | | | | |
| Sponsorship/Licensing/Media Revenues | $ 23,815 | $ 24,768 | $ 25,758 | $ 26,789 | | |
| Sponsorship/Licensing/Media Expenses | (12,225) | (12,702) | (13,199) | (13,714) | | |
| Pro-Rata Share of Operating Expenses | (2,448) | (2,497) | (2,547) | (2,599) | | |
| Estimated WSOP IP EBITDA | $ 9,142 | $ 9,569 | $ 10,012 | $ 10,476 | | |
| *Percentage Above Duff & Phelps* | *132%* | *389%* | *285%* | *216%* | | |
| **Duff & Phelps Opinion - April 2009:** | | | | | | |
| WSOP IP EBITDA | $ 3,942 | $ 1,957 | $ 2,603 | $ 3,317 | $ 3,399 | $ 3,483 |
| **HIE Board Pre-Read Sept 2009:** | | | | | | |
| WSOP IP EBITDA | $ 7,000 | | | | $10,000 to $16,000 | |
| *Percentage Above Duff & Phelps* | *78%* | | | | *187% to 359%* | |

Source: WSOP Trademark Analysis (July 2009), at Tab "Summary" [DT0019684] (native file); Duff & Phelps "WSOP IP Fairness Analysis" Presentation (Apr. 30, 2009), at CEOC_INVESTIG_00457971 [CEOC_INVESTIG_00457956]; and "HIE Board Pre-Read" Presentation (Sept. 22, 2009), at CACEXAM00456472 [CACEXAM00456459].

### C. Examiner's Valuation Range for WSOP Trademark & IP

#### 1. Valuation Date

The valuation date for the WSOP Trademark & IP was May 1, 2009, the date the transaction closed.

#### 2. Valuation Methodology

For the purpose of valuing the WSOP Trademark & IP, the Cap Method was utilized under the income approach. Pricing multiples under the market approach were not sufficiently comparable; therefore, the market approach was not utilized. The valuation noted in this portion of the Appendix is based solely on the then existing, core use of the WSOP Trademark & IP with respect to sponsorship, licensing and media. At this juncture, the value of alternative manners of exploiting the WSOP brand is not included. The impact on value of other alternative contemplated uses, such as those described in the various Project Forest presentations, is discussed later in this Appendix.

#### 3. Guideline Public Companies

A review of guideline public companies ("GPCs") was utilized to determine the appropriate beta and debt/equity ratio for the WACC calculation. Independent research was conducted to identify sufficiently comparable GPCs to be used as guideline companies. Based upon this analysis, five public companies were identified that are considered a reasonable proxy for determining the appropriate WACC for the WSOP Trademark & IP. The five companies are listed in Valuation Table 5.

**Valuation Table 5: Guideline Public Companies – WSOP Trademark & IP**

| Company Name | Ticker Symbol |
|---|---|
| Churchill Downs, Inc. | CHDN |
| William Hill plc | WMH |
| Sportech PLC | SPO |
| bwin.party digital entertainment plc | BPTY |
| Jumbo Interactive Limited | JIN |

Because of the nature of the projected cash flows and the intended usage of the IP in the online gaming space, the identified companies all have operations involving online gaming/gambling. Descriptions of each of the GPCs can be found attached to this Appendix as Exhibit A.

**4.   Income Approach – Capitalization of Cash Flows**

The projected sponsorship, licensing, and media run rate EBITDA of $7 million reflected in the September 2009 HIE Board Pre-Read presentation served as the basis for the Cap Method. This level of EBITDA was described as the current run rate and therefore represented the status quo not factoring in any speculative alternative uses of the WSOP Trademark & IP. While the document does indicate a year five EBITDA potential of $10 million to $16 million, this upside has not been captured in the Cap Method as it was predicated on launching new events in Italy, Canada, and France, and the likelihood of doing so was uncertain.[103]   Since the $7 million EBITDA run rate was based on status quo and was consistent with the run rate also noted in October 2008 for the business, this level of cash flow was determined to be a reasonable basis for calculating the value of the WSOP Trademark & IP.

A 9.5% WACC was derived using generally accepted methodologies and sources of information for the GPCs, and a capitalization rate of 7.0% was obtained by deducting a long term sustainable growth rate of 2.5%. The enterprise value of WSOP Trademark & IP was based on a range of discount rates, and therefore capitalization rates, of plus or minus 50 basis points (0.5%) from the calculated WACC of 9.5%.

Based upon the results from the Cap Method, the Fair Market Value of the WSOP Trademark & IP is reasonably estimated to range between $66.2 million to $76.1 million.[104]   The mid-point of this value range is $70.8 million.

---

[103] "HIE Board Pre-Read" Presentation (Sept. 22, 2009), at CACEXAM00456472 [CACEXAM00456459].

[104] As a supplemental proxy for value, a DCF analysis was performed utilizing the impairment testing projections from September 30, 2008, as well as the discount rate used in that impairment testing. The higher discount rate of 13.3% offsets the increased risk potentially embedded in the higher stream of cash flows. The resulting DCF value for the WSOP Trademark & IP ranged from $58.4 million to $63.9 million.

Complete detailed models of the WSOP Trademark & IP valuation can be found attached to this Appendix as **Exhibit C**.

### D. Examiner's Valuation Range for the Preferred Stock

To account for the unique attributes of the Preferred Stock, a Black-Scholes option pricing model was used to determine the value of the Preferred Stock based upon the $71 million mid-point value of the WSOP Trademark & IP. See Exhibit D for a full description of the model and underlying assumptions. After utilizing a Black-Scholes option pricing model, the estimated marketable value of the Preferred Stock, as of May 1, 2009, ranged from $14.2 million to $15.0 million. However, in order to estimate the Fair Market Value, a discount for lack of marketability ("DLOM") was considered in order to account for the illiquid nature of the Preferred Stock. A DLOM ranging from 20% to 30% was selected to apply to the marketable value of the Preferred Stock as of May 1, 2009. See Exhibit D for a full description of the determination of the DLOM.

#### 1. Value of Preferred Stock Using the Examiner's Value of WSOP Trademark & IP

Based upon the information and financial data provided, as well as the analyses performed and detailed in Exhibit D, the Fair Market Value of the Preferred Stock, assuming the value of the underlying WSOP Trademark & IP was $71 million, was estimated to range between $9.9 million and $12.0 million, on a non-marketable basis. This summary is presented in Valuation Table 6.

**Valuation Table 6:  Fair Market Value of Preferred Stock Based Upon $71 Million Value**

|  | 5 Year Exit | 10 Year Exit | 15 Year Exit |
|---|---|---|---|
| Marketable Value | $       14,961,911 | $       14,580,973 | $       14,162,979 |
| DLOM | 20.0% | 25.0% | 30.0% |
| Fair Market Value (rounded) | $       11,970,000 | $       10,936,000 | $       9,914,000 |

#### 2. Implied Value of the Preferred Stock Using the Duff & Phelps Value of WSOP Trademark & IP

An analysis was also performed to determine the implied value of the Preferred Stock utilizing Duff & Phelps' concluded value for the WSOP Trademark & IP of $15.0 million. This analysis relied upon the same methodology and assumptions as described above and in **Exhibit D**, aside from the assumed value of the underlying WSOP Trademark & IP. Valuation Table 7 details the range of indicated values from this analysis.

**Valuation Table 7:  Implied Value of the Preferred Stock Based Upon Duff & Phelps Value**

|  | 5 Year Exit | 10 Year Exit | 15 Year Exit |
|---|---|---|---|
| Marketable Value | $    10,168,285 | $    8,880,401 | $    8,082,182 |
| DLOM | 20.0% | 25.0% | 30.0% |
| Fair Market Value (rounded) | $    8,135,000 | $    6,660,000 | $    5,638,000 |

### E.  Valuation Conclusions

Based upon the results from the valuation of both the WSOP Trademark & IP and the Preferred Stock, CEOC did not receive reasonably equivalent value in the 2009 WSOP Transaction.  The valuation conclusions are presented in Valuation Table 8.  The total deficit ranged from $54.2 million to $66.2 million.  As previously noted, this does not take into account the value of any upside potential for the WSOP Trademark & IP at the time of the 2009 WSOP Transaction.

**Valuation Table 8: Valuation Conclusion – WSOP Trademark & IP**

*In Millions of $US*

| WSOP Trademark & IP | Weighting | Low [A] | High [B] |
|---|---|---|---|
| Cap Method | 100% | $    66.2 | $    76.1 |

| Preferred Stock | Weighting | Low [C] | High [D] |
|---|---|---|---|
| Black-Scholes Option Pricing Model | 100% | $    9.9 | $    12.0 |

| Deficit |  | Low [D] - [A] | High [C] - [B] |
|---|---|---|---|
| Total Deficit in Value |  | $    (54.2) | $    (66.2) |

### F.  Sensitivity Analysis

A sensitivity analysis was also performed on Duff & Phelps' valuation of the WSOP Trademark & IP in order to quantify the impact of correcting certain inputs.  With respect to the 2009 WSOP Transaction, the only correction that was made was adjusting the WACC to 9.5% as calculated in lieu of the 16.5% WACC used by Duff & Phelps.

The sensitivity analysis quantifies the impact solely of correcting the discount rate and, for the purpose of this analysis, accepts all other inputs and methodologies utilized by Duff & Phelps (*e.g.*, projections, long-term growth rate).  The resulting sensitized values are presented in Valuation Table 9.

**Valuation Table 9:  2009 WSOP Transaction Sensitivity Analysis**

| amounts in millions | Duff & Phelps | Duff & Phelps - Sensitized |
|---|---|---|
| WSOP Trademark & IP | $          15.0 | $          27.7 |

The sensitized Duff & Phelps value of the WSOP Trademark & IP is $27.7 million, exceeding both (i) the $15 million Preferred Stock value alleged by Duff & Phelps and (ii) the $5.7 million to $8.1 million value of the Preferred Stock calculated using a Black-Scholes option pricing model based upon Duff & Phelps' $15 million value of the Trademark & IP.

### G.  Illustrative Potential Value of Upside

When comparing the value of the Preferred Stock (based on the $15 million and $71 million values for the WSOP Trademark & IP calculated by Duff & Phelps and the Examiner, respectively), of the $56 million increase in value of the WSOP Trademark & IP, only $4.3 million, or 7.6%, flows through to the Preferred Stock.  The balance of the upside, $51.7 million, or 92.4%, flows through to the common shareholders at the TopCo level as well as the shareholders of CIE and HIE Holdings.  As a result of the structure of the consideration received by CEOC (preferred stock versus common stock), CEOC's ability to participate in any upside potential generated by the WSOP Trademark & IP was severely limited.

While the structure took away CEOC's ability to share in the upside, it is clear from the documents and witness commentary that various alternative uses of the brand were simultaneously being explored, and it was at least contemplated that those uses could have significant value.  When Abrahams was questioned why he would want the WSOP Trademark & IP if it were a declining business, he responded, "Well, we thought that for online real-money gaming, the brand would be a differentiator at the time."[105]  The various Project Forest and other internal presentations previously discussed attributed significant value to the brand in online real money poker both with and without legalization in the United States as well as in play-for-fun poker.  As a result of such considerations, it would have been reasonable as a seller for CEOC to want to capture at least some of that upside during the course of negotiations.  Such upside could be captured, for example, through the issuance of common stock as opposed to preferred stock, warrants, long-term options, or earn outs.

In order to demonstrate the upside growth of CIE, the financial results of CIE from 2010 through 2014 have been reviewed.  CIE experienced substantial growth in revenue and profitability during that time, as shown in Valuation Table 10.  From 2010 to 2014, total revenue and WSOP/Online Real Money Gaming revenue grew at a CAGR of 170% and 36%, respectively, and from 2011 to 2014 adjusted EBITDA grew at a CAGR of 85%.

---

[105]  C. Abrahams Jan. 29, 2016 Tr. at 77:4-12.

## Valuation Table 10:  CIE Revenue and EBITDA

| amounts in millions | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|
| **Revenue:** | | | | | |
| Social and Mobile Games | $     - | $   53.9 | $   193.3 | $   302.7 | $   549.1 |
| WSOP and Online Real Money Gaming | 11.1 | 12.6 | 14.4 | 13.9 | 37.7 |
| Total Revenue | $   11.1 | $   66.5 | $   207.7 | $   316.6 | $   586.8 |
| **Adjusted EBITDA** | $   (5.0) | $   27.8 | $   76.2 | $   97.5 | $   177.0 |

Sources:  CIE 2010-2011 Audited Financial Statements (June 13, 2012), at VRC00002101 [VRC00002099]; CAC 10-K for the year ended Dec. 31, 2013 (Mar. 28, 2014), at 58 and 95; CAC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 62.

PricewaterhouseCoopers ("PwC") prepared valuations of CIE on a quarterly basis beginning in 2012 for stock compensation purposes.  Valuation Table 11 summarizes the values PwC derived for CIE overall as well as the values ascribed to the three individual major business lines (Social/Mobile Gaming, Online Real Money Gaming, and WSOP) as of the last available quarter each year.

## Valuation Table 11:  PwC CIE Valuations

| $ amounts in millions | Q4 2012 | Q4 2013 | Q4 2014 | Q3 2015 |
|---|---|---|---|---|
| Social/Mobile Gaming | $ | $ | $ | $ |
| Online Real Money Gaming | $ | $ | $ | $ |
| WSOP and Other | | | $ | $ |
| WSOP and Online Real Money Gaming (NV and EU) | $ | | | |
| WSOP and Online Real Money Gaming (NV, NJ, EU) | | $ | | |
| Buffalo Studios | $ | $ | $ | $ |
| **Total CIE Enterprise Value, rounded** | $ | $ | $ | $ |
| Net Adjustments (e.g , Plus: Cash, Less: Debt, Earn-outs) | $ | $ | $ | $ |
| **Total CIE Equity Value - marketable, rounded** | $ | $ | $ | $ |
| Discount for lack of marketability | $ | $ | $ | $ |
| **Total CIE Equity Value - non-marketable, rounded** | $ | $ | $ | $ |
| *Total Shares Outstanding* | | | | |

Sources: Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Feb. 18, 2013), at CACEXAM00252814 [CACEXAM00252769]; Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Jan. 31, 2014), at CACEXAM00512302 [CACEXAM00512254]; Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Jan. 4, 2015), at CACEXAM00512561 [CACEXAM00512514; Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Nov. 2, 2015), at CACEXAM00512626 [CACEXAM00512579].

The values attributed to WSOP by PwC varied during the years from 2012 through 2015, as did what PwC included within its reported value.[106]  Further, the WSOP brand was and is used

---

[106]  Additionally, applying a 15.0x EBITDA multiple to 2011 EBITDA of $27.8 million results in an estimated CIE enterprise value at year-end 2011 of $417 million.

**Appendix 7, Solvency**

in social/mobile gaming and online real money gaming as well, but PwC did not separately value or break out WSOP within those components of value. As noted in CAC's Form 10-K, "CGP LLC's Interactive Entertainment operating unit consists of CIE, which is comprised of three distinct, but complementary businesses that reinforce, cross-promote and build upon each other. . . ."[107] As noted previously, given the potential upside of the WSOP Trademark & IP in May 2009, a seller should have negotiated for a position to share in that upside. Given PwC's valuation of CIE as of Q4 2014 and Q3 2015 of $██ billion and $██, respectively, each 10% interest in CIE would be worth $██ million to $██ million.

As part of the transfer of the WSOP Trademark & IP in May 2009, HIE Holdings, a wholly-owned subsidiary of CEC, received 5,494,505 shares of common stock in CIE. In December 2010, CIE effectuated a 100 to 1 reverse stock split, after which HIE Holdings then held 54,945 shares of CIE common stock. The value of CEC's equity interest in CIE, which was later transferred to CGP as part of the Growth Transaction, is presented in Valuation Table 12.[108]

**Valuation Table 12: Value of CEC's Interest in CIE**

| $ amounts in thousands | Q4 2012 | Q4 2013 | Q4 2014 | Q3 2015 |
|---|---|---|---|---|
| CIE Per Share Value | $ ██ | $ ██ | $ ██ | $ ██ |
| CEC Shares in CIE | ██ | ██ | ██ | ██ |
| Value of CEC's Shares | $ ██ | $ ██ | $ ██ | $ ██ |

Sources: (CIE Per Share Value): Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Feb. 18, 2013), at CACEXAM00252814 [CACEXAM00252769]; Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Jan. 31, 2014), at CACEXAM00512302 [CACEXAM00512254]; Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Jan. 4, 2015), at CACEXAM00512561 [CACEXAM00512514; Caesars Interactive Entertainment, Inc. Common Stock Valuation by PwC (Nov. 2, 2015), at CACEXAM00512626 [CACEXAM00512579].

The shares issued in 2009 by CIE in exchange for the WSOP Trademark & IP have substantial value which, as a result of the four step process involved in the 2009 WSOP Transaction, now accrues to CEC rather than CEOC.

---

[107] CAC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 60.

[108] For year-end 2011, the estimated value of CEC's 54,945 shares in CIE was $181 million based upon an estimated enterprise value of $417 million and 126,867 total shares outstanding. Total shares per CIE Audited Financials (June 13, 2012), at VRC00002100 [VRC00002099].

### H.  Summary of Values

Valuation Table 13 summarizes the transaction price compared to: (i) the value determined by Duff & Phelps; (ii) the values resulting from performing a sensitivity analysis to correct the discount rate used by Duff & Phelps; (iii) the values offered by other parties;[109] and (iv) the Examiner's valuation of the assets.  This summary does not include the value of the Preferred Stock received as consideration since the other parties did not directly address the value.

**Valuation Table 13:  Illustrative Summary of Values for WSOP Trademark & IP**

| amounts in millions | Value of WSOP Trademark & IP | |
| --- | --- | --- |
| | Low | High |
| Duff & Phelps | $   15.0 | $   15.0 |
| Duff & Phelps - Sensitized | $   27.7 | $   27.7 |
| Baker Tilly | $   15.0 | $   15.0 |
| Creditor Group 1 | $   125.0 | $   125.0 |
| **Examiner Valuations** | **$   66.2** | **$   76.1** |

## IV.    THE 2010 TRADEMARKS TRANSFER

As discussed in Section VII(C) of the Final Report, *supra*, in August 2010, the trademarks, copyrights and domain names ("CMBS IP") associated with the CMBS Properties (*i.e.*, Flamingo Las Vegas, Harrah's Atlantic City, Harrah's Laughlin, Harrah's Las Vegas, Paris Las Vegas, and Rio Las Vegas) were transferred from CLC (a subsidiary of CEOC) to CMBS for $100 each, a total of $600.[110]   Specifically, CLC executed Intellectual Property Assignment Agreements ("IPAA") with each CMBS PropCo wherein CLC, for stated consideration of $100 per CMBS PropCo, assigned all of its right, title, and interest in the CMBS IP – reflected on

---

[109] The values offered by other parties, including creditor groups, were (i) preliminary in nature, (ii) based on incomplete information, (iii) not intended to reflect an opinion, (iv) provided on the express understanding that the views expressed were not binding or admissible as evidence in any litigation, and (v) provided on a "not for attribution" basis to the Examiner.

[110] Flamingo Las Vegas IPAA (Oct. 11, 2013), at CEOC_INVESTIG_00453034 [CEOC_INVESTIG_00453023]; Harrah's Atlantic City IPAA (Aug. 31, 2010), at CEOC_INVESTIG_00452291 [CEOC_INVESTIG_00452290]; Harrah's Las Vegas IPAA (Aug. 31, 2010), at CEOC_INVESTIG_00452600 [CEOC_INVESTIG_00452599]; Harrah's Laughlin IPAA (Aug. 31, 2010), at CEOC_INVESTIG_00452279 [CEOC_INVESTIG_00452278]; Paris Las Vegas IPAA (Aug. 31, 2010), at CEOC_INVESTIG_00452844 [CEOC_INVESTIG_00452843]; Rio Las Vegas IPAA (Aug. 31, 2010), at CEOC_INVESTIG_00453139 [CEOC_INVESTIG_00453138].

entity specific schedules[111] to each agreement – to each respective CMBS PropCo.  The parties also agreed to execute short form confirmatory agreements that would be filed with the United States Patent and Trademark Office and United States Copyright Office including the Copyright Assignment.

## A.  Valuation Methodology

A common methodology used to establish the Fair Market Value of trade names, trademarks, and other service marks of a business is the relief from royalty method ("RFR Method").

In the RFR Method, the subject trademark is valued by referencing the amount of royalty income it could generate if it was licensed, in an arm's length transaction, to a third party.  In using the RFR Method, a sample of comparable guideline, arm's length royalty or license agreements is analyzed.  The license agreements selected and analyzed should represent transactions that reflect similar risk and return investment characteristics that make them comparable to the subject asset or adjustments should be made to the royalties to reflect the effects of any differences.  The risk and return investment characteristics may include industry conditions, the age of the trademark, or other factors.  Based on an assessment of the risk and return investment factors of the trademark as compared to the guideline transactions, a fair royalty rate is estimated for the subject intangible asset.

The RFR Method is a combination of the income and market approaches that measures the value of an asset by hypothetically identifying the avoided costs of licensing an asset of similar utility from a third party.  The value is based on the cash flows that a company is "relieved" of paying as a result of having ownership rights of an asset.  The method is sometimes referred to as royalty savings to again describe the saved expenses of licensing versus owning an asset.

The key elements of the RFR Method include: (i) the identification of the projected future income that relates to the asset; (ii) a market royalty rate that reflects the rights of use for the particular asset; (iii) any costs associated with maintaining the use rights; (iv) an appropriate tax rate; and (v) an appropriate discount rate to determine the present value of the cash flows.

Royalty rates are typically obtained from public documents, internal licensing agreements, or transfer pricing schemes.  In many of those cases, only partial rights are being licensed.  Thus, it is important to ensure that the royalty rates that are utilized in the analysis are representative of comprehensive ownership of the asset, not partial rights.

---

[111]  As reflected on the entity specific schedules for the Harrah's Las Vegas, Harrah's Atlantic City and Harrah's Laughlin IPAA's, no copyrights and minimal property-specific trademarks (related only to ancillary services rather than the "Harrah's" brand) were transferred for these three properties.   CEOC_INVESTIG_ 00452606-08; CEOC_INVESTIG_ 00452297-99; CEOC_INVESTIG_ 00452285-87.  Accordingly, the analysis and valuations conducted herein for the CMBS IP are attributable to the property-specific intellectual property for the Flamingo Las Vegas, Paris Las Vegas and Rio Las Vegas properties.

## B.  Financial Reporting Requirements

About a year after the transfer, the subject of the accounting for the CMBS IP was raised by CEC.  The dual concerns to be addressed were: (i) determine the amount of book value that should be transferred from CLC to the CMBS PropCos relating to the CMBS IP; and (ii) whether or not it was an error that the transfer was not recorded in 2010 as opposed to 2011 requiring a restatement of the 2010 financial statement.  As discussed in Section VII(C) of the Final Report, *supra*, outside legal counsel and accounting professionals from PwC concluded that the $204.8 million of book value relating to the CMBS IP should have been transferred from the books of CEOC to those of the CMBS PropCos.

The conclusions of PwC and CEC's advisors were straight forward; the entire book value of the CMBS IP should have been transferred to the CMBS PropCos.

However, a few months after the conclusions drawn by CEC's legal counsel and PwC, the company concluded, and Deloitte concurred, that only a portion of the book value ($45.3 million), relating to the CMBS IP, should be transferred from CEOC to CMBS.

A Deloitte memo dated November 6, 2011 (the "Deloitte Memo") noted the following:

● In 2010, the Company concluded that as the legal ownership of the trademarks related Flamingo, Paris, and Rio was transferred and the accounting impact should have been evaluated in 2010.  During the 2011 third quarter the Company considered the following views:

o View A – The 2010 transactions (i.e. legal transfer of the trademarks and conveyance of the Global Rights back to CI) had nominal, if any, economic substance, and as the transaction is between related parties there should be no accounting impact other than disclosure in the stand-alone financial statements of the CMBS Properties.

o View B – As the legal ownership transferred from CI to the CMBS Properties, and the transaction is between entities under common control, the Company should have transferred the entire August 2010 historical book value of the trademarks to the CMBS Properties in 2010.  The useful life of the trademarks remains indefinite as the nature of the asset remained unchanged.

o View C – Same as View B, however the Company should reflect the fact that the CMBS Properties did not retain all of the rights associated with the trademarks, and therefore, the CMBS Properties should have only reflected a portion of the trademarks historical book value in 2010.  The amount of book value to be allocated to the CMBS Properties should have been based on a relative fair value method allocation between the Limited Use Rights and the Global Use Rights and that future impairments would be allocated between the CI and the CMBS Properties.  The useful life of the assets should be considered in aggregate and considered exclusive of the allocation methodology,

and therefore, similar to View B is considered indefinite. This is considered reasonable as the nature of the asset is unchanged (i.e. both parties will continue to use the asset indefinitely) and the CMBS Properties would not be expected to be burdened with amortization expense under the arrangement.

The Company concluded, and we agreed, that View C was the most appropriate, and therefore, as noted above, the Company recorded $45.3 million of trademarks at the CMBS Properties in third quarter 2011.

The $45.3 was based on a relative fair value allocation method applied to the August 2010 book value of $204.8 million and was based on the relative fair value of the Limited Use Rights and Global Use Rights using a valuation methodology and valuation assumptions consistent with the Company's annual valuation of trademarks in connection with the Company's annual impairment analysis.[112]

## C. CEC's Approach to Calculate the Book Value of the CMBS IP to be Transferred to CERP for Financial Reporting Purposes

The methodology used by CEC to calculate the amount of book value to be transferred from CLC to the CMBS PropCos to account for the CMBS IP for financial reporting purposes is documented in both the Deloitte Memo and related workpapers prepared by CEC (the "Workpapers").[113]  The Workpapers contain the revenue projections for each property (*i.e.*, Flamingo, Paris, and Rio) for five years as well as applicable royalty rates, discount rates, and growth rates used by the company to arrive at the fair market value conclusion used as a basis to allocate the book value transferred from CEOC to CMBS.  The royalty rates used are the same as those used by the company for impairment testing.

The book value of the CMBS IP totaled $204.8 million which was then apportioned between CMBS and CEOC.  Both CEC and Deloitte concluded that approximately 22%, or $45.3 million, of the book value should be transferred from CEOC's books and recorded on CMBS's books to account for the CMBS IP.  The 22% was calculated as of August 2010, by CEC, based on the ratio of the fair market value of the CMBS IP under two scenarios; first, the value of the CMBS IP assuming they revert back to CEOC at the end of five years ("CMBS Valuation"); and second, the enterprise valuation of the CMBS IP ("Enterprise Valuation"). Book value, rather than fair market value, was transferred to comply with GAAP as CEOC and CMBS were under the common control of CEC.

Valuation Table 14 reflects CEC's allocation of book value of the CMBS IP as of August 2010 based on the ratio of the CEC's concluded CMBS Valuation to the Enterprise Valuation (*e.g.*, $15.333/72.372=21%) for the Flamingo, Paris, and Rio marks.

---

[112]  Deloitte Memorandum (Nov. 6, 2011), at DT0028004-07 [DT0028004].

[113]  Deloitte Memorandum (Nov. 6, 2011), at DT0028006 [DT0028004]; "Trademark Valuation" Spreadsheet (Oct. 2011), at Tab "Main" [CEC_EXAMINER_0103300] (native file).

**Valuation Table 14:  Allocation of Book Value of CMBS IP**

| amounts in thousands | August 2010 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Enterprise Valuation (a) | CMBS Valuation (a) | % | Total Recorded Book Value | Allocated Book Value |
| Flamingo | $ 72,372 | $ 15,333 | 21% | $ 68,800 | $ 14,600 |
| Paris | $ 74,832 | $ 16,868 | 23% | $ 69,300 | $ 15,600 |
| Rio | $ 66,217 | $ 14,953 | 23% | $ 66,700 | $ 15,100 |
| **Total** | **$ 213,421** | **$ 47,154** | **22%** | **$ 204,800** | **$ 45,300** |

Source: "Trademark Valuation" Spreadsheet (Oct. 2011), at Tab "Main" [CEC_EXAMINER_0103300] (native file).

Note:

(a) Includes the value of tax amortization benefit.  Without the tax amortization, the values are $175.2 million and $42.8 million.

As shown in Valuation Table 14, the CERP Trademarks had significant value, measured by either book value or fair mark value.

### D.  Calculated Value of CMBS IP

The Workpapers reflect the fair market value of the CMBS IP as $42.8 million using the CMBS Valuation and $175.2 using the Enterprise Valuation.[114]

As the CMBS IP could revert back to CEOC/CLC if the CMBS Loan was repaid in full, the likelihood of repayment of the CMBS Loan was assessed.  Given the history of the company refinancing debt when it came due, the Examiner has assumed that the CMBS Loan was refinanced for two additional five year terms and then repaid at the end of 15 years (5 years for the then current CMBS Loan term plus 10 years of additional refinancing).  Valuation Table reflects the results of the two scenarios.

---

[114] These amounts exclude the present value of tax amortization benefits.  For valuation purposes, this value should not be included as the economic tax benefit relates to certain sections of the Internal Revenue Code dealing with purchase price allocation rather than fair market value.

**Valuation Table 15:  CMBS IP Value**

| *amounts in thousands* | Five Year Reversion | | Fifteen Year Reversion | |
|---|---|---|---|---|
| Flamingo | $ | 13,946 | $ | 41,458 |
| Paris | $ | 15,342 | $ | 43,235 |
| Rio | $ | 13,600 | $ | 38,267 |
| | **$** | **42,888** | **$** | **122,960** |

Source:  "Trademark Valuation" Spreadsheet (Oct. 2011), at Tab "Main" [CEC_EXAMINER_0103300] (native file).
Note:  Exclusive of the tax amortization benefit.

     Based on this analysis, the fair market value of the CMBS IP transferred from CEOC is reasonably estimated to range between **$42.9 million** and **$123.0 million** with a mid-point of $82.9 million.  As the total consideration paid for the CMBS IP was $600, CEOC did not receive reasonably equivalent value.

## V.   THE 2011 WSOP TRANSACTION

On September 1, 2011, CEC entered into a transaction that, after a series of steps, resulted in the transfer of the WSOP tournament hosting rights from CEOC to CIE ("WSOP Tournament Rights") for a purchase price of $20.5 million.  Valuation Research Corporation ("VRC") was retained by the CEC and CEOC Boards of Directors to opine as to whether the transaction was fair from the financial point of view of CEOC.[115]   VRC's fairness opinion dated September 1, 2011, asserted that the principal economic terms of the transaction were fair to CEOC from a financial point of view.[116]

VRC's fairness opinion analysis dated July 21, 2011, estimated a value range of $18.7 million to $22.0 million for the WSOP Tournament Rights.[117]   However, in reaching its value conclusion, VRC relied upon a DCF analysis prepared by Caesars' management that incorporated numerous assumptions, some of which were not supported by, and/or were inconsistent with, historical information.

The following sections describe the analysis performed to derive an estimate of the fair market value of the WSOP Tournament Rights sold in September 2011.  A detailed review was performed of the assumptions impacting the projected cash flows as well as various other information prepared historically and contemporaneously.   Generally accepted valuation approaches and methods were then used to derive value estimates, and these values were analyzed against other value indicators and information.

In conjunction with deriving the fair market value of the WSOP Tournament Rights, the opinion and valuation prepared by VRC was analyzed, related interview commentary was considered, and submissions provided by certain of the parties in regard to the value of the rights sold were also reviewed.

Based on this analysis, it is reasonably estimated that the fair market value of the WSOP Tournament Rights ranged from $50 million to $56 million at the time of the 2011 WSOP Transaction.

---

[115]  VRC Fairness Opinion Letter to CEC (Sept. 1, 2011), at VRC00005791 [VRC00005789].

[116]  *Id.* at VRC00005796.

[117]  VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133780 [CEOC_INVESTIG_00133771].

## A. VRC Fairness Opinion

### 1. Methodology and Discounting

In March 2011, Caesars' provided a DCF valuation to VRC which arrived at a value of $20.4 million and used a discount rate of 11%.[118]   The valuation prepared by Caesars served as the basis for VRC's valuation.   Chad Rucker described VRC's process as follows:

> A: You take the Caesars model or the World Series of Poker model.

> Q: Right.   That Caesars prepares?

> A: That they prepare.   And then you build a separate model that is essentially the same as their model, but you take their model and remodel it, essentially.   So it's their model, but you redo their model just to make sure all the math and everything is working.   But the model, for all practical purposes, is their model except for you just remodel it.[119]

It is clear that VRC's actual analysis related to the 2011 WSOP Transaction was limited. While Rucker initially indicated that all of the inputs into the valuation came from Caesars aside from the discount rate and the growth rate,[120] he later stated that the growth rate was embedded in the projections received from Caesars.[121]   VRC indicated its discount rate of 11% was based upon the CAPM with inputs derived from comparable companies, although the discount rate determined by VRC was identical to the rate utilized by Caesars in the DCF model provided to VRC.

While the discount rate itself appears reasonable, VRC did not utilize a mid-year convention in discounting the cash flows, meaning the inherent assumption was that the cash flows were earned at the end of each calendar year.   Particularly given the fact that the WSOP tournament does, in fact, occur in the summer of each year, a mid-year convention is appropriate. The result of VRC's discounting method was a reduction to the present value of the cash flows by more than $1 million, or 5% of the value ascribed by VRC.

### 2. WSOP Tournament Assumptions

In deriving its estimate of value for the WSOP Tournament Rights, VRC relied upon many assumptions which were based on Caesars' management's estimates, describing the assumptions as a "significant input into VRC's analysis."[122]   However, a number of these

---

[118]   E-mail from R. Brimmer to C. Rucker (Mar. 1, 2011), at CACEXAM00177103 [CACEXAM00177103], attaching Caesars WSOP Tournament Rights Valuation Model (Mar. 2011), at Tab "DCF" [CACEXAM00177108] (native file).

[119]   C. Rucker Sept. 25, 2015 Tr. at 35:5-36:4.

[120]   *Id*. at 124:8-22.

[121]   *Id*. at 125:7-10.

[122]   VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July

assumptions were either unsupported or inconsistent with the historical composition of the EBITDA uplift from the WSOP tournament.   VRC simply adopted the assumptions set forth by Caesars without modifying any of them or performing any material due diligence.

### a.  Reduction in Revenues Due to a Hypothetical Move to a Strip Location

VRC assumed that the WSOP Event at the Rio would be moved to a Strip location and such a move would reduce revenues in the following manner:[123]

- Gaming revenue tied to WSOP entrants would decline by 15%;

- WSOP tournament revenue would decline by 10%; and

- Other WSOP revenue would decline by approximately 15.7%.

In support of this assumption, VRC's fairness opinion states:

Management's forecast is based on an analysis of the estimated EBITDA lift generated at the Rio during WSOP Main Event.  Because of the differences at Rio and other casinos on the Strip, principally proximity to other casinos, adjustments were made in order to derive a forecast for the Strip location.  For instance, the WSOP Main Event is currently held at the Rio.  Due to Rio's location away from other casinos and the Strip, Management concluded that the Rio generates a higher EBITDA lift from the WSOP Main event than if the WSOP were held at a strip property.  At the Rio, WSOP participants are more likely to stay and gamble as opposed to being able to easily travel to adjacent casinos as they would be able to do on the Strip.  Management has taken these factors into consideration when developing the financial forecast.[124]

The assumption that the WSOP Event would be moved from the Rio to a Strip location was speculative and appears to have been based upon a hypothetical sale of the Rio to a third party, even though, based on the evidence, it was likely that the tournament would have remained at the Rio even in the event of such a sale.  There is no evidence of an actual plan to move the WSOP Event from Rio to a Strip location, nor is there any analysis supporting the assumed revenue reduction percentages from such a move.  Further, the assumption appears to ignore the potential benefits from hosting the tournament on the Strip where the foot traffic is materially greater than at the Rio and where many of the surrounding properties are Caesars' properties.

---

21, 2011), at CEOC_INVESTIG_00133784 [CEOC_INVESTIG_00133771].

[123]  VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133785 [CEOC_INVESTIG_00133771].

[124]  VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133784 [CEOC_INVESTIG_00133771].

As a principal point, commentary from Caesars and Rucker discredits the notion of moving the WSOP Event from Rio to a Strip location, and Rucker was seemingly unaware that his own analysis made that assumption.  For instance:

- Brimmer:

  Q: The tournament was going to be moved from the Rio to an HOC asset.

   A: I don't think so.  I think it was just a possibility.  It was a case that we evaluated.

  Q: So if you're evaluating the value of the tournament rights for the purpose of this transaction, is it appropriate to assume that the tournament would move to a strip property?

  A: Yeah, I don't remember.  I'm not sure.

  Q: Do you know of any reason why the World Series of Poker tournament could not have remained at the Rio?

  A: The only thing that I can think of is that there have been conversations and actually some formal processes over the past – a long time, six or seven years – where we've considered divesting the Rio.  So that may have been a reason that we looked at an alternative case here.

  Q: And the Rio – if that were to happen the Rio could have purchased or obtained a license to still host the tournament, correct?

  A: I'm not sure.  Possibly.  I don't know what the company would have wanted to do.[125]

- Rucker:

  Q: Do you recall anything they told you about why or whether the World Series of Poker tournament could remain at the Rio instead of moving to the strip property?

