**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT OPERATING | ) | Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) | |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: Docket No. 6318** |

**ORDER CONFIRMING DEBTORS' THIRD AMENDED JOINT PLAN OF**
**REORGANIZATION PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

Upon the filing by the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") of the *Debtors' Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 6318] on January 13, 2017 (the "Plan"),[2] a copy of which is attached hereto as **Exhibit A**, which Plan replaces the previously filed plan of reorganization filed at Docket No. 5325; and the Court previously having approved the *Disclosure Statement for the Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4220] (the "Disclosure Statement") pursuant to the *Order Approving the Disclosure Statement for the Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4223], entered on June 28, 2016; and the Court previously having approved solicitation procedures related to the Disclosure Statement and the solicitation of acceptances and rejections of the Plan pursuant to the *Order (A) Approving the Solicitation Procedures and (B) Granting Related Relief* [Docket

---

[1] A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained at https://cases.primeclerk.com/CEOC.

[2] Capitalized terms used but not defined herein have the meanings ascribed to them in the Plan.

No. 4219], entered on June 28, 2016, as amended by Docket No. 4272 entered on July 6, 2016 (the "Solicitation Procedures Order"), which Solicitation Procedures Order and Disclosure Statement were further amended pursuant to the *Order (A) Approving the Notice for the Debtors' Continued Solicitation on the Amended Plan, (B) Extending the Voting Deadline in Connection Therewith, and (C) Granting Related Relief* [Docket No. 5328], entered on October 20, 2016 (the "Continued Solicitation Notice Order"); and the Court having previously approved the confirmation schedule and the procedures related to confirmation of the Plan pursuant to the *Order (A) Approving the Confirmation Schedule and (B) Granting Related Relief* [Docket No. 4151], entered on June 24, 2016, as amended by Docket No. 5438 entered on October 26, 2016, and further amended by Docket No. 5702 entered on November 17, 2016; and the Debtors having served on the Holders of Claims and Interests the Disclosure Statement pursuant to the Solicitation Procedures Order, *see Affidavits of Service* [Docket Nos. 4326, 4380, 4478, 4478, 4517, 4597] and the notice of Plan modifications pursuant to the Continued Solicitation Notice Order, *see Affidavits of Service* [Docket No. 5429]; and upon the filing by the parties of the *stipulation Regarding Certain Facts for the Confirmation Hearing* on December 23, 2016 [Docket No. 6153]; and the Court having considered the record in these chapter 11 cases, the substantial creditor support for the Plan, and the compromises and settlements embodied in and contemplated by the Plan, the lack of any objection to the Plan or those compromises and settlements by any creditor or other economic stakeholder, the withdrawal by the Office of the United States Trustee of its objection to the Plan on January 13, 2017 [Docket No. 6319], and the briefs and arguments regarding confirmation of the Plan submitted in connection with the hearing on confirmation of the Plan (the "Confirmation Hearing"); and after due deliberation, it is HEREBY ORDERED THAT:

1.      The Plan, including (a) all of the modifications to the Plan filed with the Court prior to or during the Confirmation Hearing and (b) all documents incorporated into the Plan through the Plan Supplement (including the final forms thereof to be filed on or before the Effective Date), is confirmed.

2.      The documents contained in the Plan Supplement are an integral part of the Plan, and the Debtors and the Reorganized Debtors (as applicable) are authorized to take all actions required under the Plan and the Plan Supplement documents to effectuate the Plan, including, but not limited to, (a) the transfer of certain of the Debtors' real property and certain other property to the REIT, free and clear of all liens, claims, and encumbrances (except as set forth in the Plan), (b) the payment of the Backstop Fees and Expenses and the Commitment Payment (each as defined in the Backstop Commitment Agreement) in connection with the Debtors' entry into the Backstop Commitment Agreement and the payment of such Backstop Fees and Expenses and the Commitment Payment pursuant to this paragraph 5(b) will qualify as Administrative Claims under the Plan, (c) the solicitation of elections from the applicable Holders of Claims pursuant to the New CEC Common Equity Election Procedures, the PropCo Equity Election Procedures, and the PropCo Preferred Subscription Procedures, (d) the negotiation of and entry into any documents and agreements (including, without limitation, engagement letters, fee letters, commitment letters, indemnifications, releases, and definitive documentation) with, as applicable, arrangers, bookrunners, and lenders (collectively, the "Financial Institutions") in connection with or related to the origination, syndication, arrangement, or securitization of the OpCo Market Debt, the CPLV Market Debt, and the CPLV Mezzanine Debt, and such other documents as may be required or desirable to effectuate the treatment afforded by the foregoing, in form and substance acceptable to the Debtors, the Reorganized Debtors, the applicable

K&E 44707255

Financial Institutions, and any other parties with consent rights under the Plan (collectively, the

"Market Debt Documents"), in each case without notice, hearing, or further order of this Court,

(e) the performance of all actions to be taken, undertakings to be made, and obligations to be

incurred by the Debtors or the Reorganized Debtors in connection therewith, including the

payment or reimbursement (as and when due) of any fees, indemnities, and expenses under or

pursuant to any such documents and agreements in connection therewith (including, without

limitation, any commitment, structuring, placement, or professional fees and expenses under any

engagement letters), (f) the grant of all Liens and security interests in accordance with the

Market Debt Documents and to make all filings and recordings and to obtain all governmental

approvals and consents necessary or desirable to establish and perfect such Liens and security

interests under the provisions of the applicable state, provincial, federal, or other law (whether

domestic or foreign), and the performance of all acts and the making, executing, and delivering

of all instruments and documents in connection therewith that may be reasonably required or

desirable for the performance of their obligations under the Market Debt Documents, in each

case without notice, hearing, or further order of this Court, and (g) the issuance and registration,

as applicable, of any new equity interests in connection with the Plan.

     3.     Pursuant to Bankruptcy Rule 3020(c)(1), the following provision in the Plan will

be immediately effective on the Effective Date:

     **(a)**     **Article VIII.E**: *Injunction*. **Effective as of the Effective Date, pursuant to section 524(a) of the Bankruptcy Code, to the fullest extent permissible under applicable law, and except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, or any documents, instruments, or agreements (including those set forth in the Plan Supplement) executed to implement the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Liens that have been discharged pursuant to Article VIII.A of the Plan, released pursuant to Article VIII.B or**

4

**Article VIII.C of the Plan, or are subject to exculpation pursuant to Article VIII.D of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, any or all of the Debtors, the Reorganized Debtors, the New Property Entities, or the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right prior to the Effective Date in a document Filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests discharged, exculpated, released, or settled pursuant to the Plan.**

4.     The Debtors must file with the Court and serve a notice of the entry of this Confirmation Order, substantially in the form attached hereto as **Exhibit B**, upon (a) all parties listed in the creditor matrix maintained by Prime Clerk LLC and (b) such additional persons and entities as deemed appropriate by the Debtors, no later than five business days after entry of this Confirmation Order, and will cause Prime Clerk LLC to file an affidavit of service with the Court.  The Debtors will publish the notice of the entry of this Confirmation Order in the *New York Times* (National Edition) and the *Wall Street Journal* within seven business days after the entry of this Confirmation Order, and will cause an affidavit of service to be filed with the Court.

5.     The Debtors must file with the Court and serve a notice of the occurrence of the Effective Date, substantially in the form attached hereto as **Exhibit C**, upon (a) all parties listed

in the creditor matrix maintained by Prime Clerk LLC and (b) such additional persons and

entities as deemed appropriate by the Debtors, no later than five business days after the Effective

Date, and will cause Prime Clerk LLC to file an affidavit of service with the Court.  The Debtors

will publish the notice of the occurrence of the Effective Date in the *New York Times* (National

Edition) and the *Wall Street Journal* within seven business days after the Effective Date, and will

cause an affidavit of service to be filed with the Court.

　　　6.　　　Notwithstanding Bankruptcy Rule 3020(e), the terms and conditions of this Order

will be immediately effective and enforceable upon its entry.

Dated:  Jan. 17 , 2017
Chicago, Illinois

The Honorable A. Benjamin Goldgar
United States Bankruptcy Judge

K&E 44707255

## **Exhibit A**

**Plan**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| CAESARS ENTERTAINMENT OPERATING | ) Case No. 15-01145 (ABG) |
| COMPANY, INC., et al.,[1] | ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

---

**DEBTORS' THIRD AMENDED JOINT PLAN OF REORGANIZATION**
**PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE**

---

> **Nothing contained herein shall constitute an offer, acceptance, or a legally binding obligation of the Debtors or any other party in interest and this Plan is subject to approval by the Bankruptcy Court and other customary conditions. This Plan is not an offer with respect to any securities. YOU SHOULD NOT RELY ON THE INFORMATION CONTAINED IN, OR THE TERMS OF, THIS PLAN FOR ANY PURPOSE PRIOR TO THE CONFIRMATION OF THIS PLAN BY THE BANKRUPTCY COURT.**

| | |
|---|---|
| James H.M. Sprayregen, P.C. | Paul M. Basta, P.C. |
| David R. Seligman, P.C. | Nicole L. Greenblatt, P.C. |
| **KIRKLAND & ELLIS LLP** | **KIRKLAND & ELLIS LLP** |
| **KIRKLAND & ELLIS INTERNATIONAL LLP** | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| 300 North LaSalle | 601 Lexington Avenue |
| Chicago, Illinois 60654 | New York, New York 10022-4611 |
| Telephone:    (312) 862-2000 | Telephone:    (212) 446-4800 |
| Facsimile:    (312) 862-2200 | Facsimile:    (212) 446-4900 |

Counsel to the Debtors and Debtors in Possession

Dated: January 13, 2016

---

[1] The last four digits of Caesars Entertainment Operating Company, Inc.'s tax identification number are 1623. A complete list of the Debtors (as defined herein) and the last four digits of their federal tax identification numbers are identified on **Exhibit A** attached hereto.

