**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>Jointly Administered |

**EARL OF SANDWICH'S (1) OBJECTION TO WHITEBOX
ADVISORS LLC'S MOTION FOR ORDER DETERMINING IT TO BE
LAWFUL OWNER OF EARL OF SANDWICH'S CLAIM AND AUTHORIZING
IT TO FILE AN EVIDENCE OF TRANSFER WITH RESPECT TO SAID CLAIM
AND (2) CROSS-MOTION FOR ORDER STAYING DISCOVERY PENDING
RESOLUTION OF THRESHOLD ISSUES AND SHORTENING NOTICE**

Earl of Sandwich (Atlantic City), LLC ("Earl") files this (1) objection to the motion of Whitebox Advisors LLC ("Whitebox") for an order determining Whitebox to be the lawful owner of Proof of Claim No. 5858, filed by Earl on September 2, 2016 (the "Claim"),[1] and authorizing Whitebox to file an evidence of transfer with respect to the Claim under Rule 3001(e)(2), and (2) cross-motion for an order, substantially in the form attached hereto, staying discovery in this contested matter pending resolution of certain threshold issues, and shortening the applicable notice period with respect to Earl's cross-motion, and respectfully states:

**PRELIMINARY STATEMENT**

1. Cowen Special Investments LLC ("Cowen") engaged Earl in negotiations over its potential acquisition of the Claim. On January 11, 2017, Cowen offered to buy the Claim for $2.15 million, subject to various conditions, including that the transaction be documented by a formal contract, after Earl had indicated it would consider selling at that price earlier that day. The next day Cowen sent Earl a draft contract, to which Earl did not respond, and the transaction never

---

[1] The motion defines "Claim" as "proof of claim no. 5497 (as amended)." Proof of Claim No. 5497 was disallowed and expunged on the ground that it was amended and replaced by Proof of Claim No. 5858 by order, entered April 14, 2017 [ECF No. 6811].

closed. Cowen thus lacked the two items it needed in order to affect the Claim's transfer pursuant to Rule 3001(e)(2): an agreement affecting the transfer and evidence of the transfer signed by Earl.

2. Although no Cowen-Earl transaction ever closed, Cowen nevertheless confirmed a transaction on January 12—less than 24 hours after Earl had indicated it would consider selling and 1.5 hours after Earl asked to see a copy of Cowen's draft transaction document—under which it agreed to sell the Claim to Whitebox for $2.32 million. (Mintz. Decl. Ex. B.) The "Conditions" in that confirmation provided "Trade subject to satisfactory completion of due diligence. Cowen executing an Assignment of Claim Agreement with [Earl]."

3. More than a month later, Cowen demanded that Earl move forward with the transaction, by letter from its Head of Credit Research and Trading, dated February 22, 2017 (*id*. Ex. D), which Earl refused. Unable to close on its contemplated transaction with Cowen, four months later, on June 19, 2017, Whitebox apparently agreed to purchase whatever interest Cowen had in the Claim and release Cowen from any liability (*id*. ¶6), and filed the motion three weeks later. In other words, Whitebox knew Cowen had not acquired the Claim and did not have a transfer agreement or evidence of transfer signed by Earl, but purchased whatever interest Cowen had in the Claim anyway so it could file a baseless motion premised on Cowen's having agreed to purchase the Claim in the hope of forcing Earl to transfer the Claim to it or otherwise extracting value from the situation.

4. The motion should be denied, without this Court even having to consider the question of mutual assent between Cowen and Earl. At the outset, this Court lacks subject matter jurisdiction over this contested matter and authority to hear or determine the same. In addition, Whitebox has not adequately pled that it has standing to enforce any conceivable Earl-Cowen agreement. Further, the relief sought by Whitebox cannot be granted as a matter of law because Rule 3001(e)(2) requires that evidence of the purported transfer be signed by the transferor (Earl)

2

and filed by the transferee (Cowen), meaning Whitebox (as transferee of a purported transferee) cannot file an evidence of transfer as a matter of law. And because this contested matter can (and should) be decided without the need to consider the question of mutual assent, Earl should not have to respond to discovery requests served by Whitebox unless and until this Court rules in Whitebox's favor on the foregoing threshold issues.

