**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>Jointly Administered |

**NOTICE OF EARL OF SANDWICH'S MOTION IN LIMINE
TO EXCLUDE EXPERT REPORT OF PETER M. LUPOFF**

PLEASE TAKE NOTICE that on February 7, 2018 at 10:00 a.m. (Central Time), Earl of Sandwich (Atlantic City), LLC ("Earl") will appear before the Honorable A. Benjamin Goldgar, in Courtroom 642 in the Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chicago, Illinois 60604, and present the annexed motion in limine to exclude the expert report of Peter M. Lupoff, pursuant to Federal Rules of Evidence 104(a), 402, and 702.

PLEASE TAKE FURTHER NOTICE that any objection to the motion must be filed by January 31, 2018 at 4:00 p.m. (Central Time), and served, so as to be received by such time by Earl's undersigned counsel, the Office of the United States Trustee, and any party that requested notice pursuant to Rule 2002.

Dated: January 23, 2018

Respectfully submitted,

/s/ Jeffrey Chubak
Jeffrey Chubak (admitted *pro hac vice*)
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 497-8247
Fax: (212) 490-4208
jchubak@storchamini.com

- and -

Joseph D. Frank (IL No. 6216085)
FRANKGECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois 60654
Tel: (312) 276-1400
Fax: (312) 276-0035
jfrank@fgllp.com

*Counsel to Earl of Sandwich (Atlantic City), LLC*

**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>Jointly Administered |

**EARL OF SANDWICH'S MOTION IN LIMINE TO
EXCLUDE EXPERT REPORT OF PETER M. LUPOFF**

Earl of Sandwich (Atlantic City), LLC ("Earl") moves for an order, in the form annexed hereto as Exhibit 1, excluding the expert report of Peter M. Lupoff ("Lupoff Report"), a copy of which is annexed hereto as Exhibit 2,[1] pursuant to Federal Rules of Evidence 104(a), 402, and 702, and respectfully states:

**INTRODUCTION**

1.     The Lupoff Report opines, in substance, that once agreement is reached between a potential bankruptcy claim seller and potential purchaser on price, a legally enforceable agreement exists between them, such that the potential seller has a binding obligation to reduce its agreement on price to a written agreement, and its failure to do so and close on the transaction is bad faith entitling the potential purchaser to damages.

2.     The report should be excluded.  It inappropriately renders a legal opinion on the question of mutual assent by concluding a potential bankruptcy claim seller has a binding obligation to negotiate a writing and close after reaching agreement on price.  Significantly, that opinion is wrong, as under both Illinois and New York law, no duty to negotiate exists absent prior agreement by parties to do so.  That the report is provided under the guise of evidence of industry

---

[1]     The Lupoff Report is unsigned.  Earl assumes this was a simple oversight on the part of Whitebox Advisors LLC ("Whitebox").

1

custom is of no matter, as evidence of industry custom cannot be used to assist the trier of fact with questions of contract formation.

3. The report should also be excluded as unreliable because Mr. Lupoff is not qualified to be an expert on the subject of bankruptcy claim trading. He relies solely on his (quite limited) experience in the bankruptcy claim trade business to reach his conclusions and does not use a methodology. His report also includes provably false statements, and inappropriately conflates the secondary loan market with the market for bankruptcy claims. Secondary market loan trades are governed by standard terms and conditions established by the Loan Syndication Trading Association ("LSTA"), agreed to in advance by market participants and expressly providing trades are binding upon oral agreement as to certain material terms and for application of New York law by default. In contrast, in the market for bankruptcy claims there are no standard terms, and agreements between creditors and claim purchasers are "bespoke."

## BACKGROUND

**I.    THE ALLEGED EARL-COWEN AGREEMENT**

4. Whitebox asserted in its Transfer of Claim, filed October 5, 2017 [ECF No. 7471] ("Transfer of Claim") that Earl's January 11, 2017, 2:04 p.m. e-mail response ("YES") to the e-mail of five minutes prior from Cowen Special Investments, LLC ("Cowen") asking "please confirm, but it sounds like you are offering the paper [$3.6 million bankruptcy claim ("Claim")] for sale at $2.15 million or approximately 59.72% of the face claim amount" constituted a legally binding offer, which was accepted by Cowen the following day at 8:34 a.m. According to Whitebox, that gave rise to an enforceable agreement under which "Earl committed to sell, convey and otherwise transfer the Claim to Cowen for $2.15 million." (Transfer of Claim Ex. 1, p.1.) Earl disagrees.

