# **EXHIBIT 2**

**Lupoff Report**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

---------------------------------------------------------------------- x
:
In re: : Chapter 11
:
Caesars Entertainment Operating Company, Inc., *et al.*, : Case No. 15-01145 (ABG)
:
Debtors. :
: Jointly Administered
---------------------------------------------------------------------- x

**Summary and Opinion of**

**Peter M. Lupoff**

## TABLE OF CONTENTS

**Clause** **Page**

**I. EXECUTIVE SUMMARY** ................................................................................................1
**II. AUTHOR'S QUALIFICATIONS** ...................................................................................2
    **A. Experience** ................................................................................................2
    **B. Remuneration** ...........................................................................................3
    **C. Materials Relied On** .................................................................................3
**III. TRADE CLAIMS TRADING** .........................................................................................3
    **B. How Trades Are Made** ............................................................................4
    **C. Trade Confirmation and Process** ............................................................4
**IV. FAILURE OF A TRADE TO CLOSE**............................................................................7
**V. CONCLUSION** ..................................................................................................................7

## I.  EXECUTIVE SUMMARY

I, Peter M. Lupoff, have been asked by counsel to *Whitebox Advisors LLC* ("*Whitebox*") to provide this Expert Report regarding the industry practices with respect to the purchase and sale, or trading, of trade claims. This action involves a failed trade of a claim between *Earl of Sandwich, LLC* ("*Earl*") (the seller) and *Cowen Special Investments LLC* ("*Cowen*") (the buyer). *Cowen* sold the claim to *Whitebox*.[1] The claim at issue was originally filed by Earl in the bankruptcy case, *In re Caesars Entertainment Operating Company, Inc*. (Case No. 15-01145).

I base my opinion on my long history in the claims trading field and multiple billions of dollars of consummated (and some failed or revised) trades that I've participated in over the last 25 years or so. While my experiences are my own, the length of time that I have been engaged in the industry, the magnitude of trades that I have participated in and the number of investing buyers, trade creditor claims-holders and broker-dealers that I have engaged with over this time have shaped my perceptions.

Bankruptcy claims trading is the buying and selling of claims, including trade claims, against companies seeking protection and relief under the US Bankruptcy Code. A trade claim is a claim against the debtor by a vendor or service provider, for unpaid amounts due them for goods and services.

When a trade claim is sold, the buyer (or intermediary on buyer's behalf) and seller initially agree to a purchase price, claim amount and, perhaps, other terms of the purchase and sale of the trade claim. An Oral Confirmation can be given telephonically, by email, text message or any combination thereof. Typical terms are simply claim amount and purchase price subject only to buyer due diligence and customary documentation in the form of a Purchase and Sale Agreement. Upon an Oral Confirmation, buyer and seller then have a Known Trade, and each party makes reasonable assumptions about the obligations and good faith efforts and behaviors of the other. The Oral Confirmation may be followed by a Written Confirmation but need not be for purposes of making the agreement binding. This writing may state that the transaction is subject only to certain conditions. While there are these additional conditions to *closing* (settlement for cash), the trade is known by both parties and is in effect, with risk of ownership transferred to the buyer upon oral confirmation. Routinely, for active trade claim buyers and intermediaries, a form of Purchase and Sale Agreement is ultimately forwarded to the seller in advance of, concurrent with, or in some instances, in lieu of a Written Confirmation.

Buyers and sellers of trade claims have grown accustomed to the implied good faith standard attached to the verbal commitment to "buy" or to "sell," whether face-to-face, by telephone, or by email or message confirmations. This has led to an industry convention that is rooted in *good faith* first and foremost. Additionally, oral buy-and-sell orders and commitments have a long history as the practice in the securities industry, not only amongst market professionals, but between market professionals and layman, or individuals with investments in stocks, securities. FINRA, the congressionally authorized governing body dedicated to protecting America's individual investors through regulation of broker-dealers to insure fair and honest operations, has stated in its Registered Representatives Brochure,[2] "(O)rders for securities transactions are contracts. Unlike many business contracts, which are usually written, most securities orders are verbal."[3]

In my experience, the failure to settle trade claims trades is nearly always a matter of the bad faith of the original trade claim holding seller. Further, my years of interaction with investors and broker-dealers (i.e.,

---

[1] As of the date of this report, I have not been asked to provide any opinion regarding the specific trade at issue in this action.
[2] FINRA REGISTERED REPRESENTATIVES BROCHURE, https://www.finra.org/file/registered-representatives-brochure.
[3] IBID at 12, emphasis added by Author

1

buyers of trade claims) have led me to believe that this is also the financial buyer communities' prevailing point of view.

