## **EXHIBIT 5**

## **LSTA Publication**

# Loan Syndications and Trading: An Overview of the Syndicated Loan Market



Bridget Marsh



Ted Basta

The Loan Syndications and Trading Association



Tess Virmani

In the past 30 years, the art of corporate loan syndications, trading, and investing has changed dramatically. There was a time when banks lent to their corporate borrowers and simply kept those loans on their books, never contemplating that loans would be traded and managed by investors like stocks and bonds in a portfolio. In time, however, investors became drawn to the attractive features of loans. Unlike bonds, loans were senior secured debt obligations with a floating rate of return, and, over the years, an institutional asset class emerged. Today, such loans are not only held by banks but are also typically sold to other banks, mutual funds, insurance companies, structured vehicles, pension funds, and hedge funds. This broader investor base has brought a remarkable growth in the volume of loans being originated in the primary market and subsequently traded in the secondary market. The syndicated loan market represents one of today's most innovative capital markets.

In 2016, total corporate lending in the United States nearly reached $2 trillion.[1] This figure encompasses all three subsectors of the syndicated loan market – the investment grade market, the leveraged loan market, and the middle market. In the investment grade market, total lending stood at approximately $860 billion in 2016. Most lending in the investment grade market consists of revolving credit facilities to larger, more established companies. The leveraged loan market, where loans are made to companies with non-investment grade ratings (or with high levels of outstanding debt), represented approximately $875 billion.[2] Leveraged loans are typically made to companies seeking to refinance existing debt, to finance acquisitions or leveraged buyouts, or to fund projects and other corporate endeavours such as dividend recapitalisations. Although investment grade lending and leveraged lending volumes are roughly comparable, leveraged loans comprise the overwhelming majority of loans that are traded in the secondary market. Then there is the middle market. As traditionally defined, middle market lending includes loans of up to $500 million that are made to companies with annual revenues of under $500 million.[3] For these companies, the loan market is a primary source of funding. In 2016, middle market lending totalled approximately $245 billion, with $105 billion of that amount considered large middle market deals.[4]

Of these three market segments, it is the leveraged loan market that has evolved most dramatically over the past 30 years. Attracted by the higher returns of the loan asset class, the investor base expanded significantly starting from the mid-1990s and has grown increasingly more diverse. This, in turn, fuelled demand for loans, leading to a commensurate rise in loan origination volumes in the primary market which peaked in 2013 at more than $1 trillion. For the loan market to grow successfully, for the loan asset class to mature, and to ease the process of trading and settlement, the new entrants to the market in the 1990s needed uniform market practices and standardised trading documentation. In response to these needs, the Loan Syndications and Trading Association ("LSTA" or "Association") was formed in 1995, and its mission since inception has included the development of best practices, market standards, and trading documentation. The LSTA has thus successfully spearheaded efforts to increase the transparency, liquidity, and efficiency of the loan market; in turn, this more standardised loan asset class has directly contributed to the growth of a robust, liquid secondary market.

The LSTA's role has expanded since the Global Financial Crisis to meet new market challenges, assuming more prominence in the loan market generally and regularly engaging with the U.S. government and its regulatory bodies on legislative and regulatory initiatives. Policymaking in the wake of the financial crisis had included sweeping changes to the financial industry, including to the loan market, even though the regulatory impact on the loan market was sometimes an unintended byproduct of reform legislation aimed somewhere else. The LSTA has, therefore, dedicated substantial time and energy since the crisis to building awareness among regulators about the loan market and how it functions, seeking to distinguish it from other markets and, at times, persuading policymakers to exempt the loan market from particular legislative measures.

Now in the second phase of its regulatory outreach programme, the LSTA is maintaining a dialogue about the loan market with regulators and promoting the many benefits of a vibrant leveraged loan market for US companies.

This chapter examines: (i) the history of the leveraged loan market, focusing on the growth and maturation of the secondary trading market for leveraged loans; (ii) the role played by the LSTA in fostering that growth through its efforts to standardise the practices of, and documentation used by participants active in, the secondary loan market to bring greater transparency to the loan asset class; and (iii) the regulatory challenges faced by the loan market in a post-financial crisis environment, which our members believe is the most important concern for the loan market.

