**EXHIBIT 8**

**ABI Journal Article**

# AMERICAN BANKRUPTCY INSTITUTE JOURNAL

July/August 2010  •  The Essential Resource for Today's Busy Insolvency Professional  •  Vol. XXIX, No. 6

# Claims Trading: The Wild West of Chapter 11s

**Written by:**
Aaron L. Hammer
Freeborn & Peters LLP; Chicago
ahammer@freebornpeters.com

Michael A. Brandess
Freeborn & Peters LLP; Chicago
mbrandess@freebornpeters.com

> **About the Authors**
>
> Aaron Hammer is the coordinator and Michael Brandess is a member of Freeborn & Peters LLP's Bankruptcy, Reorganization and Creditors' Rights Practice Group in Chicago.

In his 19th century treatise, *The Principles of Economic Philosophy*, Henry Dunning MacLeod stated, "If we were asked—Who made the discovery which has most deeply affected the fortunes of the human race? We think, after full consideration, we might safely answer—The man who first discovered that a Debt is a Saleable Commodity."[1] Although MacLeod's bold assertion would not attain universal agreement, there is no question that bankruptcy claims trading has become a considerable secondary market. The practice of trading creditors' claims during the course of a bankruptcy has expanded in recent years to the extent that many attorneys and investors now concentrate their entire careers on this industry. While claims trading has matured into the now-recognizable billion-dollar practice, changes both in the economy and in pertinent regulations have ensured that the market will continue to evolve. With bankruptcy filings increasing considerably over the past few years, opportunities for such investments are likewise enjoying greater focus from interested parties.

Investors who purchase bankruptcy claims often hope to profit in one of three ways: (1) selling their claims within a short period of time for a profit; (2) exchanging their claims for debtors' more valuable assets; or (3) effectuating a reorganization plan in which debt is traded for equity in the company.[2] Market players are able to utilize investments to meet their specific objectives. For existing creditors, trading away their claims during the course of bankruptcy means that "instead of waiting for confirmation of the reorganization plan to determine the value of the claim and authorize its payment...the creditor may choose to sell its claim to a third party."[3] As with most investments, risk-averse parties are more likely to trade their interests.



*Aaron L. Hammer*

Since claims trading is left virtually unregulated by the Bankruptcy Code, the market has attracted numerous professionals from otherwise unrelated industries. This article analyzes claims trading by closely examining the following four areas: (1) the history and evolution of claims trading; (2) the lack of regulation on claims trading; (3) the role of claims trading in modern bankruptcy reorganizations; and (4) the future of claims trading.

## A Historical Perspective of Claims Trading

Although modern claims trading began in 1978 with the enactment of the Bankruptcy Code, the practice started much earlier. In the United States, "the first recorded instance of American fiduciaries trading claims against insolvent debtors predates all federal bankruptcy laws and goes back to 1790."[4] At that time, the original 13 colonies were insolvent, yet owed tremendous debts to soldiers, farmers and merchants for their respective roles in the Revolutionary War.[5] Early American investors purchased these debts for approximately one quarter of their par value, hoping that the new American government would assume full liability. These entrepreneurs demonstrated that "'trafficking in claims is as old as the Republic.'"[6]



*Michael A. Brandess*

Approximately one century later, Congress made its first attempt to regulate claims trading with the Bankruptcy Act of 1898.[7] The Act codified a court's equitable right to "limit any claim or stock acquired by such person or committee in contemplation or in the course of the proceeding under this chapter to the actual consideration paid for."[8] Pursuant to §§ 212 and 249 of the Bankruptcy Act of 1898, trading by fiduciaries was intensely scrutinized by the courts.[9] Even though the legislation was implemented with the intention of limiting claims trading, the relevant sections were rife with loopholes.[10] In the years leading up to the creation of the modern Bankruptcy Code in 1978, the decision regarding

