**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT | ) | No. 15 B 1145 |
| OPERATING CO., INC., *et al.*, | ) | (Jointly administered) |
| | ) | |
| Debtors. | ) | Judge Goldgar |

## MEMORANDUM OPINION

This matter is before the court on the omnibus objection of the reorganized debtors (collectively, "the debtors"), including Caesars Entertainment Operating Co., Inc. ("CEOC") and Showboat Atlantic City Propco LLC ("Showboat Propco"), to the claims of Stockton University, f/k/a The Richard Stockton College of New Jersey ("Stockton"), which have been transferred to Showboat Renaissance LLC ("Renaissance"). The debtors contend that Renaissance lacks standing to enforce the claims.

For the reasons below, the objection will be sustained. Although the debtors are wrong in calling it a "standing" problem, they are right that Renaissance cannot enforce the Stockton claims. The claims will be disallowed.

### 1. Jurisdiction

The court has subject matter jurisdiction under 28 U.S.C. § 1334(a) and the district court's Internal Operating Procedure 15(a). Because a claim objection is a matter "arising in" a case under Title 11, *see In re Montalbano*, 486 B.R. 436, 438 (Bankr. N.D. Ill. 2013); *In re Tripplett*, 115 B.R. 955, 958 (Bankr. N.D. Ill. 1990), the objection here is a core proceeding – both statutorily, *see* 28 U.S.C. § 157(b)(2)(B), and constitutionally, *see Schmid v. Bank of Am.,*

*N.A.*, 498 B.R. 221, 223-24 (W.D. Wis. 2013). The court may therefore enter a final judgment. *In re Smith*, 848 F.2d 813, 816 (7th Cir. 1988).

## 2. Background

The relevant facts are drawn from the parties' papers, the proofs of claim, the identical "Addendum" attached to each proof of claim, and the court's docket.[1] The parties agree no facts are in dispute. (*See* Dkt. No. 7890, Tr. dated Feb. 21, 2018, at 4).[2]

### a. Origin of the Stockton Claims

The origin of the dispute lies in a casino sale three decades ago. In 1988, Trump Taj Mahal Associates LP and Trump Taj Mahal Realty Corp. (the "Trump entities") sold the Showboat Hotel and Casino in Atlantic City, New Jersey (the "Showboat property") to Atlantic City Showboat, Inc., a predecessor to debtor Showboat Propco. The sale documents contained a use covenant that said the Showboat property could only be operated as a "first class hotel casino" until December 15, 2082 – nearly a century (the "Trump use covenant"). The Trump use covenant was duly recorded on November 17, 1988, and March 14, 1989, with the Clerk of Atlantic County, New Jersey.

Sixteen years later, in September 2014, Showboat Propco entered into negotiations to sell the Showboat property to Stockton. At the time, the casino on the Showboat property was

---

[1]  The proofs of claim were not filed with the parties' papers but are available on the claims register. In these cases, a private claims agent, Prime Clerk, LLC, maintains the claims register rather than the clerk of the bankruptcy court. *See* 28 U.S.C. § 156(c); (Dkt. No. 51). The claims register can be accessed at https://cases.primeclerk.com/ceoc/.

[2]  The docket in the lead case (No. 15 B 1145) is cited as "Dkt. No. ___." The docket in the Showboat Propco case (No. 15 B 1258) is cited as "SP Dkt. No. ___."

shuttered.[3] Stockton planned to build and operate a university campus extension there. The negotiations between Showboat Propco and Stockton lasted about four months. During that period, no one from CEOC or Showboat Propco told Stockton about the Trump use covenant, and Stockton did not conduct a title search that would have revealed its existence.

The Trump use covenant must either have been forgotten or ignored, because during the negotiations Showboat Propco recorded a Declaration of Restrictive Covenant with the county clerk that prohibited gaming or gambling on the Showboat property until November 2024 and gave CEOC enforcement rights (the "Showboat restrictive covenant").[4] The Showboat restrictive covenant directly contradicted the Trump use covenant. One prohibited gaming or gambling; the other required it.

The contradiction went unnoticed. A month later, Stockton and Showboat Propco came to final terms on the sale. Stockton agreed to buy the Showboat property for $18 million. Stockton knew about the Showboat restrictive covenant but had no concerns: the Showboat property would be used as a university campus, not a casino.

