# ADDENDUM

## Westinghouse Bench Decision

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 17-10751-mew

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    WESTINGHOUSE ELECTRIC COMPANY LLC, et al.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   One Bowling Green

14                   New York, NY  10004

15

16                   July 20, 2018

17                   4:01 PM

18

19

20

21   B E F O R E :

22   HON MICHAEL E. WILES

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  F. FERGUSON

1    HEARING re Decision to be read into the record concerning

2    Landstar's objection to Whitebox's notices of partial

3    transfer of claim.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    PRESENT TELEPHONICALLY:

4

5    BRIAN P. MORGAN

6    CHRIS STAUBLE

7    CINDY DELANO

8    STACY A. LUTKUS

9    PATRICK MOHAN

10   MATTHEW MADDOX

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  All right.  Are the parties here on

3    the Whitebox-Landstar dispute?

4              MR. NEWMAN:  Yes, Your Honor.  This is C.G.

5    Newman from Davis & Gilbert for Landstar.

6              MR. PIERCE:  Your Honor, this is Clay Pierce from

7    Drinker Biddle & Reah on behalf of Whitebox.

8              THE COURT:   Thank you very much.  All right, we

9    are here so that I may dictate my decision into the record.

10   I'm going to direct the Whitebox attorneys as the attorneys

11   for the party who filed the transfer notices to obtain a

12   transcript of what I say and to provide it to the Court in

13   Word format so that we can clean up the inevitable

14   inadvertent misstatements or mis-citations, or misspellings

15   that will occur.

16              In particular, I have noted that after 40 years of

17   legal and judicial practice and 40 years of what to me

18   always seemed like ever-changing Blue Book conventions, I am

19   notoriously inconsistent in the citation formats that I use,

20   so that citations that I read in the record today will have

21   to be cleaned up in the final bench decision.  So let me get

22   to the decision.

23              I want to start by commending the parties' counsel

24   on their excellent, and very thoughtful submissions and on

25   the streamlined and professional way in which the exhibits

Page 5

1    and the testimony were presented.  It was a great help as

2    well as a great pleasure to the Court to have experienced

3    advocates present a case in such a high quality manner.

4         Before the Court are disputes that relate to three

5    proofs of claim filed in the Chapter 11 case of Westinghouse

6    Electric Company, et al.  The proofs of claim were filed by

7    Landstar Global Logistics, Inc., Landstar Inway, Inc., and

8    Landstar Express America, Inc.  For convenience I will refer

9    to those three entities collectively today as Landstar, as

10   for purposes of today's rulings it is not necessary to

11   distinguish among them.

12        On February 6, 2018, notices of the partial

13   transfers of the three claims were filed.  Collectively, the

14   notices contemplated a full transfer of each claim but the

15   notices were denominated as partial transfers because there

16   were multiple transferees who were involved with respect to

17   individual claims.

18        The transfer notices are at Docket Numbers 24-27

19   through 24-32.  A corrected version of Docket Number 24-27

20   was filed on February 7, 2018 to correct an inadvertent

21   error in the attachments to the notice, and that corrected

22   notice is at Docket Number 24-33.  If you hear a pause, I've

23   just taken a drink of water.  That's all.

24        The filed transfer notices included attachments

25   that explained the bases for the transfers.  The attachments

1    asserted that the Landstar entities had offered to sell the

2    claims and that the offers had been accepted by Seaport

3    Global Holdings, LLC, which was acting on behalf of an

4    entity named Whitebox Advisors, LLC, which, in turn, was

5    acting for affiliated entities named Whitebox Multi-strategy

6    Partners, LP, Whitebox Asymmetric Partners, LP, and Whitebox

7    Multi-strategy Partners, LP.  I may have listed one of those

8    entities twice.

9         During the remainder of this opinion I will refer

10   to Seaport Global Holdings, LLC as Seaport.  I will also

11   refer to the various Whitebox entities collectively as

12   Whitebox, just as the parties did throughout the trial.

13   Because for today's rulings it is not necessary to

14   distinguish among the various Whitebox entities.

15        Transfers of claims are subject to the terms of

16   Rule 3001 of the Federal Rules of Bankruptcy Procedure.  On

17   February 26, 2018, the Court approved a stipulation among

18   the parties that extended the Landstar parties' deadline for

19   the filing of objections to the claim transfers to and

20   including March 15, 2018.  Landstar then filed a timely

21   objection to the transfer notices on March 15, 2018.  (See

22   Docket Number 28-57.)

23        Section 502 of the Bankruptcy Code gives me

24   jurisdiction over claims against an estate, and the Federal

25   Rules of Bankruptcy Procedure give me power to resolve

Page 7

1    disputes over claim transfers.  The parties agreed, at least

2    with respect to the validity of the transfer notices, that I

3    had jurisdiction and that I could and should render a final

4    decision on the merits of their dispute.

5           However, there have been some changes during the

6    course of these proceedings in the legal theories advanced

7    by the parties, or more particularly, in the legal theories

8    advanced by Whitebox, which resulted in some additional

9    questions at the outset of the trial.

10          As background to those questions I need to set

11   forth a somewhat more detailed procedural history than might

12   otherwise have been needed.

13          Whitebox contended in its February 6th transfer

14   notices that a series of email exchanges gave rise to a

15   "qualified financial contract" under Section 5-701B2i of the

16   New York General Obligations Law.  Whitebox argued that the

17   alleged transfer agreement was fully binding and enforceable

18   based on the email exchanges and without regard to whether

19   further documentation was signed.

20          Landstar made a number of arguments in the

21   objection that it filed on March 15, 2018.

22          First, Landstar contended that there had not been

23   an offer and an unequivocal acceptance.  It contended that

24   the sale offer identified by Whitebox had not been accepted,

25   but instead that a counteroffer had been made.  Landstar

1    further argued that the counteroffer substantially altered

2    the economics of the proposed deal, that it was rejected by

3    Landstar and that no contract was formed.

4            Second, Landstar contended that the parties had

5    made clear in their discussions that no contract of sale

6    could or would be formed until the execution of definitive

7    written agreements, and that absent such written agreements,

8    there was no intent to be found.

9            Third, Landstar argued that material terms of a

10   contract, such as the identities of the actual purchasers

11   and certain economic terms, had never been agreed upon.

12   Landstar, therefore, objected to the transfer notices in

13   their entirety and asked the Court to order Whitebox to

14   withdraw them and to direct the claims agent to recognize

15   Landstar as the holder of the claims.

16           After the filing of the objection, certain

17   discovery disputes arose between the parties and were the

18   subject of a telephone conference with the Court.  The Court

19   also directed the parties to make further submissions

20   regarding the relevant legal issues, and the parties did so

21   on May 24, 2018.  The Whitebox submission is at Docket

22   Number 32-66 and the Landstar submission is at Docket Number

23   32-63.

24           In its May 24th submission, Whitebox continued to

25   argue that the parties' email exchanges created an

1   enforceable contract that was binding without execution of a

2   written agreement.

3           However, Whitebox also argued in the alternative

4   that the exchanges produced a binding preliminary commitment

5   that obligated the parties to negotiate in good faith as to

6   other open terms.  Whitebox described this as a contention

7   that the parties had entered into a so-called Type II

8   agreement, as that term is used in the Second Circuit Court

9   of Appeals decision in Brown v. Cara, 420 F.3d 148 (2d

10  Cir.2005).

11          In Cara, the Second Circuit describes such a

12  contract as one in which parties enter into a binding

13  agreement as to certain terms and a binding agreement to

14  negotiate in good faith as to other open issues.

15          We often see examples of such contracts in the

16  form of commitment letters to negotiate financing or, as in

17  the Cara decision, in the form of a memorandum of

18  understanding in which parties contractually commit that

19  they will work together to accomplish a particular project.

20          The parties appeared before the Court to discuss

21  Landstar's objection to the transfers on May 30, 2018.  At

22  that time, counsel for Landstar urged the Court to resolve

23  the matter based on the written materials that had been

24  submitted.  Counsel for Whitebox contended that further

25  discovery was needed and that a trial should be held to

1    resolve disputes as to the parties' intent.  I ruled that

2    discovery should be completed and that the matter should be

3    scheduled for trial.

4            The parties completed discovery and submitted a

5    pretrial order that was entered by the Court on July 16,

6    2018 with a corrected version entered July 18, 2018.  (See

7    Docket Numbers 35-86 and 35-97.) Trial was held on July 18,

8    2018.

9            In the pretrial order, Whitebox continued to argue

10   that the parties' exchanges created a fully binding

11   agreement or, alternatively, that they created a Type II

12   agreement in which the parties had legally agreed to bind

13   themselves to certain terms and to negotiate other terms in

14   good faith.

15           When I asked about this at the outset of trial,

16   however, one of Whitebox's attorneys stated that Whitebox's

17   only contention was that the parties had reached a binding

18   Type II contract.

19           There was some considerable confusion over this,

20   at least in my mind, as two different attorneys for Whitebox

21   made statements about Whitebox's contentions that I had

22   trouble reconciling.

