## EXHIBIT 2

**Avallone Deposition Transcript**

## Page 2

```
1              UNITED STATES BANKRUPTCY COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3    In re:                    )   Chapter 11
                               )
4    Caesars Entertainment Operating )  Case No. 15-01145
     Company, Inc., et al.,    )
5                              )   Jointly Administered
                               )
6                              )
                               )
7    * * * * * * * * * * * * * * * * * * * * * * * * *

8

9    VIDEO-RECORDED
     DEPOSITION OF:        THOMAS AVALLONE
10
     DATE TAKEN:           Wednesday, January 10, 2018
11
     TIME:                 9:36 a.m. - 2:42 p.m.
12
     PLACE:                Fairfield Inn Suites Marriott
13                         8214 Universal Boulevard
                           Orlando, Florida  32819
14
     REPORTED BY:          LAURA J. LANDERMAN, RMR, CRR, FPR
15                         Notary Public, State of
                           Florida at Large
16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
1    A P P E A R A N C E S:

2         AYANNA LEWIS-GRUSS, ESQUIRE
          Orrick, Herrington & Sutcliffe, LLP
3         51 West 52nd Street
          New York, New York  10019
4         alewisgruss@orrick.com
          212-506-5000
5              and
          DOUGLAS S. MINTZ, ESQUIRE
6         Orrick, Herrington & Sutcliffe, LLP
          Columbia Center
7         1152 15th Street N.W.
          Washington, D.C.  20005
8         dmintz@orrick.com
          202-339-8400
9
               Appearing on behalf of the Whitebox
10             Advisors, LLC,

11   JEFFREY CHUBAK, ESQUIRE
     Storch Amini, PC
12   140 East 45th Street -- 25th Floor
     New York, New York  10017
13   jchubak@storchamini.com
     212-497-8247
14
               Appearing on behalf of the Respondent.
15
     THE VIDEOGRAPHER:  Shawn Lane with
16                      Barkley Reporting

17   ALSO PRESENT:  Jeffrey Sirolly, Esquire
                    Deputy General Counsel with
18                  Earl Enterprises

19

20

21

22

23

24

25
```

## Page 4

```
1                    I N D E X

2    TESTIMONY OF THOMAS AVALLONE

3    Direct Examination by Ms. Lewis-Gruss           7

4    CERTIFICATE OF REPORTER                        140

5    CERTIFICATE OF OATH                            141

6    ERRATA SHEET                                   142

7                  E X H I B I T S
```

```
8    Exhibit No. 54                                  10
     (Notice of taking deposition)
9
     Exhibit No. 55                                  10
10   (Whitebox's Notice of Deposition
      of Earl Sandwich 30(b)(6)
11
     Exhibit No. 56                                  14
12   (Thomas Avallone's LinkedIn page)

13   Exhibit No. 57                                  35
     (1/12/17 email string
14    re: Sale of claims in Caesars/54%
      Bates Nos. EARL000251-000257)
15
     Exhibit No. 58                                  50
16   (1/12/17 email string from Rosenblum
      to Avallone re: Sale of Claim - Cowen
17    Bates Nos. EARL000315-000325)

18   Exhibit No. 59                                  57
     (1/16/17 email from Rosenblum to
19    Avallone re: Sale of Claim - Cowen
      Bates Nos. EARL000104-000115)
20
     Exhibit No. 60                                  67
21   (1/17/17 email from Rosenblum to
      Avallone re: Sale of Claim - Cowen
22    Bates Nos. EARL000061-000072)
```

```
23

24

25
```

## Page 5

```
1              E X H I B I T S  (cont'd)
```

```
2    Exhibit No. 61                                  73
     (2/28/17 email from Avallone to
3     Rosenblum re: Sale of Claim - Cowen
      Bates Nos. EARL000258-000261)
4
     Exhibit No. 62                                  84
5    (2/22/17 letter from Seyfried to
      Avallone re: Caesars General Unsecured
6     Trade Claims)

7    Exhibit No. 63                                 102
     (6/16/17 email from Avallone to Ortega
8     re: Caesars claim
      Bates Nos. EARL000180-000182)
9
     Exhibit No. 64                                 130
10   (7/6/17 email from Hawkins to Avallone
      re: Cowen contacts - Bates Nos. EARL000027)
```

```
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

In re:                                                                                    THOMAS AVALLONE
Caesars Entertainment Operating Company, Inc.                                                January 10, 2018

Page 6

1    THE VIDEOGRAPHER: We are now on the record in
2    the matter of In Re: Caesars Entertainment
3    Operating Company, Inc.  Today's date is January
4    10th, 2018, and the time is 9:36 a.m.  This is the
5    video-recorded deposition of Thomas Avallone being
6    taken at 8214 Universal Boulevard, Orlando,
7    Florida.  My name is Shawn Lane.  I'm the camera
8    operator.  And our court reporter today is Laura
9    Landerman.  We're both here on behalf of Barkley
10   Reporting, 10350 Santa Monica Boulevard, Los
11   Angeles, California.
12       Will counsel please introduce themselves for
13   the record?
14       MS. LEWIS-GRUSS: My name is Ayanna
15   Lewis-Gruss of Orrick, Herrington & Sutcliffe, LLP.
16   I am here on behalf of Whitebox Advisors.
17       MR. CHUBAK: Jeffrey Chubak from Storch Amini,
18   PC, on behalf of Earl of Sandwich (Atlantic City),
19   LLC.
20       MR. SIROLLY: Jeff Sirolly, deputy general
21   counsel for Earl Enterprises.
22       MS. LEWIS-GRUSS: I'm going to add that I will
23   also be joined by my colleague, Douglas S. Mintz,
24   and when he joins, we can note that in the record,
25   please.

Page 7

1        THE VIDEOGRAPHER: Will our court reporter
2    please swear in the witness?
3        THE REPORTER: Please raise your right hand.
4    Do you swear the testimony you're about to give
5    will be the truth, the whole truth, and nothing but
6    the truth, so help you God?
7        THE WITNESS: I do.
8            DIRECT EXAMINATION
9    BY MS. LEWIS-GRUSS:
10   Q   Good morning, Mr. Avallone.
11   A   Good morning.
12   Q   And is that the correct pronunciation of your
13   last name?
14   A   Avallone, yes.
15   Q   Can you please state your full name for the
16   record?
17   A   Thomas Avallone.
18   Q   What is your business address?
19   A   4700 Millenia Boulevard, Suite 400, Orlando,
20   Florida 32839.
21   Q   Have you ever had your deposition taken
22   before?
23   A   Yes, I have.
24   Q   On how many occasions?
25   A   Two or three.

Page 8

1    Q   And when did those depositions occur?
2    A   One was about 20 years ago, and one was about
3    five years ago.
4    Q   And what was the context of the deposition
5    that occurred about 20 years ago?
6    A   Licensing matter.
7    Q   And who -- what party did you appear on behalf
8    of?
9    A   Plaintiff.
10   Q   Who was the plaintiff?
11   A   Hard Rock Cafe.
12   Q   And with regard to the deposition that took
13   place approximately five years ago, what was the
14   subject matter of the dispute?
15   A   It was a malpractice claim against a law firm
16   in Minneapolis.
17   Q   And was that a personal malpractice claim that
18   you had?
19   A   No.  It was for one of our businesses.
20   Q   Which business was it for?
21   A   Buca, Inc.
22   Q   And when you say "our" business, who is the
23   our that you are referring to?
24   A   One of the businesses -- one of Robert Earl's
25   businesses.

Page 9

1    Q   So I'm going to -- you know, this is standard
2    deposition 101.  You're probably familiar with it, but
3    I'm just going to explain a few things to you.  So I'm
4    going to be asking you questions today.  You are
5    required to answer them under oath.  Do you understand
6    that?
7    A   Yes.
8    Q   And you need to answer my questions unless you
9    have a good-faith basis to believe that my questions
10   call for privileged information.  Do you understand
11   that?
12   A   Yes.
13   Q   So if you answer my question, I'm going to
14   assume that you understand my question.  If you don't
15   understand my question, please let me know, so that we
16   can make sure the record is clear.  If your attorney
17   objects, you still have to answer the question unless
18   they instruct you not to answer based on the grounds of
19   privilege.
20       So is there any reason you can't give full,
21   complete and accurate testimony today?
22   A   No.
23   Q   The court reporter, as you can see, is making
24   a typed transcript.  For the sake of the transcript and
25   the record, if you could wait until I finish my question

Page 10

1    before you begin your answer.  Thank you.
2         So do you understand that you are appearing at
3    this deposition in both your personal capacity and as a
4    corporate designee of Earl of Sandwich (Atlantic City)?
5    **A   Yes.**
6    Q   What do you understand it to be that you are
7    here as a corporate designee?
8    **A   I'm answering the questions for Earl of
9    Sandwich the entity.**
10   Q   And do you understand that your answers will
11   bind the entity?
12   **A   Yes.**
13     **(Avallone Exhibit Nos. 54 and 55 were marked.)**
14   Q   Mr. Avallone, you've now been handed the
15   documents that have been marked as Exhibits 54 and 55.
16   Do you have them in front of you?
17   **A   Yes.**
18   Q   And Exhibit 54 is a notice for your
19   deposition; is that correct?
20   **A   Yes.**
21   Q   And did you review this notice at any point
22   prior to today?
23   **A   Yes.**
24   Q   When did you first review the document?
25   **A   Shortly after it was received.**

Page 11

1    Q   And did you review it again in preparation for
2    today's deposition?
3    **A   I was shown a copy of it last night.**
4    Q   If you could put it aside and look at the next
5    document, Exhibit 55.  Do you understand that this is
6    the deposition notice for Earl of Sandwich (Atlantic
7    City) pursuant to Rule 30(b)(6)?
8    **A   Yes.**
9    Q   Have you seen this document before?
10   **A   Yes.**
11   Q   When did you first review this document?
12   **A   I don't recall when.**
13   Q   When did you most recently review this
14   document?
15   **A   I think I saw a copy of it last night.**
16   Q   And you understand that if you go to page 3
17   and 4, that there are ten categories of information that
18   you are here to testify to?
19   **A   Yes.**
20   Q   What did you do to prepare yourself to testify
21   as to these ten topics?
22   **A   Reviewed the e-mail stream between myself and
23   various -- Cowen and other representatives of Cowen.**
24   Q   Did you review any other documents?
25   **A   No.**

Page 12

1    Q   You reviewed no communications internal to
2    Earl?
3    **A   I don't understand.**
4    Q   So you said you reviewed communications with
5    Cowen and representatives of Cowen, correct?
6    **A   Yes.**
7    Q   Did you review communications with Robert
8    Earl?
9    **A   Yes.**
10   Q   Did you review communications with anyone else
11   who is employed by or represents Earl of Sandwich or any
12   related entity?
13   **A   Not that I recall.**
14   Q   Did you review e-mail communications with
15   Bruce Hawkins?
16   **A   Are you saying -- what period of time?  I'm
17   getting a little confused.**
18   Q   In preparation for your deposition today, did
19   you review e-mail communications with Bruce Hawkins?
20   **A   No.**
21   Q   What did you do to prepare for today's
22   deposition?
23   **A   I reviewed the e-mail stream.**
24   Q   Did you meet with counsel?
25   **A   Yes.**

Page 13

1    Q   When did you meet with counsel?
2    **A   Two nights ago over dinner and then again last
3    night.**
4    Q   For how long did you meet with counsel last
5    night?
6    **A   Couple hours.**
7    Q   Did you review any documents that refreshed
8    your recollection of events relevant to this dispute?
9    **A   Other than the e-mail stream, no.**
10   Q   Did you speak to Mr. Earl about his
11   deposition?
12   **A   Very briefly.**
13   Q   When did you speak to him?
14   **A   For about 30 seconds last night and about a
15   minute this morning.**
16   Q   What did Mr. Earl tell you?
17   **A   Just told me good luck.**
18   Q   Did you review a transcript of Mr. Earl's
19   deposition?
20   **A   No, I did not.**
21   Q   And do you understand that Rule 30(b)(6)
22   requires that you must testify about information known
23   or reasonably available to the organization?
24   **A   Yes.**
25   Q   So unless I state otherwise, I will be asking

In re:                                                                    THOMAS AVALLONE
Caesars Entertainment Operating Company, Inc.                                January 10, 2018

---

Page 14

1  you questions in your capacity as Earl's 30(b)(6) or
2  corporate designee, as it's alternatively referred to,
3  witness. Do you understand that?
4     A   Yes.
5        MR. CHUBAK: I think it makes sense to clarify
6     for the record that reference to Earl of Sandwich
7     as Earl of Sandwich (Atlantic City), LLC.
8        MS. LEWIS-GRUSS: Okay. We can go through it
9     with every question to make sure we're clear.
10       MR. CHUBAK: We don't need to go through it
11    with every question but for purposes of this
12    deposition.
13       MS. LEWIS-GRUSS: Okay. I was trying to agree
14    with you.
15       (Avallone Exhibit No. 56 was marked.)
16  BY MS. LEWIS-GRUSS:
17    Q   Mr. Avallone, do you have in front of you
18  what's been marked as Exhibit 56?
19    A   Yes.
20    Q   Is this your LinkedIn profile?
21    A   I assume so, yes.
22    Q   Is it your intention that the information on
23  the LinkedIn profile be accurate?
24    A   That would be nice.
25    Q   Do you -- in reviewing this document, is there

---

Page 15

1  anything that seems inaccurate to you?
2     A   No.
3     Q   And so is it correct that you are currently
4  the vice chairman of Planet Hollywood International?
5     A   Yes.
6     Q   And are you also the vice chairman of Earl
7  Enterprises?
8     A   Earl Enterprises isn't an entity, but, yes, I
9  hold myself out as vice chairman, yes.
10    Q   And so what is Earl Enterprises?
11    A   Earl Enterprises is sort of the trade name or
12  a name that we give to encompass all the entities that
13  are either owned, controlled or managed by Robert Earl
14  or one of his family trusts.
15    Q   And what's the difference between Earl
16  Enterprises and Planet Hollywood International?
17    A   Well, Planet Hollywood as a legal entity has
18  its own subsidiaries, its own ownership. Earl
19  Enterprises encompasses other entities other than just
20  Planet Hollywood.
21    Q   So Planet Hollywood has subsidiaries?
22    A   Yes.
23    Q   And Earl Enterprises encompasses other
24  entities other than just Planet Hollywood. Does that
25  mean that Earl Enterprises is a parent of Planet

---

Page 16

1  Hollywood and its subsidiaries?
2     A   No.
3     Q   So can you explain to me the relationship
4  between Planet Hollywood and Earl Enterprises?
5     A   Planet Hollywood is an entity that is
6  controlled or owned or managed by Robert Earl, so it
7  falls under that umbrella. There's no -- Earl
8  Enterprises is not an entity. It's not a -- it has no
9  shareholders. It's just a name that we use to reference
10  the group of companies.
11    Q   What organizations are part of Earl
12  Enterprises that are not part of Planet Hollywood
13  International?
14    A   There's Rawhide Holdings, Inc., which
15  effectively owns Earl of Sandwich restaurants. There is
16  also Orlando Co -- OCS Consultants that owns interest in
17  various other businesses. An Internet business called
18  Collide, a licensing business for Planet Hollywood
19  Resort and Casino in Vegas, some real estate.
20    Q   So who is the parent company of Rawhide
21  Holdings?
22    A   Rawhide Holdings is owned by the Rawhide
23  Trust.
24    Q   Is the Rawhide Trust alternatively referred to
25  as Robert Earl Family Trust?

---

Page 17

1     A   The actual name is Rawhide Trust, and it's a
2  trust set up for the benefit of Robert Earl's children.
3  We refer to it as the family trust, but that's not the
4  technical name.
5     Q   So is Earl Enterprises the name that is used
6  to refer to all entities owned and controlled by Rawhide
7  Trust?
8     A   That's one of the entities.
9     Q   There are other entities that are owned and
10  controlled by Rawhide Trust, is that correct, in
11  addition to Earl Enterprises?
12    A   You have to restate that question. I don't --
13    Q   I don't have to, but you'd like me to. So
14  what you said was --
15    A   If you want an answer, you have to. Please.
16    Q   You stated that Rawhide Trust -- that Earl
17  Enterprises is one of the entities that's owned and
18  controlled by Rawhide Trust. What other entities are
19  owned and controlled by Rawhide Trust?
20    A   Earl Enterprises doesn't own anything or
21  control anything. Earl Enterprises is the name that we
22  use to -- when we refer to businesses that are owned by
23  either Robert Earl or the trust.
24    Q   I wasn't asking about Earl Enterprises. I was
25  asking you about entities owned and controlled by

---

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 18

1 Rawhide Trust. I said is Rawhide Trust the actual legal
2 entity that owns and controls all the companies that you
3 referred to as being subsidiaries or operating under the
4 Earl Enterprises umbrella.
5 **A No. It just is the parent company of all the**
6 **businesses that are under Rawhide Holdings.**
7 Q So what businesses are under Rawhide -- so
8 Rawhide Trust is the parent of Rawhide Holdings,
9 correct?
10 **A Yes.**
11 Q What businesses are under Rawhide Holdings?
12 **A Earl of Sandwich USA, which encompasses the**
13 **Earl of Sandwich brand. And then there's various**
14 **subsidiaries under that, one of them being Earl of**
15 **Sandwich (Atlantic City).**
16 Q And that is the only company that is owned by
17 Rawhide Holdings?
18 **A There's -- there may be one or two other ones,**
19 **but those are the other only operating businesses.**
20 Q Who is the patient company of the restaurant
21 group known as Buca di Beppo?
