## EXHIBIT 7

**Schwab Deposition Transcript**

Page 1

```
 1

 2            IN THE UNITED STATES BANKRUPTCY COURT

 3            FOR THE NORTHERN DISTRICT OF ILLINOIS

 4                     EASTERN DIVISION

 5

 6

      In re:                    ) Case No. 15-01145
 7                              ) (ABG)

      CAESARS ENTERTAINMENT      )
 8    OPERATING COMPANY, INC.,   ) Chapter 11

      et al.,                    )
 9                              )

                   Debtors.      )
10    --------------------------)

11

12

13

14

15

16            DEPOSITION OF BRADLY SCHWAB

17               New York, New York

18            Tuesday, January 16, 2018

19

20

21

22

23    Reported by:

24    KRISTIN KOCH, RPR, RMR, CRR

25    JOB NO. 135595A
```

## Page 2

```
 1
 2
 3
 4                    January 16, 2018
 5                    9:16 a.m.
 6
 7
 8         Deposition of BRADLY SCHWAB, held at
 9   the offices of Storch Amini P.C., 2 Grand
10   Central Tower, 140 East 45th Street, New
11   York, New York, before Kristin Koch, a
12   Registered Professional Reporter,
13   Registered Merit Reporter, Certified
14   Realtime Reporter and Notary Public of the
15   State of New York.
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1
 2   A P P E A R A N C E S :
 3
 4
 5   STORCH AMINI P.C.
 6   Attorneys for Earl of Sandwich (Atlantic City)
 7   LLC
 8      2 Grand Central Tower
 9      140 East 45th Street
10      New York, New York 10017
11   BY:  JEFFREY CHUBAK, ESQ.
12
13
14   HERBERT SMITH FREEHILLS NEW YORK LLP
15   Attorneys for Bradly Schwab
16      450 Lexington Avenue
17      New York, New York 10017
18   BY:  SCOTT S. BALBER, ESQ.
19
20
21
22
23
24
25
```

## Page 4

```
 1
 2   A P P E A R A N C E S :  (Continued)
 3
 4
 5   ORRICK, HERRINGTON & SUTCLIFFE LLP
 6   Attorneys for Whitebox Advisors LLC
 7      51 West 52nd Street
 8      New York, New York 10019
 9   BY:  AYANNA LEWIS-GRUSS, ESQ.
10
11
12   ALSO PRESENT:
13
14   DANNY PHILLIPS, ESQ., Cowen
15   JEFFREY C. SIROLLY, ESQ., Earl Enterprises
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1
 2   B R A D L Y   S C H W A B ,
 3      called as a witness, having been duly sworn
 4      by a Notary Public, was examined and
 5      testified as follows:
 6   EXAMINATION BY
 7   MR. CHUBAK:
 8      Q.   Mr. Schwab, have you ever been
 9   deposed before?
10      A.   Yes.
11      Q.   Can you tell me on how many
12   occasions?
13      A.   Once.
14      Q.   Can you describe the litigation in
15   which you were deposed?
16      A.   It was family related.
17      Q.   Okay.  Can you tell me what you did
18   to prepare for today's deposition, if anything?
19      A.   Met with counsel.
20      Q.   Is that the counsel sitting next to
21   you, Scott Balber?
22      A.   Correct.
23         MR. CHUBAK:  I am going to hand you
24   what I would ask be marked Exhibit 80.
25         (Exhibit 80, Bradly Schwab LinkedIn
```

2 (Pages 2 to 5)

Page 6

B. Schwab

1
2    printout, marked for identification.)
3    Q.    Is this a copy of your LinkedIn
4    profile?
5    A.    It is.
6    Q.    And although the top of the second
7    page is cut off, is it true that you worked at
8    CRT from November 2011 to May 2016?
9    A.    Correct.
10    Q.    And Debt Acquisition Group before
11    that, and Triax Capital Advisors before that?
12    A.    Correct.
13    Q.    Is it fair to say that you have been
14    in the trade claim business since at least July
15    2007?
16    A.    Give or take, yeah.
17    Q.    How did you get into the trade claim
18    business?
19    A.    I don't understand the question,
20    like how did I get in.  I don't understand.
21    Q.    Well, how did you -- what was your
22    first job where your principal responsibility
23    involved the purchase and sale of trade claims?
24    A.    Probably Triax or somewhere between
25    Triax and Debt Acquisition Group.

Page 7

B. Schwab

1
2    Q.    And what were your responsibilities
3    at Triax?
4    A.    Both as a restructuring advisor, as
5    well as ultimately eventually buying and
6    selling claims.
7    Q.    What were your responsibilities at
8    Debt Acquisition Group?
9    A.    Analyzing opportunities to investing
10    in distressed opportunities.
11    Q.    Did your responsibilities include
12    the purchase and sale of trade claims?
13    A.    Yes.
14    Q.    Was that also the case at CRT?
15    A.    Correct.
16    Q.    And at each of Triax, Debt
17    Acquisition Group and CRT, did you negotiate
18    directly with trade creditors in connection
19    with the purchase and sale of trade claims?
20    A.    Yes.
21    Q.    And when you entered into --
22    withdrawn.
23    How did you memorialize agreements
24    with trade creditors with whom you entered into
25    trade claim transactions?

Page 8

B. Schwab

1
2    A.    Through purchase and sale
3    agreements.
4    Q.    Did you memorialize transactions --
5    withdrawn.
6    (Ms. Lewis-Gruss enters.)
7    Q.    Did you memorialize transactions
8    through trade confirmations?
9    A.    Can you explain what you mean by
10    "memorialize"?
11    Q.    How did you and the trade creditor
12    decide on the terms of an agreement to sell or
13    purchase a trade claim?
14    A.    It depended on the situation.
15    Q.    Can you elaborate?
16    A.    It could be in the form of verbal
17    agreements, it could be the form of e-mails, it
18    could be the form of trade confirmations, it
19    could be a form of actual purchase and sale
20    agreement.  It depends on the situation.
21    Q.    Had you ever entered into an
22    agreement with a trade creditor on the basis of
23    e-mails while at Triax?
24    A.    I don't remember.
25    Q.    Had you ever entered into an

Page 9

B. Schwab

1
2    agreement with a trade creditor on the basis of
3    e-mails while at Debt Acquisition Group?
4    A.    No idea.  I don't remember.  It's a
5    long time ago.
6    Q.    Do you remember having
7    entered into-- ever having entered into an
8    agreement with a trade creditor concerning the
9    purchase and sale of a claim on the basis of
10    e-mails while at CRT?
11    A.    Do you mean -- what do you mean by
12    "agreement"?
13    Q.    A legally-binding agreement
14    concerning the purchase and sale of a
15    bankruptcy claim.
16    MR. BALBER:  Object to the form of
17    the question.  The witness is not a lawyer
18    and he is not going to opine on legal
19    issues.
20    Q.    While at Triax, have you ever
21    entered into an agreement with a trade creditor
22    on the basis of a phone call?
23    A.    I don't remember.  At Triax?  I
24    don't remember.
25    Q.    While at Debt Acquisition Group, had

3 (Pages 6 to 9)

Page 10

B. Schwab

1  
2 you ever entered into an agreement with a trade
3 creditor on the basis of a phone call?
4     A.   I can't remember.
5     Q.   While at CRT, had you ever entered
6 into an agreement concerning the purchase and
7 sale of a bankruptcy claim on the basis of a
8 phone call?
9     A.   Yeah.  Yes.
10     Q.   Can you describe that particular
11 situation or situations?
12     A.   I mean, just parties talking to them
13 on the phone and people agree to transactions
14 and push forward with them.
15     Q.   What did you do if there was a
16 disagreement as to what the parties thought
17 they discussed?  Withdrawn.
18        Were those phone calls recorded?
19     A.   I have -- I mean, I have no idea.  I
20 don't know if CRT recorded telephone lines or
21 not.
22     Q.   When you moved to Cowen in May 2016,
23 did you move over as the head of the special
24 situations group?
25     A.   Special investments.

Page 11

B. Schwab

1  
2     Q.   Special investments.  How many trade
3 claims do you think you -- withdrawn.
4        How many trade claims did your group
5 enter into during your tenure there?
6     A.   I don't remember.  I don't have any
7 of those records.
8     Q.   Is it fair to say that it's more
9 than a hundred?
10     A.   I don't remember.  Maybe.  I don't
11 know.
12     Q.   How many trade claims did you
13 personally -- withdrawn.
14        How many trade claims transactions
15 were you personally involved in?
16     A.   Again --
17     Q.   Roughly.
18     A.   Anywhere from one to a hundred, I
19 guess, somewhere in there.  I don't know.
20     Q.   Was it more than ten?
21     A.   Probably.  I don't know.
22     Q.   Was it more than twenty?
23     A.   I don't know.
24     Q.   Do you think it was under fifty?
25     A.   Honestly, I don't know.

