**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT | ) | Case No. 15-01145 (ABG) |
| OPERATING COMPANY, INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| _____ | ) | |

**WHITEBOX ADVISORS, LLC'S
MEMORANDUM OF LAW IN OPPOSITION TO
<u>EARL OF SANDWICH'S MOTION FOR SUMMARY JUDGMENT</u>**

**DRINKER BIDDLE & REATH LLP**
191 North Wacker Drive
Suite 3700
Chicago, Illinois 60606-1698
Telephone: 312-569-1000
Facsimile: 312-569-3000

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF MATERIAL UNDISPUTED FACTS ......................................... 3

STANDARD FOR SUMMARY JUDGMENT ........................................................... 7

ARGUMENT ................................................................................................................. 8

I.    BECAUSE THE LAW OF ALL RELEVANT JURISDICTIONS IS
      CONSISTENT, THE COURT NEED NOT ENGAGE IN ANY CHOICE OF
      LAW ANALYSIS ................................................................................................. 8

II.   SUMMARY JUDGMENT ON QUESTIONS OF CONTRACTUAL
      FORMATION SHOULD BE GRANTED ONLY SPARINGLY ...................... 9

III.  THE RECORD EVIDENCE SHOWS THAT THE PARTIES FORMED A
      BINDING PRELIMINARY AGREEMENT FOR THE SALE OF EARL'S
      BANKRUPTCY CLAIMS, OBLIGING EACH SIDE TO NEGOTIATE
      DOCUMENTATION AND ANY REMAINING TERMS IN GOOD FAITH ............. 11

      A.    Whether the Intent to be Bound is Revealed by the Language of the
            Agreement ................................................................................................. 14

      B.    The Context of the Negotiations ............................................................. 14

      C.    The Existence of Open Terms .................................................................. 15

      D.    Partial Performance .................................................................................. 15

      E.    The Necessity of Putting the Agreement in Final Form, as Indicated by the
            Customary Form of Such Transaction .................................................. 16

IV.   THE EARL-COWEN EMAILS DEMONSTRATE MUTUAL ASSENT TO THE
      TRADE ................................................................................................................ 16

V.    THE CHAMPERTY DOCTRINE IS INAPPLICABLE ................................ 18

CONCLUSION .............................................................................................................. 19

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Group, Inc.,*
873 F.2d 155 (7th Cir. 1989) ............................................................................9, 12

*Anderer v. Jones,*
385 F.3d 1043 (7th Cir. 2004) .................................................................................8

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..............................................................................................7, 8

*Bear Stearns Investment Products, Inc. v. Hitachi Automotive Products (USA), Inc.,*
401 B.R. 598 (S.D.N.Y. 2009)......................................................................... *passim*

*Bluebird Partners, L.P. v. First Fid. Bank, N.A.,*
94 N.Y.2d 726 (N.Y. 2000) ...............................................................................18, 19

*Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.,*
10 N.E.3d 902, 381 Ill. Dec. 493 (2014) ..................................................................8

*Brown v. Cara,*
420 F.3d 148 (2d Cir. 2005)........................................................................11, 12, 15

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)..............................................................................................7, 8

*Citadel Group Ltd. v. Washington Reg'l Med. Ctr.*
692 F.3d 580 (7th Cir. 2012) .................................................................................14

*Consarc Corp. v Marine Midland Bank, N.A.,*
996 F.2d 568 (2d Cir. 1993)...................................................................................10

*EQT Infrastructure Ltd. v. Smith,*
861 F. Supp. 2d 220 (S.D.N.Y. 2012)....................................................................11

*Fairchild Hiller Corp. v. McDonnell Douglas Corp.,*
28 N.Y.2d 325 (N.Y. 1971) ...................................................................................19

*Int'l Bus. Mach. Corp. v. Johnson,*
629 F.Supp.2d 321 (S.D.N.Y. 2009)......................................................................17

*J.P. Morgan Chase Bank, N.A. v. Jenkins,*
   No. 14 C 4278, 2016 WL 4417072 (N.D. Ill. Aug. 18, 2016)...................................................4

*Pearce v. Manhattan Ensemble Theater, Inc.,*
   No. 06 CV 1535(KMW), 2009 WL 3152127 (S.D.N.Y. Sept. 30, 2009) ...............................10

*Philippi-Hagenbuch, Inc. v. Western Tech. Serv. Int'l, Inc.,*
   Case No. 12–1099, 2015 WL 13590362 (C.D. Ill. June 2, 2015).............................................4

*Ronan Assocs., Inc. v. Local 94-94A-94B, Int'l Union of Operating Engineers,*
   *AFL-CIO,*
   24 F.3d 447 (2d Cir. 1994)........................................................................................................9

*Seko Worldwide, LLC v. Four Soft Ltd.,*
   503 F.Supp.2d 1059 (N.D. Ill. 2007) .....................................................................................14

*Solaia Tech. LLC v Arvinmeritor, Inc.,*
   No. 02-C-4704, 2006 WL 695699 (N.D. Ill. Mar. 16, 2006) .................................................13

*Solus Alternative Asset Mgmt. L.P. v. Perry Corp.,*
   No. 652341/12, 2015 WL 4240999 (N.Y. Sup. Ct. July 13, 2015) ........................................10

*Spiegla v. Hull,*
   371 F.3d 928 (7th Cir. 2004) ...................................................................................................8

