**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| CAESARS ENTERTAINMENT | ) | Case No. 15-01145 (ABG) |
| OPERATING COMPANY, INC., *et al.*, | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

**WHITEBOX ADVISORS, LLC'S RESPONSE
TO EARL OF SANDWICH'S STATEMENT OF MATERIAL
FACTS AND COUNTERSTATEMENT OF MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056-2 of the Local

Civil Rules of the United States Bankruptcy Court for the Northern District of Illinois, Whitebox

Advisors LLC ("Whitebox"), respectfully submits: (1) its response to the specific numbered

paragraphs of Earl of Sandwich (Atlantic City), LLC's ("Earl") Statement of Material Facts

[Docket No. 8198] ("Earl Statement"); and (2) Whitebox's counterstatement of material facts.

These responses are submitted solely for the purposes of Earl's motion for summary judgment.

Nothing herein shall be deemed an admission of the truth, materiality, relevance or admissibility

of any Earl statement or declaration at trial or for any other purpose.

**I.     WHITEBOX'S RESPONSE TO EARL'S STATEMENT OF MATERIAL FACTS**

1.     Whitebox Advisors LLC ("Whitebox") and Earl are the sole parties to the

contested matter, initiated by the Transfer of Claim, filed October 5, 2017 [ECF No. 7471]

("Transfer of Claim").

**Response:** Admitted**.**

2.     Whitebox is a Delaware LLC, and SEC-registered investment advisor to the funds

it manages.

**Response:**  Admitted.

3.        Earl is a Florida LLC, formed to own an Earl of Sandwich-branded quick-service restaurant located in the Showboat Casino Hotel in Atlantic City, which restaurant closed as a result of the Debtors' chapter 11 cases (resulting in Earl's Claim (defined below)).  Earl is a wholly- owned subsidiary of Earl of Sandwich (USA), LLC, which is wholly-owned by Rawhide Holdings Inc., which is wholly-owned by Rawhide Trust under Trust Agreement dated March 7, 1996. (Notification as to Affiliates, annexed to the Declaration of Jeffrey Chubak ("Chubak Decl.") as Ex. 1.)  Robert Earl formed the trust, and its beneficiaries are his children.  (Thomas Avallone ("Avallone") Deposition Transcript ("Avallone Tr."), annexed to the Chubak Decl. as Ex. 2, 17:1-4.)

**Response:**  Admitted.

4.        This Court has subject matter jurisdiction over the underlying contested matter under 28 U.S.C. § 1334(b).  This is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper in this district under 28 U.S.C. §§ 1408-09.

**Response:**  Admitted.

5.        In October 2016, Avallone, Earl's Sole Manager, President, CEO, and Secretary, and Barrett Mikelberg, a bankruptcy claim sourcer ("Mikelberg"), exchanged a series of e-mails concerning Proof of Claim No. 5858 ("Claim"), filed by Earl in the amount of $3.6 million. (Chubak Decl. Ex. 5, WBA-170-72.)

**Response:**  Admitted.

6.        Those communications did not result in agreement on pricing for a potential bankruptcy claim trade. (*Id.*.)

Response:  Admitted.

7.     On January 11, 2017, at 12:59 p.m., Avallone e-mailed Mikelberg concerning the Claim.  (Chubak Decl. Ex. 5, WBA-169.)

**Response**:  Admitted.

8.     Mikelberg forwarded that e-mail to Bradly Schwab ("Schwab"), the Head of Cowen Special Investments LLC ("Cowen"), a Delaware LLC whose place of business is in New York.  (Mikelberg Tr. 70:1-20.)

**Response**:  Admitted.

9.     Avallone and Schwab thereafter exchanged a series of e-mails concerning a potential transaction at the price level indicated in Avallone's prior e-mail to Mikelberg. (Chubak Decl. Ex. 5, WBA-166-69.)

**Response**:  Admitted.

10.    In the initial e-mail, sent January 11, 2017, at 1:59 p.m., Schwab introduced himself as "the largest buyer of CZR claims over the past several months." (Chubak Decl. Ex. 6, Earl243.)  In that e-mail, Schwab interposed inquiries regarding allowance and pricing, which Avallone answered five minutes later as follows (Avallone's text is in bold and red):

> Was wondering if you have support documentation regarding the claim as being allowed as you mention below. I do see that it was filed for $3.6 million as well as $4.5 million. **Was disputed at $4.5 – we settled at $3.6 million – Prime Clerk has it as a Class I Undisputed allowed claim**.
>
> Moreover, please confirm, but it sounds like you are offering the paper [Claim] for sale at $2.15 million or approximately 59.72% of the face claim amount. Is that correct?  **YES** Would you have any flexibility? **NO**

(*Id.*)

**Response**:  Admitted.

11.    At 2:17 p.m. that day, Schwab responded "I would have interest at 59.72% subject to confirming" that the Claim is allowed.  (Chubak Decl. Ex. 5, WBA-168.)

**Response:**  Admitted.

12.     Avallone responded at 2:38 p.m. that day stating he "can easily get a letter from the Debtor/Restructuring Officer confirming [the Claim is] allowed if we decide to move forward." (*Id.*. WBA-167.)

**Response:**  Admitted.

13.     Schwab wrote back at 3:47 p.m. that day stating as follows:

Thomas - as a follow-up to the below. I would be a buyer of your $3.6mm allowed CZR claim at $2.15 million or 59.72% of the allowed face amount subject to (a) written confirmation from the debtor that the claim is a Class I and allowed (b) additional due diligence (c) documentation and (d) closing before close of business Tuesday January 17th.

Please confirm that you are good with the above terms and I will forward you a purchase and sale agreement for review.

(*Id.*. WBA-167.)

