**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT<br>OPERATING COMPANY, INC., *et al.*,<br><br>                          Debtors. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>Jointly Administered |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
<u>EARL OF SANDWICH'S SUMMARY JUDGMENT MOTION</u>**

Dated: October 8, 2018

                                                    Joseph D. Frank (No. 6216085)
                                                    FRANKGECKER LLP
                                                    325 North LaSalle Street, Suite 625
                                                    Chicago, Illinois 60654
                                                    Tel: (312) 276-1400
                                                    Fax: (312) 276-0035
                                                    jfrank@fgllp.com

                                                    - and -

                                                    Jeffrey Chubak (admitted pro hac vice)
                                                    STORCH AMINI PC
                                                    140 East 45th Street, 25th Floor
                                                    New York, New York 10017
                                                    Tel: (212) 497-8247
                                                    Fax: (212) 490-4208
                                                    jchubak@storchamini.com

                                                    Counsel to Earl of Sandwich (Atlantic City),
                                                    LLC

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

RESPONSE TO LEGAL STANDARD ............................................................................... 2

ARGUMENT ....................................................................................................................... 3

I. EARL NEVER TRANSFERRED ITS CLAIM ..................................................... 3

II. NO PRELIMINARY AGREEMENT WAS EVER FORMED .............................. 5

 A. The *Tribune* Factors Weigh Against the Existence of a Type II Preliminary Agreement .............................................................................................. 5

 1. First Factor: Language of the Alleged Preliminary Agreement ................... 5

 2. Second Factor: Context of Negotiations ...................................... 7

 3. Third Factor: Existence of Open Terms in the Alleged Agreement ........... 7

 4. Fourth Factor: Partial Performance............................................... 8

 5. Fifth Factor: Necessity of Putting Agreement in Final Form, as Indicated by the Customary Form of Such Transactions........................................... 9

 B. Any Alleged Offer by Avallone Was Rejected by Schwab's Counteroffer ........... 9

 C. Post-January 12 Communications Weigh Against the Existence of a Type II Preliminary Agreement ................................................................... 10

III. THE LUPOFF REPORT IS INADMISSIBLE ..................................................... 11

 A. Rule 702 .................................................................................................. 11

 1. Lupoff is Not Qualified................................................................ 11

 2. The Lupoff Report is Not Reliable ............................................. 12

 3. The Lupoff Report is Irrelevant ................................................. 13

 B. Rule 802 .................................................................................................. 14

IV. WHITEBOX LACKS STANDING..................................................................... 14

CONCLUSION................................................................................................................... 16

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
    884 F.2d 69 (2d Cir. 1989)................................................................................................ 5, 6

*Bear Stearns Inv. Prods., Inc. v. Hitachi Automotive Prods. (USA), Inc.*,
    401 B.R. 598 (S.D.N.Y. 2009)............................................................................................ 3, 8

*Brown v. Cara*,
    420 F.3d 148 (2d Cir. 2005)................................................................................................. 1

*CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assocs.*,
    411 B.R. 571 (N.D. Ill. 2009) ............................................................................................. 11

*Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*,
    500 N.E.2d 1 (Ill. 1986) ....................................................................................................... 5

*Cherry River Music Co. v. Simitar Entm't, Inc.*,
    38 F. Supp. 2d 310 (S.D.N.Y. 1999) ................................................................................... 13

*Chicago Inv. Corp. v. Dolins*,
    481 N.E.2d 712 (Ill. 1985) ................................................................................................... 5

*Citadel Group Ltd. v. Washington Regional Med. Ctr.*,
    692 F.3d 580 (7th Cir. 2012) .................................................................................................2, 5

*Good Shepherd Manor Found., Inc. v. City of Momence*,
    323 F.3d 557 (7th Cir. 2003) ............................................................................................... 13

*Hot Wax, Inc. v. Warsaw Chem. Co.*,
    45 F. Supp. 2d 635 (N.D. Ill. 1999) .................................................................................... 14

*Justinian Capital SPC v. WestLB AG*,
    28 N.Y.3d 160 (2016). ................................................................................................. 14, 15

*Kern v. Tri-State Ins. Co.*,
    386 F.2d 754 (8th Cir. 1967) ............................................................................................... 14

*Michele Pommier Models, Inc. v. Men Women NY Model Mgmt. Inc.*,
    14 F. Supp. 2d 331 (S.D.N.Y. 1998).................................................................................... 13

*Michele Pommier Models, Inc. v. Men Women NY Model Mgmt. Inc.*,
    173 F.3d 845 (2d Cir. 1999)................................................................................................ 13

*Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    544 F.3d 752 (7th Cir. 2008) ............................................................................................... 15

*Schwimmer v. Sony Corp. of Am.*,
   637 F.2d 41 (2d Cir. 1980) .................................................................................................... 14

*Shann v. Dunk*,
   84 F.3d 73 (2d Cir. 1996) ........................................................................................................ 1

*Stonehill Capital Mgmt. v. Bank of The West*,
   28 N.Y. 3d 439 (2016) ............................................................................................................ 8

