**IN THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| In re:<br><br>CAESARS ENTERTAINMENT OPERATING COMPANY, INC., *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 15-01145 (ABG)<br><br>Jointly Administered |

**DECLARATION OF JEFFREY CHUBAK IN FURTHER SUPPORT OF EARL OF SANDWICH'S SUMMARY JUDGMENT MOTION**

I submit this reply declaration in further support of Earl of Sandwich (Atlantic City), LLC's summary judgment motion. Attached hereto as Ex. 15 is a true and correct copy of the transcript of the deposition of Peter Lupoff. I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 8, 2018

/s/ Jeffrey Chubak

# EXHIBIT 15

**Lupoff Deposition Transcript**

IN THE UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re: )Chapter 11
)
CAESARS ENTERTAINMENT ) Case No. 15-01145
OPERATING COMPANY, INC., ) Jointly
et al., ) Administered
)
Debtors. )
-----------------------------

DEPOSITION OF PETER LUPOFF
New York, New York
Tuesday, August 14, 2018

Reported by:
LISA MURACO
JOB NO. 146105

Tuesday, August 14, 2018
10:00 a.m.

Deposition of PETER LUPOFF, held at the offices of DRINKER BIDDLE & REATH LLP, 1177 Avenue of the Americas, New York, New York, before LISA M. MURACO, a Notary Public of the State of New York.



A P P E A R A N C E S:

STORCH AMINI
Attorneys for Debtor
2 Grand Central Tower
140 East 45th Street
New York, New York 10017
BY: JEFFREY CHUBAK, ESQ.

DRINKER BIDDLE & REATH
Attorneys for Peter Lupoff
1177 Avenue of the Americas
New York, New York 10036
BY: CLAY PIERCE, ESQ.





P E T E R L U P O F F,
called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MR. CHUBAK:

Q. State your full name for the record, please.
A. Peter Lupoff.
Q. Good morning.
A. Hi.
Q. Mr. Lupoff, have you ever been deposed before?
A. Yes.
Q. Can you tell me the matters in which you've been deposed in.
A. The matter regarding a failed trade in Westinghouse, where White Box as plaintiff, Landstar, defendant.
And Fulcrum versus Strategic, which was a failed trade claim, back in -- I think it was 2011.
Q. And prior to the Fulcrum litigation, have you -- had you been deposed in connection





or testified in trial in connection with the failed bankruptcy trade claim?
A. No.
Q. Did you prepare an expert report in connection with the Fulcrum litigation?
A. I did.
Q. Following the conclusion of this deposition, can you provide me with a copy of that report.
MR. PIERCE: We'll take the request under advisement. I think we're in communication right now, trying to get a copy of it.
MR. CHUBAK: Okay.
(Lupoff Exhibit 1, subpoena, marked for identification.)
MR. PIERCE: So just so you understand the process, Peter, Mr. Chubak is going to be marking documents which he's going to be handing to you. Each of them will be called an exhibit. He'll ask you some questions about them. You have a right to read them before answering questions. But that's the first exhibit.

P. Lupoff

THE WITNESS: Okay.

BY MR. CHUBAK:

Q. Have you received a copy of this document before today?

A. It may have come as an attachment to an e-mail. I don't recall it offhand.

Q. Do you understand that this document commanded you to bring certain documents to today's deposition?

A. I don't understand that. Does that -- I can read it now, if you'd like me to.

Q. Yeah, please.

(Witness complies.)

A. This is probably the first time I'm reading it, since that's the first time I've been aware that there was an obligation for today, other than coming.

Q. Okay. I'm going to refer you to the middle of the first page, where there's the italicize word "Production."

It says: "You or your representatives must bring with you to the deposition the following documents."

And then it says: "Says see



P. Lupoff

attached schedule."

A. I see it.

Q. I'm going to refer you to the last page that says "Schedule."

A. Okay.

Q. Do you understand that this document commanded you to bring the documents identified in paragraph 1 through 5?

A. I understand that now, yes.

Q. Do you understand -- your counsel, prior to the start of this deposition -- withdrawn.

Prior to the start of this deposition, Mr. Pierce represented that you had not brought any documents in connection with -- withdrawn.

I'm going to ask you several questions about the documents identified in this list.

The first paragraph asked you to bring the purchase and sale agreement for the last 20 bankruptcy trade claims that you've been involved in.

Can you identify the last 20



P. Lupoff

bankruptcy trade claims that you've been in involved in?

MR. PIERCE: Object to form.

You can answer.

A. I probably couldn't create a complete list of 20. I could probably provide a list that might have 50 to 100 names on it, and contained in that list would be the last 20.

Q. Can you tell me the purchasing entity in connection with those 50 to 100 trades?

MR. PIERCE: Objection to form.

You can answer.

A. Not -- I can probably provide a number of names where it's possible. I don't believe we purchased any trade claims in any of our Tiburon entities, although I'm not 100 percent certain of that. And there were at least a dozen entities that possibly could have been a counter-party. Although more than likely at Tiburon, we used one vehicle for this kind of purpose, and I would have imagined that's where that would have been done.



P. Lupoff

That's a very quick thing to figure out, and also don't believe we brought any in the period of time of 2009 and 2017, when I operated Tiburon.

At Millennium, however, I'm fairly certain we brought one or two, but only one or two. For those, I could probably -- I'm fairly certain I know at least one of them.

And I am unclear if we purchased a second one. That I have a name of a second one, it's plausible.

The entity at Millennium could have been any number of Millennium entities. And since I didn't construct the paperwork for the trade and wouldn't have filed transfers, it would have been a different department within Millennium. Millennium is pretty segmented.

We need to hear from them, given the fact they created separate units or separate specialized investment vehicles in order to do these kinds of transactions. I would not know that.

I could probably come up with five or six various Millennium entities that's

P. Lupoff

plausible and still potentially get wrong what the entity was.

It's also feasible that we own claims at Millennium through a participation structure through a third-party broker-dealer, in which case there wouldn't be a purchase and sale agreement or a 3001, and there would have been ownership of claims.

Q. I'm asking specifically about claim trades that you have been involved in, not Millennium generally.

A. Oh, me?

Q. Yeah.

A. As a person?

Q. Yeah.

MR. PIERCE: Object to the form. You're asking trade claims that Peter Lupoff brought for his own account?

MR. CHUBAK: No. Whether at Millennium that he's personally been involved in. Not a separate department.

A. No, this isn't a separate department. You're asking for the names of the entities, and what I'm saying is, sitting in my



P. Lupoff

seat in Millennium or at any firm where I manage risk, as part of managing risk I have the ability to allocate capital to distress as a strategy, and then within distressed as a strategy, I have the ability to allocate capital to trade claims.

In any way that that expression of risk comes in a document, those entities, Millennium, Robeco, Tiburon, every one of them have multiple vehicles that may be the basis under which the actual paperwork is done.

In all of those places, I would have been the person on a call or through an electronic medium that would have said, "I buy or I sell X, Y, Z trade claim for Y price and Z amount." I might not have done the paperwork, and the entity might not specifically have been, say, Millennium Partners LP or Robeco Weiss Peck & Greer distressed/special sits fund. The fund I ran there might have been an entity that was set up just for the purpose of doing private obligations. And that, I wouldn't necessarily know or recall.

Q. Were you involved in the negotiation



P. Lupoff

of any bankruptcy trade claims while at Millennium?

A. When you say "negotiation," do you mean the documentation, or do you mean the purchase?

Q. Discussions with sellers or potential sellers.

MR. PIERCE: Object to the form. You can answer.

A. Okay. Yes.

Q. Can you identify which sellers or potential sellers you engaged directly.

A. At Millennium in particular, or my last 20?

Q. Within the last 15 years.

A. Yes, I can.

Q. Please, tell me.

A. Okay. So some of the ways in I'm which I'm engaged --

MR. PIERCE: Peter, I'm going to interrupt you. Give him names, okay? That's what he's asking for. Just give him the names. Answer his question as directly and succinctly as you can, otherwise we're



P. Lupoff

going to be here all day.

A. All right.

MR. CHUBAK: Please don't interrupt me mid question other than for an objection.

A. I do need to understand if -- because -- not to parse words, but am I speaking to a seller of trade claims? If I'm speaking to an intermediary, or only to the original vendor?

Q. Are you asking about buying a broker claim?

MR. PIERCE: Object to the form.

A. I don't really distinguish, but yeah, I'm asking if, when you say the last 20 claims I bought, can I name who I bought those claims from, do you mean the original creditor or the vendor itself, or the intermediary that put it together?

Q. Why don't you tell me the person or entity listed on the 3001 notice?

MR. PIERCE: Object to the form.

A. It's easier to tell you who I spoke to and said, "You're done." It's harder to say

P. Lupoff

who was on a 3001, because in some instances, I didn't see the 3001.

In other instances, the dealer may have bought the claims from the original vendors, and then I bought them from a dealer, and the dealer may have been in the chain of title. And therefore, I'm a 3001.

There are very many permutations about how this could get done. I could explain all of those, if you like.

Q. I think I'd like you to explain all of those.

A. Okay.

MR. PIERCE: I'm sorry. Could you read back the last question.

(Question was read back as follows:

"QUESTION: I think I'd like you to explain all of those.")

MR. PIERCE: You can answer.