  A: From what I remember, the Rio was the best place within their portfolio to hold the games there.  And the reason why is because of space. The Rio had excess space.  Number 2 is in looking at the report, I also saw that the quality of the poker gambler is not as high as a regular gambler. Poker players, from what I remember and from what I see from the document, they are not the best customers for a casino.  And the primary reason why they're not the best customers for a casino is you think about it, these are poker players, they know how to assess odds and assess risks,

---

[125]  R. Brimmer Sept. 29, 2015 Tr. at 100:20-101:23.

so they are only going to gamble in certain things.  So if you look at this report, you can see that there's some language in there which says that the strip properties could be better utilized for a higher quality gambler or a better quality gambler.

Q: But is it your understanding that the projections that are utilized in this model assumed that the tournament would transfer to a strip location?

A: No, I didn't say that.

Q: Okay.  So you believe that the projections assume it would remain at the Rio?

A: From what I see here, I think that the World Series of Poker are going to be where they currently are.[126]

- Hession:

    Q: Why was VCR [sic] told by management to consider the strip location at all?

    A: Oh, I see your question.  I'm sorry.  You know, I don't know.  I'm not sure.  I'm not sure.[127]

Earlier versions of Caesars' valuation of WSOP Tournament Rights, prepared in September 2010, did not consider moving the WSOP Event from the Rio to a Strip property.[128] Further, the following contemporaneous documents indicate that even if the Rio was sold, the WSOP Event would likely still be hosted at the Rio.

- An e-mail, dated September 8, 2010, from Hession to Halkyard included a draft copy of the WSOP term sheet assuming the sale of Rio.[129]  The attached draft term sheet stated that:

    Harrah's Entertainment (HET) conveys to the Rio, a 5-year license to host and operate World Series of Poker Las Vegas (WSOPLV) at a fee of $2MM per year in 2011-2013 and $7MM per year in 2014-2015.

---

[126]  C. Rucker Sept. 25, 2015 Tr. at 103:23-105:10.

[127]  E. Hession Nov. 3, 2015 Tr. at 73:16-22.

[128]  "WSOP Tournament Purchase Harrah's Interactive Entertainment" Presentation (Sept. 2010), at CEOC_INVESTIG_00408282 [CEOC_INVESTIG_00408277].

[129]  E-mail from E. Hession to J. Halkyard (Sept. 8, 2010) [PRIV_INVESTIG_00004847], attaching WSOP Rio Host License Terms (Sept. 8, 2010), at PRIV_INVESTIG_00004848 [PRIV_INVESTIG_00004848].

- An e-mail, dated September 14, 2010, from Hession to Sambur and Kranias included another draft copy of the WSOP term sheet assuming the sale of Rio.[130] This e-mail stated:

> If you recall, to help potential buyers become more confident in their EBITDA estimates in the early years following the purchase, we are enabling WSOP to remain at the property for a short period of time.

- The term sheet attached to the e-mail stated:

> Harrah's Interactive Entertainment, Inc. (HIE) licensed to Rio the rights to operate and host the World Series of Poker Las Vegas (WSOPLV) at a fee of $2MM per year for years 1-3 and $7MM per year for years 4 and 5. The term of the license is 5 years, subject to mutually agreed upon extensions and pricing.[131]

Both the e-mails and attached term sheets clearly indicated that even if the Rio was sold, the WSOP Event would likely have stayed at the Rio for some indefinite period of time.

Based upon the documents and interview commentary, it appears that moving the WSOP Event from the Rio to a Strip location was not a likely or planned event, and there was no reasonable basis to assume a reduction in the uplift associated with the WSOP tournament. Further, even if VRC's assumption was correct, it did not consider the potential benefits of having greater foot traffic on the Strip as well as other Caesars properties in close proximity.

### b. Non-Rio Gaming Revenue Tied to WSOP Entrants

VRC included Rio gaming revenue tied to WSOP entrants.[132]  However, it did not include any non-Rio gaming revenue tied to WSOP entrants (*i.e.*, cross-play from WSOP entrants who gambled at other Caesars properties during the tournament). Various WSOP Tournament valuation models prepared by Caesars, including the one sent to VRC in March 2011, quantified non-Rio gaming revenue tied to WSOP entrants at $3.3 million for 2010 (the baseline year for the projections).[133]  However, these revenues were not included in the valuation of WSOP Tournament Rights prepared by Caesars and/or adopted by VRC.

---

[130] E-mail from E. Hession to D. Sambur and G. Kranias (Sept. 14, 2010), at CEOC_INVESTIG_00291237; [CEOC_INVESTIG_00291237], attaching WSOP Rio Host License Terms (Sept. 14, 2010), at CEOC_INVESTIG_00291238 [CEOC_INVESTIG_00291238].

[131] WSOP Rio Host License Terms (Sept. 14, 2010), at CEOC_INVESTIG_00291238; [CEOC_INVESTIG_00291238].

[132] VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133785 [CEOC_INVESTIG_00133771].

[133] Caesars WSOP Tournament Rights Valuation Model (Jan. 2011), at Tab "DCF" [CEOC_INVESTIG_00043132] (native file); Caesars WSOP Tournament Rights Valuation

Brimmer noted this as a good and fair question and described the difference as a specific property view versus a portfolio view, further noting, "If you were thinking about taking this tournament and putting it at the property like an MGM property that had a portfolio of assets, then it would be more appropriate to use the total."[134]   Hession also indicated the inclusion of non-Rio gaming revenue applies in a "holistic approach" where other properties are in the system, such as was the case with Caesars.[135]

If a player was tied to the WSOP tournament, their gaming revenue should be attributed to the tournament rights regardless of whether they gambled at the Rio or an alternate Caesars property.   Therefore, the $3.3 million of non-Rio gaming revenue should have been included in the valuation of the WSOP Tournament Rights.

### c.   Las Vegas Event Royalty Rate

Early analyses performed by Caesars attributed 80% of the EBITDA uplift from the WSOP tournament to the value of the brand.[136]   This allocation was ultimately changed to the application of a 25% royalty rate to calculate EBITDA lift from the WSOP tournament. Brimmer recalled that the 80% "was always more qualitative and just a judgment, and it was based on input from management, people like Kevin Ortzman who oversaw the Rio" and that it evolved based on "case studies."[137]

The case studies referred to by Brimmer, and incorporated into VRC's analysis, involved the comparison of:

- The host fees from third-party casinos: $125,000 from Choctaw and $100,000 from Palm Beach Kennel Club;[138] and

- Average EBITDA lift of $452,801 per event from various Caesars properties hosting WSOP circuit events.[139]

---

Model (Feb. 2011), at Tab "DCF" [CACEXAM00122101] (native file); Caesars WSOP Tournament Rights Valuation Model (Mar. 2011), at Tab "DCF" [CACEXAM00177108] (native file)' WSOP Valuation (undated), at Tab "DCF" [CEOC_INVESTIG_00002417] (native file).

[134]   R. Brimmer Jan. 20, 2016 Tr. at 377:10-378:17.

[135]   E. Hession Jan. 20, 2016 Tr. at 592:13-593:15.

[136]   WSOP   Tournament   Purchase   (Sept.   2010),   at   CEOC_INVESTIG_00408283 [CEOC_INVESTIG_00408277].

[137]   R. Brimmer Jan. 20, 2016 Tr. at 363:4-23.

[138]   VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133781 [CEOC_INVESTIG_00133771].

[139]   VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133781 and CEOC_INVESTIG_00133788 [CEOC_INVESTIG_00133771].

The royalty rate was determined by calculating the host fees paid by third-party casinos as a percentage of the average EBITDA lift from Caesars events. However, by comparing the host fee from third-party casinos to EBITDA lift from Caesars properties hosting circuit events, two unrelated sources of revenue and expenses were matched. Further, no analysis was done to support the relative comparability of the Caesars circuit event properties. Brimmer admitted that the events at the third-party casinos were much smaller in scale, indicating that he did not have a strong opinion about the comparability of Choctaw and describing Palm Beach Kennel Club as "not a big business."[140] There was a wide range in EBITDA lift at the Caesars circuit events, ranging from $152,888 at Horseshoe Southern Indiana to $908,489 at Tunica, and not knowing which events were most comparable to Choctaw and Palm Beach Kennel Club renders the analysis unreliable in terms of a meaningful royalty rate.[141]

For the years 2007 and 2008, Caesars compared Rio's net benefit from hosting the WSOP Tournament to then-contemplated host fees and determined the percentage to be 29%.[142] However, Brimmer described this as part of a historical analysis relating to debt service.[143]

While historical analyses cast doubt as to the appropriateness of the 25% royalty rate, it is difficult to determine a more meaningful measure to apply.

### d. Hotel EBITDA Adjustment

In valuing the WSOP Tournament Rights for base year 2010, VRC first included incremental lodging EBITDA in its calculation of WSOP Event EBITDA. Subsequently, an adjustment was made to deduct the full amount of the incremental lodging EBITDA, $3.1 million,[144] under the premise that, absent the tournament, the rooms would have been available to have been sold to independent travelers at higher rates. VRC did not provide any rationale for deducting hotel EBITDA from its calculations.

Caesars' historical calculations of the net benefit from hosting the WSOP tournament did not include any offset for Hotel EBITDA.[145] As such, it does not appear to be a typical or ordinary course adjustment in evaluating the uplift from hosting the WSOP tournament. Further,

---

[140] R. Brimmer Sept. 29, 2015 Tr. at 117:9-118:23.

[141] VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133788 [CEOC_INVESTIG_00133771].

[142] Updated Rio Analysis (undated), at Tab "Sheet1" [CEOC_INVESTIG_00430521] (native file); "Project Forest" Presentation (Jan. 6, 2009), at CEOC_INVESTIG_00430518 [CEOC_INVESTIG_00430516].

[143] R. Brimmer Jan. 20, 2016 Tr. at 371:6-19.

[144] VRC "WSOP Land Based License and Lease Fairness Opinion Analysis" Presentation (July 21, 2011), at CEOC_INVESTIG_00133785 [CEOC_INVESTIG_00133771].

[145] *See*, *e.g.*, Updated Rio Analysis (undated), at Tab "Sheet1" [CEOC_INVESTIG_00430521] (native file); "Project Forest" Presentation (Jan. 6, 2009), at CEOC_INVESTIG_00430518 [CEOC_INVESTIG_00430516   ]; 2010 WSOP P&L (Sept. 13, 2010), at CEC_EXAMINER_1446947 [CEC_EXAMINER_1446945].

contemporaneously prepared documents refute the premise that, absent the tournament, rooms would have been able to be sold at higher rates. For instance, metrics following the 2009 tournament noted, "The 2009 prevailing casino rate was often lower than the flat WSOP rate."[146]

Based upon the lack of support for this adjustment, Hotel EBITDA should not have been excluded in valuing the uplift from the WSOP tournament.

### e.   Non-Financial Benefits

Caesars' historical and ordinary course calculations of the net benefit from hosting the WSOP tournament included non-financial benefits to the Rio from television and public relations exposure.[147] The non-financial benefits to the Rio, totaling $10.2 million, consisted of:

- $4.7 million from domestic ESPN TV exposure;

- $0.1 million from international ESPN TV exposure;

- $0.5 million from syndicated TV exposure; and

- $5 million from public relations exposure.

Brimmer did not recall considering non-financial benefits when putting together his analysis in 2011, and he was not certain what the $10.2 million represented but conceded, "It seems like there probably should have been some value associated with it at one point to make the case."[148] Hession understood there could be some value to it but had a hard time believing somebody would pay for it.[149]

VRC did not include any of these non-financial benefits in its valuation of the WSOP Tournament Rights. Any form of uplift or benefit from hosting the WSOP tournament should be considered in a valuation of the WSOP Tournament Rights.

### f.   Incremental Gaming Revenue Percentage

One of the key assumptions in VRC's valuation was that only 50% of Rio gaming revenue tied to WSOP entrants was incremental revenue. VRC provided no support or rationale for such an assumption, and Rucker could not recall the basis.[150] Contemporaneous valuation

---

[146] WSOP Memo (Oct. 22, 2009), at CEC_EXAMINER_1446979 [CEC_EXAMINER_ 1446971].

[147] Updated Rio Analysis (undated), at Tab "Sheet1" [CEOC_INVESTIG_00430521] (native file); "Project Forest" Presentation (Jan. 6, 2009), at CEOC_INVESTIG_00430518 [CEOC_INVESTIG_00430516].

[148] R. Brimmer Jan. 20, 2016 Tr. at 373:25-374:25.

[149] E. Hession Jan. 20, 2015 Tr. at 603:3-10.

[150] C. Rucker Sept. 25, 2015 Tr. at 109:23-111:9.

documents prepared by Caesars also did not provide any support for this 50% assumption, and in interviews no reasonable explanation was provided.

Brimmer explained that the analysis, done in 2008, examined individuals who didn't play in the event in one year but did in the following year, comparing the gaming revenue in both years to arrive at the incremental lift.[151] However, on its face, the analysis appears flawed as it did not compare the selected individuals' year-over-year gaming during the period of the tournament but rather over an entire year's time period.[152] Brimmer later described the calculation, which was only analyzed in 2008, as looking at the incremental gaming revenue from new players to WSOP, a view that would inherently assume that returning WSOP players' gaming revenue would have been earned with or without the tournament.[153] This premise seems unlikely, and it is also unclear whether the impact of the Recession on 2008 gaming revenue was taken into account.

There does not appear to be any reasonable analysis to support the assumption that only 50% of Rio gaming revenue tied to entrants is incremental, although no alternate measure of incremental gaming revenues from the WSOP tournament has been found.

#### g. Spectator Revenue

VRC's valuation ignored any uplift associated with spectators of WSOP tournaments. Neither Rucker nor Caesars personnel could provide any rationale for not including income from spectators.[154] Brimmer acknowledged that "there has to be some value associated with that, but it's just not measurable."[155]

Any incremental income from WSOP spectators should be included in the valuation of WSOP Tournament Rights. However, it does not appear that Caesars ever quantified the incremental income from spectators; as such, there is no practical method to determine a supportable amount that should have been used by VRC.

### B. Contemporaneous Indicators of Value

Caesars has valued WSOP regularly since at least 2008. Prior to the sale of WSOP IP to CIE in May 2009, the valuation of WSOP was typically for the combined businesses of WSOP IP and WSOP tournament. After the sale, WSOP tournament was often valued separately. Below is a discussion of various WSOP tournament valuations prepared by Caesars between 2008 and 2011.

---

[151] R. Brimmer Jan. 20, 2016 Tr. at 314:20-315:8.

[152] *Id*. at 316:4-11.

[153] Interview of R. Brimmer, Feb. 10, 2016 (not transcribed).

[154] C. Rucker Sept. 25, 2015 Tr. at 109:15-18; R. Brimmer Sept. 29, 2015 Tr. at 104:20-25.

[155] R. Brimmer Jan. 20, 2016 Tr. at 318:2-11.

### 1. Impairment Testing Values

Certain of Caesars' impairment analyses included values specifically related to the WSOP tournament such as the:

- September 30, 2008 Impairment Analysis:[156]  In its July 2009 review of the WSOP trademark as of September 30, 2008, Caesars ascribed $54.2 million to the WSOP Tournament Rights.

- September 30, 2009 Impairment Analysis:[157]  The WSOP Tournament Rights were valued at $88.5 million. This impairment analysis does not provide details regarding assumptions embedded in the projected revenues and expenses for the tournament cash flows.

- September 30, 2010 Impairment Analysis:[158]  The total WSOP trademark was valued at $284.9 million, including cash flow from sponsorship/licensing/media, the tournament, and online.  Importantly, the cash flow projected for the Rio tournament portion, excluding gaming lift and other benefits, was projected to grow each year without any reduction corresponding to an alleged move to a Strip location.

Most importantly, Caesars evaluated, but did not recognize, an impairment charge after the 2011 WSOP Transaction in September 2011.  Deloitte analyzed the sale of the WSOP Tournament Rights for accounting purposes, documenting its analysis and findings in a memorandum dated October 25, 2011.[159]  The Deloitte memorandum noted the following:[160]

- CEOC sold its interest in WSOP Tournament Rights to CT LLC for $20.5 million (both CEOC and CT LLC where wholly owned subsidiaries of CEC).

- The book value associated with the WSOP Tournament Rights was $73.7 million.[161]

- As consideration for the sale, CEC forgave $20.5 million in intercompany debt due from CEOC and replaced it with an intercompany receivable from CT LLC:

---

[156]  Impairment Review (Sept. 30, 2008), at Tab "WSOP TM-tournament-2008" [DT0019684] (native file).

[157]  Impairment Review (Sept. 30, 2009), at Tab "74-WSOP TM" [DT0019572] (native file).

[158]  Impairment Review (Sept. 30, 2010), at Tab "71-WSOP TM" [DT0018027] (native file).

[159]  Deloitte Workpaper "Transfer of WSOP Trademark Memo" (Oct. 25, 2011), at DT0019084-87 [DT0019084].

[160]  *Id.* at DT0019084-85.

[161]  The total book value for WSOP was $88.7 million, of which $15 million pertained to the WSOP IP previously transferred in 2009.  Impairment Review (Sept. 30, 2011), at Tab "TM-TR42 WSOP TM" [DT0022111] (native file).

o   CT LLC did not make any payments directly to CEOC; rather, in essence, CT LLC assumed a CEOC liability to CEC.

- The difference, $53.2 million, between the book value of $73.7 million and the transfer price of $20.5 million was recorded on CEC's books as an increase in CEC's equity investment in CT LLC and a decrease in its equity investment in CEOC.

- CT LLC was later dissolved and its interest in CIE was distributed up to its parent, CEC.

- Although the book value of the WSOP Tournament exceeded the purchase price, an impairment charge was not recorded.  The Deloitte memorandum specifically notes the following:

> Consideration of Impairment Indicator: Because VRC determined the tournament rights had a value between $18.7 and $22 million and the recorded book value was $73.7 million, we considered whether the trademark was impaired under the provisions of ASC 360.  As part of our evaluation, we compared the valuation methodology used by VRC with the Company's methodology used for determining whether or not an asset has been impaired.  We concluded that the valuation methodologies were not consistent.  We also concluded that the trademark should be valued consistently with methods used by the company in the past.  ASC 350-30-21 states:

> Separately recorded indefinite-lived intangible assets, whether acquired or internally developed, shall be combined into a single unit of accounting for purposes of testing impairment testing if they are operated as a single asset and, as such, are essentially inseparable from one another.

> We combine all cash flows that contribute to the value of the WSOP trademark.  The analysis for impairment was performed in conjunction with our annual assessment of non-amortizing intangible assets and is documented in a separate memo.  That analysis did not indicate any impairment for the WSOP trademark.  Since there was no impairment, the entire book value of $73.7 million related to the tournament rights was transferred to CIE.[162]

It is clear from (i) the Deloitte memorandum and (ii) CEC management continuing to carry the WSOP Tournament Rights on its books at $73.7 million that VRC significantly undervalued the asset.  Neither CEC nor Deloitte utilized the VRC valuation of the WSOP Tournament Rights for financial statement purposes, and it appears that management believed

---

[162]  Deloitte Workpaper "Transfer of WSOP Trademark Memo" (Oct. 25, 2011), at DT0019086 [DT0019084].

the fair market value to be at least equivalent to the book value of $73.7 million. This supports the position that CEOC did not receive reasonably equivalent value.

## 2. Internal Valuations

In contemplation of the 2011 WSOP Transaction, Caesars prepared numerous estimates of the value of the WSOP Tournament Rights such as:

- July 9, 2010 e-mail from Abrahams:[163] contemplated a deal structure for the WSOP Tournament Rights resulting in $40 million to $55 million in cash consideration.

- August 2010 WSOP Tournament Purchase presentation:[164] estimated a valuation range of $21.5 million to $44.0 million, with contemplated cash consideration of $25 million to $30 million.

- September 2010 WSOP Tournament Purchase presentation:[165] estimated a valuation range of $25.9 million to $42.1 million, with contemplated cash consideration of $30 million.

- January 26, 2011 valuation model provided to VRC:[166] model determined the value of the WSOP Tournament Rights as of December 2010 to be $24.9 million.

- February 2011 valuation model:[167] determined the value of the WSOP Tournament Rights to be $27.5 million.

---

[163] E-mail from C. Abrahams to R. Brimmer, *et al.* (July 9, 2010), at CEOC_INVESTIG_00041049 [CEOC_INVESTIG_00041049].

[164] E-mail from C. Abrahams to M. Cohen, *et al.* (Aug. 22, 2010) at CEOC_INVESTIG_00039737 [CEOC_INVESTIG_00039737], attaching "WSOP Tournament Purchase Harrah's Interactive Entertainment" Presentation (Aug. 2010), CEOC_INVESTIG_00039738 (native file) at 5 and 9.

[165] Meeting invitation from C. Abrahams to R. Brimmer, D. Sambur and M. Cohen (Oct. 20, 2010), at CEOC_INVESTIG_00408276 [CEOC_INVESTIG_00408276], attaching "WSOP Tournament Purchase Harrah's Interactive Entertainment" Presentation (Sept. 2010), at CEOC_INVESTIG_00408282-83 [CEOC_INVESTIG_00408277].

[166] E-mail from R. Brimmer to C. Rucker and E. Hession (Jan. 26, 2011), at CEOC_INVESTIG_00043131 [CEOC_INVESTIG_00043131], attaching Caesars WSOP Tournament Rights Valuation Model (prepared in Jan. 2011), at CEOC_INVESTIG_00043132 at Tab "DCF" [CEOC_INVESTIG_00043132]. A presentation is also attached to this e-mail [CEOC_INVESTIG_00043133].

[167] E-mail from C. Abrahams to D. Sambur and R. Brimmer (Feb. 23, 2011), at CACEXAM00122100 [CACEXAM00122100], attaching Caesars WSOP Tournament Rights Valuation Model (prepared in Feb. 2011), at Tab "DCF" [CACEXAM00122101] (native file).

- <u>March 1, 2011 valuation model provided to VRC</u>:[168]   determined the value of WSOP Tournament Rights as of December 2010 to have been $20.4 million. This value is nearly identical to the value determined by VRC in its fairness opinion, including the 11% discount rate (which Rucker suggested was the one input determined by VRC independently).

Clearly, the internal values calculated by Caesars varied over the time period from July 2010 through March 2011. These differences were largely due to modified assumptions (*e.g.*, discount rate, growth rates, whether or not the tournament would move to a Strip property and what the impact of such a move would be) and a change in methodology (*i.e.*, early valuations were calculated assuming 80% of the uplift was attributable to the WSOP brand and later valuations instead assumed a 25% royalty fee).

Generally speaking, the values calculated for the WSOP Tournament Rights were declining while the book value remained at $73.7 million, even after the transaction. In the end, the contemplated hosting rights fee to be paid to CT was also decreased. In the draft third party term sheets in 2010, the annual hosting fee was initially contemplated as $2 million for years 1-3 and $7 million for years 4-5.[169]  The outer year hosting fee was later lowered to $5 million, and finally to $2 million for each year. On July 19, 2011, Hession inquired as to why the annual hosting fee was reduced from $2 million for years 1-3 and $5 million for years 4-5 to $2 million for each year.[170]  Abrahams responded:

> We did it to keep the valuation down and to keep the rights fee below what's in the valuation in the fairness opinion. I would like to see it grow for various reasons (set precedent for future, etc.), but the fair thing is to keep it at $2 mil per year.[171]

There is a natural value link or correlation between the value of the WSOP Tournament Rights and the value of the rights fee to be paid by the Rio. The value of what CIE receives from CEOC (*i.e.*, the WSOP Tournament Rights) should be consistent with the value of what CIE turns around and licenses to the Rio in exchange for an annual rights fee. In other words, the Rio should pay a fee commensurate with the value of the hosting rights it is receiving (which CIE received from CEOC).

---

[168]  E-mail from R. Brimmer to C. Rucker, *et al.* (Mar. 1, 2011), at CACEXAM00177103 [CACEXAM00177103], attaching Caesars WSOP Tournament Rights Valuation Model (prepared in Mar. 2011), at Tab "DCF" [CACEXAM00177108] (native file).

[169]  WSOP Rio Host License Terms (Sept. 8, 2010), at PRIV_INVESTIG_00004848 [PRIV_INVESTIG_00004848]; WSOP Rio Host License Terms (Sept. 14, 2010), at CEOC_INVESTIG_00291238 [CEOC_INVESTIG_00291238].

[170]  E-mail from C. Abrahams to E. Hession, *et al.* (July 19, 2011), at PRIV_INVESTIG_00004744 [PRIV_INVESTIG_00004744].

[171]  *Id.*

As described by Abrahams, "So what I would say is from CIE's perspective the royalty we receive is relevant relative to the price we are paying."[172]  Abrahams further noted, "So from our perspective the purchase price would be lower with a lower rights fee and that rights fee of 2 million, from what I remember, was below the cash flow stream he was valuing in his analysis."[173]  With respect to the annual rights fee, the appearance is that the terms were modified for years 4 and 5 in order to retain consistency with the $20.5 million value reflected in VRC's fairness opinion.  If the terms were not modified, CIE would be receiving from the Rio greater value than what it paid to CEOC for the WSOP Tournament Rights.

### C.  Examiner's Valuation Range for WSOP Tournament Rights

#### 1.  Valuation Date

The valuation date for the WSOP Tournament Rights was September 1, 2011, the date that the transaction closed.

#### 2.  Valuation Methodology

For the purpose of valuing the WSOP Tournament Rights, the DCF Method was utilized. Pricing multiples under the market approach were not sufficiently comparable; therefore, the market approach was not utilized.

#### 3.  Guideline Public Companies

A review of GPCs was utilized in determining the appropriate beta and debt/equity ratio for the WACC calculation.  The five GPCs previously discussed with respect to the 2009 WSOP Transaction were utilized, as well as one additional company that was publicly traded as of the valuation date, in order to calculate the WACC.   The six companies are listed in Valuation Table 16.

**Valuation Table 16: Guideline Public Companies – WSOP Tournament Rights**

| Company Name | Ticker Symbol |
|---|---|
| Churchill Downs, Inc. | CHDN |
| Amaya, Inc. | AYA |
| William Hill plc | WMH |
| Sportech PLC | SPO |
| bwin.party digital entertainment plc | BPTY |
| Jumbo Interactive Limited | JIN |

Descriptions of each of the GPCs can be found attached to this Appendix as Exhibit A.

---

[172]  C. Abrahams Oct. 7, 2015 Tr. at 212:7-9.

[173]  *Id.* at 213:13-17.

### 4.  Income Approach – DCF

For the purpose of valuing the WSOP Tournament Rights, the following modifications were made to the projections relied upon by VRC:

- No reduction in revenue or EBITDA from an assumed move to a Strip property;

- Inclusion of non-Rio gaming revenue tied to WSOP entrants;

- No adjustment to eliminate Hotel EBITDA; and

- Inclusion of non-financial benefits.

The modifications made to the projections are consistent with the prior discussion of each of the assumptions.  The modified projections were then discounted utilizing the appropriate WACC and capitalization rate.  The resulting WACC for the WSOP Tournament Rights was 11.5%.  A long-term growth rate of 2.0% was selected to arrive at a capitalization rate of 9.5%.  The enterprise value of the WSOP Tournament Rights was based on a range of discount rates that are plus or minus 50 basis points (0.5%) from the calculated WACC.

### 5.  Valuation Conclusions

Based upon the results from utilizing the modified projections in the DCF Method, the Fair Market Value of the WSOP Tournament Rights is reasonably estimated to range between $50.3 million and $55.9 million.[174]  The valuation conclusions are presented in Valuation Table 17.

**Valuation Table 17: Valuation Conclusion – WSOP Tournament Rights**

*In Millions of $US*

| WSOP Tournament | Weighting | Low | High |
|---|---|---|---|
| Discounted Cash Flow Method | 100% | $ 50.3 | $ 55.9 |

The complete valuation model for the WSOP Tournament Rights is attached as **Exhibit E** to this Appendix.

This analysis indicates that CEOC did not receive reasonably equivalent value based upon the $20.5 million transaction price, and the total deficit ranges from $29.8 million to $35.4 million.

---

[174]  As previously noted, the assumption that 50% of gaming revenue tied to WSOP entrants was considered incremental is not supported by reasonable analysis.  If this percentage were modified to 80%, the resulting total value of the WSOP Tournament Rights would range from $55.8 million to $62.0 million.  This modified value range could also be viewed as giving some consideration to incremental cash flows from WSOP spectators.

### D.  Sensitivity Analysis

A sensitivity analysis was not performed on the valuation prepared by VRC since the corrections to the assumptions used in the projections have already been factored into the Examiner's valuation of the WSOP Tournament Rights.  A sensitivity analysis, therefore, would not provide a materially different value range.

### E.  Summary of Values

Valuation Table 18 summarizes the transaction price compared to: (i) the value range determined by VRC; (ii) the values offered by other parties; and (iii) the Examiner's valuation of the assets.

**Valuation Table 18:  Illustrative Summary of Values for WSOP Tournament Rights**

| amounts in millions | Low | High |
|---|---|---|
| *Transaction Price* | $  20.5 | $  20.5 |
| VRC | $  18.7 | $  22.0 |
| Baker Tilly | $  40.0 | $  74.0 |
| **Examiner Valuation** | **$  50.3** | **$  55.9** |

## VI.    THE CERP TRANSACTION

In October 2013, CEOC transferred to CERP (i) Octavius Tower, (ii) RDE Casino, (iii) LINQ Retail, and (iv) the Observation Wheel (collectively, the "LINQ/Octavius" assets) in the CERP Transaction.  In exchange for the LINQ/Octavius assets, CEOC received purportedly "equivalent value" consisting of cash, bonds, and avoided future corporate overhead costs, as well as the assumption of $450 million of debt by CERP.

In conjunction with the CERP Transaction, CEC and Apollo arranged for CEOC to retain Perella Weinberg Partners LP ("Perella") to opine as to whether the value of the consideration to be received by CEOC was reasonably equivalent to the value of the LINQ/Octavius assets transferred.  Perella did not issue a fairness opinion; instead, it described its reasonably equivalent value opinion as "taking a more narrow look at what is being given up and what is being received and it's not necessarily opining on whether or not that transfer of value is fair in a more holistic sense."[175] Further, Perella did not view its role as ensuring that CEOC got the best deal from a negotiating perspective.[176]

Perella's opinion concluded that CEOC received a net benefit ranging from $82 million to $378 million, consisting of: (i) an enterprise value range for the LINQ/Octavius assets ranging from $648 million to $836 million; (ii) a reduction of $450 million for the LINQ/Octavius debt assumed by CERP; (iii) total additional consideration of $138 million to $150 million for contributed bonds; and (iv) $329 million to $426 million for avoided corporate overhead costs. However, Perella's reasonably equivalent value opinion hinges on the validity of including avoided costs as consideration and other assumptions regarding the LINQ/Octavius assets.  The following sections describe the analysis performed to derive an estimate of the fair market value of the assets sold in October 2013 in the CERP Transaction as well as the corresponding consideration received by CEOC.  The analysis included assessing key assumptions impacting the valuation of the assets, with consideration given to Perella's opinion and related interview commentary.  Generally accepted valuation approaches and methods were used to derive value estimates, and these values were analyzed against other value indicators and information.  Also reviewed were the submissions provided by the various parties with respect to the CERP Transaction and the various critiques of Perella's analysis.

Based on this analysis, it is reasonably estimated that the fair market value of the assets sold in the CERP Transaction ranged from $779 million to $877 million (or $329 million to $427 million net of debt assumed), and the total consideration received by CEOC was $129 million. Additional detail regarding the assets and the analysis performed is described below.

### A.  Construction Costs and Status at Time of Transfer

On April 25, 2011, CEC, Caesars LINQ, LLC, and Caesars Octavius, LLC (the "Borrowers") entered into a credit agreement (the "LINQ/Octavius Credit Agreement") with

---

[175]   J. Scherer Oct. 20, 2015 Tr. at 40:19-22 and 48:8-16.

[176]   *Id.* at 41:24-42:11.

JPMorgan Chase Bank, N.A. as the Administrative Agent and Collateral Agent.[177]   The LINQ/Octavius Credit Agreement provided for a $450 million senior secured term facility with a six-year maturity, secured by all material assets of the Borrowers.[178]   The financing was incurred to complete the Octavius Tower at Caesars Palace Las Vegas and to develop a retail, dining, and entertainment corridor between the Quad and the Flamingo Las Vegas on the Las Vegas Strip ("Project LINQ").[179]

At the time of the sale, Octavius Tower was a newly-constructed 23-story premium hotel tower within Caesars Palace, featuring 662 guest rooms, 60 suites, and six luxury villas.[180]   It was built to cater to VIP customers and to target ultra-high-end Asian guests.   Construction on Octavius Tower began in February 2008 but was halted in January 2009 due to the downturn in the economy.[181]   As of early 2011, the Company had spent $355 million of the total projected cost of $455 million.[182]   Octavius Tower was completed and opened in January 2012;[183] therefore, there were no remaining project costs at the time of the CERP Transaction.   Caesars anticipated that its most valuable guests would migrate to Octavius Tower from Augustus Tower.[184]

RDE Casino,[185] also known as O'Shea's Casino, sits within the Quad (now the LINQ Resort and Casino).   Formerly a stand-alone casino adjacent to the Flamingo on the Las Vegas Strip, the original O'Shea's Casino was closed on April 30, 2012[186] during the construction and development of Project LINQ and the renovation of the Quad.   RDE Casino reopened as the new O'Shea's Casino in December 2013 as part of the Quad.[187]   The casino can be accessed either from inside the Quad or directly from the LINQ Retail promenade.

Project LINQ is a "party district" with 260,000 square feet of leasable space as well as the World's largest Observation Wheel called the "High Roller."   It was estimated to have total

---

[177]   Octavius/Linq Credit Agreement (Apr. 25, 2011), at CEOC_INVESTIG_00003127 [CEOC_INVESTIG_00003127].

[178]   CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 80.

[179]   *Id.* at 70.

[180]   Exhibit 99.1 to CEC 8-K (Sept. 24, 2013), at 4.

[181]   "Project Linq + Octavius Tower Financing" Presentation (Feb. 25, 2011), at CEOC_INVESTIG_00004113 [CEOC_INVESTIG_00004103].

[182]   *Id.*

[183]   CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 40.

[184]   "Project Linq + Octavius Tower Financing" Presentation (Feb. 25, 2011), at CEOC_INVESTIG_00004117 [CEOC_INVESTIG_00004103].

[185]   RDE stands for "Retail, Dining, and Entertainment" and "RDE Casino" appears to have been the working name for O'Shea's Casino during construction and renovation activities.

[186]   CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 29.

[187]   CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 31.

construction costs of $521 million ($324 million for LINQ Retail and $197 million for the Observation Wheel), of which $100 million in funding remained at the time of the CERP Transaction.[188]   At the time of the CERP Transaction, LINQ Retail was expected to open in phases beginning in late 2013, and the Observation Wheel was expected to open in the second quarter of 2014.[189]   At the time, LINQ Retail was also expected to include four bars, 12 food and beverage offerings, seven retail outlets and an entertainment venue, with seven additional spaces currently in negotiations.[190]   Of the foregoing, Caesars intended to own and operate five spaces within LINQ Retail, and 76% of the remaining space was subject to executed leases with the rest under negotiation.[191]   Examples of LINQ Retail tenants with executed leases as of August 1, 2013 are listed below.[192]

- Yard House – 13,703 sq. ft.; 10-year lease

- Brooklyn Bowl – 76,256 sq. ft.; 15-year lease

- The Foundry – 8,033 sq. ft.; 10-year lease

- Chayo Cocina – 11,120 sq. ft.; 10-year lease

- Sprinkles – 2,429 sq. ft.; 10-year lease

- Tilted Kilt – 4,854 sq. ft.; 10-year lease

Through the CMBS refinancing that occurred as part of the transaction that transferred LINQ/Octavius from CEOC to CERP, the $450 million senior secured term facility was repaid.

### B. Perella Opinion

#### 1. Opinion Overview

On October 10, 2013, Perella issued its Project Citizen report.   The valuation range determined by Perella for the four LINQ/Octavius assets is summarized in Valuation Table 19.

---

[188] Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000013 [CEOC_ INVESTIG_00000006].

[189] Exhibit 99.1 to CEC 8-K (Sept. 24, 2013), at 4.

[190] *Id*. at 8.

[191] *Id*.

[192] The Linq – Capital Committee Schedule (Aug. 1, 2013), at CEOC_INVESTIG_00024667 [CEOC_INVESTIG_00024667].

**Valuation Table 19:  Perella Valuation Summary – Assets Transferred**

| *amounts in millions* | Low | High |
|---|---|---|
| Octavius Tower | $ 162 | $ 203 |
| RDE Casino | $ 67 | $ 83 |
| LINQ Retail | $ 252 | $ 303 |
| Observation Wheel | $ 265 | $ 346 |
| Less: Remaining Construction Costs | $ (98) | $ (98) |
| Total Enterprise Value | $ 648 | $ 836 |
| Less:  LINQ/Octavius Debt | $ (450) | $ (450) |
| Total Equity Value | $ 198 | $ 386 |

Source:  Perella  "Project  Citizen"  Presentation  (Oct.  10,  2013),  at
CEOC_INVESTIG_00000011 [CEOC_INVESTIG_00000006].