KE 33843292

# TABLE OF CONTENTS

**Page**

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW** ...................................................................................................1
A.    Defined Terms ...............................................................................................1
B.    Rules of Interpretation. ...............................................................................39
C.    Computation of Time. ..................................................................................40
D.    Governing Law. ...........................................................................................40
E.    Reference to Monetary Figures. ..................................................................40
F.    Nonconsolidated Plan. .................................................................................40

**ARTICLE II. ADMINISTRATIVE CLAIMS AND OTHER UNCLASSIFIED CLAIMS** ................................40
A.    Administrative Claims. ................................................................................40
B.    Professional Fee Claims. .............................................................................41
C.    Priority Tax Claims. .....................................................................................42

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS** ...........................42
A.    Summary of Classification. ..........................................................................42
B.    Treatment of Claims and Interests. ..............................................................44
C.    Special Provision Governing Unimpaired Claims. ......................................54
D.    Elimination of Vacant Classes. ....................................................................55
E.    Plan Objections. ...........................................................................................55
F.    Voting. ..........................................................................................................55
G.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. .................55
H.    Controversy Concerning Impairment. ..........................................................55

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ...........................................................55
A.    Sources of Recoveries. .................................................................................55
B.    Master Lease Agreements. ............................................................................62
C.    Management and Lease Support Agreements. ...............................................62
D.    Right of First Refusal Agreement. ................................................................62
E.    PropCo Call Right Agreement. .....................................................................62
F.    Tax Indemnity Agreement. ...........................................................................62
G.    Transition Services Agreement. ....................................................................62
H.    Subsidiary-Guaranteed Notes Settlement. ....................................................62
I.    Unsecured Creditors Committee Settlement. ................................................62
J.    Second Priority Noteholders Committee Settlement. ....................................63
K.    Danner Settlement. .......................................................................................63
L.    Cash Collateral Order Amendments and Operating Cash for OpCo and the REIT. ..........63
M.    Deferred Compensation Settlement. .............................................................63
N.    The Separation Structure. .............................................................................63
O.    Treatment of the NRF Bankruptcy Disputes and NRF Non-Bankruptcy Disputes. .........64
P.    Restructuring Transactions. ..........................................................................65
Q.    New Corporate Governance Documents. ......................................................65
R.    New Boards. ..................................................................................................66
S.    New Employment Contracts. ........................................................................67
T.    Shared Services. ...........................................................................................67
U.    Exemptions. ..................................................................................................68
V.    New Interests. ...............................................................................................68
W.    Cancellation of Existing Securities and Agreements. ...................................69
X.    Corporate Action. .........................................................................................69
Y.    Effectuating Documents; Further Transactions. ...........................................70
Z.    Exemption from Certain Taxes and Fees. .....................................................70

1

| AA. | Corporate Existence. | 71 |
| BB. | Vesting of Assets. | 71 |
| CC. | General Settlement of Claims. | 71 |
| DD. | Ordinary Course of Business Through Effective Date. | 71 |
| EE. | Retention of Causes of Actions. | 71 |

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......72**

| A. | Assumption of Executory Contracts and Unexpired Leases. | 72 |
| B. | Preexisting Obligations to the Debtors under Executory Contracts and Unexpired Leases. | 72 |
| C. | Rejection of Executory Contracts and Unexpired Leases. | 73 |
| D. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases. | 73 |
| E. | Modifications, Amendments, Supplements, Restatements, or Other Agreements. | 74 |
| F. | Indemnification Provisions. | 74 |
| G. | Treatment of D&O Liability Insurance Policies. | 75 |
| H. | Insurance Policies and Surety Bonds. | 75 |
| I. | Benefit Programs. | 76 |
| J. | Reservation of Rights. | 76 |
| K. | Nonoccurrence of Effective Date. | 76 |
| L. | Contracts and Leases Entered Into After the Petition Date. | 76 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS .......76**

| A. | Timing and Calculation of Amounts to Be Distributed. | 76 |
| B. | Distributions on Account of Obligations of Multiple Debtors. | 77 |
| C. | Distributions Generally. | 77 |
| D. | Rights and Powers of Disbursing Agent. | 78 |
| E. | Distributions on Account of Claims or Interests Allowed After the Effective Date. | 78 |
| F. | Delivery of Distributions and Undeliverable or Unclaimed Distributions. | 78 |
| G. | Compliance with Tax Requirements/Allocations. | 80 |
| H. | No Postpetition Interest on Claims. | 80 |
| I. | Setoffs and Recoupment. | 80 |
| J. | Allocation Between Principal and Accrued Interest. | 80 |
| K. | Claims Paid or Payable by Third Parties. | 81 |
| L. | The Coletta Claims. | 81 |
| M. | Indemnification of Indenture Trustees. | 81 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND
DISPUTED CLAIMS.......82**

| A. | Resolution of Disputed Claims. | 82 |
| B. | Adjustment to Claims Without Objection. | 82 |
| C. | Time to File Objections to Claims. | 83 |
| D. | Disallowance of Claims. | 83 |
| E. | Amendments to Claims. | 83 |
| F. | No Distributions Pending Allowance. | 83 |
| G. | Distributions After Allowance. | 83 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .......84**

| A. | Discharge of Claims and Termination of Interests. | 84 |
| B. | **Debtor Release.** | 84 |
| C. | **Third-Party Release.** | 85 |
| D. | **Exculpation.** | 86 |
| E. | **Injunction.** | 87 |
| F. | **Release of Liens.** | 87 |
| G. | Setoffs. | 87 |
| H. | Recoupment. | 88 |
| I. | Subordination and Turnover Rights. | 88 |
| J. | Document Retention. | 88 |

KE 33843292

K.    Protections Against Discriminatory Treatment. ...............................................88
L.    Reimbursement or Contribution. .......................................................................88
M.    Term of Injunctions or Stays. ...........................................................................88
N.    Orders Modifying the Automatic Stay. .............................................................88

**ARTICLE IX. CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN.** ....................**89**
A.    Conditions Precedent to the Effective Date. .....................................................89
B.    Waiver of Conditions. ........................................................................................91
C.    Substantial Consummation of the Plan. ............................................................92
D.    Effect of Nonoccurrence of Conditions to the Effective Date. .........................92

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** .................**92**
A.    Modification and Amendments. .........................................................................92
B.    Effect of Confirmation on Modifications. ..........................................................93
C.    Revocation or Withdrawal of the Plan. .............................................................93

**ARTICLE XI. RETENTION OF JURISDICTION** ...........................................................**93**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ..........................................................**95**
A.    Immediate Binding Effect. ................................................................................95
B.    Additional Documents. ......................................................................................95
C.    Payment of Statutory Fees. ...............................................................................95
D.    Payment of Certain Fees and Expenses. ...........................................................95
E.    Dismissal of Involuntary Petition. ....................................................................96
F.    Dismissal of Litigation and Appeals. ...............................................................96
G.    Dissolution of the Second Priority Noteholders Committee and Unsecured Creditors
        Committee. ........................................................................................................96
H.    Consent, Consultation, and Waiver Rights. ......................................................97
I.    Reservation of Rights. .......................................................................................97
J.    Successors and Assigns. ....................................................................................97
K.    Service of Documents. .......................................................................................97
L.    Entire Agreement. .............................................................................................99
M.    Exhibits. ...........................................................................................................100
N.    Votes Solicited in Good Faith. .........................................................................100
O.    Waiver or Estoppel. .........................................................................................100
P.    Nonseverability of Plan Provisions. ................................................................100
Q.    Conflicts. ..........................................................................................................100
R.    Closing of Chapter 11 Cases. ..........................................................................101

3

Caesars Entertainment Operating Company, Inc. and the other Debtors in the above-captioned Chapter 11 Cases respectfully propose the following joint plan of reorganization pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan. The Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of the Plan and certain related matters. Each Debtor is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

*A.*     *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.     "1145 Securities" mean, collectively, (a) the New Interests issued in respect of Claims as contemplated by the Plan, (b) the guaranty under the OpCo Guaranty Agreement of the OpCo First Lien Notes, (c) the OpCo First Lien Notes, the PropCo First Lien Notes, and the PropCo Second Lien Notes, (d) the New CEC Convertible Notes and the New CEC Common Equity issued upon conversion thereof, and (e) the New CEC Common Equity issued in exchange for OpCo Series A Preferred Stock pursuant to the CEOC Merger.

2.     "2016 Fee Notes" means the Senior Unsecured Notes arising under the 6.50% Senior Unsecured Notes Indenture with CUSIP No. 413627AX8, other than those held by CAC and members of the Ad Hoc Group of 5.75% and 6.50% Unsecured Notes in the Chapter 11 Cases as disclosed on March 17, 2016 [Docket No. 3422].

3.     "5.75% Senior Unsecured Notes Indenture" means that certain Indenture, dated as of September 28, 2005, by and between CEOC, CEC, and the 5.75% Senior Unsecured Notes Indenture Trustee, providing for the issuance of 5.75% Senior Notes due 2017, as amended, amended and restated, supplemented, or otherwise modified from time to time.

4.     "5.75% Senior Unsecured Notes Indenture Trustee" means Law Debenture Trust Company of New York, solely in its capacity as indenture trustee under the 5.75% Senior Unsecured Notes Indenture, and any predecessors and successors in such capacity.

5.     "6.50% Senior Unsecured Notes Indenture" means that certain Indenture, dated as of June 9, 2006, by and between CEOC, CEC, and the 6.50% Senior Unsecured Notes Indenture Trustee, providing for the issuance of 6.50% Senior Notes due 2016, as amended, amended and restated, supplemented, or otherwise modified from time to time.

6.     "6.50% Senior Unsecured Notes Indenture Trustee" means Law Debenture Trust Company of New York, solely in its capacity as indenture trustee under the 6.50% Senior Unsecured Notes Indenture, and any predecessors and successors in such capacity.

7.     "8.50% First Lien Notes Indenture" means that certain Indenture, dated as of February 14, 2012, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 8.50% Senior Secured Notes due 2020, as amended, amended and restated, supplemented, or otherwise modified from time to time.

8.     "9.00% First Lien Notes Indentures" means (a) that certain Indenture, dated as of August 22, 2012, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 9.00% Senior Secured Notes due 2020, as amended, amended and restated, supplemented, or otherwise modified from time to time, including pursuant to that certain Additional Notes Supplemental Indenture, dated as of December 13, 2012, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture

KE 33843292

Trustee; and (b) that certain Indenture, dated as of February 15, 2013, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 9.00% Senior Secured Notes due 2020, as amended, amended and restated, supplemented, or otherwise modified from time to time.

9.    "10.00% Second Lien Notes Indentures" means, collectively, that (a) certain Indenture, dated as of December 24, 2008, by and between CEOC, CEC, and the applicable 10.00% Second Lien Notes Indenture Trustee, providing for the issuance of 10.00% Second-Priority Senior Secured Notes due 2015 and 10.00% Second-Priority Senior Secured Notes due 2018, as amended, amended and restated, supplemented, or otherwise modified from time to time, and (b) certain Indenture, dated as of April 15, 2009, between CEOC, CEC, and the applicable 10.00% Second Lien Notes Indenture Trustee, providing for the issuance of 10.00% Second-Priority Senior Secured Notes due 2018, as amended, amended and restated, supplemented, or otherwise modified from time to time.

10.    "10.00% Second Lien Notes Indenture Trustee" means, as applicable, (a) Delaware Trust Company, solely in its capacity as successor indenture trustee under the 10.00% Second Lien Notes Indenture dated as of December 24, 2008, and any predecessors and successors in such capacity, or (b) Wilmington Savings Fund Society, FSB, solely in its capacity as successor indenture trustee under the 10.00% Second Lien Notes Indenture dated as of April 15, 2009, and any predecessors and successors in such capacity.

11.    "11.25% First Lien Notes Indenture" means that certain Indenture, dated as of June 10, 2009, by and between the Escrow Issuers, CEC, and the First Lien Notes Indenture Trustee, providing for the issuance of 11.25% Senior Secured Notes due 2017, as amended, amended and restated, supplemented, or otherwise modified from time to time, including that certain Second Supplemental Indenture, dated as of September 11, 2009, between CEOC, CEC, and the First Lien Notes Indenture Trustee.