5. Should this Court elect to consider the question of mutual assent, the motion should still be denied. At the outset, the e-mails attached to the Mintz Declaration as Exhibit A are inadmissible hearsay introduced by counsel to a party that did not send or receive the same (and whose client is not even mentioned in said e-mails). More significantly, the e-mails do not evidence mutual assent, but rather, demonstrate Cowen rejected any conceivable preliminary proposal by Earl. Even if this Court somehow found the parties agreed to the terms of a potential transaction, any resulting agreement would by its terms be an unenforceable agreement to agree.

## ARGUMENT

### I. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER AND AUTHORITY TO HEAR OR DETERMINE THIS CONTESTED MATTER

6. Whitebox asserts this Court has "arising in" subject matter jurisdiction over this contested matter because it is a bankruptcy claim trading dispute that would not exist but for the Debtors' bankruptcy, citing *In re Casual Male Corp.*, 317 B.R. 472, 476 (Bankr. S.D.N.Y. 2004) (Motion ¶¶7, 39), in which Bankruptcy Judge Robert E. Gerber held arising in jurisdiction existed over a state court breach of contract action (removed and referred to the Bankruptcy Court) between a creditor and purported claim purchaser concerning the ownership of the creditor's claim.

7. However, that decision's holding concerning arising in subject matter jurisdiction is incorrect as it improperly equates trade claim disputes between a creditor and purported purchaser of its claim with debtor-creditor disputes concerning claim allowance. 317 B.R. at 476 n.11 (citing *In re Poplar Run Five Ltd. P'ship*, 192 B.R. 848, 857 (Bankr. E.D. Va. 1995)). While

3

arising in jurisdiction clearly exists with respect to the latter (*see* 28 U.S.C. § 157(b)(2)(B)), such jurisdiction cannot exist with respect to the former because a purported claim purchaser typically does not even have standing to be heard under Bankruptcy Code section 1109(b) during the pendency of its contract dispute, as during such period it is a mere contingent creditor of a creditor.[2]

8.  Even if this Court somehow concluded arising in subject matter jurisdiction existed, this Court could not hear or determine this contested matter given that "related to" subject matter jurisdiction is lacking. This Court has interpreted the scope of related to jurisdiction as follows:

> The Seventh Circuit interprets "related to" jurisdiction more narrowly than other circuits. The court does so "to prevent the expansion of federal jurisdiction over disputes that are best resolved by state courts." *In re FedPak Sys., Inc.*, 80 F.3d 207, 214 (7th Cir. 1996); *see also Home Ins. Co. v. Cooper & Cooper, Ltd.,* 889 F.2d 746, 749 (7th Cir. 1989). The court has also expressed concern about the seemingly unlimited breadth of the phrase "related to" "in a universe where everything is related to everything else." *FedPak,* 80 F.3d at 214 (internal quotation omitted). Bankruptcy jurisdiction, the court has said, "extends no farther than its purpose." *Elscint v. First Wis. Fin. Corp. (In re Xonics, Inc.),* 813 F.2d 127, 131 (7th Cir. 1987). That purpose is "to provide a single forum for dealing with all claims to the bankrupt's assets." *Id.*
>
> In this circuit, then, a dispute is "related to" a bankruptcy only if it "affects the amount of property for distribution [i.e., the debtor's estate] or the allocation of property among creditors." *FedPak,* 80 F.3d at 213-14 (internal quotation omitted); *see also In re Memorial Estates, Inc.,* 950 F.2d 1364, 1368 (7th Cir. 1991); *Xonics,* 813 F.2d at 131 … Under this restrictive definition, not surprisingly, one non-debtor's action for damages against another non-debtor is typically not a matter over which a bankruptcy court can exercise jurisdiction.

*In re Mission Bay Ski & Bike, Inc.*, 398 B.R. 250, 253 (Bankr. N.D. Ill. 2008) (Goldgar, J.). Significantly, this contested matter does not affect the amount of property available for distribution under the Debtors' chapter 11 plan, nor the allocation of property between multiple creditors.

---

[2] *See, e.g., In re Lehman Bros. Holdings Inc.*, No. 11-cv-3760, 2012 WL 1057952, at *5 (S.D.N.Y. Mar. 26, 2012) ("As the Second Circuit explained in *Refco*, although bankruptcy courts are 'primarily courts of equity, … they are not empowered to address *any* equitable claim tangentially related to the bankruptcy proceeding. Bankruptcy Court is a forum where creditors and debtors can settle their disputes *with each other.* Any internal dispute between a creditor and that creditor's investors belongs elsewhere.' *Refco*, 505 F.3d at 118 … Put simply, a 'creditor of a creditor is not a 'party in interest' within the meaning of section 1109(b).' *In re Innkeepers USA Trust*, 448 B.R. 131, 144 (Bankr. S.D.N.Y. 2011).").