5. The precise nature of Whitebox's claim was clarified at Cowen's depositions, in which Cowen testified the agreement it understood it reached with Earl was one to reduce their agreement on price to a mutually acceptable Assignment of Claim Agreement and close on that transaction.

6. Specifically, Bradly Schwab, the Head of Cowen at the time of the alleged Earl-Cowen agreement, testified:

> Q. Based on the e-mails that we have reviewed so far, did you understand Cowen to have had an agreement with Earl of Sandwich concerning the purchase and sale of the bankruptcy claim?
>
> A. Can you define agreement?
>
> Q. A mutual understanding concerning the purchase and sale of the bankruptcy claim …
>
> A. I would say an understanding to employ best efforts to move forward to see if you can get to a document that's mutually acceptable …
>
> Q. Sitting here today, what did you understand this response [Earl's January 12, 9:47 a.m. e-mail, "Please forward draft document"] to mean?
>
> A. That there is an understanding to push forward all subject to figuring out a purchase and sale agreement, which is subject to negotiation based on the terms and conditions that were listed earlier.

(*See* Exhibit 3 hereto, at 33:25-34:14.)

7. Gail Rosenblum, the Cowen Vice President who transmitted a draft Assignment of Claim Agreement to Earl on January 12 at 1:24 p.m., in response to Earl's 9:52 a.m. e-mail of the same day ("Please forward draft document") likewise testified "we expect … when someone agrees to the price and to the quantity [claim amount] and asks for a document that they are going to proceed and complete a transaction." (*See* Exhibit 4 hereto, at 56:22-57:10.) Cowen's corporate representative gave similar testimony.

3

8.  The Lupoff Report is intended to support the theory that Earl's agreement on the price term for a potential transaction required it to negotiate an Assignment of Claim Agreement and close on that transaction.[2]

## II.  THE LUPOFF REPORT

9.  The Lupoff Report states it is intended to provide evidence of industry custom in the bankruptcy claim trading industry.  (*Id*. Executive Summary.)

10.  His evidence consists of an opinion on the specific point in time when potential bankruptcy claim sellers and purchasers reach a binding agreement requiring them to negotiate a claim transfer agreement and settle a trade.

11.  Not surprisingly, according to Mr. Lupoff that point in time is when the potential seller and purchaser have reached agreement on price:

> 13. The rapidly changing value of trade claims necessitates that parties confirm trades as soon as they reach agreement on price. Confirmation can occur in different ways, including telephonically, by email, text message, in a writing or any combination thereof. Confirmation is sometimes followed up in a subsequent writing once the buyer and seller agree to the purchase and sale of a trade claim for a price and amount.  This confirmation, whether oral or written, usually states that the transaction is only subject to satisfactory standard and typical due diligence by the buyer.  While there are these additional conditions to *closing* (settlement for cash), the trade is known by both parties and is in effect, with risk of ownership transferred to the buyer upon oral confirmation …

---

[2]  Significantly, the clarification that Whitebox is seeking to enforce an alleged duty to reduce agreement on price to a future writing and close on that transaction does not comport with its Transfer of Claim.  Pursuant to Rule 3001(e)(2), if an objection to a transfer of claim has been filed, the claim may only be transferred if "the court finds that the claim <u>has been</u> transferred" (past tense).  If a person merely agreed to negotiate the sale of its claim under a future agreement, then by definition there has been no transfer. Whitebox's theory also amounts to an admission Earl has not been paid for its Claim, and that the Transfer of Claim—which must be accompanied by "evidence of the transfer," a term defined in the Advisory Committee Notes as a "statement of the transferor acknowledging the … consideration for the transfer"—is therefore deficient.