Selling trade claim creditors are no less familiar or socialized to the actionability of oral commitments than buyers, especially when dealing with broker-dealers and other investment professionals. However, they likely have a heightened ability to rationalize bad faith as a function of their human biases (buyer's remorse) and less livelihood-centric need to manage them (relative to financial buyers). This contrasts with buyers of trade claims, who are likely better calibrated than selling trade claim creditors and thus, less prone to buyer's remorse bias in buy/sell decision-making. Buyers of trade claims are in the business of buying and selling trade claims every day for their livelihood.

## II.     AUTHOR'S QUALIFICATIONS

### A.     Experience

1.     I am the Managing Member of Lupoff Friends and Family Interests, LLC, a family office making direct and managed investments, which is my vehicle for research, teaching, advisory and writing activities.[4]

2.     My experience in distressed investing strategies began in 1990 when I began working with deep value/distressed investor, Martin Whitman, of *Third Avenue Funds*. During the course of my more than twenty-five-year investment career, I can be credited with initiating some of the meaningful advances that have taken place in the distressed and high yield markets, particularly with respect to loans and trade claims. In the late 1980s, I envisioned that a liquid secondary market in commercial bank loans would provide institutional investors with an alternative debt instrument to conventional bonds. As such, I became one of the first traders of commercial bank loans, which revolutionized liquidity and forged trading conventions on private obligations. In 1988, I operated what I believed to be the first stand-alone bank loan trading desk for The Bank of New York. In 1990, working for Mr. Whitman, I saw a need amongst commercial banks to find sources of capital to acquire their massive troubled loan exposures that banks chose to or were compelled to sell for regulatory reasons. In 1991, I established one of the first trade claim trading desks to assist suppliers with liquidity and cash needs, impacted by the same corporate bankruptcies. By 1991-92, the entity I managed, *Whitman Loan Corp*, was believed to be the first and most active trader of all distressed, non-security obligations, i.e., bank loans, private placements, trade claims and receivables. In 1995, I conceived of "bankruptcy and default-triggered puts" for suppliers to troubled companies, thereby expanding their use of derivatives and creating another, new investable product for institutional funds, and a financing source for trade creditors. I humbly consider myself a pioneer in the trading of private obligations and instrumental in market and industry's growth and protocols established, which govern the transfer of loans, trade claims and other private obligations. I have traded multiple billions of dollars value in trade claims during my investment career.

3.     Funds I have managed or co-managed have achieved awards such as *GAIM's* Top Performing Emerging Distressed Manager, *MARHedge's* Event-Driven Manager and an *Institutional Investor* nomination as Hedge Fund House of the Year.

4.     I am a regular featured discussant on academic papers related to, and consultant to, The Federal Reserve Bank, regarding market shocks and liquidity. Additionally, I have written white

---

[4] A copy of my *curriculum vitae* is attached as Exhibit A.

2

papers and articles on topics within my areas of expertise. A list of my most recent publications is attached as Exhibit B.[5]

### B. Remuneration

5. I am being compensated for my time at a rate of $750 per hour.

### C. Materials Relied On

6. I have largely drawn upon my personally attained knowledge and experiences, given my history in the trade claim trading industry. Additionally, I reviewed, and in some instances, cited:

- FINRA REGISTERED REPRESENTATIVES BROCHURE, https://www.finra.org/file/registered-representatives-brochure.
- Jeffrey M. Jones, *U.S. Stock Ownership Down Among All but Older, Higher-Income*, GALLUP NEWS (May 24, 2017), http://news.gallup.com/poll/211052/stock-ownership-down-among-older-higher-INCOME.aspx.