## Growth of the Secondary Market for Leveraged Loans

The story of the leveraged loan market starts about 30 years ago in the United States, with the first wave of loan market growth being driven by the corporate M&A activity of the late 1980s. Although a form of loan market had existed prior to that time, a more robust syndicated loan market did not emerge until the M&A deals of the 1980s and, in particular, those involving leveraged buy-outs

(LBOs), which required larger loans with higher interest rates. This had two significant consequences for the loan market. First, because banks found it difficult to underwrite very large loans on their own, they formed groups of lenders – syndicates – responsible for sharing the funding of such large corporate loans. Syndication enabled the banks to satisfy market demand while limiting their own risk exposure to any single borrower. Second, the higher interest rates associated with these large loans attracted non-bank lenders to the loan market, including traditional bond and equity investors, thus creating a new demand stream for syndicated loans. Retail mutual funds also entered the market at this time and began to structure their funds for the sole purpose of investing in bank loans. These loans generally were senior secured obligations with a floating interest rate. The resultant asset class had a favourable risk-adjusted return profile. Indeed, non-bank appetite for syndicated leveraged loans would be the primary driver of demand that helped propel the loan market's growth.[5]

Although banks continued to dominate both the primary market (where loans are originated) and the secondary market (where loans are traded), the influx of the new lender groups in the mid-1990s saw an inevitable change in market dynamics within the syndicated loan market. In response to the demands of this new investor class, the banks, which arranged syndicated loans, began modifying traditional deal structures, and, in particular, the features of the institutional tranche or term loan B, that portion of the deal which would typically be acquired by the institutional or non-bank lenders. The size of these tranches was increased to meet (or create) demand, their maturity dates were extended to suit the lenders' investment goals, and their amortisation schedules tailored to provide for only small or nominal instalments to be made until the final year when a large bullet payment was scheduled to be made by the borrower. In return, term loan B lenders were paid a higher rate of interest. All these structural changes contributed to a more aggressive risk-return profile, which was necessary in order to attract still more liquidity to the asset class.

A true secondary market for leveraged loans in the United States emerged in the 1990s. During the recession of the early 1990s, default rates rose sharply, which severely limited the availability of financing, particularly in transactions involving financing from regional and foreign banks. Interest rates to non-investment grade borrowers thus increased dramatically. Previously, banks had carried performing loans at par or face value on their balance sheets, while valuations below par (expected sale prices) were only generally assigned to loans that were in or near default. During the credit cycle of the early 1990s, however, a new practice developed in the banking industry. As banks in the U.S. sought to reduce their risk and strengthen their balance sheets, they chose to sell those leveraged loans which had declined in value since their syndication, rather than hold the loans until their maturity date as they had in the past. In so doing, a new distressed secondary market for leveraged loans emerged, consisting of both traditional (bank) and non-traditional (non-bank) buyers. Banks were not simply originators of these loans but now were also loan traders, and thus, in their role as market makers, began to provide liquidity for the market.

Although leveraged lending volume in the primary market had reached approximately $100 billion by 1995, trading activity was still relatively low, standing at approximately $40 billion.[6] The early bank loan trading desks at this time initially acted more as brokers than traders, simply brokering or matching up buyers and sellers of loans. As liquidity improved and the lender base expanded, investors began to look to the secondary market as a more effective platform from which to manage their risk exposure to loans, and eventually active portfolio management through secondary loan trading was born. With the advent of this new and vibrant secondary loan market,

there naturally was a greater need for standard trading documents and market practices which could service a fair, efficient, liquid, and professional trading market for commercial loans – a need reflected in the LSTA's creation in 1995. (The LSTA and its role in the development of a more standardised loan market are discussed more fully below, under "The Standardisation of a Market".)