---

1  Harvey Miller, "Chapter 11 in Transition: From Boom to Bust and Into the Future," 81 *Am. Bankr. L. J.* 375, 377 (2007); quoting Henry Dunning MacLeod, 31 *The Principles of Economic Philosophy* 481 (2d ed., Longmans, Green, Reader and Dyer, 1872).
2  Andrew Africk, "Trading Claims in Chapter 11: How Much Influence can be Purchased in Good Faith under Section 1126?," 139 *U. Pa. L. Rev.* 1393, 1394 (1990).
3  Michael H. Whitaker, "Regulating Claims Trading in Chapter 11 Bankruptcies: A Proposal for Mandatory Disclosure," 3 *Cornell J. L. & Pub. Pol'y* 303, 309 (1994).
4  Chaim J. Fortgang and Thomas Moers Mayer, "Trading Claims and Taking Control of Corporations in Chapter 11," 12 *Carodozo L. Rev.* 1, 25 (1990).
5  *See id.* at 25.
6  *Id.* at 26.
7  *See* Whitaker, *supra*, note 3, citing the Bankruptcy Act of 1898, §§ 212, 249.
8  Fortgang and Mayer, *supra*, note 4 (*quoting* the Bankruptcy Act of 1898, 11 U.S.C. § 212 (1976) (emphasis added)).
9  *Id.* at fn. 64; *quoting Pepper v. Litton*, 308 U.S. 295, 308-309 (1939) ("fiduciaries who trade in claims may have their claims rejected in whole or in part if honoring the claim 'would not be fair or equitable to other creditors.'").
10  *Id.* at 28. ("First, the sanctions against trading by fiduciaries were in each case remedies of the estate, not of the damaged claims seller. The beneficiaries of section 212 and 249 were the uninjured creditors who did not sell, not the injured creditors who did. The sanctions thus appeared somewhat illogical and the courts were not always eager to enforce them.").

*continued on page 62*

**ON THE INSIDE:** FORECLOSURE SALES IN BANKRUPTCY COURT  •  FURTHER ANALYSIS OF TWOMBLY/IQBAL  •  SUMMER REGIONAL CONFERENCES ROUNDUP

# *Claims Trading: The Wild West of Chapter 11s*
*from cover*

how to reflect the substance of §§ 212 and 249 was considered by both Congress and the National Conference of Bankruptcy Judges. However, when Congress later "reconciled the House and Senate bill into the final bill which became the Bankruptcy Code, Congress dropped" the sections pertaining to the regulation of claims trading.[11] For the next few years, the market would go completely unregulated.

In 1983, Congress enacted the Federal Rules of Bankruptcy Procedure, including Rule 3001(e), which pertains to the trading of claims.[12] From 1983-91, Rule 3001(e) "required not only that parties transferring claims inform the court that a transfer of claims was taking place, but also that they disclose the consideration paid for the transferred claims."[13] Therefore, the "challenges to claims trading focused on whether the sellers had access to adequate information to enable them to make an informed decision on the sale of their claim."[14] Accordingly, a hearing would take place prior to the execution of each trade, at which time the court would decide whether to authorize the transaction. The advisory committee notes encouraged judicial involvement, stating that Rule 3001(e)'s disclosure requirements would provide the court with grounds to intervene. As a result, judicial interference chilled claims trading activity.[15] Many of these transactions were denied largely because courts disliked the splitting of claims out of a fear that creditors could circumvent § 1126(c) of the Bankruptcy Code by increasing the size of a voting class for its own benefit.[16] Judicial scrutiny over the claims trading market continued throughout the 1980s.

## Lack of Claims Trading Regulation

In 1991, Fed. R. Bankr. P. 3001(e) was amended to limit the court's oversight on claims trading. The rule, as modified, denied courts the discretion to regulate the trading of claims. Fed. R. Bankr. P. 3001(e) currently limits judicial involvement in claims trading to dispute resolution between a transferor and transferee. Additionally, "only the transferor may object to a transfer. If no objection is timely filed, the court is required to affect the transfer."[17] The decision to reduce judicial intervention has lead to the current lack of regulation and the increased market activity. Courts are no longer able to examine the terms or consideration received from the transferee. The changes successfully limited judicial activism; however, the absence of market transparency left a considerable legacy.