But Stockton claims to have been unaware of the Trump use covenant. According to Stockton, it first learned of the Trump use covenant when it at last obtained a title report a week

---

[3]    In their disclosure statement, the debtors explained that four of their Atlantic City casinos closed in 2014, including the Showboat casino at issue. (Dkt. No. 4220, Ex. 1 at 28). The closings were attributed to "significant challenges in the Atlantic City market," including "the effects of Hurricanes Irene and Sandy on the local economy, an oversaturated local market, and increased competition from casinos on the East coast." (*Id.*).

[4]    Specifically, the Showboat restrictive covenant prohibited "(a) any Gaming or Gambling, (b) any maintaining or operating of an Establishment, or (c) the use of the Restricted Property or any portion thereof as the basis for Online Gaming, or the housing of any electronic equipment utilized in connection with Online Gaming, regardless of when or where such Online Gaming takes place . . . ."

-3-

or so before the closing set for December 12, 2014. Stockton was understandably troubled at the

discovery: Stockton had thought the Showboat property encumbered with a covenant prohibiting

gaming, not one demanding it. Stockton told CEOC and Showboat Propco there would be no

deal unless the Trump use covenant were released.

CEOC and Showboat Propco were receptive to Stockton's concerns. They asked the

Trump entities about a release, and the Trump entities were willing to consider one. But there

was a hitch. The Trump entities were themselves debtors in bankruptcy cases. Releasing a use

covenant in their favor would arguably require bankruptcy court approval – after 21-days notice

and hearing. *See* 11 U.S.C. § 363(b)(1); Fed. R. Bank. P. 2002(a)(2). A release could not be

obtained in time for the December 12 closing.[5]

To avoid postponing the closing date, the parties agreed to add to the Purchase and Sale

Agreement (the "PSA") a provision addressing the Trump use covenant:

> From and after the Closing, [Showboat Propco] shall use
> commercially reasonable efforts, at its sole cost and expense, to
> obtain from [the Trump entities] (with . . . bankruptcy court
> approval) an executed written release of the [Trump use covenant]
> in recordable form . . . . If and when [Showboat Propco] obtains
> such Use Covenant Release, [Showboat Propco] shall deliver the
> original thereof to [Stockton]. From and after the Closing Date
> and continuing until such time as [Showboat Propco] delivers to
> [Stockton] such Use Covenant Release, if at all, [Showboat
> Propco] shall indemnify, defend and hold harmless [Stockton]
> from any Liabilities arising out of or in connection with any claim
> or action by [the Trump entities] (or successors or assigns) to
> enforce the Use Covenant against the Property and/or any
> judgment thereon (the "Use Covenant Indemnification
> Obligations").

The "Liabilities" were defined as "all damages, claims, demands, liens, costs, judgments, losses,

---

[5]    Apparently, no one considered asking the bankruptcy court to shorten the notice
period. *See* Fed. R. Bankr. P. 9006(c)(1) (permitting certain periods to be shortened "for cause").

liabilities and expenses, including, without limitation, reasonable attorneys' fees and costs."
CEOC agreed in the PSA to guarantee Showboat Propco's "payment and performance" of its
indemnification obligation.

The parties agreed that the PSA would " inure to the benefit of and be binding on the
parties . . . and their respective heirs, legal representatives, successors, and assigns." Critically,
though, the PSA's binding effect was subject to a condition: Stockton could not assign its rights
or delegate its duties under the PSA "without the prior written consent of [Showboat Propco]."

The PSA was signed, the sale closed, and Stockton took possession of the Showboat
property.

About a month later, on January 15, 2015, CEOC, Showboat Propco, and more than 150
other Caesars affiliates filed voluntary chapter 11 petitions. As of the petition date, Showboat
Propco and CEOC had not obtained a release of the Trump use covenant. In fact, they never
obtained one. (They claim to have tried in early 2015, even characterizing their efforts as
"robust." (*See* Obj. at 11). But if so, they were unsuccessful.)

With the Trump use covenant still in place, the chief executive officer of Trump
Entertainment Resorts, Inc. (parent of the Trump entities) warned Stockton in March 2015 that
the Trump entities would be "forced to exercise all available remedies" in connection with
Stockton's breach. (Resp. at 5). This appears to have been so much noise. Nothing in the record
suggests the Trump entities ever took any action against Stockton.