23           It was made emphatically clear by the end of the

24   trial, however, that Whitebox was contending only that a

25   partial Type II contract had been reached and was not

1    contending that a fully enforceable agreement on all

2    relevant terms had been reached.

3              These exchanges at the outset of the trial raised

4    other issues.  In the pretrial order and at the outset of

5    the trial, Landstar took the position that the so-called

6    Type II contract issue should not be considered by the

7    Court.

8              Landstar argued that the only relevant issue

9    before the Court was whether transfers had actually

10   occurred.  Landstar contended at the outset of the trial

11   that it was plain from Whitebox's changed position that

12   transfers of the claims had not actually occurred and that

13   the only contention was that Landstar had breached a

14   commitment to discuss a possible transfer, and so there was

15   nothing more that I should do.

16             The Court pointed out, however, that Whitebox's

17   reliance on the Type II contract issue did not involve any

18   element of unfair surprise.  Whitebox's attorney referred to

19   this contention in a letter dated January 30, 2018, a copy

20   of which had previously been sent to the Court and had been

21   pre-marked as an agreed exhibit for the trial.

22             As I have noted here, Whitebox had also addressed

23   the issue in its May 24 submissions and in the pretrial

24   order.  It was also plain and the parties acknowledged that

25   they were prepared to go to trial on the issue.  After

Page 12

1      discussion, Landstar agreed that the matter should proceed

2      to trial on all issues.

3              These exchanges raised questions in my mind as to

4      my jurisdiction over the parties' dispute.  Plainly, the

5      parties agreed that I had jurisdiction to resolve the issues

6      that were framed by the filing of the Notices of Transfer

7      and the objection thereto.  The parties conceded my

8      jurisdiction over these issues in their pre-trial order.

9              At trial I raised a question as to whether I still

10     had jurisdiction to consider the Type II contract theory in

11     the absence of other contentions.  I pointed out that I have

12     jurisdiction over disputes that relate to Chapter 11 cases

13     and that this has been widely interpreted to apply to cases

14     that affect an estate.

15             However, if Whitebox were merely to be entitled to

16     seek money damages from Landstar, it was hard to see how the

17     matter would affect the bankruptcy estate.

18             Whitebox's counsel argued in response that if it

19     succeeded on its claim, it believed it would be entitled to

20     seek specific performance and that I had jurisdiction to

21     resolve that issue and to resolve all of the related

22     disputes between the parties.  It insisted that I had

23     jurisdiction over all aspects of the parties' dispute from

24     the outset and should render a final decision.

25             Landstar argued initially that I should not reach

1    the Type II contract issue for the reasons that I have

2    stated.  But ultimately it conceded that this was not a

3    jurisdictional issue, and after discussion, Landstar

4    explicitly agreed on the record that the Court should make a

5    final decision of the matter and that Landstar consented to

6    a final resolution of the matter by the Court.

7         It is clear that the parties' entire dispute over

8    these alleged transfers has revolved from the start around

9    the question of whether they had entered into enforceable

10   and binding contracts of any kind.  The parties agreed that

11   I had clear and admitted original jurisdiction over their

12   disputes at the outset.

13        Section 13-67 of Title 28 of the United States

14   Code provides that if a District Court has original

15   jurisdiction over a matter, it also has "supplemental

16   jurisdiction over all other claims that are so related to

17   claims in the action within such original jurisdiction that

18   they form part of the same case or controversy under Article

19   III of the United States Constitution." The Bankruptcy Court

20   is a unit of the District Court that exercises the District

21   Court's jurisdiction under Section 13-34 of Title 28 of the

22   United States Code.

23        There is some disagreement in prior decisions as

24   to whether a bankruptcy court may exercise supplemental

25   jurisdiction under Section 13-67.  See, for example, 16

1   Moore's Federal Practice, Section 106.05[10] at 106.34.2(1)

2   Second Edition 2012.

3        However, the Second Circuit Court of Appeals has

4   held that bankruptcy courts do have jurisdiction under the

5   principles of supplemental jurisdiction set forth in Section

6   13-67.   See Klein v. Civale & Trovato, Inc., In re: Lionel

7   Corp. 29 F.3d 88, 92 (2d Cir. 1994).

8        Furthermore, as I noted, the parties agreed that I

9   had jurisdiction at the outset of these disputes.   Even if

10  the issues narrowed once the trial was completed, my

11  jurisdiction was not lost.   See Dery v. Wyer 265 F.2d 804,

12  808 (2d Cir. 1959).   Noting the general principle that the

13  sufficiency of a Court's jurisdiction should be determined

14  once and for all at the threshold, and if found to be

15  present then, should continue until final resolution of the

16  action.

17        I concluded for these reasons, and I reaffirm

18  here, that it was appropriate for me to hear and resolve all

19  of the parties' disputes regardless of whether the nature of

20  the issues might have changed somewhat as the case

21  progressed, and regardless of whether the issues might have

22  narrowed as the case progressed.   And as noted, the parties

23  agreed with that approach and agreed to my entry of a final

24  and binding ruling.

25        As to the issues, Whitebox contends that there was

1    a so-called Type II contract between the parties, pursuant

2    to which they agreed to be legally bound to a price and to

3    negotiate in good faith to complete agreement as to other

4    terms of sale.  It also claims that Landstar breached this

5    agreement by abandoning the deal rather than engaging in

6    good faith negotiations.

7            As the party claims a breach of contract, it is

8    Whitebox's burden to prove the existence of the contract by

9    a fair preponderance of the evidence.  See Angelo, Gordon &

10   Company, LP v. Dycom Industries, 2006 U.S. District Lexis

11   15784 SDNY, March 31, 2006 at Page 5.  This is true

12   regardless of the type of contract that is alleged.

13           It is also Whitebox's burden to prove that any

14   such contract was breached, which again is subject to a

15   preponderance of the evidence standard.  See Diesel

16   Properties SRL v. Greystone Bus Credit II LLC, 631 F.3d

17   42,52 (2d Cir. 2011), Mercury Partners, LLC v. Pacific

18   Medical Buildings, LP, Number 02CIV6005, 2007 West Law,

19   2197830 at Star 8, SDNY July 31, 2007.

20           Several other principles of New York law are

21   relevant to these issues.  First, it is a basic tenet of

22   contract law that no contract exists unless there is an

23   offer, an acceptance of the offer, consideration, mutual

24   assent, and an intent to be bound.  See Kowalchuk v. Stroup,

25   873 NYS 2d. 4346 active 2009.

1          An offer and acceptance occur if a definitive

2     offer is made and if there is an "unequivocal" acceptance of

3     that offer.  See Kolchins v. Evolution Markets, Inc., 31 NY

4     3d. 100, 1006, 2018.  ("The first step is to determine

5     whether there is a sufficiently definite offer such that its

6     unequivocal acceptance will give rise to an enforceable

7     contract."); Roer v. Cross County Medical Center Group, 8380

8     2d. 861, 862, Second Department, 1981.  ("It is a

9     fundamental principle of contract law that a valid

10    acceptance must comply with the terms of the offer.")

11         If a communication is subject to additional or

12    different terms, then it is not an acceptance of an offer.

13    "To enter a contract, a party must clearly and unequivocally

14    accept the offeror's terms.  If, instead, the offeree

15    responds by conditioning acceptance on new or modified

16    terms, that response constitutes both a rejection and a

17    counteroffer which extinguished the original offer." See

18    Thor Properties, LLC v. Willspring Holdings, LLC, 118 A.D.

19    3d 505, 507-8 First Department 2014.  (Internal citations

20    omitted).

21         As a result, if a purported acceptance is

22    "qualified with conditions," it is "equivalent to a

23    rejection and counteroffer." Robison v. Sweeney, 301 A.D. 2d

24    815, 818 Third Department 2003.  This is a fundamental

25    principle of contract law.  Id, see also Jericho Group, Ltd.

1    v. Midtown Development LP, 32 A.D. 3d 294, 299 First

2    Department 2006; Commerce Funding Corp. v. Comprehensive

3    Habilitation Services, Inc., 2005 U.S.  District Lexis 2832

4    at Star 33, 37-38, SDNY February 24, 2005.  ("A

5    communication that purports to accept an offer cannot be

6    subject to additional or different terms.  Such a

7    communication is no acceptance at all, but is an absolute

8    rejection of the offer and a proposed counteroffer.")

9           Whitebox has filed papers yesterday asserting

10    that there are certain exceptions to this rule that ought to

11    be applicable to this case, but I will discuss those after

12    I've made my factual findings and when I discuss the

13    application of the law to the facts as I have found them.

14           Second, the creation of a contract requires more

15    than a conceptual agreement on terms.  It requires in

16    addition an agreement to be legally bound to those terms

17    such that an enforceable obligation is created.  Contracts

18    are obligations that are undertaken by agreement rather than

19    obligations that are enforced or imposed by law, and parties

20    can impose limits and conditions as to when an agreement

21    will become binding.

22           Under New York law, therefore, it is well-settled

23    that if the parties to an agreement do not intend it to be

24    binding upon them unless and until it is reduced to writing

25    and signed by both of them, they are not bound and may not

1   be held liable until it has been written out and signed.