22 **A Planet Hollywood International, Inc.**
23 Q So what relationship does Planet Hollywood
24 International, Inc., have to Earl of Sandwich USA?
25 **A No direct relationship.**

Page 19

1 Q Does Planet Hollywood -- is Planet Hollywood
2 International owned and controlled by Rawhide Trust?
3 **A Planet Hollywood International, no.**
4 Q Who is Planet -- is there a parent company of
5 Planet Hollywood International?
6 **A Yes.**
7 Q What is that parent?
8 **A There's not a patient. There's several**
9 **owners.**
10 Q Who are the owners of Planet Hollywood
11 International?
12 **A Planet Hollywood Resorts International, LLC,**
13 **Robert Earl, the Holst Trust.**
14 Q How do you spell that, please?
15 **A H-O-L-S-T. And that's -- and then about 30**
16 **very small holders less than 1 percent.**
17 Q Are you one of those small holders?
18 **A No, I'm not.**
19 Q Who is the beneficiary of the Holst Trust?
20 **A Robert's three children.**
21 Q Who is the owner of Planet Hollywood Resorts
22 International, LLC?
23 **A OCS Consultants, Inc.**
24 Q And OCS Consultants, Inc., is also a
25 subsidiary of Rawhide Holdings?

Page 20

1 **A No.**
2 Q No. So that OCS Consultants, Inc., is
3 different than the company you said was a subsidiary of
4 Rawhide Holdings?
5 **A I never said OCS was a subsidiary of Rawhide**
6 **Holdings.**
7 Q Okay. So if we go back, you did say that
8 OCS -- so is OCS part of the Earl Enterprises
9 organization?
10 **A That being one of the entities we would**
11 **consider under the group.**
12 Q Okay. So what is the difference between OC --
13 between Planet Hollywood International and Earl
14 Enterprises in terms of the companies that they include?
15 **A Planet Hollywood has no ownership of Rawhide**
16 **Holdings or any of their subsidiaries or -- which is**
17 **Earl of Sandwich.**
18 Q Do they both -- does Earl Enterprises and
19 Planet Hollywood both manage the same companies?
20 **A Earl Enterprises is just the name we refer to.**
21 **It's not an entity. Planet Hollywood International,**
22 **Inc., actually provides management services to all the**
23 **group companies under -- that would be considered under**
24 **this group of Earl Enterprises.**
25 Q Does either Earl Enterprises or Planet

Page 21

1 Hollywood International maintain a chart that lists all
2 of the companies that it owns, operates or otherwise has
3 an interest in?
4 **A Yes.**
5 Q And who maintains that document?
6 **A The legal department.**
7 Q Does Planet Hollywood International maintain a
8 document that lists all directors, officers and managers
9 of any company that it owns, controls, or otherwise
10 operates?
11 **A Yes.**
12 Q And because Earl Enterprises is not a legal
13 entity, is it correct to assume that it does not
14 maintain a list of officers, directors, executives of
15 companies because it doesn't have any companies that it
16 owns, controls or manages; is that correct?
17 **A Yes.**
18 Q But you hold yourself out in your e-mail as
19 the vice chairman of Earl Enterprises, correct?
20 **A Yes.**
21 Q Why do you hold yourself out as being vice
22 chairman of Earl Enterprises rather than vice chairman
23 of Planet Hollywood International?
24 **A Because it has a broader reach to all the**
25 **different companies and not just -- not just Planet**

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 22

1    Hollywood.
2        Q    But Planet Hollywood International does
3    include some of the restaurants?
4        A    Some.
5        Q    But not all?
6        A    Correct.
7        Q    And is it correct that you serve as the
8    president of Earl of Sandwich (Atlantic City)?
9        A    Yes.
10       Q    Do you serve as -- and you're also the
11   secretary of Earl of Sandwich (Atlantic City)?
12       A    Yes.
13       Q    Are you an officer of any other entity?
14       A    Yes.
15       Q    What -- which other entities do you serve as
16   an officer for?
17       A    99 percent of all the entities of Planet
18   Hollywood, Earl of Sandwich, Rawhide Holdings, mostly --
19   all the entities, 99 percent of them.  There may be one
20   or two small ones there's --
21       Q    And do you also own, either in part or in
22   whole, franchises for companies that operate under the
23   Earl Enterprises banner?
24       A    Do I personally?
25       Q    Yes.

Page 23

1        A    No.
2        Q    Was there a point in time when you did have
3    ownership or partial ownership of franchises?
4        A    No.
5        Q    Are you aware of any public statements or
6    legal filings in which it was stated that you were an
7    owner of Earl -- well, of franchises?
8        A    No.
9        Q    Are you aware that Planet Hollywood has filed
10   for bankruptcy in the past?
11       A    Yes.
12       Q    Which Planet Hollywood is it that filed for
13   bankruptcy?
14       A    Planet Hollywood International, Inc., and its
15   subsidiaries.
16       Q    And Planet Hollywood International, Inc., has
17   filed for bankruptcy twice?
18       A    Correct.
19       Q    And at the time that Planet -- during one of
20   those bankruptcies, it's not correct that you co-owned
21   about Mr. Earl a franchise of Planet Hollywood in Reno,
22   Nevada?
23       A    I did not.
24       Q    So prior to the time that you became the vice
25   chairman of Planet Hollywood International and Earl

Page 24

1    Enterprises, what positions did you have within Mr.
2    Earl's companies?
3        A    Do you want me to go through a history?
4        Q    Please.
5        A    Started in 1988 and I was the CFO of Hard Rock
6    Cafe International, the public company.  Robert acquired
7    the company.  We went -- we were public in 1987.  That's
8    when I joined Hard Rock International.  In 1988
9    Robert -- a company that Robert was controlling bought
10   Hard Rock Cafe, and I remained as CFO.  Moved down to
11   Orlando, was put -- made CFO of some of the other
12   businesses related -- Orlando-related businesses, and
13   then became CFO of Planet Hollywood.
14           And then in 2008, we acquired Buca, Inc.,
15   restaurant company, and at that time I was made CEO or
16   president of that entity to turn it around.  And then
17   after that, I became vice chairman sort of looking
18   after -- looking at additional M&A opportunities and
19   just looking after some of the businesses for Mr. Earl.
20       Q    Are you a member of any board of any
21   corporation?
22       A    Planet Hollywood International, Inc.
23       Q    Are there any others?
24       A    Not outside the group.
25       Q    Within the group, are you a member of the

Page 25

1    board of any other organizations?
2        A    I -- yes.  I assume, yes.  And to the extent
3    that they have boards, I would -- I would most likely be
4    on them.
5        Q    So much like you're an officer of 99 percent
6    of all entities within the group, you're also a member
7    of the board of the majority of entities within the
8    group to the extent they have boards?
9        A    To the extent they have boards.
10       Q    Are you also a manager of the majority of
11   entities that are within the group?
12       A    Yes.  You know, some were member managed, some
13   manager managed, but in that capacity.
14       Q    Does Earl of Sandwich USA have a board?
15       A    No.
16       Q    What corporate positions do you hold for Earl
17   of Sandwich USA?
18       A    I'm not sure, but I believe I'm the manager.
19       Q    Are you the president of Earl of Sandwich USA?
20       A    I don't believe I have an officer title.
21       Q    Are there officers of Earl of Sandwich USA?
22       A    Operating officers, yes.
23       Q    Do you know if there's a president of Earl of
24   Sandwich USA?
25       A    We have a CEO for Earl of Sandwich USA,

Page 26

1  several vice presidents of operations, but it's not --
2  they're not named in the operating documents as such.
3      Q  You have an MBA from Case University; is that
4  correct?
5      A  Yes.
6      Q  Do you have any other advanced degrees?
7      A  No.
8      Q  How would you describe your job
9  responsibilities?
10     A  I basically look after the businesses and look
11  after some of the day-to-day things and sort of bring
12  things to Robert's attention for him to make decisions
13  about.
14     Q  What are the day-to-day things that you look
15  after?
16     A  Just the running of the various departments.
17  We have presidents of each of the different brands and
18  just communicating with them what's happening.  To the
19  extent that there's needs for development or requests, I
20  would sort of coordinate them and present them to Robert
21  for his approval.
22     Q  Is there a document that lists your job
23  responsibilities?
24     A  No.
25     Q  Have your responsibilities changed throughout

Page 27

1  the course of your employment with Robert Earl?
2      A  Yes.
3      Q  When did they last change?
4      A  After I -- after I was no longer the CEO of
5  Buca di Beppo restaurant chain and became vice chairman
6  was the last time it changed.
7      Q  And you became vice chairman in 2012?
8      A  Yes.  I mean, around --
9      Q  And when you became vice chairman, was there
10  an announcement made to the employees of the company?
11     A  Yes.
12     Q  And did that announcement list what
13  position -- the specifics of your position in any way?
14     A  I don't recall.
15     Q  How frequently do you travel for business?
16     A  It depends, but I would say, generally, once
17  every other month or twice.
18     Q  Do you travel with Mr. Earl when you travel on
19  business?
20     A  Occasionally.
21     Q  But not always; is that correct?
22     A  Not always.
23     Q  And do you travel internationally for
24  business?
25     A  Yes.

Page 28

1      Q  Is the majority of your business travel
2  domestic or international?
3      A  Domestic.
4      Q  And where within the U.S. do you travel most
5  frequently for business?
6      A  New York, Las Vegas and California.
7      Q  What business do you transact in New York?
8      A  We have restaurants there.
9      Q  How often do you meet with Mr. Earl?
10     A  What do you mean by meet?
11     Q  What do you mean -- what do you understand the
12  word "meet" to mean?
13     A  In person?  By phone?  Correspondence?
14     Q  So you consider -- when you have a phone call
15  with Mr. Earl, you consider that to be a meeting?  I
16  just want to make --
17     A  No, I don't.  I consider a meeting as in
18  person.
19     Q  So I want to make sure that we're using the
20  words in the same way, so that's an important
21  clarification.
22     A  Yes.
23     Q  So how do communicate with Mr. Earl?
24     A  When he's in town, I meet with him either at
25  his house or in the office and then generally by phone

Page 29

1  and e-mail.
2      Q  So how often do you meet with Mr. Earl in
3  person?
4      A  When he's in town, pretty much every day if
5  not every -- every other day, if not more.  When he's
6  not in town, occasionally, you know, if I know he's
7  going to be in California for a while, I will meet with
8  him and plan a trip around that when I know where he's
9  going to be to go through stuff.  Sometimes I fly out to
10  California just to meet with him to go through issues.
11     Q  What is or was the business of Earl of
12  Sandwich (Atlantic City), LLC?
13     A  It operated Earl of Sandwich Restaurant in
14  Showboat Casino in Atlantic City.
15     Q  Did Earl of Sandwich (Atlantic City) operate
16  that company, or did it just hold the lease for the
17  location in Atlantic City?
18     A  It operated it.
19     Q  Mr. Avallone, I'm handing you what's been
20  previously marked as Exhibit 36.
21     A  Yes.
22     Q  This document was described by your counsel as
23  a partial organizational chart.  Do you agree with that
24  description?
25     A  Yes, except the name Robert Earl Family Trust

Page 30

1   should be Hol -- should be the Rawhide Trust, the formal
2   name.
3       Q   Does the Rawhide Trust have corporate
4   officers?
5       A   Rawhide Trust has trustees.
6       Q   Who are those trustees?
7       A   Trustee -- the trustee's actually Lauren
8   Investments Holding -- Lauren Investments or Lauren
9   Holdings.
10      Q   And that's a single trustee?  It has one
11  trustee?
12      A   That is the single trustee.  There are two
13  directors of that entity that act -- that basically act
14  as trustees.
15      Q   Who are those directors?
16      A   Thomas Kessler and Caroline Deletra.
17      Q   Rawhide Holdings -- does Rawhide Holdings,
18  Incorporated, have any corporate officers?
19      A   I'm sure it does.
20      Q   Are you one of the officers of Rawhide
21  Holdings, Incorporated?
22      A   I am.
23      Q   Do you know what title you have?
24      A   I don't.
25      Q   Is there a board of directors or board of

Page 31

1   members of Rawhide Holdings, Incorporated?
2       A   I'm not sure.
3       Q   And we talked about the corporate officers of
4   Earl of Sandwich USA a few minutes ago; is that correct?
5       A   Yes.
6       Q   And forgive me if I'm repeating this question
7   because I don't remember your answer.
8           Is there a board of members of Earl of
9   Sandwich USA?
10      A   I don't believe so.
11      Q   And you also don't believe there's a board of
12  directors for Earl of Sandwich USA?
13      A   Correct.
14      Q   And all the corporate officer positions for
15  Earl of Sandwich (Atlantic City) that existed were held
16  by you most recently?
17      A   Yes.
18      Q   And even though that franchise is no longer
19  operating, you still serve as the president and
20  corporate secretary of Earl of Sandwich (Atlantic City)?
21      A   Yes.
22      Q   And you're also the CEO of Earl of Sandwich
23  (Atlantic City); is that correct?
24      A   No, I don't believe so.
25      Q   You don't believe so.  Okay.  We'll come back

Page 32

1   to that.
2           Are you the manager of Earl of Sandwich
3   (Atlantic City)?
4       A   Yes.
5       Q   Are you the sole member of Earl of Sandwich
6   (Atlantic City)?
7       A   Am I?
8       Q   Yes.
9       A   I am not a member.
10      Q   Who is a member of Earl of Sandwich (Atlantic
11  City)?
12      A   Earl of Sandwich USA.
13      Q   And Earl of Sandwich USA is the sole member of
14  Earl of Sandwich (Atlantic City)?
15      A   Correct.
16      Q   Does Rawhide Holdings incorporate or conduct
17  any business itself or is, as the name suggests, just a
18  holding company?
19      A   It's just a holding company.
20      Q   And Earl of Sandwich USA, LLC, has operations;
21  is that correct?
22      A   Yes.
23      Q   What role, if any, do you have with regard to
24  the Rawhide Trust?
25      A   I communicate with the trustees.

Page 33

1       Q   Do you communicate with the trustees regarding
2   the business of Earl of Sandwich USA, LLC?
3       A   Yes.
4       Q   And you also communicate with the trustees
5   regarding the business of any other entity that the
6   trust owns; is that true?
7       A   Yes.
8       Q   Mr. Avallone, you've been handed a document
9   that was previously marked as Exhibit 37.  Do you have
10  that in front of you?
11      A   Yes.
12      Q   Have you seen this document before today?
13      A   Yes.
14      Q   What do you understand this document to be?
15      A   Replacing Dave Crabtree with myself.
16      Q   And does this document refresh your
17  recollection that you were appointed the CEO of Earl of
18  Sandwich (Atlantic City), LLC?
19      A   Okay.  Yes.
20      Q   So it's correct and true -- well, correct and
21  true is redundant, so it's true that you, as you sit
22  here today, are the president, CEO and secretary of Earl
23  of Sandwich (Atlantic City)?
24      A   Yes.
25      Q   You are also manager of Earl of Sandwich

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 34

1    (Atlantic City), LLC?
2        A    Yes.
3        Q    Are there any other managers of Earl of
4    Sandwich (Atlantic City)?
5        A    Not that I'm aware of.
6        Q    Does Earl of Sandwich (Atlantic City) have
7    governing documents?
8        A    Yes.
9        Q    Do you know what those governing documents are
10   by title?
11       A    Operating agreement.
12       Q    And does the operating agreement set out the
13   authority granted to the corporate officers of Earl of
14   Sandwich (Atlantic City)?
15       A    Yes.
16       Q    Does that document also set out the authority
17   granted to the manager of Earl of Sandwich (Atlantic
18   City), LLC?
19       A    Yes.
20       Q    Are there any other documents that establish
21   or are there any other documents that govern the
22   operations of Earl of Sandwich (Atlantic), LLC [sic]?
23       A    No other documents.
24       Q    Are you familiar with an individual by the
25   name of Barrett Mikelberg or Mikelberg?

Page 35

1        A    Yes.
2            (Avallone Exhibit No. 57 was marked.)
3        Q    Mr. Avallone, do you have in front of you
4    what's been marked as Exhibit 57?
5        A    Yes.
6        Q    And this is a document bearing the Bates
7    number, which is little numbers at the bottom, Earl 251
8    through Earl 257?
9        A    Yes.
10       Q    So if you -- do you understand that when
11   e-mails print out, that what's first on the page is
12   actually the last e-mail in the thread?
13       A    Yes.
14       Q    So if you could turn to the page that has Earl
15   255 at the bottom, please.
16       A    Uh-huh.
17       Q    No.  Actually, I'm sorry.  If you could turn
18   to Earl 253.  So about halfway, a little more than
19   halfway down the page is there an e-mail from you to
20   Mr. Mikelberg?
21       A    Yes.
22       Q    So on January 11th, you sent an e-mail to
23   Mr. Mikelberg stating that Earl of Sandwich (Atlantic
24   City) might be a seller of its 3.6 million undisputed
25   allowed claim for 2.15 million cash; is that correct?

Page 36

1        A    Yes.
2        Q    And did Mr. Mikelberg respond to that e-mail?
3        A    No.
4        Q    Did anyone respond to your January 11th e-mail
5    to Mr. Mikelberg?
6        A    Yes.
7        Q    Who responded?
8        A    Bradley Schwab.
9        Q    And at the time you received Mr. -- Mr. Schwab
10   responded to you on January 11th; is that correct?
11       A    Yes.
12       Q    And Mr. Schwab responded in writing; is that
13   correct?
14       A    Yes.
15       Q    And at the time you received Mr. Schwab's
16   written e-mail to you, did you know who he was?
17       A    No.
18       Q    You had no prior interactions with Mr. Schwab
19   before January 11, 2017; is that correct?
20       A    I don't think so.
21       Q    And Mr. Schwab's e-mail signature block says
22   that he's the head of Cowen Special Investments.  Do you
23   see that?
24       A    Yes.
25       Q    Did you have any interactions with Cowen

Page 37

1    Special Investments prior to receiving Mr. Schwab's
2    e-mail on January 11th, 2017?
3        A    No.
4        Q    Had you heard of Cowen Special Investments
5    prior to receiving Mr. Schwab's e-mail on January 11th,
6    2017?