Page 12

B. Schwab

1  
2     Q.   How were those trade claim
3 transactions memorialized?
4     A.   Any combination of verbal, e-mail,
5 trade confirmation or straight to a document.
6     Q.   Do you remember any specific
7 transactions that were memorialized by e-mail?
8     A.   No.
9     Q.   Do you remember any specific
10 transactions that were memorialized by a phone
11 call?
12     A.   No.
13     Q.   Is it correct that the transactions
14 that you did enter into while at Cowen were
15 memorialized by either an Assignment of Claim
16 Agreement or a written trade confirmation?
17        MR. BALBER:  Object to the form of
18 the question.
19     A.   Define "memorialize."
20     Q.   How did the parties to the
21 transaction decide what the transaction's terms
22 were?
23        MR. BALBER:  Which transaction?  I
24 mean -- object to the form of the question.
25     A.   To successfully close a transaction

Page 13

B. Schwab

1  
2 it will go to a purchase and sale agreement.
3 That's how they get done.  Every transaction.
4     Q.   When you agreed to the terms of a
5 transaction with a trade claim holder, how did
6 you memorialize that transaction's terms prior
7 to closing?
8     A.   It can be verbal, it can be written,
9 an e-mail, it could be a trade confirmation, it
10 could be a purchase and sale agreement.
11     Q.   You testified a moment ago that you
12 had no specific recollection of any transaction
13 being memorialized by e-mail or a phone call
14 except perhaps the subject transaction.
15        MR. BALBER:  Finish your question.
16     Q.   Is it correct that while at Cowen
17 trade claim transactions you entered into were
18 memorialized by a written trade confirm or an
19 Assignment of Claim Agreement?
20        MR. BALBER:  Object to the form of
21 the question.  Mischaracterizes the
22 witness' prior testimony.
23        You can answer.
24     A.   I don't remember specifically any of
25 the transactions, but that's how they would be

B. Schwab

1
2  done, either verbally, either orally on the
3  telephone or written trade confirmation or
4  purchase and said agreement.
5      Q.    For the avoidance of doubt, is it
6  correct that you do not recall entering into
7  any transaction while at Cowen -- withdrawn.
8          Do you recall entering into -- ever
9  entering into a claim purchase or sale
10 agreement with -- withdrawn.
11         While at CRT, do you recall ever
12 entering into an agreement with a trade
13 creditor on the basis of a phone call?
14     A.    I would assume I did.  I don't
15 remember specifically.
16     Q.    Do you have any specific
17 recollection of any transaction entered into on
18 the basis of a phone call?
19     A.    I'd have to think about it.  It's a
20 long time ago already.  I would assume I did
21 somewhere, but I don't recall off the top of my
22 head any specific transaction.
23     Q.    While at Cowen, do you recall
24 entering into a transaction with a trade
25 creditor or -- withdrawn.

B. Schwab

1
2      While at Cowen, do you recall
3  entering into an agreement concerning the
4  purchase and sale of a bankruptcy claim on the
5  basis of a phone call?
6      A.    I'm trying to think.  Based on price
7  and size and structure?  From the -- I guess my
8  question being what's entering into an
9  agreement, being that an agreement is a signed
10 document, purchase and sale agreement?
11     Q.    Is that how you understood a --
12     A.    Well, to close a purchase and sale
13 agreement of a claim, you need a purchase and
14 sale agreement.  Eventually that's where you --
15 all transactions will go.
16     Q.    Can an agreement close on the basis
17 of another written instrument, such as a trade
18 confirmation?
19     A.    No.
20     Q.    Did Triax Capital Advisors carry
21 claims that it purchased on its books or did
22 they -- or did it sell claims to third parties?
23         MR. BALBER:  Object to the form of
24 the question.
25     A.    It didn't hold it on its books.

B. Schwab

1
2      Q.    Did Debt Acquisition Group hold
3  claims that it purchased on its books or did it
4  sell them to third parties?
5      A.    Both.
6      Q.    Is that true for CRT as well?
7      A.    Yes.
8      Q.    Is that also true for Cowen Special
9  Investments?
10     A.    Yes.
11     Q.    How did Triax record claims that it
12 understood it had an agreement to purchase on
13 its books and records?
14     A.    I wasn't involved in that.
15     Q.    How did Debt Acquisition Group
16 record the purchase of claims it thought it
17 purchased on its books and records?
18     A.    I wasn't involved in that either.
19     Q.    Were you involved in that at CRT?
20     A.    Anecdotally.  I wasn't in charge of
21 the books and records of the business.
22     Q.    Did you enter a trade ticket --
23     A.    Nope.
24     Q.    -- into a system?
25     A.    Nope.

B. Schwab

1
2      Q.    Did you tell anyone when you had
3  entered into an agreement to purchase a
4  bankruptcy claim?
5      A.    Purchase from a booking -- books and
6  records standpoint a signed purchase and sale
7  agreement is executed.  It was forwarded to the
8  middle and back office and they booked all the
9  trades.
10     Q.    Was that true for Cowen Group as
11 well -- for Cowen Special Investments as well?
12         MR. BALBER:  Object to the form of
13 the question.
14     A.    Yes, but I didn't handle any of that
15 at Cowen.
16     Q.    To the best of your knowledge, did
17 Cowen Special Investments ever book a trade as
18 being locked in prior to entry of a purchase
19 and sale agreement?
20         MR. BALBER:  Object to the form of
21 the question.
22         If you understand what that means,
23 you can answer it.
24     A.    Can you repeat it, please.
25     Q.    To the best of your knowledge, did

Page 18

B. Schwab

1
2 Cowen ever treat a trade as having been agreed
3 to prior to entry of a purchase and sale
4 agreement?
5     A.   Not to my knowledge.
6     Q.   How many people worked under you at
7 Cowen?
8     A.   Two or three, depending on the time.
9     Q.   Can you tell me who they were?
10     A.   John Mori, Gail Rosenblum and Neil
11 Desai.
12     Q.   Can you tell me what their
13 respective roles and responsible were?
14     A.   John Mori was a sourcer slash call
15 it assistant trader.  Neil was an analyst when
16 he was there.  He was only there four or five
17 months.  And Gail Rosenblum was middle office,
18 back office, service provider.
19     Q.   What were Gail's responsibilities
20 specifically?
21     A.   Document close and enter --
22 facilitate the internal processes of booking
23 and closing trades.
24     Q.   Did Gail advise Cowen once a
25 trade -- a claim trade's terms were agreed to?

Page 19

B. Schwab

1
2     MR. BALBER:  Object to the form of
3 the question.
4     A.   I don't know what Gail did.
5     Q.   Did you advise Cowen when a trade
6 claim's agreement terms were agreed to?
7     A.   So prior -- so I understand from a
8 timeline perspective, prior to there being an
9 executed purchase and sale agreement?
10     Q.   Correct.
11     A.   I guess sometimes.  You know, it
12 wasn't required.
13     Q.   How did you advise Cowen on the
14 occasions that you did?
15     MR. BALBER:  Object to the form.
16 What do you mean by "advise Cowen"?  He is
17 Cowen.  I don't understand the question.
18     MR. CHUBAK:  That's fair.
19     A.   Advise who?
20     Q.   Did you ever instruct Cowen to
21 memorialize the trade on its books and records?
22     MR. BALBER:  Same objection.
23     Q.   Prior to entry into an Assignment of
24 Claim Agreement?
25     A.   No.

Page 20

B. Schwab

1
2     Q.   Are you the founding partner of
3 Haybeach Partners?
4     A.   One of three.
5     Q.   Who are the other two?
6     A.   Darius Goldman and Neil Desai.
7     Q.   Has Haybeach purchased any trade
8 claims since its launch?
9     A.   Purchase meaning what?  Define.
10     Q.   Entered into an Assignment of Claim
11 Agreement with a creditor in a bankruptcy case.
12     A.   No.
13     Q.   Has Haybeach agreed to the terms of
14 the purchase of any bankruptcy claim without
15 regard to whether it's entered into an
16 Assignment of Claim Agreement?
17     A.   Yes.
18     Q.   Can you tell me what -- about --
19     A.   It's confidential.
20     Q.   Does Haybeach work with Whitebox?
21     A.   No.
22     (Exhibit 81, e-mail dated January
23 11, 2017, Bates stamped Confidential
24 CSI_00000044 through Confidential
25 CSI_00000051, marked for identification.)

Page 21

B. Schwab

1
2     Q.   Do you recognize this document as
3 your January 11th e-mails with Tom Avallone?
4     A.   If it's from me, it's from me.  I
5 guess recognize, I guess, yes.
6     Q.   I'd like to refer you to the third
7 page, specifically the 12:59 p.m. e-mail
8 towards the bottom.
9     A.   Okay.
10     Q.   Sent from Thomas Avallone to Barrett
11 Mikelberg at TriaxAdvisors.com.  The page is
12 Bates stamped CSI-46.
13     Were you forwarded this e-mail by
14 Barrett Mikelberg?
15     A.   If it's in an e-mail chain, I would
16 assume so.
17     Q.   Do you remember having read this
18 e-mail, "may be a seller of my $3.6 million
19 undisputed allowed claim for $2.15 million
20 cash"?
21     A.   I don't remember reading it, but
22 it's here, so -- it's a year ago.
23     Q.   What about the e-mail that followed
24 that one, that's on the page Bates stamped
25 CSI-45, I'm referring to your e-mail to Thomas

Page 22

B. Schwab

Avallone at 1:59 p.m., do you remember having
sent that e-mail?