*Spiegla v. Hull,*
   481 F.3d 961 (7th Cir. 2007) ...................................................................................................8

*Srail v. Vill. of Lisle,*
   588 F.3d 940 (7th Cir. 2009) ...................................................................................................8

*Stonehill Cap. Mgmt. v. Bank of the West,*
   28 N.Y.3d 439 (N.Y. 2016) ....................................................................................................18

*Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.,*
   670 F.Supp. 491 (S.D.N.Y. 1987)................................................................................ *passim*

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.,*
   487 F.3d 89 (2d Cir. 2007).....................................................................................................10

*In re Westinghouse Elec. Co. LLC,*
   No. 17-10751 (MEW), 2018 WL 3655702 (Bankr. S.D.N.Y. Aug. 1, 2018) ..................16, 18

*Estate of Williams v. Indiana State Police,*
   26 F. Supp. 3d 824 (S.D. Ind. 2014).......................................................................................4

*Wittmer v. Peters*,
 87 F.3d 916 (7th Cir. 1996) ..........................................................................................4

**STATUTES, RULES & REGULATIONS**

Federal Rule of Evidence 702 ...........................................................................................5

N.Y. Judiciary Law § 489 ...........................................................................................18, 19

**OTHER AUTHORITIES**

Richard A. Lord, Williston on Contracts § 6:10 (4th ed. 2004) ...................................17

## PRELIMINARY STATEMENT

This case presents one narrow and straightforward question:  did the movant Earl of Sandwich (Atlantic City), LLC ("Earl") enter into an enforceable preliminary agreement for the sale of its claims in this bankruptcy, subject to the parties' good faith negotiation of remaining terms and documentation.  Earl admits in its papers that the parties did in fact reach an agreement on the amount of claims Earl would sell and the price Earl would be paid—the two key terms to any agreement for the sale of trade claims.  Earl argues, however, that the agreement was not binding because the parties never signed a contract, and because terms other than price and claim amount had yet to be agreed upon.  As discussed below, Earl's argument ignores on-point decisions finding that "preliminary agreements" subject to documentation and further good faith negotiations are in fact enforceable.  For that reason, its motion should be denied.

The Southern District of New York's decision in *Bear Stearns Investment Products, Inc. v. Hitachi Automotive Products (USA), Inc.*, 401 B.R. 598 (S.D.N.Y. 2009), amply demonstrates why Earl's motion fails as a matter of law.  In that case, the court found that Bear Stearns and Hitachi had entered into a binding "Type II" preliminary agreement for the sale of Hitachi's bankruptcy claims.  As here, the parties agreed through a series of emails and telephone conversations on the amount of claims to be sold and the price to be paid, with the understanding that the deal and any terms yet to be negotiated would ultimately be documented in a written agreement.  Hitachi, however, continued to solicit competing bids for its claims, and ultimately cut off negotiations with Bear Stearns in order to pursue a more profitable sale to a different buyer.  When Bear Stearns sued, Hitachi argued (just as Earl does here) that there was no enforceable deal between the parties because a written contract hadn't been signed and there

were terms yet to be negotiated.  The court rejected this argument, finding that, based on the preliminary agreement, Hitachi was required to make a good faith effort to close the trade.

In this matter, just as in *Bear Stearns*, the email exchange between Earl and Cowen Special Investments LLC ("Cowen") (Whitebox Advisors LLC's ("Whitebox") broker for this transaction) show that the parties agreed on the key price terms and were committed to moving forward with the sale of Earl's claims, subject to due diligence and documentation.  Critical for the purposes of this motion, Cowen specifically asked Earl to confirm its intention to go forward with the trade prior to Cowen expending the time and money to hire counsel and negotiate an assignment of claim.  Because Earl confirmed its intention to move forward with the trade, it was obligated under *Bear Stearns* to negotiate the remaining terms of the deal in good faith—something Earl admits it made no effort to do.

In its motion papers, Earl all but ignores the law on preliminary agreements and instead argues it is entitled to summary judgment because Whitebox has not produced a signed contract. Most of the law Earl cites on this point is irrelevant because it does not involve the "Type II" preliminary agreement at issue in *Bear Stearns* and this case.  Similarly, Earl spends an inordinate amount of time focusing on communications that occurred ***after*** the parties' agreed to the trade—for example, email communications between Whitebox and Cowen after it became clear that Earl was refusing to live up to its obligation to negotiate in good faith.  These facts are also for the most part irrelevant.  At best, they raise factual issues that may prevent the court from granting summary judgment to Whitebox.  But they do not and cannot justify any grant of summary judgment for Earl, whose motion relies in significant part on the credibility of a single witness (Thomas Avallone) who claims he was never authorized to enter into any kind of agreement for the sale of Earl's bankruptcy claims.

Because Earl's motion for summary judgment is supported by neither the applicable law nor the relevant undisputed facts, this Court should deny the motion in all respects.

**STATEMENT OF MATERIAL UNDISPUTED FACTS**

On April 18, 2015, Earl filed proof of bankruptcy claim no. 5497 (as amended, the "Claim") against Showboat Atlantic City Operating Company, LLC in this bankruptcy.  *See* Whitebox's Counterstatement of Material Facts ("Counterstatement") ¶ 1.  The Claim is a general unsecured claim in the amount of $3,600,000 and is eligible for payment as a Class I claim under the Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code filed by the Debtors on October 20, 2016.  *See id.* ¶ 2.