**Response:**  Admitted.

14.     On January 12, 2017, at 8:34 a.m., Schwab wrote to Avallone:

Thomas – as a follow-up to my below email and our quick conversation, my acceptance of your offer is good through 11 am eastern time today, January 12th. After which you will need to check back in with me to see if I am still able to transact at your offered level.

As I am sure you can appreciate there are numerous other parties seeking to close transactions prior to the January 17th deadline rather than hold equity. If this is a transaction Planet Hollywood would like to pursue then we need to move quickly. As mentioned I can forward a draft document for your review.

Please let me know ASAP so I can plan accordingly and accommodate you. So you are aware, it's a bank holiday on Monday which accelerates the need to move quickly.

(*Id.*. WBA-166.)

**Response:**  Admitted.

15.    Schwab testified that he did not recall the substance of his "quick conversation" with Avallone.  (Schwab Deposition Transcript ("Schwab Tr."), annexed to the Chubak Decl. as Ex. 7, 31:5-18.)

**Response**:  Admitted.

16.    Avallone testified that he specifically told Schwab any agreement to sell the Claim would require prior approval from Robert Earl (whose family trust is Earl's ultimate owner) and that Avallone also first needed to understand "how it affected me as a member of the unsecured creditors committee" before the Claim could be sold. (Avallone Tr. 41:24-43:1, 81:9-12, 83:4-16.)

**Response**:  Denied, except to admit that Avallone testified that he "needed to get approval from the owner and how it affected me as a member of the unsecured creditors committee," and acknowledged that he did not put these alleged preconditions in writing. (Avallone Tr. 41:24-43:1.)

17.    Remaining on the creditors' committee was a significant consideration because if Earl were removed from the committee upon the sale of the Claim, it would not be entitled to compensation payable to committee members under Section XII.G of the then-proposed chapter 11 plan [ECF No. 6191].

**Response**:  Denied.  Statement No. 17 is not supported by citation to admissible evidence, as required by Local Rule 7056-1.

18.    Cowen does not record its telephone calls. (Schwab Tr. 31:19-22; Gail Rosenblum ("Rosenblum") Deposition Transcript ("Rosenblum Tr."), annexed to the Chubak Decl. as Ex. 8, 49:11-13; Bryan Seyfried ("Seyfried") Deposition Transcript ("Seyfried Tr."), annexed to the Chubak Decl. as Ex. 9, 30:12-14.)

**Response:**  Denied.  Mr. Schwab testified that he thinks Cowen records its phone calls, but he did not know.  Ms. Rosenblum and Mr. Seyfried testified that they do not think Cowen records its phone calls.  (Schwab Tr. 31:19-22; Rosenblum Tr. 49:11-13; Seyfried Tr. 30:12-14.)

19.     At 9:47 a.m. that day, Avallone wrote to Schwab "Please forward draft document." (Chubak Decl. Ex. 5, WBA-166.)

**Response:**  Admitted.

20.     Five minutes later Schwab instructed Rosenblum, then a Vice President of Cowen, to "[p]lease forward Thomas a document.  Thanks."  (*Id.*. WBA-163, WBA-166.)

**Response:**  Admitted.

21.     The conditions set forth in Schwab's e-mails, quoted above, were not previously waived. (Schwab Tr. 29:18-25; Rosenblum Tr. 46:3-48:5; Seyfried Tr. 38:11-39:11; *see also* Amit Patel ("Patel") Deposition Transcript ("Patel Tr."), annexed to the Chubak Decl. as Ex. 10, 27:21-29:21.)

**Response:**  Denied, except to admit that Ms. Rosenblum testified that Cowen did not waive the requirement that due diligence be performed with respect to the transaction. (Rosenblum Tr. 47:19-48:5.)

22.     Whitebox has taken the position that the terms of the alleged Earl-Cowen agreement (the existence of which Earl disputes) are set forth in e-mails exchanged between Avallone, Schwab, and Rosenblum on January 11-12, 2017, and in the Draft AoC Agreement (defined below) Rosenblum sent Avallone January 12, 2017 at 1:24 p.m., in accordance with Schwab's instructions. (Response to Interrogatory Nos. 1-2 Interposed by Whitebox, annexed to the Chubak Decl. as Ex. 11.)

**Response:**  Admitted.

23.    On January 12, 2017, at 11:12 a.m., Rosenblum e-mailed Whitebox's counsel, copying Patel, Whitebox's Portfolio Manager, and Cindy Chen Delano, Whitebox's Legal Analyst ("<u>Delano</u>"). (Chubak Decl. <u>Ex. 12</u> (Deposition Ex. 83), the "<u>Trade Confirm</u>," so called because Whitebox described the e-mail (Transfer of Claim Ex. 1, p.2) as one "confirm[ing] the terms of Whitebox's acquisition of the Claim.")

**Response:**  Admitted.

24.    Rosenblum attached a draft of the "upstream" to the Trade Confirm, which is the draft Claim transfer agreement between Cowen and Earl that Rosenblum contemplated sending Avallone, and invited Whitebox to review and comment upon the same before it was sent to him. (Chubak Decl. Ex. 12.)

**Response:**  Admitted.

25.    The Trade Confirm stated that the "downstream" Cowen-Whitebox trade would be governed by the following terms:

**Claim:** [A]llowed general unsecured claim in the amount of $3,600,000.00

**Original Creditor:** Earl of Sandwich (Atlantic City) LLC

**Purchase Rate:** 62.00%

**Purchase Price:** $2,232,000.00 - Product of the Purchase Rate and the total amount of the Claim

**Form of Purchase:** Assignment of Claim Agreement to be prepared by Cowen.

**Conditions:** Trade subject to satisfactory completion of due diligence. Cowen executing an Assignment of Claim agreement with original holder of Claim. Execution of a mutually acceptable Assignment of Claim customary for the sale and purchase of distressed trade claims

(*Id..*)

**Response:**  Admitted.

26.     The Trade Confirm further stated "as will be stated to the Seller, the trade is subject to the completion of due diligence and confirmation the claim is allowed in the amount of $3,600,000.00." (*Id.*.)