*TIAA v. Tribune*,
   670 F. Supp. 491 (S.D.N.Y. 1987) .............................................................................. 5, 6, 7, 10

*Tilley v. Cook Co.*,
   103 U.S. 155 (1880) .............................................................................................................. 13

*U.S. v. Schultz*,
   No. 14-467, 2016 WL 7409911 (N.D. Ill. Dec. 22, 2016) ..................................................... 13

*In re Westinghouse Elec. Co.*,
   588 B.R. 347 (Bankr. S.D.N.Y. 2018) .............................................................................passim

**Statutes and Rules**

Fed. R. Bankr. P. 3001 ................................................................................................... 1, 3, 16

Fed. R. Civ. P. 56 ............................................................................................................. 2, 11

Fed. R. Evid. 702 ....................................................................................................... 2, 11, 13

Fed. R. Evid. 801 ................................................................................................................ 14

Fed. R. Evid. 802 ....................................................................................................... 2, 11, 14

N.Y. Judiciary Law § 489 .................................................................................................... 14

**Other Authorities**

Chaim Fortgang and Thomas Moers Mayer, Trading Claims and Taking Control of
   Corporations in Chapter 11, 12 Cardozo L. Rev. 1 (Oct. 1990) ............................................ 13

# **INTRODUCTION**[1]

The subject Transfer of Claim states: "Earl Transferred its Claim to Cowen", "Earl sold the Claim to Cowen … in January 2017", and "Earl committed to sell the Claim to Cowen under applicable law." (Transfer of Claim Ex. 1, pp.1-2.)

In its moving papers, Earl argued Whitebox is not entitled to relief because Earl had not transferred its Claim, as required to effect a transfer under Rule 3001, nor had it agreed to transfer the Claim or negotiate a claim transfer agreement.

Whitebox has responded by taking two mutually inconsistent positions. Its principal argument is that e-mails exchanged between Earl and Cowen on January 11-12, 2017 gave rise to a "Type II" preliminary agreement under New York law, under which "the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree[d] to bind themselves to negotiate in good faith to work out the terms remaining open." *Shann v. Dunk*, 84 F.3d 73, 77 (2d Cir. 1996); *see also Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005), discussed in *In re Westinghouse Elec. Co.*, 588 B.R. 347 (Bankr. S.D.N.Y. 2018).[2]

Whitebox, however, recognizing that it is not entitled to relief pursuant to Rule 3001(e)(2) unless "the court finds … that the claim has been transferred," also states Cowen's transmission to Earl of a draft Assignment of Claim Agreement (referred to herein as the Draft AoC Agreement) resulted in a qualifying transfer: "the document [Draft AoC Agreement] was not an agreement to sell Earl's claim on some future date, but rather was an assignment that ***effectuated*** the trade and shifted title from one party to another—akin to the signing over of a deed to property at a house closing." (Opp. Br. p.4) (the "Expansive View" of its alleged ownership interest in the Claim.)

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in Earl's opening brief.

[2] In contrast, a "Type I" preliminary agreement is one "where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities." *Shann*, 84 F.3d at 77.

1

Whitebox's sole support for this novel position is that "the parties never discussed the preparation of any written contract requiring Earl to close on the trade. Instead, the parties relied on the email communications between Earl and Cowen." (*Id*.)

Both arguments fail. Whitebox cannot point to any record evidence adduced during fact discovery evidencing a Type II preliminary agreement to negotiate. Rather, the evidence shows neither Cowen nor Earl wished to be bound prior to execution of a written agreement. Whitebox accordingly bases its Type II preliminary agreement argument on the Expert Report of Peter M. Lupoff [ECF No. 7406-1] ("Lupoff Report"), which opines that it is industry custom for agreement by a potential bankruptcy claim buyer and seller on the price term for a potential trade to give rise to a binding agreement to negotiate a claim assignment agreement, and that failure by the potential seller to so negotiate constitutes actionable bad faith. The Lupoff Report, however, should not be considered competent summary judgment evidence under Rule 56(c), as it is inadmissible under Rules 702 and 802 for reasons set forth below.[3]

Whitebox's alternative argument, that the Claim was actually transferred on transmission of the Draft AoC Agreement, fails on multiple levels. Among other things, the Expansive View is (1) inconsistent with (a) Whitebox's argument that Cowen and Earl entered into a Type II preliminary agreement, (b) the record evidence, and (c) the Lupoff Report, and (2) a collateral attack on prior determinations by the Court that Earl presently owns the Claim.

## RESPONSE TO LEGAL STANDARD

Whitebox states whether Earl and Cowen intended to enter into a preliminary agreement is a mixed question that should be determined at trial. (Opp. Br. pp.9-10.) That argument fails. *Citadel Group Ltd. v. Washington Regional Med. Ctr.*, 692 F.3d 580, 592 (7th Cir. 2012) ("When

---

[3] The Court's Order on Earl's prior motion to exclude the Lupoff Report [ECF No. 7796, p.2] directed Earl not to move to exclude the report until a trial date had been set. Accordingly, Earl has not moved to exclude the report, with its reply papers, but instead objects to the report's admission, pursuant to Rule 56(c).