A. So I'm going to further break it down and ask you the question: Do you want to know just the claims that are bought, or where I have engaged? You're talking about just closed claims, right?



P. Lupoff

Q. Yes.

A. So there's no more than three and no less than one at Millennium.

At Millennium, we spoke to Deutsche Bank's desk on a claim -- I believe that claim was Lehman Brothers. What I don't recall was whether we bought it or not.

And I don't recall who the underlying claimants were, or if they were in -- my belief is that they were in aggregate a variety of claims pooled with Deutsche Bank as the counter-party, and Deutsche Bank selling the participation in an SIV.

Bought a claim, and I don't recall if we did that or not, but that was the structure of that deal.

We bought a claim in the Death Row Records bankruptcy. And I don't recall if we bought that through a broker or through a lawyer. Because we did seek claims both through a broker and through a lawyer. And we bought one.

One of them failed. The broker -- this is my best recollection, was Fulcrum out



P. Lupoff

of Austin. I could be wrong. That's my best recollection. And the lawyer was an LA-based lawyer. I couldn't tell you the name.

And that probably is the sum total of all claims at Millennium that either traded, that we actually closed, or that we attempted to close and didn't.

And like I said, with the Lehman Brothers, I just simply don't recall. But I do recall the structure and the people pretty intimately.

Q. Do you remember the name of the purchasing entity in connection with any of those trades?

MR. PIERCE: Object to the form.

A. In none of those circumstances at Millennium would I have been involved in anything more than a conversation with in-house counsel, who would have done the documentation on terms of the purchase and sale agreement. But the actual entity that held that, as far as I was concerned, if I saw it in my PNL, I owned it. I didn't really need to understand it was MLP LLC or Millennium Partners, LLC. I



P. Lupoff

couldn't tell you.

Q. What about in connection with the Death Row Records bankruptcy?

A. That's exactly what I'm talking about. Those very few trades of Millennium, I couldn't tell you what the entity for Millennium was that housed that asset.

Q. I'm going to refer you to paragraph 5 of the subpoena.

A. Yes.

Q. Have you written on any bankruptcy-related matters in the past 20 years?

A. I was just thinking about this. It's feasible that the closest any came was an article I wrote in 2014 about energy prices crashing and the ramifications for bankruptcy in -- amongst high-yield issuance in the energy sector.

Q. Did that article have anything to do with bankruptcy trade claims?

A. I don't imagine I got specific about instruments, no.

MR. CHUBAK: I'd like to mark this

P. Lupoff
as Lupoff 2.
(Lupoff Exhibit 2, Summary and Opinion of Peter M. Lupoff, marked for identification.)
BY MR. CHUBAK:
Q. Do you recognize this document?
A. I do.
Q. Can you tell me what it is.
A. It's the expert report that I generated related to this case.
Q. I'm going to refer you to page 8 of the report.
A. Okay.
Yes.
Q. It's unsigned. I assume that's a technical defect; is that correct?
A. I've seen versions of this --
MR. PIERCE: Object to form.
Which?
MR. CHUBAK: Which?
MR. PIERCE: You're asking him if it's unsigned, or you're asking him if it's a technical defect?
BY MR. CHUBAK:



P. Lupoff
Q. Is it a technical defect that the version that I was sent was not signed?
A. Yeah, this seems unusual --
MR. PIERCE: Object to the form.
Go ahead. You can answer.
You need to give me a moment to object.
A. Okay. Sorry.
I'm fairly certain I signed the document that was filed, yes.
MR. PIERCE: Counsel, I'm happy to send you a signed copy of this.
MR. CHUBAK: Okay.
BY MR. CHUBAK:
Q. I'm going to refer you to Exhibit A --
A. Yes.
Q. -- on the following page.
Is this a correct copy of your resume as of the date of the report?
A. Yes.
Q. What was your role at Bank of New York? I'm referring to --
A. I was part of a three-person team



P. Lupoff
that started their loan sales and syndications department. I was most intimately involved in the outward-facing part of that process, developing and dealing with the buyers of loans.
Q. Did your team trade bankruptcy claims?
A. No.
Q. What was your role at CIBC?
A. I went to CIBC to start a freestanding loan trading business, where I had authority to trade large syndicated loans independent of the bank's decisions about taking risk.
Q. Is a syndicated loan different from -- withdrawn.
How do syndicated loans trade?
A. How do syndicated --
MR. PIERCE: Object to form.
BY MR. CHUBAK:
Q. How do syndicated loans trade?
MR. PIERCE: Object to form.
You can answer.
A. Would you like me to step you



P. Lupoff
through the process?
Q. Yes.
A. Okay. Today, or then? It differs.
Q. Then.
A. In 1990 -- in 1988 through 1990, there was an explosion in highly leveraged transactions, HLT's, as they were described, which was the bank loan equivalent of the junk bonds and seniored -- and they were -- the loans were seniored to those bonds.
Loans -- the syndicated loans are evidenced by a credit agreement. Credit agreement is signed to by the agent of the borrower. And signatories to that initial syndication are those banks that step up to fund the entirety of the loan that's placed.
When syndication breaks, as the expression goes, parties to the syndicated loan agreement, which are referred to as assignees, or original signatories, have the right to further on sell additional exposure or buy additional exposure in secondary markets.
The secondary market was beginning to develop 1987, on. And so, in my time at

P. Lupoff

CIBC, the way we would do loan trades at the time was, we would make a -- what's referred to as a two-sided market, calling other banks. Other banks would call us. That -- they would hear that the X, Y, Z bank facilities syndicate just broke. They would understand the pricing, the company they're interested in. There was an explosion of foreign bank branch offices that came to the states to allocate capital to syndicated loans.

And the way most of them bought those syndicated loan was in a secondary market, meaning secondary -- the first market being the initial syndication and then the secondary market being how loans were traded.

And then quickly to get through this point for you, a bank would call and say, "I'd like to buy 10 million of the X, Y, Z company loan. Where you would sell it?"

I might say 99, meaning one, you know, penny below par. Maybe we bought it at 98 as part of the original syndicate.

And just to make this simple, say they buy it at 99, I would send them a



P. Lupoff

commitment letter. I would send them a form, an assignment agreement, which by that time was typically an exhibit to the credit agreement.

We would execute that. We would send it to the agent. Oftentimes, it required agent and borrower consent. Such consent not to be unreasonably withheld.

And that buying bank would own the loan. That's the way it worked then.

Q. In your role as vice president at CIBC, were you involved in any bankruptcy trade claims?

A. No.

Q. While at MJ Whitman Third Avenue Funds -- withdrawn.

Your resume states that you managed all activities as principal agent in distressed private obligations for Whitman Funds, while at MJ Whitman Third Avenue Funds.

Did that encompass -- does distressed private obligations include bankruptcy trade claims?

A. Yes.

Q. Do you remember -- do you remember



P. Lupoff

any bankruptcy trade claims that were executed while at MJ Whitman?

A. Yes.

Q. Can you identify them for me.

A. The company -- the bankrupt entities by name?

Q. You could tell me the cases.

A. Sure. And this is -- it'd be a pretty long list. And if you want me to draw in memory, I could go a long time and name names.

Q. I'd like you to tell me the names of the cases.

A. Well, I'm not going to recall without referring to some notes that I have on this. I'm not going to know off the top of my head. But I'll do the best I can.

Q. Okay.

A. That okay?

So the junk bond debacle of the late 80s created this moment where, in 1990, there was a colossal explosion of bankruptcies. There really weren't before that. There was no trading of trade claims or limited trading or



P. Lupoff

trade claims or bankruptcy claims until I was at Whitman. It was just sort of a perfect storm that occurred when I was there.

And the first sort of wave were highly leveraged retail companies. So discount companies like Ames Department Stores, Caldors -- I'll try to even do this in alphabetical order, if I could think about it.

Ames, Bradlees, Caldors, Barneys. Stop & Shop, Grand Union, Elder-Beerman. Kmart. Phar-Mor. It's a P-H. Phar-mor.

C. Eaton & Company. E-A-T-O-N. That was up in Canada.

MR. PIERCE: Spell it again.

THE WITNESS: C. Eaton.

A. It's a big department store chain in Canada.

Herman's Sporting Goods Store.

I'm drawing a blank. I mean, I could, if you would like, over the course of our time today, as names pop in my head -- that sort of the way my memory works.

Q. Sure.

Your resume also indicates that

P. Lupoff

while at MJ Whitman Third Avenue, you ran a department of approximately 8 to 10 professionals.

Can you tell me -- can you identify those professionals and tell me what their roles were in connection with the bankruptcy trade claim business?

A. Sure. Do you want just the people that were related to the trade claim business --

Q. Yes.

A. -- or all of the people?

Q. Just the people related to the trade claim business.

A. Okay. Kevin Wyman, W-Y-M-A-N.

Q. Can you tell me a little bit about what they did in connection with the trade claim basis?

MR. PIERCE: Object to form.

A. So each person by name --

MR. PIERCE: Got to pause.

Object to form.

You can answer.

A. Each person and then specifically



P. Lupoff

what they did?

Q. For example, person A sourced bankruptcy claims.

A. Sure.

Everyone I'm going to tell you about, with one or two exceptions, sourced bankruptcy claims.

I did as well.