The consideration purported to be received by CEOC included two components which
Perella valued as shown in Valuation Table 20.

**Valuation Table 20:  Perella Valuation Summary – Consideration**

| *amounts in millions* | Low | High |
|---|---|---|
| CEOC Debt Contribution | $ 138 | $ 150 |
| Reallocated Corporate Expenses | $ 329 | $ 426 |
| Total Consideration | $ 467 | $ 576 |

Source:  Perella  "Project  Citizen"  Presentation  (Oct.  10,  2013),  at
CEOC_INVESTIG_00000011 [CEOC_INVESTIG_00000006].

Perella's opinion concluded that CEOC received a benefit of $82 million to $378 million,
representing the excess of the value of the consideration over the value of the assets
transferred.[193]

## 2.  Octavius Tower and RDE Casino

### a.  Lease Terms

In the case of both Octavius Tower and RDE Casino, the asset transferred was the right to
receive a lease payment from CEOC under existing operating leases executed on April 25, 2011,
as part of the $450 million financing.  Both leases are for a 15-year term consisting of a flat rent
payment of $35 million and $15 million for the Octavius Tower and RDE Casino, respectively.

---

[193]  The net benefit calculated by Perella is the difference between (i) the low consideration value
and the high asset value ($467 million–$386 million) and (ii) the high consideration value and
the low asset value ($576 million–$198 million).

Notably, the underlying leases do not contain any language regarding renewal rights.[194]   An analysis regarding the resulting leverage that the lessor will have at the time of a potential renegotiation is presented later in this Appendix.

With respect to Octavius Tower and RDE Casino, Perella's report makes two key assumptions regarding the leases which are relevant to the valuation: (i) the lease structure reflects fair market, arm's length terms; and (ii) the lease will be renegotiated and renewed upon expiration, with the new lease terms increasing at the historical CPI average of 3.3%.[195]   In reality, the actual leases are both silent regarding any renewal or renegotiation upon the expiration of the leases' 15-year terms.

In response to Perella's diligence questions, Caesars informed Perella that the Octavius Tower lease terms were set up for credit support for the LINQ/Octavius debt and that the RDE lease approximated O'Shea's earnings prior to being shut down.[196]   There is nothing to suggest that either of these would necessarily represent fair market value lease terms.   In and of itself, the fact that the lease payments are flat with no escalation clause based on inflation raises the question as to whether or not the leases represent fair market value since such leases typically include escalation clauses.   Further, the flat lease payments for Octavius Tower and RDE Casino are inconsistent with other negotiated Caesars leases with third parties, such as the underlying leases with the tenants for LINQ Retail and the draft RSA, as well as the escalation clause allowed in the leases on the reimbursement caps.[197]

Perella arrived at a midpoint enterprise value for Octavius Tower and RDE Casino of $183 million and $75 million, respectively, based on the lease payments for each.   Both the Octavius Tower and RDE Casino transactions are typical sale-leaseback transactions.   Sale-leasebacks are a form of financing in which a company sells its real estate for cash and simultaneously enters into a long-term lease with the buyer.   The terms of sale-leaseback transactions are based, in part, on the required rate of return demanded by the buyer, the length of the lease, and the risk of collection.   An interest rate of 9.25%,[198] the rate of interest on the LINQ/Octavius financing, would approximate a rate of return commensurate with the risk of nonpayment on the lease as calculated by a third party.

---

[194]   Linq   Amended   and   Restated   Operating   Lease   (Oct.   11,   2013),   at CEOC_INVESTIG_00153576-618 [CEOC_INVESTIG_00153576]; Octavius Amended and Restated   Operating   Lease   (Oct.   11,   2013),   at   CEOC_INVESTIG_00152749-88 [CEOC_INVESTIG_00152749].

[195]   Perella "Project Citizen" Presentation (Oct. 11, 2013), at CEOC_INVESTIG_00000017 and 26 [CEOC_INVESTIG_00000006].

[196]   Response to Perella Diligence Requests (Aug. 16, 2013), at CEOC_INVESTIG_00038264 [CEOC_INVESTIG_00038264].

[197]   Schedule   B   to   Amended   LINQ   and   Octavius   Leases   (Oct.   10,   2013),   at CEOC_INVESTIG_00152786, CEOC_INVESTIG_001583616 [CEOC_INVESTIG_00152749, CEOC_INVESTIG_001583576].

[198]   CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 64.

In a sale-leaseback transaction, (i) the buyer/lessor simply collects lease payments without the cost and risk involved with an operating business, and (ii) the lease payments are essentially a secured payment as the buyer/lessor owns the real estate, thus minimizing the overall risk.

When the lease payments for Octavius Tower and RDE Casino are analyzed with respect to Perella's calculated enterprise value, the return on investment to the buyer is significantly higher than warranted given expected returns and the risk of collection. Valuation Table 21 reflects the pre-tax return to CERP on the two leaseback transactions.

**Valuation Table 21:  Octavius/RDE Casino Calculation of Return to Buyer**

| *amounts in millions* | Octavius Tower | | RDE Casino |
|---|---|---|---|
| Perella Enterprise Value – Midpoint | $ | 183 | $ 75 |
| Gross Annual Lease Payment | $ | 35 | $ 15 |
| Return on Enterprise Value | | 19.1% | 20.0% |
| Pre-Tax Net Annual Lease Payments (a) | $ | 31 | $ 13 |
| Pre-Tax Return on Enterprise Value | | 16.9% | 17.3% |

Note:
(a) Base rent less property taxes, insurance, and capital cost (assumes all capital costs are actually paid).

The returns calculated based upon Perella's midpoint enterprise value are in excess of the expected return on sale-leaseback transactions for these assets, suggesting that (i) the lease rate being paid is above market, and/or (ii) the value of the asset is understated. In order for the lease payments to align with normal industry ratios and credit risk, the purchase price for Octavius Tower and RDE Casino would have to increase to $218 million and $91 million, respectively. Alternatively, if the enterprise value is held constant, the annual lease payments would have to be reduced to $17 million and $7 million, respectively, to account for market-based returns. Valuation Table 22 reflects these adjustments.

**Valuation Table 22:  Octavius Tower and RDE Casino Adjusted Lease Economics**

| *amounts in millions* | Octavius Tower | | RDE Casino |
|---|---|---|---|
| After-Tax Net Annual Lease Payment | $ | 20 | $ | 8 |
| Typical Sale-Leaseback Return (a) | | 9.25% | | 9.25% |
| Adjusted Sales Price to Arrive at 9.25% Return | $ | 218 | $ | 91 |
| Perella Mid Point Enterprise Value | $ | 183 | $ | 75 |
| Shortfall in Purchase Price | $ | 35 | $ | 16 |
| Adjusted Rent Using 9.25% Return | $ | 17 | $ | 7 |
| Overpayment of Annual Rent | $ | 3 | $ | 2 |

Note:
(a) Based upon the interest rate for the LINQ/Octavius financing.  *See* CEC 10-K for the year ended Dec. 31, 2011 (Mar. 15, 2012), at 64.

As shown in this analysis, there is a correlation between the lease payment and the value of the lease stream.  With the lease payments dictated by executed leases, the analysis therefore demonstrates that the values calculated by Perella for Octavius Tower and RDE Casino were too low.

Further, the market-based return on the sale-leaseback of Octavius Tower and RDE Casino is understated given the amount of hard consideration actually paid by CERP for the assets (*i.e.*, assumption of the LINQ/Octavius debt and the cash/bonds).[199]  Although Perella's midpoint enterprise value for all four LINQ/Octavius assets was $742 million, CERP only paid $594 million, or 80% of that amount, in hard consideration ($450 million of assumed debt and $144 million in cash/bonds).  When this 80% ratio is considered, CERP's implied rate of return on the enterprise value for Octavius Tower and RDE Casino is even greater than the 16.9% and 17.3% shown in Valuation Table 21, respectively.

**b.  Valuation Methodology**

Perella values the leases using the DCF Method.  In Perella's DCF analysis, the lease payments are held flat throughout the projection period; however, Perella assumes the corresponding costs (*i.e.*, capital costs, property tax, and insurance) will increase annually based upon the historical CPI average of 3.3%.  The effect of valuing a flat revenue stream with increasing costs is that the net lease cash flow, before discounting to present value, decreases in each year, thereby driving the value down and suggesting that the lease terms may not be at fair market value.  Further, Perella assumes the capital costs will be reimbursed at the full cap amount outlined in the leases.[200]  However, Caesars' response to Perella's diligence questions

---

[199]  As discussed later in this Appendix, *infra*, the reallocated corporate expenses should not be counted as consideration.

[200]  Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000017 and 26 [CEOC_INVESTIG_00000006].

indicates that no capital costs had been incurred to date, nor was an allowance accrued, for RDE Casino.  Caesars also indicated a projection of future capital costs was not available.[201]  For both Octavius Tower and RDE Casino, Perella assumed in its DCF analysis that capital costs would be reimbursed up to the cap each year,[202] but the basis for that assumption is unclear.

### c. Discount Rate

The final input into Perella's DCF analysis for the Octavius Tower and RDE Casino leases is a discount rate.  Perella indicated, "WACC of CEC applied as [a] discount rate on [the] basis that the stream of lease payments reflects an operating cost and carries a risk profile consistent with the holding company of the tenant, CEC."[203]  There are two problems with Perella's discount rate: (i) the inputs to derive the rate; and (ii) the relevance of this type of discount rate to a stream of lease payments.

While Perella indicated it used the weighted average cost of capital (WACC) of CEC, in reality it is a hybrid of both CEC and CEOC inputs.  Perella relevered the mean industry peer group beta (0.76) using CEC's debt to equity ratio of 763.1% to arrive at a relevered beta of 4.52.[204]  This is materially higher than the CEC levered beta of 1.74 as well as the levered beta of the peer group of 1.29.[205]  Using this calculated beta, Perella arrives at a cost of equity of 33.7% and a WACC of 12.7%.  Had Perella utilized CEC's levered beta, the resulting cost of equity would have been 11.5% and the WACC 10.6%, which has the result of increasing the values derived under the DCF Method.

More importantly, Perella's use of CEC's WACC, which incorporates the cost of equity for a casino operator, rather than a stream of lease payments, is unfounded.  Market-based valuation multiples and the components of the discount rate are derived from guideline public companies with cash flow characteristics similar in nature to the subject company.  Perella's use of CEC's WACC is not appropriate as the lessor is not exposed to the same operating risks as a casino operator, such as regulatory reporting, inventories, significant fixed and variable labor costs, competition, seasonality and variable revenue streams.  The cash flows received by CERP for Octavius Tower and RDE Casino are lease payments based on executed leases in effect at the time.  Further, CERP is not exposed to the same risks as an operating business.  That is, CERP does not operate the underlying businesses (*i.e.* casinos, retail shops, food & beverage, etc.); rather it simply collects rent.

Given a lease stream is being valued, discount rates and rates of return on real estate investment trusts ("REITs") capture the risk profile of the subject assets more appropriately than

---

[201]  Response to Perella Diligence Requests (Aug. 16, 2013), at CEOC_INVESTIG_00038264 [CEOC_ INVESTIG_00038264].

[202]  Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000018 and 27 [CEOC_INVESTIG_00000006].

[203]  *Id*. at CEOC_INVESTIG_00000017 and 26.

[204]  *Id.* at CEOC_INVESTIG_00000038.

[205]  Beta represents the systematic risk of a security in relation to the market as a whole.

casino operators.   REITs consist of commercial income-producing real estate properties, including retail and hospitality assets that are leased out to third parties under long-term leases, very similar to the relationship between CERP and Octavius Tower/RDE Casino.  Perella did not consider REITs as relevant guideline companies.

### 3.  LINQ Retail

#### a.  Valuation Methodology

Perella utilized three different methodologies in its valuation of LINQ Retail: (i) DCF Method; (ii) Cap Method; and (iii) Precedent Transactions Method.

Perella concluded that the enterprise value of LINQ Retail using a DCF analysis was $229 million.  Using the DCF Method to value the LINQ Retail is appropriate; however, Perella included a ten-year forecast period through 2023 based on the format of the projections provided by Caesars management.  Based upon the projections presented in Perella's DCF, Caesars expected the cash flows from LINQ Retail to stabilize much earlier than 2023.  In a DCF analysis, the terminal period typically is calculated once the subject company has achieved stable growth.  The effect of Perella extending its DCF past stabilization is a decrease to the resulting value because of an assumed reduction in nominal future cash flows.  Cody Leung of Perella confirmed in her interview that the value would have been higher had the terminal value been calculated after year five.[206]   Leung also acknowledged that "you can do it either way."[207] However, the value is depressed in Perella's DCF as a result of utilizing a 10-year projection period with an implied long-term growth rate of 5.2% (the difference between the discount rate of 12.7% and the exit cap rate of 7.5%),[208] far higher than long-term growth rates typically utilized in DCF analyses.  A long-term growth rate of 5.2% is reflective of an enterprise growing at 5.2% each year into perpetuity which is not possible.  Perella's analysis reflects either (i) the growth rate is too high, (ii) the discount rate is too high, or (iii) a combination of both.  If a more reasonable 2% long-term growth rate is assumed, then the resulting discount rate would be 9.5% rather than the 12.7% utilized by Perella.

Under the Cap Method, Perella arrived at a value of $355 million, more than 55% greater than the value using a DCF, even though both methodologies are income approaches to valuation.[209]  Perella's perpetuity cap rate methodology also implies a high long-term growth rate

---

[206] C. Leung Oct. 16, 2015 Tr. at 172:3-11.

[207] *Id*. at 174:10-175:4.

[208] Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000021 [CEOC_INVESTIG_00000006].

[209] Perella's analysis utilizing an incorrect amount for EBITDA and resulting net operating income ("NOI").  Specifically, Perella's analysis utilized $27.7 million for EBITDA, arriving at Property NOI of $27.1 million after deducting a reserve for replacement.  However, the $27.7 million was incorrectly labeled as EBITDA and, in fact, already represented NOI for 2015.  As a result, the NOI was understated by $600,000, resulting in an understatement of the enterprise value in Perella's analysis by $8.4 million.

of 5.7% (the difference between the discount rate of 12.7% and the perpetuity cap rate of 7.0%). This has the same implications as previously noted with respect to Perella's DCF.

Perella identified a competitive set of six retail transactions in order to calculate a value for LINQ Retail of $214 million to $266 million under the Precedent Transactions Method. The transactions were selected from Las Vegas retail mall property transactions covering a period from 2003 through 2005 and from 2010 onwards. However, there are a number of problems relative to the comparability of the precedent transactions to LINQ Retail, making this an unreliable method to value LINQ Retail. For instance:

- Four of the six transactions occurred more than nine years prior to the CERP Transaction. While Perella performed an analysis to demonstrate that capitalization rates were similar in the 2003 through 2005 time period compared to the then current period, such an analysis was not done on sales price per square foot which is a more relevant comparison;

- One property (Grand Canal Shoppes) appears to have sold twice; once in April 2004 for $1,427 per square foot, and again in May 2013 for $1,778 per square foot. This increase of 25% calls into question the applicability of transactions that occurred in the earlier years without an adjustment for the passage of time;

- One transaction (Miracle Mile Shops) in December 2003 was a distressed sale situation involving the former Aladdin Casino; and

- Several of the transactions involved aged properties, including Fashion Show Mall that was 23 years old at the time of sale. LINQ Retail was a new retail establishment.

Generally, real estate sales are adjusted by an appraiser to account for differences in property attributes such as the above. Joshua Scherer of Perella found such adjustments to be a "rabbit hole," as there are "any number of elements and factors that affect value, including time, including the interest rate environment, including how hot private equity was or wasn't at the time, including how acquisitive corporates were at the time."[210] Due to the lack of quality transactions comparable to LINQ Retail, the precedent transactions selected by Perella do not provide a reasonable indication of value for the LINQ Retail portion of the CERP Transaction.

### b. Discount Rate

Similar to the discount rate utilized for the Octavius Tower and RDE Casino leases, Perella also used the hybrid 12.7% "CEC" discount rate in its valuation of LINQ Retail. The same two potential issues with Perella's discount rate remain: (i) the inputs to derive the value, and (ii) the relevance of a hybrid discount rate to a retail establishment.

The issues with the inputs into Perella's WACC are the same as already discussed with respect to Octavius Tower and RDE Casino.

---

[210] J. Scherer Oct. 20, 2015 Tr. at 168:8-17.

Further, the LINQ Retail collects rents from a diversified mix of third-party tenants. The rents are based upon an executed lease agreement, including both a base rent as well as a percentage rent component. Having a diversified tenant mix reduces the risk of loss due to any one tenant defaulting on its lease. At the time of the CERP Transaction, LINQ Retail was nearly fully leased up. LINQ Retail is not an operating company or casino, but rather the projections reflect the cash flow from the executed leases which are less risky than cash flows derived from an operating casino. Therefore, Perella's use of CEC's WACC to discount the lease stream is inappropriate. Similar to Octavius Tower and RDE Casino, what is being valued is a stream of lease payments. Therefore discount rates and rates of return on real estate investment trusts (REITs) are more appropriate than utilizing casino operators.

### 4. Observation Wheel

#### a. Valuation Methodology

Perella valued the Observation Wheel using a DCF analysis based upon projections provided by Caesars management.[211] One of the critical assumptions made in the Observation Wheel projections was that the cash flow (both revenue and expenses) would be flat with 0% growth from Year 2 into perpetuity, meaning that ten years from now there would be no change in revenue due to an increase in ticket prices, ridership or both.

There are numerous indications that contradict Perella's assumption of 0% growth for the Observation Wheel into perpetuity.

- The projections for the Observation Wheel appear to be based, in part, upon a Feasibility Study prepared by the Glenroe Group in a report dated February 6, 2010.[212] However, the Glenroe Group's report included a low, base, and high case for growth rates into perpetuity of 1.28%, 1.92%, and 2.55%, respectively.[213] The growth rates assumed by the Glenroe Group are consistent with inflationary growth.

- CEC's Ratings Agency Presentation dated August 20, 2013, describes the LINQ/Octavius assets to be a "collection of assets heavily concentrated in the attractive Las Vegas market, with tangible near-term growth potential."[214]

---

[211] E-mail from A. van Hoek to C. Leung (Aug. 10, 2013), at PWP_CZR_EX_00120887 [PWP_CZR_EX_00120887], attaching Observation Wheel Forecast Assumptions (Aug. 10, 2013), at PWP_CZR_EX_00120890 [PWP_CZR_EX_00120890] (native file).

[212] Las Vegas Wheel Project Feasibility Study (Feb. 6, 2010), at CEOC_INVESTIG_00012148-78 [CEOC_INVESTIG_00012148].

[213] Las Vegas Wheel Project Feasibility Study (Feb. 6, 2010), at CEOC_INVESTIG_00012169 [CEOC_INVESTIG_00012148].

[214] "CEC Ratings Agency" Presentation (Aug. 20, 2013), at CEOC_INVESTIG_00069574 (native file) at 4 and 16.

- When VRC was engaged in 2011 to work on a then-anticipated form of the CMBS refinancing that did not ultimately occur, Brimmer e-mailed to VRC projections for the Observation Wheel, indicating, "Please use Company Projections section. For years beyond forecast horizon assume inflationary growth."[215]

Based upon the foregoing and the logical premise that a new business would expect to at least maintain growth consistent with inflation, it is unreasonable to assume a flat cash flow stream for the Observation Wheel.

### b. Discount Rate

The issues with the technical inputs into Perella's WACC are the same as already discussed with respect to the other LINQ/Octavius assets. Further, it is not clear why the WACC for a gaming company would be applicable to the Observation Wheel which does not share the same operating risk profile as a casino as it is not dependent on lodging or gaming directly. In its feasibility study, the Glenroe Group compares the Observation Wheel to amusement parks, theme parks and other tourist attractions.[216] These types of companies are more comparable to the Observation Wheel than casino operators and should have been used to derive the WACC rather than casino operations.

### 5. CEOC Debt Contribution

Perella's opinion describes a portion of the consideration as consisting of $150 million face value of CEOC debt, the 5.375% Senior Note due 2013 ("2013 Notes") and the 10% 2nd Lien Secured Note due 2018 ("2018 Notes"). Ultimately, this portion of the consideration included: (i) $25,000,000 of the 2018 Notes; (ii) $44,489,000 of the 2013 Notes; and (iii) $80,722,000 of cash.[217]

The market value of the debt was estimated by Perella as $138 million.[218] In its valuation summary, Perella reflected a range of $138 million to $150 million as consideration received by CEOC for the notes. The appropriate measure of value for the 2013 Notes and 2018 Notes should be their then current market value, as opposed to face value, at the time of the transfer. The value of the "currency" received at the time of the transfer was the then current market value, not the face value at time of maturity. This is the same position that Evercore took and the Sponsors accepted with respect to the bond portfolio component of the Growth Transaction.[219]

---

[215]  E-mail from R. Brimmer to C. Rucker (Apr. 4, 2011), at VRC00012034 [VRC00012034].

[216]  Las Vegas Wheel Project Feasibility Study (Feb. 6, 2010), at CEOC_INVESTIG_00012162 and CEOC_INVESTIG_00012168 [CEOC_INVESTIG_00012148].

[217]  CEOC Board Resolution (Oct. 10, 2013), at CEOC_INVESTIG_00452076 [CEOC_INVESTIG_00452075].

[218]  Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000032 [CEOC_INVESTIG_00000006]. Perella's analysis assumed the entire amount would be financed with the contributed debt, although ultimately a portion of the consideration was cash.

[219]  Evercore "Project Hermes Valuation Discussion Materials" Presentation (Oct. 21, 2013), at

### 6.  Reallocated Corporate Expenses

As part of its October 10, 2013, analysis of the CERP Transaction, Perella attributed a value to avoided costs ("Reallocated Corporate Expenses") ranging from $329 million to $426 million.  Perella concluded that avoided Reallocated Corporate Expenses was a form of consideration received by CEOC as a result of the transfer of the LINQ/Octavius assets to CERP. The concept of considering indirect cost as consideration was advocated by Apollo.[220]  The underlying theory was that, but for the refinancing of the CMBS debt, the lenders would have foreclosed on the six CMBS properties, resulting in significant fixed overhead cost that could not have been eliminated and which CEOC would have to absorb.  These additional overhead costs would not provide any additional benefit to CEOC.

Perella's inclusion of these hypothetical futures costs was predicated on several critical assumptions provided by CEC and Apollo.

- Perella noted:

> The Proposed Transaction assumes that if a refinancing of PropCo were not to occur, PropCo would almost certainly default on certain debt obligations upon the maturity of such debt obligations in February 2015 and that such default would result in the prompt separation of PropCo from CEC with no on-going shared services or relationship.[221]

> Per Company guidance, there is no legal or contractual way for CEOC to avoid increasing its share of reallocated corporate expenses upon a default at PropCo and we therefore assume that CEOC would be allocated additional corporate expenses.[222]

- Perella's analysis also assumes that CEC could eliminate some of the cost over time but would still incur $83.2 million, of which $77.3 million would represent CEOC's share, in additional overhead cost per year into perpetuity with no benefit to CEOC.[223]

There are numerous problems with Perella's inclusion of hypothetical future avoided costs as consideration.  The assumption that CMBS would have defaulted is speculative and without basis for several reasons, including:

---

CEOC_INVESTIG_00249874-87 [CEOC_INVESTIG_00249739].

[220] CMBS Discussion Materials (Aug. 2013), at PWP_CZR_EX_00000382 [PWP_CZR _EX_00000381].

[221] Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000011 [CEOC_INVESTIG_00000006].

[222] *Id.* at CEOC_INVESTIG_00000034.

[223] *Id.* at CEOC_INVESTIG_00000035.

- There was never any realistic possibility of a default. The only issue was the precise terms of an agreement.

  - Key CMBS lenders initiated the refinancing process.

  - Witness and documents suggest the negotiations were constructive.

  - An internal Apollo analysis indicates CMBS mortgage lenders would only recover 50-75% of principal in a foreclosure.

  - Witnesses commented that, from both sides' perspective, a refinancing rather than a default was essential. For example, Jacqueline Beato stated "a foreclosure would be mutually destructive to both parties."[224]

- There is no evidence that the lender planned to actually foreclose on the CMBS properties, nor that they wanted to own the CMBS properties;

- Perella relies upon an assumption that there would be "no on-going shared services or relationship,"[225] which is inconsistent with the Shared Services Agreement that arose out of the 2010 CMBS amendments;[226]

- The debt that was coming due was owed by CMBS, not CEOC. CMBS, as a CEC wholly owned subsidiary, had its debt guaranteed by CEC;

- The debt did not mature for another 17 months (February 2015); as such, the debt was not in default; and

- No witness, including the Apollo, Perella, Caesars, or Paul Weiss witnesses, could identify a precedent for use of reallocated costs in a fairness opinion, as opposed to being a factor considered by a seller.

  - When Leung from Perella was asked if she had ever heard of the concept of Corporate Reallocated Expenses as a form of consideration she indicted that she had not.[227]

  - Further, Scherer, the senior Perella resource on the matter, responded in an interview that he was not aware of any financial literature that supported Reallocated Corporate Expenses as consideration.[228]

---

[224] J. Beato Sept. 24, 2015 Tr. at 30:17-18.

[225] Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000011 [CEOC_INVESTIG_00000006].

[226] Second Amended and Restated Shared Services Agreement (Aug. 31, 2010), at PW_EXAMINER_00236262 [PW_EXAMINER_00236248].

[227] C. Leung Oct. 16, 2015 Tr. at 96:24-97:7.

The future Reallocated Corporate Expenses are both hypothetical and speculative. For valuation purposes, in order for an indirect benefit to be considered as having value it must be both ascertainable and measurable with a reasonable degree of certainty. Further, from a valuation and accounting perspective, this type of cost could be best described as a contingent liability with the likelihood of this cost being incurred as remote. Under generally accepted valuation principles, if the likelihood of a contingent event is remote, it is not measurable and would not be booked as an asset or liability.

Accordingly, from a valuation point of view, the Reallocated Corporate Expenses would not be characterized as consideration.

### C. Contemporaneous Indicators of Value

In August 2013, Apollo prepared at least three versions of a presentation intended for Perella entitled "CMBS Discussion Materials" over the course of three days.

On August 14, 2013, Brian Finnegan of Paul Weiss e-mailed to Scherer the seemingly final version of CMBS Discussion Materials.[229] In this version, CMBS Discussion Materials presented the calculated values under the proposed structure as (i) the release of the CMBS lease guarantee ($4.38 billion),[230] (ii) Reallocated Corporate Expenses ($1.78 billion),[231] and (iii) the LINQ/Octavius assets as presented in Valuation Table 23.

**Valuation Table 23:  August 14, 2013 Final CMBS Discussion Materials**

| *amounts in millions* | Value |
|---|---|
| Octavius Tower and RDE Casino | $        400 |
| LINQ Retail | 322 |
| Observation Wheel | 387 |
| Less: Remaining Construction Costs | (81) |
| Total Enterprise Value | $     1,028 |
| Less:  LINQ/Octavius Debt | (450) |
| Total Equity Value | $        578 |

Source:    CMBS    Discussion    Materials    (Aug.    2013),    at
PWP_CZR_EX_00000383-84, 86 [PWP_CZR_EX_00000381].

---

[228]  J. Scherer Oct. 20, 2015 Tr. at 102:25-103:9.

[229]  E-mail from B. Finnegan to J. Scherer, *et al.* (Aug. 14, 2013) [PWP_CZR_EX_00000380], attaching "CMBS Discussion Materials" (Aug. 2013), at PWP_CZR_EX_00000381-90 [PWP_CZR_EX_00000381].

[230]  *Id.* at PWP_CZR_EX_00000383.

[231]  *Id*. at PWP_CZR_EX_00000384.

The resulting equity value, which Apollo provided to Perella, was $578 million, $286 million (or 98%) greater than the mid-point value calculated by Perella.

## D. Analyst Report Commentary

In addition to any internal analysis, a review of market participants' view of the CERP Transaction and the transferred assets provides additional insight into the expected economics of the project and the impact on CEOC. Notably, certain analysts had confidence in the success of the LINQ and Observation Wheel while others felt the funds should have instead been used to pay down debt.[232]

- *Deutsche Bank – February 28, 2011*

  We view this transaction as an incremental negative to the CEOC credit as we are uncertain the $50 million lease payment can be generated by EBITDA contribution of the Octavius tower. While we believe the Linq project will be successful, the properties that will benefit from the enhanced traffic are not included in the CEOC.

- *Credit Suisse – March 19, 2012*

  In our view, the LINQ will further solidify the company's position on the Strip (particularly as it controls three of the four corners of the Flamingo intersection), while potentially attracting millions of customers that walk by its assets on an annual basis. We see LINQ giving CZR an opportunity to capture additional gaming and nongaming spend, particularly from retail gamblers . . . . We believe that the Strip is over-saturated at the high-end of the retail spectrum and the tenant mix at the LINQ should fit squarely into CZR's targeted player demographics.

- *Barclays – August 22, 2012*

  Given the foot traffic currently walking by the Linq area today (20.4 million), we believe 3.4 million wheel riders is a realistic goal for the project.

- *Morningstar – May 2, 2013*

  We continue to have an unfavorable view of management's decision to invest approximately $550 million in Project Linq, an open-area entertainment, dining, and shopping district that will have the world's tallest Ferris wheel. In our view, the project will have a low return on investment, and the $550 million could have more effectively been used to pay down the company's massive debt load, which ended the quarter at more than $21 billion (more than 10 times last-12-months EBITDA).

---

[232] Appendix 8**,** Analyst Commentary.

MGM recently announced a similar outdoor project, which we expect to negate any short-term gain visitation gains Caesars may experience.

- *Morningstar – September 18, 2013*

  Caesars stock was down by approximately 10% on news of the refinancing, which we attribute to the proposed shift in security interests in the Octavius Tower at Caesars Palace and Project Linq to holders of the new debt, resulting in existing debtholders no longer having a security interest in the two properties, or a claim on the assets in the event of a Chapter 11 filing. We note that Caesars has made no progress in paying down debt since the company was taken private in an LBO in early 2008, and total debt/EBITDA currently stands at approximately 10 times.

## E. The Examiner's Valuation Range for LINQ/Octavius Assets

### 1. Valuation Date

The valuation date for the valuation of the LINQ/Octavius assets as part of the CERP Transaction was October 11, 2013, the date the transaction closed.

### 2. Guideline Public Companies

For each of the LINQ/Octavius assets, the GPCs identified were utilized to determine the appropriate beta and debt/equity ratio for the WACC calculation. For LINQ Retail, the GPCs were also utilized for selection of appropriate valuation multiples to apply under the market approach. Independent research identified sufficiently relevant GPCs. The cash flow for Octavius Tower, RDE Casino, and the LINQ Retail are scheduled lease payments. As such, the focus of identifying guideline companies was on publicly traded REITs, with a particular focus on hotel properties, as REITs have similar required rates of returns and risk profiles as Octavius Tower, RDE Casino and LINQ Retail.

Fourteen companies were identified that are generally comparable to the lease-based LINQ/Octavius assets in terms of risk characteristics, services, products, industry participation, and competitive landscape. The REITs identified generally own or operate properties in the high-end retail and/or hotel and hospitality industries. The fourteen GPCs are listed in Valuation Table 24.

**Appendix 7, Solvency**

**Valuation Table 24: Guideline Public Companies – LINQ/Octavius/RDE**

| Company Name | Ticker Symbol |
|---|---|
| Urstadt Biddle Properties Inc. | UBA |
| General Growth Properties, Inc | GGP |
| Taubman Centers, Inc. | TCO |
| Ashford Hospitality Trust, Inc. | AHT |
| Chatham Lodging Trust | CLDT |
| Chesapeake Lodging Trust | CHSP |
| Diamondrock Hospitality Co. | DRH |
| FelCor Lodging Trust Incorporated | FCH |
| Host Hotels & Resorts, Inc. | HST |
| LaSalle Hotel Properties | LHO |
| RLJ Lodging Trust | RLJ |
| Sotherly Hotels Inc. | SOHO |
| Strategic Hotels & Resorts, Inc. | BEE |
| Summit Hotel Properties, Inc. | INN |

A detailed analysis of each of the GPCs was performed to determine the degree of comparability to the subject assets. In particular, with regards to the steady-stream of lease payments projected for Octavius Tower, RDE Casino, and LINQ Retail, the REITs listed in Valuation Table 24 best reflect the required rate of return or risk associated with that type of cash flow.

For the valuation of the Observation Wheel, a search was performed for GPCs that operate in the amusement park industry. The three companies identified that are reasonably comparable to the Observation Wheel are the amusement park companies listed in Valuation Table 25.

**Valuation Table 25: Guideline Public Companies – Observation Wheel**

| Company Name | Ticker Symbol |
|---|---|
| SeaWorld Entertainment, Inc. | SEAS |
| Six Flags Entertainment Corporation | SIX |
| Cedar Fair, L.P. | FUN |

Summary descriptions of each of the GPCs can be found attached to this Appendix as Exhibit A.

### 3.   Income Approach – DCF Method

The projected cash flows for RDE Casino and Octavius Tower are a consistent stream of lease payments through the initial lease expiration, at which time it is assumed the leases would be renegotiated with 2% annual growth in line with inflation.  For these reasons, the DCF Method was utilized to value the stream of lease payments.  The DCF Method was also determined to be appropriate for LINQ Retail and the Observation Wheel.

For both Octavius Tower and RDE Casino, the projected cash flows mirror those utilized by Perella through the term of the initial leases as the cash flows are based upon executed leases. For LINQ Retail, the projected cash flows also mirror those utilized by Perella, but it was determined that operations were stabilized after five years, and therefore a terminal value was calculated at that point in the forecast.  For the Observation Wheel, 2% inflationary annual growth was applied to the steady state projected cash flows utilized by Perella.

The cash flows for each asset were then discounted utilizing an appropriate WACC and capitalization rates based upon the GPC data previously presented in Valuation Table 24 and Valuation Table 25.

The resulting WACC for Octavius Tower, RDE Casino, and LINQ Retail was 9.6%, and for the Observation Wheel was 12.5%.  The WACC for the Observation Wheel includes the addition of a 3.0% company-specific risk premium to account for the difference and uniqueness of the asset compared to the amusement park GPCs.  In each instance, a long-term growth rate of 2.0% was selected to arrive at capitalization rates of 7.6% and 10.5%, respectively.  The enterprise value of each asset was determined by using a range of discount rates plus or minus 50 basis points (0.5%) from the calculated WACC.

### 4.   Market Approach – Selected Multiples

The GPC Method was utilized for LINQ Retail based upon the trading multiples of certain of the GPCs at or around the valuation date.  The market approach was not utilized for the other LINQ/Octavius assets as it was determined that the income approach provides a better indication of value due to the following reasons.  In the case of Octavius Tower and RDE Casino, the GPCs' valuation multiples could not be applied since multiples inherently contain future growth which is inconsistent with the flat lease terms embedded in the Octavius Tower and RDE Casino leases.  For the Observation Wheel, while the WACC was adjusted in the DCF Method, there is no comparable method to adjust the GPCs' valuation multiples to account for the additional risk resulting from the uniqueness of the Observation Wheel compared to the amusement park GPCs.

For the valuation of LINQ Retail, an appropriate range of valuation multiples was determined based upon forward-looking multiples for 2015.  At the time, LINQ Retail was a new property that was set to open in March 2014, with no historical operating results.  As such, forward-looking multiples were deemed most appropriate to account for the forecasted growth of LINQ Retail.  A summary of the selected multiples is shown in Valuation Table 26.

### Valuation Table 26: Selected Multiples – LINQ Retail

| Asset | Metric | Low | High |
|---|---|---|---|
| LINQ Retail | 2015E EBITDA | 10.0 x | 11.0 x |

The selected multiples for LINQ Retail are below the median of the selected GPCs.  This is to adequately capture the risk of achieving the anticipated levels of growth in the operational forecasts, and the lack of operational history.   The selected multiples take into account qualitative and quantitative factors.  The selected range of multiples was then applied to the appropriate measure of EBITDA to arrive at an estimated enterprise value.

### 5.   Valuation Conclusions

The resulting conclusion of value from the DCF Method and GPC Method were each accorded 50% weighting for LINQ Retail, and the DCF Method 100% weighting for each of the remaining LINQ/Octavius assets.  The resulting valuation conclusions are presented in Valuation Table 27.  The Fair Market Value of the LINQ/Octavius assets at the time of the transfer is reasonably estimated to range between $778.5 million and $876.9 million.