12.    "12.75% Second Lien Notes Indenture" means that certain Indenture, dated as of April 16, 2010, by and between the Escrow Issuers, CEC, and the 12.75% Second Lien Notes Indenture Trustee, providing for the issuance of 12.75% Second-Priority Senior Secured Notes due 2018, as amended, amended and restated, supplemented, or otherwise modified from time to time.

13.    "12.75% Second Lien Notes Indenture Trustee" means BOKF, N.A., solely in its capacity as successor indenture trustee under the 12.75% Second Lien Notes Indenture, and any predecessors and successors in such capacity.

14.    "Additional CEC Bank Consideration" means an amount equal to $10,000,000 per month (which shall be fully earned on the first day of each month) earned from January 1, 2017, through the earlier of (a) the Effective Date or (b) June 30, 2017, which amount New CEC shall contribute to the Debtors on the Effective Date and which shall be payable in (x) Cash and/or (y) New CEC Common Equity (at a price per share of New CEC Common Equity using an implied equity value for New CEC of $6.5 billion, post conversion of the New CEC Convertible Notes and before giving effect to the Cash that would have otherwise been used to pay the consideration and the New CEC Common Equity Buyback), which shall be issued in exchange for OpCo Series A Preferred Stock pursuant to the CEOC Merger; provided that the election to pay Cash or New CEC Common Equity shall be made in New CEC's sole discretion, provided, further, that, unless consented to by the Requisite Consenting Bank Creditors, such election must be the same as the similar election made by CEC for the Additional CEC Bond Consideration. Subject to the Bank RSA remaining in effect, if and to the extent that the Additional CEC Bond Consideration is increased, the amount of the Additional CEC Bank Consideration will increase by a percentage amount equal to the amount by which the Additional CEC Bond Consideration has been increased.

15.    "Additional CEC Bond Consideration" means to the extent that the Effective Date shall not have occurred on or before May 1, 2017, New CEC shall (a) contribute to the Debtors on the Effective Date Cash in the amount of $20,000,000 per month and/or (b) issue New CEC Common Equity (at a price per share of New CEC Common Equity using an implied equity value for New CEC of $6.5 billion, post conversion of the New CEC Convertible Notes and before giving effect to the Cash that would have otherwise been used to pay the consideration and the New CEC Common Equity Buyback) of a value equal to $20,000,000 per month (which shall be issued in exchange for OpCo Series A Preferred Stock pursuant to the CEOC Merger), in both instances commencing on May 1, 2017, and ending on the Effective Date, which amount shall be (x) prorated for any partial month, and (y) so long as New CEC has made all payments required of it under the Bond RSA, reduced by $4,800,000; provided that the

2

election to pay Cash or New CEC Common Equity shall be made in New CEC's sole discretion, provided, further, that, unless consented to by the Requisite Consenting Bond Creditors, such election must be the same as the similar election made by CEC for the Additional CEC Bank Consideration.

16.    "Administrative Claim" means a Claim for the costs and expenses of administration of the Estates pursuant to section 503(b) and 507(a)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) all fees and charges assessed against the Estates pursuant to chapter 123 of the Judicial Code, including the U.S. Trustee Fees; (c) Professional Fee Claims; and (d) Restructuring Support Advisors Fees.

17.    "Administrative Claims Bar Date" means the deadline for filing requests for payment of Administrative Claims (other than (x) Professional Fee Claims and (y) Administrative Claims arising in the ordinary course of business), which shall be the first Business Day that is 45 days following the Effective Date, except as specifically set forth in the Plan or in a Final Order, or as agreed-to by the Reorganized Debtors.

18.    "Administrative Claims Objection Bar Date" means the deadline for filing objections to requests for payment of Administrative Claims (other than requests for payment of Professional Fee Claims), which shall be the first Business Day that is 180 days following the Effective Date; provided that the Administrative Claims Objection Bar Date may be extended by the Bankruptcy Court after notice and a hearing.

19.    "Affiliate" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

20.    "Allowed" means with respect to Claims: (a) any Claim other than an Administrative Claim that is evidenced by a Proof of Claim which is or has been timely Filed by the applicable Claims Bar Date or that is not required to be evidenced by a Filed Proof of Claim under the Bankruptcy Code or a Final Order; (b) any Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed; (c) all Claims classified in Class 1 (Undisputed Unsecured Claims); (d) any Claims agreed to by the Debtors prior to the Distribution Record Date and included on a schedule to be provided to the Unsecured Creditors Committee on such date; or (e) any Claim Allowed pursuant to (i) the Plan, (ii) any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or (iii) a Final Order of the Bankruptcy Court; provided that with respect to any Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim shall have been Allowed by a Final Order. Except as otherwise specified in the Plan or any Final Order, and except for any Claim that is Secured by property of a value in excess of the principal amount of such Claim, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date. For purposes of determining the amount of an Allowed Claim, there shall be deducted therefrom an amount equal to the amount of any Claim that the Debtors may hold against the Holder thereof, to the extent such Claim may be offset, recouped, or otherwise reduced under applicable law. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed by the applicable Claims Bar Date, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be. "Allow" and "Allowing" shall have correlative meanings.

21.    "Alpha Released Parties" means Alpha Frontier Limited, as purchaser under the CIE Asset Sale, and each and all of its respective direct and indirect current and former: shareholders, affiliates, subsidiaries, partners (including general partners and limited partners), investors, managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, other professionals, advisors, and representatives, and each and all of their respective heirs, successors, assigns, and legal representatives, each in their capacities as such.

22.    "Approvals" shall have the meaning set forth in Article IV.R.3 hereof.

KE 33843292

23.    "Assumed Executory Contracts and Unexpired Leases Schedule" means the schedule of certain Executory Contracts and Unexpired Leases to be assumed, or assumed and assigned, as applicable, by the Debtors pursuant to the Plan in the form filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time, which schedule shall be reasonably acceptable to the Requisite Consenting Bond Creditors, the Requisite Consenting Bank Creditors, the Second Priority Noteholders Committee, the Unsecured Creditors Committee, CEC, and the Debtors.

24.    "Available Cash" means the excess of (a) the pro forma amount of balance sheet Cash of the Debtors available after giving effect to the Effective Date, the consummation of the Plan, all debt reductions and repayments, the payment of all fees, expenses, and related uses of Cash on the Effective Date in accordance with the Plan over (b) the Minimum Cash Requirement. The pro forma amount of such balance sheet Cash shall exclude (i) Cash held by non-Debtor Chester Downs and Marina, LLC and Chester Downs Finance Corp., (ii) Cash held by the international entities owned by the Debtors, each of which is a non-Debtor other than Caesars Entertainment Windsor Limited, and (iii) customer Cash held in custody by the Debtors.

25.    "Avoidance Actions" means any and all avoidance, recovery, subordination, or similar remedies that may be brought by or on behalf of the Debtors or the Estates, including causes of action or defenses arising under chapter 5 of the Bankruptcy Code or under similar or related state or federal statutes and common law, including fraudulent transfer laws.

26.    "Backstop Commitment" means the PropCo Preferred Backstop Investors' commitment pursuant to the Backstop Commitment Agreement to backstop with Cash the exercise of the PropCo Preferred Equity Put Right in an amount equal to (a) $250,000,000 plus (b) the PropCo Preferred Equity Upsize Amount.

27.    "Backstop Commitment Agreement" means that certain Backstop Commitment Agreement, by and between CEOC and the PropCo Preferred Backstop Investors party thereto from time to time, as the same may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms, the form of which shall be included in the Plan Supplement.

28.    "Ballot" means the form or forms distributed to certain Holders of Claims or Interests that are entitled to vote on the Plan by which such parties may indicate acceptance or rejection of the Plan.

29.    "Bank Debt Contract Rate" means (a) with respect to Term B-4 Loans, a per annum rate equal to 10.50%, (b) with respect to Term B-5 Loans, a per annum rate equal to 6.22%, (c) with respect to Term B-6 Loans, a per annum rate equal to 7.22%, and (d) with respect to Term B-7 Loans, a per annum rate equal to 9.75%.

30.    "Bank Debt Tranche" means Term B-4 Loans, Term B-5 Loans, Term B-6 Loans, and/or Term B-7 Loans issued pursuant to the Prepetition Credit Agreement.

31.    "Bank Guaranty Accrual Period" means the period from (and including) the Petition Date until (but not including) the Effective Date; provided that from the date of the Bank Pay Down, until (but not including) the Effective Date, the aggregate principal amount of Bank Guaranty Purchased Obligations upon which the Bank Guaranty Settlement Percentage shall be applied will be reduced by $300,000,000 on account of the Bank Pay Down.

32.    "Bank Guaranty Accrued Amount" means, with respect to each Bank Debt Tranche held by a Holder of a Prepetition Credit Agreement Claim, an aggregate amount equal to (a) the aggregate principal amount of Bank Guaranty Purchased Obligations of such Bank Debt Tranche held by such Holder multiplied by a rate per annum equal to the product of (x) the Bank Guaranty Settlement Percentage and (y) the Bank Guaranty Contract Rate, minus (ii) the aggregate amount of Monthly Adequate Protection Payments (as defined in the Cash Collateral Order) received by such Holder during the Bank Guaranty Accrual Period (which Monthly Adequate Protection Payments are deemed to have been paid on account of interest (and not recharacterized as principal or otherwise disallowed)) on account of its Prepetition Credit Agreement Claims, minus (iii) the Upfront Payment paid by CEC to such Holder.

33.  "Bank Guaranty Purchased Obligations" means the Debtors' obligation, which shall be funded entirely by CEC or New CEC, to purchase 100% of the rights of each Holder of a Prepetition Credit Agreement Claim for the Bank Guaranty Settlement Purchase Price, in full and final cancellation of all rights under the Prepetition Credit Agreement, including on account of any right to postpetition interest.

34.  "Bank Guaranty Settlement" means the settlement set forth in Article IV.A.8 of the Plan, which shall be deemed approved by the Holders of Prepetition Credit Agreement Claims if Class D votes to accept the Plan.

35.  "Bank Guaranty Settlement Percentage" means a percentage rate equal to (a) for the period from the Petition Date through and including October 1, 2015, 80.3%, (b) for the period from October 2, 2015, through and including January 1, 2016, 83.3%, (c) for the period from January 2, 2016, through and including April 1, 2016, 86.4%, (d) for the period from April 2, 2016, through and including July 1, 2016, 89.5%, (e) for the period from July 2, 2016, through and including October 1, 2016, 92.6%, (f) for the period from October 2, 2016, through and including January 1, 2017, 95.7%, (g) for the period from January 2, 2017, through and including April 1, 2017, 98.8%, and (h) for the period from April 2, 2017, until the end of the Bank Guaranty Accrual Period, 100%, provided that, for the avoidance of doubt, the aggregate principal amount outstanding under the Prepetition Credit Agreement Bank Debt Tranches shall be reduced by $300,000,000 from the date of the Bank Pay Down, forward through the end of the Bank Guaranty Accrual Period, on account of the Bank Pay Down on such date.