4

Rather, it concerns whether one creditor or another party owns a claim that has been allowed. That is, it is a breach of contract litigation by one nondebtor (Whitebox) against another with whom it never engaged in contract negotiations (Earl) seeking specific performance (transfer of the Claim).

9. The absence of related to subject matter jurisdiction means this contested matter is not a core proceeding under 28 U.S.C. § 157(b)(1), and as a result this Court cannot hear this proceeding under section 157(c)(1), let alone determine the same, absent Earl's consent (and Earl does not so consent). As noted in *In re Central Ice Cream Co.*, 82 B.R. 933, 936 (N.D. Ill. 1987):

> It is apparent that the core and noncore concepts embodied in the 1984 Act envision that noncore related proceedings are to some extent removed from core proceedings, the latter being the heart of the bankruptcy matter. The terms themselves, as well as the fact that bankruptcy judges may enter final orders only in core proceedings, make this self-evident.… Accordingly, <u>a proceeding that is not a related proceeding *a fortiori* cannot be a core proceeding</u>.

(Emphasis added.)[3]

10. Moreover, if the Debtors' plan (confirmed January 17, 2017) is consummated while this contested matter is pending—which is likely, given that Whitebox has stated it needs discovery to prosecute its claim (Motion ¶¶5, 13 n.2), and the Debtors' parent projects the effective date for the Debtors' plan will occur this calendar year in its Form 10-K (an excerpt of which is attached as <u>Exhibit 1</u>)—there can be little doubt this Court will lack post-effective date subject matter jurisdiction over this contested matter, making it pointless for this Court to even hear the same.[4]

---

[3] *See also In re Found. for New Era Philanthropy*, 201 B.R. 382, 389 (Bankr. E.D. Pa. 1996) (citing, *inter alia*, *Pettibone v. Easley*, 935 F.2d 120 (7th Cir. 1991)) ("not only must a core proceeding be related to a bankruptcy case, but disputes [that] might otherwise fall squarely within the examples of core matters found in 28 U.S.C. § 157(b)(2)— *e.g.*, proof of claim litigation—have been found outside bankruptcy court jurisdiction—*i.e.*, to be unrelated matters— when their outcome would not affect the bankruptcy estate"); *In re Ragland*, No. 05-18142, 2006 WL 1997416, at *3 (Bankr. E.D. Pa. May 25, 2006) (quoting *In re Marcus Hook Dev. Park Inc.*, 943 F.2d 261, 264 (3d Cir. 1991)) ("when determining whether a bankruptcy court has the power to determine a dispute, a court need only decide whether the proceeding 'is at least 'related to' the bankruptcy'"); *In re Touch Am. Holdings Inc.*, 401 B.R. 107, 117 n.19 (Bankr. D. Del. 2009) ("Core proceedings represent a subset of 'related-to' proceedings").

[4] It is well established on consummation of a reorganization plan, this Court's subject matter jurisdiction is "sharply reduced." *Federalpha Steel LLC Creditors' Trust v. Federal Pipe & Steel Corp. (In re Federalpha Steel LLC)*, 341 B.R.872, 880 (Bankr. N.D. Ill. 2006); *see also Pettibone Corp., v. Easley*, 935 F.2d 120, 122 (7th Cir. 1991). "As elsewhere, courts in the Seventh Circuit have consistently held that post-confirmation jurisdiction can be exercised by a bankruptcy court only to the extent necessary to interpret or implement the plan." *Globaleyes Telecomm'ns, Inc. v.*

5

II. **WHITEBOX HAS NOT ADEQUATELY PLED STANDING TO ENFORCE ANY ALLEGED CLAIM TRANSFER AGREEMENT BETWEEN EARL AND COWEN**

11. It is black letter law that "a cause of action based on a contract may be brought only by a party to that contract, by someone in privity with such a party … or by an intended third-party beneficiary of the contract." *Kaplan v. Shure Bros., Inc.*, 266 F.3d 598, 602 (7th Cir. 2001). Whitebox does not dispute that it is not a party to any purported Earl-Cowen agreement, and that it cannot be an intended third-party beneficiary, as it was not even mentioned in the e-mail thread purportedly forming the same (Mintz Decl. Ex. A). Rather, Whitebox's motion is premised on its having standing by being in privity with Cowen pursuant to an (unfiled) Assignment and Release Agreement, dated June 19, 2017, pursuant to which Cowen allegedly "transferred to Whitebox any and all rights of Cowen with respect to Earl's Claim." (Mintz Decl. ¶6.)