4

14. Below I summarize some key features of the confirmation process.

15. **_Oral Confirmation_.** The buyer … and seller orally agree to a purchase price, claim amount and, perhaps, other terms of the purchase and sale of the trade claim. An Oral Confirmation can be done telephonically, by email, text message or any combination thereof. <u>Once a buyer receives an oral confirmation from a seller, the agreement is binding and the parties are understood to have traded the claim. Typical terms are simply claim amount and purchase price</u>, subject only to and [sic] customary documentation in the form of a Purchase and Sale Agreement (also known as an Assignment of Claim Agreement). In trading parlance, parties now "know the trade" (thus forming a "<u>Known Trade</u>"), and each party makes reasonable assumptions about the obligations and good faith efforts and behaviors of the other.

16. Practitioners in the market for trading bankruptcy claims have grown accustomed to the implied good faith standard attached to the verbal commitment to "buy" or to "sell" inherent in an Oral Confirmation. <u>As technology has advanced, the commitment to "buy" or sell" which constitutes the Oral Confirmation is now frequently made through email and messaging confirmations</u>. This has led to an industry convention that is rooted in *good faith* first and foremost …

17. In fact, the buyer of a trade claim will list the trade claim on its books for accounting purposes upon an Oral Confirmation, just as they would with any orally confirmed purchase of shares of stock, bonds or other securities and obligations for any Known Trade … [3]

18. **_Written Confirmation_.** While <u>an Oral Confirmation is binding on the parties</u>, sometimes, as parties may prefer, a Written Confirmation may later be generated, typically by the buyer. The Written Confirmation restates the terms of the trade as agreed upon by parties through the Oral Confirmation and provides a written record of the material terms. Unsurprisingly, the presumption that parties will act in good faith in the processing and closing of the trade that was executed upon the Oral Confirmation continues in the event of a Written Confirmation …

---

[3] Each of Bradly Schwab, Gail Rosenblum, and Cowen's corporate representative testified that Cowen did <u>not</u> record bankruptcy claim trades in its books and records unless and until a mutually agreed Assignment of Claim Agreement (or similar document) was executed by the parties thereto and/or the bankruptcy claim seller was paid pursuant to the terms thereof. *See*, *e.g.*, Exhibit 3 hereto, at 37:12-38:8, and Exhibit 4 hereto, at 55:13-56:7.

5

      27. *General Considerations and Protocols*. As noted above, <u>implicit in every trade claim is an obligation of the buyer and seller to act in good faith and use commercial best efforts to close the trade. This is so regarding their interactions from the moment of Oral Confirmation and Known Trade</u>, and persists through review of the Purchase and Sale Agreement and closing. Buyer and seller must remain available to each other for regular and timely correspondence or discussion and reasonable efforts to modify any writings to satisfy the business decision to sell the claim.

      28. To the extent that a Purchase and Sale Agreement is not acceptable to either party upon receipt of the initial draft, as mentioned, parties must act in good faith and use commercial best efforts to close.

(Emphasis added.)

    12.    The substance of the foregoing is repeated in the Executive Summary and Conclusion.

    13.    The remainder of the Lupoff Report is dedicated to describing his professional experience (*id*. ¶¶1-4) and accusing trade creditors that do not close on a bankruptcy claim sale transaction after reaching agreement with a potential purchaser on price of bad faith (*id*. ¶¶20, 28, 31-33, 35).

## **ARGUMENT**

**I.    THE LUPOFF REPORT SHOULD BE EXCLUDED BECAUSE IT RENDERS A LEGAL OPINION ON THE QUESTION OF MUTUAL ASSENT**

    **A.    Legal Standard**

    14.    Rule 702 provides "[i]f scientific, technical or other specialized knowledge <u>will assist the trier of fact to understand the evidence or to determine a fact in issue</u>, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto in the form of an opinion or otherwise." (Emphasis added.)