## III. TRADE CLAIMS TRADING

7. Bankruptcy claims trading is the buying and selling of claims, including trade claims, against companies seeking protection and relief under the US Bankruptcy Code. A trade claim is a claim against the debtor by a vendor, supplier or service provider for unpaid amounts due them for goods and services. During the course of my career, I have participated in trading, in my best estimate, well over 10,000 trade claims, totaling multiple billions of dollars in value.

8. There is not a single type of participant in the market to buy trade claims, and I have been involved in trades involving many different counterparties. As noted above, trade claims are held by the debtor's vendors, suppliers and other service providers. They are often evidenced by unpaid invoices and bills of lading as the claim arises for failure to pay the trade creditor for goods or services. Therefore, trade creditors engaged in the sale of their trade claims can be suppliers, landlords, lawyers and other professionals, unions and employees, among others.

9. Market participants who acquire trade claims might include trading operations of investment banks, hedge funds and other active asset managers and independent broker-dealers. It is feasible that these parties may be acquiring trade claims for the economic benefit of other parties, such as pension funds, insurance companies, corporations and other entities. The commonality amongst most buyers of trade claims is their perception that, despite the myriad risks associated with buying trade claims (discussed further on), the purchase price renders the claim an attractive investment relative to other alternative investments, such as stocks, bonds, funds, loans, etc.

10. Trade claims are routinely bought and sold based upon the buyer and seller expectations of ultimate recovery in the bankruptcy case, the timing of that recovery and the current cash needs of the seller and investing alternatives of the buyer.

---

[5] I have not testified as an expert at trial or by deposition in the last four years.

3

B.  **How Trades Are Made**

11. Under the US Bankruptcy Code, a trade claim is allowed in the amount in which it is filed (via a Proof of Claim) unless it is disallowed or reduced by a bankruptcy court order. Claims are routinely disputed and/or disallowed during the lifetime of the bankruptcy case. As such, it is commonplace for trade claims to be sold with some lack of clarity regarding the amount of the claim.

12. As trade claims are traded among many parties in a large but private market (like the massive commercial loan trading market), the business of buying and selling claims involves a variety of key parties. These include the seller (the trade creditor, as mentioned, who is unpaid for goods or services provided to the debtor); the buyer (usually and/or ultimately, professionally run investment management companies); and the broker or intermediary, who has set up the significant systems to study, track and trade or match the buyer and seller. Given that trade claims and bank debt are private obligations, there is no exchange (as with stocks) and parties cannot simply trade them electronically. Further, as every claim arises from an unpaid obligation of the debtor, unlike securities, the claims are not *contemplated* obligations, evidenced by a security certificate, loan agreement or bond indenture; rather, they are created by a failure to pay by the bankrupt company. Therefore, each trade claim, if sold, involves due diligence by the buyer before closing the purchase and sale of a trade claim. While trading of claims is a large market, lawyers and the buyer's/intermediary's due diligence personnel are also key participants in the process of buying and selling claims.

C.  **Trade Confirmation and Process**

13. The rapidly changing value of trade claims necessitates that parties confirm trades as soon as they reach agreement on price. Confirmation can occur in different ways, including telephonically, by email, text message, in a writing or any combination thereof. Confirmation is sometimes followed up in a subsequent writing once the buyer and seller agree to the purchase and sale of a trade claim for a price and amount. This confirmation, whether oral or written, usually states that the transaction is only subject to satisfactory standard and typical due diligence by the buyer. While there are these additional conditions to *closing* (settlement for cash), the trade is known by both parties and is in effect, with risk of ownership transferred to the buyer upon oral confirmation. Unlike the buying and selling of many consumer assets like a car or home, objective indications of the moment of agreement are critical because the value of the claims can change precipitously from day to day. Accordingly, once an agreement is reached, it is important that the parties work *honestly* to "settle the trade" by completing due diligence and documentation, thereby ensuring that one side does not get a "free ride" to rescind the agreement if circumstances or the markets change. It is unusual for an agreement to buy and sell a trade claim, not to close.