Around the same time, the loan market acquired investment tools similar to those used by participants in other mature markets, for example, a pricing service, bank loan ratings, and other supporting vendor services. In 1996, the LSTA established a monthly dealer quote-based secondary mark-to-market process to value loans at a price indicative of where those loans would most likely trade. This enabled auditors and comptrollers of financial institutions that participated in secondary trading to validate the prices used by traders to mark their loan positions to "market". Within a few years, however, as leveraged lending topped $300 billion and secondary trading volume reached $80 billion, there was a need to "mark-to-market" loan positions on a more frequent basis.[7] In 1999, this led to the LSTA and Thomson Reuters Loan Pricing Corporation jointly forming the first secondary mark-to-market pricing service run by an independent third party to provide daily U.S. secondary market prices for loan market participants. Shortly thereafter, two other important milestones were reached, both of which facilitated greater liquidity and transparency. First, the rating agencies began to make bank loan ratings widely available to market participants. Second, the LSTA and Standard & Poor's together created the first loan index, the S&P/LSTA Leveraged Loan Index (LLI), which has become the standard benchmarking tool in the industry. Just as the market's viability was on the rise, so was its visibility. In 2000, the Wall Street Journal began weekly coverage of the syndicated loan market and published the pricing service's secondary market prices for the most widely quoted loans. All these tools – the pricing service, the bank loan ratings, the loan index, and the coverage of secondary loan prices by a major financial publication – were important building blocks for the loan market, positioning it for further successful growth.

At about this time, the scales tipped, and the leveraged loan market shifted from a bank-led market to an institutional investor-led market comprised of finance and insurance companies, hedge, high-yield and distressed funds, loan mutual funds, and structured vehicles such as collateralised loan obligations or "CLOs". Between 1995–2000, the number of loan investor groups managing bank loans grew by approximately 130% and accounted for more than 50% of new deal allocations in leveraged lending. By the turn of the millennium, leveraged lending volume was approximately $310 billion and annual secondary loan trading volume exceeded $100 billion as illustrated in the chart below. With these new institutional investors participating in the market, the syndicated loan market experienced a period of rapid development that allowed for impressive growth in both primary lending and secondary trading.



LSTA                                                                      An Overview of the Syndicated Loan Market

Unfortunately, as the credit cycle turned and default rates increased sharply in the early 2000s, there was a temporary lull in the market's growth, with secondary loan trading stalled for a number of years. By 2003, however, leveraged lending (and trading) volumes quickly rebounded as investor confidence was restored.

Even the most bullish of loan market participants could not have predicted the rate of expansion that would take place over the next four years. Once again, this growth was driven by M&A activity and large LBOs. Increasing by nearly 200% from 2003–2007, leveraged loan outstandings were more than half a trillion dollars and secondary trading volumes reached $520 billion. Although hedge funds, loan mutual funds, insurance companies, and other investor groups played a large part in this phase of the loan market's expansion, the growth had only been possible because of the emergence of CLOs. This structured finance vehicle changed the face of the leveraged loan market and was also responsible for its revival after the Global Financial Crisis.

The 2008 Global Financial Crisis led to a recession in the United States, a contraction of global supply and demand, and record levels of default rates. Several years passed before leveraged lending issuance was restored to pre-crisis levels, finally reaching $665 billion in 2012. Although secondary trading activity had been in steady decline from 2008 through 2012, the asset classes' investment thesis (senior secured, floating rate, high risk-adjusted return) coupled with the investment tools put in place years earlier and the standardisation of legal and market practices helped the market to expand further during its next phase which began in 2013.