While the Fed. R. Bankr. P. 3001(e) amendments severely restricted the court's discretion to intervene in the claims-trading market, judges have made individual attempts to regulate the practice by citing to alternative sections in the Bankruptcy Code. For instance, under § 1126(e), "so called 'vulture investors' who purchase claims against a debtor company in order to block confirmation of the debtor's plan of reorganization in order to propose their own plan and take control of the debtor company, may have their votes designated or disenfranchised."[18] In *In re Allegheny*, the court decided that votes must be disqualified if they are cast with the ulterior purpose of aiding interests the claimholder may have other than as a creditor.[19] *Allegheny* attempted to set boundaries for claims-trading practices; however, without the need for disclosure, courts are rarely informed of the claim-holder's intent when purchasing claims or voting on a plan of reorganization. *Allegheny* has proven to be the exception rather than the rule.

Additionally, recent case law has proven that traded claims are subject to disallowance under § 502(d) in certain situations. The *In re Enron Corp.* court made the distinction between a purchaser's rights and an assignee's rights. In 2004, Hon. **Arthur J. Gonzalez** of the U.S. Bankruptcy Court in the Southern District of New York ruled that § 502(d) pertained to all transfers.[20] Therefore, if the original creditor had received the claims in violation of § 502(d), the taint would follow the claims regardless of the claim-holder. However, the ruling was reversed, and on remand the court held, "sales and assignments can have very different consequences for the transferee...an assignor cannot give more than he has. By contrast...a purchaser does not stand in the shoes of the seller and, as a result, can obtain more than the transferor had in certain circumstances."[21] As this principle pertains to claims trading, "a personal disability that has attached to a creditor who transfers its claim will travel to the transferee if the claim is assigned, but will not travel to the transferee if the claim is sold."[22] The *Enron* ruling only affected claims obtained through assignment as opposed to those purchased. The holding has proven to have a minimal effect on the market.

## Role of Claims Trading in Modern Reorganizations

Aside from the few unsuccessful efforts to regulate claims trading in recent years, this over-the-counter (OTC) market has faced no regulatory challenges that would have threatened to stymie its growth. Following the 1991 amendments to Fed. R. Bankr. P. 3001, "distress investments came into vogue with the 'mega-bankruptcies' that followed in the wake of the leveraged buyout boom of the 1980s. With its prospects for high profits, claims trading in Chapter 11 became a Wall Street staple."[23] In 1992, the market was projected to include up to $300 million in traded claims.[24] By 2010, some estimates place the market as high as "hundreds of billions" of dollars.[25] Investors discovered that "you could buy claims at a steep discount from frustrated creditors and hopefully, within a relatively short period, realize

---

11 *Id.* at 30.
12 Fed. R. Bankr. P. 3001(e). Rule 3001(e) provides in part:
 (1) Transfer of claim other than for security before proof filed. If a claim has been transferred other than for security before proof of the claim has been filed, the proof of claim may be filed only by the transferee or an indenture trustee.
 (2) Transfer of claim other than for security after proof filed. If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 20 days of the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.
13 *See* Whitaker, *supra*, note 3, at 317.
14 W. Andrew P. Logan III, "Claims Trading: The Need for Further Amending Federal Rule of Bankruptcy Procedure 3001(e)(2)," 2 *Am. Bankr. Inst. L. Rev.* 495, 496 (1994).
15 *See* Whitaker, *supra*, note 3, at 319.
16 *Id.* at 321; *citing In re Ionosphere Clubs Inc.*, 119 B.R. 440 (Bankr. S.D.N.Y. 1990).
17 *Id.* at 320.
18 Logan, *supra*, note 14. at 502-3.
19 118 B.R. 282 (Bankr. W.D. Pa. 1990).
20 *See* Ronald L. Cohen and Laurie R. Binder, "Recent Developments in Claims Trading," 2005 *Ann. Surv. of Bankr. Law*, Part I § 17 (September 2006).
21 *In re Enron Corp.*, 279 B.R. 425, 436 (S.D.N.Y. 2007).
22 *Id.*
23 Frederick Tung, "Confirmation and Claims Trading," 90 *Nw. U. L. Rev.* 1684 at 1685 (1996).
24 *Id.*; *citing* Diana B. Henriques, "The Vulture Game," *N.Y. Times*, July 19, 1992, s 6 (Magazine), at 18.
25 Prof. Adam J. Levitin, "Bankruptcy Markets: Making Sense of Claims Trading," 4 *Brook. J. Corp. Fin. & Com. L.* at 74 (contending that because market is unregulated, there is no data to support how much market is actually worth).