Still, Stockton maintained that CEOC and Showboat Propco had not only breached the
PSA but had also committed fraud in connection with the sale of the Showboat property.
Because of the undisclosed and unreleased Trump use covenant, Stockton claimed to have
suffered nearly $10 million in costs in connection with a property it could not use. (*Id.* at 9).

### b. The Stockton Proofs of Claim

Stockton filed two identical proofs of claim in the jointly-administered bankruptcy cases,

No. 3597 against CEOC and No. 4223 against Showboat Propco on May 23, 2015. The claims

were later amended on November 24, 2015, by proofs of claim Nos. 5575 and 5574,

respectively.[6] The amended claims are also identical.

In the proofs of claim, Stockton alleges that CEOC and Showboat Propco are liable to it

in connection with the sale of the Showboat property under a host of tort and breach of contract

theories. Specifically, the proofs of claim list the following "claims and/or causes of action

relating to the Showboat Transaction and/or arising under and relating to the [PSA]":

> a. breach of contract
> b. breach of the duty of good faith and fair dealing;
> c. breach of express representations, warranties and covenants;
> d. fraud in the inducement, and/or fraud in the execution;
> e. fraud in the performance;
> f. intentional or negligent misrepresentations;
> g. fraudulent intentional or negligent concealment of material facts;
> h. unjust enrichment and unclean hands;
> i. indemnification; and
> j. action to quiet title to the [Showboat property] and/or declaratory relief with respect to the unenforceability of the [restrictive covenant].[7]

---

[6]      Although Stockton says in the Addendum that "[t]his amended proof of claim is in addition to any other . . . proof of claim," the amended claims appear to have been meant to supersede the original claims. For example, when the claims were transferred to Renaissance (a subject discussed below), the notices of transfer referred to the original claims "as amended." The parties' papers do not distinguish between the original and amended claims.

[7]      Other aspects of the Stockton claims are harder to discern. Rather than fill in the sections on the Official Form calling for a creditor to specify the "amount of claim," "basis for claim" "amount of secured claim," "basis of perfection," and "amount unsecured," Stockton simply referred to the Addendum. As a consequence, the proofs of claim do not describe the amounts of the claims, say whether the claims are secured or unsecured, and if secured provide the basis of perfection. What matters for current purposes, though, are the legal bases of the

### c. Stockton's Transfer of the Claims

In January 2016, less than a year after filing its proofs of claim, Stockton sold the

Showboat property to Renaissance for $23 million. In September 2016, Renaissance was able to

obtain from the Trump entities a release of the Trump use covenant. According to the debtors,

Renaissance now operates a hotel on the Showboat property. (Obj. at 5).

As part of the sale, Stockton assigned to Renaissance its claims against Showboat Propco

and CEOC. The assignment was made under a Partial Assignment of Claims Agreement dated

January 15, 2016. (*See* Dkt. No. 3397; SP Dkt. No. 9).

On February 23, 2016, Renaissance filed notices of transfer in the CEOC and Showboat

Propco bankruptcy cases showing "Stockton University" as the transferor and "Showboat

Renaissance LLC" as the transferee. (Dkt. No. 3307; SP Dkt. No. 7).

The notices of transfer were necessary to comply with Bankruptcy Rule 3001(e)(2), Fed.

R. Bankr. P. 3001(e)(2), which supplies the procedure when a claimant transfers its claim other

than for security. Rule 3001(e)(2) requires the clerk of the court to notify the transferor when a

purported transferee files "evidence of a transfer." Fed. R. Bankr. P. 3001(e)(2). The transferor

then has 21 days from the mailing of the notice to object. *Id.* If the "alleged transferor" does not

object in that time, "the transferee shall be substituted for the transferor." *Id.*

Prime Clerk mailed notices of the claim transfers to Stockton on March 14, 2016, in the

Showboat Propco case and on March 11, 2016, in the CEOC case. (Dkt. No. 3400; SP Dkt. No.