2   Scheck v. Francis, 311 NYS 2d. 841, 843 1970.  This is true

3   even if the parties have orally agreed upon all the terms of

4   a transaction.  Schwartz v. Greenberg, 304 NY 250 1952;

5   Kowalchuk v. Stroup, 61 A.D. 3d 118 active 2009.  See also

6   Matter of Municipal Consultants & Publications v. Town of

7   Ramapo, 47 NY 2d. 144, 148 1979; ADCO Electric Corp. v. HRH

8   Construction, LLC, 880 NYS 2d. 188 active 2009; Lost CR

9   Associates v. Marine Midland Bank, 741 NYS 2d 115 active

10  2002.

11          Courts have identified a number of factors that

12  aid in determining in a particular case whether a binding

13  contract has been formed in the absence of a document

14  executed by both sides.  These factors are:  One, whether

15  there is an expressed reservation of the right not to be

16  bound in the absence of a writing; two, whether there has

17  been a partial performance of the contract; three, whether

18  all terms of the alleged contract have been agreed upon;

19  and, four, whether the agreement at issue is the type of

20  contract usually committed to writing.  See Winston v.

21  Mediafare Entertainment Corp., 777 F.2d 78 80 Second Circuit

22  1986.

23          These circumstances may be shown by oral testimony

24  or by correspondence or other preliminary or partially

25  complete writings.  Restatement second of contract Section

1  27, Comment C (1981)(cited with approval in Winston 777 F.2d

2  at 81).

3           No single one of these factors is decisive, but

4  each can provide significant guidance in a particular case.

5  However, "considerable weight is put on a party's explicit

6  statement that it reserves the right to be bound only

7  whenever an agreement is signed." RG Group, Inc. v. Horn &

8  Hardart Co., 751 F.2d 69 75 Second Circuit 1984.

9           "When there is a writing showing that one party

10  did not intend to be bound, a court need look no further

11  than the first Winston factor." RKG Holdings Inc. v. Simon,

12  182 F.3d 901 Second Circuit 1999.  (Quoting Arcadian

13  Phosphates Inc. v. Arcadian Corp., 884 F.2d 69, 72 Second

14  Circuit 1989.)

15           Third, there usually is no binding contract unless

16  there is a full agreement on all important terms.

17  "Ordinarily preliminary manifestations of assent that

18  require further negotiation and further contracts do not

19  create binding obligations." Shann v. Dunk, 84 F.3d 73

20  Second Circuit 1996, collecting cases on this point.  See

21  also Brown v. Cara, 420 F.3d 148,153 Second Circuit 2005.

22  (Noting that "Ordinarily where the parties contemplate

23  further negotiations and the execution of a formal

24  instrument, a preliminary agreement does not create a

25  binding contract.")

1          (Quoting and citing Adjustrite Systems, Inc., v.

2     GAB Business Services, Inc., 145 F.3d 543 548 Second Circuit

3     1988.) "Parties can make preliminary agreements that only

4     cover certain terms and that do bind the parties to engage

5     in further discussions about open terms." See Municipal

6     Consultants & Publishers, Inc., v. Town of Ramapo, 47 New

7     York 2d.144 (1979).

8          Judge Lavelle set forth a thoughtful discussion of

9     these types of contracts in his decision in Teachers

10    Insurance & Annuity Association v. Tribune Co., 670 F.

11    Supp. 491 SDNY 1987, which is often cited as one of the

12    leading decisions on this point.

13         In that decision, Judge Lavelle observed that "In

14    seeking to determine whether a preliminary commitment should

15    be considered binding, a court's task is once again to

16    determine the intentions of the parties at the time of their

17    entry into the understanding as well as their manifestations

18    to one another by which the understanding was reached.

19         Courts must be particularly careful to avoid

20    imposing liability where a binding obligation was not

21    intended.  There is a strong presumption against finding

22    binding obligation in agreements which include open terms,

23    call of future approvals, and expressly anticipate future

24    preparation and execution of contract documents.

25         Nonetheless, if that is what the parties intended,

1    courts should not frustrate their achieving that objective

2    or disappoint legitimately bargained contract expectations.

3    Teachers Insurance & Annuit Association v. Tribune Co., 670

4    F.Supp at 499.

5              Similar reservations have been expressed by the

6    New York State Courts.  For example, in Kaplan v. Continuum

7    Health Partners, Inc., No. 107226/2010, 2011, New York

8    Miscellaneous Lexis 69 -- 6796, excuse me that *6, Supreme

9    Court New York County, January 11, 2011.  The Court stated

10   that, "As a general matter, courts express reluctance about

11   the binding nature of letters of intent.  Preliminary

12   agreements, such as a letter of intent or memorandum of

13   understanding are not intended to bind either party to the

14   contemplated transaction, except in rare circumstances where

15   the agreement clearly manifests the intent to be bound.".

16             As with contracts generally, the determination of

17   whether a binding preliminary or Type II agreement has been

18   reached involves a determination as to the intent of the

19   parties.  If, as noted above, the parties have clearly

20   reserved the right not to be bound at all, unless and until

21   a written agreement is signed, then that also precludes

22   contentions that there is a Type II contract, and there is

23   no contract at all, unless and until a written agreement is

24   signed.

25             I will now turn to the evidence at trial.  At

1   trial on July 18, each party submitted a binder of exhibits

2   and the full contents of the binders were admitted into

3   evidence by agreement.  Landstar offered an additional

4   binder, Landstar Exhibit 21, containing copies of other

5   transfer notices that Whitebox had submitted in the

6   Westinghouse case.

7            I ruled that these could be submitted in evidence,

8   but that Whitebox would be granted additional time through

9   5:00 PM on July 19, to state whether it had any objections

10  to the authenticity of the documents included in the binder.

11  Whitebox has confirmed that it has no authenticity

12  objections, and so, Landstar Exhibit 21 is part of the

13  record and the record was deemed to be closed at 5:00 PM on

14  July 19, yesterday.

15           Four witnesses testified at the trial: The first

16  witness was Mr. James Belardo of Seaport.  Mr. Belardo is

17  the individual who engaged in the relevant communications

18  with Landstar about this matter;

19           The second witness was Mr. Peter Lupoff.  Mr.

20  Lupoff was presented as an expert witness as to the claims

21  treating process;

22           The third witness was Ms. Dawn Bowers.  Ms. Bowers

23  is an employee of Landstar who had communications with Mr.

24  Belardo and who allegedly committed Landstar to an

25  enforceable Type II contract with Whitebox;

1          The fourth witness was Mr. Amit Patel.  Mr. Patel

2     works for Whitebox Advisors and testified about his role in

3     the transaction.

4          I have read and carefully considered all of the

5     exhibits.  I note that multiple copies of email chains had

6     been produced, but there are some differences in the chains,

7     and some exhibits includes copies of emails that do not

8     appear in other exhibits.

9          So with the assistance of my law clerk, Ms.

10    Eisenberg, we have carefully combed through the exhibits to

11    identify and chronologize all of the emails for the purpose

12    of these findings.

13         I have also carefully listened to the witnesses'

14    testimony at trial, and I have made assessments of their

15    credibility.

16         I find the following facts based on the trial

17    record: Mr. Belardo testified that he reviewed filed proofs

18    of claim to identify parties who had filed claims, and then

19    contacted them to determine if they would be willing to sell

20    their claims.  Mr. Belardo contacted Ms. Bowers for this

21    purpose by email on January 10, 2018.

22         The witnesses acknowledged that Mr. Belardo and

23    Ms. Bowers did not know each other, had had no prior

24    business dealings, and had not engaged in prior discussions

25    with each other.

1          In all of the discussions that follow, Mr. Belardo

2     was acting on behalf of his client, Whitebox.  There is no

3     contention that Mr. Belardo ever was an agent of Landstar or

4     that he represented Landstar, and there was no evidence at

5     trial that would have been sufficient to support a

6     contention that Seaport acted for anyone other than

7     Whitebox.

8          Mr. Belardo sent a follow-up email to Ms. Bowers

9     on January 23, 2018, stating that he had a client,

10    "interested in buying the unsecured claims in the 70s",

11    meaning at a price equal to 70 plus percent of the stated

12    amounts of the claims.  He asked if that, "sparks any

13    interest".  And Ms. Bowers responded that same day by

14    saying, yes, and by asking which claims the client might be

15    interested in.  Mr. Belardo responded the client would be

16    interested in all of Landstar's claims, and the parties

17    arranged a call, in order to have a further discussion.

18         Ms. Bowers testified credibly that during their

19    phone call, she told Mr. Belardo that she had authority to

20    negotiate a price at which the Landstar claims might be

21    sold, but that all other terms had to be reviewed and

22    approved by legal counsel.

23         Mr. Belardo testified that he did not believe that

24    Ms. Bowers made such a statement, but he also acknowledged

25    that he did not have a full recollection of the details of

1    their calls.

2              I find that Ms. Bowers testimony on this point is

3    credible, and I find that the statement was made.