7        A    I'd heard of Cowen but not Cowen Special
8    Investments.
9        Q    The Cowen that you had been familiar with or
10   at least had heard of, did you believe that that was a
11   company related to Cowen Special Investments or did you
12   think it was something completely different?
13       A    No.  The Cowen that I dealt with was the --
14   was the retail investment banking arm of the restaurant
15   division.
16       Q    So in his e-mail to you, Mr. Schwab asked you
17   a number of questions; is that correct?
18       A    Yes.
19       Q    And did you respond to those questions?
20       A    Yes.
21       Q    And this e-mail is printed in black and white.
22   If we looked at the original, you may have used colored
23   ink to differentiate your answers, but is it true that
24   you responded to Mr. Schwab's questions in what I call
25   in line, so in the body of his actual e-mail to you?

Page 38

1    A    Yes.
2    Q    And so that we're clear, Mr. Schwab in that
3    January 11, 2017, e-mail asked, "Was wondering if you
4    have support documentation regarding the claim being
5    allowed as you mention below.  I do see that it was
6    filed for 3.6 million as well as 4.5 million."
7        What was your response to that question?
8        MR. CHUBAK: Objection.  It's not a question.
9    A    (Reviewing document.)  He was wondering
10   whether we had support documentation to support the 3.6
11   as well as the 4.5, and I was -- and I responded that it
12   was -- that the claim was originally at 4 point -- it
13   was disputed at 4.5 and that we agreed on, with the
14   debtor, a 3.6 million dollar claim.
15   Q    And the claim that you and Mr. Schwab were
16   discussing is a claim filed by Earl of Sandwich
17   (Atlantic City), LLC, in the Caesars bankruptcy; is that
18   correct?
19   A    That is correct.
20   Q    And that claim was filed and amended; is that
21   correct?
22   A    It was filed and amended, yes.
23   Q    And do you know that the amended claim number
24   is 5858?
25   A    Yes.

Page 39

1    Q    So Mr. Schwab goes on and asks you a few more
2    questions, including he'd like you to confirm that you
3    are offering the paper for sale at 2.15 million or
4    approximately 59.72 percent of the face claim amount, is
5    that correct," and "is that correct" is in his question.
6    Do you see that?
7    A    Yes.
8    Q    And how did you respond?
9    A    I responded question.
10   Q    And he also asked you if you would have any
11   flexibility.  How did you respond?
12   A    No.
13   Q    And Mr. Schwab responded to you again in
14   writing, and he told you that he would have interest at
15   59.72 percent subject to confirming the above, and you
16   had asked for 59.72 percent; is that correct?
17   A    We were discussing -- the price was -- 59.72
18   percent calculates out to be the 2.15 million, and that
19   was one aspect of the negotiation.
20   Q    And Mr. Schwab asked you or stated -- let me
21   strike that.
22        Mr. Schwab stated -- actually, Mr. Schwab
23   asked you if you have support documentation confirming
24   that Earl Enterprises had settled a claim with the
25   estate.  Do you see that?

Page 40

1    A    Yes.
2    Q    And you didn't tell Mr. Schwab that Earl
3    Enterprises wasn't a legal entity, did you?
4    A    No.
5    Q    And you didn't tell him that the party that
6    had settled the claim with the estate was anything other
7    than Earl Enterprises; is that correct?
8    A    Correct.
9    Q    And so for purposes of negotiating a potential
10   sale of Claim 5858, it wasn't important to you to
11   clarify which legal entity had settled the claim; is
12   that correct?
13   A    I wouldn't say it wasn't important.  It
14   wasn't -- it wasn't pertinent to the negotiations.
15   Q    Why wasn't it pertinent?
16   A    Well, I mean, you know, in looking at it, I
17   mean, price is one thing, but there's also other
18   variables that I have to con -- had to consider.  The
19   actual terms and conditions --
20   Q    That's not my question.  My question was
21   solely about Earl Enterprises and the difference between
22   Earl Enterprises and Earl of Sandwich and what entity
23   you held yourself out as representing in any
24   communications with Mr. Schwab.
25        So you tell him in response to his asking for

Page 41

1    support documentation that you can easily get a letter
2    from the debtor or restructuring officer confirming the
3    nature of the claim, correct?
4    A    Yes.
5    Q    Okay.  And, again, on the same day Mr. Schwab
6    then says -- no.  He lists a number of conditions for
7    the benefit of the seller.  Do you see that?
8    A    Yes.
9    Q    And he says that if you're good with those
10   terms, he'll move forward -- or sorry.  He says that if
11   you're good with those terms, he'll forward you a
12   purchase and sale agreement for review; is that correct?
13   A    Yes.
14   Q    And at some point after receiving that e-mail,
15   did you have a phone conversation with Mr. Schwab?
16   A    Yes.
17   Q    And when did that conversation occur?
18   A    I don't recall exactly, but I would have
19   assumed it was sometime later on the 11th.
20   Q    And what did Mr. Schwab -- did you ask
21   Mr. Schwab to call you or did he reach out to you on his
22   own?
23   A    I don't recall.
24   Q    And what did Mr. Schwab say to you?
25   A    I don't recall exactly, but I do recall

Page 42

1    stating that, as part of discussions, that as part of
2    any transaction, that I need to be comfortable,
3    obviously, with the terms and conditions, which includes
4    the price, needed to get the approval from the owner and
5    how it affected me as a member of the unsecured
6    creditors committee.
7        Q   Where did you -- and you said that all on the
8    phone?
9        A   Yes.
10       Q   And how do you recall that you said that
11   specifically when you don't recall anything that
12   Mr. Schwab said to you?
13       A   Because whenever I spoke to -- in my
14   discussions with any of the people who called me or I
15   spoke to about the claim, I made that statement because
16   I wanted to be transparent and let them know that, you
17   know, I'm on the unsecured creditors committee.  I need
18   other approvals.  You know, that this isn't going to be
19   a quick thing.  I need to review everything, and I need
20   to see how it sits on, you know, being on the unsecured
21   creditors committee with my access to, you know, certain
22   confidential information as relating to the bankruptcy.
23   I just wanted to make sure we -- I was very up front
24   with them and transparent.
25       Q   Why didn't you put that in writing?

Page 43

1        A   I didn't see a need to.
2        Q   And is it not your practice that when you're
3    negotiating to make sure that proposed terms and
4    conditions are in writing?
5        A   That's the purpose of the purchase and sale
6    agreement.
7        Q   And did you send anybody at Cowen a purchase
8    and sale agreement that listed those conditions?
9        A   No.
10       Q   And did you make any effort to reach out to
11   the creditors committee to find out how a potential sale
12   would impact your rights and responsibilities on the
13   creditors committee?
14       A   Yes.
15       Q   What steps did you take?
16       A   I spoke to creditors committee counsel.
17       Q   When did those conversations occur?
18       A   I don't recall.
19       Q   Do you believe that they occurred at about the
20   time you were negotiating with Cowen in January of 2017?
21       A   Probably sometime after that.
22       Q   What does that mean to you, sometime after
23   that?  What length of time?
24       A   Maybe early February.
25       Q   Would it surprise you that those documents

Page 44

1    have not been produced in this action?
2        A   No.
3            MS. LEWIS-GRUSS:  So we're going to state that
4    all such documents need to be produced and we are
5    going to continue this deposition because we can't
6    do that without those documents because the record
7    is incomplete.  So we suggest that you find a way
8    to produce them to us at lunch; and if not, we're
9    coming back.
10           THE WITNESS:  There is no documents.
11   BY MS. LEWIS-GRUSS:
12       Q   You just said that you had e-mails.
13       A   No.  I had a conversation, I said.
14       Q   No, that's not what you said, but we can go
15   back.
16       A   Okay.
17       Q   So before you had e-mails, but now that you
18   found out we're going to have to continue your
19   deposition --
20       A   No.
21       Q   -- you're telling me under oath that such
22   communications only occurred by phone?
23       A   Yes.
24       Q   Okay.  So did you understand that at the
25   time -- so why did you wait till February to reach out

Page 45

1    to the creditors committee counsel as opposed to in
2    January when you were actually actively negotiating with
3    Cowen?
4        A   Because in -- I was negotiating with Cowen,
5    but at the time I did not -- had no intent that I
6    actually had a deal going.  We were just talking about
7    it.  And when I looked at the -- the purchase and sale
8    agreement, the assignment agreement they sent me, there
9    was items in there that I didn't like.  And because of
10   that, I didn't --
11       Q   So were you negotiating in bad faith with
12   Cowen Special Investments?
13       A   No.
14           (Whereupon, Douglas S. Mintz, Esq., enters the
15   deposition room.)
16       Q   So you told them that you would have these
17   conditions, but you took no steps to actually make sure
18   that you complied or made those conditions come to
19   fruition; is that correct?
20       A   No.
21       Q   But you were negotiating in January and it
22   wasn't until February that --
23       A   Well, there was --
24       Q   -- you took any steps?
25       A   No, that's -- I received a purchase and sale

Page 46

1  agreement.  Didn't like the terms.  There was other
2  considerations having to do with me being on the
3  committee.  And as you can see by the e-mail that there
4  was -- after that there was no discussions or anything
5  else.  The negotiations ended.
6      Q    So once you received the purchase and sale
7  agreement from Cowen, did you inform them that the deal
8  was off and that you would not be pursuing any further?
9      A    There was never a deal to have.  It was
10 negotiations.  The negotiations ended.
11     Q    Did you ever tell Cowen that you would not be
12 pursuing the negotiations further?
13     A    I didn't need to because I said if I don't
14 hear from you, we're going to assume you're no longer
15 interested, so that's how it ended.
16        MS. LEWIS-GRUSS:  Let's take a break.
17        THE WITNESS:  Okay.
18        THE VIDEOGRAPHER:  Going off the record.  The
19    time is 10:37 a.m.
20        (A 14-minute recess was had.)
21        THE VIDEOGRAPHER:  Please stand by.  Going
22    back on the record.  The time is 10:51 a.m.
23 BY MS. LEWIS-GRUSS:
24     Q    So you testified before the break,
25 Mr. Avallone, that at the time you were negotiating with

Page 47

1  Cowen, you had no intent to actually have a deal going;
2  is that true?
3      A    No.  What I said was I had no intent to sell
4  it at that time.  I was the -- at the time we were just
5  negotiating.  It was not a -- in my mind, it was not a
6  sale by any means.
7      Q    So did you inform Cowen that you were just in
8  negotiation -- negotiating and did not have the intent
9  to complete a sale in January of 2017?
10     A    I think the e-mails speak for themselves that
11 we were negotiating back and forth various conditions
12 and that we needed to have, you know, a signed document.
13 I was hoping we could get to a signed agreement that I
14 could -- in terms that were acceptable to me that I
15 could present to Robert to get his approval to proceed
16 or not, for him to make the decision.
17     Q    But it's your testimony as you sit here today
18 that you, as the corporate representative of Earl of
19 Sandwich (Atlantic City), LLC, had no intent to close a
20 deal with Cowen in January 2017 when you were
21 negotiating with representatives with Cowen for the sale
22 of what has been referred to as Claim 5858, correct?
23        MR. CHUBAK:  Objection, misstates testimony.
24     A    No.  I had no intent on January 11th that the
25 sale was going -- if all the conditions that I just --

Page 48

1  and if the documents were in order and if I got Robert
2  Earl's approval and if it didn't affect my standing on
3  the unsecured creditors committee, then I would have
4  been in a position to bring it to Robert, get his
5  approval and then do a deal.
6      Q    And if you look back at what's been marked as
7  Exhibit 57, Mr. Schwab, at 8:34 on January 12th, sends
8  you an e-mail saying that his acceptance of your offer
9  is good through 11:00 a.m. Eastern time that day.  Do
10 you see that?
11     A    Yes.
12     Q    And in response to that e-mail, you didn't say
13 to Mr. Schwab, "I need more time to obtain approvals."
14 You said, "Please forward draft document," correct?
15     A    Yes, because I wanted to move the process
16 along, and documents are the most important aspect of a
17 transaction of this nature.
18     Q    And in Mr. Schwab's January 12th e-mail to
19 you, he said, "There are numerous other parties seeking
20 to close transactions prior to the January 17th
21 deadline."  Do you see that?
22     A    Yes.
23     Q    And you didn't in response to Mr. Schwab say,
24 "We will not be able to close this deal prior to January
25 17 because I need more time to obtain approvals," did

Page 49

1  you?
2      A    No.
3      Q    And at the time you sent your e-mail on
4  January 12th, 2017, at 9:46 in the morning, you didn't
5  indicate to Mr. Schwab that there were any conditions to
6  closing; isn't that correct?
7      A    By saying send me a draft document, I think
8  that speaks for itself.  There was no final document,
9  that there were negotiations to continue --
10     Q    My question called for yes or no.  Did you
11 indicate in your e-mail to Mr. Schwab that there were
12 other conditions to closing that would need to be
13 completed?
14     A    I think the word "draft" answers that
15 question.
16     Q    So the answer is, no, you didn't actually say
17 anything other than please forward draft document,
18 correct?
19        MR. CHUBAK:  Objection, asked and answered.
20     A    Correct.
21     Q    And did you receive a draft document from
22 Mr. Schwab?
23     A    I received a draft document.  I don't recall
24 who from.
25     Q    If we could go back to Exhibit 57 for a

Page 50

1   moment, please.  Mr. Schwab in his e-mail to you of 8:34
2   a.m., January 12th, said that the offer was good through
3   11:00 a.m. Eastern time today, correct?
4       A   Yes.
5       Q   And you responded prior to 11:00 a.m. Eastern
6   time on January 12th, correct?
7       A   Not to that question.
8       Q   You responded to his e-mail prior to 11:00
9   a.m. Eastern time on January 12th; is that correct?
10      A   I responded to his e-mail.
11      Q   And what question did you say you didn't
12  respond to?  What I stated to you doesn't involve a
13  question; isn't that true?
14      A   He was saying acceptance of the offer is good
15  until 11:00 a.m.  I sent a note to send a draft, not
16  a -- I did not agree to --
17      Q   Mr. Schwab had said to you the offer --
18  acceptance of the offer is good through 11:00 and that
19  he could forward a draft.  Your response sent prior to
20  11:00 a.m. Eastern time on January 12th was to forward a
21  draft, correct?
22      A   Yes.
23      (Avallone Exhibit No. 58 was marked.)
24      Q   Mr. Avallone, you've now been handed what has
25  been marked as Exhibit 58.  It's a document that was

Page 51

1   produced by your counsel bearing the Bates Nos. Earl 315
2   to Earl 325.  Do you see that?
3       A   Yes.
4       Q   Is this the e-mail that you received from
5   Cowen Special Investments forwarding you the draft
6   document that you requested?
7       A   Yes.
8       Q   And at the time that you received this
9   document, you had agreed with Cowen Special Investments
10  on a price for a potential -- what you would call a
11  potential sale of the claim?
12      A   Yes.
13      Q   And, in fact, Cowen Special Investments
14  accepted the price you asked for.  There was no discount
15  from your original request for 2.15 million dollars,
16  correct?
17      A   There was a request when he asked for
18  flexibility, and I said no.
19      Q   And he then accepted your price; is that
20  correct?
21      MR. CHUBAK: Objection, calls for a legal
22  conclusion.
23      A   Part of the negotiations, one aspect of it,
24  yes.
25      Q   So my question was specifically about price.

Page 52

1   He accepted your price; is that correct?
2       A   Yes.
3       Q   So on January 12th, you received an e-mail
4   from Gail Rosenblum.  Who do you understand Gail
5   Rosenblum to be?
6       A   She was a -- a representative accountant.
7       Q   And she sent you a draft document; is that
8   correct?
9       A   Yes.
10      Q   And did you forward the draft document to
11  Mr. Earl?
12      A   No.
13      Q   Did you forward the draft document to legal
14  counsel?
15      A   No.
16      Q   Did you forward the draft document to anyone?
17      A   No.
18      Q   Did you review the draft document?
19      A   Yes.
20      Q   Did you inform Cowen of any concerns you had
21  about the draft document?
22      A   No.
23      Q   Did you send a black line requesting changes
24  to the draft document?
25      A   No.

Page 53

1       Q   Did you inform Cowen at the time you received
2   Ms. Rosenblum's e-mail in the afternoon of January 12th
3   that you were displeased with the draft agreement?
4       A   No.
5       Q   Did you inform Cowen that you had reviewed the
6   draft document and would not be proceeding with the deal
7   for the sale of Claim 5858?
8       MR. CHUBAK: Objection, compound question.
9       A   Could you repeat the question?
10      Q   So at the time that you received the draft
11  contract from Ms. Rosenblum on the afternoon of January
12  12th, 2017, did you inform Cowen that you would not
13  proceed with any deal to sell Claim 5858?
14      A   The negotiations weren't going to continue.  I
15  did not inform Cowen.
16      Q   Did you have a conversation with Ms. Rosenblum
17  by phone after she forwarded this document to you?
18      A   Yes.
19      Q   When did that call occur?
20      A   I do not recall.
21      Q   Do you have reason to believe that that call
22  occurred in January of 2017?
23      A   Yes.
24      Q   Do you believe that it occurred soon after you
25  received the e-mail from Ms. Rosenblum on January 12th?

Page 54

1    A   Yes.
2    Q   Did you call Ms. Rosenblum?
3    A   I don't recall.
4    Q   What did you say to Ms. Rosenblum during that
5    phone call?
6    A   I said about the claim and about what was
7    needed, the approval of the documents.  I needed to
8    speak to -- get approval from the owner of the business,
9    and I had to see what -- how it affected me and the
10   creditors committee.
11   Q   What steps did you take to obtain approval of
12   the document?
13   A   I read the document.
14   Q   So you have authority to approve the document
15   on your own?
16   A   No.
17   Q   So, again, what steps did you take to obtain
18   approval of the document?