A.   No.  I assume I did send it, but I
don't remember sending it.

Q.   Do you remember having received a
response from Thomas Avallone at 2:04 p.m. that
says "see below" with the below --

A.   If I have the e-mail in front of me,
then I have it.  I don't remember seeing it, so
I don't recall.

Q.   I am going to refer you to the
second to last paragraph of that e-mail, the
one beginning "moreover, please confirm."

Do you remember having asked Thomas
Avallone:  "It sounds like you are offering the
paper for sale at $2.15 million or
approximately 59.72% of the face claim amount.
Is that correct?"

A.   I don't remember writing the e-mail,
but it's here, so it's my e-mail.

Q.   Do you remember Thomas Avallone
responding "yes" to that question?

A.   No, I don't remember that.

Q.   I am going to refer you to the

Page 23

B. Schwab

e-mail that preceded it, the one dated January
11, 2017, at 2:17 p.m., the text of which
actually starts on the page Bates stamped
CSI-45.

Do you remember having sent this
e-mail?

A.   I don't remember sending it, but
it's here, it's mine.

Q.   I am going to refer you to the
second paragraph of this e-mail, the part that
begins after the dash:  "Do you happen to have
any support documentation confirming this" --
this being that Earl Enterprises settled claims
with the estate -- "either a settlement
agreement or an allowance
letter/correspondence."

Would you characterize that as a
condition to an agreement?

A.   As due diligence.

Q.   Would you have entered into --
strike that.

Would you enter into claim trade
agreements without regard to whether you know
whether the claim is allowed?

Page 24

B. Schwab

A.   Yes.

MR. BALBER:  Object to the form of
the question.

Q.   Is it fair to describe this as a
condition to any potential agreement with Earl
of Sandwich?

MR. BALBER:  Object to the form of
the question.

A.   It would be due diligence,
confirmatory.

Q.   What do you mean "confirmatory"?

A.   You would agree to price in notional
and the transaction would be conditional upon
confirming that there is a settlement agreement
in terms of size.  It's just -- it would be due
diligence, it would be confirmatory, not a
condition to -- it would be a condition to a
transaction at buyer's discretion confirming
what it is.  It's due diligence.

Q.   So when you wrote:  "I would have
interest in 59.72% subject to confirming the
above.  Please let me know," were you accepting
what you understood to be a prior offer of
Tom's subject to your confirming the diligence?

Page 25

B. Schwab

MR. BALBER:  Object to the form of
the question.

A.   Based on the correspondence.  I
mean, I don't remember specifically, it's a
year ago, but based on the correspondence,
correct.

Q.   Was your ability to conduct
diligence material to any transaction?

MS. LEWIS-GRUSS:  Objection.

A.   I don't understand the question.

Q.   Would you have entered into a
transaction without the ability to conduct
diligence?

A.   No.

Q.   I am going to refer you to Thomas
Avallone's 2:38 p.m. e-mail to you of the same
day towards the bottom of the page Bates
stamped CSI-44, the e-mail in which he says:
"I can easily get a letter from the
Debtor/Restructuring Officer confirming nature
of the claim amount as undisputed and allowed
if we decide to move forward."

Do you recall having received this
e-mail?

Page 26

B. Schwab
1
2  A.  No, I don't recall.
3  Q.  What do you understand Tom to have
4  meant when he wrote "if we decide to move
5  forward"?
6  A.  I don't -- I can't refer to that.  I
7  don't remember what I was thinking at the point
8  in time.
9  Q.  I am going to refer you to the
10  3:47 p.m. e-mail of the same day, the one that
11  is at the top of the same page, specifically
12  the part where you wrote:  "I would be a buyer
13  of your $3.6 million allowed CZR claim at $2.15
14  million of 59.72% of the allowed face amount
15  subject to (a)," (b), (c), (d).
16  Do you recall having sent this
17  e-mail?
18  A.  No.
19  Q.  Did you -- sitting here now and
20  reading this e-mail, do you understand it to be
21  an offer subject to conditions?
22  A.  It would be a bid subject to
23  conditions.
24  Q.  What's the difference between a bid
25  and an offer?

Page 27

B. Schwab
1
2  A.  Bid is my -- me showing you what I
3  would pay for something.  Offering is what he
4  would do to me.
5  Q.  Were you looking to Thomas to accept
6  your bid?
7  A.  No, I mean, reading through the
8  correspondence, it would be me offered the
9  paper at -- looking through it now, it would be
10  considered he offered the paper at
11  59.72 percent earlier in the earlier e-mails.
12  Q.  Did you ever accept Thomas' prior
13  offer?
14  A.  Well, that's what the top e-mail is.
15  Q.  If that's the case, why did you ask
16  Thomas to "please confirm that you are good
17  with the above terms"?
18  A.  Just verbiage.  They were his terms
19  from the earlier e-mail.
20  Q.  Is it your position that by sending
21  this e-mail you accepted Thomas' prior offer?
22  A.  In terms of moving a transaction
23  forward, in my experience in most instances
24  that would facilitate the conversation to move
25  a transaction forward, correct.

Page 28

B. Schwab
1
2  Q.  But this was just a bid?  Withdrawn.
3  What do you mean by move the
4  transaction forward?
5  A.  I mean it would go from an e-mail,
6  as I said, it could be verbal, it could be
7  e-mail, it could go to a trade confirmation, it
8  could go to a purchase and sale agreement.
9  Eventually it would have to get to a purchase
10  and sale agreement.  This isn't a
11  transaction -- it's a transaction subject to
12  negotiating the final terms and conditions of a
13  transaction.
14  Q.  Did Thomas ever agree to any of the
15  conditions set forth in this e-mail?
16  A.  I don't -- I mean, that's the only
17  e-mails I have sitting in front of me.  I don't
18  have any other e-mail after this one, so...
19  Q.  Were these conditions material to
20  any deal you would have made with Earl of
21  Sandwich?
22  MR. BALBER:  Object to the form of
23  the question.
24  A.  I don't understand the question.
25  Q.  Would you have entered into an

Page 29

B. Schwab
1
2  agreement concerning the purchase and sale of
3  the claim without these conditions attached?
4  A.  Which conditions?
5  Q.  The ones identified in (a), (b), (c)
6  and (d) of this e-mail.
7  A.  They would all be addressed in the
8  documentation process.
9  Q.  Would -- did you negotiate -- I'm
10  sorry.  Withdrawn.
11  Would you ever negotiate the terms
12  of a purchase and sale agreement?
13  A.  Yes.
14  Q.  Is that true for transactions in
15  which the claim was not held by Cowen, but
16  instead sold to a third party?
17  A.  Yes.
18  Q.  Do you recall ever having waived the
19  conditions set forth in your 3:47 p.m. e-mail?
20  A.  In general or in specific to this?
21  Q.  Specific to this.
22  A.  I wasn't involved in anything post
23  the e-mail correspondence.  So I was not
24  involved in any of that process at Cowen in
25  this specific instance.

8 (Pages 26 to 29)

Page 30

B. Schwab

Q.   The following paragraph reads:
"Please confirm that you are good with the
above terms and I will forward you a purchase
and sale agreement for review."

Do you recall Tom ever having
confirmed that he was good with the above
terms?

A.   Based on the e-mail sitting in front
of me, no, I don't remember.

(Exhibit 82, e-mail dated January
12, 2017, Bates stamped Confidential
CSI_00000103 through Confidential
CSI_00000111, marked for identification.)

Q.   I have asked that this document be
marked Exhibit 82.

Do you recognize this as your
correspondence from the following day or the
morning of the following day specifically?

A.   If it says me and it's my e-mails, I
guess yeah, but I don't remember other than
seeing the document.

Q.   Do you recall having sent the
e-mail -- I'm sorry -- the 8:34 a.m. e-mail at
the bottom of the first page of this exhibit?

Page 31

B. Schwab

A.   I don't remember sending any of the
e-mails.  I just -- I have the correspondence
in front of me.  It's a year ago.

Q.   I am going to refer you to the first
sentence of the e-mail.  "Thomas -- as a
follow-up to my below email" -- that's a
reference to the 3:47 e-mail we just
discussed -- "and our quick conversation."

Do you recall when that conversation
took place?

A.   I don't.  All I know is we had one.
I don't remember the specifics regarding it
or --

Q.   Do you know what -- I'm sorry.

A.   I don't know when it took place or
what it consisted of, but there was a
conversation.

Q.   Do you know if Cowen Special
Investments records its phone calls?

A.   I don't.  I don't think it does, but
I don't.

Q.   I am going to refer you to the
following phrase in that -- clause in that same
sentence:  "My acceptance of your offer is good

Page 32

B. Schwab

through 11am eastern time, January 12th."