Earl agreed to sell its Claim to Cowen in January of 2017.  Specifically, in a series of email and telephone communications occurring on January 11 and 12, 2017, Bradley Schwab, Managing Director at Cowen, and Thomas Avallone, Vice Chairman of Earl Enterprises, agreed to a claims trade whereby Earl committed to sell the Claim to Cowen (the "Transaction") for $2.15 million.  *See id.* ¶ 3.

Three specific emails are key to the instant motion.  In the first, sent on January 11, 2017 at 2:04 p.m. (ET), Mr. Avallone confirmed to Mr. Schwab that Earl was offering to sell the Claim at $2.15 million, or 59.72% of its allowed face value.  *See id.* ¶ 4.   In the second, sent on January 12, 2017 at 8:34 a.m., Mr. Schwab confirmed Cowen's acceptance of Earl's offer and advised Mr. Avallone that, if Earl was prepared to go forward with the trade, Cowen would send to Mr. Avallone a draft Assignment of Claim agreement.  *See id.* ¶ 5.   Mr. Schwab also stated that Cowen's acceptance "is good through 11 am eastern time today, January 12th."  *See id.*   At 9:47 a.m. that same day, Mr. Avallone replied "Please forward draft document," confirming his

agreement to the trade and the additional negotiations necessary to document the transaction. *Id.* ¶ 6.

Following Mr. Avallone's agreement to move forward on the trade, Gail Rosenblum, a vice president at Cowen, sent Mr. Avallone a draft claims assignment agreement later that day. *See id.* ¶ 7. Although Earl suggests otherwise, the document was not an agreement to sell Earl's claim on some future date, but rather was an assignment that ***effectuated*** the trade and shifted title from one party to another—akin to the signing over of a deed to property at a house closing. *See* Declaration of Jeffrey Chubak [Dkt. No. 8199] ("Chubak Decl."), Ex. 5, WBA-176-185. The record shows that the parties never discussed the preparation of any written contract requiring Earl to close on the trade. Instead, the parties relied on the email communications between Earl and Cowen.

As set forth in the accompanying affidavit of Whitebox's expert Peter Lupoff,[1] parties trading bankruptcy claims routinely negotiate binding and enforceable agreements over the telephone, through email communications, and even through instant messaging communications, before the preparation of any formal contract. *See* Declaration of Peter M. Lupoff ("Lupoff Decl."), Ex. A (Summary and Opinion of Peter M. Lupoff), at 1, 4.[2] This practice is necessitated

---

[1] As set forth in his affidavit, Mr. Lupoff was a key player in the creation of the secondary market for bankruptcy trade claims in the 1990s, and has negotiated thousands of trades over the course of his twenty-five year investment career. *See* Lupoff Decl., Ex. A, at 2.

[2] Mr. Lupoff's expert report constitutes competent summary judgment evidence. It is well-settled that an expert report that is accompanied by an affidavit or sworn statement may be considered when resolving a motion for summary judgment. *See, e.g., J.P. Morgan Chase Bank, N.A. v. Jenkins*, No. 14 C 4278, 2016 WL 4417072, at *2 and n.2 (N.D. Ill. Aug. 18, 2016) (citing *Wittmer v. Peters*, 87 F.3d 916, 917 (7th Cir. 1996); *Estate of Williams v. Indiana State Police*, 26 F. Supp. 3d 824, 837 (S.D. Ind. 2014)); *see also Philippi-Hagenbuch, Inc. v. Western Tech. Serv. Int'l, Inc.*, Case No. 12–1099, 2015 WL 13590362, at *3 (C.D. Ill. June 2, 2015) (finding that even an unsworn expert report may be considered when deciding pending summary judgment motions where expert affirmed his opinions under oath and submitted an affidavit verifying the authenticity of his reports). Here, Mr. Lupoff's expert report, which is annexed to his declaration, is dated, signed, and sworn. Further, Mr. Lupoff's expert report is admissible under

by the volatility in prices in the claims trading market.  *See id.*at 4.  Because the secondary

market price for a bankruptcy claim may rise or fall sharply on any given day, parties routinely

ask each other to agree to the economics of the deal prior to either side preparing any document

or performing any due diligence.  *See id.* at 4-5.  Otherwise, a party may incur the expense of

preparing a draft contract only to find that its counterparty has decided to abandon the deal based

on a sudden increase or decrease in market prices.  *See id.* at 4.

As part of its business as a claims broker, Cowen also engaged third-parties for a

subsequent sale of the Claim.  *See* Counterstatement ¶ 10.  On or about January 12, 2017, Cowen

initiated discussions with Whitebox concerning a subsequent sale of the Claim.  At 11:12 a.m.

(ET) on that same day (hours after Mr. Schwab accepted Mr. Avallone's offer), Cowen sent an e-

mail trade confirmation to Whitebox that confirmed the terms of Whitebox's acquisition of the

Claim.  *See id.*  Cowen sent the trade confirmation to Whitebox based on its belief that it had

agreed to a binding trade with Earl.

On January 17, 2017, during the week following the above discussions, the Court

confirmed the Plan [Dkt. No. 6334], and the prices of claims similar to the one at issue in this

matter began to rise.  This increase is evidenced by the trading price of the Debtors' 10%

Second-Priority Senior Secured Notes due December 15, 2018, which receive approximately the

same percentage recovery under the Plan as Class I Claims.[3]

Over the next several weeks into late February of 2017, Cowen reached out to Mr.