**Response**:  Admitted.

27.     Schwab asked Rosenblum to send the Trade Confirm to Whitebox. (Rosenblum Tr. 14:5-25, referring to Chubak Decl. Ex. 12.)

**Response**:  Denied.  Ms. Rosenblum testified that she was asked to forward the Assignment of Claim Agreement to Earl.  (Rosenblum Tr. 14:5-25.)

28.     Patel testified that on receipt of the Trade Confirm, "we [Whitebox] were confident that Cowen had executed a similar confirm with Earl of Sandwich." (Patel Tr. 88:15-24.) His expectation was based on Whitebox's prior course of dealing with Cowen and its predecessors, which had "facilitated the purchase by Whitebox of 80 percent of the Class I claims in the case." (*Id.*. 89:5-8.) In fact, no such "similar confirm," or any instrument for that matter, had been executed with Earl.

**Response**:  Admitted, except denied to the extent Statement No. 28 asserts that further confirmation from Earl was required or necessary.  The transaction or trade was confirmed by Avallone's email at 9:47 a.m. on January 12, 2017 stating "Please forward draft document." (Chubak Decl. Ex. 5, WBA-166.)

29.     Whitebox has taken the position that it alone had and has the right to waive the conditions specified in the Trade Confirm at any time, because those conditions exist for its benefit. (*Id.*. 92:9-95:17.) Whitebox also testified that those conditions had not been waived. (*Id.*. 97:18- 101:8.)

**Response:**  The first sentence of Statement No. 29 is admitted.  The second sentence of Statement No. 29 is denied.  Patel testified that he does not recall whether the conditions specified in the January 12, 2017 email from Rosenblum to Whitebox's counsel were waived. (Patel Tr. 97:16-100:20.)

30.      Whitebox forwarded its "initial comments" to the "draft of the upstream" agreement Rosenblum attached to the Trade Confirm on January 12, 2017 at 12:57 p.m. (Chubak Decl. Ex. 5, WBA-10-11.)

**Response:**  Admitted.

31.      On January 12, 2017 at 1:24 p.m., Rosenblum e-mailed to Avallone a draft Assignment of Claim Agreement  ("Draft AoC Agreement"). Rosenblum's transmittal  e-mail stated:

> Attached you will find a draft document for review. This transaction is subject to satisfactory completion of due diligence, including confirmation that the claim is an allowed claim. Would you kindly forward the documentation you received from the Debtor confirming this fact. In addition, we will need to receive and review any other documentation you may have supporting the claim.
>
> It appears two claims (numbers 5858 and 5497) have been filed for the Earl of Sandwich (Atlantic City).  Would you confirm the status of each.
>
> As you know we are working on a tight timeframe and thus are forwarding this draft document for your review, prior to diligence review, completion to include language confirming the claim is allowed, and further review and comment by our counsel.

(Chubak Decl. Ex. 5, WBA-175.)

**Response:**  Denied.  Rosenblum's transmittal e-mail stated:

> Attached you will find a draft document for review. This transaction is subject to satisfactory completion of due diligence, including confirmation that the claim is an allowed claim. Would you kindly forward the documentation you received from the Debtor confirming this fact. In addition, we will need to receive and review any other documentation you may have supporting the claim.

It appears two claims (numbers 5858 and 5497) have been filed for the Earl of Sandwich (Atlantic City). Would you confirm the status of each claim.

As you know we are working on a tight timeframe and thus are forwarding this draft document for your review, prior to diligence review, completion to include language confirming the claim is allowed, and further review and comment by our counsel.

32.     The Draft AoC Agreement included a merger clause (Section 14) and provided it would not become effective, and Cowen would have no obligation to pay Earl thereunder, unless and until Earl and Cowen "have executed and delivered to each other this Agreement and the Notice of Transfer" annexed thereto. (*Id.*. WBA-175-76, 181.)

**Response:** Denied as stated. Statement No. 31 is an attempt to summarize or paraphrase the terms of the Draft AoC Agreement, which is a document that speaks for itself. (*Id.*. WBA-176, 181.).

33.     Avallone testified he was dissatisfied with both the terms of the Draft AoC Agreement (including the representation and warranties, and indemnity and late payment clauses) and its complexity, and would not recommend Robert Earl approve a sale of the Claim governed by that instrument. (Avallone Tr. 54:19-55:6, 64:19-65:6.)

**Response:** The first clause of Statement No. 33 is admitted. The second clause of Statement No. 33 is denied. Avallone testified that the Draft AoC Ageement "wasn't in a position that I could give to Mr. Earl with confidence and say here's the deal." (Avallone Tr. 64:19-65:6.)

34.     Avallone did not respond to Rosenblum's transmittal e-mail that day. Rosenblum sent a follow-up e-mails on January 12, 2017 at 5:37 p.m. and the next morning at 9:10 a.m., asking if he had questions or comments on the Draft AoC Agreement, and inviting Avallone to reach out to her and Schwab to discuss "the process" and "next steps." (Chubak Decl. Ex. 5, WBA-162.)

**Response:**  The first sentence of Statement No. 34 is denied.  Avallone responded to Rosenblum's transmittal by calling the night of January 12, 2017, which call Roseblum missed. (Chubak Decl. Ex. 5, WBA-162.)  The second sentence of Statement No. 34 is admitted.

35.    Rosenblum and Avallone spoke by phone on January 13, 2017.  (*Id.*.; Avallone Tr. 53:16-54:3, 59:16-21.)

**Response:**  Admitted.

36.    Avallone testified that during his conversation with Rosenblum, he advised her that any agreement to sell the Claim would require prior approval from Robert Earl, and also that he first needed to understand how a sale of the Claim would affect his ability to remain on the creditors' committee.  (*Id.*. 54:4-10, 83:4-16, 119:1-13.)