2

the material facts are not in dispute, the existence and interpretation of a [preliminary] contract are questions of law that the court may decide on a motion for summary judgment … [A]s long as the extrinsic evidence … is undisputed and leads to only one reasonable interpretation, we can decide the matter on summary judgment"). Significantly, *Bear Stearns Inv. Prods., Inc. v. Hitachi Automotive Prods. (USA), Inc.*, 401 B.R. 598 (S.D.N.Y. 2009), relied on heavily by Whitebox, was decided on summary judgment.

## ARGUMENT

**I.   EARL NEVER TRANSFERRED ITS CLAIM**

In its opening brief, Earl argued Whitebox is not entitled to relief under Rule 3001(e)(2), because the Rule only provides for relief where the Court determines the subject claim "has been transferred" (Opening Br. p.4), a requirement that cannot be satisfied by an alleged preliminary agreement.  In response, Whitebox (1) argues that the language of Rule 3001(e)(2) is "beside the point, given that the Court directed Whitebox to file a Rule 3001 Notice of Transfer" (Opp. Br. p.7, n.4), and (2) adopted the Expansive View, under which the Claim was actually transferred to it under its Type II preliminary agreement (*id*. p.4), notwithstanding that no cash was ever paid in consideration for the same.  Both arguments fail.  The Court did not direct Whitebox to file the Transfer of Claim, but rather stated it would not give an advisory opinion on a claim transfer dispute as to which no Rule 3001(e)(2) transfer had been filed.[4]  Even if it did, such direction would not trump the Rule's plain language.  The Expansive View must also be rejected for the following reasons:

---

[4] Whitebox's initial motion sought an order finding it owns the Claim by virtue of the alleged Earl-Cowen transaction and A&R Agreement, and authorizing Whitebox to file a Transfer of Claim [ECF No. 7120-1].  The Court denied relief, on the ground that no Transfer of Claim had been filed and "[s]o there has been no occasion for an objection to be filed.  As far as I'm concerned I don't have a dispute in front of me" [ECF No. 7232, p.15].  The Court invited Whitebox to file a Transfer of Claim if it sought relief under Rule 3001(e)(2). *Id*. ("if somebody wants to file evidence of a transfer, there will be notice given and 21 days to object, and then there can be an objection.  At that point, I'll have something to decide").  But no direction was given.

3

(1) <u>It is Illogical</u>.  It would make no sense for a seller in any commercial transaction to transfer the property that is the subject thereof to the buyer, without receiving payment, or having received or reviewed a draft of the instrument intended to govern the transaction.

(2) <u>It is Inconsistent with the Position the Parties Had a Type II Preliminary Agreement</u>, under which the Claim would be transferred in the future, after the parties negotiated and executed the Draft AoC Agreement and funds have changed hands at a closing.

(3) <u>It is Inconsistent with the Record Evidence</u>.  The January 11, 2:38 p.m. and 3:47 p.m. e-mails exchanged both contemplate preparation of a written contract, as did every e-mail exchanged on January 12.  The Draft AoC Agreement, which Whitebox asserted reflects the terms of the parties' alleged agreement (SMF ¶22), states no transfer is effective unless and until it is signed and cash is transferred in accordance with its terms (SMF ¶32, citing WBA-175-76), neither of which happened.  Cowen never even booked the alleged trade, let alone receipt of the Claim on e-mail transmission of the Draft AoC Agreement, and later told Whitebox it would be "impossible" for Cowen to deliver the subject Claim and that it did not even believe it had a valid cause of action against Earl. (SMF ¶¶46, 59, 65.)

(4) <u>It is a Collateral Attack</u>. The Expansive View challenges the Court's determination, at the August 26, 2017 hearing, that the Claim has not been transferred on the claims register, nor can it be transferred prior to a determination on the Transfer of Claim [ECF No. 7232, p.15]. (*See* Footnote 4, *supra*.)

(5) <u>It is Inconsistent with the Lupoff Report</u>.  The Expansive View is inconsistent with the Lupoff Report, which states bankruptcy claims are not transferred until parties "close the trade," and "after the parties agree to the trade, if they cannot successfully close the documentation, the parties must reverse their agreed commitments." (*Id*. ¶¶27, 29.)