And then I would take the bigger claims. Oftentimes, those would be the calls I would make, or the ones where my younger people or more junior people were having trouble.

So Kevin Wyman is one.

Jed Kelly.

Gary Cohen.

Greg Bany. That's B-A-N-Y.

Jeremy Motz, M-O-T-Z.

Sonya Danne. That's S-O-N-Y-A. Her last name, married name now, D-A-N-N-E. She was more administrative on the desk.

I forgot one that was a sourcer also, Allison Cutler. She called trade creditors directly.

Joseph Nadkharni, N-A-D-K-H-A-R-N-I.



P. Lupoff

He acted more in a paralegal-like capacity, processing the paperwork.

There was at the very end of my time there, there was a person named Mary, and I can't remember Mary's last name. I apologize.

Q. Can you tell me which of those persons were involved in negotiating directly with creditors in bankruptcy cases?

A. When you say "negotiate," do you mean paperwork, or do you mean the getting to an oral agreement, an initial agreement on a trade?

Q. Why don't you tell me both.

A. Okay. Every one of those that was a sourcer, as I described, would have been engaged to a degree in getting to "yes." Even if ultimately I had to approve it, a price, they were transmitting that information. "We'll pay you $0.30 for your Barneys -- your $1 million Barneys claim."

When we got to "yes" on that, and we followed up with documentation, to the extent we drove that, which isn't always the case, those sourcers would have distributed to them



P. Lupoff

the first cut of a purchase and sale agreement, or a written confirm, if a written confirmation was done before a purchase and sale agreement.

They would not have written those documents because they would have been somewhat standardized and then customized to the particulars of whatever trade they were working on closing.

To the extent that they were minor issues, which they mostly always were, in terms of negotiating a document, rather than five-day, business day notice to cure an issue, the other side wants ten. We did such a high volume of business that the nuance around that was fairly well understood at one point, what's reasonable. So I gave as much latitude as possible around the simplest of the ministerial aspects of the documentation.

To the extent things became more material, we had in-house counsel at Whitman. As mentioned, Joseph Nadkharni as a paralegal. And then there was me. And we oftentimes would mull over what to do in order to give a trade creditor a document that worked for them and

P. Lupoff

worked for us. So oftentimes, the issues that could arise were easily sorted out and satisfied by thinking it through and discussing it.

Q. So you were involved in the negotiation of trade documentation with creditors; is that correct?

A. We're about talking about me now? Not just --

MR. PIERCE: Object to form.

BY MR. CHUBAK:

Q. You can answer.

MR. CHUBAK: Can you read the question back, please.

(Question was read back as follows:

"QUESTION: So you were involved in the negotiation of trade documentation with creditors; is that correct?")

MR. PIERCE: Object to form.

Do you mean only trade documentation?

MR. CHUBAK: No, trade documents.

MR. PIERCE: Object to form.

BY MR. CHUBAK:



P. Lupoff

Q. I'm going to ask the question again.

When a creditor had an issue with proposed trade documentation, were you involved in the negotiation of that documentation with the creditor directly?

A. Oftentimes.

Q. Do you remember any specific bankruptcy trade claims that you were involved in?

MR. PIERCE: Object to form.

A. Are you asking for anecdotes?

Q. I'm asking for specific creditors that you dealt with.

A. Yes.

Q. Can you tell me their names.

A. Heller Financial. The easiest ones to mention would be the repeat ones, and the repeat ones were the big ones. The big ones were oftentimes factors who were factoring receivables prepetition.

And those kinds of counterparties, I almost most dealt with exclusively, because the scale of the transactions were significant.

Q. Do you remember dealing creditors



P. Lupoff

that were factors?

A. Yes.

Q. What categories of creditors did you deal with directly?

MR. PIERCE: Object to the form.

You can answer.

A. I'm not sure I understand "category." You mean, manufacturer? Service provider?

Q. Sure.

A. Yeah. The full gamut of it. The way we operated as desk, we had 8 to 10 people. I have this visual right now of this desk and sitting in the desk in the center, as I did with people all making the calls that we did, with the ability to pick up on each other's lines.

Over the course of a day, there could a seamless number of calls where Jed or Kevin or Mary, or whoever it was would have something that might require me to come in and help explain. And I would pick up and do that.

In some instances, I would drive it. In other instances, I would just --



P. Lupoff

particularly, if it's much bigger, I might do it entirely myself.

Q. Do you recall the dollar amount of trade claim -- of bankruptcy claims that your desk purchased during the years you were at MJ Whitman?

A. I can speculate on it. I can't tell you an absolute number, no.

It would have been the vast majority of what I have done in my career, in terms of number of claims. Not necessarily the dollar, notional dollar amount.

Q. While at MJ Whitman Third Avenue Funds, did you trade syndicated loans?

A. Yes.

Q. Did your desk -- did other persons at your desk also trade syndicated loans?

A. Similarly, there would have been sourcers for loans. A different exercise. They would have covered banks as a constituent group, not as suppliers.

Q. While at Lehman Brothers from 1997 to '98, did you work as a trader-manager -- withdrawn.

P. Lupoff

In your role as senior vice president at Lehman Brothers, were you involved in bankruptcy trade claims?

A. Yes.

Q. Can you tell me about any specific trades that you were involved in during your one year there.

A. I remember trading Caldors. I remember trading Levitz.

MR. PIERCE: Say that again.

THE WITNESS: Levitz. Furniture company.

A. We wrote a number of bankruptcy-triggered puts for vendors, which meant that we gave them -- they're like an option that gave a vendor the right, but not the obligation, to put claims to us to the extent a company filed that they were doing business with.

The notional amount of that was way larger than actual trades in claims. I believe we did Barneys. Offhand, that's the best I recall.

Q. Do you recall how many bankruptcy



P. Lupoff

trade claims you were involved while at Lehman?

MR. PIERCE: Object to form.

A. Surely, less than Whitman and more than successive --

Q. Was it more than ten?

A. And -- do you mind if I ask for some clarifications.

Q. Of course.

A. Would you distinguish between a trade claim and writing a vendor an option to put a claim to us?

Q. Would you consider those -- withdrawn.

Was a bankruptcy put, as you put it, did that involve a Rule 3001 transfer?

A. If they exercised it, it meant claims were created and they were putting claims to us. In that instance, the claims put to us would have been transferred, yes.

Q. In connection with the documentation of a bankruptcy put, was a Rule 3001 transfer of claim an evidence of transfer signed and filed with bankruptcy court?

MR. PIERCE: Object to form.



P. Lupoff

You can answer.

A. Not with regard to the option created. Only its execution. Right? Because I'd be giving a supplier to Levitz the right but not the obligation to, say, put $20 million of claims to us.

If Levitz didn't file bankruptcy, that put expires. It's worthless. They did file bankruptcy. And in some instances, claims were put to us. When claims were put to us, it required a purchase and sale agreement, and the 3001(e) filing.

Q. Sir, I'm asking about plain vanilla agreements that resulted in the transfer of a claim for a specific dollar amount, not puts.

A. Okay.

Q. Can you tell me if you executed -- if you were involved in more than ten of those bankruptcy claim trades.

A. As best --

MR. PIERCE: Object to form. Just pause.

THE WITNESS: Sorry about that.

MR. PIERCE: Object to form.



P. Lupoff

You can answer.

A. As best as I can recall, and as I think through the volume of puts that we did and how those eventuated in filings, I would assume in excess of ten claims, yes.

Q. Do you recall the entity that filed the claim transfer notice in connection with those trades?

MR. PIERCE: Object to form.

You can answer.

A. Similar to Millennium, a legal department would have done that. I couldn't tell you what the actual entity on the document would have been.

Q. What was your role in connection with those trades?

MR. PIERCE: Object to form. Lacks foundation.

Go ahead.

A. As trader in the prop unit at Lehman for all things private, particularly with a focus on distressed -- I say that because there was a par loan trader that did just performing loans, commercial syndicated loans.

P. Lupoff

All things private and distressed was my purview. I made markets in them, meaning I set prices where we were buyer, prices where we were seller. I did that for proprietary money, as well as for creating markets for client flow through the sell side operation of Lehman to facilitate customer orders.

We thought of trade creditors as no less than clients than we thought of institutional buyers. We would have never really made that distinction. So we would have managed those relationships as well.

Would have spearheaded the decision to do the research work on valuing all things distressed. And in valuing all things distressed, you value entire capital structure of a company that is stressed and near bankruptcy, or is in bankruptcy. We'd be valuing -- the analyst may value bonds. I didn't trade the bonds. I just traded in evaluation of, let's say, Levitz, if they were bonds, I didn't trade them. I just would have been trading bank loans and trade claims and



P. Lupoff

then writing option structures prepetition.

I ran those businesses more narrowly as a trader of those. If anybody in the room at Lehman Brothers in the trading room had a client, whether it's an institutional buy side firm that focussed on distressed, or trade creditors that they might have called because we had a sourcing operation there, too, sort of less extensive than at Whitman, I would have set prices. I would have either communicated directly with a client. Or like at Whitman, I would have communicated through the party that deals with the client.

And then executing and committing risk capital based on an initial commitment, that would have been my obligation solely.

Q. Whether at Lehman or MJ Whitman, were you ever involved in trades that -- where the creditor refused to sign trade documentation after agreement on price was reached?