### Valuation Table 27: Valuation Conclusions – CERP Transaction

*In Millions of $US*

| Octavius Tower | Weighting | Low | | High | |
|---|---|---|---|---|---|
| Discounted Cash Flow Method | 100% | | 213.2 | | 239.7 |
| Concluded Range | | $ | 213.2 | $ | 239.7 |
| **RDE Casino** | **Weighting** | **Low** | | **High** | |
| Discounted Cash Flow Method | 100% | | 87.4 | | 98.2 |
| Concluded Range | | $ | 87.4 | $ | 98.2 |
| **LINQ Retail** | **Weighting** | **Low** | | **High** | |
| Guideline Public Company Method | 50% | $ | 283.0 | $ | 311.3 |
| Discounted Cash Flow Method | 50% | | 219.3 | | 250.2 |
| Concluded Range | | $ | 251.1 | $ | 280.7 |
| **Observation Wheel** | **Weighting** | **Low** | | **High** | |
| Discounted Cash Flow Method | 100% | | 324.8 | | 356.3 |
| Concluded Range | | $ | 324.8 | $ | 356.3 |
| **Total - CERP Transaction** | | **Low** | | **High** | |
| Less:  Remaining Construction Costs | | $ | (98.0) | $ | (98.0) |
| **Total Enterprise Value** | | **$** | **778.5** | **$** | **876.9** |
| Less:  LINQ/Octavius Debt Assumed | | $ | (450.0) | $ | (450.0) |
| **Total Equity Value** | | **$** | **328.5** | **$** | **426.9** |

The Fair Market Value of the equity in the CERP Transaction, after deducting the debt assumed by CERP, is reasonably estimated to range between **$328.5 million and $426.9 million**, which is less than the $578 million value contained in Apollo's analysis on August 14, 2013.[233] The complete valuation models for the CERP Transaction are attached as **Exhibit F** to this Appendix.

Furthermore, the estimated value of the consideration received by CEOC is $128.8 million.  This is equivalent to the cash and market value of the debt contribution, with no additional value assigned to the Reallocated Corporate Expenses.  The total value of the consideration is summarized in Valuation Table 28.

### Valuation Table 28:  Value of CERP Consideration

*In Millions of $US*

| Consideration | Face Value of Notes | Market Price (a) | Value |
|---|---|---|---|
| Cash | | | $    80.72 |
| 2013 Notes | $    44.49 | $    0.5192 | 23.10 |
| 2018 Notes | $    25.00 | $    0.9997 | 24.99 |
| Reallocated Corporate Expenses | | | - |
| Total Consideration | | | $    128.81 |

Note:
(a) Market pricing on October 10, 2013, per Bloomberg, L.P. for CUSIP: (i) 413627BC3 and 413627BG4 for 2013 Notes (weighted); and (ii) 413627AN0 for 2018 Notes.

This analysis indicates that CEOC did not receive reasonably equivalent value based upon the value of the assets transferred compared to the value of the consideration received by CEOC, and the total deficit ranges from $199.7 million to $298.1 million.

### F.  Impact of Octavius Tower Lease on Caesars Palace

The transfer of Octavius Tower from CEOC to CERP will have additional financial impacts beyond those noted in this Appendix.  As noted, the term of the leases is 15 years with no provision for renewal.

Octavius Tower had a significant impact on total revenue and EBITDA generated at Caesars Palace.  Octavius Tower opened in January 2012,[234] and included a total of 668 rooms (*i.e.*, 602 guest rooms, 60 suites, and six luxury villas).[235]  These new rooms increased room capacity by approximately 20% during the first year of operations.  By adding 668 new rooms,

---

[233] "CMBS Discussion Materials" Presentation (Aug. 2013), at PWP_CZR_EX_00000386 [PWP_CZR_EX_00000381].

[234] CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 40.

[235] Exhibit 99.1 to CEC 8-K (Sept. 24, 2013), at 4.

Caesars Palace experienced an increase not only in room revenue, but also in gaming revenue, food and beverage sales, retail, etc.

Caesars Palace recorded higher EBITDA margins than the balance of the CEOC properties, with margins ranging from 22.4% to 30.1% in the period from 2012 through 2014 compared to 17.1% to 21.5% for the balance of CEOC. During the same period, the revenue per available room ("RevPAR") at Caesars Palace averaged $224,456.[236] Applying this RevPAR metric to the 668 additional rooms results in incremental revenue of $149.9 million. Valuation Table 29 reflects the potential impact this incremental revenue would have had on the enterprise value of Caesars Palace assuming an 11.0x EBITDA multiple.[237]

**Valuation Table 29:  Incremental Value Associated with Octavius Tower**

*In Thousands of $US*

| Octavius Tower | Low | Mid | High |
|---|---|---|---|
| Incremental Revenue | $       149,937 | $       149,937 | $       149,937 |
| EBITDA Margin (2012-2014) | 22.40% | 26.25% | 30.10% |
| EBITDA | $33,586 | $39,358 | $45,131 |
| Multiple | 11.0x | 11.0x | 11.0x |
| Incremental Value | $369,444 | $432,942 | $496,440 |
| Perella Estimated Value of Octavius Tower at Mid Point | $183,000 | $183,000 | $183,000 |
| Illustrative Value Shortfall | $186,444 | $249,942 | $313,440 |

Source:  Low and high EBITDA margin calculated based upon Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAMINER_0145430] (native file); Perella midpoint per Perella "Project Citizen" Presentation (Oct. 10, 2013), at CEOC_INVESTIG_00000011 [CEOC_INVESTIG_00000006].

During the 15-year lease term, CERP will (i) have collected, after payment of real estate taxes and insurance, approximately $388 million in pre-tax lease payments (significantly more than the value ascribed to Octavius Tower by Perella), (ii) have earned a 13.9% internal rate of return ("IRR") on that investment, and (iii) still own the real estate. At the end of the lease term, CERP will have recouped the entirety of Perella's value for Octavius Tower.

Moreover, at the end of the lease term, CERP will most likely be in a superior negotiating position compared to CEOC who is much more reliant on a lease renewal than CERP due to the

---

[236] RevPAR calculated based upon Caesars Palace revenue per Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAMINER_0145430] (native file) and number of rooms per CEC 10-Ks for the years ended Dec. 31, 2012 (Mar. 15, 2013), at 28; Dec. 31, 2013 (Mar. 17, 2014), at 30; and Dec. 31, 2014 (Mar. 16, 2015), at 31.

[237] 11.0x multiple per Nov. 2013 Apollo Discussion Materials (Nov. 12, 2013), at CEOC_INVESTIG_00010374 [CEOC_INVESTIG_00010374].

potential loss of the incremental value of $369 million to $496 million that Octavius Tower provides to CEOC.

Octavius Tower's impact on the value of Caesars Palace will provide the owner of Octavius Tower significant leverage in renegotiating lease terms, as well as any potential sale of Caesars Palace.  While studies exist in valuation literature to capture a loss of control based on empirical data,[238] to estimate such a discount today would be speculative since, in this case, it relates to a future renegotiation of the lease.

### G.  Sensitivity Analysis

A sensitivity analysis was also performed on the valuations prepared by Perella in order to quantify the impact of correcting certain inputs and methodologies.  With respect to the CERP Transaction, the following corrections were made to Perella's financial model.

- Capitalized cash flows in the LINQ Retail DCF model at stabilization after five years rather than ten;

- Removed the precedent transactions methodology from the valuation of LINQ Retail due to the lack of comparable data;

- Applied 2% annual growth to the steady state projected cash flows for the Observation Wheel in order to account for inflationary growth;

- Adjusted the discount rate for Octavius Tower, RDE Casino, and LINQ Retail to utilize CEC's levered beta in lieu of CEOC's in the WACC calculation;[239] and

- Adjusted the value of the consideration to account for (i) the market value of the bonds as of the valuation date and (ii) the lack of value that should be ascribed to the avoided Reallocated Corporate Expenses.

The sensitivity analysis quantifies the impact solely of correcting the aforementioned inputs and methodologies and, for the purpose of this analysis, accepts all other inputs and methodologies utilized by Perella (*e.g.*, projected cash flows, exit capitalization rates, use of perpetuity capitalization rate method).  In order to calculate the sensitized value of each of the LINQ/Octavius assets, Perella's weighting methodology in which the average of the low and the high for each methodology was selected.  The resulting sensitized values are presented in Valuation Table 30.

---

[238]  Shannon P. Pratt & Alina V. Niculita. Valuing a Business: the Analysis and Appraisal of Closely Held Companies (5th ed. 2008), at 404-05.

[239]  The WACC for the Observation Wheel was not adjusted due to perceived company-specific risk in comparison to the other LINQ/Octavius assets.

**Appendix 7, Solvency**

### Valuation Table 30:  CERP Transaction Sensitivity Analysis

| amounts in millions | Perella Weinberg Partners | | Perella - Sensitized | |
|---|---|---|---|---|
| | Low | High | Low | High |
| Octavius Tower | $ 202.7 | $ 162.5 | $ 262.8 | $ 192.2 |
| Linq Retail | 302.6 | 251.8 | 315.6 | 270.7 |
| RDE Casino | 82.9 | 66.9 | 107.3 | 79.1 |
| Observation Wheel | 346.1 | 264.7 | 357.6 | 296.5 |
| Less: PV of $100m in remaining construction costs | (98.0) | (98.0) | (98.0) | (98.0) |
| **Total Enterprise Value Octavius/LINQ** | $ 836.2 | $ 647.8 | $ 945.4 | $ 740.5 |
| Less: LINQ/Octavius Debt | (450.0) | (450.0) | (450.0) | (450.0) |
| Equity Value of LINQ/Octavius (A) | $ 386.2 | $ 197.8 | $ 495.4 | $ 290.5 |
| Valuation of CEOC Debt Contribution (B) | 138.0 | 150.0 | 128.8 | 128.8 |
| Valuation of CEOC Share of Reallocated Corporate Expenses (C) | 329.5 | 425.6 | - | - |
| **Net Benefit to CEOC = (B+C-A)** | $ 81.3 | $ 377.8 | $ (366.6) | $ (161.7) |

The sensitized Perella equity values range from $291 million to $495 million, exceeding the sensitized value of the total consideration of $129 million.

### H. Summary of Values

Valuation Table 31 summarizes the values and net benefit/deficit to CEOC in the Perella opinion compared to: (i) the values resulting from performing a sensitivity analysis to correct certain of the inputs and methodologies used by Perella; (ii) the values offered by other parties;[240] and (iii) the Examiner's valuation of the assets.

**Valuation Table 31:  Illustrative Summary of Values for
LINQ/Octavius Assets and Consideration**

| amounts in millions | Equity Value of Assets (a) | | Value of Consideration | | Net Benefit/(Deficit) to CEOC | |
|---|---|---|---|---|---|---|
| | Low [A] | High [B] | Low [C] | High [D] | Low [C] - [B] | High [D] - [A] |
| *Perella* | $ 197.8 | $ 386.2 | $ 467.5 | $ 575.6 | $ 81.3 | $ 377.8 |
| Perella - Sensitized | $ 290.5 | $ 495.4 | $ 128.8 | $ 128.8 | $ (366.6) | $ (161.7) |
| Baker Tilly | $ 578.0 | $ 578.0 | $ 133.6 | $ 350.2 | $ (444.4) | $ (227.8) |
| Creditor Group 1 (b) | $ 1,067.8 | $ 1,308.0 | $ 133.6 | $ 133.6 | $ (1,174.4) | $ (934.2) |
| Creditor Group 2 | $ 774.0 | $ 1,184.0 | $ 272.0 | $ 300.0 | $ (912.0) | $ (474.0) |
| **Examiner Valuations** | **$ 328.5** | **$ 426.9** | **$ 128.8** | **$ 128.8** | **$ (298.1)** | **$ (199.7)** |

Notes:
(a) Equity value is net of LINQ/Octavius debt assumed by CERP.
(b) For comparability, excludes value assigned by Creditor Group 1 to Caesars Palace value degradation of $129.5 million to $259.0 million.

---

[240]  The values offered by other parties, including creditor groups, were (i) preliminary in nature, (ii) based on incomplete information, (iii) not intended to reflect an opinion, (iv) provided on the express understanding that the views expressed were not binding or admissible as evidence in any litigation, and (v) provided on a "not for attribution" basis to the Examiner.

## VII.    THE GROWTH TRANSACTION

In October of 2013, as part of the Growth Transaction, CEOC and its affiliates sold to CGP (i) Planet Hollywood, (ii) its equity interest in Horseshoe Baltimore (which was under development at the time of the transaction), and (iii) a 50% stake in the management fee stream associated with each property (collectively, the "Growth Assets").  The transaction price for the equity in these assets, including excess cash and net of debt assumed, was $360 million.  The transaction closed on October 21, 2013.  Valuation Table 32 provides a summary of the assets sold.

**Valuation Table 32:  Growth Transaction – Summary of Assets**

| Metric | Planet Hollywood | Horseshoe Baltimore |
|---|---|---|
| Location | Las Vegas Strip | Baltimore, MD |
| Casino Space (sq. ft.) | 64,500 | 122,000 |
| Slot Machines | 1,100 | 2,500 |
| Table Games | 90 | 150 |
| Hotel Rooms | 2,500 | - |

Source:  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31.

In conjunction with the Growth Transaction, the Valuation Committee of the CEC Board of Directors retained Evercore Group L.L.C. ("Evercore") to value the Growth Assets[241] and to opine as to whether the value of the consideration to be received by CEOC was reasonably equivalent to the value of the assets transferred.[242]  Evercore was also ultimately involved in negotiating the purchase price with the Sponsors.[243]  Evercore's opinion provided an overall value range for the equity in the Growth Assets of $268 million to $420 million and stated that CEOC received reasonably equivalent value and that the total consideration was fair from a financial point of view to CEOC.[244]  However, in reaching these conclusions, Evercore was not provided with latest projections prepared by Caesars in the ordinary course of business, excluded the impact of Planet Hollywood's Project Songbird theater renovation and contract with Britney

---

[241]  Evercore  Engagement  Letter  (Jan.  21,  2013),  at  CEOC_INVESTIG_00128462-69 [CEOC_INVESTIG_00128462].

[242]  Evercore  "Hermes  Valuation  Discussion  Materials"  Presentation  within  CEC  Board  of Directors    Meeting    Minutes    (Oct.    21,    2013),    at    CEOC_INVESTIG_00249939 [CEOC_INVESTIG_00249739].  Evercore's analysis and opinion also included the transfer of CIE to CGP; however, that portion of the analysis is not relevant to the valuation as CIE did not originate at CEOC.

[243]  N. Bryson Sept. 28, 2015 Tr. at 13:17-20.

[244]  Evercore  Opinion  Letter  (Oct.  21,  2013),  at  CEOC_INVESTIG_00171765 [CEOC_INVESTIG_00171760].

Spears, and ignored relevant market multiples that both the company and analysts have employed when valuing Las Vegas assets.

The following sections describe the analysis performed to derive an estimate of the fair market value of the Growth Assets sold to CGP in October 2013.  An analysis was performed of the historical performance of Planet Hollywood and capital expenditures for each property, and the projections available contemporaneously were compared to those provided to Evercore.  Using this analysis and information, generally accepted valuation approaches and methods were used to derive value estimates, and these values were reviewed against certain other value indicators and information.

In conjunction with deriving the fair market value of the Growth Assets, the opinion and valuations prepared by Evercore were analyzed, and related interview commentary was considered.  Also reviewed were the submissions provided by the various parties with respect to the value of the assets as well as critiques offered regarding Evercore's valuation.

Based on this analysis, it is reasonably estimated that the fair market value of the equity in the Growth Assets ranged from $797 million to $953 million at the time of the Growth Transaction, including excess cash and net of debt assumed.

## A.  Historical Financial Results and Capital Expenditures

### 1.  Planet Hollywood

CEOC acquired Planet Hollywood on February 18, 2010, for $654 million when Planet Hollywood was distressed and was failing to make payments on its debt.[245]   The acquisition of Planet Hollywood provided Caesars with seven contiguous resorts on the east side of the Las Vegas Strip.[246]  CEOC assumed Planet Hollywood's $554 million in debt, resulting in acquired equity of $100 million.  At the time, Planet Hollywood's LTM EBITDA was $35 million, resulting in a purchase multiple of LTM EBITDA of 18.7x.[247]

As referenced in Caesars' presentation to Planet Hollywood lender KeyCorp in December 2012, "Caesars has driven significant outperformance of the property," increasing revenue 27% and EBITDA 186% since the acquisition.  Caesars further noted that the property had generated significant free cash flow and reduced leverage under Caesars' management.[248]  Caesars referred to the Planet Hollywood projections as "conservative internal estimates," with a projected EBITDA CAGR of 6% compared to significantly higher historical growth since

---

[245] Planet Hollywood Situation Overview (Nov. 30, 2012), at EVERCORE_0000905 [EVERCORE_0000905] (native file).  *See also*, https://www.cpexecutive.com/post/harrahs-steps-in-as-new-owner-of-planet-hollywood-las-vegas/

[246] CEC 10-K for the year ended Dec. 31, 2010 (Mar. 4, 2011), at 6.

[247] Planet Hollywood Situation Overview (Nov. 30, 2012) [EVERCORE_0000905] (native file).

[248] Planet Hollywood Update Materials for KeyCorp (Dec. 2012) [CEOC_INVESTIG_00116613] (native file) at 2.

acquisition of the property.[249]  Importantly, the projections referred to as "conservative" in Caesars' lender presentation are nearly identical to the projected revenue and EBITDA relied upon by Evercore in its valuation.[250]

Valuation Table 33 demonstrates the improvement in Planet Hollywood's financial performance and EBITDA margin since CEOC's acquisition of the property in 2010, along with the compound annual growth.

**Valuation Table 33:  Planet Hollywood Financial Performance**

| amounts in millions | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|
| Net Revenue | $ 231 | $ 260 | $ 307 | $ 303 | $ 339 |
| EBITDA | $ 28 | $ 60 | $ 92 | $ 85 | $ 108 |
| EBITDA Margin | 12% | 23% | 30% | 28% | 32% |
| Revenue CAGR Since 2009 | | 13% | 15% | 9% | 10% |
| EBITDA CAGR Since 2009 | | 114% | 81% | 45% | 40% |
| Revenue CAGR Since 2010 | | | 18% | 8% | 9% |
| EBITDA CAGR Since 2010 | | | 53% | 19% | 22% |

Sources: Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAMINER_0145430] (native file); Planet Hollywood Update Materials for KeyCorp (Dec. 2012), CEOC_INVESTIG_00116613 (native file) at 3.
Note:  2009 represents performance pre-acquisition by Caesars and is presented for comparison purposes only.  Further, 2010 includes two months of pre-Caesars results prior to the acquisition.

In terms of capital expenditures, CEOC increased the amount invested in Planet Hollywood each year from the acquisition through the time of the Growth Transaction in late 2013.  The total projected capital expenditures per management's projections, Evercore's fairness opinion, and the LRP are consistent in total, with the timing differing due to the need to accelerate funding for the theater renovations related to Project Songbird (which is factored into Evercore's projected capital expenditures presented in Valuation Table 34).

---

[249]  *Id*. at 4.

[250]  Also important to note is the explanation provided by Caesars to the Planet Hollywood lenders.  Caesars notes that it is requesting consent for the Growth Transaction because CEOC is highly levered and cash flow negative, indicating "the proposed transfer cleans-up Caesars' corporate structure and moves Planet Hollywood from a highly-levered subsidiary (CEOC) to an unlevered holding company."  Planet Hollywood Update Materials for KeyCorp (Dec. 2012) [CEOC_INVESTIG_00116613] (native file) at 5.

**Valuation Table 34:  Planet Hollywood Capital Expenditures**

| *amounts in millions* | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| Historical (a) | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ | |
| Projected - Mgmt (b) | | | | $ | $ ▮ | $ ▮ | $ ▮ |
| Projected - Evercore (c) | | | | $ | $ | $ | $ ▮ |
| Projected - LRP (d) | | | | $ ▮ | $ ▮ | $ ▮ | $ ▮ |

Sources:
(a) Historical capital expenditures per CAC (undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b) Management projections per "Caesars Valuation Materials" (Jan. 3, 2013 – document mislabeled as 2012), at CEOC_INVESTIG_00285580 [CEOC_INVESTIG_00285549].
(c) Evercore "Project Hermes Valuation Discussion Materials" Presentation (Oct. 21, 2013), at CEOC_INVESTIG_00249973 [CEOC_INVESTIG_00249739].
(d) Impairment Review (Sept. 30, 2013), at Tab "5.17 – PHV GW" [CEOC_INVESTIG_00513908] (native file).

Given the amounts above and the financial performance of this property, there is nothing to suggest or indicate that, absent the Growth Transaction, CEOC would have been unable to fund ongoing capital expenditures for Planet Hollywood.

## 2.  Horseshoe Baltimore

In July 2012, a consortium led by Caesars was awarded a gaming license to operate a casino in downtown Baltimore, Maryland.  In October 2012, Caesars entered into definitive agreements with other investors to form a venture that would build and own the Horseshoe Baltimore casino, subject to regulatory approvals and receipt of project financing.[251]  The project was funded with approximately $333 million in debt financing and $107.5 million of equity.[252]  Financing was completed on July 2, 2013, and construction began upon close of the financing.[253]  As of October 17, 2013, $55.7 million of equity had been funded by CEOC, and CGP assumed the remaining uncalled capital contributions up to $22.3 million.[254]  The casino was expected to open in Q3 2014,[255] and ultimately opened in August 2014.[256]

---

[251]  CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 73.

[252]  Horseshoe Baltimore Financing Model (Aug. 15, 2013), at Tab "S&U and PF Cap Public" [PRIV_INVESTIG_00021175] (native file).

[253]  Evercore "Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249983 [CEOC_INVESTIG_00249739].

[254]  CAC Prospectus (Oct. 21, 2013), at CS-CZR-EXM-00260457 [CS-CZR-EXM-00260448].

[255]  Evercore "Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249983 [CEOC_INVESTIG_00249739].

[256]  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 3.

Because it was a new property, maintenance capital expenditures were projected to be minimal beginning in 2016, as presented in Valuation Table 35.

**Valuation Table 35:  Horseshoe Baltimore Capital Expenditures**

| amounts in millions | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|
| Historical (a) | $ ▮ | $ ▮ | $ ▮ | $ ▮ | | | |
| Projected - Sponsors (b) | | | | $ | $ | $ ▮ | $ ▮ |
| Projected - Evercore (c) | | $ ▮ | $ ▮ | $ ▮ | $ | $ | $ |

Sources:
(a) Historical capital expenditures per CAC (undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b) Sponsor projections per "Caesars Valuation Materials" (Jan. 3, 2013 – doc mislabeled as 2012), at CEOC_INVESTIG_00285589 [CEOC_INVESTIG_00285549].
(c) Evercore "Project Hermes Valuation Discussion Materials" Presentation (Oct. 21, 2013), at CEOC_INVESTIG_00249984 [CEOC_INVESTIG_00249739].

## B.  Evercore Fairness Opinion

### 1.  Opinion Overview

Evercore issued a preliminary analysis of the Growth Transaction on April 21, 2013.[257] The values calculated for Planet Hollywood were substantially similar to the final values presented in Evercore's later issued final report in October, with the primary difference being the amount of excess cash.[258]  For Horseshoe Baltimore, the equity values were similar to the final values, with decreased projections offset by the addition of excess cash in October.

On October 21, 2013, Evercore issued its final Project Hermes Valuation Discussion Materials report in which it valued the Growth Assets as summarized in Valuation Table 36.[259]

---

[257] Evercore "Project Hermes Valuation Discussion Materials" Presentation (Apr. 21, 2013), at CEOC_INVESTIG_00514753-926 [CEOC_INVESTIG_00514717].

[258] The amount of excess cash decreased from $110 million to $88 million in the final valuation. *See* Evercore "Project Hermes Valuation Discussion Materials" Presentation (Apr. 21, 2013), at CEOC_INVESTIG_00514828 [CEOC_INVESTIG_00514717]; Evercore "Project Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249974 [CEOC_INVESTIG_00249739].  As discussed later in this Appendix, it appears the decrease in excess cash related to funding of the Project Songbird renovations while Planet Hollywood was still a CEOC property.

[259] Evercore "Project Hermes Valuation Discussion Materials" within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249974, CEOC_INVESTIG_00249985 and CEOC_INVESTIG_00249996 [CEOC_INVESTIG_00249739].

**Appendix 7, Solvency**

**Valuation Table 36:  Evercore Valuation Summary**

| *amounts in millions* | Planet Hollywood | | Horseshoe Baltimore | | Total | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| Selected Enterprise Value (a) | $ 625 | $ 725 | $ 50 | $ 125 | $ 675 | $ 850 |
| Less: Debt | $ (513) | $ (513) | $ - | $ - | $ (513) | $ (513) |
| Add: Excess Cash | $ 88 | $ 88 | $ 66 | $ 66 | $ 154 | $ 154 |
| Less: PV of I/O Strip | $ (8) | $ (8) | $ - | $ - | $ (8) | $ (8) |
| Total Equity Value | $ 192 | $ 292 | $ 116 | $ 191 | $ 308 | $ 483 |
| Caesars % Ownership | 100% | 100% | 40.9% | 40.9% | | |
| Caesars' Equity Value | $ 192 | $ 292 | $ 48 | $ 78 | $ 240 | $ 370 |
| 50% of Management Fees | | | $ 20 | $ 28 | $ 20 | $ 28 |
| Add: PV of Tax Savings | $ 7 | $ 20 | $ 1 | $ 2 | $ 8 | $ 22 |
| **Adjusted Equity Value** | **$ 199** | **$ 312** | **$ 69** | **$ 108** | **$ 268** | **$ 420** |

Source:  Evercore "Project Hermes Valuation Discussion Materials Presentation" within CEC Board of Directors
Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249974, 985 and 996 [CEOC_INVESTIG_00249739].
Note:
(a) Planet Hollywood enterprise value includes 50% of management fee stream.  Horseshoe Baltimore is presented
separately and shown as an addition to equity value.

The total equity value range for the Growth Assets calculated by Evercore ranged from
$268 million to $420 million.  The consideration received by CEOC was $360 million.

## 2. Valuation Methodology

### a. Methodologies

Evercore calculated the enterprise value of Planet Hollywood and Horseshoe Baltimore using three valuation methods: (i) DCF Method; (ii) GPC Method; and (iii) Precedent Transactions Method. Valuation Table 37 presents a summary of the enterprise value ranges calculated by Evercore under each methodology.

**Valuation Table 37:  Evercore Enterprise Value Ranges by Asset**

| amounts in thousands | Selected Value Range | DCF | Trading Peers | Precedent Transactions |
|---|---|---|---|---|
| Planet Hollywood - low | $    625,000 | $    717,000 | $    546,000 | $    500,000 |
| Planet Hollywood - high | $    725,000 | $    935,000 | $    813,000 | $    654,000 |
| Horseshoe Baltimore - low | $    50,000 | $    (15,000) | $    39,000 | $    3,000 |
| Horseshoe Baltimore - high | $    125,000 | $    138,000 | $    198,000 | $    161,000 |

Source: Evercore "Project Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249974-975, 985-986 [CEOC_INVESTIG_00249739].

According to Nancy Bryson, Managing Director at Evercore, Evercore placed more emphasis on the public company trading analysis and the DCF analysis for Planet Hollywood, giving less weight to precedent transactions due to a limited number of comparable transactions available.[260]  However, the enterprise values calculated by Evercore using the DCF method are materially higher than the selected value range.  That is, Evercore's DCF value for Planet Hollywood ranged from $717 million to $935 million, almost entirely above the selected value range for the property.  In fact, the mid-point and high values in Evercore's DCF of $826 million and $935 million, respectively, are more than $100 million and $210 million higher than the high end of its selected value range of $725 million.

Conversely, Evercore's trading peers and precedent transaction analyses provided significantly lower values than the DCF.  However, both market methods are highly sensitive to the selection of the guideline companies and their relative multiples.

In selecting a valuation methodology for Horseshoe Baltimore, Evercore looked at the trading peers, precedent transactions, and a DCF analysis.  As in the case of Planet Hollywood, Evercore gave more weight to the trading peers and the DCF as there was shortage of suitable precedent transactions to review.[261]  In its DCF analysis for Horseshoe Baltimore, Evercore mistakenly included construction costs in its capital expenditures when it is more appropriate to exclude these costs from the DCF but then deduct the corresponding debt from the enterprise value to arrive at equity value.

---

[260]  N. Bryson Sept. 28, 2015 Tr. at 150:22-151:13.

[261]  Id. at 180:25-181:16.

Finally, as shown in Valuation Table 36, Evercore included a total of $8 million to $22 million of additional value in the Growth Assets related to the present value of tax savings that Evercore assumed would inure to the benefit of CEOC.  However, for valuation purposes, this value should not be included as the economic tax benefit relates to certain sections of the Internal Revenue Code dealing with purchase price allocation rather than fair market value.  Importantly, the market multiples and WACC are based upon guideline public company data which do not reflect any such tax benefits.  Therefore, the tax savings as calculated by Evercore should not be included when determining the value of the Growth Assets in comparison to the transaction price of $360 million.

### b.  Multiples

For its public company trading analysis of Planet Hollywood, Evercore presented the data for seven GPCs, including three Las Vegas operators and four regional operators.  However, only three regional operators (Boyd, Pinnacle and Isle of Capri) were ultimately utilized because: (i) Evercore considered the Las Vegas multiples to be inflated due to the operators' exposure to Macau; and (ii) Penn National was going through a REIT conversion which Evercore felt would give an unwarranted multiple uplift to Planet Hollywood.[262]  The companies considered by Evercore, and the corresponding EBITDA multiples, are presented in Valuation Table 38.

### Valuation Table 38:  Evercore Comparables

| Company | Used by Evercore | 2013 EBITDA Multiple | 2014 EBITDA Multiple |
|---|---|---|---|
| **Las Vegas Operators:** | | | |
| Las Vegas Sands | NO | 14.3 | 12.8 |
| Wynn Resorts | NO | 12.7 | 12.1 |
| MGM Resorts | NO | 12 | 11.1 |
| **Regional Operators:** | | | |
| Penn National Gaming | NO | 10.1 | 9.7 |
| Boyd Gaming | YES | 9.7 | 9.3 |
| Pinnacle Entertainment | YES | 6.3 | 6.1 |
| Isle of Capri Casinos | YES | 7.3 | 6.9 |
| *Average - All* | | *10.3x* | *9.7x* |
| *Average - Regional Only* | | *8.4x* | *8.0x* |
| *Average - Regional (excl. Penn)* | | *7.8x* | *7.4x* |
| Selected Multiple Range - Planet Hollywood | | 7.0x - 9.0x | 6.5x - 8.5x |

Source: Evercore "Project Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249976 [CEOC_INVESTIG_00249739].

---

[262] *Id.* at 138:21-139:11, 142:10-14.

While Bryson indicated that Evercore focused on "the remaining three regional guys who, while being called regional also had some Las Vegas exposure as well,"[263] her belief about Las Vegas exposure was incorrect. Specifically: (i) Boyd Gaming does have Las Vegas exposure, but not on the Strip; (ii) Pinnacle Entertainment's only Nevada properties are in Jackpot, Nevada, 450 miles from Las Vegas and drawing from primarily Idaho residents;[264] and (iii) Isle of Capri has no properties in Las Vegas or Nevada.

Evercore did not perform any detailed analysis of the guideline companies for Planet Hollywood,[265] instead focusing more on the earnings and outlook for earnings than the customer profiles in selecting the guideline companies.[266] However, the three regional operators had significantly lower growth prospects than Planet Hollywood, with 2014 expected EBITDA growth ranging from 4.3% to 5.6%, compared to 14.4% for Planet Hollywood.[267] In fact, Planet Hollywood's projected growth exceeded the Las Vegas operators as well. Despite the clear distinction between the three regional operators compared to Planet Hollywood in terms of geography, growth and other factors, Evercore relied upon the mean and median of three regional companies in determining the multiples to apply under the guideline company trading analysis.[268]

Evercore applied its selected multiples to three periods: (i) latest-twelve-months (LTM) EBITDA as of June 30, 2013; (ii) 2013 estimated EBITDA; and (iii) 2014 estimated EBITDA.[269] Evercore applied equal weight to all three periods. However, the periods selected, in particular the LTM EBITDA and 2013 estimated EBITDA, did not capture the significant growth expected at Planet Hollywood. Because Planet Hollywood's growth had not yet stabilized, forward multiples more appropriately capture the value embedded in the property's growth expectations. In addition, Evercore had an error in its EBITDA metric for LTM as of June 30, 2013. Evercore indicated the LTM EBITDA, adjusted to include 50% of the management fee on a pro forma basis, was $77 million.[270] However, the actual LTM EBITDA, including the pro forma

---

[263] *Id.* at 139:12-15.

[264] Reuters.com, Pinnacle Entertainment Inc. (PNK.O) Company Profile Reuters.com (2016), http://www.reuters.com/finance/stocks/companyProfile?rpc=66&symbol=PNK.O.

[265] N. Bryson Sept. 28, 2015 Tr. at 145:5-13.

[266] *Id.* at 145:23-146:8.

[267] The projections used by Evercore for Planet Hollywood reflect continued expected growth in EBITDA of more than 13% annually. Evercore "Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249973 and 76 [CEOC_INVESTIG_00249739].

[268] N. Bryson Sept. 28, 2015 Tr. at 142:10-143:3. While Bryson indicates reliance upon the mean and median, the multiples selected by Evercore appear to actually be bracketed around the median of the three regional operators.

[269] Evercore valued the 50% management fee stream with the property; therefore, the multiples were applied to EBITDA plus 50% of the calculated management fee.

[270] To arrive at LTM EBITDA, Evercore utilized 50% of the historical 2012 EBITDA and 50% of the projected 2013 EBITDA, rather than simply using the latest twelve months of historical

management fee, was $88 million, resulting in an understatement of the calculated value for the LTM period of $83 million to $105 million.[271]

Evercore employed a similar approach for precedent transactions, examining a five year history of primarily regional, non-distressed casino sales. It did not consider the use of transactions that closed in 2007 as it would have been, according to Bryson, "classified as a boom time. That was not really comparable to the current environment."[272] However, Evercore did utilize a number of transactions which occurred during the Recession in 2008 and 2009, but did not make any adjustments to account for the recessionary period.[273] More importantly, Evercore also utilized the incorrect LTM EBITDA in its analysis, resulting in an understatement of the value using precedent transactions of $72 million to $94 million as a result of this error.[274]

For Horseshoe Baltimore, Evercore again utilized the three regional operators, selecting forward-looking multiples of 6.5x to 8.5x applied to both 2017 and 2019 projected EBITDA and discounted the result to present value at a cost of equity ranging from 20% to 30%. Evercore performed its equity valuation using both 2017 and 2019 EBITDA. While there may be certain circumstances where Evercore's approach makes sense, such as when a company is in distress and does not expect to turnaround until five years into the future,[275] that was not the case with the projections for Horseshoe Baltimore. The property was expected to be profitable by 2015 and forecasted growth was inflationary by 2017. Additionally, forward-looking multiples are intended to capture stable growth at a future point in time and are therefore already typically lower than current trading multiples. As such, it is not typically necessary to discount the resulting value after applying a forward multiple.

### c. Discount Rate

Evercore utilized the unlevered beta for Las Vegas properties to calculate the WACC for Planet Hollywood and Horseshoe Baltimore, even though the multiples they selected were only from regional properties.[276] The median beta for Las Vegas properties was 0.94, and for regional properties was 0.52. The impact of utilizing a higher unlevered beta is an increase to the discount rate and corresponding reduction to the value. While Bryson indicated this choice was

---

EBITDA which would have been available at that time. Evercore's approach is not an acceptable means to derive LTM EBITDA as it is a historical figure that does not require estimation.

[271] Calculated by multiplying Evercore's multiple range of 7.5x – 9.5x to the $11 million difference in LTM EBITDA.

[272] N. Bryson Sept 28, 2015 Tr. at 166:25-167:7.

[273] *Id.* at 148:11-150:2.

[274] Calculated by multiplying Evercore's multiple range of 6.5x – 8.5x to the $11 million difference in LTM EBITDA.

[275] Aswath Damodaran, The Cost of Distress: Survival, Truncation Risk and Valuation (2006), at 35-36.

[276] Beta represents the systematic risk of a security in relation to the market as a whole.

due to the leveraged capital structure of the regional operators,[277] her explanation falls short since the unlevered beta has, by definition, already removed the impact of the operators' capital structure. Additionally, it is unclear why a highly leveraged entity would not be comparable to Caesars which was also highly leveraged.

In addition, Evercore applied a development risk premium of 7% to 13% based upon their consideration of Baltimore as a startup project.[278] However, the application of this size of development risk premium is not warranted due to (i) Caesars' long history of developing casino and other projects, (ii) Horseshoe Baltimore was to be managed by Caesars and plugged into the Total Rewards network, and (iii) Caesars had already acquired the gaming license, secured financing, and started construction before the Growth Transaction closed. In fact, Evercore did not lower the development risk premium from the time it prepared a draft valuation in January 2013 to the final valuation in October 2013, despite Caesars' acquiring financing and beginning construction during that ten-month period. Marty Cicco, Senior Managing Director at Evercore, did not recall knowledge of any delay in construction or being over budget in the development of Horseshoe Baltimore, and he acknowledged that the project had entitlements, zoning, and financing in place.[279] In addition, Horseshoe Baltimore had $66 million of excess cash at the time of the closing which would have diminished the risk of cost overruns or a slow start-up after opening.

### 3. Projections

#### a. Planet Hollywood Projections

In January 2013, Alex van Hoek of Apollo provided Evercore with a presentation entitled "Caesars Valuation Materials" which contained the projections ultimately relied upon by Evercore.[280] The projections contained therein for Planet Hollywood were nearly identical to the Q4 2012 LRP, as shown in Valuation Table 39.

---

[277] N. Bryson Sept 28, 2015 Tr. at 177:9-178:15.

[278] *Id.* at 181:21-25-182:13-24.