36.  "Bank Guaranty Settlement Purchase Price" means, with respect to each Bank Debt Tranche held by a Holder of a Prepetition Credit Agreement Claim, an amount equal to the Bank Guaranty Accrued Amount in respect of the aggregate principal amount of Bank Guaranty Purchased Obligations of such Bank Debt Tranche held by such Holder of a Prepetition Credit Agreement Claim for the Bank Guaranty Accrual Period; provided that each such Holder of a Prepetition Credit Agreement Claim shall remain entitled to receive any distributions set forth herein on account of such Holder's Bank Guaranty Purchased Obligations.

37.  "Bank RSA" means that certain Second Amended and Restated Restructuring Support and Forbearance Agreement (including all term sheets, schedules, exhibits, and annexes thereto), dated as of October 4, 2016, as amended, amended and restated, supplemented, or otherwise modified from time to time, by and between, among others, CEOC on behalf of itself and each of the Debtors, CEC, and the Consenting Bank Creditors (as defined therein) party thereto from time to time.  As provided in the Bank RSA, the Plan, the Confirmation Order, the documents in the Plan Supplement, and any modifications, amendments, or supplements thereto shall be reasonably acceptable to the Requisite Consenting Bank Creditors and to the extent that any such amendment, supplement, modification, or restatement could have, in the good faith opinion of the Requisite Consenting Bank Creditors, after consulting with its professionals, any material impact on the legal or economic rights of the Prepetition Credit Agreement Claims, shall be approved by the Requisite Consenting Bank Creditors.

38.  "Bank Pay Down" means the Debtors' partial principal payment of the Prepetition Credit Agreement Claims held by the Holders of the Prepetition Credit Agreement Bank Debt Tranches (for the avoidance of doubt, exclusive of Swap and Hedge Claims or any Claims on account of letters of credit) in Cash in the amount of $300,000,000 paid on October 3, 2016 (or such other date as the Majority Bank Creditors (as defined in the Bank RSA) may agree to in writing, upon written request of the Debtors), pursuant to, and subject to the terms of, the *Order (A) Authorizing the Repayment of Certain Secured Loan Amounts, and (B) Granting Related Relief* [Docket No. 4666].

39.  "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

40.  "Bankruptcy Court" means the United States Bankruptcy Court for the Northern District of Illinois having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under section 157 of the Judicial Code, the United States District Court for the Northern District of Illinois.

41.  "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of

the Bankruptcy Court, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

42.    "BIT Debtors" means the Debtors at which the Holders of General Unsecured Claims are entitled to higher recoveries than Holders of General Unsecured Claims at other Debtors based on the Liquidation Analysis, which Debtors are, collectively, (a) the Par Recovery Debtors, (b) Caesars Riverboat Casino, LLC, (c) Chester Downs Management Company, LLC, and (d) Winnick Holdings, LLC.

43.    "Bond RSA" means that certain Sixth Amended and Restated Restructuring Support and Forbearance Agreement (including all term sheets, schedules, exhibits, and annexes thereto), dated as of October 4, 2016, as amended, amended and restated, supplemented, or otherwise modified from time to time, by and between, among others, CEOC on behalf of itself and each of the Debtors, CEC, and the Consenting Creditors (as defined therein) party thereto from time to time. As provided in the Bond RSA, the Plan, the Confirmation Order, the documents in the Plan Supplement, and any modifications, amendments, or supplements thereto shall be reasonably acceptable to the Requisite Consenting Bond Creditors and to the extent that any such amendment, supplement, modification, or restatement could have, in the good faith opinion of the Requisite Consenting Bond Creditors, after consulting with its professionals, any material impact on the legal or economic rights of the Secured First Lien Notes Claims, shall be approved by the Requisite Consenting Bond Creditors.

44.    "Business Day" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

45.    "CAC" means Caesars Acquisition Company, a Delaware corporation, which is a non-Debtor.

46.    "CAC RSA" means that certain Amended and Restated Restructuring Support Agreement (including all exhibits thereto), dated as of July 9, 2016, as amended, amended and restated, supplemented, or otherwise modified from time to time, by and between, among others, CEOC on behalf of itself and each of the Debtors, and CAC.

47.    "Caesars Cases" means, collectively, the cases captioned (a) Wilmington Savings Fund Society, FSB, solely in its capacity as successor Indenture Trustee for the 10% Second-Priority Senior Secured Notes due 2018, on behalf of itself and derivatively on behalf of Caesars Entertainment Operating Company, Inc. v. Caesars Entertainment Corporation, et al., Case No. 10004-VCG (Del. Ch.), (b) Trilogy Portfolio Company, LLC, et al. v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc., No. 14-cv-07091 (S.D.N.Y.), (c) Frederick Barton Danner v. Caesars Entertainment Corporation and Caesars Entertainment Operating Company, Inc., No. 14-cv-7973 (S.D.N.Y.), (d) UMB Bank v. Caesars Entertainment Corporation, et al., C.A. No. 10393-VCG (Del. Ch.), (e) BOKF, N.A., solely in its capacity as successor Indenture Trustee for the 12.75% Second-Priority Senior Secured Notes due 2018 v. Caesars Entertainment Corporation, No. 15-cv-01561 (S.D.N.Y.), (f) UMB Bank, N.A. solely in its capacity as Indenture Trustee under those certain indentures, dated as of June 10, 2009, governing Caesars Entertainment Operating Company, Inc.'s 11.25% Notes due 2017; dated as of February 14, 2012, governing Caesars Entertainment Operating Company, Inc.'s 8.5% Senior Secured Notes due 2020; dated August 22, 2012, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020; dated February 15, 2013, governing Caesars Entertainment Operating Company, Inc.'s 9% Senior Secured Notes due 2020 v. Caesars Entertainment Corporation, No. 15-cv-04634 (S.D.N.Y.), (g) Wilmington Trust, National Association v. Caesars Entertainment Corporation, No. 15-cv-08280 (S.D.N.Y.), and (h) all claims in, causes of action relating to, and claims arising out of any facts alleged in the Caesars Cases otherwise described in clauses (a)–(g) above.

48.    "Caesars Controlled Group" means all members of the NRF Employers' "controlled group" as that term is defined in the Internal Revenue Code (including 26 U.S.C. § 414) and ERISA (including 29 U.S.C. § 1301(b)).

49.    "Caesars Palace-Las Vegas" means the hotel, gaming, retail, and resort property located at 3500-3570 Las Vegas Boulevard South, Las Vegas, Nevada 89109, and related properties, including the portion of such property known as The Forum Shops, but specifically excluding the portion of such property commonly known as Octavius Tower.

6

50.    "Caesars Riverboat Casino Unsecured Claim" means a General Unsecured Claim against Debtor Caesars Riverboat Casino, LLC.

51.    "Cash" or "$" means the legal tender of the United States of America or the equivalent thereof, including bank deposits and checks.

52.    "Cash Collateral Order" means (a) the *Interim Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay to Permit Implementation; (IV) Scheduling a Final Hearing and (V) Granting Related Relief* [Docket No. 47], (b) the *Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay to Permit Implementation, and (IV) Granting Related Relief* [Docket No. 988], and (c) any stipulations thereto.

53.    "Causes of Action" means any claim, cause of action (including Avoidance Actions or rights arising under section 506(c) of the Bankruptcy Code), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  Causes of Action also include: (a) all rights of setoff, counterclaim, cross-claim, or recoupment, and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; and (d) all claims and defenses set forth in section 558 of the Bankruptcy Code.

54.    "CEC" means Caesars Entertainment Corporation, a Delaware corporation formerly known as Harrah's Entertainment, Inc., which is a non-Debtor.

55.    "CEC Released Parties" means each and all of: (a) CEC; (b) CAC; (c) the Sponsors; and (d) with respect to each of the foregoing identified in the foregoing clauses (a) through (c), each and all of their respective direct and indirect current and former:  shareholders (other than (i) the Debtors and (ii) recipients of New CEC Common Equity Distributed under this Plan who become shareholders solely as a result of such distribution), Affiliates (other than the Debtors), subsidiaries (other than the Debtors and their direct and indirect subsidiaries), partners (including general partners and limited partners), investors, managing members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, other professionals, advisors, and representatives, and each and all of their respective heirs, successors, and legal representatives, each in their capacities as such.

56.    "CEC RSA" means that certain First Amended and Restated Restructuring Support, Settlement, and Contribution Agreement (including all exhibits thereto), dated as of July 9, 2016, as amended, amended and restated, supplemented, or otherwise modified from time to time, by and between, among others, CEOC on behalf of itself and each of the Debtors and CEC.

57.    "CEOC" means Caesars Entertainment Operating Company, Inc., a Delaware corporation, formerly known as Harrah's Operating Company, Inc., which is a Debtor.

58.    "CEOC Interests" means an Interest in CEOC.

59.    "CEOC Merger" means the merger of OpCo into a wholly-owned subsidiary of New CEC that will be disregarded from New CEC for U.S. federal income tax purposes on the Effective Date, pursuant to which OpCo Series A Preferred Stock will be exchanged for New CEC Common Equity, which is intended to be treated as a reorganization under section 368(a)(1)(A) or (G) of the Internal Revenue Code or as a tax-free liquidation (from the perspective of New CEC) under section 332 of the Internal Revenue Code, as applicable.

60.    "CEOC Merger Agreement" means the agreement pursuant to which OpCo will consummate the CEOC Merger, the form of which shall be included in the Plan Supplement.

61.    "CERP" means Caesars Entertainment Resort Properties, LLC, a Delaware limited liability company, and all of its direct and indirect subsidiaries, each of which are non-Debtors.

62.    "CES" means Caesars Enterprise Services, LLC, which is a non-Debtor.

63.    "CES LLC Agreement" means that certain Amended Limited Liability Company Agreement of Caesars Enterprise Services, LLC, dated as of May 20, 2014, as amended, amended and restated, supplemented, or otherwise modified from time to time.

64.    "CES Shared Services Agreement" means certain Omnibus License and Enterprise Services Agreement, dated as of May 20, 2014, by and between CEOC, CERP, Caesars Growth Properties Holdings, LLC, Caesars World, Inc., and CES, as amended, amended and restated, supplemented, or otherwise modified from time to time.

65.    "CGP" means Caesars Growth Partners, LLC, a Delaware limited liability company, and all of its direct and indirect subsidiaries, each of which are non-Debtors.

66.    "Challenged Transactions" means all of the transactions that were reviewed by the examiner appointed in the Chapter 11 Cases by the Bankruptcy Court pursuant to section 1106 of the Bankruptcy Code, or that such examiner was empowered or authorized to review pursuant to the *Order Granting in Part and Denying in Part Motions to Appoint Examiner* [Docket No. 675] and the *Order (I) Granting Debtors' Motion for an Order Expanding the Scope of the Examiner's Investigation and (II) Amending the Examiner Order and Discovery Protocol Orders* [Docket No. 2131].