12. However, such (hearsay) testimony is insufficient to establish privity, as Whitebox has not proffered evidence it was assigned Cowen's contract rights with Earl. This precise issue was addressed in *Kaplan*. There, a real property purchaser (RBK) assigned its entire beneficial interest in a land trust that RBK formed to acquire the property to a third party (Kaplan). 266 F.3d at 600. Kaplan subsequently sued the seller (Shure), and the District Court dismissed the complaint for lack of standing. *Id.* at 601-02. On appeal, Kaplan argued that he had standing because "he attained … privity as a matter of law by accepting RBK's assignment of its entire beneficial interest in the Land Trust, which (he claims) included RBK's rights in the real estate contract with Shure." *Id.* at 602. The Seventh Circuit rejected that argument as having "no support in Illinois law":

> Kaplan [is] not the corporate successor to RBK, and it is difficult to see how he could otherwise succeed to RBK's rights in the contract unless those rights had been expressly and validly transferred to him by some instrument. Kaplan asserts that the assignment was that instrument, but neither the assignment itself nor the Land Trust Agreement to which it refers mentions anything about RBK's rights in the real estate contract. Moreover, Kaplan does not allege that the trustee [of the

---

*Verizon North, Inc.*, 425 B.R. 481, 497 (S.D. Ill. 2010); *see also In re Spiers Graff Spiers*, 190 B.R. 1001, 1007 (Bankr. N.D. Ill. 1996) (collecting cases). This contested matter has nothing to do with plan interpretation or implementation.

land trust] ever received RBK's contract rights at any time, so Kaplan's power … would not seem to include the power to enforce the real estate agreement against Shure. <u>In short, Kaplan has not established that RBK transferred its contract rights either to the Trust or to Kaplan, and his conclusory assertion that RBK's assignment of its beneficial interest in the Land Trust by itself accomplished such a transfer is contrary to Illinois law</u>.

*Id*. at 603 (citations omitted, emphasis added).

13.  Similarly here, Whitebox merely states that by its assignment agreement with Cowen, "Cowen transferred to Whitebox any and all rights of Cowen with respect to Earl's Claim." (Mintz Decl. ¶6.) Nowhere does Whitebox proffer evidence it acquired Cowen's contractual right to enforce any purported Earl-Cowen agreement. Earl even asked Whitebox for a copy of such agreement so Earl can evaluate the question of standing. Having denied Earl's request, Whitebox should be forced to rely upon testimony in the Mintz Declaration concerning the nature of the rights transferred, and this Court should conclude Whitebox failed to adequately plead standing.

### III.  WHITEBOX CANNOT FILE AN EVIDENCE OF TRANSFER WITH RESPECT TO THE CLAIM AS A MATTER OF LAW

14.  Pursuant to Rule 3001(e)(2) the Claim cannot be transferred absent Cowen's filing evidence signed by Earl that Earl transferred the Claim to Cowen. Rule 3001(e)(2) provides that to affect the transfer of a proof of claim, "evidence of the transfer shall be filed by the transferee." The Advisory Committee Notes explain precisely what evidence is required: "a statement of the transferor acknowledging the transfer and the consideration for the transfer." The notes further explain such statement is needed to "assist the court in dealing with evils that may arise out of post-bankruptcy traffic in claims against an estate" and "facilitate the court's determination of the appropriate order to be entered because of the transfer." It is undisputed that there is no evidence of transfer of the Claim by Earl to Cowen, let alone to Whitebox. The relief sought by Whitebox should be denied as Rule 3001(e)(2) does not contemplate or permit Whitebox to sign an evidence of transfer on Earl's or Cowen's behalf, as it has proposed in the motion.

7

IV.	**NO EARL-COWEN CLAIM TRANSFER AGREEMENT WAS EVER FORMED**

    A.	**Illinois (Not New York) Law Applies under Governing Choice of Law Rules**

15.	Under this Court's choice of law rules, the law of the forum state (Illinois) presumptively applies unless it is clear non-forum contacts are of greater significance. *In re Jafari*, 569 F.3d 644, 648 (7th Cir. 2009); *see also Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 903 (Ill. 2007) (citing Restatement (Second) of Conflicts of Law § 188). Relevant contacts are:

    (a)	<u>Place of contracting</u>. According to Whitebox the purported agreement was documented by e-mail, not in any one particular place, but by persons located in Florida (Thomas Avallone (of Earl) ("<u>Avallone</u>")) and New York (Bradly Schwab (of Cowen) ("<u>Schwab</u>")).