    15.    "Rule 702 allows a qualified expert to give both factual and opinion testimony [but] only if the testimony will help in understanding the factual issues in the case." *RLJCS Enterps.,*

6

*Inc. v. Prof'l Ben. Trust, Inc.*, No.03-cv-6080, 2005 WL 3019398, at *3 (N.D. Ill. Nov. 8, 2005). A well-settled corollary is that the rule does not permit expert assistance on legal questions. *Id.* (citing *U.S. v. Sinclair*, 74 F.3d 753, 757 n.1 (7th Cir. 1996)) (Rule 702 "prohibit[s] experts from offering opinions about legal issues that will determine the outcome of a case"); *Wendler & Ezra, P.C. v. AIG*, 521 F.3d 790, 791-92 (7th Cir. 2008) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process"). Significantly, "[t]his prohibition is not limited to expert testimony on pure legal matters, but also on mixed questions of law and fact." *Id*.

16. Whitebox has the burden of proving the Lupoff Report satisfies the requirements of Rule 702, and this Court has "wide latitude in performing its gate-keeping function." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011).

**B.   The Lupoff Report Renders a Legal Opinion on the Question of Whether Agreement on Price Alone Established an Enforceable Agreement to Sell the Claim**

17. The key issue herein is whether Earl agreed to sell its $3.6 million Claim to Cowen for $2.15 million. Whitebox's position is that it did, and that Earl had a contractual duty to negotiate a written Assignment of Claim Agreement and close after reaching agreement by e-mail on the price term for a potential trade, which duty Whitebox alleges Earl breached. Earl disputes that it had any such duty.

18. Whether Earl had a duty to negotiate a written Assignment of Claim Agreement after reaching agreement on the price term for a potential trade depends on whether there existed an underlying binding agreement requiring Earl to so negotiate. As noted in *A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Group, Inc.*, 873 F.2d 155 (7th Cir. 1989), unlike the duty of good faith imposed by courts with respect to contract <u>performance</u>, there is no inherent duty of good faith with respect to contract <u>formation</u>. *Id*. at 159 & n.2. The scope of a

7

duty to negotiate is determined not by reference to common law, but by the framework the parties have established for themselves in any prior agreements or letters of intent. *Id*. at 159-60. *See also Bercoon, Weiner, Glick and Brook v. Manufacturers Hanover Trust Co.*, 818 F. Supp. 1152, 1157 (N.D. Ill. 1993) ("In short, the terms of any prior agreements control on the question of whether a duty to negotiate in good faith was created").[4]

19. Whether Earl and Cowen agreed to establish such a framework for themselves presents a question of mutual assent.

20. That, in turn, is a legal question. *Bauer v. Qwest Commc'ns Co., LLC*, 743 F.3d 221, 227 (7th Cir. 2014) ("Whether a contract was formed is a question of law").

21. The Lupoff Report plainly renders an opinion on the legal question of whether agreement on a price term for a potential bankruptcy claim trade gives rise to an enforceable agreement to negotiate a formal Assignment of Claim Agreement and close on that transaction. It specifically states a bankruptcy claim transfer agreement "is binding" "once a buyer receives an oral confirmation from a seller," with "oral confirmation" occurring where "the buyer … and seller orally agree to purchase price, claim amount and, perhaps other terms of the purchase and sale of the trade claim" either "telephonically, by email, text message or any combination thereof." (Lupoff Report ¶15.) Mr. Lupoff further states "an Oral Confirmation is binding on the parties," and results in the immediate and automatic establishment of an "obligation of the buyer and seller to act in good faith and use commercial best efforts to close the trade." (*Id*. ¶¶18, 27.) The report

---

[4] That is also the case under New York law, which Whitebox states applies because the draft agreement Cowen sent to Earl included a New York governing law clause. (Transfer of Claim Ex. 1, n.2). *Solus Alternative Asset Mgm't LP v. Perry Corp.*, No. 652341/2012, 2015 WL 4240999, at *10 (Sup. Ct. N.Y. Co. July 13, 2015) (citations omitted, emphasis added) ("Solus also argues that, even if the parties [to failed sale of participation interest in Madoff claims] intended not to be bound, 'they may nevertheless bind themselves to negotiate in good faith toward that written contract.' Whether Perry had a good faith obligation to negotiate … will depend on the existence of an underlying binding agreement requiring them to do so").