14. Below I summarize some key features of the confirmation process.

15. *Oral Confirmation*. The buyer (or intermediary on buyer's behalf) and seller orally agree to a purchase price, claim amount and, perhaps, other terms of the purchase and sale of the trade claim. An Oral Confirmation can be done telephonically, by email, text message or any combination thereof. Once a buyer receives an oral confirmation from a seller, the agreement is binding and the parties are understood to have traded the claim. Typical terms are simply claim amount and purchase price, subject only to and customary documentation in the form of a Purchase and Sale Agreement (also known as Assignment of Claim Agreement). In trading parlance, parties now "know the trade" (thus forming a "Known Trade"), and each party makes reasonable assumptions about the obligations and good faith efforts and behaviors of the other. Depending on the preferences of the parties, an Oral Confirmation is sufficient for parties to advance to the distribution of a form Purchase and Sale Agreement, which is reviewed and tailored by the parties while the buyer conducts due diligence.

4

16.     Practitioners in the market for trading bankruptcy claims have grown accustomed to the implied good faith standard attached to the verbal commitment to "buy" or to "sell" inherent in an Oral Confirmation.  As technology has advanced, the commitment to "buy" or "sell" which constitutes the Oral Confirmation is now frequently made through email and messaging confirmations, in addition to the telephone or face-to-face. This has led to an industry convention that is rooted in *good faith* first and foremost. As the adage goes, *your word is your bond*.[6]

17.     In fact, the buyer of a trade claim will list the trade claim on its books for accounting purposes upon an Oral Confirmation, just as they would with any orally confirmed purchase of shares of stock, bonds or other securities and obligations for any Known Trade. Subsequently, the buyer of a trade claim would then adjust their portfolio profit and loss figures up or down on daily prices for calculation of their fund performance, inclusive of any purchased trade claims post-Oral Confirmation.

18.     *Written Confirmation*. While an Oral Confirmation is binding on the parties, sometimes, as parties may prefer, a Written Confirmation may later be generated, typically by the buyer. The Written Confirmation restates the terms of the trade as agreed upon by parties through the Oral Confirmation and provides a written record of the material terms. Unsurprisingly, the presumption that parties will act in good faith in the processing and closing of the trade that was executed upon the Oral Confirmation continues in the event of a Written Confirmation.

19.     *Seller Pre-Conditions and Tactics*. In some instances, a seller may come to an agreement with a buyer on claim amount and purchase price, but will require a senior management approval as they, the selling trade creditor contact, lack the authority to execute a trade. In such a case, if operating in good faith, the seller must inform the buyer of this Pre-Condition. A financial buyer, who is typically a sophisticated party and familiar with these protocols, may provide a bid, but would condition the actionability of the bid in a way satisfactory to them, in order to justify making a bid with any Seller Pre-Condition and associated market risk. Otherwise, the seller gets a "free option" – that is, they reserve the right to sell to the buyer at an agreed upon price regardless of the passage of time or a change in the market value. Typically any seller of any financial instrument or obligation would pay something to a buyer for an option, which again, would be negotiated in advance.

20.     For these reasons, it may be bad faith, a tactic of a seller, to get a free option, by raising the specter of a senior management approval post Oral Commitment between the parties. Further, should seller elicit a bid from a buyer, subject to the Pre-Condition of senior management approval, it would be bad faith for seller to accept a bid and then fail to seek senior management approval.

21.     *Purchase and Sale Agreement*. Routinely, for active trade claim buyers and intermediaries, a form of Purchase and Sale Agreement is forwarded to the seller in advance of, concurrent with, or even in lieu of a Written Confirmation. This gives the buyer and seller the opportunity to discuss any material aspects of the Purchase and Sale Agreement that might require more clarity or pose concern.

22.     The Purchase and Sale Agreement enumerates the exchange for value and transfer of ownership. It also specifies all the representations and warranties made by buyer and seller to each other. Further, because many of the risks associated with buying trade claims relate to the amount of claim, the timing and amounts of distribution of sale proceeds from buyer to seller are set out in the agreement. Such terms may vary as a means of managing the risks that can cause adjustments in the amount.

---

[6] The use of oral confirmations is not limited to the bankruptcy claims trading industry. Oral buy-and-sell orders and commitments have long been commonplace in the securities industry, not only amongst market professionals, but between market professionals and laymen (i.e., individuals with investments in stocks and securities).