At a time when other fixed income markets were reporting lower levels of trading activity, the loan market continued to exhibit a significant rise in liquidity. Loan trading volumes in 2014 reached a new high of $628 billion and the size of the loan market grew to an all-time high of $831 billion. It was surprising then that 2015 proved to be disappointing for loan investors. Portfolio managers had not anticipated the contagion that would spread as the price of oil plummeted and global economies weakened. LLI returns were negative 0.7% on the year, marking the first time since 2008 that annual returns were in the red. Annual secondary loan trade volumes, however, totalled $591 billion in 2015 – just a 6% decline from 2014's all-time high of $628 billion. Fortunately, disappointment with the market's performance was short-lived. In 2016, risk assets and commodities rallied, lifting loan returns above 10% for only the third time in the past 20 years. Although the tale of 2016 did not start on a high note, by March the market had begun a record-setting rally where loan prices in the secondary market ran higher through December. By year's end, the secondary market's V-shaped recovery was complete as the median trade price pushed back above par to 100.25. This "risk-on" recovery was the product of both favourable technicals (demand outstripped supply for most of the year) and stronger fundamentals.

### The Standardisation of a Market

No regulatory authority directly oversees or sets standards for the trading of loans in the United States, although, of course, loan market participants themselves are likely to be subject to other governmental and regulatory oversight. Instead, the LSTA leads the loan market by developing policies, guidelines, and standard documentation and promoting just and equitable market practices. The LSTA's focus is attuned to the distinctive structural features of the loan market which stem from the fact that corporate loans are privately negotiated debt obligations that are issued and traded subject to voluntary industry standards. Because the LSTA represents the interests of both the sellers and buyers of leveraged loans in the market, it serves as a central forum for the analysis and discussion of market issues by these different market constituents and thus is uniquely placed to balance their needs and drive consensus.

Loan market participants have generally adopted the standardised documents and best practices promulgated by the LSTA. The LSTA is active in the primary market, where agent banks originate syndicated loans, and in the secondary market, where loan traders buy and sell syndicated loans. Over the years, the Association has published a suite of standard trading documents: forms or "trade confirmations" are available to evidence oral loan trades made by parties and form agreements are available to document the terms and conditions upon which the parties can settle those trades. The adoption of the LSTA's standard trading documents by the market has directly contributed to the growth of a robust, liquid secondary market.

It is customary for leveraged loans to be traded in an over-the-counter market, and, in most instances, a trade becomes legally binding at the point the traders orally agree the material terms of the trade. Those key terms are generally accepted as including the borrower's name, the name, facility type, and amount of the loan to be sold, and the price to be paid for the loan. For commercial reasons, most U.S. borrowers choose New York law as the law governing their credit agreements, and for similar reasons, the LSTA has chosen New York as the governing law in their trading documentation. Since 2002, loan trades agreed over the telephone, like agreements relating to derivatives contracts and certain other financial instruments, have benefited from an exemption from a New York law which would otherwise require them to be set forth in a signed writing to be enforceable. Because of the LSTA's lobbying efforts, the applicable New York law was changed in 2002 to facilitate telephone trading. Thus, provided both parties have traded together previously on LSTA standard documentation, even if one party fails to sign a confirmation evidencing the terms of the trade, the loan trade will be legally binding and enforceable, if it can be shown that the parties orally agreed the material trade terms. This was a critical legislative reform that contributed to legal certainty in the loan market and harmonised its status with that of other asset classes.

After agreeing the essential trade terms, loan market practice requires that parties then execute a form of LSTA trade confirmation (the legislative change discussed above merely makes it possible legally to enforce an oral trade even if a confirmation has not been signed). Loans can be traded on what is referred to as par documentation or on distressed documentation. Two forms of trade confirmations are available for this purpose and the choice of which one to use is a business decision made at the time of trade. Performing loans, where the borrower is expected to pay in full and on a timely basis, are typically traded on par documentation which means that the parties evidence their binding oral trade by executing an LSTA Par Confirmation and then settling the trade by completing the form of Assignment Agreement provided in the relevant credit agreement (the term par is used because performing loans historically traded at or near par). Alternatively, where a borrower is in, or is perceived to be in, financial distress or the market is concerned about its ability to make all interest payments and repay the loan in full and on a timely basis, parties may opt to trade the borrower's loans on distressed documentation. In this case, the trade is documented on an LSTA Distressed Confirmation, and the parties settle the transaction by executing the relevant assignment agreement and a supplemental purchase and sale agreement. The LSTA has published a form agreement for this purpose which has been refined over the years and is generally used by the market. This agreement includes, amongst other provisions, representations and warranties, covenants, and indemnities given by seller and buyer. The adoption of standard documents in this regard, particularly for distressed debt trading,

significantly contributed to a more liquid loan market, for market participants, knowing that an asset is being traded repeatedly on standard documents, can then uniformly price the loan and more efficiently settle the trade.