double digit returns: The trading of distressed debt claims became a cottage industry."[26] The claims-trading market "started slowly and after the 1991 amendment of the Bankruptcy Rules that enhanced free trading of claims and the subsequent obligation imposed on financial institutions to liquefy bad loans, claims trading grew exponentially to the point that in many reorganization cases, a substantial portion of the creditor body changed from month to month."[27]

The claims-trading market has proven attractive because the purchaser assumes all of the seller's rights and disabilities of the claim for a fraction of the value of the debt.[28] As this market continues to evolve, broader varieties of investors find themselves interested in the practice. Individual speculators can even participate in the claims-trading market through mutual funds or through online brokers, such as secondmarket.com.[29] Following the 1991 amendments, numerous investors and corporate raiders began to use bankruptcy as a focal point for takeovers of both chapter 11 companies and their key assets.[30] Because claims grant creditors control to accept or reject a plan of reorganization under § 1129(a) of the Bankruptcy Code, the ownership of those claims endows upon the holder substantial authority in the reorganization.

Despite the vast benefits created by the market, claims trading has also generated negative implications on the structure of the reorganization process. "[T]he creation of an active secondary market for the trading of distressed debt—and the new opportunities for profit-taking created thereby—has fundamentally altered the traditional dynamic between the Chapter 11 debtor and its creditors."[31] Modern claims traders are often only interested in quick and substantial returns on their investments. In this capacity, hedge funds have taken a huge role in the chapter 11 reorganization process through actively participating in claims trading. These traders are often satisfied with the liquidation value of their claims rather than the more universally beneficial going-concern value. With minimal disclosure requirements, hedge funds are able to secure substantial interests in a chapter 11 entity. One disconcerting reality due to the lax disclosure requirements under Fed. R. Bankr. P. 3001(e) is that many hedge funds have begun establishing separate entities for the sole purpose of purchasing claims while remaining anonymous. Accordingly, "hedge funds and other distressed investors may move in and out of the various levels of a debtor's capital structure without the knowledge of the court, debtor, or other investors."[32]

Once investors have purchased a sufficient amount of claims in the debtor-entity, they can then influence the chapter 11 case by deciding whether to sell their interests or by taking equity in a chapter 11 plan. In either case, "chapter 11 may be seen as an M&A transaction."[33] The hedge funds have had two underlying effects on modern chapter 11 bankruptcies. First, because hedge funds are primarily concerned with quick returns from their investment, a majority of large chapter 11s have resulted in the sale of the debtor's business. Second, the cost of chapter 11 reorganizations has continued to increase.[34] Restructuring experts have tendered arguments both for and against the growing claims-trading market. Arguments in favor of claims trading contend that (1) distressed investors provide liquidity to lenders disinterested in taking part in the reorganization process, (2) the market provides a market-based valuation of claims and (3) claims trading often reduces the cost for entities looking to borrow capital.[35] Conversely, opponents of the claims-trading market argue that the practice has destabilized countless chapter 11 reorganizations. For example, testimony before Congress in March 2009 was that claims trading was a potential reason for Circuit City's inability to successfully reorganize.[36] One of the key problems associated with the claims-trading market and the absence of information is that "a sophisticated hedge fund with vast resources and expertise may take advantage of an unsophisticated, unsecured, and possibly even 'involuntary' creditor."[37]

The claims-trading market continues to grow and is doing so without any regulatory guidance. Secondmarket.com reported that a record high $3.76 billion in claims were traded in April 2010.[38] Investment opportunities are available everywhere and to everyone—from the online broker targeting consumers to hedge funds operating with considerable liquidity and opaque motivations. Bankruptcy judges and experts advocate in favor of greater transparency in the market, while savvy investors continue to manipulate bankruptcy reorganizations through the buying and selling of claims.