10). On March 15, Renaissance filed amended notices of transfer in both cases clarifying that the

---

claims. Those, at least, are evident.

transfers were made "to the extent provided for" in the Partial Assignment.[8] (Dkt. No. 3397; SP

Dkt. No. 9). Stockton was notified of the amended notice of transfer in the Showboat Propco

case on March 23, 2016 (SP Dkt. No. 11), but appears not to have been notified of the amended

transfer in the CEOC case. In any event, Stockton did not object to the transfers. Renaissance

was therefore "substituted" for Stockton. Renaissance is now the record holder of the claims.

Under the confirmed plan, holders of claims are entitled to certain cash distributions on

account of their claims, but only if and to the extent the claims are allowed. (Dkt. No. 6318 Ex.

1 at 44-54, 76-78, & 82-83). The debtors have objected to the allowance of the Stockton claims

on the ground that fatal problems with the assignment means Renaissance lacks "standing" to

assert the claims. The objection is fully briefed and ready for ruling.

### 3. Discussion

The debtors' objection will be sustained, but not on standing grounds. Renaissance does

have standing to assert the claims, as that term is properly understood. The claims will instead be

disallowed because Renaissance cannot enforce them. The obstacle to enforcement the debtors

raise is substantive, not jurisdictional.

### a. Standing

First, the "standing" point. Standing is a jurisdictional requirement rooted in Article III of

the Constitution, which confines a federal court's power to the adjudication of "cases" and

"controversies." U.S. Const. Art. III, § 2; *see Spokeo, Inc. v. Robins*, ___ U.S. ___, ___, 136

---

[8]    A copy of the Partial Assignment was not attached to the notices of transfer, nor is
the partial assignment discussed in the parties' papers. So it is unclear what the "extent of" the
assignment was.

S.Ct. 1540, 1547 (2016); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing

implements Article III by limiting "the category of litigants empowered to maintain a lawsuit in

federal court to seek redress for a legal wrong." *Spokeo*, ___ U.S. at ___, 136 S.Ct. at 1547. A

litigant has standing to seek redress only if he "is entitled to have the court decide the merits of

the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975).

Standing focuses on the party bringing the claim, not on the claim itself. 13A Charles

Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3531 at 2

(3d ed. 2008). Although a claim may be within the court's subject matter jurisdiction, the claim

is not justiciable if the "litigant advancing it is not properly situated to be entitled to its judicial

administration." *Id.* If the litigant lacks standing, the court cannot reach the merits but must

dismiss the matter for lack of jurisdiction. *See Cottrell v. Alcon Labs.*, 874 F.3d 154, 164 n.7 (3d

Cir. 2017); *Hope, Inc. v. DuPage County*, 738 F.2d 797, 804 (7th Cir. 1984).

To have standing, a party must demonstrate he has "(1) suffered an injury in fact, (2) that

is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed

by a favorable judicial decision." *Spokeo*, ___ U.S. at ___, 136 S.Ct. at 1547; *see also Lujan*,

504 U.S. at 560-61. Of these, the injury-in-fact element is "foremost." *Steel Co. v. Citizens for a*

*Better Environment*, 523 U.S. 83, 103 (1998). To satisfy it, the party "must show that he or she

suffered an invasion of a legally protected interest that is concrete and particularized and actual

or imminent, not conjectural or hypothetical." *Spokeo*, ___ U.S. at ___, 136 S.Ct. at 1548

(internal quotations omitted).

Renaissance plainly has standing to assert the Stockton claims. The claims assert, among

other things, a breach of contract. Invasion of a contract right qualifies as a concrete injury for

standing purposes. *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012). Renaissance may not

have been a party to the contract, but Stockton, which was a party and asserts a breach, assigned its claims for that breach to Renaissance. Assignees of claims belonging to injured parties have standing even though the assignees themselves did not suffer the injury. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 271 (2008); *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000); *American Orthopedic & Sports Med. v. Independence Blue Cross Blue Shield*, 890 F.3d 445, 454 (3d Cir. 2018) (explaining that "[a]n assignment purports to transfer ownership of a claim to the assignee, giving it standing to assert those rights and to sue on its own behalf"); *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 107 (2d Cir. 2008) (same).[2]