4              Mr. Belardo then gave Ms. Bowers advice as to how

5    she could initiate a potential sale.  By email on January

6    24, 2018, he advised Ms. Bowers that, "In order to engage my

7    client", he would need a "sell order" or "offer" end by

8    email.  He also sent her the text of a typical sell order.

9    See Defendant's Exhibit 1.

10             The language that Mr. Belardo suggested stated

11   that, "Landstar agrees to sell its unsecured claims against

12   Westinghouse," with the amounts of the claims and the

13   percentage sale price to be filled in by Ms. Bowers.  The

14   form suggested by Mr. Belardo also said that, "This offer

15   shall be subject to agreement of terms and conditions and

16   execution of documentation by both buyer and Landstar."  It

17   also included language pursuant to which the offer would

18   expire if not accepted by a particular time.

19             Ms. Bowers talked to her superior about the form

20   of the proposed sell order that Mr. Belardo had sent.  Ms.

21   Bowers testified credibly that she and her superior were

22   comfortable; that the language that Mr. Belardo had sent,

23   including, in particular, the statement that the offer was

24   subject to an agreement on terms and the execution of

25   documentation, meant that Landstar would not be bound unless

Page 26

1    and until a written contract was executed; that, among other

2    things, met with the approval of Landstar's internal

3    counsel.

4            Based on my own questions to Mr. Belardo at trial,

5    I find that he, too, understood the subject to language to

6    have this meaning and effect.  Whitebox elicited general

7    testimony from Mr. Belardo, that he felt that parties should

8    negotiate in good faith once they reached conceptual

9    agreement on price.  However, he acknowledged he did not

10   know if there was such a legal obligation.

11           More importantly, when I asked him specifically

12   about the fact that the offer language he had sent to Ms.

13   Bowers was "subject to" execution of a written agreement, he

14   acknowledged that the words "subject to" meant that there

15   was no deal unless and until a written agreement was signed.

16           After her discussion with her superior, Ms. Bowers

17   sent an email to Mr. Belardo that stated in full as follows:

18           "Landstar agrees to sell its unsecured claims

19   against Westinghouse in the total amount of $754,470.56 at

20   78 percent; this officer shall be subject to agreement of

21   terms and execution of documentation by both buyer and

22   Landstar.  This offer shall be exclusive to Seaport and its

23   client, but shall expire at 3:00 PM on 1/24/18."  This email

24   was sent on January 24, 2018 at 10:45 AM.  See Defendant's

25   Exhibit 2.

1          Mr. Belardo then sent Ms. Bowers an email at 11:00

2     AM, stating that he had, "A few questions on the claim

3     amount," and asking Ms. Bowers to give him a call.  Ms.

4     Bowers testified that she believes that she and Mr. Belardo

5     discussed the sizes of the Landstar claims, and that she

6     believes there were some questions about the amount of the

7     Landstar Logistic claims and whether that filed claim

8     different from the amount that Westinghouse had listed on

9     its schedules of assets and liabilities.

10          She also testified that Mr. Belardo asked if

11     Landstar could support the amount of the filed claims, and

12     Ms. Bowers testified that it could.

13          I should note that the record was not crystal

14     clear as to whether these particular points were discussed

15     during a phone call that occurred prior to sending the so-

16     called offer or whether they occurred after Mr. Belardo sent

17     his request for a further call about the claims themselves.

18     The emails suggest that there were two calls, but the

19     witnesses did not appear to recall for certain how many

20     calls they had or when each statement was made.

21          In context, however, it makes sense that the

22     conversation about the claims happened after Mr. Belardo

23     sent his email at 11:00 AM stating that he had questions on

24     the claim amounts.  If the discussion had already happened

25     before the sell offer was sent, then, presumably, Mr.

1    Belardo would not still have had questions.

2            I find that these parts of Mr. Belardo's and Ms.

3    Bowers' discussions took place after the "sell order" had

4    been sent.

5            During their second call after the sell order had

6    been sent, Mr. Belardo noted that one of the Landstar claims

7    had been filed in an amount that exceeded $700,000, but that

8    the Debtor's schedules of assets and liabilities had listed

9    only a small amount of about $81,000.  Ms. Bowers explained

10   the reasons why she thought the filed amount was valid.  She

11   testified that she believes Mr. Belardo asked her whether

12   Landstar could support the claim and that she testified that

13   she thought it could.  Mr. Belardo then spoke to others at

14   Seaport about the potential sale.

15           The record shows that at 11:28:17 AM on January

16   24, Rick Feinstein, another Seaport employer, sent a

17   Bloomberg instant message to representatives of Whitebox,

18   noting the potential sale of a, "754k Westinghouse claim"

19   for which, "my cost", that is, the cost without Seaport's

20   commission, would be 78 percent.

21           The record shows that Mr. Feinstein did not

22   participate in any of the phone calls with Ms. Bowers.  He

23   said in his instant message, though, that there was

24   potential, "counterparty risk" since the scheduled amount of

25   the debt differed from the filed claim, and he described the

1    explanation that had been provided by Landstar.

2           Mr. Feinstein also stated in his email that, "They

3    are willing to provide recourse as to the $754k as they are

4    very confident.  They would not want funding based on $80k.

5    It is a public company, so should be easy to review

6    financials."

7           It is difficult to know exactly where Mr.

8    Feinstein got the information that he gave to Whitebox.  Mr.

9    Feinstein did not participate in the calls between Ms.

10   Bowers and Mr. Belardo.  Ms. Bowers testified that there was

11   a discussion about the claim amount, but that there was

12   never any discussion of an agreement pursuant to which

13   Landstar would provide recourse as to the notional amount of

14   the claim.  In addition, she testified that there was never

15   any discussion as to whether Landstar would pay interest on

16   any recourse payment.

17          Mr. Belardo testified that he believed he had told

18   Ms. Bowers that Landstar would have to make representations

19   about the validity of the claims, but he said he did not

20   have a clear recollection of the conversation.

21          More importantly, no testimony was offered from

22   Mr. Belardo to the effect that Ms. Bowers, or anyone else at

23   Landstar, had actually made the statement that appears in

24   Mr. Feinstein's email about a willingness to provide

25   recourse for the -- as to the claims.

1              To the contrary, Ms. Belardo testified that she

2      never had a conversation -- or excuse me.  To the contrary,

3      Ms. Bowers testified that she never had a conversation with

4      Mr. Belardo about providing recourse for the claims.

5              I find that Ms. Bowers testified on this point was

6      credible.  There is nothing in the testimony of Mr. Belardo

7      and Ms. Bowers that would support a contrary finding.  Ms.

8      Bowers testified consistently that she was only willing and

9      able to discuss the price at which claims might be sold, and

10     that she had no authority and could not enter into

11     negotiations as to any other terms.

12             I find, therefore, that in their conversations,

13     Ms. Bowers did not state that Landstar would provide

14     recourse of the claims.  Instead, as she acknowledged, she

15     only expressed confidence that the claims were good.

16             After receiving Mr. Feinstein's message, Mr. Patel

17     of Whitebox asked for copies of the relevant proofs of

18     claim.  At 11:33:33 AM on January 24, he also asked, "How

19     much interest on disallowance can they live with?"  Mr.

20     Friedberg, another Seaport employee, responded, "Dunno, 5-6

21     percent."  Mr. Patel responded, "That's fine," and "Let's

22     lock it up."  See Defendant's Exhibit 14.

23             One thing on which the parties do agree is that

24     Mr. Belardo and Ms. Bowers had not had any discussions about

25     the possibility that Landstar would pay interest on a

1    recourse claim.  Both Mr. Belardo and Ms. Bowers so

2    testified.

3           In some way that is not clear from the record, Mr.

4    Patel's interest in pursuing your purchase of the claim was

5    communicated to Mr. Belardo.

6           At this point, Mr. Belardo responded by email to

7    the sell offer that Ms. Bowers had sent.  He did not simply

8    accept the deal on the precise terms that Ms. Bowers had

9    listed in the email form that he himself had previously

10   provided to her.  Instead, he sent an email at 11:42 AM that

11   said, in its entirety, the following:

12          This email confirms that we are "done".  Seaport's

13   client, "buyer" buys, and Landstar's "seller" sells,

14   $754,470.56 of unsecured claims against Westinghouse at 78

15   percent, subject to: and then three bullet items were

16   listed.  First, agreement of terms and execution of

17   documentation agreeable to both buyer and sell Landstar.

18   Second, buyer's satisfactory due diligence on the claims

19   being sold.  And the third bullet item, Landstar providing

20   recourse as to the notional amount of the claims; any

21   repayment under such provision shall include 5 percent

22   interest."

23          The message continued: "Please respond to this

24   email in the affirmative confirming the above, after which I

25   will provide a Trade Confirmation for your review.  We very

1    much look forward to working with you on this."  See

2    Defendant's Exhibit 8.

3              As I noted, Mr. Belardo himself had drafted the

4    sell order that Ms. Bowers had sent.  That sell order

5    included no reference to any protection as to the notional

6    amounts of the claims and no reference to any requirement

7    that a recourse payment would include interest of any

8    amount.  These were new terms that Seaport included in the

9    email that it sent on behalf of Whitebox, after it had

10   conversations with Landstar about the disparity between the

11   filed amount and the scheduled amounts and after different

12   personnel at Whitebox -- excuse me -- at Seaport had

13   discussion with Mr. Patel about potential interest paid.