19   A   I did my own review, and if I had found it
20   satisfactory, I would have passed it on to the legal
21   department because it -- I was expecting a one-page
22   assignment to look at, and I got a seven- or eight-page
23   document that had all these conditions, that had
24   indemnities and reps and warranties --
25   Q   So, in fact --

Page 55

1    A   -- and it didn't even guarantee.
2    Q   So, in fact, you did nothing to obtain
3    approval of the documents; isn't that correct?
4    A   Yeah.  It was at that point that the
5    transaction just got more complicated than I was
6    expecting.
7    Q   So, again, you did nothing to obtain approval
8    of the document; isn't that correct?
9        MR. CHUBAK:  Objection, asked and answered.
10   A   Correct.
11   Q   Did you inform Ms. Rosenblum that you had
12   expected to receive a one-page document?
13   A   No.
14   Q   Why not?
15   A   Because, again, this was all part of
16   negotiations and not a deal, that this was -- this was
17   not something that was expecting to happen very quickly,
18   and they wanted it to happen quickly because of -- they
19   were mentioning because of the claim deadlines and
20   things of that nature, that I wasn't -- didn't want --
21   wasn't prepared to negotiate any further.
22   Q   Did you inform Ms. Rosenblum during your
23   conversation that you were not prepared to meet the
24   January 17th deadline?
25   A   I don't recall.

Page 56

1    Q   What did you do to familiarize yourself with
2    the deposition topics prepared for today?
3    A   I'm sorry.  Could you repeat that?
4    Q   So you're under obligation to testify on
5    behalf of the company regarding deposition topics set
6    out in the notice --
7    A   Yes.
8    Q   -- of deposition.
9    A   Uh-huh.
10   Q   So for you to say you don't recall is somewhat
11   surprising given that you were obligated to prepare for
12   this deposition.
13       What did you -- so I'm going to ask you again,
14   you know, as you sit here today, what did Ms. Rosenblum
15   tell you during your conversation with her in January of
16   2017?
17       MR. CHUBAK:  Objection, asked and answered.
18   You're asking about a phone call.
19   A   I don't recall.
20       MS. LEWIS-GRUSS:  Mr. Chubak, I'm going to ask
21   my questions.
22   A   I don't recall.
23   Q   Do you take notes of your phone calls?
24   A   No.
25   Q   When you have a phone call regarding potential

Page 57

1    sale of a claim for 2.15 million dollars, do you report
2    that phone call to Mr. Earl?
3    A   No.
4    Q   Why not?
5    A   Because it's common practice that I would get
6    all the information together and put it in final form
7    that would include negotiation of all the documents,
8    price, pluses, any other contingencies, and I put
9    together a full package to discuss with him to get
10   his -- to make a recommendation for him to make a
11   decision.
12   Q   And you have authority to engage in
13   negotiations with third-parties on behalf of Earl
14   Enterprises; isn't that correct?
15   A   Yes.
16       (Avallone Exhibit No. 59 was marked.)
17   Q   Mr. Avallone, do you have in front of you
18   what's been marked as Exhibit 59?
19   A   Yes.
20   Q   And this a document that was produced by your
21   counsel bearing the Bates stamps Earl 104 through Earl
22   115?
23   A   Yes.
24   Q   And it says in the middle of the page or -- in
25   the middle of the page, there's an e-mail from

In re:                                                                                          THOMAS AVALLONE
Caesars Entertainment Operating Company, Inc.                                    January 10, 2018

Page 58

1　Ms. Rosenblum to you sent at approximately 9:00 a.m. on
2　January 13th, 2017.  Do you see that?
3　　A　Yes.
4　　Q　And Ms. Rosenblum states, "It appears I missed
5　a call from you last night."  Do you see that?
6　　A　Yes.
7　　Q　Do you have any reason to dispute that you
8　called Ms. Rosenblum?
9　　A　No.
10　　Q　And at the top of this page is an e-mail from
11　Ms. Rosenblum on January 16th, 2017.  Do you see that?
12　　A　Yes, sir.
13　　Q　And by this e-mail Ms. Rosenblum again
14　forwards you the draft document; is that correct?
15　　A　(Reviewing document.) Yeah, based on the
16　header, it looks like there was an attachment attached
17　to it, yes.
18　　Q　If you turn the page, can you see if there's
19　an attachment to this e-mail, please?
20　　A　Yes.
21　　Q　And do you have any reason to believe that the
22　draft Ms. Rosenblum sent you on January 16th is
23　different than the e-mail she sent you on January 12th?
24　　A　No.  I didn't review it.
25　　Q　And would it surprise you to receive an e-mail

Page 59

1　from Ms. Rosenblum that didn't reflect the conditions
2　that you mentioned to her on your phone call sometime in
3　the range of January 12th to January 14th of 2017?
4　　A　No.
5　　Q　Why not?
6　　A　Because I wouldn't expect the agreement to
7　have those conditions in there.  That would be something
8　that would take care of itself when I was -- they were
9　my conditions that, you know, if things were acceptable,
10　would be silent.
11　　Q　So is it -- so let's go back.  Do you now
12　having looked at this e-mail believe that you had a
13　phone conversation with Ms. Rosenblum sometime between
14　January 12th and January 16th, 2017?
15　　A　I don't recall.
16　　Q　So when Ms. Rosenblum said, "I wanted to
17　follow up on our call late Friday," do you think that
18　you did not, in fact, have a call with Ms. Rosenblum on
19　Friday?
20　　A　No.  Okay.  All right.  There's no reason to
21　believe that we didn't have a call.
22　　Q　And I'll represent to you that January 16th,
23　the date of her e-mail, was a Monday.  January 16th,
24　2017 was a Monday, and so January 14th -- so the Friday
25　would have been probably January 13th, so we're going to

Page 60

1　refer to your call as occurring on or about January
2　13th.  Okay?
3　　A　Yes.
4　　Q　Thank you.  So it's your testimony on behalf
5　of Earl of Sandwich (Atlantic City) that on January
6　13th, you told Ms. Rosenblum that the deal would not
7　proceed until you had received certain approvals,
8　correct?
9　　A　On this call or another call.  I don't --
10　　Q　You believe you had more than one call with
11　Ms. Rosenblum?
12　　A　I don't recall.
13　　Q　So is there a reason -- do you believe that
14　the call that occurred on or about January 13th was the
15　first call you had with Ms. Rosenblum prior -- or after
16　she had sent you the draft agreement?
17　　A　(Reviewing document.) I really don't recall
18　when -- the dates of calls or the time I don't recall.
19　　Q　So before -- but you did speak to
20　Ms. Rosenblum before she --
21　　A　Yes.
22　　Q　-- sent you the draft agreement on January
23　16th?
24　　A　Yes.
25　　Q　And despite the fact that you had told her

Page 61

1　that you had certain conditions precedent to closing the
2　deal, she did not include those conditions in the draft
3　agreement she sent you on January 16th; isn't that
4　correct?
5　　A　Correct.
6　　Q　But those conditions, in your mind, didn't
7　need to be included in the draft because they were only
8　things for you to worry about; is that true?
9　　A　No.  Those are things that would be settled
10　before I will be in a position to be able to sign it.
11　　Q　And does this draft agreement contain any
12　conditions precedent to closing for any party on -- on
13　behalf of any party?
14　　MR. CHUBAK: Objection.  The document speaks
15　for itself.
16　　A　This is not a document that I would have
17　signed.
18　　Q　That's not my question to you.
19　　A　Okay.
20　　Q　So why would an agreement only protect one
21　side -- one party and not both?
22　　A　Don't understand the question.
23　　Q　Is it your testimony that the draft document
24　doesn't contain any conditions precedent to closing?
25　　MR. CHUBAK: Objection.  The document speaks

Page 62

1    for itself.
2    A  I'd have to -- give me a minute to read the
3    document, and I'll let you know if there's anything in
4    it.
5    Q  But at the time that you reviewed this
6    document in January of 2017, did you understand there to
7    be any conditions precedent to closing as reflected in
8    the document?
9    A  I'll have to read the document and let you
10   know.
11   Q  I'm not asking you about what it says today.
12   I'm asking about your understanding in January of 2017.
13   A  It's my understanding in January that this
14   document had to be negotiated heavily.
15   Q  What was that understanding based off of?
16   A  My initial review of the document.
17   Q  But it was not based off of anything that you
18   communicated to Cowen; isn't that correct?
19   A  No.  I hadn't -- hadn't -- hadn't proceeded
20   that far.
21   Q  But you had conversations with Cowen, that's
22   correct, isn't it?
23   A  As part of the negotiations, yes.
24   Q  And Cowen in its communications with you
25   stated that it had certain things that it needed to

Page 63

1    finalize; isn't that true?  That the agreement was
2    subject to due diligence; isn't that true?
3    A  Correct.
4    Q  And Cowen had every right to waive those
5    conditions; isn't it true?
6    MR. CHUBAK: Objection, calls for a legal
7    conclusion.
8    Q  Mr. Avallone, you're a sophisticated
9    businessman, aren't you?
10   A  In certain areas.
11   Q  You have an MBA, don't you?
12   A  I do.
13   Q  You regularly negotiate transactions; isn't
14   that true?
15   A  Yes.
16   Q  And you review contracts all the time in
17   connection with your responsibilities to negotiate
18   transactions on behalf of companies owned and controlled
19   by Robert Earl; isn't that true?
20   A  I review contracts, but I also send everything
21   to our legal department before.
22   Q  But you would make it -- you review them on
23   your own, as you've just testified?
24   A  Yes.
25   Q  So upon receiving this e-mail from

Page 64

1    Ms. Rosenblum on January 16th, what did you do?
2    A  I don't believe I did anything.
3    Q  And you didn't contact Ms. Rosenblum in
4    response to this e-mail; is that correct?
5    A  I don't recall.
6    Q  You didn't send her an e-mail saying "trying
7    to get those approvals that I told you about," did you?
8    A  I wasn't in a position to ask for the
9    approvals yet.
10   Q  Why weren't you in a position to ask for the
11   approvals yet?
12   A  Because I didn't have an agreement.  I didn't
13   have the complete terms and understanding of what was
14   going to be considered as part of the sale, what we were
15   receiving, and as far as timing.
16   Q  So you received from Cowen Special Investments
17   a ten-page draft agreement.  What terms remained to be
18   completed in that agreement?
19   A  Well, I would not have signed this agreement.
20   I didn't like the indemnities.  I didn't like the fact
21   that -- with some of the reps and warranties.  I didn't
22   do any, you know, haven't done any specific -- I hadn't
23   done any research about holding on to it, whether there was
24   any claims against it and everything was free and clear.
25   I didn't like the idea that they could pay late and not

Page 65

1    pay me at closing and just pay an 8 percent interest
2    rate on it.
3    There was certain things about this.  It was
4    complex and it -- to me it was something that wasn't in
5    a position that I could give to Mr. Earl with confidence
6    and say here's the deal.
7    Q  So the fact that you didn't like the terms
8    proposed by Cowen didn't mean that the terms weren't
9    complete, correct?
10   A  It means I wouldn't have signed a deal with
11   them under these terms.
12   Q  That's not the question.  What you testified
13   earlier was that the terms hadn't been completed.  In
14   fact, the terms had been completed.  You just decided
15   that you didn't like them; isn't that correct?
16   MR. CHUBAK: Objection, asked and answered and
17   calls for a legal conclusion.
18   MS. LEWIS-GRUSS: His decision is not calling
19   for a legal conclusion.  He's already testified
20   he's not a lawyer.  Mr. Chubak, I'm going to
21   continue to ask the questions I want to ask.  I
22   suggest that you not make objections unless they
23   have foundation.
24   A  Could you repeat the question?
25   MS. LEWIS-GRUSS: Could you please read back

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 66

1     the question?
2          (The record was read back as requested.)
3     A   No, the terms hadn't been completed.
4     Q   What -- again, what terms hadn't been
5   completed?
6     A   Timing of payments, the amount of the
7   contingencies, the reps and warranties.
8     Q   How did you memorialize your concerns with the
9   terms in this agreement?
10     A   I didn't.
11     Q   And you didn't convey those concerns to Cowen;
12   isn't that correct?
13     A   As part of the negotiations, no, I did not.
14     Q   And it's your testimony that when you received
15   this specific draft on January 16th, there were no
16   further negotiations; isn't that correct?
17     A   Correct.
18     Q   And in response to receiving this draft, you
19   didn't tell Ms. Rosenblum or anyone else at Cowen
20   Special Investments that you needed to obtain the
21   approval of Robert Earl; isn't that correct?
22     A   I don't believe that's correct.
23     Q   You don't believe it's correct?
24     A   No.  I had told them about the approval of
25   Mr. Earl at some point.

Page 67

1     Q   But you -- do you have reason to believe that
2   that happened after you received the e-mail that you
3   have in front of you that's been marked as   Exhibit 59?
4     A   I don't recall when.
5     Q   So as you sit here today, when do you believe
6   the negotiations with Cowen came to a conclusion?
7     A   I think from probably sometime after this or
8   right around this time and got confirmation from Gail
9   that said "If I don't hear from you, I'm going to assume
10   you're no longer interested," and I didn't respond.
11     Q   And when did that occur?
12     A   I don't recall exactly the date.
13     Q   And did there come a time when Cowen informed
14   you that you did have a deal?
15     A   Yes.
16     Q   And what form did that communication take
17   place or in what form did that communication come?
18     A   I believe I got a letter from someone at
19   Cowen.
20          MS. LEWIS-GRUSS: Let's mark this, please.
21          (Avallone   Exhibit No. 60   was marked.)
22   BY MS. LEWIS-GRUSS:
23     Q   So after Ms. Rosenblum -- do you have in front
24   of you what's been marked as   Exhibit 60?
25     A   Yes.

Page 68

1     Q   And that document bears the Bates Nos. Earl 61
2   through Earl 72.  Do you see that?
3     A   61 to when?
4          THE REPORTER: 72.
5     A   Yes.
6     Q   And by this e-mail, Ms. Rosenblum again sends
7   you the draft document; isn't that correct?
8     A   Yes.
9     Q   And Ms. Rosenblum in her e-mail says there's
10   additional time for your review of the document.  Do you
11   see that?
12     A   Yes.
13     Q   And she doesn't say in this e-mail, you know,
14   that you only have until a certain date to accept; isn't
15   that correct?
16     A   Yes.
17     Q   And she doesn't say "If I don't hear back from
18   you, we'll consider the deal as lost," does she?
19     A   Not in this e-mail.
20     Q   And as you sit here today, you don't know the
21   date of the e-mail that you believe exists in which
22   Ms. Rosenblum said you have until a certain time to
23   accept?
24     A   It was a week or so after this.
25     Q   Okay.  Well, I'm going to ask your counsel to

Page 69

1   find that because I don't believe any such e-mail was
2   produced to us.
3          In this e-mail, Ms. Rosenblum says that she
4   left a message with Lori on January 17th, 2017.  Do you
5   see that?
6     A   Yes.
7     Q   Who's Lori?
8     A   Lori's my assistant.
9     Q   Did you speak to Ms. Rosenblum on January 17th
10   after receiving her e-mail?
11     A   I don't recall.
12          MR. CHUBAK: The referenced e-mail was January
13     18th, 9:33 a.m.  It's included in the transcript
14     claim.
15     Q   So that's not a week later, is it?  January
16   18th wouldn't be a week later, would it?
17     A   It's somewhere around there.  It's sometime
18   after that, within the week.
19     Q   So Ms. Rosenblum sends you this e-mail on
20   January 17th with the draft document.  That draft
21   document does not, in fact, say -- I mean, that draft
22   document does not reference the conditions that you had
23   allegedly conveyed to Ms. Rosenblum; isn't that correct?
24     A   Correct.  But she does say working with our
25   counterparts and negotiate a mutually agreeable

Page 70

1 agreement, so it --
2    Q    And what --
3    A    -- could easily have applied to conditions
4 that needed to be there.
5    Q    And what steps did you take to mutually
6 negotiate those terms?
7    A    None.
8    Q    And did you inform Ms. Rosenblum that you
9 would not be taking any steps to mutually negotiate
10 those terms?
11    A    No, because in my mind, the negotiations --
12 wasn't negotiating anymore.
13    Q    And did you convey what was in your mind to
14 anyone at Cowen Special Investments?
15    A    Nope.
16    Q    And in the course of your business
17 negotiations, is that how you normally obtain
18 transactions?
19        MR. CHUBAK: Objection, vague.
20    A    It's not a transaction.  This was a
21 negotiation.
22    Q    Do you normally conclude negotiations in the
23 course of your business dealings in which -- by just
24 walking away?
25    A    Sometimes.

Page 71

1    Q    In what situations do you conclude
2 negotiations by walking away without informing your
3 counter party that you're no longer interested in
4 continuing negotiations?
5    A    It's just not at that particular -- usually
6 we'll come back if there was a period of just -- a
7 waiting period.  I wasn't rushing forward on it and at
8 some point just stopped negotiating.
9    Q    So is it your testimony that you -- that in
10 your mind, the negotiations concluded -- the
11 negotiations with Cowen concluded or is it that you were
12 taking your time to consider the terms proposed in the
13 draft agreement?
14        MR. CHUBAK: Objection, asked and answered.
15    A    No.  What I'm saying is that I did not have to
16 because in the e-mail that I'm referring to later, which
17 counsel has told me is the 18th now, which she says, you
18 know, if I don't hear from you I'm assuming we're not
19 doing business anymore, that's how it concluded.
20    Q    So what did you mean when you said there was a
21 waiting period in your answer to my last question?
22    A    Well, I'm just saying nothing happened between
23 when I received the first draft and January 17th.
24    Q    Why did you believe there was a waiting period
25 between the time you received the first draft on January

Page 72

1 12th and January 17th?
2    A    Again, this was not a transaction in my mind
3 that, you know, something was being sold and we had to
4 get the documents done very quickly.  This was a
5 negotiation, and if it wasn't going to take place today,
6 you know, we had time to complete this.