Which offer were you referring to
when you said "my acceptance of your offer"?

A.   His original -- I guess I was
referring to his original at 59.72 percent of
the 2.15 million.

Q.   Was "my acceptance" -- withdrawn.

When you wrote "my acceptance of
your offer is good through 11am eastern time
today," was that a condition to any -- to
entering into any transaction with Earl of
Sandwich?

A.   I don't know if it's a condition or
an expiration.

Q.   Would that be an expiration of your
bid?

A.   It could be interpreted that way.

Q.   And what did you expect Mr. Avallone
to do to prevent the bid from expiring?

A.   I don't know if I expected anything
other than either he would -- we would get
somewhere and push forward or we wouldn't push
forward.

Q.   I am going to refer you to the next

Page 33

B. Schwab

paragraph, the second sentence in particular,
the one which begins "if this is a transaction
Planet Hollywood would like to pursue."

A.   Uh-huh.

Q.   Is it correct that you understood at
that point in time that you did not have an
agreement concerning the terms of a purchase
and sale agreement with Earl of Sandwich?

MR. BALBER:  Object to the form of
the question.

A.   As I said, I don't remember
specifically at that point in time.  All I can
refer to is what's written in front of me.

Q.   Is it fair to say that you wouldn't
have said "if this is a transaction Planet
Hollywood would like to pursue" if you
understood you had a deal at that point in
time?

MR. BALBER:  Object to the form of
the question.

A.   It's just words.  I mean, I think
there is a transaction based on 59.72 percent
of 2.15 million.

Q.   Based on the e-mails that we have

B. Schwab

1 B. Schwab
2 reviewed so far, did you understand Cowen to
3 have had an agreement with Earl of Sandwich
4 concerning the purchase and sale of the
5 bankruptcy claim?
6     A.   Can you define "agreement"?
7     Q.   A mutual understanding concerning
8 the purchase and sale of the bankruptcy claim
9 whose terms were defined -- under defined
10 terms.
11     A.   I would say an understanding to
12 employ best efforts to move forward to see if
13 you could get to a document that's mutually
14 acceptable.
15     Q.   Is that based solely on Thomas'
16 2:04 p.m. e-mail on the third page of the -- of
17 Exhibit 81?
18         MR. BALBER:  Object to the form of
19     the question.
20     A.   I guess it is.  I mean, if you are
21 just referring to an e-mail, I guess.
22     Q.   Do you remember having spoken with
23 Thomas Avallone?
24     A.   I remember speaking -- I know there
25 was a conversation.  I don't remember the

1 B. Schwab
2 contents of the conversation.
3     Q.   I am going to refer you to the
4 9:47 a.m. e-mail that precedes it on the same
5 page in which Thomas Avallone writes to you:
6 "Please forward draft document."
7         Do you remember having received this
8 e-mail?
9     A.   I don't recall receiving it, but
10 it's here.
11     Q.   Sitting here today, what did you
12 understand this response to mean?
13     A.   That there is an understanding to
14 push forward all subject to figuring out a
15 purchase and sale agreement, which is subject
16 to negotiation based on the terms and
17 conditions that were listed earlier.
18     Q.   Is it possible that Tom was
19 responding to your e-mail -- to the second
20 paragraph of your 3:47 p.m. e-mail "please
21 confirm that you are good with the above terms
22 and I will forward you a purchase and sale
23 agreement for review"?
24         MR. BALBER:  Object to the form of
25     the question.

1 B. Schwab
2     A.   You would have to ask him.  You
3 would have to ask Tom.
4     Q.   Did you understand Thomas Avallone's
5 e-mail "please forward draft document" to be an
6 acceptance of your bid?
7     A.   I don't remember, but in convention
8 that would be yes, that people would request
9 copies of draft documents to review to push
10 forward with a transaction.
11     Q.   In your experience, has a potential
12 counterparty or counterparty ever accepted a
13 bid by asking for a draft document?
14     A.   Yes.
15     Q.   In your experience, has a potential
16 counterparty ever accepted a bid -- withdrawn.
17         Where was Gail working at this time?
18     A.   Physically?
19     Q.   Physically.
20     A.   In -- in relation to where I was
21 sitting?
22     Q.   Yes.
23     A.   In a cube outside my office.
24     Q.   There was no time zone difference
25 between you guys?

1 B. Schwab
2     A.   No.  Not that I know.  And this is
3 Thursday.  No, I don't believe there is.
4     Q.   You testified earlier that Cowen
5 Special Investments did not record bankruptcy
6 claim trades absent the existence of an
7 Assignment of Claim Agreement; is that correct?
8         MR. BALBER:  Objection.
9     Mischaracterizes the witness' prior
10     testimony.
11         You can answer.
12     A.   We did not put anything on the books
13 and records until there were signed purchase
14 and sale agreements.
15     Q.   On January 12 did you instruct --
16 withdrawn.
17         Following this e-mail exchange, did
18 you do anything to ensure that this claim trade
19 was reflected on Cowen's books and records?
20     A.   After the correspondence I had I
21 wasn't involved in the transaction ever again.
22     Q.   Do you know who was involved?
23     A.   I would -- I mean, from the
24 standpoint of Gail was managing the process and
25 then it went from there.

Page 38

B. Schwab

1
2      Q.   Do you know if Gail did anything to
3   ensure that the trade was reflected on the
4   books and records of Cowen Special Investments?
5      A.   Not that I'm aware of, just because
6   you wouldn't put it on the books and records
7   unless there is an executed purchase and sale
8   agreement.
9      Q.   Did Thomas ever tell you that any
10  transaction with Earl would be subject to the
11  approval of Robert Earl?
12     A.   I don't remember.  I only know there
13  was a conversation which I don't remember the
14  contents of.
15     Q.   Did Thomas ever advise you that he
16  was a member of the Official Committee of
17  Unsecured Creditors in the Caesars Chapter 11
18  cases?
19     A.   I don't remember.
20        (Exhibit 83, e-mail dated January
21     12, 2017, Bates stamped Confidential
22     CSI_00000112 through Confidential
23     CSI_00000122, marked for identification.)
24     Q.   Do you recognize this document?  I
25  am referring to the first page only.

Page 39

B. Schwab

1
2      A.   No, not that I -- I'm not party to
3   it, so...
4      Q.   Do you understand that Whitebox has
5   taken the position in this litigation that this
6   is the instrument pursuant to which the Earl of
7   Sandwich claim was conveyed to Whitebox?
8        MR. BALBER:  Maybe you should ask
9     him a foundational question like does he
10    have any idea what this litigation is
11    about.  I mean, that's kind of a pretty
12    specific premise you are putting on a
13    non-party witness.  So object to the form
14    of the question.  No foundation.
15     A.   It would be a trade confirmation via
16  e-mail.
17     Q.   Was it Gail's practice to not copy
18  you on trade confirmations sent in connection
19  with bankruptcy claim transactions?
20     A.   It depended.
21     Q.   Did you or Gail ever discuss the
22  trade confirmation concerning the Earl claim
23  between Cowen Special Investments and Whitebox
24  Advisors?
25     A.   I don't remember.

Page 40

B. Schwab

1
2        MR. CHUBAK:  Can we take a break.
3        (Recess was taken from 10:09 to
4     10:16.)
5        MS. LEWIS-GRUSS:  Whitebox joins in
6     any objections made to the questions posed
7     during today's deposition, specifically the
8     questions asked by Mr. Chubak on behalf of
9     his client, Earl of Sandwich of Atlantic
10    City.
11  BY MR. CHUBAK:
12     Q.   Do you remember ever seeing a copy
13  of Exhibit 83 prior to today?
14     A.   I don't recall ever seeing it.
15        (Exhibit 84, e-mail dated January
16     12, 2017, Bates stamped Confidential
17     CSI_00000214 through Confidential
18     CSI_00000224, marked for identification.)
19     Q.   Do you recall having received this
20  e-mail?
21     A.   I don't remember receiving it, but
22  it's here, so...
23     Q.   This is an e-mail from Gail
24  Rosenblum to Thomas Avallone dated January 12,
25  2017 at 1:24 p.m.  At the bottom she asks

Page 41

B. Schwab

1
2   Mr. Avallone that "we" -- I'm sorry.
3   Withdrawn.
4        At the bottom of this e-mail Gail
5   Rosenblum states that "we would be happy to
6   answer any questions you may have."
7        Standing here today, sitting here
8   today, do you understand that "we" to be a
9   reference to you and her?
10     A.   No, "we" would be a reference to
11  Cowen.
12     Q.   Do you recall ever having spoken to
13  Thomas Avallone following receipt of this
14  e-mail?
15     A.   Not that I remember, no.
16        MR. CHUBAK:  I'd like to mark this
17     as 85.
18        (Exhibit 85, e-mail dated January
19     12, 2017, Bates stamped Confidential
20     CSI_00000242 through Confidential
21     CSI_00000253, marked for identification.)
22     Q.   Do you recall ever having seen this
23  e-mail?
24     A.   No, I don't.
25     Q.   And by "this e-mail" I am referring

11 (Pages 38 to 41)

Page 42

B. Schwab

to the top e-mail on the first page of this
exhibit.