---

Federal Rule of Evidence 702, as set forth in Whitebox's Preliminary Objection to Earl's Motion in
Limine to Exclude Expert Report of Peter M. Lupoff, which is incorporated herein by reference [Dkt. No.
7776].

[3] From January 11, 2017 to January 18, 2017, the trading price of the notes increased from $76.25 to
$77.94.  The trading price of the Second-Priority Senior Secured Notes provides a useful benchmark of
the Claim's value because both will receive approximately the same percentage recovery under the Plan.

Avallone to ensure that Earl would honor its obligations to Cowen.  *See id.* ¶ 12.  However, Mr. Avallone remained silent and unresponsive to Cowen's requests to have the parties move quickly to close the Transaction.  *See id.*  During that time period, Mr. Avallone never communicated to Cowen that a trade did not take place or that there was a misunderstanding between the parties. *See id.* ¶ 13.

Having received no response from Earl, Cowen sent a letter to Mr. Avallone on February 22, 2017 seeking to enforce the terms of the trade agreed to by the parties.  *See id.* ¶ 14.  On February 28, 2017, in response to this letter, Mr. Avallone communicated to Ms. Rosenblum that Earl's sale of the Claim always required approval "from the owner of the business." *See id.* ¶ 15. This response marked the first time that Mr. Avallone (or any other representative of Earl) wrote anything to the effect that approval of the Transaction was conditioned on or required approval from someone other than Mr. Avallone.

Discovery has confirmed that Mr. Avallone was the only representative of Earl to participate in communications with Cowen concerning the sale of the Claim, and the communications set forth in Exhibit A to the Declaration of Timothy R. Casey ("Casey Decl.") are the only written communications between Cowen and Earl with respect to the Claim and the Transaction.  Although Mr. Avallone has testified that he advised Mr. Schwab over the phone that he did not have the authority to bind Earl absent the approval of his superiors, Mr. Avallone never included this assertion in any of his written communications, and no other witness has vouched for the truth of Mr. Avallone's assertion.

At no time during his communications with Cowen did Mr. Avallone ever make any statements contrary to the written correspondence attached as Exhibit A to the Casey Decl.

- 6 -

Likewise, at no point in time did Mr. Avallone or any other representative of Earl modify or attempt to modify the terms of the Transaction set forth in the communications.

Months later, on June 7, 2017, Whitebox learned from another party (Triax Capital Advisors) that Earl was offering to sell the Claim for $3 million (or approximately 83 cents on the dollar) rather than $2.15 million, the price the parties had agreed to. *See id.* ¶ 16. On July 10, 2017, Whitebox commenced this disputed action by filing a motion asking the Court to make a determination regarding Earl's obligation to proceed with the trade. At a hearing held on August 16, 2017, the Court ruled that Whitebox's motion was procedurally improper and that Whitebox must file a Rule 3001 Notice of Transfer before the Court would adjudicate the parties' respective rights.[4] Whitebox filed a Notice of Transfer for the Claim on October 5, 2017. *See* Dkt. No. 7471.

## STANDARD FOR SUMMARY JUDGMENT

The Court's obligation in the context of summary judgment is to determine whether there exist genuine issues for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). "'If . . . there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 n.2 (1986) (internal citations omitted). "[A]ny doubt as to the existence of a genuine issue for trial should be resolved against the moving party." *Id.* at 331 n.2.

The party seeking summary judgment bears the burden of showing there are no material

---

[4] Earl's argument that it never "transferred its claim" as purportedly required by Rule 3001(e) is thus beside the point, given that the Court directed Whitebox to file a Rule 3001 Notice of Transfer. *See* Memorandum of Law in Support of Earl's Motion for Summary Judgment [Dkt. No. 8197] ("Earl MOL"), at 4.

issues of fact in dispute, *Celotex*, 477 U.S. at 323, but it is equally clear that "at summary

judgment, the judge's function is not . . . to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In

making that determination, the Court must consider the facts in the light most favorable to the

non-movant. *See Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). Even if the facts are

not in dispute, summary judgment is inappropriate when the information before the court reveals

that "alternate inferences can be drawn from the available evidence." *Spiegla v. Hull*, 371 F.3d

928, 935 (7th Cir. 2004), *abrogated on other grounds by Spiegla v. Hull*, 481 F.3d 961 (7th Cir.

2007); *see also Anderer v. Jones*, 385 F.3d 1043, 1064 (7th Cir. 2004).

Viewing the facts with deference to Whitebox as required, Earl cannot sustain its burden

of proving that there are no issues of fact which would preclude Whitebox from presenting its

claims at trial.

## ARGUMENT

**I.     BECAUSE THE LAW OF ALL RELEVANT JURISDICTIONS IS CONSISTENT,
THE COURT NEED NOT ENGAGE IN ANY CHOICE OF LAW ANALYSIS**

The parties disagree on what law should govern the question of contract formation.

Whitebox believes that New York law should govern while Earl contends Illinois law controls.

*See* Earl MOL, at 5. The Court need not resolve that dispute, however, because there is no

substantive difference between the law of New York and Illinois relevant to this dispute. *See*

*Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905, 381 Ill.