**Response:**  Admitted that Avallone so testified.

37.    Rosenblum testified that she did not recall the substance of her conversation with Avallone.  (Rosenblum Tr. 48:13-49:10.)

**Response:**  Denied.  Rosenblum testified that she does not remember whether Avallone told her that any transaction was subject to the review and approval of his superiors, and that "I don't remember the name Robert Earl."  (Rosenblum Tr. 49:15-20.)  Rosenblum further testified that she does not remember Avallone mentioning that he needed to understand how the transaction would impact Earl's role on the Unsecured Creditors Committee, and stated that such a statement "would stick out in [her] mind."  (*Id.*. 49:21-50:3.)

38.    Rosenblum sent a follow-up e-mail on January 17, 2017, at 4:26 p.m., advising Avallone that the confirmation order had been entered but that "there is additional time for your review of the document" before the plan becomes effective.  (Chubak Decl. Ex. 5, WBA-161.)

The e-mail further stated "We are available to address any questions or concerns you may have about the document or process, and are accustomed to working with our counterparties to negotiate a mutually agreeable agreement. I hope you will let me know how I may assist with this process." (*Id.*.)

**Response:**  The first sentence of Statement No. 38 is denied.  While Rosenblum stated that "there is additional time for your review of the document," there is no reference to the plan becoming effective.  (Chubak Decl. Ex. 5, WBA-161.)  The second sentence of Statement No. 38 is admitted.

39.    On January 18, 2017, at 7:13 a.m., Rosenblum e-mailed Schwab "There has been no response from [Avallone]. I can send one more email and write we have allocated funds for this transaction and ask him to confirm that he intends/does not intend to proceed, although it seems obvious. We will also need to speak with Jillian (WB)." (Chubak Decl. Ex. 14,  CSI_398.)

**Response:**  Admitted.

40.    Schwab responded: "I would assume its gone and he is not interested in doing anything. I assume you have heard nothing from him since last week, correct? I have heard nothing. I would send one last email and tell him that after today it will be a much more difficult transaction to complete. I would also tell Jillian that seller has disappeared and that there is most likely no transaction."  (*Id.*. CSI_401.)

**Response:**  Admitted.

41.    Rosenblum confirmed: "You are correct. Thomas has not responded since my conversation with him late Friday.  Agree with all you wrote and will do." (*Id.*. CSI_404.)

**Response:**  Admitted.

- 12 -

42.     Schwab further e-mailed Rosenblum at 7:52 a.m.: "If you have no response by noon your time just kill it and move on," to which Rosenblum responded "Okay, really made every effort but although he considered it, doubt he was ever a serious seller." (*Id.*. CSI_424.)

**Response**:  Admitted.

43.     On January 18, 2017, at 9:33 a.m., Rosenblum wrote to Avallone that language in the Draft AoC Agreement would need to change as a result of plan confirmation, and asked him to "kindly advise by noon, eastern time today if you plan to move ahead with the transaction or we will assume you are no longer interested."  (Chubak Decl. Ex. 5, WBA-161.)

**Response**:  Admitted.

44.     Avallone did not respond to that e-mail, and testified he understood negotiations came to a close as a result.  (Avallone Tr. 46:3-15.)

**Response**:  Admitted.

45.     Cowen does not record bankruptcy claim trades in its books and records unless and until a mutually agreed Assignment of Claim Agreement (or similar instrument) has been executed by the parties to the trade and/or the bankruptcy claim seller has been paid under the terms thereof. (Seyfried Tr. 21:14-23:3; Schwab Tr. 37:4-14; Rosenblum Tr. 23:21-24:6, 56:2-7.)

**Response**:  Admitted.

46.     As the Draft AoC Agreement was never executed, no Cowen-Earl bankruptcy claim trade was ever recorded in Cowen's books and records. (Seyfried Tr. 23:4-17; Schwab Tr. 37:17- 38:8; Rosenblum Tr. 55:13-56:7.)

**Response**:  Admitted.

47.     Cowen never paid Mikelberg any commission for having sourced the Earl Claim. (Mikelberg Tr. 83:18-84:13; *see also* Chubak Decl. Ex. 13.)

**Response:**  Admitted.

48.     Notwithstanding that Schwab, Rosenblum, and Avallone stated in e-mails and

testimony that there was no trade as of noon on January 18, 2017, Rosenblum advised Whitebox

and its attorneys at 4:01 p.m. that day that "[w]e are waiting to hear from the Seller and will be in

touch tomorrow, hopefully in the morning."  (Chubak Decl. Ex. 14, CSI_449.)

**Response:**  The first clause of Statement No. 48 is denied because it is not supported by

citation to admissible evidence, as required by Local Rule 7056-1.  The second clause of

Statement No. 48 is admitted.

49.     On January 19, 2017, Bottge and Patel exchanged the following Bloomberg

instant messages:

> JBOTTGE said: we are apparently having trouble with the CZR seller (3.6mm). they are
> just non responsive

> JBOTTGE said: mentioned to cindy as well

> APATEL362 said: that's not good

> APATEL362 said: we have a confirm

> APATEL362 said: in place

> APATEL362 said: talk to me

> APATEL362 said: we got this straight?

> JBOTTGE said: im hoping the guy has a bad case of gout

> JBOTTGE said: and his internal counsel is working through the language

> JBOTTGE said: spoke to them very late Friday.. they had the docs in hand.. asked us if
> we'd be in on Monday – Gail told them she'd be in to work on the transaction.. and
> we've been reaching out ever since

> APATEL362 said: ok J

> BOTTGE said: breathe.