4

## II. NO PRELIMINARY AGREEMENT WAS EVER FORMED

In its opening brief, Earl gave three reasons why no preliminary agreement was formed. First, the four *Chicago Investment Corp.* factors, applicable under Illinois law, and the four *Winston* factors, applicable if New York law applied, weigh against there being such an agreement. (Opening Br. pp.7-13, 16.)  Second, any alleged offer by Avallone was rejected when Schwab made a counteroffer with additional conditions prior to Schwab's alleged acceptance, which counteroffer Avallone never accepted. (*Id*. pp.13-14.) Third, post-January 12 communications that "may be decisive of the question of whether a contract had been made" (*Ceres Ill., Inc. v. Ill. Scrap Processing, Inc.*, 500 N.E.2d 1, 5 (Ill. 1986)) weigh against the existence of such agreement.  (*Id*. pp. 14-15.)  In response, Whitebox argues Earl applied the wrong standard, and that the five-factor standard articulated in *TIAA v. Tribune*, 670 F. Supp. 491 (S.D.N.Y. 1987), described in *Westinghouse* as "quite similar" to the *Winston* factors (588 B.R. 347 at 365), applies and weighs in its favor. (Opp. Br. pp.11-16.) Whitebox also argues Schwab never made a counteroffer because his additional conditions did not change the economics of the proposed transaction.  (*Id*. p.16.) Lastly, Whitebox argues post-January 12 communications are not decisive of the inquiry, but instead merely show "confusion and concern by Whitebox and Cowen when Earl failed to follow through on its agreement." (*Id*. p.17.)  Whitebox is wrong on all fronts.

### A. The *Tribune* Factors Weigh Against the Existence of a Type II Preliminary Agreement

#### 1. First Factor: Language of the Alleged Preliminary Agreement[5]

This factor is "the most important" of the five.  *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989).  As noted in *Tribune*:

---

[5] This factor is the sole inquiry under Illinois law, which Earl submits applies. *Citadel*, 692 F.3d at 592 ("The parties decide for themselves whether preliminary negotiations will bind them, and they do so through their words"). Whitebox argues that under Illinois law "[t]he duty to negotiate need not be expressed in the preliminary agreement." (Opp. Br. p.14, Footnote 5, citing *id*.)  However, that is not what *Citadel* held.  Rather, it held "Whether a party has a duty to negotiate in good faith and the scope of that duty are determined by the terms of the framework established in

5

> In seeking to determine whether such a preliminary commitment should be considered binding, a court's task is, once again, to determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached. <u>Courts must be particularly careful to avoid imposing liability where binding obligation was not intended. There is a strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents</u>. Nonetheless, if that is what the parties intended, courts should not frustrate their achieving that objective or disappoint legitimately bargained contract expectations.

670 F. Supp. at 499 (emphasis added). "[a] party that does not wish to be bound 'can very easily protect itself by not accepting language that indicates a 'firm commitment' or binding agreement.'" *Arcadian*, 884 F.2d at 73 (citing *Tribune*). "Conversely, a party that *wishes* to be bound can very easily protect itself by refusing to accept language that shows an intent *not* to be bound." *Id*.

There can be little doubt that no Earl-Cowen, Type II preliminary agreement was reached under this framework. Whitebox stated the subject preliminary agreement's terms are set forth in the January 11-12, 2017 e-mails exchanged by Earl and Cowen (and Draft AoC Agreement). (Chubak Decl. Ex. 11.) None of those e-mails indicated the transaction under discussion was binding or that the parties were otherwise committed. Indeed, unlike in *Tribune*, where the court found the parties' communications to be "replete with the terminology of binding contract" (*Tribune*, 670 F Supp. at 500), the subject e-mails, as well as the Draft AoC Agreement, evidenced an intention on the part of Earl and Cowen <u>not</u> to be bound prior to execution of a written agreement. (Opening Br. pp.9-11.) As noted in *Westinghouse*, 588 B.R. at 356, "[i]f … the parties have clearly reserved the right not to be bound at all, unless and until a written agreement is signed, then that also precludes contentions that there is a Type II contract, and there is no contract at all unless and until a written agreement is signed."

---

the parties' preliminary agreement" and that such "A duty may be based on explicit language [in the preliminary agreement] and language that is less so." *Id*. Here there is no language establishing a preliminary agreement, let alone establishing a duty to negotiate. Accordingly, no preliminary agreement was ever formed under Illinois law, and Earl had no duty to negotiate with Cowen.

6

Whitebox's response is that Avallone and Schwab evidenced an intention to be bound because their January 11, 2:04 p.m. and January 12, 8:34 a.m. e-mails "used the words 'offer' and 'acceptance.'" (Opp. Br. p.14.) Respectfully, that is insufficient to establish a Type II agreement given the substance of their communications. Further, Avallone did not even use those words; rather, they were written by Schwab in both e-mails, with Avallone merely stating "Yes" in the former in response to Schwab's pricing inquiry of five minutes prior. (SMF ¶¶10, 14.) It would be improper to find that the one-word response of Avallone (not an attorney) at the outset of negotiations resulted in a Type II preliminary agreement, given that the "primary concern for courts in such disputes is to avoid trapping parties in surprise contractual obligations that they never intended." *Tribune*, 670 F. Supp. at 497.[6] This factor accordingly weighs in Earl's favor.