A. Yes.

Q. Can you identify those potential trades.



P. Lupoff

MR. PIERCE: Can you read the question back, please.

(Question was read back as follows:

"QUESTION: Can you identify those potential trades.")

MR. PIERCE: Can you read the previous question.

Question was read back as follows:

"QUESTION: Whether at Lehman or MJ Whitman, were you ever involved in trades that -- where the creditor refused to sign trade documentation after agreement on price was reached?")

MR. PIERCE: Object to form.

You can answer.

A. I remember -- I have a visceral reaction and memory of those moments because they're infrequent, and they're painful. And in my experiences, in my personal experiences, were entirely about a change in market price that went against the other side, that went against the seller.

I believe I recall one. I don't remember which discount retailer it was. But



P. Lupoff

we bought a claim against a small -- from a small vendor in California, that they themselves were small. The claim was small. $20- -- 30,000 face amount.

And there was a change in the case where claims market prices moved 10 or 20 points higher. And had a conversation where they said, "You won't sue us because we're judgment-proof and it's too small a claim."

That happened once or twice, where in some instances, we would make the commercial decision to pay a higher price, if that was what was necessary, even though it was bad behavior. It was bad faith. And -- but there were at least two or three, I think, over that period of time that you mentioned, Lehman Brothers and MJ Whitman, where people refused to sign documents and walked.

MR. PIERCE: Jeff, the next 10, minutes or 5 minutes, I'm going to need to take a break.

MR. CHUBAK: That's fine.

MR. PIERCE: Want to do it now?

MR. CHUBAK: We could break now, if

P. Lupoff

you'd like.

MR. PIERCE: Great.

(Recess is taken.)

BY MR. CHUBAK:

Q. So prior to our break I had asked you a question about bankruptcy trade claims that failed to close because the creditor declined to enter into trade documentation.

Do you recall that?

A. Yeah, I recall your question. Yes.

Q. And you had mentioned that you recall two or three trade claims that failed to close -- withdrawn.

And do you recall having mentioned that while at Lehman Brothers or MJ Whitman, you recall two or three trade claim where -- that they were never documented following agreement on price?

MR. PIERCE: Object to form.

A. Is that the same question? I don't follow.

Q. I'm asking you if you -- withdrawn.

I had asked you about bankruptcy trade claims where written documentation wasn't



P. Lupoff

entered into following an agreement on price.

Do you recall that?

A. Yes.

Q. Do you recall your answer to the question?

A. Yes.

Q. So while at Lehman or MJ Whitman, how many -- how many trades do you recall where -- where you were unable to enter into trade documentation following agreement on price?

MR. PIERCE: Object to form.

You can answer.

A. Two to three, but only because the other side refused to do documentation.

Q. Did you consult with internal counsel about those trades?

MR. PIERCE: I'm going to object to form, and also instruct the witness not to answer that. That's privileged.

MR. CHUBAK: I'm not asking about privileged communications.

MR. PIERCE: You just asked him whether he talked to a lawyer about whether or not --



P. Lupoff

MR. CHUBAK: It's a "yes" or "no" question. I'm not asking about privileged communications.

MR. PIERCE: You're asking whether he talked to a lawyer about specific subject matter. That means you're getting into the content of communications. If you want to ask whether he ever spoke to any lawyers at any of these places, you can do that.

I think you asked about the subject of the conversation. You traipsed through the line of privilege, and I have to instruct him not to answer.

MR. CHUBAK: I respectfully disagree.

MR. PIERCE: That's fine.

MR. CHUBAK: I'm not asking about a privileged communication.

MR. PIERCE: You can't answer the question.

You can ask your next question.

BY MR. CHUBAK:

Q. Did any of those failed trades



P. Lupoff

result in lawsuits?

A. I don't recall. Certainly not to the extent where I was engaged in something ongoing.

Q. Do you remember the names of the trade creditors in connection with those trades?

A. I do not.

Q. Why did you leave Lehman in May 1998?

A. I had done a lot, I felt. I was grateful for my time in investment business and wanted to try some new things.

I had gown a little weary of large institutions after being so integral to the way things worked at Whitman and Third Avenue. Lehman was an awesome institution with very good people, but it left me at a place where I wanted to try new things, and I tried new things.

Q. What is Tiburon Holdings LLC?

A. You're talking about the time period post Lehman?

Q. Yes.

P. Lupoff

A. It was an LLC that I had formed for the purposes of doing a variety of different activities post my investment management career, and was the entity that I operated through as a limited liability company.

Q. Were you the sole member of the LLC?

A. Yes.

Q. Did you have outside investors?

A. No.

Q. Did Tiburon Holdings LLC trade bankruptcy claims?

A. No. We owned one claim, but we didn't trade claims.

Q. How did Tiburon Holdings LLC come to acquire that claim?

MR. PIERCE: Object to form.

A. We were a vendor to a bankrupt debtor.

Q. Oh, okay.

What was the debtor?

A. A company called hookt.com. H-O-O-K-T.com

Q. Did Tiburon Holdings LLC sell that claim?



P. Lupoff

A. We kept it. We contemplated it, but we kept the claim.

Q. Did Tiburon Holdings trade syndicated loans?

A. No.

Q. What is Schultze Asset Management LLC?

A. Schultze Asset Management is a distressed manager in Purchase, New York.

Q. Can you tell me who the members are of Schultze Asset Management?

A. I believe to this day --

MR. PIERCE: Object to form.

You can answer.

A. I believe that George Schultze is the sole manager -- sole member.

Q. Did Schultze Asset Management trade bankruptcy claims?

A. Yes.

Q. Can you tell me how big -- withdrawn.

Did Schultze Asset Management have a bankruptcy trade claim desk?

A. No.



P. Lupoff

Q. Who at Schultze Asset Management was responsible for trading bankruptcy claims?

A. Me.

Q. Do you recall how many bankruptcy trade claims you entered into at Schultze Asset Management?

A. Under five.

Q. Do you remember what cases offhand?

A. Offhand, I just call a company called Footstar.

MR. PIERCE: Spell that.

A. F-O-O-T-S-T-A-R.

Q. Were you responsible for sourcing bankruptcy claims?

A. I don't -- I can't answer that question in a simple way.

Q. Can you answer it in a nonsimple way?

A. Schultze was a distressed manager. With a focus on distress, we would have engaged broker-dealers, and we would have acquired claims most likely through broker-dealers. And I would been the point person for working with the broker-dealers on claims.



P. Lupoff

Q. Which brokers did you work with?

A. I won't recall offhand.

Q. Can you tell me the approximate dollar amount of the under five bankruptcy trade claims that were purchased at Schultze.

A. I can't say I recall.

Q. Do you recall the name that the entity identified as the purchaser on the Rule 3001 transfer?

A. I can't say I recall that either.

Q. What is EagleRock Capital Management?

A. Event-driven hedge fund here in New York at the time.

Q. Why did you leave Schultze to go to EagleRock?

THE WITNESS: Is it appropriate to ask for a moment with you to talk about this?

MR. PIERCE: Nope. You've got to answer his question.

MR. CHUBAK: No.

A. I believe that I saw some things that, morally, I couldn't accept at that firm,

P. Lupoff

and left. And as did our senior analyst.
Q. Did those morally questionable things have anything to do with the bankruptcy claim trade --
A. No.
Q. -- business segments?
What was your role at EagleRock?
A. I was a co-portfolio manager. Focussed largely on distressed and all things private.
Q. In your role as portfolio manager, did you trade bankruptcy claims?
A. I did.
Q. Can you tell me how big the bankruptcy trade -- withdrawn.
Do you have a bankruptcy trade claim desk at EagleRock?
A. No.
Q. Can you tell me who at EagleRock was responsible for trading bankruptcy claims.
A. That would be me.
Q. Was it just you?
A. We had a paralegal that helped settle all things private, including trade



P. Lupoff

claims.
Q. How did you source bankruptcy claims?
A. Similarly, as would be the case with all of the hedge funds that I worked at, largely through intermediaries.
Q. When you say all of the hedge funds that you worked at, does that include Lehman Brothers?
A. No, Lehman Brothers is an investment bank for prop desk. Although, there, too, we probably sourced most of our claims through brokers.
Q. At MJ Whitman, did you also source most of your claims through brokers?
A. We had a sourcing team, as I laid out for you. Although, we did buy from brokers from time to time.
Q. While at EagleRock, did you ever -- did EagleRock -- withdrawn.
Do you recall the name of the entity listed as the transfer on the Rule 3001 transfer for bankruptcy claims purchased?
A. I couldn't tell you, no.