[279] M. Cicco Feb. 5, 2016 Tr. at 27:25-28, 28:19-24, 31:13-24

[280] E-mail from A. van Hoek to N. Bryson (Jan. 3, 2013), at EVERCORE_0049514-15 [EVERCORE_0049514], attaching Caesars Valuation Materials (file name indicates the year to be 2013) (Jan. 3, 2012), at EVERCORE_0049516-70 [EVERCORE_0049516].

**Valuation Table 39:  Planet Hollywood Initial Projections**

| amounts in millions | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|
| **Valuation Materials (a):** | | | | | |
| Revenue | $   304 | $   317 | $   331 | $   348 | $   365 |
| EBITDAM | $     86 | $     94 | $   105 | $   118 | $   131 |
| | | | | | |
| **Q4 2012 LRP (b):** | | | | | |
| Revenue | $   303 | $   317 | $   333 | $   349 | $   367 |
| EBITDAM | $     85 | $     94 | $   106 | $   119 | $   132 |

Sources:
(a) "Caesars Valuation Materials" (Jan. 3, 2013 – document mislabeled as 2012), at CEOC_INVESTIG_00285580 [CEOC_INVESTIG_00285549;].
(b) Impairment Review (Dec. 31, 2012), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508330] (native file).

Evercore made two adjustments to the projections in between January 2013 and October 2013, both of which are discussed in greater detail later in this section:

- In April 2013, Evercore lowered the expected EBITDA projection for 2013 by approximately 6%; and

- In July 2013, Evercore reallocated the projected capital expenditures due to Project Songbird, but did not make any corresponding adjustment to revenue or EBITDA.

Aside from the two adjustments noted above, Evercore utilized projections which were more than nine months outdated at the time the Growth Transaction closed.  The more appropriate projections to utilize would have been the Q3 2013 LRP as it represented the latest set of projections available prior to the transfer date.  However, as discussed later in this section, Evercore was not provided with these projections despite requesting updated projections numerous times.

**b.  Lowering of Expected 2013 EBITDA**

In April 2013, Evercore lowered the expected EBITDA projection for 2013 from $94 million to $88 million based on instructions from management.[281]  Bryson indicated that the adjustment was because "the year was getting off to a slow start but they were still confident in the longer term projections."[282]  Bryson also indicated her belief that the year continued its slow pace and that she believed "it came in closer to the modified numbers than the original numbers."[283]

---

[281] N. Bryson Sept. 28, 2015 Tr. at 106:13-108:24.

[282] *Id.* at 89:5-13.

[283] *Id.* at 89:15-20.

**Appendix 7, Solvency**

In reality, Planet Hollywood significantly outperformed its 2013 projected EBITDA, both year-to-date as of April 2013 and by the time the Growth Transaction closed in October 2013. The detail by month is presented in Valuation Chart 1. After the end of the first quarter of 2013, Planet Hollywood was exceeding its projected EBITDA by 9%, and by the end of the third quarter by 15%.

**Valuation Chart 1:  Planet Hollywood 2013 Budget to Actual Performance**



Sources:   Consolidated Planning Model (Dec. 2012) at Tab "INPUTS" [APOLLO-EXAMINER_00601970] (native file) and Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAMINER_0145430] (native file).

Based on the year-to-date performance of Planet Hollywood both at the time the projections were lowered in April 2013 and when the transaction closed, the reduction in 2013 projected EBITDA was not warranted.

### c.  Outdated Projections

Evercore sent numerous diligence request lists to Caesars throughout 2013 prior to issuing its final report in October, including April, July and early October.  In each diligence request, Evercore inquired as to whether or not updated long-term projections were available.[284]  According to Bryson, Evercore was told that there were not any updated projections.[285]

However, in reality Caesars continued to modify its long-term projections throughout 2013, with material increases to the projected EBITDA.  Brimmer confirmed that the updated quarterly LRPs represent the company's current view of the projections, and indicated he could not think of any reason why the updated projections would not have been provided to Evercore,[286] while Hession indicated he did not "have any reason to think we didn't [provide updated projections]."[287]

The increases in projected EBITDA in the quarterly LRPs throughout 2013 are presented in Valuation Chart 2.

---

[284]  Evercore Diligence Request List (Apr. 11, 2013), at CEOC_INVESTIG_00105999 [CEOC_INVESTIG_00105999]; Evercore Diligence Request List (July 15, 2013), at EVERCORE_0063625 [EVERCORE_0063625]; and Evercore Diligence Request List (Oct. 6, 2015), at EVERCORE_0054811 [EVERCORE_0054809].

[285]  N. Bryson Sept. 28, 2015 Tr. at 115:23-116:2.

[286]  R. Brimmer Jan. 20, 2016 Tr. at 387:19-22; 382:20-24.

[287]  E. Hession Jan. 20, 2016 Tr. at 612:6-11.

**Valuation Chart 2:  Planet Hollywood Long-Range Plans**



Sources:[288]

Based upon the material changes to the LRP during 2013, Evercore should have been provided with, and should have utilized, the most current LRP available as of the time of the transaction rather than continuing to use projections that were more than nine months old.[289]

In addition, Caesars' LRP projections consistently extended over a five-year projection period beyond the current year.  Because the projections relied upon by Evercore were created during 2012, the last projected year was 2016 (although it is unclear why Evercore was not provided with the projection for 2017 as that year was included in the Q4 2012 LRP).  Therefore, by the time of the transaction, Evercore's projection period only covered 3.2 years, while the projections created during 2013 projected EBITDA through 2018.  The additional two projection

---

[288] Impairment Review (Q4 2012), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508329] (native file); Impairment Review (Q1 2013), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508686] (native file); Impairment Review (Q2 2013), at Tab "INPUTS-LRP" [CEOC_INVESTIG_00508687] (native file); Impairment Review (Q3 2013), at Tab "3.2 – INPUTS-LRP" [CEOC_INVESTIG_00513908] (native file); Evercore "Project Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249973 [CEOC_INVESTIG_00249739].

[289] At a minimum, Evercore should have been provided with the Q2 2013 LRP. However, it is likely that the Q3 2013 LRP would have been available in October 2013 as Brimmer indicated that the LRP was typically provided to the accounting group in the last month of the quarter. *See* R. Brimmer Sept. 29, 2015 Tr. at 55:25-56:21.

years have a material impact on the resulting value for the property, particularly since Planet Hollywood was a high-growth entity and the final year impacts the terminal period. The Q3 2013 LRP EBITDA projection for 2018 was $165 million,[290] 26% higher than the $131 million used by Evercore for 2016.[291]

### 4. Horseshoe Baltimore Ownership Interest

Evercore calculated its valuation of CEOC's interest in Horseshoe Baltimore using an ownership interest of 40.9%, rather than the actual 52% ownership interest CEOC held at the time of the transaction. According to Evercore's "Overview of Acquired Assets," this ownership interest was based upon the anticipated interest in the joint venture after a buy-back by other equity owners which had not yet occurred. Evercore notes, "$10mm buy-back expected in Q4 2013 by partners will adjust ownership level to anticipated 40.9% (these funds are to be 100% refunded to Cronus upon receipt)."[292]

While Evercore's analysis assumed CEOC would be reimbursed for the anticipated buy-back, it does not appear that occurred. Regarding the interest in Horseshoe Baltimore, CEC's 10-Ks stated the following:

- At December 31, 2012, Caesars had an approximately 52% indirect ownership interest in the venture, which was consolidated as a variable interest entity into our financial statements.[293]

- As of December 31, 2013, CGP LLC had an approximately 52% indirect ownership interest in the venture.[294]

- In February 2014, CGP LLC's joint venture, CR Baltimore Holdings ("CRBH"), sold a portion of its interest in CBAC Gaming, LLC, the entity which owns a majority of the interests in the Horseshoe Baltimore joint venture to Caves Valley Partners, an existing joint venture partner. CGP LLC received $13 million of the proceeds from the sale. The sale reduced CRBH's ownership from 51.8% to 41.4%.[295]

Based on CEC's public filings, it is evident that Caesars' interest in Horseshoe Baltimore was 52% both before and after the Growth Transaction. Further, the 2014 10-K indicates that the

---

[290] Impairment Review (Sept. 30, 2013), at Tab "3.2 – INPUTS-LRP" [CEOC_INVESTIG_00513908] (native file).

[291] Evercore "Project Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249973 [CEOC_INVESTIG_00249739].

[292] *Id.* at CEOC_INVESTIG_00249901.

[293] CEC 10-K for the year ended Dec. 31, 2012 (Mar. 15, 2013), at 67.

[294] *Id.* at 73.

[295] *Id.* at 97.

proceeds from the buy-back were paid to CGP, not CEOC.  As such, it is appropriate to utilize 52% as the ownership interest in Horseshoe Baltimore for the purpose of valuing the equity as of the transaction date.

Counsel for CGP has informed the Examiner that CGP wired the proceeds of the buyback (approximately $12.76 million) to CEC on May 14, 2015.  However, counsel for CEC has informed the Examiner that CEOC has not received the proceeds from CEC.

### 5.  Project Songbird

#### a.  Overview of Project Songbird

Planet Hollywood owned a large theater space known as "PH Live at Planet Hollywood" ("PH Live") which operated under a lease agreement with a third party, Base Entertainment.  In July 2013, Planet Hollywood decided to terminate this deal and take possession of this theater to refurbish it.  Additionally, Caesars entered into a performance agreement with Britney Spears for a period of two years and 96 shows.[296]  This deal and the subsequent efforts to revamp PH Live are referred to as "Project Songbird."  The project required an initial investment of $27 million to terminate the existing PH Live lease contract with Base Entertainment, to acquire control over the beverage operation in a smaller theater, and for the new renovations.[297]  Planet Hollywood would also provide $7.5 million in pre-production capital for the build out of the show[298] and pay upfront artist fees of $4.8 million.[299]

According to Jason Gastwirth, the contract with Britney Spears was executed and construction was funded in mid-July 2013, and demolition of the theater began in late July 2013.[300]  At that point in time, according to Gastwirth, "the project is a full go."[301]  Tickets for Britney Spears' shows went on sale in late September 2013, with her first shows scheduled for late December 2013.[302]  Importantly, all of these activities occurred prior to the closing of the Growth Transaction.

---

[296]  E-mail from T. Evans to J. Garrison, *et al.* (Nov. 8, 2013), at CEOC_INVESTIG_00022956 [CEOC_INVESTIG_00022955].

[297]  E-mails between R. Brimmer, E. Chavez, P. Kang, J. Gastwirth, and E. Hession (Mar. 25, 28 and July 8, 2013), at CEOC_INVESTIG_00011436 [CEOC_INVESTIG_00011435]; e-mails between E. Hession, C. Crumbley, J. Beato, and N. Romatzick (June 25, July 8, 2013), at CEOC_INVESTIG_00048132-33 [CEOC_INVESTIG_00048132].

[298]  E-mails between E. Hession, C. Crumbley, J. Beato, and N. Romatzick (June 25, July 8, 2013), at CEOC_INVESTIG_00048132-33 [CEOC_INVESTIG_00048132].

[299]  Letter to KeyBank from E. Hession entitled "Re: Planet Hollywood Hotel & Casino Theatre Project" (Apr. 23, 2013), at CEOC_INVESTIG_00048143 [CEOC_INVESTIG_00048141].

[300]  J. Gastwirth Jan. 14, 2016 Tr. at 36:17-20 and 38:5-15.

[301]  *Id.*

[302]  E-mail from D. Colvin to T. Dunn (Sept. 26, 2013), at TPG-Examiner_00389293 [TPG-Examiner_00389293].

### b. Impact on Evercore's Valuation

Evercore did not update the Planet Hollywood projections used in its valuation of Planet Hollywood to include incremental revenue/EBITDA for Project Songbird. Bryson indicated that she was told that the Project Songbird projected revenue and EBITDA were included in the Planet Hollywood projections, indicating:

> And I believe that even at one point we had been on the phone with them and had gotten the impression that some updates to the earnings needed to happen. And then we had another call with them where it was clear that we had kind of misunderstood what they said and that we didn't actually need to change the numbers.[303]

Cicco explained things slightly differently, indicating that when Evercore was provided with the additional detail regarding capital expenditures for Project Songbird, they asked if there were any corresponding EBITDA adjustments and were told there weren't any.[304] Any implication that the projected EBITDA for Project Songbird may have already been included in the projections used by Evercore[305] was contradicted by numerous Caesars witnesses.[306] Instead, Brimmer suggested that it was unlikely the projections would have been reforecast before the end of 2013 when the plan for 2014 was developed, and that to have done so earlier would have been a departure from the typical process.[307] Tariq Shaukat also indicated the Project Songbird projections would have been provided to the P&A team as part of the 2014 budgeting process later in the year, and it would not have been normal course to do so earlier than the fourth quarter of 2013.[308]

Most importantly, Evercore had in its possession Caesars' cash flow model which projected the incremental cash flows from Project Songbird.[309] In fact, Evercore's valuation model included a separate valuation of Project Songbird; however, this valuation was not

---

[303]  N. Bryson Sept. 28, 2015 Tr. at 123:13-124:7.

[304]  M. Cicco Feb. 5, 2016 Tr. at 50:19-51:12.

[305]  Further, the first Project Songbird economic model was not created until February 2013, after Evercore had been provided with the management case projections utilized in its valuation of Planet Hollywood. The earliest version of the Project Songbird economic model located within the document production was labeled as "v9" dated Feb. 11, 2013 [CEOC_INVESTIG_00089971] (native file). However, the Excel "Date Created" was Feb. 8, 2013 for all versions of the model, suggesting the model was initially created on that date.

[306]  *See, e.g.*, E. Hession Nov. 3, 2015 Tr. at 244:7-12. When questioned as to whether Bryson may have been told that the impact was already in the numbers presented earlier in the year, Hession indicated, "I don't recall that." *Id.*

[307]  R. Brimmer Sept. 29, 2015 Tr. at 244:10-245:9.

[308]  T. Shaukat Oct. 28, 2015 Tr. at 80:5-17, 81:7-22.

[309]  "Project Songbird Financial Analysis" version 24, (Mar. 25, 2013), [EVERCORE_0051441] (native file).

included in Evercore's final report or valuation conclusion.  Instead, it appeared in the section of Evercore's native valuation model entitled "UNUSED."[310]  Evercore's valuation model for Project Songbird reflects that:

- Evercore appears to have arrived at incremental equity value for Project Songbird ranging from $10 to $20 million.[311]  However, it is not clear how this conclusion corresponds to the supporting analysis which Cicco described as a breakeven analysis used to justify the cost of the project, as analyzed "in a vacuum."[312]

- In the supporting analysis, Evercore utilized both a trading peers methodology (GPC Method) and the DCF Method to value Project Songbird.  The value ranges for Project Songbird derived under each method were $13 million to $30 million and $20 million to $36 million, respectively.[313]

  o Under the market approach, Evercore applied forward-looking EBITDA multiples of 4.0x to 6.0x to 2015 and 2016 expected EBITDA of $10 million and $11 million, respectively, but discounted the resulting value using a 20% to 30% cost of equity.  Given that the projections show stabilized cash flows in year two (2015), it is unnecessary to discount the cash flows after applying a forward multiple.  It appears they may have just utilized the same model and approach used for Horseshoe Baltimore.

  o It is unclear as to the basis for the low 4.0x to 6.0x EBITDA multiples selected, or why the multiples and valuation approaches would be any different for Project Songbird than Planet Hollywood as a whole, given that entertainment cash flows are part of the overall integrated operations of the property.  Cicco was unable to explain the basis or rationale for either.[314]

  o In its DCF, Evercore utilized a 15% to 20% discount rate without any explanation as to how the discount rate was derived.

- Most importantly, Evercore's breakeven analysis assumed that the resulting value of $13 million to $36 million was offset by the required capital expenditures of $27 million.  This is an erroneous assumption and an improper analysis for three reasons:

---

[310] Evercore Hermes Analysis Workbook version 278 (Oct. 16, 2013), at Tabs "AEV_SB" through 'FF_SB2' [EVERCORE_0066497] (native file).

[311] *Id.* at Tab "AEV_SB" [EVERCORE_0066497] (native file).

[312] M. Cicco Feb. 5, 2016 Tr. at 46:11-48:5.

[313] Evercore Hermes Analysis Workbook version 278 (Oct. 16, 2013), at Tab "FF_SB" [EVERCORE_0066497] (native file).

[314] M. Cicco Feb. 5, 2016 Tr. at 54:9-21.

o  The Project Songbird capital expenditures were already accounted for in the DCF for Planet Hollywood as part of the modification to capital expenditures made by Evercore in July 2013.

o  The DCF for Project Songbird also accounted for capital expenditures (which is duplicative of the additional Songbird capital expenditures noted in the Planet Hollywood DCF).[315]   Comparing the expected capital expenditures to a valuation analysis which is already reduced for the same capital expenditures is improper.  Cicco agreed, indicating he didn't "know the logic of why that was done."[316]

o  It appears the capital expenditures for Project Songbird were funded while Planet Hollywood was a CEOC property.  Planet Hollywood's excess cash as of December 31, 2012, was $110 million.[317]  According to Evercore's draft January 21, 2013, Project Hermes presentation, Planet Hollywood's excess cash as of December 31, 2012, was $110 million.[318]  By the time of the Growth Transaction in October 2013, the excess cash was $88 million, a decrease of $22 million.[319]  Given that demolition and construction started in July 2013 before the Growth Transaction closed, it appears that the decrease in excess cash was likely a result of funding Project Songbird while the property was still at CEOC.  Accordingly, the capital expenditures would not serve as a reduction to cash flows or value being transferred to CGP.  Cicco, while unaware of which entity did fund the capital expenditures for the project, did confirm that it makes a difference in a valuation.[320]

In summary, Evercore's breakeven analysis of Project Songbird was materially flawed due to (i) the improper treatment and double counting of capital expenditures, (ii) lack of consideration for the fact that it appears that CEOC funded the capital expenditures rather than CGP, and (iii) other unsupported assumptions such as the applicable EBITDA multiples.

---

[315]  Evercore Hermes Analysis Workbook v278 (Oct. 16, 2013), at Tabs "FinSum_SB" and "DCF_SB" [EVERCORE_0066497] (native file).

[316]  M. Cicco Feb. 5, 2016 Tr. at 57:5-12.

[317]  "Project Hermes Discussion Materials" (Jan. 21, 2013), at EVERCORE_0039829 [EVERCORE_0039776].

[318]  "Project Hermes Discussion Materials" (Jan. 21, 2013), at EVERCORE_0039829 [EVERCORE_0039776].

[319]  Evercore "Hermes Valuation Discussion Materials" Presentation within CEC Board of Directors Meeting Minutes (Oct. 21, 2013), at CEOC_INVESTIG_00249974 [CEOC_INVESTIG_00249739].

[320]  M. Cicco Feb. 5, 2016 Tr. at 50:5-18.

### c. Project Songbird Economics

Numerous e-mail communications show that management viewed the Britney Spears deal to have better economics than other similar deals made in the ordinary course of business at Caesars for the following reasons:

- The renovated venue, PH Live theatre, would be available to other artists,[321]

- Planet Hollywood would capture the incremental food and beverage revenues,[322]

- The city wide marketing of the Britney Spears show would result in greater occupancy of the rooms at the Caesars' casinos,[323]

- Planet Hollywood would have ███████████████████████████████████████████████████████

An e-mail from Tom Evans to Hession states, "This deal is one of the most favorable residency deals in our history by every measure, whether considering number of years, number of shows, or upfront payment amount."[325]   Similarly, an e-mail from Colvin to Beato and Hession states:

> Songbird is better economics than recent similar deals we have done in the normal course at CP.  The venue will be open to other artists.  A big part of the positive ebitda is from capturing a lot of incremental F and B revenue at PH.  City wide marketing uplift in Vegas helps fill more rooms.  Positive use of Songbird to help with our city wide meet and greet VVIP program.  That is why we are ok with a CEOC LC.[326]

---

[321] E-mails between D. Colvin to J. Beato and E. Hession (July 8, 2013), at CEOC_INVESTIG_00030347 [CEOC_INVESTIG_00030347].

[322] *Id.*

[323] *Id.*

[324] E-mail from J. Gastwirth to T. Shaukat (Mar. 6, 2013), at CEC_EXAMINER_0331227 [CEC_EXAMINER_0331227].

[325] E-mail from T. Evans to E. Hession (June 24, 2013), at CEOC_INVESTIG_00122425 [CEOC_INVESTIG_00122425].

[326] E-mails between D. Colvin to J. Beato and E. Hession (July 8, 2013), at CEOC_INVESTIG_00030347 [CEOC_INVESTIG_00030347].

### d.  Sponsor Views

The Sponsors were clear that they did not want Project Songbird to impact the valuation of Planet Hollywood.  E-mails from the Sponsors to management specify that they were "highly sensitive to any changes to the CGP deal, particularly the consideration paid for PH."[327]

Another e-mail from Kranias requested assurance from management that the Britney Spears deal would not affect the valuation of Planet Hollywood, asking "Can you assure us that there is zero percent change that entering the Britney contact could result in an increase to the PH purchase price?"[328]

Ultimately, the documents demonstrate that a significant amount of incremental EBITDA was expected from Project Songbird, but the purchase price for Planet Hollywood was not increased.

### e.  Incremental EBITDA

The Project Songbird economic model was initially created in February 2013.  Evercore was provided with a version of the Project Songbird model on April 7, 2013.[329]  The latest version of the Project Songbird model that would have been available prior to the closing of the Growth Transaction was from July 2013.[330]

The Project Songbird model was robust and provided a very detailed forecast of projected cash flow from Project Songbird.  Review of the model indicates that Caesars' incremental cash flows were projected for (i) the Main Theater based upon an estimate of contribution profit per show, (ii) the Auxiliary Theater based upon food and beverage sales of $11 per paid ticket, and (iii) incremental flow through from ancillary revenue based upon an estimate of $5 per incremental attendee.[331]

A five-year summary of the projected incremental cash flow from Project Songbird is presented in Valuation Table 40.  Gastwirth indicated that the Project Songbird model did not account for the contractual 4% of revenues required to be paid to Robert Earl under the Planet

---

[327]  E-mail from G. Kranias to G. Loveman, *et al.* (July 7, 2013), at PRIV_INVESTIG_00029509 [PRIV_INVESTIG_00029509].

[328]  E-mail from G. Kranias to G. Loveman, et al. (June 5, 2013), at PRIV_INVESTIG_00023588 [PRIV_INVESTIG_00023587].

[329]  E-mail from E. Favre to N. Bryson (Apr. 7, 2013), at EVERCORE_0051416-22 [EVERCORE_0051416], attaching Project Songbird Model version 24 (Mar. 25, 2013), [EVERCORE_0051441] (native file).

[330]  E-mail from R. Brimmer to E. Hession (July 8, 2013), at CEOC_INVESTIG_00011435-37 [CEOC_INVESTIG_00011435]; Project Songbird Model version 26 (Mar. 25, 2013), [CEOC_INVESTIG_00011438] (native file).

[331]  Project Songbird Model version 26 (July 8, 2013), at Tab "Output" [CEOC_INVESTIG_00011438] (native file).

Hollywood Resort & Casino Licensing Agreement.[332]  Therefore, the projected revenues have been reduced by 3.92% accordingly.

**Valuation Table 40:  Project Songbird Projected Incremental Cash Flows**

| amounts in thousands | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|
| **Main Theater:** | | | | | |
| Gross Revenue (Unadjusted) | $ 12,309 | $ 19,916 | $ 21,408 | $ 22,051 | $ 22,714 |
| | | | | | |
| EBITDA (Unadjusted) | $ 5,002 | $ 8,093 | $ 8,700 | $ 8,961 | $ 9,231 |
| Adjustment for Robert Earl Payment (a) | (483) | (781) | (839) | (864) | (890) |
| EBITDA (Adjusted) | $ 4,520 | $ 7,313 | $ 7,861 | $ 8,096 | $ 8,340 |
| | | | | | |
| CEC Share (%) | 83.7% | 79.1% | 79.6% | 79.6% | 79.6% |
| | | | | | |
| CEC EBITDA - Main Theater (Adjusted) | $ 3,784 | $ 5,784 | $ 6,260 | $ 6,444 | $ 6,635 |
| **Auxiliary Theater:** | | | | | |
| Total F&B Revenue (Unadjusted) | $ 848 | $ 921 | $ 940 | $ 1,056 | $ 1,176 |
| | | | | | |
| EBITDA (Unadjusted) | $ 339 | $ 368 | $ 376 | $ 422 | $ 470 |
| Adjustment for Robert Earl Payment (a) | (33) | (36) | (37) | (41) | (46) |
| CEC EBITDA - Auxiliary Theater (Adjusted) | $ 306 | $ 332 | $ 339 | $ 381 | $ 424 |
| **Incremental Flowthrough - Ancillary:** | | | | | |
| Estimated Incremental Revenue (b) | $ 4,000 | $ 6,250 | $ 5,950 | $ 5,950 | $ 5,950 |
| | | | | | |
| Incremental Ancillary EBITDA (Unadjusted) | $ 1,600 | $ 2,500 | $ 2,380 | $ 2,380 | $ 2,380 |
| Adjustment for Robert Earl Payment (a) | (157) | (245) | (233) | (233) | (233) |
| Incremental Ancillary EBITDA (Adjusted) | $ 1,443 | $ 2,255 | $ 2,147 | $ 2,147 | $ 2,147 |
| **Net Incremental Cash Flows (Adjusted)** | **$ 5,533** | **$ 8,371** | **$ 8,746** | **$ 8,972** | **$ 9,206** |

Source:  Project Songbird Model version 26 (Jul. 8, 2013), at Tab "Output" [CEOC_INVESTIG_00011438] (native file).

While the above only summarizes the cash flows for five years, the Project Songbird model extended until 2046.  The incremental cash flows for Project Songbird are material to the value conclusion at more than $8 million of annual incremental cash flows and should have been accounted for in the valuation of Planet Hollywood.

**f.   Actual Results as of Transaction Date**

E-mail communications from management in late September, just weeks before the close of the Growth Transaction, reflected that ticket sales for the Britney Spears show were tracking

---

[332]  *See* J. Gastwirth  Jan. 14, 2016 Tr. at 73:4-8; Planet Hollywood Resort & Casino Licensing Agreement  (Feb.  19,  2010),  at  EVERCORE_0041914  [EVERCORE_0041901].    While Gastwirth recalled the percentage due to Robert Earl as 4%, the contractual terms call for a total of 3.92%.  *See* J. Gastwirth  Jan. 14, 2016 Tr. at 74:14-16.

above benchmarks.[333]   An e-mail from Shaukat to the Board, nine days post-announcement, stated that the Britney Spears show tickets were selling at "2x the pace of Celine and Elton's shows in the last 2 years, and over 4x Shania's residency launch, making it the fastest residency sale in recent memory."  The VIP packages were nearly sold out and the show had a substantial impact on the website visitation and hotel booking for Planet Hollywood.[334]

## C. Contemporaneous Indicators of Value

### 1. Cushman & Wakefield Appraisal

Cushman & Wakefield ("Cushman") was engaged by Key Bank Real Estate Capital to perform an appraisal of Planet Hollywood as of September 30, 2013, and Cushman's report was issued on October 24, 2013.[335]   While the appraisal was prepared specifically for the lender and would not have been available to Evercore, it provides a third party's view of the property's value at the same time as the Growth Transaction.  Hession received a copy of the appraisal on October 25, 2013, four days after the Growth Transaction closed.[336]

Cushman's appraisal included the casino, gaming devices, table games, hotel rooms, restaurants, night clubs, lounges, leases retail space, convention space, trade show, meeting space, standard back of the house facilities, and the PH Live theater that was under renovation at the time and would be home to the Britney Spears residency.[337]   Cushman relied on the Income Capitalization Approach to value to the assets.[338]   The Sales Comparison and Cost Approaches were not used as it was determined that they could not provide credible results due to:  (i) dearth of available comparable data and, (ii) Cost Approach did not reflect the economic factors that motivate casino investors, and it was rare for casino hotels to be sold or purchased on the basis of depreciated cost.[339]

---

[333]  E-mail from D. Colvin to T. Dunn (Sept. 26, 2013), at TPG-Examiner_00389293 [TPG-Examiner_00389293].

[334]  E-mail from T. Shaukat to Board Members (Sept. 26, 2013), at TPG-Examiner_00389426 [TPG-Examiner_00389426].

[335]  Cushman & Wakefield Appraisal of Planet Hollywood as of Sept. 30, 2013 (Oct. 24, 2013), at CEOC_INVESTIG_00085142-311 [CEOC_INVESTIG_00085142].

[336]  E-mail from T. Evans to E. Hession (Oct. 25, 2013), at CEOC_INVESTIG_00085141 [CEOC_INVESTIG_00085141].

[337]  Cushman & Wakefield Appraisal of Planet Hollywood as of Sept. 30, 2013 (Oct. 24, 2013), at CEOC_INVESTIG_00085144 [CEOC_INVESTIG_00085142].

[338]  References to valuation approaches and methods within this section are as described by Cushman.

[339]  Cushman & Wakefield Appraisal of Planet Hollywood as of Sept. 30, 2013 (Oct. 24, 2013), at CEOC_INVESTIG_00085266 [CEOC_INVESTIG_00085142].

Cushman utilized the following two methods under what Cushman refers to as the Income Capitalization Approach to appraise the property:[340]

- Discounted Cash Flow method

    o Value is obtained by discounting the anticipated future net income streams and a reversionary value to obtain a net present value at a chosen yield rate (internal rate of return or discount rate).  Cushman used a projection period of ten years, a discount rate of 14% annually and a terminal capitalization rate of 12% to calculate a valuation amount of $873.6 million.[341]

- EBITDA Multiplier method

    o Value is obtained by dividing the net operating income by an overall rate which is extracted from the market.  In the gaming industry, asset valuation is discussed in multiples of the projected EBITDA.  Cushman utilized an 8.0x EBITDA multiplier which equated to an overall capitalization rate of 12.5% percent to arrive at a valuation amount of $901.6 million.[342] Cushman provided the following reason for its selected EBITDA multiple:

        As shown, high quality assets in strong markets have traded between a 7.0 and 8.0 multiple, which is in line with the selected multiple. Note that we have applied the multiple to the subject's stabilized deflated EBITDA, as EBITDA is forecast to grow significantly from year one to the stabilized year, due to changes at the subject property (added food and beverage and entertainment outlets).[343]

In order to determine the property's future performance, Cushman performed a comparable analysis by reviewing and analyzing the operating performance of comparable casino hotels located in Las Vegas, as well as composite data from the Strip's $72 million and over market.[344]

Cushman considered the Britney Spears show to have a huge impact on the entertainment revenues at Planet Hollywood:

    Entertainment revenues at the subject property are generated by various entertainment shows. Note that historically, entertainment revenues have been minimal, as the subject property did not offer any headline shows.  However,

---

[340] *Id*. at CEOC_INVESTIG_00085230.

[341] *Id*. at CEOC_INVESTIG_00085258.

[342] *Id*. at CEOC_INVESTIG_00085261.

[343] *Id*.

[344] *Id.* at CEOC_INVESTIG_00085235.

entertainment revenue is expected to dramatically increase due to the renovation of PH Live which will hours Britney Spears residency.[345]

In its review of entertainment revenues, Cushman took into account the economics of the Britney Spears show and forecasted entertainment revenue of $52 per occupied room, which was in alignment with the range of comparable properties.[346]

The appraised value of Planet Hollywood as determined by Cushman, as of September 30, 2013, using the income capitalization approach was $886.9 million.[347]

### 2. Impairment Testing Values

As part of its annual impairment testing, Caesars performed enterprise valuations for its casino properties, including Planet Hollywood.  The methodology was reviewed by Deloitte.  A summary of the values calculated for 2011 through 2013 is presented in Valuation Table 41.

**Valuation Table 41:  Planet Hollywood Impairment Testing Values**

| *amounts in thousands* | 30-Sep-11 | 30-Sep-12 | 30-Sep-13 |
|---|---|---|---|
| Fair Value based upon EBITDA Multiple | $     690,353 | $     609,277 | $     879,661 |
| Fair Value based upon DCF Analysis | $ 1,613,812 | $ 1,161,280 | $ 1,590,768 |
| EBITDA Weight | 20% | 20% | 20% |
| DCF Weight | 80% | 80% | 80% |
| Weighted Fair Value | $ 1,429,120 | $ 1,050,879 | $ 1,448,547 |

Sources:  Impairment Review (Sept. 30, 2011), at Tab "GW-3 EBITDA Analysis" [DT0022111] (native file); Impairment Review (Sept. 30, 2012), at Tab "GW-3 EBITDA Analysis" [DT0005005] (native file); Impairment Review (Sept. 30, 2013), at Tab "GW-3 EBITDA Analysis" [DT0009709] (native file).

The weighted fair value calculated in the impairment testing for Planet Hollywood as of September 30, 2013, was $1.4 billion,[348] 132% greater than the midpoint of Evercore's selected value range for Planet Hollywood.

In its impairment testing review in 2013, Deloitte noted that the implied multiples for the Las Vegas properties, after weighting the income and market approaches applied by Caesars, resulted in an EBITDA multiple range of 11.0x to 11.5x.  Deloitte determined this range to be

---

[345]  *Id.* at CEOC_INVESTIG_00085241.

[346]  *Id.* at CEOC_INVESTIG_00085241-243.

[347]  *Id.* at CEOC_INVESTIG_00085262.

[348]  Impairment Review (Sept. 30, 2013), at Tab "GW-3 EBITDA Analysis" [DT0009709] (native file).

reasonable compared to the EBITDA multiples reflected in analyst reports and in recent transactions.[349]  However, the multiples used by Evercore were materially lower than this range.

### 3.  Other Indicators

The Sponsors offered their own views as to the value of Planet Hollywood in anticipation of the Growth Transaction.

- In an e-mail dated June 22, 2012, van Hoek sent a presentation titled "Caesars Entertainment Model and Capital Planning Considerations" to Rowan.  In the presentation, a sale of Planet Hollywood to a third party was contemplated to provide gross proceeds of $705 million to $984 million and net proceeds, after deducting debt, of $336 million to $728 million, depending on timing of the sale.[350]

- On August 30, 2012, Kendall Garrison of TPG provided an estimate of current and potential future values for both Planet Hollywood and Horseshoe Baltimore.[351]

  - In TPG's analysis, the current equity value for Planet Hollywood is noted as $315 million with future values ranging from $239 million to $554 million based upon a range of EBITDA multiples from 9.0x to 10.0x as applied to historical and projected EBITDA.[352]

  - The current equity value for Horseshoe Baltimore is noted as $25 million with future values ranging from $18 million to $239 million based upon a range of EBITDA multiples from 8.0x to 10.0x as applied to projected EBITDA scenarios both with and without tables games.[353]

- In preparing to negotiate from the perspective of buyer, on December 24, 2012, TPG prepared "Caesars Valuation Materials."  Using the same management projections that were the basis for Evercore's valuation, TPG calculated an enterprise value for Planet Hollywood of $830 million using a DCF analysis,

---

[349] Deloitte Memorandum – ASC 350:  Goodwill and Non-amortizing Intangible Assets Impairment Testing (Nov. 1, 2013), at DT0005264 [DT0005245].

[350] E-mail from A. van Hoek to M. Rowan, *et al.* (June 22, 2012) [APOLLO-Examiner_00019592], attaching "Caesars Entertainment Model and Capital Planning Considerations" (June 2012), at APOLLO-Examiner_00019611 [APOLLO-Examiner_00019594].

[351] E-mail from K. Garrison to J. Weingart (Aug. 30, 2012), at TPG-Examiner_00194918 [TPG-Examiner_00194918].

[352] "Potential Caesars Limited Partnership Financing" (Aug. 30, 2012), at TPG-Examiner_00194919 [TPG-Examiner_00194919].

[353] *Id.*

consisting of (i) $749 million for the casino[354] and (ii) $81 million for 50% of the management contract.[355]

- In the same presentation, TPG also analyzed the value of Planet Hollywood using a lower "TPG Case" set of projections.[356] TPG calculated an enterprise value for Planet Hollywood of $689 million using a DCF analysis, consisting of (i) $612 million for the casino[357] and (ii) $77 million for 50% of the management contract.[358]

- On January 3, 2013, the Sponsors prepared another version of the "Caesars Valuation Materials" presentation.[359] In this version, the Sponsors used the lower "Sponsor Case" projections and calculated an enterprise value for Planet Hollywood of $655 million for the casino, not including 50% of the management contract.[360] This value is very similar to the mid-point enterprise value Evercore selected for Planet Hollywood (which was based upon higher projections and included 50% of the management contract).

With respect to Horseshoe Baltimore, as was previously discussed, there was an anticipated buy-back of part of Caesars' equity interest in the joint venture. Ultimately, Caves Valley Partners paid $13 million for an additional 10% interest in early 2014.[361] This suggests an implied total equity value of $130 million which exceeds Evercore's calculated mid-point by $43 million, or 49%.

### D. Analyst Report Commentary

In addition to any internal analysis, a review of market participants' view of the Growth Transaction and the transferred assets provides additional insight into views regarding appropriate multiples and growth in the Las Vegas market at the time. While views on growth in the Las Vegas market were not strong in April 2013, by October the views had improved.[362]

- *RBC Capital Markets – April 18, 2013*

---

[354] "Caesars Valuation Materials" Presentation (Dec. 24, 2012), at CEOC_INVESTIG_00395059 [CEOC_INVESTIG_00395057].

[355] *Id.* at CEOC_INVESTIG_00395060.