67.    "Chapter 11 Cases" means the jointly administered chapter 11 cases commenced by the Debtors in the Bankruptcy Court and styled In re Caesars Entertainment Operating Company, Inc., et al., No. 15-01145 (ABG).

68.    "Chester Downs Management Unsecured Claim" means a General Unsecured Claim against Debtor Chester Downs Management Company, LLC.

69.    "CIE" means Caesars Interactive Entertainment LLC, a Delaware limited liability company formerly known as Caesars Interactive Entertainment, Inc., which is a non-Debtor.

70.    "CIE Asset Sale" means the consummated sale contemplated by that certain Stock Purchase Agreement, dated as of July 30, 2016, between Alpha Frontier Limited and CIE.

71.    "CIE Equity Buyback Proceeds" means Cash in the amount of $1,200,000,000 from the CIE Asset Sale proceeds in the CIE Escrow Account, which amount will be used on the Effective Date to make distributions to Holders of Claims in accordance with the distributions set forth in Article III hereof and pursuant to the New CEC Common Equity Cash Election Procedures.

72.    "CIE Escrow Account" shall have the meaning set forth in the CIE Proceeds and Reservation of Rights Agreement.

73.    "CIE OpCo Deleveraging Proceeds" means Cash in the amount of $500,000,000 from the CIE Asset Sale proceeds in the CIE Escrow Account, which amount will be used to fund distributions to the Holders of Prepetition Credit Agreement Claims and Holders of Secured First Lien Notes Claims.

74.    "CIE Proceeds and Reservation of Rights Agreement" means that certain proceeds agreement, dated as of September 9, 2016, by and among CEC, CAC, CIE, and CEOC, as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with its terms and the *Stipulation Regarding CIE Sale Proceeds* [Docket No. 5078], dated September 22, 2016, by and among CEOC, CAC, CIE, and the Second Priority Noteholders Committee.

8

75.    "Claim" means any claim against the Debtors or the Estates, as defined in section 101(5) of the Bankruptcy Code, including: (a) any right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

76.    "Claims Bar Date" means the date established by the Bankruptcy Court by which Proofs of Claim must have been Filed with respect to such Claims, pursuant to: (a) the *Agreed Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment Under Section 503(b)(9) of the Bankruptcy Code, (II) Establishing the Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing of Claims, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Docket No. 1005], entered by the Bankruptcy Court on March 4, 2015; (b) a Final Order of the Bankruptcy Court; or (c) the Plan.

77.    "Claims Objection Bar Date" shall mean the later of:  (a) the first Business Day following 365 days after the Effective Date; and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion Filed on or before the day that is before 365 days after the Effective Date.

78.    "Claims Register" means the official register of Claims maintained by the Notice and Claims Agent.

79.    "Class" means a category of Holders of Claims or Interests as set forth in Article III of the Plan in accordance with section 1122(a) of the Bankruptcy Code.

80.    "Coletta Claim" means that certain Proof of Claim Number 4053, filed by Alfred Coletta and Rosemary Coletta, Co-Guardians of the Person of Anthony Coletta, Incapacitated, and Alfred Coletta, in his own right, against Debtor Chester Downs Management Company, LLC, as such Proof of Claim may be amended or superseded.

81.    "Confirmation" means the entry of the Confirmation Order on the docket of the Bankruptcy Court in the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

82.    "Confirmation Date" means the date upon which the Bankruptcy Court enters the Confirmation Order on its docket in the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

83.    "Confirmation Hearing" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

84.    "Confirmation Objection Deadline" means November 21, 2016.

85.    "Confirmation Order" means the order of the Bankruptcy Court, materially consistent with the Restructuring Support Agreements and the Plan, and reasonably acceptable to the Debtors, CEC, the Requisite Consenting Bank Creditors, the Requisite Consenting Bond Creditors, the Requisite Consenting SGN Creditors (only with respect to their treatment and recovery), the Second Priority Noteholders Committee, the NRF (only with respect to the treatment of the NRF Claim, the NRF Bankruptcy Disputes, the NRF Non-Bankruptcy Disputes, and Article IV.O hereof) and the Unsecured Creditors Committee (in each case, as evidenced by their written approval, which approval may be conveyed in writing by their respective counsel including by electronic mail), confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

86.    "Consenting First Lien Bank Lenders" means Holders of Prepetition Credit Agreement Claims who are Consenting Bank Creditors (as defined in the Bank RSA).

87.    "Consenting First Lien Noteholders" means Holders of First Lien Notes who are Consenting Creditors (as defined in the Bond RSA).

88.    "Consenting Second Lien Creditors" shall have the meaning set forth in the Second Lien RSA.

89.    "Consenting SGN Creditors" shall have the meaning set forth in the SGN RSA.

90.    "Consummation" shall mean "substantial consummation" as defined in section 1101(2) of the Bankruptcy Code.

91.    "Convenience Cash Pool" means $17,570,000, which shall be available (a) first to satisfy Allowed Convenience Unsecured Claims on a Pro Rata basis up to a recovery equal to 65.5% of each Allowed Convenience Unsecured Claim, and (b) second to fund the Unsecured Creditors Cash Pool.

92.    "Convenience Unsecured Claim" means any bona fide Claim arising prior to the Petition Date in an amount equal to or less than $280,000 as of the Voting Record Date, as evidenced by a Proof of Claim or the Debtors' Schedules (in accordance with the Bar Date Order), but only to the extent agreed to by the Debtors or allowed by a Final Order or has been asserted in an amount equal to or less than $280,000 that directly relates to and arises solely from either (a) the receipt of goods or services by the Debtors (other than a BIT Debtor or a Non-Obligor Debtor) or (b) employment services provided to the Debtors (other than a BIT Debtor or a Non-Obligor Debtor), provided that, for the avoidance of doubt, Claims held by a single entity at different Debtors shall not be aggregated for purposes of determining eligibility to be treated as a Holder of a Convenience Unsecured Claim, provided, further, that a Holder of a Claim in an amount greater than $280,000 shall not be permitted to reduce its Claim to an amount equal to or less than $280,000 to qualify its Claim for treatment as a Convenience Unsecured Claim.

93.    "CPLV Loan Agreement" means the mortgage loan agreement and, if applicable, mezzanine loan agreement(s) by and among CPLV Sub and the CPLV Loan Lender, to be effective on the Effective Date, (a) the form of which shall be included in the Plan Supplement, (b) which shall be based on the material terms set forth in the Bank RSA and the Bond RSA, (c) which shall be in form and substance consistent in all material respects with the Bank RSA and the Bond RSA, and (d) which shall be reasonably acceptable to the Requisite Consenting Bond Creditors, the Requisite Bank Creditors, the Second Priority Noteholders Committee, and the Unsecured Creditors Committee.

94.    "CPLV Loan Lender" means the lender or the trustee for the certificate holders for the CPLV Market Debt.

95.    "CPLV Loan Documents" means, collectively, the CPLV Loan Agreement and all other agreements, documents, and instruments evidencing or securing the CPLV Market Debt to be delivered or entered into in connection therewith (including any mortgage, pledges, promissory notes, intercreditor agreements, and other security documents), which shall be in form and substance reasonably acceptable to the Requisite Consenting Bond Creditors, the Requisite Consenting Bank Creditors, the Second Priority Noteholders Committee, the Unsecured Creditors Committee, CEC, and the Debtors.

96.    "CPLV Market Debt" means the first lien mortgage loan and, if applicable, mezzanine loan(s) to be provided on or prior to the Effective Date by the CPLV Loan Lender to CPLV Sub in an amount no less than $1,800,000,000 but no more than $2,600,000,000, at least $1,800,000,000 of which will be provided by third party lenders in Cash, the Cash proceeds of which shall be distributed to the Holders of Prepetition Credit Agreement Claims and the Holders of Secured First Lien Notes Claims as set forth in Article III.B hereof.

97.    "CPLV Mezz" means the one or more newly formed wholly owned unrestricted direct or indirect subsidiaries of PropCo, which on and after the Effective Date will be the sole member of CPLV Sub or, if there are multiple such subsidiaries, each tranche will be the sole member of the below subsidiary and with one such tranche being the sole member of CPLV Sub.

98.    "CPLV Mezz Organizational Documents" means the form of the operating agreement, certificate of incorporation, articles of incorporation, charter, bylaws, limited liability company agreement, and/or other similar organizational and constituent documents for CPLV Mezz, which shall be included in the Plan Supplement and

which shall be in form and substance reasonably acceptable to the Requisite Consenting Bond Creditors, the Requisite Consenting Bank Creditors, the Second Priority Noteholders Committee, the Unsecured Creditors Committee, CEC, and the Debtors.

99.    "CPLV Mezzanine Debt" means one or more tranches of mezzanine debt under the CPLV Mezzanine Loan Agreement, which debt shall be issued only if the Debtors, after using commercially reasonable efforts, are unable to finance $2,600,000,000 of CPLV Market Debt, and which CPLV Mezzanine Debt shall be issued pursuant to Article IV.A.3 hereof in an initial aggregate principal amount equal to the excess, if any, of $2,600,000,000 over the sum of (a) the original aggregate principal amount of the CPLV Market Debt, (b) the aggregate amount of the CPLV Mezzanine Equitized Debt in respect of PropCo Preferred Equity distributed to the Holders of Allowed Secured First Lien Notes Claims, and (c) unless Holders of Prepetition Credit Agreement Claims make the CPLV Mezzanine Election, the PropCo Second Lien Upsize Amount.

100.    "CPLV Mezzanine Election" means an affirmative election (by marking the appropriate box) on the Class D Ballots by a majority of the Class of Holders of Prepetition Credit Agreement Claims (calculated based solely on the principal amount of Allowed Prepetition Credit Agreement Claims held by the Holders who submit Class D Ballots voting to accept the Plan) to convert up to $333,000,000 in principal amount of PropCo Second Lien Notes otherwise to be received as a result of the PropCo Second Lien Upsize Amount (if any), into an equal principal amount of CPLV Mezzanine Debt in lieu thereof.

101.    "CPLV Mezzanine Equitized Debt" means all CPLV Mezzanine Debt that is reduced (or not issued) as a result of the issuance of PropCo Preferred Equity, including the PropCo Preferred Equity Upsize Shares.

102.    "CPLV Mezzanine Lenders" means the lenders under the CPLV Mezzanine Loan Agreement.

103.    "CPLV Mezzanine Loan Agreement" means the loan agreement(s) by and among CPLV Mezz and the CPLV Mezzanine Lenders, to be effective on the Effective Date, (a) the form of which shall be included in the Plan Supplement, (b) the material terms of which are set forth in the Bank RSA and the Bond RSA, (c) which shall be in form and substance consistent in all material respects with the Bank RSA and the Bond RSA, and (d) which shall be reasonably acceptable to the Requisite Consenting Bond Creditors and, solely if the Holders of Prepetition Credit Agreement Claims in Class D make the affirmative CPLV Mezzanine Election, the Requisite Consenting Bank Creditors.