    (b)	<u>Place of negotiation of the purported contract</u>. Florida and New York.

    (c)	<u>Place of performance</u>. N/A. The alleged contract was not performed.

    (d)	<u>Location of subject matter of the contract</u>. The Claim is on file with the Debtors' claim agent, which operates as an agent of this Court by operation of 28 U.S.C. § 156(c).

    (e)	<u>Domiciles, places of incorporation, and places of business of the parties</u>. Cowen is a Delaware LLC headquartered in New York; Earl is incorporated in Florida, and its principal place of business is Florida (its New Jersey store closed in 2014).

16.	In short, Illinois law applies by default, and contacts this Court is required to consider in evaluating if another court has a more significant relationship are a wash between Florida, New York, and Illinois, meaning Illinois law properly applies, which does not have an analogue to N.Y. Gen. Obl. Law § 5-701, which statute Whitebox's claim for relief is premised upon. (Motion ¶¶23, 25, 31.)

17.	Whitebox has not engaged in a proper choice of law analysis, but instead summarily states New York law applies because the choice of law provision in the draft contract that Gail Rosenblum (of Cowen) ("<u>Rosenblum</u>") forwarded to Avallone on January 12 at 1:24 p.m., in response to Avallone's 9:47 a.m. e-mail of the same day simply stating "Please forward draft document," provided the contract would have been governed by New York law had Earl and Cowen executed the same. (Motion ¶23 n.5, citing *Highland Cap. Mgmt. L.P. v. Bank of Am.*,

8

*N.A.*, No. 10-cv-1632, 2013 WL 4502789, at *10-11 (N.D. Tex. Aug. 23, 2013), *aff'd*, 574 Fed. App'x 486, 488 (5th Cir. 2014)). However, *Highland*—the sole decision relied on by Whitebox—does not support Whitebox's position. *Highland* concerned the enforceability of a $15.5 million loan purchase and sale trade. The parties agreed to the transaction's key terms by phone, "subject to appropriate consents and documentation," after which Bank of America (the seller) sent a confirmatory e-mail to Highland (the purchaser), again, "subject to appropriate consents and documentation." *Id*. at *1. Bank of America later refused to consummate the transaction, whereupon Highland sued for breach. The *Highland* court accepted Highland's argument that the transaction was governed by New York law because the parties previously entered into trades governed by the LSTA's Standard Terms and Conditions for Part/Near Part Trade Confirmations, Paragraph 21 of which provides New York law applies by default to trades governed thereby, and Bank of America did not opt out of the Standard Terms for the trade at issue. *Id*. at *11.[5] Here, however, choice of law provisions in a draft contract are unenforceable as Earl had never entered into a prior claim transaction with Cowen (or Whitebox), let alone one that provided its terms would apply to future transactions between the parties. Further, Cowen's e-mail describing the key terms of the then-contemplated transaction, sent by Schwab on January 11 at 3:47 p.m., does not state that it is governed by New York law, nor does any other e-mail in the thread attached to the Mintz Declaration as Exhibit A.

18. The *Highland* court also stated its conclusion that New York law applied "would be the same even if it determined that the choice of law provision in the LSTA did not govern [Highland's] contract claim … because the draft agreements circulated by it [Bank of America,

---

[5] While the Fifth Circuit affirmed the District Court's dismissal of the Complaint, it expressly concluded the LSTA Standard Terms were <u>not</u> binding on the transaction at issue because Bank of America expressed an intent not to be governed by them for this transaction, and "Highland offer[ed] no evidence to suggest that Bank of America even thought the LSTA terms would apply." Nevertheless, the Fifth Circuit did not disturb the District Court's conclusion that New York law governed because "neither side disagree[d]" with that conclusion.

the party that declined to consummate the transaction] call for application of New York law." 2013 WL 4502789, at *11. The District Court, however, provided no support for that conclusion. And significantly, no draft agreement was prepared or circulated by Earl, the party that declined to move forward with the potential transaction herein. Accordingly, the *Highland* court's conclusion is inapplicable, putting aside that it is mere dicta in a nonbinding decision.