8

is, in substance, an advocacy piece to support Whitebox's theory of the case, and should therefore be excluded. That Mr. Lupoff states, in a footnote, that he "ha[s] not been asked to provide any opinion regarding the specific trade at issue in this action" (*id*. n.1) does not cure this basic defect.

### C. Evidence of Industry Custom on the Legal Question of Mutual Assent is Inadmissible

22. Mr. Lupoff couches his opinion on mutual assent by purporting to provide evidence of industry custom. (Lupoff Report, Executive Summary, "I … have been asked … to provide this Expert Report regarding the industry practices with respect to the purchase and sale, or trading, of trade claims"). However, it is well established that while evidence of industry custom may be relevant to questions of contract <u>interpretation</u> (*e.g.*, *WH Smith Hotel Servs., Inc. v. Wendy's Int'l, Inc.*, 25 F.3d 422, 429 (7th Cir. 1994)), such evidence is <u>not</u> relevant to questions of contract <u>formation</u>, and is thus inadmissible under Rule 402. *See*, *e.g.*, *Tilley v. Cook Co.*, 103 U.S. 155, 160 (1880) ("unless some contract is shown, evidence of usage or custom is immaterial"); *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp.2d 310, 319 (S.D.N.Y. 1999) ("While industry custom and usage … is relevant to determine the meaning of a contract, it 'cannot create a contract where there has been no agreement between the parties'"); *In re Cairns & Assocs., Inc.*, 372 B.R. 637, 655 (Bankr. S.D.N.Y. 2007) (same); *Ozier v. Haines*, 411 Ill. 160, 166 (1952) ("While there are many instances where custom and usage have been used to interpret an enforcible contract, we know of no case, and none has been brought to our attention, where custom and usage have been held to create an enforcible contract").

### II. MR. LUPOFF IS NOT QUALIFIED TO PROVIDE EXPERT TESTIMONY ON THE SUBJECT OF BANKRUPTCY CLAIM TRADING AND HIS REPORT IS UNRELIABLE

#### A. A. Legal Standard

23. To qualify as an expert under Rule 702, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education."

9

24. Mr. Lupoff seeks to qualify based on his experience. (*Id*. ¶¶1-4.) The Advisory Committee Notes provide as follows with regard to experts who seek to qualify based on experience:

> Nothing in this amendment is intended to suggest that experience alone … may not provide a sufficient foundation for expert testimony …
>
> [However,] [i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it." *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions, and their assurances of reliability. Under *Daubert*, that's not enough."). The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable. *See O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir. 1994) (expert testimony based on completely subjective methodology held properly excluded).

25. As noted above, Whitebox has the burden of demonstrating the Lupoff Report meets Rule 702's requirements.

### B. Mr. Lupoff Lacks the Bankruptcy Claim Trading Experience Required to Qualify as an Expert

26. By his own admission, Mr. Lupoff has had minimal direct involvement in the bankruptcy trade claim business for at least the past two decades. (Lupoff Report ¶2; *id.* Ex. A.) Since 1998, Mr. Lupoff appears to have focused on trading distressed debt[5] and other securities (not bankruptcy claims) (1998-2009), and launching an investment fund (Tiburon Capital Management) (2009-2017) and family office (Lupoff Friends & Family Interests) (2017-).

---

[5] The term "distressed debt" refers to loans which trade in the secondary market at a discount to par. Lumping trading in bankruptcy claims with trading in distressed debt is the only conceivable way Mr. Lupoff can possibly represent he has "multiple billions of dollars of consummated" trades under his belt, as he does in his Executive Summary.

10

Nowhere, however, does he mention the dollar amount invested in bankruptcy claims at either entity. While their websites (http://www.tiburonholdings.net, http://www.lupoff.com) discuss their investment philosophies, there is no mention of bankruptcy claim trading as part of their overall strategies. A PACER party search (https://pcl.uscourts.gov/pcl/pages/search/findParty.jsf) for "Lupoff" and "Tiburon Capital" has not yielded a single case whose docket includes a Rule 3001 transfer of claim filed by those entities.