23. Sellers will be asked to make standard representations about the trade claim and their behaviors, such as:

- The claim is valid and allowed in the amount stated, and is not subject to any valid legal or equitable defenses.
- The seller is duly organized, VALIDLY existing and in good standing under the laws of the jurisdiction of their formation.
- The seller has the full power and authority to enter into the agreement to sell the trade claim and perform any obligations under the Purchase and Sale Agreement.
- The seller has obtained all CORPORATE and all other approvals required to perform their obligations under the Purchase and Sale Agreement. No third party or governmental approval is necessary.
- The Purchase and Sale AGREEMENT is legal, valid, biding and enforceable.

24. In short, these standard representations are a formal mechanism through which the seller reiterates the oral promises it made to elicit the desired purchase price from buyer at the Oral Confirmation stage.

25. Buyers also make standard representations, such as:

- The buyer has the CONTRACTUAL capacity and authority to enter in the Purchase and Sale Agreement.
- The Purchase and Sale Agreement is legal, valid, biding and enforceable.
- If a portion of THE Purchase Price is deferred, the Buyer may need to make further representations about timely payment based on the certain events.

26. To the extent a party must take action to meet the obligations of any representation, the need for that action creates a condition to settlement. The failure of a party to take necessary action does not mean that the claim has not been traded.

27. *<u>General Considerations and Protocols</u>*. As noted above, implicit in every trade claim trade is an obligation of the buyer and seller to act in good faith and use commercial best efforts to close the trade. This is so regarding their interactions from the moment of Oral Confirmation and a Known Trade, and persists through review of the Purchase and Sale Agreement and closing. Buyer and seller must remain available to each other for regular and timely correspondence or discussion and reasonable efforts to modify any writings to satisfy the business decision to sell the claim.

28. To the extent that a Purchase and Sale Agreement is not acceptable to either party upon receipt of the initial draft, as mentioned, parties must act in good faith and use commercial best efforts to close. This includes, to the extent necessary, prompt correspondence to the other party about required edits in order for the Purchase and Sale Agreement to be acceptable. Typically, to the extent necessary, parties edit drafts of the Agreement, red-lining proposed changes in order to make the Agreement either more closely match the particulars of the trade, the parties involved, or their limits regarding the business decision implications of various representations and warranties. Most changes regard time periods, such as the number of days to notify the other party of certain events, or number of days to cure a breach, or days to make payment(s) due the other party. It is rare that a trade claim trade does not close, and given the logic of, and reasonable nature of the standard representations as described above, the silence or inaccessibility of a party during negotiation of the Purchase and Sale Agreement, might suggest the parties' second thoughts post-commitment to the Known Trade. Further, "take it or leave it" edicts around customary representations and warranties in the Agreement carry a whiff of bad faith. Finally, to the extent that a

6

Purchase and Sale Agreement remains in negotiation, or, in fact, fails to be negotiated at all given a party's silence or inaccessibility (or even outright statement of an intention to break the trade), the trade continues to exist, as upon an Oral Commitment risk transfers to the buyer. A seller cannot operate in bad faith regarding efforts to document a Known Trade and use their unethical behavior to drive an outcome because they've changed their minds. Put another way: trade commitment and settlement are two different things.

### IV.    FAILURE OF A TRADE TO CLOSE

29.    Rarely does a trade of a trade claim fail to close. In my career, I have only had two or three trades fail to close. When a trade fails to close, the transaction must be unwound. In other words, after the parties agree to the trade, if they cannot successfully close the documentation, the parties must reverse their agreed commitments.

30.    As noted above, a buyer will typically list a Known Trade on its books, in portfolio, from the date of an Oral Confirmation. As such, the failure of a trade to close can have potentially complicated accounting and regulatory consequences, as profits or losses are "booked" daily based on the perceived market price of the trade claim post Oral Commitment, when the trade claim is considered bought and owned. This would necessitate an "unwinding" of the trade, i.e., amending books and records and, in some instances, creating additional regulatory filings and costs.