When a loan is traded, the existing lender of record agrees to sell and assign all of its rights and obligations under the credit agreement to the buyer.[8] In turn, the buyer agrees to purchase and assume all of the lender's rights and obligations under the credit agreement. The parties must then submit their executed assignment agreement to the administrative agent which has been appointed by the lenders under the credit agreement. The borrower's and agent's consent is typically required before the assignment can become effective. Once those consents are obtained, the agent updates the register of lenders, and the buyer becomes a new lender of record under the credit agreement and a member of the syndicate of lenders.[9]

If, for some reason, the borrower does not consent to the loan transfer to the buyer, the parties' trade is still legally binding under the terms of the LSTA's Confirmation and must be settled as a participation.[10] The LSTA has published standardised par participation agreements and distressed participation agreements which may be used to settle par and distressed trades respectively where loan assignments are not permissible. Under this structure, the seller sells a 100% participation interest in the loan to the buyer and retains bare legal title of the loan. Although the seller remains a lender of record under the credit agreement and the borrower will not typically be aware that a participation interest in the loan has been sold, the seller must pass all interest and principal payments to the buyer for so long as the participation is in place. The transfer of a participation interest on LSTA standard documents is typically afforded sale accounting treatment under New York law. Thus, if the seller of the participation becomes a bankrupt entity, the participation is not part of the seller's estate, and the seller's estate will have no claim to the participation or the interest and principal payments related thereto.

The LSTA continues to expand its suite of trading documents and has increasingly played a more active role in the primary market. In 2014, the LSTA released new versions of its primary documents, including an expanded publication of its Model Credit Agreement Provisions which now include language addressing refinancing mechanics, "amend and extends" whereby certain lenders may extend their loan's maturity date in exchange for a higher margin (pursuant to this post-financial crisis credit agreement development, only those lenders participating in the extension need consent to it), sponsor and borrower acquisitions of loans on the open market or through a "Dutch Auction" procedure, and guidelines regarding the borrower's creation and updating of a list of entities and competitors it seeks to ban from joining the syndicate of lenders or acquiring participations in the loan. In 2016, the *LSTA's Complete Credit Agreement Guide* was published; this textbook is a comprehensive resource for understanding the complexities of today's syndicated credit agreements, providing in-depth explanations of credit terms, market trends, and global forces that impact the negotiation of each new deal. This year, the LSTA plans to finalise Model Credit Agreement Provisions for Investment Grade Revolving Credit Financings and its first complete Form of Investment Grade Credit Agreement.

### Regulatory Challenges

2016 saw continued heightened regulatory scrutiny of the US loan market while a new regulatory focus on loans emerged in Europe. For the last three years, institutions regulated by the US banking regulators have been at times frustrated as they competed for European deals hamstrung by the Interagency Guidance on Leveraged Lending ("US Guidance").[11] The US Guidance is not a rule but has been largely applied as such by the US banking regulators. In addition to rigorous reporting and monitoring requirements, the US Guidance indicates certain criteria to be considered in developing an institution's "leveraged lending" definition, including whether a loan's leverage exceeds 3x senior debt to EBITDA or 4x total debt to EBITDA. It further restricts banks from originating – defined broadly to include amendments and refinancings – a non-pass credit. In the years following the US Guidance's release, the banks endeavoured to comply and as the paths to conformance became clearer, the market saw US banks retreat from deals for which there was market demand, but which would not pass regulatory muster. At the same time, US banks watched their non-US counterparts able to participate in these deals. That trend may very well have ended now that the European Central Bank ("ECB") has published draft guidance of its own in November 2016 ("Draft Guidance").[12] The ECB's Draft Guidance applies to all "significant credit institutions" supervised by the ECB under the Single Supervisory Mechanism, but, like its US counterpart, would not apply to nonbank lenders. Even though the Draft Guidance's goals are aligned with the US Guidance, institutions that did not have significant business in the US may be facing painful change. Moreover, because of the market dynamics in Europe, as Fitch Ratings recently pointed out, because banks represent a significant share of the European leveraged credit markets and European leveraged credit investors rely more heavily on supply from private equity sponsors, the potential impact in Europe may be particularly significant.[13] On the other side of the coin, for European banks with businesses already subject to the US Guidance, these entities may welcome the ECB's actions as a step toward a more level playing field globally.