### The Future of Claims Trading

With the relative absence of liquidity in the marketplace since 2007, chapter 11 reorganizations have become increasingly complicated. The claims-trading market both frustrates the reorganization process, yet infuses much needed capital, creating mixed results. While additional regulation would negate many of the practice's current benefits, it would also eliminate many of the complications created when claims change hands. A recent law journal article suggests utilizing creditors' committees as platforms to promote claims trading[39]—"facilitating claims trading is part of creditors' committees' duties" either in the effort to maximize the profitability of their claims or by providing them with an easy and appropriate exit strategy."[40]

Ultimately, the lack of transparency in this booming market leaves the future difficult to predict. While increased disclosure mandates would provide greater protections for unsophisticated creditors attempting to sell their claims, such regulations would detract from many of the profitable opportunities currently enjoyed. Sen. Christopher Dodd's 2010 financial reform bill, which seeks to regulate OTC derivative trading, suggests that Congress is willing to exchange market activity for economic stability.[41] However, until there is concrete proof rather than mere speculation that claims trading has caused a substantial reorganization effort to fail, amending Rule 3001(e) to provide for greater transparency is unlikely to occur. ■

---

26 Miller, *supra*, note 1 at 389.
27 *Id.* at 389-90.
28 *See Shropshire, Woodliff & Co. v. Bush*, 204 U.S. 186, 189 (holding that "priority is attached to the debt, and not to the person of the creditor; to the claim, and not to the claimant").
29 Secondmarket.com's claims trading site can be found at www.secondmarket.com/markets/bankruptcy-claims.html?gclid=ClPetZ_5oZoCFSQeDQodamTC-Q. Secondmarket.com is one example of a claims trading platform, and there are other similar platforms currently in use.
30 *See* 9 Bankr. Dev. J. at fn. 1.
31 James H.M. Sprayregen, Jonathan S. Henes, Lisa G. Laukitis and Javier Schiffrin, "Vulture Investors Heed Caution: Creditors Committees and Trading May be a Dangerous Combination," *Financier Worldwide* (April 2004) (available at www.kirkland.com/siteFiles/kirkexp/publications/2408/Document1/Vulture%20Investors%20Heed%20Caution.pdf).

32 Kevin J. Coco, "Empty Manipulation: Bankruptcy Procedure Rule 2019 and Ownership Disclosure in Chapter 11 Cases," 2008 *Colum. Bus. L. Rev.* 610, 618 (2008).
33 Miller, *supra*, note 1, at 395.
34 *See id.* ("A 'free market' of reorganization has emerged. This is exactly what existed 100 years ago before the Supreme Court and then Congress intervened to change the system because it was rife with corruption.").
35 *See id.* at 615.
36 "Circuit City Unplugged: Why Did Chapter 11 Fail to Save 34,000 Jobs?," 111th Cong., 1st Sess. (March 11, 2009) (testimony of Harvey Miller).
37 *Id.* at 616.

38 Emily Chasan, "Bankruptcy Claims Trading at Record High in April," Reuters (May 18, 2010) (available at www.reuters.com/article/idUSN1726466620100518).
39 Levitin, *supra*, note 25, at 108.
40 *Id.*
41 Restoring American Financial Stability Act of 2010, S.3217, 111th Cong., 2d Sess. (2010).

Copyright 2010    American Bankruptcy Institute.
Please contact ABI at (703) 739-0800 for reprint permission.