The debtors argue that Renaissance lacks "standing" to assert the claims because of problems, legal and factual, with the assignment itself. But those are arguments about Renaissance's entitlement to relief – substantive arguments, not arguments about standing. To have a justiciable claim, an assignee need only allege its right to pursue the claim through the assignment. *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008). As long as that much has been alleged, questions about the validity or effectiveness of the assignment go to the merits of the litigation, not to the assignee's standing. *See Perry v. Thomas*, 482 U.S. 483, 492 (1987) (rejecting argument that a plaintiff's inability to enforce an agreement raised a standing problem and characterizing the matter as a "straightforward issue of contract interpretation"); *Encompass Office Solutions, Inc. v. Connecticut Gen. Life Ins. Co.*, No. 3:11-CV-02487-L, 2017 WL

---

[2]    The other standing requirements are also plainly met. The alleged breach is "fairly traceable" to CEOC and Showboat Propco, *Spokeo*, ___ U.S. at ___, 136 S.Ct. at 1547, because they were the parties to the contract who allegedly breached it. The injury the alleged breach caused is " likely to be redressed by a favorable judicial decision," *id.*, because a favorable decision will result in a cash payment under the plan representing a portion of the damages suffered.

3268034, at *5-6 (N.D. Tex. July 31, 2017) (finding standing despite a questionable assignment);

*cf. Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 851 (10th Cir. 2015) (criticizing the contention

that the question whether someone is a party to a contract implicates standing, calling it instead

"a garden-variety question of [contract law]").[10/]

As the court of appeals has often explained, standing and entitlement to relief "are not the

same thing." *Arreola*, 546 F.3d at 794-95; *see also Booker-El v. Superintendent, Ind. St. Prison*,

668 F.3d 896, 899-900 (7th Cir. 2012); *Miller v. Herman*, 600 F.3d 726, 731 (7th Cir. 2010).

Standing is "a prerequisite to *filing suit*, while the underlying merits of a claim (and the laws

governing its resolution) determine whether the plaintiff is *entitled to relief*." *Arreola*, 546 F.3d

at 795 (emphasis in original). That a plaintiff cannot prove his right to relief does not mean he

lacked standing to pursue it in the first place. *Id.*; *see also Construction Indus. Ret. Fund v.*

*Kasper Trucking, Inc.*, 10 F.3d 465, 467 (7th Cir. 1993) (observing that "a litigant doomed to

lose does not for that reason lack standing to sue"); *Booker-El*, 668 F.3d at 900 (requiring only a

colorable claim of injury and noting that "[w]ere we to require more . . . , we would decide the

merits of the case before satisfying ourselves of standing").

Because Renaissance asserts an assignment of Stockton's claims, and because the claims

allege an injury (a breach of contract) fairly traceable to CEOC and Showboat Propco (the

breaching parties) and likely to be redressed by a favorable decision (through a payment under

the debtors' confirmed plan), Renaissance has standing to assert the Stockton claims. Whether it

---

[10/]      For this reason, perhaps, bankruptcy courts treat a so-called "standing" objection
that a claimant is not the owner of the claim as a substantive objection under section 502(b)(1),
11 U.S.C. § 502(b)(1), that the claim is not enforceable. *See, e.g., In re Richter*, 478 B.R. 30, 48
(Bankr. D. Colo. 2012); *In re Cleveland*, 396 B.R. 83, 93-94 (Bankr. N.D. Okla. 2008); *cf. In re*
*Perron*, 474 B.R. 310, 313 n.1 (D. Me. 2012) (declining to address a secured creditor's right to
enforce a note and mortgage as a question of "standing").

-11-

can enforce those claims against the bankruptcy estates is a different question.

### b. Enforceability

The answer to that question is no. Renaissance cannot enforce Stockton's claims. In the face of the debtor's arguments that the assignment of the claims was ineffective, arguments it does not contest, the only basis Renaissance offers for its right to enforce the claims is a rule of bankruptcy procedure that necessarily confers no substantive rights.

### i. Claim Objections Generally

To understand why this dispute ends up turning on a bankruptcy rule rather than, say, applicable nonbankruptcy law, some background on the claims process may be helpful.