14             Furthermore, Mr. Belardo made quite clear in his

15   email that the 78 percent purchase price was only

16   acceptable, "subject to" the other listed terms, including

17   the requirement that Landstar provide recourse and agree to

18   pay interest on any recourse payment.

19             There was no unequivocal acceptance of the sale

20   offer, as set forth by Ms. Bowers.  Instead, there was only

21   a conditional response, which included new terms, and which

22   clearly communicated that an agreement on the purchase price

23   was, "subject to" these other terms.

24             Ms. Bowers did not respond in the affirmative to

25   Mr. Belardo's email.  Instead, within six minutes, she

1    responded with a statement of concern and a request for

2    reassurance.  More particularly, she said the following in

3    an email at 11:48 AM:

4            "James, I just want to get some clarity here.  Why

5    am I agreeing to the terms below?  Does this commit Landstar

6    to the deal before we see the actual trade confirmation?  My

7    legal department will need to review any documents that need

8    to be signed."

9            The parties disagree as to the significance of

10   this statement and what it meant.  I find, after considering

11   the evidence and the credibility of the witnesses, that this

12   was a plain statement by Ms. Bowers that Landstar did not

13   wish to be bound right away and did not wish to be bound

14   unless and until there was a written agreement that had also

15   been reviewed and approved by counsel and then signed.

16           I find that Ms. Bowers intended the message in

17   this way, that the message fairly communicates that intent,

18   and that Mr. Belardo understood the message in this way.

19   The statement was a forthright, reasonable and clear notice

20   to Seaport that Landstar did not intend to be bound, unless

21   and until a signed written agreement had been presented, the

22   language and all of the terms were approved by counsel, and

23   the writing had been executed.

24           Mr. Belardo responded in an email at 12:06 PM on

25   January 24.  He stated: "This commits both you (and my

Page 34

1    client) to the 78 percent purchase price, subject to -- and

2    then there's an italicized phrase -- agreement of terms and

3    execution of documentation -- end of the italics.  We just

4    want to make sure we are all conceptually on the same page

5    regarding terms before spending additional efforts

6    (including time/money on attorneys) reviewing/negotiating

7    the Trade Confirm.  Of course, you will need to agree to,

8    and ultimately execute, both a Trade Confirmation and then

9    an assignment of claim document."

10          Whitebox argues that this statement was intended

11   to convey that a legally binding agreement was now in place

12   as to a sale at the stated price, coupled with a binding

13   agreement that the parties would negotiate the rest of the

14   terms.  Certainly, the statement that the email "commits"

15   the parties to a purchase price provides some support for

16   this contention.

17          In context, however, I find that Whitebox's

18   argument is not a credible or reasonable explanation of the

19   email exchange.  What Landstar plainly asked and what it

20   plainly wanted to confirm was that Landstar was not bound to

21   a deal unless and until a written confirmation was reviewed

22   and signed.

23          Seaport's reassurance in response to Landstar's

24   expression of concern was that the concept of a deal had

25   been discussed and that Seaport wanted to be sure the

1    parties were "conceptually" on the same page before working

2    out the full terms.

3            Seaport also reassured Ms. Bowers in an italicized

4    statement that any commitment to a price was "subject to

5    agreement of terms and execution of documentation."

6            Saying that a deal is subject to documentation may

7    not always mean that the parties agree that they are not

8    bound and unless and until a written agreement is signed.

9    But in this case, I find that that is exactly what the

10   statement conveyed, and that is exactly what the statement

11   was intended to convey to Ms. Bowers.

12           Landstar expressed its concern and the response

13   was that there was only a conceptual understanding that was

14   subject to further discussion, documentation and agreement.

15           Whitebox's contention that somehow this statement

16   confirmed the actual existence of a binding agreement is

17   belied by the full context and the wording of the exchanges.

18   In fact, the statement was intended to, and it did, convey

19   to Ms. Bowers that there was no binding agreement at that

20   time of any kind.

21           After receiving Mr. Belardo's email, Ms. Bowers

22   responded by an email at 12:11 PM.  She stated, "Sounds

23   good.  Please send the documents so I can get the review

24   period stated."

25           There was some contention at trial that the

1    "sounds good" statement was an acceptance of Mr. Belardo's

2    proposal; in context, it very plainly was not.  The thing

3    that "sounded good" to Ms. Bowers was that this was just a

4    conceptual set of terms that were not yet binding.  She made

5    quite clear that she did not have authority to agree to the

6    additional terms that had been proposed, that she would not

7    be the one who would negotiate them, and that such terms

8    required review and discussion by counsel.

9            In addition, Whitebox also acknowledged at trial

10   that there never was an agreement on the recourse provision.

11   Plainly, it cannot contend that the sounds good statement

12   was an acceptance of the proposed recourse provision because

13   Whitebox itself acknowledges that that term was never agreed

14   to.

15           A draft confirmation was then circulated by

16   Seaport.  The confirmation itself said it would be effective

17   and would be binding after it had been executed by the

18   parties.  At that point, Landstar's internal counsel got

19   involved to discuss the confirmation, and more particularly,

20   the proposed recourse provisions.

21           Ms. Bowers testified that she had no further

22   involvement in the discussions and that counsel was in

23   charge of those items.

24           The emails reflect that there were discussions and

25   that Seaport pressed Landstar for comments on the draft

1    confirmation.  Instead, however, Michael Woodruff, an

2    internal counsel at Landstar, informed Mr. Belardo via email

3    on January 26 at 2:31 PM that, "Landstar is going to have to

4    remove itself from this offering at this time."  The email

5    was some cryptic as to the reasons.  It stated only that,

6    "We did a risk analysis and the figures and calculations

7    didn't work for us."

8              However, at trial, Whitebox's counsel elicited

9    testimony from Ms. Bowers about her conversations with

10   counsel.  And she stated that counsel had explained that the

11   proposed recourse and interest provisions were the reasons

12   why Landstar had decided not to go forward.

13             I should note that at various times during the

14   trial, Whitebox speculated that Landstar might have backed

15   out of the deal for another reason, such as the possibility

16   that claims values were going up in the trading market, but

17   no evidence was offered that claims values actually changed

18   or that Landstar was aware of any change in claims values,

19   and there was absolutely no evidence that concerns over the

20   78 priced -- 78 percent price were the reasons why the deal

21   fell apart.

22             The only evidence presented to me was that

23   Landstar did not wish to agree to the proposed recourse

24   terms and to the proposed agreement to pay interest on any

25   recourse payment.  And I find that these reasons, and not

1    any speculative alternative reasons, were the reasons why

2    Landstar decided not to go forward.

3              Whitebox offered testimony as to what it believed

4    are certain customs in the claims trading business.  But

5    rather than review that evidence here, I will discuss it in

6    the context of my application of the governing law to the

7    facts as I have found them.

8              Turning to the application of the law to the

9    facts: first, I conclude that there never was a binding

10   offer and acceptance sufficient to create a contract of any

11   kind.  Mr. Belardo himself drafted the offer to be sent by

12   Ms. Bowers.  It mentioned only a price at which the relevant

13   claims would be sold.  Mr. Belardo then realized that there

14   might be some risk as to allowance of the full stated amount

15   of the claims.  And so, when he responded on behalf of

16   Whitebox, he inserted a new term that he himself had never

17   included in the offer form that he had drafted.  That term

18   was a requirement that Landstar provide recourse as to the

19   notional amount of the claim.

20             In addition, Mr. Belardo's response stated that

21   Whitebox's willingness to buy the claims was subject to an

22   agreement that 5 percent interest be paid on any recourse

23   payment.  The parties agree that there was never any prior

24   discussion of that notion.

25             In context, this was a counteroffer, not an

1    unequivocal acceptance of the offer that Ms. Bowers made.

2    It introduced new terms and expressly conditioned an

3    agreement on price to an agreement on these other terms.

4         At the conclusion of the trial on July 18, I asked

5    the parties to make further submissions to the Court on the

6    issue of whether Mr. Belardo's email should be considered a

7    counteroffer rather than an acceptance, and the parties made

8    those submissions at approximately 5:00 PM yesterday.

9         In its submission, Whitebox did not dispute the

10   general rules that I have decided above.  However, Whitebox

11   argued that the recourse provisions were not really new

12   conditions; that, instead, they were merely terms that,

13   "would otherwise be implied in fact or in law from the

14   offer," citing Richard A. Lord, Williston on Contracts,

15   Section 6:15 (4th Edition, 2002).

16        Whitebox's theory is that the recourse provision

17   was not a new term at all, but that a recourse provision was

18   necessarily implicit in the offer that Ms. Bowers had sent.

19   Whitebox also argued, in the alternative, that the recourse

20   language was inconsequential and not significant enough to

21   turn its alleged acceptance into a counteroffer.