7    Q    But Cowen --
8    A    Cowen was the one who were saying that there
9 was -- they were under some time pressure.
10    Q    Right.  So, in fact, Cowen told you you didn't
11 have a waiting period, that you needed to move quickly
12 on this deal, correct?
13    A    They believed that, yes.
14    Q    And you continued to negotiate with them
15 understanding that they believed the deal needed to
16 conclude on or about January 16th or 17th, even though
17 you knew there was no way for you to obtain the
18 approvals within that time period; is that correct?
19    A    That is correct.
20    Q    So the waiting period that you just testified
21 under oath existed only existed in your mind; is that
22 correct?
23    A    It was a period -- yeah.
24    Q    Did you -- after Ms. Rosenblum sent you the
25 document, did you speak to anybody at Cowen Special

Page 73

1 Investments other than Ms. Rosenblum?
2    A    After when?
3    Q    After Ms. Rosenblum began e-mailing you, did
4 you speak to anybody else at Cowen Special
5 Investments --
6    A    Don't --
7    Q    -- besides Ms. Rosenblum?
8    A    Don't recall.
9    Q    Do you know -- and if you look at this e-mail,
10 there is somebody named John Mori copied on that e-mail.
11 Do you know who that is?
12        THE REPORTER: John what?
13        MS. LEWIS-GRUSS: Mori, M-O-R-I.
14    A    No.
15    Q    Did you have any communications with Mr. Mori?
16    A    Not that I'm aware of.
17        (Avallone Exhibit No. 61 was marked.)
18    Q    Mr. Avallone, you've been handed what's been
19 marked as Exhibit 61, which is an e-mail bearing the
20 Bates stamps Earl 258 to Earl 261.  Do you see that?
21    A    Yes.
22    Q    And at the bottom of this page is the January
23 18th e-mail that your attorney testified to; is that
24 correct?
25        MR. CHUBAK: I'm not under deposition, just

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 74

1  for the record.
2      MS. LEWIS-GRUSS: But you are providing
3  testimony, apparently, on the record.
4  BY MS. LEWIS-GRUSS:
5      Q   So at the bottom of this page, is there an
6  e-mail that you received from Ms. Rosenblum on January
7  18th, 2017?
8      A   Yes.
9      Q   And this is an e-mail which Ms. Rosenblum
10 said, "Would you kindly advise by noon Eastern time
11 today if you plan to move ahead with the transaction";
12 is that correct?
13     A   Yes.
14     Q   And you didn't respond to this e-mail; is that
15 correct?
16     A   Yes.
17     Q   And despite having said that to you on January
18 18th, Ms. Rosenblum actually contacts you again on
19 January 24th and says that there's more time and that
20 you could still consider the transaction; isn't that
21 correct?
22     A   Yes.
23     Q   And did you respond to Ms. Rosenblum's January
24 24th e-mail at any time prior to the conclusion of
25 January 2017?

Page 75

1      A   I don't believe so.
2      Q   And why not?
3      A   Because she's already said on January 18th
4  that, you know, negotiations are ended and no longer --
5  that I was no longer interested, so we confirmed that we
6  were no longer negotiating.  And I took this e-mail on
7  the 24th to mean, "Hey, good news.  You're not under
8  time pressure.  If you want to come back and talk to us,
9  we can start negotiations again."
10     Q   And so what does that mean that you took this
11 e-mail to mean, "Hey, good news you're not under time
12 pressure, if you want to come back, we can start
13 negotiations again," what does that mean to you?
14     A   She said, "We have been in touch with the
15 claims agent and an attorney, and although the plan was
16 confirmed, it's not yet effective, and the agent is
17 still transferring Caesars's claims.  The attorney
18 stated this typically takes a while for the effective
19 date conditions in the plan to be satisfied.  Should you
20 wish to speak further regarding the sale of the claim, I
21 hope you will contact Brad or me."  So I took that to
22 mean that there was more time and we could start up
23 negotiations again.
24     Q   And did you take any steps to start up
25 negotiations again?

Page 76

1      A   No.
2      Q   Did you speak to Mr. Earl and advise him that
3  you had received an offer?
4      A   No.
5      Q   So when you -- so is it your testimony that
6  you decided not to move forward with the negotiations
7  for the sale of Claim 5858 when you received
8  Ms. Rosenblum's e-mail on January 18th, 2017?
9      A   I'm sorry.  Could you repeat that?
10     Q   Is it your testimony that the date on which
11 you decided not to move forward with the negotiations
12 for the sale of Claim 5858 was January 18th, 2017, the
13 date on which you received Ms. Rosenblum's e-mail?
14     A   I think that was where it was finally
15 concluded.
16     Q   So up until that point, it's your testimony
17 the negotiations were ongoing?
18     MR. CHUBAK: Objection, asked and answered.
19     A   Yeah.  There was little, if any, activity from
20 the date I received the first assignment.
21     Q   And that's because you chose not to take any
22 steps to obtain the approvals that you claim were
23 necessary for closing this transaction; isn't that
24 correct?
25     MR. CHUBAK: Objection, misstates testimony.

Page 77

1      A   It was -- there was nothing to dis -- the
2  negotiations -- nothing further happened.  There were no
3  further negotiations at that point.
4      Q   So when Brad Schwab agreed to your price term
5  of 2.15 million dollars on January 12th, 2017, did you
6  convey that information to Mr. Earl?
7      A   No, I did not.
8      Q   Why not?
9      A   Because it wasn't a -- it wasn't a
10 transaction -- wasn't in a position where I would take
11 it to Mr. Earl because there's more involved than just
12 the price.  There's --
13     Q   So you don't -- so Mr. Earl would not have
14 been interested in learning that somebody had offered
15 you 2.15 million dollars to purchase Claim 5858?
16     A   He might have been interested.
17     Q   And it's not your job responsibility to keep
18 Mr. Earl informed of offers to purchase assets of Earl
19 of Sandwich?
20     A   No, that's something that I would normally do.
21     Q   And yet you didn't do that in this case; isn't
22 that correct?
23     A   I would keep Mr. Earl informed of the prices
24 from time to time, and if there was -- after I had
25 gotten information.  I believe I did tell Mr. Earl that,

Page 78

1    you know, we're being offered in the neighborhood of 2.2
2    million or 2.1 million, something like that, at some
3    point in time.
4        Q   So when I asked you so when Brad Schwab agreed
5    to your price term of 2.15 million dollars on January
6    12th, 2017, did you convey that information to Mr. Earl,
7    you said, no, I did not, are you changing that
8    testimony?
9        A   No, I did not.  At the time I did not.
10       Q   But --
11       A   What I -- what I said was the 2.15 million to
12   Brad was a number that I think that subject to getting
13   everything else done and a signed document -- and a
14   document ready for signature that I could bring it to
15   Mr. Earl and get his approval to do the transaction.
16   His approval, I should say, or get his decision on
17   whether or not he wants to do the transaction.
18       Q   And you said that to Brad?  Is that what --
19       A   No, no.
20       Q   -- you're testifying to?
21       A   I'm just saying -- you asked me about the 2.1
22   million and what happened.  I just said that I would be
23   in a position after the whole document's complete to go
24   to Mr. Earl and get a decision.
25       Q   So you were authorized to negotiate the

Page 79

1    complete terms of this agreement prior to obtaining
2    Mr. Earl's approval?
3        MR. CHUBAK: Objection, misstates testimony.
4        A   Typically, I would get a transaction to a
5    stage where it would be ready for signature or at least
6    terms that I would be happy with.  And once I was happy
7    with all of the terms and conditions and all the
8    consequences of the deal, I would bring the full package
9    to Mr. Earl to get his approval before I proceed.
10       Q   So you would engage Cowen's time and resources
11   negotiating with you without having any idea whether the
12   ultimate terms might be acceptable to Mr. Earl; is that
13   your testimony?
14       MR. CHUBAK: Objection, mischaracterizes.
15       A   I would wait till the deal is -- is -- I would
16   wait till a transaction is further -- far enough along
17   before I brought it to Mr. Earl because it makes no
18   sense to bring him a transaction that was incomplete.
19       Q   What were the material terms of this
20   transaction to you, in your mind?
21       A   Price, contingencies, payment terms, how it
22   affected the standing on the unsecured committee.
23       Q   And when did you convey to Cowen that the
24   payment terms were material to you?
25       A   I didn't, but I expected it to be in a -- in a

Page 80

1    negotiated purchase and sale agreement.
2        Q   Did you convey that expectation to Cowen?
3        A   No.
4        Q   And when did you convey to Cowen that there
5    were certain contingencies that were material to you?
6        MR. CHUBAK: Objection, asked and answered.
7        A   I didn't.  The transaction hadn't progressed
8    far enough to -- to even consider putting certain of
9    those terms in there.
10       Q   And when did you convey to Cowen -- strike
11   that.
12           But you had agreed with Cowen on the material
13   term of price; isn't that correct?
14       A   Price only.  I thought that was a number that
15   I could present to Robert that he would actually -- he
16   would consider.
17       Q   But you didn't actually present that number to
18   Robert --
19       A   Nope.
20       Q   -- in January of 2017?
21       A   Nope.
22       THE VIDEOGRAPHER: Ms. Lewis-Gruss, we have
23   about five minutes on this disk.
24       MS. LEWIS-GRUSS: We can switch it now.  That
25   is fine.

Page 81

1        THE VIDEOGRAPHER: This concludes Disk No. 1
2    in the deposition of Thomas Avallone.  The time is
3    11:38 a.m.  We are off the record.
4           (A 5-minute recess was had.)
5        THE VIDEOGRAPHER: This is the beginning of
6    Disk No. 2 in the deposition of Thomas Avallone.
7    The time is 11:43 a.m.  We are on the record.
8    BY MS. LEWIS-GRUSS:
9        Q   So is it your testimony that at some point in
10   January 2017 you told Cowen that you required the
11   approval of Mr. Earl before completing this transaction?
12       A   Yes.
13       MR. CHUBAK: Objection, asked and answered.
14       Q   Did you tell Cowen that you would not take any
15   steps to obtain the approval of Mr. Earl during January
16   2017?
17       A   No.  It was -- the negotiations weren't that
18   far along to where I thought it was appropriate to bring
19   to Mr. Earl.
20       Q   My question was not about whether you thought
21   it was appropriate.  My question was whether you
22   informed Cowen that you had not brought the transaction
23   to Mr. Earl.  So in January 2017, did you inform Cowen
24   that you had not brought the transaction to Mr. Earl?
25       A   No.

Page 82

1    Q    And in 2017, is it -- did you tell Cowen that
2    the deal could not go forward until you had discussed
3    the draft agreement with legal counsel?
4    A    Could you repeat that?
5    Q    In 2017 -- in January 2017, did you tell Cowen
6    the deal could not go forward until you had discussed
7    and obtained the approval of Earl of Sandwich (Atlantic
8    City)'s legal counsel?
9    A    The negotiations wouldn't continue.  I didn't
10   tell Cowen that I didn't send the documents to the legal
11   department.
12   Q    Thank you.  I think you were trying to answer
13   my next question, which I appreciate, but my question is
14   did you tell Cowen that legal counsel's approval was
15   required of any deal?
16   A    No.
17   Q    And you also, as you just testified, didn't
18   tell Cowen that you had not brought the draft agreement
19   or any subject of the negotiations to Earl of Sandwich's
20   legal counsel; is that correct?
21   A    Yes.
22   Q    And is it correct that in January 2017 -- at
23   some point in January 2017 you told representatives of
24   Cowen that you needed to determine how this proposed
25   transaction would affect Earl of Sandwich's standing on

Page 83

1    the unsecured creditors committee before you agreed to
2    enter into -- or you agreed to sign the draft agreement?
3    A    Could you repeat that, please?
4    Q    So as you sit here today, is it your testimony
5    that at some point in January 2017 you told
6    representatives of Cowen Special Investments that you
7    needed to obtain more information from the unsecured
8    creditors committee regarding how this deal would impact
9    Earl of Sandwich's standing on that committee before you
10   could proceed?
11   A    Before I -- before any -- before I would be in
12   a position to sell any claim, I needed to understand how
13   selling the claim would affect my standing on the
14   unsecured creditors committee.
15   Q    And did you tell Cowen that?
16   A    Yes.
17   Q    And did you tell Cowen that you would not be
18   taking any steps to determine how selling the claim
19   would affect your standing on the unsecured creditors
20   committee?
21   A    Not as part of the negotiations at that time.
22   Q    Did you tell them that as part of any other
23   communication?
24   A    No.
25   Q    We started to talk about this a little bit

Page 84

1    earlier, but at some point you received an e-mail from
2    a Mr. -- or a note from a Mr. Seyfried?
3    A    Yes.
4    Q    Do you know when that happened?
5    A    I'm not sure of the timing.  Sometime before
6    the 28th of February.
7    Q    And you know that because you sent a response
8    on February 28th; is that correct?
9    A    Yes, correct.
10   Q    And that response is set out in what's been
11   previously marked as Exhibit 61?
12   A    Yes.
13   (Avallone Exhibit No. 62 was marked.)
14   Mr. Avallone, you've been handed what's been
15   marked as Exhibit 62.  Do you have that in front of you?
16   A    Yes.
17   Q    I represent to you that this document was
18   filed with the court, which is why it has a header on
19   the top that states a file date.  Do you see that?
20   A    Yes.
21   Q    And when you received this document from
22   Mr. Seyfried, it didn't have that header, I would
23   assume; is that correct?
24   A    Correct.
25   Q    I will represent to you that this document was

Page 85

1    not found in the production made by your counsel in this
2    action --
3    A    Correct.
4    Q    -- so we do not have a copy.  I was making a
5    representation, but are you -- were you aware that this
6    document was not in the production of Earl of Sandwich?
7    A    Yes.
8    Q    And how are you aware of that fact?
9    A    Because I was looking for the document and I
10   couldn't find it.
11   Q    And how did you receive this document?
12   A    I believe it was by mail.
13   Q    And it does have your e-mail address listed on
14   it as well.  Do you see that?
15   A    Yes.
16   Q    So do you believe you didn't receive it by
17   e-mail?
18   A    I don't believe I received it by e-mail.
19   Q    And are you aware of the record retention
20   policy of your company?
21   A    Yes.
22   Q    And with regard to hard copy documents on hard
23   copy correspondence, for what length of time are you
24   required to maintain a record?
25   A    It depends on the record, but anywhere from

In re:

Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE

January 10, 2018

Page 86

1     three to five years.

2        Q    And so you did have a duty to maintain a hard

3     copy of this document if you, in fact, received it in

4     hard copy form, correct?

5        A    I would have liked to have kept a copy of it.

6        Q    But you did search your files for it --

7        A    Yes.

8        Q    -- and you didn't find it?   At the time you

9     received this letter, did you contact your legal

10    department?

11       A    I believe I did.

12       Q    And solely for the purposes of identifying

13    where this document might be in the records of Earl of

14    Sandwich, do you believe you provided a copy of this

15    document to legal counsel by e-mail?

16       A    I did not.

17       Q    And do you know for a fact that you did not

18    provide a copy by e-mail?

19       A    Yes.

20       Q    Do you believe you provided legal counsel with

21    a hard copy?

22       A    I actually think the general counsel at the

23    time came into my office and we discussed it.

24       Q    Who was the general counsel at the time?

25       A    Martha McIntosh.

Page 87

1        Q    Do you believe you gave the original of the

2     document to Ms. McIntosh?

3        A    No.

4        Q    And why do you not believe that happened?

5        A    Because I think we just discussed it briefly,

6     and I wrote my response to Gail.

7        Q    And that response is what is set out in

8     Exhibit 61 at the top of the page?

9        A    Yes.

10       Q    And why did you respond to Gail rather than

11    Mr. Seyfried?

12       A    Because I didn't know Mr. Seyfried and I had

13    been communicating earlier with Gail, and I wanted to

14    show Gail that, you know, look at the correspondence.  I

15    never thought we had a deal.  I never agreed to any kind

16    of deal.  We were in negotiations.  Negotiations ended.

17    Look, your own document said we're finished.  Why are

18    you telling me that there's a deal now.

19       Q    And in your e-mail to Gail sent on February

20    20 -- February 28th, you said, "I always stated that any

21    sale would require approval from the owner of the

22    business"; is that correct?

23       A    Yes.

24       Q    But you did not say that you had also stated

25    that it would require you to do research as to how a

Page 88

1     sale of Claim 5858 would impact Earl of Sandwich's

2     standing on the unsecured creditors committee; is that

3     correct?

4        A    No.  I thought the e-mail -- her e-mail to me

5     saying that the deal's over unless I hear from you was

6     sort of enough, and I just wanted to emphasize the fact

7     was -- plus, I needed approval from Robert.  I could

8     have also added we never had a signed document, we never

9     negotiated agreements, we never got the approval in, but

10    I didn't add that.  I thought it was self-explanatory,

11    the e-mails.

12       Q    So, again, when you responded -- so when

13    you -- so you sent an e-mail to Ms. Rosenblum on

14    February 28th that was intended to respond to a letter

15    you had received from Mr. Seyfried on February 22nd,

16    correct?

17       A    I'm sorry.  Could you -- could you repeat

18    that?

19       Q    You received a -- you received the document

20    that's been marked as Exhibit 62 --

21       A    Right.

22       Q    -- by mail from Mr. Seyfried sometime after he

23    sent it to you on February 22nd, 2017?

24       A    Yes.

25       Q    In response to receiving that letter, you sent

Page 89

1     an e-mail to Ms. Rosenblum on February 28th, 2017?

2        A    Correct.

3        Q    In that e-mail to Ms. Rosenblum, the only

4     condition to closing that you specifically stated was

5     that you had always told her that any sale would require

6     approval -- would require approval from the owner of the

7     business, correct?  It's a yes or no question.