A. No.

Q. The second sentence of this e-mail
reads: "Brad and I are available" -- and this
e-mail being one sent by Gail Rosenblum to
Thomas Avallone copying you. It reads: "Brad
and I are available by phone and email to
discuss the claim and process."

Do you recall having spoken to
Thomas Avallone by phone or communicating with
him by e-mail later that day?

A. I don't remember.

Q. Do you remember having spoken to
Thomas Avallone by phone or communicating with
him by e-mail following January 12, 2017?

A. I don't believe I spoke to him
ever -- no, I don't think there was any
communication, to the best of my knowledge. I
don't remember.

MR. CHUBAK: Can you mark this 86.

(Exhibit 86, e-mail dated January
16, 2017, Bates stamped Confidential
CSI_00000304 through Confidential

Page 43

B. Schwab

CSI_00000316, marked for identification.)

Q. Do you recall ever having received
this e-mail?

A. I don't.

Q. And by "this e-mail" I am referring
to the top e-mail on -- of the first page of
this exhibit.

A. No, I don't recall directly, no.

Q. The first sentence of this e-mail
states: "I wanted to follow up to our call
late Friday."

Do you recall having -- ever having
been on a phone call with Thomas Avallone on
the referenced Friday?

A. I do not.

MR. CHUBAK: Can you mark this 87.

(Exhibit 87, e-mail dated January
17, 2017, Bates stamped Confidential
CSI_00000344 through Confidential
CSI_00000356, marked for identification.)

Q. Do you recall ever having seen this
e-mail? And by "this e-mail" I am specifically
referring to the top e-mail on the page Bates
stamped CSI underscore 344.

Page 44

B. Schwab

A. I don't remember receiving it, no.
I am just CC'd on it, so...

Q. I am going to refer you to the first
sentence of the e-mail: "I wanted to follow up
to the message I left with Laurie this
afternoon."

Did you -- do you recall having
heard -- strike that.

Do you have knowledge of what
message Gail left with Laurie that afternoon?

A. No.

MR. CHUBAK: Can you mark this as
88.

(Exhibit 88, e-mail dated January
18, 2017, Bates stamped Confidential
CSI_00000398 through Confidential
CSI_00000400, marked for identification.)

Q. I am going to refer you -- I'm
sorry.

Do you recall ever having seen this
e-mail?

A. I don't.

Q. I am going to refer you to the
second sentence of this e-mail beginning "there

Page 45

B. Schwab

has been no response from Thomas" in which Gail
writes: "I can send one more email and write
we have allocated funds for this transaction."

Is it true that Cowen Special
Investments allocated funds for a potential
transaction with Earl of Sandwich?

MS. LEWIS-GRUSS: Objection.

A. I don't -- you would have to ask
her. I don't -- I don't know what they did. I
mean, there is a balance sheet available at the
firm, so I don't -- I don't know what they did.
She wrote the e-mail. I didn't.

Q. Is it your testimony today that as
head of Cowen Special Investments you did not
know whether Cowen Special Investments had
allocated funds for bankruptcy claim purchases?

MR. BALBER: Object to the form of
the question. Is it your testimony
yesterday or tomorrow too or just today?
Go ahead. I'm joking.

A. In general or in this specific case?
I don't understand the question.

Q. Is it your testimony today that
Cowen Special Investments had allocated

Page 46

B. Schwab

1  funds --
2       A.   I don't -- I don't believe -- I
3  don't know.
4       Q.   I am going to refer you to the last
5  phrase in that same sentence:  "I can send one
6  more email and write" -- "and ask him to
7  confirm that he intends/does not intend to
8  proceed, although it seems obvious."
9
10       Do you recall having received that
11  message from Gail?
12       A.   As I said, I don't recall ever
13  seeing the e-mail, so -- I would assume I did
14  receive it.  This is a year ago.  I don't
15  remember.
16       Q.   What do you think Gail meant when
17  she said it seemed obvious?
18       A.   Again, I don't -- I mean, at the
19  point in time or just reading through the
20  correspondence now?  I don't understand the
21  question.
22       Q.   What do you think Gail meant sitting
23  here today?
24       MR. BALBER:  Object to the form of
25  the question.  I don't think Gail is here

Page 47

B. Schwab

1
2  today.
3       A.   That she had not heard back.
4       MR. CHUBAK:  Mark this 89.
5       (Exhibit 89, e-mail dated January
6  18, 2017, Bates stamped Confidential
7  CSI_00000401 through Confidential
8  CSI_00000403, marked for identification.)
9       Q.   Do you recall having sent the e-mail
10  at the top of the first page of this exhibit,
11  Bates stamped CSI underscore 401?
12       A.   I do not.
13       Q.   You testified earlier today that you
14  understood there to have been an agreement
15  based on your acceptance of Thomas' prior bid;
16  is that correct?
17       A.   An understanding to move forward and
18  explore the possibility subject to getting to a
19  final transaction document, purchase and sale
20  agreement.
21       Q.   If that's correct, can you tell me
22  why you said in the third paragraph of this
23  e-mail that the seller had disappeared and
24  there is most likely no transaction?
25       A.   You can't close a transaction with

Page 48

B. Schwab

1
2  someone who doesn't communicate back with you.
3       Q.   Was the transaction referenced in
4  that sentence ever documented?
5       MR. BALBER:  Object to the form of
6  the question.
7       A.   Define "documented."
8       Q.   Reduced to paper.
9       A.   In what capacity?  E-mail, verbal,
10  purchase and sale agreement, trade confirm?  I
11  mean, in what capacity?  I don't understand the
12  question.
13       Q.   Was this transaction ever documented
14  by a signed purchase and sale agreement?
15       A.   Between Earl of Sandwich and Cowen?
16       Q.   Correct.
17       A.   No.
18       Q.   Was it ever documented by a written
19  trade confirmation?
20       A.   An executable trade confirmation?
21  No.  Not that I'm aware of, no.
22       Q.   Do you believe that any transaction
23  between Cowen Special Investments and Earl of
24  Sandwich (Atlantic City) LLC was documented at
25  all?

Page 49

B. Schwab

1
2       A.   Again, "transaction" meaning what?
3  Like there was a closed trade?
4       Q.   No.
5       A.   You need a purchase and sale
6  agreement to have a closed transaction, so...
7       Q.   Do you believe that an agreement
8  concerning the potential sale of Earl of
9  Sandwich's Caesars claim was ever documented?
10       MS. LEWIS-GRUSS:  Objection.
11       MR. BALBER:  You can answer.
12       A.   Based on the e-mail correspondence
13  an understanding to move forward and, you know,
14  use a best efforts basis to get to a
15  transaction document.
16       Q.   You testified earlier that you don't
17  recall having spoke -- the substance of any
18  conversation you may have had with Thomas
19  Avallone.
20       Is it your testimony today that any
21  agreement between Cowen Special Investments and
22  Earl of Sandwich (Atlantic City) LLC was
23  documented solely by e-mails exchanged between
24  you and Mr. Avallone?
25       A.   Again, the question being a closed

Page 50

```
1              B. Schwab
2  transaction?  No.  An understanding to push
3  forward with the transaction, I believe there
4  was.
5       Q.   When you say "understanding," do you
6  mean negotiations over the terms of the
7  potential bankruptcy claim trade?
8            MR. BALBER:  Object to the form of
9       the question.
10      A.   "Terms" is vague, right?  Terms can
11  be many things in a transaction.  What terms?
12      Q.   If you believed you had an
13  understanding to push forward with the
14  transaction, why were you asking Thomas to
15  agree -- withdrawn.
16           What would have been the material
17  terms of a transaction you entered into with
18  Earl of Sandwich?
19           MR. BALBER:  Object to the form of
20      the question.
21      A.   I'd have to look at the specifics to
22  the claim itself, but eventually we would get
23  to a signed purchase and sale agreement which
24  would be inclusive of all -- addressing any and
25  all terms and conditions.  Right?  It's a
```

Page 51

```
1              B. Schwab
2  twelve-page document.
3       Q.   Did Cowen Special Investments --
4  withdrawn.
5            Would you have required an indemnity
6  under any such agreement?
7       A.   I don't know.
8       Q.   Would any such agreement have
9  included representations and warranties?
10      A.   Yes.
11      Q.   Would any such agreement include a
12  Power of Attorney provision?
13      A.   It depends.
14      Q.   Can you tell me what it depends on?
15           MR. BALBER:  Object to the form of
16      the question.
17      A.   It's totally transaction specific.
18  There is no standard document.  Every
19  transaction is different.
20      Q.   Would any transaction with Earl of
21  Sandwich (Atlantic City) LLC have required an
22  indemnity provision?
23      A.   I don't know.  I don't know.
24      Q.   Would you have required that Earl of
25  Sandwich (Atlantic City) LLC make
```