Dec. 493, 496 (2014) ("A choice-of-law determination is required only when a difference in law

will make a difference in the outcome.") (internal quotations omitted). In analyzing the question

of whether a preliminary agreement existed under Illinois law, the Seventh Circuit extensively

relied upon and quoted the seminal *Teachers Insurance* decision from District Judge Leval of the Southern District of New York. *See A/S Apothekernes Laboratorium for Specialpraeparater v. I.M.C. Chem. Group, Inc.*, 873 F.2d 155, 158-60 (7th Cir. 1989) (relying upon and quoting *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y. 1987)). Earl cites no case suggesting that the analysis set forth in *Teachers Ins.* is inconsistent with Illinois law or, more generally, a correct statement of the law of contracts. Nor has Whitebox found any such decision. Finally, the *Bear Stearns* case—which applies the preliminary agreement analysis to bankruptcy claims trading and is an important precedent for this case—likewise relies upon *Teachers Insurance. See Bear Stearns*, 401 B.R. at 624-28 (citing and quoting *Teachers Insurance*, which it references as *Tribune*). Accordingly, *Teachers Ins.* and *Bear Stearns* are the relevant precedent for considering the question of whether a preliminary agreement exists here, irrespective of whether New York or Illinois law applies.

## II. SUMMARY JUDGMENT ON QUESTIONS OF CONTRACTUAL FORMATION SHOULD BE GRANTED ONLY SPARINGLY

Whether a contact has been formed is often a mixed question of fact and law, requiring a factual inquiry. *See Ronan Assocs., Inc. v. Local 94-94A-94B, Int'l Union of Operating Engineers, AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994) ("Under traditional principles of contract law, questions as to what the parties said, what they intended, and how a statement by one party was understood by the other are questions of fact; however, the matter of whether or not there was a contract, in light of the factual findings on these questions, is an issue of law."). More specifically, "[w]hether a contracting party intends not to be bound in the absence of a[n] [executed] writing is a question of fact to be presented for resolution to the factfinder at trial." *Consarc Corp. v Marine Midland Bank, N.A.*, 996 F.2d 568, 576 (2d Cir. 1993).

Thus, when determining whether a contract has been formed, "it is necessary that the totality of all acts of the parties, their relationship and their objectives be considered," which requires a factual inquiry. *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 97 (2d Cir. 2007). Beyond the communications between the parties, a determination on the totality of the circumstances includes a review of each counterparty's internal deliberations and conduct. *See, e.g., Bear Stearns*, 401 B.R. at 606 (citing to Hitachi's internal email saying a deal had been struck and instructing employees to proceed to close with Bear Stearns). Courts also look to industry custom when assessing parties' objective intent to be bound. *See Consarc*, 996 F.2d at 575 (noting that in determining intent not to be bound, courts consider (among other factors) "usage and custom of the industry"); *Solus Alternative Asset Mgmt. L.P. v. Perry Corp.*, No. 652341/12, 2015 WL 4240999, at *9 (N.Y. Sup. Ct. July 13, 2015) (reviewing expert reports regarding industry custom to determine whether a contract was formed to sell Madoff-related bankruptcy claims). Indeed, even with a fully developed factual record, determining whether parties intended to be bound to an agreement is often a triable issue. *See Pearce v. Manhattan Ensemble Theater, Inc.*, No. 06 CV 1535(KMW), 2009 WL 3152127, at *6 (S.D.N.Y. Sept. 30, 2009) ("Whether parties intended to be bound only by a written contract is a question of fact that is usually best determined by a jury at trial"); *see also Consarc*, 996 F.2d at 576 (summary judgment is "an improper procedural vehicle for determining the parties' intent not to be bound in the absence of written agreements—even in cases where evidence strongly suggests the contrary.").

Consistent with the foregoing, Whitebox respectfully submits that, in the event that the Court cannot discern the parties' intent to be bound from an examination of the emails currently

in the record, the Court should conduct an evidentiary hearing to resolve the contract formation

question raised by Earl's motion.

**III.    THE RECORD EVIDENCE SHOWS THAT THE PARTIES FORMED A BINDING PRELIMINARY AGREEMENT FOR THE SALE OF EARL'S BANKRUPTCY CLAIMS, OBLIGING EACH SIDE TO NEGOTIATE DOCUMENTATION AND ANY REMAINING TERMS IN GOOD FAITH**

A contract can be formed even if "there was a mutual intent to be bound to a preliminary

commitment . . . which required further steps." *Teachers Ins.*, 670 F. Supp. at 499-500; *see also*

*Brown v. Cara*, 420 F.3d 148, 156-57 (2d Cir. 2005) (finding that the parties were bound to

negotiate in good faith open terms and noting that the purpose of recognizing preliminary

agreements as binding is to "permit [parties] to make plans in reliance upon their preliminary

agreements and present market conditions . . . [without] expend[ing] enormous sums negotiating

every detail of final contract documentation before knowing whether they have an agreement,

and if so, on what terms.") (internal citation omitted).  Where parties explicitly agree that they do

not intend to be bound without an executed written contract, they nonetheless contractually bind

themselves to negotiate in good faith toward final documentation of that contract.  *See EQT*

*Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 229-30 (S.D.N.Y. 2012) (denying a motion to

dismiss and finding that an agreement to negotiate in good faith may exist even where the

purchase price was not binding); *Teachers Ins.*, 670 F. Supp. at 498 ("[P]arties can bind

themselves to a concededly incomplete agreement in the sense that they accept a mutual

commitment to negotiate together in good faith in an effort to reach final agreement within the

scope that has been settled in the preliminary agreement.").  "The obligation to negotiate in good

faith has been generally described as preventing one party from, 'renouncing the deal,

abandoning the negotiations, or insisting on conditions that do not conform to the preliminary

agreement.'"  *A/S Apothekernes Laboratorium*, 873 F.2d at 158 (quoting *Teachers Ins.*, 670

F.Supp. at 498).