APATEL362 said: need a kick save here

JBOTTGE said: please.

JBOTTGE said: do I need to fly out and take you to yoga

JBOTTGE said: some namaste

(Chubak Decl. Ex. 14, CSI_458-59; *see also id*. CSI_471.)

**Response:**   Admitted.

50.     On January 23, 2017, Bottge asked Rosenblum and Schwab "Any feedback yet from the seller? Still MIA?" Schwab responded "As of now seller is sitting tight. Will keep you posted if anything changes."  (*Id.*. CSI_482.)

**Response:**   Admitted.

51.     In a February 2, 2017 Bloomberg instant message conversation, Nicholas Stukas, the Head of Relative Value Credit at Whitebox ("<u>Stukas</u>") (Patel Tr. 54:15-18), asked Bottge about the status of the alleged trade ("I thought the tr[a]de was agreed and we had a confirm?"). Bottge responded: "In the confirm, trade is subj to us executing an assignment of claim agreement   with the original holder and due diligence .. I have neither from the seller." (Chubak Decl. Ex. 14, CSI_504.)

**Response:**   Admitted.

52.     Stukas asked Bottge to "give amit [Patel] a call" because "he knows 10x more about claims settlement than I do," and further explained "it is a problem for us in that we are hedging stock on this and so we may have suffered some losses from hedging this claim that we thought we were done on." (*Id.*.)

**Response:**   Admitted.

53.     On February 7, 2017, Bottge advised Patel by Bloomberg instant message of claims available for sale across various bankruptcy cases, and associated pricing. Among the

claims listed by her was "Caesars [Class] I Claims – 60s (transferability questionable)." (*Id.*.

CSI_537.) In the same conversation, Bottge and Patel exchanged the following messages:

> APATEL362 said: did you guys notice earl of sandwich?
>
> JBOTTGE said: no. is this going to put me in a bad mood
>
> APATEL362 said: why not? …
>
> APATEL362 said: can you send cindy [Delano] the upstream confirm?
>
> APATEL362 said: we want to look at the language
>
> JBOTTGE said: ill check.. im not sure we ever got the assignment of claim agreement
> executed with them
>
> APATEL362 said: no not the AOC the confirm
>
> APATEL362 said: didnt you guys get a confirm from them to match the downstream
> [Trade Confirm that Cowen sent to Whitebox]
>
> JBOTTGE said: checking

(*Id.*.)

> **Response**:  Admitted.

54.    Bottge e-mailed Schwab and Rosenblum "Whitebox wondering if we have given

earl notice and would like to see the upstream confirm."  (*Id.*. CSI_531.)

> **Response**:  Admitted.

55.    Schwab responded: "Not sure where the confusion is here: 1. There is no

upstream confirm 2. WB purchase always subject to execution of transaction with upstream."

(*Id.*.)

> **Response**:  Admitted.

56.    Bottge thereafter responded to Patel: "I do not have an upstream confirm" "let me

know if you want to chat."  (*Id.*. CSI_537.)

> **Response**:  Admitted.

57.     By letter, dated February 22, 2017, Seyfried, the Head of Credit Research and

Trading and Cowen's corporate representative (Seyfried Tr. 7:15-18, 8:5-8), wrote Avallone as

follows:

We believe that we had an agreement in principle on the terms of the trade and expect all
parties to make a good faith effort to complete the transaction on such terms, even while
retaining rights to negotiate the terms of definitive documents and conduct reasonable due
diligence, as applicable. As such, we look forward to receiving your comments on the draft
document and moving forward with this trade on the agreed terms.

(Transfer of Claim Ex. 2 ("<u>Seyfried Decl.</u>"), Ex. C.)

**Response:**  Admitted.

58.     On February 28, 2017, Avallone e-mailed Rosenblum:

Dear Gail
I received a note from Bryan Seyfried alleging that we had deal to sell our claim. Please
note that is not true as indicated by your email below.  I always stated that any sale would require
approval from the owner of the business.
    Regards,
    Tom

(Chubak Decl. Ex. 5, WBA-160.)

**Response:**  Admitted that Avallone sent the email quoted above.

59.     By e-mail, sent February 28, 2017, Danny Phillips, the "Director, Legal" at

Cowen Credit Research and Trading ("<u>Phillips</u>"), advised Delano of Cowen's view

concerning the potential Earl trade, stating:

Cowen takes the failure of a party to stand up to a trade as a very serious matter and has
therefore taken all reasonable actions to attempt to hold the seller to a good faith negotiation to
complete the trade. Among other things, [Cowen sent the above-described letter]. We have not
yet heard back from the principal [at Earl] and believe at this point that a response is unlikely.
The party is not a regular participant in the trade claims business and appears to have walked
away from the trade.

Upon review of the matter, we do not believe that any further action would be productive
or is practical in this instance.

(*Id..* WBA-66.)

**Response:**  Admitted.

60.    By e-mail, sent March 20, 2017, Douglas Mintz of Orrick, Herrington & Sutcliffe, LLP ("Mintz"), and Whitebox's former counsel herein, advised Delano that filing a Transfer of Claim, under Rule 3001(e)(2) "would … provide a great deal of leverage and if the evidence is viable, could suffice to ensure the transfer."  (*Id.*. WBA-343-44.)

**Response:**  Admitted.

61.    Mintz stated that although "not required by the Rule," it is "market practice" for parties to a proof of claim transfer agreement to "submit as evidence" of the transfer under Rule 3001(e)(2) "a brief document confirming the trade, signed by both parties and waiving the transferor's objection."  (*Id.*. WBA-344.)

**Response:**  Admitted.

62.    Delano forwarded that e-mail to Phillips four days later, with the note "Given that [Earl] is not a common player in the claims trading space, wanted to share the below strategy with you. We think it important to consummate a trade as it would be bad market precedent to permit otherwise." (*Id.*.)