 2. Second Factor: Context of Negotiations

The context of negotiations does not demonstrate an intention to be bound to a Type II preliminary agreement. In *Tribune*, the court noted that Tribune needed to consummate the deal at issue—a real estate financing commitment—by a specific date, to realize a significant tax benefit. 670 F. Supp. at 500. Whitebox has not so much as alleged a reason (as in *Tribune*) Earl would have benefited from a preliminary binding commitment to negotiate in good faith. This factor accordingly weighs in Earl's favor.

 3. Third Factor: Existence of Open Terms in the Alleged Agreement

"The existence of open terms is always a favor tending against the conclusion that the parties have reached a binding agreement." *Tribune*, 670 F. Supp. at 499. Nevertheless, the existence of open terms "does not bar a finding that a Type II contract existed if there was an agreement to be bound by some terms, coupled with a binding agreement to negotiate in good faith

---

[6] Nor does Schwab's use of the terms "offer" and "acceptance" evidence an intention to be bound, given the balance of his communications with Avallone on January 11-12 (Opening Br. pp.9-11) and thereafter.

7

as to other terms." *Westinghouse*, 588 B.R. at 370. Even had Earl and Cowen agreed to be bound to the $2.15 million price then under discussion (Earl disputes as much),[7] the factual record is devoid of any binding agreement to negotiate in good faith as to remaining terms. The sole support for Whitebox's position is the Lupoff Report, which is inadmissible as set forth below. This factor accordingly weighs in Earl's favor.

### 4.     Fourth Factor: Partial Performance

In its opening brief, Earl asserted no portion of the alleged Earl-Cowen contract, as described in Whitebox's interrogatory responses, had been performed. (Opening Br. p.16.) In response, Whitebox asserts that it "took steps to perform by (i) preparing the documentation and (ii) lining up the downstream sale." (Opp. Br. pp.15-16.) That argument fails. Preparation of documentation Cowen intended the contemplated transaction to be subject to does not qualify as performance (consummation) of a contract. *Westinghouse*, 588 B.R. at 356 (quoted above).[8] Whether Cowen lined up a downstream sale is irrelevant as the contemplated trade was between Earl and Cowen. Significantly, the only items to be performed under the then-contemplated transaction—payment of $2.15 million and the transfer of the Claim on claims register—remain unperformed. This factor accordingly weighs in Earl's favor.

---

[7] Whitebox takes inconsistent positions concerning the nature of any partial agreement as to certain terms. Throughout its brief, Whitebox emphasized Earl and Cowen reached agreement on "quantity" (whether the Claim would be sold in whole or in part) and price. (Opp. Br. 2, 13, 15, 17.) However, Whitebox previously stated in its interrogatory responses that all terms of the alleged (now Type II preliminary) agreement are included in the January 11-12 e-mail communications and Draft AoC Agreement. (Chubak Decl. Ex. 11.)

[8] Whitebox argues *Westinghouse* is incorrect insofar as it held "agreements cannot be enforceable where they are 'subject to further documentation.'" (Opp. Br. p.18, Footnote 8, citing *Stonehill Capital Mgmt. v. Bank of The West*, 28 N.Y. 3d 439, 451 (2016) and *Bear Stearns*.) *Stonehill* and *Bear Stearns* were addressed in detail in *Westinghouse*. 588 B.R. at 366-369. Whitebox's brief does not address Judge Wiles' analysis.

8

     5.    <u>Fifth Factor: Necessity of Putting Agreement in Final Form, as Indicated by the Customary Form of Such Transactions</u>

This factor considers whether it is customary for bankruptcy claim trades to be papered. In its opening brief, Earl noted Whitebox's own counsel stated it is "market practice" for parties to paper bankruptcy claim transfer agreements with a "brief document confirming the trade, signed by both parties." (Opening Br. p.7, citing SMF ¶61.) Earl also noted Judge Wiles found "based on the record that it is customary for parties in this industry to execute written documentation in connection with the trading of claims." (*Id*.) Whitebox asserts that this factor weighs in its favor, citing the Lupoff Report. (Opp. Br. p.16.) However, even the Lupoff Report states that following an "oral confirmation" bankruptcy claim trades are typically papered, using "customary documentation." (Lupoff Report Introduction, ¶15.) This factor accordingly weighs in Earl's favor.

    **B.**    **Any Alleged Offer by Avallone Was Rejected by Schwab's Counteroffer**

Whitebox's argument that Avallone made an offer by his January 11, 2:04 p.m. e-mail that was accepted by Schwab's January 12, 8:34 a.m. e-mail ignores that Schwab solicited Avallone's acceptance of two counterproposals made in the interim (on January 11, 2:17 p.m. and 3:47 p.m.) that varied from the terms of Avallone's alleged offer, and thus constituted counteroffers which constituted a rejection of any alleged prior offer as a matter of law. Whitebox states Schwab's proposals cannot be considered a counteroffer because they did not modify the proposed deal's economics, unlike in *Westinghouse*. (Opp. Br. p.16.) That is a distinction without difference under New York and Illinois law. (Opening Br. pp.13-14, citing authorities; *see also Westinghouse*, 588 B.R. at 354, collecting cases.) Significantly, Schwab understood his interim proposals, as well as his January 12, 8:34 a.m. e-mail to be a counteroffer, as in each such e-mail he invited Avallone to accept the same, which never happened.