P. Lupoff

Q. In your role as portfolio manager at EagleRock, how many bankruptcy trades were you involved in?
A. In number of transactions, probably 5 to 10. However, in one or two transactions, those transactions may have been pooled claims, where the actual number of claims were significant.
MR. CHUBAK: Can you read that back.
(Answer was read back as follows:
"ANSWER: In number of transactions, probably 5 to 10. However, in one or two transactions, those transactions may have been pooled claims, where the actual number of claims were significant.")
BY MR. CHUBAK:
Q. What is a pooled claim?
A. When we were talking about Lehman, for example, and I described how Deutsche Bank might have sold a hundred million dollars' worth of Lehman claims in a participation.
I believe at EagleRock we bought at least one claim from Goldman Sachs, where we participated in a much larger number of claims



P. Lupoff

that were pooled together to create one structured product, if you will.
So a hundred million dollars of Parmalat claims sold by Goldman Sachs, EagleRock might have taken 25 million of that, but the Parmalat claims that made up that hundred million dollar pool might have been thousands of claims.
Q. While at EagleRock, do you recall ever having purchased -- been involved in purchase of a nonbroker claim?
A. Yes.
Q. Can you identify that claim or claims.
A. Yes. I believe it was Footstar.
Q. Do you recall the name of the creditor whose claim you purchased?
A. I do not.
Q. Do you recall the dollar amount?
A. I don't.
Q. Do you recall the name of the entity that's listed as the transferee on the Rule 3001 transfer?
A. No.

P. Lupoff

Q. How many claims were you involved -- withdrawn.

How many bankruptcy claims were you involved in the purchase of in Footstar?

A. I can't say I recall.

Q. Was it more than one?

A. Yes.

Q. How many nonbrokered bankruptcy claim transactions were you involved in at EagleRock?

A. I can't say I recall.

Q. Was it more than ten?

A. We didn't do more than ten in total.

Q. Okay. So --

A. So some subset of that.

Q. And did you do more than five?

A. I'm sure not.

Q. And one of those five was a -- was a participation transaction that you referred to earlier?

A. One of the 5 to 10 was in a Parmalat trade with Goldman, yes.

Q. Why did you leave EagleRock to go to Azura Capital Partners?



P. Lupoff

A. An opportunity to start and run my own fund for the first time with a partner who was a good friend of mine.

Q. Who is that partner?

A. Mark May, M-A-Y.

Q. In your role as co-portfolio manager at Azura, did you trade bankruptcy claims?

A. I would have, but Azura raised the money and then returned the money. We never operated -- we never took in outside capital and deployed that capital.

Q. Why was the capital not deployed?

A. My partner chose to return back to his much larger firm and we wound down the launch.

Q. Was is Robeco U.S.A.?

A. Robeco is a Dutch parent. 3 -- at the time, a $380 billion asset manager in Europe.

Q. In your role as portfolio manager at Robeco, were you involved in the acquisition of bankruptcy claims?

A. Yes.

Q. Can you tell me if you bought broker



P. Lupoff

claims?

A. Yes.

Q. Did you buy nonbroker claims as well?

A. I can't say I recall.

Q. Which brokers did you utilize?

A. I won't know off the top of my head, specifically. I will say over the entirety of my career working at hedge funds, where we bought through brokers, there were just a handful that were regular and that anyone would have used, and would have been the people that we dealt with day in/day out, speaking about markets and pricing and ultimately, executing where we bought claims.

But I'm never -- unless there's a unique circumstance where I remember it, it's going to be hard for me to recall the specific broker-dealer.

Q. How many bankruptcy claims were you involved in the purchase of while at Robeco, brokered or nonbrokered?

A. Five or less would be my guess, as best as I can recall.



P. Lupoff

Q. What was the extent of your involvement?

A. Similarly, I would have been the point person for pricing risk, for valuing claims as part of the larger capitalization of a bankrupt company. For buying those claims, for then executing in markets, committing capital, but then ultimately turning the paperwork to in-house counsel to document.

Q. Do you recall the name of the purchasing entity listed on the Rule 3001 transfer?

A. I know specifically at Robeco there was an SIV, and I couldn't tell you the name of it.

Q. Did you trade syndicated loans while at Robeco?

A. Yes.

Q. Why did you leave Robeco for Millennium?

A. Robeco wanted to wind down its U.S. asset management business. And while we could have stayed and gone through some sunset period with them, Millennium had made overtures and

P. Lupoff

made a very attractive offer to take our team over to Millennium.

Q. How big was your team?

A. Three.

Q. Was anyone on your team involved in the five or less bankruptcy trade claims that you entered into, that you were involved in at Robeco?

A. Can you repeat that, please.

(Question was read back as follows:

"QUESTION: Was anyone on your team involved in the five or less bankruptcy trade claims that you entered into, that you were involved in at Robeco?")

A. Do you mean in terms of pricing or execution? No.

Q. How many bankruptcy trade claims for you involved in at Millennium?

MR. PIERCE: Objection. Asked and answered.

You can answer.

A. By "involved," you mean actually closed?

Q. Sure.



P. Lupoff

A. Just the one to two -- one, two, or three that we discussed.

Q. Were you involved in any bankruptcy trades that failed to close while at Millennium?

A. Yes.

Q. Can you describe those.

MR. PIERCE: Object to form.

A. There was one. It was the Death Row Records claim. The vendor, upon due diligence after we agreed on price and amount, appeared to have sold the claim to somebody else at the same time.

Q. Did that failed trade result in a lawsuit?

A. No.

Q. Do you remember the size of the claim?

A. In excess of 25, maybe in excess of 50 million.

Q. Do you remember the name of the creditor?

A. It was a rapper.

Q. Do you recall which rapper?



P. Lupoff

A. I think I do. I think it was -- unless it's the one we bought. I think this is the one that failed.

I think his name is Daz, D-A-Z. Dillinger, D-I-L-L -- like the gun, however that's spelled.

Q. Why did you leave Millennium?

A. Enormous opportunity in bank debt coming out of the financial crisis. And Millennium had no interest in doing less liquid obligations after the financial crisis.

Q. Is Tiburon Capital Management LLC separate from Tiburon Holdings?

A. Yes.

Q. Are you the sole member of Tiburon Capital Management?

A. I wound down to run Capital Management, unless you want to talk about a time period.

Q. Yeah.

I'm asking, when did you wind down Tiburon Capital Management?

A. In June of 2017, I think.

Q. What was the dollar amount that you



P. Lupoff

managed in or about June 2009 to September 2012, say, before you joined Gray & Company?

A. I think we were $65 million in assets under management when we sold the business to Gray & Company.

MR. PIERCE: Is that million or billion?

THE WITNESS: Million.

BY MR. CHUBAK:

Q. About how much of your portfolio was allocated to bankruptcy trade claims?

A. At Tiburon in that time?

Q. Correct.

A. I'm fairly certain it was zero.

Q. What about after Tiburon was sold to Gray & Company?

A. The assets that we managed expanded significantly. We still didn't do trade claims, to the best of my recollection.

If we had a claim, it was an oversight. It wouldn't be significant.

Q. What is Lupoff Friends and Family Interests LLC?

P. Lupoff

A. It's my family office for investing personal capital.
Q. Do you have outside investors?
A. I do not. Not other than family members.
Q. Does Lupoff Friends and Family Interests buy bankruptcy claims?
A. We do not buy claims directly.
Q. How do you buy bankruptcy claims?
MR. PIERCE: Object to form. Mischaracterizes his testimony. Lack of foundation.
Go ahead.
A. We can allocate capital third-party managers. And the among the third-party managers we're allocating capital to is a hedge fund that invests in trade claims.
Q. What is the name of that hedge fund?
A. Hain, H-A-I-N, Capital.
And we've made a commitment. We have not allocated, but we made a commitment.
MR. PIERCE: Jeff, I just want to give you some forewarning. At 12 o'clock, I need to do a brief call in another



P. Lupoff

matter. I just want to let you know that's coming.
MR. CHUBAK: Okay. That's fine. How long a call do you think? I don't think we need a need a lunch break, frankly.
MR. PIERCE: I thought that there was, when I scheduled for that. So I apologize for that.
(Discussion held off the record.)
BY MR. CHUBAK:
Q. I'm going to refer you to page 1 of your report.
A. Okay.
Q. Where you wrote that you base your opinion on your long history in the claims trading field and multiple billions of dollars of consummated trades that you participated in over the past 25 years.
A. Yes.
Q. Is your experience principally based on your time at MJ Whitman and Lehman?
MR. PIERCE: Object to form.
A. No.



P. Lupoff

Q. What is it based on?
A. I have a career that's over 25 years of engaging in private obligations. Specifically, covering all creditors and interest, whether they're trade creditors, factors, or institutional buy side clients.
At Whitman, we operated as principal buying claims at Whitman, as well, for our underlying funds. I ran a fund there that invested in claims.
Subsequent to that, I've always had distressed as part of the mandate of every asset manager I worked at.
Q. So when you're referring to multiple billions of dollars of consummated trades --
MR. PIERCE: Did you finish your answer?
THE WITNESS: No.
MR. PIERCE: Let the witness finish his answer. Thank you.
A. So at all of the hedge funds where I've worked, were distressed as part of the strategy, trade claims is one of the ways that you can express an investment. And so, at all



P. Lupoff

of those firms, whether we bought one claim in that year or we were highly active in the prior years, it's in the capitalization of companies we value. Would not choose trade claims just because we want to own trade claims. Because my allocation, my strategy was never that narrow.
So trade claims as a prospect to invest in, I would have been in markets daily, bidding claims, valuing claims, but may have chose other parts of the capitalization to express that risk. And/or I might have bid for claims and just simply not got the chance to buy them.
And then finally, with my time at Tiburon and Lupoff Friends and Family, the work around the trade claim sector involved to more advisory. So when Tiburon was bought by Gray & Company, I became Gray & Company's chief investment officer, I provided advisory work to pension endowment clients. And the pension endowment clients we advised, many of them had investments with managers that did distress, and I would spend the time to talk about the

P. Lupoff

narrow strategies of some of these firms with regard to trade claims, and would need to remain steeped in the trade claim markets, how their opportunities there were relative to other parts of the capitalization.