[356] *Id.* at CEOC_INVESTIG_00395058.

[357] *Id.* at CEOC_INVESTIG_00395061.

[358] *Id.* at CEOC_INVESTIG_00395062.

[359] "Caesars Valuation Materials" (Jan. 3, 2013 – document mislabeled as 2012), at CEOC_INVESTIG_00285549-603 [CEOC_INVESTIG_00285549].

[360] *Id.* at CEOC_INVESTIG_00285581.

[361] CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 97.

[362] *See* Appendix 8, Analyst Commentary.

We believe the addition of Planet Hollywood provides a source of free cash flow to the entity. The debt will likely transfer with the property and eventually be refinanced (despite its low interest rate) in order to access the cash flow generated at this entity.   Although 10x multiples are typically applied for Las Vegas Strip properties, there are no recent, comparable transactions to confirm this valuation. We believe a 10x multiple is too high given that the Las Vegas Strip is exhibiting only slight growth, the tier-two property status of Planet Hollywood, and the potential addition of two new casinos on the Strip by 2016.

RBC provided a low case valuation of Planet Hollywood of $760 million and a high case of $855 million at 8.0x and 9.0x of estimated EBITDA of $95 million, respectively.

- *RBC Capital Markets – October 28, 2013*

    We are anticipating Planet Hollywood to have another strong EBITDA increase over the prior year similar to the first half of the year. Non-gaming revenues should drive revenue growth while operating costs have remained essentially flat. We also look for further improvement in the fourth quarter and 2014, given our view that the Las Vegas market should be relatively healthy given the pick up in the group and convention segment.

    We anticipate the Baltimore Project will open during 3Q 2014. Our annualized EBITDA estimate for this project is $83.4MM.

- *Barclays – October 29, 2013*

    For Horseshoe Baltimore, we assume win/unit/day of $255 and EBITDA margins of 25% to arrive at total EBITDA of $87 million, which is similar to or lower than our estimate for similar casinos in urban areas (such as Hollywood Columbus, Horseshoe Cleveland and MGM Grand Detroit) . . . We then apply a 13x multiple on the online gaming and interactive businesses (similar to how we value other high growth, high margin or fee based businesses in gaming), a 12x multiple on the management fees, a 10x multiple on Planet Hollywood (at the high end of the multiple range we use for Las Vegas properties given its favorable location and strong recent performance) and an 8x multiple (in-line with similar regional assets) on Horseshoe Baltimore. As a result, we generate an enterprise value of $2.95 billion.

## E.  Examiner's Valuation Range for Growth Assets

### 1.  Valuation Date

The valuation date for the Growth Assets was October 21, 2013, the date the transaction closed.

### 2.  Guideline Public Companies

A review of the guideline public companies was utilized to determine the appropriate beta and debt/equity ratio for the WACC calculation under the income approach and selection of appropriate valuation multiples under the market approach.  Independent research, as well as a review of the GPCs identified by the collective group of financial advisors engaged with respect to the Transferred Assets across the range of transactions, was conducted to identify sufficiently comparable GPCs.  Based upon this analysis, ten companies, including Caesars, were identified that were considered sufficiently comparable to the Growth Assets in terms of risk characteristics, services, products, industry participation, and competitive landscape.  Those ten companies are listed in Valuation Table 42.

**Valuation Table 42: Guideline Public Companies – Growth Transaction**

| Company Name | Ticker Symbol |
|---|---|
| Boyd Gaming Corporation | BYD |
| Caesars Entertainment Corporation | CZR |
| Churchill Downs, Inc. | CHDN |
| Isle of Capri Casinos | ISLE |
| Las Vegas Sands Corporation | LVS |
| MGM Resorts International | MGM |
| Monarch Casino and Resort, Inc. | MCRI |
| Penn National Gaming Inc. | PENN |
| Pinnacle Entertainment Inc. | PNK |
| Wynn Resorts Limited | WYNN |

A detailed analysis of each of the GPCs was performed to determine their relative degree of comparability to the subject properties.  Various metrics, including both quantitative and qualitative, were analyzed, including:

- Size, including total assets, revenues, EBITDA, operating margins;

- Debt/total capital ratio;

- Growth;

- Depth and geographic breadth of operations; and

- Types of properties either owned or operated.

Of the identified GPCs, Caesars, Las Vegas Sands, MGM Resorts International, Wynn, and to a lesser extent Boyd Gaming Corporation, own and/or operate properties that are Las Vegas-centric.  The remaining GPCs (Churchill Downs, Isle of Capri, Monarch, Penn National Gaming and Pinnacle) own and/or operate properties that are more regional in nature.  For the purpose of selecting the valuation multiples for the Growth Transaction, both Caesars and Las

Vegas Sands were excluded. While Caesars was included in the selected GPCs for overall comparison purposes, it was not ultimately relied upon in any calculations. Las Vegas Sands was excluded as approximately 85% of its operations are in Asia, making them less comparable to the subject properties.[363]  A description of each of the GPCs, as well as a summary of their financial and operational data, can be found attached to this Appendix as **Exhibit A**.

### 3. Income Approach – DCF Method

For Planet Hollywood, the projections included in the Q3 2013 LRP (and associated impairment testing) were utilized in the DCF model.[364] Prepared in or around September 2013, these were the latest projections prior to the transaction available and prepared by Caesars in the ordinary course of business. An adjustment was made to include the incremental cash flow projected for Project Songbird previously shown in Valuation Table 40. Since the management fees are valued separately, management fees were deducted from the LRP's projected EBITDAM to arrive at EBITDA. The LRP does not contain projections for Horseshoe Baltimore. Therefore, the development model sent to Evercore in August 2013 was utilized for the projections and management fees.[365]

For the terminal period, depreciation and capital expenditures were set equal to a normalized level of capital expenditures. For Planet Hollywood, it was determined that a normalized level of capital expenditures would be $13.9 million. This level is in excess of historical capital expenditures for the property and is consistent with projected capital expenditures as of the time of the Growth Transaction. For Horseshoe Baltimore, normalized capital expenditures were set at $7.5 million, an amount in excess of projected capital expenditures since capital expenditures into perpetuity would exceed those in the first few years as a new property.

The projections were then discounted utilizing the appropriate WACC and capitalization rates. The calculated WACC for Planet Hollywood and Horseshoe Baltimore was 10.7% and 10.8%, respectively. In both instances, a long-term growth rate of 2.0% was selected to arrive at capitalization rates of 8.7% and 8.8%, respectively. For the purpose of the valuation analysis, the enterprise value of each property was calculated using a range of discount rates plus or minus 50 basis points (0.5%) from the calculated WACC.

### 4. Market Approach – Selected Multiples

The multiples selected for the market approach were based upon the trading multiples of the GPCs at or around the valuation date. For the valuation of each of the Growth Assets, a

---

[363] For the year ended 12/31/2012, 85% of LVS's revenue and 88.3% of its EBITDA came from facilities in Macau or Singapore, per Capital IQ segment information.

[364] Impairment Review (Sept. 30, 2013), at Tabs "3.2 – INPUTS-LRP" and '5.17 – PHV GW' [CEOC_INVESTIG_00513908] (native file).

[365] E-mail from E. Hession to C. Abrahams, *et al.* (Aug. 15, 2013), at PRIV_INVESTIG_00021171-74 [PRIV_INVESTIG_00021171], attaching Baltimore model (Aug. 15, 2013), at Tab "Updated Projections" [PRIV_INVESTIG_00021175] (native file).

range of forward-looking EBITDA multiples was selected based on property-specific factors.  In the case of both Planet Hollywood and Horseshoe Baltimore, forward-looking multiples were deemed most appropriate in order to capture the forecasted cash flow growth through operational maturity.

While Planet Hollywood had an established history of operations, the property was in a high growth state.  It had achieved 60% compound annual EBITDA growth since its acquisition by Caesars, and projected continued high growth through the projection period.  As such, the multiples selected were 2014E and 2015E EBITDA multiples.

As a new development not scheduled to open until ten months after the valuation date, for Horseshoe Baltimore only forward multiples were applicable.  EBITDA multiples for 2015E and 2016E were selected because 2014 was the first year of operations and was not representative of future expected cash flow.

A summary of the selected multiples for Planet Hollywood and Horseshoe Baltimore is shown in Valuation Table 43.

**Valuation Table 43: Selected Multiples – Growth Transaction**

| 2014E EBITDA Multiple | Low | High |
|---|---|---|
| Planet Hollywood | 10.0 x | 11.0 x |
| Horseshoe Baltimore | NA | NA |

| 2015E EBITDA Multiple | Low | High |
|---|---|---|
| Planet Hollywood | 9.5 x | 10.5 x |
| Horseshoe Baltimore | 8.5 x | 9.5 x |

| 2016E EBITDA Multiple | Low | High |
|---|---|---|
| Planet Hollywood | NA | NA |
| Horseshoe Baltimore | 8.0 x | 9.0 x |

The selected multiples for Horseshoe Baltimore were consistent with other regional operators.

Planet Hollywood is located on the Strip in Las Vegas; as such, Las Vegas multiples weighed more heavily in valuing the asset.  However, Planet Hollywood would not command the same multiples as certain Las Vegas-based GPCs, such as Wynn or MGM.  Accordingly, the multiples selected take into account these qualitative and quantitative factors.

The selected range of multiples was then applied to the appropriate measure of EBITDA to arrive at an estimated enterprise value.  For Planet Hollywood, equal weight was given to the 2014E and 2015E multiples.  Horseshoe Baltimore's 2016E multiple was accorded 75% weighting, with the remaining 25% given to the 2015E multiple, based upon the multi-year ramp up period reflected in the projections for the property.

**Appendix 7, Solvency**

## 5.  Management Fees

In determining the value of the management fees associated with the Growth Transaction, the same projections, discount rates, and capitalization rates as noted in the DCF Method were used.  The projected management fees for Planet Hollywood were based on a fee of 3% of projected revenues and 4.5% of projected EBITDAM.  The Horseshoe Baltimore projected management fees included fees paid to both Caesars and other equity holders in the joint venture. As 50% of only the Caesars' management fees were sold in the transaction, only the Caesars portion of the management fees was used.[366]

The resulting management fees were reduced by an appropriate tax rate and then discounted to present value at a discount rate consistent with the WACC utilized in each of the subject property valuations.  According to the documents, 50% of the calculated management fee would be retained by CEOC.

## 6.  Valuation Conclusion

The quality of data available, reasonably comparable set of GPCs, and the robust forecasting process undertaken by Caesars in creating the forecasts, supports placing equal weighting on the two methods.  As discussed previously in Section I of this Appendix, *supra*, the Precedent Transactions Method was considered but not ultimately relied upon.

The valuation conclusions include Evercore's calculated present value of the I/O Strip (an offset of $8 million) and excess cash, but do not include any value related to the present value of tax savings calculated by Evercore.  The valuation conclusions are presented in Valuation Table 44.

---

[366] E-mail from D. Epstien to E. Hession (Aug. 16, 2013), at CEOC_INVESTIG_00097632 [CEOC_INVESTIG_00097632].

**Valuation Table 44: Valuation Conclusions – Growth Transaction**

| Planet Hollywood | Weighting | Low | | High | |
|---|---|---|---|---|---|
| Guideline Public Company Method | 50% | $ | 1,095.2 | $ | 1,207.7 |
| Discounted Cash Flow Method | 50% | | 912.6 | | 1,023.1 |
| Concluded Range | | $ | 1,003.9 | $ | 1,115.4 |
| Add: Management Fee Stream (50%) | | | 72.6 | | 81.4 |
| Enterprise Value - Planet Hollywood | | $ | 1,076.5 | $ | 1,196.8 |
| Less: Debt Assumed | | $ | (513.2) | $ | (513.2) |
| Add: Excess Cash | | | 88.0 | | 88.0 |
| Less: PV of I/O Strip | | | (8.0) | | (8.0) |
| Equity Value - Planet Hollywood | | $ | 643.3 | $ | 763.6 |
| **Horseshoe Baltimore** | **Weighting** | **Low** | | **High** | |
| Guideline Public Company Method | 50% | $ | 512.0 | $ | 575.3 |
| Discounted Cash Flow Method | 50% | | 491.3 | | 552.3 |
| Enterprise Value - Horseshoe Baltimore | | $ | 501.7 | $ | 563.8 |
| Less: Debt Assumed | | $ | (332.9) | $ | (332.9) |
| Add: Excess Cash | | | 66.0 | | 66.0 |
| Total Equity Value - Horseshoe Baltimore (excl. mgmt fee) | | $ | 234.8 | $ | 296.9 |
| Caesars Equity Interest | | | 51.8% | | 51.8% |
| Equity Value - Planet Hollywood | | $ | 121.6 | $ | 153.8 |
| Add: Management Fee Stream (50%) | | | 31.8 | | 35.8 |
| Caesars Equity Value - Horseshoe Baltimore | | $ | 153.4 | $ | 189.6 |
| **Total - Growth Transaction** | | **$** | **796.7** | **$** | **953.2** |

The Fair Market Value of the equity in the Growth Assets, after accounting for the appropriate ownership percentages, excess cash, debt assumed by CGP, and the sale of 50% of the management fee, is reasonably estimated to range between $796.7 million to $953.2 million.[367] The complete valuation models for the Growth Transaction and management fees are attached as Exhibit G to this Appendix. This analysis indicates that CEOC did not receive reasonably equivalent value based upon the $360 million transaction price, and the total deficit ranges from $437 million to $593 million.

---

[367] Caesars' impairment testing utilized a long-term growth rate of 3% for its DCF analyses compared to 2% used in this analysis. If a 3% long-term growth rate was utilized in this analysis, the resulting equity value range, equally weighting the DCF and Guideline Public Company methods, would be $852.2 million to $1.0 billion.

### F.  Sensitivity Analysis

A sensitivity analysis has also been performed on the valuations prepared by Evercore in order to quantify the impact of correcting certain inputs.  With respect to the Growth Transaction, the following corrections were made to the financial models utilized by Evercore.

- Utilized Q3 2013 LRP projections in lieu of the outdated projections from January 2013;

- Included the incremental cash flows for Project Songbird;

- Extended the length of the DCF period through 2018 to include the entire period covered by the projections in lieu of calculating the terminal period after 2016;

- Excluded LTM and 2013 expected EBITDA from the guideline company trading analysis and precedent transactions analysis as these period do not adequately capture the growth of Planet Hollywood or the incremental cash flows for Project Songbird;

- Excluded value from the present value of tax savings; and

- Utilized the correct 52% ownership interest for Caesars' equity interest in Horseshoe Baltimore in lieu of the 40.9% interest utilized by Evercore.

The sensitivity analysis quantifies the impact solely of correcting the aforementioned inputs and, for the purpose of this analysis, accepts all other inputs and methodologies utilized by Evercore (*e.g.*, discount rates, terminal period methodology, EBITDA multiples).  The resulting sensitized values are presented in Valuation Table 45.

**Valuation Table 45:  Growth Transaction Sensitivity Analysis**

| amounts in millions | Evercore | | Evercore - Sensitized | |
|---|---|---|---|---|
| | **Low** | **High** | **Low** | **High** |
| Planet Hollywood (including mgmt fees) (a) | $    625.0 | $    725.0 | $    834.6 | $    1,087.5 |
| Less: Debt | (513.0) | (513.0) | (513.0) | (513.0) |
| Excess Cash | 88.0 | 88.0 | 88.0 | 88.0 |
| PV of I/O Strip | (8.0) | (8.0) | (8.0) | (8.0) |
| PV of Tax Savings | 7.0 | 20.0 | - | - |
| Total - Planet Hollywood Equity Value | $    199.0 | $    312.0 | $    401.6 | $    654.5 |
| Horseshoe Baltimore | $    50.0 | $    125.0 | $    50.0 | $    125.0 |
| Excess Cash | 66.0 | 66.0 | 66.0 | 66.0 |
| Subtotal | $    116.0 | $    191.0 | $    116.0 | $    191.0 |
| Caesars Ownership Percentage | 40.9% | 40.9% | 52.0% | 52.0% |
| Subtotal | $    48.4 | $    78.1 | $    61.3 | $    99.3 |
| 50% of Management Fee Stream | $    20.0 | $    28.0 | $    20.0 | $    28.0 |
| PV of Tax Savings | 1.0 | 2.0 | - | - |
| Total - Horseshoe Baltimore Equity Value | $    69.4 | $    108.1 | $    81.3 | $    127.3 |
| **Growth Transaction - Equity Value** | **$    268.4** | **$    420.1** | **$    482.9** | **$    781.8** |

Note:
(a) Sensitized values represent the average of the GPC Method and DCF Method.

The sensitized Evercore values range from $483 million to $782 million, exceeding the transaction price of $360 million.

## G.  Summary of Values

Valuation Table 46 summarizes the transaction price compared to: (i) the values determined by Evercore; (ii) the values resulting from performing a sensitivity analysis to correct certain of the inputs and methodologies used by Evercore; (iii) the values offered by other parties;[368] and (iv) the Examiner's valuation of the assets.

---

[368] The values offered by other parties, including creditor groups, were (i) preliminary in nature, (ii) based on incomplete information, (iii) not intended to reflect an opinion, (iv) provided on the express understanding that the views expressed were not binding or admissible as evidence in any litigation, and (v) provided on a "not for attribution" basis to the Examiner.

**Valuation Table 46:  Illustrative Summary of Values for Growth Assets**

| amounts in millions | Equity Value | |
| --- | --- | --- |
| | Low | High |
| *Transaction Price* | $   *360* | $   *360* |
| Evercore | $   268 | $   420 |
| Evercore - Sensitized | $   483 | $   782 |
| Baker Tilly | $   631 | $   995 |
| Creditor Group 1 | $   851 | $ 1,081 |
| Creditor Group 2 | $   826 | $ 1,076 |
| **Examiner Valuations** | **$   797** | **$   953** |

## VIII.   THE FOUR PROPERTIES TRANSACTION

In May of 2014, as part of the Four Properties Transaction, CEOC sold to CGP (i) the Quad, (ii) Bally's Las Vegas, (iii) the Cromwell, and (iv) Harrah's New Orleans, as well as a 50% stake in the management fee stream associated with each property (collectively, the "Four Properties").  The transaction price was $2 billion, consisting of $1.815 billion cash, plus the assumption of the Cromwell's $185 million credit facility.  The transaction closed in two pieces, with the Quad, Bally's Las Vegas, and the Cromwell closing on May 5, 2014, and Harrah's New Orleans following on May 20, 2014.[369]

Valuation Table 47 provides a summary of the assets sold.

### Valuation Table 47:  Four Properties – Summary of Assets

| Metric | The Quad | Bally's Las Vegas | The Cromwell | Harrah's New Orleans |
|---|---|---|---|---|
| Location | Las Vegas Strip | Las Vegas Strip | Las Vegas Strip | New Orleans, LA |
| Casino Space (sq. ft.) | 44,600 | 66,200 | 28,100 | 125,100 |
| Slot Machines | 760 | 1,000 | 450 | 1,820 |
| Table Games | 60 | 70 | 60 | 140 |
| Hotel Rooms | 2,550 | 2,810 | 188 | 450 |

Source:  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 17, 2014), at 30; CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31.
Note:  The Quad's casino space increased to 62,200 sq. ft. by year end 2014.

CGP described to its lenders the properties to be purchased in the Four Properties Transaction, indicating that:[370]

- CGP will own "a collection of well-positioned assets in destination markets with diverse revenue streams and significant near-term upside."

- The properties are "irreplaceable properties located at the center of the Las Vegas Strip and downtown New Orleans."

- The properties are "strategically located assets" benefitting from tremendous foot traffic (20 million people annually) on the east side of the Strip which was expected to increase upon the opening of the LINQ.

- The Las Vegas market is strong, with 2013 gaming and lodging performance at or near post-recession highs.

---

[369] Centerview Partners "Confidential Discussion Materials" (May 19, 2014), at CEOC_INVESTIG_00453089 [CEOC_INVESTIG_00453085].

[370] "CGP Presentation to Lenders" (Mar. 27, 2014), at CEOC_INVESTIG_00022504, CEOC_INVESTIG_00022510-11 [CEOC_INVESTIG_00022500].

- The free cash flow generating capacity for the properties is "strong and predictable," with "low maintenance capex requirements."[371]

In conjunction with the Four Properties Transaction, the Special Committee of the Board of Directors of CEC retained Centerview Partners LLC ("Centerview") to assist in negotiating the purchase price and to provide a fairness opinion.[372]   Centerview's opinion provided a reference range for the assets using three different valuation methods ranging from $1.7 billion to $2.5 billion[373] and concluded the ultimate $2 billion purchase price was fair.  In addition, the CEC Special Committee and the CEOC Board of Directors received an opinion from Duff & Phelps which derived an overall value range of $1.8 billion to $2.2 billion for the assets and opined that the transaction was "on terms no less favorable to the Company than those that could have been obtained in a comparable transaction by the Company with a person that is not an affiliate of the Company."[374]   However, in reaching these conclusions, the financial advisors did not rely on the latest projections prepared by Caesars in the ordinary course of business, and instead utilized projections which had been reduced for this transaction and never used for any other purpose.  Among other facts, the financial advisors also did not appropriately account for the rent expense at the Quad.

The following sections describe the analysis performed to derive an estimate of the fair market value of the Four Properties (properties and management fee streams) sold in May 2014 as part of the Four Properties Transaction.  An analysis was performed of the historical performance and capital expenditures for each property, as well as the projections available and prepared contemporaneously.  Using this analysis and information, generally accepted valuation approaches and methods were used to derive value estimates, and these values were analyzed against other value indicators and information.

In conjunction with deriving the fair market value of the Four Properties, the opinions and valuations prepared by Centerview and Duff & Phelps were analyzed, and the related interview commentary was considered.  Also reviewed were the submissions provided by the various parties in regard to the values of the assets sold and the critiques of the financial advisors' valuations.

Based on this analysis, it is reasonably estimated that the fair market value of the Four Properties ranged from $2.59 billion to $2.97 billion (or $2.41 billion to $2.78 billion net of debt assumed) at the time of the transaction.  Additional value related to the land transferred along with the Four Properties is estimated to range from $109 million to $140 million.[375]

---

[371]  *Id.* at CEOC_INVESTIG_00022518 [CEOC_INVESTIG_00022500].

[372]  Executed Centerview Engagement Letter (Dec. 20, 2013), at  CENTERVIEW_0000303 [CENTERVIEW_0000303]; J. Bosacco Sept. 15, 2015 Tr. at 29:14-19.

[373]  Complete detail regarding Centerview's reference range under each methodology is noted in Valuation Table 57.

[374]  Duff & Phelps Engagement Letter (Jan. 17, 2014), at DP00000288 (native file), at 1.

[375]  This does not include any value associated with the land subject to easements.

### A.  Historical Performance and Capital Expenditures

At the time of the Four Properties Transaction, three of the four properties had either recently been or were in the midst of going through material renovations.  As a result, the historical performance and future potential performance varies between the properties; each is described in greater detail below.

### 1.  The Quad

Caesars acquired Imperial Palace in late 2005 for $370 million.[376]  Since its acquisition by Caesars, the property went through a series of rebranding efforts and renovations which began on December 21, 2012, when the Imperial Palace was rebranded as the Quad as part of an initial $90 million renovation to upgrade the property.[377]  According to Greg Miller, Caesars' lead for large projects, this renovation was done on the "low rise," or ground floor, portion of the Quad,[378] including the casino and facade.  This initial renovation was completed in December 2013.[379]

The second renovation included hotel towers, parking, pool, convention space, food and beverage, retail and entertainment,[380] and was to be completed in two phases: (i) Phase 1 with a $100 million budget in 2014; and (ii) Phase 2 with a $120 million budget scheduled to be completed by mid-2015,[381] for a total budget of $223 million.[382]  Given that the Quad was being sold prior to the completion of the renovations, the closing documents for the Four Properties Transaction provided for CGP to have a maximum renovation expense of $223.1 million for this renovation, with overage of up to 15% of the estimated cost to be covered by CEOC.[383]

The renovations were intended to "reposition The Quad from a lower-tier product to one targeting younger guests and trend seekers.  The renovated property was designed to substantially increase cash average daily rate ("ADR") levels and to appeal to the Las Vegas region's growing Generation X and Generation Y clientele."[384]  CGP estimated the impact of the

---

[376]  HET 8-K for the year ended Dec. 31, 2004 (Aug. 23, 2005), at 2.

[377]  Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421650 [CEOC_INVESTIG_00421632].

[378]  G. Miller Sept. 22, 2015 Tr. at 58:15-59:6.

[379]  CEC 10-K for the year ended Dec. 31, 2013 (Mar. 17, 2014), at 31, 37.

[380]  Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421650 [CEOC_INVESTIG_00421632].

[381]  CEC 8-K for the year ended Dec. 31, 2013 (Mar. 26, 2014), at 14; "The Quad" (Jan. 15, 2014), at CEOC_INVESTIG_00010302 [CEOC_INVESTIG_00010270].

[382]  CEC 8-K for the year ended Dec. 31, 2013 (Mar. 26, 2014), at 28.

[383]  Project Positive Closing Documents (Sept. 19, 2014), at CEOC_INVESTIG_00251203, CEOC_INVESTIG_00251261 [CEOC_INVESTIG_00251171].

[384]  Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421651 [CEOC_INVESTIG_00421632].

Quad's full renovation to be $31 million to $47 million in incremental EBITDAM.[385]  After the renovation, John Bosacco (Centerview) believed the Quad would be considered a mid-tier destination property.[386]

Following the Four Properties Transaction and after completion of Phase 1 of the second renovation, the Quad was renamed The LINQ on October 30, 2014.[387]  As of the end of 2014, the resort had 1,250 rooms under renovation and not in service.[388]

A summary of the Quad's historical and projected capital expenditures, reflective of the renovation spend, is presented in Valuation Table 48.

### Valuation Table 48:  The Quad Capital Expenditures

| amounts in millions | Imperial Palace | | | The Quad | | The LINQ | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
| Historical (a) | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ | | | |
| Projected - January Plan (b) | | | | | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| Projected - February Plan (b) | | | | | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| Projected - LRP (c) | | | | | $ ■ | | | | |

Sources:
(a) Historical capital expenditures per CAC (undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b)  Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab "Centerview Sensitivity" [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).

Primarily as a result of the property's renovations as well as the construction of the adjacent LINQ Retail promenade, the Quad's financial results were hindered in the years preceding the Four Properties Transaction.[389]  The Quad's financial results from 2007 through 2013 are presented in Valuation Table 49.

---

[385]  *Id.* at CEOC_INVESTIG_00421624.

[386]  J. Bosacco Sept. 15, 2015 Tr. at 188:23-25.

[387]  Michelle Rindels, *Two Vegas resorts getting major makeovers*, The Seattle Times (Jul. 2, 2014),  *available at*  http://www.seattletimes.com/life/travel/two-vegas-resorts-getting-major-makeovers/.

[388]  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 31.

[389]  Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421650 [CEOC_INVESTIG_00421632].

**Appendix 7, Solvency**

**Valuation Table 49:  The Quad Historical Financial Performance**

| amounts in millions | Imperial Palace | | | | | | The Quad |
|---|---|---|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Net Revenue | $  194 | $  178 | $  134 | $  125 | $  138 | $  119 | $  101 |
| EBITDA | $  62 | $  47 | $  31 | $  21 | $  37 | $  25 | $  13 |
| EBITDA Margin | 32% | 27% | 23% | 17% | 27% | 21% | 13% |

Source:  Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAMINER_0145430] (native file).

From 2011 to 2013, The Quad experienced a decline in net revenue larger than other Las Vegas Properties at 27% (compared to 5.5% for comparable Caesars Strip properties). Management attributed the decline to the ongoing renovation of the Quad and the construction of the neighboring LINQ outdoor shopping, dining, and entertainment promenade as well as the Observation Wheel.[390]

CGP estimated the revenue impact of the LINQ construction and the Quad renovation disruption to be $26 million to $33 million in 2013, with an approximate EBITDA impact of $14 million to $25 million.[391]  Combined with the incremental EBITDA expected from the Quad renovations, this represents total expected incremental EBITDA of $45 million to $72 million. However, it does not appear this incremental EBITDA includes the additional significant benefit the Quad was expected to receive from LINQ overflow.[392]

## 2.  Bally's Las Vegas

Bally's Las Vegas originally opened in 1973 and benefits from a large convention business and a loyal customer base.[393]  In 2013, Bally's Las Vegas completed a $32 million rolling renovation of all 756 rooms in its South Tower, rebranded as the Jubilee Tower.[394]  As a result of the renovation, Bally's Las Vegas expected to increase ADR for the renovated rooms by $40, resulting in expected incremental EBITDA of $7.5 million annually.[395]  The South Tower renovation was fully paid for by CEOC.

---

[390] Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421636 [CEOC_INVESTIG_00421632].

[391] Id. at CEOC_INVESTIG_00421650.

[392] "CGP Presentation to Lenders" (Mar. 27, 2014), at CEOC_INVESTIG_00022516 [CEOC_INVESTIG_00022500].

[393] Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421652 [CEOC_INVESTIG_00421632].

[394] The South Tower represents more than 25% of the total rooms at Bally's Las Vegas.

[395] Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421634 [CEOC_

In addition, the Grand Bazaar retail development began in late 2013 with expected opening in late 2014 (although it ultimately did not open until 2015). While the Grand Bazaar is owned, funded, and operated by a third party, Bally's Las Vegas would receive lease payments ($3 million in year 1, $4 million in year 2, and $5 million in years 3-5, subject to CPI increases thereafter) as well as an expectation of increased foot traffic and improved food and beverage revenue.[396]

A summary of Bally's Las Vegas's historical and projected capital expenditures, reflective of the renovations, is presented in Valuation Table 50.

**Valuation Table 50:  Bally's Las Vegas Capital Expenditures**

| amounts in millions | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Historical (a) | $ | $ | $ | $ | $ | $ | | | |
| Projected - January Plan (b) | | | | | $ | $ | $ | $ | $ |
| Projected - February Plan (b) | | | | | $ | $ | $ | $ | $ |
| Projected - LRP (c) | | | | | $ | | | | |

Sources:
(a) Historical capital expenditures per CAC (undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b)  Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab "Centerview Sensitivity" [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).

The renovation of the South Tower, during which rooms were taken offline on a rolling basis, likely impacted Bally's Las Vegas's financial results during 2013. Valuation Table 51 summarizes the historical results for Bally's Las Vegas.

**Valuation Table 51:  Bally's Las Vegas Historical Financial Performance**

| amounts in millions | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $  376 | $  336 | $  264 | $  257 | $  271 | $  260 | $  252 |
| EBITDA | $  88 | $  93 | $  77 | $  66 | $  77 | $  64 | $  63 |
| EBITDA Margin | 23% | 28% | 29% | 26% | 28% | 25% | 25% |

Source:    Monthly    Actual    versus    Budget    Analysis    for    2007-Q1    2015,    at    Tab    "Summary" [CEC_EXAMINER_0145430] (native file).

### 3.  The Cromwell

Caesars acquired the Barbary Coast (now known as the Cromwell) in 2007 from Boyd Gaming in an exchange transaction for approximately 24 acres of land on the Las Vegas Strip.[397]

---

INVESTIG_00421632].

[396]  *Id.* at CEOC_INVESTIG_00421652.

[397]  Boyd Gaming Corp. 10-K for the year ended Dec. 31, 2007 (Feb. 29, 2008), at 1. For a brief period, an agreement with Gansevoort Hotel brand was pursued to rebrand Bill's Gamblin' Hall & Saloon as a Gansevoort property. However, during a Massachusetts Gaming Commission

The property was rebranded as Bill's Gamblin' Hall & Saloon immediately upon the acquisition.[398]

Caesars began funding renovations and rebranding efforts in November 2012,[399] and Bill's Gamblin' Hall and Saloon was closed for approximately 15 months starting on February 4, 2013.[400]  The Cromwell's casino and hotel were expected to open April 2014, and the nightclub in May 2014.[401]  The redevelopment included a full remodel of all hotel rooms and the casino, an extension of the rooftop for a pool and Drai's day/nightclub, a renovated facade, a new parking garage and porte-cochere, and a new Giada De Laurentiis restaurant.  The expectation was that the Cromwell would have significant financial upside as it would fill a void in the Las Vegas market for a "niche, boutique product offering" and would target higher margin customers.[402]

The Cromwell's gaming floor opened in April 2014, featuring 450 slot machines and 60 table games.  Its 188 hotel rooms became available to guests starting in May 2014.  It features luxurious accommodations in an intimate, Parisian-inspired atmosphere where each room gives guests a VIP experience.  The hotel's blend of modern and vintage design is another unique element.[403]

The budget for the renovation was forecasted to be $235 million,[404] including a first-lien term loan of $185 million.[405]  CEOC originated the loan and designated completion funds within the Cromwell entity, which were then assumed by and transferred to CGP in the asset sale.[406]  The Cromwell was materially complete at the time of the Four Properties Transaction.

---

investigation related to a request for a gaming license, it was discovered that one of Gansevoort's major investors allegedly had ties to the Russian mafia.  The Gansevoort agreement was terminated and rebranding as the Cromwell commenced.  E-mail from J. Garrison to D. Wilfong, *et al.* (Oct. 21, 2013), at CEOC_INVESTIG_00014752-53 [CEOC_INVESTIG_00014752].

[398]  Harrah's Entertainment, Inc. 10-K for the year ended Dec. 31, 2007 (Feb. 29, 2008), at 5.

[399]  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 52.

[400]  Ron Sylvester, *From Barbary to Bill's: Sun sets today on Las Vegas relic*, Las Vegas Sun (Feb. 4, 2013), *available at* http://lasvegassun.com/news/2013/feb/04/barbary-bills-sun-sets-today-strip-relic/.

[401]  CEC 8-K for the year ended Dec. 31, 2013 (Mar. 26, 2014), at 21.

[402]  Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421654 [CEOC_INVESTIG_00421632].

[403]  CEC 10-K for the year ended Dec. 31, 2014 (Mar. 16, 2015), at 3.

[404]  CEC 8-K for the year ended Dec. 31, 2013 (Mar. 26, 2014), at 21.

[405]  "The Cromwell (f/k/a Bill's Gamblin' Hall & Saloon)" (Jan. 15, 2014), at CEOC_INVESTIG_00010240 [CEOC_INVESTIG_00010237].

[406]  Project Positive Closing Documents (Sept. 19, 2014), at CEOC_INVESTIG_00251699 [CEOC_INVESTIG_00251171].

A summary of the Cromwell's historical and projected capital expenditures is presented in Valuation Table 52.

**Valuation Table 52:  The Cromwell Capital Expenditures**

| amounts in millions | Bill's Gamblin' Hall & Saloon | | | Closed | The Cromwell | | | | |
| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Historical (a) | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ | | | |
| Projected - January Plan (b) | | | | | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ |
| Projected - February Plan (b) | | | | | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ |
| Projected - LRP (c) | | | | | $ ▮ | | | | |

Sources:
(a) Historical capital expenditures per CAC (undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b) Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab "Centerview Sensitivity" [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).

While historical performance for Bill's Gamblin' Hall and Saloon is not comparable to the expected performance of the Cromwell, Valuation Table 53 presents a summary of historical financial results prior to the casino closing in early 2013.

**Valuation Table 53:  Bill's Gamblin' Hall & Saloon Historical Financial Performance**

| amounts in millions | Bill's Gamblin' Hall & Saloon | | | | | | Closed |
| | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $  49 | $  57 | $  52 | $  51 | $  53 | $  51 | NM |
| EBITDA | $  13 | $  13 | $  13 | $  10 | $  11 | $  10 | NM |
| EBITDA Margin | 27% | 23% | 24% | 19% | 21% | 20% | |

Source:  Monthly  Actual  versus  Budget  Analysis  for  2007-Q1  2015,  at  Tab  "Summary" [CEC_EXAMINER_0145430] (native file).
Note:  NM means Not Meaningful as property was closed for renovations on February 4, 2013.

### 4.  Harrah's New Orleans

Harrah's New Orleans opened in 1999 and is the only land-based casino in Louisiana, attracting both tourists and locals.[407]  In 2012 and 2013, Harrah's New Orleans earned more than 40% of its gaming revenue from tourists.[408]  CGP describes the property as the "#1 property in large and stable New Orleans market," achieving increasing market share as high as 60% in 2013.[409]

---

[407] Four  Properties  Summary  (Mar.  25,  2014),  at  CEOC_INVESTIG_00421653; [CEOC_INVESTIG_00421632].

[408] *Id.* at CEOC_INVESTIG_00421653.

[409] "CGP Presentation to Lenders" (Mar. 27, 2014), at CEOC_INVESTIG_00022512 [CEOC_ INVESTIG_00022500].

Harrah's New Orleans feeds from a "hybrid" market comprised of both national and local players.[410]  Caesars described this hybrid market, stating "Local and National VIP's make up 50% of the total rated Theo, while Regional VIP's make up only 5%."[411]

Harrah's New Orleans has had ongoing capital spend, and as of early 2014 planned a hotel room renovation that was executed in late 2014.[412]  Valuation Table  presents a summary of Harrah's New Orleans' historical and projected capital expenditures.