104.    "CPLV Mezzanine Loan Documents" means, collectively, the CPLV Mezzanine Loan Agreement and all other agreements, documents, and instruments evidencing or securing the CPLV Mezzanine Debt to be delivered or entered into in connection therewith (including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents), which shall be in form and substance reasonably acceptable to the Requisite Consenting Bond Creditors and, solely if the Holders of Prepetition Credit Agreement Claims in Class D make the affirmative CPLV Mezzanine Election, the Requisite Consenting Bank Creditors.

105.    "CPLV Sub" means the newly formed wholly owned unrestricted direct or indirect subsidiaries of PropCo, which on and after the Effective Date will own Caesars Palace-Las Vegas, and which shall lease Caesars Palace-Las Vegas to OpCo or, if there are multiple such subsidiaries, each one will be the sole member of the below subsidiary, with one such subsidiary owning Caesars Palace-Las Vegas and leasing Caesars Palace-Las Vegas to OpCo.

106.    "CPLV Sub Organizational Documents" means the form of limited liability company agreement, articles of incorporation, bylaw, and/or other similar organizational and constituent documents for CPLV Sub, which shall be included in the Plan Supplement and which shall be in form and substance reasonably acceptable to the Requisite Consenting Bond Creditors, the Requisite Consenting Bank Creditors, the Second Priority Noteholders Committee, the Unsecured Creditors Committee, CEC, and the Debtors.

107.    "Danner Agreement" means that certain Settlement and Forbearance Agreement, dated as of August 15, 2016, by and among CEOC, CEC, and Frederick Barton Danner.

KE 33843292

108.    "Debtors" means, collectively, each of the entities identified on **Exhibit A** attached hereto.

109.    "Debtor Release" means the release given on behalf of the Debtors and their Estates to the Released Parties as set forth in Article VIII.B of the Plan.

110.    "Deferred Compensation Plans" means, collectively, the (a) Harrah's Entertainment, Inc. Executive Supplemental Savings Plan, (b) Harrah's Entertainment, Inc. Executive Supplemental Savings Plan II, (c) Harrah's Entertainment, Inc. Executive Deferred Compensation Plan, (d) Harrah's Entertainment, Inc. Deferred Compensation Plan, and (e) Park Place Entertainment Corporation Executive Deferred Compensation Plan.

111.    "Deferred Compensation Settlement" means that settlement encompassed in the Deferred Compensation Settlement Agreement, which settlement shall be effective on the Effective Date.

112.    "Deferred Compensation Settlement Agreement" means that certain settlement agreement, dated as of September 14, 2016, by and between CEOC and CEC, pursuant to which CEOC and CEC have settled each of their asserted property interests in the assets held in various trust accounts in respect of the Deferred Compensation Plans, which settlement agreement was filed as Exhibit 1 to Exhibit A to the *Debtors' Motion for Entry of an Order Approving Settlement By and Among Debtor Caesars Entertainment Operating Company, Inc. and Caesars Entertainment Corporation Concerning the Treatment of Nonqualified Deferred Compensation Plans* [Docket No. 4982].

113.    "Des Plaines Interests" means an Interest in Des Plaines Development Limited Partnership, a Debtor.

114.    "Disbursing Agent" means, on the Effective Date, the Debtors, their agent, or any Entity or Entities designated by the Debtors to make or facilitate distributions that are to be made on or after the Initial Distribution Date pursuant to the Plan, which designee may be the Reorganized Debtors, provided that all distributions on account of Notes Claims shall be made to or at the direction of each of the applicable Indenture Trustees for distribution in accordance with the Plan following the procedures specified in each of the applicable Indentures.

115.    "Disclosure Statement" means the *Disclosure Statement for the Debtors' Second Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 4220], dated June 28, 2016, and as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law and approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

116.    "Disputed" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

117.    "Disputed Unsecured Claim" means any General Unsecured Claim other than an Insurance Covered Unsecured Claim that has not been agreed to by the Debtors as of the Effective Date, provided that for voting purposes, any such General Unsecured Claim that has not been agreed to by the Debtors by the Voting Deadline shall be in Class J. For the avoidance of doubt, to the extent the Holder of a Disputed Unsecured Claim resolves their Claim before the Voting Deadline such that it is an Undisputed Unsecured Claim, such Holder shall be permitted to vote the Allowed amount of such Undisputed Unsecured Claim to accept or reject the Plan in Class I against the applicable Debtor.

118.    "Distribution Record Date" means the date for determining which Holders of Allowed Claims or Interests are eligible to receive distributions hereunder, which shall be the Effective Date or such other date as is designated in a Bankruptcy Court order.

119.    "D&O Liability Insurance Policies" means, collectively, (a) all insurance policies for directors', members', trustees', officers', and managers' liability maintained by CEC (or its subsidiaries) for the benefit of the

Debtors' directors, members, trustees, officers, and managers as of the Petition Date (including any "tail policy") and (b) all insurance policies for directors', members', trustees', officers', and managers' liability maintained by the Debtors, the Estates, the Reorganized Debtors, or the New Property Entities as of the Effective Date (including any "tail policy").

120.    "DTC" means The Depository Trust Company.

121.    "Effective Date" means the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect and (b) all conditions precedent specified in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, which shall be the day Consummation occurs.

122.    "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

123.    "ERISA" means the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

124.    "Escrow Issuers" means Caesars Operating Escrow LLC, a Delaware limited liability company formerly known as Harrah's Operating Escrow LLC, and Caesars Escrow Corporation, a Delaware corporation formerly known as Harrah's Escrow Corporation.

125.    "Estate" means, as to each Debtor, the estate created for the Debtor on the Petition Date pursuant to section 541 of the Bankruptcy Code and all property (as defined in section 541 of the Bankruptcy Code) acquired after the Petition Date through the Effective Date.

126.    "Estimated REIT E&P" means the Debtors' reasonable estimate of the earnings and profits of the REIT, which will be calculated and delivered to the Consenting First Lien Noteholders and the Consenting First Lien Bank Lenders in accordance with the Bank RSA and the Bond RSA.

127.    "Exculpated Party" means, collectively, in each case solely in their capacity as such, each and all of: (a) each Debtor; (b) CES; (c) the Unsecured Creditors Committee; (d) the Unsecured Creditors Committee Members; (e) the Second Priority Noteholders Committee; (f) the Second Priority Noteholders Committee Members; (g) CEC; (h) CAC; and (i) with respect to each of the foregoing identified in subsections (a) through (h) herein, each and all of their respective direct and indirect current and former: affiliates, subsidiaries, partners (including general partners and limited partners), managing members, members, officers, directors, principals, employees, managers, controlling persons, agents, attorneys, investment bankers, other professionals, advisors, and representatives, each in their capacities as such.

128.    "Exculpation" means the exculpation set forth in Article VIII.D of the Plan.

129.    "Executory Contract" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

130.    "Federal Judgment Rate" means the federal judgment interest rate in effect as of the Petition Date calculated as set forth in section 1961 of the Judicial Code, which amount is 0.18% per annum.

131.    "File," "Filed," or "Filing" means file, filed, or filing with the Bankruptcy Court (including the clerk thereof) in the Chapter 11 Cases or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

132.    "Final Cash Collateral Order" means the *Final Order (I) Authorizing Use of Cash Collateral, (II) Granting Adequate Protection, (III) Modifying the Automatic Stay to Permit Implementation, and (IV) Granting Related Relief* [Docket No. 988] entered by the Bankruptcy Court on March 25, 2015, including all stipulations related thereto.

13

133. "Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter which has not been reversed, stayed, modified, or amended, as to which the time to appeal, petition for certiorari or move for reargument, reconsideration, or rehearing has expired and no appeal, petition for certiorari or motion for reargument, reconsideration, or rehearing has been timely filed, or as to which any appeal, petition for certiorari or motion for reargument, reconsideration, or rehearing that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, reargument, reconsideration, or rehearing was sought; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or the Local Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order.

134. "First Lien Intercreditor Agreement" that certain First Lien Intercreditor Agreement, dated as of June 10, 2009, by and between the Prepetition Credit Agreement Agent and the First Lien Notes Indenture Trustee.

135. "First Lien Notes" means, collectively, the: (a) 11.25% Senior Secured Notes due 2017, issued in the aggregate principal amount of $2,095,000,000 pursuant to the 11.25% First Lien Notes Indenture; (b) 8.50% Senior Secured Notes due 2020, issued in the original principal amount of $1,250,000,000 pursuant to the 8.50% First Lien Notes Indenture; and (c) 9.00% Senior Secured Notes due 2020, issued in the aggregate principal amount of $3,000,000,000 pursuant to the 9.00% First Lien Notes Indentures.

136. "First Lien Notes Claims" means, collectively, Secured First Lien Notes Claims and First Lien Notes Deficiency Claims.

137. "First Lien Notes Deficiency Claims" means any unsecured Claim arising under the First Lien Notes Indentures.

138. "First Lien Notes Indentures" means, collectively, the: (a) 11.25% First Lien Notes Indenture; (b) 8.50% First Lien Notes Indenture; and (c) 9.00% First Lien Notes Indentures.

139. "First Lien Notes Indenture Trustee(s)" means UMB Bank, National Association, solely in its capacity as indenture trustee under the First Lien Notes Indentures, and any predecessors and successors in such capacity.

140. "Gaming Approvals" means all state and local authorizations, consents, and regulatory approvals required to consummate the transactions contemplated by the Plan and maintain the Debtors' casino gaming licenses for their casino properties in the ordinary course.

141. "General Unsecured Claim" means any Claim that is not Secured and is not: (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim); (b) a Non-Obligor Unsecured Claim; (c) a Convenience Unsecured Claim; (d) a Priority Tax Claim; (e) an Other Priority Claim; (f) an Intercompany Claim; (g) a Section 510(b) Claim; (h) a First Lien Notes Deficiency Claim; (i) a Second Lien Notes Claim; (j) a Senior Unsecured Notes Claim; or (k) a Subsidiary-Guaranteed Notes Claim.

142. "Goldman Sachs Swap Claim" means any Claim arising from or related to that certain ISDA Master Agreement, dated as of January 28, 2008, by and between Goldman Sachs Capital Markets, L.P., as succeeded by Goldman Sachs Bank USA and CEOC, as supplemented by those five certain Confirmations thereunder, dated as of September 29, 2010, October 4, 2010, October 4, 2010, January 18, 2012, and January 18, 2012, respectively.

143. "Governmental Unit" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

144. "Guaranty and Pledge Agreement" means that certain Guaranty and Pledge Agreement, dated as of July 25, 2014, made by CEC in favor of the Prepetition Credit Agreement Agent, as amended, amended and restated, supplemented, or otherwise modified from time to time.

145. "Harrah's Atlantic City" means the hotel, gaming, retail, and resort property located at 777 Harrah's Boulevard, Atlantic City, New Jersey 08401, and related properties, including the Harrah's Resort Atlantic City's Waterfront Shops, which property is currently owned by CERP.

146. "Harrah's Laughlin" means the hotel, gaming, retail, and resort property located at 2900 South Casino Drive, Laughlin, Nevada 89029, and related properties, which property is currently owned by CERP.