      **B.**      **No Earl-Cowen Claim Transfer Agreement Was Ever Formed[6]**

            1.      <u>Mutual Assent is Lacking with Respect to the Purported E-mail Agreement</u>

19.      The elements of a breach of contract claim—offer, acceptance, breach, damages—are the same under Illinois and New York law. Under the law of either state, however, the e-mails at issue do not establish mutual assent.

            *(i)*      *Whitebox's Theory of Offer and Acceptance*

20.      According to Whitebox, Avallone offered the Claim for sale on Earl's behalf by responding "YES" on January 11 at 2:04 p.m. to the following question e-mailed by Schwab to Avallone five minutes prior: "please confirm, but it sounds like you are offering the paper for sale at $2.15 million or approximately 59.72% of the face claim amount. Is that correct?" (Motion ¶¶13, 29.)

21.      Whitebox further asserts Schwab accepted the offer on Cowen's behalf by e-mail, sent on January 12 at 8:34 a.m. which provides:

> Thomas – as a follow-up to my below email [a January 11 at 3:47 p.m. e-mail purposely omitted by Whitebox, but quoted below] and our quick conversation, my acceptance of your offer is good through 11 am eastern time today, January 12th. After which you will need to check back in with me to see if I am still able to transact at your offered level.
>
> As I am sure you can appreciate, there are numerous other parties seeking to close transactions prior to the January 17th deadline rather than hold equity. If this is a

---

[6] As noted above, the motion should be denied on the grounds that it is premised on the admissibility of hearsay e-mails introduced by counsel to a party that was not even a party to the same, and which are not admissible under the Federal Rules of Evidence, made applicable by Rule 9017.

10

> transaction Planet Hollywood [Earl] would like to pursue then we need to move quickly. As mentioned I can forward a draft document for your review.
>
> Please let me know ASAP so I can plan accordingly and accommodate you. So you are aware, it's a bank holiday on Monday which accelerates the need to move quickly.

(*Id*. ¶¶13, 30-31.) That narrative ignores select e-mails, and makes no sense as a matter of law, as described below.

*(ii)   Schwab Rejected any Purported Offer Before his Purported Acceptance*

22.   After Avallone advised Schwab that Earl would consider selling the Claim, but before Schwab's purported acceptance, Schwab sent two e-mails omitted from the above narrative. First, on January 11 at 2:17 p.m. he stated:

> As for it being allowed, I am on the claims register at Prime Clerk and see the two "asserted claims" but nothing that shows them as being "allowed"
>
> It sounds as if Earl enterprises settled the claims with the estate – do you happen to have any support documentation confirming this, either a settlement agreement or an allowance letter/correspondence.
>
> I would have an interest at 59.72% <u>subject to confirming the above</u>. Please let me know.

Then at 3:47 p.m., Schwab gave additional conditions clarifying the terms of his proposed transaction and wrote Avallone as follows:

> Thomas – as a follow-up to the below. I would be a buyer for your $3.6mm allowed CZR claim at $2.15 million or 59.72% of the allowed face amount <u>subject to</u> (a) written confirmation from the debtor that the claim is a Class I [Undisputed Unsecured Claims] and allowed (b) additional due diligence (c) documentation and (d) closing before close of business Tuesday January 17th.
>
> Please confirm that you are good with the above terms and I will forward you a purchase and sale agreement for review.

23.   Avallone did not respond to either e-mail by the close of business, prompting Schwab's e-mail of January 12 at 8:34 a.m., which Whitebox describes as the purported acceptance of Avallone's purported offer of January 11 at 2:04 p.m. (both quoted above). That theory fails,

11

however, because if Avallone's 2:04 p.m. e-mail constituted an offer (which Earl disputes), then each of Schwab's 2:17 and 3:47 p.m. e-mails constituted a counteroffer which had the effect of <u>rejecting</u> Avallone's prior offer.  As a result, Schwab could not have later accepted the same by his e-mail sent at 8:34 a.m. the next day.  2 Williston on Contracts § 6:13 (4th ed.) ("A conditional acceptance is, in effect, a statement that the offeree is willing to enter into a bargain differing in some respect from that proposed in the original offer.  The conditional acceptance is, therefore, itself a counteroffer and operates to reject the original offer, so that thereafter even a purportedly unqualified acceptance of that offer will not form a contract"); *see also Lamanna v. Wing Yuen Realty, Inc.*, 283 A.D.2d 165 (N.Y. App. Div. 1st Dep't 2001) (same); *Williams v. Toshiba Am. Med. Sys., Inc.*, No. 93-cv-3448, 1994 WL 162784, at *8 (N.D. Ill. April 25, 1994) (same).