27.    According to his Curriculum Vitae, his most recent professional involvement in the bankruptcy claim trade business appears to have been 1998, as a "Trader/Manager of all distressed private obligations [various instruments, including 'trade claims'] for early IB proprietary unit" at Lehman Brothers. He appears to have focused on trading bank loans and other non-bankruptcy claim financial instruments, as Director-Partner-Trade of MJ Whitman, Inc.-Third Avenue Funds (*id.* ¶2; *id.* Ex. A), and the Lupoff Report is otherwise devoid of information stating precisely how many bankruptcy claim purchase and sale transactions Mr. Lupoff has handled in those positions.

28.    None of the publications listed in Exhibit B to his report are bankruptcy-related.

### C.    The Lupoff Report Does Not Articulate How he Drew on his Experience to Reach his Conclusions

29.    The Lupoff Report does not articulate how his experience led to his conclusions on mutual assent or bad faith, or why his experience constitutes a sufficient basis for an opinion on bankruptcy claim trading generally, and further, declined to apply his experience to the facts. (Lupoff Report n.1.) Mr. Lupoff's statements as to how the bankruptcy trade claim industry operates falls into this category. They are based almost entirely on personal experience, and thus his own ipse dixit, and not on the basis of any reliable methodology. *Mintel Int'l Grp., Ltd. v. Neergheen*, 636 F. Supp. 2d 677, 684 (N.D. Ill. 2009) (expert "must be able to explain why he reached [a] conclusion on the basis of a reasoned application of scientific, technical, or other

11

specialized knowledge, and not simply as a result of guesswork or a desire to please the side that hired him").

30. To the extent statements in the Lupoff Report are not based on personal experience, they are inadmissible hearsay, such as those concerning what "[p]ractitioners in the market for trading bankruptcy claims" believe or "have grown accustomed to," or how they record trades on their respective books and records. Such statements cannot be used to establish the truth of the matter asserted. *See*, *e.g.*, *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

31. That is for good reason, as his statement that bankruptcy claim trades are recorded on purchasers' books and records upon reaching agreement on price (Lupoff Report ¶¶17, 30) is provably false. As noted above (*see* n.3, *supra*), Cowen testified it did <u>not</u> record bankruptcy claim trades on its books and records until an Assignment of Claim Agreement was executed and/or cash changed hands.

**D.     The Lupoff Report Inappropriately Tries to Export LSTA Standards for Secondary Market Loan Trades to the Bankruptcy Claim Trade Market**

32. The Lupoff Report is unreliable, as it incorrectly presumes standards governing the enforceability of secondary market loan trades that have not been reduced to documentation, which standards have been agreed to in advance by participants in that market, apply to the bankruptcy claim trade market.

33. The LSTA was formed in 1995 to develop uniform practices and standard documents in the secondary loan market. Parties to secondary market loan trades opt into the LSTA's standard terms and conditions in one of two ways. They can do so at the time of a trade by agreeing to use so-called long-form documentation, that incorporates LSTA standard terms and conditions. More commonly, parties that trade together rely on prior execution of LSTA-published

12

documents that provide parties will be bound to LSTA standard terms and conditions in future trades. *See generally Highland Capital Mgm't L.P. v. Bank of Am., N.A.*, No. 10-cv-1632, 2013 WL 4502789, at *10-12 (N.D. Tex. Aug. 23, 2013), *aff'd*, 574 Fed. App'x 486 (5th Cir. 2014).

34. Making LSTA standard terms and conditions applicable to future trades streamlines future trades between repeat counterparties, which can thereafter confine negotiations to short-form trade confirmations, and exceptions they may wish to make to standard terms incorporated therein.