31.    In my opinion, the failure to settle trade claims trades is nearly always a matter of the bad faith of the original trade claim holding seller. In my years of interaction with investors and broker-dealers (i.e., buyers of trade claims), I have found that this is also the financial buyer communities' prevailing point of view. In my personal experiences, I have never had a professional investment firm or broker-dealer fail to close a trade claim trade, yet I certainly have had original trade creditor claims holders attempt or threaten to thwart closure in order to extract new terms or a higher price.

32.    Buyers of trade claims understand that both regulation and practice require acceptance of oral and other informal commitments. They are also less prone to the buyer's remorse bias in buy/sell decision-making, as they are in the business of buying and selling claims, loans, obligations and/or securities every day for a profit. Indeed, buyers of trade claims make probabilistic predictions and obtain swift feedback in the form of market prices daily on outcomes.

33.    Sellers, on the other hand, likely have a heightened ability to rationalize bad faith as a function of their human biases (buyer's remorse) and less livelihood-centric need to manage them. Regarding failing trade claim trades, in the past, when piecing together why sellers have mulled bad faith, sometimes they have candidly admitted to me that they might get an extra penny of purchase price elsewhere. I have also heard stories about others at their company second-guessing the decision to sell. I have heard the explanation that they had not done sufficient due diligence on the market value and fear that they have committed to a price that is not "market." I have also had trade creditors from smaller companies or who hold small claims threaten to break trades, saying that we, as the buyer, will do nothing, or pay a higher price, in order to avoid the cost of litigation as "it's not worth it to us to fight." In all of these circumstances, the seller had agreed to sell and I had agreed to buy. Whatever the reason for their behavior, selling trade claim creditors are no less familiar or socialized to the actionability of oral commitments – especially when dealing with broker-dealers and other investment professionals – even if they are sometimes motivated to shirk these oral commitments.

### V.    CONCLUSION

34.    As I describe above, once a buyer receives an oral or other informal confirmation from a seller, a trade claim is sold. The claim ownership transfers to the buyer with settlement for cash

7

occurring upon the execution of the purchase and sale agreement. Trades are routinely confirmed telephonically, by email, text message, in a writing or any combination thereof. Upon oral or other informal confirmation, the claim is considered traded and sold, and is a "known trade." Given the variety of ways to confirm a trade (telephonic, email, text, writing) – creating a Known Trade – there is no required standard in the claims trading industry that a trade be confirmed by a formal signed writing.

        35.      In my experience, once confirmed, trade claim trades rarely fail to close. The few trade claim trades that do fail to close, however, are most often attributable to the bad faith of a party, most typically the selling trade claim creditor.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 14th day of January, 2018

                                                            _____

                                                                   Peter M. Lupoff

# Exhibit A

1 Hanson Place – 2SD | T 212.226.4783 (city)
Brooklyn, NY – 11243 | T 845.526.2169 (Putnam Valley)
USA | W 646.840.4925
| C 415.516.7524
155 Bell Hollow Road | E peter@lupoff.com
Putnam Valley, NY 10579 | E peter.lupoff@tiburonholdings.net

## Peter M. Lupoff

**Experience**

*June, 2017-Present*     **Lupoff Friends & Family Interests LLC** *New York, NY*
**Principal** – Single Family Office (direct public and private investments)

*Jan., 2017-Present*     **World Policy Institute**     *New York, NY*
**Fellow** – Focus of Economy and Markets, Impact Investing, Market Shocks and Dislocation
 *Article: The Plausible Coincidence of a Trump Win and US Equity Market's Rally, February 2017*

*Jan., 2017-Present*     **Yale School of Management**     *New Haven, CT*
**Special Guest Lecturer** – TERP Syllabus (see below); Impact Investing Programs

*June, 2009-April, 2017*     **Tiburon Capital Management LLC**     *New York, NY*
**Portfolio Manager, CIO, Founder**–Event-Driven Funds and managed accounts
- Event-Driven (Special Sit, Stressed/Distressed) 6.5% compounded return inception to date
- Separately Managed Institutional Accounts, Mutual Fund, High Conviction Investment Accounts
- Registered Investment Advisor with SEC
- Recognizable and regular speaker (TV, Radio, Conferences) and writer on topics associated with strategies
- Tiburon Extern Research Project ("TERP") – Investment workshops, Proprietary Intellectual Property