Substantively, the US Guidance and the ECB's Draft Guidance are very much aligned: both recommend banks' definitions of leveraged transactions include loans where the borrower's post-financing leverage exceeds 4x EBITDA; both note that underwriting transactions presenting a total debt to EBITDA ratio in excess of 6x raise concerns for most industries; both recommend that borrowers should show the cash-flow ability to repay at least half of its total debt in five to seven years and both question weak covenant features, such as the absence of, or where there is significant headroom in, financial covenants. In some ways, however, the Draft Guidance goes even further. The Draft Guidance does not have any of the comforting language granting latitude for workouts and troubled credits found in the US Guidance, and critically, EBITDA in the Draft Guidance refers to "*unadjusted* EBITDA".[14] The use of unadjusted EBITDA would not only be a novel regulatory move, but also one that is totally at odds with the metrics used in financings. In the US, where the guidance uses adjusted EBITDA which permits some assumptions, recent data showed the average leverage level of M&A deals goes up roughly a turn when non-adjusted EBITDA is used.[15] That being said, EBITDA addbacks may be the next frontier of regulatory scrutiny. At the beginning of 2016, anecdotal feedback indicated that the US banks had largely determined how the bank examiners were interpreting and applying the US Guidance and were well on their way to conformance. In July, the regulators "found the incidence of non-pass originations ha[d] reduced to a de minimis level",[16] meaning that banks were conforming with the requirement to only originate loans to companies that show the ability to repay all senior debt or half of total debt in five to seven years from base cashflows. That same SNC Review flagged several areas of continued concern, but overall, the banks received a good report card and "examiners noted continued progress toward full compliance with underwriting and risk management expectations".[17] In only a matter of months, however, the spectre of noncompliance again

© Published and reproduced with kind permission by Global Legal Group Ltd, London

loomed.  Rumblings that the regulators were concerned that US banks were again originating non-pass credits were picked up in the financial headlines as at least three deals were flagged as problematic due to inappropriate and unsupported EBITDA adjustments.  It is likely this focus will continue in 2017, even as industry comments to the ECB have argued against incorporating unadjusted EBITDA in the final guidance.  Finally, as the US and Europe's regimes are converging, it should be noted that the Bank of England (BOE) in the UK has decided that no regulatory action is required to address risks in the UK market.[18]  The BOE has indicated that they will continue to monitor this space; for now, it seems there may be a competitive advantage for these institutions.  How meaningful any regulatory arbitrage will prove to be is unclear.  And, of course, the BOE may certainly decide in time to revisit releasing guidance of its own, but in light of an eventual Brexit, that may be a complicated decision.

As 2017 unfolds, the regulatory landscape for leveraged loans continues to move.  Europe will soon begin the odyssey of figuring out what the ECB's guidance says, does and means for the loan business.  Unfortunately, three years after the US Guidance was released, it seems US banks, who thought they may have concluded their journey, may still be *en route*.  It is true that many US market participants have allowed themselves to hope that the post-crisis regulatory *status quo* is in for a shake-up.  With the election of Donald Trump and conservative majorities in both houses of the US Congress, regulatory change in the finance sector is at the very least possible and likely probable.  However, at the time of writing, it is early days in the Trump administration, so speculation is still the name of the game.  There have been beacons of hope for financial regulatory reform, such as Trump's February 3rd executive order outlining core principles for the regulation of the U.S. financial system.  These principles include making regulation efficient, effective, and appropriately tailored.  Although this may seem like music to the ears of many, it is still a long road to regulatory change.  Look at the US Guidance, for instance, the reality is that the professional staff at the banking agencies will not change overnight and that the staff seems happy with the impact the US Guidance is having.  Trump will eventually appoint new heads to the OCC, the Fed and FDIC (as well as a Vice-Chair for Supervision at the Fed).  Once these appointments are confirmed, the tone at the top may begin to change, but that is still in the distance.