Section 501 of the Bankruptcy Code allows creditors with claims to file proofs of claim. 11 U.S.C. § 501(a). When a proof of claim is filed under section 501, section 502 says that the claim is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a); *see In re Woods*, 316 B.R. 522, 527 (Bankr. N.D. Ill. 2004) ("A central feature of the claims allowance process is that once a proof of claim is filed, the claim is treated as allowed unless an objection is filed"). Section 502 also says that if an objection to the claim is made, the court must determine the amount of the claim as of the petition date unless it is subject to one or more grounds for disallowance. 11 U.S.C. § 502(b); *see In re Guidry,* 321 B.R. 712, 714 (Bankr. N.D. Ill. 2005).

The relevant ground for disallowance here is the first listed in the statute. Under section 502(b)(1), a claim will not be allowed if it is "unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured." 11 U.S.C. § 502(b)(1); *see also Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1104 (7th Cir. 2014). That a claim is "unenforceable" does not mean the creditor

holds no claim, only that it cannot be enforced under an agreement or under applicable nonbankruptcy law. *Midland Funding, LLC v. Johnson*, ___ U.S. ___, ___, 137 S.Ct. 1407, 1412 (2017).

Section 502(b)(1) "is most naturally understood to provide that, with limited exceptions, any defense to a claim that is available outside of the bankruptcy context is also available in bankruptcy." *Travelers Cas. & Sur. Co. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450 (2007). That understanding is consistent with "the settled principle that '[c]reditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provision of the Bankruptcy Code.'" *Id.* (quoting *Raleigh v. Illinois Dep't of Revenue*, 530 U.S. 15, 20 (2000)); *see also Midland Funding*, ___ U.S. at ___, 137 S.Ct. at 1411 ("[S]tate law usually determines whether a person has a [claim]").

Here, the agreement (if it were relevant) would be the PSA, and the applicable law (if it were relevant) would be New Jersey law.[11] But it turns out that neither is relevant.

### ii. The Tort Claims

New Jersey law is irrelevant to the Stockton tort claims because in response to the debtors' objection Renaissance has forfeited any argument under nonbankruptcy law that the tort claims are enforceable.

In their objection, the debtors argued that Renaissance could not pursue the assigned tort

---

[11]     The debtors maintain that New Jersey law applies. (Obj. at 7 n. 6). Renaissance agrees. (Resp. at 2, 8). When the parties agree on the law governing their dispute, federal courts defer to their agreement. *Travelers Cas. & Sur. Co. of Am., Inc. v. Northwestern Mut. Life Ins. Co.*, 480 F.3d 499, 500 (7th Cir. 2007); *In re Caesars Entm't Operating Co.*, 561 B.R. 420, 436 n.5 (Bankr. N.D. Ill. 2015).

claims because they were non-assignable under New Jersey law. The assignment of the tort

claims was therefore invalid. (Obj. at 7). In its response, Renaissance did not address the

argument. Indeed, Renaissance did not address the tort claims at all. Only the breach of contract

claims were addressed. (*See* Resp. at 8-11). In reply, the debtors noted that Renaissance made

"no mention of the tort claims" and suggested that "Renaissance is no longer pursuing [those]

claims." (Reply at 2 n.3). To this, Renaissance said nothing.

A party's failure to oppose an argument signals acquiescence, and acquiescence operates

as a forfeiture. *Boogaard v. National Hockey League*, 891 F.3d 289, 295 (7th Cir. 2018); *Sebesta

v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017) (dictum); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461,

466 (7th Cir. 2010); *Wojtas v. Capital Guardian Trust Co.*, 477 F.3d 924, 926 (7th Cir. 2007);

*Cincinnati Ins. Co. v. Eastern Atl. Ins. Co.*, 260 F.3d 742, 747 (7th Cir. 2001); *Kauthar SDN

BHD v. Sternberg*, 149 F.3d 659, 668 (7th Cir. 1998) ("We consistently have held that a party's

failure to address a claim in its opening brief results in a waiver of that issue"). Because

Renaissance did not respond to the debtors' objection concerning the tort claims, any argument

that the objection should be overruled and the tort claims allowed has been forfeited.[12]

In all likelihood, though, Renaissance made a conscious decision to let the tort claims go.

The debtors are correct: New Jersey forbids the assignment of tort claims (intentional or

otherwise) before judgment. *See Integrated Sols., Inc. v. Service Support Specialties, Inc.*, 124

F.3d 487, 490 (3d Cir. 1997) (applying New Jersey law); *Costanzo v. Costanzo*, 248 N.J. Super.