22        However, the evidence at trial simply does not

23   support Whitebox's contentions.  First, the parties made

24   clear at trial that buyers of claims often ask for recourse

25   provisions, but Ms. Bowers plainly was not a professional

1    buyer or seller of claims.

2            There's no evidence that she understood the

3    concept of a recourse provision at all.  That may not have

4    seemed unusual to Whitebox or Seaport, but it certainly was

5    unusual to Ms. Bowers and to Landstar, and there had not

6    even been any discussion of the point at the time Ms. Bowers

7    sent her sell order.

8            Under those circumstances, the facts simply would

9    not support a finding that a recourse term was implied in

10   fact or implied in law in the offer that Ms. Bowers had

11   sent.

12           The witnesses at trial also made clear that while

13   recourse provisions are usually negotiated, there are many

14   occasions in which parties do not include recourse

15   provisions in their deals.  Furthermore, the interest

16   provision had never been discussed.  And certainly, there is

17   nothing in the offer to sell that implicitly suggests that

18   interest will be paid on a recourse obligation, let alone as

19   to a particular interest rate.

20           I should also note there that although Whitebox

21   initially took the position that there was a full agreement

22   on terms, at trial, it agreed that there never was an actual

23   agreement as to the recourse provision.  Its contention was

24   that Landstar had breached an obligation to have further

25   discussions about the point.  Whitebox went so far as to

1   admit that if the parties had not reached agreement on the

2   recourse issue after good faith discussions, then there

3   would have been no deal and that Landstar could have walked

4   away.

5         Whitebox cannot reconcile those concessions with

6   its current contention that the recourse provision was

7   merely a point that was already clear and implicit in the

8   sell order as either an implied in fact or an implied in law

9   term.

10        Whitebox, in its own contentions about the alleged

11  Type II contract, has acknowledged and agreed that the

12  recourse items were open terms that had not been agreed upon

13  and that required further negotiation and agreement.

14        If I were to accept Whitebox's new contention that

15  these terms were already implicit and necessarily had

16  already been included in the sell order itself, that would

17  contradict Whitebox's own arguments and admissions about the

18  alleged Type II agreement and about the consequences of the

19  parties' exchanges.

20        Whitebox has clearly acknowledged that the

21  recourse items were open points about which no agreement was

22  reached; that cannot now turn around and argue after trial

23  that they were implied points that were already necessarily

24  resolved and already agreed upon back when the original

25  offer was sent.  Nor is there any factual support for

1    Whitebox's alternative contention that these new terms were

2    not important conditions or qualifications.

3            Whitebox's own witnesses, including its expert

4    witness, testified that a recourse provision is of key

5    importance to a buyer.  The expert testified that he would

6    usually recommend against doing a deal without such a

7    provision.

8            I, therefore, find and hold that Seaport's

9    response to Ms. Bowers' email was a counteroffer, not an

10    acceptance.

11            As I noted earlier, at trial, there was some

12    suggestion that Ms. Bowers had accepted the counteroffer

13    when she responded by email, sounds good.  But in context,

14    as I have held, what she actually sought to confirm and what

15    was actually communicated to her by Mr. -- that was actually

16    communicated by her to Mr. Belardo was that there was no

17    legal commitment at that time and that further terms were to

18    be discussed.

19            And Whitebox, as I have noted in making its own

20    Type II contract argument, contends only that there was an

21    agreement on price and not an agreement on other terms.

22            As a counteroffer, Mr. Belardo's email cancelled

23    and nullified the original offer sent by Ms. Bowers.

24    Landstar was free either to accept or reject the

25    counteroffer.  It never accepted it, and after two days of

Page 43

1    discussions, it made clear that it rejected the

2    counteroffer.  As a result, there was no contract.

3              Whitebox, in arguing that a Type II contract was

4    formed, also asks me, in effect, to deconstruct the

5    counteroffer into separate pieces.  It says that since the

6    price was the same in both the offer and the counteroffer, I

7    should treat the counteroffer as an acceptance of the posed

8    price and as a preliminary agreement to negotiate other

9    terms.

10             However, it is often the case that there is an

11   overlap between an offer and a counteroffer.  I could offer

12   to sell my car for $3,000, and I might receive a

13   counteroffer that says the buyer is willing to pay $3,000,

14   so long as I agree to pay any repair expenses that the buyer

15   incurs over the next year.  Plainly, that is a counteroffer,

16   not an acceptance.  The price mentioned in the two

17   communications is the same, but the law does not treat that

18   as an acceptance or as a preliminary agreement that

19   obligates the parties to have further discussions.

20             The notion that a Type II contract was formed

21   depends on a contention that the parties actually agreed:

22   one, to be legally bound by certain terms; and two, to work

23   together in good faith on other open items.

24             The message sent by Mr. Belardo cannot reasonably

25   be interpreted as an offer to form such a contract.  It did

1    not say, for example, that the buyer agrees to pay the price

2    Mr. -- Ms. Bowers suggest, so long as the parties commit

3    themselves in good faith to negotiate other terms.  Even

4    that would have been a counteroffer, though it would have

5    been one that, if accepted, might have created a Type II

6    contract.

7              Here, the actual wording of the message sent by

8    Mr. Belardo defies Whitebox's contention that a Type II

9    contract was even offered, let alone reached.  The email

10   stated that Whitebox's agreement to pay a particular price

11   was subject to other terms that were set forth.  It was not

12   an offer to be bound by a price term, coupled with a

13   commitment to negotiate other provisions.

14             By its express terms, it was an offer to accept

15   the price if -- and only if -- another particular term were

16   included in the deal.  By its terms, the deal was presented

17   as a package, not as a partial agreement to one term, to be

18   followed by a negotiation of other terms.

19             Whitebox also argues that the customer had

20   practice in the claims trading business is that when parties

21   have reached an agreement on price, they understand that

22   they should negotiate in good faith on other terms.

23             This testimony was extremely vague and self-

24   serving.  It described the general practices of traders who

25   regularly deal with each other in this field, but it stopped

Page 45

1    far short of showing that parties customarily understand

2    that they have made legally binding Type II contracts

3    whenever they agree on price and regardless of whether other

4    terms have been proposed.

5            I am particularly concerned about this contention,

6    because in other reported cases, parties in this same

7    industry have taken very different positions as to what the

8    alleged revealing customs are in the industry and as to

9    whether people in the industry believed that any agreement

10   of any kind is formed in the absence of a signed contract.

11           In fact, an affiliate of Seaport has itself

12   successfully argued in New York State Court that a stock

13   trade had no binding effect of any kind because the trade

14   communications said that the deal was "subject to" the

15   execution of written documents.  The State Court case is

16   Luxor Capital Group, L.P. v. Seaport Group, LLC.  The Trial

17   Court decision is reported at 2016 New York Misc. Lexis 1454

18   (April 15, 2016) and the decision on appeal is reported at

19   148 A.D. 3rd 590 (2017).  I will have more to say about that

20   decision in a few minutes.

21           I reject the contention that there is a custom in

22   the industry to the effect that communications of the type

23   that occurred here purportedly give rise to enforceable

24   obligations or to partial binding agreements on terms.  The

25   vague testimony at trial did not support the existence of

1    any such custom.

2          Furthermore, custom is relevant to the extent that

3    it provides evidence of what a party intends.  There is no

4    evidence that Ms. Bowers or anyone else at Landstar had any

5    familiarity with the alleged customs of people who more

6    regularly deal with each other in the trading of claims.

7          If claims traders want their customs to be binding

8    when they deal with non-professionals like Ms. Bowers, it is

9    incumbent on them to set forth the terms in a clear and

10   unequivocal way.  Contracts are supposed to be matters of

11   voluntary agreement; they are not supposed to be traps for

12   the innocent and unwary.

13         Accordingly, if Seaport had intended that there be

14   a binding Type II contract, it could and should have clearly

15   and explicitly asked Landstar to confirm that the parties

16   had an enforceable agreement as to price and that the

17   parties were entering into a binding and enforceable

18   agreement to negotiate other terms in good faith.

19         Perhaps Seaport does not use such language because

20   it thinks sellers, such as Landstar, would be scared off by

21   it.  But if a party would not have agreed to an explicit

22   agreement of the kind alleged, then a court certainly should

23   not impose such terms after the fact.

24         In any event, I find that the alleged customs are

25   not sufficient to override the plain meaning and effect of

1    the communications that the parties actually had in this

2    case.  Seaport's response was a counteroffer that was never

3    accepted, and there is nothing in the purported customs in

4    the industry that supports giving the communications a

5    different legal effect.

6            Second, and as an independent reason why no

7    binding contract was formed, I find, based on the evidence,

8    that no contract of any kind could have been formed because

9    Landstar, through Ms. Bowers, had clearly indicated its

10   intention not to be bound to any term, unless and until a

11   full written agreement on all terms was signed and executed.