8        A    Well, not if you ask it that way.

9        Q    There are words on this page.  Are the words

10    on this page written by you, "Dear Gail, I received a

11    note from Bryan Seyfried alleging that we had a deal to

12    sell our claim.  Please note that it is not true, as

13    indicated by your e-mail below.  I always stated that

14    any sale would require approval from the owner of the

15    business.  Regards, Tom."

16       A    Yes.

17       Q    That e-mail does not say "I always stated that

18    any sale would require approval or further understanding

19    of how any sale would impact Earl of Sandwich's standing

20    on the unsecured creditors committee."  Yes or no?

21       A    Correct.

22       Q    That -- your February 28th, 2017, e-mail does

23    not state that any deal was subject to further

24    negotiation regarding the payment terms, correct?

25       A    We never had a deal.

Page 90

1    Q   That's not my question.  I'm asking you a very
2    specific question regarding the text of this e-mail.
3    This e-mail does not state that you had previously told
4    Ms. Rosenblum or anyone else at Cowen that any deal was
5    subject to further negotiation regarding the payment
6    terms, correct?
7    A   Correct.
8    Q   And this e-mail does not state that you had
9    always told Cowen that any sale of Claim 5858 was
10   subject to further negotiations over the contingencies?
11   A   We never had a deal.  It was negotiations
12   that -- if you take out the word "deal" and you put in
13   the word "negotiations," I think the answer is yes.
14   Q   So using your terminology, this e-mail does
15   not state that you had always told Cowen that finalizing
16   your negotiations for any sale of Claim 5858 was subject
17   to further negotiations over the contingencies?
18   A   Yes.
19   Q   What were those contingencies?
20   A   Getting a signed -- a mutually agreeable
21   signed purchase and sale agreement, getting approval
22   from Mr. Earl, and getting understanding what the
23   ramifications of the sale of the claim would be to me
24   on -- as a member of the unsecured creditors committee.
25   Q   And on February 28th, 2017, when you

Page 91

1    informed -- when you sent this e-mail to Ms. Rosenblum,
2    you did not inform her that you had taken no steps to
3    complete those stated contingencies; is that correct?
4    A   By her own e-mails, the negotiations had --
5    were already -- had ended.
6    Q   On February 28th, 2017, when you sent an
7    e-mail to Ms. Rosenblum, did you state in that e-mail
8    that you had taken no steps to complete the
9    contingencies that you identified?
10   A   Correct.
11   Q   So at any point after receiving Mr. Seyfried's
12   letter, did you discuss this dispute with Mr. Earl?
13   A   After -- probably sometime in April or May.
14   Q   So it's not your practice upon receiving a
15   letter from a third-party saying "we had a deal" that
16   you would bring that to Mr. Earl's attention?
17   A   No, because it was very obvious from Gail's
18   own admission that we didn't have a deal.  We had
19   negotiations.  Negotiations ended.  And I never received
20   this response from Gail, so I assume that she took my
21   note and I didn't know there was an issue until probably
22   sometime in May and June, when after speaking to another
23   potential buyer of the claim that there was a company
24   called Whitebox that was alleging some kind of interest
25   in it.

Page 92

1    Q   So that was nonresponsive, but I appreciate
2    you providing me with more context.  Again, you receive
3    a letter from Mr. Seyfried.  This letter was
4    insufficient to notify -- in February of 20 -- sometime
5    after February 22nd, 2017.  This letter was insufficient
6    to notify you that there was a dispute?
7    A   I thought it was cleared up.
8    Q   Why did you believe it was cleared up?
9    A   Because I sent the note to Gail spelling it
10   all out, and I did not receive a response disputing what
11   I told her.
12   Q   And you didn't have further involvement of
13   legal counsel?
14   A   Nope.
15   Q   And it is -- is it traditional that when you
16   would receive something -- well, how would you
17   characterize the February 22nd, 2017, letter?
18   A   A letter from somebody in Cowen requesting
19   some information that got cleared up when I sent the
20   note to Gail saying that this is wrong, you know,
21   explain to this person that there's -- that we never had
22   a deal.
23   Q   Would you consider this to be notice of a
24   dispute -- this February 22nd, 2017, letter to be notice
25   of a dispute?

Page 93

1    A   I guess it's a dispute.
2    Q   And so it's not your practice to notify Mr.
3    Earl when you're advised of a dispute?
4    A   Not -- not one that I thought was resolved.
5    Q   And you have authority to attempt to resolve
6    disputes; is that correct?
7    A   Yes.
8    Q   And it's not your practice to have legal
9    counsel handle responses to notices of potential or
10   actual disputes; isn't that correct?
11   A   No, that's not true.
12   Q   So is it your practice to have legal counsel
13   handle responses to notices of potential or actual
14   disputes?
15   A   When it's a significant dispute or one that --
16   a serious dispute, one that I think that could cause --
17   cause damage.  Like I said, this is -- you know, I
18   thought this was over and done with, you know, by virtue
19   of the e-mails.  We never had a deal.  There was
20   negotiations.  Negotiations ended.  And, you know, Gail
21   by her own admission says, "We never had a deal and
22   would you like to continue to speak on terms?  Would you
23   like to move forward?"  And so it was -- there was no
24   dispute.
25   Q   Please identify where Ms. Avallone -- where

Page 94

1    Ms. Rosenblum says "We never had a deal."
2    A    "Should you wish to speak further regarding
3    the sale, I hope you will contact us.  If I don't hear
4    from you, I'm going to assume you don't want to proceed
5    forward."
6    Q    So that the record's clear, could you identify
7    the exhibit number and the date and time of the e-mails
8    to which you're referring to?
9    A    Okay.  The January -- Exhibit 61, the January
10   24th memo, third paragraph, "Should you wish to speak
11   further regarding the sale of the Earl of Sandwich
12   claim, I hope you will contact Brad or me."
13        On the January 18th memo, again, this is the
14   second paragraph, "Would you kindly advise by noon
15   Eastern time if you plan to move ahead with this
16   transaction?  We will assume you are no longer
17   interested."
18        On the January 17th e-mail, in the third
19   paragraph where it says, "We initially anticipated that
20   confirmation would prevent us from proceeding.  However,
21   we are able to move forward to complete a transaction as
22   we're no longer under a tight deadline.  There's
23   additional time to look at the documents."
24        On the January 12th e-mail, she says to follow
25   up, a chance to review the agreements.

Page 95

1    Q    So your testimony earlier was that
2    Ms. Rosenblum said "We never had a deal."  Ms. Rosenblum
3    never actually used the words "we never had a deal";
4    isn't that true?
5    A    Not in those words.
6    Q    And Ms. Rosenblum never informed you that you
7    had not reached agreement or that -- Ms. Rosenblum never
8    stated to you that Cowen believed it had not reached
9    agreement on all material terms relevant to the sale of
10   Claim 5858; isn't that true?
11   A    You had too many negatives in there.  Could
12   you repeat that, please?
13   Q    Did Ms. Rosenblum ever tell you that Cowen
14   believed it had not reached an agreement with you
15   concerning the material terms for the sale of Claim
16   5858?
17   A    No, she did not.
18   Q    So you send this e-mail off February 28th.
19   You hear nothing further from Cowen; is that correct?
20   A    Yes.
21   Q    Okay.  Did you take any further steps
22   regarding this claim in March of 2017?
23   A    With regard to this claim?
24   Q    Yes.
25   A    With regard to -- in what respects?

Page 96

1    Q    Did you take any steps in March 2017 to make
2    sure that there was no further dispute between Cowen and
3    Earl regarding Claim 5858?
4    A    No, because I thought it was over.  I had
5    never received any response from Gail.
6    Q    You testified earlier that in February 2017
7    you advised Mr. Earl that you had received an offer for
8    2.15 million dollars for the purchase of Claim 5858.
9    Who was that offer from?
10   A    It's probably this offer, I would imagine --
11   Q    But --
12   A    -- from a valuation standpoint.
13   Q    What does that mean?
14   A    Well, I think, you know, from time to time I
15   would send Robert notes after speaking to various people
16   who were looking to buy the claim, what they were
17   offering verse, you know, what they were offering, that
18   I would get an indication of what the recovery
19   percentages were, and I would relay that information to
20   Mr. Earl.
21   Q    So Mr. Earl was interested in understanding
22   what the recovery percentages were in February of 2017?
23   A    He was always interested in what the recovery
24   was going to be.
25   Q    And so he would want to know if you received

Page 97

1    an actual offer for the sale of the claim; isn't that
2    true?
3        MR. CHUBAK:  Objection, vague, and asked and
4        answered.
5    A    If it was an offer that was -- that -- if
6    there was an offer that was out there and finished, I
7    would have presented it to him.
8    Q    But he wouldn't be interested in knowing you
9    had received an offer just from a valuation standpoint?
10   A    He would.
11   Q    But you made the decision not to tell him
12   about this offer in January of 2017.  Isn't that your
13   testimony?
14   A    Yes.
15   Q    So if the deal had concluded on or about
16   January 18th when Ms. Rosenblum sent you an e-mail
17   saying you have until a specific time to respond or
18   we'll consider the deal done, why did you inform Mr.
19   Earl in February about the terms of this deal?  Did
20   you --
21   A    Again, in January of 2018, this was a price
22   that was established.
23   Q    And you meant January 2017 in your answer, not
24   January 2018.
25   A    I did, right.

Page 98

1    Q   So -- but you inform -- did you inform Mr.
2    Earl in February of 2017 that you had received an offer
3    to purchase the claim for 2.15 million dollars?
4    A   I would have told Mr. Earl that in -- that
5    we -- that the value of the claim was in the
6    neighborhood -- was worth in the neighborhood of 2.2
7    million dollars.
8    Q   Did you believe that Cowen's offer to purchase
9    the claim for 2.15 million dollars was still good in
10   February of 2017?
11   A   I assumed that if I went back to them and
12   started negotiations again, they would talk to me.  I
13   know when I told Robert the number he wasn't interested,
14   in February.  When I did give him the amount, he wasn't
15   interested in doing anything at that level.
16   Q   But the deal had already fallen apart by that
17   point in time; isn't that your testimony?
18   A   The negotiations had fallen apart, yes.
19       MS. LEWIS-GRUSS: So it's 12:11.  In the
20   interest of being able to come back on the record
21   for a little bit before you have to do your call, I
22   think it would be a good time to go to lunch.
23       MR. CHUBAK: Okay.
24       MS. LEWIS-GRUSS: And we can take that lunch
25   for 45 minutes.  Is that enough time to get lunch?

Page 99

1        THE WITNESS: More than enough.
2        MR. CHUBAK: Sounds good.
3        THE VIDEOGRAPHER: Going off the record.  The
4    time is 12:11 p.m.
5        (A 56-minute recess was had.)
6        THE VIDEOGRAPHER: Going back on the record.
7    The time is 1:07 p.m.
8    BY MS. LEWIS-GRUSS:
9    Q   Good afternoon, Mr. Avallone.  You testified
10   earlier that you had not heard that once you -- sorry.
11       You testified earlier that once you e-mailed
12   Ms. Rosenblum at the end February 2017, you considered
13   the dispute with Cowen to be resolved; is that correct?
14   A   Yes.
15   Q   And it wasn't until sometime later that you
16   were notified by a third-party that Whitebox was
17   asserting that it had purchased the claim from Cowen; is
18   that correct?
19   A   Yes.
20   Q   Do you recall who it was that told you
21   Whitebox was asserting a claim that it had purchased
22   Claim 5858 from Cowen?
23   A   I believe that it was Alex Ortega, but he told
24   me that Whitebox said that they had an interest.  He
25   didn't mention Cowen until -- until later or I found

Page 100

1    out, you know, until later.  I think he just said
2    Whitebox said there was an interest in it.
3    Q   And who is Mr. Ortega?
4    A   He is -- he deals in trading claims.  He
5    called me at one point asking me if I was willing to
6    sell the claim.
7    Q   And do you know the date of -- the date on
8    which Mr. Ortega called and asked if you were interested
9    in trading the claim?
10   A   No, I do not.
11   Q   Do you believe it was in the spring of 2017?
12   A   I don't recall.
13   Q   Do you know whether you had conversations with
14   Mr. Ortega concerning the sale of the claim prior to
15   January of 2017?
16   A   I believe I did.
17   Q   And what makes you believe that you had
18   conversations with Mr. Ortega prior to January 2017?
19   A   I recall discussing early on, probably late in
20   '16 or sometime in '16 having some -- a conversation
21   about the claim.  And then just since I'm not
22   involved -- I don't know people in the claim industry or
23   people who trade claims of that nature.  There was --
24   you know, he was a person who called me that I called
25   back, again, curious about valuation and, you know, and

Page 101

1    what, you know, what the claim was, would he be
2    interested in it.
3    Q   And when Mr. Ortega contacted you, did you do
4    any research to determine if he was a legitimate buyer
5    of claims?
6    A   No.
7    Q   And at the time -- so do you believe that you
8    first spoke to Mr. Ortega in late 2016?
9    A   I believe so.
10   Q   And did you inform Mr. Ortega of a price at
11   which you would be willing to trade Claim 5858?
12   A   I did not.
13   Q   Did you inform Mr. Ortega that any sale of
14   Claim 5858 would be subject to Mr. Earl's approval?
15   A   Yes.
16   Q   What form did that communication take place?
17   A   By phone.
18   Q   Did you inform Mr. Ortega that any sale of
19   Claim 5858 would require you to determine how a sale
20   would affect Earl of Sandwich's standing on the
21   unsecured creditors committee?
22   A   Yes.
23   Q   And did you inform Mr. Ortega of any other
24   conditions that you would require before agreeing to
25   trade Claim 5858?

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 102

1  A  Have to agree to terms and conditions having
2  to do with the sale.
3  Q  And did you ever put that in writing to
4  Mr. Ortega?
5  A  No.
6  Q  In any negotiation you've been involved with,
7  not limited to Claim 5858, have you ever put it in
8  writing that any -- that in order to execute an
9  agreement, you would first need to obtain the approval
10  of Mr. Earl?
11  A  I'm sure I have.  I can't give you a specific
12  instance, though.
13  (Avallone Exhibit No. 63 was marked.)
14  Q  So, Mr. Avallone, you've now been handed
15  Exhibit 63, which bears the Bates stamps Earl 180 to
16  Earl 182.  Do you have that in front of you?
17  A  Yes.
18  Q  And is this a communication you had with
19  Mr. Ortega in June of 2017?
20  A  (Reviewing document.)  I'm sorry.  What was
21  the question?  I just wanted to review the document
22  first.
23  Q  So in this e-mail, is there a communication
24  that you had with Mr. Ortega in June of 2017?
25  A  Yes.

Page 103

1  Q  And if we could start at the back of the
2  document, which is actually the earliest e-mail in the
3  chain.  Mr. Ortega reached out to you in May of 2017 and
4  asked if Earl has an offer at which it would execute a
5  sale.  Do you see that?
6  A  Yes.
7  Q  And had you previously made an offer to
8  Mr. Ortega at which Earl would execute a sale?
9  A  No.
10  Q  And why do -- do you know why Mr. Ortega seems
11  to suggest that it would be Earl who would be making the
12  offer?
13  A  No.
14  Q  And you respond to him a few weeks later on
15  June 7th, 2017; is that correct?
16  A  Yes.
17  Q  And you -- what did you ask Mr. Ortega?
18  A  What is the current price for the claim, for
19  the 3.6 million dollar claim, and how fast can we close
20  if I accept.
21  Q  And were you interested in closing quickly at
22  the time that you sent this e-mail in June -- on June
23  7th, 2017?
24  A  I was curious about the timing.
25  Q  And why was that something that you were

Page 104

1  curious about?
2  A  Just curious.  Just curiosity.
3  Q  And so did you believe that if Mr. Ortega said
4  that you would be able to close a sale quickly, that you
5  would have the necessary time to obtain all of the
6  approvals that were required prior to you finalizing a
7  sale?
8  A  Absolutely.
9  Q  And why did you believe that to be the case?
10  A  Because that's the only way I could do a deal.
11  Q  I'm sorry.  I don't understand.  So you had
12  previously testified that it would take you a lengthy
13  amount of time to obtain the approvals necessary to
14  complete the deal you were negotiating with Cowen, but
15  something -- did anything change between January of 2017
16  and June of 2017 so that in June 2017 you could obtain
17  those approvals quickly, if necessary?
18  A  It was all dependent upon how fast we could
19  negotiate a purchase and sale agreement and get an
20  approval from Mr. Earl.
21  Q  And so in January of 2017 when you were
22  negotiating with Cowen, it would have been possible for
23  you to quickly obtain approvals from Mr. Earl and to
24  determine whether or not the sale would negatively
25  impact Earl's standing on the unsecured creditors

Page 105

1  committee if you had wanted to move quickly; isn't that
2  true?
3  A  If I was -- if we were able to negotiate a
4  satisfactory agreement, yes.
5  Q  So, in fact, there was no reason that you
6  couldn't have completed a deal if you had wanted to in
7  January of 2017, at least with regard to timing?
8  MR. CHUBAK:  Objection, mischaracterizes
9  testimony.
10  A  The negotiations -- we could have finalized
11  negotiations and come to a deal quickly if we wanted to,
12  yes.
13  Q  And so Mr. Ortega writes you back on June 7th,
14  and then on June 9th, which is two days after you ask
15  him for a price, you ask him for his final and best
16  offer; is that correct?
17  A  Yes.
18  Q  And did Mr. Ortega provide you with a final
19  and best offer?
20  A  I don't recall.
21  Q  Do you have reason to believe that he did?
22  MR. CHUBAK:  Objection, asked and answered.
23  A  I -- I don't recall.
24  Q  What terms would you expect Mr. Ortega to
25  include if he had presented you with a final and best

In re:
Caesars Entertainment Operating Company, Inc.

Page 106

1    offer?