Page 52

```
1              B. Schwab
2  representations and warranties in connection
3  with a potential transaction concerning the
4  sale of its bankruptcy claim in Caesars?
5       A.   Possibly. I don't know.
6       Q.   Would you have required that Earl of
7  Sandwich (Atlantic City) LLC give Cowen Special
8  Investments a Power of Attorney or limited
9  Power of Attorney under any --
10      A.   Quite possibly.  I don't know.
11      Q.   Had you discussed any of an
12  indemnity, representations and warranties or
13  Power of Attorney with Earl of Sandwich
14  Atlantic City?
15      A.   I never spoke -- I don't recall ever
16  speaking with Earl of Sandwich about any
17  agreement, so the answer --
18      Q.   Do you recall ever having spoken
19  with Thomas Avallone about an indemnity or
20  representations or warranties --
21      A.   I do not.
22           (Exhibit 90, e-mail dated January
23      18, 2017, Bates stamped Confidential
24      CSI_00000424 through Confidential
25      CSI_00000427, marked for identification.)
```

Page 53

```
1              B. Schwab
2       Q.   I am going to refer you to the top
3  two e-mails on the page stamped CSI underscore
4  424.
5            Do you recall having sent the e-mail
6  time stamped 7:51 a.m.?
7       A.   I do not.
8       Q.   With respect to Gail's e-mail time
9  stamped 7:58 a.m., what do you think she meant
10  when she said that she made every effort but
11  doubts that he was ever a serious seller?
12      A.   You would have to ask her.  I don't
13  know what she meant, I mean, other than she
14  tried her best to get in touch with him.
15           (Exhibit 91, e-mail dated February
16      7, 2017, Bates stamped Confidential
17      CSI_00000531 through Confidential
18      CSI_00000536, marked for identification.)
19      Q.   I am going to refer you to the top
20  two e-mails on the page stamped CSI underscore
21  531.  What do you think -- let me start --
22  withdrawn.
23           Who is Jillian Bottge?
24      A.   She is a salesperson who covers
25  Whitebox.
```

14 (Pages 50 to 53)

| Page 54 | Page 55 |

**Page 54**

B. Schwab

2  Q.  When you say "covers Whitebox," what
3  do you mean by that?
4     A.  She is their account representative
5  at Cowen.
6     Q.  What do you think she meant when she
7  wrote "Whitebox wondering if we have given earl
8  notice"?
9        MR. BALBER:  Object to the form of
10  the question.
11    A.  You would have to ask -- I don't
12  know.  You would have to ask her.
13    Q.  Whitebox has testified that when it
14  received the written confirm from Gail on
15  January 12th, 2017, that it was confident that
16  Cowen Special Investments had entered into a
17  mirror confirm with Earl of Sandwich (Atlantic
18  City) LLC.
19        Was it Cowen Special Investments'
20  practice or your practice to enter into a
21  mirror confirm with a bankruptcy claim seller
22  prior to entering into a confirm with Whitebox?
23        MS. LEWIS-GRUSS:  Objection.
24        MR. BALBER:  Object to the form of
25  the question.

**Page 55**

B. Schwab

2        MS. LEWIS-GRUSS:  Misstates
3  Whitebox's testimony.
4     A.  Can you repeat the question.
5     Q.  Whitebox testified that when it
6  received the written confirm from Gail on
7  January 12, 2017, that it was confident Cowen
8  Special Investments had entered into a mirror
9  trade confirmation with Earl of Sandwich
10  (Atlantic City) LLC.
11        Was it your practice to enter into a
12  trade confirm with a bankruptcy claim seller
13  prior to sending a trade confirmation to
14  Whitebox?
15        MR. BALBER:  Object to the form of
16  the question.
17        MS. LEWIS-GRUSS:  Same objection.
18    A.  In general -- I don't understand --
19    Q.  In general.
20    A.  In general that -- I wasn't involved
21  in any of the correspondence with Whitebox, so
22  I can't attest to anything that was done with
23  Whitebox.  I wasn't involved in any of the
24  conversations or correspondence.
25    Q.  Have you ever sent or been copied on

**Page 56**

B. Schwab

2  trade confirmations sent from Cowen Special
3  Investments to Whitebox?
4     A.  Not that I recall, unless -- I don't
5  believe so, no.
6     Q.  Do you recall ever having entered
7  into a written trade confirmation with a
8  bankruptcy claim seller while as head of Cowen
9  Special Investments LLC?
10    A.  Meaning did I negotiate or I entered
11  into?  Because I don't enter into any
12  agreements at Cowen Special Investments.  I am
13  not a signatory when I was there.
14    Q.  Which persons are signatories at
15  Cowen Special Investments?
16    A.  Brian Seyfried and, I don't know,
17  was it Owen?  Owen Littman, I guess, Brian
18  Seyfried.
19    Q.  Do you know if they ever entered
20  into written trade confirmations with potential
21  bankruptcy claim sellers prior to Cowen Special
22  Investments sending a trade confirmation to
23  Whitebox with respect to the purchase and sale
24  of q bankruptcy claim?
25    A.  This specific bankruptcy claim or in

**Page 57**

B. Schwab

2  general?
3     Q.  In general.
4     A.  The answer is I would assume yes, we
5  entered into trade confirms.
6     Q.  Do you recall approximately how many
7  bankruptcy claim trades Cowen Special
8  Investments entered into with Whitebox in 2016?
9     A.  No.
10    Q.  Was it more than ten?
11    A.  I have no idea.
12    Q.  Do you recall approximately how many
13  bankruptcy claim trades Cowen Special
14  Investments did with Whitebox Advisors in 2017?
15    A.  No.
16    Q.  Was it more than ten?
17    A.  I don't know.  I don't remember.  I
18  doubt it, but I don't know.
19    Q.  Did Cowen Special Investments --
20  strike that.
21        Do you recall having sent the e-mail
22  at the top of Exhibit 91 time stamped
23  10:09 a.m.?
24    A.  I don't remember sending it, no.
25    Q.  Standing here -- sitting here today,

Page 58

B. Schwab

1
2  why do you think you wrote Whitebox purchase
3  always subject to execution of trade confirm
4  with upstream?
5      A.   Our standard documentation, which I
6  don't know what was communicated to Whitebox
7  other than now seeing the e-mail, is subject to
8  completing -- a downstream transaction is
9  subject to successfully closing an upstream.
10  That's standard in our documentation.
11      Q.   And just to make the record clear,
12  what do you mean by downstream and upstream?
13      A.   Upstream would be the original
14  holder or the seller to Cowen, and then Cowen
15  to a buyer would be the downstream.
16      Q.   Do you know why transactions with
17  Whitebox are subject to execution of a
18  transaction with upstream?
19          MS. LEWIS-GRUSS:  Objection.
20      A.   To the best of my recollection, most
21  transactions are subject to that, if not all.
22      Q.   As head of Cowen Special
23  Investments, did you require that transactions
24  with Whitebox be subject to execution of a
25  transaction with upstream?

Page 59

B. Schwab

1
2      A.   I don't recall ever making any
3  specific anything to Whitebox.
4      Q.   Is the purpose of making any
5  transaction subject to execution of a deal with
6  upstream to protect Cowen?  Strike that.
7          What is the purpose of making any
8  sale to Whitebox subject to execution of a
9  transaction with upstream?
10      A.   To manage a mismatch in terms of
11  having a buyer but not having a seller, and
12  that's not Whitebox specific, that's in
13  general.
14      Q.   What do you mean by "mismatch"?
15      A.   That you have a buyer but not have a
16  seller or vice versa.
17      Q.   What would happen if you had a buyer
18  but not a seller in the absence of this
19  condition?
20          MR. BALBER:  Object to the form of
21  the question.
22      A.   You don't -- I mean, to close a
23  transaction you don't necessarily need a trade
24  confirm executed on the upstream to get a
25  transaction closed, right, so, I mean, you can

Page 60

B. Schwab

1
2  e-mail, you can skip trade confirms, go
3  straight to documentation.  It can take any
4  number of different mechanics.
5      Q.   In the absence of this condition,
6  would Cowen have legal exposure to Whitebox?
7          MR. BALBER:  Object -- finish the
8  question.  Sorry.
9          MR. CHUBAK:  Withdrawn.
10          Mark this 92.
11          (Exhibit 92, Assignment and Release
12      Agreement, Bates stamped WBA-0000145
13      through WBA-0000157, marked for
14      identification.)
15      Q.   Do you recognize this agreement?
16      A.   No.
17      Q.   Sitting here today, do you have any
18  idea why your name is listed underneath the
19  part marked "Seller"?
20      A.   No, other than that's just a
21  correspondence that was on all the standard
22  documents, point of contact.
23      Q.   Did you ever discuss with Brian
24  Seyfried -- withdrawn.
25          Do you recall ever having discussed