Courts have identified five primary factors used to determine whether a preliminary

agreement encompassing an obligation to negotiate in good faith exists:  (1) whether the intent to

be bound is revealed by the language of the agreement; (2) the context of the negotiations;

(3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the

agreement in final form, as indicated by the customary form of such transactions.  *See Cara*, 420

F.3d at 157; *Bear Stearns,* 401 B.R. 625.  In the parlance of these cases, this type of preliminary

agreement is referred to as a "Type II" preliminary agreement.

The above factors are similar to those used to determine whether the parties have reached

a meeting of the minds on a fully-formed contract, subject only to a more formal

memorialization—the so-called "Type I" preliminary agreement.  *Id*.  The factors, however,

"have a somewhat different significance where . . . the nature of the contract alleged is that it

commits the parties in good faith to negotiate the open terms."  *Id.* (quoting *Teachers Ins.*, 670

F.Supp. at 499).  "Put another way, if the question is whether the parties bound themselves to

negotiate in good faith towards a mutual contractual end, then 'the language of the agreement, its

contents and omissions, and the context in which it was negotiated and signed, may lead to

different conclusions.'"  *Id.* (quoting *Cara*, 420 F.3d at 157).

In this regard, the factors set forth by Earl (*see* Earl MOL at 7-8) are inapposite because

they concern whether the parties created a fully-formed "Type I" contract, rather than a

preliminary "Type II" agreement to negotiate the final documents in good faith.  As authority,

Earl cites *Solaia Tech. LLC v Arvinmeritor, Inc.*, No.  02-C-4704, 2006 WL 695699 (N.D. Ill.

Mar. 16, 2006).  That case, however, concerns an effort by one party to enforce an unsigned

settlement as the embodiment of the deal.  *See id.*, at *5.  It has nothing to do with whether parties to a trade, upon agreeing to amount and price, had reached a preliminary agreement to use good faith efforts to memorialize and close their trade.

By contrast, the *Bear Stearns* case aptly demonstrates how courts should apply the jurisprudence concerning preliminary agreements to a dispute over a trade of a bankruptcy claim. In that case, the trade claim seller, Hitachi Automotive Products (USA) ("Hitachi"), discussed selling its general unsecured and reclamation claims in the Delphi bankruptcy case to Bear Stearns Investment Products, Inc. ("Bear Stearns").  *Bear Stearns*, 401 B.R. at 605.  Through a phone call and an email, the parties reached agreement as to price, type and amount of claim, and also recognized that the deal would be documented through a trade confirm and assignment of claim.  *See id.* at 606.  The parties then engaged in some back and forth over the language of the trade document but did not reach agreement on a final version.  *See id.* at 607-11.  In the meantime, Hitachi continued to entertain other bids and a few months later sold its claims to Deutsche Bank for additional consideration. *See id.* at 611.  Bear Stearns subsequently sued Hitachi for breach of contract.

The court first considered Bear Stearns's contention that the parties had agreed to a fully-formed "Type I" agreement that was subject only to final memorialization, but it rejected that argument because there were certain material terms that were still to be negotiated.  *Id.* at 619-20.  It then applied the five factors set forth above to determine whether the parties had entered into a binding "Type II" agreement that required them to work in good faith to document the sale, and granted Bear Stearns summary judgment to that effect. *Id.* at 624-28.  Given that Whitebox is not arguing that a fully-formed "Type I" agreement exists here, this Court should

- 13 -

turn to the five-factor analysis to determine whether a preliminary "Type II" agreement encompassing an obligation to negotiate in good faith exists.[5]

### A.    Whether the Intent to be Bound is Revealed by the Language of the Agreement

"Contracts of preliminary commitment characteristically contain language reserving rights of approval and establishing conditions such as the preparation and execution of documents satisfactory to the contracting party." *Teachers Ins.*, 670 F.Supp. at 500.  In other words, was there "mutual intent to be bound to a preliminary commitment" which "required further steps?" *Id.*  Terms of reservation are "by no means incompatible with intention to be bound." *Id.*

Here, the parties expressly used the words "offer" and "acceptance." *See* Counterstatement ¶¶ 4 and 5.  In addition, they made clear that they needed to reach this agreement by 11 a.m. that morning—which they did. *See id.* ¶ 5.  Finally, Mr. Avallone recognized the need to work out the terms of the document to be signed at closing by replying: "Please forward draft document." *See id.* ¶ 6.  All of this demonstrates an intent to be bound, as opposed to mere negotiations.[6]

### B.    The Context of the Negotiations

---

[5] The duty to negotiate in good faith need not be expressed in the preliminary agreement. *Citadel Group Ltd. v. Washington Reg'l Med. Ctr.* 692 F.3d 580, 592 (7th Cir. 2012) ("A [good faith duty to negotiate] may be based on explicit language and language that is less so." (internal citations omitted))  As *Bear Stearns* makes clear, in the trading context, the courts focus the analysis on the five enumerated factors, as opposed to whether the emails or telephone calls make an express reference to such a duty.  In any event, the parties here recognized that, after reaching their preliminary agreement, the next steps involved negotiation of the final document of transfer to be signed at closing.