**Response:**  Admitted.

63.    By letter, sent April 18, 2017, Mintz responded to Phillips' February 28, 2017 e-mail, stating Cowen's position on Earl therein "is problematic" because in addition to not delivering the Claim to Whitebox pursuant to the Trade Confirm, "Whitebox considered the completion of this trade in developing a strategy around the Caesars bankruptcy case that included purchasing other, larger claims from you.      Thus there is potential for significant damages." (*Id.*. WBA-60.)

**Response:**  Denied.  Mintz did not state that Cowen's position on Earl is problematic, but rather Earl's failure to complete its end of the trade.  (Chubak Decl., Ex. 5, WBA-60.)

64.     Mintz further stated: "We request that you file a notice of the transfer with the Bankruptcy Court … Additionally, we believe you should review proper remedies under applicable state law including contractual and tort claims. Or in the alternative, we request that you permit us to proceed on your behalf." Mintz further threatened litigation against Cowen "if you are unable or unwilling to pursue these paths."  (*Id.*. WBA-61.)

**Response:**  Admitted.

65.     By letter, sent by e-mail on April 20, 2017, Scott Balber ("<u>Balber</u>"), Cowen's counsel, responded to Mintz's letter, stating that the Trade Confirm did not result in formation of a contract enforceable against Cowen, because the conditions set forth therein had not been met; and even if the Trade Confirm resulted in formation of a contract, "Cowen's performance of its obligation—notably to deliver the Claims—is excused under the doctrine of impossibility of performance."  (*Id.*. WBA-869-70.)

**Response:**  Admitted.

66.     Balber further added that Cowen "wants to cooperate in Whitebox's efforts to complete the purchase of the Claims," and so "Cowen is amenable to discussing the assignment to Whitebox of any cause of action that it may have against [Earl], in exchange for a release of any potential claims against Cowen." (*Id.*.)

**Response:**  Admitted.

67.     On April 26, 2017, Patel and Stukas, both of Whitebox, exchanged the following messages:

APATEL362: Czr en fuego

STUKAS1: yes …

APATEL362: But now Cowen is starting to owe us real money

APATEL362: On that earl of sandwich

STUKAS1: yeah

STUKAS1: there hasn't been another turn from them has there?

APATEL362: The lawyers are speaking today w each other

APATEL362: They want to assign their rights to us but I fear Cowen is actually the party that screwed up

APATEL362: So we are trying to get a detailed account of how it went down w seller

APATEL362: Which Cowen has been hesitant to give

STUKAS1: this could be bad

STUKAS1: it's now almost a million bucks

APATEL362: We are not booking those gains are we?

STUKAS1: I guess we need to think about that. Currently we are marking the earl of sandwich claim at the same price (currently 68) as the other CZR claims. We will need to mark the other claims up at month-end, and we should probably mark the earl of sandwich claim down to our cost at the purported trade.

STUKAS1: I am not including it in managing the hedge

APATEL362: Agree.

(*Id.*. WBA-361-62.)

**Response**:  Admitted.

68.     Whitebox apparently agreed to Balber's proposal, and the parties commenced negotiating the A&R Agreement (defined below).

**Response**:  Denied.  Statement No. 68 is not supported by citation to admissible evidence, as required by Local Rule 7056-1.

69.     Whitebox transmitted the initial draft on May 3, 2018.  (*Id.*. WBA-846.)

**Response:**  Denied.  Whitebox transmitted a draft Assignment Agreement on May 3, 2017.  (Chubak Decl., Ex. 5, WBA-846.)

70.     On May 4, 2017, Balber e-mailed Mintz stating that one issue he had with the draft was that "Cowen is not willing to agree to any reps and warranties regarding the underlying claim or any rights it may have against the seller [Earl] with respect to the claim."  (*Id.*. WBA-838.)

**Response:**  Admitted.

71.     Early drafts included a "Rule 11" representation and warranty, which contemplated Cowen representing that it has a non-frivolous cause of action against Earl which, if brought, would not violate Rule 11. (*E.g.*, Whitebox's May 15, 2017 draft (*id.*. WBA-807-20), and in particular *id.*. WBA-810 (Section 3(f)); Whitebox's May 23, 2017 draft (*id.*. WBA-788-803), and in particular *id.*. WBA-793 (Section 3(f)).)

**Response:**  Admitted.

72.     Balber's subsequent May 25, 2017 draft, however, deleted that representation and warranty.  (*Id.*. WBA-1239-54, and in particular *id.*. WBA-1245-46.)

**Response:**  Admitted.

73.     Whitebox's counsel e-mailed Balber about this the next day, stating it "understood Cowen had agreed to make the Rule 11 representation." (*Id.*. WBA-1234.) Whitebox reinserted the representation into a subsequent draft. (*E.g.*, *id.*. WBA-421-36, and in particular *id.*. WBA-424 (Section 3(f).)

**Response:**  Admitted.

74.     However, Balber again deleted the representation in his June 12, 2017 draft.  (*Id.*. WBA-1613, WBA-1616-1628, and in particular *id.*. WBA-1618 (Section 3(f) struck through.))

Whitebox conceded, and omitted the subject representation from future drafts. (*Id.*. WBA-709,

WBA-712-27, and in particular *id.*. WBA-714 (Section 3(f) struck through.))

**Response:** The first sentence of Statement No. 74 is admitted.  The second sentence of

Statement No. 74 is denied except to admit that the subject representation was omitted from

future drafts.  (Chubak Decl., Ex. 5, WBA-714.)

75.     The representation was omitted from the execution version of the Assignment and

Release Agreement ultimately entered into, dated as of June 19, 2017. (*Id.*. WBA-145-76, and

particular *id.*. WBA-147-48) ("A&R Agreement").