Whitebox also states Avallone accepted Schwab's counterproposal, by e-mailing "Please forward draft document" on January 12, 9:47 a.m. However, the quoted statement cannot

9

reasonably be construed as acceptance of said counterproposal, or otherwise evidence an intention to be bound, especially given the context, as it was made in response to two of Schwab's prior e-mails proposing to send Avallone such document. (SMF ¶¶13-14.) Moreover, Avallone testified that he asked Schwab for a draft document because he understood any transaction would be governed by the same, not because he intended to bind Earl. (Avallone Tr. 48:15-17.) At a minimum, the request for a draft document supports letting the "strong presumption" against finding a Type II preliminary agreements under *Tribune* stand.[9]

### C. Post-January 12 Communications Weigh Against the Existence of a Type II Preliminary Agreement

In its opening brief, Earl argued that post-January 12 Cowen-Whitebox communications show that they understood Earl was not bound due to the absence of a signed writing, in particular an "upstream" trade confirmation Whitebox believed (based on prior course of conduct) that Earl and Cowen had executed when Cowen sent Whitebox the Trade Confirm. (Opening Br. pp.14-15.) Whitebox responds that "all that these communications show … is confusion and concern by Whitebox and Cowen when Earl failed to follow through on its agreement to proceed with the trade,"[10] which in turn "raises material questions of fact regarding the parties' intent." (Opp. Br. pp.17-18.) Respectfully, there is no dispute as to any material fact as to what the subject communications were, or intention evidenced by the same. Whitebox cannot avoid summary judgment by now stating it and Cowen did not mean what they said internally or to each other.

---

[9] Significantly, the Transfer of Claim states Schwab accepted Avallone's alleged offer, not that Avallone accepted Schwab's conditional acceptance of Avallone's original offer. Rule 8(d), which permits inconsistent claims and defenses, and pleading in the alternative, does not apply in contested matters, pursuant to Rule 9014(c). Whitebox should not be permitted to do so in its opposition papers.

[10] For example, Whitebox points to the Trade Confirm as evidence "that Cowen believed that Earl had agreed to a trade." (Opp. Br. p.17.) However, that document included "Conditions" indicating mutual assent had not been achieved. (SMF ¶25.) Indeed, in response to a later request by Whitebox for Cowen's upstream confirm with Earl, Schwab stated "1. There is no upstream confirm. 2. WB purchase always subject to execution of transaction with upstream." (SMF ¶55.)

10

### III. THE LUPOFF REPORT IS INADMISSIBLE

Whitebox submitted the Lupoff Report in support of its argument that Earl and Cowen having reached agreement on the price term for a potential trade gave rise to an enforceable Type II preliminary agreement. As in *Westinghouse*, 588 B.R. at 364, the Lupoff Report states it is the custom and practice in the bankruptcy trade claim industry "that when parties have reached an agreement on price [by e-mail or otherwise], they understand that they should negotiate in good faith on other terms" ("use commercial best efforts to close the trade"), subject to the limitation that the buyer has an "out" if it is dissatisfied with the results of its diligence. (*E.g.*, Lupoff Report ¶¶13, 15-16, 18, 27.) The Lupoff Report should not be considered competent summary judgment evidence under Rule 56(c), as it is inadmissible under Rules 702 and 802.

#### A. Rule 702

"In applying Rule 702, courts undertake a three-step analysis: [1] the witness must be qualified as an expert by knowledge, skill, experience, training, or education, [2] the expert's reasoning or methodology must be scientifically reliable, [3] and the testimony must assist the trier of fact to understand the evidence or to determine a fact in issue." *CDX Liquidating Trust ex rel. CDX Liquidating Trustee v. Venrock Assocs.*, 411 B.R. 571, 579 (N.D. Ill. 2009). Whitebox bears the burden of establishing the Lupoff Report's admissibility. *Id*. Whitebox has not satisfied its burden on any of the foregoing requirements.

##### 1. Lupoff is Not Qualified

Whitebox seeks to qualify Lupoff as an expert solely by virtue of his experience. The Advisory Committee Notes caution: "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached [and] why that experience is a sufficient basis for the opinion … The trial judge's gatekeeping function requires more than simply 'taking the expert's word for it.'" The Lupoff Report does not tackle those

11

requirements. Lupoff is also not qualified, because he testified he has not been in the bankruptcy trade claim business for at least the past two decades.[11] At deposition he was not even able to recall the name of a single entity on behalf of which he allegedly purchased a bankruptcy claim, or creditors that he dealt with save a few merchant invoice factors. *E.g.*, Lupoff Tr. 66:16-67:8.