Q. When you wrote that you have been involved in billions of dollars of consummated and some failed to revise trades, are you referring to bankruptcy trade claims and other distressed opportunities or just bankruptcy trade claims?

A. Just trade claims.

Q. You testified earlier today that you didn't recall a number of any -- withdrawn.

Is it your testimony today that you've been involved in multiple billions of dollars of consummated bankruptcy trade claims?

A. Yes.

Q. Earlier today, I asked you about the names of the purchasing entities on those bankruptcy trade claims, and you couldn't give me -- identify the name of the transferee on the Rule 3001 transfer; is that correct?

A. Correct.



P. Lupoff

Q. Earlier today, I asked you questions about trade creditors that you engaged with directly, and you couldn't give me the names of trade creditors other than a few factors; is that correct?

MR. PIERCE: Object to form.

A. That's correct.

Q. So when you say you were involved in multiple billions of dollars of consummated bankruptcy trade claims, what was the degree of your involvement?

MR. PIERCE: Object to form.

You can answer the question.

A. The notional amount of the claims that I recall trading.

I don't think you asked for a dollar amount attached to any particular name. You just asked names.

But when I just think of a handful, I get pretty quickly to some numbers that make it easy to believe it is in excess of 2 billion, and probably in excess of 10,000 claims in number, considering that many of the claims were pooled or were buying factored



P. Lupoff

claims from a Heller or from a Sanwa credit.

I don't think those numbers are outside of the scope of people that --

MR. PIERCE: There's no pending question.

THE WITNESS: Okay.

MR. CHUBAK: Please let him answer. Let him finish his question.

MR. PIERCE: He wasn't asking a question. He was answering.

Counsel, the last couple of questions you have been -- your facial expression has suggested a certain incredulity, that you don't believe the numbers that are written down on the firm. And I wouldn't say that they were harassing, but they're definitely -- you're challenging him.

Why don't you ask some questions about some facts, and then he could give you those. I'm sure you'll have ample opportunity to argue to the Judge about why this witness's CV is -- I'm not done yet.

MR. CHUBAK: You could object to



P. Lupoff

questions --

MR. PIERCE: You can't cut me off.

MR. CHUBAK: You can object to questions, but speaking objections aren't permitted.

MR. PIERCE: I'm not objecting.

MR. CHUBAK: Okay.

MR. PIERCE: I'm saying that what you've been -- you've been treating the witness in a way which I think falls outside the bounds of propriety. If you could be polite and respectful to him, I would appreciate it. And also, if you could start asking some questions about actual facts, rather than reviewing the testimony you've already obtained and asking him to admit that somehow that just proves what's in his report. It doesn't. You can keep doing that, if you want to, but it's not very productive.

MR. CHUBAK: I'll continue questioning my witness. Thank you.

BY MR. CHUBAK:

Q. How many nonbrokered bankruptcy

P. Lupoff

claim trades have you been involved in over the course of the past 25 years?

MR. PIERCE: Object to form.

A. Vast majority of the time that I was at Whitman, and then a small portion of the claims subsequently went at either hedge funds or on the prop desk at Lehman.

Q. After you left Lehman, do you recall having been involved in the purchase of nonbrokered bankruptcy claims?

A. Yes.

Q. Can you tell me where and under what circumstances.

MR. PIERCE: Object to form.

A. I think I mentioned that we bought a Footstar claim from a vendor directly. I think that was at EagleRock.

Q. Do you recall the --

MR. PIERCE: Are you done with your answer, sir?

THE WITNESS: Yes.

BY MR. CHUBAK:

Q. Do you recall roughly the dollar amount of nonbrokered bankruptcy claim trades



P. Lupoff

that you purchased?

MR. PIERCE: Ever?

BY MR. CHUBAK:

Q. While at MJ Whitman or Lehman?

MR. PIERCE: Object to form.

You can answer.

A. The dollar amount other than if those two firms, that were non- --

Q. Yeah, other than at those two firms.

A. I don't remember those numbers specifically, no.

Q. Do you remember roughly the dollar amount while at MJ Whitman?

MR. PIERCE: Object to form. Dollar amount of what?

MR. CHUBAK: Of nonbrokered bankruptcy claim trades with which Mr. Lupoff was involved in the purchase of.

MR. PIERCE: Thank you for the clarification.

Object to form.

You can answer.

A. I can come up 300 million-plus easily just in a handful of trades without



P. Lupoff

thinking more than that. But I've not really thought of it in that context before.

Q. When dealing with bankruptcy claims, did you distinguish between trade claims -- what does the word "trade claim" mean to you?

A. Trade claim is the obligation of a bankrupt debtor to a vendor or service provider for an unpaid bill. It's usually evidenced by an invoice or a bill of lading.

Q. Do you recall the approximate dollar amount of trade claims -- trade claim purchases that you were involved in at MJ Whitman, nonbrokered?

MR. PIERCE: Object to form. I think also asked and answered.

But go ahead.

A. Like I said, I can think of a handful, maybe four or five, a number that get us in excess of 300 million, much less the thousands more we did.

But, no, I can't come up with a number offhand.

Q. Can you identify those three or four? Who -- can you identify those three or



P. Lupoff

four?

A. We did in excess of 150 million with Heller in one Kmart transaction alone.

In the Phar-Mor bankruptcy, where the creditors were drug companies, the claims tended to be between 25 and 75 million. We did four or five of those at least.

As I think it through anecdotally, I can put those together, as I've done in the past, in preparation for these kinds of conversations. But without referring to notes, I can't remember off the top of my head more than that for the time being.

You know, we got to be -- well, one other thing --

MR. PIERCE: There's no question pending.

THE WITNESS: I'm sorry. I'm still answering his particular question.

A. In the C. Eaton bankruptcy, if you were to look at the dollar amount of the general and secured, we were more than a third of the class, whatever that would have been.

And I couldn't tell you what that is

P. Lupoff

in number. But there would be a couple of cases where the totals would have been -- our objective was to get to a control part of the general and secured class. So another way to back into it would be to look at the general and secured class in a case and then calculate at least a third, and that would be my estimate on some of them.

Q. In the second-to-last paragraph of the first page, you mentioned that FINRA has stated that orders for securities transactions are contracts, and that most security orders are verbal.

Is FINRA involved -- is FINRA responsible for regulating the bankruptcy trade claim business?

A. No.

Q. What does FINRA have anything to do with bankruptcy trade claims generally?

MR. PIERCE: Object to form.

A. I believe that it sets up an understanding amongst laymen that have any familiarity with shares trading, stock trading, of the actionability of oral commitments.



P. Lupoff

And so, my point is that decision-makers amongst trade creditors are, to a degree, very well informed and understand what their oral commitment means, especially with dealing a financial party on the other side.

Q. Is the bankruptcy trade claim market regulated?

A. You mean --

MR. PIERCE: Object to form.

A. -- by a regulatory entity?

Q. Sure.

A. No.

Q. Is bankruptcy claim trades securities -- I'm sorry. Withdrawn.

Are bankruptcy claims securities?

A. I'm not a lawyer to parse words over whether it's a security or not. But to my knowledge, it isn't.

But we in the business, we in the industry will think about financial obligations that arise that in often instances would pursue similar claims that are securities as trading like them.



P. Lupoff

Q. I'm going to refer you to paragraph 3.

A. Page 1?

Q. Of page 2.

A. Okay.

Q. What is GAIM, G-A-I-M?

A. Global Alternative Investment Management. It's an, entity, a European entity.

Q. Which fund was awarded top emerging distressed manager?

A. Schultze.

Q. Remind me again, did you trade bankruptcy claims while at Schultze?

A. Yes.

Q. Is this the fund where there were under five bankruptcy trade claims handled by you?

MR. PIERCE: Object to form.

You can answer.

A. Plus or minus 5. 5 to 10, maybe. I don't recall.

Q. What is MARHedge?

A. I don't recall what MAR stands for,



P. Lupoff

but it's another hedge fund industry firm that does conferences and gives out awards. It's San Francisco-based, I believe.

Q. When were you awarded MARHedge's event-driven manager award?

A. That was at EagleRock.

Q. And when were you awarded institutional investor?

A. We just nominated -- that was at Robeco.

Q. In paragraph 4, you state that you're a regular featured discussant on academic papers.

When have you been featured as a discussant on academic papers regarding market stocks and liquidity?

A. With -- just broadly or...

Q. Broadly.

A. Most recently, as part of a workshop up at Yale School of Management last semester. I'm sorry. Talking semester terms, that would be, like, February or March of last year.

December at Yale School of Management. A number of times with the Fed at

P. Lupoff

regular, year-end meetings that they did. I probably haven't done one of their regular meetings since 2010.

And then informally with the Fed since then. When I say "informally," not as part of any organized discussion. More in a conference room behind closed doors.

Q. Have you written any white papers on bankruptcy-related matters?

A. The closest one I think may be one I did on the shock to oil price back at the 4th quarter of 2014 and its impact on high-yield issuers and the energy patch prospect for bankruptcies, to the best of my recollection.