**Valuation Table 54:  Harrah's New Orleans Capital Expenditures**

| amounts in millions | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|---|
| Historical (a) | $ ▇ | $ ▇ | $ ▇ | $ ▇ | $ ▇ | $ ▇ | | | |
| Projected - January Plan (b) | | | | | $ ▇ | $ ▇ | $ ▇ | $ ▇ | $ ▇ |
| Projected - February Plan (b) | | | | | $ ▇ | $ ▇ | $ ▇ | $ ▇ | $ ▇ |
| Projected - LRP (c) | | | | | $ ▇ | | | | |

Sources:
(a) Historical capital expenditures per CAC (undated), at CACEXAM00512644 [CACEXAM00512644] and at CACEXAM00513069 [CACEXAM00513069].
(b) Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab "Centerview Sensitivity" [CENTERVIEW_0001017] (native file).
(c) Impairment Review (Mar. 31, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).

CGP anticipated introducing resort fees at Harrah's New Orleans in late 2014, adding an additional $15 per room to current rates,[413] with an expected increase to EBITDA of approximately $1 million annually.[414]

A summary of the historical results for Harrah's New Orleans beginning in 2007 is presented in Valuation Table 55.

---

[410] "New Orleans" (May 2014), at CEC_Examiner_1438570 [CEC_EXAMINER_1438563].

[411] *Id.*

[412] Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421653 [CEOC_INVESTIG_00421632].  *See also*  http://www.bizneworleans.com/October-2014/Harrahs-Fest-Celebrates-Harrahs-New-Orleans-15-Years-in-Southern-Louisiana/

[413] Four Properties Summary (Mar. 25, 2014), at CEOC_INVESTIG_00421636 [CEOC_INVESTIG_00421632].

[414] *Id.* at CEOC_INVESTIG_00421634.

**Valuation Table 55:  Harrah's New Orleans Historical Financial Performance**

| amounts in millions | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|
| Net Revenue | $ 412 | $ 397 | $ 353 | $ 353 | $ 346 | $ 350 | $ 344 |
| EBITDA | $ 98 | $ 86 | $ 77 | $ 68 | $ 84 | $ 92 | $ 84 |
| EBITDA Margin | 24% | 22% | 22% | 19% | 24% | 26% | 25% |

Source: Monthly Actual versus Budget Analysis for 2007-Q1 2015, at Tab "Summary" [CEC_EXAMINER_0145430] (native file).

## B.  Projections for the Four Properties Transaction

One of the most critical inputs impacting the valuation of the Four Properties is the projections for each property.  As previously discussed, the LRP represents the projections that Caesars prepares in the ordinary course of business which are used for numerous internal and external purposes and are subject to audit procedures by the external auditors.  However, rather than use the LRP, Centerview and Duff & Phelps used a set of projections that management created, at the direction of Fred Kleisner, chair of the CEC Special Committee, solely for the transaction which were materially lower than the company's ordinary course projections.  For the purpose of the valuation analysis, given the transaction date of May 2014, it would have been appropriate to use the projections created in the ordinary course of business during the first quarter of 2014 which were included in the Q1 2014 LRP as discussed below.

### 1.  Change in Projections

The Four Properties projections that were initially provided to Centerview for the purpose of its draft valuation were materially lowered less than three weeks later.  Centerview noted in its Confidential Discussion Materials that the Special Committee directed Centerview to utilize projections provided by management on February 5, 2014 (the "February Business Plan") rather than the projections initially provided to Centerview and CAC on January 17, 2014 (the "January Business Plan").[415]  Similarly, Duff & Phelps was provided the January Business Plan when first retained, but shortly after was instructed by the Special Committee to utilize the February Business Plan.[416]

An analysis of the January Business Plan suggests that the initial projections for the Four Properties were primarily based upon the LRP.[417]  For example, the Bally's Las Vegas and Harrah's New Orleans projected EBITDA in the January Business Plan were consistent with the

---

[415] Centerview Partners "Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004683 [CENTERVIEW_0004670].

[416] J. Schiedemeyer Sept. 16, 2015 Tr. at 80:25-81:23;87:13-17.

[417] Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab "Centerview Sensitivity" [CENTERVIEW_0001017] (native file).

Q4 2013 LRP,[418] and the Cromwell's projected EBITDA was consistent with the Q1 2014 LRP.[419]

Further, the LRP served as the basis for the Growth Transaction just a few months earlier, and for the purpose of that transaction Evercore indicated that management stood behind its numbers.[420]   However, for the Four Properties Transaction, neither the LRP itself nor the initial January Business Plan were used.   The magnitude of the modifications that were made to the projected EBITDA in order to arrive at the February Business Plan is presented in Valuation Table 56.

---

[418]   Impairment Review (Dec. 31, 2013), at Tab "Q4 LRP" [CEOC_INVESTIG_00491055] (native file).

[419]   Impairment Review (Mar. 31, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).   The January Business Plan' projections for the Quad do not tie to the long-range plan, and the source for those projections is unclear.

[420]   N. Bryson Sept. 28, 2015 Tr. at 21:2-15.

**Valuation Table 56:  EBITDA Change from January Business Plan
to February Business Plan**

| amounts in millions | The Quad | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| January Business Plan | $    41 | $    85 | $    87 | $    97 | $    108 | $    418 |
| February Business Plan | $    26 | $    70 | $    72 | $    77 | $    83 | $    327 |
| % Reduction | -37% | -18% | -18% | -21% | -23% | -22% |

| amounts in millions | Bally's Las Vegas | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| January Business Plan | $    79 | $    88 | $    93 | $    105 | $    115 | $    480 |
| February Business Plan | $    75 | $    83 | $    87 | $    94 | $    99 | $    438 |
| % Reduction | -5% | -6% | -6% | -10% | -14% | -9% |

| amounts in millions | The Cromwell | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| January Business Plan | $    33 | $    51 | $    54 | $    57 | $    60 | $    255 |
| February Business Plan | $    28 | $    45 | $    47 | $    50 | $    52 | $    221 |
| % Reduction | -15% | -13% | -13% | -13% | -13% | -13% |

| amounts in millions | Harrah's New Orleans | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| January Business Plan | $    88 | $    91 | $    92 | $    99 | $    106 | $    476 |
| February Business Plan | $    87 | $    89 | $    89 | $    91 | $    93 | $    449 |
| % Reduction | -2% | -3% | -3% | -8% | -12% | -6% |

| amounts in millions | Four Properties Combined | | | | | |
|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | Total |
| January Business Plan | $    241 | $    315 | $    326 | $    358 | $    389 | $    1,629 |
| February Business Plan | $    216 | $    286 | $    295 | $    311 | $    327 | $    1,434 |
| % Reduction | -10% | -9% | -10% | -13% | -16% | -12% |

Source:  Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab
"Centerview Sensitivity" [CENTERVIEW_0001017] (native file).

The change in the projections for each property was a result of the modification of
various assumptions impacting both revenue and EBITDA (*e.g.*, growth assumptions, cost
initiatives, ADR, WPU).[421]  Without exception, every modification that was made to an
individual assumption resulted in lower revenue and/or EBITDA.  As shown above, the
projected EBITDA for each of the Four Properties in each projected year was reduced, with an

---

[421] Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab
"Summary of Changes" [CENTERVIEW_0001017] (native file).

aggregate reduction of more than 12%. The projected revenue was also reduced for each property in each year.

As previously discussed, the individual Four Properties exceeded their projections in some years and fell short in others, and the aggregate variance over the period from 2011 through 2013 was -2.8% (even given the significant construction disruption previously discussed). Therefore, the change in projections to arrive at the February Business Plan does not appear to be supported by an analysis of historical performance compared to budget. Further, the LRP had just been reduced a few months earlier in Q3 2013.[422]  Deloitte noted that Caesars reduced the Las Vegas revenue projections by approximately 1% to 5% and EBITDA projections by approximately 3% to 15% compared to prior period projections. A review of the quarterly LRPs noted a marked change in the outer-year growth rates and projected EBITDA for Bally's Las Vegas and Harrah's New Orleans.[423]

Brimmer viewed the January Business Plan as "reasonable and something management will endeavor to deliver."[424]  Brimmer further explained that the projections were only changed because Fred Kleisner asked for them to be changed, and that the change was outside of the ordinary course.

Q. [I]f Mr. Kleisner never brought up any changes would you have changed them?

A. No . . . we only changed the numbers because – we only presented an alternative case because Fred asked us to.

Q. All right. So the only reason you changed – you presented the February plan was because Fred asked. Otherwise in the ordinary course you would not have done that.

A. Correct. And not to knit-pick [*sic*] on nomenclature, but the plan didn't change. The budget for 2014 didn't change. The benchmark against which we were providing incentive compensation didn't change. It was just this alternative view that was more middle of the road, risk adjusted. That changed.[425]

Hession was not aware that the projections would be utilized by the financial advisors in the manner they were. Instead, he believed the projections would be adjusted by the "well-paid advisers" instead of "taking our numbers, copying them into a spreadsheet. . . ."[426]

---

[422]  *See* Section VI of the Final Report, *supra*.

[423]  *Id.*

[424]  E-mail from R. Brimmer to E. Moore, *et al.* (Feb. 4, 2014), at CEOC_INVESTIG_00068943 [CEOC_INVESTIG_00068943].

[425]  R. Brimmer Sept. 29, 2015 Tr. at 193:17-194:15.

[426]  E. Hession Nov. 4, 2015 Tr. at 304:21-305:13.

More importantly, the February Business Plan was never utilized for any other purpose. With respect to Dhivy Jayaseelan's inquiry regarding the Cromwell's lower set of projections on April 22, 2014, Spyro Costopoulos responded:

> Got it. Here is a "management sensitivity" case that was shown the special committees for their diligence. This was not used in any of the bank materials for the financing, etc. We believe the special committees just used this for their negotiations / forming opinions. So I wouldn't distribute further as "approved" by the banks.[427]

## 2. Contemporaneous View of Performance

At the same time that the projections for the Four Properties were being lowered for the express purpose of the fairness opinion for the Four Properties Transaction, Caesars painted a more positive view of actual and expected financial performance internally and to its Board of Directors (which included Special Committee members Kleisner and Lynn Swann), particularly for the Las Vegas market in which three of the Four Properties operate.

The Financial and Operating Review presented to the CEC Board of Directors at the February 20, 2014, meeting contained relevant views regarding actual results and expectations both for CEC overall and specific to the Las Vegas market.[428] For example:

- While the enterprise missed plan by $61 million in Q4 2013, the miss was attributed "primarily to gaming weakness in AC ($40m) and Tunica ($7m)."

- "Gaming revenue market share has generally improved across the enterprise in the most recent quarter."

- Las Vegas EBITDA exceeded plan for Q4 2013 and the full year 2013 by 6% and 8%, respectively.

- "Adjusted for hold, CEC beat its Las Vegas competitive set in Q4 due to hospitality growth and cost containment." The competitive set noted includes Las Vegas Sands and Wynn Resorts.

- "On a normalized basis, CEC outperformed its Las Vegas competitive set in 2013."

- In Las Vegas, resort fees added $24 million in incremental EBITDA in the ten months since implementation.

---

[427] E-mail from S. Costopoulos to D. Jayaseelan and M. Grey (Apr. 22, 2014), at CEOC_INVESTIG_00053650 [CEOC_INVESTIG_00053650].

[428] Board Package (Feb. 20, 2014), at CEC_EXAMINER_1265427-65 [CEC_EXAMINER_1265371].

- "After declining 3% in 2013, Las Vegas group revenue will increase 8% in 2014, driven by a strong Q1."

The 2014 Plan and Forecast Review was also presented to the CEC Board of Directors at the February meeting.[429]  This presentation noted:

- Management recommended a reduction in the operating plan for the enterprise from $2.10 billion in adjusted EBITDA to $2.05 billion.  Of the $50 million reduction, $30 million was due to Atlantic City and $15 million to Las Vegas.  However, the Las Vegas reduction was attributed to a timing difference relating to the Quad renovation, not weaker overall performance in the region.

- "Las Vegas is expected to deliver 14% EBITDA Ex growth in 2014 driven by realization of 5+5 initiatives."

Following the February 20, 2014, meeting of the CEC Board of Directors, the information that Caesars continued to compile and present reflected equally positive and improving views.

A May 2014 Las Vegas Update presentation (prepared in April 2014 in apparent preparation for the May 7, 2014, meeting of the CEC Board of Directors)[430] noted:[431]

- "In 2014, [Las Vegas Market] is projected to grow by $417M (13%) in revenue and EBITDA by $200M (23% YoY)."

- "While the broader market has been growing, fueled by non-gaming and international play, this represents a significant outpacing of market growth."

- "Through Q1 CEC has experienced strong performance, beating plan by $13MM (6%) and PY by $21MM (11%), with growth coming from all corners of the business."

- "Las Vegas continues to be a bright spot in domestic gaming, but with dynamics unique from other markets."

- "Despite intense competition, CZR finished 2013 strong, outperforming MGM and Wynn in Net Revenue and EBITDA growth in Q4."

---

[429] *Id.* at CEC_EXAMINER_1265466-98.

[430] E-mail from T. Clapsis to S. Wiegand (Apr. 27, 2014), at CEC_EXAMINER_1438381 [CEC_EXAMINER_1438381], attaching "Las Vegas Update" Presentation (May 2014), at CEC_EXAMINER_1438673-92 [CEC_EXAMINER_1438673].

[431] Nearly all of the following bullets were also included in the May 7, 2014 CEC Board of Directors package.

- "Adjusting for hold impact, CZR outperformed MGM, LVS, and Wynn on a EBITDA basis."

Another example is the regional presentation for New Orleans also prepared in April 2014[432] which noted the following:[433]

- "Harrah's NOR Quarterly EBITDA of $23.2M compares favorably to Plan (8%) but below PY (-16%) as the property's record-setting results in Q1 13 provides a difficult comparison."

- "Regional competitors continue to ramp their operations; however, we've yet to see a material impact to our business (although increased competitive capital investment remains on the horizon in 2014)."

- "Volumes are coming in as planned given loss of Super Bowl from 2013";

- "NOR 'Hybrid' market creates strong national contribution while driving significant local business";

- "Our current view for the market is that it is well positioned to achieve its full year 2014 EBITDA target."

Similar information was presented to the CEC Board of Directors in the Financial and Operating Review on May 7, 2014.[434]  Highlights provided regarding CEC's overall financial performance reflected equally positive views of the Las Vegas market:

- "CEOC EBITDA was flat to plan as strength in Las Vegas was offset by underperformance in Atlantic City and other regional markets";

- "Lodging Revenue grew 12% domestically, due entirely to Las Vegas";

- "F&B Revenue increased 3% due to new venues in Las Vegas";

- CEC Las Vegas EBITDA growth of 9% outperformed LVS and WYNN.  On a hold-normalized basis, CEC Las Vegas still outperformed LVS.

---

[432] Email from T. Clapsis to S. Wiegand (Apr. 27, 2014), at CEC_EXAMINER_1438381 [CEC_EXAMINER_1438381], attaching "New Orleans" Presentation (May 2014), at CEC_EXAMINER_1438563-94 [CEC_EXAMINER_1438563].

[433] All of the following bullets were also included in the May 7, 2014 Board of Directors package.

[434] Board Package (May 7, 2014), at TPG-Examiner_00770656-709 [TPG-Examiner_00770636].

- While 20 CEC properties are noted as having fallen short of plan for Q1 2014, Harrah's New Orleans, Bally's Las Vegas, and the Quad are all noted as beating plan. Cromwell was excluded as it had not yet opened.

- "CEC Group Revenue had the best quarter since the 2008 peak, on the strength of banquets and occupancy."

The 2014 Forecast Review was also presented to the CEC Board of Directors on May 7, 2014, noting:[435]

- "We expect the enterprise to deliver on-plan 2014 Adjusted EBITDA of $2,050M";

- "The Las Vegas market is expected to deliver 23% EBITDA Ex growth driven by realization of 5+5 initiatives and the openings of The Linq and The Cromwell";

- "We expect to achieve full year plan";

- "We still expect to achieve plan despite net risk";

- "Las Vegas market trends exceeded expectations for Q1, while Atlantic City and Central markets were weak";

- "Current pacing indicates 60% of initiatives will be realized by 2014 and 90% by 2015";

- In evaluating expected plan EBITDA and liquidity following the Four Properties Transaction, CEC compiled its pro forma estimates "based on LRP projections provided to accounting for impairment testing," not the lowered February Business Plan.

The view of 2014 expected results and of the Las Vegas and New Orleans markets generally, as evaluated internally and presented to the CEC Board of Directors, was in clear contradiction to the change in projections to the February Business Plan.

### 3. Unfounded Use of February Business Plan

Rather than the February Business Plan, the more appropriate projections to utilize for a valuation of the Four Properties would have been the Q1 2014 LRP, prepared in or around March 2014, as it represented the latest set of ordinary course projections as of the transaction date. The Q1 2014 LRP was similar to the January Business Plan and reflected the improvement in the actual and expected performance described above. While it is unclear why these projections were not provided to the financial advisors, the Q1 2014 LRP should have been used to derive the fair market value of the Four Properties.

---

[435] *Id*. at TPG-Examiner_00770776-808.

There is nothing in either the recent years' financial data or Caesars' internal analyses to contemporaneously justify the reduction in the projections.  In summary:

- The Four Properties in the aggregate had missed plan by only 2.8% (even with the significant construction disruption from remodeling and construction activities) in the most recent three years;

- The LRP was utilized for all other purposes, including evaluating pro forma EBITDA and liquidity anticipated as a result of the Four Properties Transaction;

- The LRP served as the basis for the Growth Transaction just a few months earlier, and for the purpose of that transaction management defended its projections;

- The arguably aggressive assumptions embedded in the earlier LRPs had already been tempered by late 2013 to become more realistic and achievable;

- As of early 2014, the Las Vegas and New Orleans markets were ahead of and expected to achieve plan;

- 90% of cost initiatives were expected to be achieved by 2015 (whereas the February Business Plan applied a 25% discount to cost initiatives for Bally's Las Vegas and Harrah's New Orleans);[436] and

- None of the individual Four Properties were behind plan year-to-date.

### C. Centerview Fairness Opinion

### 1. Opinion Overview

On January 24, 2014, Centerview presented to the CEC Special Committee its preliminary views regarding the value of the Four Properties based on, among other things, the January Business Plan.[437]  In this initial valuation, Centerview determined a valuation range for the Four Properties of $1.9 billion to $3.5 billion.[438]

On May 4, 2014, Centerview issued its final Confidential Discussion Materials in which it provided a reference range of values for each of the assets.  While each of the methodologies and individual assets is discussed in greater detail in the following section, Valuation Table 57 presents a summary of the total reference range determined by Centerview for the Four Properties.

---

[436] Centerview Comparison of January and February Business Plan (Feb. 5, 2014), at Tab "Summary of Changes" [CENTERVIEW_0001017] (native file).

[437] J. Bosacco Sept. 15, 2015 Tr. at 104:12-25; Centerview "Confidential Discussion Materials" Presentation (Jan. 24, 2014), at CENTERVIEW_0002574 [CENTERVIEW_0002563].

[438] Centerview "Confidential Discussion Materials" Presentation (Jan. 24, 2014), at CENTERVIEW_0002574 [CENTERVIEW_0002563].

**Valuation Table 57:  Centerview Valuation Summary**

| *amounts in thousands* | DCF | Trading Multiples | Precedent Transactions |
|---|---|---|---|
| Reference Range - low | $  1,978,000 | $  1,788,000 | $  1,700,000 |
| Reference Range - high | $  2,491,000 | $  2,312,000 | $  2,202,000 |

Source:  Centerview Partners "Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004687 [CENTERVIEW_0004670].

The values calculated by Centerview represented enterprise values and were not presented net of the $185 million of debt assumed for the Cromwell.

**2.  Valuation Methodology**

**a.  Methodologies**

Centerview valued each of the Four Properties casinos using three valuation methods: (i) DCF Method; (ii) GPC Method, and (iii) Precedent Transactions Method.  The 50% interest in the management fee stream was valued using the DCF Method for each property.  A summary of the value ranges calculated by Centerview under each methodology is included in Valuation Table 58.

**Valuation Table 58:  Centerview Valuation Ranges by Asset**

| *amounts in thousands* | DCF | Trading Multiples | Precedent Transactions | Management Contract (50%) |
|---|---|---|---|---|
| The Quad - low | $    218,000 | $    149,000 | $    149,000 | $    31,500 |
| The Quad - high | $    317,000 | $    245,000 | $    245,000 | $    42,000 |
| Bally's Las Vegas - low | $    656,000 | $    588,000 | $    530,000 | $    45,000 |
| Bally's Las Vegas - high | $    806,000 | $    736,000 | $    662,000 | $    59,000 |
| The Cromwell - low | $    364,000 | $    324,000 | $    324,000 | $    18,500 |
| The Cromwell - high | $    445,000 | $    405,000 | $    405,000 | $    24,500 |
| Harrah's New Orleans - low | $    596,000 | $    582,000 | $    553,000 | $    48,500 |
| Harrah's New Orleans - high | $    735,000 | $    737,000 | $    700,000 | $    64,000 |

Source:  Centerview Partners "Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004690 [CENTERVIEW_0004670].

Bosacco indicated that as a firm, Centerview typically weights its valuation methods equally.[439]  The DCF values calculated by Centerview were generally higher than the values using trading multiples and precedent transactions.  In the aggregate, while the low end of the

---

[439] J. Bosacco Sept. 15, 2015 Tr. at 192:20-21.

DCF range for the Four Properties was in line with the purchase price at $1.98 billion, the high end of the DCF range was nearly $2.5 billion, meaning that the value of the assets could have been as much as $491 million higher, or 25%, than the actual transaction price of $2 billion.

### b.  Projections

As discussed previously, the values determined by Centerview were derived based upon the February Business Plan and therefore were lower than the values that would have been derived had either the initial January Business Plan or the Q1 2014 LRP been utilized.  The most appropriate projections to utilize for a valuation of the Four Properties would have been the Q1 2014 LRP as it represented the latest set of projections as of the transfer date.

### c.  Multiples

Centerview considered six companies in its public company trading analysis, two Las Vegas/international operators and four regional operators.  Only the regional operators were considered for Harrah's New Orleans.  The companies considered by Centerview, and the corresponding EBITDA multiples, are presented in Valuation Table 59.

**Valuation Table 59:  Centerview Comparables**

| Company | 2015 EBITDA Multiple |
|---|---|
| **Las Vegas Operators:** | |
| Wynn Resorts | 14.7x |
| MGM Resorts | 10.5x |
| **Regional Operators:** | |
| Penn National Gaming | 11.5x |
| Boyd Gaming | 8.5x |
| Pinnacle Entertainment | 9.0x |
| Isle of Capri Casinos | 7.0x |
| *Average - All* | *10.2x* |
| *Average - Regional Only* | *9.0x* |
| Selected Range - Quad | 7.5x - 9.5x |
| Selected Range - Bally's | 8.0x - 10.0x |
| Selected Range - Cromwell | 8.0x - 10.0x |
| Selected Range - Harrah's | 7.5x - 9.5x |

Source: "Confidential Discussion Materials" Presentation (May 4, 2014), at CENTERVIEW_0004690 and 699 [CENTERVIEW_ 0004670].

For the Las Vegas operators, Centerview performed an analysis of the implied value of the Las Vegas operations for both Wynn Resorts and MGM Resorts by disaggregating the

companies' international operations (*i.e.*, Macau), calculating an implied Las Vegas 2015 EBITDA multiple of 14.7x for Wynn and 10.5x for MGM.  As expected, the implied Las Vegas multiples for MGM and Wynn Resorts were lower than the multiples for the entire international enterprise.  However, they were still considerably higher than the average of the regional operators.  Centerview's analysis appears to show that Las Vegas operators commanded a higher multiple even when international operations are excluded.

Ultimately, even after disaggregating the international operations of the Las Vegas operators, Centerview selected a range of multiples for the Las Vegas assets (Bally's Las Vegas, the Quad, and the Cromwell) that was below the average of the Las Vegas and regional comparables.

In its precedent transactions approach, Centerview only utilized Las Vegas properties to value the Las Vegas assets.  Again, Centerview selected a range of multiples below the indicated average and median for the Las Vegas-based precedent transactions.  In his interview, Bosacco conceded that "there is not an ideal direct comparable from a comparable company basis"[440] and "there are not a lot of comparable transactions out there."[441]  Other observations related to Centerview's analysis include:

- Centerview did analyze the growth trajectory and EBITDA margin for the Four Properties assets compared to the selected public companies.[442]  It should be noted that the Four Properties generally had greater projected revenue growth than the public companies.

- Centerview utilized a number of transactions which occurred during the recession in 2008 and 2009 but did not make any adjustment to account for the impact of the recession during that time.[443]

### d.  Rent Expense

In its valuation of the Quad, Centerview did not appropriately account for the rent expense for O'Shea's casino (a/k/a RDE Casino from the CERP Transaction).   In order to understand the issue involving the Quad's rent expense, Valuation Figure 3 presents the transaction flow of RDE Casino and the Quad, followed by the relevant facts.

---

[440]  J. Bosacco Sept. 15, 2015 Tr. at 191:22-23.

[441]  *Id*. at 192:14-15.

[442]  *Id*. at 217:8-23.

[443]  *Id*. at 210:19-211:6.



**Appendix 7, Solvency**

**Valuation Figure 3:  RDE Casino Asset and Rent Flowchart**



- RDE Casino physically sits within the Quad Casino and can be accessed either through the Quad casino or the LINQ Retail complex.  RDE casino itself is managed by the Quad, and all revenue and expenses are run through the Quad, including the annual rent expense.

- RDE Casino was sold to CERP in October 2013 and then was leased back to CEOC for $15 million a year paid by the Quad (the lease amount was set based upon the historical profits of O'Shea's).

- As part of the CERP Transaction, CERP assumed $450 million of LINQ/Octavius debt, which had been used to fund, in part, the construction of the Observation Wheel, LINQ Retail, Octavius Tower and RDE Casino.

- After the CERP Transaction, CEOC leased back only RDE Casino and Octavius Tower, paying rent to CERP that was used, at least in part, to service the $450 million LINQ/Octavius debt.[444]

- The rent for RDE Casino is disproportionate to the value assigned by Perella for the casino.  RDE Casino represented approximately 10% of the total enterprise

---

[444] The $35 million lease payment for Octavius Tower, which was set up for credit support on the LINQ/Octavius debt, was insufficient to cover the entirety of the debt service, particularly after accounting for property taxes and insurance.

value of the assets transferred to CERP; however, it represents 30% of the lease payments used to service the LINQ/Octavius debt. As such, the $15 million in annual rent is being used to service the debt for construction of additional assets beside RDE Casino.

As part of the Four Properties Transaction, the Quad was sold to CGP. The sale of the Quad included the projected operating and financial results of RDE Casino, including the payment of the $15 million rent to CERP. The $15 million rent expense for RDE Casino included in the projections for the Quad is utilized to cover a portion of the interest expense associated with third-party debt held by a related party. The interest expense is then charged to the Quad as "rent." Prior to the CERP Transaction, the Quad's facility cost was capitalized by debt; therefore, the associated interest expense would be excluded in a calculation of EBITDA for the Quad. In order to properly match the financial statistic of the Quad to the GPCs, the rent charge should be added back to the stated EBITDA, which is referred to as EBITDAR.[445]

Rent, particularly in this case, can be viewed as a financing mechanism, no different from debt. Typically, when EBITDAR is utilized to value an entity, the corresponding present value of the lease payments is deducted in order to approximate the debt value of the lease. However, in the case of the Quad, the debt value of the RDE Casino lease payments was already deducted in the CERP Transaction. Specifically, the $450 million in LINQ/Octavius debt was deducted to arrive at the equity value transferred by CEOC to CERP; therefore, as part of the Four Properties Transaction it would be duplicative to deduct the rent expense in arriving at both the enterprise value and equity value of the Quad.

## D. Duff & Phelps Opinion

### 1. Opinion Overview

On May 5, 2015, Duff & Phelps issued its "Presentation to the Special Committee of the Board of Directors of and the Board of Directors of Caesars Entertainment Corporation and the Board of Directors of Caesars Entertainment Operating Company, Inc." which addressed the valuation of the Quad, Bally's Las Vegas, and the Cromwell.[446] On May 19, 2014, Duff & Phelps issued an additional "Presentation to the Special Committee of the Board of Directors of and the Board of Directors of Caesars Entertainment Corporation and the Board of Directors of Caesars Entertainment Operating Company, Inc." which addressed the valuation of Harrah's New Orleans.[447]

Duff & Phelps selected an overall enterprise value range for the Four Properties of $1.802 billion to $2.191 billion. Duff & Phelps' value range included $63 million to $189 million attributed to the present value of goodwill amortization tax shield.

---

[445] EBITDAR represents Earnings Before Interest, Taxes, Depreciation, Amortization, and Rent.

[446] Duff & Phelps "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 5, 2014), at DP00000043 [DP00000043].

[447] Duff & Phelps "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 19, 2014), at DP00000045 [DP00000045].

### 2.  Valuation Methodology

#### a.  Methodologies

Duff & Phelps considered three valuation methods in valuing the Four Properties casinos: (i) DCF Method; (ii) GPC Method, and (ii) Precedent Transactions Method.[448]  Duff & Phelps ultimately did not utilize the data from its precedent transaction analysis to specifically pick multiples because the "comps are a better data set," yet it was considered as part of an overall public market approach.[449]

Valuation Table 60 presents a summary of the value ranges calculated by Duff & Phelps under each methodology as well as the additional value Duff & Phelps determined for the management fee stream (which was not broken out by property in Duff & Phelps' valuation presentation).

**Valuation Table 60:  Duff & Phelps Valuation Summary**

| amounts in thousands | Selected Value Range | DCF | Transactions / Trading Multiple |
|---|---|---|---|
| The Quad - low | $    149,000 | $    160,000 | $    138,000 |
| The Quad - high | $    199,000 | $    211,000 | $    186,000 |
| Bally's Las Vegas - low | $    608,000 | $    619,000 | $    596,000 |
| Bally's Las Vegas - high | $    687,000 | $    712,000 | $    662,000 |
| The Cromwell - low | $    330,000 | $    335,000 | $    324,000 |
| The Cromwell - high | $    373,000 | $    381,000 | $    365,000 |
| Harrah's New Orleans - low | $    517,000 | $    506,000 | $    528,000 |
| Harrah's New Orleans - high | $    589,000 | $    576,000 | $    601,000 |
| Management Contract (50%) - low | $    135,000 | $    135,000 | |
| Management Contract (50%) - high | $    154,000 | $    154,000 | |
| Four Properties Total - low | $    1,739,000 | | |
| Four Properties Total - high | $    2,002,000 | | |

Sources:  Duff & Phelps "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 5, 2014), at DP00000043 [DP00000043]; Duff & Phelps "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 19, 2014), at DP00000045 [DP00000045].

---

[448]  Duff & Phelps' "public company analysis" is the same as the GPC Method previously described in the Overview of Valuation and Valuation Methodologies, and its "M&A transaction analysis" is the same as the Guideline Company Transaction Method.

[449]  J. Schiedemeyer Sept. 16, 2015 Tr. at 222:10-23.

Duff & Phelps' final selected value conclusions for the casino properties represent the midpoint of the DCF analysis and the public market analysis. Jeff Schiedemeyer of Duff & Phelps indicated that it is typical for his firm to apply equal weighting to the methods.[450]

In addition to the values noted in Valuation Table 60, Duff & Phelps also included additional value related to the present value of goodwill amortization tax shield, ranging from $63 million to $189 million, that Duff & Phelps assumed would inure to the benefit of CEOC. However, for valuation purposes, this value should not be included as the economic tax benefit relates to certain sections of the Internal Revenue Code dealing with purchase price allocation rather than fair market value. Importantly, the market multiples and WACC are based upon guideline public company data which do not reflect any such tax benefits. Therefore, the tax shield as calculated by Duff & Phelps should not have been included when determining the value of the Four Properties in comparison to the transaction price of $2 billion.

**b.  Projections**

Like Centerview, Duff & Phelps utilized the February Business Plan for its valuation of the Four Properties. While it was initially provided with the January Business Plan, shortly afterwards the Special Committee instructed Duff & Phelps to use the revised projections.[451] Schiedemeyer noted, "We specifically do not express opinions on management's projections."[452]

As previously discussed, the more appropriate projections to utilize in a valuation of the Four Properties would have been the Q1 2014 LRP.

**c.  Multiples**

Duff & Phelps included nine companies in its public company trading analysis, three Las Vegas/international operators, and six regional operators. The companies considered by Duff & Phelps, and the corresponding multiples, are presented in Valuation Table 61.

---

[450] *Id*. at 223:7-13.

[451] *Id*. at 80:25-81:23, 87:13-17.

[452] *Id*. at 91:16-17.

**Valuation Table 61:  Duff & Phelps Comparables**

| Company | TTM EBITDA Multiple | 2014 EBITDA Multiple | 2015 EBITDA Multiple |
|---|---|---|---|
| **Las Vegas Operators:** | | | |
| Las Vegas Sands | 18.8x | 15.5x | 14.1x |
| Wynn Resorts | 18.9x | 16.4x | 15.4x |
| MGM Resorts | 14.1x | 12.9x | 11.9x |
| **Regional Operators:** | | | |
| Penn National Gaming | 6.9x | 7.4x | 7.0x |
| Boyd Gaming | 10.4x | 9.5x | 9.1x |
| Pinnacle Entertainment | 9.3x | 9.6x | 9.4x |
| Isle of Capri Casinos | 7.8x | 7.6x | 7.3x |
| Churchill Downs | 10.3x | 7.9x | 7.6x |
| Monarch Casino | 7.1x | 6.9x | 6.5x |
| *Mean - All* | *11.5x* | *10.4x* | *9.8x* |
| Selected Range - Quad | | | 7.5x - 8.5x |
| Selected Range - Bally's | | 9.0x - 10.0x | |
| Selected Range - Cromwell | | | 8.0x - 9.0x |
| Selected Range - Harrah's | 7.5x - 8.5x | 7.0x - 8.0x | |

Sources:  Duff & Phelps "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 5, 2014), at DP00000043 [DP00000043].; Duff & Phelps "Presentation to the Special Committee and Board of Directors of CEC and CEOC" (May 19, 2014), at DP00000045 [DP00000045].

The range of multiples selected by Duff & Phelps for each asset was below the indicated mean from the guideline public companies.

In deriving the value of the properties, Schiedemeyer indicated:

- "We see them kind of fitting in between the regionals and the larger Vegas properties with Macau exposure.  And that's how we went about selecting our multiples.  And then we made a distinction, you know, with growth between the properties that may have been influenced slightly higher or slightly lower for an individual property based on growth after expectations."[453]  Schiedemeyer viewed the Four Properties, with the exception of Harrah's New Orleans, to be destination properties, distinct from regional properties which draw more from their immediate geography.[454]

---

[453]  *Id.* at 212:21-213:5.

[454]  *Id.* at 213:18-214:17.

- Schiedemeyer indicated Total Rewards impacts the selection of the multiple through its impact on the growth expectations for the properties, stating, "And in our view investors would attach a lower multiple to a lower growth business."[455]

### d.  Rent Expense

Like Centerview, Duff & Phelps also did not appropriately account for the rent expense for O'Shea's casino in its valuation of the Quad.

## E.  Contemporaneous Indicators of Value

### 1.  Impairment Testing Values

As part of its annual impairment testing, Caesars performed enterprise valuations for its casino properties, including Bally's Las Vegas and Harrah's New Orleans.  The valuation conclusions and methodologies were reviewed by Deloitte.  A summary of the values calculated for 2011 through 2013 is presented in Valuation Table 62 and Valuation Table 63.

**Valuation Table 62:  Bally's Las Vegas Impairment Testing Values**

| amounts in thousands | 30-Sep-11 | 30-Sep-12 | 30-Sep-13 |
|---|---|---|---|
| Fair Value based upon EBITDA Multiple | $    554,653 | $    460,698 | $    523,144 |
| Fair Value based upon DCF Analysis | $ 1,321,188 | $    923,915 | $    822,244 |
| EBITDA Weight | 20% | 20% | 20% |
| DCF Weight | 80% | 80% | 80% |
| Weighted Fair Value | $ 1,167,881 | $    831,272 | $    762,424 |

Source:  Impairment Review (Sept. 30, 2011), at Tab "GW-3 EBITDA Analysis" [DT0022111] (native file); Impairment Review (Sept. 30, 2012), at Tab "GW-3 EBITDA Analysis" [DT0005005] (native file); Impairment Review (Sept. 30, 2013), at Tab "GW-3 EBITDA Analysis" [DT0009709] (native file).

The weighted fair value calculated in the impairment testing for Bally's Las Vegas as of September 30, 2013, of $762.4 million is 15% greater than the average of the values calculated by Centerview using its three valuation methodologies, and 18% greater than the midpoint of Duff & Phelps' selected value range for Bally's Las Vegas.

---

[455] *Id.* at 213:6-17.

**Valuation Table 63:  Harrah's New Orleans Impairment Testing Values**

| amounts in thousands | 30-Sep-11 | 30-Sep-12 | 30-Sep-13 |
|---|---|---|---|
| Fair Value based upon EBITDA Multiple | $  570,740 | $  617,184 | $  703,894 |
| Fair Value based upon DCF Analysis | $  917,105 | $  847,779 | $  878,669 |
| EBITDA Weight | 20% | 20% | 20% |
| DCF Weight | 80% | 80% | 80% |
| Weighted Fair Value | $  847,832 | $  801,660 | $  843,714 |

Source:  Impairment Review (Sept. 30, 2011), at Tab "GW-3 EBITDA Analysis" [DT0022111] (native file); Impairment Review (Sept. 30, 2012), at Tab "GW-3 EBITDA Analysis" [DT0005005] (native file); Impairment Review (Sept. 30, 2013), at Tab "GW-3 EBITDA Analysis" [DT0009709] (native file).