147. "Harrah's New Orleans" means the gaming, retail, and resort property located at 228 Poydras Street, New Orleans, Louisiana 70130, and related properties, which property is currently owned by CGP.

148. "Holder" means any Entity holding a Claim or an Interest.

149. "Impaired" means, with respect to a Claim, a Class of Claims, or a Class of Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

150. "Improved Bank Recovery Event" means, subject to the Bank RSA remaining in effect, if and to the extent the consideration being received by the Holders of Secured First Lien Notes Claims (from any source) is increased as compared to the treatment provided to such Holders in this Plan, then there shall be an increase of the consideration (to be funded by CEC or New CEC) to the Holders of Prepetition Credit Agreement Claims by the same amount of consideration and subject to the same legal terms of any such increase to the Holders of Secured First Lien Notes Claims, provided, however, that the foregoing Improved Bank Recovery Event shall not apply with respect to an increase resulting from an Improved Bond Recovery Event.

151. "Improved Bond Recovery Event" means, subject to the Bond RSA remaining in effect, if and to the extent the consideration being received by the Holders of Prepetition Credit Agreement Claims (from any source) is increased as compared to the treatment provided to such Holders in this Plan, then there shall be an increase in the consideration (to be funded by CEC or New CEC) to the Holders of Secured First Lien Notes Claims by the same amount of consideration (as a percentage of claim) of any such increase to the Holders of Prepetition Credit Agreement Claims, provided, however, that the foregoing Improved Bond Recovery Event shall not apply with respect to an increase resulting from an Improved Bank Recovery Event.

152. "Improved Recovery Agreement" means an agreement among the Unsecured Creditors Committee, CEC, and CEOC (which shall only be effective if the Unsecured Creditors Committee has agreed to a restructuring support agreement with the Debtors and CEC that remains in effect) that to the extent the Holders of Second Lien Notes Claims, in their capacity as such and as a Class or sub-Class, receive a recovery percentage under the Plan or through some other agreement with the Debtors and/or CEC, however funded from any source, greater than the recovery percentage received by the Holders of Claims in Class H (Senior Unsecured Notes Claims), Claims I (Undisputed Unsecured Claims), Class J (Disputed Unsecured Claims), Class K (Convenience Unsecured Claims), and Class L (Insurance Covered Unsecured Claims) under the Plan, in their capacities as such, additional consideration shall be made available (on the same terms as to the Holders of Second Lien Notes Claims in their capacity as such and as a Class or sub-Class) to the Holders of Claims in Class H, Class I, Class J, Class K, and Class L such that their recovery percentage will be equal to the recovery percentage received by such Holders of Second Lien Notes Claims in their capacity as such and as a Class or sub-Class, commensurate with the respective vote of each of Class H, Class I, Class J, Class K, and Class L to accept or reject the Plan, as applicable, provided, however, for the avoidance of doubt, in the event the Holders of Second Lien Notes Claims in their capacity as such and as a Class or sub-Class receive any recovery percentage greater than the recovery percentage received by the Holders of Claims in Class H, Class I, Class J, Class K, and Class L and not contingent upon Plan treatment tied to voting outcomes, then any Plan treatment tied to voting outcomes for Class H, Class I, Class J, Class K, and Class L also shall be eliminated, and the Holders of Claims in such Classes shall receive the greater recovery percentage received by such Holders of Second Lien Notes Claims.

153. "Indemnification Provisions" means each of the Debtors' indemnification or contribution provisions in place before or as of the Effective Date whether in the bylaws, certificates of incorporation, other formation documents, board resolutions, or employment contracts for the Debtors' current and former directors, members, trustees, officers, managers, employees, attorneys, other professionals, and agents of the Debtors and such current and former directors, members, trustees, officers, and managers' respective Affiliates. For the avoidance of

15

doubt, Indemnification Provisions shall not include any provisions providing for indemnification or contribution relating to any purported, alleged or actual guarantee by CEC of any of the Debtors' respective debts.

154.    "Indemnifiable Losses" means losses, liabilities, judgments, claims, causes of action, costs, and expenses (including reasonable and documented attorney's fees and expenses) incurred or suffered by an Indemnified Person in accordance with Article VI.M hereof.

155.    "Indemnified Person" means, collectively, in each case solely in their capacity as such, (a) the Prepetition Credit Agreement Agent (solely in its capacity as administrative agent under the Prepetition Credit Agreement, including making distributions in accordance with the Plan), (b) each Indenture Trustee, and, (c) with respect to each of the forgoing identified in subsection (a) and (b), each and all of their respective: directors, officers, employees, agents, professionals, and attorneys, each in their capacities as such.

156.    "Indentures" means, collectively, the: (a) 5.75% Senior Unsecured Notes Indenture; (b) 6.50% Senior Unsecured Notes Indenture; (c) 8.50% First Lien Notes Indenture; (d) 9.00% First Lien Notes Indenture; (e) 10.00% Second Lien Notes Indentures; (f) 11.25% First Lien Notes Indenture; (g) 12.75% Second Lien Notes Indenture; and (h) Subsidiary-Guaranteed Notes Indenture.

157.    "Indenture Trustees" means, collectively, the: (a) 5.75% Senior Unsecured Notes Indenture Trustee; (b) 6.50% Senior Unsecured Notes Indenture Trustee; (c) each 10.00% Second Lien Notes Indenture Trustee; (d) 12.75% Second Lien Notes Indenture Trustee; (e) First Lien Notes Indenture Trustee, and (f) Subsidiary-Guaranteed Notes Indenture Trustee, or each of their predecessors, if applicable.

158.    "Indenture Trustee Charging Lien" means any Lien or other priority in payment to which any of the Indenture Trustees is entitled, pursuant to each of the applicable Indentures or any ancillary documents, instruments or agreements.

159.    "Initial Board" shall have the meaning set forth in Article IV.R.3 hereof.

160.    "Initial Directors" shall have the meaning set forth in Article IV.R.3 hereof.

161.    "Initial Distribution Date" means the date on which the Disbursing Agent shall make initial distributions to Holders of Claims and Interests pursuant to the Plan, which shall be as soon as reasonably practicable after the Effective Date.

162.    "Institutional Accredited Investor" means an institution that is an "accredited investor" pursuant to Rule 501(a)(1), (2), (3) or (7) under the Securities Act that is not also a Qualified Institutional Buyer.

163.    "Insurance Covered Unsecured Claim" means any General Unsecured Claim on account of an asserted personal injury tort or workers compensation against a Debtor (other than a BIT Debtor or a Non-Obligor Debtor). The Holders of Insurance Covered Unsecured Claims must exhaust all remedies with respect to the Debtors' insurance policies as set forth in Article VI.K hereof before such Holders shall receive the distributions set forth in Article III.B.12 hereof.

164.    "Intercompany Claim" means any Claim held by a Debtor against any Debtor arising before the Petition Date.

165.    "Intercompany Interests" means any Interest held by a Debtor in a Debtor.

166.    "Interests" means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in the Debtors (including all options, warrants, rights, or other securities or agreements to obtain such an interest or share in such Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any

16

claims against any Debtor subject to subordination pursuant to section 510(b) of the Bankruptcy Code arising from or related to any of the foregoing.

167.    "Interim Compensation Order" means the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Retained Professionals* [Docket No. 587], entered by the Bankruptcy Court on March 4, 2015, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Professional or otherwise.

168.    "Interim Directors" shall have the meaning set forth in Article IV.R.3 hereof.

169.    "Internal Revenue Code" means title 26 of the United States Code, 26 U.S.C. §§ 1–9834, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

170.    "IRS" means the Internal Revenue Service.

171.    "Involuntary Petition" means the involuntary chapter 11 petition filed against CEOC on January 12, 2015, in the United States Bankruptcy Court for the District of Delaware (Case No. 15-10047 (KG)) by the Petitioning Creditors and later transferred to the Bankruptcy Court (Case No. 15-03193 (ABG)).

172.    "Judicial Code" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

173.    "Legacy Plan of the NRF" means the Legacy Plan of the National Retirement Fund (formerly known as the Pension Plan of the National Retirement Fund).

174.    "Lien" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

175.    "Liquidation Analysis" shall have the meaning set forth in the Disclosure Statement.

176.    "Liquidation Value" means, with respect to any Class of Claims, the value of recoveries for such Class of Claims at each Debtor as shown in the Liquidation Analysis.

177.    "Local Bankruptcy Rules" means the local rules, the general orders, and the chambers rules for the United States Bankruptcy Court for the Northern District of Illinois, as now in effect or hereinafter amended, and the rules and regulations promulgated thereunder.

178.    "Management and Lease Support Agreements" means those certain Management and Lease Support Agreements, by and among New CEC, OpCo, PropCo, Manager, and their respective, applicable subsidiaries to be effective on the Effective Date, (a) the form of which shall be included in the Plan Supplement, (b) which shall be based on the material terms set forth in the Bank RSA and the Bond RSA, (c) which shall be in form and substance consistent in all material respects with the Bank RSA and the Bond RSA, and (d) which shall be reasonably acceptable to the Debtors, CEC, the Requisite Consenting Bank Creditors, the Requisite Consenting Bond Creditors, the Second Priority Noteholders Committee, and the Unsecured Creditors Committee.

179.    "Management Equity Incentive Plan" means the management equity incentive plan to be adopted by the New Board(s) on the Effective Date, the form of which shall be included in the Plan Supplement and, solely for the New Board of the REIT, shall be in form and substance reasonably acceptable to the Requisite Consenting Bond Creditors, including as to the amount of New Interests to be set aside for the Management Equity Incentive Plan, which shall be determined by the Debtors prior to the Confirmation Hearing.

180.    "Manager" means a wholly-owned subsidiary of New CEC that will provide management services pursuant to the Management and Lease Support Agreements with respect to the assets subject to the Master Lease Agreements.

181.    "Master Lease Agreements" means those certain Leases, by and among OpCo and/or its subsidiaries and PropCo and/or its subsidiaries, to be effective on the Effective Date, (a) the form of which shall be included in the Plan Supplement, (b) which shall be in form and substance consistent in all material respects with the terms attached hereto as **Exhibit B**, and (c) which shall be reasonably acceptable to the Debtors, CEC, the Requisite Consenting Bank Creditors, Requisite Consenting Bond Creditors, the Second Priority Noteholders Committee, and the Unsecured Creditors Committee.

182.    "Merger Agreement" means that certain Amended and Restated Agreement and Plan of Merger, dated as of July 9, 2016, between CAC and CEC, which can be found at Caesars Entertainment Corporation, Report on Form 8-K, Ex. 2.1 (July 11, 2016), as amended, amended and restated, supplemented, or otherwise modified from time to time.

183.    "Minimum Cash Requirement" means $447,000,000 of Cash reduced by $0.50 for every dollar raised in revolving credit (provided that such reduction shall in no instance be greater than $100,000,000), $44,525,000 of which Cash shall be contributed to the REIT on the Effective Date to fund the REIT's initial balance sheet.

184.    "New Boards" means, collectively, the boards of directors of OpCo and PropCo and any other Reorganized Debtor, if applicable, on and after the Effective Date to be appointed in accordance with the Plan, the initial board members of which shall be identified in the Plan Supplement.