24.    Indeed, it is clear from the e-mail traffic Schwab himself understood he had made a counteroffer on January 11 at 3:47 p.m., as (a) that e-mail asked Avallone to [p]lease confirm that you are good with the above terms," and (b) Schwab's e-mail sent at 8:34 a.m. the next day asked Avallone to accept the terms and conditions set forth in his 3:47 p.m. e-mail ("as a follow up to my below email … my acceptance of your offer [*i.e.*, your acceptance of my counteroffer] is good through 11 am eastern time today, January 12th … <u>Please let me know ASAP</u>") and confirm "[i]f this is a transaction Planet Hollywood would like to pursue."  If the 8:34 a.m. e-mail were an acceptance, as Whitebox asserts, there would be no need for Avallone to let Schwab know or confirm if the transaction outlined in Schwab's 3:47 p.m. e-mail were acceptable to Earl. Rosenblum also plainly understood that Schwab made a counteroffer, and Avallone had not accepted the same, as after several e-mails sent by her which Avallone did not respond to she asked him on January 18 at 9:33 a.m. to "kindly advise by noon, eastern time if you plan to move ahead with the transaction or we will assume you are no longer interested."  Again, no response from Avallone would be required if Schwab had in fact accepted a prior offer by Earl.

12

*(iii)   Avallone Never Accepted Schwab's Counteroffer*

25. Significantly, when Avallone finally did respond to Schwab's 3:47 p.m. e-mail (a) outlining the terms of Cowen's counteroffer, and (b) asking Avallone to "[p]lease confirm that you are good with the above terms," Avallone did not confirm that he was good with those terms, and instead simply instructed Schwab to "Please forward draft document." Whitebox cannot point to a single e-mail in which Avallone affirmatively "confirm[ed he was] good with the above terms."

*(iv)   Counteroffer's Conditions were Not Satisfied Prior to its Expiration*

26. Rosenblum's e-mail to Avallone transmitting the draft contract was sent at 1:24 p.m., after the 11:00 a.m. stated deadline set forth in Schwab's 8:34 a.m. e-mail, and Avallone did not respond to that e-mail or follow up e-mails from her prior to receipt of Cowen's February 22 letter (Mintz Decl. Ex. D). As a result, none of the conditions set forth in Schwab's counteroffer (*e.g.*, written Debtor confirmation concerning classification and allowance of the Claim, agreeable documentation, and closing by January 17) were met and the counteroffer expired on January 12 at 11:00 a.m., under the terms of his e-mail of 8:34 a.m. that day, without having been accepted.

*(v)   Avallone's Silence Cannot Establish Mutual Assent as a Legal Matter*

27. Whitebox argues Avallone's unresponsiveness following his request to Schwab that Cowen "[p]lease forward draft document" establishes mutual assent. (Motion ¶31.) However, silence can only operate as assent when it has the effect to mislead or when a course of conduct, accompanied by silence, would be deceptive or beguiling. *Karlin v. Avis*, 457 F.2d 57, 62 n.8 (2d Cir. 1972) (citing the Restatement, Corbin, and Williston); *see also Russell v. Raynes Assoc. Ltd. P'ship*, 166 A.D.2d 6, 15 (N.Y. App. Div. 1st Dep't 1991). Moreover, silence which breeds ambiguity cannot constitute acceptance. *Gomez v. Bicknell*, 302 A.D.2d 107, 116 (N.Y. App. Div. 1st Dep't). Avallone's conduct was not misleading or deceptive. Schwab told him to please confirm his acceptance of the counteroffer, and Avallone did <u>not</u> confirm as much; instead he

13

simply asked for a copy of the documentation the contemplated transaction would be subject to, and did not respond to further e-mails. His conduct was unambiguous.[7]

               (vi)     *Earl Never Executed an Evidence of Transfer of Claim*

28.     Finally, mutual assent is lacking by operation of law, as Rule 3001(e)(2) provides such assent must be evidenced by an instrument signed by the transferor and filed with the Bankruptcy Court by the transferee (Cowen, not Whitebox), and Earl never signed such instrument. Both Cowen and Whitebox, sophisticated claim purchasers, knew that such instrument is needed to affect the transfer on the records of the Debtors' claims agent and that it was lacking.