35. Both under the LSTA's standard trading documents and New York law which governs thereunder by default, "in most instances, a trade becomes legally binding at the point the traders orally agree [to] the material terms of the trade," which terms "include[e] the borrower's name, the name, facility type, and amount of the loan to be sold, and the price to be paid for the loan," "<u>provided both parties have traded together previously on standard LSTA documentation</u>." Bridget Marsh, et al., Loan Syndications and Trading: An Overview of the Syndicated Loan Market, Int'l Comp. Legal Guide Lending & Sec. Fin. 1, 3 (2017), annexed hereto as <u>Exhibit 5</u> (emphasis added). *See also* Anne Marrs Huber, et al., The Trading of Bank Debt in and Out of Chapter 11, 15 J. Bankr. L. & Prac. 1 Art. 3, n.83 and accompanying text (Feb. 2006) (emphasis added) ("<u>market participants</u> typically consider themselves bound once an oral trade has been consummated," quoting LSTA Code of Conduct and LSTA Distressed Trade Confirmation).

36. Cowen and Whitebox are LSTA members. (*See* <u>Exhibit 6</u> hereto.) Neither Earl nor its parent companies are (*id*.), nor have they previously transacted using LSTA documentation. Thus, the Lupoff Report's basic premise—that standards for achieving mutual assent between parties that agreed in advance to be bound by LSTA standard terms apply to Cowen's negotiations with Earl—is false, putting aside that the alleged subject trade is not even a secondary market loan trade. That is, unlike loans trading in the secondary market, bankruptcy claims do <u>not</u> trade on the

basis of an oral agreement as to price and additional material terms, and no explanation is given in the Lupoff Report why they should.

37. In contrast to the secondary loan market, where the LSTA has developed standard documents, "[d]ocumentation for [bankruptcy] trade claims is far from standardized." Adam J. Levitin, Bankruptcy Markets: Making Sense of Claims Trading, 4 Brook. J. Corp. Fin. & Com. L. 67, 91-92 (Fall 2009). *See also* Distressed Briefing, DebtWire North America (Aug. 20, 2012), annexed hereto as Exhibit 7 ("Currently, there is no industry standard way to document the buying and selling of bankruptcy trade claims. Individually stylized agreements are struck each time original claim buyers take an obligation off the hands of a vendor and then sell that position in a secondary deal to a new financial buyer"); Aaron L. Hammer (Whitebox's counsel herein), et al., Claims Trading: The Wild West of Chapter 11s, XXIX Am. Bankr. J. No. 6 (July/Aug. 2010), annexed hereto as Exhibit 8 (describing the bankruptcy claim trading market as "virtually unregulated").[6]

38. Mr. Lupoff's statements, that terms of Assignment of Claim Agreements governing bankruptcy claim trades are "standard" (*id*. ¶¶23-25, 28), and that the only conceivable reason for not reaching agreement once parties agreed on a price term is creditor bad faith (*see* ¶13, *supra*), is false. Indeed, Chaim Fortgang and Thomas Moers Mayer have observed that "[f]ailure to agree on these provisions [representations, warranties, indemnities, etc.] has destroyed a surprisingly large number of deals after claims buyers and claims sellers agreed on economic terms." Trading Claims and Taking Control of Corporations in Chapter 11, 12 Cardozo L. Rev. 1, 19 (Oct. 1990).

---

[6] Although the LSTA has entertained the idea of leading an effort to publish standardized bankruptcy claim trade documents and terms and conditions (Exhibit 7 hereto), to date that idea has repeatedly stalled.

## **NOTICE**

39. Notice of this motion has been provided to counsel for Whitebox, counsel for the Debtors, and the office of the United States Trustee.

WHEREFORE, Earl requests that the Court enter the proposed order excluding the Lupoff Report, pursuant to Rules 104(a), 402, and 702, and granting Earl such other and further relief as this Court deems just and proper.

Dated: January 23, 2018

Respectfully submitted,

/s/ Jeffrey Chubak
Jeffrey Chubak (admitted *pro hac vice*)
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 497-8247
Fax: (212) 490-4208
jchubak@storchamini.com

- and -

Joseph D. Frank (IL No. 6216085)
FRANKGECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois 60654
Tel: (312) 276-1400
Fax: (312) 276-0035
jfrank@fgllp.com

*Counsel to Earl of Sandwich (Atlantic City), LLC*