*Sept., 2012-May, 2015*     **Gray & Company Global Investment Solutions**    *Atlanta, New York, NY*
**Chief Investment Officer** - *$12bn Pension and Endowment Client investment consultancy*
- Asked to take role as part of Tiburon Capital Management acquisition by Gray & Company
- Largest minority-owned consultant at time. Emphasis on curating, vetting, recommending minority and women owned investment managers
- Investment committee member, directed firm perspective on exposures, directed bespoke client solutions
- Advised company consultants on allocation recommendations to pension and endowment clients
- Re-acquired Tiburon in 2015

*Feb., 2008-June, 2009*     **Millennium Management LLC**     *New York, NY*
**Portfolio Manager, Managing Director** – Distressed/Event-Driven allocation of a $12.5B Multi-Strategy Fund
- Short regional and community banks with in top 5 foreclosure markets. Short LCDX
- Due to market concern, peaked at 24% of allocation invested, down to 8% by year-end 2008
- Modest (non-public) loss for 2008. Up every month through June, 2009

*Dec., 2005-Dec., 2007*     **Robeco USA**     *New York, NY*
**Portfolio Manager** – Robeco WPG Distressed/Special Situations Fund (DSS)
- DSS up 19.83% net in 2006, 9.42% net through July, 2007 and wind down
- Raised or assisted in raising all investor capital ($130mm at July, 2007)
- Activist member various bankruptcy committees
- *Institutional Investor* Nominated Institutional Investor of Year – DSS cited as reason

*Jan., 2005-Oct., 2005*     **Azura Capital Partners, LLC**     *New York, NY*
**Partner, Co-Portfolio Manager**
- Raised close to $50mm to launch event-driven, multi-strategy fund (Distressed/Credit Focus).
- Co-Portfolio Manager, Trader, Chief Operating Officer

*April, 2004-Jan., 2005*     **EagleRock Capital Management**, *LLC*     *New York, NY*
**Co-Portfolio Manager-Distressed/High Yield; Senior Analyst**
- Managed 2 person group responsible for 40% of Portfolio of $250mm fund. 30.35% return, 2005 *MARHedge* Awarded Event-Driven Manager of Year
- Research and trading responsibilities for Distressed/High Yield
- Direct, activist participation (bankruptcy committees; otherwise) in achieving value

*March, 2003 – Mar., 2004*   **Schultze Asset Management, LLC**   *Purchase, NY*
**Co-Portfolio Manager, Managing Director**
- Co-director of investments for event driven/distressed investment firm
- 2004 *GAIM* Awarded Top Performing Emerging Distressed Manager
- Identified, acquired and managed in 2003, most significant 2004 alpha generator: *Horizon Natural Coal*.
- 24.7% Net Return in 2003
- Research, trading and capital raising responsibilities
- Direct, activist participation (bankruptcy committees; otherwise) in achieving value

*May, 1998 – Nov. 2003*   **tiburon holdings llc**   *New York, NY*
**Managing Member**
- Advisor to Beal Bank, CSG Investments on their entry into distressed investments
- Principal investments in value and distressed (largely) entertainment properties
- Co-founded and launched Hip-Hop record label, *Sub Verse Music*, with 30 releases and Worldwide distribution
- Purchased, turned-around and sold urban/hip-hop site, *Urbanearth.com*

*May, 1997 – May, 1998*   **Lehman Brothers**   *New York, NY*
**Senior Vice President**
- Trader/Manager of all distressed private obligations (bank debt, private placements, trade claims, receivables, derivatives thereon) for early IB proprietary unit

*June, 1990 – April, 1997*   **MJ Whitman, Inc./Third Avenue Funds**   *New York, NY*
**Partner, Member of Board of Directors, Portfolio Manager, Trader**
- Managed all activities as principal and agent in distressed private obligations for Whitman funds, partner capital and firm (bank debt, private placements, trade claims, receivables, derivatives thereon)
- Ran Department of approximately 8-10 professionals
- Conceived and ran the *Whitman Pilot Fish Opportunity Fund LP*
- Directed all purchase and sales of private obligations for *Third Avenue Value Fund*
- Led and executed many bankruptcy/banking advisory functions
- Arguably largest (or one of largest) distressed private obligations traders
- Innovated Bankruptcy-Triggered Put product (Kmart – 1997), other Pioneering Trade Claim/Receivables Products