## Conclusion

Today's loan market certainly looks very different from that before the financial crisis.  We are experiencing a new and more challenging period, not only for investors but also for the LSTA.  Loan prices are now said to be closely correlated to, and no longer shielded from, the daily price fluctuations of other asset classes.  Although the risk-adjusted returns of leveraged loans are still advantageous, today's returns come with a higher level of volatility.  In this environment, the LSTA remains committed to promoting a fair, efficient, and liquid market for loans and maintaining its position as the market's principal advocate.

## Endnotes

1. Thomson Reuters Loan Pricing Corporation.
2. Thomson Reuters Loan Pricing Corporation.  "Leveraged" is normally defined by a bank loan rating by Standard & Poor's of BB+ and below (by Moody's Investor Service, Ba1 and below) or, for non-rated companies, typically an interest rate spread of LIBOR + 125 basis points.
3. For a more detailed description on the loan market sectors, see Peter C. Vaky, Introduction to the Syndicated Loan Market, in THE HANDBOOK OF LOAN SYNDICATIONS & TRADING, 39 (Allison Taylor and Alicia Sansone, eds., 2007); Steve Miller, Players in the Market, in THE HANDBOOK OF LOAN SYNDICATIONS & TRADING, *supra*, 47.
4. Thomson Reuters Loan Pricing Corporation.
5. For a more detailed description of the history of the loan market, see Allison A. Taylor and Ruth Yang, Evolution of the Primary and Secondary Leveraged Loan Markets, in THE HANDBOOK OF LOAN SYNDICATIONS & TRADING, *supra*, 21.
6. Thomson Reuters Loan Pricing Corporation.
7. Thomson Reuters Loan Pricing Corporation.
8. For a detailed comparison of assignments and participations, see Michael Bellucci and Jerome McCluskey, THE LSTA'S COMPLETE CREDIT AGREEMENT GUIDE, 2nd ed., 541–542 (McGraw-Hill 2016).
9. For further information on the structure of assignments, see *id*. at 543–561.
10. For further information on the structure of participations, see *id*. at 561–567.
11. Interagency Guidance on Leveraged Lending, 78 Fed. Reg. 17766 (Mar. 22, 2013) issued by the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC") and the Board of Governors of the Federal Reserve System ("Federal Reserve").
12. ECB Supervisory Authority's Public consultation on the draft guidance on leveraged transactions", dated Nov. 23, 2016, *available at* https://www.bankingsupervision.europa.eu/legalframework/publiccons/html/leveraged_transactions.en.html.
13. Fitch Ratings, "European Leveraged Credit May Suffer If US-Style Guidelines Introduced", Sept. 23, 2016, *available at* https://www.fitchratings.com/site/dam/jcr:64c72ed0-0115-47a1-8581-169c8d785850/European%20Leveraged%20Credit%20May%20Suffer%20if%20US-Style%20Guidelines%20Introduced.pdf.
14. Draft Guidance, footnote 7.
15. CR Trendlines published by Covenant Review on Dec. 13, 2016, *available at* https://covenantreview.com/samples/download/29.
16. Shared National Credits Program, 1st Quarter 2016 Review, July 2016, *available at*: https://www.federalreserve.gov/newsevents/press/bcreg/bcreg20160729a1.pdf ("SNC Review"), p. 3.
17. *Id.*
18. Bank of England News Release, "Financial Policy Committee statement from its meeting, 24 March 2015", dated Mar. 26, 2015, *available at* http://www.bankofengland.co.uk/publications/Pages/news/2015/021.aspx.