---

[12]        Older court of appeals decisions talked about "waiver" rather than "forfeiture."
More recent decisions draw a distinction, describing forfeiture as a "passive" failure to address a
point or press a claim and waiver as an "affirmative" decision, one that is "knowing and
intentional," not to do so. *See United States v. Groce*, 891 F.3d 260, 269 (7th Cir. 2018); *see
also United States v. Pankow*, 884 F.3d 785, 790 (7th Cir. 2018); *CNH Indus. Am. LLC v. Jones
Lang LaSalle Americas, Inc.*, 882 F.3d 692, 705 (7th Cir. 2018).

-14-

116, 121, 590 A.2d 268, 271 (N.J. Super. Ct. Law Div. 1991). Any purported assignment is

considered a nullity, leaving the assignee with nothing to enforce. *See Village of Ridgewood v.

Shell Oil Co.*, 289 N.J. Super. 181, 195, 673 A.2d 300, 307 (N.J. Super. Ct. App. Div. 1996).

Here, Stockton asserted claims based on various fraud theories, and as far as the record shows no

judgment has been entered on the claims. The tort claims were thus not legally assignable under

New Jersey law, and Renaissance cannot enforce them.

Because Renaissance has forfeited any argument in opposition to the debtors' objection to

the tort claims, and because the objection was well-taken in any event, the objection as to the tort

claims will be sustained.

### iii. The Breach of Contract Claims

The debtors' objection will also be sustained as to the breach of contract claims. Just as

New Jersey law is irrelevant to the tort claims, the PSA is irrelevant to the breach of contract

claims – not because Renaissance has forfeited its arguments under the PSA but because it has

waived them. The argument Renaissance has chosen to advance instead, one based on

Bankruptcy Rule 3002(e), is a non-starter.

In its objection, the debtors argued not only that Renaissance was not a party to the PSA

but also that Renaissance could obtain no rights under the PSA by assignment. (Obj. at 8 & n.8).

That was so, the debtors said, because the PSA forbade an assignment without the consent of

Showboat Propco, and consent had not been given or even requested. (*Id.*). Their

characterization was accurate. The PSA expressly barred Stockton from assigning its rights or

delegating its duties "without the prior written consent of [Showboat Propco]."

Confronted with this argument, Renaissance disclaimed any reliance on the PSA.

-15-

Renaissance declared in its response: "The PSA assignment language is not relevant –

Renaissance is not arguing that it is an assignee of all rights and obligations under the PSA.

Rather, Renaissance is the purchaser of the transferor's claims against the debtor, as

contemplated by the Bankruptcy Code which places Renaissance in Stockton's shoes." (Resp. at

10 n.8). Despite the passing reference to the "Bankruptcy Code," Renaissance cited and relied on

Bankruptcy Rule 3001(e)(2). (*Id.* at 8).[13] According to Renaissance, in other words, Rule

3001(e) permitted the assignment no matter what the PSA said. (*Id.*).

     Not so. Rule 3001(e) is a procedural rule. It governs procedure, not substance. When

claims are transferred other than for security, Rule 3001(e) says who can file the proof of claim if

a claim is transferred before the proof of claim is filed, Fed. R. Bankr. P. 3001(e)(1), requires

evidence of a transfer to be filed when a claim is transferred after the proof of claim is filed, Fed.

R. Bankr. P. 3001(e)(2), and creates a procedure for addressing objections to the transfer, *id.* But

that is all it does. It neither allows nor disallows transfers. It says nothing about whether

particular transfers are valid or invalid under nonbankruptcy law. It certainly does not override

anyone's contract rights. *See In re Woodbridge Grp. of Cos., LLC*, No. 17-12560 (KJC), 2018

WL 3131127, at *2 (Bankr. D. Del. June 20, 2018) (making this point).

     As if the rule were not clear enough on this score, the Advisory Committee Note confirms

that the intent of the rule is purely procedural. The Note provides: "[t]his rule is not intended . .

. to affect any remedies otherwise available under nonbankruptcy law to a transferor or

transferee." Fed. R. Bankr. P. 3001(e) advisory committee's note (1991); *see also* Geoffrey

---

[13]     The Code nowhere addresses the assignment of claims in a bankruptcy case. *See*
Tally M. Wiener, *On the Nature of the Transferred Bankruptcy Claim*, 12 U. Pa. J. Bus. L. 35, 41
(2010).