12           As I mentioned earlier, courts have identified

13   four factors to be considered in determining whether a party

14   has an expressed an intention not to be bound in the absence

15   of a written agreement.  The factors are: one, whether there

16   is an expressed reservation of the right not to be bound in

17   the absence of a writing; two, whether there has been

18   partial performance of the contract; three, whether all

19   terms of the alleged contract have been agreed upon; and

20   four, whether the agreement at issue is the type of contract

21   usually committed to writing.  See, for example, Winston v.

22   Mediafare Entertainment Corp., 777 F.2nd 7880 (2nd Circuit,

23   1986).

24           These factors differ slightly when parties contend

25   that a Type II contract had been reached.  In such a case,

1    the third factor listed in Winston, i.e., whether all terms

2    have been agreed upon, will always involve a situation in

3    which all the terms exist.  But, otherwise, the factors are

4    quite similar.

5            A court should consider: (a) whether the intent to

6    be bound on a partial or preliminary basis is revealed by

7    the language of the agreement; (b) the context of the

8    negotiations; (c) the existence of open terms; (d) partial

9    performance; and (e) the necessity of putting the agreement

10   in final form, as indicated by the customary form of such a

11   transaction.  See Brown v. Cara, 420 F.3d, 148-157 (2nd

12   Circuit, 2005).

13           As to the first factor, I find that there was a

14   clearly expressed reservation of a right not to be bound,

15   either in full or to a partial set of terms, and the absence

16   of the execution of a written contract.  As I have noted, I

17   find that the whole purpose and the understood intent of Ms.

18   Bowers emails to Mr. Belardo after receiving his

19   counteroffer was to reconfirm what she had previously said

20   orally; namely, that the completion of a deal required the

21   approval of other people, including internal lawyers, and

22   that there would be no agreement unless and until a written

23   contract was signed.

24           I find that this position was communicated orally

25   to Mr. Belardo prior to the time when Ms. Bowers sent the

1    sell order that Mr. Belardo had drafted.  I find that Ms.

2    Bowers clearly confirmed it in the email exchanges with Mr.

3    Belardo, in which she asked him to clarify that Landstar

4    would not be bound, and in which he responded that there was

5    just "conceptually" on agreement on price, that "of course"

6    was subject to further agreements on terms and entry into

7    written agreements.

8              I also find that in this particular case, both

9    parties understood that the language in the offer that Mr.

10   Belardo drafted, to the effect that the offer and any

11   agreement would be "subject to" an agreement on terms and

12   execution of a written contract was an explicit reservation

13   of a right not to be bound at all, unless and until a

14   written agreement was signed.

15             On this particular point, Whitebox has argued

16   that, as a matter of law, I should treat the subject to

17   language as though it had no particular effect, or at least

18   only limited effect.  In support of that proposition,

19   Whitebox has cited to the decision by the New York Court of

20   Appeals in Stonehill Capital Management, LLC v. Bank of the

21   West, 28 NY 3d. 439 (2016).

22             In that case, a party conducted an auction sale of

23   a syndicated loan.  The auction terms stated that a buyer

24   would be required to execute a purchase agreement in a form

25   that was provided with the auction terms.  The auction terms

1    also stated that bids would be fully binding offers and

2    would be fully binding when accepted.

3            A bid was submitted and then accepted.  However,

4    the written acceptance said that the bid was accepted,

5    "subject to mutual execution" of an acceptable sale

6    agreement.  The seller then later sought to back out of the

7    deal.

8            In Stonehill, the Court held that the acceptance

9    of an auction bid usually forms a binding contract, that the

10   offering memo for the auction said explicitly that bids were

11   non-contingent, final and binding officers, and told bidders

12   they would be required to execute a sale agreement in a

13   specified previously disclosed form.  It also found that the

14   parties' correspondence indicated that they understood that

15   a binding deal was in place after the auction was finished.

16           In light of these facts, the Court held that under

17   the "totality of the circumstances" of that particular case,

18   the seller's reference to the "mutual execution" of an

19   agreement was not enough to avoid the contract.  Given that

20   the terms of the sale had been preset and that parties had

21   effectively been told that a binding contract would be

22   formed when a bid was accepted, the Court held that the use

23   of the subject to language in that particular case was not

24   enough to show that the parties did not intend to be bound.

25           Importantly, the Court noted that accepting the

1    seller's view of the significance of that language would

2    have contradicted other terms of the auction.  It would have

3    meant that the auction was not final and binding; whereas,

4    the auction terms had explicitly said otherwise.

5             In Stonehill, the Court of Appeals cited the three

6    other decisions.  The first was Emigrant Bank v. UBS Real

7    Estate Securities, Inc., 49 A.D. 3rd, 382 (2008).  Emigrant

8    Bank also involved an accepted auction bid on the sale of a

9    mortgage loan portfolio.  The bid form that was submitted

10   said that a sale was "subject to a mutually acceptable

11   purchase and sale agreement, which will be subject to

12   negotiation but substantially in the form of the agreement

13   posted to the bidding website.

14            The buyer added as a condition that, "a mutually

15   acceptable mortgage loan sale and servicing agreement will

16   be negotiated in good faith.

17            The Court in Emigrant held that a motion to

18   dismiss should have been denied.  As in the context of that

19   particular case, the subject to language did not

20   unmistakably and automatically and as a matter of law

21   condition an agreement on the execution of a definitive

22   contract.

23            The second decision cited in Stonehill was Bed

24   Bath & Beyond, Inc. v. Ibex Construction, LLC, 52 A.D. 3rd

25   413 (2008).  In Bed Bath & Beyond, the Court held that a

1    letter of intent in connection with a construction project

2    was a binding agreement.

3          While the language of the letter of intent was not

4    quoted in the opinion, the Court held that the plain

5    language of the letter of intent manifests the parties'

6    intent to be bound by its terms.

7          Since other terms plainly manifested that intent,

8    the use of "subject to language" elsewhere in the agreement

9    did not, in that particular case, amount to an express

10   reservation of a right not to be bound or a condition

11   precedent to the contract.

12         The third cited decision in Stonehill was Eastern

13   Consolidated Properties, Inc. v. Morrie Golick Living Trust,

14   83 A.D. 3d 534 (1st Department, 2011).  In that case, a

15   broker contended that it had obtained a buyer who was ready,

16   willing and able to buy a property.  However, the deal memo

17   between parties stated that it was subject to the signing of

18   a mutually agreeable contract of sale.

19         The Court held, on the strength of this language,

20   that the deal memo was "a classic example of an agreement to

21   agree" that did not constitute a binding contract of any

22   kind and that did not trigger any duty of good faith

23   negotiation and that, in light of the language, there was no

24   triable issue of fact.

25         Given these three cases cited with approval in

Page 53

1  Stonehill, and in particular, Stonehill's citation to the

2  Eastern Consolidated Properties decision, the Stonehill

3  decision simply cannot reasonably be read as a general

4  ruling that the "subject to" language as either meaningless

5  or of no import.

6         In fact, there is an extremely long line of

7  decisions in both the State Courts and the Federal Courts

8  that have relied on such "subject to" language, as clearly

9  indicating that parties have reserved a right not to be

10  bound in the absence of a fully negotiated and executed

11  written contract.

12         Just a partial list of these cases includes the

13  following: Tebbutt, T-E-B-B-U-T-T, v. Niagara Mohawk Power

14  Corp., 508 NYS 2nd 69 at 1986 (acceptance of a purchase

15  offer "subject to agreement on the terms of this sale,"

16  coupled with a statement that if the terms were

17  satisfactory, "we can proceed to prepare whatever contract

18  documents may be required," indicated without room for

19  dispute that the parties only intended to be bound if and

20  when a written agreement was executed).

21         Reprosystem, BV v. SCM Corp., 727 F.2d 257 262

22  (2nd Circuit 1984) (an intent not to be bound in the absence

23  of a written agreement was "conclusively established" when

24  the proposed contracts stated that agreements would be

25  binding "when executed and delivered").

1            RG Group, Inc. v. Horn & Hardart Co., 751 F.2nd 69

2     (2nd Circuit 1984) (no written agreement where a draft

3     contract said it would be binding "when duly executed.").

4            Adjustrite Systems v. JAB Business Services, 145

5     F.3d 543 (2nd Circuit 1997) (where the parties signed a two-

6     page agreement regarding a sale of assets, which provided

7     for the execution of a "sales agreement contract", as well

8     as other agreements that never were executed, the two-page

9     agreement was not a binding agreement but was just an

10    unenforceable agreement to agree).

11           Missigman, M-I-S-S-I-G-M-A-N v. USI Northeast

12    Inc., 131 F.Supp. 2nd 495 510 (SDNY 2001) (finding no

13    contract where an agreement was "subject to the execution of

14    an employment agreement").

15           Angelo Gordon & Company, L.P. v. Dycom Industries,

16    2006 US District Lexis 15784 (SDNY March 31, 2006) (where a

17    trade confirmation stated that it would be binding "upon

18    execution" by both buyer and seller, the Court concluded

19    that the parties did not intend to be bound without a signed

20    written agreement).

21           DCR Mtge. VI Sub 1, LLC v. People's United

22    Financial, Inc., 148 A.D. 2nd 986 987 (2nd Department 2017)

23    (no contract or an agreement was "subject to negotiation of

24    the mutually agreed upon loan sale agreement").