2    A  Well, that would have been the starting point.
3    If it was something that I felt was reasonable that I
4    could bring to Robert and I would be willing to bring to
5    Robert, that would start the process of getting the --
6    of negotiating a purchase and sale agreement and to
7    give -- to submit to Robert for his approval.
8    Q  Would the final and best offer include a price
9    term?
10   A  Yes.
11   Q  Would it include any other terms?
12   A  The terms would be spelled out in the purchase
13   and sale agreement.
14   Q  And that agreement is something you would
15   negotiate after receiving the final and best offer;
16   isn't that correct?
17   A  Yes.
18   Q  And prior to asking Mr. Ortega for his final
19   and best offer, did you inform him that any sale would
20   require the approval of Mr. Earl?
21   A  Yes.
22   Q  When did you inform Mr. Ortega of that?
23   A  It would have been either in my first
24   conversations with him, whenever that occurred.  Like I
25   said, I believe it was sometime in '16.

Page 107

1    Q  And would that have been something you
2    reminded Mr. Ortega of when you spoke to him -- when you
3    communicated with him in June of 2017?
4    A  Yes.
5    Q  And how did you communicate -- by what form
6    did you communicate to Mr. Ortega in June of 2017 that
7    any sale would require Mr. Earl's approval?
8    A  It would have been by phone.
9    Q  And when did that phone call occur?
10   A  I do not recall.
11   Q  And how do you recall that you told Mr. Ortega
12   in June of 2017 that any sale would require Mr. Earl's
13   approval if you don't recall anything else about that
14   phone call?
15   A  Because it's something I mentioned to all the
16   claimants, again, in the effort to be -- for
17   transparency, that, you know, the unsecured committee
18   and these other issues were all out there, and Robert's
19   approval was important.
20   Q  So as you sit here today, do you have a
21   specific memory of telling Mr. Ortega in June 2017 that
22   any sale would require Mr. Earl's approval?
23   A  I don't have a specific number.
24   Q  And as you sit here today, do you have a
25   specific memory of telling Mr. Ortega in June of 2017

Page 108

1    that any sale would require you to first make sure that
2    the sale would not negatively impact Earl of Sandwich's
3    rights with regard to the unsecured creditors committee?
4    A  I'm not sure.  I don't recall.
5    Q  Do you have a -- as you sit here today, do you
6    have a specific memory of telling Mr. Ortega in June of
7    2017 that there were any other conditioncies [sic] or
8    necessary approvals required before you could complete a
9    sale of Claim 5858?
10   MR. CHUBAK: Objection.  The document speaks
11   for itself.
12   A  Yeah, we'd have to have a mutual, agreeable
13   purchase and sale document.
14   Q  Is that something that you told Mr. Or -- that
15   you specifically recall telling Mr. Ortega in June 2017?
16   A  I believe it was understood.
17   Q  Why do you believe it was understood?
18   A  Because that's my understanding of how these
19   things operated.  The purchase and sale agreement is
20   required to lay out the terms of a sale.
21   Q  So that's based on just how you norm -- your
22   understanding of how business is done.  It's not based
23   on a specific conversation you had with Mr. Ortega; is
24   that correct?
25   A  Not that I recall.

Page 109

1    Q  And so in response to your June 9th e-mail
2    asking for a final and best offer, Mr. Ortega asks you a
3    day later "Were you by any chance able to speak to
4    Whitebox yesterday?"  Do you see that?
5    A  Yes.
6    Q  And did you speak to Whitebox?
7    A  I don't recall.
8    Q  Do you recall ever having communications with
9    an attorney by the name of Cindy DeLano?
10   A  Vaguely, yes.
11   Q  And do you recall reaching out to anyone at
12   Whitebox prior to that call to ask them what was going
13   on with Whitebox's stated interest in the claim?
14   A  There was some conversations.  I know I spoke
15   to Whitebox.  I don't recall exactly when.
16   Q  And did you -- how did you know who to contact
17   at Whitebox?
18   A  I got a contact information.  I'm not sure
19   from whom I got it from.  I'm not sure where I got that.
20   Q  And so after you -- so -- so after you get
21   this e-mail from Mr. Ortega saying were you by any
22   chance able to speak to Whitebox, you write him back and
23   you say -- what did you say to Mr. Ortega at that time
24   on June 10th?
25   A  I said, "Yes, looks like there will be a

In re:                                                                    THOMAS AVALLONE
Caesars Entertainment Operating Company, Inc.                              January 10, 2018

Page 110

1    fight.  Don't understand how they think the claim was
2    assigned.  We never agreed a price and I never got owner
3    approval."
4        Q    And you didn't say in that e-mail that "I told
5    Cowen I always needed owner approval"; isn't that true?
6        A    That's true.
7        Q    And you didn't say to Mr. Ortega, "I never
8    figured out how this claim would impact our standing on
9    the unsecured creditors committee"; isn't that true?
10       A    That is true.
11       Q    And you didn't tell Mr. Ortega that there were
12   any other terms, contingencies or conditions precedent
13   that had not been met other than you never agreed on a
14   price and you never got owner approval; isn't that
15   correct?
16       A    Yeah.
17       Q    And what did you mean when you said you never
18   agreed on a price?
19       A    I think it was the overall terms.  Just
20   generally by "price," I meant overall terms.  And,
21   again, this was -- from a timing standpoint, this was
22   six months after that.  And based on my recollection of
23   all the memos back then, we never really agreed.  We
24   were negotiating.  We never really agreed on a final
25   format.

Page 111

1        Q    But you had actually agreed on a dollar amount
2    for the sale of the claim; isn't that true?
3        A    We said there was a dollar amount -- yeah, I
4    believe there was a dollar amount that I would -- if
5    everything else, all the other issues were resolved,
6    that I could bring to Robert, yes.
7        Q    And Mr. Ortega reaches out to you again on
8    June 16th.  Do you see that?
9        A    Yes.
10       Q    And you responded that same day; is that
11   correct?
12       A    Yes.
13       Q    And you thanked him for bringing the issue to
14   your attention?
15       A    Yes.
16       Q    And you sent a demand letter to Cowen to make
17   them fix it?
18       A    Yes.
19       Q    And did you draft the demand letter to Cowen?
20       A    No.
21       Q    Who drafted that letter?
22       A    Our legal department.
23       Q    Did you consult with the legal department
24   concerning that letter?
25       A    Probably saw the copy of it the final form.

Page 112

1        Q    And did you tell your legal department that
2    you had informed Cowen that any sale was contingent on
3    approval by Mr. Earl?
4            MR. CHUBAK: Objection, privileged.
5        A    Yes.
6        Q    Did you -- when you spoke to Whitebox, did you
7    tell the representatives of Whitebox that you had
8    informed Cowen that any sale of Claim 5858 was
9    contingent on Mr. Earl's approval?
10       A    I don't recall.
11       Q    And when you spoke to Whitebox, did you tell
12   the representatives of Whitebox that you had informed
13   Cowen that any sale of Claim 5858 was contingent on a
14   resolution of the issues concerning the unsecured
15   creditors committee?
16       A    I don't recall.
17       Q    Did you -- when you spoke to Whitebox, did you
18   tell the representatives of Whitebox that you had not
19   reached agreement as to the price of the sale of Claim
20   5858?
21       A    I -- I don't recall the exact words, but I'm
22   sure I said that I never had an agreement with Cowen.
23   We never came to -- we never came to a deal.  We were
24   still doing negotiations until they got broken off.
25       Q    And going back to your communications with

Page 113

1    Mr. Ortega, you never put it in writing to Mr. Ortega --
2    scratch that.  You know what?  Let's move on.  I think
3    you've covered that question.
4            You testified earlier about sending an e-mail
5    to Barrett Mikelberg.  When did you first communicate
6    with Mr. Mikelberg?
7        A    I don't recall.  I'd have to look at --
8        Q    It's fine.  You don't need an exact date.  Do
9    you believe that you communicated with Mr. Mikelberg in
10   the fall of 2016?
11       A    I might have.  I spoke to several parties that
12   deal -- dealt in trade claims, and they called me and I
13   called them back, again, curious.  He might have been
14   one of those.  I -- I don't recall exactly when the
15   first time was I spoke to him.
16       Q    Mr. Avallone, I'm handing you what's been
17   previously marked as Exhibit 26.  Do you have that in
18   front of you?
19       A    Yes.
20       Q    And is this -- is it 25 or is it 26 that you
21   have in front of you?
22       A    26.
23       Q    And is this an e-mail exchange that you had
24   with Mr. Mikelberg in the fall of 2016?
25       A    Yes.

In re:                                                                                    THOMAS AVALLONE
Caesars Entertainment Operating Company, Inc.                                             January 10, 2018

Page 114

1    Q    And Mr. Mikelberg was a claims broker.  Is
2    that a correct way to describe his role?
3    A    I know he bought claims.
4    Q    So he bought claims either in his personal or
5    corporate capacity.  That was your understanding?
6    A    He was in the business.  I don't -- I don't
7    know what his --
8    Q    And so he reached out to you in October of
9    2016 and asked if you'd be interested in selling your
10   Caesars claim; is that accurate?
11   A    Yes.
12   Q    And you responded and you said -- you asked
13   him how much he would pay for your claim?
14   A    Yes.
15   Q    And did you inform Mr. Mikelberg that any sale
16   of the claim would be subject to Mr. Earl's approval?
17   A    Yes.
18   Q    As you sit here today, do you have a specific
19   memory of informing Mr. Mikelberg that any sale would be
20   subject to Mr. Earl's approval?
21   A    In the ph -- any phone conversation I had with
22   him and I've stated our position, I would have told him
23   that selling of the claim required Mr. -- the owner's
24   approval and especially at -- and how it affected the
25   unsecured committee.

Page 115

1    Q    And do you specifically recall telling him
2    that or is your testimony based on the fact that you
3    believe you would have told him that?
4    A    I told him that.
5    Q    And on what date did you tell him that?
6    A    I do not know.
7    Q    And you only told him that by phone; is that
8    correct?
9    A    Yes.
10   Q    You never met with Mr. Mikelberg in person?
11   A    No.
12   Q    And you didn't tell Mr. Mikelberg that in
13   e-mail -- you did not tell Mr. Mikelberg in any e-mails
14   that any sale of Claim 5858 would have required Mr.
15   Earl's approval and also an understanding of how the
16   sale would affect the unsecured creditors committee; is
17   that accurate?
18   A    Not in e-mail, no.
19   Q    And at some point you tell Mr. Mikelberg that
20   you're going to take the settlement instead.  That's on
21   October 20th, 2016.  Do you see that?
22   A    Yes.
23   Q    And did you inform Mr. Mikelberg that the
24   reason you decided to take the settlement was because
25   Mr. Earl had decided to take the settlement?

Page 116

1    A    No.
2    Q    And did you inform Mr. Earl that you had
3    received these communications from Mr. Mikelberg in
4    October 2016 concerning Claim 5858?
5    A    I don't think I would have spoken to him about
6    this specific claim other than to say I got an offer
7    that was around 35, 40 cents a share, whatever number he
8    mentioned.
9    Q    You would not have asked Mr. Earl in October
10   2016 for his approval to sell the claim at that offer?
11   A    No, because I wouldn't have recommended it.  I
12   would have just informed him of the price.
13   Q    So as you sit here today, do you have a
14   specific memory of telling Brad Schwab on or about
15   January 11th or January 12th, 2017, that any sale of
16   Claim 5858 would require Mr. Earl's approval?
17        MR. CHUBAK: Objection, asked and answered.
18   A    Yes.
19   Q    And your memory is clear that that
20   conversation happened on January 11th or January 12th,
21   2017?
22   A    Yes.
23   Q    And how is your memory clear with regard to
24   the date on which that conversation happened given your
25   inability to remember anything else about that

Page 117

1    conversation?
2         MR. CHUBAK: Objection.
3    A    Well, just based on e-mail correspondence and
4    dates when talked about we had, you know, phone calls or
5    discussions, that -- those dates appear correct.
6    Q    So you know you were communicating with
7    Mr. Schwab in the period of January 11th and January
8    12th, 2017; isn't that true?
9    A    Yes.
10   Q    But you know that you had a phone
11   conversation -- and you know you had a phone
12   conversation with him in that window.  Is that your
13   understanding?
14   A    Yes.
15   Q    Do you know if you had any other conversations
16   with Mr. Schwab by phone on any other dates?
17   A    I'm not sure.
18   Q    But it's your testimony under oath that you
19   specifically told Mr. Schwab on or about January 11th or
20   January 12th, 2017, that any sale would require Mr.
21   Earl's -- a sale of Claim 5858 would require Mr. Earl's
22   approval?
23   A    I would have said owner's approval or my
24   boss's approval, something like that.
25   Q    And that's just because you just know that you

Page 118

1  say that all the time when you were negotiating; isn't
2  that true?
3      A   Yes.
4      Q   But you don't actually know that you said it
5  to Mr. Schwab on or about January 11th or January 12th,
6  2017?
7      A   No, I --
8          MR. CHUBAK: Objection, mischaracterizes his
9      testimony, asked and answered.
10     A   Yeah, I told --
11     Q   What else --
12     A   -- Mr. Schwab.
13     Q   What else did you tell Mr. Schwab on that
14 phone call?
15     A   Again, I don't know the specifics, but we
16 would have discussed the timing.  We would have -- we
17 would have discussed the possible, you know, when they
18 were merging and timing.
19     Q   And what did Mr. Schwab say to you on
20 the con -- in the conversation you had with him on or
21 about January 11th or January 12th, 2017?
22     A   I don't recall.
23     Q   Do you recall anything that Mr. Schwab said to
24 you in that conversation?
25     A   I didn't think it was relevant.

Page 119

1      Q   And did you have -- as you sit here today, do
2  you have a specific memory of telling Ms. Rosenblum that
3  any sale of Claim 5858 could not be completed until you
4  had obtained Mr. Earl's approval?
5          MR. CHUBAK: Objection, asked and answered.
6      A   Yes.
7      Q   What are the circumstances of that
8  conversation?  What do you remember about them?
9      A   It would have been surrounding the -- her
10 sending me the agreement and me seeing what needed to be
11 done, what information I needed, and, again, how it
12 affected my relationship with the unsecured creditors
13 committee because that was very important.
14     Q   And so you said one of the top things you
15 discussed is what information was needed.  What
16 information did you tell Ms. Rosenblum you needed from
17 her regarding the sale of Claim 5858?
18     A   A mutual -- mutually agreeable purchase and
19 sale agreement.
20     Q   So that's a document, not information.  Was
21 there any information that you required from
22 Ms. Rosenblum that you specifically recall asking her
23 for?
24     A   No.  But I think she asked me for some
25 information about the claims and whether -- and she was

Page 120

1  going to find out whether or not it was transferable or
2  not or were we inside a window, and there were some
3  things she was doing, and whether or not -- what was the
4  status of the claims and asked, you know, asked me
5  can -- you know, about just the validity of the claims
6  and what other information was available.
7      Q   Do you recall what time of day that call took
8  place during?  Do you recall what time of day that call
9  took place in?
10     A   No.
11     Q   Do you recall which date it occurred on?
12     A   Not without looking or trying to find
13 documents.
14     Q   Do you recall where you were when you had that
15 conversation with Ms. Rosenblum?
16     A   Not -- no.
17     Q   And do you recall where you were when you
18 spoke to Mr. Schwab on or about January 11th or January
19 12th, 2017?
20     A   I can't say for certain.
21     Q   Have you ever sold any other bankruptcy claim?
22     A   I was -- never sold a claim, but there was a
23 claim that we had a couple of years ago from Kodak that
24 I know our chief financial officer and VP of finance had
25 gotten some indications of interest about buying the

Page 121

1  claim.  And sitting here I can't tell you whether or not
2  it was actually sold or not.  I actually did see a
3  document for selling a claim, but whether that was ever
4  negotiated or signed I don't -- I can't tell you.
5      Q   And did you review that document so that you
6  could approve it?  Did you review the document that you
7  mention with regard to the Kodak claim?
8      A   I read the document.  I didn't review it.  I
9  did read it.  And if it went any further, they would
10 have sent it back over to legal.
11     Q   And you don't know whether it was sent to
12 legal?
13     A   I don't know if we pursued it.  I don't even
14 remember what the -- what the dollar amount was.
15     Q   And were -- who is Earl Enterprises's CFO
16 currently?
17     A   Earl Enterprises, again, isn't an entity, but
18 the CFO is Bruce Hawkins.
19     Q   So you're the vice chairman of Earl
20 Enterprises, but Earl Enterprises is not an entity?
21     A   There you go.
22     Q   But are Earl Enter --
23     A   He would refer to himself as the CFO of Earl
24 Enterprises to encompass the group (indicating), but his
25 official title is CFO of Planet Hollywood and most of

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 122

1 these other entities as well. Makes for very long
2 business cards.
3 Q Was Mr. Hawkins -- did Mr. Hawkins have any
4 involvement in considering whether or not to sell Claim
5 5858?
6 A No. He wasn't involved other than he
7 actually -- some people had contacted him, and he
8 forwarded maybe a couple of names or gave names or I
9 told him to have so-and-so call me or whatever about the
10 claim.
11 Q And who is the VP of finance of Planet
12 Hollywood International?
13 A Yeah, Richard Olgee.
14 Q And that's O-L-G-E-E?
15 A Yes.
16 Q And was Mr. Olgee involved in --
17 A No, not at all.
18 Q Can I ask my question just so the record's
19 clear?
20 A Certainly.
21 Q Was Mr. Olgee involved in any discussions
22 concerning the sale of Claim 5858?
23 A No.
24 Q Was anyone -- who would you say were the
25 people at Planet Hollywood International who were

Page 123

1 involved in the decision of whether to sell Claim 5858?
2 A It would only be myself to sort of gather the
3 information and get all the terms right and then Mr.