Page 61

B. Schwab

1
2  with Brian Seyfried selling whatever interest
3  Cowen Special Investments had in Earl of
4  Sandwich's Caesars claim to Whitebox?
5      A.   No.
6          MR. CHUBAK:  Let's take a short
7  break.
8          (Recess was taken from 10:53 to
9  11:01.)
10  BY MR. CHUBAK:
11      Q.   Do you recall having spoken with
12  anyone at Cowen Special Investments' parent
13  company or companies about the Earl trade
14  following January 2017?
15          MR. BALBER:  And I am going to
16  caution you, if any conversations were in
17  the presence of either internal counsel or
18  external counsel, you are instructed not to
19  answer.
20      A.   Not that I recall, other than -- I
21  wasn't involved in anything, so just getting
22  updates.
23      Q.   Did you ever speak with Brian
24  Seyfried about the Earl claim?
25      A.   Not that I -- I mean, I would assume

16  (Pages 58 to 61)

Page 62

```
1              B. Schwab
2   so, but not that I recall specifically, no.
3        Q.   Without telling me anything
4   privileged, did you ever speak with Owen
5   Littman about the Earl claim?
6            MR. BALBER:  You are instructed not
7   to answer.
8            MR. CHUBAK:  I am not asking --
9            MR. BALBER:  You are instructed not
10  to answer.
11           Next question.
12           MR. CHUBAK:  I am not asking about
13  any privileged communication.  I am just
14  asking if he spoke with him.
15           MR. BALBER:  Just move on.  You are
16  wasting everybody's time at a ridiculous
17  rate.  Move on.  Next question.  I am not
18  letting him answer a question about his
19  conversation with the general counsel of
20  the company.  It's just not happening.
21  Next question.
22           MR. CHUBAK:  I am not asking about a
23  privileged communication.  I am asking if
24  he spoke with him.
25           MR. BALBER:  Good.  Next question.
```

Page 63

```
1              B. Schwab
2        Q.   You testified a moment ago that you
3   weren't involved with anything concerning the
4   Earl claim, just getting updates.
5            What do you mean by just getting
6   updates?
7        A.   Meaning that I was aware that there
8   were conversations going on between Whitebox
9   and Cowen that I wasn't party to and just being
10  told periodically.
11       Q.   Did you speak with Jillian Bottge
12  about the status of the Earl trade following
13  January 2017?
14       A.   Not that I remember.
15       Q.   What were the conversations that you
16  were getting updates on?
17       A.   That I know there was an ongoing
18  conversation between Whitebox and Cowen and
19  that was the essence of it.  I don't know what
20  was progressing.
21       Q.   Who were you getting updates from?
22       A.   Brian Seyfried and Danny
23  periodically.
24       Q.   What did Brian tell you in
25  connection with those updates?
```

Page 64

```
1              B. Schwab
2            MR. BALBER:  Anything he told you in
3   which either internal or outside counsel
4   was privy, you are instructed not to
5   answer.
6        A.   Other than that it was an ongoing
7   conversation, that's it.
8        Q.   What was the conversation?
9        A.   That there was an ongoing
10  conversation between Whitebox and Cowen.  The
11  specifics, no, I wasn't privy to any of the
12  specifics of the conversations.
13           MR. CHUBAK:  We are done.
14           MR. BALBER:  Great.
15  EXAMINATION BY
16  MS. LEWIS-GRUSS:
17       Q.   Mr. Schwab, if you could take out
18  the document previously marked as Exhibit 82, I
19  would appreciate that.
20           Do you have that document in front
21  of you?
22       A.   I do.
23       Q.   Can you turn to the page that's
24  stamped at the bottom 106, and at the bottom of
25  the page there is an e-mail from Mr. Avallone
```

Page 65

```
1              B. Schwab
2   to Mr. Mikelberg dated January 11 at 12:59 p.m.
3   Do you see that?
4        A.   Yes.
5        Q.   And this e-mail was forwarded to you
6   by Mr. Mikelberg; is that correct?
7        A.   Correct.
8        Q.   When you received this e-mail from
9   Mr. Mikelberg, did you understand that
10  Mr. Avallone was offering a Caesars claim for
11  sale at the -- for $2.15 million cash?
12           MR. CHUBAK:  Objection.  Calls for a
13  legal conclusion.
14       A.   My understanding that the seller was
15  willing to engage into a conversation at
16  approximately those terms and conditions.
17       Q.   And as you testified, Mr. Mikelberg
18  forwarded to you, and you then responded on the
19  same day at 1:59 p.m.; is that correct?
20       A.   According to the e-mails, correct.
21       Q.   And the e-mail at the top of this
22  page appears to be an e-mail that you sent to
23  Mr. Avallone at 1:59 p.m. on January 11, 2017;
24  is that correct?
25       A.   So it appears.
```

B. Schwab

1
2    Q.   Do you have any reason to think you
3    didn't send it?
4    A.   No.
5    Q.   And you asked in this e-mail
6    Mr. Avallone if he was offering the paper for
7    sale at $2.15 million or approximately
8    59.72 percent of the face claim amount; is that
9    correct?
10   A.   Yes.
11   Q.   How would you classify that
12   statement?
13       MR. CHUBAK:  Objection to the form
14   of the question.  Calls for a legal
15   conclusion.
16   A.   That he was interested in entering
17   into a transaction based on those terms.
18   Q.   And you asked him if he had any
19   flexibility; is that true?
20   A.   Correct, that's what the e-mail
21   says.
22   Q.   Mr. Avallone then responded to you
23   that same day at 2:04 p.m.; is that correct?
24   A.   Yes, it appears to be.
25   Q.   And Mr. Avallone said that you had

B. Schwab

1
2    asked him if he was offering the paper for sale
3    at 2.15 million or approximately 59.72 percent
4    of the face claim amount and he said "yes."  Do
5    you see that?
6    A.   Back on -- just for my
7    clarification, on the -- at the 1:59 p.m.
8    e-mail?
9    Q.   So at 2:04 Mr. Avallone says "see
10   below."
11   A.   Yes.
12   Q.   Right?
13   A.   Yes.
14   Q.   And so the word "yes" is
15   capitalized.
16       Do you, as you sit here today,
17   understand that to be Mr. Avallone's response
18   to your question?
19   A.   Correct.
20   Q.   And the "no" that's capitalized was
21   also a response to your question?
22   A.   Correct.
23   Q.   So in response to your question
24   about whether he was offering the paper for
25   sale at $2.15 million or approximately

B. Schwab

1
2    59.72 percent of the face claim amount, did you
3    understand Mr. Avallone's "yes" to mean that he
4    was agreeing to sell -- he was offering to sell
5    the paper, the Earl of Sandwich claim, at the
6    price listed in your e-mail?
7    A.   Correct.
8        MR. CHUBAK:  Objection to the form
9    of the question.
10   Q.   And so for clarity, as you sit here
11   today, do you consider Mr. Avallone's "yes" an
12   offer to sell the Earl of Sandwich claim?
13       MR. CHUBAK:  Objection.  Calls for a
14   legal conclusion.  I also object to the
15   form of the question.
16   A.   It would be my understanding that he
17   would engage into a transaction based on those
18   terms and conditions, subject to.
19   Q.   And that was your understanding when
20   you received the e-mail on January 12th?
21   A.   Correct.
22   Q.   And then if you turn back to page
23   105, on the same day January 11th at 2:17 p.m.
24   you said "I would have interest at 59.72%
25   subject to confirming the above."

B. Schwab

1
2        Did you consider that to be an
3    offer?
4        MR. CHUBAK:  Objection to the form
5    of the question.  Calls for a legal
6    conclusion.
7    A.   That, again, that we had a basic
8    understanding of an outline of a potential
9    transaction.
10   Q.   And what were the terms of that
11   basic understanding?
12   A.   59.72 percent or approximately, you
13   know, $2.15 million.
14   Q.   And in your business when you reach
15   an agreement, do you refer to price and amount,
16   is that a phrase you use?
17   A.   Yeah, or a notional.  It would be a
18   face amount.
19   Q.   I want to make sure we are using the
20   same terms.  So the term amount, is that -- do
21   you mean price or do you mean what you are
22   actually buying?
23   A.   Notional being -- or face being the
24   face value of the claim, 4 million odd, right,
25   purchase price being a dollar amount, and a

Page 70

B. Schwab

1  purchase price percentage being the actual
2  59.72 percent.
3     Q.   And then Mr. Avallone on January
4  11th at 2:38 says he can easily get a letter
5  confirming the nature of the claim.  Do you see
6  that?
7     A.   Yes.
8     Q.   As you sit here today, do you have
9  any recollection of what you understood
10  Mr. Avallone to be telling you at the time he
11  sent you this e-mail?
12     A.   It would be -- the request would
13  have been for confirmatory due diligence.
14     Q.   And you then send Mr. Avallone an
15  e-mail in response at 3:47 p.m.; is that
16  correct?
17     A.   Correct.
18     Q.   And that is where you state that you
19  would be a buyer of the 3.6 million allowed CZR
20  claim at 2.15 million or 59.72 percent of the
21  allowed face; is that correct?
22     A.   Correct.
23     Q.   And did you consider that to be an
24  offer to purchase the claim at the terms first