[6] Earl incorrectly asserts that the language of the draft assignment of claim demonstrates that absence of an intent to be bound.  Earl MOL at 9.  "The fact that the subsequent written agreements provided the *written* agreements would not be valid absent signing, does not mean that the [agreement reached in emails] was conditioned on the signing as well." *Seko Worldwide, LLC v. Four Soft Ltd.*, 503 F.Supp.2d 1059, 1061 (N.D. Ill. 2007) (emphasis in original).

Here, the context of the negotiations demonstrates that the parties had <u>concluded</u> negotiations on the material terms—amount and price—because Mr. Schwab turned the process over to Ms. Rosenblum to work on the documentation.  Mr. Avallone never "broke off negotiations," as he now claims.  Nor, for that matter, did he continue to negotiate, which one might expect if parties had not yet reached a deal.  Rather, at the time, he necessarily understood that he had a deal in place and waited for the documentation so that he could move toward closing at the agreed upon price.

### C.    The Existence of Open Terms

"[W]here the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, these same omissions may actually support finding a binding Type II agreement."  *Cara*, 420 F.3d at 158 (internal citations omitted).  In addition, where the preliminary agreement covers the important economic terms, "the fact that countless pages of relatively conventional minor clauses remain[] to be negotiated does not render the [preliminary] agreement unenforceable."  *Teachers Ins.*, 670 F.Supp. at 501.

Here, the parties proceeded as any typical trade would—they agreed to the material economic terms and left the ministerial documentation for later.  Indeed, Mr. Avallone never complained to Cowen about any of the terms of the assignment of claim.  The fact that some of the terms of the final document may have needed further negotiation is entirely consistent with the expectations of the parties.

### D.    Partial Performance

Courts do not attached "great importance" to this factor.  *Teachers Ins.*, 670 F.Supp. at 502.  Nevertheless, Cowen took steps to perform by (i) preparing the documentation and

(ii) lining up the downstream sale.  *See* Counterstatement ¶ 10.  While the parties did not reach the closing table, Cowen was doing its part to complete the trade.

>    **E.    The Necessity of Putting the Agreement in Final Form, as Indicated by the Customary Form of Such Transaction**

Whitebox's expert Peter Lupoff will testify that parties trading bankruptcy claims routinely negotiate binding and enforceable agreements over the telephone, through email communications, and even through instant messaging communications.  *See* Lupoff Decl., Ex. A, at 1, 4.  Once they reach this binding preliminary agreement, they then prepare the final form of the transfer document.  *See id.* at 5.  The custom thus supports Whitebox's view that the parties had reached a binding preliminary agreement.

## IV.    THE EARL-COWEN EMAILS DEMONSTRATE MUTUAL ASSENT TO THE TRADE

Relying on Judge Wiles' *Westinghouse* opinion, Earl argues that no preliminary agreement exists here because Schwab made a counteroffer to Avallone that was never accepted. Earl MOL at 13-14.  That argument is wrong because, in *Westinghouse*, Judge Wiles held that Whitebox's broker did not accept the seller's offer as stated but instead raised a new economic term for the deal—a provision for recourse with 5% interest—and thus made a counteroffer.  *See In re Westinghouse Elec. Co. LLC*, No. 17-10751 (MEW), 2018 WL 3655702, at *12-13 (Bankr. S.D.N.Y. Aug. 1, 2018).[7]  Earl can make no such argument in this matter because Schwab never added any such economic term.

In addition, if Mr. Schwab's response is viewed as a counteroffer, it was accepted by Mr, Avallone.  The record shows that Schwab asked Avallone if he was prepared to go forward with

---

[7] Whitebox has taken an appeal of the Westinghouse decision.  Nothing stated herein should be interpreted as an admission by Whitebox that Judge Wiles' decision is correct.

the trade, in which event Schwab would "forward a purchase and sale agreement for your

review."  Counterstatement ¶ 5.  Mr. Avallone accepted by stating:  "Please forward draft

document." *Id.* ¶ 6.  Earl cannot now recharacterize Mr. Avallone's statement as something other

than acceptance, given that Cowen viewed it as assent to the trade.  Richard A. Lord, Williston

on Contracts § 6:10 (4th ed. 2004) ("In short, how the offeror treats the offeree's language will,

assuming that treating the language either as language of acceptance or treating it as language

requiring further discussion is reasonable, determine the language's effect."); *see also Int'l Bus.*

*Mach. Corp. v. Johnson*, 629 F.Supp.2d 321, 331 (S.D.N.Y. 2009) ("[A] contract is created when

the offeree engages in ambiguous conduct that leads an offeror to believe that the offeree has

assented to the deal.").  Thus, in this matter, there was an agreement on the price and the amount

of the trade, and that the parties should move forward with finalizing the trade based on the

economics to which each party had consented.

Earl argues that summary judgment is appropriate based on a few communications

between Cowen and Whitebox immediately following Earl's agreement to sell the Claim.  Earl

MOL at 14-15.  All that these communications show, however, is confusion and concern by

Whitebox and Cowen when Earl failed to follow through on its agreement to proceed with the

trade.  Moreover, some of the evidence cited by Earl is fatal to its motion.  Earl admits, for

example, that immediately following Earl's agreement to sell its claim Cowen arranged to sell

the Claim to Whitebox, and sent Whitebox a trade confirmation documenting that sale.  This

necessarily shows that Cowen believed that Earl had agreed to a trade.