**Response:** Admitted.

76.     Under Section 1 of the executed A&R Agreement, Cowen sold to Whitebox "(a)

any and all rights Seller [Cowen] may have to purchase the Rights [defined as the Claim, and

proceeds thereof] directly from Claimholder [Earl] and (b) any and all … causes of action Seller

has against the Claimholder arising out of or in connection with the Seller Transaction," a term

defined as Cowen's attempt to buy the Claim from Earl ("WHEREAS, on or about January 12,

2017, Seller sought to purchase the following from [Earl]").  (*Id.*. WBA-146, emphasis added.)

**Response:** Denied as stated.  Statement No. 76 is an attempt to summarize or paraphrase

the terms of the A&R Agreement, which is a document that speaks for itself.  (*Id.*. WBA-146.).

77.     The purchase price under the agreement was $1 (*id.*.), a price the parties later

joked about.  (*Id.*. WBA-1416, WBA-1420.)

**Response:** Admitted.

78.     Under Section 6, each party agreed "the Purchase Price and the Release [of

Cowen] set forth in section 10 below are intended to represent: 'fair consideration' … and

'reasonably equivalent value'" for the so-called Transferred Rights under the Uniform

Fraudulent Conveyance Act, and Bankruptcy Code section 548 and the Uniform Fraudulent

Transfer Act. (*Id.*. WBA-149.)

**Response:**  Denied as stated.  Statement No. 78 is an attempt to summarize or paraphrase

the terms of the A&R Agreement, which is a document that speaks for itself.  (*Id.*. WBA-149.)

79.    Under Section 8(a), the parties agreed that "Upon execution of this Agreement,

Buyer shall have any and all rights the Seller may have to enforce the terms of the Seller

Transaction as against Claimholder." (*Id.*. WBA-150.) Cowen further agreed to cooperate with

Whitebox to "effectuate the intent and purpose of, and to carry out the terms of," the A&R

Agreement.  (*Id.*. WBA-151-52.)

**Response:**  Denied as stated.  Statement No. 79 is an attempt to summarize or paraphrase

the terms of the A&R Agreement, which is a document that speaks for itself.  (*Id.*. WBA-151-

52.).

80.    According to Whitebox, that purpose is "to further clarify/sweep up any loose

ends regarding Whitebox's right to stand in Cowen's shoes" [ECF No. 7788-6, p.9 of 55].

**Response:**  Admitted that Whitebox's former counsel stated that the A&R Agreement

was intended "to further clarify/sweep up any loose ends regarding Whitebox's right to stand in

Cowen's shoes" [ECF No. 7788-6, p.9 of 55].

81.    Section 14 further provides that the A&R Agreement and "all matters arising out

of or relating to it shall be governed by and construed in accordance with the laws of the State of

New York." (*Id.*. WBA-151.)

**Response:**  Admitted.

82.    Less than a month after entering into the A&R Agreement, Whitebox moved for

an order declaring it "the lawful owner of the Claim and all rights related thereto by virtue of the

Transaction between Earl and Cowen, and the subsequent execution of the Assignment and Release Agreement" and authorizing Whitebox "to file a transfer notice and evidence of transfer with this Court with respect to the Claim," pursuant to Rule 3001(e) [ECF No. 7120-1].

**Response:** Admitted.

83.     In its motion, Whitebox alleged that Earl abandoned the subject trade after observing that "[f]rom January 11, 2017 to January 18, 2017, the trading price of the notes [10% second lien notes due December 2018, which "will receive the same percentage recovery under the Plan as Allowed Class I Claims"] increased from $76.25 to $77.94" (2%) [ECF No. 7120, ¶15]. There is no record evidence to support this allegation.

**Response:** The first sentence of Statement No. 83 is admitted. The second sentence of Statement No. 83 is denied. (Declaration of Douglas Mintz [Dkt. No. 7120-2], Ex. C.)

84.     Rather, Whitebox only decided to pursue this litigation months later when Patel observed "Czr en fuego" and "now Cowen is starting to owe us real money" "[o]n that earl of sandwich." (Chubak Decl. Ex. 5, WBA-361-62.)

**Response:** Denied. Whitebox communicated its disappointment with Earl's failure to consummate the trade as early as January 19, 2017 (Declaration of Timothy R. Casey ("Casey Decl."), Ex. B, CSI-458-59). Earl's failure to consummate the trade was a problem for Whitebox no later than February 2, 2019, because, among other reasons, "[Whitebox] is hedging stock on this and so may have suffered some losses from hedging this claim we thought [sic] we were done on." (*Id.*., CSI-504).

85.     Whitebox's motion (see ¶82, supra) was denied, without prejudice [ECF No. 7214], whereupon Whitebox filed its Transfer of Claim.

**Response:**  Admitted that Whitebox's motion was denied without prejudice on August

16, 2017 [Dkt. No. 7214].  Whitebox filed the Transfer of Claim on October 5, 2017 [Dkt. No.

7471].

## COUNTERSTATEMENT OF MATERIAL FACTS

1.      On April 18, 2015, Earl of Sandwich (Atlantic City), LLC ("Earl") filed proof of bankruptcy claim no. 5497 (as amended, the "Claim") against Showboat Atlantic City Operating Company, LLC in this bankruptcy.

2.      The Claim is a general unsecured claim in the amount of $3,600,000 and is eligible for payment as a Class I claim under the Third Amended Joint Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code filed by the Debtors on October 20, 2016.  (Dkt. No. 5325.)

3.      Earl agreed to sell its Claim to Cowen Special Investments LLC ("Cowen") in January of 2017.  Specifically, in a series of email and telephone communications occurring on January 11 and 12, 2017, Bradley Schwab, Managing Director at Cowen, and Thomas Avallone, Vice Chairman of Earl Enterprises, agreed to material terms of a claims trade whereby Earl committed to sell, convey and otherwise transfer the Claim to Cowen (the "Transaction") for $2.15 million.  (Casey Decl., Ex. A, WBA-166-185.)