2. The Lupoff Report is Not Reliable

The Lupoff Report is unreliable because Judge Wiles found his conclusions to be wrong, as a matter of both law and practice. As noted in *Westinghouse*:

> [Lupoff's] testimony was extremely vague and self-serving. It described the general practices of traders who regularly deal with each other in this field, but it stopped far short of showing that parties customarily understand that they have made legally binding Type II contracts whenever they agree on price and regardless of whether other terms have been imposed.
>
> I am particularly concerned about this contention because, in other reported cases, parties in this same industry have taken very different positions as to what the alleged prevailing customs are in the industry and as to whether people in the industry believe that any agreement of any kind is formed in the absence of a signed contract. In fact, an affiliate of Seaport has itself successfully argued in New York State Court that a stock trade had no binding effect of any kind because the trade confirmations said that the deal was "subject to" the execution of written documents. The State Court case is *Luxor Capital Group, L.P. v. Seaport Group, LLC*; the trial court decision is reported at 2016 WL 1558847, 2016 N.Y. Misc. Lexis 1454 (April 15, 2016), and the decision on appeal is reported at 148 A.D.3d 590, 50 N.Y.S.3d 70 (2017). I will have more to say about that decision in a few minutes.
>
> I reject the contention that there is a custom in the industry to the effect that communications of the type that occurred here purportedly give rise to enforceable obligations or to partial binding agreements on terms. The vague testimony at trial did not support the existence of any such custom …
>
> If claims traders want their customs to be binding when they deal with non-professionals like [Landstar employees], it is incumbent on them to set forth the terms in a clear and unequivocal way. Contracts are supposed to be matters of

---

[11] Lupoff Tr. (annexed to the accompanying reply declaration) 8:17-19, 46:11-46:14 (Tiburon Holdings, May 1998-November 2003), 48:2-8 (Schultze, November 2003-March 2004), 52:2-9, 54:9-18 (EagleRock, April 2004-January 2005), 55:7-12 (Azura, January-October 2005), 56:21-25 (Robeco, December 2005-December 2007), 9:6-12, 58:18-59:3 (Millennium, February 2008-June 2009), 8:17-19, 60:13-61:23 (Tiburon Capital/Gray & Co., June 2009-April 2017), 62:7-18 (Lupoff Friends & Family, June 2017-), 69:25-70:8 (bankruptcy claim trade experience is principally from MJ Whitman, pre-April 1997).

voluntary agreement. They are not supposed to be traps for the innocent and unwary.

588 B.R. at 364-65.

### 3. The Lupoff Report is Irrelevant

The Lupoff Report is not helpful to a trier of fact. It offers a prohibited legal opinion on whether a potential bankruptcy claim buyer and seller intended to enter into a Type II preliminary agreement on their reaching agreement on the price term for a potential transaction. *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003) ("expert testimony as to legal conclusions that will determine the outcome of the case is inadmissible").[12] The report also opines on bankruptcy claim sellers' intent in a prohibited manner. *U.S. v. Schultz*, No. 14-467, 2016 WL 7409911, at *3 (N.D. Ill. Dec. 22, 2016) ("assertions about another person's 'intent' are neither helpful nor admissible under Rule 702"). And while evidence of industry custom may be used to assist a trier of fact to interpret an enforceable contract, such evidence cannot be used to create an enforceable agreement. *See, e.g., Tilley v. Cook Co.*, 103 U.S. 155, 160 (1880) ("unless some contract is shown, evidence of usage or custom is immaterial"); *Michele Pommier Models, Inc. v. Men Women NY Model Mgmt. Inc.*, 14 F. Supp. 2d 331, 339 (S.D.N.Y. 1998), *aff'd*, 173 F.3d 845 (2d Cir. 1999) ("industry custom does not create a legal obligation"); *Cherry River Music Co. v. Simitar Entm't, Inc.*, 38 F. Supp. 2d 310, 319 (S.D.N.Y. 1999)

---

[12] Whitebox did not dispute that the Lupoff Report calls for legal conclusions in its objection to Earl's prior motion to exclude [ECF No. 7776], which Whitebox incorporates by reference. In its objection, Whitebox proposed "only exclud[ing] any impermissible conclusions." (Obj. p.2.) However, Lupoff's conclusion that agreement on the price term for a potential trade gives rise to an enforceable agreement to negotiate all other terms and close on a transaction is repeated in various forms throughout the report. Were that conclusion stripped out, what would be left would be ¶¶1-12 (statement of qualifications, Rule 26(a)(2)(B) disclosures, and background regarding the bankruptcy claim trade industry) (none of which is helpful to Whitebox) and Lupoff's unfounded assertion that potential sellers that fail to close after reaching agreement on price act in bad faith, which is inconsistent with the view of leading bankruptcy practitioners. Chaim Fortgang and Thomas Moers Mayer, "Trading Claims and Taking Control of Corporations in Chapter 11," 12 Cardozo L. Rev. 1, 19 (Oct. 1990) (quoted in Opening Br. p.18).

13

("industry custom … is relevant to determining the meaning of a contract [but] 'cannot create a contract where there has been no agreement by the parties'").