Q. I'm going to refer you to paragraph 7, where you state that you participated, in your estimate, well over 10,000 trade claims, totalling multiple billions of dollars in value.

Was that experience principally at MJ Whitman?

MR. PIERCE: Object to form.

Asked and answered.

You can go ahead.



P. Lupoff

A. No, that was surely a time where I was very actively in markets because I ran a desk that was actively involved in markets.

It was at the outset of that business becoming more material. But it's hard to say, because some of the later trades that I have been involved in, where they were either pooled or participations in SIVs, might have been larger in terms of the number of claims. There's a difference between, say, the number of claim and the dollar, notional amount traded.

MR. PIERCE: Jeff, I apologize, but I've got to take a break at this point.

Let us go off the record.

(Recess is taken.)

BY MR. CHUBAK:

Q. I'm going to refer you to the portion of your portfolio that begins with paragraph 13.

A. Yes.

Q. Do you believe that when agreement is priced -- withdrawn.

Is it your testimony that when an



P. Lupoff

agreement on price is reached with a trade creditor, that the enforceable bankruptcy trade claim agreement exists?

MR. PIERCE: Object to form.

You can answer.

A. Price and amount. On price and amount, the buyer owns the claim risk transfers.

Q. What is the basis for your belief that that's the case?

A. From my experiences in the trade claim business over the last 25 years or so, the reasonable expectations of the parties and the trades, that they are bound by their oral agreements.

Q. Have you ever shared your beliefs with others in the bankruptcy trade claim business?

MR. PIERCE: Object to form.

A. Yes.

Q. Can you tell me who you've discussed your beliefs with in the bankruptcy trade claim business.

A. Lawyers. Other traders of claims.



P. Lupoff

Buy side clients. Trade creditors. Vendors.

Q. Can you tell me what other bankruptcy claim trade purchasers you've discussed that with.

MR. PIERCE: Objection to form.

You're asking him to give you individual names?

MR. CHUBAK: Yeah.

MR. PIERCE: Okay.

A. I can't with any specificity.

Q. Do you go to any bankruptcy claim trade events?

MR. PIERCE: Object to form.

A. I don't think I've ever seen a bankruptcy claim trade event.

Q. Are you member of the American Bankruptcy Institute?

A. No.

Q. Are you a member of the Turnaround Management Association?

A. No.

Q. Are you a member of any bankruptcy-related organizations?

A. No.

P. Lupoff

Q. Have you ever been a member of the American Bankruptcy Institute, Turnaround Management Association, or similar organization?

A. Perhaps my institutions have. I don't recall. But I would say the greatest volume of conversations in public forums about this topic, if that's what you're driving at, are at industry conferences around stressed investing. And that, I have done quite a bit.

MR. CHUBAK: Can you read that back.

(Answer was read back as follows:

"ANSWER: Perhaps my institutions have. I don't recall. But I would say the greatest volume of conversations in public forums about this topic, if that's what you're driving at, are at industry conferences around stressed investing. And that, I have done quite a bit.")

BY MR. CHUBAK:

Q. When you refer to distressed investing, are you referring to syndicated loan trading?

MR. PIERCE: Object to form.



P. Lupoff

A. No.

Q. What are you referring to?

A. All obligations that can trade the bankrupt debtor, which would include bank loans, trade claims, bonds, equity, anything in a bankrupt debtor's capitalization.

Q. Are you in touch with people who buy trade claims, bankruptcy claims professionally?

A. Yes.

MR. PIERCE: Object to form.

BY MR. CHUBAK:

Q. Can you identify those persons.

MR. PIERCE: Object to form.

You can answer.

A. How broad a list do you want?

Q. Can you tell me the name of people that run funds specifically oriented towards buying bankruptcy claims, that you interact with.

MR. PIERCE: Object to form. You've got to pause, let me object.

You can answer the question, if you understand it.

A. Just bankruptcy claims? When you



P. Lupoff

say "bankruptcy claim," are you including the whole capitalization of companies, or just trade claims? A distressed investment entity?

Q. Persons who manage funds that focus principally on buying bankruptcy claims.

A. First of all, there are not that many that focus principally on buying trade claims. But specifically within the last two weeks, I've talked to two.

Q. Can you tell me who those persons are.

A. Rob Koltai at Hain Capital. That's K-O-L-T-A-I. And Vladimir Jelisavcic. And I will botch his name terribly. It begins with a J. His firm is Bowery Capital.

MR. PIERCE: Spell that.

A. B-O-W-E-R-Y.

Q. Have you spoken with Vlad about your belief that an enforceable agreement exists upon reaching an agreement with respect to price?

MR. PIERCE: Object to form.

You can answer.

A. Possibly. Probably in the last



P. Lupoff

25 years. Not within the last week.

Q. Do you recall having had any discussion with Vlad?

A. At all?

MR. PIERCE: In the 25 years?

BY MR. CHUBAK:

Q. About the subject matter that I'm asking about, specifically whether an enforceable agreement --

A. I don't recall.

MR. PIERCE: You've got to pause. You have to pause, okay?

THE WITNESS: I'm sorry.

MR. PIERCE: Object to form.

A. I don't recall offhand.

Q. Is it fair to say that your belief that an enforceable agreement exists upon reaching agreement with a bankrupt -- with a creditor on price of their bankruptcy claim -- withdrawn.

Is your belief that an enforceable agreement exists upon reaching agreement with respect to price and amount of a bankruptcy claim trade based on your -- based on your --

P. Lupoff

based solely on your experience?

A. Can you repeat that.

MR. PIERCE: Object to form. I don't think that was a sentence.

A. I didn't really understand.

Q. I'm going to refer you to paragraph 18 of your report.

Can you tell me what form a written confirmation would take following an oral confirmation.

A. If an oral confirmation, in which I've written this report, could be face-to-face, by telephone, by e-mail, text. And the written confirmation is a longer writing, incorporates those terms, typically in a one-page or two-page writing.

A written confirmation will reiterate price and amount, and then will expand on some additional terms that are ministerial, that are required in order to generate a purchase and sale agreement.

Q. Is a written confirmation signed by the parties ordinarily?

MR. PIERCE: Object to form.



P. Lupoff

You can answer.

A. I've seen them and generated them not requiring execution. I've seen them and generated them requiring only my execution. And then I've seen them and generated them with two-party execution. And not in all trades have written confirmations been created, in my experiences.

Q. In your experience, what bankruptcy claim trades that did not have a signed written confirmation were considered enforceable?

MR. PIERCE: Object to form. He's not a lawyer. You're asking a legal question.

You can answer.

A. Well, I have thought, based on my experiences and the people that I've done business with, that my oral commitments, that oral commitments are enforceable. If I understand your question.

Q. Would you consider an oral commitment enforceable if the written confirmation states that it's subject to written documentation?



P. Lupoff

MR. PIERCE: Object to form.

You can answer.

A. Can you repeat that more time, please.

(Question was read back as follows:

"QUESTION: Would you consider an oral commitment enforceable if the written confirmation states that it's subject to written documentation?")

A. Okay.

MR. PIERCE: I'm sorry. Read it again.

BY MR. CHUBAK:

Q. You know what, withdrawn.

MR. PIERCE: Yeah.

BY MR. CHUBAK:

Q. Are you aware of any lawsuit that has been brought for breach of duty to negotiate the bankruptcy claim trade agreement in good faith after the parties reach agreement on price?

A. Yes.

Q. Can you identify the lawsuits that you're aware of.



P. Lupoff

A. I'm pretty sure that was the cause of action verdict in the Fulcrum versus Strategic failed trade, where I was an expert back in 2011.

Q. Are you aware of any other cases?

A. Not really looking at case law, no. I'm sorry.

MR. PIERCE: I assume you're excluding Westinghouse?

MR. CHUBAK: I'm sorry?

MR. PIERCE: I assume you're excludeing Westinghouse.

MR. CHUBAK: He can answer it as he wants.

MR. PIERCE: I'm just asking for clarification. You've written about Westinghouse in your summary judgment motion. It's not a secret.

MR. CHUBAK: Sure. Frankly, I would include Westinghouse within that category. But it doesn't matter.

MR. PIERCE: Maybe I don't understand the category. It's fine.

Go ahead.

P. Lupoff

BY MR. CHUBAK:

Q. I'm going to refer you to paragraph 29, where you state: "In my career, I only had two or three trades fail to close."

A. Yes.

Q. You mentioned one earlier. I believe it was the rapper --

A. The Daz Dillinger, Death Row Records.

Q. Can you identify the other two claims that you're referring to.

A. Off the top of my head, I cannot. I recall one in my Whitman -- in my time at Whitman, where the claimant was small and we chose not to pursue a cause of action. But I don't recall the name of the party or the claim.

Q. Did any of those result in lawsuits?

A. Not to my recollection, no.

Q. In the next paragraph, you state that a buyer would typically list a known trade on its books and portfolio from the date of an oral confirmation?

A. Yes.



P. Lupoff

Q. Is that always the case?

A. I can't say I can speak for all buyers of claims, but those that are operating professionally and especially if they're regulated entities. I think compliance would take a dim view of making an oral commitment of capital and not putting it on your books.