The weighted fair value calculated in the impairment testing for Harrah's New Orleans as of September 30, 2013, of $843.7 million is 30% higher than the average value calculated by Centerview using its three valuation methodologies, and 53% greater than the midpoint of Duff & Phelps' selected value range for Harrah's New Orleans.

In its impairment testing review in 2013, Deloitte noted that the implied multiples for the Las Vegas properties, after weighting the income and market approaches applied by Caesars, resulted in an EBITDA multiple range of 11.0x to 11.5x.  Deloitte determined this range to be reasonable compared to the EBITDA multiples reflected in analyst reports and in recent transactions.[456]  However, the multiples used by Centerview and Duff & Phelps were materially lower than this range.

Neither the Quad nor the Cromwell appears to have been subject to impairment testing procedures during this timeframe.

**2.  Other Indicators**

A number of documents prepared in late 2013 and early 2014 provide a range of valuation multiple indications for the Four Properties assets.

- A November 2013 Board of Directors Liquidity Discussion presentation presented illustrative asset sale proceeds for the Four Properties assuming an EBITDA multiple range of 8.0-10.0x for the Cromwell, the Quad, and Bally's Las Vegas and 6.0-8.0x for Harrah's New Orleans.[457]  Beato described these multiples as

---

[456] Deloitte Memorandum – ASC 350:  Goodwill and Non-amortizing Intangible Assets Impairment Testing (Nov. 1, 2013), at DT0005264 [DT0005245].

[457] "Liquidity Discussion" Presentation (Nov. 24, 2013), at CEOC_INVESTIG_00026847 (native file) at 9.

"conservative," indicating that most Las Vegas analysts would use a 10.0x multiple for Las Vegas and 7.0-8.0x for regional.[458]

- A November 2013 Sponsor deck valued CEOC's equity using an 11.0x multiple.[459]

## F.  Valuation Range for the Four Properties

### 1.  Valuation Date

The valuation date for the three Las Vegas-based properties, Bally's Las Vegas, Cromwell, and Quad ("Las Vegas Properties") was May 5, 2014, the date the first portion of the transaction closed.  The valuation date for Harrah's New Orleans was May 20, 2014, the date the second portion of the transaction closed.

### 2.  Guideline Public Companies

The process for selecting GPCs for the Four Properties was the same as previously outlined for the Growth Assets.  The same ten GPCs were considered and selected for the Four Properties.

For the purpose of selecting the valuation multiples for the Four Properties, Caesars and Las Vegas Sands were again excluded for the reasons previously outlined.

A description of each of the GPCs, as well as a summary of their financial and operational data, can be found attached to this Appendix as Exhibit A.

### 3.  Income Approach – DCF

The projections included in the Q1 2014 LRP were utilized in the DCF model.[460] However, because the LRP did not include multi-year projections for capital expenditures, the amounts from the January Business Plan were utilized for projected capital expenditures.[461]

The LRP projects EBITDARM.  Since the management fees were valued separately, management fees were deducted to arrive at the appropriate financial metric for each property (EBITDA for Bally's Las Vegas, the Cromwell, and Harrah's New Orleans, and EBITDAR for the Quad).

---

[458] J. Beato Sept. 24, 2015 Tr. at 253:8-21.

[459] Apollo "Caesars: Discussion Materials" Presentation (Nov. 2013), at CEOC_INVESTIG_00010374 (native file) at 11.

[460] Impairment Review as of Mar. 31, 2014 (Apr. 30, 2014), at Tab "Q1 LRP" [CEOC_INVESTIG_00162537] (native file).

[461] The January Business Plan was utilized for projected capital expenditures since that set of projections more closely correlated to the LRP than the February Business Plan utilized by Centerview and Duff & Phelps.

**Appendix 7, Solvency**

For the terminal period, depreciation and capital expenditures were set equal to a normalized level of capital expenditures. For the Quad, Bally's Las Vegas, and Harrah's New Orleans it was determined that a normalized level of capital expenditures would be $11.5 million, $11.2 million, and $13.9 million, respectively. This level is in excess of historical maintenance capital expenditures for the property and is consistent with projected capital expenditures as of the time of the Four Properties Transaction. For the Cromwell, normalized capital expenditures were set at $6.2 million, an amount in excess of projected capital expenditures since capital expenditures into perpetuity would exceed those in the first few years as a new property.

The projections were then discounted utilizing the appropriate WACC and capitalization rates. Both Centerview and Duff & Phelps valued the Four Properties as the sale of four individual assets as opposed to four assets sold as one cohesive business. The difference impacts the calculated WACC. As part of the WACC calculations, a size premium is included in the cost of equity calculations (a component of the WACC). When viewed individually, the size premium for each of the Four Properties ranges from 2.36% to 2.81%. However, when viewed as a single business unit, the size premium is reduced to 1.86%, resulting in a reduction in the WACC and an increase in the calculated enterprise value. The latter approach has been selected. The rationale to view the Four Properties as the sale of one business unit as opposed to four separate asset sales is as follows:

- The properties were acquired by the same buyer (CGP);

- The properties were sold by the same seller (CEOC);

- The properties are all casino hotels with the same risk characteristics;

- The properties will continue to be managed by the same management team at both the property and corporate levels;

- The properties will continue to be managed as part of the larger Caesars network;

- The properties will still be managed and marketed as part of Total Rewards;

- The bifurcated closing occurred within the same month; and

- As a group, the properties constitute a going concern.

The resulting WACC for the Quad, Bally's Las Vegas, and the Cromwell was 8.8%. The WACC for Harrah's New Orleans was 8.5%. In each instance, a long-term growth rate of 2.0% was selected to arrive at capitalization rates for the Las Vegas Properties and Harrah's New Orleans of 6.8% and 6.5%, respectively. The enterprise value of each asset was determined by using a range of discount rates plus or minus 50 basis points (0.5%) from the calculated WACC.

### 4. Market Approach – Selected Multiples

The multiples selected for the market approach were based upon the trading multiples of the GPCs at or around the respective valuation dates. For the valuation of each of the Four

Properties, a range of EBITDA multiples was utilized using a combination of trailing twelve months (TTM) and forward-looking multiples, depending on property-specific factors. Because of the construction development and material renovations to the three Las Vegas Properties, forward-looking EBITDA multiples were most appropriate as the historical operations may not be reflective of future expectations. The forward multiples provide a reasonable basis for determining an indication of value by accounting for the forecasted cash flow growth through the operational maturity indicated in the projections.

Harrah's New Orleans had an established history of operations and the property was not in the process of a material change at the time of the Four Properties Transaction. As such, utilizing both TTM EBITDA multiples and 2014E EBITDA multiples was deemed to be appropriate.

The South Tower of Bally's Las Vegas was renovated in 2013. Therefore, the multiples selected were 2014E and 2015E EBITDA multiples. Similarly, the Quad and the Cromwell were not operating in a steady state in either 2013 or 2014 due to renovations. Therefore, only 2015E multiples were utilized.

A summary of the selected multiples for each of the Four Properties is shown in Valuation Table 64.

**Valuation Table 64: Selected Multiples – Four Properties Transaction**

| TTM EBITDA Multiple | Low | High |
|---|---|---|
| The Quad | NA | NA |
| Bally's Las Vegas | NA | NA |
| The Cromwell | NA | NA |
| Harrah's New Orleans | 9.0 x | 10.0 x |

| 2014E EBITDA Multiple | Low | High |
|---|---|---|
| The Quad | NA | NA |
| Bally's Las Vegas | 10.0 x | 11.0 x |
| The Cromwell | NA | NA |
| Harrah's New Orleans | 8.5 x | 9.5 x |

| 2015E EBITDA Multiple | Low | High |
|---|---|---|
| The Quad | 9.5 x | 10.5 x |
| Bally's Las Vegas | 9.5 x | 10.5 x |
| The Cromwell | 9.5 x | 10.5 x |
| Harrah's New Orleans | NA | NA |

Source: See Appendix 7: Valuation Analyses for support.

The selected multiples for the three Las Vegas Properties were based on both a qualitative and quantitative analysis of the subject properties as compared to the Las Vegas Strip-

based GPCs, as well as the regional GPCs, and are generally bracketed around the median multiples of all the GPCs. The three Las Vegas Properties would command higher multiples than regional and would be more in line with the Las Vegas GPCs due to their location on the Las Vegas Strip.

Accordingly, the selected multiples take into account both qualitative and quantitative factors, which resulted in multiples lower than the Las Vegas GPCs. The selection of multiples for Harrah's New Orleans are bracketed at or below the median of the GPCs, reflecting the geographic location of Harrah's New Orleans and its status as more of a "super-regional" type of property. These factors would result in the market paying less, on a relative basis, than for the Las Vegas-based GPCs but more than the purely regional GPCs.

The multiples were applied to the appropriate financial metric for each property (EBITDA for Bally's Las Vegas, the Cromwell, and Harrah's New Orleans and EBITDAR for the Quad) from the Q1 2014 LRP and, in the case of Harrah's New Orleans, TTM historical EBITDA.

For the Quad and the Cromwell, 2015E multiples were given 100% weighting due to the timing of the forecast and the risk and likelihood of achieving the significant future increases in revenue and resulting cash flow within the forecast. Bally Las Vegas's 2014E multiple was accorded 75% weighting, with the remaining 25% given to the 2015E multiple, again based on the assumption of the likelihood of achieving the forecast given the state of operations as of the valuation date. Harrah's New Orleans was equally weighted between the TTM and 2014E multiples, as the subject property was more stabilized as of the valuation date.

### 5.  Management Fees

In determining the value of the management fees associated with the Four Properties, the same projections, discount rates and capitalization rates as noted in the DCF Method were used. The projected management fees were based on 2% of projected revenues and 5% of projected EBITDAM. According to the documents, 50% of the calculated management fee would be retained by CEOC. The resulting estimated management fees were reduced by the appropriate tax rate and then discounted to present value at a discount rate consistent with the WACC utilized in each of the subject property valuations.

### 6.  Valuation Conclusion

The quality of data available, reasonably comparable set of GPCs, and the robust forecasting process undertaken by Caesars in creating the projections, supports placing equal weighting on the two methods. Also, both the DCF Method and GPC Method utilized the forecasted future operations given (i) the use of forward multiples in the GPC Method, and (ii) the inherent reliance on the forecast in the DCF Method. Although the Four Properties Transaction was bifurcated between the three Las Vegas Properties and Harrah's New Orleans, with separate closing dates of May 5, 2014 and May 20, 2014, respectively, the valuation conclusions are shown on a combined basis in Valuation Table 65. As discussed in the Overview of Valuation and Valuation Methodologies section of this Appendix, the use of precedent transactions was considered but not ultimately relied upon.

Valuation Table 65 also includes the value of the excess land transferred in connection with the Four Properties Transaction, the value of which is discussed in the next section of this Appendix.

### Valuation Table 65: Valuation Conclusions – Four Properties, Management Fees, and Land

*In Millions of $US*

| The Quad | Weighting | Low | | High | |
|---|---|---|---|---|---|
| Guideline Public Company Method | 50% | $ | 571.0 | $ | 653.0 |
| Discounted Cash Flow Method | 50% | | 564.8 | | 689.7 |
| Concluded Range | | $ | 567.9 | $ | 671.4 |
| Add: Management Fee Stream (50%) | | $ | 45.6 | $ | 52.9 |
| Enterprise Value - The Quad | | $ | 613.5 | $ | 724.3 |
| **Bally's Las Vegas** | **Weighting** | **Low** | | **High** | |
| Guideline Public Company Method | 50% | $ | 714.5 | $ | 786.9 |
| Discounted Cash Flow Method | 50% | | 768.5 | | 891.0 |
| Concluded Range | | $ | 741.5 | $ | 839.0 |
| Add: Management Fee Stream (50%) | | $ | 51.9 | $ | 60.1 |
| Enterprise Value - Bally's Las Vegas | | $ | 793.4 | $ | 899.1 |
| **The Cromwell** | **Weighting** | **Low** | | **High** | |
| Guideline Public Company Method | 50% | $ | 440.8 | $ | 487.2 |
| Discounted Cash Flow Method | 50% | | 440.4 | | 505.4 |
| Concluded Range | | $ | 440.6 | $ | 496.3 |
| Add: Management Fee Stream (50%) | | $ | 23.2 | $ | 26.8 |
| Enterprise Value - The Cromwell | | $ | 463.8 | $ | 523.1 |
| **Harrah's New Orleans** | **Weighting** | **Low** | | **High** | |
| Guideline Public Company Method | 50% | $ | 649.6 | $ | 723.9 |
| Discounted Cash Flow Method | 50% | | 684.9 | | 793.3 |
| Concluded Range | | $ | 667.3 | $ | 758.6 |
| Add: Management Fee Stream (50%) | | $ | 54.5 | $ | 63.3 |
| Enterprise Value - Harrah's New Orleans | | $ | 721.8 | $ | 821.9 |
| **Total - Four Properties Transaction** | | **Low** | | **High** | |
| **Total Enterprise Value** | | **$** | **2,592.4** | **$** | **2,968.3** |
| Less: Cromwell Debt Assumed | | $ | (185.0) | $ | (185.0) |
| **Total Equity Value - Casino Properties** | | **$** | **2,407.4** | **$** | **2,783.3** |
| Add: Excess Land | | $ | 109.0 | $ | 140.0 |
| **Total Equity Value - Casino Properties and Excess Land** | | **$** | **2,516.4** | **$** | **2,923.3** |

Note: Values reflected above do not include any amount associated with Total Rewards or CES.

**Appendix 7, Solvency**

The Fair Market Value of the Four Properties, after accounting for the remaining renovation costs for the Quad and the 50% portion of the management fee streams, was reasonably estimated as ranging between $2.59 billion and $2.97 billion.[462]  After accounting for CGP's assumption of the Cromwell debt, the total equity value was reasonably estimated as ranging between $2.41 billion and $2.78 billion.  The complete valuation models for the Four Properties and management fees are attached as Exhibit H to this Appendix.

This analysis indicates that CEOC did not receive reasonably equivalent value based upon the $2 billion transaction price, and the total deficit ranges from $592 million to $968 million for the Four Properties alone, and $701 million to $1.1 billion including the excess land.

Further, as will be described in greater detail later in this Appendix, the transfer of CEOC's Las Vegas-based assets as part of the Four Properties Transaction, as well as the Growth and CERP Transactions, substantially altered the complexion of CEOC and transformed it into a primarily regional casino operator.

## G.  Four Properties Land Transfers and Easements

### 1.  Easement Lots

In 2011, various Debtor entities granted easements on four lots (containing numerous parcels totaling approximately 25.8 acres of land that is directly east of the LINQ Hotel & Casino, Flamingo Las Vegas Hotel & Casino, and the Cromwell (collectively, "Easement Lots"). The grantees included:  (i) Flamingo Las Vegas Propco, LLC (granted at no cost); (ii) Harrah's Imperial Palace Corp. (granted for $260,000 per year, subject to annual increases of 3% and other adjustments); and (iii) Caesars Linq, LLC (granted for approximately $1.4 million per year, subject to annual increases of 3% and other adjustments).[463]  A map depicting the easement lots is contained in Valuation Figure 4.

---

[462]  Both Duff & Phelps and Caesars' impairment testing utilized a long-term growth rate of 3% for their DCF analyses compared to 2% used in this analysis.  If a 3% long-term growth rate was utilized in this analysis, the resulting enterprise value range, equally weighting the DCF and Guideline Public Company methods, would be $2.77 billion to $3.23 billion.

[463]  Chicago Title Company (Las Vegas).

### Valuation Figure 4:  Map of Easement Lots



Under the easements, the grantors agree to provide and maintain sufficient parking spaces for the continued compliance of the grantee's operations and also provide for vehicle and pedestrian use through portions of the grantor property.  Sufficient parking spaces is net of parking provided in other locales (such as the grantees' property or other easements), as defined by each easement.

The value of the Easement Lots granted is a function of the requirement to provide parking and vehicular and pedestrian access.  The Easement Lots provide the grantors with the right to relocate the easements at their sole cost and expense.  For example, the grantors could provide structured parking in lieu of the existing surface parking.  Fulfilling the parking requirement with structured parking (at the grantors' expense) would free up the remaining land to be developed to its highest and best use as market conditions warrant.

Detailed information regarding the regulatory parking requirements, specifically a formal parking study, for each of the affected hotel and casino properties has been requested.  The Examiner has been informed that such studies could not be located.

The granting of the Easement Lots has diminished the value of the grantors' land with a corresponding increase in value to the grantees.  Definitive values for the Easement Lots cannot be determined without a full detailed analysis of the regulatory parking requirements and their effect on the easements' parking requirements.  However, an illustrative analysis of the potential impact of the Easement Lots has been prepared.  Valuation Table 66 reflects the illustrative

impact/damages to CEOC as a result of granting the easements ranging from $18.7 million to $59.6 million.  **Exhibit I** contains the complete analysis of the Easement Lots.

### Valuation Table 66:  Illustrative Value of Easement Lots

| | Ceiling | Sensitivity | |
|---|---|---|---|
| # of Parking Spaces Required | **2,786** | **2,090 (75%)** | **1,393 (50%)** |
| Acres | 3.4 | 2.6 | 1.7 |
| | | | |
| ***Easement Loss of Value to Grantor*** | | | |
| Value of Unencumbered Land | $ 103,300,000 | $103,300,000 | $  103,300,000 |
| Less: Encumbered Value Potential | (43,700,000) | (64,119,136) | (84,555,864) |
| **Loss in Value to Grantor from Granting Easement** | **$  59,600,000** | **$  39,180,864** | **$   18,744,136** |
| | | | |
| ***Easement Value to Grantee*** | | | |
| Cost to Construct Structured Parking | $  69,660,000 | $  52,250,000 | $   34,825,000 |
| Value of Land for Structured Parking | 12,040,000 | 9,030,864 | 6,019,136 |
| Value of Easement to Grantee | $  81,700,000 | $  61,280,864 | $   40,844,136 |
| Less: Capitalized Revenue Payments | (22,100,000) | (22,100,000) | (22,100,000) |
| **Net Easement Value to Grantee** | **$  59,600,000** | **$  39,180,864** | **$   18,744,136** |

### 2.  Unimproved Land

As part of the Four Properties Transaction, approximately 31 acres of unimproved land (the "Parcels") were transferred from CEOC to CGP along with the three Las Vegas Properties.

The parcels consisted of four separate properties, as summarized in Valuation Table 67 and depicted in Valuation Figure 5.

**Appendix 7, Solvency**

### Valuation Table 67:  Four Properties Transaction – Undeveloped Land

| Debtor Entities / Grantors | Non Debtor Entities / Grantee | Undeveloped Parcels | Description |
|---|---|---|---|
| 3535 LV CORP & 3535 PARENT LLC | 3535 LV NEWCO LLC | 162-16-301-007 (a) | 9.81 acres directly east of Harrah's Las Vegas (Lot A) (d) |
| OCTAVIUS LINQ HOLDING CO. LLC | CAESARS LINQ, LLC | 162-16-401-007 (b) | 0.99 acres directly east of The Flamingo (Lot B) (e) |
| PARBALL CORPORATION & PARBALL PARENT LLC | PARBALL NEWCO LLC | 162-21-102-002 (c ) | 7.13 acres directly east of Bally's (Lot C) (f) |
| | | 162-21-202-005 (c) | 14.1 acres directly east of Planet Hollywood (Lot D) (g) |

Sources:

(a) May 5, 2014 deed from 3535 LV Corp to 3535 LV Parent LLC recorded as document # 20140505-0003345, [CEC-Examiner-Supp-0000046-50]; and May 5, 2014 deed from 3535 LV Parent, LLC to 3535 LV Newco, LLC recorded as document # 20140505-0003346. [CEC-Examiner-Supp-0000051 – 55]

(b) Deed requested but not provided.

(c) May 5, 2014 deed from Parball Corporation to Parball Parent, LLC recorded as document # 20140505-0003343 [CEC-Examiner-Supp-00000107 – 110]; and May 5, 2014 deed from Parball Parent, LLC to Parball Newco, LLC recorded as document # 20140505-0003344 [CEC-Examiner-Supp-00000111 – 114]

(d)  Clark  County  Assessor's  gis/database.  [http://gisgate.co.clark nv.us/gismoreports/printmap.aspx?mapnumber=1126745&]

(e)  Clark  County  Assessor's  gis/database.  [http://gisgate.co.clark nv.us/gismoreports/printmap.aspx?mapnumber=1126741&]

(f)  Clark  County  Assessor's  gis/database.  [http://gisgate.co.clark nv.us/gismoreports/printmap.aspx?mapnumber=1126744&]

(g)  Clark  County  Assessor's  gis/database.  [http://gisgate.co.clark nv.us/gismoreports/printmap.aspx?mapnumber=1126742&]

Note:  The undeveloped parcels referred to above are currently being utilized as employee parking lots, delivery and construction staging areas or otherwise vacant.

**Valuation Figure 5:  Map of Undeveloped Land**



Source: Clark County website (http://gisgate.co.clark.nv.us/openweb/)

None of the financial advisors on the Four Properties Transaction were aware that this excess land was part of the transaction and no separate value was ascribed to this land.  When CEC was asked about the purpose of including the excess land in the Four Properties Transaction, the response was that it was required to meet parking requirements.  The easements, previously discussed, were meant to provide parking for both the Cromwell and the Quad.  As such, only Bally's Las Vegas may have had the need for additional parking spaces.[464]  The Examiner has requested to be provided with documents reflecting the need for additional parking, but as of the date of this Report, such documents have not been received.

An analysis was performed by a licensed appraiser to arrive at a value conclusion for these Parcels.  Land is valued under its highest and best use.  Highest and best use considers the legally permissible, physically possible, financially feasible, and maximally productive use of the land.  The evaluation of highest and best use considers the land, as if vacant, and as improved.

The Parcels are zoned H-1 by Clark County.

While real estate market conditions have improved since the Recession, very little development activity is occurring off of the Strip.  As market conditions improve, the highest and best use of the land will be to develop uses that are complementary to the adjacent casino resorts.  At the present time, however, the highest and best use of the land, as if vacant, is to hold for future development until market conditions warrant.

---

[464]  Bally's currently has both valet and self-parking available.

The highest and best use, as improved, is the same as the as-if-vacant analysis: hold for future development until market conditions warrant. The current parking lot improvements provide no significant contributory value to the Parcels. The WestStar Federal Credit Union ground lease provides no significant contributory value or encumbrance to its parcel.

Five land sales were identified that provide an indication of value for the Parcels. In addition to the five land sales, four nearby land listings were also considered as supporting evidence for the value conclusion.

The land sales analysis focuses on the characteristics of each sale relative to the Parcels. Land sales that have inferior characteristics warrant upward adjustment in prices and superior characteristics warrant downward adjustments. Sales that are the most similar provide the best indicator of value for the Parcels while sales that require large adjustments are less useful. The five land sales are summarized below:

- Land Sale No. 1, at $1.2 million per acre, is the December 2015 sale of 41.65 acres along the north side of Tropicana Avenue, just east of Koval Lane. The buyer was the UNLV Foundation, which plans to construct a 50,000-seat stadium on the site. Although this site has good frontage and access on Tropicana, its location is considered significantly inferior since it is not adjacent to major gaming properties along the Strip. The inferior location warrants a significant upward adjustment. Further, it is larger than the Parcels, warranting an upward adjustment. Overall, this sale is considered significantly inferior and therefore requires a significant upward adjustment.

- Land Sale No. 2, at $6.9 million per acre, is the February 2014 sale of 26.36 acres on the Strip at Riviera Boulevard adjacent to the Las Vegas Global Business District ("LVGBD"), which is an entity of the Las Vegas Convention and Visitors Authority. It is located across Paradise Road from the Westgate Hotel and Casino and close to the Las Vegas Convention Center. The site was the former Riviera Hotel and Casino, whose improvements will be demolished. This sale is significantly superior due to its Strip frontage and the value of the specific location to LVGBD (proximity to the convention center). These attributes warrant a large downward adjustment.

- Land Sale No. 3, at $3.2 million per acre, is the October 2014 sale of 6.08 acres on Convention Center Drive between the Strip and Paradise Road. It was purchased for the construction of a non-gaming mixed-use resort. It is considered comparable in most characteristics. However, this sale's location and site configuration are inferior to the Parcels. Overall, the sale warrants an upward adjustment.

- Land Sale No. 4, at $1.8 million per acre, is the April 2014 sale of 11.00 acres off of Paradise Road north of Tropicana Avenue behind the Hard Rock Hotel & Casino. It was purchased by a Chinese investment group to hold for investment. The site is irregularly shaped and has only 235 feet of frontage on Paradise Road.

This sale's location and overall site characteristics are all inferior, warranting a large upward adjustment.

- Land Sale No. 5, at $4.0 million per acre, is the March 2013 sale of 87 acres on the Strip that is being developed as Resorts World Las Vegas by Genting, a Malaysian-based gaming company.  The site had been under development as Boyd's Gaming Echelon Place project.  The site included a partially completed central energy facility and five partially-completed structures.  This sale's Strip location is significantly superior but the large site and partially-complete improvements limited the potential buyer pool.  Overall, however, the sale still warrants downward adjustment.

Based on the analyses of the five land sales, the value conclusion for the fee simple interest in the Parcels totaling approximately 31 acres, as of the May 2014 date of value, is $3.5 to $4.5 million per acre, which totals $109 million to $140 million.  **Exhibit I** contains the complete analysis of the transferred land.

### H.  Sensitivity Analysis

A sensitivity analysis has also been performed on the valuations prepared by the financial advisors in order to quantify the impact of correcting certain inputs.  With respect to the Four Properties Transaction, the following corrections were made to the financial models utilized by Centerview and Duff & Phelps.

- Utilized Q1 2014 LRP projections in lieu of the February Business Plan;

- Utilized capital expenditures projections from the January Business Plan in lieu of the February Business Plan;

- Utilized EBITDAR in lieu of EBITDA to value the Quad; and

- Excluded value from goodwill tax amortization tax shield (applies to Duff & Phelps only).

The sensitivity analysis quantifies the impact solely of correcting the aforementioned inputs and, for the purpose of this analysis, accepts all other inputs and methodologies utilized by the financial advisors (*e.g.*, discount rates, terminal period methodology, EBITDA multiples).  The resulting sensitized values are presented in Valuation Table 68 and Valuation Table 69.  The sensitized values do not include any value associated with the excess land or CES/Total Rewards.

**Valuation Table 68:  Four Properties Sensitivity Analysis – Centerview**

| amounts in millions | Centerview | | Centerview - Sensitized | |
| | Low | High | Low | High |
|---|---|---|---|---|
| The Quad | $ 172.0 | $ 269.0 | $ 444.6 | $ 614.1 |
| Cromwell | 337.3 | 418.2 | 391.2 | 484.8 |
| Bally's Las Vegas | 591.3 | 734.4 | 650.4 | 809.0 |
| Harrah's New Orleans | 577.0 | 724.1 | 612.9 | 768.9 |
| Subtotal | $ 1,677.6 | $ 2,145.7 | $ 2,099.1 | $ 2,676.7 |
| 50% of Management Fee Stream | $ 142.4 | $ 188.9 | $ 173.5 | $ 230.9 |
| **Four Properties Enterprise Value** | **$ 1,820.1** | **$ 2,334.6** | **$ 2,272.6** | **$ 2,907.6** |

Note:  Property values reflect the average of the conclusions of value from the income approach (DCF) and market approaches (GPC Method and Precedent Transaction Method).

**Valuation Table 69:  Four Properties Sensitivity Analysis – Duff & Phelps**

| amounts in millions | Duff & Phelps | | Duff & Phelps - Sensitized | |
| | Low | High | Low | High |
|---|---|---|---|---|
| The Quad | $ 149.1 | $ 198.4 | $ 437.3 | $ 528.9 |
| Cromwell | 329.8 | 372.9 | 384.8 | 434.4 |
| Bally's Las Vegas | 607.4 | 687.0 | 686.1 | 778.4 |
| Harrah's New Orleans | 517.0 | 588.5 | 574.5 | 653.0 |
| Subtotal | $ 1,603.2 | $ 1,846.8 | $ 2,082.7 | $ 2,394.7 |
| Goodwill Amortization Tax Shield | $ 62.9 | $ 189.6 | $ - | $ - |
| 50% of Management Fee Stream | $ 134.3 | $ 153.4 | $ 159.8 | $ 182.9 |
| **Four Properties Enterprise Value** | **$ 1,800.4** | **$ 2,189.9** | **$ 2,242.5** | **$ 2,577.6** |

Note:  Property values reflect the average of the conclusions of value from the income approach (DCF) and market approach (GPC Method/Precedent Transaction Method).

The sensitized Centerview values range from $2.3 billion to $2.9 billion, and the sensitized Duff & Phelps values range from $2.2 billion to $2.6 billion, both of which exceed the transaction price of $2 billion.

## I.  Summary of Values

Valuation Table 70 summarizes the transaction price compared to: (i) the values determined by Centerview and Duff & Phelps; (ii) the values resulting from performing a sensitivity analysis to correct certain of the inputs used by Centerview and Duff & Phelps; (iii) the values offered by other parties;[465] and (iv) the Examiner's valuation of the assets.  The values noted do not include any additional value that was transferred attributed to CES or Total Rewards.

**Valuation Table 70:  Illustrative Summary of Values for Four Properties and Excess Land**

| *amounts in millions* | Properties and Mgmt Fees | | Additional Value of Excess Land | | Total Value | |
|---|---|---|---|---|---|---|
| | **Low** | **High** | **Low** | **High** | **Low** | **High** |
| *Transaction Price* | $ 2,000 | $ 2,000 | | | $ 2,000 | $ 2,000 |
| Centerview | $ 1,820 | $ 2,335 | | | $ 1,820 | $ 2,335 |
| Duff & Phelps | $ 1,802 | $ 2,191 | | | $ 1,802 | $ 2,191 |
| Centerview - Sensitized | $ 2,273 | $ 2,908 | | | $ 2,273 | $ 2,908 |
| Duff & Phelps - Sensitized | $ 2,243 | $ 2,578 | | | $ 2,243 | $ 2,578 |
| Baker Tilly | $ 2,210 | $ 2,930 | | | $ 2,243 | $ 2,578 |
| Creditor Group 1 | $ 3,137 | $ 3,893 | $   256 | $   384 | $ 3,393 | $ 4,277 |
| Creditor Group 2 | $ 2,400 | $ 2,920 | $   129 | $   469 | $ 2,529 | $ 3,389 |
| **Examiner Valuations** | **$ 2,592** | **$ 2,968** | **$   109** | **$   140** | **$ 2,701** | **$ 3,108** |

<u>Note</u>:  Values reflected above represent enterprise value and are not presented net of the Cromwell debt assumed. Values also do not include any amount associated with Total Rewards or CES.

---

[465] The values offered by other parties, including creditor groups, were (i) preliminary in nature, (ii) based on incomplete information, (iii) not intended to reflect an opinion, (iv) provided on the express understanding that the views expressed were not binding or admissible as evidence in any litigation, and (v) provided on a "not for attribution" basis to the Examiner.

## IX.     CEOC Multiple Degradation

The transfer of the Las Vegas-based assets out of CEOC during 2013 and 2014 significantly changed the complexion of CEOC.  Certain creditor groups have suggested that the Four Properties Transaction may give rise to a claim based upon the degradation of CEOC's multiple and resulting enterprise value arising out of this transformation, but the Examiner believes that issue should be considered in the broader context of the CERP, Growth, and Four Properties Transactions collectively.

Absent the 2013 and 2014 transfers, CEOC, on a pro forma basis, would have consisted of 35 casino/hotels,[466] six of which were located in Las Vegas (Caesars Palace, Bally's Las Vegas, the Quad, the Cromwell, Planet Hollywood, and LINQ Retail/Observation Wheel).  The six Las Vegas assets produced a disproportionate percentage of CEOC's total EBITDA.  Based upon the 2015 Annual Plan, on a pro forma basis, these six properties were expected to generate approximately 41% of CEOC's EBITDA as shown in Valuation Table 71.

After the asset sales, CEOC was left with only one Las Vegas property, Caesars Palace, reducing CEOC's EBITDA in Las Vegas by approximately $330 million as shown in Valuation Table 71.

### Valuation Table 71:  2015 Pro-Forma Projected CEOC EBITDA vs. Projected CEOC EBITDA

| amounts in millions | 2015 Pro-Forma Projected CEOC EBITDA (*i.e.*, assuming no asset transfers) | | | 2015 Projected CEOC EBITDA (post asset transfers) | | |
|---|---|---|---|---|---|---|
| | # of Properties | EBITDA | % | # of Properties | EBITDA | % |
| Las Vegas Properties | 6 | $ 615 | 41% | 1 | $ 285 | 28% |
| Regional Properties | 29 (a) | $ 899 | 59% | 27 (b) | $ 748 | 72% |
| Total | 35 | $ 1,514 | 100% | 28 | $ 1,033 | 100% |

Source:   2015 EBITDA Projections contained within Impairment Review (Dec. 31, 2014), at Tab "2) LRP" [DT0011980] (native file).

Note:

(a)  Includes  Horseshoe Baltimore, Harrah's New Orleans, Harrah's Lake Tahoe, Harvey's Lake Tahoe, Harrah's Reno, Bally's Atlantic City, Caesars Atlantic City, Harrah's Philadelphia, Harrah's Joliet, Horseshoe Hammond, Horseshoe Southern Indiana, Harrah's Metropolis, Harrah's North Kansas City, Harrah's Council Bluffs, Horseshoe Council Bluffs, Harrah's Gulf Coast, Horseshoe Tunica, Tunica Roadhouse, Harrah's Louisiana Downs, Horseshoe Bossier City, London Clubs, Conrad Punta del Este, Windsor, and Managed Properties (Ak-Chin, Rincon, Cherokee, Cleveland, Cincinnati, and Thistledown).

(b)  Includes all of the above except Horseshoe Baltimore and Harrah's New Orleans.

Further, the change in the mix of EBITDA generated by Las Vegas properties versus regional properties from 41% to 28% resulted in CEOC exhibiting the financial attributes of a regional casino operator.

---

[466]  Includes LINQ Retail and the Observation Wheel as well as Managed/International.

Regional casino companies, such as Isle of Capri and Pinnacle, garner a lower multiple, as reflected in Solvency Figure 20 than Las Vegas operators. For example, in 2014, Las Vegas-based operators traded at an EBITDA multiple of 12.4x compared to 8.4x for regional operators. Further, a diversified portfolio of regional and Las Vegas properties may command an overall higher multiple than a group of regional properties sold individually or together. To illustrate this concept, weighting the EBITDA multiples by the percentage of EBITDA generated at Las Vegas versus the regional properties (*i.e.*, 12.4x and 8.4x, respectively) results in a decrease of the multiple by 0.5x.[467] If this 0.5x multiple is applied to CEOC's projected 2015 EBITDA of $1.03 billion noted in Valuation Table 71 the resulting diminution in value is $516 million.

## X.   SUMMARY OF VALUATION ANALYSES

Valuation Table 72 summarizes the Examiner's values, consideration, and resulting deficit for transactions and assets analyzed in this Appendix.

### Valuation Table 72:  Summary of Valuation Analyses

| amounts in millions | Examiner's Value Range | | Consideration Paid | | Range of Deficit | |
|---|---|---|---|---|---|---|
| | Low | High | Low | High | Low | High |
| WSOP Trademark & IP | $ 66.2 | $ 76.1 | $ 9.9 | $ 12.0 | $ 54.2 | $ 66.2 |
| 2010 Trademark Transfer (a) | 42.9 | 123.0 | - | - | 42.9 | 123.0 |
| WSOP Tournament Rights | 50.3 | 55.9 | 20.5 | 20.5 | 29.8 | 35.4 |
| CERP Transaction | 328.5 | 426.9 | 128.8 | 128.8 | 199.7 | 298.1 |
| Growth Transaction | 796.7 | 953.2 | 360.0 | 360.0 | 436.7 | 593.2 |
| Four Properties Transaction | 2,407.4 | 2,783.3 | 1,815.0 | 1,815.0 | 592.4 | 968.3 |
| Undeveloped Land | 109.0 | 140.0 | - | - | 109.0 | 140.0 |
| Easement Lots (b) | 18.7 | 59.6 | - | - | 18.7 | 59.6 |
| **Total** (c) | $ 3,819.7 | $ 4,618.0 | $ 2,334.2 | $ 2,336.3 | $ 1,483.4 | $ 2,283.8 |

Note:

(a) The consideration paid for the trademarks was $600.00.

(b) The value range presented for the Easement Lots is net of the value of the annual payments to be received by CEOC.

(c) Values do not include any amount associated with Total Rewards or CES.

---

[467] On a pro forma basis, 41% of CEOC's multiple would at 12.4x and 59% would be at 8.4x, resulting in a weighted multiple of 10.02x. This is compared to a reduced actual weighted multiple of 9.5x (28% at 12.4x and 72% at 8.4x). The difference is 0.5x.