185.    "New CEC" means the combined CEC and CAC after consummation of the transactions contemplated by the Merger Agreement.

186.    "New CEC Cash Contribution" means the excess of (a) $925,220,000 in Cash New CEC shall contribute to the Reorganized Debtors on the Effective Date to fund general corporate purposes, the Restructuring Transactions, and the distributions under the Plan (which amount includes the CIE OpCo Deleveraging Proceeds, the Unsecured Creditor Cash Pool, and the Unsecured Insurance Creditor Cash Pool), plus (b) the Bank Guaranty Settlement Purchase Price, plus (c) the Additional CEC Bank Consideration and/or the Additional CEC Bond Consideration, plus (d) any proceeds or settlement received on behalf of CEOC's, CEC's, or the Sponsor's applicable insurance policies prior to the Effective Date, less (e) any portion of the RSA Forbearance Fee under the Bond RSA and the Bank RSA paid by CEC and/or New CEC.

187.    "New CEC Common Equity" means the new shares of common stock in New CEC, par value $0.01 per share, of which an amount up to an aggregate of 70.216% on a fully diluted basis (after accounting for any dilution from the New CEC Convertible Notes) may be issued and exchanged pursuant to the CEOC Merger for distribution to the Debtors' creditors pursuant to the Plan.

188.    "New CEC Common Equity Buyback" means the purchase of shares of New CEC Common Equity at the New CEC Common Equity Buyback Purchase Price by New CEC from the New CEC Common Equity Buyback Participants in an aggregate amount equal to or greater than $1,000,000,000 but in no event to exceed the amount of the CIE Equity Buyback Proceeds as set forth in Article IV.A.1(g) hereof.

189.    "New CEC Common Equity Additional Buyback Amount" shall equal $200,000,000 of the CIE Equity Buyback Proceeds as may be subject to modification solely in accordance with Article IV.A.1(g) hereof.

190.    "New CEC Common Equity Buyback Participants" means those Holders that participate in the New CEC Common Equity Buyback pursuant to Article IV.A.1(g) hereof.

191.    "New CEC Common Equity Buyback Purchase Price" means the price per share of New CEC Common Equity implied by a valuation of $5,880,940,000, before giving effect to the conversion of New CEC Convertible Notes.

192.    "New CEC Common Equity Cash Election Form" means the election form to be provided to Holders of Claims in Class D, Class E, Class F, Class G, Class H, Class I, Class J, and Class L on a date after the

Confirmation Date to be determined by the Debtors, CEC, and the Second Priority Noteholders Committee, which form shall be part of the New CEC Cash Election Procedures, pursuant to which the Holders of Claims in such Classes may elect to receive Cash in lieu of the New CEC Common Equity as and to the extent provided herein and therein.

193.    "New CEC Common Equity Cash Election Procedures" means the procedures governing the New CEC Common Equity Buyback, which procedures will be included in the Plan Supplement and approved by the Confirmation Order, and which must be reasonably acceptable to the Debtors, CEC, the Second Priority Noteholders Committee, the Unsecured Creditors Committee, the Requisite Consenting Bank Creditors, the Requisite Consenting Bond Creditors, and the Requisite Consenting SGN Creditors.

194.    "New CEC Common Equity Initial Buyback Amount" shall equal $1,000,000,000 of the CIE Equity Buyback Proceeds as may be subject to modification solely in accordance with Article IV.A.1(g) hereof.

195.    "New CEC Convertible Notes" means the $1,119,060,000 in principal amount of 5.00% convertible notes to be issued by New CEC pursuant to the New CEC Convertible Notes Indenture.

196.    "New CEC Convertible Notes Documents" means, collectively, the New CEC Convertible Notes Indenture and all other agreements, documents, and instruments evidencing the New CEC Convertible Notes to be delivered or entered into in connection therewith (including any intercreditor agreements), which shall be consistent with the terms of the Plan.

197.    "New CEC Convertible Notes Indenture" means the indenture to be entered into by and among New CEC, as issuer, and the New CEC Convertible Notes Trustee, to be effective on the Effective Date, pursuant to which New CEC will issue the New CEC Convertible Notes, in the form attached to the Second Lien RSA and included in the Plan Supplement, as may be further modified by written agreement of the Second Priority Noteholders Committee, CEC, and the Debtors, and shall be in form and substance reasonably acceptable to the Requisite Consenting SGN Creditors, the Unsecured Creditors Committee, the Requisite Consenting Bank Creditors, and the Requisite Consenting Bond Creditors.

198.    "New CEC Convertible Notes Trustee" means the indenture trustee to be appointed for the New CEC Convertible Notes Indenture.

199.    "New CEC OpCo Stock Purchase" means New CEC's obligation to purchase 100% of the OpCo Common Stock from the Debtors for $700,000,000 of Cash.

200.    "New CEC PropCo Common Stock Purchase" means, solely if the Partnership Contribution Structure is used, New CEC's obligation to purchase 5% of PropCo Common Equity on a fully diluted basis (including dilution in connection with the exercise of all PropCo Equity Elections, but excluding dilution from PropCo Preferred Equity, if any) from the Holders of Secured First Lien Notes Claims for $91,000,000 of Cash. If the PropCo Equity Election would materially affect the amount and/or value of PropCo Common Equity New CEC must purchase for the Partnership Contribution Structure, the Debtors will negotiate with CEC and the representatives of the Consenting Bond Creditors regarding appropriate adjustments to the amount of Cash necessary to purchase 5% of PropCo Common Equity pursuant to the New CEC PropCo Common Stock Purchase.

201.    "New Corporate Governance Documents" means such certificates or articles of incorporation, bylaws, or such other applicable formation documents of some or all of the Reorganized Debtors, which form shall be consistent with the terms of the Plan and shall be included in the Plan Supplement.

202.    "New Debt" means, collectively, the: (a) CPLV Market Debt; (b) CPLV Mezzanine Debt, if any; (c) OpCo Market Debt; (d) OpCo First Lien Term Loan, if any; (e) OpCo First Lien Notes, if any; (f) PropCo First Lien Term Loan; (g) PropCo First Lien Notes; and (h) PropCo Second Lien Notes.

203.    "New Debt Documents" means, collectively, the: (a) CPLV Loan Documents; (b) CPLV Mezzanine Loan Documents, if necessary; (c) OpCo Market Debt Documents; (d) OpCo First Lien Loan

Documents, if necessary; (e) OpCo First Lien Notes Documents, if necessary; (f) PropCo First Lien Credit Agreement Documents; (g) PropCo First Lien Notes Documents; and (h) PropCo Second Lien Notes Documents.

204.    "New Employment Contracts" means those certain new employment contracts between, as applicable, OpCo or PropCo and certain of their officers, which for PropCo shall be reasonably acceptable to the Requisite Consenting Bond Creditors, and which for OpCo shall be reasonably acceptable to CEC and the Debtors, the forms of which shall be included in the Plan Supplement.

205.    "New Interests" means, collectively, the: (a) OpCo Common Stock; (b) OpCo Series A Preferred Stock; (c) PropCo LP Interests; (d) PropCo LP GP Interests; (e) PropCo GP Interests; (f) PropCo Preferred Equity; (g) REIT Common Stock; (h) REIT Preferred Stock; (i) membership interests, stock, partnership interests, or other equity interests in CPLV Sub; (j) membership interests, stock, partnership interests, or other equity interests in CPLV Mezz; and (k) membership interests, stock, partnership interests, or other equity interests in the TRS(s).

206.    "New Property Entities" mean, collectively:    (a) the REIT;  (b) PropCo GP;  (c) PropCo; (d) CPLV Sub; (e) CPLV Mezz, if necessary; and (f) the TRS(s).

207.    "New Property Entity Organizational Documents" mean, collectively, the:  (a) PropCo Organizational Documents;  (b) REIT Organizational Documents; (c) CPLV Sub Organizational Documents; (d) CPLV Mezz Organizational Documents, if necessary; (e) PropCo GP Organizational Documents; and (f) TRS Organizational Documents.

208.    "Non-Debtor Subsidiaries" means all direct and indirect subsidiaries of any Debtor that are not Debtors in the Chapter 11 Cases.

209.    "Non-First Lien Claims" means, collectively, the:    (a) Second Lien Notes Claims; (b) Subsidiary-Guaranteed Notes Claims; (c) Senior Unsecured Notes Claims; and (d) General Unsecured Claims (including, for the avoidance of doubt, Disputed Unsecured Claims, Undisputed Unsecured Claims, Par Recovery Claims, Caesars Riverboat Casino Unsecured Claims, Chester Downs Management Unsecured Claims, Winnick Unsecured Claims, and Insurance Covered Unsecured Claims).

210.    "Non-Obligor Cash Pool" means the up to $6,000,000 necessary to pay the Non-Obligor Unsecured Claims in full.

211.    "Non-Obligor Debtors" means, collectively:  (a) 3535 LV Parent, LLC; (b) Bally's Las Vegas Manager, LLC; (c) BPP Providence Acquisition Company, LLC; (d) Caesars Air, LLC; (e) Caesars Baltimore Acquisition Company, LLC; (f) Caesars Baltimore Development Company, LLC; (g) Caesars Baltimore Management Company, LLC; (h) Caesars Entertainment Windsor Limited (f/k/a Caesars Entertainment Windsor Holding, Inc.); (i) Caesars Escrow Corporation (f/k/a Harrah's Escrow Corporation); (j) Caesars Massachusetts Acquisition Company, LLC; (k) Caesars Massachusetts Development Company, LLC; (l) Caesars Massachusetts Investment Company, LLC; (m) Caesars Massachusetts Management Company, LLC; (n) Caesars Operating Escrow LLC (f/k/a Harrah's Operating Escrow LLC); (o) CG Services, LLC; (p) Christian County Land Acquisition Company, LLC; (q) Cromwell Manager, LLC; (r) Corner Investment Company Newco, LLC; (s) CZL Management Company, LLC; (t) Des Plaines Development Limited Partnership; (u) Flamingo-Laughlin Parent, LLC; (v) FHR Parent, LLC; (w) HIE Holdings Topco, Inc.; (x) JCC Holding Company II Newco, LLC; (y) Laundry Parent, LLC; (z) LVH Parent, LLC; (aa) Octavius Linq Holding Co., LLC; (bb) Parball Parent, LLC; (cc) PH Employees Parent LLC; (dd) PHW Investments, LLC; and (ee) The Quad Manager, LLC.

212.    "Non-Obligor Unsecured Claim" means any Claim against a Non-Obligor Debtor other than: (a) an Administrative Claim (including, for the avoidance of doubt, a Professional Fee Claim); (b) an Other Secured Claim; (c) a Priority Tax Claim; (d) an Other Priority Claim; (e) an Intercompany Claim; or (f) a Section 510(b) Claim.

213.    "Non-Released Parties" means those parties identified on the Non-Released Parties Schedule from time to time, which shall include the NRF and the Board of Trustees of the NRF.

KE 33843292