           2.     <u>Any Purported E-mail Agreement was an Unenforceable Agreement to Agree Because it was Subject to Further Documentation</u>

29.     It is well established under Illinois law that mutual assent is lacking where parties have agreed to terms "subject to" a future definitive agreement signed by the relevant parties. As noted by the Seventh Circuit in *Empro Mfg. Co. v. Ball-Co. Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) (citing *Interway, Inc. v. Alagna*, 407 N.E.2d 615 (Ill. App. Ct. 1st Dist. 1980)):

> [A]s a matter of law parties who make their pact "subject to" a later definitive agreement have manifested an (objective) intent not to be bound, which under the parol evidence rules becomes the definitive intent even if one party later says that the true intent was different …
>
> Illinois [law] allows parties to approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on specifics. Approaching agreement by stages is a valuable method of doing business. So long as Illinois preserves the availability of this device, a federal court … must send the disappointed party home empty-handed.

New York law is in accord.[8]

---

[7] Should this proceed to discovery the evidence will also show Avallone made clear in prior discussions with Schwab, referenced in Exhibit A to the Mintz Declaration, that any conceivable agreement to sell the Claim would be subject to approval of Earl's owner, Robert Earl, consistent with Avallone's e-mail of February 28 at 4:07 p.m.

[8] *See, e.g.*, *Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970) ("if the parties to an agreement do not intend it to be binding upon them until it is reduced to a writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed"); *Eastern Cons. Props., Inc. v. Morrie Golick Living Trust*, 83 A.D.3d 534 (N.Y. App. Div. 1st Dep't 2011) ("deal memorandum entered into by the parties, which expressly stated, 'This memo shall memorialize the terms of the deal that have been accepted, subject to the signing of a mutually acceptable

30. Thus, even if the e-mail traffic were somehow interpreted to include a valid offer and acceptance, there would be no agreement under both New York and Illinois law as both parties' e-mails contemplated the transaction being subject to further definitive documentation, rendering the same an unenforceable agreement to agree. Specifically: (a) Schwab stated his counteroffer was "subject to … documentation;" (b) Avallone responded the next day "Please forward draft document" (so he could review the same); and (c) Rosenblum acknowledged as much in her e-mail of January 17 at 4:26 p.m. ("As we are no longer under a tight deadline, there is additional time for your review of the document").

## V.  DISCOVERY SHOULD BE STAYED PENDING RESOLUTION OF THRESHOLD ISSUES AND THE APPLICABLE NOTICE PERIOD SHOULD BE SHORTENED

31. Whitebox served requests for production and interrogatories and a deposition notice on Earl. Because this contested matter can be decided without the need to consider whether mutual assent can be inferred from the e-mails attached as Exhibit A to the Mintz Declaration, discovery should be stayed until the threshold issues described in Parts I-III and IV.B.vi hereof have been resolved. *See*, *e.g.*, *DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08-cv-1531, 2008 WL 4812440, at *2 (N.D. Ill. Oct. 28, 2008) (discovery stay appropriate where a pending court filing "raises a potentially dispositive threshold issue like jurisdiction, standing …"); *Tamburo v. Dworkin*, No. 04-cv-3317, 2010 WL 4867346, at *1 (N.D. Ill. 2010) (same). A Local Rule 7037-1 certification is attached as <u>Exhibit 2</u>.

32. Cause exists under Rule 9006(c) to shorten the applicable notice period with respect to this cross-motion as Earl has been engaged in discussions with Whitebox concerning a stay of discovery pending resolution of threshold issues since July 31, 2017, and Whitebox did not advise Earl that it would not consent to a stay until the evening of August 7, 2017. (*See* Exhibit 3 hereto.)

---

Contract of Sale,' is a classic example of an agreement to agree"); *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 425-27 (N.Y. App. Div. 1st Dep't 2010).

**CONCLUSION**

Whitebox's motion should be denied. Moreover, Earl should not have to respond to discovery requests served by Whitebox unless and until this Court rules in Whitebox's favor on the threshold issues described above. Earl further requests an expedited determination on at least the threshold questions as the mere pendency of Whitebox's motion damages Earl's ability to sell its Claim in the secondary market.

Dated: August 7, 2017               Earl of Sandwich (Atlantic City), LLC

By: /s/ Jeffrey Chubak
Jeffrey Chubak (admitted *pro hac vice*)
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 497-8247
Fax: (212) 490-4208
E-mail: jchubak@storchamini.com