*Oct., 1988-June, 1990*   **CIBC**   *New York, NY*
**Vice President**
- Established first standalone, highly profitable proprietary Loan Trading business ($175 million authority)

*Dec., 1986-Oct., 1988*   **Bank of New York**   *New York, NY*
**Assistant Vice President**
- Co-Founded Loan Syndications and Sales Department
- Underwrote credit, assisted in Credit Agreement and other drafting
- Pioneered loan trading - did first of market's HLT commercial loan trades documented

**Education**   **MBA**, Fordham University Graduate School of Business

**BA**,   Hofstra University

**Miscellaneous**   Advisor, Consultant, Expert Witness related to areas of expertise (private obligations, pricing illiquids, hedge funds)
Regular Federal Reserve Bank Academic Paper Discussant and consultant on illiquid markets
President, Clean Power for Humanity (non-profit, sustainable electrification of rural Asian villages)
Donor, Judge, Defy Ventures (entrepreneurial training of the previously incarcerated)
Advisor/Independent Board Member of 2 minority-owned alternative investment managers

Interests: Basketball, Music, Cooking, Writing, Reading

# Exhibit B

<u>P. Lupoff Publications</u>

I have authored the following publications within the last ten years:

- "Doing Well by Doing Good – Impact Investing as a Mainstream Investment Philosophy," December 2017
- "The Plausible Coincidence of a Trump Win and US Equity Market Rally," December 2016
- "When Numbers Cloud Meaning - the Fallacy of Investment Research Exactitude," October 2016
- "Disrupted Industries in Secular Change with Diminished Moats as Fertile Ground for Shorts," July 2016
- "Far from the Madding Crowd – Averting Underperformance (and Profiting) from Crowded Hedge Fund Trades," April 2016
- "Disarray in Credit Markets – Passive Investment Risks/Active Investor Opportunities," November 2015
- "Quarterly Capitalism and Appropriate Corporate Stewardship," August 2015
- "The Coincidence of Activism and Shareholder-Friendly Corporate Activities," June 2015
- "The Deflation Bogeyman," March 2015
- "Oil's Price Decline and its Impact on the High Yield Market," February 2015
- "Where is the "Bottom" in Oil – Parsing the Risks and Opportunities," December 2014
- "I'm Not Dead (Yet) – US Equities through Year-End," September 2014
- "Investment Process, Idea Generation and Human Biases," August 2014
- "The Current Fallacy of Okun's Law and the Fed's Historic Believe in It," July 2014
- "US Jobs and the Labor Force Participation Rate," July 2014
- "The Likely Coming Increased Corporate Capital Expenditures and Implications for Cash Use, Equities," June 2014
- "Assessment of the Loan ETF (and Mutual Fund) Redemptions and Scenarios," June 2014
- "With My Cash (US) and Your Tax Domicile (Europe) We Make a Beautiful Couple – The Impetus for Cross-Border M&A," May 2014
- "Free Cash Flow Matters Most," May 2014
- "The 2014 Tiburon Panorama – Climate, Themes, Opportunities and Risks," January 2014
- "The Seismic Shift towards a New Corporate Social Contract," September 2013
- "Ruminations on a Tossed Coin – Reconciling the Impact of Trading Given Sideways Trading Markets, Random Walk," July 2012
- "Performance in this Period of High Correlation and Low Idiosyncratic Risk," June 2012
- "A Very Brady (European) Sequel," July 2011
- "Emergence Theory Redux and the Tiburon Advantage," July 2011
- "Fallacies in Expected Value Approach and Opportunities Present Due to the Pari-Mutuel Nature of Markets," February 2011
- "Edge/Odds – The Kelly Formula and Maximizing Returns," March 2010
- "Emergence Theory and the Creation of a Superior Investment Advisor," February 2010