LSTA                                                                         An Overview of the Syndicated Loan Market



**Bridget Marsh**

The Loan Syndications and Trading Association    Tel:    +1 212 880 3000
366 Madison Avenue, 15th Floor                                  Email: bmarsh@lsta.org
New York, NY 10017                                                       URL:    www.lsta.org
USA

Bridget Marsh is Executive Vice President and Deputy General Counsel of the Loan Syndications and Trading Association (LSTA).  Bridget leads the legal projects for the development and standardisation of the LSTA's documentation, is responsible for addressing secondary loan market trading disruptions, and ensures that the LSTA's legal products reflect current market practices.  Bridget regularly speaks on the loan market at American Bar Association events and is a Fellow of the American College of Commercial Finance Lawyers.

Prior to joining the LSTA, Bridget practised as a corporate finance attorney at Milbank, New York, and as a lawyer in the corporate department of Simmons & Simmons, London, and completed a judicial clerkship for The Honorable Justice Beaumont of the Federal Court of Australia.  Bridget Marsh received a B.A. magna cum laude from Georgetown University, a law degree with first class honours from Sydney Law School, University of Sydney, and a Master's in Political Science from the University of New South Wales.  She is admitted as an attorney in New York, England & Wales, and New South Wales, Australia.



**Ted Basta**

The Loan Syndications and Trading Association    Tel:    +1 212 880 3000
366 Madison Avenue, 15th Floor                                  Email: tbasta@lsta.org
New York, NY 10017                                                       URL:    www.lsta.org
USA

Ted Basta is Senior Vice President of Market Data & Analysis for the LSTA, where he manages key strategic partnerships and products of the LSTA, including the LSTA's trade and settlement data initiatives, the LSTA/Thomson Reuters LPC Mark-to-Market Pricing Service and the S&P/LSTA Leveraged Loan Index.  In addition, Ted manages the LSTA's Market Data and Analysis team which is responsible for the Association's analytical and reporting initiatives all of which enhance market visibility, transparency and liquidity.  Those efforts include the continued development, expansion and distribution to loan market participants of market analytics and secondary trading and settlement data.

Prior to joining the LSTA, Ted was Vice President and Director of Global Pricing with Loan Pricing Corporation (LPC), where he managed the LSTA/LPC Mark-to-Market Pricing Service.  Ted received an M.B.A. from the Zicklin School of Business at Baruch College and a B.A. in Accounting from Long Island University.



**Tess Virmani**

The Loan Syndications and Trading Association    Tel:    +1 212 880 3000
366 Madison Avenue, 15th Floor                                  Email: tvirmani@lsta.org
New York, NY 10017                                                       URL:    www.lsta.org
USA

Tess Virmani is Senior Vice President & Associate General Counsel of the Loan Syndications and Trading Association (LSTA).  Ms. Virmani works with the LSTA's Primary Market Committee and Trade Practices and Forms Committee on legal projects for the development, standardisation and revision of the LSTA's documentation and is also involved in resolving secondary loan market trading disruptions.  In addition, Ms. Virmani participates in the LSTA's advocacy efforts, including comment letters and engagement with regulators.

Prior to joining the LSTA, Ms. Virmani spent three years practising as a finance attorney at Skadden, Arps, Slate, Meagher & Flom LLP, New York.  She received a B.S. from the School of Foreign Service at Georgetown University and a J.D. from Fordham University School of Law.  She is admitted as an attorney in New York.



Since 1995, the Loan Syndications and Trading Association has been dedicated to improving liquidity and transparency in the floating rate corporate loan market.  As the principal advocate for this asset class, we aim to foster fair and consistent market practices to advance the interest of the marketplace as a whole and promote the highest degree of confidence for investors in floating rate corporate loans.  The LSTA undertakes a variety of activities to foster the development of policies and market practices designed to promote just and equitable marketplace principles and to encourage coordination with firms facilitating transactions in loans and related claims.  For more information, please visit www.lsta.org.

© Published and reproduced with kind permission by Global Legal Group Ltd, London