Groshong, *Trading Claims in Bankruptcy: Debtor Issues*, 10 Am. Bankr. Inst. L. Rev. 625, 642

(2002) (noting that Rule 3001(e) rule "is procedural" and does not render void or inapplicable

transfer restrictions "in a contract or in nonbankruptcy law").

If Rule 3001(e)(2) had the effect Renaissance contends, it would violate the Bankruptcy

Rules Enabling Act, 28 U.S.C. § 2075. Enacted in 1964, the Act supplements the Rules

Enabling Act, 28 U.S.C. §§ 2071-74; *see generally In re Tallerico*, 532 B.R. 774, 783-84 (Bankr.

E.D. Cal. 2015) (describing the Act's history), and delegates to the Supreme Court "the power to

prescribe by general rules, the forms of process, writs, pleadings, and motions, and the practice

and procedure in cases under Title 11," 28 U.S.C. § 2075. But the Act's "key restriction,"

*Tallerico*, 532 B.R. at 784, is that rules prescribed for bankruptcy cases "shall not abridge,

enlarge, or modify any substantive right," 28 U.S.C. § 2075; *see also Tennessee Student

Assistance Corp. v. Hood*, 541 U.S. 440, 454 (2004). Rule 3001(e)(2) would not validate an

otherwise invalid claim transfer even if it purported to, and it does not purport to.[14]

Rule 3001(e), then, does not authorize Renaissance to use the assignment to pursue

Stockton's claims for breach of the PSA. Because Renaissance has chosen not to contest the

debtors' argument (1) that the PSA bars an assignment without Showboat Propco's consent, and

(2) that Showboat Propco did not consent to the assignment, Renaissance cannot enforce the

---

[14]    This is not to suggest the line between substance and procedure is always clear.
To the contrary, it can be "notoriously difficult to draw." *U.S. Express Lines, Ltd. v. Higgins*,
281 F.3d 383, 392 (3d Cir. 2002); *see also* Martin H. Redish & Dennis Murashko, *The Rules
Enabling Act and the Procedural-Substantive Tension: a Lesson in Statutory Interpretation*, 93
Minn. L. Rev. 26, 27 (Nov. 2008) ("To this day, no real consensus has interpreted as to how the
[Rules Enabling] Act should be interpreted."). But there are no line-drawing difficulties here.

assigned claims.[15/]  The debtors' objection as to the breach of contract claims will be sustained.

## 4. Conclusion

The objection of the reorganized debtors to proofs of claim Nos. 3597, 4223, 5574, and

5575 filed by Stockton University and transferred to Showboat Renaissance LLC is sustained.

The claims are disallowed.  A separate order will be entered consistent with this opinion.

Dated: July 30, 2018

A. Benjamin Goldgar
United States Bankruptcy Judge

---

[15/]       Perhaps an argument could have been made that Stockton's assignment to
Renaissance breached the PSA but was nonetheless effective, leaving (a) the claims in
Renaissance's hands and (b) CEOC and Showboat Propco with a breach of contract action
against Stockton. *See Bel-Ray Co., Inc. v. Chemrite (PTY) Ltd.*, 181 F.3d 435, 441-43 (3d Cir.
1999) (discussing the effect of non-assignment clauses under New Jersey law).  But Renaissance
disclaimed any reliance on the PSA for the assignment's effectiveness.  A party that disclaims a
particular argument will be held to its disclaimer. *Vidimos v. Laser Lab Ltd.*, 99 F.3d 217, 222
(7th Cir. 1996).  The argument has therefore been waived. *See United States v. Hible*, 700 F.3d
958, 961 (7th Cir. 2012) ("We will find waiver when a defendant for strategic reasons elects to
pursue one argument while foregoing another." (internal quotation omitted)); *Heritage Techs.,
L.L.C. v. Phibro-Tech, Inc.*, No. 1:05-cv-1851-LJM-WTL, 2007 WL 2406907, at *3 (S.D. Ind.
Aug. 20, 2007) (finding a potentially "compelling argument" of contract interpretation waived
where the party expressly said it was not making the argument).