25           Hawkins v. Medapproach Holdings, Inc., 2018 U.S.

1    District Lexis 43500 at Star 3-4 (SDNY March 15, 2018)

2    (finding no intent to be bound where a proposed agreement

3    stated that it was "subject to attorney review and

4    discussion").

5              Perhaps most remarkable of all in this particular

6    regard is the decision in the New York State Courts in 2017

7    in the lawsuit involving an affiliate of Seaport that I have

8    referred to earlier.  The case name is Luxor Capital Group,

9    L.P. v. Seaport Group, LLC.  The Trial Court decision is

10   reported at 2016 New York Misc. Lexis 1454 (April 15, 2016),

11   and the decision on appeal is reported at 148 A.D. 3d 590

12   (2017).  The decision on appeal was issued after the

13   Stonehill decision.

14             In the Luxor case, Luxor argued that Seaport had

15   breached a contract to sell Twitter common stock.  Seaport

16   argued that there had only been an unenforceable agreement

17   to agree and not an enforceable contract.  The Trial Court

18   decision noted that, "Seaport intends that the parties did

19   not enter into an enforceable agreement because the

20   purported agreement was explicitly subject to mutually

21   satisfactory documentation.  Seaport urges that the parties

22   did not intend those instant messages to be binding until

23   their agreement was reduced to writing and signed, which

24   never happened.  Seaport maintains Luxor requested that the

25   trade be subject to documentation, and Luxor's internal

1    emails demonstrate that it knew and intended that the

2    subject to language meant there was an out.

3            The Trial Court agreed and held that instant

4    messages saying that a deal was "subject to mutually

5    satisfactory documentation" constituted a reservation of a

6    right not to be bound absent a written agreement.  The Trial

7    Court accepted Seaport's argument that, "to ignore these

8    expressions of the parties' intent would violate the

9    fundamental principle that the court must interpret the

10   agreement to give every provision meaning."  It, therefore,

11   granted summary judgment in favor of Seaport.

12           The Appellate Division affirmed, holding that the

13   "subject to" language had the effect that the lower court

14   had found.  It confirmed that the Stonehill decision did not

15   require a different result, and that, "unlike in Stonehill,

16   the totality of the circumstances here does not reflect any

17   certainty as to the existence of an enforceable contract."

18           It certainly is true after Stonehill that a

19   statement that an agreement is subject to further

20   documentation and execution of a written contract does not

21   automatically indicate an intent not to be bound, at least

22   where there are other explicit statements in the parties'

23   dealings that plainly and unequivocally confirm an intent to

24   be bound.

25           But the language does have meaning, and it

1   frequently is understood and used to convey the notion that

2   a party does not intend to be bound at all unless and until

3   a written agreement is signed.

4          I find that that is what the parties understood

5   the language to mean in this particular case.

6          Whitebox urges me to find the contrary and places

7   strong reliance on Chief Judge McMahon's decision in Bear

8   Stearns Investments Products v. Hitachi Auto Products USA,

9   401 B.R. 598 (SDNY 2009).

10         I should first note that all of Judge McMahon's

11  discussions of the relevant case law and her findings about

12  the absence of a full agreement in that case are fully

13  consistent with what I have held and with what I have found

14  in this case.

15         The only difference in the outcomes is that in

16  Bear Stearns, Judge McMahon found that an enforceable Type

17  II contract had been reached.  She explicitly declined to

18  reach such a conclusion based on contentions about industry

19  custom where there was no evidence that the seller was

20  familiar with those customs.  However, she found that there

21  was other evidence, primarily in the form of an internal

22  communication that the seller had sent that showed, in her

23  mind, a clear intent by the seller to be bound by a

24  preliminary agreement and to negotiate the rest of the terms

25  in good faith.

1        Here, in contrast, I find that the evidence shows

2    the opposite, for all of the reasons that I have explained

3    in detail and that I need not repeat.

4        As the Court of Appeals noted in its decision in

5    RG Group, Inc. v. Horn & Hardart Co., 751 F.2nd 69 74-75

6    (2nd Circuit 1984), "It is important to commerce that the

7    law make clear what force will be given to various

8    expressions of intent, or otherwise, parties could never be

9    assured that they were, in fact, channeling their

10   negotiations toward an oral contract or toward a written

11   one.  Hard and fast requirements of former are out of place,

12   of course.  But when a party gives forthright reasonable

13   signals that it means to be bound only by a written

14   agreements, courts should not frustrate that intent."

15       I find that Landstar gave such forthright

16   reasonable signals in this case; and, therefore, that no

17   binding contract of any kind, whether a fully formed

18   contract or a so-called Type II contract could have been

19   formed in the absence of a signed written agreement.

20   Whether this is stated as a reservation of the right not to

21   be bound, for purposes of the first factor in the Winston

22   decision, or as what the evidence shows as to the parties'

23   intent.

24       And as to the context of the negotiation, the

25   first and second factors listed at Cara, I find the evidence

1    clearly shows an intent not to be bound to any agreement at

2    all, including any preliminary agreement, unless and until a

3    full written agreement on all terms has been signed.

4           It is not really clear that I even need to

5    consider the other factors in light of this finding.  See

6    (indiscernible), 414 Fed. Appendix 354 355 (2nd Circuit

7    2011), but I will do so for the sake of completeness.

8           The second factor to be considered under Winston

9    and the fourth factor listed under Cara is whether there has

10   been partial performance of the contract.  This is relevant,

11   of course, because partial performance is good evidence the

12   parties believed they had an actual deal.  The parties

13   concede that there was no partial performance in this case.

14          The third factor to be considered under Winston

15   and the third factor under Cara is, "whether all terms of

16   the alleged contract had been agreed upon" or whether there

17   were "open terms."

18          By the end of trial, both parties conceded that

19   there was never a full agreement on all terms.  That itself

20   does not bar a finding that a Type II contract existed if

21   there was an agreement to be bound by some terms, coupled

22   with a binding agreement to negotiate in good faith as to

23   other terms.  But there was no such binding partial

24   agreement or binding agreement to negotiate in this case.

25          The final factor to be considered is whether the

1   agreement at issue is the type of contract usually committed

2   to writing or, as stated in Cara, the customary form of the

3   transaction.  I find based on the record that it is

4   customary for parties in this industry to execute written

5   documentation in connection with the trading of claims.  The

6   witnesses at trial confirmed that this is the usual

7   practice, though Whitebox contended it was not necessarily a

8   legal requirement.

9            As I noted earlier, Whitebox argued that there are

10  customs in the claims trading field that they believe call

11  for a different result in this case.  Whitebox argues that

12  it is important that traders be able to make deals based on

13  emails exchanges and important that parties be bound by

14  those deals before written documents are signed because,

15  otherwise, parties would be free to pull out of deals just

16  because prices have changed.

17           But if this is truly the case, the right answer is

18  that Seaport and other parties in this industry ought to be

19  clear and direct in setting forth their agreements in the

20  emails they exchange.  If Seaport wishes to enter into

21  partial Type II contracts, it can and should say so

22  explicitly.  If that is its intent, there is no reason why

23  it cannot say in its emails that we consider this to be a

24  binding legally -- or legally binding preliminary contract

25  with price already agreed upon and with the parties

1    obligated legally in good faith to negotiate other terms.

2            What seems to be happening instead is that the

3    participants in this industry use language that reassures

4    sellers that nothing is binding until the whole deal is

5    done, and that permits the people in the industry to take

6    different positions in different cases as to what the

7    language means and what the customs allegedly are, depending

8    upon the participants' self-interest in those individual

9    cases.

10           To see this disparity, one need only contrast the

11   positions taken by Whitebox here with the positions taken by

12   Seaport in the New York State Court.  No court should

13   endorse such a practice.

14           Similarly, much of what Whitebox argues, in terms

15   of custom, is not so much a request that I find that there

16   was an actual preliminary agreement here; rather, it asks

17   me, due to the needs of the industry, to impose one upon

18   Landstar, even in the absence of proof that Landstar itself,

19   which is not a participant in the industry, actually

20   understood that it had entered into a preliminary agreement.

21   That is not the proper role of a court.

22           The role of a court is to determine what parties

23   have agreed to, and if they have made an agreement, to

24   enforce it.  It is not the role of the court whether to

25   serve the interests of an industry or for other purposes, to

1    impose contracts on parties that the parties themselves have

2    not agreed to.

3           Courts have correctly urged caution in finding an

4    intent to form a preliminary or Type II contract.  And I

5    find, based on the evidence, that it is quite clear that

6    there was no intent by either party to form such a contract

7    in this case.

8           There was a conceptual agreement as to a purchase

9    price, but there was never a binding agreement between the

10   parties.  I, therefore, find in favor of Landstar.  The

11   transfer notices should be canceled and withdrawn, and the

12   claims and noticing agent should recognize that Landstar

13   entities as the proper owners of the claims.

14           A separate order will be issued to this effect.

15   Thank you very much.

16           (Whereupon these proceedings were concluded at

17   5:38 PM)

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 25, 2018