4 Earl to make the ultimate decision.
5 Q Have you ever purchased a bankruptcy claim?
6 A Never.
7 Q Have you ever dealt with outside advisors
8 concerning potential purchases or sales of bankruptcy
9 claims?
10 A Not that I recall.
11 Q You stated at the beginning of the day that
12 Planet Hollywood International has filed for bankruptcy
13 twice?
14 A Yes.
15 Q And would you say that you were involved in
16 those bankruptcies?
17 A Yes.
18 Q What was your involvement in those
19 bankruptcies?
20 A Well, I was the CFO at the time, so, you know,
21 I would be res -- I was responsible for, you know,
22 filing whatever documents needed to be filed with the
23 courts. It was a prearranged bankruptcy that our
24 advisors at the time -- I'm trying to think of who they
25 were. I can't think of their name -- but sort of

Page 124

1 arranged with various bond holds that we had. It wasn't
2 a prepack, but it was a prearranged bankruptcy, so we
3 were -- we sort of knew going in what the -- what the
4 recoveries was going to be. And Mr. Earl was able to
5 raise some money from some existing stockholders, and
6 family trust put in some money. And then there's just
7 the overall administration of the -- of the bankruptcy
8 reporting.
9 Q Did it take up a substantial amount of your
10 day-to-day work when they were ongoing?
11 A Ongoing bankruptcies? Yeah, I mean, there's a
12 lot more additional -- there's a lot of additional work.
13 Q Did you inform the financial advisors for the
14 Planet Hollywood bankruptcies that you were required to
15 bring all decisions to Mr. Earl for his approval?
16 A They knew that.
17 Q How did they know that?
18 A Mr. Earl told them.
19 Q And did Mr. Earl tell them that in writing?
20 A I have -- I don't know.
21 Q Have you ever seen a writing from Mr. Earl to
22 his financial advisors in the Planet Hollywood
23 bankruptcy in which he stated that you were required to
24 bring all decisions to his attention for approval?
25 A No.

Page 125

1 Q Do you continue to deal with financial
2 advisors for the group of companies referred to as Earl
3 Enterprises today?
4 A Could you repeat that?
5 Q Does Earl Enterprises have financial advis --
6 outside financial advisors?
7 A Occasionally we talk to financial advisors.
8 Q And do you talk to those financial advisors
9 directly?
10 A Yes.
11 Q And have you informed those financial advisors
12 that any decision must be approved by Mr. Earl?
13 A Absolutely.
14 Q And what form does that communication take
15 place in?
16 A With the financial advisors.
17 Q So did you tell the financial advisors in
18 writing that any decision you make has to be --
19 A No.
20 Q -- approved by Mr. Earl?
21 A No. When we engage -- again, this is the way
22 we've been operating for 30 years. We engage a
23 professional. We engage somebody -- you know, I would
24 talk to them. Robert Earl's the owner. He's got the
25 vested interest in the business, you know. And

In re:
Caesars Entertainment Operating Company, Inc.

THOMAS AVALLONE
January 10, 2018

Page 126

1    especially in the financial area, it would be Mr.
2    Earl -- we can talk about it, but let's get Mr. Earl's
3    comments and let's get his -- it's his decision.
4         Q    And does that happen in writing or in oral
5    communications of some sort?
6         A    An understanding -- I would say oral
7    communications and understanding.
8         Q    And is that memorialized in any agreements
9    that you have with your financial advisors?
10        A    No.
11        Q    And you said you've been doing business this
12   way for 30 years; is that correct?
13        A    Yes.
14        Q    And Planet Hollywood International is
15   currently not a public company; is that correct?
16        A    Correct.
17        Q    And Planet Hollywood International at some
18   point in the last 30 years was a public company?
19        A    Yes.
20        Q    And it's particularly important when you are a
21   public company to follow corporate formalities; isn't
22   that correct?
23        A    Yes.
24        Q    And also particularly important when you are a
25   public company to make sure the market understands the

Page 127

1    roles and responsibilities of corporate officers; isn't
2    that correct?
3         A    Yes.
4         Q    And even though you're no longer a public
5    company, I'm sure that Earl -- that it's correct that
6    Earl Enterprises endeavors to abide by all of its
7    corporate organizational documents at all times; isn't
8    that correct?
9         A    Yes, with the understanding that Mr. Earl,
10   whether he has the formal title or not, is the
11   president, CEO, chairman of the board, ultimate owner or
12   looking after for his kids. His family -- he and his
13   family are the beneficiary or the owners of the company,
14   and, you know, he will make the decisions that are best
15   for his family.
16        Q    So is it your testimony under oath that the
17   corporate document of companies doing business under the
18   Earl Enterprises banner are inaccurate?
19            MR. CHUBAK: Objection, mischaracterizes
20        testimony.
21        A    I'm saying there's certain authorities that
22   are laid out on the corporate documents. But, you know,
23   even, you know, as president, manager, whatever I am of
24   all these entities, I am still very aware that my
25   ultimate responsibility is to the owners of the

Page 128

1    business, the shareholders, and in this case, it's
2    Robert Earl.
3         So, you know, while the authority on the
4    documents gives me permission to sign papers and do all
5    these other things, we just don't operate that way. I
6    wouldn't do anything unless I had Mr. Earl's approval if
7    I thought there was a -- you know, if there's something
8    that was contentious or just anything -- anything -- any
9    major decision.
10        Q    And do you tell third-parties that you do not
11   act in accordance with the authority granted to you by
12   the corporate documents of Earl of Sandwich (Atlantic
13   City), LLC?
14            MR. CHUBAK: Objection, argumentative.
15        A    No.
16        Q    When were you appointed to serve on secured
17   creditors committees --
18        A    Yes.
19        Q    -- for the Caesars bankruptcy?
20        A    January, if I get the year right, '15.
21        Q    And do you currently serve -- well, when did
22   you -- when -- when did your service on the unsecured
23   creditors committee come to an end?
24        A    I -- I technically think it ended just a
25   little while ago, a month or so ago, maybe.

Page 129

1         Q    And did you attend meetings in person?
2         A    Yes.
3         Q    And how often were those meetings held?
4         A    In-person meetings were infrequent. We
5    probably had maybe two or three a year. But we had --
6    for the majority of the bankruptcy, we had meetings
7    twice a week. We had conference calls twice a week
8    for -- for most of 2015 and a good portion of '16. Or
9    wait. Let me get my dates right. I don't know. I
10   mean, it's -- whether it was '15 or '16, but for a year
11   and a half, two years, there was lots of meetings.
12        Q    Did you inform the members of the unsecured
13   creditors committee for the Caesars bankruptcy that any
14   decisions needed to -- before you could make any
15   decisions, you needed to obtain Mr. Earl's approval?
16            MR. CHUBAK: Objection.
17        A    The decisions I made on the -- in the -- as a
18   member of the unsecured creditors committee to the
19   extent it didn't really affect the businesses owned by
20   Robert Earl. But that being said, I did -- you know,
21   when there was the -- I did discuss with Mr. Earl, you
22   know, what was going on the day-to-day what was going on
23   with the bankruptcy.
24        Q    Again, my question was did you inform the
25   members of the unsecured creditors committee for the

Page 130

1    Caesars bankruptcy that before you could make any
2    decisions, you needed to obtain Mr. Earl's approval?
3        A    No.
4            MR. CHUBAK:  We're seven minutes from 2:00
5    p.m.
6            MS. LEWIS-GRUSS:  I think I can do this pretty
7    quickly.
8            (Avallone Exhibit No. 64 was marked.)
9    BY MS. LEWIS-GRUSS:
10       Q    Mr. Avallone, do you have what's been marked
11   Exhibit 64 bearing the Bates stamp Earl 27?
12       A    Yes.
13       Q    This document was produced by your counsel in
14   this litigation.  Is this an e-mail that you received
15   from Mr. Hawkins?
16       A    Yes.
17       Q    And you've testified Mr. Hawkins is CFO of
18   Planet Hollywood International?
19       A    Yes.
20       Q    And was there -- and Mr. Hawkins was
21   forwarding you contact information for two people at
22   Cowen & Company.  Do you see that?
23       A    Yes.
24       Q    And why did Mr. Hawkins forward you the
25   contact information for these two individuals?

Page 131

1        A    I don't recall.
2        Q    Did you ask him to?
3        A    I might have said, "Do we know anyone at
4    Cowen?"  I said I deal with -- Gavin O'Reilly was a
5    market -- you know, is on the investment banking.  These
6    guys are maybe on the lending side.  I don't -- you
7    know, we just wanted to keep a relationship.
8        Q    So you don't think that this e-mail was in any
9    way connected to the dispute that we're here to talk
10   about today?
11       A    I might have asked them who do we know at
12   Cowen, and those are the names he gave me.
13       Q    And did you speak with Mr. Lauria or
14   Mr. Viola?
15       A    I do not recall.
16       Q    Do you have a reason to believe that you did
17   speak to either of those individuals --
18       A    I -- I don't recall --
19       Q    -- as you sit --
20       A    -- either of these names as I sit here.
21       Q    As you sit here today, do you recall speaking
22   to anyone at Cowen in July of 2017?
23       A    Not -- not right now.  No, not off the top of
24   my head.
25           MS. LEWIS-GRUSS:  We can break for your call.

Page 132

1        That fine.
2            THE VIDEOGRAPHER:  Going off the record.  The
3    time is 1:55 p.m.
4            (A 30-minute recess was had.)
5            THE VIDEOGRAPHER:  Please stand by.  Going
6    back on the record.  The time is 2:21 p.m.
7    BY MS. LEWIS-GRUSS:
8        Q    Good afternoon, Mr. Avallone.  Did you ever
9    speak -- did you ever speak to anyone at the law firm
10   known as Proskauer about whether or not sale of Claim
11   5858 would impact Earl's standing on the unsecured
12   creditors committee?
13       A    Yes.
14       Q    When did those conversations occur?
15       A    I don't recall when it occurred.
16       Q    Do you believe that you had conversations
17   with -- well, first of all, who at Proskauer did you
18   speak to?
19       A    Vincent Indelicato.
20       Q    And do you believe that you spoke to
21   Mr. Indelicato in January of 2017 regarding the question
22   of whether the sale of Claim 5858 would impact Earl of
23   Sandwich's standing on the unsecured creditors
24   committee?
25       A    I don't recall the date.

Page 133

1        Q    Do you have a reason to believe that it did
2    not occur in January of 2017?
3        A    I don't recall the date.
4        Q    Is there anything that would help you remember
5    what season that conversation occurred in?
6        A    Not that I can think of.
7        Q    And in what form did those communications
8    occur?
9        A    A phone call.
10       Q    And did you ever exchange e-mails with
11   Mr. Indelicato at any point in time concerning the
12   issues surrounding the potential sale of Claim 5858?
13       A    I don't recall.
14       Q    And do you recall what Mr. Indelicato told you
15   about whether a sale of Claim 5858 would impact Earl of
16   Sandwich's standing on the unsecured creditors
17   committee?
18       A    Yes.
19       Q    What did Mr. Indelicato tell you?
20       A    If I sold the claim and I was no longer a
21   creditor, I could no longer sit on the committee.
22       Q    And when did Mr. Indelicato tell you that?
23       A    I don't recall.
24       Q    And do you believe that you had had that
25   conversation with Mr. Indelicato prior to the time you

Page 134

1    discussed a potential sale of the claim with Cowen
2    Special Investments?
3      A    No.
4      Q    And do you believe that you had had that
5    conversation with Mr. Indelicato prior to the time
6    during the spring of 2017 when you discussed the
7    potential sale of the claim with Alex Ortega?
8      A    No.
9      Q    Did you tell Mr. Indelicato in January 2017
10   that any sale of the claim known as Claim 5858 would
11   require Mr. Earl's approval?
12     A    No.
13     Q    Did you tell Mr. Indelicato at any point in
14   time that any sale of Claim 5858 would require
15   Mr. Earl's approval?
16     A    No.
17     Q    Are you familiar with the term "litigation
18   hold"?
19     A    Yes.
20     Q    What do you understand that term to be -- to
21   refer to?
22     A    Generally, I get a letter from an attorney
23   saying that there's litigation, possible litigation, and
24   don't destroy any e-mails or -- of the nature.
25     Q    And did you receive a litigation hold with

Page 135

1    regard to the present action?
2      A    I don't recall.
3      Q    So would it be fair to say that you don't know
4    the date on which you would have received a litigation
5    hold in this action?
6      A    I don't recall, yeah.
7      Q    Did you do anything to collect documents in
8    this action?
9      A    Well, I think as part of the request I went
10   through certain of my files and discussed with the legal
11   counsel, and they instructed the IT department to
12   download all of my e-mails and, you know, performed the
13   search of the database.
14     Q    Do you maintain hard copy records of any sort?
15     A    Some documents.
16     Q    What types of documents do you maintain in
17   your hard copy files?
18     A    Me personally or me acting as a corporate
19   representative?
20     Q    That's a fair question.  You personally, what
21   hard copy records do you maintain in connection with
22   your business?
23     A    I try not to keep paper.  You know, there's
24   certain originals of -- well, it depends.  I can't think
25   of anything offhand, but, you know, typically, if it's a

Page 136

1    legal document, you know, it's retained in a file over
2    at legal.  I very rarely print out any e-mails or
3    anything of that nature.
4          Reports and financial statements and things of
5    that I keep for a short period of time and then discard
6    them.  I have some historical financial information as
7    far as, you know, bound copies of audit reports I keep.
8      Q    Do you maintain a calendar, a handwritten
9    calendar?
10     A    No.
11     Q    Do you maintain any notation system that you
12   can --
13     A    I keep a "to do" list sheet that I do, and
14   occasionally when I need to meet with Robert, I'll list
15   things to talk about and work on.  But, you know, once
16   it's filled up, I throw it out and start the next list.
17     Q    Do you know whether your secretary maintains
18   your calendar?
19     A    She does not.
20     Q    Do you maintain your calendar on electronic
21   form?
22     A    I do.
23     Q    Do you know whether the files of your
24   secretary were searched for responsive documents?
25     A    I don't recall.

Page 137

1      Q    And your secretary's first name is Lori; is
2    that correct?
3      A    Yes.
4      Q    And I apologize for not knowing her last name.
5      A    Connell.
6      Q    Lori Connell.  Okay.  Do you know whether
7    Mr. Hawkins's files were searched for responsive
8    documents?
9      A    I don't -- I don't know.
10     Q    Do you know if anyone other than you and
11   Mr. Earl were asked to search for responsive documents?
12     A    I don't know, but I can't think of anybody
13   else who would have any documents that would be
14   responsive.
15     Q    But Mr. Hawkins did receive inquiries from
16   potential purchasers of Claim 5858; isn't that true?
17     A    Yes.
18     Q    And you testified that you reviewed some
19   documents in preparation for today's deposition; is that
20   correct?
21     A    Yes.
22     Q    Did you review a litigation hold in connection
23   with preparation for today's deposition?
24     A    No, I did not.
25          MS. LEWIS-GRUSS:  Well, I think that we can

Page 138

1    conclude today's portion of your deposition subject
2    to any questions that your counsel wants to ask and
3    my right to ask follow-up questions.
4        MR. CHUBAK: Let's talk.  Let's go off the
5    record for a moment.
6        THE VIDEOGRAPHER: Going off the record.  The
7    time is 2:30 p.m.
8        (A 1-minute recess was had.)
9        THE VIDEOGRAPHER: Going back on the record.
10   The time is 2:31 p.m.
11       MS. LEWIS-GRUSS: I understand, Mr. Avallone,
12   that your counsel is not going to ask you any
13   questions during this deposition.  Whitebox
14   reserves its right to continue this deposition upon
15   production of any additional documents relevant to
16   the claims at issue today.  That being said, I
17   thank you very much for your time, and I hope you
18   have a good remainder of your day.
19       THE WITNESS: Thank you very much and have a
20   safe flight back.
21       THE VIDEOGRAPHER: This concludes the
22   video-recorded deposition of Thomas Avallone.  The
23   time is 2:32 p.m.  We are off the record.
24       THE REPORTER: Do you want this typed up?
25       MS. LEWIS-GRUSS: Yes.

Page 139

1        THE REPORTER: Do you want a copy?
2        MR. CHUBAK: Yes.
3        THE REPORTER: And rough drafts for both of
4    you?
5        MS. LEWIS-GRUSS: Yes.
6        MR. CHUBAK: Yes, please.
7        (The proceedings were concluded at 2:35 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 140

1            CERTIFICATE OF REPORTER
2    STATE OF FLORIDA:
3    COUNTY OF ORANGE:
4        I, LAURA J. LANDERMAN, R.M.R., C.R.R., F.P.R., do
5    hereby certify that I was authorized to and did
6    stenographically report the foregoing deposition of
7    THOMAS AVALLONE; that a review of the transcript was
8    requested; and that the foregoing transcript, pages 1
9    through 141, are a true and complete record of my
10   stenographic notes.
11       I FURTHER CERTIFY that I am not a relative,
12   employee, attorney or counsel of any of the parties, nor
13   am I a relative or employee of any of the parties'
14   attorneys or counsel connected with the action, nor am I
15   financially interested in the outcome of the action.
16       Signed this 22nd day of January, 2018.
17
18
19       _____
20       LAURA J. LANDERMAN, R.M.R., C.R.R., F.P.R.
21
22
23
24
25

Page 141

1            CERTIFICATE OF OATH
2    STATE OF FLORIDA
3    COUNTY OF ORANGE:
4        I, LAURA J. LANDERMAN, R.M.R., C.R.R., F.P.R.,
5    Notary Public, State of Florida at Large, do hereby
6    certify that THOMAS AVALLONE personally appeared before
7    me this 10th day of January and was duly sworn/affirmed.
8
9        WITNESS my hand and official seal this 22nd day of
10   January, 2018.
11
12   Identification:   Professionally known
13
14
15
16
17
18       _____
19       LAURA J. LANDERMAN, R.M.R., C.R.R., F.P.R.
20
21
22
23
24
25