Page 71

B. Schwab

1  set by Mr. Avallone?
2     MR. CHUBAK:  Objection to the form
3  of the question.  Calls for a legal
4  conclusion.
5     A.   An understanding that -- a basic
6  outline of a transaction, that's would
7  that would -- and it would progress from there.
8     Q.   You testified earlier that this
9  e-mail includes conditions at the buyer's
10  discretion.
11        What does that mean when you use the
12  phrase "buyer's discretion"?
13     A.   That Cowen, you know, subject to due
14  diligence, at Cowen's own discretion or
15  eventually -- or buyer on the back end, the
16  downstream parties confirming it is what it is,
17  it is what we think it is.
18     Q.   Does buyer's discretion mean that
19  Cowen could decide whether or not to waive
20  those conditions?
21     A.   Correct.
22     MR. CHUBAK:  Objection.  Calls for a
23  legal conclusion.
24     Q.   And you also stated it could be the

Page 72

B. Schwab

1  buyer on the back end.
2        Could the buyer on the back end
3  waive those conditions?
4     MR. CHUBAK:  Objection.  Calls for a
5  legal conclusion.
6     A.   Subject to a conversation we could
7  work through a process.
8     Q.   And if we go to the first page of
9  this document, on the morning of January 12 at
10  8:34 a.m. you sent another e-mail to
11  Mr. Avallone; is that correct?
12     A.   It appears to be correct.
13     Q.   And you have no reason to think you
14  didn't send this e-mail?
15     A.   No, correct.
16     Q.   And in this e-mail you accepted
17  Mr. Avallone's offer; is that correct?
18     MR. CHUBAK:  Objection.  Calls for a
19  legal conclusion.
20     A.   It appears to be, yes.
21     Q.   And you say "my acceptance of your
22  offer"; isn't that true?
23     A.   Uh-huh.  Yes.
24     Q.   And you said your offer was good

Page 73

B. Schwab

1  through 11 a.m. eastern time; is that correct?
2     A.   Correct.
3     Q.   And did Mr. Avallone respond prior
4  to 11 a.m. eastern time?
5     A.   According to the e-mail
6  correspondence, at 9:47 he said "please forward
7  draft document."
8     Q.   And that was his acceptance on
9  January 12th?
10     MR. CHUBAK:  Objection.  Calls for a
11  legal conclusion.
12     A.   It was him requesting a document
13  based on my prior e-mail.
14     Q.   And you understood at the time you
15  received his e-mail that he was accepting your
16  offer?
17     MR. CHUBAK:  Objection.  Calls for a
18  legal conclusion.
19     A.   My understanding -- I mean, I can't
20  tell you -- at the point in time it was more
21  the it would progress forward and we would
22  enter into a conversation.
23     Q.   So was it your understanding at the
24  time you received Mr. Avallone's e-mail on

19  (Pages 70 to 73)

Page 74

B. Schwab

1
2  January 12th that Mr. Avallone had agreed to
3  price and amount regarding the Earl of Sandwich
4  claim?
5      A.   In concept, yes.
6      Q.   And if Mr. Avallone had not agreed
7  to price and amount regarding the Earl of
8  Sandwich claim, would you have asked
9  Ms. Rosenblum to forward Thomas a document?
10      A.   I would think not.  I mean, I'm not
11  in that time period, but if he requested a
12  document, I would only ask Gail to send a
13  document if it was a document requested.
14      Q.   So you testified you had a
15  conversation with Mr. Avallone sometime on
16  January 12th.
17      A.   There was a conversation.  I don't
18  know specifically when it was.
19      Q.   And you testified you don't recall
20  whether or not Mr. Avallone said to you that he
21  needed approval from any other individual or
22  party?
23      A.   Correct.
24      Q.   If Mr. Avallone had told you that he
25  needed approval from somebody else, what would

Page 75

B. Schwab

1
2  you have done?
3      MR. CHUBAK:  Objection.  Calls for
4  speculation.
5      MR. BALBER:  You can answer.
6      A.   I mean, most likely I would have
7  sent the document anyway and he would have
8  shared it with whoever he had to internally
9  share it with to work through a process.
10      Q.   Would you have noted in your e-mail
11  to him that he had told you that that was a
12  condition?
13      MR. CHUBAK:  Objection.  Calls for
14  speculation and to the form of the
15  question.
16      A.   I didn't, so, I mean, probably not.
17  I mean, I don't know.
18      Q.   Would you have informed
19  Ms. Rosenblum that there was -- there had been
20  a request by the counterparty or a statement by
21  the counterparty that he needed additional
22  approvals?
23      MR. CHUBAK:  Objection.  Calls for
24  speculation.
25      A.   Apparently, no, and probably not.

Page 76

B. Schwab

1
2      Q.   Well, how do you say "apparently,
3  no" when you don't recall --
4      A.   Well, because I didn't, I didn't in
5  the e-mail, and I don't remember him ever
6  telling me that he was, so...
7      Q.   Okay.  So I think just so we are
8  clear, you don't recall one way or the other
9  whether --
10      A.   Correct.
11      Q.   -- Mr. Avallone ever said he needed
12  approvals?
13      A.   Correct.
14      Q.   And your e-mails to Gail don't say
15  please send a draft document, further approvals
16  are necessary; isn't that true?
17      A.   Correct.
18      Q.   And as you sit here today, you have
19  no reason to believe that Mr. Avallone ever
20  told you that he needed approvals from any
21  other party; isn't that correct?
22      A.   I don't recall.
23      Q.   So once you -- in your normal
24  practice while you were employed by Cowen, once
25  a counterparty had agreed to price and quantity

Page 77

B. Schwab

1
2  or price and amount, what were the traditional
3  steps that Cowen would take?
4      A.   It depended on the type of
5  transaction.  Just depended how the transaction
6  evolved.  In -- you know, it could be anywhere
7  from go straight to a document, to a trade
8  confirm and a document.  It depended on the
9  transaction.
10      (Continued on next page to include
11  jurat.)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 78

B. Schwab

Q. What steps, if any, would Cowen take to secure a buyer for the downstream?

A. It depended. It depends on the buyer and who the party is. In some cases it would be a trade confirm. In other cases it would just be a verbal agreement.

MS. LEWIS-GRUSS: Okay. I think we are done. Thank you.

MR. BALBER: Thank you.

(Time noted: 11:18ï¿½a.m.)

-----------------------

BRADLY SCHWAB

Subscribed and sworn to before me this       day of        2018.

-----------------------------------------

## Page 79

C E R T I F I C A T E

STATE OF NEW YORK    )
                     ) ss.:
COUNTY OF NASSAU     )

I, KRISTIN KOCH, a Notary Public within and for the State of New York, do hereby certify:

That BRADLY SCHWAB, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 19th day of January, 2018.

-----------------------

KRISTIN KOCH, RPR, RMR, CRR, CLR

## Page 80

-------------------I N D E X-----------------

WITNESS          EXAMINATION BY      PAGE

BRADLY SCHWAB      MR. CHUBAK       5

          MS. LEWIS-GRUSS    64

-------------------EXHIBITS-----------------

NUMBER                    PAGE LINE

Exhibit 80
Bradly Schwab LinkedIn printout...... 5   25
Exhibit 81
E-mail dated January 11, 2017,
Bates stamped Confidential
CSI_00000044 through Confidential
CSI_00000051....................... 20   22
Exhibit 82
E-mail dated January 12, 2017,
Bates stamped Confidential
CSI_00000103 through Confidential
CSI_00000111....................... 30   11
Exhibit 83
E-mail dated January 12, 2017,
Bates stamped Confidential
CSI_00000112 through Confidential
CSI_00000122....................... 38   20
Exhibit 84
E-mail dated January 12, 2017,
Bates stamped Confidential
CSI_00000214 through Confidential
CSI_00000224....................... 40   15
Exhibit 85
E-mail dated January 12, 2017,
Bates stamped Confidential
CSI_00000242 through Confidential
CSI_00000253....................... 41   18

## Page 81

-------------------EXHIBITS-----------------

NUMBER                    PAGE LINE

Exhibit 86
E-mail dated January 16, 2017,
Bates stamped Confidential
CSI_00000304 through Confidential
CSI_00000316....................... 42   23
Exhibit 87
E-mail dated January 17, 2017,
Bates stamped Confidential
CSI_00000344 through Confidential
CSI_00000356....................... 43   18
Exhibit 88
E-mail dated January 18, 2017,
Bates stamped Confidential
CSI_00000398 through Confidential
CSI_00000400....................... 44   15
Exhibit 89
E-mail dated January 18, 2017,
Bates stamped Confidential
CSI_00000401 through Confidential
CSI_00000403....................... 47   5
Exhibit 90
E-mail dated January 18, 2017,
Bates stamped Confidential
CSI_00000424 through Confidential
CSI_00000427....................... 52   22
Exhibit 91
E-mail dated February 7, 2017,
Bates stamped Confidential
CSI_00000531 through Confidential
CSI_00000536....................... 53   15
Exhibit 92
Assignment and Release Agreement,
Bates stamped WBA-0000145 through
WBA-0000157....................... 60   11