Cowen told Earl that it believed the parties' had agreed to a binding trade, stating that:

> We believe that we had an agreement in principle on the terms of the trade
> and expect all parties to make a good faith effort to complete the

> transaction on such terms, even while retaining rights to negotiate
> definitive documents and conduct reasonable due diligence, as applicable.

Transfer of Claim, Ex. 2, Ex. C [Dkt. No. 7471]. Cowen said the same thing to Whitebox,

writing that "Cowen takes the failure of a party to stand up to a trade as a very serious matter and

has therefore taken all reasonable actions to attempt to hold the seller to a good faith negotiation

to complete the trade." Chubak Decl., Ex. 5, WBA-66. These statements, like Cowen's

transmission of a trade confirmation to Whitebox, plainly show that Cowen believed it and Earl

had agreed to a binding trade, and were obliged to negotiate the rest of the deal in good faith.[8] In

any event, because this evidence raises material questions of fact regarding the parties' intent, the

Court should not grant summary judgment for Earl.

## V.   THE CHAMPERTY DOCTRINE IS INAPPLICABLE

Earl's argument that Whitebox lacks standing because the Assignment and Release

Agreement between Whitebox and Cowen (the "A&R Agreement") is champertous under N.Y.

Judiciary Law § 489(1) is without merit.

As an initial matter, the issue of champerty should not be resolved by summary judgment.

*See Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 94 N.Y.2d 726, 734-35 (N.Y. 2000) (noting

the Court of Appeals' reluctance to find that an assignment is champertous as a matter of law).

---

[8] To the extent that Earl argues based on the *Westinghouse* opinion that agreements cannot be enforceable where they are "subject to further documentation," that is clearly not the law, as discussed above. *See, e.g*, *Stonehill Cap. Mgmt. v. Bank of the West*, 28 N.Y.3d 439, 451 (N.Y. 2016) (referring to the "subject to" language as "formulaic" and holding that the court "disagree[d] . . . that the 'subject to' language in the April 27th email clearly expresses an intent not to be bound to the sale . . . . This email stated that closure of the transaction required execution of a signed document and [plaintiff's] tender of the 10% deposit. That, however, is ***not the same as a clear expression that the parties were not bound to consummate the sale and that [defendant] could withdraw at any time, for any reason***.") (emphasis added). The court in *Bear Stearns* found that the parties had made an enforceable preliminary agreement despite the fact that the parties agreed that they would later document the deal, even though the parties never expressly stated to one another that their oral agreement to make the trade was legally binding. The *Bear Stearns* decision correctly recognizes that trades like the one agreed to by Earl are made every day based on phone calls, without any formal written agreement requiring the parties to close on the deal.

The "question of intent and purpose of the . . . assignee of a claim is usually a factual one to be

decided by the trier of facts." *Fairchild Hiller Corp. v. McDonnell Douglas Corp.*, 28 N.Y.2d

325, 330 (N.Y. 1971). Earl does not cite to any record evidence, beyond the A&R Agreement

itself, illuminating Whitebox's intent in entering into the A&R Agreement.

In addition, the language of the A&R Agreement belies any claims that it falls within the

exceedingly narrow scope of the champerty doctrine. New York law is clear: "in order to fall

within the statutory prohibition, the assignment must be made for the very purpose of bringing

suit and *this implies an exclusion of any other purpose*." *Id.* (emphasis added). The sole purpose

of the A&R Agreement was not to permit Whitebox to sue Earl. Rather, the A&R Agreement

states that Whitebox "desires to purchase, acquire and receive, the Transferred Rights," defined

as (a) any and all rights Cowen may have to purchase the Claim directly from Earl; and (b) any

and all claims Cowen may have against Earl. *See* Casey Decl., Ex. C, at 2. Thus, the A&R

Agreement had at least two purposes, one of which was to acquire the right to effectuate the

purchase of the Claim from Earl. Under these circumstances, champerty is inapplicable. *See*

*Bluebird*, 94 N.Y.2d at 736 ("Judiciary Law § 489 requires that the acquisition be made with *the*

intent and for the purpose (as contrasted to *a* purpose) of bringing an action or proceeding.")

(emphasis in original).

## **CONCLUSION**

WHEREFORE, Whitebox respectfully requests that the Motion be denied and that the

Court enter such further relief as it deems just and proper.

Dated: September 19, 2018

Respectfully submitted,

WHITEBOX ADVISORS, LLC

By:    /s/ Timothy R. Casey
        One of its attorneys

Timothy R. Casey (A.R.D.C. # 6180828)
Drinker Biddle & Reath LLP
191 North Wacker Drive
Suite 3700
Chicago, Illinois 60606-1698
Telephone: 312-569-1000
Facsimile: 312-569-3000
E-mail: Timothy.Casey@dbr.com

—and—

James H. Millar
Clay J. Pierce (previously admitted *pro hac vice*)
Drinker Biddle & Reath LLP
1177 Avenue of the Americas
41st Floor
New York, New York 10036
Telephone: 212-248-3140
Facsimile: 212-248-3141
E-mail: James.Millar@dbr.com;
        Clay.Pierce@dbr.com