4.      On January 11, 2017 at 2:04 p.m. (ET), Mr. Avallone confirmed to Mr. Schwab via email that Earl was offering to sell the Claim at $2.15 million, or 59.72% of its allowed face value.  (*Id.*., WBA-169.)

5.      On January 12, 2017 at 8:34 a.m., Mr. Schwab confirmed Cowen's acceptance of Earl's offer and advised Mr. Avallone that, if Earl was prepared to go forward with the trade, Cowen would prepare and send to Mr. Avallone a draft Assignment of Claim agreement.  (*Id.*., WBA-166-67.)  Mr. Schwab also stated that Cowen's acceptance "is good through 11 am eastern time today, January 12th."  (*Id.*., WBA-167.)

6.      At 9:47 a.m. that same day, Mr. Avallone replied "Please forward draft document," indicating his agreement to the trade and the additional negotiations necessary to document the transaction.  (*Id.*.)

7.      Following Mr. Avallone's agreement to move forward on the trade, Gail Rosenblum, a vice president at Cowen, sent Mr. Avallone a draft claims assignment agreement later that day.  (*Id.*., WBA-175-185.)

8.      Parties trading bankruptcy claims routinely negotiate binding and enforceable agreements over the telephone, through email communications, and even through instant messaging communications, prior to the preparation of any formal contract.  (Declaration of Peter M. Lupoff ("Lupoff Decl."), Ex. A (Summary and Opinion of Peter M. Lupoff), at 1, 4.)

9.      This practice is necessitated by the volatility in prices in the claims trading market.  (*Id.*., at 4.)  Because the secondary market price for a bankruptcy claim may rise or fall sharply on any given day, parties routinely ask each other to agree to the economics of the deal prior to either side preparing any document or performing any due diligence.  (*Id.*., at 4-5.) Otherwise, a party may incur the expense of preparing a draft contract only to find that its counterparty has decided to abandon the deal based on a sudden increase or decrease in market prices.  (*Id.*., at 4.)

10.     On or about January 12, 2017, Cowen initiated discussions with Whitebox concerning a subsequent sale of the Claim. At 11:12 a.m. (ET) on that same day (hours after Mr. Schwab accepted Mr. Avallone's offer), Cowen sent an e-mail to Whitebox that confirmed the terms of Whitebox's acquisition of the Claim.  (Casey Decl, Ex. B, CSI-485-486.)

11.     On January 17, 2017, during the week following the above discussions, the Court confirmed the Plan [Dkt. No. 6339], and the prices of claims similar to the one at issue in this

matter began to rise.  From January 11, 2017 to January 18, 2017, the trading price of the

Debtors' 10% Second-Priority Senior Secured Notes due December 15, 2018 increased from

$76.25 to $77.94.  (Declaration of Douglas Mintz [Dkt. No. 7120-2], Ex. C.)

12.     Over the next several weeks into late February of 2017, Cowen reached out to Mr.

Avallone to ensure that Earl would honor its obligations to Cowen.  However, Mr. Avallone

remained silent and unresponsive to Cowen's requests to have the parties move quickly to close

the Transaction.  (Casey Decl., Ex. A, WBA-160-164).

13.     Before February 28, 2017, Mr. Avallone never communicated to Cowen that a

trade did not take place or that there was a misunderstanding between the parties. (*Id.*.).

14.     Having received no response from Earl, Cowen sent a letter to Mr. Avallone on

February 22, 2017 seeking to enforce the terms of the trade agreed to by the parties.  (*Id.*., WBA-

165.)

15.     On February 28, 2017, in response to this letter, Mr. Avallone communicated to

Ms. Rosenblum that Earl's sale of the Claim always required approval "from the owner of the

business."  (*Id.*., WBA-160.)  This response marked the first time that Mr. Avallone (or any other

representative of Earl) wrote anything to the effect that approval of the Transaction was

conditioned on or required approval from someone other than Mr. Avallone.

16.     On June 7, 2017, Triax Capital Advisors notified Whitebox that the Claim was

now on sale for $3 million (or approximately 83 cents on the dollar) rather than $2.15 million,

the price the parties had agreed to.  (Casey Decl., Ex. A, WBA-188.)

17.     On July 10, 2017, Whitebox commenced this disputed action by filing a motion

asking the Court to make a determination regarding Earl's obligation to proceed with the trade.

(Dkt. No. 7120.)

18.    At a hearing held on August 16, 2017, the Court ruled that Whitebox's motion
was procedurally improper and that Whitebox must file a Rule 3001 Notice of Transfer before
the Court would adjudicate the parties' respective rights.  (Dkt. No. 7214.)

19.    Whitebox filed a Notice of Transfer for the Claim on October 5, 2017.  (Dkt. No.
7471.)

Dated: September 19, 2018

Respectfully submitted,

WHITEBOX ADVISORS, LLC

By:    _____/s/ Timothy R. Casey_____
       One of its attorneys

Timothy R. Casey (A.R.D.C. # 6180828)
Drinker Biddle & Reath LLP
191 North Wacker Drive
Suite 3700
Chicago, Illinois 60606-1698
Telephone: 312-569-1000
Facsimile: 312-569-3000
E-mail: Timothy.Casey@dbr.com

—and—

James H. Millar
Clay J. Pierce (previously admitted *pro hac vice*)
Drinker Biddle & Reath LLP
1177 Avenue of the Americas
41st Floor
New York, New York 10036
Telephone: 212-248-3140
Facsimile: 212-248-3141
E-mail:  James.Millar@dbr.com;
         Clay.Pierce@dbr.com