### B. Rule 802

In its opening brief, Earl argued the Lupoff Report was inadmissible hearsay, citing the Order on the prior motion to exclude [ECF No. 7796, n.2]. Whitebox argues the report is competent summary judgment evidence, because it is submitted under cover of a declaration attesting to the report's authenticity and stating Lupoff has personal knowledge of the facts included therein. (Opp. Br. p.4, n.2.) Respectfully, that is insufficient. The report remains a statement, other than one made by Lupoff while testifying at trial, offered by Whitebox to prove the truth of the matter asserted, under Rule 801(c). Annexing it to a sworn declaration does not make it admissible. *Hot Wax, Inc. v. Warsaw Chem. Co.*, 45 F. Supp. 2d 635, 638 (N.D. Ill. 1999); *see also Schwimmer v. Sony Corp. of Am.*, 637 F.2d 41, 45 n.9 (2d Cir. 1980) (citing *Kern v. Tri-State Ins. Co.*, 386 F.2d 754, 756-57 (8th Cir. 1967)) ("a hearsay affidavit is a nullity on a motion for summary judgment").

### IV. WHITEBOX LACKS STANDING

In its opening brief, Earl argued that Whitebox lacks standing to enforce any alleged Earl-Cowen agreement, because the A&R Agreement on which standing is premised is champertous under N.Y. Judiciary Law § 489(1), and hence void. (Opening Br. pp.18-19.) Whitebox's response is that the relevant inquiry in evaluating a champerty defense is whether the agreement's "sole purpose [was] to permit Whitebox to sue Earl," and questions of intent are not appropriately determined on summary judgment. (Opp. Br. p.19.) That argument fails. The relevant inquiry is not whether the assignment was made for the "sole purpose" of suing on a claim, but whether that is the assignment's "primary purpose." *Justinian Capital SPC v. WestLB AG*, 28 N.Y.3d 160, 163 (2016). There is no reason why that purpose cannot be determined at this stage where, as here, there are no disputed material facts. Indeed, the Court of Appeals determined an assignment

14

champertous in *Justinian*, on a renewed motion to dismiss treated as one for summary judgment. *Id*. at 166.

Whitebox also argues the A&R Agreement's primary purpose was not to permit it to commence legal action against Earl to recover the Claim, citing its final recital paragraph, which states its purpose is to effect the assignment by Cowen to Earl of "Transferred Rights," and Section 1, defining "Transferred Rights" as (a) any and all rights Cowen may have to purchase the Claim directly from Earl, and (b) any and all causes of action Cowen may have against Earl arising out of or in connection with Cowen's attempt to purchaser the Claim on January 12. (SMF ¶76.) That argument likewise fails. That the definition of Transferred Rights includes Cowen's alleged right to buy the Claim directly from Earl is insufficient to defeat summary judgment, because Avallone long since made clear Cowen had no contractual right to buy the Claim and that he would not proceed in further negotiations concerning a sale of the Claim, by ignoring Rosenblum's post-January 12 e-mails and later rebuffing Cowen's demand letter. (*Id*. ¶¶34-44, 57-58.) Cowen and Whitebox likewise made clear their intention in entering into the A&R Agreement was not to permit Whitebox to buy the Claim directly from Earl, but rather to permit Whitebox to file a Transfer of Claim, in Cowen's stead, in exchange for a release of potential claims Whitebox may have had against Cowen. (*Id*. ¶¶64-67.)[13] *Rockwell Automation, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 544 F.3d 752 (7th Cir. 2008) ("National Union argues [XYZ] creates a question of material fact [but] we are not required to draw every conceivable inference from the record, and mere speculation or conjecture will not defeat a summary judgment motion"); *see also Justinian*, 28 N.Y.3d at 168 (speculation by claim assignee that an assignment may have been for a purpose other than permitting the assignee to sue on the claim is insufficient to defeat summary judgment).

---

[13] Whitebox also stated the A&R Agreement's purpose was "to further clarify/sweep up any loose ends regarding Whitebox's right to stand in Cowen's shoes." (SMF ¶80.) Whitebox used that alleged right to litigate against Earl, further evidencing its intention.

15

## **CONCLUSION**

An order should be entered declining to substitute Whitebox for Earl as the owner and holder of the Claim, pursuant to Rule 3001(e)(2), and directing the prompt distribution to Earl of all cash, securities, and other property payable on account of the Claim under the Debtors' chapter 11 plan, together with all interest and dividends paid or accrued on account of said distributions since the plan effective date.

Dated: October 8, 2018

Respectfully submitted,

/s/ Jeffrey Chubak
Joseph D. Frank (No. 6216085)
FRANKGECKER LLP
325 North LaSalle Street, Suite 625
Chicago, Illinois 60654
Tel: (312) 276-1400
Fax: (312) 276-0035
jfrank@fgllp.com

- and -

Jeffrey Chubak (admitted pro hac vice)
STORCH AMINI PC
140 East 45th Street, 25th Floor
New York, New York 10017
Tel: (212) 497-8247
Fax: (212) 490-4208
jchubak@storchamini.com

Counsel to Earl of Sandwich (Atlantic City), LLC