So I would say most well-run, regulated financial institutions would, yes.

Q. In paragraph 31, you state (as read): "In my opinion, the failure to settle trade claims is nearly always a matter of bad faith of the original trade claim holding seller." And that "This is the financial buyer community's prevailing point of view."

What is the basis for your statement that "this is the financial buyer community's prevailing point of view"?

MR. PIERCE: Object to form.

You can answer.

A. Discussions I've had with other players in the market that are more actively engaged over the years, that when trade claim trades fail to close, it's almost always with



P. Lupoff

an original trade creditor on the other side that's failing to close. It's not always the case.

But what does seem to be most often the case, and I have a hard time coming up with one that hasn't, it's almost always financially motivated. The motive of the refusal to close is because there's a change, whether it's a buyer or seller, there's a change in the case that has changed the value significantly.

Q. What players in the market have you spoken with about this?

A. I'm not going to be able to identify any other than in my course of dealing over the years. I've been involved in this and spoken at conferences. Met socially with people in the business. It's been part of the dialogue of people in our business, generally.

Q. Can you identify which people you've spoken with about this.

A. Offhand, no.

Q. Can you tell me what conferences you've spoken at about this.

A. About the particular issue of failed



P. Lupoff

trade claims? Or about distress investing generally?

Q. About the particular issue of failed trade claims.

A. I won't remember that, no.

Q. I'm going to refer you to paragraph 33. Where --

MR. PIERCE: I'm sorry. 33?

MR. CHUBAK: 33.

BY MR. CHUBAK:

Q. Where you describe excuses offered by bankruptcy -- by creditors in bankruptcy cases for not consummating a bankruptcy claim trade following agreement on price.

And specifically, the second-to-last sentence, where you state (as read): "In all of these circumstances, the seller had agreed to sell and I had agreed to buy."

Can you identify failed bankruptcy claim trades where you were told that the claim trade failed because the potential seller might get an extra penny of purchase price elsewhere?

MR. PIERCE: Object to form.

A. Well, I'm going to have a hard time

P. Lupoff

identifying a specific, other than I think I mentioned the small supplier to a discount department store out west that told me basically they were judgment-proof, and that the claim was too small.

But it has been my experiences that exclusively, any issue I ever had with settlement had to do with price, regardless of what might have been said about other reasons. It was almost always that there was a higher price or a lower price, depending upon which way things were going.

I can't name any specific, no.

Q. Were you involved in any failed bankruptcy claim trades where someone at the potential seller's company second-guessed the decision to sell, and that resulted in the trade's failure?

MR. PIERCE: Object to form.

Go ahead.

A. I'll say broadly, with these kinds of expressions, they're all utterances, as best I can recall them, close to verbatim, said to me, and in many instances, as the buyer of the



P. Lupoff

claim, you do what's commercially reasonable at the time.

And so, in some instances, what may be commercially reasonable at the time is to say to the seller, "Is this about price?"

If it's about price, "Tell me the price I need to pay for you to live up to your obligation."

And then in some instances, they'll say, "Okay. You committed 40. You pay me 45, and we're done."

Q. Can you identify any specific trades in which that happened.

A. No.

Q. What about with respect to the following sentence: "Hearing an explanation that they hadn't done sufficient due diligence on market value"?

A. I'm not going to be able to identify a specific party that's uttered any one of these things so much as these are the kinds of comments I've heard over the years, broadly.

Q. When you say you've heard these comments over the years, are you referring to



P. Lupoff

your experience at MJ Whitman?

MR. PIERCE: Object to form.

A. Not necessarily. Because in some instances, they come back to me through the broker-dealer, explaining why a trade is taking time or what's happening, and closing what we might have been working on.

Q. Can you recall when you heard -- withdrawn.

Have you heard -- what do you -- have any trade creditors given you -- I apologize. Withdrawn.

MR. PIERCE: Jeff, how close are you to the end? Do you want to take a few minutes to see if there are any additional questions you want to ask?

MR. CHUBAK: Let's take a couple of minutes. I don't think it's going to take more than that.

(Recess is taken.)

BY MR. CHUBAK:

Q. You testified earlier that you didn't recall the name of the purchasing entity on the bankruptcy claim trades with which you



P. Lupoff

were involved at several prior employers; is that correct?

A. Yes.

MR. PIERCE: Object to form.

THE WITNESS: I'm sorry.

BY MR. CHUBAK:

Q. Given that, I'm going to demand that you actually produce the transfers of claim for the bankruptcy claims with which you were involved.

Can you do that for me?

A. Is that for me to answer?

Q. Yes.

A. I can notify all of my prior firms. Other than Tiburon, I can't compel people to give me things, but I can request them.

Q. You were commanded to produce these things today. And you're testifying based on your experience in the bankruptcy trade claim business; is that correct?

A. Yes.

Q. And you haven't brought these things today?

A. I have not.

P. Lupoff

MR. PIERCE: Object to form.

BY MR. CHUBAK:

Q. Respectfully, how can you testify based on your experience if you don't even know the name of the entity purchasing the bankruptcy claim on the Rule 3001 transfer?

MR. PIERCE: Object to form.

A. There's a vast difference between operational and administrative knowledge and market knowledge. The filing of 3001(e) is a ministerial and operational back office function in the firms where I worked. To understand, to know that process is not the same thing as understanding value of claims and how claims trade.

And what are the practices in the industry? The practices in the industry, only very tangentially matter regarding the ministerial aspects of transfer. The ministerial aspect of filing a 3001(e) is a very minor, after-the-fact process that isn't something that people expert in the industry are necessarily involved in.

And those that are expert at and



P. Lupoff

involved in that may know nothing about trade claims.

Q. Didn't you testify earlier that you were involved in the negotiation of trade documentation?

A. Yes.

Q. Doesn't the trade documentation list the name of the purchasing entity?

A. Yes.

Q. But you don't recall the name of the purchasing entity at MJ Whitman or Lehman?

MR. PIERCE: Object to form.

A. I can hypothesize what they are likely. At MJ Whitman, it was MJ Whitman or MJ Whitman Senior Debt Corp., or Whitman Loan Corp., or in and around the variation on the theme.

But what I remember are the transactions. The ministerial aspects of how paperwork -- to my thinking, it's almost like confirms on securities. What's printed on it is less relevant than the risk transfers that's valued properly, and that as an investor in trade claims has a product that you're getting



P. Lupoff

at the end of the case the value that you thought you did in cash and securities.

The ministerial aspects of it you can be involved in, understand the minutiae of what a five-day notice period is versus a ten. Understand how true-ups work. Sign the document at the bottom.

But what the buying entity is, is not particular relevant to somebody that's managing the risk, as long as that risk is associated with the vehicle that they run.

MR. CHUBAK: I'm done.

(Recess is taken.)

EXAMINATION BY

MR. PIERCE:

Q. This is Clay Pierce from Drinker Biddle & Reath on behalf of the witness, and also on behalf of White Box.

Mr. Lupoff, you were shown earlier today a copy of what's been marked as Exhibit 1.

Do you have it in front of you?

A. I do.

Q. Exhibit 1 is the subpoena, correct?



P. Lupoff

A. Yes.

Q. And the subpoena lists a schedule on the last page of items which Earl of Sandwich asked you to produce today.

Do you see that?

A. I do.

Q. The very first paragraph on Schedule 1 references purchase and sale agreements for the last 20 bankruptcy claims Peter Lupoff has been involved in.

Do you see that?

A. Yes.

Q. Do you have any purchase and sale agreements for bankruptcy claim trades you were involved in in your files?

A. No.

Q. What about Rule 3001(e) statements, do you have any of those?

A. No.

Q. What about documents entitled "Transfer of Claim" other than for security or "Notice of Transfer of Claim" other than for security forms, do you have any of those?

A. No.

P. Lupoff

Q. Who has all of those documents?

A. Each of my prior funds where I was employed. I would imagine they have it in their records.

Q. Do you have any understanding as to whether or not those funds are obligated to produce these documents to you, if you were to ask for them?

A. I don't.

Q. Okay. Are all of these documents -- strike that.

Is it your understanding that Rule 3001(e) statements are filed electronically in bankruptcies where they're submitted?

A. To the best of my knowledge, yes.

(Continued on the following page to include jurat.)



P. Lupoff

Q. Okay. And those electronic filings are publically available?

A. Yes.

MR. PIERCE: No further questions.

MR. CHUBAK: Nothing further.

(Time Noted: 1:12 p.m.)

---------------------

PETER LUPOFF

Subscribed and sworn to before me this day of 2018.

--------------------------------------



C E R T I F I C A T E

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

I, LISA M. MURACO, a Notary Public within and for the State of New York, do hereby certify:

That PETER LUPOFF, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of August, 2018.

______________________

LISA M. MURACO



I N D E X


| WITNESS | PAGE |
| --- | --- |
| PETER LUPOFF | |
| MR. CHUBAK | 4 |
| MR. PIERCE | 100 |


E X H I B I T S


| DESCRIPTION | PAGE |
| --- | --- |
| Lupoff Exhibit 1, subpoena | 5 |
| Lupoff Exhibit 2, Summary and Opinion of Peter M. Lupoff | 18 |


INFORMATION REQUESTED


| | Page | Line |
| --- | --- | --- |
| Report | 5 | 8 |